1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555, 08-01420 (SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., ET AL.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

                    U.S. Bankruptcy Court

                    One Bowling Green

                    New York, New York

                    August 11, 2009

                    10:02 a.m.

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1    MOTION of Bank of New York to Dismiss Complaint in Case No. 09-

2    01242

3

4    SCHEDULING Conference on Defendant's Motion for Summary

5    Judgment and Debtors' Cross-Motion for Summary Judgment

6

7    MOTION of Trustee to Dismiss Complaint in Case No. 09-01160

8

9    MOTION of Unclaimed Property Recovery Service's Motion for

10    Orders (A) Compelling Payment of Unclaimed Funds by the New

11    York State Comptroller, (B) Lifting the Automatic Stay, or,

12    Alternatively, Providing Relief From the Automatic Stay, (C)

13    Allowing Payment for Services Provided Post-Petition and (D)

14    Other Relief

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Esther Accardi

25

3

```
 1    A P P E A R A N C E S :

 2    WEIL GOTSHAL & MANGES, LLP

 3         Attorneys for Debtors

 4         767 Fifth Avenue

 5         New York, New York 10153

 6

 7    BY:   HARVEY R. MILLER, ESQ.

 8          PETER GRUENBERGER, ESQ.

 9

10

11    WEIL GOTSHAL & MANGES, LLP

12         Attorneys for Debtors

13         1300 Eye Street, N.W.

14         Washington, D.C. 20005

15

16

17    BY:   RALPH I. MILLER, ESQ.

18

19

20    WEIL GOTSHAL & MANGES, LLP

21         Attorneys for Debtors

22         8911 Capital of Texas Highway

23         Austin, Texas 78759

24

25    BY:   MEREDITH B. PARENTI, ESQ.
```

4

1    A P P E A R A N C E S : (continued)

2    HUGHES HUBBARD & REED, LLP

3          Attorneys for SIPA Trustee

4          One Battery Park Plaza

5          New York, New York 10004

6

7    BY:   JEFFREY S. MARGOLIN, ESQ.

8          DANIEL S. LUBELL, ESQ.

9

10

11   REED SMITH, LLP

12         Attorneys for Bank of New York

13         599 Lexington Avenue

14         New York, New York 10022

15

16   BY:   ERIC A. SCHAFFER, ESQ.

17

18

19   FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP

20         Attorneys for HWA 555 Owners LLC

21         One New York Plaza

22         New York, New York 10004

23

24   BY:   STEPHANIE J. GOLDSTEIN, ESQ.

25         BRIAN D. PFEIFFER, ESQ.

5

1   A P P E A R A N C E S : (continued)

2   MILBANK TWEED HADLEY & MCCLOY, LLP

3        Attorneys for Creditors' Committee

4        1850 K Street, NW

5        Washington, D.C. 20006

6

7   BY:   DAVID S. COHEN, ESQ.

8

9

10  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

11       Attorneys for American Family Life Assurance

12       One Rodney Square

13       Wilmington, Delaware 19899

14

15  BY:   ROBERT A. WEBER, ESQ.

16

17

18  SULLIVAN & CROMWELL, LLP

19       Attorneys for Barclays

20       125 Broad Street

21       New York, New York 10004

22

23  BY:   PENNY SHANE, ESQ.

24

25

6

1    A P P E A R A N C E S : (continued)

2    APPEARING TELEPHONICALLY:

3    JEFFREY H. DAVIDSON, ESQ., STUTMAN TREISTER & GLATT

4    MARINA FINEMAN, ESQ., STUTMAN TREISTER & GLATT

5    WHITMAN L. HOLT, ESQ., STUTMAN TREISTER & GLATT

6    NATALIE FOY, BANK OF AMERICA

7    STEPHEN GRISANTI, TRICADIA CAPITAL

8    SCOTT HARTMAN, PRO SE

9    JAMES HEISER, CHAPMAN & CUTLER

10   FRANKLIN TOP, CHAPMAN & CUTLER

11   GERARD UZZI, ESQ., WHITE & CASE

12   STEPHANIE TUDWAY, ESQ., MILBANK TWEED HADLEY & MCCLOY

13

14

15

16

17

18

19

20

21

22

23

24

25

7

        P R O C E E D I N G S

1

2          THE COURT:  Please be seated.  Mr. Miller, good

3    morning.

4          MR. MILLER:  Good morning, Your Honor.  May it please

5    the Court.  Ralph Miller here from Weil Gotshal & Manges on

6    behalf of the debtor, Lehman Brothers Special Financing, known

7    as LBSF.

8          There are two matters on the docket this morning for

9    LBSF.  And we understand that the Court wants to take up first

10   a motion to dismiss, which has been filed by BNY Corporate

11   Trust Services.  And in just a moment I will yield to Mr.

12   Schaffer who will present that argument.

13         I do want to note that the second matter concerns

14   scheduling in another adversary proceeding, case number 8-

15   13555, Lehman Brothers Special Financing Inc. v. American

16   Family Assurance Company, knows as AFLAC.

17         I do believe that there is a relationship between the

18   issues in the motion to dismiss and the second scheduling

19   issue, because it presents a unique situation where there are

20   many people who are eager to make the legal arguments that are

21   before the Court in the first motion, Your Honor.  We think

22   that does bear on the other issues.  So in some instances these

23   may go together.  That is, the presence of parties in Court who

24   are eager to make these arguments, which the absent party

25   Perpetual presumably would make i, they were here, we think is

8

1   a factor to be considered.  But we understand the order that

2   the Court would prefer us to start, and we're happy to do that,

3   of course, whatever the Court wants with that motion.  But we

4   note that there may end up being some interaction between them

5   at the end of the day.

6         If that is the order the Court wishes to proceed,

7   which we understand it is, I will allow Mr. Schaffer to proceed

8   with this motion, unless the Court has --

9         THE COURT:  Before we start on the BNY motion to

10  dismiss and the Perpetual litigation is there anyone else who

11  wishes to be heard in respect of the order in which we proceed

12  today?

13        MR. WEBER:  Good morning, Your Honor.  Rob Weber from

14  Skadden Arps on behalf of AFLAC.

15        We're happy to proceed in the order of the agenda.

16        THE COURT:  Fine.

17        MR. WEBER:  Thank you.

18        THE COURT:  Let's do that.  And in terms of the

19  subject matter relationship that appears to exist between the

20  two cases, I'm aware of that.  And for that reason I don't

21  think the order matters.

22        MR. SCHAFFER:  Your Honor, Eric Schaffer from Reed

23  Smith.  I'm here today on behalf of BNY Corporate Trustee

24  Services Ltd.

25        Your Honor, why are we here?  Our goal here and in

9

1    England is to avoid getting caught in the middle of a fight

2    between LBSF and Perpetual.  We have a real risk of conflicting

3    judgments.

4        THE COURT:  Let me ask you a question, Mr. Schaffer,

5    and I don't mean to interject after your second sentence.  But

6    in light of what Mr. Miller said about the AFLAC litigation

7    let's just hypothesize something for a moment.

8        Let's assume, and this is purely a hypothetical, that

9    you succeed on your motion to dismiss, and let's also assume,

10   for the sake of discussion, that I promptly hear a summary

11   judgment in the AFLAC litigation and find as a matter of law

12   that the issues raised by your adversary in this litigation

13   should be found their way and that the Lehman priority is the

14   priority that applies as a matter of law and it can be applied

15   to all similar transactions, including this one, are you not

16   stuck in the very same problem of conflicting determinations

17   that make it impossible for you to act?

18       MR. SCHAFFER:  Your Honor, first of all for purposes

19   of the Perpetual litigation, we're here in one case with one

20   holder, two discreet bond issues and we'll argue how applying

21   the law to the facts before us there is no alternative but to

22   dismiss or to stay or to abstain.

23       But to directly respond to your point, assuming that

24   the AFLAC litigation goes forward, it presents what LBSF has

25   referred to as a near-identical fact scenario, very similar

10

1    issues.  If this Court were to find in favor of LBSF then I

2    think what would happen next is LBSF would take the High Court

3    up on its offer to say come back here, tell us what you'd like

4    under the UNCITRAL Model Law and we'll consider it.  The High

5    Court has said if you want to come back and ask for application

6    of bankruptcy law -- of U.S. Bankruptcy law, we'll consider it.

7    It may be that it would be, if not res judicata, collateral

8    estoppel, it may be that the High Court would say we here in

9    England have made a decision with regard to applicable non-

10   bankruptcy law and now we will defer to the U.S. Court with

11   regard to the overlay of bankruptcy law.

12        I think this is something that -- there's one thing

13   that Mr. Miller and I agree on, that there should be some

14   coordination between the courts.  And I think the question

15   you've raised is one we've all thought about.  And we need to

16   find a way to ensure that there is consistency.  We need to

17   find, at least from my perspective, that we don't have

18   conflicting judgments.  And I think that's one way that it

19   could play out.  Now, having said that you appreciate that

20   AFLAC is our co-defendant in that litigation, that in that case

21   we have an active noteholder and we have indemnification.  So

22   it would be incumbent upon me to say I think AFLAC has gotten a

23   winning argument there.

24        THE COURT:  Well, whether you're rooting for AFLAC or

25   not doesn't matter for purposes of this question.

11

1          MR. SCHAFFER:  Right.

2          THE COURT:  And the question really goes to the

3    conflict that your client is exposed to, not to court

4    communication or issues under the UNCITRAL Model Law, which

5    we'll get to at some point.

6          My question really goes to the dilemma that your

7    client seems to be in.  Because even if you should prevail in

8    respect of the arguments you're making on the motion to

9    dismiss, you're exposed to the very same issue of potential

10   conflicting law, that maybe conflicting governing law that puts

11   you in a I can't win situation unless you have an indemnity

12   from a party in the case of Perpetual unwilling to give you

13   one.  So what do you do about that?

14         MR. SCHAFFER:  Well, we focus here on the case before

15   us.  And in the Perpetual case, as we've written, as I'll

16   argue, we think dismissal is appropriate.  That resolves the

17   issue with regard to the Perpetual litigation, which is what

18   we're here on first.  It is conceivable that there could be a

19   different decision in AFLAC from what ultimately transpires in

20   England with regard to Perpetual.  But if we're correct,

21   applying Rule 119, the other doctrines we've referenced, this

22   case should be dismissed or you should defer it to the court in

23   England.  And, understand, the trustee, BNY, didn't create the

24   problem here.  LBSF and related entities went out and

25   structured this transaction -- all of these transactions with

12

1    the intent to market them throughout Europe, Asia, Australia.

2    We didn't create the problem, we wish Perpetual were here.  But

3    it's not and that's why we're just focusing on what we have

4    before us and the rules that we have.  We do see AFLAC as an

5    opportunity if the English court would defer or will accept

6    that as being binding consistent with the model law.

7         THE COURT:  Well, let me understand something very

8    basic.  You're here.

9         MR. SCHAFFER:  Yes.

10        THE COURT:  Why is Perpetual a necessary and

11   indispensable party if you're here and obviously prepared to

12   vigorously defend the litigation and/or dismiss the litigation

13   which is certainly part of the defense.

14        MR. SCHAFFER:  Your Honor, we are not here prepared to

15   defend on the merits.  We are here because we were sued.  We

16   are here on a motion to dismiss.  If you look at Rule 19 you

17   start with the analysis, what's a necessary party and then

18   what's indispensable.  And under necessary there are three

19   alternatives that can make a party necessary.  Lehman has

20   argued at great length with regard to one of them, and they've

21   said that we are a necessary -- but Perpetual is not necessary

22   because we're an adequate representative.  And that's simply

23   not the case.

24        If we had gotten direction and indemnification.  If it

25   were satisfactory to us as required under the documents as

13

1    required under English law, we might be here as an adequate

2    representative.  But there's no dispute that we have not been

3    indemnified.  And the chancellor made clear in the course of

4    the proceeding and in the judgment, we don't have a duty.  So

5    it would be a mistake to presume that whatever happens on the

6    motion before you today, if we lose that we are here on behalf

7    of Perpetual.  I can't say that we will be.

8              THE COURT:  Okay.  Well, if you're not there on behalf

9    of Perpetual and if the case is not dismissed it looks as if

10   there will be nobody opposing the legal arguments made by LBSF.

11   And there'll be potentially a conflict in law.  Alternatively,

12   if you are going to be appearing in the AFLAC litigation and

13   making arguments that are opposed to LBSF in that litigation

14   what's to prevent you from considering those arguments in the

15   AFLAC litigation as the equivalent arguments that you'd make

16   here if you were a party that was representing Perpetual here?

17             MR. SCHAFFER:  Your Honor --

18             THE COURT:  Because you're not going to take

19   inconsistent positions, are you?

20             MR. SCHAFFER:  I think that's unlikely.  I think that

21   with regard to Perpetual we may have no position.  With regard

22   to the AFLAC litigation, you're correct, it's a separate case,

23   it involves common issues.  And --

24             THE COURT:  Aren't the legal issues for all practical

25   purposes the same?

14

1          MR. SCHAFFER:  I think they are.

2          THE COURT:  So if BNY is before me in a separate

3     litigation that involves identical legal issues, and is

4     asserting consistent with what it views as its obligations in

5     the AFLAC case, a position that is opposed to LBSF's legal

6     position, can I take that into consideration in deciding the

7     Perpetual case?

8          MR. SCHAFFER:  Your Honor, I don't think that's a

9     basis for you to deny the motion to dismiss.

10         THE COURT:  I wasn't asking that question.  I was

11    asking can I, in your view, take into consideration for

12    purposes of the Perpetual litigation, arguments that BNY would

13    make in the AFLAC litigation that are of the same legal import?

14         MR. SCHAFFER:  Assuming that we were here on the

15    merits of the Perpetual litigation, I think that it would be

16    difficult for you not take that into account.  I think that --

17    I think it's likely that you would be consistent in your

18    approach and I don't know that I would have a basis for arguing

19    against that except to say that the real party-in-interest, the

20    necessary and indispensable party is Perpetual.  As to whether

21    a decision would be in AFLAC, would effectively be binding on

22    Perpetual I think I have to leave that for another day.  And

23    who knows, Perpetual might appear here.

24         THE COURT:  Well, let me ask, is there anybody here

25    representing the interest of Perpetual?  Is there any observer

15

1    in Court who has been sent to Court on behalf of Perpetual?   Is

2    there any lawyer who has been retained to observe this

3    proceeding?   Is there any business person who's been sent here

4    to observe this proceeding?

5         Apparently not, or they're choosing to be quiet.

6         Have you made any efforts, Mr. Schaffer, to encourage

7    Perpetual to participate actively in this case so as to get you

8    off the horns of this particular dilemma?

9         MR. SCHAFFER:  Your Honor, I can say that English

10   counsel levels have expressed my concerns in direct language,

11   that we think it is very useful for them to be here; for them

12   to participate.  We don't want to be here caught in the middle.

13   And my client, my co-counsel, have unquestionably told them we

14   think they should be here.

15         THE COURT:  And what have they said as far as you

16   know?

17         MR. SCHAFFER:  they understand our request.

18         THE COURT:  Okay.  Why don't you proceed with your

19   argument.

20         MR. SCHAFFER:  Your Honor, I started out why are we

21   here?  We want to get out of the middle in this fight.  To

22   quote from LBSF's skeleton argument that it filed in England.

23   It would be wholly wrong for the English court needlessly to

24   place BNY in a position where it might become subject to

25   conflicting decisions and orders of the courts in England and

16

1     the U.S.  That's one thing we agree on, it would be wholly

2     wrong.  We agree the courts should coordinate.  And we think

3     that letting the two cases proceed independently risk chaos.

4          What I'd like to address this morning, Your Honor,

5     briefly, what's the record, what are the issues before you and

6     not before you, and then get into how does the law apply on the

7     facts of this case?  The record I think is pretty

8     straightforward.  We have a complaint here, we have the English

9     action, we have a lot of transaction documents.  We've got

10    judgments and orders.  There are several declarations,

11    including a declaration from levels that authenticates English

12    documents, cites to relevant English case law.

13         Your Honor's aware, we have two cases filed.  The one

14    in England filed on May 13 seeks a declaration -- Perpetual

15    seeks a declaration.  First, that the assets held by BNY as

16    trustee must be distributed pursuant to noteholder priority.

17    And, second, they seek a declaration that Perpetual is not

18    obligated to indemnify BNY against the risk that this Court

19    might require distribution to LBSF.  A week later we had this

20    case filed here where LBSF is seeking a declaration that BNY is

21    required to make payment pursuant to SWAP counterparty

22    priority.  The intervened in England, of course, Perpetual is

23    not here but we have LBSF seeking exactly the opposite relief

24    with regard to distribution.

25         Your Honor, you've seen the English judgment, the

17

order.  It holds that noteholder priority is effective as

between Perpetual and LBSF.  And it's relevant, I think, in two

particular respects.

First, it confirms that we have a right to

indemnification as a condition to enforcement by Perpetual of

its interest in collateral.  Without indemnification we have no

duty to act.  And we have no duty to take any action that could

subject us to any liability.  Again, Perpetual has refused to

provide indemnification.

Now, Lehman said that even without indemnification

we're an adequate representative.  But under the judgment we

have no obligation, and English law controls there.

The English court deferred the question as to what

constitutes appropriate indemnification, but it never

questioned our right.  Now, on this point, I think LBSF's sur

reply mischaracterizes the law.  LBSF says the Court recognized

that we claim a right to indemnification, but reserve judgment

on the issue until after this Court rules on summary judgment

in this case.

Well, that's wrong for a couple of reasons.  First,

the High Court recognized, not a claim, but a right to

indemnification.  The only thing reserved is a determination of

what constitutes "appropriate indemnities."  And there I look

at paragraphs 56 and 63.

And the chancellor is quite clear on this in response

18

1   to questions that were raised about indemnification during the

2   trial.  If I may quote the chancellor.  He says, "I did not

3   understand it to be an issue because it is quite clear from the

4   wording of the relevant clause that you cannot be made to do

5   anything without an indemnity.  You have not been offered any

6   indemnity.  Therefore, there can't be any question at the

7   moment of telling you to do anything.  There was further

8   discussion, the chancellor repeated, it's quite clear from the

9   document and nobody has suggested otherwise, you do not have to

10  do anything without an indemnity.

11       THE COURT:  Let me ask you something, Mr. Schaffer,

12  because you're obviously quite familiar with the proceedings in

13  the High Court.

14       Assuming for a moment, the judgment of the High Court,

15  and I recognize that it's on appeal.

16       MR. SCHAFFER:  Yes.

17       THE COURT:  Has agreed to do a right to

18  indemnification, but there's an open question as to the form

19  that that indemnity will take.  Why are you not now subject to

20  whatever appeal risk may exist, able to appear and be heard

21  fully in this Court on behalf of Perpetual because you've been

22  granted a right to indemnity?

23       THE COURT:  But, Your Honor, the English court says

24  you have a right, but we don't have the indemnification.  If we

25  appear here we still don't have the indemnity, we still don't

19

1    have a duty.  And we don't know that we'll ever get the

2    indemnification.

3         Now, the amount at issue here is, I think, ninety

4    million Australian dollars which at the time this litigation

5    started was about seventy million dollars U.S.  It is

6    conceivable that a further hearing, the English court would

7    say, the form of indemnification should take the form of a

8    letter of credit for seventy million U.S., for ninety million

9    Australian dollars.  Could that be adequate?  It might be.  But

10   we don't have that.

11        And so if this case were to go forward we're in a

12   position where we might say well, we've got a right to

13   indemnification, let's go do our best.  But we could be second-

14   guessed.

15        THE COURT:  Do you need indemnification in respect of

16   positions that you take in litigation?  Or do you need

17   indemnification in respect of acting by virtue of authority

18   obtained in the litigation?  In other words, if you simply sits

19   on the money that's there and don't act, what indemnity do you

20   need, what risk are you exposed to?

21        MR. SCHAFFER:  If we never distribute the money, it's

22   hard to say there's a risk.

23        THE COURT:  Correct.  So the risk then is if you fail

24   to exercise fiduciary duties in respect of your beneficiary,

25   which would mean a risk in failing to articulate arguments

20

1    consistent with their economic objectives.  That seems to me to

2    be a risk.

3           MR. SCHAFFER:  Well, Your Honor, I will argue against

4    you on that one.

5           THE COURT:  You can argue against me on anything you

6    like.

7           MR. SCHAFFER:  Well, I'm going to pick on this one in

8    particular and say we don't have a fiduciary duty on this.  The

9    documents are clear and the English court agrees.  If we don't

10   have indemnification there's no duty.  And the English case law

11   appended to the Lyon's affidavit says, "Where there's a dispute

12   between two claimants to a trust fund, the trustee's job is to

13   remain neutral," and that's the position we've taken in England

14   and that's the position we take here.  We don't have a duty.

15   And in the absence of a duty we can't be an adequate

16   representative.

17          THE COURT:  To what extent -- I'll withdraw that.

18   Just proceed.

19          MR. SCHAFFER:  Your Honor, I was talking about the sur

20   reply saying it mischaracterized the position, also, of the

21   High Court with regard to the suggestion that it would wait

22   until after this Court rules on summary judgment.  The High

23   Court never said anything about waiting for this Court to

24   decide summary judgment.  To the contrary, the English court

25   rejected LBSF's request to stay the English litigation until

21

1    their could be a decision on the merits here.  And the

2    chancellor also recognized in his judgment that we have a

3    pending motion to dismiss.  The reason that we have the delay

4    until October in the High Court as set forth in paragraphs 61

5    and 63, is to give LBSF's foreign representative or this Court

6    time to determine what they may wish to do in the English

7    proceedings pursuant to the common law or the UNCITRAL Model

8    Law.  And the Court was clearly anticipating that the 1505

9    motion since granted would be filed.

10          Even then what the court invited the foreign

11   representative of this Court to do was to make requests, "in

12   light of" the conclusion that noteholder priority is effective.

13   The judgment on leave to appeal also is clear, English courts

14   aren't waiting for a judgment on the summary judgment motion.

15   They simply want to have this Court have the benefit of a final

16   non-appealable order from the English court with regard to

17   English law and to make it possible for this Court to determine

18   what it would wish the English court to continue.  And there I

19   point to paragraphs 8 and 9 of the judgment on leave to appeal.

20   So the High Court invited coordination, but it certainly did

21   not ask this Court to do anything specific and, certainly, did

22   not ask this Court to proceed to the merits of summary

23   judgment.

24          THE COURT:  Wait one moment, Mr. Schaffer.

25   Coordination is meaningless unless the U.S. Bankruptcy Court is

22

1    given the space and the item to deal with U.S. Bankruptcy law

2    issues.  Coordination makes sense, at least in theory.  Let's

3    look at this from 30,000 feet.  To the extent we have English

4    law governed contractual documents the English court will be

5    dealing with enforceability of those English law documents.

6         But to the extent that we have a U.S. Chapter 11

7    debtor that is asserting rights under the peculiarities of safe

8    harbor provisions of the U.S. Bankruptcy law, that are, I

9    think, in everybody's estimation unprecedented.  And as to

10   which there appears to be little governing authority, I would

11   think that the U.K. High Court would consider it rationale,

12   although I'm not looking into their brains on this, for the

13   U.S. Court to deal with U.S. law issues and for the U.K. court

14   to deal with U.K. law issues, and for us to be coordinating so

15   we come out with the most rationale result possible.  That to

16   me would be sensible.  Why isn't that sensible?

17        MR. SCHAFFER:  It is sensible if the Courts have

18   reached an agreement on how things should proceed.  As I

19   understand Your Honor, you're saying the English court is well

20   suited to decide English law, and you are well suited to decide

21   issues under the Bankruptcy Code.  It's hard to argue with

22   that.

23        THE COURT:  That seems right to me so far.

24        MR. SCHAFFER:  It's hard to argue with that.  Now,

25   would it make sense for the English court to say I'll defer to

23

 1    you with regard to how bankruptcy law applies as an overlay

 2    upon the English law that I have decided.  That makes good

 3    sense too.  And were I on the phone with you and the Lord

 4    Chancellor, I think that that would make eminent sense.  But

 5    I'm here not knowing how you and the chancellor might

 6    communicate, if at all.  How you might coordinate.  And on the

 7    facts and law before us.  I'm encouraging coordination.  I've

 8    been consistent on that.  And on this, I think LBSF is also

 9    consistent.  It's good not to have conflicting judgments.  It

10    may be that through the vehicle of the 1505 order and the model

11    law that that's exactly where the two courts come out.  It may

12    be that the English court says I appreciate that there's been a

13    decision on the merits in the AFLAC case, and I'm going to

14    follow that.  Those would be sound decisions, those would be

15    rationale decisions.  But if we don't have that, if the two

16    courts just proceed on parallel paths, completely

17    independently, we've got a problem.  And unless the courts are

18    going to find some accommodation, I come back to the rules, to

19    the doctrines that I've addressed and say dismissal is

20    appropriate.

21          Your Honor, I said that I wanted to talk about the

22    issues before the Court.  I think you understand them.  What I

23    would like to focus on perhaps more is what are the issues not

24    before the Court?  We are not here today on the merits of

25    LBSF's claim.  We're not here to oppose them on the merits.

24

1    We're here because if they were to prevail on the merits we can

2    have a conflicting order.  There's no question they're saying

3    Judge, you have here an opportunity to set a precedent

4    applicable to hundreds of transactions, to thousands of

5    holders.  But you have before you just the one case, involving

6    one absent holder, and two particular notes.  I think the sur

7    reply captures the essence of the dispute.  They're saying why

8    should the debtor lose the right to get a declaratory judgment

9    on important issues of bankruptcy law just because some

10    noteholder refuses to submit to jurisdiction here?  Well,

11    they're looking to leapfrog the rules and go to the merits.

12    But the merits are not before you unless the rules are

13    satisfied, they're not guidelines.  The Supreme Court says that

14    the rules have the force of a federal statute, there's no

15    carve-out based on amounts at issue.  Or a desire, however well

16    meaning, to get a substantive decision.

17        And they can't disagree, Your Honor, because the

18    reason they didn't sue Perpetual is based on the same Rule

19    12(b); that they're worried there may not be jurisdiction, they

20    couldn't get service.  Well, 12(b)(7) provides that you have to

21    have an indispensable party absent which you need to dismiss.

22    So the questions not should Perpetual be rewarded for not

23    showing up, it's whether the debtor can satisfy the

24    requirements of the rules in the face of unrefuted evidence

25    that we have not received any indemnification as required under

25

1    English law.  The answer's not to ignore the rules, is to try

2    to work within them, to have coordination to proceed pursuant

3    to the model law to do the things they are now starting to do.

4          THE COURT:  But, Mr. Schaffer, they argue that

5    Perpetual is not a necessary indispensable party because you're

6    before the Court and you're fully equipped, should you elect to

7    do so, to argue all of the purely legal issues that need to be

8    addressed in this litigation, and they'll be the very same

9    legal issues that you've acknowledged you will be presenting in

10    the context of the AFLAC litigation at more or less the same

11    time.  So how's that prejudicial to your client?

12          MR. SCHAFFER:  Your Honor, if we are forced to go

13    forward, put aside all the time and expense of being involved

14    in the litigation, we are at risk of being second-guessed, we

15    are at risk of having Perpetual to proceed to try and execute

16    in London.  Perpetual can come in here -- come in here, I wish.

17    Forgive me, Your Honor.

18          Perpetual could take the position that we didn't do a

19    very good job when we were litigating in New York, and,

20    therefore, that vitiates our right to indemnification.

21          THE COURT:  They could take that very same position if

22    the motion to dismiss is granted and make the arguments that

23    you're going to make in the context of the AFLAC case, you lose

24    because then law which is applicable in the U.K., which

25    demonstrates that Perpetual's rights have been adversely

26

1    affected and they argue you didn't do a good job.

2         MR. SCHAFFER:  Your Honor, in that instance it's not a

3    situation in which we would have been deemed by the Court to

4    have been acting on their behalf.  I hope that we do a good job

5    in the other litigation.

6         THE COURT:  I expect based on this performance that

7    you will.

8         MR. SCHAFFER:  I thank you for that, Your Honor.  But

9    having said that still doesn't give us a duty, we don't want to

10   be second-guessed.  But beyond that, we don't want to have a

11   situation where they say we don't care what you did in New

12   York, we have a judgment in London and we have jurisdiction

13   over you in London, now pay us the money.

14        Now, admittedly then, we can say show us the

15   indemnification.  But we will be at risk that there's a

16   judgment here for which they have offered no indemnification.

17   We have an opportunity applying the rules to get the trustee

18   out of the middle.  I appreciate that we have some issues here

19   that are of great significance in this bankruptcy case, they

20   truly are.  But that's not a reason to leapfrog the rules,

21   particularly, since the Court has the ability to set a

22   precedent in some other case that is not only before you,

23   there's been a summary judgment motion filed.  It's teed up

24   ready to go and it doesn't present the sticky questions of Rule

25   19, the sticky questions of due process.

27

```
 1              I think that it makes a lot of sense to say we have

 2      AFLAC, it is an opportunity.  The Court concedes upon that.

 3      But it's all the more opportunity not to go down what is a very

 4      uncertain path in having this case and the Perpetual case in

 5      London going down parallel cases without any -- without any

 6      harmonization.

 7              THE COURT:  Well, let's touch on that point for a

 8      moment.  At various times during your presentation you've

 9      talked about coordination with the High Court as it relates to

10      the Perpetual case, in particular, because that's the only one

11      we're arguing right now.

12              MR. SCHAFFER:  Yes.

13              THE COURT:  Do you have a proposal for coordination?

14      If you were designing the coordination, what would it consist

15      of?

16              MR. SCHAFFER:  Your Honor, I thought about a lot of

17      questions you might ask me, that wasn't on the list.

18              THE COURT:  Okay.  Well then I succeeded.

19              MR. SCHAFFER:  But I think what would make a lot of

20      sense, consistent with the colloquy we had a few minutes ago,

21      the English court should decide what is English law, what do

22      the documents mean, what is English case law with regard to the

23      priority, with regard to indemnification?  This Court should

24      use that as a basis consistent with Supreme Court decisions

25      like Butner, saying that's applicable non-bankruptcy law, let's
```

28

1    now figure out what bankruptcy law means.  I think it would

2    make sense for you to defer to the English court on English

3    law.  And I think it would make sense for the English court to

4    issue an order that says and I'm going to defer to the

5    bankruptcy court or to whatever appellate proceedings might

6    ultimately transpire from here with regard to the U.S.

7    Bankruptcy Code.  I think that makes a lot of sense.

8            My concern is there may not be an agreement.  And if

9    there's not that doesn't let me out of my dilemma.  It doesn't

10   let this Court out of its dilemma.  And that's why we've got a

11   practical answer that I think might move along the lines I've

12   just suggested.  But absent that we have a legal answer.  And a

13   legal answer absent a practical decision is to say let's apply

14   the rules, let's look to comity, let's look to everything to be

15   wise arguing, which I think is a basis for dismissing the case

16   if we can't have coordination.

17           THE COURT:  So do I understand you to say that your

18   motion to dismiss is in some respects conditional?  That is,

19   you would be content to be a party to this litigation and not

20   to press your motion to dismiss to conclusion if there were in

21   place a workable protocol that coordinated the two proceedings?

22           MR. SCHAFFER:  Your Honor, I don't think I've gone

23   that far.  But our motions --

24           THE COURT:  But I did ask you that question.

25           MR. SCHAFFER:  You did.  Your Honor, we've asked for

29

1    dismissal, but alternatively, we've asked for abstention or a

2    stay.  And so it is within the scope of our motion to say stay

3    things pending some further harmonization, pending some

4    rationalization between the two courts.  If we had the English

5    court telling us BNY, go forward and litigate and we've got

6    things covered here, you will not be subjected to an

7    inconsistent decision, I think that goes a long way toward

8    helping us out of our dilemma.  We still have the question of

9    indemnification.  I don't want to avoid that.

10           To the contrary, we've got the chancellor saying you

11   are entitled to appropriate indemnities.  And so when I say we

12   could work things out that way, I am assuming that the Court,

13   consistent with its judgment, would say and, of course, as part

14   of this, BNY, you get appropriate indemnities and the Court

15   would tell us what that is.  The appropriate indemnities,

16   certainly to mind, mean something that enables us to be held

17   harmless except in our capacity as the holder of the funds that

18   ultimately are distributed to one side or the other.  And I

19   hope that's responsive to the Court's question.

20           THE COURT:  I'm not going to press for a further

21   answer, so let's deem it responsive.

22           MR. SCHAFFER:  Your Honor, let me drill down into Rule

23   19.  I won't cite you to any of the treatises that are in the

24   briefs.  I think all of that is sufficiently covered.  You

25   understand there's a two-step inquiry under Rule 19.  First, is

30

1    the missing party necessary?  Second, if it's necessary the

2    joinder's not feasible if the Court determines whether in

3    equity and good conscience the case can proceed without the

4    necessary party.  One of the cases that we cited in our reply

5    was the Supreme Court decision in Pimentel.  And under the

6    Pimentel analysis, this is a textbook example of a case where

7    Rule 19 requires dismissal.

8           Let's start with necessary party under 19(a)(1).  A

9    party's necessary in any of three circumstances.  Let me leave

10   for the third the whole idea we might be an adequate

11   representative.  Because any of the three would be sufficient

12   for our purposes.

13          First, under 19(a)(1)(A), if the Court cannot accord

14   complete relief among the existing parties.  Well, we don't

15   have a stake in the priority issue.  The competing interest

16   here are Perpetual and LBSF, and we don't think there's any

17   complete relief possible as between them in this case.  That's

18   one alternative.

19          Second, under 19(a)(1)(B)(2), a party is necessary if

20   the claims and interest relating to the subject of the action

21   and are so situated that the disposition of the action in the

22   person's absence may subject any existing party, that's BNY, to

23   a substantial risk of incurring double, multiple, or otherwise

24   inconsistent obligations by reason of the claimed interest.

25   Well, obviously, we have got that risk here.  Perpetual says we

31

1    want a distribution in London pursuant to noteholder priority,

2    LBSF says no, SWAP counterparty governs distribute the same

3    funds to us.  We have got a risk that if Perpetual's not here

4    and not bound we are subject to double or inconsistent

5    obligations.  Indeed, LBSF's goal here is to create a conflict.

6    They want you to reach the opposite answer of what the High

7    Court did.  It's precisely the risk against which the rule

8    protects.

9          Then the last necessary party prong, 19(a)(1)(B)(1), a

10   party is necessary if disposition in a person's absence may, as

11   a practical matter, impede or impair the person's ability to

12   protect that interest.  Well, Perpetual's not here, obviously

13   can't protect its interest.  We've talked about is BNY an

14   adequate representative.  We don't have a beneficial interest

15   other than to collect our fees and expense which, thankfully,

16   everyone agrees come off the top.  We are not, as has been

17   suggested by LBSF, joined at the hip.  Far from having an

18   identity of interest, we were sued.  And the reason we were

19   sued is we're taking LBSF seriously.  We're saying they might

20   win.  And that's why we need indemnification.  The decision to

21   sue us rather than indemnify us shows that we and Perpetual are

22   antagonistic.

23         Now, we talked before does the English court say that

24   we have the right to indemnification?  Again, it's not a right,

25   it's satisfactory indemnification that we're entitled to.  We

32

1    don't have that.  Repeating that we could be an adequate

2    representative doesn't make us one.  We don't have a duty.

3          We've talked about the AFLAC case.  What that case

4    recognizes is that a noteholder really is necessary otherwise

5    why sue AFLAC?  Why not just come after us again?  LBSF is

6    recognized that in a priority dispute you should have the

7    noteholder there.  You need to bind the noteholder.

8          And what that case also shows is the importance of

9    indemnification.  We're there in AFLAC because we have it.  We

10   really are neutral.  Under the documents, under English case

11   law we have an obligation to remain neutral.  So we think that

12   under all three alternative prongs of 19(a) Perpetual is

13   necessary, not just the adequate representative issue under all

14   three.

15         So we then go onto 19(b), is Perpetual an

16   indispensable party?  Well, 19(b) sets forth several factors

17   that I think warrant dismissal here.

18         The first consideration is the extent to which the

19   judgment might prejudice the missing person or the existing

20   parties?  Obviously, a decision in Perpetual's absence could

21   prejudice Perpetual.  Look again to what the Supreme Court said

22   in Pimentel.  "Conflicting claims by beneficiaries to a common

23   trust present a textbook example of a case where one party may

24   be severely prejudiced by a decision in his absence."  We could

25   be greatly prejudiced.  This is squarely within the Pimentel

33

1    decision, where the case was dismissed under Rule 19.

2         Second consideration under 19(b) is the extent to

3    which prejudice could be lessened or avoided.  I don't think it

4    could happen unless somehow the courts found a way to

5    coordinate, and we've talked about that.

6         Third consideration is whether a judgment rendered in

7    a person's absence, Perpetual's absence, could be adequate?

8    Now, as the Pimentel court explains what this refers to is the

9    social interest in efficient administration of justice and

10   avoidance of multiple litigation.  A judgment entered in

11   Perpetual's absence here would certainly undermine the public

12   state in settling disputes in their entirety.  So we have the

13   risks of conflicting judgments, multiple litigation,

14   inefficiency.  There, again, it weighs heavily in favor of

15   dismissal.

16        The fourth and the last consideration I'll address is

17   whether the plaintiff would have an adequate remedy if the

18   action's dismissed.  The English court is competent to apply

19   U.S. law.  LBSF said so.  It's in the judgment.  LBSF says as

20   set forth in paragraph 63 of the judgment, "You can apply

21   bankruptcy law here Lord Chancellor."  They certainly have the

22   ability to go to England, they have an adequate remedy, they

23   have all of the parties.  And, indeed, they're actively

24   pursuing an appeal.  And, presumably, they will actively

25   follow-up on this Court's 1505 order.

34

1          Your Honor, I referred you to the decision of the

2    Second Circuit in Rappaport.  I think that's a close parallel

3    to what we have here.  There a bank was sued in the U.S. with

4    regard to who owned an account where competing claimants were

5    in Mexico.  The Mexico claimants were not subject to personal

6    jurisdiction in this Court, all the parties in the Mexican

7    inaction.  In that case, the Court of Appeals affirmed, said

8    that where the defendant bank faces a substantial risk of

9    inconsistent obligations if there are conflicting judgments,

10   dismissal is appropriate under Rule 19.

11         That's our case.  We've met our burden of showing

12   under Rule 19 the nature of our interest, the nature of the

13   interest possessed by the absent party.  And we've shown that

14   the protection of those interest are impaired unless the case

15   is dismissed.

16         Your Honor, I'm happy to put aside Rule 19 and move on

17   to forum nonconvenience, which I think I can treat a little bit

18   more quickly appreciating the Court has been very good in

19   giving us adequate time to fully go through these issues.

20         Your Honor, forum nonconvenience also supports

21   dismissal.  Considerations that apply here are the extent to

22   which the plaintiff's choice of forum is entitled to deference,

23   the existence of adequate alternatives, the balance of private

24   and public interests.

25         Your Honor, you understand that the plaintiff's choice

35

1    of forum as a general rule gets a lot of deference.  But that's

2    not true where there's forum shopping.  Here we have an

3    interesting situation where Perpetual and LBSF are both forum

4    shopping.  Perpetual sued first, while LBSF joined they also

5    have sued here to try and force Perpetual, to try and force the

6    issues into this Court.  And they're each happy to proceed

7    without the other in the first instance.

8         Perpetual, itself a trustee, has no desire to submit

9    to jurisdiction in the U.S. it would seem.  And LBSF, with all

10   deference to my good friends representing LBSF, they're not

11   worried about our lack of indemnification, and they'd be happy

12   to litigate against an empty chair.

13        So we look then and we say is England the more

14   appropriate forum?  Well, the bankruptcy case is here, but the

15   transactions were all structured there.  English law governs

16   and the English court, alone, has jurisdiction over all the

17   competing claimants.  There's a judgment that is now binding on

18   everyone including LBSF.  In our reply brief we discuss res

19   judicata, collateral estoppel.  We think with regard to those

20   decisions -- those issues of English law that the judgment is

21   binding.

22        Now, one thing that LBSF says in its sur reply is that

23   we all agree the only issues now before this Court are issues

24   of bankruptcy law.  Your Honor, I want to quickly respond to

25   that.  We have never addressed the merits, let alone agreed on

36

1    the issues presented.  But where LBSF has willingly

2    participated in the English court and is seeking further relief

3    under the Bankruptcy Code, we think that forum nonconvenience

4    warrants dismissal because that's the only court that right now

5    has all the parties and can decide all the issues.

6            Let me move on to comity.  Bankruptcy does not negate

7    considerations of comity.  To the contrary, Section 1334(c)

8    expressly provides for abstention in the interest of justice or

9    comity.  Section 1505 of the Bankruptcy Code is founded on the

10    Doctrine of Comity.  Now, LBSF does not question the fairness

11    or competence of the English court, or the relevance of the

12    English jurisdiction where it is still seeking further relief.

13    We think, however, that LBSF misreads the English court with

14    regard to its view of its relationship with this Court.

15    They're wrong when they say the English court recognizes that

16    only this court has jurisdiction over bankruptcy issues.

17            In paragraph 61 the English court invited LBSF to

18    raise bankruptcy issues in England under the Common Law or the

19    UNCITRAL Model Law.  That's why they are proceeding pursuant to

20    this Court's 1505 order.

21            And in paragraph 63 of the judgment the English court

22    notes "that LBSF submitted that under the model law that the

23    model law clerk could entitle this court, the English court, to

24    apply provisions of the U.S. Bankruptcy Code."

25            The question's not which court is more familiar with

37

```
1    the Bankruptcy Code or more familiar with non-bankruptcy law.

2    Your Honor, I think both courts could fairly consider these

3    issues.  The question is which court is in the better

4    position -- the best position to hear from all parties.  To

5    adjudicate the issues and to reach a final decision binding on

6    all.

7         We think comity also warrants communication between

8    the courts to avoid inconsistent judgments.  We were concerned

9    that before the sur reply LBSF didn't seem to take note that

10   the issues that it had forcefully advocated in seeking an

11   international protocol in it's 1505 motion.  But, again, we're

12   now in agreement on that.

13        Moving on then to the last of our substantive

14   arguments.  And that is the stay.  We ask that if this action

15   is not dismissed that it be stayed pending resolution of the

16   English action.  Any decision's going to require non-bankruptcy

17   law to be decided.  It's going to be res judicata or collateral

18   estoppel.  We've got an appeal.  It can only be helpful to this

19   Court to know what the English law is with a final non-

20   appealable order.  LBSF, it worries about conflicting

21   decisions.  And it looks that AFLAC presumably is what might be

22   a conflict.  It says, in this case, don't miss an opportunity

23   to provide substantive import on important issues.  Your Honor,

24   I think we agree AFLAC is an opportunity.  And if the goal is a

25   precedential ruling the Court can go to that case teed-up for
```

38

1    summary judgment without the risk of conflicting orders,

2    without the due process problems where they seek to litigate in

3    the absence of a noteholder.

4         Let me try and wrap up at this point.  To go back to

5    where I started.  In England LBSF wrote it would be wholly

6    wrong needlessly to place BNY in a position where it might be

7    subject to conflicting positions and orders.  With this in

8    mind, this Court can't skip to the ultimate merits.  The rules,

9    the other doctrines we've referenced exist precisely to deal

10   with the kind of problems you have here.

11        What can you do about this?  We've talked about this.

12   Certainly dismissal takes care of the problem in this case.

13   Alternatives, you can coordinate with the English court.  You

14   might have a consensus that that court would defer to you on

15   the merits.  And assuming that we have a judgment that covers

16   us on indemnification from the English court I think that's

17   perfectly workable.  But a failure to address conflicting

18   orders it seems to me is not an option.

19        Your Honor, in our reply memorandum we quoted from

20   another case in this Court, petition of Briarley.  And I'd like

21   to recite to that.  "Working in all transnational bankruptcies

22   is the potential for chaos if the courts involved ignore the

23   importance of comity.  Yet it is critical to harmonize the

24   proceedings into different courts less decrees at war with one

25   another result."  It's critical to avoid warring decrees here.

39

1    And, Your Honor, we think on the record, on the facts, on the

2    law, this complaint should be dismissed.  Alternatively, we

3    would ask that you abstain in the interest of comity or stay

4    until it's clear that BNY will not be at risk of conflicting

5    judgments.  Thank you very much, Your Honor.

6                 THE COURT:  Thank you.

7                 MR. MILLER:  Your Honor, Ralph Miller again, here for

8    LBSF.

9                 I'd like to start with a practical question that the

10   Court asked which LBSF has given some thought to.  And that is

11   what might be an orderly way to deal with the coordination

12   issue.  And I'd like to talk a little bit about the necessary

13   party issue and the separate and distinct indispensable party

14   issue.

15                THE COURT:  Okay.

16                MR. MILLER:  First, with regard to coordination, there

17   are as the Court knows, interim rules that were opposed for

18   coordination which have actually been adopted by this district.

19   And they make a distinction between scheduling coordination,

20   which, for example, does not require any sort of advance

21   notice.  And coordination that amounts to a request for

22   recognition or assistance on some kind of action.  We think

23   there are two separate phases of coordination that would be

24   appropriate in this case.  And, Your Honor, referred to the

25   need for this Court to have space and time to deal with these

40

1    issues.

2         We suggest that the English court, the Vice Chancellor

3    has recognized that, noting that the court will not be back in

4    session to consider this until October.  And we would suggest

5    that after the scheduling conference that we're going to have

6    later today and whatever scheduling decisions this Court might

7    make, it would be perfectly appropriate for this Court to have

8    a scheduling communication with the London court indicating

9    what sort of space and time this Court anticipates it might

10   require to have guidance on these issues.  And then to make a

11   further decision on whether this Court wishes or does not wish

12   to seek assistance with coordination in light of the ruling it

13   makes.  Although, LBSF believes that it's going to be a ruling

14   which hopefully would require some coordination.  There are

15   certainly outcomes here in which no coordination is necessary.

16   So we don't think that that decision can be made now as to what

17   the coordination is going to be.

18        At that same time, these issues are potential conflict

19   that were raised by Mr. Schaffer, could be address.  And I'll

20   talk about that in a moment.  So we suggest that the first

21   coordination request should be once the Court decides what he

22   schedule is to let the Vice Chancellor know that this Court

23   will have a hearing say, in October or November, or whenever

24   it's going to have it.  And anticipate that after that the

25   Court will make a further decision.  In which, by the way, it

41

1    may choose to give some advance notice of what it's going to

2    do, because there is -- although we don't think the advance

3    notice provisions directly apply, that would be an option the

4    Court would have.  You can decide whether to do that or not.

5    But in any event, if at a later stage the Court would be in a

6    position to tell the London court whether it does or does not

7    need a substantive sort of court action.  But it needs the

8    space and time.  And we think that is the first coordination

9    requirement.  And we think that that is something that we have

10   confidence the London court will be amenable to.

11        During the same time the appeal will be continuing, I

12   don't know how fast that guidance might come back.  But it is

13   possible that that guidance may or may not be useful in this

14   Court's deliberation.  I don't think that you should wait for

15   the appeal in London.

16        I do want to talk about this issue of indemnity for

17   just a moment and then go to Rule 19.  The position of Mr.

18   Schaffer is, and we think it is correct, that the London court

19   has determined that indemnity is required.  It just has not

20   determined what the form that indemnity is going to take.

21        One of the cases, for example, cited in their brief at

22   page 5, the House of Wilkinson v. Neary case.  Notes that the

23   trustee entitled to indemnity had a lien on the trust assets to

24   secure that indemnity.  And it also is possible that the court

25   can issue direction on how a trustee is to act, that's

42

1    mentioned in that case.

2         So while there are some details to be worked out the

3    basic principle here we think is the principle of equity that

4    the court presumes has done that which should be done.  And in

5    this case, indemnity should be granted.  The English court has

6    said it's going to be granted.  And the fact that the details

7    are not known is certainly no reason to dismiss this case.  It

8    might be a reason to take -- to take into consideration if and

9    when a potential conflict down the road comes to arise, which

10   is -- there's a lot of ways that that might not happen.

11        Turning to Rule 19, Your Honor, there's actually a

12   case very much in point.  And if I might approach with some

13   highlighted copies?

14        THE COURT:  You may approach.

15        (Pause)

16        MR. MILLER:  The facts are actually surprisingly

17   similar here because, Your Honor, the parent corporation of

18   BNY, Bank of New York, which was a trustee, and it was arguing

19   in a case with the Federal Deposit Insurance Corporation that

20   the noteholders in the trust it was dealing with were necessary

21   parties.  The court in that case found that applying Rule 19

22   analysis, and this is Federal Deposit Insurance Corporation v.

23   Bank of New York, 479 F.Supp.2d 1, which was affirmed by the DC

24   Circuit 508 F.3d 1 in 2008, so it's a recent case very much in

25   point and very similar facts.  And as we noted in our brief,

43

1    the court said on it's numbered page 10 of this decision under

2    Rule 19(a)(2)(1), "It is well settled in adjudicating an absent

3    person's claim cannot impair or impede the person's ability to

4    protect its interest if he is adequately represented by one of

5    the existing parties."  Now, in that case Bank of New York, the

6    parent, said well, we have an antagonism here because we filed

7    an interpleader and we're not in agreement with the

8    noteholders.  And the court said that was not the kind of

9    antagonism that was required.  The court noted that in another

10   case BNY had represented the noteholders -- those same

11   noteholders in their pending appeal before the DC Circuit.

12   there was indemnity in that case.

13        The court found that there was not a potential for

14   double, multiple or otherwise inconsistent obligations.

15   Because BNY did represent the noteholders as the indemnity

16   trustee, this is over on page 11 under the 19(a)(2)(ii)

17   analysis.  And they would -- in effect, they would be bound by

18   the Court's decision, which we believe is the result it would

19   incur here.  Because if you go over to page 13, the Court

20   concluded because venue in the district is proper, the first

21   file rule may not be applied.  And the noteholders are not

22   necessary party, so the defendant's motion to dismiss was

23   denied.

24        We believe that marches through the elements of

25   necessary party, and it is absolutely the correct analysis in

44

1    this case.

2          THE COURT:  Let me break in, Mr. Miller, and ask you a

3    question that's been borrowing me, though.

4          MR. MILLER:  Yes, Your Honor.

5          THE COURT:  One of the arguments made by BNY in this

6    case is that if you look at what LBSF did in the AFLAC

7    litigation you see that there is either an express or a tacit

8    acknowledgement that noteholders are, if not necessary parties,

9    certainly entirely appropriate parties to be named in

10   litigation involving the resolution of these issues.  How do

11   you reconcile the fact that the noteholder is a party in the

12   AFLAC case, and that you named them as a party in that case?

13   And that don't add Perpetual in this case when BNY is, in

14   effect, a totally different position in those two litigations

15   because hearing Perpetual there on their own and lacking

16   direction or indemnity from their noteholder, and in AFLAC

17   their taking active positions with indemnity presumably, how do

18   I reconcile that?

19         MR. MILLER:  Well, Your Honor, I think you can

20   reconcile that easily on a couple of grounds.  First of all,

21   the predicate of that case was that AFLAC was in discussion

22   with LBSF and it threatened to initiate suit and is a U.S.

23   entity.  So the feeling was that it was important to go ahead

24   and activate a litigation to get a declaratory judgment.  And

25   rather than have another possibility of the case in London and

45

1    a case here, LBSF concluded that the orderly proceeding was to

2    go ahead and initiate a declaratory judgment with the parties

3    in this case, and with the party it was dealing with.  Because

4    LBSF had come forward.

5         So far as we know there's been no communication

6    between Perpetual and LBSF before Perpetual filed its suit in

7    London.  And it's notable that Perpetual's suit only BNY.  It

8    obviously felt that was sufficient.  LBSF did intervene.  LBSF

9    has not asked that court to decide the bankruptcy issues that

10   are before this Court.  There were some Insolvency Act issues

11   under English law that are somewhat analogous that were

12   submitted and were considered under English law.

13        But the difference is, first of all, that there was a

14   direct communication, a threat of litigation, and a response to

15   that.  And the other answer, Your Honor, is that there was no

16   jurisdictional issues.

17        I want to come back to jurisdictional issue because

18   Mr. Schaffer keeps saying that there is, in effect, a test of

19   admission, there's no jurisdiction.  We don't believe they're a

20   necessary party and we certainly don't think they're going to

21   prove to be an indispensable party if they were a necessary

22   party.  But we're not at all certain that Perpetual could not

23   be subjected to jurisdiction if that's what the Court concluded

24   he wanted to have done.  That becomes a scheduling issue and

25   I'll deal with that in a moment.

46

1          One of the things I might do if I might put up the

2     chart, Your Honor, that you've seen before.

3          (Pause)

4          MR. MILLER:  We do have small copies of this.  This is

5     a chart that was used before the court in an argument which Mr.

6     Schaffer was present for in the long motion to intervene in

7     this case, in the earlier intervention motion, so it's been

8     used in this case.  And it simply illustrates the relationship

9     of these parties.

10         And one of the things that I think the Court

11    recognizes is there's no contractual relationship between LBSF

12    as the SWAP counterparty and Perpetual as a noteholder.  In

13    many transactions, Your Honor, there are many noteholders.  And

14    in many transactions those noteholders -- some of them cannot

15    be found and cannot be reached.  As a general principle LBSF

16    does not believe that noteholders should be parties to these

17    kinds of proceedings.  Otherwise, for one thing, it become

18    completely unworkable.  But it was not contemplated by these

19    transactions that all the noteholders had to be drawn in.

20         THE COURT:  Thank you.

21         (Pause)

22         THE COURT:  These are copies of the same demonstrative

23    that's up on the board?

24         MR. MILLER:  Yes, Your Honor.  I'm simply handing the

25    Court copies of a demonstrative which is up on the board.

47

1        There's a two-step analysis under Rule 19.  And as we

2   believe the FDIC case against Bank of New York illustrates

3   under the elements of Rule 19 and as our brief set out, we

4   think that Perpetual is not a necessary party.  We believe that

5   BNY is an adequate representative.  We also suggest, as I did

6   at the beginning, that the presence of BNY and AFLAC in a case

7   with virtually identical issues is something that this Court

8   can consider under the broad discretionary issues of Rule 19.

9        There's going to be a very adequate representative

10  here in the form of AFLAC and Skadden Arps, its counsel making

11  these arguments.  And BNY has said that they are not conflicted

12  in that case.  So those arguments are going to be presented and

13  that's going to provide adequate protection, we believe, for

14  the rights of Perpetual, for the arguments on that side of

15  these bankruptcy and statutory issues.  And we think that

16  that's part of the equity in good conscious analysis when you

17  reach the indispensable party part of the analysis.

18       Even if Perpetual were a necessary party, whether

19  dismissal is appropriate or not requires a consideration of

20  additional factors.  And I might point out that in the equity

21  in good conscious category BNY could have taken a number of

22  steps that it didn't take that could have brought this issue

23  more clearly before this Court

24       One we encouraged BNY to consider was an interpleader.

25  That was something that was done, as the Court knows, in

48

1    Ballyrock case by the trustee.  And that has allowed those

2    parties to gather around the race that existed.

3         If the trustee were concerned it could, as it did in

4    the FDIC case, interplead into this court and that would have

5    resolved any issue.  It could have interpleaded in the London

6    court and that might have affected the issues as well, Your

7    Honor, but it chose not to do that.

8         BNY also could have tried to bring Perpetual in

9    itself.  It actually, in its motion to dismiss, suggested that

10   the Court order jurisdictional discovery to be taken by LBSF

11   which seemed strange.  If it wanted jurisdictional discovery

12   BNY could take jurisdictional discovery.  So it has, sort of,

13   taken a position of sitting on its hands and saying we don't

14   have an indemnity and we're certainly not going to do anything

15   without an indemnity.  And we don't have this party here and

16   we're not going to do anything to bring that party in so the

17   case should be dismissed.

18        And while we understand that position from their self

19   interest, as a matter of equity in good conscious we don't

20   think that dismissal could possibly be the appropriate remedy

21   that would arise here.  We think, at most, the second step

22   would be to say the parties can proceed and see if they can

23   bring Perpetual in.

24        Now the problem with bring Perpetual in, in addition

25   to the fact that we don't think it's required under the law and

49

1    we think it would delay the entire process, is that it would

2    impact the scheduling and the coordination in London.  And that

3    is, again, an issue of coordination with the London court.  We

4    don't know whether the London court would go through the time

5    necessary for that or not.  It's true that if BNY has asked

6    Perpetual to come in, presumably they have not wanted to do so,

7    if they changed their mind and came in Perpetual would have the

8    ability to speed this whole process.  Perpetual could come in

9    and then it could facilitate a resolution here but it has

10   chosen not to do that.

11          So Perpetual is taking the position that it's in a big

12   hurry in London.  It wants expedited adjudication.  It's done

13   nothing to allow that case to slow down and to suppose the

14   stay.  It has opposed the delays that were sought by LBSF to

15   let this Court act.  And yet it has not done anything to

16   facilitate the resolution of this case by either coming in to

17   participate or trying to authorize BNY to participate by giving

18   it in the indemnity.

19          I'd also point out, Your Honor, that as a practical

20   matter if the indemnity is confirmed by the English court, and

21   this is really the point that's made in the FDIC case, if a

22   judgment is rendered against BNY and BNY has an indemnity then

23   if BNY does have to pay the money over it has the indemnity to

24   get that money back if it had paid it twice.  In other words

25   there's no real possibility that BNY is going to have to pay

50

1    this money twice.  And I think it's also safe to assume it's

2    not going to release the money until it's certain that it's not

3    going to have to pay it twice.

4           Finally, in terms of this, sort of, hypothetical

5    conflict, I cannot imagine any possibility where the vice

6    chancellor and this Court would both issue contempt citations

7    or directions to BNY if their judgments were in conflict.

8    That's precisely what this coordination is for.  It's too early

9    to decide how that's going to happen.  But the fight is about

10   the box in the lower left corner here, these notes issued by

11   Australia, New Zealand Bank or Royal Bank of Scotland.  The

12   question is which of two parties will get those notes and BNY

13   has those notes in its control and its possession and they're

14   only going to go out once.  And they're going to go out after

15   the issues are sorted out as to which court has authority to

16   direct the payment of those notes.  We're not there yet because

17   the final judgment has not been appealed in London and because

18   this Court has not reached the merits.

19          And I might stress, we're not trying to jump ahead to

20   the merits.  It is critical, Your Honor, that in the

21   indispensable party analysis the most important question for

22   determination, as the briefs made clear, is whether there is an

23   adequate alternative for it.  And in this case, Your Honor, the

24   English court has not ever suggested that it is an adequate

25   forum for these statutory bankruptcy issues.  And there's a

51

1    case law in English law as well as case law cited in our brief

2    in the United States that recognizes that United States

3    Bankruptcy Courts are by far the most appropriate court for any

4    sort of resolution of bankruptcy issues.  And there is an

5    English court case that it cited it's in the briefing by BNY

6    which has similar recognition of the importance of cooperation

7    between English courts and U.S. bankruptcy courts.  And this is

8    the Bunk Indosuez  S.A. vs. Pharamet Resources, Inc. (ph.) case

9    from the chancery division where the Court notes that the Court

10   would do its utmost to cooperate with the U.S. bankruptcy court

11   and avoid any action that might disturb the orderly

12   administration of Inc. in Texas.

13        The English courts have recognized that there should

14   be a unitary bankruptcy proceeding, generally speaking in

15   world-wide bankruptcies.  And this Court has control over these

16   assets and the disposition of the assets of LBSF in which it

17   has security interests are something that can only be resolved,

18   we believe, fairly and effectively in this court.

19        So the simple solution, we believe, is to conclude

20   that Perpetual is not a necessary party.  In the alternative,

21   it's certainly not a necessary and indispensable party.  And

22   coordination, which we're going to discuss, I think, this

23   afternoon, is quite practical between the AFLAC matter and this

24   matter so that the briefing will be before the Court one time.

25        The debtor does not believe, by the way, that

52

1    coordination is always necessary just because the same legal

2    issue is going to come up in several cases.  But because, as

3    the Court's noted, this is a case of the first impression on

4    some of these issues and the cases are moving together and we

5    have some commonality of parties with BNY and LBSF in both

6    cases.  It may make sense to coordinate that and I think the

7    Court has expressed some interest in reading these briefs only

8    once and hearing arguments, maybe, that come together at one

9    time on some of these issues.

10           And we are, by the way, very cognizant of the

11   tremendous number of cases that this case has before it the

12   issues are weighty and difficult, there's a lot of paper and

13   we, the debtor, wants to make certain that the Court has

14   adequate space and time, as it referred to, to consider these

15   matters.  We'll take that up in the scheduling conference but

16   to summarize, our belief is that the motion to dismiss should

17   be denied.  That coordination should be discussed in the next

18   session that we're going to have and that BNY should be given

19   an opportunity to file a summary judgment if it wants to.  It

20   should be given adequate time to respond to the summary

21   judgment that's already on file in this case.  If it wishes, to

22   adopt by reverence the arguments that are made by AFLAC, is

23   certainly can do that as courts of course recognize adoption by

24   reference even between different cases, if necessary.

25           And we suggest that we then develop a coordinated

PY

53

1    briefing schedule, which we think probably takes us into

2    October and November as we will discuss, but not far beyond the

3    schedule that the London court has set out.  And the Court, we

4    would suggest, may want to have a scheduling coordination

5    communication, once this is all sorted out, with the London

6    court to explain when this Court thinks these issues will be

7    presented.  And that, of course, does not anticipate what the

8    London court's going to do with that information but as the

9    London court clearly suggested, the vice chancery, it would be

10   helpful to the London court to know what assistance this Court

11   might be requesting.  And this would be simply notice of when

12   this Court might be in a position to make the decision on

13   whether it needs assistance and what sort of assistance or

14   coordination it might request.

15          So we think in that logical order the Court will have

16   space and time to consider things, all the parties will be

17   heard.  There's going to be adequate briefing on the issues.

18   Nobody's rights are going to be prejudiced and the concerns of

19   BNY that it's going to somehow have to pay this money out twice

20   or not get guidance from the courts, we think is completely

21   fictitious and is not something that has any realistic

22   possibility of existing under these circumstances.

23          I'd be happy to take any questions, Your Honor.

24          THE COURT:  I have a couple.

25          MR. MILLER:  Yes, Your Honor.

54

1        THE COURT:  I note the Federal Deposit Insurance

2    Corporation vs. Bank of New York decision that you handed up

3    and I've really only focused on the highlighted language on

4    page 10, which states a proposition that's probably beyond

5    doubt.  It's really just a question of its application.

6        The highlighted sentence reads, "It is well settled

7    that adjudicating an absent person's claim cannot impair or

8    impede the person's ability to protect his interest if he is

9    adequately represented by one of the existing parties."  And it

10   goes on to talk about the role of the indentured trustee under

11   a bond issue.

12       What concerns me here, in light of the argument made

13   by BNY though is their argument that they have no duty to

14   represent the interests of Perpetual in this litigation absent

15   an indemnity.  And that that question remains in dispute and

16   that as a result they can just sit on their hands, whether they

17   choose to do that remains to be seen.

18       If they just sit on their hands how are the interests

19   of Perpetual represented adequately?

20       MR. MILLER:  Well Your Honor, let me respond to that

21   in two ways.  First of all, I understand Mr. Schaffer takes the

22   position, and we believe this is a correct reading if our

23   language was not precise we apologize, that the vice chancellor

24   has decided that they are indemnified.  The vice chancellor has

25   just not decided what the form of that indemnity is going to

55

1    be.

2         THE COURT:  And that's consistent with my questioning

3    of Mr. Schaffer during his argument.

4         MR. MILLER:  Yes, Your Honor.  So we think that it's

5    not factually the case that they don't have an indemnity.  They

6    don't quite have the form of the indemnity but that doesn't

7    prevent them from going forward and in fact we think they're

8    obligated to go forward and assert the interests of Perpetual.

9         But to answer your second question, how are the

10   interests adequately protected, the interests are adequately

11   protected because precisely the same statutory and legal issues

12   are going to be briefed by BNY and by AFLAC in the coordinated

13   proceeding which is occurring.  And this Court is going to have

14   all the legislative history, if you decide legislative history

15   is relevant, and the case law and all of the other issues.

16        This is distinct in the sense that in neither of these

17   cases is there any suggestion of factual disputes.  And that,

18   by the way, is the one of the reasons that forum non conveniens

19   makes no sense here.  There is no witnesses, there is no

20   documents, there's nothing that's a convenience issue here that

21   implicates forum non conveniens.  This is unique because it is

22   a legal dispute and the legal issues are going to be before

23   this Court from this very same party, BNY, with indemnity.  So

24   in that sense the interests of Perpetual will be protected and

25   will be fully asserted and will be considered by the Court.

56

1    And certainly LBSF agrees that it's appropriate for the Court

2    to take into consideration the briefing in that other case and

3    to rely upon it.

4         And if BNY simply chooses to incorporate its position

5    by reference, I think Mr. Schaffer said he thought it would be

6    unlikely he would take an inconsistent position in the cases.

7    It can do so and it can do so with or without indemnity.  And

8    in those circumstances Perpetual's interests are protected.

9         THE COURT:  I'm a little unclear as to the status of

10   the UNCITRAL Model Law provisions as they have been activated

11   in the U.K. and where things stand procedurally.  Is there, at

12   this point, an authorized and empowered foreign representative

13   for LBSF speaking on behalf of that estate in the high court?

14        MR. MILLER:  Your Honor, I haven't had that updated in

15   the last day or two.  My understanding is that an application

16   has been made for a foreign representative to be appointed but

17   there has not actually been a ruling on that application yet.

18   It is expected, I believe, and I think the vice chancellor

19   recognized that this is a fairly formalistic thing and it's

20   very likely that that will proceed and will occur.  Exactly

21   when, I don't know but certainly before October and we

22   anticipate that there will be a foreign representative.

23        Now that foreign representative then has to take

24   actions and do things, I mean the mere appointment does not

25   change things.  That foreign representative will, of course, be

57

1    acting for the Lehman estates.

2            The Court, by the way, I'm told that would deal with

3    this is in recess in England as are other courts in summer

4    recess that we've discussed before, Your Honor, as a very

5    civilized practice.  So I believe it is the recess that has

6    caused this delay and we don't believe any substantive issues.

7            THE COURT:  I've expressed my envy as to that in the

8    past.

9            MR. MILLER:  I understand, Your Honor.  It's about

10   space and time, right?

11           THE COURT:  Well, yes.  And the opportunity to

12   refresh.

13           Now, I'm unfamiliar with outbound practice in the

14   model law context, all of my experience is inbound experience

15   in which foreign representatives come to this court and seek

16   recognition under Chapter 15.  Ordinarily the foreign

17   representatives who are appointed are representatives of

18   accounting firms or other liquidators acting on behalf of

19   foreign entities.

20           Is the party to be authorized to speak on behalf of

21   LBSF as a foreign representative a current employee of the

22   debtor in possession or is there some mechanism for appointing

23   a third-party fiduciary to act on behalf of LBSF?

24           MR. MILLER:  My understanding is, Your Honor, that it

25   is a representative of the debtor.  Of course to the extent

58

1    that a debtor is, to some extent, a fiduciary of its

2    constituencies --

3            THE COURT:  Oh, I understand that.

4            MR. MILLER:  -- it would have that.  But yes, the

5    foreign representative is just a debtor's representative.

6            THE COURT:  It will be a designated individual, is

7    that correct?

8            MR. MILLER:  Yes, I believe that's correct Your Honor.

9            THE COURT:  Okay.

10           MR. MILLER:  And I'm not certain I know who that is,

11   it may be someone in our law firm's London office but I'm not

12   certain who that is.

13           THE COURT:  All right.  Under the American Law

14   Institute procedures on court-to-court communication, such

15   communication typically only occurs upon the adoption of a

16   protocol in which, in this instance, the U.S. Bankruptcy Court

17   and the chancellor of the High Court would be empowered to

18   confer with one another pursuant to a set of approved

19   procedures and principles.  Is there any understanding, at this

20   point, as to such a protocol?  I know that in the Lehman case

21   itself the adoption of a multi-lateral protocol has been a

22   subject of some controversy as it has related to LBIE in

23   particular.  This is not an LBIE issue but I do recognize the

24   potential for there being some sensitivity as it relates to

25   court-to-court communication between me in my capacity as the

59

1    bankruptcy judge administering these adversary proceedings and

2    me in my capacity as the bankruptcy judge who has overall case

3    authority for the Lehman bankruptcy as a whole.  Recognizing

4    that at least as it relates to LBIE, I note that there has been

5    some pushback from the joint administrators of LBIE as it

6    relates to that multi-lateral protocol which has been

7    characterized as the Alvarez & Marsal protocol by them.

8         To what extent do any of these broader political

9    issues in the case represent a potential area of controversy as

10   it involves court-to-court communication?

11        MR. MILLER:  Your Honor, Mr. Lemmons has confirmed, my

12   understanding is that this case does not have any relationship

13   to those protocols or the issues that are involved there.  We

14   did speak earlier to some of the people who were dealing with

15   those and they didn't think that this was a related issue.

16   There, of course, LBIE does have its own administrators.  As

17   the Court has noted, LBIE is not involved in this and we don't

18   believe LBIE has anything to do with this nor any other

19   bankruptcy administration.

20        We think that the procedure here could be a letter,

21   for example, requesting scheduling which the Court could simply

22   send to the vice chancellor that would make reference to the

23   various procedures.  And we would be pleased, Your Honor, to

24   draft such a letter if we were authorized to do so and

25   circulate it to the parties and try to present it to the Court.

60

1    The only purpose of the letter at this point, we are

2    suggesting, is to advise that court of scheduling constraints

3    so that it can take those into account with regard to its

4    schedule.  We think that's all that's needed at this point.

5    But we think it would be helpful and fair to the London court

6    to understand that and of course we're not familiar with what

7    scheduling constraints the Court might have and I think that

8    may be some of the subject of the discussion in this next

9    session we're going to have.  So we think that that -- we have

10   a high degree of confidence that that would lead -- we

11   certainly believe there will be a cooperative attitude.  The

12   vice chancellor has expressed nothing but graciousness and

13   understanding of the complexity and a great deal of sensitivity

14   to these issues.  And we anticipate that this will be

15   considered receptively.  We don't know what the outcome would

16   be, of course, but at least it would be an appropriate way, we

17   think, to frame the issue and let the London court know what

18   this Court needs in the way of space and time.

19        THE COURT:  Fine.  Okay.  One follow-up question on

20   court-to-court communication.  You have been focusing, at least

21   initially, on scheduling coordination as opposed to allocation

22   of responsibility for determining issues that overlap in the

23   two courts.  Is it your contemplation, consistent with some of

24   the conversations that I had with Mr. Schaffer during his

25   presentation, that it would be reasonable to work out, if

61

1    feasible, an allocation of responsibility in which the English

2    high court would deal with matters of English law and would be

3    primary, if not exclusive, in that area.  And the U.S.

4    Bankruptcy Court would deal with issues of U.S. bankruptcy law

5    with the English court deferring to the United States

6    Bankruptcy Court as to issues of U.S. bankruptcy law?

7            MR. MILLER:  Certainly, Your Honor, and it seems to us

8    that is a logical and a reasonable way to deal with that.  I

9    think, in fairness, until the issues of bankruptcy law are

10   determined, how they may be relevant to the English court

11   judgment is impossible to predict.  But we certainly think that

12   the English court has already expressed an interest in how this

13   Court is going to resolve these bankruptcy issues.  And we

14   think that that proposed allocation is something that not only

15   makes sense but we think it's consistent with all the case law

16   and the residents.

17           THE COURT:  And I mention this only for discussion

18   purposes and not because I think it's a desirable option; in my

19   experience, recently, I have had joint hearings, televised

20   joint hearings with the Canadian court in Montreal in a cross-

21   border bankruptcy case, Quebecor World.  Those joint hearings

22   took place as recently as this summer, quite successfully I

23   might add.  Is there any contemplation that a matter of this

24   sort might be reasonably adjudicated through some kind of joint

25   hearing in which arguments are being made simultaneously, both

62

1    in the High Court and here with video hookups or is that simply

2    unnecessary and unduly complicating?

3            MR. MILLER:  Well certainly, Your Honor, as far as

4    LBSF is concerned, if the Court has any interest in doing that

5    it would certainly be happy to cooperate.  But there are no

6    factual issues here.  There are no witnesses that we think are

7    relevant.  Everything is in the documents.  And under the

8    circumstances we're not certain that the benefit of a televised

9    hearing would be worth the complexity and the burden.  It's

10   essentially an issue of oral arguments.  And again, I don't

11   believe that --

12           THE COURT:  It would, however, be a way for me to hear

13   from counsel for Perpetual.

14           MR. MILLER:  It would.  That's a very good point, Your

15   Honor.  And there certainly is an issue here of ultimately if

16   we had a finding that U.S. bankruptcy law ipso facto

17   provisions, for example, invalidated these clauses that change

18   priority based on bankruptcy, which is what LBSF is seeking.

19   And the English court had concluded its appeals and had decided

20   that setting aside all U.S. bankruptcy issues under English law

21   that the priority was noteholder priority, there's ultimately

22   going to have to be a question of -- essentially a choice of

23   law question between U.S. bankruptcy law and the law of the

24   contract under the circumstances.  That would certainly seem to

25   be an appropriate issue, perhaps, for a joint hearing Your

63

1    Honor because that's going to be something where both courts

2    are going to have to deal with that issue.  But that's far down

3    the road, it seems to us.  It would certainly be an opportunity

4    for Perpetual to be heard on that issue.  They have chosen, in

5    effect, to rest on that issue rather than to come in to contest

6    on this issue.  They've chosen to rest on the premise that the

7    London court should trump this Court regardless of U.S.

8    bankruptcy law.  So we assume that would be their position that

9    might be in that hearing and that would be a very appropriate

10   time for such a joint hearing, Your Honor.

11              THE COURT:  All right.  Thank you.

12              MR. MILLER:  Thank you.  Is there anyone else that

13   wishes to be heard on this?  Mr. Schaffer do you have any

14   follow up comments?

15              MR. SCHAFFER:  Your Honor, I don't know if the

16   committee wishes to be heard, if not I have just a few remarks.

17              THE COURT:  Does the committee have any --

18              MR. COHEN:  No, Your Honor.  As I promised when you

19   granted our intervention we would not be duplicative and we

20   agree with the debtors' arguments and position and have worked

21   closely with them on formulating those.

22              THE COURT:  Understood.

23              MR. SCHAFFER:  Your Honor, if I may briefly speak to

24   some of Mr. Miller's remarks.  The FDIC case is something that

25   we addressed in our memorandum at pages 14 and 15.  And what I

64

1    think is significant there is that it notes that where the

2    beneficiary and the trustee are antagonistic, there is no

3    adequate representation.  Here, unlike in the FDIC case, we

4    haven't represented the beneficiary before.  We don't have

5    indemnification, they sued us.  We are antagonistic.  This

6    really is the textbook example referred to in Pimentel.

7         Your Honor, there was some brief discussion of could

8    Perpetual be joined and Mr. Miller suggest that perhaps they

9    could be.  If they can be, I don't know why we wouldn't want to

10    have them joined.  In the briefing there was a suggestion that

11    is this Court dismisses the complaint they'd like to have leave

12    to amend to join Perpetual and we don't object to that.

13         Your Honor, there was a question you asked, why should

14    the holders be sued?  Who has the beneficial interest?  And we

15    looked at this chart, there are a couple of lines that are

16    missing from the chart and that is the lines between BNY

17    corporate trustee, I'd say there are dotted lines to LBSF and

18    to Perpetual because we as trustee are holding funds and they

19    are the two competing claimants.  There really are lines there;

20    they just haven't been put on that chart.

21         There was a question about interpleader, Your Honor.

22    Interpleader works if you have consistent decisions from both

23    courts.  If we had no risk of inconsistent decisions an

24    interpleader might work.

25         Of course this case is not the AFLAC case.  Our

65

1    appearance there is not an appearance for Perpetual.  And in

2    any event, whatever happens in AFLAC would not necessarily

3    resolve the risk of inconsistent judgments in this case.

4         As a final point, I was somewhat heartened to hear Mr.

5    Miller say that unless and until we have indemnification,

6    there's no real risk for us, we're not going to have to pay the

7    money out to two different parties.  If we have that assurance,

8    if they're telling us that they'll agree we don't have to pay

9    something out until we've got an order that appropriately

10   covers us from both courts, well that's a very good thing.  If

11   we know we're --

12        THE COURT:  So are you withdrawing your motion on that

13   representation?

14        MR. SCHAFFER:  Your Honor, I am not but I would invite

15   an order from this or the English court that says you will

16   never be exposed to conflicting orders, and I'll end on that

17   note.

18        THE COURT:  I can't imagine anybody ever giving you

19   that assurance.  But I think it makes some sense for me to give

20   everybody a break, we've been at this for an hour and forty

21   minutes and I'm going to take fifteen minutes to reflect on

22   what I've heard and I'll come back at about five to 12.  We're

23   adjourned till then.

24        (Recess from 11:39 a.m. until 12:02 p.m.)

25        THE COURT:  Please be seated.  This is a very

66

1    challenging motion to dismiss, and I've given this matter

2    considerable attention, both before the argument in reading the

3    briefing, and since the argument, following what I think was a

4    very well-presented argument on both sides.

5          One of my initial judgments, and it hasn't been

6    altered by the argument, is that the legal argument in the

7    AFLAC litigation is, in effect, a derivative for this

8    litigation.  What makes this an especially challenging matter

9    to decide as a free-standing motion to dismiss or to stay or to

10   abstain, is that BNY as a party-defendant here, is a party-

11   defendant in another litigation in which it is comfortable to

12   articulate the very same legal arguments that would otherwise

13   be articulated in this litigation.

14         As a result, this is not about BNY's saving time and

15   expense or avoiding discovery, because we're not dealing with

16   discovery or witnesses or evidence; we're dealing purely with

17   legal issues as far as I can tell.  This motion practice is

18   really about BNY's attempting to avoid being caught in the

19   middle of a conflict in which the High Court in London may

20   declare that noteholder priorities are applicable, and the

21   bankruptcy court in New York may declare that swap counterparty

22   priorities are applicable.

23         In stating what I have just stated, I am not, by any

24   stretch of the imagination, suggesting what I would decide

25   after considering the matter on the merits, but that is, in

67

1    effect, BNY's problem.  What's a fiduciary to do when presented

2    with conflicting legal authority, that is, by definition,

3    irreconcilable?

4        The narrow question presented, however, is whether

5    dismissal of this action is required under the strict

6    application of Rule 19 principles involving allegedly necessary

7    or allegedly indispensable parties.  In this case that party is

8    Perpetual.  I understand Perpetual to be a large and

9    sophisticated financial institution based in Australia with

10   billions of Australian dollars under management.  I have no

11   knowledge one way or the other as to whether Perpetual does

12   business in the United States and is subject to the

13   jurisdiction of the U.S. Courts.  But by virtue of the fact

14   that they're not here and no effort has been made by either

15   LBSF or BNY to join Perpetual, I'm going to assume for purposes

16   of what I'm about to say that Perpetual either could not be

17   joined, or if joined, that there would be some kind of

18   jurisdictional argument made by Perpetual in which Perpetual

19   would seek to extricate itself from the litigation and argue

20   that there are insufficient contacts to permit the exercise of

21   jurisdiction over them.

22       I further assume that what's going on here involves

23   some measure of game theory on both sides of the Atlantic.  I

24   assume that Perpetual has brought the litigation that it has

25   brought in the High Court because it perceives tactical

68

1    advantages and substantive advantages in having its claims

2    against BNY heard there.  I further assume that LBSF has made

3    the judgment that this bankruptcy court is probably the best

4    forum in which to litigate issues that relate to the proper

5    interpretation of certain provisions of the United States

6    Bankruptcy Code, and that it makes sense for that litigation to

7    be pursued, regardless of whether Perpetual is a party or can

8    be named as a party.

9         This gets us to the crux of the matter.  To what

10   extent is BNY a fair representative of Perpetual for purposes

11   of adjudicating this dispute?  BNY is, after all, a corporate

12   trustee.  I made some reference to the highlighted quote from

13   the FDIC v. Bank of New York case from the district court in

14   the District of Columbia.  And the highlighted portion, which

15   appears to be black-letter law, it's just a question of how

16   it's to be applied, states that, "It is well settled that

17   adjudicating an absent person's claim cannot 'impair or impede

18   the person's ability to protect his interest' if he is

19   adequately represented by one of the existing parties."

20        BNY asserts that it cannot be such an existing party

21   that can adequately represent the interests of Perpetual in

22   this litigation, because they're actually adverse in litigation

23   in the High Court, and that antagonism represents an effective

24   bar to BNY's standing here in a representative capacity.  I'm

25   not convinced of that.  I believe that the litigation in the

69

1    High Court -- and I have only a limited understanding of that

2    litigation, and so I comment on it at my peril -- is

3    fundamentally not about the issues that are presented to me in

4    this litigation.

5            In a sense, both litigations touch on BNY's duties as

6    a fiduciary.  And their rights and entitlements to indemnity

7    are certainly center stage in the U.K. litigation.  But this is

8    really forum selection that goes to the heart of substantive

9    rights.  The substantive issues are not before me at the

10   moment.  But at some point, I will be asked to consider whether

11   noteholder priorities, as those terms are defined in the

12   documents, or swap counterparty priorities, are applicable in

13   light of bankruptcy provisions.

14           I'm sensitive to the issues of comity and cooperation

15   and coordination that have been discussed throughout the

16   argument.  But I also recognize that the only rational outcome

17   here that makes good sense in a cross-border setting, is for

18   the United States Bankruptcy Court to be the principal if not

19   exclusive decider of issues relating to U.S. bankruptcy law.

20   And similarly, it makes sense for the High Court in London to

21   be the principal if not exclusive decider of issues of English

22   law.  I think it's very difficult for rational and fair-minded

23   people to disagree with that proposition.

24           The question becomes whether BNY, feeling some self-

25   described insecurity with respect to its own status, is, at

70

1    this juncture, a person that can fairly represent the interests

2    of Perpetual in this litigation?  And I answer that, yes, it

3    is.  It is, in part, because it will be doing exactly that if

4    it simply sits on its hands in this litigation and actively

5    prosecutes its position in the AFLAC case.

6           As noted during argument, Mr. Schaffer, on behalf of

7    his client, acknowledged this point.  It's inconceivable that

8    BNY will be taking a position in the AFLAC case that isn't

9    exactly congruent with the position that it would be taking

10   here, in the Perpetual case.  Presumably, and I don't know what

11   it will be saying in substance, BNY will be rooting for its

12   beneficiary, AFLAC, that I gather will be arguing in favor of

13   noteholder priority.

14          While the facts may be subtly different, the legal

15   issues are exactly the same, as I'm understanding the situation

16   presented here.  And so, if BNY does nothing other than

17   ardently present the legal argument that it will be advancing

18   in the AFLAC case, it will coincidentally also be ardently

19   advocating the very same points in the Perpetual case.

20   Accordingly, it seems to me clear that BNY will at least

21   indirectly be adequately representing the interests of

22   Perpetual.

23          What we end up with, as a result, is a fairly subtle

24   issue that seems to be more about the interests of the

25   corporate trustee than it is about strict application of

71

1     pleading principles.  BNY has quite appropriately sought to

2     extricate itself from a difficult situation here so as not to

3     be at the wrong end of conflicting directions from two courts.

4     I believe that coordination is the most appropriate answer to

5     this problem.  Both counsel for BNY and counsel for LBSF have

6     spoken to the issue of coordination during argument today.

7     It's not clear to me that they are on exactly the same page as

8     it relates to the nature of this coordination.  Mr. Miller has

9     been very precise in talking about scheduling coordination;

10    whereas Mr. Schaffer has been broader in his approach, and has

11    acknowledged the wisdom of a more comprehensive form of

12    allocation of responsibility.  I'm not sure if that's something

13    that he actually believes or if he was simply agreeing with

14    something that I had said.  But either way, that's the message

15    that I took from him.

16         Accordingly, I have some uncertainty as I make these

17    comments from the bench as to whether the parties are in a

18    position to stipulate as to the nature of the coordination that

19    should take place here.  But I did hear Mr. Miller volunteer to

20    be the drafter of a letter that presumably would be shared with

21    counsel for BNY, and that presumably I might send, with

22    everybody's consent, to my counterparty in London, to initiate

23    court-to-court communication, and at least to get into the

24    question of scheduling as an initial matter.

25         Whether the coordination is simply scheduling

72

1    coordination or broader coordination that deals with abstention

2    and deferring to other courts for purposes of avoiding

3    conflicting adjudications, I believe that some level of

4    coordination is mandated here.  And my reading of the High

5    Court's decision is more consistent with LBSF's reading than it

6    is BNY's reading.  I do not know what the Chancellor was

7    meaning to say, nor do I interpret his words.  I do know what I

8    understood them to be telling me.  He was giving me space and

9    time.  Space and time to do what, is what's in dispute.

10        I believe that the decision does not represent an

11   express deferral in favor of the U.S. Bankruptcy Court as it

12   relates to U.S. bankruptcy law issues.  But I do believe that

13   the decision can be understood to be allowing time for the U.S.

14   Bankruptcy Court to hear, consider and determine issues that

15   are unique to U.S. bankruptcy practice.

16        Given that, and given what I believe to be BNY's real

17   purpose here, which is to avoid being torn apart by conflicting

18   decisions, the best means to achieve that is through

19   coordination.  That doesn't mean that that will be the outcome.

20   That just means that it's a means to avoid bad adverse result,

21   without guarantees that it will be avoided.

22        I believe, as a matter of law, that Perpetual is not

23   an indispensable party.  Perpetual may or may not be a

24   necessary party, but I don't need to decide that question.

25   Without doubt, Perpetual is a directly interested and affected

73

1    party, and a sophisticated one, at that.  Perpetual has the

2    capacity, should it elect to do so, to closely monitor and

3    participate in this litigation.  For tactical reasons, I

4    assume, it has decided to stay away, which is its right.

5         BNY, however, doesn't have a choice to stay away.  BNY

6    is here as trustee, entitled to indemnification as a matter of

7    English law.  The form of such indemnification being, at this

8    point, not yet finally determined.  It is exposed to only a

9    theoretical risk at this juncture.

10        The motion to dismiss the litigation is denied for the

11   reasons I have stated.  But I also believe that in order to

12   achieve coordination and consistency here, in this Court, that

13   the scheduling of matters in the Perpetual litigation should be

14   coordinated fully with the scheduling of matters in the AFLAC

15   separate litigation.  That way BNY in particular will be able,

16   to some extent, to finesse its position.  It will be able to

17   make arguments at the same time with the benefit of full

18   indemnity in the AFLAC case that I assume will be the very same

19   arguments that it would make in the Perpetual case.

20        Furthermore, that kind of coordination will be of

21   benefit of the Court by giving the Court the opportunity to

22   hear at one time from sophisticated lawyers, issues that I'm

23   told are of first impression and that should be as fully and

24   effectively briefed as possible.

25        That's the Court's ruling.  To the extent that anyone

1    wishes to seek judicial review of that ruling, which has been

2    made, as you can observe, extemporaneously, I would like the

3    opportunity to prepare a memorandum decision.  But otherwise,

4    this bench ruling will suffice.

5          What's the next matter?

6          MR. MILLER:  Your Honor, we do have a form of order

7    and a disk for editing purposes, if you'd like to have it.  Or

8    the Court may simply let the transcript cover this.  I don't

9    know what the Court would like to have.  I can present it to

10   you.

11         THE COURT:  Well, we'll probably modify it to make

12   clear that the order is incorporating by reference the bench

13   comments made within the last twenty minutes.

14         MR. MILLER:  Continuing, Ralph Miller for LBSF.  I

15   believe the next matter on the agenda, Your Honor, is based on

16   a letter that we sent the Court asking for a conference in case

17   number 8-13555.  Is that the matter the Court wants to consider

18   now?  That's the Lehman Brothers Special Financing v. American

19   Family Life Assurance Company of Columbus and BNY Corporate

20   Trustee Services case.

21         THE COURT:  Let's to there.

22         MR. MILLER:  All right, Your Honor.  I think, first of

23   all, it is important to distinguish between cases that have

24   some commercial imperatives and cases where we are dealing with

25   administration and judicial efficiency and other issues.

75

1        So far as we know, there is no commercial imperative.

2    I might contrast that with the Libra case, for example, where

3    we have an expiring option and market conditions have changed

4    and there's some considerable doubt as to whether that is a

5    melting snowball of some sort.  In this case, the funds in both

6    the AFLAC case and the present case that we were just

7    discussing, which we called the Saphir or Mahogany case, are

8    held by trustees, in this case BNY.  This is also true of other

9    cases where this issue might ultimately come up.  And these are

10    sophisticated parties on the other side.  We're not talking

11    about individuals who are not getting money.  That money's

12    invested at interest.  So I want to start out by stressing that

13    there is no great urgency as between one month and the next

14    month in terms of when this has to be resolved.

15        There is a summary judgment that has been filed in the

16    Saphir Mahogany case some time ago, but we assured the Court at

17    that time, and we've assured BNY, that we want to give them

18    adequate time to respond to that, now that this motion to

19    dismiss has been ruled.  We're not trying to squeeze them.

20    More importantly, we understand the Court has many issues that

21    it is considering, and we're not trying to squeeze the Court

22    with briefing on things that are unnecessary in terms of not

23    enough time, particularly between the reply brief and the

24    hearing dates.

25        For those reasons, we have proposed a schedule.

1    Summary judgment has been filed, as you know, by AFLAC.  And

2    LBSF would like, with leave of Court, to file a cross summary

3    judgment.  And we proposed to do that by August the 21st --

4    this is in my letter -- with responses due by September the

5    11th, and replies due October the 2nd, and hearing the week of

6    October 12th or thereafter.  We also have, by the way, a

7    corresponding suggestion on how the Saphir schedule could be

8    coordinated with that, which is not in my letter; but just to

9    note that it would be possible for BNY, if it wished to file a

10   motion for summary judgment, which it may not, to file by

11   August 21st.  Responses could be simultaneously done September

12   the 18th, a little later, to give more time; October 9th

13   replies, and then a hearing thereafter, as the Court might see

14   fit.  We don't know whether BNY would want to file a cross

15   motion for summary judgment in the Saphir Montgomery (sic)

16   case, or not, but we certainly believe that's appropriate, if

17   it chooses to do that.

18          And -- something I want to clarify.  The Perpetual

19   case is the same as the Saphir case.  I mean, the Saphir

20   Mahogany case is what we call the Perpetual case.  Just to make

21   sure the record is clear.  Perpetual, of course, is not a

22   party, so we used the names of those entities that are parties.

23          Now, there is, and you will shortly hear from, I

24   believe, Mr. Weber here on behalf of AFLAC.  And they are

25   suggesting that there is some need to get all this done by

77

1    September the 17th, which is a date where some matters are set

2    in the Ballyrock case.  We don't believe that's necessary, Your

3    Honor.  We don't think the issues are the same, and I'll

4    explain why briefly.

5         The Ballyrock setting is on a motion to dismiss, it's

6    not a summary judgment.  There's nothing, in our view, that can

7    happen on September the 17th that's going to implicate any

8    determinative outcome in these cases.  Obviously, if the Court

9    should grant the motion the dismiss and find -- first of all,

10   there are issues ahead of the issue of ipso facto and Safe

11   Harbors which have to be resolved issues wrongful termination,

12   other issues that may well cause that issue never to be

13   reached.  If it were reached, the only possibility that it

14   could have any impact here, would be if the Court decided not

15   to dismiss the pleading.

16        Well, these pleadings already have not been dismissed.

17   There has not been dismissal practice.  So that just puts them

18   on the same footing.  We don't think that would have any

19   implication.  It's not the same standard.

20        So we don't believe there is any need to try to rush

21   toward something basically a month from now on September the

22   17th.  And I think that's the primary issue of dispute.  There

23   have been some discussions about whether the Court might be

24   willing to put off that September 17th hearing.  I think there

25   may be counsel here for Barclays and some of the parties in the

78

1    Ballyrock case, and they can speak for themselves.  My

2    understanding is those parties don't want to put off that

3    hearing.  So we're not suggesting a change in that hearing.

4         THE COURT:  The hearing was already put off at my

5    request because of some congestion in my own trial calendar.

6    So that was already an adjourn date.  So I can appreciate

7    parties saying let's get on with it.

8         MR. MILLER:  Well, so we're not suggesting that, Your

9    Honor.  But our suggestion is that those are not linked

10   matters.  We believe that if the Court adopted a schedule along

11   the lines that we have suggested, there would be ample time for

12   briefing; there would be ample time for the Court to consider

13   the replies; and you would have the briefing before you, and we

14   think that that would be logical.  We also believe it is

15   consistent with the general schedule that the High Court has

16   set.  The coordination letter could then set out what the date

17   of this hearing was and the Court would know -- obviously date

18   of decision would not be clear from that, but it would at least

19   know that that matter was moving forward, and it would be

20   submitted to the Court in an orderly fashion and in a

21   coordinated fashion.

22        And that is our proposal, Your Honor, for scheduling.

23   I believe other parties have other views, and we want to let

24   them --

25        THE COURT:  Fine.

79

1         MR. MILLER:  -- discuss it.

2         THE COURT:  Let's hear what others have to say.

3         MR. WEBER:  Your Honor, Rob Weber from Skadden Arps,

4    again for AFLAC.  Your Honor, let me start with an apology.  If

5    we surprised or offended the Court or our adversaries by our

6    filing before formal leave to file for summary judgment had

7    been granted, we didn't intend to do so, and that's not the way

8    we wanted to start off.  So I wanted --

9         THE COURT:  I understand.

10        MR. WEBER:  -- to clear air on that.

11        THE COURT:  You jumped the gun, but it's okay.

12        MR. WEBER:  It does seem to have refined the

13   scheduling discussion a bit.  So now that we're on that, where

14   to start?  AFLAC is not involved in the Perpetual proceeding.

15        THE COURT:  I understand that.

16        MR. WEBER:  The common legal issues are of dire

17   concern to us, and we have been, since this case began,

18   speaking loudly and to anyone who would listen, that a

19   coordinated, comprehensive approach to all of the adversaries

20   with the common legal issues, needs to be developed.  And

21   unfortunately, it hasn't happened yet.

22        The reason that we are pressing for the September 17th

23   hearing date as the date in our proceeding, Your Honor, is that

24   because we do believe the Court could reach one of the common

25   legal issues.  It may not happen in the chain of possibilities

80

1    until near the end, but the debtors have raised their arguments

2    regarding 541(c) and 365(e), and to some extent the Safe

3    Harbors.  Ballyrock does not think the Safe Harbors are

4    involved, because they terminated pre-petition and didn't rely

5    on the Safe Harbors.  But there is a chance that the Court

6    could reach the common legal issues on September 17th.

7         Now, it's not a lot of time, but I will say this.

8    When we were here a month ago, Mr. Miller told you that his

9    summary judgment brief in the AFLAC case would look just like

10   the one he had already filed in the Perpetual case.  He's

11   already briefed those issues.  I'm not sure of the extent to

12   which additional work will be required, our brief is pretty

13   good, but they'll have to respond.

14        To clarify one point on the way the issues are being

15   characterized.  It's not just an issue of noteholder priority

16   versus swap counterparty priority.  One doesn't even reach the

17   noteholder priority issue, as we've set out in our summary

18   judgment papers, Your Honor.  There's a termination provision.

19   And if the swaps are terminated because of an LBSF default,

20   they get no termination payment, period.  And it doesn't matter

21   whether that termination is based upon an ipso facto provision,

22   which the Safe Harbors would insulate, or some other form of

23   default which the contracts also contemplate.  So that is a

24   threshold issue.

25        There are a number of proceedings that are already

81

1    filed where these common legal issues appear in some form or

2    another.  And because of the different facts, it may well be

3    like in our case, that a termination occurred post-petition,

4    but the collateral has been tied up and is still sitting there.

5    It may well be, as in the Ballyrock case, that the termination

6    occurred and the collateral was mostly disbursed, and the

7    fight's happening after the fact, trying to reel it in or do

8    something else.

9        But the common legal issues are looming, they're

10    large, and from what I understand, there's 10 to 12 billion

11    dollars more of transactions waiting to be decided based on the

12    results of these common issues.  Who knows?  They may end up in

13    adversaries before Your Honor.

14        So we don't think, as a threshold matter, that the

15    September 17th date is going to be as difficult to meet as

16    perhaps others do.  We are happy to meet whatever briefing

17    schedule the Court would like, working backwards from that

18    date, or alternatively, the mechanism that Mr. Miller alluded

19    to, we had discussed briefly with the Ballyrock parties.  To

20    the extent the Court wants to rule on anything other than the

21    common issues in the Ballyrock case, go forward on the 17th.

22    But if the Court were to reach the common issues, we had

23    suggested that we ask jointly the Court to defer ruling until

24    it could hear in the AFLAC matter.  Ballyrock was not agreeable

25    to that, and I understand their position.

82

1          So, does the Court have any questions?

2          THE COURT:  Not at this moment.  Is there anyone else

3     who wishes to speak to scheduling?

4          MR. WEBER:  Thank you, Your Honor.

5          MR. COHEN:  Good afternoon, Your Honor.  David Cohen

6     with Milbank Tweed Hadley & McCloy here on behalf of the

7     committee.

8          We agree with the Court's direction on the last

9     motion, that the Perpetual and AFLAC matters should be closely

10    coordinated.  We agree with the Court that those cases should

11    be heard together on the same day.  We also agree that the

12    schedule put forward by Mr. Miller with respect to scheduling

13    summary judgment is an appropriate schedule.  It gives the

14    parties time to work through these novel issues.  It gives the

15    Court time to digest these issues.

16         While there may be certain overlap on some factual

17    issues in the Ballyrock case or the Harrier's RACERS case,

18    which are being heard on the 17th, we don't think every

19    adversary or every motion that touches upon these issues needs

20    to be scheduled on the same day.  So we would support a hearing

21    in the Perpetual and the AFLAC matters during the week of

22    October 12th, with the schedule set forth by the debtors.

23         THE COURT:  Anyone else wishes to be heard on this?

24    Mr. Schaffer?

25         MR. SCHAFFER:  Your Honor, Eric Schaffer, BNY

83

1    Corporate Trustee Services.  I have no problem with anything

2    Mr. Weber has said with regard to AFLAC.  I am troubled by the

3    proposed schedule with regard to Perpetual, where the Court

4    understands, we haven't been focused on the merits in any way.

5    We've been focused on some very different issues.  And the idea

6    that we would now have ten days to file a summary judgment

7    motion and memorandum, when we haven't even filed an answer, is

8    certainly troubling.

9         It seems to be inconsistent with giving this Court an

10   opportunity to get things organized, perhaps, with the English

11   Court.  And we may want to join Perpetual, we may want to do a

12   lot of things.  I haven't spoken to my client.  But I do know

13   that hearkening back to when LBSF first came before you with

14   its summary judgment motion on June 3rd, I remember alluding to

15   the argument right before us, and saying we shouldn't be jammed

16   on this.  And you assured that we would have adequate time

17   to --

18        THE COURT:  I remember telling you that you were not

19   going to be jammed.

20        MR. SCHAFFER:  Yes.  And, Your Honor, I think ten days

21   is inappropriate in the context of how the Perpetual case is

22   unfolding.  I don't want to in any way take away from what Mr.

23   Weber has said, but that schedule does not work for us in the

24   context of the Perpetual case.

25        THE COURT:  Okay.  Someone else wishes to be heard.  I

84

1    see another lawyer coming forward.

2         MS. SHANE:   Thank you, Your Honor.  Penny Shane from

3    Sullivan & Cromwell on behalf of Barclays.  I just wanted to

4    confirm that Barclays does, in the Ballyrock matter, oppose

5    very much any further delay, precisely for the reason Your

6    Honor first articulated.  There has been some delay already.

7    We certainly don't want to jam anybody, least of all the Court,

8    but agree with the position that's been stated, that there's

9    very little reason to expect that any overlapping issue would

10   implicate anybody else's rights.  We don't think it's likely

11   the Court will get to those issues.

12        And in that unlikely event that the Court thought on

13   September 17th that an arguably overlapping issue might play a

14   role in the decision, we would ask that the Court consider then

15   what should flow from that in the way of postponing a decision,

16   if that were the way the Court was going.  But we think it's so

17   unlikely, that it would be best addressed at that time.

18        THE COURT:  Okay.

19        MS. SHANE:  Thank you, Your Honor.

20        THE COURT:  Let me just explain my schedule.  I'm the

21   one who's jammed.  And I'm not in a position to hear the AFLAC

22   matter on the 17th of September.  And I also recognize from

23   what has been stated by certain parties that it would be

24   potentially burdensome, especially in the Perpetual case, for

25   BNY to be forced to a definitive argument on a summary judgment

85

1    as early as that.

2         I don't hear much objection to the schedule proposed

3    by Mr. Miller, although it seems to me that that's a schedule

4    that should be consensual to the greatest extent possible.  And

5    so I think it makes some sense, during the lunch break, and

6    we're going to take one before we get to the matter in the LBI

7    case, for those parties who are in court and who are interested

8    in scheduling, to meet and confer about the dates that have

9    been proposed.  And to the extent that there is agreement,

10   fine.  To the extent that there needs to be adjustment, fine.

11   And you can then give me a status report at 2 o'clock on your

12   efforts to reach an agreement on scheduling.

13        I do think it make sense for there to be coordination

14   between the briefing schedule applicable to the Perpetual case

15   and the briefing schedule applicable to the AFLAC case.  If

16   there isn't coordination as to briefing, there should at least

17   be coordination as to the timing of the hearing on those

18   dispositive motions.

19        I will note that the week of the 19th of October is

20   the annual conference of NCBJ, and I will be out for most of

21   that week.  So we can't have oral argument that week.  I will

22   also note, and I'm just saying this for purposes of fair notice

23   to everyone, that I have an unusually crowded docket at the

24   moment with demands for hearing dates that are sometimes

25   driven, not by the consent of the parties, but by the purported

86

1    demands of transactions within particular cases.  For that

2    reason, even though I know that parties to the Ballyrock

3    litigation have already been adjourned once, not at their

4    urging, but at rather the Court's direction, it is conceivable,

5    that even if everybody agrees to a date, that there may be a

6    need to push dates around, just to accommodate and juggle my

7    calendar.

8        I'm going to try to do that minimally, and I'm going

9    to try to respect the dates that you select.  But I'm only one

10   person, and there are many of you.  Let's take a lunch break,

11   and hopefully you'll work out a schedule.  And I'll hear that

12   at 2 o'clock.  We're adjourned.

13   (Recess from 12:46 p.m. until 2:04 p.m.)

14       THE COURT:  Please be seated.  And I want to talk

15   about the scheduling of a conference as well as talking about

16   the schedule for the adversary proceedings that we were

17   discussing before the lunch break.  First of all, has there

18   been some agreement reached on dates, or is there still a

19   disagreement?

20       MR. MILLER:  Your Honor, Ralph Miller.  There is great

21   progress.  I'm not certain whether there's agreement or not,

22   but I'll report what we have learned and see if anybody wishes

23   to speak to the issue.

24       Mr. Schaffer has indicated that if BNY is going to

25   file a cross motion for summary judgment, which he thinks he

1    probably will, but I understand he's not spoken to his clients

2    yet, that he would need until the end of September for that.

3    So if we work off of that schedule, it would look like -- and

4    we did discuss these dates, but I'm then going to give the

5    qualifier on what the problems with that might be -- that would

6    give LBSF filing a summary judgment in AFLAC and BNY filing a

7    summary judgment in the Saphir/Perpetual/Mahogany case, on

8    Friday, September the 25th.  Four weeks later, for joint

9    responses in all cases would be Friday, October 23rd.  Then

10   giving ourselves two weeks and a weekend for replies, would be

11   November the 9th.  And then giving the Court more than a week

12   before the week of the hearing, and we understand there's

13   nothing -- we don't know of anything that's scheduled that week

14   of the 9th, would mean that it could be scheduled the week of

15   the 16th and be heard before Thanksgiving, if the Court had

16   time before Thanksgiving.  If not it could be heard afterward.

17          And that is a schedule that's certainly acceptable to

18   LBSF.  It would obviously need to go through the coordination

19   process.  Our understanding is that there probably -- Mr. Weber

20   may wish to speak about how he -- or not.  And I don't know if

21   Mr. Schaffer wants to speak.  But those are the dates that were

22   discussed with the group.  And at least, they were the

23   proposals of Mr. Schaffer, and they're acceptable to the

24   debtor, LBSF.

25          THE COURT:  Okay.  We're partway there.

88

1          MR. SCHAFFER:  Your Honor, Eric Schaffer for BNY

2    Corporate Trustee Services.  Mr. Miller is accurate in reciting

3    the dates we discussed.  At this point, you'll understand that

4    I can't commit to what, if anything, we might do with regard to

5    Perpetual.  But certainly with regard to the AFLAC case,

6    there's no objection.  Perpetual's a bit of a moving target.

7    And it may very well be that we'll be here in that respect as

8    well.

9          One thing that I mentioned to Mr. Miller and others is

10   that we're dealing with a bit of a moving target based on what

11   has happened in England.  Right now we have a judgment of the

12   High Court that would have noteholder priority effective prior

13   to the filing of LBSF.  That is very significant for purposes

14   of whether there could be an ipso facto issue at all.

15   Obviously, if that decision would be reversed on appeal, it

16   would have us writing a very different brief.

17         Mr. Miller's response was, well you can write in the

18   alternative.  And I think he's right.  But I simply wanted to

19   note that.  And depending upon what applicable English law is,

20   we might have very different arguments.

21         A last point, Your Honor.  I mentioned, I have not

22   been able to reach my client.  It is possible we would be

23   seeking leave to appeal, and I don't want to leave court today

24   without noting that that's a possibility.

25         THE COURT:  I considered everything possible.

89

1          MR. SCHAFFER:  Thank you.

2          MR. WEBER:  Good afternoon, Your Honor.  Rob Weber,

3     from Skadden on behalf of AFLAC.  Without bellyaching too much,

4     we can live with the schedule.  But I do want to note a

5     concern.  Because of the uncertainty in the Perpetual matter

6     with what happens in England, I am a little bit concerned about

7     coupling the two proceedings.  AFLAC has no involvement in the

8     proceeding in England nor in the Perpetual case here.  There

9     are common issues of bankruptcy law in the case here.

10          But to the extent that the scheduling or the timing in

11     the London proceeding or in the Perpetual proceeding gets held

12     up because there are appeals, etcetera, we still think we

13     should be moving ahead in the AFLAC matter.

14          THE COURT:  I understand that.  Here's what I think

15     makes sense.  I think that since you started out by saying

16     you're not bellyaching too much, we should assume that you can

17     at least come up with a provisional schedule that assumes the

18     ability to manage the cases in tandem.  If it turns out that

19     there is a development that makes it unworkable or unfair from

20     the perspective of your client to maintain that schedule, or

21     that there are delays associated with the Perpetual matter, we

22     can make adjustments at that time, or at least we can consider

23     making adjustments.

24          MR. WEBER:  Understood, Your Honor.  Thank you.

25          THE COURT:  Okay.

90

1    MR. WEBER:  One follow-up point.  And I haven't

2   discussed this yet with Mr. Miller, so I hope I don't surprise

3   him too much.  We're not fighting about the entire pot of cash.

4   There's no dispute that the amounts over and above what the

5   debtors claim in this pot of cash comes back to AFLAC.  And

6   given the relaxed -- slightly more relaxed schedule that we're

7   now talking about, I would hope that we could work with the

8   debtors over the intervening weeks to come up with a mechanism

9   to release those excess funds back to AFLAC.

10    THE COURT:  It sounds like it's at least a fruitful

11   topic for discussion and perhaps could lead to a stipulation.

12   But I can't mandate that.

13    MR. WEBER:  Thank you, Your Honor.

14    THE COURT:  Are we done, then, with scheduling, for

15   the time being?  I suggest that some kind of prehearing

16   scheduling order be prepared and submitted.

17    MR. MILLER:  Your Honor, Ralph Miller again.  If it's

18   acceptable with the Court and the parties, we'll then put

19   together an order and circulate it for comments and try to

20   present it to the Court.

21    THE COURT:  That sounds fine.  If the parties wish to

22   be excused, who are involved in the Perpetual and the AFLAC

23   proceedings, that's fine.  They can leave now.  But I did want

24   to also talk about the chambers conference that had been

25   requested.  I think it slipped off my calendar.  And I see Mr.

91

1    Gruenberger here.  I would be inclined to have that conference

2    at your convenience, which may mean taking a break so that we

3    can have that conference, and then we can go to the LBI

4    adversary proceeding.  But I don't want people to be

5    inconvenienced.

6         MR. GRUENBERGER:  Your Honor, Peter Gruenberger, Weil

7    Gotshal & Manges, for the debtors.  I don't think we'll be more

8    than fifteen minutes, Your Honor.  And whenever Your Honor

9    believes best for Your Honor's schedule, we'll do it whenever

10   you'd like.

11        THE COURT:  Let me just ask LBI's counsel and counsel

12   for the landlord in San Francisco for an estimate of time on

13   the argument relating to the motion to dismiss.

14        MR. LUBELL:  I think it will be reasonably brief,

15   under half an hour.

16        THE COURT:  Total?

17        MR. LUBELL:  I think my opening will be ten minutes.

18        THE COURT:  You think under a half hour total?

19        MR. LUBELL:  Yes.

20        MS. GOLDSTEIN:  I think that sounds fair, but in my

21   experience, lawyers tend to underestimate how much time they'll

22   be speaking.

23        THE COURT:  That's true in my experience as well.

24        MS. GOLDSTEIN:  Myself included.  But I think it will

25   be relatively brief.

92

1          THE COURT:  You know what I think makes sense, if it's

2     all right with you?  Let's take a break until 2:30 to take care

3     of the chambers conference.  And then we can release LBHI's

4     counsel and simply proceed with the LBI matter.

5          MR. MILLER:  Thank you, Your Honor.

6          THE COURT:  And I'm going to suggest that we, if it's

7     available, use the large conference room down the hall, 608.

8     Okay.  We're adjourned.

9          (Recess from 2:12 p.m. until 2:36 p.m.)

10          THE COURT:  Be seated.  Let's proceed.

11          MR. LUBELL:  Good afternoon, Your Honor.  Dan Lubell

12     from Hughes Hubbard & Reed for James W. Giddens, trustee of

13     Lehman Brothers Inc.

14          We're here today on the trustee's motion to dismiss

15     the complaint of HWA 555 Owners, LLC, the landlord of the San

16     Francisco premises previously occupied by LBI.  HWA's complaint

17     seeks a declaration that LBI assume the lease of the San

18     Francisco property in connection with the purchase agreement

19     among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB

20     745 LLC and Barclays Capital Inc.

21          The trustee submits that, based upon the well-pleaded

22     allegations of the complaint and the record of this proceeding

23     as to which this Court may take judicial notice, that the

24     complaint should be dismissed because it fails to state a claim

25     upon which relief may be granted for at least three reasons.

93

1    First and foremost, there was neither a motion by the trustee

2    nor an order of the Court approving a standalone assumption of

3    the lease by the LBI estate, as is required by Section 365 of

4    the Bankruptcy Code.  And when I'm talking about a standalone

5    assumption, I assume Your Honor understands I mean an

6    assumption by the estate itself under Section 365(b) as opposed

7    to the less risky assumption and assignment under 365(f), which

8    your sale order did address.

9         Second, HWA lacks rights to enforce the provisions of

10   the clarification letter upon which it relies for a standalone

11   assumption as section 13.9 of the purchase agreement

12   specifically disclaims third-party beneficiary rights and

13   allows under section 13.5 the parties themselves to amend the

14   provisions of their agreement, which the parties did in this

15   case under a waiver agreement filed with this Court.

16        And finally, even if HWA has standing to enforce the

17   clarification letter to compel the trustee to assume the San

18   Francisco lease, as HWA waited until the day the lease was

19   deemed rejected by Section 365(d)(4) to bring its complaint,

20   its time to do so has past.

21        As to the first reason, Section 365(a) of the

22   Bankruptcy Code requires a motion by the trustee and court

23   approval.  It provides, quote, "The trustee, subject to the

24   court's approval, may assume or reject any executory contract

25   or unexpired lease of the debtor," unquote.  Section 365(b)(1)

94

1    is specific that the trustee, quote, "may not assume", unquote,

2    a lease unless the trustee cures any defaults under the lease

3    and provides adequate assurances of future performance under

4    the lease.

5         Moreover, it's well-established law in this

6    jurisdiction under the Second Circuit's Burger Boys decision,

7    93 (sic) F.3d 755, that the trustee's intention to assume or

8    reject an unexpired lease must be made by formal motion filed

9    pursuant to Bankruptcy Rules 6006, 9014 and 9013.

10        The complaint here fails to state a claim because it

11   fails to allege any motion by the trustee seeking a standalone

12   assumption of the lease by the LBI estate.  No notice was

13   provided to creditors, the parties-in-interest of a standalone

14   assumption; no cure amounts were offered by the trustee; no

15   adequate assurances were offered by the trustee.  Indeed, as we

16   demonstrated in our paper, the clarification letter upon which

17   HWA relies for finding an assumption did not even exist at the

18   time the trustee made his application to approve the purchase

19   agreement nor at the time the application was granted by this

20   Court.

21        And for your reference to the record, the trustee's

22   application is docket number 2 in the LBI case; it was dated

23   9/19, September 19th.  The order approving that application,

24   docket number 3, was dated September 20th.  And the

25   clarification letter was not entered into or filed with this

95

1    Court until September 22nd; it's LBI docket number 280.

2            Accordingly, Your Honor, without any notice, motion or

3    intention of the trustee to assume the lease for LBI's own

4    estate at the time of the sale order, the requisite elements

5    for a lease assumption cannot be found.  We believe, Your

6    Honor, a sale order bears that out.  While it has specific

7    provisions dealing with assumption and assignment of leases to

8    Barclays, it has no provisions regarding any standalone

9    assumptions of any contracts, including the lease.

10   Furthermore, it has specific instructions as to contracts that

11   weren't being dealt with immediately by the sale order, which

12   required the parties to come back by separate motion at a later

13   time.

14           We believe that, consistent with the Second Circuit

15   and your own instructions in the sale order, Your Honor would

16   have required a separate motion at a later time with respect to

17   the assumption of the San Francisco lease.

18           I'm fairly confident that by approving the purchase

19   agreement in general, Your Honor was not, by the terms of the

20   sale order itself, purporting to approve any leases that it had

21   not examined.  And, indeed, I've sat in this court enough time

22   to know that Your Honor does not like surprises, but in HWA's

23   view of the world you may be surprised to learn that you

24   purportedly approved an assumption of a lease that had never

25   been submitted to this Court and that you had not actually

96

1    considered according to the dictates of the Second Circuit

2    Orion Picture case.

3           THE COURT:  Let me ask a question about the lease

4    itself.  Did Barclays use the space?  And if so, for how long

5    and pursuant to what agreements?

6           MR. LUBELL:  Barclays did use the space.  It was

7    operating under LBI's right to use the space.  It used it

8    until -- under that, until the lease was deemed rejected in

9    April.  I believe it has -- it's occupying the space still

10   under an agreement with HWA.  And it's only a portion of the

11   space.  I believe the other part of the space was used by an

12   LBHI entity until April when the lease was deemed rejected.

13          THE COURT:  And how much of the space is being

14   occupied?

15          MR. LUBELL:  Roughly half.

16          THE COURT:  And it's being occupied presently pursuant

17   to a direct agreement between HWA 555 or its agent as landlord

18   and Barclays as tenant, or is it being operated under some

19   other agreement that includes a sublease?

20          MR. LUBELL:  I believe it's a direct relationship.

21   There is no sublease agreement.

22          THE COURT:  Okay.

23          MR. LUBELL:  I think that HWA just doesn't want to own

24   up to the distinction between court approval of a contract

25   among contracting parties and a lease assumption order.  The

1    lease assumption that they seek to enforce here is an agreement

2    entered into after the sale order was entered and it plainly

3    states that the trustee shall assume the lease, quote, "in

4    connection with the bankruptcy proceedings", unquote.

5    Moreover, it's an agreement that envisions modifications of the

6    provisions by the parties themselves.

7            I heard the term "moving parts" today, the purchase

8    agreement had several moving parts.  And this was done here, as

9    was documented by the waiver letter filed as part of the record

10   of the proceeding in this case in connection with the trustee's

11   motion to extend his time to assume or reject the San Francisco

12   lease.  I believe it's something you could take judicial notice

13   of as it's in fact part of the purchase agreement and part of

14   the record of the proceedings involving HWA here.

15           And, finally, the purchase agreement disclaims third-

16   party beneficiary rights by approving the purchase agreement.

17   The Court, we submit, was not ordering relief, that it had not

18   been sought, nor changing the terms of the agreement that

19   allowed the parties themselves to modify their agreement and

20   that limited enforcement to the parties themselves.

21           However, even assuming that a landlord has standing to

22   enforce the sale order so as to enforce the purchase agreement

23   as to the now-waived obligation of the trustee under the

24   clarification letter to assume the San Francisco lease with or

25   without a sublease to Barclays, its time to do so has elapsed.

98

1        As I'm sure Your Honor will recall, this is round two

2    of this dispute.  You had previously said to HWA at the time we

3    moved for the extension of our time to assume or reject the

4    lease that it could seek a declaratory judgment that the lease

5    had been deemed assumed.  It's noteworthy that HWA waited until

6    the lease had actually been deemed rejected under Section

7    365(d)(4) before it filed its complaint here.  So, Your Honor,

8    even if a third party may enforce the purchase agreement

9    through the sale order, HWA's time to do so has now lapsed.

10        In sum, as the trustee never sought a standalone

11    assumption of the lease; as this Court did not approve the

12    assumption of the lease by the LBI estate; as HWA does not have

13    third-party rights to enforce the purchase agreement; as

14    Barclays, the actual counterparty to the purchase agreement,

15    has waived the requirement of the trustee to assume the lease;

16    and as the time to assume the lease has expired, we believe

17    that there are multiple reasons why this complaint fails to

18    state a claim on which relief may be granted and why it must be

19    dismissed.  Thank you, Your Honor.

20        THE COURT:  Thank you.

21        MS. GOLDSTEIN:  Good afternoon, Your Honor.  Stephanie

22    Goldstein from Fried, Frank, Harris, Shriver & Jacobson, for

23    HWA Owners; it's an affiliate of Vornado, and that is in fact

24    the landlord for the space in California.

25        Just before I get to my overall presentation, I did

99

1    want to clarify an issue with respect to Barclays' current use

2    of the space.  In fact, the clarification letter that's dated

3    as of September 20th, and specifically referencing Your Honor's

4    sale order, specifically deals with Barclays' entitlement to

5    use the space.  As I'm sure Your Honor recalls, there's a

6    provision that deals with one assumption of a number of leases,

7    the one in San Francisco being assumed and not assumed and

8    assigned, and I'll get back to that language.  There's then a

9    second provision in the clarification letter that provides that

10   Barclays and LBI would, and the language is actually "shall",

11   enter into a sublease with respect to the premises.  And then

12   there's about another half a page dealing with Barclays' right

13   to continue to use the space, pending the parties' -- and

14   that's Barclays' and LBI's -- entry into a sublease agreement.

15        So following the entry of the sale order, Barclays

16   continued to use space at 555 California Street in California,

17   in San Francisco.  They used one of two floors in that

18   building; Neuberger Berman was in the other space on the other

19   floor.  And their right to use the floor was specified and laid

20   out in the clarification order.

21        As alleged in the complaint, there never has been a

22   sublease entered or presented to the landlord for approval.  A

23   sublease satisfactory to the landlord is a requirement of the

24   underlying lease.

25        Subsequent to the deemed rejection date in this

100

1    proceeding, and because Barclays wanted to continue to use the

2    space, we entered into a contingent license agreement with

3    Barclays that provided if the lease had been rejected as a

4    result of the proceedings before Your Honor, they would have a

5    separate independent right to remain in the premises separate

6    from the clarification letter.  That wasn't part of the

7    complaint, but it's come up.  We're happy to present you with

8    that underlying license agreement if you find it necessary.

9          THE COURT:  Let me just understand one aspect of what

10   you last said.  The license agreement is between HWA 555, your

11   client, and Barclays?

12         MS. GOLDSTEIN:  That's correct, Your Honor.

13         THE COURT:  And when was it entered into?

14         MS. GOLDSTEIN:  On April 17th.

15         THE COURT:  And the deemed rejection date of the lease

16   is what date?

17         MS. GOLDSTEIN:  I believe it's April 9th.

18         MR. PFEIFFER:  April 17th, Your Honor.

19         MS. GOLDSTEIN:  April 17th, sorry.

20         THE COURT:  So on the very same day that the lease is

21   deemed rejected, two nondebtors enter into an agreement

22   relating to the occupancy of the space, and that's in lieu of

23   the lease, is that right?

24         MS. GOLDSTEIN:  It's contingent.  So if in fact as a

25   result of the proceedings the lease had been assumed by the

1  estate and there would be a separate sublease, that would be an

2  alternative.  But I think the concern was whether or not

3  Barclays had a right to continue to use the space, which they

4  needed to continue to do, and the landlord was happy to comply

5  with their request to continue to use the space, provided that

6  their right to use the space was not intended to be an argument

7  about whether or not -- the effect of the sale order as it

8  related to the lease in its totality.

9       THE COURT:  All right, and what's the term of the

10  sublease -- excuse me, of the sublease -- of the license?

11      MR. PFEIFFER:  Brian Pfeiffer from Fried Frank, Your

12  Honor.  It expires at the end of August.  And, again, just to

13  step back --

14      THE COURT:  At the end of this month?

15      MS. GOLDSTEIN:  Correct.

16      MR. PFEIFFER:  At the end of this month.

17      THE COURT:  Okay.  And then if it expires within days,

18  do the parties contemplate that it will be extended?  Are there

19  negotiations underway relating to continued occupancy and use

20  of the premises?

21      MS. GOLDSTEIN:  Yeah, Your Honor, our client is

22  continuing to have a dialogue with Barclays about continued use

23  of the space, and it's hopeful something -- some form of

24  arrangement can be reached.  Those conversations are ongoing,

25  and like all of those types of things they remain fluid.

102

1          THE COURT:  Okay.  Understood.  I just was trying to

2     understand the on-the-ground view of this property.

3          MS. GOLDSTEIN:  We're trying to reach a constructive

4     result.

5          I want to return, having answered the questions, those

6     questions, to what got us here to begin with, or at least what

7     put the ball in motion, and going back to almost a year ago now

8     when the Barclays-Lehman deal was presented to this Court for

9     approval.  And our very strong view on this is that in this

10    case LBHI made a motion to approve the asset purchase

11    agreement.  At that time, the lease affecting the San Francisco

12    property was going to be assumed and assigned to Barclays.

13    Subsequently, after the SIPC proceeding commenced, the trustee

14    obviously -- the trustee for LBI joined LBHI's motion and

15    sought approval as well of the asset purchase agreement.

16         Your Honor obviously recalls more than I, because I

17    wasn't here, but that following the hearing there was a

18    clarification letter as of September 20th that was entered

19    into.  And with respect to the lease affecting the San

20    Francisco property, the language was slightly changed from what

21    was originally envisioned in terms of there being an

22    assignment, an assumption and then assignment of the lease in

23    California.  And, instead, the language that was put in there,

24    which I just referred to, and probably discussed at some length

25    before, was that on the closing date, and the clarification

1    letter is quite specific that it's a reference to "on the

2    closing date", but the precise language is "Notwithstanding

3    anything to the contrary contained in Sections 4.2(d), 4.3(c),

4    8.14 or any other provisions of the Agreement with respect to

5    the Leased Premises located in (i) 555 California Street, San

6    Francisco, California," and I'll skip over the reference to the

7    other leases, "the Parties agree as follows:  (a) as

8    contemplated in the Agreement, on the Closing Date," and then

9    there's (i) dealing with three other leases in other cities.

10   And then it says, "and (ii)", quote, "the underlying lease

11   affecting the San Francisco Property shall be assumed by Seller

12   in connection with the Bankruptcy Proceedings."  And that's the

13   precise and exact language that was in the clarification

14   letter.  So -- and then we talked about the sublease

15   provisions, et cetera, that went on after that.

16        THE COURT:  One of the problems with language,

17   especially when we're trying to find its plain meaning, is that

18   sometimes it isn't so plain.  And I'm struggling with "shall be

19   assumed", which is different from "shall be assumed pursuant to

20   the Sale Order" or "shall be deemed assumed pursuant to the

21   Sale Order", both of which are references to the order that was

22   entered on September 20th, versus "shall be assumed", meaning

23   something to be done in the future pursuant to some other

24   motion practice in the bankruptcy court, which never took

25   place.

104

1        So how do you conclude that it's an actual assumption

2    pursuant to the sale order as opposed to an undertaking to do

3    something in the future that was never done?

4        MS. GOLDSTEIN:  A couple of answers to that, Your

5    Honor.  With respect to the leases respecting the other

6    properties, and I understand there are different issues there

7    as well, it also uses that same language, which is "shall

8    assume".

9        Additionally, with respect to what qualifies that,

10   it's not just a standalone provision that says "it shall be

11   assumed in connection with the Bankruptcy Proceedings".  What

12   qualifies it is the language that precedes it which says "on

13   the Closing Date", which as I read that is that it's specifying

14   a point in time when something is going to happen as opposed to

15   reflecting something that had optionality attached to it.

16       And when you look at the other provisions in the

17   clarification letter dealing with the leases, and I'm referring

18   to the PIM B business leases that come in paragraph 22, it

19   specifically refers to optionality, to whether or not people

20   can choose to assume and assign agreements later, some that

21   would only be assumed and wouldn't be subsequently assigned.

22       But there are specific provisions in the clarification

23   letter that draw a distinction between something saying "on the

24   Closing Date, this is what shall happen" and then having

25   separate provisions in the clarification letter just a couple

105

1    of paragraphs later that actually go on to say "We shall have

2    the option and that reflect conditionality."

3              And so I think it's laid out in our briefs that we

4    then say yes, the terms and -- all of the conditions of the

5    purchase agreement will become effective, and that's a little

6    bit of a summary and not the language there.  But basically I

7    think the fact that it does reference and tie back to the

8    closing date, and I think, in the context of what was happening

9    at the time, it wasn't as if this was not thought about.  It's

10   specified quite precisely in the clarification letter.  And the

11   San Francisco lease was obviously being thought about from the

12   outset of this transaction because it's referenced in the asset

13   purchase agreement as well when it was going to be assumed and

14   assigned to Barclays.

15             But I think the clarification letter in the

16   negotiations, it gave Barclays the right to use that space

17   following the closing of the transaction, which everyone knew

18   was imminent.  And the fact that it says on the closing date

19   the lease shall be assumed, everyone knew the closing date was

20   coming fast and furious, that we weren't -- no one was waiting

21   six months to get antitrust approvals or all sorts of other

22   approvals that sometimes are necessary in other types of

23   transactions.

24             THE COURT:  Well, a variety of mistakes were made in

25   the heat of the moment last September, and several motions were

1    presented in the months that followed, seeking to cure mistakes

2    that were made in the listing of executory contracts that were

3    supposedly closing-date contracts.  There was a computer error

4    alleged by Cleary Gottlieb in connection with a post-closing

5    adjustment.  There was litigation with American Express

6    concerning whether or not a particular contract was in fact

7    assumed and assigned.  And that's understandable because a

8    tremendous amount of work was being done during a crisis over

9    just a few days.

10           Was this lease ever expressly listed in a decretal

11   paragraph of any order of the Court?

12           MS. GOLDSTEIN:  It is not expressly listed in a

13   decretal paragraph.  It is listed on the schedules to the asset

14   purchase agreement, and it's listed on schedules to the

15   clarification letter, but it's not specifically referenced in

16   the order.

17           THE COURT:  One of the problems, I think, with the

18   clarification letter is that my best recollection is I never

19   approved that.  My recollection is that it was entered into

20   either the Monday or the Tuesday following the weekend when the

21   transaction was closing.  And a variety of issues arose in

22   respect of the clarification letter during the period

23   immediately following the closing, but it was never actually

24   made the subject of a formal motion that it be approved,

25   although it was a long time ago.  So if you have either a

107

1    better recollection or have checked out what the docket

2    reflects, I'll be happy to hear what you have to say, but my

3    recollection is that I never approved it.

4         MS. GOLDSTEIN:  Your Honor, I wasn't here so I can't

5    comment.  I do know that in the order that approves the sale

6    transaction it does refer to and it defines the purchase

7    agreement as including the asset purchase agreement.  There was

8    a first amendment and then the clarification letter.  My

9    understanding from some of my colleagues is that some of the

10   terms of the clarification letter were discussed in court over

11   that Friday, that marathon --

12        THE COURT:  We've had a lot of hearings that have

13   touched on the sale to Barclays, both contemporaneously and

14   after the fact, and the clarification letter obviously will

15   speak for itself and it's not in evidence other than through

16   judicial notice at this point, but it is my recollection that

17   it was entered into after the closing, during the business days

18   that followed, and that it was never the subject of a separate

19   motion for court approval.  To the extent that it was somehow

20   obliquely referenced in transaction documents doesn't

21   necessarily mean that it's the subject of a formal court order.

22   And that's one of the problems that I'm having with your legal

23   position, which is, as argued by the trustee, there really is

24   no freestanding motion to assume the lease at 555 California

25   Street, nor is there an omnibus motion to assume leases.  It's

108

1    hard to connect the dots.

2         And so I'm going to listen carefully to your argument,

3    but one of my concerns here is that there is actually no clear

4    court order that covers this lease.  And it becomes difficult

5    as a result, in the face of the trustee's objection, to

6    demonstrate that this was in fact assumed.

7         MS. GOLDSTEIN:  Well, I hear you.  And many of our

8    arguments, quite frankly, are teed off the fact that the

9    purchase agreement and the order approving the sale transaction

10   is defined to include the clarification letter.  And, quite

11   frankly, everyone operated, at least on our end, after the fact

12   in letting Barclays continue to use the premises on the

13   assumption that the terms of the clarification letter were part

14   of that purchase agreement and that it gave the Barclays

15   employees a right to use that space.

16        You know, the other arguments do come from the fact of

17   whether or not -- and they're laid out in our briefs, so I

18   won't belabor them now.  We do believe it was assumed.  We do

19   believe the clarification order, in terms of the clear language

20   provided in that, knew how to contemplate future action when it

21   was necessary.  And that's following the closing of the

22   transaction.  It was quite some time before we heard that LBI

23   was taking a different position with respect to the lease

24   that's currently at issue.

25        We also believe --

1        THE COURT:  So one of the questions I have, and this

2    really isn't addressed to you as much as it is to the people

3    who are sitting in the courtroom, is there anybody here who is

4    representing the interests of Barclays?

5        Apparently not.

6        What's concerning to me is that there's this very

7    technical legal argument being made by the LBI trustee and by

8    you with regard to what parties contemplated last September at

9    the time of the sale transaction.  Barclays has been using the

10   space.  And since April, you've told me, Barclays has been

11   using the space by private agreement with HWA 555.

12       So the real parties-in-interest here as it relates to

13   the use and occupancy of the space are the landlord and, in

14   this instance, the contingent licensee.  I presume your

15   position is they're either there because the lease was assumed

16   or they're there pursuant to the license agreement, but they're

17   there and they're paying rent, or something in lieu of rent,

18   which is acceptable, at least for the time being, to your

19   client, correct?

20       MS. GOLDSTEIN:  For the time being, Your Honor,

21   they're using one of two floors; they're not using all of the

22   space.  So it impacts half of the overall -- of the lease.

23       THE COURT:  Well, I understand, but what I'm finding

24   baffling here is that the party potentially to be adversely

25   affected by the conclusion that the lease is assumed is

110

1    Barclays, I presume, since they're the ones that would be using

2    the space pursuant to the assumed lease because they allegedly

3    bought the right to use it.  Why aren't they here?  Where have

4    they been in all this?

5         MR. LUBELL:  If you recall, Your Honor, this issue did

6    come up at the time we moved to extend our time to assume or

7    reject the leases.  Barclays did put in papers to the effect

8    that a standalone assumption had not been done and that it was

9    in fact in this waiver letter, the intent of the parties, that

10   it would be done by separate motion, and that it was in fact

11   waived if they weren't going to order us to assume it by April

12   17th.

13        This is an adversary complaint that was brought; they

14   weren't named as a party in the complaint itself.  If HWA were

15   to prevail on the complaint, it would make the LBI estate

16   liable for the entire space for the entire two years, that it's

17   an administrative expense, which is something that was never

18   addressed in any of the motions to approve the purchase

19   agreement.

20        And at least in the trustee's motion, the

21   clarification letter was not in the trustee's motion or in the

22   form of order that he was seeking to approve.  There was a

23   mention of it that did get slipped in into the one that was

24   entered in the LBHI case that you were approving the purchase

25   agreement, which included the clarification letter.

111

1          But we still say that HWA does not have the right to

2     enforce that agreement by the terms of it and that under that

3     agreement, as you pointed out, we were supposed to, if Barclays

4     made us, assume the lease in connection with the bankruptcy

5     proceedings.  But like many things else, it was all a moving

6     target that the parties agreed to modify and which they

7     modified in writing.  And the obligation, from our point of

8     view, disappeared.  And from HWA's point of view, there had

9     never been a motion to approve a standalone assumption of this

10    lease.

11         And your sale order only addressed assumption and

12    assignment of leases to Barclays, which from the LBI estate

13    really has the effect of releasing us from liabilities, not

14    imposing ten million dollars and two years' worth of

15    liabilities on the estate, which is quite a different issue and

16    which was never addressed with the Court at the time it entered

17    its order.

18         THE COURT:  I appreciate that explanation, but I still

19    don't understand why Barclays isn't here to be heard.  I

20    recognize this is an adversary proceeding between the trustee

21    of LBI and HWA 555 as landlord, but it directly affects

22    Barclays' use and occupancy of at least one floor at this

23    location in San Francisco.  They're well aware of the fact that

24    there's a dispute concerning this because they entered into a

25    private agreement with the landlord relating to the occupancy

112

1    of this space that had presumably, although it's not before me,

2    as one of its contingencies the fact that there's this dispute

3    over lease assumption.  They don't care.  You haven't sought

4    indemnity from them.  You haven't sought to involve them.  I

5    don't get this.  I don't understand how the LBI trustee --

6              MR. LUBELL:  I believe --

7              THE COURT:  -- could be on the hook for millions of

8    dollars relating to a transaction that you had nothing to do in

9    designing.

10             MR. LUBELL:  I believe we may have some agreement with

11   Barclays in terms of, if the lease were deemed assumed, that

12   they would still be obligated to the sublease in the

13   clarification letter.  But as I say, this is something that HWA

14   is trying to enforce in essentially an agreement among the

15   contracting parties that, according to your sale order and

16   according to the agreement itself, allowed for modification and

17   which was in fact modified.

18             THE COURT:  You just told me two very inconsistent

19   things in the last five minutes.

20             MR. LUBELL:  Okay.

21             THE COURT:  I just want to be sure I know what's

22   right.  On the one hand you told me that the estate of LBI

23   would be exposed to millions of dollars of unintended liability

24   associated with the assumption of this lease, and on the other

25   hand you told me that there's some kind of back agreement with

113

1    Barclays that in the event that happens Barclays is

2    responsible.  Which is it?

3          MR. LUBELL:  Well, but you've got to recall, Your

4    Honor, that the lease -- the Barclays space is only half the

5    lease.  So when I say that it's ten million dollars, five

6    million dollars, you know, would relate to the sublease.  And

7    there was some formula in there.

8          And I believe, in connection with one of our last

9    lease rejection -- extension rejection motions, that there was

10   some provision that did deal with this contingency, if this

11   came up, that gave the LBI trustee some recourse against

12   Barclays.  I mean, we are in a strange situation too where they

13   proceeded with a sublease of what they're saying is still

14   property of the estate and the like, which to me suggests that

15   they don't believe it themselves that there's an ongoing lease.

16         THE COURT:  Well, just so it's clear, I heard it

17   described as a license, not a sublease.

18         MR. LUBELL:  Right, but it's essentially using what

19   they're saying is our space that we assumed.

20         THE COURT:  Well, that document's not in front of me;

21   we don't need to spend a lot of time on it.

22         MR. LUBELL:  Okay.

23         THE COURT:  I was just trying to confirm --

24         MR. LUBELL:  Okay.

25         THE COURT:  -- the term that you used.

114

1            MR. LUBELL:  I really think the point is that, you

2      know, there were motions here to assume and assign leases, that

3      there was no termination by the trustee to proceed with a

4      standalone assumption of the lease.  They did enter into an

5      agreement after the Court approved the purchase agreement in

6      our proceeding.  It did say we would -- shall assume the lease

7      in connection with the bankruptcy proceedings.  The parties

8      continue to negotiate about that and about many other things.

9            And we never brought a formal motion.  You never

10     entered a formal order.  They -- you know, I heard it referred

11     to as a clarification order, but it's just an agreement among

12     the parties that didn't give them any rights to enforce it,

13     that gave us the right to modify it, which we did, and that

14     when they did come around to seek to enforce it, it was the day

15     that the lease was in fact deemed rejected and it was the day

16     that they seemed to have entered into their license agreement

17     there.

18            And I think all those facts together require dismissal

19     of the complaint because there was not a standalone assumption

20     of the lease by the LBI estate.

21            THE COURT:  Okay, well, you ended up getting two bites

22     at the apple because I was in the middle of hearing from HWA

23     555's counsel.  As a point of clarification, you came up, we

24     had some colloquy, and you've now made a second argument why

25     you should win.  I think I should give landlord's counsel an

115

1    opportunity to --

2            MR. LUBELL:  That's fine.  That's fine.

3            THE COURT:  -- push back.

4            MR. LUBELL:  Okay.  And there goes our half hour.

5            MS. GOLDSTEIN:  That's why I always say that the time

6    estimates are usually incorrect.

7            Just reflecting as I was listening, and also on Your

8    Honor's point about, sort of, technical arguments on both

9    sides, and I think this goes back to Burger Boys and the

10   substance of Burger Boys, which is that yes, you need a motion,

11   but nothing in Burger Boys dictates the type of motion that has

12   to be presented or what it has to actually say.

13           The point of it, and it's made perfectly clear in

14   Burger Boys, is that the party is to give opportunity to the

15   landlord to be heard.  Here we had an opportunity to be heard;

16   we were here.  And I use "we" because it wasn't me; my

17   colleagues were here at the time of the sale order.  There was

18   an opportunity to be heard if there was an issue with respect

19   to the assumption.  LBI happened to be up to date on its

20   payments on the lease, so there was really nothing for us to

21   complain about at the time.

22           And so I think the whole flavor of Burger Boys and

23   what that's intended to address is that unfairness to the

24   landlord and being deprived of the opportunity to object to a

25   motion to assume is not the situation Your Honor was presented

116

1    with here.

2          We are mindful, obviously, that there was a lot going

3    on at the time, and a lot of people were working incredibly

4    hard to try to ensure that the sale to Barclays would take

5    place.  The one thing that remains somewhat mystifying to me

6    and unanswered in my mind is with respect to the clarification

7    letter, which is how language that said "On the Closing Date,

8    the lease affecting the San Francisco Property shall be assumed

9    by Seller in connection with the Bankruptcy Proceedings" was

10   put in followed by a page and a half discussing subleases and

11   the requirement of the parties to enter into subleases and the

12   use of the underlying premises in the interim.  It was clearly

13   something that was thought about at the time, and we clearly

14   relied on it following the sale to Barclays.

15         With respect to the waiver letter, I think we all --

16   all of it returns to the same point that we were talking about

17   earlier, which is what is the impact of the Court's order.

18   Insofar as the court order, which has specific provisions

19   providing that all of its provisions of the asset purchase

20   agreement, which is defined to include the clarification

21   letter, are being approved and the debtors were supposed to

22   take actions to effectuate the provisions of those agreements,

23   insofar as the order effectuated the assumption of the lease,

24   which we believe was the case, based on the language in the

25   transaction documents, there's nothing for the parties to waive

117

1    after the fact.

2         And, in fact, there are a number of cases that look

3    quite skeptically at parties who after the fact tried to modify

4    obligations to say something, saying -- and that's the Delta

5    case and the Chabor (ph.) case that are cited in our papers --

6    saying you have to look most skeptically when after the fact

7    people are offering interpretations about what the intent was

8    at the time.  We don't think the waiver letter complies with

9    paragraph 26, in any event, of the sale order because I

10   don't -- LBHI hasn't approved it, and neither has the

11   creditors' committee.  It was an agreement signed only by

12   Barclays and by LBI.

13        So we think -- for all of those reasons, we believe

14   the lease was assumed in connection with the sale order.  We

15   think that if there's any doubt as to what the trustee intended

16   at the time and what they were thinking about as between LBI

17   and Barclays, the proper approach is to conduct discovery,

18   which could be limited to particular issues as to the lease at

19   that point in time and what was contemplated as to the lease

20   and as between LBI and Barclays, so that we have a clear

21   picture of what truly was intended as opposed to after-the-fact

22   rationalizations about what was intended.

23        As to the argument my colleague here raises about now

24   that we've waited too long, that was never an argument that

25   they've raised before this argument.  So I think it's not

118

1    properly subject to consideration.  As I reflect on it before

2    Your Honor, though, we were working with people, we were trying

3    our best to get things resolved in a way that would be most

4    productive for the estate and for our client and all concerned.

5    We obviously took until as much time as we thought was

6    appropriate in the hope that we wouldn't need to burden the

7    Court with this issue.  Unfortunately, that didn't come to

8    pass, which necessitated the filing of the adversary complaint,

9    but it was filed before the deemed rejected date and we think

10   it's proper for consideration by the Court.

11          If you have no other questions --

12          THE COURT:  I actually have a question for counsel for

13   the trustee.  And it's just, in part, a function of the passage

14   of time and my lack of direct recollection of something.  Were

15   any leases assumed in connection with the sale order itself?

16          MR. LUBELL:  Standalone assumption, no.

17          THE COURT:  No, I'm not -- that's not my question.  My

18   question is --

19          MR. LUBELL:  Were they assumed and assigned to

20   Barclays?  Yes.

21          THE COURT:  Let me start over.  The principle argument

22   that I hear being made by counsel for HWA 555 is that the

23   transaction documents, when read together with the order --

24   actually, orders, plural -- approving the sale to Barclays on

25   September 20th constitute an assumption by the trustee of the

119

1      lease at 555 California Street in San Francisco.  My question

2      is whether there are any leases which were in fact assumed in

3      accordance with that order, and if so, what leases are they and

4      is Barclays occupying premises pursuant to such leases?

5              MR. LUBELL:  Your Honor, there were several leases, by

6      the specific terms of your order, that were assumed and

7      assigned to Barclays under 365(f), and Barclays presumably are

8      occupying those leases.  I think originally the San Francisco

9      lease may have been on that list, but it was specifically

10     excluded as one of the leases to be specifically assumed and

11     assigned to Barclays.  And -- well, that's the answer to your

12     question.

13             So, no, this specific contract was not assumed and

14     assigned to Barclays, nor was there any standalone assumption

15     by the trustee.  I think that's the point of Burger Boys, that

16     you need to find that intention in the motion to approve.

17             And in the liquidation context, I think it's important

18     that it's not just the landlord who has a concern here, as in

19     the assumption and assignment context, but the whole estate

20     about taking on a ten million dollar liability two years when

21     you're liquidating.

22             There was supposed to be a -- I mean, we're getting a

23     little far afield, but this idea of a sublease, I believe, was

24     initially rejected by HWA when they were approached about it

25     and then was one of the reasons why there never was any push to

120

1    proceed with the sublease.

2         In terms of reliance, there couldn't really be

3    reliance because there was never a standalone motion to --

4    never a motion to approve a standalone assumption of the lease.

5    And like I've -- I don't mean to be repetitive, but we did have

6    the right in the agreement that you approved to modify that

7    agreement, and this is the whole purchase agreement itself, and

8    we did have the right.  And third parties were not to have the

9    right to essentially tell us that we have to assume after the

10   parties have agreed that was not necessary, and especially now

11   when Barclays has made its own arrangements with the landlord.

12        I also don't believe in the sale order, the form of

13   the sale order that we sought approval for in this proceeding,

14   that there was any requirement that LBHI or the creditors'

15   committee agreed to any modifications of agreements between

16   Barclays and ourselves.  You won't find that in the form of the

17   approval order, just like you won't find any reference to the

18   clarification letter.  And even if LBHI and the committee

19   needed to consent, I believe you could find their consent when

20   this issue was raised back when we were seeking further time to

21   assume or reject the lease and extension of time to assume or

22   reject the lease.

23        THE COURT:  I have a question for counsel for the

24   landlord.  You mentioned discovery.  What discovery would you

25   need and what discovery is pertinent to this dispute?

121

1          MS. GOLDSTEIN:  I think the pertinent discovery

2    relates to the communications between the debtors and Barclays,

3    and I'm not saying lumped together but around the time of the

4    sale transaction and the negotiations with respect to the lease

5    in San Francisco and the discussions after the fact with

6    Barclays about the sublease.

7          Mr. Lubell referred to -- or stated that HWA was not

8    amenable to a sublease.  That is not accurate.  I don't know

9    where that comes from.  And that certainly is not the case.

10   But clearly those would be the two main categories of discovery

11   that I think would be appropriate with respect to the issues

12   here, which I think are quite straightforward.

13         THE COURT:  Okay.

14         The trustee has presented a very strong motion to

15   dismiss, but notwithstanding that, I'm not going to grant it

16   today and would urge that instead it be converted into a motion

17   for summary judgment to be presented on a future date following

18   the taking of such discovery as is appropriate under the

19   circumstances of this case.

20         Now, in making this proposal, I am mindful of the

21   Second Circuit's recent decision in the Dana case in which, in

22   the context of a claim objection, the district court and the

23   bankruptcy court were reversed because of a failure on the part

24   of the bankruptcy court to permit requested discovery.  That's

25   not to say that every time a party requests discovery that the

122

1    discovery is appropriate.  Nor is it true that every time a

2    party requests discovery that it's a reason not to grant an

3    otherwise strong motion to dismiss as a matter of law.  But

4    there are aspects of this argument that trouble me.  One of the

5    things that troubles me is that Barclays isn't here and that

6    there seems to be a real party-in-interest, with real economics

7    and real interest in the space, apparently relying on LBI to do

8    its dirty work.  That may or may not be the case, but that's

9    the appearance.

10         It's also not at all clear to me what the actual

11   consequences to the LBI estate will be if the lease is deemed

12   assumed versus the lease is deemed rejected.  When I asked some

13   questions about that, counsel provided some answers but they

14   were general in nature:  Ten million dollars went to five

15   million dollars.

16         I also don't understand the circumstances surrounding

17   Barclays' waiver of whatever rights it had under the

18   clarification letter.  And the clarification letter is one of

19   the most incorrectly named documents ever written.  It's just

20   not that clear, and never was.

21         So while I totally agree with the notion that it takes

22   a motion in order to assume a lease, it's not clear to me

23   whether or not, in all of the pushing and shoving that was

24   going on last September, there was or was not an intention to

25   sweep this lease into the sale transaction.  There may or may

123

1    not have been.  And the fact that the option was included to

2    assume this lease in the clarification letter suggests that

3    Barclays may have wanted to retain the option, but that's not

4    clear to me either.

5         So I'm not granting the motion to dismiss, nor am I

6    denying it.  I'm going to permit the parties to enter into a

7    stipulation to take reasonable discovery, not burdensome

8    discovery, and that when such discovery has been completed the

9    parties may submit supplemental briefing, to the extent

10   necessary, that references that discovery.

11        And the motion to dismiss will be converted into a

12   dispositive motion.  There'll be no need to file an answer.

13   And I am assuming that there will be no need for a trial.  This

14   is a summary matter.

15        Mr. Lubell?

16        MR. LUBELL:  I just think that Burger Boys is your

17   bright-line test.  There's either --

18        THE COURT:  Why don't you stand up if you're going to

19   be speaking to the law?

20        MR. LUBELL:  I was going to say Burger Boys is your

21   bright-line test as to whether there was a motion to -- for a

22   standalone assumption of the lease.  And under that, no

23   matter -- I mean, that's a fact you could look into the record

24   on already.  I mean, we were in this case all of one day when

25   the sale order was granted.  I'm not sure that going over

124

1   discovery after that point is going to change the fact that

2   there was never a motion.

3        THE COURT:  Look, I'm not a fan of needless discovery,

4   nor am I a fan of needless litigation, but a number of things

5   have happened in the last eleven months as it relates to the

6   sale transaction:  One is that special counsel for LBHI, Jones

7   Day, has come forward to take 2004 discovery relating to

8   whether or not Barclays did everything it was supposed to do in

9   connection with the original deal.  It's within that setting

10  that when questions are raised as to whether parties have done

11  the right thing I look closely.

12       MR. LUBELL:  Okay.  I understand, Your Honor.  I was

13  just hoping to --

14       THE COURT:  And there were enough moving parts at that

15  time.  The questions relating to the intent of the parties,

16  including Barclays, not here, as it relates to this lease,

17  represent issues that I'm concerned about, and I think that

18  some discovery may be appropriate.  I'm hardly directing it,

19  and it shouldn't be a fishing expedition.  If the parties

20  determine that discovery is either limited in nature or

21  unnecessary, and as a result with letter briefs you can simply

22  advise me as to what the status is, there's no need to further

23  argue this; I'll consider it on the papers.  But I'm holding

24  the motion to dismiss in abeyance pending the completion of

25  discovery, and it shouldn't take a lot of time.

125

1          MR. LUBELL:  Okay, Your Honor.  I understand.

2          THE COURT:  I'd like to think that it would be

3    concluded within no more than sixty days.

4          MR. LUBELL:  Thank you, Your Honor.

5          THE COURT:  Is there anything more?

6          We're adjourned.

7       (Proceedings concluded at 3:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

126

1

2                          I N D E X

3

4                        R U L I N G S

5                                          PAGE LINE

6    Motion to dismiss the litigation is denied     73    10

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

127

1

2                    C E R T I F I C A T I O N

3

4      I, Esther Accardi, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

       ESTHER ACCARDI (CET**D-485)

8      AAERT Certified Electronic Transcriber

9

       Also Transcribed By:    Clara Rubin (CET**D-491)

10

11

       Veritext LLC

12

       200 Old Country Road

13

       Suite 580

14

       Mineola, New York 11501

15

16

       Date: August 12, 2009

17

18

19

20

21

22

23

24

25