# EXHIBIT A

# LOAN AGREEMENT

Dated as of September 5, 2007

Between

**A/P HOTEL, LLC,**
as Borrower

and

**LEHMAN BROTHERS HOLDINGS INC.,**
as Lender

THE ATRIUM SUITES LAS VEGAS HOTEL
(TO BE KNOWN AS THE PARADISE BOUTIQUE HOTEL)
4255 SOUTH PARADISE ROAD
LAS VEGAS, NEVADA

OHS East:160274726.8
1-414050

## TABLE OF CONTENTS

Page

I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ................................. 1

Section 1.1    Definitions ........................................................................ 1

Section 1.2    Principles of Construction.................................................... 29

II. GENERAL TERMS.................................................................................... 29

Section 2.1    Loan Commitment; Disbursement to Borrower ..................... 29

2.1.1    Agreement to Lend and Borrow ......................................... 29

2.1.2    Origination Fee; No Re-Borrowing ..................................... 29

2.1.3    The Note, Security Instrument and Loan Documents................ 30

2.1.4    Use of Proceeds.......................................................... 30

Section 2.2    Interest; Extension Option; Loan Payments; Late Payment
Charge.......................................................................... 30

2.2.1    Payments..................................................................... 30

2.2.2    Interest Calculation ....................................................... 31

2.2.3    Eurodollar Rate Unascertainable; Illegality; Increased Costs ........ 31

2.2.4    Payment on Maturity Date ............................................... 34

2.2.5    Payments after Default.................................................... 34

2.2.6    Late Payment Charge...................................................... 34

2.2.7    Usury Savings .............................................................. 35

2.2.8    Indemnified Taxes ......................................................... 35

Section 2.3    Prepayments.................................................................. 36

2.3.1    Voluntary Prepayments.................................................... 36

2.3.2    Mandatory Prepayments .................................................. 37

2.3.3    Prepayments After Default ............................................... 37

2.3.4    Making of Payments ....................................................... 38

2.3.5    Application of Prepayments ............................................... 38

Section 2.4    Interest Rate Cap Agreement ............................................. 38

Section 2.5    Conditions Precedent to Closing.......................................... 40

Section 2.6    Subsequent Advances ..................................................... 45

Section 2.7    Borrowing Procedures ..................................................... 53

Section 2.8    Funds Advanced............................................................. 55

OHS East:160274726.8
1-414050

-i-

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| Section 2.9 | Reallocations | 55 |
| Section 2.10 | Change Orders | 56 |
| Section 2.11 | No Reliance | 56 |
| Section 2.12 | Release on Payment in Full | 56 |
| III. | CASH MANAGEMENT | 56 |
| Section 3.1 | Establishment of Accounts | 56 |
| Section 3.2 | Deposits into Deposit Account | 57 |
| Section 3.3 | Account Name | 58 |
| Section 3.4 | Eligible Accounts | 58 |
| Section 3.5 | Permitted Investments | 58 |
| Section 3.6 | The Initial Deposits | 59 |
| Section 3.7 | Transfer of Funds in Property Account and Deposit Account | 59 |
| Section 3.8 | Withdrawals from the Tax and Insurance Premium Accounts | 60 |
| Section 3.9 | Withdrawals from the Replacement Reserve Account | 61 |
| Section 3.10 | Intentionally Omitted | 61 |
| Section 3.11 | Withdrawals from the Debt Service Account | 61 |
| Section 3.12 | Withdrawals from the Borrower Expense Account | 61 |
| Section 3.13 | Intentionally Omitted | 61 |
| Section 3.14 | Withdrawals from the Extraordinary Expense Account | 61 |
| Section 3.15 | Intentionally Omitted | 62 |
| Section 3.16 | Intentionally Omitted | 62 |
| Section 3.17 | Continuing Security Interest | 62 |
| Section 3.18 | Sole Dominion and Control | 62 |
| Section 3.19 | Security Interest | 62 |
| Section 3.20 | Rights on Default | 63 |
| Section 3.21 | Financing Statement; Further Assurances | 63 |
| Section 3.22 | Borrower's Obligation Not Affected | 63 |
| IV. | REPRESENTATIONS AND WARRANTIES | 63 |
| Section 4.1 | Borrower Representations | 63 |
| 4.1.1 | Organization | 64 |

OHS East:160274726.8
1-414050

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 4.1.2 | Proceedings | 64 |
| 4.1.3 | No Conflicts | 64 |
| 4.1.4 | Litigation | 64 |
| 4.1.5 | Agreements | 65 |
| 4.1.6 | Solvency | 65 |
| 4.1.7 | Full and Accurate Disclosure | 66 |
| 4.1.8 | No Plan Assets | 66 |
| 4.1.9 | Compliance | 66 |
| 4.1.10 | Financial Information | 66 |
| 4.1.11 | Condemnation | 67 |
| 4.1.12 | Federal Reserve Regulations | 67 |
| 4.1.13 | Utilities and Public Access | 67 |
| 4.1.14 | Not a Foreign Person | 67 |
| 4.1.15 | Separate Lots | 67 |
| 4.1.16 | Assessments | 67 |
| 4.1.17 | Enforceability | 68 |
| 4.1.18 | No Prior Assignment | 68 |
| 4.1.19 | Insurance | 68 |
| 4.1.20 | Use of Property | 68 |
| 4.1.21 | Certificate of Occupancy; Licenses | 68 |
| 4.1.22 | Flood Zone | 68 |
| 4.1.23 | Physical Condition | 69 |
| 4.1.24 | Boundaries | 69 |
| 4.1.25 | Leases | 69 |
| 4.1.26 | Survey | 70 |
| 4.1.27 | Intentionally Omitted | 70 |
| 4.1.28 | Filing and Recording Taxes | 70 |
| 4.1.29 | Intentionally Omitted | 70 |
| 4.1.30 | Intentionally Omitted | 70 |
| 4.1.31 | Illegal Activity | 70 |

OHS East:160274726.8
1-414050

-iii-

## TABLE OF CONTENTS
(continued)

Page

4.1.32  No Change in Facts or Circumstances; Disclosure ................................ 71
4.1.33  Investment Company Act ................................ 71
4.1.34  Principal Place of Business; State of Organization ................................ 71
4.1.35  Single Purpose Entity ................................ 71
4.1.36  Business Purposes ................................ 76
4.1.37  Taxes ................................ 76
4.1.38  Forfeiture ................................ 77
4.1.39  Environmental Representations and Warranties ................................ 77
4.1.40  Taxpayer Identification Number ................................ 77
4.1.41  OFAC ................................ 77
4.1.42  Intentionally Omitted ................................ 78
4.1.43  Deposit Accounts ................................ 78
4.1.44  Embargoed Person ................................ 79

Section 4.2          Survival of Representations ................................ 81

V.     BORROWER COVENANTS ................................ 82

Section 5.1          Affirmative Covenants ................................ 82
5.1.1   Existence; Compliance with Legal Requirements ................................ 82
5.1.2   Taxes and Other Charges ................................ 83
5.1.3   Litigation ................................ 83
5.1.4   Access to the Property ................................ 84
5.1.5   Intentionally Omitted ................................ 84
5.1.6   Cooperate in Legal Proceedings ................................ 84
5.1.7   Award and Insurance Benefits ................................ 84
5.1.8   Further Assurances ................................ 84
5.1.9   Mortgage and Intangible Taxes ................................ 85
5.1.10  Financial Reporting ................................ 85
5.1.11  Business and Operations ................................ 88
5.1.12  Costs of Enforcement ................................ 88
5.1.13  Estoppel Statement ................................ 88
5.1.14  Loan Proceeds ................................ 88

## TABLE OF CONTENTS
(continued)

|  |  | **Page** |
|---|---|---|
| 5.1.15 | Performance by Borrower | 89 |
| 5.1.16 | Confirmation of Representations | 89 |
| 5.1.17 | Leasing Matters | 89 |
| 5.1.18 | Management Agreement | 91 |
| 5.1.19 | Environmental Covenants | 93 |
| 5.1.20 | Alterations | 95 |
| 5.1.21 | Required Equity | 95 |
|  |  | 95 |
| 5.1.22 | Intentionally Omitted | 95 |
| 5.1.23 | OFAC | 96 |
| 5.1.24 | Compliance with Factual Assumptions | 96 |
| Section 5.2 | Negative Covenants | 96 |
| 5.2.1 | Liens | 96 |
| 5.2.2 | Dissolution | 96 |
| 5.2.3 | Change in Business | 97 |
| 5.2.4 | Debt Cancellation | 97 |
| 5.2.5 | Zoning | 97 |
| 5.2.6 | No Joint Assessment | 97 |
| 5.2.7 | Name, Identity, Structure | 97 |
| 5.2.8 | ERISA | 98 |
| 5.2.9 | Affiliate Transactions | 98 |
| 5.2.10 | Transfers | 98 |
| 5.2.11 | Insured Contractors | 100 |
| VI. | INSURANCE; CASUALTY; CONDEMNATION | 104 |
| Section 6.1 | Insurance | 104 |
| Section 6.2 | Casualty | 109 |
| Section 6.3 | Condemnation | 109 |
| Section 6.4 | Restoration | 110 |
| VII. | RESERVE FUNDS | 114 |
| Section 7.1 | Intentionally Omitted | 114 |

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 7.2 | Tax and Insurance Escrow Fund | 114 |
| Section 7.3 | Replacements and Replacement Reserve | 115 |
| 7.3.1 | Replacement Reserve Fund | 115 |
| 7.3.2 | Disbursements from Replacement Reserve Account | 115 |
| 7.3.3 | Performance of Replacements | 117 |
| 7.3.4 | Failure to Make Replacements | 119 |
| 7.3.5 | Balance in the Replacement Reserve Account | 120 |
| Section 7.4 | Interest Reserve | 120 |
| Section 7.5 | Debt Service Shortfall Reserve Account | 120 |
| Section 7.6 | Renovation Reserve | 120 |
| Section 7.7 | Marketing and Branding Reserve | 121 |
| Section 7.8 | Pre-Opening Expenses Reserve | 121 |
| Section 7.9 | Contingency Reserve | 122 |
| Section 7.10 | Reserve Funds, Generally | 122 |
| VIII. | DEFAULTS | 123 |
| Section 8.1 | Event of Default | 123 |
| Section 8.2 | Remedies | 128 |
| Section 8.3 | Construction Remedies | 129 |
| Section 8.4 | Remedies Cumulative; Waivers | 130 |
| IX. | SPECIAL PROVISIONS | 130 |
| Section 9.1 | Sale of Notes and Securitization | 130 |
| Section 9.2 | Reallocation of Loan Amounts; Restructuring of the Loan | 132 |
| Section 9.3 | Servicer | 133 |
| Section 9.4 | Exculpation | 133 |
| Section 9.5 | Securitization Indemnification | 137 |
| X. | MISCELLANEOUS | 139 |
| Section 10.1 | Survival | 139 |
| Section 10.2 | Lender's Discretion | 140 |
| Section 10.3 | Governing Law | 140 |
| Section 10.4 | Modification, Waiver in Writing | 141 |

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 10.5 | Delay Not a Waiver | 141 |
| Section 10.6 | Notices | 141 |
| Section 10.7 | Trial by Jury | 142 |
| Section 10.8 | Headings | 143 |
| Section 10.9 | Severability | 143 |
| Section 10.10 | Preferences | 143 |
| Section 10.11 | Waiver of Notice | 143 |
| Section 10.12 | Remedies of Borrower | 144 |
| Section 10.13 | Expenses; Indemnity | 144 |
| Section 10.14 | Schedules and Exhibits Incorporated | 145 |
| Section 10.15 | Offsets, Counterclaims and Defenses | 145 |
| Section 10.16 | No Joint Venture or Partnership; No Third Party Beneficiaries | 146 |
| Section 10.17 | Publicity | 146 |
| Section 10.18 | Waiver of Marshalling of Assets | 146 |
| Section 10.19 | Waiver of Counterclaim | 146 |
| Section 10.20 | Conflict; Construction of Documents; Reliance | 147 |
| Section 10.21 | Brokers and Financial Advisors | 147 |
| Section 10.22 | Prior Agreements | 147 |
| Section 10.23 | Local Law Provisions | 147 |

# TABLE OF CONTENTS

**Schedules & Exhibits**                                                      Page

Schedule I            Organizational Chart of Borrower
Schedule II           Leasing Matters
Schedule III          Certificates / Permits / Licenses/Exceptions to Representations
Schedule IV           Environmental Reports
Schedule V            Intentionally Omitted
Schedule VI           Intentionally Omitted
Schedule VII          Existing Leases
Schedule 4.1.45(b)    List of Plans and Specifications
Schedule 4.1.45(o)    Renovation Budget
Schedule 4.1.45(p)    Renovation Schedule

Exhibit A             Form of Collateral Assignment of Interest Rate Cap
Exhibit B             Form of Contractor's Consent Agreement
Exhibit C             Form of Request for Disbursement
Exhibit D-1           Form of Unconditional Lien Waiver for Progress Payment
Exhibit D-2           Form of Conditional Lien Waiver for Progress Payment
Exhibit D-3           Form of Unconditional Lien Waiver for Final Payment
Exhibit D-4           Form of Conditional Lien Waiver for Final Payment

OHS East:160274726.8
1-414050

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of September 5, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation with an address at 399 Park Avenue, New York, New York 10022 ("Lender") and A/P HOTEL, LLC, a Delaware limited liability company having an address at 345 South Figueroa Street, Suite 100, Los Angeles, California 90071 ("Borrower").

### WITNESSETH:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Acceptable Counterparty" shall mean any Counterparty to the Interest Rate Cap Agreement that has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, an unqualified credit rating of not less than "AA-" from S&P and "Aa3" from Moody's or the equivalent by the Rating Agencies.

"Acceptable Guarantor" shall a Person identified by Borrower and acceptable to Lender to be a Guarantor under the Guaranty and the Completion Guaranty.

"Account Collateral" shall mean: (i) the Accounts, and all Cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, Cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i)-(iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"Accounts" shall mean, collectively, the Property Account, the Tax Account, the Insurance Premium Account, the Borrower Expense Account, the Extraordinary Expense Account, the Replacement Reserve Account, the Debt Service Account, the Deposit Account, the

Interest Reserve Account, the Renovation Account, the Contingency Account, the Marketing and Branding Account, the Pre-Opening Expense Account, the Debt Service Shortfall Reserve Fund and any other escrow accounts or reserve accounts required to be established by the Loan Documents.

"**Acquisition Advance**" shall mean that portion of the Loan to be made by Lender to Borrower in the original principal amount of $51,618,000.00.

"**Act**" shall have the meaning set forth in Section 4.1.35 hereof.

"**Additional Indemnified Liabilities**" shall have the meaning set forth in Section 10.13(b) hereof.

"**Additional Insolvency Opinion**" shall mean an update of the Insolvency Opinion which reflects the underlying facts, matters or transactions which required the delivery of the applicable opinion and concludes that such underlying facts, matters or transactions which required the delivery of the applicable opinion do not change the basic opinions contained therein.

"**Additional Interest**" shall mean a deferred financing fee payable to Lender upon repayment of the Loan, whether the Loan is repaid on, before or after the Maturity Date, in an amount equal to one (1.0%) percent of the original Loan amount; provided, however, that the Additional Interest shall be reduced to one-half of one percent (0.5%) if the Loan is repaid from proceeds of a financing provided by Lehman Brothers Holdings Inc.

"**Advance**" shall mean any disbursement of the proceeds of the Loan by Lender pursuant to the terms of this Agreement.

"**Advance Conditions**" shall have the meaning set forth in Section 2.6 hereof.

"**Advance Termination Date**" shall mean the date that is ninety (90) days prior to the Completion Date.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. Such term shall include the Guarantor unless otherwise specified or if the context may otherwise require.

"**Affiliate Agreements**" shall mean, collectively, the Project Management Agreement and the Asset Management Agreement.

"**Affiliate Fees**" shall have the meaning set forth in Section 2.5.4 hereof.

"**Affiliated Manager**" shall mean any property manager which is an Affiliate of, or in which Borrower, Principal, or any Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

-2-

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration**" shall mean any demolition, alteration, installation, improvement or expansion of or to the Property or any portion thereof other than the Renovation Work.

"**Alteration Threshold Amount**" shall mean, with respect to an Alteration at the Property, an amount equal to 5% of the original principal balance of the Loan.

"**Annual Budget**" shall mean the operating budget, excluding all planned capital expenditures (which such capital expenditures shall instead be set forth in the Capital Improvements Budget), for the Property prepared by Borrower for the applicable Fiscal Year or other period.

"**APCC**" shall mean Asia Pacific Capital Company, a California corporation.

"**Applicable Laws**" shall mean all existing and future, federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

"**Applicable Interest Rate**" shall mean (A) from and including the date of this Agreement through the first Payment Date, an interest rate per annum equal to 10.72%; and (B) from and including the first Payment Date and for each successive Interest Period through and including the date on which the Debt is paid in full, an interest rate per annum equal to (I) the Eurodollar Rate or (II) the Prime Rate, if the Loan begins bearing interest at the Prime Rate in accordance with the provisions of Section 2.2.3 hereof.

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.10(d) hereof.

"**Approved Brand**" shall mean a hotel operated as either a "Hyatt," "Hilton," "Meridien," "Westin," "Marriott," "St. Regis," "Mandarin Oriental," "Omni," "Sheraton" or another brand hotel reasonably acceptable to Lender.

"**Approved Expense**" shall have the meaning set forth in Section 3.7 hereof.

"**Architect**" shall mean an architect (or architect) licensed in the State of Nevada and insured, acceptable to Lender in its sole discretion. Lender has approved the designation of Jack Hollander & Associates, Inc. as the Architect.

"**Architect's Agreement**" shall mean the architect's agreement between Borrower and the Architect for the Renovation Work.

"**Asset Management Agreement**" shall mean that certain Hotel Asset Management Agreement dated as of July 24, 2007, between Borrower and FCIC as amended by that certain First Amendment to Hotel Asset Management Agreement dated as of the date hereof, between Borrower and FCIC.

"**Assignment of Asset Management Agreement**" shall mean that certain Conditional

-3-

Assignment of Hotel Asset Management Agreement dated as of the date hereof from Borrower, as assignor, to Lender, as assignee, and consented to by FCIC, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Contracts" shall mean that certain Assignment of Contracts, Licenses, Permits, Agreements, Warranties and Approvals dated as of the date hereof from Borrower and FCIC, as assignor, in favor of Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Interest Rate Cap" shall collectively mean that certain Collateral Assignment of Interest Rate Cap Agreement given by Borrower to Lender dated as of the date hereof required by this Agreement as security for the Loan, consented to by the Counterparty, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases" shall mean, that certain first-priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Project Management Agreement" shall mean that certain Conditional Assignment of Hotel Project Management Agreement dated as of the date hereof from Borrower, as assignor, to Lender, as assignee, and consented to by FCIC, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Atrium Manager" shall mean Atrium Manager, LLC, a Delaware limited liability company.

"Atrium Paradise" shall mean Atrium Paradise, LLC, a Delaware limited liability company.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 U.S.C. § 101 et seq., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"Basic Carrying Costs" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes; and (ii) Insurance Premiums.

"Borrower" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"Borrower Expense Account" shall have the meaning set forth in Section 3.1(b)(v) hereof.

-4-

"Borrower's Members" shall have the meaning set forth in Section 9.4(e) hereof.

"Breakage Costs" shall have the meaning set forth in Section 2.2.3(d) hereof.

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in Las Vegas, Nevada or New York, New York are not open for business.

"Capital Expenditures" shall mean, for any period, the amount expended with respect to the Property for items capitalized under the Uniform System of Accounts (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"Capital Improvements Budget" shall mean the capital improvements budget, including all planned Capital Expenditures for the Property (which shall not include fees or other payments to Borrower, Guarantor or any Affiliate or employee of any thereof unless specifically approved by Lender in writing) prepared by Borrower for the applicable Fiscal Year or other period following the Substantial Completion of the Renovation Work, and specifically detailing the cost of any Capital Improvements to be completed during such Fiscal Year or other period.

"Cash" shall mean coin or currency of the United States of America or immediately available federal funds, including such funds delivered by wire transfer.

"Casualty" shall have the meaning set forth in Section 6.2 hereof.

"Casualty Consultant" shall have the meaning set forth in Section 6.4(b)(iii) hereof.

"Casualty Retainage" shall have the meaning set forth in Section 6.4(b)(iv) hereof.

"Change Order" shall mean any changes, addenda or other modifications of the Plans and Specifications or any of the Construction Contracts.

"Closing Date" shall mean the date of the funding of the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" shall mean the Property, the Accounts, the Reserve Funds, the Personal Property, the Rents, the Account Collateral, and all other real or personal property, if any, of Borrower that is at any time pledged, mortgaged or otherwise given as security to Lender for the payment of the Debt under the Security Instrument, this Agreement or any other Loan Document.

"Complete", "Completed" and "Completion" shall mean: (a) with respect to the entire Renovation Work, that (i) all of the improvements and equipment have been constructed or installed (as applicable) as set forth in the Plans and Specifications, (ii) the Renovation Work has otherwise been completed in the manner required by this Agreement and the Renovation

-5-

Documents such that (x) there is no impediment to the issuance of all applicable use and occupancy permits (or the equivalent) for the Property and (y) all work to be done in connection with the Renovation Work has been finished and fully accomplished, subject only to minor items not constituting any impediment to the events described in clause (x) above, and (iii) all of the Property has been issued a final certificate of occupancy (or the equivalent) and all other Licenses for the use, operation and occupancy of the Property as required hereunder, under the Management Agreement and by all Applicable Laws; and (b) with respect to any portion of the Renovation Work, that the construction and installation of the applicable improvements and equipment has been finished in a good and workmanlike manner, subject only to minor items still not constituting any impediment to the continuation of work in accordance with the Plans and Specifications.

"**Completion Date**" shall mean May 31, 2008.

"**Completion Guaranty**" shall mean that certain Completion Guaranty from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Constituent Member**" shall mean, any direct member in Borrower and any Person that, directly or indirectly through one or more other partnerships, limited liability companies, corporations or other entities is a member in Borrower.

"**Construction Consultant**" shall mean Construction Management and Development Inc. (CM&D) or another architect or engineer or firm of architects or engineers appointed by Lender in connection with the review of the Renovation Documents, its review of the Renovation Work and its approval of Requests for Disbursements made by Borrower under this Agreement from time to time. All fees, costs, expenses and compensation payable or reimbursable to Lender's Construction Consultant shall be paid by Borrower, as and when payable to such Construction Consultant or upon demand by Lender.

"**Construction Contract**" shall mean any contract or subcontract made by or on behalf of Borrower with any Person engaged to provide labor, materials or other goods or services for the design or construction of the Renovation Work.

"**Contractor**" shall mean any Person to a Construction Contract, other than Borrower.

"**control**" (and the correlative terms "**controlled by**" and "**controlling**") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of

-6-

beneficial interests, by contract or otherwise.

"<u>Counterparty</u>" shall mean the Person which is the issuer of the Interest Rate Cap Agreement.

"<u>Creditors Rights Laws</u>" shall have the meaning set forth in Section 4.1.35 hereof.

"<u>Debt</u>" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"<u>Debt Service</u>" shall mean, with respect to any particular period of time, interest payments due under the Note for such period.

"<u>Debt Service Account</u>" shall have the meaning set forth in Section 3.1(b)(iii) hereof.

"<u>Debt Service Coverage Ratio</u>" shall mean a ratio in which:

(a)    the numerator is the underwritten Net Cash Flow for the twelve (12) full calendar month period immediately preceding the date of calculation as set forth in the financial statements required hereunder; and

(b)    the denominator is the aggregate amount of Debt Service which would be due and payable for such 12 full calendar month period, calculated at an interest rate equal to the lesser of (i) LIBOR at the time of the calculation or (ii) the "strike price" on the Interest Rate Cap Agreement plus, in each of (i) and (ii), the Eurodollar Rate Margin for the Loan at the time of the calculation.

"<u>Debt Service Coverage Ratio Event</u>" shall mean, as of any date, any period of time during which the Debt Service Coverage Ratio, calculated as set forth herein, for the twelve (12) consecutive month period ending on the last day of the month immediately preceding such date based upon financial information provided pursuant to this Agreement shall be less than 1.2:1.0.

"<u>Debt Service Shortfall</u>" shall have the meaning set forth in Section 7.5 hereof.

"<u>Debt Service Shortfall Event</u>" shall mean notice from Lender to Borrower stating that the sum of (a) amounts on deposit in the Deposit Account (including the Debt Service Account), (b) amounts on deposit in the Interest Reserve Account and (c) payments received under the Interest Rate Cap Agreement, is insufficient to pay a Debt Service Shortfall.

"<u>Debt Service Shortfall Reserve Fund</u>" shall have the meaning set forth in Section 7.5 hereof.

"<u>Default</u>" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

-7-

OHS East:160274726.8
1-414050

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

"**Deposit Account**" shall have the meaning set forth in Section 3.1(b) hereof.

"**Deposit Bank**" shall mean the financial institution selected by Lender in accordance with this Agreement. As of the date hereof, the Deposit Bank shall be Wells Fargo Bank, N.A.

"**Disclosure Document**" shall have the meaning set forth in Section 9.5 hereof.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or State chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or State chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a State chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and State authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean a depository institution or trust company, insured by the Federal Deposit Insurance Corporation, (a) the short term unsecured debt obligations or commercial paper of which are rated at least A-1+ by S&P, P-1 by Moody's and F-1+ by Fitch in the case of accounts in which funds are held for thirty (30) days or less, or (b) the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's in the case of accounts in which funds are held for more than thirty (30) days.

"**Embargoed Person**" shall have the meaning set forth in Section 4.1.44 hereof.

"**Entitlements**" shall mean all final landmark, architectural, zoning, platting, site plan and other applicable development approvals and permits from all applicable Governmental Authorities for the performance of the Renovation Work.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Law**" shall mean any federal, State and local laws, statutes, ordinances, rules, regulations, published standards and policies, and other government directives or requirements, as well as written case law, that, at any time, apply to Borrower (each in connection with its respective interests in, or conduct upon, the Property) or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, and all regulations promulgated thereunder.

-8-

"Environmental Liens" shall have the meaning set forth in Section 5.1.19(a) hereof.

"Environmental Report" shall have the meaning set forth in Section 4.1.39 hereof.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"Estimated Remaining Cost" shall mean the estimated remaining amount of Renovation Costs to be incurred to achieve the Completion of the Renovation Work.

"Eurodollar Rate" shall mean, with respect to any Interest Period, an interest rate per annum equal to LIBOR plus the applicable Eurodollar Rate Margin.

"Eurodollar Rate Margin" shall mean five percent (5.0)%.

"Event of Default" shall have the meaning set forth in Section 8.1(a) hereof.

"Exchange Act" shall have the meaning set forth in Section 9.5 hereof.

"Executive Order" shall have the meaning set forth in the definition of "Prohibited Person" in Section 1.1 hereof.

"Existing Leases" shall mean the Leases in effect as of the date hereof, all of which (other than the Rooms License Agreements) are listed on Schedule VII hereof.

"Extended Maturity Date" shall have the meaning set forth in Section 2.2.1(b) hereof.

"Extension Option" shall have the meaning set forth in Section 2.2.1(b) hereof.

"Extension Period" shall have the meaning set forth in Section 2.2.1(b) hereof.

"Extraordinary Expense" shall mean an operating expense or capital expenditure with respect to the Property that (i) is not set forth on the Approved Annual Budget (ii) is not an Approved Expense and (iii) is not subject to payment by withdrawals from the Replacement Reserve Account or paid in connection with an emergency at the Property. Borrower shall deliver promptly to Lender a reasonably detailed explanation of each such proposed Extraordinary Expense for the reasonable approval of Lender.

"Extraordinary Expense Account" shall have the meaning set forth in Section 3.1(b)(vi) hereof.

"FCIC" shall mean Financial Capital Investment Company, a Nevada corporation.

"FIRREA" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as the same may be amended from time to time.

"First Extended Maturity Date" shall mean the Payment Date occurring in September, 2011.

-9-

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Force Majeure**" shall mean the failure of Borrower to perform any obligation hereunder by reason of any act of God, enemy or hostile government action, civil commotion, insurrection, sabotage, strikes or lockouts or any other reason primarily due to cause or causes beyond the reasonable control of Borrower or any Affiliate of Borrower.

"**Franchise Agreement**" shall mean any franchise agreement executed by Borrower or Manager on Borrower's behalf pursuant to which the Property may be operated as an Approved Brand and which agreement is acceptable in all material respects to Lender, which acceptance by Lender shall not be unreasonably withheld, conditioned or delayed.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**General Contract**" shall mean a guaranteed maximum price general construction contract (if any) between Borrower and the General Contractor for the construction of the Renovation Work, including, without limitation, the related budget contained therein.

"**General Contractor**" shall mean the general contractor that is a party to the General Contract, which general contractor shall be insured and acceptable to Lender in its sole discretion.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean all income, computed in accordance with the Uniform System of Accounts or GAAP (if applicable), derived from the ownership and operation of the Property from whatever source (but only to the extent paid or payable to Borrower), including, but not limited to, the Rents, utility charges, escalations, forfeited security deposits for Leases relating to retail and office space, all deposits made under Room License Agreements (less any returned deposits), interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, other required pass throughs and interest on the Reserve Funds, and payments received under the Interest Rate Cap Agreement, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance), Awards, unforfeited security deposits for Leases relating to retail and office space, utility and other similar deposits and any disbursements to Borrower from the Reserve Funds. Gross income shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof.

-10-

OHS East:160274726.8
1-414050

"<u>Guarantor</u>" shall mean, collectively, Richard Alter and Eddy Chao, the guarantors under the Guaranty, the Completion Guaranty and the Environmental Indemnity.

"<u>Guaranty</u>" shall mean that certain Guaranty of Recourse Obligations of Borrower from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Hard Costs</u>" shall mean all costs incurred for labor performed in connection with the construction of the Renovation Work (including, without limitation, demolition and grading) and materials incorporated into the Renovation Work, and any other cost designated as "Hard Costs" in the Renovation Budget.

"<u>Hazardous Materials</u>" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; mycotoxins; microbial matters and airborne pathogens (naturally occurring or otherwise); underground or above-ground storage tanks, containing any hazardous substance; any substance the presence of which on the Property is prohibited by any federal, State or local authority which are now or in the future defined as, and any other material or substance now or in the future defined as, a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"<u>Holdback for Renovation</u>" shall mean that portion of the Loan proceeds in the amount of $14,382,000.00.

"<u>Immediate Family Member</u>" shall mean a spouse, parent, sibling, child or grandchild of such individual or the spouse of such sibling, child or grandchild, or the child or grandchild of such sibling, or trusts formed for the sole benefit of such individual or any of the foregoing.

"<u>Improvements</u>" shall have the meaning set forth in the Granting Clauses of the Security Instrument with respect to the Property.

"<u>Indemnified Parties</u>" shall mean Lender, any Affiliate of Lender who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, the holders of any Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties, as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business), provided, however, for the purpose

-11-

of the definition of Indemnified Parties only, successors and assigns shall not include any bona fide third party who purchases the fee interest in the Property from Lender or any other Indemnified Party after Lender or such other Indemnified Party has acquired such interest in the Property through foreclosure, deed-in-lieu of foreclosure or the exercise of any other remedies available to Indemnitee hereunder, under the Note, the Security Instrument or any of the other Loan Documents.

"**Indemnified Taxes**" shall mean any present or future stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.

"**Independent Director**" or "**Independent Manager**" shall mean a natural Person who is not at the time of initial appointment, or at any time while serving as a director or manager of Borrower and has not been at any time during the preceding five (5) years: (a) a stockholder, director or manager (with the exception of serving as the Independent Director or Independent Manager, as applicable, of Borrower), officer, employee, partner, member, attorney or counsel of Borrower or an Affiliate of Borrower; (b) a creditor, customer, supplier or other Person who derives not more than 5% of its revenues (excluding any fee paid by Borrower for such Person to serve as an Independent Director or Independent Manager) from its activities with Borrower or an Affiliate of Borrower; (c) a Person controlling, controlled by or under common control with Borrower or any Affiliate of such Person or any such stockholder, partner, member, creditor, customer, supplier or other Person; or (d) a member of the immediate family by blood, marriage or otherwise, of any such stockholder, director, manager, officer, employee, partner, member, creditor, customer, supplier or other Person.

A natural Person who satisfies the foregoing definition other than subparagraph (b) shall not be disqualified from serving as an Independent Director or Independent Manager, as applicable, of Borrower if such individual is an Independent Director or Independent Manager, as applicable, provided by a nationally-recognized company that provides professional Independent Directors or Independent Managers, and that also provides other corporate services in the ordinary course of its business to Borrower and/or its Affiliates or if such individual receives customary director's fees for so serving, subject to the limitation on fees set forth below.

A natural Person who otherwise satisfies the foregoing shall not be disqualified from serving as an Independent Director or Independent Manager, as applicable, of Borrower if such individual is at the time of initial appointment, or at any time while serving as a Independent Director or Independent Manager, as applicable, of Borrower, an Independent Director or Independent Manager, as applicable, of one or more "Single Purpose Entities" that are Affiliates of Borrower (other than any entity that owns a direct or indirect equity interest in Borrower) if such natural Person is an Independent Director or Independent Manager, as applicable, provided by a nationally-recognized company that provides professional Independent Directors or Independent Managers, or such individual does not derive more than 5% of his or her annual income from serving as a director or manager, as applicable, of Borrower or an Affiliate of Borrower for that year.

"**Initial Deposits**" shall have the meaning set forth in Section 3.6 hereof.

-12-

"Net Cash Flow After Debt Service" for any period shall mean the amount obtained by subtracting Debt Service on the Loan for such period from Net Cash Flow for such period.

"Net Cash Flow Schedule" shall have the meaning set forth in Section 5.1.10(b) hereof.

"Net Operating Income" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations (excluding any payments received by Borrower under the Interest Rate Cap Agreement).

"Net Proceeds" shall have the meaning set forth in Section 6.4(b) hereof.

"Net Proceeds Deficiency" shall have the meaning set forth in Section 6.4(b)(vi) hereof.

"No Downgrade Letter" shall mean written confirmation from the Rating Agencies that the action or matter under consideration will not result in the downgrade, withdrawal or qualification of the then current ratings assigned to any Securities or, prior to the consummation of a Securitization, the proposed rating of any Securities.

"Note" shall mean that certain Promissory Note, dated as of the date hereof, in the original principal amount of $66,000,000.00 made by Borrower in favor of Lender, as the same may be amended, restated, extended, renewed, severed, split, replaced, supplemented or otherwise modified from time to time.

"Obligations" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"Officer's Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower or other appropriate officer of Borrower or Principal, which in all events shall be subject to Section 9.4 hereof.

"Operating Expenses" shall mean the total of all expenditures, computed in accordance with the Uniform System of Accounts or GAAP (if applicable), of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance premiums, license fees, property taxes and assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenditures and contributions to the Reserve Funds or expenses paid from the Replacement Reserve.

"Origination Fee" shall mean the fee payable by Borrower to Lender in connection with the origination, closing and funding of the Loan in an amount equal to one (1.0%) percent of the maximum principal amount of the Loan.

"Other Charges" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or

-17-

imposed against the Property or any part thereof.

"**Payment Date**" shall mean the ninth (9th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**Permitted Encumbrances**" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Financing**" shall mean the leasing of equipment in the ordinary course of business of operating the Property provided that (i) the equipment leased is readily replaceable without material interference or interruption to the operation of the Property taken as a whole and (ii) such lease is secured only by the equipment leased therein.

"**Permitted Investments**" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by Servicer, the trustee under any Securitization or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

(i) obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), and the U.S. Department of Housing and Urban Development (local authority bonds); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(ii) Federal Housing Administration debentures;

(iii) obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter

-18-

affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(iv)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in a No Downgrade Letter; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(v)    fully Federal Deposit Insurance Corporation insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances with maturities of not more than 365 days and issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category and otherwise acceptable to each other Rating Agency, as confirmed in a No Downgrade Letter; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vi)    debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in a No Downgrade Letter in its highest long term unsecured rating category; provided, however, that the investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(vii)    commercial paper (including both non interest bearing discount obligations and interest bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in a No Downgrade Letter in its highest short term unsecured debt rating; provided, however, that the

-19-

investments described in this clause must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity;

(viii)  units of taxable money market funds, with maturities of not more than 365 days and which funds are regulated investment companies, seek to maintain a constant net asset value per share and invest solely in obligations backed by the full faith and credit of the United States, which funds have the highest rating available from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency and otherwise acceptable to each other Rating Agency, as confirmed in a No Downgrade Letter for money market funds; and

(ix)  any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency, as confirmed in a No Downgrade Letter;

provided, however, that no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall mean all furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, inventory and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the UCC, whether tangible or intangible, other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof.

"**Plan**" shall mean an employee benefit plan (as defined in section 3(3) of ERISA) whether or not subject to ERISA or a plan or other arrangement within the meaning of section 4975 of the Code.

"**Plan Assets**" shall mean assets of a Plan within the meaning of section 29 C.F.R. Section 2510.3-101 or similar law.

"**Plans and Specifications**" shall mean the architectural and engineering plans and specifications prepared by the Architect designated herein, approved by the applicable Governmental Authorities to the extent such approval is required under Applicable Laws, which

-20-

have been submitted to Lender as the final plans and specifications for the renovation of the Property, and which have been approved by Lender following consultation with Lender's Construction Consultant (provided that Lender's approval shall be solely for its own benefit and not for the benefit of Borrower, Guarantor or any other Person), as the same may be amended from time to time as provided in this Agreement.

"**Pledge Agreement**" shall mean the Pledge and Security Agreement from Atrium Paradise, as pledgor, to Lender, as pledgee, pursuant to which Pledgor pledges and collaterally assigns, and grants a security interest in, 100% of the beneficial ownership interests in Borrower, given as additional security for the Loan.

"**Policies**" shall mean the policies of insurance coverage required under Section 6.1(a) hereof.

"**Pre-Opening Expenses Account**" shall have the meaning set forth in Section 7.8 hereof.

"**Pre-Opening Expenses Reserve Fund**" shall have the meaning set forth in Section 7.8 hereof.

"**Prepayment Date**" shall have the meaning set forth in Section 2.3.1(a) hereof.

"**Prime Rate**" shall mean, on a particular date, a rate per annum equal to the rate of interest published in *The Wall Street Journal* as the "prime rate", as in effect on such day, with any change in the prime rate resulting from a change in said prime rate to be effective as of the date of the relevant change in said prime rate; provided, however, that if more than one prime rate is published in *The Wall Street Journal* for a day, the average of the prime rates shall be used; provided, further, however, that the Prime Rate (or the average of the prime rates) will be rounded to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. In the event that *The Wall Street Journal* should cease or temporarily interrupt publication, then the Prime Rate shall mean the daily average prime rate published in another business newspaper, or business section of a newspaper, of national standing chosen by Lender. If *The Wall Street Journal* resumes publication, the substitute index will immediately be replaced by the prime rate published in *The Wall Street Journal*. In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available to Borrower and verifiable by Borrower but is beyond the control of Lender. Lender shall give Borrower prompt written notice of its choice of a substitute index and when the change became effective. Such substitute index will also be rounded to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. The determination of the Prime Rate by Lender shall be conclusive and binding absent manifest error.

"**Principal**" shall have the meaning set forth in Section 4.1.35 hereof.

"**Prohibited Person**" shall mean any Person:

(a)    listed in the Annex to, or otherwise subject to the provisions of, the Executive

-21-

Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list (the "Treasury List"); or

(f)    who is, to Borrower's actual knowledge, an Affiliate of a Person listed above.

"**Project Management Agreement**" shall mean that certain Hotel Project Management Agreement dated as of July 24, 2007, between Borrower and FCIC, as amended by that certain First Amendment to Hotel Project Management Agreement dated as of the date hereof, between Borrower and FCIC.

"**Property**" shall mean, each parcel of real property, the Improvements thereon and all Personal Property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to the Property and Improvements, as more particularly described in the Granting Clauses of the Security Instrument and referred to therein as the "Property".

"**Property Account**" shall have the meaning set forth in Section 3.1(a) hereof.

"**Property Account Agreement**" shall have the meaning set forth in Section 3.1(a) hereof.

"**Property Account Bank**" shall mean Wells Fargo Bank, N.A., provided that it remains an Eligible Institution, and any successor Eligible Institution or other Eligible Institution selected by Borrower, subject to Lender's approval.

"**Property Condition Report**" shall have the meaning set forth in Section 4.1.23 hereof.

"**Property Improvement Program**" shall mean any "property improvement program" required under the terms of any Management Agreement or Franchise Agreement entered into by Borrower in accordance with this Agreement.

"**Provided Information**" shall have the meaning set forth in Section 9.1(a)(i) hereof.

-22-

OHS East:160274726.8
1-414050

"**Punchlist Items**" shall mean non-structural details of construction, mechanical adjustment or decorative work which are not required to be completed to achieve Substantial Completion, all as determined by Lender in its reasonable discretion.

"**Qualified Pledgee**" means one or more of the following: (i) a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan provided such entity (A) has total assets (in name or under management) in excess of $650,000,000, and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000; and (B) is regularly engaged in the business of making or owning commercial real estate loans or commercial loans secured by a pledge of interests in a mortgage borrower or owning and operating commercial mortgage properties, (ii) if prior to a Securitization, an entity reasonably approved in writing by Lender, or (iii) if after a Securitization, an entity for which Borrower shall have obtained prior written confirmation from the Rating Agencies that the applicable pledge of direct or indirect equity interests to such entity will not, in and of itself, cause a downgrade, withdrawal or qualification of the then current ratings of the Securities issued pursuant to the Securitization.

"**Rating Agencies**" shall mean each of S&P, Moody's, and Fitch; and any other nationally recognized statistical rating agency which has been approved by Lender and has rated the Securities.

"**Reallocation Request**" shall have the meaning set forth in Section 2.9 hereof.

"**Reference Bank**" shall mean a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market that has an established place of business in London. If any such Reference Bank should be removed from the Telerate Page 3750 or in any other way fail to meet the qualifications of a Reference Bank, Lender may designate alternative Reference Banks meeting the criteria specified above.

"**Release**" of any Hazardous Materials shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"**Renewal Lease**" shall have the meaning set forth in Section 5.1.17(a) hereof.

"**Renovation Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Renovation Budget**" shall mean the line item breakdown of the projected total Renovation Costs (none of which costs shall be allocated to fees or other payments to Borrower, Guarantor or any Affiliate or employee of any thereof), which shall be in form and substance satisfactory to, and be approved by, Lender following consultation with the Construction Consultant (provided that Lender's approval shall be solely for its own benefit and not for the benefit of Borrower, Guarantor or any other Person), as the same may be amended from time to time as provided in this Agreement.

-23-

"Renovation Costs" shall mean the Hard Costs and the Soft Costs for the Renovation Work and the payment of the related costs in connection therewith through the Substantial Completion of the Renovation Work, as more particularly set forth in the Renovation Budget.

"Renovation Cost Category" shall mean each of the categories of types or items of costs listed in the Renovation Budget as Renovation Cost categories.

"Renovation Documents" shall mean, collectively, (a) all Construction Contracts and all other documents, instruments and agreements, whether now or hereafter made, that relate or pertain to the Renovation Work, including, but not limited to, the Plans and Specifications, the Renovation Budget, the Renovation Schedule and the Construction Contracts, (b) all guaranties, warranties, and other undertakings covering the quality or performance of the Renovation Work in accordance with the Plans and Specifications, the Renovation Budget, the Renovation Schedule and all Applicable Laws, (c) all architectural, engineering, design, management or other contracts or subcontracts with providers of goods, materials or services for the construction, monitoring, design or management of the Property or any portion thereof, (d) all covenants that relate or pertain to the Property and the Renovation Work, (e) all extensions, modifications, amendments or renewals of any of the foregoing, and (f) all Licenses.

"Renovation Reserve Fund" shall have the meaning set forth in Section 7.6 hereof.

"Renovation Schedule" shall mean the schedule indicating, among other things, (a) the date that the Renovation Work is to commence, (b) the dates on which various stages of the Renovation Work are to be Completed, (c) the Completion Date, and which otherwise shall be in form and substance satisfactory to, and by approved by, Lender following consultation with the Construction Consultant (provided that Lender's approval shall be solely for its own benefit and not for the benefit of Borrower, Guarantor or any other Person), as the same may be amended from time to time as provided in this Agreement.

"Renovation Work" shall mean the improvements, renovations and construction to be funded from the Holdback for Renovation, in accordance with the Loan Documents, as more particularly described in the Plans and Specifications and the Renovation Budget.

"Rents" shall have the meaning set forth in the Granting Clauses of the Security Instrument.

"Replacement Interest Rate Cap Agreement" shall mean an interest rate cap agreement from an Acceptable Counterparty with material terms substantially identical to the Interest Rate Cap Agreement.

"Replacement Reserve Account" shall have the meaning set forth in Section 3.1(b)(vii) hereof.

"Replacement Reserve Fund" shall have the meaning set forth in Section 7.3.1 hereof.

"Replacement Reserve Monthly Deposit" shall mean the greatest of (i) the amount, if any, required under the Franchise Agreement (if any) to be deposited for Replacements, (ii) the

-24-

amount, if any, required under the Management Agreement to be deposited for Replacements and (iii) an amount equal to one-twelfth of 4% of Gross Income from Operations, required to be deposited on a monthly basis commencing upon the Substantial Completion of the Renovation Work.

"**Replacements**" shall mean the furniture, fixtures and equipment required to keep the Property in good order and repair or as required by the Management Agreement or the Franchise Agreement (if any), including any Property Improvement Program.

"**Request for Disbursement**" shall mean a written request, duly executed by Borrower, for the disbursement of funds from the Holdback for Renovation, in form substantially similar to the form annexed hereto as Exhibit C, and meeting any specific requirements set forth in Article 2 hereof. Each such request shall include:

(a) a detailed breakdown of the applicable percentages of completion of the Renovation Work by each Renovation Cost Category in the Renovation Budget and the costs of the various phases of construction of the Renovation Work, showing the amounts expended to date for such construction and the amounts then due and unpaid, and an itemized estimate of the amount necessary to Substantially Complete the Renovation Work; and

(b) a certification by Borrower that (i) the construction of the Renovation Work to the date of such Request for Disbursement substantially complies with the Plans and Specifications and complies in all material respects with all Applicable Laws, (ii) the Holdback for Renovation is "in balance", (iii) no Event of Default has occurred and is continuing under any of the Loan Documents and no Default exists under any of the Loan Documents, and (iv) all materials and information delivered by or on behalf of Borrower to Lender in connection with such Request for Disbursement are true, correct and complete in all material respects.

"**Required Debt Service Shortfall Amount**" shall mean an amount determined by Lender to be sufficient to cover the Debt Service Shortfall.

"**Required Equity**" shall mean the equity contribution by the members of Borrower in an amount of not less than $18,700,000.00, comprised of Cash and land and improvements, the value of which shall be approved by Lender in Lender's sole discretion.

"**Reserve Fund Deposits**" shall mean the amounts to be deposited into the Reserve Funds for any given month or at any other time as provided in this Agreement or in the other Loan Documents.

"**Reserve Funds**" shall mean the Tax and Insurance Escrow Fund, the Replacement Reserve Fund, the Interest Reserve Fund, the Renovation Reserve Fund, the Contingency Fund, the Marketing and Branding Fund, the Pre-Opening Expense Fund and any other escrow or reserve fund established by the Loan Documents.

"**Reserve Rate**" shall mean the rate per annum which Lender determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/1,000%) of

-25-

the one-month United States dollar lending rates that at least three major New York City banks selected by Lender are quoting, at 11:00 a.m. (New York time) on the relevant LIBOR Determination Date, to the principal London offices of at least two of the Reference Banks, or (ii) in the event that at least two such rates are not obtained, the lowest one-month United States dollar lending rate which New York City banks selected by Lender are quoting as of 11:00 a.m. (New York time) on such LIBOR Determination Date to leading European banks.

"**Responsible Officer**" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president or authorized representative of such Person.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation subject to Force Majeure, with such Alterations as may be reasonably approved by Lender.

"**Restoration Threshold Amount**" shall mean, as to the Property, an amount equal to 5% of the maximum principal balance of the Loan.

"**Restricted Party**" shall mean Borrower, Principal, if any, Guarantor or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, Principal, Guarantor, any Affiliated Manager or any non-member manager.

"**Retainage**" shall mean, with respect to any Construction Contract, the amount to be withheld from payment of Hard Costs thereunder until the satisfactory Completion of the work to be performed under such Construction Contract and the satisfaction of any other conditions hereunder to the disbursement of such withheld amount, which amount shall be determined, in each instance, by applying the applicable retainage percentage to the amount of such payment. Unless Lender otherwise consents in writing, the retainage percentage shall be ten percent (10%).

"**Room License Agreement**" shall mean any short term license or similar agreement for the use or occupancy of any meeting room, conference space, banquet facilities, dining room or hotel room occupancy agreement.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

"**Second Extended Maturity Date**" shall mean the Payment Date occurring in September, 2012.

"**Securities**" shall have the meaning set forth in Section 9.1 hereof.

"**Securities Act**" shall have the meaning set forth in Section 9.5 hereof.

-26-

"Securitization" shall have the meaning set forth in Section 9.1 hereof.

"Security Deposits" shall have the meaning set forth in Section 5.1.17(g) hereof.

"Security Instrument" shall mean that certain first priority Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Leases, Rents and Security Deposits, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Servicer" shall have the meaning set forth in Section 9.3 hereof.

"Servicing Agreement" shall have the meaning set forth in Section 9.3 hereof.

"Severed Loan Documents" shall have the meaning set forth in Section 8.2(c) hereof.

"Single Purpose Entity" shall mean a Person who satisfies the requirements of Section 4.1.35 hereof.

"Soft Costs" shall mean all costs incurred for ancillary services performed in connection with the Renovation Work and designated as "Soft Costs" in the Renovation Budget and any other costs designated as "Soft Costs" in the Renovation Budget.

"Sponsor" shall mean, collectively, FCIC and APCC.

"Spread Maintenance Payment" shall mean, with respect to any repayment of the outstanding principal amount of the Loan prior to the end of the Lockout Period, a payment to Lender in an amount equal to the sum of the present value of each future installment of interest that would be payable under the Note on the outstanding principal amount of the Loan from the date of such prepayment through, but excluding, the end of the Lockout Period assuming an interest rate equal to the Eurodollar Rate Margin, discounted at an interest rate per annum equal to LIBOR in effect at the time of such repayment.

"State" shall mean, unless expressly stated to the contrary or otherwise dictated by the context in which the word appears, the State of Nevada.

"Strike Rate" shall mean a LIBOR rate of six percent (6.0%).

"Subsequent Advance" shall mean any Advance that is made by Lender after Lender makes the Acquisition Advance.

"Substantial Completion" or "Substantially Complete" means that Lender has received evidence satisfactory to Lender in its reasonable discretion that (a) all of the Renovation Work has been substantially completed in a good and workmanlike manner, in compliance with the Plans and Specifications and all Applicable Laws and Licenses, and in a manner reasonably acceptable to Lender and otherwise in compliance with the terms of the Loan Documents, (b) lien waivers have been delivered by each of the Contractors in connection with all work

-27-

performed and materials supplied in connection with the Renovation Work and (c) all applicable Governmental Authorities having jurisdiction having approved the use and occupancy of the Renovation Work, including, without limitation, the issuance of a temporary or permanent certificate of occupancy for all of the Renovation Work, to the extent that such approval is required under Applicable Laws.

"**Survey**" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and reasonably satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Account**" shall have the meaning set forth in Section 3.1(b)(i) hereof.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in Section 7.2 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Terrorism Insurance**" shall have the meaning set forth in Section 6.1(a)(viii) hereof.

"**Title Insurance Company**" shall mean Fidelity National Title Insurance Company or another title insurance company approved by Lender in Lender's sole discretion to provide the Title Insurance Policy.

"**Title Insurance Policy**" shall mean, with respect to the Property, an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"**Transfer**" shall have the meaning set forth in Section 5.2.10 hereof.

"**Transferee**" shall have the meaning set forth in Section 5.2.10 hereof

"**Trigger Event**" shall mean the occurrence of either of the following events: (a) an Event of Default, or (b) a Debt Service Coverage Ratio Event; provided, however, such Trigger Event shall cease and terminate (i) in the case of a Trigger Event due to a Debt Service Coverage Ratio Event as of any date as to which Borrower establishes to the reasonable satisfaction of Lender that the Debt Service Coverage Ratio, as of such date, based upon the financial information to be provided to Lender pursuant to this Agreement, is equal to or in excess of 1.2:1.0 for two (2) consecutive quarters and (ii) in the case of a Trigger Event due to the occurrence of an Event of Default as of the date such Event of Default is thereafter cured or waived.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as

-28-

OHS East:160274726.8
1-414050

in effect in the State.

"UCC Insurance Policy" shall mean a UCC insurance policy in form acceptable to Lender and insuring the lien of the Pledge Agreement encumbering the Collateral pledged by the pledgor under such Pledge Agreement.

"Underwriter Group" shall have the meaning set forth in Section 9.5 hereof.

"Uniform System of Accounts" shall mean the most recent edition of the Uniform System of Accounts for Hotels as adopted by the American Hotel and Motel Association.

Section 1.2    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

II.    GENERAL TERMS

Section 2.1    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date. Lender shall fund the Acquisition Advance to Borrower on the date hereof provided that Borrower satisfies the conditions set forth in Section 2.5. Borrower may, prior to the Advance Termination Date, request and shall receive Subsequent Advances of the Loan, up to a maximum amount of Fourteen Million Three Hundred Eighty-Two Thousand and 00/100 Dollars ($14,382,000.00) over the initial term of the Loan, provided that Borrower satisfies the Advance Conditions set forth in Section 2.6 hereof.

2.1.2    Origination Fee; No Re-Borrowing.

(a) Origination Fee. Borrower shall have paid to Lender the Origination Fee in connection with the origination, closing and funding of the Loan and as a condition to Lender's obligations hereunder.

(b) No Re-Borrowing. Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

-29-

2.1.3    The Note, Security Instrument and Loan Documents.

The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

2.1.4    Use of Proceeds.

Borrower shall use the proceeds of the Loan to (i) acquire the Property, (ii) fund the Renovation Costs in accordance with the terms and conditions of this Agreement, (iii) pay all Basic Carrying Costs, if any, due with respect to the Property, (iv) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein or in the other Loan Documents, (v) pay costs and expenses (as approved by Lender) incurred in connection with the closing of the Loan, (vi) fund any working capital requirements of the Property, and (vi) pay reimbursable out-of-pocket expenses of Borrower with respect to the Property.

Section 2.2    Interest; Extension Option; Loan Payments; Late Payment Charge.

2.2.1    Payments.

(a) Interest.    Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to and including the last day of the Interest Period in which the Maturity Date occurs (notwithstanding that said last day extends beyond the Maturity Date) at the Applicable Interest Rate.    Monthly installments of interest only shall be paid on each Payment Date commencing on October 9, 2007 and on each subsequent Payment Date thereafter up to and including the Maturity Date.    Interest on the outstanding principal amount of the Loan for the period commencing on the Closing Date through and including September 14, 2007 shall be paid by Borrower on the Closing Date.    Subject to the terms of Section 2.2.4 hereof, the outstanding principal balance of the Loan together with all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

(b) Extension of the Maturity Date.    Borrower shall have the option to extend the term of the Loan beyond the Initial Maturity Date for two (2) successive terms (each, an "Extension Option") of one (1) year each (each, an "Extension Period").    The first Extension Option, if exercised by Borrower pursuant to this Section 2.2.1(b), shall automatically extend the Maturity Date from the Initial Maturity Date to the First Extended Maturity Date.    If Borrower shall have exercised the first Extension Option described in the immediately preceding sentence to extend the Maturity Date to the First Extended Maturity Date, Borrower shall have a second Extension Option to extend the Maturity Date from the First Extended Maturity Date to the Second Extended Maturity Date (the First Extended Maturity Date and the Second Extended Maturity Date are each an "Extended Maturity Date") upon satisfaction of the following terms and conditions:

(i)    no Event of Default shall have occurred and be continuing on the date Borrower exercises the applicable Extension Option and on the date that the applicable Extension Period is commenced;

-30-

OHS East:160274726.8
1-414050

(ii)    Borrower shall notify Lender of its election to extend the Maturity Date as aforesaid not earlier than one hundred twenty (120) days and no later than twenty (20) days prior to the then applicable Maturity Date, it being understood that such notice shall be irrevocable;

(iii)    on or before the Business Day preceding the first day of the applicable Extension Period, Borrower shall pay to Lender an extension fee in an amount equal to one-quarter of one (0.25%) percent of the then outstanding Loan amount;

(iv)    Borrower shall obtain and deliver to Lender prior to the date on which the applicable Extension Period is commenced, one or more Replacement Interest Rate Cap Agreements (if the existing Replacement Interest Rate Cap Agreement shall terminate prior to the Extended Maturity Date), which Replacement Interest Rate Cap Agreements shall be effective commencing on the first day of such Extension Period and shall have a maturity date not earlier than the next succeeding Extended Maturity Date;

(v)    Substantial Completion has occurred by the Completion Date;

(vi)    Borrower reimburses Lender for all costs reasonably incurred by Lender in connection with Borrower's exercise of the applicable Extension Option, including, without limitation, reasonable attorneys' fees and expenses; and

(vii)    if the Debt Service Coverage Ratio (calculated based on the projected forward twelve (12) month underwritten Net Cash Flow for the succeeding twelve (12) month period (as reasonably determined by Lender)) is less than 1.2:1.0, then Borrower shall deposit with Lender, concurrently with the notice described in clause (b)(ii) above, additional funds for deposit into the Interest Reserve Account as Lender may reasonably require such that at all times funds on deposit in the Interest Reserve Account, together with Net Cash Flow, shall result in a Debt Service Coverage Ratio (calculated based on the projected forward twelve (12) month underwritten Net Cash Flow for the succeeding twelve (12) month period (as reasonably determined by Lender)) of 1:2:1.0.

(c) Setoffs, defenses and counterclaims.    All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

2.2.2    Interest Calculation.

Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance.

2.2.3    Eurodollar Rate Unascertainable; Illegality; Increased Costs.

(a) (i)   In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances

-31-

affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall forthwith give notice by telephone of such determination, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period, with a written confirmation of such determination promptly thereafter. If such notice is given, the Loan shall bear interest at the Prime Rate beginning on the first day of the next succeeding Interest Period. (ii) If, pursuant to the terms of this Section 2.2.3(a), the Loan is bearing interest at the Prime Rate and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower by telephone of such determination, confirmed in writing, to Borrower as soon as reasonably practical, but in no event later than one (1) Business Day prior to the last day of the then current Interest Period. If such notice is given, the Loan shall bear interest at the Eurodollar Rate beginning on the first day of the next succeeding Interest Period. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest at either the Eurodollar Rate or the Prime Rate.

(b) If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender in good faith to make or maintain the portion of the Loan bearing interest at the Eurodollar Rate, (I) the obligation of Lender hereunder to make the Loan bearing interest at the Eurodollar Rate shall be canceled forthwith and (II) the Loan shall automatically bear interest at the Prime Rate on the next succeeding Payment Date or within such earlier period as required by Applicable Law. Borrower hereby agrees promptly to pay Lender (within ten (10) days of Lender's written demand therefor), any additional amounts necessary to compensate Lender for any reasonable costs actually incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the Loan hereunder. Upon written demand from Borrower, Lender shall demonstrate in reasonable detail the circumstances giving rise to Lender's determination and the calculation substantiating the Prime Rate and any additional costs actually incurred by Lender in making the conversion. Lender's written notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(c) In the event that any change in any requirement of any Applicable Law or in the interpretation or application thereof, or compliance in good faith by Lender with any directive (whether or not having the force of law) hereafter issued from any Governmental Authority which is generally applicable to all Lenders subject to such Governmental Authority's jurisdiction:

(i)    shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of which is not otherwise included in the determination of LIBOR hereunder;

-32-

(ii)    shall, if the Loan is then bearing interest at the Eurodollar Rate, hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(iii)    shall, if the Loan is then bearing interest at the Eurodollar Rate, hereafter impose on Lender any other condition, the result of which is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender (within ten (10) Business Days of Lender's written demand therefor), any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender reasonably deems to be material (provided such costs are charged by Lender to its borrowers under similar loans generally). If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(c), Lender shall provide Borrower with written notice specifying in reasonable detail the event or circumstance by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender in good faith to Borrower shall be conclusive absent manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under the Note, this Agreement and the other Loan Documents.

(d) Borrower agrees to indemnify Lender and to hold Lender harmless from any actual out of pocket loss or expense (without duplication of any other sums paid pursuant to this Agreement and any other Loan Documents) which Lender sustains or incurs as a consequence of (I) any Event of Default by Borrower in payment of the principal of or interest on the Loan while bearing interest at the Eurodollar Rate, including, without limitation, any such actual out of pocket loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Eurodollar Rate (to the extent such loss or expense is commercially reasonable and typically charged by other institutional lenders making loans of similar size, nature and character), (II) any prepayment (whether voluntary or mandatory) of the Loan on a day that (A) is not the Payment Date immediately following the last day of an Interest Period with respect thereto or (B) is the Payment Date immediately following the last day of an Interest Period with respect thereto if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such actual out of pocket loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Eurodollar Rate hereunder and (III) the conversion (as permitted pursuant to the terms of this Agreement, whether voluntary or involuntary) of the Applicable Interest Rate from the Eurodollar Rate to the Prime Rate with respect to any portion of the outstanding principal amount of the Loan then bearing interest at the Eurodollar Rate on a date other than the Payment Date immediately following the last day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Eurodollar Rate hereunder

-33-

(the amounts referred to in clauses (I), (II) and (III) are herein referred to collectively as the "Breakage Costs"). This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

### 2.2.4   Payment on Maturity Date.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance, all accrued and unpaid interest thereon (which for the purposes of calculation shall include interest through and including the last day of the Interest Period in which the Maturity Date occurs, notwithstanding that the Interest Period extends beyond the Maturity Date), and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

### 2.2.5   Payments after Default.

Upon the occurrence and during the continuance of an Event of Default, (a) interest on the outstanding principal balance of the Loan and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein and (b) Lender shall be entitled to receive and Borrower shall pay to Lender on each Payment Date an amount equal to the Net Cash Flow After Debt Service for the prior month, such amount to be applied by Lender to the payment of the Debt in such order as Lender shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due) or the cure and acceptance by Lender of the cure of the Event of Default. To the extent permitted by Applicable Law, interest at the Default Rate not paid by Borrower shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default, the acceptance of any payment of Net Cash Flow After Debt Service shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under the Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payment of Net Cash Flow After Debt Service.

### 2.2.6   Late Payment Charge.

If any regularly scheduled payment of principal, interest or any other sums due under the Loan Documents is not paid by Borrower on the date on which it is due (other than the payment of the balance of the principal sum of the Note due on the Maturity Date), Borrower shall pay to Lender upon demand an amount equal to the lesser of three percent (3%) of such unpaid sum or the maximum amount permitted by Applicable Law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. With respect to regularly scheduled payments of interest, no late payment charge shall be due and payable if and only if (a) such payments are to

-34-

be made from the Debt Service Account, (b) sufficient funds are then available in the Debt Service Account to make any such payment, (c) Lender (or the Servicer on behalf of Lender) does not timely apply such funds to the then scheduled payment of interest, and (d) no Event of Default shall have occurred and be continuing. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by Applicable Law.

### 2.2.7  Usury Savings.

This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### 2.2.8  Indemnified Taxes.

All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, Indemnified Taxes, excluding, in the case of Lender, Indemnified Taxes measured by its net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender is resident or organized, or any political subdivision thereof and, in the case of Lender, taxes measured by its overall net income, and franchise taxes imposed on it, by the jurisdiction of Lender's applicable lending office or any political subdivision thereof or in which Lender is resident or engaged in business. If any non-excluded Indemnified Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all non-excluded Indemnified Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any non-excluded Indemnified Tax is payable pursuant to Applicable Law by Borrower, Borrower shall send to Lender an original official receipt showing payment of such non-excluded Indemnified Tax or other evidence of payment reasonably satisfactory to Lender. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such non-excluded Indemnified Tax when due to the appropriate taxing authority and required to be paid by Borrower hereunder or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence; provided, however, in the event that Lender or any successor and/or assign of Lender is not incorporated under the laws of the

OHS East:160274726.8
1-414050

United States of America or a state thereof Lender agrees that, prior to the first date on which any payment is due such entity hereunder, it will deliver to Borrower (i) two duly completed copies of United States Internal Revenue Service Form W-8BEN or W-8ECI or successor applicable form, as the case may be, certifying in each case that such entity is entitled to receive payments under the Note, without deduction or withholding of any United States federal income taxes, or (ii) an Internal Revenue Service Form W-9 or successor applicable form, as the case may be, to establish an exemption from United States backup withholding tax. Each entity required to deliver to Borrower a Form W-8BEN or W-8ECI or Form W-9 pursuant to the preceding sentence further undertakes to deliver to Borrower two further copies of said letter and W-8BEN or W-8ECI or Form W-9, or successor applicable forms, or other manner of certification, as the case may be, on or before the date that any such letter or form expires (which, in the case of the Form W-8ECI, is the last day of each U. S. taxable year of the non-US. entity) or becomes obsolete or after the occurrence of any event requiring a change in the most recent letter and form previously delivered by it to Borrower, and such other extensions or renewals thereof as may reasonably be requested by Borrower, certifying in the case of a Form W-8BEN or W-8ECI that such entity is entitled to receive payments under the Note without deduction or withholding of any United States federal income taxes, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such entity from duly completing and delivering any such letter or form with respect to it and such entity advises Borrower that it is not capable of receiving payments without any deduction or withholding of United States federal income tax, and in the case of a Form W-9, establishing an exemption from United States backup withholding tax. Notwithstanding the foregoing, if such entity fails to provide a duly completed Form W-8BEN or W-8ECI or other applicable form and, under Applicable Law, in order to avoid liability for Indemnified Taxes, Borrower is required to withhold on payments made to such entity that has failed to provide the applicable form, Borrower shall be entitled to withhold the appropriate amount of Indemnified Taxes and deduct such amount from such payments. In such event, Borrower shall promptly provide to such entity evidence of payment of such Indemnified Taxes to the appropriate taxing authority and shall promptly forward to such entity any official tax receipts or other documentation with respect to the payment of the Indemnified Taxes as may be issued by the taxing authority.

Section 2.3    Prepayments.

2.3.1    Voluntary Prepayments.

Following the expiration of the Lockout Period, Borrower may, at its option, prepay the Loan in whole or, solely in accordance with Section 2.3.2 hereof, in part, upon satisfaction of the following conditions:

(a) Borrower shall provide prior written notice to Lender specifying the date (the "Prepayment Date") upon which the prepayment is to be made, which notice shall be delivered to Lender not less than thirty (30) days prior to such payment; and

-36-

(b) Borrower shall pay to Lender, simultaneously with such prepayment, (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the Prepayment Date; (ii) if such prepayment is not made on a Payment Date, all interest on the principal amount being prepaid which would have accrued from the date of prepayment through and including the last calendar day of the Interest Period then in effect (notwithstanding that such Interest Period extends beyond the date of prepayment) calculated at the Applicable Interest Rate for the Interest Period in which the prepayment occurs (the "**Interest Shortfall**"); (iii) Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clause (ii); (iv) the Additional Interest; (v) subject to the terms of Section 2.3.2, if the prepayment occurs during the Lockout Period, the Spread Maintenance Payment; and (vi) all other sums then due under this Agreement, the Note or the other Loan Documents.

If the Interest Shortfall was calculated based upon the Assumed Note Rate, upon determination of LIBOR on the LIBOR Determination Date in question in which the prepayment occurs, (i) if the Applicable Interest Rate for such period is less than the Assumed Note Rate, Lender shall promptly refund to Borrower the amount of the Interest Shortfall paid, calculated at a rate equal to the difference between the Assumed Note Rate and the Applicable Interest Rate, or (ii) if the Applicable Interest Rate is greater than the Assumed Note Rate, Borrower shall promptly (and in no event later than the next occurring Payment Date) pay Lender the amount of such additional Interest Shortfall calculated at a rate equal to the excess of the Applicable Interest Rate over the Assumed Note Rate.

2.3.2    Mandatory Prepayments.

On the next occurring Payment Date following the date on which Borrower actually receives any Net Proceeds, if and to the extent Lender is not obligated to make such Net Proceeds available to Borrower for the Restoration of the Property, Borrower shall prepay (without penalty or premium or payment of the Spread Maintenance Payment) a portion of the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds. Such prepayment shall be applied, first, to interest on the outstanding principal balance of the Loan that would have accrued at the Applicable Interest Rate on the amount prepaid through the end of the Interest Period in which such prepayment occurs and then to all other amounts then due to Lender under this Agreement or any of the other Loan Documents and then to the outstanding principal balance of the Loan. Any prepayment of the Loan pursuant to this Section 2.3.2, in whole or in part, shall be accompanied by payment of the Additional Interest (or, in the case of a partial prepayment, a pro rata portion thereof).

2.3.3    Prepayments After Default.

If, following and during the continuance of an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default, Borrower shall pay, in addition to the debt; (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the Prepayment Date; (ii) the Interest Shortfall, if applicable, with respect to the amount prepaid; (iii) Breakage Costs, if any, without duplication of any sums paid

-37-

pursuant to the preceding clause (ii); (iv) the Additional Interest; (v) if such payment is made during the Lockout Period, an amount equal to the Spread Maintenance Payment; and (vi) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

### 2.3.4  Making of Payments.

Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 12:00 p.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date.

### 2.3.5  Application of Prepayments.

All prepayments received pursuant to this Section 2.3 shall be applied first, provided no Event of Default shall have occurred and be continuing, to interest on the outstanding principal balance being prepaid that accrued through and including the Prepayment Date; second, to interest on the outstanding principal balance being prepaid that would have accrued through the end of the Interest Period in which the prepayment occurred, and third, to the payments of principal due under the Loan in the inverse order of maturity.

### Section 2.4    Interest Rate Cap Agreement.

(a) Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an Interest Rate Cap Agreement with an Acceptable Counterparty, which shall be coterminous with the Loan, and have a notional amount which shall not at any time be less than the maximum principal balance of the Loan and which shall at all times have a strike rate equal to or lower than the Strike Rate. The Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments equal to the excess of one (1) month LIBOR over the Strike Rate, calculated on the notional amount. The notional amount of the Interest Rate Cap Agreement may be reduced from time to time in amounts equal to any prepayment of the principal of the Loan in accordance with Section 2.3 hereof.

(b) Borrower shall collaterally assign to Lender pursuant to an Assignment of Interest Rate Cap Agreement substantially in the form annexed hereto as Exhibit A, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument). The Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement directly to the Deposit Account or if the Deposit Account is not then required to be in effect, into such account as specified by Lender. At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such

-38-

OHS East:160274726.8
1-414050

documents as may be required to evidence Lender's release of the Interest Rate Cap Agreement and to notify the Counterparty of such release.

(c) Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement. All amounts paid by the Counterparty under the Interest Rate Cap Agreement shall be deposited immediately into the Deposit Account or if the Deposit Account is not then required to be in effect, into such account as specified by Lender. Borrower shall take all actions reasonably requested by Lender to enforce Lender's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d) In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "A+" by S&P, and "Aa3" by Moody's (or the equivalent), Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty not later than thirty (30) days following receipt of notice from Lender or Servicer of such downgrade, withdrawal or qualification.

(e) In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Cap Agreement as and when required hereunder, Lender may purchase such Interest Rate Cap Agreement and the actual out of pocket cost incurred by Lender in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date commencing five (5) Business Days after the date that Borrower shall receive notice from Lender that such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f) Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below "A+" (or the equivalent) by the Rating Agencies, the Counterparty must, not more than 30 days thereafter, either (x) post collateral on terms acceptable to each Rating Agency or (y) find a replacement Acceptable Counterparty, at the Counterparty's sole cost and expense, acceptable to each Rating Agency (notwithstanding the foregoing, if the Counterparty's rating is downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement. Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by Section 5(b)(v) of the ISDA Master Agreement, with the Counterparty as the Affected Party."

(g) In connection with an Interest Rate Cap Agreement with respect to which the Counterparty is a Person other than Lender or an Affiliate of Lender, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(1)   the Counterparty is duly organized, validly existing, and in good standing under

-39-

OHS East:160274726.8
1-414056

the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

    (2)   the execution and delivery of the Interest Rate Cap Agreement by the Counterparty, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

    (3)   all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

    (4)   the Interest Rate Cap Agreement, and any other agreement which the Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty and constitutes the legal, valid and binding obligation of the Counterparty, enforceable against the Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 2.5   <u>Conditions Precedent to Closing.</u>

The obligation of Lender to make the Loan hereunder and to the funding on the date hereof of the Acquisition Advance is subject to the fulfillment by Borrower or waiver by Lender of the following conditions precedent no later than the Closing Date:

    2.5.1   <u>Representations and Warranties; Compliance with Conditions.</u>

The representations and warranties of Borrower contained in this Agreement and the other Loan Documents and of the Guarantor in the Guaranty and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default or an Event of Default shall have occurred and be continuing; and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

    2.5.2   <u>Loan Agreement and Note.</u>

-40-

Lender shall have received counterparts to this Agreement and the Note, in each case, duly executed and delivered on behalf of Borrower.

2.5.3  Delivery of Loan Documents; Title Insurance; UCC Insurance Policy; Reports; Leases.

2.5.3.1 Loan Documents.

Lender and Title Insurance Company shall have received from Borrower fully executed and acknowledged counterparts of the Security Instrument, the Assignment of Leases and any other Loan Documents to be recorded, in the reasonable judgment of Lender, so as to effectively create upon such recording valid and enforceable Liens upon the Property, of the requisite priority, in favor of Lender, subject only to the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents.

2.5.3.2 Title Insurance.  Lender shall have received a Title Insurance Policy (or a marked, signed commitment to issue, or a pro-forma version of a Title Insurance Policy) issued by the Title Insurance Company and dated as of the Closing Date, with reinsurance and direct access agreements reasonably acceptable to Lender.  Such Title Insurance Policy shall (a) provide coverage in amounts satisfactory to Lender (but in no event greater than the maximum principal amount of the Note) and with a pending disbursements clause, (b) insure Lender that the Security Instrument creates a valid first lien on the Property encumbered thereby, free and clear of all exceptions from coverage other than Permitted Encumbrances and standard exceptions and exclusions from coverage (as modified by the terms of any endorsements), (c) contain such endorsements and affirmative coverages as Lender may reasonably request, (d) name Lender as the insured, and (e) be assignable.  Lender also shall have received evidence that all premiums in respect of such Title Insurance Policy have been paid or will be paid on the Closing Date.

2.5.3.3 Survey.

Lender shall have received a current Survey, certified to the Title Insurance Company and Lender and their successors and assigns, in form and content acceptable to Lender and prepared by a professional land surveyor, properly licensed in the State of Nevada and acceptable to Lender.  The Survey shall reflect the same legal description contained in the Title Insurance Policy and shall include, among other things, a metes and bounds description of the real property comprising part of the Property reasonably satisfactory to Lender.  The surveyor's seal shall be affixed to the Survey and the surveyor shall provide a certification for the Survey in form and substance acceptable to Lender.

2.5.3.4 UCC Insurance Policy.

Lender shall have received the UCC Insurance Policy issued by the Title Insurance Company and dated as of the Closing Date.  Such UCC Insurance Policy shall (a) provide coverage in the amount of $66,000,000.00, (b) insure Lender that the Pledge Agreement creates a valid first lien on the Collateral encumbered thereby, free and clear of all exceptions

-41-

from coverage other than standard exceptions and exclusions from coverage, (c) contain such endorsements and affirmative coverages as Lender may reasonably request, (d) name Lender as the insured, and (e) be assignable. Lender also shall have received evidence that all premiums in respect of such UCC Insurance have been paid or will be paid on the Closing Date.

### 2.5.3.5 Insurance.

Lender shall have received (a) the original Policies required hereunder, evidencing insurance coverage in respect of the Property of types, in amounts, with insurers and otherwise in compliance with the terms, provisions and conditions set forth in this Agreement, and (b) evidence of the payment of all Insurance Premiums payable for the existing policy period. Such Policies shall indicate that Lender is named as an additional insured on each liability policy, and that each casualty policy and rental interruption policy contains a loss payee endorsement in favor of Lender.

### 2.5.4    Affiliate Fees.

Borrower shall have disclosed to Lender all fees, commissions and other amounts (collectively, the "**Affiliate Fees**") that have been or will be reimbursed or paid to or on behalf of Borrower or Guarantor or any Affiliate of Borrower or Guarantor in connection with the acquisition or financing of the Property, including, without limitation, amounts paid by the seller of the Property or any Affiliate of the seller. Such Affiliate Fees shall be subject to Lender's approval, it being understood that Lender will permit approved cost reimbursements and project management fees to be paid during the renovation of the Property in accordance with the Approved Annual Budget.

### 2.5.5    Required Equity.

All Required Equity shall have been contributed on an unconditional basis and shall be applied to the purchase price to be paid by Borrower for the acquisition of the Property.

### 2.5.6    Environmental Reports.

Lender shall have received the Environmental Reports in respect of the Property, which Environmental Reports shall be in form and substance acceptable to Lender.

### 2.5.7    Zoning.

Lender shall have received letters or other evidence with respect to the Property that the Property complies currently with all applicable zoning and building laws and that the use of the Property as a transient hotel (and the other appurtenant and related uses) is permitted in the zoning district in which the Property is located.

### 2.5.8    Encumbrances.

-42-

Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first priority Lien as of the Closing Date with respect to the Security Instrument, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

2.5.9   Related Documents.

Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall be in form and substance reasonably satisfactory to Lender, and shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received originals or copies thereof.

2.5.10  Delivery of Organizational Documents.

Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Borrower and the Constituent Members and/or the formation, structure, existence, good standing and/or qualification to do business, that would be reasonably satisfactory to a prudent leader, including, without limitation, good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.

2.5.11  Opinions of Borrower's Counsel.

Lender shall have received opinions from Borrower's counsel with respect to non-consolidation and the due execution, authority, enforceability of the Loan Documents and such other matters, including, without limitation, Delaware and single member opinions, as Lender may reasonably require, all such opinions in form, scope and substance as would be reasonably satisfactory to a prudent lender.

2.5.12  Basic Carrying Costs.

Borrower shall have paid all Basic Carrying Costs relating to the Property which are in arrears, including without limitation, (a) accrued but unpaid Insurance Premiums, (b) currently due Taxes (including any Taxes in arrears) and (c) currently due Other Charges, which amounts shall be funded with proceeds of the Loan.

2.5.13  Completion of Proceedings.

All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Lender, and Lender shall have received all such counterpart originals or certified copies of such documents as Lender may reasonably request.

2.5.14  Payments.

-43-

All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

2.5.15  Transaction Costs.

Borrower shall have paid or reimbursed Lender for all title insurance premiums, recording and filing fees, costs of Environmental Reports, Physical Conditions Reports, appraisals and other reports; the fees and costs of Lender's counsel and all other third party out-of-pocket expenses incurred in connection with the origination of the Loan.

2.5.16  Material Adverse Change.

There shall have been no Material Adverse Change with respect to Borrower, Guarantor or the Property since the date of the most recent financial statements delivered to Lender. The income and expenses of the Property, the occupancy thereof, and all other features of the transaction shall be as represented to Lender without Material Adverse Change. Neither Borrower, Guarantor nor any of their constituent Persons shall be the subject of any proceeding or similar action under the Bankruptcy Code, or any similar federal or State law.

2.5.16  Leases.

Lender shall have received true, correct and complete copies of all Leases (other than Room License Agreements) as requested by Lender.

2.5.17  Tax Lot.

Lender shall have received evidence that the Property constitutes one (1) or more separate tax lots, which evidence shall be reasonably satisfactory in form and substance to Lender.

2.5.18  Management Agreements; Renovation Documents.

Lender shall have received a true, correct and complete copy of the Project Management Agreement, the Asset Management Agreement and each of the Renovation Documents (including, but not limited to, the Plans and Specifications, the Renovation Budget and the Renovation Schedule) in effect on the Closing Date.

2.5.19  Appraisal.

Lender shall have received an appraisal of the Property, which shall be reasonably satisfactory in form and substance to Lender.

2.5.20  Licenses.

-44-

OHS East:160274726.8
1-414050

Lender shall have received copies of all Licenses (including, but not limited to the Entitlements), required for the use, occupancy, renovation and operation of the Property and the Improvements in accordance with applicable Legal Requirements and for the uses set forth in Section 4.1.20.

### 2.5.21  Certifications.

Each Contractor shall have certified to Lender that, to the best of such Contractor's knowledge, the price set forth in its Construction Contract entered into between Borrower and such Contractor is sufficient to Complete the portion of the Renovation Work covered by such Construction Contract. Additionally, each of Borrower and Architect shall have certified to Lender that, to the best of its knowledge, the aggregate price set forth in the Construction Contracts is sufficient to Complete the Renovation Work as contemplated by the Plans and Specifications and the Renovation Budget.

### 2.5.22  List of Contractors.

Borrower shall have delivered or caused to be delivered to Lender a list of the names, addresses and telephone numbers of all of the Contractors and other Persons performing any service or furnishing any materials in connection with the Renovation Work.

### 2.5.23  Bonds.

If required, Lender shall have received payment and performance bonds with respect to all Construction Contracts in effect as of the Closing Date, in each case, in form and substance required by Lender, and as labor and material payment bonds, issued in favor of Lender and Borrower as dual obligees by one or more financially responsible surety companies acceptable to Lender, with each such bond in a penal sum equal to the total contract price payable to the Construction Contractor under the applicable Construction Contract, plus any other sums payable by Borrower with respect to the Plans and Specifications or pursuant to Applicable Laws.

### 2.5.24  Insurance Coverage.

Borrower shall have delivered to caused to be delivered, pursuant to Section 6.1, evidence of the builder's risk insurance, insurance required to be carried by the Architect and engineers, and insurance required to be carried by the Construction Contractors, each as in effect as of the Closing Date.

### 2.5.25  Further Documents.

Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested including the Loan Documents in form and substance satisfactory to Lender and its counsel.

Section 2.6    Subsequent Advances.

-45-

Lender shall not be obligated to make any Subsequent Advance on the Loan until all of the conditions precedent set forth in this Section have been satisfied in full (the "**Advance Conditions**"):

2.6.1   Request for Disbursement.

Borrower shall submit a Request for Disbursement in accordance with the terms and conditions of this Agreement, and such Request for Disbursement shall have been approved by Lender and, Lender's Construction Consultant.

2.6.2   Satisfactory Title; Survey Update.

The Security Instrument shall constitute a valid first Lien on the Property for the full amount of the Loan advanced to and including the date of the applicable Advance, subject only to Permitted Encumbrances. Simultaneously with the submission by Borrower of each Request for Disbursement, Borrower shall provide Lender with:

(a) an endorsement to the Title Policy, which endorsement (i) insures Lender against unfilled mechanic's liens and materialmen's liens, (ii) increases the coverage under the Title Policy to the full principal amount then advanced under the Loan; (iii) insures that, since the date of the Title Policy or the most recent endorsement to the Title Policy, there has been no change in the status of title to the Property (except for the Lien of unpaid taxes, not yet due and payable), and (iv) changes the effective date of the Title Policy to the date of the Advance being made by Lender; and

(b) lien waivers, substantially in the form annexed hereto as Exhibit D-1 (with respect to an unconditional lien waiver for a progress payment), Exhibit D-2 (with respect to a conditional lien waiver for a progress payment), Exhibit D-3 (with respect to an unconditional lien waiver for final payment) or Exhibit D-4 (with respect to a conditional lien waiver for final payment), as applicable, from the Contractors and other Persons that have furnished services or materials to the Property (subject to Borrower's right to contest hereunder), of the rights of such Contractors or other Persons to obtain any mechanic's lien or materialmen's lien on any property comprising the Renovation Work for any amount remaining unpaid on account of work performed or materials provided through the period covered by the immediately preceding Request for Disbursement.

2.6.3   Performance; No Defaults.

No Default or Event of Default shall have occurred and be continuing.

-46-

2.6.4   Representations and Warranties.

All representations and warranties contained in the Loan Documents shall have been true, correct and complete in all material respects on the date on which made and shall continue to be true, correct and complete in all material respects on the date of each Subsequent Advance unless Borrower discloses in writing to Lender the existence of a changed representation or warranty; provided, however, in no event shall any such changed representation or warranty prejudice Lender or its rights and remedies hereunder to the extent that any event or fact disclosed would constitute or result in a Default or an Event of Default under any of the Loan Documents.

2.6.5   Payment of Lender's Costs.

Borrower shall have paid all costs incurred by Lender in connection with Lender's determination that the Advance Conditions have or have not been satisfied, including, without limitation, consultant fees, title insurance charges, credit reporting fees, attorneys' fees and costs, appraisal fees, inspection fees and engineering fees. At Lender's election, such amounts payable by Borrower shall be deducted from the Subsequent Advance disbursed by Lender (and Borrower shall be responsible for concurrently using its own funds to make up any decrease in such Subsequent Advance as a result of such net funding).

2.6.6   Architect's Certification.

Lender shall have (a) received a certification of the Architect to the effect that the Estimated Remaining Cost of the Renovation Work does not exceed the amount of the Loan Proceeds which remain undisbursed and available for the payment of Renovation Costs, which certification shall be confirmed by such reports and certificates of Lender's Construction Consultant as Lender shall reasonably deem necessary or appropriate, (b) determined that the disbursement of the amount being requisitioned for any Renovation Cost Category, when combined with all prior disbursements for such Renovation Cost Category, will not exceed the amount allocated to such Renovation Cost Category in the Renovation Budget, and (c) determined that the amount set forth in the Request for Disbursement is in conformance with the Renovation Budget and does not reflect any reallocation of amounts between or among any Renovation Cost Categories.

2.6.7   Certificate and Application for Payment.

Borrower shall have submitted to Lender the certificate and application for payment, which:

(a) with respect to Hard Costs, shall be made on a form substantially conforming to A.I.A. Forms G702 and G703, or alternative forms approved by Lender, and on which Borrower, the Contractors and the Architect shall certify, among other things, (i) the percentage of the Renovation Work Completed after giving effect to the work for which the Request for Disbursement is being submitted, (b) that all work which has been certified as having been Completed is in fact Completed and in conformity with the Plans and Specifications, (iii) that the Plans and Specifications have not been modified except as

-47-

approved in writing by Lender, and (iv) the amount estimated by the Contractors to be the Estimated Remaining Cost of the Renovation Work and whether or not the aggregate amount of the unfunded balance of the Loan proceeds are sufficient to Complete the Renovation Work in accordance with the Plans and Specifications, the Renovation Budget, the Renovation Schedule and all Applicable Laws;

(b) with respect to Soft Costs, shall be made on forms reasonably approved by Lender, specifying in reasonable detail the Renovation Costs for which the Subsequent Advance is requested and the amount so requested, and shall be accompanied by evidence reasonably acceptable to Lender that the Renovation Costs for which disbursement is requested, have been incurred and are due and owing, or have been paid and are reimbursable in accordance with the applicable Renovation Documents;

(c) shall include or be accompanied by (i) an itemization in trade breakdown of the portion of each payment which is to be paid to the various Contractors under their respective Construction Contracts, which itemization shall confirm the amounts described in paragraph (e) below, and (ii) an affidavit of the applicable Contractors confirming that such itemization is true, complete and correct;

(d) with respect to costs of machinery, equipment or other personal property to be acquired for purposes of the Renovation Work (other than construction materials), shall be made on a form reasonable approved by Lender and shall be accompanied by purchase orders for the applicable property or other documentation therefore satisfactory to Lender; and

(e) with respect to each item of Renovation Costs, shall specify the amounts of the requested disbursement which are to be paid to the various Contractors or other Persons providing labor, materials or services to or otherwise for purposes of the Renovation Work, shall be accompanied by all receipts, vouchers, invoices, contractor requisitions and other evidence that the Renovation Costs for which disbursement is requested have in fact been incurred and are payable as provided in the Request for Disbursement.

2.6.8  Report from Construction Consultant.

Lender shall have received a report from Lender's Construction Consultant, which shall be satisfactory to Lender, indicating, among other things, that the construction and installation of the improvements and equipment in connection with the Renovation Work are being and have been performed in a sound and workmanlike manner in accordance with the Plans and Specifications, that all materials are as required by the Plans and Specifications, that all work reported to have been Completed or which should have been Completed has in fact been Completed and is in conformity with the Plans and Specifications, and that all Licenses required for the portion of the Renovation Work Completed to date have been issued.

2.6.9  Receipts and Vouchers for Prior Advances.

Borrower shall have submitted to Lender, along with the Request for Disbursement, all receipts, vouchers, payment affidavits and other writings evidencing that all Subsequent

-48-

Advances previously made have been applied to the payment of the Renovation Costs specified in the prior Requests for Disbursements approved by Lender.

### 2.6.10 Stored Personal Property.

If the requested disbursement is for personal property to be incorporated into the Property and Lender, in its sole discretion, determined to approve such disbursement, then either:

(a) such personal property shall be (i) stored at the Property, a bonded public warehouse or at another location approved by Lender, in a secured area, segregated from any other personal property, not under the possession or control of any Person other than Borrower (unless Lender shall have received assurances satisfactory to Lender as to the protection of its security interest in such personal property), (ii) insured for their full replacement cost, which insurance shall name Lender as an additional insured and be with such insurance companies as are acceptable to Lender and otherwise be in form and substance reasonably satisfactory to Lender, (iii) owned by Borrower free and clear of any Lien other than a Lien that constitutes a Permitted Encumbrance with respect thereto, and (iv) scheduled to be incorporated into the Property within 30 days after delivery thereof; provided that (1) all such personal property shall be available to inspection by Lender or Lender's Construction Consultant at Borrower's sole cost and expense, (2) the aggregate cost of all such personal property stored at one time, whether at the Property or otherwise, shall not exceed $250,000.00, (3) Lender shall have received (I) bills of sale or other evidence reasonably satisfactory to Lender of the cost of and Borrower's title to, all such personal property, and (II) UCC-1 financing statements, warehouseman's receipts or other evidence reasonably satisfactory to Lender of Lender's Lien on such personal property, and (4) Borrower shall deliver to Lender a letter from Borrower or the supplier of such personal property specifying the security measures that have been taken to protect such personal property from theft, casualty and deterioration; and

(b) the proceeds of the Subsequent Advance are to be paid to a supplier of personal property to be incorporated into or used for the Property as a deposit for such property and Lender shall have approved both the amount of the payment on, and the supplier of, such personal property (which approval shall not be unreasonably withheld if the amount to be disbursed is within the applicable Renovation Cost Category on the Renovation Budget).

### 2.6.11 Retainage.

If the amount to be disbursed pursuant to any Request for Disbursement (or any portion thereof) is for payment to any Contractor, such amount shall have been adjusted for the withholding of the applicable Retainage. No Retainage with respect to any line item in the Renovation Budget shall be disbursed to the applicable Contractor until Lender shall have received certifications of the Architect and the Construction Consultant satisfactory to Lender that one hundred percent (100%) of the work (including any Punchlist Items) allocated to such line item has been Completed. Upon confirmation by Lender of Lender's receipt of such proof, and upon the satisfaction of the Advance Conditions, the Retainage allocated to such line item may be paid to the applicable Contractors.

OHS East:160274726.8
1-414050

### 2.6.12 No Fire or Other Casualty.

No portion of the Property shall have been damaged or destroyed by fire or other casualty except if Borrower has received Insurance Proceeds sufficient in the determination of Lender to repair or restore the Property and Lender has agreed to apply such Insurance Proceeds to such repair or restoration in accordance with Section 6.4 hereof.

### 2.6.13 No Condemnation.

No portion of the Property shall have been taken in any Condemnation proceeding, and no such proceeding shall be threatened or pending except for any minor Condemnation proceeding that does not materially and adversely affect the Property or the construction and installation of the improvements and equipment in accordance with the terms of this Agreement.

### 2.6.14 No Violations.

Borrower shall have furnished to Lender a certificate certifying that (a) the certifying parties have not received any written notice from any Governmental Authority of any claimed violations of any Applicable Laws which have not been cured or which will be cured as part of the Renovation Work, and (b) the certifying parties are not aware of any circumstances that could give rise to the issuance of any such notice of claimed violation.

### 2.6.15 No Stop Notice.

No stop notice (whether bonded or not) shall have been served upon or otherwise delivered to Lender in connection with the construction of the Renovation Work or otherwise in connection with the Loan, unless Borrower shall have (a) paid and discharged the same using funds other than Loan proceeds, (b) effected the release thereof by delivering to Lender a surety bond complying with the requirements of all Applicable Laws for such release and (c) taken such other actions as Lender may reasonably approve in writing to release Lender from any obligation or liability with respect to such stop notice.

-50-

2.6.16 No Claim of Lien.

No claim of lien, notice and claim of mechanic's lien or other similar document or instrument shall have been recorded against the Property or any portion thereof, unless Borrower shall have (a) paid and discharged the same, (b) effected the release thereof by delivering to Lender a surety bond complying with the requirements of Applicable Laws for such release, (c) delivered to Lender the unconditional commitment of the Title Insurance Company that issued the Title Insurance Policy, to indemnify, defend and hold Lender and the Property harmless from and against all list, liability, expenses, claims, actions and costs (including, without limitation, reasonable attorneys' fees and costs) arising out of or in connection with such claim of lien, notice or claim of mechanic's lien or other similar document or instrument, or (d) taken such other actions as Lender may approve in writing to release Lender from any obligation or liability with respect to such claim of lien, notice or claim of mechanic's lien or other similar document or instrument.

2.6.17 No Material Adverse Change.

There shall have been no Material Adverse Change in the financial condition or business condition of Borrower, Guarantor or the Property since the date of the most recent financial statements delivered to Lender. Neither Borrower, Guarantor nor any of their constituent Persons shall be the subject of any proceeding or similar action under the Bankruptcy Code, or any similar federal or State law.

2.6.18 Holdback for Renovation Being "In Balance".

The determination as to whether or not the Holdback for Renovation is "in balance" may be made by Lender at any time, including, without limitation, with each Request for Disbursement; it being understood that such determination shall be made by Lender in accordance with Section 2.7 hereof. Funds deposited with Lender to bring the Holdback for Renovation "in balance" shall be deposited into an interest-bearing account with Lender (which interest shall be added to the funds on deposit), shall be pledged to Lender as additional collateral for the Loan, shall be disbursed on the same terms and conditions as funds are disbursed from the Holdback for Renovation hereunder and shall be disbursed prior to any further disbursement of funds from the Holdback for Renovation; it being agreed that Borrower may access funds allocated by Lender to the contingency line item category in the Renovation Budget to bring the Holdback for Renovation "in balance". Within ten (10) days after Lender's request, (a) Borrower and Guarantor shall execute and deliver to Lender such documents, in form reasonably acceptable to Lender, as are reasonably requested by Lender in connection with the deposit of such amounts with Lender, including, without limitation, a pledge agreement, and (b) Borrower shall reimburse Lender for the reasonable costs and expenses incurred by Lender in connection therewith, including, without limitation, reasonable attorneys' fees and costs.

2.6.19 Final Advance.

If the amount to be disbursed pursuant to the Request for Disbursement is for the final payment for Renovation Costs (excluding any Punchlist Items), the development, construction

-51-

and equipping of the Renovation Work shall have been Completed substantially in accordance with the Plans and Specifications, and Lender shall have received the following items:

(a) a certificate of Completion of the Renovation Work on A.I.A. Form G704 or on another commercially reasonable form supplied or approved by Lender, on which Borrower, the Contractors and the Architect shall certify that the Renovation Work has been Completed in its entirety and in accordance with the Plans and Specifications (excluding Punchlist Items), all applicable building, zoning and other Legal Requirements and all Licenses and that all certificates of occupancy, approvals and other Licenses (if any) required for the use, operation and occupancy of the Property have been issued, together with a copy of each such License;

(b) a certificate from Borrower certifying that all furnishings, fixtures and equipment, all inventory and all other property contemplated under the Renovation Budget and the Plans and Specifications to be incorporated into or installed in the Property shall have been incorporated or installed free and clear of all Liens other than the Permitted Encumbrances;

(c) an affidavit supplied by Borrower and the Contractors listing the names of all Persons that have supplied labor or material for the Renovation Work, which affidavit shall be accompanied by (i) copies of all waivers or releases previously executed by each Person listed in the affidavit of such mechanic's or materialmen's right to file a mechanic's lien or materialmen's lien with respect to the Renovation Work and (ii) such additional waivers or releases of such Person's rights to file mechanic's liens or materialmen's liens as may be necessary to insure that no Person shall have any right to obtain a mechanic's lien or materialmen's lien on the Property;

(d) an inspection report from Lender's Construction Consultant satisfactory to Lender which, among other things, confirms that Completion of the Renovation Work has been achieved in its entirety and in accordance with the Plans and Specifications (excluding Punchlist Items), and all Applicable Laws and Licenses, and that all certificates of occupancy and other Licenses (if any) required for the use, operation and occupancy of the Property have been issued; and

(e) to the extent applicable, all occupancy, use or similar certificates or Licenses for the Property issued by any applicable Governmental Authority charged with the duty of inspecting or regulating facilities similar to the Property and any other Governmental Authority charged with the duty of inspecting new construction and approving and certifying the same as ready for occupancy or use (provided that if no material impediment to the issuance of a final certificate of occupancy with respect to the Property exists and it is customary in Las Vegas, Nevada, to commence occupancy and operation of properties similar to the Property under a temporary certificate of occupancy, such a temporary certificate of occupancy shall be deemed sufficient as a certificate of occupancy for purposes hereof, for so long as such temporary certificate of occupancy remains valid and effect; and provided further that Borrower shall remain obligated to diligently pursue, take all actions and perform all work necessary or required to obtain such final certificate of occupancy).

-52-

OHS East:160274726.8
1-414050

2.6.20  Other Documents.

Borrower shall have delivered such other documents and certificates as Lender or its counsel may reasonably require and evidence that Borrower has paid, or is paying simultaneously with the Request for Disbursement, the amount or the balance of the amount of the costs to which the Request for Disbursement relates.

Section 2.7    Borrowing Procedures.

(a) There shall be no more than one Subsequent Advance per month. Each such Subsequent Advance shall be made pursuant to a Request for Disbursement and only if and when all of the Advance Conditions shall have been satisfied in full. Such Request for Disbursement, together with all documents and other items required pursuant to this Agreement, shall have been submitted to Lender at least ten (10) days prior to the date on which the Subsequent Advance is requested to be made. No Request for Disbursement other than the final Request for Disbursement shall be in an amount of less than $150,000.00. Borrower shall at no time submit a Request for Disbursement for any Subsequent Advance the amount of which, when added to the aggregate amount of all previously disbursed Subsequent Advances, shall exceed $14,382,000.00. Each Subsequent Advance shall be net of Retainage, which shall be disbursed as provided in clauses (c) and (d) of this Section 2.7. The maximum amount that Lender shall be obligated to disburse for any item comprising a Renovation Cost shall not exceed (i) at any time, in the aggregate, the percentage of Completion of the applicable Renovation Work with respect to such Renovation Cost (except with respect to deposits for materials, furniture, fixtures or equipment, architectural and engineering fees and permit fees, which are approved in advance by Lender in its reasonable discretion and which shall be disbursed as reasonably approved in advance by Lender), and (ii) the total amount designated for such Renovation Cost Category. Disbursements from any contingency line item category in the Renovation Budget shall be permitted for the payment of any amounts incurred by Borrower in excess of the applicable line items set forth in the Renovation Budget. All funds disbursed by Lender from the Holdback for Renovation shall be used solely for the payment of the applicable Renovation Costs as shown on the Renovation Budget and as approved by Lender. For the purposes hereof, Renovation Costs shall be deemed to have been "incurred" by Borrower as follows: (A) Hard Costs shall be deemed to have been incurred when the labor has been performed or the materials have been supplied (or, where contract deposits are due prior to delivery of materials or performance of labor and the same have been approved by Lender in writing) and incorporated into the Property, payment therefor has been requested by the applicable Contractor, and such Contractor is entitled to payment; and (B) Soft Costs shall be deemed to have been incurred when such costs are due and payable and the services relating thereto have been rendered or the value thereof has been received by Borrower.

(b) Lender shall be obligated to disburse funds from the Holdback for Renovation only at such times as the Holdback for Renovation is "in balance" pursuant to Section 2.6.18. The Holdback for Renovation shall be "in balance" only at such times as the undisbursed funds in the Holdback for Renovation are sufficient, as determined by Lender in its good faith sole discretion, in the aggregate and individually as to each Renovation Cost Category,

-53-

to pay all costs of Completing the Renovation Work and to pay all other Renovation Costs (including, without limitation, the same with respect to the work contemplated by each line item on the Renovation Budget) set forth in the Renovation Budget through the Substantial Completion of the Renovation Work. For purposes of determining whether the Holdback for Renovation is "in balance" as provided herein, Lender shall take into account (i) reallocations permitted under Section 2.9 hereof, (ii) funds available in the contingency line item category, (iii) funds available in the Renovation Account, and (iv) funds available in the Contingency Account. In the event that Lender determines, in its good faith sole discretion, that the Holdback for Renovation is not, or will not be, "in balance" as provided herein, Borrower shall, within ten (10) days after written notice from Lender, deposit or cause to be deposited with Lender, immediately available funds sufficient to bring the Holdback for Renovation "in balance," as determined by Lender in its good faith sole discretion.

(c) Provided that the Advance Conditions are satisfied, Lender shall disburse the Retainage from the Holdback for Renovation, prior to the Advance Termination Date, upon the satisfaction of the following conditions: (i) Lender shall have received evidence reasonably satisfactory to Lender that the Substantial Completion of the Renovation Work has occurred; (ii) Lender shall have received original, notarized conditional lien waivers with respect to such disbursement from each Contractor and other Person who will receive funds from such disbursement of the Retainage; (iii) Lender shall have received original, notarized unconditional lien waivers with respect to all prior disbursements of the Holdback for Renovation from each Contractor and other Person who received funds from any prior disbursements of the Holdback for Renovation; (iv) Lender shall have received such endorsements to the Title Insurance Policy as may be reasonably required by Lender (or, at Lender's election, the Title Insurance Company's unconditional commitment to issue such endorsements), in form reasonably acceptable to Lender, updating the Title Insurance Policy as of the date of the disbursement of the Retainage, and insuring the continued priority of the Security Instrument, affirmatively insuring over mechanics' liens, materialmen's liens or claims of liens in connection with the construction of the Renovation Work, and containing only such exceptions to title as are reasonably acceptable to Lender; (v) Lender shall have received evidence reasonably satisfactory to Lender that all applicable Governmental Authorities having jurisdiction have approved the use and occupancy of the Renovation Work, including, without limitation, the issuance of a permanent or temporary certificate of occupancy (as the case may be), or the local equivalent thereof, for all of the Renovation Work; and (vi) Lender shall have received a written certification from the Architect, in form reasonably satisfactory to Lender, that the Renovation Work has been Completed in accordance with the Plans and Specifications and all Applicable Laws and Licenses, that all utility connections for the Renovation Work have been Completed and that the Property is otherwise fully operational and fully ready for use and occupancy.

(d) Notwithstanding the foregoing, prior to the date on which Lender is obligated to release the Retainage under clause (c) above, Lender may, in its discretion and from time to time, release a portion of the Retainage to Borrower for payment to a Contractor provided that the Advance Conditions and the following additional conditions are satisfied: (i) Lender shall have received evidence reasonably satisfactory to Lender that all of such Contractor's work has been Completed in a good and workmanlike manner, in compliance with all

-54-

Applicable Laws and in a manner reasonably acceptable to Lender and otherwise in compliance with the terms of the Loan Documents; (ii) Lender shall have received original, notarized conditional lien waivers with respect to such disbursement from such Contractor; (iii) Lender shall have received original, notarized unconditional lien waivers from such Contractor with respect to all prior disbursements from the Holdback for Renovation received by such Contractor; (iv) Lender shall have received such endorsements to the Title Policy as may be reasonably required by Lender (or, at Lender's election, the Title Insurance Company's unconditional commitment to issue such endorsements), in form reasonably acceptable to Lender, updating the Title Insurance Policy as of the date of the disbursement of such portion of the Retainage, and insuring the continued priority of the Security Instrument, affirmatively insuring over mechanics' liens, materialmen's liens or claims of liens in connection with the construction of the Renovation Work, and containing only such exceptions to title as are reasonably acceptable to Lender; (v) Lender shall have received evidence reasonably satisfactory to Lender that all applicable Governmental Authorities shall have made their final inspection and approval of such Contractor's work, if applicable; and (vi) Lender shall have received a written certification from the Architect, in form reasonably satisfactory to Lender, that such Contractor's work was completed in accordance with the Plans and Specifications.

(e)  In the event that all of the Advance Conditions for any Subsequent Advance have not been satisfied in full on or before the Advance Termination Date, Lender's obligation to make, and Borrower's right to receive, any Subsequent Advances from the Holdback for Renovation shall terminate and be of no further force or effect.

Section 2.8    Funds Advanced.

All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made, and Borrower shall not commingle such funds with other funds of Borrower. In connection with each Request for Disbursement, Borrower shall provide evidence satisfactory to Lender in its reasonable discretion that funds advanced to Borrower pursuant to the most recent Advance were applied consistently with the terms of the Request for Disbursement with respect to such Advance. Lender may make Advances payable directly to Borrower or payable jointly to Borrower and to the applicable Contractor, or Lender may, at its election, require that payments to be made through a fund control or escrow system acceptable to Lender, at Borrower's sole cost and expense. No Advance by Lender shall be deemed to be an approval or acceptance by Lender of any work performed thereon or any materials furnished with respect thereto.

Section 2.9    Reallocations.

Subject to the requirements of Applicable Law, Lender shall not unreasonably withhold its consent to any request by Borrower to (a) reallocate any cost savings related to Hard Costs (excluding in any contingency line item) to any other Hard Cost line item, (b) reallocate any cost savings related to Soft Costs (excluding in any contingency or taxes line item) to any other Soft Cost line item, or (c) add or delete line items (other than contingency and taxes) from the Renovation Budget. All other amendments or revisions to the Renovation Budget, including,

-55-

without limitation, any reallocation from any contingency or taxes line items, shall be subject to Lender's prior written approval in its good faith sole discretion. Requests for the reallocation of amounts in the Renovation Budget shall be in the form of the Reallocation Request ("**Reallocation Request**") in form reasonably acceptable to Lender. Further, upon receipt of a Reallocation Request, Lender shall have the right, in its good faith sole discretion, to increase or decrease the allocation to any contingency or taxes line item in the Renovation Budget, and to determine whether any item of cost, expense or fee for which Borrower requests a disbursement constitutes a Renovation Cost and the line item to which such cost, expense or fee relates.

Section 2.10    Change Orders.

All Change Orders shall be submitted to Lender not less frequently than monthly. Borrower shall not, without Lender's prior written approval (not to be unreasonably withheld, conditioned or delayed), permit the performance of any work pursuant to, or request a disbursement for, any Change Order which would (each of the following, a "**Material Change Order**") (a) result in an increase in the price payable under any Construction Contract by more than Two Hundred Fifty Thousand Dollars ($250,000.00) in the case of any individual Change Order, (b) cause the aggregate of all Change Orders (both proposed and previously executed and, to the extent required herein, approved) to result in an increase in the price payable under all Construction Contracts of more than Five Hundred Thousand Dollars ($500,000.00), or (c) involve a material structural change in the Renovation Work or a change in the gross or net square footage of the Renovation Work or the Property. Notwithstanding the foregoing, requests for Lender's approval of Material Change Orders may accompany the Requests for Disbursement in connection therewith.

Section 2.11    No Reliance.

All conditions and requirements of this Agreement are for the sole benefit of Lender and no other Person shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Lender shall have the right, in its sole and absolute discretion, to waive any such condition or requirement.

Section 2.12    Release on Payment in Full.

Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Agreement, release the Lien of the Security Instrument on the Property and remit any remaining Reserve Funds to Borrower.

III.    CASH MANAGEMENT

Section 3.1    Establishment of Accounts.

(a) Borrower shall promptly following the date hereof (i) establish and maintain an account (the "**Property Account**") with Property Account Bank into which Borrower shall deposit, or cause to be deposited, all Rents and other income derived from the ownership and

-56-

operation of the Property including all amounts payable by each of the respective credit card companies or credit card clearing banks with whom Borrower or Manager does business in connection with the Property (collectively, a "**Credit Card Company**"), and (ii) execute an agreement with Lender and the Property Account Bank providing for the control of the Property Account by Lender (the "**Property Account Agreement**").

(b) Lender shall (i) establish an account with the Deposit Bank (the "**Deposit Account**") into which Borrower shall deposit or cause to be deposited all sums on deposit in the Property Account, and (ii) execute an agreement with the Deposit Bank providing for the control of the Deposit Account by Lender and establishing the following Accounts (which may be book entry sub-accounts) into which amounts in the Property Account shall be deposited or allocated:

(i) An account with Deposit Bank into which Borrower shall deposit, or cause to be deposited from the Deposit Account (if required pursuant to Section 7.2 hereof), the Monthly Tax Deposit (the "**Tax Account**");

(ii) An account with Deposit Bank into which Borrower shall deposit, or cause to be deposited from the Deposit Account (if required pursuant to Section 7.2 hereof), the Monthly Insurance Premium Deposit (the "**Insurance Premium Account**");

(iii) An account with Deposit Bank into which Borrower shall deposit, or cause to be deposited from the Deposit Account, the Monthly Debt Service Payment Amount (the "**Debt Service Account**");

(iv) Intentionally omitted;

(v) An account with Deposit Bank into which Approved Expenses and collected sales and/or occupancy taxes shall be deposited (the "**Borrower Expense Account**");

(vi) An account with Deposit Bank into which amounts to be applied to the payment of Extraordinary Expenses shall be deposited (the "**Extraordinary Expense Account**"); and

(vii) Upon the date of Substantial Completion, an account with Deposit Bank into which Borrower shall deposit, or cause to be deposited, the Replacement Reserve Monthly Deposit (the "**Replacement Reserve Account**").

Section 3.2    Deposits into Deposit Account.

(a) Borrower represents, warrants and covenants that (i) Borrower shall, or shall cause Manager to, promptly deposit all Rents and other income of Borrower derived from the ownership and operation of the Property into the Property Account, (ii) contemporaneously with the closing hereunder, Borrower shall execute, and shall furnish the Lender for delivery, notices, substantially in the forms annexed to the Restricted Account Agreement (Soft Lockbox) dated as of the date hereof by and among Borrower, Manager, Lender, Servicer

-57-

and Deposit Account Bank, to the Credit Card Companies and to all tenants now or hereafter occupying space at the Property, directing them to pay all Rents and other sums due under the agreement or Lease (as the case may be) to which they are a party into the Property Account, (iii) Borrower shall deposit, or shall cause the Counterparty to deposit, all sums paid under the Interest Rate Cap Agreement directly into the Deposit Account or if the Deposit Account is not required to be in effect, into such account as specified by Lender; (vi) other than the Accounts and any security deposit accounts maintained as required by law and/or the Leases, there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are deposited, and (vii) neither Borrower nor any other Person shall open any other such account with respect to the deposit of income in connection with the Property. Until deposited into the Property Account, any Rents and other income of Borrower derived from the ownership and operation of the Property held by Borrower shall be deemed to be Collateral and shall be held in trust by it for the benefit, and as the property, of Lender and shall not be commingled with any other funds or property of Borrower.

(b) Borrower, or Lender on behalf of Borrower, shall direct the Property Account Bank to transfer, on each Business Day during the continuance of a Trigger Event, all funds on deposit in the Property Account to the Deposit Account.

(c) Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 3.2 without Lender's prior written consent.

Section 3.3    Account Name.

(a) The Accounts shall each be in the name of Borrower; provided, however, that Lender shall have "control" over the Accounts pursuant to the UCC.

(b) In the event Lender transfers or assigns the Loan, Borrower acknowledges that the Property Account Bank and Deposit Bank, at Lender's request, shall change the name of the secured party on each Account to the name of the transferee or assignee. In the event Lender retains a servicer to service the Loan, Borrower acknowledges that the Property Account Bank and Deposit Bank, at Lender's request, shall change the name of each account to the name of the servicer, as agent for Lender.

Section 3.4    Eligible Accounts.

Borrower shall, and Borrower shall cause Property Account Bank and Deposit Account Bank to, maintain each Account as an Eligible Account.

Section 3.5    Permitted Investments.

Sums on deposit in any Account other than the Property Account or Deposit Account may be invested in Permitted Investments provided (i) such investments are then regularly offered by Deposit Bank for accounts of this size, category and type, (ii) such investments are permitted by Applicable Law, (iii) the maturity date of the Permitted Investment is not later than

-58-

the date on which sums in the applicable Account are anticipated by Lender to be required for payment of an obligation for which such Account was created, and (iv) no Event of Default shall have occurred and be continuing. All income earned from Permitted Investments shall be the property of Borrower. Borrower hereby irrevocably authorizes and directs Deposit Bank, to hold any income earned from Permitted Investments as part of the Accounts. Borrower shall be responsible for payment of any federal, State or local income or other tax applicable to income earned from Permitted Investments. No other investments of the sums on deposit in the Accounts shall be permitted except as set forth in this Section 3.5. Lender shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds or of any funds deposited in the related Accounts.

Section 3.6    The Initial Deposits.

Lender shall determine, in its reasonable discretion, the initial amounts (the "Initial Deposits") required to be deposited in each of the Tax Account and the Insurance Premium Account, and Borrower shall deposit the respective Initial Deposits into each Account on the Closing Date. Lender acknowledges that Borrower may use the proceeds of the Loan in connection with making the Initial Deposits.

Section 3.7    Transfer of Funds in Property Account and Deposit Account.

(a) Prior to the occurrence of a Trigger Event, all amounts on deposit in the Property Account shall be disbursed to, or as directed by, Borrower. During the continuance of a Trigger Event, Property Account Bank shall transfer pursuant to instructions provided by Lender to Deposit Account all amounts available in the Property Account. Servicer (on behalf of Lender) shall withdraw all funds on deposit in the Deposit Account and apply such amounts on the date immediately preceding each Payment Date (and if such day is not a Business Day then the preceding day which is a Business Day) in accordance with Section 3.7(b); provided, however, that Servicer (on behalf of Lender) shall apply funds on deposit in the Deposit Account, pursuant to the then applicable Approved Annual Budget, for the payment of Operating Expenses and Monthly Debt Service Payments on the first Business Day of every second calendar week.

(b) Provided that the Trigger Event is not an Event of Default, Servicer (on behalf of Lender) shall disburse the funds in the Deposit Account in the following order of priority, to the extent that deposits are required to be made therein:

(i)    First, funds sufficient to pay the Monthly Tax Deposit shall be deposited in the Tax Account;

(ii)    Second, funds sufficient to pay the Monthly Insurance Premium Deposit shall be deposited in the Insurance Premium Account;

(iii)    Third, funds sufficient to pay the Monthly Debt Service Payment Amount shall be deposited into the Debt Service Account to be applied to the payment of accrued and unpaid interest computed at the Applicable Interest Rate;

-59-

(iv)    Fourth, following Substantial Completion, funds sufficient to pay the Replacement Reserve Monthly Deposit shall be deposited in the Replacement Reserve Account;

(v)    Fifth, funds sufficient to pay any interest accruing at the Default Rate, and late payment charges, if any, shall be deposited in the Debt Service Account;

(vi)    Sixth, to the payment of Deposit Bank for reasonable fees and expenses incurred in connection with this Agreement and the accounts established hereunder;

(vii)    Seventh, funds sufficient to pay collected sales and/or occupancy taxes and all costs and expenses required to be paid during such month by or on behalf of Borrower in connection with the ownership and operation of the Property in accordance with the Approved Annual Budget (the "Approved Expenses") shall be deposited in the Borrower Expense Account after deposits for items (i) through (vi) above have been made (provided deposits to the Borrower Expense Account shall not include amounts which have previously been paid pursuant to items (i) through (vi) above);

(viii)    Eighth, funds sufficient to pay any Extraordinary Expenses for such month which have been approved by Lender (and that have not been previously paid pursuant to items (i) through (vii) above) shall be deposited in the Extraordinary Expense Account after deposits for items (i) through (vii) above have been made; and

(ix)    Ninth, provided that no Event of Default or Debt Service Coverage Ratio Event has occurred and is continuing, and provided that sufficient sums have been deposited in the applicable Accounts pursuant to subsections (i) through (viii) above, all amounts remaining in the Deposit Account after deposits for items (i) through (viii) for the current month and all prior months shall be disbursed to Borrower or, at Borrower's election, to a repayment of the Loan in accordance with Section 2.3.1 to the extent therein permitted.

Section 3.8    Withdrawals from the Tax and Insurance Premium Accounts.

So long as no Event of Default then exists and further provided Lender and/or Servicer (on behalf of Lender) is not prohibited from doing so by applicable laws, rules or regulations, Lender or Servicer (on behalf of Lender) shall withdraw funds from the Tax Account to pay Taxes on or before the date Taxes are due and payable. So long as no Event of Default then exists and further provided Lender and/or Servicer (on behalf of Lender) is not prohibited from doing so by applicable laws, rules or regulations, Lender or Servicer (on behalf of Lender) shall withdraw funds from the Insurance Premium Account to pay Insurance Premiums on or before the date Insurance Premiums would otherwise become delinquent.

Provided the Tax Account and the Insurance Premium Account contain sufficient funds and provided Lender and/or Servicer (on behalf of Lender) is not prohibited from doing so by applicable laws, rules or regulations, Lender or Servicer (on behalf of Lender) shall withdraw funds on or prior to the date required pursuant to this Section 3.8 for the payment of Taxes and Insurance Premiums, as applicable; provided, however, it shall not be an Event of Default (and

-60-

no late charge or default interest shall be due in connection therewith) if (a) such payments are to be made from the Tax Account and the Insurance Premium Account, (b) sufficient funds are then available in the Tax Account and the Insurance Premium Account to make any such payment, (c) Lender or Servicer on behalf of Lender does not timely apply such funds to the Taxes and Insurance Premiums that are then due and payable, and (d) no Event of Default shall have occurred and be continuing.

Section 3.9    Withdrawals from the Replacement Reserve Account.

Following the Substantial Completion of the Renovation Work, Lender or Servicer (on behalf of Lender) shall disburse funds on deposit in the Replacement Reserve Account in accordance with the provisions of Section 7.3 hereof.

Section 3.10    Intentionally Omitted.

Section 3.11    Withdrawals from the Debt Service Account.

Lender or Servicer (on behalf of Lender) shall have the right to withdraw funds from the Debt Service Account to pay the Monthly Debt Service Payment Amount on or after the date when due, together with any late payment charges or interest accruing at the Default Rate; provided, however, that to the extent the Debt Service Account contains sufficient funds and provided (except during any period of time in which Lender in good faith has reason to believe that the Borrower or the Property may be involved in a bankruptcy, insolvency or similar proceeding affecting creditors' rights) Lender has not delivered written notice to Borrower stating that Lender is prohibited from doing so by applicable laws, rules or regulations, it shall not be an Event of Default (and no late charge or default interest shall be due in connection therewith) if (a) such payments are to be made from the Debt Service Account, (b) sufficient funds are then available in the Debt Service Account to make any such payment, (c) Lender (or Servicer on behalf of Lender) does not timely apply such funds to the Monthly Debt Service Payment that is then due and payable, and (d) no Event of Default shall have occurred and be continuing.

Section 3.12    Withdrawals from the Borrower Expense Account.

Provided that no Event of Default has occurred and is continuing, Borrower shall have the right to request that funds be withdrawn from the Borrower Expense Account for the payment of Approved Expenses. Such withdrawals shall be in accordance with the then applicable Approved Annual Budget.

Section 3.13    Intentionally Omitted.

Section 3.14    Withdrawals from the Extraordinary Expense Account.

OHS East:160274726.8
1-414050

Provided that no Event of Default has occurred and is continuing, Borrower shall have the right to request that funds be withdrawn from the Extraordinary Expense Account for the payment of Extraordinary Expenses.

Section 3.15    Intentionally Omitted.

Section 3.16    Intentionally Omitted.

Section 3.17    Continuing Security Interest.

This Agreement shall create a continuing security interest in the Account Collateral and shall remain in full force and effect until payment in full of the Obligations. Upon payment in full of the Obligations, this Agreement shall terminate and Borrower shall be entitled to the return, upon its request and at its expense, of such of the Account Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof, and Lender shall promptly execute such instruments and documents, at no cost to Lender, as may be reasonably requested by Borrower to evidence such termination and the release of the lien hereof.

Section 3.18    Sole Dominion and Control.

Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, including Property Account Bank and Deposit Bank, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein.

Section 3.19    Security Interest.

Borrower hereby grants to Lender a first priority security interest in each of the Accounts and the Account Collateral as additional security for the Debt.

OHS East:160274726.8
1-414050

Section 3.20    Rights on Default.

Notwithstanding anything to the contrary in this Article III, upon the occurrence and during the continuance of an Event of Default, Lender shall promptly notify Property Account Bank and Deposit Bank in writing of such Event of Default (with a copy of such notice to Borrower) and, without notice from Property Account Bank, Deposit Bank or Lender, (a) Borrower shall have no further right in respect of (including, without limitation, the right to instruct Deposit Bank or Property Account Bank to transfer from) the Accounts, (b) Lender may direct Deposit Bank to liquidate and transfer any amounts then invested in Permitted Investments to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Deposit Bank, as agent for Lender, or Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (c) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, Lender may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

Section 3.21    Financing Statement; Further Assurances.

Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral with respect thereto in the form required to properly perfect Lender's security interest therein. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Deposit Bank or Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral; provided no such instruments, documents or actions materially increase Borrower's obligations hereunder and/or materially decrease it rights hereunder.

Section 3.22    Borrower's Obligation Not Affected.

The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

IV.    REPRESENTATIONS AND WARRANTIES

Section 4.1    Borrower Representations.

Borrower represents and warrants as of the Closing Date that:

-63-

#### 4.1.1  Organization.

Borrower is duly formed/organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property, businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Property and to transact the businesses in which it is now engaged (it being understood and agreed, however, that certain licenses, permits and authorizations required for the operation of the Property such as liquor licenses may be held in the name of Manager and/or other third parties for the benefit of Borrower and/or the Property).    Attached hereto as Schedule I is an organizational chart of Borrower.

#### 4.1.2  Proceedings.

Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

#### 4.1.3  No Conflicts.

The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, Management Agreement, Franchise Agreement (if any) or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is bound, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of the Property or any of Borrower's other assets, or any license or other approval required to operate the Property, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority requir[e] (if any) for the execution, delivery and performance by Borrower of this Agreement or any of Loan Documents has been obtained and is in full force and effect.

#### 4.1.4  Litigation.

To Borrower's actual knowledge, and except as set forth on Schedule III attar[...] and made a part hereof, there are no actions, suits or proceedings at law or in equity [...] any Governmental Authority or other agency now pending or threatened in writ[...]

-64-

OHS East:160274726.8
1-414050

affecting Borrower or Borrower's interest in the Property, which actions, suits or proceedings, if determined against Borrower or Borrower's interest in the Property, can reasonably be expected to have a Material Adverse Effect.

### 4.1.5  Agreements.

Borrower is not a party to any agreement or instrument or, to Borrower's actual knowledge, subject to any restriction which can reasonably be expected to have a Material Adverse Effect. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property, (b) obligations under the Loan Documents, (c) obligations under the Affiliate Agreements and (d) obligations under the Construction Contracts and other agreements entered into by Borrower in connection with the performance of the Renovation Work (subject to the prior approval of Lender, if such approval is required under the Loan Documents).

### 4.1.6  Solvency.

Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). No petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Borrower or any constituent Principal in the last seven (7) years, and neither Borrower nor any constituent Principal in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any of its constituent Principals are contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no actual knowledge of any Person contemplating the filing of any such petition against it or such constituent Principals.

-65-

### 4.1.7  Full and Accurate Disclosure.

To the best of Borrower's knowledge, no statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which will have, or might reasonably be expected to have a Material Adverse Effect.

### 4.1.8  No Plan Assets.

Borrower is not a Plan, and none of the assets of Borrower constitute or will constitute Plan Assets of one or more Plans. In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) the assets of Borrower are not treated as Plan Assets of any governmental plan that is subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

### 4.1.9  Compliance.

Except as otherwise disclosed to Lender, Borrower and to Borrower's actual knowledge, the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes. To the best of Borrower's knowledge, Borrower has not received written notice of a default or violation of any order, writ, injunction, decree or demand of any Governmental Authority which remains uncured and outstanding. There has not been committed by Borrower or, to Borrower's actual knowledge, any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

### 4.1.10  Financial Information.

To Borrower's actual knowledge, all financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared in accordance with the Uniform System of Accounts throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect except as referred to or reflected in said financial statements. To Borrower's actual knowledge, since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

-66-

### 4.1.11 Condemnation.

To the best of Borrower's knowledge, no Condemnation or other similar proceeding has been commenced or, to the best of Borrower's knowledge, is threatened in writing with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

### 4.1.12 Federal Reserve Regulations.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

### 4.1.13 Utilities and Public Access.

To Borrower's actual knowledge, the Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended use. To Borrower's actual knowledge after due inquiry, water, gas, electric, telephone, storm sewer and sanitary sewer services are available to the Property either over, under or upon public rights of way directly adjacent to the Property or over, under or upon an easement (not terminable by the grantor thereof or by his heirs, personal representatives, successors or assigns) for the benefit of the Property that connects to public rights of way. To Borrower's actual knowledge, all roads necessary for the use of the Property for its current purpose have been completed, are physically open and are either (1) dedicated to public use or (2) in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy, and have been accepted by all Governmental Authorities.

### 4.1.14 Not a Foreign Person.

Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

### 4.1.15 Separate Lots.

The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

### 4.1.16 Assessments.

To Borrower's actual knowledge and except as disclosed on the Title Insurance Policy, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

-67-

4.1.17  Enforceability.

The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set off, counterclaim or defense with respect thereto.

4.1.18  No Prior Assignment.

To Borrower's actual knowledge, except as will be released on the Closing Date, there are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.19  Insurance.

Borrower has obtained and has delivered to Lender certified copies of all insurance policies or certificates of insurance reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. To Borrower's actual knowledge, no Person, including Borrower, has done, by act or omission, anything which would materially impair the coverage of any such policy.

4.1.20  Use of Property.

The Property is an existing hotel that will be developed for use exclusively as a 202-suite luxury boutique hotel and for other appurtenant and related uses, including ancillary retail and restaurant uses. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and the intended use of the Property following Substantial Completion shall be in conformity of the certificate of occupancy issued for the Property.

4.1.21  Certificate of Occupancy; Licenses.

To Borrower's actual knowledge and except as set forth on Schedule III attached hereto and made a part hereof, all certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property as set forth in Section 4.1.20 hereof (collectively, the "Licenses"), have been obtained and are in full force and effect and are not subject to revocation, suspension or forfeiture. At all times during which the Property is open for business as a hotel, Borrower shall maintain or cause to be maintained all Licenses necessary for the operation of the Property as a hotel. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

4.1.22  Flood Zone.

None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so located, the flood insurance required pursuant to Section 6.1(a)(vi) is in full force and effect.

-68-

OHS East:160274726.8
1-414050

### 4.1.23 Physical Condition.

To Borrower's actual knowledge and except as otherwise identified in that certain The Uniform Building Inspection Report dated August 15, 2007, issued by Glenn Curtis, Master Inspector (as the same may have been heretofore amended, the "Property Condition Report") or in the Environmental Report, the Property, including, without limitation, all buildings, improvements, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond. Except as otherwise identified in the Property Condition Report and the Environmental Report, the Property is free from damage covered by fire or other casualty and, to Borrower's actual knowledge, all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.

### 4.1.24 Boundaries.

Except as otherwise may be disclosed in the Title Insurance Policy or on the Survey, to Borrower's actual knowledge, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements.

### 4.1.25 Leases.

The Property is not subject to any Leases other than the Existing Leases. Borrower is the owner and lessor of landlord's interest in the Existing Leases. To Borrower's actual knowledge, no Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Existing Leases. To Borrower's actual knowledge, the Existing Leases are in full force and effect and, except as otherwise disclosed to Lender, there are no material defaults by the landlord or any tenant under any of the Existing Leases, and, there are no conditions that, with the passage of time or the giving of notice, or both, would constitute material defaults under any of the Existing Leases. Except as otherwise disclosed to Lender, other than with respect to Room License Agreements, no Rent has been paid more than one (1) calendar month in advance of its due date. To the best of Borrower's knowledge, there are no offsets or defenses to the payment of any portion of the Rents except as otherwise disclosed to Lender. Except as otherwise disclosed to Lender, all work to be performed by the landlord under the Existing Leases has been performed as required and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any tenant has already been received by such tenant. There has been no prior sale, transfer or assignment, hypothecation or

-69-

pledge of the Existing Leases or of the Rents received therein which is still in effect. To Borrower's actual knowledge, except as described on Schedule II or as otherwise disclosed in this Section 4.1.25, none of the tenants under the Existing Leases has sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under sublease, nor does anyone except such tenant and its employees occupy such leased premises. No tenant under an Existing Lease has a right or option pursuant to such Existing Lease or otherwise to purchase all or any part of the leased premises. To Borrower's actual knowledge, no Hazardous Materials have been disposed, stored or treated by any tenant under an Existing Lease on or about the leased premises in violation of any Environmental Law nor does Borrower have any actual knowledge of any tenant's intention to use its leased premises for any activity which, directly or indirectly, involves the use, generation, treatment, storage, disposal or transportation of any Hazardous Materials, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property or each respective tenant's business at the Property as set forth in their respective Existing Leases, (B) held by a tenant for sale to the public in its ordinary course of business or (C) fully disclosed to and approved by Lender in writing pursuant to the Environmental Reports.

### 4.1.26 Survey.

To Borrower's actual knowledge, the Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

### 4.1.27 Intentionally Omitted.

### 4.1.28 Filing and Recording Taxes.

To Borrower's actual knowledge, all transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

### 4.1.29 Intentionally Omitted.

### 4.1.30 Intentionally Omitted.

### 4.1.31 Illegal Activity.

No portion of the Property has been or will be purchased with proceeds of any illegal activity and to Borrower's actual knowledge, there are no illegal activities or activities relating to any controlled substances at the Property.

-70-

### 4.1.32 No Change in Facts or Circumstances; Disclosure.

To Borrower's actual knowledge, all information submitted by Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects. To Borrower's actual knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or would reasonably be expected to have a Material Adverse Effect. To Borrower's actual knowledge, Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any Provided Information or representation or warranty made herein to be materially misleading.

### 4.1.33 Investment Company Act.

To the best of Borrower's knowledge, Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money.

### 4.1.34 Principal Place of Business; State of Organization.

Borrower maintains an office, as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower is formed/organized under the laws of the State of Delaware and its organizational identification number is 4393012.

### 4.1.35 Single Purpose Entity.

Borrower covenants and agrees that its organizational documents shall provide that it has not, and shall not and that, except as otherwise provided in Section 4.1.35(cc) hereof, the organizational documents of its general partner(s) if Borrower is a partnership, or its managing member(s) or sole member (as applicable) if Borrower is a limited liability company which does not satisfy the requirements of Section 4.1.35(cc) hereof (in each case, "**Principal**") shall provide that it has not and shall not:

(a) with respect to Borrower, engage in any business or activity other than the acquisition, development, ownership, operation, leasing, managing, disposing, financing, re-financing and maintenance of the Property, and entering into the Loan, and activities incidental thereto and with respect to Principal, engage in any business or activity other than the ownership of its interest in Borrower, and activities incidental thereto;

(b) with respect to Borrower, acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property and intangible property as may be

-71-

necessary for the operation of the Property and with respect to Principal, acquire or own any material asset other than its interest in Borrower;

(c) merge into or consolidate with any Person or dissolve (unless such dissolution occurs as a matter of Applicable Law), terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d) (i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and, with respect to Borrower only, qualification to do business in the State where the Property is located, or (ii) without the prior written consent of Lender, or unless required by Applicable Laws, amend, modify, terminate or fail to comply with, in any material respects, the provisions of Borrower's operating agreement, Articles of Organization or similar organizational documents, as the case may be, or of Principal's Certificate of Incorporation, Articles of Organization or similar organizational documents, as the case may be, whichever is applicable;

(e) own any subsidiary (except for Principal's ownership of Borrower) or make any investment in, any Person (other than Principal's interest in Borrower) without the prior written consent of Lender;

(f) commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person, participate in a cash management system with any other Person or fail to use its own separate invoices and checks;

(g) (i) with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt and Taxes and Other Charges except for (A) trade payables in the ordinary course of its business of owning and operating the Property and Permitted Equipment Financing, provided that such debt (1) is not evidenced by a note, (2) with respect to trade payables, is paid within sixty (60) days of the date incurred, unless contested by Borrower in good faith, (3) does not exceed, in the aggregate, three percent (3%) of the then outstanding principal balance of the Note and (4) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances, (B) subordinate unsecured loans from its members or partners, as applicable, in accordance with the provisions of its operating agreement or limited partnership agreement, as applicable, and (C) indemnification or reimbursement obligations to certain officers and directors pursuant to its organizational documents (the "**Indemnification Obligations**"), provided that such Indemnification Obligations shall be fully subordinate to the payment of the Debt, however, notwithstanding the foregoing, Borrower may make payments to such officers or directors as a result of such Indemnification Obligations (the "**Indemnification Reimbursement Payments**"), during the term of the Loan, so long as (I) no Event of Default has occurred and is continuing, (II) there is cash flow from the operation of the Property in excess of amounts necessary to make all payments then currently due under the Loan Documents, (III) such Indemnification Reimbursement Payments shall not render Borrower insolvent or unable to pay its debts as they become due, and (IV) such Indemnification Obligations do not constitute a claim against Borrower, for so long as the

-72-

Loan is outstanding, to the extent that funds are insufficient to make such Indemnification Reimbursement Payments and (ii) with respect to Principal, incur any debt secured or unsecured, direct or contingent (including guaranteeing any obligations); provided, however, that the foregoing provision shall not be deemed to require the Borrower's members to make additional capital contributions in the event that Gross Income from Operations are insufficient to pay Operating Expenses;

(h) become insolvent and fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; provided, however, that the foregoing provision shall not be deemed to require the Borrower's members to make additional capital contributions in the event that Gross Income from Operations are insufficient to pay Operating Expenses;

(i) (i) fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from those of the members, general partners, principals and Affiliates of Borrower or of Principal, as the case may be, the Affiliates of a member, general partner or principal of Borrower or of Principal, as the case may be, and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person or (iii) include the assets or liabilities of any other Person on its financial statements, except, in each case, where consolidated financial statements are permitted or required by Applicable Law, the Uniform System of Accounts or GAAP (as applicable), provided that such consolidated financial statements shall reflect that such Persons are separate legal entities;

(j) enter into any contract or agreement with any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, Guarantor, or any member, general partner, principal or Affiliate thereof except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, Guarantor, or any member, general partner, principal or Affiliate thereof (Lender acknowledging that the Affiliate Agreements comply with this Section 4.1.35(j));

(k) seek the dissolution (unless such dissolution occurs as a matter of Applicable Law) or winding up in whole, or in part, of Borrower or of Principal, as the case may be;

(l) fail to correct any known misunderstandings regarding the separate identity of Borrower or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof or any other Person;

(m) guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person except as permitted pursuant to this Agreement;

(n) make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or

-73-

securities of any member, general partner, principal or Affiliate of Borrower or Principal, as the case may be, or any member, general partner, or Affiliate thereof;

(o) fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law or to the extent not part of a consolidated group filing a consolidated return or returns;

(p) fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower or of Principal, as the case may be, and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower or Principal, as the case may be, is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof);

(q) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, that the foregoing provision shall not be deemed to require the Borrower's members to make additional capital contributions in the event that Gross Income from Operations are insufficient to pay Operating Expenses;

(r) share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Borrower or of Principal, as the case may be, (ii) any Affiliate of a general partner, principal or member of Borrower or of Principal, as the case may be; or (iii) any other Person other than in connection with the filing of a consolidated return or returns;

(s) fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate;

(t) pledge its assets for the benefit of any other Person, and with respect to Borrower, other than with respect to the Loan;

(u) fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v) fail to provide in its (i) Articles of Organization, Certificate of Formation and/or Operating Agreement, as applicable, if it is a limited liability company, (ii) Limited Partnership Agreement, if it is a limited partnership or (iii) Certificate of Incorporation, if it is a corporation, that for so long as the Loan is outstanding pursuant to the Note, this Agreement and the other Loan Documents, it shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote of each Independent Manager and of all other general partners/managing members/directors;

-74-

(w) fail to hold its assets in its own name;

(x) if Borrower or Principal is a corporation, fail to consider the interests of its creditors in connection with all corporate actions;

(y) have any of its obligations guaranteed by an Affiliate, except as expressly permitted by the Loan Documents;

(z) violate or cause to be violated the assumptions made with respect to Borrower or Principal in the Insolvency Opinion; or

(aa)    with respect to Principal, or Borrower, if Borrower is a single member limited liability company that complies with the requirements of Section 4.1.35(cc) below, fail at any time to have at least one (1) Independent Manager;

(bb)    with respect to Principal, or Borrower, if Borrower is a single member limited liability company that complies with the requirements of Section 4.1.35(cc) below, permit its board of directors or managers, as applicable, to take any action which, under the terms of any certificate of incorporation, by-laws, voting trust agreement with respect to any common stock or other applicable organizational documents, requires the unanimous vote of one hundred percent (100%) of the members and managers without the vote of the Independent Manager;

(cc)    In the event Borrower is a Delaware limited liability company that does not have a managing member which complies with the requirements for a Principal under this Section 4.1.35, then in lieu of the requirements that Principal and the organizational documents of Principal comply with the provisions of this Section 4.1.35, the limited liability company agreement of Borrower (the "LLC Agreement") shall provide that (A) upon the occurrence of any event that causes the last remaining member of Borrower ("Member") to cease to be the member of Borrower (other than (1) upon an assignment by Member of all of its limited liability company interest in Borrower and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (2) the resignation of Member and the admission of an additional member of Borrower in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Manager of Borrower shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower, automatically be admitted to Borrower ("Special Member") and shall continue Borrower without dissolution and (B) Special Member may not resign from Borrower or transfer its rights as Special Member unless (1) a successor Special Member has been admitted to Borrower as Special Member in accordance with requirements of Delaware law and (2) such successor Special Member has also accepted its appointment as an Independent Manager. The LLC Agreement shall further provide that (v) Special Member shall automatically cease to be a member of Borrower upon the admission to Borrower of a substitute Member, (w) Special Member shall be a member of Borrower that has no interest in the profits, losses and capital of Borrower and has no right to receive any distributions of Borrower assets; (x) pursuant to Section 18-301 of the Delaware Limited Liability Company Act (the "Act"), Special Member shall not be required to make

-75-

any capital contributions to Borrower and shall not receive a limited liability company interest in Borrower, (y) Special Member, in its capacity as Special Member, may not bind Borrower and (z) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower, including, without limitation, the merger, consolidation or conversion of Borrower; provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Manager, to vote on such matters required by the LLC Agreement. In order to implement the admission to Borrower of Special Member, Special Member shall execute a counterpart to the LLC Agreement. Prior to its admission to Borrower as Special Member, Special Member shall not be a member of Borrower.

Upon the occurrence of any event that causes the Member to cease to be a member of Borrower, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower, agree in writing (A) to continue Borrower and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of Member of Borrower in Borrower. Any action initiated by or brought against Member or Special Member under any Creditors Rights Laws (defined below) shall not cause Member or Special Member to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution. The LLC Agreement shall provide that each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower. The term "Creditors Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

### 4.1.36 Business Purposes.

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

### 4.1.37 Taxes.

Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it to date and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it (if any). To the best of Borrower's knowledge, there is no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

-76-

### 4.1.38 Forfeiture.

Neither Borrower nor, to Borrower's actual knowledge, any other Person in occupancy of or involved with the operation or use of the Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

### 4.1.39 Environmental Representations and Warranties.

Borrower represents and warrants to its actual knowledge, except as disclosed in the written reports resulting from the environmental site assessments of the Property delivered to Lender prior to the Closing Date as specifically set forth on Schedule IV attached hereto and made a part hereof (collectively, the "Environmental Report") that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with current Environmental Laws and with permits issued for the Property pursuant thereto (if such permits are required), and (ii) with respect to Hazardous Materials, either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property or each tenant's respective business at the Property as set forth in their respective Leases, or (B) held by a tenant for sale to the public in its ordinary course of business, or (C) *de minimus* amounts used by tenants (including a transient occupants) in the ordinary course, (b) there are no past or present Releases of Hazardous Materials in violation of any Environmental Law and which require remediation by a Governmental Authority in, on, under or from the Property; (c) there is no past or present material non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property; (d) Borrower does not know of, and has not received, any written notice or other communication from any Person (including but not limited to a Governmental Authority) alleging the presence of Hazardous Materials in, on, under or from the Property in violation of any Environmental Law; and (e) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property in violation of Environmental Law known to Borrower and prepared by or on behalf of Borrower, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

### 4.1.40 Taxpayer Identification Number.

Borrower's United States taxpayer identification number is 26-0617170.

### 4.1.41 OFAC.

Borrower represents and warrants that neither Borrower, Guarantor, nor any of its Affiliates is, to its actual knowledge and after review of the Annex to the Executive Order, the Treasury List and any amendments or additions thereto in effect as of the Closing Date (and subject to re-confirmation in accordance with Section 5.1.16 hereof), a Prohibited Person, and, to Borrower, Guarantor and their actual knowledge, Borrower, and its respective Affiliates are in

OHS East:160274726.8
1-414050

full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4.1.42 Intentionally Omitted.

4.1.43 Deposit Accounts.

(a) This Agreement and the Property Account Agreement creates valid and continuing security interests (as defined in the UCC) in the Property Account and the Deposit Account in favor of Lender, which security interests are prior to all other Liens and are enforceable as such against creditors of and purchasers from Borrower;

(b) Borrower and Lender agree that the Property Account is and shall be maintained (i) as a "deposit account" (as such term is defined in Section 9-102(a)(29) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 9-104(a)(2) of the UCC) over the Property Account notwithstanding that Borrower may be entitled to receive the proceeds in the Property Account from time to time and (iii) such that neither Borrower nor Manager shall have any right of withdrawal from the Property Account and no Account Collateral shall be released to Borrower or Manager from the Property Account. Without limiting Borrower's obligations under the immediately preceding sentence, Borrower shall only establish and maintain the Property Account with a financial institution that has executed an agreement substantially in the form of the Property Account Agreement or in such other form reasonably acceptable to Lender.

(c) Borrower and Lender agree that the Deposit Account and each Account other than the Property Account is and shall be maintained (i) as a "securities account" (as such term is defined in Section 8-501(a) of the UCC), (ii) in such a manner that Lender shall have control (within the meaning of Section 8-106(d)(2) of the UCC) over each such Account other than the Property Account, (iii) such that neither Borrower nor Manager shall have any right of withdrawal from such Accounts and, except as provided herein, no Account Collateral shall be released to Borrower from such Accounts, (iv) in such a manner that the Deposit Bank shall agree to treat all property credited to each Account other than the Property Account as "financial assets" and (v) such that all securities or other property underlying any financial assets credited to such Accounts shall be registered in the name of Deposit Bank, indorsed to Deposit Bank or in blank or credited to another securities account maintained in the name of Deposit Bank and in no case will any financial asset credited to any such Accounts be registered in the name of Borrower, payable to the order of Borrower or specially indorsed to Borrower except to the extent the foregoing have been specially indorsed to Deposit Bank or in blank;

(d) Borrower owns the entire interest in the Property Account and the Deposit Account free and clear of any Lien or claim of any Person and has not pledged, assigned, or sold, granted a security interest in, or otherwise conveyed the Property Account or Deposit Account to any Person other than the security interest granted to Lender pursuant to this Agreement;

-78-

(e) Borrower has delivered to Lender fully executed agreements pursuant to which the bank maintaining the Property Account has agreed to comply with all instructions originated by Lender directing disposition of the funds in such accounts without further consent by Borrower; and

(f) The Property Account and the Deposit Account are not in the name of any Person other than Borrower or Lender. Borrower has not consented to the bank maintaining the Property Account or the Deposit Account to comply with instructions of any Person other than Lender.

### 4.1.44 Embargoed Person.

To the best of Borrower's knowledge, as of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Principal and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Principal, or Guarantor, as applicable, with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Principal, or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

### 4.1.45 Renovation Work. As of the Closing Date and each date on which an Advance is made hereunder:

(a) All personal property that is to be incorporated into or acquired for purposes of the renovation is or shall be owned by Borrower, subject only no Liens other than the Permitted Encumbrances;

(b) The Plans and Specifications (a true, correct and complete list of which is set forth on Schedule 4.1.45(b) hereto) (i) have been approved by Borrower and the beneficiaries of each restrictive covenant to which the Property may be subject, and (ii) have been presented for review to all Governmental Authorities having jurisdiction over the renovation of the Property or otherwise having any rights of review and approval of such Plans and Specifications, and have been reviewed and unconditionally and finally approved by each such Governmental Authority, to the extent such review and approval is required under Applicable Law;

(c) The construction and installation of the improvements and equipment, and the intended use thereof, as described in the Plans and Specifications, and the other Renovation

Documents are in full compliance with all Applicable Laws, including, to the extent applicable, all Environmental Laws and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101, as from time to time amended, together with any comparable laws of the State of Nevada and any subdivision thereof, and are also in compliance with all agreements of record that run with, and are binding upon, the Property;

(d) All utility services necessary for the contemplated use of the Property following the Substantial Completion of the Renovation Work are available on the Property or at the boundaries of the Property, or will be available at the time specified therefore in the Renovation Schedule and in accordance with the Renovation Budget, and can be brought and connected to the improvements on the Property and fully utilized in connection with the intended use of the Property following the Substantial Completion of the Renovation Work;

(e) The Property has adequate roads and sources of ingress and egress to permit the Property to be used for its intended purposes following the Substantial Completion of the Renovation Work;

(f) All agreements (if any) for the construction of public improvements required as a condition of the Renovation Work have been or will be executed and delivered and either are, or upon execution and delivery shall be, valid and in full force and effect and without default, on the part of any party to such agreements;

(g) Borrower has obtained and is maintaining, and has delivered to Lender true, correct and complete copies of, all Licenses required under Applicable Law for (i) the construction and installation of the improvements and equipment, except for any Licenses to be obtained only as a condition of subsequent work relating to the renovation of the Property (provided that the Licenses are readily obtainable during the construction and installation of the improvements and equipment in accordance with the Renovation Schedule), the non-issuance of which at any applicable time of determination shall not materially impede the construction and installation of such improvements and equipment in accordance with the Plans and Specifications, the Renovation Schedule and the other Renovation Documents;

(h) All surety bonds or other similar surety arrangements required in connection with the construction and installation of the improvements and equipment relating to the Renovation Work are in full force and effect, and the sureties or other applicable providers thereof have not indicated any intent to dishonor or fail to pay and perform their obligations thereunder, nor have any of the sureties or other applicable providers asserted any claim of discharge from any of their obligations under such surety bonds, standby letters of credit or other surety arrangements;

(i) The Property as developed, constructed and equipped in accordance with the Plans and Specifications, shall be contained wholly within the boundaries of the Property and shall not encroach upon any building line, setback line, side yard line, or any recorded or visible easement (or other easement of which Borrower has knowledge of or has reason to believe may exist with respect to the Property);

(j) The Property and the site conditions thereof are such that Legal Requirements

-80-

relating to the filling, dredging, excavation or other usage of lands classified as wetlands or lands which are subject to periodic flooding or have thereon standing or moving bodies of water are not applicable to the renovation of the Property;

(k) Borrower has not received any written notice from any insurance company of any defects or inadequacies in the renovation program or the Property that would adversely affect the insurability of the Property or materially increase the cost of insuring the Property beyond that which is customarily charged for similar property in the vicinity of the Property used for a similar purpose as the purpose for which Borrower intends to use the Property;

(l) All contracts necessary or otherwise material to the business and operations of Borrower (i) have been or will be obtained by Borrower and those heretofore obtained are in full force and effect, without any material default by Borrower existing thereunder, and (ii) to the best of Borrower's knowledge, are valid, binding and enforceable upon each other party thereto in accordance with their respective terms;

(m) Neither the nature of Borrower or of any of its business or properties, nor any relationship between Borrower and any other Person, nor any circumstance in connection with the Loan or the execution and delivery of the Loan Documents, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority on the part of Borrower as a condition to the execution and delivery of this Agreement or any of the other Loan Documents, the construction and installation of the improvements and equipment relating to the Renovation Work or the obtaining of the Loan, except to the extent that such consent, approval or authorization has been obtained or such filing, registration or qualification has been accomplished;

(n) Borrower has, on or before the date hereof, (i) delivered to Lender a true, correct and complete copies of all Construction Contracts in effect, executed by Borrower and the applicable Contractor and (ii) delivered to Lender a true, correct and complete copy of the Architect's Agreement in effect, executed by Borrower and the Architect;

(o) Attached hereto as Schedule 4.1.45(o) is a true, correct and complete copy of the Renovation Budget; and

(p) Attached hereto as Schedule 4.1.45(p) is a true, correct and complete copy of the Renovation Schedule.

Section 4.2    Survival of Representations.

Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf unless Lender has specific knowledge to the contrary relating to any such representation or warranty.

-81-

## V.   BORROWER COVENANTS

Section 5.1   Affirmative Covenants.

From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument encumbering the Property (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

5.1.1   Existence; Compliance with Legal Requirements.

(a) Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, in all material respects, with all Legal Requirements applicable to it and the Property. There shall never be committed by Borrower or, to the best of Borrower's ability, any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any State or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall, or shall cause, at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in good working order and repair, and from time to time (following the Completion of the Renovation Work) make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument. Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

(b) After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost during the contest period; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be reasonably required in the proceeding, or as may be requested by Lender, to insure compliance with such Legal Requirement, together

-82-

OHS East:160274726.8
1-414050

with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in imminent danger of being sold, forfeited, terminated, cancelled or lost.

### 5.1.2   Taxes and Other Charges.

Subject to Section 3.8 hereof, Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable including any statutory grace period. Borrower shall furnish, or cause to be furnished, to Lender receipts, or other evidence reasonably satisfactory to Lender for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender or Lender is obligated to pay such Taxes pursuant to Section 7.2 hereof). Borrower shall not suffer and shall promptly cause to be paid and discharged or shall bond or contest in accordance with the terms of this Agreement any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii)  neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, cancelled or lost during the contest period; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be reasonably required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may apply such security or part thereof held by Lender at any time when, in the judgment of Lender, the validity or applicability of such Tax or Other Charges is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any imminent danger of the Lien of the Security Instrument being primed by any related Lien.

### 5.1.3   Litigation.

Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower of which Borrower has received written notice of and which might reasonably be expected to have a Material Adverse Effect.

-83-

### 5.1.4    Access to the Property.

Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance written notice, subject to the rights of (a) tenants under their respective leases; and (b) parties under applicable Room License Agreements (including, without limitation, overnight hotel guests).

### 5.1.5    Intentionally Omitted.

### 5.1.6    Cooperate in Legal Proceedings.

Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender if an Event of Default has occurred and is then continuing, at its election, to participate in any such proceedings, however, Lender shall not take any action to prejudice Borrower or the Property in such proceeding unless reasonably necessary to protect its interest under the Loan.

### 5.1.7    Award and Insurance Benefits.

Subject to the terms of this Agreement, Borrower shall cooperate with Lender in connection with obtaining the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any reasonable expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

### 5.1.8    Further Assurances.

Borrower shall, at Borrower's sole cost and expense:

(a) furnish to Lender, on or prior to the Closing Date, all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements reasonably requested by Lender, and, from and after the Closing Date, each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith;

(b) execute and deliver to Lender upon written request such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require including, without limitation, the authorization and/or execution of UCC financing statements, provided, however, no such instruments, documents or actions shall materially

-84-

increase Borrower's obligations hereunder and/or materially decrease its rights hereunder; and

(c) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time; provided the same shall not materially increase Borrower's obligations hereunder and/or materially decrease its rights hereunder.

### 5.1.9  Mortgage and Intangible Taxes.

Borrower shall pay all State, county and municipal recording, mortgage, intangible, and all other taxes imposed upon the execution and recordation of the Security Instrument and/or upon the execution and delivery of the Note.

### 5.1.10  Financial Reporting.

(a) Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP or the Uniform System of Accounts (or such other accounting basis reasonably acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable written notice (but no more than twice per year, when there is no occurrence and continuance of an Event of Default) to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence and during the continuance of an Event of Default, Borrower shall pay any reasonable out-of-pocket costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be reasonably necessary in the protection of Lender's interest.

(b) Borrower will furnish to Lender quarterly and annually, within sixty (60) days following the end of each fiscal quarter and one hundred twenty (120) days following the end of each quarter and each Fiscal Year commencing with the Fiscal Year beginning January 1, 2008, as applicable, a complete copy of Borrower's quarterly or annual (as applicable) financial statements, with respect to such annual statements, audited by a "Big Four" accounting firm or other independent certified public accounting firm reasonably acceptable to Lender in accordance with the Uniform System of Accounts (or such other accounting basis reasonably acceptable to Lender) covering the Property for such quarter or Fiscal Year (as applicable) and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower; provided, however, that it is understood and agreed by Lender that any financial statements of Borrower, including the audited financial statements of Borrower required hereunder may be consolidated financial statements (which shall comply with Section 4.1.35(i)) between Borrower and one or more Affiliates of Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such fiscal quarter or Fiscal Year (as applicable), and shall include, but not be

-85-

limited to, amounts representing annual Net Cash Flow, Net Operating Income, Gross Income from Operations and Operating Expenses. Borrower's annual financial statements shall be accompanied by (i) an unqualified opinion of a "Big Four" accounting firm or other independent certified public accounting firm reasonably acceptable to Lender, (ii) a schedule audited by such independent certified public accounting firm reconciling Net Operating Income to Net Cash Flow (the "**Net Cash Flow Schedule**"), which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow deemed material by such independent certified public accountant, (iii) occupancy statistics for the Property in form reasonably acceptable to Lender and (iv) any material reports or other material information provided to Borrower or by Borrower under any Franchise Agreement.

(c) Borrower will furnish, or cause to be furnished, to Lender the following items, accompanied by an Officer's Certificate, stating that, to the best of such Responsible Officer's or other officer's knowledge, such items are true, correct, accurate, and complete, and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments): (i) on or before twenty-five (25) days after the end of each calendar month, a occupancy report for the subject month, including an average daily rate; (ii) (A) on or before twenty-five (25) days after the end of each calendar month, operating statements (including Capital Expenditures) prepared for the subject calendar month and (B) on or before one hundred twenty (120) days after the end of each calendar year, year-to-date operating statements, noting Net Operating Income, Gross Income from Operations, and Operating Expenses, and other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar year, and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender; and (iii) on or before twenty-five (25) days after the end of each calendar month, a Net Cash Flow Schedule. In addition, such Officer's Certificate shall also be accompanied by a certificate executed by a Responsible Officer or other appropriate officer or the Principal of Borrower or Manager (if applicable) certifying (x) that there are no trade payables outstanding for more than sixty (60) days unless contested by Borrower in good faith and (y) copies of any material reports or other material information provided to Borrower or by Borrower under any Franchise Agreement.

(d) For the Fiscal Year beginning January 1, 2008 (the Annual Budget for Fiscal Year 2007 being delivered by Borrower to Lender on or about the Closing Date) and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget for the Property not later than forty-five (45) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender, and shall be subject to Lender's written approval, which approval shall not be unreasonably withheld, conditioned or delayed (each such Annual Budget after it has been approved in writing by Lender shall be hereinafter referred to as an "**Approved Annual Budget**"); provided, however, that Borrower shall have the right to incur additional expenses in connection with the ownership, operation and/or maintenance of the Property, not to exceed ten percent (10%) of the total budgeted expenses set forth on the Approved Annual Budget without obtaining Lender's consent, provided that Borrower delivers evidence reasonably acceptable to Lender documenting such additional

-86-

expenses. In the event that Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses. In the event that Lender fails to respond to a request for approval of an Annual Budget and such failure continues for more than twenty (20) days after delivery of such request to Lender in an envelope marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN TWENTY (20) DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the request must be marked "PRIORITY", such request shall be deemed approved.

(e) Borrower shall furnish to Lender, within ten (10) Business Days after written request such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(f) As soon as completed, but in any event no later than April 30 of each calendar year, federal and state tax returns for Borrower unless an extension with respect to such return has been timely filed and a copy thereof promptly furnished to Lender.

(g) Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form and/or on a diskette, or (ii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).

(h) Borrower agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant or investor in all or any portion of the Loan or any Securities (collectively, the "Investor") or any Rating Agency rating such participations and/or Securities and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, Sponsor (but only to the extent that the information is otherwise publicly available) and the Property, whether furnished by Borrower or otherwise, as Lender determines reasonably necessary. Borrower irrevocably waives any and all rights it may have under any Applicable Laws to prohibit such disclosure, including but not limited to any right of privacy.

-87-

OHS East:160274726.8
1-414050

5.1.11  Business and Operations.

Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, leasing, management and operation of the Property (other than during the performance of the Renovation Work). Borrower will remain in good standing under the laws of each jurisdiction to the extent required for the ownership, maintenance, leasing, management and operation of the Property.

5.1.12 ~~Costs of Enforcement.~~

In the event that (a) that the Security Instrument encumbering the Property is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Security Instrument encumbering the Property in which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or an assignment by Borrower for the benefit of its creditors, ~~Borrower, its successors or assigns, subject to Section 9.4 hereof, shall be chargeable with and agrees to pay all reasonable actual out-of-pocket costs of collection and defense, including attorneys' fees~~ and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

5.1.13  Estoppel Statement.

(a) After request by Lender, Borrower shall within fifteen (15) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) to the best of Borrower's knowledge, the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations (subject to bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors generally and subject to limitations on the availability of equitable remedies) and have not been modified or if modified, giving particulars of such modification.

(b) Borrower shall use commercially reasonable efforts to deliver to Lender, upon fifteen (15) days written request (or such later period as may be set forth in such tenant's lease) tenant estoppel certificates from each commercial tenant leasing space at the Property (i.e., the tenants other than hotel guests occupying rooms pursuant to Room License Agreements) in form and substance reasonably satisfactory to Lender or in the form required by such tenant's lease to the extent Lender has previously approved such lease containing such form (to the extent that such approval was required hereunder).

5.1.14  Loan Proceeds.

Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4.

-88-

5.1.15 <u>Performance by Borrower.</u>

Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

5.1.16 <u>Confirmation of Representations.</u>

Borrower shall deliver, in connection with any Securitization, (a) one or more Officer's Certificates certifying to the best of such Responsible Officer's knowledge and subject to Section 9.4 hereof, as to the accuracy in all material respects of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower and Principal as of the date of the closing of such Securitization.

5.1.17 <u>Leasing Matters.</u>

(a) Borrower may not enter into a proposed Lease (including the renewal or extension of an Existing Lease (a "<u>Renewal Lease</u>"), but excluding Room License Agreements) demising in excess of 5,000 square feet (a "<u>Major Lease</u>") without the prior written consent of Lender, which consent will not be unreasonably withheld, conditioned or delayed. At Lender's request, Borrower shall promptly deliver to Lender copies of all Leases which are entered into pursuant to this Subsection. Borrower may enter Room License Agreements in the normal course of operating the Property without the consent of Lender.

(b) Borrower shall (i) observe and perform all the material obligations imposed upon the lessor under the Leases (other than Room License Agreements) and shall use its commercially reasonable efforts not to do or permit anything in Borrower's control to be done to materially impair the value of any of the Leases as security for the Debt; (ii) promptly send copies to Lender of all material notices of default which Borrower shall send or receive with respect to the Leases; (iii) use commercially reasonable efforts to enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed short of termination thereof; (iv) other than with respect to Room License Agreements, not collect any of the Rents more than one (1) month in advance (except Security Deposits shall not be deemed Rents collected in advance and Borrower may collect the first month's rent and any additional rent due under a Lease in advance); (v) not execute any other assignment of the lessor's interest in any of the Leases or the Rents; and (vi) not consent to any assignment of a Major Lease (if such consent is discretionary) without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed; <u>provided, however</u>, in the event the original tenant under such Major Lease is not released from its obligations under such Major Lease following such assignment, Lender's consent shall not be required for such assignment.

(c) Notwithstanding the provisions in Section 5.1.17(b)(iii), Borrower may, without the consent of Lender, amend, modify or waive the provisions of any Lease or terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Lease (including any guaranty, letter of credit or other credit support with respect thereto) with respect to any Room License Agreement and with respect to any other Lease that is not a Major Lease and that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a Material Adverse Effect, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Agreement and any lease subordination agreement binding upon Lender with respect to such Lease. A termination of a Lease (other than a Major Lease) with a tenant who is in default beyond applicable notice and grace periods shall not be considered an action which has a Material Adverse Effect. Any material amendment, modification, or waiver, and any termination, rent reduction, space surrender or term shortening which does not satisfy the requirements set forth in this Subsection shall be subject to the prior written approval of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, at Borrower's expense. At Lender's request, Borrower shall promptly deliver to Lender copies of all Leases (other than Room License Agreements), amendments, modifications and waivers which are entered into pursuant to this Section 5.1.17(c) together with Borrower's certification that it has satisfied all of the conditions of this Section 5.1.17(c).

(d) Notwithstanding the provisions above, to the extent, if any, that Lender's prior written approval is required pursuant to Section 5.1.17, Lender shall, with respect to new Leases have five (5) Business Days from receipt of such written request and any and all required material information and documentation relating thereto in which to approve or disapprove such material information and documentation; provided, such request to Lender is marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF THIS AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the request must be marked "PRIORITY". In the event Lender fails to respond to the information and proposed documentation within such time, Lender's approval shall be deemed given; provided, however, that if Lender reasonably believes that such proposed Lease is of such nature that it cannot reasonably be approved within such five (5) Business Day period, and Lender is diligently pursuing such approval, Lender shall have such additional time as is reasonably necessary to complete such approval upon notice to Borrower of the need for such additional time, it being agreed that no such extension shall be for a period in excess of five (5) Business Days. Borrower shall be required to provide Lender with such material information and documentation as may be reasonably required by Lender, in its reasonable discretion, including without limitation, lease comparables and other market information as reasonably required by Lender, provided, Lender must request the foregoing information within five (5) Business Days from the date of Lender's receipt of the proposed Lease. If Lender disapproves any new Leases, Lender shall provide Borrower with a written explanation of its disapproval.

-90-

OHS East:160274726.8
1-414050

(e) Notwithstanding the leasing approval procedure set forth above, to facilitate Borrower's leasing process, Borrower may present prospective leasing transactions to Lender for its approval prior to the negotiation of a final Lease. Such presentation shall include a summary term sheet of all material terms of the proposed lease or a draft of the Lease, either as supplemented by any additional information concerning such lease or the tenant thereunder as may be reasonably requested by Lender (the "**Lease Term Sheet**"). Provided Borrower complies with the conditions and procedures set forth in the subsection 5:1.17 (d) above, and Lender fails to approve or disapprove the Lease Term Sheet, the Lease Term Sheet shall be deemed approved by Lender. If Lender approves or is deemed to have approved the Lease Term Sheet, Lender's prior approval shall not be required for the final Lease, except to the extent such final Lease (i) deviates in any material respect from the terms set forth on the Lease Term Sheet or contains any material terms not set forth in the Lease Term Sheet, (ii) is not on the standard form of lease previously approved by Lender as modified by the Lease Term Sheet or (iii) is not fully executed within ninety (90) days after the Lease Term Sheet is received by Lender. Borrower shall deliver to Lender copies of the following: (1) the fully-executed Lease entered into by Borrower in accordance with Section 5:1.17 hereof which, provided such Lease contains substantially the same terms, without any material differences, as those set forth in the Lease Term Sheet previously approved by Lender, may be delivered after the execution of the Lease and (2) the final Lease Term Sheet, if any (to the extent that such final Lease Term Sheet contains revisions or changes that were not contained in the Lease Term Sheet initially reviewed and approved by Lender in accordance with this subsection 5.1.17(e).

(f) Notwithstanding anything contained herein to the contrary, with respect to the Property, Borrower shall not, without the prior written consent of Lender (but subject to the approval process set forth in Section 5.1.17(d)), which consent shall not be unreasonably withheld, conditioned or delayed, enter into, renew, extend, amend, modify, waive any provisions of, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Major Lease or any instrument guaranteeing or providing credit support for any Major Lease.

(g) Lender shall hold any and all monies representing security deposits under the Leases (the "**Security Deposits**") received by Lender, in accordance with the terms of the respective Lease, and shall only release the Security Deposits in order to return a tenant's Security Deposit to such tenant if such tenant is entitled to the return of the Security Deposit under the terms of the Lease.

5.1.18  Management Agreement.

Prior to the date on which the Substantial Completion of the Renovation Work has occurred, the Improvements will be operated under the terms and conditions of the Asset Management Agreement and the Renovation Work will be supervised under the terms and conditions of the Project Management Agreement. From and after the date on which the Substantial Completion of the Renovation Work has occurred, the Improvements will be operated under the terms and conditions of the Management Agreement; it being agreed that the Management Agreement and the manager thereunder shall be subject to the prior written consent

-91-

OHS East:160274726.8
1-414050

of Lender. In no event shall the management fees under the Asset Management Agreement, the
Project Management Agreement and the Management Agreement exceed, in the aggregate, four
percent (4%) of the gross income derived from the Property. The management fees due under
each of the Asset Management Agreement and the Management Agreement shall be subordinate
to the liens and security interests created or to be created for the benefit of Lender, and securing
the repayment of the Note and the obligations under the Loan Agreement. Borrower shall, or
shall use commercially reasonable efforts to cause the manager under each of the Project
Management Agreement, the Asset Management Agreement and the Management Agreement to
(i) diligently perform and observe all of the material terms, covenants and conditions of the Asset
Management Agreement, the Project Management Agreement and the Management Agreement
(as the case may be), on the part of Borrower to be performed and observed to the end that all
things shall be done which are reasonably necessary to keep unimpaired the rights of Borrower
under each of the Asset Management Agreement, the Project Management Agreement and the
Management Agreement and (ii) promptly notify Lender of the giving of any notice by the
manager to Borrower of any material default by Borrower in the performance or observance of
any of the terms, covenants or conditions of the Asset Management Agreement, the Project
Management Agreement or the Management Agreement on the part of Borrower to be performed
and observed and deliver to Lender a true copy of each such notice. In the connection with each
of the Asset Management Agreement, the Project Management Agreement and the Management
Agreement, Borrower shall assign to Lender as further security for the payment of the Debt and
for the performance and observance of the terms, covenants and conditions of this Agreement, all
the rights, privileges and prerogatives of Borrower to surrender the Asset Management
Agreement, the Project Management Agreement and the Management Agreement, or to
terminate, cancel, modify, change, supplement, alter or amend the Asset Management
Agreement, the Project Management Agreement and the Management Agreement, in any
material respect, and any such surrender of the Asset Management Agreement, the Project
Management Agreement or the Management Agreement, or termination by Borrower,
cancellation by Borrower, material modification, change, supplement, alteration or amendment
of the Asset Management Agreement, the Project Management Agreement or the Management
Agreement, without the prior consent of Lender (which consent shall not be unreasonably
withheld, delayed or conditioned) shall be void and of no force and effect. From and after the
occurrence and during the continuance of an Event of Default, if Borrower or the manager under
the Asset Management Agreement, the Project Management Agreement or the Management
Agreement shall default beyond all notice and cure periods contained under the applicable
agreement, in the performance or observance of any material term, covenant or condition of such
agreement on the part of Borrower or the manager thereunder to be performed or observed, then,
without limiting the generality of the other provisions of this Agreement, and without waiving or
releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall
be under no obligation, to pay any sums and to perform any act or take any action as may be
appropriate to cause all the terms, covenants and conditions of the Asset Management
Agreement, the Project Management Agreement or the Management Agreement on the part of
Borrower to be performed or observed on behalf of Borrower, to the end that the rights of
Borrower in, to and under the Asset Management Agreement, the Project Management
Agreement and the Management Agreement shall be kept unimpaired and free from default.
Lender and any Person designated by Lender shall have, and are hereby granted, the right to
enter upon the Property at any time (subject to the rights of tenants under their respective Leases

-92-

and guests pursuant to Room License Agreements) and from time to time, upon prior written notice to Borrower and during business hours or such other reasonable times only, for the purpose of taking any such action. If the manager under the Asset Management Agreement, the Project Management Agreement or the Management Agreement shall deliver to Lender a copy of any notice sent to Borrower of default under such agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall not, and shall not permit the manager under the Asset Management Agreement, the Project Management Agreement or the Management Agreement to, sub-contract any or all of its management responsibilities under such agreement to a third party without the prior written consent of Lender, which will not be unreasonably withheld, conditioned or delayed. Borrower shall, from time to time (but no more than twice per year when there is no occurrence and continuance of an Event of Default), use its commercially reasonable efforts to obtain from the manager under the Asset Management Agreement, the Project Management Agreement and the Management Agreement such certificates of estoppel with respect to compliance by Borrower with the terms of such agreement as may be reasonably requested by Lender. Any sums expended by Lender pursuant to this paragraph (i) shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender (if sums are not repaid within (10) days of demand), (ii) shall be deemed to constitute a portion of the Debt, (iii) shall be secured by the lien of the Security Instrument and the other Loan Documents and (iv) shall be immediately due and payable within ten (10) days of written demand by Lender therefor.

5.1.19 Environmental Covenants.

(a) Borrower covenants and agrees that so long as Borrower owns the Property and the Loan is outstanding (i) all uses and operations on or of the Property, whether by Borrower or, to the extent possible through commercially reasonable efforts by Borrower, any other Person, shall be in compliance in all material respects with all Environmental Laws and permits issued for the Property pursuant thereto if and to the extent required; (ii) there shall be no Releases of Hazardous Materials by Borrower in violation of Environmental Laws in, on, under or from any of the Property and Borrower shall use commercially reasonable efforts to insure that there shall be no Releases of Hazardous Materials by any other Person in violation of Environmental Laws, in, on, under or from any of the Property; (iii) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (A) in compliance with all Environmental Laws and with permits issued for the Property pursuant thereto, if and to the extent required, and (B) either (1) used (and, in the case of retail tenants, sold) in the ordinary course of the business of Borrower and any lessee thereof in amounts not in excess of that reasonably necessary to operate the Property and tenants respective businesses, (2) fully disclosed to and approved by Lender in writing, including within the Environmental Report, in which case the same shall be deemed fully disclosed and approved, or (3) gasoline, diesel fuel and oil which are in amounts not in excess of that necessary for the operation of motor vehicles used by tenants or in connection with the operation or maintenance of the Property and tenants respective businesses; (iv) Borrower shall keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law as the result of or whether due to any act or omission of Borrower or, to the extent possible through commercially reasonable efforts by Borrower, as the result

-93-

of or due to any act or omission of any other Person (other than Lender and its agents) (the "Environmental Liens"); (v) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities as reasonably required by Lender pursuant to paragraph (b) below, including but not limited to providing all relevant information requested and making knowledgeable persons available for interviews; (vi) Borrower shall, at its sole cost and expense, perform any Phase I environmental site assessment (a "Phase I Report") or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable good faith belief that the Property is not in compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof (provided, however, the Borrower's obligations under this subsection (a)(vi) shall be limited to payment for one (1) Phase I Report in any twelve (12) month period); (vii) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (A) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property in violation of any Environmental Law; and (B) comply with any Environmental Law; (viii) Borrower shall not knowingly allow any tenant or other user of any of the Property to violate any Environmental Law; and (ix) Borrower shall promptly notify Lender in writing after it has received written notice of (A) any presence or Release or pending Releases of Hazardous Materials in, on, under, from or migrating towards the Property in violation of any Environmental Law; (B) any material non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or pending Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to any of the Property; and (E) any written notice of which Borrower becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials in, on or under the Property in violation of any Environmental Law.

(b) Upon Lender's reasonable good faith belief that the Property is not in compliance with Environmental Laws, Lender shall so notify Borrower in writing and Borrower shall take such actions as may be necessary to demonstrate to Lender that the Property is in compliance with Environmental Laws. If Borrower has not demonstrated such compliance within thirty (30) days following such notification (or such shorter period of time as may be required by Environmental Laws or the recommendations of an environmental consultant), Lender, any other Person designated by Lender, any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times upon reasonable written notice and using commercially reasonable efforts to not interfere with any tenants operations and any other activity at the Property to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any Phase I Report or Phase II Report, if reasonably required based upon the results of the Phase I Report (the scope of which Phase II Report shall be determined in Lender's reasonable discretion as approved by a qualified technical consultant) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing as may be reasonably required by Lender based upon the results of the Phase I Report. Borrower shall cooperate with and provide reasonable access to Lender and any such Person designated by Lender.

-94-

OHS East:160274726.8
1-414050

### 5.1.20 Alterations.

Following the Substantial Completion of the Renovation Work, Borrower shall obtain Lender's prior written consent to any Alterations to any Improvements costing in excess of the Alteration Threshold Amount with respect to the Property, which consent shall not be unreasonably withheld, conditioned or delayed except with respect to Alterations that could reasonably be expected to have a Material Adverse Effect. Notwithstanding the foregoing, Lender's consent shall not be required in connection with any Alterations made in connection with (a) any Property Improvement Program provided that the same will not have a Material Adverse Effect, (b) tenant improvement work performed pursuant to the terms and provisions of a Lease and not adversely affecting any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements, (c) with the Restoration of the Property after the occurrence of a Casualty or Condemnation in accordance with the terms and provisions of this Agreement, (d) the requirements of any Franchise Agreement, (e) intentionally omitted or (f) Replacements to be funded by disbursements from the Replacement Reserve Account or otherwise set forth in the Approved Annual Budget. If the total unpaid amounts due and payable with respect to Alterations to the Improvements (other than such amounts to be paid or reimbursed by tenants under the Leases or from existing Reserves and Insurance Proceeds or Condemnation Proceeds) shall at any time exceed the Alteration Threshold Amount, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (A) cash, (B) U.S. Obligations, (C) other securities having a rating acceptable to Lender and, after Securitization, the applicable Rating Agencies as confirmed in a No Downgrade Letter, (D) a completion and performance bond issued by a financial institution having a rating by S&P of not less than "A-1+" and by Moody's if not less than "P-1" if the term of such bond is no longer than three (3) months or, if such term is in excess of three (3) months, issued by a financial institution having a rating that is acceptable to Lender and, after Securitization, the applicable Rating Agencies as confirmed in a No Downgrade Letter or (E) a Letter of Credit. Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to Alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by tenants under the Leases, from Insurance Proceeds and Condemnation Proceeds) over the Alteration Threshold Amount shall be applied from time to time at the request of Borrower to pay (or reimburse Borrower) for such Alterations as the related work is performed (subject to Lender's reasonable oversight and approval prior to any such application).

### 5.1.21 Required Equity.

Borrower and Constituent Members of Borrower shall contribute to Borrower the Required Equity on the Closing Date.

### 5.1.22 Intentionally Omitted.

-95-

5.1.23 <u>OFAC.</u>

At all times throughout the term of the Loan, Borrower and its Affiliates shall not knowingly violate any applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

5.1.24 <u>Compliance with Factual Assumptions.</u>  Borrower shall comply with each of the factual assumptions applicable to Borrower that are set forth in the opinion letter dated the date hereof from Cox, Castle & Nicholson LLP.

Section 5.2    <u>Negative Covenants.</u>

From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument in accordance with the terms of this Agreement and the other Loan Documents or the assignment by Borrower of the Loan obligations pursuant to Section 5.2.11 hereof, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1   <u>Liens.</u>

Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances and Permitted Equipment Financing.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any amounts due to mechanics, materialmen or contractors, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost during the contest period; (iv) Borrower shall promptly upon final determination thereof pay the amount due such mechanic, materialman and/or contractor, together with all costs, interest and penalties which may be payable in connection therewith; and (v) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any amounts due, together with all interest and penalties thereon.  Lender may apply such security or part thereof held by Lender at any time when the validity or applicability of any amounts due such mechanic, materialman or contractor, or the Property (or part thereof or interest therein) shall be in imminent danger of being sold, forfeited, terminated, cancelled or lost or there shall be an imminent danger of the Lien of the Security Instrument being primed by any related Lien.

5.2.2   <u>Dissolution.</u>

Borrower shall not (a) to the fullest extent permitted by Applicable Laws, engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the Property or assets of Borrower except to the extent expressly permitted by

-96-

the Loan Documents, or (c) except as expressly permitted under the Loan Documents or as required by Applicable Laws, materially modify, materially amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction, in each case, without obtaining the prior written consent of Lender not to be unreasonably withheld, conditioned or delayed.

### 5.2.3   Change in Business.

Borrower shall not enter into any line of business other than the ownership, acquisition, development, operation, leasing and management of the Property (including providing services in connection therewith), or make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business or in connection with the Renovation Work.

### 5.2.4   Debt Cancellation.

Borrower shall not cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business or with Lender's consent, not to be unreasonably withheld, conditioned or delayed.

### 5.2.5   Zoning.

Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non conforming use under any zoning ordinance or any other Applicable Law without the prior written consent of Lender, not to be unreasonably withheld, conditioned or delayed.

### 5.2.6   No Joint Assessment.

Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

### 5.2.7   Name, Identity, Structure.

Borrower shall not change its name, identity (including its trade name or names), without, in each case, first giving Lender twenty (20) days prior written notice. Except as otherwise expressly permitted in this Agreement, Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in Section 4.1.34, without, in each case, the consent of Lender, which consent shall not be unreasonably withheld. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be reasonably necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of place of organization.

-97-

5.2.8    ERISA.

(a) Borrower shall not engage in any transaction which would cause it to become subject to ERISA if any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) would be a non exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b) Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, and represents and covenants that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) the assets of Borrower are not treated as Plan Assets of any governmental plan that is subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement; and (C) one or more of the following circumstances is true:

(i)    Equity interests in Borrower are publicly offered securities within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)    Less than twenty five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

5.2.9    Affiliate Transactions.

Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower, Principal or any of the members or partners of Borrower or Principal except in the ordinary course of business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party, it being agreed that any such transaction and any agreement relating thereto shall be subject to the prior approval of Lender. Lender acknowledges that the Affiliate Agreements comply with this Section 5.2.9,

5.2.10    Transfers.

(a) Subject to the other provisions of this Agreement, Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options to purchase with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein in violation of the terms of this Section 5.2.10 or permit a Sale or Pledge of an interest in a Restricted Party (collectively, a

-98-

"Transfer"), other than pursuant to Leases of space in the Improvements to tenants and Room License Agreements, as applicable, in accordance with the provisions of Section 5.1.17 hereof, without (i) the prior written consent of Lender and (ii) if a Securitization has occurred, receipt by Lender of a No Downgrade Letter.

(b) A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than 49% of such corporation's stock shall be vested in a party or parties who are not now stockholders in violation of the terms of this Section 5.2.10; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests in violation of the terms of this Section 5.2.10; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non managing membership interests or the creation or issuance of new non managing membership interests in violation of the terms of this Section 5.2.10; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests in violation of the terms of this Section 5.2.10; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.18 hereof.

(c) Notwithstanding the provisions of Sections 5.2.10(a) and (b), the following transfers shall not be deemed to be a Transfer: (i) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party or a Restricted Party itself; (ii) a transfer of direct or indirect equity interests in Borrower for estate planning purposes to an Immediate Family Member or trust for the benefit of an Immediate Family Member of such direct or indirect partner, member or shareholder, (iii) the Sale or Pledge, in one or a series of transactions, of not more than forty nine percent (49%) of the stock in a Restricted Party (other than Borrower); provided, however, that no such transfers shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive (x) not less than five (5) Business Days prior written notice of such proposed transfer, if such transfer results in more than ten percent (10%) of the stock in a Restricted Party being transferred or (y) written notice no later than ten (10) Business Days following such transfer, if such transfer results in ten percent (10%)

-99-

or less of the stock in a Restricted Party being transferred; (iv) the Sale or Pledge, in one or a series of transactions, of not more than forty nine percent (49%) of the limited partnership interests or membership interests (as the case may be) in a Restricted Party (other than Borrower) provided, however, no such transfers shall result in the change of voting control in the Restricted Party; and as a condition to each such transfer, Lender shall receive (x) not less than five (5) Business Days prior written notice of such proposed transfer, if such transfer results in more than ten percent (10%) of the limited partnership interests or membership interests in a Restricted Party being transferred or (y) written notice no later than ten (10) Business Days following such transfer, if such transfer results in ten percent (10%) or less of the limited partnership interests or membership interests in a Restricted Party being transferred; and (v) the Pledge in favor of Lender. Additionally, APCC may be removed as the managing member of Atrium Manager in accordance with the terms of that certain Limited Liability Company Agreement of Atrium Manager dated as of July 24, 2007, between APCC and Hyundai Property Management America, a California corporation, as amended, upon the prior written approval of Lender (which may be withheld in its reasonable discretion) and the satisfaction in full of all of the conditions set forth in Section 1.13(a) of the Guaranty and Section 7(a) of the Completion Guaranty.

### 5.2.11  Insured Contractors.

With respect to any work on or about the Property, Borrower shall not employ, and shall use commercially reasonable efforts to ensure that no other party employs, any contractors, subcontractors or vendors performing such work unless such parties are covered under worker's compensation insurance as may be required by Applicable Law pursuant to insurance policies carried by Borrower, such contractor, subcontractor or vendor or otherwise.

### 5.2.12  Brokerage Agreements.

None of Borrower, Guarantor or any Affiliate thereof shall enter into, modify or amend any brokerage agreements without the prior written consent of Lender. If any Affiliate of Borrower or Guarantor is retained as a broker or finder, any brokerage commissions or similar fees or compensation payable under any brokerage agreement to which such Affiliate is a party, shall be subordinate to the liens and security interests created or to be created for the benefit of Lender, and securing the repayment of the Note and the obligations under the Loan Agreement. In connection therewith, Borrower shall cause any such affiliated broker or finder to execute a subordination agreement in form and substance reasonably satisfactory to Lender. Borrower shall provide Lender with written notice of the occurrence of any event of default under any brokerage agreement or that would entitle the broker or finder thereunder to terminate the applicable brokerage agreement. Each brokerage agreement shall be terminable by Borrower, at Lender's request, upon thirty (30) days' prior written notice following the occurrence of an Event of Default under the Loan Documents.

### 5.2.13  Marketing Plans.

None of Borrower, Guarantor or any Affiliate thereof shall enter into, modify or amend any marketing plans with respect to the Property without the prior written consent of Lender.

-100-

##### 5.2.14  No Distributions.

Borrower shall not make any distributions to a Constituent Member during any Fiscal Year in which there is, or is projected to be, negative Net Cash Flow After Debt Service.

#### Section 5.3    Covenants Regarding the Renovation Work.

From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument encumbering the Property (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

##### 5.3.1    Licenses.

Borrower shall obtain, when and as required, and shall thereafter maintain in good standing at all times, all Licenses (including, but not limited to, the Entitlements) which, from time to time, are required under Applicable Law for the construction and installation of the improvements and equipment in accordance with the Plans and Specifications and the lawful use, operation and occupancy of the Property for its intended purposes. Borrower shall, upon request by Lender from time to time, supply Lender with copies of each of the Licenses and evidence of the validity of such Licenses. Except for emergency situations, safety matters and temporary shoring (provided that Borrower discloses the same to Lender as soon as reasonably practical), Borrower shall at all times comply in all material respects with all of the terms and conditions of such Licenses. Without limiting the foregoing, if construction of the Renovations Work has stopped for any reason other than Force Majeure, then within ten (10) days after written notice from Lender, Borrower shall recommence construction of the Renovation Work.

##### 5.3.2    Completion of the Renovation Work.

Borrower shall cause the Renovation Work to be diligently and with continuity pursued to Completion in accordance in all material respects with the Renovation Schedule, the Renovation Budget and the Plans and Specifications, as approved by Lender, and all Applicable Laws, and in any event shall cause the Substantial Completion of the Renovation Work to occur on or before the Completion Date (subject to Force Majeure).

##### 5.3.3.    Plans and Specifications, Renovation Budget and Renovation Schedule.

Borrower shall use only such materials in connection with the Renovation Work as are called for in or contemplated by the Plans and Specifications, and Borrower shall not amend the Plans and Specifications, the Renovation Budget or the Renovation Schedule, or deviate from any of the foregoing (other than with respect to Change Orders permitted hereunder), without first having obtained the express written consent of Lender. All amendments to the Plans and Specifications, the Renovation Budget and the Renovation Schedule shall be highlighted by "ballooning" or other readily identifiable notations, as applicable. Borrower agrees that no approval by Lender of the Plans and Specifications, the Renovation Budget or the Renovation Schedule or any portion thereof, or any amendment or deviation therefrom, shall constitute a

-101-

representation or warranty of any kind by Lender regarding the Plans and Specifications, the Renovation Budget or the Renovation Schedule or such amendment or deviation, including, without limitation, any representation or warranty regarding the completeness, accuracy or constructability of the Plans and Specifications, the Renovation Budget or the Renovation Schedule, or whether the Plans and Specifications, the Renovation Budget or the Renovation Schedule comply with Applicable Laws.

### 5.3.4    Correction of Defects.

Within ten (10) days after written notice from Lender, Borrower shall proceed with diligence to correct any departure from the Plans and Specifications, except as may be approved by Lender in its reasonable discretion, and to correct all defects in the Renovation Work. Borrower agrees that no approval by Lender of any disbursement of funds shall constitute any warranty by Lender that the Renovation Work has been performed in accordance with the Plans and Specifications and Applicable Law, or in a workmanlike manner, and further agrees that no disbursement of funds shall constitute a waiver by Lender of Lender's right to have Borrower correct defects in work or materials, in each instance regardless of whether the defect is known to Lender at the time of disbursement. Lender shall have no duty to review or inform Borrower of the quality or suitability of the Renovation Work or the Plans and Specifications or any amendment or alteration thereof.

### 5.3.5    Contractors and Architect.

Borrower shall supply Lender and the Construction Consultant with copies (certified by Borrower as true, correct and complete) of all Contraction Contracts and other agreements with each Contractor and the Architect, in each instance before the later of the Closing Date and the effective date of the applicable Construction Contract or other agreement. Lender shall have the right to approve each Contractor and the Architect and the terms of the Construction Contracts and other agreements between Borrower and each Contractor or the Architect, as the case may be. Borrower shall cause Lender's list of Contractors, subcontractors and materialmen for the Renovation Work to be maintained with current information, including the names, addresses and telephone numbers of all Persons performing work upon or supplying materials to or for the Renovation Work (including the names of principals of unincorporated businesses), which list (on Lender's request) shall contain Borrower's affidavit as to the accuracy and completeness of such list. Borrower shall pay all bills for services and materials when and as the same become due and shall keep the Property free and clear of all mechanic's liens and materialmen's liens. If Lender approves any Construction Contract, Lender shall have the right to require the Contractor that is a party to such Construction Contract to execute and delivery to Lender the Contractor's Consent Agreement substantially in the form annexed hereto as Exhibit B.

### 5.3.6    Receipts for Personalty.

Upon request, to the extent not previously provided, Borrower shall supply Lender with copies of any contracts, bills of sale, receipted vouchers and agreements evidencing Borrower's ownership of the personal property for which disbursements of Loan proceeds have been or are to be made or which are otherwise required for the Renovation Work.

-102-

### 5.3.7  Records.

Borrower shall keep, and cause the Contractors to keep, proper and complete records regarding the Renovation Work, maintained in a manner reasonably satisfactory to Lender. Such records shall include records of all amounts expended and liabilities incurred for work or materials in connection with the Renovation Work. Borrower shall permit, and cause the Contractors to permit, Lender and the Construction Consultant and their respective representatives to have complete access to such records and all other records necessary or appropriate to verify that the funds allocated for Renovation Costs are being applied in accordance with the terms of this Agreement and the Renovation Budget approved by Lender, as such Renovation Budget may be amended from time to time with Lender's prior approval).

### 5.3.8  Enforcement of Borrower's Remedies.

Borrower shall take such action and institute such proceedings as shall be necessary or appropriate to cause and require the Contractors and their subcontractors, materialmen and other vendors (and their sureties, if any) to complete their contracts diligently in accordance with the terms of such contracts, including the correction of any defective work.

### 5.3.9  Inspections of the Renovation Work.

Borrower shall permit Lender and the Construction Consultant and their respective representatives, upon reasonable notice and during normal business hours (except in the case of an emergency), to conduct inspections of the Renovation Work and to examine at any time and from time to time the Plans and Specifications and the Renovation Budget and other Renovation Documents, whether or not kept at the Property, and provide copies of the same upon request. All such inspections and examinations shall be at the sole reasonable cost and expense of Borrower, and Borrower shall reimburse Lender for such costs and expenses within five (5) Business Days following demand by Lender. Borrower shall promptly supply Lender with all written reports issued by any Governmental Authority as a result of any inspection of the Renovation Work and shall advise Lender of the substance of all adverse reports (whether written or not) by any Governmental Authority indicating that the Renovation Work is not being performed in accordance with Applicable Laws or applicable agreements.

### 5.3.10  Conditions Precedent and Receipt of Funds.

In each instance of a disbursement, Borrower shall receive the funds disbursed in trust, for the benefit of Borrower and Lender, until application of such funds in payment of Renovation Costs as required by this Agreement.

### 5.3.11  Restriction against Purchase Money Security Interests.

Borrower shall not acquire any building materials or other property to be affixed to or otherwise incorporated into and made a part of the Property by way of conditional bill of sale, chattel mortgage, security agreement, equipment lease or other security instrument which would constitute a security interest, lien or leasehold interest in favor of a party other than Lender on such building materials or other property; provided that the foregoing provision shall not be

-103-

construed to restrict Borrower from acquiring equipment for use in the ordinary course of its operation of the Property pursuant to Permitted Equipment Financing.

### 5.3.12 Restriction against Use of Unqualified Contractors.

Borrower shall not use or authorize the use of any Contractor for the Renovation Work that does not maintain in full force and effect all licenses, registrations, qualifications and permits required by Applicable Law to be maintained by such Contractor in connection with its performance of the applicable Construction Contract.

### 5.3.13 Guaranteed Maximum Price.

Borrower shall deliver to Lender by no later than the date that is three (3) months after the date hereof, documentation satisfactory to Lender setting forth the Guaranteed Maximum Price for the Renovation Work.

## VI.    INSURANCE; CASUALTY; CONDEMNATION

Section 6.1    Insurance.

(a) Borrower shall keep, or shall cause to be kept, at its sole cost and expense, in full force and effect policies of insurance coverage of the types and minimum limits as set forth below during the term of this Agreement:

(i)    *Property Insurance.*    Comprehensive all risk insurance on the Improvements and all personal property, including fire, lightning, windstorm, vandalism and malicious mischief, boiler and machinery, contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, and if required by Lender, flood and/or earthquake coverage, containing an agreed amount endorsement waiving co-insurance provisions; but in any event such insurance shall (A) be maintained in an amount equal to not less than $29,632,000; provided, however, that such amount shall be increased to $42,500,000 by no later than the commencement date of the Renovation Work, (B) provide coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses as a result of a covered loss and provide Building Ordinance coverage sufficient to insure that the Improvements will be in compliance with the then current building code applicable to the Improvements following a covered loss, and (C) providing for no deductible in excess of the lesser of: (1) $25,000; and (2) two percent (2%) of the face value of such policy;

(ii)    *Liability Insurance.*    Commercial general liability insurance to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 and a per occurrence limit of not less than $1,000,000 per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement), including bodily injury, death and property damage liability, and excess liability insurance against any and all

-104-

claims, including "Dram Shop" or other liquor liability coverage if alcoholic beverages are sold from or may be consumed at the Property and including all legal liability to the extent insurable imposed upon Lender and all court costs and reasonable attorneys' fees and expenses, arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the Property, providing for no deductible/self-insured retention. Coverage should continue (A) at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate, and (B) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts. In addition, at least $50,000,000 umbrella liability insurance shall be obtained and maintained for any and all claims;

(iii)    *Workers' Compensation Insurance*.  Statutory workers' compensation insurance (to the extent the risks to be covered thereby are not already covered by other Policies of insurance maintained by Borrower), with respect to any work performed by Borrower's employees on or about the Property;

(iv)    *Business Interruption*.  Business income insurance: (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Section 6.1(a)(i); (C) containing an unlimited indemnity period pertaining to the time to repair or rebuild; (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and all personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at immediately prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (E) in an amount equal to not less than $5,000,000 for a period of twenty-four (24) months. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate (subject to Lender's review and approval) of the gross income from the Property for the succeeding twenty-four (24) month period. All Insurance Proceeds payable to Lender pursuant to this Section 6.1(a)(iv) shall be held by Lender and shall be applied to the Obligations from time to time due and payable hereunder and under the other Loan Documents; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Obligations on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the proceeds of such business income insurance.

(v)    *Boiler and Machinery Insurance*.  Broad form boiler and machinery insurance (without exclusion for explosion) covering all boilers or other pressure vessels, machinery and equipment located in, on or about the Property and insurance against loss of occupancy or use arising from any such breakdown in such amounts as are commercially available and are generally required by institutional lenders for properties comparable to the Property, but no less than $25,000,000;

-105-

(vi)    *Flood Insurance*.  If all or any portion of the Property is located within a federally designated flood hazard zone, flood insurance if available, in amount equal to the maximum limit of flood coverage available from FEMA/FIA, plus such excess limits requested by Lender and having no deductible in excess of $25,000.  If none of the Improvements is so identified, such flood hazard insurance shall have excess limits of not less than $10,000,000;

(vii)    *Earthquake Insurance*.  If the Property is in seismic zones 3 or 4, earthquake insurance ("**Earthquake Insurance**") with coverage amounts equal to the product of one times (1.0x) the probable maximum loss applicable to the Property (the "**PML**") as set forth in a report reasonably satisfactory to Lender prepared by a seismic engineer or other qualified consultant multiplied by the replacement cost of the Improvements as such replacement cost may be reasonably estimated by Lender with a deductible not to exceed 5% of the total insured values at risk.  If none of the Improvements is so identified, such Earthquake Insurance shall be no less than $10,000,000;

(viii)    *Terrorism Insurance*.  The commercial property insurance and business interruption insurance required under Sections 6.1(a)(i) and 6.1(a)(iv) above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain, if commercially available, commercial property insurance and business interruption insurance for loss resulting from perils and acts of terrorism ("**Terrorism Insurance**") on terms (including amounts) consistent with those required under Sections 6.1(a)(i) and 6.1(a)(iv) above at all times during the term of the Loan (the "**Terrorism Insurance Required Amount**");

(ix)    *Insurance relating to Structural Work*.  At all times during which structural construction, repairs or alterations are being made with respect to the Improvements:

(A)    Borrower's insurance shall (i) include coverage in accordance with the above mentioned commercial general liability insurance policy, (ii) provide XCU coverage with regard to the construction project, and (iii) include three (3) years extended completed operations coverage, after completion of the construction project;

(B)    Borrower shall cause its construction manager ("**CM**") or General Contractor and shall have the CM or General Contractor cause its contractors and Subcontractors to maintain similar coverage to that which is provided in Section 6.1(a)(ii).  Such Policies shall maintain limits of liability as follows:  (i) $50,000,000 commercial liability and automobile liability for the CM or General Contractor and $5,000,000 for the contractors and Subcontractors; and (ii) $500,000 employers' liability.

(C)    Borrower's insurance shall include Builder's Risk "all risk" Insurance.  Such Policies shall: (i) be written on a completed value form; (ii) include all of the terms required in Section 6.1(a)(i) above; (iii) include

-106-

foundations, excavations, underground machinery or equipment, retaining walls and all paved surfaces; (iv) include limits equal to one hundred percent (100%) of the hard costs and soft costs for all recurring expenses in the event of damage or destruction; (v) maintain deductibles not to exceed $25,000; (vi) maintain sub-limits for each of the perils of Flood and Earthquake to be the greater of (1) $10,000,000 and (2) the amount otherwise specified by Lender; and (vii) allow for permission to occupy.

(x)   *Motor Vehicle Liability Insurance.*  If applicable, motor vehicle liability coverage for all owned and non-owned vehicles, included rented and leased vehicles containing minimum limits per occurrence of $1,000,000.

(xi)   *Other Insurance.*  Such other insurance including, but not limited to, (a) in the event Borrower maintains any employees, blanket fidelity bond and errors and omissions insurance coverage insuring against losses resulting from dishonest or fraudulent acts committed by (1) Borrower's personnel or (2) temporary contract employees or student interns and (c) sinkhole and mine subsidence insurance, in form and substance reasonably satisfactory to Lender.

The determination of whether (i) the premium payable by Borrower for insurance required hereunder is "commercially reasonable" or (ii) "institutional lenders" for properties comparable to the Property generally require a type of insurance coverage shall be made by Lender in its sole discretion. Each such determination by Lender shall take into account, if the Loan is part of a Securitization, whether or not the failure to require Borrower to obtain a type of insurance might reasonably be expected to result in a down grade, qualification or withdrawal of the then current ratings on the Securities, in which event Lender's determination to require such insurance will be presumptively reasonable.

(b) (i)   *Property, Business Interruption, Liability and Boiler, Machinery and Terrorism Insurance.*  Borrower will maintain the insurance coverage described in Subsection (a)(i), (a)(viii) and (a)(x) above at least equal to the actual replacement cost of the Improvements and the Personal Property; the insurance described in Subsection (a)(i), (a)(ii), (a)(iv), (a)(v) and (a)(viii) above, will be maintained by Borrower with the insurers who insure the Improvements and Personal Property on the date of this Agreement provided that same maintain the claims paying ability rating by S&P not lower than "A-". If Borrower's insurers or reinsurance carriers fail to provide or maintain such a rating, Borrower may satisfy the ratings requirement of this Section by providing to Lender a "cut through" endorsement in form and substance approved by Lender issued by an insurer with at least an "A-" rating by S&P.

(iii)   [Reserved]

(iv)   *Other Insurance.*  Borrower will maintain the insurance coverage described in Subsection (a)(iii) above with either an insurer having a claims paying ability rating by S&P of not less than "A-" or the applicable state workers' compensation fund. If Borrower's insurers or reinsurance carriers fail to provide or maintain such a

-107-

OHS East:160274726.8
1-414050

rating, Borrower may satisfy the ratings requirement of this Section by providing to Lender a "cut through" endorsement in form and substance approved by Lender issued by an insurer with at least an "A" rating by S&P.

(c) Intentionally Omitted.

(d) _Blanket Coverage_. The insurance coverage required under Subsection (a) may be effected under a blanket Policy or Policies covering the Property and other property and assets not constituting a part of the Property; provided that any such certificates of insurance evidencing the coverage required herein shall specify, except in the case of general liability insurance, the portion of the total coverage of such policy that is allocated exclusively to the Property, and any sublimits in such blanket Policy applicable to the Property, which amounts shall not be less than the amounts required pursuant to Subsection (a) and which shall in any case comply in all other respects with the requirements of this Section.

(e) _Form of Insurance Policies; Endorsements_. All insurance Policies shall be in such form and with such endorsements as are comparable to the forms of and endorsements to Borrower's insurance Policies in effect on the date hereof or otherwise in accordance with commercially reasonable standards applied by prudent owners of first class office buildings in the general vicinity of the Property. Certificates of insurance with respect to all of the insurance Policies required hereunder have been delivered to Lender. Borrower's Commercial General Liability Policies shall name Lender as an additional insured with respect to liability arising from Borrower's ownership of the Property. Borrower's "All Risk" Property Insurance and Terrorism Insurance shall name Lender as an additional insured and shall provide that all Net Proceeds in excess of the Restoration Threshold Amount be payable to Lender as set forth in this Section, and shall contain: (i) a standard "non contributory mortgagee" endorsement or its equivalent relating, inter alia, to recovery by Lender notwithstanding the negligent or willful acts or omissions of Borrower; (ii) to the extent available at commercially reasonable rates, a waiver of subrogation endorsement in favor of Lender; (iii) an endorsement providing that no Policy shall be impaired or invalidated by virtue of any act, failure to act, negligence of, or violation of declarations, warranties or conditions contained in such Policy by Borrower, Lender or any other named insured, additional insured or loss payee, except for the willful misconduct of Lender knowingly in violation of the conditions of such Policy; (iv) an endorsement providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of first class hotels in the general vicinity of the Property, but in no event in excess of $25,000, except in the event of an earthquake in which case the deductible shall not exceed 5% of the insured values at risk; and (v) a provision that such Policies shall not be canceled or terminated without at least thirty (30) days prior written notice to Lender in each instance. Certificates of insurance with respect to all renewal and replacement Policies shall be delivered to Lender not less than ten (10) days prior to the expiration date of any of the insurance Policies required to be maintained hereunder which certificates shall bear notations evidencing payment of applicable premiums due thereunder (the "**Insurance Premiums**"). If Borrower fails to maintain insurance required by this Agreement, Lender may procure such insurance upon three (3) Business Days (defined herein) notice to Borrower.

-108-

(f) *Compliance with Insurance Requirements*. Borrower shall comply with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Property or cause or permit any condition to exist thereon which would be prohibited by any insurance requirement, or would invalidate insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to this Section.

(g) Intentionally Omitted.

(h) *Separate Insurance*. Borrower will not take out separate insurance contributing in the event of loss with that required to be maintained pursuant to this Section unless such insurance complies with Subsection (e).

Section 6.2    Casualty.

If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and, provided that Lender has made the Net Proceeds available for Restoration, Borrower shall commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such Alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4; provided, however, regardless of whether Lender has made the Net Proceeds available for Restoration, Borrower shall promptly commence and diligently prosecute the removal and disposal of any debris, refuse or hazards resulting from the Casualty and insure that the Property is in a safe condition. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies (and shall approve the final settlement, which approval shall not be unreasonably withheld) with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than the Restoration Threshold Amount and Borrower shall deliver to Lender all instruments reasonably required by Lender to permit such participation.

Section 6.3    Condemnation.

Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender, at its own expense, may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall

-109-

not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. If the Property or any portion thereof is taken by a condemning authority, provided that Lender has made the Net Proceeds available for Restoration, Borrower shall, commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 6.4; provided, however, regardless of whether Lender has made the Net Proceeds available for Restoration, Borrower shall promptly commence and diligently prosecute the removal and disposal of any debris, refuse or hazards resulting from the Condemnation and insure that the Property is in a safe condition. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.4    Restoration.

The following provisions shall apply in connection with the Restoration of the Property:

(a) If the Net Proceeds shall be less than the Restoration Threshold Amount and the costs of completing the Restoration shall be less than the Restoration Threshold Amount, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that no Event of Default has occurred and is continuing and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b) If the Net Proceeds are equal to or greater than the Restoration Threshold Amount or the costs of completing the Restoration is equal to or greater than the Restoration Threshold Amount Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4. The term "Net Proceeds" shall mean: (i) the net amount of all insurance proceeds received by Lender as a result of such Casualty, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of the Award, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

(i).    The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

(A)    no Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are Insurance Proceeds, less than thirty-five percent (35%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

-110-

OHS East:160274726.8
1-414050

(C)    the Loan-to-Value Ratio upon completion of the Restoration is estimated, by an appraiser acceptable to Lender, to be no greater than 0.75:1.0;

(D)    provided that Lender has made the Net Proceeds available for Restoration, Borrower shall commence the Restoration as soon as reasonably practicable and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws including, without limitation, all applicable Environmental Laws;

(E)    Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(iv), if applicable, (3) payments under the Interest Rate Cap Agreement or (4) by other funds of Borrower;

(F)    Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) such time as may be required under Applicable Law in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or Condemnation, or (3) the expiration of the insurance coverage referred to in Section 6.1(a)(iv);

(G)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

(H)    Lender shall be satisfied that the pro forma Debt Service Coverage Ratio two years after the completion of the Restoration shall be equal to or greater than the lesser of (1) 1.2:1.0 and (2) the Debt Service Coverage Ratio as of the date of occurrence of such Casualty or Condemnation; provided, however, that for the purpose of such calculation, Debt Service shall be calculated on the lesser of the actual Debt Service on the Loan or the "strike price" on the Interest Rate Cap Agreement, plus the weighted average of the interest rate Eurodollar Rate Margins for the Loan at the time of the calculation;

(I)    such Casualty or Condemnation, as applicable, does not result in the total loss of access to the Property and the related Improvements;

(J)    Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be reasonably acceptable to Lender;

(K)    the Net Proceeds together with any Cash or Cash equivalent deposited by Borrower with Lender are sufficient in Lender's reasonable discretion to cover the cost of the Restoration; and

-111-

(L)    the Franchise Agreement (if any) shall remain in full force and effect during the Restoration and shall not otherwise terminate as a result of the Casualty or Condemnation or the Restoration.

(ii)    The Net Proceeds shall be held by Lender in an interest bearing account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration, the cost of which is greater than the Restoration Threshold Amount, shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration the cost of which is greater than $250,000.00, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "**Casualty Retainage**" shall mean an amount equal to five percent (5%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however,

-112-

that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month (it being agreed, however, that disbursements for Operating Expenses and Debt Service shall be made on the first Business Day of every second calendar week).

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(vii)   The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Agreement or any of the other Loan Documents.

(c) All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.4(b)(vii) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its discretion. If Lender shall receive

-113-

and retain Net Proceeds, the Lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

## VII.    RESERVE FUNDS

Section 7.1    - Intentionally Omitted.

Section 7.2    Tax and Insurance Escrow Fund.

Borrower has this day made Initial Deposits in the amounts of $500,000.00 (the "Initial Tax Escrow Deposit") and $161,000.00 (the "Initial Insurance Premium Escrow Deposit"). The Initial Tax Escrow Deposit is being deposited on the date hereof into the Tax Account and the Initial Insurance Premium Escrow Deposit is being deposited on the date hereof into the Insurance Premium Account. The Initial Tax Escrow Deposit shall be applied to the payment of Taxes that become due and payable during the period between the date hereof and the date of Substantial Completion of the Renovation Work, and the Initial Insurance Premium Escrow Deposit shall be applied to the payment of Insurance Premiums that become due and payable during the period between the date hereof and the date of Substantial Completion of the Renovation Work. From and after the date of Substantial Completion of the Renovation Work, Borrower shall cause to be deposited on each Payment Date (a) into the Tax Account, one-twelfth of the Taxes (the "Monthly Tax Deposit") that Lender (or Servicer on behalf of Lender) reasonably estimates (which estimate shall be based upon the Approved Annual Budget) will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates; and (b) if the liability or casualty Policy maintained by Borrower covering the Property shall not constitute an approved blanket or umbrella Policy pursuant to Section 6.1(d) hereof, or Borrower shall not have delivered proof of payment of the Insurance Premiums for such blanket or umbrella Policy as required pursuant to Section 6.1(f) hereof, or Lender shall require Borrower to obtain a separate Policy pursuant to this Agreement, into the Insurance Premium Account, one-twelfth of the Insurance Premiums (the "Monthly Insurance Premium Deposit") that Lender (or Servicer on behalf of Lender) estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "Tax and Insurance Escrow Fund"). The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note and this Agreement, shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Initial Tax Escrow Deposit, the Initial Insurance Premium Escrow Deposit and the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.1.2 hereof. In making any payment relating to the Initial Tax Escrow Deposit, the Initial Insurance Premium Escrow Deposit and the Tax and Insurance Escrow Fund, Lender (or Servicer on behalf of Lender) may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim

-114-

thereof. If the amount of the Initial Tax Escrow Deposit, the Initial Insurance Premium Escrow Deposit or the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 5.1.2 hereof, Lender shall, in its reasonable discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower. If at any time Lender (or Servicer on behalf of Lender) reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in (a) and (b) above, Lender (or Servicer on behalf of Lender) shall notify Borrower of such determination, and Borrower shall increase its monthly payments to Lender by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

Section 7.3    Replacements and Replacement Reserve.

7.3.1    Replacement Reserve Fund.

Commencing on the first Payment Date following the date of Substantial Completion of the Renovation Work and on each Payment Date thereafter, Borrower shall deposit with Lender the Replacement Reserve Monthly Deposit for Replacements required to be made to the Property during the calendar year. Amounts so deposited shall hereinafter be referred to as Borrower's "Replacement Reserve Fund".

7.3.2    Disbursements from Replacement Reserve Account.

(a) Lender (or Servicer on behalf of Lender) shall make disbursements from the Replacement Reserve Account to reimburse Borrower only for the costs of the Replacements or to pay the costs of the Replacements if Borrower has not previously paid the cost of same. Lender shall not be obligated to make disbursements from the Replacement Reserve Account to reimburse Borrower for, or to pay directly, the costs of routine maintenance to the Property.

(b) Lender (or Servicer on behalf of Lender) shall, upon written request from Borrower following the Substantial Completion of the Renovation Work and upon satisfaction of the requirements set forth in this Section 7.3.2, disburse to Borrower amounts from the Replacement Reserve Account necessary to reimburse Borrower for the actual approved costs and Replacements upon completion of such Replacements (or, upon partial completion in the case of Replacements made pursuant to Section 7.3.2(e)) as determined by Lender (or Servicer on behalf of Lender). In no event shall Lender (or Servicer on behalf of Lender) be obligated to disburse funds from the Replacement Reserve Account if an Event of Default exists.

(c) Each request for disbursement from the Replacement Reserve Account shall be in a form specified or approved by Lender (or Servicer on behalf of Lender) and shall specify (i) the specific Replacements for which the disbursement is requested, (ii) the quantity and

-115-

price of each item purchased, if the Replacement includes the purchase or replacement of specific items, (iii) the price of all materials (grouped by type or category) used in any Replacement other than the purchase or replacement of specific items, and (iv) the cost of all contracted labor or other services applicable to each Replacement for which the disbursement is requested. With each request Borrower shall certify that, to the best of Borrower's knowledge, all Replacements have been made in accordance with all applicable Legal Requirements of any Governmental Authority having jurisdiction over the Property to which the Replacements are being provided. Each request for disbursement shall include copies of invoices for all items or materials purchased and all contracted labor or services provided and, unless Lender has agreed to issue a check as described below in connection with a particular Replacement without a lien waiver, each request shall include evidence satisfactory to Lender (or Servicer on behalf of Lender) of payment of all such amounts or if such evidence is not available until after the disbursement, such evidence shall be submitted by Borrower prior to or simultaneously with the next succeeding request for disbursement. Except as provided in Section 7.3.2(e), each request for disbursement from the Replacement Reserve Account shall be made only after substantial completion of the Replacement for which disbursement is requested. Borrower shall provide Lender evidence of substantial completion satisfactory to Lender in its reasonable judgment.

(d) Borrower shall pay all invoices in connection with the Replacements with respect to each request for disbursement prior to submitting such request for disbursement from the Replacement Reserve Account or, at the request of Borrower, Lender (or Servicer on behalf of Lender) will issue joint checks, payable to Borrower and the contractor, supplier, materialman, mechanic, subcontractor or other party to whom payment is due in connection with a Replacement. In the case of payments made by joint check, Lender may require a waiver of lien from each Person receiving payment prior to the disbursement by Lender (or Servicer on behalf of Lender) from the Replacement Reserve Account. In addition, as a condition to any disbursement, Lender may require Borrower to obtain lien waivers from each contractor, supplier, materialman, mechanic or subcontractor who receives payment in an amount equal to or greater than $100,000.00 for completion of its work or delivery of its materials. Any lien waiver delivered hereunder shall conform to the requirements of Applicable Law and shall cover all work performed and materials supplied (including equipment and fixtures) for the Property by that contractor, supplier, subcontractor, mechanic or materialman through the date covered by the current reimbursement request (or, in the event that payment to such contractor, supplier, subcontractor, mechanic or materialmen is to be paid from the proceeds of such disbursement, the release of lien shall be effective through the date covered by the previous release of funds request).

(e) If the contractor performing such Replacement requires periodic payments pursuant to terms of a written contract (and if such contract is for work the cost of which exceeds $25,000.00 and Lender has approved in writing in advance such contract or such payments in its reasonable judgment), a request for reimbursement from the Replacement Reserve Account may be made after completion of a portion of the work under such contract, provided (A) such contract requires payment upon completion of such portion of the work, (B) the materials for which the request is made are on site at the Property and are properly secured or have been installed in the Property, (C) all other conditions in this Section 7.3 for

-116-

disbursement have been satisfied, (D) funds remaining in the Replacement Reserve Account are, in Lender's reasonable judgment, sufficient to complete such Replacement and other Replacements when required, and (E) if required by Lender, each contractor or subcontractor receiving payments under such contract shall provide a waiver of lien with respect to amounts which have been paid to that contractor or subcontractor.

(f) Borrower shall not make a request for disbursement from the Replacement Reserve Account more frequently than twice in any calendar month and (except in connection with the final disbursement) the total cost of all Replacements in any request shall not be less than $10,000.00.

7.3.3    Performance of Replacements.

(a) Borrower shall make Replacements when required in order to keep the Property in condition and repair consistent with the standards set forth in the Property Improvement Plan (if applicable) or, if no such standard is provided, other full service hotels in the same market segment in the geographical area in which the Property is located, and to keep the Property or any portion thereof from deteriorating (other than ordinary wear and tear). Borrower shall complete all Replacements in a good and workmanlike manner as soon as practicable following the commencement of making each such Replacement.

(b) Lender reserves the right, at its option, to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors or other parties providing labor or materials in connection with the Replacements costing, in the aggregate, in excess of $200,000.00. Upon Lender's request, Borrower shall assign any contract or subcontract to Lender.

(c) In the event Lender determines in its reasonable discretion that any Replacement is not being performed in a workmanlike or timely manner or that any Replacement has not been completed in a workmanlike or timely manner, Lender shall have the option after notice to Borrower to withhold disbursement for such unsatisfactory Replacement and to proceed under existing contracts or to contract with third parties to complete such Replacement and to apply the Replacement Reserve Fund toward the labor and materials necessary to complete such Replacement, and to exercise any and all other remedies available to Lender upon the occurrence and during continuance of an Event of Default hereunder.

(d) In order to facilitate Lender's completion or making of the Replacements pursuant to Section 7.3.3(c) above, after the occurrence of an Event of Default and following notice to Borrower, Borrower grants Lender the right to enter onto the Property and perform any and all work and labor necessary to complete or make the Replacements and/or employ watchmen to protect the Property from damage. All sums so expended by Lender, to the extent not from the Replacement Reserve Fund, shall be deemed to have been advanced under the Loan to Borrower and secured by the Security Instrument. For this purpose, Borrower constitutes and appoints Lender its true and lawful attorney in fact with full power of substitution to complete or undertake the Replacements in the name of Borrower. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be

-117-

revoked; provided, however, that Lender shall not exercise such power of attorney unless an Event of Default has occurred and is continuing. Borrower empowers said attorney in fact as follows: (i) to use any funds in the Replacement Reserve Account for the purpose of making or completing the Replacements; (ii) to make such additions, changes and corrections to the Replacements as shall be necessary or desirable to complete the Replacements; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Property, or as may be necessary or desirable for the completion of the Replacements, or for clearance of title; (v) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (vi) to prosecute and defend all actions or proceedings in connection with the Property or the rehabilitation and repair of the Property; and (vii) to do any and every act which Borrower might do in its own behalf to fulfill the terms of this Agreement.

(e) Nothing in this Section 7.3.3 shall: (i) make Lender responsible for making or completing the Replacements; (ii) require Lender to expend funds in addition to the Replacement Reserve Fund to make or complete any Replacement; (iii) obligate Lender to proceed with the Replacements; or (iv) obligate Lender to demand from Borrower additional sums to make or complete any Replacement.

(f) Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties making Replacements pursuant to this Section 7.3.3 to enter onto the Property during normal business hours (subject to the rights of tenants under their Leases and parties under the Room License Agreements, as applicable, and upon reasonable prior notice) to inspect the progress of any Replacements and all materials being used in connection therewith, and to examine all plans and shop drawings relating to such Replacements which are or may be kept at the Property. Borrower shall use commercially reasonable efforts to cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other persons described above in connection with inspections described in this Section 7.3.3(f) or the completion of Replacements pursuant to this Section 7.3.3.

(g) If the cost of any individual Replacements item exceeds $100,000.00, Lender may require an inspection of the Property (subject to the rights of tenants under their Leases and parties under the Room License Agreements, as applicable, and upon reasonable prior notice) at Borrower's expense prior to making a monthly disbursement from the Replacement Reserve Account, with respect to the Property, in order to verify completion of the Replacements for which reimbursement is sought. Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and/or may require a copy of a certificate of completion by an independent qualified professional acceptable to Lender prior to the disbursement of any amounts from the Replacement Reserve Account. Borrower shall pay the expense of the inspection as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional.

(h) The Replacements and all materials, equipment, fixtures, or any other item comprising a part of any Replacement shall be constructed, installed or completed, as

-118-

OHS East:160274726.8
1-414050

applicable, free and clear of all mechanic's, materialmen's or other Liens (other than Permitted Exceptions, those Liens existing on the date of this Agreement which have been approved in writing by Lender, and those Liens which are being contested in good faith and with due diligence as required by the terms hereof).

(i) If the cost of any individual Replacement exceeds $100,000.00, before each disbursement from the Replacement Reserve Account with respect to the Property, Lender may require Borrower to provide Lender with a search of title to the Property effective to the date of the disbursement, which search shows that no mechanic's or materialmen's Liens or other Liens of any nature have been placed against the Property since the date of recordation of the related Security Instrument and that title to the Property is free and clear of all Liens (other than the Lien of the related Security Instrument and other Permitted Encumbrances, those Liens existing on the Liens which are being contested in good faith and with due diligence as required by the terms hereof.

(j) All Replacements shall comply with all applicable Legal Requirements of all Governmental Authorities having jurisdiction over the Property and applicable insurance requirements including, without limitation, applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters.

(k) In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk, and public liability insurance and other insurance to the extent required under Applicable Law in connection with a particular Replacement. All such policies shall be in form and amount reasonably satisfactory to Lender. All such policies which can be endorsed with standard mortgagee clauses making loss payable to Lender or its assigns shall be so endorsed. Certified copies of such policies shall be delivered to Lender.

7.3.4   Failure to Make Replacements.

(a) It shall be an Event of Default under this Agreement if Borrower fails to comply with any provision of this Section 7.3 and such failure is not cured within ninety (90) days after notice from Lender; provided Borrower shall be provided additional time as is reasonably necessary to cure on amount of Excusable Delay. Upon the occurrence and during the continuance of an Event of Default, Lender may use the Replacement Reserve Fund (or any portion thereof) for any purpose, including but not limited to completion of the Replacements as provided in Sections 7.3.3(c) and 7.3.3(d), or for any other repair or replacement to the Property or toward payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion. Lender's right to withdraw and apply the Replacement Reserve Funds shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents.

(b) Nothing in this Agreement shall obligate Lender to apply all or any portion of the Replacement Reserve Fund on account of an Event of Default to payment of the Debt or in any specific order or priority.

-119-

.7.3.5   Balance in the Replacement Reserve Account.

The insufficiency of any balance in the Replacement Reserve Account shall not relieve Borrower from its obligation to fulfill all preservation and maintenance covenants in the Loan Documents.

Section 7.4   Interest Reserve.

(a)   Lender shall establish at closing an account with the Deposit Bank (the "Interest Reserve Account"), to be funded at closing with Loan proceeds in the amount of $9,000,000.00 (the "Interest Reserve Fund"), to be applied to the Monthly Debt Service Payment Amounts to the extent that amounts on deposit in the Debt Service Account are insufficient to pay the same.

(b)   Lender (or Servicer on behalf of Lender) shall release funds in the Interest Reserve Account, to the extent available therein, and deposit such funds into the Debt Service Account, if, as and when the funds on deposit in the Debt Service Account and available for the payment of accrued interest as and when due and payable are insufficient to cover the payment then due.

Section 7.5   Debt Service Shortfall Reserve Account.

Upon the occurrence of a Debt Service Shortfall Event, Borrower shall either (i) deposit with Lender the Required Debt Service Shortfall Amount to be applied to the Monthly Debt Service Payment Amounts to the extent that the sum of (A) amounts on deposit in the Deposit Account (including the Debt Service Account), (B) amounts on deposit in the Interest Reserve Account and (C) payments received under the Interest Rate Cap Agreement, are insufficient to pay same and pay the amounts described in Section 3.7(b)(i), (ii), (iii), (v) and (vi) (a "Debt Service Shortfall"), or (ii) deliver to Lender a Letter of Credit in the face amount of the Required Debt Service Shortfall Amount.  Amounts so deposited shall hereinafter be referred to as Borrower's "Debt Service Shortfall Reserve Fund".  Provided that an Event of Default shall not have occurred and be continuing, Lender shall advance portions of the Debt Service Shortfall Reserve Fund and apply same to the Monthly Debt Service Payment Amounts upon written request of Borrower.

Section 7.6   Renovation Reserve.

(a)   Borrower shall cause to be deposited with Lender on the date hereof a portion of the Required Equity in the amount of $4,000,000.00 (the "Renovation Reserve Fund") for the payment of Renovation Costs incurred by or on behalf of Borrower.  Lender shall establish at closing an account with the Deposit Bank in the name of Borrower and pledged to Lender (the "Renovation Account") into which such Renovation Reserve Fund shall be deposited.  Lender (or Servicer on behalf of Lender) shall have sole and exclusive dominion and control over the Renovation Account, all funds held therein and all proceeds thereof for the purposes herein provided, until disbursed in accordance with this Section.  No funds shall be advanced from the Holdback for Renovation until all funds in the Renovation Account shall have been disbursed in accordance with this Section.  Provided that no Event of Default has occurred and is continuing and that the Loan is "in balance" in accordance with Section 2.6.18, Lender (or Servicer on

-120-

behalf of Lender) shall, upon receipt and approval of a Request for Disbursement, make disbursements from the Renovation Reserve Fund to pay for Renovation Costs in accordance with the Renovation Budget. All such disbursements from the Renovation Account shall occur no more frequently than once per month and shall be made in accordance with the terms and conditions of Section 2.7 hereof.

Section 7.7    Marketing and Branding Reserve.

Borrower shall cause to be deposited with Lender on the date hereof the amount of $740,000.00 (the "**Marketing and Branding Reserve Fund**") for the payment of costs incurred by or on behalf of Borrower in connection with the marketing and branding of the hotel located on the Property. Lender shall establish at closing an account with the Deposit Bank in the name of Borrower and pledged to Lender (the "**Marketing and Branding Account**") into which such Marketing and Branding Reserve Fund shall be deposited. Lender (or Servicer on behalf of Lender) shall have sole and exclusive dominion and control over the Marketing and Branding Account, all funds held therein and all proceeds thereof for the purposes herein provided, until disbursed in accordance with this Section. Provided that no Event of Default has occurred, Lender (or Servicer on behalf of Lender) shall make disbursements from the Marketing and Branding Fund upon receipt of a written request from Borrower, and evidence reasonably satisfactory to Lender that the funds requested by Borrower correspond to a line item in the then current Approved Annual Budget. Each such request from Borrower shall indicate the amount of such request, together with appropriate supporting documentation, and shall describe in detail the costs incurred for which the disbursement is requested. All such disbursements from the Marketing and Branding Account shall occur no more frequently than once per month and shall not be in an amount of less than $100,000.

Section 7.8    Pre-Opening Expenses Reserve.

-121-

Borrower shall cause to be deposited with Lender on the date hereof the amount of $500,000.00 (the "**Pre-Opening Expenses Reserve Fund**") for the payment of costs incurred by or on behalf of Borrower in connection with the pre-opening expenses of the hotel located on the Property. Lender shall establish at closing an account with the Deposit Bank in the name of Borrower and pledged to Lender (the "**Pre-Opening Expenses Account**") into which such Pre-Opening Reserve Fund shall be deposited. Lender (or Servicer on behalf of Lender) shall have sole and exclusive dominion and control over the Pre-Opening Expenses Account, all funds held therein and all proceeds thereof for the purposes herein provided, until disbursed in accordance with this Section. Provided that no Event of Default has occurred, Lender (or Servicer on behalf of Lender) shall make disbursements from the Pre-Opening Reserve Fund upon receipt of a written request from Borrower and evidence reasonably satisfactory to Lender that the funds requested by Borrower correspond to a line item in then current Approved Annual Budget. Each such request from Borrower shall indicate the amount of such request, together with appropriate supporting documentation, and shall describe in detail the costs incurred for which the disbursement is requested. All such disbursements from the Pre-Opening Expenses Account shall occur no more frequently than once per month and shall not be in an amount of less than $100,000.

Section 7.9    Contingency Reserve.

Borrower shall cause to be deposited with Lender on the date hereof the amount of $720,965.16 (the "**Contingency Reserve Fund**") for the payment of costs incurred by or on behalf of Borrower in connection with contingent costs associated with the Renovation Work or the operation of the Property. Lender shall establish at closing an account with the Deposit Bank in the name of Borrower and pledged to Lender (the "**Contingency Account**") into which such Contingency Reserve Fund shall be deposited. Lender (or Servicer on behalf of Lender) shall have sole and exclusive dominion and control over the Contingency Account, all funds held therein and all proceeds thereof for the purposes herein provided, until disbursed in accordance with this Section. Provided that no Event of Default has occurred, Lender (or Servicer on behalf of Lender) shall make disbursements from the Contingency Reserve Fund upon receipt of a written request from Borrower and evidence reasonably satisfactory to Lender that the funds requested by Borrower correspond to a line item in then current Approved Annual Budget; it being agreed that no portion of the Contingency Reserve Fund shall be disbursed unless and until the Holdback for Renovation and all applicable Reserve Funds have been used. Each such request from Borrower shall indicate the amount of such request, together with appropriate supporting documentation, and shall describe in detail the costs incurred for which the disbursement is requested. All such disbursements from the Contingency Account shall occur no more frequently than once per month and shall not be in an amount of less than $100,000.

Section 7.10    Reserve Funds, Generally.

(a) Borrower grants to Lender a first priority perfected security interest in each of the Reserve Funds and the related Accounts and any and all monies now or hereafter deposited in each Reserve Fund and related Account as additional security for payment of the Debt. Until expended or applied in accordance herewith, the Reserve Funds and the related Accounts shall constitute additional security for the Debt.

-122-

(b) Upon the occurrence and continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c) The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

(d) The Reserve Funds shall be held in interest bearing accounts and all earnings or interest on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund.

(e) Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or related Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(f) Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, actual out-of-pocket losses, actual damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the related Accounts or the performance of the obligations for which the Reserve Funds or the related Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds or the related Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

## VIII.  DEFAULTS

Section 8.1    Event of Default.

(a) Each of the following events shall constitute an event of default hereunder after the expiration of any notice and/or cure period provided below, as applicable (an "Event of Default"):

(i)    subject to Section 3.11 of this Agreement, if (A) any monthly installment of principal and/or interest due under the Note is not paid when due (unless (1) such monthly installment is to be made from the Debt Service Account, (2) sufficient funds are then available in the Debt Service Account, (3) Lender (or the Servicer on behalf of Lender) does not timely apply such funds to the then current monthly installment, and (4) no Event of Default has occurred and is continuing) or (B) the payment due on the Maturity Date is not paid when due or (C) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

-123-

(ii)    subject to Section 3.8 of this Agreement, if any of the Taxes are not paid when the same are due and payable (except to the extent sums sufficient to pay such Taxes have been deposited with Lender in accordance with the terms of this Agreement) or any of the Other Charges are not paid within ten (10) Business Days of the date when the same are due and payable;

(iii)    subject to Section 3.8 of this Agreement, if the Policies are not kept in full force and effect or if the Policies are not assigned and delivered to Lender within ten (10) Business Days of Lender's written request;

(iv) · if a violation or breach of the provisions of Section 5.2.10 hereof or Article 4 of the Security Instrument occurs;

(v)    if any representation or warranty made by Borrower herein or by Borrower or Guarantor in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made; provided, however, Borrower shall have five (5) Business Days after written notice thereof to cure any default under this clause (v) arising as a direct result of any unaffiliated Manager's action;

(vi)    if Borrower, Principal or Guarantor shall make an assignment for the benefit of creditors;

(vii)    if a receiver, liquidator or trustee shall be appointed for Borrower, Principal, Guarantor, or if Borrower or Principal, Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Principal or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower or Principal, or Guarantor shall be instituted; provided, however, that if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Principal or Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(viii)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)    if Borrower shall breach any of its respective negative covenants contained in Section 5.2 and such breach results in a Material Adverse Effect; provided, however, that solely with respect to a material breach under Sections 5.2.1 and 5.2.7 hereof, such a material breach shall not constitute an Event of Default hereunder unless such breach shall continue for a period of ten (10) days following Lender's notice to Borrower of same;

(x)    if the Property ceases to be operated pursuant to the Management Agreement and the Franchise Agreement (if any), or if a default occurs and continues

-124-

beyond any applicable cure period under the Management Agreement or the Franchise Agreement if such default permits either Borrower or Manager or the franchisor under the Franchise Agreement to terminate or cancel the Management Agreement or the Franchise Agreement;

(xi)    if Borrower or Principal violates or does not comply in all material respects with any of the provisions of Section 4.1.35 hereof and the same is reasonably likely to result in a Material Adverse Effect or the substantive consolidation of Borrower with another Person;

(xii)    if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days; provided, however, that after prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity, in whole or in part, of any mechanic's liens; provided that (i) no Event of Default has occurred and is continuing under the Note, this Agreement or any of the other Loan Documents, (ii) such proceeding shall suspend the collection of the mechanic's or materialman's liens from Borrower and from the Property or Borrower shall have paid all of the mechanic's or materialman's liens under protest, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost during such contest, and (v) Borrower shall have deposited with Lender adequate reserves or security for the payment of the mechanic's liens, together with all interest and penalties thereon as determined by Lender in its reasonable discretion;

(xiii)    if any federal tax Lien or state or local income tax Lien is filed against Borrower or the Property and same is not discharged of record within thirty (30) days after same is filed;

(xiv)    (A) Borrower fails, after ten (10) Business Days written notice, to timely provide Lender with the written certification and evidence referred to in Section 5.2.8 hereof, or (B) Borrower consummates a transaction which would cause the Security Instrument or Lender's exercise of its rights under the Security Instrument, the Note, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA or a State statute;

(xv)    if Borrower shall fail to deliver to Lender, within twenty (20) Business Days after written request by Lender, the estoppel certificate required of Borrower pursuant to the terms of Section 5.1.13(a) hereof;

-125-

(xvi)  if any Default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Environmental Indemnity) and such default continues (1) after the expiration of applicable grace periods, if any, or (2) if no grace period is specified therein, after ten (10) Business Days written notice of such default;

(xvii)  if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument excluding any security agreement relating to Permitted Equipment Financing unless such default will have a Material Adverse Effect;

(xviii)  with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice (if any required) and the expiration of such grace period (if any);

(xix)  if any of the assumptions contained in the Insolvency Opinion, or in any Additional Insolvency Opinion delivered to Lender subsequent to the closing of the Loan, is not true and correct as of the date of such opinion or shall thereafter become untrue in any material respect and there is a material risk that the assets of Borrower may become consolidated as a result thereof;

(xx)  if (i) any Interest Rate Cap Agreement is terminated for any reason by Borrower; or (ii) any Interest Rate Cap Agreement is terminated for any reason by the Counterparty and is not replaced by Borrower with a Replacement Interest Rate Cap Agreement satisfying the requirements of Section 2.4 within ten (10) Business Days of such termination; or (iii) the Counterparty defaults in the performance of its monetary obligations under the Interest Rate Cap Agreement and Borrower does not deliver to Lender a Replacement Interest Rate Cap Agreement satisfying the Requirements of Section 2.4 within ten (10) Business Days of Borrower's receipt of notice of such default; or (iv) the Counterparty defaults under the provision contained in the Interest Rate Cap Agreement described in Section 2.4(f) hereof and Borrower does not within ten (10) Business Days (A) replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement in accordance with Section 2.4 hereof, and (B) deliver to Lender, in form and substance reasonably satisfactory to Lender (x) an Assignment of Interest Rate Cap (y) a recognition letter from the Counterparty thereto acknowledging the assignment of the Replacement Interest Rate Cap Agreement and (z) any other opinions or documents required pursuant to Section 2.4 hereof;

(xxi)  reserved;

(xxii)  intentionally omitted;

(xxiii)  reserved;

-126-

OHS East:160274726.8
1-414050

(xxiv) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or the other Loan Documents not specified in clauses (i) to (xxiii) above or (xxv) below, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; *provided, however,* that if such non monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days; or

(xxv) if there shall be a default under the Security Instrument beyond any applicable notice and cure periods contained in such documents, whether as to Borrower or the Property;

(xxvi) if Borrower fails to satisfy any material condition for the receipt of the disbursement of the Holdback for Renovation or to resolve the situation to Lender's satisfaction, for a period in excess of thirty (30) days after written notice from Lender;

(xxvii) if Borrower fails to bring the Holdback for Renovation "in balance" as required by the terms of this Agreement within fifteen (15) Business Days after written notice from Lender;

(xxviii) if a material default by Borrower occurs under the Architect's Agreement, the General Contract or any material Construction Contract, and the expiration of any cure period expressly set forth therein;

(xxix) in the event of the bankruptcy or insolvency of the General Contractor or the withdrawal of the General Contractor from the construction of the Renovation Work, and the failure of Borrower to procure a replacement general contract with a replacement general contractor reasonably acceptable to Lender at the same price, or, if at a higher price, to supply the additional funds thereby required, within thirty (30) days after such bankruptcy, insolvency or withdrawal;

(xxx) if Borrower (i) fails at any time to continuously and diligently cause the Renovation Work to be Completed, subject only to Force Majeure, or (ii) fails to cause the Substantial Completion of the Renovation Work to occur on or before the Completion Date (subject to extension for Force Majeure); or

(xxxi) if Lender reasonably determines that Borrower (for any reason other than Force Majeure) will be unable to cause the Substantial Completion of the Renovation Work to occur on or before the Completion Date.

(b) Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above) and, at any time during the existence thereof, in addition to any other rights or remedies available to it pursuant to this Agreement and the

-127-

other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and/or any part of the Property, including, without limitation, all rights or remedies available at law or in equity; and upon the occurrence and during the continuance of any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    Remedies.

(a) Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property or any other Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the other Collateral and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b) With respect to Borrower and the Property and to the extent allowed by Applicable Law, at no material cost or material expense to Borrower, other than with respect to Borrower's legal counsel, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or Collateral for the satisfaction of any of the Debt in preference or priority to any other Collateral, and Lender may seek satisfaction out of the Property or all of the Collateral or any part thereof, in its absolute discretion in respect of the Debt. In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such

-128-

delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect: Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(c) Lender shall have the right, from time to time, to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until after an Event of Default and after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. The Severed Loan Documents shall not contain any representations, warranties, covenants or material terms not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date. ~~Borrower shall not be responsible for the payment of any costs or expenses~~ (other than legal counsel employed by Borrower) ~~in complying with this Section 8.2(c)~~.

Section 8.3    Construction Remedies.

From and after the occurrence of an Event of Default, Lender shall have the right (and Borrower hereby irrevocably constitutes and appoints Lender as its attorney-in-fact, which power is coupled with an interest and is deemed to be non-cancelable, with full power of substitution, to do so), in its sole discretion, but not the obligation, to enter the Property and take any and all actions necessary in its sole discretion to Complete the Renovation Work, subject to Lender's right at any time to discontinue any work without liability, including, but not limited to, making changes in the Plans and Specifications, the Architect's Agreement, the General Contract and any other Construction Contracts or any Renovation Documents, work, or materials, entering into, modifying, or terminating any contractual arrangements, paying, settling, compromising or releasing any claims, prosecuting and defending actions and proceedings in connection with the Renovation Work, taking such action as it deems necessary with respect to any bonds or insurance policies, and settling, compromising or releasing claims with any sureties or insurers. If Lender elects to Complete the Renovation Work, it will not thereby assume any liability to Borrower or to any other Person for Completing the Renovation Work, or for the manner or quality of construction of the Renovation Work, and Borrower expressly waives any such liability. Borrower irrevocably appoints, designates, empowers, and authorizes Lender as Borrower's attorney-in-fact, which power is coupled with an interest and is deemed to be

-129-

non-cancelable, with full power of substitution, to sign and file for record any notices of completion, notices of cessation of labor, or any other notice or written document that Lender may deem necessary (during an Event of Default) to file or record to protect its interests, and to Complete construction in Borrower's name or in Lender's own name. In any event, all sums expended by or on behalf of Lender after the occurrence of an Event of Default in Completing construction (whether or not construction is, in fact, Completed) and supervising such construction (in addition to any fees charged by third party inspectors or architects to supervise construction), will be considered to be disbursed to Borrower, and will be secured by the Security Instrument and the other Loan Documents, and any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional advance to Borrower, payable on demand, bearing interest at the Default Rate and secured by the Security Instrument, but only to the extent not in excess of the maximum principal amount permitted by the Security Instrument and the other Loan Documents.

Section 8.4    Remedies Cumulative; Waivers.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

IX.    SPECIAL PROVISIONS

Section 9.1    Sale of Notes and Securitization.

Lender may, at any time, sell, transfer or assign the Note, this Agreement, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities (the "Securities") in one or more public or private securities offering evidencing a beneficial interest in a rated or unrated public offering or final private placement (a "Securitization"). At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, Borrower, at Lender's expense (subject to the last paragraph of this Section 9.1), shall use commercially reasonable efforts to satisfy the market standards to which the holder of the Note customarily adheres or which may be reasonably required by the Rating Agencies and/or Lender in connection with a Securitization or the sale of the Note or the participations or Securities, including, without limitation, to:

(a) (i)    provide such financial and other information with respect to the Property, Borrower, Sponsor (but only to the extent that such information is otherwise publicly

OHS East:160274726.8
1-414050

available), Guarantor and if available, the Manager and/or the franchisor under any Franchise Agreement, (ii) if available, provide budgets relating to the Property and (iii) at no cost or expense to Borrower (subject to the last paragraph of this Section 9.1), perform or permit or cause to be performed or permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's); engineering reports and other due diligence investigations of the Property, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Securitization (the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys reasonably acceptable to Lender and the Rating Agencies;

(b) if required by the Rating Agencies, deliver (i) a revised Insolvency Opinion, (ii) revised opinions of counsel as to due execution and enforceability with respect to the Property, Borrower, Guarantor, Principal, if any, and the Loan Documents, and (iii) revised sections of the organizational documents for Borrower and Principal, if any, relating to single purpose bankruptcy remoteness, which counsel opinions and organizational documents shall be reasonably satisfactory to Lender and the Rating Agencies;

(c) if required by the Rating Agencies, use commercially reasonable efforts to deliver such additional tenant estoppel letters, subordination agreements or other agreements from parties to agreements that affect the Property, which estoppel letters, subordination agreements or other agreements shall be reasonably satisfactory to Lender and the Rating Agencies.

(d) execute such amendments to the Loan Documents as may be requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (except for modifications and amendments required to be made pursuant to Section (e) and (f) below) (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, (ii) modify or amend any economic term or any other material term of the Loan, (iii) otherwise increase the obligations or decrease the rights of Borrower pursuant to the Loan Documents, (iv) impose any personal liability on any Constituent Member of Borrower, Principal, Sponsor, Guarantor or their respective Affiliates, (v) impose any additional personal liability on Borrower or (vi) impose any cost on Borrower other than as set forth in the last paragraph of this Section 9.1;

(e) if Lender elects, in its sole discretion, prior to or upon a Securitization, to split the Loan into multiple parts, or the Note into multiple component notes or tranches, which may have different interest rates, amortization payments, principal amounts, payment priorities and maturities, Borrower agrees to cooperate with Lender in connection with the foregoing and to execute the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions reasonably necessary to effectuate the same. Such Notes or components may be assigned different interest rates, so long as the weighted average of such interest rates does not exceed the Applicable Interest Rate (without giving effect to any deviation attributable to the imposition of any rate of interest at the Default Rate

-131-

or prepayments pursuant to Section 2.3.2 or 2.3.3 hereof). Subject to the last paragraph of this Section 9.1, Borrower shall not be responsible for the payment of any cost or expenses in complying with this Section 9.1(e);

(f) execute modifications to the Loan Documents changing the interest rate and/or the amortization payments for portions of the Loan, provided that the weighted average of the interest rate spreads for such portions of the Loan after such modification shall not exceed the interest rate spread for the Loan immediately prior to such modification (without giving effect to any deviation attributable to the imposition of any rate of interest at the Default Rate or prepayments pursuant to Section 2.3.2 or 2.3.3 hereof). The Borrower shall also provide opinions and endorsements to the title insurance policy (reflecting such modifications) reasonably necessary to effectuate the same;

(g) make or update such representations and warranties as of the closing date of the Securitization with respect to the Property, Borrower, Guarantor, Principal (if any), and the Loan Documents as are customarily provided in securitization transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents to the extent they are true as of the closing date of the Securitization; and

(h) supply to Lender such documentation, financial statements and reports in form and substance reasonably required for Lender to comply with Regulation AB of the federal securities law.

Lender shall have the right to issue press releases, advertisements and other promotional materials describing Lender's participation in the financing or the financing's inclusion in any Securitization effectuated by Lender.

All costs and expenses incurred by Borrower or Lender in connection with Borrower's complying with requests made under this Section 9.1 except for Borrower's own legal fees and expenses, shall be paid by Lender, and in no event shall any Securitization or splitting of the Loan alter the weighted average interest rate applicable or payable from time to time in respect of the Loan regardless of any splits and/or of differing amortization schedules and/or prepayment or payment requirements or applications. Notwithstanding anything to the contrary contained herein, Borrower shall pay for any costs and expenses with respect to items which Borrower is otherwise required to deliver pursuant to the terms of the Loan Documents.

Section 9.2    Reallocation of Loan Amounts; Restructuring of the Loan.

Lender, without in any way limiting its other rights hereunder, in its sole and absolute discretion, shall have the right, at any time prior to a Securitization to adjust the interest rates on portions of the Loan or to reallocate the amount of the Loan between a senior mortgage loan and subordinate mortgage loan or between a mortgage loan and a mezzanine loan, provided that (i) the aggregate principal amount of the such portions of the Loan or the aggregate principal amount of the Loan as reallocated and restructured immediately following such reallocation or restructuring shall equal the outstanding principal balance of the Loan immediately prior to such

-132-

reallocation or restructuring, and (ii) the weighted average interest rates applicable to such portions of the Loan or to the reallocated and restructured Loan immediately following such reallocation or restructuring shall equal the interest rate which was applicable to the Loan immediately prior to such reallocation or restructuring (without giving effect to any deviation attributable to the imposition of any rate of interest at the Default Rate or prepayments pursuant to Section 2.3.2 or 2.3.3 hereof). Borrower shall cooperate with all reasonable requests of Lender in order to adjust the interest rates on portions of the Loan or to reallocate and restructure the Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith, including, without limitation, amendments to the Loan Documents and endorsements to the Title Insurance Policy (to reflect any reallocated amount of the Loan), all in form and substance reasonably satisfactory to Lender, and Borrower shall pay all costs and expenses (except Lender's own fees and expenses, including, the fees and expenses of Lender's legal counsel, which shall be borne by Lender) in connection such reallocation and restructuring pursuant to this Section 9.2 (all such costs and expenses, the "**Reallocation Costs**"), including, without limitation, any additional title insurance premiums and any additional mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any amendments of the Loan Documents in connection with the reallocation or restructuring. Notwithstanding anything to the contrary contained in this Section 9.2, Borrower shall not be required to take any action that would result in a material breach of the representations, warranties and/or covenants contained in Section 4.1.35 hereof. In the event that Lender elects to reallocate or restructure the Loan pursuant to this Section 9.2, Lender shall have the right following the occurrence of an Event of Default, to apply all payments of principal to the separate notes on a sequential pay basis.

Section 9.3    Servicer.

At the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer. Borrower shall be responsible for the payment of the regular monthly servicing fee due to Servicer under the Servicing Agreement at actual cost, it being understood that such servicing fee shall not exceed fifteen (15) basis points of the maximum principal amount of the Loan. Such servicing fees shall be added to the Applicable Interest Rate and be paid on a monthly basis. Additionally, Borrower shall pay any and all of Servicer's reasonable out-of-pocket costs and expenses incurred in connection with review of draws, change orders, construction progress reports, leases and subordination agreements, any property inspections, any defaults under the Loan and any casualty and condemnation matters.

Section 9.4    Termination.

(a) Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note, the Security

-133-

Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by this Agreement, the Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Borrower shall not otherwise be personally liable for the performance of the Loan Documents. ~~Lender by accepting this Agreement, the Note and the Security Instrument, agrees that it shall not, except as otherwise provided in the Security Instrument and in subsections (a), (b) and (c) of this Agreement, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the other Loan Documents or the Security Instrument.~~ The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the other Loan Documents or the Security Instrument; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Security Instrument, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) impair the right of Lender to enforce the provisions of Sections 4.1.8, 4.1.28, 5.1.9 and 5.2.8 hereof; or (vii) impair the right of Lender to obtain a monetary judgment or other judgment on the Note against Borrower if necessary to (A) preserve or enforce its rights and remedies against the Property or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the Security Instrument; provided, however, that Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards. Except as expressly provided in this Agreement, the Note, the Security Instrument or any other Loan Document, Lender and its successors and assigns shall look solely to Borrower's interest in the Property, all rights, estates and interests now or at any time hereafter securing the payment and performance of the obligations of Borrower under this Agreement, the Note, the Security Instrument and the other Loan Documents for the payment of any claim or for any performance in connection with this Agreement, the Note, the Security Instrument and the other Loan Documents.

(b) Notwithstanding the provisions of this Section 9.4 to the contrary, ~~Borrower~~ (but not any Constituent Member or Affiliate of Borrower other than Guarantor under the Guaranty) ~~shall be personally liable to Lender for the actual losses it incurs arising out of or as attributable to or relating to any of the following: (i) the gross negligence (which continues after notice from Lender that such activity is occurring) or intentional, willful misconduct of Borrower, (ii) the physical waste or willful destruction of the Property, including the intentional removal from the Property of any portion of the Personal Property in violation of the Loan Documents, (iii) the filing of any mechanic's or materialman's lien against the~~

-134-

Property to the extent either that there were sufficient funds to pay the underlying obligations or that the work or materials related thereto was not approved by Lender (to the extent that such approval is required under the Loan Documents) or such work or materials is not permitted under the Loan Documents; (iv) Borrower's failure to pay Taxes (except to the extent that sums sufficient to pay such amounts were deposited with Lender pursuant to the terms of Section 7.2 hereof); (v) Borrower's failure to obtain Lender's prior written consent, where in the Loan Documents such consent is expressly required, prior to entering into, modifying or amending the Management Agreement, the Franchise Agreement (if any), any Major Lease or any other agreement (including, without limitation, the organizational documents of Borrower and any Constituent Member and any documents relating to the renovation of the Property) with respect to which Lender's consent is required hereunder; (vi) contesting the validity or enforceability of the Loan Documents (it being agreed that the liability of Borrower under this clause (vi) shall be limited only to the reasonable attorneys' fees of Lender); provided, however, that Borrower shall be permitted to allege and prove that no default shall have occurred and that Borrower is in compliance with the Loan Documents; and (vi) contesting the validity or enforceability of the jury and counterclaim waiver provisions of the Loan Documents.

(c) Notwithstanding the provisions of this Section 9.4 to the contrary, Borrower (but not any Constituent Member or Affiliate of Borrower other than Guarantor under the Guaranty) shall be personally liable to Lender for the full amount of the outstanding Obligations in the event of: (i) any fraud or intentional material misrepresentation in connection with the Loan or the execution and the delivery of this Agreement, the Note, the Security Instrument or the other Loan Documents which has a Material Adverse Effect on the value of the Property or the other collateral for the Loan; (ii) any intentional misapplication, misappropriation or conversion of Rents, Security Deposits or the proceeds of sale of any portion of or interest in the Property or any other collateral for the Loan, including any interference with the operation of the cash management arrangements hereunder, which misapplication, misappropriation, conversion or interference remains uncured 10 days after Borrower's receipt of notice thereof from Lender; (iii) Borrower's intentional misapplication or misappropriation of Insurance Proceeds or Awards in violation of the Loan Documents, which misapplication or misappropriation remains uncured 10 days after Borrower's receipt of notice thereof from Lender; (iv) any voluntary action by Borrower or Guarantor which causes a default under Section 5.2.10 hereof; (v) a voluntary bankruptcy or insolvency proceeding commenced by Borrower, Atrium Paradise, Atrium Manager, Sponsor, Guarantor or any Affiliate of Atrium Manager, Atrium Paradise, Sponsor or Guarantor, or any involuntary bankruptcy or insolvency proceeding against Borrower, Atrium Paradise, Atrium Manager, Sponsor, Guarantor or any Affiliate of Atrium Paradise, Atrium Manager, Sponsor or Guarantor, which is not dismissed within 90 days of such filing, provided such filing was facilitated, coordinated or directed by Borrower, Atrium Paradise, Atrium Manager, Sponsor, Guarantor or any Affiliate of Atrium Paradise, Atrium Manager, Sponsor or Guarantor; (vi) if Borrower incurs any indebtedness (secured or unsecured) on account of payable obligations in violation of any express restrictions or prohibitions set forth in the Loan Documents and such breach remains uncured 20 days after Borrower's receipt of notice thereof from Lender (other than trade payables entered into in the ordinary course of business); (vii) if Borrower makes any distributions to any Constituent Member or otherwise

-135-

diverts funds at any time (A) during the continuance of a Default, (B) when the Loan is out of balance, or (C) prior to the payment in full of any Operating Expenses that are sixty (60) days past due; or (viii) if Borrower fails to comply with the provisions of Section 4.1.35 hereof (other than Section 4.1.35(g)).

(d) Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instrument or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Agreement, the Note, the Security Instrument and the other Loan Documents.

(e) Notwithstanding anything to the contrary contained in this Agreement, the Note, the Security Instrument or any of the other Loan Documents, neither any present or future Constituent Member in Borrower nor any present or future shareholder, officer, director, employee, trustee, beneficiary, advisor, partner, member, principal, participant or agent of or in Borrower or of or in any person or entity that is or becomes a Constituent Member in Borrower (collectively, "**Borrower's Members**"), other than Guarantor under the Guaranty, shall have any personal liability, directly or indirectly, under or in connection with this Agreement, the Note, the Security Instrument or any of the other Loan Documents, or any amendment or amendments to any of the foregoing made at any time or times hereafter and Lender, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability.

(f) For purposes of this Section 9.4, neither the negative capital account of any Constituent Member in Borrower or in any other Constituent Member in Borrower, nor any obligation of any Constituent Member in Borrower to restore a negative capital account or to contribute or loan capital to Borrower or to any other Constituent Member in Borrower shall at any time be deemed to be the property or an asset of Borrower (or any such other Constituent Member) and neither Lender nor any of its successors or assigns shall have any right to collect, enforce or proceed against with respect to any such negative capital account or obligation to restore, contribute or loan.

-136-

Section 9.5    Securitization Indemnification.

(a)    Borrower understands that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, a "**Disclosure Document**") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)    Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus, as applicable, including without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.5, Lender hereunder shall include its officers and directors), each of its directors, each of its officers who have signed the Registration Statement and each Person or entity who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Lender Group**"), and Lender, each of its directors and each Person who controls Lender within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "**Underwriter Group**") for any losses, claims, damages or liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading (collectively, the "**Liabilities**") and (C) agreeing to reimburse Lender, the Lender Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender in connection with defending the Liabilities; *provided, however*, that Borrower will be liable in any such case (1) under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the debt, including, without limitation, financial statements of Borrower, operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property, and (2) to the extent that Borrower has been furnished with

-137-

OHS East:160274726,8
I-414050

those materials reasonably necessary for Borrower to determine the truth or inaccuracy of the applicable statements. This indemnity agreement will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification provided for in Clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

(c)     In connection with filings under the Exchange Act, Borrower agrees to indemnify (i) Lender, the Lender Group and the Underwriter Group for Liabilities to which Lender, the Lender Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading (to the extent that Borrower has been furnished with those materials reasonably necessary for Borrower to determine the truth or inaccuracy of the applicable statements) and (ii) reimburse Lender, the Lender Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group or the Underwriter Group in connection with defending the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.5 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.5, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel reasonably satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.5 the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof; _provided_, _however_, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall promptly notify the indemnifying party in writing, and shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party to parties. The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

-138-

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreements provided for in Section 9.5(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.5(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); *provided*, *however*, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered:   (i) Lender's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.   Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)     The liabilities and obligations of both Borrower and Lender under this Section 9.5 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 9.6     Syndication.

Subject to the last paragraph of Section 9.1, Lender shall have the right to sell the Loan or grant participations or other interests therein, with or without novation, in the institutional syndication market.   Borrower shall reasonably cooperate with Lender to allow for successful syndication of the Loan.   Such cooperation shall include, but not be limited to, (i) having appropriate representatives available for lender meetings and tours of the Property, (ii) execution of documentation reasonably acceptable to Lender and its counsel which establishes a loan agency role (which agent may be any holder of the Loan) and the right to assign direct interests in the Loan to a syndicate of lenders (provided that such assignment does not increase the economic obligations of Borrower under the Loan) and (iii) the ability to tranche the Loan into senior and subordinate claims (each claim to be evidenced by separate notes payable to each syndicate member in the amount of each member's portion of such claim).   Lender shall request to act as the administrative agent of the Loan in connection with any such syndication; *provided*, *however*, that Lender shall have no liability hereunder in the event that another Person acts as the administrative agent.   All costs and expenses incurred by Borrower or Lender in connection with Borrower's complying with requests made under this Section 9.6 except for Borrower's own legal fees and expenses, shall be paid by Lender, and in no event shall any syndication of the Loan alter the weighted average interest rate applicable or payable from time to time in respect of the Loan.   Notwithstanding anything to the contrary contained herein, Borrower shall pay for any costs and expenses with respect to items which Borrower is otherwise required to deliver pursuant to the terms of the Loan Documents.

X.     MISCELLANEOUS

Section 10.1     Survival.

-139-

OHS East:160274726.8
1-414050

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2   Lender's Discretion.

Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive..

Section 10.3   Governing Law.

(a) THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS); PROVIDED, HOWEVER, THAT WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED BY THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS, AND THE DETERMINATION OF DEFICIENCY JUDGMENTS, THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED SHALL APPLY. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS PROVIDED IN THE IMMEDIATELY PRECEDING SENTENCE.

(b) WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS, BORROWER (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY

OHS East:160274726.8
1-414050

TIME TO THE LAYING ON VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

Section 10.4   Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5   Delay Not a Waiver.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6   Notices.

Any notice or other written communication hereunder shall be in writing and shall be deemed to have been given on the next business day if sent by Federal Express or other reputable overnight courier and designated for next business day delivery, or on the third day following the day such notice is deposited with the United States postal service first class certified mail, return receipt requested, addressed as follows:

-141-

If to Borrower:    A/P Hotel, LLC
345 South Figueroa Street, Suite 100
Los Angeles, California 90071
Attention: Eddy Chao
Telephone No.: (213) 680-8811
Facsimile No.: (213) 628-8900

With a copy to:    Paul, Hastings, Janofsky & Walker LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
Attention: Rick S. Kirkbride, Esq.
Telephone No.: (213) 683-6261
Facsimile No.: (213) 996-3261

With a copy to:    Cox Castle & Nicholson, LLP
2049 Century Park East, 28th Floor
Los Angeles, California 90067
Attention: Gregory J. Karns, Esq.
Telephone No.: (310) 277-4222
Facsimile No.: (310) 277-7889

If to Lender:    Lehman Brothers Holdings Inc.
399 Park Avenue
New York, New York 10022
Attention: Mr. Joseph J. Flannery
Telephone No.: (212) 526-3137
Facsimile No.: (646) 758-1938

With a copy to:    Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103
Attention: Marc S. Shapiro, Esq.
Telephone No.: (212) 506-5005
Facsimile No.: (212) 506-5151

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

Section 10.7    Trial by Jury.

BORROWER AND LENDER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM,

-142-

COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER OR BORROWER, AS APPLICABLE, IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY LENDER OR BORROWER, AS APPLICABLE.

Section 10.8    Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9    Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10    Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11    Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

OHS East:160274726.8
1-414050

Section 10.12  Remedies of Borrower.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 10.13  Expenses; Indemnity.

[redacted] (i) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; including, without limitation, confirming compliance with environmental and insurance requirements; (ii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (iv) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (v) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; [redacted] claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property or any other security given for the Loan; and [redacted]. Any cost and expenses due and payable to Lender may be paid from any amounts in the Deposit Account after fifteen (15) Business Days prior written notice from Lender to Borrower.

[redacted] Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, actual out-of-pocket losses, actual damages (excluding diminution in value, lost revenue, and other consequential damages), penalties, actions,

-144-

judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any material misrepresentation by Borrower contained in this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Additional Indemnified Liabilities"); ~~provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Additional Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender.~~ To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Additional Indemnified Liabilities incurred by Lender.

Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and the Indemnified Parties from and against any and all actual out-of-pocket losses (excluding consequential damages) (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's reasonable discretion) that Lender may incur, directly or indirectly, as a result of a default, not caused by Lender's actions or use of plan assets, under Sections 4.1.8 or 5.2.8 hereof.

(d) Subject to any limitations expressly provided under Section 8.2 and 9.1 hereof, Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

Section 10.14  Schedules and Exhibits Incorporated.

The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15  Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

-145-

### Section 10.16 No Joint Venture or Partnership; No Third Party Beneficiaries.

(a) Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b) This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

### Section 10.17 Publicity.

All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender or any of its Affiliates shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld. Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel, shall not be subject to the prior written approval of Lender.

### Section 10.18 Waiver of Marshalling of Assets.

To the fullest extent permitted by Applicable Law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members/partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

### Section 10.19 Waiver of Counterclaim.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory

-146-

counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 10.20 _Conflict; Construction of Documents; Reliance._

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. To the extent allowed by Applicable Law, Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and, to the extent allowed by Applicable Law, Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21 _Brokers and Financial Advisors._

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan transactions contemplated by this Agreement other than HFF, L.P. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the Loan transactions contemplated herein. The provisions of this Section 10.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 10.22 _Prior Agreements._

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.23 _Local Law Provisions._

(a)    Anything herein to the contrary notwithstanding, it is specifically understood and agreed that all funds furnished by Lender and employed in the performance of the obligations of Borrower under this Agreement or any other Loan Document shall be

-147-

OHS East:160274726.8
1-414050

deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom such funds are furnished.

      (b)    Notwithstanding any other provision hereof, in no event shall Lender be required to make any Advance if Borrower has theretofore sent a notice under Section 106.380 of Nevada Revised Statutes.

[NO FURTHER TEXT ON THIS PAGE]

OHS East:160274726.8
1-414050

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS001040 | Release Drainage Ditch Conceptual Design Docs - Ph 1A | 0 | | 04JUL08 |
| **Retail Space Conceptual Design - Phase 1B** | | | | |
| PS001050 | Retail Space Conceptual Design Docs - Ph 1B | 120 | 23JUN08 | 05DEC08 |
| PS001060 | Owner Rev Retail Space Conceptl Des Docs-Ph 1B | 10 | 08DEC08 | 19DEC08 |
| PS001480 | Finalize Retail Space Design - Phase 1B | 260 | 08DEC08 | 04DEC09 |
| PS001070 | Release Retail Space Conceptual Des Docs-Ph 1B | 0 | | 19DEC08 |
| **New Tower Conceptual Design - Phase 1C** | | | | |
| PS001080 | New Tower Conceptual Design Docs - Ph 1C | 120 | 08DEC08 | 22MAY09 |
| PS001090 | Owner Rev New Tower Conceptual Des Docs - Ph | 10 | 25MAY09 | 05JUN09 |
| PS001490 | Finalize New Tower Design - Ph 1C | 260 | 25MAY09 | 21MAY10 |
| PS001100 | Release New Tower Conceptual Des Docs - Ph 1C | 0 | | 05JUN09 |
| **50% Construction Documents** | | | | |
| PS001130 | Develop 50% Construction Documents | 15 | 02NOV07 | 22NOV07 |
| PS001140 | Owner Review 50% Construction Documents | 10 | 23NOV07 | 06DEC07 |
| PS001150 | Release 50% Construction Documents | 0 | | 06DEC07 |
| **90% Construction Documents** | | | | |
| PS001160 | Develop 90% Construction Documents | 15 | 23NOV07 | 13DEC07 |
| PS001170 | Owner Review 90% Construction Documents | 10 | 14DEC07 | 27DEC07 |
| PS001180 | Release 90% Construction Documents | 0 | | 27DEC07 |
| **100% Construction Documents** | | | | |
| PS001200 | Develop 100% Construction Documents | 10 | 14DEC07 | 27DEC07 |
| PS001210 | Owner Review 100% Construction Documents | 10 | 28DEC07 | 10JAN08 |
| PS001220 | Incorp Owner Comments Construction Documents | 5 | 11JAN08 | 17JAN08 |
| PS001230 | Release 100% Construction Documents | 0 | | 17JAN08 |
| **Permitting** | | | | |
| PS001240 | Submit for Permitting - Demo Plan | 0 | 02NOV07 | |
| PS001250 | Bldg Dept Review - Demo Plan | 33 | 02NOV07 | 18DEC07 |
| PS001350 | Permitting | 60 | 23NOV07 | 14FEB08 |
| PS001260 | Permit Avail - Demo Plan | 0 | | 18DEC07 |
| **Bid & Award** | | | | |
| PS001370 | Prepare Bid Packages | 80 | 02NOV07 | 21FEB08 |

Timeline milestones (right side chart):

- Release Drainage Ditch Conceptual Des Docs-Ph 1A
- Retail Space Conceptual Design Docs-Ph 1B
- Owner Rev Retail Space Conceptl Des Docs-Ph 1B
- Finalize Retail Space Design - Phase 1B
- ◆Release Retail Space Conceptual Des Docs - Ph 1B
- New Tower Conceptual Design Docs - Ph 1C
- Owner Rev New Tower Conceptual Des Docs - Ph 1C
- Finalize New Tower Design - Ph 1C
- Release New Tower Conceptual Des Docs - Ph 1C◆
- Develop 50% Construction Documents
- Owner Review 50% Construction Documents
- ◆Release 50% Construction Documents
- Develop 90% Construction Documents
- Owner Review 90% Construction Documents
- ◆Release 90% Construction Documents
- Develop 100% Construction Documents
- Owner Review 100% Construction Documents
- Incorp Owner Comments Construction Documents
- ◆Release 100% Construction Documents
- ◆Submit for Permitting - Demo Plan
- Bldg Dept Review - Demo Plan
- Permitting
- ◆Permit Avail - Demo Plan
- Prepare Bid Packages

Sheet 3 of 5

LVPM
Paradise Suites
Total Project Schedule
For Interpretation Only

Start Date    21MAY07
Finish Date   21MAY10
Data Date     01JUN07
Run Date      20JUN07 14:55

Early Bar
Progress Bar
Critical Activity

© Primavera Systems, Inc.

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS001380 | Review & Award Subcontractors | 80 | 14DEC07 | 03APR08 |

**Shop Drawings: Submittals & Fabrication**

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS001610 | Prepare Long Lead Equipment Submittals | 80 | 11JAN08 | 01MAY08 |
| PS001630 | Owner Review Long Lead Equipment Submittals | 70 | 08FEB08 | 15MAY08 |
| PS001650 | Fabricate Long Lead Equipment Submittals | 80 | 22FEB08 | 12JUN08 |
| PS001660 | Fabricate HVAC Long Lead Equipment | 80 | 22FEB08 | 12JUN08 |
| PS001570 | Fabricate Signage | 60 | 21MAR08 | 12JUN08 |

**Construction**

**Overall**

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS000170 | Notice to Proceed (Hotel 100% Unoccupied) | 0 | 01NOV07* | |
| PS000670 | Mobilization & Obtain Permits | 30 | 01NOV07 | 12DEC07 |
| PS000680 | FFE Removal | 30 | 01NOV07 | 12DEC07 |
| PS001180 | General Conditions / Contingency | 244* | 01NOV07 | 07OCT08 |
| PS001410 | Food & Beverage | 244* | 01NOV07 | 07OCT08 |
| PS001420 | Hotel Materials | 244* | 01NOV07 | 07OCT08 |
| PS001430 | Architectural Theme Elements | 190* | 16JAN08 | 07OCT08 |
| PS001440 | Operations Costs | 60 | 08OCT08 | 30DEC08 |
| PS001450 | FCIC | 60 | 08OCT08 | 30DEC08 |

**Floors 6 & 5**

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS000160 | Utilities Locate & Demolition - Floors 6 & 5 | 10 | 19DEC07 | 01JAN08 |
| PS000190 | Framing & Door Frames - Floors 6 & 5 | 20 | 16JAN08 | 12FEB08 |
| PS001270 | Tower Renovation | 130* | 16JAN08 | 07OCT08 |
| PS000200 | Rough Mech, Electrical & Plumb - Floors 6 & 5 | 20 | 30JAN08 | 04MAR08 |
| PS000210 | Hang Drywall Tape & Float - Floors 6 & 5 | 30 | 20FEB08 | 01APR08 |
| PS000220 | Doors, Case Base & Trim - Floors 6 & 5 | 20 | 19MAR08 | 15APR08 |
| PS000230 | Painting & Wall Treatments - Floors 6 & 5 | 25 | 09APR08 | 13MAY08 |
| PS000240 | Floor Finishes - Floors 6 & 5 | 25 | 30APR08 | 03JUN08 |
| PS000250 | Electrical Fixtures & Finishes - Floors 6 & 5 | 20 | 28MAY08 | 24JUN08 |
| PS000260 | Plumbing Fixtures & Finishes - Floors 6 & 5 | 20 | 28MAY08 | 24JUN08 |
| PS000270 | Final Clean / Punch - Floors 6 & 5 | 20 | 25JUN08 | 22JUL08 |
| PS000660 | Install FFE - Floors 6 & 5 | 15 | 23JUL08 | 12AUG08 |

**Floors 4 & 3**

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS000700 | Utilities Locate & Demolition - Floors 4 & 3 | 10 | 02JAN08 | 15JAN08 |

LVPM
Paradise Suites
Total Project Schedule
For Interpretation Only

Sheet 3 of 6

© Primavera Systems, Inc.

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS000710 | Framing & Door Frames - Floors 4 & 3 | 20 | 13FEB08 | 11MAR08 |
| PS000720 | Rough Mech, Electrical & Plumb - Floors 4 & 3 | 20 | 27FEB08 | 01APR08 |
| PS000730 | Hang Drywall Tape & Float - Floors 4 & 3 | 30 | 19MAR08 | 29APR08 |
| PS000740 | Doors, Case Base & Trim - Floors 4 & 3 | 20 | 16APR08 | 13MAY08 |
| PS000750 | Painting & Wall Treatments - Floors 4 & 3 | 25 | 07MAY08 | 10JUN08 |
| PS000760 | Floor Finishes - Floors 4 & 3 | 25 | 28MAY08 | 01JUL08 |
| PS000770 | Electrical Fixtures & Finishes - Floors 4 & 3 | 20 | 25JUN08 | 22JUL08 |
| PS000780 | Plumbing Fixtures & Finishes - Floors 4 & 3 | 20 | 25JUN08 | 22JUL08 |
| PS000790 | Final Clean / Punch - Floors 4 & 3 | 20 | 23JUL08 | 19AUG08 |
| PS000800 | Install FFE - Floors 4 & 3 | 15 | 20AUG08 | 09SEP08 |
| **Floors 2 & 1** | | | | |
| PS000810 | Utilites Locate & Demolition - Floors 2 & 1 | 10 | 16JAN08 | 29JAN08 |
| PS000820 | Framing & Door Frames - Floors 2 & 1 | 20 | 12MAR08 | 08APR08 |
| PS000830 | Rough Mech, Electrical & Plumb - Floors 2 & 1 | 25 | 26MAR08 | 29APR08 |
| PS000840 | Hang Drywall Tape & Float - Floors 2 & 1 | 30 | 16APR08 | 27MAY08 |
| PS000850 | Doors, Case Base & Trim - Floors 2 & 1 | 20 | 14MAY08 | 10JUN08 |
| PS000860 | Painting & Wall Treatments - Floors 2 & 1 | 25 | 04JUN08 | 08JUL08 |
| PS000870 | Floor Finishes - Floors 2 & 1 | 25 | 04JUN08 | 29JUL08 |
| PS000880 | Electrical Fixtures & Finishes - Floors 2 & 1 | 20 | 23JUL08 | 19AUG08 |
| PS000890 | Plumbing Fixtures & Finishes - Floors 2 & 1 | 20 | 23JUL08 | 19AUG08 |
| PS000900 | Final Clean / Punch - Floors 2 & 1 | 20 | 20AUG08 | 16SEP08 |
| PS000910 | Install FFE - Floors 2 & 1 | 15 | 17SEP08 | 07OCT08 |
| PS000510 | Tower Renovation Complete | 0 | | 07OCT08 |
| PS000650 | Paradise Suites Renovation Complete | 0 | | 07OCT08 |
| PS000280 | Utilites Locate & Demolition | 15 | 30JAN08 | 19FEB08 |
| PS000290 | Excavation, Steel & Concrete | 25 | 26FEB08 | 28MAR08 |
| PS000300 | Framing | 20 | 26MAR08 | 22APR08 |
| PS000320 | Rough Mechanical, Electrical & Plumbing | 30 | 02APR08 | 13MAY08 |
| PS000310 | Install Glass & Glazing | 30 | 23APR08 | 03JUN08 |
| PS000340 | Exterior Finishes | 30 | 07MAY08 | 17JUN08 |
| PS000330 | Interior Finishes | 30 | 14MAY08 | 24JUN08 |
| PS000350 | Erection Of Porte-Cochere | 20 | 18JUN08 | 15JUL08 |
| PS000360 | Place & Finish Exterior Concrete | 10 | 16JUL08 | 29JUL08 |
| PS000370 | Landscape Replace | 10 | 30JUL08 | 12AUG08 |
| PS000620 | New Entry & Porte Cochere Complete | 0 | | 12AUG08 |

© Primavera Systems, Inc.

LVPM
Paradise Suites
Total Project Schedule
For Interpretation Only

| Activity ID | Activity Description | Orig Dur | Start | Finish |
|---|---|---|---|---|
| PS000380 | Utilities Locate & Demolition | 15 | 20FEB08 | 11MAR08 |
| PS000390 | Sawcut Break & Haul | 15 | 12MAR08 | 01APR08 |
| PS000400 | Excavate, Steel & Concrete Footings | 30 | 02APR08 | 13MAY08 |
| PS000410 | Framing | 20 | 14MAY08 | 10JUN08 |
| PS000420 | Rough Plumbing | 20 | 21MAY08 | 17JUN08 |
| PS000430 | Rough Mechnical | 20 | 21MAY08 | 17JUN08 |
| PS000440 | Rough Electrical | 20 | 21MAY08 | 17JUN08 |
| PS000450 | Interior Finishes | 20 | 04JUN08 | 01JUL08 |
| PS000460 | Exterior Finishes | 20 | 04JUN08 | 01JUL08 |
| PS000470 | Ceilings & Fixtures | 20 | 18JUN08 | 15JUL08 |
| PS000480 | Finish M-P & E | 20 | 02JUL08 | 29JUL08 |
| PS000490 | Floor Finishes | 20 | 02JUL08 | 29JUL08 |
| PS000500 | Seating & Equipment | 20 | 30JUL08 | 26AUG08 |
| PS000510 | Pool, Spa, Club & BOH Complete | 0 | | 26AUG08 |
| PS000520 | Sawcut Break & Haul | 10 | 02APR08 | 15APR08 |
| PS000530 | Excavate, Steel & Place Structural Concrete | 25 | 16APR08 | 20MAY08 |
| PS000540 | Framing & Structure | 20 | 21MAY08 | 17JUN08 |
| PS000550 | Rough M-P & E | 20 | 28MAY08 | 24JUN08 |
| PS000560 | Hang Drywall Tape & Float | 30 | 11JUN08 | 08JUL08 |
| PS000570 | Interior Finishes & Wall Treatments | 30 | 25JUN08 | 05AUG08 |
| PS000580 | Floor Finishes | 20 | 23JUL08 | 19AUG08 |
| PS000590 | Bar Installation & Equipment | 25 | 13AUG08 | 16SEP08 |
| PS000600 | Specialty Lighting & Sound Equipment | 25 | 13AUG08 | 16SEP08 |
| PS000610 | Health Department Approval | 10 | 17SEP08 | 30SEP08 |
| PS000640 | Lobby, Lounge & Restaurant Complete | 0 | | 30SEP08 |
| PS000690 | Demolition | 16 | 21MAY08 | 10JUN08 |
| PS000920 | Paint Building | 25 | 11JUN08 | 15JUL08 |
| PS000940 | Hardscape | 20 | 16JUL08 | 12AUG08 |
| PS000930 | Glazing | 20 | 16JUL08 | 12AUG08 |
| PS000970 | Lighting | 20 | 16JUL08 | 12AUG08 |
| PS000950 | Pave & Seal | 10 | 13AUG08 | 26AUG08 |
| PS000960 | Landscape | 20 | 27AUG08 | 23SEP08 |
| PS000980 | Signage | 5 | 24SEP08 | 30SEP08 |

Start Date    21MAY07
Finish Date   21MAY07
Data Date     01JUN07
Run Date      20JUN07 14:06

PS05

Early Bar
Progress Bar
Critical Activity

Sheet 5 of 6

LVPM
Paradise Suites
Total Project Schedule
For Interpretation Only

© Primavera Systems, Inc.

LVPM