**Hearing Date and Time: September 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  September 10, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :   08-13555 (JMP)
                                        :
                    Debtors.            :   (Jointly Administered)
                                        :
                                        :
----------------------------------------------------------------x
```

### NOTICE OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF A DEBT REPAYMENT AGREEMENT WITH ELQ HYPOTHEKEN N.V.

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for an order, pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), approving a debt repayment agreement with

ELQ Hypotheken N.V., all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **September 15, 2009 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **September 10, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 26, 2009
     New York, New York

                    /s/ Richard P. Krasnow
                    Richard P. Krasnow

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :     08-13555 (JMP)
                                          :
                    Debtors.              :     (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------------x
```

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO RULE 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL**
**OF A DEBT REPAYMENT AGREEMENT WITH ELQ HYPOTHEKEN N.V.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

       Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

       1.    LBHI is a lender to ELQ Hypotheken N.V. ("ELQ"), a limited liability

company incorporated in the Netherlands that is an affiliate of LBHI.  Other LBHI affiliates that

are currently subject to English administration proceedings in the United Kingdom are also

lenders to ELQ; one of these is a secured lender.  Historically, ELQ was reliant on intergroup

funding.  Since the commencement of the above referenced chapter 11 cases, however, it has

become apparent that ELQ will be unable to repay all of its outstanding debt in full as that debt is

currently structured.  This has resulted in two possible outcomes in respect of ELQ's debt:  the

enforcement of rights and remedies by ELQ's secured lender, or the compromise and settlement

of ELQ's debt as described herein.  LBHI believes that the latter outcome will result in

maximized recoveries for LBHI.  Accordingly, by this Motion, LBHI seeks approval for entry

into a Debt Repayment Agreement (as defined below) that includes, *inter alia*, a release and

discharge of the debt owed by ELQ to LBHI.

## Background

2.        Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

3.        On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.        On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

5.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

### Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

7.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

### Relief Requested

9.      By this Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Rule 9019, approving LBHI's release and discharge of €40,000,000 in outstanding debt (and accrued interest and fees) on two unsecured revolving loan facility agreements entered into with ELQ, as part of a restructuring of ELQ's debt.

### The ELQ Group And Its Business

10.      ELQ is an indirect subsidiary of LBHI.  Two of its subsidiaries are Quion 50 B.V. ("Quion") and ELQ Portefeuille 1 B.V. ("Portefeuille" and, together with ELQ and

Quion, the "ELQ Group").  The assets of the ELQ Group consist primarily of mortgage loans.

From 2004 until recently, the ELQ Group was a provider of mortgage loans and mortgage loan

servicing.  While it continues to service its existing loan portfolio, the ELQ Group has ceased to

provide new mortgages due to the poor state of the capital markets and Lehman's financial

condition.

### ELQ's Financing

11.    Prior to the Commencement Date, the ELQ Group's primary financing

sources were LBHI, and two other affiliates that are currently subject to English administration

proceedings in the United Kingdom:  Lehman Brothers Limited ("LBL"), and Storm Funding

Limited ("Storm").[1]  The general terms of the financing provided by LBHI, LBL, and Storm are

described below.

The LBHI Debt

12.    LBHI entered into two English law governed unsecured revolving loan

facility agreements with ELQ (the "LBHI Agreements"):  (i) A €25,000,000 unsecured revolving

loan facility agreement dated November 15, 2007 between LBHI (as lender) and ELQ (as

borrower); and (ii) a €15,000,000 unsecured revolving loan facility agreement dated March 26,

2008 between LBHI (as lender) and ELQ (as borrower).  The amount currently due under the

LBHI Facility Agreements is €40,000,000 plus accrued interest and fees (the "LBHI Debt").

The LBL Debt

13.    LBL entered into an number of unsecured intercompany current account

arrangements with ELQ as borrower and LBL as lender (the "LBL Arrangements").  The amount

due under these arrangements is €1,021,578 plus accrued interest and fees (the "LBL Debt").

---

[1]    Certain partners of PriceWaterhouseCoopers LLP ("PWC") have been appointed as joint administrators of LBL and Storm.

The Storm Debt

14.     Storm entered into two English law governed secured warehouse facility

agreements:

    i.  A €100,000,000 secured warehouse facility agreement dated August
26, 2004 between Storm (as lender, agent and security agent),
Portefeuille (as borrower) and ELQ (as guarantor and corporate
services provider) (the "Portefeuille Agreement"); and

    ii.  A €300,000,000 secured warehouse facility agreement dated August 6,
2007 between Storm (as lender, agent and security agent), Quion (as
borrower) and ELQ (as guarantor and corporate services provider) (the
"Quion Agreement" and, together with the Portefeuille Agreement, the
"Storm Agreements").

The amount due under the Storm Agreements is €69,231,250 plus accrued interest and fees (the

"Storm Debt").

15.     Storm contends that the Quion Agreement is secured by eight Dutch law

governed pledges (the "Quion Pledges") with Storm as the pledgee; and that likewise, the

Portefeuille Agreement is secured by eight Dutch law governed pledges with Storm as the

pledgee (the "Portefeuille Pledges" and, together with the Quion Pledges, the "Pledges").

## ELQ's Financial Situation

16.     Prior to the Commencement Date, ELQ was mid-way through a bid

process for the sale of its shares.  This sale process halted because of the commencement of the

Debtors' chapter 11 cases, and the English administration proceedings in the United Kingdom,

which affected two of ELQ's direct shareholders, Mable Commercial Funding Limited

("Mable") and Lehman Brothers Holdings Plc ("LBHP")[2] – both Lehman affiliates.  ELQ's only

other shareholder is ELQ Holdings B.V.  Attempts to revive the sale in November 2008 were

---

[2]     Certain partners of PWC have been appointed as joint administrators of Mable and LBHP.

unsuccessful, and all of the initial bidders subsequently withdrew their bids. Since this time, ELQ has been continuously at risk of defaulting on its debts.

17.     In April 2009, the ELQ Group liquidated some of its encumbered mortgage loan assets and realized approximately €17,000,000 in proceeds that secure the Storm Debt. Storm's collateral has an estimated value (inclusive of said approximately €17,000,000) of approximately €39,500,000 (the "Storm Collateral Estimate") – i.e., approximately 57% of its total claim. ELQ also holds approximately €20,000,000 of cash that is pledged to Storm. The only unencumbered assets of the ELQ Group are (i) certain "Residual Certificates" that evidence deferred payment obligations of several special purpose entities that purchased mortgage loans from Portefeuille, and (ii) a small amount of fixed and current assets. Given that the Storm debt is non-recourse as to Quion and Portefeuille, if the Residual Certificates and their fixed and current assets were to be liquidated, the net proceeds would result in a dividend to ELQ as to which the aggregate claims of Storm, LBHI, and LBL would rank equally as unsecured claims. LBHI estimates that, assuming the Storm Collateral Estimate is accurate, in a liquidation scenario LBHI could recover, at most, approximately between €2,500,000 and €2,600,000 from this dividend, i.e. approximately 6.3% of its claim.

18.     The managers of ELQ (the "ELQ Management") believe that on a going concern basis, and assuming their debts are restructured and paid, ELQ and its subsidiaries are still viable businesses. LBHI agrees. Furthermore, the ELQ Management and its lenders believe that a controlled liquidation of its Loan Portfolio (as defined below) will yield a higher return for the ELQ Group's creditors than a "fire-sale" liquidation. To ensure the continuation of the ELQ Group, the ELQ Management has proposed to undertake a controlled liquidation of the Loan Portfolio (as defined below) combined with a scheme of repayment of the LBHI Debt, the Storm

Debt and the LBL Debt (collectively, the "Debt Repayment Agreement"), as outlined below,

which the parties – including LBHI – believe will maximize creditor recoveries while also

affording ELQ the opportunity to continue to operate on a sound financial footing.

## The Debt Repayment Agreement

19.     The Debt Repayment Agreement is set out in the following agreements

(together, the "Transaction Documents"):

   i. Four English law governed standstill agreements (the "Standstill Agreements") to be entered into in August 2009 between: (i) LBHI and ELQ (ii) LBL and ELQ, (iii) Storm, ELQ and Portefeuille (the "Portefeuille Standstill Agreement") and (iv) Storm, ELQ and Quion (together with the Portefeuille Standstill Agreement, the "Storm Standstill Agreements"), attached hereto as Exhibits A, B, C, and D respectively.

  ii. A Dutch law governed "Run-Off Agreement" to be entered into in August 2009 between ELQ, Portefeuille, Quion, the ELQ Management, Storm, LBHI and LBL, attached hereto as Exhibit E.

 iii. The Dutch law governed Conditional Share Transfer Agreement to be entered into in August 2009 between ELQ Holdings B.V., Mable, LBHP, ELQ, the ELQ Management, Storm and LBHI, attached hereto as Exhibit F.

The Standstill Agreements

20.     All four Standstill Agreements are substantially similar and expire on: (i)

June 30, 2010 or (ii) such earlier time as the completion of the sale and transfer of all the shares

in the share capital of ELQ in accordance with the Conditional Share Transfer Agreement

("Completion") or (iii) upon Early Termination (defined below) of the relevant Standstill

Agreements or (iv) such later time as may be agreed between the relevant parties.

21.     A summary of the salient terms of the Standstill Agreements is set forth

below:[3]

---

[3]     This summary is qualified in its entirety by the terms and conditions of the Standstill Agreements, and is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Standstill Agreements.  The terms of the Standstill Agreements control, to the extent that there is any conflict or inconsistency between the summary and said terms.

    i.    Each of Storm, LBHI and LBL have, for the duration of the Standstill Agreements only, agreed to the following:

        a.  Suspension of all events of default;

        b.  Not to commence any insolvency proceedings or take any other action against any member of the ELQ Group; and

        c.  Not to make a demand or enforce the payment of monies outstanding under the Storm Agreements, the LBHI Agreements or the LBL Arrangements.

    ii.    The Standstill Agreements also provide the following:

        a.  Any undrawn or unutilized portions of the relevant credit agreement will be cancelled;

        b.  Drawn and unutilized portions of the relevant credit agreement will not be made available or reinstated after any repayment or prepayment thereof;

        c.  The borrower will maintain the existing borrowings under the LBHI Agreements, the Storm Agreements and the LBL Arrangements and will not transfer such borrowings to third parties including to affiliates; and

        d.  Except as specifically provided in the relevant Standstill Agreement, the LBHI Agreements, the Storm Agreements and the LBL Arrangements will remain in full force and effect.

        e.  An early termination of the obligations of each of Storm, LBHI and LBL shall occur upon (1) the commencement of an insolvency or like proceeding as to their respective borrower; (2) the borrower's failure to comply with the terms of the Standstill Agreement; (3) the Run-Off Agreement becoming ineffective or being repudiated, breached or terminated; or (4) any of the Standstill Agreements becoming ineffective or being repudiated, breached or terminated ("<u>Early Termination</u>").

<u>The Run-Off Agreement</u>

        22.    The Run-Off Agreement provides that the ELQ Management will use all reasonable endeavours to collect and/or realize all mortgage receivables (the "<u>Mortgage Receivables</u>") from the mortgage loans set out in Schedule 2 (the "<u>Loan Portfolio</u>") to the Run-Off Agreement, and residual income from the Residual Certificates from each of its obligors.

23.    A summary of the salient terms of the Run-Off Agreement is set forth below:[4]

i.    <u>Collection Accounts</u>

a.    The amounts received from Mortgage Receivables that are pledged to Storm as security for each of the Storm Agreements will be paid into two ELQ collection accounts that will be pledged to Storm (the "<u>Pledged Collection Accounts</u>").

b.    All other amounts (including any amounts realized from Residual Certificates) will be paid into a separate unencumbered account (the "<u>Third Collection Account</u>" and, together with the Pledged Collection Accounts, the "<u>Collection Accounts</u>").

c.    Funds paid into the Collection Accounts must be transferred to accounts specified by Storm and LBHI within one business day.

ii.    <u>The Payment Waterfall.</u>    Proceeds realized from the ELQ Assets (defined as: (i) any cash held by the ELQ Group, (ii) the proceeds of the Mortgage Receivables less the associated realization costs and (iii) the proceeds of the Residual Certificates up to €8,000,000 less the associated realization costs) will be paid to Storm, LBHI and LBL (the "<u>Payment Waterfall</u>") as follows:

a.    First, any realizations of ELQ Assets up to €39,500,000 will be paid to Storm, out of which Storm will pay €500,000 to LBL in satisfaction of the LBL Debt.  Approximately €37,000,000 of the first €39,500,000 (composed of the €20,000,000 cash in hand and €17,000,000 of proceeds generated from the April 2009 Sale) will be paid up-front to Storm upon signing of the Transaction Documents.

b.    Second, any realizations of ELQ Assets from €39,500,001 to €60,000,000 will be allocated and paid to Storm and LBHI in a ratio of 44% to Storm and 56% to LBHI.

c.    Third, any realizations of ELQ Assets exceeding €60,000,000 realized before or after June 30, 2010 (or such later date as agreed by all parties in writing) will be (i) applied towards payment of the Storm Debt and the LBHI Debt, respectively, and (ii) retained by ELQ and applied towards bonus payments to ELQ Management, all in a ratio of 35.2% to Storm, 44.8% to LBHI,, and 20% to ELQ.

---

[4]    This summary is qualified in its entirety by the terms and conditions of the Run-Off Agreement, and is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Run-Off Agreement.  The terms of the Run-Off Agreement control, to the extent that there is any conflict or inconsistency between the summary and said terms.

    d.    Any other payments that are not the result of realizations of the ELQ Assets will also be paid in accordance with the Payment Waterfall described above.

    iii.    <u>Release and Discharge of Debt</u>

    a.    Upon Completion (defined in paragraph 20 above), both the Storm Debt and LBHI Debt will be fully and unconditionally discharged and released, except:

    (1)    an amount of LBHI Debt equal to 56% of the Rabobank Required Cash Balance (as more fully described in paragraph 25 below under the Conditional Share Transfer Agreement) at the time of Completion and an amount of the Storm Debt equal to 44% of the Rabobank Required Cash balance at the time of Completion, which will not be discharged and will remain due and payable to LBHI and Storm as the case may be; and

    (2)    if at Completion a total of €8,000,000 has not been realized from the Residual Certificates (the "<u>Residual Target</u>"), an amount of LBHI Debt equal to 56% of the amount by which the Residual Target has not been met, and an amount of Storm Debt equal to 44% of the amount by which the Residual Target has not been met (i) will not be discharged; (ii) will be due and payable solely from the remaining proceeds (including any sale proceeds) derived from the Residual Certificates.

<u>The Conditional Share Transfer Agreement</u>[5]

    24.    The Conditional Share Transfer Agreement provides that the ELQ Management will purchase the share capital of ELQ from Mable, LBHP, and ELQ Holdings B.V. for €1.00 upon satisfaction of certain conditions, including the discharge and release of the Storm Debt, the LBHI Debt and the LBL Debt, subject to the exceptions described in the preceding paragraph.

    25.    The ELQ Group has used Coöperatieve Rabobank Amsterdam en Omstreken U.A. ("<u>Rabobank</u>") for most of its banking and transactions. The Conditional Share

---

[5]    This summary is qualified in its entirety by the terms and conditions of the Conditional Share Transfer Agreement, and is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Conditional Share Transfer Agreement. The terms of the Conditional Share Transfer Agreement control, to the extent that there is any conflict or inconsistency between the summary and said terms.

Transfer Agreement requires that, at Completion, ELQ must maintain a cash balance with, and as required by Rabobank to cover the "direct debit contracts"[6] of the ELQ Group (the "Rabobank Required Cash Balance"), up to a maximum cash balance of €5,800,000.  If, at Completion, the Rabobank Required Cash Balance is less than €5,800,000, LBHI and Storm will receive the difference in accordance with the Payment Waterfall.  After Completion, the Rabobank Required Cash Balance will be recalculated every six months for a period of two years.  If at any six month interval the Rabobank Required Cash Balance is either lower than the amount required at Completion or lower than the amount required in the previous six months, LBHI and Storm will receive the difference in accordance with the Payment Waterfall.  If at the expiration of the two year period the Rabobank Required Cash Balance has not been reduced to zero, the reviews at six month intervals will continue to be conducted and further cash distributions may be made to LBHI and Storm in accordance with the Payment Waterfall.

### The Controlling Legal Standard

26.     Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve compromises "if they are in the best interest of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir.

---

[6]     Direct debit contracts are like standing bank orders that companies (or individuals) may use to pay certain expenses such as utilities, rent, or insurance, by authorizing these creditors to take money directly out of the company's bank account on a monthly basis.  Typically a bank that deals in direct debit contracts requires that the company maintain a certain cash balance to honor these direct debit contracts.

1994).  Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." *TMT Trailer Ferry,* 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939).

27.    The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness."  *Drexel Burnham Lambert Group*, 134 B.R. at 505; see also *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, and in the best interest of the estate."  *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

28.    While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation.  *Drexel Burnham Lambert Group*, 134 B.R. at 496.  "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact….  The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness."  *Nellis*, 165 B.R. at 123 (internal citations omitted).

29.    The court may give weight to the "informed judgments of the … debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness…. If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.").

30.    Significantly, there is no requirement that "the value of the compromise … be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427. Instead, "there is no reason, at lease in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2nd Cir. 1974).

### The Debt Repayment Agreement Meets the Legal Standard Established Under Rule 9019 and Is in the Bests Interests of LBHI's Estate

31.    LBHI believes that the Debt Repayment Agreement represents the best method by which it can maximize its recoveries on the LBHI Debt. If the Debt Repayment Plan is not consummated the alternative option would be enforcement by Storm of its rights and remedies as a secured creditor. It appears that, in a foreclosure sale context, Storm is significantly undersecured, and the remaining unencumbered assets – from which Storm, LBHI, LBL and other unsecured creditors would share – have minimal value. As stated above, LBHI estimates that in this scenario, at best, it might recover approximately 6.3% of its claim. On the other hand, if the Debt Repayment Agreement is consummated and ELQ Management meets its €60,000,000 target from the realization of the ELQ Assets in a non-foreclosure context, LBHI will stand to recover (i) €11,480,000 of the LBHI Debt, approximately 28.7% of its claim, plus

(ii) 44.8% of ELQ Asset realizations over €50,000,000, and (iii) any additional amounts which may be payable out of the Residual Certificates and under the Conditional Share Transfer Agreement.  It is beyond peradventure that such recoveries would far exceed LBHI's estimated minimal recoveries in the alternative scenario.  Therefore, LBHI has concluded that the Debt Repayment Agreement is in the best interests of LBHI, its estate, its creditors, and all parties in interest.

### Notice

32.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

33.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  August 26, 2009
New York, New York


/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                          :

| | |
|---|---|
| In re | **:**      **Chapter 11 Case No.** |
| | **:** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | **:**      **08-13555 (JMP)** |
| | **:** |
|             **Debtors.** | **:**      **(Jointly Administered)** |
| | **:** |
| | **:** |

-------------------------------------------------------------------x

## ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF A DEBT REPAYMENT AGREEMENT WITH ELQ HYPOTHEKEN N.V.

        Upon the motion, dated August 26, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization and approval of LBHI's release and

discharge of debt owed by ELQ Hypotheken N.V., all as more fully described in the Motion; and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered February 13, 2009 governing case management and administrative procedures

[Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion and the Objection; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, LBHI's execution of the Debt Repayment Agreement is approved; and it is further

ORDERED that LBHI is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Debt Repayment Agreement and perform any and all obligations contemplated therein; and it is further

ORDERED that in connection with the Debt Repayment Agreement, LBHI is authorized, but not directed, to release and discharge the LBHI Debt; and it is further

ORDERED that the terms of this Order shall be immediately effective and enforceable upon its entry; it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2009
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE