WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                   :
**In re**                                            :    **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                                                   :
                                            **Debtors.**    :    **(Jointly Administered)**
                                                                   :
                                                                   :
-------------------------------------------------------------------x

**NOTICE OF EXHIBITS TO DEBTORS' MOTION**
**FOR AN ORDER PURSUANT TO RULE 9019 OF THE FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL**
**OF A DEBT REPAYMENT AGREEMENT WITH ELQ HYPOTHEKEN N.V.**

PLEASE TAKE NOTICE that, on August 26, 2009, the Lehman Brothers

Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases (together, the

"Debtors") filed a Motion (the "Motion") pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure, approving a debt repayment agreement with ELQ Hypotheken N.V.

[Docket No. 4959], all as more fully described in the Motion.

PLEASE TAKE FURTHER NOTICE that attached hereto are the following

exhibits to the motion:  at Exhibit A; Exhibit B; Exhibit C; Exhibit D; Exhibit E; and Exhibit F.

Dated:  August 26, 2009
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtors
and Debtors in Possession

**EXHIBIT A**

From: Lehman Brothers Holding Inc.

To:    ELQ Hypotheken N.V. (the "Borrower")

18 AUGUST ~~July~~ 2009

Dear Sirs

**Loan Facility Agreements dated 15 November 2007 and 26 March 2008 between ELQ Hypotheken N.V. as Borrower and Lehman Brothers Holdings Inc. - UK Branch ("LBHI") as Lender (the "Loan Facility Agreements") and any other loan facility made available to the Borrower by LBHI (together with the Loan Facility Agreements: the "Facility Agreements")**

We refer to our recent discussions relating to the Facility Agreements according to which you, the Borrower, asked us (LBHI) to enter into a standstill agreement in connection with the proposed restructuring of the Borrower's debt. We understand that, on or about the date hereof, standstill agreements on similar commercial terms will be made between the Borrower and Storm Funding Limited (in administration) and between the Borrower and Lehman Brothers Limited (in administration).

The terms of this Agreement are conditional upon the execution of the following on or in advance of the Effective Date:

(a)    a standstill and forbearance agreement between Quion 50, the Borrower and Storm in relation to the Quion 50 Warehouse Facility (the "**Quion 50 Standstill**");

(b)    a standstill agreement between the ELQ Portefeuille, the Borrower and Storm in relation to the ELQ Portefeuille Warehouse Facility (the "**ELQ Portefeuille Standstill**");

(c)    a standstill agreement between the Guarantor and LBL in relation to the Intercompany Arrangements (the "**LBL Standstill**"); and

(d)    the Run-Off Agreement.

**1      Definitions**

Unless otherwise defined in this Clause 1 (*Definitions*) or in the body of this Agreement (as defined below), capitalised terms in the Loan Facility Agreements have the same meaning in this Agreement.

Except to the extent that the context requires otherwise:

"**Effective Date**" means the last date on which each of the Borrower and the Lender has executed this Agreement.

"**ELQ Portefeuille**" means ELQ Portefeuille I B.V.

"**ELQ Portefeuille Warehouse Facility**" means the Warehouse Facility Agreement dated 6 August 2007 between Quion 50 B.V. as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent.

"**Facilities**" means the loan facilities made available under the Facility Agreements.

"**Group**" means ELQ Hypotheken N.V., ELQ Portefeuille I B.V., Quion 50 B.V. and Hypotheek Explorer No. 1 B.V.

A10668324 - LBHI Standstill

"**Intercompany Arrangements**" means the intercompany current account arrangements between LBL as lender and the Guarantor as borrower under which LBL made loans available to the Guarantor.

"**LBL**" means Lehman Brothers Limited (in administration).

"**Proceedings**" means any legal action or proceedings arising out of or in connection with this Agreement.

"**Quion 50**" means Quion 50 B.V.

"**Quion 50 Warehouse Facility**" means the Warehouse Facility Agreement dated 6 August 2007 between Quion 5as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent.

"**Run-Off Agreement**" means the run-off agreement in respect of ELQ Hypotheken N.V. and its group of companies, dated on or around the date hereof and made between, *inter alia*, ELQ Hypotheken N.V., ELQ Portefeuille I B.V., Storm Funding Limited (in administration), LBHI and LBL.

"**Standstill ExpiryDate**" means the earlier of:

(a)     the date of Completion (as such term is defined in the Conditional Share Transfer Agreement); and

(b)     the Long Stop Date (as such term is defined in the Run-Off Agreement).

"**Standstill Period**" means the date commencing on the Effective Date and expiring on the Standstill Expiry Date.

"**Suspended Defaults**" means any Event of Default outstanding now under clause 7(a) of each Loan Facility Agreement, any non-payment default under any other Facility Agreement and, following the Run-off Agreement becoming effective, any Event of Default under any provision of the Facility Agreements that may occur as a result from, or in connection with, the performance by the Borrower of its obligations under the Run-off Agreement.

2      **Interpretation**

Unless a contrary indication appears, any reference in this Agreement to:

(c)     any party shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(d)     "**assets**" includes present and future properties, revenues and rights of every description;

(e)     this "**Agreement**" refers to this letter;

(f)     any "**agreement**" or other instrument is a reference to that agreement or other instrument as amended, novated, supplemented, extended, restated or replaced;

(g)     a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(h)     a provision of law is a reference to that provision as amended or re-enacted; and

(i)     clause headings are for ease of reference only.

A10668324 - LBHI Standstill



**3    Lender's Undertakings**

3.1    **Standstill**: During the Standstill Period, the Lender will not, in respect of any Suspended Defaults:

    3.1.1    commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) against the Borrower or any other member of the Group;

    3.1.2    make demand for, accelerate the due date for or declare prematurely payable any moneys outstanding or demand cash cover for the Loan under any of the Facility Agreements;

    3.1.3    take any action to demand or enforce the payment of moneys under any of the Facility Agreements including making any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*));

    3.1.4    exercise any right of appropriation, amalgamation or combination of accounts or liabilities, counterclaim or set-off in reduction of amounts outstanding under any of the Facility Agreements; or

    3.1.5    take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer or to perfect or to enforce or to make any demand under any security interest or any guarantee or like commitment or similar support given in connection with any of the Facility Agreements by any member of the Group.

3.2    Clause 3.1 shall apply only to the matters specifically referred to in this Agreement.

3.3    **Discontinuation of Facilities**: The following restrictions will apply to the Facilities:

    3.3.1    undrawn or unutilised portions of the Maximum Credit will be cancelled;

    3.3.2    drawn and utilised portions of the Loans under the Maximum Credit will not be made available to the Borrower or reinstated after any repayment or prepayment thereof; and

    3.3.3    the Borrower will ensure that, except with the prior approval of the Lender, existing borrowings under the Facilities will be maintained by it and will not be transferred to third parties including Group companies.

3.4    Notwithstanding Clause 3.1, the Suspended Defaults remain outstanding during the Standstill Period unless waived by the Lender. At the Standstill Expiry Time the rights of the Lender in respect of the Suspended Defaults shall be reinstated in full, unless such rights have been released, waived or lapsed prior to the Standstill Expiry Time.

3.5    Except as specifically provided in this Agreement, the Facility Agreements remain in full force and effect and the Lender reserves all rights and remedies under or in connection with the Facility Agreements and the Borrower agrees that neither this Agreement nor any act or omission on the part of the Lender during the continuation of this Agreement shall constitute a suspension or waiver by the Lender of any event of default (howsoever described) or of any rights or remedies available to them

under the Facility Agreement, or other agreement or otherwise, all of which are hereby reserved.

## 4  Conditions Precedent

Clause 3.1 is conditional on the Borrower notifying the Lender that Lehman Brothers Limited (in administration) and Storm Funding Limited (in administration) have entered into the LBL Standstill Agreement, the Quion 50 Standstill Agreement and the ELQ Portefeuille Standstill Agreement on substantially the same terms as this Agreement.

## 5  Borrower's Undertakings

**5.1**  Subject to the terms of this Agreement, , the Borrower hereby confirms that during the Standstill Period it will (and shall procure that each member of the Group will):

**5.1.1**  not commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) regarding the Borrower and or any other member of the Group;

**5.1.2**  not take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer regarding the Borrower and or any other member of the Group;

**5.1.3**  promptly provide or procure the provision to the Lender of all information concerning the Borrower's business and affairs, financial condition, assets and operations provided to any other creditor of the Borrower or as requested by the Lender in writing and promptly correct any information so provided if the Borrower discovers or is otherwise notified that such information was or has become inaccurate or misleading in any material respect;

**5.1.4**  consult with the Lender in relation to the implementation and documentation of the restructuring of the Borrower's debt;

**5.1.5**  consult with the Lender prior to any transaction, other than in the ordinary course of business or as envisaged by the Run-off Agreement (following the time this agreement has become effective), either alone, or in a series of transactions, in excess of EUR 1,000,000 in any twelve month period, or any sale, transfer, lease or otherwise dispose of any shares in any other entity or of all or material part of its present or future undertaking, material assets, rights or revenues whether by one or a series of transactions related or not; and

**5.1.6**  notify the Lender of any breach of this Agreement by it.

## 6  Early Termination

The Lender shall cease to be bound by the provisions of paragraph 3 immediately prior to the occurrence of any of the following:

**6.1**  (a) any administration, receivership, liquidation, bankruptcy, Dutch suspension of payments proceedings (*surséance van betaling*), Dutch bankruptcy proceedings (*faillissement*) or Dutch liquidation (*vereffening*) or any other insolvency related

3





proceedings (or any analogous proceedings in any relevant jurisdiction) including emergency regulations (*noodregeling*), whether voluntary or involuntary, being commenced against or in respect of any member of the Group; (b) any liquidator, administrative or other receiver, compulsory manager or other similar officer being appointed in respect of any member of the Group; (c) any other action being taken to enforce any security in respect of any asset of any member of the Group or to enforce any guarantee or indemnity given by any member of the Group; (d) any other step being taken by any person with a view to the administration or liquidation of any member of the Group; (e) any member of the Group gives notice under section 36(2) of the Dutch 1990 Tax Collection Act (*Invorderingswet 1990*); or (f) any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*)) affecting any asset or assets of a member of the Group and such attachment is not discharged within five Business Days;

6.2    the Borrower's failure to comply with any of its obligations under the terms of this Agreement;

6.3    the Run-Off Agreement becoming ineffective or being repudiated, breached or terminated; or

6.4    the Quion 50 Standstill and/or the ELQ Portefeuille Standstill and/or the LBL Standstill and/or becoming ineffective or being repudiated, breached or terminated.

## 7    Litigation

The Borrower confirms that it is not aware of any actual, pending or threatened litigation, arbitration or other proceedings which might be material to the Lender in considering whether or not to enter into this Agreement.

## 8    Future Arrangements and Waivers

8.1    The agreement of the Lender to the terms of this Agreement shall not be taken to imply any agreement by the Lender to the terms of any future arrangement or accommodation with the Borrower or any other member of the Group other than those expressly provided for in this Agreement.

8.2    Except as expressly agreed in this Agreement, nothing contained in this Agreement shall:

8.2.1    constitute a waiver of any rights of the Lender as between members of the Group and the Lender under any Facility Agreement and, except as expressly agreed in this Agreement, the Lender reserves any rights it may have against any member of the Group under any Facility Agreement; or

8.2.2    oblige the Lender to make any further advances or extend any other credit or financial accommodation to any member of the Group beyond that outstanding at the Effective Date.

## 9    Execution and effective date

This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

This Agreement will come into effect on the Effective Date.

A10668324 - LBHI Standstill



## 10   Disclosure

**10.1**   The Borrower confirms its consent to the disclosure by the Lender to any professional advisers retained by the Lender of details relating to any of the Facility Agreements and amounts owing thereunder.

**10.2**   The Lender acknowledges that all negotiations and discussions arising in connection with any proposed restructuring of the Group's finances and/or operations (the "**Restructuring**"), and any presentations, reports or other information provided the Lender in connection with the Restructuring are highly sensitive, and the Lender shall (save where expressly permitted by clause 10.1 above) treat as confidential and not disclose any such information to any other person save to the extent required by law, expressly permitted under the provisions of any of the Facility Agreements or the disclosure or use is required by the bankruptcy proceedings in In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP), in the U.S. Bankruptcy Court for the Southern District of New York, including to the United States Trustee or the statutory official committee of unsecured creditors appointed therein. LBHI further agrees that it shall only use such information for the purpose of considering the feasibility and negotiating the terms of the Restructuring and for no other purpose.

## 11   Miscellaneous

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any of the Facility Agreements, until the Standstill Expiry Time, this Agreement shall prevail and the Borrower and the Lender agree that each of the Facility Agreements is deemed amended to that extent commencing from the Effective Date until the Standstill Expiry Time.

The provisions of this Agreement are entered into without prejudice to any standstill agreement or arrangements which may have been or may be entered into with any other creditors of the Group.

Each Facility Agreement and this Agreement will, from the date of this agreement, be read and construed as the one document.

## 12   Governing Law

The terms of this Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in all respects in accordance with English law.

The courts of England shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) and accordingly any Proceedings may be brought in such courts. Each of the Lender and the Borrower irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. These submissions are for the benefit of the Lender and shall not limit the Lender's right to commence Proceedings in any other court of competent jurisdiction nor shall the commencement of Proceedings in any one or more jurisdictions preclude the commencement of Proceedings in any other jurisdiction (whether concurrently or not).

 

5

## 13    Personal Liability

The representatives of LBHI have entered into and signed this Agreement as agent for and on behalf of LBHI and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by LBHI; or in respect of any failure on the part of LBHI to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this Agreement.

[signature page to follow]

A10668324 - LBHI Standstill





If you agree to the above please sign and return the enclosed copy of this Agreement to LBHI at the above address.

Yours faithfully

..................................................................

By

for and on behalf of

Lehman Brothers Holdings Inc.

in its capacity as Lender under the Facility Agreements

as agent without personal liability




We agree to the above

.................................................

By

Director

for and on behalf of

ELQ Hypotheken N.V. as Borrower under the Facility Agreements

---

A10668324 - LBHI Standstill

If you agree to the above please sign and return the enclosed copy of this Agreement to LBHI at the above address.

Yours faithfully

…………………………………………………

By

for and on behalf of

Lehman Brothers Holdings Inc.

in its capacity as Lender under the Facility Agreements

as agent without personal liability




We agree to the above


…………………………………………….

By

Director

for and on behalf of

ELQ Hypotheken N.V. as Borrower under the Facility Agreements




A10668324 - LBHI Standstill

**EXHIBIT B**

Lehman Brothers Limited (in administration)

To:   ELQ Hypotheken N.V. (as "**Borrower**")

18 August ~~July~~ 2009

Dear Sirs

**Intercompany Current Account Arrangements with ELQ Hypotheken N.V. as Borrower and Lehman Brothers Limited as Lender (the "Intercompany Arrangements")**

We refer to our recent discussions relating to the Intercompany Agreements according to which you, the Borrower, asked us (Lehman Brothers Limited (in administration), "**LBL**") to enter into a standstill agreement in connection with the proposed restructuring of the Borrower's debt. We understand that, on or about the date hereof, standstill agreements on similar commercial terms will be made between the Borrower and Lehman Brothers Holdings Inc. and between the Borrower and Lehman Brothers Limited (in administration).

The terms of this Agreement are conditional upon the execution of the following on or in advance of the Effective Date:

(a)   a standstill and forbearance agreement between Quion 50, the Guarantor and Storm in relation to the Quion 50 Warehouse Facility (the "**Quion 50 Standstill**");

(b)   a standstill agreement between the ELQ Portefeuille, the Borrower and Storm in relation to the ELQ Portefeuille Warehouse Facility (the "**ELQ Portefeuille Standstill**");

(c)   a standstill agreement between the Guarantor and LBHI in relation to the LBHI Loan Facility Agreements (the "**LBHI Standstill**"); and

(d)   the Run-Off Agreement.

**1   Definitions**

Except to the extent that the context requires otherwise :

"**Administrators**" means the administrators of LBL, as appointed by the High Court of Justice.

"**Borrower**" means ELQ Hypotheken N.V.

"**Effective Date**" means the last date on which each of the Borrower and the Lender has executed this Agreement.

"**ELQ Portefeuille**" means ELQ Portefeuille I B.V.

"**ELQ Portefeuille Warehouse Facility**" means the Warehouse Facility Agreement dated 6 August 2007 between Quion 50 B.V. as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent.

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

Lehman Brothers Limited (in administration)

"**Group**" means ELQ Hypotheken N.V. Portefeuille I B.V., Quion 50 B.V. and Hypotheek Explorer No. 1 B.V.

"**LBHI**" means Lehman Brothers Holdings Inc UK Branch (subject to Chapter 11 bankruptcy proceedings in the United States).

"**LBHI Loan Facility Agreements**" means the Loan Facility Agreement dated 15 November 2007 and the Loan Facility Agreement dated 26 march 2008 between ELQ Hypotheken N.V. as Borrower and LBHI as Lender and any other loan facility made available to ELQ Hypotheken N.V. and/or the Group and/or the Related Subsidiaries by LBHI.

"**Lender**" means Lehman Brothers Limited.

"**Proceedings**" means any legal action or proceedings arising out of or in connection with this Agreement.

"**Quion 50**" means Quion 50 B.V.

"**Quion 50 Warehouse Facility**" means the Warehouse Facility Agreement dated 6 August 2007 between Quion 5as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent.

"**Run-Off Agreement**" means the run-off agreement in respect of ELQ Hypotheken N.V. and its group of companies, dated on or around the date hereof and made between, *inter alia,* ELQ Hypotheken N.V., ELQ Portefeuille I B.V., Storm Funding Limited (in administration), LBHI and LBL.

"**Standstill Expiry Date**" means the earlier of:

(a)     the date of Completion (as such term is defined in the Conditional Share Transfer Agreement); or

(b)     the Long Stop Date (as such term is defined in the Run-Off Agreement).

"**Standstill Period**" means the period commencing on the Effective Date and expiring on the Standstill Expiry Date.

"**Suspended Defaults**" means any Event of Default outstanding now under the Intercompany Agreements and, following the Run-off Agreement becoming effective, any Event of Default under any provision of the Intercompany Agreements that may occur as a result from, or in connection with, the performance by the Borrower of its obligations under the Run-off Agreement.

2    **Interpretation**

Unless a contrary indication appears, any reference in this Agreement to:

(c)     any party shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

Lehman Brothers Limited (in administration)

(d)    "**assets**" includes present and future properties, revenues and rights of every description;

(e)    this "**Agreement**" refers to this letter;

(f)    any "**agreement**" or other instrument is a reference to that agreement or other instrument as amended, novated, supplemented, extended, restated or replaced;

(g)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(h)    a provision of law is a reference to that provision as amended or re-enacted; and

(i)    clause headings are for ease of reference only.

**3     Lender's Undertakings**

**3.1    Standstill**: During the Standstill Period, the Lender will not, in respect of any Suspended Defaults:

**3.1.1**    commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) against the Borrower or any other member of the Group;

**3.1.2**    make demand for, accelerate the due date for or declare prematurely payable any moneys outstanding or demand cash cover for the Loan under any of the Intercompany Agreements;

**3.1.3**    take any action to demand or enforce the payment of moneys under any of the Intercompany Agreements including making any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*));

**3.1.4**    exercise any right of appropriation, amalgamation or combination of accounts or liabilities, counterclaim or set-off in reduction of amounts outstanding under any of the Intercompany Agreements; or

**3.1.5**    take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer or to perfect or to enforce or to make any demand under any security interest or any guarantee or like commitment or similar support given in connection with any of the Intercompany Agreements by any member of the Group.

**3.2**    Clause 3.1 shall apply only to the matters specifically referred to in this Agreement.

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

Lehman Brothers Limited (in administration)

3.3 **Discontinuation of Intercompany Arrangements**: On and from the Effective Date:

3.3.1 any drawn or unutilised portions of the credit available under the Intercompany Arrangements will be cancelled;

3.3.2 drawn and utilised portions of the credit under the Intercompany Arrangements will not be made available to the Borrower or reinstated after any repayment or prepayment thereof; and

3.3.3 the Borrower will ensure that, except with the prior approval of the Lender, existing borrowings under the Intercompany Arrangements will not be transferred to third parties including Group companies.

3.4 Notwithstanding Clause 3.1, the Suspended Defaults remain outstanding during the Standstill Period unless waived by the Lender. At the Standstill Expiry Time the rights of the Lender in respect of the Suspended Defaults shall be reinstated in full, unless such rights have been released, waived or lapsed prior to the Standstill Expiry Time.

3.5 Except as specifically provided in this Agreement, the Intercompany Agreements remain in full force and effect and the Lender reserves all rights and remedies under or in connection with the Intercompany Agreements and the Borrower agrees that neither this Agreement nor any act or omission on the part of the Lender during the continuation of this Agreement shall constitute a suspension or waiver by the Lender of any event of default (howsoever described) or of any rights or remedies available to them under the Intercompany Agreement, or other agreement or otherwise, all of which are hereby reserved.

## 4    Conditions Precedent

Clause 3.1 is conditional on the Borrower notifying the Lender that Lehman Brothers Holdings Inc. and Storm Funding Limited (in administration) have entered into a standstill agreement with the Borrower on substantially the same terms as this Agreement.

## 5    Borrower's Undertakings

5.1 Subject to the terms of this Agreement, the Borrower hereby confirms that during the Standstill Period it will (and shall procure that each member of the Group will):

5.1.1 not commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) regarding the Borrower and or any other member of the Group;

5.1.2 not take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver,

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

Lehman Brothers Limited (in administration)

compulsory manager or other similar officer regarding the Borrower and or any other member of the Group;

**5.1.3** to promptly provide or procure the provision to the Lender of all information concerning the Borrower's business and affairs, financial condition, assets and operations provided to any other creditor of the Borrower or as requested by the Lender in writing and promptly correct any information so provided if the Borrower discovers or is otherwise notified that such information was or has become inaccurate or misleading in any material respect;

**5.1.4** consult with the Lender in relation to the implementation and documentation of the restructuring of the Borrower's debt;

**5.1.5** consult with the Lender prior to any transaction, other than in the ordinary course of business or as envisaged by the Run-off Agreement (following the time this agreement has become effective), either alone, or in a series of transactions, in excess of EUR 1,000,000 in any twelve month period, or any sale, transfer, lease or otherwise dispose of any shares in any other entity or of all or material part of its present or future undertaking, material assets, rights or revenues whether by one or a series of transactions related or not; and

**5.1.6** notify the Lender of any breach of this Agreement by it.

## 6    Early Termination

The Lender shall cease to be bound by the provisions of paragraph 3 immediately on the occurrence of any of the following:

**6.1** (a) any administration, receivership, liquidation, bankruptcy, Dutch suspension of payments proceedings (*surséance van betaling*), Dutch bankruptcy proceedings (*faillissement*) or Dutch liquidation (*vereffening*) or any other insolvency related proceedings (or any analogous proceedings in any relevant jurisdiction) including emergency regulations (*noodregeling*), whether voluntary or involuntary, being commenced against or in respect of any member of the Group; (b) any liquidator, administrative or other receiver, compulsory manager or other similar officer being appointed in respect of any member of the Group; (c) any other action being taken to enforce any security in respect of any asset of any member of the Group or to enforce any guarantee or indemnity given by any member of the Group; (d) any other step being taken by any person with a view to the administration or liquidation of any member of the Group; (e) any member of the Group gives notice under section 36(2) of the Dutch 1990 Tax Collection Act (*Invorderingswet 1990*); or (f) any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir*

AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.

Lehman Brothers Limited (in administration)

*beslag*)) affecting any asset or assets of a member of the Group and such attachment is not discharged within five Business Days;

6.2    the Borrower's failure to comply with any of its obligations under the terms of this Agreement;

6.3    the Run-Off Agreement becoming ineffective, being repudiated, breached or terminated; or

6.4    the Quion 50 Standstill and/or the ELQ Portefeuille Standstill and/or the LHBI Standstill becoming ineffective or being repudiated, breached or terminated..

## 7    Litigation

The Borrower confirms that it is not aware of any actual, pending or threatened litigation, arbitration or other proceedings which might be material to the Lender in considering whether or not to enter into this Agreement.

## 8    Execution and Effective Date

The agreement constituted by this Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

This Agreement will come into effect on the Effective Date.

## 9    Disclosure

9.1    The Borrower confirms its consent to the disclosure by the Lender to any professional advisers retained by the Lender of details relating to any of the Intercompany Agreements and amounts owing thereunder.

9.2    The Lender acknowledges that all negotiations and discussions arising in connection with any proposed restructuring of the Group's finances and/or operations (the **"Restructuring"**), and any presentations, reports or other information provided the Lender in connection with the Restructuring are highly sensitive, and the Lender shall (save where expressly permitted by clause 9.1 above) treat as confidential and not disclose any such information to any other person save to the extent required by law, expressly permitted under the provisions of any of the Intercompany Agreements or the disclosure or use is required by the bankruptcy proceedings in In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP), in the U.S. Bankruptcy Court for the Southern District of New York, including to the United States Trustee or the statutory official committee of unsecured creditors appointed therein. LBHI further agrees that it shall only use such information for the purpose of considering the feasibility and negotiating the terms of the Restructuring and for no other purpose.

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

Lehman Brothers Limited (in administration)

**10    Miscellaneous**

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any of the Intercompany Agreements, until the Standstill Expiry Time, this Agreement shall prevail and the Borrower and the Lender agree that each of the Intercompany Agreements is deemed amended to that extent commencing from the Effective Date until the Standstill Expiry Time.

The provisions of this Agreement are entered into without prejudice to any standstill agreement or arrangements which may have been or may be entered into with any other creditors of the Group.

Each Intercompany Agreement and this Agreement will, from the date of this agreement, be read and construed as the one document.

**11    Governing Law**

The terms of this Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in all respects in accordance with English law.

The courts of England shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) and accordingly any Proceedings may be brought in such courts. Each of the Lender and the Borrower irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. These submissions are for the benefit of the Lender and shall not limit the Lender's right to commence Proceedings in any other court of competent jurisdiction nor shall the commencement of Proceedings in any one or more jurisdictions preclude the commencement of Proceedings in any other jurisdiction (whether concurrently or not).

**12    Personal Liability**

The Administrators have entered into and signed this Agreement as agent for and on behalf of LBL and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by LBL; or in respect of any failure on the part of the LBL to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this Agreement.

[signature page to follow]

---

Lehman Brothers Limited (in administration)

If you agree to the above please sign and return the enclosed copy of this Agreement to LBL at the above address, marked for the attention of the Administrator.

Yours faithfully

..................................................................

By

for and on behalf of

Lehman Brothers Limited (in administration)

in its capacity as Lender

as agent without personal liability

We agree to the above

...............................................................

By

Title

for and on behalf of

ELQ Hypotheken N.V. as Borrower

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

If you agree to the above please sign and return the enclosed copy of this Agreement to LBL at the above address, marked for the attention of the Administrator.

Yours faithfully


…………………………………………………

By

for and on behalf of

Lehman Brothers Limited (in administration)

in its capacity as Lender

as agent without personal liability




We agree to the above


…………………………………………….

By

Title

for and on behalf of

ELQ Hypotheken N.V. as Borrower

A10669273 – LBL Standstill

**EXHIBIT C**

EXECUTION VERSION

## Storm Funding Limited (in administration)

> Storm Funding Limited
> (in administration)
> 25 Bank Street
> London
> E14 5LE

To:    ELQ Portefeuille I B.V. (as "**Borrower**")

And:   ELQ Hypotheken N.V. (as "**Guarantor**", "**Corporate Services Provider**")

18 August ~~July~~ 2009

Dear Sirs

**Warehouse Facility Agreement dated 26 August 2004 between ELQ Portefeuille I B.V. as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm Funding Limited as Original Lender, Agent and Security Agent (the "Warehouse Facility Agreement) and any other loan facility made available to the Borrower and/or the Guarantor by Storm (together with the Warehouse Facility Agreement: the "Facility Agreements")**

We refer to our recent discussions relating to the Facility Agreements according to which you, the Borrower, asked us (Storm Funding Limited (in administration), "**Storm**") to enter into a standstill agreement in connection with the proposed restructuring of the Borrower's debt. Such agreement between Storm and the Borrower and the Guarantor is reflected in the Run-Off agreement entered into on or about the date of this Agreement between amongst others Storm, the Borrower and the Guarantor.

We write in our capacity as Original Lender and in our capacity as Security Agent to confirm the agreement between the Original Lender, the Security Agent (each a "**Secured Party**" and together the "**Secured Parties**") and the Group as set out in this Agreement.

The terms of this Agreement are conditional upon the execution of the following on or in advance of the Effective Date:

(a)    a standstill and forbearance agreement between Quion 50, the Guarantor and Storm in relation to the Quion 50 Warehouse Facility (the "**Quion 50 Standstill**");

(b)    a standstill agreement between the Guarantor and LBHI in relation to the LBHI Loan Facility Agreements (the "**LBHI Standstill**");

(c)    a standstill agreement between the Guarantor and LBL in relation to the Intercompany Arrangements (the "**LBL Standstill**"); and

(d)    the Run-Off Agreement.

## 1    Definitions

Unless otherwise defined in this paragraph 1 (*Definitions*), capitalised terms in the Warehouse Facility Agreement have, unless expressly defined in this Agreement, the same meaning in this Agreement.

Except to the extent that the context requires otherwise:

---

A10648620 – Storm/Portefeuille Standstill

"**Administrators**" means the administrators of Storm, as appointed by the High Court of Justice.

"**Collection Account**" means the account with number 168766906 maintained by the Borrower with Coöperatieve Rabobank Amsterdam en Omstreken U.A., which is pledged in favour of Storm in relation to the Warehouse Facility Agreement.

"**Conditional Share Transfer Agreement**" means the conditional share transfer agreement in respect of ELQ Hypotheken N.V. and made between, *inter alia*, Lehman Brothers Holdings Plc, Mable Commercial Funding Limited and ELQ Holding B.V.

"**Effective Date**" means the last date on which each of the Borrower and the Lender has executed this Agreement.

"**Group**" means ELQ Hypotheken N.V.,and ELQ Portefeuille I B.V, Quion 50 and Hypotheken Explorer No.1 B.V.

"**Intercompany Arrangements**" means the intercompany current account arrangements between LBL as lender and the Guarantor as borrower under which LBL made loans available to the Guarantor.

"**LBHI**" means Lehman Brothers Holdings Inc UK Branch (subject to Chapter 11 bankruptcy proceedings in the United States).

"**LBL**" means Lehman Brothers Limited (in administration).

"**LBHI Loan Facility Agreements**" means the Loan Facility Agreement dated 15 November 2007 and the Loan Facility Agreement dated 26 march 2008 between ELQ Hypotheken N.V. as Borrower and LBHI as Lender and any other loan facility made available to ELQ Hypotheken N.V. and/or the Group and/or the Related Subsidiaries by LBHI.

"**Proceedings**" means any legal action or proceedings arising out of or in connection with this Agreement.

"**Quion 50**" means Quion 50 B.V.

"**Quion 50 Warehouse Facility**" means the Warehouse Facility Agreement dated 6 August 2007 between Quion 5as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent.

"**Related Subsidiaries**" means Quion 50 and Hypotheken Explorer No I B.V.

"**Run-Off Agreement**" means the run-off agreement in respect of ELQ Hypotheken N.V. and its group of companies, dated on or around the date hereof and made between, *inter alia,* ELQ Hypotheken N.V., ELQ Portefeuille I B.V, Storm Funding Limited (in administration), LBHI and LBL.

"**Standstill Expiry Date**" means the earlier of:

(a)    the date of Completion (as such term is defined in the Conditional Share Transfer Agreement)

(b)    the Long Stop Date  (as such term is defined in the Run-Off Agreement).

Storm Funding Limited (in administration)

"**Standstill Period**" means the date commencing on the Effective Date and expiring on the Standstill Expiry Date.

"**Suspended Defaults**" means any Event of Default outstanding now under any of the Facility Agreements and, following the Run-off Agreement becoming effective, any Event of Default under any provision of any of the Facility Agreements that may occur as a result from, or in connection with, the performance by the Borrower or the Guarantor of its obligations under the Run-off Agreement.

## 2    Construction

The provisions of clause 1.2 (*Principles of Construction*) of the Warehouse Facility Agreement shall apply to this Agreement as though they were set out in full in this letter except that references to the "**Agreement**" are to be construed as references to this letter.

## 3    Secured Parties undertakings

3.1    **Standstill and forbearance:** Subject to the terms of this Agreement, from the date hereof until the Standstill Expiry Date, we hereby confirm in our capacity as Secured Party that we have agreed to a standstill of the secured debt owed to Storm by the Group and to forbear our security over the assets, Mortgage Receivables and Beneficiary Rights as secured by the security created pursuant to the Security Documents. During Standstill Period, the Lender will not, in respect of any Suspended Defaults:

3.1.1    commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) against the Borrower, the Guarantor or any other member of the Group;

3.1.2    make demand for, accelerate the due date for or declare prematurely payable any moneys outstanding or demand cash cover for the Loan under any of the Facility Agreements;

3.1.3    take any action to demand or enforce the payment of moneys under any of the Facility Agreements including making any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*));

3.1.4    exercise any right of appropriation, amalgamation or combination of accounts or liabilities, counterclaim or set-off in reduction of amounts outstanding under any of the Facility Agreements; or

3.1.5    take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer or to perfect or to enforce or to make any demand under any security interest or any guarantee or like commitment or

similar support given in connection with any of the Facility Agreements by any member of the Group.

3.2      Clause 3.1 shall apply only to the matters specifically referred to in this Agreement.

3.3      **Discontinuation of Facility**: The Facility shall not continue to be made available and :

     3.3.1      any undrawn or unutilised portions of the Total Commitments will be cancelled;

     3.3.2      drawn and utilised portions of the Loans under the Total Commitments will not be made available or reinstated to the Borrower after any repayment or prepayment; and

     3.3.3      except with the prior approval of the Lender, the Borrower shall not transfer existing borrowings under the Facility to third parties including companies within the Group and/or Related Subsidiaries.

3.4      Notwithstanding Clause 3.1, the Suspended Defaults remain outstanding during the Standstill Period unless waived by the Lender. At the Standstill Expiry Date the rights of the Lender in respect of the Suspended Defaults shall be reinstated in full, unless such rights have been released, waived or lapsed prior to the Standstill Expiry Date.

3.5      Except as specifically provided in this Agreement, the Facility Agreements remain in full force and effect and the Lender reserves all rights and remedies under or in connection with the Facility Agreements and the Borrower and the Guarantor agree that neither this Agreement nor any act or omission on the part of the Lender during the continuation of this Agreement shall constitute a suspension or waiver by the Lender of any event of default (howsoever described) or of any rights or remedies available to them under the Facility Agreements, or other agreement or otherwise, all of which are hereby reserved.

## 4      Group's Undertakings

4.1      **Asset Realisation**: Subject to the terms of this Agreement, from the date hereof until the Standstill Expiry Date, we hereby confirm in our capacity as Secured Party that we have agreed that the Group is entitled to realise its assets, Mortgage Receivables and Beneficiary Rights owned by the Borrower and/or the Guarantor and (as the case may be) as secured by the security created pursuant to the Security Documents, by means of a private sale of such assets, Mortgage Receivables and Beneficiary Rights and/or collection of any balance held in the ELQ Accounts and the Borrower's Accounts and/or transfer of any of such assets, Mortgage Receivables and Beneficiary Rights to a third party, provided however that the Borrower and the Guarantor will jointly and severally procure that any proceeds of such sale, collection or transfer of any such assets, Mortgage Receivables and Beneficiary Rights will be paid into the Collection Account, in accordance with the Run-off Agreement.

## Storm Funding Limited (in administration)

**4.2**   **Further undertakings**: Subject to the terms of this Agreement, , each of the Borrower and the Guarantor hereby confirms that during the Standstill Period it will (and shall procure that each member of the Group will):

**4.2.1**   not commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) regarding the Borrower, the Guarantor and or any other member of the Group;

**4.2.2**   not take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer  regarding the Borrower, the Guarantor and or any other member of the Group;

**4.2.3**   promptly provide or procure the provision to the Lender of all information concerning the Borrower's and the Guarantor's business and affairs, financial condition, assets and operations provided to any other creditor of the Borrower and the Guarantor or as requested by the. Lender in writing and promptly correct any information so provided if the Borrower or the Guarantor discovers or is otherwise notified that such information was or has become inaccurate or misleading in any material respect;

**4.2.4**   consult with the Lender in relation to the implementation and documentation of the restructuring of the Borrower's or the Guarantor's debt;

**4.2.5**   consult with the Lender prior to any transaction, other than in the ordinary course of business or as envisaged by the Run-off Agreement (following the time this agreement has become effective), either alone, or in a series of transactions, in excess of EUR 1,000,000 in any twelve month period, or any sale, transfer, lease or otherwise dispose of any shares in any other entity or of all or material part of its present or future undertaking, material assets, rights or revenues whether by one or a series of transactions related or not; and

**4.2.6**   notify the Lender of any breach of this Agreement by it.

## 5   Early Termination

The Secured Parties shall cease to be bound by the provisions of paragraph 3 immediately on the occurrence of any of the following:

**5.1**   (a) any administration, receivership, liquidation, bankruptcy, Dutch suspension of payments proceedings (*surséance van betaling*), Dutch bankruptcy proceedings (*faillissement*) or Dutch liquidation (*vereffening*) or any other insolvency related proceedings (or any analogous proceedings in any relevant jurisdiction) including emergency regulations (*noodregeling*), whether voluntary or involuntary, being commenced against or in respect of any member of the Group; (b) any liquidator, administrative or other receiver, compulsory manager or other similar officer being

## Storm Funding Limited (in administration)

appointed in respect of any member of the Group; (c) any other action being taken to enforce any security in respect of any asset of any member of the Group or to enforce any guarantee or indemnity given by any member of the Group; (d) any other step being taken by any person with a view to the administration or liquidation of any member of the Group; (e) any member of the Group gives notice under section 36(2) of the Dutch 1990 Tax Collection Act (*Invorderingswet 1990*); or (f) any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*)) affecting any asset or assets of a member of the Group and such attachment is not discharged within five Business Days;

5.2     the Borrower failing to comply with any of its obligations hereunder;

5.3     the Run-Off Agreement becoming ineffective, being repudiated, breached or terminated; or.

5.4     the Quion 50 Standstill and/or the LBHI Standstill and/or the LBL Standstill becoming ineffective, being repudiated, breached or terminated.[●].

## 6       Litigation

The Borrower confirms that it is not aware of any actual, pending or threatened litigation, arbitration or other proceedings which might be material to the Lender in considering whether or not to enter into this Agreement.

## 7       Future Arrangements and Waivers

7.1     The agreement of a Secured Party to the terms of this Agreement shall not be taken to imply any agreement by such Secured Party to the terms of any future arrangement or accommodation with the Borrower or any other member of the Group other than those expressly provided for in this Agreement.

7.2     Except as expressly agreed in this Agreement, nothing contained in this Agreement shall:

7.2.1     constitute a waiver of any rights of any Secured Party as between members of the Group and any Secured Party under any Facility Documents and, except as expressly agreed in this Agreement, each Secured Party reserves any rights it may have against any member of the Group under any Facility Documents; or

7.2.2     oblige any Secured Party to make any further advances or extend any other credit or financial accommodation to any member of the Group beyond that outstanding at the Effective Date.

A10648620 – Storm/Portefeuille Standstill

## Storm Funding Limited (in administration)

8    **Execution and Effective Date**

8.1    The agreement constituted by this Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.2    This Agreement will come into effect on the Effective Date.

9    **Disclosure**

9.1    The Borrower and the Guarantor confirm their consent to the disclosure by any Secured Party to any professional advisers retained by the Lender or any Secured Party of details relating to any Facility Documents and amounts owing thereunder.

9.2    The Lender acknowledges that all negotiations and discussions arising in connection with any proposed restructuring of the Group's finances and/or operations (the **"Restructuring"**), and any presentations, reports or other information provided the Lender in connection with the Restructuring are highly sensitive, and the Lender shall (save where expressly permitted by Clause 9.1above) treat as confidential and not disclose any such information to any other person save to the extent required by law, expressly permitted under the provisions of the Facility Agreements or the disclosure or use is required by the bankruptcy proceedings in In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP), in the U.S. Bankruptcy Court for the Southern District of New York, including to the United States Trustee or the statutory official committee of unsecured creditors appointed therein. LBHI further agrees that it shall only use such information for the purpose of considering the feasibility and negotiating the terms of the Restructuring and for no other purpose.

10    **Miscellaneous**

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any of the Facility Agreements, until the Standstill Expiry Date, this Agreement shall prevail and the Borrower, the Guarantor and the Lender agree that the Facility Agreements are deemed amended to that extent commencing from the Effective Date until the Standstill Expiry Date.

The provisions of this Agreement are entered into without prejudice to any standstill agreement or arrangements which may have been or may be entered into with any other creditors of the Group.

The Facility Agreements and this Agreement will, from the date of this agreement, be read and construed as the one document.

## Storm Funding Limited (in administration)

11    **Governing Law**

The terms of this Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in all respects in accordance with English law.

The courts of England shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) and accordingly any Proceedings may be brought in such courts. Each of the Lender and the Borrower irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. These submissions are for the benefit of the Lender and shall not limit the Lender's right to commence Proceedings in any other court of competent jurisdiction nor shall the commencement of Proceedings in any one or more jurisdictions preclude the commencement of Proceedings in any other jurisdiction (whether concurrently or not).

12    **No Personal Liability**

The Administrators have entered into and signed this Agreement as agent for and on behalf of Storm and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by Storm; or in respect of any failure on the part of the Storm to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this Agreement.

[signature page to follow]

A10648620 – Storm/Portefeuille Standstill

Storm Funding Limited (in administration)

If you agree to the above please sign and return the enclosed copy of this Agreement to Storm at the above address, marked for the attention of the Administrator.

Yours faithfully

By the Administrator

for and on behalf of

Storm Funding Limited (in administration)

in its capacity as Lender, Agent and Security Agent

as agent without personal liability

We agree to the above

......................................................

By

Director

for and on behalf of

ELQ Portefeuille I B.V.

We agree to the above

......................................................

By

Director

for and on behalf of

ELQ Hypotheken N.V.

9

If you agree to the above please sign and return the enclosed copy of this Agreement to Storm at the above address, marked for the attention of the Administrator.

Yours faithfully


.............................................................

By the Administrator

for and on behalf of

Storm Funding Limited (in administration)

in its capacity as Lender, Agent and Security Agent

as agent without personal liability




We agree to the above


..................................................

By

Director

for and on behalf of

ELQ Portefeuille I B.V.

We agree to the above


..................................................

By

Director

for and on behalf of

ELQ Hypotheken N.V.

---

8

**EXHIBIT D**

EXECUTION VERSION

## Storm Funding Limited (in administration)

Storm Funding Limited
(in administration)
25 Bank Street
London
E14 5LE

To:   Quion 50 B.V. (as "**Borrower**")

And:  ELQ Hypotheken N.V. (as "**Guarantor**", "**Corporate Services Provider**")

18 August ~~[...]~~ 2009

Dear Sirs

**Warehouse Facility Agreement dated 6 August 2007 between Quion 50 B.V. as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm Funding Limited as Original Lender, Agent and Security Agent (the "Warehouse Facility Agreement") and any other loan facility made available to the Borrower and/or the Guarantor by Storm (together with the Warehouse Facility Agreement: the "Facility Agreements")**

We refer to our recent discussions relating to the Facility Agreements according to which you, the Borrower, asked us (Storm Funding Limited (in administration), "**Storm**") to enter into a standstill agreement in connection with the proposed restructuring of the Borrower's debt. Such agreement between Storm and the Borrower and the Guarantor is reflected in the Run-Off agreement entered into on or about the date of this Agreement between amongst others Storm, the Borrower and the Guarantor.

We write in our capacity as Original Lender and in our capacity as Security Agent to confirm the agreement between the Original Lender, the Security Agent (each a "**Secured Party**" and together the "**Secured Parties**") and the Group as set out in this Agreement.

The terms of this Agreement are conditional upon the execution of the following on or in advance of the Effective Date:

(a)   a standstill and forbearance agreement between ELQ Portefeuille, the Guarantor and Storm in relation to the ELQ Portefeuille Warehouse Facility (the "**ELQ Portefeuille Standstill**");

(b)   a standstill agreement between the Guarantor and LBHI in relation to the LBHI Loan Facility Agreements (the "**LBHI Standstill**");

(c)   a standstill agreement between the Guarantor and LBL in relation to the Intercompany Arrangements (the "**LBL Standstill**"); and

(d)   the Run-Off Agreement.

## 1   Definitions

Unless otherwise defined in this paragraph 1 (*Definitions*), capitalised terms in the Warehouse Facility Agreement have, unless expressly defined in this Agreement, the same meaning in this Agreement.

Except to the extent that the context requires otherwise:

"**Administrators**" means the administrators of Storm, as appointed by the High Court of Justice.

Storm Funding Limited (in administration)

"**Collection Account**" means the account with number 129711268 maintained by the Borrower with Coöperatieve Rabobank Amsterdam en Omstreken U.A., which is pledged in favour of Storm in relation to the Warehouse Facility Agreement.

"**ELQ Portefeuille**" means ELQ Portefeuille I B.V.

"**ELQ Portefeuille Warehouse Facility**" means the Warehouse Facility Agreement dated 6 August 2007 between Quion 50 B.V. as Borrower, ELQ Hypotheken N.V. as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent.

"**Effective Date**" means the last date on which each of the Borrower and the Lender has executed this Agreement.

"**Group**" means ELQ Hypotheken N.V., Quion 50 B.V., ELQ Portefeuille and Hypotheken Explorer No.1 B.V.

"**Intercompany Arrangements**" means the intercompany current account arrangements between LBL as lender and the Guarantor as borrower under which LBL made loans available to the Guarantor.

"**LBHI**" means Lehman Brothers Holdings Inc UK Branch (subject to Chapter 11 bankruptcy proceedings in the United States).

"**LBHI Loan Facility Agreements**" means the Loan Facility Agreement dated 15 November 2007 and the Loan Facility Agreement dated 26 March 2008 between ELQ Hypotheken N.V. as Borrower and LBHI as Lender and any other loan facility made available to ELQ Hypotheken N.V. and/or the Group and/or the Related Subsidiaries by LBHI.

"**LBL**" means Lehman Brothers Limited (in administration).

"**Proceedings**" means any legal action or proceedings arising out of or in connection with this Agreement.

"**Related Subsidiaries**" means ELQ Portefeuille I B.V. and Hypotheken Explorer No I B.V.

"**Run-Off Agreement**" means the run-off agreement in respect of ELQ Hypotheken N.V. and its group of companies, dated on or around the date hereof and made between, *inter alia*, ELQ Hypotheken N.V., ELQ Portefeuille I B.V., Storm Funding Limited (in administration), LBHI and LBL.

"**Standstill Expiry Date**" means the earlier of:

(a)     the date of Completion as such term is defined in the Conditional Share Sale Agreement; and

(b)     the long Stop Date (as such term is defined in the Run-off Agreement).

"**Standstill Period**" means the period commencing on the Effective Date and expiring on the Standstill Expiry Date.

"**Suspended Defaults**" means any Event of Default outstanding now under any of the Facility Agreements and, following the Run-off Agreement becoming effective, any Event of Default under any provision of any of the Facility Agreements that may occur as a result

from, or in connection with, the performance by the Borrower or the Guarantor of its obligations under the Run-off Agreement.

## 2    Construction

The provisions of clauses 1.2 (*Principles of Construction*), through 1.9 (*Successors*) of the Warehouse Facility Agreement shall apply to this letter as though they were set out in full in this letter except that references to the "**Agreement**" are to be construed as references to this letter.

## 3    Secured Parties undertakings

3.1    **Standstill and forbearance:** Subject to the terms of this Agreement, from the date hereof until the Standstill Expiry Time, we hereby confirm in our capacity as Secured Party that we have agreed to a standstill of the secured debt owed to Storm by the Group and to forbear our security over the assets, Mortgage Receivables and Beneficiary Rights as secured by the security created pursuant to the Security Documents. During Standstill Period, the Lender will not, in respect of any Suspended Defaults:

3.1.1    commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) against the Borrower, the Guarantor or any other member of the Group;

3.1.2    make demand for, accelerate the due date for or declare prematurely payable any moneys outstanding or demand cash cover for the Loan under any of the Facility Agreements;

3.1.3    take any action to demand or enforce the payment of moneys under any of the Facility Agreements including making any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*));

3.1.4    exercise any right of appropriation, amalgamation or combination of accounts or liabilities, counterclaim or set-off in reduction of amounts outstanding under any of the Facility Agreements; or

3.1.5    take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer or to perfect or to enforce or to make any demand under any security interest or any guarantee or like commitment or similar support given in connection with any of the Facility Agreements by any member of the Group.

3.2    Clause 3.1 shall apply only to the matters specifically referred to in this Agreement.

## Storm Funding Limited (in administration)

**3.3**    **Discontinuation of Facility**: The Facility shall not continue to be made available and:

**3.3.1**    any undrawn or unutilised portions of the Total Commitments will be cancelled;

**3.3.2**    drawn and utilised portions of the Loans under the Total Commitments will not be made available or reinstated to the Borrower after any repayment or prepayment; and

**3.3.3**    except with the prior approval of the Lender, the Borrower shall not transfer existing borrowings under the Facility to third parties including companies within the Group and/or related Subsidiaries.

**3.4**    Notwithstanding Clause 3.1, the Suspended Defaults remain outstanding during the Standstill Period unless waived by the Lender.  At the Standstill Expiry Time the rights of the Lender in respect of the Suspended Defaults shall be reinstated in full, unless such rights have been released, waived or lapsed prior to the Standstill Expiry Time.

**3.5**    Except as specifically provided in this Agreement, the Facility Agreements remain in full force and effect and the Lender reserves all rights and remedies under or in connection with the Facility Agreements and the Borrower and the Guarantor agree that neither this Agreement nor any act or omission on the part of the Lender during the continuation of this Agreement shall constitute a suspension or waiver by the Lender of any event of default (howsoever described) or of any rights or remedies available to them under the Facility Agreements, or other agreement or otherwise, all of which are hereby reserved.

## 4    Group's Undertakings

**4.1**    **Asset Realisation**: Subject to the terms of this Agreement, from the date hereof until the Standstill Expiry Time, we hereby confirm in our capacity as Secured Party that we have agreed that the Group is entitled to realise its assets, Mortgage Receivables and Beneficiary Rights owned by the Borrower and/or the Guarantor and (as the case may be) as secured by the security created pursuant to the Security Documents, by means of a private sale of such assets, Mortgage Receivables and Beneficiary Rights and/or collection of any balance held in the ELQ Accounts and the Borrower's Accounts and/or transfer of any of such assets, Mortgage Receivables and Beneficiary Rights to a third party, provided however that the Borrower and the Guarantor will jointly and severally procure that any proceeds of such sale, collection or transfer of any such assets, Mortgage Receivables and Beneficiary Rights will be paid into the Collection Account, in accordance with the Run-off Agreement.

**4.2**    **Further undertakings**: Subject to the terms of this Agreement, each of the Borrower and the Guarantor hereby confirms that during the Standstill Period it will (and shall procure that eachmember of the Group will):

Storm Funding Limited (in administration)

---

4.2.1   not commence any, or file a request with the competent authority for the commencement of, bankruptcy, administration, receivership, liquidation or other insolvency proceedings (or any analogous proceedings in any other jurisdiction) regarding the Borrower, the Guarantor and or any other member of the Group;

4.2.2   not take any action to appoint any, or seek the appointment of any, liquidator, administrator, administrative receiver or other receiver, compulsory manager or other similar officer regarding the Borrower, the Guarantor and or any other member of the Group;

4.2.3   to promptly provide or procure the provision to the Lender of all information concerning the Borrower's and the Guarantor's business and affairs, financial condition, assets and operations provided to any other creditor of the Borrower and the Guarantor or as requested by the Lender in writing and promptly correct any information so provided if the Borrower or the Guarantor discovers or is otherwise notified that such information was or has become inaccurate or misleading in any material respect;

4.2.4   consult with the Lender in relation to the implementation and documentation of the restructuring of the Borrower's or the Guarantor's debt;

4.2.5   consult with the Lender prior to any transaction, other than in the ordinary course of business or as envisaged by the Run-off Agreement (following the time this agreement has become effective), either alone, or in a series of transactions, in excess of EUR 1,000,000 in any twelve month period, or any sale, transfer, lease or otherwise dispose of any shares in any other entity or of all or material part of its present or future undertaking, material assets, rights or revenues whether by one or a series of transactions related or not; and

4.2.6   notify the Lender of any breach of this Agreement by it.

## 5   Early Termination

The Secured Parties shall cease to be bound by the provisions of paragraph 3 immediately on the occurrence of any of the following:

5.1   (a) any administration, receivership, liquidation, bankruptcy, Dutch suspension of payments proceedings (*surséance van betaling*), Dutch bankruptcy proceedings (*faillissement*) or Dutch liquidation (*vereffening*) or any other insolvency related proceedings (or any analogous proceedings in any relevant jurisdiction) including emergency regulations (*noodregeling*), whether voluntary or involuntary, being commenced against or in respect of any member of the Group; (b) any liquidator, administrative or other receiver, compulsory manager or other similar officer being appointed in respect of any member of the Group; (c) any other action being taken to enforce any security in respect of any asset of any member of the Group or to enforce any guarantee or indemnity given by any member of the Group; (d) any other step being taken by any person with a view to the administration or liquidation

# Storm Funding Limited (in administration)

of any member of the Group; (e) any member of the Group gives notice under section 36(2) of the Dutch 1990 Tax Collection Act (*Invorderingswet 1990*); or (f) any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*)) affecting any asset or assets of a member of the Group and such attachment is not discharged within five Business Days;

5.2    the Borrower failing to comply with any of its obligations hereunder; or

5.3    the Run-off Agreement becoming ineffective, being repudiated, breached or terminated;

5.4    the ELQ Portefeuille Standstill and/or the LBHI Standstill and/or the LBL Standstill becoming ineffective, being repudiated, breached or terminated. [●].

## 6    Litigation

The Borrower confirms that it is not aware of any actual, pending or threatened litigation, arbitration or other proceedings which might be material to the Lender in considering whether or not to enter into this Agreement.

## 7    Future Arrangements and Waivers

7.1    The agreement of a Secured Party to the terms of this Agreement shall not be taken to imply any agreement by such Secured Party to the terms of any future arrangement or accommodation with the Borrower or any other member of the Group other than those expressly provided for in this Agreement.

7.2    Except as expressly agreed in this Agreement, nothing contained in this Agreement shall:

7.2.1    constitute a waiver of any rights of any Secured Party as between members of the Group and any Secured Party under any Facility Documents and, except as expressly agreed in this Agreement, each Secured Party reserves any rights it may have against any member of the Group under any Facility Documents; or

7.2.2    oblige any Secured Party to make any further advances or extend any other credit or financial accommodation to any member of the Group beyond that outstanding at the Effective Date.

## 8    Execution and Effective Date

8.1    The agreement constituted by this Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.2    This Agreement will come into effect on the Effective Date.

## 9   Disclosure

**9.1**   The Borrower and the Guarantor confirm their consent to the disclosure by any Secured Party to any professional advisers retained by the Lender or any Secured Party of details relating to any Facility Documents and amounts owing thereunder.

**9.2**   The Lender acknowledges that all negotiations and discussions arising in connection with any proposed restructuring of the Group's finances and/or operations (the "**Restructuring**"), and any presentations, reports or other information provided the Lender in connection with the Restructuring are highly sensitive, and the Lender shall (save where expressly permitted by Clause 9.1 above) treat as confidential and not disclose any such information to any other person save to the extent required by law, expressly permitted under the provisions of the Facility Agreements or the disclosure or use is required by the bankruptcy proceedings in In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP), in the U.S. Bankruptcy Court for the Southern District of New York, including to the United States Trustee or the statutory official committee of unsecured creditors appointed therein. LBHI further agrees that it shall only use such information for the purpose of considering the feasibility and negotiating the terms of the Restructuring and for no other purpose.

## 10   Miscellaneous

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and the Facility Agreements, until the Standstill Expiry Time, this Agreement shall prevail and the Borrower, the Guarantor and the Lender agree that the Facility Agreements are deemed amended to that extent commencing from the Effective Date until the Standstill Expiry Time.

The provisions of this Agreement are entered into without prejudice to any standstill agreement or arrangements which may have been or may be entered into with any other creditors of the Group.

The Facility Agreements and this Agreement will, from the date of this agreement, be read and construed as the one document.

## 11   Governing Law

The terms of this Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in all respects in accordance with English law.

The courts of England shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) and accordingly any Proceedings may be brought in such courts. Each of the Lender and the Borrower irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an

## Storm Funding Limited (in administration)

inconvenient forum. These submissions are for the benefit of the Lender and shall not limit the Lender's right to commence Proceedings in any other court of competent jurisdiction nor shall the commencement of Proceedings in any one or more jurisdictions preclude the commencement of Proceedings in any other jurisdiction (whether concurrently or not).

## 12    Personal Liability

The Administrators have entered into and signed this Agreement as agent for and on behalf of Storm and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by Storm; or in respect of any failure on the part of the Storm to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this Agreement.

[signature page to follow]

A106790038 – Storm/Quion Standstill

Storm Funding Limited (in administration)

If you agree to the above please sign and return the enclosed copy of this Agreement to Storm at the above address, marked for the attention of the Administrator.

Yours faithfully

...............................................................................

By the Administrator

for and on behalf of

Storm Funding Limited (in administration)

in its capacity as Lender, Agent and Security Agent

as agent without personal liability

We agree to the above

....................................................

By

Director

for and on behalf of

ELQ Portefeuille I B.V.

We agree to the above

....................................................

By

Director

for and on behalf of

ELQ Hypotheken N.V.

9

If you agree to the above please sign and return the enclosed copy of this Agreement to Storm at the above address, marked for the attention of the Administrator.

Yours faithfully

....................................................

By the Administrator

for and on behalf of

Storm Funding Limited (in administration)

in its capacity as Lender, Agent and Security Agent

as agent without personal liability

We agree to the above

.................................................

By

Director

for and on behalf of

ELQ Portefeuille I B.V.

We agree to the above

.................................................

By

Director

for and on behalf of

ELQ Hypotheken N.V.

A106790037 – Storm/Quion Standstill

**EXHIBIT E**

EXECUTION VERSION

Dated   18 August 2009

ELQ HYPOTHEKEN N.V.

and

THE GROUP COMPANIES NAMED HEREIN

and

THE MANAGERS

and

STORM FUNDING LIMITED (in administration)

and

LEHMAN BROTHERS HOLDINGS INC, UK BRANCH

(subject to Chapter 11 Bankruptcy proceedings in the US)

and

LEHMAN BROTHERS LIMITED (in administration)

# RUN-OFF AGREEMENT

in respect of ELQ Hypotheken N.V. and its group of companies

---

Linklaters

Linklaters LLP
World Trade Centre Amsterdam
Zuidplein 180
1077 XV Amsterdam

Telephone (+31) 20 799 6200
Facsimile (+31) 20 799 6300
Ref PK/MR/MB

**THIS AGREEMENT** is dated 18 August 2009 and made between:

(1)    **ELQ HYPOTHEKEN N.V.**, a public company with limited liability (*naamloze vennootschap*) incorporated under the laws of the Netherlands, registration number 34201343 with its statutory seat in Zwanenburg and its principal place of business at Haarlerbergweg 21C-23C, 1101 CH Amsterdam-Zuidoost, the Netherlands ("**ELQ**");

(2)    **ELQ PORTEFEUILLE I B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of The Netherlands, registration number 34206552 with its statutory seat in Zwanenburg and its principal place of business at Haarlerbergweg 21C-23C, 1101 CH Amsterdam-Zuidoost, the Netherlands ("**Portefeuille**");

(3)    **QUION 50 B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of The Netherlands, registration number 34262224 with its statutory seat in Zwanenburg and its principal place of business at Fascinatio Boulevard 1302, 2909 VA Capelle aan den IJssel, the Netherlands ("**Quion 50**");

(4)    **RICHARD BOLTON, AART BOONZAAIJER, CHARLES SOGTOEN** and **MARCEL RASKER**, each a managing director of ELQ, (each a "**Manager**" and collectively, the "**Managers**");

(5)    **STORM FUNDING LIMITED (in administration)**, a limited liability company incorporated and existing under the laws of England and Wales, registration number 2682306, with its principal place of business at 25 Bank Street, London E14 5LE, United Kingdom ("**Storm**");

(6)    **LEHMAN BROTHERS HOLDINGS INC, UK Branch (subject to Chapter 11 Bankruptcy proceedings in the US)**, a corporation incorporated and existing under the laws of Delaware, United States of America, with its principal executive offices at 1271 Avenue of the Americas, New York NY 10019, 10020, United States of America ("**LBHI**"); and

(7)    **LEHMAN BROTHERS LIMITED (in administration)**, a limited liability company incorporated and existing under the laws of England and Wales, registration number 846922, with its principal place of business at 25 Bank Street, London E14 5LE, United Kingdom ("**LBL**").

BACKGROUND:

(A)    ELQ, Portefeuille and Quion 50, as the case may be, have entered into the Standstill Agreements with each of Storm, LBHI and LBL, as the case may be.

(B)    In order to agree a scheme of repayment for the Storm Debt, the LBHI Debt and the LBL Debt, the parties enter into this Agreement pursuant to which the proceeds of the assets currently held by the ELQ Group (as defined below) will be realised and shared in the manner set out in this Agreement.

(C)    It is acknowledged by the parties to this Agreement that various members of the ELQ Group are indebted to Storm, LBHI and LBL (as applicable). The parties have agreed that settlement of the Storm Debt, the LBHI Debt and the LBL Debt shall be achieved through concluding this Agreement, the Standstill Agreements and the Conditional Share Transfer Agreement between the relevant parties and the realisation of the ELQ Assets in accordance with this Agreement and having the proceeds thereof applied towards the repayment of such debts in order for such debts to be unconditionally discharged and released in accordance with this Agreement, regardless of whether the relevant creditor has

a direct claim against the entity of the ELQ Group owning the relevant ELQ Assets or the relevant ELQ Asset itself.

(D)     The Managers are a party to this Agreement only in respect of Clause 4 (*Management Incentive Scheme*) and Clause 7.2 (*No Petition*) and therefore no liabilities or obligations can accrue to the Managers other than pursuant to these provisions.

IT IS AGREED AS FOLLOWS

# 1      Definitions and interpretation

## 1.1    Definitions

In this Agreement:

"**Assets Realisation Costs**" means the following costs reasonably incurred for the realisation of the ELQ Assets:

(a)     legal fees;

(b)     fees of other professional advisors, including but not limited to valuators;

(c)     costs relating to the termination of hedging arrangements and other costs for the unwinding thereof;

(d)     foreclosure and related expenses including but not limited to bailiff costs, public auction costs and fees of external advisors;

(e)     incentives paid to borrowers under the Mortgage Loans, including transactional fees, commissions paid to intermediaries and marketing and other related expenses; and

(f)     commissions, fees and marketing costs relating to sales of pools of Mortgage Receivables.

"**Assets Realisation Proceeds**" means the Collection Proceeds (as defined in Clause 3.2(b) below) and the Sale Proceeds (as defined in Clause 3.2(c) below).

"**Bankruptcy Court**" means the Bankruptcy Court for the Southern District of New York.

"**Business Day**" means a day, other than a Saturday or a Sunday, on which banks are open for general business in The Netherlands and London.

"**Collection Accounts**" means the Portefeuille Collection Account and the Quion 50 Collection Account and each of them a **Collection Account**.

"**Collection Proceeds**" has the meaning given to it in Clause 3.2 (*Realisation*) of this Agreement.

"**Completion**" means the completion of the sale and transfer of the Shares pursuant to and in accordance with the Conditional Share Transfer Agreement.

"**Conditional Share Transfer Agreement**" means the conditional share transfer agreement entered into on or about the date of this Agreement between amongst others the shareholders of ELQ, the Managers, ELQ, LBHI and Storm as defined therein.

"**Court Approval Long Stop Date**" has the meaning given to it in Clause 2.6 of this Agreement.

"**Discharge Conditions**" means

(a)    the payment by the ELQ Group to Storm of EUR 20,000,000 out of cash held by the ELQ Group in accordance with Clause 3.3(a) (*Distribution*) of this Agreement ; and

(b)    the disposal by the ELQ Group of all the Mortgage Loans of the ELQ Group and the receipt of all proceeds of such disposals by the ELQ Group; and

(c)    the payment of the Asset Realisation Proceeds received by the ELQ Group as at the date of satisfaction of the conditions referred to under (a) and (b) above, in accordance with Clause 3.3 (*Distribution*).

"**Discharge Conditions Notification**" has the meaning given to it in Clause 5.7) of this Agreement;

"**Early Termination Event**" means any of the events listed in the paragraph entitled "Early Termination" in each of the Standstill Agreements.

"**ELQ Assets**" means any cash held in hand, in a bank account or other financial institution by the ELQ Group, the proceeds of the Mortgage Receivables less the Assets Realisation Costs and the Residual Income up to the Residual Target less the Assets Realisation Costs, including but not limited to the Assets Realisation Proceeds.

"**ELQ Group**" means ELQ, Quion 50 and Portefeuille and each of their group companies (*groepsvennootschappen*) as defined in article 2:24b of the Dutch Civil Code.

"**Intercompany Arrangements**" means the intercompany current account arrangements with ELQ as Borrower and LBL as Lender.

"**LBHI Debt**" means an amount of EUR 40,000,000 plus accrued interest and fees, being the debt that is owed by ELQ to LBHI under the LBHI Loan Facility Agreements.

"**LBHI Loan Facility Agreements**" means the Loan Facility Agreement dated 15 November 2007 and the Loan Facility Agreement dated 26 March 2008 between ELQ as Borrower and LBHI as Lender (as amended from time to time).

"**LBHI Rabobank Proportion**" has the meaning given to it in Clause 5.2.1 of this Agreement.

"**LBHI Representatives**" means the restructuring officers and representatives of LBHI from time to time in the US Chapter 11 proceedings of LBHI acting without personal liability.

"**LBHI Residual Proportion**" has the meaning given to in Clause 5.2.2 of this Agreement.

"**LBL Administrators**" means Michael John Andrew Jervis, Anthony Victor Lomas, Steven Anthony Pearson and Dan Yoram Schwarzmann of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT, England, acting without personal liability.

"**LBL Debt**" means an amount of EUR 1,021,578 plus accrued interest and fees being the debt that is owed by the ELQ Group to LBL under the Intercompany

Arrangements and any other loan facility or similar arrangement made available to the ELQ Group by LBL.

"**Long Stop Date**" means 30 June 2010 or such later date as agreed by all parties in writing.

"**Mortgage Loans**" means the mortgage loan agreements (*hypothecaire leningen*) secured by a right of mortgage (*recht van hypotheek*) to which any member of the ELQ Group is a party (as lender and mortgagee respectively) evidenced by a notarial deed, including but not limited to the mortgage loans listed in Schedule 2.

"**Mortgage Receivables**" means all present and future personal claims (*vorderingen op naam*) that any member of the ELQ Group may have vis-à-vis any person under the Mortgage Loans and any rights relating to such claims.

"**Portefeuille Collection Account**" means the account with number 168766906 maintained by Portefeuille with Coöperatieve Rabobank Amsterdam en Omstreken U.A., which is pledged in favour of Storm in relation to the Portefeuille Warehouse Facility.

"**Portefeuille Warehouse Facility**" means the Warehouse Facility dated 26 August 2004 between Portefeuille as Borrower, ELQ as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent (as amended from time to time).

"**Quion 50 Collection Account**" means the account with number 129711268 maintained by Quion 50 with Coöperatieve Rabobank Amsterdam en Omstreken U.A., which is pledged in favour of Storm in relation to the Quion 50 Warehouse Facility.

"**Quion 50 Warehouse Facility**" means the Warehouse Facility dated 6 August 2007 between Quion 50 as Borrower, ELQ as Guarantor and Corporate Services Provider and Storm as Original Lender, Agent and Security Agent (as amended from time to time).

"**Rabobank Cash Excess**" has the meaning given to in Clause 4.5 of the Conditional Share Transfer Agreement.

"**Rabobank Proportion**" means the LBHI Rabobank Proportion and the Storm Rabobank Proportion.

"**Rabobank Required Cash Balance**" means the cash balance to be maintained by the ELQ Group to cover direct debit contracts of the ELQ Group with Rabobank as required from time to time by Rabobank, or any other financial institution which has replaced Rabobank after the date of this Agreement as a party to such direct debit contracts.

"**Residual Certificates**" means the residual certificates listed in Schedule 1.

"**Residual Certificates Court Decision**" has the meaning given to it in Clause 3.4.2of this Agreement.

"**Residual Income**" means the income derived from the Residual Certificates.

"**Residual Proportion**" means the LBHI Residual Proportion and the Storm Residual Proportion.

"**Residual Target**" means the payment to Storm and LBHI by the ELQ Group of EUR 8,000,000 in respect of Residual Income in accordance with Clause 3.4 (*the Residual Debt*).

"**Residual Target Shortfall**" means the amount by which the Residual Target exceeds the payments actually made by the ELQ Group to Storm and LBHI in respect of Residual Income in accordance with this Agreement, as at the date of Completion.

"**Sale Proceeds**" has the meaning given to it in Clause 3.2 of this Agreement.

"**Security**" means the security created in favour of Storm in relation to the Portefeuille Warehouse Facility and the Quion 50 Warehouse Facility

"**Shares**" has the same meaning as the term so defined in the Conditional Share Transfer Agreement.

"**Standstill Agreements**" means:

(a)     the standstill agreement entered into on or about the date of this Agreement between Storm, ELQ and Portefeuille in relation to the Portefeuille Warehouse Facility Agreement;

(b)     the standstill agreement entered into on or about the date of this Agreement between Storm, ELQ and Quion 50 B.V. in relation to the Quion 50 Warehouse Facility Agreement;

(c)     the standstill agreement entered into on or about the date of this Agreement between LBHI and ELQ in relation to the LBHI Loan Facility Agreements (the "**LBHI Standstill**");

(d)     the standstill agreement entered into on or about the date of this Agreement between LBL and ELQ in relation to the amounts owed under the Intercompany Arrangements.

"**Storm Administrators**" means Michael John Andrew Jervis, Anthony Victor Lomas, Steven Anthony Pearson and Dan Yoram Schwarzmann of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT, England, acting without personal liability.

"**Storm Debt**" means an amount of EUR 69,231,250 plus accrued interest and fees, being the debt owed to Storm by any member of the ELQ Group under the Portefeuille Warehouse Facility and the Quion 50 Warehouse Facility.

"**Storm Rabobank Proportion**" has the meaning given to it in Clause 5.1.1 of this Agreement.

"**Storm Residual Proportion**" has the meaning given to in Clause 5.1.2 of this Agreement.

**1.2**     Interpretation

Unless a contrary indication appears, any reference in this Agreement to:

(a)     any party shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(b)     the "**Storm Administrators**" and/or the "**LBL Administrators**" shall be construed as being to the Storm Administrators and/or the LBL Administrators both jointly and severally and to any other person who is

appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Storm Administrators and/or the LBL Administrators;

(c)    any reference to "**Assets Realisation Costs**" shall be construed to be a reference solely to the Assets Realisation Costs as incurred for the realisation of the asset the reference relates to, it being understood that the Assets Realisation Costs shall only be paid from the proceeds of the asset they relate to.

(d)    this "**Agreement**" refers to this document;

(e)    any "**agreement**" or other instrument is a reference to that agreement or other instrument as amended, novated, supplemented, extended, restated or replaced;

(f)    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(g)    a provision of law is a reference to that provision as amended or re-enacted; and

(h)    clause headings are for ease of reference only.

**1.3**    Third Party Rights

A person who is not a party to this Agreement has no right to enforce or to enjoy the benefit of any term of this Agreement, except for the Storm Administrators, the LBL Administrators and the LBHI Representatives who shall enjoy the benefit of Clause 9.10 (*Administrators and LBHI Representatives*).

## 2    Conditions Precedent

**2.1**    The terms of this Agreement are conditional upon the execution of the Standstill Agreements.

**2.2**    The rights and obligations of LBHI under Clauses 3 (*Realisation of Assets*) and 5 (*Future Arrangements and Waivers*) shall be conditional upon a court order approving the discharge of the LBHI Debt pursuant to and in accordance with the terms of this Agreement having been issued by the Bankruptcy Court (the "**Court Order**") and being unconditional (the "**Condition**").

**2.3**    LBHI shall use reasonable endeavours to: (1) file with the Bankruptcy Court a motion seeking the Court Order and (2) procure that such Court Order is obtained by no later than the Court Approval Long Stop Date.

**2.4**    For the avoidance of doubt, if the Condition has been fulfilled then LBHI is required to perform its obligations and is entitled to the rights under this Agreement including Clauses 3 (*Realisation of Assets*) and 5 (*Future Arrangements and Waivers*) immediately.

**2.5**    LBHI shall give written notice to the other parties of the satisfaction of the Condition promptly after LBHI becomes aware of the satisfaction of such Condition (and in any event within one (1) Business Day of it becoming so aware).

2.6    If the Condition has not been fulfilled by 30 September 2009 (or such later date as the parties agree in writing) (the "**Court Approval Long Stop Date**"), then any of the parties to this Agreement may rescind (*ontbinden*) this Agreement by written notice to all other parties.

2.7    In order to ensure and to provide comfort to Storm that the portion of the Storm Debt that has, prior to any rescission (*ontbinding*) of this Agreement pursuant to Clause 2.6, already been repaid to Storm in accordance with this Agreement does not have to be repaid upon such rescission, the parties agree that Storm shall:

    (a)    remain entitled to retain any amounts which it has already received pursuant to this Agreement prior to such rescission; and

    (b)    such amounts shall continue to be applied in or towards payment of the Storm Debt notwithstanding such rescission,

provided however, that a challenge to Storm's full entitlement to such amounts received pursuant to this Agreement prior to such rescission in accordance with its position as a secured creditor under the Portefeuille Warehouse Facility and/or the Quion 50 Warehouse Facility may only be commenced by LBHI within three (3) months of such rescission pursuant to Clause 2.6 (the "**Three Month Period**") and for the avoidance of doubt, nothing in this Clause shall prejudice LBHI's right to continue such challenge following expiry of the three month period. LBHI hereby waives, with effect from expiry of the Three Month Period, any and all of its rights to commence a challenge to Storm's full entitlement to amounts received pursuant to this Agreement prior to such rescission after the Three Month Period, which waiver is hereby accepted by the other parties hereto.

2.8    Prior to the satisfaction of the Condition, any funds which: (a) would become payable to LBHI in accordance with this Agreement should the Condition be satisfied and (b) are deposited by the ELQ Group into the Collection Accounts, shall remain in the Collection Accounts (the "**LBHI Retained Funds**") to be applied towards repayment of the LBHI Debt as soon as the Court Order is obtained. For the avoidance of doubt, the LBHI Retained Funds shall not be applied towards the repayment of the Storm Debt or the LBL Debt or any other debt except the LBHI Debt. Further, the ELQ Group shall not be entitled to refrain from depositing amounts which are payable to LBHI into the Collection Accounts in accordance with this Agreement.

2.9    In the event any member of the ELQ Group enters into insolvency proceedings prior to the satisfaction of the Condition, and Storm enforces the right of pledge in favour of it over the Collection Accounts, Storm shall ensure that the LBHI Retained Funds continue to be held for the benefit of LBHI until the Court Approval Long Stop Date notwithstanding the commencement of insolvency proceedings in respect of the ELQ Group member.

2.10    For the avoidance of doubt, in the event that this Agreement is rescinded pursuant to Clause 2.6 of this Agreement, the obligations contained in Clauses 2.8 and 2.9 shall not apply.

2.11    For the avoidance of doubt, if any member of the ELQ Group enters into insolvency proceedings after the Condition has been satisfied and:

    2.11.1    Storm enforces its right of pledge over a Collection Account; and

2.11.2    at the date of such enforcement, the Collection Account contain funds which were due to be transferred to LBHI in accordance with the terms of this Agreement but which are, as a result of such enforcement, not transferred to LBHI (the "**Trapped Funds**");

Storm shall, within 5 Business Days of enforcement in relation to such Collection Account, instruct the account bank with whom such Collection Account is held to transfer the Trapped Funds without set-off from the relevant Collection Account to LBHI.

# 3    Realisation of Assets

## 3.1    Quion 50 and Portefeuille undertakings

In consideration for LBHI entering into this Agreement, the LBHI Standstill Agreement and the Conditional Share Transfer Agreement and in consideration for LBHI discharging and releasing the LBHI Debt subject to and in accordance with the provisions of this Agreement, each of Quion 50 and Portefeuille agree to make payments in respect of the LBHI Debt to LBHI in accordance with the provisions of this Agreement. LBHI accepts and agrees that such payments shall be made by Quion 50 and Portefeuille.

## 3.2    Realisation

(a)    Each member of the ELQ Group will use all reasonable endeavours to collect all Mortgage Receivables and Residual Income from each of its debtors and/or to sell the same. If and to the extent the Mortgage Receivables are proposed to be sold or collected at a consideration which is 10% below the projections shown by the ELQ Group to Storm, as set out in Schedule 3, then this sale or collection will be subject to Storm's and LBHI's consent, provided that this clause 3.2(a) shall be without prejudice to the obligations of the ELQ Group to obtain releases of the security over the Mortgage Receivables prior to any sale of such Mortgage Receivables.

(b)    Each member of the ELQ Group shall procure that the relevant debtors pay amounts due pursuant to paragraph (a) above into:

(i)    the Portefeuille Collection Account, in case the payments are made under and pursuant to a realisation of Mortgage Receivables pledged to Storm as security for the Portefeuille Warehouse Facility; or

(ii)    the Quion 50 Collection Account, in case the payments are made under and pursuant to a realisation of Mortgage Receivables pledged to Storm as security for the Quion 50 Warehouse Facility; or

(iii)    a separate account which is not subject to a right of pledge in favour of Storm, LBHI or LBL (the "**Separate Account**"), for all other payments (including, but not limited to, payments under and pursuant to the Residual Certificates and/or pursuant to a sale of the Residual Certificates) made under this Agreement or the Conditional Share Transfer Agreement which do not fall within the scope of the payments referred to in Clauses 3.2(b)(i) or 3.2(b)(ii) above.

The proceeds set out under Clauses 3.2(b) (i), (ii) and (iii) less the Assets Realisation Costs, which the ELQ Group may withdraw from the relevant Collection Account and/or the Separate Account, shall together be referred to as the "**Collection Proceeds**".

(c)     Storm shall only release its security over the Mortgage Receivables in connection with a sale as referred to in paragraph (a) on the basis that the purchase price for the Mortgage Receivables is paid by the relevant buyer(s) into:

(i)     the Portefeuille Collection Account, in case the payments are made pursuant to a sale of Mortgage Receivables pledged to Storm as security for the Portefeuille Warehouse Facility so that Storm retains security over the Sale Proceeds (as defined below); or

(ii)    the Quion 50 Collection Account, in case the payments are made pursuant to a sale Mortgage Receivables pledged to Storm as security for the Quion 50 Warehouse Facility so that Storm retains security over the Sale Proceeds (as defined below).

The proceeds set out under Clauses 3.2(c) (i) and (ii) less the Assets Realisation Cost, which the ELQ Group may withdraw from the relevant Collection Account, shall together be referred to as the "**Sale Proceeds**".

(d)     Each member of the ELQ Group shall procure that any ELQ Assets held by any member of the ELQ Group and the Collection Proceeds and the Sale Proceeds shall be paid from the Collection Accounts and/or the Separate Account in accordance with Clause 3.3 (*Distribution*) on the first (1st) Business Day following realisation.

**3.3**     Distribution

The ELQ Assets will be distributed and paid by the ELQ Group to Storm, LBHI and ELQ in the following order of priority:

(a)     **first**: any realisations of ELQ Assets from EUR 0 up to a maximum of EUR 39,500,000 in or towards payment of the Storm Debt to be paid directly to Storm;

(b)     **second**: any realisations of ELQ Assets from EUR 39,500,001 up to a maximum of EUR 60,000,000 in or towards payment of the Storm Debt and the LBHI Debt in a ratio of 44% (Storm):56% (LBHI) to be paid directly to Storm and LBHI in such respective proportions; and

(c)     **third**: any realisations of ELQ Assets exceeding EUR 60,000,000 realised before or after the Long Stop Date, shall be (i) paid in or towards payment of the Storm Debt and the LBHI Debt to be paid directly to Storm and LBHI respectively and (ii) retained by ELQ to be applied towards the New Bonus Arrangements (as referred to in Clause (b)) all in a ratio of 35.2% (Storm):44.8% (LBHI):20% (ELQ) in such respective proportions.

The ELQ Group shall procure that Storm and LBHI are provided with a schedule of payments made to both parties on a monthly basis. Any payments to be made to Storm and LBHI pursuant to this Agreement shall be made from the Collection Accounts and/or the Separate Account into the following bank accounts:.

**Storm account:**Account name: Storm Funding Limited – in Administration

Account bank: HSBC Bank Plc

BIC no: MIDLGB22

IBAN: GB96MIDL40051568450087

**LBHI account:**

Account name: Lehman Brothers Holdings Inc (UK Branch)

Account bank: Citibank N.A, London

Swift no: CITIGB2L

IBAN GB80CITI18500812136384

Account number 001-2136384

### 3.4    The Residual Debt

3.4.1    The ELQ Group shall provide Storm and LBHI with a breakdown of the origins of any payment made to it in accordance with Clause 3.2 (*Realisation*). Storm, LBHI and the ELQ Group shall reasonably determine whether the Residual Target has been met and any disputes in relation thereto are subject to Clause 11.2 (*Jurisdiction*). If it is established that the Residual Target has been met, ELQ shall be notified thereof in writing and is consequently released from any obligation to pay any Residual Income. If it is established that the Residual Target has not been met ELQ shall be notified thereof in writing and ELQ shall be informed of the amount of Residual Debt outstanding as of that moment, unless the Residual Certificates Court Decision determines that the ELQ Group does not have title to the Residual Certificates. Upon receipt of such notification by ELQ, the ELQ Group shall procure that the Residual Income received and the proceeds of a sale of any Residual Certificates up to the amount of the Residual Target shall be paid directly to Storm and LBHI respectively in or towards payment of the Storm Debt and the LBHI Debt in accordance with Clause 3.3 (*Distribution*).

3.4.2    For the avoidance of doubt, if the relevant court establishes in final instance that the ELQ Group does not have title to the Residual Certificates (the **"Residual Certificates Court Decision"**) or if the Residual Target has been met, the Storm Residual Proportion and the LBHI Residual Proportion shall be deemed released and discharged as of the date of the Residual Certificates Court Decision or the date that the Residual Target has been met.

## 4    Management Incentive Scheme

4.1    To incentivise the Managers to realise the ELQ Assets, the ELQ Group shall replace the existing discretionary bonus arrangements for 2009 with bonus arrangements generally in line with the following and Schedule 4 (the **"New Bonus Arrangements"**):

(a)    a retention bonus of EUR 480,408 in total payable to the Managers in December 2009; and

(b)     subject to a realisation of the ELQ Assets for an amount exceeding EUR 60,000,000, the Managers will be entitled to be paid out of the 20% of the realisations retained by ELQ in accordance with Clause 3.3(c) for payment of further bonuses.

Subject to the provisions of the Conditional Share Transfer Agreement, all Managers' rights under the New Bonus Arrangements shall be strictly personal and cannot be assigned or transferred.

**4.2**     Duty of care

Other than the ELQ Group's duty of care as described under Clause 3 (*Realisation*) and 7.3 (*No new obligations*), ELQ shall be under no duty of care vis-à-vis LBHI, Storm and LBL.

**4.3**     Representation

The ELQ Group represents that Schedule 5 accurately sets out all bank accounts held by the ELQ Group and/or in the name of any of the entities in the ELQ Group on the date of this Agreement and the balances held in these accounts on the date of this Agreement.

**5      Future Arrangements and Waivers**

**5.1**     The Storm Debt

Upon Completion the Storm Debt shall be fully and unconditionally discharged and released except for:

**5.1.1**     an amount of Storm Debt which is equivalent to 44% of the Rabobank Required Cash Balance at the time of Completion (the "**Storm Rabobank Proportion"**), which shall not be discharged and shall remain due and payable to Storm. If any cash distributions are made to Storm in accordance with Clause 4.5 of the Conditional Share Transfer Agreement, these are to be applied against the Storm Rabobank Proportion;

**5.1.2**     if the Residual Target has not been met at Completion, an amount of Storm Debt which is equivalent to 44% of the Residual Target Shortfall, which shall not be discharged and shall remain due and payable to Storm (the "**Storm Residual Proportion**"). If any Residual Income or any proceeds of a sale of any Residual Certificates are paid to Storm after Completion, these are to be applied against the Storm Residual Proportion.

**5.2**     The LBHI Debt

Upon Completion the LBHI Debt shall be fully and unconditionally discharged and released except for:

**5.2.1**     an amount of LBHI Debt which is equivalent to 56% of the Rabobank Required Cash Balance at the time of Completion (the "**LBHI Rabobank Proportion"**), which shall not be discharged and shall remain due and payable to LBHI. If any cash distributions are made to LBHI in accordance with Clauses 4.5 of the Conditional Share Transfer Agreement, these are to be applied against the LBHI Rabobank Proportion;

**5.2.2**     if the Residual Target has not been met at Completion, an amount of LBHI Debt which is equivalent to 56% of the Residual Target Shortfall, which

shall not be discharged and shall remain due and payable to LBHI (the "**LBHI Residual Proportion**"). If any Residual Income or any proceeds of a sale of any Residual Certificates are paid to LBHI after Completion, these are to be applied against the LBHI Residual Debt.

5.3    Release of security

Upon Completion the Security shall be released.

5.4    Limited Recourse

Following Completion each of the Storm Debt and the LBHI Debt shall be limited recourse to:

5.4.1    any cash held in hand, in a bank account or other financial institution held by the ELQ Group in excess of the Rabobank Required Cash Balance, which shall be payable to Storm and LBHI in accordance with Clauses 4.5 of the Conditional Share Transfer Agreement;

5.4.2    any Residual Income received by the ELQ Group and any proceeds of a sale of the Residual Certificates.

5.5    The LBL Debt

5.5.1    From the payment set out in Clause 3.3(a), Storm shall pay EUR 500,000 to LBL towards payment of the LBL Debt.

5.5.2    The LBL Debt will be discharged and released upon receipt by LBL of EUR 500,000 from Storm in accordance with Clause 5.5.1 above.

5.6    Discharge Conditions notification

If, at or prior to the Long Stop Date, Storm, LBHI and the ELQ Group have jointly established that the Discharge Conditions have been met Storm and LBHI shall serve a joint written notice confirming that the Discharge Conditions have been met upon ELQ, Quion 50, Portefeuille, the Managers and the shareholders of ELQ (the "**Discharge Conditions Notification**").

5.7    Discharge Conditions have not been met

If the Discharge Conditions have not been met on the Long Stop Date, then the Parties will negotiate in good faith for a period of 30 days on an extension of the Long Stop Date, the Standstill Agreements and the Conditional Share Transfer Agreement.

6    **Partial Payments**

If Storm or LBL receives a payment under this Agreement and/or the Conditional Share Transfer Agreement that is insufficient to fully discharge the Storm Debt or the LBL Debt, Storm or LBL, as the case may be, shall apply that payment towards repayment of the Storm Debt or the LBL Debt in the following order:

(a)    **first**, in or towards payment pro rata of any principal; and

(b)    **second**, in or towards payment of any unpaid interest and fees.

## 7    Protection of Distribution

**7.1**    The parties acknowledge that each of Storm, LBHI and LBL have agreed to be bound by the terms of Standstill Agreements.

**7.2**    No petition

The Managers, in their capacity of statutory directors of the members of the ELQ Group and the members of the ELQ Group shall not without consulting Storm and LBHI, instigate and support:

(a)    any petition or resolution in connection with administration, receivership, liquidation, bankruptcy, Dutch suspension of payments proceedings (*surséance van betaling*), Dutch bankruptcy proceedings (*faillissement*), Dutch liquidation (*vereffening*) or any other insolvency related proceedings (or any analogous proceedings in any relevant jurisdiction) including emergency regulations (*noodregeling*), whether voluntary or involuntary, being commenced vis-à-vis or in respect of any member of the ELQ Group;

(b)    the appointment of any liquidator, administrative or other receiver, compulsory manager or other similar officer or any other action being taken to enforce any security in respect of any asset of any member of the ELQ Group or to enforce any guarantee or indemnity given by any member of the ELQ Group or any other step being taken by any person with a view to the administration or liquidation of any member of the ELQ Group, except in each case to the extent that such step is taken by Storm with a view to share the proceeds thereof in accordance with this Agreement;

(c)    the giving of notice by any member of the ELQ Group under section 36(2) of the Dutch 1990 Tax Collection Act (*Invorderingswet 1990*);

(d)    any expropriation, attachment, sequestration, distress or execution (including by way of executory attachment (*executoriaal beslag*) or interlocutory attachment (*conservatoir beslag*)) that affects any asset or assets of a member of the ELQ Group.

**7.3**    No new obligations

Until the earlier of (1) full and final satisfaction of the Storm Debt, the LBHI Debt and the LBL Debt and (2) Completion, ELQ, Quion 50 and Portefeuille shall not, and each of them shall procure that the other members of the ELQ Group shall not enter into any new business arrangements that may have the effect of increasing the net trading liabilities of the ELQ Group except with the prior written consent of Storm and LBHI.

## 8    Termination

Any party may rescind this Agreement in accordance with Clause 2.6 if the Court Order has not been obtained prior to the Court Approval Longstop Date.

In the event that an Early Termination Event occurs, any party may terminate this Agreement.

For the avoidance of doubt, the parties shall continue to be bound to Clauses 2 (*Conditions Precedent*), 6 (*Partial Payments*), 9 (*Miscellaneous Provisions*) and 11 (*Governing Law and enforcement*) of this Agreement notwithstanding termination or rescission of this Agreement.

## 9    Miscellaneous provisions

### 9.1    No Agency

Storm, LBL, LBHI and ELQ do not act as an agent of any of the parties to this Agreement.

### 9.2    Currency of account

Any payments made from ELQ to Storm and/or LBHI under this Agreement shall be made in the currency in which ELQ received these. For the purpose of determining the remainder of the Storm Debt or the LBHI Debt, payments made in any currency other than the currency of the claim to which it is to be applied shall be converted into that currency against a rate of exchange reasonably selected by (i) Storm, in relation to the Storm Debt and (ii) LBHI, in relation to the LBHI Debt and notified to the other parties.

### 9.3    No set-off

All payments under this Agreement shall be made without any set-off or counterclaim.

### 9.4    Certificates and Determinations

Any certification or determination by Storm in relation to the Storm Debt of a rate or amount under the Portefeuille Warehouse Facility and the Quion 50 Warehouse Facility is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

Any certification or determination by LBHI in relation to the LBHI Debt of a rate or amount under the LBHI Loan Facility Agreements is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

### 9.5    Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

### 9.6    Amendments

This Agreement can only be amended in writing by a document signed by all parties, except that Storm and LBHI may amend Clause 3.3 (*Distribution*) (a) and (b) with a document signed by each of these parties.

### 9.7    Confidentiality

(a)    Each party agrees to keep all information received by it under or in connection with this Agreement confidential and not to disclose it to anyone, save to the extent permitted by paragraph (b) below, and to ensure that such information is protected with security measures and a degree of care that would apply to its own confidential information.

(b)    Disclosure of any information received by a party under or in connection with this Agreement is permitted:

(i)      in order to comply with applicable law or orders given by a court of competent jurisdiction; or

(ii)     to affiliates, officers, directors, employees, professional advisers, auditors, partners and representatives, creditor committees and rating agencies provided that the person to whom the information is to be given is informed in writing of its confidential nature except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the information; or

(iii)    in the exercise of the statutory duties of the Storm Administrators and/or the LBL Administrators (including, but not limited to, the creditors' committee) or to the extent required by current insolvency practice or to enable the Storm Administrators and/or the LBL Administrators properly to carry out the duties of their office; or

(iv)    the disclosure or use is required by the bankruptcy proceedings in In re Lehman Brothers Holdings Inc. et al., Case No. 08-13555 (JMP), in the US Bankruptcy Court for the Southern District of New York, including to the United States Trustee or the statutory official committee of unsecured creditors appointed therein.

**9.8**    Assignment

No party may transfer its rights and obligations under this Agreement without the express written consent of all other parties.

**9.9**    No rescission

Other than as provided under Clause 2.6 and Clause 8 (*Termination*), to the extent permissible by law, each of the parties hereby waives its right to rescind (*ontbinden*) or terminate (*opzeggen*) this Agreement.

**9.10**   Administrators and LBHI Representatives

(a)    The Storm Administrators have entered into and signed this Agreement as agents for and on behalf of Storm and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by Storm; or in respect of any failure on the part of the Storm to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this letter.

(b)    The LBL Administrators have entered into and signed this Agreement as agents for and on behalf of LBL and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by LBL; or in respect of any failure on the part of the LBL to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this letter.

(c)    The LBHI Representatives have entered into and signed this Agreement as agents for and on behalf of LBHI and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by LBHI; or in respect of any failure on the part of

the LBHI to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document or assurance made pursuant to this letter.

## 10   Notices

### 10.1   Communications in writing

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by fax or letter.

### 10.2   Addresses

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party for any communication or document to be made or delivered under or in connection with this Agreement is that stated on the signature page or such substitute address, fax number or department or officer as the party may notify to Storm (or as Storm may notify to the other Parties, if the change affects Storm itself) by not less than five Business Days' notice.

### 10.3   Notification of address and fax number

Promptly upon receipt of notification of an address and fax number or change of address or fax number pursuant to Clause 10.2 (*Addresses*) or changing its own address or fax number, Storm shall notify the other parties.

### 10.4   English language

Any notice given under or in connection with this Agreement must be in English.

## 11   Governing law and enforcement

### 11.1   Governing law

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by Dutch law.

### 11.2   Jurisdiction

The competent court at Amsterdam, the Netherlands, has exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement).

## 12   Counterparts

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

[signature pages to follow]

This Agreement has been duly executed on the date stated above.

**ELQ Hypotheken N.V.**

Signed by Aart Boonzaaier, Richard Bolton, Marcel Rasker, Charles Sogtoen, managing directors

**Notice Details**

Address: Haarlerbergweg 21C-23C, 1101 CH Amsterdam Zuidoost, The Netherlands

Fax: 0031808904011

Attention: Richard Bolton

**ELQ Portefeuille I B.V.**

Signed on behalf of ELQ Hypotheken N.V., as managing director, by Aart Boonzaaier, Richard Bolton, Marcel Rasker, Charles Sogtoen, managing directors

**Notice Details**

Address: Haarlerbergweg 21C-23C, 1101 CH Amsterdam Zuidoost, The Netherlands

Fax: 0031808904011

Attention: Richard Bolton

**Quion 50 B.V.**

Signed on behalf of ELQ Hypotheken N.V., as managing director, by Aart Boonzaaier, Richard Bolton, Marcel Rasker, Charles Sogtoen, managing directors

**Notice Details**

Address: Fascinatio Boulevard 1302, 2909 VA Capelle aan de IJssel, the Netherlands

Fax: 0031808904011

Attention: Richard Bolton

**Richard Bolton**, as a Manager



**Notice Details**

Address: 34b Backershagenlaan, 2243 AD Wassenaar, The Netherlands

Fax/Telephone: 031705119797

Attention: Richard Bolton

**Aart Boonzaaijer**, as a Manager



**Notice Details**

Address: Grootslag 4, 3991 RC Houten, The Netherlands

Fax: -

Attention: Aart Boonzaaijer

**Charles Sogtoen**, as a Manager



**Notice Details**

Address: Witte Singel 22, 2311 BG Leiden, The Netherlands

Fax: -

Attention: Charles Sogtoen

Signed by **Marcel Rasker**, as a Manager

**Notice Details**

Address: Jozef Israelplein 13, 2102 AL Heemstede, The Netherlands

Fax: -

Attention: Marcel Rasker

**Storm Funding Limited (in administration)**
Signed by Dan Yoram Schwarzmann for and on behalf of Storm Funding Limited (in administration) acting as agent without personal liability

**Notice Details**

Address: Plumtree Court, EC4A 4HT, London

Fax: +44 2072120316

Attention: Dan Schwarzmann

**Lehman Brothers Holdings Inc. UK Branch (subject to Chapter 11 bankruptcy proceedings in the US)**
Signed by Daniel Ehrmann acting as agent without personal liability for and on behalf of Lehman Brothers Holdings Inc. UK Branch

**Notice Details**

Address: Alvarez & Marsal, C/O Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, New York NY 10020, United States of America

Fax: +1 212 520 0876

Attention: Daniel Ehrmann


and


Address: 10th Floor, One Canada Square, Canary Wharf, London E14 5AA, United Kingdom

Fax: +44 207 715 5201

Attention: John Keen

**Notice Details**

Address: Jozef Israelplein 13, 2102 AL Heemstede, The Netherlands

Fax: -

Attention: Marcel Rasker

**Storm Funding Limited (in administration)**
Signed by Dan Yoram Schwarzmann for and on behalf of Storm Funding Limited (in administration) acting as agent without personal liability

**Notice Details**

Address: Plumtree Court, EC4A 4HT, London

Fax: +44 2072120316

Attention: Dan Schwarzmann

**Lehman Brothers Holdings Inc. UK Branch (subject to Chapter 11 bankruptcy proceedings in the US)**
Signed by Daniel Ehrmann acting as agent without personal liability for and on behalf of Lehman Brothers Holdings Inc. UK Branch
**Notice Details**

Address: ~~Alvarez & Marsal, C/O~~ Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, New York NY 10020, United States of America

Fax: +1 212 520 0876

Attention: Daniel Ehrmann


and


Address: 10th Floor, One Canada Square, Canary Wharf, London E14 5AA, United Kingdom

Fax: +44 207 715 5201

Attention: John Keen

**Lehman Brothers Limited (in administration)**
Signed by Michael John Andrew Jervis for and on behalf of Lehman Brothers Limited (in administration) acting as agent without personal liability

}



**Notice Details**

Address: Plumtree Court, EC4A 4HT, London

Fax: +44 2072120316

Attention: Michael John Andrew Jervis

## SCHEDULE 1

### Residual Certificates

| Issuer | Common Code | ISIN |
|---|---|---|
| Eurosail-NL 2007-1 BV | 30726707 | XS0307267079 |
| Eurosail-NL 2007-2 BV | 32722199 | XS0327221999 |
| EMF-NL 2008-1 BV | 35231633 | XS0352316334 |
| EMF-NL PRIME 2008-A BV | 036246731 | XS0362467317 |
| EMF-NL 2008-2 BV | 038244418 | XS0382444189 |

.

## SCHEDULE 2

**Overview of Mortgage Loans**

## Mortgage receivables as at June 30, 2009

currency: euros

### Summary

| Servicer | Normal loans | Bridge Loan | Total |
|---|---|---|---|
| Stater | 18,252,073.38 | 650,000.00 | 18,902,073.38 |
| Quion | 3,389,450.00 | 586,750.00 | 3,976,200.00 |
| | 21,641,523.38 | 1,236,750.00 | 22,878,273.38 |
| Building deposits | | | 142,234.66 |
| | | | 22,736,038.72 |

### Loan list

| Servicer | LOAN_NO | LOANPART_NO | Current balance | Bridge Loan |
|---|---|---|---|---|
| Stater | 701516 | 110 | 285,000.00 | N |
| Stater | 724017 | 110 | 125,000.00 | N |
| Stater | 734447 | 115 | 52,500.00 | N |
| Stater | 734447 | 127 | 11,929.81 | N |
| Stater | 745938 | 115 | 40,386.00 | N |
| Stater | 745938 | 127 | 83,364.00 | N |
| Stater | 746321 | 119 | 50,000.00 | N |
| Stater | 752218 | 116 | 49,345.21 | N |
| Stater | 752218 | 128 | 6,854.93 | N |
| Stater | 755898 | 114 | 146,000.00 | N |
| Stater | 755898 | 126 | 44,000.00 | N |
| Stater | 760645 | 115 | 205,000.00 | N |
| Stater | 760645 | 127 | 66,795.01 | N |
| Stater | 773540 | 118 | 60,000.00 | N |
| Stater | 778255 | 116 | 244,500.00 | N |
| Stater | 782669 | 116 | 56,000.00 | N |
| Stater | 782669 | 128 | 2,682.31 | N |
| Stater | 783031 | 117 | 210,000.00 | N |
| Stater | 783031 | 129 | 62,753.52 | N |
| Stater | 783032 | 110 | 296,250.00 | N |
| Stater | 783032 | 120 | 88,527.36 | N |
| Stater | 784375 | 110 | 105,000.00 | N |
| Stater | 792260 | 119 | 84,885.62 | N |
| Stater | 803725 | 115 | 270,000.00 | N |
| Stater | 803725 | 127 | 38,102.11 | N |
| Stater | 806996 | 110 | 6,901.87 | N |
| Stater | 813671 | 115 | 85,000.00 | N |
| Stater | 816536 | 119 | 102,000.00 | N |
| Stater | 816536 | 120 | 30,755.93 | N |
| Stater | 823262 | 120 | 40,482.01 | N |
| Stater | 823262 | 133 | 4,003.17 | N |
| Stater | 829569 | 120 | 63,000.00 | N |
| Stater | 836092 | 119 | 127,500.00 | N |
| Stater | 836092 | 120 | 38,300.20 | N |
| Stater | 839144 | 118 | 195,000.00 | N |
| Stater | 861820 | 113 | 47,400.00 | N |
| Stater | 861820 | 125 | 98,600.00 | N |
| Stater | 867209 | 110 | 100,000.00 | N |

| Servicer | LOAN_NO | LOANPART_NO | Current balance | Bridge Loan |
|---|---|---|---|---|
| Stater | 867209 | 124 | 65,000.00 | N |
| Stater | 887710 | 123 | 91,500.00 | N |
| Stater | 904615 | 120 | 47,716.00 | N |
| Stater | 912196 | 117 | 223,837.00 | N |
| Stater | 913703 | 114 | 37,500.00 | N |
| Stater | 925203 | 117 | 436,708.00 | N |
| Stater | 925203 | 129 | 650,000.00 | Y |
| Stater | 929237 | 110 | 148,892.90 | N |
| Stater | 946922 | 110 | 30,999.00 | N |
| Stater | 946922 | 123 | 88,032.00 | N |
| Stater | 946922 | 135 | 5,969.00 | N |
| Stater | 972688 | 110 | 192,961.65 | N |
| Stater | 972688 | 120 | 13,928.97 | N |
| Stater | 980690 | 110 | 174,500.00 | N |
| Stater | 980718 | 119 | 121,000.00 | N |
| Stater | 984272 | 110 | 50,000.00 | N |
| Stater | 984272 | 124 | 75,000.00 | N |
| Stater | 985945 | 114 | 203,100.00 | N |
| Stater | 986790 | 114 | 143,601.00 | N |
| Stater | 988662 | 108 | 215,000.00 | N |
| Stater | 994639 | 119 | 255,000.00 | N |
| Stater | 1000482 | 120 | 173,600.00 | N |
| Stater | 1003843 | 116 | 216,199.00 | N |
| Stater | 1003864 | 119 | 360,000.00 | N |
| Stater | 1005543 | 110 | 40,000.00 | N |
| Stater | 1005543 | 124 | 142,096.71 | N |
| Stater | 1006150 | 110 | 275,000.00 | N |
| Stater | 1008267 | 119 | 196,875.00 | N |
| Stater | 1012789 | 110 | 212,500.00 | N |
| Stater | 1030275 | 117 | 133,605.91 | N |
| Stater | 1037244 | 114 | 235,000.00 | N |
| Stater | 1037244 | 126 | 32,000.00 | N |
| Stater | 1037244 | 138 | 19,800.00 | N |
| Stater | 1040196 | 110 | 208,000.00 | N |
| Stater | 1041910 | 113 | 143,000.00 | N |
| Stater | 1051799 | 119 | 75,000.00 | N |
| Stater | 1060514 | 114 | 96,875.00 | N |
| Stater | 1072264 | 110 | 344,300.00 | N |
| Stater | 1075377 | 110 | 171,562.00 | N |
| Stater | 1076095 | 110 | 450,000.00 | N |
| Stater | 1076095 | 124 | 51,210.39 | N |
| Stater | 1082866 | 118 | 285,000.00 | N |
| Stater | 1088936 | 118 | 231,000.00 | N |
| Stater | 1093114 | 113 | 204,000.00 | N |
| Stater | 1094252 | 116 | 292,050.00 | N |
| Stater | 1096087 | 120 | 278,750.00 | N |
| Stater | 1096868 | 118 | 187,500.00 | N |
| Stater | 1098105 | 114 | 795,000.00 | N |
| Stater | 1098371 | 110 | 313,500.00 | N |
| Stater | 1101327 | 120 | 238,049.00 | N |
| Stater | 1101884 | 113 | 88,750.00 | N |
| Stater | 1102175 | 110 | 224,694.50 | N |
| Stater | 1102175 | 120 | 59,012.51 | N |

| Servicer | LOAN_NO | LOANPART_NO | Current balance | Bridge Loan |
|---|---|---|---|---|
| Stater | 1102293 | 118 | 42,794.52 | N |
| Stater | 1102293 | 130 | 143,100.00 | N |
| Stater | 1104139 | 120 | 145,000.00 | N |
| Stater | 1104139 | 133 | 5,000.00 | N |
| Stater | 1109426 | 110 | 110,000.00 | N |
| Stater | 1113395 | 114 | 499,949.19 | N |
| Stater | 1114007 | 110 | 199,590.95 | N |
| Stater | 1114973 | 117 | 178,000.00 | N |
| Stater | 1116046 | 118 | 230,000.00 | N |
| Stater | 1117727 | 117 | 139,500.00 | N |
| Stater | 1118161 | 117 | 211,250.00 | N |
| Stater | 1118968 | 116 | 214,500.00 | N |
| Stater | 1120566 | 113 | 101,250.00 | N |
| Stater | 1120566 | 125 | 6,670.90 | N |
| Stater | 1122502 | 114 | 175,000.00 | N |
| Stater | 1126550 | 115 | 193,000.00 | N |
| Stater | 1129950 | 116 | 286,814.00 | N |
| Stater | 1130878 | 119 | 500,000.00 | N |
| Stater | 1132252 | 118 | 442,750.00 | N |
| Stater | 1143985 | 114 | 79,200.00 | N |
| Stater | 1147585 | 118 | 175,000.00 | N |
| Stater | 1147860 | 117 | 591,000.00 | N |
| Stater | 1150068 | 108 | 246,746.00 | N |
| Stater | 1150799 | 110 | 187,963.22 | N |
| Stater | 1151414 | 116 | 130,000.00 | N |
| Quion | 203516 | 1 | 133,650.00 | N |
| Quion | 204149 | 1 | 554,000.00 | N |
| Quion | 205484 | 1 | 285,000.00 | N |
| Quion | 205995 | 1 | 108,500.00 | Y |
| Quion | 206185 | 1 | 445,000.00 | N |
| Quion | 206740 | 1 | 18,000.00 | Y |
| Quion | 206942 | 1 | 183,000.00 | N |
| Quion | 206988 | 1 | 188,000.00 | N |
| Quion | 208475 | 1 | 490,000.00 | N |
| Quion | 209455 | 1 | 90,000.00 | Y |
| Quion | 209478 | 1 | 206,800.00 | N |
| Quion | 210079 | 1 | 40,000.00 | Y |
| Quion | 211048 | 1 | 47,000.00 | Y |
| Quion | 211458 | 1 | 236,000.00 | Y |
| Quion | 211778 | 1 | 118,800.00 | N |
| Quion | 211846 | 1 | 205,000.00 | N |
| Quion | 211846 | 2 | 50,000.00 | N |
| Quion | 212624 | 1 | 206,800.00 | N |
| Quion | 215200 | 1 | 170,500.00 | N |
| Quion | 215716 | 1 | 47,250.00 | Y |
| Quion | 216127 | 1 | 152,900.00 | N |

End of list

**SCHEDULE 3**

**Projection of proceeds Mortgage Receivables**

### Proceeds from loan sales and/or redemptions and foreclosures in 3 scenarios

*amounts in euros*

#### Scenario 1 - loan sales to third parties  ORIGINAL SCENARIO

| | Principal balance | Valuation | Cash Proceeds | | | |
|---|---|---|---|---|---|---|
| Sellable loans (less building deposits) | 17,048,582 | 100% | 17,048,582 | Sale to EMF NL 2008-2 | | |
| Non- Sellable loans performing (less b.d.) | 13,717,222 | 60% | 8,230,333 | Sale to third party | | |
| Non- Sellable loans non-performing | 7,782,067 | 40% | 3,112,827 | Sale to third party | } | |
| Bridging loans | 1,236,750 | 100% | 1,284,750 | Hold to maturity | | 11,827,910 |
| Estimated cost of termination and unwinding swap positions*) | | | (600,000) | | | |
| Legal fees | | | (200,000) | | | |
| | 39,784,621 | 74% | 28,876,492 | | | |

#### Scenario 1 - loan sales to third parties  BASED ON MOST RECENT BID ON REMAINING LOANS

| | Principal balance | Implied Valuation | Cash Proceeds | | | |
|---|---|---|---|---|---|---|
| Sellable loans (less building deposits) | 17,048,582 | 100% | 17,048,582 | Sale to EMF NL 2008-2 | | |
| Non- Sellable loans performing | 13,717,222 | 77% | 10,562,261 | Sale to third party based on recent bid | | |
| Non- Sellable loans non-performing | 7,782,067 | 62% | 4,824,881 | Sale to third party based on recent bid | } | |
| Bridging loans | 1,236,750 | 100% | 1,236,750 | Hold to maturity | | 15,823,892 |
| Estimated cost of termination and unwinding swap positions*) | | | (600,000) | | | |
| Legal fees | | | (200,000) | | | |
| | 39,784,621 | 71% | 32,872,474 | | | |

#### Scenario 2 - Sellable loans sold; Non Sellable loans exited through redemptions and foreclosures

| | Principal balance | Implied Valuation | Cash Proceeds | | | |
|---|---|---|---|---|---|---|
| Sellable loans (less building deposits) | 17,048,582 | 100% | 17,048,582 | Sale to EMF NL 2008-2 | | |
| Non- Sellable loans performing | 13,717,222 | 72% | 9,827,599 | Incentivize borrower to redeem - see below | | |
| Non- Sellable loans non-performing | 7,782,067 | 66% | 5,110,981 | Foreclose - see below | | |
| Bridging loans | 1,236,750 | 100% | 1,284,750 | Hold to maturity | } | 15,223,329 |
| Estimated cost of termination and unwinding swap positions*) | | | (600,000) | | | |
| Legal fees and brokerage fees | | | (400,000) | | | |
| | 39,784,621 | 82% | 32,271,911 | | | |

| Non-Sellable Performing | Principal balance | Incentive to borrower | Valuation if sold | Net Proceeds |
|---|---|---|---|---|
| 35% redeemed at 80% foreclosure value | 4,801,028 | 921,881 | | 3,879,146 |
| 35% redeemed at 70% foreclosure value | 4,801,028 | 1,321,675 | | 3,479,352 |
| 30% not redeemed | 4,115,167 | | 60% | 2,469,100 |
| | 13,717,222 | | | 9,827,599 |

| Non-Sellable Non Performing | Principal balance | Loss on forclosure | Net Proceeds |
|---|---|---|---|
| 50% foreclosed at 70% foreclosure value | 3,891,033 | 1,174,486 | 2,716,548 |
| 50% foreclosed at 60% foreclosure value | 3,891,033 | 1,496,600 | 2,394,433 |
| | 7,782,067 | | 5,110,981 |

#### Scenario 3 -  Not applicable anymore as it was based on NOT accessing the prefund

**Principal balances as at June 30, 2009**

*) the cost of unwinding and terminating the current swaps is estimated at EUR 0.6m and relate to the on balance sheet loans only.

## SCHEDULE 4

### Allocation of amounts under the New Bonus Arrangements

|  | Entitlement to amounts under Clause 4.1(a) | Entitlement to amounts under Clause 4.1(b) |
| --- | --- | --- |
| Aart Boonzaaijer | EUR 100,000 | 5% |
| Marcel Rasker | EUR 70,000 | 5% |
| Charles Sogtoen | EUR 76,666 | 5% |
| Richard Bolton | EUR 233,742 | 5% |
|  | EUR 480,408 | 20% |

## SCHEDULE 5

**List of Bank Accounts**

ELQ Hypotheken N.V. and subsidiaries
Bank Accounts
As at 9 July 2009

Bank accounts ELQ Hypotheken N.V. and subsidiaries

| Entity | Accountnr | Balance as at 9 July 2009 | BIC/SWIFT | IBAN | |
|---|---|---|---|---|---|
| ELQ Hypotheken N.V. | 102889282 | 142,448.55 | RABONL2U | NL12RABO0102889282 | Generaal Corporate Account |
| ELQ Hypotheken N.V. | 383559839 | 4,654.67 | RABONL2U | NL40RABO0383559839 | Share Proceeds Account |
| ELQ Hypotheken N.V. | 393591530 | 35,800.78 | RABONL2U | NL05RABO0393591530 | Salary Account |
| ELQ Hypotheken N.V. | 3835530291 | 227,847.04 | RABONL2U | N/A | Guarantee Account (Pledged to Rabobank) |
| ELQ Hypotheken N.V. | 147398797 | 6,778,761.35 | RABONL2U | NL18RABO0147398797 | Guarantee Account  Direct debet contract (Pledged to Rabobank) |
| ELQ Hypotheken N.V. | 129738069 | 969.32 | RABONL2U | NL90RABO0129738069 | Corporate Account |
| Hypotheek Explorer I | 13147541 | 18,107.36 | RABONL2U | NL62RABO0013147541 | Corporate Account |
| ELQ Portefeuille I B.V. | 132665859 | 13,206.01 | RABONL2U | NL07RABO0132665859 | Collection/Corporate Account |
| ELQ Portefeuille I B.V. | 168766825 | 32,264.42 | RABONL2U | NL56RABO0168766825 | Capital Account |
| ELQ Portefeuille I B.V. | 168766906 | - | RABONL2U | NL03RABO0168766906 | Portfolio Covenant Account |
| Quion 50 B.V. | 127984518 | 62,217.79 | RABONL2U | NL73RABO0127984518 | Generaal Corporate Account |
| Quion 50 B.V. | 127984526 | 12,671,703.08 | RABONL2U | NL51RABO0127984526 | Collection Account |
| Quion 50 B.V. | 129711268 | - | RABONL2U | NL97RABO0129711268 | Portfolio Covenant Account |
| | | 19,987,980.38 | | | |

Receivable on Stichting ELQ Ontvangsten as at 29 June 2009    29,939,945.70

**EXHIBIT F**

6

EXECUTION VERSION

18 August [~~July~~] 2009

## LEHMAN BROTHERS HOLDINGS PLC (in administration)

## MABLE COMMERCIAL FUNDING LIMITED (in administration)

## ELQ HOLDING B.V.

## THE MANAGERS

## ELQ HYPOTHEKEN N.V.

## STORM FUNDING LIMITED (in administration)

### and

## LEHMAN BROTHERS HOLDINGS INC, UK BRANCH

## (subject to Chapter 11 Bankruptcy proceedings in the US)

## Conditional Share Transfer Agreement

in respect of ELQ Hypotheken N.V. and its group of companies

Linklaters

Linklaters LLP
World Trade Centre Amsterdam
Zuidplein 180
1077 XV Amsterdam

Telephone (+31) 20 799 6200
Facsimile (+31) 20 799 6300
Ref PK/MR/MB

This Conditional Share Transfer Agreement (the "**Agreement**") is made on 18 August *[hw]* 2009 between:

(1) **ELQ HYPOTHEKEN N.V.**, a public company with limited liability (*naamloze vennootschap*) incorporated under the laws of the Netherlands, registration number 34201343 with its statutory seat in Zwanenburg and its principal place of business at Haarlerbergweg 21C-23C, 1101 CH Amsterdam-Zuidoost, the Netherlands (the "**Company**");

(2) **LEHMAN BROTHERS HOLDINGS PLC (in administration)**, a company incorporated in England and Wales (registered no. 01854685), whose registered office is at 25 Bank Street, London E14 5LE, England ("**LBH**");

(3) **MABLE COMMERCIAL FUNDING LIMITED (in administration)**, a company incorporated in England and Wales (registered no. 02682316), whose registered office is at 25 Bank Street, London E14 5LE, England ("**Mable**");

(4) **ELQ HOLDING B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, registration number 34211914 with its statutory seat in Zwanenburg and its principal place of business at Haarlerbergweg 21C-23C, 1101 CH Amsterdam Zuidoost, the Netherlands ("**ELQ Holding**");

LBH, Mable and ELQ Holding, being the shareholders of the Company who jointly hold the entire issued and outstanding share capital of the Company,   hereinafter each a "**Shareholder**" and collectively referred to as the "**Shareholders**";

(5) **RICHARD BOLTON, AART BOONZAAIJER, CHARLES SOGTOEN and MARCEL RASKER** each a managing director of the Company, (each a "**Manager**" and collectively, the "**Managers**");

(6) **STORM FUNDING LIMITED (in administration)**, a limited liability company incorporated and existing under the laws of England and Wales, registration number 2682306, with its principal place of business at 25 Bank Street, London E14 5LE, United Kingdom ("**Storm**"); and

(7) **LEHMAN BROTHERS HOLDINGS. INC, UK Branch (subject to Chapter 11 Bankruptcy proceedings in the** USA, a corporation incorporated and existing under the laws of Delaware, United States of America, with its principal executive offices at 1271 Avenue of the Americas, New York NY 10019, 10020, United States of America ("**LBHI**").

**Whereas**:

(A) This Agreement is entered into in connection with the Standstill Agreements and the Run-Off Agreement (as defined below).

(B) The parties to the Run-Off Agreement have agreed that, if the Discharge Conditions are satisfied on or before the Long Stop Date and a Discharge Conditions Notification has been sent in accordance with Clause 5.6 of the Run-Off Agreement, the Storm Debt, the LBHI Debt and the LBL Debt (to the extent the LBL has not already been discharged and released) shall be partially discharged and released, in accordance with Clause 5 (*Future Arrangements and Waivers*) of the Run-Off Agreement and the Shareholders shall sell to the Managers (or a company designated by the Managers) and the Managers (or a company designated by the Managers) shall purchase and accept whatever right, title and interest the Shareholders may have in the Shares (as defined below), in accordance with and subject to the terms of this Agreement.

**IT IS AGREED** as follows:

**1      Interpretation**

In this Agreement:

1.1      Unless otherwise defined in this Agreement, words and expressions defined in the Run-Off Agreement shall have the same meaning wherever used in this Agreement, except that references to the "**Agreement**" are to be construed as references to this agreement.

1.2      A reference to the Administrators (as defined below) shall be construed as being to the Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Administrators.

1.3      References to books, records or other information mean books, records or other information in any form, including paper, electronically stored data, magnetic media, film and microfilm.

1.4      The following expressions bear the following meaning:

"**Administrators**" means the LBH Administrators, the LBHI Representatives, the Mable Administrators and the Storm Administrators.

"**Collection Proceeds**" has the meaning given to it in the Run-Off Agreement.

"**Completion**" means the sale and transfer of the Shares pursuant to and in accordance with the provisions of this Agreement.

"**Completion Conditions**" means:

(i)      service of the Discharge Conditions Notification in accordance with Clause 5.6 of the Run-Off Agreement; and

(ii)      payment of any Excess Cash Distribution in accordance with Clause 4.2 of this Agreement.

"**Completion Working Capital**" has the meaning given to in Clause 4.3 of this Agreement.

"**Discharge Conditions Notification**" has the meaning given to it in Clause 5.6 of the Run-Off Agreement.

"**Dividends**" means, in relation to any Share, all present and future:

(i)      dividends and distributions of any kind and any other sum received or receivable in respect of that Share;

(ii)      rights, shares, money or other assets accruing or offered by way of redemption, bonus, option or otherwise in respect of that Share;

(iii)      allotments, offers and rights accruing or offered in respect of that Share; and

(iv)      other rights and assets attaching to, deriving from or exercisable by virtue of the ownership of, that Share.

"**ELQ Group**" means the Company, Quion 50 and Portefeuille and each of their group companies (*groepsvennootschappen*) as defined in article 2:24b of the Dutch Civil Code.

"**Excess Cash Distribution**" has the meaning given to it in Clause 4.2 of this Agreement.

"**LBH Administrators**" means Anthony Victor Lomas, Steven Anthony Pearson, Mike John Andrew Jervis and Dan Yoram Schwarzmann of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4 HT, England, acting as agents only and without personal liability.

"**LBHI Debt**" has the meaning given to it in the Run-Off Agreement.

"**LBHI Rabobank Proportion**" has the meaning given to it in the Run-Off Agreement.

"**LBHI Representatives**" means the restructuring officers and representatives of LBHI in the US Chapter 11 proceedings of LBHI acting without personal liability.

"**Mable Administrators**" means Anthony Victor Lomas, Steven Anthony Pearson, Mike John Andrew Jervis, Graham Hunter Martin and Dan Yoram Schwarzmann of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4 HT, England, acting as agents only and without personal liability.

"**Mortgage Receivables Purchase Agreements**" means (i) the mortgage receivables purchase agreements dated 26 July 2007, as amended and restated on 16 January 2009, between Portefeuille, Eurosail-NL 2007-1 B.V., Stichting Security Trustee Eurosail-NL 2007-1 and the Company, in relation to the securitisation transaction ELQ RMBS/Eurosail-NL 2007-1 B.V (ii) the mortgage receivables purchase agreements dated 29 November 2007, as amended and restated on 16 January 2009, between Portefeuille , Eurosail-NL 2007-2 B.V., Stichting Security Trustee Eurosail-NL 2007-2 and the Company in relation to the securitisation transaction ELQ/Eurosail-NL 2007-2 B.V.; (iii) the mortgage receivables purchase agreements dated 21 April 2008, as amended and restated on 16 January 2009, between Portefeuille, EMF-NL 2008-1 B.V., Stichting Security Trustee EMF-NL 2008-1 and the Company. in relation to the securitisation transaction ELQ/EMF-NL 2008-1 B.V.; (iv) the mortgage receivables purchase agreements dated 26 August 2008, as amended and restated on 16 January 2009, between ELQ Portefeuille I, Quion 50 ., EMF-NL 2008-2 B.V., Stichting Security Trustee EMF-NL 2008-2 andthe Company, in relation to the securitisation transaction Lehman/EMF-NL 2008-2 B.V.; and (v) the mortgage receivables purchase agreements dated 23 May 2008, as amended and restated on 16 January 2009, between Portefeuille, Quion 50, EMF-NL PRIME 2008-A B.V., Stichting Security Trustee EMF-NL PRIME 2008-A and the Company in relation to the securitisation transaction EMF-NL PRIME 2008-A B.V.

"**Portefeuille**" means ELQ Portefeuille I B.V.

"**Quion 50**" means Quion 50 B.V.

"**Rabobank Required Cash Balance**" means the cash balance to be maintained by the ELQ Group to cover direct debit contracts of the ELQ Group with Rabobank as required time to time by Rabobank, or any other financial institution which has replaced Rabobank after the date of this Agreement as a party to such direct debit contracts.

"**Releases**" means duly executed releases of the assets held by the ELQ Group from the Security.

"**Rental Guarantee**" means the rental guarantee dated 26 February 2007 between Cisco Systems International B.V. and the Company.

"**Run-Off Agreement**" means the agreement dated on or about the date of this Agreement between amongst others the Company, the Managers, Portefeuille, Quion 50, Storm, LBHI and LBL, pursuant to which the proceeds of the assets held by the ELQ Group will be realised and shared in the manner set out in such agreement, as a result of which the repayment scheme for the LBHI Debt, the Storm Debt and the LBL Debt is arranged for.

"**Sale and Transfer Deed**" means the notarial deed of sale and transfer of the Shares, which shall be executed before a Dutch civil-law notary in Amsterdam, the Netherlands, in accordance with the draft notarial deed attached as Schedule 1.

"**Security**" has the meaning given to it in the Run-Off Agreement.

"**Servicing Contract**" means the servicing contract dated 30 June 2004 between Stater Nederland B.V. and the Company.

"**Shares**" means all issued shares in the share capital of the Company, consisting of (i) 45,000 ordinary class A shares, having a nominal value of EUR 1, numbered A1 to A 45,000 inclusive, held by ELQ Holding; (ii) 40 cumulative preference class A shares, having a nominal value of EUR 0.01, numbered PA1 to PA40 inclusive, held by LBH; and (iii) 1 cumulative preference class B share, having a nominal value of EUR 0.01, numbered PB1, held by Mable.

"**Storm Debt**" has the meaning given to it in the Run-Off Agreement.

"**Storm Rabobank Proportion**" has the meaning given to it in the Run-Off Agreement.

"**Transfer Purchase Price**" means EUR 1 in total for the Shares.

1.5     Third Party Rights

A person who is not a party to this Agreement has no right to enforce or to enjoy the benefit of any term of this Agreement, except for the Storm Administrators, LBH Administrators, the Mable Administrators and the LBHI Representatives who shall enjoy the benefit of Clause 10 (*Administrators' Liability*).

## 2     Pre-Completion Undertakings

2.1     During the period starting on the date of this Agreement and ending on Completion, each of the Shareholders may only vote in favour of a resolution to dismiss any of the Managers (the "**Improper Performing Manager**"), if:

2.1.1     such resolution is solely based on the improper performance of the Improper Performing Manager, as meant in Section 2:9 of the Dutch Civil Code; and

2.1.2     the Shareholders in advance have notified the Improper Performing Manager in writing about the contemplated dismissal resolution (the "**Dismissal Notification**"); and

2.1.3     the Improper Performing Manager has not sent an Arbitration Notice (as defined in Clause 2.2) within five Business Days after the Dismissal Notification has been sent.

2.2     If within five Business Days after the Dismissal Notification has been sent the Improper Performing Manager notifies the Shareholders in writing that he wishes to start arbitral proceedings to establish whether his performance was improper as meant in Section 2:9 of the Dutch Civil Code (the "**Arbitration Notice**"), then such dispute shall be

finally settled in accordance with the Arbitration Rules of the Netherlands Arbitration Institute and Clause 2.3 (the "**Dismissal Arbitration**").

2.3     Within ten Business Days after the Arbitration Notice has been sent, an arbitral tribunal shall be established and shall consist of three arbitrators. The arbitrators shall be appointed out of the General List of Arbitrators of the Netherlands Arbitration Institute (the "**Arbitral Tribunal**"). The Improper Performing Manager and the Shareholders shall each appoint one arbitrator, subsequently these appointed arbitrators shall jointly appoint an independent chairman.

2.3.1   The place of the Dismissal Arbitration shall be Amsterdam, the Netherlands.

2.3.2   The Dismissal Arbitration shall be conducted in the English language.

2.3.3   During the period starting on the date on which the Arbitration Notice has been sent and ending on the date on which the Arbitral Tribunal has rendered its decision:

(i)     no resolution regarding the contemplated dismissal of the Improper Performing Manager will be adopted;

(ii)    the Improper Performing Manager shall be suspended and shall abstain of any of his activities under his employment contract;

(iii)   the rights of the Improper Performing Manager under this Agreement and the Run-Off Agreement shall be suspended;

(iv)    the Shareholders may appoint a new managing director of the Company;

(v)     the Shareholders shall not (directly or indirectly) sell, encumber, transfer or otherwise dispose of the Shares (or part thereof), or commit to take any of the action referred to in Clause 2.3.3 (i) above, unless explicitly agreed by the Shareholders and the Managers (other than the Improper Performing Manager) in writing.

2.3.4   Once the Arbitral Tribunal has established that the performance of the Improper Performing Manager was improper as meant in Section 2:9 of the Dutch Civil Code, the Shareholders may vote in favour of a resolution to dismiss the Improper Performing Manager.

2.3.5   Irrespective of the outcome of the Dismissal Arbitration, the total Arbitral Tribunal fees arising in connection with the Dismissal Arbitration (including the fees of the arbitrators) shall be paid by the Shareholders, while the Improper Performing Manager and the Shareholders shall bear their own costs incurred from their (legal) advisors in relation to the Dismissal Arbitration.

2.3.6   For the purposes of Clauses 2.2 and 2.3, the Improper Performing Manager and the Shareholders shall each use reasonable efforts to facilitate that the Dismissal Arbitration shall be finalised within three months after the Arbitration Notice has been sent.

2.3.7   For the avoidance of doubt, if the Improper Performing Manager is dismissed following the Dismissal Arbitration without the Arbitral Tribunal deciding on a compensation package (if any), the Improper Performing Manager remains entitled to start court proceedings before the competent courts of Amsterdam. These court proceedings will not negatively impact on the application (including the timing) of the provisions of Clause 2.

2.4    The New Bonus Arrangement shall terminate in respect of a Manager upon: (i) his decease; (ii) such Manager becoming legally incapacitated (*handelingsonbekwaam*); (iii) the resignation by such Manager; or (iv) such Manager being dismissed by the Shareholders in accordance with Clause 2.1. The New Bonus Arrangement of such a Manager shall terminate as at the date on which any of the aforementioned situations occurs and he shall only be entitled to the amounts which are payable (*opeisbaar*) under his New Bonus Arrangement as at such date. Any amount payable to such Manager shall be paid out in accordance with Schedule 4 of the Run-Off Agreement. Any entitlement under the New Bonus Arrangement to which the Manager would have been entitled to had any of the aforementioned situations not occurred, shall remain with the Company, provided however that the Managers (including the deceased or leaving Manager), Storm and LBHI shall conduct negotiations in good faith with a view to agree on a reallocation of such entitlement to either Storm, LBHI, the successors of the deceased Manager or the leaving Manager or the other Managers in the proportions and on the terms as the Managers, Storm and LBHI agree. At Completion, the Shares shall not be sold and transferred to a Manager who has ceased to be a Manager in accordance with this Clause 2, but shall be sold and transferred to the other Managers (which may include a new Manager to be appointed) in accordance with this Agreement in a proportion to be designated by the Managers who will acquire the Shares. Where in this Clause 2.4 reference is made to a Manager, this shall also include the company to which the Managers will have or have transferred the Shares and New Bonus Arrangements pursuant to Clause 6.5 (*Assignment*) and this Clause 2.4 shall apply accordingly to such company in respect of the (proportional) rights of the Managers.

2.5    During the period starting on the date of this Agreement and ending on Completion, the Shareholders and the Company shall procure that the Company shall not distribute any Dividends to the Shareholders.

2.6    For the sole purpose of resolving the conflicts of interest that Richard Bolton, Marcel Rasker, Charles Sogtoen and Aart Boonzaaijer have in connection with the entering into of this Agreement, Mable - at the level of ELQ Holding - and Mable, LBH and ELQ Holding - at the level of the Company -, in their capacity as a shareholder of ELQ Holding and the Company, respectively, undertake to cooperate with ELQ Holding and the Company, each other and the Managers to resolve the conflicts of interest matters, including to take all necessary corporate actions such as resolutions at shareholders' meetings in which the entering into of this Agreement by Richard Bolton, Marcel Rasker, Charles Sogtoen and Aart Boonzaaijer for and on behalf of ELQ Holding, the Company and themselves, will be ratified.

# 3    Transfer of the Shares

3.1    On the tenth Business Day following satisfaction of the Completion Conditions, the Shareholders shall sell and transfer such rights, title and interest as they may have in the Shares to the Managers (or a company designated by the Managers), who shall purchase and accept the same, by execution of the Sale and Transfer Deed, subject to and in accordance with Clauses 3, 4 and 5 of this Agreement.

3.2    It is expressly agreed between the parties to this Agreement that the Shares will be sold and transferred with all the rights and obligations attached and accrued thereto at the date of execution of the Sale and Transfer Deed on an "as is, where is" basis and

subject to all faults, liens, executions, distraints, encumbrances and claims of third parties, if any, which shall be for the risk and the account of the Managers or the Company as the case may be. Neither the Shareholders, nor the Administrators give any representations, warranties or other assurances of any kind with respect to the rights and obligations attached and accrued to the Shares and Section 17 of Book 7 of the Dutch Civil Code shall not be applicable in this regard.

Unless otherwise required by law (and then only to that extent), the Shareholders and the Administrators shall not be liable for any loss or damage of any kind whatsoever, consequential or otherwise, arising out of, or due to, or caused by or pursuant to any defects or deficiencies in any of the Shares.

## 4    Consideration

4.1    The consideration for the Shares shall be the Transfer Purchase Price, payable upon Completion by the Managers (or a company designated by the Managers) to the Shareholders in exchange for the transfer of the Shares to the Managers (or a company designated by the Managers).

4.2    The Shareholders and the Company shall, and the Managers shall procure that the Company shall, on or before Completion, have distributed or otherwise made available to Storm and LBHI any cash, if any, of the Company in a manner as agreed with Storm and LBHI (the "**Excess Cash Distribution**"), the amount of which shall be equal to the amount of the cash held in hand, or in a bank account or with a financial institution at Completion, (other than any Residual Income or proceeds of a sale of any Residual Certificates in excess over EUR 8,000,000), less (i) the Completion Working Capital (as determined in accordance with Clause 4.3 of this Agreement); and (ii) the Rabobank Required Cash Balance at Completion subject to a maximum of EUR 5,800,000. For the avoidance of doubt and solely for the purposes of determining the distribution of the Excess Cash Distribution, Clause 3.3 of the Run-Off Agreement shall apply in relation to any Excess Cash Distribution.

4.3    The amount of working capital that the Company will retain at Completion shall be fixed at EUR 4,000,000 (the "**Completion Working Capital**"), based on:

(i)     EUR 1,500,000 required for general working capital;

(ii)    EUR 1,500,000 required for any claim pursuant to a breach of the representations and warranties under the Mortgage Receivables Purchase Agreements; and

(iii)   EUR 1,000,000 required for any actual and contingent VAT due under the Servicing Contract and the deposit required for the Rental Guarantee.

The amount of the Completion Working Capital shall be adjusted downwards only in the event that the amount referred to in Clause 4.3 (iii) is at a lower level at Completion than on the date hereof anticipated. For the avoidance of doubt, there will be no adjustment of the Completion Working Capital if the amount referred to in Clause 4.3 (iii) is established to be at a higher level at Completion than on the date hereof anticipated. Prior to Completion, Management shall provide Storm and LBHI with evidence confirming the amount referred to in Clause 4.3(iii) as at the date of Completion.

4.4     For the purposes of this Agreement, it is assumed that as at Completion, the Rabobank Required Cash Balance shall be equal to EUR 5,800,000.

     **4.4.1**    If at Completion the Rabobank Required Cash Balance:

         (i)     exceeds EUR 5,800,000, then the amount in excess of EUR 5,800,000 will be for the risk and the account of the Company and not affect Completion occurring, nor the amount of the Excess Cash Distribution;

         (ii)     is below EUR 5,800,000, then the Excess Cash Distribution will be increased with the difference between the Rabobank Required Cash Balance and EUR 5,800,000

For the avoidance of doubt, the Company shall ensure that the Collection Proceeds are applied in accordance with Clause 3.3 of the Run-Off Agreement and shall not at any time be applied to satisfy the Rabobank Required Cash Balance under Clause 4.4 above (if any).

4.5     Every six months after Completion ("**Six Months Interval**") the amount of the Rabobank Required Cash Balance as at such Six Months Interval will be established (the "**Six Months Interval Reviews**").

If and to the extent that the amount of the Rabobank Required Cash Balance at any Six Months Interval is (i) less than the amount of the Rabobank Required Cash Balance at Completion or (ii) lower than the Rabobank Required Cash Balance at any previous Six Months Interval (the amount of such difference form time to time shall be referred to as the "**Rabobank Cash Excess**"), then a further cash distribution in accordance with Clause 3.3 of the Run-Off Agreement shall be made in an amount equal to the Rabobank Cash Excess.

For the avoidance of doubt, there will be no distribution or obligation on the part of Storm and LBHI to repay a part or all of any distribution received under this Clause 4.5 in the event that the amount of the Rabobank Required Cash Balance at any subsequent Six Months Interval is higher than the amount of the Rabobank Required Cash Balance at Completion or any previous Six Months Interval.

The Six Months Interval Reviews will be conducted and further cash distributions will be required to be made in accordance with this Clause 4.5 for a period of two consecutive years after Completion, provided that, if at the expiry of the two year period, the Rabobank Required Cash Balance has not been reduced to zero, the Six Month Interval Reviews will continue to be conducted and further cash distributions will be required to be made in accordance with this Clause 4.5 unless and until Storm, LBHI and the Company agree otherwise.

4.6     The parties agree that in consideration of the releases to be granted by Storm and LBHI and the retention of Completion Working Capital by the Company following Completion, in the event of a change of control of any company in the ELQ Group within 24 months after the date of Completion, through a sale of all or a majority of the Shares or of all or a substantial part of the its assets and/or liabilities or otherwise, the Managers shall notify Storm and LBHI in writing as soon as reasonably practicable of such change of control and pay to Storm and LBHI an amount calculated as follows. Where the consideration for the relevant Shares and/or assets exceeds EUR 1, fifty per cent (50%) of such excess shall be paid by the Managers, within 10 Business Days

after receipt of the consideration, to Storm and LBHI in a ratio of 44% (Storm) :56% (LBHI).

## 5   Completion

5.1   Subject to Clause 5.2, on the tenth Business Day following satisfaction of the Completion Conditions, the transfer of the Shares by the Shareholders to the Managers (or to a company designated by the Managers of which the notary executing the Sale and Transfer Deed has been notified in writing) shall take place by the execution of the Sale and Transfer Deed.

5.2   On Completion the Managers (or a company designated by the Managers) shall pay the Transfer Purchase Price to the Shareholders.

5.3   On Completion, Storm shall deliver the Releases to the Company.

5.4   The Shareholders, the Managers (or a company designated by the Managers) and the Company shall execute and deliver such other documents and take such other steps as may be reasonably required by the Shareholders, the Company and/or the Managers (or a company designated by the Managers), as appropriate, to effect any Excess Cash Distributions and transfer of the Shares to the Managers (or a company designated by the Managers) .

5.5   If the Discharge Conditions Notification has not been served by the Long Stop Date, as the same may have been extended, or the Run-Off Agreement is terminated or rescinded in accordance with its terms, this Agreement shall legally terminate (*van rechtswege beëindigen*).

Following termination of this Agreement, the Shareholders shall have no obligation whatsoever to sell and transfer the Shares, and consequently the Managers (or a company designated by the Managers) shall not be obliged to purchase and accept the Shares, pursuant to the terms of this Agreement.

## 6   Miscellaneous provisions

### 6.1   Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

### 6.2   Amendments

This Agreement can only be amended in writing by a document signed by all parties.

### 6.3   Access Company's records

The Company shall at the reasonable request of any Shareholder, Storm and/or LBHI submit (i) such books, records and/or information that such Shareholder, Storm and/or LBHI in its reasonable opinion requires in the context of the performance of the Run-Off Agreement, the Standstill-Agreements and this Agreement and (ii) the Company shall provide such assistance as any Shareholder, Storm and/or LBHI may reasonably

require in the verification and assessment of such books, records and/or information, including but not limited to the Managers or other senior management being available for meetings and interviews. Clause 6.4 shall apply accordingly to any books, records and information being provided to any Shareholder, Storm and/or LBHI under this Agreement.

6.4    **Confidentiality**

(a)    Subject to this Clause 6.4, each party agrees to keep all information received by it under or in connection with this Agreement confidential and not to disclose it to anyone, save to the extent permitted by paragraph (b) below, and to ensure that such information is protected with security measures and a degree of care that would apply to its own confidential information.

(b)    Disclosure of any information received by a party under or in connection with this Agreement is permitted:

(i)    in order to comply with applicable law or orders given by a court of competent jurisdiction; or

(ii)    to affiliates, officers, directors, employees, professional advisers, auditors, partners, representatives, any rating agencies and any creditor committees, provided that the person to whom the information is to be given is informed in writing of its confidential nature except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the information.

(c)    The duty of confidentiality as set out in this Clause 6.4 shall not apply to (i) information disclosed in the exercise of the statutory duties of the Administrators (including, but not limited to, the creditors' committee) or to the extent required by current insolvency practice or to enable the Administrators properly to carry out the duties of their office or (ii) the disclosure or use required by the bankruptcy proceedings in Lehman Brothers Holdings Inc. et al, Case No 08-13555 (GMP) in the US Bankruptcy Court for the Southern District of New York, including to the United States Trustee or the statutory official committee of unsecured creditors appointed therein.

6.5    **Assignment**

No party may transfer its rights and obligations under this Agreement without the express written consent of all other parties, except that the Managers may designate a newly incorporated company, which is fully owned and controlled by them, to accept and purchase the Shares and/or to accept the rights and obligations under the New Bonus Arrangement, subject to the same rights and obligations that the Managers have as if such company is a Manager. The Managers shall procure that such company accepts the rights and obligations assigned to it and shall perform its obligations accordingly.

6.6    **No rescission**

Other than as provided under Clause 5.5, and to the extent permissible by law, each of the parties hereby waives its right to rescind (*ontbinden*) or terminate (*beëindigen*) this Agreement.

## 7    Governing law and enforcement

### 7.1    Governing law

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by Dutch law which waiver is accepted by all the parties to this Agreement.

### 7.2    Jurisdiction

Save for the Dismissal Arbitration as set out in Clause 2, the competent court at Amsterdam, the Netherlands, has exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement).

## 8    Delay and Waiver

No failure by any party to exercise, and no delay by it in exercising, any right, power or remedy in connection with this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such right preclude any other or further exercise of such right or the exercise of any other right. Any express waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach. No waiver shall be effective unless given in writing by the waiving party.

## 9    Counterparts

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

## 10    Administrators' Liability

The Administrators have entered into and signed this Agreement as agents for and on behalf of Storm, LBH, LBHI and Mable and neither they, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by Storm, LBH, LBHI and Mable; or in respect of any failure on the part of the Storm, LBH, LBHI and Mable to observe, perform or comply with any such obligations; or under or in relation to any associated agreements or negotiations; or under any document (including but not limited to the Sale and Transfer Deed) or assurance made pursuant to this Agreement.

This Agreement has been duly executed on the date stated above.

[signature pages to follow]

**ELQ Hypotheken N.V.**

Signed by Aart Boonzaaijer, Richard Bolton, Charles Sogtoen, Marcel Rasker, each a managing director

**Notice Details**

Address: Haarlerbergweg 21C-23C,

1101 CH Amsterdam Zuidoost,

the Netherlands

Fax: 020-8904011

Attention: Richard Bolton

**ELQ Holding B.V.**

Signed by Aart Boonzaaijer and Richard Bolton, both managing directors

**Notice Details**

Address: Haarlerbergweg 21C-23C,

1101 CH Amsterdam Zuidoost,

the Netherlands

Fax: 020-8904011

Attention: Richard Bolton

**Aart Boonzaaijer**, as a Manager

**Notice Details**

Aart Boonzaaijer
Grootslag 4
3991 RC Houten
the Netherlands
Attention: Aart Boonzaaijer



**Charles Sogtoen**, as a Manager

**Notice Details**

Address:

Charles G.J.F. Sogtoen
Witte Singel 22
2311 BG Leiden
the Netherlands
Attention: Charles Sogtoen

**Marcel Rasker, as a Manager**

**Notice Details**

Address:
Marcel R Rasker
Jozef Israelsplein 13
2102 AL Heemstede
the Netherlands
Attention: Marcel Rasker

**Richard Bolton**, as a Manager

**Notice Details**

Address:
Richard  Bolton
34b Backershagenlaan
2243 AD Wassenaar
the Netherlands

Fax: 0031  705119797
Attention: Richard Bolton

**Storm Funding Limited (in administration)**
Signed by Dan Yoram Schwarzmann for and on behalf of Storm Funding Limited (in administration) acting as agent and without personal liability

**Notice Details**

Address:  Plumtree Court,  EC4A  4HT, London, United Kingdom

Fax: +44 (0) 20 7212 6316

Attention: Dan Schwarzmann

**Charles Sogtoen**, as a Manager

**Notice Details**

Address:

Charles G.J.F. Sogtoen
Witte Singel 22
2311 BG Leiden
the Netherlands
Attention: Charles Sogtoen

}

**Marcel Rasker, as a Manager**

**Notice Details**

Address:
Marcel R Rasker
Jozef Israelsplein 13
2102 AL Heemstede
the Netherlands
Attention: Marcel Rasker

}

**Richard Bolton**, as a Manager

**Notice Details**

Address:
Richard Bolton
34b Backershagenlaan
2243 AD Wassenaar
the Netherlands

Fax: 0031 705119797
Attention: Richard Bolton

}

**Storm Funding Limited (in administration)**
Signed by Dan Yoram Schwarzmann for and on behalf of Storm Funding Limited (in administration) acting as agent and without personal liability

**Notice Details**

Address: Plumtree Court, EC4A 4HT, London, United Kingdom

Fax: +44 (0) 20 7212 6316

Attention: Dan Schwarzmann

}

**Lehman Brothers Holding Inc. UK Branch (subject to Chapter 11 bankruptcy proceedings in the US)**
Signed by Daniel Ehrmann for and on behalf of Lehman Brothers Holding Inc. UK Branch (subject to Chapter 11 bankruptcy proceedings in the US) }

**Notice Details** Daniel Ehrmann

Address:

Alvarez & Marsal

1271 Avenue of the Americas, 45th Floor, New York, New York 10020, United States of America

Fax: +1 212 520 0876


Attention: Daniel Ehrmann

**Notice Details  John Keen**

Address:

10th Floor, One Canada Square, Canary Wharf, London E14 5AA, United Kingdom

Attention: John Keen

 Fax: +44 207 715 5201


**Lehman Brothers Holdings PLC (in administration)**
Signed by Dan Yoram Schwarzmann for and on behalf of Lehman Brothers Holdings PLC (in administration) acting as agent and without personal liability }

**Notice Details**

Address: Plumtree Court, EC4A 4HT, London, United Kingdom

Fax: +44 (0) 20 7212 6316

Attention: Dan Schwarzmann

**Lehman Brothers Holding Inc. UK Branch (subject to Chapter 11 bankruptcy proceedings in the US)**
Signed by Daniel Ehrmann for and on behalf of Lehman Brothers Holding Inc. UK Branch (subject to Chapter 11 bankruptcy proceedings in the US)

**Notice Details** Daniel Ehrmann

Address:

Alvarez & Marsal

1271 Avenue of the Americas, 45th Floor, New York, New York 10020, United States of America

Fax: +1 212 520 0876

Attention: Daniel Ehrmann

**Notice Details  John Keen**

Address:

10th Floor, One Canada Square, Canary Wharf, London E14 5AA, United Kingdom

Attention: John Keen

 Fax: +44 207 715 5201

**Lehman Brothers Holdings PLC (in administration)**
Signed by Dan Yoram Schwarzmann for and on behalf of Lehman Brothers Holdings PLC (in administration) acting as agent and without personal liability

**Notice Details**

Address: Plumtree Court, EC4A 4HT, London, United Kingdom

Fax: +44 (0) 20 7212 6316

Attention: Dan Schwarzmann

Mable Commercial Funding Limited (in administration)
Signed by Dan Yoram Schwarzmann for and on behalf of Mable Commercial Funding Limited (in administration)

Notice Details
Address: Plumtree Court, EC4A 4HT, London, United Kingdom

Fax: +44 (0) 20 7212 6316

Attention: Dan Schwarzmann

## SCHEDULE 1

Draft Sale and Transfer Deed

Dated   2009

ELQ Holding B.V.

and

Lehman Brothers Holdings PLC (in administration)

and

MABLE COMMERCIAL FUNDING LIMITED (in administration)

and

●

and

ELQ Hypotheken N.V.

# DEED OF SALE AND TRANSFER OF SHARES

Linklaters

Linklaters LLP
World Trade Centre Amsterdam
Zuidplein 180
1077 XV Amsterdam

Telephone (+31) 20 799 6200
Facsimile (+31) 20 799 6300

Ref BJK/SK/L-159996

## DEED OF SALE AND TRANSFER OF SHARES
*(ELQ Hypotheken N.V.)*

This ● day of ● two thousand and nine, there appeared before me, Bartholomeus Johannes Kuck, civil law notary in Amsterdam, the Netherlands:

●,

in this respect acting as [attorney-in-fact] of:

(1)   a.   **ELQ Holding B.V.**, a private company with limited liability incorporated under the laws of the Netherlands (*besloten vennootschap met beperkte aansprakelijkheid*), having its official seat (*statutaire zetel*) in Zwanenburg, the Netherlands, and its office at Haarlerbergweg 21C-23C, 1101 CH Amsterdam Zuidoost, the Netherlands, registered with the Dutch Trade Register of the Chambers of Commerce and Industry under number 34211914 ("**ELQ Holding**");

      b.   **Lehman Brothers Holdings PLC** (in administration), a company incorporated under the laws of England and Wales, having its registered office at 25 Bank Street, London E14 5LE, England, registered with the Companies House under number 01854685 ("**LBH**"), acting by its administrators Anthony Victor Lomas, Steven Anthony Pearson, Mike John Andrew Jervis and Dan Yoram Schwarzmann of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT, United Kingdom, acting as agents only and without personal liability (the "**LBH Administrators**"); and

      c.   **Mable Commercial Funding Limited** (in administration), a company incorporated under the laws of England and Wales, having its registered office at 25 Bank Street, London E14 5LE, England, registered with the Companies House under number 02682316 ("**Mable**"), acting by its administrators Anthony Victor Lomas, Steven Anthony Pearson, Mike John Andrew Jervis, Dan Yoram Schwarzmann and Graham Hunter Martin of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT, United Kingdom, acting as agents only and without personal liability (the "**Mable Administrators**" and the LBH Administrators jointly the "**Administrators**"),

      (ELQ Holding, LBH and Mable jointly the "**Sellers**");

(2)   ● **B.V.**, a private company with limited liability incorporated under the laws of the Netherlands (*besloten vennootschap met beperkte aansprakelijkheid*), having its official seat (*statutaire zetel*) in ●, the Netherlands, and its office at ● [*insert address*], ● [*insert postcode and place*], the Netherlands, registered with the Dutch Trade Register of the Chambers of Commerce and Industry under number ● (the "**Purchaser**")[1]; and

---

[1]   Based on the most recent developments we have included a Newco designated by the relevant managers to purchase and accept the Shares.

(3)     **ELQ Hypotheken N.V.**, a public company with limited liability incorporated under the laws of the Netherlands (*naamloze vennootschap*), having its official seat (*statutaire zetel*) in Zwanenburg, the Netherlands, and its office at Haarlerbergweg 21C-23C, 1101 CH Amsterdam Zuidoost, the Netherlands, registered with the Dutch Trade Register of the Chambers of Commerce and Industry under number 34201343 (the "**Company**").

The aforementioned proxies appear from five written powers of attorney attached to this deed (Annexes).

The person appearing declared the following:

**Recitals:**

(A)     Pursuant to a notarial deed of contribution, executed before [a deputy of] J. Borren, civil law notary in Amsterdam, the Netherlands, on [the twenty-fifth day of August two thousand and four], ELQ Holding has been registered in the register of shareholders of the Company as the holder of forty-five thousand (45,000) ordinary shares A in the capital of the Company, numbered A1 through A45,000, with a nominal value of one euro (EUR 1) each (the "**ELQ Holding Shares**") [title document still to be obtained and reviewed].

(B)     Pursuant to the notarial deeds listed under (i) through (viii) below, LBH has been registered in the register of shareholders of the Company as the holder of:

   (i)     thirty-three (33) cumulative preference shares in the capital of the Company, numbered P1 through P33, with a nominal value of one eurocent (EUR 0.01) each, by a notarial deed of issuance of shares, executed before [a deputy of] G.F.O. Dam, civil law notary in Huizen, the Netherlands, on the twenty-sixth day of April two thousand and six [title document still to be obtained and reviewed];

   (ii)    one (1) cumulative preference share in the capital of the Company, numbered P34, with a nominal value of one eurocent (EUR 0.01), by a notarial deed of issuance of one (1) share, executed before [a deputy of] G.F.O. Dam, aforementioned civil law notary, on the ninth day of June two thousand and six [title document still to be obtained and reviewed];

   (iii)   one (1) cumulative preference share in the capital of the Company, numbered P35, with a nominal value of one eurocent (EUR 0.01), by a notarial deed of issuance of one (1) share, executed before [a deputy of] G.F.O. Dam, aforementioned civil law notary, on the twenty-eighth day of June two thousand and six [title document still to be obtained and reviewed];

   (iv)    one (1) cumulative preference share in the capital of the Company, numbered P36, with a nominal value of one eurocent (EUR 0.01), by a notarial deed of issuance of one (1) share, executed before [a deputy of] G.F.O. Dam, aforementioned civil law notary, on the third day of August two thousand and six [title document still to be obtained and reviewed];

   (v)     one (1) cumulative preference share in the capital of the Company, numbered P37, with a nominal value of one eurocent (EUR 0.01), by a

notarial deed of issuance of one (1) share, executed before [a deputy of] M.P. Oortman Gerlings, civil law notary in Huizen, the Netherlands, on the twenty-eighth day of August two thousand and six [title document still to be obtained and reviewed];

(vi)     one (1) cumulative preference share in the capital of the Company, numbered P38, with a nominal value of one eurocent (EUR 0.01), by a notarial deed of issuance of one (1) share, executed before [a deputy of] G.F.O. Dam, aforementioned civil law notary, on the twenty-ninth day of September two thousand and six [title document still to be obtained and reviewed];

(vii)    one (1) cumulative preference share in the capital of the Company, numbered P39, with a nominal value of one eurocent (EUR 0.01), by a notarial deed of issuance of one (1) share, executed before [a deputy of] G.F.O. Dam, aforementioned civil law notary, on the ninth day of November two thousand and six [title document still to be obtained and reviewed]; and

(viii)   one (1) cumulative preference share in the capital of the Company, numbered P40, with a nominal value of one eurocent (EUR 0.01), by a notarial deed of issuance of one (1) share, executed before [a deputy of] G.F.O. Dam, aforementioned civil law notary, on the twenty-ninth day of November two thousand and six [title document still to be obtained and reviewed].

The aforementioned cumulative preference shares mentioned under (i) through (viii) were converted by a notarial deed of amendment to the articles of association, executed before dr. T.P. van Duuren, civil law notary in Amsterdam, the Netherlands, on the fourteenth day of March two thousand and eight, from forty (40) aforementioned cumulative preference shares into forty (40) cumulative preference A shares, numbered PA1 through PA40, with a nominal value of one eurocent (EUR 0.01) each (the "**LBH Shares**").

(C)     Pursuant to a notarial deed of issuance of one (1) share in the capital of the Company, executed before dr. T.P. van Duuren, aforementioned civil law notary, on the twenty-eighth day of March two thousand and eight, Mable has been registered in the register of shareholders of the Company as the holder of one cumulative preference B share in the capital of the Company, numbered PB1, with a nominal value of one euro (EUR 1) (the "**Mable Share**" and the ELQ Holding Shares and the LBH Shares jointly the "**Shares**").

(D)     On the ● day of ● two thousand and nine *inter alia* the Sellers and the Managers (as defined in the Conditional Share Transfer Agreement (as defined below)) entered into an agreement (the "**Conditional Share Transfer Agreement**") regarding the intended sale and transfer of the Shares. A copy of the Conditional Share Transfer Agreement (without Annexes) has been attached to this deed (<u>Annex</u>).

(E)     In implementation of the Conditional Share Transfer Agreement, the Sellers and the Purchaser have reached agreement on the sale and transfer of the entire issued share capital of the Company, as follows:

- ELQ Holding shall sell and transfer the ELQ Holding Shares to the Purchaser;
- LBH shall sell and transfer the LBH Shares to the Purchaser; and
- Mable shall sell and transfer the Mable Share to the Purchaser,

on the terms set out below.

**Now therefore, the Sellers, the Purchaser and (for the purpose of articles 4 and 6) the Company have agreed as follows:**

**1       Purchase and sale; transfer**

1.1     ELQ Holding hereby sells and transfer the ELQ Holding Shares to the Purchaser and the Purchaser hereby purchases and accepts the same from ELQ Holding.

1.2     LBH hereby sells and transfer the LBH Shares to the Purchaser and the Purchaser hereby purchases and accepts the same from LBH.

1.3     Mable hereby sells and transfer the Mable Share to the Purchaser and the Purchaser hereby purchases and accepts the same from Mable.

1.4     The share transfer restrictions (also referred to as the 'blocking clause') provided for in article 9 of the Company's articles of association (containing a prior approval system (*goedkeuringsregeling*) do not apply as each of the Sellers (acting in their capacity as all of the shareholders of the Company) hereby renounce the compliance with the share transfer restrictions, such in accordance with article 9.20 of the Company's articles of association.

1.5     Section 2:204c of the Dutch Civil Code does not apply to the transfer in question.

**2       Purchase price**

The Purchaser has paid the Transfer Purchase Price (as defined in the Conditional Share Transfer Agreement) and each of ELQ Holding, LBH and Mable gives full discharge for the payment made.

**3       Dissolution (*ontbinding*) and nullification (*vernietiging*)**

The Sellers and the Purchaser waive the right to dissolve or nullify the agreement laid down in this deed or to demand dissolution or nullification thereof.

**4       Civil law notary**

The civil law notary who executes this deed is a civil law notary holding office with Linklaters LLP, the Sellers' and the Company's legal adviser. The Sellers, the Purchaser and the Company hereby acknowledge that they have been informed of the existence of the Ordinance Containing Rules of Professional Conduct and Ethics (*Verordening beroeps- en gedragsregels*) of the Royal Professional Organisation of Civil Law Notaries (*Koninklijke Notariële Beroepsorganisatie*) and explicitly agree and acknowledge (i) that Linklaters LLP may advise and act on behalf of the Sellers and the Company with respect to this deed, and any agreements or any disputes related to or resulting from this deed, and (ii) that the civil law notary holding office with Linklaters LLP executes this deed.

**5       Governing law and jurisdiction**

5.1     Clauses 7.1 and 7.2 of the Conditional Share Transfer Agreement shall apply *mutatis mutandis*.

5.2     If a party to this deed is represented by (an) attorney(s) in connection with the execution of this deed or any agreement or document pursuant to this deed,

and the relevant power of attorney is expressed to be governed by the laws of the Netherlands, such choice of law is hereby accepted by the other party, in accordance with Article 14 of the Hague Convention on the Law Applicable to Agency of the fourteenth day of March nineteen hundred seventy-eight.

**6       Miscellaneous**

6.1      It is hereby expressly agreed between the parties to this deed that the Shares are being sold and transferred with all the rights and obligations attached and accrued thereto at the date of this deed on an "as is, where is" basis and subject to all faults, liens, executions, distraints, encumbrances and claims of third parties, if any, of which the expense of discharging shall be met by the Managers (as defined in the Conditional Share Transfer Agreement). Neither the Sellers, nor the Administrators give any representations, warranties or other assurances of any kind with respect to the rights and obligations attached and accrued to the Shares and Section 7:17 of the Dutch Civil Code does not apply to the sale and transfer in question:

6.2      Unless otherwise required by the laws of the Netherlands (and then only to that extent), the Sellers and the Administrators shall not be liable for any loss or damage of any kind whatsoever, consequential or otherwise, arising out of, or due to, or caused by or pursuant to any defects or deficiencies in any of the Shares.

**Finally, the Company has declared:**

The Company hereby acknowledges the transfer of the Shares effected by this deed, shall register the same in its register of shareholders and shall forthwith report its sole shareholder for registration in the Dutch Trade Register of the Chambers of Commerce and Industry.

**Close**

The person appearing is known to me, civil law notary.

This deed was executed in Amsterdam, the Netherlands, on the date first above written. Before reading out, a concise summary and an explanation of the contents of this deed were given to the person appearing. The person appearing then declared that [he] / [she] had taken note of and agreed to the contents of this deed and did not want the complete deed to be read to [him] / [her]. Thereupon, after limited reading, this deed was signed by the person appearing and by me, civil law notary.