Jeff J. Friedman
Merritt A. Pardini
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for the Board of Education of the City of Chicago*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| Debtors. | : | Jointly Administered |

------------------------------------------------------------------x

| | | |
|---|---|---|
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | : | |
| Plaintiff, | : | Adv. Proc. No. 09-_____ (JMP) |
| v. | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : | |
| Defendant. | : | |

------------------------------------------------------------------x

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Board of Education of the City of Chicago (the "School Board"), by and through its undersigned counsel, hereby brings this Complaint for Declaratory Judgment against defendant Lehman Brothers Special Financing Inc. ("LBSF") to determine the respective rights of the School Board and LBSF under a Swap Agreement (as defined below) and title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and alleges as follows:

**PRELIMINARY STATEMENT**

1. The School Board initiates this adversary proceeding to prevent LBSF from assuming and assigning the Swap Agreement in contravention of section 365 of the Bankruptcy Code and applicable non-bankruptcy law. As a result of certain material prepetition defaults (as described below, the "Events of Default"), LBSF cannot assume or assign the Swap Agreement. Further, even though LBSF has not performed its post-petition obligations under the Swap Agreement, LBSF has demanded that the School Board, *the non-defaulting party*, pay approximately $1.2 million in so-called "Cure Amounts" that are not owed by the School Board under the Swap Agreement. Even if, as described below, the inability to cure certain Events of Default were not fatal to LBSF's ability to assume or assign the Swap Agreement, the payments demanded by LBSF are not due and owing under the Swap Agreement and will not be due upon any assumption and assignment of the Swap Agreement pursuant to section 365 of the Bankruptcy Code.

2. The Events of Default relate primarily to the credit and financial condition of Lehman Brothers Holdings Inc. ("Holdings"), the guarantor with respect to the Swap Agreement and the parent corporation of LBSF. Holdings filed for relief under the Bankruptcy Code on September 15, 2008. As a credit support provider under the Swap Agreement, the financial condition of Holdings is a material and essential part of the Swap Agreement. Without LBSF's inducement to the School Board of Holdings' credit support, the School Board would not have entered into the Swap Agreement with LBSF.

3. More importantly, the Events of Default are enforceable under the Bankruptcy Code. These defaults occurred weeks *before* the commencement of LBSF's bankruptcy case, and they are therefore not *ipso facto* clauses under section 365(e)(1) of the Bankruptcy Code. Requiring the School Board to pay the Cure Amounts would result in an inequitable and unfair

windfall to LBSF – a debtor-in-possession that was in default pre-petition and made no attempt to satisfy its postpetition obligations under the Swap Agreement.

4. Further, the Events of Default prevent LBSF from assuming or assigning the Swap Agreement over the objection of the School Board. Section 365 of the Bankruptcy Code requires that LBSF cure all material nonmonetary defaults, including the Events of Default, as a condition to assumption and assignment. The cure requirement is an obligation of LBSF; it is not an obligation of non-defaulting counterparties like the School Board. Here, the Events of Default – Holdings' bankruptcy filing and insolvency – are material nonmonetary defaults that are incapable of being cured under the Bankruptcy Code. Consequently, LBSF cannot assume and assign the Swap Agreement under the Bankruptcy Code without the consent of LBSF.[1]

5. Even assuming, *arguendo*, that the Swap Agreement could be properly assumed and assigned in the face of the incurable Events of Default, no authority under the Bankruptcy Code suggests that assumption by LBSF reinstates the School Board's payment obligations under the Swap Agreement. LBSF had the wherewithal to make the monthly payments required of it under the Swap Agreement during the postpetition period and chose not to do so. LBSF cannot now demand the benefits of the Swap Agreement for the period in which it chose not to bear the burdens.

6. Consequently, the payments demanded by LBSF are not due and owing to LBSF under the Swap Agreement, and the School Board should not be required to make the payments even if assumption and assignment is permitted in the face of the Holdings related Events of Default. LBSF's attempt to ignore the standards governing assumption and assignment of

---

[1] Notwithstanding the School Board's right to prevent the assumption or assignment of the Swap Agreement, the School Board would be willing to waive its rights and consent to the assignment of the Swap Agreement to a suitable third party, but will not do so if a condition is the payment by the School Board of amounts payable under the Swap Agreement at a time when LBSF was not performing and was not providing LBSF with the interest rate hedge it bargained for.

3

executory contracts under the Bankruptcy Code, solely under the guise of a procedural order dealing with the assignment of derivatives, should not be permitted as a matter of law.

7. Accordingly, the School Board seeks declaratory relief in this Court to determine the rights of the parties under the Swap Agreement as a matter of law and to fully and finally resolve the ongoing dispute between the School Board and LBSF.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2).

9. The predicates for the relief requested herein are 28 U.S.C. § 2201 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## THE PARTIES

10. LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 46th Floor, New York, NY 10020.

11. The School Board is a body politic and corporate created pursuant to section 34-2 of the Illinois School Code, 105 ILCS 5/1–34A, with its principal business address at 125 South Clark Street, Chicago, Illinois 60603.

## BACKGROUND

**I.** **The Swap Agreement**

12. In connection with the issuance of certain variable rate bonds, the School Board sought to enter into an interest rate swap agreement with LBSF. Through a swap agreement, the School Board intended to hedge its exposure to variable interest rate risks and control the cost of borrowing on the bond issue.

13. Accordingly, on December 3, 2003, the School Board and LBSF entered into an International Swap Dealers Association, Inc. Master Agreement (together with the Schedule thereto and the Guarantee and Credit Support Annex to such Schedule, the "Master Agreement"). The Master Agreement provides the terms of the parties' contractual relationship and governs the transactions at issue here. The terms and conditions of the transactions are evidenced by certain confirmations exchanged between the parties that are incorporated into the Master Agreement.

14. LBSF and the School Board executed a "Confirmation" (appended to and together with the Master Agreement, the "Swap Agreement") on December 8, 2003. A copy of the Swap Agreement is attached hereto as Exhibit 1.

### A. The Payment Obligations Under the Swap Agreement

15. Pursuant to the Confirmation, the School Board agreed to make payments to LBSF of a fixed rate of interest (3.771%) on the notional amount ($95,350,000) semiannually on the first business day of each March and September until the Swap Agreement is terminated. (*See* Confirmation at 2.) LBSF, on the other hand, agreed to make monthly payments to the School Board at the floating rate (70% of USD-LIBOR-BBA) on the first business day of each month until the Swap Agreement is terminated. *Id.*

16. These payment obligations are referenced in section 2(a)(i) of the Swap Agreement, which provides "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement." (Swap Agreement, § 2(a)(i).)

17. Each payment obligation is expressly subject to the condition precedent that no "Event of Default" has occurred and is continuing under the Swap Agreement. (*See* Swap Agreement, § 2(a)(iii), *as amended* at 23.)

18. Specifically, section 2(a)(iii) of the Swap Agreement provides:

> Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default, Potential Event of Default or Incipient Illegality with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated, and (3) each other applicable condition precedent specified in this Agreement.

(*Id.*)

19. Therefore, if an Event of Default has occurred and is continuing, then the non-defaulting party has no obligation to make a payment under section 2(a)(i) of the Swap Agreement. (*See id.*)

### B. The Relevant Events of Default Under the Swap Agreement

20. Section 5(a) of the Swap Agreement sets forth the events that constitute an "Event of Default" under the Swap Agreement with respect to a party, any "Credit Support Provider" of such party and any "Specified Entity" of such party. (*See* Swap Agreement, § 5(a).)

21. Holdings is defined as the Specified Entity and Credit Support Provider in relation to LBSF for purposes of section 5(a). (*See* Swap Agreement at 15, 21.)

22. Under section 5(a), an Event of Default occurs under the Swap Agreement if, among other things, any Specified Entity or Credit Support Provider: (i) fails to pay its debts as they become due; (ii) institutes a bankruptcy proceeding that results in the entry of an order for relief; or (iii) takes any action in furtherance or approval of the foregoing acts. (*See* Swap Agreement, § 5(a)(vii)(1), (4) & (9).)

23. Each of these Events of Default is a material and essential part of the Swap Agreement. The School Board would not have entered into the Swap Agreement without Holdings being named as the Credit Support Provider or Specified Entity and without the Events of Default relating to Holdings.

6

## II. The Parties' Performance Under the Swap Agreement

24. The parties performed their respective obligations under the Swap Agreement from December 3, 2003, when the agreement was entered, up to and including September 1, 2008. On September 1, 2008, the School Board made its semiannual scheduled payment due to LBSF of approximately $1,656,061.68.

25. On or before October 3, 2008 (the date on which LBSF filed a petition for relief under the Bankruptcy Code), Holdings, the Specified Entity and Credit Support Provider under the Swap Agreement, failed to pay its debts as they became due.

26. On September 14, 2008, the Board of Directors of Holdings approved resolutions to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (*See* Docket No. 1, Case No. 08-13555, Certificate of Resolutions).

27. On September 15, 2008, Holdings filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (*See* Docket No. 1, Case No. 08-13555). The filing of the voluntary petition constituted the entry for an order for relief under the Bankruptcy Code. *See* 11 U.S.C. § 301.

28. Each of Holdings' (i) failure to pay its debts as they became due; (ii) Board of Directors' approval of its bankruptcy filing; and (iii) voluntary bankruptcy filing constituted an Event of Default pursuant to section 5(a) of the Swap Agreement at the time such event occurred. (*See* Swap Agreement, § 5(a)(vii)(1), (4) & (9).) Each of the Events of Defaults were material defaults under the Swap Agreement.

29. On October 1, 2008, prior to its own bankruptcy filing, LBSF failed to make its scheduled monthly payment of approximately $155,755.81 due to the School Board under section 2(a)(i) of the Swap Agreement. LBSF's failure to make this payment when due on

7

October 1, 2008 constituted a Potential Event of Default[2] under the Swap Agreement. (*See* Swap Agreement, § 5(a)(i).)

30. From October 1, 2008 until the date hereof, LBSF has made none of the monthly payments due to the School Board under the Swap Agreement.

### III. LBSF's Bankruptcy Filing and the Debtors' Chapter 11 Cases

31. On October 3, 2008, LBSF filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code. (*See* Docket No. 1, Case No. 08-13888.)

32. The chapter 11 cases of LBSF, Holdings and their affiliated debtors (collectively, the "Debtors") have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

33. On September 17, 2008, the Office of the United States Trustee appointed the statutory committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

34. The Court has entered two orders establishing procedures related to the assumption and assignment of derivative contracts such as the Swap Agreement. On December 16, 2008, the Court entered the *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts* [Docket No. 2257] (the "Nonconsensual Assignment Order"). On January 28, 2009, the Court entered the *Order Approving Consensual Assumption and Assignment of Prepetition Derivative Contracts* [Docket No. 2667] (the "Consensual Assignment

---

[2] The failure to make a payment due under section 2(a)(i) of the Swap Agreement is an Event of Default if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party. (See Swap Agreement, § 5(a)(i).) The failure to make the payment constitutes a "Potential Event of Default" as that

8

Order"). These orders are procedural in nature and do not affect the substantive rights of the parties under the Swap Agreement or the Bankruptcy Code.

35. Pursuant to the Consensual Assignment Order, representatives of LBSF and the School Board engaged in negotiations to effect a consensual novation of the Swap Agreement. Under the proposed novation, LBSF would transfer all of its rights, liabilities, duties and obligations to a third party who would enter into a new swap agreement with the School Board on terms different from the Swap Agreement.

36. In connection with those negotiations, LBSF and the Committee demanded that the School Board make all scheduled payments to LBSF notwithstanding the continuing Events of Default and the Debtors' inability to cure them. The School Board refused to make the demanded payments as it had not been receiving any of the monthly payments required of LBSF and various Events of Default had occurred and were continuing under the Swap Agreement.

37. The negotiations over the consensual novation abruptly ended upon delivery of an Assignment Notice (the "Assignment Notice") from LBSF and Holdings to the School Board on June 30, 2009. A copy of the Assignment Notice is attached hereto as Exhibit 2.

38. LBSF alleges in the Assignment Notice that the School Board must make all scheduled payments to LBSF totaling $1,127,996.31 (the "Cure Amounts") as a result of LBSF's attempt to assume and assign the Swap Agreement. (*See* Assignment Notice at Annex D.)

39. The School Board timely delivered its objection to the Assignment Notice to counsel for the Debtors and the Committee pursuant to the Nonconsensual Assignment Order.

40. The parties have been unable to consensually resolve their dispute, and, accordingly, the School Board seeks a declaration that LBSF cannot assume or assign the Swap Agreement without the School Board's consent and that, in light of LBSF's failure to perform

---

term is defined to mean "any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default." (Swap Agreement at 12.)

and other breaches of the Swap Agreement, the School Board has no obligation to make the proposed Cure Amounts under any circumstances.

41. Based on the foregoing, there now exists an actual, justiciable controversy between the School Board and LBSF relating to their respective legal rights, duties and obligations under the Swap Agreement and the Bankruptcy Code, which controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

## COUNT I
### (Declaratory Judgment that the Events of Default are Enforceable Under the Swap Agreement between LBSF and the School Board)

42. The School Board repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

43. As alleged above, Holdings' (i) failure to pay its debts as they became due; (ii) Board of Directors' approval of its bankruptcy filing; and (iii) voluntary bankruptcy filing, each constituted an Event of Default pursuant to section 5(a) of the Swap Agreement between the School Board and LBSF at the time such event occurred and prior to the bankruptcy filing by LBSF. (*See* Swap Agreement, § 5(a)(vii)(1), (4) & (9).) As a result of each Event of Default, the School Board has no obligation to make payments under section 2(a)(i) of the Swap Agreement, including the Cure Amounts demanded by LBSF. (*See* Swap Agreement, § 2(a)(iii).)

44. Pursuant to section 2(a)(iii) of the Swap Agreement, a condition precedent to the School Board's obligation to make any payment under section (2)(a)(i) is that no Event of Default has occurred and is continuing. (*See id*.) A condition precedent is an act which one party to a contract must perform before the other party's obligation under the Swap Agreement begins; the payment obligations under the Swap Agreement are neither enforceable nor effective until the condition is performed or the contingency occurs. Because an Event of Default had occurred and is continuing, the School Board had and has no obligation to make any payment to LBSF under the Swap Agreement, including, without limitation, the proposed Cure Amounts.

10

45. LBSF contends that the School Board cannot rely on the Events of Default involving Holdings to discontinue its performance because they constitute unenforceable *ipso facto* clauses under section 365(e) of the Bankruptcy Code.

46. LBSF's argument is without merit for two reasons. First, the Events of Default occurred weeks *before* the commencement of LBSF's bankruptcy case and therefore section 365(e) is inapplicable. Second, the financial condition and/or bankruptcy filing of a third party, Holdings, is not an *ipso facto* clause <u>as applied to LBSF</u>.

47. Section 365(e) of the Bankruptcy Code provides in relevant part:

> (1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, *<u>at any time **after** the commencement of the case</u>* solely because of a provision in such contract or lease that is conditioned on—
> (A) the insolvency or financial condition of the *debtor* at any time before the closing of the case;
> (B) the commencement of a case under this title; or
> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e) (emphasis added).

48. By its clear terms, section 365(e)(1) of the Bankruptcy Code only applies if a right or obligation under an executory contract is modified "at any time after the commencement of the case." *Id*. Here, LBSF's rights under the Swap Agreement were modified beginning on September 14, 2008, weeks before LBSF commenced its bankruptcy case on October 3, 2008.

49. Further, section 365(e) of the Bankruptcy Code makes provisions conditioned on the "financial condition *<u>of the debtor</u>*" unenforceable. 11 U.S.C. § 365(e) (emphasis added). However, the Events of Default under the Swap Agreement are based on, among other things, the financial condition of Holdings, not the debtor LBSF who is the School Board's counterparty to the Swap Agreement. Thus, section 365(e) of the Bankruptcy Code is inapplicable.

11

50. By the time LBSF commenced its bankruptcy, the Events of Default had already occurred and were continuing under the Swap Agreement. From at least September 14, 2008 onwards, the School Board had no obligation to make any payment to LBSF under the Swap Agreement. (*See* Swap Agreement, § 2(a)(iii).)

51. The School Board thus requests a judgment declaring the rights and obligations of the parties under the Swap Agreement and the Bankruptcy Code, including a declaration that the Events of Default are material and enforceable against LBSF and permanently excuses the School Board's obligations to make payments to LBSF in respect of the Swap Agreement.

## COUNT II
**(Declaratory Judgment that the Swap Agreement Cannot be Assumed or Assigned Because LBSF is Incapable of Curing the Events of Default Relating to Holdings)**

52. The School Board repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

53. Section 365(d)(2) of the Bankruptcy Code authorizes a debtor in possession to assume or reject an executory contract, subject to court approval, at any time before the confirmation of a chapter 11 plan.

54. When there has been a default under an executory contract, a debtor in possession must comply with three requirements before a contract can be assumed. It must: (i) cure any outstanding default or provide adequate assurance that the default will be promptly cured; (ii) compensate counterparties to the contract for any pecuniary loss or provide adequate assurance of compensation; and (iii) provide adequate assurance of future performance under the contract. *See* 11 U.S.C. § 365(b)(1)(A)-(C).

55. As amended in 2005, section 365(b)(1)(A) of the Bankruptcy Code provides a limited exception to the requirement that nonmonetary defaults be cured, in that a debtor is not required to cure a default "arising from any failure to perform nonmonetary obligations under an *unexpired lease of real property*." 11 U.S.C. § 365(b)(1)(A) (emphasis added).

12

56. The Swap Agreement is not an unexpired lease of real property, and each of the Events of Default are material nonmonetary obligations under the Swap Agreement.

57. As section 365 requires that LBSF cure the Events of Default as a prerequisite to assumption and assignment of the Swap Agreement under the Bankruptcy Code and the defaults relating to Holdings bankruptcy filing and financial condition are incurable and not within the *ipso facto* exceptions contained in section 365(b)(2) of the Bankruptcy Code which relate only to LBSF, the Swap Agreement cannot be assumed or assigned absent the consent of the School Board.

58. The School Board requests a declaration that LBSF cannot cure the Events of Default relating to Holdings bankruptcy filing and financial condition and, accordingly, cannot assume or assign the Swap Agreement.

### COUNT III
**(Declaratory Judgment that Even if Assumption and Assignment of the Swap Agreement is Possible, the School Board is Not Obligated to Pay the Cure Amount)**

59. The School Board repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

60. As noted, LBSF must cure even the nonmonetary Events of Default before the Swap Agreement may be assumed and assigned under the Bankruptcy Code. Even assuming, *arguendo*, that LBSF is not required to cure the Events of Default relating to Holdings bankruptcy and financial condition as a prerequisite to assumption or assignment, LBSF's failure to perform its obligations under the Swap Agreement during the prepetition and postpetition period, including, without limitation, the payment of monthly amounts due to the School Board, permanently excuses the School Board's performance during such period, including the School Board's payment of the Cure Amount.

61. The School Board thus requests a judgment declaring the rights and obligations of the parties under the Swap Agreement and the Bankruptcy Code, including a declaration that the

School Board has no obligation to make any payments under the Swap Agreement, including the proposed Cure Amounts demanded by LBSF, with respect to the time that LBSF failed to perform its obligations under the Swap Agreement.

## PRAYER FOR RELIEF

WHEREFORE, the School Board respectfully requests judgment as follows:

A. On Count I, declaring that the Events of Default are material and enforceable against LBSF and permanently excuses the School Board's obligations to make payments to LBSF in respect of the Swap Agreement;

B. On Count II, declaring that (i) section 365 of the Bankruptcy Code requires that LBSF cure the Events of Default, including the nonmonetary Events of Default, before the Swap Agreement may be assumed or assigned by LBSF; (ii) LBSF cannot cure the Events of Default relating to Holdings' bankruptcy filing and financial condition; and (iii) accordingly, LBSF cannot assume or assign the Swap Agreement;

C. On Count III, declaring that the School Board has no obligation to make any payments under the Swap Agreement, including the proposed Cure Amounts demanded by LBSF, with respect to the time period that LBSF failed to perform its obligations under the Swap Agreement; and

D.  For such other and further relief as the Court deems just as proper, including costs and attorneys' fees.

Dated: August 27, 2009  
New York, New York

Respectfully submitted,

By: ___/s/ Jeff J. Friedman_____  
Jeff J. Friedman  
Merritt A. Pardini  
KATTEN MUCHIN ROSENMAN LLP  
575 Madison Avenue  
New York, New York 10022-2585  
Telephone: (212) 940-8800  
Facsimile: (212) 940-8776

*Attorneys for the Board of Education of the City of Chicago*