# EXHIBIT 1

## SWAP AGREEMENT

(Local Currency—Single Jurisdiction)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

Dated as of December 3, 2003

**LEHMAN BROTHERS SPECIAL FINANCING INC.**  and  **BOARD OF EDUCATION OF THE CITY OF CHICAGO**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    *Basic Representations.*

    (i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

ISDA® 1992

(iv)  *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)  *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)  *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)  *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)  *Furnish Specified Information.* It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)  *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5.    Events of Default and Termination Events

(a)  *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)  *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)  *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)) to be complied with or performed by the party in accordance with this Agreement if

such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its

4                                                              ISDA® 1992

winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below: —

(i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

5                                              ISDA® 1992

(iii) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Two Affected Parties.* If an Illegality under section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate.* If:—

(1) an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

ISDA® 1992

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative

**ISDA® 1992**

number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.*  If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4). if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.*    In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.*  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

ISDA® 1992

**8.    Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**9.    Expenses**

A. Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**10.    Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated: —

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

ISDA® 1992

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**11.    Governing Law and Jurisdiction**

(a)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.*    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**12.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means: —

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain

resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under

this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined

**ISDA® 1992**

by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL
FINANCING INC.**

By: _T. Courtney Jenkins_
  Name:   T. Courtney Jenkins
  Title:     Vice President
  Date:    December 3, 2003

**BOARD OF EDUCATION OF THE CITY OF
CHICAGO**

By: _____
  Name:
  Title:
  Date:

14

**SCHEDULE**

to the

**ISDA Master Agreement**

dated as of December 3, 2003

between

Lehman Brothers Special Financing Inc. ("Party A"),

a corporation organized under the laws of the State of Delaware,

and

Board of Education of the City of Chicago ("Party B"),

a school district organized under the laws of the State of Illinois.

**Part 1**
**Termination Provisions**

(a)     "Specified Entity" means in relation to Party A for the purpose of:

| | | |
|---|---|---|
| Section 5(a)(v) (Default under Specified Transaction) | : | Lehman Brothers Holdings Inc. ("Holdings"). |
| Section 5(a)(vi) (Cross Default) | : | Holdings. |
| Section 5(a)(vii) (Bankruptcy) | : | Holdings. |
| Section 5(b)(ii) (Credit Event Upon Merger) | : | Holdings. |

and in relation to Party B for the purpose of:

| | | |
|---|---|---|
| Section 5(a)(v) (Default under Specified Transaction) | : | None. |
| Section 5(a)(vi) (Cross Default) | : | None. |
| Section 5(a)(vii) (Bankruptcy) | : | None. |
| Section 5(b)(ii) (Credit Event Upon Merger) | : | None. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 12 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and to Party B. Section 5(a)(vi) is hereby amended by deleting in the seventh line thereof the words ", or becoming capable at such time of being declared,".

**"Specified Indebtedness"** will have the meaning specified in Section 12 of this Agreement.

**"Threshold Amount"** means:

(i)     with respect to the Specified Indebtedness of Party A or any applicable Specified Entity of Party A, an amount equal to 2% of Stockholders' Equity as of the end of its most recently completed fiscal year, but in no event less than $100,000,000 (or its equivalent in any currency).

15

        (ii)    with respect to the Specified Indebtedness of Party B, an amount equal to $100,000,000 (or its equivalent in any currency).

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(ii) will apply to Party A and to Party B.

        For purposes of such provisions, **"materially weaker"** shall mean that (i) the Credit Rating of the resulting, surviving or transferee entity is lower than the Credit Rating of the applicable party immediately prior to the Credit Event Upon Merger, and in any event not lower than the Credit Ratings set forth in Part 1(g)(ii)(A) or (B), as applicable, or (ii) the long-term unsecured, unenhanced debt of the resulting, surviving or transferee entity is not rated by Moody's or S&P.

(e)     The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A or to Party B.

(f)     **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Market Quotation and Second Method will apply, provided that, notwithstanding anything in this Agreement to the contrary, upon the occurrence of an Event of Default or a Termination Event with respect to which there is only one Affected Party (excluding for this purpose a Voluntary Termination pursuant to Part 1(g)(i)), the Non-defaulting Party or the non-Affected Party, as the case may be, shall have the right to either:

        (i)    designate an Early Termination Date pursuant to Section 6(a) or 6(b), as applicable, calculate the Settlement Amount and, subject to Part 4(d) of this Schedule, accept the Settlement Amount and pay such amount to, or demand payment of such amount from, the Defaulting Party or the Affected Party, as applicable; or

        (ii)    require the Defaulting Party or Affected Party to assign, at the cost of such party, its rights and obligations under this Agreement or the Affected Transactions, as applicable, to one of the Reference Market-makers which provided a Market Quotation used to determine the Settlement Amount, provided that (A) such Reference Market-maker has a Credit Rating equal to or higher than A- in the case of S&P and A3 in the case of Moody's, and is otherwise reasonably acceptable to the Non-defaulting Party or non-Affected Party, (B) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker, (C) such assignment is pursuant to documentation that is reasonably acceptable to the Non-defaulting Party or non-Affected Party, (D) the Non-defaulting Party or non-Affected Party receives such opinions and assurances as it reasonably requests in connection with such assignment, and (E) the Defaulting Party or Affected Party shall pay to the Non-defaulting Party or non-Affected Party any incidental costs and expenses incurred by the Non-defaulting Party or non-Affected Party in connection with such assignment and the enforcement of its rights hereunder.

Party A and Party B hereby acknowledge and agree that Party A and Party B shall have the right to consent (which consent shall not be unreasonably withheld) to the Reference Market-makers providing quotations used to determine a Market Quotation.

(g)    **Additional Termination Event** will apply.   Each of the following shall constitute an Additional Termination Event:

(i)    Party B provides written notice to Party A of its desire to cause the voluntary termination of one or more Transactions (or a portion of one or more Transactions) hereunder (a **"Voluntary Termination"**) at least five (5) Business Days, and no more than thirty (30) Business Days, prior to the date designated in such notice by Party B (the **"Voluntary Termination Date"**).   Section 6(b) shall not apply with respect to a Voluntary Termination, and the Voluntary Termination Date shall constitute an Early Termination Date for the purposes of the applicable provisions of this Agreement.   If Party B designates a Voluntary Termination Date, Party B shall be the Affected Party and, notwithstanding anything in this Agreement to the contrary, the Transactions (or portions thereof) designated by Party B shall be the sole Affected Transactions.     Following a Voluntary Termination with respect to a portion of a Transaction, the portion of such Transaction not terminated shall constitute a Transaction for purposes of this Agreement, and the parties shall amend any of the documents which constitute this Agreement as may be necessary or appropriate to accurately reflect the terms of such Transaction.

(ii)     (A)    With respect to Party A, Holding's Credit Rating is withdrawn or reduced below "A-" in the case of S&P or "A3" in the case of Moody's.   In such event, the Affected Party shall be Party A.

(B)    With respect to Party B, the credit rating of Party B's unenhanced, unlimited tax general obligation bonds is withdrawn or reduced by any two of Fitch, S&P and Moody's, below "BBB" in the case of Fitch, "BBB" in the case of S&P and "Baa2" in the case of Moody's.   In such event, the Affected Party shall be Party B.

(h)    **Events of Default.**

(i)    *Bankruptcy.*   Clause (6) of Section 5(a)(vii) of this Agreement is hereby amended to read in its entirety as follows:

"(6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) in the case of the Government Entity, (I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it, or (II) there shall be declared by it, or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state

17

of financial emergency or similar state of financial distress in respect of it;".

(ii)    ***Merger Without Assumption.***    Section 5(a)(viii) of this Agreement is hereby amended to read in its entirety as follows:

"(viii) ***Merger Without Assumption.***    The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if such party is the Government Entity, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, such party) and, at the time of such consolidation, amalgamation, merger, transfer or succession:

(1) the resulting, surviving, transferee or successor entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving, transferee or successor entity of its obligations under this Agreement."

(i)    ***Termination Events.***    Section 5(b)(ii) of this Agreement is hereby amended to read in its entirety as follows:

"(ii) ***Credit Event Upon Merger.***    If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X") or any Credit Support Provider of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if X is the Government Entity, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, X) and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving, transferee or successor entity is materially weaker than that of X), or such Credit Support Provider, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or".

18

**Part 2**
**Agreement to Deliver Documents**

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Certified copies of all documents evidencing necessary corporate and other authorizations and approvals with respect to the execution, delivery and performance by it of this Agreement, any relevant Credit Support Document and any Confirmation, including, where applicable, certified copies of the resolutions of its Board of Directors or equivalent governing body authorizing the execution and delivery of this Agreement, any relevant Credit Support Document and any Confirmation. | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |
| Party A and Party B | A certificate of an authorized officer of the party and any Credit Support Provider as to the incumbency and authority of the officers of the party and any Credit Support Provider signing this Agreement, any | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |

|  |  |  |  |
|---|---|---|---|
|  | Credit Support Document or any Confirmation. |  |  |
| Party A | A written opinion of legal counsel to Party A and its Credit Support Provider, substantially in the form annexed hereto as Exhibit B. | Upon execution of this Agreement. | No |
| Party B | A written opinion of legal counsel to Party B, satisfactory in form and substance to Party A. | Upon execution of this Agreement. | No |
| Party A and Party B | Annual audited financial statements of the party or, with respect to Party A, Holdings, certified by independent certified public accountants and prepared in accordance with U.S. generally accepted accounting standards, consistently applied. | Upon execution of this Agreement and within 90 days after the end of each fiscal year during the term of this Agreement. | Yes |
| Party A | A guarantee of Holdings in the form annexed hereto as Exhibit A. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Executed copies of the Credit Support Annex. | Upon execution of this Agreement. | Yes |
| Party A | Monthly report containing the Agreement termination value. | No later than the end of each month. | No |

**Part 3**
**Miscellaneous**

(a)    **Address for Notices.**  For the purpose of Section 10(a) of this Agreement:

Address for notices or communications (other than with respect to payments) to <u>Party A</u>:

20

Address:   745 Seventh Avenue, 5th Floor, New York, NY 10019
           Attention:  Municipal Financial Products – Middle Office

Facsimile:    (646) 758-2988          Telephone:    (212) 526-2240

Address for <u>financial statements to Party A</u>:

Address:   745 Seventh Avenue, 29th Floor, New York, NY 10019
           Attention:  Credit Risk Management – Patrick Verdi

Facsimile:    (646) 758-5157          Telephone:    (212) 526-3723

Address for notices or communications (other than with respect to payments) to <u>Party B</u>:

Address:   Board of Education of the City of Chicago
           125 South Clark Street, 13th Floor
           Chicago, IL  60603
           Attention: Treasurer

Facsimile:    (773) 553-2791          Telephone:    (773) 553-2790

(b)  **Notices.** Section 10(a) is amended by adding in the third line thereof after the phrase "messaging system" and before the ")" the words, "provided, however, any such notice or other communication may be given by facsimile transmission if telex is unavailable, no telex number is supplied to the party providing notice, or if answer back confirmation is not received within one hour from when the telex is sent."

(c)  **Calculation Agent.** Unless otherwise specified in a Confirmation with respect to the relevant Transaction, the Calculation Agent will be Party A, subject to reasonable verification by Party B; provided, however, that in the event of an Event of Default with respect to which Party A is the Defaulting Party or a Termination Event with respect to which Party A is the sole Affected Party, the Calculation Agent will be a financial institution selected by Party B which is experienced in effecting interest rate swaps, subject to reasonable verification by Party A.  In the event of any errors determined by reasonable verification in accordance herewith, an appropriate adjustment will be made.

(d)  **Credit Support Document.** Details of any Credit Support Document:

With respect to Party A, the Credit Support Annex in the form attached hereto, dated the date hereof (the provisions of which are incorporated by reference herein) and the Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A.

With respect to Party B, not applicable.

(e)  **Credit Support Provider.**  Credit Support Provider means, in relation to Party A, Holdings, and, in relation to Party B, not applicable.

(f)  **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of Illinois (without reference to choice of law doctrine), provided

21

that the capacity, power and authority of Party A to enter into this Agreement and any Transaction hereunder shall be governed by and construed in accordance with the laws of the State of Delaware.

(g)    **Jurisdiction and Immunity.**

   (i)    Section 11(b) of this Agreement is hereby amended to read in its entirety as follows:

   "*Jurisdiction.*   With respect to any suit, action or proceedings relating to this Agreement or any Transaction hereunder ("Proceedings"):

   Party A (1) acknowledges and agrees that Proceedings to enforce this Agreement or any Transaction hereunder against or with respect to Party B ("Enforcement Proceedings") shall be brought only in the courts of the State of Illinois or the applicable United States court having jurisdiction and located within the State of Illinois (the foregoing, "X Courts"), and (2) irrevocably submits to the non-exclusive jurisdiction of any X Court, and waives (A) any objection which Party A may have at any time to the laying of venue of any Proceedings brought in any X Court, (B) any claim that such Proceedings have been brought in an inconvenient forum, and (C) the right to object, with respect to such Proceedings, that such X Court does not have any jurisdiction over Party A.

   (ii)    Section 11(c) of this Agreement is hereby deleted in its entirety with respect to Party B.

(h)    **Netting of Payments.**   Section 2(c)(ii) of this Agreement will apply.

(i)    **Definitions.** Section 12 of this Agreement is hereby amended to add, in the appropriate alphabetical order, or amend, as applicable, the following definitions:

   (i)    "**Affiliate**" will have the meaning specified in Section 12 of this Agreement, provided that Party B shall be deemed to have no Affiliates.

   (ii)    "**Business Day**" means a day which is not a Saturday, Sunday or legal holiday or other day on which banking institutions in the State of New York or the State of Illinois are authorized by law to close.

   (iii)    "**Covered Indenture**" means the Trust Indenture relating to Party B's Unlimited Tax General Obligation Bonds (Dedicated Revenues) Series 2003D-1, Series 2003D-2 and Series 2003D-3, as it may from time to time be amended or supplemented.

   (iv)    "**Government Entity**" means Party B.

   (v)    "**Incipient Illegality**" means (a) the enactment by any legislative body with competent jurisdiction over the Government Entity of legislation which, if adopted as law, would render unlawful (i) the performance by the Government Entity of any absolute or contingent obligation to make a payment or delivery or to receive a payment or

delivery in respect of a Transaction or the compliance by the Government Entity with any other material provision of this Agreement relating to such Transaction, or (ii) the performance by the Government Entity of any contingent or other obligation which the Government Entity has under any Credit Support Document relating to such Transaction, (b) any assertion in any proceeding, forum or action by the Government Entity, in respect of such Government Entity or in respect of any school district located or organized under the laws of the State of Illinois, to the effect that performance under this Agreement or similar agreements is unlawful, or (c) the occurrence with respect to the Government Entity of any event that constitutes an Illegality."

## Part 4
## Municipal Counterparty Provisions

(a)    **Obligations.**  Section 2(a)(iii) of this Agreement is hereby amended to read in its entirety as follows:

> "(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default, Potential Event of Default or Incipient Illegality with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated, and (3) each other applicable condition precedent specified in this Agreement."

(b)    **Representations.**

(i) The introductory clause of Section 3 of this Agreement is hereby amended to read in its entirety as follows:

> "Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a) and Section 3(e), at all times until the termination of this Agreement) that:".

(ii) Section 3(a)(ii) of this Agreement is hereby amended to read in its entirety as follows:

> "(ii) *Powers.*  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance;".

23

(iii) Section 3(b) of this Agreement is hereby amended to read in its entirety as follows:

"(b)    *Absence of Certain Events.*    No Event of Default or Potential Event of Default or, to its knowledge, Incipient Illegality (in the case of the Government Entity) or Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party."

(iv) Section 3 of this Agreement is hereby amended by adding the following subsection "(e)" thereto, which subsection shall only apply to the Government Entity:

"(e)    *Non-Speculation.*    This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for purposes of managing its borrowings or investments and not for purposes of speculation."

(v)  Section 3 of this Agreement is hereby amended by adding the following subsection "(f)" thereto:

"(f)    *Subject to Suit.*    Party B represents that, subject to 735 Illinois Compiled Statutes 5/2-103(a) and 30 Illinois Compiled Statutes 305/7, it is subject to suit with respect to its obligations under this Agreement pursuant to Article XIII, Section 4 of the Illinois Constitution and 105 Illinois Compiled Statutes 5/34-2."

(c)    *Agreements.*

Section 4 of this Agreement is hereby amended by adding the following subsections "(d)" and "(e)" thereto:

"(d)    *Compliance with Covered Indenture.*    Party B will comply with all provisions of the Covered Indenture that relate to the obligations of Party B under this Agreement or have a material impact on such obligations and will not amend any such provision without the prior written consent of Party A (which consent will not be unreasonably withheld).

"(e)    *Notice of Incipient Illegality.*    If an Incipient Illegality occurs, the Government Entity will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Incipient Illegality and will also give such other information about that Incipient Illegality as the other party may reasonably require."

24

## Part 5
## Other Provisions

(a)     Section 4 of the Agreement is hereby amended by adding the following subsection "(f)"
thereto:

"(f) *Security and Source of Payment of Party B's Obligations.* The obligations of Party
B under this Agreement and each Transaction hereunder are payable from, and are
secured by a lien on, amounts deposited in the Swap Payment Account within the Debt
Service Fund (each as defined in and established under the Covered Indenture); provided
that (i) the foregoing payment source and lien may be replaced with a source of revenues,
and a lien thereon, of comparable quality, duration and amount with the written consent
of Party A, and (ii) any obligation of Party B to make any payment to Party A hereunder
or under any Transaction which arises out of the designation of an Early Termination
Date with respect to any or all Transactions is an unsecured obligation of Party B payable
from any legally available funds."

(b)     **ISDA Definitions.** Unless otherwise specified in a Confirmation, this Agreement
incorporates, and is subject to and governed by, the 2000 ISDA Definitions (the **"2000
Definitions"**) and the 1992 ISDA U.S. Municipal Counterparty Definitions (the
**"Municipal Definitions"**, and together with the 2000 Definitions, the **"Definitions"**)
(each as published by the International Swaps and Derivatives Association, Inc.). In the
event of any inconsistency between the 2000 Definitions and the Municipal Definitions,
the Municipal Definitions will govern. In the event of any inconsistency between the
Definitions and the provisions of this Agreement, the provisions of this Agreement will
govern.

(c)     **Set-off.** Without affecting the provisions of this Agreement requiring the calculation of
certain net payment amounts and notwithstanding the provisions of Section 6(e), all
payments under this Agreement will be made without Set-off or counterclaim.

(d)     **Condition Precedent to Certain Payments.** Notwithstanding the provisions of Section
6(e)(i)(3) or Section 6(e)(ii)(1) of this Agreement, if the amount referred to in either such
Section is a positive number, the Defaulting Party or the Affected Party, as applicable,
will pay such amount to the Non-defaulting Party or non-Affected Party, and if the
amount referred to therein is a negative number, the Non-defaulting Party or non-
Affected Party, as applicable, shall have no obligation to pay any amount thereunder to
the Defaulting Party or the Affected Party unless and until the conditions set forth in (i)
and (ii) below have been satisfied, at which time there shall arise an obligation of the
Non-defaulting Party or non-Affected Party to pay to the Defaulting Party or Affected
Party an amount equal to the absolute value of such negative number less any and all
amounts which the Defaulting Party or Affected Party may be obligated to pay under
Section 9:

(i)     the Non-defaulting Party or non-Affected Party shall have received confirmation
satisfactory to it in its sole discretion (which may include an unqualified opinion of its
counsel, which shall not be unreasonably withheld or delayed), that (x) no further
payments or deliveries under Section 2(a)(i) or 2(d) in respect of Terminated

Transactions will be required to be made in accordance with Section 6(c)(ii), and (y) each Affected Transaction shall have terminated pursuant to its specified termination date or through the exercise by a party of a right to terminate and all obligations owing by the Defaulting Party or Affected Party under each such Affected Transaction shall have been fully and finally performed; and

(ii)    all obligations of the Defaulting Party or Affected Party to make any payment or delivery to the Non-defaulting Party or non-Affected Party which are then due and owing shall have been fully and finally performed.

(e)    **Exchange of Confirmations.** For each Transaction entered into hereunder, Party A shall promptly send to Party B a Confirmation, via telex or facsimile transmission. Party B agrees to respond to such Confirmation within ten (10) Local Business Days, either confirming agreement thereto or requesting a correction of any error(s) contained therein. Failure by Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of the terms contained in such Confirmation, absent manifest error. The parties agree that any such exchange of telexes or facsimile transmissions shall constitute a Confirmation for all purposes hereunder.

(f)    **WAIVER OF RIGHT TO TRIAL BY JURY.** EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(g)    **Status of Parties.** The following representation shall be inserted as a new Section 3(g) of this Agreement:

"(g)    *Status of Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for such Transaction):

(i)    It is an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act (7 U.S.C. la).

(ii)    This Agreement has been subject to individual negotiation by such party.

(iii)    It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(iv)    It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(h)   **Relationship Between Parties.** The following representation shall be inserted as a new Section 3(h) of this Agreement:

"(h)   *Relationship Between Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for such Transaction):

(i)   **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of a transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(ii)   **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of such Transaction. It is also capable of assuming, and assumes, the risks of such Transaction.

(iii)   **Non-Fiduciary.** The other party is not acting as a fiduciary for or an adviser to it in respect of such Transaction."

(i)   **Additional Definitions.**

(i)   "**Credit Rating**" means, with respect to a person or entity, the rating assigned by Moody's or S&P to the long term unsecured, unenhanced senior indebtedness of such person or entity.

(ii)   "**Fitch**" means Fitch Ratings, and its successors and assigns, and if Fitch shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency agreed upon by Party A and Party B.

(iii)   "**Moody's**" means Moody's Investors Service, and its successors and assigns, and if Moody's shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency agreed upon by Party A and Party B.

(iv)   "**S&P**" means Standard and Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and its successors and assigns, and if S&P shall be dissolved or liquidated or shall no longer perform the functions of a securities

rating agency, "S&P" shall be deemed to refer to any other nationally recognized securities rating agency agreed upon by Party A and Party B.

(v)     **"Stockholders' Equity"** means, with respect to Party A, at any time, the sum at such time of (A) its capital stock (including preferred stock) outstanding, taken at par value, (B) its capital surplus and (C) its retained earnings, minus (D) its treasury stock, each to be determined in accordance with U.S. generally accepted accounting principles.

(j)     **Recording of Conversations.**  Each party to this Agreement acknowledges and agrees to the tape recording of conversations between trading and marketing personnel of the parties to this Agreement, whether by one or other or both of the parties or their agents, and that any such tape recordings may be submitted in evidence in any proceedings relating to the Agreement.

(k)     **Effect of Designation.**  Section 6(c)(i) of this Agreement is hereby amended to insert the phrase "or Voluntary Termination Date" after the phrase "Early Termination Date" in each of the first and second lines thereof.

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized officers as of the date hereof.

**LEHMAN BROTHERS SPECIAL**
**FINANCING INC.**

By: _____
   Name:  T. Courtney Jenkins
   Title:    Vice President

**BOARD OF EDUCATION OF THE**
**CITY OF CHICAGO**

By: _____
   Name:
   Title:

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and _____
_____ ("Party B") have entered into a Master Agreement dated as of
_____, pursuant to which Party A and Party B have entered and/or anticipate entering
into one or more transactions (each a "Transaction"), the Confirmation of each of which
supplements, forms part of, and will be read and construed as one with, the Master Agreement
(collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as
contemplated in the Agreement. For value received, and in consideration of the financial
accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS
HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware
("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual
payment of all amounts payable by Party A under each Transaction when and as Party A's
obligations thereunder shall become due and payable in accordance with the terms of the
Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor
hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts
punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a
guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be
unconditional, irrespective of the validity, regularity or enforceability of the Agreement against
Party A (other than as a result of the unenforceability thereof against Party B), the absence of any
action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B
with respect to any provisions thereof, the entry by Party A and Party B into additional
Transactions under the Agreement or any other circumstance which might otherwise constitute a
legal or equitable discharge or defense of a guarantor (excluding the defense of payment or
statute of limitations, neither of which are waived); provided, however, that Guarantor shall be
entitled to exercise any right that Party A could have exercised under the Agreement to cure any
default in respect of its obligation under the Agreement or to set off, counterclaim or withhold
payment in respect of any Event of Default or potential Event of Default in respect of Party B or
any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The
Guarantor acknowledges that Party A and Party B may from time to time enter into one or more
Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under
this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to
all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of
any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however,
that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based
upon, such right of subrogation until all amounts then due and payable by Party A under the
Agreement, shall have been paid in full.

EXHIBIT A
Page 1

(e)      Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)      Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 745 Seventh Avenue, New York, NY 10019 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products - Middle Office at 745 Seventh Avenue, 5th Floor, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.


By:_____
Name:
Title:

EXHIBIT B to Schedule

[Form of Opinion of Counsel to
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[Date]

Board of Education of the City of Chicago

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of December ___, 2003 between Party A and Board of Education of the City of Chicago ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement. The Master Agreement is to be supplemented by confirmations of transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with such Confirmation shall constitute one agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of each of the Master Agreement, the Confirmation dated December ___, 2003, the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based upon the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.     Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware.

2.     The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.     Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes, a legal, valid and binding obligation, enforceable against it in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

EXHIBIT B
Page 1

A.    My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware. In giving the opinions expressed above, I am assuming that the laws of the State of Illinois are the same as the laws of the State of New York.

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A and Guarantor, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or any Confirmation thereunder or the Guarantee.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

EXHIBIT B
Page 2

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and BOARD OF EDUCATION OF THE CITY OF CHICAGO ("Party B") have entered into a Master Agreement dated as of December 3, 2003, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the

Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 399 Park Avenue, 11th Floor, New York, NY 10022 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products - Middle Office at 745 Seventh Avenue, 5th Floor, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____

Name:

Title:

Oliver Budde
Vice President

# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

ISDA Master Agreement

dated as of December 3, 2003

between

| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | and | **BOARD OF EDUCATION OF THE CITY OF CHICAGO** |
|:---:|:---:|:---:|
| ("Party A") | | ("Party B") |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

## Paragraph 1. Interpretation

(a)    *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    *Secured Party and Pledgor.*  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

## Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

## Paragraph 3. Credit Support Obligations

(a)    *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

    (i)     the Credit Support Amount

exceeds

    (ii)    the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    ***Return Amount***.  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Return Amount"*** applicable to the Secured Party for any Valuation Date will equal the amount by which:

    (i)     the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

    (ii)    the Credit Support Amount.

***"Credit Support Amount"*** means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

### Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions

(a)    ***Conditions Precedent***.  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

    (i)     no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

    (ii)    no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    ***Transfer Timing***.  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    ***Calculations***.  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

(d)    ***Substitutions***.

    (i)     Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the *"Substitute Credit Support"*); and

2

ISDA® 1994

(ii)     subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "*Substitution Date*"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "*Disputing Party*") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i)     In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A)     utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B)     calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C)     utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii)     In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

## Paragraph 6. Holding and Using Posted Collateral

(a)     *Care of Posted Collateral.*  Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except

3                              **ISDA® 1994**

as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     *Eligibility to Hold Posted Collateral; Custodians.*

(i)     *General.*  Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "*Custodian*") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii)     *Failure to Satisfy Conditions.*  If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii)     *Liability.*  The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     *Use of Posted Collateral.*  Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i)     sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii)     register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i)     *Distributions.*  Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii)     *Interest Amount.*  Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the

4

extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)     that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii)    that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii)   that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)     *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies;

(i)     all rights and remedies available to a Secured Party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)   the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv)    the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold), and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)     *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then

5                                                          ISDA® 1994

(except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

    (i)    the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

    (ii)    the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

    (iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

    (iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

        (A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

        (B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    ***Deficiencies and Excess Proceeds***.  The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    ***Final Returns***.  When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

## Paragraph 9. Representations

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

    (i)    it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

    (ii)    it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

    (iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

ISDA® 1994

    (iv)    the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

## Paragraph 10. Expenses

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c) each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

## Paragraph 11. Miscellaneous

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

        **ISDA® 1994**

**Paragraph 12.**    Definitions

As used in this Annex:—

"*Cash*" means the lawful currency of the United States of America.

"*Credit Support Amount*" has the meaning specified in Paragraph 3.

"*Custodian*" has the meaning specified in Paragraphs 6(b)(i) and 13.

"*Delivery Amount*" has the meaning specified in Paragraph 3(a).

"*Disputing Party*" has the meaning specified in Paragraph 5.

"*Distributions*" means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

"*Eligible Collateral*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Eligible Credit Support*" means Eligible Collateral and Other Eligible Support.

"*Exposure*" means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

"*Independent Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Interest Amount*" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x)    the amount of that Cash on that day; multiplied by

(y)    the Interest Rate in effect for that day; divided by

(z)    360.

"*Interest Period*" means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

"*Interest Rate*" means the rate specified in Paragraph 13.

ISDA® 1994

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

    (i)    in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

   ISDA® 1994

(ii)     in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii)     in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv)     in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

"*Valuation Agent*" has the meaning specified in Paragraph 13.

"*Valuation Date*" means each date specified in or otherwise determined pursuant to Paragraph 13.

"*Valuation Percentage*" means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

"*Valuation Time*" has the meaning specified in Paragraph 13.

"*Value*" means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

(i)     Eligible Collateral or Posted Collateral that is:

(A)     Cash, the amount thereof; and

(B)     a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii)     Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii)     Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**ISDA® 1994**

Doc #:CHI02 (206524-00009) 60144416v2;12/03/2003/Time:10:32

PARTY A:  **LEHMAN BROTHERS SPECIAL FINANCING INC.**
PARTY B:  **BOARD OF EDUCATION OF THE CITY OF CHICAGO**

PARAGRAPH 13.  ELECTIONS AND VARIABLES.

(a)     *Security Interest for "Obligations".*  The term "Obligations" as used in this Annex shall not include any obligations other than those created under this Agreement.

(b)     *Credit Support Obligations.*

    (i)     *Delivery Amount, Return Amount and Credit Support Amount*

        (A)     *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)     *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)     *"Credit Support Amount"* has the meaning specified in Paragraph 3.

    (ii)    *Eligible Collateral.* The following items will qualify as **"Eligible Collateral"** for Party A, with a Valuation Percentage equal to the corresponding number:

| | Valuation Percentage |
|---|---|
| 1.  Cash | 100% |
| 2.  Negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of one year or less from the Valuation Date. | 98% |
| 3.  Negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than one year but less than five years from the Valuation Date. | 97% |
| 4.  Negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of five years or more but less than ten years from the Valuation Date. | 96% |
| 5.  Agency Securities having a remaining maturity of one year or less from the Valuation Date. | 97% |

6. Agency Securities having a remaining maturity of more than one year but less than five years from the Valuation Date.                96%

7. Agency Securities having a remaining maturity of five years or more but less than ten years from the Valuation Date.                95%

*Agency Securities.* For purposes of the foregoing, **"Agency Securities"** means negotiable debt obligations which are fully guaranteed as to both principal and interest by the Federal National Mortgage Association, the Government National Mortgage Association or the Federal Home Loan Mortgage Corporation, but excluding (1) interest only and principal only securities and (2) collateralized mortgage obligations, real estate mortgage investment conduits and similar derivative securities.

(iii) ***Other Eligible Support.*** The following items will qualify as *"Other Eligible Support"* for the party specified: Not applicable with respect to either party.

(iv) ***Thresholds.***

(A) *"**Independent Amount**"* is not applicable with respect to either Party A or Party B.

(B) *"**Threshold**"* means, with respect to Party A, the amount determined on the basis of the lower of the Credit Ratings set forth in the following table; provided that if Party A has no Credit Rating or an Event of Default has occurred and is continuing with respect to Party A, "Threshold" shall mean $0.

| CREDIT RATING (S&P/Moody's) | THRESHOLD |
|---|---|
| AAA/Aaa | Infinite |
| AA+/Aa1 | Infinite |
| AA/Aa2 | Infinite |
| AA-/Aa3 | Infinite |
| A+/A1 | $25 million |
| A/A2 | $15 million |
| A-/A3 | $1 million |
| BBB+/Baa1 | $0 |
| BBB/Baa2 | $0 |

*"**Threshold**"* means, with respect to Party B:  Not applicable.

-2-

    (C)    *"Minimum Transfer Amount"* means, with respect to Party A and Party B: $500,000; provided that if an Event of Default has occurred and is continuing with respect to such party, the Minimum Transfer Amount with respect to such party shall be $0.

    (D)    *"Rounding"*. The Delivery Amount and the Return Amount will be rounded up and down, respectively, to the nearest integral multiple of $1,000.

(c)    *Valuation and Timing.*

    (i)    *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5(I), the party making the demand under Paragraph 3, for purposes of Paragraph 5(II), the intended recipient of the Return Amount, and for all other purposes, Party A; provided that if an Event of Default has occurred and is continuing with respect to a party otherwise the Valuation Agent pursuant to the foregoing, the other party shall be the Valuation Agent.

    (ii)    *"Valuation Date"* means the first Local Business Day of each week.

    (iii)    *"Valuation Time"* means the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable, or any time on the Valuation Date or date of calculation, as applicable; provided that the calculation of Valuation and Exposure will be made as of approximately the same time on the same date.

    (iv)    *"Notification Time"* means 10:00 a.m., New York time, on a Local Business Day.

(d)    *Conditions Precedent.* There will be no "Specified Conditions" with respect to either party.

(e)    *Substitution.*

    (i)    *"Substitution Date"* means the third Local Business Day following the date on which the Secured Party receives the Substitute Credit Support.

    (ii)    *Minimum Substitution Amount.* The Pledgor may substitute Posted Credit Support pursuant to Paragraph 4(d) only if the value of the Substitute Credit Support is equal to or greater than $500,000. The Pledgor shall not be required to obtain the Secured Party's consent for any such substitution.

(f)    *Dispute Resolution.*

    (i)    *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii)     *Value*. For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be the product of (i) either (A) the bid price for the security quoted on such day by a principal market-maker for such security selected in good faith by the Secured Party or (B) the most recent publicly available bid price for the security as reported by a quotation service or in a medium selected in good faith and in a commercially reasonable manner by the Secured Party, multiplied by (ii) the valuation percentage listed in Paragraph 13(b)(iv) hereof with respect to the security.

(iii)    *Alternative*. The provisions of Paragraph 5 will apply.

(g)    *Holding and Using Posted Collateral.*

(i)     *Eligibility to Hold Posted Collateral; Custodians*. Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); provided that Party B is not a Defaulting Party and that Posted Collateral may be held only in the following jurisdictions: The United States of America.

(ii)    *Use of Posted Collateral*. The provisions of Paragraph 6(c) will apply.

(iii)   The Custodian for Party B shall be as specified by Part B in a Confirmation or other writing delivered to Party A.

(h)    *Distributions and Interest Amount.*

(i)     *Interest Rate*. The **"Interest Rate"** will be USD - Federal Funds – H.15 as defined in the ISDA Definitions.

(ii)    *Transfer of Interest Amount*. The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month.

(iii)   *Alternative to Interest Amount*. The provisions of Paragraph 6(d)(ii) will apply.

(i)    *Additional Representation(s):* None.

(j)    *Other Eligible Support and Other Posted Support.*

(i)     *"Value"* with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(ii)    *"Transfer"* with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(k)    *Demands and Notices*. All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement unless otherwise specified below:

(l)     *Addresses for Transfers.*

      Party A:        As provided by Party A.

      Party B:        As provided by Party B.

(m)     *Other Provisions:*

      Notwithstanding any language to the contrary in this Annex, the term **"Pledgor"** will mean only Party A, and the term **"Secured Party"** will mean only Party B.

      IN WITNESS WHEREOF, the parties have executed this Annex with effect from the date specified on the first page of this Annex.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _T. Courtney Jenkins_
Name: T. Courtney Jenkins
Title:   Vice President

**BOARD OF EDUCATION OF THE CITY OF CHICAGO**

By: _____
Name: _____
Title: _____

(l)    *Addresses for Transfers.*

    Party A:      As provided by Party A.

    Party B:      As provided by Party B.

(m)    *Other Provisions:*

Notwithstanding any language to the contrary in this Annex, the term **"Pledgor"** will mean only Party A, and the term **"Secured Party"** will mean only Party B.

IN WITNESS WHEREOF, the parties have executed this Annex with effect from the date specified on the first page of this Annex.


**LEHMAN BROTHERS SPECIAL**
**FINANCING INC.**

By: _____
Name:  T. Courtney Jenkins
Title:    Vice President

**BOARD OF EDUCATION OF THE**
**CITY OF CHICAGO**

By: _____
Name:
Title:

# LEHMAN BROTHERS

EXECUTION COPY

CONFIRMATION

December 8, 2003

TRANSACTION

Board of Education of the City of Chicago
125 South Clark Street, 13th Floor
Chicago, Illinois  60603

Re:    Summit ID: 607923L

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc. the "1992 Definitions") and the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc., the "2000 Definitions" and, collectively, with the "1992 Definitions", the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of December 3, 2003 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | LEHMAN BROTHERS SPECIAL FINANCING INC. |
| Party B: | BOARD OF EDUCATION OF THE CITY OF CHICAGO |
| Notional Amount: | $95,350,000, which shall reduce on the dates and in the amounts set forth in Annex I hereto. The result of such reduction in Notional Amount shall be referred to herein as a "Revised Notional Amount." |
| Trade Date: | December 8, 2003 |
| Effective Date: | December 12, 2003 |
| Termination Date: | March 1, 2034 |

FIXED AMOUNTS:

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Semiannually, on the first calendar day of each March and September, beginning March 1, 2004 up to, and including, the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate Payer Period End Dates: | Semiannually, each first calendar day of each March and September, commencing on March 1, 2004. No Adjustment shall apply to Period End Dates. |
| Fixed Rate: | 3.771% |
| Fixed Rate Day Count Fraction: | 30/360 |

FLOATING AMOUNTS:

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Monthly, on the first calendar day of each month, beginning January 1, 2004 up to, and including, the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Payer Period End Dates: | Monthly, on the first calendar day of each month, commencing on January 1, 2004. No Adjustment shall apply to Period End Dates. |
| Floating Rate: | 70% of USD-LIBOR-BBA |
| Designated Maturity: | One month |
| Spread: | None |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | Weekly on each Wednesday, effective Thursday, subject to adjustment in accordance with the Following Business Day Convention. |
| Method of Averaging: | Weighted |
| Business Day: | New York, London |

607923L

2

3.    Broker Fee.    Party A has not paid any broker or arrangement fee in connection with this Transaction.

4.    Payment Instructions:

Payments to Party A:

> JP Morgan Chase
> ABA: 021000021
> for the Account of Lehman Brothers Special Financing Inc.
> Account No. 066 143 543

Payments to Party B:

> DBTCO AMERICAS NYC/CUST
> ABA # 021001033
> ACCT # 01419647
> Chicago Pub Schl DS PL Rev Int Dep Sub Acct #039508

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:    T. Courtney Jenkins
Title:     Vice President

Confirmed as of the
date first above written:

BOARD OF EDUCATION OF THE CITY OF CHICAGO

By: _____
Name:    John Maiorca
Title:     Chief Financial Officer

607923L

3

**ANNEX I**
to Confirmation, dated December 8, 2003,
between Lehman Brothers Special Financing Inc.
and
Board of Education of the City of Chicago

| Reduction Date | Notional Amount Reduction | Revised Notional Amount |
|---|---|---|
| 03/01/04 | $0 | $95,350,000 |
| 03/01/05 | $0 | $95,350,000 |
| 03/01/06 | $0 | $95,350,000 |
| 03/01/07 | $0 | $95,350,000 |
| 03/01/08 | $0 | $95,350,000 |
| 03/01/09 | $0 | $95,350,000 |
| 03/01/10 | $0 | $95,350,000 |
| 03/01/11 | $0 | $95,350,000 |
| 03/01/12 | $0 | $95,350,000 |
| 03/01/13 | $0 | $95,350,000 |
| 03/01/14 | $0 | $95,350,000 |
| 03/01/15 | $0 | $95,350,000 |
| 03/01/16 | $0 | $95,350,000 |
| 03/01/17 | $0 | $95,350,000 |
| 03/01/18 | $4,090,000 | $91,260,000 |
| 03/01/19 | $4,270,000 | $86,990,000 |
| 03/01/20 | $4,425,000 | $82,565,000 |
| 03/01/21 | $4,655,000 | $77,910,000 |
| 03/01/22 | $4,860,000 | $73,050,000 |
| 03/01/23 | $4,785,000 | $68,265,000 |
| 03/01/24 | $4,990,000 | $63,275,000 |
| 03/01/25 | $5,195,000 | $58,080,000 |
| 03/01/26 | $5,430,000 | $52,650,000 |
| 03/01/27 | $5,655,000 | $46,995,000 |
| 03/01/28 | $5,890,000 | $41,105,000 |
| 03/01/29 | $6,150,000 | $34,955,000 |
| 03/01/30 | $6,430,000 | $28,525,000 |
| 03/01/31 | $6,685,000 | $21,840,000 |
| 03/01/32 | $6,975,000 | $14,865,000 |
| 03/01/33 | $7,275,000 | $7,590,000 |
| 03/01/34 | $7,590,000 | $0 |

607923L