UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP) and 08-01420(JMP)(SIPA)

Adv. Case Nos. 09-01177 and 09-01178

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS HOLDINGS, INC./

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

        -against-

LIBRA CDO, LTD.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x

(cont'd. on next page)

2

1              U.S. Bankruptcy Court

2              One Bowling Green

3              New York, New York

4

5              August 26, 2009

6              10:04 a.m.

7

8   B E F O R E:

9   HON. JAMES M. PECK

10  U.S. BANKRUPTCY JUDGE

11

12  CASE CONFERENCE

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2    HEARING re Debtors' Motion to Engage Citadel Solutions LLC on

3    an Interim Basis [Docket No. 4717]

4

5    HEARING re Motion of Lehman Brothers Holdings Inc., et al. for

6    Authorization and Approval of Settlement with Lehman Re Ltd.

7    [Docket No. 4716]

8

9    HEARING re Debtors' Motion for Authorization to Implement

10    Alternative Dispute Resolution Procedures for Affirmative

11    Claims of Debtors Under Derivative Contracts [Docket No. 4453]

12

13    HEARING re Debtors' Motion for an Order Enforcing the Automatic

14    Stay and Holding Shinsei Bank in Contempt for Violating the

15    Automatic Stay [Docket No. 4764]

16

17    RE: SIPC PROCEEDINGS:

18    HEARING re Second Application of Hughes Hubbard & Reed LLP for

19    Allowance of Interim Professional Compensation for Services

20    Rendered and Reimbursement of Actual and Necessary Expenses

21    Incurred from February 1, 2009 through May 31, 2009 [Docket No.

22    1292]

23

24

25

4

1

2      HEARING re Unclaimed Property Recovery Service's Motion for

3      Orders (A) Compelling Payment of Unclaimed Funds by the New

4      York State Comptroller, (B) Lifting the Automatic Stay, or,

5      Alternatively, Providing Relief from the Automatic Stay, (C)

6      Allowing Payment for Services Provided Postpetition and (D)

7      Other Relief [Case No. 08-13555, Docket No. 3345]

8

9      RE: ADV. CASE NOS. 09-01177 AND 09-01178:

10     HEARING re Motion for Summary Judgment; Defendant's Cross-

11     Motion for Summary Judgment

12

13

14

15

16

17

18

19

20

21

22

23

24     Transcribed by:  Clara Rubin

25                      Penina Wolicki

5

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES, LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   RICHARD P. KRASNOW, ESQ.

9          PETER GRUENBERGER, ESQ.

10         ROBERT J. LEMONS, ESQ.

11

12

13   WEIL, GOTSHAL & MANGES, LLP

14        Attorneys for Plaintiffs/Movants Lehman Brothers

15         Holdings, Inc. ("LBHI") and Lehman Brothers

16         Special Financing, Inc. ("LBSF")

17        1300 Eye Street, N.W.

18        Suite 900

19        Washington, DC 20005

20

21   BY:   RALPH I. MILLER, ESQ.

22

23

24

25

6

1

2    WEIL, GOTSHAL & MANGES, LLP

3         Attorneys for Plaintiffs/Movants Lehman Brothers

4          Holdings, Inc. ("LBHI") and Lehman Brothers

5          Special Financing, Inc. ("LBSF")

6         700 Louisiana

7         Suite 1600

8         Houston, TX 77002

9

10   BY:   SCARLETT E. COLLINGS, ESQ.

11

12   ALLEN & OVERY, LLP

13         Attorneys for Public Bank Berhad

14         1221 Avenue of the Americas

15         New York, NY 10020

16

17   BY:   JOHN KIBLER, ESQ.

18

19   CLEARY GOTTLIEB STEEN & HAMILTON LLP

20         Attorneys for Goldman Sachs

21         One Liberty Plaza

22         New York, NY 10006

23

24   BY:   LISA M. GOULDY, ESQ.

25

7

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for SEK, BBVA, PB, Goldman, Wachovia, DE Shaw

4         One Liberty Plaza

5         New York, NY 10006

6

7    BY:   SEAN A. O'NEAL, ESQ.

8

9

10   CLEARY GOTTLIEB STEEN & HAMILTON LLP

11        Attorneys for Barclays Capital, Inc.

12        One Liberty Plaza

13        New York, NY 10006

14

15   BY:   LUKE A. BAREFOOT, ESQ.

16

17

18   CLIFFORD CHANCE US LLP

19        Attorneys for Barclays Capital Inc.

20        31 West 52nd Street

21        New York, NY 10019

22

23   BY:   SARA M. TAPINEKIS, ESQ.

24

25

8

1

2     DECHERT LLP

3            Attorneys for Russell Investments

4            1095 Avenue of the Americas

5            New York, NY 10036

6

7     BY:   GLENN E. SIEGEL, ESQ.

8

9

10    EDWARDS ANGELL PALMER & DODGE LLP

11           Attorneys for MDFA/Beaver Country Day School

12           750 Lexington Avenue

13           New York, NY 10022

14

15    BY:   PAUL J. LABOV, ESQ.

16

17

18    DEWEY & LEBOEUF, LLP

19           Attorneys for Royal Bank of Scotland, and Affiliates

20           1301 Avenue of the Americas

21           New York, NY 10019

22

23    BY:   MARTIN J. BIENENSTOCK, ESQ.

24

25

9

1

2    GENOVESE JOBLOVE & BATTISTA P.A.

3         Attorneys for Wong Movants

4         200 East Broward Boulevard, Suite 1110

5         Fort Lauderdale, FL 33301

6

7    BY:   ROBERT F. ELGIDELY, ESQ.

8

9    GREENBERG TRAURIG, LLP

10        Attorneys for Florida Power & Lighting

11        MetLife Building

12        200 Park Avenue

13        New York, NY 10166

14

15   BY:   DAVID Y. WOLNERMAN, ESQ.

16

17   HUGHES HUBBARD & REED LLP

18        Attorneys for the James W. Giddens, SIPA and SIPC Trustee

19        One Battery Park Plaza

20        New York, NY 10004

21

22   BY:   JEFFREY S. MARGOLIN, ESQ.

23        JAMES B. KOBAK JR., ESQ.

24        DAVID W. WILTENBURG, ESQ.

25

10

1

2    HUNTON & WILLIAMS LLP

3         Attorneys for Gaselys

4         200 Park Avenue

5         New York, NY 10166

6

7    BY:   SCOTT H. BERNSTEIN, ESQ.

8

9    JENNER & BLOCK LLP

10        Attorneys for the Examiner

11        One IBM Plaza

12        330 N. Wabash Avenue

13        Chicago, IL 60611

14

15   BY:   ROBERT L. BYMAN, ESQ.

16         ANTON R. VALUKAS, ESQ.

17

18   KUTAK ROCK LLP

19        Attorneys for the Nebraska Investment Finance Authority

20        Bank of America Center

21        1111 East Main Street, Suite 800

22        Richmond, VA 23219

23

24   BY:   JEREMY S. WILLIAMS, ESQ.

25

11

1    LINKLATERS LLP

2         Attorneys for Joint Administrators of the Lehman European

3          Group Administration Companies

4         1345 Avenue of the Americas

5         New York, NY 10105

6

7    BY:   MARTIN N. FLICS, ESQ.

8

9    LOWENSTEIN SANDLER PC

10        Attorneys for: 1) Fiat Choice Power, LP, 2) Option Energy

11         Marketing & Trading, LLC; and 3) Reliant Energy Power

12         Supply, LLC

13        1251 Avenue of the Americas

14        New York, NY 10020

15

16   BY:   S. JASON TEELE, ESQ.

17

18   LOWENSTEIN SANDLER PC

19        Attorneys for: 1) Fiat Choice Power, LP, 2) Option Energy

20         Marketing & Trading, LLC; and 3) Reliant Energy Power

21         Supply, LLC

22        65 Livingston Avenue

23        Roseland, NJ 07068

24

25   BY:   MICHAEL S. ETKIN, ESQ.

1

2    MAYER BROWN LLP

3          Attorneys for Libra CDO, Bank of America and

4           Societe Generale

5          1675 Broadway

6          New York, NY 10019

7

8    BY:   CHRISTOPHER J. HOUPT, ESQ.

9          STEVEN WOLOWITZ, ESQ.

10

11

12   MILBANK, TWEED, HADLEY & MCCLOY, LLP

13          Attorneys for the Official Committee of

14           Unsecured Creditors

15          One Chase Manhattan Plaza

16          New York, NY 10005

17

18   BY:   DENNIS C. O'DONNELL, ESQ.

19          DENNIS F. DUNNE, ESQ.

20          EVAN R. FLECK, ESQ.

21

22

23

24

25

13

1

2   MILBANK, TWEED, HADLEY & MCCLOY, LLP

3        Attorneys for the Official Committee of

4         Unsecured Creditors

5        International Square Building

6        1850 K Street, NW

7        Washington, DC 20006

8

9   BY:   DAVID S. COHEN, ESQ.

10

11   MORITT HOCK HAMROFF & HOROWITZ LLP

12        Attorneys for The Hutchkiss School

13        400 Garden City Plaza

14        Garden City, NY 11530

15

16   BY:   THERESA A. DRISCOLL, ESQ.

17

18   O'MELVENY & MYERS LLP

19        Attorneys for Oceania Cruises Inc.

20        Times Square Tower

21        7 Times Square

22        New York, NY 10036

23

24   BY:   SHANNON LOWRY NAGLE, ESQ.

25

14

1

2      PATTERSON BELKNAP WEBB & TYLER LLP

3           Attorneys for the Asbury Parties

4           1133 Avenue of the Americas

5           New York, NY 10036

6

7      BY:   DAVID W. DYKHOUSE, ESQ.

8            BRIAN P. GUINEY, ESQ.

9

10

11     PAUL BATISTA, P.C.

12          Attorney for Unclaimed Property Recovery Service, Inc.

13          26 Broadway

14          Suite 1900

15          New York, NY 10004

16

17     BY:   PAUL BATISTA, ESQ.

18

19

20     PILLSBURY WINTHROP SHAW PITTMAN LLP

21          Attorneys for Embarcadero Aircraft Securitization Trust

22          1540 Broadway

23          New York, NY 10036

24

25     BY:   RICK B. ANTONOFF, ESQ.

15

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

3         Conflicts Counsel to the Official Creditors' Committee

4         865 S. Figueroa Street

5         10th Floor

6         Los Angeles, CA 90017

7

8    BY:   ERIC WINSTON, ESQ.

9

10

11   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

12        Conflicts Counsel to the Official Creditors' Committee

13        51 Madison Avenue

14        22nd Floor

15        New York, NY 10010

16

17   BY:   DANIEL P. CUNNINGHAM, ESQ.

18

19

20   SHEARMAN & STERLING LLP

21        Attorneys for Bank of America and Merrill Lynch

22        599 Lexington Avenue

23        New York, NY 10022

24

25   BY:   NED S. SCHODEK, ESQ.

16

1

2    SHEARMAN & STERLING LLP

3          Attorneys for Nomura International plc

4          599 Lexington Avenue

5          New York, NY 10022

6

7    BY:   SOLOMON J. NOH, ESQ.

8

9

10   STROOCK & STROOCK & LAVAN LLP

11         Attorneys for Various Derivative Counterparties

12         180 Maiden Lane

13         New York, NY 10038

14

15   BY:   CLAUDE G. SZYFER, ESQ.

16

17

18   SULLIVAN & CROMWELL LLP

19         Attorneys for Defendant Barclays Bank PLC

20         125 Broad Street

21         New York, NY 10004

22

23   BY:   ROBINSON B. LACY, ESQ.

24

25

17

1

2   VINSON & ELKINS LLP

3        Attorneys for Shinsei Bank

4        666 Fifth Avenue

5        26th Floor

6        New York, NY 10103

7

8   BY:   DENIS F. CRONIN, ESQ.

9         J. RONALD TROST, ESQ.

10        DOV R. KLEINER, ESQ.

11

12  WHITE & CASE, LLP

13        Attorneys for Ad Hoc Group of Creditors

14        1155 Avenue of the Americas

15        New York, NY 10036

16

17  BY:   J. CHRISTOPHER SHORE, ESQ.

18        LISA THOMPSON, ESQ.

19

20  U.S. DEPARTMENT OF JUSTICE

21        Office of the United States Trustee

22        33 Whitehall Street, 21st Floor

23        New York, NY 10004

24

25  BY:   ANDREW D. VELEZ-RIVERA, ESQ.

18

1

2    SECURITIES INVESTOR PROTECTION CORPORATION

3         805 15th Street, N.W.

4         Suite 800

5         Washington, DC 20005

6

7    BY:   KENNETH J. CAPUTO, ESQ.

8

9

10   TELEPHONIC APPEARANCES:

11   ALSTON + BIRD, LLP

12        Attorneys for Creditor, Bank of America

13        One Atlantic Center

14        1201 West Peachtree Street

15        Atlanta, GA 30309

16

17   BY:   WILLIAM S. SUGDEN, ESQ. (TELEPHONICALLY)

18

19   BERNSTEIN, SHUR, SAWYER & NELSON, P.A.

20        Attorneys for Trustee, Citibank, N.A.

21        100 Middle Street

22        West Tower

23        Portland, ME 04101

24

25   BY:   MICHAEL A. FAGONE, ESQ. (TELEPHONICALLY)

19

1

2    CHAPMAN & CUTLER LLP

3        Attorneys for Creditor, US Bank, N.A.

4        111 West Monroe Street

5        Chicago, IL 60603

6

7    BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

8          FRANKLIN H. TOP, III, ESQ. (TELEPHONICALLY)

9

10   COLEMAN LAW FIRM, P.C.

11       Attorneys for Creditors, Schoellhorn Trust

12       The Chambers - The 48th Floor

13       77 West Wacker Drive

14       Chicago, IL 60601

15

16   BY:   STEVE JAKUBOWSKI, ESQ. (TELEPHONICALLY)

17

18   FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP

19       Attorneys for Creditor, CalPERS

20       The Wells Fargo Center

21       400 Capitol Mall, Suite 1450

22       Sacramento, CA 95814

23

24   BY:   HOLLY A ESTIOKO, ESQ. (TELEPHONICALLY)

25

20

1

2    POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

3         Interested Party

4         700 W. 47th Street, Suite 1000

5         Kansas City, MO 64112

6

7    BY:   DANIEL J. FLANIGAN, ESQ.

8

9    STUTMAN, TREISTER & GLATT PC

10        Attorneys for Interested Party, Elliott Co.

11        1901 Avenue of the Stars

12        12th Floor

13        Los Angeles, CA 90067

14

15   BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

16        MARINA FINEMAN, ESQ. (TELEPHONICALLY)

17        WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

18

19   STUTMAN, TREISTER & GLATT PC

20        Attorneys for Creditor, Perry Capital

21        1901 Avenue of the Stars

22        12th Floor

23        Los Angeles, CA 90067

24

25   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

21

1

2    WHYTE HIRSCHBOECK DUDEK S.C.

3         Attorneys for Creditor, Metavante Corporation

4         555 East Wells Street, Suite 1900

5         Milwaukee, WI 53202

6

7    BY:   BRUCE G. ARNOLD, ESQ. (TELEPHONICALLY)

8

9    THE BAUPOST GROUP

10        Interested Party

11        10 St. James Avenue

12        Suite 1700

13        Boston, MA 02116

14

15   BY:   MEGHAN S. MICHELS, ESQ. (TELEPHONICALLY)

16

17   CREDIT SUISSE FIRST BOSTON

18        Interested Party

19

20   BY:   ANDREW REBAK (TELEPHONICALLY)

21

22

23

24

25

22

P R O C E E D I N G S

1

2     THE COURT:  Be seated, please.  Good morning.

3     MR. KRASNOW:  Good morning, Your Honor.  Richard

4  Krasnow, Weil, Gotshal & Manges, on behalf of the Chapter 11

5  debtors.  Your Honor, if it's acceptable to the Court, I would

6  propose that we deal with the matters on today's calendar in

7  the order in which they appear on the agenda that was filed

8  with the Court yesterday?

9     THE COURT:  That's the right way to do it.

10    MR. KRASNOW:  Thank you, Your Honor.  Going to the

11 uncontested portion, there is indeed one, on today's calendar.

12 The first item, Your Honor, is a status report by the examiner.

13    MR. VALUKAS:  Good morning, Your Honor.

14    THE COURT:  Good morning.

15    MR. VALUKAS:  Anton Valukas.  I'm glad I'm on the

16 uncontested part of the agenda.

17    THE COURT:  At least today.

18    MR. VALUKAS:  Your Honor, Mr. Byman informed the

19 Court, I think about a month ago, that I would be making a

20 status report, and I'm here to make that report today.  When I

21 was first appointed by Your Honor in mid-February, I indicated

22 I believed the report could be completed by and within nine

23 months, which put us to somewhere in the middle of November.

24 That will not be my estimate as of today.

25    I'm here to advise you that we will have this report

1   to the Court on or before February 1st.  And I'd like to

2   explain to you how it is we got there.  I have had an

3   opportunity speaking with counsel for a number of the parties

4   prior to today, just to give them the information on this new

5   date.  But essentially, what's taken place is this.  At the

6   time I made my estimate, I made the assumption that with the

7   parties involved and the fact that this matter had been on the

8   Court's docket for some time, that the files and documents

9   would have been organized in a fashion that we could have

10   answered some of the questions with some speed.

11        It turns out that that really is not the case.  The

12   parties were appropriately focused on certain issues, not on

13   other issues.  The documents were scattered among several

14   different systems which were, in some respects, incompatible.

15   So there were technical issues about how we could gather them

16   once we even had access to them and the appropriate protective

17   orders in place.  That's no one's fault, it's just a fact of

18   life, a logistics fact of life.

19        We initially estimated that we would be looking at

20   approximately a million or a million and a half pages from the

21   various documents that would be involved for purposes of doing

22   the analysis and interviewing approximately a hundred

23   witnesses.  We were looking at Enron and some of the other

24   cases as a template for that type of report.  To date we have

25   reviewed over 10 million pages.  We will review the rest of

24

1   what need to get, assuming that we have no problems, and we

2   don't expect to have problems, within the next forty-five days.

3   So it was considerably more material necessary to be reviewed

4   to give a fair analysis of what was taking place.  And a large

5   part of what's involved here is nuance-driven, so looking at

6   the documents is critical to preparing a report which is both

7   accurate and fair to all the parties.

8        We've interviewed over ninety-five witnesses to date.

9   We will complete the interviews by the end of September, in to

10  early October.  We expect another sixty individuals who are key

11  to this and who have been identified, either by the party or by

12  the documents, as necessary for purposes of completing the

13  report.

14       There has been remarkably good cooperation from the

15  parties.  There's been pushback in some instances.  We've only

16  had to issue several -- we've issued some subpoenas, but very

17  few, considering the nature of this case.  And in each

18  instance, after the matter had been fully briefed, the

19  materials that we had requested were produced without the

20  necessity for contested hearings.  So we feel that we're

21  getting the documents we need to complete the report.

22       We've coordinated with the government.  We either meet

23  with or speak with the three U.S. Attorneys and the SEC on a

24  weekly basis and exchange the information that they feel

25  necessary to have exchanged.  So that coordination has taken

25

1    place.  We've met with the SIPA trustees and their counsel in

2    connection with this matter.  We have given them access to all

3    of the interviews that we've done as we've done them, so as to

4    avoid replication.  And to the extent that assists them, that

5    is good.  We have shared with them the documents we have

6    received.  They have shared with us their database and the

7    materials they have received, which I think has had a

8    significant impact in both shortening the investigation and

9    reducing the cost.

10         We have, as I think the Court knows, used contract

11   attorneys, because of the multiple millions of dollars -- or

12   millions of documents.  Our estimate, which we shared with the

13   Trustee, is that it's saved the estate tens of millions of

14   dollars to date over the fees that otherwise might have been

15   incurred using usual law firm rates.

16         So, that's where we are.  The other reason for the

17   necessity in taking these additional two and a half or three

18   months to complete is that, obviously, one of the things the

19   Court has charged us in the order with resolving is individual

20   liability and the liability of various institutions as it may

21   or may not exist in connection with this case.  And it is

22   imperative, in my view, that we make sure the parties have

23   given us all the facts necessary for me to reach those

24   conclusions before giving a report to the Court.

25         So all that being said, I feel comfortable that we

26

1    will have this report to you on or before February 1st.

2        THE COURT:  All right.  Thank you for the report.  And

3    is there anything you wish to add?

4        MR. VALUKAS:  None at this point.  Not until I come

5    back with the report.

6        THE COURT:  Fine.

7        MR. VALUKAS:  Thank you.

8        THE COURT:  Thank you very much, sir.

9        MR. VALUKAS:  Your Honor, with the Court's permission,

10   I would excuse myself, if I may?

11       THE COURT:  You may excuse yourself.  And if you or

12   anybody else would like to watch the proceedings from Room 608,

13   that room is available.

14       MR. VALUKAS:  Okay.  Thank you.

15       MR. KRASNOW:  Richard Krasnow, Weil Gotshal, for the

16   Chapter 11 debtors.  Your Honor, the next item on the

17   uncontested portion of today's hearing is the debtors' motion

18   to engage Citadel Solutions LLC on an interim basis.

19       Your Honor, as set forth in the motion, Citadel is

20   being engaged by the debtors to provide certain back office and

21   infrastructure assistance to the debtors in connection with

22   work that they need to perform.  There were no objections filed

23   in connection with the motion.  However, after the filing of

24   the motion, based on discussions had with the committee, there

25   were certain modifications made to the proposed interim

27

1   agreement, as well as modifications to the form of the proposed

2   order approving this engagement.

3         For that reason, the debtors filed a supplement to the

4   motion on August 24th, which both describes the changes that

5   are proposed to be made to the interim agreement and also

6   attached to it a black-line version of the agreement to reflect

7   those changes and a black-line of the proposed order reflecting

8   changes.

9         There have been no objections filed in respect of that

10  supplement.  And therefore, Your Honor, for the reasons set

11  forth both in the motion and the supplement, we would request

12  that the Court grant the relief sought.

13        THE COURT:  Do you wish to identify for the record any

14  of the changes that were made?

15        MR. KRASNOW:  Your Honor, as indicated in the

16  supplement, the changes in the revised agreement eliminate caps

17  on damage claims that could otherwise be asserted against

18  Citadel for breach of confidentiality.  It also provides that

19  neither LBHI nor Citadel shall be liable for any speculative,

20  exemplary, punitive, indirect or consequential damages relating

21  to or arising under the revised agreement.  But actual damages

22  would be the nature of the claims that could be asserted.

23  Those basically are the changes, Your Honor.

24        THE COURT:  With no objections, the modifications seem

25  reasonable, and I approve the motion.

28

1          MR. KRASNOW:  Your Honor, at the conclusion of today's

2     hearing, we'll provide chambers with the appropriate disks with

3     respect to the orders.

4          THE COURT:  Fine.

5          MR. KRASNOW:  Your Honor, the next and last

6     uncontested matter on today's calendar relates to LBHI's motion

7     for authorization and approval of the settlement with Lehman

8     Re, an entity that has, in fact, filed a petition with this

9     Court for relief under Chapter 15.  The settlement, which

10    relates to issues regarding ownership of certain loans, is

11    described in the motion itself.  There have been no objections

12    filed with respect to the motion, and the only reason that a

13    certificate of no objection was not filed was because there was

14    a request by the LBI trustee that there be an additional

15    paragraph be included in the proposed order making it clear

16    that nothing in the settlement order, assuming Your Honor

17    approves it and enters it, would prejudice rights which they

18    have.

19         Your Honor, I have a black-line version of the

20    proposed order which I could share with the Court.

21         THE COURT:  Why don't you?

22         MR. KRASNOW:  If I may approach?

23         THE COURT:  Please.  Thank you.  I've reviewed it.  It

24    looks fine.

25         MR. KRASNOW:  Your Honor, for the reasons set forth in

29

1    the motion and given the fact that there were no objections, we

2    would request that the Court approve the settlement and enter

3    the order as modified.

4         THE COURT:  The settlement is approved.  And I will

5    enter the order in its modified form.

6         MR. KRASNOW:  Thank you, Your Honor.  Your Honor, we

7    now turn to the reason why this courtroom is crowded today.

8    We'll do the contested matters.  The first matter on the

9    calendar, contested matter, relates to the proposed alternative

10   dispute resolution procedures proposed by the debtors.  And I

11   turn the rostrum over to my partner, Mr. Gruenberger.

12        MR. GRUENBERGER:  Good morning, Your Honor.  Peter

13   Gruenberger, Weil, Gotshal & Manges, for the debtors.

14        THE COURT:  Good morning.

15        MR. GRUENBERGER:  Our motion requests the Court to

16   order implementation of a set of alternate dispute resolution

17   procedures, including mediation, governing derivatives

18   contracts in the money to the debtors.  No one can seriously

19   question, Your Honor, that dealing with the vast number and

20   considerable complexity of the derivatives contracts here

21   presents a challenge, a challenge for all the important

22   constituents in these cases:  the debtors, all derivatives

23   counterparties, indenture trustees, the unsecured creditors'

24   committee, and above all, the Court.

25        The challenge is to come up with a workable process

30

1    apart from the filing and prosecution of hundreds of adversary

2    proceedings, one that offers a reasonable alternative for

3    resolution of disputes that surely will impact many of the

4    6,000 or more derivatives contracts under which the debtors had

5    more than 900,000 transactions with hundreds of different

6    counterparties.

7         We believe that in conjunction with the creditors'

8    committee, we have succeeded in presenting a feasible and fair

9    ADR process.  It goes without saying, Your Honor, that debtors

10   have a fiduciary duty to maximize the value of their assets

11   embodied in the derivatives contracts in a manner that promotes

12   expedition, avoids unnecessary costs and waste of resources,

13   and at the same time, reduces burdens on an already burdened

14   Court.  Reliance wholly on adversary proceedings virtually

15   guarantees such draconian outcomes.

16        Our proposed ADR procedures do just the opposite.  One

17   may ask, will our mediation proposal eliminate all adversary

18   proceedings?  No.  It will not.  But these ADR procedures

19   demonstrably fall within the acceptable range of

20   reasonableness, a path that promises to reduce the number and

21   variety of adversary proceedings that are certain to swamp this

22   Court's calendar for years to come, in the absence of an ADR

23   process.  Are debtors' ADR procedures including mediation a

24   perfect fix, where one size fits all?  No.  They are not

25   perfect, because there are just too many and too diverse a

31

1    population of complex transactions, contracts and issues that

2    would permit a perfection.

3         One example only suffices to demonstrate the

4    schizophrenia exhibited by objectors in their attack on these

5    ADR procedures.  One segment of them argues that the Court

6    lacks power to order mediation in the absence of a pending

7    adversary proceeding, while another segment argues

8    simultaneously that the Court should refrain from ordering

9    mediation for any dispute that is or may become the subject of

10   an adversary proceeding.  No set of procedures, Your Honor,

11   could be crafted to satisfy such contradictory positions.

12        In an atmosphere where objectors clamor for a

13   personalized, hand-tailored process that takes into account

14   only their particular needs, nothing could make every party-in-

15   interest happy.  In this prevailing climate of NIMBY, not in my

16   back yard, no perfect fix is possible; and impossible, also,

17   where parties feel, without constraint, to file unauthorized

18   surreplies last night, as one did after 6 p.m., to place phone

19   calls later last night, and sending e-mails as late as this

20   morning, as three objectors did, still seeking exclusion from

21   the ADR procedures, for their own asserted special reasons.

22        One cannot create any system for these folks, much

23   less a perfect one.  But fortunately, Your Honor, perfection

24   for everyone is not and cannot be the standard.  In filing this

25   motion and the initial proposed orders, debtors tried their

32

1    best, in conjunction with the creditors' committee, to fashion,

2    from the outset, a reasonable set of procedures.  And

3    reasonableness not perfection is the test.

4         Starting promptly after we filed this motion on July

5    20th, debtors modified their initial proposed order that was

6    attached to our motion four separate times in order to

7    accommodate counterparties who took the time and made the

8    effort to contact us with helpful suggestions.  My declaration

9    and Exhibits A, B and C attached thereto, which accompanies

10   debtors' omnibus responses to the objections, details the

11   specific efforts debtors undertook that resulted in the twenty-

12   two or so negotiated modifications we made to the proposed

13   orders, with the help of the committee and its constituents,

14   reasonable counterparties.  Our joint efforts led to many

15   potential objectors to refrain from filing any objections and

16   caused several objectors eventually to withdraw all the

17   objections they filed.

18        These cumulative changes, Your Honor, are reflected in

19   the revised proposed order, which is attached to debtors'

20   omnibus response as Exhibit B.  Debtors and the creditors'

21   committee believe that this revised proposed order represents a

22   compromise in the form of a well-balanced and fair set of

23   procedures that does nothing to skew the ability of any party

24   to negotiate and mediate its disputes, evenhandedly, on a level

25   playing field with the debtors.

1          Mediation procedures similar to the ones we've

2     proposed, Your Honor, were ordered by Judge Gonzalez in Enron

3     and by Judge Gerber in Ames.  In Enron, for example, the

4     mediation of seventy-seven large derivatives contract disputes

5     resulted in a settlement rate of one hundred percent.  That

6     brought into the Enron debtors' estates over 600 million new

7     dollars, with respect to in-the-money claims, and resulted in

8     the expungement of some 2.5 billion claims against the Enron

9     debtors' estates.

10          So mediation really does work if, but only if, Your

11    Honor, parties approach it with open minds.  And we mean

12    mediation as we propose it here, which includes:  mandatory

13    good-faith participation, with nothing binding unless

14    settlement is reached voluntarily; utilization of respected

15    mediators, not connected to any party; preservation of the

16    rights and remedies of all parties which remain unaltered

17    before, during and after mediation, even if settlement is not

18    reached.  The same rules and requirements will apply equally to

19    all parties.  Confidentiality will be maintained throughout.

20    Mandatory attendance by principals with authority to settle

21    will be required, but video conference attendance may be had.

22    One hundred percent of mediators' fees will be borne by the

23    debtors.

24          The remaining objections, Your Honor, were filed by

25    about fifty counterparties.  They should be overruled in toto

34

1    as they lack merit for many reasons.  Debtors' omnibus response

2    attaches as Exhibit A thereto a table of objections and

3    rebuttals thereto in which we specifically rebut, one by one,

4    each of the remaining objections.  And our omnibus response

5    rebuts category by category, the remaining objections.

6         I trust that Your Honor does not wish me to cover here

7    each specific objection or even each category of objection and

8    our rebuttals thereto?  That could take days.

9         THE COURT:  You're right.  You're absolutely right.  I

10   don't want you to do that.

11        MR. GRUENBERGER:  Thank you.  And of course, I will

12   endeavor to answer any questions Your Honor may have.  But as

13   to these remaining objections, I would note briefly, the

14   objections contain certain fallacies, indeed, fatal flaws, that

15   debtor highlight starting at paragraph 12 of our omnibus

16   response.  The primary inherent fallacy results in the failure

17   of objectors to recognize that negotiation and mediation

18   presents an opportunity, an opportunity to achieve cost-

19   effective alternatives to litigation, which guarantees only

20   long delay, huge cost, and added burden for Your Honor.

21        These flaws adhere in part on a misunderstanding of

22   the Court's power to order mediation, and that's due to

23   objectors' misreading of the standing mediation order, which is

24   Amended General Order M-143, which governs in this district.

25   Objectors also seem to be ignoring section 105(a) of the

1    Bankruptcy Code, which provides the Court with the inherent

2    power to issue any order necessary or appropriate to carry out

3    the provisions of Title 11, including control of its own docket

4    and to order sanctions after notice and hearing.  And we cite

5    cases at paragraphs 10, 21 and 22 of our omnibus response to

6    that effect.

7         In conjuring up every evil imaginable, some of these

8    objectors also misread the proposed order itself.  That order

9    prejudices no party.  No party's rights are adversely impacted

10   by participating in ADR.  No decisions are rendered by anyone.

11   No party wins or loses in mediation, and no party or the

12   mediator can force a settlement on any party.

13        Another underlying fallacy is the objectors' unfounded

14   presumptions that debtors will act in bad faith.  It is

15   illogical of them, however, to presume that debtors will misuse

16   mediation and thereby act contrary to their own best self-

17   interest by willfully forcing needless litigation.  No such bad

18   faith does or will exist.

19        Another flaw involves objectors' belief that their

20   views are infallible on questions of contract interpretation

21   and application of the Bankruptcy Code, including the safe

22   harbors.  These misapprehensions result in objectors

23   presumptuously placing on themselves the Court's robes, and in

24   that guise, rejecting even the possibility that a competing

25   interpretation of law or contract or a different view might

36

1    exist.

2         It is telling, Your Honor, that not one of these

3    fifty-some-odd objectors has come up with a single alternative

4    proposal for handling any of these complex matters other than

5    adversary proceedings.  So the objectors give Your Honor a

6    clear invitation for you to now engage in premature mini-trials

7    over every word in our ADR procedures.  This is not, Your

8    Honor, the proper time or place for hearing arguments and

9    holding mini-trials on questions dealing with issues such as in

10   personam jurisdiction, scope of the safe harbor, specific

11   contract interpretation, indenture trustee authorization to

12   settle and the like.

13        These issues should be mediated once the Court puts in

14   place ADR procedures.  Should debtors commence a mediation with

15   respect to a counterparty or an indenture trustee, such issues

16   should be raised in a response to an ADR notice which triggers

17   a mediation.  And if necessary, that party or trustee always

18   has recourse, ultimately, to seek withdrawal from mediation, by

19   application to the Court for cause shown, as permitted by the

20   standing order.  That is when issues of this sort would be ripe

21   for determination by the Court upon an adequate record.  That

22   record does not exist today, and at this juncture, this Court

23   should not hold mini-trials that these parties are demanding.

24        By the way, Your Honor, it's interesting to note that

25   only fifty objections in a case involving 6,000 contracts is a

37

1    very, very small number.  That I think reflects the reality

2    that the vast majority of counterparties has no problem with

3    these ADR procedures, as we propose them.

4         As to objectors' challenges to the participation

5    rights of the creditors' committee in the ADR process, we will

6    leave rebuttal on those matters to the committee, with whom we

7    agree, and at whose responses to the objections we join.

8         Finally, Your Honor, as to the matter of mediators.

9    Debtors are quite content to leave identification of specific

10   mediators to the Court in the exercise of its sound discretion.

11   Although we do suggest that the Court consider appointing three

12   or four mediators in number in order to accomplish the salutary

13   goals of our motion.  Thank you.

14        THE COURT:  I have a couple of --

15        MR. GRUENBERGER:  Yes, Your Honor.

16        THE COURT:  -- questions.

17        MR. GRUENBERGER:  Certainly.

18        THE COURT:  Obviously, the debtors and the creditors'

19   committee have been involved in an ambitious endeavor and in an

20   effort to come up with a set of procedures that will satisfy

21   the particular needs of this case which are, perhaps, unique.

22        MR. GRUENBERGER:  We agree, Your Honor.

23        THE COURT:  It seems to me that the claims to be

24   mediated are in a category that is, by most people's

25   estimation, complicated, sophisticated and challenging.  And I

38

1    certainly support the notion of the development of workable ADR

2    procedures for dealing with these claims.  That having been

3    said, I'm not sure I agree with you that fifty objections

4    represents a small number.  It may be a small number in

5    reference to the number of potential parties who might have

6    objected, but it creates something of a difficult case

7    management problem for right now.

8         I have a couple of questions as a result.  One is,

9    given the progress that the debtors have made as described in

10   your omnibus response, and the various amendments that took

11   place to the proposed form of order and to the procedures, is

12   it your view that time's up at this point, and that today is

13   the day when an order in the form that you have now developed

14   it should be entered?  Or is there some value in spending a

15   little bit more time to try to accommodate some or all of the

16   remaining objections that have not yet been resolved?  That's a

17   fundamental question that I have.

18        MR. GRUENBERGER:  That is a fundamental and good

19   question, Your Honor.  And I would answer each of its parts as

20   follows.  Yes, I do think that time is up, only because of the

21   nature of many of the objections.  I do not think that I could

22   negotiate with parties who say Your Honor has no power to order

23   mediation.  I do not think I can negotiate with parties who say

24   Your Honor has no power to issue sanctions after notice and

25   hearing if a party does not participate in mediation in good

39

1    faith, according to a mediator.

2         THE COURT:  I can resolve those two points very

3    quickly.

4         MR. GRUENBERGER:  But that's only two, Your Honor.

5         THE COURT:  I know, but I can tell you right now, I

6    acknowledge that I:  a) have the power to order mediation; you

7    can do it, frankly, without an order.  I can just, on my own --

8    all of this process that you have initiated is all well and

9    good.  I could, on my own, create my own monstrosity.  I could

10   simply say there shall be mediation, and it will follow the

11   following format.  And it may be the subject of some

12   complaints, but I believe I have the power to do it.  And I

13   believe that General Order M-143 gives me that power on my own

14   motion.

15        MR. GRUENBERGER:  Agreed, Your Honor.

16        THE COURT:  I also believe that I have the power to

17   sanction.  So as it relates to those two issues that have been

18   bandied about, I can easily swat those down.

19        MR. GRUENBERGER:  That only scratches the surface,

20   Your Honor.  I don't think I could -- or anybody -- could

21   negotiate with people who say there's no dispute here.  There's

22   no dispute.  We believe that we've paid exactly what we owe.

23   So therefore, we're out of the ADR, right?  And my response to

24   that, as we put forth in our papers, is you're not infallible.

25   You might be wrong.  You might be right.  We haven't scrubbed

40

1    every single one of these 900,000 transactions.  Why don't you

2    wait to see whether or not we do commence a mediation with

3    respect to your contract, rather than carve you out without any

4    record or any basis?  The same for an indenture trustee who

5    says I don't have settlement authority.  Well, that may be

6    right, it may not.  I don't know, when there are hundreds of

7    indenture trusts here and one indenture trustee says as to all

8    of them, in a brief, there's no settlement authority.

9         Well, if that's so, the ADR process that we propose,

10   Your Honor, allows that response to be made, and if so, we will

11   investigate it.  But we can't, in advance, know everything and

12   rebut every one of these characterizations -- that's all they

13   are today.  And today certainly is not, and I repeat, and I

14   don't like to repeat what I've said before, today is not the

15   day to have mini-trials on all of these issues.

16        From in personam jurisdiction, no authority to settle,

17   sure, we might negotiate, as we did prior today.  Well, two

18   days' notice or four days' notice, yes.  But that's a small,

19   small, small tip of the iceberg.  The iceberg is huge because

20   the category of contracts is huge; the number of parties is

21   huge.  And rather than fight over every word in advance, when

22   we don't have the facts, and we're not going to have mini-

23   trials over these facts, as Your Honor's indicated, we're not

24   going to do that either, what do we do?  I don't believe the

25   nature of these allows for that kind of negotiation.

41

1          The creditors' committee and we, together, handled

2     scores of calls and e-mails.  We tried our best.  The nature of

3     the objections, as set forth in our table, indicates to Your

4     Honor great diversity of problem-raising.  It's very easy to

5     raise problems now, but I think it's much easier, rather than

6     try to resolve all of those in advance, to start the process.

7     Because we'll be here with the shape of the -- this is like

8     negotiating with foreign powers.  They will spend days, hours,

9     months, years, negotiating the shape of the table, and never

10    get to it.  Let's start lunch at the table.

11         THE COURT:  It's a little early for lunch, but I

12    understand --

13         MR. GRUENBERGER:  Your Honor, I've tried to answer

14    your question the best way I can.

15         THE COURT:  And you have.  I understand the point.

16    But what I was actually driving at in part is timing.  It's

17    August 26th --

18         MR. GRUENBERGER:  Yes.

19         THE COURT:  -- a time when civilized societies are at

20    the beach.

21         MR. GRUENBERGER:  And the French as well as civilized

22    people.

23         THE COURT:  And we're here.  We're here in a

24    reasonably well-air conditioned room for a change.  And the

25    question that arises is why does this have to happen today?

42

1    Why does this have to happen before Labor Day?  The examiner

2    just gave a status report on timing.  He indicated he needs

3    more time.  It's a big job that he has and he looked for -- not

4    that I had a problem listening to it -- he looked for more time

5    to complete a herculean task.

6         In some respects this is a herculean task too, it's

7    just a different sort of task.  It's designing a structure that

8    will be flawed, that will include imperfections of one sort of

9    another, that will not satisfy everyone, and that can only

10   really be tested in practice.

11        MR. GRUENBERGER:  Agreed.

12        THE COURT:  The reason I ask the timing question is

13   that we achieved something of value in the context of the proof

14   of claim process that was highly litigated in this case as it

15   related to derivative questionnaires by encouraging parties to

16   meet and confer.  It happened in a relatively brief period of

17   time.  And various adjustments resulted from that which may

18   not, again, be perfect, but which I think resulted in a general

19   improvement in the overall content of the questionnaire and the

20   procedures applicable to it.

21        And so I have a lingering question as to whether there

22   would be any harm -- and I'm simply asking the question, I'm

23   not encouraging the result -- would there be any harm if this

24   matter were put off to the next omnibus hearing, not for

25   purposes of delaying the process of implementing ADR, as much

43

1    as for the process of improving the overall structure of the

2    ADR order?  And what I'm trying to get a sense of, and I

3    realize that you've answered the question for the debtors,

4    indicating that while there might be some tweaking around the

5    margins, as to the substance, you believe that the remaining

6    objectors are -- not your word, mine -- obdurate --

7         MR. GRUENBERGER:  I would say dug-in.

8         THE COURT:  -- dug-in.  Okay.  Both those terms apply.

9    That they're tenacious, and in your view, not particularly

10   well-reasoned.  And I'm not characterizing them.  I'm just

11   saying that that's -- you view that you're kind of narrowed

12   down to the stubborn, hardcore, that you can't move, and that

13   you're not going to accommodate any further anyway.  Is that

14   really where we are?  Or are we at a point where some of those

15   stubborn folks, having heard what I have to say, which is there

16   will be ADR, and it will look an awful lot like exactly what

17   you have come up with, if not be exactly that, but I'm willing

18   to give some people a chance to deal with their special

19   situations, so as to avoid mini-trials later.  Because,

20   candidly, it doesn't do me that much good to rubber stamp a set

21   of procedures that I know are going to be objected to in the

22   future, and end up with a whole bunch of litigation of parties

23   saying I opt out for the following reason, I opt out for

24   another reason.  And I have a docket which is crowded with ADR

25   opt-outs.  That's not good either.  And I don't know if that's

44

1    a realistic risk or not, but I'm concerned about it.

2         MR. GRUENBERGER:  Your Honor, I was not -- well maybe

3    I was born yesterday, but not late last night.  So I will

4    certainly not stand in front of the firing squad and say that

5    today is the magic day, no other day works.  Certainly there is

6    nothing magical inherent in today as opposed to September 15th,

7    which I think is the next omnibus date.

8         But I have a suggestion, Your Honor.  And that

9    involves, if Your Honor will bear with me for a moment, and

10   hearing from the committee, because I think their views are

11   important.  I've told you my views on behalf of the debtors.  I

12   think there are many objectors here.  If you're suggesting that

13   they come up and argue their position or you're suggesting they

14   come up -- and maybe you should just ask them whether they

15   think that their objections could be negotiated away in the

16   next two and a half weeks.  I'm not going anywhere on vacation,

17   so I'll be ready, willing and able to do it.  But I don't know

18   if they are.  And maybe you should ask them.

19        THE COURT:  Well, let's do the following.  Most of my

20   questions were rhetorical.  I'm interested in hearing from the

21   creditors' committee and to get the view of the committee as to

22   whether additional time might be useful.  If it is the

23   considered view of both the debtor and the committee that there

24   would be little purpose served in delay, then we won't delay,

25   unless there are parties-in-interest who represent objectors

45

1   who come forward and tell me in sufficient numbers that more

2   time could resolve their objections and lead to a better

3   result.

4          If the answer is that more time could lead to a better

5   result, we should take more time.  If the answer is that more

6   time is a waste of time, we should resolve it today.

7          MR. GRUENBERGER:  I'm all right with that, Your Honor,

8   definitely.

9          THE COURT:  Let's hear from the committee.

10          MR. COHEN:  Good morning, Your Honor.  David Cohen

11   with Milbank, Tweed, Hadley & McCloy here, on behalf of the

12   committee.

13          To go directly to the Court's question as to whether

14   more time may help, we think that there may be some value on

15   the margins.  A lot of the objections go to the timing issue

16   and whether it should be twenty days or thirty days or seven

17   days or fourteen days.  And I think we could have further

18   discussions that may be productive and may resolve those

19   objections.

20          I think, as long as we have, from the Court -- what I

21   understand the Court to be saying is that there will be ADR in

22   some form; that the ADR will be mandatory; and that the Court

23   has the power to issue sanctions.  That gets us a long way in

24   moving forward with resolving some of these objections.

25          THE COURT:  I'm saying all those things.

46

1          MR. COHEN:  Correct.  The other issue that I think the

2     Court should address today, is that there's a role for the

3     committee to play.  There are certain objections that seek to

4     exclude the committee.  As part of the process of getting here,

5     we've worked with the debtors for months to come up with what

6     we think are fair and balanced procedures.  But reasonable

7     minds can differ.  But under the proposed order, there are

8     different ways that a resolution could be settled without

9     further involvement of the Court, one of which is the December

10    procedures order, another is the January procedures order, both

11    of which contemplate the committee's involvement.  If the

12    committee were excluded from the mediation process wholesale,

13    then there runs the issue of 9019s in the hundreds coming

14    before the Court.  We think that that undermines the goal of

15    minimizing the burden on the Court.

16          THE COURT:  Okay.  Thank you.

17          MR. COHEN:  Thank you.

18          THE COURT:  Now, we have a fairly crowded courtroom.

19    And this is not an open casting call.  This is rather a request

20    that if there are parties who have been active in this process

21    and who have objected who believe that it is not going to be

22    useful to provide some more time to try to accommodate, I'd

23    like to hear from only that subset, those who believe that the

24    objections that have been raised are objections that are so

25    fundamental that timing is not -- they can't be resolved with

1    some more time.

2         Fine.  I think there should be some more time.  And I

3    think that it -- I think it makes sense for this to be put over

4    either to the next omnibus hearing date, or alternatively, to

5    find a time prior to the next omnibus hearing date, or after

6    it -- I'm not wedded to September 15th, but prior to may be

7    desirable, just an afternoon when I may have some time

8    available -- for purposes of just bringing this matter to the

9    Court's attention.  That way, if there are ongoing resolved

10   objections, there will be, in effect, a pure ADR day in which

11   people who wish to be heard will have an opportunity to be

12   heard, and other matters on the omnibus list will not be

13   affected in the sense of having to wait while listening to

14   matters that they may not be concerned with.

15        So, I'm suggesting that we either put this off to the

16   15th or to some day, if I can find it on my calendar, right

17   before then, so that we can have a time that's just about ADR

18   issues.

19        MR. GRUENBERGER:  Your Honor, may I ask three

20   clarifying questions, please?

21        THE COURT:  Sure.

22        MR. GRUENBERGER:  Thank you.  Number one, Your Honor

23   used a phrase a little earlier, opt-out.  Our procedures do not

24   provide for an opt-out.  The mediation standing order does

25   provide for, after mediation starts, a party may for cause

48

1    shown ask to be withdrawn.  Yes, that is part of our approach.

2         THE COURT:  What I meant by opt-out was that -- and

3    I'm identifying the Reed Smith papers that were filed, I think

4    this morning --

5         MR. GRUENBERGER:  I think it was 7 o'clock last night.

6         THE COURT:  I saw them this morning.  And I believe

7    you made reference to those papers, at least obliquely, in your

8    opening remarks.

9         MR. GRUENBERGER:  Yes, I did.

10        THE COURT:  They argue that an indenture trustee lacks

11   the power to participate in a meaningful way in a mediation,

12   and that without guidance from real counterparties with

13   economics, that they are, in effect, being forced into a

14   wasteful process which they presumably will seek, even if these

15   procedures are approved over their objection, to opt out of.  I

16   presume they will do that by filing a motion seeking -- I'm not

17   proposing they do this, by the way, but I'm simply identifying

18   something that might be done -- filing a motion or some other

19   pleading that would say we can't participate in a meaningful

20   way in these procedures, and we ask that we not be bound by the

21   order, or we seek reconsideration of the order, or we seek

22   exclusion from the ambit of the order.

23        I'm using that simply as one example.  I am neither

24   highlighting that for purposes of emphasizing the value or the

25   strength of their argument, but simply to identify that it's

49

1    the most recent pleading I read on the subject, and so I'm

2    identifying it as something that may be an example of not only

3    what they have argued, but what others in a similar situation

4    might argue, or that others might argue related to in personam

5    jurisdiction.  So all I'm saying is this.  I think that there

6    is the risk that in coming up with an order which is

7    acknowledged to being imperfect by everyone involved, that we

8    run the risk of creating problems that could be avoided if we

9    spend some more time thinking about ways around those problems

10   in advance.

11            MR. GRUENBERGER:  Your Honor, I --

12            THE COURT:  That's the simple reason that I'm

13   suggesting some more time be spent.

14            MR. GRUENBERGER:  Certainly.  Just on that point, Your

15   Honor.  One of the three points I was going to make was, I

16   think there has to be a decision by Your Honor today that

17   enough is enough on filing papers.  I mean, filing

18   surreplies -- the BNY called it a reply, but this is our

19   motion.  We replied, they objected, we replied, they put in

20   another paper.  Now, if that's okay, everybody else is going to

21   put in more paper between now and whenever that date is.  And

22   that just makes an impossible burden for us as well as Your

23   Honor.  So I think you should put a hiatus on filing more

24   papers.  I really do.

25            THE COURT:  I'll discuss that point at the end of this

50

1    phase of the hearing.  But at some point, it may be desirable,

2    before the next hearing, that there be a status report

3    concerning progress made in the negotiations and discussions.

4    And so I would expect there would be some more papers, at least

5    papers from the debtors and the creditors' committee,

6    indicating what the next generation of the order looks like and

7    what the remaining durable objections still look like.

8         MR. GRUENBERGER:  Fair enough, Your Honor.  I was only

9    addressing more briefs in the nature of letters or briefs to

10   the Court.

11        My next point, Your Honor, was going to deal with

12   issues that have been raised by certain of the objectors, and

13   that is that some of the objectors say well, you know, we --

14   you alluded to it partially a little earlier -- we negotiated a

15   bar date order and a questionnaire after some hearings, and we,

16   the counterparties, have to give information in order to

17   support our claims against the debtors' estates.  And that came

18   after certain parties in that negotiation and hearing argued

19   that well, what's fair for the goose is fair for the gander,

20   and therefore the debtors ought to supply the same kind of

21   information to the counterparties.

22        That objection was not granted.  It was overruled,

23   dropped.  And now parties are trying to get in -- the

24   counterparties, through the back door of this ADR process the

25   same objection, that now we have to give to them what they gave

51

1     us in the bar date questionnaire.  The purpose of those two

2     different hearings and procedures are totally different.

3          We needed, as debtors, to figure out whether or not

4     the proofs of claim had validity, because if there's no

5     objection, as Your Honor clearly knows, there is presumptive

6     validity.  And so in order to object to that, we needed the

7     information.  This ADR process provides that we, in an ADR

8     notice, give a brief explanation of our reasons for a demand

9     for settlement.  The only burden the counterparty has is to

10    give the same quality of information to support either an

11    acceptance or rejection of that demand, nothing more, nothing

12    less.

13         But now, the delay -- and the delay is okay, it has a

14    good purpose -- is going to bump us up near the October 22 bar

15    date questionnaire date, which is October 22 or 23, I think.

16    But that's okay.  But I don't think that by this deferral, that

17    we are going to have to -- I hope not -- automatically default

18    to yes, we're going to give you the same kind of information

19    now, because we never believed that was going to be possible,

20    having Your Honor reject that the first time around.

21         So that's just the point I'm trying to make, is that

22    the burden on us is going to be incredible if parties believe

23    they can do that.

24         THE COURT:  Well, Mr. Gruenberger, you've moved into a

25    substantive point.  And my suggestion, and it's just that, is

52

1    that time be spent to try to accommodate parties who have

2    objections as to the form of the order or as to certain

3    procedures that might be adopted to make this less burdensome

4    on all parties.

5           MR. GRUENBERGER:  Okay.

6           THE COURT:  I certainly wasn't suggesting that the

7    time be used to reopen issues that may be antithetical to the

8    interests of the debtors, although that doesn't mean that

9    people may not ask you for that again.

10          MR. GRUENBERGER:  Right.

11          THE COURT:  I'm simply talking about something that's

12   very benign, or at least it seemed to me it was --

13          MR. GRUENBERGER:  Agreed, Your Honor, and understood.

14          THE COURT:  -- which is that maybe if we had a little

15   bit more time, some of the fifty objections would fall away or

16   would no longer be actively pressed, because we would end up

17   with a more perfect order.

18          MR. GRUENBERGER:  Your Honor, we will work the phones;

19   we will work the negotiations; we will work the meetings, as

20   best we can, as soon as we can.  I promise you that.

21          THE COURT:  Okay.

22          MR. GRUENBERGER:  Thank you.

23          THE COURT:  Fine.  Is there anyone else who wishes to

24   be heard at this point?

25          MR. WILLIAMS:  Your Honor, if I may?

53

1          THE COURT:  Okay.

2          MR. WILLIAMS:  Good morning, Your Honor.  Jeremy

3    Williams, of Kutak Rock on behalf of the Nebraska Investment

4    Finance Authority.  Your Honor, just briefly.  We do disagree,

5    and I apologize for not rising sooner, to the implementation of

6    the ADR procedures, because we believe that as a government

7    entity, we would be exempted from the ADR procedures.

8          THE COURT:  I don't know if that's true or not, but

9    I'm not hearing that today.  I read the response of the debtors

10   to your objection, which references your Web site as a "quasi-

11   governmental unit."  I also understand that -- I'm not really

12   ruling on your position now -- I also understand that you're

13   there for purposes unrelated to the police and regulatory

14   powers of the state, but that you provide what amounts to

15   economic facilitation for business within the state.

16         Whether or not you're covered or not, I don't know,

17   but I'm not going to decide that now.  And if I were to decide

18   it now, you would lose.

19         MR. WILLIAMS:  Yes, Your Honor.

20         THE COURT:  So, sometimes it's better just to stay

21   back.  Is there more for now?  Anybody else like to come up?

22   All kidding aside, anybody who does wish to be heard in

23   connection with the ADR procedures should feel free to express

24   a general position.  But it seems to me that our time today

25   might be better spent moving to other matters on the contested

54

1    agenda.  But I do think that we should establish when next this

2    will be heard.

3            MR. GRUENBERGER:  Exactly, Your Honor.

4            THE COURT:  My inclination is for this to be put over

5    to the September 15 omnibus date, unless I can confirm a time

6    on my calendar when it can be specially heard before that.  And

7    let's move on to other matters on the agenda.  But I'm going to

8    ask one of my law clerks to check with my courtroom deputy if I

9    have any available time.

10            One of the problems that I have in September is I

11    basically have no time.  I have a very, very full calendar.  So

12    it's going to be a question of squeezing it.  It may be that

13    for purposes of at least putting a pin in the calendar that we

14    should assume it's going to be the 15th.

15            MR. KRASNOW:  Richard Krasnow, Your Honor, for the

16    Chapter 11 debtors.  I was going to suggest that I had thought

17    most people in the courtroom really related to the matter that

18    Your Honor just considered.  Perhaps it would be less

19    disruptive if there was a recess.  But in light of Your Honor's

20    statement, we can turn --

21            THE COURT:  Well, why don't we do this.  Why don't I

22    go off the bench.  Why don't I find out if there's a time that

23    I can do this other than the 15th, because people who are here

24    may want to know what that date is.  And I'll come back.  And

25    when I come back, I'm going to give everybody time to clear,

55

1    and then we'll go to the next matter.

2         MR. KRASNOW:  Yes, Your Honor.

3         (Recess from 10:59 a.m. to 11:02 a.m.)

4         THE COURT:  Be seated.  I never should have even

5    thought about another date.  The 15th is really the only date

6    that works.  My courtroom deputy suggested if I want to start

7    sitting on a Saturday we could do it on a Saturday, but that's

8    not going to work for anybody I don't think.  So, the 15th on

9    the omnibus day and anybody who now wishes to be excused is

10   free to leave and then we can move onto the next set of

11   matters.

12        MR. KRASNOW:  Your Honor, should we wait a moment

13   and --

14        THE COURT:  Sure.

15      (Pause)

16        MR. KRASNOW:  Your Honor, bear with us for a moment.

17        THE COURT:  I've been bearing with you for almost a

18   year.

19      (Pause)

20        MR. KRASNOW:  Your Honor, I think we're ready.

21   Richard Krasnow, Weil, Gotshal and Manges on behalf of the

22   Chapter 11 debtors.

23        The next and final matter on today's calendar is the

24   debtors' motion for an order enforcing the automatic stay and

25   holding Shinsei Bank in contempt for violating that stay.  Your

56

1    Honor, let us be clear that this motion relates to the facts in

2    this case, not any facts that might be alleged in some

3    hypothetical motion, facts not before this Court and which

4    while alleged refer to in various pleadings filed in response

5    to this motion, represent nothing but speculation and

6    conjecture as to what the debtors' position might or might not

7    be in connection with matters that have not yet come into

8    existence in any court.

9            THE COURT:  But Mr. Krasnow, one of the problems with

10   taking that position is that to the extent that there is a

11   determination made with respect to the application of the

12   automatic stay cross-border in Tokyo and the administration of

13   a Tokyo insolvency case, the principles would appear to be

14   comparable to the principles who would apply in any other

15   insolvency proceeding affecting Lehman anywhere else on the

16   globe.  And so it becomes difficult, I'm just making this point

17   so that I see this as a situation contrary to your present

18   articulation which establishes a principle that probably does

19   have broad application.  And for that reason, I welcome and

20   will hear all of the objectors who have raised questions that

21   you've demonized as hypothetical.

22           MR. KRASNOW:  Your Honor, I wouldn't say we demonized

23   it.

24           THE COURT:  Well, maybe I overspoke, but I think it's

25   pretty close.

57

1          MR. KRASNOW:  But, Your Honor, the issues and the

2     facts specific to this case could well exist and indeed there

3     is a proceeding in California, as Your Honor is aware, where

4     there is a similar situation.  And so the questions of comity,

5     full faith and credit, what may occur in a bankruptcy

6     proceeding involving a non-Lehman debtor in Delaware,

7     California or a proceeding that is pending in Japan or anywhere

8     else is, in our view, not at issue.  The question is, in our

9     view, is whether or not conduct of this creditor, the conduct

10    in another court whether that court is in Japan or in another

11    state, is conduct which violates the automatic stay.  The

12    target here is not, as suggested by Shinsei and some of the

13    other objectors, the jurisdiction authority of courts outside

14    of this court to exercise their jurisdiction.  We're not here

15    today suggesting to the Court that the Japanese court, that the

16    court supervisor doesn't have the jurisdiction to determine the

17    issues that have been presented to it.  We're not asking this

18    Court to divest those other courts, to divest the court

19    supervisor of the jurisdiction that it has.  Rather, the focus

20    here is whether or not by invoking the court's jurisdiction the

21    creditor has violated the automatic stay.  This is no different

22    in that respect than if Shinsei Bank or a creditor had

23    commenced an action in some court seeking a recovery from the

24    Chapter 11 debtors.

25         The court in which they commenced the action may well

58

1   have the jurisdiction to consider the issue, the subject matter

2   jurisdiction, it may have in personam jurisdiction over all the

3   parties, but that doesn't mean that what that creditor has done

4   and what we allege Shinsei has done is permitted under the

5   automatic stay.  So to that extent, Your Honor, that is the

6   reason why we say comity is really not at issue.  The protocols

7   that this court has approved and is endorsed as we have is not

8   at issue.  There is nothing in the protocols that is intended

9   to modify the rights that the debtors otherwise have to the

10  protections afforded to them under the automatic stay.  And so

11  that's really the reason why, Your Honor, we've said that these

12  hypotheticals, which have been conjured up, really have no

13  bearing here because this motion is specific; it relates to the

14  specific facts of this case, it relates to precisely what

15  Shinsei has done and the question is whether or not that

16  conduct, that conduct, is violative of the automatic stay.

17      THE COURT:  Now, my understanding as to what Shinsei

18  has done is that consistent with procedures applicable to

19  insolvency proceedings in Japan, they have permissibly filed an

20  alternative plan in the Tokyo district court which, if

21  approved, would result in an outcome detrimental to the

22  interests of Lehman.  Whereas, if the Lehman plan were approved

23  there would be an outcome detrimental to the interest of

24  Shinsei in relative terms.  Do I have it right or wrong?

25      MR. KRASNOW:  If I can characterize it somewhat

59

1   differently, Your Honor?

2           THE COURT:  Sure.  But I'm trying to understand the

3   basics.

4           MR. KRASNOW:  Your Honor, can I answer the question by

5   going through what we believe and to a large extent has not

6   been contested by Shinsei as the facts, the relevant facts as

7   they pertain to the --

8           THE COURT:  I don't want to interfere with your

9   argument at all.  I'm really focused on the comity issue which

10  you said is not part of this dispute, because it seems to me

11  that it is and I need to understand why you assert that it's

12  not.  Because if what you are saying is that a Japanese

13  creditor in Japan cannot permissibly assert a position in a

14  local court that would otherwise be assertable in that court

15  without first coming to this court to obtain relief from the

16  automatic stay where that action would be potentially

17  detrimental to the property interests of Lehman, I think that

18  does raise a comity issue.  And we can discuss that at some

19  point in the argument.  I want you to know, and that's why I've

20  interjected, that I don't accept your original proposition that

21  this is just like it's happening in a state court or before

22  Judge Smith in the Central District of California in SunCal.  I

23  view it as different.

24          MR. KRASNOW:  Your Honor, even if it addresses a

25  comity issue, comity, as far as I am aware, is not a defense to

60

1    a action taken by a creditor that otherwise violates the

2    automatic stay.  And the focus here -- comity, as I understand

3    it, really relates to the relationship between the courts and

4    it's an international variation, if you will, of full faith and

5    credit.  And as I noted earlier, this is not a full faith and

6    credit issue.  It's not a question of whether or not another

7    court in the United States or a court in Japan has jurisdiction

8    and whether or not that jurisdiction should be recognized by

9    this court or whether the Japanese court should recognize the

10   jurisdiction of this court.  It is rather focused on the

11   actions of the debtor.

12        To answer your question as to what Shinsei has done,

13   broadly speaking that's correct but the manner in which they

14   are effectuating what Your Honor has described, is what is at

15   issue here.  It's not simply proposing another plan where

16   Lehman's recoveries would be different than what is proposed,

17   not under the Lehman plan but the Sunrise Finance plan.  It is

18   that they are taking a position with respect to that which

19   would result in a reduced recovery, which in our view violates

20   the stay.  It is not defensive in nature.  It is offensive in

21   nature.  And that, to us, is a critical difference and it is a

22   critical difference that has been recognized in this court.

23        If I may, Your Honor, just briefly touch upon some of

24   the facts as they relate to what is happening in Japan or has

25   happened, because it's relevant to exactly the point that I've

1    just raised.

2         Sunrise Finance, which is an affiliate of Lehman, is

3    the subject of a proceeding in Japan; a rehabilitation

4    proceeding and thus Sunrise itself is a debtor-in-possession,

5    if you will, under Japanese law.  In connection with that

6    proceeding there was a requirement that claims be filed.

7    Shinsei Bank filed a claim, LBHI, the Chapter 11 debtor, filed

8    a claim, as did Lehman Brothers Asia Holding which we refer to

9    in our papers as LB Asia.  LB Asia itself is the subject of

10   insolvency proceeding in Hong Kong.  LBHI is the single largest

11   creditor of LB Asia and thus would reap the benefits of

12   substantially all of the recoveries that the joint provisional

13   liquidators of LB Asia successfully obtain.

14        The claims that LBHI and LB Asia filed in connection

15   with the Sunrise proceeding represent approximately seventy-two

16   percent, it's our understanding, of the total claims asserted

17   against LB Asia.  Consistent with the Japanese law, there was a

18   date by which objections, if any, had to be filed to claims.

19   It is our understanding that objections in that proceeding

20   could be filed not only by Sunrise, the debtor, but as well by

21   creditors.  No objections were filed by anybody by the deadline

22   established in that case to the LB Asia's claim.

23        Sunrise did, in fact, challenge the amount asserted by

24   LBHI in its claim.  The challenge went to the difference

25   between what our books and records reflected what was due and

62

1    what Sunrise's records reflected what was due.  That dispute

2    was resolved when LBHI reduced the amount of its claim to the

3    amount reflected in Sunrise's books and records.

4         LB -- Sunrise, thereafter, approved, did not

5    challenge, the claim filed by LBHI as amended.  Nobody else,

6    including Shinsei Bank, challenged or disputed the claim filed

7    by LBHI in its original amount or as amended.

8         It is our understanding, and is reflected in a

9    supplemental declaration by a Japanese counsel supports this,

10   that under Japanese law as a result of their not having been

11   any objections interposed to either LB Asia's claim or LBHI's

12   claim as amended, they are allowed valid claims.  That, in our

13   view, is a pivotal point, Your Honor.  Thereafter, Sunrise

14   filed a plan which contemplates a distribution, pro rata

15   distribution, of around twenty percent of allowed claims to

16   creditors similarly situated.  And in that regard, it's our

17   understanding, LBH's claim, LBHI's claim and Shinsei Bank's

18   claim are all similarly situated and thus we would all get a

19   recovery of twenty percent.

20        Shinsei filed a competing plan.  And it wasn't simply

21   a competing plan which suggested different classes of creditors

22   and the like, it was a plan where the material difference

23   between the Sunrise plan and its plan went and goes to an

24   attempt through the plan to equitably subordinate the Lehman

25   claims.

63

1       We accept and agree with the characterization in

2   Shinsei Bank's objection to what that means under Japanese law.

3   That is a reprioritization of claims.  Claims, we submit, that

4   would otherwise be allowed.  It is a means by which

5   distributions which would otherwise be made to Lehman in

6   respect of its allowed valid claims would be reallocated to

7   other creditors with the primary beneficiary being Shinsei

8   Bank.  That is what is before the Japanese court.  That is what

9   Shinsei Bank did.  The issue, therefore, is fundamentally

10  whether or not that kind of action, whether it occurs in a

11  Japanese court, a court in the States, a court in another

12  foreign jurisdiction, is of the type that violates the

13  automatic stay.

14      Now, there are references throughout the pleadings

15  that have been filed in the objections of those filed by

16  Shinsei and by some of the other parties who are strangers to

17  this proceeding and whose objections, we submit, should simply

18  be overruled for the reasons set forth in our reply, that the

19  law is clear that once a Chapter 11 debtor participates in

20  another proceeding, call it a foreign proceeding, foreign to

21  the home court, if you will, this court, if you will, with

22  respect to Lehman, whether it is in Japan or elsewhere, that

23  the automatic stay cannot be utilized to prevent another party

24  from acting in a defensive matter in respect of a claim that's

25  been filed by the debtor.  We agree, Your Honor.  We cannot

64

1    file a claim in another Chapter 11 case or another

2    rehabilitation proceeding or a liquidation proceeding overseas

3    and simply contend that the other side, be it an administrator,

4    a liquidator or creditors in that case, if they have the right

5    in those -- under those governing laws of the foreign

6    proceeding to object to a plan, that we cannot stand up and say

7    our claim is valid, per se, you cannot challenge it, because to

8    do so would undercut our ability to get a distribution and

9    violate the automatic stay.  That is not our position.  That

10   shouldn't be our position.  It can't be our position.  We

11   accept the fact the defensive actions taken in respect of

12   actions taken by a Chapter 11 debtor are absolutely permitted.

13   It is our view, however, that the attempt to equitably

14   subordinate a claim is not defensive in nature.  It is

15   offensive in nature.

16          And we point out, Your Honor, and the objectants point

17   out, one or more of them, that, in fact, that issue, which is,

18   again, I think goes to the core of our motion, is equitable

19   subordination defensive or offensive has really only been

20   addressed, as best as we can all determine based on our

21   pleadings, by three courts.  And I used the address in the

22   sense of, at least as to two of the decisions that are referred

23   to by the parties, as at least mentioning subordination not

24   really analyzing the issues.  Those three decisions are the

25   SunCal, as I will refer to as SunCal decision that I'm sure

65

1    Your Honor is aware of, which is, Your Honor, in another

2    matter, a Chapter 15 matter, is noted as the law of that case

3    and not this case, the court did there note its view that

4    equitable subordination was defensive.  It was a conclusory

5    statement without any analysis.  It is on appeal.  But there is

6    absolutely no analysis of a fundamental difference between an

7    objection to claim and equitable subordination.

8          The other decision that I've alluded to that the other

9    parties rely upon is the decision in this court by Judge Drain

10    in the Miteom case.

11          In that particular case, the Chapter 11 debtor before

12    Judge Drain had filed a claim.  A trustee in another case

13    objected to the claim and in its objection it also asserted as

14    alternative relief equitable subordination.  The judge, in that

15    case, in our view, really didn't analyze a fundamental

16    difference between equitable subordination and objection.

17    Focused more on the objection to the claim, the challenge to

18    the validity of the claim, and in that context concluded that

19    the objection was permissible.

20          And as to equitable subordination, focused on the fact

21    that the trustee who had interposed these challenges contended

22    that it was not seeking affirmative relief and on those grounds

23    Judge Drain said, well, this is defensive in nature.  We would

24    submit that we believe Judge Drain is wrong and that the

25    appropriate analysis to be undertaken is that which Judge

66

1    Gonzalez did in Enron, which we believe is on all fours with

2    this particular case.

3         In that case, Enron had asserted a claim in an Indiana

4    proceeding.  An adversary proceeding was commenced seeking to

5    equitably subordinate that claim.  There was no objection to

6    the claim.  So it was the pristine issue which, if you will,

7    which is before this court, a claim that was not being

8    challenged as to validity or amount but rather was being

9    subject to equitable subordination.  And Judge Gonzalez noted

10   that the very nature of equitable subordination is -- first it

11   is premised on an acceptance of the fact that the claim itself

12   is valid and allowed.  And that what the party, the offensive

13   party, is seeking to do is exactly what is being sought in

14   Japan as acknowledged by Shinsei Bank which is to take an

15   allowed and valid claim, subordinate it to and reprioritize it

16   vis-a-vis other claims so the distributions that the claimant

17   would otherwise be entitled to are redistributed to others.

18   That, Judge Gonzalez noted, is offensive in nature, it is not

19   defensive in nature, and therefore is subject to the automatic

20   stay.

21        We believe, Your Honor, that the analysis undertaken

22   by Judge Gonzalez as set forth in Enron is the correct and more

23   persuasive analysis.  It applies directly to this case.  And

24   that Your Honor should, we suggest, should conclude that as in

25   Enron so to here the actions that Shinsei Bank has taken

67

1    through it's plan, and this is the primary focus of the plan if

2    not the singular purpose of the plan, to equitably subordinate

3    our allowed claim violates the automatic stay, that they are in

4    contempt for having taken that action and that, therefore, they

5    should purge themselves of that contempt by withdrawing their

6    plan.

7         Your Honor, unless the Court has any questions, for

8    the reasons I've stated and as reflected in our motion, we

9    believe that the relief we sought should be granted.

10        THE COURT:  I have a couple of questions.

11        Your argument assumes that what is happening in Japan

12   is equitable subordination.  I don't know if that's true or

13   not.  Did the parties stipulate that that's what's happening or

14   is there any dispute with respect to the relief that's being

15   sought in Japan as a result of the Shinsei plan?  The reason I

16   bring this up is that as far as I know, the term "equitable

17   subordination" if used in a Japanese court probably wouldn't

18   resonate.

19        MR. KRASNOW:  Your Honor, that's why I, in my

20   argument, refer to Shinsei Bank's description of what they're

21   seeking to do which is consistent with what -- how we've

22   articulated it.

23        THE COURT:  Well, I understand that their plan would

24   elevate their claim and the claims of others in the same class

25   and would subordinate or put in a more junior class claims in

68

1    which LB Asia and LBHI currently would be pari passu under your

2    plan, they'd be junior under their plan, correct?

3             MR. KRASNOW:  Yes, Your Honor.

4             THE COURT:  I don't know whether or not classification

5    for purposes of an alternative plan under the Japanese

6    insolvency regime is or is not the equivalent of equitable

7    subordination.

8             MR. KRASNOW:  Your Honor, again, I would refer the

9    Court to Shinsei's reply where I don't believe they challenge

10   our characterization, and indeed describe in a defensive manner

11   that we don't believe it's meritorious, but in a defensive

12   manner that what they are seeking to achieve through the plan

13   is to reprioritize the claim, which is the terms actually used

14   by the courts and in the decisions that I've described,

15   including Judge Gonzalez's, as how we view equitable

16   subordination.  And if one peruses the plan and opinions that

17   were filed by Shinsei Bank, the reasons why they believe that

18   the Lehman claim should be subordinated, and we're talking

19   about translations from Japanese to English, while the merits

20   of what they say certainly don't resonate with us, the

21   arguments that are being made resonate to me, anyway, in terms

22   of what I would often see when one comes across a claim that

23   someone is saying should be equitably subordinated.

24             So, Your Honor, I would submit that based upon the

25   pleadings that were filed in Japan, and again, Your Honor,

69

 1   there's a translation issue, but what one doesn't have to

 2   translate is, in fact, the objection that Shinsei Bank filed

 3   and I think it's clear there that what they're talking about is

 4   equitable subordination, in essence, as we know that.

 5          THE COURT:  I don't meant to elevate form over

 6   substance, but one of the things I'm struggling with is that in

 7   the ordinary course of U.S. Bankruptcy practice, a claim might

 8   be equitably subordinated by means of an adversary proceeding,

 9   or it might be subordinated by means of classification and then

10   there would be litigation concerning the reasonableness of that

11   classification.  But there would be litigation, no doubt,

12   unless parties consented to the propriety of that

13   classification scheme.

14          In the context of a Japanese insolvency proceeding, it

15   is unclear to me whether or not as a matter of applicable

16   jurisprudence the District Court judge sitting and comparing

17   these two plans is involved in a litigation context in which a

18   party is taking shots at LBHI, or whether or not the court is

19   evaluating the reasonableness and fairness of two schemes and

20   making a decision yes, this one is fair, I will support this

21   one.  I don't know how it works, and I don't know if there's a

22   distinction to be made.  But it seems to me that if what a

23   foreign judge is doing consistent with applicable foreign law

24   is assessing the reasonableness of a distribution scheme, the

25   consequence of which may be adverse to a party in bankruptcy;

70

1    in this case LBHI, that's a perfectly reasonable thing for the

2    judge to do, and I don't think the automatic stay is

3    implicated.

4          MR. KRASNOW:  Your Honor, I'm not going to necessarily

5    disagree with that, however, I certainly am not going to stand

6    up in front of the Court as someone who is facile and an expert

7    in Japanese law.

8          THE COURT:  I suspect there's no one here about to

9    stand up and say that.

10          MR. KRASNOW:  Having said that, Your Honor, I think

11   one can be informed as to the issue that Your Honor has raised.

12   By looking at the pleadings -- what I'll characterize as

13   pleadings, what are, I think, referred to as opinions, filed

14   with the Court's supervisor -- by Shinsei Bank, yes, by Lehman,

15   we did participate in that proceeding, we're not denying that.

16   And what, at least, I gleaned from those pleadings, those

17   opinions, and what each of the parties have put before the

18   Court's supervisor is not questions of classification, but

19   specifically whether or not equitable subordination is or is

20   not appropriate.

21          So, again, Your Honor, what I glean from those -- from

22   the position taken by Shinsei Bank and how they have

23   articulated them before the Japanese court it's apparent to us,

24   in any event, that what is at issue is precisely what would be

25   at issue here were there to be a proceeding commenced against a

1  party contending that their claims should be equitably

2  subordinated.  Not does this party belong in that class or

3  another class.

4          THE COURT:  Can you tell me how the treatment of the

5  LBHI claim under the Shinsei proposed plan in Tokyo violates

6  the automatic stay?

7          MR. KRASNOW:  It is our position that it is -- if you

8  will form over substance to look at the manner in which Shinsei

9  is seeking to equitably subordinate; whether it is by an

10  adversary proceeding or how they have done it in the plan, that

11  that attempt to subordinate what is otherwise now a valid and

12  allowed claim, is for the reasons set forth in his analysis in

13  the Enron decision, in Judge Gonzalez' rationale, is an

14  offensive act, not a defensive act.  And where a defensive act

15  would not violate the automatic stay, an offensive act, which

16  in this case is seeking to reallocate distributions we would

17  otherwise receive on our allowed claims, is taking control over

18  property of the estate, and is precisely what goes to the core

19  of the automatic stay and is a prescribed act.

20          THE COURT:  Is it taking control over property of the

21  estate to obtain an order from a court of competent

22  jurisdiction regarding an appropriate distribution scheme under

23  applicable foreign law?

24          MR. KRASNOW:  I will go back to what I said earlier in

25  my argument.  It is in our view in the context of the specific

72

1   facts here.  I am not prepared to stand up before Your Honor

2   and argue that every time there may be a plan proposed before

3   any Court, which affords one treatment for Lehman and

4   presumably other similarly situated creditor, and another, that

5   that is a per se violation of the automatic stay.  If that's

6   what Your Honor is asking I can't say that it would be.  There

7   might be facts and circumstances specific to a particular plan,

8   such as we submit has occurred in connection with the Sunrise

9   proceeding, where there would be a violation of the automatic

10   stay.  But we're not -- I mean, the parade of horribles that

11   has been described, alluded to in certain of the objections,

12   that somehow for example, we're taking the position that if

13   somebody -- another creditor to a foreign debtor, for example,

14   files a claim in connection with that case because that would

15   dilute our distributions, that somehow that violates the

16   automatic stay, for us to assert that would be absurd, we're

17   not taking that position.

18        I'm reluctant to say there's a general rule, Your

19   Honor, because as we all know what the Court will render a

20   decision based on specific facts, and, again, we're saying the

21   facts here are such that what Shinsei Bank is doing is

22   violative of the stay.

23        THE COURT:  Okay.  I think I should hear from Shinsei

24   Bank's counsel.

25        MR. KRASNOW:  Thank you, Your Honor.

73

1          THE COURT:  Mr. Trost, good morning.

2          MR. TROST:  Good morning, Your Honor.

3          Apparently, the motions are quite different that the

4    debtor filed.  We apparently responded to a different motion

5    than the original motion, which complained of Shinsei conduct.

6          But before we get to that, let's correct the record on

7    one set of facts.  The creditors in the Sunrise proceeding,

8    which is an administration proceeding, the by far -- the

9    biggest by far Lehman family creditor is LB Asia for 99.5

10   percent of the claims.  Translating roughly, don't hold me to

11   these numbers from yen to dollars, LB Asia, which is in a Hong

12   Kong liquidation proceeding, with administrators, filed a claim

13   in the Sunrise case for roughly 2.4 billion dollars.  LBHI,

14   which is the proponent of this motion, has filed a claim which

15   is now fifteen million dollars.

16         LB Asia is not a debtor in these proceedings.  So what

17   the motion seeks in the second motion, because we misunderstood

18   apparently -- we and everybody else misunderstood the first

19   motion which had nothing about offensive and defensive.  Just

20   says Shinsei was on the creditors' committee, and we abused our

21   position, and the automatic stay applies.  By the way, the

22   debtor later retracted any suggestion in their supplemental

23   pleading, any suggestion of any kind of misconduct by Shinsei.

24         THE COURT:  So there's no need to discuss it.

25         MR. TROST:  Nothing to discuss on that.  But the

74

1    creditors, the Lehman family creditors, look at the impact your

2    ruling would have if you ruled that we were in contempt of

3    court because we did not know that the automatic stay prevented

4    us from asking the Sunrise administrator to consider a plan

5    which treats the creditors' classification differently than the

6    Sunrise plan.  And LBHI only has fifteen million dollars at

7    stake.  Even if LBHI had everything, we would come out to the

8    same place the automatic stay could not possibly prevent the

9    Japanese proceeding from going forward.

10           And isn't it interesting that the debtor concedes had

11   we or some other creditor objected to the LB Asia claim in that

12   one week we had to do it, in the fall of 2008, between November

13   25th and December 2nd, is what they say.  We could have done it

14   then, we could have said you have no claim at all, LB Asia.  We

15   could have said you had no claim at all, LBHI.  They admit the

16   automatic stay wouldn't affect that.  But we are prevented --

17   because of that we are prevented from suggesting as you raised

18   the question that there are two plans that the administrator

19   should consider.  One, that classifies the Lehman claim of

20   fifteen million dollars, and classifies the LB Asia claim of

21   2.4 billion dollars on a par with the third-party creditors,

22   that's one plan the Japanese administrator could deal with.

23           There's another plan the Japanese administrator could

24   deal with.  And that plan treats the creditors differently,

25   like it would be common under our practice for people to

75

1    suggest that a class of creditors should not be treated

2    equally.  And the facts in the case, I'm going to refer the

3    Court to some exhibits we filed as part of our declaration.

4    The facts in the case make it quite clear, that Sunrise was

5    "Capitalized by debt."  It had almost no equity.

6         But LB Asia is not a debtor in these proceedings.  How

7    could it be that the automatic stay in the United States

8    Bankruptcy Court could stop in its tracks the ability of

9    creditors to contest what the classification should be.  We

10   didn't have time to file a declaration because we received the

11   reply sometime yesterday.  I think it was filed -- they didn't

12   hold back, just that things happened over the weekend.  But we

13   did ask our Japanese lawyers whether in spite of the fact that

14   the claims were allowed, whether a rehabilitation plan under

15   Japanese procedure could still reclassify the claims different

16   than they were allowed?  And the answer is yes.  I represent to

17   you and we would file such an affidavit, but I don't think it

18   makes any different.  LB Asia is not before this Court.

19        Let me go to a second series of facts.  Your Honor has

20   all this in our exhibits.  When Lehman filed their hypothetical

21   motion, the first motion they filed was a hypothetical motion,

22   which said all of these things.  They referred -- they attached

23   in the declaration, I believe I have this correctly, three

24   pleadings that had been filed before the Japanese -- in the

25   Japanese court to be considered by the Japanese supervisor.

1   One on May 15th was a rehabilitation proceeding filed by

2   Shinsei.  And it classified the claims different than had been

3   filed by Sunrise; the affiliate which is owned in the chain of

4   Lehman.

5          They also in the Japanese proceeding on May 22nd,

6   there was filed by Asia, may I just call Lehman Asia Holdings

7   Asia and LBHI, the debtor in this case, an objection to the

8   Shinsei plan.  Those were filed in the movant's papers.

9          There was also filed by Shinsei an application to

10  amend the Shinsei plan.  And then two very important documents

11  were omitted from the original motion.  And these -- the

12  lawyers for the debtors all involved in this, Shinsei gave to

13  the -- these two are in our papers, not mentioned in the

14  papers, Shinsei filed an opinion brief, a brief, in support of

15  its classification of claims, which it had a right to do under

16  Japanese law.  What did LB Asia and the debtor do?  They didn't

17  come to this Court and say automatic stay violation, automatic

18  stay violated.  This motion was filed on August 11th.  They

19  didn't come to this Court when other papers were filed.  At no

20  time when these papers were filed raising these issues under

21  Japanese law in a Japanese proceeding, before a Japanese

22  supervisor who is going to decide which of these plans to send

23  to creditors, they didn't come to this Court.  They could have

24  come in -- they could have come on May 16th; the day after May

25  15th.  They could have come on May 22nd.  They could have come

1    on June 27th; the day after Shinsei filed an application to

2    modify its plan.  They could have come on June 27th when

3    Shinsei said this is why we think our classification is proper.

4    They didn't come to this Court.  And, moreover, on July 17th in

5    the English translation of sixty-seven pages, LB Asia and this

6    debtor jointly filed an opinion brief as to why its improper

7    not to classify these claims.  That's what they did.  Something

8    happened after July 17th that caused the debtor to consider the

9    fact hey, we better stop this.  We better stop this proceeding

10   before the Japanese court.  And, although, Mr. Krasnow, who's a

11   fine lawyer articulates -- tries to narrow the scope of what

12   he's seeking to do, if he were really seeking to punish this

13   offensive defensive kind of dichotomy that's how cases are

14   going to be decided, about whether you can proceed in a

15   Japanese proceeding.  Why didn't they seek an injunction, why

16   didn't they file a complaint for an injunction?  You would have

17   tossed it out.

18        So they've made all these arguments that they want to

19   make in the proper place in Japan.  And if you were to do

20   anything -- and by the way, all of these papers are in our

21   declaration -- Mr. Kleiner's declaration, and they're not all

22   in Mr. Labine's declaration because they didn't tell you about

23   two of these things.  They didn't tell you about their sixty-

24   seven page brief.  Why didn't they tell you about that in their

25   opening papers?

78

1          THE COURT:  Mr. Trost, let me ask you a question.  Do

2     you know what the procedure is at this point in reference to

3     these two competing plans?  And do you know, what, if any,

4     action is taken either by Shinsei or by Lehman entities in the

5     prosecution of one plan or the other?  What happens next?

6          MR. TROST:  Okay.

7          THE COURT:  If you know.  If you don't know that's a

8     perfectly good answer.

9          MR. TROST:  I do know.  I can tell you what I think I

10    know.

11         THE COURT:  If that's the best you can do.

12         MR. TROST:  But our Japanese clients are with us

13    today, they came in from Tokyo.  This is a very, very, very

14    serious matter for Shinsei Bank.

15         MR. TROST:  What happens -- isn't it telling that

16    we're spending all our time talking about what's happening in

17    Japan and what is the procedure in Japan and Mr. Krasnow do you

18    know and Mr. Trost do you know, and Your Honor is right.  So

19    what happened in answer to your question.  These two competing

20    plans are before our supervisor who is something like a

21    mediator.  I mean, I think he is a person who wants the two

22    sides to come together.  So one plan, and only one plan can go

23    out to creditors.

24         THE COURT:  The supervisor is not a judicial officer?

25         MR. TROST:  I think he's a judicial officer, but I

79

1   don't know that.  But this is within the Japanese court system.

2   The Japanese civil court system, this is a bankruptcy

3   proceeding in the Japanese court system.  And the supervisor

4   has these two competing plans, and he's going to recommend one

5   to the Court to be distributed to creditors to vote.  That's

6   all I know.  That's basically what I know.  But he is very,

7   very important.  The supervisor serves as the traffic cop in

8   terms of their plan process.

9        And as a matter of fact, the -- Shinsei in a pleading

10   that we are instructed by the supervisor we cannot incorporate

11   into the record, there was an effort to mediate this dispute

12   which the debtor turned down.  Before the debtor turned it down

13   probably two weeks before they filed this motion.  So the

14   answer to your question, I think I've answered it.

15        THE COURT:  You have because you've qualified it by

16   indicating it's just what you know.  But I want to ask you if

17   there's something else that you know.  Which is whether

18   parties-in-interest, like Shinsei, or Lehman, have the ability

19   to engage the supervisor to take action in front of the

20   supervisor to influence the supervisor in terms of his exercise

21   of discretion, in terms of what's planned to adopt.  That's

22   question one.  And question two is, is there a procedure for

23   sending out the plans to creditors?

24        MR. TROST:  I don't know the answer to the second

25   question.  I do know the supervisor wants send one plan to the

80

1    Court and then go to creditors.  And my understanding is they

2    communicate, the parties -- the Japanese lawyers communicate

3    with the supervisor.  I'm not sure what the process is.  My

4    guess is it's not formal.

5           THE COURT:  All right, go ahead, I interrupted you.

6           MR. TROST:  By the way, the LB Asia facts are all in

7    our brief, and I'm not going to -- as Mr. Krasnow did not, I'm

8    not going to go over all of that.  All of the arguments are in

9    our brief, and I'll just try and hit the points which I think

10   are appropriate for oral argument.  Because having sat through

11   the Court this morning, I know how busy you are.

12          When we received the reply brief which shifted the

13   focus of the motion, we learned for the first time that because

14   we did not -- because the claims were allowed to be treated as

15   allowed claims, that we are barred -- all creditors of

16   Shinsei -- of Sunrise are barred from taking any position of

17   any form which would treat the LB Asia claim.  Let's just focus

18   on that one at less than parody with everyone else.  We learned

19   that for the first time.  We learned that we could have done it

20   had we filed an objection to the claim.  The case was filed in

21   September, enormous case, you know what the Lehman case is, the

22   same thing over there.  Nobody had any information.  Alvarez &

23   Marsal was trying their best to gather the facts, and you know

24   what it's been like.  So that's what we learned for the first

25   time.  I almost have to pinch myself to say how do I address

81

1    this subject with a straight face.  But I'm going to try and

2    address that subject with a straight face.

3            I've covered a number of these points.

4            THE COURT:  Mr. Trost, let me break in and ask you

5    this.  Do you accept the offensive versus defensive distinction

6    that has been articulated by counsel for Lehman in this

7    instance?  In other words, assuming you had been on your toes

8    in that week that you describe as a remarkably brief period of

9    time to do something that's permissible, mainly object to a

10   claim.  Assuming you would have objected to the claim, which

11   would have been offensive, that's permissible.  But the taking

12   action to subordinate is impermissible because it's taking

13   action to exercise control over property of the estate.  Do you

14   accept the jurisprudence that provides for that dichotomy of

15   behavior?  In other words, defensive behavior is in the safe

16   zone, but offensive behavior violates the stay?

17           MR. TROST:  I do not accept it, but you -- I submit

18   that you mischaracterized what Mr. Krasnow's position is.  He

19   conceded to you that we are not seeking to enforce -- to

20   control property of the estate.

21           THE COURT:  I think it's exactly what he said.  That's

22   exactly what he said.

23           MR. TROST:  That's not --

24           THE COURT:  I heard him say when I asked him a

25   question tell me how what Shinsei is doing in Japan violates

82

1    the automatic stay and he said, unless I heard him wrong,

2    they're seeking to exercise control over property of the estate

3    by seeking to subordinate the claim, that's what I heard.  Is

4    that what you said?

5            MR, KRASNOW:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. TROST:  I do not accept it.  You asked me if I

8    accept that, absolutely not.  We are not seeking -- first of

9    all, how do you deal with LB Asia?  LB Asia is not a debtor in

10   this proceeding.  How could they -- and they represent 99.5

11   percent of the Lehman claim.  They're not a debtor here,

12   they're not a party to this proceeding.  They haven't sought an

13   injunction.

14           With respect to this issue that came up of offensive

15   and defensive, I'd rather go with Judge Posner in his two

16   cases, Martin Dragona (ph.) and the other case that we cite in

17   our footnote.  We have a right to defend ourselves over there

18   in this Japanese proceeding.  Assuming this even should be an

19   interest to an American court, it would be -- others are going

20   to address this.  It would be a horrible precedent and barred

21   American bankruptcy law to have a rule that if a creditor files

22   a -- a debtor here files a 10,000 dollar claim in the UK

23   administration or the Japanese administration that you're done,

24   you can't go forward.  And as of today they're saying they just

25   want to prevent our offensive conduct.  Well, how does anybody

83

1    know what they can do in the Japanese proceeding?  Shouldn't

2    this be for the Japanese supervisor and the Japanese court to

3    decide?

4         If you were to enter this order that we violated the

5    automatic stay and it's been conceded that we can do defensive

6    things but not offensive things, what do we do over there?  If

7    the supervisor calls us and says he wants to talk to us and LB

8    Asia about what to do we got to go to Judge Peck in New York to

9    find out if we can go to the meeting.  It just can't be.  This

10   can't be -- others are going to address this comity issue.  And

11   the fact that a fifteen million dollar claim by a debtor in a

12   case with two and a half billion claims triggers all this,

13   frankly, boggles my mind.

14        Now, with respect to the Enron case I do not

15   believe -- that was a case, by the way, where there was a

16   motion -- they're proceeding in that case was a complaint, an

17   adversary proceeding to subordinate, I don't think it makes

18   much difference.  But I do not subscribe to that difference.

19   And I do not think it should be the law of the case in this

20   situation either.

21        So leaving time for others and knowing that you're

22   busy, I would just like to leave with this thought.  I think

23   Lehman's position, LBHI's position is untenable.  I could say,

24   but I'm not going to it's disingenuous because it came up at

25   the very last after all these papers were filed in the Japanese

84

1   court.  And because we didn't object because Shinsei or the

2   other creditors did not object to the proofs of claim in the

3   one-week period does not mean even if you were to consider

4   somehow you want to get involve in all this mess over Japan,

5   does not mean we can't at the supervisor's request file a

6   competing plan of rehabilitation.

7           THE COURT:  Did you say at the supervisor's request?

8   Did they supervisor request that this plan be filed, or did you

9   voluntarily file it?

10          MR. TROST:  I don't know the answer.  But I do know

11  that he now wants the two parties to get together on one plan.

12  So that I do know.

13          The supervisor -- my understanding is -- I'm not a

14  Japanese lawyer I didn't --

15          THE COURT:  That's obvious.

16          MR. TROST:  And I don't think any of us at this table,

17  on either side, knows the ins and outs of the Japanese

18  corporate reorganization law.

19          THE COURT:  The reason I'm asking questions about it

20  and the reason I've asked you questions about it and I've asked

21  Mr. Krasnow questions about it is I'm trying to understand what

22  precisely is going on in a Japanese proceeding so that I can,

23  in my own mind, characterize it within U.S. jurisprudence as to

24  whether or not it does or it does not constitute a stay

25  violation.  The mere fact that something is happening cross

85

1    border does not mean that it isn't a stay violation.

2         MR. TROST:  Correct.

3         THE COURT:  If Shinsei were to go into a Japanese

4    district court and seek to pursue claims against LBHI that

5    would be wrong.

6         MR. TROST:  That's a different case.

7         THE COURT:  Obviously.  What I'm saying very

8    simplistically is the fact that there are proceedings occurring

9    in a foreign court that's simply an irrelevancy in terms of

10   analyzing whether the stay applies.  It does apply to foreign

11   proceedings where 362(a) can be determined to be implicated.

12   What I'm trying to do determine as a matter of law is whether

13   what Shinsei has done in a set of proceedings that I am

14   unfamiliar with and so are you actually violates the stay.  It

15   could violate the stay.  The fact that it may create a parade

16   of horribles would be unfortunate.  But one of the consequences

17   would be that if there is a stay violation someone would have

18   to come here and get stay relief.  Parties in the past have

19   tried to do that, Shinsei did not.  I'm not suggesting by these

20   comments that what Shinsei has done violates the stay, but it

21   could be that if, for example, what was done in the Tokyo court

22   was not the filing of a competing plan, but the commencement of

23   a complaint against LBHI, a creditor, in the Tokyo District

24   Court seeking to subordinate the claim that that would much

25   more clearly fit within Judge Gonzalez' Enron decision.

86

1          What I am struggling with and what you should

2     understand is that just because there are adverse consequences

3     to the strict application of U.S. law doesn't mean that U.S.

4     law should not be strictly applied.  The question is whether or

5     not it should be applied in this instance.  And in order to

6     apply it in this instance I need to understand the facts and I

7     really don't have them.

8          MR. TROST:  I have two answers -- to points.  The

9     first point is you have these papers, these are in the record.

10    I can give you a separate book.  These are all the facts that

11    we have.  And you will see what's going on as far as I know.

12    These are three pleadings from the debtors' motion and three

13    pleadings from our motions, all are in the declarations.

14         What is going on is that there have been competing

15    plans of reorganization, these are liquidation plans.

16    Competing plans of reorganization with different classification

17    of claims.  And they're before the supervisor and the parties

18    have been filing briefs with the court which the supervisor

19    reads advocating one set, which is the Shinsei set which treats

20    the claims as subordinated.  And one plan which treats them all

21    as pari passu.  That's as much as I know what's going on.

22         Plus, the supervisor would like to get the parties

23    together so that they could agree on one plan.  And that has

24    been rejected by the debtor.

25         The second point, Mr. Krasnow -- I don't think I

87

1    misunderstood this in the brief.  He concedes that we had the

2    right to object to LB Asia and LBHI between November 25th and

3    December 2nd without coming to this Court to seek permission.

4    He concedes that in his written papers, he conceded it in oral

5    argument.  So they have conceded that but for the fact that we

6    didn't do anything by December 2nd, this is converted into this

7    dichotomy of offensive and defensive, and all of a sudden we

8    violated the automatic stay.

9           THE COURT:  I don't think he's conceding anything.

10   I --

11          MR. TROST:  Oh, he does concede that, Your Honor.

12          THE COURT:  No.  I think what he was saying is that

13   for purposes of existing jurisprudence doesn't involve anything

14   dramatic, it's perfectly permissible for a party in a second

15   debtors' bankruptcy case to object to a claim filed by the

16   debtor from a first bankruptcy case.  That a proof of claim in

17   which the debtor submits to the jurisdiction of another court

18   can be objected to principally without stay relief.

19          So what he is saying, however, if I'm understanding

20   his argument, is that that's different from filing an adversary

21   proceeding seeking to subordinate an allowed claim.

22          MR. TROST:  We haven't filed an adversary proceeding,

23   that I can tell you.

24          THE COURT:  I understand that.  And one of the reasons

25   that I am asking as many questions as I have asked regarding

88

1    what is going on in the Tokyo District Court is to try to

2    determine procedurally whether or not it is or is not

3    comparable in any way to adversary proceeding practice, or

4    taking offensive action, or doing anything procedurally that

5    would be deemed the exercise of control over property of the

6    estate.  Because if it's any of those things the stay is

7    violated.  If it's not, if it's characterized as this is just

8    ordinary course Japanese practice in which competing plans are

9    submitted, it happens all the time, and the supervisor looks

10   left and looks right, weighs them and compares them, says I

11   like this plan better and throws it out for a vote, I'm not

12   sure that violates anything.

13        MR. TROST:  That's where they are, the latter.  And I

14   would raise this point --

15        THE COURT:  I appreciate the fact that you've said but

16   you've also said you're not a Japanese lawyer and I accept that

17   fact, and I'm not sure I can accept that representation.  So

18   what I don't know from the stack of papers that I have, I

19   believe this is that binder, what I don't know from that stack

20   of papers, despite all of the translations from Japanese into

21   English is procedurally exactly what happens next.  And

22   procedurally what has happened in Japan.  Is there a court like

23   this, with people sitting around and a record maintained, is

24   there due process of the sort that we ordinarily expect in a

25   U.S. Bankruptcy Court.  I recognize that the procedures are

1    different, I recognize that Japanese legal proceedings are

2    entitled to respect in this country, the due process as we know

3    it is accorded, but it differs from situation to situation.  I

4    don't know enough about it to know whether or not rights of

5    creditors are fully respected and protected.  I just don't

6    know.  And I suspect there isn't a person in this courtroom who

7    really does.  But if there is I'd like to hear from him or her

8    if there's a position to express in this point.  And if we

9    don't have a position to express on this point I expect

10   supplemental briefing.

11        MR. TROST:  I would make one point and I'll sit down.

12   LB Asia.  Does it under any stretch of the imagination how

13   could the automatic stay prevent any creditor from opposing LB

14   Asia, which is not a debtor in this proceeding.  The allegation

15   in the debtors' motion is they have the beneficial interest in

16   the recovery.  But LB Asia is in a liquidation proceeding with

17   joint administrators in Hong Kong.

18        THE COURT:  I'm not dealing with LB Asia for purposes

19   of what I just articulated.  To the extent that there's a stay

20   violation as to LBHI that's really all that matters for purpose

21   of today or, frankly, the next day that we have a hearing after

22   supplemental briefing.

23        I view the LB Asia issue to some extent a red herring

24   comparable to Lehman ALI in the case of SunCal which was

25   referred to by debtors' counsel.  Lehman has a lot of entities

90

1    and most of them are not in bankruptcy.  Those that are in

2    bankruptcy are entitled to stay protection, those that are not

3    in bankruptcy are not entitled, but there may be derivative

4    benefits.

5         MR. TROST:  Thank you.

6         THE COURT:  Is there anyone else who wishes to speak

7    at this point on this subject?  Mr. Flics.

8         MR. FLICS:  Your Honor, Martin Flics of Linklaters LLP

9    on behalf of the joint administrators of the Lehman European

10   Group administration companies.

11        I will be very brief and thank you for hearing me

12   today.  I assure you that I have absolutely no insight to offer

13   on Japanese bankruptcy law.  And it may be that the decision in

14   this matter does turn on some specific matters relating to

15   Japanese bankruptcy law.  And so I will just make a few general

16   comments for whatever they are worth.

17        First, Your Honor, the original motion when we read it

18   did cause us some degree of concern based on the arguments that

19   it made and based upon a bit of a floodgates argument that was

20   actually mentioned, I believe in paragraph 35 of the motion,

21   that if we allow this other creditors will -- may do similar

22   things, whatever similar might mean.  And we did attempt to

23   contact the debtors' counsel to get some comfort on that, we

24   weren't successful to do that and that was the reason we felt

25   that it was appropriate to file the pleading that we did.

91

1          Your Honor, speaking at a very general level.

2     Obviously, we all know there a many foreign insolvency

3     proceedings.  I suspect that just at this is the biggest

4     bankruptcy case ever, I believe there are probably more foreign

5     solvency proceedings with respect to this entity than there

6     ever has been.  And it is the nature of insolvency proceedings,

7     I believe, it is fair to say, that there is an ordinary

8     process.  There are many differences, of course, among

9     insolvency regimes, but there's a fairly ordinary process.  And

10    that is some process of some type is commenced.  And that

11    creates an estate of some type.  And then creditors, or other

12    claimants, with respect to that estate enter into that process.

13    They open the door, if you will, and enter into that process if

14    they choose to assert their claims.

15         Now with respect to those claims there is no right to

16    a recovery until the end of that process when the Court or

17    whatever appropriate authority determines that there is a right

18    to that recovery.  In this case, as far as I can determine,

19    there is no suggestion of any effort to obtain an affirmative

20    recovery against LBHI or LB Asia, they are in the midst of an

21    insolvency proceeding, and the issue is what will be the

22    distribution on the claim of LBHI or LB Asia.  Now, I've

23    admitted I know none of the details, but it strikes me that

24    it's not an uncommon situation, it is precisely in a general

25    way the sort of situation that is faced in insolvency

1    proceedings around the world, hence the concern.

2         And I believe the case law in discussing offensive or

3    defensive, you can get bogged down in what is the meaning of

4    offensive of defensive, and I would submit that if you ware not

5    seeking an affirmative recovery, but you are just being heard

6    in that proceeding with respect to the claim that has been

7    asserted, then it's a wholly artificial distinction to allege

8    whether or not there's some concept of allowance in the middle

9    of the process that you have chosen to enter.

10        Your Honor, I'll also just address for a moment Mr.

11   Krasnow's comment that we really shouldn't be concerned because

12   we are -- we're not affecting the jurisdiction of a court here,

13   I mean, we're not saying Court, you can't do this.  But, in

14   fact, if there is an improper affect on creditors and there are

15   many with many claims in many proceedings, then, in fact, if

16   those creditors cannot or will not or are concerned about

17   bringing actions that they are lawfully entitled to bring, then

18   foreign courts and other tribunals will not, in fact, have the

19   ability to make the proper determinations because it will never

20   be brought before them.

21        Your Honor, finally, I am not aware that any party of

22   the debtor has cited to any case, doesn't mean there couldn't

23   be one, now we're in the future, any case in which a court has

24   enjoined the actions of a creditor in a foreign insolvency

25   proceeding in taking actions in respect of a claim that has

1    been voluntarily submitted and asserted in the course of that

2    proceeding.

3           And for those reasons, I would urge the Court to

4    overrule the motion.  Thank you.

5           THE COURT:  Are there others who wish to be heard on

6    the side of opposition to the Lehman motion?

7           MR. O'NEAL:  Your Honor, Sean O'Neal, Cleary Gottlieb

8    on behalf of three European banks that have filed objections.

9           I'll make this extremely brief.  We appreciate the

10   Court's understanding as to why other creditors would be

11   interested in this proceeding.  Our point is simple, that entry

12   of this contempt order could have broad applications outside

13   the U.S. and we appreciate Your Honor being cognizant of those

14   concerns.  And we do understand there are situations in which

15   creditors' actions outside the U.S. Can, in fact, impact the

16   automatic stay.  However, our concern here is that we need to

17   proceed very carefully and the Court needs to proceed very

18   carefully, as we know it will, in applying the automatic stay

19   to the legitimate exercise of creditor actions outside the

20   U.S., when those actions are actually in accordance with the

21   applicable foreign law.

22          We echo Mr. Flics' concerns and the sentiments

23   expressed in the objection.  We highlight a few particular

24   concerns which is that at this point in which I think Your

25   Honor is fully aware, that the facts and circumstances are not

1    sufficiently clear to the Court to determine whether or not

2    relief is appropriate.  And we should keep in mind that it is

3    the debtors' burden to make that showing.

4         It is also unclear to us whether really the Enron case

5    on subordination, as Your Honor noted, is really applicable in

6    this context where we are dealing with concepts under Japanese

7    law.  I think those -- and it can also be said that many of the

8    cases that are relied upon in this Court have been cases

9    involving U.S. proceedings, and I think we have a fundamentally

10   different issue when we're dealing with proceedings outside of

11   the U.S., due to comity and related concerns.

12        And at any rate, I think we should all keep in mind

13   that the distinction between equitable subordination and claims

14   disallowance as set forth in the Enron decision is not entirely

15   clear, not all courts have come to that view, which makes sense

16   given that the overall result is relatively the same, which is

17   no recovery.

18        And then I think, finally, Your Honor, we would

19   express concern, both about the request for relief in favor of

20   nondebtor entities, I think that has been discussed here today.

21   And the concern that the normal distinction that we've seen in

22   U.S. Cases between offensive and defensive actions might not be

23   able to be uniformly applied across jurisdictions.  So I don't

24   think the Court and the litigants should immediately jump to

25   the assumption that that normal dichotomy that is applied in

95

1    U.S. cases really makes sense in this context.

2          And with that, Your Honor, I think that's all we have.

3    And we appreciate your hearing our concerns.

4          THE COURT:  Okay, thank you.  Is there anyone else who

5    wishes to be heard before Mr. Krasnow gets a chance to talk?

6          MR. KRASNOW:  Thank you, Your Honor, I'll be brief.

7          First of all, Your Honor, we certainly take the

8    position that creditors shouldn't be permitted to do in foreign

9    jurisdictions what they can't do here.  To allow them to do

10   that would allow creditors of the estates who otherwise have

11   access or the ability to get judgments outside the United

12   States to be able to do so while creditors who may not be in

13   the similar position to get that advantage.  The automatic stay

14   applies in an extraterritorial sense.

15         Secondly, Your Honor, if Your Honor accepts our view

16   of the affective equitable subordination, which is to divert

17   recoveries that otherwise would be made to the debtors to

18   somebody else, that is an affirmative recovery.

19         Lastly, Your Honor, I am not going to argue what

20   Japanese law is or is not, I will observe, Your Honor, that it

21   is certainly our understanding, if I can phrase it that way and

22   Your Honor will accept that, that the plans were not filed,

23   either Sunrise or Shinsei's at the invitation of the court's

24   supervisor.  It is our understanding there was a deadline for

25   the filing of plans.  The plans were filed consistent with that

96

1    deadline.  Yes, Your Honor, I noted in my argument, there were

2    then opinions or briefs filed by both sides with respect to the

3    plan that Shinsei filed.  Those were filed with the court's

4    supervisor.  It's our understanding that the Court's

5    supervisor, I analogize it to some extent, like a magistrate

6    considers the legal issues in the plans and then makes a

7    recommendation to the District Court.  It is my understanding

8    that there are communications that are had between the

9    supervisor and the parties.  And, in fact, I'll use

10   understanding again, that the supervisor has reached out to

11   Sunrise, has requested that it makes certain modifications to

12   its plan; the Sunrise plan, totally unrelated to the issues at

13   hand.

14        Having said all of that, Your Honor, we would suggest

15   to take up with the Court's observation, that the appropriate

16   next steps may well be that there be supplemental declarations

17   that are filed, not by U.S. lawyers interpreting what Japanese

18   lawyers tell them the law is in Japan, but rather that we

19   solicit from our Japanese counsel a declaration which responds

20   to Your Honor's inquiries, so Your Honor could better

21   understand and, perhaps, all of us can, exactly what the

22   process is in Japan.

23        Certainly, it is our view that based upon our readings

24   of the plans that have been filed in the Shinsei plan, that

25   what they are doing through the plan is the equivalent of an

1    adversary proceeding, if you will.  But I know Your Honor is

2    not going to be terribly swayed by our views in that regard.

3    And so I think that is the appropriate and reasonable next

4    steps.

5              THE COURT:  That sounds right to me.  I think it would

6    be useful to the process and certainly will inform me if I have

7    sworn declarations from Japanese lawyers who are involved in

8    the Sunrise proceeding and who are able to provide some first-

9    hand knowledge of what the process is all about; what has

10   happened so far, what is currently being decided by the

11   supervisor, and what will happen next.

12             I'm also fairly interested in knowing something which

13   is almost the ultimate question.  And that is who's doing the

14   subordination, who's doing the classification?  It seems to me

15   and I may be putting too fine a point on this at the end of the

16   argument, that if the supervisor is being given plans to

17   consider for recommendation to the court, and the court in

18   Japan is then is authorizing that a particular plan be

19   distributed to creditors for their approval, that at that point

20   Shinsei is doing nothing.  At that point the court is doing

21   something consistent with applicable Japanese insolvency law to

22   effect an equitable distribution.  That is not a violation of

23   the automatic stay in my view.

24             So part of the question that I'm wrestling with is who

25   is doing what to whom and how are they doing it?

98

1          MR. KRASNOW:  Yes, Your Honor.

2          THE COURT:  And I'd like more information on the set

3    of questions.

4          MR. KRASNOW:  It's our position that Shinsei through

5    it's plan is, in fact, seeking the subordination.

6          But having said that, Your Honor, we will reach out to

7    our Japanese counsel.  I would suggest that since I know

8    speaking for ourselves, I can't commit timing wise in terms of

9    the filing of a declaration, I suspect that Mr. Trost is in a

10   similar position, that we each speak to our respective counsel,

11   speak to one another so that we can agree upon a date for the

12   filing.  And if we can't agree then seek the Court's advice or

13   intervention in that regard, rather than agreeing to a date

14   right now.

15         THE COURT:  I think that makes sense, too.

16         MR. TROST:  I think that makes sense.  What I was

17   going to inquire.  I assume you would like one declaration by

18   somebody and that we each have -- the lawyers ought to be able

19   to agree or point out where the Japanese lawyers disagree as to

20   what the process is.  I don't expect that but would you -- is

21   that what you -- you don't anticipate each of us filing a

22   declaration?

23         THE COURT:  Well, I, frankly, didn't have any

24   anticipation.  Although, when I said what I said, I was

25   assuming that that there'd be two declarations.  I was assuming

99

1   that there would be one from counsel for Sunrise, or for Lehman

2   in Japan, that there would be another from Shinsei's counsel.

3   If they could agree on one declaration that would be great, but

4   I have a strong sense that there might be areas of

5   disagreement.

6           MR. KRASNOW:  I was about to say, Your Honor, we would

7   be pleased and encouraged Shinsei adopting our views as to what

8   the results would be here.  And I accept Mr. Trost's

9   proposition in that regard.

10          MR. TROST:  We'll try.

11          MR. KRASNOW:  Why don't we see -- I envisioned there

12  would be two separate declarations.  If, in fact, our

13  respective counsel absolutely agree on their interpretation of

14  Japanese law, it is what it is.

15          THE COURT:  Then it suggests that it truly is a great

16  system over there.  And I'll see you next time, but I'll wait

17  to hear from you as to when next time will be.

18          MR. KRASNOW:  Thank you, Your Honor.

19          THE COURT:  We're adjourned to 2 o'clock for a

20  2 o'clock calendar.

21          MR. KRASNOW:  Thank you, Your Honor.

22       (Recess from 12:31 p.m. until 2:09 p.m.)

23          THE COURT:  Be seated, please.

24          MR. KOBAK:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.

100

1          MR. KOBAK:  James Kobak, Hughes Hubbard & Reed, on

2     behalf of the SIPA Trustee.  Your Honor, on our calendar this

3     afternoon, we have two matters, one of which is uncontested,

4     one of which is contested, and we'd propose to take them in the

5     order that they're listed, which is the uncontested matter

6     first, if that's acceptable to Your Honor.

7          THE COURT:  That's perfectly acceptable.

8          MR. KOBAK:  Good.  Thank you, Your Honor.  The first

9     matter is our application for interim allowance of fees for the

10    period February through May.  This is our second interim

11    application.  As with the first one, currently in our case it's

12    subject to a holdback of fifteen percent.  The application

13    covers the time and fees of both the trustee and my firm as

14    counsel to the trustee.  The total amount slightly exceeds 15

15    million dollars for the 4-month period, which, when the

16    holdback is applied, comes to approximately 12.9 million

17    dollars for the period.  And we've also asked for expenses of

18    approximately 132,000 dollars.

19          As I believe Your Honor is aware, our application

20    received a very thorough review by SIPC, both by Mr. Caputo,

21    their experienced counsel who's in court here today, by their

22    general counsel and by administrative personnel.

23          As a result, during each month we made some

24    adjustments to the bill, and we also had a final reduction of

25    approximately 25,000 dollars which appears in the revised order

101

1    that we filed on the docket and that we'll hand up to your

2    clerks.

3         THE COURT:  I thought I saw a revision of 65,000

4    dollars somewhere in the application.

5         MR. KOBAK:  I think that was during the course of the

6    four months, and this is an additional twenty-five.

7         THE COURT:  So now it's up to ninety?

8         MR. KOBAK:  That's correct.

9         THE COURT:  Okay.

10        MR. KOBAK:  I also will just note for the record that

11   our firm provides a ten percent public interest discount of our

12   fees, and we also do not bill for certain expenses such as

13   travel and late-night meals that ordinarily would be billed to

14   other clients.

15        There's been no objection to this application, and it

16   has been reviewed by SIPC, as I mentioned, and they have filed

17   a recommendation in support of it, which, as Your Honor knows,

18   is, by statute, subject to considerable reliance, although it's

19   not determinative on Your Honor.

20        And if you'd like, I could recite all the activities

21   that we did over those four months, but I really don't want to

22   take the Court's time, and I think it's fully documented in our

23   application.

24        THE COURT:  If I actually said I wanted you to do

25   that, what would you do?  No, I don't want to hear that.  I've

1    reviewed Josephine Wang's statement of support indicating

2    careful review by SIPC of your application.  I note the ten

3    percent reduction in your regular hourly rates.  The blended

4    rate is reasonable under the circumstances, and obviously the

5    efforts that have been undertaken are considerable and of

6    value.

7            Mr. Caputo's here.  I don't know if he wants to say

8    anything other than --

9            MR. CAPUTO:  Nothing further, Your Honor.

10           THE COURT:  Fine.

11           MR. CAPUTO:  I'll rest on the recommendation.  Thank

12   you.

13           THE COURT:  So I think that everything is in good

14   order, and I approve the application.

15           MR. KOBAK:  Fine.  Thank you, Your Honor.  We'll hand

16   up to your clerks an order.

17           THE COURT:  Fine.

18           MR. KOBAK:  Thank you.

19           THE COURT:  Now we have the contested matter.

20           MR. KOBAK:  Yes, Mr. Wiltenburg is going to handle

21   that for the trustee.

22           MR. WILTENBURG:  Good afternoon, Your Honor.  David

23   Wiltenburg, Hughes Hubbard & Reed, for the trustee.  The

24   contested matter is the motion of the Unclaimed Property

25   Recovery Service for various forms of relief, which originally

103

1    included lifting of the automatic stay and other forms of

2    relief.

3           On the -- at the omnibus hearing on June 3rd, the

4    Court made some observations and engaged in dialogue with

5    counsel, and the result was --

6           THE COURT:  Mr. Wiltenburg, can you please speak up?

7           MR. WILTENBURG:  I'm sorry, Your Honor.

8           THE COURT:  Just boom out.

9           MR. WILTENBURG:  Okay.

10          THE COURT:  Make believe you're talking to a crowded

11   courtroom.

12          MR. WILTENBURG:  Thanks, Your Honor.  I was reprising

13   the events of June 3rd.  And following discussion on that day

14   in colloquy with counsel, the Court deferred the matter to an

15   evidentiary hearing on the question of whether the contract in

16   issue is or was or was not, on the filing date, an executory

17   contract.

18          And to kind of shorten the story, the parties have had

19   communications of a sort over the intervening weeks.  There's

20   been a discovery request that was promulgated by the trustee

21   that was responded to, as we've mentioned in our papers, in a

22   way that we felt was not really sufficient.  And the parties

23   have also filed supplemental submissions, including evidence

24   and argument, going to the question, or several questions, but

25   including the question of the executory character of the

104

1    contract.

2         Now, I should say first that in preparation for

3    today's hearing I realized a couple of things, and one of them

4    was the subject of a letter of perhaps an hour ago to the

5    Court --

6         THE COURT:  I have it.

7         MR. WILTENBURG:  -- in which we withdrew reference to

8    a certain exhibit pending clarification on the record as to

9    what the true meaning of that exhibit may be.  And the second

10   item, Your Honor, is kind of a realization that the question of

11   executoriness, if you will, in the end will not make a great

12   difference, and here's the reason for that.  If the debt was

13   owed on the filing date, it is a pre-petition contract claim.

14   If the contract was executory, it has been rejected by the

15   trustee, and the result will be a rejection damages claim which

16   is equally a pre-petition unsecured claim.  So, however today's

17   question is resolved will probably end up in roughly the same

18   place.

19        Finally, Your Honor, I've, upon realizing those two

20   points, attempted to discuss them with counsel for the moving

21   party, without success.  If the discussion had happened, it

22   would have included our willingness to stipulate to a pre-

23   petition claim amount in a reasonable and negotiated number.

24        So, Your Honor, with that preamble, if the Court

25   prefers to go ahead with the hearing, I think we're prepared to

105

1   do that.

2        THE COURT:  I think it will be desirable for you to

3   talk to Mr. Batista.  He's here.  I see him.  If you want to

4   talk with him and you didn't have a chance to do that, is there

5   some value in avoiding an unnecessary hearing?

6        MR. WILTENBURG:  I would think it's been our -- it

7   would be our preference to do that.

8        THE COURT:  Mr. Batista, are you prepared to talk to

9   Mr. Wiltenburg?

10       MR. BATISTA:  Of course.

11       THE COURT:  I suggest you do that.  And I suggest you

12  use this opportunity to talk and that, since we have, as I

13  understand it, a long argument scheduled for -- I thought

14  3 o'clock, but maybe it can be accelerated earlier because I

15  think people are in the courtroom, you can talk -- either you

16  can listen, because it's going to be very interesting, or you

17  can go someplace else and maybe resolve this dispute, because

18  if it comes down to an agreed claim, that may be all that Mr.

19  Batista's client wants, assuming the number's right.

20       MR. WILTENBURG:  Thank you, Your Honor.  I think we

21  may step outside --

22       THE COURT:  I shouldn't speak for Mr. Batista.

23       Do I understand your position correctly?

24       MR. BATISTA:  That's right.  I'm happy to talk so long

25  as we can talk now in the jury room or chambers or --

1          THE COURT:  Jury room, that doesn't happen in this

2     court.

3          MR. BATISTA:  Ah-hah.

4          THE COURT:  We don't have juries here generally.  But

5     you're welcome to find an appropriate place to talk and come

6     back and give me a status report in a couple of hours.

7          MR. WILTENBURG:  Thank you, Your Honor.

8          THE COURT:  All right.

9          MR. BATISTA:  Thank you, Judge.

10          MR. KOBAK:  Thank you, Your Honor.

11          THE COURT:  That's the end of the SIPC calendar?

12          MR. KOBAK:  Yes, it is, Your Honor.

13          THE COURT:  And everybody who's involved in the SIPC

14     case who would like to be excused may leave.

15          IN UNISON:  Thank you, Your Honor.

16          THE COURT:  Is everybody here on Libra?

17       (Pause)

18          THE COURT:  Get settled.  It's -- there's no hurry.

19       (Pause)

20          THE COURT:  Mr. Miller?

21          MR. MILLER:  Good afternoon, Your Honor.  May it

22     please the Court.  I'm Ralph Miller from Weil, Gotshal & Manges

23     here for the plaintiffs and movants, Lehman Brothers Holdings,

24     Inc., known as LBHI, and Lehman Brothers Special Financing,

25     Inc., known as LBSF.  My colleague, Scarlett Collings, will be

107

1    working with me today, especially with the visual aids.

2         The undisputed facts in this summary judgment record

3    show that Societe Generale made a billion dollar bet in 2006

4    through the Libra credit default swap agreement on pools of

5    residential mortgages and by 2008, after those mortgage pools

6    had plummeted in value, that credit default swap agreement had

7    become a great liability for Societe Generale and a substantial

8    asset of LBSF.

9         By late April of 2008, the transaction was feeling the

10   effects of the economic storm that was brewing.  And the assets

11   in the special purpose vehicle known as Libra CDO were no

12   longer sufficient to pay the projected credit protection

13   obligations that would be due to LBSF.  That condition resulted

14   in an event of default by the Libra parties when the ratio of

15   collateral to potential payments fell below ninety-nine

16   percent.  This default in turn activated additional protections

17   that we're going to talk about, especially under section 5.2(c)

18   of the indenture for LBSF and others.

19        When LBHI filed for Chapter 11 protection in September

20   of 2008 and LBSF followed on October 3rd, Societe Generale

21   tried to escape from the consequences of the deal that it made

22   by giving instructions to terminate the credit default swap

23   agreement on October 10, 2008.  It's a very important fact that

24   their instructions were to terminate the credit default swap

25   agreement.

1    The trustee, acting for Libra CDO, followed that

2    instruction and gave notice of an early termination date on

3    that same day.  The summary judgment record shows that this

4    purported termination of the credit default swap agreement with

5    LBSF was invalid because it was attempted prematurely without

6    obtaining the necessary vote of noteholders and before the

7    declaration of acceleration had become final.  That vote of

8    noteholders and the finalization of acceleration were both

9    express requirements for a termination of a credit default swap

10   agreement after an acceleration declaration had been sent.

11   The reply brief of the Libra parties contain some

12   admissions that focus the issues and make them easier to

13   summarize.  Under the simultaneous briefing schedule that we

14   have had, this hearing is the first opportunity that LBHI and

15   LBSF have had to respond to and explain the arguments of the

16   Libra parties as they are set out in their reply briefs.  So I

17   want to place my emphasis during the next few minutes on points

18   from the record that have not been explained in detail in the

19   briefs.  I hope to say some things that the Court has not

20   already seen in the briefs.

21   There are five topics that I'd like to cover quickly,

22   all based entirely on undisputed evidence in the record before

23   the Court and supported by visual aids to make this explanation

24   move more efficiently.

25   First, I will use a chronology to show what the record

1   demonstrates about this transaction and its status at the time

2   of the purported termination of the credit default swap

3   agreement on October 10, 2008.

4       Next, I will explain why section 5.2(c) of the

5   indenture expressly prohibited this purported termination of

6   the credit default swap agreement on October 10, 2008 and why

7   section 5.2(c) is a logical and important protection designed

8   to ensure the continuation of this complex structure for the

9   benefit of LBSF and other parties.

10      Third, I'll show how the record, including judicial

11  admissions by the Libra parties in their answer in the first

12  filed proceeding and their complaint in the consolidated

13  adversary proceeding that was filed shortly thereafter, refutes

14  the argument of the Libra parties in their reply brief that the

15  declaration of an early termination date on October 10 did not

16  terminate the credit default swap agreement.

17      Fourth, I will explain why the reliance of the Libra

18  parties on section 12.1 of the indenture, as now clarified in

19  the reply brief, is prohibited by the automatic stay and,

20  further, why section 12.1 does not conflict with section 5.2(c)

21  of the indenture.

22      Finally, I will show how the record demonstrates that

23  enforcement of article 5 of the indenture, including section

24  5.2, will accomplish the intended goal of that article and many

25  other provisions within the structure.

110

1          By keeping the credit default swap agreement alive,

2     thus retaining it as a valuable executory contract of the

3     estate, once that executory contract is assumed and assigned,

4     it will preserve the original economics of this transaction,

5     which was intended to play out over a long period of time, and

6     the intent of the parties will be upheld.

7          Your Honor, we do have some visual aids, some

8     materials; they are in notebooks with tabs.  If Ms. Collings

9     might pass those out.  We've already provided copies to counsel

10    for the defendants.

11         THE COURT:  I'd be happy to see the visual aids.

12         (Pause)

13         MR. MILLER:  If we might, Your Honor, let's start, as

14    seems logical, with tab 1, which is a chronology.  Let me begin

15    this discussion of the status of the transaction by explaining

16    what had gone before.  Now, this is not exactly to scale

17    because we needed a lot of text, but it does try to represent

18    generally things that occurred in proximity to each other or as

19    closer to each other than things that were a long time apart.

20         First, the record shows that the credit default swap

21    agreement was executed with a related indenture and other

22    parties -- other documents by the parties on October 17, 2006.

23         Now, we already have up a transaction diagram, which

24    is tab 2.  This is a slightly revised version of a diagram that

25    was used earlier in a hearing on approval of the letter

1    agreement.  The only changes are some color changes, and the

2    name Societe Generale has been added to clarify who the senior

3    swap counterparty is.

4        As you know, the Libra CDO is a special-purpose entity

5    created under the law of the Cayman Islands that entered into

6    the credit default swap agreement with LBSF and also took in

7    investments from noteholders.  It also entered into the

8    unfunded senior swap agreement with Societe Generale.  And

9    while metaphors are always difficult, it may be helpful to

10   think of the senior swap agreement as sort of like a letter of

11   credit that stands behind the obligations of Libra CDO.

12       The economic engine that drives this whole transaction

13   is the credit default swap agreement with LBSF, which is the

14   blue square in the upper left-hand corner.  Without that

15   agreement, this would be much like an inefficient mutual fund

16   with very high costs.  While some of these investments were put

17   into things like guaranteed investment accounts and cash, many

18   were put into pools of residential mortgage.  This mortgage

19   is -- this is what the noteholders put in.

20       But the reason that those investors were willing to do

21   this was that LBSF needed credit protection on exposure to

22   mortgage pools and agreed to pay a substantial premium, tens of

23   millions of dollars a year, keyed to mortgages that could in

24   theory last up to thirty years.

25       That premium added to the investments and the

112

1    investment return, less the fees, produced a return that would

2    be attractive to the noteholders if the mortgage pools

3    continued to perform as expected.  If not, everyone understood

4    that at that point LBSF would receive what amounted to

5    insurance-like protection for diminution in value of those

6    residential mortgage pools.

7         The special-purpose vehicle Libra CDO provided

8    insulation, so the assets that were at risk were only those

9    that were put into the pool, including the promise of the

10   senior swap counterparty Societe Generale to pay money, if

11   necessary, into that vehicle.

12        As I will explain, it's important to note that the

13   senior swap counterparty Societe Generale is not a noteholder.

14   And the documents do not make any provision for payments from

15   the senior swap to go to the noteholders.  The senior swap

16   exists for the protection of LBSF, and that becomes critical in

17   interpreting the documents.

18        Looking back at tab 1 again, the chronology, the

19   collateral purchased with the proceeds of these notes, which

20   included interest in residential mortgages, dropped in value as

21   the mortgage crisis came upon the country.  And the so-called

22   reference obligations, which were also keyed mostly to

23   residential mortgages, performed poorly so that by April 30th

24   of 2008 there wasn't enough collateral to cover all the

25   obligations that were expected to be due to LBSF under the

1    credit default swap agreement.

2         As a result, the trustee issued a notice of an event

3    of default on April 30, and that is summarized in this first

4    yellow box.  It states, and this is a summary, that basically

5    the collateral had dropped below ninety-nine percent of the sum

6    of potential amounts due to be payable by Libra.

7         Two days later, on May 2nd, the trustee declared

8    acceleration of the notes.  This is the second yellow box.

9    This declaration of acceleration had a number of consequences.

10   These events occurred because the Libra CDO was

11   undercapitalized for the special purpose that gave rise to its

12   existence.  This was like an insurance company, basically, that

13   was on the brink of receivership for having inadequate assets.

14        Now, this is important to understand, Your Honor,

15   because this situation does not occur in many of the

16   transactions.  This was a default on the issuer side.  At this

17   point, LBSF and LBHI were performing fully, and there was no

18   problem; they were entitled to all of their money.

19        Under the indenture, which I will talk about further

20   in a minute, section 5.2(c) became operative.  And tab 3, which

21   is now going up, is the quote of section 5.2(c).  Section

22   5.2(c) says, "The Issuer", and that includes the trustee acting

23   for the issuer under the documents, "shall not terminate the

24   senior swap agreement, the credit default swap agreement or any

25   hedge agreement in effect immediately prior to a declaration of

114

1    acceleration unless the liquidation of the Collateral has begun

2    and such declaration is no longer capable of being rescinded or

3    annulled."

4          A lot of ink has been devoted to this, but I think the

5    parties are all in agreement that there was a declaration of

6    acceleration, and immediately prior to it there was a senior

7    swap agreement, that's the one with Societe Generale, and there

8    was a credit default swap agreement, and that's the with LBSF.

9          So at that point the issuer had a promise not to

10   terminate those until two things happened; both of them had to

11   happen:  There had to be a beginning of liquidation, and the

12   declaration of acceleration had to have become finalized.

13         The summary judgment record shows that neither of

14   those conditions have been met, but the easiest one to deal

15   with here is that the liquidation of the collateral never

16   began.  And the reason it didn't is that there were provisions

17   that required a vote.

18         If you turn to tab 4, we have collected a number of

19   similar provisions, 2-5.2(c), that are scattered throughout the

20   documents that are all designed with a common purpose, and that

21   is to keep this complex structure functioning if one party has

22   a problem or an issue arises.  For example, the first two

23   provisions there deal with replacement of the calculation agent

24   if it resigns, and replacement of the collateral manager if it

25   is removed or if it's terminated.

115

1      The next page there promises that LBSF will make no

2  attempt to place Libra CDO into bankruptcy, which would disrupt

3  the process.  And then there's a provision that has to do with

4  resignation or removal of the trustee, to replace the trustee.

5  There's a provision on the third page of that tab, that's

6  actually quoted, that deals with retaining the collateral,

7  securing the notes.  And then there is a provision that allows

8  LBSF to assign and delegate its duties to one or more

9  institutions without consent, if necessary.

10      Let's go back to section 5.2(c) now, if we could.  The

11  Libra parties agree with LBSF that liquidation could not begin

12  unless the trustee determined there was enough collateral to

13  discharge all these notes, which didn't happen, or the

14  noteholders of two-thirds of the so-called controlling class

15  and two-thirds of other classes direct a sale of the

16  collateral.  This is a result of conditions in section 5.5(a)

17  of the indenture, as explained on page 15 of LBSF's motion for

18  summary judgment.  That shareholder -- excuse me, noteholder

19  vote never occurred.

20      Let's stop for a minute to be sure it's clear in the

21  context of this transaction why this voting requirement is so

22  important.  The record shows that these were pools of mortgages

23  that could continue in theory, as I said, for up to thirty

24  years.  Many of them were thirty-year fixed mortgages.  Over

25  time, this collateral could become worth more or less, and the

116

1    reference obligations could perform better or worse.

2         If government programs to avoid residential

3    foreclosures had great success, for example, these pools could

4    increase in value, and the losses to the junior noteholders,

5    which at this point were going to be very substantial, could

6    decrease.  Section 5.2(c) gave those noteholders a vote on

7    whether liquidation was going to occur or the transaction was

8    going to continue.

9         It's an undisputed fact that the noteholders never

10   provided the needed votes.  So the liquidation, which is the

11   first condition of 5.2(c), never began.  Section 5.2(c) also

12   gave LBSF time to take remedial steps before the credit default

13   swap agreement was terminated.

14        One consequence of the proposal of the Libra parties

15   is to basically ignore section 5.2(c) so that the noteholders

16   would be disenfranchised, this vote would be necessary and so

17   that LBSF would lose any time to deal with this crisis that had

18   arisen not from its fault but from the failure of the issuer to

19   have enough collateral.

20        Now let's go back to tab 1 and look at the timeline a

21   little more, if we could, Your Honor.  While the protection of

22   5.2(c) was in effect, LBHI entered Chapter 11 on September

23   15th.  On Friday -- actually, on Thursday, October the 2nd,

24   LBSF missed a premium payment.  And the following day, on

25   Friday, October the 3rd, notice of a potential event of default

1   was sent.  And that is summarized in the third yellow box on

2   the chronology.  And what that said was that you're notified

3   "that a potential event of default has occurred pursuant to

4   Section 5(a)(i) of the Agreement as a result of the failure by

5   the Company to pay the fixed payments due to be paid by the

6   Company to Libra CDO on October 2, 2008.  Such potential event

7   of default will become an event of default if not remedied on

8   or before the third local business day after the date of this

9   notice."  That was Friday, October the 3rd.  Something else

10  very important happened on Friday, October 3rd:  That was when

11  LBSF filed for Chapter 11 protection.

12          So before this failure to pay on the 2nd ever ripened

13  into an event of default, the bankruptcy intervened.  This

14  timing is important because the Libra reply brief now makes it

15  clear, as I will explain later, that the Libra parties seek to

16  rely on this missed payment as a justification for termination

17  through a rather complex route that goes through section 12.1

18  of the indenture.  We didn't understand that until the reply

19  brief.  We thought there were other grounds that they were

20  arguing.  But that has now come into focus, and so one of the

21  things that I will explain a little bit later is why that

22  unripened potential event of default cannot be used, for

23  reasons I think the Court's aware of, because of the automatic

24  stay.

25          Moving forward to the fourth yellow box in tab 1, the

118

1  critical day for the summary judgment motions is October 10,

2  2008, when the record shows that Societe Generale instructed

3  the trustee to terminate the credit default swap agreement, and

4  the trustee issued a notice of an early termination date.

5      If you could turn to tab 5, this is the trustee's

6  notice to noteholders on Halloween 2008, October 31, and it is

7  a really critical document that we believe cannot be refuted.

8  And it says in the callout there, "On October 10, 2008, the

9  senior swap counterparty, as the controlling class,"

10  parenthetically, that's Societe Generale, "directed the

11  Trustee", at that time, that was LaSalle, its head successors,

12  it's one of the defendants, "to terminate the credit default

13  swap agreement.  And the Trustee delivered a notice of

14  termination of the credit default swap agreement to LBSF

15  establishing October 10, 2008 as the 'early termination date'

16  under the credit default swap agreement."

17      Now, an interesting thing has happened, and that is

18  that over the course of this case the interpretation of the

19  Libra parties of what happened on October 10 has changed.  And

20  tab 6 is our effort to summarize that evolution of their

21  position.  And the interesting thing is part of it's in the

22  record and part of it's not.

23      If you go to the very last box, you will see what I

24  anticipate you're going to hear in a few moments.  This is the

25  current position, as we understand it, of the Libra parties.

119

1    They argue, and this is the last blue box in their reply brief,

2    the Libra parties argue that "the October 10, 2008 notice of

3    termination effected termination of all outstanding

4    transactions, not termination of the Agreement," referring to

5    the credit default swap agreement.

6          So they've now decided to try to draw a distinction

7    between terminating all the transactions and terminating the

8    agreement, despite the fact that the noteholders were told on

9    October 31st, a contemporaneous document, that the trustee said

10   terminate the agreement, and the trustee did terminate the

11   agreement.

12         Now, let's see how those facts would interact with

13   section 5.2(c).  This is another very helpful excerpt, if you

14   go to tab 7, from the reply brief.  This is the Libra parties.

15   They say, "The Parties agree that between acceleration and

16   liquidation, Section 5.2(c) prohibits termination of the credit

17   default swap agreement in certain circumstances.  The Parties

18   agree that acceleration has occurred and that liquidation has

19   not begun."  Stopping right there, they're admitting that they

20   are in that operative period where 5.29(c) has put a lock on

21   them.  "The sole dispute", they say, "is whether Section 5.2(c)

22   applies to both termination of the transactions (a term that is

23   not mentioned in 5.2(c)) as well as to the framework 'credit

24   default swap agreement' (the term that is mentioned is 5.2(c)),

25   under which the distinct transactions were effectuated."

120

1          So we actually have quite a bit of agreement between

2     the parties.  Section 5.2(c) was effective, it was operative,

3     it prevented termination of the credit default swap agreement.

4     They say the sole issue is what really happened on October 10.

5     Did they terminate the credit default swap agreement, which

6     would be prohibited, or just the transactions under it?  That's

7     what they say is the sole dispute.

8          Well, fortunately the record is pretty clear on that.

9     If you'd turn to tab 8, we have some excerpts from the answer

10    filed by the Libra parties in this case.  And in paragraph 4,

11    the Libra parties admit that Libra terminated the credit

12    default swap agreement.  In paragraph 30 of their answer, they

13    make that much clearer.  They admit that on October 10, 2008,

14    the trustee declared October 10, 2008 to be the early

15    termination date for all outstanding transactions under the

16    credit default swap agreement, thereby terminating the credit

17    default swap agreement.  This actually is a perfectly accurate

18    statement of what the record shows.  We'll demonstrate it's

19    also a perfectly accurate record of the industry practice.  It

20    is not, however, what they are going to try to argue to you, I

21    predict, in a few moments is what really happened.

22         So we have a very interesting contrast between the

23    summary judgment record, which the answer obviously forms a

24    part of, and the position that's being taken in the reply

25    brief.

1       Now, there are other judicial admissions in the

2   record, in the complaint, and that is in tab 9.  There are

3   excerpts from the complaint.  You recall that there were two

4   simultaneous, almost simultaneous, adversary proceedings:  LBSF

5   and LBHI filed first, and later that same day the Libra parties

6   filed.  And in paragraph 4 of their complaint, they admit that

7   Libra terminated the credit default -- I'm sorry, I apologize,

8   I'm reading from the wrong tab.  In paragraph 10 they admit --

9   or they say that Libra had a clear right to terminate the CDS

10  agreement.  Paragraph 42 of that complaint says the Libra

11  trustee, on October 10, 2008, delivered to LBSF a notice of

12  termination of the CDS agreement, specifying the same date as

13  the early termination date of the CDS agreement.

14       Paragraph 48 says the CDS agreement was, on October

15  10, 2008, duly and irrevocably terminated in all respects.

16  This is their complaint.  And their prayer for relief in that

17  complaint, and what they're seeking a summary judgment for, is

18  respectfully request that this Court issue a declaration that

19  the termination of the CDS agreement was valid and the

20  automatic stay does not bar or invalidate the termination of

21  the CDS agreement and that they are entitled to terminate the

22  CDS agreement.

23       So this timeline that we had done in tab 6 puts these

24  changes of position in perspective and shows that, beginning

25  with the first filings in this case, the position of both

122

1    parties have been that October 10 was the date when the credit

2    default swap agreement was purportedly terminated.

3          It is important to note that this Court has taken

4    action based on this characterization of events.  We've talked

5    about the first three boxes on this timeline already.  The

6    fourth box has to do with the pre-motion request to Your Honor

7    from the Libra parties for their right to file their summary

8    judgment, which had to do with whether we have a summary

9    judgment and we have fact disputes.  And at that point, they

10   asked for the right to seek a declaratory judgment that, quote,

11   "termination of the CDS Agreement was valid under the express

12   terms of the CDS Agreement".

13         So these judicial admissions about the October 10,

14   2008 notice are all inconsistent with the new argument in the

15   reply brief that the Libra parties now say is the sole issue on

16   the application of 5.2(c).

17         How binding are these admissions in a summary judgment

18   proceeding?  Well, tab 10 contains some cases that deal with

19   judicial admissions, and I won't read them, but they all agree

20   that admissions in the answers and admissions in the answer and

21   counterclaim are binding throughout the proceeding.

22         However, Your Honor, I want to make it clear that this

23   record doesn't really require the use of these admissions

24   because the facts all show that what the parties said was

25   happening was the termination of the credit default swap

123

1    agreement.

2         We also have added, Your Honor, in this set of visual

3    aids an excerpt from a leading treatise on derivatives by Simon

4    Firth, an English author who has done a lot of writing on this.

5    This is revised in 2009.  I actually commend all of this to

6    everybody's reading because Mr. Firth does a good job of

7    explaining how these agreements work.

8         But if you go to the last page of tab 11, Mr. Firth

9    describes what he calls closeout following an event of default

10   procedure.  And he says, quote, "If an event of default occurs,

11   the nondefaulting party may, at any time while the event is

12   continuing, close out the agreement and all the outstanding

13   transactions under it.  The closeout is affected by the giving

14   of written notice to the defaulting party specifying the date

15   on which the closeout is to take effect.  This is referred to

16   as the early termination date."

17        Now, you're going to hear in a few moments that ISDA,

18   the International Swap Dealer's Association, says "You know,

19   our agreements don't have any provision to terminate the

20   agreements themselves; we terminate only transactions."  And

21   that's true.  The agreement does not have a way to terminate

22   itself.  And the truth of the matter is the ISDA master

23   agreement has to continue because it defines rights going on

24   after the agreement is terminated.

25        I tried to think of some metaphors that work on this,

124

1    Your Honor, and I think probably the metaphor that's the most

2    analogous to this is a group health insurance policy.  If you

3    think of a group health insurance policy, it has certificates

4    under it.

5         THE COURT:  It's a very timely analogy.

6         MR. MILLER:  Perhaps, Your Honor.  But a group health

7    insurance policy --

8         THE COURT:  Not a happy one, but a timely one.

9         MR. MILLER:  A group health insurance policy has

10   certificates issued to individuals.  And those certificates are

11   basically like separate policies of insurance, but they're all

12   governed by the master.  If you can imagine that that master

13   policy said this can't be -- the policy and coverage cannot be

14   terminated for a year, and the insurance company said "Well,

15   that's okay, we're going to go ahead and just terminate all of

16   the certificates, we'll leave the policy in place," I think

17   almost everyone would agree that you can't do indirectly what

18   you're not permitted to do directly.

19        And we actually have a case that we can talk about

20   later if we need to, but there are some cases that deal with

21   this in other contexts.  In this instance, the record is clear

22   that the parties all dealt with this, and the record shows that

23   on October 10 the early termination date was declared for the

24   credit default swap agreement, including the transactions under

25   it.

125

1        By the way, we also have in tab 12 a case where Judge

2   Gonzalez, in the Enron case, talked about closing out of

3   credit of swap agreements.  And again, he used the same

4   convention.  Remember, all of these are ISDA masters, including

5   the senior swap.  So when you talk about terminating the senior

6   swap, which is part of 5.2(c), you're also talking about an

7   ISDA master that has no provision for terminating it by itself.

8        We have a tab in a highlight here from the opinion by

9   Judge Gonzalez where he says, "Swap agreements typically

10  provide the nondefaulting counterparty the right to terminate

11  the agreement upon the other party's default."  And he cites

12  Collier.  "Once terminated, a swap agreement typically provides

13  that all transactions between the parties are cancelled, and a

14  single net amount will be due based upon market conditions at

15  the time of termination."  Again, that is precisely the

16  mechanism that was used here and precisely the mechanism that

17  the indenture was addressing in section 5.2(c).

18       So in summary, the record shows that the conditions

19  for application of 5.2(c) were fully effective.  And actually,

20  the Libra parties concede that because there was a declaration

21  of acceleration, there was a credit default swap agreement in

22  effect immediately before that.  That credit default swap

23  agreement became protected.  It required two things to happen.

24  Neither of them have happened.  That is, the liquidation

25  beginning or the declaration of term of acceleration no longer

126

1    being capable, rescinded or annulled.  But we really only have

2    to stop with the first one in this case because we all agree

3    there's been no liquidation.

4         So if 5.2(c) applies, the October 10 termination

5    cannot stand.  And again, the summary judgment record shows, in

6    the words of the answer on October 10, 2008, "The trustee

7    declared October 10, 2008 to be the early termination date for

8    all outstanding transactions under the credit default swap

9    agreement, thereby terminating the credit default swap

10   agreement."  So we think that the summary judgment record

11   clearly establishes a provision, failure to comply with the

12   provision, and no way around that.

13        However, the Libra parties have come up with a number

14   of creative arguments, as one might expect, for why we should

15   still pay no attention to section 5.2(c), and I want to deal

16   with a few of those rather quickly.

17        First of all, they say, "Well, the indenture should

18   not affect rights under the ISDA master agreement."  Well, as a

19   matter of logic, this actually doesn't make any sense standing

20   alone.  As we all know, there are all sorts of undertakings by

21   parties that they won't do certain things they have a right to

22   do:  shareholder voting agreements, covenants not to sue.  One

23   can contractually agree to withhold a right that it has.  And

24   there's been no argument as to why that would not be the case.

25        They do have a variant of this that says that there

127

1    were integration clauses in the ISDA master and the indenture.

2    But we've cited New York cases -- and this is governed by New

3    York law -- on pages 11 and 12 of our reply brief, that show

4    that all documents executed on the same date as a part of a

5    common transaction are treated as a single agreement under New

6    York law, even if there are merger clauses or even if one

7    contract states that there are no other contracts between the

8    parties.  So the law is really quite clear in New York that

9    these are treated as a single document.

10          But we actually have a very clear and compelling case

11   on this dealing with an SPV swap transaction from Judge Denise

12   Cote in this district.  This is a case that's sometimes been

13   called the Rabobank case.  In that case, Judge Cote read the

14   indenture together with the ISDA master and found that

15   conditions in the indenture prohibited termination of the swap

16   agreement which was there called a hedge agreement.

17          And on tab 13 we have some excerpts from the Rabobank

18   case which is cited throughout the briefs, but it's a long

19   case.  As Judge Cote said on page star-12, referring in this

20   case to the indenture and the ISDA master which now the Libra

21   parties say you should not read together.

22          She says, "These are carefully structured documents

23   with intricately interwoven and balanced duties and rights.

24   They spell out the parties' obligations in exquisite detail.

25   They exert minute control over the collateral manager and the

128

1    trustee.  The participation of a hedge counterparty in the

2    enterprise is a material component of its business, and the

3    termination of that participation was a matter of consequence

4    to all parties."  That hedge agreement was the effective swap

5    agreement like the credit default swap, it just happened to be

6    a hedge.

7         And we also cite another quote from that case where

8    Judge Cote says, "The agreements at issue in this dispute,

9    however, are complex agreements effectuating complex

10   transactions.  The best way to protect all of the parties'

11   carefully negotiated rights is to give the terms in these

12   agreements their clear and unambiguous meaning in the context

13   of the transaction as a whole."  And that's precisely what we

14   are asking the Court to do.

15        We think that takes care of this argument.  And

16   they're going to see some arguments, I believe, coming out that

17   say well, there are various places where the indenture says

18   this does not control over that, or that does control over this

19   and so on.  But we really don't have a conflict situation

20   within the indenture here, as I'll explain in a moment.  What

21   we have here is their argument that you disregard the indenture

22   and look only at the ISDA master and its confirmations.

23        There's another creative argument by the Libra parties

24   to try to escape from the express terms of section 5.2.  They

25   claim that article 5 should be interpreted to be only for the

129

1    protection of the noteholders.  Now, there's absolutely no

2    textual support for this position, and it's squarely

3    inconsistent with a statement in the indenture on what its

4    purpose was.

5         If you look at tab 14, we have page 1 of the

6    indenture.  This is the beginning of the indenture.  The

7    preliminary statement says the co-issuers -- that's Libra CDO

8    Ltd. and another entity that's considered a co-issuer that's

9    basically a variant of Libra CDO, it says the co-issuers are

10   duly authorized to execute and deliver this indenture to

11   provide for the issuance of the notes.  And then it says, "All

12   covenants and agreements made by the co-issuers herein are for

13   the benefit and security of -- ", and then it has a list of

14   parties, including the credit default swap counterparty, that's

15   LBSF.  Notice it doesn't say "unless otherwise provided, some

16   covenants".  It says "all covenants and agreements are for the

17   benefit of all of these parties".

18        There's also express third party beneficiary language

19   in a couple of documents that makes it clear that although LBSF

20   did not sign the indenture because it wasn't contributing

21   assets to that, it is a third party beneficiary.  This is tab

22   15.  The credit default swap agreement schedule, which is one

23   of the attachments to the ISDA master, says -- and we've

24   substituted the terms because it's Party A, Party B stuff --

25   "Libra agrees with LBSF so long as either of LBSF and Libra has

1    or may have any obligation under this agreement that LBSF shall

2    be an express third party beneficiary of the indenture."

3           There's a number of references, by the way, between

4    the indenture and the ISDA master which is further evidence

5    that they're a single transaction.  And then the indenture

6    itself in section 14.8 says "The credit default swap

7    counterparty" -- that' LBSF -- "shall be a third party

8    beneficiary of each agreement or obligation in this indenture."

9    Each agreement or obligation.

10          So this argument that you should just disregard

11   section 5 -- article 5 and section 5.2 because it obviously was

12   not intended to help LBSF, even though it would help LBSF here,

13   that has no support in the text or the record.

14          There's another very important point.  And if we go

15   back to 5.2(c) for a moment.  There are three agreements listed

16   in section 5.2(c), and one of these is the senior swap

17   agreement with Societe Generale.  As I noted before, the senior

18   swap agreement does not pay noteholders.  It exists to protect

19   LBSF.  The Libra parties argue that the drafters only intended

20   for article 5 to benefit noteholders and didn't intend to

21   benefit LBSF.  If so, there would be no reason to include the

22   senior swap agreement as an expressly listed and protected

23   agreement in section 5.2(c).

24          The fact that the senior swap agreement is protected

25   is compelling evidence that's consistent with the statement in

131

1    the preamble, and the third party beneficiary language that

2    this provision, like all the others, was for the protection of

3    all the parties, including LBSF.  So we think the record takes

4    care of the argument by the Libra parties that you can ignore

5    section 5.2(c) because LBSF shouldn't be able to rely on it.

6         We are near the end, Your Honor, but there is one more

7    argument that has been difficult for us to understand.

8         THE COURT:  Did I look like I was ready for you to

9    end?  I'm enjoying this argument; it's fine.

10        MR. MILLER:  Oh, thank you, Your Honor.

11        THE COURT:  Keep going.

12        MR. MILLER:  I just wanted to give you assurance that

13   the end is in sight.

14        THE COURT:  Okay.  That's helpful.

15        MR. MILLER:  This argument is one that has been in

16   their briefs, but we, frankly, have not been able to make sense

17   of it, and I think I'll explain to you why in a moment.  The

18   Libra party's claim that the issuer was required to terminate

19   the credit default swap agreement under section 12.1(b) --

20   which is in tab 16.  An excerpt is there and there's more of

21   it.

22        It says, "The issuer will: (b)(i) sell, terminate, or

23   otherwise liquidate any defaulted security" -- that's a defined

24   term -- "within one year after the related collateral debt

25   security" -- another defined term -- "became a defaulted

132

1    security".  As I will demonstrate in a moment, it's very

2    difficult to figure out what that's trying to say.

3          But the Libra parties have finally told us what they

4    were saying there in their reply brief, and that is in tab 17.

5    "As to section 12.1(b) of the indenture, the parties agree that

6    LBSF failed to make a payment due on October 3, 2008, and that

7    it did not cure the failure within three business days after

8    notice."  Citation omitted.  "There's no dispute that the

9    payment default rendered the transaction's defaulted securities

10   under the indenture."

11         Oh, that's not true that there's no dispute, Your

12   Honor.  There's a big dispute over that.  Now that we

13   understand that this argument is based on a payment default on

14   the day before the bankruptcy filing that had not ripened and

15   would not ripen for three days, that changes the argument very

16   substantially.

17         And the reason it was so hard to figure that out, if I

18   might take the Court on a brief scavenger hunt through the

19   definitions in the indenture.  If you look at tab 18 -- I'm not

20   going to go through this in painful detail -- there's a

21   definition of what's called synthetic security.  And the

22   synthetic security actually is another term that's very close

23   to the term transactions.  It has to do with the referenced

24   obligations here.  And that chases through definitions of

25   defaulted security, and that's the third tab at 19 and 20.  And

133

1   you can have a synthetic security that becomes a defaulted

2   security if it has what is called -- this is my favorite

3   definition we're going to talk about today -- the synthetic

4   security counterparty defaulted obligation.

5        And that handy term that we all use all the time

6   "synthetic security counterparty defaulted obligation", on page

7   75, turns out to mean that the synthetic security

8   counterparty -- that's LBSF -- has defaulted in the performance

9   of any of its payment obligations under the synthetic security.

10  That's a long way of saying premium payments.

11       So this whole 12.1(b) argument is based on the failure

12  to pay premium.  The record shows the only failure to pay

13  premium had not matured into an event of default, wasn't

14  actually due when the bankruptcy intervened, and as the Court I

15  think already knows, but we have some cases on it, when you

16  have a cure period that is still in effect on an executory

17  contract and a Chapter 11 filing occurs, the cure period is

18  frozen in time and the contract remains executory.

19       And we have some cases on that at tab 19.  Because,

20  again, we didn't have a surreply, we're submitting these

21  authorities at this time in the oral argument.  And as the, for

22  example, the Masterworks case of '89 says, "The intervention of

23  bankruptcy within the cure period preserves the executory

24  nature of the agreement, notwithstanding the pre-petition

25  notice of termination for failure to make required royalty

134

1    payments."  And I think this is a doctrine the Court is

2    familiar with.

3         So the bottom line, now that we have the Libra reply,

4    is that section 12.1(b) was never activated because the only

5    fact that could be shown that would activate it was the failure

6    to pay premium as LBSF was virtually on the cusp of bankruptcy.

7    And therefore, we really don't have this fact.

8         But I do want to point out two other reasons why you

9    shouldn't worry about 12.1(b) even if this were not factually

10    irrelevant.  First, if that section had become operative,

11    there's no conflict with section 5.2(c) because 12.1(b) has a

12    one-year time period to basically clear up this deadwood, which

13    is what it's talking about.  That one-year time period is not

14    run now, and it's not going to be necessary because it's no

15    longer going to be a defaulted security if assignment and

16    assumption occurs and the premium shortfall would be made up.

17    So essentially, there is one year to fix these problems for the

18    trustee.  They were not obligated to do it any sooner than one

19    year.  We've got until at least October 10th, even if the

20    bankruptcy had not intervened.

21         The other point is that -- the Court's familiar with

22    and our brief cites that the rule that general provisions are

23    controlled by specific provisions.  And 12.1(b) is a very

24    general provision that has to do with the housekeeping of

25    clearing out defaulted obligations.  5.2(c) is very specific.

135

1    It names three kinds of agreements.  It has a very narrow time

2    window.  It says, "During this time window" -- and it's a

3    crisis window; it's when the transaction is in danger --

4    "certain protections arise".

5         I do want to make one other point, Your Honor, that I

6    think has been clear, and that is that we have a unique

7    situation here of sort of one default followed by another

8    default.  The issuer side of this transaction went into default

9    and that activated certain protections that were very

10   important.  Then the other side went in default because

11   basically, as we all know, the whole financial system was in a

12   downward spin.  And these things were all driven, basically, by

13   the mortgage crisis.

14        This is a very logical thing to say that the

15   protections from the first default don't go away because of the

16   second default.  Nothing in the agreement suggests that it was

17   set up to do that.  The protections from the first default

18   continue; they were operating.  And they actually save us from

19   the second default because if they're read as intended, they

20   allow the transaction to be restored to operation, which is

21   precisely what was intended.

22        So recognizing limited time, I won't try to go to

23   other points in the voluminous briefs now, but I would like to

24   have a chance to respond briefly to the arguments that the

25   other parties will make.  I've tried to incorporate both the

136

discussion of the motion of summary judgment for LBSF and LBHI,

and the response to the counterpoised summary judgment from the

Libra parties.

In summary, the record shows that the purported

termination on October 10, 2008 was, as judicially admitted, an

effort to terminate the credit default swap agreement, and it

was prohibited by section 5.2(c). There is no conflict with

section 12.1(b) of the indenture because that section, based on

an alleged missed premium payment on October 2nd, never came

into effect as a result of October 3rd Chapter 11 filing of

LBSF.

Finally, the enforcement of section 5.2(c) will

preserve this valuable asset for the estate and its creditors

as well as holding out the possibility that the noteholders are

going to receive more if the collateral has a chance to play

out over time as expected.

Of course, Societe Generale will not be happy with

that outcome. But it is not being asked to do anything more

than to honor its bargain. Section 5.2(c) is not a penalty

clause. If the Court enforces the terms of section 5.2(c),

Societe Generale merely has to perform on the promises it

makes. It merely has to pay up on the bet it lost.

For these reasons and others in the motion for summary

judgment of LBSF, the summary judgment should be granted for

LBSF, declaring that the purported declaration of an early

137

1   termination date on October 10, 2008 was invalid, and that the

2   credit default swap agreement is an executory contract, it's

3   eligible for assumption and possible assignment by LBSF as a

4   debtor.

5         There are some other issues in our pleading, Your

6   Honor.  You never reach those if this is all set aside, so we

7   don't need to talk about those now.  There are issues in the

8   pleadings that deal with what happens if it were a valid

9   termination.  We had to figure out what to do with the priority

10  of payments.  I want to note that they're there but they're not

11  before this Court.  We actually have time for those in the

12  Sapphire, AFLAC, and other proceedings later, but they're in

13  the background here.

14        For the same reasons that the October 10, 2008

15  designation, really termination date, should be set aside in

16  the summary judgment of the LBSF and LBHI, the cross motion for

17  summary judgment of Libra parties should be denied.

18        I'll be happy to take questions from the Court.

19        THE COURT:  I don't have questions.  It was a very

20  instructive presentation, and I don't mean by suggesting that

21  that I'm not going to be instructed by hearing from your

22  adversary.

23        I do want to inquire as to whether, just in terms of

24  appropriate balance, it makes sense to hear anything that

25  committee might want to say.

138

1    MR. MILLER:  Yes, we'd be happy.  We would like the

2  committee to speak next, Your Honor.

3    THE COURT:  It seems to me that the committee should

4  speak now and then Libra can speak as to all of its adversaries

5  at once.

6    MR. WINSTON:  Good afternoon, Your Honor, Eric Winston

7  of Quinn Emanuel on behalf of the creditors' committee.  In the

8  courtroom today is my colleague Dan Cunningham.  And on behalf

9  of the committee, we appreciate the opportunity to speak.  We

10  will not go very long.  I do not intend to duplicate the

11  presentation that you just heard.

12    Nonetheless, the committee does fully support the

13  motion for summary judgment filed by the Lehman estate and

14  fully supports the estate's opposition to the Libra defendants'

15  cross motion for summary judgment. The detailed and well argued

16  briefs by all the parties reflect the importance of the issues

17  in this adversary proceeding.  And the Lehman debtors have

18  cogently explained why the estates are entitled to summary

19  judgment.

20    We are here today because the committee's role is

21  nonetheless distinct from the Lehman estate.  The committee

22  represents the constituency that was not a part of the

23  negotiations of the Libra transaction documents and that did

24  not have any role in the events related to the Libra

25  transaction that occurred prior to the commencement of these

139

1    adversary proceedings.  That same constituency, the unsecured

2    creditors, will benefit from the prosecution of this litigation

3    or will bear the ultimate burden -- not Lehman -- of the LBSF

4    defendants are able to enjoy the windfall that is the heart of

5    their position.

6          Thus, the committee has actively participated in this

7    adversary proceeding, including filing two briefs, for a simple

8    and obvious reason.  At stake are hundreds of millions of

9    dollars that can be made available to the estate's creditors by

10    realizing on this estate asset, which is at bottom an executory

11    contract that can and should be assumed and assigned.

12          As I said before, I don't intend to duplicate the

13    presentation of Mr. Miller, which presentation does firmly

14    confirm that the Lehman debtors are entitled to summary

15    judgment.  Instead, I will highlight for the Court two primary

16    issues of contention that are raised in the Libra defendants'

17    reply brief.

18          First, does section 5.2 of the indenture limit the

19    credit default swap agreement's termination provisions in

20    section 6.8 thereof?  And second, is there any merit, for

21    purposes of this litigation, to the purported distinction the

22    Libra defendants attempt to make between the term transactions

23    under the credit default swap agreement and the credit default

24    swap agreement itself?

25          Let me start with section 5.2(c).  As Mr. Miller

140

1    firmly demonstrated, the plain language limits the ability of

2    the issuer, or in this case the trustee, to terminate the

3    credit default swap agreement.  In its reply, Libra asserts

4    that the indenture does not modify the credit default swap

5    agreement's termination rights because there is an absence of

6    any cross-referencing language, even though the schedule to the

7    credit default swap agreement does contain other cross

8    references.

9           The straightforward response to this argument is that

10   New York law firmly recognizes that related documents executed

11   contemporaneously can form a single contract such that the

12   terms in one can govern, limit, or provide meaning to the terms

13   in another writing.  Here these two agreements are closely tied

14   together.  Under the indenture, LBSF is not only a third-party

15   beneficiary, it is also a secured party.

16          And the Rabobank case that was mentioned earlier is

17   persuasive on this point.  There the Court held the term

18   liquidation, as used in a terms supplement to the indenture,

19   would be incorporated into a hedge agreement to limit the hedge

20   counterparty's rights.  This is so even though the term

21   liquidation, as used in that indenture, did refer to other

22   things, such as asset sales.  The Rabobank court was not

23   persuaded that the fact that liquidation could have multiple

24   meanings in the indenture meant that it should refrain from

25   incorporating the term into the hedge agreement to limit the

141

1    hedge counterparty's rights.

2         Thus, section 5.2(c) of the indenture can and does

3    limit the rights of the Libra defendants to terminate the

4    credit default swap agreement, including the limitations on

5    section 6.8 of that document.

6         Now, let me turn to the argument regarding the

7    distinctions between transactions versus the credit default

8    swap agreement.  The Libra defendants appear to be arguing that

9    section 5.2(c) is inapplicable because the section refers only

10   to the termination of the credit default swap agreement when,

11   according to them, all they sought to terminate were all of the

12   transactions under that agreement.  And it's been demonstrated

13   by the visual aids that that is just not in comport with the

14   record.  The October 31 notice expressly states that the

15   controlling class under the indenture directed the trustee to

16   terminate the credit default swap agreement and the October 10,

17   2008 notice was a termination of that document.  No mention of

18   this purported distinction in that October 31 notice.

19        And as pointed out, Libra's answer twice admits that

20   on October 10 the defendants purported to terminate the credit

21   default swap agreement.  This is a judicial admission, one that

22   is fully consistent with the defendants' conduct prior to the

23   briefing of the summary judgment papers.

24        Nonetheless, there are a few other arguments raised in

25   the reply that do require some analysis and response.  One,

142

1    Libra argues in its reply that terminating all the transactions

2    would save time and expense of re-executing the ISDA master

3    agreement scheduling confirmations if the parties were to

4    initiate a new transaction.

5         There's two obvious responses.  One, this is an

6    unworkable argument in the context of a structured finance

7    transaction such as Libra since there is virtually no chance

8    that the parties would initiate a new transaction after

9    terminating all existing credit default swap transactions.

10   Indeed, while in the reply the defendants contend that there is

11   an economic distinction between the term transactions and the

12   credit default swap agreement, in the original cross motion, at

13   page 58, they concede the economic effect of the two is exactly

14   the same.

15        Libra next argues that the indenture separately

16   defines a credit default swap agreement and transaction, and

17   that is true.  But as explained at page 8 in our opposition,

18   the need for separate definitions makes sense when it was

19   necessary to describe the economic or legal terms or one or

20   more of the transactions, but that does not mean that the term

21   transactions has any independent significance from the term

22   credit default swap agreement in section 5.2(c) of the

23   indenture.  In other words, one cannot terminate the credit

24   default swap agreement without also terminating all the

25   transactions thereunder.

143

1        Which leads me to the last point.  Libra ignores the

2   inclusion of the senior swap agreement in section 5.2(c), and I

3   think that's fatal to their argument.  Section 5.2(c) provides

4   that the issuer may not terminate the credit default swap

5   agreement, or among other things, the senior swap agreement.

6   An attempt to distinguish between the termination of a master

7   agreement versus just the transactions arising thereunder, in

8   the context of section 5.2(c), makes no sense with respect to

9   the senior swap agreement.

10       The senior swap agreement is, just like the credit

11  default swap agreement, based on an ISDA master.  The indenture

12  does not in any way distinguish between the senior swap

13  agreement on the one hand and any transactions thereunder on

14  the other hand.  Thus, when section 5.2(c) states that "the

15  issuer shall not terminate the senior swap agreement", it can

16  only mean that the issuer shall not terminate any transactions

17  thereunder.  And it would not be sensible to say the same words

18  have a different meaning with respect to the credit default

19  swap agreement.

20       Your Honor, I promised I wouldn't duplicate Mr.

21  Miller's presentation, and I've hopefully fulfilled my promise

22  because I've finished my presentation.

23       THE COURT:  All right.  Thank you.

24       MR. WINSTON:  Unless the Court has any questions, I'll

25  sit down.

144

1           THE COURT:  Thank you very much.

2           MR. WINSTON:  Thank you.

3           THE COURT:  I think it's time for Libra.

4       (Pause)

5           THE COURT:  Do you have any visuals?

6           MR. WOLOWITZ:  Excuse me, Judge?

7           THE COURT:  Do you have any visuals?

8           MR. WOLOWITZ:  We do, Your Honor, and in fact we've

9       got for the Court some eight and a half by eleven copies of

10      those visuals for the Court, copies of which we've given to

11      Lehman counsel.

12          THE COURT:  Fine.

13          MR. WOLOWITZ:  This is my colleague, Christopher

14      Houpt, who will be assisting me with the visual aids.

15      (Pause)

16          THE COURT:  Am I supposed to be getting a book?

17          MR. WOLOWITZ:  Do you have a -- oh, Your Honor, do you

18      have the copies of the eight and a half by eleven?  We can hand

19      up a copy to Your Honor.

20          Chris, would you --

21          THE COURT:  I just don't know if you want me to have

22      them or not, or you want to --

23          MR. WOLOWITZ:  Yes.  Thank you, Judge.

24          THE COURT:  Because if you want me to have them, now's

25      the time to give them to me.

145

1          MR. WOLOWITZ:  And Your Honor, we also have -- I know

2    you've had plenty of paper in this case, but we have those,

3    within the context of the entirety of the agreements, tabbed

4    appropriately for the Court --

5          THE COURT:  Okay, thank you.

6          MR. WOLOWITZ:  -- both the credit default swap

7    agreement and the indenture.

8          Your Honor, Steven Wolowitz, Mayer Brown LLP for the

9    Libra parties, Libra CDO, Bank of America, and Societe

10   Generale.

11         Your Honor, when LBHI went into bankruptcy, there is

12   no dispute that that was an event of default under the credit

13   default swap agreement as to LBSF.  That's one of the

14   undisputed facts in this case.  Lehman is seeking to avoid the

15   consequences of that default which are stated in the credit

16   default swap agreement and the exercise of which is protected

17   by a statute.

18         This case is about whether the terms of this indenture

19   take away those rights that are stated in the credit default

20   swap agreement, which in unqualified terms in the credit

21   default swap agreement state that the bankruptcy event of

22   default permits the termination of the outstanding transactions

23   under the credit default swap agreement.

24         There's been a little bit of misdirection here because

25   throughout our summary judgment briefs we have made it plain

146

1    that there is no question but that these documents are to be

2    read together.  We do not say in any of our papers that the

3    indenture is to be ignored.  And the case law is clear they are

4    to be read together.

5         Our point is that when read together it establishes --

6    the two documents establish that the indenture provisions on

7    which Lehman relies were not intended by the drafters to vary

8    section 6(a) of the credit default swap agreement or the

9    specifically negotiated provision in the schedule to the credit

10   default swap agreement which is section 1(i)(vii) which says

11   that the bankruptcy event of default is applicable to LBSF.

12   And there's lots of room in that specifically tailored schedule

13   to say applicable with exceptions, applicable without

14   exceptions.  This was stated in a specifically negotiated

15   document, the schedule, to be said that it was applicable

16   without exceptions to LBSF.

17        So let's just make sure we understand what the issue

18   is.  The issue is that the indenture is not to be ignored.  The

19   issue is that the indenture is to be understood.  And that's

20   where we would like to go today.  And Your Honor, we'd like to

21   start, accordingly, with the credit default swap agreement

22   itself.

23        And let's look at the first board, Your Honor, for the

24   consequences of that bankruptcy event of default.  Section 6(a)

25   of the ISDA master, which as we know is part of the credit

147

1      default swap agreement, gives the nondefaulting party -- that

2      is the Libra parties here -- the right to terminate.  Now, what

3      does it give the right to terminate?  It gives the right to

4      terminate at any time, that is, no cure period, no waiting

5      period.  And that right to terminate is defined as the right to

6      designate an early termination date in respect of all

7      outstanding transactions.

8              Let's also take a look at the October 10, 2008 notice

9      of termination.  That notice of termination, which is also on

10     the board in the second half of the board there, Judge,

11     exercises Libra's right under section 6(a).  The language of

12     this notice tracks -- in the callout -- tracked 6(a) and said

13     that Libra was designating an early termination date in respect

14     of, quote, "all outstanding transactions".

15             Now, what is the effect of designating an early

16     termination date in respect of the outstanding transactions?

17     Let's see what the contract says.  What the contract says,

18     Judge, is that the rest of the agreement remains in place once

19     all of the outstanding transactions have been terminated.

20     Section 6(c)(2), which is on the board in front of the Court,

21     says that no further payments, quote, "in respect of the

22     terminated transactions will be required to be made".  That,

23     Your Honor, is a reference to the fact that the exchanges of

24     premium and protection payments obviously no longer have to be

25     made on those transactions if the transactions have been

1    terminated.

2         But 6(c)(2) goes on to say, "But without prejudice to

3    the other provisions of this agreement".  Similarly, section

4    9(c) of the credit default swap agreement says that, quote,

5    "The obligations of the parties under this agreement will

6    survive the termination of any transactions."

7         And ISDA itself, as counsel noted earlier, has

8    confirmed that the ISDA master does not have any mechanism for

9    termination of the framework agreement but only for termination

10   of the transactions.  And ISDA has said, quote, "The ISDA

11   master does not have any mechanism for termination of the ISDA

12   master but only for termination of outstanding transactions."

13        Lehman has recognized this, Your Honor, in one of its

14   briefs in -- not in this Libra proceeding but in the Lehman

15   bankruptcy.  In the Bank of New York proceeding, in Lehman's

16   summary judgment brief, they acknowledged the distinction

17   between the termination of the transactions and the termination

18   of the framework agreement, and acknowledged there, Your Honor,

19   that the framework agreement does not get terminated under

20   section 6(a).

21        Now, is there a way for the agreement itself to be

22   terminated?  That, after all, is the word that appears in

23   section 5.2(c) that counsel has put up on its visual aid and

24   which we'll address in a bit.  There is a way for the agreement

25   itself to be terminated.  It's black letter law that any

149

1   contract can be terminated on the mutual consent of the parties

2   to that contract, unless, of course, there is another agreement

3   that one of those parties has signed that limits the ability or

4   the circumstances in which one of those parties can terminate

5   that agreement.

6         And that's where the indenture comes in.  That's what

7   the indenture does.  And as we'll see, Your Honor, the

8   indenture itself sets forth very distinct and very separate

9   definitions of the credit default swap agreement, which is the

10  term specifically chosen in 5(2)(c) -- it's also specifically

11  chosen in 7.8(a)(11) which Lehman relies upon -- versus the

12  definition in the indenture of CDS agreement transactions.

13  In short, Your Honor, the framework agreement does not

14  disappear when there are no transactions outstanding.  And that

15  distinction is critical to an understanding of how to read

16  5.2(c) and 7.8(a)(11).

17        Let's take a look at those indentures, Your Honor.

18  Let's take a look at the board in which we have put up the

19  definitions of credit default swap agreement and CDS agreement

20  transactions in full.  And these definitions, Your Honor, we

21  believe, are key to understanding how the drafters of the

22  indenture intended the term credit default swap agreement in

23  section 5.2(c) and in 7.8(a)(11), and for that matter, in

24  7.5(f) where it also appears and on which Lehman also relied,

25  at least in their complaint, although they have not pursued it

150

1    in these summary judgment papers.

2         Credit default swap agreement in the indenture is

3    defined to mean "The ISDA master agreement together with the

4    schedule and the confirmations between the issuer" -- that's

5    Libra -- "and the credit default swap counterparty" -- that's

6    Lehman -- "under which the issuer, as seller, and the credit

7    default swap counterparty, as buyer, shall from time to time

8    enter into CDS agreement transactions."

9         And in like fashion, the definition of CDS agreement

10   transactions means "The synthetic securities in the form of

11   credit default swap transactions entered into by the issuer

12   with the credit default swap counterparty under the credit

13   default swap agreement."

14        Your Honor, the credit default swap agreement makes

15   the same distinction between the agreement and the transactions

16   in its own preamble.  There's another fundamental element, Your

17   Honor, that should inform the entire analysis here, and that is

18   the ISDA master's entire agreement clause and its definition of

19   this agreement, and the point here, Your Honor, is that we

20   believe that this establishes that the indenture does not

21   modify the subject matters of the credit default swap

22   agreement, except as expressly stated in the credit default

23   swap agreement.  There are lots of references to the indenture

24   in the schedule to the credit default swap agreement, and those

25   are obviously incorporated into that agreement.  But we

151

1    believe, Your Honor, that this definition of the entire

2    agreement and the ISDA's definition of this agreement goes to

3    show that the parties did not intend that any other contract

4    was going to cover the subject matters of this credit default

5    swap agreement unless the credit default swap agreement itself

6    says so.  The entire agreement clause says quote, "this

7    agreement constitutes the entire agreement and understanding of

8    the parties with respect to its subject matter and supersedes

9    all oral communications and prior writings with respect

10   thereto."  Now, let's work our way up the top of this page,

11   Your Honor.  As the first page of the ISDA master agreement

12   shows, the phrase, quote, "this agreement" means the ISDA

13   master, the schedule, and the confirmations.  The phrase "this

14   agreement" is used in the entire agreement clause of section

15   1(c).  It is used in 1(c), and that shows, Your Honor, that it

16   means this master agreement and all confirmations.  That is

17   what this agreement means, and if you look at the top

18   highlighted section of this page, Your Honor, you'll see that

19   the master agreement includes the schedule.  So put those

20   together, and the phrase "this agreement" as used in 9(c) means

21   the master agreement, the schedule, and the confirmations, and

22   it says there are no other agreements that address the subject

23   matters covered by this agreement.

24         Now, that entire agreement clause is very instructive.

25   And the courts say that it needs to be paid attention to in

152

1    understanding that agreement and any other agreement that is

2    entered into by the parties.  The In re Demmert case, we

3    believe, Judge, is particularly instructive here.  And that

4    came out of your sister court, the bankruptcy court in the

5    Eastern District last year.  In Demmert, the Court said that --

6    it involved a lease and a letter of intent; those are the two

7    documents in question, and it was the lease that contained this

8    merger clause.  The Court said that, quote, "The purpose of a

9    merger clause in the lease is to clarify that the defendants

10   and the plaintiff can look to no other agreement with respect

11   to their rights and obligations under the lease," close-quote.

12   The Court enforced both contracts because it found that they

13   addressed different subject matters, just as here, section 6(a)

14   in the credit default swap agreement addresses termination of

15   the transactions, and section 5.2(c) of the indenture addresses

16   a termination of the entire agreement.

17        The Demmert Court went on to say that so long as the

18   letter of intent is not being used to vary or modify the terms

19   of the lease, the Court may determine the rights of the parties

20   under the letter of intent which stands alone as a separate

21   agreement.

22        Now, here, the termination of transactions is

23   obviously one of the subject matters of the credit default swap

24   agreement.  Lehman's reading of the indenture of section 5.2(c)

25   and 7.8(a)(11) is that it changes section 6.8, would put it in

153

1   conflict with the entire agreement clause.  Basically, they're

2   saying that it does cover what occurred here, which was a

3   termination of the transactions.  And as we've explained in our

4   briefs, Your Honor, it does not cover termination of the

5   transactions, which is the event that occurred here, but rather

6   sections 5.2(c) and 7.8(a)(11) cover only this consensual

7   termination of the entire agreement.

8           Now, the parties easily could have inserted, Judge, in

9   this entire agreement clause in section 9(c) or -- I'm sorry,

10  in the schedule to section 9(c) which is where amendments to

11  the master agreement are done, could have said this agreement,

12  together with the indenture, constitutes the entire agreement,

13  but they did not do so.  And it shows --

14          THE COURT:  I'm confused by some of your references.

15  I just want to make sure that I'm looking at the right thing

16  and understanding your argument.  You said 9(c).  The entire

17  agreement provision that I'm looking at is 9(a).

18          MR. WOLOWITZ:  I'm sorry, 9(a), Your Honor.

19          THE COURT:  Okay.

20          MR. WOLOWITZ:  9(a).

21          THE COURT:  So we're on the same page, literally?

22          MR. WOLOWITZ:  We're on the same page.  I was not on

23  the right subsection, but you were, Judge.

24          THE COURT:  All right.

25          MR. WOLOWITZ:  Now, the entire agreement clause aside,

154

1    let's consider the indenture because it does need to be

2    understood.  Because Lehman does not dispute the plain meaning

3    of section 6(a) of the credit default swap agreement, it seems

4    to us, Judge, that the burden is on Lehman to establish that

5    the indenture withdraws those rights, the right to terminate

6    the transactions, and affirmatively invalidates the termination

7    of the transactions that occurred here.

8             Now, even though, according to Lehman, the indenture

9    provisions they cite to fundamentally alter Libra's right,

10   under the credit default swap agreement, to terminate the

11   transactions, there's no explanation as to why those terms were

12   not included in the credit default swap agreement's

13   specifically-negotiated schedule.  And again, the credit

14   default swap agreement and the schedule is the only contract to

15   which Lehman is a party.  They've offered no explanation as to

16   why these terms wouldn't be in there.  And in fact, the

17   schedule, far from altering Libra's right to terminate the

18   transactions as a result of LBSF's bankruptcy event of default

19   which stems from LBHI's bankruptcy filing, the schedule is

20   specifically tailored to say, as I mentioned earlier, Judge,

21   that the bankruptcy event of default was applicable to LBSF.

22            It also seems to us, Your Honor, that if the indenture

23   provisions were intended to override section 6(a) of the ISDA

24   or section 7.5(d) of the indenture that we'll get to, that says

25   that Libra shall enforce all of its material rights under the

155

1     credit default swap agreement, that these indenture

2     provisions --

3              THE COURT:  Stop one second.  You said section 6(a) of

4     the ISDA.  Did you mean section 6(a) or section 9(a)?

5              MR. WOLOWITZ:  Section 6(a), Judge, of the ISDA which

6     is the provision that gives Libra the right to terminate all

7     transactions on account of the bankruptcy event of default.

8              THE COURT:  Okay, let me ask you a question, because

9     this is a well-prepared and well-organized motion for summary

10    judgment argument on both sides.  And it's very complicated.

11    For purposes of the summary judgment argument, do you take the

12    position that none of this is ambiguous and that there's no

13    need for any review of the actual intent of the parties in

14    entering into these multiple documents in a highly structured

15    setting where parties well-represented are coming up with

16    obviously antagonistic views as to how the document should be

17    read?

18             MR. WOLOWITZ:  Yes, Your Honor, we do take the

19    position that these are unambiguous, and unambiguously in the

20    Libra parties' favor, needless to say.  Not surprisingly, there

21    are lots of cases in which very complicated documents need to

22    be parsed through, and that has been done, now.  What is

23    critical here are those distinct definitions of agreement and

24    transactions in the indenture, and that's critical to

25    understanding whether 5.2(c) of the indenture and 7.8(a)(11)

156

1    say what Lehman says they mean, or whether they're limited to a

2    termination of the agreement which doesn't happen under the

3    credit default swap agreement.  It happens if there's a

4    consensual agreement, obviously, between Lehman and Libra to

5    tear up their agreement, which can't occur.  And that's

6    something we'll get into in a bit, Your Honor.

7            THE COURT:  All right, go ahead.

8            MR. WOLOWITZ:  Your Honor, the drafters of these

9    documents did make it plain when they intended for one

10   provision to apply notwithstanding another or one provision to

11   be subject to another or one provision to apply only with

12   exceptions.  If the indenture provisions that the Lehman

13   parties have cited to were intended to override section 6(a) of

14   the ISDA master, and again, that's the one that gives Libra the

15   right to terminate the outstanding transactions upon the

16   bankruptcy event of default, then these indenture provisions

17   would have said so.  The drafters plainly knew, in dozens and

18   dozens of cases, how to do that.  Now, these provisions don't

19   contain any of those types of subject to or except as provided

20   in the language.  Neither of the provisions cited by Libra in

21   the -- by Lehman in the indenture, nor the provisions of the

22   indenture cited by the Libra parties, section 7.5(d) and

23   12.1(b), and none of them references section 6(a).  And that is

24   because, given the structure of the way these documents were

25   drafted, the drafters did not see them in conflict.  The

157

1    indenture provisions that Lehman cites simply were not intended

2    to address the situation covered by 6(a), which was a

3    termination of all outstanding transactions as a result of the

4    bankruptcy event of default.

5          Lehman's third party beneficiary status is a bit of a

6    red herring, we would submit, Your Honor, because we don't

7    dispute that they have a right to enforce provisions that were

8    intended for their benefit.  So the question is what do 5.2(c)

9    and 7.8(a)(11) and the other provisions they cite mean?  And

10   this is where the separate definitions of agreement and

11   transactions come in.

12         Let's take a look at those indenture provisions that

13   refer to termination of the agreement.  And it's not just

14   5.2(c) which Lehman put on their visual aide, Your Honor.  It's

15   also 7.8(a)(11) of the indenture.  There's actually a third

16   provision of the indenture that likewise refers only to

17   termination of the agreement, and that's 7.5(f), but Lehman has

18   not pursued 7.5(f) in their motion; they've not responded to

19   our arguments regarding 7.5(f).  It's probably because 7.5(f)

20   only talks about replacement of the agreement after it was been

21   terminated, and therefore, is not much help to Lehman on its

22   motion, here.

23         So we've displayed section 5.2(c), but we've also

24   displayed section 7.8(a)(11), Your Honor.  Each of these refers

25   to termination of the credit default swap agreement, and

158

1    neither refers to termination of the transactions, and you'll

2    recall that those terms were separately defined and carefully

3    defined in this very document, in the indenture.  So what

4    Lehman tries to do -- sorry, let me back up a moment.  It's the

5    October 10, 2008 termination notice that terminated the

6    transactions.  That's what it says.  It tracked the language as

7    we discussed earlier, Your Honor, of section 6(a), and it

8    terminated the transactions, not the agreement, and therefore,

9    5.2(c), 7.8(a)(11) don't apply.

10        So what does Lehman try to do?  In their papers, they

11   try -- and by the way, we've made plain from the very first

12   summary judgment brief, here, not just our reply brief, this

13   distinction between agreement and transactions.  So in their

14   papers, Lehman tries to equate the agreement and the

15   transactions, and they try to do so by sheer say so in their

16   briefs.  There's no textual support in the indenture to equate

17   the two.  And in fact, their attempt to equate the two

18   underscores a fundamental problem with their case because we've

19   seen the very separate and distinct definitions in this very

20   agreement of transactions and agreement.  In their papers,

21   Lehman tries to avoid that difference by calling it a semantic

22   distinction, as if that is somehow a pejorative.  But we've

23   seen in the cases that, actually, both sides have cited that

24   the Courts are required to honor those semantic differences.

25        Now, in sections 5.2(c) and 7.8(a)(11), as we said,

1    Your Honor, the drafters chose termination of the credit

2    default swap agreement, and those are separately defined in the

3    indenture agreement and transactions.  Now, that choice shows

4    that these sections, 5.2(c) and 7.8(a)(11), were not intended

5    to address a termination of the transactions under section

6    6(a), and that's consistent with the entire agreement clause,

7    which we referred to earlier.  These simply are not intended to

8    address that situation and it's that situation, the termination

9    of the transactions, which is the operative fact, here.  That's

10   what the October 10th notice, itself, says.  Now, in fact,

11   let's take a look at section 7.8(a)(11), which is one of the

12   provisions cited by Lehman throughout its papers and in its

13   complaint, because this underscores the distinction, Your

14   Honor.  7.8(a)(11) prohibits termination of the credit default

15   swap agreement unless there are no transactions remaining

16   outstanding.  Now, if, as Lehman contends, a termination of the

17   credit default swap agreement is effectively the same as having

18   no outstanding transactions, then this provision makes

19   absolutely no sense.  And again, the case law requires that

20   provisions be made sense of where at all possible, and it's

21   very possible here, particularly given the difference in the

22   definitions of agreement and transactions.  They are different

23   things.  Termination of the agreement, termination of the

24   transactions, as 7.8(a)(11) itself confirms.  And in fact, Your

25   Honor, there are provisions in the credit default swap

1    agreement sections 6(d) and 6(e) of the ISDA master that apply

2    only after termination of the transactions.  Those govern

3    calculations and termination payments.  But we've also seen

4    from the other provisions that we've cited that it's the

5    entirety of the agreement that's stated in the credit default

6    swap agreement that survives after termination of the

7    transactions.  So again, what does termination of the credit

8    default swap agreement mean?  These provisions apply to a

9    termination of the framework agreement which can't happen under

10   the agreement.  So how can it happen?  It can happen

11   consensually.  And that makes sense of these indenture

12   provisions that restrict termination of the agreement because

13   those provisions appear in the indenture because they restrict

14   what Lehman and Libra can do together, possibly to the

15   detriment of the noteholders and the other creditors under the

16   indentures.  And it makes sense that these provisions do not

17   appear in the credit default swap agreement itself, the

18   contract between Libra and Lehman, because they do not affect

19   Libra's rights as against Lehman or vice versa.  We're talking

20   about a consensual tear-up of the agreement.  And it has to be

21   that because there is no mechanism in the agreement itself for

22   the termination of the agreement.  But we know black letter law

23   permits consensual terminations unless there's another contract

24   in which one of the parties undertakes some restrictions on the

25   ability to terminate that agreement, and that's what these

1    provisions do.

2           Now, Lehman's second argument is that the transactions

3    are the confirmations.  But again, Lehman has no textual

4    support for that argument, and in fact, they ignore the express

5    definitions in the contracts which separately define the

6    confirmations and the transactions.  Your Honor, this visual

7    aid is simply the first page of one of the two confirmations

8    that we have here.  The confirmations are actually a few pages

9    long because they contain the terms, the common terms,

10   governing the more than a hundred transactions that were in

11   place here, and it's those more than a hundred transactions

12   that were terminated in this case.  The confirmations define,

13   quote, "confirmation" and quote, "transaction" separately, and

14   state that the confirmation is a letter that quote, "confirms

15   the terms and conditions of credit derivative transactions

16   entered into between us on the trade date specified below" --

17   that's when the transaction first began -- "and to be entered

18   into from time to time in the future each a 'transaction' in

19   respect of each reference obligation."  So clearly, separately

20   defined, and Lehman's effort to try to equate transactions with

21   the confirmations cannot stand.

22          In fact, let's take a look, Your Honor, if we might,

23   at the transactions themselves.  We have a visual aid, here,

24   that cannot be read from the bench, because in trying to put

25   multiple pages of what is Annex A onto one board, the

162

1    individual trades can't be read from the bench.  They're even

2    tough to read on the eight-and-a-half by eleven.

3            THE COURT:  They can't be read on this page, either.

4            MR. WOLOWITZ:  And that's the other reason, Your

5    Honor, why we gave you the notebook where that is Tab -- it's

6    Annex A to one of the confirmations in the notebook.  The only

7    point, Your Honor, here is there are more than a hundred of

8    these.  There are more than a hundred transactions and only two

9    confirmations.  Each of these transactions has the specific

10   economic terms of those transactions, and it is these that were

11   terminated.

12           Now, Lehman, recognizing that the definitions in the

13   contracts render it unable to equate the agreement with the

14   transactions or the confirmations with the transactions, tried

15   to slip into their reply brief and again, here, today, some

16   parol evidence.  And that is this October 31st letter from a

17   trustee.  They mention it for the first time in their reply

18   brief.  They put it in their visual aids, today, they put it in

19   a notebook to Your Honor, and that is improper because it is

20   inadmissible parol evidence on their case, as on ours.  These

21   two documents are unambiguous and parol evidence is not

22   admissible for purposes of interpreting the provisions or

23   interpreting what occurred here.

24           Moreover, Your Honor, that letter, the one that

25   counsel referred to as the Halloween letter, cannot be

163

1    considered without context, without understanding what the

2    trustee intended by those comments, it cannot be considered

3    without first a finding of ambiguity of the indenture and the

4    credit default swap agreement when read together, and it cannot

5    be considered without a consideration of other parol evidence.

6    For example, Your Honor, we are confident that communications

7    between Lehman and the ratings agencies would confirm that it

8    was important to the ratings agencies in giving these notes a

9    triple-A rating, that this bankruptcy event of default would be

10   enforced, and that it would be enforced upon the bankruptcy and

11   that the outstanding transactions would be terminated on that

12   bankruptcy.

13        We're also confident, Judge, that communications

14   between Lehman Brothers and the investors would likewise

15   confirm our reading of these documents.  But because both sides

16   have briefed in the case that the documents are unambiguous, we

17   have not put in that parol evidence before the Court or in a

18   visual aid.  Our point here, Judge, is that that Halloween

19   letter cannot be considered without consideration of all parol

20   evidence and without a finding of ambiguity.

21        Your Honor, in short, the plain distinction on the

22   face of the contracts between the agreement and the

23   transactions must be honored in interpreting the sections of

24   the indenture that they cite to.  Now, the reason we have cited

25   section 7.5(d) of the indenture and 12.1(b) of the indenture,

164

1    Judge, is just as an additional reason to explain to the Court

2    why Lehman's reading of their indenture provisions cannot be

3    the case.  Because if their reading of those indenture

4    provisions were to be the case, if they were to apply to

5    termination of transactions in order to prohibit termination of

6    the transactions, notwithstanding Lehman's default and

7    notwithstanding section 6(a) of the credit default swap

8    agreement, then their reading would be in conflict with two

9    other provisions of the indenture.  That is the reason why we

10   brought to the Court's attention section 7.5(d) of the

11   indenture and section 12.1(b) of the indenture, which we do not

12   have visual aids of but which are fully briefed in the papers

13   and are contained in the notebooks before the Court.

14          Now, Lehman's own -- what you're going to hear,

15   perhaps, because it was in their papers, is that, well, this

16   conflict posed by their reading of sections 5.2(c) and

17   7.8(a)(11) might not arise, in fact, because it's possible that

18   the swap counterparty might have tried to assign before the

19   termination, it's possible that they might have succeeded in an

20   assignment before termination -- speculation.  It's possible

21   that the noteholders may vote for liquidation; we shall see.

22   But the problem with Lehman's reading is that contracts, as we

23   know, have to be interpreted so as to give all terms meaning,

24   and Lehman's reading of its indenture provisions does not do so

25   in an obvious potential scenario.  For example, with respect to

1    section 12.1(b) which says that defaulted securities -- and

2    Your Honor, in our -- in one of our briefs, we went through all

3    the definitions that have to be, sort of, gone through one by

4    one to understand why these transactions that were terminated

5    or defaulted securities, suffice it to say for purposes of

6    today, that's on page 15, footnote 13 of Libra parties'

7    memorandum of law and opposition to their motion for summary

8    judgment.  The point here, Judge, is that 12.1(b) would require

9    the disposal of securities that are -- like these transactions

10   that are defaulted.  And therefore, Lehman's reading of section

11   5.2(c) that it would prohibit the termination of transactions

12   would be in conflict with 12.1(b).  Our point, here, is that

13   that is an additional reason, besides the text of the

14   definitions and the choice of words of 5.2(c) why Lehman's

15   reading of 5.2(c) and 7.8(a)(11) cannot stand.  The same is

16   true with respect to 7.5(d) of the indenture, Your Honor.  We

17   point to it simply to point out an additional reason why

18   Lehman's reading of its indenture provisions cannot be

19   accurate.

20        Now, again, it's important to recognize that on the

21   plain text reading advanced by the Libra parties, based on the

22   definitions set forth in the indenture, based on the

23   definitions set forth in the credit default swap agreement,

24   based on the deliberate choice by the drafters in sections

25   5.2(c) and 7.8(a)(11) of the term "credit default swap

1   agreement", there's no need for these various sections to

2   cross-reference each other because the drafters did not

3   consider them in conflict.  On Lehman's reading, one would have

4   to include that the drafters simply forgot to include one of

5   the "subject to"s or "except as provided in"s which they were

6   otherwise so careful to include throughout the document in

7   dozens and dozens of cases.  We agree that the contract should

8   be read together.  The indenture should be read together with

9   the entire agreement clause which reinforces the conclusion

10  that the indenture does not address the subject matters of the

11  credit default swap agreement except where the credit default

12  swap agreement says so.  And it didn't say that the indenture

13  shall affect the termination of transactions section.

14       The indenture sections addressing termination of the

15  credit default swap agreement must also be read together with

16  sections of the credit default swap agreement which show that

17  termination of the transactions is not the same as termination

18  of the agreement, for example, that section 6(c)(2) that we

19  pointed to earlier which says that provisions of the agreement

20  shall survive.

21       Your Honor, in our papers, we also pointed out why

22  this textual reading makes sense.  Why it makes sense of the

23  temporal limitation of 5.2(c) between acceleration and

24  liquidation.  But that is, again, a tertiary point to point out

25  why this textual reading of those indenture provisions makes

167

1      sense.  In our view, Your Honor, reliance upon the text alone

2      is sufficient.  But it happens also to make good sense and

3      commercial sense of the temporal limitation.

4           Your Honor, they also rely upon section 5.5(a) of the

5      indenture, which perhaps they're saving for rebuttal, today,

6      but which they did not address in their opening remarks, but

7      which they do cover in their briefs and which they do mention

8      in their complaint.  Now again, Your Honor, this language is

9      not ambiguous.  It states that after an indenture event of

10     default, that is, after an event of default under the

11     indenture, here, quote, "the trustees shall retain the

12     collateral, securing the notes intact in accordance with the

13     priority of payments and the provisions of a number of

14     sections, including section 12, unless either subsection 1 or

15     subsection 2 under 5.5(a) occurs.  Now, Your Honor, we did not

16     display subsections 1 or 2 of 5.5(a) on the visual aid, A,

17     because they're lengthy, and B, because there's no dispute that

18     they didn't occur.  Section 5.5(a) says that the trustee shall

19     retain the collateral in accordance with section 12 unless one

20     of those two things occurred.  They didn't occur, both parties

21     agree they didn't occur, and therefore, section 12 must be

22     complied with.  And as I alluded to a moment ago, section 12

23     requires termination of defaulted securities including the

24     transactions, here.  Now, we had set forth as early as the

25     brief that I mentioned, Judge, the fact that the transactions,

1    here, were defaulted securities, and in none of their briefs

2    did Lehman address that.  They tried to address it in their

3    remarks, here, today, Judge, but we don't think that attempt

4    fails.  In any event, we think the definitions are clear in the

5    footnote that I cited to.

6         But again, the point as to 5.5(a) is that it says --

7         THE COURT:  I'd like to hear more about that.  I mean,

8    Mr. Miller takes the position that there can't be defaulted

9    securities because the bankruptcy intervened, and the

10   definition has resulted inoperative.  What's your position with

11   respect to that?

12        MR. WOLOWITZ:  I think what we're dealing with, here,

13   Your Honor, is that that is a bit of a red herring because the

14   question is what was intended by these provisions.  And what

15   was intended by these provisions is that section 12 was

16   intended to apply unless two situations arose.  So the point is

17   not whether or not section 12 might have become inoperative.

18   The point, Your Honor, is that section 12, which required

19   disposal of defaulted securities, which is what these were, was

20   required by section 5.5(a) to be complied with.  Our point is

21   that section 5.5(a) simply was not intended to cover the

22   situation here where there are securities that were defaulted.

23   Whether something intervened that prevented that from coming

24   into being is nothing that they had briefed before today, and I

25   think, Your Honor, we would like a chance to respond to that

169

 1    point if Your Honor deems that to be relevant.

 2         THE COURT:  I was just reacting to what you had just

 3    said, which played on the definition of defaulted securities

 4    and it's not clear to me that there are defaulted securities

 5    within the meaning of the indenture by virtue of the bankruptcy

 6    of LBSF.  But if you don't consider it important to your

 7    argument, move on.  It's fine.

 8         MR. WOLOWITZ:  Counsel also addressed, Judge, the

 9    Rabobank case.  Rabobank says that section 5.5(a) is not

10    applicable when you have section 12 defaulted securities.  I do

11    think, Your Honor, it is important to the argument that these

12    be considered defaulted securities.  We briefed it; it was not

13    responded to by Lehman in their briefs.  We've not yet had a

14    chance to consider, fully, the arguments they've raised today

15    as to why they're not defaulted securities.  We would like the

16    opportunity to brief that question.  Not having had the

17    opportunity before now, Lehman having had the opportunity to

18    address our showing that they are defaulted securities, and not

19    having availed themselves of that opportunity.

20         THE COURT:  It's fine with me.  If you'd like to

21    submit a brief supplemental briefing on that limited question.

22         MR. WOLOWITZ:  Thank you, Judge.  In Rabobank, the

23    hedge agreement gave the counterparty the right to terminate

24    upon liquidation of any or all of the collateral.  In Rabobank,

25    the Court held that when you have defaulted securities, the

1    provisions of section 5.5 do not apply because section 5.5

2    applies to a liquidation of collateral.  Section 12 refers to

3    the disposition of defaulted securities, and when you have

4    defaulted securities, section 5.5(a) does not apply.  That's

5    what occurred in Rabobank.  What did not occur in Rabobank is

6    what counsel for the creditors' committee alluded to during the

7    committee's remarks.  The Court in Rabobank did not import from

8    the indenture some term into the hedge agreement there that was

9    not already in the hedge agreement.  In Rabobank, the hedge

10   agreement referred to the termination event as an event of

11   default under the indenture.  So there was no importation, in

12   Rabobank, of some term from the indenture into the hedge

13   agreement.  But Rabobank did hold that section 12 sales

14   dispositions are not liquidations as that term is used in

15   section 5.5(a).  So 5.5(a) does not apply where, as here, you

16   have defaulted securities.

17        Your Honor, just very briefly on the automatic stay

18   issue that Lehman raised in its complaint but which it did not

19   pursue in its briefing.  It's undisputed that Libra is a swap

20   participant within the meaning of Section 560.  It's undisputed

21   that the transactions, themselves, are swap agreements within

22   the meaning of Section 560.  It's undisputed that bankruptcy is

23   a condition of the kind specified in section 3.65(e)(1).  We've

24   briefed these points and Lehman has not responded to them in

25   their briefs.  The committee says two things.  The committee

171

1    says that termination must be fairly contemporaneous with the

2    bankruptcy filing, and they cite to Enron.  Your Honor, there's

3    no case, and the committee does not cite to one, holding that

4    the safe harbor expires in twenty-five days, which is what

5    occurred here.  We had the LBHI bankruptcy filing, as we all

6    know too well, on September 15th.  The termination notice was

7    October 10th, a mere twenty-five days later.  The Enron

8    termination, as I'm sure Your Honor knows, was more than a year

9    after the bankruptcy and was after the debtor rejected the

10   contract.  This was the Court's response to an unusual attempt

11   to game the system.

12          In fact, the committee's argument contradicts Lehman's

13   argument that the indenture supposedly gave room for Lehman to

14   try to do something about its bankruptcy default before

15   termination.  There's no textual support for Lehman's position

16   in either of the contracts.  There's no cure period in section

17   6(a) of the ISDA master agreement, the assignment provision

18   itself that is in the schedule gives no indication that it's

19   there to permit a cure of a bankruptcy event of default.  But

20   Lehman would say that twenty-five days is too soon, the

21   committee says it's too late, and there's no either statutory

22   or textual support for either position, Judge.  And we would

23   submit that there's been no case holding that twenty-five days

24   is too late.

25          Now, they also make a reference -- the committee

172

1    does -- in their papers -- on the automatic stay point, Your

2    Honor, in the application of Section 560 -- to the fact that

3    the October 10, 2008 notice terminating the transactions also

4    refers to the payment default by Lehman.  But there's no

5    dispute that that notice, at a minimum says that the

6    termination was, quote, "an event of default has occurred

7    pursuant to Section 5(a)(7) of the Agreement" -- that's the

8    bankruptcy event of default section -- "as a result of the

9    filing of the Credit Support Provider" -- that's LBHI -- "of a

10   voluntary petition for relief under Chapter 11 of Title 11 of

11   the United States Code."  Thus, on the very face of the notice,

12   the operative document, here, the October 10, 2008 notice,

13   Libra, in the words of Section 560, quote, "exercised a

14   contractual right to cause the termination of one or more swaps

15   because of a condition of the sort specified in Section

16   3.65(e)(1)."  Even if there was also an attempt to exercise

17   some nonprotected right, and we aren't suggesting that there

18   was, at most, that nonprotected attempt would be invalidated.

19   But that's a straw man, because Libra has not contended, here,

20   that a termination based upon LBSF's nonpayment would be

21   protected under the Bankruptcy Code.  And Section 560 is plain;

22   the exercise of a contractual right such as 5(a)(7) of the ISDA

23   master, the bankruptcy event of default, and referenced in the

24   October 10th notice, quote, "shall not be stayed, avoided, or

25   otherwise limited".

173

1          In summary, Your Honor, the Libra parties request that

2     their motion for summary judgment be granted in its entirety,

3     that the termination of the outstanding transactions be held

4     valid, and that there be a declaration that the automatic stay

5     was not violated, and that Lehman's motion for summary judgment

6     be denied.  Thank you, Judge.

7          THE COURT:  Thank you.  Mr. Miller, do you have

8     anything you wish to say in response?

9          MR. MILLER:  May it please the Court, Ralph Miller.

10    Yes --

11         MR. WOLOWITZ:  Oh, I'm sorry, Judge.  I'm sorry.  I

12    apologize.  There was one more thing I wanted to add.

13         In terms of these judicial admissions --

14         THE COURT:  Just so the record's clear, counsel for

15    Libra is now speaking, even though I just asked Mr. Miller if

16    he had anything to say.  I didn't want the record to be in

17    anyway confused.

18         MR. WOLOWITZ:  Steve Wolowitz, again, for the Libra

19    parties.  In terms of the judicial admissions, so-called, that

20    counsel referred to earlier, firstly, the point that we had

21    made about transactions versus agreement were made in the

22    earliest of our summary judgment briefs, and this was not an

23    argument made in any of their briefs in this case:  not in

24    their reply brief, not in their opposition brief.  They're

25    raising it for the first time in this oral argument, today.

174

1    They can't say that they're doing so strictly because we raised

2    it in our reply brief because that is not accurate.

3         Your Honor, at most, that's an admission, if it's an

4    admission at all, that the agreement was terminated.  And I

5    don't think Lehman wants to agree to that admission.  I think

6    what they're trying to suggest is that it is parol evidence as

7    to what the drafters of these documents intended when they

8    wrote 5.2(c).  It really misses the most important point, here,

9    which is that 5.2(c) is not applicable because the indenture

10   separately defines agreement and transactions.  It really

11   doesn't matter what I wrote or what my colleagues wrote when we

12   drafted our pleadings.  It's parol evidence at most, and Your

13   Honor, we would suggest that it's of dubious probative value,

14   even if parol evidence were to be admitted in this case.  It

15   cannot override the carefully drawn definitions distinguishing

16   agreement and transaction set forth by the drafters of these

17   documents, which is what is relevant, here.

18        THE COURT:  But whatever the relevance, I think the

19   argument being made, however, is that statements made in

20   pleadings filed constitute judicial admissions.  Admissions of

21   what becomes a question that I'm going to have to wrestle with.

22        MR. WOLOWITZ:  And even if they are admissions of what

23   is one of the relevant questions, but even admissions are parol

24   evidence if they are documents outside -- parol evidence often

25   consists of admissions.  What did a party say in a letter --

175

1          THE COURT:  I believe that --

2          MR. WOLOWITZ:  -- does not change it from parol

3     evidence.

4          THE COURT:  Maybe we're confusing parol evidence with

5     what I consider to be evidence that properly is part of the

6     record to be considered by the Court in considering the motion

7     for summary judgment, and I consider the pleadings of record in

8     the docket of the now-consolidated adversary proceedings to be

9     matters that I can consider in deciding motions for summary

10    judgment, and they do constitute part of the record.  I think

11    that to describe it as parol evidence is to diminish the

12    possible impact of such admissions.  And all I was really doing

13    is clarifying that what Lehman was saying -- and you can

14    challenge it, if you wish, of course -- is that statements in

15    pleadings constitute judicial admissions.  You're saying, at

16    most this is parol evidence not to be considered.  I'm telling

17    you that my reaction to that argument is it's part of the

18    record and I'm going to consider it.

19         MR. WOLOWITZ:  Judge, may we brief that issue, as

20    well, as to the fact that it is part of the record does not

21    mean that it is not parol evidence in interpreting the way the

22    drafters of these documents intended those provisions to read?

23         THE COURT:  Well, the question is whether or not

24    you've made -- and I'm not suggesting it's even that important

25    a point -- the question from Lehman's perspective, I think, is

1    that I should take into account how this matter has been

2    addressed in pleadings.

3           MR. WOLOWITZ:  Well --

4           THE COURT:  You are both saying with tremendous amount

5    of emphasis that these documents are unambiguous and that parol

6    evidence is something I need not consider.  Following, now, an

7    argument that's been going on for almost two hours with respect

8    to documents that are supposed to be clear, there's almost a

9    res ipsa loquitur factor here.  If it requires this much

10   demonstrative help and this much skilled advocacy to

11   demonstrate how plain the meaning is, and you reach

12   diametrically opposed results, one can question how plain the

13   meaning really is.  You don't need to respond to that

14   rhetorical remark.

15          MR. WOLOWITZ:  Understood, Judge.  Not to respond to

16   that, but simply to respond to the judicial admissions point.

17   I think we've got, perhaps, competing judicial admissions,

18   because as I mentioned, in the Bank of New York case, Lehman

19   admits that the termination of the transactions, as understood

20   by these documents does not constitute a termination of the

21   agreement.  And that is in paragraphs 36, I think it might also

22   be 51 of their motion for summary judgment in the Bank of New

23   York case.

24          THE COURT:  Okay.  Mr. Miller, it's your turn if you

25   wish to add anything.

177

1          MR. MILLER:  Yes, Your Honor.  Ralph Miller, again.  I

2     did have some things, and I have a number of notes.  One

3     question is, since we have been going two hours, is there any

4     desire in taking a short break which might actually shorten the

5     time I need, or does the Court want me to go ahead?  I can --

6          THE COURT:  That's a very welcome suggestion.  Why

7     don't we take a ten-minute break.

8          (Recess from 4:16 p.m. until 4:31 p.m.)

9          THE COURT:  Be seated, please.

10          MR. MILLER:  Your Honor, Ralph Miller for the movants

11     LBHI and LBSF.

12          I want to cover three things briefly, Your Honor.

13     First, I want to try to clarify some confusion about the

14     question of ambiguity and parol evidence and what is the

15     summary judgment record and the position of LBSF and LBHI on

16     the relation between the ISDA master of the confirmations, the

17     transaction and the question of credit default swap agreement

18     in section 5.2(c).

19          First of all, as the Court knows, when you're dealing

20     with a breach of contract case you have basically three parts

21     of a summary judgment record.  You have the documents

22     themselves; you have evidence of the circumstances and context

23     in which those documents were executed initially and then you

24     have the course of conduct, what happened to breach, basically,

25     under the history after those documents were entered into.  The

1    history of what happened under the documents is not parol

2    evidence trying to change the documents it's who did what.

3         In this case there's no disagreement about what the

4    text of the documents is.  There is disagreement, and there's

5    almost always disagreement, on how the context should be

6    viewed, who was thinking what when the contract was entered

7    into.  That doesn't make them ambiguous that just means that

8    the people are trying to create different things.  However, the

9    operative facts are that these were solemnly entered into and

10   all the parties are bound by these complex terms.

11        Now, the ISDA agreement is a very small document, even

12   with its attachments, compared to the indenture which is

13   hundreds and hundreds of pages.  So there's clearly a lot of

14   terms in the indenture that are not in the ISDA master.  The

15   whole purpose is that they have to be put together.  And

16   because this is an SPV transaction, all of the SPV part occurs

17   in the indenture, not in the ISDA master.  The ISDA master

18   could be a simple interest rate swap between two parties.

19        Our position, Your Honor, is not that there is an

20   identity between the agreement and the transactions.  Clearly

21   there are all sorts of revisions in the indenture that deal

22   with individual transactions, a specific transaction in going

23   to default and have to be terminated.  Transactions can be

24   bought, sold; things can happen to individual transactions.

25        The facts of what happened here has to do with a

179

1    specific mechanism for an event of default followed by an early

2    termination date and that was declared to be October 10.  And

3    the question is, what did that event mean when you put it

4    against the body of the background documents?  And the October

5    31 statement of what it meant is not parol evidence about what

6    the contract meant, it was a statement of fact, undisputed by

7    one of the parties, it's an admission, not a judicial admission

8    but it's an admission of what they did on October 10.  They

9    said the trustee instructed them, the issuer, to terminate the

10   credit default swap agreement, not the transactions there under

11   only but the credit default swap agreement.  And they said they

12   gave a notice of the termination of the credit default swap

13   agreement which is called notice of an early termination date.

14        A couple of important points that are in the record

15   and clear.  There's what's called a reinvestment period.  The

16   reinvestment period is the period in which new transactions can

17   be put under a swap agreement.  The reinvestment period ended

18   with the acceleration, it's in the documents here.  It states

19   the reinvestment period has ended.  That means that this

20   particular ISDA master and the things associated with it could

21   take no new transactions.

22        There are times when the ISDA master still exists and

23   can take new transactions.  In that instance it may be

24   important to try to cut off the right to put under new

25   transactions.  That explains, for example, one of the reasons

180

1   for 7.8(a)(11), if the transactions under an ISDA have run out

2   and the party wants to terminate so no new transaction will

3   come in and the reinvestment period has not ended, there may be

4   a window there where it's still alive, it's still an active

5   contract.

6          In this instance the reinvestment period had already

7   ended.  All that was left was to play out the outstanding

8   transactions.  And as Mr. Firth says and as the October 31st

9   letter said, the designation of an early termination date

10  closes out the agreement, it ends the credit default swap

11  agreement.  We believe that that furthermore is admitted in

12  their answer in the summary judgment record.  Their answer

13  said, on October 31st -- I'm sorry; start over.  On October

14  10th the early termination date notice was given thereby

15  terminating the credit default swap agreement.  So that's an

16  admission of what happened on that date.  It's not a question

17  of what the documents mean.  It's not parol evidence.  It's a

18  statement of what they did and that admission is binding on

19  them.

20         So your summary judgment record is clear, that they

21  did what section 5.2(c) said they could not do.  And that means

22  that what they did was barred by section 5.2(c).  And getting

23  lost in the question of whether the ISDA master continued to

24  have any meaning, certainly it did.  And whether individual

25  transactions could have been terminated, certainly they could

1    have.  None of that has to do with an event of default and an

2    early terminations date and this record which says that that

3    early termination date thereby terminated the credit default

4    swap agreement.  So this whole effort to say we didn't really

5    do what it said, I think is contradicted by the record.

6            I also have a case; I mentioned this before Your

7    Honor, that I think is helpful.  If I might approach?  And

8    this --

9            THE COURT:  Yes, you may hand that up.

10           MR. MILLER:  Pardon me?

11           THE COURT:  Yes, you may hand that up.

12           MR. MILLER:  Thank you.  I will, Your Honor.

13   Actually, Ms. Collins is going to hand it up.  And this is a

14   little bit different context but I think it stands for a

15   proposition that is clear in the law.  This is a bankruptcy

16   case having to do with a car company that had a financing

17   master contract and an effort -- that contract was one where

18   individual financing transactions were presented to the finance

19   company and the finance companies terminated the contract and

20   it became clear they did it because of the bankruptcy of the

21   car company.  And the Court there concluded that the stay

22   applied to it.

23           But near the end of this there's an argument by the

24   car company.  So they said look, it doesn't matter whether we

25   terminate the contract or just say we're not going to have any

1    new transactions under this contract, it's the same thing.  So

2    they say you can't keep us from terminating the transactions

3    even though the stay says we can't terminate the contract, that

4    is terminating the taking of transactions.

5          And what the Court says, on page 10 here, is it says

6    near the end, it says, "However the bankruptcy of Ernie Harry

7    Ford cannot be the reason for rejecting every consumer contract

8    without regard to the merits of the individual transaction with

9    a result of effectively terminating the contract purchase

10   agreement in violation of the automatic stay."

11         The point here is what is being argued here is that

12   there is a way around this provision, through an effective

13   termination that is called something else.  Whether that might

14   or might not be done, if someone sent a notice of termination

15   that said we hereby expressly say that the ISDA master remains

16   in place and the credit default swap is still in place, however

17   we terminate only the outstanding transactions, we don't have

18   those facts.  The facts are that the October 31st letter says

19   that they sent a notice of termination of the credit default

20   swap agreement and their answer and their complaint say they

21   terminated the credit default swap agreement.

22         Now, later in the briefing, which doesn't put any

23   facts in the record, they say no that really isn't how you

24   should think of that.  You should read the letter to be

25   something different.  But they can't redefine the letter from

183

1    what it was defined as contemporaneously and what they admitted

2    it was.  It was the termination of the credit default swap

3    agreement.  And I think that clears out most of the issues and

4    frankly, because they've admitted, as they say, that was the

5    sole issue under 5.2(c); you have a summary judgment record

6    that requires a summary judgment of 5.2(c).  It is true, we

7    have not pressed summary judgment on some other issues, because

8    we think there might be fact issues we don't think they're

9    necessary.

10          There's a little confusion about 5.5.  5.5 was never

11   an independent basis.  5.5 is the provision that says what's

12   necessary to liquidate and our position was and is, and it's

13   not admitted, that two-thirds vote was necessary under 5.5(a)

14   for liquidation to begin.  And if you go to the October 31st

15   notice it explains to the noteholders that they are asking for

16   the vote under 5.5(a) and that's the function that we used for

17   it, they've acted like it was an independent argument.  There's

18   the language, reading briefly through lines, this is -- you

19   can't see that because it's not the blowout, it's below it

20   right down there.  It says, "Pursuant to Section 5.5(a)(2) of

21   the Indenture, sixty-six two-thirds percent of the controlling

22   class and sixty-six two-thirds percent of the other classes of

23   notes voting as a single class may direct the trustee to

24   liquidate the collateral under the indenture."  And then it's

25   got a voting form on the right.  It says here's how to vote.

184

1    That was the discussion of 5.5.

2        The record now reflects that vote never came in and

3    liquidation never began.  So one of the conditions of 5.2(c)

4    that was necessary never happened so 5.2(c) was not satisfied

5    at the time of the termination and in fact is not satisfied

6    today.

7        We believe that there is a clear summary judgment

8    record that 5.2(c) was in effect, it's unambiguous, that

9    provision alone, what they did or purported to do on October 10

10   violated it and therefore that termination notice, that effort

11   is invalid.  Whether they could have done it differently later

12   doesn't really matter too much because the automatic stay came

13   up and they can't do it now unless they do it in some way that

14   gets them through the stay.

15       Now, I do want to mention how Section 560 impacts

16   this.  The notice of termination of October 10 also cited a

17   payment default.  It said, you're also being terminated for a

18   payment default.  We invoked Section 560 because the payment

19   default is not under the automatic -- under the safe harbor.

20   Section 560, and we actually, conveniently, have given the

21   Court a case which I'm sure the Court is familiar with, in the

22   Enron case, the same case, the Marta (ph.) case that we cited,

23   there's a discussion of the fact that Section 560 is only

24   limited to ipso facto clauses.  And so -- and this is tab 11,

25   I'm sorry; tab 12.  And it's the page that has the little

185

1    yellow flag on it but it's the lower right-hand corner.  And it

2    says, "Section 560 to Bankruptcy Code provides an exception to

3    the non-enforceability of ipso facto clauses in connection with

4    swap agreements in a bankruptcy case."  And then it goes on and

5    it says, "It preserves the right of a non-defaulting

6    counterparty to terminate the contract based upon, among other

7    things, the filing of a bankruptcy petition."  That's true.

8    Then it goes on and it says, "It does not provide an

9    unqualified right to terminate a swap agreement."  And it

10   concludes and it says, "The right to exercise termination

11   rights does not arise from all types of defaults but only from

12   defaults first triggered because of one of the otherwise

13   proscribed ipso facto provisions."

14           So trying to terminate it because of the credit rating

15   or trying to terminate it because of the payment default,

16   that's the same problem as a lease that is in arrears and

17   somebody goes into Chapter 11 protection and they won't assume

18   and assign the lease and they're going to have to make up the

19   rent and the whole assumption and assignment mechanism is set

20   to take care of that.  And one of the things that will happen,

21   if there is an assumption and assignment by Deutsche Bank, as

22   LBSF believes should happen, is that'll all be sorted out, the

23   premium payments will be made and brought up to date, adequate

24   assurance of future performance will have to be provided and

25   we'll deal with that issue.  So this whole 560 digression, we

186

1    think, is a confusion about where it was fitting in, it does

2    fit in.  And it does take care of 12.1.

3         The other point is, they really do argue in their

4    brief that there's an independent basis for termination under

5    12.1(b).  And let's put -- actually we don't have 12.1(b) to

6    put up.  We do have it here, tab 15.  This is -- I'm sorry;

7    this is tab 16.  They suggest they want some briefing on this

8    but let me suggest to Your Honor we don't need any more

9    briefing because they've had a chance to do this and they said

10   they were basing it on a payment default.

11        This does not say that the issuer will sell, terminate

12   or otherwise liquidate any defaulted security.  That's what Mr.

13   Wolowitz said a couple times.  That's not what it says.  It

14   goes on and it says, within one year after the related

15   collateral debt security became a defaulted security.  In other

16   words, it says if you got a defaulted security then you got a

17   year after it becomes a defaulted security -- I'm sorry.  If

18   you got a defaulted security and the related collateral debt

19   security becomes a defaulted security, then there's a one-year

20   period to get rid of the defaulted security.

21        It's a little confusing but what that means in the

22   definitions and they're covered a little bit here and we can go

23   into them in more depth if necessary, in our tab 18, is the

24   synthetic security which is the transactions that are the swaps

25   here based on mortgages.  The synthetic securities are the

187

1    collateral debt security.  If premium is not paid on them, then

2    they become a defaulted security and a year later that requires

3    the sale of the credit default swap agreement that's hooked up

4    to those synthetic securities.

5         There's no showing in the summary judgment record from

6    the labor parties that there's any way to meet this second

7    requirement of 12(b)(i) other than this October 3rd notice, the

8    same day as the bankruptcy filing, which would have meant, if

9    there had not been a bankruptcy filing, three business days

10   later, Tuesday or Wednesday of the following week could have

11   caused the collateral debt securities, that is the synthetic

12   securities, to become defaulted securities and then the one-

13   year period would have started.

14        The point is, the one-year period had never started.

15   There's no independent route through here and so 12.1 doesn't

16   help.  12.1 does not shed any light on how 5.2 should be

17   interpreted.

18        There's another important point here about the way the

19   ISDA master works, and I don't know if we have our blowup of

20   the ISDA master but it was passed out.  The ISDA master has a

21   lot of so-called switches that can be applied to it, where you

22   can say something applies or doesn't apply.  6(a) has an

23   automatic and a non-automatic option.  The automatic early

24   termination can be specified in the schedule.  If there's an

25   automatic early termination then if one of these conditions

188

1    occurs, which includes the bankruptcy conditions; it kicks in

2    without any notice.  There's no election.  That was not

3    selected.  The record is clear that this is not an automatic

4    termination notice, that is we need no termination notice.

5         This was an optional, if you will, termination, the

6    may clause.  That allows, in the SPV deals, the indenture to

7    control and regulate when those rights are exercised.  They may

8    be done, they're not automatics.  And under certain periods,

9    and remember 5.2(c) only operates under this sort of narrow but

10   important situation where basically the deal is in financial

11   trouble, the notes are in the process of being accelerated.

12   Liquidation may be imminent if this two-thirds vote comes in.

13   The deal is crashing, the plane is hitting toward the ground.

14   The question is at that point, who's entitled to have people

15   put on their parachutes and jump out, in effect, or are we

16   going to ride it down and try to fly through the storm.  And

17   this is a disaster situation and this may clause in 6.1(a)

18   allows the much more complicated indenture, which is dealing

19   with the complexity of the SPV structure to activate, turn on

20   and turn off and that's what happened in Rabobank, basically,

21   was the Court was saying, and there was not a bankruptcy in

22   Rabobank by the way, but the Court was saying the early

23   termination date was not going to be activated because some of

24   the requirements of the indenture were not met.  So we think,

25   again, the record is clear on the way these -- on the way the

189

1    facts interact with the provisions here.

2         Let me pick up a couple of more points of confusion,

3    see if I can clarify them very quickly.  The -- one of the

4    arguments is whether the ISDA is something where the terms are

5    being buried in the ISDA.  As I think I've said, Your Honor, we

6    don't make any argument that the terms of the ISDA are being

7    buried.  We simply say that the right to exercise certain

8    things under the ISDA is allowed or not allowed under the

9    indenture.  I think I've already talked about 5.5 and 12,

10   section 12.  I've mentioned that we don't believe -- we're not

11   seeking a summary judgment under 7.8, we do have it in the case

12   still.

13        And I now want to talk a little bit about where we are

14   structurally in terms of this overall transaction and what

15   needs to happen to make sense out of it.  As the Court will

16   recall from the hearing on the approval of the letter agreement

17   with Deutsche Bank, this is a transaction with great value but

18   with perishability.  And in order to preserve the value for the

19   estate, it's important that an assumption and assignment occur

20   because the senior swap agreement here has a provision which

21   says, and we don't agree that it's enforceable, but it purports

22   to say the senior swap doesn't make termination payments.  It

23   does have to make payments that are periodic if the transaction

24   continues.  So the value of this transaction is to let it

25   continue.

190

1          As a reality matter, Your Honor, a delay in getting a

2      resolution in this case risks the de facto termination of the

3      transaction and therefore would allow Societe Generale to

4      escape from its obligations and its debt.  Because the Deutsche

5      Bank commitment expires in early October it may or may not be

6      extendable but frankly market conditions have shifted quite a

7      bit since that commitment originally came in and we don't know

8      where it stands.  So if the Court decided to have delay

9      briefing and discovery, which I know is an issue that was

10     raised, the practical consequence here is that that may be

11     about the same as a ruling for the labor parties because, as a

12     practical matter, if this can't be put back together in time

13     it's going to die and slip away.  And so as far as the estate

14     is concerned, we believe we've done everything we possibly can

15     and we believe that the summary judgment record is clear.  We

16     think that judicial admissions take care of some of these new

17     factual contentions that are being raised.  We don't believe

18     there's any need for further briefing.  Obviously if the Court

19     said that if they want to submit some briefs they can and we

20     may or may not need to respond but we certainly do not

21     encourage the Court to go into an extended schedule in part

22     because of the commercial realities that are involved here.

23          And again, all we're asking Societe Generale to do and

24     the labor parties is to stay the course, let the deal live and

25     follow the documents.

191

 1          And with that, Your Honor, I would take any questions

 2     from the Court and then I believe the committee counsel, Mr.

 3     Winston, has a few brief remarks.

 4          THE COURT:  Okay.  Just in terms of timing, I'm pretty

 5     much at my limit of being able to hear more about this case.  I

 6     know it's very interesting but it's something that requires me

 7     to spend some time with the documents.  And so hearing you

 8     speak to these issues carries with it a point of diminishing

 9     returns.  With that, I'll hear from the committee briefly.

10          MR. WINSTON:  Your Honor, I guess I would say thank

11     you for letting me talk.  Eric Winston --

12          THE COURT:  No, you can talk as much as you want.  You

13     have five minutes or less.

14          MR. WINSTON:  Eric Winston of Quinn Emanuel on behalf

15     of the creditors' committee.  I am going to respond to one

16     point raised by counsel for Libra and that goes to the

17     understand of the Rabobank case.

18          Towards the end of his presentation he made the

19     statement that what didn't occur in Rabobank was the

20     importation of definitions from the indenture in that case into

21     the hedge agreement.  I think there's two paragraphs that I'd

22     like to read from the Rabobank decision that completely dispose

23     of that argument.

24          There's a very nice discussion at page 10 of the

25     Westlaw site that summarizes the arguments.  But starting at

192

1    page 11 the Court states, "Rabobank argues that a liquidation

2    in fact occurred with the sale of collateral in August 2008.

3    To make this argument it essentially ignores section 5.5(a) of

4    the term supplement and points to section 5(e)(ii)(1) of the

5    schedule to the hedge agreement.  That latter provision

6    explains that an 'additional termination event' permitting

7    termination of the hedge agreement exists on the occurrence of

8    an 'event of default' under the indenture followed by the

9    acceleration of the notes and the liquidation of any or all of

10   the collateral."  And it's that language that I think counsel

11   was referring to.

12           The Court continues, "Rabobank argues that a sale of

13   assets pursuant to Section 12.1 of the term supplement

14   constitutes a liquidation under Section 5(e)(ii)(1) of the

15   schedule."  And this is where I think the Court disposes of his

16   argument, "The parties agree that the hedge agreement and

17   indenture were executed as part of a single transaction and

18   should be read together.  Reading these two provisions in the

19   term supplement and the scheduled together, therefore to give

20   full meaning to both provisions the term liquidation in the

21   schedule should be understood to incorporate the definition

22   given to that term in section 5(a) of the term supplement of

23   the indenture and to require that each of the three predicate

24   events for liquidation occurs before this additional

25   termination event exists."

193

1          The Court made it one hundred percent clear what it

2    was doing.  It was taking a term and that indenture and

3    incorporating it into that hedge agreement.

4          Thank you, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          MR. WOLOWITZ:  Your Honor, let me maybe start with the

7    last first, just in terms of Rabobank.  "Rabobank's right to

8    terminate the hedge agreement is contractually defined and

9    includes the right to terminate in the event of a defined

10   default under the indenture."  That's the way the termination

11   event in the hedge agreement in Rabobank was defined.  It was

12   defined in terms of events occurring under the indenture.

13   Nothing was imported.

14         Your Honor, with respect to the October 10, 2008

15   notice, the operative document here, the notice itself said in

16   accordance with section 6(a) of the agreement.  We hereby

17   designate October 10, 2008 as the early termination date in

18   respect of all outstanding transactions.  That's the document.

19   It's undisputed.  They've admitted that's the document.  That's

20   in their response to our statement of material undisputed

21   facts.

22         With respect to Section 560, that same document says,

23   "We have determined that an event of default has occurred

24   pursuant to Section 5(a)(7) of the agreement," that's the

25   bankruptcy event of default, "As a result of the filing by the

194

1    credit support provider of a voluntary petition for relief

2    under Chapter 11 of Title 11," etcetera.  That's what the

3    operative document says in both of those respects, Your Honor.

4         Your Honor, if there is a finding of ambiguity, and I

5    have no idea whether Your Honor's going to go there or not,

6    contrary to what both parties have urged we would request that,

7    as indicated in the scheduling order that was discussed with

8    the Court, that we be permitted to take discovery.  If parol

9    evidence is going to be admitted by either side, we believe

10   that the Court needs an entire record.

11        Now with respect to the Deutsche Bank agreement and

12   its ostensible deadlines, we do not believe that that deadline

13   ought to control the proper administration of justice of this

14   case.  And it may be the case that they are willing to extend,

15   as they did once before, considering that they are not going

16   out of pocket a nickel, we would hope that they would do so

17   again if that's the way the Court goes.  We would just like to

18   put that request on the record.

19        THE COURT:  Okay.  We're not going to talk about the

20   extension with Deutsche Bank now because it's not before me.

21   I'm going to assume, for the sake of where we are at the

22   moment, that the October 2 deadline, I believe it is, remains

23   the effective deadline for the transaction.  But Mr. Miller did

24   raise an important issue, which is that the passage of time

25   could be the death knell for a transaction which has been

195

1    creatively restructured on the debtors' part and which could

2    produce significant value to the estate.

3         So a question for you, since you had raised the

4    question of supplemental briefing, I didn't ask for it as much

5    as you posed that it is something you wanted.  I don't know to

6    what extent the whole question of defaulted securities

7    represents an issue that I'm going to be paying much attention

8    to in deciding this.  Nor do I know whether or not judicial

9    admissions versus parol evidence, another subject that you had

10   said you wanted to address, is a matter of any significance to

11   the overall decision to be made here.  But if you want to

12   submit something, I think you should have the opportunity to do

13   that and it should happen within the next week.

14        Now, I guess I have another process question, which is

15   really addressed to Mr. Miller and his team.  What has to

16   happen by October 2nd?

17        MR. MILLER:  Ralph Miller, Your Honor, to respond to

18   your question.  I'm advised by my colleagues that what needs to

19   happen is first of all there would need to be a finding that

20   this was an assumable executory contract because at the moment

21   there is considerable doubt about that.  If that occurs, very

22   quickly thereafter we would try to activate, on the shortest

23   notice possible, the remainder of our pending motion to assume

24   and assign.

25        If that can be achieved with Deutsche Bank within the

1    option period the fact that there may be appeals does not

2    present a problem that the assignment provides that any money

3    that is received or payments that are made during an appellate

4    process will essentially be escrowed and will await the outcome

5    of appeals.

6         So the goal would be to try to get a trial court

7    resolution of this issue, which was submitted by summary

8    judgment, cross summary judgments actually.  And then if that

9    issue were resolved as LBSF and LBHI believe it should be under

10    this record to find that this is an executory contract it's

11    assumable and assignable, we would come back with a separate

12    hearing to see if anybody has any opposition to the actual

13    assumption and assignment.  And that could be done, we think,

14    on shortened notice if necessary.  If that happens and the

15    trial court level then the deal is done with Deutsche Bank, it

16    becomes operative and everything else can play out on appeal if

17    necessary.

18         THE COURT:  Is that correct?

19         MR. MILLER:  I believe that's correct, Your Honor.

20         THE COURT:  Okay.  If LBSF wishes to submit something

21    in response to whatever Libra submits on the supplemental

22    briefing that they've requested, that's obviously something

23    that LBSF has the right to do and I assume it will be done as

24    promptly as is physically and humanly possible.  Although I

25    suppose you could also say never mind we don't think anything

1    they've said matters and we give up that right and you'll make

2    your own decision on that; only because I don't want to be

3    burdened with a lot more papers and the Libra papers have been,

4    at least in my estimation, quite extensive and very well

5    prepared.  It would be helpful if whatever is submitted is not

6    only well prepared but extraordinarily concise, because I don't

7    want to read very much more than is really necessary at this

8    point.

9         The argument and the presentations on both sides were

10   outstanding and I'll take this under submission, recognizing

11   that there is a very tight deadline that applies to this.

12        THE COURT:  Without suggesting by this comment that

13   there may be a need for some additional time on my part, I am

14   simply going to make the observation of my situation briefly.

15   I have a lot on my plate at the moment, and a lot of what I

16   have on my plate is happening in the next month.  That's not a

17   complaint, it's just a statement of condition.  And,

18   regrettably, one of the most pressing matters that I have,

19   unrelated to LBHI or this very intriguing controversy that

20   we've been talking about today, is a matter that requires

21   determination by no later than September 30th.  It's a matter

22   of enormous size and complexity and has been pending in this

23   Court since July 20th, which explains the equipment which

24   surrounds you.  I simply point out that it may be difficult for

25   me to make the deadline that you have established, although I

198

1    do everything in my power to do that.

2           Conceivably, what may be required as a result is

3    something that is less than the fully developed forty-five page

4    footnoted decision which this controversy probably deserves.

5    It might be, in the interest of time, simply my decision, with

6    the reasons for that decision being explained in a bench

7    decision on a date that I will have to identify at some point

8    between now and the end of September.  I'm simply musing on

9    this to let you know that I want to deal with the realities of

10   the case, but I also have to deal with the realities of the

11   other demands that I have on my physical ability to get this

12   done.

13          To complicate matters, September is also the time when

14   law clerks turn over.  So that's just to tell you that there

15   may be some practical implications here that we're going to

16   have to address.  And you'll hear from me, if I don't hear from

17   you first, as to what we're going to do about this.

18          I expect that the most appropriate time for me to hear

19   from you is in the submission of supplemental briefing within

20   the next week, and the most appropriate time for you to hear

21   from me is after I've concluded how I'm going to decide this

22   and when I'm going to be able to decide it.  And that will be

23   sometime before the next omnibus hearing.  Or, perhaps, at the

24   next omnibus hearing, which, conveniently, is September 15th.

25          Now, we need to deal with unclaimed property, to the

1       extent that's still an active matter for discussion.

2            (Off the record from 2:44 p.m. to 2:46 p.m.)

3                MR. MILLER:  Thank you for your time, Your Honor.

4                THE COURT:  Thank you, Mr. Miller.  Mr. Wiltenburg,

5       what's going on here?

6                MR. BATISTA:  Well, we weren't able to resolve it,

7       Judge.  And I think we're --

8                THE COURT:  Well, what --

9                MR. BATISTA: -- in agreement, unfortunately, that we

10      should go ahead with the hearing that the Court outlined on

11      June 3rd as to whether or not this is an executory contract.

12      Our position is that it is not.  Mr. Gelb is here and will

13      testify if Your Honor permits.  I think it will take twenty

14      minutes, and the Court asked the question on June 3rd as to

15      what UPRS did, what Mr. Gelb did in order to make the claim to

16      the State of New York for unclaimed property that we now know

17      has resulted in a 5 or 6 million dollar recovery.

18               THE COURT:  Mr. Batista, here's my problem.   And I

19      think you're aware that I have been on the bench since 10

20      o'clock this morning.

21               MR. BATISTA:  Absolutely, Judge.

22               THE COURT:  What you're not aware of is that I've been

23      involved in a trial on both Monday and Tuesday of this week,

24      and then I have a calendar tomorrow.

25               MR. BATISTA:  I have no idea how you do this, Judge.

200

1        THE COURT:  Well, that's not the point.  The point is

2   that I don't think I'm in a position to hear you at this point

3   in the day.  It's not that I'm physically incapable of it, but

4   I'm, at this moment, with the Lehman docket being as contested

5   as it was today, including a contest on ADR procedures, a

6   contest on international law relating to the application of the

7   automatic stay to a bankruptcy which is pending in the District

8   Court in Tokyo, and the argument that just transpired that I

9   think you saw, which is a very highly technical matter of

10  contract interpretation.  I think it's going to be difficult

11  for me to be mentally alert enough to deal responsibly with the

12  issues that you want to present.  It had been my hope when I

13  saw you walk in that you'd been able to work this out.  And I

14  don't mean to delve into your settlement discussions, and I'm

15  not going to, but Mr. Wiltenburg said when this case was first

16  called at 2 o'clock that from the perspective of his client he

17  thought it might not matter, at least in terms of the economics

18  of what we're dealing with, whether the contract in question is

19  deemed to be executory or non-executory.

20       At the last hearing that we had in June I focused on

21  the executory nature of the contract, in part because there was

22  an issue at the time of rejection, the trustee having elected

23  to reject the contract.  I believe that you took the position

24  on behalf of your client that there was no performance that

25  needed to be performed on his part, such that the contract was,

201

1      for all practical purposes, fully performed and not executory

2      for purposes of the rejection notice that had been issued by

3      the trustee.

4             It seemed at the time that that was a matter that the

5      parties cared about.  Even if you weren't able to resolve the

6      claim issue do the parties, at this juncture, care about the

7      determination of the question of whether the contract that

8      underlies the work of your client is or is not executory for

9      present purposes?  If it's not a matter of importance we don't

10     need a hearing.  If it is a matter of importance, and if it's

11     to be a contested matter that will have some significance to

12     the case, I suggest that we reschedule it.  But I don't

13     understand why this is a problem.

14            MR. BATISTA:  Oh, we think the record that we have

15     already indicates that this is not an executory contract, that

16     UPRS performed every substantial act it needed to perform prior

17     to the September of 2008 filing, and that all that remains to

18     happen, not to be done, but all that remains to happen is for

19     the State of New York to pay the 5 to 6 million dollars in

20     unclaimed funds that will be paid for one reason only, which is

21     the presentation of the claim that my client made prior to

22     September.  Now, if Mr. Wiltenburg wants to stipulate that all

23     that work was done and that it is not an executory contract,

24     well, I'm sure we'll -- well, we don't want to go through the

25     exercise of a hearing to reach that conclusion.

202

1           THE COURT:  Well, it's obvious from what I've already

2    seen pre-submitted by the trustee that there are any number of

3    issues that can be presented as part of a hearing if the

4    parties can't reach an agreement, including issues of

5    credibility and documents that may have been submitted in

6    incomplete form, and, I mean, this is a controversy that has,

7    pardon my use of the term, an ugly side to it.  And I don't

8    know whether or not, as we open this up for what is claimed to

9    be a twenty minute proceeding, that it's going to turn out to

10   be a two hour proceeding.  And, in part, because what I've

11   already seen in the supplemental submission of the trustee

12   raises questions as to whether this is or is not executory and

13   whether or not there was performance that needed to be done

14   post-petition, whether or not there were acts of further

15   contact with the state.

16           All of this is out there.  If the parties could

17   stipulate to facts that would be easy.

18           MR. BATISTA:  Can I address that, Your Honor?

19           THE COURT:  Well, Mr. Wiltenburg was raising his

20   finger first.

21           MR. BATISTA:  I'm sorry.

22           MR. WILTENBURG:  Your Honor, if I may, the perception

23   that I was trying to share earlier today was that the

24   executory/non-executory question which we think comes out the

25   way we contend, answering it may not really get us that much

203

1    closer to resolution of the bigger question of what the

2    entitlement is, because if it was, as is contended, a debt that

3    was owing on the filing date, it's a pre-petition unsecured

4    claim.  If it was an executory contract that was rejected

5    rejection damages are a pre-petition unsecured claim.  So you

6    get about to the same place.

7         THE COURT:  Not necessarily, if there's post-petition

8    activity that elevates the claim to administrative status.

9         MR. WILTENBURG:  Yes, and that would be an inquiry

10   that's not really teed up today.

11        THE COURT:  So without going into the specifics of

12   your discussion about quantum of claim, because that's not

13   really a matter that I need concern myself with at this moment,

14   why do we need to have an evidentiary record at all if you're

15   prepared to, in effect, stipulate that it doesn't matter what

16   the status is of the contract other than the fact that if it's

17   deemed to be non-executory you're not going to reject it?

18        MR. WILTENBURG:  Yes.  It's the position of the

19   claimant that nothing substantial happened after the filing

20   date.  Probably nothing happened that really contributed

21   benefit to the estate, but they say nothing at all happened of

22   significance.  So, you know, against the background of that

23   contention it's hard to see where there's going to be a

24   significant administrative claim.

25        THE COURT:  Are you prepared to stipulate that it's

204

1    not executory?  Because that's Mr. Batista's position.  It's

2    not executory.  Everything was done already.  If everything was

3    done already it's hard for him to prove an administrative

4    claim.  It seems like it's the perfect position for you to be

5    in.

6         MR. WILTENBURG:  I guess we can stipulate to that.

7    I've got to talk to my client, but --

8         THE COURT:  And that means there's no rejection of the

9    contract, and there is a claim associated with the ten percent

10   collection fee that the firm earns once the money arrives in

11   your hands.

12        MR. WILTENBURG:  Yes.  And, Your Honor, our position

13   is that's a pre-petition claim, and we were talking about

14   fixing and allowing the amount.

15        THE COURT:  I don't want to get into the middle of

16   that.  And if you haven't been able to reach an agreement on

17   the amount of that claim maybe you can do it between now and

18   whenever we see each other again.  But I don't think we need a

19   hearing on this if after conferring with your client you can

20   agree with Mr. Batista's legal position.  Then I don't need to

21   hear any evidence.  And all of this argument about misleading

22   documents, that all goes away.

23        MR. WILTENBURG:  Agreed.

24        MR. BATISTA:  May I just comment on that, Judge,

25   because I don't want to leave the record unclear?  I think that

205

1    at the outset of our time today the document on which the

2    trustee's claim was based that there was something misleading

3    about my client's position was withdrawn.  In effect, they had

4    attached to their papers --

5              THE COURT:  That's what the letter was about?

6              MR. BATISTA:  That's what --

7              MR. WILTENBURG:  Yes, Yes.  Your Honor, I had --

8              MR. BATISTA:  Those were contacts by my client with

9    the State of New York for other clients of his company.

10             THE COURT:  Okay.

11             MR. WILTENBURG:  Your Honor, I had doubts about the

12   inference we drew from that and, accordingly, withdrew that

13   exhibit via the letter.

14             THE COURT:  Look, you --

15             MR. BATISTA:  I just wanted the record to be clear.

16             THE COURT:  Here's where I think you should end up.

17   That doesn't mean that you will end up there.  I think you

18   should work out a stipulation.  I think the stipulation should

19   resolve the contested matter that brings you back in court

20   today, that it should be one that either deems the contract in

21   question to be non-executory, which is how we've been

22   discussing it lately, or executory.  If it doesn't matter to

23   the trustee but it matters to unclaimed property, and unclaimed

24   property would prefer that it be deemed non-executory, why not

25   simply agree to that?  I'm not directing anybody to do that.

206

1    That just seems like an easy default.

2         MR. WILTENBURG:  We'll work on that, Your Honor.

3         THE COURT:  If you can stipulate that the agreement is

4    non-executory, then to the extent that there was a notice to

5    reject as of sometime in June that should be deemed annulled or

6    voided so that the contract exists in full force and effect.

7    To the extent there are claims to be asserted against the LBI

8    estate those claims are governed by the existing contract.

9         MR. WILTENBURG:  Your Honor, I hate to quibble on a

10   point, but this being a liquidation contracts are sort of

11   rejected by operation of law if they're not assumed.  There is

12   no way we're going to assume that.  So, you know, we're not

13   going to deem it to be --

14        THE COURT:  I'm not deeming it to be assumed.  As I

15   understand the procedural posture of the case, and I raised

16   this when we had our hearing on June 3rd, I couldn't tell where

17   the trustee was on rejection.  It seemed to me that you had

18   made an election to specifically reject this contract and that

19   the election was made right at the time that they were making

20   their claim for 500,000 dollars for producing value to the

21   estate that you didn't even know about.  So part of what gives

22   this little tempest in a teapot a bad aroma on both sides is

23   that it doesn't seem as if you gentlemen are working

24   constructively to get to the right outcome, which is a

25   practical outcome that avoids unnecessary litigation,

207

1    unnecessary administrative expense, unnecessary court time,

2    and, frankly, more smoke than is necessary.  I am, frankly,

3    disappointed that the trustee has been unable to resolve what

4    should be a fairly concise and simple dispute.  That's how I

5    saw it last time.  That's how I see it now.  And I'm, frankly,

6    angry.  Get it done, please.  I'll see you next time on this if

7    there is a next time.

8              IN UNISON:  Thank you, Your Honor.

9         (Proceedings concluded at 5:25 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

208

1                              I N D E X

2

3                            R U L I N G S

4     DESCRIPTION                                    PAGE      LINE

5     Debtors' motion to engage Citadel Solutions    27        25

6     LLC on an interim basis approved

7     Debtors' motion for authorization and          29         4

8     approval of settlement with Lehman Re Ltd.

9     approved

10    Debtors' application for interim allowance     102        14

11    of fees for the period February through

12    May approved

13

14

15

16

17

18

19

20

21

22

23

24

25

VERITEXT REPORTING COMPANY
212-267-6868                                            516-608-2400

209

1

2                      C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7       _____

8       Clara Rubin

9       AAERT Certified Electronic Transcriber (CET**D-491)

10      Also transcribed by:      Penina Wolicki

11

12      Veritext LLC

13      200 Old Country Road

14      Suite 580

15      Mineola, NY 11501

16

17      Date: August 28, 2009

18

19

20

21

22

23

24

25