WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
:
**In re**                                                                           :          **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :          **08-13555 (JMP)**
:
**Debtors.**                          :          **(Jointly Administered)**
:
:
-------------------------------------------------------------------x

## NOTICE OF MOTION FOR AUTHORIZATION
## TO ASSUME AN INTEREST RATE SWAP WITH MEG ENERGY CORP.

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Special Financing Inc. ("LBSF" and, together with Lehman Brothers Holdings Inc. and

its affiliated debtors in the above referenced chapter 11 cases, the "Debtors") for authorization to

assume an interest rate swap master agreement and trades with MEG Energy Corp., all as more

fully described in the Motion, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**September 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Lori R. Fife, Esq., Richard W. Slack, Esq., and Robert J. Lemons, Esq., attorneys

for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New

York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:

Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq.,

and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Wilbur F. Foster, Jr., Esq.,

and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in

these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be

so filed and received by no later than **September 10, 2009 at 4:00 p.m. (prevailing Eastern

Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 31, 2009
      New York, New York

           /s/ Robert J. Lemons
           Lori R. Fife
           Richard W. Slack
           Robert J. Lemons

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :    08-13555 (JMP)
                                              :
                   Debtors.                   :    (Jointly Administered)
                                              :
                                              :
-------------------------------------------------------------------x
```

## MOTION FOR AUTHORIZATION
## TO ASSUME AN INTEREST RATE SWAP WITH MEG ENERGY CORP.

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

   Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in

possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in

the above-referenced chapter 11 cases, the "Debtors" and, collectively with their non-debtor

affiliates, "Lehman"), files this Motion and respectfully represents:

### Background

   1.  Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), the Debtors commenced with this Court voluntary cases

under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors'

chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>").

## Jurisdiction

3.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Debtors' Swap Agreements

4.      In the ordinary course of their businesses prior to the Commencement Date, the Debtors actively dealt in the swap markets and entered into various types of swap agreements, including interest rate swaps.  By this Motion, LBSF seeks authorization pursuant to sections 105(a) and 365 of the Bankruptcy Code to assume an interest rate swap master agreement and trades with MEG Energy Corp. ("<u>MEG</u>").

5.      Interest rate swaps generally provide for the exchange of one or more payments, on specified payment dates (the "<u>Payment Dates</u>"), based on a notional principal amount (the "<u>Notional Amount</u>") multiplied by a fixed rate for one party (the "<u>Fixed Rate</u>"), and by the level of one or more floating interest rates for the other party (the "<u>Floating Rate</u>").  The former party's payments (each, a "<u>Fixed Payment</u>") are fixed and remain constant for the duration of the contract.  The other party's payments (each, a "<u>Floating Payment</u>") vary, having been set to the Floating Rate.  At each Payment Date, depending on the fluctuations of the

Floating Rate, the Floating Payment may be either higher or lower than the Fixed Payment. Pursuant to the contract, the two parties generally net-out their obligations, the party owing the larger amount paying the difference to the other.

6.      These swap agreements typically are memorialized pursuant to master agreements that are executed pursuant to widely used standard forms such as the ISDA Master Agreement.  The parties to a master agreement then may enter into individual transactions under the master agreement.  These individual transactions are customarily documented in the form of confirmations, which typically set forth, among other things, the specific terms and conditions of the transactions (certain of which may modify the terms and conditions of the standard forms), including, for example, specified quantities and delivery dates for physical commodity transactions, and specified methods for calculation of payment amounts and specified payment dates for rate transactions.

7.      Ordinarily, upon the commencement of a case under the Bankruptcy Code, sections 362(a) and 365(e)(1) of the Bankruptcy Code prohibit creditors from enforcing rights against a debtor.  Swap agreements, however, generally qualify as a type of derivative contract for which the Bankruptcy Code contains so-called "safe harbor" provisions.  These provisions permit qualifying non-debtor counterparties to exercise certain contractual rights triggered by a debtor's chapter 11 case or financial condition, including, under certain conditions, to terminate the contract and accelerate the amounts owed thereunder, and to exercise rights of setoff against collateral in their possession (if any) to satisfy claims against the debtor under the contract (the "Safe Harbor Provisions").[1]  The Safe Harbor Provisions do not, however, permit the counterparty to cease performance on the contract instead of terminating the contact.

---

[1]      These provisions are contained in sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 555; 556; 559; 560; and 561 of the Bankruptcy Code.  The Debtors reserve all of their rights as to whether any particular contract

**The Agreement**

8.        LBSF and MEG are parties to a certain 1992 ISDA Master Agreement,

including the schedule thereto (the "Schedule"), dated as of April 18, 2006 (the 1992 ISDA

Master Agreement and the Schedule together, the "Master Agreement").  The Master Agreement

provides the basic terms of the parties' contractual relationship and contemplates being

supplemented by trade confirmations that provide the economic terms of the specific transactions

agreed to by the parties.  Under the Master Agreement, LBSF and MEG entered into four interest

rate swap transactions (each a "Transaction" and collectively, the "Transactions"), the terms of

which were documented pursuant to one trade confirmation dated April 11, 2006, which was

subsequently modified on April 13, 2006, and three trade confirmations dated October 11, 2007

(collectively, the "Confirmations" and together with the Master Agreement, the "Agreement"). [2]

9.        Under the Agreement, LBSF has an obligation to pay the floating three-

month USD-LIBOR-BBA ("Three Month LIBOR") interest rate on the Notional Amounts of

$175,000,000, in the case of the first Transaction (the "First Transaction"), $30,000,000, in the

case of the second Transaction (the "Second Transaction"), $27,500,000, in the case of the third

Transaction (the "Third Transaction"), and $117,500,000, in the case of the fourth Transaction

(the "Fourth Transaction").  Under each Transaction, MEG has the obligation to pay a fixed rate

of interest on the applicable Notional Amount (5.28657% with respect to the First Transaction,

4.849% with respect to the Second Transaction, 4.825% with respect to the Third Transaction,

and 4.80% with respect to the Fourth Transaction).  *See* Confirmations at 2.  Until December 31,

---

constitutes an agreement subject to these safe harbor provisions of the Bankruptcy Code, or that any particular
counterparty is a party entitled to exercise rights pursuant thereto.

[2] The Master Agreement is attached hereto as "Exhibit A."  Copies of the Confirmations are attached hereto as
"Exhibit B."

2010, payments are required to be made on a net basis across all four Transactions by the party

owing the larger amount on the last calendar day of each of March, June, September and

December, subject to a business day convention, for amounts accrued on the respective Notional

Amounts during the prior three months.  *See id.*  LBHI acts as a credit support provider for

payment obligations of LBSF under the Agreement.  *See* Exhibit A of the Schedule.

        10.    Due to declining Three Month LIBOR rates, MEG has consistently been a

net obligor on all four Transactions.  The following chart illustrates the payment obligations on

all four Transactions (as documented by the payment notices attached hereto at "Exhibit C"):

| Transactions | LBSF's Payment Obligation | MEG's Payment Obligation | Net due to LBSF |
|---|---|---|---|
| **June 30, 2008 to Sept. 30, 2008** | | | |
| First Transaction | $1,252,503.97 | $2,364,271.58 | $1,111,767.61 |
| Second Transaction | $214,714.97 | $371,756.67 | $157,041.70 |
| Third Transaction | $196,822.05 | $339,090.28 | $142,268.23 |
| Fourth Transaction | $840,966.95 | $1,441,333.33 | $600,366.38 |
| **Sept. 30, 2008 to Dec. 31, 2008** | | | |
| First Transaction | $1,682,396.33 | $2,364,271.58 | $681,875.25 |
| Second Transaction | $288,410.80 | $371,756.67 | $83,345.87 |
| Third Transaction | $264,376.57 | $339,090.28 | $74,713.71 |
| Fourth Transaction | $1,129,608.97 | $1,441,333.33 | $311,724.36 |
| **Dec. 31, 2008 to March 31, 2009** | | | |
| First Transaction | $638,203.13 | $2,312,874.38 | $1,674,671.25 |
| Second Transaction | $109,406.25 | $363,675.00 | $254,268.75 |
| Third Transaction | $100,289.06 | $331,718.75 | $231,429.69 |
| Fourth Transaction | $428,507.81 | $1,410,000.00 | $981,492.19 |
| **March 31, 2009 to June 30, 2009** | | | |
| First Transaction | $539,680.56 | $2,338,572.98 | $1,798,892.42 |
| Second Transaction | $92,516.67 | $367,715.83 | $275,199.16 |
| Third Transaction | $84,806.94 | $335,404.51 | $250,597.57 |
| Fourth Transaction | $362,356.94 | $1,425,666.67 | $1,063,309.73 |

As of the date hereof, however, MEG has missed four (4) payments for each of the Transactions,

beginning on September 30, 2008, and currently owes LBSF $9,692,963.87 plus default interest

accrued on the missed payments.

11.     Section 2(e) of the Agreement provides that "a party that defaults in the performance of any payment obligation will . . . be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand . . . for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate" (as that term is defined in the Agreement).  To date, the default interest on the unpaid amounts specified above totals approximately $665,000.  Thus, in addition to the payments that MEG has refused to make, MEG also owes LBSF default interest that continues to accrue.

12.     An "Event of Default" is defined in Section 5(a) of the Master Agreement to include the bankruptcy of any party or credit support provider.  Section 6(a) of the Master Agreement provides that if an Event of Default with respect to a party (the "Defaulting Party") has occurred and is continuing, the other party (the "Non-Defaulting Party") may designate an Early Termination Date for the Agreement.

13.     Section 6(c) of the Agreement provides that if a Non-Defaulting Party designates an Early Termination Date under Section 6(a), then the Agreement, including all outstanding Transactions thereunder, will terminate on that date even if the Event of Default is later cured.

14.     Section 6(e) of the Agreement provides that if an Early Termination Date occurs, the parties will make a final payment pursuant to the payment measure and method selected by the parties in the schedule to the Agreement.

15.     In sum, if there is an Event of Default then the Non-Defaulting Party has the right to designate an Early Termination Date in respect of all outstanding Transactions, thereby terminating the Agreement.  In respect of such termination, a final payment is calculated

and paid in order to put the parties into the same economic position (as determined at the time of
the termination) as if the termination had not occurred.  As of the date hereof, under the terms of
the Agreement, MEG would owe a substantial payment to LBSF – reflecting the value of the
Agreement to LBSF, including, but not limited to the approximately $9.7 million of unpaid
amounts owed by MEG to LBSF – if MEG terminated the Agreement.  Although MEG has taken
the position that there has been an Event of Default based on the bankruptcy of LBHI and has
therefore refused to perform, it has not attempted to terminate the Agreement.  Instead, MEG has
simply refused to perform its ongoing obligations under the Agreement.  In short, like many
other counterparties to derivative contracts with the Debtors, MEG is refusing to "pay to play."

### Assumption of the Agreement Is Within LBSF's Sound Business Judgment

16.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a
debtor in possession, "subject to the court's approval, may assume or reject any executory
contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

17.     In determining whether an executory contract or unexpired lease should be
assumed, courts apply the "business judgment" test.  *Orion Pictures Corp. v. Showtime
Networks, Inc.* (*In re Orion Pictures*), 4 F.3d 1095, 1099 (2d Cir. 1993); *see also Richmond
Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny
would slow the administration of the debtor's estate and increase its cost, interfere with the
Bankruptcy Code's provision for private control of administration of the estate, and threaten the
court's ability to control a case impartially"); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y.
2006) ("The decision to assume or reject an executory contract is within the sound business
judgment of the debtor-in-possession. . . .").  Under this test, a court should approve the
assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has
exercised its sound business judgment in determining that assumption of an agreement is in the

best interests of its estate.  *See, e.g.*, *In re Child World, Inc.*, 142 B.R. 87, 89-90 (Bankr.

S.D.N.Y. 1992).

18.    LBSF has determined, in its sound business judgment, that assumption of

the Agreement is in the best interests of its estate and its creditors because assumption would

allow LBSF to realize immediately the value of its "in the money" Agreement with MEG.  This

is the case because upon assumption of the Agreement, (i) MEG will be required to pay LBSF all

accrued unpaid amounts under the Agreement – to date, $9,692,963.87, plus default interest

thereon – and (ii) LBSF, at its option, will be able to lock-in the positive future value reflected in

the current, mark-to-market value of the Agreement in favor of LBSF through hedging.

19.    Furthermore, as long as the Floating Rates remain lower than the Fixed

Rates under the Agreement, LBSF continues to be entitled to net payments under the Agreement.

If LIBOR remains at a low enough rate through December 31, 2010, when the Transactions

mature, LBSF will be entitled to net payments for the remaining lives of the Transactions.

Additionally, LBSF's hedges of the Transactions will compensate LBSF in the event Fixed Rates

exceed the Floating Rates and LBSF is required to make net payments to MEG.

20.    Based on the foregoing, LBSF submits that the assumption of the

Agreement represents a reasonable exercise of LBSF's business judgment, is in the best interests

of its estate and creditors, and should be approved.

## LBSF Does Not Need To Take Any Action To Cure Any Defaults

21.    Section 365(b) of the Bankruptcy Code establishes certain conditions that

must be satisfied prior to the assumption of an executory contract if the contract contains a

default:

> (b)(1) If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease

unless, at the time of assumption of such contract or lease, the trustee—

>    (A) cures, or provides adequate assurance that the trustee will
>    promptly cure, such default…

>    (B) compensates, or provides adequate assurance that the trustee will
>    promptly compensate, a party other than the debtor to such contract or
>    lease, for any actual pecuniary loss to such party resulting from such
>    default; and

>    (C) provides adequate assurance of future performance under such
>    contract or lease.

11 U.S.C. § 365(b)(1).

22.    Certain defaults need not be cured and do not require the debtor to provide

adequate assurance of future performance.  Section 365(b)(2) provides an exception to the

requirements of section 365(b)(1) for certain defaults:

>    (2) Paragraph (1) of this subsection does not apply to a default that is a
>    breach of a provision relating to—

>    (A) the insolvency or financial condition of the debtor at any time
>    before the closing of the case;
>    (B) the commencement of a case under this title; [or]
>    (C) the appointment of or taking possession by a trustee in a case
>    under this title or a custodian before such commencement…

11 U.S.C. § 365(b)(2).  The purpose of section 365(b)(2) is to ensure that "the requirements of

section 365(b)(1) do not apply to defaults triggered by provisions relating to the insolvency or

financial condition of the debtor, the commencement of a Chapter 11 case, or the appointment of

a trustee in the case or a custodian before the case."  *L.R.S.C. Co. v. Rickel Home Cents., Inc. (In*

*re Rickel Home Centers)*, 209 F.3d 291, 298 (3d Cir. 2000).

23.    The only default that MEG has alleged to exist is the Event of Default that

occurred when LBHI commenced its chapter 11 case on September 15, 2008.  Based solely on

the commencement of LBHI's chapter 11 case, on September 30, 2008, December 31, 2009,

March 31, 2009 and June 30, 2009, MEG refused to pay LBSF, alleging a breach of the

Agreement's unenforceable *ipso facto* provisions.  *See* Correspondence attached hereto as

Exhibit D.

24.     *Ipso facto* clauses are void and unenforceable pursuant to section

365(e)(1) of the Bankruptcy Code because the automatic termination or modification of a

debtor's contractual rights deters rehabilitation and causes a forfeiture of assets.  *See Summit Inv.*

*and Dev. Corp. v. LeRoux (In re LeRoux)*, 69 F.3d 608, 610 (1st Cir. 1995).  Most courts have

interpreted section 365(e)(1) broadly to "abrogate[] the power of *ipso facto* clauses," such that

"[n]o default may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an

alleged default where the only cause for default is the debtor's commencement of a bankruptcy

case."  *In re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) (holding that counterparty

could not accelerate notes because such right was only triggered upon a bankruptcy default

clause, which was void pursuant to section 365(e)(1));  s*ee also In re Ernie Haire Ford, Inc.*, 403

B.R. 750, 759 (Bankr. M.D. Fla. 2009) (holding that counterparty's enforcement of right to

terminate contract at will was unenforceable under section 365(e)(1) where the sole basis for

termination was the debtor's bankruptcy filing).

25.     The alleged default relied upon by MEG to withhold performance is not

enforceable against LBSF and, pursuant to section 365(b)(2), does not need to be cured by LBSF

before LBSF may assume the Agreement.  Section 2(a)(iii) of the Agreement states that as a

condition precedent to performance, no "Event of Default" has occurred and is continuing.  The

only "Event of Default" MEG is relying upon to avoid its performance obligations under the

Agreement is LBHI's chapter 11 filing.

## MEG Cannot Enforce Defaults After Assumption

Assumption Cures Ipso Facto Defaults

26.     The policies underlying section 365 of the Bankruptcy Code that favor the preservation and assumption of valuable contracts by the debtor mandate the conclusion that the debtor's act of assumption effectively acts to cure any default that arises from the breach of *ipso facto* clauses.  *See Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc. (In the Matter of Allied Tech., Inc.)*, 25 B.R. 484, 496 (Bankr. S.D. Ohio 1982) (holding that the debtor-lessee's act of assuming an unexpired lease "acts to cure this 'default,' a curing which is preemptive of any relevant state law.").  As at least one other court has observed, "[a]ny conclusion to the contrary would render a debtor's right to assign (or to preserve an assignment prior to assumption) meaningless, and would obviously be contrary to 11 U.S.C. § 365."  *Id.*  Not only would a different conclusion render the contract valueless to the debtor – it would ensure that no contract that contains *ipso facto* clauses could ever be assigned:

> In essence, to permit forfeiture of an assumed lease on the basis of enforcement of an *ipso facto* clause against a performing nondebtor assignee would render any assumed lease containing an *ipso facto* clause valueless for purposes of assignment, and would be wholly inconsistent with the concept implicit in 11 U.S.C. § 365 that assumption of a lease rectifies the lease, and otherwise places the parties in their prepetition postures.

*Id.*

The Court Should Hold Safe Harbored *Ipso Facto* Rights Unenforceable Upon Assumption

27.     Although the Safe Harbor Provisions may *initially* allow counterparties to enforce *ipso facto* provisions to the extent that they seek to liquidate, terminate, or accelerate their contracts with the Debtors, or offset or net out their positions, any such enforcement must be *because of a condition specified in section 365(e)(1).  See In re Amcor Funding Corp.*, 117

B.R. 549, 551, 553 (Bankr. D. Ariz. 1990) (holding that the automatic stay would remain in full

force and effect to stay a counterparty's liquidation of a securities contract, where the

counterparty clearly sought to do so "to ease its own bankrupt condition, at the expense of the

[debtor's] estate," and not because of the debtor's bankruptcy).  If a counterparty is motivated by

a different reason, it cannot enforce an ipso facto clause to terminate a swap.  *See id.*

28.      Specifically, section 560 of the Bankruptcy Code provides:

> The exercise of any contractual right of any swap participant or financial
> participant to cause the liquidation, termination or acceleration of one or more
> swap agreements because of a condition of the kind specified in section 365(e)(1)
> of this title or to offset or net out any termination values or payment amounts
> arising under or in connection with the termination, liquidation, or acceleration of
> one or more swap agreements shall not be stayed, avoided, or otherwise limited
> by operation of any provision of this title . . . .

11 U.S.C. 560 (emphasis added).  The purpose of providing this exception for the termination,

liquidation, or acceleration of swap agreements because of the commencement of a bankruptcy

case is "to ensure that the swap and forward contract financial markets are not destabilized by

uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code."

*See* Act of June 25, 1990, Pub. L. No. 101-311, H.R. No. 101-484, *as reprinted* in 1990

U.S.C.C.A.N. at 223.

29.      Prior to the addition of the Safe Harbor Provisions, parties who had

entered into swaps to cover their exposure to market fluctuations would lose the certainty that

their swaps were intended to provide.  *See* Scott Tucker, *Interest Rate Swaps and the 1990*

*Amendments to the United States Bankruptcy Code: A Measure of Certainty Within Swap Market*

*Contracts*, 1991 UTAH L. REV. 581, 581-82 (1991);  Interest Swap: Hearing Before the

Subcomm. on Courts and Admin. Practice of the S. Comm. Judiciary, 101st Cong., 1st Sess., on

S. 396 ("Interest Swap Hearing"), at 22 (1989) (statement of Mark C. Brickell, Chairman, Int'l

Swap Dealers Ass'n).  Swap participants would not know whether the debtor intended to assume

or reject their swaps, and they would be required by the automatic stay to allow the debtor time

to make this decision.  *See* Interest Swap Hearing at 27 (statement of Brickell); *id.* at 51-55

(statement of Perlstein).  Meanwhile, swap participants would be uncertain as to whether they

should enter into new swaps to ensure that their positions were covered, risking double coverage

if the debtor assumed their swaps, or await the debtor's decision and find themselves exposed if

the debtor rejected.  *See* Tucker, *Interest Rate Swaps*, 1991 UTAH L. REV. at 582; Interest Swap

Hearing at 27 (statement of Brickell); *id.* at 51 (statement of Perlstein).  This uncertainty "could

cause a rippling effect, which would undermine the stability of financial markets." Interest Swap

Hearing at 1 (statement of Heflin).  Such uncertainty resulted in fear that "liquidity of the market

would be restricted by concern about the effect of certain Bankruptcy Code provisions."  *See*

Interest Swap Hearing at 16 (statement of Brickell).  "Because financial markets can change

significantly in a matter of days, or even hours, a non-bankrupt party to ongoing securities and

other financial transactions could face heavy losses unless the transactions are resolved promptly

and with finality." H.R. REP. NO. 101-484, at 223, 224.  The key to reducing risk was to allow

"two parties to a swap agreement" to terminate and exercise the setoff process without the delay

and uncertainty attendant to seeking relief from the automatic stay:

> The setoff process, which is at the center of the swap agreement, may be skewed
> if one of the parties has filed for bankruptcy. . . . Concerns have been raised that
> under current bankruptcy law, termination and setoff of a swap agreement would
> be automatically stayed when one of the parties files a bankruptcy petition,
> whereupon the trustee, after indefinitely postponing termination of the swap
> agreement, could refuse setoff and unfairly "cherry pick" only the portions of the
> agreement advantageous to the debtor, while rejecting the portions unfavorable to
> the debtor.

*Id*. at 225 (emphasis added).  For this reason, Congress provided "safe harbors" from the

destabilizing effects of lengthy bankruptcy proceedings for parties to specified commodities and

financial contracts.  *Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)*,

556 F.3d 247, 252 (4th Cir. 2009).

30.     Once a debtor has assumed an executory contract, however, the

uncertainty that arises for non-debtor parties to a contract because of the commencement of a

bankruptcy case no longer exists.  Upon assumption, the estate becomes bound by the terms of

the contract and obligated to continue performance in accordance with the contract's terms, and

has relinquished the ability to reject the contract's obligations.  Assumption of an executory

contract "is in effect a decision to continue performance.  It requires the debtor to cure most

defaults and continues the parties' rights to future performance under the contract or lease."  *In re*

*Penn Traffic Co.*, 524 F.3d 373, 378 (2d Cir. 2008).  Upon assumption, there is no longer the

possibility of rejection or breach that would result in a general unsecured claim:  "[i]f the debtor

breaches or seeks to reject an executory contract after it has been assumed, the damages suffered

by the non-debtor counterparty are … granted administrative expense priority."  *Nostas Assocs.*

*v. Costich (In re Klein Sleep Prods.,  Inc.)*, 78 F.3d 18, 28 (2d Cir. 1996).  It follows from this

that any swap counterparty would have no legal basis to seek enforcement of a right to terminate,

accelerate, or liquidate a swap under section 560 of the Bankruptcy Code if the debtor has

assumed the contract because the termination, acceleration, or liquidation would no longer be

due to the commencement of the chapter 11 case, with its attendant uncertainty as to the

treatment of the contract.

31.     Even if LBSF had not sought authority to assume the Agreement, the

Court could hold that the Agreement's *ipso facto* provisions are no longer enforceable if MEG

attempted to terminate the Agreement at this point in the chapter 11 case.  The plain language of

the Safe Harbor Provisions only permits a termination "because of a condition of the kind

specified in section 365(e)(1)," *i.e.* the insolvency or financial condition of the debtor at the

commencement of a bankruptcy case. *See, e.g.,* 11 U.S.C. §§ 560, 561; *see also Calpine*, 2009

WL 1578282, at *6 (noting that section 556 – a Safe Harbor Provision – is limited to enforcing

only those terms that trigger termination upon the occurrence of one of the three specified

conditions listed in section 365(e)(1)).  Courts considering this limitation have held that a

counterparty who waits to terminate a safe harbored contract for a reason other than the

commencement of a debtor's chapter 11 case may not terminate the contract under the Safe

Harbor Provisions. *See, e.g., In re Enron Corp.*, No. 01 B 16034 (AJG), 2005 WL 3874285, *4

(Bankr. S.D.N.Y. Oct. 5, 2005) (Gonzalez, J.) (recognizing that a counterparty's use of the Safe

Harbor Provisions "must be made fairly contemporaneously with the bankruptcy filing" and the

failure to make such election renders the contract "just another ordinary executory contract.");

*In re Amcor Funding Corp.*, 117 B.R. at 551, 553.

        32.     At this point in time, it is clear that any attempt by MEG to terminate the

Agreement could not be because of the commencement of LBSF's or LBHI's chapter 11 cases.

Termination of the Agreement nearly one year after the commencement of LBSF's chapter 11

case would not be a termination permitted by *Enron* or *Amcor* and is not what Congress intended

when enacting the Safe Harbor Provisions.  Instead, Congress enacted the Safe Harbor

Provisions to maintain liquidity in the financial markets by allowing for the "*prompt* closing out

or liquidation of [counterparties'] open accounts" upon the commencement of the debtor's

bankruptcy case. H.R. REP. NO. 97-420, at 1 (1982) (emphasis added).  When Congress further

broadened the bankruptcy protections afforded to certain contracts in 1990, the rationale was that

"[t]he *immediate* termination for default and the netting provisions are critical aspects of swap

transactions and are necessary for the protection of all parties in light of the potential for rapid

changes in the financial markets." S. Rep. No. 101-285, at 1 (1990) (emphasis added). *See generally* Tucker, *Interest Rate Swaps*, 1991 Utah L. Rev. at 581. (discussing Congress's intent in adding the Safe Harbor Provisions to address the uncertainties that would arise when a party to a swap agreement commenced a case under the Bankruptcy Code).

33.    LBSF's chapter 11 case has been pending for nearly a year, during which time LBSF has operated as a debtor in possession while MEG has made no attempt to terminate the Agreement or perform thereunder. Moreover, LBSF's cash position has improved dramatically since the Commencement Date. Finally, by seeking to assume the Agreement, LBSF has clearly indicated that it intends to perform its obligations and will not seek to reject the Agreement. Based on the foregoing, MEG can no longer reasonably assert, if it seeks to terminate the Agreement, that "it is *in fact* doing so for one of the three reasons set forth in § 365(e)(1)." *See In re Amcor Funding Corp.*, 117 B.R. at 551.

34.    For the foregoing reasons, therefore, the Court should find that all of the requirements of section 365 of the Bankruptcy Code have been met, that LBSF is duly authorized to assume the Agreement, and that the Agreement's *ipso facto* provisions are unenforceable once LBSF has assumed the Agreement, because any such enforcement could not be because of the commencement of LBSF's or LBHI's chapter 11 cases.

## Notice

35.    No trustee or examiner has been appointed in these chapter 11 cases. In compliance with Bankruptcy Rules 6006(c) and 9014, LBSF has served notice of this Motion on MEG. In addition, LBSF has served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the

attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

and (vi) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that

no other or further notice need be provided.

36.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  August 31, 2009
        New York, New York


/s/ Robert J. Lemons
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


Attorneys for Debtors
and Debtors in Possession

**PROPOSED ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                  :

In re                                      :        Chapter 11 Case No.
                                                  :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :        08-13555 (JMP)
                                                  :

                      Debtors.        :        (Jointly Administered)
                                                  :
                                                  :
-------------------------------------------------------------------x

**ORDER GRANTING MOTION PURSUANT TO SECTIONS
105(a) AND 365 OF THE BANKRUPTCY CODE FOR AUTHORIZATION
TO ASSUME AN INTEREST RATE SWAP WITH MEG ENERGY CORP.**

       Upon the motion, dated August 31, 2009 (the "Motion"), of Lehman Brothers

Special Financing Inc. (the "LBSF"), as debtor in possession (collectively with Lehman Brothers

Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"

and, together with their non-debtor affiliates, "Lehman"), pursuant to sections 105(a) and 365 of

title 11 of the United States Code (the "Bankruptcy Code") for authorization to assume an

interest rate swap master agreement and trades with MEG Energy Corp. (the "Agreement"), all

as more fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the amended order entered February 13, 2009 governing case management and administrative

procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New

York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities

and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for

the Southern District of New York; and (vi) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing

(the "Hearing") having been held to consider the relief requested in the Motion; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that LBSF's assumption of the Agreement is hereby approved

pursuant to section 365(a) of the Bankruptcy Code, and the Agreement is hereby assumed; and it

is further

ORDERED that all existing defaults under the Agreement with respect to LBSF,

LBHI or any of their affiliates are hereby deemed to be cured; and it is further

ORDERED that any provision of the Agreement that purports to modify any right

or obligation under the Agreement and/or to modify any other term or condition under the

Agreement due to any existing defaults under the Agreement with respect to LBSF, LBHI, or

any of their affiliates is not enforceable; and it is further

ORDERED that any defaults that may arise because of a condition of the kind

specified in section 365(e)(1) of the Bankruptcy Code with respect to LBSF or LBHI that occur

before the effective date of any chapter 11 plan for LBSF ("Ipso Fact Defaults"), are not

enforceable; and it is further

ORDERED that MEG shall immediately perform its obligations to make

payments to LBSF under the Agreement, without regard to any alleged existing defaults or Ipso

Fact Defaults, including but not limited to promptly making all payments that were, without

regard to any alleged existing defaults or Ipso Fact Defaults, owed to LBSF on September 30,

2008, December 31, 2008, March 31, 2009, and June 30, 2009; and it is further

ORDERED that nothing herein shall constitute an assumption of any obligations

by LBHI; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: _____, 2009
      New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE