1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-14884-jmp

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN RE LTD.,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            August 12, 2009

            2:02 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1    Motion for Preliminary Injunction by Peter Mitchell and Jeffrey

2    Hunter of PricewaterhouseCoopers, Bermuda, Joint Provisional

3    Liquidators of Lehman Re Limited.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

```
                                                         3
 1

 2    A P P E A R A N C E S :

 3    CADWALADER, WICKERSHAM & TAFT, LLP

 4         Attorneys for Joint Provisional Liquidators

 5         One World Financial Center

 6         New York, NY 10281

 7

 8    BY:   INGRID BAGBY, ESQ.

 9          GREGORY M. PETRICK, ESQ.

10

11

12    CLEARY GOTTLIEB STEEN & HAMILTON, LLP

13         Attorneys for Barclays Capital

14         One Liberty Plaza

15         New York, NY 10006

16

17    BY:   LINDSEE P. GRANFIELD, ESQ.

18

19

20    MELBANK, TWEED, HADLEY & MCCLOY, LLP

21         Attorneys for Official Creditors' Committee

22         One Chase Manhattan Plaza

23         New York, NY 10005

24

25    BY:   DENNIS C. O'DONNELL, ESQ.
```

4

1

2    MORGAN, LEWIS & BOCKIUS, LLP

3         Attorneys for SunCal Debtors

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:    MATTHEW W. OLSEN, ESQ.

8           MENACHEM O. ZELMANOVITZ, ESQ.

9

10

11   SALANS

12        Attorneys for Swedbank

13        620 Fifth Avenue

14        New York, NY 10020

15

16   BY:    PAUL C. GUNTHER, ESQ.

17

18

19   SELTZER, CAPLAN, MCMAHON & VITEK

20        Attorneys for Lusardi Construction Company

21        2100 Symphony Towers

22        750 B Street

23        San Diego, CA 92101

24

25   BY:    DENNIS J. WICKHAM

5

1

2    WEIL, GOTSHAL & MANGES, LLP

3          Attorneys for Lehman Holdings, Inc., et al.

4          767 Fifth Avenue

5          New York, NY 10153

6

7    BY:   RICHARD P. KRASNOW, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

1

2      THE COURT:  Be seated, please.  Let's proceed.

3      MS. BAGBY:  Good afternoon, Your Honor.  Ingrid Bagby

4  from Cadwalader, Wickersham & Taft.  Cadwalader's counsel to

5  the joint provisional liquidators of Lehman Re Limited.  Those

6  provisional liquidators are Peter Mitchell and Jeffrey Hunter

7  of PricewaterhouseCoopers, Bermuda.  And I'd like to note in

8  the first instance that Mr. Hunter is here in the courtroom

9  today, should the Court have any questions --

10      THE COURT:  Okay.

11      MS. BAGBY:  -- in respect to any matter.  This is the

12  joint provisional liquidators' -- or as we refer to them -- the

13  JPLs' motion for a preliminary injunction in this Chapter 15

14  case that was filed on August 6, 2009.  As set forth in the

15  JPLs' verified petition, the JPLs are seeking recognition of

16  their Bermuda winding up proceeding involving Lehman Re as a

17  foreign main proceeding or, alternatively, as a foreign nonmain

18  proceeding.

19      Pending the hearing on the JPLs' request for

20  recognition under Chapter 15, the JPLs are seeking interim

21  injunctive relief under Bankruptcy Code Section 1519.  The JPLs

22  initially moved for a temporary restraining order which had an

23  ex parte hearing on August 6th.  The Court denied, but the

24  Court entered a scheduling order on August 7th setting a

25  hearing on the request for -- the JPLs request for a

7

1    preliminary injunction for today.  And I will note that

2    pursuant to the Court's scheduling order on August 7th, the

3    JPLs provided notice of today's hearing, as well as all the

4    pleadings in support of the verified petition, to all creditors

5    and parties in interest known to the JPLs, both by e-mail,

6    facsimile, as well as mail, and over 300 parties were noticed.

7    And affidavits of service have been filed with the Court.

8           THE COURT:  Were parties associated with the Laurel

9    Cove project noticed?

10          MS. BAGBY:  They were, Your Honor.  Counsel of record

11   that filed the Laurel Cove complaint were noticed, and I

12   believe we also noticed the entity itself, the plaintiff

13   entities.  We didn't have addresses, as I recall, for those

14   entities, but we researched them.

15          THE COURT:  Have you received any responses of any

16   sort from them?

17          MS. BAGBY:  We have not received a response from the

18   Laurel Cover parties.

19          THE COURT:  All right.

20          MS. BAGBY:  And I will just clarify, for those in the

21   courtroom, that at this moment, the JPLs are only seeking

22   preliminary injunctive relief.  The other relief sought in the

23   petition, for example, discovery, is not being sought today.

24   That, obviously, awaits a hearing on recognition, which the

25   Court has set for September 9th.

8

1           So moving to the JPLs' preliminary injunction

2   application, we're seeking a preliminary injunction, as set

3   forth in the verified petition, to enjoin the commencement or

4   continuation of legal proceedings against the company or its

5   assets, or enforcing judgments against the company or its

6   assets.  Section 1519 allows for provisional relief pending a

7   decision on recognition and incorporates the traditional

8   injunction standards that have been recognized by the Second

9   Circuit.  In particular, a party seeking a preliminary

10  injunction under Second Circuit case law must show that without

11  the injunction, the party, likely, will suffer irreparable

12  harm, and that the party is likely to succeed on the merits.

13  Or alternatively, there is the existence of sufficiently

14  serious questions going to the merits, combined with a finding

15  that the balance of hardships tips in the movant's favor.  And

16  that's the consistent with the authority that we've cited in

17  our memorandum of law on pages 21 and 22.

18          And the JPLs contend that irreparable harm is present

19  here and previously has been found in other similar

20  international insolvency proceedings where there's a danger of

21  a premature piecing out of property involved in a foreign

22  liquidation.  In particular, like In re Lyons (ph.) from the

23  Southern District of New York and like MMG, also from the

24  Southern District, have acknowledged that draining a foreign

25  estate's assets through litigation can constitute irreparable

1   harm.  And in particular, we cited both Lyons and MMG in our

2   memorandum of law.  The Lyons Court, in particular, said

3   irreparable harm may result if the foreign representative is

4   forced to participate in expensive litigation that threatens to

5   drain the assets of the estate.  And while the loss of estate

6   assets may be a financial harm, financial harms can also be

7   irreparable if there's a substantial chance that upon the

8   resolution of the action, the parties cannot be returned to

9   their prior position, and that's a Second Circuit case,

10  Brenntag International Chemicals v. Bank of India.

11       And so the JPLs contend that they satisfy these

12  standards.  First, with respect to irreparable harm, as set

13  forth in the petition, as well as the declaration of Peter

14  Mitchell, one of the JPLs, the JPLs are currently defending, as

15  the Court is aware, against three active litigations of which

16  they're aware.  And these litigations involve a substantial

17  expense and time from the estate.  Those litigations are

18  SunCal, which is pending in the bankruptcy court in the Central

19  District of California, Laurel Cove, which is pending in the

20  state court in Tennessee, and Centennial Hills, which is

21  pending in the state court of Nevada.  And the details on those

22  litigations are set forth in the verified petition at

23  paragraphs 28 through 30, and as I said, in addition, they're

24  set forth in the Mitchell declaration at paragraphs 11 through

25  14.

10

1    I will note that, for example, in SunCal, while we

2  have agreed to an extension of the time to respond with the

3  plaintiff in that party, and, I think, now, out, at least,

4  agree response date is September 30th, that remains subject to

5  approval by the bankruptcy court in California.  However,

6  Laurel Cover, currently we understand that answers are likely

7  due on August 23rd, but we, as yet, do not have an agreement

8  with the other party as to an extension of the time to answer.

9  And Centennial Hills, as is explained in the verified petition,

10 the state court has previously ordered that a foreclosure can

11 proceed on the mechanic's lien out there after August 17, 2009.

12    So based on these facts, absent a stay, Lehman Re

13 cannot delay, for example, in retaining counsel to respond to

14 these various litigations.  And that's one of the bases upon

15 which we think there is irreparable harm in this case.  All of

16 these litigations are complex and time-consuming, and, for

17 example, SunCal requires the JPLs to immediately start to

18 investigate the factual allegations and to retain counsel in

19 connection with that case.  And so they cannot afford to wait

20 until -- as fiduciaries, they cannot afford to wait until the

21 answer time runs on September 30th or until their recognition

22 hearing is determined to decide whether or not to respond to

23 the complaint there.

24    In addition, in terms of irreparable harm, Lehman Re

25 is not currently operating as a going concern.  Since it's

11

1    subject to provisional liquidation, it's essentially winding

2    up, and the Bermuda bankruptcy proceeding is focused on

3    equitably distributing the company's limited assets.  The

4    depletion of assets to fund these various litigations that may

5    arise will constitute irreparable harm because Lehman Re's

6    insolvency proceeding has a finite amount of assets to spend.

7    And this is set forth, for example, in the Mitchell declaration

8    at paragraph 19.  Peter Mitchell has averred that failure to

9    secure the company's assets will substantially deplete the

10   company's resources, thereby limiting the company's ability to

11   maximize the estate's value for all creditors.

12          And as a further example of the irreparable harm that

13   can arise due to litigation in an international insolvency

14   context, we would point the Court to the case of Innua Canada,

15   Limited, which is not cited in our brief.  I can provide the

16   citation to that, however.  It's 2000 Bankr. LEXIS 994.  That

17   is a bankruptcy court decision from very recently this year in

18   the District of New Jersey.  And Innua involved a Canadian

19   company subject to an insolvency proceeding that had commenced

20   a Chapter 15 case in the District of New Jersey.  And prior to

21   the recognition hearing but after the filing, the company

22   became subjected to two lawsuits and moved for a preliminary

23   injunction.  The New Jersey bankruptcy court granted the

24   preliminary injunction in that instance and stated that the

25   need for immediate imposition of the automatic stay in order to

12

1    prevent any dissipation in the company's assets becomes clear

2    in light of the two lawsuits that have been commenced.

3            In addition to the known litigation risk, or the

4    existing litigation, Your Honor, the irreparable harm is

5    presented here because there's a serious possibility of unknown

6    litigations affecting the company's interest right now, as

7    happened with the Centennial Hills litigation.  And this is

8    highlighted in the Mitchell declaration at paragraph 15, that

9    based on discussions with borrowers and other parties in

10   interest, the JPLs believe there is a substantial risk that

11   other similar litigation will be commenced in the United

12   States.  So again, Centennial represents an example of

13   potential litigation that could be started at any moment with

14   respect to the company's interest in various mortgages on

15   properties that are located throughout the United States.

16           The second prong that the JPLs are required to show

17   for a preliminary injunction is a likelihood of success on the

18   merits.  And the grounds for recognition of the Bermuda winding

19   up as either a foreign main proceeding or a foreign nonmain

20   proceeding are set forth in the verified petition and described

21   in the memorandum of law.  The JPLs clearly are foreign

22   representatives in the sense that they were appointed by the

23   Bermuda court, a copy of the Bermuda court order is attached to

24   the verified petition.  They're fiduciaries charged with

25   liquidating the company's assets.  In addition, the Bermuda

13

1    winding up is a foreign proceeding under Section 10123, and a

2    foreign main proceeding under Section 15024.  Specifically, the

3    Bermuda winding up is a judicial proceeding under a law

4    relating to insolvency for the purpose of liquidating a

5    company's assets.

6             In terms of recognition as a foreign main proceeding

7    under 15042, the company's center of main interest is in

8    Bermuda.  And we've highlighted specific facts in the record

9    before the Court to show that.  For example, the debtor's

10   registered office is located in Bermuda, and absent any

11   evidence to the contrary, a foreign debtor's registered office

12   is presumed to be at center of main interest.  But we have

13   additional facts that show that Bermuda is the center of main

14   interest.  For example, not only was the company's principal

15   office located in Bermuda, but as described in verified

16   petition paragraph 10, the company maintained an individual

17   employee there in Bermuda.  In addition, the company had a

18   principal representative in Bermuda who regularly was required

19   to report to the Bermuda monetary authority.  The company's

20   statutory books and records were located in Bermuda.  At the

21   time of the petition, as well as presently, the company had and

22   maintains bank accounts in Bermuda.

23            THE COURT:  Can we stop you for a second?

24            MS. BAGBY:  Sure.

25            THE COURT:  Because you're obviously focused on the

14

1   likelihood that I will grant recognition of this case as a

2   foreign main proceeding as being your prong for likelihood of

3   success on the merits.  And I assume that you're referring to

4   paragraph 10 of Mr. McBeth's affidavit?

5          MS. BAGBY:  I can certainly discuss paragraph 10.  I

6   was --

7          THE COURT:  You referenced paragraph --

8          MS. BAGBY:  -- discussing paragraph 10 of the verified

9   petition.

10          THE COURT:  Okay, I happen to remember paragraph 10 of

11   Mr. McBeth's affidavit because it raises questions as to

12   whether this is or is not a foreign main proceeding under the

13   authority of the Bear Stearns case.  This is something that

14   your adversaries have been hammering.  Both the SunCal papers

15   and the Centennial Hills papers reference separately the Bear

16   Stearns case, and without commenting further on the issues,

17   there, there will probably be a need for more than just a

18   recitation of what documents say in order to demonstrate a

19   likelihood of success of actual recognition.  Are you prepared,

20   today, to move forward with evidence?

21          MS. BAGBY:  We are prepared to move forward with

22   evidence, if that's what the Court requires.  If I can --

23          THE COURT:  Well, it's what you'll need to do if you

24   intend to prevail.

25          MS. BAGBY:  Absolutely.  If I can respond, though, to

15

1    Your Honor's question with respect to the citations by the

2    SunCal parties in the McBeth affidavit, because I think if

3    those citations are read carefully and in context, they don't,

4    in fact, stand for the proposition that the SunCal parties have

5    cited them for.  For example, if we look at paragraph 10 of the

6    McBeth affidavit which is attached to the declaration of Robin

7    Mayor, the JPLs Bermuda counsel, paragraph 10 says that since

8    the company's establishment, the company being Lehman Re, it

9    has always relied on the services and franchise of the Lehman

10   Group.  It does not say that it has always relied upon the

11   services and franchise of any particular Lehman entity.  It

12   says Lehman Group.  The phrase Lehman Group is defined in

13   paragraph 7 of the McBeth affidavit to include Lehman Brothers

14   Holding, Inc., incorporated in the State of Delaware and the

15   group of companies referred to herein.  We contend that

16   Mr. McBeth was describing the entire group of companies by

17   using the phrase Lehman group.  And so for the SunCal parties

18   or any other party to point to these statements and say this

19   shows that Lehman Re was relying on a specific Lehman entity --

20        THE COURT:  Well, presumably, there are facts; it's

21   not just a question of reading a document for plain meaning.

22   There's facts that demonstrate what the state of affairs

23   actually was prior to September 15th in terms of reliance on

24   Lehman in New York or Lehman in some other location.  But

25   you're still stuck with the question that we're dealing with

16

1    the facts as they exist today.  And as they exist today, it

2    doesn't appear that there's any substantial presence in Bermuda

3    other than winding up.

4         MS. BAGBY:  Well, if I can clarify Your Honor's

5    question, when you say the facts as they exist today, you mean

6    existing as of the date of the filing of the Chapter 15

7    petition.

8         THE COURT:  Correct.

9         MS. BAGBY:  Okay, well, again, I think if that is

10   predicated upon the argument presented by the SunCal

11   plaintiffs, for example, that one should read the statute in

12   the present tense, we are certainly prepared to put on

13   evidence, and we can have Mr. Hunter describe there can be no

14   one else that can control Lehman Re today by virtue of the

15   Bermuda court order as described in the verified petition and

16   as described in the order that's attached to the verified

17   petition.  The JPLs, pursuant to the Bermuda court order, have

18   the sole authority to control the company's assets.  And all of

19   those assets, or a large portion of those assets are located in

20   Bermuda.  The JPLs certainly are located in Bermuda.

21        So we can proceed with presenting evidence with

22   respect to that point.  I just want to make sure that I

23   understand, the Court is interested in hearing the facts as

24   they are presented today, or as of the date of the filing of

25   the petition.

17

1          THE COURT:  Well, what I'm simply letting you know is

2     that I've seen the papers that have been filed by both SunCal

3     and I'm saying Centennial Hills, it's actually Lusardi

4     Construction, in opposition to the relief you seek today.  And

5     both of those objectors independently -- perhaps they

6     conferred -- but independently, they have raised issues

7     relating to the applicable authority that I'm guided by, and I

8     will be guided by Judge Lifland's decision in Bear Stearns,

9     which is also, as I understand it, viewed by the authors of

10    Chapter 15 as being right on the money in terms of the

11    analysis.  So it's not an outlier case.  It's a case that

12    properly interprets Chapter 15 as it relates to main and

13    nonmain proceedings.  And it suggests, based upon what I've

14    read, that you have a pretty heavy burden in demonstrating

15    likelihood of success on the merits.  I'm just letting you know

16    that.

17          MS. BAGBY:  Okay, well, if I can respond to two

18    points.  First is just to emphasize that not only are we

19    seeking recognition under foreign main, but also as an

20    alternative under foreign nonmain with respect to the

21    requirement that we have an establishment in Bermuda which is a

22    place of nontransitory economic activity.  And again, we would

23    contend that, based on the statements in the verified petition,

24    for example, that a company office has been located in Bermuda

25    the entire time of the company's existence, that is an

18

1   indication and a piece of evidence in support of a place of

2   nontransitory economic activity.  And neither of the objectors,

3   I think, have taken any issue with that.

4         Your Honor, if you are prepared, or if you would like

5   for us to go forward with respect to testimony, if I could

6   request a very brief conference with our client.  Two minutes?

7         THE COURT:  Well, you can proceed any way you want.  I

8   think it makes sense for you to continue with your -- I'm

9   viewing this as an opening statement --

10         MS. BAGBY:  Okay.

11         THE COURT:  -- and legal argument, and I think that I

12   should hear openings or legal argument from those parties who

13   are here in opposition to the relief that you seek, and then we

14   can decide how best to proceed in terms of presentation of

15   evidence.

16         MS. BAGBY:  Okay, very well, Your Honor.  So as I

17   said, with respect to specific facts that substantiate the

18   debtor's comain being in Bermuda, we would highlight those

19   facts that are set forth in the verified petition.  And in

20   response to some of the issues that were raised by the two

21   written objections that were filed, SunCal as well as

22   Centennial Hills/Lusardi, first of all, we would like to note

23   that both parties employed the incorrect injunction standard.

24   The injunction standard that should be applied under Chapter 15

25   is the injunction standard that we've set forth in our memo of

19

1   law, likelihood of success on the merits and irreparable harm.

2   Both parties spend a lot of time discussing whether the balance

3   of harms and public interest factors should be considered here,

4   and I will note that both of those parties relied upon cases,

5   or at least the SunCal party's relied upon cases employing

6   Section 105 injunctions, in which parties sought to extend the

7   stay to third party nondebtors.

8          The SunCal parties, one of their main objections to

9   the preliminary injunctive relief is that it will cause a delay

10  in their, in the SunCal debtor's Chapter 11 proceedings.  And

11  we certainly take issue with that, first and foremost because,

12  despite the SunCal debtor's characterization of their

13  proceedings as a reorganization, and they contend, therefore,

14  it should take precedence over Lehman Re's liquidation.  The

15  SunCal Chapter 11 plan of reorganization that's been filed

16  calls for a sale of all their assets.  So we don't see the

17  basis for contending that a reorganization trumps a

18  liquidation.

19         The SunCal debtors also, as I said, contend that

20  putting in place a preliminary injunction will create a burden

21  on them and delay their reorganization.  But we note that with

22  respect to the SunCal litigation, there are multiple other

23  parties named besides Lehman Re, which has only recently been

24  named in that litigation, and there's no reason why the rest of

25  the litigation cannot proceed while a stay is in place

20

1    protecting Lehman Re.  There's no reason why that stay would

2    halt the total reorganization going on in California.

3         And further on the delay point, I think it's important

4    to note that the SunCal plaintiff's complaint is, in fact, the

5    third amended complaint that they've filed in that proceeding.

6    That litigation has been ongoing since early 2009, and only

7    when they filed the third amended complaint just recently, did

8    they decide to name Lehman Re.  So any delay that may be

9    associated with Lehman Re seeking a stay is, in fact, created

10   by their own delay in naming Lehman Re and, in fact, going

11   through three amended complaints.

12        Another argument that the SunCal parties make is that

13   Chapter 15 relief, particularly preliminary injunction relief,

14   requires the commencement of an adversary proceeding.  As a --

15   and they cite only one, I think, one Central District of

16   California case, or one California case in support of that

17   proposition.  However, as this Court may be aware, there are

18   numerous cases filed in the Southern District of New York,

19   including cases before this Court, where preliminary injunctive

20   relief, as well as permanent injunctive relief, has been issued

21   in a Chapter 15 case without a separate adversary proceeding.

22   And those cases include Hatteras Reinsurance, CapCity Clothing,

23   and BluePoint Re, among many others.

24        THE COURT:  I'm familiar with the Hatteras case

25   because it was a case that was assigned to me.  But there is

21

1    something I should bring to your attention, and you may already

2    know this.  This is not the first time that issues with regard

3    to SunCal have come before this Court.  There was a motion

4    practice fairly early in the LBHI bankruptcy case in which

5    SunCal sought relief from the automatic stay.  I denied that

6    relief.  There was a follow up hearing which was telephonic.

7    Mr. Couchot who's -- did I pronounce your name incorrectly?

8            MR. OLSEN:  It's Olsen, Your Honor.

9            THE COURT:  Olsen, I'm sorry.  Mr. Couchot was here

10   during the first hearing.  He was on the phone during the

11   second hearing.  There were follow-up proceedings that involved

12   Court-to-Court communication with the bankruptcy judge in the

13   Central District of California relating to that matter,

14   particularly as it related to one of the amended complaints you

15   described.  And, until this moment, I was happily free of

16   SunCal, and it's now back.  So that part of the burden that I

17   think you have is also the fact that prior to your involvement

18   in the case, I've had some history with SunCal and an awareness

19   that the California bankruptcy court made the determination

20   that the automatic stay did not apply as it related to the

21   equitable subordination litigation which you seek now to stay.

22   And I have been informed by at least the pleadings, and I'm

23   simply telling you what I've read, that there's a matter of

24   opinion before the Ninth Circuit BAP relating to that question.

25   So one of the burdens or hurdles for you is to explain why this

22

1    Court should be involved in yet another collateral attack on

2    matters that are being litigated, apparently quite actively, in

3    California.

4            MS. BAGBY:  Well, Your Honor, I think you've touched

5    right on the heart of the issue for the JPLs with respect to

6    the SunCal litigation.  While apparently everyone who's, as you

7    said, fortunately or unfortunately been involved in that

8    litigation for some time, the JPLs have not.  And they, not

9    only were they not actively involved in that litigation, they

10   made no appearance in that litigation, they filed no pleadings

11   in that litigation.  And they have authorized no one to act on

12   their behalf with respect to that litigation or that bankruptcy

13   proceeding.  Now, we know the SunCal plaintiffs have stated in

14   their objection that Lehman ALI, a nondebtor but a Lehman

15   affiliate, filed a proof of claim allegedly on behalf of, I

16   guess, the JPLs and Lehman Re in the SunCal bankruptcy

17   proceedings.  It struck us as quite odd that the proof of claim

18   was not attached to the objection.  The allegation in the

19   objection that we received last night that a proof of claim was

20   filed by Lehman ALI was the first that the JPLs heard of this.

21   The JPLs have informed me, and we can hear about this later,

22   that they, as I said, have not authorized anyone to file a

23   proof of claim on their behalf.  They were never named in this

24   litigation previously.  So while it is unfortunate that these

25   issues are back before Your Honor, it is not due to a concerted

23

1     effort by the JPLs to collaterally attack a litigation in which

2     they've been actively involved.

3          THE COURT:  The only reason I bring this up is you

4     should be aware that I'm not a clean slate on the subject.

5          MS. BAGBY:  Absolutely.  And as I said, unfortunately

6     for the JPLs, they seem to be the only people who have, if you

7     will, a clean slate on this issue, but they've been named, or

8     their company has been named as a defendant in this litigation.

9     And so again, you know, there has been made a bald assertion

10     that there's some sort of agency relationship on behalf Lehman

11     ALI and Lehman Re, but there's been no factual substantiation

12     of that.  And it's very difficult for the JPLs to rebut

13     something on which they have no information or evidence other

14     than a bald legal conclusion in an objection.

15          With respect to the objections that were raised by

16     Lusardi to the JPLs' request for a preliminary injunction, that

17     Lusardi's main argument seems to be that their mechanic's lien

18     action in Nevada State court is not an action against the

19     debtor, and, therefore, should not be subject to a stay.  But

20     the only authority that they cite substantiating that

21     proposition is one Nevada State court that, critically, did not

22     involve a debtor involved in an insolvency proceeding.  In

23     fact, there is substantial case law showing that actions that

24     affect the interest of the debtor's property, particularly

25     liens in property owned by a third party, can be subject to the

24

1    automatic stay.  And we've cited one of those cases in our

2    brief for a different proposition, but that case is Fidelity

3    Mortgage, 550 F.2d 47.  That was actually a Second Circuit act

4    case in which the Second Circuit found that a debtor's junior

5    lien interest was a property interest that would be protected

6    by the stay from foreclosure by its senior creditor.  And we

7    certainly have additional case law to substantiate that

8    proposition, but again, Lusardi seems to be relying solely on a

9    Nevada State court that has nothing to do with a debtor subject

10   to an insolvency proceeding.

11        THE COURT:  Yes, but it seems to be applicable

12   nonbankruptcy law that goes to the substance of the litigation

13   that you're seeking to stay.  If I understood that decision

14   correctly, it seemed to say that a party in your position, in

15   the position of Lehman Re, was not a necessary party in

16   mechanic's lien litigation, and that it was proper to proceed

17   simply against the named property owner.  At least that's how I

18   read the case.  And if that's true, and that, in fact, is the

19   last word on the subject by the highest court of Nevada, that

20   is an obstacle you're going to need to get around.

21        MS. BAGBY:  Well, it does present a state law

22   obstacle, if you will, Your Honor, but again, we would look to

23   bankruptcy law to determine whether interests of the debtor are

24   being affected.  Here, we're talking about the debtor's lien on

25   property that has been subordinated.

25

1      THE COURT:  I understand, but the argument appears to

2   be that -- and I'm not saying that it's right, I'm just saying

3   what the argument appears to be -- that a party such as the

4   JPLs in this circumstance would need to go into Nevada State

5   court as a plaintiff and take action to protect its interests

6   affirmatively.  Additionally, based upon the materials

7   presented by Lusardi construction company, it appears that

8   counsel, for some Lehman entity, and I don't know if it was

9   Lehman Re or if it was Lehman ALI, or of it was LBHI, but I

10   believe it was the party that purported to have an ownership

11   interest in the note and mortgage, appeared at the hearing,

12   made an argument as an amicus, not as an intervening party, and

13   in effect, participated in the litigation.  That's all true,

14   right?

15      MS. BAGBY:  Well, in fact, the JPLs filed a brief as

16   an amicus and attempted to participate in the litigation.  But

17   that does not mean that they actually submitted to the

18   jurisdiction there to determine whether Lehman Re's interest in

19   the property was being affected.

20      THE COURT:  Yes, but what this does demonstrate, and I

21   brought this up during the TRO hearing, is that there was

22   actual notice this was going on months ago.  And it does raise

23   some questions as to the -- it's an unflattering term, but I'll

24   use it -- the gaming of the system associated with filing a

25   Chapter 15 as a last resort as opposed to a first initiative to

26

1    try to deal with these issues.  These litigation threats have

2    been pending in the United States for quite a long time.

3            MS. BAGBY:  Well, in fact, Your Honor, in terms of

4    the, for example, the Centennial litigation as laid out in the

5    verified petition, the JPLs did not find out about that

6    litigation until it was well advanced.  It had been pending

7    since, I believe, November of 2008, and the JPLs found out

8    about it in the summer of 2009.  At that point, and this is why

9    we think preliminary injunctive relief is important, and the

10   stay is important, they had to scramble to determine their

11   legal -- Lehman Re's legal rights, not just in that proceeding

12   but to the actual deed of trust, the mortgage itself.  They had

13   to scramble to locate local counsel; they had to scramble to

14   understand the procedural posture of a proceeding that had been

15   going on for six months.  Now, it may be that under state law,

16   it was not required to give them notice.  That's an open issue.

17   But they found themselves in a circumstance where their

18   property interest was being jeopardized, and they had to react

19   quickly to try and preserve it.  And that's exactly why we

20   think a preliminary injunction is in order.  Because they may

21   be subject to similar litigation, not even threats but

22   realities, right now with respect to the various properties in

23   which they hold mortgage interests.

24           So, in terms of the -- I believe that the JPLs do not

25   view their waiting to file a Chapter 15 as having any intent to

27

1    game or try to posture or gain leverage.  What it was was an

2    attempt, first of all, to understand the facts of what

3    properties they were charged with, to gather as much

4    information as possible, during which period they were not

5    subject to litigation threats.  But once it became clear, once

6    Centennial started, and shortly thereafter Laurel Cove and

7    Pacific Point, once it became clear that they were going to be

8    subject to litigation which would be continuing, they sought --

9    they are seeking relief from this Court.

10       THE COURT:  Well, continue with your presentation, but

11   one of the things that I'm interested in knowing is the risk to

12   the JPLs of harm if relief is not granted today as opposed

13   to -- assuming it's ever granted -- the hearing to take place

14   in September on recognition.

15       MS. BAGBY:  There are, I think, a couple forms of

16   harm.  First of all, as I said, SunCal is a good example of

17   this.  The JPLs are currently subject to ongoing active

18   litigation that while, for example with SunCal, the response

19   time may be September 30th, as fiduciaries responsible to other

20   creditors, the JPLs cannot wait until either September 29th or

21   they cannot wait until September 10th when they find out

22   whether  or not they have recognition and an automatic stay to

23   investigate the allegations, to incur the expense in retaining

24   counsel, to try and gather the relevant documents, some of

25   which they may have, some of which they may not have.  All of

1    that takes time, all of that is distraction from the JPLs'

2    primary duty which is to be gathering and preserving assets of

3    the estate for the benefit of all creditors.  So the first

4    principal harm is the distraction from the purpose of the

5    reorganization and the attendant expense that the JPLs will

6    suffer while they have to respond to litigation that may

7    ultimately be stayed if relief is granted on September 9th.

8         The second form of harm is the risk attenuated with

9    any litigation itself, any one of these parties that is in a

10    litigation right now could seek, for example, expedited relief

11    tomorrow against the JPLs, and the JPLs would have to respond

12    immediately.  Any one of those parties, for example, Lusardi,

13    we don't know what they're going to do after August 17th when

14    they're permitted to proceed with the foreclosure, how quickly

15    they can accomplish that.

16         THE COURT:  Let me return, just for a minute, to the

17    SunCal litigation which you referenced because you were talking

18    about a pleading deadline which has been extended by agreement

19    to the end of September, and the need that the JPLs would have

20    to begin the process of dealing with that case on the merits.

21    Assuming an adverse result of the recognition hearing on the

22    9th, let's just assume for the sake of discussion, that that's

23    true and that you have twenty days to deal with unstayed

24    litigation.  Is there anything about the legal position of

25    Lehman Re that is distinct from the legal position of the other

1    party's defendant that are affiliated with the Lehman family of

2    companies?  Presumably they have either answered or they have

3    aligned positions.  Is there anything distinct?  Or can you

4    simply file what amounts to a "me, too," we agree with

5    everything you're all saying about why we shouldn't be

6    equitably subordinated.

7         MS. BAGBY:  Your Honor, to be candid, I'm not sure

8    that we have an answer to that question, now, because we don't

9    know the facts.

10         THE COURT:  Seems like it's pretty easy to find them

11    out.  It's probably a phone call away.  I'm surprised you

12    haven't made that call.

13         MS. BAGBY:  Well, I think, first of all, assuming

14    that -- I'm not sure that it's as simple as a phone call away

15    in the sense that the claims against Lehman Re relate solely to

16    one particular property, the property against which Lehman Re

17    asserts a lien, which, by the way, is a property that's not

18    owned by a debtor.  It's owned by a nondebtor called LB Pacific

19    Point.  So in that sense, our position is distinct that we have

20    a claim against one property owned by a nondebtor, that the

21    SunCal plaintiffs are seeking to equitably subordinate Lehman

22    Re's loan or claim against a nondebtor piece of property and,

23    presumably as a prerequisite to that, to avoid the foreclosure

24    action that put that property with the nondebtor.  So we

25    potentially do have a distinct legal position as opposed to the

30

1     other Lehman entities that, for example, Lehman ALI was, I

2     believe, the original lender and had an extensive commercial

3     relationship with the SunCal entities.  That's certainly not

4     Lehman Re's case, at least as far as we know.  But again, while

5     we may be able to discern some facts about the litigation

6     quickly, I don't think, sitting here today, that the JPLs can

7     determine whether or not on, in the middle of September,

8     they'll be able to put together a "me, too" response.  And

9     again, as fiduciaries, they have an obligation to their

10    creditors to make sure they have all the facts before they act.

11         THE COURT:  I don't take away from anything you're

12    saying except to note that the legal effort associated with

13    this Chapter 15 proceeding, I would wager, is a multiple of the

14    effort that would be associated with answering that complaint

15    as a "me, too" party defendant.

16         MS. BAGBY:  If it turns out, Your Honor, that we can

17    respond as a "me, too" party defendant, but again, the JPLs are

18    not in a position to make that determination right now, and as

19    it --

20         THE COURT:  Well, it may be that you should have been

21    or could have been or might want to be in terms of being able

22    to present your case most effectively today.  Because one of

23    the things I need to weigh is the relative harm to the parties

24    and, at least so far, I'm not overwhelmed with the argument.

25    It doesn't mean that you might not ultimately push back on me

31

1  and prevail before this is over.  But at the moment, having to

2  litigate the SunCal litigation between now and September 30

3  doesn't exactly seem like a particularly strong argument in

4  August.  Laurel Cove, I knew nothing about that because, while

5  you say they were served, they're not here, although you say

6  something is due on the 23rd.  And as to Centennial Hills, I've

7  seen papers -- and you're certainly prepared in any way you

8  want to rebut them -- suggesting that as a matter of applicable

9  Nevada State law, you don't have a particularly strong position

10  because you were never a party that was even entitled to notice

11  of their mechanic's lien foreclosure proceedings.  I accept as

12  true what they've said unless you can demonstrate that it's not

13  true.

14       MS. BAGBY:  Well, Your Honor, assuming that even if it

15  is true, again, the request for the preliminary injunction is

16  not a permanent injunction, and it's not to stay Lusardi

17  indefinitely.  It's to stay Lusardi for a finite amount of time

18  to allow the JPLs to fully understand the facts and

19  circumstances of that case.  Now, while the JPLs were forced to

20  react quickly and participate in that, the JPLs have tried to

21  investigate, for example, the underlying circumstances relating

22  to Lusardi's mechanic's lien.  But that, again, is a

23  distraction and a cost and takes away from the JPLs ability to

24  simultaneously manage twenty plus properties, or loans related

25  to twenty plus properties.  So, in terms of long-term what will

32

1    happen to Lusardi, I think sitting here right now, the JPLs

2    don't have a specific answer, and it may be that the JPLs are

3    not an appropriate party to that litigation.  But today, the

4    JPLs can contend that they are being harmed by being forced to

5    react to that quickly without being given an ample opportunity

6    to evaluate the facts and circumstances.

7         THE COURT:  Well, let me ask you a question as it

8    relates to the Lusardi construction company objection.  And let

9    me also find out, because I never did take appearances; we just

10   started.  Is there anybody in court today representing Lusardi?

11        MS. BAGBY:  I'm trying to find --

12        MR. WICKHAM:  Your Honor, this is Dennis Wickham on

13   CourtCall representing Lusardi.

14        THE COURT:  Okay, fine.  You're coming through loud

15   and clear.

16        MR. WICKHAM:  Thank you.

17        THE COURT:  My question is this.  Assuming for the

18   sake of today's argument that what was argued in the Lusardi

19   objection is true, namely that the JPLs, as a matter of

20   applicable Nevada State practice, were not entitled to notice,

21   but that they have a variety of options available to them which

22   include appearing as a plaintiff in Nevada State court or

23   bringing some kind of action for relief associated with alleged

24   mistakes made during the course of the litigation, assuming I

25   were to grant a preliminary injunction today that enjoined

33

1   parties from taking action adverse to the JPLs, what affect

2   would that have as it relates to the Centennial Hills

3   litigation?  Because it seems to me that even if you were to

4   get such a preliminary injunction, the mechanic's lien or

5   plaintiffs would be able to take appropriate action under state

6   law to pursue their one defendant which is the owner of the

7   property.

8         MS. BAGBY:  Is that question directed at -- oh, I

9   thought it was --

10        THE COURT:  Sort of directed to the room.

11        MS. BAGBY:  Okay.

12        THE COURT:  But it also includes counsel for Lusardi

13   that I presume has some familiarity with applicable state

14   practice.  I'm trying to understand if that piece of the puzzle

15   is even impacted if you were to be granted the preliminary

16   injunctive relief you seek.  That's the question.

17        MR. WICKHAM:  Your Honor, this is Dennis Wickham.  I'm

18   prepared to give you my answer, if you want to hear from me

19   first.

20        THE COURT:  I think that would be fine.

21        MR. WICKHAM:  All right.  Your Honor, I think that the

22   Court correctly reads the Nevada Supreme Court to say that

23   nothing that transpires in the existing action is either

24   against the Lehman Re, the trustee holder, or against the

25   property.  So you could issue an injunction against actions

34

1    against Lehman Re being commenced for prosecuted, and in my

2    view, that injunction wouldn't affect us, and you could say I

3    issued an injunction to the world against people asserting

4    liens or taking action against property of the estate and,

5    again, under the Nevada case, we would not be violating that

6    order by going forward with our foreclosure sale.  If, in fact,

7    Lehman Re wants to assert something under its note and vide

8    trust, it needs to go to Nevada, but Your Honor, as a practical

9    matter, all it has is a note.  If it wants to foreclose on its

10   note, it's got to go to Nevada anyway.  And so there was not a

11   stay issue here.  And Nevada law is different than in a lot of

12   other places, as appears to be in Tennessee, where you may be

13   able to resolve all these issues in one action.  That's not

14   what the Nevada process states.

15        I'll address other issues when it's appropriate, but

16   as to that one, you shouldn't, in my view, issue an injunction

17   that leaves a concern in my Nevada state court judge that she

18   is somehow interfering with your order, and as you saw, if you

19   were able to review the transcript, she was very concerned

20   about not doing that and believed that, under the Nevada state

21   law, she wasn't doing that.  But the only harm you have from

22   such an injunction is one of ambiguity, not one of loss.

23        THE COURT:  Yes, but based upon what I read, she

24   seemed to be concerned about that issue in the context of an

25   allegation that this was all a violation of the automatic stay

35

1    associated with the bankruptcy of LBHI, not an injunction

2    associated with a Chapter 15 filed by the JPLs of Lehman Re.

3           MR. WICKHAM:  Correct, Your Honor.  The answer, as a

4    matter of law, is the same, as long as we don't have ambiguity.

5    The LBHI assertion was made by Lehman Re, stating, essentially,

6    my cousin's in bankruptcy.  Don't proceed in this case.  But

7    Lehman Holdings never even asserted an arguable claim to be an

8    owner of this note.  There is no one who spoke bankruptcy in

9    the room, at least according to the transcript, but the Nevada

10   Court looked at the Nevada case, the Supreme Court case, and

11   said I'm not taking action against the debtor.  I'm not taking

12   action against the debtor's property, even if you assumed that

13   they had some interest in the note.

14          So the record's clear, Your Honor, and I think all

15   agree, it was Lehman Re who appeared and filed the amicus

16   brief.  The liquidators, on behalf of Lehman Re.

17          THE COURT:  Okay.  Thank you for that response.  I

18   just take it as a legal position, not an expert opinion, as to

19   what the consequence of a preliminary injunction would be to a

20   state law proceeding in the State of Nevada.  But let me just

21   ask counsel for the JPLs if you have anything you want to add

22   to that or if you want to move on.  Either one is fine.

23          MS. BAGBY:  Okay, well, I will respond briefly, and

24   then I will move on in very brief fashion.  Just, again, in

25   response to it may be ultimately true that the liquidators'

36

1    ultimate remedy or recourse, if you will, with respect to the

2    Centennial Hills property is in Nevada, but Centennial Hills is

3    an example of what can happen when litigation is started that

4    potentially affects Lehman Re's interest and how the JPLs have

5    to respond, how quickly they have to respond, how costly it is

6    to respond.  Now Centennial Hills, itself, as I said,

7    ultimately, that may be resolved by the Nevada State court, and

8    as counsel mentioned, maybe Nevada has unique issues under

9    Nevada law, but the purpose of the preliminary injunction as

10   sought by the JPLs is allow them to essentially have the

11   breathing room to evaluate each one of these actions and

12   understand the facts of them before they have to respond and

13   potentially respond too quickly or not be able to respond to

14   the detriment of the estate and all of its creditors.

15           I think we've addressed, Your Honor, most of the

16   specific objections that have been raised by the SunCal and

17   Lusardi parties with the exception of presenting specific facts

18   going to the likelihood of success on the merits.  And for

19   that, I think we'll wait until the end and, as Your Honor said,

20   how we want to proceed after that.  I would like to say, again,

21   that as described in the memo of law, the JPLs contend that a

22   preliminary injunction is necessary because there is

23   irreparable harm, and that's as a result of the pending

24   litigations, and we would compare this case to either In re

25   Lyons or to MMG, LLC in that respect.  And unless Your Honor

37

1    has further questions --

2          I will just note that in response, we did not receive

3    objections, but there have been some changes to the proposed

4    preliminary injunction order at the request of two parties, the

5    Lehman U.S. debtors, which I'm sure Mr. Krasnow will speak to.

6    In addition, we received a change by one reinsurer, Aetna,

7    whose counsel at Bingham has signed off on proposed language

8    allowing ceding reinsurers of the company to take action with

9    respect to collateral that's been posted to them.  Apparently,

10   under Bermuda law, this collateral is -- actions by ceding

11   insurers are not stayed with respect to this collateral, so the

12   provisional liquidators have agreed to, essentially, carve that

13   out from the proposed preliminary injunction, should Your Honor

14   decide to enter it.  And so we would be prepared to circulate

15   blacklines to everybody.

16         THE COURT:  Okay.  I realize that this is an odd time

17   to be asking for appearances, but -- since we've already been

18   going for about an hour -- but there are people in the room who

19   haven't been introduced, many I know, some I don't, and I just

20   wanted to give everybody who wishes to enter an appearance an

21   opportunity so I can figure out who all the players are.

22   Mr. Krasnow, I certainly know.

23         MR. KRASNOW:  Your Honor, Richard Krasnow, Weil,

24   Gotshal & Manges, LLP, for the Chapter 11 debtors.

25         MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Melbank,

38

1    Tweed, Hadley & McCloy on behalf of the official committee of

2    unsecured creditors in the LBHI case.

3         MR. ZELMANOVITZ:  Menachem Zelmanovitz of Morgan Lewis

4    on behalf of the SunCal debtors, together with Matthew Olsen of

5    our firm.

6         MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

7    Steen & Hamilton, LLP on behalf of Barclays Capital, Inc., not

8    here objecting but we just have a clarification of something

9    that Ms. Bagby said earlier based on a conversation we had

10   yesterday as to why we didn't need to object relating to one

11   thing in the proposed injunction.

12        THE COURT:  You can make that clarification any time

13   you like, and you appear to like that chair because you were in

14   it this morning, I think.

15        MS. GRANFIELD:  Always hoping I don't have to speak,

16   Your Honor, if I can avoid it.  If it's -- would you like me to

17   make that clarification right now?

18        THE COURT:  Well, if, by making that statement, you

19   think you'll be able to go back to your office, that would be a

20   saving to you and to Barclay, so why don't we do that.

21        MS. GRANFIELD:  Thank you very much, Your Honor.  The

22   clarification is simply the JPLs' verified petition and their

23   recognition request does have some references to Barclays and,

24   potentially, Barclays having possession of records or documents

25   which, because I've really only learned of this whole thing

39

1    yesterday, I don't know if that's true or not true, or what the

2    situation was.  But simply, with respect to the proposed

3    injunction that included words in the first substantive order

4    paragraph that people were enjoined from managing or exercising

5    control over the company's assets except as expressly

6    authorized by the petitioners in writing, that in discussions

7    with Ms. Bagby, and as she said earlier in her original

8    remarks, you know, they're not seeking through this injunction

9    to get any part of the relief that they may be seeking with

10   respect to discovery or matters relating to documents that they

11   might seek, if they are granted the recognition which is in

12   their recognition papers.  And so really, it's just a

13   clarification that this part of the injunction, managing or

14   exercising control, is not something, if Barclays happens to

15   have records -- which I don't know, standing here today,

16   whether we do or not -- relating to Lehman Re, that by

17   continuing to possess those records, we'd somehow be violating

18   this part of the injunction.  That's simply the clarification,

19   Your Honor.

20            THE COURT:  Can she go home?

21            MS. GRANFIELD:  Thank you.

22            MS. BAGBY:  Just to clarify, Your Honor, Ingrid Bagby.

23   That is certainly not the JPLs intention by seeking that

24   relief, and we're certainly happy for Ms. Granfield to go home.

25            THE COURT:  Okay, if you wish, you can be excused.

40

1          MS. GRANFIELD:  Thank you.

2          MR. GUNTHER:  Your Honor, Paul Gunther here on behalf

3     of Swedbank.  We're not objecting, either, to the relief.  But

4     we just wanted to -- the relief requested today.  We just

5     wanted to clarify that -- well, I don't know, I just have

6     another clarification.  I don't know if the Court would like me

7     to --

8          THE COURT:  Why don't you come forward and let's deal

9     with that, and then if you wish to leave, you can leave, too.

10          MR. GUNTHER:  Thank you, Your Honor.  Paul Gunther,

11    Salans for Swedbank.  We support the relief that's being sought

12    today.  I just wanted to notify the Court that we did have a

13    conversation with Lehman Re's counsel --

14          THE COURT:  Let me understand something.  I heard you

15    say you represent Swedbank?

16          MR. GUNTHER:  Correct.

17          THE COURT:  I don't understand the relationship that

18    Swedbank has to this dispute.

19          MR. GUNTHER:  Swedbank is a lender and a construction

20    loan in which Lehman Re is a mezzanine lender.  And when we had

21    read the proposed order, our concern was that it would affect

22    the ability of Swedbank to send notices to the borrower and

23    also to Lehman Re of any defaults, and thereby paralyzing the

24    process.  We spoke with counsel, and I think we've come to an

25    agreement in principle.  I wasn't the person who was speaking

41

1    to counsel, so if I'm incorrect in anything I'm saying, let me

2    know.  But we have agreed, in principle, that the final order

3    would be modified to allow for Swedbank to serve default

4    notices on the borrower and on all of the other lenders without

5    triggering any violation of the automatic stay or any permanent

6    injunction.

7              THE COURT:  Can you identify the borrower in question?

8              MR. GUNTHER:  The borrower -- I believe there are

9    several, one being Ritz-Carlton, Philly, but I'm not sure of,

10   again, I'm pinch hitting, Your Honor, so I apologize.

11             THE COURT:  It's not Laurel Cove?

12             MR. GUNTHER:  I can't state whether -- I don't know,

13   Your Honor.  I don't know.

14             MS. BAGBY:  Can I --

15             MR. GUNTHER:  Sure, sure.

16             MS. BAGBY:  Sorry, Your Honor.  I do know that, with

17   respect to Swedbank's positions, they are not involved in the

18   Laurel Cove loan facility, just to clarify.  And I'll respond

19   to counsel after his motion.

20             MR. GUNTHER:  So we support the relief requested

21   today.  I believe that we've agreed in principle to an

22   arrangement whereby the notices, with respect to the final

23   order, permanent injunction, notices would be sent out and that

24   would start the cure period, but we would have to come back to

25   the Court to seek any kind of foreclosure, any relief against

42

1    the assets.  Your Honor, that's all I wanted to say today.

2         THE COURT:  Okay.

3         MR. GUNTHER:  Thank you.

4         THE COURT:  Is there anything more that counsel for

5    the JPLs wishes to say as it relates to that clarification?

6         MS. BAGBY:  Yes, Your Honor.  If I can just clarify

7    what counsel to Swedbank said, we had several productive

8    discussions with Swedbank's counsel yesterday.  I think those

9    productive discussions will continue.  I'm not sure it's fair

10   to characterize our agreement as an agreement in principal, but

11   I think we have agreed to continue working productively to

12   resolve the issue that counsel has identified between now and

13   the final hearing.

14        THE COURT:  All right.  You're welcome to stay and

15   you're free to go.

16        MR. GUNTHER:  Thank you, Your Honor.

17        THE COURT:  Any other clarifications?  Maybe we'll

18   clear the courtroom.

19        MR. KRASNOW:  Your Honor, Richard Krasnow, Weil,

20   Gotshal & Manges for the Chapter 11 debtors.  There are some

21   clarifications, but since I think it's appropriate for us to

22   stay during the course of the hearing, I will discuss those, if

23   I may, Your Honor, at the end rather than take any time away

24   from the various parties on the real battle at hand.

25        THE COURT:  Okay.  I'm --

43

 1          MR. KRASNOW:  I would note, Your Honor, however, that

 2     the debtors do not oppose, and indeed support the Chapter 15

 3     petition.  We have been working closely with the JPLs on any

 4     number of matters, and while they are not signatories to the

 5     protocol, they have been actively participating in the protocol

 6     process, including attending the meeting that was held in

 7     London of all the administrators who are signatories to the

 8     protocol.  Thank you, Your Honor.

 9          THE COURT:  All right, thank you.

10          MR. ZELMANOVITZ:  May I be heard in objection, in

11     opposition to the motion, Your Honor?

12          THE COURT:  Absolutely.

13          MR. ZELMANOVITZ:  Thank you.  Menachem Zelmanovitz of

14     Morgan Lewis on behalf of the SunCal debtors, who are debtors

15     in cases, as Your Honor mentioned, in the Central District of

16     California.  This, as Your Honor has correctly pointed out,

17     this motion seeks to enjoin the SunCal adversary proceeding.

18     It's important, I think, to understand that that proceedings

19     seeks a specific type of relief against Lehman Re, which is

20     simply this equitable subordination of the Lehman Re claims.

21          We would submit, Your Honor, that the petitioners

22     cannot meet the most basic statutory prerequisite for the

23     relief they seek under 1519(a), which is that the relief is

24     urgently needed to protect the assets of the debtor or the

25     interests of the creditors.

44

1          With respect to SunCal, the SunCal adversary

2     proceeding, which is really -- our purpose today is to oppose

3     the motion specifically as it seeks relief or seeks to enjoin

4     that particular proceeding.  Petitioners made no showing of

5     need, much less urgent need.  And I think we have to focus on

6     precisely what relief is requested today.

7          They are seeking to enjoin the litigation against

8     their client only from now until September 9th.  That's all

9     that's before Your Honor today.  Now, with the scheduled

10    hearing recognition and request of permanent injunctive relief

11    scheduled for September 9th, what is the urgent need for

12    relief?  As Your Honor has correctly pointed out, there should

13    be plenty of time from September 9th to September 30th when

14    they have time, and the first thing they have to do is simply

15    answer the complaint.

16         Now, another thing to understand, and although I have

17    not been involved directly in the litigation in California it's

18    been explained to me that the Lehman debtors have been

19    intimately involved, as well as nondebtors, intimately involved

20    in that litigation from the outset.  I believe Your Honor is

21    aware of that.

22         In fact, Lehman Re's interest has been conveyed to it

23    from some of the other debtors.  I believe it was either Lehman

24    ALI or Lehman Commercial, whatever the case is, who have been

25    involved in that proceeding from day one, so that they have

45

1    time to answer, three weeks after the scheduled hearing, where

2    Your Honor will have an opportunity at that hearing, on a full

3    evidentiary record, to determine whether or not they should be

4    entitled to permanent injunctive relief.

5         It seems to us, Your Honor, there's absolutely no

6    basis to actually grant such relief from now to September 9th.

7    In fact, as Your Honor has pointed out, there is especially

8    good reason for this Court not to embroil itself in the

9    litigation between the SunCal debtors and Lehman Re.  The

10   California Bankruptcy Court, as Your Honor has noted, has

11   already ruled on a motion by the Lehman debtors that the

12   automatic stay does not apply to the equitable subordination

13   claim.  And that is on appeal to the Bankruptcy Appellate

14   Panel.  By seeking to have this Court enjoin the equitable

15   subordination claim at this time what petitioners are really

16   trying to do is trying to cause this Court to issue an

17   inconsistent ruling and, also, essentially, to allow a

18   collateral attack on the appellate process that is ongoing.

19        Especially where there is no need for the injunctive

20   relief at this time, we would respectfully submit that there is

21   ample reason for this Court not to involve itself in the

22   litigation between the parties that is pending in its sister

23   court in California.

24        We would further submit, Your Honor, that petitioners

25   cannot satisfy any of the prerequisites for injunctive relief.

46

1    We've already discussed irreparable harm, and Your Honor, in

2    your questioning of counsel, I think, has, in fact, clearly set

3    forth why we believe there is no irreparable harm between now

4    and September 9th.  The balance of harm, we believe, also lies

5    in favor, if there is any harm at all, lies in favor of the

6    SunCal debtors, because clearly -- clearly -- the property

7    that's at stake in that litigation is an important property and

8    very important to the administration of the SunCal debtors'

9    estates.  Nothing can be done with that property until the

10   resolution of that litigation.  And to delay that is going to

11   be to the detriment of all the creditors of the SunCal estates.

12        And for the same reason, we would submit, the public

13   interest weighs in favor of the reorganization of the SunCal

14   debtors, rather than injunctive relief for the benefit of

15   Lehman Re's liquidation.

16        As to the likelihood of success on the merits, we

17   would submit that there are numerous factors that indicate that

18   there is no basis for permanent injunctive relief.  First of

19   all, again, as we mentioned, it would be an impermissible

20   collateral attack on the California bankruptcy court's ruling.

21   Secondly, there is a serious question, as Your Honor began to

22   point out to counsel, as to whether the Lehman Re proceeding

23   will be recognized.  There is no business activity in Bermuda

24   today.  That can't be controverted.  Today there are no

25   employees in Bermuda.  There apparently are no records of

47

1    significance, although that may be debated.  And other than a

2    bank account, and, clearly, when were those funds deposited,

3    there are no assets in Bermuda as far as we know either.  If,

4    in fact, the proceeding is not recognized, as was the case in

5    Bear Stearns, there is no basis for the issuance of injunctive

6    relief under 1521.  And, therefore, there is no likelihood of

7    success on the merits.

8            Thirdly, as the California Bankruptcy Court ruled, in

9    the underlying merits of the issue before us, or before that

10   Court, the automatic stay, we know that Court has ruled, does

11   not apply to the equitable subordination claim.  For the same

12   reason we would submit that any injunctive relief here, which

13   really should mirror -- the purpose of it would be to mirror

14   the automatic stay -- for the same reason that should not

15   apply.  As the Court there found, a debtor should be permitted

16   to act defensively against claims filed in its case.  That was

17   the basis of the decision in California.  And until the

18   Bankruptcy Appellate Panel determines otherwise, that is the

19   law there.  And we would submit, Your Honor, that should be the

20   law here as well.

21           So, in sum, 1519(a) states that "From the time of

22   filing a petition for recognition until the Court rules on the

23   petition, the Court may, at the request of the foreign

24   representative, where relief is urgently needed", and I stress

25   that again, "where relief is urgently needed", then the Court,

48

1    "to protect the assets of the debtor or the interests of the

2    creditors, grant relief of a provisional nature".  Again, we

3    submit there is clearly no such urgent need here as against the

4    SunCal debtors, nor can petitioners satisfy any of the other

5    requirements for injunctive relief.  And, accordingly, we would

6    submit that the motion must be denied.

7         Your Honor, as a formal matter, just so that I don't

8    leave an ambiguity on the record, there was some reference made

9    as to some surprise as a reference of a proof of claim that was

10   filed for the benefit of Lehman Re in the SunCal cases.  Over

11   the last day or two we were scrambling, obviously, Your Honor,

12   to try to come up with a set of papers and working, obviously,

13   with counsel in California.  We were finally provided with the

14   actual proof of claim, and if Your Honor would permit I'd be

15   happy to hand up a copy to you and hand a copy to counsel.  And

16   I'll go through it with you just quickly --

17        THE COURT:  Well, I'd be happy to --

18        MR. ZELMANOVITZ: -- just to show you.

19        THE COURT:  I'd be happy to see it, but I think the

20   first thing you should do is give it to counsel.

21        MR. ZELMANOVITZ:  Absolutely, Your Honor.

22        MS. SPEAKER:  Thank you.

23        MR. OLSEN:  May I approach, Your Honor?

24        THE COURT:  Yes.  Thank you.

25        MR. ZELMANOVITZ:  This may also explain somewhat why

49

1   Lehman ALI was not initially a defendant in the litigation.

2   This is a proof of claim filed, I believe, by Lehman ALI, and

3   if you want to turn to page 2, on top you see what it says it

4   that "Pursuant to Section 501 of the Bankruptcy Code Bankruptcy

5   Rules 3001, 3003, this proof of claim is made by and on behalf

6   of Lehman ALI Inc. as agent for the lenders".  Undefined.

7   Except that there's no description of who the lenders are.

8   However, it's clear who the debtor is.  If you look at the next

9   paragraph "The liability of SJD Partners, Ltd., the debtor".

10  Now, SJD Partners is the entity that owned the property in

11  question that we're talking about, which was then foreclosed

12  upon.  If Your Honor would turn the page you see that on top it

13  says "The agent is the holder of valid and perfected first

14  priority security interests in" and (a) refers specifically to

15  Pacific Point Property, which is the property in question.

16  There's no way to tell simply from this that this was on behalf

17  of Lehman Re.  Now that we know that they're saying that Lehman

18  Re holds the first mortgage, obviously the lenders included

19  Lehman Re.  This is what was filed.  That's why it took a

20  while, as I understand it, before Lehman Re could be added as a

21  defendant, but clearly Lehman Re was in the loop, as they say,

22  and knew exactly what was going on with respect to this

23  property and this litigation.  Thank you, Your Honor.

24         THE COURT:  All right.  Thank you.  Is there anyone

25  else at this point who wishes to speak in opposition to the

50

1   preliminary injunction?  And this is an opportunity for

2   Mr. Wickham, if he wishes to talk on the phone, to address the

3   Court.

4         MR. WICKHAM:  I think, Your Honor, I will if there's

5   no one in the courtroom who wishes to speak.

6         THE COURT:  I think you're it.  Go ahead.

7         MR. WICKHAM:  Then thank you, Your Honor.

8   Dennis Wickham on behalf of Lusardi.  Your Honor, the Nevada

9   Supreme Court decision of A.F. Construction pronounces, and is

10  binding, on the nature and extent of Lehman Re's rights and the

11  trust deed on property in Nevada.  It is binding on whether or

12  not a prosecution on a mechanic's lien and then enforcement of

13  a mechanic's lien and a foreclosure sale on a mechanic's lien

14  causes harm to a trust deed holder.  In considering, it does

15  not.  So there is no harm that Lehman Re can show, as a matter

16  of Nevada law, and justify enjoining Lusardi's actions in that

17  case.  They are not required to respond.  They are not required

18  to defend.  They are not required to take any action, and, as

19  I'll speak in a minute, they were welcome to do so but not

20  required to do so by the Nevada Court.  The first time they

21  asked for a continuance and received a continuance from the

22  Nevada Court.  But "we don't know if we will be harmed if we

23  don't do something" isn't irreparable harm.  The Nevada Court

24  tells us, the Nevada Supreme Court tells us, there isn't harm

25  from what my client is doing.  Now, Nevada law provides Lehman

51

1    Re multiple remedies at law.  No harm to Lehman Re, except that

2    we know of immediate harm to my client.  My client.  I've

3    enjoyed listening to the proceedings that you're endearing me,

4    giants of the financial industry discussing the multiple

5    billions of dollars at issue in the Lehman case.  I mean, I'm a

6    small -- I represent a small general contractor and a bunch of

7    even smaller subcontractors who simply want to pursue their

8    rights against the owner of property who hired them, didn't pay

9    them, and who has not responded even by filing the answer to

10   the complaint.

11        They are entitled to go forward with that, as a

12   general contractor would like -- who's the subs -- and the

13   mechanic's lien sale hopefully will bring something to pay

14   them.  Their actions improved the value of this collateral,

15   which is why Nevada law provides this speedy but very focused

16   remedy.  The remedy is focused on the rights between my clients

17   and Centennial, and as long as Centennial doesn't commence a

18   bankruptcy protection we should not be there.

19        So an injunction in this case doesn't really serve the

20   purpose of Chapter 15.  We don't have a claim against the

21   debtor.  We shouldn't be told that we should proceed just as

22   other creditors of Lehman Re.  We're not trying to attach or

23   levy on any asset of the debtor.  But the consequence of an

24   injunction now simply continues to embroil us in this

25   proceeding, without any showing that there is a reason for the

52

1    Court to act.

2           And I do think that the Court correctly sensed from

3    our opposition paper a concern that, in fact, we have some

4    gaining of the Nevada Court.  Lehman Re appeared.  Lehman Re

5    was given an opportunity to intervene, to come in as a

6    plaintiff, to assert its rights if it wished to, comes in and

7    says well, we don't really know whether or not we're in first

8    or not.  We don't want to say whether we are a prior lien or

9    not, but we'd like to argue why you shouldn't go forward.  Then

10   hear that the Court says no, Nevada law is very specific.  I am

11   going forward.  And so they attempt to come to this Court and

12   ask for, essentially, the same thing.  We don't know what's

13   going on with respect to what we want to do checked

14   technically, so please just let him out of the box by enjoining

15   anything.

16          And, Your Honor, I don't think that there is any basis

17   in the law, nor would any injunction further the purposes of

18   Chapter 15 in stopping Lusardi from taking its limited action.

19          THE COURT:  But can I break in?  May I break in --

20          MR. WICKHAM:  Oh, for sure.

21          THE COURT:  -- for just a question that I have, because

22   you said enjoining Lusardi from taking its limited action.

23   What is it that is threatened to take place on August 17th, and

24   what harm --

25          MR. WICKHAM:  Nothing.

53

1      THE COURT: -- if any, to your client in deferring that

2   action until at least September 9th?

3      MR. WICKHAM:  Your Honor, nothing on the 17th.  The

4   harm is, is if my client cannot notice a sale.  Nothing at the

5   sale.  But can't notice a sale.  That is, it wouldn't be

6   conducting a sale within the time period that we're talking

7   about.  But an injunction purportedly would forbid it from

8   taking that next step, which is noticing the sale to

9   Centennial.

10      THE COURT:  Yes.  Once notice of a mechanic's lien for

11   closure is given under Nevada law, and I gather you're a

12   California lawyer and not a Nevada lawyer.  Is that right?

13      MR. WICKHAM:  That is correct, Your Honor.

14      THE COURT:  Are you a member of the Nevada bar?

15   Hello?  Did I lose you?  Are you a member of the Nevada bar?

16   Are you still there?  Isn't that amazing?  Mr. Wickham, are you

17   still with us?  I think that since we were in the middle of an

18   argument, and I was asking a question that I thought was sort

19   of important, because it's a question of Nevada law, which I

20   was about to ask him about and the line went dead, that we

21   should take a little break, and we should determine if there's

22   a problem with the phone line.  So let's break for ten minutes

23   resuming at 3:30, and, hopefully, Mr. Wickham will be back with

24   us to complete his argument, and, if not, we'll proceed in his

25   absence.  We're adjourned for ten minutes.

54

1          (Recess from 3:20 p.m. until 3:52 p.m.)

2          THE COURT:  Be seated, please.  Mr. Wickham, are you

3     there?

4          MR. WICKHAM:  I am, Your Honor.

5          THE COURT:  You created quite a stir by not answering

6     my question.

7          MR. WICKHAM:  I know, Your Honor, and I could hear the

8     stir, but you couldn't hear me.  I think every lawyer at their

9     time wished they had a magic button when they get a question

10    they don't want to answer, but that was not --

11         THE COURT:  That was not the question?

12         MR. WICKHAM:  -- the question.

13         THE COURT:  Okay.  Maybe I'll ask you another one

14    during the course of the hearing.

15         MR. WICKHAM:  Very well.

16         THE COURT:  Are you a member of the Nevada bar?

17         MR. WICKHAM:  I am not, Your Honor.

18         THE COURT:  Then I don't know how you --

19         MR. WICKHAM:  I --

20         THE COURT:  -- I don't know how you can make

21    representations as to Nevada law.

22         MR. WICKHAM:  I can tell you that the Nevada Supreme

23    Court can state what is Nevada law --

24         THE COURT:  Yeah, I read that.  So --

25         MR. WICKHAM:  -- since it's a biased court of the law.

55

1    And I can argue that that is the statement, and I was making

2    that argument in response to the debtor's claim, that the

3    Bankruptcy Code analysis of what property rights are is somehow

4    not governed by what state law is.  And, quite frankly, I think

5    that the standard is exactly the opposite, which is, it is the

6    pronouncements of the Nevada Supreme Court to tell you the

7    nature of the debtor's property interest and whether or not

8    Nevada procedure will have an effect on that interest.

9         THE COURT:  Okay, but what I was asking you, however,

10   was about the timing and sequence of events relating to a

11   mechanic's lien foreclosure proceeding being conducted under

12   applicable Nevada law.

13        MR. WICKHAM:  Yes, Your Honor, and I inquired of

14   Nevada counsel as to what next steps are in place, and --

15        THE COURT:  Did that happen during our break?

16        MR. WICKHAM:  It did not.  It happened this morning.

17        THE COURT:  Oh, okay.  So --

18        MR. WICKHAM:  And what I was told in this particular

19   action, the Court -- the Nevada State Court still needs to

20   enter an order with respect to the amounts owed to the

21   subcontractors who were in the action.  There's reference to

22   that in the transcript, but that still has not occurred.  And

23   then I was told that the time -- the minimum time to notice and

24   publish a sale in Nevada is twenty-one days and was told that

25   it's both advertised in a newspaper and published, the notice

56

1    statute.

2          THE COURT:  Yeah, there was a statement made by

3    counsel for the JPLs earlier that you may have heard indicating

4    that -- this is the note I made to myself -- the foreclosure

5    can proceed as of August 17th.  Is that true?  What does that

6    mean, from your perspective?  What happens on August 17 --

7          MR. WICKHAM:  What I asked --

8          THE COURT:  -- if anything.

9          MR. WICKHAM:  What I asked and therefore represent to

10   the Court is nothing is magic about August 17th.  My belief is

11   that the transcript -- the counsel were asked how long will it

12   take you to get me, me being the state court judge, the numbers

13   and amounts for the subcontractors.  And my understanding is

14   that subcontractors and general contractors have different

15   statutory priorities as well as depending on what they did.

16   And I thought that the representation was that they could get

17   that to her in a month, but that wouldn't equate to the 17th.

18         THE COURT:  All right, so --

19         MR. WICKHAM:  So I don't know the answer as to what

20   the magic is of the 17th, but there is no sale date noticed

21   now, and there would not be a notice of the sale until the

22   Court enters the order with respect to the subcontractors.

23         THE COURT:  And that hasn't happened as of today?

24         MR. WICKHAM:  Yes, sir.  That's correct, Your Honor.

25         THE COURT:  And you have no notice as to when that's

57

1   expected to happen?

2        MR. WICKHAM:  I did not ask that question, so I do not

3   know.

4        THE COURT:  Okay.  Thank you.  Is there anything more

5   you want to say?  Because I interrupted you, and you had a long

6   break.  And if there's anything more you want to say in your

7   argument, this is the time for it.

8        MR. WICKHAM:  I appreciate that, Your Honor.  The

9   question, it seems to me, for the Court is, in the absence of

10  any evidence of irreparable harm to the estate, should the

11  Court issue a preliminary injunction that says, well, but don't

12  do anything for a month?  And I submit, Your Honor, that that

13  puts the statute on its head.  If that was the intention in

14  Chapter 15, there would in fact be an automatic stay on the

15  commencement of a petition under Chapter 15.  The requirement

16  is more than that.  And in equity it requires real harm,

17  imminent harm, not theoretical harm, not tangential harm; that

18  isn't shown in this case.

19        The last piece that I'd like to address, Your Honor,

20  we noted that the statute provides for the Court to issue a

21  bond.  The debtor had argued that the federal -- the bankruptcy

22  procedure means they don't have to do so.  I think if the Court

23  is going to restrain my client from taking action on the

24  mechanic's lien sale and starts to, you know, find some lawsuit

25  that we have no intention of filing against the debtor, that

58

1    there ought to be a bond, and there ought to be a sizable bond

2    in balancing the equities and the relative size of the parties,

3    the relative harms and then the absence of any evidence of harm

4    to a debtor who's still asserting that they are a first lien

5    creditor.

6           And, Your Honor, I note that there is not any case

7    that has ever held that the automatic stay applies when the

8    holder of a first lien creditor commences a bankruptcy petition

9    against junior lienholders going forward.  It's the opposite.

10   There's a split in the circuits as to whether or not the stay

11   is implicated at all, but even in the courts that have held the

12   state is implicated it's only when someone comes to court and

13   says I'm a junior lienholder and I wish to stop a foreclosure

14   sale of a senior lienholder because it'll affect my rights.

15   That's not the facts of this case; that's not what the debtor

16   is -- or, excuse me, that's not what the debtor is saying in

17   this case.

18          But more importantly, the second part of the premise

19   is also not true.  Under the A.F. Construction case, the

20   mechanic's lien foreclosure doesn't affect Lehman Re's interest

21   on the property, if they have a --

22          THE COURT:  May I have a --

23          MR. WICKHAM:  -- a need to assert it, but A.F.

24   Construction says go forward in the mechanic's lien case, we

25   can address the lenders' rights separately.

59

1        And so, Your Honor, I think the injunction should be

2    denied.  If the Court wants to deny it conditioned on the

3    representations that I made with respect to timing, that is,

4    that there could not be a sale in twenty-one -- add seven -- in

5    twenty-eight days, that's fine because it's not going to

6    happen, but I don't think there is a basis in the record at all

7    for the Court to act.

8        THE COURT:  Is there any prejudice to your client in

9    agreeing to defer taking steps to initiate the foreclosure

10   process, that twenty-one day timing, until after the

11   recognition hearing which is scheduled for September 9?

12       MR. WICKHAM:  Yes, Your Honor.

13       THE COURT:  What's that harm?

14       MR. WICKHAM:  I -- there is a partially completed

15   building with an owner that doesn't appear to be interested in

16   protecting their interest and my client's right in that

17   property.  They need to be able to take action now.  They

18   should not be in a -- without any harm shown to the other side,

19   but they shouldn't be put in a position where they are in limbo

20   for another, roughly, sixty-day period, that is, the roughly

21   thirty-day period, the Court's time-out, which I think is even

22   longer than thirty days, and then another thirty days to move

23   forward as we are right now, which is getting the order and

24   noticing and publishing the sale.

25       This isn't the completed building with rents and other

60

1    things.  This is a partially completed building that we need to

2    act upon.

3            THE COURT:  And what entity, if you know, is the

4    managing member of LB/VPC Nev-Centennial Hills LLC?

5            MR. WICKHAM:  I do not know because they have not been

6    named, but I believe that in the amicus brief that Lehman

7    Re filed with the Court there were exhibits attached to that

8    that I don't think were attached to the petition.  I have those

9    exhibits, and I believe those exhibits have the loan documents.

10   And so I can at least go through and tell the Court who signed

11   the loan documents, the building loan agreement, and hopefully

12   that will give the answer to the Court's questions.  So I

13   stalled --

14           THE COURT:  I'm not asking you to research that.

15           MR. WICKHAM:  No, but I'm still -- I'm flipping

16   through the pieces of paper in front of me.

17           THE COURT:  Well, I don't need -- I was asking if you

18   knew; I'm not asking you to make this an open-book exam.  It's

19   fine, you can --

20           MR. WICKHAM:  Oh, it's a limited liability company,

21   and the piece of paper doesn't state anything other than a

22   signature by a vice president.

23           THE COURT:  All right, thank you.  What I was trying

24   to figure out was whether there was a Lehman-related entity

25   that was in control of this LLC and whether or not foreclosure

61

1    by the mechanic's lienors that would potentially wipe out

2    equity in the property would lead to a bankruptcy in Nevada.

3    But you don't need to answer that.

4        MR. WICKHAM:  I don't know, Your Honor.

5        THE COURT:  I think this is a time for anybody else

6    who's in court to respond to the -- first, either to add weight

7    to the arguments that have been made both on behalf of the JPLs

8    and those who are opposing the preliminary injunction.  And if

9    there's no one else who wishes to be heard at this time, it's

10   an opportunity for counsel for the JPLs to respond.

11       MS. BAGBY:  Thank you, Your Honor.  I do wish to

12   respond to some of the points that were raised.  First, with

13   respect to Lusardi's counsel's discussion of what took place in

14   the Nevada State Court, it's important that it be noted that

15   the JPLs are court fiduciaries.  They're creatures of --

16   they're appointed by the Bermuda Court; they're creatures of

17   Bermuda law.  And they're not advocates.  They're fiduciaries.

18   And in the -- in that sense, they're required to act honorably

19   and fairly and in an even-handed fashion.

20       So, for example, when counsel's describing that the

21   JPLs filed an amicus brief in the Nevada State Court, in large

22   portion -- as opposed to appearing and contesting ownership, in

23   large portion that was due to the fact that at that moment

24   there was some ambiguity about what entity owned the mortgage

25   in question.  And the JPLs acted quickly; they saw they had to

62

1    because the property interest was at stake, and they filed an

2    amicus brief.

3         So the JPLs are acting where they have sufficient

4    knowledge to protect property interests, whether they're

5    subject to Lehman Re's ownership interest or another Lehman

6    entity.  But there is absolutely no strategic gaming of the

7    system in terms of their attempts to protect these property

8    interests.

9         And as Your Honor may be aware, the JPLs have now

10   reached a settlement with respect to the Lehman U.S. debtors in

11   terms of many of the issues about missing ownership

12   documentation on some of these mortgage loans, and that's the

13   subject of a 9019 motion that I think will be heard before Your

14   Honor on August 26th, if I recall correctly.  So, just to

15   clarify that point.

16        The second is there was some discussion about the

17   August 17th date.  That date is stated by the Nevada State

18   Court in its order, which is Exhibit F to the verified

19   petition, and that states that on August 17th Lusardi can

20   proceed with a foreclosure action.

21        Now, we've heard that that foreclosure action may take

22   some time.  I'm not admitted in Nevada, so I will not represent

23   to the Court how long that will take.  But the magic of the

24   August 17th deadline was in fact set by the Nevada State Court.

25        THE COURT:  Okay.

63

1          MS. BAGBY:  And in terms of the lien priority issue,

2     to be clear, it is Lehman Re's position that Lehman Re has a

3     first-priority interest in this property, in the Centennial

4     Hills property, but the Nevada State Court, in its order, has

5     decided that Lusardi has a prior and now senior security

6     interest by virtue of its purported mechanic's lien.

7          So, again, we contend that our property interest has

8     in fact already been hampered, and therefore that relates to

9     the cases that I cited to Your Honor earlier about when a

10    junior lienholder -- a debtor's property is subject to

11    foreclosure potentially from a senior lienholder.

12         THE COURT:  Do you have any facts that you could, at

13    this point, introduce in a Nevada Court to contradict the

14    determination that appears to have been made as to lien

15    priority?  Because it appears that this is a matter that goes

16    to the fact question of when work began on the property

17    relative to when the mortgage was recorded to secure the note.

18    It's a first-in-time-first-in-right kind of question.

19         MS. BAGBY:  Absolutely, Your Honor, and that is

20    something that obviously, ever since they became aware of this

21    litigation, the JPLs have been pursuing diligently.  They have,

22    I think, been investigating this.  They have uncovered some

23    evidence that I think we have found isn't conclusive, yet we're

24    not certain.  We've tried to investigate at the same time that

25    we've tried to take other remedies in the court process.  So --

64

1        MR. PETRICK:  Your Honor, if I may be heard on that, I

2   have some first-hand knowledge.  I'm Greg Petrick of

3   Cadwalader.

4        THE COURT:  You'll have to identify yourself for the

5   record --

6        MR. PETRICK:  Yes.

7        THE COURT:  -- and I'll be happy to hear what you have

8   to say on the points.

9        MR. PETRICK:  Gregory Petrick of Cadwalader on behalf

10  of the JPLs.

11       THE COURT:  Oh, yes, I've read some of your papers.

12       MR. PETRICK:  Yes.  Your Honor, the JPLs have

13  commenced a forensic examination of books and records that were

14  available from the borrower.  And there's -- the facts, as we

15  believe them to have happened, is work was started, certain gas

16  lines were drilled on the property for a prior owner, and the

17  contractor was paid for that work prior to the transfer of the

18  ownership to a new entity.

19       We believe that the mortgage that the JPLs have was

20  recorded and in place prior in time to a second phase of that

21  work being commenced.  The forensic review has revealed payment

22  of an invoice for that work that was completed, I believe, in

23  June of 2007, way prior in time to the mortgage that's at

24  subject being advanced and recorded.

25       We've also had some discussions with the borrower

65

1    about their understanding of whether or not the loan was

2    originated prior to the second phase.  And I believe that there

3    is some ambiguity in the borrower's mind as to whether or not

4    that loan was in fact in place before the second phase started.

5         So I think that the record, based on what we have been

6    able to find from our forensic examination, suggests that the

7    loan was in fact -- the Lehman Re loan was in fact in place and

8    recorded prior to the commencement of the second phase of this

9    work.  That's the best I can offer.

10        THE COURT:  All right.

11        MS. BAGBY:  Your Honor, with respect to some of the

12   issues that were raised by counsel to SunCal, I'd first like to

13   note that, while we appreciate being provided with a copy of

14   the proof of claim now, upon which their assertion in their

15   objection is based that Lehman Re has participated in the

16   SunCal proceedings, we are prepared to present Mr. Hunter, or I

17   can proffer his testimony, again, that the JPLs are the only

18   parties that are authorized to act for Lehman Re, and the JPLs

19   did not authorize anyone to file a proof of claim on their

20   behalf.  In addition, I think, as counsel conceded, this proof

21   of claim nowhere mentions Lehman Re.

22        So I think the proof of claim standing, on itself,

23   doesn't show that the JPLs or Lehman Re participated in the

24   SunCal bankruptcy proceedings.  That's important because, as I

25   understand it, and I'm sure I'll be corrected as one of the

66

1      people that's late to the SunCal party, but as I understand it,

2      the Court's decision in California in terms of lifting the

3      automatic stay was premised -- with respect to the equitable

4      subordination proceeding, was premised on the fact that LCPI

5      and other Lehman entities had either filed formal proofs of

6      claim, like Lehman ALI, or filed informal proofs of claim

7      through motions to lift the say.  In other words, they were

8      actively participating in those bankruptcies and, as a result,

9      the California Court said the stay is lifted with respect to

10     these equitable subordination actions, they can go forward.

11          There is no evidence before the Court that Lehman Re

12     has participated in those bankruptcy proceedings.

13          THE COURT:  Did Judge Smith lift the automatic stay or

14     did she determine that the automatic stay was inapplicable?

15          MS. BAGBY:  I'm not certain as to whether it was

16     lifting the stay or that the stay was not applicable, but I do

17     believe the crux of the decision was -- oh, I'm being told that

18     the stay was not applicable, but I believe the crux of that

19     decision is based on either formal proofs of claim or, for

20     example, Lehman Commercial Papers' filing a motion to lift the

21     stay constituting an informal proof of claim.

22          Again, Lehman Re has not filed any motion in those

23     proceedings, nor of the JPLs, nor have they authorized anyone

24     to file anything on their behalf.

25          THE COURT:  Well, to what extent -- I don't need to

67

1   get into Judge Smith's decision; it's on appeal, but it's law

2   of the case until reversed, although it's not law of this case,

3   it's law of that case.  The issue before me, and where I think

4   we need to focus attention, because it's been over two hours

5   that we've been together on this, is irreparable harm.  We

6   could spend some time with evidence, unlikely to success, but I

7   think that, unless you're able to convince me that there's

8   irreparable harm here, that you're not going to prevail.  So

9   let's focus on that.

10          You should know that, based upon what I'm hearing, I'm

11   having a hard time finding irreparable harm.  Most of that has

12   to do with timing.  In the case of SunCal, it doesn't appear

13   that anything seriously adverse to the interests of the JPLs

14   will happen between now and the September 9 hearing on

15   recognition.

16          And as to Centennial Hills, even if there were to be

17   the commencement of some state law foreclosure action in Nevada

18   as early as August 17th, twenty-one days should get us into the

19   hearing.  I haven't done the exact math; you better check it to

20   see that I'm right.

21          Furthermore, if what is happening in Nevada is a

22   foreclosure by mechanic's lienors, under applicable Nevada

23   procedure, against parties other than Lehman Re and the JPLs,

24   unless Lehman Re gets a very unusual kind of injunction, it

25   would seem that it wouldn't stop that foreclosure action

68

1    because it relates to parties other than Lehman Re.

2         So one of my questions from earlier is how an

3    injunction applicable to Lehman Re stops a foreclosure action

4    under Nevada law where you're not a party.  So that's a

5    question I think you're going to need to speak to.  It seems to

6    me that the only way that foreclosure, once commenced, is

7    stopped is if either someone moves the Nevada Court for cause

8    shown to stay the foreclosure or the owner of the property,

9    LB/VPC Nevada-Centennial Hills LLC, at least as I read the

10   caption of the complaint from the Nevada State proceeding,

11   files a bankruptcy case in some appropriate jurisdiction to

12   stay the foreclosure.  I can't think of another alternative,

13   but I'm happy to hear you if you have any other alternatives

14   for me to consider.

15        MS. BAGBY:  Well, Your Honor, again, I think, from the

16   JPLs' perspective, the need for the injunction, using

17   Centennial as an illustration, was that they were scrambling at

18   the last minute to respond to it.

19        Now, in Your Honor's question about the foreclosure,

20   whether or not that affects the debtor's interest, if it

21   potentially could in the sense that, while the debtor may be

22   not named as a party to the foreclosure action, Lusardi has no

23   incentive, certainly in the current market, if they proceed

24   with a foreclosure, to sell the property for anything more than

25   the value of their lien.  That will have the effect of

69

1   essentially wiping out what is now Lehman Re's second lien.  So

2   it has an economic impact on the estate in terms of allowing

3   Lusardi to proceed with their foreclosure action.

4         In terms of irreparable harm, Your Honor, we are

5   prepared to, as I said, proffer Mr. Hunter's testimony on

6   irreparable harm as well as some other matters that are

7   discussed today, or we can present him, if Your Honor would

8   prefer, for live testimony.

9         THE COURT:  Well, in the interest of expediting the

10  hearing, is there any objection to proceeding by means of a

11  proffer, with the understanding that Mr. Hunter's available for

12  cross-examination?

13        MR. ZELMANOVITZ:  I'm not sure I understand, Your

14  Honor, what would be proffered as to the testimony of

15  Mr. Hunter on irreparable harm.

16        THE COURT:  I don't know yet either.

17        MR. ZELMANOVITZ:  Therefore --

18        THE COURT:  That makes two of us.

19        MR. ZELMANOVITZ:  -- I can't answer the question.

20        THE COURT:  Well, the question is, really, procedural:

21  Whether or not you're prepared to --

22        MR. ZELMANOVITZ:  Well, to some extent, Your Honor --

23        THE COURT:  -- consent to having this proceed by means

24  of a proffer.  If it's going to take a long debate to get into

25  the question of it, we'll just call him live.

70

1         MS. BAGBY:  That's right, Your Honor.  Okay.  Then

2    that's what we'll do.

3         MR. HUNTER:  May I approach?

4         THE COURT:  Yes.  You're going to stand right there.

5    And before sitting down you're going to raise your right hand

6    and I'm going to swear you as a witness.

7         (Witness duly sworn)

8         THE COURT:  Please be seated and speak up into the

9    microphone when you sit down.

10   DIRECT EXAMINATION

11   BY MS. BAGBY:

12   Q.   Please give us your name.

13   A.   David Jeffrey Hunter.

14   Q.   Okay.  And you can move that microphone closer to you if

15   it's easier.  Okay.

16        THE COURT:  You don't have to swallow it, though.

17        THE WITNESS:  No.

18   Q.   And, Mr. Hunter, can you tell us where you're currently

19   employed?

20   A.   PricewaterhouseCoopers in Bermuda.

21   Q.   And, Mr. Hunter, are you currently one of the joint

22   provisional liquidators of Lehman Re?

23   A.   Yes, I am.

24   Q.   When were you appointed a joint provisional liquidator of

25   Lehman Re?

71

1      A.    September the 23rd, 2009.

2      Q.    And your appointment was --

3            THE COURT:  You have the year wrong; it was 2008.

4            THE WITNESS:  Sorry.  Apologies.

5            MS. BAGBY:  Thank you, Your Honor.

6      Q.    Was your appointment pursuant to an order of the Bermuda

7      Supreme Court?

8      A.    Yes, it was.

9      Q.    Can you tell us briefly what it means to be a joint

10     provisional liquidator in Bermuda?

11     A.    Pursuant to the order that was granted, we're -- our

12     mandate is to basically:  marshal the assets; identify the

13     assets; take possession of the books and records; conduct such

14     investigations as we deem appropriate under the circumstances;

15     take such actions to protect the assets; and to report to

16     court -- this is the court in Bermuda.

17     Q.    And when you state "take control", for example, of the

18     assets and the books and records, those are the assets and

19     books and records of Lehman Re?

20     A.    Yes.

21     Q.    And do you have additional duties and responsibilities as

22     a joint provisional liquidator?

23     A.    Basically our role -- the position of the directors is in

24     abeyance, and so we fulfill all the roles of the directors and

25     take responsibility of the company.

72

1    Q.   And you understand that we're here today on the joint

2    provisional liquidators' request for preliminary injunctive

3    relief from this Court in connection with the Lehman Re Chapter

4    15 proceeding, correct?

5    A.   Yes, I do.

6    Q.   Okay.  Currently, do you believe that, absent an

7    injunction from this Court, the estate of Lehman Re will be

8    harmed between now and the hearing on the Chapter 15 petition,

9    which is September 9th?

10   A.   Yes.

11           MR. ZELMANOVITZ:  Objection, Your Honor.

12           THE COURT:  You have to state the --

13           MR. ZELMANOVITZ:  Calls for a conclusion.

14           THE COURT:  You have to state the reason.

15           MR. ZELMANOVITZ:  Calls for a conclusion.  It's based

16   on nothing that's in the records yet.

17           THE COURT:  Well, it does call for a conclusion, and

18   he is, however, an estate fiduciary.  I thought there was

19   another reason for the objection, which is, the distinction

20   between harm and irreparable harm, which is the ultimate

21   question which is before the Court.

22           I suggest that the question be rephrased.  And he's

23   certainly prepared to comment -- I shouldn't say he's certainly

24   prepared.  I'm prepared to allow him to testify as to his

25   opinion as to those circumstances of which he is aware that

73

1    might be adverse to the estate, which is different from harm or

2    irreparable harm.

3    BY MS. BAGBY:

4    Q.   Mr. Hunter, is it your understanding that, absent an

5    injunction from this Court, the estate or the assets of Lehman

6    Re could be irreparably harmed between now and the recognition

7    hearing on September 9th?

8    A.   I'd like to say yes with an explanation as to why I think

9    that.

10   Q.   And what is your explanation for that answer?

11   A.   My explanation, to put it in context, the three properties

12   in particular represent about twenty percent of the portfolio

13   of the collateral interest.  So they represent a big portion of

14   the estate.

15       There -- the aspects of irreparable harm would be the

16   actions that are commenced against the properties that we have

17   no control over, that have been commenced and that we are

18   concerned will be -- continue to commence.

19       We don't know what sort of -- we know with the properties

20   that there's lien interests out there.  We don't have entirety

21   of the fact situation to understand the particular

22   circumstances.  And we're concerned with actions that are

23   commenced, the extent that we have to commit our time and

24   engage professionals and engage counsel, and in each of the

25   jurisdictions, to defend the actions and to address the various

74

1    litigation matters that are presented to us.

2    Q.   Okay.  And in your answer you referred to the "three

3    properties".  What did you mean by those three properties?

4    A.   The three properties being Centennial Hills, what's

5    referred to as Pacific Point, and Laurel Cove.

6    Q.   Okay.  And in addition to the litigations that you've

7    described with respect to the three properties, are you aware

8    of additional litigation risk for actions that have not yet

9    been commenced?

10   A.   With respect to the balance of the portfolio?

11   Q.   With respect to any of the properties in the portfolio.

12   A.   There's -- throughout the process, there has been threats

13   or indications that the parties would take action against us

14   and would seek to recover from the collateral.  And so, yes,

15   that's an ongoing imminent threat.

16       Part of it is that we can't really control it because we

17   don't know what's out there or what's presented to us.

18   Q.   Okay.  And you mentioned that there were some costs

19   associated with defending at least the existing litigations.

20   So, currently it's correct to say that you're incurring

21   expenses and costs in defending the actions with respect to the

22   three properties?

23   A.   Yes, we're -- we have local counsel engaged for each of

24   those dates.  We've -- we use Cadwalader as our main U.S.

25   counsel.  It involves a significant portion of the JPLs' time

75

1    that is directed to deal with the litigation matters, which

2    goes against what we're trying to do, which is a

3    rationalization and realiazion of the properties on an

4    efficient basis.

5    Q.   Okay.  And you mentioned -- with respect to the costs that

6    you described in defending -- that you've incurred in defending

7    these actions, do you anticipate that you will be able to

8    replace those costs that you've expended if, for example, there

9    is a permanent injunction entered on September 9th?

10   A.   I'm sorry, could you repeat that?

11   Q.   Of course.  You mentioned that you incurred -- you have

12   incurred costs in defending the litigations currently against

13   Lehman Re, correct?

14   A.   Yes.

15   Q.   Okay.  Do you anticipate being able to recover those costs

16   if ultimately those litigations are stayed by a permanent

17   injunction in the Chapter 15 case?

18   A.   I don't think there's any recovery of those costs.  The

19   things that we're trying to do that are costly, as Mr. Petrick

20   indicated, were hiring forensic accountants to get information

21   that doesn't exist.  And there won't be a recovery of those

22   costs, absent our ability to recover it from the collateral.

23   Q.   You also mentioned that you spend a significant portion of

24   your time as a JPL attending to these litigation matters.  Is

25   it fair to say that these litigations distract from your

76

1    ultimate task of liquidating the estate and maximizing the

2    value of the estate's assets?

3    A.   The litigations, as they are presented to us, take up a

4    large proportion of our time and they have to be addressed on

5    an immediate basis so that we can find out what the fact

6    situation is and seek to get information to defend and just

7    establish what the fact is so that we know what the parties-in-

8    interest are.

9        It -- that becomes an immediate issue that does take up a

10   lot of our time and a great proportion of our time.

11   Q.   And are you concerned at all that there will be additional

12   litigation commenced in the period between now and September

13   9th?

14   A.   There is -- yes.

15   Q.   And what is the basis for your concern?

16   A.   The basis is we continue to get specific liens or matters

17   that are presented to us where we don't have complete knowledge

18   of the fact situation.  Pacific Point is an example of that

19   where we're required to defend on actions as they appear.

20       There's a number of instances where things appear on very

21   little notice and we have to activate a process internally

22   because we're fiduciaries, and it's not my money but it's money

23   that we report to the Court.  We have to be able to rationalize

24   the commitment of our time, the cost to engage third parties

25   and the cost that we have in terms of any proposed course of

77

1    action with respect to the litigation.

2    Q.    And are these current litigations, as well as the threat

3    or substantial risk of future litigation that you've described,

4    are these delaying the completion of the liquidation of the

5    company?

6    A.    Yes.

7    Q.    Okay.  You mentioned the Pac Point litigation, or Pacific

8    Point litigation.  You're familiar with the litigation that's

9    currently pending in the Central District of California

10   Bankruptcy Court involving the SunCal debtors?

11   A.    I'm broadly familiar with it, not intimately knowledgeable

12   of the -- all the issues.

13   Q.    Okay.  Have the JPLs authorized Lehman ALI to make an

14   appearance on behalf of Lehman Re in the SunCal litigation?

15   A.    No.

16   Q.    Have the JPLs authorized Lehman ALI to make an appearance

17   on behalf of Lehman Re in the SunCal Chapter 11 cases?

18   A.    No.

19   Q.    Has Lehman ALI ever advised the JPLs that it intended to

20   take any action such as making an appearance or filing a proof

21   of claim on behalf of Lehman Re in the SunCal litigation?

22   A.    No.

23   Q.    Has Lehman ALI ever made a recommendation to the JPLs

24   about taking action in the SunCal litigation?

25   A.    No.

78

1    Q.   And is it your understanding that only the JPLs have the

2    authority to cause Lehman Re to make an appearance in a

3    litigation or file a proof of claim?

4         MR. ZELMANOVITZ:  Your Honor, objection.  Calls for a

5    legal conclusion.

6         THE COURT:  Sustained.

7    Q.   Is there any party, other than the JPLs, that have

8    authority to act on behalf of Lehman Re in connection with the

9    litigation in connect -- excuse me, let me rephrase that.

10        Is there any party that has authority to act on behalf of

11   the JPLs in connection with the Pacific Point SunCal

12   litigation?

13   A.   Not that I'm aware and not that we've endorsed on our

14   behalf.

15        MS. BAGBY:  Your Honor, those are our questions with

16   respect to the irreparable harm point, but I think this might

17   be the appropriate time to see if there's cross-examination.

18        THE COURT:  Yes, let's find out.

19        MS. BAGBY:  We would preserve our right to ask

20   additional questions if the Court wants further information,

21   for example, on the foreign main/nonmain issue.

22        THE COURT:  Understood.

23   CROSS-EXAMINATION

24   BY MR. ZELMANOVITZ:

25   Q.   Good afternoon, Mr. Hunter.

79

1   A.   Good afternoon.

2   Q.   You talked about being concerned about engaging counsel

3   and being involved in these various litigations.  Let's take

4   the Pacific Point or a SunCal litigation as an example.

5        To ultimately determine what assets you had to be able to

6   distribute them to creditors, don't you have to resolve that

7   litigation?

8   A.   We have to understand what the circumstances are.  I don't

9   have the knowledge of the litigation.  We have very little

10  knowledge about the circumstances of that.

11  Q.   Let me ask the question again.  Do you understand there is

12  a dispute?

13  A.   Yes.

14  Q.   And don't you have to resolve that dispute before you can

15  effectively take the property and sell it and be able to

16  distribute the proceeds?

17       MS. BAGBY:  Objection, Your Honor.  That calls for a

18  legal conclusion.

19       THE COURT:  Well, here's -- I'm going to overrule that

20  objection.  The question's really a basic one, which is, you

21  have an asset which is tied up in litigation somewhere; don't

22  you have to resolve that litigation in order to extract

23  whatever value there is to extract?  And that's really the

24  question.

25       MR. ZELMANOVITZ:  Thank you, Your Honor.

80

1   A.   I think that's a fair comment, yes.

2   Q.   In fact, you have already retained counsel in each of

3   these litigations, have you not, as you testified?

4   A.   We're in the process of finalizing our California counsel

5   with respect to SunCal.

6   Q.   Between now and September 9th, tell me exactly how you

7   understand you will be harmed, irreparably harmed, if there's

8   no injunction with respect to the SunCal litigation.

9   A.   I can't speak to circumstances that I don't know may or

10   may not occur.  What does occur:  that we get situations that

11   we're not aware of where creditors may present themselves as

12   having advance status and standing as a lien that we need to

13   deal with that -- to support what we believe to be the first

14   charge that we have on a property.

15   Q.   But, therefore, really, to state it fairly, you're not

16   aware of anything which would cause you irreparable harm at

17   this time with respect to that litigation between now and

18   September 9th?

19   A.   I'm aware that --

20        MS. BAGBY:  Your Honor, he just answered that

21   question.

22        THE COURT:  Well, I think he's -- I overrule the

23   objection because the answer was not directly responsive.  He

24   spoke in terms of other risks elsewhere; he didn't speak in

25   terms of the Pacific Point project in particular.

81

1    A.    I can speak to the specific point -- sorry, the Pacific

2    Point issue/property is that there's been recent developments

3    there, where creditors have presented themselves and have

4    somehow acquired an interest that we would have to defend, that

5    were presented to us with very little notice.  I believe that

6    there's other creditors, potentially lienholders, out there

7    that could present themselves to us at any time, and we would

8    have to deal with them directly and immediately to protect what

9    we believe to be the first charge that Lehman Re has on that

10   property.

11   Q.    Are you talking about creditors who've appeared in a

12   SunCal litigation?

13   A.    I don't know enough about the SunCal litigation to know

14   who has or who hasn't appeared.

15   Q.    So you really can't say today whether there's anything

16   occurring in a SunCal litigation that will cause irreparable

17   harm to you as between now and September 9th?

18   A.    I can't speak to the SunCal litigation because I don't

19   know who all the parties are and what the particulars are to

20   it.

21   Q.    Isn't it a fact that you are obtaining information on a

22   daily basis from the Lehman debtors with respect to each of

23   these properties?

24   A.    When you say "the Lehman debtors", are you referring to

25   the borrowers or --

82

1    Q.    I'm referring to Lehman ALI, Lehman Commercial Paper and

2    the other Lehman entities.

3    A.    On a daily basis, no.  I would say on a periodic basis,

4    yes.  I wouldn't say that it's timely or that it's complete.

5    Q.    And is your counsel in communication with counsel for the

6    Lehman entities that are defendants in the SunCal litigation?

7          MS. BAGBY:  Objection, Your Honor.  It's asking for

8    privileged information to be --

9          THE COURT:  I'm sorry, what's the objection?

10         MS. BAGBY:  It's potentially asking for privileged

11   information.

12         THE COURT:  I don't know how it is.

13         But why don't you rephrase the question to make sure

14   that any response excludes attorney-client communications?

15   Q.    Without telling me the substance of any of the

16   communications, assuming there are any, can you tell me whether

17   your counsel in a SunCal litigation is in communication with

18   counsel for the other Lehman entities that are parties to that

19   litigation?

20   A.    I'm not sure to what degree they are.  If I can say

21   something, I think that your question is how much information

22   do we as JPLs receive and know about the Pacific Point

23   property, and the answer to that would be it's limited.  We

24   haven't -- we don't have an ongoing discussion directly with

25   the Lehman -- big Lehman or LBHI or Lehman ALI in terms of the

83

1    **recent or current developments, or we don't have an ongoing**

2    **report from them.**

3            MR. ZELMANOVITZ:  I have no further questions, Your

4    Honor.

5            THE COURT:  Is there anyone else who wishes to ask any

6    questions, including Mr. Wickham?

7            Mr. Wickham, you are at a great disadvantage because

8    you can't see the witness and you can't see me.

9            MR. WICKHAM:  Your Honor, I do not wish to ask any

10   questions at this time.

11           THE COURT:  All right.

12           Is there anyone else who wishes to ask any questions?

13           Any redirect?

14           MS. BAGBY:  Yes, Your Honor, just one quick question,

15   I think.

16   REDIRECT EXAMINATION

17   BY MS. BAGBY:

18   **Q.   Mr. Hunter, do you have a full factual or legal**

19   **understanding of all of the allegations asserted in the SunCal**

20   **litigation?**

21   **A.   No.**

22   **Q.   And, Mr. Hunter, do you have all of the information that**

23   **you think you need to fully evaluate the allegations in the**

24   **SunCal litigation?**

25   **A.   I think we got a substantial shortage of any information**

84

1   in respect to that litigation.

2          MR. ZELMANOVITZ:  Just a quick question.

3   RECROSS-EXAMINATION

4   BY MR. ZELMANOVITZ:

5   Q.   Mr. Hunter, you have a copy of the complaint in that

6   litigation, the latest complaint, correct?

7   A.   Yes.

8   Q.   And your counsel has a copy of that complaint, correct?

9   A.   Yes.

10         MR. ZELMANOVITZ:  No further questions.

11         THE COURT:  Mr. Hunter, you're excused.  Thank you.

12         (Witness excused.)

13         THE WITNESS:  Thank you.

14         THE COURT:  Now, I've excused him, recognizing that he

15   may be recalled to the extent that we get into questions of

16   likely success on the merits, but I don't think that there's

17   going to be a need to do that.  I don't think that, despite

18   best efforts, that the JPLs for Lehman Re have carried their

19   burden of establishing irreparable harm.  And I say that

20   recognizing that there is indeed some concern, which I take to

21   be sincere, on the part of Mr. Hunter and, I presume, others on

22   behalf of the JPLs that there may well be some expense,

23   distraction and adversity associated with existing and

24   potential future litigation that may arise between today and

25   the date set for the recognition hearing, which is September 9.

85

1          However, based upon what I've heard both in argument

2     and in the testimony just presented, most of this is completely

3     ordinary-course litigation expense and an expense which I

4     believe, without having any evidence on the point, but I

5     believe to be, relatively speaking, less expense than the

6     expense associated with preparing the Chapter 15 petition and

7     related papers and preparing for and prosecuting the current

8     hearing for the, both, TRO and preliminary injunction.

9          In effect, this is one of those situations in which

10    you have to incur some legal expense to try to save legal

11    expense, but the legal expense to be saved falls into the

12    category that I would describe as speculative.

13         There has not been any showing of immediate and

14    irreparable harm to occur between today's date and September 9.

15    Additionally, I am mindful of the language quoted by counsel

16    for SunCal but which is part of the statute in Section 1519(a)

17    which states that relief of the kind being sought today should

18    be granted only when it is, quote, "urgently needed to protect

19    the assets of the debtor or the interest of the creditors".

20         And the use of the words "urgently needed", I believe,

21    elevates the burden.  The harm needs to be not just speculative

22    or even reasonably foreseeable; it needs to be irreparable, and

23    the provisional relief being sought from the Court must be

24    urgently needed.  I don't see an urgent need for this relief.

25         In the case of the SunCal litigation, there is, quite

86

1       appropriately, a pleading extension to September 30th.  I can

2       understand that there may be some distraction on the part of

3       the JPLs and some lawyers retained by them to pay close

4       attention to that litigation, but that does not rise to the

5       level of urgency when we have a hearing scheduled on September

6       9th.

7                In the case of Centennial Hills, while I am unable to

8       accept as an evidentiary finding statements made by

9       Mr. Wickham, who acknowledges that everything he said as it

10      relates to Nevada practice is second-hand and complete hearsay,

11      but I have no reason to doubt that nothing's going to happen

12      any earlier than August 17th.  But I have every reason to doubt

13      that even if I were to issue a preliminary injunction with

14      respect to the Centennial Hills foreclosure proceeding that

15      that preliminary injunction would do anything to stop the

16      foreclosure.  And there's been no showing that it's even

17      possible to word a preliminary injunction in a manner that

18      would stop that proceeding.  And, frankly, if it were possible,

19      all parties involved in that state court litigation should have

20      actual notice of that potential injunction.

21               Moreover, quite apart from the potential futility in

22      entering a preliminary injunction as it relates to the

23      Centennial Hills foreclosure, there is once again no urgent

24      need to intervene since, as I understand the facts, nothing's

25      about to happen.  And even if there is a foreclosure that is

87

1    noticed under applicable Nevada law, it may be that either the

2    debtor in that proceeding will step forward to take action or

3    that some relief can be obtained from a court of competent

4    jurisdiction in Nevada to stay the foreclosure for cause shown

5    or, alternatively, bankruptcy relief may be sought by that

6    borrower.  So, once again, I see no immediacy and I see no

7    urgent need.

8              As to irreparable harm, I don't see that either.  I

9    see litigation cost, but of course we have that today.

10             As to Laurel Cove, that's a complete mystery.  No one

11   has appeared, no papers have been filed, and to me it raises

12   some questions as to the adequacy of notice, because one would

13   expect that a party directly to be affected by a preliminary

14   injunction such as this in an active litigation such as that

15   would step forward.

16             However, based upon what has been stated by counsel

17   for the JPLs, it appears that nothing there is scheduled to

18   occur any earlier than August 23rd.  And, once again, it's a

19   matter that can be dealt with by having lawyers on the ground

20   in Tennessee step forward to defend the interests of the JPLs.

21             I think it best that I not get to the question of

22   likelihood of success on the merits today, and the reason I say

23   that is that fairly sophisticated issues of Chapter 15 practice

24   have been identified by both the SunCal parties and the Lusardi

25   Construction Company in papers filed that I've read adverting

88

1   generally to Judge Lifland's decision in a somewhat comparable

2   Chapter 15 setting in the Bear Sterns matter.

3        I don't think it's a good idea for us to delve into

4   that subject prior to the recognition hearing to the extent

5   that this may turn out to be a contested recognition hearing.

6   I say that because it may be a form of relatively inexpensive

7   discovery for those parties who are seeking to oppose

8   recognition, and for another reason:  I've already determined

9   that the preliminary injunction fails of its own accord due to

10  the failure to demonstrate irreparable harm to my satisfaction.

11  And there's simply no need to get into it; at least not yet.

12       We don't have to deal with likelihood of success.  We

13  can deal with the actuality of success on September 9.  Either

14  there will be or there will not be a case made for recognition

15  of the Bermuda insolvency case as a main or non-main

16  proceeding.  But counsel for the JPLs is certainly on notice

17  now that in all likelihood it will be a contested hearing and

18  parties will need to prepare accordingly.

19       The motion for a preliminary injunction is denied for

20  the reasons stated.

21       Is there anything that anyone wishes to say before I

22  adjourn?

23       We're adjourned.

24       MR. ZELMANOVITZ:  Thank you, Your Honor.

25  (Proceedings concluded at 4:50 PM)

89

1                         I N D E X

2

3                     T E S T I M O N Y

4    WITNESS               EXAM BY            PAGE      LINE

5    David Hunter          Ms. Bagby           70        11

6    David Hunter          Mr. Zelmanovitz     78        24

7    David Hunter          Ms. Bagby           83        17

8    David Hunter          Mr. Zelmanovitz     84         4

9

10                    R U L I N G S

11   DESCRIPTION                              PAGE      LINE

12   Motion for preliminary injunction denied  88        19

13

14

15

16

17

18

19

20

21

22

23

24

25

90

1

2                        C E R T I F I C A T I O N

3

4      I, Dena Page, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Dena Page

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  August 14, 2009

16

17

18

19

20

21

22

23

24

25