IN THE HIGH COURT OF JUSTICE                                      2009 FOLIO NO.

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN:

LEHMAN BROTHERS SPECIAL FINANCING INC.

**Claimant**

-and-

LANDWIRTSCHAFTLICHE RENTENBANK

**Defendant**

---

**PARTICULARS OF CLAIM**

---

## The Parties

1   The Claimant is Lehman Brothers Special Financing Inc. ("**LBSF**"), a corporation organised and incorporated under the laws of Delaware. LBSF is registered to carry on business in the state of Delaware and has its principal business address at 1271 Sixth Avenue, New York, NY 10020. LBSF is a subsidiary of Lehman Brothers Holdings Inc. ("**LBHI**"). On 3 October 2008, LBSF filed a petition in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") seeking relief under chapter 11 of title 11 ("**Chapter 11**") of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and since that date it has operated its business and managed its properties as a debtor in possession pursuant to paragraphs 1107(a) and 1108 of the Bankruptcy Code.

2      The Defendant is Landwirtschaftliche Rentenbank ("**Rentenbank**"). Rentenbank is a depository institution organised under the public law of the Federal Republic of Germany, with a principal place of business located at Hochstrasse 2, 60313 Frankfurt am Main, Germany. Rentenbank was established by the Rentenbank Act of 1949 (the "**Act**"). According to Section 1 of the Act, Rentenbank is a "direct federal institution under public law."

**The Swap Master Agreement**

3      On 9 January 1996, LBSF and Rentenbank entered into a swap master agreement (the "**Swap Master Agreement**") based on the 1992 Multicurrency Cross-Border master agreement general terms promulgated by the International Swaps and Derivatives Association, Inc. (formerly known as the International Securities Dealers Association) and a schedule thereto which sets out specific terms agreed between the parties (the "**Schedule**"). A credit support annex to the Schedule was entered into by the parties on the same day (the "**Credit Support Annex**") pursuant to which collateral was posted by LBSF in respect of its obligations under the Swap Master Agreement and the Schedule. Further, on 28 July and 25 August 2003, LBSF and Rentenbank entered into transactional confirmations ("**Confirmations**") which set out the terms upon which specific swap transactions were to be carried out under the Swap Master Agreement and the Schedule. Copies of the Confirmations are at pages 1 to 8 of Attachment A.

4      By amendment agreements dated 28 July 2004 (the "**First Amendment**") and 26 February 2007 (the "**Second Amendment**"), the Swap Master Agreement was amended to further refine the terms upon which the transactions contemplated by the Confirmations were to be carried out.

5      In particular, part 4(h) of the Schedule provided that the Agreement would be governed by and construed in accordance with the laws of the State of New York. However, section 1(a) of the Second Amendment provides that part 4(h) is deleted in its entirety and replaced by the following provision:

> *"4(h)   Governing Law. This Agreement will be governed by and construed in accordance with English law."*

6   Accordingly, the Swap Master Agreement is governed by and construed in accordance with English law and, pursuant to section 13 of the Swap Master Agreement, the parties have submitted to the jurisdiction of the English courts.

## The Swap Guarantee

7   At or about the time that the Swap Master Agreement and Schedule were executed, LBHI executed a guarantee (the "**Swap Guarantee**") under which LBHI agreed to guarantee the payment of all amounts payable by LBSF to Rentenbank under the Swap Master Agreement. The Swap Guarantee is attached to the Swap Master Agreement as Exhibit B to the Schedule.

## Event of Default under the Swap Master Agreement

8   Section 5(a)(vii) of the Swap Master Agreement provides that the occurrence at any time with respect to a party or any Credit Support Provider of such party of any of the following events constitutes an Event of Default with respect to such party:

> *"Bankruptcy. The party, any Credit Support Provider of such party ...*
>
> *(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceedings seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator,*

*receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts".*

9      Pursuant to Part 4(g) of the Schedule, LBHI is a Credit Support Provider for the purposes of the Swap Master Agreement.

10     LBHI and certain of its subsidiaries and affiliates commenced with the Bankruptcy Court voluntary cases under Chapter 11 on 15 September 2008. LBSF commenced its voluntary case under Chapter 11 on 3 October 2008.

11     The commencement of LBHI's and LBSF's Chapter 11 cases on 15 September 2008 and 3 October 2008 respectively, constituted Events of Default under section 5(a)(vii) of the Swap Master Agreement.

12     Upon LBHI's 15 September 2008 filing of its Chapter 11 case (it being the earlier filing and therefore the first Event of Default under section 5(a)(vii) of the Swap Master Agreement), the early termination provisions set forth in Section 6 of the Swap Master Agreement were triggered.

**Early Termination Amount**

13     Section 6(a) of the Swap Master Agreement provides that:

*"Right to Terminate Following Event of Default. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an*

*Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of [certain Events of Default specified in section 5(a)(vii) of the Swap Master Agreement]."*

14   Pursuant to Part 1(e) of the Schedule, the "Automatic Early Termination" provisions of Section 6(a) of the Swap Master Agreement apply to each of the parties.

15   Section 6(d)(i) of the Swap Master Agreement provides that:

*"On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e) and (2) giving details of the relevant account to which any amount payable to it is to be paid."*

16   Under section 6(e) of the Swap Master Agreement, the amount of payment due on Early Termination (the "**Early Termination Amount**") is based on the parties' election in the Schedule of a payment measure. Part 1(h) of the Schedule provides that the Second Method and Market Quotation payment measure shall apply. In accordance with the parties' election in Part 1(f) of the Schedule and pursuant to Section 6(e)(i)(3) of the Swap Master Agreement, the Early Termination Amount is:

*"an amount ... payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."*

17   Section 6(d)(ii) of the Swap Master Agreement provides that an Early Termination Amount is payable as follows:

*"An amount calculated as being due in respect of any Early Termination Date under section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) ...*

> *Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed."*

18    "Applicable Rate" is defined in section 14 of the Swap Master Agreement, in relevant part, as the "Default Rate". "Default Rate" is defined as *"a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum"*. The certified cost of funding applicable to LBSF is the sum of the overnight London Inter-Bank Offer Rate (LIBOR) and 1250 basis points (12.5%), compounded daily. Accordingly, the Default Rate is equivalent to overnight LIBOR plus 13.5% per annum, compounded daily. The Termination Currency, per part 1(g) of the Schedule, is United States Dollars (USD). A copy of the certificate of cost of funding is at page 9 of Attachment A.

19    By letter dated 15 September 2008 to LBSF, Rentenbank gave notice of and declared the occurrence of an Early Termination Date according to Automatic Early Termination under the Swap Master Agreement, and stated that a calculation statement would be provided the next day. A copy of the letter is at page 10 of Attachment A.

20    By letter dated 16 September 2008, Rentenbank provided to LBSF a statement calculating the Early Termination Amount in respect of the Swap Master Agreement ('**Calculation Statement**"). The Calculation Statement amounts to an admission that the sum of €27,358,780 (equivalent to US$39,032,728) (the "**LBSF Receivable**") is due and owing from Rentenbank to LBSF (the amount of the LBSF Receivable having been arrived at by deducting LBSF's outstanding obligations under the Swap Master Agreement (excluding collateral) from collateral posted by LBSF under the Credit Support Annex in the sum of €68,060,894). A copy of Rentenbank's 16 September 2008 letter to LBSF, with the corresponding Calculation Statement, is attached at pages 11 to 13 of Attachment A.

21   In the circumstances described in paragraphs 19 to 20 above and pursuant to section 6(d)(ii) of the Swap Master Agreement, the LBSF Receivable was payable by Rentenbank to LBSF on 16 September 2008, the date on which Rentenbank issued its Calculation Statement in respect of its 15 September 2008 notice letter declaring such Early Termination Date. Further, pursuant to section 6(d)(ii) of the Swap Master Agreement, interest is payable at the Default Rate on the basis of daily compounding from 16 September 2008 to the date of actual payment.

22   By letter of 15 December 2008, LBSF demanded immediate payment of the LBSF Receivable reflected in Rentenbank's Calculation Statement, together with interest accruing at the Default Rate. A copy of LBSF's letter of 15 December 2008 to Rentenbank is attached at pages 14 to 16 of Attachment A.

23   Wrongfully and in breach of section 6(d)(ii) of the Swap Master Agreement and despite the demand for payment, Rentenbank has failed to pay the sums due from it under the Swap Master Agreement.

**LBSF's Claim**

24   LBSF makes its claim in United States Dollars as the Swap Master Agreement provides at part 1(g) of the Schedule that the termination currency is United States Dollars. The sterling equivalent of LBSF's claim at the date of this claim is £26,605,453.51 (including interest as set out below), using an exchange rate of US$1:£0.6121 as published by Bloomberg on 23 June 2009.

25   By reason of the breach of contract set out in paragraph 23 above, and by operation of section 6(d)(ii) of the Swap Master Agreement, LBSF is entitled to claim and claims from Rentenbank payment of the sum of US$43,465,860.98, being the sum outstanding by way of (i) principal of US$39,032,728 and (ii) accrued interest (being interest on the principal at the contractual default rate of overnight LIBOR plus 13.5% per annum for the period from 16 September 2008 to 23 June 2009, compounded on a daily basis) in the sum of US$4,433,132.98 as at 23 June 2009.

26   In addition, LBSF is entitled to claim and claims from Rentenbank contractual interest on the sum of US$43,465,860.98, pursuant to section 6(d)(ii) of the Swap Master Agreement at a contractual default rate of overnight LIBOR plus 13.5% per annum, compounded on a daily basis.

27   Further or alternatively LBSF is entitled to claim, and claims, interest pursuant to section 35A of the Supreme Court Act 1981 on all sums found owing for such time and at such rate as the Court shall deem fit.

28   LBSF is entitled to an inquiry as to all sums owing by Rentenbank under the Swap Master Agreement and an Order for payment of all sums found due (over and above the sums claimed herein) upon the making of such inquiry together with interest thereon pursuant to the contractual default rate as specified in paragraph 26 above or, alternatively, Section 35A of the Supreme Court Act 198114 or the Court's equitable jurisdiction.

29   Further, pursuant to section 5(a)(ii) and 11 of the Swap Master Agreement, LBSF is entitled to claim and claims an indemnity from Rentenbank in respect of all costs associated with this claim and incurred by LBSF by reason of the enforcement and protection of its rights under the Swap Master Agreement (as amended), the Schedule (as amended) and the Confirmations.

**AND THE CLAIMANT CLAIMS**

1    The sum of US43,465,860.98;

2    Contractual interest as specified at paragraph 26 above;

3    Further or alternatively, interest on the amount found to be due to the Claimant at such rate and for such period as the Court thinks fit pursuant to the equitable jurisdiction of the Court pursuant to section 35A of the Supreme Court Act 1981;

4    An inquiry as to all sums owing by Rentenbank under the Swap Master Agreement and an Order for payment of all sums found due (over and above the sums claimed herein) upon the making of such inquiry together with interest thereon pursuant to the contractual default rate as specified in paragraph 26 above or, alternatively, Section 35A of the Supreme Court Act 1981 or the Court's equitable jurisdiction.

5    Indemnification in respect of all costs and expense of this action and the preservation and enforcement of its rights as described at paragraph 29 above;

6    Damages;

7    Such further or other relief as the Court may deem appropriate in all the circumstances;

8    Costs.

**Statement of Truth**

**The Claimant believes that the facts set out in these Particulars of Claim are true.**

I am duly authorised by the Claimant to sign this statement.

Signed:    *[signature]*

Name:    M. SHANKLAND

Position:    PARTNER.

Date:    23 June 2009

2009 FOLIO NO.

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN:

LEHMAN BROTHERS
SPECIAL FINANCING INC.

**Claimant**

-and-

LANDWIRTSCHAFTLICHE
RENTENBANK

**Defendant**

---

PARTICULARS OF CLAIM

---

Weil, Gotshal & Manges
One South Place
London  EC2M 2WG

Tel: 020 7903 1000
Ref: MS/ZH/58399.0003

**Solicitors for the Claimant**