JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
               :

In re:                     :    Chapter 11
               :

LEHMAN BROTHERS HOLDINGS INC., *et al.,*   :    Case No. 08-13555 (JMP)
               :

           Debtors.     :    (Jointly Administered)
               :

------------------------------------------------------------x

**NOTICE OF HEARING OF DEBTOR'S MOTION FOR AN ORDER,**
**PURSUANT TO FED. R. CIV. P. 60 AND FED. R. BANKR. P. 9024, MODIFYING**
**THE SEPTEMBER 20, 2008 SALE ORDER AND GRANTING OTHER RELIEF**

       **PLEASE TAKE NOTICE** that a hearing on the Debtor's Motion for an Order,

Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008

Sale Order and Granting Other Relief (the "Motion"), which was filed under seal substantially

contemporaneously herewith, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**October 15, 2009 at 2:00 p.m. (Prevailing Eastern Time)** (the "Hearing").

       **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local

Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Robert W. Gaffey, William J. Hine, and Jayant W. Tambe) and Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard P. Krasnow, Lori R. Fife, Shai Y. Waisman, and Jacqueline Marcus), attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Dennis O'Donnell, and Evan Fleck) and Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010 (Attn: Susheel Kirpalani and James C. Tecce), attorneys for the official committee of unsecured creditors appointed in these cases; (v) Hughes Hubbard & Reed, LLP, One Battery Park Plaza, New York, NY 10004 (Attn: William R. Maguire, Neil Oxford and Seth D. Rothman), attorneys for the SIPA Trustee; (vi) Jenner & Block LLP, 919 Third Avenue, 37th Floor, New York, New York 10022-3908 (Attn: Anton R. Valukas, Vincent E. Lazar, Robert L. Byman, David C. Layden, and Patrick J. Trostle) attorneys for the examiner; and (vii) Boies,

Schiller & Flexner LLP, 575 Lexington Avenue, 7th Floor, New York, New York 10022 (Attn: Jonathan D. Schiller, Hamish P.M. Hume and Jack G. Stern), attorneys for Barclays Capital Inc., so as to be filed and received no later than **October 9, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

   **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

   **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 15, 2009      Respectfully submitted,
   New York, New York

            /s/ Robert W. Gaffey

            Robert W. Gaffey
            Jayant W. Tambe
            William J. Hine
            JONES DAY
            222 East 41st Street
            New York, New York  10017
            Telephone:  (212) 326-3939
            Facsimile:  (212) 755-7306

            ATTORNEYS FOR DEBTOR AND DEBTOR
            IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 |
| Debtors. | (Jointly Administered) |

## DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. CIV. P. 60 AND FED. R. BANKR. P. 9024, MODIFYING THE SEPTEMBER 20, 2008 SALE ORDER AND GRANTING OTHER RELIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 3

JURISDICTION AND VENUE ................................................................................................ 9

STATEMENT OF FACTS ...................................................................................................... 10

A.    Background and The Principal Negotiators .......................................................... 10

B.    The Undisclosed $5 Billion Discount ................................................................... 12

C.    Lehman's Lawyers And Others Are Never Told About The Discount ............... 23

D.    Lehman's Boards Are Told The Deal Is A "Wash" And Approve A Transaction On That Basis ...................................................................................... 28

E.    The 9/16/08 Financial Schedule Upon Which The Asset Purchase Agreement Was Based .......................................................................................... 29

        1.    The Deliberate Understatement of Assets ................................................ 29

        2.    The Inflation of Assumed Liabilities ....................................................... 33

F.    The Distortions In The 9/16/08 Financial Schedule And The Asset Purchase Agreement Were Embedded In The Transaction Presented to the Court ....................................................................................................................... 38

G.    The Court's Approval of the Sale Transaction ..................................................... 42

H.    The Use of the Repurchase Agreement To Convey $5 Billion To Barclays ....... 47

        1.    The Disclosed Use Of The Repurchase Agreement As A Funding Vehicle For LBI ...................................................................................... 47

        2.    The Undisclosed Manipulation of the Repurchase Agreement to Deliver the Discount to Barclays ............................................................. 50

I.    The Last Minute Search For Even More Assets To Give To Barclays ............... 55

        1.    Barclays' Demand For More Assets ........................................................ 55

        2.    The Scramble For Assets To Satisfy Barclays' Demand ......................... 57

        3.    The Net Effect of the Search for Additional Value .................................. 60

J.    The Material Changes To The Sale Transaction In The "Clarification Letter," Finalized After The Sale Order Is Entered ............................................. 61

K.    The December 2008 Settlement Agreement .......................................................... 64

L.    The Net Effect Of The Undisclosed Deal Modifications ..................................... 66

ARGUMENT ............................................................................................................................ 66

I.     BARCLAYS' RECEIPT OF VALUE IN EXCESS OF WHAT THE COURT
       AUTHORIZED IS INCONSISTENT WITH THE BANKRUPTCY CODE AND
       SHOULD BE REMEDIED............................................................................................. 66

       A.     Barclays Received Transfers of Estate Property that Were Not Authorized
              by the Sale Order or the Code and Such Property Therefore May Be
              Recovered Pursuant to Sections 549 and 550 of the Code .................................. 68

       B.     The Excess Value that Barclays Retained by Terminating the Repurchase
              Agreement Is Property of the Sellers' Estates under Section 559 of the
              Code and Must Be Returned by Barclays Pursuant to Section 542 of the
              Code ................................................................................................................. 70

       C.     To the Extent the Undisclosed Transfers of Estate Property Effected by the
              Clarification Letter Are Deemed Authorized by the Sale Order, the Sellers
              Are Entitled To Relief from the Sale Order under Bankruptcy Rule 9024
              and Rule 60(b) of the Federal Rules of Civil Procedure...................................... 72

II.    LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO
       MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT ..................................... 75

       A.     Barclays Received An Undisclosed Multi-Billion Dollar Discount On Its
              Purchase Price..................................................................................................... 76

       B.     Barclays Failed To Pay To Former Lehman Employees All The Bonuses It
              Contracted To Pay Under The Asset Purchase Agreement .................................. 77

       C.     Barclays Did Not Assume $1.5 Billion In Contract Cure Liabilities As
              Presented To The Court ....................................................................................... 79

III.   LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO
       NEWLY DISCOVERED EVIDENCE THAT COULD NOT HAVE BEEN
       UNCOVERED BEFORE THE SALE ORDER'S ENTRY ........................................... 81

IV.    LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO
       MISREPRESENTATION (WHETHER INNOCENT OR INTENTIONAL) ............... 82

V.     LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER AND FURTHER
       DISCOVERY DUE TO POTENTIAL OCCURRENCE OF MISCONDUCT OR
       FRAUD...................................................................................................................... 84

CONCLUSION.................................................................................................................... 87

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Cryovac, Inc.*,
862 F.2d 910 (1st Cir. 1988)...................................................................................................82

*Bros Inc. v. W.E. Grace Manufacturing Co.*,
351 F.2d 208 (5th Cir. 1965) ..........................................................................................83 n.67

*Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*,
130 F.3d 52 (2d Cir. 1997)...................................................................................................69

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983)...............................................................................................68

*Hadden v. Rumsey Prods., Inc.*,
196 F.2d 92 (2d Cir. 1952)...................................................................................................73

*In the Matter of Emergency Beacon Corp.*,
666 F.2d 754 (2d Cir. 1981).............................................................................................74, 82

*In the Matter of Lintz West Side Lumber, Inc.*,
655 F.2d 786 (7th Cir. 1981) ...............................................................................................74

*In re 310 Assocs.*,
346 F.3d 31 (2d Cir. 2003)...............................................................................................75, 76

*In re American Freight System, Inc.*,
126 B.R. 800 (D. Kan. 1991)................................................................................................74

*In re BCD Corp.*,
119 F.3d 852 (10th Cir. 1997) .........................................................................................73, 74

*In re CADA Investments, Inc.*,
664 F.2d 1158 (9th Cir. 1981) ..............................................................................................74

*In re Center Wholesale, Inc.*,
795 F.2d 1440 (9th Cir. 1985) ..............................................................................................74

*In re Chrysler LLC*,
--- F.3d ----, 2009 WL 2382766 (2d Cir. Aug. 5, 2009) ............................................................68

*In re Eads*,
135 B.R. 380 (Bankr. E.D. Ca. 1991).....................................................................................69

*In re Enron Corp.*,
284 B.R. 376 (Bankr. S.D.N.Y. 2002) ........................................................................................66

*In re F.A. Potts & Co., Inc.*,
86 B.R. 853 (Bankr. E.D. Pa. 1988), *aff'd*, 93 B.R. 62 (E.D. Pa. 1988), *aff'd without
op.*, 891 F.2d 280 (3d Cir. 1989) ...............................................................................................68

*In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*,
77 B.R. 15 (Bankr. E.D. P.a. 1987) ...........................................................................................70

*In re Lundy*,
110 B.R. 300 (N.D. Ohio 1990) ...............................................................................................74

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
140 B.R. 969 (N.D. Ill. 1992) ...................................................................................................67

*In re Metaldyne Corp.*,
--- B.R. ----, No. 09-13412 (MG), 2009 WL 2244602 (Bankr. S.D.N.Y. July 28,
2009) ....................................................................................................................................66, 67

*In re Metzger*,
346 B.R. 806 (N.D. Cal. 2006) .................................................................................................74

*In re New York Trap Rock Corp.*,
42 F.3d 747 (2d Cir. 1994) ........................................................................................................69

*In re Ngan Gung Rest.*,
254 B.R. 566 (Bankr. S.D.N.Y. 2000) .....................................................................................66

*In re UAL Corp.*,
411 F.3d 818 (7th Cir. 2005) ....................................................................................................68

*In re Zilog, Inc.*,
450 B.R. 996 (9th Cir. 2006) ....................................................................................................68

*Lamont v. Grass*,
453 F. Supp. 608 (N.D.N.Y. 1978) ...........................................................................................74

*Lasky v. Continental Prods. Corp.*,
804 F.2d 250 (3d Cir. 1986) ......................................................................................................73

*Lawrence v. Wink*,
293 F.3d 615 (2d Cir. 2002) ......................................................................................................73

*Leber-Krebs, Inc. v. Capitol Records*,
779 F.2d 895 (2d Cir. 1985) ......................................................................................................85

*Loloee v. GMAC*,
241 B.R. 655 (9th Cir. 1999) ................................................................................................74

*Londsdorf v. Seefeldt*,
47 F.3d 893 (7th Cir. 1995) ..................................................................................................82

*Marshall v. Monroe & Sons, Inc.*,
615 F.2d 1156 (6th Cir. 1980) ..............................................................................................73

*Matter of Futuronics Corp.*,
5 B.R. 489 (S.D.N.Y. 1980).................................................................................................75

*Matter of Georgia Steel, Inc.*,
25 B.R. 790 (Bankr. M.D. Ga. 1982)....................................................................................75

*McKinney v. Boyle*,
404 F.2d 632 (9th Cir. 1968) ................................................................................................82

*Metlyn Realty Corp. v. Esmark, Inc.*,
763 F.2d 826 (7th Cir. 1985) ................................................................................................82

*Olle v. Henry & Wright Corp.*,
910 F.2d 357 (6th Cir. 1990) ................................................................................................82

*Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.)*,
596 F.2d 1092 (2d Cir. 1979)................................................................................................75

*Pearson v. First NH Mortgage Corp.*,
200 F.3d 30 (1st Cir. 1999)...................................................................................................85

*Ross v. Kirschenbaum (In re Beck Indus., Inc.)*,
605 F.2d 624 (2d Cir. 1979)..................................................................................................70

*Tew v. Ariz. State Ret. Sys.*,
69 B.R. 608 (S.D. Fla. 1987), *rev'd on other grounds*, 873 F.2d 1400 (11th Cir. 1989) ........71

*Toibb v. Radloff*,
501 U.S. 157 (1991)..............................................................................................................66

*Ty Inc. v. Softbelly's, Inc.*,
353 F.3d 528 (7th Cir. 2003) ....................................................................................83 n.67

*U.S. v. Cirami*,
563 F.2d 26 (2d Cir. 1977).........................................................................................82 n.66

*U.S. v. Int'l Bhd of Teamsters*,
247 F.3d 370 (2d Cir. 2001)..........................................................................................73, 81

*U.S. v. One (1) Douglas A-26B Aircraft,*
   662 F.2d 1372 (11th Cir. 1981) ...............................................................................................83

*Universal Oil Prods. Co. v. Root Refining Co.,*
   328 U.S. 575 (1946)...................................................................................................................85

*Whitaker v. Assoc. Credit Servs., Inc.,*
   946 F.2d 1222 (6th Cir. 1991) .................................................................................................73

**STATUTES**

11 U.S.C. § 101.....................................................................................................................................2

11 U.S.C. § 105(a) ..............................................................................................................................1

11 U.S.C. § 363.....................................................................................................................................1

11 U.S.C. § 363(n)............................................................................................................................69

11 U.S.C. § 363(b)............................................................................................................................67

11 U.S.C. § 365.....................................................................................................................................1

11 U.S.C. § 542...................................................................................................................................71

11 U.S.C. § 542(a) ..........................................................................................................6, 70, 71, 72

11 U.S.C. § 549...........................................................................................................................68, 69

11 U.S.C. § 550(a) ...........................................................................................................................69

11 U.S.C. § 559............................................................................................................6, 7, 70, 71, 84

28 U.S.C. § 157(b).............................................................................................................................9

28 U.S.C. § 1334................................................................................................................................9

28 U.S.C. § 1409................................................................................................................................9

**OTHER AUTHORITIES**

Federal Rule of Bankruptcy Procedure 2002....................................................................................1

Federal Rule of Bankruptcy Procedure 2004....................................................................................3

Federal Rule of Bankruptcy Procedure 6004....................................................................................1

Federal Rule of Bankruptcy Procedure 6006....................................................................................1

Federal Rule of Bankruptcy Procedure 9024.............................................................................1, 72

Federal Rule of Civil Procedure 60(b).................................................................... 1, 72-77, 79-84

Federal Rule of Civil Procedure 60(d).................................................................................72, 85, 86

*Moore's Federal Practice 3d*, § 60.24[1] (2009) ..............................................................................73

*Moore's Federal Practice 3d* § 60.21[4][a] (2009) .........................................................................85

*Moore's Federal Practice 3d* § 60.21[4][f] (2009) .........................................................................85

*Moore's Federal Practice* 2d ¶ 60.27[2] (1975) ......................................................................82 n.65

Lehman Brothers Holdings Inc. (the "Debtor" or "LBHI") hereby moves pursuant to Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy Procedure, for an order modifying the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order"). In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated as of September 16, 2008 ("Asset Purchase Agreement") and related agreements, modifications and purported "clarification[s]" thereof.

As described in more detail below, the Sale Order was entered on an inaccurate record due to mistake, inadvertence or misrepresentations to the Court. There were multiple factors that led to that result. At its simplest, they were: (i) the failure of certain Lehman and Barclays representatives to disclose key components of the transaction as it was originally presented to the Court on September 17, 2008; (ii) the failure to disclose critical changes in the deal that took place between September 17, 2008 and the hearing held on Friday, September 19, 2008 to approve the Sale Transaction (the "Sale Hearing"); and (iii) the failure to disclose critical changes in the deal that were made after the Court issued the Sale Order and before the transaction closed on September 22, 2008.

In particular, LBHI seeks (i) to modify the Sale Order by removing from the definition of "Purchased Assets" certain assets, which by reason of mistake, inadvertence or misrepresentation were not intended by the Court to be covered by its authorization of sale and for which Barclays paid nothing; (ii) to amend other provisions of the Sale Order as appropriate; (iii) further discovery, fact finding or hearings as necessary to assess the transaction on an accurate and complete record; and (iv) such other relief as the Court deems appropriate and just.

In addition, LBHI seeks to modify the Sale Order by (i) inserting a provision providing that, notwithstanding any finding of fact or conclusion of law presently contained therein, the Sellers and other interested parties may, in their discretion, pursue claims arising from the Sale Transaction, including, without limitation, claims for breach of contract, quasi-contract, conversion, breach of fiduciary duty claims, aiding and abetting breach of fiduciary duty, or related actions, as well as appropriate claims arising under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), including claims for unauthorized transfer of Sellers' assets, (ii) striking the Sale Order's reference to the so-called Clarification Letter, which was not before the Court, and in fact not even completed, when the Sale Order was signed, and which purported to effect substantial and material amendments to the transaction the Court had previously approved, and (iii) declaring that transfers made pursuant to amendments effected by the Clarification Letter are void and unauthorized and should be carved out of the Sale Order.

2

## PRELIMINARY STATEMENT[1]

1.      This motion arises from the sale to Barclays of Lehman assets under
circumstances that were difficult and unprecedented. LBHI does not question the procedures
followed by the Court or the need for expedition given the difficult economic circumstances in
which Lehman found itself a year ago. The Court acted appropriately based on the facts
disclosed to it at the time, but the exigent circumstances surrounding the sale led to inappropriate
consequences effected by mistake, inadvertence and/or misrepresentation. Discovery, taken
pursuant to the Court's Rule 2004 Order issued on LBHI's motion on June 25, 2009, has now
revealed that (i) material components of the transaction were not disclosed to the Court before
and at the Sale Hearing; and (ii) the transaction that purported to close on September 22, 2008
differed materially from the transaction explained to and approved by the Court at the Sale
Hearing. Throughout the week, information conveyed to the Court suggested that Barclays was
effectively paying fair value for the assets it was acquiring. Indeed, when Barclays' purported
assumption of liabilities as an integral part of the transaction was factored into the mix, all
information conveyed to the Court indicated that Barclays was providing significant value to the
Debtors' estates. The information upon which the Court was asked to rely was wrong.

2.      The fact is that the deal was actually structured to give Barclays an immediate and
enormous windfall profit. Certain Lehman executives agreed to give Barclays an undisclosed
$5 billion discount off the book value of securities transferred to Barclays, and later agreed to

---

[1] The facts set out in this motion were developed by LBHI independently and through discovery which
LBHI, LBI, the Creditors Committee and the Examiner have conducted pursuant to the Court's order entered
June 25, 2009 authorizing discovery under Bankruptcy Rule 2004. The documents and testimony cited are annexed
in an Appendix to this motion (submitted to the Court in five volumes). References to that record are annotated
herein as "A.___." Owing to the strictures of a Confidentiality Stipulation and Order upon which Barclays insisted
before it would produce any information, the publicly-filed version of this Motion has been heavily redacted, which
reflects Barclays excessive application of "Highly Confidential" and "Confidential" designations to testimony and
documents. It is LBHI's intention to engage in further discussions with Barclays to have many, if not most, of those
designations removed or, alternatively, to ask the Court to do so in the interests of transparency.

NYI-4215277v1

give billions more in so-called "additional value" that Barclays demanded, but the Court never approved. This immediate windfall to Barclays (i) was not disclosed to the boards of LBHI or LBI, (ii) was not revealed in the agreement the Court was asked to approve, and (iii) was never disclosed to the Court until now.

3.     To right the wrong that resulted, it is not necessary for the Court to undo the sale. Rather, the Court needs only to require Barclays to return to the Sellers' estates the value it took in excess of what the Sellers were entitled to convey based on the record before the Court. That will require modification of the Sale Order, including the elimination of the reference to the so-called "Clarification Letter." Never submitted to the Court for approval, the Clarification Letter purported to significantly alter the Asset Purchase Agreement.

4.     The tumultuous circumstances that led to the Sale Transaction also cannot explain away the manipulation of the numbers or the fact that everyone other than a few "negotiators" was kept in the dark about material aspects of the transaction. Whether these executives acted under mistake or inadvertence, or actually knew what they were doing, the result is the same: an undisclosed, unwarranted and inequitable loss to the Sellers' estates of many billions of dollars, and a huge financial windfall to Barclays.

5.     Evidence discovered since the Sale Transaction demonstrates that the sale was, from the beginning, based on an undisclosed distortion of the book value of the securities to be transferred to Barclays. The Asset Purchase Agreement submitted to the Court expressly stated that those securities had a "book value" of approximately $70 billion as of September 16, 2008. The actual book value was $5 billion higher. From September 16, 2008, when the Asset Purchase Agreement was signed, through September 22, 2008, when the deal closed, and notwithstanding the changes to the deal during that week, this $5 billion discount remained

4

buried within the transaction. To make matters worse, as the size of the pool of securities available for sale to Barclays diminished during the week, the notional amount of discount always remained at $5 billion. Thus, the percentage of the discount against the assets transferred grew much, much larger.

6.    By Friday, September 19th, when the Sale Hearing commenced, individuals negotiating the Sale Transaction had essentially abandoned the original structure set forth in the Asset Purchase Agreement and had, without any meaningful disclosure, decided instead to deliver securities to Barclays by simply terminating a certain executory repurchase agreement entered into between LBI and Barclays on September 18, 2008 (the "Repurchase Agreement"). It was never mentioned in any agreement or other document put before the Court that termination of the Repurchase Agreement had become the facility to transfer the securities to Barclays at a discounted price. To the contrary, the Repurchase Agreement was described to the Court only as a means of providing temporary funding so LBI could operate until the filing of its planned liquidation proceeding at the end of the week.

7.    Pursuant to the Repurchase Agreement, Barclays transferred $45 billion in cash to LBI on September 18th in exchange for approximately $50 billion of securities, subject to LBI's right and obligation to repurchase those same securities from Barclays at a later date for $45 billion. By mid-week, certain Lehman and Barclays executives decided that, rather than mark down the value of the securities on Lehman's books to fit the undisclosed discount (their original plan), the better way to deliver the discount to Barclay's would be to terminate the executory Repurchase Agreement, leaving all $50 billion of the securities in Barclays' hands. Changing the deal in this way orchestrated an exchange of $50 billion in securities for a payment

5

of only $45 billion, thus giving Barclay's the agreed upon $5 billion undisclosed discount. The following testimony of Lehman's former CFO Ian Lowitt is illustrative:

**REDACTED**

(A. 19 [Lowitt] 138:18–139:3.)

8.    The use of the Repurchase Agreement to make this gratuitous transfer of estate property to Barclays contravened the statutory requirements for terminated repo transactions under Section 559 of the Bankruptcy Code.  Right after LBI's liquidation proceeding was filed on Friday, September 19th Barclays "liquidate[d] [its] repurchase agreement[] with a debtor," as expressly contemplated by 11 U.S.C § 559, by sending a Notice of Termination of the Repurchase Agreement to LBI.  (A. 68.)  Pursuant to Section 559, upon Barclay's liquidation of the Repurchase Agreement, the "excess of the market prices" of the assets subject to the Repurchase Agreement over the "stated repurchase prices" for those same securities should have been "deemed property of the estate," 11 U.S.C. § 559, obligating Barclays to return the excess $5 billion of estate property to Sellers' estates pursuant to Section 542(a) of the Code.  Some of the Lehman and Barclays negotiators, however, attempted to make this Section 559 problem disappear after the Sale Order was entered by (i) purporting to "rescind" the Notice of Termination retroactively (as if it never had existed), (ii) changing the definition of "Purchased Assets" in the Asset Purchase Agreement to substantiate the assets subject to the Repurchase Agreement, (iii) declaring that Barclays would purportedly "have no further obligations" under the Repurchase Agreement (including "any payment or delivery obligations"), and then

NYI-4215277v1

(iv) "terminating" the Repurchase Agreement, all presumably to avoid the mandate of Section 559. They did this in two paragraphs in the Clarification Letter that was finalized and signed only after the Sale Order was entered. These major changes to the deal were never brought to the attention of the Court or the creditors.

9. The undisclosed gains for Barclays did not end with the delivery to Barclays of this $5 billion windfall. Evidence uncovered in discovery also shows that on the day the Sale Hearing was conducted, and into the weekend following issuance of the Sale Order, a scramble was going on inside Lehman to find billions more in assets to turn over to Barclays, without additional consideration and without disclosure. On the purported basis that Lehman had fallen short of what it was supposed to deliver under the Asset Purchase Agreement – which, of course, did not take the undisclosed discount into account – Barclays executives demanded even more assets. Lehman executives agreed to turn over an *additional* $5 billion in assets to Barclays. These assets consisted of approximately $800 million in so-called "15c3-3 assets" and at least $1.9 billion worth of unencumbered assets contained in so-called "clearance boxes." In addition, by inserting various clauses in the post-hearing Clarification Letter, additional assets, worth approximately $2.3 billion more, supposedly were transferred to Barclays, also without consideration, disclosure or the Court's approval.

10. Discovery also has revealed that -- from the very beginning -- the consideration Barclays was to pay in the Sale Transaction, in the form of assumed liabilities, was significantly and intentionally inflated. The Court was told that, as consideration in the Sale Transaction, Barclays would assume approximately $2 billion in 2008 bonus liabilities to Lehman employees who transferred to Barclays. The accrual upon which this assumed liability was based had, in fact, been deliberately inflated by $1 billion. And, in any event, Barclays ultimately paid no

7

more than about          in 2008 bonuses to transferred Lehman employees, allowing

Barclays to pocket the difference. (*See* A. 9 [Exall] 108:11-109:9; A. 137 (spreadsheet showing

approximately

                    Documents produced in discovery by Barclays reveal that this was its

plan all along.

11.     Similarly, the Court was told Barclays would assume liability for contract cure

payments in a range of up to $1.5 billion. This number, too, was intentionally inflated and, in

any event, Barclays actually paid only about          for contract cures.

12.     The Sale Transaction was described to the Court as an equivalent exchange of

value, or a net benefit to Lehman. Instead, because of these undisclosed and unauthorized

features of the deal, Barclays received billions more than the value it paid. Because discovery

has not been completed since LBHI first brought this issue before the Court late in June, LBHI

cannot calculate at this point the precise amount of Barclays' windfall. On the record developed

thus far, the available evidence indicates that Barclays received approximately $8.2 billion in

excess Lehman assets, between (i) at least $5 billion in excess collateral in the Repurchase

Agreement; (ii) $2.7 billion in so-called "additional value" added to the deal at Barclays'

demand while the Sale Hearing was in progress; and (iii) $2.3 billion in OCC margin deposits

added after the sale hearing ended, less (iv) the $1.738 billion in liabilities Barclays actually

assumed. The number may be even larger. According to one Barclays document, for example,

Barclays estimated ¡

                    (A. 77; *see also* A. 75 ¡

13.     Given what has now been revealed in discovery, it is not particularly surprising

that, in February 2009, Barclays announced it had enjoyed a gain of $4.2 billion "on acquisition"

8



of the Lehman assets. This immediate gain – in Barclays' own words – was attributable to "*[t]he excess of the fair value of net assets acquired over consideration paid . . . on acquisition.*" (A. 130 at 95 (emphasis added).) In fact, the available evidence suggests that this announced "gain on acquisition" was understated by over $6 billion because of various post-closing valuation adjustments that Barclays elected to make. But what is certain is that any such immediate gain for Barclays, derived from paying less than fair value was never disclosed and never approved. As one key Lehman executive put it, such a gain was ´

(A. 20 [McDade] 158:25-159:7)

14.     The foregoing is exacerbated by the fact that many of the Lehman decision-makers who "negotiated" the transaction with Barclays had at the same time been offered lucrative Barclays employment contracts conditioned on the closing of the Sale Transaction. This not only calls into serious question the arms length nature of the transaction but evidences that the circumstances surrounding the Sale Order mandate a thorough review of the record on which it was based.

15.     In sum, the evidence demonstrates that the transaction that ultimately closed was materially different from the Sale Transaction the Court approved, and the Sale Order was the product of mistake, inadvertence or, misrepresentation. The Court can, and should, revise the Sale Order to reflect the transaction that was actually disclosed at the Sale Hearing, *i.e.*, to enable the return to the Sellers' estates of the billions in extra value given to Barclays as a result of undisclosed features of the deal or post-hearing amendments to it.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

9

REDACTED

# PAGES 10-66 FILED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

# REDACTED

## ARGUMENT

## I. BARCLAYS' RECEIPT OF VALUE IN EXCESS OF WHAT THE COURT AUTHORIZED IS INCONSISTENT WITH THE BANKRUPTCY CODE AND SHOULD BE REMEDIED

127. The very underpinnings of Chapter 11, and the principal aim of the Bankruptcy

Code itself, require that both the value of the estate and return to the creditors be maximized.

*See Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (Chapter 11 "embodies the general Code policy

of maximizing the value of the bankruptcy estate"); *In re Enron Corp.*, 284 B.R. 376, 405

(Bankr. S.D.N.Y. 2002) ("one of the principal aims of the Bankruptcy Code is to maximize value

for creditors"), *abrogated by In re Enron Corp.*, 317 B.R. 629 (Bankr. S.D.N.Y. 2004.); *In re*

*Ngan Gung Rest.*, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000) ("clear purpose" of Chapter 11 is

"to maximize value for the general benefit of all creditors" (citation and quotations omitted)); *In*

*re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL 2244602, at *5 (Bankr. S.D.N.Y. July 28,

2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate.")

(citing *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992)); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 976 (N.D. Ill. 1992) ("Bankruptcy is a collective proceeding, one in which creditors divide claims while the court attempts to maximize the total value of the assets."). With having transferred estate property to Barclays that was as much as $8.2 billion, and perhaps more, above the amount disclosed to and approved by the Court, the mandate of Chapter 11 of the Code cannot be met unless that excess amount is returned to the Sellers' estates.

128. The urgency attendant to the sale to Barclays does not excuse this mandate. The Sellers, the Court and the creditors acted in what they thought was the best interests of all the stakeholders, but they were kept in the dark about the ultimate structure and true economic impact of the Sale Transaction. Acting on the information presented to them, the boards of directors of the Sellers authorized the sale, and the Court approved the sale under Section 363(b) of the Code, based on the premise that the transfer of LBI's cash and securities to Barclays was at least a "wash" – *i.e.*, that while the net value of the cash and securities to the estate was being transferred to Barclays, the loss of that value to the estate was offset by the value of the other estate liabilities that Barclays had agreed to assume (including, critically, the contract cure amounts and the accrued compensation amounts). Unbeknownst to the Sellers' directors, many of its key officers, the creditors, and the Court, however, the undisclosed discount, the inflated liabilities and the post-Sale Order changes to the structure and economics of the sale effected by the Clarification Letter actually resulted in the transfer of estate property to Barclays that exceeded the value of the liabilities assumed by Barclays by up to $8 billion, and possibly more.

67

129. Thus, while it was appropriate for the Court to find that there was a "reasonable business justification" for the immediate sale of these assets as required by the Second Circuit, *see Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009), that finding was made based on a skewed record that indicated there was an equivalent exchange of consideration when, in fact, a correct record would have shown that was not so.

130. As a result, Barclays obtained a multi-billion dollar windfall, to the overwhelming detriment of the Sellers' estates and their creditors. No justification exists in either law or equity to permit Barclays to retain the benefits of this windfall at the hands of innocent creditors. *See In re UAL Corp.*, 411 F.3d 818, 824 (7th Cir. 2005) ("If the mistake is not corrected, the cost will be borne not by its maker-United-but by creditors no less innocent than the airplanes' owners. A refusal to correct would serve no deterrent or punitive purpose; it would merely redistribute wealth among creditors capriciously."); *In re F.A. Potts & Co.*, 86 B.R. 853, 863 (Bankr. E.D. Pa. 1988) ("[I]t is of overwhelming importance that the rights of creditors in a concern in bankruptcy should be protected and that a disposal of property on terms which violate this rule should not be permitted to stand." (citation and quotation omitted)), *aff'd*, 93 B.R. 62 (E.D. Pa. 1988), *aff'd without op.*, 891 F.2d 280 (3d Cir. 1989); *see also In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006) (the burdens of error or malfeasance must be borne by those who caused it, rather than by innocent creditors who were misled thereby).

## A. Barclays Received Transfers of Estate Property that Were Not Authorized by the Sale Order or the Code and Such Property Therefore May Be Recovered Pursuant to Sections 549 and 550 of the Code

131. Section 549 of the Bankruptcy Code provides, with exceptions not relevant here, "the trustee may avoid a transfer of property of the estate -- (1) that occurs after the commencement of the case; and ... (B) that is not authorized under this title or by the court."

11 U.S.C. § 549. Section 550, in turn, permits recovery of such unauthorized transfers. In particular, that section provides, in pertinent part, that "to the extent that a transfer is avoided under section … 549 … of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]" 11 U.S.C. § 550(a). "Section 550(a)(1) groups initial transferees with 'entit[ies] for whose benefit such transfer was made' and subjects both groups to strict liability." *Christy v. Alexander & Alexander of N.Y. Inc., (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997). Thus, even good faith on the part of the recipient will not insulate it from its obligation to return the property or its value. *Id.*

132. The Sellers are authorized by Sections 549 and 550 of the Bankruptcy Code to obtain the return of the undisclosed – and thus unauthorized – transfer of more than $8 billion of value from their estates. Indeed, it is well-established, for example, that secret agreements among bidders are simply unacceptable in bankruptcy; judicial sales require open and honest disclosure. *See* 11 U.S.C. § 363(n) (providing that "if the sale price was controlled by an agreement among potential bidders at such sale," the trustee "may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated …."); *see also In re N.Y. Trap Rock Corp.*, 42 F.3d 747, 754 (2d Cir. 1994) (recognizing that secret agreements "deprive the selling debtor of full market value."); *In re Eads*, 135 B.R. 380, 387 (Bankr. E.D. Ca. 1991).

133. The same corrective action is appropriate here, where a small group of executives negotiated a sale transaction without disclosing the true market value of the assets transferred. Collusion between fiduciaries of the debtor and a prospective purchaser is certainly no less

69

offensive to the central purpose of the Bankruptcy Code than collusion among bidders.

"Bankruptcy courts do not tolerate such conduct even from those who are not fiduciaries, much less from one who is." *Ross v. Kirschenbaum (In re Beck Indus., Inc.)*, 605 F.2d 624, 363 (2d Cir. 1979) (citation omitted); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (denying approval of sale that included a "sweetheart" employment agreement that raised the specter that contract had no other effect but to subsidize the executive personally and to reduce the purchase price).

## B. The Excess Value that Barclays Retained by Terminating the Repurchase Agreement Is Property of the Sellers' Estates under Section 559 of the Code and Must Be Returned by Barclays Pursuant to Section 542 of the Code

134. Additional statutory authority to seek return of the undisclosed transfer of value from the Sellers' estates is provided by sections 559 and 542(a) of the Code. The manipulation of the Repurchase Agreement that was undertaken in the Clarification Letter after the Sale Order had already been entered was an undisclosed attempt to make an end run around Section 559's treatment of an executory repurchase agreement terminated as a result of the filing of a bankruptcy proceeding. Section 559 of the Code expressly *requires* that excess collateral on such a repo default to be returned to the debtor's estate. Section 559 allows a party that has received property in a repo from a counter-party that files while the repo is pending to keep, under a "safe harbor" provision, the principal amount of the repo. But it also requires that excess collateral (such as the $5 billion "haircut" under the Repurchase Agreement at issue here) must be returned to the debtor's estate. Section 559 states in relevant part:

> . . . In the event that a repo participant or financial participant
> liquidates one or more repurchase agreements with a debtor and
> under the terms of one or more such agreements has agreed to
> deliver assets subject to repurchase agreements to the debtor, *any*
> *excess of the market prices* received on liquidation of such assets
> (or if any such assets are not disposed of on the date of liquidation
> of such repurchase agreements, at the prices available at the time

70

> of liquidation of such repurchase agreements from a generally
> recognized source or the most recent closing bid quotation from
> such a source) *over the sum of the stated repurchase prices and
> all expenses in connection with the liquidation of such
> repurchase agreements shall be deemed property of the estate,
> subject to the available rights of setoff."*

11 U.S.C. § 559 (emphasis added).

135.   In short, Section 559 prohibits the non-debtor counterparty from pocketing the
excess collateral when the debtor commences a bankruptcy proceeding.

136.   Here, right after LBI's liquidation proceeding was filed on Friday, September
19th, Barclays "liquidate[d] [its] repurchase agreement[] with a debtor," as expressly
contemplated by 11 U.S.C § 559, by sending a Notice of Termination of the Repurchase
Agreement to LBI. (A. 68.) Pursuant to Section 559, upon Barclay's liquidation of the
Repurchase Agreement, the "excess of the market prices" of the assets subject to the Repurchase
Agreement over the "stated repurchase prices" for those same securities "shall be deemed
property of the estate," 11 U.S.C. §559, which thereby obligated Barclays to return this excess
$5 billion of estate property to LBI's estate pursuant to section 542(a) of the Code. *See Tew v.
Ariz. State Ret. Sys.*, 69 B.R. 608, 609 (S.D. Fla. 1987) (Sections 542 and 559 require turnover of
excess repo collateral), *rev'd on other grounds*, 873 F.2d 1400 (11th Cir. 1989).

137.   While some of the Lehman and Barclays negotiators apparently attempted to
circumvent these statutory requirements by purporting to "rescind" the Notice of Termination
retroactively and instead simply declaring in the post-Sale Order Clarification Letter that
Barclays shall "have no further obligations" under the Repurchase Agreement (including "any
payment or delivery obligations"), their efforts were never disclosed to or authorized by the
Court. As a result, the "excess value" of the assets that are the subject of the Repurchase
Agreement – value that is at least $5 billion and may be even higher – remains "property of the

71

estate" of the Sellers pursuant to Section 559, and that property must be returned by Barclays to the Sellers' estates pursuant to Section 542(a) of the Code.

## C. To the Extent the Undisclosed Transfers of Estate Property Effected by the Clarification Letter Are Deemed Authorized by the Sale Order, the Sellers Are Entitled To Relief from the Sale Order under Bankruptcy Rule 9024 and Rule 60(b) of the Federal Rules of Civil Procedure

138. The undisclosed transfer of more than $8 billion of value from the Sellers' estates was accomplished in the case by material changes made to the Clarification Letter after the Sale Order was entered by this Court. To the extent these changes accomplished by the Clarification Letter are deemed to have been authorized (unknowingly and in advance) by the Sale Order entered by the Court, then the Sellers are entitled to relief from the Sale Order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, which is made applicable by Bankruptcy Rule 9024.

139. Federal Rule of Civil Procedure 60(b) sets out the grounds upon which a party can seek relief from a final judgment or order, including:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . .
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).[65] Rule 60(d) also provides that the Rule does not limit the Court's power to entertain an independent action for relief from an order or to set aside a judgment for fraud on the court. Fed. R. Civ. P. 60(d).

---

[65] Federal Rule of Bankruptcy Procedure 9024 states that Rule 60 applies in proceedings under the Bankruptcy Code, except for in limited circumstances not applicable here. Fed. R. Bankr. P. 9024.

72

140. To secure relief under Rule 60, the movant need not prove its entire case in the motion. It must show only that it satisfies one of the above criteria and that it has a meritorious claim or defense. *See* James W. Moore, *Moore's Federal Practice* § 60.24[1] (3d ed. 2009) (citing *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983) and other cases). This "does not mean that the moving party must show that he or she is likely to prevail"; the movant "must make allegations that, if *established at trial*, would constitute a valid claim or defense." *Id.* § 60.24[2] (citations omitted).

141. Whether or not to grant relief under Rule 60 is left to the sound discretion of the court. *See, e.g., Lasky v. Cont'l Prods. Corp.*, 804 F.2d 250, 256 (3d Cir. 1986); *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1160 (6th Cir. 1980). In exercising its discretion, the Court may consider applicable principles of equity. *See Whitaker v. Assoc. Credit Servs., Inc.*, 946 F.2d 1222, 1224 (6th Cir. 1991). Under Rule 60, a court can fashion the relief it deems proper, including (i) ordering further discovery, *see, e.g., Hadden v. Rumsey Prods., Inc.*, 196 F.2d 92, 96 (2d Cir. 1952) (remanding for further discovery in response to Rule 60 motion); (ii) requiring further briefing and hearings, *see, e.g., U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 379 (2d Cir. 2001) (referring Rule 60 motion to Independent Review Board which required further briefing); (iii) referring the dispute to an evidentiary or adversary proceeding, *see, e.g., Lawrence v. Wink (In re Lawrence)*, 293 F.3d 615, 618-19 (2d Cir. 2002) (adversary proceeding initiated to adjudicate ownership of shares in dispute); *In re BCD Corp.*, 119 F.3d 852, 855 (10th Cir. 1997) (affirming bankruptcy court's grant of Rule 60 relief after four-day hearing); and (iv) sequestering assets for later use in satisfying the modified judgment or order. *See, e.g., Lawrence*, 293 F.3d at 618-19 (bankruptcy court amended sale order to impound proceeds of sale pending proceedings to determine ownership).

NYI-4215277v1

142. The flexibility provided by Rule 60 is particularly germane in cases like this, where a bankruptcy court is asked to modify its own sale order. *See, e.g., In re Emergency Beacon Corp.*, 666 F.2d 754, 761 (2d Cir. 1981) (vacating a portion of order under Rule 60(b)(6)); *GMAC Mortgage Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655, 663 (B.A.P. 9th Cir. 1999) (where sale was not subject to reversal, suggesting damages award to compensate movant); *Owens-Corning Fiberglass Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.)*, 795 F.2d 1440, 1451 (9th Cir. 1985) (holding that voiding the bankruptcy court's order did not require that movant "be placed in the precise position it would have occupied" had the court never approved the order, and suggesting that bankruptcy court grant movant superpriority interest as an alternate remedy); *Doolittle v. County of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (voiding part of sale order and stating "[t]he Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts"); *In re Lundy*, 110 B.R. 300, 304 (N.D. Ohio 1990) (granting relief under Rule 60 from selected portions of bankruptcy court's order). In other cases, courts have vacated bankruptcy court sale orders in their entirety. *See Taylor v. Lake (In re CADA Invs., Inc.)*, 664 F.2d 1158, 1163 (9th Cir. 1981); *Golfland Entm't Ctrs., Inc. v. Peak Inv., Inc. (In re BCD Corp.)*, 119 F.3d 852, 862 (10th Cir. 1997); *In re Lintz W. Side Lumber, Inc.*, 655 F.2d 786, 792 (7th Cir. 1981); *Lamont v. Grass (In re Lamont)*, 453 F. Supp. 608, 609-10 (N.D.N.Y. 1978), *aff'd*, 603 F.2d 213 (2d Cir. 1979).

143. Here, if the undisclosed transfers to Barclays are deemed to have been authorized by the Sale Order, relief under Rule 60(b) is appropriate to obtain from Barclays the return of the undisclosed transfers. *See Road Runner Freight Sys., Inc. v. Am. Freight Sys., Inc. (In re Am. Freight Sys., Inc.)*, 126 B.R. 800, 805 n.2 (D. Kan. 1991) (noting "the purpose of the finality rule

74

is to obtain the highest price for the debtor's assets, for the benefit of the debtor's estate and ultimately, the creditors" and cautioning against strict adherence to the finality rule where it would "require a result contrary to the rule's underlying purpose of achieving the highest possible price."). *See also Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1101 (2d Cir. 1979) (holding that "[t]he test is whether, upon granting the motion to reconsider, the court will be able to reestablish the rights of the opposing party as they stood when the original judgment was rendered"); *Georgia Steel, Inc. v. Citizens and S. Nat'l Bank (In re Georgia Steel, Inc.)*, 25 B.R. 790, 794 (Bankr. M.D. Ga. 1982) (adopting *Texlon* test); *In re Futuronics Corp.*, 5 B.R. 489, 498 (S.D.N.Y. 1980) (adopting *Texlon* test).

144. As detailed below, to the extent the Sale Order is deemed to have authorized the undisclosed transfers, the Sellers are entitled to relief under four of the subsections of Rule 60(b).

## II.   LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT

145. To provide relief, the Court need not reach the issue of whether the failure to make disclosures to the Court was intentional, because Rule 60(b)(1) allows for relief from orders on the grounds of mistake, inadvertence, surprise or excusable neglect. Thus, for example, if in the tumult of the week of September 15, 2008, the reason the news of the $5 billion discount or the inflated liabilities did not reach lawyers drafting the Asset Purchase Agreement was miscommunication, and not by design, relief is still warranted because these critical facts still were not disclosed to the Court. The Advisory Committee Notes to Rule 60 make clear that this provision was amended to allow for relief based on "the mistake or neglect of others," and not just the mistakes or neglect of the party seeking relief. Fed. R. Civ. P. 60(b) Advisory Committee Notes; *see also Moore's Federal Practice* § 60.41[3]. Even a mistake by the Court is a basis for relief under Rule 60(b)(1). *See In re 310 Assocs.*, 346 F.3d 31, 34-35 (2d

Cir. 2003) (bankruptcy court has authority under Rule 60(b)(1) to set aside its order approving payment of breakup fee to potential purchasers).

146.   Considering this Motion under either the mistake, inadvertence or the excusable neglect provisions of the Rule all lead to the same conclusion. There are ample grounds for modifying the Sale Order and fashioning relief to correct the undisclosed and unauthorized transfer of billions of dollars in assets to Barclays at the expense of the Sellers' estates and their creditors, or at least to conduct further examination of these issues.

## A.   Barclays Received An Undisclosed Multi-Billion Dollar Discount On Its Purchase Price

147.   The combined effect of the undisclosed discount, inflated liabilities, Repurchase Agreement, the September 19-21 additions of value for Barclays, and Clarification Letter was an attempt to transfer to Barclays, at no additional cost, an undisclosed value of up to $10 billion. This was never explained to the Court either in the Asset Purchase Agreement or during the Sale Hearing. It was not even explained after the parties filed the Clarification Letter on September 22, 2008 or during the December 2008 proceedings concerning the Settlement Agreement. Whether this failure to disclose was an accident caused by the rush of events during the week of September 15, or was intentional, the Sale Order requires modification to the extent it approved of the Barclays windfall based on mistake, inadvertence or excusable neglect.

148.   As but one example, the Sale Order's reference to the "Clarification Letter" has no basis in the record developed at the Sale Hearing. The Clarification Letter -- which effected major amendments to the Sale Transaction -- was not shown or explained to the Court. It could not have been shown or explained to the Court; it was not completed when the Sale Order was entered and even the drafts in existence during the Sale Hearing were changed substantially over the following weekend to make further material changes in the transaction.

76

149. Similarly, as explained to the Court throughout the week, the Sale Transaction was portrayed, at the least, as a "wash" transaction whereby Barclays was to acquire Lehman's broker-dealer assets for an equivalent amount in cash and assumed liabilities. But, the undisclosed discount and inflated liabilities -- which remained at the core of the deal even as it changed over the week -- skewed this balance in Barclays favor at every step. This multi-billion dollar benefit to Barclays was never revealed to the Court, interested parties or, for that matter, to potential competing bidders for Lehman's assets. Again, whether by mistake or by design, this was a material omission warranting relief under file 60(b).

150. Given the huge disparity between the value the Court ascribed to the transaction and the value the Estate ended up receiving after giving effect to the post-approval changes described in detail above Rule 60 relief is still appropriate here. That disparity, in the aggregate, approached at least $8.2 billion (after taking account of the liabilities Barclays actually did assume) and represents an unjustified windfall for Barclays. This is particularly so given the fact that, at each stage, the deal was described as an equivalent exchange of value with no embedded, immediate gain built in for Barclays.

## B. Barclays Failed To Pay To Former Lehman Employees All The Bonuses It Contracted To Pay Under The Asset Purchase Agreement

151. One of the key assumptions upon which the Court relied in approving the Sale Transaction and issuing the Sale Order was the assurance, embodied in the express terms of the Asset Purchase Agreement, that Barclays would pay, in the aggregate, $2 billion in bonuses to former-Lehman employees who transferred to Barclays. Paragraph 9.1(c) of the Asset Purchase Agreement states expressly that Barclays

> *shall* ... pay each Transferred Employee an annual bonus (the "08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive

77

compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability"). *Such 08 Annual Bonuses shall be awarded ... so that the aggregate amount awarded shall equal the Accrued 08 FY Liability.*

(A. 30 § 9.1(c) (emphasis added).)

152.	The 9/16/08 Financial Schedule, to which the Asset Purchase Agreement expressly refers, shows the "Accrued '08 FY Liability" to have been $2.0 billion. (A. 31.) As shown above, however, that Assumed Liability was inflated from the start and, in fact, Barclays has not paid that full amount, and there is significant evidence indicating it never intended to do so. (*See supra* ¶¶ 59-64.)

153.	At the Sale Hearing, however, the Court was told several times that Barclays would assume this $2.0 billion in liabilities. (A. 150 [Docket No. 318], 9/19/08 Tr. at 100:22-25; *id.* at 101:1-4; *see* A. 149 [Docket No. 352], 9/17/08 Tr. at 23:5-24:8), and the Court took that number into account, in full, to assess the Sale Transaction. In particular, in evaluating the breakup fee requested by Barclays, and so the Court could calculate the full value of the deal, the Court was told that "there will be an exposure for 2.5 billion dollars in connection with the retention of these 10 to 12,000 employees." (*Id.* at 23:23-25; *see also id.* at 36:9-14 (ascribing approximately $5.7 billion value to the proposed transaction)) Even after the deal changed (purportedly warranting the Clarification Letter), the Court was told that "Barclays is also agreeing to the same employee compensation arrangements." (A. 150 [Docket No. 318], 9/19/08 Tr. at 48:13-14; *see also id.* at 100:22-25.)

154.	While Barclays' failure to pay a full $2 billion in bonuses as required under the Asset Purchase Agreement constitutes a breach of contract (and LBHI reserves its right to bring such claim against Barclays), it also provides ample basis for the Court to modify its Sale Order

78

under Rule 60(b)(1). Putting aside how this failure to pay came about and whether the $2 billion figure was reasonable or derived in good faith, and without regard to whether any of the parties had nefarious intent, the simple fact is that this "accrued liability" was overstated.

the accrual was deliberately increased by $1 billion, as an "agreed" number. Without knowledge of this inflation, however, the Court noted that Barclays' assumption of this amount of liability was an integral part of the consideration Lehman was to receive. And the Court relied on this assumption of this liability in assessing the overall value of the deal to the Estate.

## C. Barclays Did Not Assume $1.5 Billion In Contract Cure Liabilities As Presented To The Court

155. During the hearings leading up to the issuance of the Sale Order, the Court was also informed that Barclays would be assuming contract cure liabilities in an amount estimated at up to $1.5 billion. (*See* A.149 [Docket No. 352], 9/17/08 Tr. at 24:1-5, 36:9-12; A. 150 [Docket No. 318], 9/19/08 Tr. at 101:1-4, 48:11-14) The financial schedule upon which the Asset Purchase Agreement was premised placed LBHI's total liabilities for such "cure" amounts even higher, at $2.25 billion.

156. While it was disclosed that the $1.5 billion figure presented to the Court for contract cure liabilities was an estimate (A. 149 [Docket No. 352], 9/17/08 Tr. at 24:1-5; A. 150 [Docket No. 318], 9/19/08 Tr. at 101:1-4), it was not disclosed that this purported estimate was not even close to the mark, and, like the compensation item, had been deliberately written up. The Court also considered this estimate, in full, in assessing the overall value of the proposed transaction to the Estate.

157. At no time, however, was the Court informed (either prior to issuing the Sale Order, in any later proceedings, or in connection with the follow-on procedures whereby

**REDACTED**

Barclays designated contracts it was to assume) that Barclays was only going to pay approximately \$238 million in contract cure liabilities. (*See supra* ¶¶ 65-68.) At no time was the Court informed that the \$1.5 billion estimate originally presented to the Court was off by some

, or that the actual figure for Barclays assumed cure liabilities was less than of the parties' estimate. But that is in fact the case. Barclays has paid only for contract cures, demonstrating that the estimate of cure liability upon which the deal was based was wildly exaggerated.

158.    Thus, the \$1.5 billion estimate for contract cures was, at best, a large mistake. Whether the mistake was made in deriving the figure, or in how it was presented to the Court, or even in the Court's reliance on it, does not matter for this purpose. The fact is, it was a mistake in an amount that was material to the transaction. And the end result of this mistake was that (i) the Court was given an inflated view of the value of the proposed Sale Transaction to the Estate (*i.e.,* expecting that the Estate would be relieved of liabilities of this magnitude) at the time it issued the Sale Order, and (ii) the Estate ended up bearing the liability for the contract cure amounts not assumed by Barclays derived from some . in total, pre-filing, dollars. This changed the consideration Barclays was expected to pay under the Sale Transaction and, at the very least, the Court's estimate of the value of that transaction.

## III.    LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO NEWLY DISCOVERED EVIDENCE THAT COULD NOT HAVE BEEN UNCOVERED BEFORE THE SALE ORDER'S ENTRY

159.    To warrant relief under Rule 60(b)(2), based on newly discovered evidence, the movant must demonstrate:

> (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it



> probably would have changed the outcome, and (4) the evidence
> must not be merely cumulative or impeaching.

*U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

160. The test is easily satisfied in this case. As described above, the Sale Transaction was negotiated, approved and closed within a very short period of time. The only people informed about the specifics of the proposed transactions were employees of Barclays and a limited set Lehman employees, many whom have now transferred to and secured lucrative employment with Barclays as a result of the transaction. The disclosures made to the Court failed to disclose the key issues on which this motion is premised – *i.e.*, the discount, the inflated liabilities, the use of the Repurchase Agreement as a conduit, the "additional value" collected on September 19 and Barclays' failure to pay $2 billion in bonuses to former Lehman employees.

161. Especially because counsel was never informed of the discount and inflated liabilities that skewed the deal from the start, these facts could not have been discovered at the time the Sale Order was issued. There was insufficient time to examine these questions thoroughly and properly evaluate the amounts of the liabilities in question or the value of the securities and other assets involved in the Repurchase Agreement, the Clarification Letter and Settlement Agreement. The Debtor acted with due diligence at the time (to the extent that was even possible under the time constraints and financial circumstances at the time), and has acted with due diligence since then in investigating potential assets and claims belonging to the Sellers' estates. The facts presented above are not merely cumulative. Rather, they were material and likely would have changed the Court's and the parties' assessment of the value of the Sale Transaction had they been known to all concerned and presented at the hearings leading to the Sale Order. For these reasons, the requested relief is also warranted under Rule 60(b)(2).

81

## IV. LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO MISREPRESENTATION (WHETHER INNOCENT OR INTENTIONAL)

162. The relief requested is also authorized by Rules 60(b)(3), which addresses, among other things, misrepresentations, whether innocent or intentional. Rule 60(b)(3) allows for relief from orders based on the fraud, misrepresentation or misconduct of an adverse party. Fed. R. Civ. P. 60(b)(3). Courts have held that Rule 60(b)(6) can provide similar relief when the fraud, misrepresentation or misconduct is that of someone other than an adverse party. *See, e.g., Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 832-33 (7th Cir. 1985) ("Unless the false testimony can be traced to the adverse party, the case must be decided under the residual category of Rule 60(b)(6)") (Easterbrook, C.J.); *McKinney v. Boyle*, 404 F.2d 632, 634 (9th Cir. 1968) (Rule 60 motion based on alleged fraud by one's own counsel was brought under section (b)(6) of the rule); *see also Olle v. Henry & Wright Corp.*, 910 F.2d 357, 364-66 (6th Cir. 1990) (challenge to bankruptcy court's sale order under Rule 60(b)(6) can be brought if no other section of Rule 60(b) is applicable). Indeed, the Court's discretion "is especially broad under subdivision (6), because relief under it is is to be granted when 'appropriate to accomplish justice.'" *In re Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981) (affirming bankruptcy court's Rule 60 modification of its order).[66]

163. Unlike for claims of fraud, misrepresentations or misconduct under Rule 60(b) can include *unintentional* acts, not just misrepresentations or omissions prompted by scienter or an intent to defraud. *See Londsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995) ("[Rule] 60(b)(3) applies to both intentional and unintentional misrepresentations"); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988) ("'Misconduct' [under Rule 60(b)(3)] does not demand

---

[66] As the Second Circuit recognized, "[c]lause (6) ... has been described by Professor Moore as 'a grand reservoir of equitable power to do justice in a particular case when the relief is not warranted by the preceding clauses,' 7 *Moore's Federal Practice* ¶ 60.27(2), at 375 (2d ed. rev. 1975), which, in a proper case, is to be 'liberally applied.' *Id.* at 352." *U.S. v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977).

proof of nefarious intent or purpose as a prerequisite to redress. . . . The term can cover even accidental omissions"); *U.S. v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372, 1375 n.6 (11th Cir. 1981) ("Were the term 'misrepresentation' as used in Rule 60(b)(3) interpreted to encompass only false statements made with an intention to deceive, the behavior described by that word would be wholly subsumed within the category of behavior that the same subsection of the rule refers to as 'fraud.'").[67]

164. The scope and effect of such misrepresentations and omissions, whether or not they were intentional, goes to basic aspects of the Sale Transaction. For example, in this case to effect the proposed sale, the parties drafted the Asset Purchase Agreement, which misdescribed the "Long Positions" as stating "book value" on September 16 and also used the 9/16/08 Financial Schedule upon which it is based. (*See supra* ¶¶ 53-58.) The 9/16/08 Financial Schedule misrepresented the "Long Position" as if it showed book value when, in fact, it was marked down to include -- but not to show -- the $5 billion discount. The 9/16/08 Financial Schedule also included compensation and contract cure liabilities of $2.0 billion and $2.25 billion, respectively, both inflated. (*See supra* ¶¶ 59-68.) These misrepresentations made their way into the Asset Purchase Agreement submitted to the Court and interested parties, who relied upon them, both in approving the proposed transaction and in forming objections or, perhaps, deciding not to object when they otherwise would have done so. The Asset Purchase Agreement includes both of these categories of misstatements.

165. In addition, neither the Court nor the parties in interest to the Sellers' proceedings were ever told of the effects of the Clarification Letter and Repurchase Agreement. Among other things, the Court was not told that:

---

[67] See *also Ty Inc. v. Softbelly's, Inc.*, 353 F.3d 528, 536 (7th Cir. 2003) (misconduct not involving deceit is covered by Rule 60(b)(3)); *Bros Inc. v. W.E. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir. 1965).

- The parties intended all along for Barclays to acquire Lehman assets at a negotiated price $5 billion less than their book value (*see supra* ¶¶ 53-58);

- The liabilities Barclays was to assume under the Asset Purchase Agreement had been inflated (*see supra* ¶¶ 59-68);

- The value of the collateral Lehman posted to secure the Repurchase Agreement exceeded the value of the funds Barclays had advanced thereunder by at least $5 billion and the Repurchase Agreement was used to replace the Asset Purchase Agreement as a vehicle to give the $5 billion discount to Barclays (*see* pp. *supra* ¶¶ 95-104);

- The Clarification Letter, which was filed after the closing of the Sale Transaction and after issuance of the Sale Order, purported to make material changes to the definitions of Purchase Assets and Assumed Liabilities and provided substantial amounts of additional assets to Barclays (*see supra* ¶¶ 118-122);

- The post-approval changes made to the Sale Transaction in the Clarification Letter allowed Barclays to avoid having to face the strictures of section 559 of the Bankruptcy Code with respect to the extra collateral Lehman had posted under the Repurchase Agreement, wrongfully giving that collateral to Barclays, rather than returning it to Sellers estate (*see supra* ¶¶ 134-37).

166. Each of these items was material to the issues before the Court at the time the Sale order was issued and should have been subject to judicial scrutiny as well as the scrutiny of creditors. These issues went to the very heart of the proposed Sale Transaction.

## V.  LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER AND FURTHER DISCOVERY DUE TO POTENTIAL OCCURRENCE OF MISCONDUCT OR FRAUD

167. If it were to determine that there was neither mistaken nor innocent misrepresentation, the Court still has grounds under Rule 60 to issue relief, pursuant to Rule 60(b)(3) based on fraud. As an independent basis for this application for relief from the Sale Order, Rule 60(d) also allows a movant to seek relief from an order or judgment where there has been a "fraud on the court." Fed. R. Civ. P. 60(d). In this regard, fraud on the court can be defined as including "egregious conduct involving a corruption of the judicial process itself." C.

84

Wright, A. Miller & M. Kane, 11 *Federal Practice and Procedure* § 2870 (2d ed. 2009) (citation omitted); *see Moore's Federal Practice* § 60.21[4][a] ("Fraud on the court must involve more than injury to a single litigant; it is limited to fraud that 'seriously' affects the integrity of the normal process of adjudication.") (citation omitted). Fraud on the court is not limited to situations in which a party commits fraud, nor does a party have to benefit from the fraud to have it qualify as fraud on the court. *Moore's Federal Practice* § 60.12[4][e].

168. Evidence developed in discovery could support a finding that there was a deliberate plan to hide the discount and the inflated liabilities, and to add additional value for Barclays without disclosure and after the Hearing. However, whether there has been a fraud on the court should be decided based on a full record in an adversary proceeding, after full discovery. *See Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). *See Moore's Federal Practice* § 60.21[4][f]. For present purposes, it is enough that a Rule 60 movant need only make a "colorable" showing of fraud to warrant the court's permitting further discovery and evidentiary proceedings. *See Pearson v. First NH Mortgage Corp.*, 200 F.3d 30, 35 (1st Cir. 1999). And the Court has great flexibility in fashioning the relief it deems appropriate to correct the fraud perpetrated against the court. *See Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 900 (2d Cir. 1985) ("In tracing the development of a court's equity power to combat fraud in the enforcement of judgments, the Supreme Court [in *Hazel-Atlas*] recognized that the relief devised may '[take] several forms: [including] setting aside a judgment to permit a new trial, altering the terms of a judgment, or restraining the beneficiaries of a judgment from taking any benefit whatever from it.'").

169. In this case, the facts readily would support a "colorable" claim of fraud. Evidence exists from which the Court could conclude that the discount for Barclays, the inflated

liabilities, and material undisclosed changes in the deal, all were affirmatively hidden from the Court by self-interested Lehman executives who elevated their employment prospects at Barclays over Lehman's interests.

170.  If there were a fraud, the Court's ability to administer the estate fairly, and to protect the interests of the estate and its creditors, was corrupted by it being kept in the dark about crucial aspects of the Sale Transaction. The failure to make critical disclosures in this case prevented the Court from properly protecting the interests of creditors and the Sellers' estates as the transaction ended up providing a huge windfall to Barclays, about which, without disclosure, no one could have been aware. Leaving this in Barclays' hands would constitute a grave inequity by rewarding a subterfuge at the expense of others who relied on the Court to look out for their interests. Relief would therefore be appropriate, in a form and amount to be determined after full discovery and an evidentiary hearing under Rule 60(d).

NYI-4215277v1

## CONCLUSION

171. For the foregoing reasons, LBHI respectfully requests that the Court issue an

order modifying the Sale Order as indicated herein (*see* pp. 1-2, *supra*) and granting such other

relief as the Court deems just and proper.

Dated: September 15, 2009
New York, New York

Respectfully submitted,

/s/ Robert W. Gaffey

Robert W. Gaffey
Jayant W. Tambe
William J. Hine
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939

ATTORNEYS FOR DEBTOR AND DEBTOR
IN POSSESSION