# A. 31

9/16/08 Fam

BR

## ASSETS

| | |
|---|---|
| Gov & Ag | $40 0 |
| Commercial Paper | 1 1 |
| Mortgages | 2 7 |
| Total Corp Debt | 4 9 |
| Corp Equity | 8 8 |
| Derivatives | 4 5 |
| Cash | 0 7 |
| Total | $62.7 |
| Collateralized ST Agr | 10 0 |
| Receivables | 0 0 |
| Other Assets | 0 0 |
| Inv In Con Subs | 0 0 |
| Due From Subs | 0 0 |
| Total | 10.0 |
| Adj. Total Assets | $72.65 |

## LIABILITIES

| | |
|---|---|
| ST Borrowings | $0 0 |
| Gov & Ag | 21 0 |
| Commercial Paper | 0 0 |
| Mortgages | 0 0 |
| Corp Debt | 2 1 |
| Corp Equities | 6 3 |
| Derivatives | 4 5 |
| Total | $33.9 |
| Collateralized ST Fund | 34 5 |
| Payables | 0 0 |
| Deposits | 0 0 |
| Due To Subs | 0 0 |
| Sub Notes | 0 0 |
| Total | 34.5 |
| Total | 68.4 |
| Cure pmt | 2 25 |
| Comp | 2 0 |
| Total | $72.65 |


EXHIBIT

CONFIDENTIAL

# A. 32

**BARCLAYS CAPITAL INC.**

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

1.  Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

(i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

(ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A *previously delivered by Seller and accepted by Purchaser*, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1



elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

(iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

(v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

(c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter). Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)     Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)     Seller hereby represents and warrants to Purchaser that LB I Group Inc. has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no indebtedness.

2.     IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.     Assumed and Excluded Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.     Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue, the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

     5.    <u>License</u>. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

     6.    <u>Subordinated Notes of LBI</u>. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

     7.    <u>Breakup Fee</u>. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

     8.    <u>Transfer of Customer Accounts</u>. All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value. Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

     9.    <u>Deletion of Purchase Price Adjustment Provisions</u>. Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

     10.    <u>Payables, Deposits and Receivables</u>. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

     11.    <u>Intercompany Obligations</u>. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.    Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

5

(b)     With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good
faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that any such purchaser
entering into the sublease agreement as a subtenant shall be reasonably acceptable to the
Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and
the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to the
demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)     If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.     Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.     745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.     Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.     Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    <u>Definition of Excluded Contract.</u>  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    <u>PIM Business Leases.</u>

(a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "<u>PIM Leases</u>").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

(b)  Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "<u>New York Property</u>"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "<u>NY Sublease Premises</u>"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

23.    <u>No Overseas Assets.</u>  Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold.  Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

       The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _Gerard A. Bicci_

Name: Gerard S. LaRocca

Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name:  Anson B. Frelinghuysen
Title:  as Counsel for James W. Giddens,
        Trustee for the SIPA Liquidation
        of Lehman Brothers Inc.

LB 745 LLC


By: _____
Name:
Title:


*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

SEP-20-2008  19:48                                              P.04/05
Sep-20-08 06:41P                        516 365 0150            P.04
SEP-20-2008  18:39

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC

By: _Wel Wan_
Name: _Mark Marcucci_
Title: _President_


[SIGNATURE PAGE TO CLARIFICATION LETTER]

# Schedule 1(a) – Excluded Real Estate Assets

**New York**
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

**New Jersey**
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

**Branches**
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

**South America Branches**
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc

Schedule I(b) - Included Real Estate Assets



SCHEDULE 1(C)

PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | Monarch Centre Associates, LLC |
| 2. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 3. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 4. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 5. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 6. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 7. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| 8. | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |

# A. 33

 **THE BOND MARKET TRADE ASSOCIATION**

# MASTER
# REPURCHASE AGREEMENT
### SEPTEMBER 1996 VERSION

Dated as of    July 23,1998

Between:

Lehman Brothers Inc.

and    Barclays Capital Inc.

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;



EXHIBIT
Coghlan
117
KK 8/13/09

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360-day-per-year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in *The Wall Street Journal* (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including any CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such

3

cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or a Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or a Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5.  Income Payments·

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6.  Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7.  Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and

such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

---

*Language to be used under 17 C.F.R. §403.4(e) if Seller is a government securities broker or dealer other than a financial institution.

**Language to be used under 17 C.F.R. §403.5(d) if Seller is a financial institution.

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; *provided, however*, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and per-

5

formance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in sub-paragraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

   (i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

   (ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in subparagraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full

by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i)  The nondefaulting party shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a)  The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b)  Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

### 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

### 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

### 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation",

9

respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a)  in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b)  in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c)  in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

Lehman Brothers Inc.                    Barclays Capital Inc.

[Name of Party]                         [Name of Party]

By:_____             By:_____
                                            Kenneth Sklover

Title:  Robert E. Guglielmo            Title: Assistant Secretary, Barclays Capital Inc.

Date:  Senior Vice President  7/23/98   Date:  AUG 10 1998

## ANNEX I
### Supplemental Terms and Conditions

This Annex forms a part of the Master Repurchase Agreement dated as of **July 23, 1998** (the "Agreement") between **Lehman Brothers Inc. and Barclays Capital Inc..** Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.  This Annex I and Annex II shall be executed by the parties hereto to the extent applicable, and shall also form a part of the Agreement.

2.  Definitions. For purposes of the Agreement, the following terms shall have the following meanings:
    "Margin Notice Deadline", 10:00 am New York City time.
    "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

3.  Inconsistency. In the event of any inconsistency between the terms of the Agreement and this Annex, this Annex shall govern.

4.  Distributions. Income payments on the Securities subject to Transactions under the Agreement shall be treated as specified in Paragraph 5(i).

5.  Submission to Jurisdiction and Waiver of Immunity.
    (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.
    (b)  To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

6.  Substitution
    The following two subparagraphs shall be added to Paragraph 9 of the Agreement:

    "(c) In the case of any Transaction for which the Repurchase Date is other than the business day immediately following the Purchase Date and with respect to which Seller does not have any existing right to substitute substantially the same Securities for the Purchased Securities, Seller shall have the right, subject to the proviso to this sentence, upon notice to Buyer, which notice shall be given at or prior to 10 am (New York time) on such business day, to substitute substantially the same Securities for any Purchased Securities, *provided, however,* that Buyer may elect, by the close of business on the business day notice is received, or by the close of the next business day if notice is given after 10 am (New York time) on such day, not to accept such substitution. In the event such substitution is accepted by Buyer, such substitution shall be made by Seller's transfer to Buyer of such other Securities and Buyer's transfer to Seller of such Purchased Securities, and after substitution, the substituted Securities shall be deemed to be Purchased Securities. In the event Buyer elects not to accept such substitution, Buyer shall offer Seller the right to terminate the Transaction.

(d) In the event Seller exercises its right to substitute or terminate under sub-paragraph (c), Seller shall be obligated to pay to Buyer, by the close of the business day of such substitution or termination, as the case may be, an amount equal to (A) Buyer's actual cost (including all fees, expenses and commissions) of (i) entering into replacement transactions; (ii) entering into or terminating hedge transactions; and/or (iii) terminating transactions or substituting securities in like transactions with third parties in connection with or as a result of such substitution or termination, *and* (B) to the extent Buyer determines not to enter into replacement transactions, the loss incurred by Buyer directly arising or resulting from such substitution or termination.  The foregoing amounts shall be solely determined and calculated by Buyer in good faith."

## ANNEX II

Names and Addresses for Communications between Parties

### For all legal notices under this Agreement:

Barclays Capital Inc.
Customer Documentation Unit
222 Broadway
New York, NY 10038
Immediate Attention: Cheryl A. Grassmann

### With a copy to:

Barclays Capital Inc.
Legal Department
222 Broadway
New York, NY 10038
Immediate Attention: General Counsel

### For operational questions or problems:

Mr. Keith McDonald
Barclays Capital Inc.
222 Broadway
New York, NY 10038
Telephone:  (212) 412-6831
Fax:        (212) 412-1867

Lehman Brothers
Three World Financial Center, 12th Floor
New York, NY 10285-1200
Attn:  Robert H. Bing
Central Funding
Telephone:  (212) 526-8634
Fax:        (212) 528-6678