# A. 34

**Unknown**

Sent: Sunday, May 17, 2009 12:46 AM

| | |
|---|---|
| **From:** | Aprigliano, Sindy <Sindy.Liu@LEHMAN.COM> |
| **Sent:** | Monday, September 15, 2008 3:05 PM (GMT) |
| **To:** | Tonucci, Paolo <paolo.tonucci@lehman.com>; Azerad, Robert <RAzerad@lehman.com> |
| **Cc:** | Veksler, Irina <irina.veksler@lehman.com> |
| **Subject:** | PDCF Haircuts |
| **Attach:** | ole0.bmp |

Paolo,

The estimated impact is approx.. $4bn - this is a conservative estimate as I assumed the haircuts for the liquid book were on the high end without knowing the term of the debt:

☒ Picture (Metafile)

Thanks,
Sindy



EXHIBIT
Coghlin
118
RK 8/13/09

10297296

**Chase Triparty Haircut Summary**
**Trades Maturing Sep 15, 2008**
as of Sep 12, 2008

| Collateral Allocated Summary | Prin ($Bn's) | Current Haircut | Fed Haircut | Variance | Impact |
|---|---|---|---|---|---|
| ASSET BACKS - INVESTMENT GRADE | 1.1 | 15% | 20% | 5% | 0.1 |
| ASSET BACKS - NON-INVESTMENT GRADE | 0.9 | 33% | 20% | -13% | (0.1) |
| C1 - INVESTMENT GRADE CONVERTIBLES | 0.0 | 15% | 20% | 5% | 0.0 |
| C2 - NON-INVESTMENT GRADE CONVERTIBLES | 0.2 | 5% | 20% | 15% | 0.0 |
| CORPORATES - INVESTMENT GRADE | 5.8 | 7% | 20% | 13% | 0.7 |
| `RPORATES - NON-INVESTMENT GRADE | 1.6 | 15% | 20% | 5% | 0.1 |
| JITIES | 3.1 | 6% | 20% | 14% | 0.4 |
| "ERNMENT AGENCY | 12.7 | 2% | 6% | 4% | 0.6 |
| L | 20.7 | 2% | 6% | 4% | 0.8 |
| MONEY MARKETS | 3.9 | 9% | 20% | 11% | 0.4 |
| MUNI | 1.9 | 8% | 20% | 12% | 0.2 |
| OTHER | 0.0 | 7% | 20% | 13% | 0.0 |
| PRIVATE LABELS - HIGH YIELD | 0.6 | 19% | 20% | 1% | 0.0 |
| PRIVATE LABELS - INVESTMENT GRADE | 1.8 | 13% | 20% | 7% | 0.1 |
| TREASURIES | 21.2 | 1% | 4% | 3% | 0.5 |
| Grand Total | 75.5 | 4% | 9% | 5% | 3.9 |

10300641

# A. 35

# Filed Under Seal Pursuant To Protective Order

# A. 36

# Filed Under Seal Pursuant To Protective Order

# A. 37

**Unknown**

**Sent:** Sunday, March 22, 2009 2:45 AM

| | |
|---|---|
| **From:** | Tonucci, Paolo [paolo.tonucci@lehman.com] |
| **Sent:** | Tuesday, September 16, 2008 9:57 AM (GMT) |
| **To:** | Lowitt, Ian T [ilowitt@lehman.com]; Kelly, Martin [martin.kelly@lehman.com] |
| **Subject:** | Re: |

Fantastic.  Great work.
Paolo


-----------------------------------

----- Original Message -----
From: Lowitt, Ian T
To: Kelly, Martin
Cc: Tonucci, Paolo
Sent: Tue Sep 16 05:33:59 2008
Subject: Re:

You are a hero. Well done. Ian
------Original Message------
From: Martin Kelly
To: Ian Lowitt
Cc: Tonucci, Paolo
Sent: Sep 16, 2008 5:10 AM
Subject:

Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final price did not change meaningfully -
approx a $5b all in economic loss versus our marks and $3.6b of resi assets left behind. Assume we can fund this after everything else
winds down but paolo you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in
LBI and LBHI. Took 745 for $1b and several data centers for $400mm. Bart reviewed all of it before final agreement. I'm going to try
to get some sleep and will be in mid morning.


-----------------------------------



# A. 38

| From: | Tonucci, Paolo [paolo.tonucci@lehman.com]. | Sent:9/16/2008 5:57 AM. |
|---|---|---|
| To: | Lowitt, Ian T [ilowitt@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]. | |
| Cc: | | |
| Bcc: | | |
| Subject: | Re:. | |

Fantastic. Great work.
Paolo

————————————————

—— Original Message ——
From: Lowitt, Ian T
To: Kelly, Martin
Cc: Tonucci, Paolo
Sent: Tue Sep 16 05:33:59 2008
Subject: Re:

You are a hero. Well done. Ian
—————Original Message—————
From: Martin Kelly
To: Ian Lowitt
Cc: Tonucci, Paolo
Sent: Sep 16, 2008 5:10 AM
Subject:

Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final price did not change meaningfully - approx a $5b all in economic loss versus our marks and $3.6b of resi assets left behind. Assume we can fund this after everything else winds down but paolo you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI. Took 745 for $1b and several data centers for $400mm. Bart reviewed all of it before final agreement. I'm going to try to get some sleep and will be in mid morning.

————————————————


EXHIBIT
136A
8.14.09 AW

# A. 39

# LEHMAN BROTHERS HOLDINGS INC.

### Minutes of the Board of Directors
### September 16, 2008

A meeting of the Board of Directors of Lehman Brothers Holdings Inc. (the "Corporation" or collectively with its subsidiaries, the "Firm") was held jointly with a meeting of the Board of Directors of Lehman Brothers Inc. ("LBI") telephonically at 6 a.m. on September 16, 2008, pursuant to written notice.

## PRESENT – LBHI BOARD MEMBERS

Mr. Michael L. Ainslie
Mr. John F. Akers
Mr. Roger S. Berlind
Mr. Thomas H. Cruikshank (*also a LBI Board Member*)
Ms. Marsha Johnson Evans
Mr. Richard S. Fuld, Jr. (*also a LBI Board Member*)
Sir Christopher Gent
Mr. Jerry A. Grundhofer
Mr. Roland A. Hernandez
Mr. Henry Kaufman
Mr. John D. Macomber

## PRESENT – OTHER LBI BOARD MEMBERS

Mr. Howard L. Clark, Jr.
Mr. Frederick Frank

## ALSO PRESENT BY INVITATION

Mr. Ian T. Lowitt
Mr. Herbert H. McDade III
Mr. Hugh E. McGee III
Mr. Thomas A. Russo
Mr. Mark Shafir
Mr. Jeffrey A. Welikson
Mr. Andrew J. Levander (Dechert)
Ms. Lori Fife (Weil Gotshal & Manges)
Mr. Michael Lubowitz (Weil Gotshal & Manges)
Mr. Thomas Roberts (Weil Gotshal & Manges)
Mr. Alvin Brown (Simpson Thacher & Bartlett)
Mr. John Finley (Simpson Thacher & Bartlett)
Mr. Andrew Keller (Simpson Thacher & Bartlett)
Mr. Barry W. Ridings (Lazard)

Mr. Russo introduced the meeting, stating that the Board of Directors of each of the Corporation and LBI is present because the matters to be considered involve both companies. Mr. Russo reported that the agenda items for the meeting are an asset sale transaction for consideration by both companies, the retention of Alvarez & Marsal for consideration by the Corporation, and a debtor-in-possession financing facility for the Corporation. Mr. Russo reported that there are still a few details to be resolved on the sale transaction, but the Firm is hoping to be in a position to announce the transaction before the U.S. markets open. He introduced Mr. Roberts of Weil, Gotshal & Manges to present the transaction.

## APPROVAL OF THE SALE OF CERTAIN ASSETS AND OF DEBTOR-IN-POSSESSION FINANCING

Mr. Roberts stated that Mr. Barry Ridings of Lazard is present at the meeting, and that the Board of Directors of the Corporation will be asked to consider the retention of Lazard by the Corporation. Mr. Roberts presented the proposed transaction with Barclays, as consisting of (1) the sale to Barclays of 745 Seventh Avenue and related data centers for approximately $1.45 billion, to close within the next week, (2) debtor-in-possession ("DIP") financing from Barclays of $500 million for the Corporation, half in the form of a term facility and half in the form of a revolving facility, which would probably start that day, and (3) the transfer of most assets of the U.S. broker dealer, along with approximately 10,000 employees, to Barclays. Mr. Roberts stated that this transaction would benefit the creditors of the Corporation and also save the franchise and many jobs.

The Directors asked which entity will receive the proceeds from the sale of 745 Seventh Avenue and are advised it is the Corporation indirectly through its subsidiary which owns that real estate. The Directors asked about the timeline and are advised that the Bankruptcy Court hearing to approve the transaction is expected to be held on Friday or Monday. The Directors asked about employees to be retained at the Corporation and are advised it will be certain commercial real estate managers and managers of other assets retained by the Corporation, as well as the employees of Aurora and certain support groups at the Corporation.

The Directors asked about the sale of the Investment Management Division ("IMD"), and are advised that it is not included in this transaction. The Directors asked how the sale price for 745 Seventh Avenue was determined, and are advised it was an internal evaluation but that the Corporation retained Cushman & Wakefield and is expecting its oral appraisal that morning. The Directors asked about the DIP financing, and are advised that it will be secured by shares of Neuberger Berman and will become due upon the sale of Neuberger Berman. The Directors are also advised that the transaction involves the sale of two data centers at appraised value, and that the two data centers have an aggregate book value of $450 million and are owned by the Corporation.

Mr. Shafir continued the description of the transaction, describing the assets and liabilities to be transferred to Barclays and stating that there would be an additional purchase price component of $250 million for goodwill.

Mr. Roberts resumed by describing that it is a condition to the transaction that eight specific Firm employees enter into employment agreements with Barclays. He stated that Mr. McGee was one of those employees, so interested Firm employees were involved in the transaction negotiations on behalf of the Firm. Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that his agreement to continued employment was a condition precedent to the transaction. Mr. Roberts reported that both Weil, Gotshal & Manges and Simpson Thacher & Bartlett then told Barclays there were to be no more discussions concerning Mr. McDade's employment until all terms of the Firm transaction were completed. Mr. Roberts reported that the discussions regarding Mr. McDade's employment were suspended to protect Mr. McDade's independence.

Mr. Lubowitz of Weil, Gotshal & Manges reported on the most significant contract terms for the proposed sale of assets. He described that the contract provides that closing must occur within eight days of signing, and that Weil, Gotshal & Manges expected to go into Bankruptcy Court later that day to get the Bankruptcy Court approval process underway. Mr. Lubowitz reported that the contract is quite tight in terms of Barclays' obligation to close. He stated that there is no MAE ("material adverse effect") clause, and there is no bringdown of the representations and warranties. He described that one significant condition of the proposed sale is that a minimum percentage of the Firm's top 200 employees must indicate that they will stay at Barclays post-closing. Mr. Lubowitz reported that Barclays has requested that such percentage be 75%, but that the percentage is still open. Mr. McDade stated that the Firm expects to be able to satisfy a 75% test but is trying to reduce the percentage to create more certainty. Mr. Lubowitz described that the assets being sold include the Lehman Brothers name, but that the name will be licensed back to the rest of the Firm, including the Asset Management Group. Mr. Lubowitz described that the contract allows the Corporation to consider other bids, but provides for a 3% break-up fee. The Directors asked about the break-up fee and about the status of the Firm's operations in the United Kingdom and Asia.

Mr. Brown of Simpson Thacher & Bartlett reported on the employee benefits aspects of the proposed sale of assets. He reported that the Firm proposed post-closing covenants to protect employee benefits, but that the only commitment Barclays would make is to keep current severance levels in place for the balance of the calendar year. Mr. Brown reported that Barclays would not assume any liability for the Firm's pension or benefit plans. He described the status of the Firm's pension plans, deferred compensation plans, and 401(k) plan. Mr. Brown reported that the Firm is attempting to eliminate a contract provision which provides that Barclays' confidentiality obligation terminates if the agreement terminates. Mr. Brown described the draft employment letters for eight specific Firm employees which are a condition to the deal. He described that the draft employment letters provide for at-will employment for a period of time, with salary and guaranteed cash bonus and a retention award.

3

The Directors asked about the Firm subsidiaries and employees which will remain with the Corporation. Ms. Fife described that approximately two thousand employees will be moved from the Corporation to LBI that morning in advance of the transaction with Barclays.

The Directors are briefed on the timeline for the day and on the fact that the Barclays transaction is subject to Bankruptcy Court approval, and that another party can make a topping bid. The Directors are advised that the plan is to sign the Barclays transaction that morning, then make a public announcement of the transaction, and then request Bankruptcy Court approval that day of the break-up fee and interim authority for the DIP financing. The Directors are advised that those matters should get heard and approved by the Bankruptcy Court that afternoon. The Directors are also advised that the Corporation will ask the Bankruptcy Court that day to set a hearing for approval of the sale, that there will be an organizational meeting with the U.S. Trustee that evening and that a creditors' committee should be appointed then. The Directors are advised that the creditors' committee will be briefed on the transaction the next day. The Directors are advised that it will be necessary to put LBI in a Securities Investor Protection Corporation ("SIPC") proceeding for a very short period of time to facilitate the sale of LBI assets to Barclays.

Mr. Ridings of Lazard advised the Directors that the applicable standards for this sale (under Section 363 of the Bankruptcy Code) are to obtain the highest and best price and a price greater than liquidation value. He advised the Directors that he believes these tests can be met, but that it will be a close decision for the Bankruptcy Court judge. He advised that the chances of a topping bid are very remote since the business is deteriorating. He advised that he will testify at the Bankruptcy Court hearing in support of approval of the proposed transaction with Barclays.

Mr. Russo asked for any questions or comments. The Directors summarized the consideration as follows: approximately $1 billion to the Corporation for 745 Seventh Avenue, $250 million to LBI for the Lehman Brothers name, and approximately $450 million to the Corporation for the data centers. For LBI, the transaction was described as a wash – with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets.

Mr. Lowitt advised that he believes that LBI would not be able to fund itself that day without this deal, based on how funding went yesterday. Mr. Lowitt stated that if the Firm does not do this deal that day, LBI would have to declare bankruptcy.

The Directors asked questions about the sale and license-back of the Lehman Brothers name, Barclays' ability to solicit Firm employees if the deal does not go forward, and the fact that Barclays will have already signed up approximately 200 of the Firm's employees. The Directors asked if Mr. Levander has any objections. Mr. Levander asked bankruptcy counsel about the acceptability of the break-up fee. Mr. Russo asked to release Messrs. McDade and McGee from the meeting to finalize the transaction. Messrs. McDade and McGee then left the meeting. The Directors asked if

4

the transaction is subject to approval by Barclays' board of directors or shareholders, and are advised that Barclays only requires board approval and that its board is meeting now. The Directors asked about the other members of the Firm's management executive committee who are included among the eight employees whose agreement to continue employment is a condition to the deal, and they are advised that Messrs. Felder, Donini, Lowitt, Gelband, and Lee are included.

Mr. Russo asked for a motion to approve this transaction in principle with authority delegated to appropriate officers to negotiate final terms and report back to the Executive Committee of the Board of Directors of the Corporation for final approval of the transaction.

Mr. Roberts summarized the Board approvals being requested as follows: the approval of the transaction with Barclays, the execution of documents and the taking of actions in connection with the outline presented that day, and the retention of Lazard on terms to be negotiated by management. After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of DIP Facility

**WHEREAS**, it is proposed that Lehman Brothers Holdings Inc. ("LBHI") enter into (i) a Debtor-in-Possession Credit Agreement for up to $500 million, to be dated on or about the date hereof (the "DIP Facility"), by and between, LBHI and Barclays Bank PLC (the "Agent"), (ii) a Pledge Agreement, to be dated on or about the date hereof (the "Pledge Agreement"), relating to LBHI's equity interest in the business of Neuberger & Berman by and between LBHI and the Agent, and (iii) all other documents, instruments and certificates required or appropriate in connection with execution, delivery or performance of such agreements (the items referred to in the foregoing clauses (i) - (iii) being individually a "Loan Document" and collectively, the "Loan Documents"), substantially on the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP ("Weil"), including a final maturity of the earlier of six months and the closing of the sale of the investment management division; now, therefore, be it

**RESOLVED** that (i) the execution, delivery and performance of the Loan Documents, substantially on the material terms described to the Board of Directors by Weil, on the date hereof, to provide debtor-in-possession financing in such aggregate principal amounts as so described, are authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of each of the Loan Documents is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter into each of the Loan Documents and consummate the transactions contemplated thereby; and further

**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the Chief Restructuring Officer, the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBHI is, individually authorized, empowered and directed, in the name and on behalf of LBHI to perform such acts and deeds and to negotiate, prepare, execute and deliver the Loan Documents substantially in accordance with the material terms described to the Board of Directors by its legal counsel, Weil, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and delivery thereof; and further

**RESOLVED** that each Authorized Officer of LBHI is individually authorized, empowered and directed to take such additional action from time to time and execute, certify, deliver, file and record with the appropriate judicial, public and governmental authorities or any other persons or entities from time to time such additional documents, instruments and agreements, including, without limitation, Uniform Commercial Code financing statements, intellectual property recordations, and any amendment, extension, waiver or consent in connection with the Loan Documents, as any such Authorized Officer may deem appropriate or desirable to implement the provisions and carry out the purposes of the foregoing resolutions and the Loan Documents authorized and approved thereby, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such action to be the conclusive evidence of the authority therefor granted.

### Authorization of Asset Purchase Agreement

**WHEREAS**, it is proposed that Lehman Brothers Inc. ("LBI") sell substantially all of the assets comprising its U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant, and that LBHI sell its assets primarily related to the conduct of such businesses and cause its appropriate subsidiaries to sell the headquarters building of LBHI and LBI at 745 Seventh Avenue and other real estate assets related to such businesses, pursuant to an Asset Purchase Agreement, to be dated on or about the date hereof (the "Asset Purchase Agreement") by and among Barclays Capital Inc. ("BarCap"), LBHI, LBI and LB 745 LLC; now, therefore, be it

**RESOLVED** that (i) the execution, delivery and performance of the Asset Purchase Agreement, substantially on the material terms described to the Board of Directors by its legal counsel, Weil and Simpson, Thacher & Bartlett LLP ("Simpson" and together with Weil, "Counsel"), on the date hereof, to sell the assets described above is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Asset Purchase Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Asset Purchase Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially in accordance with the material terms described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## Authorization of Retention of Lazard by LBHI

**WHEREAS,** it is proposed that LBHI, in conjunction with entering into the Asset Purchase Agreement and the Loan Documents as described herein, enter into a financial advisory agreement to be dated on or about September 16, 2008 (the "Financial Advisory Agreement") between LBHI and Lazard Ltd. ("Lazard") whereby, among other things, Lazard will serve as LBHI's financial advisor in connection with, and provide certain valuation services with respect to, the restructuring of LBHI's business; now, therefore, be it

**RESOLVED** that (i) Lazard be engaged by the Corporation to serve as its financial advisor pursuant to the Financial Advisory Agreement to be negotiated by Authorized Officers of the Corporation, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Financial Advisory Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Financial Advisory Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Financial Advisory Agreement with such terms, conditions, changes, additions and modifications thereto as such

Authorized Officer shall consider necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## General Authority and Ratification of Past Actions for LBHI

**RESOLVED** that other appropriate officers of LBHI designated by the Authorized Officers of LBHI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBHI, respectively, to attest or deliver certificates on behalf of LBHI and to take such additional action on behalf of LBHI as the Authorized Officers of LBHI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBHI have been authorized to execute on behalf of LBHI pursuant to the foregoing resolutions and to perform and carry out the purposes of the Loan Documents, the Asset Purchase Agreement, the Engagement Letter (as hereinafter defined) and the Financial Advisory Agreement, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefor granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBHI are ratified, confirmed and approved in all respects.

Mr. Shafir updated the Directors on the potential sale of IMD, stating that Bain Capital and Hellman & Friedman may together purchase a 100% interest in IMD. He reported that negotiations have commenced, that final due diligence is underway, and that Private Equity will probably be excluded from the transaction. He reported that the IMD business is deteriorating, given the current situation. Messrs. Shafir and Ridings then left the meeting.

## APPROVAL OF THE RETENTION OF ALVAREZ & MARSAL

Mr. Russo stated that the next agenda item was for the Board of Directors of the Corporation to consider the engagement of Alvarez & Marsal as Restructuring Advisor, including the election of Mr. Bryan Marsal as Chief Restructuring Officer of the Corporation. Ms. Fife of Weil, Gotshal & Manges presented to the Board of the Corporation and described that it is very common in Chapter 11 cases to hire chief restructuring officers to prepare restructuring plans and budgets, and to deal with the bankruptcy case generally, leaving the Corporation's employees the time to operate the business. Ms. Fife reported that Weil, Gotshal & Manges has previously worked with Alvarez & Marsal and with Mr. Marsal, and that Mr. Marsal was interviewed yesterday by Mr. Russo. The Directors of the Corporation asked questions regarding the

compensation which would be paid, and were advised that it would be based on hourly fees comparable to a law firm. The Directors of the Corporation asked about the amount of time the Corporation will be in Chapter 11 proceedings and the possibility of there being residual value for the Corporation's stockholders. Mr. Levander asked Ms. Fife to speak about Alvarez & Marsal, including their reputation, their competitors, and potential conflicts with the Firm. Ms. Fife reported that Alvarez & Marsal is one of the two leading firms in this area, very highly regarded and very experienced. She stated that Weil, Gotshal & Manges recommends them very highly. Ms. Fife stated that the retention of Alvarez & Marsal would require approval by the Bankruptcy Court, and that the Bankruptcy Court will require that Alvarez & Marsal be free of conflicts. Mr. Levander stated that he holds a high opinion of Alvarez & Marsal as well. After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of Engagement Letter

**WHEREAS**, it is proposed that LBHI enter into an engagement letter to be dated on or about the date hereof (the "Engagement Letter") between LBHI and Alvarez & Marsal North America, LLC ("A&M") whereby, among other things, A&M will serve as LBHI's Restructuring Advisor, subject to such approval by the U.S. Bankruptcy Court for the Southern District of New York of the retention of A&M as may be required by law; now, therefore, be it

**RESOLVED** that (i) A&M be engaged by the Corporation to serve as its restructuring advisor pursuant to the Engagement Letter to be negotiated by Authorized Officers of the Corporation, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Engagement Letter is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Engagement Letter and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Engagement Letter with such terms, conditions, changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefor to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

### Authorization of Retention of Bryan Marsal

**WHEREAS**, it is proposed that LBHI, in accordance with Article V, Section 21 of its By-Laws, retain and appoint Bryan P. Marsal of A&M as its Chief Restructuring Officer; now, therefore, be it

**RESOLVED** that Bryan P. Marsal be, and hereby is, appointed, effective immediately, to serve as the Chief Restructuring Officer of LBHI, having in such capacity the rank of Executive Vice President and authority and supervision over the restructuring of the business, operations, finances and activities of LBHI and its subsidiaries, including, without limitation, the sale of assets of LBHI and its subsidiaries, to serve as such until his successor is elected or appointed and qualified or, if earlier, until his death, resignation or removal from office.

Mr. Russo then reviewed the timeline for that morning.


There being no further business to come before the meeting, the meeting was, upon motion duly made and seconded, adjourned.


Respectfully submitted,

Jeffrey A. Welikson

Jeffrey A. Welikson
Secretary of the Meeting

10

# A. 40

# Filed Under Seal Pursuant To Protective Order

# A. 41

# Filed Under Seal Pursuant To Protective Order

# A. 42

# Filed Under Seal Pursuant To Protective Order

# A. 43

# Filed Under Seal Pursuant To Protective Order

# A. 44

# Filed Under Seal Pursuant To Protective Order

# A. 45

# Filed Under Seal Pursuant To Protective Order

# A. 46



EXHIBIT

343A

9.3.09    AW


## 🦅 BARCLAYS

Barclays Bank plc – Announcement

Wednesday 17 September 2008

**Barclays announces agreement to acquire Lehman Brothers North American investment banking and capital markets businesses**

John Varley

Good morning. I apologise if I have kept you waiting for a couple of minutes. But welcome to the call and thank you very much for joining us this morning. I am joined by Bob Diamond and Rich Ricci in New York and in London by Chris Lucas and Mark Merson.

What I am going to do is make a few comments to begin with and then we are happy in the usual way to take your questions. As you have seen, we have announced an agreement to acquire the core North American Investment Banking and Capital Market businesses of Lehman's. That acquisition is subject to approvals that we are now seeking from the US Bankruptcy Court.

When we look at transactions, we ask ourselves two questions. Does the transaction fit with our strategy? And does the transaction make economic sense to our shareholders? The acquisition of the businesses that we have announced today is in line with our strategy of seeking higher growth through time by geographical diversification. And it meets our financial tests, including delivering a strengthening of our capital ratios.

You will remember that when we talked to you about our Half Year Results, we said that our objective in 2008 was very simple. It was and is to manage the impact of the credit crunch whilst maintaining strategic momentum. And I think this transaction fits within that framework. The market backdrop is as challenging as anything we have ever seen. Our intention as we do our business around the Group is to stay close to our customers and clients and manage our risks whilst keeping our eye open to opportunities presented by the market disruption which might be attractive to our shareholders.

Having the licence from our owners to take those opportunities is, of course we fully recognise, dependent on our businesses continuing to perform, not withstanding the difficult circumstances. And you will see that as part of our announcement today, we have said that our trading performance in July and August was satisfactory. Group profits were a bit below the run rate of the first six months of the year which is what we would expect during the high summer. But all our businesses were profitable.

It was against that backdrop of strong relative financial performance that we looked hard at the Lehman Brothers opportunity over the last weekend. I should say that we thought some months back that it was possible that this opportunity might arise, but we were clear that we would only be interested in pursuing it at the right price. The knowledge that the opportunity might arise also caused us to manage our exposures to Lehman Brothers and we have minimum exposure arising out of the bankruptcy.

We knew from that work over the summer that there was a significant value opportunity in the business and we knew that there might be a good economic opportunity available to us. Furthermore we satisfied ourselves in the due diligence process which took place at the back end of last week and over the weekend, that the franchise of much of Lehman's and in particular the US broker/dealer business, remains strong and healthy.

I stress again that there are important approvals outstanding, including agreement from the United States Bankruptcy Court for the Southern District of New York. But subject to those, we have announced the following:

The acquisition of the core of old Lehman's based around the US broker/dealer operations, we have acquired the associated infrastructure. We will be taking on about 10,000 employees. We are acquiring trading assets with a current estimated value of 72 billion dollars and trading liabilities with a current estimated value of 68 billion dollars for a cash consideration of 250 million dollars.

In addition to acquiring these trading assets, we have made a decision to acquire three buildings. The Lehman's Headquarters in New York and two data centres.

We also mentioned in our announcement today that certain of our shareholders have expressed support for the transaction and an interest in increasing their shareholdings in Barclays. In fact the transaction is capital ratio accretive without additional equity issuance. And the source of that accretion is the negative goodwill from the transaction, which amounts to about 2 billion US dollars post tax.

The acquisition of these businesses and assets significantly enhances BarCap's position in the United States by a transaction that is de-risked by excluding the overwhelming majority of Lehman risk assets.

Before moving on this opportunity, we satisfied ourselves as to the fit between the two capital markets businesses in terms of activities and culture. And the large business would of course be part of IBIM, reporting to Bob. The transaction meets our financial test with significant margin for error. We expect it to be immediately economic profit positive. We expect it to be accretive to earnings on an ongoing basis in the first year, including the impact of equity raising. And the return on investment is very high.

So to summarise and before taking your questions, we have a transaction which subject to the consent of the US Court, makes good sense strategically and financially. I think that the transaction plays to our strengths. The acquisition transforms our position in the largest global capital market. It creates capital ratio enhancement and it meets and some, the financial tests that we have which are designed to ensure that we create shareholder benefit.

So with that I will open up to your questions. And just to remind you what we are concentrating on this morning is the transaction that we have announced. Could you in the usual way when you ask a question, say your name and which organisation you represent.

Question and Answer Session

Question 1 : Mike Trippett, Oriel Securities

John good morning. It's Mike Trippett. Just a couple of questions actually. One, could you give an idea of the risk weighting of the assets?

Answer : John

Shall we take that one first of all and I will ask Chris to comment.

Answer : Chris

Yes in terms of the assets, we have taken, with risk weighted asset the number is about 13.5 billion for the trading assets and then there is obviously that which relates to the buildings on top of that to get to a total of 15. That is the dollar number.

John

And you had a second question Mike?

Further Question  : Mike

Yes the second question was just trying to get a sense of good assets, bad assets and impairments that would have been already taken either through the P&L or to AFS on the assets that you are acquiring?

John

Let me ask Chris to comment and Bob you may want to add. Chris you go first of all.

Answer : Chris

I should say that out of a total of 72.7 which is a net number, the vast majority of those assets are quoted equity Government and Agency paper, CP money market instruments and derivatives and a relatively sizeable cash and matched book. There is a small amount of mortgage paper which has been heavily written down and included in those numbers. So we have been through a process where we took the original marks, reviewed them and then took some further write downs, but that is against the very small portion, less than 5% of that book.


John

Bob anything you want to add?

**Further Answer : Bob**

Slightly repetitious but I think it is an important question and an important answer. Because of the way that this deal ended up happening through bankruptcy, a couple of things were important. First and foremost, as Chris said, we got to choose which inventory came with the deal. And primarily we chose things that were important to the underlying businesses. So for example, many of the positions that we took in equities, had to do with our cash equities business. I think the second thing that is important is we had just completed 72 hours of due diligence on every position. So when it came time to make the decision on what came, we personally had been doing due diligence and were able to establish the marks.

**Further answer - Chris**

Mike I should just say you did ask about AFS. These are entirely a trading book and therefore would go through the profit and loss account and the numbers I have given you reflect any of those adjustments.

**Mike**

Okay thank you very much.

**Question 2 : Michael Helsby – Morgan Stanley**

Hello, good afternoon. I was, it is not clear from looking at the Lehman quarterly numbers exactly what the generation, you know the underlying profit generation of net revenue generation of the businesses that you would be buying exactly is. I was wondering if you could give us a helping hand in terms of what you think the net revenue you have bought, ex-write downs and take Q3 as an example?

**Answer : John**

Well Michael, we won't give you a forecast, but we will try and give you a bit of help and I will ask Chris to make a comment or two.

**Answer : Chris**

I think, when we look at what we have acquired, which is predominately the broker/dealer business. If you take a normalised view of the Lehman business, that broker/dealer business is broadly about half of what we have seen historically. I think that is probably the best starting place I can give you.

**Michael**

That is better than what I heard. Thank you.

<u>Question 3 : Tom Rayner – Citigroup</u>

Yes good morning everybody. Tom Rayner from Citi here. A couple of questions. One just following up on your comments on the capital and the 15 billion. Am I right, I have just done this very quickly. But you would need to increase equity by about a billion dollars, given the extra 15. You have a buffer between the trading assets and liabilities of four. And you are indicating your accretive, even without the new equity being raised. Are you assuming though that that four billion buffer is likely to come down? Because I guess it could come down from four all the way to one, and still be accretive for capital at the end of the day. Or is that very much, this is mark to market as of last night, all the toxic stuff is outside of this portfolio. We are expecting if anything maybe to run profits from these positions?

Answer : John

The 'or is it' piece of your analysis Tom, is the right way of looking at it. So we absolutely expect to preserve that buffer and in the way that Chris has described we have marked, and the capital derived from the negative goodwill that arises from the transaction is actually more than is needed to support the 15 billion dollars of risk weighted assets. It is just the combination of that part of the transaction gives them an enhancement to the Tier 1 capital and equity Tier 1.

Tom

I understand that. In fact if that buffer is preserved, that is a reasonably significant enhancement, is that right?

Answer : Chris

Well yes you can do the arithmetic. But we have been careful in the way in which we have structured it Tom as you can see to ensure that it has that characteristic. You had a second one did you?

Further Question – Tom

Yes please. I was just having a look at the Lehman Brothers Press Release today. It mentions their discussions to acquire select operations outside of North America. No real comments unless I missed it in your Statement at the beginning about the UK businesses. Can you add anything to that?

Answer : John

Tom let me ask Bob to comment. What I would say generally is that beyond what we have announced, we think we have some options. But to be clear, we have no obligations. But I should ask Bob to give you something more specific.

Answer : Bob

Spot on. Tom an example of an opportunity would be this. Within the US broker/dealer one of the most exciting businesses which you will appreciate is the cash equities business. It is a absolute machine, it is extremely profitable. Jerry Danini and the team that run it have been there for a long time. Year after year it has got a completely integrated research sales, investment banking, it is fantastic. We wouldn't want to miss the opportunity to also add some of the talent from the UK and Europe to that team. But as John said, it is an option, none of it is required because of the deal. There are other areas in the UK and Europe for example, where BarCap already has a very strong position, we wouldn't have an interest in adding any staff. So it would most typically be around those areas where Lehman has strong position and BarCap had a weak one. So it would be mostly around the equity and equity capital markets business.

Further Question

Is it not the case, if that is to happen given, I can see out my window what has been happening in the last couple of days, I mean if that's to happen, it has to happen reasonably quickly, or is it something you can take your time over?

Answer - Bob

You shouldn't assume we aren't already acting on the opportunities that we think are beneficial to us.

Tom

Okay, thanks a lot.

Question 4 : Simon Maughan, MF Global

Yeah hi, I just wondered is it just coincidence that you are acquiring assets that are roughly, a similar kind of size to the client receivables on the Lehman book? I am just trying to get a figure because obviously the size of the assets you are getting are a tiny fraction of the overall balance sheet at Lehman, but obviously the size of the staff you are getting is pretty substantial and you haven't just bought a broker/dealer with no connected prop and own bank position. There are own bank positions in the 40 billion that you have acquired and you are just telling us that they are perfectly adequately marked, is that right?

John

Simon, I will ask Chris to comment to the detail, but I suppose what I would say to you is that you know, there is no coincidence in this transaction if you see what I mean. We have had, the circumstances in which we have been able to execute the transaction, mean that we have been able to be very deliberate in choosing either pro or con. So there isn't serendipity or coincidence in the transaction. The transaction is structured as we wanted it to be. It is of course subject to Court approval and we are respectful of the Court. But we have been very deliberate in our choices here.

Further Question

Just going back to the earlier question about what the revenues you are acquiring. You are getting a fraction of the balance sheet and you are kind of hinting that this business could generate up to half of Lehman revenues which would make a fantastic deal from that perspective?

Answer : John

And that is because we have not taken the entire balance sheet that creates that income. What we have taken is a portfolio of trading assets and liabilities that are first of all de-risked and secondly those that need to support the ongoing parts of the business that we have acquired. And therefore they are predominantly market making assets and liabilities and very tradable.

Simon

Thanks

Question 5 : Tim Sykes - Execution

Good morning gentlemen. Congratulations if you get it through. Philip Bourg will probably have to write a new book. The question I have really is about what it does to you as a Group. It is a tremendous deal essentially for EPS, but investment banking is going to become a more material part of your organisation and US investment banking is going to become a more material part of the organisation. So I have got a couple of questions. Firstly did Lehman's have a system of economic capital? And the second question is, given that you are now a more material part of the US financial system, will the US regulatory protocols, for want of a better word, bite more aciduously into the way you run Barclays?

Answer : John

Well do you want to talk about the second question first and then let me try and give Tim some help on the first part of what he asks?

Answer : Bob

Tim on the economic capital. I am not sure I?

John

It was on the US regulatory issue and we will come to economic capital and shape of Group in a moment.

**Answer : Bob**

Tim, just rephrase what the question is on the regulatory issue, I am sorry.

**Tim**

The US regulatory has got more focus on ratios which potentially the UK regulators put less emphasis, such as equity to asset. And also there are obviously discussions afoot to focus on a higher level of capital backing for investment banking operations. Given that this is now more material for Barclays, will that have an impact on the way you have to look at capital adequacy first, not only the bit that you are buying, but the bit that you have?

**Answer : Bob**

Basically no. It doesn't change the way that Barclays would approach all of these things, because it is all moving on. But let me ask Rich Ricci, our Chief Operating Officer who is the guy who has gone through all that over the last couple of days to answer in specifics.

**Answer : Rich**

Good morning Tim. Your point is right, but our intention is to be combining this entity with Barclays Capital. Our assumptions going in is that we will be held to the same regulatory standards as we have in our current broker/dealer in the US Barclays Capital that Barclays has. So if anything, as you know, the regulatory standards in the US for some of those things will be more favourable, but our assumptions going in are that this will be consolidated and will be subject to the same regulatory standards we are currently.

**Answer : Chris**

Tim on your EP point, I was going to say in terms of EP we used our own view of the economic capital to support these businesses because that is what we understand and they look very similar in most respects to those that run within Barclays Capitals broker dealer in the US.

**Tim**

Okay and presumably you have already explained all this to the rating agencies and they are going to be confirmed?

**Answer : Chris**

We have clearly spoken to the rating agencies, they are considering, as they continually do, our ratings. But we have not heard of any change of view.

Tim

Great. Thank you.

Question 6 : Peter Toeman : HSBC

Good morning. I just wanted to check with you. The deal looks outstandingly attractive because obviously if one looks at the normalised revenues that Lehman's tell us they produce, they would have made maybe 2.8 billion in Q3, maybe you are taking some 50% of that, that gets you to 1.4 billion. Maybe 5 billion dollars of revenues per year. But the addition to your WRA's is only sort of 15 billion dollars. Lehman's when it was operating had WRA's of about 200 billion. So I wonder if actually to attain the revenue stream that you have indicated, actually the WRA growth that the Lehman's has to be very quick from this point. Or is it possible to attain the 1.4 billion per quarter of revenues with just sort of 15 billion for trading WRA's?

John

Bob and Rich could you comment?

Answer : Rich

Hi, its Rich. I think a couple of things, one it is a good question. The assets that we have obtained, you know a lot of them are, probably as indicated earlier in the call are more liquid, you know Government agency types. There are some that are ongoing trading positions we have acquired. Clearly what has happened over the last few days, as you can imagine, is as Lehman was in the processes of filing bankruptcy. A lot of their positions began to roll off the street as you would expect was concerned about Lehman's future and how they were dealing with them. So we saw a huge dip in WRA's. I think going forward, keeping in mind the issue that we are going to run only certain of their businesses, we are going to need to wrap up that business. But it is going to happen over time. As you know, I think there is a great opportunity on the revenue side that WRA ramp up is going to happen over time, but I don't think it does happen very quickly in situations like this.

Answer : Chris

I would expect as Rich has said, some increase in WRA's, But what we would be doing is combining the business, that is of the broker/dealer, we will be using what is called consolidated supervised entity regime for capital treatment in US broker/dealers which enables us to aggregate risk positions for the capital purposes. So it won't be entirely additive. I am sure though as Rich as said, there will be some increase.

Further question

Can I also ask you about revenue attrition in that although Lehman's seem to be a very good fit on the equity side in terms of fixed income markets that Barclays has been building out in the US for some time, so clearly in certain segments of fixed income markets like foreign exchange or corporate bonds, there must be quite a lot of overlap and how that will be treated and whether you expect that actually an element of revenue attrition will prevent you from getting the numbers, the sort of historic type of Lehman's revenue numbers?

John

Bob could you comment?

Answer : Bob

Yeah you know, it is a good question. But I am going to answer it slightly more broadly than you asked it. If you step back. This is a really unique, interesting opportunity. If you step back and look at the two organisations. Barclays Capital which has done extremely well over the last 11 years, it has real scale and depth in UK, Europe, Middle East, Africa and into Asia. Lehman has the same type of scale and depth even more in the US, but not in those areas. So if you look from a geographic point of view, it is a good balance and their US heft and depth is just what we are looking for. If you are looking at it by product, Lehman Brothers brings excellence, top tier excellence in MNA, equity sales and trading and equity capital markets in credits rating. Two of those three areas we are not in, one we are quite weak in. If you look at BarCap's strengths, it is commodities. Top three in the world, FX top three in the world, interest rate trading, top three in the world. In investment grade debt top three in the world. Areas that Lehman Brothers has traditionally been in, but weaker. The two firms combined become top three in both prime services and leverage finance, areas neither were top three in. There will be overlap, but I want to be disingenuous. We have a three month integration plan that we will take you through as we develop it over the next couple of weeks. And all the people have to be adult about this because we are going to get on with it quickly. But there is surprisingly little overlap because we are able to take just the US broker/dealer, not the entire operations and it was quite fortunate the way this worked out.

Question 7 : Manus Costello – Merrill Lynch

Hi everyone. I have a couple of questions please. One is back to this point about the future of risk weighted asset growth. If I look at the number of employees you are taking on, is that any kind of indication of where risk weighted assets might go in the future? Just thinking in terms of the relative size of the work force, versus the current size of the BarCap workforce. Can I make any kind of extrapolation about WRA per employee for example?

Answer : John

I don't think that would be very safe or scientific way of doing it no.

Further question

Is there anything inherent in any of the businesses you are buying which means that it is less capital intensive?

**Answer : John**

Only to the extent that the businesses we are buying are predominantly more vanilla in terms of the assets and liabilities that they trade with and therefore they tend to have more offsets against other similar risk positions and also lower capital charges.

**Further question**

So all else being equal, you would expect the acquired businesses to be less capital intensive than the current BarCap businesses?

**John**

Do you want to comment on that Bob?

**Answer : Bob**

Yes, I would say that. In other words it is not additive. Absolutely. I don't want to say there is no growth, but it definitely will not be additive. Let me give you the two best examples. The M&A franchise from Lehman Brothers, this is a top tier global franchise. We already have the risk management and financing franchise. They integrate well and M&A is not capital intensive. It is an advisory business. It is the same for the equity capital markets business. It is really additive on all of the other things we have been doing which do tend to use balance sheets. So we have a unique opportunity to leverage fee related advisory related businesses at a time in the market which is quite appropriate.

**Manus**

Okay thank you.

**Chris**

I was just going to add just one thing just to give you some help. If we look at our existing capital position in risk weighted asset utilisation, the broker/dealer in the US is less than 10% of BarCap's total risk weighted asset usage. Did you have a second one?

**Further question**

Yes I just wondered, away from Lehman's, the rest of BarCap have been involved in something of a de-leveraging process during the first half of the year and I wondered if this impacts the thought process on that going forwards?

**Answer : John**

Well I mean the thought process as you know has been one of, we have tried to be very disciplined in the way in which we have managed the balance sheet. We talked at the Half Year about the capital ratios that we are seeking to run to. You should of course assume that those disciplines remain in place, but we have an opportunity here and in the way that Bob and Chris have described, through time we would expect to see some WRA growth in the businesses that we are acquiring. But the overall disciplines of capital management, never more important than today as you would tell us and we would agree. I mean of course those are unaffected by this transaction.

Manus

Okay, thank you very much.

Question 8 : Leigh Goodwin – Fox Pitt Kelton

Good morning gentlemen, afternoon. The question I had, many of them have been asked already, but I just wanted to follow up on capital. I mean it sounds as if this is going to be capital ratio accretive so to speak, even without the additional capital you will be raising. And so my question is, why are you raising the extra one billion of capital?

Answer : John

Well I think the way we look at it is that the business base of Barclays is growing as a result of this transaction in the way that we have been describing. We go into it with an expansive outlook, of course a risk adjusted outlook. Let me say that very clearly. But an expansive outlook and therefore it is right for us to be quite thoughtful about, so what feels like the right capital base to enable us to grow the business safely, but grow the business in the way that we contemplate and our assessment is not least because we have had some statements of support and inquiry as we said in our announcement today from certain of our shareholders, it is right to do those two things in tandem. Simple as that really.

Further question

Okay, but are you sort of signalling any backing away from the 5.25% target?

Answer : John

No. I mean that, remember though that is our target. And what we have said is that we intend to run ahead of target at a time of market turbulence such as we have seen and as you know, on a proforma basis, if you look at the equity ratio at the end of June, flexed for the capital raising that we did in June and July, that the resultant equity ratio on a proforma basis was 6.3%. So we are sort of running well ahead of target. But we did say that our expectation roughly was that half of what we raised would be directed at creating a margin between target and actual and roughly half over time will be directed at business growth. As it happens, the way in which the transaction is structured, actually creates without equity issuance, some capital ratio accretion as we spelt out.

Leigh

Okay, thank you very much.

<u>Question 9 : Sandy Chen – Panmure Gordon</u>

Afternoon and a very well priced deal I say. There are two questions. One I missed the beginning of the call, but did you give a probability of approval with the US Bankruptcy Court for the deal?

Answer : John

It would be, and if I could put it this way impertinent of us to do that, we have to be respectful of the process of the Court. We have put a proposal which we hope the Court will think of as attractive to the protection of interest of creditors. I mean it is a big proposal within the overall bankruptcy and we will go in front of the Court as soon as we can and get a decision.

Further question

Okay. And then the second question related to the marks. Especially given the regulatory integration I guess that would occur rolling the Lehman's book that you have bought into the Barclays book, would you be able to comment on say relative marks on the RBS, ABS some of the CDO books that Lehman's? If you look at what they have been talking about in previous quarterly results, it would appear that they have taken significantly greater marks than some of their assets versus the Barclays ones. I don't know if you commented on that earlier?

Answer : John

No we haven't done Sandy and I will ask Chris to comment and Rich you might want to add.

Answer : Chris

Let me start Sandy. If we look at the portfolio of assets that we have acquired, it is less than 5% that you would regard as mortgage related. Those are marked down and then marked again through the due diligence process. So I think to do any direct comparison is actually very difficult for the reasons we have said before and the fact that the vast majority of the book is very high quality, easily tradable assets and liabilities.

John

Rich do you want to add anything?

Answer : Rich

Yes having gone through the due diligence on the weekend, again all our comments around risk is not generic proof true. I think we have come out of the process very comfortable and if anything confirmed our marks. The paper that any other institution holds, but Lehman in this particular case varies considerably and as Chris noted, I think the new entity will go into quite a cleansing process across all the asset classes. So we move forward comfortable with the marks of both entities.

Sandy

Thanks very much

Question 10 : James Alexander – M&G

Hi, I just wanted a question about the strategic rationale for buying Lehman's or the bits of Lehman's you are buying. It could be said that this is a bit of an old economy deal, given the carnage that investment banks have brought to the world over the last year or so. You couldn't just outline your vision for where investment banking is going to be over the next 2-3 years to explain why you decided to expand in this area, rather than global, retail and commercial banking?

Answer : John

James, I will start and then Bob will add. I think it is a new economy business model is what I would say to you. I mean it is very clear that advantage particularly in the stressed conditions of today, inures to those who have universal banking models with a capital markets business that is well integrated and I think you can see the differentiated performance of that business model, versus other business models very starkly in the experience of the last 12 months to be honest. If you ask me whether as a result of this transaction, we are in some sense de-emphasising the growth that we have been building in GRCB which again I think is pretty evident from the numbers that we showed for the first half, there is no de-emphasis at all. Our expectation is that the GRCB businesses will continue to grow quickly. That is absolutely the mandate that I have given Frits.

On the point about geography and asset allocation, just before asking Bob to add. I mean I do feel and I have said quite often actually in these sorts of conversations, that when I think about optimal asset allocation, I have felt for some time that we are underweight America. We, I would like us to see a greater percentage of our overall earnings come from the United States and this transaction enables us to do just that. But as you and I both know, if you are increasing your exposure to the United States, most especially if you are not a national player, by that I mean you are a foreign player, you have to choose your competitive ground very carefully. And it is no coincidence that we have chosen the businesses that we have chosen to grow in the United States through time, because we feel we have competitive advantage in them and in our capital markets business, it is very clear to us that the competitive advantage of Barclays Capital will be significantly amplified by this deal.

Bob do you want to add in the context of BarCap?

Answer : Bob

I do. But before I do, I just reiterate one of the things that John said, you know, John's vision for Barclays which has been very clear for a number of years, the universal banking model. We recognise that the Barclays Capital, BGI businesses benefit from being housed with the Global Retail and Commercial banking businesses. It is true in Spain, it is true in the UK, it is true in South Africa, it is going to be true in Russia and the other places where Frits is building. So you know, there is no competition here, we recognise that 1+1 can equal 3. And there is no change in emphasis on any of that. It is the universal banking model that allows us to get to those synergies.

In terms of investment banking, if you saw the Presentation I gave at the Lehman Brothers Conference, ironic as that is, last week, the pools of revenues in investment banking and investment management are large. They are just under a trillion. They are growing at double the rate of GDP, notwithstanding the fact that '08 will be a slow year. But most importantly they are beginning to consolidate. Investment banking and investment management is beginning to consolidate and watch this picture. We have been talking about it for two or three years. We have a strong position in wealth, in asset management and in investment banking. In each of those areas we are in the top five in the world, not net wealth, but in asset management and investment banking. Wealth, we are just outside the top ten. We are beginning to see serious consolidation. Five or six percentage points over the last year. JP Morgan, Merrills are not going to slow that down. Barclays acquiring Lehman Brothers is not going to slow that down. There is a great opportunity as these markets begin to consolidate.

James

That was a very full answer, thank you.

John

Sorry James. You asked, we gave it to you.

Question 11 : Joseph Shutt - Goldman

My question has been answered thank you.

Question 12 : John Kirk - Redburn

Good afternoon everyone. Most of my questions are done as well thanks. But just a couple. I am trying to understand. Ostensibly it appears you have a fantastically priced deal here and I am trying to understand why that is. And I suspect it is because you are in a situation of probably being the only bidder and also you are buying from what is effectively a forced seller. Is that a fair interpretation of what actually happened and is that why the price is so favourable to you?

Answer : John

Well as I said, we shouldn't be presumptuous about the deliberation of the Court, but you could read into what we said and into our remarks this morning that the businesses are strikingly

complementary and we are in a position where we can step up and do something substantial here which I hope the Court will conclude is very much in the interest of creditors because of the scale of what we are undertaking and offering. And there aren't a large number of people who would have that interest who would have that complementarity. I also think, I made some remarks to this effect in what I said at the beginning, I hope that we were reasonably well prepared and that we also had the benefit of the work we did last week and over the weekend. What it requires of course is speed because the system needs that. The clients of Lehman need that and the people of Lehman need that. So it is important that we have moved quickly.

**Further Question**

And sorry, can you confirm whether or not you were the only bidder for the business?

**Answer : John**

Well we can only comment about what we have done and we have put an application in front of the Court. So far as I am aware nobody else has done.

**Further Question**

Okay thanks. And then, apologies, a slightly more sensitive one. But clearly you have paid a very, apparently anyway, a very low price for the business. Are you planning to incentivise the 10,000 people you are planning to take on to remain with the bank? And the reason I ask is because clearly that could become a material part of the consideration actually.

**John**

I am going to ask Bob to comment. But let me just. There is an important I guess point of philosophy and point of culture and value that I would say up front. Again in my remarks I have said that our assimilation of the opportunity among other things was importantly based on whether the values and the vision of the two businesses were consistent with each other and compatible. And we do believe very strongly that the reason why we are optimistic about recruiting a large number of Lehman staff in the US broker dealer is because it is clear to us that they do share our vision and our values and that they are a client driven organisation who are excited by the sort of things that we think we can achieve over the course of the coming years.

Bob will you add to what I have said?

**Answer : Bob**

John that was absolutely spot on. The only thing I would add is that the people at Lehman understand that the culture of pay for performance, a culture where we don't make long term deals, where we don't get percentage deals, that applies to them as well and they are delighted with it. They want an environment where it is about pay for performance.

**John**

*16 of 18*

Okay thanks.

Question 13 : Michael Rogers - Goldman

Yes with respect to the acquisition of Lehman's Brokerage side, has any consideration been given to Lehman Brothers International and Europe and how does that play in the overall part of the organisation?

Answer : John

It may be that you didn't hear the answer that we gave to a similar question a bit earlier. But if I could just sort of try to summarise what 'Bob and I said. What we said is that we have opportunities but no obligations in that regard. So we have acquired assets and businesses in the United States. We are recruiting a large number of people in the United States. We now have the opportunity and it is an opportunity that we are looking at quickly and seriously to see what else might fit with the businesses that we are developing elsewhere around the world. But think of it as opportunity and not obligation.

Further Question

Is that considered an obligation with respect to how the organisation is set up is that what you are saying?

Answer : John

No I am just saying that even if you ask me as part of this package are we required to acquire businesses and assets for example in London or in mainland Europe or in Asia, the answer is no. But it is possible to think that they would be people whose activities would be complementary to the businesses that we are buying and where bringing them in, we might create synergies, of course it is possible to contemplate that. But Bob's team is looking at that as we speak.

Michael

Thank you.

Question 14 : Michael Chepnivitz - HSBC

How are you. Just one question. I realise or I appreciate that you are limited in what you can say about the approval process and the Court proceedings here, but in the actual Court hearing, presumably the creditors have their representatives there and procedurally is the outcome binary? Is it just accept or reject? Or would the creditors through their representatives have the right to say well in principle it looks like a very solid transaction, but could we ask for different terms?

Answer : John

I think it really and I apologise for giving you a boring answer. I am not trying in any sense to be obstructive, but I just shouldn't presume on what takes place in Court, that would be an inappropriate thing for me to do. We are very clear that there is an opportunity here which we can execute on it. Achieves a number of things. It achieves potentially good returns for our shareholders through time. It creates a level of certainty about a big business in the market which I think is good for the system. It creates a much greater level of certainty for Lehman's clients in the United States. It creates a certainty for the people of Lehman's and I very much hope that the Court will conclude that it is very much in the interests of creditors, but that is their deliberation and we respect it.

Are there any further questions? I am conscious of the fact that we have almost been running an hour and so if there is one more question, we are happy to take it, if not we will wrap up.

Question 15 : Clifford S? - UBS

Hi, thanks for taking my question. I noticed that the assets and liabilities is less than the amount at Lehman Brothers Inc. And I was wondering if you could talk a little bit about the entities from which you are purchasing the assets and whether or not given that Lehman Brothers Inc is a regulated indemnity in the States, that it is not in Chapter 11, whether there might be any regulatory approvals in addition to the Court if you were taking a portion of those assets out of that non bankrupt entity?

Answer : John

I will ask Rich to comment. Of course here in the United Kingdom, because our lead regulator is the FSA, of course we have ensured that we have had the appropriate dialogue with the FSA and we are announcing in the way that we are because the FSA is comfortable with what we are doing. Let me turn to Rich to talk about the United States angle.

Answer : Rich

Yes we are purchasing assets from Lehman Brothers Inc. And the same as in the UK, we do acquire approval from the SEC which we have obtained.

John Varley

Well thank you very much indeed for joining us. We are really grateful to you for giving us so much time this morning.

End

# A. 47

# Filed Under Seal Pursuant To Protective Order

# A. 48

**Unknown**

Sent: Monday, March 30, 2009 7:22 PM

| | |
|---|---|
| **From:** | Shapiro, Mark J. <mark.shapiro@lehman.com> |
| **Sent:** | Wednesday, September 17, 2008 4:01 PM (GMT) |
| **To:** | Mallory Weil <MWeil@Halstead.com> |
| **Subject:** | RE: hey |

Thanks.  I had to quarterback the rescue over the weekend, so did not
sleep for 3 days, but with Barclays taking it over,  at least there are
10,000 jobs safe for now.  Thanks for the email.

From: Mallory Weil [mailto:MWeil@Halstead.com]
Sent: Wednesday, September 17, 2008 10:56 AM
To: Shapiro, Mark J.
Cc: Gitelle, Sharon
Subject: hey

You ok over there? I say yes, since your job is perfect for this market.
Just wanted to let you know that Sharon and I are thinking of you and
hope all is well.

Mallory

Mallory Weil

Vice President

Halstead Property, LLC

212-381-6589 (w)

917-453-4696 (c)

mweil@halstead.com

This e mail is for the named addressees only. If you are not the
intended recipient, please delete it from your files. If you do not wish
to receive commercial emails from me in the future and like to "Opt-Out"
please click email address at end of this email and hit send or reply
back to your sender with subject "remove me from your list." All
information is from sources deemed reliable but is subject to errors,
omissions, change of price, prior sale or withdrawal without notice. No
representation is made as to accuracy of any description. All
measurements and square footage are approximate and all information
should be confirmed by customer. All rights to content, photographs and
graphics reserved to Broker.

MWeil@Halstead.com <mailto:MWeil@Halstead.com?subject=PLEASE REMOVE FROM
YOUR LIST>

7/27/2009

137792

# A. 49

# Filed Under Seal Pursuant To Protective Order

# A. 50

Sent:9/17/2008 12:34 PM.

From:    Lowitt, Ian T [ilowitt@lehman.com].

To:    Reilly, Gerard [greilly@lehman.com]; Felder, Eric [efelder@lehman.com].

Cc:    .

Bcc:    .

Subject:    RE: LBI to New Co - Asset transfer.

That is my understanding. But check with whoever drafted the purchase
agreement. Ian

> _____
> From: Reilly, Gerard
> Sent: Wednesday, September 17, 2008 12:20 PM
> To: Felder, Eric; Aublin, Gilles; Orlan, Fred S; Quinn, Jason;
> Bugliari, Anthony S; Grimeh, Mohammed
> Cc: Chan, Katie; Zhang, Alice; Jaidi, Hicham; Potasiewicz, Brian;
> Lowitt, Ian T
> Subject: RE: LBI to New Co - Asset transfer
>
> The only assets that are not going from my understanding which is 2nd
> hand are 50% of the resi and abs books
>
> _____
>
> From: Felder, Eric
> Sent: Wednesday, September 17, 2008 12:12 PM
> To: Aublin, Gilles; Orlan, Fred S; Quinn, Jason; Bugliari, Anthony
> S; Grimeh, Mohammed
> Cc: Chan, Katie; Zhang, Alice; Jaidi, Hicham; Potasiewicz, Brian;
> Reilly, Gerard; Lowitt, Ian T
> Subject: RE: LBI to New Co - Asset transfer
>
> I think the barclays folks picked the assets. I recall them saying
> they didn't want the auction securities but I wasn't in all the
> meetings
>
> _____
>
> From: Aublin, Gilles
> Sent: Wednesday, September 17, 2008 12:11 PM
> To: Felder, Eric; Orlan, Fred S; Quinn, Jason; Bugliari, Anthony S;
> Grimeh, Mohammed
> Cc: Chan, Katie; Zhang, Alice; Jaidi, Hicham; Potasiewicz, Brian
> Subject: FW: LBI to New Co - Asset transfer
>
> For info, following our conversations. We'll send you the list of LBI
> assets for reference and will tag them all as good for transfer.
>
> Regards,
>
> Gilles
>
> _____
>
> From: Reilly, Gerard
> Sent: Wednesday, September 17, 2008 12:06 PM

EXHIBIT
10
7/3/09 w
PENGAD 800-631-6989

> To: Aublin, Gilles
> Cc: Bernard, Clement
> Subject: RE: LBI to New Co - Asset transfer
>
> All goes
>
> _____
>
> From: Aublin, Gilles
> Sent: Wednesday, September 17, 2008 11:53 AM
> To: Reilly, Gerard
> Cc: Bernard, Clement
> Subject: LBI to New Co - Asset transfer
>
> Gerry,
>
> We are getting started on the identification of assets to be
> transferred from LBI to NewCo. What should be our working assumptions
> with regards to assets sitting into the Credit and Munis Business ?
> Should we assume that everything goes ? Or are there some guidelines
> to exclude some assets that are deemed to be more toxic (example we
> have $2.8 b of ARS in High Grade and Muni combined).
>
> Regards,
>
> Gilles
>