# A. 61

# Filed Under Seal Pursuant To Protective Order

# A. 62

| From: | Yeung, Brian [brian.yeung@lehman.com]. | Sent:9/18/2008 5:32 PM. |
|---|---|---|
| To: | Kelly, Martin [martin.kelly@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | LBI BS - 9.17.08 . | |

Hi Martin -

Attached is the file Rose asked me to send to you.

<<LBI BS_917_V with adjustment.xls>>
Regards,
Brian Yeung
Lehman Brothers
1301 Avenue of Americas, 4th Floor
New York, NY 10019
* 212.320.6560
* brian.yeung@lehman.com



EXHIBIT

201

KK 8/18/09

**Lehman Brother Inc.**
**Balance Sheet as of September 17, 2008**
($ in millions)

| | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| **LIABILITIES:** | | | | | | | |
| S.T. BORROWINGS & CURRENT PORTION OF L.T. BORROWINGS | 508 | 531 | Per Treasury | | | 531 | |
| **FIN'L INSTR & OTHER INV POSNS SOLD BUT NOT PURCHASED** | | | | | | | |
| GOVERNMENTS & AGENCIES | 35,955 | 20,024 | | | 20,024 | - | 21,000 |
| TOTAL COMM PAPER & OTHER MKKT INSTRUMENTS | 19 | 24 | | | 24 | - | |
| MORTGAGES & ASSET-BACKED SEC | 2,170 | 1,740 | | | 1,740 | - | 2,100 |
| TOTAL CORPORATE DEBT & OTHER | 6,264 | 5,619 | | | 5,619 | - | 6,300 |
| TOTAL CORPORATE EQUITIES | 2,084 | 1,660 | | | 1,660 | - | 4,500 |
| DERIV & OTHER CONTR AGREEMENTS | | | | | | | |
| TOTAL SEC & OTHER FIN INSTR SOLD NOT PURCH. | 46,492 | 29,067 | | | 29,067 | - | 33,900 |
| COLLATERLIZED SHORT-TERM FINANCING | 107,954 | 74,602 | Per H.20H Inventory File | | 55,776 | 18,826 | 34,500 |
| **PAYABLES** | | | | | | | |
| COMPENSATION PAYABLE | 360 | 520 | Per A. Abolem Financing File | 1,000 | 1,520 | - | |
| TRADE LIABILITIES | 433 | 400 | | 383 | 783 | - | |
| OTHER | 22,095 | 16,026 | | | | 16,026 | 4,300 |
| **DUE TO SUBSIDIARIES** | | | | | | | |
| FTR with LBIE | 290 | 10,720 | Per 8/31 G/L Pay to Clearing Organizations $0.5B Per H.20 IGFS File FTD $4.2B Per J Pomericano Customer Pay $11B Per G/L Taxes $0.4B | | | 10,720 | |
| REPO with LBHI | 20,732 | - | | | | - | |
| REPO with LBIE | 13,469 | 16,194 | | | | 16,194 | |
| REPO with LBSF | 1,698 | 5,032 | | | | 5,032 | |
| REPO with Bankhaus | 1,351 | 350 | | | | 350 | |
| REPO with LBF | 1,391 | 1,351 | | | | 1,351 | |
| REPO with Lehman RE | 273 | 273 | | | | 273 | |
| REPO with I BH | 2,185 | - | | | | - | |
| REPO with LBCB | 2,918 | - | | | | - | |
| REPO with LOTC | 789 | - | | | | - | |
| STOCK LOAN with LBIE | 39,216 | 9,209 | | | | 9,209 | |
| STOCK LOAN with LBSF | 2,051 | 2,979 | | | | 2,979 | |
| STOCK LOAN with LB LUX | 20,664 | - | | | | - | |
| PAYABLE with LBIE | - | 4,571 | | | | 4,571 | |
| PAYABLE with LBCC | 554 | 606 | | | | 606 | |
| PAYABLE with LBSF | 100 | 737 | | | | 737 | |
| PAYABLE with LBJ | 283 | 444 | | | | 444 | |
| PAYABLE with LBCB | - | 122 | | | | 122 | |
| PAYABLE with LBHI | 707 | - | | | | - | |
| Other Receivables <$50mm | 4,895 | 731 | | | | 731 | |
| | 113,446 | 53,319 | | | - | 53,319 | |
| **TOTAL LIABILITIES** | 298,121 | 181,516 | Per Treasury $6.9B in intercompays | | 87,146 | 95,753 | 72,700 |
| **LONG-TERM DEBT** | | | | | | | |
| SENIOR NOTES | 7,043 | 7,051 | | | | 7,051 | |
| SUBORDINATED NOTES | | | | | | | |
| TOTAL LONG-TERM DEBT | 7,043 | 7,051 | | | | 7,051 | |
| **STOCKHOLDERS EQUITY** | | | | | | | |
| ADDITIONAL PAID IN CAPITAL | 3,866 | 3,866 | | | | 3,866 | |
| RETAINED EARNINGS | 306 | (1,045) | | | | (1,045) | |
| OTHER STOCKHOLDERS EQUITY, NET | 23 | 23 | | | | 25 | |
| TOTAL STOCKHOLDERS EQUITY | 4,195 | 2,844 | | | | 2,844 | |
| **TOTAL LIABILITIES & STOCKHOLDERS EQUITY** | 302,316 | 184,360 | | | 87,146 | 98,597 | 72,700 |
| Out of Balance | | (1,558) | | | | (1,558) | |

**Lehman Brother**
Balance Sheet as of September 17, 2008
($ in millions)

| ASSETS: | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| CASH & CASH EQUIVALENTS | 268 | 412 | | | 412 | - | |
| CASH & SECURITIES SEGR. AND ON DEPOSIT | 8,550 | 4,740 | Per L. Nacerino $1.9B customer cash locked up for 15d. $1.9B Future consumer cash set aside re MMkt Mutual funds. $1B of Good Faith Deposit with Exchanges per GL. | | | 4,740 | 700 |
| FINANCIAL INSTR. & OTHER INVENTORY POSITIONS OWNED | | | | | | | |
| GOVERNMENTS & AGENCIES | 30,225 | 37,214 | | | 37,214 | - | 40,000 |
| TOTAL COMM PAPER & OTHER MMKT INSTRUMENTS | 1,158 | 958 | | | 958 | - | 1,160 |
| MORTGAGES & ASSET-BACKED SEC | 6,499 | 5,972 | | | 2,986 | 2,986 | 2,700 |
| TOTAL CORPORATE DEBT & OTHER | 5,422 | 4,839 | | | 4,839 | - | 4,900 |
| TOTAL CORPORATE EQUITIES | 9,256 | 6,758 | | | 6,758 | - | 8,800 |
| DERIVATIVES AND OTHER CONTR. AGREEMENTS | 2,758 | 3,566 | | | 3,566 | - | 4,500 |
| TOTAL SECURITIES & OTHER FIN INSTR OWNED | 55,318 | 59,307 | | | 56,321 | 2,986 | 62,000 |
| COLLATERALIZED SHORT-TERM AGREEMENTS | 155,876 | 30,337 | Per A. Aberdent Financing File | | 30,337 | | |
| RECEIVABLES | 14,383 | 29,920 | Per F Exley re Repo (from Clearing Organization of $2.4B) Per H 2/off GFS File FTD $12.75B Per J Provenzano Customer Rec $14.2B | | 0 | 29,920 | 10,000 |
| OTHER ASSETS | 363 | 317 | Per H 2/off Inversion File | | | 341 | |
| INVESTMENT IN CONS SUBS | 1,924 | 1,592 | Per GL: PPES Norm, Goodwill $1.07mm | | 76 | 1,592 | |
| DUE FROM SUBSIDIARIES | | | | | | | |
| FTD with LBIE | 2,500 | 8,248 | | | | 8,248 | |
| FTD with LBHI | | 874 | | | | 874 | |
| REVERSE REPO with LBIE | 2,061 | 13,822 | | | | 13,822 | |
| REVERSE REPO with LBSF | 1,603 | 6,504 | | | | 6,504 | |
| REVERSE REPO with LCPI | 7,985 | 6,341 | | | | 6,341 | |
| REVERSE REPO with LBHI | 332 | 424 | | | | 424 | |
| REVERSE REPO with LB I Group | 129 | 122 | | | | 122 | |
| REVERSE REPO with LBF | | 85 | | | | 85 | |
| STOCK BORROW with LBIE | 44,849 | 12,902 | | | | 12,902 | |
| STOCK BORROW with LBSF | 4,235 | 4,479 | | | | 4,479 | |
| STOCK BORROW with LB I Group | 179 | 122 | | | | 122 | |
| RECEIVABLE with LBHI | | - | | 1,383 | | 3,464 | |
| RECEIVABLE with LBIE | 140 | 2,081 | | | | | |
| Other Receivables <$50mm | 1,601 | 172 | | | | 172 | |
| | 65,634 | 56,176 | | | | 57,559 | |
| TOTAL ASSETS | 302,516 | 182,802 | | | 87,146 | 97,039 | 72,700 |

# A. 63

| From: | Hauzenberg, Rose [rhauzenb@lehman.com]. | Sent:9/18/2008 7:27 PM. |
|---|---|---|
| To: | Kelly, Martin [martin.kelly@lehman.com]; Wong, Kristie [Kristie.Wong@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | LBI BS_917_V with adjustment.xls. | |

<<LBI BS_917_V with adjustment.xls>>
Martin

I added the $141mm of Accred Comp Payable to Other Comp related and all
other such as pension to trade payable.

Rose

**Lehman Brother**
**Balance Sheet as of September 17, 2008**
**$ in millions**

| ASSETS: | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| CASH & CASH EQUIVALENTS | 268 | 412 | | | 412 | - | 700 |
| CASH & SECURITIES SEGR AND ON DEPOSIT | 8,550 | 4,740 | Per I. Nuzmov w/o $1.9B customer cash locked up for 15cl; $1.9B Futures customer cash at stake in MMK Mutual funds, $1B of Good Faith Deposits with Exchanges per GFL | | | 4,740 | - |
| **FINANCIAL INSTR & OTHER INVENTORY POSITIONS OWNED** | | | | | | | |
| GOVERNMENTS & AGENCIES | 30,225 | 37,214 | | | 37,214 | - | 40,000 |
| TOTAL COMM PAPER & OTHER MMKT INSTRUMENTS | 1,158 | 958 | | | 958 | - | 1,100 |
| MORTGAGES & ASSET-BACKED SEC | 6,499 | 5,972 | | | 2,986 | 2,986 | 2,700 |
| TOTAL CORPORATE DEBT & OTHER | 5,422 | 4,839 | | | 4,839 | - | 4,900 |
| TOTAL CORPORATE EQUITIES | 9,256 | 6,758 | | | 6,758 | - | 8,800 |
| DERIVATIVES AND OTHER CONTR AGREEMENTS | 2,758 | 3,566 | Per H.Ziff Inventory File | | 3,566 | - | 4,500 |
| TOTAL SECURITIES & OTHER FIN INSTR OWNED | 55,318 | 59,307 | | | 56,321 | 3,986 | 62,000 |
| COLLATERALIZED SHORT-TERM AGREEMENTS | 155,876 | 30,337 | Per A. Aberdeen Financing File | | 30,337 | 0 | 10,000 |
| RECEIVABLES | 14,383 | 29,920 | Per P.Tennyson Rec from Clearing Organizations of $2.4B: Per H.Ziff GFS File FTD $12.5B: Per J. Potenciano Customer Rec $14.3B | | | 29,920 | |
| **OTHER ASSETS** | | | | | | | |
| INVESTMENT IN CONS SUBS | 363 | 317 | Per GL  PPE $76mm, Goodwill $133mm | | 76 | 241 | |
| DUE FROM SUBSIDIARIES | 1,924 | 1,592 | | | | 1,592 | |
| FTD with LBIE | 2,500 | 8,248 | | | | 8,248 | |
| FTD with LBHI | | 874 | | | | 874 | |
| REVERSE REPO with LBIE | 2,061 | 13,822 | | | | 13,822 | |
| REVERSE REPO with LBSF | 1,603 | 6,504 | | | | 6,504 | |
| REVERSE REPO with LCPI | 7,985 | 6,341 | | | | 6,341 | |
| REVERSE REPO with LBHI | 352 | 424 | | | | 424 | |
| REVERSE REPO with LB I Group | | 122 | | | | 122 | |
| REVERSE REPO with LBF | 129 | 85 | | | | 85 | |
| STOCK BORROW with LBIE | 44,849 | 12,902 | | | | 12,902 | |
| STOCK BORROW with LBSF | 4,235 | 4,479 | | | | 4,479 | |
| STOCK BORROW with LB I Group | 179 | 122 | | | | 122 | |
| RECEIVABLE with LBHI | - | 2,081 | | 1,804 | | 3,885 | |
| RECEIVABLE with LBIE | 140 | - | | | | | |
| Other Receivables <$50mm | 1,601 | 172 | | | | 172 | |
| | 65,634 | 56,176 | | | | 57,980 | |
| **TOTAL ASSETS** | 302,316 | 182,802 | | | 87,146 | 97,460 | 72,700 |

**Lehman Brother**
**Balance Sheet as of September 17, 2008**
**$ in millions**

## LIABILITIES:

| | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| S T BORROWINGS & CURRENT PORTION OF L.T. BORROWINGS | 308 | 531 | Per Treasury | | | 531 | |
| FINL INSTR & OTHER INV POSNS SOLD BUT NOT PURCHASED | | | | | | | |
| GOVERNMENTS & AGENCIES | 35,955 | 20,024 | | | 20,024 | - | 21,000 |
| TOTAL COMM PAPER & OTHER MMKT INSTRUMENTS | | | | | | - | |
| MORTGAGES & ASSET-BACKED SEC | 19 | 24 | | | 24 | - | |
| TOTAL CORPORATE DEBT & OTHER | 2,170 | 1,740 | | | 1,740 | - | 2,100 |
| TOTAL CORPORATE EQUITIES | 6,264 | 5,619 | | | 5,619 | - | 6,300 |
| DERIV & OTHER CONTR AGREEMENTS | 2,084 | 1,660 | Per H Ziff Inventory File | | 1,660 | - | 4,500 |
| TOTAL SEC & OTHER FIN INSTR SOLD NOT PURCH | 46,492 | 29,067 | | | 29,067 | - | 33,900 |
| COLLATERLIZED SHORT-TERM FINANCING | 107,954 | 74,602 | Per A. Abedeen Financing File | | 55,356 | 19,246 | 34,500 |
| PAYABLES | | | | | | | |
| BONUS PAYABLE | | - | | 1,500 | 1,500 | - | |
| OTHER COMPENSATION RELATED PAYABLES | 278 | 440 | | | 440 | - | |
| TRADE LIABILITIES | 423 | 479 | | 304 | 783 | - | |
| OTHER | 22,455 | 16,027 | Per 8/31 G/L Per. to Clearing Organizations $0.9B. Per H.Ziff GFS File FTD $4.2B. Per J. Pomenciano Customer Pay $11B. Per G/L Taxes $0.4B | | | 16,027 | 4,300 |
| DUE TO SUBSIDIARIES | | | | | | | |
| FTR with LBIE | 290 | 10,720 | | | | 10,720 | |
| REPO with LBHI | 20,732 | - | | | | - | |
| REPO with LBIE | 13,469 | 16,194 | | | | 16,194 | |
| REPO with LBSF | 1,608 | 5,032 | | | | 5,032 | |
| REPO with Bankhaus | 1,351 | 350 | | | | 350 | |
| REPO with LBF | 1,391 | 1,351 | | | | 1,351 | |
| REPO with Lehman RE | 273 | 273 | | | | 273 | |
| REPO with LBB | 2,185 | - | | | | - | |
| REPO with LBCB | 2,918 | - | | | | - | |
| REPO with LOTC | 759 | - | | | | - | |
| STOCK LOAN with LBIE | 39,216 | 9,209 | | | | 9,209 | |
| STOCK LOAN with LBSF | 2,051 | 2,979 | | | | 2,979 | |
| STOCK LOAN with LB LUX | 20,664 | - | | | | - | |
| PAYABLE with LBIE | - | 4,571 | | | | 4,571 | |
| PAYABLE with LBCC | 554 | 606 | | | | 606 | |
| PAYABLE with LBSF | 100 | 737 | | | | 737 | |
| PAYABLE with LBJ | 283 | 444 | | | | 444 | |
| PAYABLE with LBCB | - | 122 | | | | 122 | |
| PAYABLE with LBHI | 707 | - | | | | - | |
| Other Receibales >$50mm | 4,895 | 731 | | | | 731 | |
| | 113,446 | 53,319 | | | | 53,319 | |
| LONG-TERM DEBT | | | | | | | |
| SENIOR NOTES | 7,043 | 7,051 | Per Treasury: $6.5B is intercompany | | | 7,051 | |
| SUBORDINATED NOTES | | 23 | | | | | |
| TOTAL LONG-TERM DEBT | 7,043 | 7,051 | | | | 7,051 | |
| **TOTAL LIABILITIES** | 298,121 | 181,516 | | | 87,146 | 96,174 | 72,700 |
| STOCKHOLDERS' EQUITY | | | | | | | |
| ADDITIONAL PAID IN CAPITAL | 3,866 | 3,866 | | | | 3,866 | |
| RETAINED EARNINGS | 306 | (1,045) | | | | (1,045) | |
| OTHER STOCKHOLDERS EQUITY, NET | 23 | 23 | | | | 23 | |
| TOTAL STOCKHOLDERS EQUITY | 4,195 | 2,844 | | | | 2,844 | |
| **TOTAL LIABILITIES & STOCKHOLDERS' EQUITY** | 302,316 | 184,360 | | | 87,146 | 99,018 | 72,700 |
| Out of Balance | - | (1,558) | | | - | (1,558) | |

# A. 64

**Unknown**

**Sent:** Wednesday, March 25, 2009 10:31 AM

| | |
|---|---|
| **From:** | Hauzenberg, Rose [rhauzenb@lehman.com] |
| **Sent:** | Thursday, September 18, 2008 11:33 PM (GMT) |
| **To:** | Kelly, Martin [martin.kelly@lehman.com]; Wong, Kristie [Kristie.Wong@lehman.com] |
| **Subject:** | RE: LBI BS_917_V with adjustment.xls |
| **Attach:** | LBI BS_917_V with adjustment.xls |

Adjusted for 141

I changed the Trade payable to $1B for the changes on LBI

<<LBI BS_917_V with adjustment.xls>>

>
> _____
> From:      Kelly, Martin
> Sent: Thursday, September 18, 2008 7:31 PM
> To:   Wong, Kristie; Hauzenberg, Rose
> Subject:     RE: LBI BS_917_V with adjustment.xls
>
> OK
>
> _____
> From:      Wong, Kristie
> Sent: Thursday, September 18, 2008 7:29 PM
> To:   Hauzenberg, Rose; Kelly, Martin
> Subject:     RE: LBI BS_917_V with adjustment.xls
>
> Do not use. We are taking the $141 out.
>
> _____
> From:      Hauzenberg, Rose
> Sent: Thursday, September 18, 2008 7:27 PM
> To:   Kelly, Martin; Wong, Kristie
> Subject:     LBI BS_917_V with adjustment.xls
>
>     << File: LBI BS_917_V with adjustment.xls >>
> Martin
>
> I added the $141mm of Accred Comp Payable to Other Comp related and
> all other such as pension to trade payable.
>
> Rose

10252963

# Lehman Brother Inc.
## Balance Sheet as of September 17, 2008
($ in millions)

| | | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|---|
| 5 | **ASSETS:** | | | | | | | |
| 7 | CASH & CASH EQUIVALENTS | 268 | 412 | | | 412 | | 700 |
| 8 | CASH & SECURITIES SEGR. AND ON DEPOSIT | 8,550 | 4,740 | Per L. Naznowitz $1.9B customer cash locked up for 15:3..$1.9B Futures customer cash set aside in MMK Mutual funds: $1B of Good Faith Deposits with Exchanges per GL. | | | 4,740 | |
| 10 | FINANCIAL INSTR. & OTHER INVENTORY POSITIONS OWNED | | | | | | | |
| 11 | GOVERNMENTS & AGENCIES | 30,225 | 37,214 | | | 37,214 | - | 40,000 |
| 12 | TOTAL COMM PAPER & OTHER MMKT INSTRUMENTS | 1,158 | 958 | | | 958 | - | 1,100 |
| 13 | MORTGAGES & ASSET-BACKED SEC | 6,499 | 5,972 | | | 2,986 | 2,986 | 2,700 |
| 14 | TOTAL CORPORATE DEBT & OTHER | 5,422 | 4,839 | | | 4,839 | - | 4,900 |
| 15 | TOTAL CORPORATE EQUITIES | 9,256 | 6,758 | | | 6,758 | - | 8,800 |
| 16 | DERIVATIVES AND OTHER CONTR. AGREEMENTS | 2,758 | 3,566 | | | 3,566 | - | 4,500 |
| 17 | TOTAL SECURITIES & OTHER FIN INSTR OWNED | 55,318 | 59,307 | Per H Ziff Inventory File | | 56,321 | 2,986 | 62,000 |
| 19 | COLLATERALIZED SHORT-TERM AGREEMENTS | 155,876 | 30,337 | Per A. Abedeen Financing File | | 30,337 | 0 | 10,000 |
| | RECEIVABLES | 14,383 | 29,920 | Per P.Tennyson Rec from Clearing Organizations of $2.4B; Per H.Ziff GFS File FTD $12.5B; Per J Polamisano Customer Rec $14.3B | | | 29,920 | |
| 21 | OTHER ASSETS | 363 | 317 | Per GL  PPE $76mm, Goodwill $133mm | | 76 | 241 | |
| 22 | INVESTMENT IN CONS. SUBS | 1,924 | 1,592 | | | | 1,592 | |
| 23 | DUE FROM SUBSIDIARIES | | | | | | | |
| 24 | FTD with LBIE | 2,500 | 8,248 | | | | 8,248 | |
| 25 | FTD with LBHI | | 874 | | | | 874 | |
| 26 | REVERSE REPO with LBIE | 2,061 | 13,822 | | | | 13,822 | |
| 27 | REVERSE REPO with LBSF | 1,603 | 6,504 | | | | 6,504 | |
| 28 | REVERSE REPO with LCPI | 7,985 | 6,341 | | | | 6,341 | |
| 29 | REVERSE REPO with LBHI | 352 | 424 | | | | 424 | |
| 30 | REVERSE REPO with LB I Group | | 122 | | | | 122 | |
| 31 | REVERSE REPO with LBF | 129 | 85 | | | | 85 | |
| 32 | STOCK BORROW with LBIE | 44,849 | 12,902 | | | | 12,902 | |
| 33 | STOCK BORROW with LBSF | 4,235 | 4,479 | | | | 4,479 | |
| 34 | STOCK BORROW with LB I Group | 179 | 122 | | | | 122 | |
| 35 | RECEIVABLE with LBHI | - | 2,081 | | 1,786 | | 3,867 | |
| 36 | RECEIVABLE with LBIE | 140 | | | | | | |
| 37 | Other Receivables <$50mm | 1,691 | 172 | | | | 172 | |
| 38 | | 65,634 | 56,176 | | | | 57,962 | |
| 41 | **TOTAL ASSETS** | 302,316 | 182,802 | | | 87,146 | 97,442 | 72,700 |

**Lehman Brother Inc.**

**Balance Sheet as of September 17, 2008**

**($ in millions)**

| | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| **LIABILITIES:** | | | | | | | |
| S.T. BORROWINGS & CURRENT PORTION OF L.T. BORROWINGS | 308 | 531 | Per Treasury | | | 531 | |
| FINL INSTR & OTHER INV POSNS SOLD BUT NOT PURCHASED | | | | | | | |
| GOVERNMENTS & AGENCIES | 35,955 | 20,024 | | | 20,024 | | 21,000 |
| TOTAL COMM PAPER & OTHER MMKT INSTRUMENTS | 19 | 24 | | | 24 | - | |
| MORTGAGES & ASSET-BACKED SEC | 2,170 | 1,740 | | | 1,740 | - | 2,100 |
| TOTAL CORPORATE DEBT & OTHER | 6,264 | 5,619 | | | 5,619 | - | 6,300 |
| TOTAL CORPORATE EQUITIES | 2,084 | 1,660 | | | 1,660 | - | 4,500 |
| DERIV & OTHER CONTR AGREEMENTS | | | | | | | |
| TOTAL SEC & OTHER FIN INSTR SOLD NOT PURCH | 46,492 | 29,067 | Per H.Zdff Inventory File | | 29,067 | - | 33,900 |
| COLLATERALIZED SHORT-TERM FINANCING | 107,954 | 74,602 | Per A. Abraham Financing File | | 55,374 | 19,228 | 34,500 |
| PAYABLES: | | | | | | | |
| BONUS PAYABLE | - | - | | 1,500 | 1,500 | | |
| OTHER COMPENSATION RELATED PAYABLES | 278 | 205 | | | 205 | | |
| TRADE LIABILITIES | 423 | 714 | | 286 | 1,000 | - | |
| OTHER | 22,455 | 16,027 | Per 8/31 G/L Pay to Clearing Organizations $0.5B; Per H.Zdff GFS File FTD $4.2B; Per J. Potenciano Customer Pay $11B; Per G/L Taxes $0.4B | | | 16,027 | 4,300 |
| DUE TO SUBSIDIARIES | | | | | | | |
| FTR with LBIE | 290 | 10,720 | | | | 10,720 | |
| REPO with LBHI | 20,732 | 16,194 | | | | 16,194 | |
| REPO with LBIE | 13,469 | 5,032 | | | | 5,032 | |
| REPO with LBSF | 1,608 | 350 | | | | 350 | |
| REPO with Bankhaus | 1,351 | 1,351 | | | | 1,351 | |
| REPO with LBF | 1,391 | 273 | | | | 273 | |
| REPO with Lehman RE | 273 | - | | | | | |
| REPO with LBB | 2,185 | - | | | | | |
| REPO with LBCB | 2,918 | - | | | | | |
| REPO with LOTC | 759 | | | | | | |
| STOCK LOAN with LBIE | 39,216 | 9,209 | | | | 9,209 | |
| STOCK LOAN with LBSF | 2,051 | 2,979 | | | | 2,979 | |
| STOCK LOAN with LB LUX | 20,664 | - | | | | | |
| PAYABLE with LBIE | - | 4,571 | Per Treasury $6.9B is intercompany | | | 4,571 | |
| PAYABLE with LBCC | 554 | 606 | | | | 606 | |
| PAYABLE with LBSF | 100 | 737 | | | | 737 | |
| PAYABLE with LBJ | 283 | 444 | | | | 444 | |
| PAYABLE with LBCB | - | 122 | | | | 122 | |
| PAYABLE with LBHI | 707 | - | | | | | |
| Other Receivables <$50mm | 4,895 | 731 | | | | 731 | |
| | 113,446 | 53,319 | | | | 53,319 | |
| **TOTAL LIABILITIES** | 298,121 | 181,516 | | | 87,146 | 96,156 | 72,700 |
| LONG-TERM DEBT: | | | | | | | |
| SENIOR NOTES | | | | | | | |
| SUBORDINATED NOTES | 7,043 | 7,051 | | | | 7,051 | |
| TOTAL LONG-TERM DEBT: | 7,043 | 7,051 | | | | 7,051 | |
| **STOCKHOLDERS EQUITY** | | | | | | | |
| ADDITIONAL PAID IN CAPITAL | 3,866 | 3,866 | | | | 3,866 | |
| RETAINED EARNINGS | 306 | (1,045) | | | | (1,045) | |
| OTHER STOCKHOLDERS EQUITY, NET | 23 | 23 | | | | 23 | |
| TOTAL STOCKHOLDERS EQUITY | 4,195 | 2,844 | | | | 2,844 | |
| **TOTAL LIABILITIES & STOCKHOLDERS' EQUITY** | 302,316 | 184,360 | | | 87,146 | 99,000 | 72,700 |
| Out of Balance | - | (1,558) | | | - | (1,558) | |

# A. 65

# Filed Under Seal Pursuant To Protective Order

# A. 66

| From: | Blackwell, Alastair [ablackwe@lehman.com]. | Sent:9/18/2008 11:32 PM. |
|---|---|---|
| To: | Lowitt, Ian T [ilowitt@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | Fw:. | |

---------------------------------

----- Original Message -----
From: Hraska, James W
To: Blackwell, Alastair
Sent: Thu Sep 18 23:28:40 2008
Subject: RE:

Without margin we are 1.5B short
With margin we owe them 7B

We have 14b in the box so this is what we are trying to do

Take a loan from chase
Book a tri to them and fill with cash

Still hope

-----Original Message-----
From: Blackwell, Alastair
Sent: Thursday, September 18, 2008 11:25 PM
To: Hraska, James W
Subject:

What's the latest

---------------------------------



# A. 67

## Management of the Unencumbered Asset Gap

**Objective**: Delivery to BCI of $1.95Bn of unencumbered collateral by COB Friday 19th September

### Current Status Summary:

|  |  | Amount | Outstanding Actions | Action Owner |
|---|---|---|---|---|
| 1. | Actual Delivery EOD Friday | $1.09Bn | Validation of Settled v Unsettled of TriParty at BoNY | J.Hraska |
| 2. | Additional 074 DTCC Depot (ADP/TMS) | $863m | Validated | |
| 3. | Additional 636 DTCC Depot (FI) | $301m | Validated | |
| 4. | Additional Euroclear 22780 | $32m | Validated | |
| 5. | Additional Canadian Assets | $4m | Validated | |
|  | **Total Unencumbered Collateral** | **$2.290Bn** | | |
|  | **Surplus** | **$340m** | Subject to removal of unsettled Assets in TriParty list | |

### Methodology Employed:

1. Actual Delivery EOD Friday ($800m - $1Bn)

   - The financing desk pledged all unencumbered 074 assets at start of day Sept 19th (as determined by front end financing systems) to the BoNY Triparty.

   - Additional unencumbered collateral became available via intra day delivers. This was also pledged to BoNY Triparty by the desk. This ceased once Chase froze accounts.

   - Due to system limitations the current $1.09Bn balance shown requires validation using the actual TriParty account list when available from BoNY to determine any unsettled positions.

2. On Saturday Sept. 20th GFS data (processed for COB 19th) was utilized to identify unencumbered collateral (not sourced by the front end financing systems). Collateral was reviewed to ascertain value and location. Findings below;



**DTCC Depositories for LBI:**

074 – TMS&ADP

- Collateral was found in both 931 Firm Account Range & Stock Loan Accounts
- Market Value = $863m

636 – Fixed Income / MTS

- Stock Record review from Mainframe (MTS)
- Account 636 (Firm Inventory: primarily mortgage collateral)
- Market Value = $301m

**LBI Euroclear Account**

- LBI Euroclear 22780 = $32m

**Canadian Assets**

- Market Value = $3.55m

# A. 68

# Filed Under Seal Pursuant To Protective Order

# A. 69

**Administrator**

Sent: Wednesday, March 25, 2009 10:30 AM

| | |
|---|---|
| **From:** | Kelly, Martin [martin.kelly@lehman.com] |
| **Sent:** | Friday, September 19, 2008 4:32 AM (GMT) |
| **To:** | O'Meara, Chris M (NY) [comeara@lehman.com] |
| **Subject:** | |
| **Attach:** | LBI BS_917_V with adjustment (4).xls |

<<LBI BS_917_V with adjustment (4).xls>>

Martin Kelly
Managing Director
Lehman Brothers Inc
Ph 212 526 3606

10283530

**Lehman Brother Inc.**
**Balance Sheet as of September 17, 2008**
($ in millions)

| | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| **LIABILITIES** | | | | | | | |
| ST. BORROWINGS & CURRENT PORTION OF L.T. BORROWINGS | 308 | 331 | | | | 331 | |
| FIN. INSTR. & OTHER INV. POSNS SOLD BUT NOT PURCHASED | | | | | | | |
| GOVERNMENTS & AGENCIES | 35,955 | 20,024 | Per Treasury | | 20,024 | | 21,000 |
| TOTAL COMM PAPER & OTHER & OTHER ST INSTLMNTS | | | | | | | |
| MORTGAGE BACKED SEC | 19 | 24 | | | | 24 | |
| TOTAL CORPORATE DEBT & OTHER | 2,170 | 1,740 | | | | 1,740 | 2,100 |
| TOTAL CORPORATE EQUITIES | 6,264 | 5,619 | | | | 5,619 | 6,300 |
| DERIV & OTHER CONTR AGREEMENTS | 2,084 | 1,660 | | | | 1,660 | 4,000 |
| TOTAL SEC & OTHER FIN INSTR. SOLD NOT PURCH. | 46,492 | 29,067 | Per 14,267 treasury File | | | 29,067 | 33,900 |
| COLLAT SHORT TERM FINANCING | 107,934 | 74,602 | Per A. Jockers Financing File | | | 34,900 | |
| **PAYABLES** | | | | | | | |
| Bonus payable | 701 | 608 | | 2,000 | 2,000 | 20,173 | |
| Curr pref/restricted/accrued payable | | | | 1,645 | 2,250 | | |
| OTHER | 22,455 | 16,341 | Per 8/31 OL Pty to Clearing Organizations $0.0B. Per HLBT OFS $40 FTD $4.3B Per A. Pietrusken Container Per 31/30b Per OL Trans $0.4B | | 0 | 16,341 | 4,300 |
| **DUE TO SUBSIDIARIES** | | | | | | | |
| FTR with LBIE | 290 | 10,720 | | | | 10,720 | |
| FTR with LBHI | 20,132 | | | | | | |
| REPO with LBIE | 13,469 | 16,194 | | | | 16,194 | |
| REPO with LBSF | 1,608 | 5,032 | | | | 5,032 | |
| REPO with Bankhaus | 1,351 | 350 | | | | 350 | |
| REPO with LBF | 1,391 | 1,351 | | | | 1,351 | |
| REPO with Lehman RE | 273 | 273 | | | | 273 | |
| REPO with LBL | 2,181 | | | | | | |
| REPO with LBJ | 2,918 | | | | | | |
| REPO with LOTC | 759 | | | | | | |
| STOCK LOAN with LBIE | 19,216 | 9,209 | | | | 9,209 | |
| STOCK LOAN with LBSF | 2,051 | 2,979 | | | | 2,979 | |
| STOCK LOAN with LB LUX | 20,664 | | | | | | |
| PAYABLE with LBIE | 554 | 4,571 | | | | 4,571 | |
| PAYABLE with LBCC | 100 | 606 | | | | 606 | |
| PAYABLE with LBSF | 283 | 737 | | | | 737 | |
| PAYABLE with LBJ | | 444 | | | | 444 | |
| PAYABLE with LBCB | | 122 | | | | 122 | |
| PAYABLE with Lehman RE | 707 | | | | | | |
| Other Receivbare <$50mm | 4,895 | 731 | | | | 731 | |
| STOCK LOAN with LBSF | 113,446 | 53,319 | | | | 53,319 | |
| **TOTAL LIABILITIES** | 298,121 | 181,516 | | 87,146 | 98,015 | | 72,700 |
| **LONG-TERM DEBT** | | | | | | | |
| SENIOR NOTES | 7,041 | 7,051 | Per Treasury file 35 in entity/company | | | 7,051 | |
| SUBORDINATED NOTES | | | | | | | |
| TOTAL LONG-TERM DEBT | 7,041 | 7,051 | | | | 7,051 | |
| **STOCKHOLDERS' EQUITY** | | | | | | | |
| ADDITIONAL PAID IN CAPITAL | 3,866 | 3,866 | | | | 3,866 | |
| RETAINED EARNINGS | 306 | (1,043) | | | | (1,043) | |
| OTHER STOCKHOLDERS EQUITY, NET | 23 | 23 | | | | 23 | |
| TOTAL STOCKHOLDERS EQUITY | 4,195 | 2,844 | | | | 2,844 | |
| **TOTAL LIABILITIES & STOCKHOLDERS' EQUITY** | 302,316 | 184,360 | | 87,146 | 100,859 | | 72,700 |
| Out of Balance | | (1,558) | | | | (1,558) | |

**Lehman Brother Inc.**

**Balance Sheet as of September 17, 2008**

($ in millions)

| | 08/31/08 | 09/17/08 | Notes | Transaction Adjustments | Balance Sheet Transferred | Balance Sheet Remaining | Purchase Agreement |
|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | |
| CASH & CASH EQUIVALENTS | 268 | 412 | | | | 412 | |
| CASH & SECURITIES SEGR. AND ON DEPOSIT | 8,550 | 4,740 | Per L. Nisenson 11/18 customer cash held up for I-Co. 11/19 Please number: cash not sold to AMC. Adams Note: 11B of Dowd Fails deposited with Barclays per GFL. | | | 4,740 | 700 |
| | | | | | | | |
| **FINANCIAL INSTR. & OTHER INVENTORY POSITIONS OWNED:** | | | | | | | |
| GOVERNMENTS & AGENCIES | 30,025 | 37,214 | | | | 37,214 | |
| TOTAL COMM PAPER & OTHER MARKT INSTRUMENTS | 1,504 | | | | | | 40,000 |
| MORTGAGES & ASSET-BACKED SEC | 6,499 | 938 | | | | 938 | |
| TOTAL CORPORATE DEBT & OTHER | 5,422 | 5,572 | | | | | 16,100 |
| TOTAL CORPORATE EQUITIES | 9,246 | 4,839 | | | | 2,986 | 2,100 |
| DERIVATIVES AND OTHER CONTRL AGREEMENTS | 2,758 | 1,228 | | | | 4,839 | 4,900 |
| TOTAL SECURITIES & OTHER FIN INSTR OWNED | 55,318 | 59,307 | Per MLHF Inventory File | | | 5,758 / 3,566 | 4,500 |
| | | | | | | | 62,000 |
| COLLATERALIZED SHORT-TERM AGREEMENTS | 155,876 | 30,337 | Per A. Abraham Financing File | | 30,337 | 0 | |
| RECEIVABLES | 14,383 | 29,920 | Per T. Peterson file from Greg Organisation of 51.8b Per BLKP OFS File FTD 1112.8c Per J Peterson Customer File 11/18 Per GOL, PFS 11.6sec. Deposit 11/19am | | | 29,920 | 10,000 |
| OTHER ASSETS | 363 | 317 | | | 76 | 241 | |
| INVESTMENT IN CONS. SUBS | 1,924 | 1,592 | | | | 1,592 | |
| **DUE FROM SUBSIDIARIES** | | | | | | | |
| FTD with LBIE | 2,500 | 8,248 | | | | 8,248 | |
| FTD with LBHI | | 10 | | | | 10 | |
| REVERSE REPO with LBIE | 2,661 | 874 | | | | 874 | |
| REVERSE REPO with LBSF | 1,603 | 13,822 | | | | 13,822 | |
| REVERSE REPO with LCPI | 7,985 | 6,504 | | | | 6,504 | |
| REVERSE REPO with LBHI | 352 | 6,341 | | | | 6,341 | |
| REVERSE REPO with LB I Group | | 424 | | | | 424 | |
| REVERSE REPO with LBF | 129 | 128 | | | | 128 | |
| STOCK BORROW with LBIE | 44,449 | 83 | | | | 83 | |
| STOCK BORROW with LBSF | 4,233 | 12,902 | | | | 12,902 | |
| STOCK BORROW with LB I Group | 179 | 4,479 | | | | 4,479 | |
| STOCK BORROW with LBF | | 122 | | | | 122 | |
| RECEIVABLE with LBIE | 140 | 2,081 | | | | 2,081 | |
| RECEIVABLE with LBHI | 1,601 | | | 3,645 | | 3,726 | |
| Other Receivables <$50mm | 51,654 | 173 | | | | 12 | |
| **TOTAL ASSETS** | 300,316 | 182,802 | | | 871,465 | 99,801 | 12,700 |

# A. 70

# Filed Under Seal Pursuant To Protective Order

# A. 71

# Filed Under Seal Pursuant To Protective Order

# A. 72

# Filed Under Seal Pursuant To Protective Order

# A. 73

# Filed Under Seal Pursuant To Protective Order

# A. 74

**Administrator**

Sent: Tuesday, March 24, 2009 10:40 PM

| | |
|---|---|
| **From:** | Keller, Andy R [akeller@stblaw.com] |
| **Sent:** | Saturday, September 20, 2008 12:27 AM (GMT) |
| **To:** | Berkenfeld, Steven [sberkenf@lehman.com]; Genirs, Kevin [kgenirs@lehman com] |
| **Cc:** | Finley, John G [jfinley@stblaw.com] |
| **Subject:** | Fw: Revised Clarification Letter--PIM notes/matched book liabilities? |
| **Attach:** | Clarification Letter_#1916861 DOC;Clarification Letter_#1916861 DOC |

1) Cleary did not accept changes to language on payment for PIM notes. Should pay outstanding amount (unless you otherwise agree) or LBHI effectively pays comp for Barclays employees
2) I don't understand where the $68B of matched book liabilities is being assumed by Barclays. Seems to have been deleted. Is that the deal?

Andrew Keller
akeller@stblaw.com
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3577
Fax: (212) 455-2502

----- Original Message -----
From: david.murgio@weil.com <david.murgio@weil.com>
To: Keller, Andy R; ClaytonW@sullcrom.com <ClaytonW@sullcrom.com>; dleinwand@cgsh.com <dleinwand@cgsh.com>;
feldsteinh@sullcrom.com <feldsteinh@sullcrom.com>; Finley, John G; Jonathan.Hughes@barcap.com <Jonathan.Hughes@barcap.com>;
Kevin.Genirs@lehman com <Kevin.Genirs@lehman com>; Dowd, Patrick M; Martelli, Peter; Richard.Smith3@barcap.com
<Richard.Smith3@barcap com>; sberkenf@lehman.com <sberkenf@lehman.com>; vlewkow@cgsh.com <vlewkow@cgsh.com>;
harvey.millen@weil.com <harvey miller@weil.com>; james grogan@weil.com <james grogan@weil com>; jane mcdonald@weil.com
<jane mcdonald@weil com>; lori.fife@weil.com <lori.fife@weil.com>; michael lubowitz@weil.com <michael.lubowitz@weil.com>;
robert.messineo@weil.com <robert.messineo@weil.com>; rod.miller@weil.com <rod.miller@weil.com>; Shai.Waisman@weil.com
<Shai.Waisman@weil.com>; erika.weinberg@weil com <erika.weinberg@weil.com>; michael.bond@weil.com <michael.bond@weil.com>;
Robert.Shmalo@weil.com <Robert.Shmalo@weil.com>; jeffrey.osterman@weil.com <jeffrey.osterman@weil.com>
Sent: Fri Sep 19 20:09:51 2008
Subject: Revised Clarification Letter

Please find attached a revised version of the Clarification Letter.
Cleary has offered to bring a number of copies to court, so if you are in court, they are coming.

Note that our Real Estate team made some changes to the language Cleary sent over.

Regards

David

_____

David Murgio
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Tel (212) 310 8764
Fax (212) 310 8007
e-mail david.murgio@weil.com

6/22/2009

10284820

*WGM Draft – September 19, 2008 – 7:30 pm*

## BARCLAYS CAPITAL INC.

September __, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage-backed securities trading operations of LBI and (c) all prime brokerage accounts, and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology,

1

10279855

wherever in the world held by Holdings or any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business. For the avoidance of doubt, the Business includes LBI's commodities business.

(b)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business. As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business). The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller ("PIM Employee Notes"). [Purchaser agrees to pay any proceeds it receives in respect of such PIM Employee Notes to Seller if and when received. After the date hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to jointly seek Bankruptcy Court approval of any such alternative means.] Excluded Liabilities shall include

2

10279855

any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the Business.  Nothing in this Paragraph 3 is intended to modify Section 8.12 of the Agreement [and no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."]

4.    License.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the term of the license granted for use in connection with the IMD Business (including in respect of investment funds) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with the winding up of any such businesses.

5.    Hedges on Long Positions.  The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded).  The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds.  Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

11    Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract

3

10279855

12    Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

14.    Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries, and Seller and its Subsidiaries will release Purchaser and its Affiliates, from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates. (the "Barclays Repurchase Agreement")

15.    Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within

-4-

a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing, provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease

5

10279855

agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

22.    Definition of Contract. Contract shall not include swap agreements.

6

10279855

23.   PIM Business Leases.  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

10279855

Sincerely,

**BARCLAYS CAPITAL INC.**

**By:** _____
Name:
Title:

Agreed to and accepted as of the date first written above:

**LEHMAN BROTHERS HOLDINGS INC.**

**By:** _____
Name:
Title:

**LEHMAN BROTHERS INC.**

**By:** _____
Name:
Title:

**LB 745 LLC**

**By:** _____
Name:
Title:

10279855

*WGM Draft – September 19, 2008 – 5[7]:00[3]0 pm*

**BARCLAYS CAPITAL INC.**

September __, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement. This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement and supplements in certain respects the agreements of the parties stated therein and shall amend the Agreement to the extent necessary so as to be consistent with this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets), including the items set forth in clauses (a) through (d) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets," plus, with respect to securities of owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto; it being understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 million billion. The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short agreements relating to short positions of LBI. Also included in the Purchased Assets are (a) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA, (b) the government securities trading and mortgage-backed securities trading operations of LBI and (c) all prime brokerage accounts, and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business). Purchased Intellectual Properties includes Intellectual Property Rights, Software and Technology,

1

NY2:\1914861\09\10137\30 [2]DK.C73542]1037

10279858

wherever in the world held by Holdings or any of its Subsidiaries, that are primarily used or necessary for the conduct by Purchaser of the Business and for conduct of the commodities business  For the avoidance of doubt, the Business includes the Sellers'LBI's commodities business.

(b)     The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of LBHI and its Subsidiaries.  In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," theThe following shall also be Excluded Assets:  All of the investments held by SellersSeller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement (as hereinafter defined). Also included in the Excluded Assets are (a) the mortgage servicing rights for Ginnie Mae guaranteed securities and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC,  are Excluded Assets (rather than Purchased Assets).  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.     IMD Business.  For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business.  As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and Purchased Assets and the Business include the private investment management business (other than the CTS (Corporate Cash) business).  The employees of PIM of the Closing Date shall become Transferred Employees.  For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the private investment management business of Seller (the "PIM Business") in the pool of Transferred Employees.  Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business.  The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c).  The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller ("PIM Employee Notes")  [Purchaser agrees to pay any proceeds it receives in respect of such notesPIM Employee Notes to Seller if and when received  After the date hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to jointly

2

seek Bankruptcy Court approval of any such alternative means.] Excluded Liabilities shall
include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the
benefit of clients of the PIM Business.

3.    Assumed Liabilities.  Clause (a) of the definition of "Assumed Liabilities"
consists solely of all Liabilities incurred by Purchaser, after the Closing, in connection with the
Business.  Nothing in this Paragraph 43 is intended to modify Section 8.12 of the Agreement
[and no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be
"Assumed Liabilities."]

4.    License.  All marks containing the words "LEHMAN" or "LEHMAN
BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section
8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of
the Agreement with respect to the investment banking and capital markets businesses of Seller
and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the
term of the license granted for use in connection with the IMD Business (including in respect of
investment funds) or in connection with winding up of any operations or businesses of Seller or
any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable,
except that such licenses are assignable and sublicensable (i) for use in connection with IMD
Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or a purchaser of
any other businesses of Seller and its Subsidiaries, in each case solely for use in connection with
the winding up of any such businesses.

5.    Hedges on Long Positions.  The Purchased Assets and Assumed
Liabilities include hedges placed on the Long Positions that are entered into after the date of the
Agreement and before Closing, but will not include any other types of hedges or derivatives
(other than it being understood that exchange-traded derivatives as specified in clause (d) of the
definition of "Purchased Assets" and TBA MS, but not any other are included in Long Positions,
but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and
forward currency contracts, are excluded).  The reference to "government securities" in the
definition of Long Positions includes securities of any government agency.

6.    Subordinated Notes of LBI.  The outstanding subordinated notes of LBI
and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities
associated with such subordinated notes therefore are Excluded Liabilities.

7.    Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for
Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement
(each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds.  Any cash amount received from closing out Long
Positions, less the cash amount expended to close out Short Positions, before the Closing, shall
be delivered to Purchaser.

11.    Payables, Deposits and Receivables.  No payables or deposits of a Seller
or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased
Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a
Purchased Contract.

3

10279858

12.    Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations, respectively, of Seller or its Subsidiaries or between or among any Seller or any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

13.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties

14.    Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries from any obligation, and Seller and its Subsidiaries will release Purchaser and its Affiliates, from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates.  (the "Barclays Repurchase Agreement")

15.    Risk of Loss of Artwork.  During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

16.    Records.  The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail.  The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

17.    Subleases.  Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by Seller in connection with the bankruptcy proceedings and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within

-4-

10279858

a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entity entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease

5

10279858

agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

18.    <u>Deferred Transfers</u>.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

19.    <u>745 Seventh Avenue</u>.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

1.1    20.    <u>Prorations</u>.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

21.    <u>Schedules</u>.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    <u>Definition of Contract</u>.  Contract shall not include swap agreements.  22.    <u>Definition of Contract</u>.  Contract shall not include swap agreements.

6

10279858

21.____ PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

7

10279858

Sincerely,

**BARCLAYS CAPITAL INC.**

**By:** _____
**Name:**
**Title:**

**Agreed to and accepted as of the date first written above:**

**LEHMAN BROTHERS HOLDINGS INC.**

**By:** _____
**Name:**
**Title:**

**LEHMAN BROTHERS INC.**

**By:** _____
**Name:**
**Title:**

**LB 745 LLC**

**By:** _____
**Name:**
**Title:**

10279858

Document comparison done by DeltaView on Friday, September 19, 2008 8:07:04 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/9 |
| Document 2 | pcdocs://ny2/1916861/10 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 29 |
| Deletions | 16 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 45 |

10279858

# A. 75

# Filed Under Seal Pursuant To Protective Order

# A. 76

**Unknown**

**Sent:** Sunday, March 22, 2009 3:40 AM

| | |
|---|---|
| **From:** | Yu, Anna [anna.yu@lehman.com] |
| **Sent:** | Friday, September 19, 2008 2:18 PM (GMT) |
| **To:** | Wong, Kristie [Kristie.Wong@lehman.com]; Hauzenberg, Rose [rhauzenb@lehman.com]; Beldner, Brett [brett.beldner@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com] |
| **Cc:** | Tennyson, Peter A [ptennyso@lehman.com]; Stucchio, Anthony [astucchi@lehman.com] |
| **Subject:** | FW: Seg Cash 15c3-1 |

All - The **15c3-1 seg cash** remaining is currently **$1 bn.** Tony is waiting on the answer back from the SEC regarding the transferrability of seg cash funds from Lehman to Barclays.

The **futures seg cash and margin receivables breakout will not be available for another hour** as the RISC system is down.  Pete is monitoring the situation and will advise on these balances once RISC is up and running again.

Anna

---

**From:** Glatt, Ilana
**Sent:** Friday, September 19, 2008 10:11 AM
**To:** Yu, Anna; Mancuso, Frank P; Christie, Matthew
**Subject:** Seg Cash 15c3-1

Attached is the bank account statement for our 15c3-1 Seg Cash as of yesterday. We have $1bn left with Wells Fargo Bank. There is no lien on this account.

FYI, as of 8/31, LBI had seg cash of $8.5bn. $3.3bn was 15c-31 balances and $5.2bn was from RISC/Pete Tennyson.

<<...>>



EXHIBIT

159A
8.14.09 AH

# A. 77

# Filed Under Seal Pursuant To Protective Order

# A. 78

**Unknown**

**Sent:** Sunday, March 22, 2009 2:51 AM

| | |
|---|---|
| **From:** | Lowitt, Ian T [ilowitt@lehman.com] |
| **Sent:** | Friday, September 19, 2008 6:27 PM (GMT) |
| **To:** | McDade, Bart [bmcdade@lehman.com] |
| **Subject:** | cls money all snarfed up by citi. The 15c3 lockup looks ok at 1.3 bn. Good faith not. So we are short 1.7 bn. The TBA and FX settlement don't work. We did find 5 bn of exchange listed options which we are investigating. Ian |



138017

# A. 79

## Administrator

**Sent:** Friday, May 29, 2009 2:15 AM

| | |
|---|---|
| **From:** | Aronow, David G [daronow@lehman.com] |
| **Sent:** | Friday, September 19, 2008 6:31 PM (GMT) |
| **To:** | Ullman, Neal (NY) [Neal.Ullman@lehman.com] |
| **Subject:** | FW: Update |

> _____
> From:    Aronow, David G
> Sent: Friday, September 19, 2008 12:51 PM
> To:  Coghlan, John F. (Prime Services); Feraca, John; Wickham, John;
> McBryan, John N; Blackwell, Alastair
> Subject:    FW: Update
>
>
>
> _____
> From:    Tonucci, Paolo
> Sent: Friday, September 19, 2008 12:48 PM
> To:  Aronow, David G
> Cc:  Lowitt, Ian T
> Subject:    RE: Update
>
> Got it.  Thanks.
>
>
> _____
> From:    Aronow, David G
> Sent: 19 September 2008 12:47
> To:  Tonucci, Paolo
> Cc:  Lowitt, Ian T
> Subject:    RE: Update
>
> Paolo,
>
> Apologies if you already know this--Barclays operations team has
> recalculated the value of the collateral that they received from us
> last night and they are more than fully collateralized including the
> haircuts applied. Senior management at Barclays I am told are very
> satisfied with the results of the effort. They are not interested in
> moving forward with any more collateral movements from us to them
> today through the process we built and applied yesterday.  They have
> said that we can now "stand down" with the process we had in place to
> move collateral.
>
> With JP Morgan not allowing any more activity without the overdraft
> satisfied, with DTC not allowing activity because of cash requirements
> not being satisfied, and with the FICC putting us in default, we
> effectively are not transacting with our clients anymore today on a
> clearance and settlement basis.
>
> Please let me know if you have any questions on this.
>
> Regards,
>
> David

7/27/2009



10298186

> x5-9813
>
> _____
> From:      Aronow, David G
> Sent: Friday, September 19, 2008 11:31 AM
> To:  Tonucci, Paolo
> Cc:  Lowitt, Ian T
> Subject:    Update
>
> Dave Petrie is about to speak to Gerard one last time before he leaves
> our building to see if there is going to be any resolution to the
> Chase overdraft issue.  If this issue is not resolved, I believe that
> we will not be able to clear/settle any remaining activity with the
> street including the collateral that Barclays has been waiting for.
>
> _____
> From:      Servidio, Lawrence P
> Sent: Friday, September 19, 2008 11:26 AM
> To:  Tonucci, Paolo; Blackwell, Alastair; Lowitt, Ian T; Ullman, Neal
> (NY); Aronow, David G; Legotte, Lenny
> Subject:
>
> We are frozen at JPMChase, we have no access to clearing or clearing
> tubes. No trades can take place. I have called the Fed to see if they
> can escalate.

10298186

# A. 80

**Unknown**

**Sent:** Sunday, March 29, 2009 8:25 PM

| | |
|---|---|
| **From:** | Hraska, James W <JHraska@lehman.com> |
| **Sent:** | Friday, September 19, 2008 10:30 PM (GMT) |
| **To:** | Palchynsky, John N <jpalchyn@lehman.com>; Tonucci, Paolo <paolo.tonucci@lehman.com>; Feraca, John <joferaca@lehman.com>; Aronow, David G <daronow@lehman.com> |
| **Cc:** | Blackwell, Alastair <ablackwe@lehman.com>; Forrest, Monty <mforrest@lehman.com>; Ullman, Neal (NY) <Neal.Ullman@lehman.com>; Fleming, Dan (TSY) <dfleming@lehman.com>; Jones, Craig L <cljones@lehman.com> |
| **Subject:** | RE: Urgent tri unwind |

Agreed. In addition, I just want to make sure that everyone is clear
the 7B $ that was locked up for Barcap in Tri was returned to JP Chase.
If anyone has any questions, please call me.


-----Original Message-----
From: Palchynsky, John N
Sent: Friday, September 19, 2008 6:28 PM
To: Tonucci, Paolo; Hraska, James W; Feraca, John; Aronow, David G
Cc: Blackwell, Alastair; Forrest, Monty; Ullman, Neal (NY); Fleming, Dan
(TSY); Jones, Craig L
Subject: RE: Urgent tri unwind

I guess to address our overdraft before Lehman's assets are locked
during bankruptcy?

Anyway, see you all at Barcap.

It has been one hell of a week, challenging, but exhilarating too.

Have a great weekend! ;)

JP



-----Original Message-----
From: Tonucci, Paolo
Sent: Friday, September 19, 2008 6:15 PM
To: Palchynsky, John N; Hraska, James W; Feraca, John; Aronow, David G
Cc: Blackwell, Alastair; Forrest, Monty; Ullman, Neal (NY); Fleming, Dan
(TSY); Jones, Craig L
Subject: Re: Urgent tri unwind

Why are they doing this?



----------------------------------

----- Original Message -----
From: Palchynsky, John N
To: Palchynsky, John N; Hraska, James W; Feraca, John; Aronow, David G

7/15/2009

Exhibit
109 B
dLK 8703

Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Fleming, Dan (TSY); Jones, Craig L
Sent: Fri Sep 19 16:05:09 2008
Subject: RE: Urgent tri unwind

Also, as per Bill Gallagher, it looks like JPChase is moving DTC
positions out of Lehman's pledge account to the bank's account at DTC.


-----Original Message-----
From: Palchynsky, John N
Sent: Friday, September 19, 2008 3:57 PM
To: Hraska, James W; Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Fleming, Dan (TSY); Jones, Craig L
Subject: RE: Urgent tri unwind

As per Barclay's request, $7 billion in cash was allocated to their
lockup last night. If securities were/can be used instead, that would
free up margin collateral by reducing the amount of higher haircut
securities allocated to the JPChase bank loan. This could potentially
help last night's situation with JPChase and one that could potentially
develop today.


-----Original Message-----
From: Hraska, James W
Sent: Friday, September 19, 2008 3:43 PM
To: Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Palchynsky, John N; Fleming, Dan (TSY); Jones, Craig L
Subject: Urgent tri unwind

7B in barcap tri unwinds today?  Are we rolling ?  We had 14 B in chase
that could be allocated buit not sure the status of that relationship at
this point.  We pledged only 800mm of new collat to barcap.  All is
frozen.

7/15/2009

93219