# A. 148 (A)

*HEARING TO CONSIDER ENTRY OF*
*SALE PROCEDURES ORDER*
**HEARING DATE AND TIME: September 17, 2008 at 11:00 a.m. (Eastern Time)**

*HEARING TO CONSIDER ENTRY OF*
*SALE ORDER*
**HEARING DATE AND TIME:  TBA**
**OBJECTION DEADLINE:  TBA**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                                              :
**In re**                                                     :    **Chapter 11 Case No.**
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*    :    **08-13555 (JMP)**
                                                              :
**Debtors.**                                        :    **(Jointly Administered)**
                                                              :
--------------------------------------------------------------x

## DEBTORS' MOTION TO (A) SCHEDULE A SALE HEARING; (B) ESTABLISH SALES PROCEDURES; (C) APPROVE A BREAK-UP FEE; AND (D) APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC ("LB 745"), as

debtors and debtors in possession (collectively, the "Debtors" and, collectively with their

nondebtor affiliates, "Lehman" ), respectfully represent:

## Background

1.　　On September 15, 2008 (the "Commencement Date"), LBHI commenced

a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

On September 16, 2008, LB 745 commenced a voluntary case under chapter 11 of the

Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

## Lehman's Businesses

2.　　Lehman is the fourth largest investment bank in the United States, and for

most of its 158 years, Lehman has been a leader in the global financial markets by serving the

financial needs of corporations, governmental units, institutional clients, and individuals

worldwide.  Lehman offers a full array of financial services in equity and fixed income sales,

trading and research, investment banking, asset management, private investment management,

and private equity.  LBHI's non-debtor subsidiary, Lehman Brothers Inc. ("LBI"), is a registered

broker dealer.  Lehman's worldwide headquarters in New York and regional headquarters in

London and Tokyo are complemented by a network of offices in North America, Europe, the

Middle East, Latin America and the Asia Pacific region.  On the Commencement Date, Lehman

employed over 25,000 employees.

3.　　Information as to Lehman's businesses, capital structure, and the

circumstances leading to the commencement of the chapter 11 cases is contained in the Affidavit

of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District

of New York in Support of First-Day Motions and Applications, filed with the Court on

September 15, 2008 (the "First Day Affidavit").

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction to consider this matter pursuant
to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue
is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      The Debtors are requesting, pursuant to sections 105, 363, and 365 of the
Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, and 9006, (i) an order (the
"Sale Hearing Order") substantially in the form attached hereto as Exhibit 1 (a) setting the time,
date, and place of a hearing (the "Sale Hearing") to consider the sale of the Purchased Assets[1]
and (b) approving the procedures for the conduct of the sale, (c) approving the Break-Up Fee (as
defined below), and (ii) an order approving (a) a sale of the Purchased Assets pursuant to that
Asset Purchase Agreement (the "Purchase Agreement"), among Barclays Capital Inc.
("Purchaser"), the Debtors, and LBI (collectively, the "Seller"), dated September 16, 2008, a
copy of which is annexed hereto as Exhibit 2, free and clear of all liens, claims, encumbrances,
and other interests, (b) the assumption and assignment of certain executory contracts and
unexpired leases related to the Purchased Assets (collectively, the "Contracts"), pursuant to
section 365 of the Bankruptcy Code, and (c) entry of an order substantially in the form attached
hereto as Exhibit 3 approving the Purchase Agreement (the "Sale Order").

6.      The sale of the Purchased Assets, is critical to the stabilization of value.
Each day that the Purchased Assets are subject to the vagaries and vicissitudes of the
marketplace and the impact of bankruptcy diminishes the value of such assets.  Time is of the
essence.  The Purchase Agreement represents a reasonable exercise of business judgment by the

---

[1]      Capitalized terms not defined in this Motion shall have the meaning ascribed to them in the Purchase
Agreement.

Debtors. The sale is in the best interests of the Debtors, their employees and their economic

stakeholders. The relief requested in this Motion should be granted.

### The Need for an Expeditious Sale

7.    As set forth in the First Day Affidavit, as a financial services firm,

Lehman is materially affected by conditions in the global financial markets and by worldwide

economic conditions. For most of 2008, Lehman operated in an extremely unfavorable global

business environment. The events of the past week that drove down Lehman's credit standing

were particularly harmful to the ability of Lehman to sustain its operations. The combination of

low levels of liquidity and the requirement that financial companies de-leverage their balance

sheets resulted in downward pressure on financial asset prices. These global and national

economic conditions, in the aggregate, depressed both the valuations of Lehman's inventory

positions as well as transactional volumes and market activity levels in which Lehman's capital

markets and investment banking business segments operated. Ultimately, the instability in the

financial and credit markets caused significant liquidity problems and credit downgrades for

Lehman. These factors resulted in a chain reaction of adverse economic consequences that

impeded its ability to maintain normal business operations. Attempts to pursue strategic

alternatives were thwarted by its financial deterioration and lack of support from other entities.

8.    As a result, the Debtors commenced their chapter 11 cases to preserve and

maximize the value, protect their public customers, limit turmoil in the financial markets and

benefit Lehman's creditors and employees. The proposed sale will maximize the value of the

Purchased Assets and avoid rapid erosion of their value.

9.    Pursuant to the Purchase Agreement, the Purchaser will pay approximately

$1.7 billion in cash for the Purchased Assets plus assume other obligations and expenses. The

Purchased Assets include designated assets relating to LBI's business which are owned by LBI

as well as certain assets which are owned by LBHI and related to the business of LBI. These
include Lehman's worldwide headquarters which is owned by LB 745.

10.     Upon consummation of the transaction, the Purchaser will assume
ownership of substantially all operations of LBI, including assumption of Seller's liabilities
under assumed contracts, and performance under Seller's obligations as to securities and other
transactions. All remaining customer accounts will be transferred to the Purchaser. The
Purchaser also will assume substantial liabilities relating to LBI's employees, estimated at
approximately $2.5 billion. The sale will relieve LBHI of exposure based upon its guarantees of
many of LBI's obligations.

11.     LBI is a valuable, but highly sensitive, asset of LBHI. Its value is greatly
dependent upon its ability to assure its clients and customers of its financial and operational
integrity. In the circumstances of Lehman's instability, Lehman cannot instill that assurance in
its clients and customers. Consequently, it is urgent to sell the Purchased Assets now or face
material disruption of their value. Hence, the instant motion.

12.     To effectuate the critical sale and provide the Purchaser with its required
protections pursuant to section 363 of the Bankruptcy Code, the Purchase Agreement
contemplates that, prior to the Sale Hearing, LBI will consent to the commencement of a case
under the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*. In
that proceeding, the Debtors will request that the SIPA Trustee consent to the sale and request
the SIPA Court's approval thereof. The Securities Investor Protection Corporation ("SIPC") and
the Securities and Exchange Commission (the "SEC"), as well as the Federal Reserve Bank,
have been apprised of the sale and the need for immediate approval of the sale by the SIPA

Trustee and the SIPA Court in order to preserve the value of the Purchased Assets and assist in

the stabilization of the financial markets.

      13.    The expeditious consummation of the sale pursuant to the Purchase

Agreement maximizes the value of the Purchased Assets and serves the best interests of all

parties.

## The Purchase Agreement

      14.    The Purchase Agreement includes the following salient provisions:[2]

- Closing Date. The Closing must occur on or before September 23, 2008.

- Purchase and Sale of Purchased Assets. On the terms and subject to the conditions set forth in the Purchase Agreement, at the Closing, the Purchaser shall purchase the Purchased Assets, free and clear of all Liens, pursuant to Section 363(f) of the Bankruptcy Code. The Purchased Assets include LBI's assets, as well as three real properties, including Lehman's corporate headquarters and two data centers. Buyer will also purchase the "Lehman" name and associated trademarks, but will license the use of that name back to the estate and other Lehman affiliates for a period of time.

- Purchase Price and Assumed Liabilities. In exchange for the Purchased Assets, Buyer will pay Sellers approximately $1.7 billion in cash. In addition, Buyer is assuming various liabilities of Sellers, including transfer taxes, accounts payable in the ordinary course of business, cure costs, and future liabilities under assigned contracts and leases.

- Assumption of Contracts. The Purchaser shall have the right, but not the obligation, to take assignment of contracts and leases which are designated for assumption and assignment by Purchaser. The parties estimate that the cure costs associated with such assumptions and assignments will be approximately $1.5 billion.

- Continued Employment for Domestic Employees. All domestic employees of LBI will have the opportunity to continue their employment with Purchaser on the same terms they currently have with Lehman through December 31, 2008. If such employees are terminated by Purchaser without cause, they will be given their severance in an amount

---

[2] To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

equal to what they would have been paid if they had continued to be employed by Lehman.

- <u>Transition Services</u>. The Purchaser will provide certain transition services until the Closing.

### Extraordinary Provisions in the Purchase Agreement

15.    <u>Break-Up Fee</u>. The Purchase Agreement provides that Seller shall pay Purchaser a break-up fee in an amount equal to $100 million plus up to $25 million for expense reimbursement (the "<u>Break-Up Fee</u>") on the first Business Day following the date of consummation of a Competing Bid, if no material breach by Purchaser of this Agreement has occurred.

16.    The United States Court of Appeals for the Second Circuit has approved break-up fees in bankruptcy cases, where warranted and consistent with market practices. *See Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Specifically, the Second Circuit has held that break-up fees should be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *Id.* at 657. The approval of break-up fees and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code have become an established practice in chapter 11 cases. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," pursuant to which deference is granted to the actions of a board of directors taken in good faith and in the exercise of honest judgment.[3]

---

[3] For instance, in *In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003), this Court approved a break-up fee of $20 million, equal to approximately 2% of the purchase price on the grounds

17.    The Break-Up Fee of $100 million required by the Purchaser meets the

"business judgment rule" standard.  Moreover, it recognizes the enormity of the effort made by

the Purchaser in the negotiation of the Purchase Agreement.  The proposed sale is unique

because of the fragile and highly vulnerable nature of the Purchased Assets.  Break-up fees

enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes

is fair and reasonable.    *See also, e.g., In re Footstar, Inc.*, Case No. 04-22350 (ASH) (Bankr.

S.D.N.Y. 2004); *In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr.

S.D.N.Y. 2003); *In re Magellan Health Services, Inc.*, Case No. 03-405115 (PCB) (Bankr.

S.D.N.Y. 2003); *In re Adelphia Business Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr.

S.D.N.Y. 2002); *In re Global Crossing Ltd.*, Case No. 02-40187 (REG) (Bankr. S.D.N.Y. 2002);

*In re Bethlehem Steel Corp.*, Case Nos. 01-15288 through 01-15302, 01-15308 through 01-15315

(BRL) (Bankr. S.D.N.Y. 2001); *In re Rhythms Netconnections Inc.*, Case No. 01-14283 (BRL)

(Bankr. S.D.N.Y. 2001).

18.    The proposed Break-Up Fee is reasonable in the context of these cases,

and the Break-Up Fee should be approved.

19.    <u>Employment of Key Employees and Critical Employees</u>.  Approximately

200 employees of the Sellers have been designated as key to the success of the business, and 8

employees have been designated as critical to the success of the business.  The retention of a

substantial majority of key employees, and all 8 critical employees, is a condition precedent to

the Closing.  This provision represents a reasonable recognition by Purchaser that the

---

that such fee was reasonable, did not hamper the bidding process, and the relationship among the parties was not
tainted by self-dealing. Similarly in *In re Magellan Health Services, Inc.*, Case No. 03-405115 (PCB) (Bankr.
S.D.N.Y. 2003), Judge Beatty approved a break-up fee of 2% of the purchase price.  Bidding protections similar to
those requested by the Debtors have routinely been approved by courts in this district. *See, e.g., In re Adelphia
Business Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving termination fee and
reimbursement of expenses).

relationships between key employees and Lehman customers represents a significant portion of the inherent value of the business. Without these employees, the Purchaser may lose critical human capital that it needs for business continuity.

20.    In addition, the Purchaser will offer continued employment to approximately ten thousand plus U.S.-based employees of LBI for a period of 90 days. To the extent of job eliminations during that period, the Purchaser shall pay such employees severance benefits equal to what would have been received under LBI's severance policy. That amount is equal to twenty percent of the employee's compensation for the prior year. It is estimated that the potential cost to the Purchaser will be $2.5 billion.

### Sale Notice Provisions

21.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty (20) days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Purchased Assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale, and the deadline for filing any objections. It is necessary to shorten the customary notice period, pursuant to Bankruptcy Rule 9006, to avoid erosion of the value of the Purchased Assets.

22.    The Debtors propose to serve a notice of the Sale Hearing (the "Sale Notice"), by electronic mail, facsimile, or overnight delivery, upon (a) the Office of the United States Trustee for the Southern District of New York, (b) the attorneys for any statutory committee appointed in this case; (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; (d) all parties who have requested notice in the chapter 11 cases, (e) any party that previously expressed an interest in the Purchased Assets, (f) parties to

Contracts that may be assumed and assigned to Purchaser, and (f) any other parties as required

by the Court, so as to be received by September 18, 2008. The Debtors propose that the Sale

Notice direct parties in interest to an internet site (the "Website"), which will contain all the

relevant information pertaining to the Purchase Agreement and the Sale Hearing, including (a)

the Sale Notice, (b) the Purchase Agreement, and (c) the Procedures Order.

### Sale of the Purchased Assets

23.    Ample authority exists for approval of the proposed sale. Section 363 of

the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §

363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for

determining when it is appropriate for a court to authorize the sale or disposition of a debtor's

assets, courts in the Second Circuit and others, in applying this section, have required that it be

based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d

141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from

the evidence presented a good business reason to grant such application); *Committee of Equity*

*Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)

(same). Moreover, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary

course of business may be by private sale or by public auction." Courts often allow a chapter 11

debtor to sell assets outside the ordinary course of business by private sale when the debtor

demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.

*See, e.g., In re Loral Space & Communications Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr.

S.D.N.Y. Sep. 30, 2005); *In re International Wire Group, Inc., et al.*, Case No. 04-11991 (BRL)

(Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233

B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted

by a chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right

of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615

(Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the

standards of section 363(b) were met).

      24.     The proposed sale will result in the highest and best recovery for the

Debtors. In the pursuit of strategic alternatives, LBHI has attempted to sell the Purchased Assets

together with other Lehman assets. Indeed, the financial community is well aware that the

Purchased Assets were for sale. The only serious offeror is the Purchaser.

      25.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1). To sell property under section

363(b), the Debtors must demonstrate to the Court a "good business reason" for the proposed

action. *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d. Cir 1997)

("A sale of a substantial part of a [c]hapter 11 estate other than in the ordinary course of business

may be conducted if a good business reason exists to support it."); *Comm. of Equity Sec. Holders

v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (in considering a sale

outside a plan of reorganization, a judge must not be shackled with unnecessarily rigid rules

when exercising the broad administrative power granted him under the Bankruptcy Code, but

must simply find "a good business reason" supporting the sale ); *In re Global Crossing, Ltd.*, 295

B.R. 726, 743 (Bankr. S.D.N.Y. 2003). As this Court has stated, "[w]here the debtor articulates

a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of*

*Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612,

616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the

debtor's decision to use property out of the ordinary course of business with a strong

presumption that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*

*(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*,

488 A.2d 858, 872 (Del. 1985)).

### Sale of the Purchased Assets Free and
### Clear of Liens, Claims, Encumbrances, and Interests

26.    It is appropriate for the Purchased Assets to be sold to the Purchaser free

and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the

Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the net sale

proceeds of the sale of the Purchased Assets. *See MacArthur Co. v. Johns-Manville Corp.*, 837

F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed

of free and clear of third-party interests, the third party is adequately protected if his interest is

assertable against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In*

*re Circus Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the Court's power to sell

property free and clear of liens has long been recognized); *see also In re Riverside Inv. P'ship*,

674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed

on the proceeds of the sale and discharged at the time of sale...").

27.    Any lien, claim, encumbrance, or interest in the Purchased Assets will be

adequately protected by attachment to the net proceeds of the sale, subject to any claims and

defenses the Debtors may possess with respect thereto. *See In re Circus Time, Inc.*, 5 B.R. at 7.

Moreover, each of the parties that may hold liens on the Purchased Assets could be compelled to
accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy
Code. Thus, sale of the Purchased Assets free and clear of liens, claims, encumbrances, and
interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.
Accordingly, the Purchased Assets are to be transferred to Purchaser free and clear of all liens,
claims, encumbrances, and interests, with any such liens, claims, encumbrances, and interests to
attach to the net sale proceeds realized from the sale.

<u>**Assumption and Assignment of Contracts**</u>

28.    To facilitate and effect the sale of the Purchased Assets, the Debtors seek
authorization to assume and assign the Contracts to the Purchaser. In order to provide
counterparties with adequate notice of such assumption and proposed adequate cure amounts (the
"<u>Cure Amounts</u>"), the Contracts have been divided into two categories. The first category is
comprised of those Contracts that the Purchaser requires be assumed and assigned on the Closing
Date (the "<u>Closing Date Contracts</u>"). The second category is comprised of Contracts as to which
the Purchaser has sixty days within which to decide whether it wants to pay the Cure Amounts
and assume the obligations thereunder (the "<u>Designated Contracts</u>").

29.    Section 365(a) of the Bankruptcy Code provides that a debtor in
possession "subject to the court's approval may assume or reject any executory contracts or
unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its
sound business judgment in determining to assume an executory contract or unexpired lease,
courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas
Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures*

*Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

30.    The assumption and assignment of the Contracts to the Purchaser is in the best interests of their estates and a proper exercise of business judgment. It allows the Debtors to avoid rejection damages if those contracts or leases would otherwise be rejected. Purchaser has agreed to pay all undisputed Cure Amounts associated with the Contracts, which are estimated to be approximately $1.5 billion.

31.    Section 365(b)(1) of the Bankruptcy Code requires that the Debtors cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Contracts that they will assume or assume and assign to the Purchaser. The Debtors and the Purchaser intend to develop a list of Closing Date Contracts, calculate the Cure Amounts relating thereto, and notify the counterparties thereto as soon as practicable, and in any event prior to the Sale Hearing. With respect to the Designated Contracts, the Debtors intend to file a motion setting forth the proposed procedure for notice and payment of Cure Amounts.

32.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In*

*re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no

single solution will satisfy every case, the required assurance will fall considerably short of an

absolute guarantee of performance.").

33.     Among other things, adequate assurance may be given by demonstrating

the assignee's financial health and experience in managing the type of enterprise or property

assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of lease has financial

resources and expressed willingness to devote sufficient funding to business to give it strong

likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

34.     At the Sale Hearing, the Debtors will be prepared to proffer testimony or

present evidence to demonstrate the financial credibility, willingness, and ability of Purchaser to

perform under the Closing Date Contracts. The Sale Hearing, therefore, will provide the Court

and other interested parties with the opportunity to evaluate the ability of the Purchaser to

provide adequate assurance of future performance under the Closing Date Contracts, as required

by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, the Debtors respectfully request

that at the conclusion of the Sale Hearing, the proposed assumption and assignment the Closing

Date Contracts should be approved, to be effective upon entry of the order approving the Motion.

35.     Notwithstanding any anti-assignment language in a Closing Date Contract,

the Debtors seek permission to assign such Closing Date Contract, provided that the Debtors first

assume the Closing Date Contract and then provide adequate assurance of future performance by

the Purchaser. To facilitate the assumption and assignment of the Closing Date Contracts, the

Debtors therefore request that the Court find all anti-assignment provisions of the Closing Date

Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[4]

36.     Section 365(k) of the Bankruptcy Code provides that assignment by the

debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for

any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).

Pursuant to section 365(k), the Debtors and the estates shall be relieved from any liability for any

breach of any Closing Date Contract after such assignment to and assumption by the Purchaser

upon entry of an order approving the Motion.

**Good Faith Purchaser**

37.     Section 363(m) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  Section 363(m) thus provides that a purchaser of property of the estate is

protected from the effects of a reversal on appeal of the authorization to sell such property as

long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale.

38.     Although the Bankruptcy Code does not define the meaning of "good-faith

purchaser," most courts have adopted a traditional equitable definition: "one who purchases the

---

[4] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of
the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the
trustee may assign such contract or lease…" 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that
"Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that
terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a
right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract,
lease, right, or obligation may not be terminated or modified under such provision because of the assumption or
assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

assets for value, in good faith and without notice of adverse claims." *See, e.g.. Licensing by*

*Paolo*, 126 F.3d at 390. The Second Circuit has stated that:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the
> course of the sale proceedings; where there is a lack of such integrity, a good faith
> finding may not be made. A purchaser's good faith is lost by 'fraud, collusion
> between the purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.'

*Id.* (internal citations omitted).

39.     The terms and conditions of the Purchase Agreement were negotiated by

the Debtors and Purchaser at arm's length and in good faith. Each party was represented by

sophisticated counsel. Accordingly, the Debtors request that the Court determine that the

Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser

under section 363(m) of the Bankruptcy Code.

### Request for Relief Under Bankruptcy Rules 6003(b), 6004(g), and 6006(d)

40.     Bankruptcy Rule 6003(b) permits a debtor to use, sell, lease, or otherwise

incur an obligation regarding property of the estate during the first 20 days of a case only to the

extent it is necessary to avoid immediate and irreparable harm. As set forth in greater detail

above, it is necessary to sell the Purchased Assets during the first 20 days of these cases to avoid

the immediate deterioration of value that will result without consummation of the proposed sale.

Accordingly, Bankruptcy Rule 6003(b) has been satisfied.

41.     Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or

lease of property is stayed until the expiration of 10 days after entry of the order, unless the court

orders otherwise." FED. R. BANKR. P. 6004(h). Bankruptcy Rule 6006(d) further provides that

an "order authorizing the trustee to assign an executory contract or unexpired lease under

§ 365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court

orders otherwise." FED. R. BANKR. P. 6006(d). In light of the fragility of the Purchased Assets

and the need to stabilize the business of LBI and consummate the sale, the order approving the sale of the Purchased Assets, if granted, and the assumption and assignment of the Closing Date Contracts to the Purchaser in accordance with this Motion must be effective immediately upon entry of such order. Therefore, waiver of the ten-day stay under Bankruptcy Rules 6004(h) and 6006(d) is requested.

## Notice

42.     No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates, (iii) the SEC, (iv) the Internal Revenue Service, (v) the United States Attorney for the Southern District of New York, (vi) counsel for the Purchaser, (vii) SIPC, (viii) Rock-Forty-Ninth LLC, (ix) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, and (x) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be given.

43.     No previous request for the relief sought herein has been made to this or

any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested and such other and further relief as is just.

Dated: September 17, 2008
       New York, New York

*Jacqueline Marcus*

Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                    :
In re                                               :    **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*         :    **08-13555 (JMP)**
                                                    :
          **Debtors.**                              :    **(Jointly Administered)**
                                                    :
                                                    :
------------------------------------------------------------------x

**ORDER (I) APPROVING THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT,**
**(II) CERTAIN MATTERS RELATING TO COMPETING BIDS, IF ANY,**
**(III) APPROVING THE FORM AND MANNER OF SALE NOTICES AND**
**(IV) SETTING THE SALE HEARING DATE IN CONNECTION WITH**
**THE SALE OF CERTAIN OF THE DEBTORS' ASSETS**

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008 (the "Purchase

Agreement"), among the Debtors, Lehman Brothers Inc. ("LBI" and, collectively with the

Debtors, the "Seller") and Barclays Capital, Inc. (the "Purchaser"); (B) establishing sales

procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of certain

of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances

and interests  and the assumption and assignment of certain prepetition executory contracts and

unexpired leases (the "Contracts") relating to the Purchased Assets  to the Purchaser or the

Successful Bidder(s); and upon the Court's consideration of the Motion and the record of the

---

[1]    Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the
Agreement.

Sale Hearing held on September 17, 2008 with respect to procedural matters set forth in the

Motion, including the testimony and evidence admitted at the Hearing; and after due deliberation

thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over this matter and over the property of the Debtors

and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). The statutory predicates

for the relief sought herein are 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P.

("Bankruptcy Rules") 2002, 6004, 6006, 9006 and 9014. Venue of these cases and the Sale

Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The relief requested in the Sale Motion is in the best interests of the Debtors, their

estates, LBI, the stakeholders of the foregoing, and other parties-in-interest.

C.    Good cause exists to shorten the applicable notice periods in Bankruptcy Rules

2002, 6004 and 6006 and the applicable notice periods in the Local Rules.

D.    The Debtors' estates will suffer immediate and irreparable harm if the preliminary

relief requested in Sale Motion is not granted on an expedited basis consistent with the

provisions set forth herein.

E.    The notice of the Sale Motion and the Hearing given by the Debtors constitutes

due and sufficient notice thereof given the wasting nature of the Purchased Assets and the

exigent circumstances relating to this case.

F.    The Debtors have articulated good and sufficient reasons for the Court to (i)

approve the Break-Up Fee and Expense Reimbursement (each as defined on Exhibit A attached

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate. See Fed. R. Bankr. P. 7052.

hereto) as provided in the Purchase Agreement and in this Order, (ii) approve certain matters

relating to competing bids, if any, (iii) approve the form and manner of notice of the Sale

Motion, the Sale Hearing, and the assumption and/or assignment of the Contracts and (iv) set the

Sale Hearing.

G.    The Break-Up Fee and Expense Reimbursement shall be payable in accordance

with the terms, conditions, and limitations of the Purchase Agreement, this Order and Exhibit A

and (i) if triggered, shall be deemed an actual and necessary cost and expense of preserving the

Debtors' estates, within the meaning of section 503 of the Bankruptcy Code, (ii) is of substantial

benefit to the Debtors' estates, (iii) is reasonable and appropriate, including in light of the size

and nature of the Sale, the wasting nature of the Debtors' assets, and the efforts that have been

and will be expended by the Purchaser notwithstanding that the proposed Sale is subject to

higher or better Qualified Bids (as defined below) for the Purchased Assets, (iv) has been

negotiated by the parties and their respective advisors at arms' length and in good faith and (v) is

necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the

Purchased Assets.  The Break-Up Fee and Expense Reimbursement are material inducements

for, and conditions of, the Purchaser's entry into the Purchase Agreement.  The Purchaser is

unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of

the Purchase Agreement unless it is assured of payment of the Break-Up Fee and Expense

Reimbursement.  Thus, assurance to the Purchaser of payment of the Break-Up Fee and Expense

Reimbursement promotes the possibility of competitive bidding.  Thus, the Purchaser has

provided a benefit to the Debtors' estates by leaving its bid open for a period of time.

H.      The matters set forth on Exhibit A attached hereto are reasonable and appropriate and represent the best method for maximizing the realizable value of the Purchased Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

1.      The procedures set forth in the Sale Motion and the Break-Up Fee and Expense Reimbursement are approved.

2.      All objections filed or asserted in response to the Sale Motion are hereby overruled, to the extent that they relate to the procedures.

### The Purchaser's Bid

3.      The transaction contemplated by the Purchase Agreement is designated as the "Purchaser's Bid."

### Bid Matters

4.      The matters set forth on Exhibit A attached hereto and incorporated herein by reference, are hereby approved and shall govern all matters relating to any competing bids to the Purchaser's Bid for the Purchased Assets.

5.      If the Sellers do not receive any Qualified Bids, other than the Purchaser's Bid, by the Bid Deadline (as defined on Exhibit A), the Debtors shall seek approval of the Purchaser's Bid pursuant to the Purchase Agreement at the Sale Hearing (as defined below).

6.      The failure specifically to include or reference a particular provision of the matters set forth on Exhibit A in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the matters set forth on Exhibit A be authorized and approved in their entirety as modified by this Order.

### Sale Hearing

7.      The Court shall hold a hearing on September 19, 2008 at    .m (New York time) (the "Sale Hearing") in the United States Bankruptcy Court for the Southern District of New

York in the courtroom of the Honorable James M. Peck, at which time the Court shall consider the Sale Motion and approve the Successful Bidder. Objections to the Sale Motion, if any, shall be filed and served on each of the Notice Parties (defined below) no later than 4:00 p.m. (New York time) on September 18, 2008 (the "Objection Deadline"). The Sale Hearing shall not be adjourned or canceled without prior consent of the Purchaser.

8.    The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale, or the Debtors' consummation and performance of the Purchase Agreement (including the transfer of the Purchased Assets and the Closing Date Contracts free and clear of liens, claims, and encumbrances).

9.    The Sale Hearing may be adjourned by the Debtors with the prior consent of the Purchaser from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court or an entry of an order on the Court's docket.

<u>Break-Up Fee and Expense Reimbursement</u>

10.    The Debtors are authorized and shall pay the Break-Up Fee and the Expense Reimbursement upon the occurrence of any Break-Up Fee Event as provided under the Purchase Agreement without further order of the Court. The Break-Up Fee shall be $100,000,000, and shall be paid no later than two (2) business days after it becomes payable as set forth in the Purchase Agreement. In addition, the Expense Reimbursement shall be paid by the Debtors no later than five (5) business days after delivery of an invoice to the Debtors, subject to an aggregate cap of $25,000,000 (the "Expense Reimbursement Cap").

11.    The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement, as provided by the Purchase Agreement, this Order and Exhibit A hereto shall be joint and several, shall survive termination of the Purchase Agreement, shall constitute a superpriority

administrative priority claim against each of the Debtors pursuant to sections 105(a) and

364(c)(1) of the Bankruptcy Code until paid in accordance with the Purchase Agreement. In the

event that the Debtors (or any of their affiliates) receive any proceeds from an Alternate

Transaction prior to their payment of the Break-Up Fee or Expense Reimbursement, such

proceeds in an amount equal to the unpaid portion of the Break-Up Fee and the Expense

Reimbursement Cap shall be held in trust for the Purchaser until the Break-Up Fee and the

Expense Reimbursement are paid in full pursuant to this Order and the Purchase Agreement.

Notice

12.     Notice of (a) the Motion, (b) the Sale Hearing and (c) the proposed assumption

and/or assignment of the Closing Date Contracts to the Purchaser pursuant to the Purchase

Agreement or to a different Successful Bidder shall be good and sufficient, and no other or

further notice shall be required, if given as follows:

(a)     Notice of Sale Hearing. Within one (1) day after entry of this Order (the "Mailing Date"), the Debtors (or their agent) shall make a copy of this Order (including Exhibit A to this Order) (the "Sale Notice"), the Sale Motion, the Purchase Agreement and the proposed Sale Approval Order (as defined in the Sale Motion) available and shall provide notice of the Sale in a form which is reasonably acceptable to the Purchaser by email, facsimile, federal express or other overnight delivery service, upon (i) the Office of the United States Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Creditors' Committee, (iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all non-Debtor parties to Closing Date Contracts, (vii) the United States Attorney's office, (viii) the United States Department of Justice, (ix) the Securities and Exchange Commission (the "SEC"), (x) the Federal Reserve Bank of New York ("FRBNY"), (xi) the Securities Investor Protection Corporation, (xii) the Internal Revenue Service, and (xiii) all persons who have filed a notice of appearance in these cases.

(b)     Assumption, Assignment and Cure Notice. At least one (1) day prior to the Sale Hearing, the Debtors shall file with this Court and serve on each non-Debtor party to an Contract by federal express, or other overnight delivery service, a notice of assumption, assignment and cure in a form reasonably acceptable to the Purchaser (the "Assumption, Assignment and Cure Notice"). The Assumption, Assignment and Cure Notice shall state that parties to Contracts may find out whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement by visiting http://chapter11.epiqsystems.com/lehman (the "Website"). If the Contract is one which the

6

Purchaser designates for assumption and assignment at the closing (a "Closing Date Contract"), the Debtors will compute the appropriate cure amount (the "Cure Amount") for such Closing Date Contract and will list such Cure Amounts on the Website. If the Contract is one which the Purchaser designates for assumption and assignment within the 60 days after the Closing (a "Designated Contract"), the Debtors will file a motion for approval of procedures with respect to Designated Contracts at a later date.

(c)    Any non-Debtor party to a Closing Date Contract shall file and serve on the Notice Parties any objections to (i) the proposed assumption and assignment to the Purchaser (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than the Sale Hearing. If no objection is timely received, (x) the non-Debtor party to the Closing Date Contract shall be deemed to have consented to the assumption and assignment of the Closing Date Contract to the Purchaser and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) any Cure Amount identified pursuant to the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Closing Date Contract, or any other document, and the non-Debtor party to a Closing Date Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Closing Date Contract against the Debtors or the Purchaser, or the property of any of them.

(d)    Successful Competing Bidder Other Than Purchaser. If a Successful Bidder other than the Purchaser is declared by the Debtors' Board of Directors, then no later than one (1) business day after that declaration, the Debtors shall send a subsequent Assumption, Assignment and Cure Notice to each non-Debtor party to an Contract identifying the Successful Competing Bidder.

13.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: New York, New York
      September __, 2008

_____
UNITED STATES BANKRUPTCY JUDGE

# Exhibit A

## LEHMAN BROTHERS HOLDINGS INC.

By order of the Bankruptcy Court, set forth below are certain matters to be employed with respect to the proposed sale (the "Sale") of the Purchased Assets of the Debtors as set forth in the Purchase Agreement (as defined below). On September 16, 2008 the Debtors executed that certain Asset Purchase Agreement (the "Purchase Agreement") with Barclays Capital, Inc. (the "Purchaser"). The transaction contemplated by the Purchase Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined below) pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and certain other closing conditions.

On September 17, 2008, the Debtors filed the Sale Motion seeking entry of the Orders: (I)(A) authorizing a Break-Up Fee and Expense Reimbursement, (B) approving certain matters relating to competing bids, if any, (C) the form and manner of sale notices and (D) a date for the Sale Hearing, and (II) (A) authorizing and approving the Sale of certain of the Debtors' assets free and clear of all liens, claims and encumbrances, (B) authorizing and approving the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Contracts") to the Purchaser or the Successful Bidder(s) and (C) granting related relief. On September ___, 2008, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order: (I) authorizing a Break-Up Fee and Expense Reimbursement, (B) approving certain matters relating to competing bids, if any, as set forth in the Purchase Agreement, (C) approving the form and manner of sale notices and (D) fixing a date for the Sale Hearing (such order, the "Break-Up Fee and Competing Bid Order"). Terms used but not defined herein shall have the meanings ascribed to them in the Break-Up Fee and Competing Bid Order. The Break-Up Fee and Competing Bid Order set [September ___], 2008 as the date when the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Debtors to enter into the Purchase Agreement.

1.    No Competing Bids to be Evaluated by the Debtors Other than Qualified Bids

The Debtors shall not consider or evaluate putative competing bids for the Purchased Assets except in accordance with the provisions set forth below (such bids meeting the criteria set forth herein, "Qualified Bids"). The manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids, respectively, the provision of confidential information to bidders, the receipt and negotiation of bids received, the ultimate selection of the Successful Bidder(s), and the Bankruptcy Court's approval thereof (the "Bid Matters") are discussed below. In the event that the Debtors and any party disagree as to any Bid Matters, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

1

2.    Debtors Shall Not Solicit or Engage In Discussions Regarding Proposals for Competing Transactions

From the date of execution of the Purchase Agreement until the earlier of (i) the Closing and (ii) the termination of the Purchase Agreement in accordance with its terms, none of Debtors, any of the Debtors' direct or indirect subsidiaries, or any agent or advisor to the Debtors or any of the Debtors' direct or indirect subsidiaries shall, directly or indirectly, through any officer, director, employee, agent, professional, advisor, other representative ("Representatives") or otherwise, (A) solicit, initiate, encourage or facilitate any proposal or offer from any Person (other than the Purchaser) relating to any financing, refinancing, acquisition, divestiture, business combination or reorganization or similar transaction involving a material portion the Business, the Purchased Assets or the business, assets or operations of LBI or any of its subsidiaries or the equity securities of LBI or any of its subsidiaries (a "Competing Transaction"), (B) enter into discussions or negotiations regarding a Competing Transaction, (C) furnish any information with respect to, enter into any agreement or understanding with respect to, otherwise assist or participate in, or facilitate in any other manner any Competing Transaction (including, without limitation, executing any confidentiality agreement with any other Person with respect to a Competing Transaction), (D) waive any rights under any existing standstill or waiver agreements, or (E) seek or support Bankruptcy Court approval of a motion regarding bid procedures or expense reimbursement or break up fee for the benefit of any party with respect to a Competing Transaction or take any action inconsistent in any way with the Purchase Agreement or achieving the Closing by 5:00pm (New York time) on September 24, 2008 (any action described in clauses (A) through (E), a "Prohibited Action").

3.    Debtors Permitted to Take Certain Prohibited Actions in Certain Circumstances

Notwithstanding the foregoing provisions of Section 2, in the event Debtors receive an unsolicited *bona fide* offer or proposal for a Competing Transaction prior to the entry of the Sale Order and Debtors' Boards of Directors conclude in good faith (after consultation with its outside financial and legal advisors) that such offer or proposal constitutes or is reasonably likely to result in a Superior Proposal, then, prior to the entry of the Sale Order, Debtors may, and may permit their subsidiaries and Representatives to, take any Prohibited Action described in clause (B) or (C) (other than enter into any agreement) of Section 2; provided that (x) prior to providing any nonpublic information permitted to be provided pursuant to this sentence, Debtors shall have entered into a confidentiality agreement with such third party on customary terms and which in any event is no less favorable to Debtors than the Confidentiality Agreement, and (y) concurrently with providing such information, Debtors shall also furnish to Purchaser a copy of any confidential data or information that it is furnishing to any third party pursuant to this Section 3 to the extent not previously furnished to Purchaser. "Superior Proposal" means any *bona fide* written proposal or offer with respect to a Competing Transaction made by a Qualified Bidder (A) to acquire, directly or indirectly, 100% of the Business for consideration consisting of cash and/or securities (with a value of at least $1,875,000,000) and the assumption of substantially all liabilities required to be assumed by Purchaser under the Purchase Agreement, and (B) which is otherwise on terms which

the Boards of Directors of the Debtors determine in its reasonable good faith judgment (after consultation with its financial advisor and outside counsel), taking into account, among other things, all legal, financial, regulatory and other aspects of the proposal or offer, (1) if consummated, would result in a transaction that is more favorable, from a financial point of view, to the Debtors' stakeholders than the transactions contemplated by the Purchase Agreement and (2) is reasonably capable of being promptly consummated, including with respect to receipt of all required regulatory approvals. "Qualified Bidder" means a third party that (i) enters into or arranges for one or more credit or liquidity facilities with respect to the obligations of Debtors and the Business that are at least equivalent to the financing facilities to be provided to Debtors and their Affiliates by Purchaser and its Affiliates (which credit or liquidity facilities shall take effect simultaneously with the termination of, and shall supersede, and the proceeds of which shall be used to repay in full, such facilities to be provided by Purchaser and its Affiliates) and (ii) arranges for the termination of any Master Repurchase Agreement, Master Securities Lending Agreement, Master Open Market Agreement or any other financing between any of the Debtors and FRBNY, no later than the opening of business, New York time, on Monday, September 22, 2008 and provides adequate assurance of performance of such obligations in a manner satisfactory to FRBNY.

4.    Bidder Required to Provide Certain Information in Connection with Other Competing Bids

Debtors will within 24 hours advise Purchaser orally and in writing following receipt of (1) any offer or proposal for a Competing Transaction or indication by any person that it is considering making an offer or proposal relating to a Competing Transaction, (2) any request for nonpublic information relating to Debtors or its subsidiaries or access to the properties, books or records of Debtors of any of its subsidiaries, other than requests in the ordinary course of business and unrelated to an offer or proposal relating to a Competing Transaction, or (3) any inquiry or request for discussions or negotiations regarding an offer or proposal relating to a Competing Transaction. Debtors will promptly (within 24 hours) provide Purchaser with a copy (if in writing) and summary of the related material terms of any such offer or proposal or request (including the identity of the person making or considering such offer or proposal or making such request) and will keep Purchaser apprised of any material developments, discussions and negotiations on a reasonably current basis (and in any event within 24 hours).

5.    Debtors Obligated to Negotiate

Notwithstanding anything herein to the contrary, prior to entering into an agreement in connection with any Competing Transaction, Debtors shall have provided prior written notice to Purchaser, at least 48 hours in advance (the "Notice Period"), of its intention to take such action with respect to such Competing Transaction, specifying the material terms and conditions of any such Competing Transaction (including the identity of the party proposing to effect such Competing Transaction) and furnishing to Purchaser a copy of the relevant proposed transaction agreements with the party proposing to effect such Competing Transaction and other material documents) and (B) during the Notice

3

Period, and in any event prior to taking such action, Debtors have negotiated, and have
caused its financial and legal advisors to negotiate, with Purchaser in good faith (to the
extent Purchaser desires to negotiate) to make such adjustments in the terms and
conditions of the Purchase Agreement so that such proposal or offer for a Competing
Transaction ceases to constitute a Superior Proposal.

6.    Break-Up Fee and Expense Reimbursement

    Recognizing the Purchaser's expenditure of time, energy, and resources, the
Debtors have agreed that if the Purchaser is not the Successful Bidder, the Debtors will,
in certain circumstances, pay to the Purchaser a fee in the amount of $100,000,000 (the
"Break-Up Fee") and reimbursement for the Purchaser's expenses (including the fees and
expenses of Purchaser's legal counsel and financial advisors) incurred in connection with
the Purchase Agreement, the Sale Motion, Sale Order, and the Bid Matters or the Break-
Up Fee and Competing Bid Order and financings or proposed financings (the "Expense
Reimbursement"), subject to the Expense Reimbursement Cap. The payment of the
Break-Up Fee and Expense Reimbursement will be governed by the provisions of the
Purchase Agreement and the Break-Up Fee and Competing Bid Order. Under no
circumstances will a break-up fee, expense reimbursement or other similar bid
protections be provided by the Debtors to any potential bidder or bidder other than the
Purchaser that submits a Qualified Bid.

7.    Additional Bids by Qualified Bidders With an Initial Qualified Bid and the
Purchaser

    With respect to additional bids by the Purchaser and any Qualified Bidder which
makes a Qualified Bid, subsequent or otherwise higher or better offers shall be in
minimum incremental bids with a purchase price of at least an additional $100 million in
cash consideration over the last highest offer, with any subsequent bid increases of bids
to be made in minimum increments of at least $100 million in cash consideration. The
Debtors shall notify the Purchaser of the bid and the value of such bid that their Boards of
Directors believe to be the highest offer.

8.    The Sale Hearing

    The Sale Hearing will be held before the Honorable Judge James M. Peck on
September 19, 2008 at 11:00 a.m. (New York time) in the United States Bankruptcy
Court for the Southern District of New York, One Bowling Green, New York, NY. The
Sale Hearing may be adjourned or rescheduled with the consent of the Purchaser without
further notice by an announcement of the adjourned date at the Sale Hearing. If the
Debtors do not receive any Qualified Bids (other than the Qualified Bid of the
Purchaser), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing
and will proceed with a sale of the Purchased Assets to the Purchaser following entry of
the Sale Order.

**EXHIBIT 2**

EXECUTION COPY

~~DRAFT – September 16, 2008~~

~~CONFIDENTIAL~~

ASSET PURCHASE AGREEMENT

AMONG

LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INC.

LB 745 LLC

AND

BARCLAYS CAPITAL INC.

———————————

Dated as of September 16, 2008

1

[New York # 1948695 v2]

## TABLE OF CONTENTS

**Page**

[New York #1948695 v2]

*[handwritten: "745"]*

## ASSET PURCHASE AGREEMENT

*[handwritten: Delaware]*

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "Agreement"), among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("LBHI"), **LEHMAN BROTHERS INC.**, a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), **LB 745 LLC**, a [⸺] limited liability company (collectively, "Seller"), and **BARCLAYS CAPITAL INC.**, a Connecticut corporation ("Purchaser").

## WITNESSETH:

*[handwritten: LBHI]*

WHEREAS, [⸺] is a debtor-in-possession under title [11] of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter [11] of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. [08-13555]) (the "Bankruptcy Case");

WHEREAS, the Seller and its Subsidiaries presently conduct the Business;

*[handwritten: and 745]*  *[handwritten: and 745]*

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

*[handwritten: an Affiliate of]*

WHEREAS, Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "DIP Facility") and has agreed to provide to LBI certain other financing;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

1

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means [                    ]

"Breakup Fee and Competing Bid Order" means an order of the Bankruptcy Court in the form attached as Exhibit [ ] hereto "Business" means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to or necessary for the conduct of the Business and the Purchased Assets in each case whether or not in electronic form.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall mean the following assets, properties, interests and rights of Seller and its Subsidiaries:

(a)     the shares of capital stock, limited liability company membership, general and limited partnership, and other equity interests, of Seller and its Subsidiaries (other than (i) the capital stock of Townsend Analytics and (ii) the capital stock or other equity interest of any other Subsidiary that Seller and Purchaser may agree shall be a Purchased Asset prior to the entry of the Sale Order);

2

*[handwritten: Reserved]*

(b)    all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries ~~other~~ *[handwritten: than]* ~~htan the~~ $1.3 billion in cash, cash equivalents, bank deposits or similar cash items ~~held on the date hereof (and any securities, property or assets of any type purchased or otherwise acquired directly or indirectly therewith) (the~~ "Retained Cash");

*[handwritten: the]*

(c)    ~~securities not listed on Exhibit A and any securities, property or assets of any of type purchased or otherwise acquired directly or indirectly therewith;~~ *[handwritten: Reserved]* *[handwritten: all intercompany receivables]*

(d)    the Excluded Contracts, including any accounts receivable to the extent arising out of any Excluded Contract;

(e)    any ~~Excluded~~ Intellectual Property[~~PLEASE DESCRIBE~~]; *[handwritten: Rights that do not constitute Purchased Intellectual Property]*

(f)    any (i) confidential personnel and medical records pertaining to any Excluded Employee; (ii) other books and records that LBI is required by Law to retain, including, but not limited to, books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Purchased Assets or that LBHI reasonably determines are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (iv) minute books, stock ledgers and stock certificates of Subsidiaries..

(g)    any claim, right or interest of LBHI or any of its Subsidiaries in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)    all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller or any of its Subsidiaries other than customer account insurance supplemental to SIPC coverage included in the Business;

(i)    any rights, claims or causes of action of Seller or any of its Subsidiaries against third parties relating to assets, properties, business or operations of Seller or any of its Subsidiaries other than primarily related to Purchased Assets arising out of events occurring on or prior to the Closing Date; *[handwritten: those]* *[handwritten: t]*

(j)    commercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets), private equity investments and hedge fund investments;

(k)    50% of each position in residential real estate mortgage securities;

*[handwritten: and all Archstone debt and equity positions]*

3

[New York #1948695 v2]

*primarily*

(l)    assets related to the soliciting, placing, clearing and executing of buy and sell orders for ~~futures and~~ derivatives contracts by Lehman Brothers Derivative Products Inc. and all activities related or ancillary thereto;

(m)    all artwork owned by Seller and its Subsidiaries;

(n)    all assets related to the IMD Business and derivatives contracts;

(o)    any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities referred to in Section 2.4(e); ~~and~~    *1.1(a)*

(p)    all real property leases of Seller and its Subsidiaries, and all rights and obligations appurtenant thereto, as set forth on Schedule [•], other than the Transferred Real Property Leases;    *[P], and*

(q)    the assets set forth on Schedule [    *(q) Lehman Commercial Paper Inc. and any assets thereof,*

"Excluded Contracts" means all of the Contracts of Seller and its Subsidiaries, other than the Purchased Contracts.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"Hardware" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

4

"IMB Business" means [the investment management business of Seller and its Subsidiaries.]

"Intellectual Property Rights" means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use under license, whether registered or unregistered, including without limitation such rights in and to:  (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon (collectively, "Patents") and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto (collectively, "Marks"), (iii) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights  (collectively, "Copyrights"), (iv) all Software, Technology and market and other data, and rights to limit the use or disclosure of any of the foregoing by any Person, and (v) all claims, causes of action and defenses relating to the enforcement of any of the foregoing.

"Intellectual Property Licenses" means (i) any grant to a third Person of any license, immunity, a covenant not to sue or otherwise any right to use or exploit, any of the Purchased Intellectual Property owned by Seller or any of its Subsidiaries, and (ii) any grant to Seller or its Subsidiaries of a license, immunity, a covenant not to sue or otherwise any right to use or exploit any Purchased Intellectual Property which is not owned by Seller or any of the Subsidiaries.

"Knowledge of Seller" means the knowledge after due inquiry, as of the date of this Agreement, of the senior officers and directors of Seller and its Subsidiaries.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation (including rules of any self-regulatory organization).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude,

5

proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through September 14, 2008 consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (i) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) Liens arising under the DIP Facility; and (vii) the terms and provisions of the ground lease and related documents affecting the property located at 745 Seventh Avenue, New York, NY (the "745 Seventh Ground Lease").

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Assets" means all of the assets of Seller ~~and its Subsidiaries~~ used in connection with the Business (excluding the Excluded Assets), ~~including~~;  *Stet*

(a)    the Retained Cash;

(b)    all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(c)    ~~all rights of Seller and its Subsidiaries under [real property / real property leases]~~, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

the Transferred Real Property Leases

6

*(collectively, "Long Positions")*

(d)   government securities, commercial paper, ~~mortgage loans,~~ corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements;

*with a book value as of the date hereof of approximately $70 billion*

(e)   50% of each position in the residential real estate mortgage securities;

(f)   the Furniture and Equipment;

(g)   the Purchased Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Purchased Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover damages for past or future infringements or misappropriations thereof and the right to fully and entirely stand in the place of Seller in all matters related thereto;

(h)   the Purchased Contracts;

(i)   all Documents that are used in, held for use in or intended to be used in, or that arise in connection with, or are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Excluded Employees of Seller or its Subsidiaries who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents primarily related to any Excluded Assets;

(j)   all Permits used by Seller in the Business to the extent assignable under applicable Law;

(k)   all supplies owned by Seller and used in connection with the Business;

(l)   all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, contractors and agents of Seller or its Subsidiaries or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

~~(m)   to the extent specifically provided in Article IX, the assets, if any, that constitute a part of the Qualified Plans, the VEBA and the Business Plans;~~

7



(t) *[handwritten] the occurrence after the date hereof and prior to the Closing of any Casualty or event loss with respect to any Transferred Real Property Lease or any properties subject thereto,*

(n)   rights to "Lehman" indices and analytics that support the indices; *[handwritten] and all other ~~indices~~ indices and analytics used in the Business*

(o)   general trading tools supporting the Business;

(p)   the stock of Townsend Analytics and the stock, equity interests or assets of any other Subsidiary of LBI that the Seller and Purchaser may mutually agree on prior of the entry of the Sale Order and of which a notice has been provided to any statutory committee;

(q)   the equity interests or assets (at the election of Purchaser in its sole discretion prior to the entry of the Sale Order) of Eagle Energy Management LLC;

(r)   all past and present goodwill and other intangible assets ~~associated~~ with or symbolized by the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; ~~and~~ *[handwritten] ; and*

(s)   Mercantile Exchange license agreements with respect to 335 South LaSalle Street, Chicago, IL and 400 South LaSalle Street, Chicago, IL.

"Purchased Contracts" means all Contracts ~~associated with or necessary to carry on or are related to the operation of the Business, including those Contracts set forth on~~ Schedule 1.1(c) ~~(not including an assets listed under Excluded Assets)~~ *[handwritten] or arising from* *[handwritten] designated as Purchased Contracts pursuant to Section 2.5*

"Purchased Intellectual Property" means the Purchased Marks and all other Intellectual Property Rights throughout the world that are used in, related to, or otherwise necessary for the Business, including all Intellectual Property Rights embodied in the Furniture and Equipment, ~~the Software, the Technology and the Documents that are included in~~ Purchased Assets. *[handwritten] , Software and Technology*

~~"Purchaser Procedures Order" means an order of the Bankruptcy Court substantially in the form attached as Exhibit A. [NTD: Fix Exhibit numbering]~~

"Purchased Marks" means the Mark "LEHMAN" and "LEHMAN BROTHERS" throughout the world, all other Marks throughout the world containing or incorporating the name "LEHMAN," the Internet domain name www.lehman.com, all other Internet domain names containing or incorporating any Purchased Marks, and any other Mark throughout the world that is used in, related to, or otherwise necessary for the Business; in each case, together with all of the goodwill associated therewith and all registrations and applications for the foregoing and all common law rights thereto.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Breakup Fee and Competing Bid Order and Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to

8

consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.3 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"Tax Authority" means any state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials,

9

specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"Transferred Real Property Leases" means the leases listed on Schedule [•] attached hereto and any rights and obligations appurtenant thereto.

1.1(b)

1.2    Other Definitional and Interpretive Matters

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

10

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES    *and 745*

2.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase, acquire and accept from the Seller, and Seller shall sell, transfer, assign, convey and deliver (or cause to be sold, transferred, assigned, conveyed and delivered) to Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

2.2    Excluded Assets. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

2.3    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities of Seller and its Subsidiaries (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of Seller incurred, after the Closing, in connection with the Business;

(b)    all Liabilities of Seller under the Purchased Contracts arising after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code;

(c)    all Liabilities assumed under Article IX;

(d)    accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business other than any accounts payable

11

*short positions and "repos" relating to any Securities or interests of the types included in the definition of "Long Positions" (collectively, "Short Positions" and, together with the Long Positions, the "Positions").*

arising out of one in connection with any Excluded Contract (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(e)    all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;    *with a book value as of the date hereof of approximately $69 billion*

(f)    all other Liabilities to the extent related to the Business, the Purchased Assets or the Transferred Employees arising after the Closing;

(g)    all Liabilities under Transferred Real Property Leases from the date of Closing forward;

(h)    all Liabilities relating to amounts required to be paid by Purchaser hereunder; and

(i)    all ~~Liabilities relating to the short Positions. [NTD. Where is "Positions" defined?]~~

2.4    Excluded Liabilities.    Notwithstanding anything herein to the contrary, Purchaser will not assume or be liable for any Excluded Liabilities. "Excluded Liabilities" shall mean all Liabilities of Seller and its Subsidiaries to the extent they do not arise out of the Business and the following Liabilities:

(a)    all Liabilities arising out of Excluded Assets, including Contracts that are not Purchased Contracts;

(b)    except as otherwise provided in Article XII, all Liabilities for Taxes of Seller for any Tax periods (or portions thereof) ending on or before the Closing Date;

(c)    except as otherwise provided in this Agreement, *(and)* liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Case that are subject to ~~compromise under the Bankruptcy Case~~ (the "Compromised Liabilities") other than any Cure Amounts that Purchaser is required to pay pursuant to Section 2.5;    *M.C.    l.C.*

(d)    except as expressly assumed pursuant to Article IX hereof, any Liabilities relating to the employment, potential employment or termination of employment of any Person relating to or arising out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement, including in respect of equity compensation plans and tax-qualified or not tax-qualified pension or saving plans as to which the parties agree there shall be no transfer to or assumption of liabilities by the Purchaser;    *M.C.*

(e)    all Liabilities relating to amounts required to be paid by Seller, hereunder, including upon any breach;

12

*[handwritten: (g) all intercompany payables,]*

*[handwritten: a Contract not designated as a Purchased Contract(]*

(f)    all Liabilities under Excluded Real Property Leases and Transferred Real Property Leases other than Liabilities under Transferred Real Property Leases from the date of Closing forward *[handwritten: ; and]*

2.5    Cure Amounts. *[handwritten: y]*

*[handwritten: ")"]*  *[handwritten: ";"]*  *[handwritten: This Section will not apply to ~~Transferred Real Property Leases~~]*

For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "Related Contracts") as either (1) a Purchased Contract or (2) a Rejected Contract. Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof. If a Related Contract is designated as a Purchased Contract, such ~~Purchased~~ Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract. If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof. In the event of any dispute relating to such cure amount, Purchaser shall escrow such funds in a manner satisfactory to the court.

*[handwritten: real property leases]*

*[handwritten: Purchased]*

2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Seller shall, or shall cause its Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, without further consideration, Seller and Purchaser shall, and shall cause their respective Affiliates to, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of Seller's and its Subsidiaries' representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)    If any third-party consent is required for the assignment of any Intellectual Property Licenses to Purchaser and such consent cannot be obtained, then, to the extent permitted by Applicable Law, Seller shall sublicense whatever rights they are permitted to sublicense under the respective Intellectual Property Licenses, provided such sublicense is at no cost to Seller. If, however, Seller is permitted to sublicense only at a

13

one time, fixed payment or an ongoing fee, Seller shall notify Purchaser thereof and, only if Purchaser agreed in writing to be responsible to such payment or fee, as applicable, Seller shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property Licenses, subject to the payment or fee being paid by Purchaser.

2.7    Bulk Sales Laws. Purchaser hereby waives compliance by Seller and its Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

## ARTICLE III

## CONSIDERATION

3.1    Consideration. The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser. The "Cash Amount" shall equal an amount in cash equal to the sum of (i) $250 million, (ii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Lehman headquarters at 745 Seventh Avenue in New York City less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, (iii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Cranford New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, and (iv) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Piscataway New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing. For illustrative purposes only, the parties note that as of the date hereof they expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned assumed commissions).

3.2    Payment of Cash Amount. On the Closing Date, Purchaser shall pay the Cash Amount to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.3    Adjustment to Cash Amount. Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos) that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (a) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (b) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant

[New York #1948695 v2]

to this Section 3.3). For purposes of this Section 3.3, the time value of money shall be disregarded and no interest shall be deemed earned.

# ARTICLE IV

## CLOSING AND TERMINATION

4.1    Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m (New York time) on the day of, or at Purchaser's election the day following, the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

4.2    Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

    (a)    a duly executed, reasonably customary bill of sale in the form of Exhibit A hereto;

    (b)    duly executed, reasonably customary assignment and assumption agreements (including, with respect to the 745 Seventh Ground Lease, all assignments that were entered into in connection with Seller's acquisition of such lease) and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

    (c)    a certificate, duly executed by Seller, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

    (d)    the Seller Subleases; and

    (e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or as Purchaser may reasonably request, including such instruments of conveyance and transfer in form and substance comparable to the

instruments of conveyance and transfer exchanged in connection with Seller's acquisition of the 745 Seventh Ground Lease.

4.3     Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b)     a duly executed, reasonably customary assignment and assumption agreement in the form attached hereto as Exhibit B hereto; and

(c)     the Purchaser Subleases; ~~and the~~ *Seller Sublease*

*duly executed*

4.4     Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing shall not have occurred by the close of business on September 24, 2008 (the "Termination Date");

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Seller or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)     by Purchaser upon ~~(A) a Seller's selection of a Successful Bidder (as defined in the Breakup Fee and Competing Bid Order) other than Purchaser in the Auction, (B) the completion of the Auction if Sellers have not selected a Successful Bidder, (C)~~ the entry of an order by the Bankruptcy Court authorizing a Competing Transaction, ~~(D) a Seller's selection of a Person other than Purchaser as the purchaser in an Alternative Transaction, regardless of whether or not an order authorizing such transaction has been entered by such date, (E) any breach by a Seller of Article VII, or (F) any breach by a Seller of the terms of the Breakup Fee and Competing Bid Order; or [TO BE CHANGED BASED ON CHANGES TO BPO WHICH ARE IN PROGRESS.]~~ *or*

(e)     by Purchaser if the Breakup Fee and Competing Bid Order is not approved by the Bankruptcy Court in the form attached hereto as Exhibit [ ]. *A*

4.5     Procedure Upon Termination. In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any

16

other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set forth in ~~Section Error! Reference source not found.~~, Section 4.6 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

*[handwritten: (5)    and 8.6]*

(b)    Nothing in this Section 4.6 shall relieve Purchaser or Seller of any liability for a material breach of this Agreement prior to the date of termination, The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c)    The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement; provided, that upon the termination of this Agreement, the non-solicitation obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall be of no further force and effect.

(d)    In the event that Purchaser terminates this Agreement pursuant to Section 4.4(d), Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

(e)    In the event that Purchaser or Seller terminates this Agreement pursuant to Section 4.4(a) and at any time after the date of this Agreement and prior to such termination a proposal for a Competing Transaction shall have been publicly disclosed or otherwise communicated to the Sellers and shall not have been irrevocably *[handwritten: bona fide]* withdrawn, Sellers shall pay to Purchaser (i) the Break-Up Fee ~~promptly upon such termination~~ and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

*[handwritten: on the date of such Consummation]*

(f)    The parties hereto acknowledge that the agreements contained in this Section 4.6 are an integral part of the transactions contemplated by this Agreement. The Sellers shall be jointly and severally liable for any amount due to Purchaser pursuant to this Section 4.6. In the event that the Sellers shall fail to pay any amounts due pursuant to this Section 4.6, the Sellers shall reimburse Purchaser for all reasonable costs and expenses actually incurred or accrued by Purchaser (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement ~~of this Section 4.6.~~

*[handwritten: then if a Qualified Bid shall be consummated within twelve months after such termination]*

*[handwritten: ; provided further that upon the Closing, the non-solicitation obligation of Purchaser and its Affiliates under the Confidentiality Agreement with respect to non-U.S. employees of the broker-dealer and investment banking business shall be of no further force and effect.]*