# A. 148 (B)

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect.

5.2    Authorization of Agreement.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 4.4, the entry of the Breakup Fee and Competing Bid Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller or, as the case may be, its Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by Seller of this Agreement or by Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of

18

or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller or any Subsidiary; (ii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof; other than, in the case of clause (ii), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller or any Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller or any Subsidiary with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller or any Subsidiary of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Breakup Fee and Competing Bid Order with respect to Seller's obligations under Section ~~Error! Reference source not found.~~, (iv) filings of applications and notices with, and receipt of consents, authorizations, approvals, exemptions or non-objections from, the Securities and Exchange Commission (the "SEC"), foreign and state securities authorities, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), National Futures Association ("NFA") applicable securities, commodities and futures exchanges, the Financial Services Authority ("FSA") and other industry self-regulatory organizations ("SRO"), and (v) the filing of any other required applications, filings or notices with the Board of Governors of the Federal Reserve System (the "Federal Reserve"), any foreign, federal or state banking, other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities, and (iv) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a material adverse effect.

5.4    Title to Purchased Assets. Except as set forth in Schedule 5.4, and other than the real property subject to the [Real Property Leases], intellectual property licensed to Seller and the personal property subject to the [Personal Property Leases], Seller owns (directly or indirectly) each of the Purchased Assets, and Purchaser will be vested with good and exclusive title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets, together with all of Seller's agreements hereunder and under the Seller Documents, constitute all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated.

19

5.5    Compliance with Laws; Permits.

(a)    Seller and its Subsidiaries, and their respective personnel, are in compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not have a material adverse effect.  Neither Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws applicable to their respective operations or assets or the Business, except where such violation would not have a material adverse effect.

(b)    Seller and its Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not have a material adverse effect.  Neither Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party required for the operation of the Business as presently conducted, except where such default or violation would not be material.

5.6    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, its Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

20

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1     Organization and Good Standing.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     Authorization of Agreement.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     ~~Except as set forth on Schedule 6.3,~~ None of the execution and   *M . C ,*
delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this

21

*[handwritten margin note: regulatory regimes referred to in Section 5.3(b) or as would not have a material adverse effect.]*

Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby or for Purchaser to conduct the Business, except for compliance with the ~~applicable requirements of [        ]~~

*[handwritten margin note: Cash Amount]*

6.4    <u>Financial Capability</u>.  Purchaser (i) has, ~~and~~ at the Closing will have, sufficient internal funds) available to pay the ~~Purchase Price~~ and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

6.5    <u>Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in <u>Article V</u> hereof (as modified by the Schedules hereto as supplemented or amended).  Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby.  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII

[BANKRUPTCY COURT MATTERS][~~TO DISCUSS~~]

~~7.1    Breakup Fee and Competing Bid Order~~Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "<u>Competing Bid</u>")  From the date

22

hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Asset and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Seller to prospective purchasers.

[Reserved]

No Shop. From the date of execution of this Agreement until the earlier of (i) the Closing and (ii) the termination of this Agreement in accordance with its terms, none of Seller, any of the Seller's direct or indirect Subsidiaries, or any agent or advisor to the Seller or any of the Seller's direct or indirect Subsidiaries shall, directly or indirectly, through any officer, director, employee, agent, professional, advisor, other representative or otherwise, (A) solicit, initiate, encourage or facilitate any proposal or offer from any Person (other than the Purchaser) relating to any financing, refinancing, acquisition, divestiture, business combination or reorganization or similar transaction involving the Business, the Purchased Assets or the business, assets or operations of LBI or any of its Subsidiaries or the equity securities of LBI or any of its Subsidiaries (a "Competing Transaction"), (B) enter into discussions or negotiations regarding a Competing Transaction, (C) furnish any information with respect to, enter into any agreement or understanding with respect to, otherwise assist or participate in, or facilitate in any other manner any Competing Transaction (including, without limitation, executing any confidentiality agreement with any other Person with respect to a Competing Transaction), (D) waive any rights under any existing standstill or waiver agreements, or (E) seek or support Bankruptcy Court approval of a motion regarding bid procedures or expense reimbursement or break up fee for the benefit of any party with respect to a Competing Transaction or take any action inconsistent in any way with this Agreement or achieving the Closing by 5:00pm (New York time) on September 24, 2008. Notwithstanding anything in the foregoing to the contrary, prior to the entry of the Sales Order, the Seller may take any action expressly permitted by the Breakup Fee and Competing Bid Order in response to bona fide Qualified Bid (as defined in the Purchaser Protection Order) submitted by a Qualified Bidder (as defined in the Breakup Fee and Competing Bid Order) provided such Qualified Bid was not submitted in violation of clause (A) above.

7.2   <u>Bankruptcy Court Filings</u>.  As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Breakup Fee and Competing Bid Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Breakup Fee and Competing Bid Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the

23

Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder. In the event the entry of the Sale Order or the Breakup Fee and Competing Bid Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

8.1    Access to Information. Seller agrees that, until the earlier of the Closing and termination of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Subsidiaries is bound. *Seller*

8.2    Conduct of the Business Pending the Closing. In order to attempt to preserve the going concern value of the Business, Purchaser shall have the right to be on-site and shall coordinate and consult with representatives of ~~Purchaser~~ regarding the business, operations and management of the Business  In addition, until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser:

(a)    Seller shall, and shall use its best efforts to cause its Subsidiaries *whose equity or assets constitute Purchased Assets* to:

(i)    conduct the Business only in the Ordinary Course of Business (recognizing its current distressed state); and

24

(ii)     use its commercially reasonable efforts to (A) preserve the *to* present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with customers and suppliers of the Business and Seller's Subsidiaries (recognizing that Seller reserves the right or cause any of its Subsidiaries, other than a Subsidiary the equity or assets of which constitutes a Purchased Asset, to commence a proceeding under the Bankruptcy Code or other applicable state or foreign law); and

(b)     Seller shall not, and shall not permit its Subsidiaries to, solely as it relates to the Business:

(i)     other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any director or executive officer of [＿＿＿] *or any of its Subsidiaries*, (B) increase the annual level of compensation payable or to become payable by Seller or any of its Subsidiaries *to* any such director or executive officer, (C) grant any unusual or extraordinary *~~any~~ whose equity or assets constitute Purchased Assets* bonus, benefit or other direct or indirect compensation to any such director or executive officer, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or any of its Subsidiaries is a party or involving any such director or executive officer, except, in each case, as required by applicable Law from time to time in effect or by any existing employee benefit plans;

(ii)     make or rescind any material election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent tax returns;

(iii)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iv)     cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset except in the Ordinary Course of Business; *(v) Reserved*

~~(v)     enter into any commitment for capital expenditures in excess of $[＿＿＿] for any individual commitment and $[＿＿＿] for all commitments in the aggregate;~~

(vi)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(vii)    other than (A) in the Ordinary Course of Business or
(B) secured borrowings from the Federal Reserve Bank under the Primary Dealer
Facility, incur any indebtedness for borrowed money, issue any debt securities,
assume, guarantee, endorse or otherwise become responsible for the obligations of
any other individual, corporation or other entity, or make any loan or advance or
capital contribution to, or investment in, any person, in any case that would be
related to the Business or constitute an Assumed Liability;

(viii)    set any record date or payment date for the payment of any
dividends on its capital stock or make, declare or pay any dividend, or make any
other distribution on, or directly or indirectly redeem, purchase or otherwise
acquire, any shares of its capital stock or any securities or obligations convertible
(whether currently convertible or convertible only after the passage of time or the
occurrence of certain events) into or exchangeable for any shares of its capital
stock;

(ix)    sell, transfer, pledge, lease, license, mortgage, encumber or
otherwise dispose of any of Purchased Assets (including pursuant to
securitizations) to any individual, corporation or other entity or cancel, release or
assign any material amount of indebtedness related to the Business to any such
person or any claims held by any such person, other than any such transactions as
are in the Ordinary Course of Business;

(x)    transfer ownership, or grant any license or other rights, to
any person or entity of or in respect of any Purchased Intellectual Property, other
than grants of non-exclusive licenses pursuant to license agreements entered into
in the Ordinary Course of Business;

(xi)    in connection with the Business, make any investment in,
or any acquisition of, any business entity or division, by merger, consolidation,
asset purchase or other business combination, or by contributions to capital; or
make any property transfers or purchases of any property or assets, in or from any
other individual, corporation, joint venture or other entity;

(xii)    in connection with the Business, conduct its operations or
take actions related to trading or credit extension in any manner other than in the
Ordinary Course of Business;

(xiii)    change in any material respect the policies, practices and
procedures governing operations of the Business;

(xiv)    amend or otherwise modify, except in the Ordinary Course
of Business, or knowingly violate in any material respect the terms of, any
Purchased Contract, or (ii) except as may be required by applicable Law, create or
renew any agreement or contract or other binding obligation related to the
Business containing (A) any material restriction on the ability of Purchaser to

26

conduct the Business as it is presently being conducted or (B) any material restriction on the ability of Purchaser to engage in any type of activity or business after the Closing;

(xv)    abandon, cancel, let lapse, fail to renew, fail to continue to prosecute, protect, or defend, or dispose of, any Purchased Intellectual Property;

(xvi)    commence or settle any claim, action or proceeding related to the Business, other than settlements resulting solely in the payment of monetary damages in amounts not in excess of $500,000 in the aggregate; or

(xvii)    agree to do anything prohibited by this Section 8.2.

8.3    Consents. Seller shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

8.4    Regulatory Approvals.

(a)    If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or subsidiaries, as applicable, or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 1 Business Day after the date of this Agreement, (b) comply at the earliest practicable date with any request under such Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or subsidiaries, as applicable, from any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda,

27    {other than Purchaser solely with respect to a Governmental Body in the United Kingdom}

briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws.  Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only."  Such materials and the information contained therein given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)      Each of Purchaser and Seller shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under [the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws")].  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any [Antitrust Law], each of Purchaser and Seller shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests.

8.5      Further Assurances.

(a)      Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(b)      In the event that, for any reason including a determination by a court of competent jurisdiction that any sale, transfer, assignment, conveyance or delivery contemplated by this Agreement is ineffective or invalid to vest or confirm such title, any conveyance, assignment, assumption, allocation or other action is necessary or appropriate to vest in or confirm to Purchaser full title to any of the Purchased Assets vested in Purchaser pursuant to Section 2.1, or to cause Purchaser to assume any Liabilities allocated to Purchaser pursuant to Section 2.3, then Seller shall, and shall cause its Subsidiaries to, execute and deliver all such instruments and take all such actions necessary in order to convey, assign or allocate such Purchased Assets or Liabilities to Purchaser.

28

8.6    <u>Confidentiality</u>.

*September 11*

(a)    Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Seller dated [          ]2008 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; <u>provided, however</u>, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller and its Subsidiaries shall, other than Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. For purposes of this <u>Section 8.6</u>, "<u>Confidential Information</u>" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

(b)    From and after the Closing, Seller shall, and shall cause its Subsidiaries to, use the same efforts to maintain the confidentiality of any proprietary or confidential information regarding the Purchased Intellectual Property as Seller and/or its Subsidiaries used to maintain the confidentiality of such information prior to the Closing.

8.7    <u>Preservation of Records</u>. Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Seller or Purchaser wishes to destroy such records before or after that time (and such proposed destruction is not in violation of applicable Law), such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.8    <u>Publicity</u>. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this

29

*for any of its existing uses*

Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller lists securities, provided that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof. *(A)*

8.9    Trademark License. From and after the closing Purchaser hereby grants Seller a perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks "LEHMAN" and "LEHMAN BROTHERS," including any logos containing such names (collectively, the "Licensed Marks") ~~for a period of [six(6) months] as of the Closing Date, for use outside the United States and Canada~~ or in connection with [the IMD Business and the unwinding of any of its other operations] including use in corporate or other entity names. The foregoing license as it relates to the IMD Business shall be assignable by Seller without the need for further consent to a purchaser of all or substantially all of the equity interests in or assets of the IMD Business. Seller shall have the right to sublicense the foregoing license to any of its Subsidiaries and an assignee in connection with a sale of all or substantially all of the IMD Business shall have a right to sublicense such right to any of its Affiliates in connection with the conduct of that business, provided that any such sublicense shall terminate on the date when Seller's or its assignee's license terminates. In the remainder of this provision, the licensee or sublicense (Seller or Seller's assignee or their sublicensees) shall be referred to as "Licensee." Each Licensee acknowledges Purchaser's ownership of the Licensed Marks and the validity of the Licensed Marks and shall not register any confusingly similar mark in any jurisdiction. All goodwill arising from use of the Licensed Marks shall inure to Purchaser's benefit. Each Licensee shall use each Licensed Mark in connection with any markings or other notices as required by law. Purchaser shall have the right to supervise and control  the use of the Licensed Marks by each Licensee, including by reviewing specimens of use of the Licensed Marks, with respect to the nature and quality of the products and services designed, performed, distributed, sold or otherwise commercialized by such Licensee and the materials used to promote such products and services for the purpose of protecting and maintaining the validity of the Licensed Marks and the goodwill associated with the Licensed Marks. Each Licensee shall at all times use the Licensed Marks only in connection with goods and services of quality at least as high as that offered by Seller and its Affiliates under such marks immediately prior to the Closing. Any use of the Licensed Marks in connection with the IMD Business shall include a disclaimer in a form reasonably acceptable to Purchaser indicating that the IMD Business is not affiliated with Seller. Seller or its assignee shall be responsible for each Licensee's compliance with the terms of this Section 8.H and shall be liable to Purchaser for any non-compliance by any such Licensee with any such terms. License. Purchaser hereby grants to [Seller] a perpetual, irrevocable, worldwide, nonexclusive, fully-paid, royalty-free license under all non-Mark Purchased Intellectual Property used in or covering any business of the Seller andor its Affiliates other than the Business [in the fields of investment management, investment research, portfolio management and other fields of the IMD Business] as well as the unwinding of any of Seller's other operations, solely for use in connection with such business outside of the Business. The foregoing license as it relates to the IMD Business shall be assignable without the requirement of

30

further consent by Seller in connection with a sale of all or substantially all of the assets of the IMD Business and may be sublicensed to any entity conducting the IMD Business and any successor of the IMD Business and any contractor providing services to such business or successor. The foregoing license shall be under Purchased Intellectual Property acquired by Purchaser hereunder that was previously owned by Seller or its Affiliates as well as Purchased Intellectual Property owned by third parties as to which Purchaser shall have after Closing has the right to grant a sublicense without requirement of additional consent or payment of additional consideration.

8.10    Use of Purchased Intellectual Property. Except as permitted under subsections 8.11 and 8.12 above, after the Closing Date, neither the Seller nor any of its Subsidiaries will, directly or indirectly, in any jurisdiction: (i) exploit or make use of, or authorize any third party to exploit or make use of, any of the Purchased Intellectual Property, or any Marks confusingly similar to the Purchased Marks; (ii) attempt to register the Purchased Marks or any mark confusingly similar thereto; (iii) challenge or otherwise contest the Purchaser's efforts to register, or enforce its trademark registrations for and trademark rights in, the Purchased Marks or its rights in other Purchased Intellectual Property.

8.11    Deferred Transfers.

31

(a)     If and to the extent that the allocation to and vesting in Purchaser of any Purchased Assets pursuant to Section 2.1 or otherwise would be a violation of applicable Law or require any Consent or the approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing then, unless the Parties shall otherwise agree, the allocation to and vesting in Purchaser of such Purchased Asset shall, without any further action by any Party, be automatically deferred and any allocation or vesting of such Purchased Asset pursuant to Section 2.1 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Purchased Asset shall be deemed a "Deferred Transfer Purchased Asset."

(b)     If and to the extent that the allocation to Purchaser of, and Purchaser's becoming responsible for, any Assumed Liabilities pursuant to Section 2.3 or otherwise would be a violation of applicable Law or require any Consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by Seller prior to the Closing, then, unless the Parties shall otherwise agree, the allocation to Purchaser of, and Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any Party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to Section 2.3 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled.  Any such Assumed Liability shall be deemed a "Deferred Transfer Assumed Liability."

(c)     With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible, (i) Seller shall, and shall cause any applicable Subsidiary to, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of Purchaser and its Subsidiaries (at the expense of Purchaser) and (ii) Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability.  In addition, Seller shall, and shall cause any applicable Subsidiary to, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course of Business in accordance with past practice and take such other actions as may be reasonably requested by Purchaser in order to place Purchaser, insofar as permissible under applicable Law and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been transferred to and vested in Purchaser or an applicable Subsidiary at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

32

(d)    If and when the Consents, approvals of Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability pursuant to Section 8.12(a), are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement and/or the applicable [Ancillary Agreement].

(e)    Seller shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by Purchaser, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by Purchaser. *Date*

(f)    For a period of nine months after the Closing, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, to the extent Excluded Employees occupied real property subject to a Transferred Real Property Lease prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Excluded Employees prior to the Closing, without charge or consideration.

*after the Closing Date*

(g)    For a period of nine months, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, after the Closing, to the extent Transferred Employees occupied real property is not subject to a Transferred Real Property Lease prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Transferred Employees prior to the Closing, without charge or consideration.

(h)

8.12    Release of Guarantees.  Purchaser shall deliver to the respective beneficiaries of any and all guarantees relating to or arising under any Purchased Contracts, Transferred Real Property Leases or Assumed Liabilities ("Seller Guarantees") such replacement guarantees from Purchaser and its Affiliates, letters of credit, collateral, or other credit support, as shall be required pursuant and in accordance with any Purchased Contract, Transferred Real Property Leases or Assumed Liability.  In the event that the respective beneficiaries under any of the Seller Guarantees do not agree to release (the "Guarantee Release") Seller and its Subsidiaries from any and all liability arising thereunder after theClosing, prior to the Closing, then Purchaser shall cause to be delivered to Seller, as beneficiary, at the Closing an indemnification agreement and guarantee, dated and effective as of the Closing Date and in form and substance reasonably satisfactory to Seller and from a creditworthy obligor as shall be satisfactory to Seller (collectively, "Backstop Documents"), pursuant to which Seller and its

33

Affiliates shall, from and after the Closing, be indemnified, reimbursed and held harmless from any and all liabilities, losses, claims, costs and expenses under or arising out of the relevant Seller Guarantee. From and after the Closing, Purchaser shall not permit any Contract to which a Seller Guarantee relates to be renewed, extended, amended or modified unless the Purchaser obtains and delivers to Seller the related Guarantee Release duly executed by the beneficiaries of the related Seller Guarantee.

8.13    Transition Services. The Purchaser and Seller shall use commercially reasonable efforts to enter into a Transition Services Agreement in a form reasonably acceptable to Seller and Purchaser in order for each of Seller and Purchaser to continue to receive the services provided between LBI and LBHI on the Closing Date.

8.14    Subleases.

(a)    For the leased premises located in 555 California Street, San Francisco, CA, Seller shall sublet to Purchaser pursuant to a sublease agreement (the "Seller Sublease"), reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, a portion of the demised premises in such location subject to the terms of the applicable lease and obtaining the landlord's consent to the Sublease or Bankruptcy Court approval. Purchaser shall bear its portion of the occupancy cost for such location based on the relative square footage sublet. Seller and Purchaser shall enter into the Seller Sublease at Closing to memorialize the provisions of this Section.

(b)    For the leased premises located in 125 High Street, Boston, MA, 190 S. LaSalle Street, Chicago, IL and 10250 Constellation Boulevard, Los Angeles, CA Seller shall assume such leases in connection with Seller's bankruptcy proceedings and assign such leases to Purchaser. Purchaser shall then sublet to Seller or a designee of Seller, in either event with credit reasonably acceptable to Purchaser, pursuant to three separate subleases (each, a "Purchaser Sublease", collectively the "Purchaser Sublease"), reasonably acceptable to both Purchaser and Seller and subject in all cases to the terms of the underlying lease, a portion of the demised premises in such locations shall be subject to obtaining the landlord's consent to each Sublease or Bankruptcy Court approval. Seller shall bear its portion of the occupancy cost for each such location based on the relative square footage sublet. Seller and Purchaser shall enter into each Sublease at Closing to memorialize the provisions of this Section.

8.15    Landlord Notice. Seller shall give notice, on the date hereof , to Rock-Forty-Ninth LLC in accordance with the terms of the 745 Seventh Ground Lease, regarding the transactions contemplated hereunder and shall provide Rock-Forty-Ninth LLC with the appropriate bankruptcy filings in order to provide adequate notice thereof under applicable Law.



34

Rider 34 A

8.16    <u>Artwork</u>.  Purchaser shall have the right to possess, for a period of one-year after the Closing, all of the artwork at the Seller's headquarters located at 745 Seventh Avenue, New York, New York.  At any time during such period, Purchaser shall have the option to purchase any or all of the artwork for a price equal to its appraised value (as determined by an independent, recognized appraiser).  To the extent Purchaser does not exercise such option on any or all of the artwork by the first anniversary of the Closing, then Purchaser shall return such artwork to the Seller.

ARTICLE IX

EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Employee Benefits.

*identified persons shall*

(a)    Effective as of the Closing Date, Purchaser shall, or shall cause
one of Purchaser's Subsidiaries to, continue to employ (where employment continues or
is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of
Law), or offer employment to (where employment does not continue or transfer
automatically by operation of Law), each Offeree.  For purposes of this Agreement, the
term "Offeree" means each active employee employed primarily in connection with the
Business at the Closing, other than such employees who are identified by Purchaser to
Seller prior to Closing, such names not to include any person who is in the targeted
population referred to in Section 10.1(b).  Each Offeree who accepts Purchaser's or one
of its subsidiaries' offer of employment, together with each person whose employment
transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law,
shall be referred to herein as a "Transferred Employee."  Each Person who is not a
Transferred Employee shall be referred to herein as an "Excluded Employee".  An
Offeree who performs work at his then applicable place of employment on the first
Business Day immediately following the Closing shall be deemed for all purposes of this
Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment
and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(b)    Without limiting any additional rights that each Transferred
Employee may have, Purchaser shall, or shall cause its Subsidiaries, for a period
commencing at the Closing and ending on December 31, 2008, to provide to each
Transferred Employee whose employment is terminated during such period by the
Purchaser by reason of a "reduction in force" or a "job elimination" (as those terms are
customarily applied in good faith, consistent with past practice) severance payments and
benefits at levels that are no less favorable than such levels as the Transferred Employee
would have been entitled to receive pursuant to the provisions of the Seller's severance
plans or agreements covering such Transferred Employee as in effect immediately prior
to the Closing.  Nothing contained in this Section 9.1 or elsewhere in the Agreement shall
be construed to prevent, from and after the Closing, the termination of employment of
any individual Transferred Employee or any change in the employee benefits available to
any Transferred Employee.

35

*[handwritten: from its initial level, in the same proportion as the reduction in Transferred Employees below 90% of the initial number of Transferred Employees compared to 90% of the initial number of Transferred Employees]*

(c)    On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability").  Such 08 Annual Bonuses shall be awarded on or before March 15, 2009 in such forms and proportions as are consistent with Purchaser's customary practices, so that the aggregate amount awarded shall equal the Accrued 08 FY Liability.  Any amounts that would have been allocated in respect of any Transferred Employee who voluntarily terminates employment before such award is made shall instead be allocated among the remaining Transferred Employees (who include, for this purpose, those Transferred Employees who are terminated without cause by Purchaser or its affiliates prior to the time the awards are made) (collectively, the "Remaining Transferred Employees").  However, the Accrued 08 FY Liability shall be reduced if, prior to the time such awards are made, both (x) 10% of the Transferred Employees have voluntarily terminated their employment with the Purchaser and (y) such terminated Transferred Employees would have been expected to receive at least 10% of the 08 Annual Bonuses had no such Transferred Employee's employment in fact terminated.  In that case, the Purchaser may adjust the Accrued 08 FY Liability proportionately, in a good faith and reasonably equitable manner to account for the Transferred Employees to whom 08 Annual Bonuses will not be payable, and thereby to reduce the aggregate 08 Annual Bonuses.  Any such reduction shall take into account the length of service, seniority within the Business and contribution of the Remaining Transferred Employees, relative to the allocation of the Accrued 08 FY Liability, in accordance with the principles enumerated herein.

ARTICLE X

CONDITIONS TO CLOSING

10.1    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(b)    at least 70% of the U.S. and Canadian Persons identified by Seller and reasonably accepted by Purchaser, acting in good faith, not later than two Business Days after the date hereof as the targeted population are actively employed in the

36

Business immediately prior to the Closing and as to whom management of Seller has made a good faith assessment that they will continue in employment with the Business as of the Closing Date;

(c)    [Seller shall cause creditworthy Persons to execute subleases for the three properties on the terms specified in Schedule [ ]]

(d)    [the Bankruptcy Court shall have entered a final order permitting Seller to sell the premises at 745 Seventh Avenue, New York, New York to Purchaser as contemplated by Section ___]]

(e)    [the mortgage in favor of the Seller's Affiliate with respect to the premises at 745 Seventh Avenue, New York, New York shall have been fully repaid and extinguished]; and

(f)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

10.2    Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

Insert Rider 38A

(a)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(b)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

Adjustment to purchase to be discussed if building can't be transferred.

[New York #1948695 v2]

(b)      the Bankruptcy Court shall have entered the Breakup Fee and Competing Bid Order, in form and substance reasonably acceptable to Seller and Purchaser;

(c)      the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)      LBI shall have commenced a case under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court; *and*

(e)      Purchaser shall have obtained regulatory approval under the HSR Act and all other material regulatory, self-regulatory, exchange, clearing organization and governmental approvals, authorizations, waivers and/or licenses required to conduct the transferred Business following the Closing *substantially in the manner* as it was conducted immediately prior to the Closing and, after giving effect to the Closing (subject to such exceptions as shall not, in the aggregate, be material));

*Rider 38A*

(f)      Purchaser shall have obtained confirmation from the SEC and CFTC that Purchaser will be eligible, following the Closing, to compute its net capital under Appendix E to SEC Rule 15c3-1 and adjusted net capital in accordance with the provisions of CFTC Rule 1.17(c)(6);

(g)      Purchaser shall have obtained from the SEC confirmation reasonably satisfactory to Purchaser regarding (i) the transition period during which Purchaser will be permitted to come into compliance with the consolidated holding company supervisory framework applicable to ultimate holding companies that have a principal regulator under SEC Rule 15c3-1e and g, and (ii) the scope of the deference to be extended by the SEC to the Federal Reserve and/or the home country consolidated supervisor of Purchaser's ultimate parent company in connection with the SEC's administration of the framework described in clause (i) of this subsection 10.3(g) *; and*

10.4    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XI

[RESERVED]

ARTICLE XII

TAXES

12.1    Transfer Taxes.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents,

(i) *The Sellers headquarters building at 745 Seventh Avenue, New York, NY shall be substantially habitable.*

38

successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(c). Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

12.2    Prorations. Seller and Purchaser shall enter into customary prorations for the Purchased Assets as of the Closing.

12.3    Purchase Price Allocation. Seller and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the Purchased Assets as specified in Schedule 12.3 and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

12.4    Adjustment to Purchase Price. The parties agree that any payment made under this Article XII shall be treated by such parties as an adjustment to the Purchase Price.

ARTICLE XIII

MISCELLANEOUS

13.1    Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in

39

this Agreement. The rights set forth in this <u>Section 13.2</u> shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3   <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)   Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 13.7</u> hereof; <u>provided, however</u>, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.7</u>.

13.4   <u>Waiver of Right to Trial by Jury</u>. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5   <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto), the Transition Services Agreements and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any

*[handwritten annotation: the DIP Facility, the Interim Support and Cooperation Agreement, Master Repurchase Agreement]*

*[handwritten annotation: i.e.]*

40

party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Facsimile: (646) 758-4226
Attention: Steven Berkenfeld, Esq.

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention: Thomas Roberts
~ Michael Lubowitz
and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile: (212) 455-2502
Attention:   John Finley
              Andrew Keller

If to Purchaser, to:

Barclays Capital Inc.

41



200 Park Avenue
New York, NY 10166
Facsimile: ~~Jonathan Hughes, Esq~~ (212) 412-7519
Attention: [_____]

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: 212-225-3999
~~Attn~~: Victor I. Lewkow
       David Leinwand
       Duane McLaughlin

and

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Facsimile: 212-558-3580
~~Attn~~: Mitchell S. Eitel
       Jay Clayton
Facsimile: [_____]
Attention: [_____]

*Jonathan Hughes, Esq.*

*Attention*

*Attention*

   13.8   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

   13.9   <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required

42

[New York #1948695 v2]

*or to designate its rights to acquire any assets hereunder to its Affiliates*

consents shall be void, provided that Purchaser shall be entitled to assign its rights and obligations in whole or in part to its Affiliates. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10   Non-Recourse.   No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller shall have any liability for any obligations or liabilities of Seller under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11   Counterparts.   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[*signature page follows*]

13.12 Scope of Purchased Assets. This Agreement is not intended to convey and does not convey assets and Liabilities from the non-U.S. and Canadian operations of Seller.

*non-*

43

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
      Name:
      Title:

LEHMAN BROTHERS INC.

By: _____
      Name:
      Title:

LB 745 LLC

By: _____
      Name:
      Title:

BARCLAYS CAPITAL INC.

By: _____
      Name:
      Title:

44

**EXHIBIT 3**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
:
In re                                                       :    Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*   :    08-13555 (JMP)
:
Debtors.                                          :    (Jointly Administered)
:
----------------------------------------------------------x

## ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008 (the "Purchase

Agreement"), among the Debtors, Lehman Brothers Inc. ("LBI" and, collectively with the

Debtors, the "Seller") and Barclays Capital, Inc. (the "Purchaser"); (B) establishing sales

procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of certain

of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances

and interests and the assumption and assignment of certain prepetition executory contracts and

unexpired leases (the "Contracts") relating to the Purchased Assets to the Purchaser or the

---

[1]   Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Agreement.

Successful Bidder(s); and upon the Court's consideration of the Motion and the record of the

Sale Hearing held on September 19, 2008 with respect to the Motion, including the testimony

and evidence admitted at the Hearing; and after due deliberation thereon, and sufficient cause

appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.   **Jurisdiction and Venue**.  This Court has jurisdiction to consider this

Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.   **Statutory Predicates**.  The statutory predicates for the relief sought in the

Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006

and 9008 and the applicable Local Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules").

C.   **Notice**.  As evidenced by the affidavits of service filed with this Court and

based upon the representations of counsel at the Sale Hearing and as approved under the Order

(I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to

Competing Bids, If Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting

the Sale Hearing Date in Connection with the Sale of Certain of the Sellers' Assets (the "Break-

Up Fee and Competing Bids Order"): (i) in light of the exigent circumstances of these cases and

the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the

Motion, the Sale Hearing and the transactions set forth in the Purchase Agreement  (the "Sale"),

including the assumption and assignment of the Contracts and Cure Amounts with respect

thereto, has been provided in accordance with Bankruptcy Code sections 105(a), 363 and 365,

Bankruptcy Rules 2002, 6004, 6006 and 9008 and the Local Rules; (ii) it appearing that no other

or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of these chapter 11 cases; (iv) good cause exists to shorten the applicable notice periods in Bankruptcy Rules 2002, 6004, and 6006 and the applicable notice periods in the Local Rules, and (iv) no other or further notice of the Motion, the Sale Hearing or the Sale (including the assumption and assignment of the Contracts), is or shall be required.

D.  **Irreparable Harm.**  The Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis consistent with the provisions set forth herein and the Purchase Agreement, particularly given the wasting nature of the Purchased Assets.

E.  **LBI.**  LBI is the subject of a proceeding under the Securities Investors Protection Act of 1970 ("SIPA") which was filed on September __, 2008. The Purchase Agreement provides for the sale of certain of LBI's assets to the Purchaser. The effectiveness of this Order is conditioned upon the entry of an order in LBI's SIPA proceeding which, to the extent applicable, has the same material terms as this Order is otherwise in form and substance reasonably satisfactory to the Purchaser.

F.  **Opportunity to Object**.  A reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein has been given, in light of the exigent circumstances in these cases, to all interested persons and entities, including the following: (i) the Office of the United States Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors, (iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all non-Debtor parties to Contracts that will be assumed on the Closing Date (the "Closing Date Contracts"), (vii) the United States

Attorney's office, (viii) the United States Department of Justice, the Securities and Exchange

Commission, (ix) the Securities Investor Protection Corporation, (x) the Internal Revenue

Service, (xi) all persons, if any, who have filed objections to the Sale Motion; and (xiii) all

persons who have filed a notice of appearance in the chapter 11 cases.

G.    **Corporate Authority**.  The Debtors (i) have full corporate power and

authority to execute the Purchase Agreement and all other documents contemplated thereby and

the Debtors' sale of the  Assets has been duly and validly authorized by all necessary corporate

action, (ii) have all of the corporate power and authority necessary to consummate the

transactions contemplated by the Purchase Agreement, (iii) have taken all corporate action

necessary to authorize and approve the Purchase Agreement and the consummation of the

transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly

provided for in the Purchase Agreement, are required for the Debtors to consummate such

transactions.

H.    **Sale in Best Interests**.  Good and sufficient reasons for approval of the

Purchase Agreement and the Sale have been articulated, and the relief requested in the Motion is

in the best interests of the Debtors, their estates, their creditors and other parties in interest.

I.    **Business Justification**.  The Debtors have demonstrated both (i) good,

sufficient and sound business purposes and justifications and (ii) compelling circumstances for

the Sale other than in the ordinary course of business under Bankruptcy Code section 363(b)

before, and outside of, a plan of reorganization in that, among other things, the immediate

consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value

of the Debtors' estates, particularly given the wasting nature of the Purchased Assets.  Entry of

an order approving the Purchase Agreement and all the provisions thereof is a necessary

condition precedent to the Purchaser's consummation of the transactions set forth in the
Purchase Agreement.

J.    **Arm's-Length Sale**. The Purchase Agreement was negotiated, proposed
and entered into by the Sellers and the Purchaser without collusion, in good faith and from
arm's-length bargaining positions. The Purchaser is not an "insider" of the Debtors, as that term
is defined in Bankruptcy Code section 101(31). Neither the Debtors nor the Purchaser have
engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under
Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner
with any person and the purchase price was not controlled by any agreement among bidders.

K.    **Good Faith Purchaser**. The Purchaser is a good faith Purchaser of the
Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore,
entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in
all respects in connection with this proceeding.

L.    **Highest and Best Offer**. The Purchase Agreement constitutes the highest
and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors'
estates than would be provided by any other available alternative. The Debtors' determination
that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets
constitutes a valid and sound exercise of the Debtors' business judgment.

M.    **Consideration**. The consideration constitutes reasonably equivalent value
or fair consideration, as the case may be (as those terms are defined in each of the Uniform
Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the
Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the
United States, any state, territory, possession or the District of Columbia. The Purchase

Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates. Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors and all other parties in interest.

N.    **Free and Clear**. The Debtors and LBI are the sole and lawful owners of the Purchased Assets. The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Purchased Assets, or any similar rights or (ii) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date. For avoidance of doubt, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

Further, the assumption and assignment of any Closing Date Contracts is likewise free and clear

of all Interests.

O.    **Free and Clear Findings Needed by Purchaser**. The Purchaser asserts

that it would not have entered into the Purchase Agreement and would not consummate the

transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their

creditors, if the sale of the Purchased Assets to the Purchaser and the assumption and assignment

of the Contracts to the Purchaser was not free and clear of all Interests of any kind or nature

whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests.

P.    **No Liability Findings Needed by Purchaser**. Purchaser asserts that it

will not consummate the transactions contemplated by the Purchase Agreement unless the

Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that

none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have

any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or

in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or

Excluded Liability.

Q.    **Satisfaction of 363(f) Standards**. The Sellers may sell the Purchased

Assets free and clear of any Interests of any kind or nature whatsoever because in each case, one

or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been

satisfied. The person or entity with any Interest in the Purchased Assets: (i) has, subject to the

terms and conditions of this Order, consented to the Sale or is deemed to have consented to the

Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of

such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy

Code. Those holders of Interests who did not object to the Motion are deemed, subject to the

terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All

holders of Interests are adequately protected by having their Interests attach to the proceeds

ultimately attributable to the Purchased Assets against or in which such Interests are asserted,

subject to the terms of such Interests, with the same validity, force and effect, and in the same

order of priority, which such Interests now have against the Purchased Assets or their proceeds,

subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess

with respect thereto.

R.   **No Fraudulent Transfer**. The Purchase Agreement was not entered into

for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and

under the laws of the United States, any state, territory, possession, or the District of Columbia.

Neither Debtors nor Purchaser is entering into the transactions contemplated by the Purchase

Agreement fraudulently.

S.   **No Successor Liability**. Except for the Assumed Liabilities, the transfer

of the Purchased Assets to the Purchaser under the Purchase Agreement shall not result in (i) the

Purchaser having any liability or responsibility for any claim against the Debtors or against an

insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to the Debtors

except as is expressly set forth in the Purchase Agreement. Without limiting the effect or scope

of the foregoing, to the fullest extent permitted by law, the transfer of the Purchased Assets from

the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates,

successors or assigns or their respective properties (including the Purchased Assets) to any

liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the

Debtors or the Debtors' interests in such Purchased Assets by reason of such transfer under the

laws of the United States or any state, territory or possession thereof applicable to such

transactions, including, without limitation, any successor liability.

      T.    **Cure/Adequate Assurance**.  The assumption and assignment of the

Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the

best interests of the Debtors and their estates, creditors and all other parties in interest, and

represents the reasonable exercise of sound and prudent business judgment by the Debtors. The

Debtors have: (i) to the extent necessary, cured or provided adequate assurance of cure, of any

default existing prior to the date hereof with respect to the Closing Date Contracts, within the

meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary,

provided compensation or adequate assurance of compensation to any party for any actual

pecuniary loss to such party resulting from a default prior to the date hereof with respect to the

Closing Date Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B) and 365(f)(2)(A).  The

Purchaser's promise to perform the obligations under the Closing Date Contracts after the

Closing Date shall constitute adequate assurance of future performance within the meaning of 11

U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).  Any objections to either the Cure Amount (as defined

below) or the assumption and assignment of any of the Closing Date Contracts to the Purchaser

are hereby overruled. Any counterparties to Closing Date Contracts that did not object to the

Cure Amount (as defined below) of their respective Closing Date Contracts or the assumption

and assignment of their respective Closing Date Contracts to the Purchaser are deemed to have

consented to such Cure Amounts and the assignments of their respective Closing Date Contracts

to the Purchaser.   The procedures with respect to assumption, assignment and cure of the

Contracts that are the subject of the Purchaser's designation rights (the "<u>Designated Contracts</u>")

will be set forth in one or more separate orders of the Court which will be entered at a later date
or dates.

U.    **Prompt Consummation**.  The Sale must be approved and consummated

promptly in order to preserve the viability of the business subject to the sale as going concerns,

to maximize the value of the Debtors' estates.  Time is of the essence in consummating the Sale.

V.    **Personally Identifiable Information**.  The Sale may include the transfer

of Personally Identifiable Information, as defined in Bankruptcy Code section 101(41A).  No

Consumer Privacy Ombudsman need be appointed under Code section 363(b)(1) because

Purchaser has agreed to adhere to any privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Motion is Granted**.   The Motion and the relief requested therein is

GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled**.  Any objections to the entry of this Order or the

relief granted herein and requested in the Motion that have not been withdrawn, waived, or

settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and

overruled on the merits with prejudice.

3.    **Approval**.  The Purchase Agreement and all of the terms and conditions

thereto are hereby approved.  The Debtors are hereby authorized and directed to (1) execute the

Purchase Agreement, along with any additional instruments or documents that may be

reasonably necessary or appropriate to implement the Purchase Agreement, provided that such

additional documents do not materially change its terms; (2) consummate the Sale in accordance

with the terms and conditions of the Purchase Agreement and the other agreements contemplated

thereby; and (3) take all other and further actions as may be reasonably necessary to implement
the transactions contemplated by the Purchase Agreement.

4.    **Free and Clear**.  Except as expressly provided for in the Purchase
Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors
are authorized and directed to transfer the Purchased Assets to the Purchaser and, as of the
Closing Date, the Purchaser shall take title to and possession of the Purchased Assets free and
clear of all Interests of any kind or nature whatsoever, including but not limited to the Liens and
Excluded Liabilities, with all such Interests to attach to the proceeds ultimately attributable to the
property against or in which such Interests are asserted, subject to the terms of such Interests,
with the same validity, force and effect, and in the same order of priority, which such Interests
now have against the Purchased Assets or their proceeds, subject to any rights, claims and
defenses the Debtors or their estates, as applicable, may possess with respect thereto.

5.    **Valid Transfer**.  As of the Closing Date, (a) the transactions
contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and
transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such
Purchased Assets free and clear of all Interests and Excluded Liabilities and (b) the Purchase
Agreement and the transactions and instruments contemplated hereby shall be specifically
performable and enforceable against and binding upon, and not subject to rejection or avoidance
by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with respect thereto.

6.    **General Assignment**.  On the Closing Date, this Order shall be construed
and shall constitute for any and all purposes a full and complete general assignment, conveyance
and transfer of the Sellers' interests in the Purchased Assets.  Each and every federal, state, and
local governmental agency or department is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the
Purchase Agreement.

7.    **Injunction**.  Except as expressly permitted by the Purchase Agreement or
by this Sale Order, all persons and entities, including, but not limited to, all debt security holders,
equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors,
litigation claimants and other creditors, holding Interests or Claims of any kind or nature
whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether
legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent,
liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or
in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors'
businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased
Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently
enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its
successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets,
such persons' or entities' Interests or Claims.  Following the Closing Date, no holder of an
Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and
enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests
or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and
attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order
of their priority, with the same validity, force and effect which they have against such Purchased
Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates
and Debtors, as applicable, may possess with respect thereto.

8.    **Release of Interests**. This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Debtors or the Purchased Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    **Direction to Release Interests**.    On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    **No Successor Liability**. Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the

Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having

any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or

in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or

Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased

Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the

Purchase Agreement.

11.    **Examples of No Successor Liability**.  Without limiting the effect or

scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase

Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character,

including, but not limited to, any theory of antitrust, environmental, successor or transferee

liability, labor law, de facto merger or substantial continuity, whether known or unknown as of

the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or

contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the

Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of

any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to

the operation of the Purchased Assets prior to the Closing Date.

12.    **Assumption and Assignment of Contracts**.  In accordance with

Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase

Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the

Closing Date Contracts, including customer account agreements, to which they are a party to the

Purchaser.

13.    The Sellers shall provided notice, together with the Notice of Assumption

and Assignment of, and Amounts Necessary to Cure Defaults under, Contracts and Leases

Proposed to be Assumed and Assigned to the Purchaser on September 17, 2008 (an "Assumption
Notice") to the counterparty to a Closing Date Contract which the Debtors seek to assume and
assign, which included the prepetition cure amount, if any (the "Cure Amount"), asserted by the
Sellers with respect to such Closing Date Contract, and the effective date of such assumption and
assignment (the "Assignment Effective Date"). The counterparty to such Closing Date Closing
Date Contract had until the date of the Sale Hearing to object to the assumption and assignment
of the Closing Date Contract. All counterparties to Closing Date Closing Date Contracts that
have not filed an objection by the date of the Sale Hearing are deemed to consent to (i) the Cure
Amount, if any, and (ii) the assumption and assignment of the Closing Date Contract, and the
Closing Date Contract shall be assumed and assigned as of the Assignment Effective Date. Any
objections to either the Cure Amount or the assumption and assignment of any of the Closing
Date Contracts to the Purchaser are hereby overruled. The Purchaser shall pay any Cure Amount
due on, or as soon as practicable, after the Assignment Effective Date.

14.     **Bankruptcy Code Sections 365(b)(1) and 365(f)(2).** The requirements
of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with
respect to the Closing Date Contracts.

15.     **Binding Effect of Order.** This Order shall be binding upon and shall
govern the acts of all entities, including without limitation all filing agents, filing officers, title
agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,
administrative agencies, governmental departments, secretaries of state, federal, state and local
officials, and all other persons and entities who may be required by operation of law, the duties
of their office, or contract, to accept, file, register or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Purchased Assets.

      16.    **Ipso Facto Clauses Ineffective**. Upon the Debtors' assignment of the

Contracts to the Purchaser under the provisions of this Sale Order and any additional order

contemplated by the Purchase Agreement, no default shall exist under any Closing Date

Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a

default by the Purchaser under such Closing Date Contract or otherwise take action against the

Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of

its obligations under the relevant Closing Date Contract.

      17.    **Binding on Successors**. The terms and provisions of the Purchase

Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all

creditors of (whether known or unknown) and holders of equity interests in, either Debtor,

Purchaser and its respective affiliates, successors and assigns, and any affected third parties,

notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of

the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates,

their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

      18.    **Bankruptcy Code Section 363(n)**. The consideration provided by

Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and

may not be avoided under Bankruptcy Code section 363(n).

      19.    **Good Faith**. The transactions contemplated by the Purchase Agreement

are undertaken by Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale shall not affect the validity of the Sale

(including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless

such authorization is duly stayed pending such appeal prior to the Closing Date. Purchaser is a

good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections

afforded by Bankruptcy Code section 363(m).

20.     **Fair Consideration**. The consideration provided by the Purchaser to the

Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Purchased Assets

constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code,

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of

the United States, any state, territory, possession or the District of Columbia.

21.     **Retention of Jurisdiction**. This Court retains jurisdiction, pursuant to its

statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and

enforce the terms and provisions of this Order, all amendments thereto and any waivers and

consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of

the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this

Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the

Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d)

enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the

Designated Contracts.

22.     **Surrender of Possession**. All entities that are currently, or on the Closing

Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an

interest hereby are directed to surrender possession of the Purchased Assets either to (i) the

Debtors or LBI before the Closing Date, or (ii) to Purchaser on the Closing Date.

23.    **Fees and Expenses**.  Any amounts payable by the Debtors under the

Purchase Agreement or any of the documents delivered by the Debtors in connection with the

Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement,

shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and

Competing Bid Order, entered on September ____, 2008, without further order of this Court,

shall be an allowed administrative claim in an amount equal to such payments in accordance

with sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections

provided in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified

or otherwise affected by any reorganization plan for the Debtors, except by an express agreement

with Purchaser, its successors, or assigns.

24.    **Sale Proceeds**.  Any and all valid and perfected Interests in Purchased

Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon

receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order

of priority, and with the same validity, force and effect which they now have against such

Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any

trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any

limitations on the use of such proceeds pursuant to any provision of this Order, except as

required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest

shall be used or disbursed by the Debtors without the express consent of the party or parties

asserting an Interest therein or further order of the Court after notice (to all parties who have

asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the

Bankruptcy Code.

25.    **Non-material Modifications**.  The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

26.    **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Order.

27.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

28.    **No Stay of Order**.  Notwithstanding the provisions of Interim Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Any party

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk

its appeal being foreclosed as moot.

Dated:  New York, New York
              _____, 2008


_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE