# A. 151

08-13555 [Dkt. No. 387]

Hearing Date: _____ at _____ .m. (prevailing Eastern Time)
Objection Deadline: _____ at 4:00 p.m. (prevailing Eastern Time)

James B. Kobak, Jr.
David W. Wiltenburg
Stephen Luger
Christopher K. Kiplok
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS INC.,

           Debtor.

Case No. 08-01420 (JMP) SIPA

---

**MOTION UNDER 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P.**
**9019(a) FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT**

       James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of the

business of Lehman Brothers Inc. ("Debtor" or "LBI"), by and through his undersigned counsel,

hereby files this motion (the "Motion") pursuant to sections 105(a) and 363 of title 11 of the

United States Code, 11 U.S.C §§ 101-1330 (as amended, the "Bankruptcy Code") and Rule

9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of

a settlement and compromise among the Trustee, Barclays Capital Inc. ("Barclays") and

JPMorgan Chase Bank, N.A. ("JPMorgan") and as set forth in the settlement agreement, dated



60416369 1 (4).DOC

December 5, 2008, attached hereto as Exhibit "1" (the "Settlement Agreement")[1] pursuant to

which the Trustee, Barclays and JPMorgan have agreed to settle and compromise certain claims

arising from transactions related to (i) the Replacement Transaction and (ii) the Purchase

Agreement, as defined below.  In support of the Motion, the Trustee respectfully represents as

follows:

## I.      JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 U.S.C. 1334.  This is a core

proceeding pursuant to 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory predicates for the relief sought herein are sections 105(a) and 363 of the

Bankruptcy Code.

## II.      BACKGROUND

2.     Commencing on September 15, 2008 and periodically thereafter, Lehman

Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Chapter 11

Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the

Bankruptcy Code.  The Chapter 11 Cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure.

3.     On September 16, 2008, certain of the Chapter 11 Debtors, LBI, and

Barclays entered into an Asset Purchase Agreement (as amended and clarified from time to time,

the "Purchase Agreement").

---

[1]    The Settlement Agreement attached hereto does not include a copy of Annex A, as to which Barclays,
JPMorgan and the Trustee have filed a motion seeking permission to file under seal.

4.     On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch, Judge of the United States District Court for the Southern District of New York, entered the Order Commencing Liquidation (the "LBI Liquidation Order") pursuant to the provisions of the Securities Investor Protection Act ("SIPA") in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

5.     The LBI Liquidation Order: (i) appointed the Trustee for the liquidation of the business of the Debtor pursuant to SIPA section 78eee(b)(3); (ii) appointed counsel to the Trustee pursuant to section 78eee(b)(3); and (iii) removed this case to this Court pursuant to section 78eee(b)(1).

6.     On September 20, 2008, the Court entered an order approving the Purchase Agreement and the various transactions contemplated therein. (Chapter 11 Cases Docket No. 258.) On September 20, 2008, the Court entered a concurrent Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and other Relief in the Lehman Brothers, Holdings Inc. Chapter 11 Proceeding (Docket No. 3) thereby authorizing the Trustee to consummate the sale transaction on behalf of LBI pursuant to the Purchase Agreement.

7.     The Settlement Agreement is designed to achieve the intended economic outcome of certain transactions that were carried out under emergency conditions during the days preceding and following the commencement of this SIPA proceeding. Under the leadership of the Federal Reserve Bank of New York ("New York Fed"), the Securities and Exchange Commission ("SEC") and the Secretary of the Treasury, the parties sought first to rescue Lehman, and, when this proved impossible, to create circumstances that would permit an orderly transfer of LBI customer accounts and an orderly liquidation of its business. The following

3

factual summary, which includes discussion of events occurring prior to the Trustee's appointment, is based upon the Declarations of Shari D. Leventhal ("Leventhal Decl."), Gerard LaRocca ("La Rocca Decl.") and Jeffrey M. Moore ("Moore Decl.") in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, submitted herewith.

## A.   The Replacement Transaction

8.    During the week of September 15, 2008, following the chapter 11 filing of LBHI, LBI continued to operate. As described by the New York Fed, this was a "carefully thought out decision" designed to "facilitate an orderly wind-down" of LBI, and was supported by New York Fed financing of LBI's payroll and operations. (Leventhal Decl. ¶6.)  This financing was on a fully secured basis, supported by LBI collateral.  By September 17, the New York Fed had funded to LBI $46.22 billion in cash and Treasury securities against $50.62 billion in collateral.  (Leventhal Decl. ¶9.)

9.    On September 17, 2008, Barclays agreed to replace the New York Fed in funding LBI -- that is, to "step into the shoes of the Fed."  (See LaRocca Decl. ¶ 4; Leventhal Decl. ¶7.)  The parties understood this to mean that Barclays would provide funding through a reverse repurchase transaction using essentially the same securities that had been pledged by LBI to the New York Fed (the "Fed Portfolio").  (LaRocca Decl. ¶¶ 4-5.)

10.   The form of transaction selected by Barclays to effectuate the substitute funding for LBI was a reverse repurchase transaction between Barclays and LBI, entered into on September 18, 2008 (the "Replacement Transaction"). (Leventhal Decl. ¶12.)  Pursuant to the Replacement Transaction, LBI was to provide Barclays with $49.7 billion in securities in exchange for $45 billion in cash.  (Id.)  This ratio was consistent with the ratio of cash to securities used in the earlier repurchase agreement between LBI and the New York Fed on September 17, 2008.  (Id.)

4

11.    On September 18, 2008, Barclays initiated the process of transferring $45 billion to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the New York Fed. By early evening of that date, the entire sum of $45 billion had been transferred by Barclays to LBI. (Leventhal Decl. ¶11; LaRocca Decl. ¶ 6.)

12.    Notwithstanding that both Depository Trust and Clearing Corporation ("DTCC") and the Fedwire Securities Service remained open for hours past their normal closing times on September 18 in an effort to complete the delivery of the Fed Portfolio to Barclays, operational issues interfered with the ability to transfer all of the securities. When DTCC closed at 11 PM on September 18th, Barclays had received $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the Replacement Transaction. (Leventhal Decl. ¶14.)

13.    LBI therefore agreed, either late on the night of September 18th or early in the morning of September 19, 2008, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMorgan. (Leventhal Decl. ¶15.) The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the Replacement Transaction, and Barclays would transfer the Subject Funds to LBI. (Leventhal Decl. ¶ 15; see LaRocca Decl. ¶ 7.)

14.    The transfer of the remaining securities was discussed on Friday September 19 and into the weekend, but did not occur. (LaRocca Decl. ¶9.) On September 19, SIPC commenced this proceeding and the Court approved the Purchase Agreement. The parties then entered into the Clarification Letter to the Purchase Agreement (the "Clarification Letter"), dated September 20, 2008. (LaRocca Decl. ¶10.) The closing pursuant to the Purchase

Agreement occurred early on Monday, September 22, 2008. (LaRocca Decl. ¶ 8; Leventhal Decl. ¶19.)

15. In the meantime, JPMorgan caused the Subject Funds to be transferred to an LBI account at JPMorgan. (Leventhal Decl. ¶ 16.)

16. The Clarification Letter provided that the Replacement Transaction was terminated, and that the securities that had actually been delivered were "deemed to constitute part of the Purchased Assets" under the Purchase Agreement. Accordingly, LBI would have no further obligation to "repurchase" those securities under the repo and Barclays would not be obligated to deliver such securities back to LBI. (LaRocca Decl. ¶ 10.)

17. Barclays asserts that, at the time the Clarification Letter was finalized, Barclays believed that the $7 billion in cash was in its account at JPMorgan (LaRocca Decl. ¶ 11), and did not learn until Tuesday, September 23 (well after finalizing the Clarification Letter), that the Subject Funds were not in Barclays' account at JPMorgan. (Id. ¶ 12.)

18. As set forth in the accompanying affidavits, it is asserted that these events left Barclays without the full consideration it had contracted for under the Replacement Transaction and the Purchase Agreement. Barclays had neither the $7 billion nor its equivalent value in securities that were originally to have been delivered pursuant to the Replacement Transaction. (LaRocca Decl. ¶ 13; Leventhal Decl. ¶ 17.)

19. The LBI Estate faces claims related to its retention of both the remainder of the Fed Portfolio and the Subject Funds. The proposed settlement would convey to Barclays cash and securities having a lesser value, due to "market events" since September 17. (Moore Decl. ¶¶ 4-5.) The cash portion of the settlement consideration (leaving out distributions received since September 19) is the sum of $1.25 billion and $7.1 million, which is $5.743

6

billion less than the amount that might be claimed. The securities portion of the settlement

consideration, although difficult to value with precision, is today worth "substantially less" than

$5.743 billion. (Moore Decl. ¶ 6.) The difference creates a settlement discount for the LBI

Estate.

**B.    The Settlement Agreement.**

      20.    The principal terms of the proposed Settlement Agreement are as follows:[2]

      (a) Barclays will receive (i) (x) the undelivered Fed Portfolio securities that have not been liquidated by JPMorgan (the "Settlement Securities"), together with (y) all principal and interest payments and any other distributions on the Settlement Consideration Fed Portfolio Securities (including, without limitation, the proceeds at maturity of any securities) attributable to the period on and after September 18, 2008, and (ii) $7,103,500 (representing the proceeds of certain Fed Portfolio Securities that initially were understood to be among the Settlement Consideration Fed Portfolio Securities but in fact have been liquidated by JPMorgan), plus, in the case of each of (i)(y) and (ii), interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period.

      (b) To partially account for the undelivered Fed Portfolio Securities that will not be delivered to Barclays as part of the Settlement Securities (because they have been liquidated by JP Morgan) and the decline in value of the Settlement Securities since September 19, 2008, Barclays is to receive $1.25 billion in cash.

      (c) Barclays will receive $14,942,677.88 (representing principal and interest payments, and any other distributions, on the Delivered Securities attributable to the period on and after September 18, 2008 which were received in LBI and/or JPMorgan accounts and not heretofore paid to Barclays), plus interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period (together with the payments described in paragraph (b), the "Settlement Payment").

---

2.    This summary is qualified in its entirety by reference to the Settlement Agreement, annexed hereto as Exhibit 1. In the event of any discrepancy between the Settlement Agreement and any description thereof contained in this Motion, the Settlement Agreement controls.

7

(d) The Settlement Securities and Settlement Payment will be remitted to Barclays from LBI accounts at JPMorgan. To facilitate the settlement, JPMorgan has agreed to release all liens on the Settlement Securities and Settlement Payment.

(e) The $7 billion of cash in LBI's account (referred to in paragraph 15 above) is acknowledged to have been applied against LBI's clearance advance obligations to JPMorgan, and the Settlement Securities, Settlement Payment and other amounts described in paragraphs 20(a) through (d) are not applied to such obligations.

(f) The parties will execute mutual limited releases.

## III.   RELIEF REQUESTED

21.     The Trustee has determined that protracted litigation over the foregoing events, with its attendant costs and risks, would not be in the best interest of the LBI Estate. By this Motion, the Trustee requests approval of the Settlement Agreement pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a).

## A.   Basis For Relief

22.     Under section 363(b) of the Bankruptcy Code, a debtor in possession or trustee may "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. See Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) of the Bankruptcy Code grants bankruptcy courts authority to

8

employ equitable principles in carrying out the Bankruptcy Code's provisions. See Momentum

Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136

(2d Cir. 1994).

       23.    Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by

the trustee and after notice and a hearing, the court may approve a compromise and settlement."

Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises and

settlements if they are in the best interests of the estate." Vaughn v. Drexel Burnham Lambert

Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y.

1991). Accordingly, the Court is authorized to approve the settlement, on the terms set forth in

the Settlement Agreement.

       24.    In determining whether to approve a proposed settlement pursuant to

Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable,

reasonable, and in the best interests of the debtor's estate. Protective Comm. for Independent

Stockholders of TMT Trailer Ferry Inc. v. Anderson, 390 U.S. 414, 424 (1968); In re Ionosphere

Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994). A decision to

approve a particular compromise or settlement is within the sound discretion of the bankruptcy

court. In re Drexel Burnham, 134 B.R. at 505. It is appropriate for the court to consider the

opinions of the trustee or debtor in possession that a settlement is fair and reasonable. Nellis v.

Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994). In addition, the bankruptcy court should exercise

its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown &

Co., 217 B.R. 31 (Bankr. S.D.N.Y. 1998); see also Shugrue, 165 B.R. at 123 ("the general rule

[is] that settlements are favored and, in fact, encouraged by the approval process outlined

above").

25.     In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should "canvas the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Purofied Down Prods., 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). "All that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." Florida Trailer & Equip. Co. v. Deal, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

**B.     The Settlement Falls Within the Range of Reasonableness**

26.     In the instant case, both as an exercise of his business judgment for purposes of Section 363, and as a weighing of the reasonableness factors for purposes of Rule 9019, the Trustee has concluded that the Settlement Agreement should be approved.

27.     First, litigation based on LBI's retention of both the Subject Funds and the Fed Portfolio would be expensive and protracted, and would divert significant resources and attention of the Trustee, his counsel and staff.

28.     Second, the Estate is facing significant risk in the form of a claim in the amount of not less than $7 billion,. If such a claim were brought, it can be anticipated that a right to pre-judgment interest would also be claimed. Even at a relatively modest 6% rate (the CPLR currently specifies 9%), approximately $35 million per month of interest might be claimed to accrue while the issue remains unresolved. The settlement would avoid these risks in return for settlement consideration in an amount substantially less than the potential exposure.

10

29.    Finally, the Settlement Agreement is the product of arm's length negotiations between the Trustee, Barclays, and JPMorgan, with the assistance of the New York Fed and the Securities Investor Protection Corporation.

30.    Accordingly, the Trustee submits that the settlement and compromise embodied in the Settlement Agreement is appropriate in light of the relevant factors, is fair and equitable, and should be approved.

31.    The Trustee's agreement to the settlement is based on the facts as set forth in the accompanying affidavits of knowledgeable representatives of Barclays and the New York Fed, and upon the Trustee's own review. The Trustee believes that the explanations set forth in the affidavits are reasonable and consistent with the facts known to him. As such, the proposed settlement avoids a large claim and the expense and distraction of litigation and produces a benefit to the LBI estate because the settlement consideration consists largely of securities which have declined in value.

32.    In consenting to this settlement, the Trustee does not take any position on any issue related to the Purchase Agreement or Clarification Letter or to the events and actions by various parties that preceded them that is not specifically covered by the Settlement Agreement. The Trustee will be investigating and reporting to the Court and creditors under §78-fff(d) of SIPA on many of these issues and the impact they and the Purchase Agreement and Clarification Letter have had on the wind-down of LBI and transfer of customer accounts.  .

## IV.    NOTICE

33.    The Trustee will provide notice of the Motion pursuant to the Court's Order to Show Cause. The Trustee submits that no other or further notice need be given.

60416369 1 (4).DOC

## V.    <u>NO PRIOR REQUEST</u>

34.    No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Trustee respectfully requests that the Court approve the Settlement Agreement and grant such additional and further relief as the Court deems just and appropriate.

Dated:    New York, New York
December 5, 2008

HUGHES HUBBARD & REED LLP

By: /s/ James B. Kobak, Jr.
     James B. Kobak, Jr.
     David W. Wiltenburg
     Stephen Luger
     Christopher K. Kiplok
     Jeffrey S. Margolin
     One Battery Park Plaza
     New York, New York 10004
     Telephone: (212) 837-6000
     Facsimile: (212) 422-4726
     Email: kobak@hugheshubbard.com

Attorneys for James W. Giddens, Trustee for the SIPA Liquidation of Lehman Brothers Inc.

12

60416369_1 (4).DOC

## SETTLEMENT AGREEMENT

AGREEMENT dated as of December 5, 2008 among JPMORGAN CHASE BANK, N.A. ("JPMorgan"), BARCLAYS CAPITAL INC. ("BarCap"), and JAMES W. GIDDENS, AS TRUSTEE ("Trustee") IN THE SECURITIES INVESTOR PROTECTION ACT ("SIPA") LIQUIDATION OF LEHMAN BROTHERS INC. ("LBI") (JPMorgan, BarCap and Trustee each a "Party" and collectively the "Parties").

### Background

A.    BarCap was asked by the Federal Reserve Bank of New York (the "Fed") and agreed to purchase a group of securities that had, as of the evening of September 17, 2008, been pledged by LBI to the Fed (the "Fed Portfolio") by entering into a reverse repurchase transaction with LBI in which BarCap would fund $45 billion to LBI for the Fed Portfolio (such reverse repurchase transaction, the "Replacement Transaction").

B.    On September 18, 2008, much of the Fed Portfolio was transferred to BarCap by LBI through JPMorgan, as clearing bank, against payment of $45 billion by BarCap to LBI, but the Fedwire and Depository Trust Company ("DTC") services closed for the day before the Replacement Transaction could be completed.

C.    The securities required to complete the Replacement Transaction were not delivered to BarCap before the commencement of LBI's SIPA liquidation (the "SIPA Proceeding") on September 19, 2008. JPMorgan asserts that a portion of the undelivered Fed Portfolio securities is currently in certain LBI accounts against which JPMorgan asserts it has liens (such Fed Portfolio securities as listed on Annex A hereto, the "Settlement Consideration Fed Portfolio Securities"), while the remaining portion of the undelivered Fed Portfolio securities were liquidated by JPMorgan and, thus, are no longer available for delivery.

D.    JPMorgan and BarCap agree that $7 billion was transferred by LBI to an account at JPMorgan early on the morning of September 19, 2008 as a result of the fact that not all of the Fed Portfolio securities were delivered to BarCap under the Replacement Transaction (the "Subject Funds"). Thereafter, the Subject Funds were moved by JPMorgan into what JPMorgan asserts is an LBI account. This resulted in BarCap no longer having the benefit of either the Subject Funds or the securities required to complete the Replacement Transaction. BarCap asserts that the Subject Funds were moved from the account at JPMorgan without its prior knowledge or consent, that BarCap is the owner of the Subject Funds and that BarCap is entitled to $7 billion in cash or securities of equivalent value. JPMorgan asserts that it properly moved the Subject Funds and properly applied the Subject Funds in reduction of advances JPMorgan asserts it made to LBI under a clearance agreement (including without limitation any advance made by JPMorgan to LBI to fund the payment of the Subject Funds) (all such actual outstanding advances, the "Advances").

E.    When BarCap and LBI agreed to engage in the Replacement Transaction, it was BarCap's and LBI's intention that the securities in the Fed Portfolio would be included in "Purchased Assets" as defined in the Asset Purchase Agreement dated as of September 16, 2008,

as amended (the "Asset Purchase Agreement"), which Asset Purchase Agreement was authorized and approved by an order of the court (the "Bankruptcy Court") presiding over LBI's SIPA liquidation case on September 20, 2008. Because LBI had failed to finish delivering to BarCap the securities that had been part of the Fed Portfolio, the inclusion of such undelivered securities as "Purchased Assets" under the Asset Purchase Agreement was not possible. Consequently, the securities listed on Schedule A to the Clarification Letter dated as of September 20, 2008 (the "Clarification Letter"), which was entered into in connection with the Asset Purchase Agreement and filed with the bankruptcy court presiding over the bankruptcy cases of Lehman Brothers Holdings Inc. and certain of its affiliates on September 22, 2008, include only the securities that actually had then been delivered by LBI to BarCap on September 18, 2008 (the "Delivered Securities") and do not include the portion of the Fed Portfolio securities that had not been delivered by that time.

F.    JPMorgan, BarCap and Trustee desire to provide for the resolution of their disputes on the terms and conditions set forth below.

### THEREFORE, IT IS AGREED:

#### Terms and Conditions

1.    Transfers to BarCap. At the Effective Time (as defined below), JPMorgan shall transfer to BarCap, from securities and cash that were in the LBI clearance account with JPMorgan on the close of business on September 19, 2008 (but in any event excluding any securities and cash in customer or segregated accounts or accounts bearing the name of a customer on the close of business on September 19, 2008), and proceeds of such securities (collectively, the "Specified Property Pool"):

    (a)    $1.25 billion in immediately available funds by wire transfer to BarCap in accordance with the following wire instructions (the "Cash Wire Instructions"):

            ABA # 021000018
            BK OF NYC
            Account Number: GLA111569
            Name: BZW
            Ref: Barclays Capital, Attn John Rodefeld

    (b)    $14,942,677.88 in immediately available funds by wire transfer to BarCap in accordance with the Cash Wire Instructions (representing principal and interest payments, and any other distributions, on the Delivered Securities attributable to the period on and after September 18, 2008 which were received in LBI and/or JPMorgan accounts and not heretofore paid to BarCap), plus interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period, and

    (c)    (x)(A) The Settlement Consideration Fed Portfolio Securities to BarCap in accordance with the Securities Wire Instructions at the end of this Section 3(c), together with (B) all principal and interest payments and any other distributions on the Settlement Consideration Fed Portfolio Securities (including, without limitation, the proceeds at

maturity of any securities) attributable to the period on and after September 18, 2008, and (y) $7,103,500 in immediately available funds by wire transfer to BarCap in accordance with the Cash Wire Instructions (representing the proceeds of certain Fed Portfolio securities that initially were understood to be among the Settlement Consideration Fed Portfolio Securities but in fact have been liquidated by JPMorgan), plus, in the case of each of (x)(B) and (y), interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period (such funds, interest and securities described in clauses (a), (b) and (c) collectively, the "Settlement Consideration"). The Securities Wire Instructions are:

> Fed Eligible Securities Wire Instructions
> ABA # 021000018
> BK OF NYC/BARCLAYS
>
> DTC Eligible Securities Wire Instructions
> DTC 7256

As between JPMorgan and the Trustee only, the cash amounts paid to BarCap pursuant to this Section 1 shall, to the extent that JPMorgan has a valid and first priority perfected lien (not subject to avoidance) against the LBI cash included in the Specified Property Pool (which matter is not addressed by this Settlement Agreement), be deemed to have been paid only from such cash against which JPMorgan has such a valid and first priority lien (not subject to avoidance).

2.    <u>Trustee Consent and Acknowledgement</u>.    Trustee consents and agrees to the transfer of the Settlement Consideration in accordance with Section 1 above. As of the Effective Time, Trustee acknowledges and agrees that (a) the Subject Funds were applied to reduce (dollar-for-dollar) the Advances, (b) the Settlement Consideration was not and shall not be applied to reduce the Advances, and (c) Trustee shall not assert that the Subject Funds should not have been applied to reduce the Advances or that the Settlement Consideration should be applied to reduce the Advances. JPMorgan shall not, prior to, on or after the Effective Time, assert against the Trustee or LBI any right to any replacement collateral in respect of the Settlement Consideration.

3.    <u>Rights in Property</u>.    (a) Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, (i) JPMorgan and Trustee shall be deemed to have released, waived and discharged all of their right, title and interest in and to the Settlement Consideration, and (ii) subject to the remaining provisions of this Section 3, BarCap shall be deemed to have accepted the Settlement Consideration in full release, waiver and discharge of any right, title and interest it may have to the Subject Securities, together with the proceeds of the Subject Securities (including without limitation all principal and interest payments and any other distributions on the Subject Securities (including, without limitation, the proceeds at maturity of any Subject Securities)) received on and after September 19, 2008, in each case other than the Settlement Consideration. For purposes of this Section 3, "Subject Securities" shall mean the securities identified on a CUSIP number by CUSIP number basis in the listings provided to BarCap by JPMorgan on October 23, 2008 (the "Subject Securities List"), which securities JPMorgan represents to each of BarCap and the Trustee were all of the securities in what JPMorgan has described to BarCap as LBI's clearance account with

3

JPMorgan (the "Clearance Account") at the close of business on September 19, 2008. For purposes of entering into this Settlement Agreement, each of BarCap and the Trustee has relied on JPMorgan's representations (A) as to the identification of the Subject Securities in the Subject Securities List, and (B) that JPMorgan has a prior perfected security interest with respect to (I) the Subject Securities (including the Settlement Consideration Fed Portfolio Securities) or, in the case of Subject Securities that have been liquidated, the proceeds thereof, in each case subject to any rights that BarCap may have therein, and (II) the Settlement Consideration other than the Settlement Consideration Fed Portfolio Securities. Each of JPMorgan and BarCap represent to the other and to the Trustee that (aa) as of the date of this Settlement Agreement and subject to possible exceptions as notified by the Trustee to JPMorgan and BarCap prior to the date hereof, it is not aware, and (bb) prior to such notification it was not aware, that any of the Subject Securities are property of, or held by or on behalf of LBI or a transferee broker for the benefit of, or to secure any obligation of, any customer or former customer of LBI, the account of which has been, is to be or may in the future be transferred to BarCap.

(b)    Notwithstanding the provisions of Section 3(a)(ii) hereof, for the avoidance of doubt, BarCap shall not be deemed to have released, waived or discharged any interest it may have in the Subject Securities (or the proceeds thereof) to the extent any of the Subject Securities consist of (i) property of, or held by or on behalf of LBI or a transferee broker for the benefit of or to secure any obligation of, any customer or former customer of LBI, the account of which has been, is to be or may in the future be transferred to BarCap, (ii) securities or balances held in any reserve or segregated account maintained at any time by or on behalf of LBI in accordance with Rule 15c3-3 under the Securities Exchange Act of 1934, (iii) securities or other assets held in any lien-free account at DTC or any other depository, clearing organization or clearing bank (including, without limitation, JPMorgan), (iv) securities or other assets posted or held in respect of listed or exchange-traded contracts, including margin or collateral held by or for the benefit of any exchange, depository, clearing firm, clearing organization or other facility, and (v) securities and other assets as to which JPMorgan did not, at the close of business on September 19, 2008, have a prior perfected security interest, including in each case of clauses (i) through (v) above, the proceeds thereof. Nothing in the immediately preceding sentence shall be construed to imply that any right, title or interest which has not been released, waived or discharged by BarCap with respect to any property described therein is prior to or free of any right, title or interest of JPMorgan with respect to such property. Nothing in this Settlement Agreement shall release, waive or discharge, (i) any claim that BarCap or its affiliates may have against LBI in the SIPA Proceeding, or against LBHI and its affiliates in their respective bankruptcy cases (in each case other than claims related to the failure to deliver the complete Fed Portfolio as part of the Replacement Transaction, which is being settled by delivery and payment of the Settlement Consideration as specifically set forth in this Settlement Agreement, and otherwise other than as set forth in Section 4(c) hereof), including, without limitation, BarCap (to extent it has allowed claims) being entitled to share as a creditor in such cases in any proceeds of any recoveries that those estates may have related to the Subject Securities or the proceeds thereof or any claims of those estates against any party, including, without limitation, JPMorgan except as specifically set forth in Section 4(c) hereof, or (ii) any claim that the Trustee or LBI may have against any person (except as set forth in Sections 2, 3(a)(i) and 4(d) hereof). Moreover, nothing contained in this Section 3 shall be deemed to restrict BarCap from performing any services on behalf of the Trustee, LBI or any customers or counterparties of LBI pursuant to the Transition Services Agreement entered into in connection with the Asset Purchase Agreement or otherwise. For the

4

avoidance of doubt, the release set forth in Section 3(a)(ii) hereof shall not apply to any claim relating to securities (other than the Subject Securities) that are fungible with the Subject Securities.

4.    Releases.  (a) Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, (1) this Settlement Agreement shall be deemed to supersede Sections 2 and 4 of the Services and Settlement Agreement dated as of September 22, 2008 (the "Services Agreement") in their entirety (other than Schedule A thereto), (ii) such Sections of the Services Agreement shall have no further force or effect, and (iii) except as so superseded hereby, the Services Agreement shall be deemed to be in full force and effect.

(b)    Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, BarCap shall promptly cause the lawsuit identified on Schedule A to the Services Agreement (the "Lawsuit") to be dismissed with prejudice against all of the defendants therein (the "Defendants"). Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, BarCap further covenants to cause the plaintiff not to re-institute or seek to prosecute in any forum any claims or causes of action based in whole or part on any act, omission, transaction or other occurrence described in or related to the matters described in the complaint in the Lawsuit (the "Lawsuit Claims") and shall indemnify and hold harmless each of the Defendants and their respective current and former officers, directors, employees, subsidiaries, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives from and in respect of any and all claims, causes of action, liabilities, costs, fees or expenses (including reasonable attorneys' fees) that they may suffer or incur as a result of any failure by BarCap to cause the dismissal of the Lawsuit or any threat or prosecution of any of the Lawsuit Claims by BarCap or any of its affiliates. The Parties agree to keep confidential all information contained in Schedule A to the Services Agreement, subject to any requirements of law mandating disclosure.

(c)    Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, each of JPMorgan and BarCap (in each case, on its own behalf and on behalf of each of its affiliates) hereby does and shall be deemed to forever release, waive and discharge each other, the Trustee, LBI and the LBI estate, their respective property and their respective current and former officers, directors, employees, subsidiaries, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives (collectively, "Representatives") from and in respect of all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies and liabilities (other than the right to enforce the obligations of the Parties set forth in this Agreement) (collectively, "Claims"), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds, the Replacement Transaction or the Delivered Securities. Nothing in this Settlement Agreement shall release, waive or discharge any claims that JPMorgan or its affiliates may have against LBI in the SIPA Proceeding, or against LBHI and its affiliates in their respective bankruptcy cases, in each case with respect to the Advances remaining outstanding after giving effect to this Settlement Agreement and other transactions unrelated to the Subject Funds, the Replacement

Transaction and the Delivered Securities.

(d)    Upon the receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, the Trustee, on behalf of LBI and the LBI estate, hereby does and shall be deemed to forever release, waive and discharge each of JPMorgan and BarCap, their respective property and their respective current and former Representatives (for the avoidance of doubt, in (and only in) such current or former Representatives' respective capacities as such) from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to the Subject Funds, the Replacement Transaction or the Delivered Securities.

(e)    Upon receipt of the Settlement Consideration by BarCap in accordance with Section 1 above following the Effective Time, each of JPMorgan and BarCap (in each case, on its own behalf and on behalf of each of its affiliates) hereby does and shall be deemed to forever release, waive and discharge each other and their respective property and their respective current and former Representatives from and in respect of all Claims, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, relating to any alleged agreement of BarCap to enter into one or more triparty or other repurchase transactions involving LBI.

(f)    From September 22, 2008 until the earlier of the date on which (i) the Authorizing Order (as defined below) becomes final and no longer subject to further appeal or review and (ii) the Settlement Agreement terminates, each Party agrees to toll any applicable statute of limitations in respect of any claim against it by any other Party that would be released by Section 4(c), (d) or (e) if such sections become and remain effective.

5.    Entire Agreement.  This Settlement Agreement and the Services Agreement (to the extent it is effective and not expressly superseded hereby) constitute the entire contract among the Parties relative to the subject matter hereof.  This Settlement Agreement supersedes any previous agreements or understandings among the Parties, express or implied, with respect to the subject matter hereof, except the Services Agreement (to the extent it is effective and not expressly superseded hereby).  No supplement, modification, or amendment of this Settlement Agreement, or waiver of rights hereunder or thereunder, shall be binding unless executed in writing by the Party affected thereby.  Nothing in this Settlement Agreement, expressed or implied, is intended to confer upon any person or entity other than the Parties hereto any rights, remedies, obligations or liabilities under or by reason of this Settlement Agreement.  In the event that this Settlement Agreement and the Services Agreement (to the extent it is effective and not expressly superseded hereby) shall be construed to conflict in any way, the terms of this Settlement Agreement shall control.

6.    No Admissions.  Nothing in this Settlement Agreement or any negotiations or proceedings in connection herewith shall be claimed to be evidence of an admission by any Party or its affiliates of any liability, violation of law or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party.  Neither this Settlement Agreement, nor any negotiations or proceedings in connection herewith, may be used in any

proceeding against any Party or its affiliates for any purpose except with respect to the validity, effectuation and enforcement of this Settlement Agreement. Nothing contained herein shall be deemed (a) an admission by BarCap that any of the provisions of the Services Agreement are currently effective, (b) an admission by JPMorgan or Trustee that any of the provisions of the Services Agreement are not effective, (c) an admission by any Party of any assertions made herein by any other Party or (d) without limitation of Sections 2, 3(a)(i) and 4(d) hereof, an admission by the Trustee as to any matter.

7.    Counterparts; Signatures.  This Amendment may be executed in one or more counterparts, all of which taken together shall constitute one instrument. This Agreement may be executed and delivered manually, by facsimile transmission or by email transmission.

8.    Effective Time.  (a) Except for Sections 8(b) through (e) below, the last sentence of Section 4(b) above and Sections 4(f) and 6 above (and in relation thereto, Sections 9 and 11 and the first sentence of Section 10), this Settlement Agreement shall not become effective until (the "Effective Time") the later to occur of (i) the entry of an order that has not been stayed (the "Authorizing Order") authorizing the execution, delivery and performance of this Settlement Agreement by Trustee by the Bankruptcy Court (or other court of competent jurisdiction) and (ii) the execution and delivery of this Agreement by the Trustee.

(b)    In the event that the Bankruptcy Court declines to enter the Authorizing Order (or a court enters an order precluding the entry of an order that would qualify as the Authorizing Order), this Settlement Agreement shall terminate and be of no further force or effect.

(c)    Effective upon the execution and delivery of this Settlement Agreement by JPMorgan and BarCap (even if not yet executed and delivered by Trustee) and for so long as this Settlement Agreement shall not have been terminated, each of them shall (i) reasonably cooperate with Trustee to obtain as soon as reasonably practicable the entry and finality of the Authorizing Order, provided that this clause shall not be interpreted to require JPMorgan or BarCap to agree to any change in the provisions of this Settlement Agreement, and (ii) not take any action inconsistent with this Settlement Agreement, including without limitation commencing any litigation based on claims or causes of action to be released under Sections 4(c), (d) or (e) above.

(d)    This Settlement Agreement shall automatically terminate and be of no force and effect if (i) the Effective Time has not occurred by December 23, 2008 or (ii) the Authorizing Order is stayed or vacated after the Effective Time but before the transfer of the Settlement Consideration to BarCap in accordance with Section 1 above.

(e)    If this Settlement Agreement terminates in accordance with Section 8(d) above, each provision contained in this Settlement Agreement shall be of no further force and effect from and after such date of termination and each of the releases granted by the Parties in Sections 3 and 4 shall be void *ab initio; provided, however,* that the last sentence of Section 4(b) above and Sections 4(f) and 6 above (and in relation thereto, Sections 9 and 11 and the first sentence of Section 10) shall survive any termination of this Settlement Agreement and nothing in Section 8(d) above or this Section 8(e) shall relieve the Parties' obligations under the last sentence of Section 4(b) above and Sections 4(f) and 6 above (and in relation thereto, Sections 9

7

and 11 and the first sentence of Section 10).

9.    Governing Law; Jurisdiction.  THIS SETTLEMENT AGREEMENT SHALL BE
GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS
OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF
LAWS PRINCIPLES THEREOF.  Each of JPMorgan and BarCap hereby irrevocably and
unconditionally submits, for itself and its property, to the exclusive jurisdiction of the New York
state court located in the Borough of Manhattan, City of New York, the United States District for
the Southern District of New York or the United States Bankruptcy Court for the Southern
District of New York as applicable (the "New York Court"), and any appellate court from any
such court, in any proceeding arising out of or relating to this Settlement Agreement, or for
recognition or enforcement of any judgment resulting from any such proceeding, and each of
JPMorgan and BarCap hereby irrevocably and unconditionally agrees that all claims in respect of
any such suit, action or proceeding may be heard and determined in the New York Court.  The
Trustee hereby irrevocably and unconditionally submits, for itself and its property, to the
exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New
York (the "Bankruptcy Court"), and any appellate court from such court, in any proceeding
arising out of or relating to this Settlement Agreement that is brought against the Trustee, or for
recognition or enforcement of any judgment resulting from any such proceeding against the
Trustee, and each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court
shall have exclusive jurisdiction of any action, suit or proceeding by or against the Trustee
arising out of or relating to this Settlement Agreement.  Each Party hereby irrevocably and
unconditionally waives, to the full extent it may legally and effectively do so, (i) any objection
which it may now or hereafter have to the laying of venue of any proceeding arising out of or
relating to the Settlement Agreement in the applicable New York Court or Bankruptcy Court
specified above, (ii) the defense of an inconvenient forum to the maintenance of such proceeding
in any such court, and (iii) the right to object, with respect to such proceeding, that such court
does not have jurisdiction over such Party.  Each Party irrevocably consents to service of process
in any manner permitted by law.

10.    Binding Effect.  This Settlement Agreement shall bind, and be for the benefit of,
the Parties hereto and their respective successors and assigns.  All persons and entities released
pursuant to Sections 4(c), (d) and (e) of this Settlement Agreement are intended beneficiaries of
such release.

11.    Non-Severability.  Each of the provisions of this Settlement Agreement has been
agreed upon in consideration of each other provision of this Settlement Agreement.  No Party
would have entered into this Settlement Agreement unless each of the provisions hereof was
valid, binding and enforceable against each other Party.  If any provision of this Settlement
Agreement is determined not to be valid, binding and enforceable against each Party, this
Settlement Agreement shall be terminated and the Parties restored to their respective positions
existing immediately before entry into this Settlement Agreement.

IN WITNESS WHEREOF the Parties have executed this Settlement Agreement as of
the date first set forth above.

[Remainder of page intentionally left blank]

JPMORGAN CHASE BANK, N.A.


By_____


BARCLAYS CAPITAL INC.


By_____


JAMES W. GIDDENS, AS TRUSTEE IN THE SECURITIES INVESTOR PROTECTION ACT
LIQUIDATION OF LEHMAN BROTHERS INC., ON BEHALF OF HIMSELF AND
LEHMAN BROTHERS INC.


By_____


Signature Page to Settlement Agreement dated as of December 5, 2008

JPMORGAN CHASE BANK, N.A.

By

BARCLAYS CAPITAL INC.

By

JAMES W. GIDDENS, AS TRUSTEE IN THE SECURITIES INVESTOR PROTECTION ACT
LIQUIDATION OF LEHMAN BROTHERS INC., ON BEHALF OF HIMSELF AND
LEHMAN BROTHERS INC.

By

Signature Page to Settlement Agreement dated as of December 5, 2008

60443925_15.DOC

JPMORGAN CHASE BANK, N.A.


By_____


BARCLAYS CAPITAL INC.

By_____
    Name:    Richard T. Ricci
    Title:    Chief Operating Officer,
              Investment Banking &
              Investment Management


JAMES W. GIDDENS, AS TRUSTEE IN THE SECURITIES INVESTOR PROTECTION ACT
LIQUIDATION OF LEHMAN BROTHERS INC., ON BEHALF OF HIMSELF AND
LEHMAN BROTHERS INC.


By_____


Signature Page to Agreement Regarding Settlement Agreement dated as of December 5, 2008

ANNEX A

<u>TO BE FILED UNDER SEAL</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION                   :
CORPORATION,                                      :
                                                 :
                    Plaintiff,                   :
                                                 :
        v.                                       :
                                                 :
LEHMAN BROTHERS INC.,                            :
                                                 :
                    Debtor.                      :
                                                 :
-------------------------------------------------------------X

### DECLARATION OF SHARI D. LEVENTHAL
### IN SUPPORT OF TRUSTEE'S MOTION
### FOR ENTRY OF AN ORDER
### APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. § 1746, SHARI D. LEVENTHAL declares as

follows:

1.      I am Assistant General Counsel and Senior Vice President at the

Federal Reserve Bank of New York ("New York Fed"). In that capacity, except where

stated otherwise, I have personal knowledge of the matters set forth in this declaration. I

submit this declaration in support of the Motion for Entry of An Order Approving a

Settlement Agreement filed by James W. Giddens as Trustee for the Securities Investor

Protection Act ("SIPA") liquidation of the business of Lehman Brothers Inc. ("LBI").

<u>Background</u>

2.      On Friday evening, September 12, 2008, an historic meeting began

at the New York Fed's head office in downtown Manhattan. Participating in this meeting

were the senior management of the New York Fed, the Chairman of the Securities and

Exchange Commission, the Secretary of the Treasury, and the most senior leadership of

the major global financial firms. The goal of the meeting was to find a way to rescue

Lehman Brothers, which was on the verge of insolvency. All of the participants

recognized the impact that a Lehman bankruptcy filing could have on an already fragile

financial system.

        3.      The effort to save Lehman was directed toward an acquisition of

the firm and it naturally focused on possible suitors. By Saturday, September 13th, two

institutions had expressed interest in acquiring Lehman, Bank of America and Barclays

Capital. By mid-day Saturday, Bank of America had found another bride, which left

Barclays Capital as the one viable party. By Sunday, September 14th, the major global

financial firms agreed to facilitate an acquisition by financing some of the transaction.

All were hopeful that Lehman would be saved.

        4.      For Lehman to continue as a viable entity pending closing of the

deal, it was necessary for the purchaser to guarantee all of Lehman's short-term

obligations. This guarantee was vital to stave off the effects of a panic that would likely

result from the markets' reaction to Lehman's condition. By mid-day on Sunday,

September 14th, however, it became apparent that a number of technical legal issues

arising under the laws of the United Kingdom presented a barrier that would become

insurmountable.

        5.      By Sunday evening it became certain that an acquisition of

Lehman by Barclays was not possible. Lehman's Board of Directors, therefore, made the

decision that Lehman Brothers Holdings International ("Lehman Holdings") would

commence a voluntary Chapter 11 case on September 15th.

6.    LBI, the broker-dealer subsidiary of Lehman Holdings, did not commence a Chapter 11 case on September 15th. This represented a carefully thought out decision that would enable LBI to continue to operate so as to facilitate an orderly wind down of its trading positions. To keep LBI operating, however, its operations and payroll had to be funded. The New York Fed agreed to finance LBI overnight. JPMorgan Chase Bank, N.A. ("JPMC"), as LBI's clearing bank, agreed to provide certain intra-day funding.

7.    On Tuesday, September 16th, Barclays returned with an offer to purchase certain assets, and assume certain liabilities, of LBI. Recognizing that Barclays' offer provided an opportunity for an orderly transfer of thousands of customer accounts, as well as the possibility of preserving the jobs of thousands of LBI employees, the New York Fed decided to support the transaction. However, we also explained to Barclays that the New York Fed's commitment to provide overnight funding for LBI was based on the assumption that we were facilitating an orderly wind down of the business. If Barclays wanted the New York Fed to continue funding LBI so as to facilitate an orderly transition (instead of an orderly wind down), and thus assist with the implementation of Barclays' purchase-and-assumption agreement, then Barclays needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction. Barclays and the New York Fed entered an agreement on the morning of September 17th to the effect that Barclays would take over the New York Fed's place in providing Lehman overnight funding.

8.    On the night of September 17th, the New York Fed was funding Lehman through various lending programs:  the Primary Dealer Credit Facility

("PDCF"), the Term Securities Lending Facility ("TSLF"), and Open Market Operations

("OMO"). The PDCF is a financing facility, where the New York Fed funds dealers

using the repurchase agreement ("repo") form. Open Market Operations are, by contrast,

transactions done by the New York Fed to implement monetary policy directives of the

Federal Open Market Committee. These OMO transactions are also done in the form of

repos. The TSLF is not a cash lending facility. Rather, through the TSLF, the New York

Fed lends U.S. Treasury securities against other forms of collateral.

        9.      Overnight on September 17th, the New York Fed had the following

exposures to LBI:

      a.  $20.43 billion in cash against $23.866 billion in collateral through
the PDCF;

      b.  $7.0 billion in cash against $7.159 billion in collateral through
OMO; and

      c.  $18.79 billion in treasury securities against $19.596 billion in other
collateral through the TSLF.

In total, the New York Fed had funded LBI $46.22 billion in cash and Treasury securities

against $50.62 billion in collateral.

        10.     On the morning of September 18th, in accordance with the terms of

the applicable repurchase agreements, the New York Fed's PDCF and OMO positions

with LBI were unwound. As a result of Barclays' agreement to take out the New York

Fed's exposures to LBI, the TSLF contract with LBI was terminated. The New York Fed

was paid cash, and the Treasury securities borrowed by Lehman were delivered back.

The securities that the New York Fed had held overnight on September 17th were

returned to LBI through its account at JPMC. JPMC then funded LBI intra-day on
September 18th.

    11.    Beginning in the afternoon of September 18th, Barclays initiated
the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of
funds transfers were made using the Fedwire Funds Service, which is operated by the
Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been
transferred by Barclays to LBI.

    12.    Pursuant to the repurchase agreement between Barclays and LBI
(the "September 18[th] Repo"), which was the form selected by Barclays to fund LBI
overnight, LBI was to provide Barclays with approximately $49.7 billion in securities in
return for the $45 billion in cash funded by Barclays. This ratio was consistent with the
ratio of cash to securities used in the New York Fed's repurchase agreement with LBI on
the night of September 17th.

    13.    As the Court knows, the events of the week of September 15th as
they related to Lehman Holdings and LBI were unprecedented in nature, and they
unfolded at an unprecedented speed, in turbulent markets. The effect of these events was
to push the operational components of the financial system nearly to their limits. It is not
surprising, therefore, that the intended transfer of $49.7 billion in securities from LBI to
Barclays on the night of September 18th came with a hitch.

    14.    Notwithstanding that both Depository Trust Company ("DTC")
and the Fedwire Securities Service remained open for several hours past their normal
closing times in an effort to complete this transaction, operational issues interfered with

the ability to transfer all of the intended securities to Barclays. When, at 11 PM, DTC had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo.

15.    LBI, therefore, agreed, either late on the night of September 18th, or early in the morning of September 19th, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMC. The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds to LBI. The transfer of securities, however, did not occur prior to the entry by the United States District Court for the Southern District of New York on September 19, 2008 of the Order Commencing Liquidation ("LBI Liquidation Order") pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

16.    I have been informed by JPMC that, after the Subject Funds were transferred by LBI to an account at JPMC, as described above, JPMC caused the Subject Funds to be transferred to an LBI account at JPMC.

17.    As a result of the operational issues that arose on the night of September 18th, and JPMC's transfer of the Subject Funds to an LBI account at JPMC, LBI was unjustly enriched. LBI had both Barclays' cash (the $45 billion transferred on September 18th), and approximately $7 billion in securities that had been intended to be transferred to Barclays.

The Settlement Agreement

18.     Barclays' purchase of LBI's assets and its assumption of certain liabilities pursuant to an Asset Purchase Agreement was approved by the Court in the early hours of September 20th.

19.     Only after the purchase transaction closed on Monday, September 22nd, did Barclays learn that the Subject Funds it believed were in its account at JPMC had been transferred to LBI's account. This is crucial to understanding paragraph 13 of the September 20th letter from Barclays to Lehman Holdings that sought to clarify the intention of the parties with respect to certain provisions of the Asset Purchase Agreement (the "Clarification Letter"). Some of the provisions of the Clarification Letter were discussed during conference calls in which I participated on Sunday, September 21st. During those calls, Barclays' representatives made statements that clearly reflected their belief that the Subject Funds were in Barclays' account at JPMC.

20.     Because Barclays believed that the $7 billion was in its account, it agreed in the Clarification letter that:

> all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement . . . shall be deemed to constitute part of the Purchased Assets . . . . Seller and Purchaser shall be deemed to have no further obligations to each other under the [September 18[th] Repo] (including, without limitation, any payment or delivery obligations), and . . . the [September 18[th] Repo] shall terminate.

21.     When Barclays learned for the first time, on or about September 23rd, that it had neither all of the securities intended to be transferred under the September 18th Repo, nor the Subject Funds, Barclays came to the New York Fed.

Barclays sought the New York Fed's assistance in facilitating negotiations with JPMC

regarding JPMC's movement of the Subject Funds. The proposed settlement agreement

is the result of those negotiations.

22.    The proposed settlement agreement provides that Barclays will

receive the securities that remain from the pool of LBI securities previously held by the

New York Fed under its repo with LBI on the night of September 17th and that were

intended to have been transferred to Barclays under the September 18th Repo. These

securities are identified in Annex A to the Settlement Agreement as the "Settlement

Consideration Fed Portfolio Securities". I have been told that some of the securities that

the New York Fed held on the night of September 17th have since been liquidated by

JPMC. To make up for the shortfall resulting from those liquidations, and the decline in

the value of the remaining securities since September 19th, the proposed settlement

provides that Barclays is to receive $1.25 billion in cash. In addition, approximately $7.1

million of cash would also be provided to Barclays in the proposed settlement,

representing proceeds of certain Settlement Consideration Fed Portfolio Securities that

were inadvertently liquidated by JPMC after the parties reached agreement on the terms

of the proposed settlement.

23.    The securities and cash that Barclays will receive under the

proposed Settlement will come from LBI accounts at JPMC. JPMC has a lien on these

accounts, and, consequently, on the relevant cash and securities which Barclays will

receive. JPMC has agreed to release its liens on the above-mentioned cash and securities

to facilitate this settlement.

24.    The proposed settlement is, in the New York Fed's opinion, a fair one. It addresses the unjust enrichment to the LBI estate caused by the operational failures on September 18th and 19th, and restores the parties, and the LBI estate, to the positions they would have been in had the September 18th Repo been executed as originally planned. It is also, in the New York Fed's opinion, consistent with the intent of the Clarification Letter.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

Shari D. Leventhal

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,
                                        :
                Plaintiff,              :
                                        :
        v.                              :
                                        :
LEHMAN BROTHERS INC.,                   :
                                        :
                Debtor.                 :
                                        :
------------------------------------------------------------X

### DECLARATION OF JEFFREY M. MOORE
### IN SUPPORT OF TRUSTEE'S MOTION
### FOR ENTRY OF AN ORDER
### APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. 1746, JEFFREY M. MOORE declares as follows:

1.      I am a Financial and Economic Specialist in the Market
Operations, Monitoring and Analysis area of the Markets Group at the Federal Reserve
Bank of New York ("New York Fed"). In that capacity, I am responsible for the
management and valuation of collateral. I have expertise in the areas of fixed income
securities valuation.

2.      I joined the New York Fed in 2007. Prior to joining the New York
Fed, I was a Director of Credit Risk Management at the Federal Reserve Bank of Atlanta
("Atlanta Fed"). While working at the Atlanta Fed, I attended Emory University and
received a PhD in Economics.

3.      I submit this declaration in support of the Motion for Entry of An
Order Approving a Settlement Agreement (the "Motion"), filed by James W. Giddens as

Trustee for the Securities Investor Protection Act ("SIPA") liquidation of the business of Lehman Brothers Inc. ("LBI").

4.    I have reviewed the portfolio of securities held by the New York Fed on the night of September 17th 2008 as collateral for loans made by the New York Fed to Lehman Brothers International (the "Fed Securities"). On the night of September 17th, the New York Fed valued the Fed Securities at $50.62 billion.

5.    In my opinion, based on market events between September 17th and the date of this declaration, the value of the Fed Securities would be substantially less than $50.62 billion.

6.    In my opinion, the value on the date hereof of the "Settlement Consideration Fed Portfolio Securities" identified in Annex A to the Settlement Agreement that is the subject of the Motion is substantially less than $5.743 billion (i.e., the difference between (x) $7.0 billion and (y) the sum of $1.25 billion and $7.1 million referred to in Sections 1(a) and 1(c)(y) of such Settlement Agreement).

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

Jeffrey M. Moore

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                                     :
                                                           :
LEHMAN BROTHERS INC.,                                      :    Adversary Proceeding
                                                           :    No. 08-01420-JMP SIPA
                                 Debtor.                   :
                                                           :
------------------------------------------------------------x

### DECLARATION OF GERARD LAROCCA IN SUPPORT
### OF THE TRUSTEE'S MOTION FOR ENTRY OF
### AN ORDER APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. §1746, GERARD LAROCCA declares as follows:

1.    I am the Chief Administrative Officer of Barclays Capital Inc. ("Barclays"). I submit this declaration in support of the Trustee's motion for approval of a Settlement Agreement between the Trustee, JPMorgan Chase Bank, N.A. ("JPMorgan") and Barclays. Except where stated otherwise, I have personal knowledge of the facts set forth in this declaration.

2.    The Settlement Agreement compromises substantial claims among the settling parties arising out of funding and related transactions pursuant to agreements entered into during the week of September 15, 2008. In this declaration, I describe the events leading to the settlement.

3.    The week of September 15, 2008 was one of the most tumultuous weeks in our nation's financial history. On Monday, September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI") filed for bankruptcy. Early that week, as Barclays was negotiating the purchase of certain assets of the businesses of LBHI and Lehman Brothers Inc. ("LBI"), the Federal Reserve Bank of New York (the "Fed") requested that Barclays take the place of the Fed in providing funding to LBI.

4.    On Wednesday, September 17, 2008, Barclays agreed with the Fed to replace the Fed in funding LBI – that is, to "step into the shoes of the Fed."

5.    The agreement with the Fed was to be accomplished through a reverse repurchase transaction between Barclays and LBI (the "Replacement Transaction"). Under the Replacement Transaction, Barclays was to provide $45 billion in funding to LBI and in exchange was to become the owner of securities that, as of the evening of September 17, 2008, were pledged by LBI to the Fed (the "Fed Portfolio") in connection with the Fed's provision of funding to LBI.

6.    The transfers contemplated by the Replacement Transaction between LBI and Barclays were to take place on Thursday, September 18, 2008. Thus, as Barclays and LBI had agreed, Barclays transferred $45 billion to LBI at a JPMorgan account that afternoon and early evening. Also on that Thursday, JPMorgan received, in a transfer from the Fed to LBI, the securities comprising the Fed Portfolio that were to be acquired by Barclays pursuant to the Replacement Transaction. JPMorgan, at LBI's direction, then engaged in a process of transferring the Fed Portfolio securities to Barclays. Before all of the Fed Portfolio securities were delivered to Barclays as contemplated under the Replacement Transaction, however, the Fedwire and Depository Trust Company ("DTC") services necessary to complete the transfers closed late that evening. Accordingly, the Replacement Transaction could not be completed on September 18, 2008, as originally planned.

7.    Because the Replacement Transaction could not be completed as originally contemplated, Barclays and LBI discussed how to resolve and complete the Replacement Transaction in conversations shortly after midnight, *i.e.*, during the early hours of Friday morning, September 19, 2008. To complete the Replacement Transaction, LBI and Barclays agreed that LBI would transfer back to Barclays $7 billion in cash (the "Subject Funds") from LBI.

2

8.    Pursuant to that agreement (and the instructions of LBI and Barclays pursuant to that agreement), in the early hours of Friday, September 19, 2008, JPMorgan transferred $7 billion in cash from LBI to Barclays at an account at JPMorgan, thus completing the Replacement Transaction.

9.    When the Fed, Barclays and LBI originally agreed to engage in the Replacement Transaction, the parties intended for all of the Fed Portfolio securities to be delivered to Barclays under the Replacement Transaction. As that had not happened as contemplated by the opening of business on Friday, September 19, 2008, LBI and Barclays discussed during the business day on September 19 and into the weekend of September 20, 2008, the transfer to Barclays of the portion of the Fed Portfolio securities that had not yet been delivered as originally contemplated. Despite those discussions, no agreement was reached between the parties regarding such additional transfer, and therefore no further transfer occurred before the closing of the Asset Purchase Agreement between Barclays and LBI (as amended, the "APA") early on the morning of Monday, September 22, 2008.

10.    Because the Replacement Transaction was structured as a reverse repurchase transaction, LBI was obligated under the Replacement Transaction to "repurchase" the Fed Portfolio securities from Barclays. As part of the APA, however, Barclays would be acquiring (without LBI having any repurchase obligations) the very securities that had been delivered under the Replacement Transaction. Thus, at the closing of the APA transaction on Monday, September 22, 2008, the Clarification Letter to the APA, dated as of September 20, 2008 (the "Clarification Letter"), simply terminated the repurchase part of the Replacement Transaction with respect to "all securities and other assets held by" Barclays "under the September 18, 2008 repurchase arrangement among" Barclays and LBI. This termination meant that all of the securities that were actually delivered on September 18, 2008, and that were by then held in a

3

Barclays account at the Bank of New York were "deemed to constitute part of the Purchased Assets" under the APA (and thus LBI would have no further obligation to "repurchase" those securities and Barclays would not be obligated to deliver such securities back to LBI).

11.    Because the Subject Funds had been returned to Barclays in order to complete the Replacement Transaction and no further transfer of the securities originally contemplated to be delivered to Barclays were made by LBI after Thursday, September 18, 2008, the termination of the Replacement Transaction pursuant to the Clarification Letter also meant that Barclays, naturally, retained its $7 billion in Subject Funds. At the time the Clarification Letter was finalized, Barclays believed its $7 billion—*i.e.*, the Subject Funds— was in its account at JPMorgan.

12.    On Tuesday, September 23, 2008, well after finalizing the Clarification Letter, Barclays learned for the first time that the Subject Funds were not in its account at JPMorgan.

13.    Because the Subject Funds were not in Barclays account, the transfer of the Subject Funds by JPMorgan left Barclays without the full consideration it had contracted for in the Replacement Transaction and under the APA transaction. Instead, Barclays had neither its $7 billion in Subject Funds nor the undelivered portion of the Fed Portfolio securities that were originally contemplated to have been delivered on September 18, 2008.

I declare under penalties of perjury that the foregoing is true and correct.

Executed in Wilmington, Delaware on
December 5, 2008

GERARD LAROCCA

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS INC.,

          Debtor.

Case No. 08-01420 (JMP) SIPA

## ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN TRUSTEE, BARCLAYS CAPITAL INC. AND JPMORGAN CHASE BANK, N.A.

Upon consideration of James W. Giddens' (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI" or "Debtor"), Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement (the "Motion"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that due and proper notice of the Motion and the relief requested therein having been given in accordance with the Order to Show Cause and Notice Fixing Hearing Date to Consider Trustee's Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, and no other or further notice need be given; and the relief requested in the Motion being in the best interests of LBI, its estate, customers and creditors; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that the settlement is fair and reasonable, and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the Motion is granted in all respects; and it is further

**ORDERED** that the settlement agreement (the "Settlement Agreement")[1] is authorized and approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and sections 105(a) and 363 of the Bankruptcy Code; and it is further

**ORDERED** that the Trustee is authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary to consummate the Settlement Agreement and perform any and all obligations contemplated therein; and it is further

**ORDERED** that, except as provided in section 9 of the Settlement Agreement, the Court shall retain jurisdiction to (i) enforce and implement the terms and provisions of the Settlement Agreement and resolve disputes thereunder and (ii) implement and enforce the provisions of this Order; and it is further

**ORDERED** that all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits. Those parties who did not object, or who withdrew their objections, to the Motion are deemed to have consented to the Motion; and it is further

**ORDERED** that the failure to specifically include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Trustee's implementation of the transactions contemplated in the Settlement Agreement be approved in its entirety; and it is further

**ORDERED** that the stay of this Order provided by the Bankruptcy Rules (including Bankruptcy Rule 6004) whether for ten (10) days or otherwise shall not be applicable to this Order, and this Order shall be effective and enforceable immediately upon entry.

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Settlement Agreement.

60471986_1.DOC

2

Dated:    New York, New York
          December __, 2008

                                        _____
                                        Honorable James M. Peck
                                        United States Bankruptcy Judge

60471986_1.DOC