**QUINN EMANUEL URQUHART OLIVER & HEDGES LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
Susheel Kirpalani
James C. Tecce
Erica P. Taggart

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*

Hearing Date:
OCTOBER 15, 2009
Objections Due:
OCTOBER 9, 2009

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------------x
In re:                                       : Chapter 11
                                             : Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., et al.,       : Jointly Administered
                                             :
                        Debtors.             :
------------------------------------------------------------------------x
In re:                                       : SIPA Proceeding
                                             : Case No. 08-01420 (JMP)
LEHMAN BROTHERS INC.,                        :
                                             :
                        Debtor.              :
------------------------------------------------------------------------x
```

## MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL., PURSUANT TO 11 U.S.C. § 105(a), FED. R. CIV. P. 60(b), AND FED. R. BANKR. P. 9024, FOR RELIEF FROM ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING (A) SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, DATED SEPTEMBER 20, 2008 (AND RELATED SIPA SALE ORDER) AND JOINDER IN DEBTORS' AND SIPA TRUSTEE'S MOTIONS FOR AN ORDER UNDER RULE 60(b) TO MODIFY SALE ORDER

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ...................................................................2

II.     FACTS RELATING TO TRANSACTION DOCUMENTS AND SALE
        HEARING ............................................................................................6

        A.      TRANSACTION DOCUMENTS PREPARED AND FILED BEFORE SALE
                HEARING........................................................................................6

                1.      APA .............................................................................7

                2.      FIRST AMENDMENT .........................................................8

        B.      COURT APPROVES SALE TRANSACTION FOLLOWING SEPTEMBER 19
                HEARING........................................................................................8

        C.      CLARIFICATION LETTER...................................................................12

        D.      REPRESENTATIONS TO COMMITTEE AT SALE CLOSING; COMMITTEE'S
                INVESTIGATION IN PURSUIT OF FINAL TRANSACTION RECONCILIATION.........12

III.    FACTS REVEALED IN RULE 2004 DISCOVERY...................................................16

        ███████████████████████████████████████ .........................16

        ████████████████████████████████████████████ .............19

        █████████████████████████████████████████ .................23

        █████████████████████████ .................23

        ████████████████████████ .................24

        ████████████████████████████████ .................27

██████████████████████████████████████
██████████████████████████ ...................................................................28

██████████████████████████████████████████
██████████████████████ ..........................................................................31

██████████████████████████████████████████████
█████████ .................................................................................34

IV.     JURISDICTION AND VENUE ...............................................................36

V.      ARGUMENT ...............................................................................................37

        A.     COMMITTEE IS ENTITLED TO RELIEF FROM SALE ORDER FOR
               MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT PURSUANT TO
               RULE 60(B)(1) ...............................................................................38

        B.     NEWLY DISCOVERED EVIDENCED UNEARTHED THROUGH RULE 2004
               DISCOVERY WARRANTS RELIEF FROM SALE ORDER UNDER RULE
               60(B)(2) .........................................................................................42

        C.     RELIEF FROM SALE ORDER UNDER 60(B)(3) IS APPROPRIATE............43

        D.     RULE 60(B)(6) PROVIDES A BASIS FOR RELIEF .................................44

        E.     BY GRANTING THE RELIEF REQUESTED HEREIN, ESTATES ARE
               PROVIDED AN OPPORTUNITY TO RECOVER EXCESS VALUE
               TRANSFERRED TO BARCLAYS IN THE SALE TRANSACTION...............45

               1.     IF SALE ORDER DID NOT APPROVE CLARIFICATION LETTER, OR
                      IF RELIEF FROM SALE ORDER IS AUTHORIZED TO REMOVE
                      CLARIFICATION LETTER FROM SALE ORDER, THEN TRANSFERS
                      CONSUMMATED PURSUANT THERETO ARE RECOVERABLE
                      UNDER SECTION 549 OF BANKRUPTCY CODE ...........................46

               2.     UNDER SECTION 559, THE EXCESS COLLATERAL IN FORM OF
                      "HAIRCUT" IS ESTATE PROPERTY .............................................47

        F.     COURT SHOULD ORDER IMMEDIATE ACCOUNTING ...........................47

VI.     JOINDER IN DEBTORS' RULE 60(B) MOTION ....................................49

VII.    JOINDER IN SIPA TRUSTEE'S RULE 60(B) MOTION .........................49

VIII.   CONCLUSION ..........................................................................................50

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

Frontier Farm Credit v. Schwartz (In re Schwartz),
2008 Bankr. LEXIS 1795 (Bankr. D. Kan. June 10, 2008)....................................45

FutureSource LLC v. Reuters Ltd.,
312 F.3d 281 (7th Cir. 2002).............................................................................37

Grace v. Bank Leumi Trust Co. of NY,
443 F.3d 180 (2nd Cir. 2006).............................................................................37

In re 310 Assocs.,
346 F.3d 31 (2d Cir. 2003)................................................................................38

In re Benhil Shirt Shops, Inc.,
87 B.R. 275 (S.D.N.Y. 1988)............................................................................37

In re Centennial Textiles, Inc.,
220 B.R. 165 (Bankr. S.D.N.Y. 1998)...............................................................46

In re CHC Industries, Inc.,
389 B.R. 767 (Bankr. M.D. Fla. ,2007)..............................................................37

In re Contractor Technology, Ltd.,
343 B.R. 573 (Bankr. S.D. Tex. 2006) ...............................................................46

In re Dunning Bros. Co.,
2009 Bankr. LEXIS 2427 (Bankr. E.D. Cal. Sept. 4, 2009)...................................44

In re Govola,
306 B.R. 733 (D. Conn. 2004)...........................................................................38

IF Realty L.P. v. Rochester Assocs.,
92 F. 3d 752 (8th Cir. 1996) .............................................................................37

In re Lawrence,
293 F.3d 615 (2nd Cir. 2002)............................................................................43

In re Ray,
2008 WL 544876 (Bankr. W.D. Wash. February 26, 2008)....................................37

In re Rickel & Associates, Inc.,
272 B.R. 74 (S.D.N.Y. 2002) (holding Rule 60(b)(3) ..........................................43

In re Rome Family Corp.,
407 B.R. 65 (Bankr. D. Vt. 2009).......................................................................37

In re Superior Crewboats, Inc.,
    374 F.3d 330 (5th Cir. 2004) ................................................................45

Londsdorf v. Seefeldt,
    47 F.3d 893 (7th Cir. 1995) ("[Rule] 60(b)(3) ....................................43

Matter of Emergency Beacon Corp.,
    666 F.2d 754 (2nd Cir. 1981)...........................................................37, 38

Matter of Met-L-Wood Corp.,
    861 F.2d 1012 (7th Cir. 1988) ..........................................................37

Mora v. Vasquez (In re Mora),
    199 F.3d 1024 (9th Cir. 1999) ..........................................................46

Rosenshein v. Kleban,
    918 F. Supp. 98 (S.D.N.Y. 1996).......................................................44

Sheng v. Starkey Lab., Inc.,
    53 F. 3d 192 (8th Cir. 1995) .............................................................38

## Statutes

11 U.S.C. §§ 105(a) ......................................................................37

11 U.S.C. § 559 (emphasis added)..................................................47

28 U.S.C. § 1334...........................................................................37

28 U.S.C. § 1409...........................................................................37

28 U.S.C. § 157(b).........................................................................37

Fed. R. Bankr. P. 9024...................................................................37

Fed. R. Civ. P. 60(b) ..................................37, 39, 42, 44, 45, 46, 49, 50

## Miscellaneous

Collier on Bankruptcy ¶ 549.02 (15th ed. rev. 2006) .......................46

Wright & Miller, Federal Practice and Procedure: Civil § 2857 ...........37

The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (the "Committee"), hereby moves the Court for the entry of an order, pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules") and Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

- granting the Committee relief from the Sale Order[1] to the extent it purports to approve material modifications to the Sale Transaction that were not disclosed to the Court;

- revising the Sale Order:

    o to remove approval of the Clarification Letter (as defined below) from the Sale Order to the extent it materially modified the Sale Transaction approved by the Court; and

    o to amend the Purchased Assets definition so that it contains assets with a fair value, as of the closing date, that is no greater than the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of the actual liabilities assumed by Barclays without the application of any secret or other $5 billion discount described below;

- requiring a full accounting and reconciliation of all Purchased Assets and assumed liabilities within 10 days (including any disposition of the same); and

- directing the return to the estates of the value of all Purchased Assets in excess of the above (with interest).

The Committee also joins in the Debtors' Rule 60(b) Motion[2] and the SIPA Trustee's Rule 60(b) Motion.[3]

---

[1]    Collectively, the (1) Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (A) Sale Of Purchased Assets Free And Clear Of Liens And Other Interests And (B) Assumption and Assignment of Executory Contracts And Unexpired Leases, dated September 20, 2008 and (2) Order Approving And Incorporating By Reference For Purposes Of This Proceeding, An Order Authorizing The Sale Of Purchased Assets And Other Relief In Lehman Brothers Holdings, Inc. Chapter 11 Proceeding (Docket No. 3 in the above-referenced SIPA Proceeding (08-1420 (JPM)) shall be referred to as the "Sale Order." The Sale Order approved the sale of assets from the North American broker dealer business (the "Sale Transaction") of Lehman Brothers Inc. ("LBI") to Barclays Capital, Inc. ("Barclays"). Lehman Brothers Holdings Inc., LBI and LB 745 LLC were the "Lehman Sellers."

# I.    PRELIMINARY STATEMENT

1.    ***Sunshine Is Best Disinfectant.***  Consistent with well-established precepts demanding that transparency permeate every aspect of bankruptcy-court sales, the Court authorized the Committee (and the estates) to thoroughly investigate the events surrounding the Sale Transaction.  That discovery unfortunately confirmed the Committee's long-standing suspicion that a lack of transparency resulted in the estates losing billions of dollars of assets for no additional consideration.  The Sale Transaction that ultimately closed was far different from that described to the Court and the Committee.  Not only were extensive structural changes implemented after the Court entered the Sale Order, but Barclays extracted billions of dollars worth of additional assets from these estates.  Moreover, those additional assets supplemented a secret $5 billion discount that was a component of the transaction from its inception -- but which was neither reflected in the agreements presented to the Court nor disclosed in the descriptions made to the Court.[4]  While courts are reluctant to revisit asset sale orders, the unusual circumstances of this case require the strictest integrity of, and adherence to process.  Even more important to the policy of bankruptcy sales than finality is honesty, candor, and disclosure to the Court.

---

[2]    Debtors' Motion For An Order, Pursuant To Fed. R. Civ. P. 60 And Fed. R. Bankr. P. 9024, Modifying September 20, 2008 Sale Order And Granting Other Relief, dated September 15, 2009 (the "Debtors' Motion").

[3]    The Trustee's Motion For Relief Pursuant To The Sale Orders Or, Alternatively, For Certain Limited Relief Under Rule 60(b), dated September 15, 2009 (the "Trustee's Motion").

[4]    It should come as no surprise that one definitive accounting of what was gained upon acquisition is Barclay's own public financial statements, which provide that "[o]n 22nd September 2008 Barclays completed the acquisition of Lehman Brothers North American businesses .... ***The excess of the fair value of net assets acquired over consideration paid resulted in £2,262m [nearly $4 billion] of gains on acquisition***." Ex. 53, Barclays PLC Results Announcement Figures 2008, at p. 95 (emphasis added).

2. ***Documents Did Not Reflect Secret Agreement.*** The Sale Transaction described in the APA[5] provided for Barclays to purchase assets with a "book value" of $70 billion and assume liabilities of $69 billion. During the Sale Hearing four days later, the parties told the Court that, as a result of market deterioration, the value of the assets had fallen to $47.4 billion, with Barclays assuming liabilities associated with those assets of $45.5 billion. Unbeknownst to the Court or the Committee, the value of the assets being purchased by Barclays was misstated.

3.



4. ***Investigation Unearths Material Discrepancies.*** The Committee never approved the Sale Transaction either as presented to the Court or as actually consummated. As the Committee noted during the Sale Hearing, it lacked sufficient information to make an informed decision whether to extend its support. After the transaction closed, the Committee asked for a final reconciliation, including information sufficient to identify the specific assets transferred and liabilities assumed and their respective values. The Committee's investigative efforts continued

---

[5] Asset Purchase Agreement dated September 16, 2008 among Barclays and the Lehman Sellers (the "APA"), and the hearing to consider approval of the same conducted on September 19, 2008 (the "Sale Hearing").

[6] See Sale Order ¶ 3 ("The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.").

into early spring, yet Barclays failed to produce even a basic explanation of the consummated

transaction.  After more than 20 depositions and review of thousands of documents, the

following material discrepancies between the represented and consummated Sale Transaction

have emerged:



(footnote continued)



 (bullet)

5.    Neither the change in the APA to account for the repurchase agreement component of the transaction nor the additional assets Barclays demanded and received appeared in any transaction documents until **after** the Sale Hearing.  While the Sale Order purported to approve those transaction documents (including the Clarification Letter albeit on a prospective basis), their full contents were never presented to or approved by the Court.  As a result, the Court never had the ability to inspect the final transaction documents or the opportunity to ensure the Sale Transaction as consummated comported with the transaction described to the Court.  Notwithstanding the inclusion of the term "Clarification Letter" in the Sale Order, the actual Clarification Letter that the parties executed was not, and could not have been approved by the Court.  To that end, it should be stricken from the Sale Order.[8]



[8]   The Committee submits the Sale Order's statement that the Clarification Letter has been approved should be stricken as, among other things, inaccurate.  To the extent the Court determines that the Committee's request for a determination constitutes a request for declaratory relief, i.e., a request for a declaration that the Sale Order did not approve the Clarification Letter, the Committee stands prepared to file the complaint for declaratory judgment attached hereto as Exhibit 1.  The Committee submits the question of whether the Court (and the Sale Order) ever approved the Clarification Letter presents a gating issue that should be decided in the first instance.  It may, among other things, obviate the need to consider whether Rule 60(b) relief from the Sale Order is required.  (It also may entail a request for a return of those assets as unauthorized post-petition transfers).

6.     At the time the Court entered the Sale Order, global financial markets were experiencing unprecedented upheaval.  The Court acknowledged this in entering the Sale Order.  The urgency of the moment, however, was not intended to bestow significant economic advantages on Barclays.  Rather, it was intended to restore confidence in the markets.  In order to achieve that goal, the Committee submits the Sale Order must approve the transaction as it was represented to the Court.  Absent that relief, the estates and creditors will suffer harm as a consequence of the very same lack of transparency that contributed initially to the financial crisis.  Moreover, the Committee does not seek drastic relief.  In fact, each estate fiduciary, i.e., the Debtors, the Committee and the SIPA Trustee, similarly is raising issues of grave concern with respect to the Sale Transaction, questioning the propriety of the results Barclays obtained the means through which it obtained those results.  Accordingly, the Committee should be granted relief from the Sale Order pursuant to Federal Rule 60(b) to the extent that order purports to approve material modifications to the Sale Transaction that were neither disclosed to, nor secured the imprimatur of, the Court and the Committee.

## II.     FACTS RELATING TO TRANSACTION DOCUMENTS AND SALE HEARING

### A.     TRANSACTION DOCUMENTS PREPARED AND FILED BEFORE SALE HEARING

7.     Shortly after LBHI filed for chapter 11 protection, Barclays, LBHI and LBI announced Barclays would purchase LBI's North American broker-dealer business.  Barclays and the Lehman Sellers purported to document the Sale Transaction through three agreements: the original APA dated September 16, 2008, a First Amendment to the Asset Purchase Agreement dated September 19, 2008 (the "First Amendment"), and a Clarification Letter dated "[a]s of September 20, 2008" (and executed on September 22, 2008 (the "Clarification Letter")).

1.    **APA**

8.    When executed on September 16, 2008, the APA purported to serve as the
operative document for the Sale Transaction, describing generally the cash and securities that
would be transferred to Barclays as part of the Sale Transaction.  In addition to certain real estate
transferred as part of the Sale Transaction, the APA generally provided for Barclays to pay $250
million cash plus up to $750 million in potential payments under a "true up" provision, receive
assets with a book value of $70 billion, receive 50% of the residential real estate mortgage
securities, and assume $69 billion in liabilities.

9.    Specifically, the original APA defined Purchased Assets to include:

(a) the Retained Cash; (b) all deposits . . . ; (c) the Transferred Real Property
Leases . . . ; (d) government securities, commercial paper, corporate debt,
corporate equity, exchange traded derivatives and collateralized short-term
agreements with a book value as of the date hereof *of approximately $70 billion* .
. . (e) 50% of each position in the residential real estate mortgage securities.[9]

10.    The APA did not contain a schedule setting forth the specific securities to be
transferred.  Indeed, the parties did not provide any elaboration regarding the securities included
in subsection (d).  The APA further provided for assumption of liabilities "with a book value as
of the date hereof of approximately $69 billion."[10]

11.    The APA also required Barclays to assume certain liabilities for contractual cure
payments and employee compensation (the "Cure and Compensation Liabilities").  In particular,
the APA allows Barclays to acquire contracts related to the acquired assets, after which Barclays
is "obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract."[11]
Barclays also agreed to retain certain employees and to "pay each Transferred Employee an
annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate,

---

[9]    Ex. 20, APA § 1.1 (definition of "Purchased Assets") (emphasis added).

[10]   Ex. 20, APA § 2.3(i).

[11]   Ex. 20, APA § 2.5

are equal to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation . . . ."[12]

## 2. FIRST AMENDMENT

12.     The First Amendment changed the APA's definition of "Purchased Assets" to provide that all of LBI's residential real estate securities would be transferred to Barclays as security for clearing services provided by the Depository Trust Clearance Corporation ("DTCC").[13]  But this "Residential Adjustment" was only meant to secure certain "Guaranteed Obligations" with the DTCC; the parties claimed they would return those securities to the estates to the extent they were not needed to cover the Guaranteed Obligations.[14]

## B. COURT APPROVES SALE TRANSACTION FOLLOWING SEPTEMBER 19 HEARING

13.     During the bid procedures hearing on September 17, 2008, the Lehman Sellers summarized the components of the transaction as follows:

> [L]ooking at it from the net of this transaction, there will be approximately 1,700,000,000 dollars yielded out of this transaction .... [I]f you start with the billion seven hundred million dollars, which is the cash component, as Your Honor obviously read in the papers, there will be an exposure for 2.5 billion dollars in connection with the retention of these 10 to 12,000 employees.  In addition … in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts, are estimated to be a billion five hundred million dollars.  So we have four billion dollars right there ….  In addition … the purchaser is paying 250 million dollars for the goodwill of LBI.  So there you have 4,250,000,000 dollars in that respect ….  And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed.[15]

---

[12]  Ex. 20, APA § 9.1(c).

[13]  Ex. 21, First Amendment to APA § 3.

[14]  Ex. 21, First Amendment to the APA at § 4.

[15]  Ex. 22, Tr. Hearing 9/17/08 at 22:8-11; 23:21-24:12.

14.     During the Sale Hearing (September 19), the Lehman Sellers stated the Sale

Transaction was still being negotiated in the context of deteriorating market conditions and

outlined some changes made to the terms, including the following with respect to the cash and

securities to be transferred:

> Let me try to summarize the changes that were made to the transaction. In terms
> of the economic changes, they result largely because of the markets,
> unfortunately. And from the time that the transaction was actually entered into til
> now, the markets dropped and the value of the securities dropped as well. *So,
> originally, we were selling assets that had a value of seventy -- approximately
> seventy billion dollars. And today … we're only selling assets that have a value
> of 47.4 billion dollars. Barclays is assuming liabilities, however, of 45.5 billion
> dollars in connection with those assets. So that has not changed from the
> original transaction.* There was an upside sharing in the original transaction.
> There was going to be a true-up twelve months later on and that has been
> eliminated from this transaction. Barclays is still agreeing to pay the cure
> amounts on any leases that it assumes or that we assume and assign to it.
> Barclays is also agreeing to the same employee compensation arrangements. And
> it is also agreeing to pay the 250 million dollars of goodwill to LBI.[16]

15.     Counsel also briefly described how Barclays had assumed the Fed's financing of

LBI (i.e., the substitution of the Barclays-LBI Repurchase Agreement for the Fed Repurchase

Agreement and the provision of interim financing):

> Yesterday, as Your Honor has heard, Barclays basically stepped into the shoes of
> the Federal Reserve in connection with the Primary Dealer Credit Facility as to
> the 45.5 billion dollars Lehman borrowed last Monday and received the collateral
> that Lehman had posted in connection therewith.[17]

16.     However, counsel never said that the Barclays-LBI Repurchase Agreement would

become the vehicle through which more than $50 billion of securities would be transferred from

LBI to Barclays. The parties also made a number of statements designed to describe how the

Lehman Sellers were receiving fair consideration for their assets. For example, during cross-

---

[16]   Ex. 23, Tr. Hearing 9/19/08 at 46:20-47:15 (emphasis added).

[17]   Ex. 23, Tr. Hearing 9/19/08 at 63:16-22.

examination, McDade stated the Lehman Sellers had done a valuation of their assets to

determine that fair value was being realized:

> Q: Well, in the absence of a closing balance sheet having been prepared, can you
> please describe for the Court how it is that the debtor determined that fair value
> was being realized for the sale of those assets? ….
> A: The individual assets on the balance sheet, the trading inventory was bottoms
> up, meaning individual line item detail processed through all of our individual
> risk business units in coordination with the normal finance professionals who are
> incorporated into the valuation process.[18]

    17.    With respect to the residential mortgage securities, the Court was advised that

approximately $6 billion of the securities would be pledged to the DTCC as collateral for the

singular purpose of clearing trades, after which 50% of them would be returned to LBI:

> [DTCC COUNSEL:] So it was to facilitate the transaction as a friend to the transaction
> that this was done so that the business continues to operate today.  ***Now, the arrangement
> is that the whole six billion dollars of residential mortgages will be there and subject to
> settlement***.  But the anticipation is that once all these claims settle,* the trades that are
> from Wednesday through Monday settle, *there will not be a need for all of that
> collateral.  So what the amendment to the APA says is that the fifty percent will be
> returned.*[19]

    18.    The Committee neither objected to, nor affirmatively supported the Sale

Transaction.  Given the speed with which it was consummated, and the Committee's formation

and appointment only days before the Sale Hearing, the Committee advised the Court it simply

lacked sufficient time to conduct the appropriate due diligence needed in order to arrive at an

informed position.  The Committee clearly stated on the record:  "We're not affirmatively

supporting the transaction, Your Honor, because there has been insufficient time for us to really

do all the due diligence that we would feel should be done to take that next step of saying yes,

this is the best deal and we're supportive actively."[20]

---

[18]  Ex. 23, Tr. Hearing 9/19/08 at 109:5-15.

[19]  Ex. 23, Tr. Hearing 9/19/08 at 52:19-53:2 (emphasis added).

[20]  Ex. 23, Tr. Hearing 9/19/08 at 67:16-21 (emphasis added).

19.     Even though the Clarification Letter was not presented to the Court and was executed following the Sale Order (on Monday, September 22, 2008), it is listed among the approved transaction documents.[21] It also directed the Lehman Sellers "to (1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, ***provided that such additional documents do not materially change its terms***; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement."[22] During the Sale Hearing, the Lehman Sellers' indicated that the draft Clarification Letter was on its way to the Court and that the parties were "hoping to finalize and actually present the [Clarification Letter] to Your Honor whenever it comes down here,"[23] but never presented it during the hearing or any time thereafter.

20.     The Court entered the Sale Order in the early morning hours of September 20, 2008. Notably, it included a provision making even non-material modifications to the transaction documents subject to a written agreement "between the Committee, the Debtors and the Purchaser [Barclays]."[24]

---

[21]  Ex. 24, Sale Order, Introduction (referring to "that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008" in definition of "Purchase Agreement").

[22]  Ex. 24, Sale Order § 3 (emphasis added).

[23]  Ex. 23, Tr., Hearing 9/19/08 at 44:8-10.

[24]  Ex. 24, Sale Order § 25 ("The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, ***in a writing signed by such parties***, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.") (emphasis added).

**C.      CLARIFICATION LETTER**

21.      Following the Sale Hearing and entry of the Sale Order, the parties purported to

materially modify the terms of the Sale Transaction through the inaccurately self-titled

Clarification Letter, which is dated "[a]s of September 20, 2008," but which was not executed

until September 22, 2008.[25]  The Clarification Letter supersedes its predecessor agreements with

respect to the cash and securities transferred by replacing all sections in the APA and First

Amendment that govern the transfer of securities with the following provision:

> [W]ith respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in
> the Original Agreement, instead of the items referred to in such clauses, (A) the
> securities owned by LBI and transferred to Purchaser or its Affiliates under the
> Barclays Repurchase Agreement (as defined below) as specified in Schedule A
> previously delivered by Seller and accepted by Purchaser, (B) such securities and
> other assets held in LBI's "clearance boxes" as of the time of the Closing, which at
> the close of business on September 21, 2008 were as specified on Schedule B
> previously delivered by Seller and Accepted by Purchaser . . . and (C) exchange
> traded derivatives (and any property that may be held to secure obligations under
> such derivatives) and collateralized short term agreements.[26]

**D.      REPRESENTATIONS TO COMMITTEE AT SALE CLOSING; COMMITTEE'S
INVESTIGATION IN PURSUIT OF FINAL TRANSACTION RECONCILIATION**

22.      In connection with the closing -- after entry of the Sale Order, but before

consummation of the Sale Transaction -- the Committee was told the parties had agreed to

certain changes to the Sale Transaction, including:

---

[25]  Ex. 25, Clarification Letter (bearing the date September 20, 2008); see also Ex. 26, BCI-EX-
(S)-00007262, email sent 9/22/08 at 11:09 a..m. covering final Clarification Letter.

[26]  Ex. 25, Clarification Letter § 1(a)(ii).

- the pre-mark value of the Fed Portfolio Securities was \$49.9 billion[27] (though neither the date nor the method of that mark was clear) -- but that value had (purportedly based on an updated mark-to-market) declined to between \$44 billion and \$45 billion;

- to compensate for that decline, LBI had to transfer \$1.9 billion of additional securities that had not previously been pledged as collateral for the Fed Repurchase Agreement or that had otherwise not previously been contemplated to be transferred to Barclays (but that transfer would still leave Barclays with assets valued less than the liabilities it was assuming);

- the liabilities owing to the Fed being assumed by Barclays totaled \$45.5 billion; and

- Barclays was assuming an additional \$4.25 billion in liabilities.[28]

23. Shortly after the closing, the Committee began investigating the particulars of the transaction in an attempt to prepare a final reconciliation. In the course of that investigation, the Committee discovered discrepancies between the terms of the Sale Transaction as the Lehman Sellers and Barclays had represented them to the Committee and the Court and the recitation of those terms appearing in later-filed documents.

24. Specifically, in the weeks following the transaction, various parties asked the Court to rectify purported "mistakes" and resolve disputes. In particular, Barclays, JPMorgan Chase Bank, N.A. ("JPMC"), the DTCC, the Fed, and the trustee appointed in LBI's Securities Investor Protection Act proceeding (the "SIPA Trustee"), filed the following:

---

[27] At the Sale Hearing, the Lehman Sellers indicated the value of the Fed Portfolio Securities was \$47.4 billion. See Ex. 23, Tr. Hearing, 9/19/08 at 47:1-47:7.

[28] See Ex. 27, Declaration Of Saul Burian In Support Of Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "Burian Decl.") (Docket No. 493 in Case No. 08-1420 (JPM)) at 3 (¶ 10).

- the December 2008 Settlement Motion,[29] which purported to resolve disputes concerning the failure to transfer to Barclays not less than $7 billion from the Fed Portfolio and JPMC's subsequent failure to transfer $7 billion in cash to Barclays in replacement of such securities (which JPMC instead retained and applied to reduce LBI's obligations to it); and

- the January 2009 Settlement Motion,[30] which purported to resolve disputes concerning the failure by the DTCC to transfer to Barclays securities in LBI customer accounts (instead proceeding to wind down LBI's DTCC accounts and apply the securities to LBI obligations owing to the DTCC). As a result of the DTCC's actions, the SIPA Trustee agreed to provide Barclays with a "Make-Whole Payment" (as defined therein) that could total approximately $221 million.

25.    The Committee opposed the December Settlement Motion. In its Limited Objection,[31] the Committee argued, among other things, that the settlement's approval should be adjourned because it sought the Court's imprimatur of the settling parties' depiction of the facts and circumstances surrounding the Sale Transaction. Those findings did not comport with facts the Committee was gathering in connection with its attempts to reach a final reconciliation with respect to the assets transferred and liabilities assumed:

---

[29]    Motion Under 11 U.S.C. §§ 105 And 365 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement, filed on December 5, 2008 (the "December 2008 Settlement Motion") (Docket No. 387 in Case No. 08-1420 (JMP)).

[30]    Motion Under Fed. R. Bankr. P. 9019(a) For Approval of Settlement and Compromise, filed on January 22, 2009 (the "January 2009 Settlement Motion") (Docket No. 586 in Case No. 08-1420 (JPM)).

[31]    Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement, dated December 19, 2008 (Docket No. 453 in Case No. 08-1420 (JMP)) (the "Limited Objection").

| ISSUE | DECEMBER SETTLEMENT MOTION DEPICTION | FACTS RECOUNTED TO COMMITTEE |
|---|---|---|
| VALUE OF SECURITIES TRANSFERRED | Fed Portfolio totaling $49.7 was transferred to Barclays as collateral for funding LBI | The pre-mark valuation was $49.9 billion; the September 21 valuation had declined to between $44 and $45 billion; LBI would transfer an additional $1.9 billion of securities that previously had not been pledged[32] |
| VALUE OF ASSUMED LIABILITIES | Barclays assumed New York Fed liabilities totaling $45.0 billion | Barclays assumed Fed Repurchase Agreement liabilities totaling $45.5 billion and an additional $4.25 of additional assumed liabilities[33] |

The origins of the December 2008 Settlement Motion were unbeknownst to the Committee until only recently.



---

[32]     Compare Ex. 28, Affidavit of Shari Leventhal filed in Support of December Settlement Motion (the "Leventhal Aff.") ¶¶ 12-13 with, Ex. 27, Burian Decl. at ¶ 10. See Docket No. 493 in Case No. 08-1420 (JMP).

[33]     Compare Ex. 28, Leventhal Aff. ¶¶ 7, 9, 11-12, with, Ex. 28, Burian Decl. ¶ 10.



27.     Promptly following the hearing on the Limited Objection, the Committee began requesting documents and information from Barclays on an informal basis.  The documents Barclays ultimately produced, however, were largely indecipherable.  Moreover, Barclays did not provide a final reconciliation or a balance sheet identifying the specific assets transferred, the specific liabilities assumed and their respective values.

28.     In May 2009, the Debtors also requested discovery from Barclays in furtherance of their own investigation into the Sale Transaction pursuant to Bankruptcy Rule 2004 (the "Rule 2004 Motion") (Docket No. 3596).  The Committee joined in the Rule 2004 Motion and, in an effort to avoid duplication, coordinated its investigative efforts with those of the Debtors.  Extensive discovery followed, including the production of tens of thousands of pages of documents and more than 20 depositions.

### III.     FACTS REVEALED IN RULE 2004 DISCOVERY



(footnote continued)







---

39 ██████████████████████████████████████████

40 ████████████████████

41 ████████████████████

42 Ex. 23, Tr. Hearing 9/19/08 at 127:13-16 (McDade) ("Q. And I think there was a question, but I just want to be clear. There is a closing condition regarding eight employees signing up agreements, is that correct?   A. That is correct."); Ex. 23, Tr. Hearing 9/19/08 at 149:11-16 (Ridings) ("Q. Okay. Are you aware, sir, of the provision in the asset purchase agreement that requires contracts to be negotiated with eight key employees?   A. Yes.   Q. Is it your understanding that that is a closing condition?   A. Yes.").



44 ████████████████████

45 ████████████████████



---

46

47

48

49

50

51  Ex





57

58

59

60

61

62

(footnote continued)



---

63 

64

65 <u>Ex. 20</u>, APA, at § 9.1(c) ("On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus . . . in respect of the 2008 Fiscal Year that, in the aggregate are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on ***that financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and purchaser***.") (emphasis added)



66

67

68 <u>Ex. 34</u>, APA Schedule;

(footnote continued)





71

72

73

74



75

76

77

(footnote continued)



[78]

[79]

(footnote continued)



[80]

[81]

[82]

[83]

(footnote continued)





---

[86] <u>Ex. 25</u>, Clarification Letter § 13.

[87] <u>Ex. 25</u>, Clarification Letter § 1.







---





(footnote continued)





110 Ex. 23, Tr. Hearing, 9/19/08 at 100:1-4 ("Barclays is also assuming the cure amounts relating to contracts and leases that will be assumed pursuant to the asset purchase agreement. And that has a (footnote continued)



potential exposure, Your Honor, of 1.5 billion dollars that he would testify to.") (reading McDade proffer).



35



58.

## IV.     JURISDICTION AND VENUE

59.     This Court has jurisdiction over this motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.  The statutory predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Federal Rule 60(b) and Bankruptcy Rule 9024.



119 _____ Ex. 20, APA § 9.1(c).

## V.     ARGUMENT

60.     Section 105(a) of the Bankruptcy Code authorizes the Court to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.  See 11 U.S.C. §§ 105(a).

61.     Federal Rule 60(b) enables the Court to relieve "a party or a party's legal representative from a final judgment, order or proceeding . . . [for] (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence . . . (3) fraud, misrepresentation, or misconduct by an opposing party . . . [and] (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b).  See also Fed. R. Bankr. P. 9024 ("Rule 60 F.R.Civ.P. applies in cases under the Code").  Sale orders entered under section 363(b) of the Bankruptcy Code are subject to challenge under Rule 60(b).[123]

62.     Rule 60(b) motions are addressed to the Court's discretion, and equitable principles may influence the decision whether to award relief.  See Grace v. Bank Leumi Trust Co. of NY, 443 F.3d 180, 187 (2nd Cir. 2006) ("Federal Rule of Civil Procedure 60(b) decisions by district courts are accorded deference.  We reverse only where there has been an abuse of discretion."); Matter of Emergency Beacon Corp., 666 F.2d 754, 760 (2nd Cir. 1981) ( "A motion under Rule 60(b) is addressed to the sound discretion of the trial court."); In re Benhil Shirt Shops, Inc., 87 B.R. 275, 277 (S.D.N.Y. 1988) (citing Wright & Miller, Federal Practice and Procedure: Civil § 2857) ("Decisions under Fed. R. Civ. P. 60(b) are solidly within the

---

[123]     Cf. FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 286 (7th Cir. 2002) ("[T]he order approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits that Fed. R. Civ. P. 60(b) imposes."); In re Rome Family Corp., 407 B.R. 65, 80 (Bankr. D. Vt. 2009) (citing Matter of Met-L-Wood Corp., 861 F. 2d 1012, 1016-18 (7th Cir. 1988)).  See also In re Ray, 2008 WL 544876, 5 (Bankr. W.D. Wash. February 26, 2008) ("A review of numerous circuit and bankruptcy court decisions indicates that other than the appeal of the sale order, the only method to collaterally attack a sale is by a motion to vacate the sale order under Fed. R. Civ. P. 60(b) ..."); In re CHC Industries, Inc., 389 B.R. 767, 775 (Bankr. M.D. Fla. 2007) ("To challenge a Sale Order, a party may pursue the remedies provided by § 363 of the Bankruptcy Code or Rule 60(b) …").

equitable discretion of the court. A court must weigh the countervailing principles of deciding a claim on its merits and achieving a final result."); In re Govola, 306 B.R. 733, 737 (D. Conn. 2004) ("Rule 60(b) motions are, in general, addressed to the discretion of the court with equitable principles taken into account.").

### A. COMMITTEE IS ENTITLED TO RELIEF FROM SALE ORDER FOR MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT PURSUANT TO RULE 60(B)(1)

63.     "Generally [Rule 60(b)(1) remedies] the mistake of a party or his representatives." Matter of Emergency Beacon Corp., 666 F.2d 754, 758 (2nd Cir. 1981) (upholding lower bankruptcy court decision vacating portion of prior order).  Still, mistakes of fact or law by third parties also support reconsideration under Rule 60(b)(1).  See In re 310 Assocs., 346 F.3d 31, 34-35 (2d Cir. 2003) (holding that mistake of fact by a court is proper grounds for Rule 60(b)(1) relief).  Moreover, a misunderstanding among the parties provides a basis for Rule 60(b)(1) relief.  IF Realty L.P. v. Rochester Assocs., 92 F. 3d 752, 757 (8th Cir. 1996) ("The mistake in this case did not involve attorney error but a misunderstanding among the parties resulting in lack of mutual assent to the settlement agreement. This is precisely the type of mistake that Rule 60(b) is intended to redress.") (citing Sheng v. Starkey Lab., Inc., 53 F. 3d 192,194, n.6 (8th Cir. 1995) (remanding for hearing to determine whether there was mutual assent to settlement, because if not, then contract never existed)).

64.     The Court was presented with, and approved a transaction with the understanding that the Debtors sold assets valued at $47.4 billion to a purchaser that assumed liabilities totaling $45.5 billion (plus Cure and Compensation Liabilities).  The only documents before the Court at the time it entered the Sale Order were the APA and the First Amendment.

---

[124]   See, e.g.,

| ASSET PURCHASE AGREEMENT AND FIRST AMENDMENT | SALE HEARING | CLOSING (MODIFICATIONS REFLECTED IN CLARIFICATION LETTER) |
|---|---|---|
| • *Assets*: $70 billion long position (listed as $70 billion, though this is a negotiated figure; true figure could be $75 billion)<br><br>• *Liabilities Assumed*: $69 billion<br><br>• *Residential Mortgage Securities*. 50% of residential real estate mortgage securities | • *Assets*: $70 billion long position declined to $47.4 billion (figure could include implied $5 billion discount)<br><br>• *Liabilities Assumed*. $45.5 billion (plus Cure and Compensation Liabilities)<br><br>• *Residential Mortgage Securities*. 100% of residential real estate mortgage securities ($6 billion worth) will be pledge to secure DTCC clearing, but then returned to LBI | ████████████████ |

65.     The Court never approved the Clarification Letter.  Even though the Clarification Letter materially altered significant terms of the Sale Transaction, the parties never presented it to the Court for its review and consideration.  When the parties eluded to the Clarification Letter at the Sale Hearing, the Court was advised that it only was designed to "clarify" (not change) the transaction.[125]  Instead, it was the mechanism for very material changes: ██████████

---

[125]   Ex. 23, Tr., Hearing 9/19/08 at 48:5-17 ("Some other changes that were made to the contract affect what are called purchase assets and what are excluded assets.  There was some confusion as to which subsidiaries, if any, were being sold. And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here. But in that letter, we're going to clarify that the only subsidiaries that are being purchased by Barclays are Lehman Brothers Canada Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA.  The latter two subsidiaries that I just referred to relate to a business that is called PIM, or Private Investment Management Business, which is a business that was not part of the original deal but is now being purchased by Barclays").



66.    Moreover, the Clarification Letter purported to rescind the noticed termination of the Barclays-LBI Repurchase Agreement, and thus attempt to avoid the effect of relevant portions of the Bankruptcy Code.  Barclays issued a Notice of Termination with respect to the Barclays-LBI Repurchase Agreement on September 19, 2008.[126]  That termination would have, under section 559 of the Bankruptcy Code, resulted in the haircut ███████████ ████████████ becoming property of the estates ██████████████ ███, it became necessary to "rescind" the termination notice.

67.    Indeed, the parties' ability to provide a detailed description of the changes brought about in the Clarification Letter suffered for good reason.  The Lehman Sellers and Barclays' principals continued to negotiate the material terms and contours of the Clarification Letter after entry of the Sale Order. ████████████████████

68.    ████████████████████

_____

[126] ████████████████

40

69.     Accordingly, even though the Sale Order provides for the approval of the "Purchase Agreement," and that definition includes the Clarification Letter, the actual text of the Sale Order cannot be read to authorize or approve the Clarification Letter.  Although no specific provision of the Sale Order endorses the contents of the Clarification Letter or the additional transfers it effectuates, in an abundance of caution, the Committee requests that the Court conform the Sale Order to the terms of the transaction presented to the Court and strike any reference to approval of the Clarification Letter.

70.     To the extent the Court decides that the question of whether the Sale Order (and the Court) approved the Clarification Letter presents a request for declaratory relief that only can be resolved through the initiation of a declaratory judgment action, the Committee stands prepared to file the attached complaint for declaratory judgment seeking that relief.[127]  Indeed, the Committee submits the question of whether the Court (and the Sale Order) approved the Clarification Letter is a threshold issue that should be resolved first.  Should the Court conclude that the Clarification Letter was not approved, then that determination may obviate the question of whether Rule 60(b) relief from the Sale Order is required.  It also leads to the conclusion that the transfers consummated under the Clarification Letter were not authorized and hence subject to avoidance under section 549 of the Bankruptcy Code.

---

[127]  ████████████████████████

**B.    NEWLY DISCOVERED EVIDENCED UNEARTHED THROUGH RULE 2004
DISCOVERY WARRANTS RELIEF FROM SALE ORDER UNDER RULE 60(B)(2)**

71.    Since the Court entered the Sale Order, myriad facts have been discovered that
simply were not presented for the Court's consideration.  These include, without limitation:



128

129

.

- █████████████████████████████████████████████████

72.     Each of these newly-discovered facts demonstrate the Sale Transaction that was consummated differed significantly from the transaction described to the Court.

## C.     RELIEF FROM SALE ORDER UNDER 60(B)(3) IS APPROPRIATE

73.     Rule 60(b)(3) serves to modify or vacate an order approving an asset sale where an adverse party's "fraud or misrepresentation ... prevented the movant from fully litigating the issue." In re Rickel & Associates, Inc., 272 B.R. 74, 86-87 (S.D.N.Y. 2002) (holding Rule 60(b)(3) motion to vacate a sale order "raises factual issues and will be tried together with the issues raised in [a corresponding adversary] complaint"); see also In re Lawrence, 293 F.3d 615, 624-26 (2nd Cir. 2002) (noting bankruptcy court's statement that "[i]f there were misrepresentations at the time of the sale, this Court approved such sale not fully knowing all the salient facts" and ordering the district court to grant Rule 60(b)(3) relief). Moreover, Rule 60(b)(3) allows the Court to grant relief from the Sale Order based on misrepresentations made at the Sale Hearing whether intentional or not. See Londsdorf v. Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995) ("[Rule] 60(b)(3) applies to both intentional and unintentional misrepresentations").

74.     The facts unearthed reveal that the terms of the transaction as consummated differ from those represented to the Committee:

| ISSUE | TRANSACTION AS CONSUMMATED | FACTS RECOUNTED TO COMMITTEE |
|---|---|---|
| VALUE OF SECURITIES TRANSFERRED | ███████████████ | The pre-mark valuation was $49.9 billion; the September 21 valuation had declined to between $44 and $45 billion; LBI would transfer an additional $1.9 billion of securities that previously had not been pledged[130] |
| VALUE OF ASSUMED LIABILITIES | ███████████████ | Barclays assumed Fed Repurchase Agreement liabilities totaling $45.5 billion and $4.25 of additional assumed liabilities[131] |

75. The transaction that closed similarly differed from the one presented to the Court. The Court initially was presented with information leading to the inevitable conclusion that the transaction was not meant to provide an immediate economic gain to either party but instead result in the transfer of $70 billion of assets and the assumption of $69 billion in liabilities. Those figures again purportedly dropped to $47.4 billion and $45.5 billion (plus Cure and Compensation Liabilities). ████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

### D.   RULE 60(B)(6) PROVIDES A BASIS FOR RELIEF

76. Granting the Committee Rule 60(b) relief in the instant case comports squarely with the importance placed on disclosure and transparency in bankruptcy sales. See Rosenshein v. Kleban, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) (noting "integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets"); See In re Dunning Bros. Co., 2009 Bankr. LEXIS 2427, at *31 (Bankr. E.D. Cal. Sept. 4, 2009) ("There is an important bankruptcy policy to be enforced that is grounded on the premise that the integrity of the

---

[130]   Compare Ex. 28, Leventhal Aff. ¶¶ 12-13 with Ex. 29, Burian Decl. at ¶ 10.

[131]   Compare Ex. 28, Leventhal Aff. ¶¶ 7, 9, 11-12, with Ex. 29, Burian Decl. ¶ 10.

bankruptcy system depends in large part on full, candid, and complete scheduling of assets by debtors"); <u>Frontier Farm Credit v. Schwartz (In re Schwartz)</u>, 2008 Bankr. LEXIS 1795, at *16 (Bankr. D. Kan. June 10, 2008) ("Debtor candor is essential to the orderly operation of the system. This Court categorically condemns the conduct of a debtor who (1) fails to schedule a remainder interest of substantial value; [and] (2) sells part of that interest during a chapter 11 case without seeking this Court's approval as is required by § 363 . . . .") (internal footnote omitted); <u>In re Superior Crewboats, Inc.</u>, 374 F.3d 330, 335 (5th Cir. 2004) ("The Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims; the duty is continuous.").



77. In light of the facts revealed and statements made to the Court and the Committee concerning the Sale Transaction, and the extent to which the consummated transaction differed from the approved transaction, the Committee submits it has identified ample "other reasons justifying [Rule 60(b)] relief."

### E. BY GRANTING THE RELIEF REQUESTED HEREIN, ESTATES ARE PROVIDED AN OPPORTUNITY TO RECOVER EXCESS VALUE TRANSFERRED TO BARCLAYS IN THE SALE TRANSACTION

78. By relieving the Committee of the Sale Order's approval of the Clarification Letter (to the extent the Sale Order can be said to have approved the Clarification Letter), the Court will empower the estates (and the Committee, should it obtain derivative standing) to recover billions in unauthorized transfers and other amounts specifically determined to be property of the estate under the Bankruptcy Code.

1. **IF SALE ORDER DID NOT APPROVE CLARIFICATION LETTER, OR IF RELIEF FROM SALE ORDER IS AUTHORIZED TO REMOVE CLARIFICATION LETTER FROM SALE ORDER, THEN TRANSFERS CONSUMMATED PURSUANT THERETO ARE RECOVERABLE UNDER SECTION 549 OF BANKRUPTCY CODE**

79.     Section 549 of the Bankruptcy Code permits a trustee to "restore the estate to the financial condition it would have enjoyed if the [unauthorized] transfer had not occurred . . . ." In re Centennial Textiles, Inc., 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998). The principal purpose of section 549 is to assure creditors "that the estate's fiduciary complies with applicable distribution law and Court orders." In re Contractor Technology, Ltd., 343 B.R. 573, 584 (Bankr. S.D. Tex. 2006) (holding "Creditors of the estate should have confidence that the estate's fiduciaries-from the moment of the order for relief-control the distribution of the estate's assets"). See also Collier on Bankruptcy ¶ 549.02 (15th ed. rev. 2006) ("The purpose of section 549 is to allow the trustee to avoid those postpetition transfers which deplete the estate while providing limited protection to transferees who deal with the debtor. Fraud by the debtor and, except with respect to purchasers of real property, good faith on the part of the transferee are irrelevant to the application of this section.").

80.     Any additional value provided to Barclays pursuant to the Clarification Letter beyond what was disclosed to the Court,



. See Mora v. Vasquez (In re Mora), 199 F.3d 1024, 1026 (9th Cir. 1999) ("If a trustee seeks to recover a postpetition transfer under section 549 . . . the trustee must show that a transfer occurred after the filing of the bankruptcy petition and that the transfer was not authorized by either the bankruptcy court or the Code.").

REDACTED PURSUANT TO CONFIDENTIALITY STIPULATION
AND PROTECTIVE ORDER, DATED JULY 16, 2009

### 2. UNDER SECTION 559, THE EXCESS COLLATERAL IN FORM OF "HAIRCUT" IS ESTATE PROPERTY

81.     Section 559 of the Bankruptcy Code provides, in part, that:

> In the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, *any excess of the market prices received on liquidation of such assets* … *over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate* . . . .

11 U.S.C. § 559 (emphasis added).

82.     ███████████████ Barclays provided official notice to LBI that Barclays was terminating the Barclays-LBI Repurchase Agreement.[132]  At that moment, the excess collateral representing the haircut became property of the estate through operation of section 559.  Apparently realizing this after the fact, the Clarification Letter attempts to re-write history.  At the end of the clause providing for the repurchase collateral to become "purchased assets," the Clarification Letter includes the following language: "Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void ab initio in all respects."[133]  The purpose of the language is clear -- to avoid the requirements of section 559.  The fate of the haircut under the Barclays-LBI Repurchase Agreement fits the contours of section 559 precisely, and the Court should not countenance a secret attempt to sweep extra assets to Barclays that undoubtedly belonged to the estates.

### F.     COURT SHOULD ORDER IMMEDIATE ACCOUNTING

83.     Any relief the Court may provide -- whether pursuant to Rule 60(b) or after an adversary proceeding -- will require an understanding of the specific identity and value of the assets transferred to Barclays.  To date, final transaction reconciliations and detailed balance

---

[132]     ███████████████████████████

[133]     Ex. 25, Clarification Letter.

sheets have eluded the Committee, despite nearly a year of pursuing them. The Committee

therefore moves the Court to order an immediate accounting and reconciliation of the assets it

received (including an accounting of any assets it sold).

84.     Barclays' witnesses have said there was a reconciliation process following the

transaction, but Barclays has yet to produce the result of that exercise. Barclays publicly

reported earnings that included gains "on acquisition."[134]  The gain reflected on Barclays'

financial statements surely resulted from an accounting and reconciliation of what it received as

a result of the Sale Transaction. Moreover, McDade testified to this Court that there had been a

valuation and accounting for the assets transferred up to the point of the Sale Hearing:

> Q. Does Lehman have any valuations -- internal valuations of any of the assets
> that are being transferred to Barclays?
> A. Absolutely. There are many complex securities involved.  Many different
> models that we use to evaluate those securities.
> Q. And so, sir, is it your testimony then that a valuation was conducted within
> Lehman of all of the assets that are being transferred to Barclays? When was that
> conducted?
> A. Portfolio moved during the week, but that was conducted all last evening. All
> through and up to the arrangement -- the agreement today.
> 
>                     *          *          *
> 
> Q. Did you do an audit of the -- I'm sorry. Has an audit been accomplished of the
> securities that are to be transferred to Barclays under the proposed transactions?
> A. If you mean an audit by external valuation process?
> Q. By identification of the securities?
> A. Absolutely, line by line.[135]

85.     Accordingly the Committee seeks an order requiring a reconciliation and

accounting within 10 days detailing (1) the identity and value of the assets transferred through

the termination of the Barclays-LBI Repurchase Agreement, (2) the identity and value of all

other assets transferred pursuant to the terms of the Clarification Letter or otherwise as a result of

---

[134]  ██████████████████████████████

[135]  <u>Ex. 23</u>, Tr. Hearing 9/19/08 at 109:19-110:3; 126:21-127:1.

the Sale Transaction, (3) valuations of each asset transferred as of the date of the transfer, and (4) any disposition of such assets.

## VI.    JOINDER IN DEBTORS' RULE 60(B) MOTION

The Committee joins in the Debtors' Rule 60(b) Motion (to the extent not inconsistent herewith), specifically the relief requested and arguments set forth therein.  The Committee reserves the right to be heard at any hearing in connection with the Debtors' Motion, to present evidence, to cross examine witnesses and proffer arguments.

## VII.    JOINDER IN SIPA TRUSTEE'S RULE 60(B) MOTION

The Committee joins in the SIPA Trustee's Rule 60(b) Motion (to the extent not inconsistent herewith).  The Committee reserves the right to be heard at any hearing in connection with the SIPA Trustee's Motion, to present evidence, to cross examine witnesses and proffer arguments.

# VIII.  CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court enter an order (A) granting the Committee relief from the Sale Order to the extent it purports to approve material modifications to the Sale Transaction that were not disclosed to the Court; (B) revising the Sale Order (1) to remove approval of the Clarification Letter from the Sale Order to the extent it materially modified the Sale Transaction approved by the Court; and (2) to amend the Purchased Assets definition so that it contains assets with a fair value, as of the closing date, that is no greater than the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of the actual liabilities assumed by Barclays without the application of any secret or other $5 billion discount; (C) requiring a full a accounting and reconciliation of all Purchased Assets and assumed liabilities within 10 days of the entry of such Order (including any disposition of the same); (D) directing the return to the estates of the value of all Purchased Assets in excess of the above (with interest); and (E) awarding the Committee such further, different relief as the Court deems appropriate.

Dated:  September 15, 2009
        New York, New York

                    **QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP**

                    /s/ James C. Tecce
                    Susheel Kirpalani
                    James C. Tecce
                    Erica P. Taggart

                    51 Madison Avenue, 22nd Floor
                    New York, New York 10010
                    Telephone No.:  (212) 849-7000

                    *Special Counsel to the Official Committee Of
Unsecured Creditors Of Lehman Brothers
Holdings Inc., et al.*