1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al

        Debtors.

- - - - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        One Bowling Green

        New York, New York

        September 17, 2008

        4:28 PM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1   HEARING re Debtor's Motion Pursuant to Section 1015(b) of the

2   Federal Rules of Bankruptcy Procedure Requesting Joint

3   Administration of Chapter 11 Cases

4

5   HEARING re Motion for an Order Pursuant to Section 105(a) of

6   the Bankruptcy Code Directing that Certain Orders in the

7   Chapter 11 Case of Lehman Brothers Holdings Inc. be Made

8   Applicable to LB 745 LLC

9

10  HEARING re Debtor's Motion Pursuant to Section 105(a) of the

11  Bankruptcy Code and Bankruptcy Rule 1015(c) and 9007 Seeking

12  Authority to Implement Certain Notice and Case Management

13  Procedures

14

15  HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

16  Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

17  Approve the Sale of the Purchased Assets and the Assumption and

18  Assignment of Contracts Relating to the Purchased Assets

19

20  HEARING re Motion for Order (i) Authorizing Debtor to Obtain

21  Post-Petition Financing Pursuant to Sections 363 and 364 of

22  Bankruptcy Code; (ii) Granting Liens and Superpriority Claims

23  to Post-Petition Lenders Pursuant to Section 364 of Bankruptcy

24  Code; and (iii) Scheduling Final Hearing

25  Transcribed by:   Lisa Bar-Leib

22

1  hearing on this?  That's why, Your Honor, we have come forward
2  today.  We want to go forward.  And I would point out, Your
3  Honor, we are not asking for any real substantive relief today
4  with respect to the sale motion.  We are asking Your Honor to
5  set a hearing for Friday afternoon.  And the only sensitive --
6  I'll call it somewhat sensitive issue is the approval of the
7  breakup fee.

        Now, Your Honor, we are talking about a transaction that has, as I said, many, many parts.  But looking at it from the net of this transaction, there will be approximately 1,700,000,000 dollars yielded out of this transaction.

        UNIDENTIFIED SPEAKER:  A billion.

        MR. MILLER:  I'm sorry?

        UNIDENTIFIED SPEAKER:  A billion.

        MR. MILLER:  You know, I always think of Senator Dirksen, Your Honor.  He said a billion here and a billion there.  Pretty soon you're talking about real money.

        THE COURT:  Well, you're talking about real money here.

        MR. MILLER:  Absolutely, Your Honor.  And so we have 1,700,000,000 dollars.  There has been an enormous effort put into this by the prospective purchaser, Barclays Capital, Your Honor.  And in the negotiations, quite properly, with all of the efforts that they have put into it, there was a request -- I should say a request, almost a demand, for a breakup fee.

23

1   And there were negotiations in respect of that amount.  And
2   what it came out to be, Your Honor, was a proposed breakup fee
3   of a hundred million dollars plus reimbursement of expenses of
4   up to twenty-five million dollars.
5            THE COURT:  May I ask you a question --
6            MR. MILLER:  Yes, sir.
7            THE COURT:  -- about how to equate that breakup fee
8   and expense reimbursement with the purchase price?  And I've
9   attempted to assess the notional value of the transaction
10  because in addition to the 1.7 billion dollars, there's a
11  reference to 1.5 billion dollars in cure amounts and possibly
12  as much as 2.5 billion dollars in certain employee related --
13           MR. MILLER:  Yes, sir.
14           THE COURT:  -- severance expenses which may or may
15  not be triggered.  For purposes of my evaluating the fairness
16  of the overall proposed breakup fee and expense reimbursement
17  as a percentage of the transaction, not that I need to do that
18  but frequently Courts are viewed as approving breakup fees
19  within a certain market range.  How should I view the fair
20  value of the overall transaction?
21           MR. MILLER:  I think, Your Honor, if you start with
22  the billion seven hundred million dollars, which is the cash
23  component, as Your Honor obviously read in the papers, there
24  will be an exposure for 2.5 billion dollars in connection with
25  the retention of these 10 to 12,000 employees.

24

1       In addition to that, Your Honor, in connection with
2   the assumption and assignment of contracts, the cure amounts
3   and other payments in connection with the contracts, are
4   estimated to be a billion five hundred million dollars. So we
5   have four billion dollars right there, Your Honor.
6       In addition, Your Honor, the purchaser is paying 250
7   million dollars for the goodwill of LBI. So there you have
8   4,250,000,000 dollars in that respect, Your Honor.
9       And then, Your Honor, in the interim, LBI has entered
10  into an arrangement with the prospective purchaser where
11  there's a repo agreement in which they are backing up and
12  allowing these repos to be settled and to be financed. In
13  addition, if this goes forward, there will be a support
14  agreement for this interim period of two or three days where
15  Barclays Capital will be on premises, will be offering
16  oversight and in the sole discretion, may be willing to advance
17  some monies in the interim period.
18      So the problem we had, Your Honor, there are so many
19  different elements in this transaction that to do the usual
20  calculation of whether it should be two percent, three percent,
21  etcetera, became enormously complex during the course of the
22  proceedings. As Your Honor knows, as these transactions go up
23  in value, very often the breakup fee goes up in value. And
24  this -- if Your Honor just took the 1.7, I would say to Your
25  Honor, it's above three percent, clearly above three percent.

25

1        THE COURT: I know. I did the calculation.

2        MR. MILLER: Yes, Your Honor. But this is -- again,
3 I have to use the expression, this is such a unique
4 transaction. And there's been so much effort and there is so
5 much exposure. Senior executives at Barclays likewise, like
6 the rest of us slaves, never went to sleep from Sunday right
7 through last night.

8        So, I think, Your Honor, there's an extra quota of
9 consideration that has to be given in connection with this
10 transaction. And I would also bear in mind, Your Honor, that
11 what are the prospects of a competitive bid. This is such a
12 fragile asset. And it is not an asset that people did not know
13 was for sale. For months now, Lehman Brothers has been
14 pursuing strategic alternatives. The market has known that
15 aspects of Lehman, or even all of Lehman, were available for
16 purchase or investment. So that -- I'm not going to call it
17 shopworn Your Honor, but that the public, the financial
18 markets knew that these assets were for sale. And we had a
19 benefit, Your Honor. We were lucky because Barclays had been
20 negotiating to acquire Lehman. Unfortunately, that was one of
21 the things that might have been but never turned into fruition.
22 But as the part of that process, at least they had some
23 familiarity. And that was not a long negotiation either, Your
24 Honor. It was two days, basically. Unfortunately, because of
25 various regulations in the UK, that transaction could not have

```
                                                                 107
 1   October 2nd is -- that's seventeen days out, which is the date
 2   we had put in there and penciled.  Well, Rosh Hashanah is
 3   earlier that week, so it's after the holiday.  We just want to
 4   make sure that worked for your calendar because we haven't had
 5   an opportunity to consult with your calendar.
 6            THE COURT:  I'm here.
 7            MS. SCHWEITZER:  Okay.  Do you prefer the morning or
 8   the afternoon?
 9            THE COURT:  I have a regular calendar that day, so we
10   better do it in the afternoon.  I'd say -- let's do that one at
11   3:00.
12            MS. SCHWEITZER:  3:00.
13            THE COURT:  All right?
14            MR. WAISMAN:  Your Honor, I believe that concludes
15   the calendar.  Thank you very much.
16            THE COURT:  Thank you all, and we'll wait around
17   until we hear from you about the DIP.
18            ALL:  Thank you, Your Honor.
19            THE COURT:  And I am bench-ordering that approved.
20            ALL:  Thank you.
21       (Whereupon these proceedings were concluded at 7:48 p.m.)
22
23
24
25
```

```
                                                               108
 1
 2                           I N D E X
 3
 4                          R U L I N G S
 5    DESCRIPTION                                   PAGE     LINE
 6    Debtor's bidding procedures package approved   72       18
 7    subject to adjustments according to
 8    representations made orally on the record
 9
10
...
25
```

```
                                                                    109
 1
 2                         C E R T I F I C A T I O N
 3
 4      I, Lisa Bar-Leib, certify that the foregoing transcript is a
 5      true and accurate record of the proceedings.
 6            Lisa Bar-Leib   Digitally signed by Lisa Bar-Leib
                              DN: cn=Lisa Bar-Leib, c=US
                              Reason: I am the author of this document
 7                            Date: 2008.09.19 10:48:43 -04'00'
 8      LISA BAR-LEIB
 9
10      Veritext LLC
11      200 Old Country Road
12      Suite 580
13      Mineola, NY 11501
14
15      Date:   September 18, 2008
16
...
25
```

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400