UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION :
CORPORATION, :
: 
               Plaintiff, :
:
             v. :
:
LEHMAN BROTHERS INC., :
:
             Debtor. :
:
------------------------------------------------------------X

## DECLARATION OF SHARI D. LEVENTHAL IN SUPPORT OF TRUSTEE'S MOTION FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. § 1746, SHARI D. LEVENTHAL declares as follows:

1.     I am Assistant General Counsel and Senior Vice President at the Federal Reserve Bank of New York ("New York Fed"). In that capacity, except where stated otherwise, I have personal knowledge of the matters set forth in this declaration. I submit this declaration in support of the Motion for Entry of An Order Approving a Settlement Agreement filed by James W. Giddens as Trustee for the Securities Investor Protection Act ("SIPA") liquidation of the business of Lehman Brothers Inc. ("LBI").

### Background

2.     On Friday evening, September 12, 2008, an historic meeting began at the New York Fed's head office in downtown Manhattan. Participating in this meeting were the senior management of the New York Fed, the Chairman of the Securities and Exchange Commission, the Secretary of the Treasury, and the most senior leadership of

the major global financial firms. The goal of the meeting was to find a way to rescue Lehman Brothers, which was on the verge of insolvency. All of the participants recognized the impact that a Lehman bankruptcy filing could have on an already fragile financial system.

3. The effort to save Lehman was directed toward an acquisition of the firm and it naturally focused on possible suitors. By Saturday, September 13th, two institutions had expressed interest in acquiring Lehman, Bank of America and Barclays Capital. By mid-day Saturday, Bank of America had found another bride, which left Barclays Capital as the one viable party. By Sunday, September 14th, the major global financial firms agreed to facilitate an acquisition by financing some of the transaction. All were hopeful that Lehman would be saved.

4. For Lehman to continue as a viable entity pending closing of the deal, it was necessary for the purchaser to guarantee all of Lehman's short-term obligations. This guarantee was vital to stave off the effects of a panic that would likely result from the markets' reaction to Lehman's condition. By mid-day on Sunday, September 14th, however, it became apparent that a number of technical legal issues arising under the laws of the United Kingdom presented a barrier that would become insurmountable.

5. By Sunday evening it became certain that an acquisition of Lehman by Barclays was not possible. Lehman's Board of Directors, therefore, made the decision that Lehman Brothers Holdings International ("Lehman Holdings") would commence a voluntary Chapter 11 case on September 15th.

6. LBI, the broker-dealer subsidiary of Lehman Holdings, did not commence a Chapter 11 case on September 15th. This represented a carefully thought out decision that would enable LBI to continue to operate so as to facilitate an orderly wind down of its trading positions. To keep LBI operating, however, its operations and payroll had to be funded. The New York Fed agreed to finance LBI overnight. JPMorgan Chase Bank, N.A. ("JPMC"), as LBI's clearing bank, agreed to provide certain intra-day funding.

7. On Tuesday, September 16th, Barclays returned with an offer to purchase certain assets, and assume certain liabilities, of LBI. Recognizing that Barclays' offer provided an opportunity for an orderly transfer of thousands of customer accounts, as well as the possibility of preserving the jobs of thousands of LBI employees, the New York Fed decided to support the transaction. However, we also explained to Barclays that the New York Fed's commitment to provide overnight funding for LBI was based on the assumption that we were facilitating an orderly wind down of the business. If Barclays wanted the New York Fed to continue funding LBI so as to facilitate an orderly transition (instead of an orderly wind down), and thus assist with the implementation of Barclays' purchase-and-assumption agreement, then Barclays needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction. Barclays and the New York Fed entered an agreement on the morning of September 17th to the effect that Barclays would take over the New York Fed's place in providing Lehman overnight funding.

8. On the night of September 17th, the New York Fed was funding Lehman through various lending programs: the Primary Dealer Credit Facility

("PDCF"), the Term Securities Lending Facility ("TSLF"), and Open Market Operations ("OMO"). The PDCF is a financing facility, where the New York Fed funds dealers using the repurchase agreement ("repo") form. Open Market Operations are, by contrast, transactions done by the New York Fed to implement monetary policy directives of the Federal Open Market Committee. These OMO transactions are also done in the form of repos. The TSLF is not a cash lending facility. Rather, through the TSLF, the New York Fed lends U.S. Treasury securities against other forms of collateral.

9. Overnight on September 17th, the New York Fed had the following exposures to LBI:

   a. $20.43 billion in cash against $23.866 billion in collateral through the PDCF;

   b. $7.0 billion in cash against $7.159 billion in collateral through OMO; and

   c. $18.79 billion in treasury securities against $19.596 billion in other collateral through the TSLF.

In total, the New York Fed had funded LBI $46.22 billion in cash and Treasury securities against $50.62 billion in collateral.

10. On the morning of September 18th, in accordance with the terms of the applicable repurchase agreements, the New York Fed's PDCF and OMO positions with LBI were unwound. As a result of Barclays' agreement to take out the New York Fed's exposures to LBI, the TSLF contract with LBI was terminated. The New York Fed was paid cash, and the Treasury securities borrowed by Lehman were delivered back. The securities that the New York Fed had held overnight on September 17th were

returned to LBI through its account at JPMC. JPMC then funded LBI intra-day on September 18th.

11.     Beginning in the afternoon of September 18th, Barclays initiated the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been transferred by Barclays to LBI.

12.     Pursuant to the repurchase agreement between Barclays and LBI (the "September 18th Repo"), which was the form selected by Barclays to fund LBI overnight, LBI was to provide Barclays with approximately $49.7 billion in securities in return for the $45 billion in cash funded by Barclays. This ratio was consistent with the ratio of cash to securities used in the New York Fed's repurchase agreement with LBI on the night of September 17th.

13.     As the Court knows, the events of the week of September 15th as they related to Lehman Holdings and LBI were unprecedented in nature, and they unfolded at an unprecedented speed, in turbulent markets. The effect of these events was to push the operational components of the financial system nearly to their limits. It is not surprising, therefore, that the intended transfer of $49.7 billion in securities from LBI to Barclays on the night of September 18th came with a hitch.

14.     Notwithstanding that both Depository Trust Company ("DTC") and the Fedwire Securities Service remained open for several hours past their normal closing times in an effort to complete this transaction, operational issues interfered with

the ability to transfer all of the intended securities to Barclays. When, at 11 PM, DTC had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo.

15. LBI, therefore, agreed, either late on the night of September 18th, or early in the morning of September 19th, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMC. The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds to LBI. The transfer of securities, however, did not occur prior to the entry by the United States District Court for the Southern District of New York on September 19, 2008 of the Order Commencing Liquidation ("LBI Liquidation Order") pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

16. I have been informed by JPMC that, after the Subject Funds were transferred by LBI to an account at JPMC, as described above, JPMC caused the Subject Funds to be transferred to an LBI account at JPMC.

17. As a result of the operational issues that arose on the night of September 18th, and JPMC's transfer of the Subject Funds to an LBI account at JPMC, LBI was unjustly enriched. LBI had both Barclays' cash (the $45 billion transferred on September 18th), and approximately $7 billion in securities that had been intended to be transferred to Barclays.

## The Settlement Agreement

18.    Barclays' purchase of LBI's assets and its assumption of certain liabilities pursuant to an Asset Purchase Agreement was approved by the Court in the early hours of September 20th.

19.    Only after the purchase transaction closed on Monday, September 22nd, did Barclays learn that the Subject Funds it believed were in its account at JPMC had been transferred to LBI's account. This is crucial to understanding paragraph 13 of the September 20th letter from Barclays to Lehman Holdings that sought to clarify the intention of the parties with respect to certain provisions of the Asset Purchase Agreement (the "Clarification Letter"). Some of the provisions of the Clarification Letter were discussed during conference calls in which I participated on Sunday, September 21st. During those calls, Barclays' representatives made statements that clearly reflected their belief that the Subject Funds were in Barclays' account at JPMC.

20.    Because Barclays believed that the $7 billion was in its account, it agreed in the Clarification letter that:

> all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement . . . shall be deemed to constitute part of the Purchased Assets . . . . Seller and Purchaser shall be deemed to have no further obligations to each other under the [September 18th Repo] (including, without limitation, any payment or delivery obligations), and . . . the [September 18th Repo] shall terminate.

21.    When Barclays learned for the first time, on or about September 23rd, that it had neither all of the securities intended to be transferred under the September 18th Repo, nor the Subject Funds, Barclays came to the New York Fed.

Barclays sought the New York Fed's assistance in facilitating negotiations with JPMC regarding JPMC's movement of the Subject Funds. The proposed settlement agreement is the result of those negotiations.

22. The proposed settlement agreement provides that Barclays will receive the securities that remain from the pool of LBI securities previously held by the New York Fed under its repo with LBI on the night of September 17th and that were intended to have been transferred to Barclays under the September 18th Repo. These securities are identified in Annex A to the Settlement Agreement as the "Settlement Consideration Fed Portfolio Securities". I have been told that some of the securities that the New York Fed held on the night of September 17th have since been liquidated by JPMC. To make up for the shortfall resulting from those liquidations, and the decline in the value of the remaining securities since September 19th, the proposed settlement provides that Barclays is to receive $1.25 billion in cash. In addition, approximately $7.1 million of cash would also be provided to Barclays in the proposed settlement, representing proceeds of certain Settlement Consideration Fed Portfolio Securities that were inadvertently liquidated by JPMC after the parties reached agreement on the terms of the proposed settlement.

23. The securities and cash that Barclays will receive under the proposed Settlement will come from LBI accounts at JPMC. JPMC has a lien on these accounts, and, consequently, on the relevant cash and securities which Barclays will receive. JPMC has agreed to release its liens on the above-mentioned cash and securities to facilitate this settlement.

24.  The proposed settlement is, in the New York Fed's opinion, a fair one. It addresses the unjust enrichment to the LBI estate caused by the operational failures on September 18th and 19th, and restores the parties, and the LBI estate, to the positions they would have been in had the September 18th Repo been executed as originally planned. It is also, in the New York Fed's opinion, consistent with the intent of the Clarification Letter.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

_____
Shari D. Leventhal