WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                          :
In re                                     :   Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :   08-13555 (JMP)
                                          :
                      Debtors.            :   (Jointly Administered)
                                          :
-------------------------------------------------------------------x
```

## NOTICE OF MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 AND SECTION 363 OF THE BANKRUPTCY CODE FOR AUTHORITY TO CONSUMMATE TRANSACTIONS CONTEMPLATED IN THE CHAPTER 11 PLAN PROPOSED BY THE LEHMAN LENDERS IN THE SUNCAL CHAPTER 11 CASES

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Commercial Paper Inc. ("LCPI" and together with its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession, the "Debtors"), pursuant to

Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and section 363 of title 11 of the United States Code (the "Bankruptcy Code") authorizing LCPI

(i) to propose, along with certain of LCPI's non-debtor affiliates, a chapter 11 plan of

reorganization for certain debtors whose chapter 11 cases are being jointly administered in the

United States Bankruptcy Court for the Central District of California (the "SunCal Debtors") and

(ii) to enter, along with certain of LCPI's non-debtor affiliates, into the transactions

contemplated therein, as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **October 7, 2009 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy

Court for the Southern District of New York, shall set forth the name of the objecting party, the

basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon: (i) the Chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Shai Waisman,

Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy

Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and

Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these

cases; (v) Winthrop Couchot P.C., 660 Newport Center Drive, Ste 400, Newport Beach, CA

92660, Attn: Paul J. Couchot, attorneys for the SunCal Debtors that have commenced voluntary cases under chapter 11 of the Bankruptcy Code; and (vi) The Lobel Firm, LLP, 840 Newport Center Drive, Suite 750, Newport Beach, CA 92660, Attn: William N. Lobel, attorneys for the SunCal Debtors that have filed involuntary petitions for relief under Chapter 11 of the Bankruptcy Code, so as to be so filed and received by no later than **October 2, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 16, 2009
    New York, New York

        /s/ Shai Y. Waisman
        Shai Y. Waisman

        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Telephone: (212) 310-8000
        Facsimile: (212) 310-8007

        Attorneys for Debtors
        and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                              :
**In re**                                                     :        **Chapter 11 Case No.**
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :        **08-13555 (JMP)**
                                                              :
                                        **Debtors.**          :        **(Jointly Administered)**
                                                              :
------------------------------------------------------------------x

**MOTION OF LEHMAN COMMERCIAL PAPER INC.**
**PURSUANT TO FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE 6004 AND 9019 AND SECTION 363 OF THE**
**BANKRUPTCY CODE FOR AUTHORITY TO CONSUMMATE**
**TRANSACTIONS CONTEMPLATED IN THE CHAPTER 11 PLAN**
**PROPOSED BY THE LEHMAN LENDERS IN THE SUNCAL CHAPTER 11 CASES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors-in-possession, the "Debtors," and

collectively with their non-debtor affiliates, "Lehman"), files this motion (the "Motion") and

respectfully represents:

**<u>Preliminary Statement</u>**

1. Prior to the commencement of the Debtors' chapter 11 cases, LCPI and three non-debtor Lehman affiliates, Lehman ALI, Inc. ("<u>Lehman ALI</u>"), OVC Holdings LLC ("<u>OVC Lender</u>"), and Northlake Holdings LLC ("<u>Northlake Lender</u>" and together with LCPI, Lehman ALI and OVC Lender, the "<u>Lehman Lenders</u>"), provided over $2 billion in senior secured financing (the "<u>Financing</u>") to certain indirect subsidiaries (the "<u>SunCal Borrowers</u>") of SCC Acquisitions, Inc. ("<u>SCC Acquisitions</u>") pursuant to various separate loan agreements. After the commencement of the Debtors' chapter 11 cases, certain of the SunCal Borrowers became voluntary debtors (the "<u>SunCal Voluntary Debtors</u>")[1] or involuntary debtors (the "<u>SunCal Involuntary Debtors</u>" and together with the SunCal Voluntary Debtors, the "<u>SunCal Debtors</u>")[2] in cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "<u>California Bankruptcy Court</u>").

2. To increase the prospect for recovery by the Lehman Lenders from the SunCal Debtors, the Lehman Lenders have proposed a joint chapter 11 plan for certain of the SunCal Debtors (the "<u>Proposed Plan</u>"), a copy of which is attached hereto as <u>Exhibit A</u>. If the Proposed Plan is confirmed by the California Bankruptcy Court, pursuant to such plan, LCPI may be required to enter into certain settlements or compromises with other creditors of the SunCal Debtors and to use certain assets of its estate outside the ordinary course of its business.

---

[1] The SunCal Voluntary Debtors are Palmdale Hills Property, LLC; SunCal Bickford Ranch, LLC; SunCal Emerald Meadows, LLC; Acton Estates, LLC; SunCal Summit Valley, LLC; Seven Brothers, LLC; Kirby Estates, LLC; SunCal Beaumont Heights, LLC; SunCal Johannson Ranch, LLC; SunCal Communities I, LLC; SJD Development Corp.; SunCal Communities III, LLC; SCC/Palmdale, LLC; SJD Partners, Ltd.; North Orange Del Rio Land, LLC; Tesoro SF LLC; and SCC Communities LLC.

[2] The SunCal Involuntary Debtors are SunCal Century City, LLC; SunCal Oak Knoll, LLC; SunCal Torrance Properties, LLC; SunCal Marblehead, LLC; SunCal Heartland, LLC; LB/L-SunCal Northlake, LLC; LB/L-SunCal Oak Valley, LLC; SunCal PSV, LLC and Delta Coves Venture, LLC.

Specifically, pursuant to the Proposed Plan, the Lehman Lenders would collectively, among other things, make available an amount of up to $15 million to settle certain equitable subordination claims made against the Lehman Lenders by the SunCal Debtors on behalf of non-Lehman unsecured creditors of the SunCal Debtors. Additionally, the Lehman Lenders, and/or any other entity that either asserts to be or is determined by the California Bankruptcy Court to be the owner of any of the loans (or any portion thereof under which the Lehman Lenders have provided Financing (together with the Lehman Lenders, the "Lehman Creditors") would have the right to credit bid on certain of the properties securing the Financing. Accordingly, LCPI requests, pursuant to section 363 of the Bankruptcy Code and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authority to enter into and consummate the transactions set forth in the Proposed Plan in the event that the Proposed Plan is confirmed by the California Bankruptcy Court.[3]

### Background

3. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. and the other Debtors commenced with this Court voluntary cases under chapter 11 the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[3] For the avoidance of doubt, LCPI is not seeking a determination by this Court that the Proposed Plan is confirmable. LCPI and the other Lehman Lenders will abide by the procedures established by the California Bankruptcy Court for proposing and confirming the Proposed Plan.

4. On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

5. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

6. On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

### Jurisdiction

7. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

8. Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

9. Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

### Lehman's Relationship with the SunCal Debtors

10.     Prior to the commencement of their chapter 11 cases, the SunCal Debtors' businesses focused upon the development of residential land in California.  Over the past five years, the Lehman Lenders became the SunCal Debtors' largest funding source for financing, pursuant to various separate loan agreements, secured by deeds of trust on certain of the SunCal Debtors' real estate projects and certain cash collateral and other assets of the SunCal Debtors' estates.  In the aggregate, the SunCal Debtors owe in excess of $2 billion in respect of the Financing.

11.     Of the over $2 billion owed by the SunCal Debtors in respect of the Financing, in excess of $630 million is owed collectively under (i) that certain Credit Agreement, dated as of November 17, 2005, by and among SunCal Communities I, LLC ("SunCal I") and SunCal Communities III, LLC ("SunCal III"), as borrowers, and LCPI, as syndication and administrative agent and sole lender, among other parties (as heretofore amended, the "SunCal Communities Loan Agreement") and (ii) that certain Credit Agreement, dated as of February 8, 2007, by and between Palmdale Hills Property, LLC ("Palmdale Hills"), as borrower, and LCPI, as administrative agent and lender (as heretofore amended, the "Ritter Ranch Loan Agreement").

12.     Pursuant to the SunCal Communities Loan Agreement, SunCal I and SunCal III, as borrowers, and certain other SunCal Debtors, as guarantors, each are indebted thereunder, individually and collectively, in the approximate aggregate amount of $343 million. The obligations of SunCal I and SunCal III under the SunCal Communities Loan Agreement are secured by pledges of 100% of the membership interests of SunCal I in SunCal Johannson Ranch, LLC SunCal Beaumont Heights, LLC, SunCal Summit Valley, LLC ("Summit Valley"), SunCal Emerald Meadows, LLC ("Emerald Meadows") and SunCal Bickford Ranch, LLC

("Bickford Ranch"); deeds of trust on the real properties owned by Bickford Ranch, Emerald Meadows, and Acton Estates, LLC; and pledges of 100% of the membership interests of Summit Valley in Kirby Estates, LLC and Seven Brothers, LLC.

13.     Palmdale Hills owes approximately $287 million under the Ritter Ranch Loan Agreement.  The obligations of Palmdale Hills are secured by a deed of trust in the property known as Ritter Ranch, which is owned by Palmdale Hills.[4]

14.     In addition to the over $2 billion owed by the SunCal Debtors in respect of the Financing, the SunCal Debtors owe in excess of $200 million to certain other third-party creditors.  While the SunCal Debtors' obligations to their creditors aggregate to in excess of $2.2 billion, the SunCal Debtors collectively own real estate projects and certain related cash with an estimated collective value of only $350 million to $600 million.

15.     Between November 6, 2008 and November 19, 2008, chapter 11 petitions were voluntarily filed by the seventeen SunCal Voluntary Debtors and were involuntarily filed by creditors of and against the nine SunCal Involuntary Debtors.

16.     In January 2009, the SunCal Debtors commenced an adversary proceeding in the SunCal Debtors' chapter 11 cases (the "Adversary Proceeding") seeking, among other things, to subordinate all of the Lehman Lenders' claims to payment in full of all unsecured claims against all of the SunCal Debtors (the "Equitable Subordination Action").  The SunCal

---

[4] LCPI repo'd the entirety of the loan evidenced by the the the SunCal Communities Loan Agreement and the term loan portion of the loan evidenced by the Ritter Ranch Loan Agreement to Fenway Capital Funding LLC ("Fenway") pursuant to a repurchase agreement.  The California Bankruptcy Court ruled that the transfer of such loans to Fenway pursuant to the repurchase agreement constituted the sale of such loans.  Notwithstanding the foregoing, LCPI believes that it holds economic interests in the loan made pursuant to the SunCal Communities Loan Agreement and the Ritter Ranch Loan Agreement.  The Lehman Lenders reserve all of their rights in connection with the California Bankruptcy Court's ruling regarding the repurchase transactions, including, without limitation, the right to appeal the ruling and to assert that the transactions under the repurchase agreement constituted transfers for security and not outright sales.  All of the Lehman Lenders' rights in connection therewith are hereby reserved. Regardless, LCPI is the undisputed owner of the revolving loan portion of the loan evidenced by the Ritter Ranch Loan Agreement, pursuant to which Palmdale Hills owes LCPI approximately $43.6 million.

Debtors twice amended their complaint in the Adversary Proceeding, and, thereafter, the Lehman Lenders moved to dismiss the second amended complaint. On June 11, 2009, the California Bankruptcy Court granted the Lehman Lenders' motion to dismiss the second amended complaint, with leave to further amend the complaint, on the grounds that the SunCal Debtors had failed, among other things, to state certain claims, make allegations with sufficient particularity, tie specific defendants to inequitable conduct, or sufficiently identify the alleged injured creditors. In July 2009, the SunCal Debtors filed a third amended complaint, in response to which the Lehman Lenders intend to file yet another motion to dismiss.

17. SCC Acquisitions, the indirect parent of each of the SunCal Debtors, and the SunCal Voluntary Debtors have filed a chapter 11 plan (the "<u>Competing Plan</u>") for the SunCal Debtors, and in connection therewith, a disclosure statement and three amended disclosure statements in support of the Competing Plan. The Competing Plan is premised on a favorable ruling in the Equitable Subordination Action and requires a substantive consolidation of the SunCal Debtors' estates in order to reallocate from one SunCal Debtor to the other SunCal Debtors any surplus recovery against the Lehman Lenders on account of the Equitable Subordination Action, which litigation could take years to resolve. Absent success by the SunCal Debtors in the Equitable Subordination Action, the Competing Plan does not provide any recovery for any general unsecured creditors of any of the SunCal Debtors (with the possible exception of certain holders of bond claims against bond insurers who issued bonds for the benefit of certain of the SunCal Debtors).

**The Proposed Plan**

18. As a counterpoint to the Competing Plan, the Lehman Lenders have filed with the California Bankruptcy Court the Proposed Plan for 24 of the 26 SunCal Debtors (the

"SunCal Plan Debtors"),[5] a copy of which is attached hereto as <u>Exhibit A</u>, and a disclosure statement for the Proposed Plan, a copy which is attached hereto as <u>Exhibit B</u> (the "<u>Disclosure Statement</u>"). A hearing for approval of the Disclosure Statement is scheduled before the California Bankruptcy Court on October 15, 2009.

19.     There is no guarantee that the Proposed Plan will be confirmed by the California Bankruptcy Court; however, the Proposed Plan will increase the prospect for the Lehman Lenders' recovery of the debts owed by the SunCal Plan Debtors and enable a reasonable and timely resolution of the SunCal Plan Debtors' chapter 11 cases.

20.     The salient terms of the Proposed Plan are as follows:[6]

***The Proposed Sale***     The Lehman Creditors would credit bid, with respect to some or all of the projects on which they have deeds of trust or pledges of equity interests to secure the related loans (such projects being referred to as the "<u>Properties</u>") an amount equal to the appraised fair market value of the Properties, at one or more auctions through which there would either be a sale pursuant to section 363 of the Bankruptcy Code to a third party purchaser or a court sanctioned foreclosure and conveyance to an entity designated by the Lehman Lenders, or any of them, to take title to a Property as to which a Lehman Creditor is the successful bidder (the "<u>Lehman Nominees</u>") (in either case, free and clear of all liens, claims and encumbrances other than those that are determined to be senior to the Lehman Lenders' liens) (the "<u>Proposed Sale</u>"). The Lehman Creditors would be permitted, but not obligated, to further credit bid up to the amount of their debt on the applicable Properties. If a Lehman Lender is not the successful bidder as to a particular Property, the proceeds from the sale of such Property to a third party purchaser will be deposited into a cash escrow to be established pending the outcome of the Equitable Subordination Action. The maximum amount to be deposited into the cash escrow is $200 million. This amount (the "<u>Maximum Security Amount</u>") would also provide a cap on the amount secured by the Cash Escrow

[5] Two SunCal Voluntary Debtors, SunCal III and SJD Development Corp., are not included in the Proposed Plan because they have no assets with any significant value.

[6] This summary of the Proposed Plan (this "<u>Summary</u>") is qualified in its entirety by the terms set forth in the Proposed Plan. This Summary is intended to be used for information purposes only and shall not, in any way, affect the meaning or interpretation of the Proposed Plan. Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Proposed Plan.

and the Security Properties (each as defined below under *Protection for Creditors*).

**Equitable Subordination Claims**

The Proposed Sale and all other terms of the Proposed Plan will be without prejudice to the respective rights, defenses and positions of the parties in the Equitable Subordination Action except as described below under *Substantive Consolidation*.

**Protection for Creditors**

In order to provide a *res* for the Allowed ES Claimants (as defined below) to pursue if the Property-owning SunCal Plan Debtors are successful in equitably subordinating the Lehman Lenders' liens on the Properties to the claims of the Allowed ES Claimants in the prosecution of the Equitable Subordination Action (collectively, the "ES Claim Component") and for allowed general unsecured claimants to pursue if there is a recovery in respect of a fraudulent conveyance action on certain of the Properties (collectively, the "Avoidance Action Component"), (a) the Lehman Lenders would allow a liquidating trustee to hold in a cash reserve (the "Cash Escrow") all cash and cash equivalents held in reserve accounts for the benefit of LCPI or any other Lehman Lender and securing the obligations under the Ritter Ranch Loan Agreement or securing any of the other loans as of the closing of the Proposed Sale (following the use or reserve for the use of such cash as provided for in the Proposed Plan) (the "Project Cash"),[7] and (b) the Lehman Nominees would grant deeds of trust with respect to their Properties (collectively, the "Security Properties") for the benefit of the liquidating trustee to secure recovery in respect of the ES Claim Component or the Avoidance Action Component up to the proposed Maximum Security Amount (i.e. there would not be recourse to the Lehman Nominees beyond the Security Properties). The Lehman Nominees would have full right to sell, refinance, manage and operate the Security Properties in all respects after the Proposed Sale, subject to certain conditions to protect the creditors' interests.

**Substantive Consolidation**

In all respects pertaining to the Equitable Subordination Action, the Lehman Lenders would reserve their rights to contest substantive consolidation. The Lehman Lenders would, however, agree not to contest any de facto substantive consolidation that is effectuated after the conclusion of the Equitable Subordination Action solely for the purpose of administering and distributing any recoveries resulting from any judgment obtained in connection with the Equitable

---

[7] The current amount of the cash held by the SunCal Debtors constituting cash collateral of the lenders under the Ritter Ranch Loan Agreement (the "Ritter Cash") is approximately $22 million. Other cash constituting cash collateral of the Lehman Creditors with respect to other loans made to the SunCal Debtors is approximately $2-4 million. The Lehman Lenders anticipate that a portion of the Ritter Cash in an amount to be determined may be used to fund payments to settling creditors electing the Settlement Option as described below.

Subordination Action among allowed beneficiaries of the ES Claim Component (the "<u>Allowed ES Claimants</u>").  The proceeds of a security pool, comprised of the Cash Escrow and Security Properties (the "<u>Security Pool</u>"), would be available to satisfy any such judgment.  Essentially, the Lehman Lenders would agree to subordinate their deficiency claims to the distribution rights of the Allowed ES Claimants up to the amount of any judgment or recovery in respect of the ES Claim Component of the Equitable Subordination Action.  Additionally, the Lehman Lenders would waive any arguments that no judgment is possible in the Equitable Subordination Action in favor of the creditors of SJD Partners, Ltd. (the former owner of the project known as Pacific Point, and which entity has no real estate assets) and North Orange Del Rio Land, LLC (which entity has no real estate assets) in an amount exceeding the value of the assets held by the applicable SunCal Debtors (subject, however, to the overall limitation to recovery from the Security Pool in the Maximum Security Amount).

*The Settlement Option*    The Lehman Lenders would make available an aggregate amount equal to $15 million (the "<u>Settlement Payment</u>") to pay ES Claimants (as defined below) who prefer to settle their ES Claims (as defined below) for cash payments (such option to be exercised by the ES Claimants prior to the consummation of the Proposed Plan) in full settlement of such ES Claims, provided that such ES Claimants execute and deliver unconditional, irrevocable and general releases in favor of the Lehman Lenders, the Lehman Nominees, any future owners of the applicable Property or Properties and all other defendants in the Equitable Subordination Action and their respective affiliates (the "<u>Settlement Option</u>").  The Settlement Payment would be funded from the Project Cash, if available, or otherwise from the Lehman Lenders' own sources.

Notwithstanding the foregoing, if (i) ES Claimants holding at least two-thirds of all ES Claims of a particular SunCal Debtor (in dollar amount), and (ii) at least one-half of all ES Claimants (in number) of such particular SunCal Debtor exercise the Settlement Option, then the Settlement Option would be applicable to and binding upon all ES Claimants of such SunCal Debtor including those ES Claimants who opposed the Settlement Option, did not exercise the Settlement Option or otherwise elected not to accept the Settlement Option.

For purposes of the foregoing two paragraphs, "<u>ES Claim</u>" means an allowed claim against one or more of the Property-owning SunCal Plan Debtors (not including any claims held by the Lehman Lenders and certain other entities more specifically set forth in the Proposed Plan) to which the Lehman Lenders' liens and security interests are sought to be equitably subordinated in the Equitable Subordination

Action and "ES Claimant" means any holder of an ES Claim.

*ES Litigation Funds*   If present SunCal Plan Debtors' litigation counsel resigns for any reason whatsoever, Lehman ALI would agree to make available to the SunCal Plan Debtors debtor-in-possession loans in an aggregate amount of up to $1 million which will accrue interest at 10% and which may be used solely for the payment of reasonable out-of-pocket expenses (but not any legal fees) of any counsel retained by the SunCal Plan Debtors on a contingency fee basis to prosecute the Equitable Subordination Action.

*Additional Funding*   The Lehman Lenders (or any one of them) also would make available necessary funding to confirm the Proposed Plan and enable its implementation either directly, up to an amount of $5 million, and/or from the Project Cash.

## Relief Requested

21.     LCPI requests, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019, authority to enter into and consummate the transactions set forth in the Proposed Plan in the event that the Proposed Plan is confirmed by the California Bankruptcy Court.

## The Proposed Plan Fits the Legal Standard
## Established Under Rule 9019 and is in the Bests Interests of LCPI's Estate

22.     The Proposed Plan, including the Settlement Payment, is in LCPI's best interests and should be approved under Bankruptcy Rule 9019.  Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  In granting a motion pursuant to Rule 9019(a), a court must find that the proposed settlement is fair and equitable and is in the best interests of the estate.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

23.     The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  It is the responsibility of a court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness."  *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

24.     While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation.  *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).  "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact….  The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness."  *Nellis*, 165 B.R. at 123 (internal citations omitted).

25.     The Court may give weight to the informed judgment of the debtor that a compromise is fair and equitable.  *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness….  If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.").

26.     LCPI has determined that the Settlement Payment provides the best framework for resolving its disputes with the ES Claimants in the Equitable Subordination Action.  The Lehman Lenders intend to file a motion to dismiss the SunCal Debtors' third amended complaint in the Adversary Proceeding that includes the Equitable Subordination Action.  Nonetheless, the Lehman Lenders' prospects for their success in the Equitable Subordination Action are uncertain, and the litigation of such action will be prolonged and costly.  As a result, pursuant to the Proposed Plan, the Lehman Lenders will make available the Settlement Payment of $15 million to pay ES Claimants who prefer to settle their ES Claims upon consummation of the Proposed Plan for cash payments.  Each settling ES Claimant would receive a portion of the Settlement Payment based upon the amount of their ES Claim relative to all ES Claims.  LCPI's share of the Settlement Payment, if any, will depend upon which ES Claimants accept the Settlement Option and the relative proportion of all ES Claims that are held by settling ES Claimants related to the projects securing the loans made under the Ritter Ranch Loan Agreement and the SunCal Communities Loan Agreement.

27.     In exchange for the Settlement Payment, the settling ES Claimants would execute and deliver unconditional, irrevocable and general releases in favor of the Lehman Lenders, the Lehman Nominees, any future owners of the Properties and all other defendants in the Equitable Subordination Action and their respective affiliates.  If ES Claimants holding at least two-thirds of the dollar amount of the ES Claims of a particular SunCal Debtor agree to accept the Settlement Option, then the Settlement Option would be applicable to, and binding upon, all ES Claimants of such SunCal Debtor.

28.     In short, by making available the Settlement Payment, the Lehman Lenders will increase the likelihood that they will avoid protracted, expensive and uncertain

litigation in the Equitable Subordination Action and thereby increase their prospects for recovery from the SunCal Plan Debtors.

29. The cost of settling the Equitable Subordination Action, from which the prospect of success through litigation is uncertain, is outweighed by the benefits of obtaining, on a consensual basis, releases from the ES Claimants who accept the Settlement Option, which in turn increases the likelihood that the Lehman Lenders will realize a recovery with respect to the Financing. In light of such benefits, the Settlement Payment is fair and reasonable. As a result, the Proposed Plan benefits LCPI, its estate, and its creditors.

**The Proposed Plan is an Appropriate Exercise of LCPI's Business Judgment**

30. Ample authority exists for approval of the Proposed Plan and the transactions contemplated therein pursuant to section 363 of the Bankruptcy Code. Section 363 provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. *See in re Global Crossing, Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represents the 'business judgment test'.") (quoting *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999)); *see*, *e.g. In re Delphi Corp.*, 2009 WL 637315, at * 9 (Bankr. S.D.N.Y. Mar. 10, 2009) (applying the business judgment rule). The business judgment rule is "a strong presumption that in making a business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal citations and quotations omitted). Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence. *Id.* Further, parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity. *Id.* (quotation omitted).

31.     LCPI has determined, in the sound exercise of its business judgment, that entry into and consummation of the transactions contemplated in the Proposed Plan are in the best interests of LCPI's estate and creditors. SunCal Plan Debtors owe in excess of $2 billion in respect of the Financing. Of that amount, the SunCal Debtors owe approximately $630 million in respect of the Ritter Ranch Loan Agreement and the SunCal Communities Loan Agreement. Pursuant to the Proposed Plan, the Lehman Creditors would be obligated to credit bid a minimum amount (based on appraisal amounts) on certain of the Properties and would be permitted, but not obligated, to credit bid up to the amount of their debt on each of such Properties at one or more auctions for such Properties pursuant to section 363 of the Bankruptcy Code (or a court sanctioned foreclosure and conveyance to a Lehman Nominee). Because each of the Lehman Creditors would be credit bidding for the Properties, and thus only bidding up to the amount of its security interest in each of the Properties, the Proposed Sale allows each of them to potentially obtain a recovery on the Financing without using any additional assets in the auction process.

32.     LCPI believes that the terms set forth in the Proposed Plan are fair and reasonable under the circumstances. To allow the Lehman Lenders to potentially obtain the Properties free and clear of all liens, claims and encumbrances and in light of the pending

Equitable Subordination Action, the Lehman Creditors will create a Security Pool to provide an alternative *res* for the ES Claimants to pursue in the event that the SunCal Plan Debtors that currently own the Properties are successful in the Equitable Subordination Action. Specifically, the Lehman Lenders would allow a liquidating trustee to hold the Cash Escrow, and the Lehman Nominees would grant deeds of trust with respect to the Security Properties in favor of such liquidating trustee. Notwithstanding the creation of the Security Pool, the Lehman Lenders will also attempt to resolve their disputes with the ES Claimants in the Equitable Subordination Action by making available the Settlement Payment of $15 million. As discussed, the Settlement Payment will increase the likelihood that the Lehman Lenders will avoid costly, protracted and uncertain litigation.

33. Additionally, the Lehman Lenders would make available any funding necessary to confirm the Proposed Plan and enable its implementation either directly, up to an amount of $5 million, and/or from the use of Project Cash (the "Implementation Funds"). If the Implementation Funds are drawn from the Ritter Cash (or any other Project Cash) and used to pay settling ES Claimants all or a portion of the Settlement Payment, then the Lehman Lenders will determine the extent to which such Project Cash, which served as cash collateral for the Financing extended to a particular SunCal Plan Debtor, was used to make such Settlement Payment to another SunCal Plan Debtor's ES Claimants. Based upon such determination, the Lehman Lenders will endeavor to agree, amongst themselves, the extent to which the Lehman Lender whose Project Cash was used to make such Settlement Payment would be reimbursed or otherwise made whole by the other Lehman Lender(s) deriving a benefit from such Settlement Payment. To the extent that the Implementation Funds are drawn from the Ritter Cash (or any other Project Cash) and used by the Lehman Lenders for other permitted uses as described in the

Proposed Plan, then under the Proposed Plan, such use will constitute a post-confirmation loan made by the Lehman Lender having a security interest in such Implementation Funds and the SunCal Plan Debtors' estates will be jointly and severally liable to such Lehman Lender for the repayment of such funds and such repayment would be made in accordance with the distribution provisions of the Proposed Plan.

34.     While there is no guarantee that the Proposed Plan will be confirmed by the California Bankruptcy Court, the Proposed Plan provides a viable alternative to the Competing Plan.  The only other plan that has been proposed for the SunCal Debtors is the Competing Plan, which the Lehman Lenders believe is unfairly discriminatory at the expense of the Lehman Lenders.  The Competing Plan is premised on the SunCal Debtors' success in their attempts to substantively consolidate their estates and equitably subordinate the Lehman Creditors' claims to payment in full of all unsecured claims against all of the SunCal Debtors.  Given that the SunCal Debtors have only an estimated $350 million to $600 million in assets, if the Competing Plan is confirmed and the SunCal Debtors are successful in the Equitable Subordination Action and at their attempts to substantively consolidate, the Lehman Creditors are unlikely to obtain any recovery, let alone a significant recovery, from the SunCal Plan Debtors.

35.     The Lehman Lenders believe that the Competing Plan is not feasible and cannot be confirmed and intend to file an objection to the Competing Plan in the California Bankruptcy Court.  Nonetheless, absent this Court's approval of LCPI's ability to propose, enter into, and consummate the transactions in the Proposed Plan, the Lehman Lenders will be forced to continue to challenge the Competing Plan without the benefit of a viable alternative plan, and

as a result, LCPI's estate faces the increased prospect of being unable benefit from the value of its liens.

36.     Thus, the concessions of establishing the Security Pool for ES Claimants and making available the Settlement Payment and the Implementation Funds are far outweighed by the benefits to LCPI of potentially obtaining a recovery from the applicable SunCal Plan Debtors through the Proposed Sale.  Accordingly, in light of the undeniable benefits of the Proposed Plan to LCPI's estate and its reorganization, LCPI clearly has exercised sound business judgment, and an order authorizing LCPI to consummate the transactions set forth in the Proposed Plan.

## Relief Under Bankruptcy Rule 6004(h)

37.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Because the hearing to consider the approval of the Disclosure Statement is scheduled to be heard by the Disclosure Statement on October 15, 2009, LCPI respectfully requests that any order approving this Motion be effective immediately by providing that the 10-day stay is inapplicable.

## Notice

38.     No trustee has been appointed in these chapter 11 cases.  LCPI has served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the SunCal Debtors; and

(vii) all parties who have requested notice in these chapter 11 cases.  LCPI submits that no other

or further notice need be provided.

39.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE LCPI respectfully requests that the Court grant the relief requested

herein and such other and further relief as it deems just and proper.

Dated: September 16, 2009
       New York, New York


/s/ Shai Y. Waisman
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Exhibit A**

See Attached Proposed Plan

1  Richard M. Pachulski (CA Bar No. 90073)
   Dean A. Ziehl (CA Bar No. 84529)
2  Robert B. Orgel (CA Bar No. 101875)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5
   Edward Soto (admitted *pro hac vice*)
6  Shai Y. Waisman (admitted *pro hac vice*)
   WEIL, GOTSHAL & MANGES LLP
7  767 Fifth Avenue
   New York, NY  10153-0119
8  Telephone:  (212) 310-8000
   Facsimile:  (212) 310-8007
9
   Attorneys for Lehman Commercial Paper Inc., Lehman ALI,
10 Inc., Northlake Holdings LLC and OVC Holdings LLC

11              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
12                    SANTA ANA DIVISION

13 In re:                                Case No.: 8:08-bk-17206-ES
                                         Chapter 11
14 Palmdale Hills Property, LLC, and its Related
   Debtors,                             Jointly Administered Case Nos.
15                                       8:08-bk-17209-ES; 8:08-bk-17240-ES;
            Jointly Administered Debtors  8:08-bk-17224-ES; 8:08-bk-17242-ES;
16          and Debtors-In-Possession     8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                         8:08-bk-17227-ES; 8:08-bk-17246-ES;
17 _____   8:08-bk-17230-ES; 8:08-bk-17231-ES;
   Affects:                             8:08-bk-17236-ES; 8:08-bk-17248-ES;
18 ☐ All Debtors                        8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☑ Palmdale Hills Property, LLC       8:08-bk-17574-ES; 8:08-bk-17575-ES
19 ☑ SunCal Beaumont Heights, LLC       8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☑ SCC/Palmdale, LLC                  8:08-bk-17408-ES; 8:08-bk-17409-ES;
20 ☑ SunCal Johannson Ranch, LLC        8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☑ SunCal Summit Valley, LLC          8:08-bk-17470-ES; 8:08-bk-17472-ES;
21 ☑ SunCal Emerald Meadows, LLC        and 8:08-bk-17588-ES
   ☑ SunCal Bickford Ranch, LLC
22 ☑ Acton Estates, LLC                 JOINT CHAPTER 11 PLAN
   ☑ Seven Brothers, LLC                PROPOSED BY LEHMAN LENDERS
23 ☑ SJD Partners, Ltd.
   ☐ SJD Development Corp.              **Hearing:**
24 ☑ Kirby Estates, LLC                 Date:     October 15, 2009
   ☑ SunCal Communities I, LLC          Time:     2:00 p.m.
25 ☑ SCC Communities LLC                Place:    Courtroom 5A
   ☐ SunCal Communities III, LLC                  411 West Fourth Street
26 ☑ North Orange Del Rio Land, LLC               Santa Ana, CA  92701
   ☑ Tesoro SF, LLC
27 ☑ LB/L-SunCal Oak Valley, LLC
   ☑ SunCal Heartland, LLC
28 ☑ LB/L-SunCal Northlake, LLC

☑ SunCal Marblehead, LLC
☑ SunCal Century City, LLC
☑ SunCal PSV, LLC
☑ Delta Coves Venture, LLC
☑ SunCal Torrance Properties, LLC
☑ SunCal Oak Knoll, LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Table of Contents**

I.    INTRODUCTION ................................................................................................ 1
   1.1   Prefatory Statement. ....................................................................................... 1
   1.2   Plan Debtors. .................................................................................................. 2
   1.3   Plan Summary. ............................................................................................... 2
II.   DEFINITIONS AND RULES OF INTERPRETATION ..................................... 9
   2.1   Definitions. ..................................................................................................... 9
   2.2   Rules of Construction. .................................................................................. 44
III.  TREATMENT OF UNCLASSIFIED CLAIMS ............................................... 45
   3.1   Treatment of Allowed Administrative Claims. .............................................. 46
   3.2   Treatment of Priority Tax Claims. ................................................................ 48
   3.3   Treatment of Unavoided Liens Securing Claims That Are Not Allowed. ..... 48
IV.   CLASSIFICATION OF CLAIMS AND INTERESTS ..................................... 49
V.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...................... 65
   5.1   Treatment of Allowed Secured Real Property Tax Claims (Classes 1.1 through 1.20).... 66
   5.2   Treatment of Lehman Secured Claims (Classes 2.1 through 2.19)............... 67
   5.3   Treatment of Allowed Danske Secured Claim (Class 3). ............................ 70
   5.4   Treatment of Allowed Other Secured Claims (Classes 4.1 Through 4.15).... 71
   5.5   Treatment of Allowed Secured Mechanic's Lien Claims Against the Plan Debtors (Classes 5.1 through 5.54). ....................................................................... 72
   5.6   Treatment of Allowed Priority Claims (Classes 6.1 Through 6.4). ............... 74
   5.7   Treatment of Allowed General Unsecured Claims (Classes 7.1 Through 7.24). ............. 74
   5.8   Treatment of Allowed ES Claims (Classes 8.1 through 8.19). ..................... 75
   5.9   Treatment of Allowed Interests   (Classes 9.1 through 9.24)........................ 76
VI.   ACCEPTANCE OR REJECTION OF THE PLAN .......................................... 76
   6.1   Introduction. .................................................................................................. 76
   6.2   Who May Object to Confirmation of the Lehman Plan. ................................. 76
   6.3   Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims............................................... 77
   6.4   What Is an Allowed Claim/Interest. ............................................................. 77
   6.5   What Is an Impaired Class. .......................................................................... 77
   6.6   Who Is Not Entitled to Vote........................................................................... 77
   6.7   Who Can Vote in More than One Class. ...................................................... 78
   6.8   Votes Necessary for a Class to Accept the Lehman Plan. .......................... 78
   6.9   Treatment of Nonaccepting Classes. .......................................................... 78
   6.10  Request for Confirmation Despite Nonacceptance by Impaired Class(es). ... 79
VII.  MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ......... 79
   7.1   Introduction. .................................................................................................. 79
   7.2   The Liquidating Trustee. ............................................................................... 80
   7.3   Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee................ 81
   7.4   The Committee(s). ........................................................................................ 81
   7.5   Lehman Post-Confirmation Loans. ............................................................... 81
   7.6   Plan Reserve and Post-Confirmation Accounts. ......................................... 85
   7.7   Disposition of Assets.................................................................................... 86
   7.8   Disposition of the Remaining Real Estate Projects...................................... 86
   7.9   Equitable Subordination Claims. ................................................................ 101
   7.10  Post-Confirmation Expenses, Intercompany Loans and Payables and Priorities in Payment. ................................................................................ 107
   7.11  Plan Release. ............................................................................................. 112
   7.12  Entry of Final Decrees................................................................................ 113
   7.13  Dissolution of Committees and Discharge of Trustee and Liquidating Trustee. ........... 114
VIII.  DISTRIBUTIONS ........................................................................................ 114
   8.1   Distribution Agent........................................................................................ 114

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| 8.2 | Distributions. | 114 |
|---|---|---|
| 8.3 | Old Instruments and Securities. | 115 |
| 8.4 | De Minimis Distributions and Fractional Shares. | 115 |
| 8.5 | Delivery of Distributions. | 115 |
| 8.6 | Unclaimed Property. | 116 |
| 8.7 | Disposition of Unclaimed Property. | 116 |
| IX. | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS | 117 |
| 9.1 | Standing for Objections to Claims. | 117 |
| 9.2 | Treatment of Disputed Claims. | 117 |
| X. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 118 |
| 10.1 | Executory Contracts Being Assumed. | 118 |
| 10.2 | Executory Contracts Being Rejected. | 119 |
| 10.3 | Retention of Property Rights by Lehman Nominees or Liquidating Trustee. | 119 |
| 10.4 | Bar Date for Rejection Damages. | 119 |
| 10.5 | Cure Statements. | 120 |
| 10.6 | Changes in Rates Subject to Regulatory Commission Approval. | 120 |
| XI. | EFFECT OF CONFIRMATION OF THE PLAN | 120 |
| XII. | LIMITATION OF LIABILITY | 121 |
| 12.1 | No Liability for Solicitation or Participation. | 121 |
| 12.2 | Limitation of Liability. | 122 |
| XIII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 122 |
| 13.1 | Conditions Precedent to Plan Confirmation. | 122 |
| 13.2 | Conditions Precedent to Plan Effectiveness. | 123 |
| XIV. | RETENTION OF JURISDICTION | 123 |
| XV. | MODIFICATION OR WITHDRAWAL OF PLAN | 123 |
| 15.1 | Modification of Plan. | 123 |
| 15.2 | Nonconsensual Confirmation. | 123 |
| XVI. | MISCELLANEOUS | 124 |
| 16.1 | Payment of Statutory Fees. | 124 |
| 16.2 | Payment Dates. | 124 |
| 16.3 | Headings. | 124 |
| 16.4 | Other Documents and Actions. | 124 |
| 16.5 | Notices. | 125 |
| 16.6 | Governing Law. | 125 |
| 16.7 | Binding Effect. | 125 |
| 16.8 | Successors and Assigns. | 126 |
| 16.9 | Severability of Plan Provisions. | 126 |
| 16.10 | No Waiver. | 126 |
| 16.11 | Inconsistencies. | 126 |
| 16.12 | Exemption from Certain Transfer Taxes and Recording Fees. | 126 |
| 16.13 | Post-Confirmation Status Report. | 127 |
| 16.14 | Post-Confirmation Conversion/Dismissal. | 127 |
| 16.15 | Final Decree. | 128 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# I.

# INTRODUCTION

**1.1** **Prefatory Statement.** This *Joint Chapter 11 Plan Proposed by Lehman Lenders* (the "Plan" or "Lehman Plan")[1] is Filed by the Lehman Lenders.

The Plan essentially is a blueprint of how the Plan Debtors will be structured or liquidated after or as a result of bankruptcy – whether they will survive, the forms of entities they will be, who will own them, and what distributions will be made or required. Among other things, the Lehman Plan designates classes of Claims and classes of Interests, identifies unimpaired and impaired Classes, sets forth a proposal for the satisfaction of all Claims against, and Interests in, the Plan Debtors, and provides adequate means for the implementation of the Lehman Plan. With the Lehman Plan, Holders of Claims and Interests entitled to vote on the Lehman Plan will receive a Ballot for voting on the Lehman Plan and, for Holders of Allowed ES Claims, for voting on whether the Liquidating Trustee should accept or reject, on behalf of and for the benefit of the ES Claimants, the proposed settlement of the Equitable Subordination Claims made in an ES Action against one or more Lehman Related Parties (the "ES Settlement Offer").

A separate document, entitled *Disclosure Statement With Respect to Joint Chapter 11 Plan Proposed By Lehman Lenders* (the "Lehman Disclosure Statement"), is being sent as an accompaniment to the Lehman Plan, which may be included in the same envelope as this document or under separate cover. The Lehman Disclosure Statement is intended to provide Creditors with information sufficient to enable Creditors to vote on the Lehman Plan and has been approved by the Bankruptcy Court as containing sufficient information for that purpose. The Lehman Disclosure Statement includes a summary of the Plan Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Lehman Plan, a discussion of certain alternatives to the Lehman Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Lehman Plan. Creditors should thoroughly review both the Lehman Plan and Lehman Disclosure Statement before deciding whether Creditors will accept or reject the Lehman Plan (and, if a Creditor is an ES Claimant, whether the Creditor votes for

---

[1] All capitalized terms have the meanings set forth in Article II of the Lehman Plan.

acceptance or rejection of the ES Settlement Offer by the Liquidating Trustee on behalf of the Estate of the ES Plan Debtor against which the Creditor asserts its Allowed ES Claim). No solicitation materials, other than the Lehman Disclosure Statement and related materials transmitted therewith and approved for solicitation purposes by the Bankruptcy Court, have been authorized for use in soliciting acceptances or rejections of the Lehman Plan.

**1.2** **Plan Debtors.** The Lehman Plan applies to 24 of the 26 Debtors, being all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**1.3** **Plan Summary.** The summary of the Lehman Plan that follows in this Section 1.3 of the Lehman Plan is not intended to substitute for the Lehman Disclosure Statement or for the more specific terms set forth in the Lehman Plan other than in this Section 1.3 of the Lehman Plan. If there are any discrepancies between the summary provided in this Section 1.3 of the Lehman Plan and the other provisions of the Lehman Plan, the other provisions shall control. Additionally, the Cases of the Plan Debtors have been jointly administered, but not substantively consolidated. Accordingly, the Lehman Plan provides separate treatment for Holders of Claims and Interests against each Plan Debtor. The following is a general outline of the Lehman Plan.

**1.3.1** **Generally.** The Lehman Creditors are owed, collectively, approximately $1.9 billion secured by deeds of trust on certain of the Remaining Real Estate Projects, certain Cash Collateral and other Assets of the Debtors' Estates. The Debtors have challenged the Lehman Creditors' Secured Claims, contending that (a) certain of the Lehman Creditors' Liens on the Assets of particular Debtors who are obligors under certain Lehman Loans are subject to being set aside because, among other things, other affiliated Debtors, rather than the obligor Debtors, received the benefit of such Lehman Loans (the Cross-Collateralization Claims), and (b) the Claims of the Lehman Creditors should be subordinated to the Claims of certain other Creditors allegedly harmed by the conduct of the Lehman Lenders (the Equitable Subordination Claims). The Lehman Lenders do not concur with these conclusions of the Debtors or with many of the factual contentions asserted as supporting or providing a basis for the Cross-Collateralization Claims and/or Equitable Subordination Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Nonetheless, to enable the Debtors to emerge from bankruptcy, which the Lehman Lenders believe is in the interest of all Creditors, with a Plan that is fair to all constituencies and best preserves current values and prevents further deterioration in the values of the Assets of the Debtors, the Lehman Proponents have proposed the Lehman Plan through which they: (a) make available funds for ES Pro Rata Settlement Payments to settle the ES Claims of Settling ES Claimants; (b) propose, through the Lehman Plan Sale or Foreclosure Procedures, auctions of the Remaining Real Estate Projects at which third parties may bid for the Remaining Real Estate Projects and at which the Lehman Creditors and other Holders of Allowed Secured Claims may credit bid; (c) provide for the means of liquidation of the Remaining Other Assets and the distribution of Residual Cash for Holders of Allowed Claims; and (d) protect those ES Claimants who elect not to have the Estates settle their ES Claims by (i) making available the ES Litigation Loan to enable continued prosecution of the Equitable Subordination Claims in an ES Action, (ii) granting certain specific concessions, described below, that could facilitate the entry and collection of an ES Judgment, and (iii) providing security for satisfaction of a Project Related Action Recovery.

**1.3.2** **Liquidating Trustee.** A Liquidating Trustee shall be appointed to oversee the realization of values from the Remaining Real Estate Projects and the Remaining Other Assets for the benefit of the Creditors of the Plan Debtors. The values of the Remaining Real Estate Projects and Remaining Other Assets (net of Post-Confirmation Expenses) shall be distributed to the respective Creditors of the applicable Plan Debtors in accordance with the strict priority rules of the Bankruptcy Code, applied on a Plan Debtor-by-Plan Debtor basis, except as otherwise provided in the Lehman Plan and described below. No Assets from the Estates of the Plan Debtors created under law upon the commencement of the Plan Debtors' Cases will be left with the Plan Debtors on the Effective Date; instead, such Assets will remain vested in the Plan Debtors' Estates to be administered by the Liquidating Trustee, although the Liquidating Trustee could elect hereafter to abandon to the Plan Debtors Assets of inconsequential value to the extent permitted in the Lehman Plan.

### 1.3.3 Disposition of the Remaining Real Estate Projects.

**1.3.3**    **Disposition of the Remaining Real Estate Projects.**  Within sixty (60) days after the Effective Date, the Liquidating Trustee shall sell or convey each of the Remaining Real Estate Projects for which the Successful Bidder is a third party purchaser, a Lehman Creditor or another Holder of an Allowed Secured Claim, all pursuant to the Lehman Plan Sale or Foreclosure Procedures set forth herein below.  An auction for the sale of each Remaining Real Estate Project will occur promptly after the Effective Date (but no later than sixty (60) days after the Effective Date) at which third party prospective purchasers, the Lehman Creditors and other Holders of Secured Claims may bid on any or all of the Remaining Real Estate Projects.  Lehman Creditors will make opening credit bids as set forth in Section 7.7.2(a) of the Lehman Plan for most of those Remaining Real Estate Projects and may elect to make a bid on any other Remaining Real Estate Project.  Under the Lehman Plan, the Lehman Creditors are afforded the ability to credit bid up to the amount of their Claims as specified herein below in Article IV of the Lehman Plan on a Project-by-Project basis; provided, however, that each of the Remaining Real Estate Projects conveyed to a Lehman Nominee shall become subject to a PRA Recovery Deed of Trust for the protection of the applicable Estate and its Creditors as and to the extent set forth in the Lehman Plan.

**1.3.4**    **PRA Recovery Security Pool.**  The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims.  If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in an ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), the values of the Remaining Real Estate Projects on which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding arguably would be available to satisfy the Project Related Action Recovery.  Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (a) the Lehman Plan provides that certain Cash is to be held by the Liquidating Trustee in the Plan Reserve and (b) any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures shall be subject to a deed of trust in favor of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Liquidating Trustee (as defined below, the "PRA Recovery Deeds of Trust") to secure the obligation of such Lehman Nominee to reconvey the Project acquired by such Lehman Nominee in the event of a Project Related Action Recovery, which obligation is to be set forth in a Reconveyance Agreement, and, which reconveyance obligation may, at the Lehman Nominee's election, instead be satisfied by a Cash payment in the amount of any Project Related Action Recovery. The Plan Reserve and PRA Recovery Deeds of Trust are referred to herein collectively as the "PRA Recovery Security Pool."

1.3.5 **Release of PRA Recovery Deeds of Trust.** Although the PRA Recovery Deeds of Trust generally shall remain in effect pending the final settlement or determination of the Project Related Actions, as provided herein, in order to permit the Lehman Nominees holding title to the Remaining Real Estate Projects (*i.e.*, the PRA Security Projects) to fully utilize such properties, the Lehman Plan also includes provisions by which (i) all of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated upon there having been deposited Cash into the Plan Reserve equal to the Maximum PRA Recovery Amount, and (ii) the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be: (1) released and the corresponding Reconveyance Agreement terminated upon the sale of such PRA Security Project to a third party and the deposit of any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale or (2) subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash Proceeds derived from such refinancing are deposited into the Plan Reserve.

1.3.6 **Net Proceeds from Sales to Third Party Purchasers of Remaining Real Estate Projects Subject to Lehman Secured Claim.** The Net Cash Proceeds from the sale of any Remaining Real Estate Project that is subject to a Secured Claim of a Lehman Creditor and is sold to a third party purchaser, rather than conveyed to a Lehman Nominee, shall be deposited into the Plan Reserve, subject to certain limited uses as described in the Lehman Plan, and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable Lehman Related Party(ies) shall be afforded a substitute Lien on any non-Cash Net Proceeds, in each case pending final settlement or determination of the Project Related Actions.

**1.3.7** **The Remaining Other Assets.** The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors, as set forth in the Lehman Plan.

**1.3.8** **Equitable Subordination Claims.**

(a) **Generally.** Under the Lehman Plan, ES Claimants are afforded the option to either accept the benefits of the ES Settlement, as provided in the Lehman Plan, or have the Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit. To incentivize ES Claimants to accept the Lehman Plan even if they do not accept the ES Settlement Offer, the Lehman Lenders are making available, as set forth in the Lehman Plan, funding for such continued prosecution of the Equitable Subordination Claims.

(b) **ES Settlement Offer.**

(i) **Funding for ES Settlement Offer.** The Lehman Lenders are making available funds for the ES Settlement Pro Rata Payments to Settling ES Claimants.

(ii) **Settlement by an Individual ES Claimant.** For each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment (included with the Ballot) duly executed by such ES Claimant, such ES Claimant will receive an ES Pro Rata Settlement Payment (*e.g.*, its relative share of the aggregate amount of the ES Settlement Amount).

(iii) **Full Settlement by An Estate.** If at least one-half in number and two-thirds in amount of the voting ES Claimants in any of the Estates of the Plan Debtors vote for acceptance of the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments (with respect to such Estate, the "Estate Acceptance of the ES Settlement"), all ES Claimants of such Estate will be entitled to receive an ES Pro Rata Settlement Payment upon return with their Ballots or to the Lehman Lenders of a duly executed ES Claimant Release and Assignment. If there is Estate Acceptance of the ES Settlement for an Estate of a particular Plan Debtor, the Equitable Subordination Claims of such Estate will be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

fully settled, dismissed (with prejudice) and released, including as to ES Claimants who do not vote to accept the ES Settlement Offer, who vote to reject the ES Settlement Offer or who vote to accept the Settlement Offer but who fail to execute and deliver the ES Claimant Release and Assignment.

(iv)     **Releases and Assignments.**  In exchange for the consideration payable to each Settling ES Claimant:  (A) the Liquidating Trustee will issue for or on behalf of each relevant Estate a release of all claims against the Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, as to, or to the extent attributable to, or to the extent any recovery would be payable with respect to, any or all of the ES Claims of the Settling ES Claimants (the "Estate ES Settlement Release" as more fully set forth and defined herein); and (B) in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote also, itself, will be granting a release of all claims against the Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, as to, or to the extent attributable to, or to the extent any recovery is payable with respect to, any or all of the ES Claims of such Settling ES Claimant (the "ES Claimant Release and Assignment" as more fully set forth and defined herein).

(c)     **Continued Prosecution of Equitable Subordination Claims.**
Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal (with prejudice), release and settlement of all Equitable Subordination Claims of all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in an ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of, and attributable to, the ES Claims of any Non-Settling ES Claimants, as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender

elects to pay Cash in lieu thereof.**ES Litigation Loan.** Unless all of the ES Plan Debtors' Estates accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), a Lehman Lender will make available a loan in the aggregate principal amount of up to $1 million to the Liquidating Trustee for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination Claims, which loan may be used solely for the payment of ES Litigation Expenses (as more fully defined below, the "ES Litigation Loan").

        **(ii)**      **Concessions by Lehman Lenders to Facilitate Collection of ES Judgments.** Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in an ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

        **A. Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtors' Projects Are to be Collateral for Equitable Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.**

        For some particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against those Estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Judgment as to other ES Plan Debtors' Estates.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B. To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.** As to the Estates of Del Rio and SJD Partners only, the Lehman Creditors will waive an objection or defense, that, even were the applicable Lehman Secured Claim ignored, there was insufficient value in those Estates to pay their Allowed ES Claims, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied, and (II) the applicable Estate executes the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**1.3.9** **Plan Funding by Lehman Lenders.** The Lehman Lenders will make substantial funding available to enable the confirmation and implementation of the Lehman Plan, including payment of certain Administrative Claims, Project related expenses, certain Post-Confirmation Expenses and certain settlement amounts. Such funding will be provided either (i) through new transfers of Cash by a Lehman Lender, or (ii) by the Lehman Lenders foregoing the full extent of adequate protection to which Lehman Creditors otherwise would claim entitlement with respect to their substantial Cash Collateral being held in escrow or held by the Estates, and instead permitting use of such Cash Collateral, as and to the extent set forth more fully herein below.

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

**2.1** **Definitions.** The following defined terms are used in the Lehman Plan. Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

**2.1.1** **10000 Santa Monica Project.** The Project owned by SunCal Century City, located in Century City, California.

**2.1.2** **Acquisitions.** SCC Acquisitions, Inc., a California corporation, and the Debtors' indirect parent, but not a Debtor in any of the Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.3** **Acton Estates.** Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor herein, and the owner of the Acton Project.

**2.1.4** **Acton Project.** The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described herein.

**2.1.5** **Administrative Claim(s).** Any Claim against a Plan Debtor incurred after the applicable Petition Date for such Plan Debtor but before the Confirmation Date for any cost or expense of administration of the Cases of the Plan Debtors entitled to priority under Section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fees or charges assessed against the Estates of the Plan Debtors under Section 1930 of Title 28 of the United States Code.

**2.1.6** **Administrative Claim Bar Date.** The General Administrative Claim Bar Date and the Administrative Tax Claim Bar Date.

**2.1.7** **Administrative Tax Claim(s).** A request for payment of an Administrative Claim by a governmental unit for Taxes (or for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date.

**2.1.8** **Administrative Tax Claim Bar Date.** The earlier of (a) any bar date otherwise established by the Bankruptcy Court or (b) on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit.

**2.1.9** **Affiliate.** As to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise; provided that as to any Lehman Related Party, the term "Affiliate" does not include any Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.10** **Allowed.** This term is used both separately and in conjunction with other defined terms herein (*e.g.*, Allowed Tax Claims) and means:

a.       with respect to any Administrative Claim (a) if the Claim is based upon a Fee Application, an unsecured Claim in the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (b) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Plan Debtors and is not otherwise subject to an Administrative Claim Bar Date, in the amount of such Claim and with a status as secured or unsecured as each are asserted by such creditor and not disputed by the Liquidating Trustee or the Lehman Lenders, failing which, the amount and secured or unsecured status thereof as fixed by a Final Order of the Bankruptcy Court; or (c) if the Holder of such Claim was required to File and has Filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (l) in the amount and with the status as secured or unsecured and in the statutory priority as stated in such proof of Administrative Claim if no objection to such proof of Administrative Claim is interposed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court or the Lehman Plan, or (2) in the amount and with the status as secured or unsecured and in the statutory priority as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within any applicable period of time so fixed; and

b.       with respect to any Claim which is not an Administrative Claim, (a) if no objection to such Claim was interposed by the Claims Objection Deadline, (1) if the Holder of such other Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, in the amount of such Claim and with the status as secured or unsecured and with the statutory priority as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (2) if the Holder of such Claim has Filed a Proof of Claim therefor with the Bankruptcy Court on or before the Claims Bar Date, in the amount and with the status as secured or unsecured and in the statutory priority as stated in such Proofs of Claim, or (b) if an objection to such Claim was interposed by the Claims Objection Deadline, in the amount and with the status as

secured or unsecured and in the statutory priority thereof as fixed by Final Order of the Bankruptcy Court;

c.     with respect to a Claim's status as an ES Claim, (a) with ES Claim status if ES Claim status is alleged on the Holder's Ballot in the manner provided therefor and if no objection thereto is interposed by the Claims Objection Deadline, (b) with ES Claim status if alleged by the Liquidating Trustee and either (1) the Lehman Creditors and any surviving Committee consent or (2) no objection thereto is Filed by the later of the Claims Objection Deadline or seventy-five (75) days after notice thereof to any surviving Committees and the Lehman Creditors or (c) as fixed by Final Order of the Bankruptcy Court; and

d.     with respect to any Interest, (a) if no objection to such Interest was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, (1) if the Holder of such Interest did not File proof thereof with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (2) if the Holder of such Interest has Filed a Proof of Interest therefor with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as stated in such Proof of Interest, or (b) if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and nature thereof as fixed by Final Order of the Bankruptcy Court; but

e.     with respect to any Administrative Claim, Claim or Interest, the term "Allowed" does not signify whether or not such Administrative Claim, Claim or Interest has been subordinated to another Administrative Claim, Claim or Interest or is entitled to the benefits of such subordination.

2.1.11     **Allowed Amount.**  The amount in which a Claim or Interest is Allowed.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.12** **Arch.** Arch Insurance Company, a Bond Issuer.

**2.1.13** **Assets.** All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

**2.1.14** **Available Cash.** Cash held by each Plan Debtor as of the Effective Date other than Cash Collateral.

**2.1.15** **Avoidance Actions.** All Claims and defenses to Claims accruing to the Plan Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

**2.1.16** **Ballot.** The ballot to vote to accept or reject the Lehman Plan and to vote for acceptance or rejection of the ES Settlement Offer.

**2.1.17** **Bankruptcy Code.** The Bankruptcy Reform Act of 1978, as amended, as set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as applicable to the Cases.

**2.1.18** **Bankruptcy Court.** The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of Title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

**2.1.19** **Bankruptcy Rules.** Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

**2.1.20** **Beaumont Heights Project.** The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described herein.

**2.1.21** **Bickford Ranch Project.** The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

**2.1.22** **Bickford Second Lien Loan Agreement.** That certain promissory note, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000, made by SunCal Bickford, as borrower, and payable to the order of Lehman ALI, as

lender. The loan made pursuant to and/or evidenced by the Bickford Second Lien Loan Agreement is secured by a second priority deed of trust on the Bickford Ranch Project. The outstanding balance of the loan under the Bickford Second Loan Agreement was not less than $54,494,059.38 as of the applicable Petition Date.

2.1.23 **Bond Claim(s).** Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds issued by a Bond Issuer.

2.1.24 **Bond Claimant.** Holder(s) of a Bond Claim.

2.1.25 **Bond Issuer(s).** Bond Safeguard and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors and with respect to and for the benefit of the Projects owned by such Debtors.

2.1.26 **Bond Obligation(s).** The alleged obligation(s) of the Bond Obligor(s) to indemnify the Bond Issuers for any payments made by the Bond Issuers to Holders of Bond Claims.

2.1.27 **Bond Obligor(s).** Obligors who are liable to a Bond Issuer for any payments made by such Bond Issuer to a Bond Claimant or for performance obligations under any performance bonds issued by such Bond Issuer for the benefit of any of the Debtors or their respective Projects. Arch asserts that the Bond Obligors under payment and performance bonds issued by Arch for the benefit of any Debtor or with respect to any Project are all of the Debtors, Acquisitions and Elieff. Bond Safeguard asserts that the Bond Obligors under payment and performance bonds issued by Bond Safeguard for the benefit of any Debtor or with respect to any Project are the respective Debtors for whose benefit such bonds were issued, Acquisitions and Elieff.

2.1.28 **Bond Safeguard.** Bond Safeguard Insurance Company, a Bond Issuer.

2.1.29 **Business Day.** Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a); provided that with reference to the date on which something is to be Filed, it shall not include a day on which the applicable court is inaccessible for the purpose of Filing such paper.

**2.1.30   Cases.**  The chapter 11 cases of the Debtors pending before the Bankruptcy Court.

**2.1.31   Cash.**  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

**2.1.32   Cash Collateral.**  This term is used in reference to certain Assets of a Plan Debtor's Estate with the same meaning as set forth in Bankruptcy Code Section 363(a).

**2.1.33   Claim.**  A claim — as Bankruptcy Code section 101(5) defines the term "claim"— against any Plan Debtor or any Plan Debtor's property, including, without limitation (a) any right to payment from any of the Plan Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Plan Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

**2.1.34   Claims Bar Date.**  For Claims, other than Administrative Claims, the last date for Filing proofs of Claim as was established by order or orders of the Bankruptcy Court entered prior to September 9, 2009, which date was March 31, 2009 for certain Claims.

**2.1.35   Claims Objection Deadline.**  For a Claim other than an Administrative Claim and except as otherwise set forth in the Lehman Plan, the first Business Day following the one hundred and twentieth (120th) day after the later of (a) the Effective Date or (b) the applicable bar date for the Claim; provided that: (a) for the ES Claims of Settling ES Claimants, instead, the first Business Day that is at least sixty (60) days after the Effective Date; (b) upon application to the Bankruptcy Court, the Liquidating Trustee or Lehman Lenders may obtain an extension of any such deadline for up to sixty (60) days for cause shown; and (c) any deadline may be extended by agreement of the potential target of the objection and the Liquidating Trustee or a Lehman Lender.

**2.1.36   Class.**  Each group of Claims or Interests classified in Article IV of the Lehman Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.37** **Committees.** Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee.

**2.1.38** **Confirmation Date.** The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

**2.1.39** **Confirmation Order.** The order entered by the Bankruptcy Court confirming the Lehman Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**2.1.40** **Creditor.** Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the applicable Debtor's Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**2.1.41** **Cross-Collateralization Action.** An Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date.

**2.1.42** **Cross-Collateralization Claim.** A Claim against any Lehman Creditor under state or federal fraudulent transfer laws, provided: (a) it is set forth in a complaint Filed no later than sixty (60) days following the Effective Date and (b) such Claim seeks to set aside a Lehman Secured Claim as against a particular Plan Debtor's Estate based on the principal amount of such Lehman Secured Claim against such Plan Debtor's Estate exceeding the funds alleged by the Debtors to have been advanced for the subject collateral or to have directly or indirectly benefitted the applicable Plan Debtor in connection with the applicable Lehman Loan.

**2.1.43** **Cross-Collateralization Judgment.** Any judgment in favor of the Liquidating Trustee pursuant to or as a result of a Cross-Collateralization Action against a Lehman Related Party.

**2.1.44** **Danske Bank.** Danske Bank A/S London Branch.

**2.1.45** **Danske Secured Claim.** The Secured Claim of Danske Bank, a Lehman Successor, arising from the SunCal Century City Loan Agreement.

**2.1.46   Debtor(s).**  Individually or collectively, the Voluntary Debtors and the Trustee Debtors.

**2.1.47   Debtor(s)-in-Possession.**  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Cases.

**2.1.48   Debtors' Second Amended Disclosure Statement.**  The Debtors' Second Amended Joint Disclosure Statement Describing Debtors' Second Amended Joint Chapter 11 Plan, dated June 10, 2009.

**2.1.49   Del Amo Project.**  The Project owned by SunCal Torrance, located in the City of Torrance, California, as more particularly described herein.

**2.1.50   Del Rio.**  North Orange Del Rio Land, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner and holder of the Del Rio Rights and the Del Rio CFD Bond Proceeds.

**2.1.51   Del Rio CFD Bond Proceeds.**  All proceeds of those certain bonds to be designated as "City of Orange, Community Facilities District No. 06-01 (Del Rio Public Improvements) 2007 Special Tax Bonds" or similarly designated bonds to be issued by the City of Orange, California in connection with that certain community facilities district established by the City and known as the City of Orange Community Facilities District No. 06-01 (Del Rio Public Improvements).

**2.1.52   Del Rio Development Agreement.**  Development Agreement, recorded on July 27, 2004 in the Official Records of Orange County, California as Instrument No. 2004-000677141, as amended by (i) that certain First Operating Memorandum, dated August 17, 2006, (ii) that certain Second Operating Memorandum, dated December 5, 2006, (iii) that certain Operating Memorandum No. 3, dated May 22, 2007, and (iv) that certain Operating Memorandum No. 4, dated July 21, 2008.

**2.1.53   Del Rio PSA.**  That certain Purchase Agreement and Escrow Instruction (Del Rio) dated as of June 14, 2005 by and among Del Rio, as the seller, and Lennar Homes of California and Centex Homes, as the buyers, as assigned by the buyers to Lennar Centex Del Rio Partners, LLC per that certain Assignment of Purchase Agreement and Escrow Instructions dated as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of November 14, 2005, as amended by that certain First Amendment to Purchase Agreement and Escrow Instructions (Del Rio) and that certain Second Amendment to Purchase Agreement and Escrow Instructions (Del Rio) dated as of January 30, 2007.

**2.1.54** **Del Rio Rights.** Collectively, (i) all right, title and interest of Del Rio, as developer or in any other capacity, in, to, under or pursuant to the Del Rio Development Agreement including, without limitation, all any and all Del Rio CFD Bond Proceeds, and (ii) all right, title and interest of Del Rio, as seller, under the Del Rio PSA including, without limitation, all profit participation, proceeds, revenues and income to which Del Rio is or may be entitled thereunder.

**2.1.55** **Del Rio / SJD Partners Release.** A release, in a form reasonably acceptable to the Lehman Lenders, to be executed within forty-five (45) days following the Effective Date by the Liquidating Trustee for the Estate of Del Rio or the Estate of SJD Partners to obtain certain benefits described in Section 7.8.5(b)(2) of the Lehman Plan that is in a form or substantially the form of the Plan Release set forth in Section 7.10 of the Lehman Plan, but (a) without any exception, as matters not to be released, for Cross-Collateralization Claims or Avoidance Actions and (b) with additional releasees consisting of all and any owners of the applicable Project(s) or other Assets that were at any time owned by Del Rio or SJD Partners, as applicable.

**2.1.56** **Delta Coves.** Delta Coves Venture, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Delta Coves Project.

**2.1.57** **Delta Coves Loan Agreement.** That certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lenders thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $236,000,000. The loan made pursuant to and/or evidenced by the Delta Coves Loan Agreement is secured by a first priority deed of trust on the Delta Coves Project. The outstanding balance of the loan under the Delta Coves Loan Agreement was not less than $206,023,142.48 as of the applicable Petition Date.

**2.1.58** **Delta Coves Project.** The Project owned by Delta Coves, located in Bethel Island in Contra Costa County, California, as more particularly described herein.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.59    Detailed Sale / Foreclosure Procedures.** The detailed procedures with respect to which the Liquidating Trustee shall sell or convey each of the Remaining Real Estate Projects for which there is a Successful Bidder, either to a third party purchaser, a Lehman Nominee or another Holder of an Allowed Secured Claim, pursuant to and consistent with the Lehman Plan Sale or Foreclosure Procedures, in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at, or after the hearing on, confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner and Liquidating Trustee or approval of the Bankruptcy Court.

**2.1.60    Disputed Claim(s).** All or any part of a Claim that is not Allowed, including, without limitation, all or part of a Claim as to which any one of the following applies: (i) no Proofs of Claim has been Filed with respect to such Claim and it is not deemed Allowed under the Lehman Plan, and either (a) the Claim is not listed in the Schedules or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the liability for, amount, priority or status of the Claim as secured, status as unsecured or status as an ES Claim (a) is the subject of a pending proceeding, whether arbitration, mediation, litigation, adversary proceeding or otherwise; (b) is subject to offset based upon a Filed judgment, Filed order, Filed stipulation or express provision in an executed agreement that was Filed or executed, as appropriate, after the alleged right to offset arose; (c) is the subject of a timely objection; or (d) is the subject of a request for estimation made in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court or the Lehman Plan, in each case that is Filed on or before the Claims Objection Deadline, provided that any such proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Lehman Plan.

**2.1.61    Distribution(s).** Payment(s) to Holder(s) of an Allowed Claim(s) or Allowed Interest(s) that are provided for under the Lehman Plan.

**2.1.62    Distribution Agent.** The Liquidating Trustee.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.63** **Distribution Date.** With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Lehman Plan.

**2.1.64** **Effective Date.** A date selected by the Lehman Lenders, but in no event later than the sixtieth (60th) day after the Confirmation Date.

**2.1.65** **Elieff.** Bruce Elieff, the manager of Acquisitions, the indirect parent of all of the Debtors.

**2.1.66** **Emerald Meadows Project.** The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described herein.

**2.1.67** **Encumbrance.** Any Lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, unassumed affirmative obligations under development agreements or subdivision improvement agreements, license, preference, priority, security agreement, easement, covenant, encroachment, option or other interest in the subject Project, including any right of recovery, tax (including foreign, federal, state and local tax), Order of any governmental authority or other claim there against or therein, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claims based on any theory that the acquiror is a successor, transferee or continuation of the sellers or their business, and (iv) any leasehold interest, license or other right, in favor of a person other than the transferor in connection with a sale or conveyance, to use any portion of the subject Project), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**2.1.68** **Equitable Subordination Claims.** Claims for equitable subordination pursuant to Bankruptcy Code § 510(c) held by an Estate for an ES Claimant against a Lehman Creditor.

**2.1.69** **ES Action.** (a) That certain adversary proceeding Filed in the Cases and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005 or (b) such other

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

adversary proceeding in which Equitable Subordination Claims are asserted that is timely Filed and Filed no later than sixty (60) days following the Effective Date.

**2.1.70** **ES Claim.** A Claim against an ES Plan Debtor for "new value" (as defined in 11 U.S.C. section 547(a)(2)) voluntarily provided or voluntarily extended to one or more of the ES Plan Debtors after the ES Date and prior to the applicable Petition Date(s); provided that such Claim is <u>not</u> a (i) Secured Claim, (ii) Administrative Claim, (iii) Priority Tax Claim, (iv) Priority Claim, (v) Claim of an Insider or (vi) Claim of either a Lehman Lender or Lehman Successor in such capacity. *E.g.*, ES Claims do not include Claims provided or extended pursuant to a legal or contractual commitment or obligation existing prior to the ES Date. ES Claims are entitled to vote on the ES Settlement as set forth in the Lehman Plan.

**2.1.71** **ES Claimant.** The Holder of an Allowed ES Claim.

**2.1.72** **ES Claimant Release and Assignment.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote shall be deemed to release the ES Claimant Released Claims, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, and, to the extent such ES Claimant Released Claims cannot be released by the ES Claimant, assigns to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the Settling ES Claimant with respect to such ES Claimant Released Claims, all as more fully set forth in Section 7.8.3(i) of the Lehman Plan.

**2.1.73** **ES Claimant Released Claims.** Any and all of an ES Settling Claimant's causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of such Settling ES Claimant or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of such Settling ES Claimant.

**2.1.74** **ES Date.** August 1, 2007, the earliest date on which the Lehman Lenders are alleged to have engaged in inequitable conduct as described in that certain adversary proceeding Filed in the Cases and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005.

**2.1.75** **ES Judgment.** A judgment in favor of the Liquidating Trustee on behalf of and for the benefit of any particular group of ES Claimants in connection with any of the Equitable Subordination Claims against a Lehman Related Party.

**2.1.76** **ES Litigation Expenses.** The reasonable and direct out-of-pocket expenses (but not any legal fees): (a) of and incurred by any replacement legal counsel to Miller Barondess, LLP, that is retained by the Liquidating Trustee on a contingency fee basis to prosecute the Equitable Subordination Claims of any ES Plan Debtor's Estate in an ES Action; (b) which are in excess of any Available Cash in the Post-Confirmation Accounts; and (c) which were incurred in connection with prosecuting the Equitable Subordination Claims in an ES Action; provided that (i) such expenses shall, under no circumstances, include any legal fees (including paralegal fees) or other fees of professionals employed by, or of, the replacement legal counsel or any other law firm (other than the reasonable fees and costs of any retained attorney expert witness) nor (ii) shall such expenses include any fees or expenses incurred or otherwise payable to Miller Barondess, LLP.

**2.1.77** **ES Litigation Loan.** A loan to be made available by a Lehman Lender pursuant to the terms and conditions of and as further described in Section 7.8 of the Lehman Plan.

**2.1.78** **ES Litigation Proceeds.** The proceeds of any ES Judgment or settlement (other than the ES Settlement) with respect to Non-Settled ES Claims.

**2.1.79** **ES Plan Debtors.** All of the Plan Debtors other than: Kirby Estates; Seven Brothers; SunCal Beaumont; SunCal Century City; and SunCal Johannson

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.80**     <u>ES Pro Rata Settlement Payment.</u> A payment to any particular Holder of an Allowed ES Claim equal to the ES Settlement Amount multiplied by a fraction, the numerator of which shall be the amount of such Holders' Allowed ES Claim and the denominator of which shall be the amount of all Allowed ES Claims and all Allowed Mechanic's Lien Claims.

**2.1.81**     <u>ES Settlement.</u> The settlement or settlements of Equitable Subordination Claims relating to any particular Estate of a Plan Debtor upon acceptance of an ES Settlement Offer.

**2.1.82**     <u>ES Settlement Amount.</u> The maximum aggregate amount of $15,000,000 to be made available to the Liquidating Trustee collectively by the Lehman Lenders as provided in Section 7.5 of the Lehman Plan to fund any ES Pro Rata Settlement Payments to be made to the ES Claimants who vote for acceptance of the ES Settlement Offer on their Ballots and return with the Ballots ES Claimant Release and Assignments (included with the Ballots) duly executed by such ES Claimants or who are deemed to have accepted or who are otherwise bound by, the ES Settlement pursuant to the terms of the Lehman Plan.

**2.1.83**     <u>ES Settlement Offer.</u> The offer of the applicable Lehman Lender to settle the Equitable Subordination Claims relating to any particular Estate of an ES Plan Debtor by payment of the ES Pro Rata Settlement Payments either (a) to <u>all</u> Holders of Allowed ES Claims against such Estate who return a duly executed ES Claimant Release and Assignment, if there is Estate Acceptance of the ES Settlement by such Estate, or (b) only to the Holders of Allowed ES Claims against such Estate who vote for acceptance of the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments, if there is not Estate Acceptance of the ES Settlement by such Estate.

**2.1.84**     <u>Estate or Estates.</u> The bankruptcy estates of the Debtors created pursuant to Section 541 of the Bankruptcy Code.

**2.1.85**     <u>Estate Acceptance of the ES Settlement.</u> The circumstance by which the Estate of a Plan Debtor accepts the ES Settlement Offer, which occurs if at least one-half in number and two-thirds in amount of the voting ES Claimants in such Estate vote for acceptance of

the ES Settlement Offer on their Ballots and (unless waived by the Lehman Lenders as to one or more Ballots) return with their Ballots a duly executed ES Claimant Release and Assignment.

2.1.86 **Estate ES Settlement Release.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors herein, shall be deemed to release all claims, including without limitation any Litigation Claims to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, all as more fully set forth in Section 7.8.2(b)(i) of the Lehman Plan.

2.1.87 **Fee Applications.** Applications of Professionals under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.88 **Fenway Capital.** Fenway Capital Funding LLC, which owns or holds a legal or equitable interest in all or a portion of the Lehman Loans made pursuant to and/or evidenced by the following loan agreements, but for which a Lehman Lender nonetheless continues as agent: (a) SunCal Communities I Loan Agreement; (b) Ritter Ranch Loan Agreement; (c) SunCal PSV Loan Agreement; (d) Delta Coves Loan Agreement; (e) SunCal Marblehead / SunCal Heartland Loan Agreement; (f) SunCal Oak Valley Loan Agreement; and (g) SunCal Northlake Loan Agreement.

2.1.89 **Filed.** Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court. "File" and "Filing" shall have correlative meanings.

2.1.90 **Final Order.** A final and non-appealable judgment, order, ruling or other decree issued and entered by a court of competent jurisdiction.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.91** **General Administrative Claim Bar Date.** The last date fixed by the Lehman Plan for the filing of Proofs of Claim or requests for payment of Administrative Claims other than for Taxes. Under the Lehman Plan, the General Administrative Claim Bar Date shall be the first Business Day after the sixtieth (60th) day after the Confirmation Date.

**2.1.92** **General Unsecured Claim.** A Claim against a Plan Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) a Priority Claim or (e) an ES Claim.

**2.1.93** **Heartland Project.** The Project owned by SunCal Heartland, located in Riverside County, California, as more particularly described herein.

**2.1.94** **Holder.** The beneficial owner of any Claim or Interest.

**2.1.95** **Insider.** (1) A Person other than a Lehman Related Party that is an "insider" as defined in Bankruptcy Code Section 101, (2) an Affiliate of a Person or (3) without limiting the foregoing, as to all Debtors, *inter alia*, each other Debtor, SunCal Management, LLC, Acquisitions, Elieff, Voss, Cook & Thel LLP, Greenfield Communications, SunCal Master Venture Member, LLC and SunCal Del Rio, LLC.

**2.1.96** **Interest.** Any equity security or interest in any Plan Debtor within the meaning of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Plan Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, or any other equity security or interest.

**2.1.97** **Interim Loan Agreement.** That certain Loan Agreement, dated as of October 31,2007, by and between SCC LLC, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $20,000,000. The outstanding balance of the loan under the Interim Loan Agreement was not less than $23,795,012.59 as of the applicable Petition Date. The loan made pursuant to and/or evidenced by the Interim Loan Agreement is supported by a Subsidiary Guaranty made by SCC Communities, Tesoro and Del Rio and the obligations of the guarantors thereunder are secured by (a) a first priority deed of trust on the Joshua Ridge Project;

(b) a first priority deed of trust on the Tesoro Project; and (c) an assignment of the Del Rio CFD Bond Proceeds.

**2.1.98** **Johannson Ranch Project.** The Project owned by SunCal Johannson, located in the City of Modesto, California, as more particularly described herein.

**2.1.99** **Joshua Ridge Project.** The Project owned by SCC Communities, located in the City of Victorville, California, as more particularly described herein.

**2.1.100** **Kirby Estates.** Kirby Estates, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of that portion of the Summit Valley Project not owned by SunCal Summit Valley or Seven Brothers.

**2.1.101** **LCPI.** Lehman Commercial Paper Inc., a New York corporation.

**2.1.102** **Lehman Administrative Loans.** The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, under which first priority priming Liens were granted to Lehman ALI on all borrower Debtors' assets (with the exception of SunCal Century City in which the Liens are junior priority), and as to which financing, super-priority administrative status was afforded and the automatic stay was modified to the extent necessary to implement the financing. The aggregate amount of the Lehman Administrative Loans to all of the borrower Debtors was not less than $1,790,572, as of September 9, 2009.

**2.1.103** **Lehman ALI.** Lehman ALI, Inc., a Delaware corporation

**2.1.104** **Lehman Appeal.** Any appeal by a Lehman Related Party relating to the Equitable Subordination Claims in an ES Action or any Cross-Collateralization Claims in a Cross-Collateralization Action.

**2.1.105** **Lehman Appeal Affected Debtor.** Any Estate of a Plan Debtor that cannot close due to a pending Lehman Appeal concerning such Estate's Assets or liabilities, including subordination of certain of its liabilities to other of its liabilities.

**2.1.106** **Lehman Commercial.** Lehman Commercial Paper Inc., a New York corporation.

**2.1.107** **Lehman Creditor.** Lehman Lender or Lehman Successor.

**2.1.108** **Lehman Creditor Party.** Lehman Lender, Lehman Successor, the direct or indirect parent of either, or an Affiliate of either that is wholly owned by the Lehman Lender, Lehman Successor or by a direct or indirect parent of such Lehman Lender or Lehman Successor.

**2.1.109** **Lehman Disclosure Statement.** The Disclosure Statement With Respect to Joint Chapter 11 Plan Proposed By Lehman Lenders.

**2.1.110** **Lehman Lender.** Lehman ALI, Lehman Commercial, Northlake Holdings or OVC Holdings, including each in its capacity as agent, or agent and lender, with respect to the applicable Lehman Loans.

**2.1.111** **Lehman Loan.** Each loan made pursuant to and/or evidenced by the following agreements: (a) SunCal Communities I Loan Agreement; (b) Bickford Second Lien Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan Agreement; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal PSV Loan Agreement; (h) Delta Coves Loan Agreement; (i) SunCal Marblehead / SunCal Heartland Loan Agreement; (j) SunCal Oak Valley Loan Agreement; and (k) SunCal Northlake Loan Agreement.

**2.1.112** **Lehman Nominee(s).** The entity or each entity designated by the Lehman Lenders, or any of them, to take title to a Remaining Real Estate Project as to which a Lehman Creditor is the Successful Bidder.

**2.1.113** **Lehman Plan.** This *Joint Chapter 11 Plan Proposed By Lehman Lenders*, together with the Exhibits hereto, as the same may be amended, modified or restated from time to time.

**2.1.114** **Lehman Plan Sale or Foreclosure Procedures.** The marketing, bidding and sale or transfer by foreclosure procedures for a sale or disposition of some or all of the Projects after confirmation of the Lehman Plan, all as more fully set forth in Section 7.7.2 of the Lehman Plan.

**2.1.115** **Lehman Post-Confirmation Expenses.** Post-Confirmation Expenses incurred with respect to a Litigation Claim against a Lehman Related Party, other than ES

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Litigation Expenses to the extent susceptible of satisfaction from the proceeds of the ES Litigation Loan.

**2.1.116** **Lehman Post-Confirmation Loan(s).** All funding made available to the Liquidating Trustee in connection with, or after, the Effective Date from either or both new Cash transfers from or on behalf of a Lehman Related Party or by a Lehman Lender permitting the use of Cash Collateral of a Lehman Creditor, in either case to be in the form of one or more loans, plus all costs, fees and expenses incurred in connection with making or collecting such loan(s), plus ten percent (10%) annual, compounded interest on the outstanding balance of such loan(s).

**2.1.117** **Lehman Proponents.** The Lehman Lenders, in their capacity as proponents of the Lehman Plan.

**2.1.118** **Lehman Related Party.** A Lehman Lender, Lehman Successor or Lehman Nominee, or an Affiliate of any of them.

**2.1.119** **Lehman Releasees.** The Lehman Lenders, LV Pacific Point LLC, Lehman Re Ltd., all other defendants in an ES Action, their respective Affiliates and each of their respective officers, directors, employees, agents, successors and assigns, including, without limitation, the Lehman Successors.

**2.1.120** **Lehman Secured Claim.** A Secured Claim held by a Lehman Creditor.

**2.1.121** **Lehman Settlement Approval.** Entry of a judgment, order, ruling or other decree by the United States Bankruptcy Court for the Southern District of New York, which court has jurisdiction over the case of Lehman Commercial under the Bankruptcy Code (jointly administered under case no. 08-13555), approving the actions of Lehman Commercial in proposing, voting for, participating in and implementing the settlement(s) represented by the Lehman Plan.

**2.1.122** **Lehman Successor.** Any entity, other than a Lehman Lender, that either asserts to be or is determined by the Bankruptcy Court to be the owner of a Lehman Loan or any portion thereof, such as Fenway Capital.

**2.1.123** **Liquidating Trustee.** An individual nominated by a Committee(s), identified no later than ten (10) Business Days prior to the commencement of the hearing on confirmation of the Lehman Plan and approved by the Bankruptcy Court as qualified to serve in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such capacity under the Lehman Plan; provided that if no other such person is so nominated, identified and approved, the Trustee shall serve as the Liquidating Trustee.

**2.1.124** **Litigation Claim(s).** Any and all interests of the Liquidating Trustee, Plan Debtors or their Estates in any and all claims, Liens, rights, causes of action, and objections or defenses to Claims, Liens, rights, or causes of action to the extent not waived, released or compromised under the Lehman Plan that have been or may be commenced by the Debtor(s), the Liquidating Trustee, the Trustee, or the Committee(s), as the case may be, including, but not limited to (i) Avoidance Actions, including any Cross-Collateralization Action or other Avoidance Action against a Lehman Related Party; (ii) Claims, rights or causes of action for turnover of property to the Plan Debtors' Estates and/or Liquidating Trustee; (iii) Claims, rights or causes of action for the recovery of property by, or payment of money to, the Plan Debtors' Estates or the Liquidating Trustee, including Equitable Subordination Claims in an ES Action and Cross-Collateralization Claims in a Cross-Collateralization Action; (iv) the right of the Liquidating Trustee to compensation in the form of damages, recoupment, or setoff; and (v) objections to Claims.

**2.1.125** **Litigation Recoveries.** Any Cash or other property received by the Trustee, the Plan Debtors, the Liquidating Trustee, or the Committees, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

**2.1.126** **Marblehead Project.** The Project owned by SunCal Marblehead, located in the City of San Clemente, California.

**2.1.127** **Maximum DOT Security Amount.** The aggregate amount secured by the PRA Recovery Deeds of Trust at any time which shall be equal to the Maximum PRA Recovery Amount less the aggregate amount in the Plan Reserve (including any interest accrued on funds therein).

**2.1.128** **Maximum PRA Recovery Amount.** An amount that serves as the maximum aggregate amount secured by the PRA Recovery Security Pool and equals specifically,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the sum of the following: (a) $1.74 million, if and only if there is a pending Reconveyance Agreement evidencing the obligation, upon entry of a Cross-Collateralization Judgment, to reconvey the Acton Project, Joshua Ridge Project or Tesoro Project to the applicable Plan Debtors; and (b) for an ES Judgment, (i) $200 million less, if applicable, (ii) the amount determined as set forth in clause (a) hereof, if any, multiplied by (iii) the Non-Settling ES Claimant Percentage; provided that, on motion of a Lehman Related Party, the amounts set forth in clauses (a) or (b)(i) hereof may be reduced upon a Final Order of the Bankruptcy Court, as described in Section 7.7.2(c)(v) of the Lehman Plan.

**2.1.129**  **Mechanic's Lien Claim.**  Mechanic's lien claims against a Plan Debtor's Project arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise and allegedly satisfy the requirements of Bankruptcy Code Section 546(b).

**2.1.130**  **Negative Covenant.**  The provision in each PRA Recovery Deed of Trust that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above.

**2.1.131**  **Net Cash Litigation Recoveries.**  Any Litigation Recoveries consisting of Cash and any Cash proceeds of Litigation Recoveries less associated Post-Confirmation Expenses incurred in connection therewith.

**2.1.132**  **Net Cash Proceeds.**  Net Proceeds consisting of Cash.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.133** **Net Proceeds.** Gross proceeds of sale, liquidation or refinancing, less costs, expenses, fees, commissions, taxes (including federal, state and local income tax calculated at an assumed rate of forty-five percent (45%)) and other charges incurred directly in the sale, liquidation or refinancing of the underlying asset, including payment of senior Liens or encumbrances.

**2.1.134** **Non-Settled ES Claims.** The ES Claims of Non-Settling ES Claimants.

**2.1.135** **Non-Settling ES Claimant(s):** With respect to each Estate of an ES Plan Debtor, ES Claimants that do not vote to accept the ES Settlement Offer, unless there is Estate Acceptance of the ES Settlement for such Estate, in which case there shall be no Non-Settling ES Claimants of such Estate.

**2.1.136** **Non-Settling ES Claimant Percentage.** The percentage of Allowed ES Claims that are held by Non-Settling ES Claimants.

**2.1.137** **Northlake Holdings.** Northlake Holdings LLC, a Delaware limited liability company.

**2.1.138** **Northlake Project.** The Project owned by SunCal Northlake, located in the City of Castaic California, as more particularly described herein.

**2.1.139** **Oak Knoll Project.** The Project owned by SunCal Oak Knoll, located in the City of Oakland, California, as more particularly described herein.

**2.1.140** **Oak Valley Project.** The Project owned by SunCal Oak Valley, located in Riverside County, California, as more particularly described herein.

**2.1.141** **Other Secured Claim.** A Secured Claim that is not a Secured Real Property Tax Claim, Lehman Secured Claim or Danske Secured Claim.

**2.1.142** **OVC Holdings.** OVC Holdings LLC, a Delaware limited liability company.

**2.1.143** **Pacific Point Project.** The Project formerly owned by SJD Partners, which was non-judicially foreclosed upon pursuant to a sale on August 28, 2008 by LV Pacific Point LLC, a Delaware limited liability company.

**2.1.144** **Palmdale Hills.** Palmdale Hills Property, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project, the Ritter Cash and the Palmdale Hills CFD Bonds.

**2.1.145** **Palmdale Hills CFD Bonds.** Certain community facilities district bonds issued by the City of Palmdale that are owned by Palmdale Hills.

**2.1.146** **Palm Springs Village Project.** The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

**2.1.147** **Permitted Liens.** (a) Statutory liens for Secured Real Property Tax Claims; (b) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (excluding any rights of appeal from the Final Order with respect to the sale or conveyance of the Project) that (i) appear on the lender title insurance policies concerning such Project issued to the relevant Lehman Lender or (ii) do not in any material respect detract from the value of the relevant Project and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property, excluding Liens that will be removed and stricken as against the relevant Project pursuant to the Final Order with respect to the sale or conveyance of the Project, (c) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the relevant Project that are not violated by the current use of the Project, (d) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, (e) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey of the subject Project would disclose and (f) other Liens to which the transferor of the property, in connection with such transfer, agrees to take subject.

**2.1.148** **Person.** An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

**2.1.149** **Petition Dates.** The following are dates that each of the Voluntary Debtors Filed their voluntary chapter 11 petitions or Creditors Filed involuntary chapter 11 petitions against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
|---|---|
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves | November 14, 2008 |
| SunCal Heartland | November 12, 2008 |
| SunCal Marblehead | November 12, 2008 |
| SunCal Northlake | November 12, 2008 |
| SunCal Oak Valley | November 12, 2008 |
| SunCal Century City | November 14, 2008 |
| SunCal PSV | November 14, 2008 |
| SunCal Torrance | November 14, 2008 |
| SunCal Oak Knoll | November 19, 2008 |

**2.1.150**  **Plan.** The Lehman Plan.

**2.1.151**  **Plan Debtors.** The 24 Debtors for which the Lehman Plan is being proposed, consisting of all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**2.1.152**  **Plan Release.** In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Loans, the ES Settlement Offer and the delayed satisfaction of the Secured Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor shall be deemed to release all claims, including any Litigation Claims except certain Avoidance Actions and certain claims therein and except that, with respect to all Equitable Subordination Claims in an ES Action and certain Cross-Collateralization Claims asserted in a Cross-Collateralization Action, each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by a Project Related Action Recovery, which obligation shall be secured by the PRA Recovery Security

Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment in the amount of any Project Related Action Recovery, all as more fully set forth in Section 7.10 of the Lehman Plan.

2.1.153   **Plan Reserve.** A reserve fund established by the Liquidating Trustee to hold the Ritter Cash, all Cash Collateral of a Lehman Creditor held by a Plan Debtor, and any other Cash required or permitted to be deposited therein on the Effective Date pursuant to the terms of the Lehman Plan and which funds shall be subject to withdrawal pursuant to the terms of the Lehman Plan, including (i) all Net Cash Proceeds of sales or refinancing of certain Remaining Real Estate Projects as set forth in the Lehman Plan and (ii) any other Cash which the Lehman Related Parties may desire to deposit therein from time to time, all upon the terms and conditions set forth in Article VII of the Lehman Plan.  Such funds shall be held in account(s) to be established at an FDIC insured bank to be selected by the Liquidating Trustee with the consent of the Lehman Lenders, which consent shall not be unreasonably withheld.  There shall be separate accounts or accounting for the Ritter Cash, Net Cash Proceeds derived from each Remaining Real Estate Project and other Cash Collateral of a Lehman Creditor as to a Plan Debtor, with the Ritter Cash being attributed to the Ritter Ranch Project, Net Cash Proceeds being attributed to the Remaining Real Estate Project, the sale or refinancing of which resulted in such Net Cash Proceeds and other Cash Collateral of a Lehman Creditor being attributed to the applicable Plan Debtor.  The applicable Lehman Creditor shall report the Cash Collateral held in the Plan Reserve as being owned by it for all applicable federal, state and local income tax purposes.  The Liquidating Trustee shall distribute, or cause to be distributed, forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

2.1.154   **Post-Confirmation Account(s).**  An account with a bank, financial institution or similar depository in which the Liquidating Trustee holds Cash or other liquid assets or securities for any Plan Debtor.

2.1.155   **Post-Confirmation Expenses.**  The fees and expenses incurred by the Liquidating Trustee or the Committees following the Effective Date (including the fees and costs of

Professionals and the Lehman Post-Confirmation Loans) for the purpose of (i) prosecuting and/or liquidating the Litigation Claims; (ii) selling or otherwise liquidating the Liquidating Trustee's Assets; (iii) effectuating Distributions under the Lehman Plan; and (iv) otherwise consummating the Lehman Plan and closing the Debtor(s)' Cases.

        **2.1.156**   **PRA Recovery Deed(s) of Trust.**  A deed or deeds of trust as to any particular PRA Security Project to be granted by the Lehman Nominee in favor of the Liquidating Trustee upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale or Foreclosure Procedures, subject to any Permitted Liens, which deeds of trust (a) secure the obligations set forth in the Reconveyance Agreements, and (b) are to be released or subordinated as set forth in Section 7.7.2(c) of the Lehman Plan. The PRA Security Deeds of Trust secure, in the aggregate, an amount not in excess of the Maximum DOT Security Amount.

        **2.1.157**   **PRA Recovery Security Pool.**  At any time, collectively, the PRA Recovery Deeds of Trust then in effect and the Plan Reserve.

        **2.1.158**   **PRA Security Project.**  Each Project conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures.

        **2.1.159**   **Priority Claim.** Any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

        **2.1.160**   **Priority Tax Claim.**  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code or would be so entitled were it not secured.

        **2.1.161**   **Professional.**  A Person (a) employed by the Plan Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.162** __Professional Fees.__ All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

**2.1.163** __Projects.__ The Plan Debtors' real estate development projects as more particularly described on an Exhibit or supplement hereto to be Filed on or before the Effective Date, together with all rights, remedies, privileges and easements appurtenant thereto and all other real and personal, tangible and intangible, property related thereto.

**2.1.164** __Project Related Action.__ An ES Action or Cross-Collateralization Action.

**2.1.165** __Project Related Action Recovery.__ An ES Judgment or Cross-Collateralization Judgment.

**2.1.166** __Pro Rata.__ (a) With respect to any distribution in respect of any Allowed Claim, proportionately, so that the ratio of (i)(1) the amount of property distributed on account of such Allowed Claim to (2) the amount of such Allowed Claim, is the same as the ratio of (ii)(1) the amount of property distributed on account of all Allowed Claims of the Class or Classes of the applicable Estate sharing in such distribution to (2) the amount of all Allowed Claims in such Class or Classes of the applicable Estate; and (b) in calculating allocations of responsibility for obligations among Debtors, Pro Rata shall be determined in reference to the Liquidating Trustee's reasonable estimate of the gross value of each applicable Estate's Assets as of the Confirmation Date.

**2.1.167** __Proof of Claim.__ A proof of claim as referenced in Bankruptcy Code Section 501(a).

**2.1.168** __Proof of Interest.__ A proof of interest as referenced in Bankruptcy Code Section 501(a).

**2.1.169** __Reconveyance Agreement.__ A written agreement to be executed by, and evidencing, among other things, the non-recourse obligations of, a Lehman Nominee to which a PRA Recovery Security Project is conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures, as more fully set forth in Section 7.7.2(c)(iii) of the Lehman Plan.

**2.1.170    Remaining Other Assets.**  All of the then remaining Assets of the Plan Debtors' Estates excluding the Projects, as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**2.1.171    Remaining Real Estate Projects.**  All of the then remaining Projects as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**2.1.172    Residual Cash.**  As to any particular Plan Debtor's Estate, Net Cash Proceeds derived from the liquidation by the Liquidating Trustee of any Remaining Real Estate Projects owned by such Estate and any Remaining Other Assets of such Estate, including any applicable Net Cash Litigation Recoveries in which such Estate has an interest, to the extent not subject to a Secured Claim (or to a Claim to which such Secured Claim is subordinated) and remaining after payment or reserve for the Lehman Post-Confirmation Loans and, as provided in the Lehman Plan, certain Post-Confirmation Expenses, post-Confirmation Date intercompany payables and due and payable Allowed Administrative Claims, Allowed Priority Claims and Allowed Priority Tax Claims, all as more fully set forth in Section 7.9 of the Lehman Plan.

**2.1.173    Ritter Cash.**  As of the Effective Date, the Cash owned by Palmdale Hills or in which Palmdale Hills has any residual interest and held in escrow, reserve or other accounts for the benefit of Lehman Commercial and securing the loans made pursuant to the Ritter Ranch Loan Agreement.

**2.1.174    Ritter Ranch Loan Agreement.**  That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, and Lehman Commercial, as administrative agent and lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $264,000,000. The loans made pursuant to and/or evidenced by the Ritter Ranch Loan Agreement are secured by, among other things, a first priority deed of trust on the Ritter Ranch Project.  The outstanding balance of the loans under the Ritter Ranch Loan Agreement was not less than $287,252,096.31 as of the applicable Petition Date.

**2.1.175    Ritter Ranch Project.**  The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described herein.

**2.1.176** **SCC Communities.** SCC Communities, LLC, a limited liability company, a Voluntary Debtor herein, and the owner of the Joshua Ridge Project.

**2.1.177** **SCC LLC.** SCC Acquisitions LLC, a Delaware limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent of each of the Debtors, but not itself a Debtor in any of the Cases.

**2.1.178** **SCC Palmdale.** SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the Holder of the Allowed Interest in Palmdale Hills.

**2.1.179** **SCC Palmdale Loan Agreement. That certain** Mezzanine Credit Agreement, between SCC Palmdale, as borrower, and Lehman Commercial, as lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $95,000,000. The loan made pursuant to and/or evidenced by the SCC Palmdale Loan Agreement is secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. The outstanding balance of the loan under the SCC Palmdale Loan was not less than $119,664,305.25 as of the applicable Petition Date.

**2.1.180** **Schedules.** The schedules of assets and liabilities and list of equity security holders Filed by the Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

**2.1.181** **Secured Claim.** Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, to the extent that it is secured by a valid and unavoidable Lien on the Plan Debtor(s)' Assets.

**2.1.182** **Secured Real Property Tax Claims.** Secured Claims, other than Priority Tax Claims, held by various government entities for real property tax assessments secured by Liens on the underlying real properties owned by the Plan Debtors but that are non-recourse to the Plan Debtors.

**2.1.183** **Settling ES Claimant(s):** (1) a Settling ES Claimant by Vote or (2) an ES Claimant in an Estate which accepts the ES Settlement Offer.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.184** **Settling ES Claimant(s) by Vote:** Each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment duly executed by such ES Claimant, included with the Ballot.

**2.1.185** **Seven Brothers.** Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of that portion of the Summit Valley Project not owned by Kirby Estates or SunCal Summit Valley.

**2.1.186** **SJD Development.** SJD Development Corp., a California corporation, a Voluntary Debtor herein, and the Holder of an Allowed Interest in SJD Partners.

**2.1.187** **SJD Partners.** SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor herein, and the prior owner of the Pacific Point Project.

**2.1.188** **Successful Bidder.** With respect to the each Remaining Real Estate Project, the successful bidder at the auction for the sale of such Remaining Real Estate Project conducted by the Liquidating Trustee pursuant to the Lehman Plan Sale or Foreclosure Procedures.

**2.1.189** **Summit Valley Project.** The Project owned in part by SunCal Summit Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more particularly described herein.

**2.1.190** **SunCal.** The SunCal Companies, a trade name for Acquisitions and its Affiliates.

**2.1.191** **SunCal I.** SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

**2.1.192** **SunCal III.** SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor herein.

**2.1.193** **SunCal Beaumont.** SunCal Beaumont Heights, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Beaumont Heights Project.

**2.1.194** **SunCal Bickford.** SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

**2.1.195   SunCal Century City.** SunCal Century City, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the 10000 Santa Monica Project.

**2.1.196   SunCal Century City Loan Agreement.** That certain Loan Agreement, dated as of August 11, 2006, by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000. The SunCal Century City Loan Agreement is secured by a first-priority deed of trust on the 10000 Santa Monica Project. The SunCal Century City Loan Agreement has a balance due of $120,000,000.00 as of April 1,2009.

**2.1.197   SunCal Communities I Loan Agreement.** That certain Credit Agreement, dated as of November 17, 2005, by and among (i) SunCal I and SunCal III, as borrowers, Lehman Brothers, Inc., as sole advisor, sole lead arranger and sole bookrunner, and Lehman Commercial, as syndication and administrative agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $395,313,713.37.   The loan made pursuant to and/or evidenced by the SunCal Communities I Loan Agreement is secured directly or indirectly by (a) first priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) pledges of SunCal I's Allowed Interest in Acton Estates, SunCal Summit Valley, SunCal Beaumont; SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) pledges of SunCal Summit Valley's Allowed Interest in Seven Brothers and Kirby Estates.   The outstanding balance of the loan under the SunCal Communities I Loan Agreement was $343,221,391.06 as of the applicable Petition Date.

**2.1.198   SunCal Emerald.** SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

**2.1.199   SunCal Heartland.** SunCal Heartland, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Heartland Project

**2.1.200   SunCal Johansson.** SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Johansson Ranch Project.

**2.1.201**   **SunCal Marblehead.** SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Marblehead Project.

**2.1.202**   **SunCal Marblehead / SunCal Heartland Loan Agreement.** That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrowers in the maximum aggregate principal amount of approximately $316,061,300. The loans made pursuant to and/or evidenced by the SunCal Marblehead / SunCal Heartland Loan Agreement are secured by first priority deeds of trust on the Marblehead and the Heartland Projects. The outstanding aggregate balance of the loans under the SunCal Marblehead / SunCal Heartland Loan Agreement was not less than $354,325,126.15 as of the applicable Petition Date.

**2.1.203**   **SunCal Northlake.** LB/L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Northlake Project.

**2.1.204**   **SunCal Northlake Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 9, 2005, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans in the maximum aggregate principal amount of approximately $100,000,000. The loans made pursuant to and/or evidenced by the SunCal Northlake Loan Agreement are secured by a first priority deed of trust on the Northlake Project. The outstanding aggregate balance of the loans under the SunCal Northlake Loan Agreement was not less than $123,654,776.88 as of the applicable Petition Date.

**2.1.205**   **SunCal Oak Knoll.** SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Oak Knoll Project.

**2.1.206**   **SunCal Oak Knoll/SunCal Torrance Loan Agreement.** That certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

approximately $167,700,000. The loans made pursuant to and/or evidenced by the SunCal Oak Knoll/SunCal Torrance Loan Agreement are secured by first priority deeds of trust on the Oak Knoll and the Del Amo Projects. The outstanding aggregate balance of the loans under the SunCal Oak Knoll/SunCal Torrance Loan Agreement was not less than $157,870,186.15 as of the applicable Petition Date.

       **2.1.207**   **SunCal Oak Valley.** LB/L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Oak Valley Project.

       **2.1.208**   **SunCal Oak Valley Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal mount of approximately $120,000,000. The loans made pursuant to and/or evidenced by the SunCal Oak Valley Loan Agreement are secured by a first priority deed of trust on the Oak Valley Project. The outstanding aggregate balance of the loans under the SunCal Oak Valley Loan Agreement was not less than $143,630,091.63 as of the applicable Petition Date.

       **2.1.209**   **SunCal PSV.** SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Palm Springs Village Project.

       **2.1.210**   **SunCal PSV Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $90,000,000. The loans made pursuant to and/or evidenced by the SunCal PSV Loan Agreement are secured by a first priority deed of trust on the Palm Springs Village Project. The outstanding aggregate balance of the loans under the SunCal PSV Loan Agreement was not less than $88,257,340.20 as of the applicable Petition Date.

       **2.1.211**   **SunCal Summit Valley.** SunCal Summit Valley, LLC, a Delaware limited liability company, a Voluntary Debtor herein, the owner of that portion of the Summit

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Valley Project not owned by Kirby Estates or Seven Brothers, and the Holder of Allowed Interests in Kirby Estates and Seven Brothers.

**2.1.212    SunCal Torrance.** SunCal Torrance, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Del Amo Project.

**2.1.213    Tax.** Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

**2.1.214    Tesoro.** Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Tesoro Project.

**2.1.215    Tesoro Project.** The Project owned by Tesoro located in the City of Santa Clarita, California, as more particularly described herein.

**2.1.216    Trustee.** Steven M. Speier, the duly appointed trustee of the Trustee Debtors.

**2.1.217    Trustee Debtor(s).** The following chapter 11 debtors, individually or collectively, that are represented by the Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

**2.1.218    Trustee Debtors' Committee.** The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases of the Trustee Debtors pursuant to Section 1102 of the Bankruptcy Code.

**2.1.219    Unclaimed Property.** Cash held for Distribution if either (1) such the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.,* as undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of

any Allowed Claim on the date such Distribution first could have been made under the Plan and for one hundred twenty (120) days thereafter.

**2.1.220** **Voluntary Debtor(s).** The following chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit Valley, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

**2.1.221** **Voluntary Debtors' Committee.** The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases of the Voluntary Debtors pursuant to Section 1102 of the Bankruptcy Code.

**2.2** **Rules of Construction**. For purposes of the Lehman Plan and the Lehman Disclosure Statement, unless otherwise provided herein or in the Lehman Disclosure Statement, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Lehman Plan or the Lehman Disclosure Statement to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Lehman Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Lehman Plan or the Lehman Disclosure Statement to Sections and Articles are references to Sections and Articles of or to the Lehman Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Lehman Plan in its entirety rather than to a particular portion of the Lehman Plan; (g) unless otherwise provided in the Lehman Plan or the Lehman Disclosure Statement, any reference in the Lehman Plan or the Lehman Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Lehman Plan or the Lehman Disclosure Statement to a document or schedule to the Lehman Plan, Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Documentary Supplement, or Lehman Disclosure Statement Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Lehman Plan or the Lehman Disclosure Statement or any other provision in this Section.

### III.

### <u>TREATMENT OF UNCLASSIFIED CLAIMS</u>

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority. However, certain types of Claims are not classified in any Classes under the Lehman Plan and the Lehman Proponents have not placed such Claims in a Class. These Claims are "unclassified." As to Allowed Administrative Claims and Allowed Priority Tax Claims, these Claims are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Other unclassified Claims support Liens that have not been avoided, but are not classified to the extent the Claims were not timely Filed. The treatment of these unclassified Claims is as provided below.

**3.1** **Treatment of Allowed Administrative Claims.** Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claim Bar Date set forth herein, the Liquidating Trustee shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred prior to the Effective Date in the ordinary course of post-petition business by the Plan Debtors (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

(a) **Treatment and Repayment of the Lehman Administrative Loan(s).**

The Lehman Administrative Loans are Allowed in the amount loaned or advanced by Lehman ALI after the commencement of the Cases net of any repayment thereof and shall be paid in Cash in full on the Effective Date, together with any interest, charges and expenses due thereupon, or shall be payable at such later time and on such terms more favorable to the Liquidating Trustee to which Lehman ALI may agree. Pending any such payment or during a period of voluntary deferral by Lehman ALI, the Lehman Administrative Loans and any interest, charges and expenses due thereupon shall continue to have a first priority Lien against the respective Assets securing such loans, including any proceeds thereof deposited in the Plan Reserve or Post-Confirmation Accounts (with the exception of the Lien for the amounts due under the Lehman Administrative Loan secured by the 10000 Santa Monica Project, which shall be subordinate to the Secured Claims and Liens arising from the SunCal Century City Loan Agreement).

(b) **Administrative Claim Bar Date.**

Any Administrative Claim which is subject to an Administrative Claim Bar Date and not Filed by the applicable Administrative Claim Bar Date shall be disallowed, and no distribution shall be made on account of any such Administrative Claim.

(i)     **General Administrative Claim Bar Date**.

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Plan Debtors' postpetition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which the bar date described in the following Section shall apply) shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee no later than the General Administrative Claim Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Liquidating Trustee. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claim Bar Date and that is not Filed and served on or before the General Administrative Claim Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that is required to File a request for payment of such Administrative Claims and does not File such a request by the deadline established herein, shall be forever barred from asserting such Administrative Claims against the Plan Debtors, the Liquidating Trustee, the Plan Debtors' Estates, or any of their properties.

(ii)     **Administrative Tax Claim Bar Date**.

All requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date ("Administrative Tax Claims") and for which no bar date has otherwise previously been established, must be Filed and served on the Liquidating Trustee on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such Taxes for such tax year or period with the applicable governmental

unit.  Any Holder of an Administrative Tax Claim that is required to File a request for payment of such Taxes and does not File and properly serve such a request by the applicable bar date shall be forever barred from asserting any such Administrative Tax Claims against the Plan Debtors, Liquidating Trustee, Plan Debtors' Estates, or their properties.

### 3.2    Treatment of Priority Tax Claims.

Priority Tax Claims are certain unsecured income, employment and other Taxes described by Bankruptcy Code Section 507(a)(8) and Claims, as provided in Bankruptcy Code Section 1129(a)(7)(D) which would otherwise meet such description, but for the secured status of that Claim.  The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred cash payments over a period not exceeding five (5) years from the applicable Petition Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

At the election of the Liquidating Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not exceeding five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Liquidating Trustee, provided such treatment is on more favorable terms to the applicable Plan Debtor's Estate than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash on the Effective Date.

### 3.3    Treatment of Unavoided Liens Securing Claims That Are Not Allowed.

Unless the Holder thereof objects and other treatment, consistent with the Bankruptcy Code, is agreed upon or is permitted upon order of the Bankruptcy Court with respect to such Lien or Claim, if there is a Lien that cannot be avoided even though the Claim it secures is not Allowed, then the Lien shall continue in force, be transferred or be released and extinguished on and after the Effective Date in the same manner and to the same extent as if the Claim were an Allowed Secured Claim and any such Claim it secures shall be treated on and after the Effective Date as if it were an

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Allowed Claim. The Lehman Lenders consent to such treatment.

### IV.

### CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Lehman Plan sets forth the treatment each Class will receive. The table below lists the Classes of Claims established under the Lehman Plan and states whether each particular Class is impaired or left unimpaired by the Lehman Plan. A Class is "unimpaired" if the Lehman Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such. Further, in the event that any alleged Secured Claim is not, or only is partially, Allowed as a Secured Claim, the deficiency amount will constitute a Class 7 or Class 8 Claim against the applicable Plan Debtor, as appropriate, and will receive the same treatment as provided to other Claims in Class 7 or Class 8 of such Plan Debtor, as appropriate.

THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET COMPLETE, AND THEIR LISTING HEREIN OR IN THE TABLES BELOW SHOULD NOT BE CONSTRUED AS PROVIDING FOR ALLOWANCE UNDER THE PLAN EXCEPT AS EXPRESSLY SET FORTH FOR THE PARTICULAR CLAIM.

| CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS | | Class 1 is Unimpaired | Class 1 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 1.1 | Secured Real Property Tax Claim of Los Angeles County against the Ritter Ranch Project | | Palmdale Hills; Palmdale Hills 12 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 1:  CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS | | Class 1 is Unimpaired | Class 1 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class 1.2 | Secured Real Property Tax Claim of Los Angeles County against the Acton Project in the amount of $200 | | Acton Estates; Acton Estates 1 |
| Class 1.3 | Secured Real Property Tax Claim of Riverside County against the Emerald Meadows Project in the amount of $284 | | Emerald Meadows; Emerald Meadows 9 |
| Class 1.4 | Secured Real Property Tax Claim of Placer County against the Bickford Ranch Project | | SunCal Bickford; SunCal Bickford Scheduled Amount |
| Class 1.5 | Secured Real Property Tax Claim of Contra Costa County against the Delta Coves Project in the amount of $609,221. | | Delta Coves; Delta Coves 16 |
| Class 1.6 | Secured Real Property Tax Claim of Riverside County against the Heartland Project in the amount of $559,022. | | SunCal Heartland; SunCal Heartland 5 |
| Class 1.7 | Secured Real Property Tax Claim of Orange County against the Marblehead Project in the amount of $379,156. | | SunCal Marblehead; SunCal Marblehead 49 and 57 |
| Class 1.8 | Secured Real Property Tax Claim of Los Angeles County against the Northlake Project in the amount of $1,189,919. | | SunCal Northlake; SunCal Northlake Scheduled Amount |
| Class 1.9 | Secured Real Property Tax Claim of Riverside County against the Oak Valley Project in the amount of $280,280. | | SunCal Oak Valley; SunCal Oak Valley 9 |
| Class 1.10 | Secured Real Property Tax Claim of Los Angeles County against the 10000 Santa Monica Project in the amount of $1,407,212. | | SunCal Century City; SunCal Century City 4 |
| Class 1.11 | Secured Real Property Tax Claim of San Bernardino County against the Palm Springs Village Project in the amount of $589,367. | | SunCal PSV; SunCal PSV 22 |
| Class 1.12 | Secured Real Property Tax Claim (disputed) of Alameda County against the Oak Knoll Project in the amount of $2,356,035. | | SunCal Oak Knoll; SunCal Oak Knoll 22, 23 and 24 |
| Class 1.13 | Secured Real Property Tax Claim of Los Angeles County against the Tesoro Project in the amount of $70,239. | | Tesoro; Tesoro 2 |
| Class 1.14 | Secured Real Property Tax Claim of San Bernardino County against the Joshua Ridge Project in the amount of $5,900. | | SCC Communities; SCC Communities Scheduled Amount |
| Class 1.15 | Secured Real Property Tax Claim of Placer County against the Summit Valley Project in the amount of $ 504,245. | | SunCal Summit Valley; Palmdale Hills 97 |
| Class 1.16 | Secured Real Property Tax Claim of San Bernardino County against the Summit Valley Project in the amount of $69,530. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS | | Class 1 is Unimpaired | Class 1 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class 1.17 | Secured Real Property Tax Claim of Riverside County against the Beaumont Project in the amount of $365,954. | | SunCal Beaumont; SunCal Beaumont 9 |
| Class 1.18 | Secured Real Property Tax Claim of Stanislaus County against the Johannson Ranch Project in the amount of $75,106. | | SunCal Johannson; SunCal Johannson Scheduled Amount |
| Class 1.19 | Secured Real Property Tax Claim of San Bernardino County against Seven Brothers' property in the amount of $60,828. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 1.20 | Secured Real Property Tax Claim of San Bernardino County against the property Kirby Estates' property in the amount of $1,744. | | Kirby Estates; Kirby Estates Scheduled Amount |

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| **SunCal Communities I Loan Agreement** | | | |
| Class 2.1 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal I arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal I; SunCal I: 1 |
| Class 2.2 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | Acton Estates; Acton Estates: 6 |
| Class 2.3 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Emerald; SunCal Emerald: 7 |
| Class 2.4 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Bickford; SunCal Bickford: 16 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| <u>Class</u> | <u>Claims</u> | | <u>Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.5 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Summit Valley; SunCal Summit Valley: 12 |
| | **Ritter Ranch Loan Agreement** | | |
| Class 2.6 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31. | | Palmdale Hills; Palmdale Hills 65 |
| | **SCC Palmdale Loan Agreement** | | |
| Class 2.7 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SCC Palmdale arising from the SCC Palmdale Loan Agreement in the Allowed Amount of $119,664,305.25. | | SCC Palmdale; SCC Palmdale 1 |
| | **Bickford Second Lien Loan Agreement** | | |
| Class 2.8 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Bickford arising from the Bickford Second Loan Agreement in the Allowed Amount of $56,494,059.38. | | SunCal Bickford; SunCal Bickford 17 |
| | **Interim Loan Agreement** | | |
| Class 2.9 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59. | | SCC Communities; SCC Communities: 9 |
| Class 2.10 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Del Rio arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59. | | Del Rio; Del Rio: 14 |
| Class 2.11 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59. | | Tesoro; Tesoro: 7 |
| | **SunCal Oak Knoll/SunCal Torrance Loan Agreement** | | |

| CLASS 2:  CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.12 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64. | | SunCal Oak Knoll; SunCal Oak Knoll: 12 |
| Class 2.13 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15. | | SunCal Torrance; SunCal Torrance: 4 |
| | **Delta Coves Loan Agreement** | | |
| Class 2.14 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48. | | Delta Coves; Delta Coves 21 |
| | **SunCal Marblehead / SunCal Heartland Loan Agreement** | | |
| Class 2.15 | Allowed Secured Claim of Lehman ALI against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | | SunCal Heartland; SunCal Heartland: 9 |
| Class 2.16 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | | SunCal Marblehead; SunCal Marblehead: 21 |
| | **SunCal Oak Valley Loan Agreement** | | |
| Class 2.17 | Allowed Secured Claim of OVC Holdings or its assignee or successor against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63. | | SunCal Oak Valley; SunCal Oak Valley 16 |
| | **SunCal Northlake Loan Agreement** | | |
| Class 2.18 | Allowed Secured Claim of Northlake Holdings or its assignee or successor against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88. | | SunCal Northlake; SunCal Northlake 6 |
| | **SunCal PSV Loan Agreement** | | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.19 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal PSV arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20. | | SunCal PSV; SunCal PSV 12 |

| CLASS 3: CLASSIFICATION OF ALLOWED DANSKE SECURED CLAIM | | Class 3 is Impaired | The Class 3 Claim Holder is Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 3.1 | Secured Claim of Danske Bank against SunCal Century City arising from the SunCal Century City Loan Agreement, in the Allowed Amount of $120,000,000 . | | SunCal Century; City SunCal Century City 17 |

| CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.1 | Secured Claim of, or formerly of, Yen Chu Chang Dou, et al. pursuant to first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $3,173,499.50. | | SunCal Beaumont; SunCal Beaumont 3 |
| Class 4.2 | Secured Claim of, or formerly of, Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $136,229. | | SunCal Beaumont; Palmdale Hills 101 |
| Class 4.3 | Secured Claim of, or formerly of, William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $130,000. | | SunCal Beaumont; SunCal Beaumont [___] |
| Class 4.4 | Secured Claim of, or formerly of, Scott McDaniel pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $535,000. | | SunCal Beaumont; Palmdale Hills 20 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 4:  CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.5 | Secured Claim of, or formerly of, Wayne & Francis Lee pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $650,000. | | SunCal Beaumont; SunCal Beaumont [___] |
| Class 4.6 | Secured Claim of, or formerly of, Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $154,742. | | SunCal Beaumont; SunCal Beaumont 6 |
| Class 4.7 | Secured Claim of, or formerly of, Patricia I Volkerts pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $871,703. | | SunCal Beaumont; Palmdale Hills 11 |
| Class 4.8 | Secured Claim of, or formerly of, Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $668,250. | | SunCal Summit Valley; SunCal Summit Valley 5 |
| Class 4.9 | Secured Claim of, or formerly of, K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project in the amount of $200,000. | | SunCal Summit Valley; SunCal Summit Valley [___] |
| Class 4.10 | Secured Claim of, or formerly of, Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $1,246,500. | | SunCal Summit Valley; SunCal Summit Valley [___] |
| Class 4.11 | Secured Claim of, or formerly of, Jerry Wong Scheduled Amount & Rosalie Wong, Inc. pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $390,000. | | SunCal Summit Valley; SunCal Summit Valley [___] |
| Class 4.12 | Secured Claim of, or formerly of, Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $1,388,156. | | Seven Brothers; SunCal Summit 17 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.13 | Secured Claim of, or formerly of, Philip C. Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $296,910. | | Seven Brothers; Seven Brothers [___] |
| Class 4.14 | Secured Claim of, or formerly of, Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $880,000. | | Seven Brothers; Seven Brothers [___] |
| Class 4.15 | Secured Claim of, or formerly of, Desert Wind, LLC pursuant to a first -priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $862,000. | | Seven Brothers; Seven Brothers [___] |

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.1 | Mechanic's Lien Claim of Asphalt Professionals or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | | Palmdale Hills; Palmdale Hills 1 and 46 |
| Class 5.2 | Mechanic's Lien Claim of Sierra Cascade Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | | Palmdale Hills; Palmdale Hills 33 |
| Class 5.3 | Mechanic's Lien Claim of Staats Construction. Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | | Palmdale Hills; Palmdale Hills 51 |
| Class 5.4 | Mechanic's Lien Claim of Southland Farmers, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | | Palmdale Hills; Palmdale Hills 55, 67 and 68 |
| Class 5.5 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $1,530,146. | | Palmdale Hills; Palmdale Hills 62, 63 and 64 |
| Class 5.6 | Mechanic's Lien Claim of Chameleon Design Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | | Palmdale Hills; Palmdale Hills 93, 99 |
| Class 5.7 | Mechanic's Lien Claim of Hall & Foreman, Inc. or its assignee or successor against the Emerald Meadows Project in the amount of $287,727. | | SunCal Emerald; SunCal Emerald 13 |
| Class 5.8 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Emerald Meadows Project in the amount of $991,315. | | SunCal Emerald; SunCal Emerald 15 and 16 |
| Class 5.9 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $14,893. | | Palmdale Hills; Palmdale Hills 15 |
| Class 5.10 | Mechanic's Lien Claim of MHM Engineers or its assignee or successor against the Bickford Ranch Project in the amount of $8,916. | | SunCal Bickford; SunCal Bickford 5 |
| Class 5.11 | Mechanic's Lien Claim of Land Architecture or its assignee or successor against the Bickford Ranch Project in the amount of $100,245. | | SunCal Bickford; SunCal Bickford 6 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.12 | Mechanic's Lien Claim of Kiewit Pacific Co. or its assignee or successor against the Bickford Ranch Project in the amount of $1,868,357. | | SunCal Bickford; SunCal Bickford 10 |
| Class 5.13 | Mechanic's Lien Claim of ARB, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $1,052,272. | | SunCal Bickford; SunCal Bickford 15 |
| Class 5.14 | Mechanic's Lien Claim of Independent Construction or its assignee or successor against the Bickford Ranch Project in the amount of $117,209. | | SunCal Bickford; SunCal Bickford 28 |
| Class 5.15 | Mechanic's Lien Claim of Marques Pipeline, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $330,118. | | SunCal Bickford; SunCal Bickford 29 and 30 |
| Class 5.16 | Mechanic's Lien Claim of Pacific Soils Engineering or its assignee or successor against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | | SunCal Summit Valley; SunCal Summit Valley 9 |
| Class 5.17 | Mechanic's Lien Class of, or formerly of, Hertz Equipment Rental Corporation or its assignee or successor against the Delta Coves Project in the amount of $25,444. | | Delta Coves; Delta Coves 2 |
| Class 5.18 | Mechanic's Lien Claim of MBH Architects or its assignee or successor against the Delta Coves Project in the amount of $97,091. | | Delta Coves; Delta Coves 8 |
| Class 5.19 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Heartland Project in the amount of $47,675. | | SunCal Heartland; SunCal Heartland 2 |
| Class 5.20 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Heartland Project in the amount of $563,159. | | SunCal Heartland; SunCal Heartland 8 |
| Class 5.21 | Mechanic's Lien Claim of Dennis M. McCoy & Sons or its assignee or successor against the Heartland Project in the amount of $941,960. | | SunCal Heartland; SunCal Heartland 16 |
| Class 5.22 | Mechanic's Lien Claim of SunCal Marblehead by Trimax Systems, Inc. or its assignee or successor against the Marblehead Project in the amount of $75,286. | | SunCal Marblehead; SunCal Marblehead 3 |
| Class 5.23 | Mechanic's Lien Claim of Butsko Utility Design, Inc. or its assignee or successor against the Marblehead Project in the amount of $6,250. | | SunCal Marblehead; SunCal Marblehead 4 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5:  CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | <u>Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.24 | Mechanic's Lien Claim of Dennis RMF Contracting, Inc. or its assignee or successor against the Marblehead Project in the amount of $264,749. | | SunCal Marblehead; SunCal Marblehead 28 |
| Class 5.25 | Mechanic's Lien Claim of The Jasper Companies or its assignee or successor against the Marblehead Project in the amount of $165,260. | | SunCal Marblehead; SunCal Marblehead 29 |
| Class 5.26 | Mechanic's Lien Claim of Kirk Negrete, Inc. dba United Steel Placers or its assignee or successor against the Marblehead Project in the amount of $270,056. | | SunCal Marblehead; SunCal Marblehead 38 |
| Class 5.27 | Mechanic's Lien Claim of RBF Consulting or its assignee or successor against the Marblehead Project in the amount of $7,096. | | SunCal Marblehead; SunCal Marblehead 39 |
| Class 5.28 | Mechanic's Lien Claim of RJ Noble Co. or its assignee or successor against the Marblehead Project in the amount of $175,030. | | SunCal Marblehead; SunCal Marblehead 42, 50 and 58 |
| Class 5.29 | Mechanic's Lien Claim of Orange County Stripping Services or its assignee or successor against the Marblehead Project in the amount of $4,400. | | SunCal Marblehead; SunCal Marblehead 46 and 54 |
| Class 5.30 | Mechanic's Lien Claim of Savala Equipment Co. Inc. or its assignee or successor against the Marblehead Project in the amount of $34,440.\ | | SunCal Marblehead; SunCal Marblehead 48 and 56 |
| Class 5.31 | Mechanic's Lien Claim of Rockey Murata Landscaping or its assignee or successor against the Marblehead Project in the amount of $285,643. | | SunCal Marblehead; SunCal Marblehead 60 |
| Class 5.32 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Oak Valley Project in the amount of $52,806. | | SunCal Oak Valley; SunCal Oak Valley 3 |
| Class 5.33 | Mechanic's Lien Claim of Pinnik Inc. or its assignee or successor against the Oak Valley Project in the amount of $966,987. | | SunCal Oak Valley; SunCal Oak Valley 12 and 14 |
| Class 5.34 | Mechanic's Lien Claim of Hillcrest Contracting Inc. or its assignee or successor against the Oak Valley Project in the amount of $136,567. | | SunCal Oak Valley; SunCal Oak Valley 223 |
| Class 5.35 | Mechanic's Lien Claim of MacKenzie Landscape or its assignee or successor against the Oak Valley Project in the amount of $121,297. | | SunCal Oak Valley; SunCal Oak Valley 25 |
| Class 5.36 | Mechanic's Lien Claim of All American Asphalt or its assignee or successor against the Oak Valley Project in the amount of $60,355. | | SunCal Oak Valley; SunCal Oak Valley 26 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
| --- | --- | --- |
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.37 | Mechanic's Lien Claim of Los Angeles Times or its assignee or successor against the Oak Valley Project in the amount of $43,610. | SunCal Oak Valley; SunCal Oak Valley 31 and 32 |
| Class 5.38 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Oak Valley Project in the amount of $280,685. | SunCal Oak Valley; SunCal Oak Valley 35 and 36 |
| Class 5.39 | Mechanic's Lien Claim of Ateliers Jean Nouvel or its assignee or successor against the 10000 Santa Monica Project in the amount of $1,110,000. | SunCal Century City; SunCal Century City 15 |
| Class 5.40 | Mechanic's Lien Claim of Englekirk & Sabol Construction Structure Engineering or its assignee or successor against the 10000 Santa Monica Project in the amount of $324,520. | SunCal Century City SunCal Century City 12 |
| Class 5.41 | Mechanic's Lien Claim of Brudvik Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV; SunCal PSV 4 |
| Class 5.42 | Mechanic's Lien Claim of Larry Jacinto Construction Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV; SunCal PSV 5 and 24 |
| Class 5.43 | Mechanic's Lien Claim of William + Paddon Architects + Planners Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV; SunCal PSV 9 and 10 |
| Class 5.44 | Mechanic's Lien Claim of Southern California Edison or its assignee or successor against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV; SunCal PSV 26 |
| Class 5.45 | Mechanic's Lien Claim of Pacific Masonry Walls, Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV; SunCal PSV 33 and 39 |
| Class 5.46 | Mechanic's Lien Claim of J.R. Simplot Company or its assignee or successor against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV; SunCal PSV 34 and 40 |
| Class 5.47 | Mechanic's Lien Claim of Desert Pipeline Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV; SunCal PSV 36, 42 and 47 |
| Class 5.48 | Mechanic's Lien Claim of MSA Consulting or its assignee or successor against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV; SunCal PSV 43 |
| Class 5.49 | Mechanic's Lien Claim of Jackson DeMarco or its assignee or successor against the Palm Springs Village Project in the amount of $52,234. | SunCal PSV; SunCal PSV 45 |

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.50 | Mechanic's Lien Claim of Oliphant Gold, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $456,476. | | SunCal Oak Knoll; SunCal Oak Knoll 46 |
| Class 5.51 | Mechanic's Lien Claim of RGA Environmental, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $75,617. | | SunCal Oak Knoll; SunCal Oak Knoll 1 |
| Class 5.52 | Mechanic's Lien Claim of BKF Engineers or its assignee or successor against the Oak Knoll Project in the amount of $308,817. | | SunCal Oak Knoll; SunCal Oak Knoll 2 and 19 |
| Class 5.53 | Mechanic's Lien Claim of CST Environmental Inc. or its assignee or successor against the Oak Knoll Project in the amount of $4,316,169. | | SunCal Oak Knoll; SunCal Oak Knoll 4 and 9 |
| Class 5.54 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Beaumont Heights Project in the amount of $46,188. | | SunCal Beaumont; SunCal Beaumont 11 and 12 |

| CLASS 6: CLASSIFICATION OF ALLOWED PRIORITY CLAIMS | | Class 6 is Unimpaired | Class 6 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 6.1 | Priority Claims against SunCal Marblehead (alleged amount - $10,950). | | SunCal Marblehead; SunCal Marblehead Scheduled Amount and SunCal Marblehead 45 |
| Class 6.2 | Priority Claims against SunCal Oak Knoll (alleged amount - $235). | | SunCal Oak Knoll; SunCal Oak Knoll 26 |
| Class 6.3 | Priority Claims against Palmdale Hills (alleged amount - $10,950). | | Palmdale Hills; Palmdale Hills 70 |
| Class 6.4 | Priority Claims against SJD Partners (alleged amount - $4,188). | | SJD Partners; SJD Partners Scheduled Amount and SJD Partners 12 |

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS | | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor |
| Class 7.1 | General Unsecured Claims | | Palmdale Hills |

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS | | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor |
| | | | |
| Class 7.2 | General Unsecured Claims | | Del Rio |
| Class 7.3 | General Unsecured Claims | | SunCal Beaumont |
| Class 7.4 | General Unsecured Claims | | SunCal Emerald |
| Class 7.5 | General Unsecured Claims | | SunCal Johannson |
| Class 7.6 | General Unsecured Claims | | SunCal Summit Valley |
| Class 7.7 | General Unsecured Claims | | Acton Estates |
| Class 7.8 | General Unsecured Claims | | Delta Coves |
| Class 7.9 | General Unsecured Claims | | SunCal Heartland |
| Class 7.10 | General Unsecured Claims | | SunCal Marblehead |
| Class 7.11 | General Unsecured Claims | | SJD Partners |
| Class 7.12 | General Unsecured Claims | | SunCal Century City |
| Class 7.13 | General Unsecured Claims | | SunCal Northlake |
| Class 7.14 | General Unsecured Claims | | SunCal Oak Knoll |
| Class 7.15 | General Unsecured Claims | | SunCal Oak Valley |
| Class 7.16 | General Unsecured Claims | | SunCal PSV |
| Class 7.17 | General Unsecured Claims | | SunCal Torrance |
| Class 7.18 | General Unsecured Claims | | SCC Communities |
| Class 7.19 | General Unsecured Claims | | Tesoro |
| Class 7.20 | General Unsecured Claims | | SunCal Bickford |
| Class 7.21 | General Unsecured Claims | | SunCal I |
| Class 7.22 | General Unsecured Claims | | Seven Brothers |
| Class 7.23 | General Unsecured Claims | | Kirby Estates |
| Class 7.24 | General Unsecured Claims | | SCC Palmdale |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 8: CLASSIFICATION OF ALLOWED ES CLAIMS | | Class 8 is Impaired | Class 8 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claims |
| Class 8.1 | ES Claims | | Palmdale Hills |
| Class 8.2 | ES Claims | | Del Rio - Various Filed and Scheduled |
| Class 8.3 | ES Claims | | SunCal Emerald - Various Filed and Scheduled |
| Class 8.4 | ES Claims | | SunCal Summit Valley - Various Filed and Scheduled |
| Class 8.5 | ES Claims | | Acton Estates - Various Filed and Scheduled |
| Class 8.6 | ES Claims | | Delta Coves - Various Filed and Scheduled |
| Class 8.7 | ES Claims | | SunCal Heartland - Various Filed and Scheduled |
| Class 8.8 | ES Claims | | SunCal Marblehead - Various Filed and Scheduled |
| Class 8.9 | ES Claims | | SJD Partners - Various Filed and Scheduled |
| Class 8.10 | ES Claims | | SunCal Northlake - Various Filed and Scheduled |
| Class 8.11 | ES Claims | | SunCal Oak Knoll - Various Filed and Scheduled |
| Class 8.12 | ES Claims | | SunCal Oak Valley - Various Filed and Scheduled |
| Class 8.13 | ES Claims | | SunCal PSV - Various Filed and Scheduled |
| Class 8.14 | ES Claims | | SunCal Torrance - Various Filed and Scheduled |
| Class 8.15 | ES Claims | | SCC Communities - Various Filed and Scheduled |
| Class 8.16 | ES Claims | | Tesoro - Various Filed and Scheduled |
| Class 8.17 | ES Claims | | SunCal Bickford - Various Filed and Scheduled |
| Class 8.18 | ES Claims | | SunCal I |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 8: CLASSIFICATION OF ALLOWED ES CLAIMS | | Class 8 is Impaired | Class 8 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | <u>Plan Debtor and Basis for Claims</u> |
| Class 8.19 | ES Claims | | SCC Palmdale |

| CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS | Class 9 is Impaired | Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|
| Class | Interests (and alleged Holders) | <u>Plan Debtor and Basis for Interests</u> |
| Class 9.1 | Interests in Palmdale Hills (of SCC Palmdale). | Palmdale Hills Scheduled |
| Class 9.2 | Interests in Del Rio (of SCC LLC). | Del Rio Scheduled |
| Class 9.3 | Interests in SunCal Beaumont (of SunCal I). | SunCal Beaumont Scheduled |
| Class 9.4 | Interests in SunCal Emerald (of SunCal I). | SunCal Emerald Scheduled |
| Class 9.5 | Interests in SunCal Johannson (of SunCal I). | SunCal Johannson Scheduled |
| Class 9.6 | Interests in SunCal Summit Valley (of SunCal I). | SunCal Summit Valley Scheduled |
| Class 9.7 | Interests in Acton Estates (of SunCal I). | Acton Estates Scheduled |
| Class 9.8 | Interests in Delta Coves (of Delta Coves Member LLC). | Delta Coves Scheduled |
| Class 9.9 | Interests in SunCal Heartland (of SunCal Marblehead Heartland Master LLC). | SunCal Heartland Scheduled |
| Class 9.10 | Interests in SunCal Marblehead (of SunCal Marblehead Heartland Master LLC). | SunCal Marblehead Scheduled |
| Class 9.11 | Interests in SJD Partners (of, *inter alia,* SJD Development). | SJD Partners Scheduled |
| Class 9.12 | Interests in SunCal Century City (of SunCal Century City Member LLC). | SunCal Century City Scheduled |
| Class 9.13 | Interests in SunCal Northlake (of SCLV Northlake, LLC and SCC/Northlake, LLC). | SunCal Northlake Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS | Class 9 is Impaired | Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|
| Class | Interests (and alleged Holders) | Plan Debtor and Basis for Interests |
| Class 9.14 | Interests in SunCal Oak Knoll (of Lehman SunCal Real Estate Holdings LLC). | SunCal Oak Knoll Scheduled |
| Class 9.15 | Interests in SunCal Oak Valley (of SCLV Oak Valley LLC and SCC/Oak Valley, LLC). | SunCal Oak Valley Scheduled |
| Class 9.16 | Interests in SunCal PSV (of Lehman SunCal PSV Holdings LLC). | SunCal PSV Scheduled |
| Class 9.17 | Interests in SunCal Torrance (of Lehman SunCal Real Estate Holdings LLC). | SunCal Torrance Scheduled |
| Class 9.18 | Interests in SCC Communities (of SCC LLC). | SCC Communities Scheduled |
| Class 9.19 | Interests in Tesoro (of SCC LLC). | Tesoro Scheduled |
| Class 9.20 | Interests in SunCal Bickford (of SunCal I). | SunCal Bickford Scheduled |
| Class 9.21 | Interests in SunCal I (of SCC LLC). | SunCal I Scheduled |
| Class 9.22 | Interests in Seven Brothers (of SunCal Summit Valley). | Seven Brothers Scheduled |
| Class 9.23 | Interests in Kirby Estates (of SunCal Summit Valley). | Kirby Estates Scheduled |
| Class 9.24 | Interests in SCC Palmdale (of SCC LLC). | SCC Palmdale Scheduled |

## V.

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Any references in the Lehman Plan to Class 1, Class 2, Class 4, Class 5, Class 6, Class 7, Class 8 and Class 9 are summary references made for convenience only to the group of subclasses of each such Class (Classes 1.1 through 1.20, Classes 2.1 through 2.19, Classes 4.1 through 4.15, Classes 5.1 through 5.54, Classes 6.1 through 6.4, Classes 7.1 through 7.24, Classes 8.1 through 8.19 and Classes 9.1 through 9.24). Regardless of the treatment provided herein for any Holder of a Claim, the Holder may agree to accept less favorable treatment. Provisions for treatment below

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

for Holders of Allowed Claims are not an indication that any particular Claim is Allowed unless expressly provided.

**5.1** **Treatment of Allowed Secured Real Property Tax Claims (Classes 1.1 through 1.20).**

The treatment of Allowed Secured Real Property Tax Claims in Classes 1.1 through 1.20 under the Lehman Plan is as follows:

(a)    Classes 1.1 through 1.20 are underlined unimpaired under the Plan, and each Holder of an Allowed Secured Real Property Tax Claim is not entitled to vote on the Plan;

(b)    As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim shall retain its underlying Liens on the applicable real property collateral;

(c)    On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Real Property Tax Claim agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Real Property Tax Claim, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Real Property Tax Claim:

**A. Cash Payment.** On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Real Property Tax Claim, Cash equal to the amount of such Allowed Secured Real Property Tax Claim, or such lesser amount as to which the Holder of such Allowed Secured Real Property Tax Claim, the Liquidating Trustee and the Lehman Lenders agree; or

**B. Unimpairment.** (i) As of the Effective Date, the Holder of such Allowed Secured Real Property Tax Claim shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Real Property Tax Claim and shall be free to pursue its rights and remedies against the underlying real property collateral under applicable nonbankruptcy law;

and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder notice of the selection of this alternative treatment for such Holder.

### 5.2 Treatment of Lehman Secured Claims (Classes 2.1 through 2.19).

The treatment of Lehman Secured Claims (Classes 2.1 through 2.19) under the Lehman Plan shall be as follows:

#### 5.2.1 Voting.

Classes 2.1 through 2.19 are impaired under the Plan, and each Holder of a Lehman Secured Claim is entitled to vote on the Plan.

#### 5.2.2 Liens.

As of the Effective Date, each Holder of a Lehman Secured Claim shall retain its underlying Liens on the applicable collateral. Thereafter, additional Liens may be granted or Liens may be released all as set forth in Section 5.2 and Article VII of the Plan.

#### 5.2.3 Claims.

Subject to applicable provisions of the Lehman Plan, including Article VII of the Plan (which provisions are designed to protect (a) ES Claimants as provided therein in the event of an ES Judgment subordinating all or any part of certain Lehman Secured Claims to Allowed ES Claims and (b) the Estates of Acton Estates, Tesoro and SCC Communities in the event of a Cross-Collateralization Judgment), each Lehman Secured Claim shall be Allowed for voting and all other purposes as a Secured Claim in the amounts set forth in Article IV above; provided that (i) any deficiency shall be an Allowed Class 7 Claim in the appropriate subclass thereof; (ii) as to Lehman Secured Claims for which, as to all of the applicable collateral other than Cash Collateral of the applicable Lehman Creditor, there is a Successful Bidder in accordance with the Lehman Plan Sale or Foreclosure Procedures, the amount of a Lehman Secured Claim shall equal the sum of (a) such Cash Collateral and (b) the amount bid by the Successful Bidder for the non-Cash collateral; and (iii) as to all other Lehman Secured Claims, upon disposition of all of the collateral therefor or upon a valuation motion made by the Liquidating Trustee or the applicable Holder of any Lehman Secured Claims after abandonment or surrender thereof, the amount of the applicable Lehman Secured Claim and any related deficiency shall be accordingly adjusted.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 5.2.4     Disposition of Collateral

On the Effective Date, all Cash Collateral for a Lehman Secured Claim not used on the Effective Date as permitted or required by the Lehman Plan shall be deposited into the Plan Reserve. Certain of the Remaining Real Restate Projects shall be sold or conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures. If a Project or other Asset of a Plan Debtor which is the collateral for a Lehman Secured Claim is transferred to one or more Lehman Nominees pursuant to the Lehman Plan Sale or Foreclosure Procedures, any such Project so conveyed shall become a PRA Security Project subject to a PRA Recovery Deed of Trust as and to the extent described in Article VII of the Plan. If a Project or other Asset of a Plan Debtor which is collateral for a Lehman Secured Claim is sold to a third party purchaser, the Net Cash Proceeds therefrom shall be remitted to the Liquidating Trustee who shall hold such Net Cash Proceeds in the Plan Reserve and any non-Cash Net Proceeds therefrom shall also be remitted to the Liquidating Trustee and the applicable Lehman Lender shall be afforded a substitute Lien on such non-Cash Net Proceeds. Any remaining collateral for a Lehman Secured Claim, which is not otherwise sold or conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures may be retained, sold or abandoned by the Liquidating Trustee as provided under the Lehman Plan with the Net Cash Proceeds therefrom to be applied first to pay such Lehman Secured Claim and then to pay other Claims in accordance with the Lehman Plan, provided that, if no disposition of such collateral occurs within one (1) year after the Effective Date, the applicable Lehman Lender may enforce its Liens.

### 5.2.5     Releases, Reconveyances, Assignments and Payments.

(i)     Upon final settlement or determination of the Project Related Actions in favor of the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee shall (1) release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and terminate all Reconveyance Agreements, (2) pay the applicable Lehman Nominee the amount held in the Plan Reserve in respect of, and any other, Net Cash Proceeds of the sale of the PRA Security Project previously owned by such Lehman Nominee, (3) assign non-Cash Net Proceeds (including all substitute Liens and related, underlying obligations) (x) from the sale of any PRA Security

Project, to the applicable Lehman Nominee and (y) from the sale of any collateral for a Lehman Secured Claim, to the applicable Holder of such Lehman Secured Claim, (4) distribute to the applicable Holder of a Lehman Secured Claim any remaining non-Cash collateral for such Claim, and (5) pay to the applicable Holder of a Lehman Secured Claim, the amounts held in the Plan Reserve with respect to such Lehman Secured Claim (including any Cash Collateral of such Holder that was deposited in the Plan Reserve) and any other Net Cash Proceeds of the disposition of collateral for such Lehman Secured Claim, up to the amount of the Lehman Secured Claim, with interest and fees in accordance with its contractual terms. Thereupon, the Allowed Lehman Secured Claim shall be deemed satisfied by such payments and such conveyances of collateral free and clear as set forth in Section 7.7.2(a).

(ii)     Upon final settlement or determination of the Project Related Actions against the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee, in satisfaction of the Project Related Action Recoveries, shall distribute to the applicable Estates available Cash from the Plan Reserve and shall liquidate and distribute to the applicable Estates the Net Proceeds from the PRA Recovery Security Pool and non-Cash Net Proceeds from the sale of collateral for the Lehman Secured Claims (which are the exclusive sources of satisfaction of a Project Related Action Recovery absent a voluntary payment by a Lehman Related Party in accordance with Article VII of the Plan), and upon satisfaction of the Project Related Action Recoveries, to the extent of any remainder of such Cash or property, the Liquidating Trustee shall afford Lehman Secured Claims the treatment described in the preceding subparagraph to this Section 5.2.5 of the Lehman Plan.

(iii)    As more fully set forth in Article VII of the Plan, at any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, the Liquidating Trustee shall release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust, terminate all Reconveyance Agreements and release to the applicable Holders of Lehman Secured Claims and all Lehman Nominees all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount.

**5.3**     **Treatment of Allowed Danske Secured Claim (Class 3).**

The treatment of the Danske Secured Claim (Class 3) under the Lehman Plan shall be as follows:

    **5.3.1**     **Voting.**

Class 3 is <u>impaired</u> under the Plan, and the Holder of the Allowed Danske Secured Claim is <u>entitled to vote</u> on the Plan.

    **5.3.2**     **Liens.**

As of the Effective Date, the Holder of the Allowed Danske Secured Claim shall <u>retain its underlying Liens</u> on the applicable collateral.

    **5.3.3**     **Claims.**

The Allowed Danske Secured Claim shall be Allowed for voting and all other purposes as a Secured Claim in the amounts set forth in Article IV above; <u>provided that</u> (i) any deficiency shall be an Allowed Class 7 Claim in the appropriate subclass thereof; and (ii) upon disposition of all of the collateral for such Allowed Danske Secured Claim or upon valuation motion made by the Liquidating Trustee or the Holder of such Allowed Danske Secured Claim after abandonment or surrender of such collateral, the amount of the Allowed Danske Secured Claim and any related deficiency shall be accordingly adjusted.

    **5.3.4**     **Disposition of Collateral and Means Therefor**

On the Effective Date, all Cash Collateral for the Allowed Danske Secured Claim shall be turned over to the Holder of the Allowed Danske Secured Claim in respect of such Claim, unless the Holder agrees to permit the Liquidating Trustee to retain or use any portion thereof.

The Liquidating Trustee shall market for sale and sell the non-Cash collateral for the Allowed Danske Secured Claim, including the 10000 Santa Monica Project, or abandon all or any of such collateral upon motion to the Bankruptcy Court. The collateral, together with all associated personal property, shall be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of the Allowed Danske Secured Claim consents. The Holder of the Allowed Danske Secured Claim shall receive at least thirty (30) days' prior notice of any proposed sale. The Holder of the Allowed Danske Secured Claim may elect to credit

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

bid in response to such notice up to the full amount of the Allowed Danske Secured Claim (without the amount bid being limited to the value of the interest of the Holder of the Allowed Danske Secured Claim in such collateral).

If the collateral for the Allowed Danske Secured Claim is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, there shall be turned over or paid to the Holder of the Allowed Danske Secured Claim up to the full amount of the Allowed Danske Secured Claim from any non-Cash Net Proceeds therefrom and from the Net Cash Proceeds remaining after payment, (a) first, of SunCal Century City's Pro Rata share of the Lehman Post-Confirmation Loan, (b) second, payment of SunCal Century City's direct Post-Confirmation Expenses and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors, and (c) third, any post-Confirmation Date intercompany payables.  Any remaining Net Cash Proceeds thereafter shall be used to pay other obligations of the applicable Debtor in the priorities set forth in Section 7.9.2(b) of the Plan.  If no disposition of such collateral occurs within one (1) year after the Effective Date, the Holder of the Allowed Danske Secured Claim may enforce its Liens.  The Holder of the Allowed Danske Secured Claim may advance funds to the Liquidating Trustee for the protection of its collateral or administration of the Estate of SunCal Century City on such terms as the Holder of the Allowed Danske Secured Claim and Liquidating Trustee agree.

**5.4**    **Treatment of Allowed Other Secured Claims (Classes 4.1 Through 4.15).**

The treatment of Allowed Other Secured Claims in Classes 4.1 through 4.15 under the Lehman Plan shall be as follows:

(a)    Classes 4.1 through 4.15 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Secured Claim in Classes 4.1 through 4.15 is <u>not entitled to vote</u> on the Plan;

(b)    As of the Effective Date, each Holder of an Allowed Other Secured Claim in Classes 4.1 through 4.15 shall <u>retain its underlying Liens</u> on the applicable collateral;

(c)    On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and anticipated Liquidating Trustee, as limited below, shall select and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Other Secured Claim in

Classes 4.1 through 4.15 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Other Secured Claim in Classes 4.1 through 4.15, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Claim in Classes 4.1 through 4.15:

A. **Abandonment or Surrender.**  On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 the property securing such Allowed Other Secured Claim in Classes 4.1 through 4.15 as of the Effective Date;

B. **Cash Payment.**  On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, Cash equal to the amount of such Allowed Other Secured Claim in Classes 4.1 through 4.15, or such lesser amount as to which the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, the Liquidating Trustee and the Lehman Lenders agree; or

C. **Unimpairment.**  (i) As of the Effective Date, the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Other Secured Claim in Classes 4.1 through 4.15 for which this treatment is selected, notice of the selection of this alternative treatment for such Holder.

**5.5**   **Treatment of Allowed Secured Mechanic's Lien Claims Against the Plan Debtors (Classes 5.1 through 5.54).**

The treatment of Allowed Secured Mechanic's Lien Claims in Classes 5.1 through 5.54 under the Lehman Plan shall be as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a)    Classes 5.1 through 5.54 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 is <u>not entitled to vote</u> on the Plan;

(b)    As of the Effective Date, each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 shall <u>retain its underlying Liens</u> on the applicable collateral;

(c)    On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54:

A.  <u>**Abandonment or Surrender.**</u>  On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 the property securing such Allowed Secured Claim as of the Effective Date;

B.  <u>**Cash Payment.**</u>  On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, Cash equal to the amount of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, or such lesser amount as to which the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, the Liquidating Trustee and the Lehman Lenders agree; or

C.  <u>**Unimpairment.**</u>  (i) As of the Effective Date, the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Mechanic's Lien Claim in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Classes 5.1 through 5.54 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 for which this treatment was selected, notice of the selection of this alternative treatment for such Holder.

**5.6** **Treatment of Allowed Priority Claims (Classes 6.1 Through 6.4).**

The treatment of Allowed Priority Claims in Classes 6.1 through 6.4 under the Lehman Plan shall be as follows:

(a)     Classes 6.1 through 6.4 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Priority Claim is <u>not entitled to vote</u> on the Plan.

(b)     Each Holder of an Allowed Priority Claim shall be paid (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder of the Allowed Priority Claim and the Liquidating Trustee.

**5.7** **Treatment of Allowed General Unsecured Claims (Classes 7.1 Through 7.24).**

The treatment of Allowed General Unsecured Claims in Classes 7.1 through 7.24 under the Lehman Plan shall be as follows:

(a)     Classes 7.1 through 7.24 are <u>impaired</u> under the Plan, and each Holder of an Allowed General Unsecured Claim is <u>entitled to vote</u> on the Plan; and

(b)     As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**5.8**     **Treatment of Allowed ES Claims (Classes 8.1 through 8.19).**

The treatment of Allowed ES Claims in Classes 8.1 through 8.19 under the Lehman Plan shall be as follows:

(a)     Classes 8.1 through 8.19 are <u>impaired</u> under the Plan, and each Holder of an Allowed ES Claim is <u>entitled to vote</u> on the Plan;

(b)     As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable (subject to the terms of any ES Claimant Release and Assignment with respect to Claims against a Lehman Releasee);

(c)     Each Holder of an Allowed ES Claim also shall receive either:

(i)     <u>if the Holder of an Allowed ES Claim votes to accept the ES Settlement Offer</u> (or if there is Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted) and the Holder returns with its Ballot or to the Lehman Lenders a duly executed ES Claimant Release and Assignment, an ES Pro Rata Settlement Payment to be paid as soon as reasonably practicable after the later of: (1) the Effective Date; and (2) final allowance of such Allowed ES Claim; or

(ii)     <u>if the Holder of an Allowed ES Claim does not vote to accept the ES Settlement Offer</u> (and there is not Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted), the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with an ES Action, as and when available. For Holders of Allowed ES Claims entitled to the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with an ES Action, upon final settlement or determination of the Equitable Subordination Claims in an ES Action against the applicable Lehman Related Parties, if any and consistent therewith, the Liquidating Trustee, in satisfaction of an ES Judgment, shall distribute to the applicable Estate available Cash from the Plan Reserve and shall liquidate and distribute to the applicable Estate Net Cash Proceeds from the PRA Recovery Security Pool and from the liquidation of any non-Cash Net Proceeds from

the sale of collateral of the Holders of Lehman Secured Claims or the sale of any PRA Security Project (which are the exclusive sources of satisfaction of an ES Judgment absent a voluntary payment by a Lehman Related Party in accordance with Article VII of the Plan).

**5.9**     **Treatment of Allowed Interests**

           **(Classes 9.1 through 9.24)**

The treatment of Allowed Interests in Classes 9.1 through 9.24 under the Lehman Plan shall be as follows:

(a)     Classes 9.1 through 9.24 are <u>impaired</u> under the Plan, and each Holder of an Allowed Interest is <u>deemed to reject</u> the Plan and is <u>not entitled to vote</u>; and

(b)     On the Effective Date, all such Allowed Interests shall be cancelled.

## VI.

## ACCEPTANCE OR REJECTION OF THE PLAN

**6.1**     **Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Lehman Proponents cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Lehman Plan. Some of the requirements include that the Lehman Plan must (a) be proposed in good faith, (b) be accepted in accordance with the provisions of the Bankruptcy Code, (c) pay creditors at least as much as creditors would receive in a Chapter 7 liquidation and (d) be feasible. The requirements described herein are not the only requirements for confirmation.

**6.2**     **Who May Object to Confirmation of the Lehman Plan.**

Any party in interest may object to the confirmation of the Lehman Plan but, as explained below, not everyone is entitled to vote to accept or reject the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 6.3 Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims.

A Holder of a Claim or Interest has a right to vote for or against the Lehman Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.

Because Classes 5.1 through 5.54 are unimpaired, any Holders of <u>Allowed</u> Mechanic's Lien Claims are deemed to accept the Plan. The Lehman Proponents, however, dispute the "secured" status of all, many or most of the Claims classified in Classes 5.1 to 5.54 because they believe that there are senior Liens of Lehman Creditors and no value in the junior Liens of the Holders of Mechanic's Lien Claims. Thus, <u>each listed Holder of a Mechanic's Lien Claim will be provided a Ballot on which such Holder may elect to vote its Claims as a General Unsecured Claim or an ES Claim, as applicable, in which event the Holder will have to waive contentions that its interest in the collateral securing its Claim has any value and thus that it holds a Secured Claim against the applicable Project.</u>

### 6.4 What Is an Allowed Claim/Interest.

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

### 6.5 What Is an Impaired Class.

A Class is impaired if the Lehman Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. Under the Lehman Plan, Classes 1, 4, 5 and 6 are unimpaired and Classes 2, 3, 7, 8 and 9 are impaired.

### 6.6 Who Is Not Entitled to Vote.

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims that, pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3) or (a)(8), are entitled to priority, and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to

Bankruptcy Code Section 507(a)(2), (3) or (8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Lehman Proponents believe that (a) Classes 1, 4, 5 and 6 are unimpaired and thus are not entitled to vote because they are conclusively deemed to have accepted the Plan; (b) Class 9 Interests are being cancelled under the Plan and nothing is to be paid to their Holders and accordingly these Holders are deemed to have voted to reject the Plan and also are not entitled to vote; and (c) Classes 2, 3, 7 and 8 are impaired and are entitled to vote.

EVEN IF A CLAIM IS OF THE TYPE DESCRIBED ABOVE, A CREDITOR MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 6.7 Who Can Vote in More than One Class.

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the Unsecured Claim. Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of General Unsecured Claims and ES Claims), and may vote the Claims held in each Class.

### 6.8 Votes Necessary for a Class to Accept the Lehman Plan.

A Class of Claims is deemed to have accepted the Lehman Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Lehman Plan. A Class of interests is deemed to have accepted the Lehman Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Lehman Plan.

### 6.9 Treatment of Nonaccepting Classes.

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Lehman Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code and at least one impaired Class of Claims accepts the Lehman Plan. The process by which a plan may be confirmed and become binding on non-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

accepting Classes is commonly referred to as "cramdown." The Bankruptcy Code allows the Lehman Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Lehman Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Lehman Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**6.10** **Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The Lehman Proponents will ask the Bankruptcy Court to confirm the Lehman Plan by cramdown on any impaired Class if such Class does not vote to accept the Lehman Plan.

**VII.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**7.1** **Introduction.**

This section is intended to address how the Lehman Proponents intend to fund and to have implemented the obligations to Creditors under the Lehman Plan. It thus provides information regarding funding sources and mechanisms for the Plan obligations, management of the Plan Debtors' Estates after the Effective Date and other material issues bearing upon the performance of the Lehman Plan.

The Lehman Creditors are owed, collectively, approximately $1.9 billion secured by deeds of trust on certain of the Remaining Real Estate Projects, certain Cash Collateral and other Assets of the Debtors' Estates. The Debtors have challenged the Lehman Creditors' Secured Claims, contending that (a) certain of the Lehman Creditors' Liens on the Assets of particular Debtors who are obligors under certain Lehman Loans are subject to being set aside because, among other things, other affiliated Debtors, rather than the obligor Debtors, received the benefit of such Lehman Loans (the Cross-Collateralization Claims), and (b) the Claims of the Lehman Creditors should be subordinated to the Claims of certain other Creditors allegedly harmed by the conduct of the Lehman Lenders (the Equitable Subordination Claims). The Lehman Lenders do not concur with these conclusions of the Debtors and/or with many of the factual contentions asserted as supporting or providing a basis for the Cross-Collateralization Claims and/or Equitable Subordination Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Nonetheless, to enable the Debtors to emerge from bankruptcy, which the Lehman Lenders believe is in the interest of all Creditors, with a Plan that is fair to all constituencies and best preserves current values and prevents further deterioration in the values of the Assets of the Debtors, the Lehman Proponents have proposed the Lehman Plan through which they: (a) make available funds for ES Pro Rata Settlement Payments to settle the ES Claims of Settling ES Claimants; (b) propose, through the Lehman Plan Sale or Foreclosure Procedures, auctions of the Remaining Real Estate Projects at which third parties may bid for the Remaining Real Estate Projects and at which the Lehman Creditors and other Holders of Allowed Secured Claims may credit bid; (c) provide for the means of liquidation of the Remaining Other Assets and for the distribution of Residual Cash for Holders of both Allowed ES Claims and Allowed General Unsecured Claims; and (d) protect those ES Claimants who elect not to have the Estates settle their ES Claims by (i) making available the ES Litigation Loan to enable continued prosecution of the Equitable Subordination Claims in an ES Action, (ii) granting certain specific concessions, described below, that could facilitate the entry and collection of an ES Judgment, and (iii) providing security for satisfaction of a Project Related Action Recovery.

**7.2** **The Liquidating Trustee.**

The Estate of each Plan Debtor shall be managed after the Effective Date by the Liquidating Trustee, who, except as otherwise provided herein, shall oversee and effectuate the liquidation of the Remaining Other Assets, oversee and effectuate the sale and transfer or other disposition or liquidation of the Remaining Real Estate Projects and implement the Plan. The Liquidating Trustee shall be appointed by the Court upon nomination, if any, by a Committee and, in his or her capacity as such, shall be an agent of each Estate and not a separate taxable entity therefrom. Compensation of the Liquidating Trustee shall be reasonable hourly compensation payable from the Plan Debtors' Estates after prior notice to, *inter alia*, the Lehman Lenders, Committee members, and U.S. Trustee and after order of the Bankruptcy Court. The Bankruptcy Court may, by order, replace the Liquidating Trustee in its reasonable discretion. After the Effective Date, the Liquidating Trustee, *inter alia*, will cooperate in granting, perfecting or reflecting perfection of any Liens acknowledged or created or provided for under the Plan, will complete the claims process, will resolve or abandon

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any objections to Claims, will liquidate and/or distribute assets and will resolve or dismiss any Litigation Claims which are not waived in the Plan, all in accordance with the Plan.

**7.3**     **Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee**.

Except as otherwise provided herein or any agreement, instrument or other document relating hereto, on and after the Effective Date, all property of each Plan Debtor's Estate shall vest in each respective Estate, free and clear of all Liens. Except as may be provided herein, on and after the Effective Date, the Liquidating Trustee may operate the business of each Estate and may use, acquire or dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. On motion to the Bankruptcy Court and consent of the Lehman Lenders, the Liquidating Trustee may elect hereafter to abandon to the Plan Debtors Assets of inconsequential value.

**7.4**     **The Committee(s)**.

On the Effective Date, the Voluntary Debtors' Committee and the Trustee Debtors' Committee shall continue to serve the applicable Estates of the Plan Debtors and shall be entitled to retain, employ and compensate Professionals in order to assist with the obligations and rights of the Committees under the terms of the Lehman Plan (with compensation to be paid by the Liquidating Trustee from the Post-Confirmation Account(s)), provided that the duties of the Committee(s) after the Effective Date shall be limited to monitoring the Plan's implementation. The Liquidating Trustee shall reimburse members of the Committee without further Court Order required for their reasonable out-of-pocket expenses incurred after the Effective Date for mileage, parking, or other incidentals incurred in performing their duties as members of the Committee.

**7.5**     **Lehman Post-Confirmation Loans.**

    **7.5.1**     **Amount and Uses of Lehman Post-Confirmation Loans**.

On and after the Effective Date, the Lehman Lenders, or certain of them as described herein, will make funding available to the Liquidating Trustee, in the form of one or more loans, from either or both new Cash transfers from or on behalf of a Lehman Related Party (of up to a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

maximum of $5 million) or by permitting the use of Cash Collateral of a Lehman Creditor, including, without limitation, all or a portion of the Ritter Cash, for the following purposes and in the following amounts, provided that the proceeds of a Lehman Post-Confirmation Loan may not be utilized to pay any Lehman Post-Confirmation Expenses:

(a)      Allowed Professional Fees of the insolvency counsels for the Trustee and the Committees up to the aggregate amount of $500,000 to be made after payments from the Lehman Administrative Loans and Available Cash from the Post-Confirmation Account(s) have been exhausted;

(b)      Payments in satisfaction of Allowed Priority Claims up to the amount of $35,000 after Available Cash in the Post-Confirmation Account(s) have been exhausted;

(c)      Funding for or relating to the ES Litigation Expenses solely from proceeds from the ES Litigation Loan;

(d)      All amounts required to address critical and urgent health and safety issues on the Projects (other than 10000 Santa Monica Project) until the expiration of the earlier of (i) the date that such Project is no longer an Asset belonging to an Estate of a Plan Debtor, or (ii) thirty (30) days following the auction of such Project to occur pursuant to the Lehman Plan Sale or Foreclosure Procedures, up to the aggregate amount of $400,000 after payments made from the Post-Confirmation Accounts have been exhausted;

(e)      Payments in satisfaction of the Lehman Administrative Loans (provided that (i) payment thereof first has been made from all Cash of the Plan Debtors' Estates that is not Cash Collateral of a Lehman Creditor, with any such use of Cash of one Plan Debtor's Estate for another booked as a Post-Confirmation Date intercompany payable by the borrowing Plan Debtor's Estate and (ii) the Lehman Lenders may elect prior to receipt of payment thereupon to defer receipt thereof and be paid otherwise as provided herein for such Lehman Administrative Loans);

(f)      Obligations with respect to the Remaining Real Estate Projects while owned by the Estates, to the extent requested by the Lehman Lenders holding or representing the Holder of an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any

Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders;

(g)     Obligations with respect to the PRA Security Projects that are part of the PRA Recovery Security Pool and therefore serve as collateral for a Project Related Action Recovery to the extent requested by the Lehman Lenders or Lehman Nominee holding an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders; provided, however, that repayment of a loan made for a purpose set forth in this subparagraph shall be limited in recourse to an offset against any ES Judgment; and

(h)     To the extent that the Liquidating Trustee is unable to otherwise fund them, all additional obligations of the Liquidating Trustee (in such capacity) that arise on or after the Effective Date to the extent that both their incurrence is necessary for implementation of the Lehman Plan and they become due and payable in Cash during the term of the Lehman Post-Confirmation Loans other than and excluding (i) those obligations of the type or nature (regardless of amount) already set forth in subsection (a) through (d) above and (ii) those obligations covered in any portion by insurance or for which obtaining insurance would have been reasonable, appropriate and customary.

### 7.5.2     Cash Collateral of a Lehman Creditor.

Cash Collateral of Lehman Creditors shall be available as funding for (i) loans to the Liquidating Trustee and Plan Debtors' Estates as and to the extent set forth in the preceding numbered Section of the Plan and (ii) for payment of the ES Pro Rata Settlement Payments.  At any time, the Liquidating Trustee, as directed by a Lehman Lender, shall use Cash Collateral of the Lehman Creditors to repay a Lehman Post-Confirmation Loan that was made other than from the use of Cash Collateral.

Also, upon disposition of collateral of a Lehman Creditor or of a PRA Security Project that results in proceeds being deposited to the Plan Reserve, or upon turnover of Cash Collateral to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan Reserve, a Lien in favor of the applicable Lehman Creditor shall attach to (or remain upon) such proceeds and/or Cash Collateral held in the Plan Reserve, subject to a final settlement or determination of the Project Related Actions.

Further, at the election of a Lehman Lender and to facilitate its extension of credit under the Plan, as to any payment that was to be made with funds comprising Cash Collateral of a Lehman Creditor, the Lehman Lender may direct the Liquidating Trustee to instead use the funds from a Lehman Post-Confirmation Loan in the form of new Cash from a Lehman Lender and to pay a like amount of Cash Collateral securing a Lehman Loan towards a reduction of such Lehman Loan, as the Lehman Lender directs, provided, however, that such use of Cash Collateral shall not itself be a Lehman Post-Confirmation Loan and, if such use occurs before termination of the Lehman Post-Confirmation Loan, the $5 million maximum Cash commitment of the Lehman Lenders with respect to the Lehman Post-Confirmation Loans shall increase by the amount of Cash Collateral so used to pay a Lehman Loan.

### 7.5.3    Terms and Documentation of Lehman Post-Confirmation Loans.

The Liquidating Trustee shall reasonably execute all documents reasonably requested by a Lehman Lender to evidence the Lehman Post-Confirmation Loan and the Liens securing it on terms and in a form reasonably requested by such Lehman Lender, with customary and reasonable provisions for interest, fees and expenses thereupon.  The Lehman Post-Confirmation Loan is Allowed in the amount of all funding by or on behalf of any Lehman Lender with respect thereto plus interest, fees, expenses and other charges as provided herein and in the documentation thereof. The Lehman Post-Confirmation Loan shall be an obligation of the Liquidating Trustee, payable as provided herein and secured by a self-effectuating, first priority Lien on the Post-Confirmation Accounts, Plan Reserve and all proceeds of the Plan Debtors' Assets.  The Lehman Post-Confirmation Loan is payable as set forth under the Lehman Plan, provided that, in all events, the Lehman Post-Confirmation Loan shall terminate and the Liquidating Trustee shall pay the Lehman Post-Confirmation Loan and all related interest, fees, expenses and other charges in full no later than sixty (60) days following the settlement and/or final determination of the Project Related Actions; provided, further, that to the extent such Lehman Post-Confirmation Loan is made with

funds comprising Cash Collateral of a Lehman Creditor and any applicable Lehman Creditor's Claim secured by a Lien upon such Cash Collateral is subordinated or set aside by a Project Related Action Recovery, repayment of such portion of the Lehman Post-Confirmation Loan funded with funds comprising Cash Collateral, or interest thereon, shall be effectuated by offset, dollar for dollar, against the benefits, recoveries and proceeds otherwise afforded by such Project Related Action Recovery.

**7.6** **Plan Reserve and Post-Confirmation Accounts.**

In order to, among other things, provide for a source of recovery in respect of Non-Settled ES Claims should an ES Judgment be obtained for the benefit of the Holders of such Non-Settled ES Claims, and in respect of the applicable Estates and their Creditors should a Cross-Collateralization Judgment be obtained for the benefit of such Creditors, the Lehman Lenders are making available Cash on which the Lehman Creditors claim a Lien. Specifically, (a) on the Effective Date, all Cash of the Estates of the Plan Debtors not otherwise distributed in accordance with the Plan shall be held by the Liquidating Trustee either in the Plan Reserve or a Post-Confirmation Account pending payment of any Post-Confirmation Expenses or distribution in accordance with the Plan, (b) on and after the Effective Date, all Cash Collateral of the Lehman Creditors shall be deposited by the Liquidating Trustee into the Plan Reserve, pending distribution or payment in accordance with the Plan, (c) all new Cash transfers from or on behalf of a Lehman Lender that are proceeds of or comprising a Lehman Post-Confirmation Loan shall be deposited in or held in the Plan Reserve until utilized in accordance with the Lehman Plan, and (d) on and after the Effective Date, the Lehman Lenders shall have a Lien and/or retain their Lien on all Cash in the Plan Reserve, which Cash also shall serve, among other things, as a reserve for satisfaction of a Project Related Action Recovery and shall be a component of the PRA Recovery Security Pool. The applicable Lehman Creditor shall report the Cash Collateral held in the Plan Reserve as being owned by it for all applicable federal, state and local income tax purposes. The Liquidating Trustee shall distribute, or cause to be distributed, forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## 7.7    Disposition of Assets

The Assets of the Estates of the Plan Debtors consist primarily of certain Remaining Real Estate Projects and certain Cash that is Cash Collateral for Lehman Secured Claims.  There also may be certain Remaining Other Assets, including Litigation Claims.  (Litigation Claims possibly could result in affirmative recoveries for the Estates or possibly could reduce the size of the Creditor Claims to share in available Cash for distribution.)

### 7.7.1    Litigation Claims, Net Cash Litigation Recoveries and Remaining Other Assets.

The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee, and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors in accordance with the Plan.  Pursuant to Section 1123(b)(3) of the Bankruptcy Code and subject to the compromises, waivers and releases provided herein, the Liquidating Trustee shall retain all Litigation Claims whether or not pending on the Effective Date. Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Lehman Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Liquidating Trustee may pursue such Litigation Claims. The Liquidating Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 without a Lehman Lender's consent and absent providing ten (10) days' prior written notice and opportunity to object to the Committees; and the Lehman Lenders may pursue any Litigation Claim for the applicable Estate or Estates that, upon request, the Trustee does not agree to pursue. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.  All Net Cash Litigation Recoveries realized or obtained in respect of Litigation Claims of the Estates shall be promptly deposited into the Post-Confirmation Account(s) or Plan Reserve, as appropriate. Except as otherwise provided in the Lehman Plan and the Confirmation Order, the Net Cash Litigation Recoveries shall be free and clear of all Liens and shall only be expended in accordance with the provisions of the Lehman Plan.

## 7.8    Disposition of the Remaining Real Estate Projects.

The disposition of the Remaining Real Estate Projects or related Assets shall be as follows:

### 7.8.1      Lehman Plan Sale or Foreclosure Procedures.

a.      Upon the Effective Date, the Liquidating Trustee shall market for sale the Remaining Real Estate Projects and related Assets pursuant hereto.

b.      Within sixty (60) days after the Effective Date, the Liquidating Trustee shall hold auctions on such dates and at such times and places as is reasonably established by the Liquidating Trustee, provided that all auctions shall occur no later than sixty (60) days after the Effective Date. At the auctions, the Remaining Real Estate Projects and related Assets for which there is a Successful Bidder shall be sold or conveyed to a third party purchaser, a Lehman Nominee, or another Holder of an Allowed Secured Claim who submits a qualifying bid and becomes the Successful Bidder in accordance herewith and pursuant to the further detailed procedures for such bidding and auctions, which detailed procedures shall be in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Lenders or other owners and the Liquidating Trustee or approval of the Bankruptcy Court (the "Detailed Sale / Foreclosure Procedures").

c.      Pursuant to Bankruptcy Code Section 363 and the Lehman Plan, at the auction of each Remaining Real Estate Project, such Remaining Real Estate Project and all associated personal property, including the applicable Plan Debtor's Estate's right, title and interest in, to and under any development agreements, plans, engineering reports and community facilities district bonds, shall be sold (if to a third party purchaser) or conveyed pursuant to judicial foreclosure by virtue of the Confirmation Order (if to a Holder of an Allowed Secured Claim) to the highest bidder or its nominee free and clear of any Encumbrances (other than the Permitted Liens) with such Encumbrances (other than the Permitted Liens) not paid in connection with the transaction to attach to the consideration to be received by the Liquidating Trustee in the same priority and subject to the same defenses and avoidability, if any, as before the closing of the transaction. The Liquidating Trustee shall obtain a hearing date from the Bankruptcy Court at which the Bankruptcy Court shall issue an Order approving such sales or conveyances to the extent

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

consistent herewith and order that such sale or conveyance shall be free and clear of all

Encumbrances (other than Permitted Liens) in accordance herewith.  Consistent with each

particular bid, debts and obligations secured by existing Encumbrances on said Remaining Real

Estate Projects or related property at the time of sale or conveyance either shall be paid in full upon

such sale or conveyance, attach to the Net Cash Proceeds with the same validity, priority and extent

to which they attach to the underlying collateral (such as would occur with respect to the Lehman

Secured Claims upon a sale to a third party purchaser) or be unimpaired in which case the

Remaining Real Estate Projects or other assets sold or conveyed shall remain encumbered by the

Encumbrances thereon securing the unimpaired debts and obligations and such Encumbrances

would be Permitted Liens.

        d.      Subject to the terms of the Lehman Plan, the respective Lehman

Creditors commit to credit bid the following "Initial Bids" at the auctions as to the indicated Assets

and may elect hereafter to make the following "Contingent Bids" at the auctions with respect to the

indicated Assets as set forth in the following table:

| **LEHMAN CREDITORS' INITIAL BIDS AND CONTINGENT BIDS** | | | | | |
|---|---|---|---|---|---|
| **Initial Bid #; Cont. Bid Letter** | **Class** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
| 1 | Class 2.3 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal Emerald; SunCal Emerald: 7 | Emerald Meadows Project | Initial Bid: $12 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| 2 | Class 2.4 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal Bickford; SunCal Bickford: 16 | Bickford Ranch Project | Initial Bid: $29.5 Million |
|---|---|---|---|---|---|
| 3 | Class 2.6 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31. | Palmdale Hills; Palmdale Hills 65 | Ritter Ranch Project | Initial Bid: $42.9 Million |
| 4 | Class 2.12 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64. | SunCal Oak Knoll; SunCal Oak Knoll: 12 | Oak Knoll Project | Initial Bid: $48 Million |
| 5 | Class 2.13 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15. | SunCal Torrance; SunCal Torrance: 4 | Del Amo Project | Initial Bid: $25 Million |
| 6 | Class 2.14 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48. | Delta Coves; Delta Coves 21 | Delta Coves Project | Initial Bid: $25.2 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | | | | |
|---|---|---|---|---|---|
| 7 | Class 2.15 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | SunCal Heartland; SunCal Heartland: 9 | Marblehead Project | Initial Bid: $187.5 Million |
| 8 | Class 2.16 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | SunCal Marblehead; SunCal Marblehead: 21 | Heartland Project | Initial Bid: $7.9 Million |
| 9 | Class 2.17 | Allowed Secured Claim of OVC Holdings against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63. | SunCal Oak Valley; SunCal Oak Valley 16 | Oak Valley Project | Initial Bid: $20.9 Million |
| 10 | Class 2.18 | Allowed Secured Claim of Northlake Holdings against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88. | SunCal Northlake; SunCal Northlake 6 | Northlake Project | Initial Bid: $23 Million |
| 11 | Class 2.19 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal PSV arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20. | SunCal PSV; SunCal PSV 12 | Palm Springs Village Project | Initial Bid: $13.8 Million |
| A | Class 2.1 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal I arising from the SunCal Communities I Loan | SunCal I; SunCal I: 1 | SunCal Beaumont's Beaumont Heights Project | Contingent Bid: $1.2 Million |

| | | | Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Johannson's Johannson Ranch Project | Contingent Bid: $2.1 Million |
|---|---|---|---|---|---|---|
| | | | | | SunCal Summit Valley's Summit Valley Project | Contingent Bid: $750,000 |
| B | Class 2.2 | | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | Acton Estates; Acton Estates: 6 | Acton Project | Contingent Bid: $3.4 Million |
| C | Class 2.5 | | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal Summit Valley; SunCal Summit Valley: 12 | Ownership Interests of Kirby Estates and Seven Brothers in Summit Valley Project | Contingent Bid: $1.075 Million |
| D | Class 2.9 | | Allowed Secured Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59. | SCC Communities; SCC Communities: 9 | Joshua Ridge Project | Contingent Bid: $1 Million |
| E | Class 2.11 | | Allowed Secured Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59. | Tesoro; Tesoro: 7 | Tesoro Project | Contingent Bid: $1.5 Million |

e.      Qualifying bids by third party purchasers must be bids for payment in Cash.  Other Holders of Allowed Secured Claims may credit bid such amount of their Allowed Secured Claims as agreed with the Liquidating Trustee or fixed by the Bankruptcy Court, in each case on a Project by Project basis.  The bids of such other Holders of Allowed Secured Claims and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

third party purchasers must comply with and be made consistent with the Detailed Sale / Foreclosure Procedures. If a qualifying bid or bids are received for any Project within forty-five (45) days after the Effective Date, such bids shall be Filed with the Bankruptcy Court by the Liquidating Trustee.

f.     The Initial Bids and, if made by any Lehman Creditor (and subject to the following), the Contingent Bids, and any increased bids thereof by Lehman Creditors up to the outstanding amount of the applicable Lehman Loans as set forth in Article IV of the Lehman Plan, each shall be deemed fully qualifying and eligible bids for all purposes of such auctions and the Detailed Sale / Foreclosure Procedures. If no higher and better bid is made by another Holder of an Allowed Secured Claim or third party purchaser in accordance with the Detailed Sale / Foreclosure Procedures, the applicable Lehman Creditor shall be the Successful Bidder and the Liquidating Trustee shall convey the subject Project and related Assets to a Lehman Nominee in accordance herewith. The Lehman Nominee shall report the subject Project and related Assets as being owned by it for all applicable federal, state and local income tax purposes. If there is no Successful Bidder with respect to an Asset, the Liquidating Trustee need not sell or convey it pursuant to the Lehman Plan Sale or Foreclosure Procedures.

g.     The Initial Bids are in the amount of the Lehman Creditors' previously appraised values for the subject Projects. The Contingent Bids are in the amounts of the Debtors' value estimates as set forth in the Debtors' Second Amended Disclosure Statement. The Contingent Bids relate to Assets as to which either (1) the Debtors have alleged that the Lien of the applicable Lehman Lender is subject to a Cross-Collateralization Claim or (2) a Lehman Lender holds a Lien on the equity interest in the owner of the Project, but not directly upon the Project itself.

h.     Although a Lehman Creditor may at any time elect to bid Cash for an Asset on the same terms as other third parties, for bids made through the Initial Bids and, if the applicable Lehman Creditors elect to make them, bids made through the Contingent Bids, Creditors are protected, as and to the extent provided herein:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(1) Any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures pursuant to an Initial Bid or Contingent Bid or increased bid therefrom, as set forth above (each a "PRA Security Project") shall be encumbered by a PRA Recovery Deed of Trust and such Lehman Nominee shall execute a Reconveyance Agreement.

(2) Contingent Bids B, D and E, identified in the table above, relate to three Remaining Real Estate Projects as to which the Debtors have alleged that the Lien of the Lehman Lender is subject to a Cross-Collateralization Claim. If a Lehman Creditor is a Successful Bidder pursuant to Contingent Bid B, D or E, a reconveyance obligation for a Cross-Collateralization Judgment will apply as to such Project as set forth herein and such obligation will be secured by a PRA Recovery Deed of Trust (which shall be released as provided herein).

(3) Contingent Bids A and C, identified in the table above, relate to three Remaining Real Estate Projects as to which a Lehman Lender holds a Lien on the equity interests in the owners of such Remaining Real Estate Projects, but not directly upon the Remaining Real Estate Projects. Contingent Bids A and C are in the amount of the Debtors' estimate of value for the applicable Remaining Real Estate Project set forth in the Debtors' Second Amended Disclosure Statement. They will include a Cash portion equal to the full amount of the bid, or, if less, 110% of the aggregate amount of all non-Lehman Creditor Claims against the particular Plan Debtor owning the subject Remaining Real Estate Project as estimated in the Debtors' Second Amended Disclosure Statement. The Cash portions of Contingent Bids A and C, identified in the table above, for these three Remaining Real Estate Projects, divided among the five Plan Debtor owners thereof, are as follows: Beaumont Heights Project (owned by SunCal Beaumont): $689,200 Cash; Johannson Ranch Project (owned by SunCal Johannson): $165,427 Cash; Summit Valley Project (the portion owned by SunCal Summit Valley): $750,000 Cash (entire bid); Summit Valley Project (the portion owned by Kirby Estates): $2,000 Cash; and Summit Valley Project (the portion owned by Seven Brothers): $66,911 Cash.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 7.8.2 Net Proceeds from Sales of Remaining Real Estate Projects to Third Party Purchasers.

If a Remaining Real Estate Project subject to a Lehman Lender's Lien is sold to a third party purchaser (rather than sold or conveyed to a Lehman Nominee), as to the Net Cash Proceeds therefrom, the Liquidating Trustee shall hold such Net Cash Proceeds in the Plan Reserve and, as to non-Cash Net Proceeds to the Liquidating Trustee therefrom, the applicable Lehman Lenders shall be afforded a substitute Liens on such non-Cash Net Proceeds.

### 7.8.3 PRA Recovery Security Pool.

#### (a) Generally.

The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims. If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in an ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), and if a variety of other litigation hurdles were overcome, the values of the Remaining Real Estate Projects against which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding and may bid possibly would be available to satisfy the Project Related Action Recovery. Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (1) certain Cash is to be held by the Liquidating Trustee in the Plan Reserve and the remainder therefrom shall be available to satisfy such Project Related Action Recovery to the extent otherwise provided under the Lehman Plan and (2) any Remaining Real Estate Project that is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures shall be subject to a PRA Recovery Deed of Trust (collectively, the "PRA Recovery Security Pool."

At any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, by voluntary payment of a Lehman Related Party or otherwise, the Liquidating Trustee shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds

amongst them) all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount. At any time that all Project Related Actions that were timely Filed and Filed no later than sixty (60) days following the Effective Date either (I) have been dismissed with prejudice and/or settled or (II) the Project Related Action Recovery with respect thereto as against the applicable Lehman Related Parties has been fully satisfied, the Liquidating Trustee, upon the request of the applicable Lehman Related Parties, shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve.

### (b)    PRA Recovery Deeds of Trust.

Upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale or Foreclosure Procedures, the Lehman Lenders will cause the applicable Lehman Nominees taking title to the applicable PRA Security Project to record a PRA Recovery Deed of Trust.  The Liquidating Trustee shall be the named beneficiary under any PRA Recovery Deed of Trust and, in his or her sole discretion, may delay, defer or waive receipt of the benefits or the recording thereof as to one or more Remaining Real Estate Projects.  Each PRA Recovery Deed of Trust is being given solely for the purpose of creating a Lien on the applicable PRA Security Project to be part of the PRA Recovery Security Pool and nothing contained therein shall in any way restrict or interfere with the rights of the owner of such PRA Security Project, including, without limitation, such owner's right to own, manage, operate, improve, sell, convey, refinance, encumber and otherwise deal with such PRA Security Project.

Each PRA Recovery Deed of Trust shall secure the non-recourse obligation of each Lehman Nominee who is the owner of each relevant PRA Security Project to reconvey the applicable PRA Security Project to the Liquidating Trustee in the event of a Project Related Action Recovery, subject to the terms of the Reconveyance Agreements and subject to the option of the Lehman Nominee to pay in Cash the amount of the Project Related Action Recovery in lieu of effectuating such reconveyance.  In aggregate, the PRA Security Deeds of Trust secure an amount not in excess of the Maximum DOT Security Amount.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Each PRA Recovery Deed of Trust shall also provide that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above (the "Negative Covenant").  If such Lehman Nominee fails to comply with the foregoing Negative Covenant for thirty (30) days following written notice and an opportunity to cure, then the Liquidating Trustee shall have the right to seek damages against Lehman ALI and Lehman Commercial, jointly and severally, and any claims arising from the pursuit of such remedies shall be treated as administrative expense claims in Lehman Commercial's bankruptcy case and, if Lehman ALI is then subject to its own bankruptcy proceeding, Lehman ALI shall use its best efforts to afford the same administrative priority to such claims in any such bankruptcy case.  Any payments made or assets seized in satisfaction of any judgment based on such damage claims shall be deposited into the Plan Reserve.  In addition, if a Lehman Nominee fails to pay or cause to be paid any property taxes or assessments due and payable with respect to the PRA Security Project owned by such Lehman Nominee on or prior to the date which is six (6) months prior to the earliest date on which a foreclosure of such PRA Security Project could be effectuated for non-payment of property taxes or assessments, then the Liquidating Trustee shall have the right to make a protective advance for the payment of such taxes or assessments and to foreclose upon the applicable PRA Recovery Deed of Trust encumbering such PRA Security Project in order to repay any such outstanding protective advance; provided that any proceeds of any such foreclosure sale and any interest acquired by the Liquidating Trustee in

connection with any such foreclosure sale shall be deposited into the Plan Reserve pending the completion of the Project Related Actions.

## (c)     Reconveyance Agreements.

The non-recourse performance obligations for turnover and reconveyance of each PRA Security Project secured by the applicable PRA Recovery Deed of Trust shall be in a writing (each, a "Reconveyance Agreement"), which writing is to be executed by the applicable Lehman Nominee that takes ownership of the subject PRA Security Project and shall be in a form acceptable to the Lehman Lenders or Lehman Nominee and Liquidating Trustee or as reasonably proposed by the Lehman Lenders or Lehman Nominee and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner of the applicable PRA Security Project and Liquidating Trustee or approval of the Bankruptcy Court. At a Lehman Nominee's election, such non-recourse obligations, instead may be satisfied by a Cash payment in the amount of any applicable Project Related Action Recovery.

The obligations to reconvey a particular PRA Security Project following the occurrence of, and in satisfaction of, a Cross-Collateralization Judgment or an ES Judgment are distinct. The reconveyance obligation with respect to an ES Judgment shall be included in each Reconveyance Agreement. The reconveyance obligation with respect to a Cross-Collateralization Judgment shall be included only in the Reconveyance Agreement related to the PRA Security Project as to which a Cross-Collateralization Claim is alleged in a Cross-Collateralization Action. The benefits of the reconveyance obligations with respect to ES Judgments, if any, are themselves to be cross-collateralized, to the extent provided herein, by virtue of the concessions being made by the Lehman Creditors to benefit Non-Settling ES Claimants as described in Section 7.8.5(b) of the Plan. A reconveyance obligation with respect to a Cross-Collateralization Judgment, if any, shall only apply with respect to the particular PRA Security Project as to which the Lien of the applicable Lehman Creditor is avoided by the Cross-Collateralization Judgment and the benefits thereof, if any, only shall inure to the Holders of Allowed Claims against the Plan Debtor that owned such PRA Security Project as provided in Section 7.9.2 of the Plan. Nonetheless, for PRA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Security Projects as to which the Reconveyance Agreement contains obligations to reconvey for both an ES Judgment and a Cross-Collateralization Judgment, the distribution priorities as to the Net Cash Proceeds from the disposition of the reconveyed PRA Security Project, set forth in Section 7.9.2 of the Plan, give priority to the Cross-Collateralization Judgment, which in theory would be setting aside the Lien as to which the related ES Judgment seeks to transfer the now extinguished benefits.

### (d)    Release of PRA Recovery Deeds of Trust.

The PRA Recovery Deeds of Trust generally shall remain in effect pending the final settlement or determination of the Project Related Actions. Thus, all PRA Recovery Deeds of Trust shall be released and reconveyed and all Reconveyance Agreements shall be terminated upon:

(1)    the dismissal, with prejudice, and/or settlement of all Project Related Actions against the applicable Lehman Related Parties, or

(2)    full satisfaction of each Project Related Action Recovery as against the applicable Lehman Related Parties.

Additionally, in order to permit the Lehman Nominees holding title to the PRA Security Projects to fully utilize such properties:

A.    all of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated at such time as the balance of funds in the Plan Reserve is equal to the Maximum PRA Recovery Amount; and

B.    the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be released and the corresponding Reconveyance Agreement terminated upon the sale of such Project to a third party and the deposit of any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale; and

C.    the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Proceeds derived from such refinancing are deposited into the Plan Reserve.

Whenever Lien releases or subordinations are required, the Liquidating Trustee shall act reasonably in arranging to provide, and in executing such documents as the applicable Lehman Nominee reasonably requests to effectuate, the reconveyance in full of the PRA Recovery Deeds of Trust.

**(e)** **Reduction of Maximum PRA Recovery Amount.**

The Maximum PRA Recovery Amount, which serves as the maximum aggregate amount secured by the PRA Recovery Security Pool, is an amount intended to be not less than the maximum potential cash value of the Project Related Action Recovery. For the calculation of the Maximum PRA Recovery Amount, the definition thereof herein includes, unless rebutted with lower figures, presumptions that the maximum cash value of the potential Project Related Action Recovery for Cross-Collateralization Judgments is $1.74 million and for ES Judgments is $200 million. If, however, a Lehman Lender Files a motion with the Bankruptcy Court and provides relevant evidence, as follows, the Maximum PRA Recovery Amount shall be reduced accordingly:

(1) to replace the amount used in subparagraph (a) of the definition of Maximum PRA Recovery Amount (Section 2.1.141 of the Plan), the Bankruptcy Court must find that a lower number results upon determining (I) the lesser of (A) the maximum cash value, if any, of the Lehman Secured Claims alleged to be subject to being set aside pursuant to a Cross-Collateralization Judgment, which Secured Claims are against any of the Acton Project, Joshua Ridge Project or Tesoro Project as is conveyed to a Lehman Nominee upon a credit bid and (B) the maximum Claims (other than Claims of Lehman Creditors) against Acton Estates, SCC Communities or Tesoro (as to which Plan Debtors, there are pending Cross-Collateralization Claims in a pending Cross-Collateralization Action against a Lehman Related Party and the Project owned by such Estate has been conveyed to a Lehman Nominee pursuant to a credit bid), and (II) subtracting from such amount the value of all direct or indirect benefits to the subject Plan Debtor resulting from the subject Lehman Loan; and/or

(2) to replace the amount used in subparagraph (b)(i) of the definition of Maximum PRA Recovery Amount (Section 2.1.141 of the Plan), the Bankruptcy

Court finds that a lower number results upon determining (I) the lesser of (A) the maximum cash value of the Lehman Secured Claims in the Plan Debtors' Assets that are alleged to be subject to subordination pursuant to an ES Judgment and (B) the maximum Claims (other than Claims of Lehman Creditors) against the Plan Debtors (as to which there are pending allegations in an ES Action that a Lehman Secured Claim is subject to subordination).

### 7.8.4 <u>Sale or Refinance of PRA Security Projects.</u>

a. The Lehman Nominee(s) will have full right to sell and/or refinance the PRA Security Projects in all respects after the conveyance thereof to the Lehman Nominee(s) pursuant to the Lehman Plan Sale or Foreclosure Procedures without any interference by the Liquidating Trustee, SunCal, the Trustee, the Debtors or any of their respective Affiliates or any ES Claimants or other Creditors of the applicable Plan Debtors.

b. If any particular PRA Security Project is thereafter sold by a Lehman Nominee other than to a Lehman Related Party, (a) the Liquidating Trustee shall release the PRA Recovery Deed(s) of Trust as to such PRA Security Project, (b) the Net Cash Proceeds derived from such sale shall be deposited into the Plan Reserve, and (c) the Lehman Nominee shall grant the Liquidating Trustee a substitute Lien in any non-Cash Net Proceeds received by such Lehman Nominee to become part of the PRA Recovery Security Pool and to be subject to the same terms as other PRA Recovery Deeds of Trust.

c. If any particular PRA Security Project is refinanced by the Lehman Nominee, (a) the Liquidating Trustee shall agree to subordinate the PRA Recovery Deed(s) of Trust as to such PRA Security Project so as to permit the imposition on the PRA Security Project of a new senior refinancing Lien, and (b) the Net Cash Proceeds derived from such refinancing shall be deposited into the Plan Reserve.

d. If any particular PRA Security Project is sold by a Lehman Nominee to another Lehman Related Party, then either (x) such sale may be made subject to the PRA Recovery Deed(s) of Trust (which shall be mandatory if the transferee is a Lehman Creditor Party), or (y) all of the following shall apply: (1) there shall be deposited into the Plan Reserve all Net Cash Proceeds received by the Lehman Nominee in connection with such transfer, (2) the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Liquidating Trustee shall be granted a substitute Lien on any non-Cash Net Proceeds received by a Lehman Nominee in connection with such transfer and (3) a Lien either (I) against the equity interest in the joint venture or similar entity of the Lehman Nominee or (II) against the most direct interest held by a Lehman Nominee, shall be granted to the Liquidating Trustee and the Lien so granted shall become part of the PRA Recovery Security Pool and be subject to the same terms as the PRA Recovery Deeds of Trust.

   e. As to any Remaining Real Estate Projects not sold or conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures:  (i) they shall be otherwise liquidated by the Liquidating Trustee or may be abandoned or surrendered with the consent of the Lehman Lenders and after approval of the Bankruptcy Court; (ii) such Remaining Real Estate Projects may be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of an Allowed Secured Claim with respect thereto consents; (iii) the Holder of any such Allowed Secured Claim (including any applicable Holder of any Lehman Secured Claim) shall receive at least thirty (30) days' prior notice of any proposed sale and may elect to credit bid in response to such notice up to the full amount of its Claim for which the item being sold is collateral (without the amount bid being limited to the value of the Holder's interest in such collateral); (iv) if the Remaining Real Estate Project is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, the Net Cash Proceeds (and any non-Cash Net Proceeds) therefrom shall be paid or turned over to the Holders of Allowed Secured Claims against such Remaining Real Estate Project up to the full amount of each such Holder's Allowed Claim (or used in payment of other Claims as otherwise set forth in the Lehman Plan in respect of the treatment of such Allowed Secured Claims) and any remaining Net Cash Proceeds shall be used to pay other obligations of the applicable Plan Debtor's Estate in the priorities set forth in Section 7.9.2(b) of the Plan.

  **7.9** **Equitable Subordination Claims**

   **7.9.1** **Generally.**

  As set forth in Section 5.8, ES Claimants are afforded the option to vote either for acceptance of the ES Settlement Offer and the specified benefits it provides or to have the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit.

### 7.9.2    ES Settlement Offer.

#### (a)    Payments to ES Settling Claimants.

The Settling ES Claimants are to receive the ES Pro Rata Settlement Payments as and to the extent set forth in Section 5.8.

#### (b)    Releases and Assignments.

In exchange for the ES Pro Rata Settlement Payments:  (A) the Liquidating Trustee will issue an Estate ES Settlement Release as to each Estate in which any Settling ES Claimant holds its Allowed ES Claim; (B) each Settling ES Claimant will issue an ES Claimant Release and Assignment; and (C) if there is Estate Acceptance of the ES Settlement as to all applicable Estates of the ES Plan Debtors, the Liquidating Trustee also will dismiss (with prejudice), as to the Estates of all ES Plan Debtors, any ES Action, with each party to bear its own costs and fees.

#### (i)    Estate ES Settlement Release.

In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors herein, shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

**(ii)     ES Claimant Release and Assignment.**

In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote, on behalf of itself and its Affiliates, shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of such Settling ES Claimant or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of such Settling ES Claimant (collectively, the "ES Claimant Released Claims"), from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the Estate against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties, and, to the extent such ES Claimant Released Claims are owned by the Estate of a Plan Debtor and cannot be released by the ES Claimant, assigns to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the Settling ES Claimant with respect to such ES Claimant Released Claims, including the Litigation Recoveries that otherwise would be due therefrom to, or attributable to the ES Claims of, the Settling ES Claimants.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and all successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Settling ES Claimant by Vote in the form set forth on, or attached to, the Ballot.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 7.9.3     Continued Prosecution of Equitable Subordination Claims.

Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal (with prejudice), release and settlement of all Equitable Subordination Claims as to all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in an ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of and attributable to the ES Claims of any Non-Settling ES Claimants, subject to the Plan Release and as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender elects to pay Cash in lieu thereof.

#### (a)     ES Litigation Loan.

i.     Unless the Equitable Subordination Claims in an ES Action are fully settled as to all ES Plan Debtors' Estates (*i.e.*, there is Estate Acceptance of the ES Settlement for all ES Plan Debtors' Estates), a Lehman Lender will make available to the Liquidating Trustee the ES Litigation Loan in the aggregate principal amount of up to $1 million for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination Claims. The ES Litigation Loan will accrue interest at a 10% annual rate (compounded annually). The proceeds of the ES Litigation Loan may be used solely for the payment of ES Litigation Expenses if and only if there is no Available Cash in the Post-Confirmation Accounts to fund the ES Litigation Expenses and SunCal and its principals decline to continue paying the cost of prosecuting the Equitable Subordination Claims in an ES Action.

ii.     The ES Litigation Loan shall be made available by a Lehman Lender to the Liquidating Trustee as the ES Litigation Expenses are incurred and shall be funded no more frequently than on a monthly basis. The Liquidating Trustee shall provide the Lehman Lender with reasonable substantiation and backup (including invoices and statements from the parties to be paid) for any ES Litigation Expenses to be paid with the proceeds of the ES Litigation Loan in connection with any request to the Lehman Lender for an advance of proceeds of the ES Litigation

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Loan; provided, however, that the Liquidating Trustee shall not be required to provide any substantiation or backup to the Lehman Lender that discloses, directly or indirectly, information or communications that are subject to attorney-client privilege or attorney work product or contains any other privileged or confidential information or strategies of the Liquidating Trustee with respect to an ES Action.

iii.     ES Litigation Proceeds shall be made available to pay Allowed Non-Settled ES Claims only after repayment of the ES Litigation Loan, together with interest thereon at an annual, compounded rate of interest equal to 10%; provided, that such repayment may be made without any prejudice to the right of the prevailing party to seek reasonable fees and costs from the non-prevailing party in an ES Action. Such repayment shall be from sources other than Cash Collateral to which the applicable Lehman Creditor otherwise is entitled.

iv.     At the election of a Lehman Lender, (1) the ES Litigation Loan may be funded from Cash Collateral of a Lehman Creditor, (2) the ES Litigation Loan may be funded from a transfer of new Cash from a Lehman Lender or (3) a Lehman Lender may direct that the Liquidating Trustee use, for the ES Litigation Loan, funds in the form of new Cash from one or another Lehman Creditor and pay a like amount of Cash Collateral securing a Lehman Loan towards reduction of such Lehman Loan, as the Lehman Lender directs.

**(b)     Concessions by Lehman Lenders to Facilitate Collection of ES Judgments.**

Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in an ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

**(i)     Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtors' Projects Are to be Collateral for Equitable Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.** For some

particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against those Estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Judgment as to other ES Plan Debtors' Estates.

**(ii)  To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.** As to the Estates of Del Rio and SJD Partners only, the Lehman Creditors will waive an objection or defense, that, even were the applicable Lehman Secured Claim ignored, there was insufficient value in those Estates to pay their Allowed ES Claims, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied, and (II) the applicable Estate executes the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**7.10  Post-Confirmation Expenses, Intercompany Loans and Payables and Priorities in Payment.**

**7.10.1  Post Confirmation Expenses and Intercompany Loans.**

All Post-Confirmation Expenses may be paid by the Liquidating Trustee from the Post-Confirmation Account(s) upon ten (10) days' prior written notice and opportunity to object provided to the Lehman Lenders, the Committee(s), the Holders of Lehman Disputed Secured Claim(s), or with their consent, but without further notice to other Creditors or Holders of Interests, or approval of the Bankruptcy Court. Any disputes concerning the payment of Administrative and Post-Confirmation Expenses shall be submitted to the Bankruptcy Court for resolution. To the extent readily determinable, Post-Confirmation Expenses attributable to a particular Plan Debtor shall be paid from that Plan Debtor's Assets consistent with the provisions of the Lehman Plan. To

the extent of available Assets from each Plan Debtor, other Post-Confirmation Expenses shall be payable by each Plan Debtor Pro Rata consistent with the Lehman Plan, provided that after a Plan Debtor's available Cash or Assets are exhausted, the other Plan Debtors shall absorb such Plan Debtor's share of unpaid Post-Confirmation Expenses as provided in the Lehman Plan, which shall be Pro Rata to the extent reasonably possible.  To the extent one Plan Debtor advances funds on behalf of another, the Liquidating Trustee shall book a receivable for the advancing Debtor and a payable for the borrowing Debtor.

### 7.10.2    Payables and Priorities in Payment.

Recoveries from the following sources as to which there are no unsubordinated Secured Claims shall be applied in the following manner:

### (a)    Funds Constituting ES Litigation Proceeds.

ES Litigation Proceeds of a particular Estate (unless they are or may also be a Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment) shall be applied in the following order of priority until exhausted,:

(1)    First, to payment of the ES Litigation Loan;

(2)    Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the unpaid Lehman Post-Confirmation Loans;

(3)    Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(4)    Fourth, to repayment of any post-Confirmation Date intercompany payables;

(5)    Fifth, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment until paid the full amount of their Allowed ES Claims;

(6)    Sixth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment, payable Pro Rata

among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of the Lehman Post-Confirmation Loans and next to pay such Allowed ES Claims until paid in full; and

(7)     Seventh, to the applicable Lehman Creditors.

**(b)     Various Other Funds, Including Funds Constituting a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

(i) A Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment (unless it also may become ES Litigation Proceeds based upon a pending ES Action), (ii) any Net Cash Proceeds from the sale or disposition of Remaining Other Assets or otherwise, including Net Cash Litigation Recoveries and other funds in the Post-Confirmation Accounts, and (iii) any repayment of a post-Confirmation Date intercompany payable, shall be applied in the following order of priority until exhausted:

(1)     First, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the Lehman Post-Confirmation Loan;

(2)     Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(3)     Third, to repayment of any post-Confirmation Date intercompany payables,

(4)     Fourth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(5)     Fifth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of the unpaid Lehman Post-Confirmation Loans (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(6)     Sixth, to pay, in the discretion of the Liquidating Trustee, an accelerated payment for Tax Claims; and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(7) Seventh, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan.

**(c)** **Funds that Constitute Both ES Litigation Proceeds and a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

ES Litigation Proceeds of a particular Estate that also are a Project Related Action Recovery of such Estate with respect to a Cross-Collateralization Judgment, shall be applied in the following order of priority until exhausted:

(1) First, to payment of the ES Litigation Loan;

(2) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the unpaid Lehman Post-Confirmation Loans;

(3) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(4) Fourth, to repayment of any post-Confirmation Date intercompany payables,

(5) Fifth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(6) Sixth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of the unpaid Lehman Post-Confirmation Loans (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(7) Seventh, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment until paid the full amount of their Allowed ES Claims;

(8) Eighth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment, payable Pro Rata

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of the Lehman Post-Confirmation Loans and next to pay such Allowed ES Claims until paid in full; and

(9)     Seventh, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan; and

**(d)     Funds that May Later be Determined to be Both ES Litigation Proceeds and Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

Funds that presently are known to be <u>either</u>, but not both, ES Litigation Proceeds of a particular Estate or a Project Related Action Recovery with respect to a Cross-Collateralization Judgment, which potentially could also become the other upon final settlement or determination of the relevant, pending Project Related Action, shall be applied in the following order of priority until exhausted:

(1)     First, reserved for payment of the ES Litigation Loan;

(2)     Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the unpaid Lehman Post-Confirmation Loans;

(3)     Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(4)     Fourth, to repayment of any post-Confirmation Date intercompany payables,

(5)     Fifth, to be reserved and applied upon final settlement or determination of the relevant, pending Project Related Action in accordance with the above-described priorities of distribution.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 7.10.3    Allocations and Distributions Under this Section.

For purposes of this Section 7.8.5(b)(2) of the Plan, in calculating the amount of Allowed ES Claims not paid from an Estate's own Assets for a distribution of ES Litigation Proceeds pursuant hereto, the Liquidating Trustee may ignore future expected or possible recoveries, but upon such later recoveries occurring for such Estates, the Liquidating Trustee shall recalculate the prior distribution and adjust the amount of the later distribution to ensure that the aggregate distributions are correct among entitled Holders of Allowed ES Claims.

### 7.11    Plan Release.

In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Loans, the ES Settlement Offer and the delayed satisfaction of the Secured Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor, on behalf of itself and its Affiliates exclusive of other Debtors herein shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish:

(a)    any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, from and against all Lehman Releasees, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their property;  except

(b)    the following are not released, to the extent indicated:

(i) Avoidance Actions timely Filed and Filed no later than sixty (60) days following the Effective Date other than to the extent of Cross-Collateralization Claims; and

(ii) with respect to (1) all Equitable Subordination Claims in an ES Action (*i.e.*, either (A) that certain adversary proceeding Filed in the Cases and pending

before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005 or (B) such other adversary proceeding in which Equitable Subordination Claims are asserted that is timely Filed and Filed no later than sixty (60) days following the Effective Date) and (2) those Cross-Collateralization Claims identified in the Debtors' Second Amended Disclosure Statement and asserted in a Cross-Collateralization Action (*i.e.*, an Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date), each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by a Project Related Action Recovery, which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment in the amount of any Project Related Action Recovery.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees in accordance herewith, the Lehman Releasees also shall be entitled to issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

**7.12    Entry of Final Decrees.**

The Liquidating Trustee shall cause the entry of a final decree in the Case of each Estate of a Plan Debtor at the earliest reasonable opportunity therefor. Such final decrees may be sought and entered individually for each Case.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**7.13**    **Dissolution of Committees and Discharge of Trustee and Liquidating Trustee**.

The Trustee, in his capacity as such, shall be discharged upon the Effective Date and his bond may be exonerated. The Liquidating Trustee and Committee shall be discharged upon consummation of the Plan and the entry of a final decree in each Case or as otherwise ordered by the Court.

**VIII.**

**DISTRIBUTIONS**

**8.1**    **Distribution Agent**.

The Liquidating Trustee shall serve as the Distribution Agent for distributions due under the Lehman Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such subagent as a Post-Confirmation Expense from the Post-Confirmation Accounts. The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Lehman Plan.

**8.2**    **Distributions.**

**(a)**    **Dates of Distributions.**

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

**(b)**    **Limitation on Liability.**

Neither the Lehman Related Parties, the Lehman Nominees, the Liquidating Trustee, their Affiliates, nor any of their employees, members, officers, directors, agents, attorneys or other professionals shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan, or (ii) any change in the value of Distributions made pursuant to the Lehman Plan resulting from any delays in making such Distributions in accordance with the Lehman Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**8.3** **Old Instruments and Securities.**

      **(a)** **Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any distribution pursuant to the Lehman Plan in respect of a Claim, each Person holding any note or other instrument or security evidencing such Claim must surrender such instrument or security to the Distribution Agent, if requested.

      **(b)** **Cancellation of Liens.**

Except as otherwise provided in the Lehman Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Liquidating Trustee (including, without limitation, any Cash Collateral) held by such Person and to take such actions as may be requested by the Liquidating Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Liquidating Trustee.

**8.4** **De Minimis Distributions and Fractional Shares.**

No Cash payment of less than ten dollars ($10) shall be made by the Liquidating Trustee to any Holder of Claims unless a request therefor is made in writing to the Liquidating Trustee. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Lehman Plan.

**8.5** **Delivery of Distributions.**

Except as provided in the Lehman Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows: (1) with respect to each Holder of an Allowed Claim that has Filed a Proofs of Claim, at the address for such Holder as maintained by the official claims agent for the Plan Debtors; (2) with respect to each Holder of an Allowed Claim that has not Filed a Proofs of Claim, at the address reflected on the Schedules Filed by the Plan Debtors, provided, however, that if the Plan Debtors or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Liquidating Trustee has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

**8.6    Unclaimed Property.**

If either (1) the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.,* as undeliverable) and the check or other similar instrument or distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date such Distribution first could have been made under the Plan and for one hundred twenty (120) days thereafter, then such applicable Distribution shall be Unclaimed Property under the Plan and the Liquidating Trustee shall be relieved of making such Distribution or any further Distribution to such Holder of such Allowed Claim unless and until the Liquidating Trustee is notified in writing of the then current address of such Holder of an Allowed Claim.  Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Liquidating Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated, interest bearing account to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in the Lehman Plan shall require the Liquidating Trustee or any other Person to attempt to locate the Holder of an Allowed Claim as to which there is Unclaimed Property.

**8.7    Disposition of Unclaimed Property.**

If the Person entitled thereto notifies the Liquidating Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practical. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Liquidating Trustee within ninety (90) days after the Holders' initial Distribution Date shall no

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Lehman Plan or otherwise from the Liquidating Trustee. In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Post-Confirmation Account of the Plan Debtor's Estate against which the applicable Allowed Claim was asserted.

## IX.

## OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

**9.1**      **Standing for Objections to Claims.**

The Liquidating Trustee and Lehman Lenders shall have the sole and exclusive right to File and resolve for the Estates objections to Claims and their status as ES Claims (provided, however, that the Lehman Lenders shall not be allowed to resolve for the Estates objections to Claims of any Lehman Related Party). Any objection to a Claim or its status as an ES Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline, expect as provided in the Plan.

**9.2**      **Treatment of Disputed Claims.**

(a)      **No Distribution Pending Allowance.**

If any portion of a Claim is a Disputed Claim, no payment or distribution provided for under the Lehman Plan shall be made on account of such Claim unless expressly provided hereunder or unless and until such Claim becomes an Allowed Claim.  No distribution shall be made under the Plan on account of any Disputed Claims.  A Claim that has not been Allowed by a Final Order of the Bankruptcy Court and as to which the objection deadline has not passed, including as to its status as an ES Claim, may be treated by the Liquidating Trustee as a Disputed Claim and, absent the agreement of the Lehman Lenders, the Liquidating Trustee shall so treat any such Secured Claim not expressly Allowed under the Plan and any ES Claim to which a payment otherwise would be due under subparagraph (c) of Sections 5.8 of the Plan.

(b)      **Distribution After Allowance.**

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the

Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

(c)     **Reserves for Disputed Claims**.

In the event that Disputed Claims are pending, the Liquidating Trustee shall establish reasonable reserves, including the Plan Reserve for such Disputed Claims. The Distribution Agent may move the Bankruptcy Court for approval of its determination to reserve certain amounts.

## X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**10.1     Executory Contracts Being Assumed**.

As of the Effective Date, the Liquidating Trustee shall assume and, as of and conditioned upon the occurrence of the sale or conveyance of the related Remaining Real Estate Projects in accordance with the Lehman Plan Sale or Foreclosure Procedures, shall assign to the appropriate Lehman Nominee(s) or third party purchaser of each Remaining Real Estate Project, all of the executory contracts and unexpired leases on an **Exhibit "A"**, to be attached to the Lehman Plan on or before the Confirmation Date. With the consent of the Lehman Creditors, any required cure payments shall be made by the Liquidating Trustee from Cash Collateral of a Lehman Related Party on hand as of the Effective Date.  The Lehman Lenders may add any executory contract or unexpired leases to these exhibits or delete any contract or lease therefrom up to and including the Confirmation Date.   However, if **Exhibit "A"** first is Filed and served on affected contract or lease parties, or any amendments thereto are Filed and so served, later than twenty-four (24) days before the Confirmation Date, then, the affected contract or lease parties shall have at least fifteen (15) days from the date of service of the amendments to serve a written objection to the same on the Lehman Lenders. Upon the receipt of any such objection, the Lehman Lenders shall promptly set a hearing on the same, and the assumption or rejection of the affected contract or lease will be delayed until the Court makes a determination on this issue. To the extent that an executory contract or unexpired lease has previously been assumed by a Plan Debtor pursuant to an order of the Court, such assumption shall not be affected by the Lehman Plan. The assumption of any contracts or leases pursuant to the provisions of the Lehman Plan shall be only to the extent that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such assumed contracts or leases constitute executory contracts and unexpired leases within the meaning of Section 365 of the Bankruptcy Code. Inclusion of a matter in **Exhibit "A"** does not constitute an admission by the Plan Debtors or the Liquidating Trustee that (i) such matter is an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, (ii) the Plan Debtors, Trustee or Liquidating Trustee must assume such matter in order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim under such matter must be paid or default cured if it is not an executory contract or unexpired lease, or (iii) such matter is a valid contract or lease. Any contract or lease assumed pursuant to the Lehman Plan shall be assumed as previously amended or otherwise modified by the parties thereto, whether before or after the Petition Date.

### 10.2 **Executory Contracts Being Rejected.**

As of the Effective Date, the Plan Debtors, Trustee or Liquidating Trustee, as appropriate, shall reject all of their executory contracts and unexpired leases other than those executory contracts or unexpired leases listed on **Exhibit "A"** to the Lehman Plan that are expressly assumed under the Lehman Plan.

### 10.3 **Retention of Property Rights by Lehman Nominees or Liquidating Trustee.**

To the extent that a matter that provides the Plan Debtors or their Estates with property rights does not constitute an executory contract or unexpired lease, or the Plan Debtors have obtained property rights under the executed portion of an executory contract or unexpired lease, rejection shall not constitute an abandonment by the Plan Debtors, the Lehman Nominees or the Liquidating Trustee of any such property rights.

### 10.4 **Bar Date for Rejection Damages.**

Any Claim arising out of the rejection of an executory contract or unexpired lease under the Plan shall be forever barred and shall not be enforceable against the Plan Debtors, their Estates, the Liquidating Trustee, their Affiliates, their successors, or their properties, and shall not be entitled to any distribution under the Lehman Plan, unless a Proof of Claim for such Claim is Filed and served on the Plan Debtors, or the Liquidating Trustee within thirty (30) days after the earlier of (a) the date of entry of the order of the Bankruptcy Court approving the rejection of the executory contract

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or unexpired lease, or (b) the Confirmation Date.

**10.5 Cure Statements.**

Any party whose executory contract or unexpired lease is assumed under the terms of the Lehman Plan must File and serve on the Plan Debtors, the Trustee, the Liquidating Trustee and the Lehman Lenders a statement within thirty (30) days after the Confirmation Date itemizing all charges and other costs that the party contends must be paid in order to cure any defaults upon the assumption of the contract or lease (the "Cure Statement"). Failure to timely File a Cure Statement shall constitute a waiver of any cure claim and of any defaults occurring prior to the Confirmation Date. If the Plan Debtors, the Committee(s), the Liquidating Trustee or the Lehman Lenders do not File an objection to the Cure Statement within the later of thirty (30) days after the Effective Date and thirty (30) days after the receipt of the Cure Statement by all of the required notice parties, the Liquidating Trustee will pay the amount reflected on the Cure Statement. If there is a timely objection to the Cure Statement that cannot be resolved with the claimant, the Lehman Lenders may either 1) elect within forty-five (45) days after the Cure Statement is Filed to have the contract rejected, or 2) ask the Court to promptly set a hearing with respect to the objection. If such an objection is Filed, any cure amount payable upon the assumption of the executory contract or unexpired lease shall be due and payable on or before the fifteenth (15th) day after the entry of a Final Order fixing the cure amount and then only in the amount fixed by such order.

**10.6 Changes in Rates Subject to Regulatory Commission Approval.**

The Plan Debtors are not subject to governmental regulatory commission approval of their rates.

# XI.

# EFFECT OF CONFIRMATION OF THE PLAN

Except as otherwise expressly provided in the Lehman Plan, the documents executed pursuant to the Lehman Plan, or the Confirmation Order, on and after the Effective Date, all Persons and Entities who have held, currently hold, or may hold a debt, Claim, or Interest against the Plan Debtors (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or other governmental units) shall be permanently enjoined from: (a) taking any of the following actions on account of any such debt, Claim, or Interest: (1) commencing or continuing in any manner any action or other proceeding against the Plan Debtors and the Liquidating Trustee, their successors, or their property; (2) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (3) creating, perfecting, or enforcing any Lien or encumbrance against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (4) asserting any set off, right of subrogation, or recoupment of any kind against any obligation due the Plan Debtors or the Liquidating Trustee, their successors, or their property; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Lehman Plan; and (b) taking any of the following actions on account of any Claims or rights of action that are revested in, or transferred to, the Liquidating Trustee as of the Effective Date or under the Lehman Plan (to the extent one or more Plan Debtors' Estates first held such claim or rights of action or held the right to assert such claim or right of action after the Petition Date), including, without limitation: (1) asserting such Claims or rights of action against nondebtor third parties; and (2) commencing or continuing in any manner any action or other proceeding of any kind with respect to such claims or rights of action. Any person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

## XII.

## LIMITATION OF LIABILITY

### 12.1    No Liability for Solicitation or Participation.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Lehman Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Lehman Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of

acceptances or rejections of the Lehman Plan or the offer, issuance, sale, or purchase of securities.

### 12.2    Limitation of Liability.

Effective as of the Effective Date, none of the Liquidating Trustee, the Lehman Related Parties or their respective Affiliates, nor any of their respective members, officers, directors, employees and other agents, advisors, attorneys and accountants shall have or incur any liability to any Holder of any Claim or Interest or any other Person for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Lehman Plan, the Lehman Disclosure Statement, the consummation of the Lehman Plan, the administration of the Lehman Plan, the Cases or the property to be distributed under the Lehman Plan except: (a) the Liquidating Trustee shall be liable contractually for the performance of obligations assumed or imposed under or by the Lehman Plan; (b) for liability based on willful misconduct as finally determined by a Final Order of the Bankruptcy Court; and (c) for gross negligence in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan. Each of the Liquidating Trustee, Lehman Related Parties and their respective Affiliates, and each of their respective officers, directors, employees and other agents, advisors, attorneys and accountants) shall be entitled to rely, in every respect, upon the advice of counsel with respect to their duties and responsibilities under or with respect to the Lehman Plan.

### XIII.

### CONDITIONS TO CONFIRMATION AND

### EFFECTIVENESS OF THE PLAN

### 13.1    Conditions Precedent to Plan Confirmation.

The following are conditions precedent to Confirmation of the Lehman Plan:  (a) the Bankruptcy Court shall have entered the Confirmation Order; and (b) the Lehman Settlement Approval shall be represented by a Final Order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**13.2 Conditions Precedent to Plan Effectiveness.**

The following shall be conditions precedent to the effectiveness of the Lehman Plan and the occurrence of the Effective Date.

(a) The Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the Lehman Lenders.

(b) All agreements and instruments contemplated by, or to be entered into pursuant to, the Lehman Plan, including, without limitation, each of the Plan Documents necessary for consummation of the Lehman Plan, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived other than the occurrence of the Effective Date.

## XIV.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

## XV.

## MODIFICATION OR WITHDRAWAL OF PLAN

**15.1 Modification of Plan.**

At any time prior to confirmation of the Lehman Plan, the Lehman Lenders may supplement, amend or modify the Lehman Plan. After confirmation of the Lehman Plan, the Lehman Lenders or Liquidating Trustee with the consent of the Lehman Lenders may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Lehman Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Lehman Plan or to reconcile inconsistencies in the Lehman Plan.

**15.2 Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Lehman Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, Lehman Lenders (i) may request that the Bankruptcy Court confirm the Lehman Plan in accordance with Section 1129(b) of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Bankruptcy Code, and (ii) in accordance with the Lehman Plan, and may modify the Lehman Plan in accordance with Section 1127(a) of the Bankruptcy Code.

## XVI.

### **MISCELLANEOUS**

**16.1     Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of Title 28 of the United States Code with respect to the Plan Debtors shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(l2) of the Bankruptcy Code. The Liquidating Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date with respect to the Plan Debtors until each applicable Plan Debtor's Case is closed, to the extent required by Section 1930(a)(6) of Title 28 of the United States Code.

**16.2     Payment Dates.**

Whenever any payment or distribution to be made under the Lehman Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**16.3     Headings.**

The headings used in the Lehman Disclosure Statement and in the Lehman Plan are inserted for convenience only and neither constitutes a portion of the Lehman Disclosure Statement or the Lehman Plan nor in any manner affect the construction of the provisions of the Lehman Disclosure Statement or the Lehman Plan.

**16.4     Other Documents and Actions.**

The Liquidating Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## 16.5    Notices.

All notices and requests in connection with the Lehman Disclosure Statement and the Lehman Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

Edward Soto, Esq.
Nellie P. Camerick, Esq.
Weil, Gotshal & Manges LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131

and

Shai Y. Waisman, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

**With copies to:**
Dean A. Ziehl, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Fl.
Los Angeles, CA  90067

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

## 16.6    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Lehman Plan and any agreements, documents, and instruments executed in connection with the Lehman Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

## 16.7    Binding Effect.

This Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Lehman Creditors, the Plan Debtors, the Liquidating Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**16.8    Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Lehman Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**16.9    Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Lehman Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Lehman Plan, the Bankruptcy Court shall, with the consent of the Lehman Proponents, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Lehman Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**16.10    No Waiver.**

The failure of the Plan Debtors, Liquidating Trustee, Committee or Lehman Lenders or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Plan Debtors', the Liquidating Trustee's or the Lehman Lenders' right to object to or examine such Claim, in whole or in part.

**16.11    Inconsistencies.**

In the event the terms or provisions of the Lehman Disclosure Statement are inconsistent with the terms and provisions of the Lehman Plan or documents executed in connection with the Lehman Plan, the terms of the Lehman Plan shall control.

**16.12    Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Plan Debtor or its Estate to the Liquidating Trustee or to any other Person or entity pursuant to the Lehman Plan, or any agreement regarding the transfer of title to or ownership of any of the Plan Debtors' real or

personal property or of any other interest in such property (including, without limitation, a security interest), including, without limitation, transfers or sales pursuant to the Lehman Plan Sale or Foreclosure Procedures or Reconveyance Agreements will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**16.13   Post-Confirmation Status Report.**

By the earlier of 180 days following the entry of the Confirmation Order a status report shall be Filed with the Court explaining what progress has been made toward consummation of the confirmed Plan, which report shall be Filed by the Liquidating Trustee, if the Effective Date occurs with 120 days following the entry of the Confirmation Order and, otherwise, by the Lehman Lenders. The status report shall be served on the United States Trustee, the list of twenty largest unsecured creditors Filed by the Debtors or Trustee for the jointly administered Cases of the Debtors, the Lehman Creditors, the Liquidating Trustee and those parties who have requested special notice. Unless otherwise ordered, further status reports shall be Filed every 180 days and served on the same entities.

**16.14   Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss any Case of a Plan Debtor under § 1112(b), after the Lehman Plan is confirmed, if there is a default in performing the Lehman Plan, subject to the right of any party in interest to object to such motion. If the Court orders any of the Cases converted to Chapter 7 after the Lehman Plan is confirmed, then all property that had been property of the chapter 11 Estate, and that has not been disbursed pursuant to the Lehman Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

**16.15    Final Decree.**

Once a Plan Debtor's Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trustee, or other party as the Court shall designate in the Confirmation Order, shall File a motion with the Court to obtain a final decree to close the Case of such Plan Debtor.

Dated:     September 9, 2009                    PACHULSKI STANG ZIEHL & JONES LLP

                                                By     */s/ Robert B. Orgel*
                                                       Dean A. Ziehl (CA Bar No. 84529)
                                                       E-mail: dziehl@pszjlaw.com
                                                       Robert B. Orgel (CA Bar No. 101875)
                                                       E-mail: rorgel@pszjlaw.com
                                                       Attorneys for Lehman Commercial Paper
                                                       Inc., Lehman ALI, Inc., Northlake
                                                       Holdings LLC and OVC Holdings LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## Exhibit "A"

### List of Assumed Executory Contracts and Assumed Unexpired Leases

### [TO BE FILED]

# **Exhibit B**

See Attached Disclosure Statement

1  Richard N. Pachulski (CA Bar No. 90073)
   Dean A. Ziehl (CA Bar No. 84529)
2  Robert B. Orgel (CA Bar No. 101875)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5
   Edward Soto (admitted *pro hac vice*)
6  Shai Waisman (admitted *pro hac vice*)
   WEIL, GOTSHAL & MANGES LLP
7  767 Fifth Avenue
   New York, NY  10153-0119
8  Telephone:  (212) 310-8000
   Facsimile:  (212) 310-8007
9
   Attorneys for Lehman Commercial Paper Inc., Lehman ALI,
10 Inc., Northlake Holdings LLC and OVC Holdings LLC

11              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
12                    SANTA ANA DIVISION

13 In re:                                 Case No.: 8:08-bk-17206-ES
                                          Chapter 11
14 Palmdale Hills Property, LLC, and its Related
   Debtors,                               Jointly Administered Case Nos.
15                                        8:08-bk-17209-ES; 8:08-bk-17240-ES;
              Jointly Administered Debtors 8:08-bk-17224-ES; 8:08-bk-17242-ES;
16            and Debtors-In-Possession   8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                          8:08-bk-17227-ES; 8:08-bk-17246-ES;
17 Affects:                               8:08-bk-17230-ES; 8:08-bk-17231-ES;
   ☐  All Debtors                         8:08-bk-17236-ES; 8:08-bk-17248-ES;
18 ☑  Palmdale Hills Property, LLC        8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☑  SunCal Beaumont Heights, LLC        8:08-bk-17574-ES; 8:08-bk-17575-ES
19 ☑  SCC/Palmdale, LLC                   8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☑  SunCal Johannson Ranch, LLC         8:08-bk-17408-ES; 8:08-bk-17409-ES;
20 ☑  SunCal Summit Valley, LLC           8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☑  SunCal Emerald Meadows, LLC         8:08-bk-17470-ES; 8:08-bk-17472-ES;
21 ☑  SunCal Bickford Ranch, LLC          and 8:08-bk-17588-ES
   ☑  Acton Estates, LLC
22 ☑  Seven Brothers, LLC
   ☑  SJD Partners, Ltd.                  DISCLOSURE STATEMENT WITH
23 ☐  SJD Development Corp.               RESPECT TO JOINT CHAPTER 11
   ☑  Kirby Estates, LLC                  PLAN PROPOSED BY LEHMAN
24 ☑  SunCal Communities I, LLC           LENDERS
   ☑  SCC Communities LLC
25 ☐  SunCal Communities III, LLC         **Hearing:**
   ☑  North Orange Del Rio Land, LLC      Date:      October 15, 2009
26 ☑  Tesoro SF, LLC                      Time:      2:00 p.m.
   ☑  LB/L-SunCal Oak Valley, LLC         Place:     Courtroom 5A
27 ☑  SunCal Heartland, LLC                          411 West Fourth Street
   ☑  LB/L-SunCal Northlake, LLC                     Santa Ana, CA  92701
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

☑ SunCal Marblehead, LLC
☑ SunCal Century City, LLC
☑ SunCal PSV, LLC
☑ Delta Coves Venture, LLC
☑ SunCal Torrance Properties, LLC
☑ SunCal Oak Knoll, LLC

**[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE LEHMAN PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT]**

# TABLE OF CONTENTS

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Page**

I.      INTRODUCTION ........................................................................................................... 1
  1.1   Summary of this Disclosure Statement........................................................... 1
  1.2   Purpose of this Document............................................................................... 4
  1.3   Court Approval of this Document................................................................... 5
  1.4   Competing Plans............................................................................................. 6
  1.5   Summary of the Lehman Plan......................................................................... 6
  1.6   Recommendations......................................................................................... 14
II.     PLAN CONFIRMATION DEADLINES ................................................................. 14
  2.1   Time and Place of the Confirmation Hearing............................................... 14
  2.2   Deadline for Voting for or Against the Lehman Plan.................................... 14
  2.3   Deadline for Objecting to the Confirmation of the Lehman Plan.................. 14
  2.4   Identity of Person to Contact for More Information Regarding the Lehman Plan. .......... 15
  2.5   Disclaimer..................................................................................................... 15
III.    BACKGROUND OF THE DEBTORS...................................................................... 16
  3.1   The SunCal Companies and the Debtors....................................................... 16
  3.2   The Debtors' Primary Assets........................................................................ 17
  3.3   Debt and Capital Structure............................................................................ 21
  3.4   Asset Values.................................................................................................. 25
  3.5   A Summary of the Lehman Creditors' Loans............................................... 27
  3.6   Filing of Proofs of Claim with Respect to the Lehman Loans...................... 28
IV.     DEBTORS' ALLEGED CLAIMS AGAINST THE LEHMAN LENDERS......................... 30
  4.1   Introduction................................................................................................... 30
  4.2   The Debtors' Disputes Relating to the Allowed Secured Claims of Fenway Capital
        Pursuant to Bankruptcy Code Section 506. .................................................. 30
  4.3   The Elieff Plan Proponents Assertions regarding Fraudulent Transfer Actions .. Against the
        Lehman Lenders Arising under Various Cross-Collateralized Lehman
        Loans............................................................................................................. 31
  4.4   Alleged Preference Claims Against the Lehman Lenders.............................. 33
  4.5   The Equitable Subordination Claims Relating to the Lehman Lenders' Claims............... 35
  4.6   Alleged Fraud, Breach of Fiduciary Duty and Other Potential Litigation Claims  ....Against
        the Lehman Lenders....................................................................................... 36
V.      THE ELIEFF PLAN IS UNCONFIRMABLE.......................................................... 37
  5.1   The Elieff Plan is Premised Upon an Improper Partial Substantive Consolidation. ......... 37
  5.2   Feasibility of Elieff Plan............................................................................... 38
  5.3   Success of Equitable Subordination Litigation............................................. 39
  5.4   The D.E. Shaw Sale is for Less than Fair Value, is Unfairly Discriminatory in Favor ......of
        Bond Claimants and Elieff and Cannot be Approved by the Court................ 39
  5.5   Unjustified Releases...................................................................................... 40
  5.6   Implications of the Lehman Commercial Bankruptcy................................... 40
VI.     SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ............................. 40
  6.1   Voluntary Debtors........................................................................................ 40
  6.2   Trustee Debtors............................................................................................. 41
  6.3   The Debtors' Motion for Relief from Stay in the Lehman Commercial Chapter 11
        Proceedings................................................................................................... 41
  6.4   Certain of the Voluntary Debtors' Motion for Surcharge and Use of
        Cash Collateral.............................................................................................. 42
  6.5   Lehman Commercial's Motions for Relief from the Automatic Stay Against Certain ..........
        of the Voluntary Debtors' Projects. .............................................................. 42
  6.6   The Debtors' Filing of the ES Action Against the Lehman Lenders.............. 43
  6.7   Certain Debtors' Filing of the Sales Procedures Motion............................... 43
  6.8   The Lehman Administrative Loans. .............................................................. 45
  6.9   The Contractors' Successful Motions for Relief from Stay to Pursue the Bond  .......Claims.
        47
  6.10  The Debtors' Motion Pursuant to Bankruptcy Code Section 506(d).............. 47

| | | |
|---|---|---|
| 6.11 | The Debtors' Motions to Strike the Claims and Pleadings Arising from the ....................... Repurchase Lehman Loans...................................................................................... 48 |
| 6.12 | The Debtors' Denied Preliminary Injunction Motion Against the Holders of Bond ............. Claims. ............................................................................................................ 48 |
| 6.13 | The Non-Lehman Related Primary Secured Lenders' Motions for Relief from Stay. ................................................................................................ 49 |
| 6.14 | The Rubidoux 60 Litigation. ................................................................................. 49 |
| 6.15 | Church Litigation. ............................................................................................... 51 |
| 6.16 | Mechanic's Lien Claims. ...................................................................................... 51 |
| 6.17 | The Debtors' Potential Preferential Transfers. ...................................................... 51 |
| VII. | LEHMAN CREDITORS' PLAN ............................................................................ 53 |
| 7.1 | Treatment of Unclassified Claims. ........................................................................ 53 |
| 7.2 | Treatment of Allowed Administrative Claims. ........................................................ 54 |
| 7.3 | Treatment of Priority Unsecured Tax Claims. ........................................................ 56 |
| 7.4 | Treatment of Unavoided Liens Securing Claims That Are Not Allowed. ................... 56 |
| 7.5 | Classification Of Claims And Interests. ................................................................. 57 |
| 7.6 | Treatment Of Classified Claims And Interests ....................................................... 73 |
| VIII. | ACCEPTANCE OR REJECTION OF THE LEHMAN PLAN .................................... 83 |
| 8.1 | Introduction. ....................................................................................................... 83 |
| 8.2 | Who May Object to Confirmation of the Lehman Plan............................................ 84 |
| 8.3 | Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims. ...................................................................... 84 |
| 8.4 | What Is an Allowed Claim/Interest. ...................................................................... 84 |
| 8.5 | What Is an Impaired Class. ................................................................................... 85 |
| 8.6 | Who Is Not Entitled to Vote. ................................................................................ 85 |
| 8.7 | Who Can Vote in More than One Class.................................................................. 85 |
| 8.8 | Votes Necessary for a Class to Accept the Lehman Plan. ....................................... 86 |
| 8.9 | Treatment of Nonaccepting Classes. ..................................................................... 86 |
| 8.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es)................. 86 |
| IX. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE LEHMAN PLAN ........ 86 |
| 9.1 | Introduction. ....................................................................................................... 86 |
| 9.2 | The Liquidating Trustee. ...................................................................................... 88 |
| 9.3 | Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee. ................. 88 |
| 9.4 | The Committee(s). ............................................................................................... 88 |
| 9.5 | Lehman Post-Confirmation Loans. ........................................................................ 89 |
| 9.6 | Plan Reserve and Post-Petition Accounts. ............................................................. 92 |
| 9.7 | Disposition of Assets. .......................................................................................... 93 |
| 9.8 | Equitable Subordination Claims .......................................................................... 108 |
| 9.9 | Post-Petition Expenses, Intercompany Loans and Payables and Priorities in Payment. ........................................................................................ 114 |
| 9.10 | Plan Release. .................................................................................................... 118 |
| 9.11 | Entry of Final Decrees. ...................................................................................... 120 |
| 9.12 | Dissolution of Committees and Discharge of Trustee and Liquidating Trustee........... 120 |
| X. | DISTRIBUTIONS ............................................................................................. 120 |
| 10.1 | Distribution Agent. ............................................................................................ 120 |
| 10.2 | Distributions. .................................................................................................... 121 |
| 10.3 | Old Instruments and Securities. .......................................................................... 121 |
| 10.4 | De Minimis Distributions and Fractional Shares. .................................................. 122 |
| 10.5 | Delivery of Distributions. ................................................................................... 122 |
| 10.6 | Unclaimed Property. .......................................................................................... 122 |
| 10.7 | Disposition of Unclaimed Property. ..................................................................... 123 |
| XI. | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ......................................... 123 |
| 11.1 | Standing for Objections to Claims. ...................................................................... 123 |
| 11.2 | Treatment of Disputed Claims. ........................................................................... 124 |
| XII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................... 124 |
| 12.1 | Executory Contracts Being Assumed. .................................................................. 124 |
| 12.2 | Executory Contracts Being Rejected. .................................................................. 125 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | |
|---|---|---|
| 12.3 | Retention of Property Rights by Lehman Nominees or Liquidating Trustee. | 126 |
| 12.4 | Bar Date for Rejection Damages. | 126 |
| 12.5 | Cure Statements. | 126 |
| 12.6 | Changes in Rates Subject to Regulatory Commission Approval. | 127 |
| XIII. | BEST INTEREST OF CREDITORS TEST | 127 |
| XIV. | PLAN FEASIBILITY | 129 |
| XV. | EFFECT OF CONFIRMATION OF THE LEHMAN PLAN | 129 |
| XVI. | LIMITATION OF LIABILITY | 130 |
| 16.1 | No Liability for Solicitation or Participation. | 130 |
| 16.2 | Limitation of Liability. | 130 |
| XVII. | CONDITIONS TO CONFIRMATION AND  EFFECTIVENESS OF THE LEHMAN PLAN. | 131 |
| 17.1 | Conditions Precedent to Plan Confirmation. | 131 |
| 17.2 | Conditions Precedent to Plan Effectiveness. | 131 |
| XVIII. | RETENTION OF JURISDICTION | 132 |
| XIX. | MODIFICATION OF PLAN | 132 |
| 19.1 | Modification of Plan. | 132 |
| 19.2 | Nonconsensual Confirmation. | 132 |
| XX. | MISCELLANEOUS | 132 |
| 20.1 | Payment of Statutory Fees. | 132 |
| 20.2 | Payment Dates. | 133 |
| 20.3 | Headings. | 133 |
| 20.4 | Other Documents and Actions. | 133 |
| 20.5 | Notices. | 133 |
| 20.6 | Governing Law. | 134 |
| 20.7 | Binding Effect. | 134 |
| 20.8 | Successors and Assigns. | 134 |
| 20.9 | Severability of Plan Provisions. | 134 |
| 20.10 | No Waiver. | 135 |
| 20.11 | Inconsistencies. | 135 |
| 20.12 | Exemption from Certain Transfer Taxes and Recording Fees. | 135 |
| 20.13 | Post-Confirmation Status Report. | 136 |
| 20.14 | Post-Confirmation Conversion/Dismissal. | 136 |
| 20.15 | Final Decree. | 136 |
| XXI. | CERTAIN UNITED STATES FEDERAL INCOME TAX  CONSEQUENCES OF THE LEHMAN PLAN. | 136 |
| 21.1 | Consequences to Holders of Lehman Secured Claims and Danske Bank Secured Claims | 138 |
| 21.2 | Consequences to Holders of General Unsecured Claims. | 139 |
| 21.3 | Distributions in Discharge of Accrued but Unpaid Interest. | 140 |
| 21.4 | Character of Gain or Loss | 141 |
| 21.5 | Information Reporting and Withholding | 141 |
| XXII. | CONCLUSION | 142 |
| | | |
| APPENDIX "A" | | 144 |
| | | |
| DEFINITIONS AND RULES OF INTERPRETATION | | 144 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE LEHMAN PLAN.

Creditors Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC, and OVC Holdings LLC (the "Lehman Lenders")[1] have proposed a plan (the "Lehman Plan") under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") for twenty-four (24) of the Debtors (referred to herein as the "Plan Debtors"), and submit this disclosure statement in support of the Lehman Plan (the "Disclosure Statement" or "Lehman Disclosure Statement").

# I.

# INTRODUCTION

## 1.1    Summary of this Disclosure Statement.[2]

The Lehman Plan is being proposed by the Lehman Lenders.  The Lehman Lenders are owed approximately $2 billion of debt that is secured by Liens on Assets of the Debtors.  The Lehman Plan is designed to enable a reasonable resolution of the financial distress of the Plan Debtors.  It is offered as a counterpoint to another plan, the Elieff Plan (defined below), and to the course of action for the Debtors proposed by the Elieff Plan's sponsor, an indirect parent of each Debtor, SCC Acquisitions, Inc. ("Acquisitions"), for which Bruce Elieff ("Elieff") is its sole owner and manager.

The Debtors are hopelessly insolvent.  The Debtors collectively own 18 Remaining Real Estate Projects and certain related Cash with an estimated collective value of $350 million to $600 million (the Debtors' valuations represent the lower sums).  The Debtors collectively owe debts of approximately $2.4 billion to various creditors holding Claims not secured by collateral and to the Lehman Creditors.  Importantly, however, of this debt, Elieff and his wife personally guaranteed payment of approximately $230 million in Bond Obligations potentially owed to Bond

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as set forth in Exhibit "A" of this Disclosure Statement (entitled "Definitions and Rules of Interpretation").

[2] While good faith effort has been made to make the Plan and Disclosure Statement consistent in all respects, if there are any discrepancies between the Plan and the Disclosure Statement, the Plan controls and if there are any discrepancies between the summaries provided in sections 1.1 and 1.5 of the Disclosure Statement and the other provisions of this Disclosure Statement, the other provisions shall control.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Elieff and Acquisitions appear to claim that the centerpiece of the Elieff Plan and their proposed course for the Debtors is the pursuit of various Litigation Claims, consisting primarily of certain Equitable Subordination Claims against Lehman Related Parties. The Equitable Subordination Claims essentially are premised on a contention that certain Lehman Related Parties acted so egregiously that their approximately $2 billion in Claims and Liens against the Debtors and their respective Assets should be subordinated to the Claims of all Creditors harmed by such alleged misconduct.

The Lehman Creditors dispute these Litigation Claims against the Lehman Related Parties and believe them to be just a smokescreen. The Elieff Plan and the proposed course of action of Acquisitions and Elieff are designed primarily to provide Elieff the personal benefit of reducing or eliminating his personal liability with respect to the Bond Obligations. The Elieff Plan is centered upon a sale (that Acquisitions and Elieff have arranged and proposed) of certain Remaining Real Estate Projects to D.E. Shaw or another bidder at an under-market price, but on terms that require all of the likely liability for the Elieff guaranteed Bond Obligations to be assumed and satisfied by the buyer, whether or not any other Holder of an unsecured, non-priority Claim gets paid anything at all.

Pursuit of the Equitable Subordination Claims represents a 'lottery ticket' litigation strategy. Besides having to prove inequitable conduct by the Lehman Related Parties, the benefits of any such litigation would be somewhat limited unless the Estates of the various Debtors could be merged (*e.g.*, substantively consolidated) so that values payable to the Lehman Creditors in their capacity as Creditors of one particular Debtor could be used instead to pay Creditors of another Debtor. To succeed, the Elieff Plan requires that the Debtors' Estates be substantively consolidated, requiring the Debtors to meet high evidentiary hurdles. None of the factors required for substantive consolidation (either the hopeless intermingling of the assets and liabilities of the Debtors or the treatment of the Debtors by the Creditors as a consolidated, single enterprise) are satisfied in this instance. The Lehman Creditors believe that there is no basis for such substantive consolidation and that the Lehman Related Parties not only will prevail in defending the Equitable Subordination Claims, but would also defeat any effort to substantively consolidate these Estates.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    More importantly, even if the Debtors are able to overcome the legal obstacles they

2    face in confirming the Elieff Plan, the litigation attendant to the two cornerstones of the Elieff Plan

3    could take years to resolve – thus depriving the Debtors' Creditors from access to any payment on

4    account of their Allowed Claims until resolution of such litigation, all the while forcing the Creditors

5    to bear the risk of the inevitable protracted litigation.

6    Whereas Elieff and Acquisitions are out-of-the-money parties focused on providing

7    Elieff substantial personal benefits through a flawed sale process and offering other Creditors only a

8    speculative 'lottery ticket' litigation strategy, which could take years to resolve.  The Lehman

9    Creditors, on the other hand, are in-the-money Creditors holding substantial Claims secured by Liens

10   on the Assets of the Debtors, offering Creditors a more appropriate auction process for the

11   Remaining Real Estate Projects, the choice of a $15 million settlement offer or to continue the

12   'lottery ticket' litigation and a better funded plan.  The Lehman Plan's primary purpose is to bring

13   the focus back to the disposition process for the Remaining Real Estate Projects.  The Lehman Plan

14   provides, in part, for the following:

15   (1)    A Liquidating Trustee would be selected by the Committees to implement the

16   Lehman Plan and hold and distribute funds for the Estates;

17   (2)    Plan funding would be assured through use of certain of the over $25 million

18   of Cash Collateral of the Lehman Creditors and a commitment to fund an additional $5 million to

19   allow for consummation and implementation of the Lehman Plan;

20   (3)    In addition to the funding described in clause (2) above, $15 million would be

21   funded by the Lehman Lenders to enable settlement of the Equitable Subordination Claims (the "ES

22   Settlement" as defined below) for accepting Classes or for the individual indirect beneficiaries of the

23   Equitable Subordination Claims ("ES Claimants" as defined below).  As more fully discussed in

24   Section 1.5, below, the Lehman Lenders estimate that the Holder of an Allowed ES Claim would

25   receive at least approximately 6.6% recovery on account of its Allowed ES Claim if it either accepts

26   or is deemed to accept the ES Settlement Offer;

27   (4)    For Non-Settling ES Claimants, if any:

28   (i)    A loan in the amount of $1 million would be made available by a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Lender to fund expenses for the Equitable Subordination Claims in the ES Action or through the use of Cash Collateral of the Lehman Creditors (as more fully set forth below); and

(ii)     To secure the satisfaction of a Project Related Action Recovery, recovery sources would be provided, consisting of (1) the Plan Reserve, to contain, *inter alia*, certain Cash Collateral and the Net Cash Proceeds from any sales of relevant Remaining Real Estate Projects to third party purchasers, and/or (2) continuing liens (as defined and described below, the "PRA Recovery Deeds of Trust") on any Remaining Real Estate Project transferred to a Lehman Nominee(s) securing an amount, in the aggregate, equal to the Maximum DOT Security Amount; and

(5)     Maximum value would be achieved for the Debtors' Remaining Real Estate Projects through one or more auctions conducted by the Liquidating Trustee.  The Lehman Creditors are committing to make "Initial Bids" for certain of the Remaining Real Estate Projects against which they have direct Liens and may commit to make certain additional bids (referred to in the Lehman Plan as "Contingent Bids") with respect to certain of the Remaining Real Estate Projects as to which the Lehman Lenders either have:  (a) a Lien in the equity ownership of the Remaining Real Estate Project rather than the Remaining Real Estate Project itself; or (b) a direct Lien in the Project which is subject to a Cross-Collaterization Claim.  The Initial Bids are all in amounts equal to the Lehman Lenders' appraised values for the underlying real estate (see Section 3.4, below) and as to the Contingent Bids, if made, would be equal to the Debtors' estimated value of the underlying real estate (also set forth in Section 3.4, below).

### 1.2     Purpose of this Document.

The Lehman Disclosure Statement is submitted in accordance with 11 U.S.C. § 1125 and contains information regarding the Lehman Plan, a copy of which accompanies this Disclosure Statement.  The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Lehman Plan.  The Lehman Disclosure Statement describes the Lehman Plan and contains information concerning, among other matters:  (1) the history, business, results of operations, assets and liabilities of the Debtors, (2) the business plan (*e.g.*, to liquidate) that is to be implemented following confirmation of the Lehman Plan, (3) risk factors to be

52063-001
DOCS_LA:205341.9

considered in voting on the Lehman Plan, and (4) certain tax considerations of the Lehman Plan.

The Lehman Disclosure Statement also contains a discussion of the proposed Elieff Plan, for which solicitation might be permitted by the Bankruptcy Court simultaneously with the Lehman Plan. If so, the discussion herein of the Elieff Plan would supplement, but not replace, a discussion thereof in the Elieff Disclosure Statement.

The Lehman Creditors strongly urge you to review carefully the contents of this Lehman Disclosure Statement and the Lehman Plan (including the exhibits to each) before making a decision to accept or reject the Lehman Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Holder of a Claim or Interest.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Lehman Plan will affect you and your best course of action.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

➢ **WHO CAN VOTE OR OBJECT TO THE LEHMAN PLAN;**

➢ **HOW YOUR CLAIM OR INTEREST IS TREATED;**

➢ **HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE ON ACCOUNT OF YOUR CLAIM OR INTEREST IN LIQUIDATION;**

➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDINGS;**

➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE LEHMAN PLAN;**

➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**

➢ **WHETHER THE LEHMAN PLAN IS FEASIBLE.**

**1.3    Court Approval of this Document.**

The Bankruptcy Court approved the Lehman Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor, typical of Holders of Claims or Interests receiving the Lehman Disclosure Statement, to make an informed judgment about the Lehman Plan. This approval enabled the Lehman Creditors to send you this Disclosure Statement

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and solicit your acceptance of the Lehman Plan. The Bankruptcy Court has not, however, ruled on the Lehman Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

### 1.4 Competing Plans.

At the same time that the Lehman Creditors are seeking to have the Bankruptcy Court confirm the Lehman Plan, it appears that Acquisitions and Elieff are seeking to have the Bankruptcy Court instead confirm the Elieff Plan. As noted above, the Lehman Creditors contend that the Elieff Plan is unconfirmable (*see* Article V, below). Assuming, however, that both the Elieff Plan and the Lehman Plan are confirmable, you may vote to accept or reject: the Lehman Plan; the Elieff Plan; both plans; or neither of them, irrespective of how you vote (if at all) on the other plan. The Bankruptcy Court may confirm only one plan for each Debtor (although it could conceivably confirm one plan as to some of the Debtors and another plan as to some of the other Debtors). The Bankruptcy Court will have discretion in determining which plan of reorganization to confirm but ". . . shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

### 1.5 Summary of the Lehman Plan.

The summary of the Lehman Plan that follows in this Section 1.5 is not intended to substitute for the more specific terms set forth in the Lehman Plan. If there are any discrepancies between the summary provided in this Section 1.5 and the Lehman Plan, the provisions of the Lehman Plan shall control. Additionally, the Cases of the Plan Debtors have been jointly administered, but not substantively consolidated. Accordingly, the Lehman Plan provides separate treatment for Holders of Claims and Interests against each Plan Debtor. The following is a general outline of the Lehman Plan.

(a) **Plan Debtors.** The Lehman Plan applies to 24 of the 26 Debtors., being all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

(b) **Generally.** The Lehman Creditors are owed, collectively, approximately $2.179 billion secured by deeds of trust on certain of the Remaining Real Estate

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Projects, certain Cash Collateral and other Assets of the Debtors' Estates. The Debtors have challenged the Lehman Creditors' Secured Claims, contending that (a) certain of the Lehman Creditors' Liens on the Assets of particular Debtors who are obligors under certain Lehman Loans are subject to being set aside because, among other things, other affiliated Debtors, rather than the obligor Debtors, received the benefit of such Lehman Loans (the Cross-Collateralization Claims) and (b) the Claims of the Lehman Creditors should be subordinated to the Claims of certain other Creditors allegedly harmed by the conduct of the Lehman Lenders (the Equitable Subordination Claims). The Lehman Lenders do not concur with these conclusions of the Debtors and with many of the factual contentions asserted as supporting or providing a basis for the Cross-Collateralization Claims or Equitable Subordination Claims.

Nonetheless, to enable the Debtors to emerge from bankruptcy, which the Lehman Lenders believe is in the interest of all Creditors, with a Plan that is fair to all constituencies and best preserves current values and prevents further deterioration in the values of the Assets of the Debtors, the Lehman Proponents have proposed the Lehman Plan through which they: (a) make available funds for ES Pro Rata Settlement Payments to settle the ES Claims of Settling ES Claimants; (b) propose, through the Lehman Plan Sale or Foreclosure Procedures, auctions of the Remaining Real Estate Projects at which third parties may bid for the Remaining Real Estate Projects and at which the Lehman Creditors and other Holders of Allowed Secured Claims may credit bid; (c) provide for the means of liquidation of the Remaining Other Assets and the distribution of Residual Cash for Holders of Allowed Claims; and (d) protect those ES Claimants who elect not to have the Estates settle their ES Claims by (i) making available the ES Litigation Loan to enable continued prosecution of the ES Claims in an ES Action, (ii) granting certain specific concessions, described below, that could facilitate the entry and collection of an ES Judgment and (iii) providing security for satisfaction of a Project Related Action Recovery.

(c)     **Liquidating Trustee.** A Liquidating Trustee shall be appointed to oversee the realization of values from the Remaining Real Estate Projects and the Remaining Other Assets for the benefit of the Creditors of the Plan Debtors. The values of the Remaining Real Estate Projects and Remaining Other Assets (net of Post-Confirmation Expenses) shall be distributed to the

respective Creditors of the applicable Plan Debtors in accordance with the strict priority rules of the Bankruptcy Code, applied on a Plan Debtor-by-Plan Debtor basis, except as otherwise provided in the Lehman Plan and described below. No Assets from the Estates of the Plan Debtors created under law upon the commencement of the Plan Debtors' Cases will be left with the Plan Debtors on the Effective Date; instead, such Assets will remain vested in the Plan Debtors' Estates to be administered by the Liquidating Trustee, although the Liquidating Trustee could elect thereafter to abandon to the Lehman Debtors Assets of inconsequential value to the extent permitted in the Lehman Plan.

(d)    **Disposition of the Remaining Real Estate Projects.**  Within sixty (60) days after the Effective Date, the Liquidating Trustee shall sell or convey each of the Remaining Real Estate Projects for which the Successful Bidder is either a third party purchaser, a Lehman Nominee or another Holder of an Allowed Secured Claim, all pursuant to the Lehman Plan Sale or Foreclosure Procedures set forth herein below. An auction for the sale of each Remaining Real Estate Project will occur promptly after the Effective Date (but no later than sixty (60) days after the Effective Date) at which third party prospective purchasers, the Lehman Creditors and other Holders of Secured Claims may bid on any or all of the Remaining Real Estate Projects. The Lehman Creditors will make opening credit bids as set forth in Section 7.7.2(a) of the Lehman Plan for most of those Remaining Real Estate Projects and may elect to make a bid on any other Remaining Real Estate Project. Under the Lehman Plan, the Lehman Creditors are afforded the ability to credit bid up to the amount of their Claims as specified in Article IV of the Lehman Plan on a Project-by-Project basis; provided, however, that each of the Remaining Real Estate Projects conveyed to a Lehman Nominee shall become subject to a PRA Recovery Deed of Trust for the protection of the applicable Estate and its Creditors as and to the extent set forth in the Lehman Plan.

(e)    **PRA Recovery Security Pool.**  The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims. If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in an ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), the values of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Remaining Real Estate Projects on which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding arguably would be available to satisfy the Project Related Action Recovery. Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (a) the Lehman Plan provides that certain Cash is to be held by the Liquidating Trustee in the Plan Reserve and (b) any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures shall be subject to a deed of trust in favor of the Liquidating Trustee (as defined below, the "PRA Recovery Deeds of Trust") to secure the obligation of such Lehman Nominee to reconvey the Project acquired by such Lehman Nominee in the event of a Project Related Action Recovery, which obligation is to be set forth in a Reconveyance Agreement and, which reconveyance obligation may, at the Lehman Nominee's election, instead be satisfied by a Cash payment in the amount of any Project Related Action Recovery. The Plan Reserve and PRA Recovery Deeds of Trust are referred to herein collectively as the "PRA Recovery Security Pool."

        **(f)**         <u>**Release of PRA Recovery Deeds of Trust.**</u> Although the PRA Recovery Deeds of Trust generally shall remain in effect pending the final settlement or determination of the Project Related Actions, as provided herein, in order to permit the Lehman Nominees holding title to the Remaining Real Estate Projects (*i.e.*, the PRA Security Projects) to fully utilize such properties, the Lehman Plan also includes provisions by which (i) <u>all</u> of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated upon there having been deposited Cash into the Plan Reserve equal to the Maximum PRA Recovery Amount and (ii) the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be: (1) released and the corresponding Reconveyance Agreement terminated upon the sale of such PRA Security Project to a third party and the deposit of any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale or (2) subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash Proceeds derived from such refinancing are deposited into the Plan Reserve.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(g) **Net Proceeds from Sales to Third Party Purchasers of Remaining Real Estate Projects Subject to Lehman Creditor Secured Claim.** The Net Cash Proceeds from the sale of any Remaining Real Estate Project that is subject to a Secured Claim of a Lehman Creditor and is sold to a third party purchaser, rather than conveyed to a Lehman Nominee, shall be deposited into the Plan Reserve, subject to certain limited uses as described in the Lehman Plan and the applicable Lehman Related Party(ies) shall be afforded a substitute Lien on any non-Cash Net Proceeds, in each case pending final settlement or determination of the Project Related Actions.

(h) **The Remaining Other Assets.** The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors, as set forth herein below.

(i) **Equitable Subordination Claims.**

**Generally.** Under the Lehman Plan, ES Claimants are afforded the option to either accept the benefits of the ES Settlement, as provided in the Lehman Plan, or have the Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit. To incentivize ES Claimants to accept the Lehman Plan even if they do not accept the ES Settlement Offer, the Lehman Lenders are making available as set forth below funding for such continued prosecution of the Equitable Subordination Claims.

**ES Settlement Offer.**

**Funding for ES Settlement Offer.** The Lehman Lenders are making available funds for the ES Settlement Pro Rata Payments to Settling ES Claimants.

**Settlement by an Individual ES Claimant.** For each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment (included with the Ballot) duly executed by such ES Claimant, such ES Claimant will receive an ES Pro Rata Settlement Payment (*e.g.*, its relative share of the aggregate amount of the ES Settlement Amount).

**Full Settlement by an Estate.** If at least one-half in number and two-thirds in amount of the voting ES Claimants in any of the Estates of the Plan Debtors vote for acceptance of

52063-001
DOCS_LA:205341.9

the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments (with respect to such Estate, the "Estate Acceptance of the ES Settlement"), all ES Claimants of such Estate will be entitled to receive an ES Pro Rata Settlement Payment upon return with their Ballots or to the Lehman Lenders of a duly executed ES Claimant Release and Assignment. If there is Estate Acceptance of the ES Settlement for an Estate of a particular Plan Debtor, the Equitable Subordination Claims of such Estate will be fully settled, dismissed (with prejudice) and released, including as to ES Claimants who do not vote to accept the ES Settlement Offer, who vote to reject the ES Settlement Offer or who vote to accept the ES Settlement Offer but who fail to execute and deliver the ES Claimant Release and Assignment.

**Releases and Assignments.** In exchange for the consideration payable to each Settling ES Claimant: (A) the Liquidating Trustee will issue for or on behalf of each relevant Estate a release of all claims against the Lehman Releasees or any future owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assignees of the applicable Debtor, as to, or to the extent attributable to, or to the extent any recovery would be payable with respect to, any or all of the ES Claims of the Settling ES Claimants (the "Estate ES Settlement Release" as more fully set forth and defined herein); and (B) in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote also, itself, will be granting a release of all claims against the Lehman Releasees or any future owners of the applicable Project(s) as to, or to the extent attributable to, or to the extent any recovery is payable with respect to, any or all of the ES Claims of such Settling ES Claimant (the "ES Claimant Release and Assignment" as more fully set forth and defined in the Lehman Plan).

**Estimate of Recovery on Account of Allowed ES Claims to Those Accepting, or Deemed to have Accepted the ES Settlement Offer.** The ultimate recovery on account of an Allowed ES Claim to those accepting, or deemed to have accepted, the ES Settlement Offer will vary depending on the total amount of Allowed ES Claims. The Lehman Lenders estimate that the maximum total amount of Allowed ES Claims will not exceed approximately $227.4 million and will likely be significantly less for the reasons stated below. Accordingly, to the extent each

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

potential ES Claimant holds an Allowed ES Claim and accepts the ES Settlement Offer, it is estimated that such ES Claimant will receive recovery on account of its Allowed ES Claim of not less than approximately 6.6%. It should be noted that the estimated amount of ES Claims used for purposes of calculating the estimated percentage recovery to ES Claimants ($227.4 million) (the "Claims Estimate") was not reduced to account for various factors that would likely result in a significant reduction of the Claims Estimate, namely: (a) no analysis was done and therefore no reduction was made to eliminate Claims (other than Claims filed by the Bond Issuers) which likely do not qualify as ES Claims (i.e., claims which arose prior to August 1, 2007) or which may otherwise be ultimately disallowed in accordance with the Claims allowance process in the Debtors' Cases, (b) although Claims filed by Bond Issuers in respect of bonds issued prior to August 1, 2007 were disregarded for purposes of the Claims Estimate, no reduction was made to the Claims Estimate to account for the fact that many of the Claims filed by contractors and other parties are secured by payment bonds issued by the Bond Issuers who have accounted for such Claims in their own Proofs of Claims, thereby resulting in "overlapping" Claims, (c) Claims of Bond Issuers arising from performance bonds are contingent and will likely be significantly less than the face amount of such performance bonds (which face amounts provided the basis for the Proofs of Claim filed by the Bond Issuers) depending upon whether performance is demanded by the beneficiaries of such bonds and/or the actual cost of such performance. It is difficult to assess the impact that the factors described above will have to the Claims Estimate but the Lehman Proponents believe that these factors will result in a significant reduction in the Claims Estimate and thereby increase the estimated recovery for the Allowed ES Claims.

**Continued Prosecution of Equitable Subordination Claims.** Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal (with prejudice), release and settlement of all Equitable Subordination Claims of all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in an ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of and attributable to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the ES Claims of any Non-Settling ES Claimants, as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender elects to pay Cash in lieu thereof.

**ES Litigation Loan.** Unless all of the ES Plan Debtors' Estates accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), a Lehman Lender will make available a loan in the aggregate principal amount of up to $1 million to the Liquidating Trustee for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination Claims, which loan may be used solely for the payment of ES Litigation Expenses (as more fully defined below, the "ES Litigation Loan").

**Concessions by Lehman Lenders to Facilitate Collection of an ES Judgments.**
Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in an ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

        **A.**     **Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtors' Projects Are to be Collateral for Equitable Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.** For some particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against their own estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Judgment as to other ES Plan Debtors' Estates.

**B.**     **To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.**  As to the Estates of Del Rio and SJD Partners only, the Lehman Creditors will waive an objection or defense, that, even were the applicable Lehman Secured Claim ignored, there was insufficient value in those Estates to pay their Allowed ES Claims, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied and (II) the applicable Estate executes the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**(j)**     **Plan Funding by Lehman Lenders.**  The Lehman Lenders will make substantial funding available to enable the confirmation and implementation of the Lehman Plan, including payment of certain Administrative Claims, Project related expenses, certain Post-Confirmation Expenses and certain settlement amounts.  Such funding will be provided either (i) through new transfers of Cash by a Lehman Lender, or (ii) by the Lehman Lenders forgoing the full extent of adequate protection to which Lehman Creditors otherwise would claim entitlement with respect to their substantial Cash Collateral being held in escrow or held by the Estates and instead permitting use of such Cash Collateral, as and to the extent set forth more fully in the Lehman Plan.

**1.6**     **Recommendations.**

Your vote on the Lehman Plan is important.  The Lehman Creditors urge you to vote accept the Lehman Plan by completing and returning the enclosed ballot(s) no later than the Voting Deadline (defined below) and urge the ES Claimants to vote to accept the ES Settlement Offer and execute and deliver the requested releases.

The Voting Deadline is set forth in a notice or order, which is sent as an accompaniment to the Lehman Disclosure Statement.

**II.**

**PLAN CONFIRMATION DEADLINES**

The Bankruptcy Court has not confirmed the Lehman Plan described in this Lehman Disclosure Statement.  Accordingly, the terms of the Lehman Plan are not binding on anyone.  However, if the Bankruptcy Court confirms the Lehman Plan, then the Lehman Plan will be binding

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

on the affected Debtors and on all Creditors and Holders in those Cases.

### 2.1 Time and Place of the Confirmation Hearing.

The hearing where the Bankruptcy Court will determine whether or not to confirm the Lehman Plan will take place at 411 West Fourth Street, Santa Ana, California 92701-4593 at _ .m., in Courtroom 5A.

### 2.2 Deadline for Voting for or Against the Lehman Plan.

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot and, if applicable, the ES Claimant Release and Assignment to:

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 11th Floor
> Los Angeles, California 90067-4100
> Attention: _____

Your ballot must be **received by** _____, 2009 (the "Voting Deadline"), or it will not be counted.

### 2.3 Deadline for Objecting to the Confirmation of the Lehman Plan.

Objections to the confirmation of the Lehman Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by _____, 2009:

| Counsel for Lehman Creditors | Richard M. Pachulski<br>Dean A. Ziehl<br>Robert B. Orgel<br>Jeremy V. Richards<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 11th Floor<br>Los Angeles, California 90067-4100<br><br>Edward Soto<br>Shai Waisman<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153-0119 |
|---|---|

### 2.4 Identity of Person to Contact for More Information Regarding the Lehman Plan.

Any interested party desiring further information about the Lehman Plan should contact the Lehman Creditors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Boulevard, 11th Floor, Los Angeles, California 90067, (310) 277-6910, attention:  Richard M. Pachulski, Robert M. Orgel, or Jeremy V. Richards.

### 2.5 Disclaimer.

Much of the information contained in this Lehman Disclosure Statement is either provided by the Debtors or the Trustee or is contained in the Elieff Disclosure Statement.  The Lehman Proponents represent that they are unaware of any material inaccuracies in the information set forth herein.

The Bankruptcy Court has not yet determined whether or not the Lehman Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Lehman Plan.

The discussion in this Lehman Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections mayor may not turn out to be accurate.

### III.

### BACKGROUND OF THE DEBTORS

### 3.1 The SunCal Companies and the Debtors.<sup>3</sup>

SunCal's business focused upon the "development" of residential land.  A typical

---

<sup>3</sup> The information set forth in this Article III is substantially identical to the information contained in Article IV of the Elieff Disclosure Statement.  This information is designed to provide to the reader with a general background understanding of the Debtors and their operations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

SunCal development began with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team developed a master plan for the acreage that incorporated streets, homes, parks, schools and commercial areas, and then it worked with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to achieve such plan. This process, which required the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, took a period of years. Once a master plan had been approved, SunCal provided for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sold the lots or parcels within the project to merchant builders.

The land development process is inherently capital intensive due to size and costs of the assets being acquired, the front-loaded capital requirements, and the length of time between the initial acquisition and the ultimate realization of profits. A typical SunCal project was financed through an equity contribution coupled with a land or acquisition loan. Thereafter one or more development and entitlement credit facilities would either be incorporated into the acquisition loan, or an entirely new facility would be obtained to fund the development. In some cases a layer of mezzanine debt (secured by an equity ownership interest in the entity that owns the project) was employed to provide additional funding.

SunCal historically financed its projects with land acquisition and development loans using a number of different lenders, but over the past five years, the company formed a relationship with the Lehman Lenders and the Lehman Lenders became SunCal's largest funding source.

The Debtors are twenty-six (26) entities formed to develop the Projects throughout California. Some of the Debtors directly own the Projects and others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects. SunCal Management, LLC, a non-debtor entity owned and controlled by Elieff.

### 3.2 The Debtors' Primary Assets.

The following is a general description of the Debtors and their primary Assets (other than the Litigation Claims) as of their respective Petition Dates, based solely upon the Debtors' disclosures in the Elieff Disclosure Statement:

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| Palmdale Hills | Palmdale Hills owns the Ritter Ranch Project. The Ritter Ranch |

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| (Voluntary Debtor) | Project consists of a 10,625 acre site situated in the City of Palmdale, in Los Angeles County, California. Grading of the first phase is complete with master infrastructure nearly 90% complete. The specific plan and the development agreement were approved in 1992 and allow for the development of up to 7,200 residential units. A vesting tentative parcel map consisting of 42 parcels has been processed and was recorded in 1995. Additionally, six vesting tentative tract maps totaling 553 lots were approved by the city in December 1995. All regulatory permits have been received.<br><br>Palmdale Hills also owns personal property in the form of cash in the amount of approximately $24 million and the Palmdale Hills CFD Bonds. |
| SCC Palmdale (Voluntary Debtor) | SCC Palmdale does not own any real property. SCC Palmdale is the Holder of the Allowed Interest in Palmdale Hills. |
| Acton Estates (Voluntary Debtor) | Action Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land. The Acton Project is expected to consist of 136 units. |
| SunCal Beaumont (Voluntary Debtor) | SunCal Beaumont owns the Beaumont Heights Project, that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California. The property is currently designated as low density residential use -rural residential use. The City of Beaumont is in the process of amending the general plan, preparing an environmental impact report and annexing the assemblage. The specific plan and tentative tract map are in the drafting stage. The Beaumont Heights Project was expected to consist of 1,203 units. A portion of the Beaumont Heights Project has been lost through foreclosure sales completed prior to the Petition Date. |
| SunCal Bickford (Voluntary Debtor) | SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement. The offsite water and sewer improvements are mostly complete. Improvement plans for major roads and in-tract improvements were in process of being completed and a memorandum of understanding between the City and County for the regional sewer pipeline was in process. The Bickford Ranch Project is expected to consist of 2,105 units. |

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| | SunCal Bickford owns personal property in the approximate amount of $2,305,523 in the form of cash. |
| SunCal Emerald (Voluntary Debtor) | SunCal Emerald owns the Emerald Meadows Project, consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California. The specific plan, general plan and the environmental impact report were approved in October 2005. The tentative tract map & final map were in process. The Emerald Meadows Project is expected to consist of 1,002 units. |
| SunCal Johannson (Voluntary Debtor) | SunCal Johannson owns the Johannson Ranch Project, consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California. Tentative maps were in the process of being prepared. Engineering plans and preparation of the draft specific plan were commenced prior to the filing of the Debtors' Cases. The SunCal Johansson Project is expected to consist of 921 units. |
| SJD Partners (Voluntary Debtor) | SJD Partners currently owns no real property. SJD Partners formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project." The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, pursuant to which a Lehman Affiliate, LV Pacific Point LLC ("LV PacPoint"), a Delaware limited liability company, purchased the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. SJD Partners alleges a potential preference claim and other causes of action against the LV PacPoint (*See* Article IV, below.) SJD Partners owns personal property in the approximate amount of $110,485, consisting of cash and accounts receivable. |
| SJD Development (Voluntary Debtor) | SJD Development does not own any real property. SJD Development is the Holder of an Allowed Interest in SJD Partners. |
| SunCal Summit Valley (Voluntary Debtor) | SunCal Summit Valley owns the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report were completed. The Summit Valley Project was previously expected to consist of 6,023 units. A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date. |
| | SunCal Summit Valley is the Holder of the Allowed Interests in Seven Brothers and Kirby Estates. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| Seven Brothers (Voluntary Debtor) | Seven Brothers owned 900 acres of the Summit Valley Project, a portion of which has been lost through foreclosure proceedings completed prior to the Petition Date. |
| Kirby Estates (Voluntary Debtor) | Kirby Estates owns 27 acres of the Summit Valley Project. |
| SCC Communities (Voluntary Debtor) | SCC Communities owns the Joshua Ridge Project, consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The Joshua Ridge Project was slated to be sold to the city and the city was scheduled to use the land to build a park or a school. |
| Tesoro (Voluntary Debtor) | Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. |
| Del Rio (Voluntary Debtor) | Del Rio does not own any real property. Del Rio owns the Del Rio CFD Bond Proceeds after use and application as provided in an Acquisition Agreement to be entered into between Del Rio and the City of Orange. The Acquisition Agreement will set forth certain terms for the acquisition of various facilities by the City of Orange from Del Rio, the issuance of the Del Rio CFD Bonds and the use and application of a portion of the proceeds of the Del Rio CFD Bonds for the construction of certain improvements and other applications, and with the remaining proceeds to go to Del Rio. It is anticipated that the Acquisition Agreement will provide for a maximum bond authorization in the amount of up to $25 million. The Acquisition Agreement has not been finally negotiated and the maximum authorization amount may change. |
| SunCal I (Voluntary Debtor) | SunCal I does not own any real property. SunCal I is the Holder of Allowed Interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald. |
| SunCal III (Voluntary Debtor) | SunCal III owns no real or personal property. |
| Delta Coves (Trustee Debtor) | Delta Coves owns the Delta Coves Project consisting of a 310-acre site which is located on Bethel Island within Contra Costa County. The Delta Coves Project is expected to consist of 494 waterfront residential lots, some of which will be condominiums/townhomes and some of which will contain private boat docks. The Delta Coves Project is expected to include an interior lagoon that will provide direct boating access to San |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
| --- | --- |
| | Joaquin River Delta. |
| SunCal Heartland (Trustee Debtor) | SunCal Heartland owns the Heartland Project consisting of a 417 acre site located in Riverside County, California. The Heartland Project is expected to consist of 983 units. |
| SunCal Marblehead (Trustee Debtor) | SunCal Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California. The development is expected to offer canyon and ocean views from a number of lots throughout the Marblehead Project. |
| | SunCal Marblehead also owns personal property in the approximate amount of $1,176,584 in the form of cash. |
| SunCal Northlake (Trustee Debtor) | SunCal Northlake owns the Northlake Project, consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is expected to consist of 3,417 units. |
| | SunCal Northlake also owns personal property in the amount of $967,728 in the form of cash. |
| SunCal Oak Valley (Trustee Debtor) | SunCal Oak Valley owns the Oak Valley Project consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project consists primarily of residential property and is expected to also include two commercial sites, one school site and several parks. The Oak Valley Project is expected to consist of 3,417 units. |
| SunCal Century City (Trustee Debtor) | SunCal Century City owns the 10000 Santa Monica Project, consisting of a 2-acre site which is located at the eastern edge of Century City, in Los Angeles County, California. The 10000 Santa Monica Project is expected to consist of 163 condominium units. |
| SunCal PSV (Trustee Debtor) | SunCal PSV owns the Palm Springs Village Project, consisting of a 309-acre site which is located in the City of Palm Springs, California. The current proposed development consists of 752 single family units, 398 multi-family units, an 18-hole executive golf course, a driving range, a golf clubhouse and recreational facilities. |
| SunCal Torrance (Trustee Debtor) | SunCal Torrance owns the Del Amo Project, consisting of a 14-acre site which is located in the City of Torrance in Los Angeles County, California. The site is currently a section of the Del Amo Fashion Center complex, a 3 million square feet retail mall. The |

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| | Del Amo Project is expected to consist of 365 units. |
| SunCal Oak Knoll (Trustee Debtor) | SunCal Oak Knoll owns the Oak Knoll Project, consisting of a 172.5-acre site which is located in the City of Oakland, California. The Oak Knoll Project is expected to be a diverse master planned community that includes 960 residential units, including single family homes, town homes and apartments. The Oak Knoll Project is also expected to consist of six restaurant spaces, along with a grocery anchor. |

### 3.3     Debt and Capital Structure.

In the case of the seventeen Voluntary Debtors, SunCal Affiliates are the owners of one hundred percent (100%) of the equity and SunCal Affiliates have full corporate governance authority over the Voluntary Debtors. Eleven (11) of the Voluntary Debtors own nine (9) Projects:

(a)     Four (4) Projects (Ritter Ranch Project; Acton Estates Project; Emerald Meadows Project; and Bickford Ranch Project) are owned, respectively, by Palmdale Hills, Acton Estates, SunCal Emerald, and SunCal Bickford.  Lehman Commercial asserts a first priority lien by virtue of first-priority deeds of trust on each of these four Projects.

(b)     Two (2) Projects (the Joshua Ridge and Tesoro Projects) are owned, respectively, by SCC Communities and Tesoro.  Lehman ALI is the primary secured creditor on each of these two additional Projects.

(c)     Two (2) Projects (the Johannson Ranch Project and Beaumont Heights Project) are owned, respectively, by SunCal Johannson and SunCal Beaumont.  Lehman Commercial holds a first priority pledge of the membership interests in SunCal Johannson and SunCal Beaumont.

(d)     One (1) Project (SunCal Summit Valley) is owned by three Debtors: SunCal Summit Valley, Kirby Estates and Seven Brothers, which each own a portion of the Project. Lehman Commercial holds a first priority pledge of the membership interests in SunCal Summit Valley, which in turn owns Kirby Estates and Seven Brothers.

Additionally, besides holding a first priority Lien directly on the Ritter Ranch Project, Lehman Commercial holds a first priority pledge of the membership interests in Palmdale Hills, which is the owner of the Ritter Ranch Project.  Further, Lehman ALI was also the primary secured

52063-001
DOCS_LA:205341.9

creditor of SJD Partners' Pacific Point Project prior to a non-judicial foreclosure sale of the Pacific Point Project in August of 2008.

Various unrelated third parties are the primary secured creditors with respect to certain portions of two (2) of the Voluntary Debtors' Projects (SunCal Beaumont and SunCal Summit Valley -including portions thereof owned by Seven Brothers).

Although the equity interests in the entities owning the Johannson Ranch Project, the Summit Valley Project, and the Beaumont Heights Project have been pledged to the Lehman Lenders, there are no primary secured creditors on the following Projects or portions thereof: (i) the Johannson Ranch Project, (ii) portions of the Summit Valley Project, including portions owned by Kirby Estates and Seven Brothers, and (iii) portions of the Beaumont Heights Project.

As to the nine (9) Trustee Debtors, there are currently nine (9) Projects (the Delta Coves, the Heartland, the Marblehead, the Northlake, the Oak Valley, the Oak Knoll, the 10000 Santa Monica, the Palm Springs Village, and Del Amo Projects).

As of the Petition Dates, Affiliates of SunCal and Lehman Brothers Holdings Inc. both Interest Holders and (with the exception of the 10000 Santa Monica Project) the Lehman Lenders held a first priority lien and security interest in and to each of the foregoing Projects. Danske Bank alleges a first priority lien and security interest in and to the 10,000 Santa Monica Project.

In addition to the foregoing, there are miscellaneous Real Property Tax Claims, Other Secured Claims, Mechanic's Lien Claims, Priority Claims, Administrative Claims and General Unsecured Claims asserted against each of the Projects and each of the Debtors, summarized in the chart below (which chart is compiled from information disclosed in the Elieff Disclosure Statement).

| DEBTOR | REAL PROPERTY TAX CLAIMS | ALLEGED SECURED CLAIMS | ALLEGED MECHANIC LIEN CLAIMS | PRIORITY AND ADMINISTRA-TIVE CLAIMS | DEBTORS' ALLOCATION OF BOND LIABILITY | GENERAL UNSECURED CLAIMS (EXCLUDING BOND CLAIMS) |
|---|---|---|---|---|---|---|
| Palmdale Hills | $1,037,377 | $287,252,096 | $1,069,855 | $499,970 | $27,991,917 | $5,035,730 |
| SSC Palmdale | $0 | $119,664,305 | $0 | $0 | $0 | $0 |
| SunCal Heartland | $559,022 | $354,325,126 | $1,552,794 | $231,873 | $28,947,440 | $1,827,151 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| DEBTOR | REAL PROPERTY TAX CLAIMS | ALLEGED SECURED CLAIMS | ALLEGED MECHANIC LIEN CLAIMS | PRIORITY AND ADMINISTRATIVE CLAIMS | DEBTORS' ALLOCATION OF BOND LIABILITY | GENERAL UNSECURED CLAIMS (EXCLUDING BOND CLAIMS) |
|---|---|---|---|---|---|---|
| SunCal Marblehead | $379,156 | (same as SunCal Heartland) | $1,288,212 | $740,382 | $56,510,018 | $45,528,422 |
| SunCal Beaumont | $365,954 | $4,825,659 | $46,188 | $33,672 | $0 | $183,731 |
| SunCal Oak Knoll | $2,356,036 | $158,141,365 | $4,700,604 | $874,609 | $0 | $1,135,298 |
| SunCal Torrance | $567,669 | (same as SunCal Oak Knoll) | $0 | $160,914 | $0 | $203,838 |
| SCC Communities | $5,900 | $23,795,013 | $0 | $27,072 | $0 | $32,813 |
| Del Rio | $0 | (same as SSC Communities) | $0 | $261,542 | $3,159,945 | $4,806,170 |
| Tesoro | $70,239 | (same as SSC Communities) | $0 | $118,891 | $0 | $170,969 |
| SunCal Bickford | $2,887,678 | $343,221,391 (Bickford 1st) $56,494,059 (Bickford 2nd) | $3,477,120 | $345,221 $0 | $2,827,548 | $7,319,277 |
| SunCal Emerald | $284,974 | (same as Bickford 1st) | $1,279,043 | $188,695 | $0 | $7,878,901 |
| Acton Estates | $200,454 | (same as Bickford 1st) | $0 | $59,242 | $1,290,000 | $138,250 |
| SunCal I | | (same as Bickford 1st) | $0 | $0 | $0 | $0 |
| Summit Valley | $573,775 | (same as Bickford 1st) $2,504,750 | $16,827 | $48,018 | $0 | $1,076,053 |
| SunCal III | $0 | (same as Bickford 1st) | $0 | $0 | $0 | $459 |
| Seven Brothers | $60,828 | $3,427,066 | $0 | $0 | $0 | $0 |
| Kirby Estates | $1,744 | $0 | $0 | $0 | $0 | $0 |
| SunCal Johannson | $75,107 | $0 | $0 | $34,101 | $0 | $41,181 |
| Delta Coves | $609,222 | $206,023,142 | $122,535 | $448,061 | $27,755,885 | $7,436,746 |
| SJD Development | $0 | $0 | $0 | | $0 | $368,362 |
| SJD Partners | $0 | $0 | $0 | $244,090 | $0 | $51,265,349 |
| SunCal Century City | $1,407,213 | $120,000,000 | $1,434,520 | $1,040,005 | $0 | $3,289,632 |
| SunCal Northlake | $1,189,919 | $123,654,777 | $0 | $729,432 | $0 | $911,296 |
| SunCal Oak Valley | $280,280 | $141,630,092 | $1,662,309 | $138,443 | $26,167,563 | $3,437,919 |
| SunCal PSV | $589,367 | $88,257,340 | $2,316,430 | $315,213 | $18,405,548 | $3,486,795 |
| **Total** | $13,501,914 | $2,033,216,181 | $18,966,437 | $6,539,446 | $193,055,864 | $66,244,189 |

- Certain Proofs of Claims filed against Palmdale Hills appear to be misfiled and relate to other Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

• Certain Disputed Claims, such as duplicative Claims, have been deducted from the figures above.

• The Debtors have not yet completed their investigation on what Claims are Allowed Claims and their listing herein should not be construed as providing for Allowance under the Lehman Plan. Administrative Claims are ongoing.

• $275,918 of Mechanic's Lien claims asserted against Del Rio and $1,996,537 of Mechanic's Lien claims asserted against SJD Partners have been classified as General Unsecured Claims since neither Del Rio nor SJD Partners own any underlying real property.

• The Debtors have assumed Bond Claims according to the Bond Claims arising from the particular Debtors' Projects. The Bond Issuers have asserted various Bond Claims against the Debtors in the approximate amount of $230 million (representing approximately $155 million by Arch and $75 million by Bond Safeguard, some of which Claims are not the subject of timely filed proofs of claim). The Bond Issuers assert that their Bond Claims are joint and several against all of the Debtors, which the Debtors dispute as lacking consideration and fraudulent conveyances to the extent that such Bond Claims do not arise from or exceed the amount of Bond Claims attributed to the Project of each Debtor. The Lehman Lenders adopt this view and further believe that Arch can only assert liability against the Debtor for whose benefit it issued a bond as the Debtors have no joint and several liability with respect thereto.

• The Debtors believe that the $368,362 Claims filed against SJD Development should have been filed against SJD Partners

The Lehman Lenders do not believe that the liquidated Bond Claims will be nearly as much as the face amount of Bond Claims allocated by the Debtors to each Project. For instance, certain of the Bond Claims include bonded obligations for projects that do not relate to any of the Projects or Debtors. Further, as of March 2009, the liquidated claims of Arch (the Debtors' primary bonding company) were only $132,000 based upon proofs of claim filed by Arch in the Bankruptcy Cases. Further, the majority of the Bond Claims relate to obligations under performance bonds. At this time, it is unknown what portion of the bond claims will ultimately become liquidated.

## 3.4    Asset Values.

        The below chart sets forth the appraised value of most of the Debtors' Projects based upon appraisals prepared for the Lehman Lenders during the pendency of the Bankruptcy Cases, and SunCal's stated valuation opinions for all of the Projects and the Del Rio CFD Bond Proceeds.

| NAME OF DEBTOR | APPRAISED VALUE OF DEBTORS' PROJECTS BASED UPON APPRAISALS PREPARED FOR LEHMAN LENDERS DURING THE PENDENCY OF THE DEBTORS' CHAPTER 11 PROCEEDING | SUNCAL'S STATED VALUATION OPINIONS |
|---|---|---|
| SunCal Bickford | $29,500,000 | $21,000,000 |
| SunCal Emerald | $12,000,000 | $6,000,000 |
| Palmdale Hills | $42,900,000 | $27,000,000 |
| Tesoro | $1,850,000 | $1,500,000 |
| SCC Communities | $1,200,000 | $1,000,000 |
| SunCal Marblehead | $187,500,000 | $74,000,000 |
| SunCal Heartland | $7,900,000 | $5,000,000 |
| OVC Holdings | $20,900,000 | $12,000,000 |
| Northlake Holdings | $23,000,000 | $4,000,000 |
| SunCal Oak Knoll | $48,000,000 | $32,000,000 |
| SunCal PSV | $13,800,000 | $10,000,000 |
| SunCal Torrance | $25,000,000 | $16,000,000 |
| Delta Coves | $25,200,000 | $22,000,000 |
| SunCal Century City | $50,900,000 | $39,000,000 |
| SunCal Beaumont | $1,200,000 (SunCal Opinion) | $1,200,000 |
| Acton Estates | $6,800,000 | $3,400,000 |
| SunCal Johannson | $4,000,000 | $2,100,000 |
| SunCal Summit Valley | $2,200,000 | $750,000 |
| Kirby Estates | $2,800,000 | 1,000,000 |

| NAME OF DEBTOR | APPRAISED VALUE OF DEBTORS' PROJECTS BASED UPON APPRAISALS PREPARED FOR LEHMAN LENDERS DURING THE PENDENCY OF THE DEBTORS' CHAPTER 11 PROCEEDING | SUNCAL'S STATED VALUATION OPINIONS |
|---|---|---|
| Seven Brothers | $200,000 | $75,000 |
| Del Rio | $4,500,000 (SunCal Opinion) | $4,500,000 |
| SJD Partners | $25,000,000 (SunCal Opinion) | $25,000,000 |
| **TOTAL** | $536,350,000 | $308,525,000 |

- The Lehman Lenders' appraised value of the Summit Valley Project includes the portions of the Summit Valley Project owned by Seven Brothers and Kirby Estates. The appraisal values the property that is owned outright by SunCal Summit, Seven Brothers and Kirby Estates, and not subject to other third-party seller financing lien holders.

- The Lehman Creditors do not have an appraisal of the Project belonging to SunCal Beaumont. However, the Lehman Lenders have a Lien on SunCal I's Allowed Interest in SunCal Beaumont. SunCal has stated that it believes that the value of the Beaumont Heights Project is $1,200,000, net of portions of the Project that are expected to be lost through foreclosure sales conducted by third-party seller financing lien holders.

- The Lehman Creditors do not have an estimate for the Del Rio CFD Bond Proceeds. SunCal has stated that it believes that the Del Rio CFD Bond Proceeds subject to the Lehman Lenders' liens have a value of $4.5 million.

- The Lehman Creditors do not have an appraisal for the Pacific Point Project (SJD Partners' former Project which is subject to a potential Avoidance Action discussed below). Lehman ALI non-judicially foreclosed on the Pacific Point Project on August 28, 2008, and an Affiliate of Lehman ALI (LV Pacific Point) acquired title to the Pacific Point Project at the foreclosure sale. SunCal has stated that it believes the Pacific Point Project has a fair market value of $25 million.

### 3.5    A Summary of the Lehman Creditors' Loans.

Of the 18 Remaining Real Estate Projects of the Debtors, 14 are subject to first priority Liens in favor of the Lehman Creditors by virtue of first-priority deeds of trust:

52063-001
DOCS_LA:205341.9

(a) Ritter Ranch Project;

(b) Acton Estates Project;

(c) Emerald Meadows Project;

(d) Bickford Ranch Project;

(e) Joshua Ridge Project;

(f) Tesoro Project;

(g) Delta Coves Project;

(h) Heartland Project;

(i) Marblehead Project;

(j) Northlake Project;

(k) Oak Valley Project;

(l) Oak Knoll Project;

(m) Palm Springs Village; and

(n) Del Amo Project.

As to another three of the Remaining Real Estate Projects or portions thereof, the Lehman Lenders hold first priority Liens against the five parent Debtors' Interests in the five (5) Debtors that own the Projects:

| | Parent Debtor Holding Pledged Interests | Collateral | Owner Debtor | Project |
|---|---|---|---|---|
| (i) | SunCal I | LLC Interests in SunCal Johannson | SunCal Johannson | Johannson Ranch Project |
| (ii) | SunCal I | LLC Interests in Suncal Beaumont | SunCal Beaumont | Beaumont Heights Project |
| (iii) | SunCal I | LLC Interests in SunCal Summit Valley | SunCal Summit Valley | Summit Valley Project (portion) |
| (iv) | SunCal Summit Valley | LLC Interests in Kirby Estates | Kirby Estates | Summit Valley Project (portion) |
| (v) | SunCal | LLC Interests | Seven | Summit |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Parent Debtor Holding Pledged Interests | Collateral | Owner Debtor | Project |
|---|---|---|---|
| Summit Valley | in Seven Brothers | Brothers | Valley Project (portion) |

As to the final project, 10000 Santa Monica Project, Danske Bank holds the first priority Lien.

The Lehman Lenders also hold other Liens in other of the Debtors' property, *e.g.*, a Lien in the Del Rio CFD Bond Proceeds, Liens against SunCal I's Interests in SunCal Bickford, Acton Estates and SunCal Emerald, a second priority Lien against the Bickford Ranch Project, a Lien against SCC Palmdale's Interest in Palmdale Hills and a Lien in all, or substantially all, of the Debtors' cash balances (Cash Collateral) and receivables and other rights relating to the Projects in which they assert Liens.

The various Lehman Loans, the entities against which they are asserted and the Allowed Amount of each Lehman Loan as of the Petition Date for the purposes of the Lehman Plan are all set forth in the summary of the Class 2 Lehman Secured Claims under the Lehman Plan, commencing at page 59 of the Lehman Disclosure Statement.

### 3.6 Filing of Proofs of Claim with Respect to the Lehman Loans.

On or before the bar date for filing proofs of claim, the Lehman Lenders filed proofs of claim on account of all of the Lehman Loans. All or portions of seven of the outstanding Lehman Loans (the "Repurchase Lehman Loans") are subject to outstanding repurchase agreements with Fenway Capital. Based upon this fact, the Debtors moved to strike all of the proofs of claim filed by the Lehman Lenders on the basis that they allegedly do not own the Repurchase Lehman Loans. The Lehman Lenders opposed the motion, asserting that they own the Repurchase Lehman Loans because the repurchase agreements with Fenway Capital were transfers for security only, and that they had the power and authority to file the related proofs of claim.

The Bankruptcy Court held a hearing on the foregoing motion to strike on June 30, 2009. At that hearing, the Bankruptcy Court determined, over the objection of the Lehman Lenders, that the Repurchase Lehman Loans had actually been "sold" to Fenway Capital (rather than having been pledged to Fenway Capital as collateral for a loan, as asserted by the Lehman Lenders). The

52063-001
DOCS_LA:205341.9

Bankruptcy Court ruled that the proofs of claim relating to those loans would be stricken unless the Lehman Lenders could prove that they were authorized to file proofs of claim as agent for Fenway Capital. A hearing on this outstanding issue has been set for September 22, 2009.

The Lehman Lenders contend that the Bankruptcy Court's ruling with respect to the Repurchase Lehman Loans is erroneous and, if the Bankruptcy Court finally determines that the Lehman Lenders were not authorized to file proofs of claim on account of the Repurchase Lehman Loans, will likely appeal the Bankruptcy Court's ruling. However, even if the Bankruptcy Court rules that the Lehman Lenders were not authorized to file proofs of claim on behalf of the Repurchase Lehman Loans and an appellate court upholds the Bankruptcy Court's ruling, the Lehman Lenders contend that the only effect of such rulings would be that the Lehman Lenders (or Fenway Capital) would be unable to assert unsecured deficiency claims against the Plan Debtors' Estates. The Lehman Lenders believe, however, that such a ruling would not in any way invalidate the Liens in and to the Debtors' assets created pursuant to the Lehman Loans and that all of the rights and remedies relating to such Liens, including the right to foreclose on the underlying collateral and credit bid at a foreclosure sale pursuant to the terms of the Lehman Plan, would not in any way be invalidated or impaired by such rulings.

## IV.

## DEBTORS' ALLEGED CLAIMS AGAINST THE LEHMAN LENDERS

### 4.1 Introduction.

As more fully set forth in the Elieff Disclosure Statement, the Elieff Plan Proponents contend that the Debtors or certain of the Debtors' Creditors have substantial claims against the Lehman Lenders with respect to the Lehman Loans that would result either in the subordination of the Lehman Loans to payment in full of all, or a substantial portion of the Debtors' Creditors, the avoidance or setting aside of various Claims and Liens that the Lehman Creditors assert against certain Debtors and/or recovery of substantial monies by one or more of the Debtors from the Lehman Lenders. Those claims fall into five general categories: (i) the Section 506(d) Claims; (ii) the Equitable Subordination Claims; (iii) the Fraudulent Transfer Claims; (iv) the Preference Claims; and (v) the Breach of Fiduciary Duty Claims. The nature of these claims and the Lehman Creditors'

analysis of their merits and likely value is discussed in Articles 4.2 through 4.6, below.

### 4.2 The Debtors' Disputes Relating to the Allowed Secured Claims of Fenway Capital Pursuant to Bankruptcy Code Section 506.

Bankruptcy Code section 506(a) provides that an asserted secured claim is only an Allowed Secured Claim to the extent of the value of such Creditors' interest in the Estate's interest in such property. Bankruptcy Code section 506(d) provides that to the extent a lien secures a claim against a debtor that is not an allowed secured claim, such lien is void subject to certain exceptions. Finally, Bankruptcy Code section 551 provides that such liens that are void under section 506(d) are preserved for the benefit of the applicable debtor's estate.

In Article 4.4 of the Elieff Disclosure Statement, the Elieff Plan Proponents contend that based upon the Lehman Lenders' appraised values (as set forth in Article 3.4, above), there is no value to the collateral supporting the Lehman ALI's second deed of trust on the Bickford Ranch Project, the pledge of SCC Palmdale's Allowed Interested in Palmdale Hills to Lehman Commercial, or the pledge of SunCal I's Allowed Interests in Acton Estates, SunCal Summit Valley, SunCal Bickford, and SunCal Emerald to Lehman Commercial. (The foregoing assertions are clearly erroneous as to Lehman Commercial's first priority lien in SunCal I's Allowed Interest in SunCal Summit. Based upon the Lehman Lenders' appraisal, the SunCal Summit Valley Project is worth approximately $2.2 million and, based upon the Elieff Disclosure Statement, SunCal Summit Valley has obligations that are less than this appraised value, resulting in equity value in the membership interest and the pledge of that interest to the Lehman Commercial.) However, disallowance of the foregoing alleged Secured Claims and avoidance of the foregoing alleged Liens for the benefit of the respective Debtors' Estates does not generate or create any value or unencumbered assets for distribution to general unsecured creditors of any of the Debtors. The Bickford Ranch Project, the Acton Estates Project, the Emerald Meadows Project, the Summit Valley Project and the Ritter Ranch Project are all subject to senior liens in favor of Lehman Commercial and all of the value in those projects must be distributed or paid to the applicable Lehman Creditors on account of the foregoing, valid senior liens. Thus, even if the assertions of the Elieff Plan Proponents in Article 4.4 of the Elieff Disclosure Statement were correct, they would likely be of no economic consequence to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Debtors' Creditors.

**4.3** **The Elieff Plan Proponents Assertions regarding Fraudulent Transfer Actions Against the Lehman Lenders Arising under Various Cross-Collateralized Lehman Loans.**

In Article 4.5(a) of the Elieff Disclosure Statement, the Elieff Plan Proponents contend that certain Claims and Liens of the Lehman Lenders can be set aside and avoided pursuant to Bankruptcy Code sections 544, 548, 502(d) and 551 on the theory that at least part of the Claims and Liens identified therein relate to monies received by a Debtor other than the Debtor with a secured obligation to repay those monies. The Elieff Plan Proponents contend the Lehman Lenders may only assert a Claim and Lien against a particular Debtor to the extent that particular Debtor actually received monies on account of the subject Claim (rather than to the extent the Debtor guaranteed and secured repayment of monies received by an Affiliate).

There are numerous problems with this theory of recovery, not the least of which is that a guarantee or co-obligor obligation (and the lien securing such obligation) based upon monies advanced to an Affiliate can only be set aside if the Debtor incurring such obligation or granting such lien was insolvent, or was rendered insolvent (as insolvency is defined in section 544 and applicable state law or section 548) by virtue of incurring the secured obligation at the time the obligation and lien were incurred. Article 4.5 of the Elieff Disclosure Statement does not allege that the subject cross-collateralization identified therein was incurred by any Debtor at a time when the Debtor was, or was thereby rendered, insolvent. The Lehman Creditors believe that in all, or substantially all instances of cross-collateralization identified by the Elieff Plan Proponents, the Debtor incurring the secured obligation was not insolvent, nor was it rendered insolvent (as such term is defined by applicable law) at the time the Lien and obligation were incurred.

Furthermore, the Elieff Plan Proponents concede in Article 4.5 of the Elieff Disclosure Statement that the Liens and Claims of Lehman Lenders cannot be set aside to the extent that funds were actually received by the obligor/pledgor. Taking the amount of funds that the Elieff Plan Proponents concede each of the relevant Debtors received (as set forth at page 46 of the Elieff Disclosure Statement) and comparing that number with the Debtors' estimate of the value of the

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

related collateral pledged in favor of the Lehman Lenders (derived from page 37 of the Elieff Disclosure Statement), it is clear that in only one instance (the Acton Project) is the amount of funds allegedly received ($380,000) less than the value of the pledged collateral (in this case, $3.4 million). Thus, even if the Fraudulent Transfer Claims identified in section 4.5(a) of the Elieff Disclosure Statement are valid, they would at best generate a recovery of approximately $3.02 million and then only for the benefit of Creditors of the Acton Estate. However, as Bankruptcy Code section 550 limits recovery "for the benefit of the estate" and the Lehman Creditors contend that fraudulent transfer claims cannot be prosecuted for the benefit of equity holders, the potential recovery on account of the foregoing Fraudulent Transfer Claims would be capped at no more than approximately $1.4 million, the unsecured claims asserted against the Acton estate according to the Elieff Disclosure Statement (disclosure at page 56 thereof).

Even if the fraudulent conveyance alleged with respect to the cross-collateralization set forth in the SSC Palmdale Loan (Elieff Disclosure Statement, Article 4.5(b)), had merit, the value to the estate of SSC Palmdale is zero, as noted by the Elieff Plan Proponents at page 42 of the Elieff Disclosure Statement. The collateral, SSC Palmdale's Allowed Interest in Palmdale Hills, therefore is worthless.

Likewise, even if the claims asserted in Article 4.5(c) and (d) of the Elieff Disclosure Statement were valid and the requisite insolvency could be proven, the Elieff Plan Proponents have conceded that the Claims and Liens of the Lehman Lenders are valid at least to the extent of proceeds received by the obligor/pledgor. As the proceeds received by SunCal Oak Knoll and SunCal Torrance ($103.5 million and $45 million, respectively) exceed SunCal's estimate of the value of the underlying pledged collateral ($48 million and $25 million, respectively), the Fraudulent Transfer Claims identified in Articles 4.5(c) and (d) of the Elieff Disclosure Statement are without merit.

Finally, with respect to the claims identified in Article 4.5(e) of the Elieff Disclosure Statement relating to the Interim Loan Agreement, assuming insolvency as of the date such obligations were incurred can be proved, the maximum potential liability of the Lehman Lenders would be approximately $1.5 million as to the Tesoro Estate and $4.5 million as to the Del Rio

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Estate. However, based on the Elieff Proponents' own numbers, the unsecured claims at those estates total approximately $290,000 and $270,000, respectively, therefore capping the maximum potential recovery on account of such alleged Fraudulent Transfer Claims at approximately $560,000.

While the Lehman Lenders believe that the Fraudulent Transfer Claims outlined in Article 4.5 of the Elieff Disclosure Statement are without merit, making assumptions most favorable to the Debtors, the maximum aggregate exposure of Lehman Lenders to such Fraudulent Transfer Claims is no more than approximately $2 million, and the probable value of litigation on such claims significantly less.

### 4.4 Alleged Preference Claims Against the Lehman Lenders.

In Article 4.6(a)(1) through (3) of the Elieff Disclosure Statement, the Elieff Plan Proponents assert that Delta Coves, SunCal Century City and SunCal Marblehead Heartland Master LLC made prepetition transfers in the one year preceding the Petition Date to Lehman Lenders in the sums of approximately $6.5 million, $10.6 million, and $3.4 million, respectively. The Elieff Disclosure Statement asserts, without any further support, that these payments are recoverable as preferences. However, there is absolutely no factual support in the Elieff Disclosure Statement to support these contentions. In particular, it would be necessary for the Debtors to establish balance sheet insolvency (as required by Bankruptcy Code section 547) in order to be able to maintain a preference recovery. Furthermore, and perhaps more importantly, the Lehman Lenders assert (or in the case of SunCal Century City, at all relevant times asserted) validly perfected first priority security interests and deeds of trust in and to all of the material assets of the Debtors that the Elieff Plan Proponents contend may have made alleged preferential transfers. Under such circumstances, a transfer of some or all of the collateral of a validly perfected secured creditor (even an undersecured creditor) cannot constitute a recoverable preferential transfer as it does not have the effect of depleting assets otherwise available to pay unsecured creditors. Furthermore, as noted above, the Lehman Lenders contend that pursuant to Bankruptcy Code section 550, preferences can only be recovered for the benefit of unsecured creditors of the transferor. The Lehman Lenders believe that for these, and other reasons that will be asserted at the appropriate time, the preference claims that

have been alleged against them are wholly, or largely, without merit and are unlikely to result in Creditors receiving a meaningful recovery.

Finally, the status of any preference claim against Lehman Commercial (which is itself a debtor in a chapter 11 proceeding before the United States Bankruptcy Court for the Southern District of New York) is subject to the treatment in that chapter 11 case. Specifically, there is a distinct possibility that such a claim may be treated as a general unsecured claim in Lehman Commercial's bankruptcy, which claim is subject to an uncertain recovery.

In Article 4.6(b) of the Elieff Disclosure Statement, the Elieff Plan Proponents contend that the foreclosure by Lehman ALI on its second priority deed of trust against the Pacific Point Project in August 2008 constituted a preferential transfer because there was no equity value supporting the second priority deed of trust. "Specifically, the fair market value of the Pacific Point Project was and remains approximately $25 million and the alleged obligations securing the first deed of trust was approximately $100 million." Elieff Disclosure Statement, page 52. However, based upon the Elieff Plan Proponents' own assertions, it is clear that the bankruptcy estate of SJD Partners (and in turn, the unsecured creditors of that Estate) were not deprived of any value by virtue of the alleged foreclosure. Indeed, based upon the Elieff Disclosure Statement, Lehman ALI, as the beneficiary under the first deed of trust, is undersecured by more than $75 million. Under these circumstances, no valid preference claims can be asserted against the Lehman Lenders based on the foregoing transactions.

**4.5**      **The Equitable Subordination Claims Relating to the Lehman Lenders' Claims.**

Article 4.9 of the Elieff Disclosure Statement sets forth the basis upon which the Elieff Plan Proponents believe that the Lehman Creditors' Claims could be "equitably subordinated" to the claims of all other unsecured creditors such that distributions that would otherwise be made by the Debtors to the Lehman Creditors on account of their senior secured claims could be redistributed to junior, unsecured creditors.

As the Elieff Plan Proponents acknowledge in Article 4.9(b) of the Elieff Disclosure Statement, equitable subordination requires findings that: the claimant whose claim is sought to be

equitably subordinated engaged in some type of inequitable conduct; the conduct injured creditors, or conferred an unfair advantage on the claimant; and subordination would not be inconsistent with the Bankruptcy Code. Additionally, applicable case law provides that claims can be subordinated only to the extent necessary to offset the injury to a debtor or its creditors and that the concept of equitable subordination is remedial, not penal, and is a measure that should be used only sparingly. Furthermore, the applicable provision of the Bankruptcy Code (section 510(c)) is clear that a claim may only be subordinated to "all or part of [another] allowed claim" but that a claim cannot be subordinated to an interest.

In January 2009, certain of the Debtors commenced an action in the Bankruptcy Cases (the ES Action), seeking to subordinate all of the Lehman Creditors' Claims and the Danske Bank Claim to payment in full of all unsecured claims against those Debtors and named the Lehman Lenders, Fenway Capital and Danske Bank as defendants (collectively, the "ES Defendants").

The primary basis of the Equitable Subordination Action as originally filed was that, beginning in or about August of 2007, the Lehman Lenders took over effective control of all of the material aspects of the Debtors' projects operations without regard as to whether a Lehman entity was the lender or whether a Lehman entity was an equity member and caused the Debtors to incur substantial unsecured vendor claims with the promise of payment that went unfulfilled. The Debtors twice amended their complaint, and thereafter the Lehman Lenders moved to dismiss the second amended complaint for failure to state a claim upon which relief could be granted. At a hearing held on June 11, 2009, the Bankruptcy Court granted the foregoing motion to dismiss, with leave to further amend the complaint. The Bankruptcy Court found that the Debtors had failed to (1) state a claim regarding insider status; (2) tie specific defendants to inequitable conduct or sufficiently state the basis of imputing such conduct; (3) adequately allege "gross and egregious conduct"; (4) identify particular inequitable conduct of defendants against particular Debtor plaintiffs; (5) sufficiently identify the alleged injured creditors; and (6) allege fraudulent conduct with particularity.

In July 2009, the Debtors filed a third amended complaint that added new causes of action alleging preference and fraudulent transfer liability, certain post-petition "bad acts" of the Lehman Lenders, but otherwise asserted similar allegations as the prior filed complaints. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

deadline for all ES Defendants (including the Lehman Lenders) to respond to the third amended complaint is September 30, 2009, and the Lehman Lenders intend to file a motion to dismiss such complaint.

Notwithstanding the foregoing, the Lehman Lenders are making an offer (the ES Settlement Offer) through the Lehman Plan to Holders of Allowed ES Claims, upon the terms and conditions more fully discussed in Article 9.8.2, below.

### 4.6 Alleged Fraud, Breach of Fiduciary Duty and Other Potential Litigation Claims Against the Lehman Lenders.

Article 4.7 of the Elieff Disclosure Statement purports to set forth further claims against the Project. Lehman Lenders, based upon the Interim Loan Agreement, the Restructuring Agreement of May 2008, and the foreclosure of Liens against the Pacific Point Project. However, the narrative contained in Article 4.7 of the Elieff Disclosure Statement does not state any claim for relief or theory of recovery against the Lehman Lenders based upon the alleged facts and, in reality, asserts nothing different from the material allegations set forth in the Equitable Subordination Claims (more fully discussed in Article 4.5 above).

## V.

## THE ELIEFF PLAN IS UNCONFIRMABLE

### 5.1 The Elieff Plan is Premised Upon an Improper Partial Substantive Consolidation.

The Elieff Plan requires a "partial substantive consolidation" of the Debtors' bankruptcy estates in order to reallocate from one Debtor to the other Debtors any surplus recovery on account of the Equitable Subordination Claims against the Lehman Creditors once other unsecured creditors of the subject Debtor have been paid in full. The concept of "substantive consolidation," the form of "partial substantive consolidation" relief upon which the Elieff Plan is premised and the alleged basis for substantive consolidation of the Debtors are set forth in Article 4.10 of the Elieff Disclosure Statement.

As noted above, the fundamental purpose of the partial substantive consolidation aspects of the Elieff Plan is to redistribute surplus recoveries in one Debtors' Estate (remaining after

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

payment of all non-Lehman Creditor unsecured Creditors) for the benefit of non-Lehman Lender Unsecured Creditors of other Debtors' Estates. However, the Elieff Plan Proponents' concept is misguided, erroneous and cannot be approved by the Court for, *inter alia*, the following reasons:

First, the Elieff Plan treats each Debtor as a separate legal entity and treats the Claims against each Debtor separately, at least until the Maximum Distribution (as defined in the Elieff Plan) has been reached. The Lehman Creditors contend that, to the extent appropriate, the Lehman Secured Claims against one Debtor can only be equitably subordinated to junior, unsecured claims against the same Debtor; once the claimants who are the beneficiaries of the ES Claims in the ES Action have been paid in full, the Lehman Creditors are entitled to share in the remaining recoveries of the subject Debtors' Estates. Accordingly, the Lehman Lenders contend that there can never be an excess recovery as a result of equitable subordination of the Lehman Secured Claims in one Estate that would lead to the availability of a surplus recovery for redistribution to other Estates. The Elieff Plan contemplates the redistribution of approximately $65 million from "surplus" Debtors to "deficiency" Debtors (Elieff Disclosure Statement, p.128). The Lehman Creditors contend that under applicable law, none of this redistribution can occur. Accordingly, even if the Debtors prevail to the maximum extent possible in respect of the Equitable Subordination Claims, creditor recoveries will not exceed those presented at page 128 of the Elieff Disclosure Statement. In particular, creditors of SJD Partners and SJD Development will not receive anything under the Elieff Plan and creditors of Del Rio, an approximately 29.6% recovery.

Second, the Lehman Lenders believe that there is no basis for a substantive consolidation, partial or otherwise, of the Debtors' Estates. The Lehman Lenders contend that the requirements for substantive consolidation – either a hopeless intermingling of the assets and liabilities of each of the Debtors or their treatment by creditors as a consolidated group of companies rather than as individual borrowers – cannot be established based upon the facts of this case.

Finally, in reality, what the Elieff Plan Proponents seek to accomplish is not a substantive consolidation, but instead, an improper end-run around the absolute priority rules of the Bankruptcy Code, in general, and Bankruptcy Code section 1129, in particular. The Lehman Lenders contend that there is no basis upon which the Bankruptcy Court can confirm the Elieff Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

in its current form.

### 5.2    Feasibility of Elieff Plan

The Elieff Disclosure Statement estimates that the Allowed Administrative Claims and Allowed Priority Claims against all of the Debtors total approximately $6.5 million, all of which would have to be satisfied on the Effective Date for the Elieff Plan to be confirmed. All, or substantially all of the Debtors' cash on hand and any proceeds from the sale of certain of the Lehman Creditors' collateral to D.E. Shaw or another third party comprises the Cash Collateral of the Lehman Creditors (cash in which the Lehman Creditors have a validly perfected security interest) and those funds cannot be used to finance the Elieff Plan without the consent of the Lehman Creditors, which consent the Lehman Creditors will not give. Accordingly, at least $6.5 million will need to be provided under the Elieff Plan from other sources for that Plan to become effective. Although unclear, it appears that Acquisitions (the Plan Sponsor under the Elieff Plan) proposes to advance no more than approximately $535,000 to fund confirmation of the Elieff Plan. Elieff Disclosure Statement, p. 117. Accordingly, it does not appear that the Elieff Plan is feasible or can be confirmed.

### 5.3    Success of Equitable Subordination Litigation

As noted above, absent success in the ES Action, the Elieff Plan does not provide any recovery for any general unsecured creditors of any of the Debtors (with the possible exception of the Holders of Bond Claims, an issue addressed in Section 5.4 below). Elieff Disclosure Statement, p. 130-131. Accordingly, the Lehman Creditors contend that attempting to confirm the Elieff Plan before a resolution of the Equitable Subordination Claims is a waste of time and judicial resources, accomplishes nothing for Creditors and only unfairly benefits its Elieff Plan Proponents.

### 5.4    The D.E. Shaw Sale is for Less than Fair Value, is Unfairly Discriminatory in Favor of Bond Claimants and Elieff and Cannot be Approved by the Court.

The Elieff Plan Proponents intend to consummate the Elieff Plan by selling certain Projects (identified at page 78 of the Elieff Disclosure Statement and referred to herein as the "D.E. Shaw Projects") to D.E. Shaw, a hedge fund manager, for approximately $125 million plus the

assumption of obligations (including Bond Claims) relating to the D.E. Shaw Projects not to exceed $25 million. The Lehman Proponents believe that D.E. Shaw is paying significantly less for the D.E. Shaw Projects than their value and that further, up to $25 million of the purchase price is being diverted from the Debtors' Estates to unfairly and improperly provide a more favorable recovery to the Bond Claimants (and perhaps others) at the expense of other Creditors of the Debtors' Estates. The Lehman Lenders believe that there is no valid reason for this misallocation of the purchase price other than to relieve and eliminate Elieff's personal liability under various indemnity agreements in favor of the Bond Issuers and to prejudice other Creditors. Accordingly, not only is the proposed D.E. Shaw Sale for less than fair consideration, but it unfairly and improperly provides more favorable treatment for Claims made by the Bond Issuers at the expense of Holders of other General Unsecured Claims and the Lehman Creditors. Further, to the extent the primary purpose of the Elieff Plan is to relieve Elieff of his personal liability with respect to his indemnity relating to the Bond Claims rather than to provide the best and most favorable outcome for Creditors, to whom the Debtors and Elieff owe fiduciary duties, the Elieff Plan is being proposed in bad faith (and would be unconfirmable on that basis).

### 5.5    Unjustified Releases

The Elieff Plan provides broad and general releases to Elieff and his Affiliates in exchange for a minimal, and perhaps non-existent, contribution to the Elieff Plan (and certainly a contribution substantially smaller than the one the Lehman Proponents propose). The Elieff Disclosure Statement provides no disclosure as to the actual or potential claims that are being released, nor any basis or justification for the granting of the Elieff releases. The Lehman Lenders contend that the Elieff Plan cannot be confirmed if it can contains the Elieff Releases. The Lehman Lenders further contend that the inclusion of the Elieff releases in the Elieff Plan is further evidence that the Lehman Plan is not proposed in good faith and, therefore, does not comply with the confirmation requirements of Bankruptcy Code section 1129(a)(1).

### 5.6    Implications of the Lehman Commercial Bankruptcy.

Lehman Commercial, one of the Lehman Lenders, is itself a debtor and debtor-in-possession in a bankruptcy proceeding (the "Lehman Commercial Bankruptcy Proceeding") pending

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

before the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court"). Lehman Commercial's status as a debtor and debtor in possession in its Lehman Commercial Bankruptcy Proceeding could materially impair both the ability of the Debtors to prosecute some or all of the claims asserted in the ES Action against it and, even if successfully asserted, limit the recovery on account of such claims.

**VI.**

**SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

**6.1**     **Voluntary Debtors.**

Since the Petition Dates, beginning in November 6, 2008, the seventeen (17) Voluntary Debtors have continued to operate as a "debtors-in-possession" subject to the supervision of the Bankruptcy Court. The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are jointly administered with each other pursuant to orders entered on November 10, 2008 and November 26, 2008. The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' Chapter 11 Cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, Morgan Lewis & Bockius LLP as their special litigation counsel for the Southern District of New York and Miller Barondess, LLP as their special litigation counsel.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

**6.2**     **Trustee Debtors.**

Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The Trustee Debtors are represented by their duly-appointed Chapter 11 trustee, Steven M. Speier, pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

The Trustee has filed an application to employ the Lobel Firm as the Trustee's general insolvency counsel and Miller Baroness LLP as special litigation counsel.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**6.3**      **The Debtors' Motion for Relief from Stay in the Lehman Commercial Chapter 11 Proceedings.**

On November 10, 2008, the Debtors filed a motion for an order modifying the automatic stay in the Lehman Commercial Bankruptcy Proceeding to allow the Debtors to administer their own Cases to the extent that such Cases, and the relief requested by such Debtors therein, may affect the rights of Lehman Commercial. The Debtors also requested the court to allow the Debtors to proceed to obtain post-petition debtor-in-possession financing on a priming lien basis that would subordinate Lehman Commercial's Claims and Liens arising from the Ritter Ranch Loan Agreement and the SunCal Communities I Loan Agreement to those of a proposed debtor-in-possession lender. Lehman Commercial opposed the motion on November 18, 2008 and the objection was joined by the Lehman Commercial Official Creditors' Committee. The motion was denied, without prejudice, by the New York Bankruptcy Court pursuant to an order entered on November 21, 2008.

**6.4**      **Certain of the Voluntary Debtors' Motion for Surcharge and Use of Cash Collateral.**

On January 16, 2009, seven of the Debtors filed a motion seeking an order authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of Lehman Commercial arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Debtors' Projects that are subject to deeds of trust and other security held by Lehman Commercial.

Lehman Commercial objected to the motion and subsequently filed a motion in the New York Bankruptcy Court requesting the New York Bankruptcy Court to enforce its automatic stay as to the motion. The motion was taken off calendar prior to any ruling by the New York Bankruptcy Court.

**6.5**      **Lehman Commercial's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects.**

On January 23, 2009, Lehman Commercial and Lehman ALI filed in the Bankruptcy

52063-001
DOCS_LA:205341.9

Court various motions for relief from the automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the "Lehman Lenders' Stay Motions") pursuant to which Lehman Commercial and Lehman ALI sought to foreclose on, *inter alia,* their deeds of trust encumbering certain of the Debtors' Projects.

On February 4, 2009, the Debtors filed an opposition to Lehman Commercial and Lehman ALI's requests for relief from stay. On February 13, 2009, Lehman Commercial and Lehman ALI filed a reply to the Debtors' opposition primarily asserting that the ES Action would violate Lehman Commercial's automatic stay.

On March 10, 2009, the Bankruptcy Court entered an order denying the Lehman Lenders' Stay Motion without prejudice. Lehman Commercial has appealed the Bankruptcy Court's order.

### 6.6     The Debtors' Filing of the ES Action Against the Lehman Lenders.

On January 6, 2009, the Voluntary Debtors filed the ES Action against, *inter alia,* Lehman ALI in the jointly administered cases of the Voluntary Debtors requesting, amongst other relief, that Lehman ALI's liens be equitably subordinated to the claims of unsecured creditors in all of the Debtors' Cases. On February 3, 2009, the Debtors filed a first amended complaint adding the Trustee Debtors as plaintiffs to various causes of action. On March 11, 2009, the Debtors filed a motion for leave to file a second amended complaint to add Lehman Commercial as a defendant in the ES Action. On March 24, 2009, the Bankruptcy Court granted this request and deemed the second amended complaint to be filed. On March 26, 2009, the Lehman Lenders filed an appeal of the Bankruptcy Court's order.

On April 27, 2009, the Lehman Lenders filed a motion to dismiss the second amended complaint (the "Motion to Dismiss Second Amended Complaint"), alleging, among other things, that the Debtors' requested relief was not available as a matter of law and that the Debtors were seeking to circumvent legal restrictions by substantive consolidation. On May 11, 2009, the Debtors filed an opposition to the Motion to Dismiss Second Amended Complaint, stating that the second amended complaint is not "premised on" substantive consolidation and states a valid cause of action for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

equitable subordination of the Claims or Interests of the applicable Lehman Lenders. On May 15, 2009, the Lehman Lenders filed a reply, alleging that the Debtors failed to state their cause of action with sufficient specificity or detail to establish a claim.

As more fully discussed in Section 4.5 above, at a hearing held on June 11, 2009, the Bankruptcy Court dismissed the second amended complaint with leave to amend.  In July, 2009, the Debtors filed a third amended complaint, adding new causes of action as set forth in Section 4.5 above.  The deadline for all defendants to file a responsive pleading to the third amended complaint is September 30, 2009.  The Lehman Lenders intend to move to dismiss the complaint for, among other things, failure to state a claim on which relief can be granted.

**6.7     Certain Debtors' Filing of the Sales Procedures Motion.**

On February 18, 2009, the Trustee Debtors and certain Voluntary Debtors filed a motion (the "Sale Procedures Motion") seeking approval of overbid procedures for a purchase by D.E. Shaw of a significant portion of the Debtors' assets for $200 million and its purported assumption of certain related bond liabilities personally guaranteed by Elieff.  Although the Sale Procedures Motion indicated that D.E. Shaw would assume the bond liabilities as part of its purchase of the properties, there was no such commitment in D.E. Shaw's commitment letter.  The commitment letter provided that $175 million of the purchase price would be paid in cash and the remaining $25 million would be in the form of an assumption of the Debtors' contractual and other obligations.  As part of the Sale Procedures Motion, the Debtors seeking relief conditioned the sale on the disallowance of the Lehman Lenders' credit bid rights and the transfer of their Liens to the Debtors.

On March 10, 2009, the Bankruptcy Court commenced a hearing on the Sale Procedures Motion.  At that hearing, the Bankruptcy Court held that the automatic stay in the Lehman Commercial Bankruptcy Proceeding did not apply to the Sales Procedures Motion and continued the Sales Procedures Motion to March 20, 2009.

At the March 20, 2009 hearing, the parties agreed to continue the Sale Procedures Motion to allow settlement discussions to take place.  The Sale Procedures Motion has been continued from time to time, has been modified to only include the Trustee Debtors' Projects (except the 10000 Santa Monica Project) and to modify the proposed purchase price.  It is presently

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

scheduled to proceed on September 22, 2009.

**(a)** **Lehman Commercial's Stay Assertion and the Sales Procedure Motion.**

On March 9, 2009, the Trustee, SCC Communities, Del Rio, and Tesoro filed emergency motions for an order that the automatic stay in the Lehman Commercial Bankruptcy Proceeding does not apply to the Sales Procedures Motion.

On March 10, 2009, Lehman Commercial, Lehman ALI, Northlake Holdings and OVC Holdings filed responses to the emergency motions, asserting that Lehman Commercial's automatic stay prevented the Bankruptcy Court from hearing the Sales Procedures Motion.

On March 10, 2009, the Bankruptcy Court held that the automatic stay in the Lehman Commercial Bankruptcy Case does not apply to the Sales Procedures Motion.

**(b)** **Danske Bank's Intervention into the Sales Procedures Motion.**

On March 25, 2009, Danske Bank filed a supplemental response to the Sales Procedures Motion. Danske Bank's supplemental response asserts various allegations, including the allegations that Danske Bank has a first-priority deed of trust on the 10000 Santa Monica Project by the virtue of the SunCal Century City Loan Agreement and related loan documents and that the Secured Claim and Lien arising from the SunCal Century City Loan Agreement and related loan documents are not subject to a bona fide dispute because there has been no allegation of wrongdoing by Danske Bank and that Danske Bank is a holder in due course that effectively cuts off any defenses to the loan based on the Lehman Lenders' alleged inequitable conduct.

On April 1, 2009, the Debtors filed a reply to Danske Bank's supplemental response asserting that Danske is not a holder in due course and that Danske Bank took the assignment of the disputed loan subject to all defenses thereto, including the defense of equitable subordination described below.

**(c)** **Lehman's Disclosure of the Repurchase Agreement Involving Certain Loans with the Debtors.**

After the emergence of Danske Bank in connection with the Sales Procedure Motion, the Debtors demanded that the Lehman Lenders disclose any other loans of the Debtors that were

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

subject to repurchase agreements. In response, on or about April 15, 2009, the Lehman Lenders provided a letter to the Debtors disclosing the Repurchase Lehman Loans.

### (d)      The Modifications to the Sales Procedure Motion.

The Sales Procedures Motion was thereafter modified to include a purchase of the Assets of only the Trustee Debtors and the D.E. Shaw proposed aggregate purchase price was reduced from $200 million to $195 million.

### 6.8      The Lehman Administrative Loans.

#### (a)      The Stipulation.

At a hearing on March 20, 2009, the Bankruptcy Court approved a stipulation (the "Financing Stipulation") among Lehman ALI, Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, pursuant to which each of the foregoing Debtors was authorized to borrow from Lehman ALI and Lehman ALI agreed to make individual loans in an aggregate amount equal to $1,790,572 for the purposes of paying the costs and expenses provided in their 30-day budgets and for paying up to $250,000 of certain professional expenses limited to settlement efforts (the "Lehman Administrative Loans"). The loan proceeds were used to pay for the most urgent and critical public health and safety issues on certain of the Projects. The Financing Stipulation provided Lehman ALI superpriority administrative status in each of the Debtor borrowers' Estates on account of the Lehman Administrative Loans. The Lehman Administrative Loans also have priming lien status on all of the borrowing Debtors' Assets with the exception of SunCal Century City in which the Lehman Administrative Loans have junior priority. The following is a breakdown of each Debtors' loans comprising the Lehman Administrative Loans:

| DEBTOR NAME | 1-MONTH TOTAL |
|---|---|
| SunCal Century City | $ 3,166 |
| Acton Estates | $37,059 |
| SunCal Beaumont | $0 |
| SunCal Bickford | $83,454 |
| SunCal Torrance | $0 |
| Del Rio | $0 |
| Delta Coves | $302,307 |
| SunCal Emerald | $70,259 |
| SunCal Heartland | $163,231 |

| Johannson Ranch | $0 |
|---|---|
| SCC Communities | $0 |
| Marblehead | $455,009 |
| SunCal Northlake | $46,909 |
| SunCal Oak Knoll | $250,876 |
| Oak Valley | $249,534 |
| SunCal PSV | $48,809 |
| Palmdale Hills | $79,959 |
| SunCal Summit Valley | $0 |
| Tesoro | $0 |
| **Total** | $1,790,572 |

**(b)** **The Rubidoux Objection.**

On April 10, 2009, Rubidoux (defined below) and EMR (defined below) filed an objection to the Lehman Administrative Loans. The basis for the objection was that SunCal Emerald holds title to portions of the Emerald Meadows Project in constructive trust for Rubidoux and EMR and the Financing Stipulation allowed SunCal Emerald to further encumber the SunCal Emerald Meadows Project with superpriority liens, thereby threatening Rubidoux's and EMR's rights to have those portions of the SunCal Emerald Meadows Project returned to them unencumbered, as provided contractually among EMR, Rubidoux and SunCal Emerald. Accordingly, Rubidoux and EMR requested that superpriority liens not attach to a certain portion of the SunCal Emerald Meadows Project. The Lehman Lenders and certain Debtors agreed to modify the Lehman Administrative Loans in this regard.

**6.9** **The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.**

Various contractors of the Debtors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims against the Bond Issuers. These creditors have requested the Bankruptcy Court relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including rights to payment under certain surety bonds that are alleged to have been issued in favor of such creditors. The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties. The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the surety bonds against the Bond Issuers.

### 6.10    The Debtors' Motion Pursuant to Bankruptcy Code Section 506(d).

On May 29, 2009 and June 9, 2009, the Debtors filed motions seeking orders (i) valuing certain collateral at zero dollars, which allegedly secure certain disputed proofs of claim filed by the Lehman Lenders, pursuant to 11 U.S.C. § 506(a) and Federal Rule of Bankruptcy Procedure 3012 as set forth in the below chart, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. § 506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

| Disputed Proof of Secured Claim No. | Debtor | Claim Holder | Alleged Amount | Alleged Collateral |
| --- | --- | --- | --- | --- |
| 1 | SunCal I | Lehman Commercial | $343,221,391 | SunCal I's allowed interest in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford. |
| 1 | SCC Palmdale | Lehman Commercial | $119,664,305 | SCC Palmdale's allowed interest in Palmdale Hills. |
| 2 | SunCal III | Lehman Commercial | $343,221,391 | SunCal III's ownership interest non-existent investment property |
| 17-2 | SunCal Bickford | Lehman ALI | $56,494,059 | Second priority deed of trust on the Bickford Ranch Project. |

### 6.11    The Debtors' Motions to Strike the Claims and Pleadings Arising from the Repurchase Lehman Loans

On June 9, 2009, the Debtors filed a motion seeking an order striking certain pleadings filed by the Lehman Lenders to the extent that they are premised on the Lehman Lenders' ownership of the Repurchase Lehman Loans and striking any future pleadings filed by the Lehman Lenders that are premised on their ownership of the Repurchase Lehman Loans.  As noted in Section 3.6 above, the Bankruptcy Court has ruled that the Lehman Lenders have "sold" the Repurchase Lehman Loans to Fenway Capital (a conclusion that is vigorously contested by the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Lenders) and has set a hearing for September 22, 2009 to determine whether, notwithstanding the purported "sale" of the Repurchase Lehman Loans, the Lehman Lenders were authorized to file proofs of claim on account of the Repurchase Lehman Loans as agents for Fenway Capital.

**6.12   The Debtors' Denied Preliminary Injunction Motion Against the Holders of Bond Claims.**

On February 20, 2009, the Debtors filed a complaint and a motion for preliminary injunction, pursuant to which the Debtors sought a preliminary injunction against the Holders of Bond Claims from pursuing such Claims.

On February 23, 2009, the Bankruptcy Court denied the Debtors' request for a temporary restraining order and granted the Debtors' request to require the defendants thereon to show cause why the motion for preliminary injunction should not be granted.

On March 2, 2009, several Bond Claimants objected to the motion for the preliminary injunction. The objections generally alleged that the Debtors failed to show that the balancing of the equities favored granting the preliminary injunction versus the harm to the Bond Claimants.

At a hearing held on March 4, 2009, the Court denied the motion for preliminary injunction and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

**6.13   The Non-Lehman Related Primary Secured Lenders' Motions for Relief from Stay.**

Various secured creditors, including Philip C. Dowse, successor Trustee of the Philip C. Dowse revocable trust, and Patricia I. Volkerts, as trustee, have filed motions for relief from stay with respect to portions of the properties owned by Seven Brothers and SunCal Beaumont. Such secured creditors are not defendants in the ES Action, and the applicable Debtors have not opposed the requested relief. There are other similarly situated secured parties in the real properties owned by Seven Brothers, SunCal Beaumont, and SunCal Summit, which may result in foreclosure of such real property.

**6.14   The Rubidoux 60 Litigation.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    **(a)    Procedural Background.**

2        On December 17, 2008, Rubidoux and EMR filed a complaint in the Bankruptcy

3    Court to remove a prior action (the "Rubidoux Action") filed with the Superior Court of the State of

4    California, County of Riverside (the "Superior Court") to the Bankruptcy Court. The Rubidoux

5    Action filed with the Superior Court is against SunCal Emerald for breach of contract, breach of

6    implied covenant of good faith and fair dealings, and declaratory relief.

7        On March 10, 2009, SunCal Emerald filed a motion to remand the Rubidoux Action

8    to the Superior Court on the grounds that (i) the Rubidoux Action raises exclusively issues of state

9    law and invokes no substantive right created by the Bankruptcy Code; (ii) the Rubidoux Action is a

10   non-core proceeding and the parties have duly made a demand for a jury trial with the Superior

11   Court; (iii) SunCal Emerald did not consent to the Bankruptcy Court's conducting a jury trial of, or

12   entry of a final order with respect to, the Rubidoux Action; and (iv) SunCal Emerald would suffer

13   prejudice if the Bankruptcy Court did not remand the Rubidoux Action.

14       On April 16, 2009, Rubidoux and EMR filed a first amended complaint with the

15   Bankruptcy Court and sought to add three additional claims against SunCal Emerald as described

16   below.

17       On April 23, 2009, SunCal Emerald filed an opposition to the filing of the first

18   amended complaint based on the grounds that Rubidoux and EMR's proposed amendment sought to

19   (i) address a controversy that did not exist and (ii) prevent a potential outcome that was not possible

20   under the law. On April 23, 2009, Rubidoux and EMR filed an opposition to SunCal's Emerald's

21   motion to remand the Rubidoux Action to the Superior Court.

22       On May 7, 2009, the Bankruptcy Court granted SunCal Emerald's motion to remand

23   the Rubidoux Action to the Superior Court.  The Rubidoux Action is currently pending before the

24   Superior Court.

25   **(b)    Rubidoux's Allegations.**

26       Rubidoux and EMR make the allegations that (i) certain real property over which

27   SunCal Emerald holds legal title is actually being held in constructive trust for Rubidoux and EMR,

28   (ii) said property therefore should not be considered part of SunCal Emerald's bankruptcy estate, and

(iii) that certain funds currently held in an escrow account that SunCal Emerald refuses to allow to be released to Rubidoux and EMR should also not be considered part of SunCal Emerald's bankruptcy estate because such funds belong to Rubidoux and EMR.

According to Rubidoux and EMR, these allegations are based on various prepetition agreements among EMR, Rubidoux and SunCal Emerald, pursuant to which SunCal Emerald allegedly holds title to portions of the Emerald Meadows Project in constructive trust for EMR and Rubidoux. Rubidoux and EMR allege that portions of the Emerald Meadows Project were temporarily transferred to SunCal Emerald, without any consideration, and that SunCal Emerald is required to transfer such property back to EMR and Rubidoux when certain parcel maps are recorded.

Rubidoux and EMR also allege that approximately $500,000 that is currently held in a certain escrow account by SunCal Emerald should be paid to Rubidoux and EMR.

If Rubidoux and EMR are successful in the Rubidoux Action, the SunCal Emerald Estate will be comprised of less property that could be available to other Holders of Claims against the SunCal Emerald Estate.

**6.15    Church Litigation.**

On March 30, 2009, Life Church of God in Christ (the "Church") filed an adversary complaint (the "Church Litigation") against SunCal Emerald for breach of contract, breach of implied covenant of good faith and fair dealings and declaratory relief.

The Church alleges that SunCal Emerald has not used its best efforts as required by certain agreements to record various maps to entitle the property owned by SunCal Emerald and such failure has caused its inability to transfer certain portions of the property owned by SunCal Emerald to the Church. The Church further alleges that SunCal Emerald is obligated to make certain improvements to described property but has failed to do so. The Church also alleges that SunCal Emerald has failed to keep the property free and clear of liens and encumbrances as required by certain agreements.

On April 1, 2009, SunCal Emerald filed its response to the adversary complaint generally denying various elements of the causes of action asserted against it and asserting various

affirmative defenses.

### 6.16    Mechanic's Lien Claims.

Mechanic's Lien claims constitute Claims arising pursuant to California Civil Code §3110 et seq. that were either perfected prepetition or otherwise satisfy the requirements of Bankruptcy Code 546(b). There are approximately $27 million of asserted Mechanic's Lien claims against various of the Debtors' Projects.

The $27 million of Mechanic's Lien claims exclude $275,918 of Mechanic's Lien claims asserted against Del Rio and $1,996,537 of Mechanic's Lien claims asserted against SJD Partners, neither of which own real property.

### 6.17    The Debtors' Potential Preferential Transfers.

The Debtors' Schedules and Statement of Financial Affairs, which are on file with the Bankruptcy Court and available for viewing, provide a list of all payments made to creditors, other than Insiders, for the 90 days preceding the respective Petition Dates, and all payments made to insiders during the one year preceding the respective Petition Dates.

Below is a summary showing the total payments by each Debtor to non-insiders within the 90 days preceding the Petition Date for each Debtor, as disclosed by the Debtors in the Schedules and Statement of Financial Affairs.

| NAME OF DEBTOR | AMOUNT TRANSFERRED |
|---|---|
| Acton Estates | $1,300.00 |
| SunCal Beaumont | $25,244.97 |
| SunCal Bickford | $133,669.98 |
| SunCal I | $0.00 |
| SunCal III | $0.00 |
| SunCal Emerald | $128,287.10 |
| SunCal Johansson | $26,187.00 |
| Kirby Estates | $0.00 |
| Del Rio | $86,622.93 |
| SCC Palmdale | $0.00 |
| Palmdale Hills | $6,002,491.87 |
| SCC Communities | $500.00 |
| Seven Brothers | $0.00 |
| SJD Development | $25.00 |
| SJD Partners | $748,926.28 |
| SunCal Summit Valley | $39,649.77 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Tesoro | $659.00 |
| SunCal Century City | $190,087.05 |
| Delta Coves | $597,961.92 |
| SunCal Heartland | $48,896.50 |
| SunCal Marblehead | $1,798,895.67 |
| SunCal Northlake | $833,921.81 |
| SunCal Oak Knoll | $2,324,630.92 |
| SunCal Oak Valley | $316,534.90 |
| SunCal PSV | $446,722.69 |
| SunCal Torrance | $18,618.50 |
| Total | $13,769,833.86 |

Under the Lehman Plan, the Liquidating Trustee is authorized to investigate and pursue potential Avoidance Actions.

Below is a summary showing the total payments by each Debtor to SunCal within one year preceding the Petition Date for each Debtor, as disclosed by the Debtors in the Schedules and Statements of Financial Affairs.

| NAME OF DEBTOR | AMOUNT TRANSFERRED | RECIPIENT |
|---|---|---|
| Acton Estates | $7,885.12 | SunCal Management |
| SunCal Beaumont | $15,602.83 | SunCal Management |
| SunCal Bickford | $492,802.57 | SunCal Management & Acquisitions |
| SunCal I | $20,449.52 | SunCal Bickford |
| SunCal III | $0.00 | N/A |
| SunCal Emerald | $884,890.80 | SunCal Management & Acquisitions |
| SunCal Johansson | $8,046.53 | SunCal Management & Acquisitions |
| Kirby Estates | $500.00 | SunCal Management |
| Del Rio | $50,721.00 | SunCal Management & Acquisitions |
| SCC Palmdale | $238,352.34 | N/A |
| Palmdale Hills | $1,149,348.04 | SunCal Management & Acquisitions |
| SCC Communities | $0.00 | |
| Seven Brothers | $0.00 | N/A |
| SJD Development | $0.00 | N/A |
| SJD Partners | $498,351.39 | SunCal Management |
| SunCal Summit Valley | $16,717.60 | Acquisitions & SC Master Marketing LLC |
| Tesoro | $5,000.00 | Acquisitions |
| SunCal Century City | $747,727.13 | SunCal Management & Acquisitions |
| Delta Coves | $2,305,572.58 | SunCal Management & Acquisitions |
| SunCal Heartland | $282,628.75 | SunCal Management; SunCal Marblehead Heartland Master LLC |
| SunCal Marblehead | $945,435.28 | SunCal Management; Acquisitions; and SunCal Marblehead Heartland Master LLC |
| SunCal Northlake | $819,207.14 | SunCal Management; Acquisitions; SCC College Park LLC |

52063-001
DOCS_LA:205341.9

| | | |
|---|---:|---|
| SunCal Oak Knoll | $2,914,645.70 | SunCal Management and Acquisitions |
| SunCal Oak Valley | $87,293.65 | SunCal Management and Acquisitions |
| SunCal PSV | $4,345.05 | SunCal Management; Lehman SunCal Real Estate Fund |
| SunCal Torrance | $310,181.43 | SunCal Management; Acquisitions; SunCal PSV; and Lehman SunCal Real Estate Holdings |
| Total | $11,805,704.45 | |

The Debtors contend that these payments were made in the ordinary course of the Debtors' business, predominately in the form of management fees. However, as described below, the Lehman Plan preserves the right of the Liquidating Trustee to pursue any valid claims based on these transfers. The Elieff Plan, however, would release all of the foregoing claims against Elieff and any of his related parties.

## VII.

## LEHMAN CREDITORS' PLAN

### 7.1   Treatment of Unclassified Claims.

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority. However, certain types of Claims are not classified in any Classes under the Lehman Plan and the Lehman Proponents have not placed such Claims in a Class. These Claims are "unclassified." As to Allowed Administrative Claims and Allowed Priority Tax Claims, these Claims are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Other unclassified Claims support Liens that have not been avoided, but are not classified to the extent the Claims were not timely Filed. The treatment of these unclassified Claims is as provided below.

### 7.2   Treatment of Allowed Administrative Claims.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claim Bar Date set forth herein, the Liquidating Trustee shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred prior to the Effective Date in the ordinary course of post-petition business by the Plan Debtors (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**(a)**      **Treatment and Repayment of the Lehman Administrative Loan(s).**

The Lehman Administrative Loans are Allowed in the amount loaned or advanced by Lehman ALI after the commencement of the Cases net of any repayment thereof and shall be paid in Cash in full on the Effective Date, together with any interest, charges and expenses due thereupon, or shall be payable at such later time and on such terms more favorable to the Liquidating Trustee to which Lehman ALI may agree. Pending any such payment or during a period of voluntary deferral by Lehman ALI, the Lehman Administrative Loans and any interest, charges and expenses due thereupon shall continue to have a first priority Lien against the respective Assets securing such loans, including any proceeds thereof deposited in the Plan Reserve or Post-Confirmation Accounts (with the exception of the Lien for the amounts due under the Lehman Administrative Loan secured by the 10000 Santa Monica Project, which shall be subordinate to the Secured Claims and Liens arising from the SunCal Century City Loan Agreement).

**(b)**      **Administrative Claim Bar Date.**

Any Administrative Claim which is subject to an Administrative Claim Bar Date and not Filed by the applicable Administrative Claim Bar Date shall be disallowed, and no distribution shall be made on account of any such Administrative Claim.

**(i)**      **General Administrative Claim Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Plan Debtors' postpetition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

which the bar date described in the following Section shall apply) shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee no later than the General Administrative Claim Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Liquidating Trustee. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claim Bar Date and that is not Filed and served on or before the General Administrative Claim Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that is required to File a request for payment of such Administrative Claims and does not File such a request by the deadline established herein, shall be forever barred from asserting such Administrative Claims against the Plan Debtors, the Liquidating Trustee, the Plan Debtors' Estates, or any of their properties.

### (ii)     Administrative Tax Claim Bar Date.

All requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date ("Administrative Tax Claims") and for which no bar date has otherwise previously been established, must be Filed and served on the Liquidating Trustee on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such Taxes for such tax year or period with the applicable governmental unit. Any Holder of an Administrative Tax Claim that is required to File a request for payment of such Taxes and does not File and properly serve such a request by the applicable bar date shall be forever barred from asserting any such Administrative Tax Claims against the Plan Debtors, Liquidating Trustee, Plan Debtors' Estates, or their properties.

### 7.3     Treatment of Priority Unsecured Tax Claims.

Priority Tax Claims are certain unsecured income, employment and other Taxes described by Bankruptcy Code Section 507(a)(8) and Claims, as provided in Bankruptcy Code Section 1129(a)(7)(D) which would otherwise meet such description, but for the secured status of that Claim. The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred cash payments over a period not exceeding five (5) years

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

from the applicable Petition Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

At the election of the Liquidating Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not exceeding five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Liquidating Trustee, provided such treatment is on more favorable terms to the applicable Plan Debtor's Estate than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash on the Effective Date.

### 7.4 Treatment of Unavoided Liens Securing Claims That Are Not Allowed.

Unless the Holder thereof objects and other treatment, consistent with the Bankruptcy Code, is agreed upon or is permitted upon order of the Bankruptcy Court with respect to such Lien or Claim, if there is a Lien that cannot be avoided even though the Claim it secures is not Allowed, then the Lien shall continue in force, be transferred or be released and extinguished on and after the Effective Date in the same manner and to the same extent as if the Claim were an Allowed Secured Claim and any such Claim it secures shall be treated on and after the Effective Date as if it were an Allowed Claim. The Lehman Lenders consent to such treatment.

### 7.5 Classification Of Claims And Interests.

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Lehman Plan sets forth the treatment each Class will receive. The table below lists the Classes of Claims established under the Lehman Plan and states whether each particular Class is impaired or left unimpaired by the Lehman Plan. A Class is "unimpaired" if the Lehman Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain

exceptions specified in the Bankruptcy Code.

For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such. Further, in the event that any alleged Secured Claim is not, or only is partially, Allowed as a Secured Claim, the deficiency amount will constitute a Class 7 or Class 8 Claim against the applicable Plan Debtor, as appropriate, and will receive the same treatment as provided to other Claims in Class 7 or Class 8 of such Plan Debtor, as appropriate.

THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET COMPLETE, AND THEIR LISTING HEREIN OR IN THE TABLES BELOW SHOULD NOT BE CONSTRUED AS PROVIDING FOR ALLOWANCE UNDER THE PLAN EXCEPT AS EXPRESSLY SET FORTH FOR THE PARTICULAR CLAIM.

| CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS | | Class 1 is Unimpaired | Class 1 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 1.1 | Secured Real Property Tax Claim of Los Angeles County against the Ritter Ranch Project | | Palmdale Hills; Palmdale Hills 12 |
| Class 1.2 | Secured Real Property Tax Claim of Los Angeles County against the Acton Project in the amount of $200 | | Acton Estates; Acton Estates 1 |
| Class 1.3 | Secured Real Property Tax Claim of Riverside County against the Emerald Meadows Project in the amount of $284 | | Emerald Meadows; Emerald Meadows 9 |
| Class 1.4 | Secured Real Property Tax Claim of Placer County against the Bickford Ranch Project | | SunCal Bickford; SunCal Bickford Scheduled Amount |
| Class 1.5 | Secured Real Property Tax Claim of Contra Costa County against the Delta Coves Project in the amount of $609,221. | | Delta Coves; Delta Coves 16 |
| Class 1.6 | Secured Real Property Tax Claim of Riverside County against the Heartland Project in the amount of $559,022. | | SunCal Heartland; SunCal Heartland 5 |
| Class 1.7 | Secured Real Property Tax Claim of Orange County against the Marblehead Project in the amount of $379,156. | | SunCal Marblehead; SunCal Marblehead 49 and 57 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS | | Class 1 is Unimpaired | Class 1 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class 1.8 | Secured Real Property Tax Claim of Los Angeles County against the Northlake Project in the amount of $1,189,919. | | SunCal Northlake; SunCal Northlake Scheduled Amount |
| Class 1.9 | Secured Real Property Tax Claim of Riverside County against the Oak Valley Project in the amount of $280,280. | | SunCal Oak Valley; SunCal Oak Valley 9 |
| Class 1.10 | Secured Real Property Tax Claim of Los Angeles County against the 10000 Santa Monica Project in the amount of $1,407,212. | | SunCal Century City; SunCal Century City 4 |
| Class 1.11 | Secured Real Property Tax Claim of San Bernardino County against the Palm Springs Village Project in the amount of $589,367. | | SunCal PSV; SunCal PSV 22 |
| Class 1.12 | Secured Real Property Tax Claim (disputed) of Alameda County against the Oak Knoll Project in the amount of $2,356,035. | | SunCal Oak Knoll; SunCal Oak Knoll 22, 23 and 24 |
| Class 1.13 | Secured Real Property Tax Claim of Los Angeles County against the Tesoro Project in the amount of $70,239. | | Tesoro; Tesoro 2 |
| Class 1.14 | Secured Real Property Tax Claim of San Bernardino County against the Joshua Ridge Project in the amount of $5,900. | | SCC Communities; SCC Communities Scheduled Amount |
| Class 1.15 | Secured Real Property Tax Claim of Placer County against the Summit Valley Project in the amount of $ 504,245. | | SunCal Summit Valley; Palmdale Hills 97 |
| Class 1.16 | Secured Real Property Tax Claim of San Bernardino County against the Summit Valley Project in the amount of $69,530. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 1.17 | Secured Real Property Tax Claim of Riverside County against the Beaumont Project in the amount of $365,954. | | SunCal Beaumont; SunCal Beaumont 9 |
| Class 1.18 | Secured Real Property Tax Claim of Stanislaus County against the Johannson Ranch Project in the amount of $75,106. | | SunCal Johannson; SunCal Johannson Scheduled Amount |
| Class 1.19 | Secured Real Property Tax Claim of San Bernardino County against Seven Brothers' property in the amount of $60,828. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 1.20 | Secured Real Property Tax Claim of San Bernardino County against the property Kirby Estates' property in the amount of $1,744. | | Kirby Estates; Kirby Estates Scheduled Amount |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2:  CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| | **SunCal Communities I Loan Agreement** | | |
| Class 2.1 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal I arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal I; SunCal I: 1 |
| Class 2.2 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | Acton Estates; Acton Estates: 6 |
| Class 2.3 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Emerald; SunCal Emerald: 7 |
| Class 2.4 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Bickford; SunCal Bickford: 16 |
| Class 2.5 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | | SunCal Summit Valley; SunCal Summit Valley: 12 |
| | **Ritter Ranch Loan Agreement** | | |
| Class 2.6 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31. | | Palmdale Hills; Palmdale Hills 65 |
| | **SCC Palmdale Loan Agreement** | | |
| Class 2.7 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SCC Palmdale arising from the SCC Palmdale Loan Agreement in the Allowed Amount of $119,664,305.25. | | SCC Palmdale; SCC Palmdale 1 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| | **Bickford Second Lien Loan Agreement** | | |
| Class 2.8 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Bickford arising from the Bickford Second Loan Agreement in the Allowed Amount of $56,494,059.38. | | SunCal Bickford; SunCal Bickford 17 |
| | **Interim Loan Agreement** | | |
| Class 2.9 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59. | | SCC Communities; SCC Communities: 9 |
| Class 2.10 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Del Rio arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59. | | Del Rio; Del Rio: 14 |
| Class 2.11 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59. | | Tesoro; Tesoro: 7 |
| | **SunCal Oak Knoll/SunCal Torrance Loan Agreement** | | |
| Class 2.12 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64. | | SunCal Oak Knoll; SunCal Oak Knoll: 12 |
| Class 2.13 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15. | | SunCal Torrance; SunCal Torrance: 4 |
| | **Delta Coves Loan Agreement** | | |
| Class 2.14 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48. | | Delta Coves; Delta Coves 21 |
| | **SunCal Marblehead / SunCal Heartland Loan Agreement** | | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2:  CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.15 | Allowed Secured Claim of Lehman ALI against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | | SunCal Heartland; SunCal Heartland: 9 |
| Class 2.16 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | | SunCal Marblehead; SunCal Marblehead: 21 |
| | **SunCal Oak Valley Loan Agreement** | | |
| Class 2.17 | Allowed Secured Claim of OVC Holdings or its assignee or successor against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63. | | SunCal Oak Valley; SunCal Oak Valley 16 |
| | **SunCal Northlake Loan Agreement** | | |
| Class 2.18 | Allowed Secured Claim of Northlake Holdings or its assignee or successor against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88. | | SunCal Northlake; SunCal Northlake 6 |
| | **SunCal PSV Loan Agreement** | | |
| Class 2.19 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal PSV arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20. | | SunCal PSV; SunCal PSV 12 |

| CLASS 3:  CLASSIFICATION OF ALLOWED DANSKE SECURED CLAIM | | Class 3 is Impaired | The Class 3 Claim Holder is Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 3.1 | Secured Claim of Danske Bank against SunCal Century City arising from the SunCal Century City Loan Agreement, in the Allowed Amount of $120,000,000 . | | SunCal Century; City SunCal Century City 17 |

| CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.1 | Secured Claim of, or formerly of, Yen Chu Chang Dou, et al. pursuant to first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $3,173,499.50. | | SunCal Beaumont; SunCal Beaumont 3 |
| Class 4.2 | Secured Claim of, or formerly of, Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $136,229. | | SunCal Beaumont; Palmdale Hills 101 |
| Class 4.3 | Secured Claim of, or formerly of, William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $130,000. | | SunCal Beaumont; SunCal Beaumont [__] |
| Class 4.4 | Secured Claim of, or formerly of, Scott McDaniel pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $535,000. | | SunCal Beaumont; Palmdale Hills 20 |
| Class 4.5 | Secured Claim of, or formerly of, Wayne & Francis Lee pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $650,000. | | SunCal Beaumont; SunCal Beaumont [__] |
| Class 4.6 | Secured Claim of, or formerly of, Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $154,742. | | SunCal Beaumont; SunCal Beaumont 6 |
| Class 4.7 | Secured Claim of, or formerly of, Patricia I Volkerts pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $871,703. | | SunCal Beaumont; Palmdale Hills 11 |
| Class 4.8 | Secured Claim of, or formerly of, Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $668,250. | | SunCal Summit Valley; SunCal Summit Valley 5 |
| Class 4.9 | Secured Claim of, or formerly of, K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project in the amount of $200,000. | | SunCal Summit Valley; SunCal Summit Valley [__] |
| Class 4.10 | Secured Claim of, or formerly of, Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $1,246,500. | | SunCal Summit Valley; SunCal Summit Valley [__] |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 4:  CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.11 | Secured Claim of, or formerly of, Jerry Wong Scheduled Amount & Rosalie Wong, Inc. pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $390,000. | SunCal Summit Valley; SunCal Summit Valley [___] |
| Class 4.12 | Secured Claim of, or formerly of, Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $1,388,156. | Seven Brothers; SunCal Summit 17 |
| Class 4.13 | Secured Claim of, or formerly of, Philip C. Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $296,910. | Seven Brothers; Seven Brothers [___] |
| Class 4.14 | Secured Claim of, or formerly of, Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $880,000. | Seven Brothers; Seven Brothers [___] |
| Class 4.15 | Secured Claim of, or formerly of, Desert Wind, LLC pursuant to a first -priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $862,000. | Seven Brothers; Seven Brothers [___] |

| CLASS 5:  CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.1 | Mechanic's Lien Claim of Asphalt Professionals or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | | Palmdale Hills; Palmdale Hills 1 and 46 |
| Class 5.2 | Mechanic's Lien Claim of Sierra Cascade Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | | Palmdale Hills; Palmdale Hills 33 |
| Class 5.3 | Mechanic's Lien Claim of Staats Construction. Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | | Palmdale Hills; Palmdale Hills 51 |
| Class 5.4 | Mechanic's Lien Claim of Southland Farmers, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | | Palmdale Hills; Palmdale Hills 55, 67 and 68 |
| Class 5.5 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $1,530,146. | | Palmdale Hills; Palmdale Hills 62, 63 and 64 |
| Class 5.6 | Mechanic's Lien Claim of Chameleon Design Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | | Palmdale Hills; Palmdale Hills 93, 99 |
| Class 5.7 | Mechanic's Lien Claim of Hall & Foreman, Inc. or its assignee or successor against the Emerald Meadows Project in the amount of $287,727. | | SunCal Emerald; SunCal Emerald 13 |
| Class 5.8 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Emerald Meadows Project in the amount of $991,315. | | SunCal Emerald; SunCal Emerald 15 and 16 |
| Class 5.9 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $14,893. | | Palmdale Hills; Palmdale Hills 15 |
| Class 5.10 | Mechanic's Lien Claim of MHM Engineers or its assignee or successor against the Bickford Ranch Project in the amount of $8,916. | | SunCal Bickford; SunCal Bickford 5 |
| Class 5.11 | Mechanic's Lien Claim of Land Architecture or its assignee or successor against the Bickford Ranch Project in the amount of $100,245. | | SunCal Bickford; SunCal Bickford 6 |

52063-001
DOCS_LA:205341.9

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.12 | Mechanic's Lien Claim of Kiewit Pacific Co. or its assignee or successor against the Bickford Ranch Project in the amount of $1,868,357. | | SunCal Bickford; SunCal Bickford 10 |
| Class 5.13 | Mechanic's Lien Claim of ARB, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $1,052,272. | | SunCal Bickford; SunCal Bickford 15 |
| Class 5.14 | Mechanic's Lien Claim of Independent Construction or its assignee or successor against the Bickford Ranch Project in the amount of $117,209. | | SunCal Bickford; SunCal Bickford 28 |
| Class 5.15 | Mechanic's Lien Claim of Marques Pipeline, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $330,118. | | SunCal Bickford; SunCal Bickford 29 and 30 |
| Class 5.16 | Mechanic's Lien Claim of Pacific Soils Engineering or its assignee or successor against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | | SunCal Summit Valley; SunCal Summit Valley 9 |
| Class 5.17 | Mechanic's Lien Class of, or formerly of, Hertz Equipment Rental Corporation or its assignee or successor against the Delta Coves Project in the amount of $25,444. | | Delta Coves; Delta Coves 2 |
| Class 5.18 | Mechanic's Lien Claim of MBH Architects or its assignee or successor against the Delta Coves Project in the amount of $97,091. | | Delta Coves; Delta Coves 8 |
| Class 5.19 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Heartland Project in the amount of $47,675. | | SunCal Heartland; SunCal Heartland 2 |
| Class 5.20 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Heartland Project in the amount of $563,159. | | SunCal Heartland; SunCal Heartland 8 |
| Class 5.21 | Mechanic's Lien Claim of Dennis M. McCoy & Sons or its assignee or successor against the Heartland Project in the amount of $941,960. | | SunCal Heartland; SunCal Heartland 16 |
| Class 5.22 | Mechanic's Lien Claim of SunCal Marblehead by Trimax Systems, Inc. or its assignee or successor against the Marblehead Project in the amount of $75,286. | | SunCal Marblehead; SunCal Marblehead 3 |
| Class 5.23 | Mechanic's Lien Claim of Butsko Utility Design, Inc. or its assignee or successor against the Marblehead Project in the amount of $6,250. | | SunCal Marblehead; SunCal Marblehead 4 |

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.24 | Mechanic's Lien Claim of Dennis RMF Contracting, Inc. or its assignee or successor against the Marblehead Project in the amount of $264,749. | | SunCal Marblehead; SunCal Marblehead 28 |
| Class 5.25 | Mechanic's Lien Claim of The Jasper Companies or its assignee or successor against the Marblehead Project in the amount of $165,260. | | SunCal Marblehead; SunCal Marblehead 29 |
| Class 5.26 | Mechanic's Lien Claim of Kirk Negrete, Inc. dba United Steel Placers or its assignee or successor against the Marblehead Project in the amount of $270,056. | | SunCal Marblehead; SunCal Marblehead 38 |
| Class 5.27 | Mechanic's Lien Claim of RBF Consulting or its assignee or successor against the Marblehead Project in the amount of $7,096. | | SunCal Marblehead; SunCal Marblehead 39 |
| Class 5.28 | Mechanic's Lien Claim of RJ Noble Co. or its assignee or successor against the Marblehead Project in the amount of $175,030. | | SunCal Marblehead; SunCal Marblehead 42, 50 and 58 |
| Class 5.29 | Mechanic's Lien Claim of Orange County Stripping Services or its assignee or successor against the Marblehead Project in the amount of $4,400. | | SunCal Marblehead; SunCal Marblehead 46 and 54 |
| Class 5.30 | Mechanic's Lien Claim of Savala Equipment Co. Inc. or its assignee or successor against the Marblehead Project in the amount of $34,440.\ | | SunCal Marblehead; SunCal Marblehead 48 and 56 |
| Class 5.31 | Mechanic's Lien Claim of Rockey Murata Landscaping or its assignee or successor against the Marblehead Project in the amount of $285,643. | | SunCal Marblehead; SunCal Marblehead 60 |
| Class 5.32 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Oak Valley Project in the amount of $52,806. | | SunCal Oak Valley; SunCal Oak Valley 3 |
| Class 5.33 | Mechanic's Lien Claim of Pinnik Inc. or its assignee or successor against the Oak Valley Project in the amount of $966,987. | | SunCal Oak Valley; SunCal Oak Valley 12 and 14 |
| Class 5.34 | Mechanic's Lien Claim of Hillcrest Contracting Inc. or its assignee or successor against the Oak Valley Project in the amount of $136,567. | | SunCal Oak Valley; SunCal Oak Valley 223 |
| Class 5.35 | Mechanic's Lien Claim of MacKenzie Landscape or its assignee or successor against the Oak Valley Project in the amount of $121,297. | | SunCal Oak Valley; SunCal Oak Valley 25 |
| Class 5.36 | Mechanic's Lien Claim of All American Asphalt or its assignee or successor against the Oak Valley Project in the amount of $60,355. | | SunCal Oak Valley; SunCal Oak Valley 26 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.37 | Mechanic's Lien Claim of Los Angeles Times or its assignee or successor against the Oak Valley Project in the amount of $43,610. | | SunCal Oak Valley; SunCal Oak Valley 31 and 32 |
| Class 5.38 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Oak Valley Project in the amount of $280,685. | | SunCal Oak Valley; SunCal Oak Valley 35 and 36 |
| Class 5.39 | Mechanic's Lien Claim of Ateliers Jean Nouvel or its assignee or successor against the 10000 Santa Monica Project in the amount of $1,110,000. | | SunCal Century City; SunCal Century City 15 |
| Class 5.40 | Mechanic's Lien Claim of Englekirk & Sabol Construction Structure Engineering or its assignee or successor against the 10000 Santa Monica Project in the amount of $324,520. | | SunCal Century City SunCal Century City 12 |
| Class 5.41 | Mechanic's Lien Claim of Brudvik Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $43,365. | | SunCal PSV; SunCal PSV 4 |
| Class 5.42 | Mechanic's Lien Claim of Larry Jacinto Construction Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $212,663. | | SunCal PSV; SunCal PSV 5 and 24 |
| Class 5.43 | Mechanic's Lien Claim of William + Paddon Architects + Planners Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $73,798. | | SunCal PSV; SunCal PSV 9 and 10 |
| Class 5.44 | Mechanic's Lien Claim of Southern California Edison or its assignee or successor against the Palm Springs Village Project in the amount of $23,861. | | SunCal PSV; SunCal PSV 26 |
| Class 5.45 | Mechanic's Lien Claim of Pacific Masonry Walls, Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $314,061. | | SunCal PSV; SunCal PSV 33 and 39 |
| Class 5.46 | Mechanic's Lien Claim of J.R. Simplot Company or its assignee or successor against the Palm Springs Village Project in the amount of $3,467. | | SunCal PSV; SunCal PSV 34 and 40 |
| Class 5.47 | Mechanic's Lien Claim of Desert Pipeline Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $469,784. | | SunCal PSV; SunCal PSV 36, 42 and 47 |
| Class 5.48 | Mechanic's Lien Claim of MSA Consulting or its assignee or successor against the Palm Springs Village Project in the amount of $666,897. | | SunCal PSV; SunCal PSV 43 |
| Class 5.49 | Mechanic's Lien Claim of Jackson DeMarco or its assignee or successor against the Palm Springs Village Project in the amount of $52,234. | | SunCal PSV; SunCal PSV 45 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.50 | Mechanic's Lien Claim of Oliphant Gold, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $456,476. | | SunCal Oak Knoll; SunCal Oak Knoll 46 |
| Class 5.51 | Mechanic's Lien Claim of RGA Environmental, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $75,617. | | SunCal Oak Knoll; SunCal Oak Knoll 1 |
| Class 5.52 | Mechanic's Lien Claim of BKF Engineers or its assignee or successor against the Oak Knoll Project in the amount of $308,817. | | SunCal Oak Knoll; SunCal Oak Knoll 2 and 19 |
| Class 5.53 | Mechanic's Lien Claim of CST Environmental Inc. or its assignee or successor against the Oak Knoll Project in the amount of $4,316,169. | | SunCal Oak Knoll; SunCal Oak Knoll 4 and 9 |
| Class 5.54 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Beaumont Heights Project in the amount of $46,188. | | SunCal Beaumont; SunCal Beaumont 11 and 12 |

| CLASS 6: CLASSIFICATION OF ALLOWED PRIORITY CLAIMS | | Class 6 is Unimpaired | Class 6 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 6.1 | Priority Claims against SunCal Marblehead (alleged amount - $10,950). | | SunCal Marblehead; SunCal Marblehead Scheduled Amount and SunCal Marblehead 45 |
| Class 6.2 | Priority Claims against SunCal Oak Knoll (alleged amount - $235). | | SunCal Oak Knoll; SunCal Oak Knoll 26 |
| Class 6.3 | Priority Claims against Palmdale Hills (alleged amount - $10,950). | | Palmdale Hills; Palmdale Hills 70 |
| Class 6.4 | Priority Claims against SJD Partners (alleged amount - $4,188). | | SJD Partners; SJD Partners Scheduled Amount and SJD Partners 12 |

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS | | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor |
| Class 7.1 | General Unsecured Claims | | Palmdale Hills |

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS | | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor |
| Class 7.2 | General Unsecured Claims | | Del Rio |
| Class 7.3 | General Unsecured Claims | | SunCal Beaumont |
| Class 7.4 | General Unsecured Claims | | SunCal Emerald |
| Class 7.5 | General Unsecured Claims | | SunCal Johannson |
| Class 7.6 | General Unsecured Claims | | SunCal Summit Valley |
| Class 7.7 | General Unsecured Claims | | Acton Estates |
| Class 7.8 | General Unsecured Claims | | Delta Coves |
| Class 7.9 | General Unsecured Claims | | SunCal Heartland |
| Class 7.10 | General Unsecured Claims | | SunCal Marblehead |
| Class 7.11 | General Unsecured Claims | | SJD Partners |
| Class 7.12 | General Unsecured Claims | | SunCal Century City |
| Class 7.13 | General Unsecured Claims | | SunCal Northlake |
| Class 7.14 | General Unsecured Claims | | SunCal Oak Knoll |
| Class 7.15 | General Unsecured Claims | | SunCal Oak Valley |
| Class 7.16 | General Unsecured Claims | | SunCal PSV |
| Class 7.17 | General Unsecured Claims | | SunCal Torrance |
| Class 7.18 | General Unsecured Claims | | SCC Communities |
| Class 7.19 | General Unsecured Claims | | Tesoro |
| Class 7.20 | General Unsecured Claims | | SunCal Bickford |
| Class 7.21 | General Unsecured Claims | | SunCal I |
| Class 7.22 | General Unsecured Claims | | Seven Brothers |
| Class 7.23 | General Unsecured Claims | | Kirby Estates |
| Class 7.24 | General Unsecured Claims | | SCC Palmdale |

52063-001
DOCS_LA:205341.9

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 8:  CLASSIFICATION OF ALLOWED ES CLAIMS | | Class 8 is Impaired | Class 8 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claims |
| Class 8.1 | ES Claims | | Palmdale Hills |
| Class 8.2 | ES Claims | | Del Rio - Various Filed and Scheduled |
| Class 8.3 | ES Claims | | SunCal Emerald - Various Filed and Scheduled |
| Class 8.4 | ES Claims | | SunCal Summit Valley - Various Filed and Scheduled |
| Class 8.5 | ES Claims | | Acton Estates - Various Filed and Scheduled |
| Class 8.6 | ES Claims | | Delta Coves - Various Filed and Scheduled |
| Class 8.7 | ES Claims | | SunCal Heartland - Various Filed and Scheduled |
| Class 8.8 | ES Claims | | SunCal Marblehead - Various Filed and Scheduled |
| Class 8.9 | ES Claims | | SJD Partners - Various Filed and Scheduled |
| Class 8.10 | ES Claims | | SunCal Northlake - Various Filed and Scheduled |
| Class 8.11 | ES Claims | | SunCal Oak Knoll - Various Filed and Scheduled |
| Class 8.12 | ES Claims | | SunCal Oak Valley - Various Filed and Scheduled |
| Class 8.13 | ES Claims | | SunCal PSV - Various Filed and Scheduled |
| Class 8.14 | ES Claims | | SunCal Torrance - Various Filed and Scheduled |
| Class 8.15 | ES Claims | | SCC Communities - Various Filed and Scheduled |
| Class 8.16 | ES Claims | | Tesoro - Various Filed and Scheduled |
| Class 8.17 | ES Claims | | SunCal Bickford - Various Filed and Scheduled |
| Class 8.18 | ES Claims | | SunCal I |
| Class 8.19 | ES Claims | | SCC Palmdale |

| CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS | Class 9 is Impaired | Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|
| Class | Interests (and alleged Holders) | Plan Debtor and Basis for Interests |
| Class 9.1 | Interests in Palmdale Hills (of SCC Palmdale). | Palmdale Hills Scheduled |
| Class 9.2 | Interests in Del Rio (of SCC LLC). | Del Rio Scheduled |
| Class 9.3 | Interests in SunCal Beaumont (of SunCal I). | SunCal Beaumont Scheduled |
| Class 9.4 | Interests in SunCal Emerald (of SunCal I). | SunCal Emerald Scheduled |
| Class 9.5 | Interests in SunCal Johannson (of SunCal I). | SunCal Johannson Scheduled |
| Class 9.6 | Interests in SunCal Summit Valley (of SunCal I). | SunCal Summit Valley Scheduled |
| Class 9.7 | Interests in Acton Estates (of SunCal I). | Acton Estates Scheduled |
| Class 9.8 | Interests in Delta Coves (of Delta Coves Member LLC). | Delta Coves Scheduled |
| Class 9.9 | Interests in SunCal Heartland (of SunCal Marblehead Heartland Master LLC). | SunCal Heartland Scheduled |
| Class 9.10 | Interests in SunCal Marblehead (of SunCal Marblehead Heartland Master LLC). | SunCal Marblehead Scheduled |
| Class 9.11 | Interests in SJD Partners (of, *inter alia,* SJD Development). | SJD Partners Scheduled |
| Class 9.12 | Interests in SunCal Century City (of SunCal Century City Member LLC). | SunCal Century City Scheduled |
| Class 9.13 | Interests in SunCal Northlake (of SCLV Northlake, LLC and SCC/Northlake, LLC). | SunCal Northlake Scheduled |
| Class 9.14 | Interests in SunCal Oak Knoll (of Lehman SunCal Real Estate Holdings LLC). | SunCal Oak Knoll Scheduled |
| Class 9.15 | Interests in SunCal Oak Valley (of SCLV Oak Valley LLC and SCC/Oak Valley, LLC). | SunCal Oak Valley Scheduled |
| Class 9.16 | Interests in SunCal PSV (of Lehman SunCal PSV Holdings LLC). | SunCal PSV Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS | Class 9 is Impaired | Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|
| Class | Interests (and alleged Holders) | Plan Debtor and Basis for Interests |
| Class 9.17 | Interests in SunCal Torrance (of Lehman SunCal Real Estate Holdings LLC). | SunCal Torrance Scheduled |
| Class 9.18 | Interests in SCC Communities (of SCC LLC). | SCC Communities Scheduled |
| Class 9.19 | Interests in Tesoro (of SCC LLC). | Tesoro Scheduled |
| Class 9.20 | Interests in SunCal Bickford (of SunCal I). | SunCal Bickford Scheduled |
| Class 9.21 | Interests in SunCal I (of SCC LLC). | SunCal I Scheduled |
| Class 9.22 | Interests in Seven Brothers (of SunCal Summit Valley). | Seven Brothers Scheduled |
| Class 9.23 | Interests in Kirby Estates (of SunCal Summit Valley). | Kirby Estates Scheduled |
| Class 9.24 | Interests in SCC Palmdale (of SCC LLC). | SCC Palmdale Scheduled |

### 7.6     Treatment Of Classified Claims And Interests

Any references in the Lehman Plan to Class 1, Class 2, Class 4, Class 5, Class 6, Class 7, Class 8 and Class 9 are summary references made for convenience only to the group of subclasses of each such Class (Classes 1.1 through 1.20, Classes 2.1 through 2.19, Classes 4.1 through 4.15, Classes 5.1 through 5.54, Classes 6.1 through 6.4, Classes 7.1 through 7.24, Classes 8.1 through 8.19 and Classes 9.1 through 9.24). Regardless of the treatment provided herein for any Holder of a Claim, the Holder may agree to accept less favorable treatment. Provisions for treatment below for Holders of Allowed Claims are not an indication that any particular Claim is Allowed unless expressly provided.

### 7.6.1     Treatment of Allowed Secured Real Property Tax Claims (Classes 1.1 through 1.20).

The treatment of Allowed Secured Real Property Tax Claims in Classes 1.1 through 1.20 under the Lehman Plan is as follows:

(a)     Classes 1.1 through 1.20 are <u>unimpaired</u> under the Plan, and each Holder of an

Allowed Secured Real Property Tax Claim is not entitled to vote on the Plan;

(b)      As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim shall retain its underlying Liens on the applicable real property collateral;

(c)      On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Real Property Tax Claim agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Real Property Tax Claim, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Real Property Tax Claim:

(1)      **Cash Payment.**  On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Real Property Tax Claim, Cash equal to the amount of such Allowed Secured Real Property Tax Claim, or such lesser amount as to which the Holder of such Allowed Secured Real Property Tax Claim, the Liquidating Trustee and the Lehman Lenders agree; or

(2)      **Unimpairment.**  (i) As of the Effective Date, the Holder of such Allowed Secured Real Property Tax Claim shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Real Property Tax Claim and shall be free to pursue its rights and remedies against the underlying real property collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder notice of the selection of this alternative treatment for such Holder.

**7.6.2**    **Treatment of Secured Claims with Respect to Lehman Loans (Classes 2.1 through 2.20).**

The treatment of Lehman Secured Claims (Classes 2.1 through 2.19) under the Lehman Plan shall be as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### (a)     <u>Voting.</u>

Classes 2.1 through 2.19 are <u>impaired</u> under the Plan, and each Holder of a Lehman Secured Claim is <u>entitled to vote</u> on the Plan.

### (b)     <u>Liens.</u>

As of the Effective Date, each Holder of a Lehman Secured Claim shall <u>retain its underlying Liens</u> on the applicable collateral. Thereafter, additional Liens may be granted or Liens may be released all as set forth in Section 7.6.2 and Article IX of the Plan.

### (c)     <u>Claims.</u>

Subject to applicable provisions of the Lehman Plan, including Article IX of the Plan (which provisions are designed to protect (a) ES Claimants as provided therein in the event of an ES Judgment subordinating all or any part of certain Lehman Secured Claims to Allowed ES Claims and (b) the Estates of Acton Estates, Tesoro and SCC Communities in the event of a Cross-Collateralization Judgment), each Lehman Secured Claim shall be Allowed for voting and all other purposes as a Secured Claim in the amounts set forth in Article 7.5 above; <u>provided that</u> (i) any deficiency shall be an Allowed Class 7 Claim in the appropriate subclass thereof; (ii) as to Lehman Secured Claims for which, as to all of the applicable collateral other than Cash Collateral of the applicable Lehman Creditor, there is a Successful Bidder in accordance with the Lehman Plan Sale or Foreclosure Procedures, the amount of a Lehman Secured Claim shall equal the sum of (a) such Cash Collateral and (b) the amount bid by the Successful Bidder for the non-Cash collateral; and (iii) as to all other Lehman Secured Claims, upon disposition of all of the collateral therefor or upon a valuation motion made by the Liquidating Trustee or the applicable Holder of any Lehman Secured Claims after abandonment or surrender thereof, the amount of the applicable Lehman Secured Claim and any related deficiency shall be accordingly adjusted.

### (d)     <u>Disposition of Collateral</u>

On the Effective Date, all Cash Collateral for a Lehman Secured Claim not used on the Effective Date as permitted or required by the Lehman Plan shall be deposited into the Plan Reserve. Certain of the Remaining Real Restate Projects shall be sold or conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures. If a Project or other Asset of a Plan Debtor which is

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the collateral for a Lehman Secured Claim is transferred to one or more Lehman Nominees pursuant to the Lehman Plan Sale or Foreclosure Procedures, any such Project so conveyed shall become a PRA Security Project subject to the PRA Recovery Deed of Trust as and to the extent described in Article IX of the Plan. If a Project or other Asset of a Plan Debtor which is collateral for a Lehman Secured Claim is sold to a third party purchaser, the Net Cash Proceeds therefrom shall be remitted to the Liquidating Trustee who shall hold such Net Cash Proceeds in the Plan Reserve and any non-Cash Net Proceeds therefrom shall also be remitted to the Liquidating Trustee and the applicable Lehman Lender shall be afforded a substitute Lien on such non-Cash Net Proceeds. Any remaining collateral for a Lehman Secured Claim, which is not otherwise sold or conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures may be retained, sold or abandoned by the Liquidating Trustee as provided under the Lehman Plan with the Net Cash Proceeds therefrom to be applied first to pay such Lehman Secured Claim and then to pay other Claims in accordance with the Lehman Plan, provided that, if no disposition of such collateral occurs within one (1) year after the Effective Date, the applicable Lehman Lender may enforce its Liens.

**(e)** **Releases, Reconveyances, Assignments and Payments.**

(i) Upon final settlement or determination of the Project Related Actions in favor of the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee shall (1) release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and terminate all Reconveyance Agreements, (2) pay the applicable Lehman Nominee the amount held in the Plan Reserve in respect of, and any other, Net Cash Proceeds of the sale of the PRA Security Project previously owned by such Lehman Nominee, (3) assign non-Cash Net Proceeds (including all substitute Liens and related, underlying obligations) (x) from the sale of any PRA Security Project, to the applicable Lehman Nominee and (y) from the sale of any collateral for a Lehman Secured Claim, to the applicable Holder of such Lehman Secured Claim, (4) distribute to the applicable Holder of a Lehman Secured Claim any remaining non-Cash collateral for such Claim, and (5) pay to the applicable Holder of a Lehman Secured Claim, the amounts held in the Plan Reserve with respect to such Lehman Secured Claim (including any Cash Collateral of such Holder that was deposited in the Plan Reserve) and any other Net Cash Proceeds of the disposition of

collateral for such Lehman Secured Claim, up to the amount of the Lehman Secured Claim, with interest and fees in accordance with its contractual terms. Thereupon, the Allowed Lehman Secured Claim shall be deemed satisfied by such payments and such conveyances of collateral free and clear as set forth in Section 9.7.2(a).

(ii)     Upon final settlement or determination of the Project Related Actions against the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee, in satisfaction of the Project Related Action Recoveries, shall distribute to the applicable Estates available Cash from the Plan Reserve and shall liquidate and distribute to the applicable Estates the Net Proceeds from the PRA Recovery Security Pool and non-Cash Net Proceeds from the sale of collateral for the Lehman Secured Claims (which are the exclusive sources of satisfaction of a Project Related Action Recovery absent a voluntary payment by a Lehman Related Party in accordance with Article IX of the Plan), and upon satisfaction of the Project Related Action Recoveries, to the extent of any remainder of such Cash or property, the Liquidating Trustee shall afford Lehman Secured Claims the treatment described in the preceding subparagraph to this Section (e) of the Lehman Plan.

(iii)     As more fully set forth in Article IX of the Plan, at any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, the Liquidating Trustee shall release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust, terminate all Reconveyance Agreements and release to the applicable Holders of Lehman Secured Claims and all Lehman Nominees all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount.

### 7.6.3     Treatment of Allowed Danske Bank Secured Claim (Class 3).

The treatment of the Danske Bank Secured Claim (Class 3) under the Lehman Plan shall be as follows:

**(a)     Voting.**

Class 3 is impaired under the Plan, and the Holder of the Allowed Danske Secured Claim is entitled to vote on the Plan.

**(b)     Liens.**

As of the Effective Date, the Holder of the Allowed Danske Secured Claim shall

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

retain its underlying Liens on the applicable collateral.

**(c)** **Claims.**

The Allowed Danske Secured Claim shall be Allowed for voting and all other purposes as a Secured Claim in the amounts set forth in Article 7.5 above; provided that (i) any deficiency shall be an Allowed Class 7 Claim in the appropriate subclass thereof; and (ii) upon disposition of all of the collateral for such Allowed Danske Secured Claim or upon valuation motion made by the Liquidating Trustee or the Holder of such Allowed Danske Secured Claim after abandonment or surrender of such collateral, the amount of the Allowed Danske Secured Claim and any related deficiency shall be accordingly adjusted.

**(d)** **Disposition of Collateral and Means Therefor**

On the Effective Date, all Cash Collateral for the Allowed Danske Secured Claim shall be turned over to the Holder of the Allowed Danske Secured Claim in respect of such Claim, unless the Holder agrees to permit the Liquidating Trustee to retain or use any portion thereof.

The Liquidating Trustee shall market for sale and sell the non-Cash collateral for the Allowed Danske Secured Claim, including the 10000 Santa Monica Project, or abandon all or any of such collateral upon motion to the Bankruptcy Court.  The collateral, together with all associated personal property, shall be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of the Allowed Danske Secured Claim consents. The Holder of the Allowed Danske Secured Claim shall receive at least thirty (30) days' prior notice of any proposed sale.  The Holder of the Allowed Danske Secured Claim may elect to credit bid in response to such notice up to the full amount of the Allowed Danske Secured Claim (without the amount bid being limited to the value of the interest of the Holder of the Allowed Danske Secured Claim in such collateral).

If the collateral for the Allowed Danske Secured Claim is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, there shall be turned over or paid to the Holder of the Allowed Danske Secured Claim up to the full amount of the Allowed Danske Secured Claim from any non-Cash Net Proceeds therefrom and from the Net Cash Proceeds remaining after payment, (a) first, of SunCal Century City's Pro Rata share of the Lehman Post-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52063-001
DOCS_LA:205341.9

Confirmation Loan, (b) second, payment of SunCal Century City's direct Post-Confirmation Expenses and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors, and (c) third, any post-Confirmation Date intercompany payables. Any remaining Net Cash Proceeds thereafter shall be used to pay other obligations of the applicable Debtor in the priorities set forth in Section 9.9.2(b) of the Plan. If no disposition of such collateral occurs within one (1) year after the Effective Date, the Holder of the Allowed Danske Secured Claim may enforce its Liens. The Holder of the Allowed Danske Secured Claim may advance funds to the Liquidating Trustee for the protection of its collateral or administration of the Estate of SunCal Century City on such terms as the Holder of the Allowed Danske Secured Claim and Liquidating Trustee agree.

### 7.6.4 Treatment of Other Secured Claims (Classes 4.1 Through 4.15).

The treatment of Allowed Other Secured Claims in Classes 4.1 through 4.15 under the Lehman Plan shall be as follows:

(a) Classes 4.1 through 4.15 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Secured Claim in Classes 4.1 through 4.15 is <u>not entitled to vote</u> on the Plan;

(b) As of the Effective Date, each Holder of an Allowed Other Secured Claim in Classes 4.1 through 4.15 shall <u>retain its underlying Liens</u> on the applicable collateral;

(c) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and anticipated Liquidating Trustee, as limited below, shall select and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Other Secured Claim in Classes 4.1 through 4.15 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Other Secured Claim in Classes 4.1 through 4.15, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Claim in Classes 4.1 through 4.15:

(1) <u>Abandonment or Surrender</u>. On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 the property securing such Allowed Other Secured Claim in Classes 4.1 through 4.15 as of the Effective Date;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(2)  <u>Cash Payment</u>.  On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, Cash equal to the amount of such Allowed Other Secured Claim in Classes 4.1 through 4.15, or such lesser amount as to which the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, the Liquidating Trustee and the Lehman Lenders agree; or

(3)  <u>Unimpairment</u>.  (i) As of the Effective Date, the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Other Secured Claim in Classes 4.1 through 4.15 for which this treatment is selected, notice of the selection of this alternative treatment for such Holder.

### 7.6.5  <u>Treatment of Allowed Secured Mechanic's Lien Claims Against the Plan Debtors (Classes 5.1 Through 5.54).</u>

The treatment of Allowed Secured Mechanic's Lien Claims in Classes 5.1 through 5.54 under the Lehman Plan shall be as follows:

(a)  Classes 5.1 through 5.54 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 is <u>not entitled to vote</u> on the Plan;

(b)  As of the Effective Date, each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 shall <u>retain its underlying Liens</u> on the applicable collateral;

(c)  On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Mechanic's Lien Claim in Classes

5.1 through 5.54, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54:

(1) <u>Abandonment or Surrender</u>.  On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 the property securing such Allowed Secured Claim as of the Effective Date;

(2) <u>Cash Payment</u>.  On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, Cash equal to the amount of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, or such lesser amount as to which the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54, the Liquidating Trustee and the Lehman Lenders agree; or

(3) <u>Unimpairment</u>.  (i) As of the Effective Date, the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.54 for which this treatment was selected, notice of the selection of this alternative treatment for such Holder.

**7.6.6** <u>**Treatment of Priority Claims (Classes 6.1 Through 6.4).**</u>

The treatment of Allowed Priority Claims in Classes 6.1 through 6.4 under the Lehman Plan shall be as follows:

(a) Classes 6.1 through 6.4 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Priority Claim is <u>not entitled to vote</u> on the Plan.

(b) Each Holder of an Allowed Priority Claim shall be paid (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder of the Allowed Priority Claim and the Liquidating Trustee.

### 7.6.7 Treatment of Allowed General Unsecured Claims (Classes 7.1 Through 7.24).

The treatment of Allowed General Unsecured Claims in Classes 7.1 through 7.24 under the Lehman Plan shall be as follows:

(a)    Classes 7.1 through 7.24 are impaired under the Plan, and each Holder of an Allowed General Unsecured Claim is entitled to vote on the Plan; and

(b)    As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable.

### 7.6.8 Treatment of Allowed ES Claims (Classes 8.1 through 8.19).

The treatment of Allowed ES Claims in Classes 8.1 through 8.19 under the Lehman Plan shall be as follows:

(a)    Classes 8.1 through 8.19 are impaired under the Plan, and each Holder of an Allowed ES Claim is entitled to vote on the Plan;

(b)    As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable (subject to the terms of any ES Claimant Release and Assignment with respect to Claims against a Lehman Releasee);

(c)    Each Holder of an Allowed ES Claim also shall receive either:

(i)    if the Holder of an Allowed ES Claim votes to accept the ES Settlement Offer (or if there is Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted) and the Holder returns with its Ballot or to the Lehman Lenders a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

duly executed ES Claimant Release and Assignment, an ES Pro Rata Settlement Payment to be paid as soon as reasonably practicable after the later of: (1) the Effective Date; and (2) final allowance of such Allowed ES Claim; or

(ii)     if the Holder of an Allowed ES Claim does not vote to accept the ES Settlement Offer (and there is not Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted), the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with an ES Action, as and when available.  For Holders of Allowed ES Claims entitled to the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with an ES Action, upon final settlement or determination of the Equitable Subordination Claims in an ES Action against the applicable Lehman Related Parties, if any and consistent therewith, the Liquidating Trustee, in satisfaction of an ES Judgment, shall distribute to the applicable Estate available Cash from the Plan Reserve and shall liquidate and distribute to the applicable Estate Net Cash Proceeds from the PRA Recovery Security Pool and from the liquidation of any non-Cash Net Proceeds from the sale of collateral of the Holders of Lehman Secured Claims or the sale of any PRA Security Project (which are the exclusive sources of satisfaction of an ES Judgment absent a voluntary payment by a Lehman Related Party in accordance with Article IX of the Plan).

### 7.6.9     Treatment of Holders of Allowed Interests (Classes 9.1 through 9.24)

The treatment of Allowed Interests in Classes 9.1 through 9.24 under the Lehman Plan shall be as follows:

(a)     Classes 9.1 through 9.24 are impaired under the Plan, and each Holder of an Allowed Interest is deemed to reject the Plan and is not entitled to vote; and

(b)     On the Effective Date, all such Allowed Interests shall be cancelled.

### VIII.

### ACCEPTANCE OR REJECTION OF THE LEHMAN PLAN

### 8.1     Introduction.

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Lehman Proponents cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Lehman Plan. Some of the requirements include that the Lehman Plan must (a) be proposed in good faith, (b) be accepted in accordance with the provisions of the Bankruptcy Code, (c) pay creditors at least as much as creditors would receive in a Chapter 7 liquidation and (d) be feasible. The requirements described herein are not the only requirements for confirmation.

### 8.2     Who May Object to Confirmation of the Lehman Plan.

Any party in interest may object to the confirmation of the Lehman Plan, but as explained below not everyone is entitled to vote to accept or reject the Lehman Plan.

### 8.3     Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims.

A Holder of a Claim or Interest has a right to vote for or against the Lehman Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.

Because Classes 5.1 through 5.54 are unimpaired, any Holders of Allowed Mechanic's Lien Claims are deemed to accept the Plan. The Lehman Proponents, however, dispute the "secured" status of all, many or most of the Claims classified in Classes 5.1 to 5.54 because they believe that there are senior Liens of Lehman Creditors and no value in the junior Liens of the Holders of Mechanic's Lien Claims. Thus, each listed Holder of a Mechanic's Lien Claim will be provided a Ballot on which such Holder may elect to vote its Claims as a General Unsecured Claim or an ES Claim, as applicable, in which event the Holder will have to waive contentions that its interest in the collateral securing its Claim has any value and thus that it holds a Secured Claim against the applicable Project.

### 8.4     What Is an Allowed Claim/Interest.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

### 8.5    What Is an Impaired Class.

A Class is impaired if the Lehman Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. Under the Lehman Plan, Classes 1, 4, 5 and 6 are unimpaired and Classes 2, 3, 7, 8 and 9 are impaired.

### 8.6    Who Is Not Entitled to Vote.

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims that, pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3) or (a)(8), are entitled to priority, and (4) Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(2), (3) or (8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Lehman Proponents believe that (a) Classes 1, 4, 5 and 6 are unimpaired and thus are not entitled to vote because they are conclusively deemed to have accepted the Plan; (b) Class 9 Interests are being cancelled under the Plan and nothing is to be paid to their Holders and accordingly these Holders are deemed to have voted to reject the Plan and also are not entitled to vote; and (c) Classes 2, 3, 7 and 8 are impaired and are entitled to vote.

EVEN IF A CLAIM IS OF THE TYPE DESCRIBED ABOVE, A CREDITOR MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 8.7    Who Can Vote in More than One Class.

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the secured part of the Claim and another Ballot for the Unsecured Claim. Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of General Unsecured Claims and ES Claims), and may vote the Claims held in each Class.

## 8.8 Votes Necessary for a Class to Accept the Lehman Plan.

A Class of Claims is deemed to have accepted the Lehman Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Lehman Plan. A Class of interests is deemed to have accepted the Lehman Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Lehman Plan.

## 8.9 Treatment of Nonaccepting Classes.

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Lehman Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code and at least one impaired Class of Claims accepts the Lehman Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown." The Bankruptcy Code allows the Lehman Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Lehman Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Lehman Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

## 8.10 Request for Confirmation Despite Nonacceptance by Impaired Class(es).

The Lehman Proponents will ask the Bankruptcy Court to confirm the Lehman Plan by cramdown on any impaired Class if such Class does not vote to accept the Lehman Plan.

## IX.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE LEHMAN PLAN

## 9.1 Introduction.

This section is intended to address how the Lehman Proponents intend to fund and to have implemented the obligations to Creditors under the Lehman Plan. It thus provides information regarding funding sources and mechanisms for the Plan obligations, management of the Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtors' Estates after the Effective Date and other material issues bearing upon the performance of the Lehman Plan.

The Lehman Creditors are owed, collectively, approximately $1.9 billion secured by deeds of trust on certain of the Remaining Real Estate Projects, certain Cash Collateral and other Assets of the Debtors' Estates.  The Debtors have challenged the Lehman Creditors' Secured Claims, contending that (a) certain of the Lehman Creditors' Liens on the Assets of particular Debtors who are obligors under certain Lehman Loans are subject to being set aside because, among other things, other affiliated Debtors, rather than the obligor Debtors, received the benefit of such Lehman Loans (the Cross-Collateralization Claims), and (b) the Claims of the Lehman Creditors should be subordinated to the Claims of certain other Creditors allegedly harmed by the conduct of the Lehman Lenders (the Equitable Subordination Claims).  The Lehman Lenders do not concur with these conclusions of the Debtors and/or with many of the factual contentions asserted as supporting or providing a basis for the Cross-Collateralization Claims and/or Equitable Subordination Claims.

Nonetheless, to enable the Debtors to emerge from bankruptcy, which the Lehman Lenders believe is in the interest of all Creditors, with a Plan that is fair to all constituencies and best preserves current values and prevents further deterioration in the values of the Assets of the Debtors, the Lehman Proponents have proposed the Lehman Plan through which they:  (a) make available funds for ES Pro Rata Settlement Payments to settle the ES Claims of Settling ES Claimants; (b) propose, through the Lehman Plan Sale or Foreclosure Procedures, auctions of the Remaining Real Estate Projects at which third parties may bid for the Remaining Real Estate Projects and at which the Lehman Creditors and other Holders of Allowed Secured Claims may credit bid; (c) provide for the means of liquidation of the Remaining Other Assets and for the distribution of Residual Cash for Holders of both Allowed ES Claims and Allowed General Unsecured Claims; and (d) protect those ES Claimants who elect not to have the Estates settle their ES Claims by (i) making available the ES Litigation Loan to enable continued prosecution of the Equitable Subordination Claims in an ES Action, (ii) granting certain specific concessions, described below, that could facilitate the entry and collection of an ES Judgment, and (iii) providing security for satisfaction of a Project Related Action

Recovery.

### 9.2 The Liquidating Trustee.

The Estate of each Plan Debtor shall be managed after the Effective Date by the Liquidating Trustee, who, except as otherwise provided herein, shall oversee and effectuate the liquidation of the Remaining Other Assets, oversee and effectuate the sale and transfer or other disposition or liquidation of the Remaining Real Estate Projects and implement the Plan. The Liquidating Trustee shall be appointed by the Court upon nomination, if any, by a Committee and, in his or her capacity as such, shall be an agent of each Estate and not a separate taxable entity therefrom. Compensation of the Liquidating Trustee shall be reasonable hourly compensation payable from the Plan Debtors' Estates after prior notice to, *inter alia*, the Lehman Lenders, Committee members, and U.S. Trustee and after order of the Bankruptcy Court. The Bankruptcy Court may, by order, replace the Liquidating Trustee in its reasonable discretion. After the Effective Date, the Liquidating Trustee, *inter alia*, will cooperate in granting, perfecting or reflecting perfection of any Liens acknowledged or created or provided for under the Plan, will complete the claims process, will resolve or abandon any objections to Claims, will liquidate and/or distribute assets and will resolve or dismiss any Litigation Claims which are not waived in the Plan, all in accordance with the Plan.

### 9.3 Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee.

Except as otherwise provided herein or any agreement, instrument or other document relating hereto, on and after the Effective Date, all property of each Plan Debtor's Estate shall vest in each respective Estate, free and clear of all Liens. Except as may be provided herein, on and after the Effective Date, the Liquidating Trustee may operate the business of each Estate and may use, acquire or dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. On motion to the Bankruptcy Court and consent of the Lehman Lenders, the Liquidating Trustee may elect hereafter to abandon to the Plan Debtors Assets of inconsequential value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 9.4 The Committee(s).

On the Effective Date, the Voluntary Debtors' Committee and the Trustee Debtors' Committee shall continue to serve the applicable Estates of the Plan Debtors and shall be entitled to retain, employ and compensate Professionals in order to assist with the obligations and rights of the Committees under the terms of the Lehman Plan (with compensation to be paid by the Liquidating Trustee from the Post-Confirmation Account(s)), provided that the duties of the Committee(s) after the Effective Date shall be limited to monitoring the Plan's implementation. The Liquidating Trustee shall reimburse members of the Committee without further Court Order required for their reasonable out-of-pocket expenses incurred after the Effective Date for mileage, parking, or other incidentals incurred in performing their duties as members of the Committee.

### 9.5 Lehman Post-Confirmation Loans.

### 9.5.1 Amount and Uses of Lehman Post-Confirmation Loans.

On and after the Effective Date, the Lehman Lenders, or certain of them as described herein, will make funding available to the Liquidating Trustee, in the form of one or more loans, from either or both new Cash transfers from or on behalf of a Lehman Related Party (of up to a maximum of $5 million) or by permitting the use of Cash Collateral of a Lehman Creditor, including, without limitation, all or a portion of the Ritter Cash, for the following purposes and in the following amounts, provided that the proceeds of a Lehman Post-Confirmation Loan may not be utilized to pay any Lehman Post-Confirmation Expenses:

(a) Allowed Professional Fees of the insolvency counsels for the Trustee and the Committees up to the aggregate amount of $500,000 to be made after payments from the Lehman Administrative Loans and Available Cash from the Post-Confirmation Account(s) have been exhausted;

(b) Payments in satisfaction of Allowed Priority Claims up to the amount of $35,000 after Available Cash in the Post-Confirmation Account(s) have been exhausted;

(c) Funding for or relating to the ES Litigation Expenses solely from proceeds from the ES Litigation Loan;

(d) All amounts required to address critical and urgent health and safety issues on

52063-001
DOCS_LA:205341.9

the Projects (other than 10000 Santa Monica Project) until the expiration of the earlier of (i) the date that such Project is no longer an Asset belonging to an Estate of a Plan Debtor, or (ii) thirty (30) days following the auction of such Project to occur pursuant to the Lehman Plan Sale or Foreclosure Procedures, up to the aggregate amount of $400,000 after payments made from the Post-Confirmation Accounts have been exhausted;

(e) Payments in satisfaction of the Lehman Administrative Loans (provided that (i) payment thereof first has been made from all Cash of the Plan Debtors' Estates that is not Cash Collateral of a Lehman Creditor, with any such use of Cash of one Plan Debtor's Estate for another booked as a Post-Confirmation Date intercompany payable by the borrowing Plan Debtor's Estate and (ii) the Lehman Lenders may elect prior to receipt of payment thereupon to defer receipt thereof and be paid otherwise as provided herein for such Lehman Administrative Loans);

(f) Obligations with respect to the Remaining Real Estate Projects while owned by the Estates, to the extent requested by the Lehman Lenders holding or representing the Holder of an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders;

(g) Obligations with respect to the PRA Security Projects that are part of the PRA Recovery Security Pool and therefore serve as collateral for a Project Related Action Recovery to the extent requested by the Lehman Lenders or Lehman Nominee holding an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders; provided, however, that repayment of a loan made for a purpose set forth in this subparagraph shall be limited in recourse to an offset against any ES Judgment; and

(h) To the extent that the Liquidating Trustee is unable to otherwise fund them, all additional obligations of the Liquidating Trustee (in such capacity) that arise on or after the Effective

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Date to the extent that both their incurrence is necessary for implementation of the Lehman Plan and they become due and payable in Cash during the term of the Lehman Post-Confirmation Loans other than and excluding (i) those obligations of the type or nature (regardless of amount) already set forth in subsection (a) through (d) above and (ii) those obligations covered in any portion by insurance or for which obtaining insurance would have been reasonable, appropriate and customary.

### 9.5.2    Cash Collateral of a Lehman Creditor.

Cash Collateral of Lehman Creditors shall be available as funding for (i) loans to the Liquidating Trustee and Plan Debtors' Estates as and to the extent set forth in the preceding numbered Section of the Plan and (ii) for payment of the ES Pro Rata Settlement Payments.  At any time, the Liquidating Trustee, as directed by a Lehman Lender, shall use Cash Collateral of the Lehman Creditors to repay a Lehman Post-Confirmation Loan that was made other than from the use of Cash Collateral.

Also, upon disposition of collateral of a Lehman Creditor or of a PRA Security Project that results in proceeds being deposited to the Plan Reserve, or upon turnover of Cash Collateral to the Plan Reserve, a Lien in favor of the applicable Lehman Creditor shall attach to (or remain upon) such proceeds and/or Cash Collateral held in the Plan Reserve, subject to a final settlement or determination of the Project Related Actions.

Further, at the election of a Lehman Lender and to facilitate its extension of credit under the Plan, as to any payment that was to be made with funds comprising Cash Collateral of a Lehman Creditor, the Lehman Lender may direct the Liquidating Trustee to instead use the funds from a Lehman Post-Confirmation Loan in the form of new Cash from a Lehman Lender and to pay a like amount of Cash Collateral securing a Lehman Loan towards a reduction of such Lehman Loan, as the Lehman Lender directs, provided, however, that such use of Cash Collateral shall not itself be a Lehman Post-Confirmation Loan and, if such use occurs before termination of the Lehman Post-Confirmation Loan, the $5 million maximum Cash commitment of the Lehman Lenders with respect to the Lehman Post-Confirmation Loans shall increase by the amount of Cash Collateral so used to pay a Lehman Loan.

### 9.5.3     Terms and Documentation of Lehman Post-Confirmation Loans.

The Liquidating Trustee shall reasonably execute all documents reasonably requested by a Lehman Lender to evidence the Lehman Post-Confirmation Loan and the Liens securing it on terms and in a form reasonably requested by such Lehman Lender, with customary and reasonable provisions for interest, fees and expenses thereupon. The Lehman Post-Confirmation Loan is Allowed in the amount of all funding by or on behalf of any Lehman Lender with respect thereto plus interest, fees, expenses and other charges as provided herein and in the documentation thereof. The Lehman Post-Confirmation Loan shall be an obligation of the Liquidating Trustee, payable as provided herein and secured by a self-effectuating, first priority Lien on the Post-Confirmation Accounts, Plan Reserve and all proceeds of the Plan Debtors' Assets. The Lehman Post-Confirmation Loan is payable as set forth under the Lehman Plan, provided that, in all events, the Lehman Post-Confirmation Loan shall terminate and the Liquidating Trustee shall pay the Lehman Post-Confirmation Loan and all related interest, fees, expenses and other charges in full no later than sixty (60) days following the settlement and/or final determination of the Project Related Actions; provided, further, that to the extent such Lehman Post-Confirmation Loan is made with funds comprising Cash Collateral of a Lehman Creditor and any applicable Lehman Creditor's Claim secured by a Lien upon such Cash Collateral is subordinated or set aside by a Project Related Action Recovery, repayment of such portion of the Lehman Post-Confirmation Loan funded with funds comprising Cash Collateral, or interest thereon, shall be effectuated by offset, dollar for dollar, against the benefits, recoveries and proceeds otherwise afforded by such Project Related Action Recovery.

### 9.6     Plan Reserve and Post-Petition Accounts.

In order to, among other things, provide for a source of recovery in respect of Non-Settled ES Claims should an ES Judgment be obtained for the benefit of the Holders of such Non-Settled ES Claims, and in respect of the applicable Estates and their Creditors should a Cross-Collateralization Judgment be obtained for the benefit of such Creditors, the Lehman Lenders are making available Cash on which the Lehman Creditors claim a Lien. Specifically, (a) on the Effective Date, all Cash of the Estates of the Plan Debtors not otherwise distributed in accordance

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with the Plan shall be held by the Liquidating Trustee either in the Plan Reserve or a Post-Confirmation Account pending payment of any Post-Confirmation Expenses or distribution in accordance with the Plan, (b) on and after the Effective Date, all Cash Collateral of the Lehman Creditors shall be deposited by the Liquidating Trustee into the Plan Reserve, pending distribution or payment in accordance with the Plan, (c) all new Cash transfers from or on behalf of a Lehman Lender that are proceeds of or comprising a Lehman Post-Confirmation Loan shall be deposited in or held in the Plan Reserve until utilized in accordance with the Lehman Plan, and (d) on and after the Effective Date, the Lehman Lenders shall have a Lien and / or retain their Lien on all Cash in the Plan Reserve, which Cash also shall serve, among other things, as a reserve for satisfaction of a Project Related Action Recovery and shall be a component of the PRA Recovery Security Pool. The applicable Lehman Creditor shall report the Cash Collateral held in the Plan Reserve as being owned by it for all applicable federal, state and local income tax purposes. The Liquidating Trustee shall distribute, or cause to be distributed, forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

### 9.7 Disposition of Assets

The Assets of the Estates of the Plan Debtors consist primarily of certain Remaining Real Estate Projects and certain Cash that is Cash Collateral for Lehman Secured Claims. There also may be certain Remaining Other Assets, including Litigation Claims. (Litigation Claims possibly could result in affirmative recoveries for the Estates or possibly could reduce the size of the Creditor Claims to share in available Cash for distribution.)

### 9.7.1 Litigation Claims, Net Cash Litigation Recoveries and Remaining Other Assets.

The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee, and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors in accordance with the Plan. Pursuant to Section 1123(b)(3) of the Bankruptcy Code and subject to the compromises, waivers and releases provided herein, the Liquidating Trustee shall retain all Litigation Claims whether or not pending on the Effective Date. Unless a Litigation Claim

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

is expressly waived, relinquished, released, compromised or settled in the Lehman Plan or in a Final

Order, all rights with respect to such Litigation Claims are reserved and the Liquidating Trustee may

pursue such Litigation Claims. The Liquidating Trustee shall not settle or abandon a Litigation

Claim valued at greater than $100,000 without a Lehman Lender's consent and absent providing ten

(10) days' prior written notice and opportunity to object to the Committees; and the Lehman Lenders

may pursue any Litigation Claim for the applicable Estate or Estates that, upon request, the Trustee

does not agree to pursue. Any disputes concerning the settlement or abandonment of a Litigation

Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice

to the objecting party. All Net Cash Litigation Recoveries realized or obtained in respect of

Litigation Claims of the Estates shall be promptly deposited into the Post-Confirmation Account(s)

or Plan Reserve, as appropriate. Except as otherwise provided in the Lehman Plan and the

Confirmation Order, the Net Cash Litigation Recoveries shall be free and clear of all Liens and shall

only be expended in accordance with the provisions of the Lehman Plan.

### 9.7.2 Disposition of the Remaining Real Estate Projects.

The disposition of the Remaining Real Estate Projects or related Assets shall be as

follows:

### (a) Lehman Plan Sale or Foreclosure Procedures.

(i) Upon the Effective Date, the Liquidating Trustee shall market for sale the

Remaining Real Estate Projects and related Assets pursuant hereto.

(ii) Within sixty (60) days after the Effective Date, the Liquidating Trustee shall

hold auctions on such dates and at such times and places as is reasonably established by the

Liquidating Trustee, provided that all auctions shall occur no later than sixty (60) days after the

Effective Date. At the auctions, the Remaining Real Estate Projects and related Assets for which

there is a Successful Bidder shall be sold or conveyed to a third party purchaser, a Lehman Nominee,

or another Holder of an Allowed Secured Claim who submits a qualifying bid and becomes the

Successful Bidder in accordance herewith and pursuant to the further detailed procedures for such

bidding and auctions, which detailed procedures shall be in a form acceptable to the Lehman

Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved

by the Bankruptcy Court at or after the hearing on confirmation of the Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Lenders or other owners and the Liquidating Trustee or approval of the Bankruptcy Court (the "<u>Detailed Sale / Foreclosure Procedures</u>").

(iii)    Pursuant to Bankruptcy Code Section 363 and the Lehman Plan, at the auction of each Remaining Real Estate Project, such Remaining Real Estate Project and all associated personal property, including the applicable Plan Debtor's Estate's right, title and interest in, to and under any development agreements, plans, engineering reports and community facilities district bonds, shall be sold (if to a third party purchaser) or conveyed pursuant to judicial foreclosure by virtue of the Confirmation Order (if to a Holder of an Allowed Secured Claim) to the highest bidder or its nominee free and clear of any Encumbrances (other than the Permitted Liens) with such Encumbrances (other than the Permitted Liens) not paid in connection with the transaction to attach to the consideration to be received by the Liquidating Trustee in the same priority and subject to the same defenses and avoidability, if any, as before the closing of the transaction.  The Liquidating Trustee shall obtain a hearing date from the Bankruptcy Court at which the Bankruptcy Court shall issue an Order approving such sales or conveyances to the extent consistent herewith and order that such sale or conveyance shall be free and clear of all Encumbrances (other than Permitted Liens) in accordance herewith.  Consistent with each particular bid, debts and obligations secured by existing Encumbrances on said Remaining Real Estate Projects or related property at the time of sale or conveyance either shall be paid in full upon such sale or conveyance, attach to the Net Cash Proceeds with the same validity, priority and extent to which they attach to the underlying collateral (such as would occur with respect to the Lehman Secured Claims upon a sale to a third party purchaser) or be unimpaired in which case the Remaining Real Estate Projects or other assets sold or conveyed shall remain encumbered by the Encumbrances thereon securing the unimpaired debts and obligations and such Encumbrances would be Permitted Liens.

(iv)    Subject to the terms of the Lehman Plan, the respective Lehman Creditors commit to credit bid the following "Initial Bids" at the auctions as to the indicated Assets and may elect hereafter to make the following "Contingent Bids" at the auctions with respect to the indicated

Assets as set forth in the following table:

| LEHMAN CREDITORS' INITIAL BIDS AND CONTINGENT BIDS | | | | | |
|---|---|---|---|---|---|
| **Initial Bid #; Cont. Bid Letter** | **Class** | **Claims** | **Plan Debtor and Basis for Claim** (*i.e.*, **Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
| 1 | Class 2.3 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal Emerald; SunCal Emerald: 7 | Emerald Meadows Project | Initial Bid: $12 Million |
| 2 | Class 2.4 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal Bickford; SunCal Bickford: 16 | Bickford Ranch Project | Initial Bid: $29.5 Million |
| 3 | Class 2.6 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31. | Palmdale Hills; Palmdale Hills 65 | Ritter Ranch Project | Initial Bid: $42.9 Million |
| 4 | Class 2.12 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64. | SunCal Oak Knoll; SunCal Oak Knoll: 12 | Oak Knoll Project | Initial Bid: $48 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| 5 | Class 2.13 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15. | SunCal Torrance; SunCal Torrance: 4 | Del Amo Project | Initial Bid: $25 Million |
| 6 | Class 2.14 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48. | Delta Coves; Delta Coves 21 | Delta Coves Project | Initial Bid: $25.2 Million |
| 7 | Class 2.15 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | SunCal Heartland; SunCal Heartland: 9 | Marblehead Project | Initial Bid: $187.5 Million |
| 8 | Class 2.16 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15. | SunCal Marblehead; SunCal Marblehead: 21 | Heartland Project | Initial Bid: $7.9 Million |
| 9 | Class 2.17 | Allowed Secured Claim of OVC Holdings against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63. | SunCal Oak Valley; SunCal Oak Valley 16 | Oak Valley Project | Initial Bid: $20.9 Million |
| 10 | Class 2.18 | Allowed Secured Claim of Northlake Holdings against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88. | SunCal Northlake; SunCal Northlake 6 | Northlake Project | Initial Bid: $23 Million |

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| 11 | Class 2.19 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SunCal PSV arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20. | SunCal PSV; SunCal PSV 12 | Palm Springs Village Project | Initial Bid: $13.8 Million |
|---|---|---|---|---|---|
| A | Class 2.1 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal I arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal I; SunCal I: 1 | SunCal Beaumont's Beaumont Heights Project | Contingent Bid: $1.2 Million |
| | | | | SunCal Johannson's Johannson Ranch Project | Contingent Bid: $2.1 Million |
| | | | | SunCal Summit Valley's Summit Valley Project | Contingent Bid: $750,000 |
| B | Class 2.2 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | Acton Estates; Acton Estates: 6 | Acton Project | Contingent Bid: $3.4 Million |
| C | Class 2.5 | Allowed Secured Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06. | SunCal Summit Valley; SunCal Summit Valley: 12 | Ownership Interests of Kirby Estates and Seven Brothers in Summit Valley Project | Contingent Bid: $1.075 Million |
| D | Class 2.9 | Allowed Secured Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59. | SCC Communities; SCC Communities: 9 | Joshua Ridge Project | Contingent Bid: $1 Million |

52063-001
DOCS_LA:205341.9

| E | Class 2.11 | Allowed Secured Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59. | Tesoro; Tesoro: 7 | Tesoro Project | Contingent Bid: $1.5 Million |
|---|---|---|---|---|---|

(v)     Qualifying bids by third party purchasers must be bids for payment in Cash. Other Holders of Allowed Secured Claims may credit bid such amount of their Allowed Secured Claims as agreed with the Liquidating Trustee or fixed by the Bankruptcy Court, in each case on a Project by Project basis.  The bids of such other Holders of Allowed Secured Claims and third party purchasers must comply with and be made consistent with the Detailed Sale / Foreclosure Procedures.  If a qualifying bid or bids are received for any Project within forty-five (45) days after the Effective Date, such bids shall be Filed with the Bankruptcy Court by the Liquidating Trustee.

(vi)     The Initial Bids and, if made by any Lehman Creditor (and subject to the following), the Contingent Bids, and any increased bids thereof by Lehman Creditors up to the outstanding amount of the applicable Lehman Loans as set forth in Article 7.5 of the Lehman Plan, each shall be deemed fully qualifying and eligible bids for all purposes of such auctions and the Detailed Sale / Foreclosure Procedures.  If no higher and better bid is made by another Holder of an Allowed Secured Claim or third party purchaser in accordance with the Detailed Sale / Foreclosure Procedures, the applicable Lehman Creditor shall be the Successful Bidder and the Liquidating Trustee shall convey the subject Project and related Assets to a Lehman Nominee in accordance herewith.  The Lehman Nominee shall report the subject Project and related Assets as being owned by it for all applicable federal, state and local income tax purposes.  If there is no Successful Bidder with respect to an Asset, the Liquidating Trustee need not sell or convey it pursuant to the Lehman Plan Sale or Foreclosure Procedures.

(vii)     The Initial Bids are in the amount of the Lehman Creditors' previously appraised values for the subject Projects.  The Contingent Bids are in the amounts of the Debtors' value estimates as set forth in the Debtors' Second Amended Disclosure Statement. The Contingent Bids relate to Assets as to which either (1) the Debtors have alleged that the Lien of the applicable Lehman Lender is subject to a Cross-Collateralization Claim or (2) a Lehman Lender holds a Lien

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

on the equity interest in the owner of the Project, but not directly upon the Project itself.

(viii)    Although a Lehman Creditor may at any time elect to bid Cash for an Asset on the same terms as other third parties, for bids made through the Initial Bids and, if the applicable Lehman Creditors elect to make them, bids made through the Contingent Bids, Creditors are protected, as and to the extent provided herein:

A.    Any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures pursuant to an Initial Bid or Contingent Bid or increased bid therefrom, as set forth above (each a "<u>PRA Security Project</u>") shall be encumbered by a PRA Recovery Deed of Trust and such Lehman Nominee shall execute a Reconveyance Agreement.

B.    Contingent Bids B, D and E, identified in the table above, relate to three Remaining Real Estate Projects as to which the Debtors have alleged that the Lien of the Lehman Lender is subject to a Cross-Collateralization Claim.  If a Lehman Creditor is a Successful Bidder pursuant to Contingent Bid B, D or E, a reconveyance obligation for a Cross-Collateralization Judgment will apply as to such Project as set forth herein and such obligation will be secured by a PRA Recovery Deed of Trust (which shall be released as provided herein).

C.    Contingent Bids A and C, identified in the table above, relate to three Remaining Real Estate Projects as to which a Lehman Lender holds a Lien on the equity interests in the owners of such Remaining Real Estate Projects, but not directly upon the Remaining Real Estate Projects.  Contingent Bids A and C are in the amount of the Debtors' estimate of value for the applicable Remaining Real Estate Project set forth in the Debtors' Second Amended Disclosure Statement.  They will include a Cash portion equal to the full amount of the bid, or, if less, 110% of the aggregate amount of all non-Lehman Creditor Claims against the particular Plan Debtor owning the subject Remaining Real Estate Project as estimated in the Debtors' Second Amended Disclosure Statement.  The Cash portions of Contingent Bids A and C, identified in the table above, for these three Remaining Real Estate Projects, divided among the five Plan Debtor owners thereof, are as follows:  Beaumont Heights Project (owned by SunCal Beaumont):  $689,200 Cash; Johannson Ranch Project (owned by SunCal Johannson):  $165,427 Cash; Summit Valley Project (the portion

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

owned by SunCal Summit Valley): $750,000 Cash (entire bid); Summit Valley Project (the portion owned by Kirby Estates): $2,000 Cash; and Summit Valley Project (the portion owned by Seven Brothers): $66,911 Cash.

(b)     **Net Proceeds from Sales of Remaining Real Estate Projects to Third Party Purchasers.**

If a Remaining Real Estate Project subject to a Lehman Lender's Lien is sold to a third party purchaser (rather than sold or conveyed to a Lehman Nominee), as to the Net Cash Proceeds therefrom, the Liquidating Trustee shall hold such Net Cash Proceeds in the Plan Reserve and, as to non-Cash Net Proceeds to the Liquidating Trustee therefrom, the applicable Lehman Lenders shall be afforded a substitute Liens on such non-Cash Net Proceeds.

(c)     **PRA Recovery Security Pool.**

(i)     **Generally.**

The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims. If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in an ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), and if a variety of other litigation hurdles were overcome, the values of the Remaining Real Estate Projects against which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding and may bid possibly would be available to satisfy the Project Related Action Recovery. Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (1) certain Cash is to be held by the Liquidating Trustee in the Plan Reserve and the remainder therefrom shall be available to satisfy such Project Related Action Recovery to the extent otherwise provided under the Lehman Plan and (2) any Remaining Real Estate Project that is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures shall be subject to a PRA Recovery Deed of Trust (collectively, the "PRA Recovery Security Pool."

At any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, by voluntary payment of a Lehman Related Party or otherwise, the Liquidating

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount.  At any time that all Project Related Actions that were timely Filed and Filed no later than sixty (60) days following the Effective Date either (I) have been dismissed with prejudice and/or settled or (II) the Project Related Action Recovery with respect thereto as against the applicable Lehman Related Parties has been fully satisfied, the Liquidating Trustee, upon the request of the applicable Lehman Related Parties, shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve.

### (ii)    PRA Recovery Deeds of Trust.

Upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale or Foreclosure Procedures, the Lehman Lenders will cause the applicable Lehman Nominees taking title to the applicable PRA Security Project to record a PRA Recovery Deed of Trust.  The Liquidating Trustee shall be the named beneficiary under any PRA Recovery Deed of Trust and, in his or her sole discretion, may delay, defer or waive receipt of the benefits or the recording thereof as to one or more Remaining Real Estate Projects. Each PRA Recovery Deed of Trust is being given solely for the purpose of creating a Lien on the applicable PRA Security Project to be part of the PRA Recovery Security Pool and nothing contained therein shall in any way restrict or interfere with the rights of the owner of such PRA Security Project, including, without limitation, such owner's right to own, manage, operate, improve, sell, convey, refinance, encumber and otherwise deal with such PRA Security Project.

Each PRA Recovery Deed of Trust shall secure the non-recourse obligation of each Lehman Nominee who is the owner of each relevant PRA Security Project to reconvey the applicable PRA Security Project to the Liquidating Trustee in the event of a Project Related Action Recovery, subject to the terms of the Reconveyance Agreements and subject to the option of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Nominee to pay in Cash the amount of the Project Related Action Recovery in lieu of effectuating such reconveyance. In aggregate, the PRA Security Deeds of Trust secure an amount not in excess of the Maximum DOT Security Amount.

Each PRA Recovery Deed of Trust shall also provide that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above (the "Negative Covenant"). If such Lehman Nominee fails to comply with the foregoing Negative Covenant for thirty (30) days following written notice and an opportunity to cure, then the Liquidating Trustee shall have the right to seek damages against Lehman ALI and Lehman Commercial, jointly and severally, and any claims arising from the pursuit of such remedies shall be treated as administrative expense claims in Lehman Commercial's bankruptcy case and, if Lehman ALI is then subject to its own bankruptcy proceeding, Lehman ALI shall use its best efforts to afford the same administrative priority to such claims in any such bankruptcy case. Any payments made or assets seized in satisfaction of any judgment based on such damage claims shall be deposited into the Plan Reserve. In addition, if a Lehman Nominee fails to pay or cause to be paid any property taxes or assessments due and payable with respect to the PRA Security Project owned by such Lehman Nominee on or prior to the date which is six (6) months prior to the earliest date on which a foreclosure of such PRA Security Project could be effectuated for non-payment of property taxes or assessments, then the Liquidating Trustee shall have the right to make a protective advance for the payment of such taxes or assessments and to foreclose upon the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable PRA Recovery Deed of Trust encumbering such PRA Security Project in order to repay any such outstanding protective advance; provided that any proceeds of any such foreclosure sale and any interest acquired by the Liquidating Trustee in connection with any such foreclosure sale shall be deposited into the Plan Reserve pending the completion of the Project Related Actions.

**(iii)**     <u>**Reconveyance Agreements.**</u>

The non-recourse performance obligations for turnover and reconveyance of each PRA Security Project secured by the applicable PRA Recovery Deed of Trust shall be in a writing (each, a "<u>Reconveyance Agreement</u>"), which writing is to be executed by the applicable Lehman Nominee that takes ownership of the subject PRA Security Project and shall be in a form acceptable to the Lehman Lenders or Lehman Nominee and Liquidating Trustee or as reasonably proposed by the Lehman Lenders or Lehman Nominee and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner of the applicable PRA Security Project and Liquidating Trustee or approval of the Bankruptcy Court. At a Lehman Nominee's election, such non-recourse obligations, instead may be satisfied by a Cash payment in the amount of any applicable Project Related Action Recovery.

The obligations to reconvey a particular PRA Security Project following the occurrence of, and in satisfaction of, a Cross-Collateralization Judgment or an ES Judgment are distinct. The reconveyance obligation with respect to an ES Judgment shall be included in each Reconveyance Agreement. The reconveyance obligation with respect to a Cross-Collateralization Judgment shall be included only in the Reconveyance Agreement related to the PRA Security Project as to which a Cross-Collateralization Claim is alleged in a Cross-Collateralization Action. The benefits of the reconveyance obligations with respect to ES Judgments, if any, are themselves to be cross-collateralized, to the extent provided herein, by virtue of the concessions being made by the Lehman Creditors to benefit Non-Settling ES Claimants as described in Section 9.8.3(b) of the Plan. A reconveyance obligation with respect to a Cross-Collateralization Judgment, if any, shall only apply with respect to the particular PRA Security Project as to which the Lien of the applicable Lehman Creditor is avoided by the Cross-Collateralization Judgment and the benefits thereof, if any,

only shall inure to the Holders of Allowed Claims against the Plan Debtor that owned such PRA Security Project as provided in Section 9.9.2 of the Plan. Nonetheless, for PRA Security Projects as to which the Reconveyance Agreement contains obligations to reconvey for both an ES Judgment and a Cross-Collateralization Judgment, the distribution priorities as to the Net Cash Proceeds from the disposition of the reconveyed PRA Security Project, set forth in Section 9.9.2 of the Plan, give priority to the Cross-Collateralization Judgment, which in theory would be setting aside the Lien as to which the related ES Judgment seeks to transfer the now extinguished benefits.

**(iv)**     **<u>Release of PRA Recovery Deeds of Trust.</u>**

The PRA Recovery Deeds of Trust generally shall remain in effect pending the final settlement or determination of the Project Related Actions. Thus, all PRA Recovery Deeds of Trust shall be released and reconveyed and all Reconveyance Agreements shall be terminated upon:

(A)     the dismissal, with prejudice, and/or settlement of all Project Related Actions against the applicable Lehman Related Parties, or

(B)     full satisfaction of each Project Related Action Recovery as against the applicable Lehman Related Parties.

Additionally, in order to permit the Lehman Nominees holding title to the PRA Security Projects to fully utilize such properties: <u>all</u> of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated at such time as the balance of funds in the Plan Reserve is equal to the Maximum PRA Recovery Amount; and the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be released and the corresponding Reconveyance Agreement terminated upon the sale of such Project to a third party and the deposit of any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale; and the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash Proceeds derived from such refinancing are deposited into the Plan Reserve.

Whenever Lien releases or subordinations are required, the Liquidating Trustee shall act reasonably in arranging to provide, and in executing such documents as the applicable Lehman Nominee reasonably requests to effectuate, the reconveyance in full of the PRA Recovery Deeds of Trust.

### (v)  Reduction of Maximum PRA Recovery Amount.

The Maximum PRA Recovery Amount, which serves as the maximum aggregate amount secured by the PRA Recovery Security Pool, is an amount intended to be not less than the maximum potential cash value of the Project Related Action Recovery.  For the calculation of the Maximum PRA Recovery Amount, the definition thereof herein includes, unless rebutted with lower figures, presumptions that the maximum cash value of the potential Project Related Action Recovery for Cross-Collateralization Judgments is $1.74 million and for ES Judgments is $200 million.  If, however, a Lehman Lender Files a motion with the Bankruptcy Court and provides relevant evidence, as follows, the Maximum PRA Recovery Amount shall be reduced accordingly:

(i)  to replace the amount used in subparagraph (a) of the definition of Maximum PRA Recovery Amount (Section 0 of the Plan), the Bankruptcy Court must find that a lower number results upon determining (I) the lesser of (A) the maximum cash value, if any, of the Lehman Secured Claims alleged to be subject to being set aside pursuant to a Cross-Collateralization Judgment, which Secured Claims are against any of the Acton Project, Joshua Ridge Project or Tesoro Project as is conveyed to a Lehman Nominee upon a credit bid and (B) the maximum Claims (other than Claims of Lehman Creditors) against Acton Estates, SCC Communities or Tesoro (as to which Plan Debtors, there are pending Cross-Collateralization Claims in a pending Cross-Collateralization Action against a Lehman Related Party and the Project owned by such Estate has been conveyed to a Lehman Nominee pursuant to a credit bid), and (II) subtracting from such amount the value of all direct or indirect benefits to the subject Plan Debtor resulting from the subject Lehman Loan; and/or

(ii)  to replace the amount used in subparagraph (b)(i) of the definition of Maximum PRA Recovery Amount (Section 0 of the Plan), the Bankruptcy Court finds that a lower number results upon determining (I) the lesser of (A) the maximum cash value of the Lehman Secured Claims in the Plan Debtors' Assets that are alleged to be subject to subordination pursuant

52063-001
DOCS_LA:205341.9

to an ES Judgment and (B) the maximum Claims (other than Claims of Lehman Creditors) against the Plan Debtors (as to which there are pending allegations in an ES Action that a Lehman Secured Claim is subject to subordination).

**(d)      Sale or Refinance of PRA Security Projects.**

(i)      The Lehman Nominee(s) will have full right to sell and/or refinance the PRA Security Projects in all respects after the conveyance thereof to the Lehman Nominee(s) pursuant to the Lehman Plan Sale or Foreclosure Procedures without any interference by the Liquidating Trustee, SunCal, the Trustee, the Debtors or any of their respective Affiliates or any ES Claimants or other Creditors of the applicable Plan Debtors.

(ii)      If any particular PRA Security Project is thereafter sold by a Lehman Nominee other than to a Lehman Related Party, (a) the Liquidating Trustee shall release the PRA Recovery Deed(s) of Trust as to such PRA Security Project, (b) the Net Cash Proceeds derived from such sale shall be deposited into the Plan Reserve, and (c) the Lehman Nominee shall grant the Liquidating Trustee a substitute Lien in any non-Cash Net Proceeds received by such Lehman Nominee to become part of the PRA Recovery Security Pool and to be subject to the same terms as other PRA Recovery Deeds of Trust.

(iii)      If any particular PRA Security Project is refinanced by the Lehman Nominee, (a) the Liquidating Trustee shall agree to subordinate the PRA Recovery Deed(s) of Trust as to such PRA Security Project so as to permit the imposition on the PRA Security Project of a new senior refinancing Lien, and (b) the Net Cash Proceeds derived from such refinancing shall be deposited into the Plan Reserve.

(iv)      If any particular PRA Security Project is sold by a Lehman Nominee to another Lehman Related Party, then either (x) such sale may be made subject to the PRA Recovery Deed(s) of Trust (which shall be mandatory if the transferee is a Lehman Creditor Party), or (y) all of the following shall apply:  (1) there shall be deposited into the Plan Reserve all Net Cash Proceeds received by the Lehman Nominee in connection with such transfer, (2) the Liquidating Trustee shall be granted a substitute Lien on any non-Cash Net Proceeds received by a Lehman Nominee in connection with such transfer and (3) a Lien either (I) against the equity interest in the

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

joint venture or similar entity of the Lehman Nominee or (II) against the most direct interest held by a Lehman Nominee, shall be granted to the Liquidating Trustee and the Lien so granted shall become part of the PRA Recovery Security Pool and be subject to the same terms as the PRA Recovery Deeds of Trust.

(v)     As to any Remaining Real Estate Projects not sold or conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures:  (i) they shall be otherwise liquidated by the Liquidating Trustee or may be abandoned or surrendered with the consent of the Lehman Lenders and after approval of the Bankruptcy Court; (ii) such Remaining Real Estate Projects may be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of an Allowed Secured Claim with respect thereto consents; (iii) the Holder of any such Allowed Secured Claim (including any applicable Holder of any Lehman Secured Claim) shall receive at least thirty (30) days' prior notice of any proposed sale and may elect to credit bid in response to such notice up to the full amount of its Claim for which the item being sold is collateral (without the amount bid being limited to the value of the Holder's interest in such collateral); (iv) if the Remaining Real Estate Project is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, the Net Cash Proceeds (and any non-Cash Net Proceeds) therefrom shall be paid or turned over to the Holders of Allowed Secured Claims against such Remaining Real Estate Project up to the full amount of each such Holder's Allowed Claim (or used in payment of other Claims as otherwise set forth in the Lehman Plan in respect of the treatment of such Allowed Secured Claims) and any remaining Net Cash Proceeds shall be used to pay other obligations of the applicable Plan Debtor's Estate in the priorities set forth in Section 9.9.2(b) of the Plan.

**9.8     Equitable Subordination Claims**

**9.8.1     Generally.**

As set forth in Section 7.6.8, ES Claimants are afforded the option to vote either for acceptance of the ES Settlement Offer and the specified benefits it provides or to have the Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 9.8.2  ES Settlement Offer.

        (a)        **Payments to ES Settling Claimants.**

        The Settling ES Claimants are to receive the ES Pro Rata Settlement Payments as and to the extent set forth in Section 7.6.8 of the Plan.

        (b)        **Releases and Assignments.**

        In exchange for the ES Pro Rata Settlement Payments:  (A) the Liquidating Trustee will issue an Estate ES Settlement Release as to each Estate in which any Settling ES Claimant holds its Allowed ES Claim; (B) each Settling ES Claimant will issue an ES Claimant Release and Assignment; and (C) if there is Estate Acceptance of the ES Settlement as to all applicable Estates of the ES Plan Debtors, the Liquidating Trustee also will dismiss (with prejudice), as to the Estates of all ES Plan Debtors, any ES Action, with each party to bear its own costs and fees.

        (c)        **Estate ES Settlement Release.** In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors herein, shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

### (d)     ES Claimant Release and Assignment.

In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote, on behalf of itself and its Affiliates, shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of such Settling ES Claimant or to the extent that the Net Cash Litigation Recoveries therefrom

would be payable in respect of the ES Claims of such Settling ES Claimant (collectively, the "ES Claimant Released Claims"), from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the Estate against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties, and, to the extent such ES Claimant Released Claims are owned by the Estate of a Plan Debtor and cannot be released by the ES Claimant, assigns to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the Settling ES Claimant with respect to such ES Claimant Released Claims, including the Litigation Recoveries that otherwise would be due therefrom to, or attributable to the ES Claims of, the Settling ES Claimants.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and all successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Settling ES Claimant by Vote in the form set forth on, or attached to, the Ballot.

### 9.8.3 Continued Prosecution of Equitable Subordination Claims.

Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(with prejudice), release and settlement of all Equitable Subordination Claims as to all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in an ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of and attributable to the ES Claims of any Non-Settling ES Claimants, subject to the Plan Release and as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender elects to pay Cash in lieu thereof.

(a)     **ES Litigation Loan.**

(i)     Unless the Equitable Subordination Claims in an ES Action are fully settled as to all ES Plan Debtors' Estates (*i.e.*, there is Estate Acceptance of the ES Settlement for all ES Plan Debtors' Estates), a Lehman Lender will make available to the Liquidating Trustee the ES Litigation Loan in the aggregate principal amount of up to $1 million for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination Claims.  The ES Litigation Loan will accrue interest at a 10% annual rate (compounded annually).  The proceeds of the ES Litigation Loan may be used solely for the payment of ES Litigation Expenses if and only if there is no Available Cash in the Post-Confirmation Accounts to fund the ES Litigation Expenses and SunCal and its principals decline to continue paying the cost of prosecuting the Equitable Subordination Claims in an ES Action.

(ii)     The ES Litigation Loan shall be made available by a Lehman Lender to the Liquidating Trustee as the ES Litigation Expenses are incurred and shall be funded no more frequently than on a monthly basis.  The Liquidating Trustee shall provide the Lehman Lender with reasonable substantiation and backup (including invoices and statements from the parties to be paid) for any ES Litigation Expenses to be paid with the proceeds of the ES Litigation Loan in connection with any request to the Lehman Lender for an advance of proceeds of the ES Litigation Loan; provided, however, that the Liquidating Trustee shall not be required to provide any substantiation or backup to the Lehman Lender that discloses, directly or indirectly, information or communications that are subject to attorney-client privilege or attorney work product or contains any other privileged or confidential information or strategies of the Liquidating Trustee with respect to an ES Action.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(ix)     ES Litigation Proceeds shall be made available to pay Allowed Non-Settled ES Claims only after repayment of the ES Litigation Loan, together with interest thereon at an annual, compounded rate of interest equal to 10%; provided, that such repayment may be made without any prejudice to the right of the prevailing party to seek reasonable fees and costs from the non-prevailing party in an ES Action. Such repayment shall be from sources other than Cash Collateral to which the applicable Lehman Creditor otherwise is entitled.

(ix)     At the election of a Lehman Lender, (1) the ES Litigation Loan may be funded from Cash Collateral of a Lehman Creditor, (2) the ES Litigation Loan may be funded from a transfer of new Cash from a Lehman Lender or (3) a Lehman Lender may direct that the Liquidating Trustee use, for the ES Litigation Loan, funds in the form of new Cash from one or another Lehman Creditor and pay a like amount of Cash Collateral securing a Lehman Loan towards reduction of such Lehman Loan, as the Lehman Lender directs.

**(b)     Concessions by Lehman Lenders' to Facilitate Collection of ES Judgments.**

Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in an ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

**(1)     Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtor's Projects Are to be Collateral for Equitable**

**Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.** For some particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against those Estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Judgment as to other ES Plan Debtors' Estates.

(2) **To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.** As to the Estates of Del Rio and SJD Partners only, the Lehman Creditors will waive an objection or defense, that, even were the applicable Lehman Secured Claim ignored, there was insufficient value in those Estates to pay their Allowed ES Claims, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied, and (II) the applicable Estate executes the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**9.9** **Post-Petition Expenses, Intercompany Loans and Payables and Priorities in Payment.**

**9.9.1** **Post Confirmation Expenses and Intercompany Loans.**

All Post-Confirmation Expenses may be paid by the Liquidating Trustee from the Post-Confirmation Account(s) upon ten (10) days' prior written notice and opportunity to object provided to the Lehman Lenders, the Committee(s), the Holders of Lehman Disputed Secured Claim(s), or with their consent, but without further notice to other Creditors or Holders of Interests, or approval of the Bankruptcy Court. Any disputes concerning the payment of Administrative and Post-Confirmation Expenses shall be submitted to the Bankruptcy Court for resolution. To the extent readily determinable, Post-Confirmation Expenses attributable to a particular Plan Debtor

shall be paid from that Plan Debtor's Assets consistent with the provisions of the Lehman Plan. To the extent of available Assets from each Plan Debtor, other Post-Confirmation Expenses shall be payable by each Plan Debtor Pro Rata consistent with the Lehman Plan, provided that after a Plan Debtor's available Cash or Assets are exhausted, the other Plan Debtors shall absorb such Plan Debtor's share of unpaid Post-Confirmation Expenses as provided in the Lehman Plan, which shall be Pro Rata to the extent reasonably possible. To the extent one Plan Debtor advances funds on behalf of another, the Liquidating Trustee shall book a receivable for the advancing Debtor and a payable for the borrowing Debtor.

### 9.9.2 Payables and Priorities in Payment.

Recoveries from the following sources as to which there are no unsubordinated Secured Claims shall be applied in the following manner:

(a) **Funds Constituting ES Litigation Proceeds.**

ES Litigation Proceeds of a particular Estate (unless they are or may also be a Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment) shall be applied in the following order of priority until exhausted:

(i) First, to payment of the ES Litigation Loan;

(ii) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the unpaid Lehman Post-Confirmation Loans;

(iii) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iv) Fourth, to repayment of any post-Confirmation Date intercompany payables,

(v) Fifth, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment until paid the full amount of their Allowed ES Claims;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(vi)     Sixth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment, payable Pro Rata among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of the Lehman Post-Confirmation Loans and next to pay such Allowed ES Claims until paid in full; and

(vii)    Seventh, to the applicable Lehman Creditors.

**(b)      Various Other Funds, Including Funds Constituting a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

a.      A Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment (unless it also may become ES Litigation Proceeds based upon a pending ES Action),

b.      any Net Cash Proceeds from the sale or disposition of Remaining Other Assets or otherwise, including Net Cash Litigation Recoveries and other funds in the Post-Confirmation Accounts, and

c.      any repayment of a post-Confirmation Date intercompany payable, shall be applied in the following order of priority until exhausted:

(i)      First, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the Lehman Post-Confirmation Loan;

(ii)     Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iii)    Third, to repayment of any post-Confirmation Date intercompany payables,

(iv)     Fourth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(v)      Fifth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of the unpaid Lehman Post-

52063-001
DOCS_LA:205341.9

Confirmation Loans (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(vi)     Sixth, to pay, in the discretion of the Liquidating Trustee, an accelerated payment for Tax Claims; and

(vi)     Seventh, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan.

(c)     **Funds that Constitute Both ES Litigation Proceeds and a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

ES Litigation Proceeds of a particular Estate that also are a Project Related Action Recovery of such Estate with respect to a Cross-Collateralization Judgment, shall be applied in the following order of priority until exhausted:

(i)     First, to payment of the ES Litigation Loan;

(ii)     Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the unpaid Lehman Post-Confirmation Loans;

(iii)     Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iv)     Fourth, to repayment of any post-Confirmation Date intercompany payables,

(v)     Fifth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(vi)     Sixth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of the unpaid Lehman Post-Confirmation Loans (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(vi)     Seventh, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment until paid the full

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

amount of their Allowed ES Claims;

(viii)    Eighth, to the Estates of other holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Judgment, payable Pro Rata among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of the Lehman Post-Confirmation Loans and next to pay such Allowed ES Claims until paid in full; and

(ix)    Ninth, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Lehman Plan; and

**(d)    Funds that May Later be Determined to be Both ES Litigation Proceeds and Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

Funds that presently are known to be <u>either</u>, but not both, ES Litigation Proceeds of a particular Estate or a Project Related Action Recovery with respect to a Cross-Collateralization Judgment, which potentially could also become the other upon final settlement or determination of the relevant, pending Project Related Action, shall be applied in the following order of priority until exhausted:

(i)    First, reserved for payment of the ES Litigation Loan;

(ii)    Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of the unpaid Lehman Post-Confirmation Loans;

(iii)    Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iv)    Fourth, to repayment of any post-Confirmation Date intercompany payables,

(v)    Fifth, to be reserved and applied upon final settlement or determination of the relevant, pending Project Related Action in accordance with the above-described priorities of distribution.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52063-001
DOCS_LA:205341.9

### 9.9.3    Allocations and Distributions Under this Section.

For purposes of this Section 9.8.3(b)(2) of the Plan, in calculating the amount of Allowed ES Claims not paid from an Estate's own Assets for a distribution of ES Litigation Proceeds pursuant hereto, the Liquidating Trustee may ignore future expected or possible recoveries, but upon such later recoveries occurring for such Estates, the Liquidating Trustee shall recalculate the prior distribution and adjust the amount of the later distribution to ensure that the aggregate distributions are correct among entitled Holders of Allowed ES Claims.

### 9.10    Plan Release.

In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Loans, the ES Settlement Offer and the delayed satisfaction of the Secured Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor, on behalf of itself and its Affiliates exclusive of other Debtors herein shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish:

a.    any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, from and against all Lehman Releasees, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their property; except

b.    the following are not released, to the extent indicated:

(i)    Avoidance Actions timely Filed and Filed no later than sixty (60) days following the Effective Date other than to the extent of Cross-Collateralization Claims; and

(ii)    with respect to (1) all Equitable Subordination Claims in an ES Action (*i.e.*, either (A) that certain adversary proceeding Filed in the Cases and pending before the

Bankruptcy Court as Adversary Case No. 8:09-ap-01005 or (B) such other adversary proceeding in which Equitable Subordination Claims are asserted that is timely Filed and Filed no later than sixty (60) days following the Effective Date) and (2) those Cross-Collateralization Claims identified in the Debtors' Second Amended Disclosure Statement and asserted in a Cross-Collateralization Action (*i.e.*, an Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date), each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by a Project Related Action Recovery, which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment in the amount of any Project Related Action Recovery.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees in accordance herewith, the Lehman Releasees also shall be entitled to issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

### 9.11    Entry of Final Decrees.

The Liquidating Trustee shall cause the entry of a final decree in the Case of each Estate of a Plan Debtor at the earliest reasonable opportunity therefor.  Such final decrees may be sought and entered individually for each Case.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**9.12    Dissolution of Committees and Discharge of Trustee and Liquidating Trustee.**

The Trustee, in his capacity as such, shall be discharged upon the Effective Date and his bond may be exonerated. The Liquidating Trustee and Committee shall be discharged upon consummation of the Lehman Plan and the entry of a final decree in each Case or as otherwise ordered by the Court.

# X.

# DISTRIBUTIONS

**10.1    Distribution Agent.**

The Liquidating Trustee shall serve as the Distribution Agent for distributions due under the Lehman Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such subagent as a Post-Confirmation Expense from the Post-Confirmation Accounts. The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Lehman Plan.

**10.2    Distributions.**

(i)    Dates of Distributions.

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

(ii)    Limitation on Liability.

Neither the Lehman Related Parties, the Lehman Nominees, the Liquidating Trustee, their Affiliates, nor any of their employees, members, officers, directors, agents, attorneys or other professionals shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan, or (ii) any change in the value of Distributions made pursuant to the Lehman Plan resulting from any delays in making such Distributions in accordance with the Lehman Plan's terms (including but not limited to any delays

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

caused by the resolution of Disputed Claims).

### 10.3    Old Instruments and Securities.

(i)    Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Lehman Plan in respect of a Claim, each Person holding any note or other instrument or security evidencing such Claim must surrender such instrument or security to the Distribution Agent, if requested.

(ii)    Cancellation of Liens.

Except as otherwise provided in the Lehman Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Liquidating Trustee (including, without limitation, any Cash Collateral) held by such Person and to take such actions as may be requested by the Liquidating Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Liquidating Trustee.

### 10.4    De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Liquidating Trustee to any Holder of Claims unless a request therefor is made in writing to the Liquidating Trustee. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Lehman Plan.

### 10.5    Delivery of Distributions.

Except as provided in the Lehman Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows: (1) with respect to each Holder of an Allowed Claim that has Filed a Proofs of Claim, at the address for such Holder as maintained by the official claims agent for the Plan Debtors; (2) with respect to each Holder of an Allowed Claim that has not Filed a Proofs of Claim, at the address reflected on the Schedules Filed by the Plan Debtors, provided, however, that if the Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtors or the Liquidating Trustee has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

**10.6    Unclaimed Property.**

If either (1) the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.,* as undeliverable) and the check or other similar instrument or distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date such Distribution first could have been made under the Lehman Plan and for one hundred twenty (120) days thereafter, then such applicable Distribution shall be Unclaimed Property under the Lehman Plan and the Liquidating Trustee shall be relieved of making such Distribution or any further Distribution to such Holder of such Allowed Claim unless and until the Liquidating Trustee is notified in writing of the then current address of such Holder of an Allowed Claim.  Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Liquidating Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated, interest bearing account to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in the Lehman Plan shall require the Liquidating Trustee or any other Person to attempt to locate the Holder of an Allowed Claim as to which there is Unclaimed Property.

**10.7    Disposition of Unclaimed Property.**

If the Person entitled thereto notifies the Liquidating Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practical. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by

the Liquidating Trustee within ninety (90) days after the Holders' initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Lehman Plan or otherwise from the Liquidating Trustee. In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Post-Confirmation Account of the Plan Debtor's Estate against which the applicable Allowed Claim was asserted.

## XI.

## OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

### 11.1 Standing for Objections to Claims.

The Liquidating Trustee and Lehman Lenders shall have the sole and exclusive right to File and resolve for the Estates objections to Claims and their status as ES Claims (provided, however, that the Lehman Lenders shall not be allowed to resolve for the Estates objections to Claims of any Lehman Related Party). Any objection to a Claim or its status as an ES Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline, expect as provided in the Lehman Plan.

### 11.2 Treatment of Disputed Claims.

(i) No Distribution Pending Allowance.

If any portion of a Claim is a Disputed Claim, no payment or distribution provided for under the Lehman Plan shall be made on account of such Claim unless expressly provided hereunder or unless and until such Claim becomes an Allowed Claim or Lien.  No distribution shall be made under the Lehman Plan on account of any Disputed Claims.  A Claim that has not been Allowed by a Final Order of the Bankruptcy Court and as to which the objection deadline has not passed, including as to its status as an ES Claim, may be treated by the Liquidating Trustee as a Disputed Claim and, absent the agreement of the Lehman Lenders, the Liquidating Trustee shall so treat any such Secured Claim not expressly Allowed under the Plan and any ES Claim to which a payment otherwise would be due under subparagraph (c) of Sections 7.6.8 of the Plan.

(ii) Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

(iii)    Reserves for Disputed Claims.

In the event that Disputed Claims are pending, the Liquidating Trustee shall establish reasonable reserves, including the Plan Reserve for such Disputed Claims. The Distribution Agent may move the Bankruptcy Court for approval of its determination to reserve certain amounts.

## XII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 12.1    Executory Contracts Being Assumed.

As of the Effective Date, the Liquidating Trustee shall assume and, as of and conditioned upon the occurrence of the sale or conveyance of the related Remaining Real Estate Projects in accordance with the Lehman Plan Sale or Foreclosure Procedures, shall assign to the appropriate Lehman Nominee(s) or third party purchaser of each Remaining Real Estate Project, all of the executory contracts and unexpired leases on an **Exhibit "A"**, to be attached to the Lehman Plan on or before the Confirmation Date. With the consent of the Lehman Creditors, any required cure payments shall be made by the Liquidating Trustee from Cash Collateral of a Lehman Related Party on hand as of the Effective Date.  The Lehman Lenders may add any executory contract or unexpired leases to these exhibits or delete any contract or lease therefrom up to and including the Confirmation Date.   However, if **Exhibit "A"** first is Filed and served on affected contract or lease parties, or any amendments thereto are Filed and so served, later than twenty-four (24) days before the Confirmation Date, then, the affected contract or lease parties shall have at least fifteen (15) days from the date of service of the amendments to serve a written objection to the same on the Lehman Lenders. Upon the receipt of any such objection, the Lehman Lenders shall promptly set a hearing on the same, and the assumption or rejection of the affected contract or lease will be delayed until the Court makes a determination on this issue. To the extent that an executory contract or unexpired lease has previously been assumed by a Plan Debtor pursuant to an order of the Court, such assumption shall not be affected by the Lehman Plan. The assumption of any contracts or leases

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

pursuant to the provisions of the Lehman Plan shall be only to the extent that such assumed contracts or leases constitute executory contracts and unexpired leases within the meaning of Section 365 of the Bankruptcy Code. Inclusion of a matter in **Exhibit "A"** does not constitute an admission by the Plan Debtors or the Liquidating Trustee that (i) such matter is an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, (ii) the Plan Debtors, Trustee or Liquidating Trustee must assume such matter in order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim under such matter must be paid or default cured if it is not an executory contract or unexpired lease, or (iii) such matter is a valid contract or lease. Any contract or lease assumed pursuant to the Lehman Plan shall be assumed as previously amended or otherwise modified by the parties thereto, whether before or after the Petition Date.

### 12.2    <u>Executory Contracts Being Rejected.</u>

As of the Effective Date, the Plan Debtors, Trustee or Liquidating Trustee, as appropriate, shall reject all of their executory contracts and unexpired leases other than those executory contracts or unexpired leases listed on **Exhibit "A"** to the Lehman Plan that are expressly assumed under the Lehman Plan.

### 12.3    <u>Retention of Property Rights by Lehman Nominees or Liquidating Trustee.</u>

To the extent that a matter that provides the Plan Debtors or their Estates with property rights does not constitute an executory contract or unexpired lease, or the Plan Debtors have obtained property rights under the executed portion of an executory contract or unexpired lease, rejection shall not constitute an abandonment by the Plan Debtors, the Lehman Nominees or the Liquidating Trustee of any such property rights.

### 12.4    <u>Bar Date for Rejection Damages.</u>

Any Claim arising out of the rejection of an executory contract or unexpired lease under the Lehman Plan shall be forever barred and shall not be enforceable against the Plan Debtors, their Estates, the Liquidating Trustee, their Affiliates, their successors, or their properties, and shall not be entitled to any distribution under the Lehman Plan, unless a Proof of Claim for such Claim is Filed and served on the Plan Debtors, or the Liquidating Trustee within thirty (30) days after the

52063-001
DOCS_LA:205341.9

earlier of (a) the date of entry of the order of the Bankruptcy Court approving the rejection of the executory contract or unexpired lease, or (b) the Confirmation Date.

### 12.5  Cure Statements.

Any party whose executory contract or unexpired lease is assumed under the terms of the Lehman Plan must File and serve on the Plan Debtors, the Trustee, the Liquidating Trustee and the Lehman Lenders a statement within thirty (30) days after the Confirmation Date itemizing all charges and other costs that the party contends must be paid in order to cure any defaults upon the assumption of the contract or lease (the "Cure Statement"). Failure to timely File a Cure Statement shall constitute a waiver of any cure claim and of any defaults occurring prior to the Confirmation Date. If the Plan Debtors, the Committee(s), the Liquidating Trustee or the Lehman Lenders do not File an objection to the Cure Statement within the later of thirty (30) days after the Effective Date and thirty (30) days after the receipt of the Cure Statement by all of the required notice parties, the Liquidating Trustee will pay the amount reflected on the Cure Statement.  If there is a timely objection to the Cure Statement that cannot be resolved with the claimant, the Lehman Lenders may either 1) elect within forty-five (45) days after the Cure Statement is Filed to have the contract rejected, or 2) ask the Court to promptly set a hearing with respect to the objection.  If such an objection is Filed, any cure amount payable upon the assumption of the executory contract or unexpired lease shall be due and payable on or before the fifteenth (15th) day after the entry of a Final Order fixing the cure amount and then only in the amount fixed by such order.

### 12.6  Changes in Rates Subject to Regulatory Commission Approval.

The Plan Debtors are not subject to governmental regulatory commission approval of their rates.

### XIII.

### BEST INTEREST OF CREDITORS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the Bankruptcy Court determines that Distributions under the Lehman Plan to all Holders of Claims and Interests who have not accepted the Lehman Plan and whose Claims are classified in Classes that are impaired under the Lehman Plan, are not less than those which they would receive in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

a liquidation under Chapter 7 of the Bankruptcy Code (referenced herein as the "Best Interests Test").

The Best Interests Test must be satisfied even if the Lehman Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Lehman Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that (i) all Holders of Claims in an impaired Class of Claims have accepted the Lehman Plan, or (ii) the Lehman Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Lehman Plan with a recovery of property of a value, as of the effective date of the Lehman Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Lehman Plan contemplates the orderly sale and liquidation by the Liquidating Trustee (nominated by the Committees) of all of the Remaining Real Estate Projects pursuant to the Lehman Plan Sale or Foreclosure Procedures. As more fully set forth in Section 9.7.2(a)(iv), the Lehman Lenders are making Initial Bids for most of the Remaining Real Estate Projects which bids are in all cases equal to the appraised values obtained by the Lehman Lenders and set forth at Section 3.4 herein. In certain other cases (where either the Lehman Lenders Liens are subject to a Cross-Collaterization Claim or the Lehman Lenders have a Lien on the equity interest of the entity that owns a particular Remaining Real Estate Project, rather than the Project itself), the Lehman Lenders are making Contingent Bids based upon the Debtors' value estimates as set forth in Section 3.4 herein. The Lehman Plan Sale or Foreclosure Procedures are designed to enable the Liquidating Trustee to obtain the highest and best value for the Remaining Real Estates Asset, within a reasonably practicable period of time. Given that the Initial Bids are in all cases higher than the Debtors' estimate of value for the Remaining Real Estate Projects and given the possibility that other third-party bidders may present bids that are higher and better than the Initial Bids (or, if applicable, the Contingent Bids), there is no reason to believe that the Lehman Plan Sale or Foreclosure Procedures will generate less of a recovery to the Estates and their Creditors than a hypothetical Chapter 7 liquidation as of the Effective Date of the Lehman Plan.

Further, as more fully set forth at page 130 of the Elieff Disclosure Statement, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtors believe that with the exception of Creditors of Seven Brothers, Kirby Estates, SunCal Beaumont and SunCal Johannson (whose Allowed Unsecured Claims have been estimated by the Debtors to equal $60,288; $1,744; $626,545; and $150,388, respectively), if the Equitable Subordination Claims are unsuccessful, none of the Creditors of any of the Debtors will receive any recovery in a Chapter 7 liquidation.

Based upon both the Debtors' opinion of value and, where available, the Lehman Lenders' appraised values, a liquidation of the respective Assets of Seven Brothers, Kirby Estates, SunCal Beaumont and SunCal Johannson should provide more than enough net proceeds to satisfy in full the estimated general unsecured claims against the Debtors under the Lehman Plan. Further, the Holders of Allowed ES Claims are estimated to receive a distribution of at least approximately 6.6% under the Lehman Plan, more than they would receive in a Chapter 7 liquidation. Furthermore, to the extent that ES Claimants neither accept, nor are deemed to have accepted, the ES Settlement Offer, the Lehman Plan provides funding for continued prosecution of the Equitable Subordination Claims in the ES Action, creating the likelihood of a higher recovery for ES Claimants, to the extent the Equitable Subordination Claims have any validity, than would be afforded in a Chapter 7 liquidation. Finally, as noted above, if the Lehman Plan is confirmed, the Lehman enders have made significant concessions which, all other things being equal, will enhance possible recoveries on any litigation brought by the Liquidating Trustee against the Lehman Lenders that is not released pursuant to confirmation of the Lehman Plan.

## XIV.

## PLAN FEASIBILITY

In order to confirm the Lehman Plan, the Bankruptcy Court must find that confirmation of the Lehman Plan is not likely to be followed by the liquidation or the need for further financial reorganization. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement. The Lehman Creditors are consenting to the use of their Cash Collateral held with the Debtors, and the Lehman Lenders are making an additional loan commitment of $5 million in order to fund, confirm and implement the Lehman Plan. The Debtors have estimated that there are at least $6.5 million of

Administrative Claims and Priority Claims which will need to be satisfied on, or in connection with, confirmation of any plan of reorganization of the Debtors. The Lehman Lenders believe that the combination of Cash Collateral and the Lehman Post-Confirmation Loan will provide more than adequate funds for the Lehman Plan to become effective and to be implemented.

## XV.

## EFFECT OF CONFIRMATION OF THE LEHMAN PLAN

Except as otherwise expressly provided in the Lehman Plan, the documents executed pursuant to the Lehman Plan, or the Confirmation Order, on and after the Effective Date, all Persons and Entities who have held, currently hold, or may hold a debt, Claim, or Interest against the Plan Debtors (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) shall be permanently enjoined from: (a) taking any of the following actions on account of any such debt, Claim, or Interest: (1) commencing or continuing in any manner any action or other proceeding against the Plan Debtors and the Liquidating Trustee, their successors, or their property; (2) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (3) creating, perfecting, or enforcing any Lien or encumbrance against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (4) asserting any set off, right of subrogation, or recoupment of any kind against any obligation due the Plan Debtors or the Liquidating Trustee, their successors, or their property; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Lehman Plan; and (b) taking any of the following actions on account of any Claims or rights of action that are revested in, or transferred to, the Liquidating Trustee as of the Effective Date or under the Lehman Plan (to the extent one or more Plan Debtors' Estates first held such claim or rights of action or held the right to assert such claim or right of action after the Petition Date), including, without limitation: (1) asserting such Claims or rights of action against nondebtor third parties; and (2) commencing or continuing in any manner any action or other proceeding of any kind with respect to such claims or rights of action. Any person or entity injured by any willful violation

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

## XVI.

## LIMITATION OF LIABILITY

### 16.1    No Liability for Solicitation or Participation.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Lehman Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Lehman Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Lehman Plan or the offer, issuance, sale, or purchase of securities.

### 16.2    Limitation of Liability.

Effective as of the Effective Date, none of the Liquidating Trustee, the Lehman Related Parties or their respective Affiliates, nor any of their respective members, officers, directors, employees and other agents, advisors, attorneys and accountants shall have or incur any liability to any Holder of any Claim or Interest or any other Person for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Lehman Plan, the Lehman Disclosure Statement, the consummation of the Lehman Plan, the administration of the Lehman Plan, the Cases or the property to be distributed under the Lehman Plan except: (a) the Liquidating Trustee shall be liable contractually for the performance of obligations assumed or imposed under or by the Lehman Plan; (b) for liability based on willful misconduct as finally determined by a Final Order of the Bankruptcy Court; and (c) for gross negligence in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan. Each of the Liquidating Trustee, Lehman Related Parties and their respective Affiliates, and each of their respective officers, directors, employees and other agents, advisors, attorneys and accountants) shall be entitled to rely, in every respect, upon the advice of counsel with respect to their duties and responsibilities under or with respect to the Lehman Plan.

# XVII.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE LEHMAN PLAN

**17.1    Conditions Precedent to Plan Confirmation.**

The following are conditions precedent to Confirmation of the Lehman Plan:  (a) the Bankruptcy Court shall have entered the Confirmation Order; and (b) the Lehman Settlement Approval shall be represented by a Final Order.

**17.2    Conditions Precedent to Plan Effectiveness.**

The following shall be conditions precedent to the effectiveness of the Lehman Plan and the occurrence of the Effective Date.

(a)     The Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the Lehman Lenders.

(b)     All agreements and instruments contemplated by, or to be entered into pursuant to, the Lehman Plan, including, without limitation, each of the documents necessary for consummation of the Lehman Plan, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived other than the occurrence of the Effective Date.

# XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Lehman Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

# XIX.

## MODIFICATION OF PLAN

**19.1    Modification of Plan.**

At any time prior to confirmation of the Lehman Plan, the Lehman Lenders may supplement, amend or modify the Lehman Plan. After confirmation of the Lehman Plan, the Lehman Lenders or Liquidating Trustee with the consent of the Lehman Lenders may (x) apply to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Lehman Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Lehman Plan or to reconcile inconsistencies in the Lehman Plan.

**19.2**     **Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Lehman Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, Lehman Proponents (i) may request that the Bankruptcy Court confirm the Lehman Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with the Lehman Plan, and may modify the Lehman Plan in accordance with Section 1127(a) of the Bankruptcy Code.

## XX.

## MISCELLANEOUS

**20.1**     **Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of Title 28 of the United States Code with respect to the Plan Debtors shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(l2) of the Bankruptcy Code. The Liquidating Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date with respect to the Plan Debtors until each applicable Plan Debtor's Case is closed, to the extent required by Section 1930(a)(6) of Title 28 of the United States Code.

**20.2**     **Payment Dates.**

Whenever any payment or distribution to be made under the Lehman Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**20.3**     **Headings.**

The headings used in the Lehman Disclosure Statement and in the Lehman Plan are inserted for convenience only and neither constitutes a portion of the Lehman Disclosure Statement or the Lehman Plan nor in any manner affect the construction of the provisions of the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Disclosure Statement or the Lehman Plan.

### 20.4 Other Documents and Actions.

The Liquidating Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Lehman Plan.

### 20.5 Notices.

All notices and requests in connection with the Lehman Disclosure Statement and the Lehman Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

Edward Soto, Esq.
Nellie P. Camerik, Esq.
Weil, Gotshal & Manges LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131

and

Shai Y. Waisman, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
**With copies to:**
Richard M. Pachulski, Esq.
Dean A. Ziehl, Esq.
Robert B. Orgel, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Fl.
Los Angeles, CA 90067

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

### 20.6 Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Lehman Plan and any agreements, documents, and instruments executed in connection with the Lehman Plan, unless

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

otherwise specifically provided in such agreements, documents, or instruments.

### 20.7 **Binding Effect.**

The Lehman Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Lehman Creditors, the Plan Debtors, the Liquidating Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

### 20.8 **Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Lehman Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

### 20.9 **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Lehman Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Lehman Plan, the Bankruptcy Court shall, with the consent of the Lehman Proponents, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Lehman Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

### 20.10 **No Waiver.**

The failure of the Plan Debtors, Liquidating Trustee, Committee or Lehman Lenders or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Plan Debtors', the Liquidating Trustee's or the Lehman Lenders' right to object to or examine such Claim, in whole or in part.

### 20.11 **Inconsistencies.**

In the event the terms or provisions of the Lehman Disclosure Statement are inconsistent with the terms and provisions of the Lehman Plan or documents executed in connection

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with the Lehman Plan, the terms of the Lehman Plan shall control.

**20.12  Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Plan Debtor or its Estate to the Liquidating Trustee or to any other Person or entity pursuant to the Lehman Plan, or any agreement regarding the transfer of title to or ownership of any of the Plan Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest), including, without limitation, transfers or sales pursuant to the Lehman Plan Sale or Foreclosure Procedures or Reconveyance Agreements will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**20.13  Post-Confirmation Status Report.**

By the earlier of 180 days following the entry of the Confirmation Order a status report shall be Filed with the Court explaining what progress has been made toward consummation of the confirmed Plan, which report shall be Filed by the Liquidating Trustee, if the Effective Date occurs with 120 days following the entry of the Confirmation Order and, otherwise, by the Lehman Lenders. The status report shall be served on the United States Trustee, the list of twenty largest unsecured creditors Filed by the Debtors or Trustee for the jointly administered Cases of the Debtors, the Lehman Creditors, the Liquidating Trustee and those parties who have requested special notice. Unless otherwise ordered, further status reports shall be Filed every 180 days and served on the same entities.

**20.14  Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss any Case of a Plan Debtor under § 1112(b), after the Lehman Plan is confirmed, if there is a default in performing the Lehman Plan, subject to the right of any party in interest to object to such motion. If the Court

orders any of the Cases converted to Chapter 7 after the Lehman Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Lehman Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

**20.15** **Final Decree.**

Once a Plan Debtor's Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trustee, or other party as the Court shall designate in the Confirmation Order, shall File a motion with the Court to obtain a final decree to close the Case of such Plan Debtor.

## XXI.

## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE LEHMAN PLAN

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Lehman Plan to certain Holders of Claims. The following summary does not address the United States federal income tax consequences to (i) Holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Lehman Plan or (ii) Holders of Interests as they are deemed to reject the Plan.

The following summary is based on the Internal Revenue Code of 1986 and all rules and treasury regulations promulgated thereunder ("Tax Code"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal income tax consequences described below.

The United States federal income tax consequences of the Lehman Plan are complex and are subject to significant uncertainties. The Lehman Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Lehman Plan. Thus, no assurance can be given as to whether the IRS will successfully assert alternative positions from those set forth herein or the interpretation that the IRS will adopt. In addition, this summary

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

generally does not address foreign, state or local tax consequences of the Lehman Plan, nor does it address the United States federal alternative minimum or federal income tax consequences of the Lehman Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle or other integrated transaction, and investors in pass-through entities, including partnerships).  If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

*Accordingly, the following summary of certain United States federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, Holders of Claims are hereby notified that:  (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Lehman Proponents of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.*

### 21.1    Consequences to Holders of Lehman Secured Claims and Danske Bank Secured Claims

Pursuant to the Lehman Plan, the Holders of Lehman Secured Claims and Danske Bank Secured Claims will either receive Cash or property (including Remaining Real Estate Projects conveyed to the Holders of such Claims or one or more Lehman Nominees in consideration of a successful credit bid) in satisfaction of their Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In general, each Holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of cash and the fair market value of other property received by the Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest but including any basis such holder has as a result of a transfer by a Lehman Related Party of new Cash to fund a Lehman Post-Confirmation Loan).

Distributions to such holders may be made subsequent to the Effective Date. Under the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such holder may be deferred until such time as such Holder has received its final distribution. All Holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

A Holder's initial tax basis in any Remaining Real Estate Projects conveyed should equal the fair market value thereof. Gain or loss recognized by a holder on the sale, exchange or other disposition of the Remaining Real Estate Projects will equal the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the Remaining Real Estate Projects immediately before the sale, exchange or other disposition. Any such gain or loss will be long-term if the holder's holding period for the Remaining Real Estate Project is more than one year at that time. A holder's holding period for any conveyed Remaining Real Estate Projects generally should begin the day following the day that it is conveyed to the holder. Depending upon the facts at the time, such gain or loss may be capital or may be "Section 1231 Gain" or "Section 1231 Loss." The discussion in this paragraph is premised upon the holder being considered the owner of a Remaining Real Estate Project for federal income tax purposes. There is some uncertainty to this position to the extent the Remaining Real Estate Projects are subject to the PRA Recovery Deeds of Trust. Holders of Remaining Real Estate Projects should consult their own tax advisors as to the tax consequences of the receipt, holding and disposition of Remaining Real Estate Projects.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In addition, as described in Section VII of the Plan, an amount of Cash, up to the Maximum PRA Recovery Amount, will be deposited from time to time into the Plan Reserve. Although there may be alternative characterizations of such funds for federal income tax purposes, the applicable Holders of Lehman Secured Claims will treat all such amounts as having been received by them for all applicable federal income tax purposes. Thus, the applicable Holders of Lehman Secured Claims should include all such amounts as having been received by them in their calculation of gain or loss described above. In addition, the applicable Holders of Lehman Secured Claims should include in their gross income all income earned by the Plan Reserve. Upon a distribution of any amounts from the Plan Reserve to the Holders of Allowed ES Claims, the applicable Holder of a Lehman Secured Claim should recognize a loss equal to the amount so distributed. The Holder of a Lehman Secured Claim should consult its own tax advisor regarding the character of such loss.

### 21.2 Consequences to Holders of General Unsecured Claims.

Pursuant to the Lehman Plan, as soon as reasonably practicable, the Liquidating Trustee will distribute Residual Cash, if any, Pro Rata to the Holders of Allowed General Unsecured Claims and Allowed ES Claims in satisfaction and discharge of their Claims. In addition, each Holder of an Allowed ES Claim shall receive (a) if the Holder votes to accept, the ES Settlement Offer (or if there is Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted and the Holder returns with its Ballot or to the Lehman Lenders a duly executed ES Claimant Release and Assignment, an ES Pro Rata Settlement Payment to be paid as soon as reasonably practicable after the later of (i) the Effective Date and (ii) final allowance of such Claim and (b) if the Holder does not vote to accept the ES Settlement Offer (and there is not Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted), the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with an ES Action, as and when available.

In general, each Holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as

imputed interest as further discussed below) whether received pursuant to the Lehman Plan, and (y) the Holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest).

Distributions to such Holders will be made subsequent to the Effective Date. Under the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its final distribution whether received by the Holder pursuant to the Lehman Plan. All Holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

### 21.3 Distributions in Discharge of Accrued but Unpaid Interest.

Pursuant to the Lehman Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount ("OID"). However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Lehman Plan by a Holder of an Allowed Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim of a non-corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## 21.4  Character of Gain or Loss

Where gain or loss is recognized by a Holder of such a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder (including method of accounting), whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim arose in connection with the provision of services by the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

## 21.5  Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Lehman Plan are subject to any applicable tax withholding. Under United States federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded by the IRS to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the United States federal, state and local and foreign tax consequences applicable under the Plan.*

## XXII.

## CONCLUSION

For all of the reasons stated in Article V of this Lehman Disclosure Statement, the Elieff Plan is unlikely to be confirmed and is dependent for its success and feasibility on the successful prosecution of the ES Action, which (as more fully set forth in Section 4.5 of this Lehman Disclosure Statement) the Lehman Lenders believe is wholly without merit. Indeed, as the Elieff Plan Proponents concede in the Elieff Disclosure Statement (at page 132): "The feasibility of a distribution to creditors other than each Debtor's senior creditors is dependent on the Debtors' ability to prevail in the [ES Action]."

The Lehman Plan, on the other hand, provides for: an orderly disposition of the Remaining Real Estate Assets; a settlement proposal to the Holders of Allowed ES Claims that is likely to result in a distribution of at least 6.6% on account of such Allowed ES Claims; adequate funding for the Lehman Plan to become effective and to be implemented; and a litigation fund and recovery mechanism for the continued prosecution of the Equitable Subordination Claims in the ES Action after the Effective Date on behalf of ES Claimants who have either not accepted, nor are deemed to have accepted, the ES Settlement Offer. Further, the Lehman Proponents believe that the risk that the Lehman Plan will not be confirmed is substantially less than the confirmation risk associated with the Elieff Plan.

The Lehman Proponents contend that the Lehman Plan provides a faster and higher recovery to Creditors (especially the holders of Allowed ES Claims) than the alternatives offered either by the Elieff Plan or a Chapter 7 liquidation of the Debtors' Estates. Accordingly, the Lehman Proponents urge Creditors entitled to vote with respect to the Lehman Plan to vote for its acceptance

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and, further, urge the holders of ES Claims to accept ES Settlement Offer when returning their Ballots on the Lehman Plan.

Dated: September 9, 2009                    PACHULSKI STANG ZIEHL & JONES LLP


                                            By    /s/Robert B. Orgel
                                                  Richard M. Pachulski (CA Bar No. 84529)
                                                  Dean A. Ziehl (CA Bar No. 84529)
                                                  Robert B. Orgel (CA Bar No. 101875)
                                                  Attorneys for Lehman ALI, Inc. and
                                                  Lehman Commercial Paper, Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52063-001
DOCS_LA:205341.9

# APPENDIX "A"

## DEFINITIONS AND RULES OF INTERPRETATION

### 1.   Definitions.

The following defined terms are used in the Lehman Plan.  Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.  Other capitalized terms not defined in this Appendix "A" are defined in the body of the Lehman Disclosure Statement.

**10000 Santa Monica Project.**  The Project owned by SunCal Century City, located in Century City, California.

**Acquisitions.**  SCC Acquisitions, Inc., a California corporation, and the Debtors' indirect parent, but not a Debtor in any of the Cases.

**Acton Estates.**  Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor herein, and the owner of the Acton Project.

**Acton Project.**  The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described herein.

**Administrative Claim(s).**  Any Claim against a Plan Debtor incurred after the applicable Petition Date for such Plan Debtor but before the Confirmation Date for any cost or expense of administration of the Cases of the Plan Debtors entitled to priority under Section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fees or charges assessed against the Estates of the Plan Debtors under Section 1930 of Title 28 of the United States Code.

**Administrative Claim Bar Date.**  The General Administrative Claim Bar Date and the Administrative Tax Claim Bar Date.

**Administrative Tax Claim(s).**  A request for payment of an Administrative Claim by a governmental unit for Taxes (or for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date.

**Administrative Tax Claim Bar Date.**  The earlier of (a) any bar date otherwise established by the Bankruptcy Court or (b) on or before the later of (i) sixty (60) days following the

Effective Date; and (ii) 180 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit.

**Affiliate.** As to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise; provided that as to any Lehman Related Party, the term "Affiliate" does not include any Debtor.

**Allowed.** This term is used both separately and in conjunction with other defined terms herein (*e.g.*, Allowed Tax Claims) and means:

(i)     with respect to any Administrative Claim (a) if the Claim is based upon a Fee Application, an unsecured Claim in the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (b) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Plan Debtors and is not otherwise subject to an Administrative Claim Bar Date, in the amount of such Claim and with a status as secured or unsecured as each are asserted by such creditor and not disputed by the Liquidating Trustee or the Lehman Lenders, failing which, the amount and secured or unsecured status thereof as fixed by a Final Order of the Bankruptcy Court; or (c) if the Holder of such Claim was required to File and has Filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (l) in the amount and with the status as secured or unsecured and in the statutory priority as stated in such proof of Administrative Claim if no objection to such proof of Administrative Claim is interposed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court or the Lehman Plan, or (2) in the amount and with the status as secured or unsecured and in the statutory priority as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within any applicable period of time so fixed; and

(ii)     with respect to any Claim which is not an Administrative Claim, (a) if no objection to such Claim was interposed by the Claims Objection Deadline, (1) if the Holder of

such other Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, in the amount of such Claim and with the status as secured or unsecured and with the statutory priority as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (2) if the Holder of such Claim has Filed a Proof of Claim therefor with the Bankruptcy Court on or before the Claims Bar Date, in the amount and with the status as secured or unsecured and in the statutory priority as stated in such Proofs of Claim, or (b) if an objection to such Claim was interposed by the Claims Objection Deadline, in the amount and with the status as secured or unsecured and in the statutory priority thereof as fixed by Final Order of the Bankruptcy Court;

(iii)     with respect to a Claim's status as an ES Claim, (a) with ES Claim status if ES Claim status is alleged on the Holder's Ballot in the manner provided therefor and if no objection thereto is interposed by the Claims Objection Deadline, (b) with ES Claim status if alleged by the Liquidating Trustee and either (1) the Lehman Creditors and any surviving Committee consent or (2) no objection thereto is Filed by the later of the Claims Objection Deadline or seventy-five (75) days after notice thereof to any surviving Committees and the Lehman Creditors or (c) as fixed by Final Order of the Bankruptcy Court; and

(iv)     with respect to any Interest, (a) if no objection to such Interest was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, (1) if the Holder of such Interest did not File proof thereof with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (2) if the Holder of such Interest has Filed a Proof of Interest therefor with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as stated in such Proof of Interest, or (b) if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

amount or percentage of such Interest and nature thereof as fixed by Final Order of the Bankruptcy Court; but

(v)     with respect to any Administrative Claim, Claim or Interest, the term "Allowed" does not signify whether or not such Administrative Claim, Claim or Interest has been subordinated to another Administrative Claim, Claim or Interest or is entitled to the benefits of such subordination.

**Allowed Amount.**  The amount in which a Claim or Interest is Allowed.

**Arch.**  Arch Insurance Company, a Bond Issuer.

**Assets.**  All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

**Available Cash.**  Cash held by each Plan Debtor as of the Effective Date other than Cash Collateral.

**Avoidance Actions.**  All Claims and defenses to Claims accruing to the Plan Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

**Ballot.**  The ballot to vote to accept or reject the Lehman Plan and to vote for acceptance or rejection of the ES Settlement Offer.

**Bankruptcy Code.**  The Bankruptcy Reform Act of 1978, as amended, as set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as applicable to the Cases.

**Bankruptcy Court.**  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of Title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

**Bankruptcy Rules.**  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Beaumont Heights Project.** The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described herein.

**Bickford Ranch Project.** The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

**Bickford Second Lien Loan Agreement.** That certain promissory note, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000, made by SunCal Bickford, as borrower, and payable to the order of Lehman ALI, as lender. The loan made pursuant to and/or evidenced by the Bickford Second Lien Loan Agreement is secured by a second priority deed of trust on the Bickford Ranch Project. The outstanding balance of the loan under the Bickford Second Loan Agreement was not less than $54,494,059.38 as of the applicable Petition Date.

**Bond Claim(s).** Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds issued by a Bond Issuer.

**Bond Claimant.** Holder(s) of a Bond Claim.

**Bond Issuer(s).** Bond Safeguard and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors and with respect to and for the benefit of the Projects owned by such Debtors.

**Bond Obligation(s).** The alleged obligation(s) of the Bond Obligor(s) to indemnify the Bond Issuers for any payments made by the Bond Issuers to Holders of Bond Claims.

**Bond Obligor(s).** Obligors who are liable to a Bond Issuer for any payments made by such Bond Issuer to a Bond Claimant or for performance obligations under any performance bonds issued by such Bond Issuer for the benefit of any of the Debtors or their respective Projects. Arch asserts that the Bond Obligors under payment and performance bonds issued by Arch for the benefit of any Debtor or with respect to any Project are all of the Debtors, Acquisitions and Elieff. Bond Safeguard asserts that the Bond Obligors under payment and performance bonds issued by Bond Safeguard for the benefit of any Debtor or with respect to any Project are the respective Debtors for whose benefit such bonds were issued, Acquisitions and Elieff.

**Bond Safeguard.** Bond Safeguard Insurance Company, a Bond Issuer.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Business Day.** Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a); provided that with reference to the date on which something is to be Filed, it shall not include a day on which the applicable court is inaccessible for the purpose of Filing such paper.

**Cases.** The chapter 11 cases of the Debtors pending before the Bankruptcy Court.

**Cash.** Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

**Cash Collateral.** This term is used in reference to certain Assets of a Plan Debtor's Estate with the same meaning as set forth in Bankruptcy Code Section 363(a).

**Claim.** A claim — as Bankruptcy Code section 101(5) defines the term "claim"— against any Plan Debtor or any Plan Debtor's property, including, without limitation (a) any right to payment from any of the Plan Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Plan Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

**Claims Bar Date.** For Claims, other than Administrative Claims, the last date for Filing proofs of Claim as was established by order or orders of the Bankruptcy Court entered prior to September 9, 2009, which date was March 31, 2009 for certain Claims.

**Claims Objection Deadline.** For a Claim other than an Administrative Claim and except as otherwise set forth in the Lehman Plan, the first Business Day following the one hundred and twentieth (120th) day after the later of (a) the Effective Date or (b) the applicable bar date for the Claim; provided that: (a) for the ES Claims of Settling ES Claimants, instead, the first Business Day that is at least sixty (60) days after the Effective Date; (b) upon application to the Bankruptcy Court, the Liquidating Trustee or Lehman Lenders may obtain an extension of any such deadline for up to sixty (60) days for cause shown; and (c) any deadline may be extended by agreement of the

potential target of the objection and the Liquidating Trustee or a Lehman Lender.

**Class.**  Each group of Claims or Interests classified in Article IV of the Lehman Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

**Committees.**  Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee.

**Confirmation Date.**  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

**Confirmation Order.**  The order entered by the Bankruptcy Court confirming the Lehman Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**Creditor.**  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the applicable Debtor's Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**Cross-Collateralization Action.**  An Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date.

**Cross-Collateralization Claim.**  A Claim against any Lehman Creditor under state or federal fraudulent transfer laws, provided: (a) it is set forth in a complaint Filed no later than sixty (60) days following the Effective Date and (b) such Claim seeks to set aside a Lehman Secured Claim as against a particular Plan Debtor's Estate based on the principal amount of such Lehman Secured Claim against such Plan Debtor's Estate exceeding the funds alleged by the Debtors to have been advanced for the subject collateral or to have directly or indirectly benefitted the applicable Plan Debtor in connection with the applicable Lehman Loan.

**Cross-Collateralization Judgment.**  Any judgment in favor of the Liquidating Trustee pursuant to or as a result of a Cross-Collateralization Action against a Lehman Related Party.

**Danske Bank.**  Danske Bank A/S London Branch.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Danske Secured Claim.** The Secured Claim of Danske Bank, a Lehman Successor, arising from the SunCal Century City Loan Agreement.

**Debtor(s).** Individually or collectively, the Voluntary Debtors and the Trustee Debtors.

**Debtor(s)-in-Possession.** The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Cases.

**Debtors' Second Amended Disclosure Statement.** The Debtors' Second Amended Joint Disclosure Statement Describing Debtors' Second Amended Joint Chapter 11 Plan, dated June 10, 2009.

**Del Amo Project.** The Project owned by SunCal Torrance, located in the City of Torrance, California, as more particularly described herein.

**Del Rio.** North Orange Del Rio Land, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner and holder of the Del Rio Rights and the Del Rio CFD Bond Proceeds.

**Del Rio CFD Bond Proceeds.** All proceeds of those certain bonds to be designated as "City of Orange, Community Facilities District No. 06-01 (Del Rio Public Improvements) 2007 Special Tax Bonds" or similarly designated bonds to be issued by the City of Orange, California in connection with that certain community facilities district established by the City and known as the City of Orange Community Facilities District No. 06-01 (Del Rio Public Improvements).

**Del Rio Development Agreement.** Development Agreement, recorded on July 27, 2004 in the Official Records of Orange County, California as Instrument No. 2004-000677141, as amended by (i) that certain First Operating Memorandum, dated August 17, 2006, (ii) that certain Second Operating Memorandum, dated December 5, 2006, (iii) that certain Operating Memorandum No. 3, dated May 22, 2007, and (iv) that certain Operating Memorandum No. 4, dated July 21, 2008.

**Del Rio PSA.** That certain Purchase Agreement and Escrow Instruction (Del Rio) dated as of June 14, 2005 by and among Del Rio, as the seller, and Lennar Homes of California and Centex Homes, as the buyers, as assigned by the buyers to Lennar Centex Del Rio Partners, LLC per that certain Assignment of Purchase Agreement and Escrow Instructions dated as of November 14,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2005, as amended by that certain First Amendment to Purchase Agreement and Escrow Instructions (Del Rio) and that certain Second Amendment to Purchase Agreement and Escrow Instructions (Del Rio) dated as of January 30, 2007.

**Del Rio Rights.** Collectively, (i) all right, title and interest of Del Rio, as developer or in any other capacity, in, to, under or pursuant to the Del Rio Development Agreement including, without limitation, all any and all Del Rio CFD Bond Proceeds, and (ii) all right, title and interest of Del Rio, as seller, under the Del Rio PSA including, without limitation, all profit participation, proceeds, revenues and income to which Del Rio is or may be entitled thereunder.

**Del Rio / SJD Partners Release.** A release, in a form reasonably acceptable to the Lehman Lenders, to be executed within forty-five (45) days following the Effective Date by the Liquidating Trustee for the Estate of Del Rio or the Estate of SJD Partners to obtain certain benefits described in Section 9.8.3(b)(2) of the Lehman Plan that is in a form or substantially the form of the Plan Release set forth in Section 9.10 of the Lehman Plan, but (a) without any exception, as matters not to be released, for Cross-Collateralization Claims or Avoidance Actions and (b) with additional releasees consisting of all and any owners of the applicable Project(s) or other Assets that were at any time owned by Del Rio or SJD Partners, as applicable.

**Delta Coves.** Delta Coves Venture, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Delta Coves Project.

**Delta Coves Loan Agreement.** That certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lenders thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $236,000,000. The loan made pursuant to and/or evidenced by the Delta Coves Loan Agreement is secured by a first priority deed of trust on the Delta Coves Project. The outstanding balance of the loan under the Delta Coves Loan Agreement was not less than $206,023,142.48 as of the applicable Petition Date.

**Delta Coves Project.** The Project owned by Delta Coves, located in Bethel Island in Contra Costa County, California, as more particularly described herein.

**Detailed Sale / Foreclosure Procedures.** The detailed procedures with respect to

52063-001
DOCS_LA:205341.9

which the Liquidating Trustee shall sell or convey each of the Remaining Real Estate Projects for which there is a Successful Bidder, either to a third party purchaser, a Lehman Nominee or another Holder of an Allowed Secured Claim, pursuant to and consistent with the Lehman Plan Sale or Foreclosure Procedures, in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at, or after the hearing on, confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner and Liquidating Trustee or approval of the Bankruptcy Court.

**Disputed Claim(s).** All or any part of a Claim that is not Allowed, including, without limitation, all or part of a Claim as to which any one of the following applies: (i) no Proofs of Claim has been Filed with respect to such Claim and it is not deemed Allowed under the Lehman Plan, and either (a) the Claim is not listed in the Schedules or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the liability for, amount, priority or status of the Claim as secured, status as unsecured or status as an ES Claim (a) is the subject of a pending proceeding, whether arbitration, mediation, litigation, adversary proceeding or otherwise; (b) is subject to offset based upon a Filed judgment, Filed order, Filed stipulation or express provision in an executed agreement that was Filed or executed, as appropriate, after the alleged right to offset arose; (c) is the subject of a timely objection; or (d) is the subject of a request for estimation made in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court or the Lehman Plan, in each case that is Filed on or before the Claims Objection Deadline, provided that any such proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Lehman Plan.

**Distribution(s).** Payment(s) to Holder(s) of an Allowed Claim(s) or Allowed Interest(s) that are provided for under the Lehman Plan.

**Distribution Agent.** The Liquidating Trustee.

**Distribution Date.** With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Lehman Plan.

52063-001
DOCS_LA:205341.9

**Effective Date.**  A date selected by the Lehman Lenders, but in no event later than the sixtieth (60th) day after the Confirmation Date.

**Elieff.**  Bruce Elieff, the manager of Acquisitions, the indirect parent of all of the Debtors.

**Emerald Meadows Project.**  The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described herein.

**Encumbrance.**  Any Lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, unassumed affirmative obligations under development agreements or subdivision improvement agreements, license, preference, priority, security agreement, easement, covenant, encroachment, option or other interest in the subject Project, including any right of recovery, tax (including foreign, federal, state and local tax), Order of any governmental authority or other claim there against or therein, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claims based on any theory that the acquiror is a successor, transferee or continuation of the sellers or their business, and (iv) any leasehold interest, license or other right, in favor of a person other than the transferor in connection with a sale or conveyance, to use any portion of the subject Project), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**Equitable Subordination Claims.**  Claims for equitable subordination pursuant to Bankruptcy Code § 510(c) held by an Estate for an ES Claimant against a Lehman Creditor.

**ES Action.**  (a) That certain adversary proceeding Filed in the Cases and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005 or (b) such other adversary proceeding in which Equitable Subordination Claims are asserted that is timely Filed and Filed no later than sixty (60) days following the Effective Date.

**ES Claim.**  A Claim against an ES Plan Debtor for "new value" (as defined in 11 U.S.C. section 547(a)(2)) voluntarily provided or voluntarily extended to one or more of the ES Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtors after the ES Date and prior to the applicable Petition Date(s); provided that such Claim is not a (i) Secured Claim, (ii) Administrative Claim, (iii) Priority Tax Claim, (iv) Priority Claim, (v) Claim of an Insider or (vi) Claim of either a Lehman Lender or Lehman Successor in such capacity. *E.g.*, ES Claims do not include Claims provided or extended pursuant to a legal or contractual commitment or obligation existing prior to the ES Date. ES Claims are entitled to vote on the ES Settlement as set forth in the Lehman Plan.

**ES Claimant.** The Holder of an Allowed ES Claim.

**ES Claimant Release and Assignment.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote shall be deemed to release the ES Claimant Released Claims, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, and, to the extent such ES Claimant Released Claims cannot be released by the ES Claimant, assigns to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the Settling ES Claimant with respect to such ES Claimant Released Claims, all as more fully set forth in Section 9.8.2(d) of the Lehman Plan.

**ES Claimant Released Claims.** Any and all of an ES Settling Claimant's causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of such Settling ES Claimant or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES

Claims of such Settling ES Claimant.

**ES Date.** August 1, 2007, the earliest date on which the Lehman Lenders are alleged to have engaged in inequitable conduct as described in that certain adversary proceeding Filed in the Cases and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005.

**ES Judgment.** A judgment in favor of the Liquidating Trustee on behalf of and for the benefit of any particular group of ES Claimants in connection with any of the Equitable Subordination Claims against a Lehman Related Party.

**ES Litigation Expenses.** The reasonable and direct out-of-pocket expenses (but not any legal fees): (a) of and incurred by any replacement legal counsel to Miller Barondess, LLP, that is retained by the Liquidating Trustee on a contingency fee basis to prosecute the Equitable Subordination Claims of any ES Plan Debtor's Estate in an ES Action; (b) which are in excess of any Available Cash in the Post-Confirmation Accounts; and (c) which were incurred in connection with prosecuting the Equitable Subordination Claims in an ES Action; provided that (i) such expenses shall, under no circumstances, include any legal fees (including paralegal fees) or other fees of professionals employed by, or of, the replacement legal counsel or any other law firm (other than the reasonable fees and costs of any retained attorney expert witness) nor (ii) shall such expenses include any fees or expenses incurred or otherwise payable to Miller Barondess, LLP.

**ES Litigation Loan.** A loan to be made available by a Lehman Lender pursuant to the terms and conditions of and as further described in Section 9.8 of the Lehman Plan.

**ES Litigation Proceeds.** The proceeds of any ES Judgment or settlement (other than the ES Settlement) with respect to Non-Settled ES Claims.

**ES Plan Debtors.** All of the Plan Debtors other than: Kirby Estates; Seven Brothers; SunCal Beaumont; SunCal Century City; and SunCal Johannson.

**ES Pro Rata Settlement Payment.** A payment to any particular Holder of an Allowed ES Claim equal to the ES Settlement Amount multiplied by a fraction, the numerator of which shall be the amount of such Holders' Allowed ES Claim and the denominator of which shall be the amount of all Allowed ES Claims and all Allowed Mechanic's Lien Claims.

**ES Settlement.** The settlement or settlements of Equitable Subordination Claims

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

relating to any particular Estate of a Plan Debtor upon acceptance of an ES Settlement Offer.

**ES Settlement Amount.** The maximum aggregate amount of $15,000,000 to be made available to the Liquidating Trustee collectively by the Lehman Lenders as provided in Section 9.5 of the Lehman Plan to fund any ES Pro Rata Settlement Payments to be made to the ES Claimants who vote for acceptance of the ES Settlement Offer on their Ballots and return with the Ballots ES Claimant Release and Assignments (included with the Ballots) duly executed by such ES Claimants or who are deemed to have accepted or who are otherwise bound by, the ES Settlement pursuant to the terms of the Lehman Plan.

**ES Settlement Offer.** The offer of the applicable Lehman Lender to settle the Equitable Subordination Claims relating to any particular Estate of an ES Plan Debtor by payment of the ES Pro Rata Settlement Payments either (a) to <u>all</u> Holders of Allowed ES Claims against such Estate who return a duly executed ES Claimant Release and Assignment, if there is Estate Acceptance of the ES Settlement by such Estate, or (b) only to the Holders of Allowed ES Claims against such Estate who vote for acceptance of the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments, if there is not Estate Acceptance of the ES Settlement by such Estate.

**Estate or Estates.** The bankruptcy estates of the Debtors created pursuant to Section 541 of the Bankruptcy Code.

**Estate Acceptance of the ES Settlement.** The circumstance by which the Estate of a Plan Debtor accepts the ES Settlement Offer, which occurs if at least one-half in number and two-thirds in amount of the voting ES Claimants in such Estate vote for acceptance of the ES Settlement Offer on their Ballots and (unless waived by the Lehman Lenders as to one or more Ballots) return with their Ballots a duly executed ES Claimant Release and Assignment.

**Estate ES Settlement Release.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors herein, shall be deemed to release all claims, including without

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

limitation any Litigation Claims to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, all as more fully set forth in Section 9.8.2(c) of the Lehman Plan.

**Fee Applications.**  Applications of Professionals under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

**Fenway Capital.**  Fenway Capital Funding LLC, which owns or holds a legal or equitable interest in all or a portion of the Lehman Loans made pursuant to and/or evidenced by the following loan agreements, but for which a Lehman Lender nonetheless continues as agent:  (a) SunCal Communities I Loan Agreement; (b) Ritter Ranch Loan Agreement; (c) SunCal PSV Loan Agreement; (d) Delta Coves Loan Agreement; (e) SunCal Marblehead / SunCal Heartland Loan Agreement; (f) SunCal Oak Valley Loan Agreement; and (g) SunCal Northlake Loan Agreement.

**Filed.**  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court. "File" and "Filing" shall have correlative meanings.

**Final Order.**  A final and non-appealable judgment, order, ruling or other decree issued and entered by a court of competent jurisdiction.

**General Administrative Claim Bar Date.**  The last date fixed by the Lehman Plan for the filing of Proofs of Claim or requests for payment of Administrative Claims other than for Taxes.  Under the Lehman Plan, the General Administrative Claim Bar Date shall be the first Business Day after the sixtieth (60th) day after the Confirmation Date.

**General Unsecured Claim.**  A Claim against a Plan Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) a Priority Claim or (e) an ES Claim.

**Heartland Project.**  The Project owned by SunCal Heartland, located in Riverside County, California, as more particularly described herein.

**Holder.**  The beneficial owner of any Claim or Interest.

**Insider.** (1) A Person other than a Lehman Related Party that is an "insider" as defined in Bankruptcy Code Section 101, (2) an Affiliate of a Person or (3) without limiting the foregoing, as to all Debtors, *inter alia*, each other Debtor, SunCal Management, LLC, Acquisitions, Elieff, Voss, Cook & Thel LLP, Greenfield Communications, SunCal Master Venture Member, LLC and SunCal Del Rio, LLC.

**Interest.** Any equity security or interest in any Plan Debtor within the meaning of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Plan Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, or any other equity security or interest.

**Interim Loan Agreement.** That certain Loan Agreement, dated as of October 31,2007, by and between SCC LLC, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $20,000,000. The outstanding balance of the loan under the Interim Loan Agreement was not less than $23,795,012.59 as of the applicable Petition Date. The loan made pursuant to and/or evidenced by the Interim Loan Agreement is supported by a Subsidiary Guaranty made by SCC Communities, Tesoro and Del Rio and the obligations of the guarantors thereunder are secured by (a) a first priority deed of trust on the Joshua Ridge Project; (b) a first priority deed of trust on the Tesoro Project; and (c) an assignment of the Del Rio CFD Bond Proceeds.

**Johannson Ranch Project.** The Project owned by SunCal Johannson, located in the City of Modesto, California, as more particularly described herein.

**Joshua Ridge Project.** The Project owned by SCC Communities, located in the City of Victorville, California, as more particularly described herein.

**Kirby Estates.** Kirby Estates, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of that portion of the Summit Valley Project not owned by SunCal Summit Valley or Seven Brothers.

**LCPI.** Lehman Commercial Paper Inc., a New York corporation.

**Lehman Administrative Loans.** The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley,

SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, under which first priority priming Liens were granted to Lehman ALI on all borrower Debtors' assets (with the exception of SunCal Century City in which the Liens are junior priority), and as to which financing, super-priority administrative status was afforded and the automatic stay was modified to the extent necessary to implement the financing. The aggregate amount of the Lehman Administrative Loans to all of the borrower Debtors was not less than $1,790,572, as of September 9, 2009.

**Lehman ALI.** Lehman ALI, Inc., a Delaware corporation

**Lehman Appeal.** Any appeal by a Lehman Related Party relating to the Equitable Subordination Claims in an ES Action or any Cross-Collateralization Claims in a Cross-Collateralization Action.

**Lehman Appeal Affected Debtor.** Any Estate of a Plan Debtor that cannot close due to a pending Lehman Appeal concerning such Estate's Assets or liabilities, including subordination of certain of its liabilities to other of its liabilities.

**Lehman Commercial.** Lehman Commercial Paper Inc., a New York corporation.

**Lehman Creditor.** Lehman Lender or Lehman Successor.

**Lehman Creditor Party.** Lehman Lender, Lehman Successor, the direct or indirect parent of either, or an Affiliate of either that is wholly owned by the Lehman Lender, Lehman Successor or by a direct or indirect parent of such Lehman Lender or Lehman Successor.

**Lehman Disclosure Statement.** The Disclosure Statement With Respect to Joint Chapter 11 Plan Proposed By Lehman Lenders.

**Lehman Lender.** Lehman ALI, Lehman Commercial, Northlake Holdings or OVC Holdings, including each in its capacity as agent, or agent and lender, with respect to the applicable Lehman Loans.

**Lehman Loan.** Each loan made pursuant to and/or evidenced by the following agreements: (a) SunCal Communities I Loan Agreement; (b) Bickford Second Lien Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan Agreement; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal PSV Loan

52063-001
DOCS_LA:205341.9

Agreement; (h) Delta Coves Loan Agreement; (i) SunCal Marblehead / SunCal Heartland Loan Agreement; (j) SunCal Oak Valley Loan Agreement; and (k) SunCal Northlake Loan Agreement.

**Lehman Nominee(s).** The entity or each entity designated by the Lehman Lenders, or any of them, to take title to a Remaining Real Estate Project as to which a Lehman Creditor is the Successful Bidder.

**Lehman Plan.** This *Joint Chapter 11 Plan Proposed By Lehman Lenders*, together with the Exhibits hereto, as the same may be amended, modified or restated from time to time.

**Lehman Plan Sale or Foreclosure Procedures.** The marketing, bidding and sale or transfer by foreclosure procedures for a sale or disposition of some or all of the Projects after confirmation of the Lehman Plan, all as more fully set forth in Section 9.7.2 of the Lehman Plan.

**Lehman Post-Confirmation Expenses.** Post-Confirmation Expenses incurred with respect to a Litigation Claim against a Lehman Related Party, other than ES Litigation Expenses to the extent susceptible of satisfaction from the proceeds of the ES Litigation Loan.

**Lehman Post-Confirmation Loan(s).** All funding made available to the Liquidating Trustee in connection with, or after, the Effective Date from either or both new Cash transfers from or on behalf of a Lehman Related Party or by a Lehman Lender permitting the use of Cash Collateral of a Lehman Creditor, in either case to be in the form of one or more loans, plus all costs, fees and expenses incurred in connection with making or collecting such loan(s), plus ten percent (10%) annual, compounded interest on the outstanding balance of such loan(s).

**Lehman Proponents.** The Lehman Lenders, in their capacity as proponents of the Lehman Plan.

**Lehman Related Party.** A Lehman Lender, Lehman Successor or Lehman Nominee, or an Affiliate of any of them.

**Lehman Releasees.** The Lehman Lenders, LV Pacific Point LLC, Lehman Re Ltd., all other defendants in an ES Action, their respective Affiliates and each of their respective officers, directors, employees, agents, successors and assigns, including, without limitation, the Lehman Successors.

**Lehman Secured Claim.** A Secured Claim held by a Lehman Creditor.

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Lehman Settlement Approval.** Entry of a judgment, order, ruling or other decree by the United States Bankruptcy Court for the Southern District of New York, which court has jurisdiction over the case of Lehman Commercial under the Bankruptcy Code (jointly administered under case no. 08-13555), approving the actions of Lehman Commercial in proposing, voting for, participating in and implementing the settlement(s) represented by the Lehman Plan.

**Lehman Successor.** Any entity, other than a Lehman Lender, that either asserts to be or is determined by the Bankruptcy Court to be the owner of a Lehman Loan or any portion thereof, such as Fenway Capital.

**Liquidating Trustee.** An individual nominated by a Committee(s), identified no later than ten (10) Business Days prior to the commencement of the hearing on confirmation of the Lehman Plan and approved by the Bankruptcy Court as qualified to serve in such capacity under the Lehman Plan; provided that if no other such person is so nominated, identified and approved, the Trustee shall serve as the Liquidating Trustee.

**Litigation Claim(s).** Any and all interests of the Liquidating Trustee, Plan Debtors or their Estates in any and all claims, Liens, rights, causes of action, and objections or defenses to Claims, Liens, rights, or causes of action to the extent not waived, released or compromised under the Lehman Plan that have been or may be commenced by the Debtor(s), the Liquidating Trustee, the Trustee, or the Committee(s), as the case may be, including, but not limited to (i) Avoidance Actions, including any Cross-Collateralization Action or other Avoidance Action against a Lehman Related Party; (ii) Claims, rights or causes of action for turnover of property to the Plan Debtors' Estates and/or Liquidating Trustee; (iii) Claims, rights or causes of action for the recovery of property by, or payment of money to, the Plan Debtors' Estates or the Liquidating Trustee, including Equitable Subordination Claims in an ES Action and Cross-Collateralization Claims in a Cross-Collateralization Action; (iv) the right of the Liquidating Trustee to compensation in the form of damages, recoupment, or setoff; and (v) objections to Claims.

**Litigation Recoveries.** Any Cash or other property received by the Trustee, the Plan Debtors, the Liquidating Trustee, or the Committees, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses,

interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

**Marblehead Project.** The Project owned by SunCal Marblehead, located in the City of San Clemente, California.

**Maximum DOT Security Amount.** The aggregate amount secured by the PRA Recovery Deeds of Trust at any time which shall be equal to the Maximum PRA Recovery Amount less the aggregate amount in the Plan Reserve (including any interest accrued on funds therein).

**Maximum PRA Recovery Amount.** An amount that serves as the maximum aggregate amount secured by the PRA Recovery Security Pool and equals specifically, the sum of the following: (a) $1.74 million**,** if and only if there is a pending Reconveyance Agreement evidencing the obligation, upon entry of a Cross-Collateralization Judgment, to reconvey the Acton Project, Joshua Ridge Project or Tesoro Project to the applicable Plan Debtors; and (b) for an ES Judgment, (i) $200 million less, if applicable, (ii) the amount determined as set forth in clause (a) hereof, if any, multiplied by (iii) the Non-Settling ES Claimant Percentage; provided that, on motion of a Lehman Related Party, the amounts set forth in clauses (a) or (b)(i) hereof may be reduced upon a Final Order of the Bankruptcy Court, as described in Section 9.7.2(c)(v) of the Lehman Plan.

**Mechanic's Lien Claim.** Mechanic's lien claims against a Plan Debtor's Project arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise and allegedly satisfy the requirements of Bankruptcy Code Section 546(b).

**Negative Covenant.** The provision in each PRA Recovery Deed of Trust that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to

such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above.

**Net Cash Litigation Recoveries.**  Any Litigation Recoveries consisting of Cash and any Cash proceeds of Litigation Recoveries less associated Post-Confirmation Expenses incurred in connection therewith.

**Net Cash Proceeds.**  Net Proceeds consisting of Cash.

**Net Proceeds.**  Gross proceeds of sale, liquidation or refinancing, less costs, expenses, fees, commissions, taxes (including federal, state and local income tax calculated at an assumed rate of forty-five percent (45%)) and other charges incurred directly in the sale, liquidation or refinancing of the underlying asset, including payment of senior Liens or encumbrances.

**Non-Settled ES Claims.**  The ES Claims of Non-Settling ES Claimants.

**Non-Settling ES Claimant(s):**  With respect to each Estate of an ES Plan Debtor, ES Claimants that do not vote to accept the ES Settlement Offer, unless there is Estate Acceptance of the ES Settlement for such Estate, in which case there shall be no Non-Settling ES Claimants of such Estate.

**Non-Settling ES Claimant Percentage.**  The percentage of Allowed ES Claims that are held by Non-Settling ES Claimants.

**Northlake Holdings.**  Northlake Holdings LLC, a Delaware limited liability company.

**Northlake Project.**  The Project owned by SunCal Northlake, located in the City of Castaic California, as more particularly described herein.

**Oak Knoll Project.**  The Project owned by SunCal Oak Knoll, located in the City of Oakland, California, as more particularly described herein.

**Oak Valley Project**.  The Project owned by SunCal Oak Valley, located in Riverside County, California, as more particularly described herein.

**Other Secured Claim.**  A Secured Claim that is not a Secured Real Property Tax Claim, Lehman Secured Claim or Danske Secured Claim.

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**OVC Holdings.** OVC Holdings LLC, a Delaware limited liability company.

**Pacific Point Project.** The Project formerly owned by SJD Partners, which was non-judicially foreclosed upon pursuant to a sale on August 28, 2008 by LV Pacific Point LLC, a Delaware limited liability company.

**Palmdale Hills.** Palmdale Hills Property, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project, the Ritter Cash and the Palmdale Hills CFD Bonds.

**Palmdale Hills CFD Bonds.** Certain community facilities district bonds issued by the City of Palmdale that are owned by Palmdale Hills.

**Palm Springs Village Project.** The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

**Permitted Liens.** Statutory liens for Secured Real Property Tax Claims; (b) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (excluding any rights of appeal from the Final Order with respect to the sale or conveyance of the Project) that (i) appear on the lender title insurance policies concerning such Project issued to the relevant Lehman Lender or (ii) do not in any material respect detract from the value of the relevant Project and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property, excluding Liens that will be removed and stricken as against the relevant Project pursuant to the Final Order with respect to the sale or conveyance of the Project, (c) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the relevant Project that are not violated by the current use of the Project, (d) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, (e) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey of the subject Project would disclose and (f) other Liens to which the transferor of the property, in connection with such transfer, agrees to take subject.

**Person.** An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

52063-001
DOCS_LA:205341.9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Petition Dates.** The following are dates that each of the Voluntary Debtors Filed their voluntary chapter 11 petitions or Creditors Filed involuntary chapter 11 petitions against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
|---|---|
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves | November 14, 2008 |
| SunCal Heartland | November 12, 2008 |
| SunCal Marblehead | November 12, 2008 |
| SunCal Northlake | November 12, 2008 |
| SunCal Oak Valley | November 12, 2008 |
| SunCal Century City | November 14, 2008 |
| SunCal PSV | November 14, 2008 |
| SunCal Torrance | November 14, 2008 |
| SunCal Oak Knoll | November 19, 2008 |

**Plan.** The Lehman Plan.

**Plan Debtors.** The 24 Debtors for which the Lehman Plan is being proposed, consisting of all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**Plan Release.** In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Loans, the ES Settlement Offer and the delayed satisfaction of the Secured Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor shall be deemed to release all claims, including any Litigation Claims except certain Avoidance Actions and certain claims therein and except that, with respect to all Equitable Subordination Claims in an ES Action and certain Cross-Collateralization Claims asserted in a Cross-Collateralization Action, each owner of each PRA Security Project shall have a non-recourse

obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by a Project Related Action Recovery, which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment in the amount of any Project Related Action Recovery, all as more fully set forth in Section 9.10 of the Lehman Plan.

**Plan Reserve.** A reserve fund established by the Liquidating Trustee to hold the Ritter Cash, all Cash Collateral of a Lehman Creditor held by a Plan Debtor, and any other Cash required or permitted to be deposited therein on the Effective Date pursuant to the terms of the Lehman Plan and which funds shall be subject to withdrawal pursuant to the terms of the Lehman Plan, including (i) all Net Cash Proceeds of sales or refinancing of certain Remaining Real Estate Projects as set forth in the Lehman Plan and (ii) any other Cash which the Lehman Related Parties may desire to deposit therein from time to time, all upon the terms and conditions set forth in Article IX of the Lehman Plan. Such funds shall be held in account(s) to be established at an FDIC insured bank to be selected by the Liquidating Trustee with the consent of the Lehman Lenders, which consent shall not be unreasonably withheld. There shall be separate accounts or accounting for the Ritter Cash, Net Cash Proceeds derived from each Remaining Real Estate Project and other Cash Collateral of a Lehman Creditor as to a Plan Debtor, with the Ritter Cash being attributed to the Ritter Ranch Project, Net Cash Proceeds being attributed to the Remaining Real Estate Project, the sale or refinancing of which resulted in such Net Cash Proceeds and other Cash Collateral of a Lehman Creditor being attributed to the applicable Plan Debtor.

**Post-Confirmation Account(s).** An account with a bank, financial institution or similar depository in which the Liquidating Trustee holds Cash or other liquid assets or securities for any Plan Debtor.

**Post-Confirmation Expenses.** The fees and expenses incurred by the Liquidating Trustee or the Committees following the Effective Date (including the fees and costs of Professionals and the Lehman Post-Confirmation Loans) for the purpose of (i) prosecuting and/or liquidating the Litigation Claims; (ii) selling or otherwise liquidating the Liquidating Trustee's Assets; (iii) effectuating Distributions under the Lehman Plan; and (iv) otherwise consummating the Lehman Plan and closing the Debtor(s)' Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PRA Recovery Deed(s) of Trust.** A deed or deeds of trust as to any particular PRA Security Project to be granted by the Lehman Nominee in favor of the Liquidating Trustee upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale or Foreclosure Procedures, subject to any Permitted Liens, which deeds of trust (a) secure the obligations set forth in the Reconveyance Agreements, and (b) are to be released or subordinated as set forth in Section 9.7.2(c) of the Lehman Plan. The PRA Security Deeds of Trust secure, in the aggregate, an amount not in excess of the Maximum DOT Security Amount.

**PRA Recovery Security Pool.** At any time, collectively, the PRA Recovery Deeds of Trust then in effect and the Plan Reserve.

**PRA Security Project.** Each Project conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale or Foreclosure Procedures.

**Priority Claim.** Any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

**Priority Tax Claim.** Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code or would be so entitled were it not secured.

**Professional.** A Person (a) employed by the Plan Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

**Professional Fees.** All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code.

**Projects.** The Plan Debtors' real estate development projects as more particularly described on an Exhibit or supplement hereto to be Filed on or before the Effective Date, together with all rights, remedies, privileges and easements appurtenant thereto and all other real and personal, tangible and intangible, property related thereto.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Project Related Action.**  An ES Action or Cross-Collateralization Action.

**Project Related Action Recovery.**  An ES Judgment or Cross-Collateralization Judgment.

**Pro Rata.**  (a) With respect to any distribution in respect of any Allowed Claim, proportionately, so that the ratio of (i)(1) the amount of property distributed on account of such Allowed Claim to (2) the amount of such Allowed Claim, is the same as the ratio of (ii)(1) the amount of property distributed on account of all Allowed Claims of the Class or Classes of the applicable Estate sharing in such distribution to (2) the amount of all Allowed Claims in such Class or Classes of the applicable Estate; and (b) in calculating allocations of responsibility for obligations among Debtors, Pro Rata shall be determined in reference to the Liquidating Trustee's reasonable estimate of the gross value of each applicable Estate's Assets as of the Confirmation Date.

**Proof of Claim.**  A proof of claim as referenced in Bankruptcy Code Section 501(a).

**Proof of Interest.**  A proof of interest as referenced in Bankruptcy Code Section 501(a).

**Reconveyance Agreement.**  A written agreement to be executed by, and evidencing, among other things, the non-recourse obligations of, a Lehman Nominee to which a PRA Recovery Security Project is conveyed pursuant to the Lehman Plan Sale or Foreclosure Procedures, as more fully set forth in Section 9.7.2(c)(iii) of the Lehman Plan.

**Remaining Other Assets.**  All of the then remaining Assets of the Plan Debtors' Estates excluding the Projects, as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**Remaining Real Estate Projects.**  All of the then remaining Projects as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**Residual Cash.**  As to any particular Plan Debtor's Estate, Net Cash Proceeds derived from the liquidation by the Liquidating Trustee of any Remaining Real Estate Projects owned by such Estate and any Remaining Other Assets of such Estate, including any applicable Net Cash Litigation Recoveries in which such Estate has an interest, to the extent not subject to a Secured Claim (or to a Claim to which such Secured Claim is subordinated) and remaining after

payment or reserve for the Lehman Post-Confirmation Loans and, as provided in the Lehman Plan, certain Post-Confirmation Expenses, post-Confirmation Date intercompany payables and due and payable Allowed Administrative Claims, Allowed Priority Claims and Allowed Priority Tax Claims, all as more fully set forth in Section 7.10 of the Lehman Plan.

**Ritter Cash.** As of the Effective Date, the Cash owned by Palmdale Hills or in which Palmdale Hills has any residual interest and held in escrow, reserve or other accounts for the benefit of Lehman Commercial and securing the loans made pursuant to the Ritter Ranch Loan Agreement.

**Ritter Ranch Loan Agreement.** That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, and Lehman Commercial, as administrative agent and lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $264,000,000. The loans made pursuant to and/or evidenced by the Ritter Ranch Loan Agreement are secured by, among other things, a first priority deed of trust on the Ritter Ranch Project. The outstanding balance of the loans under the Ritter Ranch Loan Agreement was not less than $287,252,096.31 as of the applicable Petition Date.

**Ritter Ranch Project.** The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described herein.

**SCC Communities.** SCC Communities, LLC, a limited liability company, a Voluntary Debtor herein, and the owner of the Joshua Ridge Project.

**SCC LLC.** SCC Acquisitions LLC, a Delaware limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent of each of the Debtors, but not itself a Debtor in any of the Cases.

**SCC Palmdale.** SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the Holder of the Allowed Interest in Palmdale Hills.

**SCC Palmdale Loan Agreement.** That certain Mezzanine Credit Agreement, between SCC Palmdale, as borrower, and Lehman Commercial, as lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of

approximately $95,000,000. The loan made pursuant to and/or evidenced by the SCC Palmdale Loan Agreement is secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. The outstanding balance of the loan under the SCC Palmdale Loan was not less than $119,664,305.25 as of the applicable Petition Date.

**Schedules.** The schedules of assets and liabilities and list of equity security holders Filed by the Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.**Secured Claim.** Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, to the extent that it is secured by a valid and unavoidable Lien on the Plan Debtor(s)' Assets.

**Secured Real Property Tax Claims.** Secured Claims, other than Priority Tax Claims, held by various government entities for real property tax assessments secured by Liens on the underlying real properties owned by the Plan Debtors but that are non-recourse to the Plan Debtors.

**Settling ES Claimant(s):** (1) a Settling ES Claimant by Vote or (2) an ES Claimant in an Estate which accepts the ES Settlement Offer.

**Settling ES Claimant(s) by Vote:** Each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment duly executed by such ES Claimant, included with the Ballot.

**Seven Brothers.** Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of that portion of the Summit Valley Project not owned by Kirby Estates or SunCal Summit Valley.

**SJD Development.** SJD Development Corp., a California corporation, a Voluntary Debtor herein, and the Holder of an Allowed Interest in SJD Partners.

**SJD Partners.** SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor herein, and the prior owner of the Pacific Point Project.

**Successful Bidder.** With respect to the each Remaining Real Estate Project, the successful bidder at the auction for the sale of such Remaining Real Estate Project conducted by the

Liquidating Trustee pursuant to the Lehman Plan Sale or Foreclosure Procedures.

**Summit Valley Project.** The Project owned in part by SunCal Summit Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more particularly described herein.

**SunCal.** The SunCal Companies, a trade name for Acquisitions and its Affiliates.

**SunCal I.** SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

**SunCal III.** SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor herein.

**SunCal Beaumont.** SunCal Beaumont Heights, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Beaumont Heights Project.

**SunCal Bickford.** SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

**SunCal Century City.** SunCal Century City, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the 10000 Santa Monica Project.

**SunCal Century City Loan Agreement.** That certain Loan Agreement, dated as of August 11, 2006, by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000. The SunCal Century City Loan Agreement is secured by a first-priority deed of trust on the 10000 Santa Monica Project. The SunCal Century City Loan Agreement has a balance due of $120,000,000.00 as of April 1, 2009.

**SunCal Communities I Loan Agreement.** That certain Credit Agreement, dated as of November 17, 2005, by and among (i) SunCal I and SunCal III, as borrowers, Lehman Brothers, Inc., as sole advisor, sole lead arranger and sole bookrunner, and Lehman Commercial, as syndication and administrative agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $395,313,713.37. The loan made pursuant to and/or evidenced by the SunCal Communities I Loan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Agreement is secured directly or indirectly by (a) first priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) pledges of SunCal I's Allowed Interest in Acton Estates, SunCal Summit Valley, SunCal Beaumont; SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) pledges of SunCal Summit Valley's Allowed Interest in Seven Brothers and Kirby Estates. The outstanding balance of the loan under the SunCal Communities I Loan Agreement was $343,221,391.06 as of the applicable Petition Date.

**SunCal Emerald.** SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

**SunCal Heartland.** SunCal Heartland, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Heartland Project.

**SunCal Johansson.** SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Johansson Ranch Project.

**SunCal Marblehead.** SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Marblehead Project.

**SunCal Marblehead / SunCal Heartland Loan Agreement.** That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrowers in the maximum aggregate principal amount of approximately $316,061,300. The loans made pursuant to and/or evidenced by the SunCal Marblehead / SunCal Heartland Loan Agreement are secured by first priority deeds of trust on the Marblehead and the Heartland Projects. The outstanding aggregate balance of the loans under the SunCal Marblehead / SunCal Heartland Loan Agreement was not less than $354,325,126.15 as of the applicable Petition Date.

**SunCal Northlake.** LB/L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Northlake Project.

**SunCal Northlake Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 9, 2005, between SunCal Northlake, as borrower,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and Northlake Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans in the maximum aggregate principal amount of approximately $100,000,000. The loans made pursuant to and/or evidenced by the SunCal Northlake Loan Agreement are secured by a first priority deed of trust on the Northlake Project. The outstanding aggregate balance of the loans under the SunCal Northlake Loan Agreement was not less than $123,654,776.88 as of the applicable Petition Date.

**SunCal Oak Knoll.**  SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Oak Knoll Project.

**SunCal Oak Knoll/SunCal Torrance Loan Agreement.**  That certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $167,700,000.  The loans made pursuant to and/or evidenced by the SunCal Oak Knoll/SunCal Torrance Loan Agreement are secured by first priority deeds of trust on the Oak Knoll and the Del Amo Projects.  The outstanding aggregate balance of the loans under the SunCal Oak Knoll/SunCal Torrance Loan Agreement was not less than $157,870,186.15 as of the applicable Petition Date.

**SunCal Oak Valley.**  LB/L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Oak Valley Project.

**SunCal Oak Valley Loan Agreement.**  That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal mount of approximately $120,000,000.  The loans made pursuant to and/or evidenced by the SunCal Oak Valley Loan Agreement are secured by a first priority deed of trust on the Oak Valley Project. The outstanding aggregate balance of the loans under the SunCal Oak Valley Loan Agreement was not less than $143,630,091.63 as of the applicable Petition Date.

**SunCal PSV.**  SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Palm Springs Village Project.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**SunCal PSV Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $90,000,000. The loans made pursuant to and/or evidenced by the SunCal PSV Loan Agreement are secured by a first priority deed of trust on the Palm Springs Village Project. The outstanding aggregate balance of the loans under the SunCal PSV Loan Agreement was not less than $88,257,340.20 as of the applicable Petition Date.

**SunCal Summit Valley.** SunCal Summit Valley, LLC, a Delaware limited liability company, a Voluntary Debtor herein, the owner of that portion of the Summit Valley Project not owned by Kirby Estates or Seven Brothers, and the Holder of Allowed Interests in Kirby Estates and Seven Brothers.

**SunCal Torrance.** SunCal Torrance, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Del Amo Project.

**Tax.** Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

**Tesoro.** Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Tesoro Project.

**Tesoro Project.** The Project owned by Tesoro located in the City of Santa Clarita, California, as more particularly described herein.

**Trustee.** Steven M. Speier, the duly appointed trustee of the Trustee Debtors.

**Trustee Debtor(s).** The following chapter 11 debtors, individually or collectively, that are represented by the Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Trustee Debtors' Committee.**  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases of the Trustee Debtors pursuant to Section 1102 of the Bankruptcy Code.

**Unclaimed Property.**  Cash held for Distribution if either (1) such the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.,* as undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date such Distribution first could have been made under the Plan and for one hundred twenty (120) days thereafter.

**Voluntary Debtor(s).**  The following chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit Valley, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

**Voluntary Debtors' Committee.**  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases of the Voluntary Debtors pursuant to Section 1102 of the Bankruptcy Code.

2.  **Rules of Construction.** For purposes of the Lehman Plan and the Lehman Disclosure Statement, unless otherwise provided herein or in the Lehman Disclosure Statement, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Lehman Plan or the Lehman Disclosure Statement to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Lehman Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Lehman Plan or

52063-001
DOCS_LA:205341.9

the Lehman Disclosure Statement to Sections and Articles are references to Sections and Articles of or to the Lehman Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Lehman Plan in its entirety rather than to a particular portion of the Lehman Plan; (g) unless otherwise provided in the Lehman Plan or the Lehman Disclosure Statement, any reference in the Lehman Plan or the Lehman Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Lehman Plan or the Lehman Disclosure Statement to a document or schedule to the Lehman Plan, Plan Documentary Supplement, or Lehman Disclosure Statement Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Lehman Plan or the Lehman Disclosure Statement or any other provision in this Section.

52063-001
DOCS_LA:205341.9

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------x
                                                    :
In re                                               :      **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,        :      **08-13555 (JMP)**
                                                    :
              **Debtors.**                          :      **(Jointly Administered)**
                                                    :
----------------------------------------------------------------------x

## ORDER PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 AND SECTION 363 OF THE BANKRUPTCY CODE AUTHORIZING LEHMAN COMMERCIAL PAPER INC. TO CONSUMMATE TRANSACTIONS CONTEMPLATED IN THE CHAPTER 11 PLAN PROPOSED BY THE LEHMAN LENDERS IN THE SUNCAL CHAPTER 11 CASES

Upon the motion (the "<u>Motion</u>"),[1] of Lehman Commercial Paper Inc. ("<u>LCPI</u>" and together with its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession, the "<u>Debtors</u>"), pursuant to Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and section 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") for an order authorizing LCPI to enter into and consummate the transactions proposed in the chapter 11 reorganization plan for the SunCal Plan Debtors proposed by LCPI and certain of its non-debtor affiliates and annexed as Exhibit A to the Motion (the "<u>Proposed Plan</u>"), all as more particularly described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

---

[1] Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Motion.

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the SunCal Voluntary Debtors; (vii) counsel to the SunCal Involuntary Debtors; and (viii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of LCPI, its estate and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019 and section 363(b) of the Bankruptcy Code, LCPI is duly authorized to (i) enter into and consummate all of the transactions contemplated the Proposed Plan; (ii) execute and deliver such assignments, conveyances, and other documents, and instruments of transfer and to take such other actions as may be reasonably necessary to consummate the transactions contemplated by the Proposed Plan, and (iii) consent to any amendment, restatement, waiver, supplement or other modification of any of the documents contemplated under the Proposed Plan, it being understood that any actions described in this paragraph taken by LCPI or its affiliates may be taken without the necessity of (x) any further court proceedings or approval or (y) any consent of any third party, and shall be conclusive and binding in all respects on all parties in interest in these cases; and it is further

ORDERED that the Proposed Plan may be modified, amended or supplemented by the proponents thereof without further order of the Court, and any agreements related to the Proposed Plan, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, *provided* that, in each case, any such modification, amendment or supplement does not have a material adverse effect on LCPI's estate; and it is further

ORDERED that this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed pursuant to Bankruptcy Rule 6004(h); and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: October __, 2009
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE