1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP) and 08-01420(JMP)(SIPA)

Adv. Case Nos. 09-01177 and 09-01178

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS HOLDINGS, INC./

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

        -against-

LIBRA CDO, LTD.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x

(cont'd. on next page)

2

1              U.S. Bankruptcy Court

2              One Bowling Green

3              New York, New York

4

5              August 26, 2009

6              10:04 a.m.

7

8    B E F O R E:

9    HON. JAMES M. PECK

10   U.S. BANKRUPTCY JUDGE

11

12   CASE CONFERENCE

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2    HEARING re Debtors' Motion to Engage Citadel Solutions LLC on

3    an Interim Basis [Docket No. 4717]

4

5    HEARING re Motion of Lehman Brothers Holdings Inc., et al. for

6    Authorization and Approval of Settlement with Lehman Re Ltd.

7    [Docket No. 4716]

8

9    HEARING re Debtors' Motion for Authorization to Implement

10   Alternative Dispute Resolution Procedures for Affirmative

11   Claims of Debtors Under Derivative Contracts [Docket No. 4453]

12

13   HEARING re Debtors' Motion for an Order Enforcing the Automatic

14   Stay and Holding Shinsei Bank in Contempt for Violating the

15   Automatic Stay [Docket No. 4764]

16

17   RE: SIPC PROCEEDINGS:

18   HEARING re Second Application of Hughes Hubbard & Reed LLP for

19   Allowance of Interim Professional Compensation for Services

20   Rendered and Reimbursement of Actual and Necessary Expenses

21   Incurred from February 1, 2009 through May 31, 2009 [Docket No.

22   1292]

23

24

25

4

1

2  HEARING re Unclaimed Property Recovery Service's Motion for

3  Orders (A) Compelling Payment of Unclaimed Funds by the New

4  York State Comptroller, (B) Lifting the Automatic Stay, or,

5  Alternatively, Providing Relief from the Automatic Stay, (C)

6  Allowing Payment for Services Provided Postpetition and (D)

7  Other Relief [Case No. 08-13555, Docket No. 3345]

8

9  RE: ADV. CASE NOS. 09-01177 AND 09-01178:

10  HEARING re Motion for Summary Judgment; Defendant's Cross-

11  Motion for Summary Judgment

12

13

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Clara Rubin

25                   Penina Wolicki

55

1    and then we'll go to the next matter.

2            MR. KRASNOW:  Yes, Your Honor.

3        (Recess from 10:59 a.m. to 11:02 a.m.)

4            THE COURT:  Be seated.  I never should have even

5    thought about another date.  The 15th is really the only date

6    that works.  My courtroom deputy suggested if I want to start

7    sitting on a Saturday we could do it on a Saturday, but that's

8    not going to work for anybody I don't think.  So, the 15th on

9    the omnibus day and anybody who now wishes to be excused is

10   free to leave and then we can move onto the next set of

11   matters.

12           MR. KRASNOW:  Your Honor, should we wait a moment

13   and --

14           THE COURT:  Sure.

15       (Pause)

16           MR. KRASNOW:  Your Honor, bear with us for a moment.

17           THE COURT:  I've been bearing with you for almost a

18   year.

19       (Pause)

20           MR. KRASNOW:  Your Honor, I think we're ready.

21   Richard Krasnow, Weil, Gotshal and Manges on behalf of the

22   Chapter 11 debtors.

23           The next and final matter on today's calendar is the

24   debtors' motion for an order enforcing the automatic stay and

25   holding Shinsei Bank in contempt for violating that stay.  Your

56

1    Honor, let us be clear that this motion relates to the facts in

2    this case, not any facts that might be alleged in some

3    hypothetical motion, facts not before this Court and which

4    while alleged refer to in various pleadings filed in response

5    to this motion, represent nothing but speculation and

6    conjecture as to what the debtors' position might or might not

7    be in connection with matters that have not yet come into

8    existence in any court.

9         THE COURT:  But Mr. Krasnow, one of the problems with

10   taking that position is that to the extent that there is a

11   determination made with respect to the application of the

12   automatic stay cross-border in Tokyo and the administration of

13   a Tokyo insolvency case, the principles would appear to be

14   comparable to the principles who would apply in any other

15   insolvency proceeding affecting Lehman anywhere else on the

16   globe.  And so it becomes difficult, I'm just making this point

17   so that I see this as a situation contrary to your present

18   articulation which establishes a principle that probably does

19   have broad application.  And for that reason, I welcome and

20   will hear all of the objectors who have raised questions that

21   you've demonized as hypothetical.

22        MR. KRASNOW:  Your Honor, I wouldn't say we demonized

23   it.

24        THE COURT:  Well, maybe I overspoke, but I think it's

25   pretty close.

57

1          MR. KRASNOW:  But, Your Honor, the issues and the

2     facts specific to this case could well exist and indeed there

3     is a proceeding in California, as Your Honor is aware, where

4     there is a similar situation.  And so the questions of comity,

5     full faith and credit, what may occur in a bankruptcy

6     proceeding involving a non-Lehman debtor in Delaware,

7     California or a proceeding that is pending in Japan or anywhere

8     else is, in our view, not at issue.  The question is, in our

9     view, is whether or not conduct of this creditor, the conduct

10    in another court whether that court is in Japan or in another

11    state, is conduct which violates the automatic stay.  The

12    target here is not, as suggested by Shinsei and some of the

13    other objectors, the jurisdiction authority of courts outside

14    of this court to exercise their jurisdiction.  We're not here

15    today suggesting to the Court that the Japanese court, that the

16    court supervisor doesn't have the jurisdiction to determine the

17    issues that have been presented to it.  We're not asking this

18    Court to divest those other courts, to divest the court

19    supervisor of the jurisdiction that it has.  Rather, the focus

20    here is whether or not by invoking the court's jurisdiction the

21    creditor has violated the automatic stay.  This is no different

22    in that respect than if Shinsei Bank or a creditor had

23    commenced an action in some court seeking a recovery from the

24    Chapter 11 debtors.

25          The court in which they commenced the action may well

58

1    have the jurisdiction to consider the issue, the subject matter

2    jurisdiction, it may have in personam jurisdiction over all the

3    parties, but that doesn't mean that what that creditor has done

4    and what we allege Shinsei has done is permitted under the

5    automatic stay.  So to that extent, Your Honor, that is the

6    reason why we say comity is really not at issue.  The protocols

7    that this court has approved and is endorsed as we have is not

8    at issue.  There is nothing in the protocols that is intended

9    to modify the rights that the debtors otherwise have to the

10   protections afforded to them under the automatic stay.  And so

11   that's really the reason why, Your Honor, we've said that these

12   hypotheticals, which have been conjured up, really have no

13   bearing here because this motion is specific; it relates to the

14   specific facts of this case, it relates to precisely what

15   Shinsei has done and the question is whether or not that

16   conduct, that conduct, is violative of the automatic stay.

17        THE COURT:  Now, my understanding as to what Shinsei

18   has done is that consistent with procedures applicable to

19   insolvency proceedings in Japan, they have permissibly filed an

20   alternative plan in the Tokyo district court which, if

21   approved, would result in an outcome detrimental to the

22   interests of Lehman.  Whereas, if the Lehman plan were approved

23   there would be an outcome detrimental to the interest of

24   Shinsei in relative terms.  Do I have it right or wrong?

25        MR. KRASNOW:  If I can characterize it somewhat

59

1    differently, Your Honor?

2         THE COURT:  Sure.  But I'm trying to understand the

3    basics.

4         MR. KRASNOW:  Your Honor, can I answer the question by

5    going through what we believe and to a large extent has not

6    been contested by Shinsei as the facts, the relevant facts as

7    they pertain to the --

8         THE COURT:  I don't want to interfere with your

9    argument at all.  I'm really focused on the comity issue which

10   you said is not part of this dispute, because it seems to me

11   that it is and I need to understand why you assert that it's

12   not.  Because if what you are saying is that a Japanese

13   creditor in Japan cannot permissibly assert a position in a

14   local court that would otherwise be assertable in that court

15   without first coming to this court to obtain relief from the

16   automatic stay where that action would be potentially

17   detrimental to the property interests of Lehman, I think that

18   does raise a comity issue.  And we can discuss that at some

19   point in the argument.  I want you to know, and that's why I've

20   interjected, that I don't accept your original proposition that

21   this is just like it's happening in a state court or before

22   Judge Smith in the Central District of California in SunCal.  I

23   view it as different.

24        MR. KRASNOW:  Your Honor, even if it addresses a

25   comity issue, comity, as far as I am aware, is not a defense to

60

1    a action taken by a creditor that otherwise violates the

2    automatic stay.  And the focus here -- comity, as I understand

3    it, really relates to the relationship between the courts and

4    it's an international variation, if you will, of full faith and

5    credit.  And as I noted earlier, this is not a full faith and

6    credit issue.  It's not a question of whether or not another

7    court in the United States or a court in Japan has jurisdiction

8    and whether or not that jurisdiction should be recognized by

9    this court or whether the Japanese court should recognize the

10   jurisdiction of this court.  It is rather focused on the

11   actions of the debtor.

12        To answer your question as to what Shinsei has done,

13   broadly speaking that's correct but the manner in which they

14   are effectuating what Your Honor has described, is what is at

15   issue here.  It's not simply proposing another plan where

16   Lehman's recoveries would be different than what is proposed,

17   not under the Lehman plan but the Sunrise Finance plan.  It is

18   that they are taking a position with respect to that which

19   would result in a reduced recovery, which in our view violates

20   the stay.  It is not defensive in nature.  It is offensive in

21   nature.  And that, to us, is a critical difference and it is a

22   critical difference that has been recognized in this court.

23        If I may, Your Honor, just briefly touch upon some of

24   the facts as they relate to what is happening in Japan or has

25   happened, because it's relevant to exactly the point that I've

61

1    just raised.

2         Sunrise Finance, which is an affiliate of Lehman, is

3    the subject of a proceeding in Japan; a rehabilitation

4    proceeding and thus Sunrise itself is a debtor-in-possession,

5    if you will, under Japanese law.  In connection with that

6    proceeding there was a requirement that claims be filed.

7    Shinsei Bank filed a claim, LBHI, the Chapter 11 debtor, filed

8    a claim, as did Lehman Brothers Asia Holding which we refer to

9    in our papers as LB Asia.  LB Asia itself is the subject of

10   insolvency proceeding in Hong Kong.  LBHI is the single largest

11   creditor of LB Asia and thus would reap the benefits of

12   substantially all of the recoveries that the joint provisional

13   liquidators of LB Asia successfully obtain.

14        The claims that LBHI and LB Asia filed in connection

15   with the Sunrise proceeding represent approximately seventy-two

16   percent, it's our understanding, of the total claims asserted

17   against LB Asia.  Consistent with the Japanese law, there was a

18   date by which objections, if any, had to be filed to claims.

19   It is our understanding that objections in that proceeding

20   could be filed not only by Sunrise, the debtor, but as well by

21   creditors.  No objections were filed by anybody by the deadline

22   established in that case to the LB Asia's claim.

23        Sunrise did, in fact, challenge the amount asserted by

24   LBHI in its claim.  The challenge went to the difference

25   between what our books and records reflected what was due and

62

1    what Sunrise's records reflected what was due.  That dispute

2    was resolved when LBHI reduced the amount of its claim to the

3    amount reflected in Sunrise's books and records.

4         LB -- Sunrise, thereafter, approved, did not

5    challenge, the claim filed by LBHI as amended.  Nobody else,

6    including Shinsei Bank, challenged or disputed the claim filed

7    by LBHI in its original amount or as amended.

8         It is our understanding, and is reflected in a

9    supplemental declaration by a Japanese counsel supports this,

10   that under Japanese law as a result of their not having been

11   any objections interposed to either LB Asia's claim or LBHI's

12   claim as amended, they are allowed valid claims.  That, in our

13   view, is a pivotal point, Your Honor.  Thereafter, Sunrise

14   filed a plan which contemplates a distribution, pro rata

15   distribution, of around twenty percent of allowed claims to

16   creditors similarly situated.  And in that regard, it's our

17   understanding, LBH's claim, LBHI's claim and Shinsei Bank's

18   claim are all similarly situated and thus we would all get a

19   recovery of twenty percent.

20        Shinsei filed a competing plan.  And it wasn't simply

21   a competing plan which suggested different classes of creditors

22   and the like, it was a plan where the material difference

23   between the Sunrise plan and its plan went and goes to an

24   attempt through the plan to equitably subordinate the Lehman

25   claims.

63

1          We accept and agree with the characterization in

2      Shinsei Bank's objection to what that means under Japanese law.

3      That is a reprioritization of claims.  Claims, we submit, that

4      would otherwise be allowed.  It is a means by which

5      distributions which would otherwise be made to Lehman in

6      respect of its allowed valid claims would be reallocated to

7      other creditors with the primary beneficiary being Shinsei

8      Bank.  That is what is before the Japanese court.  That is what

9      Shinsei Bank did.  The issue, therefore, is fundamentally

10     whether or not that kind of action, whether it occurs in a

11     Japanese court, a court in the States, a court in another

12     foreign jurisdiction, is of the type that violates the

13     automatic stay.

14          Now, there are references throughout the pleadings

15     that have been filed in the objections of those filed by

16     Shinsei and by some of the other parties who are strangers to

17     this proceeding and whose objections, we submit, should simply

18     be overruled for the reasons set forth in our reply, that the

19     law is clear that once a Chapter 11 debtor participates in

20     another proceeding, call it a foreign proceeding, foreign to

21     the home court, if you will, this court, if you will, with

22     respect to Lehman, whether it is in Japan or elsewhere, that

23     the automatic stay cannot be utilized to prevent another party

24     from acting in a defensive matter in respect of a claim that's

25     been filed by the debtor.  We agree, Your Honor.  We cannot

64

1   file a claim in another Chapter 11 case or another

2   rehabilitation proceeding or a liquidation proceeding overseas

3   and simply contend that the other side, be it an administrator,

4   a liquidator or creditors in that case, if they have the right

5   in those -- under those governing laws of the foreign

6   proceeding to object to a plan, that we cannot stand up and say

7   our claim is valid, per se, you cannot challenge it, because to

8   do so would undercut our ability to get a distribution and

9   violate the automatic stay.  That is not our position.  That

10  shouldn't be our position.  It can't be our position.  We

11  accept the fact the defensive actions taken in respect of

12  actions taken by a Chapter 11 debtor are absolutely permitted.

13  It is our view, however, that the attempt to equitably

14  subordinate a claim is not defensive in nature.  It is

15  offensive in nature.

16          And we point out, Your Honor, and the objectants point

17  out, one or more of them, that, in fact, that issue, which is,

18  again, I think goes to the core of our motion, is equitable

19  subordination defensive or offensive has really only been

20  addressed, as best as we can all determine based on our

21  pleadings, by three courts.  And I used the address in the

22  sense of, at least as to two of the decisions that are referred

23  to by the parties, as at least mentioning subordination not

24  really analyzing the issues.  Those three decisions are the

25  SunCal, as I will refer to as SunCal decision that I'm sure

65

1    Your Honor is aware of, which is, Your Honor, in another

2    matter, a Chapter 15 matter, is noted as the law of that case

3    and not this case, the court did there note its view that

4    equitable subordination was defensive.  It was a conclusory

5    statement without any analysis.  It is on appeal.  But there is

6    absolutely no analysis of a fundamental difference between an

7    objection to claim and equitable subordination.

8        The other decision that I've alluded to that the other

9    parties rely upon is the decision in this court by Judge Drain

10   in the Miteom case.

11       In that particular case, the Chapter 11 debtor before

12   Judge Drain had filed a claim.  A trustee in another case

13   objected to the claim and in its objection it also asserted as

14   alternative relief equitable subordination.  The judge, in that

15   case, in our view, really didn't analyze a fundamental

16   difference between equitable subordination and objection.

17   Focused more on the objection to the claim, the challenge to

18   the validity of the claim, and in that context concluded that

19   the objection was permissible.

20       And as to equitable subordination, focused on the fact

21   that the trustee who had interposed these challenges contended

22   that it was not seeking affirmative relief and on those grounds

23   Judge Drain said, well, this is defensive in nature.  We would

24   submit that we believe Judge Drain is wrong and that the

25   appropriate analysis to be undertaken is that which Judge

66

1    Gonzalez did in Enron, which we believe is on all fours with

2    this particular case.

3           In that case, Enron had asserted a claim in an Indiana

4    proceeding.  An adversary proceeding was commenced seeking to

5    equitably subordinate that claim.  There was no objection to

6    the claim.  So it was the pristine issue which, if you will,

7    which is before this court, a claim that was not being

8    challenged as to validity or amount but rather was being

9    subject to equitable subordination.  And Judge Gonzalez noted

10   that the very nature of equitable subordination is -- first it

11   is premised on an acceptance of the fact that the claim itself

12   is valid and allowed.  And that what the party, the offensive

13   party, is seeking to do is exactly what is being sought in

14   Japan as acknowledged by Shinsei Bank which is to take an

15   allowed and valid claim, subordinate it to and reprioritize it

16   vis-a-vis other claims so the distributions that the claimant

17   would otherwise be entitled to are redistributed to others.

18   That, Judge Gonzalez noted, is offensive in nature, it is not

19   defensive in nature, and therefore is subject to the automatic

20   stay.

21          We believe, Your Honor, that the analysis undertaken

22   by Judge Gonzalez as set forth in Enron is the correct and more

23   persuasive analysis.  It applies directly to this case.  And

24   that Your Honor should, we suggest, should conclude that as in

25   Enron so to here the actions that Shinsei Bank has taken

67

1    through it's plan, and this is the primary focus of the plan if

2    not the singular purpose of the plan, to equitably subordinate

3    our allowed claim violates the automatic stay, that they are in

4    contempt for having taken that action and that, therefore, they

5    should purge themselves of that contempt by withdrawing their

6    plan.

7            Your Honor, unless the Court has any questions, for

8    the reasons I've stated and as reflected in our motion, we

9    believe that the relief we sought should be granted.

10           THE COURT:  I have a couple of questions.

11           Your argument assumes that what is happening in Japan

12   is equitable subordination.  I don't know if that's true or

13   not.  Did the parties stipulate that that's what's happening or

14   is there any dispute with respect to the relief that's being

15   sought in Japan as a result of the Shinsei plan?  The reason I

16   bring this up is that as far as I know, the term "equitable

17   subordination" if used in a Japanese court probably wouldn't

18   resonate.

19           MR. KRASNOW:  Your Honor, that's why I, in my

20   argument, refer to Shinsei Bank's description of what they're

21   seeking to do which is consistent with what -- how we've

22   articulated it.

23           THE COURT:  Well, I understand that their plan would

24   elevate their claim and the claims of others in the same class

25   and would subordinate or put in a more junior class claims in

68

1    which LB Asia and LBHI currently would be pari passu under your

2    plan, they'd be junior under their plan, correct?

3         MR. KRASNOW:  Yes, Your Honor.

4         THE COURT:  I don't know whether or not classification

5    for purposes of an alternative plan under the Japanese

6    insolvency regime is or is not the equivalent of equitable

7    subordination.

8         MR. KRASNOW:  Your Honor, again, I would refer the

9    Court to Shinsei's reply where I don't believe they challenge

10   our characterization, and indeed describe in a defensive manner

11   that we don't believe it's meritorious, but in a defensive

12   manner that what they are seeking to achieve through the plan

13   is to reprioritize the claim, which is the terms actually used

14   by the courts and in the decisions that I've described,

15   including Judge Gonzalez's, as how we view equitable

16   subordination.  And if one peruses the plan and opinions that

17   were filed by Shinsei Bank, the reasons why they believe that

18   the Lehman claim should be subordinated, and we're talking

19   about translations from Japanese to English, while the merits

20   of what they say certainly don't resonate with us, the

21   arguments that are being made resonate to me, anyway, in terms

22   of what I would often see when one comes across a claim that

23   someone is saying should be equitably subordinated.

24        So, Your Honor, I would submit that based upon the

25   pleadings that were filed in Japan, and again, Your Honor,

69

1    there's a translation issue, but what one doesn't have to

2    translate is, in fact, the objection that Shinsei Bank filed

3    and I think it's clear there that what they're talking about is

4    equitable subordination, in essence, as we know that.

5         THE COURT:  I don't meant to elevate form over

6    substance, but one of the things I'm struggling with is that in

7    the ordinary course of U.S. Bankruptcy practice, a claim might

8    be equitably subordinated by means of an adversary proceeding,

9    or it might be subordinated by means of classification and then

10   there would be litigation concerning the reasonableness of that

11   classification.  But there would be litigation, no doubt,

12   unless parties consented to the propriety of that

13   classification scheme.

14        In the context of a Japanese insolvency proceeding, it

15   is unclear to me whether or not as a matter of applicable

16   jurisprudence the District Court judge sitting and comparing

17   these two plans is involved in a litigation context in which a

18   party is taking shots at LBHI, or whether or not the court is

19   evaluating the reasonableness and fairness of two schemes and

20   making a decision yes, this one is fair, I will support this

21   one.  I don't know how it works, and I don't know if there's a

22   distinction to be made.  But it seems to me that if what a

23   foreign judge is doing consistent with applicable foreign law

24   is assessing the reasonableness of a distribution scheme, the

25   consequence of which may be adverse to a party in bankruptcy;

70

1    in this case LBHI, that's a perfectly reasonable thing for the

2    judge to do, and I don't think the automatic stay is

3    implicated.

4         MR. KRASNOW:  Your Honor, I'm not going to necessarily

5    disagree with that, however, I certainly am not going to stand

6    up in front of the Court as someone who is facile and an expert

7    in Japanese law.

8         THE COURT:  I suspect there's no one here about to

9    stand up and say that.

10        MR. KRASNOW:  Having said that, Your Honor, I think

11   one can be informed as to the issue that Your Honor has raised.

12   By looking at the pleadings -- what I'll characterize as

13   pleadings, what are, I think, referred to as opinions, filed

14   with the Court's supervisor -- by Shinsei Bank, yes, by Lehman,

15   we did participate in that proceeding, we're not denying that.

16   And what, at least, I gleaned from those pleadings, those

17   opinions, and what each of the parties have put before the

18   Court's supervisor is not questions of classification, but

19   specifically whether or not equitable subordination is or is

20   not appropriate.

21        So, again, Your Honor, what I glean from those -- from

22   the position taken by Shinsei Bank and how they have

23   articulated them before the Japanese court it's apparent to us,

24   in any event, that what is at issue is precisely what would be

25   at issue here were there to be a proceeding commenced against a

71

1    party contending that their claims should be equitably

2    subordinated.  Not does this party belong in that class or

3    another class.

4         THE COURT:  Can you tell me how the treatment of the

5    LBHI claim under the Shinsei proposed plan in Tokyo violates

6    the automatic stay?

7         MR. KRASNOW:  It is our position that it is -- if you

8    will form over substance to look at the manner in which Shinsei

9    is seeking to equitably subordinate; whether it is by an

10   adversary proceeding or how they have done it in the plan, that

11   that attempt to subordinate what is otherwise now a valid and

12   allowed claim, is for the reasons set forth in his analysis in

13   the Enron decision, in Judge Gonzalez' rationale, is an

14   offensive act, not a defensive act.  And where a defensive act

15   would not violate the automatic stay, an offensive act, which

16   in this case is seeking to reallocate distributions we would

17   otherwise receive on our allowed claims, is taking control over

18   property of the estate, and is precisely what goes to the core

19   of the automatic stay and is a prescribed act.

20        THE COURT:  Is it taking control over property of the

21   estate to obtain an order from a court of competent

22   jurisdiction regarding an appropriate distribution scheme under

23   applicable foreign law?

24        MR. KRASNOW:  I will go back to what I said earlier in

25   my argument.  It is in our view in the context of the specific

72

1    facts here.  I am not prepared to stand up before Your Honor

2    and argue that every time there may be a plan proposed before

3    any Court, which affords one treatment for Lehman and

4    presumably other similarly situated creditor, and another, that

5    that is a per se violation of the automatic stay.  If that's

6    what Your Honor is asking I can't say that it would be.  There

7    might be facts and circumstances specific to a particular plan,

8    such as we submit has occurred in connection with the Sunrise

9    proceeding, where there would be a violation of the automatic

10    stay.  But we're not -- I mean, the parade of horribles that

11    has been described, alluded to in certain of the objections,

12    that somehow for example, we're taking the position that if

13    somebody -- another creditor to a foreign debtor, for example,

14    files a claim in connection with that case because that would

15    dilute our distributions, that somehow that violates the

16    automatic stay, for us to assert that would be absurd, we're

17    not taking that position.

18        I'm reluctant to say there's a general rule, Your

19    Honor, because as we all know what the Court will render a

20    decision based on specific facts, and, again, we're saying the

21    facts here are such that what Shinsei Bank is doing is

22    violative of the stay.

23        THE COURT:  Okay.  I think I should hear from Shinsei

24    Bank's counsel.

25        MR. KRASNOW:  Thank you, Your Honor.

73

1          THE COURT:  Mr. Trost, good morning.

2          MR. TROST:  Good morning, Your Honor.

3          Apparently, the motions are quite different that the

4     debtor filed.  We apparently responded to a different motion

5     than the original motion, which complained of Shinsei conduct.

6          But before we get to that, let's correct the record on

7     one set of facts.  The creditors in the Sunrise proceeding,

8     which is an administration proceeding, the by far -- the

9     biggest by far Lehman family creditor is LB Asia for 99.5

10    percent of the claims.  Translating roughly, don't hold me to

11    these numbers from yen to dollars, LB Asia, which is in a Hong

12    Kong liquidation proceeding, with administrators, filed a claim

13    in the Sunrise case for roughly 2.4 billion dollars.  LBHI,

14    which is the proponent of this motion, has filed a claim which

15    is now fifteen million dollars.

16          LB Asia is not a debtor in these proceedings.  So what

17    the motion seeks in the second motion, because we misunderstood

18    apparently -- we and everybody else misunderstood the first

19    motion which had nothing about offensive and defensive.  Just

20    says Shinsei was on the creditors' committee, and we abused our

21    position, and the automatic stay applies.  By the way, the

22    debtor later retracted any suggestion in their supplemental

23    pleading, any suggestion of any kind of misconduct by Shinsei.

24          THE COURT:  So there's no need to discuss it.

25          MR. TROST:  Nothing to discuss on that.  But the

74

1    creditors, the Lehman family creditors, look at the impact your

2    ruling would have if you ruled that we were in contempt of

3    court because we did not know that the automatic stay prevented

4    us from asking the Sunrise administrator to consider a plan

5    which treats the creditors' classification differently than the

6    Sunrise plan.  And LBHI only has fifteen million dollars at

7    stake.  Even if LBHI had everything, we would come out to the

8    same place the automatic stay could not possibly prevent the

9    Japanese proceeding from going forward.

10           And isn't it interesting that the debtor concedes had

11   we or some other creditor objected to the LB Asia claim in that

12   one week we had to do it, in the fall of 2008, between November

13   25th and December 2nd, is what they say.  We could have done it

14   then, we could have said you have no claim at all, LB Asia.  We

15   could have said you had no claim at all, LBHI.  They admit the

16   automatic stay wouldn't affect that.  But we are prevented --

17   because of that we are prevented from suggesting as you raised

18   the question that there are two plans that the administrator

19   should consider.  One, that classifies the Lehman claim of

20   fifteen million dollars, and classifies the LB Asia claim of

21   2.4 billion dollars on a par with the third-party creditors,

22   that's one plan the Japanese administrator could deal with.

23           There's another plan the Japanese administrator could

24   deal with.  And that plan treats the creditors differently,

25   like it would be common under our practice for people to

75

1    suggest that a class of creditors should not be treated

2    equally.  And the facts in the case, I'm going to refer the

3    Court to some exhibits we filed as part of our declaration.

4    The facts in the case make it quite clear, that Sunrise was

5    "Capitalized by debt."  It had almost no equity.

6         But LB Asia is not a debtor in these proceedings.  How

7    could it be that the automatic stay in the United States

8    Bankruptcy Court could stop in its tracks the ability of

9    creditors to contest what the classification should be.  We

10   didn't have time to file a declaration because we received the

11   reply sometime yesterday.  I think it was filed -- they didn't

12   hold back, just that things happened over the weekend.  But we

13   did ask our Japanese lawyers whether in spite of the fact that

14   the claims were allowed, whether a rehabilitation plan under

15   Japanese procedure could still reclassify the claims different

16   than they were allowed?  And the answer is yes.  I represent to

17   you and we would file such an affidavit, but I don't think it

18   makes any different.  LB Asia is not before this Court.

19        Let me go to a second series of facts.  Your Honor has

20   all this in our exhibits.  When Lehman filed their hypothetical

21   motion, the first motion they filed was a hypothetical motion,

22   which said all of these things.  They referred -- they attached

23   in the declaration, I believe I have this correctly, three

24   pleadings that had been filed before the Japanese -- in the

25   Japanese court to be considered by the Japanese supervisor.

76

1    One on May 15th was a rehabilitation proceeding filed by

2    Shinsei.  And it classified the claims different than had been

3    filed by Sunrise; the affiliate which is owned in the chain of

4    Lehman.

5        They also in the Japanese proceeding on May 22nd,

6    there was filed by Asia, may I just call Lehman Asia Holdings

7    Asia and LBHI, the debtor in this case, an objection to the

8    Shinsei plan.  Those were filed in the movant's papers.

9        There was also filed by Shinsei an application to

10   amend the Shinsei plan.  And then two very important documents

11   were omitted from the original motion.  And these -- the

12   lawyers for the debtors all involved in this, Shinsei gave to

13   the -- these two are in our papers, not mentioned in the

14   papers, Shinsei filed an opinion brief, a brief, in support of

15   its classification of claims, which it had a right to do under

16   Japanese law.  What did LB Asia and the debtor do?  They didn't

17   come to this Court and say automatic stay violation, automatic

18   stay violated.  This motion was filed on August 11th.  They

19   didn't come to this Court when other papers were filed.  At no

20   time when these papers were filed raising these issues under

21   Japanese law in a Japanese proceeding, before a Japanese

22   supervisor who is going to decide which of these plans to send

23   to creditors, they didn't come to this Court.  They could have

24   come in -- they could have come on May 16th; the day after May

25   15th.  They could have come on May 22nd.  They could have come

77

1    on June 27th; the day after Shinsei filed an application to

2    modify its plan.  They could have come on June 27th when

3    Shinsei said this is why we think our classification is proper.

4    They didn't come to this Court.  And, moreover, on July 17th in

5    the English translation of sixty-seven pages, LB Asia and this

6    debtor jointly filed an opinion brief as to why its improper

7    not to classify these claims.  That's what they did.  Something

8    happened after July 17th that caused the debtor to consider the

9    fact hey, we better stop this.  We better stop this proceeding

10   before the Japanese court.  And, although, Mr. Krasnow, who's a

11   fine lawyer articulates -- tries to narrow the scope of what

12   he's seeking to do, if he were really seeking to punish this

13   offensive defensive kind of dichotomy that's how cases are

14   going to be decided, about whether you can proceed in a

15   Japanese proceeding.  Why didn't they seek an injunction, why

16   didn't they file a complaint for an injunction?  You would have

17   tossed it out.

18       So they've made all these arguments that they want to

19   make in the proper place in Japan.  And if you were to do

20   anything -- and by the way, all of these papers are in our

21   declaration -- Mr. Kleiner's declaration, and they're not all

22   in Mr. Labine's declaration because they didn't tell you about

23   two of these things.  They didn't tell you about their sixty-

24   seven page brief.  Why didn't they tell you about that in their

25   opening papers?

78

1      THE COURT:  Mr. Trost, let me ask you a question.  Do

2  you know what the procedure is at this point in reference to

3  these two competing plans?  And do you know, what, if any,

4  action is taken either by Shinsei or by Lehman entities in the

5  prosecution of one plan or the other?  What happens next?

6      MR. TROST:  Okay.

7      THE COURT:  If you know.  If you don't know that's a

8  perfectly good answer.

9      MR. TROST:  I do know.  I can tell you what I think I

10  know.

11      THE COURT:  If that's the best you can do.

12      MR. TROST:  But our Japanese clients are with us

13  today, they came in from Tokyo.  This is a very, very, very

14  serious matter for Shinsei Bank.

15      MR. TROST:  What happens -- isn't it telling that

16  we're spending all our time talking about what's happening in

17  Japan and what is the procedure in Japan and Mr. Krasnow do you

18  know and Mr. Trost do you know, and Your Honor is right.  So

19  what happened in answer to your question.  These two competing

20  plans are before our supervisor who is something like a

21  mediator.  I mean, I think he is a person who wants the two

22  sides to come together.  So one plan, and only one plan can go

23  out to creditors.

24      THE COURT:  The supervisor is not a judicial officer?

25      MR. TROST:  I think he's a judicial officer, but I

79

1    don't know that.  But this is within the Japanese court system.

2    The Japanese civil court system, this is a bankruptcy

3    proceeding in the Japanese court system.  And the supervisor

4    has these two competing plans, and he's going to recommend one

5    to the Court to be distributed to creditors to vote.  That's

6    all I know.  That's basically what I know.  But he is very,

7    very important.  The supervisor serves as the traffic cop in

8    terms of their plan process.

9          And as a matter of fact, the -- Shinsei in a pleading

10   that we are instructed by the supervisor we cannot incorporate

11   into the record, there was an effort to mediate this dispute

12   which the debtor turned down.  Before the debtor turned it down

13   probably two weeks before they filed this motion.  So the

14   answer to your question, I think I've answered it.

15         THE COURT:  You have because you've qualified it by

16   indicating it's just what you know.  But I want to ask you if

17   there's something else that you know.  Which is whether

18   parties-in-interest, like Shinsei, or Lehman, have the ability

19   to engage the supervisor to take action in front of the

20   supervisor to influence the supervisor in terms of his exercise

21   of discretion, in terms of what's planned to adopt.  That's

22   question one.  And question two is, is there a procedure for

23   sending out the plans to creditors?

24         MR. TROST:  I don't know the answer to the second

25   question.  I do know the supervisor wants send one plan to the

80

1    Court and then go to creditors.  And my understanding is they

2    communicate, the parties -- the Japanese lawyers communicate

3    with the supervisor.  I'm not sure what the process is.  My

4    guess is it's not formal.

5           THE COURT:  All right, go ahead, I interrupted you.

6           MR. TROST:  By the way, the LB Asia facts are all in

7    our brief, and I'm not going to -- as Mr. Krasnow did not, I'm

8    not going to go over all of that.  All of the arguments are in

9    our brief, and I'll just try and hit the points which I think

10   are appropriate for oral argument.  Because having sat through

11   the Court this morning, I know how busy you are.

12          When we received the reply brief which shifted the

13   focus of the motion, we learned for the first time that because

14   we did not -- because the claims were allowed to be treated as

15   allowed claims, that we are barred -- all creditors of

16   Shinsei -- of Sunrise are barred from taking any position of

17   any form which would treat the LB Asia claim.  Let's just focus

18   on that one at less than parody with everyone else.  We learned

19   that for the first time.  We learned that we could have done it

20   had we filed an objection to the claim.  The case was filed in

21   September, enormous case, you know what the Lehman case is, the

22   same thing over there.  Nobody had any information.  Alvarez &

23   Marsal was trying their best to gather the facts, and you know

24   what it's been like.  So that's what we learned for the first

25   time.  I almost have to pinch myself to say how do I address

81

1    this subject with a straight face.  But I'm going to try and

2    address that subject with a straight face.

3          I've covered a number of these points.

4          THE COURT:  Mr. Trost, let me break in and ask you

5    this.  Do you accept the offensive versus defensive distinction

6    that has been articulated by counsel for Lehman in this

7    instance?  In other words, assuming you had been on your toes

8    in that week that you describe as a remarkably brief period of

9    time to do something that's permissible, mainly object to a

10   claim.  Assuming you would have objected to the claim, which

11   would have been offensive, that's permissible.  But the taking

12   action to subordinate is impermissible because it's taking

13   action to exercise control over property of the estate.  Do you

14   accept the jurisprudence that provides for that dichotomy of

15   behavior?  In other words, defensive behavior is in the safe

16   zone, but offensive behavior violates the stay?

17         MR. TROST:  I do not accept it, but you -- I submit

18   that you mischaracterized what Mr. Krasnow's position is.  He

19   conceded to you that we are not seeking to enforce -- to

20   control property of the estate.

21         THE COURT:  I think it's exactly what he said.  That's

22   exactly what he said.

23         MR. TROST:  That's not --

24         THE COURT:  I heard him say when I asked him a

25   question tell me how what Shinsei is doing in Japan violates

82

1    the automatic stay and he said, unless I heard him wrong,

2    they're seeking to exercise control over property of the estate

3    by seeking to subordinate the claim, that's what I heard.  Is

4    that what you said?

5            MR, KRASNOW:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. TROST:  I do not accept it.  You asked me if I

8    accept that, absolutely not.  We are not seeking -- first of

9    all, how do you deal with LB Asia?  LB Asia is not a debtor in

10   this proceeding.  How could they -- and they represent 99.5

11   percent of the Lehman claim.  They're not a debtor here,

12   they're not a party to this proceeding.  They haven't sought an

13   injunction.

14           With respect to this issue that came up of offensive

15   and defensive, I'd rather go with Judge Posner in his two

16   cases, Martin Dragona (ph.) and the other case that we cite in

17   our footnote.  We have a right to defend ourselves over there

18   in this Japanese proceeding.  Assuming this even should be an

19   interest to an American court, it would be -- others are going

20   to address this.  It would be a horrible precedent and barred

21   American bankruptcy law to have a rule that if a creditor files

22   a -- a debtor here files a 10,000 dollar claim in the UK

23   administration or the Japanese administration that you're done,

24   you can't go forward.  And as of today they're saying they just

25   want to prevent our offensive conduct.  Well, how does anybody

83

1    know what they can do in the Japanese proceeding?  Shouldn't

2    this be for the Japanese supervisor and the Japanese court to

3    decide?

4            If you were to enter this order that we violated the

5    automatic stay and it's been conceded that we can do defensive

6    things but not offensive things, what do we do over there?  If

7    the supervisor calls us and says he wants to talk to us and LB

8    Asia about what to do we got to go to Judge Peck in New York to

9    find out if we can go to the meeting.  It just can't be.  This

10   can't be -- others are going to address this comity issue.  And

11   the fact that a fifteen million dollar claim by a debtor in a

12   case with two and a half billion claims triggers all this,

13   frankly, boggles my mind.

14           Now, with respect to the Enron case I do not

15   believe -- that was a case, by the way, where there was a

16   motion -- they're proceeding in that case was a complaint, an

17   adversary proceeding to subordinate, I don't think it makes

18   much difference.  But I do not subscribe to that difference.

19   And I do not think it should be the law of the case in this

20   situation either.

21           So leaving time for others and knowing that you're

22   busy, I would just like to leave with this thought.  I think

23   Lehman's position, LBHI's position is untenable.  I could say,

24   but I'm not going to it's disingenuous because it came up at

25   the very last after all these papers were filed in the Japanese

84

1   court.  And because we didn't object because Shinsei or the

2   other creditors did not object to the proofs of claim in the

3   one-week period does not mean even if you were to consider

4   somehow you want to get involve in all this mess over Japan,

5   does not mean we can't at the supervisor's request file a

6   competing plan of rehabilitation.

7        THE COURT:  Did you say at the supervisor's request?

8   Did they supervisor request that this plan be filed, or did you

9   voluntarily file it?

10       MR. TROST:  I don't know the answer.  But I do know

11   that he now wants the two parties to get together on one plan.

12   So that I do know.

13       The supervisor -- my understanding is -- I'm not a

14   Japanese lawyer I didn't --

15       THE COURT:  That's obvious.

16       MR. TROST:  And I don't think any of us at this table,

17   on either side, knows the ins and outs of the Japanese

18   corporate reorganization law.

19       THE COURT:  The reason I'm asking questions about it

20   and the reason I've asked you questions about it and I've asked

21   Mr. Krasnow questions about it is I'm trying to understand what

22   precisely is going on in a Japanese proceeding so that I can,

23   in my own mind, characterize it within U.S. jurisprudence as to

24   whether or not it does or it does not constitute a stay

25   violation.  The mere fact that something is happening cross

85

1    border does not mean that it isn't a stay violation.

2              MR. TROST:  Correct.

3              THE COURT:  If Shinsei were to go into a Japanese

4    district court and seek to pursue claims against LBHI that

5    would be wrong.

6              MR. TROST:  That's a different case.

7              THE COURT:  Obviously.  What I'm saying very

8    simplistically is the fact that there are proceedings occurring

9    in a foreign court that's simply an irrelevancy in terms of

10   analyzing whether the stay applies.  It does apply to foreign

11   proceedings where 362(a) can be determined to be implicated.

12   What I'm trying to do determine as a matter of law is whether

13   what Shinsei has done in a set of proceedings that I am

14   unfamiliar with and so are you actually violates the stay.  It

15   could violate the stay.  The fact that it may create a parade

16   of horribles would be unfortunate.  But one of the consequences

17   would be that if there is a stay violation someone would have

18   to come here and get stay relief.  Parties in the past have

19   tried to do that, Shinsei did not.  I'm not suggesting by these

20   comments that what Shinsei has done violates the stay, but it

21   could be that if, for example, what was done in the Tokyo court

22   was not the filing of a competing plan, but the commencement of

23   a complaint against LBHI, a creditor, in the Tokyo District

24   Court seeking to subordinate the claim that that would much

25   more clearly fit within Judge Gonzalez' Enron decision.

86

1          What I am struggling with and what you should

2     understand is that just because there are adverse consequences

3     to the strict application of U.S. law doesn't mean that U.S.

4     law should not be strictly applied.  The question is whether or

5     not it should be applied in this instance.  And in order to

6     apply it in this instance I need to understand the facts and I

7     really don't have them.

8          MR. TROST:  I have two answers -- to points.  The

9     first point is you have these papers, these are in the record.

10    I can give you a separate book.  These are all the facts that

11    we have.  And you will see what's going on as far as I know.

12    These are three pleadings from the debtors' motion and three

13    pleadings from our motions, all are in the declarations.

14         What is going on is that there have been competing

15    plans of reorganization, these are liquidation plans.

16    Competing plans of reorganization with different classification

17    of claims.  And they're before the supervisor and the parties

18    have been filing briefs with the court which the supervisor

19    reads advocating one set, which is the Shinsei set which treats

20    the claims as subordinated.  And one plan which treats them all

21    as pari passu.  That's as much as I know what's going on.

22         Plus, the supervisor would like to get the parties

23    together so that they could agree on one plan.  And that has

24    been rejected by the debtor.

25         The second point, Mr. Krasnow -- I don't think I

87

1   misunderstood this in the brief.  He concedes that we had the

2   right to object to LB Asia and LBHI between November 25th and

3   December 2nd without coming to this Court to seek permission.

4   He concedes that in his written papers, he conceded it in oral

5   argument.  So they have conceded that but for the fact that we

6   didn't do anything by December 2nd, this is converted into this

7   dichotomy of offensive and defensive, and all of a sudden we

8   violated the automatic stay.

9            THE COURT:  I don't think he's conceding anything.

10  I --

11           MR. TROST:  Oh, he does concede that, Your Honor.

12           THE COURT:  No.  I think what he was saying is that

13  for purposes of existing jurisprudence doesn't involve anything

14  dramatic, it's perfectly permissible for a party in a second

15  debtors' bankruptcy case to object to a claim filed by the

16  debtor from a first bankruptcy case.  That a proof of claim in

17  which the debtor submits to the jurisdiction of another court

18  can be objected to principally without stay relief.

19           So what he is saying, however, if I'm understanding

20  his argument, is that that's different from filing an adversary

21  proceeding seeking to subordinate an allowed claim.

22           MR. TROST:  We haven't filed an adversary proceeding,

23  that I can tell you.

24           THE COURT:  I understand that.  And one of the reasons

25  that I am asking as many questions as I have asked regarding

88

1    what is going on in the Tokyo District Court is to try to

2    determine procedurally whether or not it is or is not

3    comparable in any way to adversary proceeding practice, or

4    taking offensive action, or doing anything procedurally that

5    would be deemed the exercise of control over property of the

6    estate.  Because if it's any of those things the stay is

7    violated.  If it's not, if it's characterized as this is just

8    ordinary course Japanese practice in which competing plans are

9    submitted, it happens all the time, and the supervisor looks

10   left and looks right, weighs them and compares them, says I

11   like this plan better and throws it out for a vote, I'm not

12   sure that violates anything.

13          MR. TROST:  That's where they are, the latter.  And I

14   would raise this point --

15          THE COURT:  I appreciate the fact that you've said but

16   you've also said you're not a Japanese lawyer and I accept that

17   fact, and I'm not sure I can accept that representation.  So

18   what I don't know from the stack of papers that I have, I

19   believe this is that binder, what I don't know from that stack

20   of papers, despite all of the translations from Japanese into

21   English is procedurally exactly what happens next.  And

22   procedurally what has happened in Japan.  Is there a court like

23   this, with people sitting around and a record maintained, is

24   there due process of the sort that we ordinarily expect in a

25   U.S. Bankruptcy Court.  I recognize that the procedures are

89

1   different, I recognize that Japanese legal proceedings are

2   entitled to respect in this country, the due process as we know

3   it is accorded, but it differs from situation to situation.  I

4   don't know enough about it to know whether or not rights of

5   creditors are fully respected and protected.  I just don't

6   know.  And I suspect there isn't a person in this courtroom who

7   really does.  But if there is I'd like to hear from him or her

8   if there's a position to express in this point.  And if we

9   don't have a position to express on this point I expect

10  supplemental briefing.

11          MR. TROST:  I would make one point and I'll sit down.

12  LB Asia.  Does it under any stretch of the imagination how

13  could the automatic stay prevent any creditor from opposing LB

14  Asia, which is not a debtor in this proceeding.  The allegation

15  in the debtors' motion is they have the beneficial interest in

16  the recovery.  But LB Asia is in a liquidation proceeding with

17  joint administrators in Hong Kong.

18          THE COURT:  I'm not dealing with LB Asia for purposes

19  of what I just articulated.  To the extent that there's a stay

20  violation as to LBHI that's really all that matters for purpose

21  of today or, frankly, the next day that we have a hearing after

22  supplemental briefing.

23          I view the LB Asia issue to some extent a red herring

24  comparable to Lehman ALI in the case of SunCal which was

25  referred to by debtors' counsel.  Lehman has a lot of entities

90

1   and most of them are not in bankruptcy.  Those that are in

2   bankruptcy are entitled to stay protection, those that are not

3   in bankruptcy are not entitled, but there may be derivative

4   benefits.

5           MR. TROST:  Thank you.

6           THE COURT:  Is there anyone else who wishes to speak

7   at this point on this subject?  Mr. Flics.

8           MR. FLICS:  Your Honor, Martin Flics of Linklaters LLP

9   on behalf of the joint administrators of the Lehman European

10  Group administration companies.

11          I will be very brief and thank you for hearing me

12  today.  I assure you that I have absolutely no insight to offer

13  on Japanese bankruptcy law.  And it may be that the decision in

14  this matter does turn on some specific matters relating to

15  Japanese bankruptcy law.  And so I will just make a few general

16  comments for whatever they are worth.

17          First, Your Honor, the original motion when we read it

18  did cause us some degree of concern based on the arguments that

19  it made and based upon a bit of a floodgates argument that was

20  actually mentioned, I believe in paragraph 35 of the motion,

21  that if we allow this other creditors will -- may do similar

22  things, whatever similar might mean.  And we did attempt to

23  contact the debtors' counsel to get some comfort on that, we

24  weren't successful to do that and that was the reason we felt

25  that it was appropriate to file the pleading that we did.

91

1          Your Honor, speaking at a very general level.

2    Obviously, we all know there a many foreign insolvency

3    proceedings.  I suspect that just at this is the biggest

4    bankruptcy case ever, I believe there are probably more foreign

5    solvency proceedings with respect to this entity than there

6    ever has been.  And it is the nature of insolvency proceedings,

7    I believe, it is fair to say, that there is an ordinary

8    process.  There are many differences, of course, among

9    insolvency regimes, but there's a fairly ordinary process.  And

10   that is some process of some type is commenced.  And that

11   creates an estate of some type.  And then creditors, or other

12   claimants, with respect to that estate enter into that process.

13   They open the door, if you will, and enter into that process if

14   they choose to assert their claims.

15          Now with respect to those claims there is no right to

16   a recovery until the end of that process when the Court or

17   whatever appropriate authority determines that there is a right

18   to that recovery.  In this case, as far as I can determine,

19   there is no suggestion of any effort to obtain an affirmative

20   recovery against LBHI or LB Asia, they are in the midst of an

21   insolvency proceeding, and the issue is what will be the

22   distribution on the claim of LBHI or LB Asia.  Now, I've

23   admitted I know none of the details, but it strikes me that

24   it's not an uncommon situation, it is precisely in a general

25   way the sort of situation that is faced in insolvency

92

1   proceedings around the world, hence the concern.

2        And I believe the case law in discussing offensive or

3   defensive, you can get bogged down in what is the meaning of

4   offensive of defensive, and I would submit that if you ware not

5   seeking an affirmative recovery, but you are just being heard

6   in that proceeding with respect to the claim that has been

7   asserted, then it's a wholly artificial distinction to allege

8   whether or not there's some concept of allowance in the middle

9   of the process that you have chosen to enter.

10       Your Honor, I'll also just address for a moment Mr.

11  Krasnow's comment that we really shouldn't be concerned because

12  we are -- we're not affecting the jurisdiction of a court here,

13  I mean, we're not saying Court, you can't do this.  But, in

14  fact, if there is an improper affect on creditors and there are

15  many with many claims in many proceedings, then, in fact, if

16  those creditors cannot or will not or are concerned about

17  bringing actions that they are lawfully entitled to bring, then

18  foreign courts and other tribunals will not, in fact, have the

19  ability to make the proper determinations because it will never

20  be brought before them.

21       Your Honor, finally, I am not aware that any party of

22  the debtor has cited to any case, doesn't mean there couldn't

23  be one, now we're in the future, any case in which a court has

24  enjoined the actions of a creditor in a foreign insolvency

25  proceeding in taking actions in respect of a claim that has

93

1  been voluntarily submitted and asserted in the course of that

2  proceeding.

3        And for those reasons, I would urge the Court to

4  overrule the motion.  Thank you.

5        THE COURT:  Are there others who wish to be heard on

6  the side of opposition to the Lehman motion?

7        MR. O'NEAL:  Your Honor, Sean O'Neal, Cleary Gottlieb

8  on behalf of three European banks that have filed objections.

9        I'll make this extremely brief.  We appreciate the

10  Court's understanding as to why other creditors would be

11  interested in this proceeding.  Our point is simple, that entry

12  of this contempt order could have broad applications outside

13  the U.S. and we appreciate Your Honor being cognizant of those

14  concerns.  And we do understand there are situations in which

15  creditors' actions outside the U.S. Can, in fact, impact the

16  automatic stay.  However, our concern here is that we need to

17  proceed very carefully and the Court needs to proceed very

18  carefully, as we know it will, in applying the automatic stay

19  to the legitimate exercise of creditor actions outside the

20  U.S., when those actions are actually in accordance with the

21  applicable foreign law.

22        We echo Mr. Flics' concerns and the sentiments

23  expressed in the objection.  We highlight a few particular

24  concerns which is that at this point in which I think Your

25  Honor is fully aware, that the facts and circumstances are not

94

1    sufficiently clear to the Court to determine whether or not

2    relief is appropriate.  And we should keep in mind that it is

3    the debtors' burden to make that showing.

4        It is also unclear to us whether really the Enron case

5    on subordination, as Your Honor noted, is really applicable in

6    this context where we are dealing with concepts under Japanese

7    law.  I think those -- and it can also be said that many of the

8    cases that are relied upon in this Court have been cases

9    involving U.S. proceedings, and I think we have a fundamentally

10   different issue when we're dealing with proceedings outside of

11   the U.S., due to comity and related concerns.

12       And at any rate, I think we should all keep in mind

13   that the distinction between equitable subordination and claims

14   disallowance as set forth in the Enron decision is not entirely

15   clear, not all courts have come to that view, which makes sense

16   given that the overall result is relatively the same, which is

17   no recovery.

18       And then I think, finally, Your Honor, we would

19   express concern, both about the request for relief in favor of

20   nondebtor entities, I think that has been discussed here today.

21   And the concern that the normal distinction that we've seen in

22   U.S. Cases between offensive and defensive actions might not be

23   able to be uniformly applied across jurisdictions.  So I don't

24   think the Court and the litigants should immediately jump to

25   the assumption that that normal dichotomy that is applied in

95

1    U.S. cases really makes sense in this context.

2          And with that, Your Honor, I think that's all we have.

3    And we appreciate your hearing our concerns.

4          THE COURT:  Okay, thank you.  Is there anyone else who

5    wishes to be heard before Mr. Krasnow gets a chance to talk?

6          MR. KRASNOW:  Thank you, Your Honor, I'll be brief.

7          First of all, Your Honor, we certainly take the

8    position that creditors shouldn't be permitted to do in foreign

9    jurisdictions what they can't do here.  To allow them to do

10   that would allow creditors of the estates who otherwise have

11   access or the ability to get judgments outside the United

12   States to be able to do so while creditors who may not be in

13   the similar position to get that advantage.  The automatic stay

14   applies in an extraterritorial sense.

15         Secondly, Your Honor, if Your Honor accepts our view

16   of the affective equitable subordination, which is to divert

17   recoveries that otherwise would be made to the debtors to

18   somebody else, that is an affirmative recovery.

19         Lastly, Your Honor, I am not going to argue what

20   Japanese law is or is not, I will observe, Your Honor, that it

21   is certainly our understanding, if I can phrase it that way and

22   Your Honor will accept that, that the plans were not filed,

23   either Sunrise or Shinsei's at the invitation of the court's

24   supervisor.  It is our understanding there was a deadline for

25   the filing of plans.  The plans were filed consistent with that

96

1    deadline.  Yes, Your Honor, I noted in my argument, there were

2    then opinions or briefs filed by both sides with respect to the

3    plan that Shinsei filed.  Those were filed with the court's

4    supervisor.  It's our understanding that the Court's

5    supervisor, I analogize it to some extent, like a magistrate

6    considers the legal issues in the plans and then makes a

7    recommendation to the District Court.  It is my understanding

8    that there are communications that are had between the

9    supervisor and the parties.  And, in fact, I'll use

10    understanding again, that the supervisor has reached out to

11    Sunrise, has requested that it makes certain modifications to

12    its plan; the Sunrise plan, totally unrelated to the issues at

13    hand.

14         Having said all of that, Your Honor, we would suggest

15    to take up with the Court's observation, that the appropriate

16    next steps may well be that there be supplemental declarations

17    that are filed, not by U.S. lawyers interpreting what Japanese

18    lawyers tell them the law is in Japan, but rather that we

19    solicit from our Japanese counsel a declaration which responds

20    to Your Honor's inquiries, so Your Honor could better

21    understand and, perhaps, all of us can, exactly what the

22    process is in Japan.

23         Certainly, it is our view that based upon our readings

24    of the plans that have been filed in the Shinsei plan, that

25    what they are doing through the plan is the equivalent of an

97

1    adversary proceeding, if you will.  But I know Your Honor is

2    not going to be terribly swayed by our views in that regard.

3    And so I think that is the appropriate and reasonable next

4    steps.

5        THE COURT:  That sounds right to me.  I think it would

6    be useful to the process and certainly will inform me if I have

7    sworn declarations from Japanese lawyers who are involved in

8    the Sunrise proceeding and who are able to provide some first-

9    hand knowledge of what the process is all about; what has

10   happened so far, what is currently being decided by the

11   supervisor, and what will happen next.

12       I'm also fairly interested in knowing something which

13   is almost the ultimate question.  And that is who's doing the

14   subordination, who's doing the classification?  It seems to me

15   and I may be putting too fine a point on this at the end of the

16   argument, that if the supervisor is being given plans to

17   consider for recommendation to the court, and the court in

18   Japan is then is authorizing that a particular plan be

19   distributed to creditors for their approval, that at that point

20   Shinsei is doing nothing.  At that point the court is doing

21   something consistent with applicable Japanese insolvency law to

22   effect an equitable distribution.  That is not a violation of

23   the automatic stay in my view.

24       So part of the question that I'm wrestling with is who

25   is doing what to whom and how are they doing it?

98

1          MR. KRASNOW:  Yes, Your Honor.

2          THE COURT:  And I'd like more information on the set

3     of questions.

4          MR. KRASNOW:  It's our position that Shinsei through

5     it's plan is, in fact, seeking the subordination.

6          But having said that, Your Honor, we will reach out to

7     our Japanese counsel.  I would suggest that since I know

8     speaking for ourselves, I can't commit timing wise in terms of

9     the filing of a declaration, I suspect that Mr. Trost is in a

10    similar position, that we each speak to our respective counsel,

11    speak to one another so that we can agree upon a date for the

12    filing.  And if we can't agree then seek the Court's advice or

13    intervention in that regard, rather than agreeing to a date

14    right now.

15         THE COURT:  I think that makes sense, too.

16         MR. TROST:  I think that makes sense.  What I was

17    going to inquire.  I assume you would like one declaration by

18    somebody and that we each have -- the lawyers ought to be able

19    to agree or point out where the Japanese lawyers disagree as to

20    what the process is.  I don't expect that but would you -- is

21    that what you -- you don't anticipate each of us filing a

22    declaration?

23         THE COURT:  Well, I, frankly, didn't have any

24    anticipation.  Although, when I said what I said, I was

25    assuming that that there'd be two declarations.  I was assuming

99

1    that there would be one from counsel for Sunrise, or for Lehman

2    in Japan, that there would be another from Shinsei's counsel.

3    If they could agree on one declaration that would be great, but

4    I have a strong sense that there might be areas of

5    disagreement.

6            MR. KRASNOW:  I was about to say, Your Honor, we would

7    be pleased and encouraged Shinsei adopting our views as to what

8    the results would be here.  And I accept Mr. Trost's

9    proposition in that regard.

10           MR. TROST:  We'll try.

11           MR. KRASNOW:  Why don't we see -- I envisioned there

12   would be two separate declarations.  If, in fact, our

13   respective counsel absolutely agree on their interpretation of

14   Japanese law, it is what it is.

15           THE COURT:  Then it suggests that it truly is a great

16   system over there.  And I'll see you next time, but I'll wait

17   to hear from you as to when next time will be.

18           MR. KRASNOW:  Thank you, Your Honor.

19           THE COURT:  We're adjourned to 2 o'clock for a

20   2 o'clock calendar.

21           MR. KRASNOW:  Thank you, Your Honor.

22      (Recess from 12:31 p.m. until 2:09 p.m.)

23           THE COURT:  Be seated, please.

24           MR. KOBAK:  Good afternoon, Your Honor.

25           THE COURT:  Good afternoon.