Lovells LLP
Matthew P. Morris
590 Madison Avenue
New York, New York 10022
Telephone: (212) 909-0600
Fax: (212) 909-0660

*Attorneys for Phoenix Life Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS, INC.,

               Debtor.

**Chapter 11 Case No. 08-13555 (JMP)**

PHOENIX LIFE LIMITED,

               Plaintiff,

     v.

LEHMAN BROTHERS COMMERCIAL
CORPORATION,

               Defendant.

**Adv. Proc. No. 08-_____**

## ADVERSARY COMPLAINT FOR CONSTRUCTIVE TRUST AND OTHER EQUITABLE RELIEF

Plaintiff Phoenix Life Limited ("**PLL**"), by its attorneys Lovells LLP, for its complaint against Lehman Brothers Commercial Corporation ("**LBCC**"), hereby respectfully states as follows:

## **NATURE OF THE ACTION**

1.     PLL commences this adversary proceeding for a constructive trust on PLL's funds wrongfully transferred to LBCC by Lehman Brothers International (Europe) ("**LBIE**") and currently held in an LBCC account.  PLL is party to a reinsurance agreement and supporting security agreement with Lehman Re Limited ("**Lehman Re**"). Pursuant to these agreements, Lehman Re reinsured PLL's payment obligations on certain annuity contracts and provided PLL with a security interest in Lehman Re assets as collateral to secure Lehman Re's performance under the reinsurance agreement. That collateral was held for PLL's benefit by LBIE pursuant to a custody agreement between LBIE and Lehman Re.  The appointment of a provisional liquidator for Lehman Re triggered an event of default under the reinsurance agreement and automatically terminated the reinsurance agreement between PLL and Lehman Re. The event of default also made PLL's security interest in the assets held by LBIE as custodian under the security agreement immediately enforceable.  PLL subsequently learned that the majority of the collateral assets held by LBIE were--without PLL's knowledge or required authorization-- redeemed by LBIE and the proceeds (together with coupons, interest payments and swaps) were transferred, again without PLL's knowledge or required authorization, to an account in the name of Lehman Re with LBCC.  LBIE knew that the transferred collateral had been pledged to PLL, and LBCC therefore holds these funds in constructive trust for the benefit of PLL.  LBCC has no rights of possession over the collateral or the proceeds from the redemptions, coupons, interest payments and swaps. Prior to the commencement of this adversary proceeding, PLL sent a demand letter to LBCC, stating that the transferred funds were held in trust and seeking assurances that LBCC would not deal with the funds without PLL's consent. Despite PLL's

demand, LBCC has failed to respond. Of necessity, PLL commences this adversary proceeding for constructive trust.

## THE PARTIES

2. Plaintiff Phoenix Life Limited ("**PLL**") is a company registered in England, registered number 1016269, with its registered office in Wythall, Birmingham.

3. Defendant Lehman Brothers Commercial Corporation ("**LBCC**") is a Delaware corporation with its principal place of business in New York, New York. On October 5, 2008, LBCC commenced a voluntary Chapter 11 case under the United States Bankruptcy Code.

## JURISDICTION AND VENUE

4. This is a civil proceeding arising in a case under the United States Bankruptcy Code, 11 U.S.C. §101 et seq. within the meaning of 28 U.S.C. §1334. It is properly brought as an adversary proceeding pursuant to Bankruptcy Rule 7001.

5. This Court has jurisdiction of this adversary proceeding under 28 U.S.C. §§157 and 1334.

6. This is a core proceeding under 28 U.S.C. §157(b)(2).

7. Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C §1409(a).

## FACTS

8. Britannia Life Limited ("**Britannia**") (now PLL) is party to a reinsurance agreement dated March 22, 1999, and as amended February 28, 2006, with Lehman Re whereby Lehman Re reinsured PLL's payment obligations in relation to a pool of annuity

contracts (the "**Reinsurance Agreement**").[1] This Reinsurance Agreement was supported by a security agreement dated March 22, 1999 (the "**Security Agreement**"),[2] between Lehman Re and Britannia[3] pursuant to which Lehman Re granted security in favor of PLL over certain collateral, including cash and non-cash assets (as defined in section 9(vii) of the Security Agreement), to secure its obligations under the Reinsurance Agreement (the "**Collateral**").

9.     Lehman Re also entered into a custody agreement with LBIE dated March 19, 1999, which provided for LBIE to hold the Collateral as custodian for Lehman Re (the "**Custody Agreement**").[4] The Custody Agreement was formed to facilitate Lehman Re's obligations to PLL under the Security Agreement and PLL is a third-party beneficiary under the Custody Agreement. In particular, pursuant to section 2 of the Custody Agreement, Lehman Re authorized LBIE to establish "accounts … in the name of [Lehman Re] and in the capacity as Custodian, for the deposit of any Securities, and other Property (apart from Cash) from time to time received by [LBIE] for the account of [Lehman Re], and a deposit account or accounts … in the name of [LBIE] which will be an account subject to the Client Money Rules and designated as a client account, for the deposit of funds in any currency from time to time received by [LBIE] for the account of [Lehman Re], whether by way of deposit or arising out of or in connection with any Securities, or other property in the Custody Account."[5]

---

[1]   Lehman Re originally contracted with Britannia under the Reinsurance Agreement. Britannia was subsequently named Alba Life Limited ("**Alba**"). The long-term business of Alba was then transferred to PLL pursuant to a transfer under Part VII of the Financial Services and Markets Act 2000 approved by the English High Court on December 8, 2006.  PLL is thus the successor-in-interest to the rights of Britannia under the Reinsurance Agreement. A copy of the Reinsurance Agreement is attached as <u>Exhibit A</u>.

[2]   A copy of the Security Agreement is attached as <u>Exhibit B</u>.

[3]   By virtue of the transfer of business from Alba (formerly Britannia) to PLL, PLL is a successor-in-interest to Britannia under the Security Agreement. Hereafter, PLL is referred to as the counterparty to Lehman Re under the Reinsurance and Security Agreements.

[4]   A copy of the Custody Agreement is attached as <u>Exhibit C</u>.

[5]   Capitalized terms not otherwise defined herein shall have the meaning set forth in the Custody Agreement.

10.     Pursuant to section 2.1 of the Security Agreement, Lehman Re was required to "discharge each of the Obligations in the manner provided for in the Reinsurance Agreement and pay to [PLL] when due and payable and in the manner provided for in the Reinsurance Agreement each sum owing by [Lehman Re] to [PLL] in respect of the Obligations."[6]

11.     Pursuant to section 2.3 of the Security Agreement, Lehman Re granted a fixed charge in favor of PLL over the Collateral in the "Accounts." "Accounts" is defined in section 1.1 of the Security Agreement as "the accounts with [LBIE] in which the Non-Cash Collateral and Cash Collateral subject to this Security Agreement are held." This created a security interest in favor of PLL over the Collateral in Lehman Re's accounts with LBIE as established under the Custody Agreement.

12.     Pursuant to section 9 of the Security Agreement, the Collateral was to be credited to Euroclear Bank ("**Euroclear**") account number 97588 (the "**Euroclear Collateral Account**"). By letter dated March 22, 1999, LBIE confirmed to PLL that (i) the Euroclear Collateral Account had been opened in the name of LBIE for the purpose of holding the Collateral; (ii) the Collateral was held in the Euroclear Collateral Account subject to the fixed charge in favor of PLL; (iii) LBIE agreed to hold the Collateral in charge for the benefit of PLL; and (iv) LBIE would accept instructions from PLL in accordance with the provisions of the Security Agreement.[7]

13.     The Custody Agreement did not grant LBIE the right to dispose of, transfer or hypothecate the Collateral, or granted these rights only with proper authorization or written permission. The Custody Agreement granted LBIE, under sections 6(a)(ii)(aa) and 6(a)(iii)(aa), the rights to "collect and receive … all income and other payments and distributions in respect

---

[6]     Capitalized terms not otherwise defined herein shall have the meaning set forth in the Security Agreement.

[7]     A signed copy of the acknowledgement letter from LBIE to PLL, dated March 22, 1999, is attached as <u>Exhibit D</u> ("**LBIE Acknowledgement**").

of [the Collateral]", and "to receive and hold for the account … any capital arising out of or in connection with [the Collateral]."  LBIE also had the right, pursuant to section 6(b) of the Custody Agreement, to carry out other transactions "upon receipt of specific Instructions." "Instructions" is defined under section 1 to mean "instructions from any Authorized Person", which includes PLL and any Lehman Re officer, employee or agent.  Section 6(c) of the Custody Agreement provides that LBIE agrees that its authority to administer the Collateral is subject to the instructions given to it by Lehman Re under Annex 1 of the Security Agreement and the acknowledgement LBIE gave to PLL in Annex 2 of the Security Agreement.

14.    Finally, section 10(a) of the Custody Agreement authorizes LBIE "to appoint agents, (including any member of the Lehman Organization), whether in its own name or that of [Lehman Re], to perform any of the duties of [LBIE] under [the Custody Agreement]; provided that any agent so appointed other than Euroclear or the CGO[8] shall only be appointed with the prior written consent of [PLL]."  Section 10(c) of the Custody Agreement then permits LBIE "to deposit any [Collateral] at its discretion in any Clearance System [defined as Euroclear or CGO], or any other clearance system reasonably deemed appropriate by the Custodian on the condition that [PLL]'s prior written consent has been obtained in accordance with Section 10(a) [of the Custody Agreement.]"

15.    With respect to PLL, Annex 1 of the Security Agreement gave PLL the right to give instructions to LBIE regarding the Collateral in accordance with the provisions of the Security Agreement.  Further, Annex 2 of the Security Agreement is an acknowledgement and agreement by LBIE to accept instructions from PLL in relation to the Collateral held with

---

[8]    Section 1 of the Custody Agreement defines CGO as the "Central Gilts Office; the computer based system managed by the Bank of England to facilitate the book-entry transfer of gilt-edged securities."

Euroclear in accordance with the Security Agreement. See LBIE Acknowledgement at Exhibit D; see also Security Agreement at Exhibit B, Annex 1 & Annex 2.

16.     Between July 1, 2007 and August 31, 2008, LBIE redeemed a substantial amount of the bonds that constituted the Collateral and transferred the proceeds, together with coupons, interest payments and swaps (the "**Transferred Funds**") from the Euroclear Collateral Account to LBCC, without PLL's prior written authorization or knowledge, in violation of PLL's security interest and in breach of section 10 of the Custody Agreement (the "**Wrongful Transfer**"). The Transferred Funds are currently being held by LBCC in account number 270-90007 in Lehman Re's name (the "**LBCC Account**").

17.     Between July 1, 2007 and August 31, 2008, PLL was neither informed nor had any reason to believe that there had been a redemption of the bonds held by LBIE in the Euroclear Collateral Account or the Wrongful Transfer of the Transferred Funds to the LBCC Account. It was not until the September 2008 administration of LBIE that the Wrongful Transfer and the location of the Transferred Funds came to light.

18.     On September 15, 2008, LBHI, the parent company of LBIE and LBCC, filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York and LBIE was placed in administration with the U.K. Companies Court, Chancery Division of the High Court of Justice under the management of certain partners in PricewaterhouseCoopers who were appointed as administrators to LBIE ("**PwC**" or the "**LBIE Administrators**").

19.     On September 23, 2008, Lehman Re petitioned for the appointment of liquidators in Bermuda Commercial Court.[9] This triggered an Event of Default (as defined in article 6 of the Reinsurance Agreement) and automatically terminated the Reinsurance Agreement

---

[9]     A Bermuda-based partner of PwC was designated as provisional liquidator of Lehman Re.

(pursuant to article 8 of the Reinsurance Agreement). The occurrence of the Event of Default under the Reinsurance Agreement also had the effect that PLL's security interest in the Collateral held by LBIE as custodian under the Security Agreement became immediately enforceable.  At the time, PLL believed the entirety of the Collateral was being held in the Euroclear Collateral Account; PLL was unaware that any of the Collateral had been deposited into the LBCC Account.  Shortly thereafter, as a result of an investigation by PwC described below, PLL learned that the Collateral in its entirety was no longer located in the Euroclear Collateral Account and that some portion of it had been transferred to LBCC.

20.     Since September 2008, PLL has sought to establish what assets were still held by LBIE as collateral subject to PLL's security. In 2007, PLL had received a statement from Lehman Re showing the Collateral held on behalf of PLL as of June 29, 2007.[10] PLL used this information as the starting point for its investigation.

21.     On September 17, 2008, PLL wrote to the LBIE Administrators seeking confirmation that the Collateral held by LBIE would be made available to PLL.[11]

22.     On December 18, 2008, PLL wrote to Alvarez and Marshal, who were acting for LBCC, indicating that it understood that £50 million held in the LBCC Account was held by LBCC on trust for PLL. PLL also sought confirmation that LBCC would not deal with these funds without the consent of PLL or Lehman Re's Joint Provisional Liquidators.[12]

23.     In 2009, PLL received copies of the LBCC cash account records covering the period from July 2007 to August 2008 from Lehman Re (the "**LBCC Records**").[13]  The LBCC

---

[10]   A chart provided by Lehman Re to PLL illustrating the Euroclear Account Collateral Balance as of June 29, 2007 is attached as <u>Exhibit E</u>.

[11]   A letter from PLL to the LBIE Administrators, dated September 17, 2008, is attached as <u>Exhibit F</u>.

[12]   A letter from PLL to Alvarez and Marshall (who were acting for LBCC), dated December 18, 2008, is attached at <u>Exhibit G</u>.

[13]   A copy of the LBCC Records provided by Lehman Re from July 2007 to August 2008 is attached as <u>Exhibit H</u> ("**LBCC Records**").

Records showed that 10 bonds that ought to have been held as Collateral for PLL had been redeemed between 2007 and 2008 and that the redemption proceeds, together with interest, swaps and coupons had been transferred by LBIE to the LBCC Account.[14] Lehman Re also provided PLL with records of the redemptions of bonds, coupons, interest and swaps in the Euroclear Collateral Account between 2007 and 2008 (the "**LBIE Records**").

24. In July 2009, PLL provided this information to PwC and requested that PwC investigate whether it was possible to reconcile the cash movements set out in the LBCC Records with the LBIE Records.

25. On information and belief, PwC carried out an investigation based on the data provided by PLL and prepared a report that connected the redemption of bonds by LBIE with the transfer of these proceeds, together with coupons, interest and swaps to the LBCC Account.[15] The LBIE Administrators confirm that this reconciles with LBIE's records and that they understand that bonds were redeemed by LBIE and the proceeds transferred to the LBCC Account. In particular, PwC found that "[w]hilst there is no direct correlation between the actual decrease in monthly bond values … and the cash redeemed over the period, there is a sufficient link in the overall movement to establish the correlation." See Summary of Findings at Exhibit J, p. 7.

26. On August 31, 2008, the LBCC Account balance was £49,836.656.10 (or $91,163,703.17). See LBCC Records at Exhibit H, "August 2008".

---

[14] A table summarizing the bonds that continue to be held in the Euroclear Collateral Account and those redeemed and transferred to the LBCC Account is attached as Exhibit I.

[15] A copy of PwC's Cash Movements to the LBCC Account and Bond Valuations: Summary of Findings is attached as Exhibit J, p. 2 ("**Summary of Findings**").

27.     On September 12, 2008, the LBCC Account balance was £50,052,102.98 (or $89,792,421.65).[16]

28.     PLL did not provide LBIE with prior written consent to appoint LBCC as agent under section 10(a) of the Custody Agreement.  PLL did not consent to the redemption of the bonds and the transfer of the proceeds, together with interest, coupons and swaps into the LBCC Account.


## FIRST CLAIM FOR RELIEF

### Constructive Trust

29.     PLL repeats and re-alleges paragraphs 1 through 28 as if fully set forth herein.

30.     PLL is currently in possession of the Transferred Funds belonging to PLL.

31.     LBIE knew that these Transferred Funds were part of the Collateral in Lehman Re's accounts with LBIE in which PLL had a security interest, and at least since December 18, 2009, if not earlier, LBCC was on notice of such.

32.     LBCC's acceptance of the Transferred Funds in these circumstances gave rise to a confidential and/or fiduciary relationship between LBCC and PLL with respect to the Transferred Funds.

33.     Upon information and belief, the Transferred Funds are not comingled, and/or are traceable and identifiable as a portion of the Collateral posted by Lehman Re for the benefit of PLL.

34.     Such possession is in diminution of PLL's superior right, title and interest in the Transferred Funds.

---

[16]   A copy of the LBCC Account balance, dated September 12, 2008, is attached at <u>Exhibit K</u>.

35.  Upon information and belief, LBCC came into possession of these Transferred Funds (a) in error, and/or (b) wrongfully by Lehman Re's breach of the Reinsurance Agreement by providing transferring instructions contrary to the Security Agreement, and/or (c) wrongfully by LBIE's breach of the Custody Agreement.

36.  LBCC's continued possession of the Transferred Funds is wrongful, and LBCC would be unjustly enriched if it were to retain the property.

37.  LBCC holds the Transferred Funds in trust for PLL.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment

38.  PLL repeats and re-alleges paragraphs 1 through 37 as if fully set forth herein.

39.  The Transferred Funds held by LBCC are the property of PLL.

40.  PLL has properly demanded that the Transferred Funds be held without interference by LBCC.

41.  LBCC is holding the Transferred Funds in constructive trust for PLL.

## THIRD CLAIM FOR RELIEF

### Unjust Enrichment

42.  PLL repeats and re-alleges paragraphs 1 through 41 as if fully set forth herein.

43.  LBCC had and has no legal or equitable right, title or interest in the Transferred Funds that it received via the Wrongful Transfer.

44.  LBCC received the Transferred Funds via Wrongful Transfer solely as a result of one or more mistakes of fact or breach of the Security or Custody Agreements.

45.     LBCC has not relied to its detriment on the Transferred Funds.

46.     LBCC has been unjustly enriched at the expense of PLL and PLL has been deprived of the Transferred Funds plus accrued interest.


## FOURTH CLAIM FOR RELIEF

### Conversion

47.     PLL repeats and re-alleges paragraphs 1 through 46 as if fully set forth herein.

48.     The Transferred Funds do not constitute property of LBCC.

49.     In failing to return the Transferred Funds to PLL, LBCC has wrongfully exercised control over the Transferred Funds without the authority or consent of PLL.

50.     LBCC's continued possession of the Transferred Funds constitutes conversion of the Transferred Funds.


## FIFTH CLAIM FOR RELIEF

### Relief from the Automatic Stay

51.     PLL repeats and re-alleges paragraphs 1 through 50 as if fully set forth herein.

52.     The Transferred Funds do not constitute property of LBCC's estate.

53.     Nonetheless, out of an abundance of caution, PLL seeks relief from the stay to the extent necessary to pursue the relief requested in this Adversary Complaint and to obtain possession of the Transferred Funds.

54.     Because the Transferred Funds belong to PLL and do not constitute property of LBCC's estate, cause exists for relief from the stay to the extent such relief is required.

## PRAYER FOR RELIEF

WHEREFORE, PLL respectfully requests that the Court enter judgment:

(i)    Ordering that the Transferred Funds held by LBCC are held in constructive trust for the benefit of PLL.

(ii)   Declaring that LBCC is not to utilize or otherwise dispose of the Transferred Funds and that LBCC deliver the Transferred Funds to PLL.

(iii)  On PLL's claim of unjust enrichment, directing LBCC to deliver to PLL the Transferred Funds received by the Wrongful Transfer.

(iv)   On PLL's conversion claim, directing that LBCC deliver the Transferred Funds to PLL.

(v)    Granting PLL such other and further relief as the Court may deem proper.

Dated:    September 22, 2009
          New York, New York

                              **LOVELLS LLP**
                              By: /s/Matthew P. Morris
                              Matthew P. Morris, Esq.
                              590 Madison Avenue
                              New York, New York 10022
                              Telephone: (212) 909-0600
                              Fax: (212) 909-0660
                              matthew.morris@lovells.com
                              Attorneys for Phoenix Life Limited

# EXHIBIT A

# REINSURANCE AGREEMENT

Issued to
**Britannia Life Limited**
(hereinafter called the "Ceding Insurer")


By


**Lehman Re Ltd.**
(hereinafter called the "Reinsurer")

REINSURANCE AGREEMENT (the "Agreement") dated 22 March 1999

Between

(1)     Britannia Life Limited (the "**Ceding Insurer**") whose registered office is at
        Britannia Court
        50 Bothwell Street
        Glasgow
        G2 6HR

        and

(2)     Lehman Re Ltd. (the "**Reinsurer**") whose registered office is at
        HM 68
        Hamilton HM AX
        Bermuda

**WHEREAS:**

(i)     The Ceding Insurer is a life insurance company authorised to carry on life
        insurance business in the UK in accordance with the Insurance Companies Act
        1982;

(ii)    The Reinsurer is an insurance company authorised to carry on reinsurance
        business under the laws of Bermuda;

(iii)   The Ceding Insurer wishes to arrange for its payment obligations in relation to a
        pool of annuity contracts to be reinsured and it has been agreed between the
        Ceding Insurer and the Reinsurer that the Reinsurer will reinsure the Ceding
        Insurer's payment obligations under such annuity contracts on and subject to the
        terms and conditions of this Agreement.  "**Agreement**" means (a) this document,
        (b) Annex 1 (attached hereto) consisting of Annexes 1(A), 1(B) and 1(C)
        (Annexes 1A and 1B being separately bound and as described in Annex 1 and (c)
        Annexes, 2, 3 and 4 attached hereto.

## Article 1 – Business Reinsured

The Reinsurer agrees to reinsure with effect from 1 January 1998 (the "**Effective Date**")
the Contractual Annuity Payments, as defined and set out in Annex 1, which the Ceding
Insurer is liable to make in respect of the Covered Policies, as defined and set out in
Annex 1, which Covered Policies were in force on 31 December 1997 ("**Business
Reinsured**"). This reinsurance shall be subject to the terms, conditions and limitations
hereinafter set forth and, subject thereto, shall continue until the Ceding Insurer is no

longer liable to make any payments in respect of any of the Covered Policies. The provisions of this Agreement shall not come into effect until the Commutation and Release Agreement between the Ceding Insurer and Nationale-Nederlanden Reinsurance Company N.V. has been signed by all the parties to the Commutation and Release Agreement.

## Article 2 – Contractual Annuity Payments

The Reinsurer's liability in respect of any Contractual Annuity Payment will be calculated in accordance with Article 3. The Reinsurer shall not be liable in respect of any non-Contractual Annuity Payments paid by the Ceding Insurer except as set out in this Article.

In the event of the death of an annuitant in respect of a Covered Policy (or at the end of the guaranteed period (if any) whichever is the later), the Ceding Insurer will reimburse the Reinsurer in respect of all sums paid by the Reinsurer in respect of the relevant Covered Policy, which were made in respect of the period following the date the payments were due to cease under the Covered Policy together with interest calculated at overnight LIBOR plus 1% per annum for the period from the Transfer Date (as defined in Article 9) following receipt of notification of the relevant annuitant's death by the Ceding Insurer to the date of reimbursement.

"LIBOR" means the overnight rate set forth for GBP (as defined below) as determined by the Valuation Agent by reference to Telerate page 3750 as of 11.a.m, London time.

## Article 3 – Reinsurer's Liability
The Reinsurer shall pay to the Ceding Insurer one hundred percent (100%) of the Ultimate Net Loss (as defined in Article 4) on the Business Reinsured.

## Article 4 – Ultimate Net Loss

"Ultimate Net Loss" is defined as the total sum actually paid by the Ceding Insurer, during each Quarterly Period in settlement of the Contractual Annuity Payments arising under the Covered Policies provided that the Ceding Insurer was legally liable to make such payment in respect of the Covered Policies.

"Quarterly Period" means each of the quarters 1 January to 31 March inclusive, 1 April to 30 June inclusive, 1 July to 30 September inclusive and 1 October to 31 December inclusive.

## Article 5 – Reinsurance Premiums, Commission and Taxes

The Ceding Insurer shall pay to the Reinsurer, or to such person as the Reinsurer shall direct on the date of this Agreement a **Reinsurance Premium** defined as a single lump sum payment in Great British Pounds (or any successor currency) (herein referred to as "**GBP**") of          (inclusive of adjustment in respect of (a) interest since the Effective Date

£ 11402 518

London-2/203867/12                    3

this Agreement, (b) interest on claims paid by the Reinsurer to the Ceding Insurer in respect of the expected delay between the Ceding Insurer paying claims to its policyholders and receiving claims from the Reinsurer (c) the Interim Payment in accordance with Article 9 of this Agreement and (d) the Contribution to Survivorship Costs in accordance with Article 13 of this Agreement), together with the Asset Portfolio defined and set out in Annex 2 in respect of the Business Reinsured.

The Ceding Insurer will deliver to the Reinsurer duly executed transfers in favour of the Reinsurer in respect of the Asset Portfolio.

The Reinsurance Premium shall be paid to the Reinsurer gross of any commissions, taxes, stamp duties or proportion of any procuration or other expenses, all of which shall be paid by the Ceding Insurer. The Reinsurer shall not be liable for any such amounts.

## Article 6 - Events of Default

The occurrence at any time with respect to the specified party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party (the "Defaulting Party"):

**Failure to Pay:** Failure by either party to make, when due, any payment required to be made when due in accordance with Article 2, 3, 5 or 9 of this Agreement which failure has not been rectified on or before the fifth Banking Day after written notice is received from the other party of such failure.

**Breach of Agreement:** Failure by either party to comply with or perform any material obligation under this Agreement or the Security Agreement of even date herewith between the Ceding Insurer and the Reinsurer (the "Security Agreement") (other than an obligation to make any payment under this Agreement or any inadvertent delay, error or omission made in connection with this Agreement or the Security Agreement or any related transaction) which has not been rectified on or before the 30th day after notice is received from the other party of such failure.

**Bankruptcy:** The Reinsurer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes, or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official

management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

**Illegality:** Due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful for either party to perform any absolute or contingent obligation to make a payment or to receive a payment under this Agreement or to comply with any other material provision of this Agreement.

**Tax Event:** Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date of this Agreement (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a change in tax law, either party (the "**Burdened Party**") will, or there is a substantial likelihood that it will, on the next date on which any payment is due (a) be required to pay to the other party an additional amount in respect of tax or (b) receive a payment from which an amount is required to be deducted or withheld for or on account of a tax.

**Regulatory Events:** (1) Failure by the Reinsurer to maintain the minimum margin of solvency required of it as an insurance company under the statutes or regulations of its domicile and such minimum margin solvency is not restored on or before fifteen days have elapsed since receipt of notice in accordance with Article 7 by the Ceding Insurer; (2) total or partial withdrawal or revocation of the Reinsurer's authorisation or licence to carry on insurance business in the jurisdiction of its domicile other than at the request of the Reinsurer; or (3) transfer at the instance of any competent governmental or regulatory authority of the Business Reinsured.

## Article 7 - Covenants

Each party hereby covenants to the other to notify such other party of any failure to maintain the minimum solvency margin required under the law of its domicile promptly upon becoming aware of such failure.

The Reinsurer hereby covenants to provide the Ceding Insurer with copies of the Reinsurer's annual financial statements and any relevant regulatory statements, within thirty days of the production of such statements.

## Article 8 - Termination

Immediately upon the occurrence of an Event of Default which is Bankruptcy this Agreement shall terminate. Such termination shall be without prejudice to any rights, remedies or obligations that arose before such termination. If an Event of Default occurs which is *not* Bankruptcy, the party which is the non-Defaulting party (or either party in the case of an Illegality or the Burdened Party in the case of a Tax Event) may by not more than 7 days notice to the defaulting party, specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as the termination date of this Agreement.

This Agreement may also be terminated upon the mutual written agreement of the parties.

On termination there will be payable to the Ceding Insurer the net present value of the then future expected annuity cash flows (**"Future Expected Annuity Cash Flows"**) in relation to the Covered Policies as calculated by the Valuation Agent as at the close of business on the termination date of this Agreement, such amount to be determined by reference to the Valuation Agent's proprietary models and such other commercial factors that the parties have agreed to in a letter dated of even date herewith, which may be amended by mutual agreement of the parties in writing from time to time (the "Models Letter") in the form set forth in Annex 4 attached hereto. The Valuation Agent is not a fiduciary and its conclusion will be binding, absent manifest error.

**"Valuation Agent"** means Lehman Brothers International (Europe) whose registered office is at
One Broadgate
London
EC2M 7HA

## Article 9 – Accounts

The Ceding Insurer shall prepare and provide the Reinsurer with a statement (the "Statement") containing the information set out in Annex 3 in respect of the Contractual Annuity Payments (as defined in Annex 1) in respect of each Quarterly Period after the calendar year 1998 within thirty days of the end of that Quarterly Period. Within 15 days of receipt by the Reinsurer of such statement the Reinsurer will calculate the payment, if any, to be made to the Ceding Insurer in respect of each Quarterly Period or the calendar year 1998, as the case may be. In respect of any payment due to be made on or after 28 February 1999, interest calculated at overnight LIBOR plus 1% per annum and accruing on a daily basis will be payable on the amount due in the event of the payment by the Reinsurer being made after the relevant Transfer Date (provided that the Reinsurer had

received the Statement within thirty days of the end of the relevant Quarterly Period) or, in the event that the Statement is delivered after the thirty day period for delivery, interest at overnight LIBOR plus 1% per annum shall accrue on a daily basis from the day which is thirty days after the day of receipt by the Reinsurer of the Statement. Such payment, if any, will be transferred by the Reinsurer on the relevant Transfer Date in respect of that Quarterly Period. If any of the Transfer Dates are not Business Days the first Business Day preceding that date shall be deemed to be the Transfer Date.

Notwithstanding the above, the Reinsurer will pay any interim amount to the Ceding Insurer in respect of Contractual Annuity Payments made by the Ceding Insurer during 1998 as shown in the Ceding Insurer's 1998 accounts (the **"Interim Payment"**). In relation to such Interim Payment, the Ceding Insurer will provide the information set out in Annex 3 to the Reinsurer by 30 April 1999.

**"Business Day"** means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, Bermuda, Glasgow and Edinburgh.

**"Transfer Date"** means (i) 31 May in respect of each Quarterly Period ending 31 March, (ii) 31 August in respect of each Quarterly Period ending 30 June, (iii) 30 November in respect of each Quarterly Period ending 30 September and (iv) 28 February in respect of each Quarterly Period ending 31 December.

Notwithstanding the above, if in respect of each Quarterly Period any amounts are due to the Reinsurer under the provisions of Article 2 these amounts will be deducted from any amounts due to the Ceding Insurer and the balance will be paid by the Ceding Insurer to the Reinsurer if negative or the Reinsurer to the Ceding Insurer if positive and shall be the only amount payable in respect of that Quarterly Period.

## Article 10 – Currency

All payments under this Agreement will be effected in GBP, being in the same currency as the Covered Policies.

## Article 11 – Inspection of Books

For as long as either party remains under any liability hereunder during normal business hours, the Ceding Insurer shall, upon reasonable written notice by the Reinsurer, make available for inspection by such representatives as may be authorised by the Reinsurer for that purpose, all books, records and other information relating to the Covered Policies hereunder in the Ceding Insurer's possession or under its control and the said representatives may arrange at their own cost for copies to be made of any records containing such information as they may require. For the purposes of this Agreement, the Reinsurer's sole retrocessionaire shall act as a representative.

## Article 12 – Disclosure of Information

Neither party shall disclose any information relating to this Agreement or the Covered Policies to any person, except that such information may be disclosed (a) to any retrocessionaire which agrees to treat such information as confidential on terms substantially similar to those set forth herein, (b) to the employees, professional advisors or authorised representatives of each party, which agrees to treat such information as confidential on terms substantially similar to those set forth herein, or (c) to any third party if such information is already publicly known or if such disclosure is required by law, by any court of competent jurisdiction or any regulatory or taxation authority or upon obtaining the prior written consent of the other party.

## Article 13 – Expenses

All postal and other administrative expenses (apart from those relating to the Covered Policies), will be paid by the party incurring such expenses. Subject to the paragraph below, the Ceding Insurer shall be responsible for all claims and administration expenses related to the Covered Policies, excluding reasonable litigation expenses incurred with the prior written approval of the Reinsurer, whose consent shall not be unreasonably withheld. For the avoidance of doubt any expenses incurred as a result of arbitration under Article 15 shall be dealt with in accordance with Article 15.

The Reinsurer shall be liable for GBP90,000 of those costs ("**Contribution to Survivorship Costs**") relating to establishing evidence of survivorship as required in Annex 3. For the avoidance of doubt, the Contribution to Survivorship Costs have been deducted from the premium payable by the Ceding Insurer set forth in Article 5 above.

## Article 14 – Alterations to Agreement

Any alterations which may from time to time become necessary to this Agreement will be made by written agreement of both parties, or by means of correspondence to be attached to the Agreement, embodying such alterations as may be agreed upon and will be regarded as part of this Agreement and equally binding.

## Article 15 – Arbitration

Any dispute, controversy or claim arising out of or in connection with this Agreement or any retrocession agreement entered into by the Reinsurer in respect of the Covered Policies (the "**Reinsurance Agreements**"), including any question regarding their existence, validity, interpretation, breach or termination (a "**Dispute**"), shall be finally resolved by arbitration under the rules of the London Court of International Arbitration (the "**LCIA**") (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Article.

in relation to all Disputes other than a Dispute arising from an interpretation of the Models Letter (a "**Model Dispute**"), the Dispute shall be determined by one Arbitrator and such Arbitrator shall be appointed by the LCIA. In relation to a Model Dispute, the dispute shall be determined by one Arbitrator and such Arbitrator shall be appointed by the Chairman of the Life Board of the Institute of Actuaries and the Faculty of Actuaries or its successor professional body. In determining any Model Dispute such Arbitrator shall apply the methodology set forth in the Models Letter and such Arbitrator's decision shall be binding on the parties. The Arbitrator of a Model Dispute shall adopt such rules of evidence and procedure (including but not limited to all or part of the LCIA Rules) as he deems appropriate to effectuate the parties' intention to have an efficient and expeditious binding resolution to the dispute.

If any Dispute raises issues which are substantially the same as or connected with issues raised in a Dispute which has already been referred to arbitration (an "**Existing Dispute**"), or arises out of substantially the same facts as are the subject of an Existing Dispute (in either case, a "**Related Dispute**"), the Arbitrator appointed or to be appointed in respect of any such Existing Dispute shall also be appointed as the Arbitrator in respect of any Related Dispute.

The Arbitrator upon the request of one of the parties to a Dispute or a party to one of the Reinsurance Agreements which itself wishes to be joined in any reference to arbitration proceedings in relation to a Dispute, may join any party to one of the Reinsurance Agreements to any reference to arbitration proceedings in relation to that Dispute and may make a single, final award determining all Disputes between them. Each of the parties to this Agreement hereby consents to be joined to any reference to arbitration proceedings in relation to any Dispute at the request of a party to that Dispute.

Where, pursuant to the above provisions, the same Arbitrator has been appointed in relation to two or more Disputes, the Arbitrator may, with the agreement of all the parties concerned or upon the application of one of the parties, being a party to each of the Disputes, order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the Arbitrator thinks fit. The Arbitrator shall have power to make such directions and any provisional, interim or partial award as it considers just and desirable.

The seat of the arbitration shall be London and the language of the arbitration shall be English.

The parties hereby agree to waive any right of application to determine a point of law or appeal to any court of law or other judicial authority insofar as such waiver may be validly made.

## Article 16 – Governing Law

This Agreement shall be governed by and construed in accordance with the substantive law of England.

## Article 17 – Change in Law

In the event of any change in any relevant law as specified herein, whether arising from legislation, decisions or otherwise, at any time after the Reinsurer enters into this Agreement by which the Reinsurer's liability is increased or extended the parties hereto agree to take up for immediate discussion at the request of either party a suitable revision in the terms of the Agreement. Failing agreement on such revision within thirty days after such a request, it is agreed that the Reinsurer's liability hereunder whensoever arising shall be determined as if the said change in the governing law had not taken place.

## Article 18 - Third Party Rights

This Agreement is solely between the Ceding Insurer and the Reinsurer and in no circumstances shall any other party have any rights under this Agreement.

## Article 19 - Extra-contractual Obligations

This Agreement does not apply to and specifically excludes Extra-contractual Obligations. "**Extra-contractual Obligations**" means any claim or payment arising from any policy issued by the Ceding Insurer, other than the Contractual Annuity Payments.

## Article 20 - Counterparts

This Agreement may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

## Article 21 - Parties

This Agreement shall be deemed to have been drafted by both parties, and shall not be construed in favour of or against either party as a result of such party's role in drafting any relevant provision.

## Article 22 - Prior Communications

For the avoidance of doubt, all prior discussions and communications between the parties are superseded by the terms of this Agreement.

## Article 23 - Non-material changes to Data

In respect of the data set out in Annex 1 (the "**Data**"), the Reinsurer hereby agrees that the Ceding Insurer may make administrative changes to the Data from time to time which do not have an impact on the value of liabilities.

Executed in duplicate

For and on behalf of **Britannia Life Limited**
Date: 22nd March 99

Authorised signatory

For and on behalf of **Lehman Re Ltd.**

Date:

Authorised signatory

*Annex 1*

## Lehman Re Ltd. - Britannia Life Limited

### Reinsurance Agreement

This Annex is divided into three parts, Annex 1(A), Annex 1(B) and Annex 1(C) (Annexes 1(A) and 1(B) being separately bound but forming part of the Agreement).

*Annex 1(A)* is separately bound and is the list of Annuity Numbers corresponding to those policies covered by this Agreement ("**Covered Policies**").

*Annex 1(B)* is separately bound, consists of three parts: Part I (titled "D_OF_DTH.TXT"), Part II (titled "D1297ING.TXT") and Part III (titled "TSTOP.XLS") and consists of data provided by the Ceding Insurer regarding both Covered Policies and policies which are not covered by this Agreement. This is the form in which the data was received by the Reinsurer (and/or its advisors) from the Ceding Insurer.

Where an Annuity Number listed in Annex 1(A) appears twice in Annex 1(B) Part II (D1297ING.TXT), this Agreement covers the first life annuity and on the death of the first life annuitant the reversionary annuity.

The term "**Contractual Annuity Payments**" means, in respect of the Covered Policies, those payments which are itemised under the heading "GR-YR-AMT" in Annex 1(B) Part II (D1297ING.TXT).

*Annex 1(C):* The following are not liabilities under the policies listed in Annex 1(A) and should not be included in Annex 1(B):

1.   The amount of annuity payable under "escalation only" policies where the annuity payable is equal to the increases each year on an increasing given amount.

2.   The difference between the full amount of annuity payable under the policy and the amount actually paid (as set out in Annex 1(B)) in relation to policies with escalating annuities which have had the amount of in payment annuity limited by the UK Inland Revenue rules.

3.   The amount of annuity payable under policies in respect of which payment is currently suspended (temporary stop) where the annuity becomes properly payable.

4.   The amount of any spouse's pension which has not been identified in Annex 1(B).

12

*Annex 2*

## Lehman Re Ltd. - Britannia Life Limited

### Reinsurance Agreement

The Asset Portfolio means the portfolio of assets comprising:

| Nominal | Coupon | Description | Maturity |
|---|---|---|---|
| GBP 5,000,000 | 9.50% | British Conversion Stock | 18 April 2005 |
| GBP 25,000,000 | 9.00% | British Treasury | 6 August 2012 |
| GBP 7,000,000 | 10.00% | British Treasury | 8 September 2003 |
| GBP 11,000,000 | 9.00% | British Treasury | 13 October 2008 |
| GBP 6,000,000 | 13.00% | British Treasury | 14 July 2000 |
| GBP 17,000,000 | 8.75% | British Treasury | 25 August 2017 |

*Annex 3*

## Lehman Re Ltd. - Britannia Life Limited

## Reinsurance Agreement

At the close of each Quarterly Period hereunder:

> Details of all Contractual Annuity Payments made by the Ceding Insurer in respect of each Covered Policy at the end of the Quarterly Period and

> List of any annuitants in such Quarterly Period:

> (a) to whom payments have been suspended;

> (b) for whom a death certificate has been received by the Ceding Insurer; and

> (c) to whom payments have been suspended during the previous Quarterly Period under (a) above but in relation to which a death certificate has since been received by the Ceding Insurer.

At the close of each Quarterly Period ending 31 December details of all Covered Policies in force:

> Annuity Number
> Sex
> Date of birth
> Date of birth of spouse (if applicable)
> Current annuity
> Reversionary annuity (if applicable)
> Escalation rate (if applicable)
> Date of last evidence of survivorship
> Names of beneficiaries and spouses.

Every year commencing on the Quarterly Period ending on 31 December 1999:

> Proof/certification of evidence of survivorship for the current calendar year for each policy.

> In the event of any dispute arising between the parties relating to evidence of survivorship the provisions of Article 15 will apply.

## *Annex 4*

[on the letterhead of Lehman Re Ltd.]

Models Letter

[Date]

Britannia Life Limited
Britannia Court
5 Bothwell Street
Glasgow
G2 6HR

**Dear Sirs,**

### Calculation of Discount Factors and Mortality Basis

We refer to the Reinsurance Agreement and Security Agreement to be entered into between ourselves and yourselves. Terms defined in the Reinsurance Agreement and the Security Agreement shall have the same meaning in this letter.

Pursuant to Article 8 of the Reinsurance Agreement and the definition of Required Amount in the Security Agreement, the calculation by the Valuation Agent of the discount factors and mortality basis used to determine the net present value of the Future Expected Annuity Cash Flows is based on the following methodology.

**Discount Factors**

The discount factors are calculated from the swap curve. The swap curve comprises the par yields for each maturity at which banks lend to each other. GBP long term swap rates are currently published on Reuters' pages ICAQ and BIRV01.
*Example*

Assume the swap rate in year $i$ is $S_i$, and the discount factor in year $i$ is $D_i$.

**Year 1**

The 1 year swap rate is $S_1$, and the discount factor, $D_1$, is $\dfrac{1}{(1+S_1)}$.

## Year 2

We know that the value of a two year bond with an interest rate $S_2$ will have a price of par.

$$S_2 * (D_1 + D_2) + 100\% * D_2 = 100\%$$

$$100\% - S_2 * D_1 = S_2 * D_2 + 100\% * D_2$$

$$D_2 = \frac{100\% - S_2 * D_1}{100\% + S_2}$$

## Year n

We know that the value of an $n$ year bond with an interest rate $S_n$ will have a price of par.

$$S_n * (D_1 + D_2 + \dots + D_n) + 100\% * D_n = 100\%$$

$$100\% - S_n * (D_1 + D_2 + \dots + D_{n-1}) = S_n * D_n + 100\% * D_n$$

$$D_n = \frac{100\% - S_n * (D_1 + D_2 + \dots + D_{n-1})}{100\% + S_n}$$

In the event that the Reinsurance Agreement is terminated pursuant to the terms of Article 8 thereof, the Valuation Agent shall calculate the discount factors by obtaining bid quotations from three leading dealers in the GBP swaps market. The highest and the lowest quotations will be discarded and the remaining quotation will be used.

## Mortality Basis

The mutually agreed mortality basis used in the calculation of the net present value of the then Future Expected Annuity Cash Flows in Article 8 of the Reinsurance Agreement, will be determined by reference to the mortality tables published from time to time by the Continuous Mortality Investigations Bureau and the mortality experience of the Covered Policies.

If the parties fail to agree on a mortality basis then such Dispute shall be a "**Model Dispute**" and shall be finally resolved by arbitration in accordance with the terms of Article 15 of the Reinsurance Agreement.

This letter will be governed by and construed in accordance with English law.

Yours faithfully,

**Lehman Re Ltd.**

Accepted and agreed

..........................................
**Britannia Life Limited**

Date:

**C L I F F O R D**
**C H A N C E**

LIMITED LIABILITY PARTNERSHIP

EXECUTION VERSION

> **Comment:** NB At first opportunity include provision to rectify incorrect cross reference to the Custodian Agreement in clause 2.3 of the Security Agreement.

DATED February 23 2006

ALBA LIFE LIMITED

AND

LEHMAN RE LTD.

---

DEED OF AMENDMENT RELATING TO A SECURITY
AGREEMENT AND REINSURANCE AGREEMENT BOTH
DATED 22 MARCH 1999

---

# CONTENTS

**Clause**                                                                            **Page**

1. Amendment Of Security Agreement ............................................................................. 1
2. Amendment Of Reinsurance Agreement ...................................................................... 2
3. Duty Of Disclosure ...................................................................................................... 2
4. Law And Jurisdiction ................................................................................................... 2
5. Counterparts ................................................................................................................. 2
6. Third Party Rights ........................................................................................................ 2
7. Delivery ........................................................................................................................ 2

**THIS DEED** is made on    Feb... y 28                  2006

**BETWEEN**

(1)   **ALBA LIFE LIMITED (FORMERLY KNOWN AS BRITANNIA LIFE LIMITED)**, a company incorporated in Scotland and whose registered address is at Britannic Court, 50 Bothwell Street, Glasgow G2 6HR (the "**Secured Party**"); and

(2)   **LEHMAN RE LTD.**, a company incorporated under the laws of Bermuda with registered number EC24732 whose registered address is at 3 Queen Street, Hamilton, HM 11 Bermuda (the "**Chargor**").

**INTRODUCTION:**

(A)   The Secured Party and the Chargor entered into both a security agreement ("**Security Agreement**") and a reinsurance agreement ("**Reinsurance Agreement**") on 22 March 1999, whereby the Chargor granted the Secured Party a first fixed charge as security for the payment and discharge of all the Obligations (as such term is defined in the Security Agreement).

(B)   The parties wish to amend the Security Agreement and the Reinsurance Agreement.

**THIS DEED WITNESSES:**

1.   **AMENDMENT OF SECURITY AGREEMENT**

The Security Agreement is with effect from 22 March 1999 amended as follows:

1.1   by the insertion between Clause 1.2 and Clause 2 of a new Clause 1.3 in the following terms:

"In this Security Agreement, a reference to a document is a reference to that document as modified from time to time."

1.2   by the deletion of Clause 17.A and replacing it by:

"17.A   **NEGATIVE PLEDGE AND UNDERTAKING**

17.A1   The Chargor covenants that it will not during the subsistence of this Security Agreement, except with the prior written consent of the Secured Party:

(i)   create, grant or permit to exist any Encumbrance, as defined in Clause 17.1, other than the charge hereby created, on or over all or any part of the Collateral or any interest therein; or

(ii)   except to the extent permitted by Clauses 6, and 6A, sell, transfer, lend, assign or otherwise deal with all or any part of the Collateral or any interest therein; or

(iii)   terminate or rescind the Custodian's Agreement.

17.A2    The Chargor undertakes that it will during the subsistence of this Security Agreement procure that the Custodian will not terminate or rescind the Custodian's Agreement, except with the prior written consent of the Secured Party and pursuant to the Chargor's right under the Custodian's Agreement or as otherwise permitted by law."

## 2. AMENDMENT OF REINSURANCE AGREEMENT

The Reinsurance Agreement is with effect from 22 March 1999 amended by the deletion of the third paragraph of Article 6 (*Breach of Agreement*) and replacing it by:

"**Breach of Agreement:** Failure by either party to comply with or perform any material obligation under this Agreement or the Security Agreement of even date herewith between the Ceding Insurer and the Reinsurer as modified from time to time (the "**Security Agreement**") (other than an obligation to make any payment under this Agreement or any inadvertent delay, error or omission made in connection with this Agreement or the Security Agreement or any related transaction) which has not been rectified on or before the 30th day after notice is received from the other party of such failure."

## 3. DUTY OF DISCLOSURE

Neither the Secured Party, nor any agent of the Secured Party, shall, in anticipation or as a result of entering into this Deed, have a duty or obligation to make any representation, warranty or disclosure of any nature, express or implied, and the Chargor hereby waives any remedy or right it might have in relation to any failure to perform any such duty or obligation.

## 4. LAW AND JURISDICTION

This Deed shall be governed by English Law and, for the Secured Party's benefit, the English Courts shall have exclusive jurisdiction to settle any dispute which my arise from or in connection with it.

## 5. COUNTERPARTS

This Deed may be executed and delivered in counterparts (including by facsimile transmission) each of which will be deemed an original.

## 6. THIRD PARTY RIGHTS

The parties to this Deed agree to exclude the provisions of the Contracts (Rights of Third Parties) Act 1999.

## 7. DELIVERY

This Deed is delivered on the date written at the start of this Deed.

**EXECUTED as a DEED by:**

**ALBA LIFE LIMITED**

_[signature]_ Director

_[signature]_ Director/Secretary

**LEHMAN RE LTD.**

_[signature]_ Director

_[signature]_ Director/Secretary

# EXHIBIT B

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made on     22 March 1999

BETWEEN

(1) Britannia Life Limited (the "Secured Party") of Britannia Court, 50 Bothwell Street, Glasgow, G2 6HR, (fax: 0141 223 6000); and

(2) Lehman Re Ltd. (the "Chargor") of HM 68, Hamilton HM AX, Bermuda (fax: 441-296-8452) with registered number EC24732.

IT IS AGREED as follows:

1. DEFINITIONS AND INTERPRETATION

1.1 In this Security Agreement:

"**Accounts**" means the accounts with the Custodian in which the Non-Cash Collateral and Cash Collateral subject to this Security Agreement are held .

"**Banking Day**" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in (i) London, Glasgow, Edinburgh and Bermuda and (ii) in the case of a delivery of Permitted Collateral (a) the location of the account into which such delivery is to be made, and (b) either, in the case of a delivery of Cash, the principal financial centre of the currency of such Cash or, in the case of a delivery of Non-Cash Assets, the location of the account out of which such delivery shall be made, and, if different, the place where the delivery will be registered (if applicable).

"**Call Amount**" means on any Valuation Date the GBP amount (rounded pursuant to Clause 5.1) by which the Required Amount exceeds the aggregate Value (calculated as at the close of business on the day immediately preceding the Valuation Date) of the Collateral held by the Custodian on behalf of the Secured Party on such date;

"**Cash**" means GBP and such other currency or currencies as may from time to time be agreed in writing between the parties.

"**Cash Collateral**" means Collateral comprising Cash.

"**Collateral**" means (except as referred to in Clause 6.3) all the Permitted Collateral delivered pursuant to this Security Agreement together with all Proceeds, interest earned on Cash Collateral, substitutions for and additions to the foregoing and which have not been redelivered to the Chargor.

**"Collateral Rights"** means all rights, powers and remedies of the Secured Party provided by this Security Agreement or by law.

**"Custodian"** means Lehman Brothers International (Europe) which will hold the Euroclear Collateral on behalf of the Secured Party.

**"Custodian's Agreement"** means the agreement between the Chargor and the Custodian substantially in the form of Annex 3.

**"Deposit"** means each credit balance from time to time on an Account and all rights, benefits and proceeds in respect thereof.

**"Euroclear"** means the securities custody and clearing system operated under that name by the Brussels branch of the Morgan Guaranty Trust Company of New York.

**"Euroclear Collateral"** means any Permitted Collateral comprising Non-Cash Collateral from time to time credited to the Euroclear Collateral Account.

**"Euroclear Collateral Account"** means the account number 97558 held in Euroclear in the name of the Custodian or such other account with Euroclear as the parties shall agree.

**"Expected Annuity Cash Flows"** means the then expected liability cash flows of the Covered Policies. The mortality assumption used to calculate these portfolios will be updated by agreement of the parties on each anniversary of the date of this Security Agreement, to account for changes in the expected future mortality in respect of the Covered Policies (as defined in the Reinsurance Agreement).

**"GBP"** means the lawful currency of the United Kingdom and, wherever mentioned in this Security Agreement, shall also include any successor currency thereto.

**"Gilts"** means the negotiable debt obligations of the United Kingdom, or negotiable debt obligations which are fully guaranteed or guaranteed as to principal and interest by the United Kingdom.

**"Non-Cash Assets"** means (a) Gilts and debt securities (including bank certificates of deposit) rated either AA by Standard & Poor's Ratings Group or Aa2 by Moody's Investor Services, Inc., or higher; (b) commercial paper rated A1 by Standard & Poor's Ratings Group or P1 by Moody's Investor Services, Inc., or higher and (c) such other assets (excluding Cash) as may be agreed by the parties in writing from time to time.

**"Non-Cash Collateral"** means Collateral comprising Non-Cash Assets.

**"Obligations"** means all obligations owing to the Secured Party by the Chargor under the Reinsurance Agreement, whether present or future, actual or contingent (and whether incurred by the Chargor alone or jointly, and whether as principal or surety or in some other capacity).

**"Permitted Cash Collateral"** means Cash Collateral not exceeding the amounts specified in Clause 6A2.

"Permitted Collateral" means collectively Cash and Non-Cash Assets.

"Proceeds" means all principal, interest, dividends and other payments and distributions of cash or other property paid or distributed in connection with all Non-Cash Collateral and all rights privileges and other securities of every kind distributed with respect thereto or in exchange therefor. For the avoidance of doubt, Proceeds will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Collateral.

"Reinsurance Agreement" means the Reinsurance Agreement between the Secured Party and the Chargor dated the date hereof .

"Required Amount" means on any Valuation Date 98.5% of the net present value of the future Expected Annuity Cash Flows (after the payment in respect of the Expected Annuity Cash Flows to be made on that Valuation Date) (calculated as at the close of business on the day immediately preceding the Valuation Date) such amount to be determined by reference to the Valuation Agent's proprietary models and such other commercial factors as the parties have agreed to previously in accordance with Annex 4 (Models Letter) of the Reinsurance Agreement.

"Return Amount" means on any Valuation Date, the GBP amount (rounded pursuant to Clause 5.2) by which the aggregate Value (calculated as at the close of business on the day immediately preceding the Valuation Date) of the Collateral held by the Custodian on behalf of the Secured Party exceeds the then current Required Amount.

"Royal Decree No. 62" means the Belgian Royal Decree No. 62 of 10 November 1967 promoting the circulation of securities, as amended from time to time.

"Valuation Agent" means Lehman Brothers International (Europe).

"Valuation Date" means (i) the Transfer Date (as defined in the Reinsurance Agreement), (ii) the final Banking Day in each calendar month during the term of the Reinsurance Agreement and (iii) each Banking Day on which the Call Amount or the Return Amount exceeds GBP 1,000,000.

"Value" means on any date:

(i)     with respect to GBP, the amount thereof and with respect to Cash comprising currencies other than GBP, the equivalent amount in GBP, determined by the Valuation Agent; Provided that Cash in excess of the Permitted Cash Collateral shall have a Value of zero;

(ii)    with respect to any Gilts the bid price therefor obtained by the Valuation Agent; and

(iii)   with respect to any other Permitted Collateral, the fair market value thereof (expressed in GBP) on such date as determined in any reasonable manner by the Valuation Agent having regard to standard market practice.

1.2     In this Security Agreement, any reference to (a) a "Clause" is, unless otherwise stated, a reference to a Clause hereof and (b) "this Security Agreement" is a reference to this

Security Agreement as amended, varied or supplemented from time to time. Clause headings are for ease of reference only. Terms used but not defined herein shall bear the respective meanings ascribed to them in the Reinsurance Agreement.

2. COVENANT AND CHARGE

2.1 The Chargor shall discharge each of the Obligations in the manner provided for in the Reinsurance Agreement and pay to the Secured Party when due and payable and in the manner provided for in the Reinsurance Agreement each sum owing by the Chargor to the Secured Party in respect of the Obligations.

2.2 On the date hereof, the Chargor shall transfer to the Accounts, Permitted Collateral, having an aggregate Value at least equal to the Required Amount.

2.3 The Chargor charges with full title guarantee and by way of first fixed charge all of the Collateral in the Accounts and all of its rights under the Custody Agreement (insofar as the same relate to the Collateral) in favour of the Secured Party as security for the payment and discharge of all of the Obligations.

2.4 The Chargor shall deliver a notice to the Custodian of the security interest over each of the Accounts, in the form set out in Annex 1.

2.5 The Chargor shall procure delivery of the Custodian's Agreement upon execution of this Security Agreement.

2.6 The Chargor hereby agrees that the security provided by the terms of the covenant and charge in this Security Agreement shall be a continuing security for each of its Obligations and shall not be satisfied by any intermediate payment or satisfaction of the whole or any part of the Obligations.

2.7 The Chargor hereby waives any right it may have of first requiring the Secured Party to proceed against or claim payment from any other person or enforce any guarantee or security before enforcing this Security Agreement.

2.8 Where any discharge (whether in respect of the security constituted by this Security Agreement, any other security or otherwise) is made on the faith of any payment, security or other disposition which is avoided or any amount paid pursuant to any such discharge or arrangement must be repaid on bankruptcy or liquidation (or otherwise) of the Chargor, the security constituted by this Security Agreement and the liability of the Chargor under this Security Agreement shall continue as if there had been no such discharge or arrangement.

3. DELIVERY OF ADDITIONAL COLLATERAL

3.1 If a Call Amount exists on a Valuation Date, the Secured Party may at any time, by giving written notice (a "Request for Collateral") to the Chargor and the Custodian, require the Chargor to comply with the provisions of Clause 3.2. or 3.3

3.2 If a Call Amount exists on a Valuation Date and the Chargor receives a Request for

Collateral by 10am London time, the Chargor shall by 12pm London time on the Banking Day following the date of receipt of the Request for Collateral at the cost and expense of the Chargor, arrange for the delivery to the Accounts of further Permitted Collateral with a Value of not less than the Call Amount (and which, for the avoidance of doubt, will be subject to the charge in Clause 2 of this Agreement).

3.3    If a Call Amount exists on a Valuation Date and the Request for Collateral is received by the Chargor after 10am London time, the Chargor shall arrange for the delivery to the Accounts of further Permitted Collateral with a Value of not less than the Call Amount (and which, for the avoidance of doubt, will be subject to the charge in Clause 2 of this Agreement) by close of business on the second Banking Day following the date of the receipt of the Request for Collateral.

4.    RETURN OF COLLATERAL

4.1    If a Return Amount exists on a Valuation Date, the Chargor may at any time, by giving written notice (a "**Request for Return**") to the Secured Party and the Custodian, require the Secured Party to comply with the provisions of Clause 4.2, or 4.3.

4.2    If a Return Amount exists on a Valuation Date, and the Secured Party receives a Request for Return, by 10 am London time, the Secured Party shall, by 12pm, London time, on the Banking Day following the date of receipt of the Request for Return, at the cost and expense of the Secured Party, arrange with the Custodian for the redelivery of a portion of the Collateral having a Value, as of the date of the redelivery, equal to the Return Amount to the Chargor, whereupon that portion of the Collateral shall be released from the security interest constituted by this Security Agreement.

4.3    If a Return Amount exists on a Valuation Date, and the Request for Return is received by the Secured Party after 10am, London time, the Secured Party shall arrange with the Custodian for the redelivery of the relevant portion of the Collateral equal to the Return Amount (rounded pursuant to Clause 5.2) by close of business on the second Banking Day following the date of receipt of the Request for Return.

4.4    When no more amounts are or may become payable by the Chargor with respect to the Obligations, the Secured Party will release the security interest under Clause 2 and procure that the Custodian shall redeliver all Collateral (together with any interest earned pursuant to Clause 8.1) to the Chargor.

4.5    Any notice given by the Chargor in accordance with Clause 4.1 shall specify:

(i)     the Required Amount;

(ii)    the Value of the Collateral in the Accounts as of the close of business on the day immediately preceding the relevant Valuation Date;

(iii)   the Return Amount;

(iv)   any other information necessary for the effective redelivery of Collateral in accordance with Clause 4.2 or 4.3; and

(v)     the type of Collateral the Chargor wishes to have returned (where more than one type of Permitted Collateral has been delivered to the Accounts pursuant to this Security Agreement).

5.      ROUNDING AND MINIMUM TRANSFERS

5.1     All Call Amounts shall be rounded up to the nearest integral multiple of GBP100,000.

5.2     All Return Amounts shall be rounded down to the nearest integral multiple of GBP100,000.

5.3     The Chargor will procure that the Valuation Agent will notify each party by 9.a.m., London time on each Valuation Date of the existence of a Call Amount or a Return Amount as the case may be.

6.      EXCHANGE AND SUBSTITUTION OF COLLATERAL

6.1     The Chargor may replace all or any part of the Collateral with Permitted Collateral of equal Value provided that the Chargor shall have previously given not less than two (2) Banking Days notice to the Secured Party identifying such of the Collateral which the Chargor wishes to replace.

6.2     The Secured Party shall, at the cost and expense of the Chargor, arrange for the delivery to the Chargor of the Collateral which the Chargor wishes to replace pursuant to Clause 6.1, as soon as practicable after the Secured Party has received from the Chargor additional Permitted Collateral of at least equal Value, as of the date of delivery of such additional Permitted Collateral, as such Collateral being replaced.

6.3     (i)     In the event that any Non-Cash Assets which comprise Collateral does not have the minimum credit rating as stated in the definition of "Non-Cash Assets", the relevant Non-Cash Assets will be deemed Old Collateral and shall, subject to Clause 6.3(iv), cease to constitute or form part of the Permitted Collateral for the purposes of Clauses 2 and 3 and shall be deemed to have a Value of zero.

        (ii)    The Secured Party may, within one (1) Banking Day of the first day on which it becomes aware that any Non-Cash Assets which comprise Collateral does not have the minimum credit rating as stated in the definition of "Non-Cash Assets" notify the Chargor accordingly.  Within one (1) Banking Day of such notice being given the Chargor will deliver to the Accounts Permitted Collateral (the "Replacement Collateral") so that the Value of the Collateral in the Accounts has an aggregate Value at least equal to the Required Amount.

        (iii)   Within one (1) Banking Day of the due delivery by the Chargor to the Accounts of the Replacement Collateral, the Secured Party will arrange for the redelivery of the Old Collateral.

        (iv)    Until such time as the Old Collateral has been replaced to the satisfaction of the Secured Party, by Replacement Collateral, the Old Collateral shall continue to constitute Collateral for the purposes of this Security Agreement.

6.A    SPECIAL PROVISIONS FOR CASH COLLATERAL

6.A1    The Chargor shall ensure that any Collateral comprising Cash (whether as a result of the initial transfer on the date hereof, the receipt of Proceeds or otherwise howsoever) is reinvested in other Permitted Collateral (not being Cash) by no later than close of business on the 3rd Business Day on which that Cash first becomes Collateral.

6.A2    The Chargor shall be permitted, during the period commencing three Business Days prior to each Transfer Date, to sell Non-Cash Collateral, the Value of which may not exceed the Ultimate Net Loss to be paid on that Transfer Date in respect of the previous Quarterly Period; Provided that any such Non-Cash Collateral and such proceeds shall at all times remain subject to this charge and comprise Non-Cash Collateral and Cash Collateral, as the case may be.

7.    PROCEEDS OF NON-CASH COLLATERAL

7.1    The Secured Party shall arrange for the delivery to the Chargor of any Proceeds attributable to Non-Cash Collateral to the extent that the Value of such Proceeds when added to the Value of the other Collateral, as of the most recent Valuation Date, exceed the Required Amount on such date. All Proceeds not so delivered shall form part of the Collateral.

8.    INTEREST ON CASH

8.1    Interest earned on the Cash Collateral shall accrue for the benefit of the Chargor and shall form part of the Cash Collateral. Interest shall be earned at such rate or rates as shall be agreed between the Chargor and the Custodian and in accordance with the Custodian's normal practice.

9.    EUROCLEAR

In respect of any Collateral to be held in Euroclear, the parties agree as follows:

(i)    The Custodian is a participant in Euroclear and Euroclear itself is an affiliate of the Caisse Interprofessionnelle de Dépôts et de Virements de Titres/Interprofessionele Effectendeposito-en Girokas, being the entity organised pursuant to article 1 of the Belgian Royal Decree No. 62.

(ii)    The parties note that the English law security created by this Security Agreement is similar to a Belgian law pledge (*nantissement, gage* or *pand*), and wish to perfect it accordingly under the rules of Belgian law.

(iii)    The Chargor shall deliver to the Secured Party all Permitted Collateral which is to be held in Euroclear and to be charged to the Secured Party under this Security Agreement, and for this purpose the Chargor shall arrange, and as the case may be, give the necessary transfer instructions for such Permitted Collateral to be credited to the Euroclear Collateral Account.

(iv)    Each of the Chargor and the Secured Party shall, and shall procure that the Custodian shall, treat the Euroclear Collateral Account as a special account

specifically opened for the purpose of holding collateral, whether or not exclusively in the context of this Security Agreement, and each undertakes that it will not, and shall procure that the Custodian will not, use the Euroclear Collateral Account for any other purposes. The Chargor shall on the date of execution of this Security Agreement provide a letter of agreement from the Custodian to the Secured Party in the form set out in Annex 2 (Part A), (a) stating that the Euroclear Collateral Account will be treated as a special account specifically opened for the purpose of holding collateral and that it shall not use such account for any other purpose and (b) consenting to hold the Euroclear Collateral subject to the fixed charge in favour of the Secured Party constituted by this Security Agreement.

(v)     The parties agree that the Euroclear Collateral shall be subject to the fungibility regime organised by Royal Decree No. 62.

(vi)    The Chargor acknowledges that any monies standing from time to time to the credit of the Euroclear cash account associated with the Euroclear Collateral Account, whether such monies proceed from the sale or repayment of Collateral or otherwise, represent a claim against Euroclear which is exclusively owed to the Custodian and that the Chargor has no right whatsoever against Euroclear in respect of such monies or claim. Should, however, the Chargor have any such right pursuant to mandatory provisions of Belgian law or otherwise, then the parties hereby confirm for the avoidance of doubt that such right shall be part of the Collateral. For the avoidance of doubt, the parties confirm that the rights of the Chargor against the Custodian in connection with such monies are subjecet to the security created by this Security Agreement.

(vii)   The Chargor represents and warrants that the Euroclear Collateral will be comprised exclusively of securities which are admitted to listing on a stock exchange or are dealt in on another regulated market which operates regularly and is recognised and open to the public, and of debt instruments which are transferable, liquid and have a value which can be accurately determined at any time or at least twice a month, in Belgium or abroad. Without prejudice to any other rights of the Secured Party under English law or hereunder, the Chargor acknowledges the right of the Secured Party to enforce the security created by this Security Agreement over the Euroclear Collateral (in the form of securities) in accordance with the procedure set out in article 5, §2 of the Royal Decree No. 62, i.e. pursuant to the rules of Belgian law and without the need of a prior authorisation from the Belgian courts. The Chargor waives any right to object to, or claim damages by reason of, any enforcement made in accordance with such procedure on the grounds that all or part of the Collateral would not actually, or would no longer at the time of enforcement, meet the requirements described in the first sentence of this paragraph.

10.   POWER OF SALE

10.1   If at any time an Event of Default has occurred under Article 6 of the Reinsurance Agreement and is continuing the Secured Party shall be entitled, without prior notice to the Chargor or prior authorisation from any court, to sell or otherwise dispose of in any manner permitted by law, all or any part of the Collateral. The Secured Party shall be entitled to apply the proceeds of that sale or other disposal in paying the costs of that sale or disposal and in or towards the discharge of the Obligations. The Secured Party shall be entitled to treat any Cash Collateral as if it were the proceeds of such sale or other disposal.

10.2   The power of sale or other disposal in Clause 10.1 shall operate as a variation and extension of the statutory power of sale under Section 101 of the Law of Property Act 1925 and the Secured Party may exercise any power available to it by virtue of this Security Agreement or available to a secured creditor. The restrictions contained in Sections 93 and 103 of the Law of Property Act 1925 shall not apply to this Security Agreement or to any exercise by the Secured Party of its right to consolidate mortgages or its power of sale.

10.3   In favour of a purchaser of all or any part of the Collateral, a certificate in writing by an officer, attorney or agent of the Secured Party that any power of sale or other disposal has arisen and is exercisable shall be conclusive evidence of that fact and no purchaser shall be concerned to enquire whether any power exercised or purported to be exercised by the Secured Party has become exercisable or whether any Obligation remains due.

11.   APPLICATION OF CASH COLLATERAL

In respect of Collateral in the form of Cash, the Secured Party may at any time after an Event of Default with respect to the Chargor has occurred under Article 6 of the Reinsurance Agreement and is continuing, without prior notice to the Chargor, apply or appropriate the Collateral in or towards the payment or discharge of any amounts payable by the Chargor with respect to any Obligation in such order as the Secured Party sees fit; or set off all or any part of any amount payable by the Chargor with respect to any Obligation against any obligation of the Secured Party to repay any amount to the Chargor in respect of the Permitted Collateral; and for these purposes the Secured Party shall be entitled to make any currency conversions or effect any transaction in currencies which it thinks fit and to do so at such times and rates as it thinks proper.

12.   FURTHER ASSURANCE

On demand by the Secured Party, the Chargor shall promptly upon notice from the Secured Party execute all documents and do all things (including the delivery, transfer, assignment or payment of all or part of the Collateral to the Custodian on behalf of the Secured Party) that the Secured Party may reasonably specify for the purpose of (a) exercising the Collateral Rights when the relevant Collateral Rights become exercisable or (b) securing and perfecting its security over or title to all or any part of the Collateral or (c) enabling the Secured Party to vest all or part of the Collateral in its name or in the name(s) of its nominee(s), agent or any purchaser when the Collateral Rights become exercisable.

13.  POWER OF ATTORNEY

The Chargor, by way of security, irrevocably appoints the Secured Party as its attorney and in its name, on its behalf and as its act and deed to execute, deliver and perfect all documents and do all things in the name of the Chargor or the Secured Party (as the attorney may decide) that the Secured Party may consider to be requisite for (a) carrying out any obligation imposed on the Chargor under this Security Agreement or (b) exercising any of the Collateral Rights. The Chargor shall ratify and confirm all things done and all documents executed by the Secured Party in the exercise of that power of attorney.

14.  RECEIVER

14.1  If at any time, an Event of Default has occurred under Article 6 of the Reinsurance Agreement and is continuing, the Secured Party may by writing (acting through an authorised officer of the Secured Party) without notice to the Chargor appoint one or more persons to be receiver of the whole or any part of the Collateral (each such person being (a) entitled to act individually as well as jointly and (b) for all purposes deemed to be the agent of the Chargor).

14.2  In addition to the powers of the Secured Party conferred by Clause 13, each person appointed pursuant to Clause 14.1 shall have, in relation to the part of the Collateral in respect of which he was appointed, all the powers (as varied and extended by the provisions hereof) conferred by the Insolvency Act 1986 and the Law of Property Act 1925 on mortgagors and mortgagees in possession, administrators, receivers and administrative receivers appointed under those Acts (whether or not such person is such).

15.  EFFECTIVENESS OF COLLATERAL

15.1  The collateral constituted by this Security Agreement and the Collateral Rights shall be cumulative, in addition to and independent of every other security which the Secured Party may at any time hold for the Obligations or any rights, powers and remedies provided by law. No prior security held by the Secured Party over the whole or any part of the Collateral shall merge into the collateral hereby constituted.

15.2  This Security Agreement shall remain in full force and effect as a continuing arrangement unless and until the Secured Party discharges it.

15.3  No failure on the part of the Secured Party to exercise, or delay on its part in exercising, any Collateral Right shall operate as a waiver thereof, nor shall any single or partial exercise of a Collateral Right preclude any further or other exercise of that or any other Collateral Right. The obligations of the Chargor under this Security Agreement shall not be affected by any act, omission or circumstance which, but for this provision, might operate to release or otherwise exonerate the Chargor from its obligations hereunder.

15.4 If, at any time, any provision of this Security Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Security Agreement nor of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

15.5 In relation to any share in a company which is for the time being part of the Collateral, the rights attached to such share shall be exercisable by the Secured Party only for the purpose of preserving the value of such share or of realising it, and unless there is an Event of Default with respect to the Chargor, shall be exercisable only in accordance with the Chargor's instructions or otherwise in its interests.

15.6 The Chargor acknowledges that any securities held through, by or in Euroclear or any successor or any other clearance system are held on a fungible basis.

16. SUBSEQUENT INTERESTS AND ACCOUNTS

16.1 If the Secured Party at any time receives notice of any subsequent mortgage, assignment, charge or other interest affecting all or any part of the Collateral, all payments which would otherwise have been made by the Chargor to an Account shall thereafter be treated as having been credited to a new account of the Chargor and not as having been applied in reduction of the Obligations as at the time when the Secured Party received notice.

16.2 All monies received, recovered or realised by the Secured Party under this Security Agreement (including the proceeds of any conversion of currency) may in its discretion be credited to and held in any suspense or impersonal account pending their application from time to time in or towards the discharge of any of the Obligations.

17 REPRESENTATIONS AND WARRANTIES RELATING TO THE CHARGOR

The Chargor represents and warrants to the Secured Party that:

17.1 the Collateral is beneficially owned by the Chargor free from any mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, third-party right or interest, other encumbrance or security interest of any kind, or another type of preferential arrangement having similar effect ("Encumbrance") other than the security interest granted under Clause 2;

17.2 it has the power to grant a security interest in any Collateral it transfers to the Secured Party under this Security Agreement and all the necessary corporate authority has been obtained and action taken for the Chargor to grant a security interest in any Collateral it transfers to the Secured Party under this Security Agreement and execute and deliver and perform the covenants and obligations contained in this Security Agreement;

17.3 upon the transfer of any Collateral by the Chargor to the Secured Party, the Secured Party shall have a valid security interest in such Collateral; and

17.4 the performance by the Chargor of any of its obligations contained in this Security Agreement will not result in the creation of any Encumbrance on any Collateral transferred to the Secured Party other than the security interest created under this Security Agreement.

17.5 it is not unable to pay its debts within the meaning of section 123 of the Insolvency Act 1986 or otherwise, and that it has not and will not become unable to pay its debts within the meaning of that section in consequence of its entering into, or doing any act or thing contemplated or permitted or required to be done by it under this Security Agreement and the assets of the Chargor are now and will remain immediately after the date hereof greater than its liabilities (taking into account the actuarial value of its contingent and prospective liabilities) for the purposes of Section 123(2) and 241 of the Insolvency Act 1986.

17.A NEGATIVE PLEDGE

The Chargor covenants that it will not during the subsistence of this Security Agreement, except with the prior written consent of the Secured Party:

(i) create, grant or permit to exist any Encumbrance, as defined in Clause 17.1, other than the charge hereby created, on or over all or any part of the Collateral or any interest therein; or

(ii) except to the extent permitted by Clauses 6, and 6A, sell, transfer, lend, assign or otherwise deal with all or any part of the Collateral or any interest therein.

18. COSTS AND EXPENSES

All the Secured Party's costs and expenses (including legal fees and any value added tax) incurred in connection with (a) the perfection or enforcement of the collateral hereby constituted or (b) the exercise of any Collateral Right, shall be reimbursed to the Secured Party by the Chargor on demand on a full indemnity basis together with interest from the date the same were incurred to the date of payment at overnight LIBOR plus 1% per annum.

19. THE TRANSFERRED COLLATERAL

19.1 All calls or other payments which may become due in respect of the Collateral transferred to the Secured Party shall be paid by the Chargor, and any failure on the part of the Chargor to make such payment will result in the Secured Party having the right to elect to make such payment on behalf of the Chargor and demand immediate repayment by the Chargor of such payment to itself (and such payment shall be so repayable by the Chargor).

19.2 At any time after the occurrence of an Event of Default and without any further consent or authority on the part of the Chargor, the Secured Party may exercise, at its discretion (in the name of the Chargor or otherwise) in respect of any of the Collateral transferred to it, any voting rights and any powers or rights which may be exercised by the person or persons in whose name or names such Collateral is registered or who is the bearer or holder of them.

19.3 The Secured Party shall have no liability to perform or fulfil any obligation of the Chargor in respect of the Collateral transferred to the Secured Party.

20. CURRENCY CONVERSION

For the purpose of or pending the discharge of any of the Obligations the Secured Party may convert any money received, recovered or realised or subject to application by it under this Security Agreement from one currency to another, as the Secured Party may think fit: and any such conversion shall be effected at the Valuation Agent's spot rate of exchange for the time being for obtaining such other currency with the first currency.

21. NOTICES

Any notice or demand to be served by one person on another pursuant to this Security Agreement may be served by leaving it at the address specified above (or such other address as such person may previously have specified in writing) or by letter posted by prepaid first-class post to such address (which shall be deemed to have been served on the [tenth] day following the date of posting, or by fax to the fax number specified above (or such other number as such person may previously have specified) (which shall be deemed to have been received when transmission has been completed).

22. SUCCESSORS

This Security Agreement shall remain in effect despite any amalgamation or merger (however effected) relating to the Secured Party; and references to the Secured Party shall be deemed to include any assignee or successor in title of the Secured Party and any person who, under the laws of its jurisdiction of incorporation or domicile, has assumed the rights and obligations of the Secured Party hereunder or to which under such laws the same have been transferred.

23. CLIENT MONEY RULES

Each party agrees as follows:

23.1 that the Secured Party is not treating the Chargor as a client as defined in the Financial Services (Client Money) Regulations 1991 (the "Rules");

23.2 that money transferred to the Secured Party pursuant to this Security Agreement will not be subject to the protections conferred by the Rules to which the Secured Party is subject.

24. VALUATION AGENT

24.1 The Chargor shall procure that all calculations carried out by the Valuation Agent shall be determined in a commercially reasonable manner.

25. LAW AND JURISDICTION

This Security Agreement shall be governed by English law and, for the Secured Party's

benefit, the English courts shall have exclusive jurisdiction to settle any dispute which may arise from or in connection with it.

26.   AMENDMENTS

No amendment, modification or waiver in respect of this Security Agreement will be effective unless in writing (including writing evidenced by facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

27.   COUNTERPARTS

This Agreement may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.


IN WITNESS WHEREOF this Security Agreement has been signed on behalf of the Secured Party and executed as a deed by the Chargor and is intended to be and is hereby delivered by it as a deed on the date specified above.


The Secured Party
BRITANNIA LIFE LIMITED

By:

Name:        W G Henderson

Title:        Finance Director

Department/officer for receipt of Notices:


EXECUTED as a DEED
by LEHMAN RE LTD.

_____  Director

_____  Director



# ANNEX 1
## NOTICE TO CUSTODIAN

To:     Lehman Brothers International (Europe)

Copy to: Britannia Life Limited

We refer to the Security Agreement (the "Security Agreement") dated [          ] entered into by us in favour of Britannia Life Limited of Britannia Court, 50 Bothwell Street, Glasgow G2 6HR, a copy of which is annexed to this notice. Terms defined in the Security Agreement shall have the same meanings in this notice.

Notice is hereby given by us to you that, by and pursuant to the Security Agreement, we have charged in favour of the Secured Party all of the Collateral.

We hereby instruct that you shall accept instructions from Britannia Life Limited in relation to the Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully

For and on behalf of
Lehman Re Ltd.
Date ...............................

Acknowledged by Lehman Brothers International (Europe)

.........................................
Date ...................................

## ANNEX 2
## FORM OF CUSTODIAN'S ACKNOWLEDGEMENT

[on the letterhead of Lehman Brothers International (Europe)]

BRITANNIA LIFE LIMITED                    [date]
Britannia Court
50 Bothwell Street
Glasgow G2 6HR

Gentlemen,

Euroclear account No. 97558

We acknowledge receipt of a security agreement dated _____ 1999 between Lehman Re Ltd. as Chargor and yourselves as Secured Party (the "Security Agreement"). Terms defined in the Security Agreement shall have the same meaning in this letter.

We hereby confirm that the above mentioned account is opened in our name in Euroclear. We agree to treat such account as a special account specifically opened for the purpose of holding collateral, whether or not exclusively for your account and/or in the context of the transactions on the occasion of which this letter is issued, and we undertake that we will not knowingly use such account for any other purposes.

We confirm that all Permitted Collateral delivered to us and which is to be held in Euroclear shall be transferred to and held in the Euroclear Collateral Account.

We agree that the Euroclear Collateral is and shall be subject to the fungibility regime organised by the Royal Decree No. 62. We acknowledge that the Euroclear Collateral is to be held in the Euroclear Collateral Account subject to the fixed charge in your favour constituted by the Security Agreement, and agree to hold the Euroclear Collateral in charge for your benefit.

We agree that we shall accept instructions from Britannia Life Limited in relation to the Euroclear Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully,

*Sd Britto*

Lehman Re Ltd.

Accepted and agreed

Britannia Life Limited

Date: 22-d March 99.

**Year 2**

We know that the value of a two year bond with an interest rate $S_2$ will have a price of par.

$$S_2 * (D_1 + D_2) + 100\% * D_2 = 100\%$$

$$100\% - S_2 * D_1 = S_2 * D_2 + 100\% * D_2$$

$$D_2 = \frac{100\% - S_2 * D_1}{100\% + S_2}$$

**Year n**

We know that the value of an $n$ year bond with an interest rate $S_n$ will have a price of par.

$$S_n * (D_1 + D_2 + \ldots + D_n) + 100\% * D_n = 100\%$$

$$100\% - S_n * (D_1 + D_2 + \ldots + D_{n-1}) = S_n * D_n + 100\% * D_n$$

$$D_n = \frac{100\% - S_n * (D_1 + D_2 + \ldots + D_{n-1})}{100\% + S_n}$$

In the event that the Reinsurance Agreement is terminated pursuant to the terms of Article 8 thereof, the Valuation Agent shall calculate the discount factors by obtaining bid quotations from three leading dealers in the GBP swaps market. The highest and the lowest quotations will be discarded and the remaining quotation will be used.

**Mortality Basis**

The mutually agreed mortality basis used in the calculation of the net present value of the then future expected annuity cash flows in Article 8 of the Reinsurance Agreement, will be determined by reference to the mortality tables published from time to time by the Continuous Mortality Investigations Bureau and the mortality experience of the Covered Policies.

If the parties fail to agree a mortality basis then such Dispute shall be a "Model Dispute" and shall be finally resolved by arbitration in accordance with the terms of Article 15 of the Reinsurance Agreement.

This letter will be governed by and construed in accordance with English law.

Yours faithfully,

# EXHIBIT C

CUSTODY AGREEMENT

FOR LEHMAN BROTHERS INTERNATIONAL (EUROPE)

and

LEHMAN RE LTD.

# TABLE OF CONTENTS

**SECTION**
                         **PAGE**

|  | PREAMBLE | 1 |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | APPOINTMENT OF CUSTODIAN | 3 |
| 3. | PROPERTY ACCEPTED | 3 |
| 4. | REPRESENTATIONS AND WARRANTIES | 3 |
| 5. | IDENTIFICATION AND SEGREGATION OF ASSETS | 4 |
| 6. | PERFORMANCE BY THE CUSTODIAN | 4 |
|  | (a) Transactions not requiring Instructions | 4 |
|  | (b) Transactions requiring Instructions | 5 |
| 7. | REGISTRATION | 6 |
| 8. | CUSTODY ACCOUNT PROCEDURES | 6 |
| 9. | WITHDRAWAL AND DELIVERY | 6 |
| 10. | USE OF AGENTS, CLEARANCE SYSTEMS, AND DEPOSITORIES | 7 |
| 11. | SCOPE OF RESPONSIBILITY | 7 |
| 12. | INDEMNITY | 9 |
| 13. | FEES AND EXPENSES | 9 |
| 14. | TERMINATION | 9 |
| 15. | ASSIGNMENT | 10 |
| 16. | DISCLOSURE | 10 |
| 17. | NOTICES | 10 |
| 18. | GOVERNING LAW | 10 |
|  | SIGNATURES | 10 |
| 19. | ANNEX 1 - Form of Notice to Custodian | 11 |
| 20. | ANNEX 2 - Form of Custodian's Acknowledgement | 12 |

# CUSTODY AGREEMENT

THIS CUSTODY AGREEMENT is made as of [?] March 1999 by and among Lehman Brothers International (Europe) ("**Lehman**") acting through its office at Genferstrasse 24, 8027 Zurich, Switzerland and Lehman Re Ltd. (the "**Client**") having its office or principal place of business at The Exchange Building, 2nd Floor, 46 Reid Street, Hamilton, HM DX, Bermuda.

WITNESSETH

THAT WHEREAS, the Client wishes to open and maintain a custody account or accounts with Lehman to hold certain assets in accordance with this Custody Agreement and on such other terms and conditions as may be referred to in the Schedules attached hereto (if any) or as otherwise may be incorporated herein and amended from time to time upon prior written notice to the Client. Lehman is hereafter referred to as, the "**Custodian**".

WHEREAS, the Client wishes to establish such custody account or accounts under the terms and conditions of this Custody Agreement and the Schedules attached hereto, if any (this Custody Agreement and such Schedules as both may be amended from time to time, collectively, the "**Agreement**" or "**Custody Agreement**");

NOW, THEREFORE, in consideration of the premises and of the agreements hereinafter set forth, the parties agree as follows:

1. **DEFINITIONS**

"**Authorised Person(s)**" means (i) any officers, employees or agents of the Client as have been authorised by notice in writing to the Custodian to act on its behalf in the performance of any acts or duties under this Agreement, or (ii) any other person, firm or company holding a duly executed Power-of-Attorney from the Client which is in a form acceptable to the Custodian or (iii) Britannia Life Limited in accordance with the provisions of a Security Agreement between Britannia Life Limited and the Client.

"**CGO**" means the Central Gilts Office; the computer based system managed by the Bank of England to facilitate the book-entry transfer of gilt-edged securities.

"**Clearance System**" means Euroclear or the CGO;

"**Client Money Rules**" means the Financial Services (Client Money) Regulations 1991;

"**Instructions**" means instructions from any Authorised Person received by the Custodian, either orally or via telephone, telex (whether tested or untested), facsimile transmission, bank wire or other teleprocess or electronic instruction system acceptable to the Custodian which have been transmitted with proper testing or authentication on such terms and conditions as the Custodian may specify provided that:

(a) Instructions shall continue in full force and effect until cancelled or superseded;

(b)    if any Instructions are unclear and/or ambiguous, the Custodian may without any liability on its part, act upon what it reasonably believes in good faith such Instructions to be or refuse to execute such Instructions until any ambiguity or conflict has been resolved to its satisfaction;

(c)    Instructions shall be provided and carried out subject to the operating procedures, marketing practices, rules and regulations of any relevant stock exchange, Clearance System, depository or market where they are to be executed, and can be acted upon by the Custodian only during banking hours and on banking days when the applicable financial markets are open for business.  All such Instructions shall be carried out subject to the local laws, regulations, customs, procedures and practices applicable at the place of performance of such Instructions or to which the Custodian is otherwise subject and shall be governed by and construed in accordance with the local law applicable at such place of performance; and

(d)    Instructions are to be given in the English language and the Custodian shall be entitled to rely upon the continued authority of any Authorised Person to give the same until the Custodian receives notice from the Client to the contrary.  The Custodian shall be entitled to rely upon any Instructions received in the manner prescribed it believes in good faith to have been given by any Authorised Person.

"Lehman Organisation" means, any entity controlled, directly or indirectly, by the Custodian, any entity that controls, directly or indirectly, the Custodian or any entity directly or indirectly under common control with the Custodian.  For this purpose, "control" means ownership of a majority of the voting power of the Custodian.

"Person" means any person, firm, company, corporation, government, state or agency thereof or any association or partnership (whether or not having separate legal personality) or two or more of the foregoing;

"Property" means as the context requires, any Securities, Cash or any other property held by the Custodian under the terms of this Agreement.

"Securities" means bonds, debentures, notes, stocks, shares, units or other securities and all rights or property which may at any time accrue or be offered (whether by way of bonus, redemption, preference, option or otherwise) in respect of any of the foregoing or evidencing or representing any other rights or interests therein (including, without limitation, any of the foregoing not constituted, evidenced or represented by a certificate or other document but by an entry in the books or other permanent records of the issuer, a trustee or other fiduciary thereof or a Clearance System).

2.    APPOINTMENT OF CUSTODIAN

The Client hereby authorises the Custodian to establish on the terms of this Agreement a custody account or accounts (the "Custody Account") in the name of the Client and in the capacity as Custodian, for the deposit of any Securities, and other Property (apart from Cash) from time to time received by the Custodian for the account of the Client, and a deposit account or accounts (the "Client Deposit Account") in the name of the Custodian which will be an account subject to the Client Money Rules and designated

as a client account, for the deposit of funds in any currency from time to time received by the Custodian for the account of the Client, whether by way of deposit or arising out of or in connection with any Securities, or other property in the Custody Account.

3.    PROPERTY ACCEPTED

(a)    The Custodian agrees to accept for custody in the Custody Account at its discretion and subject to the conditions set forth herein:

(i)    Securities; and/or

(ii)    any other form of property (apart from Cash) acceptable to the Custodian and capable of deposit under the terms of this Agreement.

(b)    The Custodian agrees to accept for custody in the Client Deposit Account at its discretion and subject to the conditions set forth herein Cash:

"Cash" means Great British Pounds (or any successor currency) ("GBP") and such other currency or currencies acceptable to the Custodian and capable of deposit under the terms of this Agreement.

4.    REPRESENTATIONS AND WARRANTIES

The Client hereby represents and warrants to Custodian that:

(a)    during the term of this Agreement it (and any Person on whose behalf it may act as agent or otherwise in a representative capacity) has and will continue to have full capacity and authority to enter into this Agreement and to carry out all the transactions contemplated herein, and has taken and will continue to take all action (including, without limitation, the obtaining of all necessary governmental consents in any applicable jurisdiction) and customer consents (where applicable) to authorise the execution, delivery and performance of this Agreement; and

(b)    if a company or other corporate body, the resolutions of its Board of Directors or other managing body authorising the execution, delivery and performance of this Agreement have been obtained and that these remain and will continue to remain in full force and effect as of the date hereof and during the term of this Agreement without revocation or amendment.

The Custodian hereby represents and warrants to the Client that it is duly authorised to act as Custodian and that it will comply with all applicable laws and regulations, including Swiss regulations.

5.    IDENTIFICATION AND SEGREGATION OF ASSETS

(a)    With respect to Property in the Custody Account except as otherwise provided in this Agreement, the Custodian will separately identify on its records all Property held on behalf of the Client by the Custodian.

(b)    With respect to Property in the Custody Account or the Client Deposit Account, the Custodian will supply to the Client from time to time as mutually agreed upon, a statement with respect to all of the Property in the Custody Account

and the Client Deposit Account (such statement may be provided in the form of a printed statement or as electronically transmitted information). In the event that the Client does not inform the Custodian in writing of any exceptions or objections within 30 days after the date of such statement, the Client shall be deemed to have approved such statement.

(c) With respect to Cash in the Client Deposit Account, this shall be held by the Custodian in accordance with the Client Money Rules and will only be held in client bank accounts with banks from which the Custodian has previously received written acknowledgement:

   (i)   that all money standing to the credit of the account is held by the Custodian as trustee and that the bank is not entitled to combine the account with any other account or to exercise any right of set-off or counterclaim against money in that account in respect of any sum owed to it on any other account of the Custodian;

   (ii)  that interest earned on the account shall be credited to the account, or to an account of that type, and

   (iii) that, in accordance with regulation 2.07.3 of the Client Money Rules; the title of the account sufficiently distinguishes the account from any account containing money that belongs to the Custodian, and is in the form requested by the Custodian.

6.   PERFORMANCE BY THE CUSTODIAN

   (a)   <u>Transactions not requiring Instructions</u>

      The Custodian is authorised by the Client to carry out the following transactions relating to the Property:

      (i)   to sign any affidavits, certificates of owner    other certificates relating to the Property which may be             r regulations made by any tax authority c. authority in any relevant jurisdiction, whether otherwise, and whether relating to ownership, income tax or capitu. gains, or any other tax, duty or levy (and the Client further agrees to ratify and to confirm or to do such things as may be necessary to complete or evidence the Custodian's actions under this Section 6(a)(i) or otherwise under the terms of this Agreement);

      (ii)  (aa)  to collect and receive, for the account of the Client, all income and other payments and distributions in respect of the Property, and (in the absence of contrary Instructions) credit the same to the Client Deposit Account;

            (bb)  to take any action necessary and proper in connection with the receipt of income and other payments and distributions as are referred to in Section 6(a)(ii)(aa) above, including (without limitation) the presentation of coupons and other interest items;

| (iii) | (aa) | to receive and hold for the account of the Client any capital arising out of or in connection with the Property whether as a result of its being called or redeemed or otherwise becoming payable (other than at the option of the holder thereof) and (in the absence of contrary Instructions) credit the same to Client Deposit Account; |
|---|---|---|
| | (bb) | to take action necessary and proper in connection with the receipt of any capital as is referred to in Section 6(a)(iii)(aa) above, including (without limitation) the presentation for payment of any property which becomes payable as a result of its being called or redeemed or otherwise becoming payable (other than at the option of the holder thereof) and the endorsement for collection of cheques, drafts and other negotiable instruments; |
| (iv) | | to receive and hold for the account of the Client all Securities received by the Custodian as a result of a stock dividend, share subdivision or reorganisation, capitalisation of reserves or otherwise; |
| (v) | | to exchange interim or temporary receipts for definitive certificates, and old or overstamped certificates for new certificates; |
| (vi) | | to make cash disbursements for any expenses incurred in handling the Property and for similar items in connection with the Custodian's duties under this Agreement, and, (in the absence of contrary Instructions) debit the same to a designated fee account of the Client with the Custodian and; |
| (vii) | | to deliver to the Client transaction advices and/or regular statements of account (such statements may be provided in printed form or as an electronic transmission) showing the Property held at such intervals as may be agreed between the parties hereto and to notify the Client of all notices, reports and other financial information relating to the Property when received by the Custodian, and to seek Instructions as to any action to be taken in connection therewith. |

(b)     **Transaction requiring Instructions**

The Custodian is authorised by the Client to carry out the following transactions relating to the Property upon receipt of specific Instructions:

| (i) | to deliver Property sold by the Client against payment or as may be specified by the Client in its Instructions; |
|---|---|
| (ii) | to make payment for and to receive Property purchased by the Client, such payment to be made by the Custodian in accordance with the prevailing rules, operating procedures or market practice on any relevant stock exchange, Clearance System, depository or |

market, where or through which such payment is to be made, or as may be specified by the Client in its Instructions;

(iii) to deal with bonus or script issues, warrants and other similar interest offered or received by the Custodian (or its nominee company or other agents) or to handle proxy forms, only as may be specified by the Client in its instructions;

(iv) to exercise any voting rights attached to Securities and to forward proxy forms signed in blank by the Custodian (or its nominee company or other agent) or to destroy proxy forms, only as may be specified by the Client in its Instructions; and

(v) excepts as otherwise provided herein, to deliver or dispose of the Property only as may be specified by the Client in its Instructions.

(c) the Custodian agrees that its obligations hereunder are subject to (i) the instruction given to it by the Client contained in Annex 1 of a Security Agreement between the Client and Britannia Life Limited and (ii) an acknowledgement it has given to Britannia Life Limited contained in Annex 2 of said Security Agreement, copies of which are attached.

7. REGISTRATION

The Client agrees and understands that except as may be specified by the Client in its Instructions, Property shall be registered as the Custodian may direct either in the name of the Custodian or its nominee company or its agent in the jurisdiction where the Property is required to be registered or otherwise held.

8. CUSTODY ACCOUNT PROCEDURES

Unless otherwise agreed to by the Custodian and the Client (and subject to Section 6(c) above), the Custodian shall, or shall instruct any other entity authorised to hold Property in accordance with Section 10 hereof, to receive or deliver Securities and credit or debit the Custody Account in accordance with proper Instructions. The proceeds from the sale or exchange of Property and Property purchased or acquired will be credited to the Custody Account on the date the proceeds of such Property are actually received by the Custodian.

9. WITHDRAWAL AND DELIVERY

The Client may at any time hereof subject to Clause 6(c) above, demand withdrawal of all or any part of the Property in the Custody Account and/or the Client Deposit Account. Payments of Cash shall be made at the expense of the Client by banker's draft, telegraphic transfer, cheque or otherwise as may be agreed by the Custodian. Delivery of any Property other than Cash will be made without undue delay at such locations as the parties hereto may agree at the expense of the Client. Where necessary, the Custodian will on withdrawal transfer any Property into the name of the Client or as it may direct at the expense of the Client. The Custodian shall have no obligation to deliver the Property of the Client where the Custodian believes that there may be insufficient Property in the Custody Account and the Client Deposit Account to cover any exposure that the Custodian has to the Client.

The Client agrees and understand that:

(a)    the Custodian is authorised, subject to applicable laws, rules and regulations, to appoint agents (including any member of the Lehman Organisation), whether in its own name or that of the Client, to perform any of the duties of the Custodian under this Agreement; provided that any agent so appointed other than Euroclear or the CGO shall only be appointed with the prior written consent of Britannia Life Limited (which is party to the Security Agreement of even date herewith between Britannia Life Limited and the Client).    The Custodian may delegate to any agent so appointed any of its functions under this Agreement, including (without limitation) the collection of all payments due on the Property and whether of an income or a capital nature;

(b)    if the Custodian appoints any agent pursuant to Section 10(a) above, it shall be entitled to pay all normal remuneration to such agent for the account of the Client;

(c)    the Custodian is entitled to deposit any Property at its discretion in any Clearance System, or any other clearance system reasonably deemed appropriate by the Custodian on the condition that Britannia Life Limited's prior written consent has been obtained in accordance with Section 10(a) above, and any Property so held shall be subject to the rules and operating procedures of such Clearance System (or such other clearing system, as the case may be,) and any applicable laws and regulations whether of a governmental authority or otherwise.

11.    SCOPE OF RESPONSIBILITY

The Client agrees and understands that:

(a)    subject to the terms hereof, the Custodian shall use all reasonable care in the performance of its duties under this Agreement but shall not be responsible for any loss or damages suffered by the Client as a result of the Custodian performing such duties unless the same results from acts of negligence, fraud or wilful default on the part of the Custodian or its employees in which event the liability of the Custodian in connection with any Property shall not exceed the market value of such Property at the time of such negligence, fraud or wilful default as aforesaid together with reasonable legal costs incurred in such a recovery;

(b)    unless otherwise expressly agreed, the Custodian need not maintain any insurance on Property held under the terms of this Agreement;

(c)    upon receipt of each and every transaction advice and/or statement of account supplied to it by the Custodian pursuant to Section 6(a)(vii) hereof, the Client shall examine the same and notify the Custodian within thirty (30) days of the date of any such advice or statement of any discrepancy between Instructions given and the situation shown therein and/or of any other errors therein.    In the absence of any notification by the Client, the Custodian shall not (in the absence of negligence or wilful default on its own part) be liable for the consequences of any discrepancy or error which was made or existed during the period covered by the

statement or the transaction indicated by the advice provided however that the Custodian shall not be liable for any such consequences during the period prior to the receipt of any such notification;

(d)     the Custodian or its nominee company or agents, as the case may be, after notification to the Client and receipt from the Client of its consent, may (but without being under any duty or obligation) institute or defend legal proceedings, or take or defend any other action arising out of or in connection with the Property provided that the Client indemnifies the Custodian against any reasonable costs, charges and expenses arising from such proceedings or other action and makes available to the Custodian such security in respect of such reasonable costs, charges and expenses as the Custodian in its absolute discretion deems necessary.   The Custodian shall not be entitled to the indemnification above if such legal proceeding or action is the result of its negligence or wilful default.

(e)     (i)     the Custodian does not have any responsibility if for any reason or cause beyond its control, including (without limitation) nationalisation, expropriation, currency restrictions, acts of war, terrorism, insurrection, revolution, nuclear fusion, fission or acts of God, the operation of the Custody Account and/or Client Deposit Account and/or the Custodian's ability to carry out Instructions or account to the Client is restricted removed or subject to delay in any way;

        (ii)    all collections of the Property and or any funds or other property paid or distributed in respect of the Property are made at the risk of the Client, provided that the Custodian has not acted in a negligent manner or in bad faith;

        (iii)   the Custodian shall not be liable for any loss resulting from or caused by, the carrying out of any Instructions of the Client;

(f)     the Client shall be responsible for all filings, tax returns and reports on any transactions undertaken pursuant to this Agreement which must be made to any relevant authority whether governmental or otherwise and for the payment of all unpaid calls, taxes (including without limitation any value added tax), imports, levies or duties due on any principal or interest, or any other liability or payment arising out of or in connection with the Property, and in so far as the Custodian is under any obligation (whether of a governmental nature or otherwise) to pay the same on behalf of the Client it may do so out of any monies or assets held by the Custodian pursuant to the terms of this Agreement;

(g)     the Custodian is not acting under this Agreement as investment manager or investment adviser to the Client and the Custodian's duty is solely to keep safe custody of the Property (with responsibility for the selection, acquisition and disposal of the Property remaining with the Client at all times) and;

(h)     the Custodian may rely in the performance of its duties under this Agreement and without liability on its part, upon any Instructions believed by it in good faith to be genuine and given by an Authorised Person.

12.   INDEMNITY

The Client agrees to indemnify the Custodian and each of the Custodian's nominees or other agents and to hold the Custodian and such nominees or agents harmless, against all reasonable costs, liabilities and expenses including (without limitation) any reasonable legal fees and disbursements, arising directly or indirectly:

(a)   from the fact that the Property is registered in the name of or held by the Custodian or any such nominees or agents;

(b)   without limiting the generality of Section 12(a) above, from any act or thing including without limitation any overdraft or other financial accommodation which arises on the records of the Custodian (whether on an advised or unadvised basis), which the Custodian or such nominee or agent allows, takes or does or omits to allow, take or do in relation to the Property under or pursuant to the terms of this Agreement or as a consequence of the carrying out of any Instructions; or

(c)   from the Custodian or any such nominee or agent carrying out any Instructions believed by it in good faith to have been given by an Authorised Person.

PROVIDED THAT neither the Custodian, its nominees nor agent shall be indemnified against any liability arising out of the Custodian's or such nominee's or agent's own wilful misfeasance, bad faith, negligence or reckless disregard of its duties under this Agreement.

13.   FEES AND EXPENSES

Without prejudice to any of its liabilities and obligations under this Agreement, the Client agrees to pay to the Custodian from time to time such fees/commissions for its services pursuant to this Agreement as may be notified by the Custodian to the Client from time to time and the Custodian's out-of-pocket or incidental expenses including (but without limitation) all those items referred to in Section 12 hereof, and to hold the Custodian harmless from any liability, loss or withholding, resulting from any taxes or other governmental charges, and any expenses related thereto, which may be imposed, or assessed in connection with or arising out of the Custody Account and/or the Client Deposit Account. Subject to specific Instructions from the Client to the contrary, the Custodian is further authorised to debit (as well after as before the date of any termination pursuant to Section 14 hereof) any designated fee account of the Client with the Custodian any amount owing to the Custodian from time to time under this Agreement.

14.   TERMINATION

Either of the parties hereto may terminate this Agreement on giving not less than 30 days written notice to the other party.  Upon the expiration of such notice the Custodian shall account to the Client in accordance with the terms of Section 9 hereof provided however that if the Custodian has effected any transaction on behalf of the Client the contractual settlement date of which is or is likely to extend beyond the expiration of such notice, then the Custodian and the Client shall mutually agree whether to close out or complete such transaction and the Custodian shall be entitled in its absolute discretion to retain sufficient funds from the Property for that purposes.

15. ASSIGNMENT

This Agreement shall bind and enure for the benefit of the parties hereto and their respective successors, and neither party may assign, transfer or charge all or any of its rights and benefits hereunder without the written consent of the other.

16. DISCLOSURE

The Client agrees and understands that the Custodian or its agent may disclose information regarding the Custody Account and/or the Client Deposit Account if required to do so by any court order or similar process in any relevant jurisdiction or by order of an authority having power to do so over the Custodian or its agents within the jurisdiction of such court or authority, provided that prior to making any such disclosure the Custodian advises the Client so that if the Client objects to such disclosure the Client may take appropriate action in the applicable court or with the appropriate authority.

17. NOTICES

Except as otherwise provided herein all notices and other communications to be given under this Agreement shall be in writing in the English language and shall be made either by telex or facsimile, or by letter addressed to the party concerned at the addresses set out above (or at such other addresses as may be notified in writing by one party to any other party from time to time).

18. GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the England. Both Parties irrevocably submit to the jurisdiction of England.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement, and the Schedules hereto (if any), to be executed by their respective officers thereunto duly authorised.

| LEHMAN BROTHERS INTERNATIONAL (EUROPE) | LEHMAN RE LTD. |
| --- | --- |
| | as Client |
| By: | By: |
| Title : | Title: S.V.P. |
| Attest: | Attest: |

## FORM OF NOTICE TO CUSTODIAN

To:     Lehman Brothers International (Europe)

Copy to: Britannia Life Limited

We refer to the Security Agreement (the "Security Agreement") dated [        ] entered into by us in favour of Britannia Life Limited of Britannia Court, 50 Bothwell Street, Glasgow G2 6HR, a copy of which is annexed to this notice. Terms defined in the Security Agreement shall have the same meanings in this notice.

Notice is hereby given by us to you that, by and pursuant to the Security Agreement, we have charged in favour of the Secured Party all of the Collateral.

We hereby instruct that you shall accept instructions from Britannia Life Limited in relation to the Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully

*Ed Stt*

For and on behalf of
Lehman Re Ltd.
Date ..March 19/99..

Acknowledged by Lehman Brothers International (Europe)

Date ...... March 19 1999

## FORM OF CUSTODIAN'S ACKNOWLEDGEMENT

[on the letterhead of Lehman Brothers International (Europe)]

BRITANNIA LIFE LIMITED         [date]
Britannia Court
50 Bothwell Street
Glasgow G2 6HR

Gentlemen,

**Euroclear account No. 97558**

We acknowledge receipt of a security agreement dated _____ 1999 between Lehman Re Ltd. as Chargor and yourselves as Secured Party (the "**Security Agreement**"). Terms defined in the Security Agreement shall have the same meaning in this letter.

We hereby confirm that the above mentioned account is opened in our name in Euroclear. We agree to treat such account as a special account specifically opened for the purpose of holding collateral, whether or not exclusively for your account and/or in the context of the transactions on the occasion of which this letter is issued, and we undertake that we will not knowingly use such account for any other purposes.

We confirm that all Permitted Collateral delivered to us and which is to be held in Euroclear shall be transferred to and held in the Euroclear Collateral Account.

We agree that the Euroclear Collateral is and shall be subject to the fungibility regime organised by the Royal Decree No. 62. We acknowledge that the Euroclear Collateral is to be held in the Euroclear Collateral Account subject to the fixed charge in your favour constituted by the Security Agreement, and agree to hold the Euroclear Collateral in charge for your benefit.

We agree that we shall accept instructions from Britannia Life Limited in relation to the Euroclear Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully,



**Britannia Life Limited**
Britannia Court
50 Bothwell Street
Glasgow G2 6HR

Tel 0141 248 2000
Fax 0141 223 8000
DX GLASGOW 6 550531

Our Reference   WGH/EG/SOL.REV
Please ask for   Ext 8175
Your Reference

Lehman Re Ltd.
HM 68
Hamilton
HM AX
BERMUDA

Dear Sirs,

## LETTER OF INTENT

We refer to the Reinsurance Agreement between Britannia Life Limited and Lehman Re Ltd. to be dated 22nd March 1999 (the **"Reinsurance Agreement"**).   Terms defined in the Reinsurance Agreement shall have the same meaning in this letter.

By your signature below, please acknowledge the agreement in principle of Britannia Life Limited and Lehman Re Ltd. to conclude the following transaction on or before 30 June 1999 with an effective date of 1 January 1998:

1.  Nationale-Nederlanden Reinsurance Company NV ("NN Re") and Britannia Life Limited intend to enter into a commutation and release agreement in respect of the remaining liabilities of the Life Association of Scotland Limited ("L.A.S.") annuity portfolio which was ceded by L.A.S. and reinsured with NN Re on 31st December 1992 and which have not been reinsured with Lehman Re Ltd., pursuant to the Reinsurance Agreement (the **"Remaining Liabilities"**); and

2.  Simultaneously therewith, Lehman Re Ltd. will enter into a reinsurance agreement with Britannia Life Limited, in respect of the Remaining Liabilities.  Any Remaining Liabilities so ceded shall form part of the Covered Policies under the Reinsurance Agreement.

The consideration payable by Britannia Life Limited to Lehman Re Ltd. for the reinsurance of the Remaining Liabilities shall be determined in accordance with the following methodology:

### Mortality Basis

The mortality basis, which will be determined in a manner consistent with Annex 4 of the Reinsurance Agreement, will be used to determine the expected liability cash flows under the Covered Policies.  The reinsurance premiums will be these cash flows divided by 96%.

### Discount Factors

The consideration will be calculated from the swap curve. The swap curve comprises the par yields for each maturity at which banks lend to each other. GBP long term swap rates are currently published on Reuters' pages ICAQ and BIRV01. Below are examples of how the discount factors are calculated for various maturities using annual swap rates.

*Example*

**Assume the swap rate in year $i$ is $S_i$, and the discount factor for the end of year $i$ is $D_i$**

<u>Year 1</u>

The 1 year swap rate is $S_1$, and the discount factor, $D_1$, is $\dfrac{1}{(1 + S_1)}$

<u>Year 2</u>

We know that the value of a two year bond with an interest rate $S_2$ will have a price of par.

$$S_2 * (D_1 + D_2) + 100\% * D_2 = 100\%$$

$$100\% - S_2 * D_1 = S_2 * D_2 + 100\% * D_2$$

$$D_2 = \frac{100\% - S_2 * D_1}{100\% + S_2}$$

<u>Year $n$</u>

We know that the value of an $n$ year bond with an interest rate $S_n$, will have a price of par.

$$S_n * (D_1 + D_2 + \ldots\ldots + D_n) + 100\% * D_n = 100\%$$

$$100\% - S_n * (D_1 + D_2 + \ldots\ldots + D_{n-1}) = S_n * D_n + 100\% * D_n$$

$$D_n = \frac{100\% - S_n * (D_1 + D_2 + \ldots\ldots + D_{n-1})}{100\% + S_n}$$

The actual consideration shall be determined on the trade date of the transactions and will be subject to, amongst other factors, approval by all parties, the then current interest rates, the assets to be transferred and the underlying insurance portfolio.

The conclusion of the transaction is conditional upon all of the following being satisfied:

(a)     the conclusion of documentation in form and substance satisfactory to all parties;

(b)     approval being given by the Board of Directors of each party;

(c)    appropriate regulatory approval being given;

(d)    the continuance of the arrangements set out in the Reinsurance Agreement; and

(e)    simultaneously, NN Re and Britannia Life Limited enter into the commutation and release agreement referred to in paragraph 1. above in respect of the Remaining Liabilities.

## Refund of Premiums

In the event that on or prior to 30th June 1999, it is determined that an annuitant had died and the guaranteed period (if any) had ended in respect of a Covered Policy prior to 1st January 1998, Britannia Life Limited and Lehman Re Ltd. agree that the effect thereof shall be reflected in the calculation of the consideration for the reinsurance of the Remaining Liabilities as referred to above. The net payment ("Payment") shall equal the net present value of the reinsurance premiums (after adjustment for claims paid) adjusted for interest at overnight Libor − 1% per annum due pursuant to the Reinsurance Agreement and attributable to such annuitants less the net present value of the quotient of (i) the Remaining Liabilities and (ii) 96 percent. If the Payment is positive, Lehman Re Ltd. shall remit to Britannia Life Limited an amount equal to the Payment, and if that amount is a negative amount, the absolute value thereof shall be payable by Britannia Life Limited to Lehman Re Ltd..

This letter will be governed by and construed in accordance with English Law.

We look forward to working with you to conclude this transaction.

Yours faithfully,

**Britannia Life Limited**

Agreed and accepted

**Lehman Re Ltd.**

**Date:** March 22 1994

# LEHMAN RE

## Models Letter

22 March 1999

Britannia Life Limited
Britannia Court
5 Bothwell Street
Glasgow G2 6HR

Dear Sirs,

### Calculation of Discount Factors and Mortality Basis

We refer to the Reinsurance Agreement and Security Agreement to be entered into between ourselves and yourselves. Terms defined in the Reinsurance Agreement and the Security Agreement shall have the same meaning in this letter.

Pursuant to Article 8 of the Reinsurance Agreement and the definition of Required Amount in the Security Agreement, the calculation by the Valuation Agent of the discount factors and mortality basis used to determine the net present value of the Expected Annuity Cash Flows is based on the following methodology.

### Discount Factors

The discount factors are calculated from the swap curve. The swap curve comprises the par yields for each maturity at which banks lend to each other. GBP long term swap rates are currently published on Reuters' pages ICAQ and BIRV01.

*Example*

Assume the swap rate in year $i$ is $S_i$, and the discount factor in year $i$ is $D$.

**Year 1**

The 1 year swap rate is $S_1$, and the discount factor, $D_1$, is $\dfrac{1}{(1 + S_1)}$

**LEHMAN RE LTD.**
**HM 68**
**HAMILTON HMAX BERMUDA**
**(441) 296-8451**
**FAX: (441) 296-8452**

# EXHIBIT D

# LEHMAN BROTHERS

BRITANNIA LIFE LIMITED
Britannia Court
50 Bothwell Street
Glasgow G2 6HR

Gentlemen,

Euroclear account No. 97558

We acknowledge receipt of a security agreement dated 22 MARCH 1999 between Lehman Re Ltd. as Chargor and yourselves as Secured Party (the "Security Agreement"). Terms defined in the Security Agreement shall have the same meaning in this letter.

We hereby confirm that the above mentioned account is opened in our name in Euroclear. We agree to treat such account as a special account specifically opened for the purpose of holding collateral, whether or not exclusively for your account and/or in the context of the transactions on the occasion of which this letter is issued, and we undertake that we will not knowingly use such account for any other purposes.

We confirm that all Permitted Collateral delivered to us and which is to be held in Euroclear shall be transferred to and held in the Euroclear Collateral Account.

We agree that the Euroclear Collateral is and shall be subject to the fungibility regime organised by the Royal Decree No. 62. We acknowledge that the Euroclear Collateral is to be held in the Euroclear Collateral Account subject to the fixed charge in your favour constituted by the Security Agreement, and agree to hold the Euroclear Collateral in charge for your benefit.

We agree that we shall accept instructions from Britannia Life Limited in relation to the Euroclear Collateral to Britannia Life in accordance with the provisions of the Security Agreement.

Yours faithfully,

LEHMAN BROTHERS INTERNATIONAL (EUROPE), ZURICH BRANCH
GENFERSTRASSE 24   P.O. BOX 341   8027 ZURICH SWITZERLAND   TELEPHONE 411 287 88 89   FACSIMILE 411 287 88 22   TELEX 816 292
Lehman Brothers International (Europe)
Regulated by the Securities and Futures Authority for the conduct of investment business in the United Kingdom
Member of the London Stock Exchange and the International Securities Market Association
Registered in England No 2538254 at One Broadgate London EC2M 7HA

# EXHIBIT E

**Alba Life Collateral Balance as of 29/06/2007**

| Security | CUSIP | Proceeds |
|---|---|---|
| FOSSE 1 A | XS0119816824 | 74,519 |
| Granite 2000-2 A1 | XS0118075778 | 598,332 |
| HFP 1 3A1 | XS0114776585 | 5,059,042 |
| Southern Pacific F A2 | XS0163532566 | 596,747 |
| Southern Pacific G A2 | XS0170183700 | 518,176 |
| Southern Pacific H A2 | XS0179982698 | 2,230,233 |
| Granite 2002-2 3A | XS0153569792 | 8,093,414 |
| Granite 2003-1 3A | XS0160703434 | 3,377,772 |
| HFP 7 4A2 | XS0165443705 | 3,039,509 |
| MFPLC 3A A3 | US620525AS41 | 5,043,198 |
| PRS 7 A2 | XS0183097939 | 1,132,041 |
| SPF 05 B A | XS0221839318 | 3,331,312 |
| SPF 06 A A | XS0241080075 | 3,992,213 |
| PRS 05-1 A2C | XS0217069656 | 4,950,948 |
| SPS 04-2 A2C | XS0196612963 | 2,834,888 |
| Granite 2004-2 3A | XS0193218350 | 3,009,521 |
| Permanent 2 5A | XS0163978900 | 2,005,315 |

Cash Amount        13,702,483

**Total Collateral (£)**        **63,589,664**

Required Balance        59,476,666

# EXHIBIT F

Messrs. A Lomas, S Pearson,
D Schwarzmann and M Jervis
(Joint Adminstrators of
Lehman Brothers International
Europe)
PricewaterhouseCoopers LLP
Plumtree Court
London
EC4A 4HT

And By Fax: +44 (0) 20 7822 4652

17 September 2008

Dear Sirs

**Lehman Brothers International Europe (in Administration) ("Lehman Brothers")**

**Re: Custody Agreement between Lehman Brothers and Lehman Re Limited in respect of Reinsurance and Security Agreements between Phoenix Life Limited (ex Britannia Life) and Lehman Re Limited**

Lehman Brothers maintain Custody and Client Deposit Accounts for Lehman Re Limited pursuant to a Custody Agreement which relates to Reinsurance and Security Agreements dated 22 March 1999 made between Lehman Re Limited and Phoenix Life Limited (then Britannia Life Limited).

Although we are not currently seeking to call upon the collateral security held by Lehman Brothers in respect of Lehman Re Limited's liabilities to Phoenix Life Limited, we write to give you notice of Phoenix Life's interest in funds and securities held in the Custody and Client Deposit Accounts (including Lehman Brother's Euroclear account number 97558) which are charged and held in trust for Phoenix Life's benefit.

We should be grateful if you would confirm that the collateral security held in Custody and Client Deposit Accounts on behalf of Lehman Re Limited will be made available in the event that Phoenix Life calls upon its security.

Yours faithfully

**Edward Gillibrand**
**Legal Department**
**Phoenix Life Division**
Pearl Group Management Services Limited

Email:          edward.gillibrand@plg.net
Direct Dial:    01564 204337
Direct Fax:     01564 828811

TELEPHONE: 0845 002 0344   FAX: 0845 002 0347   WWW.PEARLGROUPLIMITED.CO.UK

Pearl Group Management Services Limited is authorised and regulated by the Financial Services Authority. Pearl Group Management
Services Limited is registered in England, no. 3588063. Our registered office is 1 Wythall Green Way, Wythall, Birmingham B47 6WG.

P7.v1 4.08

# EXHIBIT G

Daniel Ehrmann
Alvarez and Marsal
600 Lexington Avenue
New York NY10022
USA

18 December 2008

And by email: dehrmann@alvarezandmarsal.com

Dear Sir

**PHOENIX LIFE LIMITED - REINSURANCE AGREEMENT WITH LEHMAN RE LIMITED AND RELATED SECURITY - FUNDS TRANSFERRED TO LEHMAN BROTHERS COMMERCIAL CORPORATION**

Phoenix Life Limited ("PLL") is part of the Pearl Group and was previously known as Britannia Life Limited[1]. PLL is party to a reinsurance agreement and a related security agreement with Lehman Re Limited ("Lehman Re") in respect of which Lehman Re granted PLL security over assets held by Lehman Brothers International (Europe) ("LBIE") as custodian. This security includes a fixed charge over account number 97558 held in the name of LBIE with Euroclear Bank (the "Euroclear Account").

We enclose a copy of a notice from LBIE to Britannia Life Limited acknowledging that the Euroclear Collateral is held in the Euroclear Account subject to a fixed charge in favour of Britannia Life Limited and that LBIE holds the collateral in the Euroclear Account in charge for the benefit of Britannia Life Limited (now PLL). LBIE also agreed that they shall accept instructions from Britannia Life Limited in relation to the collateral held in the Euroclear Account.

Joint Provisional Liquidators were appointed for Lehman Re on 23 September 2008 which resulted in PLL's security becoming enforceable. PLL has since been trying to enforce its security over the assets secured and has been in contact with LBIE and Euroclear in that regard.

PLL has been advised that £50 million was transferred out of the Euroclear Account to Lehman Brothers Commercial Corporation ("LBCC") in August 2008 in contravention of PLL's security and in breach of the custody agreement relating to these assets. We believe that these funds are now held in an account in the name of LBCC as shown on the enclosed statement. PLL regards these funds as being held by LBCC on trust for PLL and requests confirmation that LBCC will not deal with these funds without the consent of PLL or the Joint Provisional Liquidators of Lehman Re.

---

[1] Britannia Life Limited was subsequently named Alba Life Limited. The long-term business of Alba Life Limited was transferred to Phoenix Life Limited pursuant to a scheme under Part VII of the Financial Services and Markets Act 2000 approved by the English High Court on 8 December 2006.

Pearl Group Management Services Limited is authorised and regulated by the Financial Services Authority. Pearl Group Management Services Limited is registered in England, no. 3588063. Our registered office is 1 Wythall Green Way, Wythall, Birmingham B47 6WG.

We should be grateful if you would provide us with all correspondence and any other information held by LBCC in relation to the transfer of these funds from the Euroclear Account to LBCC.

Given that these funds appear to have been transferred in breach of the security and custody arrangements we should be grateful for your urgent response.

Yours faithfully

**Edward Gillibrand**
Phoenix Life Division
Pearl Group Limited

CC  Peter Mitchell, Joint Provisional Liquidator,  Lehman Re

# EXHIBIT H

For Monthly Activity of

## Lehman Re
## GBP Cash Activity
## Account #10016-00060

July 2007

Beginning Balance 13,702,482.92     £13,702,482.92

| Code | Date | Description | ISIN/CUSIP | Ref | Activity | Balance | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 42125-00022 FX (F) | 48045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | LBCC Account 27090007 | | | | | | DBS General Ledger | | |
| I | 7/16/2007 | Interest Earned | | | 80,688.06 | £13,783,170.98 | | | | (80,688.06) | 80,688.06 |
| C | 7/16/2007 | Coupon - Holmes | XS0114770385 | | 73,049.32 | 13,856,220.30 | (73,049.32) | | | | 73,049.32 |
| R | 7/16/2007 | EARLY REDEMPTION-HOLMES | XS0114770385 | | 5,000,000.00 | 18,856,220.30 | | (5,000,000.00) | | | 5,000,000.00 |
| C | 7/16/2007 | Coupon- HOLMES | XS0165443705 | | 43,829.59 | 18,900,049.89 | (43,829.59) | | | | 43,829.59 |
| C | 7/20/2007 | Coupon- Granite | XS0153569792 | | 116,866.00 | 19,016,915.89 | (116,866.00) | | | | 116,866.00 |
| C | 7/20/2007 | Coupon- Granite | XS0190703434 | | 49,208.13 | 19,066,124.02 | (49,208.13) | | | | 49,208.13 |
| | | | | | | | (282,953.04) | (5,000,000.00) | (5,351.039) | (80,688.06) | 5,363,641.10 |

Ending Balance 19,066,124.02     £19,066,124.02

payments to LBIE

Note: Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal down the LBCC accts. No direct link given LBCC and G/L, entries manually processed at month end.

Recap GBP Cash in Bank to USD:

| GBP Cash | 19,066,124.02 |
|---|---|
| FX Rate | 2.02425 |
| $ | 38,594,661.54 |

Recap LBCC Bank Statement:

| Per here (above) | 19,066,124.02 |
|---|---|
| Per LBCC | 19,066,127.59 |
| Difference | (3.57) |

Reconciliation to bank

Difference per above     (3.57)

A   Per DBS FX rate at Month end

£0.00

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

For Monthly Activity of

August 2007

Beginning Balance 19,066,124.02

**LBCC Account 27090007**

| Code | Date | Description | ISIN / CUSIP | Ref | Balance | Activity | DBS General Ledger 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 42125-00022 F/X (F) | 45045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 8/2/2007 | Interest - July | XS0106573286 | | £19,142,503.58 | £76,379.56 | - | - | - | (76,379.56) | 76,379.56 |
| C | 8/9/2007 | Coupon - Maund | XS0119819424 | | 19,218,301.50 | 75,797.92 | (75,797.92) | - | - | - | 75,797.92 |
| C | 8/14/2007 | Coupon - Fosse | XS0119661296 | | 19,219,421.48 | 1,119.98 | (1,119.98) | - | - | - | 1,119.98 |
| R | 8/29/2007 | Rate Charge on Partial Redemption | | | 19,103,667.73 | (115,753.75) | | 115,753.75 | | | (115,753.75) |
| | | | | | 19,103,667.73 | | (76,917.90) | 115,753.75 | - | (76,379.56) | 153,297.46 |
| | | | | | | | | | | | (115,753.75) |

Ending Balance 19,103,667.73

**Note•** Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal down the LBCC a/cs. No direct link b/wn the LBCC and G/L - entries manually processed at month end.

**payments to LBIE**

**Recap: LBCC Bank Statement**
Per note (above) 19,103,667.73
Per LBCC 19,103,671.30
Difference 43.57

**Recap: GBP Cash in Bank to USD**
GBP Cash 19,103,667.73
F X Rate 2.0153
$ 38,499,627.57

**Difference per above** (3.57)

**Reconciliation to bank**

A Per DBS FX rate at Month end

(5,421.92)

GBP Cash 31December 2007.xls

Lehman Re
GBP Cash Activity
Account #10016-00060

For Monthly Activity of

September 2007

Beginning Balance 19,103,667.73

£19,103,667.73

LBCC Account 21096007

| Code | Date | Description | ISIN / CUSIP | Ref | Balance | Activity | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 42120-00020 Swaps (S) | 48045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 9/1/2007 | Interest Earned - August | | | £19,191,824.78 | £88,157.03 | | | | (88,157.03) | 88,157.03 |
| R | 9/12/2007 | Partial Redemption | XS0179992698 | | 19,659,326.76 | 467,502.00 | | (467,502.00) | | | 467,502.00 |
| R | 9/12/2007 | Partial Redemption | XS0196642963 | | 20,866,187.76 | 1,206,861.00 | | (1,206,861.00) | | | 1,206,861.00 |
| R | 9/12/2007 | Partial Redemption | XS0221838318 | | 21,538,060.68 | 671,872.92 | | (671,872.92) | | | 671,872.92 |
| R | 9/12/2007 | Partial Redemption | XS0241080075 | | 21,910,124.68 | 372,064.00 | | (372,064.00) | | | 372,064.00 |
| C | 9/13/2007 | Redemption / Granite Mortgages | XS0118075778 | | 21,919,270.56 | 9,145.88 | (9,145.88) | | | | 9,145.88 |
| R | 9/13/2007 | Redemption / Granite Mortgages | XS0118075778 | | 22,515,190.56 | 596,920.00 | | (596,920.00) | | | 596,920.00 |
| C | 9/18/2007 | Partial Redemption | XS0118075778 | | 22,741,401.56 | 225,211.00 | | (225,211.00) | | | 225,211.00 |
| C | 9/18/2007 | Coupon - Preferred Residential | XS0218397939 | | 22,817,879.72 | 76,478.16 | (76,478.16) | | | | 76,478.16 |
| C | 9/18/2007 | Coupon - Preferred Residential | XS021056656 | | 22,836,208.35 | 18,328.63 | (18,328.63) | | | | 18,328.63 |
| S | 9/19/2007 | Partial Redemption Southern Pacific | XS0183397939 | | 22,918,564.35 | 102,756.00 | | (102,756.00) | | | 102,756.00 |
| S | 9/20/2007 | Swap 166513 | XS0170183700 | | 22,991,882.35 | 52,918.00 | | | (52,918.00) | | 52,918.00 |
| S | 9/20/2007 | Swap 166513 | | | 23,041,788.57 | 49,906.22 | | | (49,906.22) | | 49,906.22 |
| C | 9/20/2007 | Coupon - SPF 06-A A | | | 23,087,550.73 | 45,762.16 | (45,762.16) | | | | 45,762.16 |
| | | | | | 23,087,550.73 | | [149,714.83] | (3,643,186.92) | [102,824.22] | (88,157.03) | 3,983,883.00 |

Ending Balance 23,087,550.73

payments to LBIE

Note: Amounts obtained from LBCC Bank Statement Acct #27/096007 and matched to Corporate Actions (payment advices sent by FX Settlement for journal) between the LBCC a/cs. No direct link btwn the LBCC a/cs. No direct link btwn LBCC and G/L entries manually processed at month-end

Recap: GBP Cash in Bank to USD

| | |
|---|---|
| GBP Cash | £23,087,550.73 |
| FX Rate | 2.02295 |
| $ | 46,723,048.35 T/B |

Recap LBCC Bank Statement

| | |
|---|---|
| Per here (above) | 23,087,550.73 |
| Per LBCC | 23,087,554.31 |
| Difference | £3.58 |

Reconciliation to bank

| | |
|---|---|
| Difference per above | (3.58) |

A  Per DBS FX rate at Month end

£0.00

# Lehman Re
## GBP Cash Activity
## Account #10016-00060

For Monthly Activity of

October 2007

Beginning Balance 23,087,550.73

£23,087,550.73

| | | | | | | DBS General Ledger | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | LBCC Account 27690007 | | | | | | | | | 10016-00060 |
| Code | Date | Description | ISIN / CUSIP | Ref | Balance | Activity | 11016-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 42120-00020 Swaps (S) | 49045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
| C | 10/1/2007 | Interest Earned - August | | | £23,181,760.26 | £94,209.55 | | | | (94,209.55) | 94,209.55 |
| C | 10/5/2007 | Coupon - Southern | XS0241080075 | | 23,241,118.96 | 59,358.70 | (59,358.70) | | | | 59,358.70 |
| C | 10/5/2007 | Coupon - Southern | XS0221830318 | | 23,290,826.57 | 49,707.59 | (49,707.59) | | | | 49,707.59 |
| C | 10/5/2007 | Coupon - Southern | XS0196612903 | | 23,335,319.08 | 44,492.51 | (44,492.51) | | | | 44,492.51 |
| C | 10/5/2007 | Coupon - Southern | XS0179342098 | | 23,369,544.05 | 34,224.97 | (34,224.97) | | | | 34,224.97 |
| C | 10/5/2007 | Coupon - Southern | XS0170183100 | | 23,377,817.50 | 8,273.45 | (8,273.45) | | | | 8,273.45 |
| C | 10/5/2007 | Coupon - Southern | XS0160332566 | | 23,387,121.19 | 9,303.69 | (9,303.69) | | | | 9,303.69 |
| C | 10/5/2007 | Coupon - Permanent | XS0169478900 | | 23,417,391.18 | 30,269.99 | (30,269.99) | | | | 30,269.99 |
| R | 10/8/2007 | Early Redemption - Southern | XS0169332566 | | 24,012,499.18 | 595,108.00 | | (595,108.00) | | | 595,108.00 |
| R | 10/8/2007 | Partial Redemption - Southern | XS0217069656 | | 24,513,018.68 | 500,519.50 | | (500,519.50) | | | 500,519.50 |
| R | 10/29/2007 | Coupon - Granite | XS0160703434 | | 24,567,031.67 | 54,012.99 | | | | | 54,012.99 |
| | | | | | 24,567,031.67 | | | | | | |
| | | | | | | (289,643.89) | (289,643.89) | (1,095,627.50) | - | (94,209.55) | 1,479,480.94 |

payments to LBIE

Ending Balance 24,567,031.67

£24,567,031.67

Note - Amounts obtained from LBCC Bank Statement Acct #27690007 and matured to Corporate Actions payment advices sent to FX Settlement for journal down the LBCC accts. No direct link down the LBCC accts. GL entries manually processed at month-end.

A   Per DBS FX rate at Month end

**Recap LBCC Bank Statement**

| Per name (above) | 24,567,031.67 |
|---|---|
| Per LBCC | 24,567,035.25 |
| Difference | (3.58) |

**Reconciliation to bank**

Difference per above   (3.58)

**Recap GBP Cash on Bank to USD**

| GBP Cash | 24,567,031.67 |
|---|---|
| FX Rate | 2.0636 |
| | $ 50,781,282.81  TFB |

# Lehman Re
## GBP Cash Activity
## Account #10016-00060

For Monthly Activity of

November 2007

Beginning Balance   24,507,031.67

£0.00

£24,567,031.67

| | | | | | | | DBS General Ledger | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LBCC Account 27090007 | | | | | | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 48045-00020 GBP Interest (I) | 10015-00110 BOJ (GBP Operating) (C) | 10016-00060 GBP Cash |
| Code | Date | Description | ISIN/CUSIP | Ref | Balance | Activity | | | | | GBP Interest (I) / GBP Cash |
| I | 11/22/2007 | Interest Earned | | | £24,676,694.57 | (109,662.90) | | | (109,662.90) | | 109,662.90 |
| O | 11/5/2007 | Payment | | | 22,912,956.57 | (1,763,738.00) | | | | 1,763,738.00 | (1,763,738.00) |
| O | 11/9/2007 | Coupon - Mound | X5016657286 | | 22,993,464.13 | 80,507.56 | (80,507.56) | | | | 80,507.56 |
| O | 11/14/2007 | Coupon - Fosse | X5011981824 | | 22,994,442.07 | 977.94 | (977.94) | | | | 977.94 |
| R | 11/14/2007 | Early Redemption - Fosse | X5011981824 | | 23,053,183.35 | 58,741.28 | | (58,741.28) | | | 58,741.28 |
| C | 11/15/2007 | Coupon - Granite | X5015369792 | | 23,181,525.64 | 128,342.29 | (128,342.29) | | | | 128,342.29 |
| C | 11/15/2007 | Coupon - Holmes Financing | X5016443705 | | 23,228,421.80 | 46,896.16 | (46,896.16) | | | | 46,896.16 |
| O | 11/30/2007 | Payment - 3rd Car settlement with Alea | | | 21,362,672.20 | (1,865,749.60) | | | | 1,865,749.60 | (1,865,749.60) |
| | | | | | 21,362,672.20 | 21,362,672.20 | (256,723.95) | (58,741.28) | (109,662.90) | 1,865,749.60 | 425,128.13 |
| | | | | | | | | | | 1,865,749.60 | (3,629,487.60) |

Ending Balance   21,362,672.20

£21,362,672.20

payments to LBIE

Note:- Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal down the LBCC a/cia. No direct link down LBCC and GL, unless manually processed at month-end.

A   Per DBS FX rate at Month end

**Recap: GBP Cash in Bank to USD**

| | |
|---|---|
| GBP Cash | £21,362,672.20 |
| FX Rate | 2.0628 |
| $ | 44,062,647.68 |

**Recap 1 LBCC Bank Statement**

| | |
|---|---|
| Per here (above) | 21,362,672.20 |
| Per LBCC | 21,362,675.78 |
| Difference | (3.58) imm |

Difference per above   (3.58)

Reconciliation to bank

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

For Monthly Activity of

December-07

£0.00

Beginning Balance  21,362,672.20

£21,362,672.20

| | | LBCC Account 27090007 | | | | | DBS General Ledger | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Code | Date | Description | ISIN / CUSIP | Ref | Balance | Activity | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 4217000020 Swaps (S) | 48645-00020 GBP Interest (I) | 10016-00060 GBP Cash |
| I | 12/1/2007 | Interest Earned | | | £21,464,331.16 | £101,658.96 | | | | (101,658.96) | 101,658.96 |
| R | 12/11/2007 | Partial Redemption - SPS | XS0196612963 | | 22,366,387.76 | 902,056.60 | | (902,056.60) | | | 902,056.60 |
| R | 12/11/2007 | Partial Redemption - SPF | XS0221859318 | | 22,703,517.97 | 337,130.21 | | (337,130.21) | | | 337,130.21 |
| C | 12/11/2007 | Coupon - Soutern | XS0170183700 | | 22,711,328.59 | 7,810.62 | (7,810.62) | | | | 7,810.62 |
| C | 12/10/2007 | Coupon | XS0196612963 | | 22,726,566.67 | 15,238.08 | (15,238.08) | | | | 15,238.08 |
| C | 12/10/2007 | Coupon - SPS | XS0170982896 | | 22,757,440.30 | 30,873.63 | (30,873.63) | | | | 30,873.63 |
| C | 12/10/2007 | Coupon | XS0163978900 | | 22,789,163.93 | 31,723.63 | (31,723.63) | | | | 31,723.63 |
| C | 12/10/2007 | Coupon - Permanent | XS0196978900 | | 22,824,797.29 | 35,633.36 | (35,633.36) | | | | 35,633.36 |
| C | 12/10/2007 | Coupon - SPF | XS0221859318 | | 22,871,561.74 | 46,764.45 | (46,764.45) | | | | 46,764.45 |
| C | 12/10/2007 | Coupon | XS0241906075 | | 22,935,050.68 | 63,488.94 | (63,488.94) | | | | 63,488.94 |
| R | 12/10/2007 | Partial Redemption | XS0241906075 | | 23,211,002.68 | 275,952.00 | | (275,952.00) | | | 275,952.00 |
| R | 12/10/2007 | Partial Redemption | XS0240106075 | | 23,573,787.68 | 362,785.00 | | (362,785.00) | | | 362,785.00 |
| C | 12/10/2007 | Early Redemption - Southern | XS0170183700 | | 24,000,240.68 | 426,453.00 | | (426,453.00) | | | 426,453.00 |
| C | 12/17/2007 | Coupon - PRS | XS0183097939 | | 24,016,479.29 | 16,238.61 | (16,238.61) | | | | 16,238.61 |
| R | 12/17/2007 | Coupon - PRS | XS0183097939 | | 24,092,994.84 | 76,515.55 | (76,515.55) | | | | 76,515.55 |
| C | 12/18/2007 | Swap 165513 | | | 24,136,924.64 | 43,929.80 | | | (43,929.80) | | 43,929.80 |
| S | 12/18/2007 | Partial Redemption - PRS | XS0183097939 | | 24,314,094.64 | 177,170.00 | | (177,170.00) | | | 177,170.00 |
| R | 12/18/2007 | Partial Redemption - PRS | XS0217006866 | | 24,752,293.44 | 438,198.60 | | (438,198.60) | | | 438,198.60 |
| C | 12/20/2007 | Coupon - Granta | XS0193218350 | | 24,801,265.15 | 48,971.71 | (48,971.71) | | | | 48,971.71 |
| | | | | | 24,801,265.15 | | | | | | |
| | | | | | 24,801,265.15 | | (373,256.58) | (2,919,745.61) | (43,929.80) | (101,658.96) | 3,438,592.95 |

Ending Balance  24,801,265.15

£24,801,265.15

**payments to LBIE**

Note>> Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal b/wn the LBCC accs. No direct link b/wn LBCC and G/L - entries. manually processed at month-end

A - Per DBS FX rate at Month end

**Recap: GBP Bank Statement**

| | | |
|---|---|---|
| For here (above) | 24,801,265.15 | |
| Per LBCC | 24,801,268.73 | |
| Difference | -43.58 | bran |

**Recap: GBP Cash in Bank Statement**

| | | |
|---|---|---|
| GBP Cash | 24,801,265.15 | |
| FX Rate | 1.9929 | A |
| $ | 49,426,441.31 | 7/8 |

GBP Cash 31December 2007.xls

Lehman Yu
GBP Cash Activity
Account B100-10-00000

For Monthly Activity of

December-07

Beginning Balance 21,382,872.26

21,382,872.26

| | | | LBCC Account 0709001 | | | | | | | | GBS General Ledger | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Code | Date | Description | ISIN / CUSIP | Ref | Activity | Balance | 1010-000-00 Accrued Interest (C) | 4202-00-00-10 Inventory Redemption (R) | 1210-000-00 Accr'd Purchases (P) | 4210-00-000 Swap (S) | 4210-00-0022 FX (K) | 4K010-00000 GBP-interest (I) | 1001-0-00010 GBP Operating (O) | | |
| | 12/1/2007 | Interest Earned | | | £121,956.67 | £21,504,531.78 | | | | | | 121,956.97 | | | |
| R | 12/1/2007 | Partial Redemption - SP5 | XS0109612903 | | 902,056.60 | 22,456,587.76 | | (902,056.60) | | | | | | | |
| R | 12/1/2007 | Partial Redemption - SP5 | XS0221638316 | | 337,130.21 | 22,703,517.97 | | (337,130.21) | | | | | | | |
| O | 12/3/2007 | Coupon - Brown | XS0721438703 | | 8,610.82 | 22,711,328.59 | | | | | | | 8,610.82 | | |
| O | 12/3/2007 | Coupon - Brown | | | 15,238.06 | 22,726,566.67 | (15,238.06) | | | | | | 15,238.06 | | |
| O | 12/3/2007 | Coupon - Nﬂ | XS0109612903 | | 30,873.83 | 22,757,440.50 | (30,873.83) | | | | | | 30,873.83 | | |
| O | 12/3/2007 | Coupon - Nﬂ | XS0109612903 | | 31,723.63 | 22,789,163.93 | (31,723.63) | | | | | | 31,723.63 | | |
| O | 12/3/2007 | Coupon - Paramount | XS0422185610 | | 35,633.56 | 22,824,797.79 | (35,633.56) | | | | | | 35,633.56 | | |
| O | 12/3/2007 | Coupon - SP5 | XS0221618210 | | 46,794.45 | 22,871,591.74 | (46,794.45) | | | | | | 46,794.45 | | |
| R | 12/3/2007 | Partial Redemption - Dean | XS0179408705 | | 83,468.64 | 22,955,060.68 | (83,468.64) | | | | | | | | |
| R | 12/3/2007 | Partial Redemption - Dean | XS0179406705 | | 275,962.00 | 23,211,022.68 | | (275,962.00) | | | | | | | |
| R | 12/3/2007 | Partial Redemption | XS0241498075 | | 362,785.00 | 23,573,787.58 | | (362,785.99) | | | | | | | |
| R | 12/3/2007 | Partial Redemption - Southern | XS0175463703 | | 426,433.00 | 24,000,240.98 | | (426,433.000) | | | | | | | |
| O | 12/7/2007 | Coupon - PNB | XS0742937309 | | 18,238.61 | 24,018,479.79 | (18,238.61) | | | | | | | | |
| O | 12/7/2007 | Coupon - PNB | XS0742937309 | | 78,515.55 | 24,096,994.94 | (78,515.55) | | | | | | | | |
| O | 12/3/2007 | Swap 099513 | | | 43,629.80 | 24,140,624.84 | | | | (43,629.80) | | | | | |
| O | 12/19/2007 | Partial Redemption - PPG | XS0193802309 | | 177,170.00 | 24,317,794.84 | | (177,170.000) | | | | | | | |
| R | 12/19/2007 | Partial Redemption - PPG | XS0172486004 | | 428,196.60 | 24,745,991.44 | | (428,196.60) | | | | | | | |
| O | 12/20/2007 | Coupon - Grams | XS0195213100 | | 48,971.71 | 24,601,285.15 | | | | | | | 48,971.71 | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | (113,964.39) | (2,810,746.01) | | (43,629.80) | | 631,038.35 | 351,658.96 | | |

Ending Balance 24,601,285.15

payments to LBIE

£24,601,285.15

Reconcile GBP Cash in Bank to USD
GBP Cash         24,601,285.15
FX Rate              $ 49,429,442.83

Report LBCC Bank Statement
Per here (above)     24,601,285.15
Per LBCC             24,601,285.73
Difference               £3.58

Reconcile LBCC Bank Statement
Per here (above)     24,601,285.15
Per LBCC             24,601,288.73
Difference               £3.58

Reconciliation to bank

Difference per above         (3.58)

A  the GBS FX line at Month end

Note: Amounts obtained from LBCC Bank Statement Acct #0709001 and matched to Corporate Actions payment advices sent to FX Settlement for journal than the LBCC and coll., and GL  entries manually processed at month-end

1/6

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

January-08

Beginning Balance  24,801,265.15

£24,801,265.15

£0.00

LBCC Account 27090007

| Code | Date | Description | ISIN / CUSIP | Ref | Activity | Balance | DBS General Ledger | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 48045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
| I | 1/4/2008 | Interest Earned | | | £101,426.28 | £24,902,691.43 | - | - | (101,426.28) | 101,426.28 |
| C | 1/15/2008 | Coupon - Holmes | XS0165443705 | | 49,552.43 | 24,952,243.86 | (49,552.43) | - | - | 49,552.43 |
| C | 1/22/2008 | Coupon - Granite | XS0153569792 | | 130,019.22 | 25,082,263.08 | (130,019.22) | - | - | 130,019.22 |
| R | 1/22/2008 | Early Redemption - Granite | XS0153569792 | | 8,000,000.00 | 33,082,263.08 | - | (8,000,000.00) | - | 8,000,000.00 |
| C | 1/22/2008 | Coupon - Granite | XS0160703434 | | 54,702.81 | 33,136,965.89 | (54,702.81) | - | - | 54,702.81 |
| | | | | | | 33,136,965.89 | - | - | - | - |
| | | | | | | 33,136,965.89 | - | - | - | - |
| | | | | | | 33,136,965.89 | - | - | - | - |
| | | | | | | 33,136,965.89 | | | | |
| | | | | | | | (234,274.46) | (8,000,000.00) | (101,426.28) | 8,335,700.74 |

Ending Balance  33,136,965.89

payments to LBIE

£33,136,965.89

**Note>** Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal btwn the LBCC a/cs. No direct link btwn
LBCC and G/L - entries manually processed at month-end.

A  Per DBS FX rate at Month end

**Recap> LBCC Bank Statement**

| | |
|---|---|
| Per here (above) | 33,136,965.89 |
| Per LBCC | 33,136,969.47 |
| Difference | £3.58 lmn |

**Reconciliation to bank**

Difference per above  _____
(3.58)

**Recap> GBP Cash in Bank to USD**

| | |
|---|---|
| GBP Cash | £33,136,965.89 |
| FX Rate | 1.9885 |
| $ | 65,892,856.67 |

GBP Cash 31Aug2009.xls

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

For Monthly Activity of

February -08

Beginning Balance 33,136,965.89 £33,136,965.89

| Code | Date | Description | ISIN / CUSIP | Ref | Activity | Balance | 1015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 48045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | LBCC Account 27090007 | | | | | DBS General Ledger | | |
| 1 | 2/4/2008 | Interest Earned | | | £117,077.22 | £33,254,043.11 | - | - | (117,077.22) | 117,077.22 |
| C | 2/8/2008 | Coupon | XS0165573286 | | 82,280.77 | 33,336,323.88 | (82,280.77) | - | - | 82,280.77 |
| | | | | | | 33,336,323.88 | (82,280.77) | - | (117,077.22) | 199,357.99 |

Ending Balance 33,336,323.88

payments to LBIE

**Note>** Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal bwn the LBCC a/cs. No direct link bwn LBCC and GL - entries manually processed at month-end

Recap> LBCC Bank Statement
Per here (above)   33,336,323.88
Per LBCC   33,336,327.46
Difference   -£3.58   Imm

A   Per DBS FX rate at Month end

Recap> GBP Cash in Bank to USD
GBP Cash   £33,336,323.88
FX Rate   1.98975
$   66,330,950.44

£0.00

Lehman Re
GBP Cash Activity
Account #10016-00060

For Monthly Activity of

March-08

Beginning Balance 33,336,323.88

£33,336,323.88

£0.00

| | | | | | | | | DBS General Ledger | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | LBCC Account 27090007 | | | | 11015-00010 | 42005-00110 | 42120-00020 | 45045-00020 | 10016-00060 |
| Code | Date | Description | ISIN CUSIP | Ref | Balance | Activity | Accrued Interest (C) | Inventory Redemption (R) | Swaps (S) | GBP Interest (I) | GBP Cash |
| I | 3/4/2008 | Interest Earned | | | £33,463,863.52 | £127,539.64 | | | | (127,539.64) | 127,539.64 |
| S | 3/5/2008 | 16683 Swap | | | 33,502,328.70 | 38,465.18 | | | (38,465.18) | | 38,465.18 |
| C | 3/11/2008 | Coupon - Southern | XS01966U2663 | | 33,516,509.27 | 14,185.57 | (14,180.57) | | | | 14,180.57 |
| C | 3/11/2008 | Coupon - Southern | XS017960298 | | 33,542,134.38 | 25,625.09 | (25,625.09) | | | | 25,625.09 |
| C | 3/11/2008 | Coupon - Permanent Financing | XS018376600 | | 33,576,365.31 | 34,239.95 | (34,239.95) | | | | 34,239.95 |
| C | 3/12/2008 | Coupon - Southern | XS022163319 | | 33,615,452.67 | 39,087.36 | (39,087.36) | | | | 39,087.36 |
| C | 3/12/2008 | Coupon - Southern | XS024180075 | | 33,670,133.40 | 54,680.73 | (54,680.73) | | | | 54,680.73 |
| R | 3/11/2008 | Early Redemption - Southern | XS017960568 | | 35,147,747.40 | 1,477,614.00 | | (1,477,614.00) | | | 1,477,614.00 |
| R | 3/11/2008 | Partial redemption | XS019661263 | | 35,577,711.20 | 429,963.80 | | (429,963.80) | | | 429,963.80 |
| R | 3/11/2008 | Partial redemption | XS022183319 | | 35,849,101.20 | 271,390.00 | | (271,390.00) | | | 271,390.00 |
| R | 3/11/2008 | Partial redemption | XS024180075 | | 36,560,854.20 | 711,753.00 | | (711,753.00) | | | 711,753.00 |
| C | 3/17/2008 | Coupon - Preferred | XS018509703 | | 36,573,297.60 | 12,443.40 | (12,443.40) | | | | 12,443.40 |
| C | 3/19/2008 | Coupon | XS017960656 | | 36,638,889.76 | 65,592.16 | (65,592.16) | | | | 65,592.16 |
| C | 3/20/2008 | Coupon | XS018300709 | | 36,724,156.75 | 85,266.99 | (85,266.99) | | | | 85,266.99 |
| C | 3/21/2008 | Partial redemption | XS017960656 | | 37,483,168.25 | 759,011.50 | | (759,011.50) | | | 759,011.50 |
| C | 3/21/2008 | Coupon - Granite | XS018321836 | | 37,530,187.96 | 47,019.71 | (47,019.71) | | | | 47,019.71 |
| | | | | | 37,530,187.96 | | | | | | |
| | | | | | 37,530,187.96 | | | | | | |
| | | | | | 37,530,187.96 | | | | | | |
| | | | | | 37,530,187.96 | | | | | | |
| | | | | | 37,530,187.96 | | | | | | |
| | | | | | 37,530,187.96 | | | | | | |
| | | | | | | £37,530,187.96 | (378,126.96) | (3,649,732.30) | (38,465.18) | (127,539.64) | 4,193,864.08 |

Ending Balance 37,530,187.96

payments to LBIE

Note~ Amounts obtained from LBCC Bank Statement #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal down the LBCC a/cs. No direct link btwn LBCC and G/L entries manually processed at month-end.

Recap: LBCC Bank Statement
Per here (above)   37,530,187.96
Per LBCC   38,289,203.04
Difference   (758,015.08) lmm

A. Per DBS FX rate at Month end

Recap: GBP Cash in Bank to USD
GBP Cash   £37,530,187.96
FX Rate   1.9892
$ 74,655,049.89  7/8

GBP Cash 31 Aug 2008.xls

For Monthly Activity of

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

April-08

Beginning Balance 37,530,187.96

£37,530,187.96

£0.00

| | | | LBCC Account 27090007 | | | | | | DBS General Ledger | | |
| Code | Date | Description | ISIN / CUSIP | Ref | Activity | Balance | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 42120-00020 Swaps (S) | 48945-00020 GBP Interest (I) | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 4/1/2008 | Interest Earned | | | £147,046.48 | £37,677,234.44 | | | | (147,046.48) | 147,046.48 |
| R | 4/16/2008 | Redemption - Holmes | XS0165443705 | | 3,000,000.00 | 40,677,234.44 | | (3,000,000.00) | | | 3,000,000.00 |
| C | 4/16/2008 | Coupon - Holmes | XS0165443705 | | 44,329.81 | 40,721,564.25 | (44,329.81) | | | | 44,329.81 |
| R | 4/21/2008 | Granite - Early Redemption | XS0180703A345 | | 3,340,000.00 | 44,061,564.25 | | (3,340,000.00) | | | 3,340,000.00 |
| C | 4/22/2008 | Granite - Coupon | XS0180703A345 | | 47,369.14 | 44,108,933.39 | (47,369.14) | | | | 47,369.14 |
| | | | | | | 44,108,933.39 | | | | | |
| | | | | | | 44,108,933.39 | | | | | |
| | | | | | | 44,108,933.39 | | | | | |
| | | | | | | 44,108,933.39 | | | | | |
| | | | | | | | (91,698.95) | (6,340,000.00) | | (147,046.48) | 6,578,745.43 |

Ending Balance 44,108,933.39

payments to LBIE

**Recap: LBCC Bank Statement**
Per here (above)   44,108,933.39
Per LBCC   44,108,936.97
Difference   (3.58) item

269,880.08

**Recap: GBP Cash in Bank to USD**
GBP Cash   £44,108,933.39
FX Rate   1.97135
$ 86,954,145.83   T/B

Note> Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal btwn the LBCC a/cs. No direct link btwn LBCC and G/L - entries manually processed at month-end.

A. Per DBS FX rate at Month end

Lehman Re
GBP Cash Activity
Account #10016-00060

For Monthly Activity of

May-08

Beginning Balance  44,108,933.39

£44,108,933.39

| | | LBCC Account 27096007 | | | | | | DBS General Ledger | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Code | Date | Description | ISIN / CUSIP | Ref | Balance | Activity | 1101540010 Accrued Interest (C) | 4202540110 Inventory Redemption (R) | 4212040020 Swaps (S) | 46945-00020 GBP Interest (I) | 10016-00060 GBP Cash |
| I | 5/5/2008 | Interest Earned | | | £44,257,909.21 | £148,975.82 | . | . | . | (148,975.82) | 148,975.82 |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |
| | | | | | 44,257,909.21 | | . | . | . | | |

Ending Balance  44,257,909.21

payments to LBIE

(148,975.82)  148,975.82

£44,257,909.21

£0.00

Note> Amounts obtained from LBCC Bank Statement Acct #27096007 and matched to Corporate Actions payment advices sent to FX Settlement for journal btwn the LBCC accts. No direct link btwn LBCC and G/L - entries
manually processed at month-end.

Recap> LBCC Bank Statement

| | |
|---|---|
| Per here (above) | 44,257,909.21 |
| Per LBCC | 44,257,912.79 |
| Difference | £3.58  imm |

Recap> GBP Cash in Bank to USD

| | |
|---|---|
| GBP Cash | £44,257,909.21 |
| FX Rate | 1.97685 |
| | $ 87,491,247.82  T/B |

A  Per DBS FX rate at Month
end

Lehman Re
GBP Cash Activity
Account #10016-00060

For Monthly Activity of
Infogac Report ='A~LSTM6117 / (6)'

June-08

Beginning Balance    44,257,909.21

£44,257,909.21

£0.00

| | | | | LBCC Account 27090007 | | | | | DBS General Ledger | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Code | Date | Description | ISIN / CUSIP | Ref | Balance | Activity | 11015-00010 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 42124-00020 Swaps (S) | 48045-00020 GBP Interest (I) | 10016-00060 GBP Cash |
| I | 6/2/2008 | Interest Earned | | | £44,424,937.52 | £167,028.31 | · | · | · | (167,028.31) | 167,028.31 |
| C | 6/12/2008 | Southern Pacific - Redemption | XS0221838318 | | 44,654,799.95 | 229,862.33 | (229,862.33) | · | · | · | 229,862.33 |
| R | 6/12/2008 | Permanent Financing - Coupon | XS0153978000 | | 44,685,219.74 | 30,419.89 | (30,419.89) | · | · | · | 30,419.89 |
| C | 6/12/2008 | Southern Pacific - Coupon | XS0221838318 | | 44,715,837.30 | 30,617.56 | (30,617.56) | · | · | · | 30,617.56 |
| C | 6/12/2008 | Southern Pacific - Coupon | XS0241080075 | | 44,753,706.23 | 37,868.93 | (37,868.93) | · | · | · | 37,868.93 |
| C | 6/12/2008 | MPFC - Coupon | XS0186573266 | | 44,825,983.63 | 72,277.40 | (72,277.40) | · | · | · | 72,277.40 |
| R | 6/12/2008 | Southern Pacific - Redemption | XS0106912963 | | 45,123,800.63 | 297,817.00 | · | (297,817.00) | · | · | 297,817.00 |
| R | 6/12/2008 | Southern Pacific - Redemption | XS0241080075 | | 45,453,797.62 | 329,996.99 | · | (329,996.99) | · | · | 329,996.99 |
| R | 6/20/2008 | Preferred Residential - Redemption | US7403784F16 | | 46,263,969.32 | 810,171.70 | · | (810,171.70) | · | · | 810,171.70 |
| C | 6/20/2008 | Preferred Residential - Redemption | XS0183007939 | | 46,328,782.31 | 64,812.99 | · | (64,812.99) | · | · | 64,812.99 |
| C | 6/20/2008 | Southern Pacific - Coupon | XS0196612963 | | 46,334,862.25 | 6,079.94 | (6,079.94) | · | · | · | 6,079.94 |
| C | 6/20/2008 | Granite Mtges - Coupon | XS0192518350 | | 46,381,220.45 | 46,358.20 | (46,358.20) | · | · | · | 46,358.20 |
| | | | | | 46,381,220.45 | | · | · | · | · | · |
| | | | | | 46,381,220.45 | | · | · | · | · | · |
| | | | | | 46,381,220.45 | | · | · | · | · | · |
| | | | | | 46,381,220.45 | | · | · | · | · | · |
| | | | | | 46,381,220.45 | | (223,621.92) | (1,732,661.01) | · | (167,028.31) | 2,123,311.24 |

Ending Balance    46,381,220.45

payments to LBIE

**Recap - LBCC Bank Statement**
Per here (above):    46,381,220.45
Per LBCC             46,381,224.01
Difference           -£3.56 Ihm

A   Per DBS FX rate at Month end

**Recap- GBP Cash In Bank to USD**
GBP Cash       £46,381,220.45
FX Rate        1.99155
$ 92,370,519.59  7/8

Note> Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal down then the LBCC a/cs. No direct link btwn LBCC and G/L. entries manually processed at month-end.

GBP Cash 31Aug2008 xls

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

July-08

£0.00

Beginning Balance 46,381,220.45   46,381,220.45   E46,381,220.45

| | | | LBCC Account 27090007 | | | | | DBS General Ledger | | | | |
| Code | Date | Description | ISIN/CUSIP | Ref | Activity | Balance | 1101S-00010 Accrued Interest (C) | 42120-00020 Swaps (S) | 48045-00020 GBP Interest (I) | 42120-00040 SWAPS & DERIVAC FUT HE | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | 7/2/2008 | Interest Earned | | | £166,017.27 | E46,547,237.72 | - | - | (166,017.27) | - | 166,017.27 |
| C | 7/7/2008 | Coupon - Preferred Residential | XS0183097939 | | £10,230.30 | 46,557,468.02 | (10,230.30) | - | - | - | 10,230.30 |
| C | 7/9/2008 | Coupon - Preferred Residential | US74037AAF16 | | £49,343.07 | 46,606,811.09 | (49,343.07) | - | - | - | 49,343.07 |
| T | 7/17/2008 | Payment to Abs (Q4 07 & Q1 08) | | | -£2,054,073.00 | 44,552,738.09 | - | - | - | 2,054,073.00 | (2,054,073.00) |
| S | 7/18/2008 | 166315R Swap | | | 35,855.56 | 44,588,593.65 | - | (35,855.56) | - | - | 35,855.56 |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | 44,588,593.65 | | | | | |
| | | | | | | | (59,573.37) | (35,855.56) | (166,017.27) | 2,054,073.00 | (2,054,073.00) |
| | | | | | | | | | | 261,446.20 | |

Ending Balance 44,588,593.65

payments to LBIE

**Recap - LBCC Bank Statement**

Per here (above):  44,588,593.65
Per LBCC  44,588,597.23
Difference  (3.58) mm

A  Per DBS FX rate at Month end

Note: Amounts obtained from LBCC Bank Statement Acct #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal from the LBCC a/cs. No direct link btwn LBCC and GL - entries manually processed at month-end.

T/B

**Lehman Re**
**GBP Cash Activity**
**Account #10016-00060**

August-08

Beginning Balance 44,588,593.65

£44,588,593.65

£0.00

LBCC Account 27090007

| Code | Date | Description | ISIN / CUSIP | Ref | Activity | Balance | 11015-00110 Accrued Interest (C) | 42025-00110 Inventory Redemption (R) | 4804S-00020 GBP Interest (I) | 10016-00060 GBP Cash |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | DBS General Ledger | |
| I | 8/4/2008 | Interest Earned | | | £171,886.45 | £44,760,480.10 | - | - | (171,886.45) | 171,886.45 |
| R | 8/27/2008 | Redemption - Mount Financing | XS0166573286 | | £5,000,000.00 | 49,760,480.10 | - | (5,000,000.00) | - | 5,000,000.00 |
| C | 8/27/2008 | Coupon - Mount Financing | XS0166573286 | | £76,176.00 | 49,836,656.10 | (76,176.00) | - | - | 76,176.00 |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | 49,836,656.10 | - | - | - | - |
| | | | | | | | (76,176.00) | (5,000,000.00) | (171,886.45) | 5,248,062.45 |

Ending Balance 49,836,656.10

£49,836,656.10

payments to LBIE

**Recap> LBCC Bank Statement**

| | |
|---|---|
| Per here (above) | 49,836,656.10 |
| Per LBCC | 49,836,659.68 |
| Difference | £3.58 imm |

A  Per DBS FX rate at Month end

**Recap> GBP Cash in Bank to USD**

| | |
|---|---|
| GBP Cash | £49,836,656.10 |
| FX Rate | 1.82925 |
| | $ 91,163,703.17 |

Note> Amounts obtained from LBCC Bank Statement #27090007 and matched to Corporate Actions payment advices sent to FX Settlement for journal b/wn the LBCC a/cs. No direct link b/wn LBCC and GtL - entries manually processed at month-end.

# EXHIBIT I

| Security | CUSIP | $ Activity |
|---|---|---|
| FOSSE 1 A | XS0119816824 | Redeemed and proceeds remitted by LBIE to LBCC |
| Granite 2000-2 A1 | XS0118075778 | Redeemed and proceeds remitted by LBIE to LBCC |
| HFP 1 3A1 | XS0114776585 | Redeemed and proceeds remitted by LBIE to LBCC |
| Southern Pacific F A2 | XS0163532566 | Redeemed and proceeds remitted by LBIE to LBCC |
| Southern Pacific G A2 | XS0170183700 | Redeemed and proceeds remitted by LBIE to LBCC |
| Southern Pacific H A2 | XS0179982698 | Redeemed and proceeds remitted by LBIE to LBCC |
| Granite 2002-2 3A | XS0153569792 | Redeemed and proceeds remitted by LBIE to LBCC |
| Granite 2003-1 3A | XS0160703434 | Redeemed and proceeds remitted by LBIE to LBCC |
| HFP 7 4A2 | XS0165443705 | Redeemed and proceeds remitted by LBIE to LBCC |
| MFPLC 3A A3 | US620525AS41 | Redeemed and proceeds remitted by LBIE to LBCC |
| PRS 7 A2 | XS0183097939 | Still held by LBIE |
| SPF 05 B A | XS0221839318 | Still held by LBIE |
| SPF 06 A A | XS0241080075 | Still held by LBIE |
| PRS 05-1 A2C | XS0217069656 | Still held by LBIE |
| SPS 04-2 A2C | XS0196612963 | tbc but which PLL belives are still held by LBIE |
| Granite 2004-2 3A | XS0193218350 | Still held by LBIE |
| Permanent 2 5A | XS0163978900 | tbc but which PLL belives are still held by LBIE |

# EXHIBIT J

# Cash Movements to the LBCC Account and Bond Valuations

## Summary of Findings – Draft Report

13 July 2009

Strictly Private and Confidential



_PriceWaterhouseCoopers_

Advisory

# Table of Contents

Page

1   General Observations & Further Investigations                              1
2   LBCC Account Movements                                                     3
3   Bond Values from 1 July 2007 to 31 August 2008                             5
4   Bond Valuations at 15 September 2008 and 9 July 2009                        8


Appendix
1   ITS Data Summary                                                          10

This document has been prepared solely for the addressees of the
Engagement Contract under its terms and for no other person or purpose

# Section 1
## General Observations & Further Investigations

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose



This work has been carried out in accordance with our engagement letter dated 10 October 2008.

**General Observations**

- The opening balance in the LBCC account was £13,702.482.92 on 1 July 2007.

- Net cash inflows into the LBCC account in the period 1 July 2007 to 31 August 2008 were £36,134,173.18 consisting largely of redemptions of £37.4m and coupons of c.£2.5m, interest and swaps of c.£1.9m and the only payments out being to Alba of c£5.6m.

- The LBCC account held a balance of £49,836,656.10 at 15 September 2008.

- Bond values per ITS decreased from £49.9m at 28 June 2007 to £12.1m at 31 August 2008, illustrating a net movement of £37.8m which broadly ties in to the redemptions figure of £37.4m. The difference is assumed to be the actual ITS values at the date of redemption which have not been seen.

- The redemption of bonds has increased the cash position in the LBCC and the increase in cash from coupons, interest and swaps has been offset to some extent by the payments to Alba.

- Gross collateral has remained fairly constant over the period as bonds were redeemed for cash.

- On 15 September 2008, ITS information showed that there were seven bonds remaining in the Euroclear account. We understand that one of the bonds may have been deemed after 31 August 2008, however, we have no further information at this time.

- Recent bond valuations calculated of the seven bonds at 9 July 2009 indicate that those bonds assumed to be held in Euroclear on 15 September 2008 have decreased in value from £11.8m to £10.3m based upon information obtained from Reuters and Datastream. Note that we have been unable to assess any additional accrued interest and have relied upon the calculation factors from ITS as at 31 August 2008 in obtaining these valuations.

**Further Investigations**

- Clarification is required of the bonds held in Euroclear at 15 September 2008.

- Details of who authorised the transfers to the LBCC account, why and on what basis and also the basis on which LBCC thought the money was being received. This information should be requested together with the relevant transfer paperwork.

- Further consideration should be given to current bond valuations, in particular, to establish the precise amount of accrued interest at 15 September 2008 and to date and also to consider whether the calculation factor used is reasonable.

**General Limitations**

- We have relied upon the LBCC account statements for the period 1 July 2007 to 31 August 2008 and the ITS statements for the same period. Please note that we have not conducted any audit or verification work on these statements and are therefore unable to warrant the accuracy of the information provided.

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose

# Section 2
## LBCC Account Movements

This document has been prepared solely for the addressees of the
Engagement Contract under its terms and for no other person or purpose



# LBCC Cash Account summary for the period 1 July 2007 to 31 August 2008

**Inflows**

| Description | ID | Total £ | Redemptions £ | Coupons £ | Redemption Date(s) into LBCC Account |
|---|---|---|---|---|---|
| Fosse 1A | XS0119816824 | 76,077.28 | 58,741.28 | 17,336.00 | 14-Nov-07 |
| Granite 2000 | XS018075778 | 606,065.88 | 596,920.00 | 9,145.88 | 13-Sep-07 |
| HFP13A1 | XS0114776585 | 5,073,049.32 | 5,000,000.00 | 73,049.32 | 16-Jul-07 |
| Southern pacific F-A2 | XS0163532566 | 604,411.69 | 595,108.00 | 9,303.69 | 08-Oct-07 |
| Southern Pacific GA2 | XS0170183700 | 545,293.07 | 529,209.00 | 16,084.07 | 19 Sept to 10 Dec 2007 |
| Southern Pacific HA2 | XS0179982698 | 2,312,641.69 | 2,221,068.00 | 91,573.69 | 12 Sept 2007 to 11 March 2008 |
| Granite 2002 | XS0153569792 | 8,375,227.51 | 8,000,000.00 | 375,227.51 | 22-Jan-08 |
| Granite 2003 | XS0160703434 | 3,545,293.07 | 3,340,000.00 | 205,293.07 | 21-Apr-08 |
| HFP74A2 | XS0165443705 | 3,184,607.99 | 3,000,000.00 | 184,607.99 | 16-Apr-08 |
| MFPLC 3AA3 | XS0166573286 | 5,387,039.65 | 5,000,000.00 | 387,039.65 | 27-Aug-08 |
| PRS 7A2 | XS0183097939 | 609,701.92 | 467,193.99 | 142,507.93 | 18 Sept 2007 to 20 June 2008 |
| SPF05 | XS0221839318 | 1,676,432.42 | 1,510,255.46 | 166,176.96 | 12 Sept 2007 to 12 June 2008 |
| SPF06 | XS0241080075 | 2,037,758.45 | 1,776,598.99 | 261,159.46 | 12 Sept 2007 to 12 June 2008 |
| PRS 05 | XS0217069656 | 2,775,830.44 | 2,507,901.50 | 267,928.94 | 8 October 2007 to 31 March 2008 |
| SPS04-2 A2C | XS0196612963 | 2,816,571.30 | 2,836,698.40 | 95,626.65 | 12 Sept 2007 to 12 June 2008 |
| Granite 2004 | XS0193218350 | 142,349.62 | - | 142,349.62 | No redemptions took place in the period |
| Permanent 2-5A | XS0163978900 | 130,554.19 | - | 130,554.19 | No redemptions took place in the period |
| | | | 37,439,694.62 | 2,574,964.82 | |

| | |
|---|---|
| Interest | 1,697,753.53 |
| SWAPS | 221,074.76 |

**Outflows**

| | |
|---|---|
| ALBA payment | (3,919,822.60) |
| Payment | (1,763,738.00) |
| | **36,134,173.18** |
| **Opening balance** | **13,702,482.92** |
| Closing Balance | 49,836,656.10 |
| Closing balance per statement | 49,836,656.10 |

- Cash held in the LBCC account at 15 September 2008 is £49.8m and is reconciled.

- The opening balance on the LBCC account at 29 June 2007 was £13.7m

- Total redemptions received between July 2007 and August 2008 were £37.4m and coupons received were £2.6m

- Interest was received of £1.7m.

- The only outflows relate to payments to Alba of circa £5.6m.

- Bonds have either been redeemed in lump sums or as a number of partial redemptions

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose

# Section 3
## Bond Values from 1 July 2007 to 31 August 2008

This document has been prepared solely for the addressees of the
Engagement Contract under its terms and for no other person or purpose



# Summary of Redemptions from 1 July 2007 to 31 August 2008.

| Security | CUSIP | Notional Value at 29 June 2009 £ | Redemptions to 31 August 2008 per LBCC £ | Redemption Value Difference £ | Est Value at 31 August 08 £ | Est Value at 31 August 08 per ITS "Mark" £ | Redemption Date(s) into LBCC Account |
|---|---|---|---|---|---|---|---|
| Fosse 1A | XS0119816824 | 74,519.14 | 58,741.28 | 15,777.86 | | | 14-Nov-07 |
| Granite 2000 | XS0118075778 | 598,332.37 | 596,920.00 | 1,412.37 | | | 13-Sep-07 |
| HFP13A1 | XS0114776585 | 5,059,042.39 | 5,000,000.00 | 59,042.39 | | | 16-Jul-07 |
| Southern pacific F-A2 | XS0163532566 | 596,746.84 | 595,108.00 | 1,638.84 | | | 08-Oct-07 |
| Southern Pacific GA2 | XS0170183700 | 518,176.06 | 529,209.00 | - | | | 19 Sept to 10 Dec 2007 |
| Southern Pacific HA2 | XS0179982698 | 2,230,233.13 | 2,221,068.00 | 9,165.13 | | | 12 Sept 2007 to 11 March 2008 |
| Granite 2002 | XS0153569792 | 8,093,413.80 | 8,000,000.00 | 93,413.80 | | | 22-Jan-08 |
| Granite 2003 | XS0160703434 | 3,377,772.27 | 3,340,000.00 | 37,772.27 | | | 21-Apr-08 |
| HFP74A2 | XS0165443705 | 3,039,508.87 | 3,000,000.00 | 39,508.87 | | | 16-Apr-08 |
| MFPLC 3AA3 | XS0166573286 | 5,043,197.79 | 5,000,000.00 | 43,197.79 | | | 27-Aug-08 |
| PRS 7A2 | XS0180097939 | 1,132,041.06 | 467,193.99 | | 664,847.07 | 582,587.50 | 18 Sept 2007 to 20 June 2008 |
| SPF05 | XS0221839318 | 3,331,312.50 | 1,510,255.46 | | 1,821,057.04 | 1,784,695.15 | 12 Sept 2007 to 12 June 2008 |
| SPF06 | XS0241080075 | 3,992,213.26 | 1,776,598.99 | | 2,215,614.27 | 2,234,008.92 | 12 Sept 2007 to 12 June 2008 |
| PRS 05 | XS0217069656 | 4,950,947.55 | 2,507,901.50 | | 2,443,046.05 | 2,462,675.87 | 8 October 2007 to 31 March 2008 |
| SPS04-2 A2C | XS0196612963 | 2,834,887.84 | 2,836,698.40 | | - | 104,285.27 | 12 Sept 2007 to 12 June 2008 |
| Granite 2004 | XS0193218350 | 3,009,520.82 | - | | 3,009,520.82 | 2,904,742.28 | No redemptions took place in the period |
| Permanent 2-5A | XS0163978900 | 2,005,314.90 | - | | 2,005,314.90 | 2,019,395.53 | No redemptions took place in the period |
| | | 49,887,180.60 | 37,439,694.62 | 300,929.33 | 12,159,400.15 | 12,092,400.52 | |

*Source: ITS and LBCC bank statements*

▪ The redemption values for the period to 31 August 2008 are taken directly from the LBCC statements

▪ The redemption value difference (highlighted) arises as a result of the actual value of the bonds at the date of redemption. The ITS system at 31 August 2008 shows that these bonds have been fully redeemed therefore there is not expected to be any value remaining in the Euroclear account.

▪ Bonds held at 31 August 2008 had an estimated value of £12.09m per ITS.

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose

# There is a direct correlation between the decrease in bond values and the increase in cash in the period 1 July 2007 to 31 August 2008

▪ Attached at Appendix 1 is a summary of the movements in the bond values at each month end from July 2007 to August 2008.

▪ The summary also highlights the month end closing cash balance in the LBCC account together with an estimated gross collateral position.

▪ Attached opposite is a graph showing the decline in bond value with the corresponding increase in the LBCC bank position.

▪ The graph also illustrates that the estimated gross collateral position remained fairly constant over the period.

▪ Whilst there is no direct correlation between the actual decrease in monthly bond values per ITS and the cash redeemed over the period, there is a sufficient link in the overall movement to establish the correlation. Note that the LBCC account has also received coupons of c£2.5m, interest of £1.6m, swaps of £250k (ie a total of £4.35m) and has also made payments to Alba of c.£5.6m.



This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose

# Section 4
# Bond Valuations at 15 September 2008 and 9 July 2009

This document has been prepared solely for the addressees of the
Engagement Contract under its terms and for no other person or purpose



Advisory

# Bond Valuation at 14 September 2008 and 9 July 2009

## Value of Bonds remaining at 31 August 2008, calculated using prices at 15 September 2008 and 9 July 2009

| CUSIP | Description | Face Value | Factor | Accrued Interest | 15/09/2008 Price £ | Value 15/09/2008 | 09/07/2009 Price £ | Value at 09/07/2009 |
|---|---|---|---|---|---|---|---|---|
| XS0183097939 | PREFERRED RESD.SECS 2004 F/R 15/12/41 Q | 3,500,000 | 0.164919000 | 7,676.98 | 98.30 | 575,080.80 | 98.30 | 575,080.80 |
| XS0221839318 | STHN.PAC.FNG.05-B 2005 F/R 06/43 (A)Q | 5,690,000 | 0.318513000 | 24,890.45 | 100.28 | 1,842,303.97 | 68.00 | 1,257,280.95 |
| **XS0241080075** | **SPF 06 A A** | 5,000,000 | 0.440874200 | 30,175.79 | **94.35** | 2,109,999.83 | **83.67** | 1,874,573.01 |
| **XS0217069656** | **PRS 05-1 A2C** | 6,500,000 | 0.374345200 | 30,896.88 | **92.72** | 2,287,000.53 | **94.68** | 2,334,692.11 |
| XS0196612963 | SOUTH PACIFIC SECS. 2006 F/R 10/12/42 | 6,200,000 | 0.016615000 | 1,430.92 | 100.00 | 104,443.92 | 100.00 | 104,443.92 |
| XS0193218350 | GRANITE MORTGAGES 2004 F/R 06/44 Q | 3,000,000 | 1.000000000 | 36,103.28 | 94.53 | 2,872,003.28 | 68.45 | 2,089,600.28 |
| XS0163978900 | PERMANENT FINANCING 2003 F/R 06/42 (5-A) | 2,000,000 | 1.000000000 | 27,857.53 | 99.80 | 2,023,857.53 | 99.80 | 2,023,857.53 |
| | | | | | | 11,814,689.86 | | 10,259,528.59 |

*\* Prices taken from Datastream*
*Bold = Reuters Values - last Value dated 23 April 2009*

- The calculations assume the same Factor calculated on ITS as at 31 August 2008.

- Accrued interest  has not been accounted for after 31 August 2008.

- The bonds listed are those assumed to be in existence at 15 September 2008. We have no details of transactions between 31 August 2008 and 15 September 2008. Bond XS0196612963 may have been redeemed after 31 August 2008.

- The Description of the bonds is taken from the unique ID number as currently found on Reuters / Datastream and although different to previous descriptions, it is understood that these are the same bonds.

- The total value of the bonds remaining at 15 September 2008 was £11.8m and at 9 July 2009 had decreased to £10.3m. For the period to 9 July 2009, we would assume that additional interest would have accrued although this is currently unquantifiable.

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose

# Appendix 1
## ITS Data Summary

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose



# ITS data summary showing month end bond valuations, LBCC bank balance and estimated gross collateral

**ITS Accounts - 30 June 2007 to 31 August 2008**

*Source: Marks Raw Values*

| Security | Cusip | 30-Jun-07 | 31-Jul-07 | 31-Aug-07 | 30-Sep-07 | 31-Oct-07 | 30-Nov-07 | 31-Dec-07 | 31-Jan-08 | 29-Feb-08 | 31-Mar-08 | 30-Apr-08 | 31-May-08 | 30-Jun-08 | 31-Jul-08 | 31-Aug-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOSSE 1 A | XS0119816824 | 74,519.14 | 74,922.56 | 58,883.16 | 59,226.39 | 59,575.97 | | | | | | | | | | |
| Granite 2000-2 A1 | XS0118075778 | 598,332.37 | 601,592.32 | 604,592.77 | - | | | | | | | | | | | |
| HFP 1 3A1 | XS0114776585 | 5,059,042.39 | | | - | | | | | | | | | | | |
| Southern Pacific F A2 | XS0163532566 | 596,746.84 | 600,109.01 | 603,245.00 | - | | | | | | | | | | | |
| Southern Pacific G A2 | XS0170183700 | 518,176.06 | 521,095.56 | 523,818.64 | 428,502.66 | 431,186.15 | 433,488.02 | | | | | | | | | |
| Southern Pacific H A2 | XS0179982698 | 2,230,233.13 | 2,242,162.41 | 2,253,247.64 | 1,764,082.84 | 1,774,611.25 | 1,783,603.57 | 1,486,772.73 | 1,495,077.98 | 1,494,382.04 | | | | | | |
| Granite 2002-2 3A | XS0153569792 | 8,093,413.80 | 8,019,315.74 | 8,053,476.12 | 8,097,234.14 | 8,015,333.76 | 8,053,668.48 | 8,100,869.61 | | | | | | | | |
| Granite 2003-1 3A | XS0160703434 | 3,377,772.27 | 3,346,829.74 | 3,361,485.48 | 3,380,113.67 | 3,345,917.78 | 3,362,305.03 | 3,382,415.06 | 3,345,353.52 | 3,354,226.47 | 3,371,433.26 | | | | | |
| HFP 7 4A2 | XS0165443705 | 3,039,508.87 | 3,011,586.18 | 3,024,683.06 | 3,040,840.23 | 3,011,606.29 | 3,026,380.68 | 3,043,428.01 | 3,009,407.27 | 3,017,204.27 | 3,035,885.70 | | | | | |
| MFPLC 3A A3 | US620525AS41 | 5,043,197.79 | 5,070,428.72 | 5,016,265.34 | 5,045,123.93 | 5,074,649.39 | 5,016,914.41 | 5,049,617.15 | 5,076,571.33 | 4,999,832.96 | 5,017,865.27 | 5,052,577.74 | 5,016,142.00 | 5,041,809.84 | 5,068,851.77 | |
| PRS 7 A2 | XS0183097939 | 1,132,041.06 | 1,138,430.09 | 1,144,241.79 | 907,312.78 | 913,020.28 | 917,911.63 | 729,866.36 | 734,202.22 | 706,824.06 | 640,719.39 | 645,310.46 | 648,570.69 | 577,031.79 | 579,456.10 | 582,587.50 |
| SPF 05 B A | XS0221839318 | 3,331,312.50 | 3,349,304.15 | 3,366,041.25 | 2,663,120.27 | 2,679,157.22 | 2,692,867.33 | 2,325,314.61 | 2,338,419.36 | 2,266,029.51 | 2,036,122.06 | 2,047,859.67 | 2,018,414.95 | 1,767,089.71 | 1,775,285.34 | 1,784,695.15 |
| SPF 06 A A | XS0241080075 | 3,992,213.26 | 4,013,672.08 | 4,033,627.49 | 3,626,497.73 | 3,648,239.08 | 3,666,819.35 | 3,263,181.00 | 3,281,490.39 | 3,188,216.52 | 2,519,117.97 | 2,539,470.88 | 2,568,360.21 | 2,212,303.56 | 2,222,528.26 | 2,234,008.92 |
| PRS 05-1 A2C | XS0217069656 | 4,950,947.55 | 4,977,651.62 | 5,001,843.88 | 4,454,226.13 | 4,481,097.54 | 4,504,042.47 | 4,016,142.58 | 4,039,027.51 | 3,871,595.48 | 3,101,640.52 | 3,269,658.96 | 3,285,383.66 | 2,440,316.29 | 2,450,073.19 | 2,462,675.87 |
| SPS 04-2 A2C | XS0196612963 | 2,834,887.84 | 2,850,254.09 | 2,864,549.09 | 1,742,825.92 | 1,753,352.00 | 1,762,354.30 | 835,446.00 | 840,168.86 | 831,684.86 | 401,465.05 | 404,150.69 | 406,067.20 | 103,283.16 | 103,754.31 | 104,295.27 |
| Granite 2004-2 3A | XS0193218350 | 3,009,520.82 | 3,025,635.14 | 3,040,054.13 | 3,010,396.54 | 3,028,443.75 | 3,043,854.66 | 3,011,849.35 | 3,028,986.25 | 2,918,803.82 | 2,920,282.83 | 2,938,392.78 | 2,955,471.69 | 2,917,093.39 | 2,904,866.81 | 2,904,742.28 |
| Permanent 2 5A | XS0163978900 | 2,005,314.90 | 2,016,266.52 | 2,026,461.63 | 2,009,421.91 | 2,021,647.75 | 2,032,109.09 | 2,010,212.32 | 2,021,659.18 | 2,012,149.93 | 1,996,221.67 | 2,011,362.41 | 2,021,401.28 | 2,001,476.60 | 2,007,454.03 | 2,019,395.53 |
| **Month End Total Bond Valuation** | | 49,887,180.60 | 44,859,255.94 | 44,976,516.49 | 40,228,925.13 | 40,237,838.22 | 40,296,319.01 | 37,255,114.76 | 29,210,363.87 | 28,660,949.94 | 25,040,753.72 | 18,908,783.62 | 18,919,811.68 | 17,060,404.34 | 17,112,269.81 | 12,092,400.52 |
| **Cash to LBCC (excl Interest, swaps etc)** | | | | | | | | | | | | | | | | |
| Redemptions | | 14,584,700.61 | 5,000,000.00 | (115,753.75) | 3,643,186.92 | 1,095,627.50 | 58,741.28 | 2,919,745.61 | 8,000,000.00 | - | 3,649,732.30 | 6,340,000.00 | - | 1,732,661.01 | - | 5,000,000.00 |
| Coupons | | 570,734.77 | 282,953.04 | 76,917.90 | 149,714.83 | 289,643.89 | 256,723.95 | 373,258.58 | 208,510.48 | 82,280.77 | 378,126.96 | 91,698.95 | - | 223,621.92 | 59,573.37 | 76,176.00 |
| | | 15,155,435.38 | 5,282,953.04 - | 38,835.85 | 3,792,901.75 | 1,385,271.39 | 315,465.23 | 3,293,004.19 | 8,208,510.48 | 82,280.77 | 4,027,859.26 | 6,431,698.95 | - | 1,956,282.93 | 59,573.37 | 5,076,176.00 |
| **LBCC Closing Month End Balance** | | 13,702,482.92 | 19,066,124.02 | 19,103,667.73 | 23,087,550.73 | 24,567,031.67 | 21,362,672.20 | 24,801,265.15 | 33,136,965.89 | 33,336,323.88 | 37,530,187.96 | 44,108,933.39 | 44,257,909.21 | 46,381,220.45 | 44,588,593.65 | 49,836,656.10 |
| **Estimated Gross Collateral** | | 63,589,663.52 | 63,925,379.96 | 64,080,184.22 | 63,316,475.86 | 64,804,869.89 | 61,658,991.21 | 62,056,379.90 | 62,347,329.76 | 61,997,273.82 | 62,570,941.68 | 63,017,717.00 | 63,177,720.89 | 63,441,624.78 | 61,700,863.46 | 61,929,056.62 |

This document has been prepared solely for the addressees of the Engagement Contract under its terms and for no other person or purpose

# EXHIBIT K

LEHMAN BROTHERS
COMMERCIAL CORP
745 7TH AVE
NEW YORK, NY  10019

LEHMAN BROTHERS REINSURANCE
STG INTEREST ACCOUNT
ATTN:JAMES BLAKYA
745 SEVENTH AVENUE, 5TH FLOOR
NEW YORK, NY  10019-6801

SEP 12, 2008
Salesman    Account
63270099    27090007

Page    1

US NON-SEGREGATED ACCOUNT

. . . . OPENING ACCOUNT BALANCES . . . .

POUND STG    50,052,102.98CR

. . . . CLOSING ACCOUNT BALANCES . . . .

POUND STG    50,052,102.98CR

M A R G I N   R E Q U I R E M E N T   S U M M A R Y

| | Margin Requirement Initial | Excess/Deficit | Margin Call/Excess |
|---|---|---|---|
| GBP | | OCR | |
| Total Value in Base Currency | | 50,052,102.98CR | |
| USD | | OCR | |

A C C O U N T   V A L U E   S U M M A R Y

| | Account Balance (Unrealized G/L on Futures) | Equity Net Present Value on Forwards | Net Option Value | Collateral Market Value | Net Liquidating Value |
|---|---|---|---|---|---|
| GBP | 50,052,102.98CR | 89,792,421.65CR | OCR | 50,052,102.98CR | 89,792,421.65CR |
| Total Value in Base Currency | | | | | |
| USD | 89,792,421.65CR | 89,792,421.65CR | OCR | 50,052,102.98CR | 89,792,421.65CR |

* * * * CURRENCY CONVERSION RATES * * * *
* Base Currency - USD
* GBP    1.7939700