1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Lead Case No. 08-13555(JMP)

Adv. Case Nos. 09-01241 and 09-01032

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

        -against-

HARRIER FINANCE LIMITED, a.k.a. RATHGAR CAPTIAL CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

        -against-

BALLYROCK ABS CDO 2007-1 LIMITED,

                    Defendant.

        -and-

BLACKROCK MORTGAGE INVESTORS MASTER FUND, L.P.,

                    Counter-Defendant.

- - - - - - - - - - - - - - - - - - - -x

    (cont'd. on next page)

2

1

2                    U.S. Bankruptcy Court

3                    One Bowling Green

4                    New York, New York

5

6                    September 17, 2009

7                    2:03 p.m.

8

9      B E F O R E:

10     HON. JAMES M. PECK

11     U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

HEARING re Motion of Harrier Finance Limited, a.k.a. Rathgar

Capital Corporation, to Dismiss Adversary Proceeding [Case No.

09-01241, Docket No. 8]


HEARING re Motion to Dismiss Adversary Proceeding by Ballyrock

ABS CDO 2007-1 [Case No. 09-01032, Docket No. 13]

Transcribed by:  Sharona Shapiro

                 Penina Wolicki

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES, LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  RICHARD W. SLACK, ESQ.

9         ERIC J. PETERMAN, ESQ.

10

11

12   WEIL, GOTSHAL & MANGES, LLP

13        Attorneys for Plaintiffs/Movants Lehman Brothers

14         Holdings, Inc. ("LBHI") and Lehman Brothers

15         Special Financing, Inc. ("LBSF")

16        1300 Eye Street, N.W.

17        Suite 900

18        Washington, DC 20005

19

20   BY:  RALPH I. MILLER, ESQ.

21

22

23

24

25

5

1

2   LINKLATERS LLP

3        Attorneys for Harrier Finance Limited, a.k.a. Rathgar

4            Capital Corporation

5        1345 Avenue of the Americas

6        New York, NY 10105

7

8   BY:  AMANDA J. GALLAGHER, ESQ.

9        BRENDA DILUIGI, ESQ.

10        STERLING P. A. DARLING JR., ESQ.

11

12

13   MILBANK, TWEED, HADLEY & MCCLOY, LLP

14        Attorneys for the Official Committee of

15         Unsecured Creditors

16        One Chase Manhattan Plaza

17        New York, NY 10005

18

19   BY:  WILBUR F. FOSTER, ESQ.

20

21

22

23

24

25

6

1

2    MILBANK, TWEED, HADLEY & MCCLOY, LLP

3         Attorneys for the Official Committee of

4          Unsecured Creditors

5         International Square Building

6         1850 K Street, NW

7         Washington, DC 20006

8

9    BY:  DAVID S. COHEN, ESQ.

10

11   ORRICK, HERRINGTON & SUTCLIFFE LLP

12        Attorneys for Ballyrock

13        666 Fifth Avenue

14        New York, NY 10103-0002

15

16   BY:  STEVEN J. FINK, ESQ.

17

18   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

19        Counsel to the Official Creditors' Committee

20        865 S. Figueroa Street

21        10th Floor

22        Los Angeles, CA 90017

23

24   BY:  ERIC P. TAGGART, ESQ.

25

7

1

2    SIDLEY AUSTIN, LLP

3         Attorneys for Blackrock and Long Hill

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:  NICHOLAS P. CROWELL, ESQ.

8         ALEX J. KAPLAN, ESQ.

9

10

11    SKADEN, ARPS, SLATE, MEAGHER, & FLOM, LLP

12         Attorneys for Aflac

13         One Rodney Square

14         Wilmington, DE  19899

15

16    BY:  ANTHONY W. CLARK, ESQ.

17

18

19    SULLIVAN & CROMWELL LLP

20         Attorneys for Barclays Bank PLC and Long Island

21              International Limited

22         125 Broad Street

23         New York, NY 10004

24

25    BY:  ROBINSON B. LACY, ESQ.

8

1   TELEPHONIC APPEARANCES:

2   ALSTON + BIRD, LLP

3        Attorneys for Creditor, Bank of America

4        One Atlantic Center

5        1201 West Peachtree Street

6        Atlanta, GA 30309

7

8   BY:  WILLIAM S. SUGDEN, ESQ. (TELEPHONICALLY)

9

10  CHAPMAN & CUTLER LLP

11       Attorneys for Creditor, US Bank, N.A.

12       111 West Monroe Street

13       Chicago, IL 60603

14

15  BY:  JAMES HEISER, ESQ. (TELEPHONICALLY)

16       FRANKLIN H. TOP, III, ESQ. (TELEPHONICALLY)

17

18  REED SMITH

19       Attorneys for Creditor, Bank of New York

20       1201 Market Street

21       Suite 1500

22       Wilmington, DE 19801

23

24  BY:  KATHLEEN A. MURPHY, ESQ. (TELEPHONICALLY)

25       MARK W. ECKARD, ESQ. (TELEPHONICALLY)

9

1    REED SMITH

2         Attorneys for Creditor, Bank of New York

3         10 South Wacker Drive, 40th Floor

4         Chicago, IL 60606

5

6    BY:  MATTHEW L. BROWN, ESQ. (TELEPHONICALLY)

7

8    STUTMAN, TREISTER & GLATT PC

9         Attorneys for Interested Party, Elliott Co.

10        1901 Avenue of the Stars

11        12th Floor

12        Los Angeles, CA 90067

13

14   BY:  JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

15        K. JOHN SHAFFER, ESQ. (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25

10

1                     P R O C E E D I N G S

2          THE COURT:  Please be seated.  Good afternoon.

3          MR. SLACK:  Good afternoon, Your Honor.  Richard

4    Slack from Weil, Gotshal for the debtors.  Your Honor, we have

5    two matters on the agenda for this afternoon.  The first is a

6    motion by Harrier Finance to dismiss an adversary proceeding

7    brought by LBSF.  The second matter is also a motion to

8    dismiss.  It's procedurally a little more complicated because

9    there's both an adversary proceeding and then there was a

10   counterclaim for interpleader, and I believe the motions that

11   are outstanding really are directed to dismissing LBSF's claims

12   to the money in that case, whether from the original complaint

13   or from the answer to the interpleader.  But both those matters

14   are on for this afternoon.

15          Your Honor, one point of housekeeping.  The two

16   matters have a couple of issues that overlap, and I'm going to

17   be dealing with one of those issues, the penalty issue.  And my

18   partner, Ralph Miller, who I believe you have seen in other

19   matters, is going to be handling the ipso facto arguments, with

20   your permission.

21          THE COURT:  That's fine.

22          MS. GALLAGHER:  Good afternoon, Your Honor.  Amanda

23   Gallagher for defendant Harrier Finance, Limited.  Your Honor,

24   in their response to our motion to dismiss, LBSF claims that

25   the contracted issue, the swap agreement, is a red herring.

1   They would like it to be so because the express terms of the

2   contract as written dispose of this claim in its entirety.

3   Under the terms of the swap agreement, LBSF was only entitled

4   to a payment from Racers, the counterparty, if certain

5   conditions were met.  At the time the swap was terminated none

6   of those conditions had been met.

7          Specifically, LBSF paid 4.5 million dollars against

8   the risk that one of the reference entities -- and there were

9   twelve -- would experience a credit event.  If there was a

10  credit event, that particular swap would terminate and there

11  would be a payment from Racers to LBSF.  If, however, there

12  were no credit event before the scheduled termination date of

13  the swaps, there would be no payment to LBSF, the swaps would

14  terminate and the parties would go on their way.

15         Here, although there has been no credit event and the

16  swaps terminated in accordance with their terms, LBSF is asking

17  this Court to rewrite the terms of the party's agreement to

18  provide for a payment to it.  Basically, LBSF wants to keep the

19  terms of the swap agreement that it likes and rewrite the terms

20  that it does not.

21         Under the terms of the swap agreement, if LBHI, who

22  is a credit support provider, or LBSF file for bankruptcy,

23  Racers had the right to terminate the swap.  They exercised

24  that right on October 1st.  The swap then terminated.  Under

25  the terms of the agreement the parties, when they entered into

12

1    the agreement -- Racers and LBSF -- agreed that if LBSF was the

2    defaulting party and the swap terminated early, both parties

3    would walk away without any further obligations to one another.

4         LBSF argues that this Court should discount those

5    terms and the provision for early termination upon the

6    bankruptcy of the credit support provider because LBSF had

7    prepaid the premiums.  However, LBSF, who structured this swap,

8    knew that at the time they entered into the swap and agreed to

9    those terms anyway.

10        So LBSF looks for a reason for this Court to rewrite

11   those express terms and not just invalidate that no-payment

12   provision but rewrite it to substitute a different payment

13   provision which is commonly known as second method for the

14   method that currently exists which is currently known as first

15   method.

16        THE COURT:  Let me stop you for a second and ask a

17   question that may be obvious to parties involved in the

18   structured finance but it's not entirely obvious to me, and

19   that is the degree to which this kind of provision, this no

20   payment in the event of a bankruptcy event, is negotiated, not

21   negotiated, standard, not standard, is it a check-the-box

22   provision or is it a negotiated provision that may vary from

23   transaction to transaction?

24        MS. GALLAGHER:  It is negotiated.  And in fact, in

25   this particular case you have the ISDA master agreement and

13

1    then you opt in and opt out of certain provisions of the master

2    agreement pursuant to a schedule.  In this particular case, the

3    schedule, that negotiated part of the agreement, contains the

4    no payments upon termination provision if LBSF is the

5    defaulting party.

6         THE COURT:  To the extent that it's a negotiated

7    provision, is it a matter of relevance or concern to know what

8    those negotiations consisted of in order to dispose of the

9    motion to dismiss?

10        MS. GALLAGHER:  I don't think so with respect to an

11   unambiguous term of the contract where the parties negotiated

12   it.  And further, if we were to go down that route, I think

13   what Your Honor would find is that Lehman and the Lehman

14   entities are the ones who structured and marketed this swap.

15   So --

16        THE COURT:  Who are the parties who actually

17   negotiated this provision?

18        MS. GALLAGHER:  This is where we're going to get a

19   little bit unclear because my client is not actually a party to

20   the swap agreement.

21        THE COURT:  Your party received the money.

22        MS. GALLAGHER:  My party is a certificate holder of

23   the trust that was the party to the swap agreement, and when

24   the swap terminated and the trust unwound, received the money,

25   correct -- or the underlying securities which were monetized.

14

1          THE COURT:  Whatever value was in the counterparty

2     went to you as the noteholder?

3          MS. GALLAGHER:  Went to me among others.

4          THE COURT:  Okay.

5          MS. GALLAGHER:  Or went to my client among others.

6          THE COURT:  I know it didn't go to your personal

7     account.

8          MS. GALLAGHER:  That would be a different issue.

9          THE COURT:  That would, indeed.

10         MS. GALLAGHER:  Okay.  So to get back on track, LBSF

11    now turns to two arguments, in part, to ask Your Honor to

12    rewrite the terms of the contract.  They argue, first, that it

13    is either an unenforceable penalty or forfeiture and therefore

14    is unconscionable and against public policy under New York law.

15         As an initial matter this is not a penalty.  This

16    does not say to LBSF, "Because you, LBSF, defaulted, you must

17    pay Racer something, you must do something."  It just says to

18    the parties, "Your relationship is over.  You walk away,

19    neither side taking any."  And it's important to know that at

20    the time they negotiated this contract no one would know what

21    the markets were going to be doing in 2008.  I think everybody

22    can agree upon that.

23         Second, they argue it's a forfeiture.  One, I don't

24    believe it is a forfeiture because LBSF is not forfeiting

25    anything.  It did not have a right to payment at the time the

15

1   swap was terminated.  No credit event had occurred.  And until

2   and unless a credit event occurred, LBSF would take nothing.

3   However, even if it were a forfeiture, New York holds that as

4   long as the provision is unambiguous the Courts will enforce

5   it.  There's been no argument here, nor can there be, that this

6   provision is in any way ambiguous.

7          Further, you have a court in this district who looked

8   at a very similar provision, albeit one that was less favorable

9   to the defaulting party, in the Drexel Burnham case.  In that

10  case, the provision provided that the nondefaulting party could

11  demand a payment but didn't have to.  And in that case Judge

12  Pollack held that this type of provision was neither a penalty

13  nor forfeiture nor unjust enrichment.  The parties just agreed

14  that their relationship would end and they would walk away.

15  There's been no other case that I've been able to identify that

16  has dealt with this type of provision, much less found it to be

17  unenforceable.

18         Next, LBSF argues that the provision is unenforceable

19  as an ipso facto clause.  Initially I would note that LBSF

20  specifically did not assert a claim for violation of the

21  automatic stay.  Their complaint states so on page 14 in

22  footnote 2.

23         Second, this is not a violation of the ipso facto

24  clause because the contract terminated as a result of LBHI's

25  bankruptcy, not LBSF's, and terminated automatically by

16

1   operation of law once the notice was given on October 1st.   So

2   when LBSF filed for bankruptcy on October 3rd, this was not an

3   executory contract and it terminated and the parties went on

4   their ways in accordance with the contract as written

5   prepetition.

6         However, even if this were considered an ipso facto

7   clause, it still falls within the provision -- the safe harbor

8   provision of Section 560 because it terminated -- let me stop

9   there.   Even so, Racers did not rely on LBSF's bankruptcy.   But

10   even if it had, that would have been a termination of the swap

11   permitted by Section 560 and the contract would have then

12   executed in accordance with its terms as did the contract in

13   Margulis (ph.) to let the parties walk away with no payment,

14   although in Margulis it required a larger payment from the

15   debtor.

16         THE COURT:   I have some confusion as to the payments

17   due upon Racers' exercise of its right to seek early

18   termination, I gather, under Section 6(a) of the ISDA Master

19   Agreement.   You had said earlier in your argument that there

20   were no amounts payable to LBSF under the swap agreement.   But

21   that can't be right upon the exercise of the early termination

22   event, because I take it that there was a termination payment

23   that would have been due but for the language which you say

24   should forgive that payment.   Do I understand that correctly?

25   Was there simply no payment due?

17

1          MS. GALLAGHER:  Simply no payment due.  The schedule

2     to the ISDA Master Agreement provided for a termination payment

3     in some circumstances.  So if the swap terminated for a variety

4     of reasons, then in those particular -- if those conditions

5     were met then an early termination payment would be made.  But

6     Part 6(h)(ii) provides that if the swap terminated because of

7     LBSF's default, in the event that Party A, which is LBSF, is

8     the defaulting party or affected party under the terms of this

9     agreement, no termination payments shall be made by either

10    party.

11          THE COURT:  I understand that provision.  I know the

12    importance of it to the argument.  I'm simply trying to

13    understand something that's very crude really.  If there were

14    no provision of the sort you have just read -- in other words,

15    if that box hadn't been checked -- and I recognize from our

16    earlier colloquy that I'm using that as short-hand for the

17    negotiated concept that upon LBSF's or LBHI's bankruptcy no

18    payment would be due to either party.

19          But let's just say for the sake of discussion that

20    that's unenforceable as a matter of bankruptcy law.  Let's just

21    make that hypothetical assumption.  Would there otherwise have

22    been a calculated payment due upon termination from Racers to

23    LBSF?

24          MS. GALLAGHER:  Not under the terms of the contract.

25    That is a provision that was negotiated.  That particular

18

1    section, Section 6 in the schedule, the parties agreed to

2    delete the provision of the master agreement in its entirety

3    and replace it with a separate provision which provided, in

4    certain circumstances under paragraph A, that an early

5    termination payment would be calculated under the second

6    method.  And then the parties agreed that if LBSF were the

7    defaulting party then no payment would be made.  If that was

8    rendered unenforceable, there is no provision in the contract

9    that provides for what would happen if LBSF were the defaulting

10   party.  The contract would then be silent and that would be a

11   different agreement.

12         THE COURT:  I'm just trying to understand the

13   agreement that's before me.  I'm not trying to create a new

14   one.  But it's your position that it wouldn't matter whether

15   the agreement included or didn't include the provision that

16   would exonerate all payments to either party because if it

17   didn't exist there would be no ability to calculate to a define

18   number an early termination payment?

19         MS. GALLAGHER:  The only way to do that would be if

20   the Court rewrote the agreement to pull the second method in.

21   But the agreement as written does not rely on second method or

22   any other method to calculate that payment if LBSF were the

23   defaulting party.  Theoretically, I suppose, the parties could

24   have agreed that there would be a payment due but agree to a

25   different formulation.

19

1          THE COURT:  Okay.  I've taken you down this path far

2     enough.  Why don't you just proceed with your argument?

3          MS. GALLAGHER:  Further, the argument that there

4     should be found to be a fraudulent conveyance fails because in

5     order for that argument to work the Court would have to find

6     that Racers knew or should have known it was probable at the

7     time of the termination that the contract would be rewritten

8     such that LBSF would be owed a payment under the contract.  And

9     that just does not stand under New York law.

10         Next -- I'm sorry, I was on the ipso facto clause

11    part.  LBSF argues that the lack of payment is due to the

12    bankruptcy.  That elides two concepts:  the lack of payment is

13    due to the termination which the parties agreed prepetition

14    would result in no payment.  That was a prepetition agreement

15    that was self executing at the time of the termination.  Under

16    Margulis that should be enforced.

17         Further, if LBSF is correct that no party can rely on

18    the bankruptcy of another entity to trigger a party, the

19    underlying swaps don't work because the underlying swaps

20    themselves include, as a credit event, the bankruptcy of one of

21    the referenced entities.  So in other words, if one of the

22    referenced entities went bankrupt, that would have triggered a

23    payment under the swap to LBSF.  And if that is improper under

24    the Bankruptcy Code, the swaps don't work.

25         Finally, LBSF asserts two equitable claims.  However,

1    under New York law, those claims are barred because the entire

2    subject matter of the contract -- sorry, of this dispute, is

3    covered by a contract.  There's one case that is twenty years

4    old that does hold that if a nonparty is sued under quasi-

5    contractual theory that can proceed.  That case, however,

6    Seiden (ph.), has been disavowed and disapproved by multiple

7    recent cases which hold if there is a contract that governs he

8    subject matter of the case, you look to the contract and you

9    proceed under contract law.

10           Finally, just this one little point.  LBSF argues

11   that because Harrier is not a party to the contract and is not

12   mentioned in the contract, they cannot rely on the terms of the

13   agreement.  But the contract itself, and particularly the

14   provision that is at the heart of this issue, which is the no

15   payments and early termination clause, states in the express

16   language that if the contract terminates there's no payment to

17   either side and the underlying securities will be distributed

18   to the certificate holders which include Harrier.  So this was

19   contemplated, you cannot begin to even consider this case

20   without going back to the contract, which knocks out the two

21   equitable claims.

22           I have nothing further, unless you have any

23   questions.

24           THE COURT:  Not at the moment.  Thank you.

25           MR. SLACK:  Your Honor, Richard Slack from Weil,

21

1    Gotshal for the debtors.  I'd like to start by addressing a

2    question that Your Honor had for Ms. Gallagher which I believe

3    was:  Absent the clause that we seek to invalidate would there

4    be a payment that was due upon termination to LBSF?  And the

5    answer to that is yes.  If you look at -- and I apologize I

6    don't have copies, Your Honor, but I can read into the record

7    and tell you where to find it.  If you look at Ms. Gallagher's

8    declaration that she filed and you look at Exhibit B which is

9    the confirmation, Your Honor, which is the amended and restated

10   schedule, the execution copy, Exhibit B.

11        THE COURT:  Rather than hunt through my book I'll

12   just listen to you.

13        MR. SLACK:  Okay.  Your Honor, Section 6(3), which

14   talks about payments on early termination, lists a whole

15   schedule of things that are paid.  And then (4)(i) specifically

16   deals with the fact that there would be a payment owed to LBSF

17   absent the -- what I'll call the flip or the invalidation of

18   their right to get that payment.

19        THE COURT:  What's the amount of that payment?

20        MR. SLACK:  Excuse me?

21        THE COURT:  What is the amount of that payment?

22        MR. SLACK:  The amount of that payment, as of the

23   time we filed the complaint, and we haven't recalculated it,

24   was 55 million -- was the value at that time, your Honor, out

25   of the, I think, approximately 300 that was paid.  So there was

22

1    still money that would have gone out to Harrier but we would

2    have been paid our 55 million at that time.

3          Your Honor, there's no dispute, I think, among the

4    parties today that New York law has a doctrine that invalidates

5    penalty provisions as unenforceable.  And what's important, I

6    think, is there's been a lot of discussion about the fact that

7    this was negotiated between sophisticated parties, that there

8    were agreements.

9          And there's one thing which is common amongst all of

10   the cases that we cite, and that is there are in fact contracts

11   that were negotiated, many of them with sophisticated parties,

12   but all of them agreed on provisions that a court ultimately

13   found was invalid.  And so the fact that you have negotiation,

14   and here there were obviously negotiations to address the swap.

15   What I would say, Your Honor, another question that you had,

16   and obviously it's not in our complaint but I think what

17   discovery will show is that provisions like this are put in

18   only at the behest of the rating agency.  So they're

19   essentially forced upon the parties, they're certainly not

20   actively agreed to, absent that kind of rating agency pressure.

21   But again, that's not in our complaint but I think that's what

22   you'll find is the genesis for those provisions.

23          THE COURT:  Let's just -- I mean, we're off topic,

24   but let me just follow through on that comment because it's

25   something that I've been giving some thought to.  These

23

1    transactions, whether it's Racers or Ballyrock, which we're

2    going to get to a little bit later this afternoon, are

3    transactions that were, at least as I Understand it, largely

4    structured by your client and its affiliates prebankruptcy.   I

5    mean, these didn't just materialize on their own.  They were

6    structured by the rocket scientists of Wall Street.

7         MR. SLACK:  Look, with some -- with obviously some

8    variation to that theme the answer is that's true.

9         THE COURT:  And with that understanding, one of the

10   problems that I'm confronting is that there are market

11   expectations that are imbedded in these transactions,

12   particularly when we get to noteholders like Harrier.  And from

13   a policy perspective I simply question whether it is a good

14   thing for bankruptcy opportunism to get in the way of market

15   expectations.

16        That's not to say that the law might not allow you to

17   make the arguments that you're making.  But I have a hard time

18   seeing this provision as a penalty.  It may be a forfeiture or

19   it may be subject to some other characterization, a give-up, a

20   walk-away, but I'm not sure it's a penalty, and I'd like to

21   understand why you think it is.

22        MR. SLACK:  Well, it's a good opportunity to talk

23   about the penalty issue.  And Your Honor, if you would indulge

24   me a minute of background which I think it is important before

25   I jump in and address that directly, which is that what we've

24

1    done, Your Honor, is we've pled, I believe, that this is a

2    penalty.  So putting aside, I think, for a moment whether or

3    not at the end of discovery it's going to be found as a

4    penalty, I think we've alleged -- and I'll talk about the

5    Racers allegations because they really haven't been rebutted.

6    We alleged that there was a credit default swap along the lines

7    that you heard from Ms. Gallagher.

8         We alleged that LBSF prepaid all of the premiums owed

9    under the contract, and as a result, LBSF had no further

10   financial commitments.  And that's important and I'll get to

11   that.  Therefore, LBHI, as a credit support provider, had

12   absolutely no role here.  In other words, because all of the

13   premiums had been paid by LBSF up front, from the moment those

14   were paid on, there was no need to have LBHI as a guarantor;

15   there was nothing to guarantee.

16        Now, on September 15th, LBHI commenced its Chapter 11

17   case.  On October 3rd, LBSF commenced its.  And Racers Trust

18   terminated the credit default swap based on LBHI's bankruptcy.

19   But here's the important thing.  LBHI's bankruptcy couldn't

20   have had any financial impact, could not damage Racers in any

21   way, shape or form because all of the payments had already been

22   made.  So at the time of the termination, when LBSF's position

23   was in the money by fifty-five million, there was never an

24   issue that LBSF was going to pay more money because of the

25   bankruptcy.  This is a situation where there was literally no

25

1    damage of any kind to Racers Trust.

2         Now, that is obviously going to be important once we

3    get to the penalty issue, which I'm going to get to right now

4    which is under New York law when you're looking at a

5    provision -- and I think here's the important thing, when

6    you're looking at a provision that has consequences based on

7    either a breach or a default, that subjects itself to the

8    question:  is it a penalty.

9         Now, most of the time you would say, well, this isn't

10   going to come up.  But the test that you ask yourself, and

11   there's a two-part test and we cite a number of cases that

12   apply this exact test, including when we get to it, the Drexel

13   case, makes factual findings on these two points.  Number

14   one -- or just so we're clear, under New York law, "A

15   contractual provision that imposes a specific consequence for a

16   breach of default will be invalid as a penalty unless, 1) the

17   damages from the breach were difficult to ascertain at the time

18   the parties entered into the contract, and 2) the consequences

19   from the breach bear a reasonable relationship to the amount of

20   damages that would be expected from the breach."

21        Now, there's no question that what we're talking

22   about here is a clause that kicks in precisely because of a

23   breach, because of an event of default.  And so the question

24   you have to ask is did -- first off, in this motion is just did

25   we plead it.  And we did in our complaint.

26

1          But if you go beyond that and you ask yourself how do

2     you apply those two provisions in this case?  First, the

3     potential damages to Racers and Harrier from a Lehman

4     bankruptcy were not hard to determine.  They were zero.  In

5     other words, this provision didn't protect the economics at all

6     for Racers and Harrier because LBSF and LBHI would have owed

7     zero amount to them.

8          What's interesting, on page 5 and page 6 of Harrier's

9     reply brief, is they set up a red herring and argue, quote,

10    "Racers did not assume the risk of continuing the swap

11    agreement beyond LBSF and LBHI's bankruptcy."  And it continues

12    that it had a dilemma.  But there was no risk, Your Honor, and

13    there were no payments that needed to be made.  There was

14    nothing that the bankruptcy was going to do to harm them.  So

15    having a provision, from either a breach or a default that

16    penalized LBSF, is almost by definition in this case an

17    unenforceable penalty.

18          Now, one of the arguments that Ms. Gallagher makes is

19    that LBSF wasn't owed money, not real money.  Now, Your Honor,

20    we've spent a lot of time through a number of hearings dealing

21    with different matters, the bar date, talking about the mark to

22    market value of these derivative securities and the fact that

23    these are in fact marked on books, that they're owed.  This is

24    real money to the estate.  And in fact, we have many

25    counterparties -- not enough, but many counterparties that have

27

1   paid Lehman based on these kind of mark to market transactions.

2   So this is in fact real money.  And the fact that you have a

3   clause which is taking away the value of these swaps when on

4   the return -- in other words, what is the harm?  The harm here

5   was nothing.  There was no harm to Racers or the beneficial

6   owner.

7         THE COURT:  I need to break in and just ask you

8   what's really a rhetorical question, which is, does that

9   matter?  Because it seems to me that in all kinds of structured

10  finance transactions there are triggering events which is

11  simply part of the transactional structure.  And I don't think

12  that there is any way to deny that the commencement by LBHI on

13  September 15, 2008 of a Chapter 11 case was an event which

14  under the ISDA Master Agreement would give rise to at least the

15  ability, pursuant to the terms of the agreement, to declare an

16  early termination date and to terminate the transactions under

17  the agreement at a minimum.

18        The fact that it was prepaid, in effect that there

19  really wasn't a monetary credit risk to Racers, doesn't take

20  away from Racers the right to exercise whatever default

21  remedies are available, because the default is undeniable.  So

22  I guess what I'm questioning is what does it matter that

23  there's actually no money that's due and owing from LBSF or

24  from LBHI as a credit support provider?

25        MR. SLACK:  Right, well, I think the answer is that

28

1    nothing prevented an early termination date here.  In other

2    words, there was nothing -- I think Your Honor's right that

3    putting aside bankruptcy issues nothing prevented Racers from

4    exercising a right under the contract to have an early

5    termination date.

6         The real question here was what was the effect of the

7    bankruptcy on LBSF's right to receive that fifty-five million

8    as a termination payment.  And so the real question here is not

9    whether anybody's taking away anybody's right to terminate.

10   The real question here is whether the particular clause that

11   says that LBSF has to essentially give up its fifty-five

12   million as a result of its breach, whether that is reasonably

13   related or proportional to the damage.  Because that's the

14   issue here.

15        The issue under New York law -- and it's a penalty

16   issue under New York law -- is simply whether -- you know, they

17   must show that the damages from the breach, and that's the

18   damages to them -- in other words, you're not allowed to take

19   away somebody's value of fifty-five million in this kind of a

20   clause unless it's proportional to the damage that you're going

21   to suffer.

22        And I submit, Your Honor, that when you look at New

23   York law and you look at the test and you apply it to these

24   facts, nothing's stopping them from terminating, the only

25   question is whether LBSF gets taken away its fifty-five

29

1    million.  Or put differently, Your Honor, at the time they

2    terminate, the expectation should have been that they get the

3    300 million less the 55.  They got a windfall.  And they got

4    that windfall with having absolutely no risk on their side.

5    The bankruptcy didn't cause them any harm whatsoever.

6         Now, Your Honor, I would only -- I guess I would say

7    this.  If you look at the second part of that test, which is

8    obviously closely related to the first part, the question was

9    could you measure up front the amount of damage or at least

10   have some idea of the amount of damage that Harrier would

11   suffer as a result of an LBHI or an LBSF bankruptcy.  And the

12   answer again is yes, you could, because in this case it was

13   not.

14        And so I think from a penalty standpoint under New

15   York law, Your Honor, if you just apply the test as its

16   written, I think it's met here.  I don't think there's any

17   question.  And I think certainly we plead that it's met here.

18        Now, one of the things, Your Honor, that Ms.

19   Gallagher argued certainly is in their briefs.  They talk about

20   the difference between a forfeiture and a penalty.  And I would

21   posit, Your Honor, that the cases that they cite don't make any

22   distinction between those two from a practical standpoint.

23        Now, what do the cases say the difference is?  And

24   I'd like to use one of the cases that they cite and talk about

25   it versus one of the cases that we cite.  And I think they give

30

1    you a good overview of how penalty and forfeiture work.  Both

2    Ballyrock and Harrier cite the Christ (ph.) case, and I can get

3    you the cite in a second.  And the Christ case is a case where

4    you had an employee and that employee, which was a senior

5    employee, had stock options.  And when that employee left the

6    business, a shareholder's agreement said that those stock

7    options would have to be forfeited.  And the Court looked at

8    that as a forfeiture and not a penalty, and the reason is, is

9    that leaving the company wasn't a breach of any agreement, it

10   wasn't a default or an event of default, it was a condition.

11   So in that situation they looked at it as a forfeiture.

12            Now, before I get to the fact that I don't think

13   there's a difference in the law in how you treat them, I think

14   that is the distinction between a forfeiture and a penalty.

15   And if you take a look at the OPM case that we cite, the OPM

16   case is a case where there was a lease for equipment.  And the

17   lessor in that case had an obligation to make maintenance

18   payments.  And what that case said is that if the lessor didn't

19   make a maintenance payment or any part thereof, including one

20   dollar -- and this is the point the Court makes -- that the

21   equipment would then be leased at one dollar for the next

22   ninety-six months.

23            Now, what's important about that, Your Honor, from

24   the standpoint of the arguments that are made by Harrier and

25   Ballyrock for that matter -- it's for both -- is that this is a

31

1    clause that didn't require somebody to pay money.  In other

2    words, this wasn't a typical liquidated damage clause.  This

3    was a clause that frankly was an unrealized gain in the future.

4    It was an unrealized gain of what they would make in the event

5    down the road that they had a lease.

6          The Court looked at that as a penalty and a penalty

7    case.  And the reason was it was a consequence of a default.

8    It was a consequence of a breach.  And it applied the two tests

9    for penalty to that clause, again notwithstanding that it

10   wasn't your liquidated damage clause and notwithstanding that

11   it was completely negotiated by the parties.  And I think those

12   two cases, though there are many others, show the distinction

13   between penalty and forfeiture.

14         Now, Your Honor, this distinction between penalty and

15   forfeiture only came up in the reply briefs.  So we didn't get

16   the opportunity to put any cases in.  And I think the two cases

17   that I just talked about really deal with the issue and explain

18   it.  The only additional thing that I would say is that there

19   are a number of forfeiture cases, Your Honor, that deal with

20   forfeiture and apply the same penalty structure as we've talked

21   about here.  In other words, they ask whether the forfeiture

22   was proportional and whether you could figure it out from the

23   beginning.

24         And we would be able to send a letter, if that would

25   be helpful to Your Honor, with a number of those cases that

32

1    essentially show that whether you're talking about forfeiture

2    or penalty, the test that's applied is exactly the same.

3            THE COURT:  But is the bankruptcy consequence the

4    same?  It seems to me that penalties are, generally speaking,

5    not to be allowed in a bankruptcy, but that certain forfeitures

6    may be permissible as a matter of law.  So it's a distinction

7    that may actually be significant.

8            MR. SLACK:  Well, I think from the standpoint of at

9    least the New York cases, and at the risk of just reading

10   citation, in fact there are a number of cases that both use the

11   term interchangeably in New York -- I mean, I think the

12   distinction that I gave you was the way the cases generally

13   work.  But because the test is the same, there's a number of

14   New York cases that actually treat it the same.  And they

15   actually apply the same test.  So if you look at -- let me read

16   you a couple of cites here, Your Honor.  Or if it would easier

17   I can do it afterwards.  Which is easier for you?

18           THE COURT:  Maybe afterward --

19           MR. SLACK:  Okay.

20           THE COURT:  -- rather than have citations.

21           MR. SLACK:  That is fine.  But what I can tell Your

22   Honor is that the cases in forfeiture and penalty end up

23   applying the same tests and, you know, they're used

24   interchangeably.

25           THE COURT:  Well, I suppose one of the problems I'm

33

1    having with this argument -- and it's true for both sides -- is

2    that there's this attempt to label something conveniently

3    either as a penalty or as a forfeiture.  Regardless of the

4    label there appears to have been a bargained for provision of

5    the credit default swap in which the parties, whether due to

6    rating agency pressure or otherwise, agreed that upon the

7    occurrence of a bankruptcy event no payment would be due.  And

8    the notes were sold on that basis, which is why market

9    expectations -- something that parties really have not briefed

10   and I understand why -- may have factored in .  Well, upon the

11   occurrence of the bankruptcy at least the notes are secure.

12         MR. SLACK:  Well --

13         THE COURT:  You don't have to worry about a fifty-

14   five million dollar or some other large payment that's taken

15   away.  And Lehman, as sponsor, benefited from the structure.

16         MR. SLACK:  Well, I think -- look, Your Honor, I

17   think it depends, I think, on the facts.  Here we have a

18   situation in Racers where anybody who looked at the documents

19   would see that there was no harm that came from a Lehman

20   bankruptcy or a -- you know, an LBHI or an LBSF bankruptcy.

21   And so the question I don't think is, you know, if there's

22   another issue down the road that's a different issue.  Today's

23   issue, which I think is governed by New York law, is whether or

24   not under New York law this would be an unenforceable penalty.

25   And you know, if down the road there's some other issue -- and

34

1    Your Honor, I don't know whether there's be an issue or not

2    based on this situation from an offering.  In other words,

3    market participants on all sides, including noteholders -- and

4    here you have a sophisticated noteholder -- can just as easily

5    look at the law as any other person and be aware of the fact

6    that there are certain penalty clause.

7         We often have, Your Honor, indemnification clauses.

8    Those are disclosed in corporate America.  And sometimes

9    they're invalid based on the fact that you can't indemnify for

10   intentional fraud, you can't indemnify for, you know,

11   securities violations.  There's a number of things that the law

12   says you can't indemnify for.  And yet you have indemnity

13   clauses by sophisticated parties and they're publicly disclosed

14   in 10-Ks.  I'm not suggesting, Your Honor, that the issue isn't

15   a real one.  It's just not today's issue.  And I don't think it

16   bears directly on whether this is a penalty under New York law.

17        Your Honor, a couple of points that I don't want to

18   leave the podium before I hit on, on the penalty.  And the

19   first is the Drexel Burnham case which I think is actually

20   important to distinguish where we are in this case and why it

21   is that this case should proceed, because Drexel Burnham was a

22   case that was on summary judgment, was not a case on a motion

23   to dismiss.

24        And the key there was it was after a full record had

25   been developed.  And the Drexel court made significant findings

35

1    based on that record.  And what's interesting is that the Court

2    may or may not have had some of the same questions Your Honor

3    has, but it didn't happen on a motion to dismiss.  And the

4    reason was is that the Court applied the very tests under New

5    York law, it looks like.  We don't know how it applied it

6    because there's no reasoning or analysis, but at the end of the

7    day what the Drexel court found was that, quote, "The amount

8    liquidated bears a reasonable relationship to the probable

9    loss."  So there was an actual finding, after a full record,

10   about whether or not the tests that we were talking about under

11   New York had been met.

12          Now, what I would tell Your Honor is that had the

13   Drexel cases had these facts it would have come out exactly

14   opposite.  And the reason is because there he actually made a

15   finding that there was a reasonable relationship to the

16   probable loss.  Here, again, the probable loss is zero.  We

17   know that there was no probable loss for Harrier.  And so I

18   think it's at least important to understand that on a summary

19   judgment the Drexel court did exactly what I'm asking this

20   Court to do, is let us have the opportunity to develop the

21   facts.  We think the facts are going to show on summary

22   judgment, if you apply that test, you'll come out exactly

23   opposite.

24          The Drexel court also found -- and again, I'm

25   quoting, "that the amount of actual loss is incapable or

36

1    difficult to precise estimation at the time the contract is

2    entered into".  Again, a factual finding exactly dealing with

3    the New York test.  There's no discussion.  There's no cases.

4    We don't know how they go there.  The point, again, is that

5    this swap would come out differently because of the nature of

6    the prepayment.

7          Now, what's important about Drexel also is that it

8    was a completely different type of instrument.  And it was back

9    about twenty years ago -- actually eighteen years ago -- when

10   they didn't have credit default swaps.  So this was a garden

11   variety interest rate swap which we've talked about on other

12   occasions.  And what was interesting about that provision, Your

13   Honor, was it was a mutual provision.  That provision said if

14   either party was in default, you'd have some kind of a -- you'd

15   have no payments on either side.  Now, here this is just a one-

16   way clause.

17         Lastly, Your Honor, I guess it's pretty evident from

18   looking at Drexel, but Drexel doesn't tell us what the

19   reasoning or analysis was other than making certain findings

20   which I've read to you.  And it was an unpublished decision,

21   for whatever that's worth.  And there's been a fair amount of

22   criticism about it as to at least questioning as to whether

23   it's going to apply to other cases.  And we cite some of that

24   in our brief and I won't go into it, but I think, Your Honor,

25   that actually if you look at what Drexel did, it supports

37

1    getting by the summary judgment motion and having -- or getting

2    by the motion to dismiss and going to summary judgment motions.

3         THE COURT:  May I ask you a question or two about the

4    facts that may be in dispute, if any, and the facts that you

5    would be seeking to develop if you were to get past the motion

6    to dismiss phase?

7         MR. SLACK:  Well, I think, Your Honor, let -- I think

8    the main things that we would try to show, I think, is assuming

9    that we would have two levels of argument, the first level

10   would be that if you just look at the fact that this was

11   prepaid, that on its face the damages here were not difficult

12   to ascertain at the time because they were zero.

13        But I think we would likely take discovery of what

14   were one, the consequences that were expected at the time.  I

15   think we would look at -- we would have expert testimony that

16   would talk about the way these swaps were put together and how

17   they were put together and the fact that there really was no

18   economic -- I think one of the things you're going to find is,

19   if you were to go through discovery, is probably the credit

20   support provider here was just a mistake.  Right?  There was no

21   need to have a credit support provider in this case at all.  It

22   was just that's the way these were done; every deal had a

23   credit support provider.  But there was no need for it here.

24   It was all prepaid.  So I think in this kind of a deal what

25   you're going to see is a development of why this swap was done

38

1    the way it was done and why there were provisions that frankly

2    weren't needed in this swap because if its facts.

3           The other thing you're going to see, Your Honor,

4    which we haven't gotten to dealing with some of the causes of

5    action, I think there are a number of factual issues that

6    ultimately you would see developed in connection with the

7    claims that we have, namely the fraudulent conveyance claim and

8    the quasi-contract claim.

9           One of the questions that we've talked about here on

10   the fraudulent conveyance that was raised by Ms. Gallagher is

11   the fact that there was a claim back at the beginning, is that

12   really a probable claim?  Well, that's an issue of fact.  And

13   the cases that they cite, they cite for that Staten Island

14   case, for example, in their reply on the fraudulent conveyance

15   claim, that case was a summary judgment case where the Court

16   denied summary judgment on both parties and sent it to trial as

17   to whether that claim that we would have here, in other words,

18   to give back the money, was a probable claim that would be a

19   debt of Racers and would render it insolvent.

20          Your Honor, I wanted to, before I sit down -- and I

21   appreciate that you've had a number of questions and we've gone

22   through it, but I did want to touch on the cause of action

23   relating to the quasi-contract causes of action.  And that is

24   that Harrier said that because there's a contract here, namely

25   the swap, that deals sort of in general with these issues, that

39

1   if we're right -- in other words, if you say that this is a

2   penalty or an ipso facto clause and it's invalid, do we have a

3   claim to get back the money because at that point it would be

4   clear that there would be a windfall, they would have fifty-

5   five million of our money that we should get.  And the question

6   is do we have a cause of action that allows us to get it?  Now,

7   Harrier's position is really just tough luck even though at

8   that point it will have been determined to be a windfall, it

9   would take the position that the contract itself doesn't

10  require it to give us the money back -- if it did I promise you

11  we'd plead it -- and they're saying that because that contract

12  exists they don't have to respond in some kind of quasi-

13  contract which is money hadn't received or unjust enrichment.

14          Now, obviously, there's a stark unfairness to that

15  position, but it's also wrong.  The law is very different.  The

16  law is that where you have a contract that doesn't deal with

17  the specific issue, you can bring a quasi-contract claim.  And

18  if you look, the Sternberg (ph.) case which we cite -- which I

19  don't think is ever discussed in our reply; we had it in our

20  papers -- I think it is very telling.  There you had a real

21  estate brokerage firm which sued a seller of a building under

22  theories of breach of contract, quantum meruit, fraud, to

23  recover a commission from the sale of the building.  And the

24  plainest contract with the seller specified that the plaintiff

25  would receive 450,000 dollars in commission should the building

40

1    be sold for more than 11.5 million.  The building was sold for

2    10.6 million and the defendant refused to pay anything.  The

3    trial court dismissed it, agreed that you know what, there was

4    a contract here.

5         The trouble was the appellate division disagreed.

6    The appellate division said that as long as the contract

7    doesn't deal with the specific, what happens if you're under

8    11.5 million, then you can bring a quasi-contract claim.  And

9    that's the Sternberg case.  There's a couple of other cases

10   that we cite in our briefs.  There's never a response to that.

11   Now, that is the main issue here, Your Honor, is the contract

12   doesn't deal with it specifically.

13        Now, there's a second argument which Ms. Gallagher

14   alluded to, which is even if the contract covered it so that it

15   was barred, there's an argument that if you're a third party to

16   that contract, as Harrier is here -- Harrier is not a party to

17   the swap agreement -- can they get shielded by the swap that

18   they're not a party to?

19        And Ms. Gallagher referred to the Seiden case, which

20   we do cite.  And what I would tell Your Honor is there is a

21   split here.  I think we have the better of the split.  Seiden

22   was decided by Judge Mukasey in 1991 and his decision in Seiden

23   has been -- there's a number of cases, I mean, a whole slew of

24   them.

25        We cite three, I think, very recent cases in the

41

1    Southern District that also say, as Seiden does, that where

2    you're a stranger to the contract you can't prevent a quasi-

3    contract claim against you regardless if the contract itself

4    deals with it.  And that's the Hughes (ph.) case from the

5    Southern District in 2006; the Marketplace La Guardia case from

6    March of 2008 from the Eastern District; the Greystone Bus

7    Credit case from the Southern District in 2008.  Now, that

8    doesn't sound like this is a theory that's out of favor.  Now,

9    I recognize that there are cases that go the other way.  I

10   think that the Seiden case -- we cite it and we discuss it at

11   length -- is the better law.

12          So Your Honor, with that, I know that I've spoken

13   awhile but I would ask the Court's indulgence to let Mr. Miller

14   address the ipso facto argument.

15          THE COURT:  Fine.

16          MR. MILLER:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          MR. MILLER:  I'm Ralph Miller with Weil, Gotshal.

19   The motion to dismiss should be denied with regard to the ipso

20   facto allegation in paragraphs 34 and 35 of the complaint.  And

21   I think it would be helpful if I begin by reading the operative

22   part which will resolve some confusion that may have arisen in

23   Ms. Gallagher's presentation.

24          If you go to her declaration, Exhibit B is the

25   schedule.  And page 10 has a subparagraph -- this is actually

42

 1    6(h), actually, and it goes over to subparagraph (iv).  It's

 2    about nine lines.  It says:  "If an early termination date is

 3    designated hereunder, other than as a result of the occurrence

 4    of an event described in section (6)(e)(ii)," which is not an

 5    issue, "market quotation and second method shall be used to

 6    calculate any termination payment owing by either party on such

 7    early termination date;".  Let me stop there.

 8             That's the provision that says, and that was in

 9    effect on the bankruptcy date, I will explain at LBSF, that an

10    early termination date would be paid.  And it -- an early

11    termination payment would be made if there was an early

12    termination date.  And second method is specified in market

13    quotation.  You go back to the ISDA, as the Court knows,

14    there's paragraphs that explain and we'll probably have some

15    lawsuits to deal with how market quotation in second method are

16    applied.

17             Then there is a proviso, and this proviso is what is

18    being attacked in this case.  It says:  "Provided that in the

19    event Party A," that's LBSF, "is the defaulting party or

20    affected party under the terms of this agreement, no

21    termination payments shall be paid by either party, and Party B

22    shall deliver to the holders at each series of certificates,

23    pro rata, the underlying securities held by Party B."  Party B

24    is the issuer or the trustee.  And it says we just give all the

25    collateral back to the noteholders.

43

1          It is that proviso that is being attacked here as

2     both the penalty and forfeiture under New York law and as an

3     ipso facto clause.  So the first thing that is important to

4     understand is that all of this operates only if there is a

5     default.  And then the default in issue that's being relied

6     upon here is the LBHI bankruptcy filing.  It's also important

7     to understand that it does not take effect until there is an

8     early termination date.

9          Ms. Gallagher slipped over a point here that we need

10    to make clear on the timeline.  Could we have the timeline

11    here, please?  She referred to an October 1st letter, and she

12    said then there was an early termination date.  That was true,

13    Your Honor.  The early termination date -- and this is one of

14    the exhibits to her declaration, is the letters -- was

15    designated for October 6, 2008.  As the Court's well aware,

16    LBSF's bankruptcy occurred on October 3, 2008.  So although the

17    letter was sent, it specified an early termination date that

18    had not taken place at the time of the bankruptcy filing.  And

19    so no termination had arisen that would have triggered the

20    proviso or the clause at the date of the bankruptcy.  So at

21    that point, the bankruptcy locked in the provisions of Section

22    541 and other protections of the bankruptcy code, and it became

23    property of the estate.

24          Now, we're not arguing here that the termination

25    could not occur.  What we're arguing here, under the ipso facto

44

1   clause, and we believe that we have met the plausible case

2   standard, is that the change in the way the termination payment

3   was calculated, which is not within the language "acceleration,

4   termination, liquidation, offset or net out" in Section 560, is

5   outside of the safe harbor. There's really no argument on that

6   in the papers in this case. And that's one of the reasons we

7   need to go forward. It's mentioned in a footnote in passing,

8   but it is not discussed.

9        The sole argument here is that this occurred on

10  October 1, and you don't have to worry about it. The letter

11  was sent on October 1, but nothing happened until October 6,

12  and October 6 is after the bankruptcy.

13       I should also clarify the references by Ms. Gallagher

14  to automatic termination. As the Court is aware, because

15  you've been spending entirely too much time, as we all have,

16  with ISDA master agreements, section 6 of the ISDA master does

17  have a sentence that deals with automatic termination

18  provisions. And that can be a specified automatic termination.

19  This was not an automatic termination provision. A notice had

20  to be sent, and it had to specify a relevant event of default.

21  And as the Court is also aware, with some frequency, events of

22  default occur and a party who has a right to terminate chooses

23  not to. It waives the default.

24       Under these provisions -- and it has to specify an

25  early termination date, which would be with respect to all

45

1    transactions.  There's no option to terminate only certain

2    transactions.  That's the way these documents are set up, and

3    they're in the record.  So there was no automatic anything upon

4    the filing of LBHI's bankruptcy.  What happened was, a letter

5    was sent, it specified that bankruptcy, and it selected an

6    early termination date that occurred after the bankruptcy of

7    LBSF.  And then the trustee applied the proviso and sent the

8    money out with no termination payment.

9            So we believe that all of the elements of ipso facto

10   are met here.  And I would also add, as the Court is aware,

11   Section 541 refers to the commencement of a case under this

12   title, which is language that's unnecessary if you're referring

13   only to the bankruptcy of the specific debtor.

14           Finally, I do want to address a point.  Ms. Gallagher

15   said that the contracts don't work if you apply ipso facto,

16   because the reference obligations could have bankruptcies that

17   cause payments to be made to LBSF.  As the Court is aware,

18   there are reference obligations out there.  They are corporate

19   names, I believe, in this case.  But they are entities that are

20   not actually involved in the transaction.  And if certain

21   things happen to them, one of which may be a bankruptcy, then

22   LBSF would get more money, because the credit protection was to

23   protect against basically bad things happening in the market.

24           That would not be an ipso facto violation, because it

25   would not activate the part of Section 541 that has to do with

46

1    effecting a forfeiture or modification of the property of the

2    estate.  It would actually be a benefit to LBSF.  So the

3    argument that this -- if you apply ipso facto the contract

4    ceases to work, is just not true.  If ipso facto is applied, it

5    achieves exactly the purposes that the ipso facto doctrine is

6    intended to achieve.  This was a valuable asset of the estate

7    on the day that LBSF went into bankruptcy.  It became property

8    of the estate.

9          As of that time, when an early termination date

10   became effective, LBSF had a right to calculation of

11   termination payments under second method and market quotation.

12   This proviso purports to take that away simply because of the

13   bankruptcy filing.  And that is the kind of asset diminution

14   that the ipso facto doctrine is set up to protect against.  We

15   believe it's not in any safe harbor, and we've think we've

16   established a plausible case.

17         So I believe that that concludes all of the issues

18   that were addressed in the argument.  I'd be happy to take any

19   questions from the Court.

20         THE COURT:  I just want to be clear on something.

21   The October 1, 2008 notification of the default related to

22   LBHI's bankruptcy on September 15, as credit support provider,

23   correct?

24         MR. MILLER:  That's correct, Your Honor.

25         THE COURT:  As a result, does it make any difference

47

1    for this analysis that LBSF went into bankruptcy three days

2    before the effective date of the early termination date,

3    because the early termination date is not geared to LBSF's

4    bankruptcy, but it's geared to another event?

5            MR. MILLER:  Yes, Your Honor, it does, because

6    Section 541, as the Court knows, creates the bankruptcy estate

7    on the day that the bankruptcy filing occurs.  And

8    541(c)(1)(B) -- well, (c)(1) says, "Except as provided in

9    paragraph 2, an interest of the debtor in the property becomes

10   property of the estate under Section (a)(1), (a)(2), or (a)(5)

11   of this section, notwithstanding any provision in agreement,

12   transfer instrument, or applicable nonbankruptcy law."

13   Skipping down to (b):  "that is conditioned on the insolvency

14   or financial condition of the debtor, or the commencement of a

15   case under this title, or on the appointment of or taking

16   position by a  trustee in a case under this title, or a

17   custodian before such commencement, and that effects or give an

18   option to effect a forfeiture, modification or termination of

19   the debtor's interest in property."

20           The debtor in this case had an interest in property.

21   It had this credit protection purchased under the credit

22   default swap agreement for which it had prepaid all the

23   premiums.  I might add, by the way, one of the other penalty

24   components here is that there's no refund of this prepaid

25   premium.  It was prepaid for the entire term of the credit

48

1   default swap period.  And one of the consequences of this

2   proviso is that that prepaid premium is forfeited.

3         So that's a forfeiture and a penalty as well, under

4   both bankruptcy law and under New York law.  It's not as

5   significant, because it's whatever portion of four and a half

6   million dollars of premium is forfeited as opposed to the 55

7   million, but it is still a forfeiture.

8         That property, that property right existed; no early

9   termination date had yet occurred.  And then the early

10  termination date did occur and the termination occurred.  We're

11  not trying to set aside the termination in this case, Your

12  Honor.  But at that point, the proviso that took away the

13  normal right to receive a payment under market quotation and

14  second method, that proviso came into effect simply because of

15  a commencement of the case under this title, and for that

16  reason, Your Honor, we believe it's an ipso facto provision

17  that cannot deprive the creditors of the estate of that

18  valuable asset.

19        THE COURT:  Okay.  Thank you.

20        I assume you wish to comment?

21        MS. GALLAGHER:  Just a few comments, Your Honor.  To

22  start with, the ipso facto clause argument.  I'd like to point

23  out what -- is that what the agreement says that if an early

24  termination date is designated -- designated.  That act took

25  place on October 1st, prior to the bankruptcy of LBSF.  And

49

1    under Margulis, which is at 323 B.R. 130, the Court there

2    explained that the automatic stay does not totally restrain the

3    mere passage of time, thus it does not solve a contract from

4    terminating by its own terms, as long as the termination does

5    not depend on a postpetition act; and explained that where a

6    debtor defaults under a contract prior to bankruptcy and the

7    nondebtor party serves a termination notice that takes effect

8    without further action at a future date, the filing of a

9    bankruptcy petition between the giving of notice and

10   termination does not toll or stay the termination.

11           So the contract terminated, which nobody disputes, on

12   October 6th.  And under the prepetition terms of the contract,

13   that meant that neither party got a payment.  And that was

14   based off of the default, which again, took place prepetition.

15           Turning back to the penalty and forfeiture arguments.

16   There's been a lot of argument about there's no harm to

17   Harrier, there's no harm to Racers.  What there was was a

18   contract.  And what LBSF is asking this Court to do is to

19   change the terms of that contract.  If we were going to do

20   that, we'd have to go back and look at all the terms of the

21   contract.  Maybe it was the ratings agency that required this

22   provision.  Maybe it wasn't.  It doesn't really matter, because

23   the parties entered into the contract on those terms and set a

24   premium on those terms.  Perhaps the premium would have been

25   higher; it would have been a different deal; there would have

50

1    been different risks and a different calculation for Racers and

2    the certificate holders.

3            And similarly, if the ratings agency would not have

4    given the ratings without this provision, would the swap have

5    been effective?  Would Harrier have bought the certificates?

6    It's unclear at all, because I think if it wasn't rated AAA

7    none of this -- we wouldn't be here.

8            THE COURT:  Is it your position that it's completely

9    irrelevant that the counterparty, in this case LBSF and LBHI,

10   had fully paid all obligations?  Is it completely irrelevant?

11   Because I could imagine a contract that said if a designation

12   of an early termination date were made on a cloudy day in New

13   York, that there would be no obligation to make any payments on

14   the part of either party.  It would be irrational, but

15   presumably, under your theory, you'd be able to walk away.

16           The condition has nothing to do with the financial

17   position of Lehman Brothers or any of its affiliates, but that

18   the parties simply bargained for.  That might be a forfeiture,

19   however.

20           MS. GALLAGHER:  It might be, but that would be

21   enforceable, as long as it was not ambiguous.  But that's not

22   the situation we have.

23           THE COURT:  So would the question be whether it was

24   partly cloudy?  You don't have to answer that.  What I'm saying

25   is, it seems to me that if there's no economic harm, if it's

51

1    not about the money, but it's simply about -- and I used the

2    term opportunism with your adversary and I'll use it with you

3    now -- it's simply about the opportunism of the moment, taking

4    advantage of the fact that on September 15th LBHI filed for

5    bankruptcy, causes no economic harm whatsoever to Racers,

6    because it's fully paid up.  But there's an opportunity to

7    declare an early termination date taking advantage of the

8    circumstances.  Could be a penalty, could be a forfeiture.  You

9    say it's neither, or you say it doesn't matter?

10            MS. GALLAGHER:  I say it's neither.  Because what you

11   have here, looking at the totality of the circumstances, is a

12   relatively low premium, 4.5 million prepaid, in exchange for

13   certain protection upon occurrences of events, which I will

14   note, have not happened yet, none of these -- no credit event

15   has happened.  If the deal was early termination payment upon

16   default based upon LBSF or LBHI's bankruptcy, that would have

17   been a different deal.  That may have required a higher premium

18   payment.  It may have been structured differently.

19            It also may have caused Harrier and/or Racers to say

20   let's do a cost benefit analysis, do we want to terminate here

21   or not?  But that's not the deal.  That's not the deal these

22   people struck.  They said if there's a bankruptcy event of

23   default, parties walk away, end the relationship.  And that

24   could have affected -- we could have, I suppose, following

25   LBSF's suggestion, go and do a ton of discovery on this.  But I

52

1    think it comes down to the fact that you have a contract that

2    is very clear here on this point, that was structured by

3    Lehman, marketed on this basis, upon which Racers and Harrier

4    relied, and now, after the fact, Lehman is saying, in essence,

5    well you should have known that the contract we wrote was

6    unenforceable as a matter of law in our favor.

7        THE COURT:  Are you saying that we should do a ton of

8    discovery because that would make this motion go away?

9        MS. GALLAGHER:  No, I don't think we need to get

10   there.  I don't think we need to get there, because I think, if

11   you look at the contract as written, unambiguous on its face,

12   very clearly written, sets forth the parties' obligations, and

13   it's unclear what the damage would have been to Racers to keep

14   up this swap in the face of the turmoil in the market.  Among

15   other things, the securities could have lost value leaving not

16   enough money.  Or, if they kept it open, LBSF would be sitting

17   here with perhaps a mark to market book value on its books but

18   no cash and no right to get the cash until and unless there was

19   a credit event.

20       But that would have been a different contract, and

21   that's not the contract we were faced with here.  What LBSF is

22   asking you to do is to go back after the fact, with hindsight,

23   and strike out the provision they now find unpalatable and

24   unfavorable to them and leave Harrier, in essence, holding the

25   bag.  And Harrier, for what it's worth, is the one who made the

53

1    certificate holders make the determination to instruct the

2    trust whether or not to terminate.

3         So if we had a different contract, we might have a

4    live swap agreement.  I don't know.  But the problem is, and

5    that, I don't even know -- I don't think you can take discovery

6    on that, because that's a hypothetical.  But what we do have is

7    a contract that provided for clear rights and obligations to

8    both parties.  Now, LBSF wants to take the part that it likes

9    and rewrite the part it didn't.

10        Turning to the penalty forfeiture argument.  LBSF

11   argues that you must look at any consequence to a breach and

12   make a determination of whether it's a penalty.  But this does

13   not -- this provision does not impose any payment obligation or

14   liability on LBSF.  And to take LBSF's argument out to its

15   logical conclusion, then any breach of a contract that

16   terminates a contract, you'd have to look to see whether or not

17   the parties should have agreed that that would be enough to

18   terminate the contract.  And I don't think that's what a

19   penalty means.

20        With respect to the quasi-contractual provisions,

21   just two points.  Mr. Slack relies on the Sternberg provision

22   and claims that because that court says that the contract

23   didn't deal with what happened if the properties sold for less

24   than 11.4 million dollars, you could maintain a quasi-

25   contractual claim here.  But this contract did deal with what

54

1    happened here.  It expressly dealt with what happened here.

2    It's just that LBSF doesn't like what it said.

3            And again, with Seiden you were pointed to several

4    cases by the Southern District.  I would just point you to the

5    cases that we cited in our reply brief by the Appellate

6    Division.  This is a question of New York law.  I think the

7    Appellate Division has been clear on what New York state courts

8    have been said about quasi-contractual claims in a situation

9    where there is a contract that deals with the issue at hand.

10           I have nothing further, unless you have any further

11   questions.

12           THE COURT:  I don't at this moment.  Mr. Slack, Mr.

13   Miller?

14           MR. SLACK:  Just a couple of quick points.  Your

15   Honor, the -- one of the main points that I've heard made here

16   dealing with penalty versus forfeiture, is that the forfeiture

17   only -- you only invalidate a forfeiture if the clause is

18   ambiguous.  And for that they cite one case.  It's the Christ

19   case, which I talked about earlier.  It doesn't say that.

20   Instead, the law is -- the law in New York, Your Honor, which

21   was set way back in 1934, but it's still good law, in Wurth and

22   Hommid (ph.) Fair Booking v. Wurth, as I said, applies

23   essentially the same test for forfeiture as it does for

24   penalty.

25           In Wurth, the New York Court of Appeals said, "The

55

1  restrictive covenant in this case was inserted in order to

2  protect the goodwill of the business.  The stipulation for the

3  forfeiture, or the right to enforce the notes upon a breach of

4  that covenant cannot be regarded as liquidated damages and

5  enforced, accordingly, unless the parties fix that sum as a

6  reasonable estimate of the loss that would follow from a

7  material interference with the goodwill of the business."

8       What the New York courts have done, and again, there

9  are a number of others, the New York courts have applied the

10 restatement.  And what the New York courts have done is

11 essentially apply a very similar test, if not virtually

12 identical to that of the penalty law, so that whether you look

13 at this as a penalty question or a forfeiture question, I

14 believe that the test that the Court's going to apply under New

15 York law is essentially the same.

16      The last point I wanted to make, Your Honor, was that

17 point that was just made by my opponent on 11.4 -- the

18 Sternberg 11.4 million below.  And she says well, our contract

19 deals with this.  The trouble with that, Your Honor, is the

20 causes of action only come into play, essentially, if this

21 Court were to invalidate it.  So what essentially Ms. Gallagher

22 is saying is that if the Court invalidates the clause that we

23 want invalidated, that she can then use that same clause in

24 saying that the contract now bars us from having relief under

25 New York law on quasi-contract.

56

1          And I would suggest, Your Honor, that if you in fact

2      invalidate that provision, then you cannot rely on an

3      unenforceable provision -- and we actually cite cases in our

4      brief that I won't go through -- to bar a quasi-contract case.

5          THE COURT:  Okay.  I wasn't expecting you to stop at

6      that moment, but you did.

7          MR. MILLER:  Your Honor, may I address briefly the

8      question of the Margulis case which was raised?

9          Your Honor, the Margulis case, I believe is not

10     applicable here, because that was dealing with whether the

11     automatic stay prevented something that was already in

12     operation from occurring because of the bankruptcy, if no

13     postpetition act was necessary.  In that case there was what

14     amounted to an agreed judgment that could be satisfied if a

15     smaller amount were paid by a specific date.  And the

16     bankruptcy intervened, and the argument was that the failure to

17     pay could not be used because the time period should be tolled.

18         The judge, Judge Bernstein, ruled, Your Honor, that

19     the automatic stay prevents entities from taking action to

20     commence or continue a proceeding to collect a prepetition debt

21     interfering with property of the estate or in some cases

22     interference with the property of the debtor.  Conversely, the

23     automatic stay does not toll or restrain the mere passage of

24     time, thus it does not stop a contract from terminating by its

25     own terms, as long as the termination does not depend on a

1    postpetition act.

2         Our position is not that the early termination date

3    did not occur.  It was that the rights that existed before it

4    did occur became property of the estate.  Significantly, in the

5    Margulis case, there was an ipso facto clause claim also.

6    There, Judge Bernstein did not simply say, for the same reason

7    I don't need to address the ipso fact clause; the Court went on

8    and said, well, this is an ipso facto situation because it was

9    not conditioned on insolvency or commencement of the case or

10   appointment of a trustee, it was because of a nonpayment.

11        And so the Court allowed that to go forward.  But if

12   the doctrine had been that an ipso facto claim based on

13   becoming property of the estate does not occur if it's

14   triggered before the bankruptcy, then that discussion would not

15   have been necessary.  So I believe the Margulis case does not

16   apply here, because -- and as Ms. Gallagher pointed out, we're

17   not contending that there was an automatic stay violation by

18   the occurrence here of the termination date or that the early

19   termination date did not become effective.  We're simply saying

20   there was property on the estate on that date, and the clause

21   which took away the termination payment was the ipso facto

22   clause.  Thank you, Your Honor.

23        THE COURT:  Thank you.  I think what I'm -- oh,

24   someone's standing up to speak.  Another surprise.

25        MR. CLARK:  Always like to surprise the Court, Your

58

Honor.  Tony Clark of Skadden Arps on behalf of Aflac.  I'm

hesitant to jump into the fray here, Your Honor, but the Court

heard --

        THE COURT:  Since you're not a party.

        MR. CLARK:  -- exactly.  When --

        THE COURT:  So you should be beyond hesitant.

        MR. CLARK:  I'm chastised, then, Your Honor.  When

the Court heard back in, I believe it was August 11th, some

argument by counsel about scheduling of these various matters

as well as the Aflac motion for summary judgment that raises

some of these same issues, the concern that was expressed by my

colleague, Mr. Weber, at that time, is the reason I rise today.

        The way these things got briefed up, certainly the

560 issue that we're most concerned about, didn't get full

treatment, because the parties -- the swap counterparties,

believe that they're not under the Bankruptcy Code.  But now,

today we've had argument on 541(c)(1), 365(e)(1).  Those are

squarely before the Court in our case.  And so if Your Honor,

in ruling on either the Harrier motion or the Ballyrock motion,

is tempted to substantively delve into those issues, we would

very much like the opportunity -- we asked to be heard today

and we were told no, you're going to be on a different

schedule, but we'd like the opportunity to be heard

substantively on those before the Court rules on those issues.

If you're not going to rule on them, then you don't need to

59

1    hear from me.

2          And one other comment, Your Honor.  On behalf of

3    Aflac, and I suspect every other counterparty to the Lehman

4    swaps, we very much appreciated the Court's questions and

5    comments about market expectations and bankruptcy opportunism.

6    We agree with those concepts, Your Honor.

7          THE COURT:  Those comments were simply comments.

8          MR. CLARK:  We appreciate the comments.

9          THE COURT:  And do not in any way --

10         MR. CLARK:  They were questions.  I appreciate that.

11         THE COURT:  -- do not in any way reflect how the

12   Court is likely to rule.  They're simply statements of a market

13   observer.

14         MR. CLARK:  Understood, Your Honor.  But they still

15   sounded pretty good to me.

16         And I'm happy to address the scheduling issues, if

17   Your Honor would like me to answer any questions.

18         THE COURT:  I don't have any questions of you right

19   now.  What I'm going to do is take a break between now and

20   Ballyrock, and we'll, at a quarter of, describe whether or not

21   I'm going to take this under advisement or provide some rulings

22   that may guide the parties.  And then we'll take the Ballyrock

23   argument at 3:45.

24         MR. CLARK:  Thank you, Your Honor.

25         THE COURT:  We're adjourned till then.

60

1      (Recess from 3:32 p.m. to 3:47 p.m.)

2          THE COURT:  Be seated, please.  As to the motion to

3      dismiss filed by Harrier Finance, I'm taking that under

4      advisement.  And I'm mindful of the comments that were made

5      concerning the potential overlap of some of the issues that are

6      being presented in the context of this motion to dismiss and

7      other matters that are pending in somewhat similar cases

8      involving swap terminations.

9          I don't know how long it's going to take me to decide

10     the Harrier matter.  It's conceivable that it could be decided

11     before argument in Aflac.  It's also conceivable that I will

12     elect to defer issuing a decision until after hearing argument

13     and reviewing all of the relevant briefing, both in Aflac and

14     Perpetual.

15         I would note, just as a matter of pure procedure, and

16     by saying this I don't mean in any way to influence my thinking

17     with respect to the Ballyrock matter that's about to be heard,

18     that I consider the motion to dismiss procedure that we're now

19     addressing to be qualitatively different from my consideration

20     of fully briefed motions for summary judgment, where there are

21     no facts in dispute, presumably, and where the record is beyond

22     pleadings.

23         It is at least conceivable that before getting to the

24     merits, and after giving this matter some further thought, that

25     I might simply deny the motion without prejudice to allow the

61

1    parties an opportunity to conclude on an expedited schedule

2    whatever discovery -- not a ton of it -- whatever discovery

3    might be necessary to more fully present the issues.

4    Alternatively, I might simply grant the motion.  And when I say

5    simply, it's not that I think it's simple.  This is an

6    incredibly complex matter that is not clearly governed by any

7    of the cases that have been cited.

8         And certainly in the case of Drexel, that has been

9    discussed at length here, and regardless of whether it is a

10   published or unpublished decision, and regardless of whether

11   Judge Pollack is or is not one of the more respected district

12   court judges from the past, it's not this case.

13        So this is something that's going to take some time

14   and consideration.  And I recognize that every time I read

15   papers in one of these matters, and hear argument, I learn

16   more.  And I'm going to try to avoid deciding things too

17   quickly that are of such enormous significance, not only in

18   this bankruptcy case but to the market generally.

19        Let's take Ballyrock.

20   (Pause)

21        MR. FINK:  Good afternoon, Your Honor.  My name is

22   Steven Fink.  I'm with the law firm Orrick, Herrington &

23   Sutcliffe.  And we represent defendant Ballyrock ABS CDO 2007-1

24   Ltd., the issuer.

25        Your Honor, as the Court may be aware, Ballyrock has

62

1   no financial interest in the outcome of this dispute.  At the

2   end of the day the assets in issue will go either to Lehman or

3   to the noteholders.  Ballyrock moved to dismiss here.  We were

4   named as a defendant, and it was Ballyrock's belief that we

5   have an obligation under the deal documents to enforce the deal

6   as we understand it.

7          It's Ballyrock's belief that the termination of the

8   swap here was proper, that as a result of that termination

9   which was before Lehman Special's financing -- I'm sorry,

10  Lehman Special's bankruptcy petition, that at Lehman Special's

11  interest in a distribution was subordinated to the rights of

12  the noteholders.  And that's why we brought the motion that we

13  did.

14         As the Court I think is familiar, the noteholders

15  have now appeared.  They've filed papers in support of the

16  motion.  And for that reason, counsel to Barclays Bank, I

17  believe the largest noteholder, with the Court's permission,

18  will address the substance of the motion.  I do, however, have

19  two factual points that I'd like to make, after hearing the

20  Harrier argument earlier this afternoon, Your Honor, before I

21  hand over the floor.  There are two points that were emphasized

22  during the Harrier argument as factual matters, which I believe

23  are different for Ballyrock than they were for Harrier, and

24  which I believe will make this an easier case for Your Honor to

25  decide.

63

1          First of all, in Harrier, counsel for Lehman

2    emphasized that there they had alleged that there had been a

3    full prepayment of all of the premiums so that Lehman had

4    satisfied all of its obligations in advance.  There was nothing

5    left for it to do and therefore nothing left for its credit

6    support provider, Lehman Holdings, to do.  That is not true

7    here, Your Honor.  There's no such allegation in this case.

8    And in fact, there was a million dollars in accrued and owing

9    premiums on the date of the termination.

10          The second difference here, Your Honor, and this came

11   up in the discussion of the ipso facto argument, had to do with

12   the timing of the termination in the Harrier matter.  Here, not

13   only did the notice of termination precede Lehman Special's

14   bankruptcy petition, but the early termination date specified

15   in that notice also took place well in advance of the Lehman

16   Special financing.

17          The chronology, very briefly, as the Court knows,

18   LBHI filed its petition on September 15, 2008.  It was the very

19   next day, September 16, 2008, when Ballyrock issued the notice

20   of termination.  And as it was permitted to do under the swap

21   documentation, it specified that same day, September 16, 2008,

22   as the early termination date.  And it was not until October

23   3rd when Lehman Special filed its bankruptcy petition.

24          So I wanted to bring those two factual points to Your

25   Honor's attention.  Unless you have questions for me, I'm going

64

1   to sit down and let Barclays' counsel take over from here.

2         THE COURT:  Okay.  Thank you.  Mr. Lacy?

3         MR. LACY:  Good morning, Your Honor, Robinson -- I'm

4   sorry, good afternoon.  Robinson Lacy from Sullivan & Cromwell

5   for Barclays Bank PLC and Long Island International.

6         Your Honor, we're here to talk about the meaning of

7   some agreements.  I don't think you've got them in front of

8   you.  I was wondering if you would like to have copies of the

9   declarations so you can actually look at these papers while we

10   talk about them.  I have extra copies right here.

11        THE COURT:  If you have copies, I'll take them.

12        MR. LACY:  I'm handing to both Lehman's counsel, who

13   I'm sure does have this with him, and handing up to the Court.

14        THE COURT:  Thank you.

15        MR. LACY:  I just handed up Mr. Fink's declaration in

16   support of the motion and my declaration in support of the

17   motion.  We are here to talk about some issues arising from an

18   indenture and some credit default swap transactions between

19   Lehman Brothers Special Financing and Ballyrock, under which

20   LBSF obligations were guaranteed by LBHI.  The Court, just a

21   couple of days ago, in Metavante had a chance to describe the

22   basic structure of swap transactions using just the master

23   agreements.  You have a master agreement.  The master agreement

24   contemplates that there will be individual confirmations

25   setting up the terms of specific transactions in the future.

65

1          In this case, the master agreement is attached to Mr.

2     Fink's declaration as Exhibit A.  It's the first document in

3     the big binder.  The master agreement defines the term -- can

4     you find it, Your Honor?

5          THE COURT:  I have it.

6          MR. LACY:  Okay.  The master agreement defines the

7     term "transaction", actually in the very first line of the

8     lead-in text.  It says that "the parties have entered and/or

9     anticipate entering into one or more transactions, each a

10    'transaction' that will be governed by this master agreement

11    and the documents and other confirming evidence, each a

12    confirmation exchanged between the parties confirming these

13    transactions."

14         The confirmations, Your Honor, appear as Exhibit E to

15    Mr. Fink's declaration.  If you had a chance to look at these

16    things, you'll notice that this -- even these confirmations

17    don't cause any transfer of risk, because they don't identify

18    the reference obligations.  But they do set out the basic

19    framework.  We have here a credit default swap, one on mortgage

20    backed securities and the other on collateralized debt

21    obligations.

22         You'll see from the first page of Exhibit E that

23    these are -- this is a pay-as-you-go, or physical settlement

24    swap.  The first provision here is relating to the

25    collateralized debt obligation reference asset, the other one

66

1    relating to the residential mortgage backed securities.

2    There's also a pay-as-you-go provision.  Pay-as-you-go, as you

3    can see from these confirms, refers to business standard terms.

4    The distinctive feature of that is that unlike the Harrier

5    credit default swap, you don't have a finite number of issuers

6    -- reference issuers who might go into bankruptcy, for example,

7    triggering a total payment on -- with respect to their debt.

8         When you're dealing with the mortgage backed

9    security, the security represents a pass-through interest in

10    the whole pool of residential mortgages.  There will never

11    actually be a default on the mortgage backed security itself.

12    What will happen is that there will be defaults on the

13    underlying mortgages, payments will come through shorter than

14    you expect, fewer than you expect.  And this is providing

15    credit protection for that.

16         The significance of that, Your Honor, is that under

17    pay-as-you-go, if one of the homeowners makes a late payment,

18    then the seller of protection, in this case Ballyrock, will

19    make a payment to LBSF.  But then if the homeowner catches up,

20    sends in two months -- mortgage payments the following month,

21    that comes back.  So you actually get payments back and forth

22    under the credit protection aspect of this, in addition to the

23    premium payments, which come from LBSF to Ballyrock.

24         The termination provisions of the master agreement

25    are familiar to Your Honor.  Paragraph 5 says that a bankruptcy

67

1    of the credit support provider is an event of default for LBSF.

2    LBHI is, there's no doubt about this, a credit support

3    provider.  And then on page 8, section 6 talks about what

4    happens upon an event of default.  Section 6(a) says that, "In

5    the event of an event of default, the nondefaulting party can

6    serve a notice designating an early termination date in respect

7    of all outstanding transactions."  So what gets terminated are

8    the transactions.  And you remember we saw transactions defined

9    up at the beginning.

10              There's no provision in here to terminate the master

11   agreement itself.  And in fact, the master agreement, it says

12   that this termination will be without prejudice to the other

13   provisions of this agreement.  That's on the top of page 9.

14   The effective designation is that all the payment obligations

15   under the transactions stop, but without prejudice to the other

16   provisions of this agreement.  That's immensely important.

17   That's at (c)(2), Your Honor, at the top of page 9.  Because,

18   of course, the other provisions of this agreement provide for

19   the calculation, under some circumstances, of a termination

20   payment.  And we're all here because LBSF thinks it's entitled

21   to somewhat more than 400 million dollars, calculated under

22   this agreement.  So the basic claim for money of LBSF here is a

23   claim under this agreement.

24              As you just heard, Ballyrock sent a notice

25   terminating on September 16th effective the same day.  On the

1    18th Ballyrock sent the noteholders a notice saying that it had

2    delivered a September 16th notice terminating the credit

3    default swap agreement and all CDS agreement transactions

4    thereunder.  I'll come back to that somewhat gnomic

5    pronouncement.

6         The way credit default swap agreement is defined in

7    the indenture -- and I guess we'd better go to that -- well,

8    I'll just say.  The way credit default swap agreement is

9    defined in that indenture, that language literally means that

10   Ballyrock, in addition to terminating the transactions, had

11   terminated the master agreement.  That -- we've assumed that

12   that is the case for purposes of this motion.  However, Your

13   Honor, nobody actually believes that happened.  They had no

14   right to terminate the master agreement.

15        Lehman's claim is based on the assumption that the

16   master agreement is still in force and enforceable to collect

17   the termination payment.  You could terminate the master

18   agreement, but it would be done outside of the terms of the

19   master agreement by the parties agreeing, basically, to rescind

20   it.  But that would have required the agreement of both LBSF

21   and Ballyrock.

22        THE COURT:  Just so I'm clear on what you just said.

23   Does it matter for purposes of this motion whether the

24   agreement remains in effect or it has been deemed terminated,

25   and is the only issue here determination of transactions under

69

1    the agreement, as opposed to the agreement itself?

2         MR. LACY:  It is our submission, and I think this

3    will emerge very clearly, the only relevant thing here is the

4    termination of the transactions.  The transactions -- the

5    termination of the transactions is what gives rise to the

6    calculation of the termination payment.  And the termination of

7    the transactions based on a default with respect to LBSF, is

8    what triggers the indenture provisions that subordinate that

9    termination payment to the rights of the noteholders.  And

10   that's the basic issue we're talking about.  The termination of

11   the master agreement has nothing to do with either of those

12   things.

13        Now, having said that, the principal argument that is

14   presented in the complaint is that the termination of the

15   transactions was prohibited because of provision 7.8(a)(xi) of

16   the indenture.  That is on page -- the indenture is behind Tab

17   F.  It's the big document behind Mr. Fink's declaration.  If

18   you go to page 173, and about three quarters of the way down

19   the page you'll see a little Roman xi there.  I guess we'd

20   better go up to the top so we can see the lead-in language.

21        The lead-in language of 7.8(a) says:  "The issuer

22   will not."  So these are all prohibitions.  That's on the top

23   of page 172.  And then over to page 173, one of the things it

24   cannot do is "terminate the credit default swap agreement,

25   unless:  a) no transactions remain outstanding under and as

70

1    defined in the credit default swap agreement, or b) the issuers

2    entered into a replacement therefore, that either satisfies the

3    rating condition, and is a form of proof credit default swap

4    agreement, or 2) satisfies section 12.3(c)."  12.3(c) is a

5    provision that allows a waiver of any provision by consent of

6    all of the relevant parties.

7            So in the complaint, the basic claim that LBSF is

8    making is that termination on the 16th of September is invalid

9    because it violated this provision.  And it seems to me that

10   there is no plausible reading of this provision that would

11   support that conclusion.  As I mentioned before, the credit

12   default swap agreement, as used there, that is a defined term.

13   The credit default swap agreement is defined on page 19, and it

14   means -- and I won't read the whole thing -- but it means the

15   ISDA master agreement, not just any one, but the particular one

16   that we were just looking at, the one dated July 12 between the

17   parties, together with the schedule and any confirmations

18   thereto.

19           Now, the credit default swap agreement exists

20   independent of the confirmations.  The definition refers to --

21   it says, "with the schedule and any confirmations thereto."

22   But it says, "any confirmations."  It does not require that

23   there be confirmations.  So the credit default swap agreement

24   is in existence so long as the ISDA master agreement itself is

25   in existence.

71

1          If you go back to section 7.8, this will seem so

2     obvious that it's embarrassing for me to be saying this, but

3     this is in fact necessary to respond to the principal argument

4     in the complaint.  This obviously is distinguishing -- this

5     provision is distinguishing between the credit default swap

6     agreement and the transactions -- and we saw how that's

7     defined.  By the way it says here "transactions as defined in

8     the credit default swap agreement."  That what we were just

9     reading.  The transactions are the things that you do by

10    issuing the confirms.  It says you can't terminate the credit

11    default swap agreement unless, first option, "no transactions

12    remain outstanding."  So clearly you can terminate the

13    transactions without terminating the credit default swap

14    agreement, because that, in fact, is exactly the circumstance

15    in which this authorizes you, under clause 8, to terminate the

16    credit default swap agreement.  And that, we submit, is exactly

17    what happened on September 16th.

18         As I said, there is a letter to the noteholders in

19    which the issuer seems to be saying that it had terminated both

20    the transactions and the credit default swap agreement.  We

21    don't understand why that would have happened, but let's assume

22    it happened.  It was permitted under this clause because once

23    you terminate the transactions, which they did, then they were

24    entitled to terminate the credit default swap agreement.  That,

25    Your Honor, is the guts of the complaint and the guts of the

72

1     motion.

2          Let me just show you, Your Honor, in my declaration,

3     it's the small thing you've got up there, the document behind

4     Tab A, the first exhibit.  This is the notice of termination

5     dated September 16th.  And at the beginning of the second

6     paragraph, down on the bottom of the first page, it says, "The

7     undersigned hereby give notice that an event of default has

8     occurred and is continuing, and hereby designates September 16,

9     2008 as the early termination date in respect of all

10    transactions under the master agreement."  There's nothing in

11    here that purports to terminate the master agreement, but it is

12    absolutely clear that it terminated the transactions.  That's

13    what was authorized under section 6(a) of the master agreement,

14    which is what they cited.

15         So as I say, I don't think there's any doubt about

16    the history.  The transactions were terminated.  The

17    termination of the transactions is what gave rise to the

18    termination payment, which is what we're here to fight about.

19    The transaction -- the termination of the transactions is what

20    gave rise to the subordination under the indenture, which is

21    what we're here to fight about.  If there was a termination of

22    the master agreement at the same time, it has no effect on

23    anything, but in any event, it was permitted.

24         For a long time, Your Honor, I thought that LBSF was

25    saying that terminating the transactions was equivalent to

1    terminating the master agreement.  That reading would make --

2    there are things in their opposition that quite clearly say

3    that.  That would make the first clause of 7.8 a nullity,

4    because it's saying you can terminate the master agreement if

5    there are no transactions outstanding.  And they're saying if

6    you terminate the transactions you've already terminated the

7    master agreement, you're not allowed to do that.  At this

8    point, as these cases -- these related cases have progressed,

9    there is no longer any doubt that everyone in the room agrees

10   that the master agreement is different from the transactions.

11        During the Metavante argument on Tuesday -- I think

12   it was Metavante, LBSF's counsel actually pointed to -- let me

13   make sure I --

14        No, on the Libra motions, on pages 179 to 180 of the

15   transcript of the argument on the Libra motions, Mr. Miller

16   actually pointed to 7.8(a)(xi) of the Libra indenture, which is

17   as a practical matter equivalent to 7.8(a)(xi) of this

18   indenture, and said, there's an example of a provision under

19   which the master agreement can survive the termination of the

20   transactions; where it is realistic to say the master agreement

21   is still there after the transactions no longer are there.

22        He made that concession in the course of arguing that

23   you'd have to treat the transactions the same as the master

24   agreement under section 5.2(c).  We have no 5.2(c) issue in

25   this case.  That arises after an acceleration, and there's been

74

1   no acceleration under this indenture.

2          THE COURT:  Just for my information, because I

3   haven't done the comparison, and if you haven't then it's an

4   easy question to answer, which is just I don't know.  Is the

5   indenture in Ballyrock, for all practical purposes, identical

6   to the indenture in Libra or not?

7          MR. LACY:  I wouldn't want to go that far, because

8   it's a very -- they're two very long documents.  I'll tell you

9   that 5.2(c), most of the words are the same as 5.2(c) of the

10  Ballyrock indenture.  There are a few differences.  In

11  7.8(a)(xi), I think in substance they're exactly the same.  But

12  I have not attempted to compare all the other sections.

13         THE COURT:  Fine.  It doesn't matter.  I was just

14  curious if this was, in fact, a -- if you can call it a form.

15         MR. LACY:  There is no question that these are, to

16  some degree, cookie-cutter deals.

17         THE COURT:  Okay.

18         MR. LACY:  Although I think I -- I was going to try

19  to remember who the lawyers were on the two deals, and I can't.

20         All right.  Well, that gets us to the other main

21  argument in the complaint, which is that the subordination

22  provision in the indenture is unenforceable as a forfeiture.

23  And you've already heard a lot about this branch of the law

24  this afternoon, so I don't think I need to say that much.

25         First of all, there is no question, mercifully, that

75

1    the terms of the indenture provide that a termination payment

2    payable under the master agreement based on a default by the

3    Lehman parties is subordinated to payments to all of the senior

4    noteholders; whereas any other termination payment would get

5    paid before the noteholders.  And I say mercifully, there's no

6    dispute about that, because there's nineteen pages explaining

7    the waterfall, and we don't want to have to go through it.  But

8    we all agree on that.  So let's accept that.

9           The second point is that there's no assertion that

10   there's any ambiguity about these provisions.  And if I wanted

11   to spend the next twenty minutes leading you through those

12   nineteen pages, you'd conclude that there was no ambiguity,

13   because they are excruciatingly detailed.  They are designed so

14   that a computer can calculate how much money is supposed to go

15   to everybody on each payment date.

16          But again, there is no assertion that there's any

17   ambiguity.  So what is the assertion?  The assertion is that

18   the subordination provision is unenforceable as a penalty.  The

19   short answer to that is as follows.

20          New York law has two different rules concerning

21   penalties and forfeitures.  A penalty is a bad liquidated

22   damages provision.  And I won't read every case to you.  You

23   can read them all yourself.  You probably have read them all

24   yourself.  But the cases do not set aside provisions as

25   penalties unless they are provisions providing for a

76

1    calculation of damages and it is determined that the

2    calculation doesn't satisfy the test for liquidated damages

3    provisions.

4         Now, the OPM case is a slight extension of that,

5    because the damages was a transfer of a leasehold interest.  In

6    other words, the penalty was that the lessee got the use of

7    some property for a dollar a month for a very long time, a

8    couple of years after the expiration of the lease term, as a

9    consequence of failing to make some maintenance payment -- the

10   consequence of the lessor's failure to make a maintenance

11   payment.  That was treated as a liquidated damages provision.

12   There was no argument reflected in the decision concerning

13   whether that should be treated under the rule for liquidated

14   damages.  It does not strike me as being crazy, or even

15   particularly controversial, to say that you should not be able

16   to get out of the rule on liquidated damages by providing for a

17   transfer of an interest in real estate as opposed to cash.  But

18   the fact is, that was treated as a liquidated damages

19   provision.

20        Now, the rule on forfeitures is utterly different.

21   The rule on forfeitures is a rule of construction.  And I think

22   you can pretty much find out everything you need to know about

23   that by reading Judge Lynch's opinion in the Christ case.  But

24   since I brought it with me, I'm going to read a little bit of

25   it to you myself.  In Christ, which is the case that you heard

1    discussed before, the district court said:  "Cases stating New

2    York anti-forfeiture principle use it as an interpretive

3    device, not as a rule that voids clear agreements intended by

4    the parties."  He cites some cases.  There's a parenthetical

5    after one of these cases:  "Though the law does not favor

6    forfeiture, courts will enforce it if the parties agreed to

7    it."  Then there are some more citations.  "Courts should

8    interpret contracts to avoid forfeiture (emphasis added)."  And

9    then this is his own writing again:  "While New York courts

10   will not interpret provisions that are ambiguous on their face

11   to effect a forfeiture, a contract is only ambiguous if it is

12   susceptible to two equally plausible interpretations."  We know

13   that.  Here there is no ambiguity to resolve.  Therefore this

14   provision is enforceable.

15        In the financial world, among sophisticated parties,

16   people get to agree on how risks are allocated.  And they can

17   take very big risks if they want to.  In fact, you probably

18   have observed, over the last year, that Lehman was not unknown

19   to take very big risks.  So the rule in New York, which is what

20   applies -- this is all -- these are all New York law

21   agreements -- is that the whole world of forfeiture, the

22   question of whether something is a forfeiture, doesn't come up

23   unless you have an ambiguous provision to interpret.  There is

24   no ambiguity concerning the indenture provisions that provide

25   for the subordination of the termination payment.  So the rule

78

1    concerning forfeitures does not apply.

2         And now, just to pull this together.  The Court will

3    have observed that the rule against penalties is spiritually

4    inconsistent with the rule concerning forfeitures.  It is

5    possible to say that it all looks sort of like the same thing,

6    that somebody's being treated unfairly, that there is some

7    undue suffering being inflicted on somebody, which you should

8    be able to reach under the same rule.  But the fact is that the

9    cases are very, very clear about the distinction.  The only

10   provision that allows a court to refuse to enforce a clear

11   provision is the penalty rule, the rule having to do with bad

12   liquidated damages provisions.

13        Once you get outside of that defined area, the rule

14   is the forfeiture rule, and the Court is required to enforce

15   something, even if it would call the thing it was enforcing a

16   forfeiture.

17        In Lehman's opposition to the motion, they cited, I

18   don't know, fifteen cases concerning how this should be

19   unenforceable.  And every single -- all but two of those were

20   liquidated damages cases.  OPM is a liquidated damages case.

21   They were all liquidated damages cases.  There are two that we

22   address in our reply brief that were talking about forfeiture,

23   but neither of them held with this case at all.

24        Your Honor, the only remaining issues on this motion

25   have to do with bankruptcy code provisions, and I don't propose

79

1   to spend very much time on them.  Although it was not asserted

2   in the complaint, it is now asserted that the operation of the

3   subordination provision violates Section 541(c).  It can't,

4   Your Honor, because that all happened -- the termination, the

5   subordination, all happened before LBSF went into bankruptcy.

6   It cannot be the case -- I mean, Your Honor is aware of this.

7   What 541 does is it gets into the estate whatever property the

8   debtor had immediately before the commencement of the case.

9   Immediately before the commencement of the case, LBSF's rights

10  were a right to a termination payment which had been

11  subordinated pursuant to the indenture.  Section 541 cannot

12  resuscitate those rights.

13       We have a separate argument that says that it makes

14  no sense to read the triggering conditions mentioned in 541(c)

15  as referring to events having to do with somebody other than

16  the debtor.  That's a slightly more interesting question which

17  you've got in Harrier.  And I will just say, since I listened

18  to that argument with interest, that that language is the same

19  as the language of 365(e), of course.  And I do not see how a

20  company in bankruptcy would be entitled to receive payments

21  under a credit default swap based on the bankruptcy of the

22  reference entity, if the Court were to take the position that

23  those events in 365(e) are not limited to events affecting the

24  debtor.  Colliers reads those as limited to events affecting

25  the debtor, that is, a bankruptcy of the debtor, the financial

80

1   condition of the debtor, all affecting the debtor.  And I think

2   it would be a stretch to do what Lehman is trying to do, which

3   is to say, oh no, it also applies to a triggering event based

4   on the guarantor's bankruptcy.

5           But fortunately, that issue does not have to be

6   reached in this motion, because it seems to me, I mean, there's

7   really been twenty-five years of law saying that 541 does not

8   resuscitate property rights.  Whatever the property rights were

9   as of immediately before the beginning of the bankruptcy case,

10  that is all that the bankruptcy estate gets.

11          I'd like to close, I think, just for a moment, on the

12  Drexel case.  Lehman is now being much more charitable to that

13  opinion than they were in the papers in opposition to

14  Ballyrock's motion.  I just wanted to mention that the many

15  criticisms of that decision which were referred to in argument,

16  at least as they are identified in the brief in opposition to

17  Ballyrock's motion, consist of an ABA PLI presentation in 1998,

18  which as I recall, was written by the then-young Martin

19  Bienenstock, a partner at Weil Gotshal.  I do not think that

20  counts as any sort of groundswell of criticism of that

21  decision.

22          Unless you have any questions, Your Honor, I'm done.

23          THE COURT:  I have no questions at this moment.

24      (Pause)

25          MR. SLACK:  Your Honor, good afternoon, Richard

81

1     Slack, again, from Weil Gotshal, for the debtors.

2          I want to comment on one of the two factual

3     distinctions that Mr. Fink raised at the beginning of his

4     discussion.  And we'll get to it in a minute.  It is, in fact,

5     true that unlike the Harrier case we just discussed, Ballyrock

6     did have premiums that were to be paid.  I think Mr. Fink

7     identified them -- I think he said it was roughly a million

8     dollars.

9          In contrast, and I think it's also an important

10    factual distinction, the amount that was owed to LBSF, and this

11    is not according to LBSF, this is according to the CDO itself,

12    was 404 million.  The question which we addressed at great

13    detail in the last motion with Harrier, and I think is equally

14    as stark here, albeit it's not an absolute prepayment, is

15    whether a clause that stems from a default or a breach, and

16    hence is a penalty clause and not a forfeiture clause --

17    because the one thing that we haven't heard -- what I

18    understand Mr. Lacy to be arguing, is that if it's not a

19    liquidated damages clause, you're not in a penalty at all.

20         We cited at least a couple of cases that weren't like

21    that.  Clearly it would come up a lot in the liquidated damage

22    analysis.  But I think the OPM case, which Mr. Lacy said seems

23    to be a reasonable extension, is, in fact, very much like the

24    cases that we have in both Harrier and Ballyrock, where you

25    have an amount which is an unrealized gain.  That's what's

82

1    really being forfeited in -- or I should say as a penalty in

2    those cases, in OPM and here.

3                THE COURT:  Is that true?  Because my understanding

4    of what's going on in Ballyrock, and correct my impression if

5    it's incorrect, is that this is a diversion of a waterfall that

6    but for the bankruptcy default, the waterfall would give LBSF a

7    payment?

8                MR. SLACK:  That's exactly right.

9                THE COURT:  But because of the bankruptcy default,

10   there's a reset of the priorities, and the noteholders come

11   first?

12               MR. SLACK:  That's exactly right, Your Honor.  So --

13               THE COURT:  Presumably that's the way the notes were

14   sold, too?

15               MR. SLACK:  That is -- you know, we spoke about it

16   before.  That is the way the notes were sold.  That's the

17   agreement that was reached.  And the question that you have,

18   and again, you see these in public deals as well -- in public

19   deals where deals go out to shareholders, you can have invalid

20   provisions, because they're for many different reasons.  And

21   merely because a provision is invalid under New York law and

22   it's a public company that may have disclosed it, and there may

23   have been expectations in the market, doesn't change the New

24   York law that --

25               THE COURT:  Is it in --

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

83

1          MR. SLACK:  -- it's a penalty.

2          THE COURT:  -- is it invalid as a penalty under New

3    York law, or is it unenforceable as a matter of bankruptcy law,

4    or both?

5          MR. SLACK:  Both.  It is both, Your Honor.  We --

6    independently, what we have alleged in our complaint is that it

7    is an unenforceable penalty, and also that it is an ipso

8    facto -- it is invalid as a matter of being an ipso facto

9    clause.  I don't believe the complaint uses the word ipso

10   facto, but we do say that it was unenforceable under the

11   bankruptcy rules.

12         THE COURT:  Were these deals sold on the strength of

13   legal opinions that confirmed that the documents were legally

14   binding and enforcing, and that were, with the exception of

15   what I assume is a bankruptcy exclusion which appears in every

16   opinion, otherwise enforceable as a matter of applicable state

17   law, which in this case is New York law?

18         MR. SLACK:  I don't remember this deal.  Certainly

19   that would be typical.  But I don't know in this deal whether

20   that was the case.  And there are such opinions that would be

21   issued in a number of these deals, maybe all of them for all I

22   know, but I don't know in this particular deal.

23         THE COURT:  All right.  I would assume that they'd be

24   standard practice in most deals of this type?

25         MR. SLACK:  Yeah, I just don't --

84

1          THE COURT:  I'm not saying what the opinion would

2     say --

3          MR. SLACK:  Right.

4          THE COURT:  -- I'm just saying that one would

5     ordinarily expect an opinion to be part of the closing binder.

6          MR. SLACK:  So, Your Honor, the comment, and I'll get

7     to it later, is that we contend that as a matter of penalty

8     law, that the disparity between the damage that you can readily

9     calculate and the loss of potentially 400 million, which is

10    what you have here, is so disparate that it is, in fact, a

11    penalty under New York law.  Now, I don't think the Court has

12    to decide today whether or not it is, in fact, a penalty.  The

13    fact is that we have pled in our complaint that it is

14    disproportionate, and we have provided, we've said that you can

15    calculate it.

16         And I want to make one point, which is very important

17    in this case, that we don't have to worry about in Harrier.

18    But when there's a -- this cause could have treated this very

19    differently.  And, in fact, it is, when I say in Ballyrock,

20    when you have the reversal of the waterfall, it is a pure

21    penalty.  And why do I say that?  Because upon an early

22    termination of the deal when the CDO calculated, that's

23    Ballyrock calculated the 404 million that Lehman was owed, it

24    netted out all payments.  So that 404 is a pure number after

25    everything that Lehman and LBHI would have owed.  It is a pure

85

1   penalty.  And anytime Lehman is in the money that calculation

2   of early termination is going to be a penalty, because it nets

3   out everything that Lehman and LBHI would owe.

4          Now, Mr. Lacy, I think, correctly said that this case

5   has one different issue than we dealt with in Harrier, and

6   that's the 7.8 argument, which I'd like to address.

7       Now, Your Honor, if you look over at the board that's put

8   up, which Mr. Lacy also pointed to, which is 7.8, it reads "The

9   issuer will not terminate the credit default swap agreement

10  unless no transactions remain outstanding under, and as defined

11  in, the credit default swap agreement, or the issuer has

12  entered into a replacement therefore that satisfies the rating

13  condition and is a formed approved credit default swap

14  agreement or to satisfy Section 12.3(c) hereof".

15      Now, what we contend, that means on its face, is that in

16  order to terminate the credit default swap agreement you must

17  either have no transactions outstanding, which means that the

18  vehicle here has to be an empty shell, that the transactions

19  expired on their own terms, that it's essentially an empty

20  vessel, or you're gone out and tried to get a replacement swap.

21  Now, the reason for that, and the reason that it's in the

22  indenture like that, I think, is fairly obvious from the

23  language itself, which is this is a provision that benefits

24  LBSF, probably benefits the whole deal, frankly, that attempts

25  to keep the deal going to maturity.  That's the point.  In

86

1    other words, unless this is an empty vessel you have to go out

2    and get a replacement for LBSF, and if you get that replacement

3    the deal goes on.  And so this is a limitation on the ability

4    to terminate because, and, again, we talked about the rating

5    agencies, because when the rating agencies rate these things

6    the expectation, I think, at least from the LBSF side, is that

7    these transactions are going to go to maturity.

8           And there's a number of provisions throughout the

9    indenture which help the deal move to maturity, and this is one

10   of them.

11          THE COURT:  But let me stop you for a second.

12          MR. SLACK:  Yes.

13          THE COURT:  I don't see anything in that section that

14   talks about maturity.  What I'm focused on -- it's your

15   demonstrative -- I just want to be clear that I'm understanding

16   your argument -- is that there are two alternatives in the

17   section that deals with the prohibition on termination.  The

18   exclusion from that prohibition in part (a) is that no

19   transactions are outstanding.  The exclusion in (b) is that

20   there has been a replacement.

21          MR. SLACK:  That's correct.

22          THE COURT:  Let's focus on (a).  Is it your position

23   that the right way to interpret this is that you can't

24   terminate the transactions in order to activate (a)?  Because

25   those are our facts.

87

1          MR. SLACK:  I wouldn't phrase it the way you've asked

2     it, but I believe the answer is yes, if I could explain how

3     this works.  If you look at the document that Mr. Lacy had you

4     look at, so we can just work off of Mr. Fink's declaration.

5          THE COURT:  I have the section here, but I'm looking

6     at your blowup.

7          MR. SLACK:  Right.  What I want to explain is that

8     the way Mr. Lacy reads this you have a definition of credit

9     default swap agreement, which includes, if you look at the

10    definition on page 19 of the indenture, the ISDA master

11    together with any schedule and any confirmations, which are,

12    essentially, the -- and if you look at the definition of

13    confirmations that's all the documentation, including the

14    transactions.

15         So in order, when you're talking about the credit

16    default swap agreement you are, in fact, talking about

17    everything including the transactions.  The way Mr. Lacy wants

18    to read this is that you can terminate the credit default swap

19    agreement; because every time you're terminating the credit

20    default swap agreement you are, in fact, terminating the

21    transactions.  You cannot terminate the credit default swap

22    agreement without terminating the transactions.

23         So what Mr. Lacy wants you to read this, is

24    essentially to read (a) out, because every time you would

25    terminate the credit default swap agreement, which is what was

1    done here, you immediately terminate the transactions, and,

2    therefore, you're okay under 7.8.

3         THE COURT:  That's not what I think I heard him say.

4    What I thought I heard him say, he referred to Exhibit A to his

5    own declaration, which is a letter dated September 16 addressed

6    to Lehman Brothers Special Financing Inc, and there's a

7    termination here the transactions.  And I think he then said

8    that in Exhibit B there was a misrepresentation in effect or

9    misstatement of the content of the actual notice of event of

10   default and designation of early termination date by

11   referencing a termination of the credit default swap agreement

12   itself.

13        So my understanding of his argument, and I just want

14   us to understand our terms --

15        MR. SLACK:  Yes.

16        THE COURT: -- because I may be misunderstanding him

17   or you may be misunderstanding him.  But my understanding is

18   that he's saying under this indenture provision there is an

19   ability automatically, although time sequence is not clear, to

20   terminate the credit default swap agreement, provided that

21   there are no transactions that remain outstanding.  That if a

22   notice such as the one which went out on September 16 is given

23   to designate an early termination date, and terminate

24   transactions becomes effective, and here we know that the

25   effective date is September 16, as of September 16, assuming

89

1    the effectiveness of that notice, no transactions remain

2    outstanding at that moment in time, at least according to

3    Ballyrock, which means that there is an ability to terminate

4    the credit default swap agreement.  Assuming all that's true.

5              MR. SLACK:  That --

6              THE COURT:  That's my understanding of the argument I

7    heard before you stood up.

8              MR. SLACK:  That is my understanding of the argument.

9              THE COURT:  Okay.  What's wrong with it?

10             MR. SLACK:  What's wrong with that argument, Your

11   Honor, is that if you look at the way the document works the

12   termination of the transactions is viewed as terminating the

13   credit default swap agreement.  In other words, if you look at

14   the way the market works, and certainly this is what we plead.

15   We plead that what was done here was the termination of the

16   credit default swap agreement.  That's what we plead.  And the

17   reason we pled that way is that the market, well, first off,

18   let me say this.

19             You cannot terminate, on an early termination date,

20   less than all of the transactions.  Can't do it.  So if you

21   look at the master, and you look at Section 6 of the master,

22   you can't terminate two of the transactions.  You have to

23   terminate all of the transactions.

24             Now, what happens when you terminate all of the

25   transactions, that's the only way this works, is you've

90

1    terminated the credit default swap agreement.  And what I think

2    is interesting, Your Honor, is that is what the parties

3    understood was happening here, was that even though Mr. Lacy is

4    right that you're allowed to terminate under Section 6 of the

5    master all of the transactions, everyone understood, every

6    market participant understood, and that's why we pled it this

7    way, that what happened here was you terminated the credit

8    default swap agreement.

9         Now, if you look at, I think what's interesting is

10   that when you look at the arguments that were made here

11   Ballyrock filed the first motion to dismiss.  It's very telling

12   that Ballyrock did not argue the argument that Mr. Lacy is

13   making now.  What Ballyrock argued, and I'm going to get to it,

14   Mr. Lacy didn't even touch on it, was that this was a covenant

15   and not a condition.  The 7.8 was a covenant and not a

16   condition.  That happens to be dead wrong for a bunch of

17   reasons we'll get to.

18        Instead, what Ballyrock said happened in its opening

19   brief, and as the CDO you'd think Lehman would know.  We pled

20   it that way, and Ballyrock is the CDO, they would know.  What

21   they said is that Ballyrock terminated the credit default swap

22   agreement, as it was contractually entitled to do, on September

23   16, 2008.  It also said that termination of the credit default

24   swap agreement gave rise to an early termination payment

25   obligation by Ballyrock to Lehman Special, and that is because

1   everyone understands that when you have terminated all of the

2   transactions you have terminated the credit default swap

3   agreement.

4           Now, we pled it that way, and we think when we take

5   discovery and when you look at the admissions, that that's what

6   the evidence is going to show, is that terminating one is the

7   same thing as terminating another.  Now, Ballyrock wasn't the

8   only participant, and Lehman wasn't the only participant.  The

9   other participant to this was the trustee.

10          MR. SPEAKER:  Yes, the trustee.

11          MR. SLACK:  The trustee's complaint and interpleader,

12  much like LBSF's and much like the CDO, was that what happened

13  was that the credit default swap agreement between the parties

14  had terminated as of that date.  And then if you look at the

15  second bullet on the board that you see there it says on

16  December 4, 2008 and, again, on January 28, 2009, Ballyrock Ltd

17  or its representatives responded that its termination of the

18  credit default swap agreement was valid in accordance with its

19  term.  And that is, again, because what we allege happened here

20  was that, in fact, there was a termination of the credit

21  default swap agreement by virtue of terminating all of the

22  transactions thereunder.

23          Now, I don't want to stop talking about Ballyrock for

24  a second, because I think that in addition to the judicial

25  admissions the letters that they sent make this point, I think,

92

1    even more stark.  So they sent a letter on December 4th to LBSF

2    and said contrary to your contention in the November 18th

3    letter the credit default swap agreement, together with all

4    transactions thereunder, was terminated on September 16th upon

5    the delivery of the termination notice from the issuer to LBSF.

6    In other words, everyone understands that when you terminate

7    all the transactions you are terminating the credit default

8    swap agreement.

9         The next letter that they sent, in January, I think

10   is, perhaps, even a little more interesting, because the

11   January letter says as we indicated in the December 4th letter

12   and reiterated in our recent telephone conversation, the issuer

13   effectively terminated the credit default swap agreement on

14   September 16, 2008.  Again, the idea is that even though, as

15   Mr. Lacy said, they terminated the transactions, everyone

16   understood, every participant understood that what was going on

17   here was a termination of the credit default swap agreement.

18        And if you allow us to go to discovery, which, I

19   think, we're entitled to, what you're going to find is that

20   that was, as a general matter, what the market considered here

21   was the meaning of terminating all transactions.

22        Now, if we go back can we put up 7.8?

23        It wasn't until the noteholders came in and filed a

24   motion to dismiss that they took a different position than

25   every one of the people who were actually the participants.

93

1    The CDO, the trustee, LBSF.  The noteholders said no, no, no,

2    no.  We just terminated the transactions.  We didn't terminate

3    the credit default swap agreement.  So, because of that,

4    somehow this works.

5           But since, Your Honor, and this is what I'm telling

6    you, if, in fact, as we pled, and as I believe the admissions

7    that you've just seen confirm, the termination of transactions

8    is effectively a termination of the credit default swap

9    agreement.  7.8 has absolutely no meaning under Mr. Lacy's

10   interpretation, because every time you terminate transactions

11   or terminate the credit default swap agreement there are, by

12   definition, no transactions outstanding.  There would be

13   absolutely no reason to have 7.8 if what Mr. Lacy is saying is

14   true, because when you have an early termination date you must

15   terminate all transactions.  So there would always be no

16   transactions outstanding.

17          The only way this has any meaning is to read it the

18   way LBSF has posited it should be read, and that is that there

19   is a temporal aspect to it, and that is that you cannot

20   terminate all of the transactions or the credit default swap

21   agreement, which are tantamount to the same thing, unless prior

22   to that time the transactions have been terminated according to

23   their terms.

24          In other words, they've run out.  And the way that

25   works, Your Honor, is very simple.  You can have a master.  If

94

1    the transaction is under it there's no early date where you've

2    terminated.  If the transactions run out that master is still

3    there, and you can, in fact, then go out and either terminate

4    it because it's an empty vessel or you could go out and get a

5    replacement and have more transactions under it.

6          The point simply is here is that Mr. Lacy's

7    interpretation, if, and I contest it's the way we've pled this,

8    if, in fact, what happened when they sent the notice is that it

9    was a termination of the credit default swap agreement, then

10    this has absolutely no meaning the way they said to interpret

11    it.

12          Now, I wanted to make a couple of comments with

13    respect to Mr. Lacy's arguments on the penalty.  Ballyrock is a

14    different case than Harrier in penalty, and the factual issues

15    that we have in Ballyrock are slightly different.  But I think

16    the law is the same, and I would tell you that there are no

17    cases that suggest that you have to have a liquidated damage

18    clause, as they're traditionally trying to say it, and that

19    there are cases we cite to, and there are more that say that

20    you can have other types of penalty clauses as long as what's

21    happening is it's stemming from a breach or a default.  And in

22    that situation you apply penalty law.  And the two tests that

23    we set out in Harrier you would apply here.  And I would

24    suggest that we've pled that they're met.  And, really, I guess

25    what I would say to Your Honor is we've pled that this is a

95

1    penalty clause on the basis of meeting the two tests that are

2    in New York law.

3          We believe that's sufficient to survive a motion to

4    dismiss.  If they think this is a forfeiture as opposed to a

5    penalty then the correct thing to do here is to take discovery

6    on issues which we don't think exist in Harrier but would exist

7    here, and that is what is the proportionality of the alleged

8    penalty, as we say it is, to what was the harm that was

9    expected at the time of the agreement.

10          In Harrier we say that since there was no harm it's

11    an easy test.  Here what we're saying is discovery.  We think

12    the disparity here of 400 million to a million in premiums is

13    probably sufficient to say there's a penalty.  But the issue

14    that they've raised is you have to look at it at the time.  So

15    you have to look at what was the expectation of the parties.

16    Could you calculate at that time, and, as I pointed out in the

17    Harrier argument, even in Drexel the Court, on summary

18    judgment, had a record where it went out and made that

19    determination, apparently, we don't know the analysis,

20    according to New York penalty law.

21          And we would suggest that here we should be doing the

22    same thing.  We should, in Ballyrock we should be looking at,

23    we should be taking discovery and then coming back to Your

24    Honor on summary judgment or a trial to determine whether or

25    not that, in fact, what we pled, that this is a penalty clause

96

1    and it meets the two tests, whether, in fact, that's the case.

2    And at that point is when, if we haven't met the tests for

3    penalty, they can argue well, it's a forfeiture or something

4    else.  I assume we'll see that in their summary judgment

5    argument.

6         So, Your Honor, unless you've got some additional

7    questions on 7.8 I'm going to turn it over again to Mr. Miller

8    for the ipso facto argument.

9         THE COURT:  Okay.

10        MR. MILLER:  Good afternoon, Your Honor, Ralph Miller

11   from Weil, Gotshal, again, talking only about ipso facto, and

12   I'll try to be brief and focused, Your Honor, given the hour.

13   We do have something to pass out quick which I think will

14   assist in dealing with the critical issue of timing here.

15        First, I want to deal with two issues while that's

16   being passed out, to get them out of the way.  It's important

17   to understand what is not being argued on this motion to

18   dismiss.  The reply brief states on page 17 that Ballyrock and

19   the movants need not and do not rely on the safe harbor

20   provisions for the purposes of this motion.  And they continue

21   and say, quote, "Thus the issue of whether Section 560 would

22   permit the subordination of LBSF's claim to the termination

23   payment if the swap were terminated while LBSF was subject to

24   the Bankruptcy Code is not presented by this motion".  So I'm

25   not going to spend any time with that unless the Court wants me

97

1    to.

2            They have not asserted that a safe harbor protection

3    arises.  What they have asserted is that as a matter of timing

4    the termination notice occurred based on LBHI's bankruptcy,

5    before the LBSF bankruptcy, and there's no doubt, Your Honor,

6    that that factually is correct, that the termination notice was

7    sent and it did specify an early termination date in the gap

8    period between September 15th and October 3rd.

9            However, the provisions here are quite different from

10    Harrier.  In Harrier the provision said that there would be no

11    early -- that there would be no termination payment,

12    essentially.  It was what's sometimes called a walkaway clause.

13    And for that, that becomes operative at the time of the

14    effectiveness of the termination.  We did plead this.  There

15    was some question about that.  I want to make that clear.

16    Paragraph 32, which quotes from Section 541, says "Further,

17    such a provision", and that's referring to the revision I want

18    to go over briefly, "is unenforceable because it seeks to take

19    property of the debtor because of a bankruptcy filing".

20    Property of a debtor becomes property of the estate, quote, and

21    this is all from 541(c), "notwithstanding any provision in an

22    agreement ... (b) that is conditioned ... on the commencement

23    of a case under this title ... that effects a forfeiture,

24    modification, or termination of the debtor's interest in

25    property."  LB Special Financing's Interests are being

1    forfeited because of, quote, "the commencement of a case under

2    this title".  So, for notice pleading purposes anybody who

3    speaks 541(c) understands that's lifted right straight out of

4    541(c), and while we didn't use the colloquial term ipso facto

5    we did use the statutory language.

6            I want to talk now very briefly about the critical

7    fact that the provision in issue here has to do with

8    application of cash on each quarterly payment date.  I actually

9    call it quarterly distribution date.  And for that purpose we

10   passed out an excerpt from the declaration of Mr. Fink that has

11   some tabs on it.  And I'll be quick with those, Your Honor.

12   The first few pages simply establish that this is the

13   indenture.  The first tab should be page 59, which defines the

14   Quarterly Distribution Date, a capitalized term that's quite

15   important in the indentures.  It means the sixth day of each

16   February, May, August and November.

17           And, then, if you go over to page 228 of the

18   indenture, which is the second tab, it deals with the

19   application of cash popularly known as the waterfall.  And it

20   says "notwithstanding any other provisions in this indenture

21   but subject to a clause", some clauses that are applicable, "on

22   each quarterly distribution date the trustee shall disperse

23   amounts transferred to the payment account from the collection

24   accounts pursuant to Section 10.2(g) as follows and for

25   application by the trustee in accordance with the following

1      priorities".

2             The key point, Your Honor, here is, and this is clear

3      through the documents, and we can further develop it beyond the

4      motion to dismiss in pleading stage, is that the quarterly

5      distribution date is an important date at which the numbers are

6      all added together.  Everybody figures out where everything is

7      happening, and some money is dispersed out that's going to be

8      very difficult to ever get back.  So it's important that that

9      be done correctly.

10            The operative provision here, as the Court has

11     correctly noted, changes that distribution sequence.  If you

12     look over on the next page, paragraph (a)(3), this is the so-

13     called interest proceeds waterfall.  There's two.  One for

14     interest and one for principal.  Actually, they're pretty much

15     the same.  And little three there has to do with the normal

16     payment to LBSF.  It says that the third item, which is

17     basically after expenses and taxes, "is to the payment of the

18     credit default swap counterparty of any unpaid termination

19     payment (excluding any defaulted synthetic termination payment)

20     payable", and then it goes on "because the termination of the

21     credit default swap agreement".

22            Now, the defined term "defaulted synthetic

23     termination payment" is the magic word that operates here once

24     there's been a bankruptcy.  And, so, in the absence of the

25     bankruptcy LBSF is number three on the list.  If there is a

1    bankruptcy you can flip over from page 229 to the red tab on

2    page 234 to priority number nineteen.  From three to nineteen,

3    with sixteen in between.  And there the payment of any

4    defaulted hedge termination payments and any accrued interest

5    and any defaulted synthetic termination payments, provided that

6    such payment shall not exceed 30,000 dollars on any coordinated

7    distribution day.

8         So this moves them down to number, it moves us, LBSF,

9    down to number nineteen, and, by the way, it sticks a 30,000

10   limit on it, just to be clear.  And then there are some more

11   below that.  There are only a few more below that, and then you

12   go to 234, that same page, (b) starts the waterfall all over

13   again for principal payments, and it works the same way.  Move

14   from a high priority down to a very low priority.

15        Now, if you go to the next tab after that this is

16   just a summary of the classes of noteholders.  And what happens

17   under this change on the applicable quarterly distribution date

18   is that the waterfall would pour through all those classes of

19   notes, the 150 million Class A-1 Ds, down through all of those

20   before it would reach LBSF, and, pretty obviously, there is

21   almost never any money left over.

22        The complaint alleges, and, I believe, it's

23   undisputed, that the first quarterly distribution date that

24   came up after the bankruptcy was November 6th.  As we just saw

25   it's on the 6th of certain months.  326 million dollars went

1    through the waterfall.  None of it came to LBSF.  At that

2    point, Your Honor, no suit had been filed.  Nothing had been

3    done.  And that money, actually, is not an issue in the present

4    complaint the way it's pleaded.  What happened was February 6th

5    came up, and it became clear coming up to February 6th that

6    there was another 137 million that was about to go over the

7    waterfall.  This cased was filed.  It sought a temporary

8    restraining order.  The trustee came in and filed an

9    interpleader and interpleaded those funds and they are now

10   trapped.

11         The critical point here, Your Honor, for the ipso

12   facto clause, is the operative time for these provisions in

13   these documents is the quarterly distribution dates.  This

14   clause applies on quarterly distribution dates, so the first

15   clause came to apply on November 6th, and that is, literally,

16   water under the bridge, so to speak, and then the second clause

17   came to apply, and would have applied on February 6th, and was

18   stopped.

19         And so under that analysis, Your Honor, we believe

20   it's clear that this, the rights that were specified became

21   property of the estate on October 3rd.  Some of them were

22   diverted on November the 6th.  That's a separate issue.  There

23   are more at issue in this complaint that would have been

24   diverted on February the 6th but for this case and but for the

25   interpleader.

102

1        And that is what the complaint is dealing with, and

2   to sustain our position and to deny the motion to dismiss, all

3   this Court has to find is that there is a plausible case under

4   Section 541 that the property in the registry of the Court is

5   property in which the estate has an interest and which

6   distribution of that property, at this time, which was going to

7   occur five months after the bankruptcy filing, would be

8   pursuant to the provision applying to that quarterly

9   distribution date which we have pleaded is an inner ipso facto

10  clause.

11       And because that's the only issue that's presented

12  here there is the issue of whether commencement of a case of

13  LBHI can be an ipso facto clause, but we think that's clear

14  under the statutory language.

15       Those are the only issues.  We think that the motion

16  to dismiss should be denied with regard to paragraph 32.  I'll

17  be happy to take any questions, Your Honor.

18       THE COURT:  No questions.

19       MR. MILLER:  Thank you, Your Honor.

20       MR. FINK:  Your Honor, I just, again, I'm going to

21  stick to one very quick factual point to clear up.  Mr. Slack

22  responded to the point that I made, which is that there was a

23  million dollars in accrued and owing premiums immediately

24  before the termination date.  I didn't mean to imply, Your

25  Honor, that that was the only amount that would become due over

103

1   time.  There was approximately 1.3 million monthly that came

2   due for premium to Ballyrock.

3          Mr. Slack also suggested that those amounts were

4   netted out in the calculation of the 400 million dollars.

5   That's not true, Your Honor.  There is netting of what's called

6   unpaid amounts, and those are defined in the ISDA master, which

7   is Exhibit A to my declaration, which you have in the materials

8   that Mr. Lacy handed up on page 17.  What the unpaid amount

9   says is that any amount due and owing immediately before the

10  termination due yet netted, but not the stream of payments that

11  would have been due thereafter.

12         THE COURT:  Okay.

13         MR. LACY:  Your Honor, we rely on the terms of the

14  agreement, so I have very little to say.  Obviously the

15  noteholders that bought this paper were not involved in any

16  negotiations with anybody.  All they had to go on when they

17  bought this is what appears in the documents.  No amount of

18  discovery is going to change that.  So the investment decision

19  had to be made based on the written agreements, and to say that

20  we should suspend and have a lot of discovery is not going to

21  advance the ball any.  Discovery is also not going to change

22  the question of whether this falls into the penalty world or

23  whether it falls into the forfeiture world.

24         Penalties, the rule of penalties only applies when

25  the defaulting party is being required to make a payment or, in

1    a few cases, give up a property interest as a result of the

2    default. Nothing like that is happening. There's no

3    conveyance. LBSF is not being asked to give any money to

4    anybody. The provision that says you don't get something that

5    you were expecting under the contract because of the default,

6    that's forfeiture.

7          And Mr. Slack's argument that whenever something is

8    triggered by a default you're in the penalty world is not what

9    the cases are about. The cases are about people working their

10   way through a one year contract and somehow doing something

11   wrong, you know, eleven months into it and getting fired and

12   then being told they don't get anything for the entire year.

13   Its forfeiture is very much about the consequences of default,

14   and what it says is that the parties, their sophisticated

15   parties have agreed on what the consequence of a default is,

16   and it does not fall under the world of liquidated damages,

17   then it is enforced if it's unambiguous.

18         The comments about 7.8(a)(xi) concerning what the

19   market understands, I'm not sure that's true, but it's

20   illuminating because it sheds light on what I referred to as

21   this nomic announcement in that September 18 letter that the

22   issuer had terminated not only the transactions but the master

23   agreement. Perhaps that explains why they said that.

24         The rights of the parties in this case, however, are

25   determined by the written agreement, and it draws a distinction

105

1    between the credit default swap agreement, which is in

2    existence as long as the master agreement is there, and the

3    individual transactions.

4         I think I quoted some language from the argument in

5    the Libra case before, and another one has been handed to me

6    during the argument.  On pages 36 and 37 Mr. Miller said now,

7    you're going to hear in a few moments that ISDA, the

8    International Swap Dealers Association, says, quote, "You know,

9    our agreements don't have any provision to terminate the

10   agreements themselves.  We terminate only transactions."  And

11   that's true.  The agreement does not have a way to terminate

12   itself.

13        And the truth of the matter is the ISDA master

14   agreement has to continue, because it defines rights going on

15   after the agreement is terminated.  I assume that's referring

16   to the transactions.  As I said before, there wouldn't be a

17   case going on if LBSF did not claim a right to a termination

18   payment under the master agreement.  It has to be taking the

19   position that the master agreement is still in effect.

20        The notion that you cannot terminate the master

21   agreement without terminating all of the transactions makes no

22   sense in light of the actual agreement.  Now, I don't have a

23   nice colored chart, so I'd like to refer you back to Section

24   7.8 in the binder with Mr. Fink's declaration.  That is Exhibit

25   F, Section 7.8.  a(xi) is on page 173, okay?  You will remember

1    that there are two circumstances under which you're allowed to

2    terminate the credit default swap agreement.  Well, let's look

3    at that second one.

4         The second way that you're allowed to terminate the

5    credit default swap agreement is if you have entered into a

6    replacement thereto.  Okay?  That implies that agreement

7    contemplates that there will be times when there are

8    transactions outstanding, and you have, therefore, not

9    satisfied clause (a), but you want to enter into a new credit

10   default swap agreement, and this says you can do it if you

11   satisfy the requirements, that is that it satisfies the rating

12   conditions and is a form approved credit default swap

13   agreement.  Okay?  So it is perfectly clear that the agreement

14   contemplates that the credit default swap agreement, that is

15   the master, will be terminated at times when transactions

16   continue.

17        Which gets us to for whose benefit is this written?

18   The notion that this is here for the benefit of Lehman, to gut

19   the termination provisions of the master agreement, which is

20   basically what they're saying.  They're saying this cancels out

21   all the rights to terminate based on Section 5 and 6 of the

22   master agreement.

23        Well, that's not what this is here for.  The reason

24   this is here is to make sure that the master agreement that is

25   in place satisfies the rating conditions.  This is something

1   that makes sure that the rating which Standard & Poor's and

2   Moody's gave to this vehicle, which on the senior notes is AAA,

3   okay, that the assumptions they made when they rated it

4   concerning the terms of the master agreement would continue to

5   be true.  That's what this is here for.  It has nothing to do

6   with preventing people from terminating swaps.

7           Your Honor, in Metavante -- I'll sit down

8   afterwards -- in Metavante you read at some length from the

9   legislative history of the safe harbor, reflecting the

10  importance that the Congress felt, the importance that Congress

11  attached to the ability to swap, terminate swaps if the other

12  side gets into trouble.  To say that this provision takes away

13  the right to terminate in the master agreement is an

14  extraordinary stretch, and it's not supported by the language

15  of the agreement.

16          The final thing I want to say is this.  If you like,

17  we don't think the master agreement was ever terminated.  If it

18  would LBSF feel any better go ahead and issue a judgment saying

19  the master agreement has not been terminated.  It doesn't

20  matter to any issue of any importance.  The transactions have

21  been terminated.  That's what gave rise to the termination

22  payment, and that's what gave rise to the subordination under

23  the waterfall.  I guess I better say a final word to Mr.

24  Miller.

25          If something has happened prepetition which has

1    subordinated a right to periodic payments going forward you

2    don't get to reverse that by going into bankruptcy under

3    Section 540 -- 541, that the subordinated occurred as soon as

4    it was a credit -- it  was a -- what is it called?  A synthetic

5    defaulted security payment.  Whatever that thing is.

6             THE COURT:  I'm not sure that that's what he's

7    saying.  I think I heard him say that the waterfall is

8    effective only on certain dates that are all the sixth date of

9    certain months, one of which is November and one of which is

10   February.  And that because November is later than September in

11   every year, in 2008 November was a payment date, post-petition,

12   as a result of which the waterfall became operative at a time

13   when Lehman had arguable rights that contradicted the

14   disadvantageous treatment of that paragraph.

15            He didn't say it in those words, but that's the

16   meaning I derived.  And if I got it wrong he'll tell me.

17            MR. LACY:  I'm sure that's what he said, but that

18   proves way too much.  That would be true of any obligation that

19   involves a periodic payment.

20            THE COURT:  Absolutely.

21            MR. LACY:  If you had a lease, and there had been

22   some event under the lease, a bankruptcy of a parent, say, that

23   caused the rent to go down by fifty percent, and then a month

24   later the landlord went into bankruptcy, you couldn't say oh, I

25   get to take that back now because the rent gets calculated

109

1    every month.  It's payable every month.  I get to reverse that

2    fifty percent reduction in the rent.  If you had some event

3    that subordinates a note that is providing for periodic

4    payments, and there are notes that provide for periodic

5    payments, they're subordinated to other rights, you can't take

6    that back when you go into bankruptcy.  You get the rights that

7    you had when you went into bankruptcy, and that's the end.

8           I think I've said enough.  Thank you very much, Your

9    Honor.

10          THE COURT:  You probably have, but I have a question.

11          MR. LACY:  Yes?

12          THE COURT:  Before you move into this subject matter,

13   you talked about Section 7.8(a)(xi) as having provisions that

14   were of significance to the rating agencies, Standard & Poor's,

15   Moody's and the like.  First, how do you know that's true?

16          MR. LACY:  Oh.

17          THE COURT:  And, secondly, why is that significant?

18   And, third, is it a subject matter for discovery?

19          MR. LACY:  It's not.  Your Honor, we know that by

20   looking at the definition of rating condition and the

21   definition of form of proof credit default swap agreement.

22   What was defined in terms of the requirements of the rating

23   agencies?

24          THE COURT:  That's only as it relates to xi(B).  Are

25   you suggesting that the rating agencies have no concern with

110

1    respect to (a), which is the only one that I'm concerned with

2    at the moment?

3              MR. LACY:  The --

4              THE COURT:  I'm not trying to confuse you.

5              MR. LACY:  Yes.  I'm sorry.

6              THE COURT:  It just shows you that I'm confused.

7              MR. LACY:  I can tell, from reading the definitions

8    of rating condition and the definition of form approved credit

9    default swap agreement, that that's, that this whole clause has

10   the effect -- the credit default swap agreement itself, the

11   thing dated July 12, okay, that is, itself, a form approved

12   credit default swap agreement.  So that satisfied the rating

13   conditions as well.  And you can find that by looking at the

14   definition.  You don't have to do any discovery.  You can find

15   it in the definitions, okay?  So I know that this is saying as

16   long as there are any transactions outstanding they have to be

17   governed by a master agreement that the rating agencies are

18   happy with.

19             THE COURT:  I understand.  I'm not particularly

20   concerned about that.

21             MR. LACY:  Oh, I'm sorry.  That's all I was trying to

22   say.

23             THE COURT:  Okay.  But what I'm concerned about is

24   a), because it's my understanding, unless I'm misreading this,

25   that you take the position that the ability to terminate the

111

1    credit default swap agreement under the present facts arises

2    under 7.8(a)(xi)(A).

3            MR. LACY:  That's correct.

4            THE COURT:  Because that section, read indirectly,

5    allows for a credit default swap agreement to be terminated

6    provided no transactions are outstanding.  The debtor claims

7    that that is a provision that only applies when all

8    transactions have run off in accordance with their ordinary

9    maturities.

10           MR. LACY:  Right.

11           THE COURT:  And as a result the credit default swap

12   agreement is then an empty shell.

13           MR. LACY:  Right.

14           THE COURT:  You take the position, if I understand it

15   correctly, that upon the unanticipated bankruptcy default --

16           MR. LACY:  Yes.

17           THE COURT: -- of a Lehman entity the counterparty,

18   here the issuer, has the ability to terminate transactions

19   consistent with 560 of the Bankruptcy Code right away --

20           MR. LACY:  Yes.

21           THE COURT: -- which is what was done here.  That that

22   eviscerates the document because there are no transactions that

23   are outstanding, and there is an ability, then, to terminate

24   the credit default swap agreement, notwithstanding the negative

25   covenant of 7.8.  Correct?

112

1          MR. LACY:  Your Honor, all of that is true, but it's

2   very important to keep this is context.  The more important

3   submission is that whether or not the credit default swap

4   agreement can be terminated has nothing to do with this case.

5   The case has to do with whether the transactions could be

6   terminated.  So our basic submission is that there's nothing in

7   here that prevented the termination of the transactions,

8   because that is what gave rise to the termination payment and

9   gave rise to the subordination.

10         So the termination or not, I happen to think it

11  didn't happen.  But if we have an allegation in the complaint

12  that says the credit default swap agreement was terminated.  It

13  shouldn't have been terminated, okay?  I probably wasted too

14  much time addressing the argument, because, ultimately, it's

15  immaterial.  The argument I presented on that point is, as you

16  just said, it was okay to terminate the credit default swap

17  agreement because the transactions had been terminated.

18         But the essential point is it doesn't matter.  The

19  essential point is there's nothing in here that prevents the

20  termination of the transactions.

21         THE COURT:  And it's your position that once the

22  transactions are terminated the waterfall kicks in in a way

23  that subordinates Lehman's right to payment.

24         MR. LACY:  Yes.  And I think the language, and I rely

25  on the language of the agreement rather than anything I can say

113

1    about that.

2              THE COURT:  Okay.  Is there anything more?

3              MR. SLACK:  Just a couple of more things.

4              THE COURT:  Okay.

5              MR. SLACK:  Thank you.  I know we've spoken a lot

6    about the penalty forfeiture distinction, and Mr. Lacy got up

7    and said it's a forfeiture when you don't get anything.  In

8    other words, he says that if you're not giving up money in a

9    liquidated damage analysis it's a forfeiture.  And yet OPM is

10   exactly the case that applies penalty when what they're doing

11   is they're giving up something.  They're giving up future rent.

12   That's what's happening there.  It's exactly opposite what he

13   says is the law.  And I would point out that they don't cite a

14   case, and this is an important distinction.  There's not a case

15   that makes the distinction that they're trying to make here,

16   that Ballyrock and the other defendants are making, about when

17   it's a penalty and when it's a forfeiture.

18             Now, there's been a lot of discussion about 7.8, and

19   the couple of points that I want to make on 7.8, Your Honor,

20   is, number one, Mr. Lacy put in, in his declaration, the

21   termination document.  He relies on it.  I don't know that

22   that's appropriate on a motion to dismiss, particularly on this

23   issue, but, you know, it's here.  We're talking about it.  And

24   there's no question that what it says is they're terminating

25   the transactions, yet every participant in the deal understood

114

1    that to mean that the credit default swap agreement was being

2    terminated, because that's how the market participants, Lehman,

3    the trustee, the CDO, understood that that clause kicked in

4    that we looked at, 7.8, which says you can't terminate the

5    credit default swap agreements.

6         This was a termination of the credit default swap

7    agreement, and what Mr. Lacy never was able to articulate is a

8    situation, under his interpretation, where (a) has any meaning,

9    because under his interpretation anytime you terminate the

10   credit default swap agreement, again, by definition, if you

11   believe that you will have contemporaneously terminated the

12   transactions.  Again, if you look at the definition of credit

13   default swap agreement it includes the schedules and the

14   confirmation.  So it includes the transactions.  And so I

15   would --

16        THE COURT:  But Mr. Slack --

17        MR. SLACK:  I would say that the --

18        THE COURT:  Mr. Slack.  Let me just break in for a

19   second.  He just made a point and sat down.  Just a moment ago.

20   The point that he made was we've spent too much time, even in

21   my own argument, he said, talking about termination about the

22   credit default swap agreement, because that doesn't matter to

23   my case.  What matters to my rights is that the transactions

24   were terminated.

25        MR. SLACK:  Right.

115

1        THE COURT:  And that by virtue of terminating the

2   transactions my client noteholder has a right to payments ahead

3   of Lehman.  How important is it to your case that there is a

4   functional equivalence to termination of transactions and

5   termination of the credit default swap agreement, in your view?

6        MR. SLACK:  I would tell you that it is, it is

7   important, because what we allege here is that on September

8   16th that the credit default swap agreement was terminated.

9   And that is what, when that happens there's a prohibition under

10  7.8 unless there are no transactions.  What our argument is,

11  Your Honor, is that there is a temporal aspect to 7.8 or else

12  it doesn't mean anything.  In other words, that you cannot

13  terminate the transactions and the credit default swap

14  agreement at the same time, because otherwise that's what

15  always would happen and (a) would always be read out.  You'd

16  never have (a).  (a) would be, you may as well just take a blue

17  pencil, if Mr. Lacy's right, and draw a line through (a),

18  because it never has any meaning.

19        What we're suggesting is the only way to give (a) any

20  meaning whatsoever is that the only time it has meaning is if

21  the transactions run off on their own, because in an early

22  termination situation you must terminate all transactions, and

23  that is tantamount in the market, and that's what every

24  participant understood, to terminating the credit default swap

25  agreement.  And because there's an understanding, a meeting of

1    the minds between all the participants that that's what it

2    means, this prohibition kicked in.

3         Now, one point that I didn't make, and I would be

4    remiss if I don't mention it here, not only did the CDO

5    concede, admit that they're the same thing, that there's a

6    functional equivalence, but we plead in our complaint that they

7    actually went out and tried to get a replacement and rejected

8    it because it wasn't a good enough deal for them.

9         Well, they obviously knew they had this obligation

10   and did it anyhow.  Now, that's what we pled.  And we're

11   entitled, I think, to develop that during discovery, because

12   why in the world are they going out trying to get a

13   replacement, you look at 7.8, if they didn't have to?  If they

14   could have just terminated without doing this I'm not sure why

15   they would have gone out.  Now, that's the subject of

16   discovery.  We pled that that shows that they understood,

17   consistent with their admissions, that 7.8 actually applies.

18   But we'll take discovery on that at some point and we'll figure

19   that out.

20        MR. SPEAKER:  Your Honor, Mr. Miller, I think,

21   doesn't have anymore, so we have nothing more, I think.

22        THE COURT:  Silence?

23        MR. LACY:  Your Honor, since Mr. Slack did, in fact,

24   make a new point just now, Mr. Miller, during the -- this is

25   Libra, right?

117

1          MR. SPEAKER:  Libra.

2          MR. LACY:  During the Libra argument explained

3    something important, which I'd like to remind the Court about.

4    These deals have a thing called a reinvestment period.  During

5    the reinvestment period, if one investment ends the vehicle has

6    the option of going and making a new investment.  One of the

7    kinds of investments it can make is a credit default swap.

8    Part of the argument in Libra had to do with the fact that in

9    that deal the reinvestment period had ended, so that when the

10   transactions were terminated there was no possibility there was

11   no possibility there were going to be anymore transactions or

12   anymore master agreement.

13          In this deal the reinvestment period is a defined

14   term, and you'll see it runs until 2011.  So the reinvestment

15   period was still in place at the time, last September, and if

16   you want to know why they were looking around for a new swap

17   agreement it's because they had the option to actually go into

18   an entirely new credit default swap as an investment.  Thank

19   you, Your Honor.

20          THE COURT:  Okay.  I think I'm going to do the same

21   thing with Ballyrock that I did with Harrier, in that I'm going

22   to take it under advisement.  This is incredibly complicated,

23   even though everybody stands up and says that it's really

24   simple.  There are a variety of characterization issues that I

25   need to consider, and I'm going to want to review, again, the

118

1    presentations that were made and the authorities provided.

2         It also occurs to me that for reasons that are

3    similar to the reasons expressed at the end of the Harrier

4    argument there is an overlap in legal issues in this case, in

5    the Libra case, in the Harrier case and other cases that are

6    pending before me.  And I am conscious of the fact that anyone

7    ruling in any of these cases no doubt will have an impact upon

8    others.  So for the time being I'm just going to take this

9    under advisement and think about it some more.  We're adjourned

10   until the next omnibus hearing.

11        (Proceedings concluded at 5:34 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

Sharona Shapiro

AAERT Certified Electronic Transcriber (CET**D-492)

Also transcribed by:    Penina Wolicki

Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:   September 21, 2009