**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., | ) | Case No. 08-13555(JMP) |
| | ) | |
| Debtor | ) | |
| | ) | |
| In re | ) | |
| | ) | Case No. 08-01420 (JMP)(SIPA) |
| LEHMAN BROTHERS, INC., | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| LAWRENCE FOGARAZZO and CAROLYN | ) | |
| FOGARAZZO, Joint Tenants With Rights of | ) | ADVERSARY COMPLAINT |
| Survivorship, STEPHEN L. HOPKINS, AND | ) | |
| DON ENGEL on behalf of themselves, and all | ) | ADV. PRO. 09-_____(JMP) |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against - | ) | |
| | ) | |
| LEHMAN BROTHERS, INC. | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

Plaintiffs, individually and on behalf of all other persons similarly situated, by their

undersigned attorneys, for their complaint, allege upon personal knowledge as to themselves and

their own acts and upon information and belief as to all other matters, based upon the

investigation made by and through their attorneys, which investigation included a review of

analyst reports published and disseminated to the investing public by Defendant Lehman

Brothers Inc. ("Lehman") on RSL Communications, Inc. ("RSL" or the "Company"), and recent

public filings and related documents from the United States Securities and Exchange

Commission ("SEC") and the States of New York, Alabama, and Utah, attacking the

independence and accuracy of research reports issued by Defendant, as well as additional

publicly available information:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding pursuant to §27 of the

Exchange Act, 15 U.S.C. §78aa,  and 28 U.S.C. §§ 157, 1331, 1334, and 1337.

2.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

3.      The claims asserted below arise under §§10(b) and 20(a) of the Exchange Act,

15 U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and

Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

4.      In connection with the acts, conduct and other wrongs alleged herein, Defendants,

directly and indirectly, used the means and instrumentalities of interstate commerce, including

the United States mails, interstate telephonic communications and the facilities of the national

securities exchanges.

## NATURE OF ACTION

5.      This is a securities class action brought on behalf of public investors who

purchased the common stock of RSL during the period from April 30, 1999 through and

including December 29, 2000 (the "Class Period").  Defendant is charged with violations of

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5

promulgated thereunder.[1]

6.      During the Class Period, Defendant issued to the investing public false and

misleading analyst reports on RSL as part of its bids to win or maintain lucrative banking and

financial advisory work from the Company.

7.      As a result of Defendant's false and misleading statements, the market price of

RSL common stock was artificially inflated throughout the Class Period, to the injury of

Plaintiffs and the other Class members who purchased RSL stock at that time, relying upon the

integrity of the market price of the stock.

8.      On or about April 28, 2003, in connection with the settlement of charges filed

against the Defendant, the SEC and the Attorneys General of various states, including New

York, Alabama, and Utah (who were litigation task force leaders), found that the Defendant had

---

[1]On November 14, 2003, the Plaintiffs filed a Consolidated Amended Class Action
Complaint ("Consolidated Complaint") against Defendant Lehman Brothers, as well as,
Goldman Sachs & Co., and Morgan Stanley & Co., Inc., *Fogarazzo, et al. v. Lehman Bros., et
al.*, No. 03 CV 5194 (SAS) (S.D.N.Y.). The Consolidated Complaint makes materially the same
allegations as those made in the Complaint herein. On May 21, 2004, the district court denied
defendants' motions to dismiss plaintiffs' complaint containing claims arising under § 10(b) of
the Securities Exchange Act of 1934. *Fogarazzo v. Lehman Bros., Inc.*, 341 F.Supp.2d 274
(S.D.N.Y. 2004). On July 9, 2004, the district court also denied defendant Morgan Stanley's
application to certify an interlocutory order for immediate appeal of the May 21 Order.
*Fogarazzo v. Lehman Bros., Inc.*, 2004 WL 1555136 (S.D.N.Y. July 9, 2004). On February 10,
2005, the district court denied defendants' application for leave to file a motion for judgment on
the pleadings, rejecting defendants' contention that plaintiffs did not plead loss causation. On
November 11, 2004, Plaintiffs filed their original motion for class certification, which motion
was granted by the district court on July 27, 2005. On December 22, 2005, the Second Circuit
Court of Appeals ordered that the district court's class certification decision be held in abeyance
pending the decision in *Miles v. Merrill Lynch & Co.*, 04-8026 (2d Cir. June 30, 2005), but
specifically denied defendants' 23(f) petition to appeal the district court's application of the
*Affiliated Ute* presumption. On remand, on August 4, 2009, the district court, granted plaintiffs'
renewed motion for class certification.

failed, during the Class Period, to adopt sufficient procedures and processes to ensure that the interaction between its research analysts and investment bankers and/or covered companies did not expose analysts to economic pressures or influences from the affected investment banking personnel or covered companies, and had violated several rules of the NASD and NYSE by issuing false and misleading analyst reports on numerous companies, including RSL, as a result of analysts having had conflicts of interest.  The SEC complaints charged the Defendant with violating numerous rules of conduct of the NASD and NYSE, by issuing false and misleading analyst reports on numerous companies, including RSL.  The complaint describes the influence and control exerted by Defendant's investment bankers on its supposedly independent research analysts in order to obtain lucrative investment banking opportunities from covered companies, including RSL, details how positive ratings and research reports on RSL and numerous other companies issued by the Defendant to the public were contrary to the Defendant's more negative assessments of the true value and prospects of such companies, and asserts that such ratings and reports contributed to the inflation of the stock prices of such companies, including RSL, during the Class Period.

## THE PARTIES

### Plaintiffs

9.    Plaintiffs, Lawrence and Carolyn Fogarazzo, Stephen L. Hopkins, and Don Engel all purchased shares of RSL common stock during the Class Period as set forth in the accompanying certifications, and have been damaged as a result of the Defendant's misconduct as described herein.

### Defendants

10.     Defendant Lehman was during the class period, a global investment bank serving institutional, corporate, government and individual clients.  Lehman was also a broker- dealer registered with the SEC and was a member of all principal securities and commodities exchanges, including the NYSE and NASD.  Lehman's businesses included securities underwriting, sales and trading, investment banking, private equity, financial advisory services, investment research, venture capital, correspondent brokerage services, and asset management. During the class period, Lehman maintained its corporate headquarters at 745 Seventh Avenue, New York, New York.

## CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this action as a class action pursuant to Rules 7023 (a) and (b) (3) of the Federal Rules of Bankruptcy and Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates inclusive (the "Class").  Excluded from the Class are the Defendant, members of the Defendant's employees' immediate family, as well as their officers, directors, subsidiaries or affiliates, and any entity in which any excluded person has a controlling interest, and legal representatives, heirs, successors or assigns of any of the foregoing.

12.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class who purchased RSL common stock during the Class Period.

13.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Defendant engaged in acts or conduct in violation of the federal securities laws as alleged herein;

- whether the Defendant participated in and pursued the common course of conduct complained of herein;

- whether the Defendant issued false and misleading statements during the Class Period;

- whether the market prices of the Company's common stock during the Class Period was artificially inflated because of the Defendant's conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

14.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and the other members of the Class sustained damages arising out of the Defendant's wrongful conduct in violation of federal law as complained herein.

15.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class, and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

16.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

17.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendant made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations made were material;

- the common stock of the Company traded on the NASDAQ National Market System, an efficient market;

- the market reacted to public information disseminated by Defendant;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and,

- Plaintiffs and the other members of the Class purchased their Company stock between the time the Defendant failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

18.    Based upon the foregoing, Plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

## LEHMAN'S FRAUDULENT SCHEME

### Background

19.    Lehman was a global investment bank providing financial advisory, capital markets and underwriting services, among other services, to its clients.  During the Class Period, Lehman's investment banking department ("Investment Banking"), among other activities, engaged in securities offerings, including initial public offerings ("IPOs"), secondary offerings and debt financings, and provided merger and acquisition and other advisory services for its clients.

**The Investment Banking Function at Lehman**

20.    During the Class Period, Lehman competed vigorously with other investment banks to be selected as the lead manager, underwriter and/or placement agent for securities offerings, because of the financial rewards associated with those roles.  In addition, Lehman hoped to gain ongoing transactional and advisory work from existing and potential clients, including secondary offerings and financial advisory arrangements.  In 2001, Lehman served as lead manager, underwriter, and/or placement agent for sixty-six equity deals, and earned approximately $ 1.3 billion from underwriting services.

**Lehman's Global Equity Research and Public Dissemination of Reports**

21.    During the Class Period, Lehman's Equity Research Department ("Research") employed up to 600 employees, including approximately 100 senior research analysts and 200 junior research analysts.  Additionally, during 2001, Research covered approximately 80 industries and approximately 900 U.S. companies.  Senior research analysts in the United States reported to the Director of U.S. Equity Research, who reported to the Managing Director of Global Equity Research.

22.    Research analysts collected financial and other information about a company and its industry, analyzed that information, and developed recommendations and ratings regarding a company's securities.  In addition, research analysts also examined the financial condition of

-8-

selected publicly traded companies that were believed to be of potential investment value.
Lehman claimed that its analysts made evaluations of companies' anticipated earnings, revenue
and cash flow, operating and financial strengths and weaknesses, and long term viability and
dividend potential. During the Class Period, Lehman analysts produced and compiled written
research materials including research reports and First Call notes regarding companies and
industry sectors.

23.    Lehman's research was distributed to both institutional clients and retail
investors. Lehman distributed its research product directly to its own client base, consisting of
institutional investors and high net worth individual retail investors. In June 1999, Lehman
entered into a "strategic alliance" with Fidelity Investments. Among other things, the "strategic
alliance" provided Fidelity's retail customers with access to Lehman research. Lehman also sold
its research products to other broker-dealers that in turn provided the research to their retail
costumers. Lehman also made its research available to the public through services such as
Thomson Financial/First Call and Multex.com, Inc. Ratings of Lehman's analysts were freely
and publicly available through a number of print and electronic media outlets. Lehman analysts
appeared regularly in the financial press, and the substance of their reports were widely reported
in the media.

24.    Appearing at the top of its research reports that were devoted to specific stocks,
Lehman assigned a "rank" according to a 5-point scale reflecting how the analyst believed the
stock would perform relative to the market generally. During the Class Period, Research used
the following ratings: 1- Buy (expected to outperforms the market by 15 or more percentage
points), 2 - Outperform (expected to outperform the market by 5-15 percentage points), 3 -
Neutral (expected to perform in line with the market, plus or minus 5 percentage points), 4 -

Underperform (expected to underperform the market by 15 or more percentages points), and 5 - Sell.  The definitions for these ratings were provided to Lehman clients on a monthly basis.

25.     Although Lehman purported to rank stocks according to a 5-point scale, in fact, during the Class Period, Lehman analysts never assigned a "5- Sell" rating to a domestic company and almost never assigned a "4-Underperform" rating to a stock.

26.     Lehman's research reports also assigned to the stock a price target designed to reflect the price at which the analyst believed the stock would trade within a time period that was identified in some reports and unidentified in others.

27.     Lehman held out its research analysts as providing independent recommendations and analyses of companies and stocks upon which investors could rely to reach investment decisions.  Lehman promoted its research for the "quality and timeliness of its investment recommendations."

28.     In fact, Lehman's research analysts were subjected to conflicts of interest arising from the close relationship between Research and Investment Banking.  Such conflicts of interest adversely impacted the independence of Lehman's public stock recommendations.

29.     Analysts worked closely with members of Investment Banking and other departments to generate business for Lehman.  Analysts often worked with Investment Banking to identify and win corporate finance business for Lehman, including secondary offerings or debt finances.  To this end, analysts were expected to have target and alignment meetings with their Investment Banking counterparts on a periodic basis.

30.     Lehman aligned its analysts with an Investment Banking team.  Analysts' responsibilities included providing research to their Investment Banking counterparts so that the

bankers could leverage the research product in order to create and/or maintain investment

banking business relationships with a company.

31.      Recognizing the strategic importance of this alignment, on August 5, 1999,

Lehman's Managing Director of Global Equity Research circulated a memorandum to Global

Research Directors (the "August 5 Memorandum"), which detailed key areas of "strategic

importance."  The memorandum concluded that in order for Lehman to be more profitable,

Investment Banking and Research should work together to increase Lehman's number of equity

originations, stating:

> Investment Banking Partnership- This is a key challenge for not only
> research but the entire global equities businesses.  Increasing our
> equity origination will be one of the most important accomplishments
> of the firm.  One of the most significant ways we will increase the
> equity division's total revenue to more than $ 2 billion is by
> substantially increasing origination.

32.      The August 5 Memorandum also set forth the "paradigm" for Lehman's

investment banking relationships:

> the analyst is THE key driver of the firm relationship with its
> corporate client base.  Analysts need to accept responsibility and use
> it to expand the franchise and DRIVE PROFITABILITY EVERY
> DAY BUT IN A WAY THAT IS CONSISTENT WITH BUILDING
> A LONG TERM FRANCHISE

(Emphases in original).

33.      The August 5 Memorandum emphasized the research analyst's role in identifying

potential banking business for Lehman, stating: "global research must drive the banking

targeting efforts, consistent with the new paradigm."  The August 5 memorandum stated further:

"to ensure we have proper recognition of analysts' impact on banking, we have to closely track

every dollar of IBD revenue (equity, M&A, debt ) by analyst."

-11-

34.     On September 14, 1999, the Managing Director of Global Equity Research again emphasized the importance of the Investment Banking/Research partnership in a memo directed to Coverage Analysts.  Coverage Analysts were provided with an attachment, dated September 13, 1999, entitled "1 + 1= $" (the September 13 Attachment), that emphasized that the successful partnership of Research and Investment Banking was key to Lehman's growth as a firm.

35.     The September 13 Attachment explained numerous ways in which Lehman's Research and Investment Banking divisions could benefit each other, and stated that "seamless Banking/Research coverage" was critical to all Investment Banking products.  The attachment also contained a chart, entitled "Secret to Success– Lehman Wins Business When Banking And Research are Aligned." The September 13 Attachment explained that the Research /Investment Banking partnership at Lehman would be institutionalized through executive committee support, targeting and alignment, full partnership accountability between bankers and research analysts, and reinforced through compensation.

36.     The September 13 Attachment also revealed that Lehman's investment bankers and research analysts would be required to complete performance reviews of each other. Bankers would evaluate research analysts on, among other things "the extent to which the analysts places origination as [a] priority," and "adds value in building banking business," and the analyst's "effectiveness in the pitching process."

37.     Finally, the September 13 Attachment revealed that Lehman reinforced the partnership of Research and Banking through compensation.  Analyst compensation would be "impacted by contribution to banking" and "reviewed with appropriate banking group heads." The primary criterion in evaluating analyst compensation was the analysts' contribution to Lehman's investment banking revenue.

-12-

38.    As part of the relationship between Investment Banking and Research, analysts

met or communicated with their Investment Banking counterparts several times a week , or even

daily.  These communications included analysts identifying banking opportunities for Lehman.

For example, on July 7, 2000, one senior analyst sent the following email to Investment Bankers:

> FYI, I have recently come across several great companies in the
> wireless data services industry, an incredible sector for most
> technology inventors....  In my view, we as a firm (tech & telecom)
> should get all over this sector ...   I think we should be very
> coordinated in attacking this banking windfall.

39.    Investment bankers pressured analysts to issue positive research coverage on a

company to help Lehman win banking business.  Lehman's investment bankers understood that

if Lehman's research department would cover a potential banking client, Lehman's chances to

obtain banking business from that client would be greatly strengthened.  For example, on

October 4, 2000, a banker sent the following email to an analyst :

> Spoke with [a Worlstor employee] over at Worlstor.  Here's the
> scoop and what we need to do.  They are meeting with other bankers
> over the next 4 days...  They like [Salomon] because of their research
> report.  Action plan for us includes ...  We need to say [Lehman's
> analyst] is publishing a big storage ssp report and we would like to
> make Worlstor the feature of the report like Solly did MSI and
> Storagenetworks...
>
> [Analyst] you need to call (the CEO) and the CFO at least 3 times
> between now and the Board meeting ...  The message is we luv you
> and have been waiting for you.  [Analyst] your call and enthusiasm
> is key.

(Emphasis added).

40.    Another banker wrote the following email to investment bankers and analysts on

June 29, 2000:

> Our competition on the CPQ debt deal is likely the following... Given
> their stock price action after today's downgrade by [SSB], we are the

highest equity recommendation.  The bottom line is that they need a
very strong story around their credit and we, with [analyst] are in the
best position to deliver."

41.    Investment bankers also routinely reviewed drafts of analysts' research reports

before publication in order to insure that the reports were aimed at generating investment

banking revenue from the company.

### Lehman Gave Its Analysts Financial Incentives To
### Use Research To Generate Investment Banking Revenue

42.    Lehman tied the compensation of senior research analysts to the amount of

Investment Banking revenue the analyst helped to generate.  Typically, Lehman analysts

received relatively small base salaries and considerably larger bonuses.  Bonuses were

determined by, in large part, the amount of investment banking revenue generated by companies

the analysts covered.  The bonuses Lehman paid to analysts dwarfed their base salaries and gave

the analysts a strong personal financial incentive to obtain investment banking business, which

created conflicts of interest for the analysts.

### Analyst Employment Contracts Tied
### Bonuses Directly To Investment Banking Revenue

43.    Some of Lehman's approximately 100 senior research analysts had employment

contracts that linked their bonuses directly to the amount of investment banking revenue they

generated.  Depending on the contract, the analyst's entire bonus or an additional Investment

Banking Department ("IBD") bonus was paid based on the aggregate IBD net revenues and fees

generated by companies covered by the analyst, or by companies where the analyst significantly

contributed to the investment banking business.

44.    For example, one analyst contract provided for an annual salary of $200,000, and

a minimum bonus of $ 4.8 million.  The minimum bonus could increase in $1 million

increments, based on the Aggregate IBD Net Revenues and Fees for the performance year, as

follows:

| Minimum Bonus | Aggregate IBD Net Revenues and Fees |
|---|---|
| $ 4.8 Million | Less than $50 million |
| $ 5.8 million | At least $ 50 million but less than $75 million |
| $ 6.8 million | At least $75 million but less than $100 million |
| $ 7.8 million | At least $ 100 million but less than $125 million |
| $ 8.8 million | $125 million or more |

Aggregate IBD Net Revenues and Fees were defined as revenues and fees booked or received by

Lehman from companies covered by the analyst or from companies whose award of business to

Lehman was attributed to the analyst's "significant contribution."

45.    Another analyst's contract provided for the payment of a yearly salary of

$200,000, a minimum bonus of $3.3 million, and an additional bonus equal to 5% of Investment

Banking revenues and fees generated by companies covered by the analyst or companies where

the analyst substantially contributed to the award of investment banking business.

**Lehman Compensated Other Analysts Based
On Their Contribution To Investment Banking Revenue**

46.    Analysts who did not have specific clauses in their contracts related to investment

banking revenue were nevertheless compensated financially if companies they covered generated

Investment Banking revenue.

47.    As an example of these interrelationships, a Lehman analyst had described that he

had arranged a meeting between Lehman analysts, Lehman investment bankers, and a large blue

chip company.  The analyst explained that his relationship with the company resulted in
Investment Banking receiving ten potential projects for the company.  The Director of U.S.
Equity Research congratulated the analyst, stating: "well done, we need senior bankers to see
who (the analysts) have the real relationships with the big companies.  This is how we justify big
comp. packages." (emphasis added).

48.    Also, Lehman monitored the investment banking revenue that analysts generated.
For example, Lehman's "Performance Reviews" kept track of the investment banking and
trading revenue attributable to each senior analyst.  Senior analysts were shown Performance
Reviews during their compensation evaluations.

49.    For each analyst, Investment Banking also generated a spreadsheet known as a
"Project Review" that identified Investment Banking projects with revenue booked for the year
and projects expected to generate revenue in the next year.  The Director of U.S. Equity
Research used the Project Reviews in conducting both mid-year and year-end evaluations for
senior analysts.

50.    Senior analysts also frequently provided lists of the Investment Banking deals
they had worked on during the year to the Director of U.S. Equity Research, in connection with
the consideration of their year-end bonuses.  For example, in December 1999, one senior analyst
(who did not have an Investment Banking revenue clause in his contract) wrote in an email to the
Director of U.S. Equity Research that his research accomplishments and banking revenue were
relevant to his compensation.  In describing his research accomplishments, the analyst noted that
he had written frequently on a company, and that the company had raised $430 million in equity
and high yield financing through Lehman.  The analyst noted that he had written frequently

about another company and, as a result, Lehman had a "good shot" at leading an upcoming

equity deal.  With respect to banking revenue from RSL, the analyst wrote:

> I believe the revenues generated by my universe generated at least
> as much as other research universes, excluding the Delta Three
> IPO (which RSL's CEO will tell I (sic) was a key part of why LB
> won the books [Delta Three was covered by another analyst] and
> for which I believe I should get credit.

51.    One Senior analyst sent an email, on February 9, 2000, to Lehman's Managing

Director of Global Research and the Director of U.S. Equity Research, requesting a promotion to

vice president.  In support of his request, the analyst emphasized that his estimated investment

banking revenue for the year 2000 was greater than $5 million, and added that "1999 Banking

Revenue [of] $1.2M solely [was]due to research relationship."

52.    In addition, senior analysts were required to complete "business plans" each year.

The business plans included an entire section devoted to banking and required analysts to

identify their banking initiatives for the coming year.  The business plans required senior

analysts to report:

- their plan to add stocks to coverage for either sales and trading and/or banking;

- whether Research/Banking targets and alignment discussions were reflected in the

  business plan; and

- whether analysts had completed the selection of "franchise and super league

  clients" with their bankers.

53.    Investment Bankers participated in analyst evaluations by providing written

comments on a form titled "Year End Performance Review for Analysts (to be completed by

Bankers)" to the heads of Research.  Bankers were asked to evaluate:

- Whether the analyst places origination as a priority;

• The analyst's contribution toward building relationships with clients in the sector;

• The analyst's effectiveness in the pitching process;

• The quality of the analyst's reputation with banking clients; and

• The analyst's level of initiative in providing the banker with value-added ideas for banking clients.

54.     One senior analyst's review stated that the analyst "cares a great deal about competing for business and winning."  Another senior analyst's review stated "strong originator/rainmaker," "strong pitchman" and "very supportive of banking effort; coordinate with banking team on targeting major clients."

55.     Analysts were criticized if they failed to work closely with Investment Banking. For example, in one instance, a senior analyst was criticized for not having had more frequent contact with her Investment Banking counterpart.

56.     One analyst sent a memorandum, dated December 22, 1999, to the Managing Director of Global Equity Research and the Director of U.S. Equity Research, stating that he was "surprised" by the review he received from an investment banker (the "December 22 Memorandum").  As a result, Lehman required the analyst to meet with the investment banker in order to receive "feedback" and "improve the relationship between research and investment banking".

57.     The analyst described this meeting with the banker, in the December 22 Memorandum, stating:

> [banker] has concluded, after seeing me for 2-3 months (based on two pitches and other feedback) that I may not have the capabilities to be a "banking analyst", i.e., telling companies what they want to hear and not what I think!"...

58.     The analyst also commented that the bankers told him "that the analysts need to be available at extremely short notice to assist in pitch meetings."  The analyst defended himself, in part, by commenting that he spent an "inordinate" amount of time on banking prospects.

**Lehman Used The Promise Of Future Research Coverage
To Obtain Investment Banking Business From Companies**

59.     Lehman's marketing efforts aimed at companies included assurances that its research would be favorable and, thus, raise the price of the company's stock.

60.     Lehman competed with other investment banks for selection as lead underwriter for securities offerings, including IPOs, as well as secondary and debt offerings.  As part of this competition, Lehman met with companies to present its qualifications.  Research analysts attended these meetings, referred to as "pitch" meetings, with members of Investment Banking in an effort to win investment banking business for Lehman.  At these meetings, Lehman research analysts typically advised companies how best to position and market the company's "story" to investors.

61.     At such meetings, Lehman often presented companies with marketing materials known as pitchbooks that touted Lehman's underwriting qualifications.  The pitchbooks typically featured the Lehman analyst who would be covering the company after a banking transaction, and stated that the analyst would issue research on the company as soon as the "quiet period" (a period of time after an offering during which the underwriting firms cannot publish research) ended.  The pitchbooks often provided examples of favorable research reports by an analyst, and how such favorable reports resulted in a company's stock price being raised.

62.     The pitchbooks often featured the role that the analyst would play in marketing the offering.  Some pitchbooks listed research as a key part of Lehman's underwriting services

and, in one case, stated that the "[analyst] will lead a powerful marketing campaign." Other pitchbooks described the analyst as the "axe" in the industry, and provided numerous examples of how the analyst's positive coverage had positively impacted a company's stock price.

63.    Lehman's initiation of research coverage of a company was often tied to Investment Banking fees from the covered company. For example, in February 2000, Lehman bankers questioned a delay in initiating Lehman's coverage of Curagen Corporation, following Lehman's participation in a convertible bond offering by Curagen. The analyst had explained he needed more time and more meetings with the company before issuing a report. The bankers then questioned the delay in an email to the Director of U.S. Equity Research, who responded that the analyst was doing a great job given his many responsibilities, and asked the bankers:

> [W]hen did we decide to promise equity research for a small convertible bond deal. What were the economics & how much did we make.

One of the bankers responded to the question, stating:

> We made $1.5m in banking and Lehman made $12m as of last Thursday. The real question is could we just put a note out that would satisfy the company and get us in the next deal.

64.    On another occasion, the Director of U.S. Equity Research received inquiries from Lehman employees on behalf of officers of public companies seeking to have Lehman initiate research coverage of their company. The Director of U.S. Equity Research responded by directing such inquiries to Investment Banking. For example, in February 2000, the Director of U.S. Equity Research advised a Lehman employee in an email:

> The proper process is to introduce the principals to someone in investment banking. If we have the resources and there appears to be significant revenue potential, banking will request research.

-20-

65.    Similarly, in October 1999, the Director of U.S. Equity Research advised another

Lehman employee in an email:

> doing business is not enough, we need to do a lot of business to
> commit resources.  Finally, you should find a contact in banking to
> channel these requests as well.

66.    In another email in March 2000, an analyst explained to his product manager his

reason for initiating coverage on a stock listed only in Mexico that will be of "little interest to

our US institutional salesforce."  The analyst wrote:

> The reason for coverage is there is a potential banking deal (big $$$)
> we're trying to get later this year.  The bankers just want the report
> out.  They don't care about promoting the stock and realize it is of
> little interest to my client base.

**Conflicts of Interest Resulted in the Publication
of Exaggerated or Unwarranted Research.**

67.    The relationship between Investment Banking and Research as alleged herein

created conflicts of interest for Lehman's research analysts.  The financial incentives and

pressure exerted on analysts to assist in obtaining investment banking deals and to maintain

banking relationships adversely affected the integrity of the analysts' ratings, price targets, and

research reports.  These conflicts of interest caused Lehman analysts to issue more positive

research reports or ratings than were warranted by the financial data, and to avoid downgrades or

negative reports regarding companies that were Lehman investment banking clients, such as

RSL.

68.    In doing so, Lehman analysts were driven not by their assessment of the inherent

value of companies, including RSL, but rather the opportunity for Lehman to earn lucrative

investment banking fees.  As noted in a complaint filed by the SEC:

Lehman used research to obtain investment banking business from covered companies. Specifically, Lehman tied the financial compensation of analysts directly and indirectly to the analyst's success in generating investment banking revenue from covered companies. In addition, Lehman also used the promise of future research coverage to obtain valuable underwriting business and marketed to companies the ability of Lehman analysts to move the market for a stock. Lehman analysts were subject to conflicts of interest that, at times, adversely impacted the independence of Lehman's research product.

In certain instances, the financial incentives and pressure on analysts to assist in obtaining investment banking deals and to maintain banking relationships adversely affected the integrity of the analysts' ratings, price targets, and research reports, and caused analysts to issue more positive reports or ratings, and to avoid downgrades or negative reports regarding companies that were investment banking clients.

### Lehman's Banking Business with RSL

69.    Lehman had substantial Investment Banking relationships with RSL. Lehman was lead or joint-lead underwriter or placement agent in the Company's various public offerings from 1997 through 2000 (which yielded in excess of $64 million in total investment banking fees), including but not limited to: (a) the RSL IPO, in late 1997; (b) a high yield note placement by RSL, in December 1998; (c) RSL's deltathree.com, Inc. ("Delta 3") spin-off IPO, dated September 3, 1999, for which Lehman was lead underwriter and received approximately $5 million in fees, commissions, and other compensation; (d) the February 2000 issuance of $200 million in 12 7/8% Senior Notes due 2010 (aggregate commissions amounting to approximately $5.0 million shared by three placement agents, including Lehman), for which Lehman was lead or co-lead placement agent; (e) the February 2000 issuance of $115 million aggregate liquidation preference of 7 ½% Series A preferred shares (aggregate commissions amounting to approximately $4.0 million shared by three placement agents), for which Lehman was lead or

-22-

co-lead placement agent and Lehman exercised its over-allotment option with respect to an

additional $15 million aggregate liquidation preference of Series A preferred shares; and (f)

RSL's Consent Solicitation Statement, dated on or about September 13, 1999, to certain of

RSL's note holders, for which Lehman served as Solicitation Agent and received $750,000 in

compensation.  On at least three occasions during 1999-2000, the Lehman analysts covering RSL

upgraded or were "held off" from downgrading analyses of RSL for "banking reasons, "

including the investment banking business mentioned above.  Further, in an August 11, 2000

internal email written by a Lehman analyst confirms that the telecom industry is in a "mess" and

they need to be given the freedom from banking to downgrade the RSL stock.

### Lehman's False and Misleading Statements During the Class Period

70.    On May 3, 1999, RSL announced its plans to spin-off its Delta 3 subsidiary and

offer Delta 3 common stock to the public in an IPO.  On September 3, 1999, RSL filed its

registration statement for the Delta 3 IPO.

71.    On April 30, 1999, Lehman analysts had issued a Strong Buy rating (its then

highest rating) for RSL shares, citing the importance of the Delta 3 IPO to the valuation of RSL

shares.  In response to this report, RSL stock rose approximately $1 per share.

72.    On May 21, 1999, Lehman analysts reiterated the Strong Buy rating for RSL,

emphasizing that RSL shares were "real cheap." In response to this report, the price of RSL's

shares rose approximately $3 per share.

73.    After having met with RSL's management, Lehman analysts, on July 9, 1999,

issued yet another bullish report on RSL containing a 1-Buy rating (its then highest rating) for

RSL shares.  In response to this report, the price of RSL's shares rose approximately $2 per

share.

74.     On September 3, 1999, RSL filed a registration statement with the SEC for the

Delta 3 IPO, for which Lehman was appointed lead underwriter and received approximately $5

million in fees, commissions, and other compensation.

75.     The analyst ratings and reports concerning RSL referred to in paragraphs 71, 72,

and 73 herein were false and misleading because Lehman knew or recklessly disregarded and

failed to disclose that:

      i.      it regularly used analyst research to obtain and/or maintain lucrative

investment banking business from companies it covered, including RSL;

      ii.      it caused the analyst covering RSL to upgrade or not downgrade his

research reports and/or ratings of RSL for "banking reasons, " including

but not limited to the fact that Lehman: (a) sought and won the lead

underwriter position for RSL's IPOs, including the lucrative Delta 3 IPO

spin-off; (b) sought and won the lucrative lead placement agent position for

RSL's issuance of Senior Notes and Series A preferred shares and

exercised its over-allotment options for the preferred shares; and (c) sought

and won the lucrative solicitation agent position, in connection with RSL's

Consent Solicitation Statement;

      iii.      its analysts were subject to financial conflicts of interest that adversely

impacted the independence of Lehman's research product, including

analyst ratings, reports, and price targets concerning RSL;

      iv.      it failed to adequately supervise its analysts and protect the objectivity of

its published research;

-24-

      v.      as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

76.      On September 7, 1999, with RSL trading at $20 3/16 per share, Lehman analysts resumed its 1-Buy rating (its then highest stock rating) for RSL shares and evaluated RSL's break-up value as exceeding $40 per share. Additionally, the analyst cited RSL's Delta 3 IPO as "pure upside to our valuation" of RSL. Documents reveal that RSL, based on conversations with analysts, in fact, thought little about Delta 3's long-term prospects after the IPO had been successfully sold to investors. On November 1, 1999, Lehman analysts reiterated their 1-Buy rating with a price target of $40 per share for RSL shares and, as a result, RSL shares rose approximately $3 per share.

77.      The analyst ratings and reports concerning RSL referred to in the preceding paragraph herein were false and misleading because Lehman knew or recklessly disregarded and failed to disclose that:

      i.      it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

      ii.      it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) sought and won the lead underwriter position for RSL's IPOs, including the lucrative Delta 3 IPO spin-off; (b) sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Series A preferred shares and

exercised its over-allotment options for the preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

iii.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

iv.    it failed to adequately supervise its analysts and protect the objectivity of its published research;

v.    as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

78.    In February 2000, with RSL trading at $17 per share, the Lehman analyst drafted but did not a issue a new report on RSL in which he lowered his revenue projections for RSL but, nonetheless, maintained a bullish price target of $35 per share.  The first sentence of the text of the draft report read: "we are revising our Revenue and EBITDA estimates for RSL to reflect declining revenue from U.S. prepaid and wholesale and more moderate ramp in European retail revenue."  Based on his prior experience, the analyst knew that his attempt to express his more negative view of RSL would be resisted by Lehman's Investment Banking division.  On February 24, 2000, the analyst sent an email to his supervisor, captioned "RSL Note - Bankers are going to resist," in which he enclosed his draft report, and stated:

> Below is a draft of a note lowering our numbers on RSL (maintaining our 1 rating) Recall we were a co. in their recent convert deal.  I've wanted to lower numbers for several months now, but have held back

> as 1) we led the DeltaThree IPO (was owned by RSL) and more
> recently were on the cover of the convert .... I've given our coverage
> banker the courtesy of seeing this and preparing the company. I
> know they are going to resist. I've been quiet on this too long, and
> I plan on going ahead anyway.

(emphasis in original).

79.     The Lehman investment banker dealing with RSL prevailed on the analyst not to
issue the report and instead to meet with RSL management, and to reconsider his analysis. As a
result, on March 2, 2000, the analyst issued a report that maintained the 1-Buy rating and $40
price target for RSL shares. The first sentence of the text of the report touted that "RSL's
European unit posted strong sequential revenue growth in Q4..." On March 9 and 10, 2002, the
analyst issued additional reports on RSL in which he raised the price target to $50 per share.
Despite negative news about the Company, including lowered earnings expectations, on March
10, 2000, RSL stock had shot up to $32 per share.

80.     The analyst ratings and reports concerning RSL referred to in the preceding
paragraph herein were false and misleading because Lehman knew or recklessly disregarded and
failed to disclose that:

   i.     it regularly used analyst research to obtain and/or maintain lucrative

          investment banking business from companies it covered, including RSL;

   ii.    it caused the analyst covering RSL to upgrade or not downgrade his

          research reports and/or ratings of RSL for "banking reasons, " including

          but not limited to the fact that Lehman: (a) sought and won the lead

          underwriter position for RSL's IPOs, including the lucrative Delta 3 spin-

          off IPO; (b) sought and won the lucrative lead placement agent position

          for RSL's issuance of Senior Notes and Series A preferred shares, and

-27-

exercised its over-allotment options for the preferred shares; and (c)

sought and won the lucrative solicitation agent position, in connection

with RSL's Consent Solicitation Statement;

iii.     its analysts were subject to financial conflicts of interest that adversely

impacted the independence of Lehman's research product, including

analyst ratings, reports, and price targets concerning RSL;

iv.     it failed to adequately supervise its analysts or impose adequate controls in

order to protect the objectivity of its published research; and,

v.     as a result of the foregoing, its analysts issued more positive reports and

ratings than were justified, and avoided downgrades or negative reports

regarding investment banking clients, including RSL, and thus caused

RSL's stock price to be artificially inflated throughout the Class Period.

81.     On March 16, 2000, the investment banker for RSL sent an email to the analyst's

supervisor praising the analyst's "open-mindedness" and crediting the analyst with raising RSL's

stock price:

> I just wanted to drop you a note to let you know of [analyst's] recent
> helpfulness in a touchy situation with RSL Communications.  RSL is
> a telecom company... and is the parent company of Delta 3 for which
> we recently led an IPO.  Following RSL's recent convertible notes
> issue (for which we were a co), [analyst] was inclined negatively
> toward the Company's prospects; however, he agreed to hold off on
> a downgrade (which would have harmed an important banking
> relationship) at the request of banking until he could hear out
> management.  [Analyst] met with the Company's CEO and was
> convinced positively, **he issued a positive report and was the axe
> behind significant positive momentum to the stock**.  The CEO
> praised [analyst's] open-mindedness and has indicated we will be
> included in the underwritings of their coming spinoffs.  Thus,
> [analyst] has helped our banking relationship with the client
> significantly.

(emphasis added).   The supervisor forwarded the email to the analyst and wrote "good job & congratulations."

82.     On or about May 5, 2000, the Lehman analyst issued another report, reiterating the 1-Buy rating on the stock and the $50 price target, despite the fact that the stock price had declined to $15.50 per share and the Company had missed its revenue estimates by a substantial amount.

83.     The analyst rating and report concerning RSL referred to in the preceding paragraph was false and/or misleading because Lehman knew, or recklessly disregarded and/or failed to disclose that:

      i.     it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

      ii.    it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons ," even though a downgrade was warranted, including but not limited to the fact that Lehman: (a) sought and won the lead underwriter position for RSL's IPOs, including the lucrative Delta 3spin-off IPO; (b) sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Series A preferred shares, and exercised its over-allotment options for the preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

    iii.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

    iv.    it failed to adequately manage its analyst and protect the objectivity of its published research;

    v.    as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

84.    By August 14, 2000, RSL's stock price had declined to approximately $4 per share. In an August 14, 2000 email, the analyst candidly complained to his supervisor about the influence Investment Banking had continued to exert over his research:

> Enough is enough. It's hard enough to be right about stocks, it's even harder to build customer relationships when all your companies blow up, you knew they were going to, and you couldn't say anything. Every single one of my companies has blown up in some fashion (or will - GBLX) and with the exception of PGEX, I haven't been able to speak my mind. I think I've been a team player, and I believe it is now imperative for the franchise that I be able to take action on bad situations.

85.    The analyst voiced particular concerns about RSL, stating "for the record, I have attempted to downgrade RSLC THREE times over the last year, but have been held off for banking reasons each time." (Emphasis in original.)

86.    Even after his complaint, the analyst did not downgrade RSL but rather simply was permitted to drop coverage of RSL in September 2000, devoting a few short sentences to the Company in a "Sector Report."

87.     The Sector report concerning RSL, referred to in the preceding paragraph herein, was false and/or misleading because Lehman knew, or recklessly disregarded and/or failed to disclose that:

i.      it regularly used analyst research to obtain and/or maintain lucrative investment banking business from companies it covered, including RSL;

ii.     it caused the analyst covering RSL to upgrade or not downgrade his research reports and/or ratings of RSL for "banking reasons, " including but not limited to the fact that Lehman: (a) had sought and won the lead underwriter position for RSL's lucrative Delta 3spin-off IPO; (b) had sought and won the lucrative lead placement agent position for RSL's issuance of Senior Notes and Preferred shares and exercised its over-allotment options for the Preferred shares; and (c) sought and won the lucrative solicitation agent position, in connection with RSL's Consent Solicitation Statement;

iii.    its analysts were subject to financial conflicts of interest that adversely impacted the independence of Lehman's research product, including analyst ratings, reports, and price targets concerning RSL;

iv.     it failed to adequately manage its analyst and protect the objectivity of its published research;

v.      as a result of the foregoing, its analysts issued more positive reports and ratings than were justified, and avoided downgrades or negative reports regarding investment banking clients, including RSL, and thus caused the stock price of RSL to be artificially inflated throughout the Class Period.

88.    On December 29, 2000, RSL was trading at $0.20 per share and was de-listed from the NASDAQ stock exchange.

**Defendant's Misconduct Revealed**

89.    On or about April 28, 2003, a settlement was reached in connection with charges filed against Defendants by the SEC and the Attorneys General of various states, including New York, Alabama, and Utah (who were task force leaders).  Pursuant to settlement memoranda, which includes numerous findings of fact that relate to Plaintiffs' complaint, the substance of which is particularized herein, the SEC and the aforementioned state Attorneys General found that the Defendant had systematically failed to adopt sufficient procedures and processes to ensure that the interaction between its research analysts and investment bankers or covered companies did not expose its analysts to undue pressures or influences from investment banking personnel and/or covered companies.  Moreover, the afore-stated charges allege that the Defendant had violated several rules of the NASD and NYSE by issuing false and misleading analyst reports on numerous companies which served to artificially inflate the prices of numerous companies, including RSL.

90.    Additionally, the SEC and various states' settlement memoranda sets forth specific e-mails and internal communications described above, which establish that the Defendant had violated federal securities laws in connection with their published research and ratings on many companies its analysts had covered, including RSL.

91.    Moreover, the findings of fact in the aforesaid settlement memoranda reveal that while the purported role of Defendant's research analysts was to produce objective research, the Defendant systematically encouraged their analysts to participate in investment banking-related activities.  Additionally, analysts' compensation was directly tied to investment banking revenue.

As a result of their participation in investment banking-related activities and the financial pressures arising from linkage of their compensation to investment banking revenue, analysts issued numerous misleading and false research reports which served to bolster the Defendant's investment banking revenues and, consequently, artificially inflated the stock prices of numerous companies, including RSL.  The Defendant knew or should have known of these undue pressures or influences, and yet failed to adequately manage them and, thus, failed to protect the objectivity and accuracy of its published research concerning many companies it covered, including RSL.

92.    Lehman settled these charges for the payment of $50 million, in addition to accepting other remedial obligations.

### The Market for RSL Shares

93.    The market for RSL common stock was open, well-developed and efficient at all relevant times herein.  As a result of the materially false and misleading statements and failures to disclose outlined herein, RSL's common stock price had been artificially inflated or otherwise stabilized during the Class Period.  The suppression of the truth concerning such artificial inflation and/or stabilization of RSL's stock price continued until the time the Defendant each admitted to the SEC and/or relevant state authorities that its reports and ratings concerning RSL were, in fact, false and misleading and caused injury to investors, including the members of the Class.

94.    Defendant had communicated false and misleading statements to the investment community, and such communications had been absorbed by the securities markets, leading to the artificial inflation of the stock price of RSL shares.  Plaintiffs and the other members of the

Class purchased or otherwise acquired RSL common stock in reliance upon the integrity of the market concerning RSL, and have been damaged thereby.

95.     During the Class Period, Defendant materially misled the investing public, thereby inflating the price of RSL common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make its statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Defendant's analysts' conflicts of interests.

96.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and the other members of the Class.  As described herein, during the Class Period, the Defendant made or caused to be made a series of materially false or misleading statements about RSL.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of RSL, thus causing the price of the Company's common stock to be overvalued at all relevant times herein.  As the following chart shows, Defendant's false and misleading reports, ratings and/or statements were repeatedly issued while RSL's stock price was plummeting and had the effect of temporarily halting the downward trend and driving the price back up.  These specific points can be viewed graphically in the following chart where the arrows indicate the timing of Defendant's statements:



# RSL Communications
## stock price history for April 1, 1999 - Sept. 29, 2000

Class Period: April 30, 1999 - Dec. 29, 2000
May 1999: RSL issued **$175 million** of unregistered Senior Notes. GS was the placement agent.
Sept - Nov 1999: SEC filings for IPO of deltathree.com wherein RSL sold 6.9 million shares at
$15 per share for **$103.5 million**. LB was lead underwriter and GS a participating underwriter.
Feb 2000: RSL issued **$115 million** of Series A Covertible Preferred Shares (2.3 million);
**$100 million** of Senior Notes; and **100 million Euros** of Senior Notes. GS, LB and MS were
co-lead placement agents.

The Defendant's materially false and misleading statements during the Class Period resulted in
Plaintiffs and the other members of the Class purchasing the Company's common stock at
artificially inflated prices, thus causing the damages complained of herein.

97.    Defendant regularly issued analyst research reports which were reported in the
financial press, made readily available through Defendant's web sites and public activities,
including road shows, and made available through third-party investment report subscriber
services, among other outlets.  Consequently, the Defendant's reports were publicly available
and entered and influenced the public marketplace concerning the price of RSL shares.

98.    As a result, the markets digested all information with respect to RSL from all
publicly-available sources and reflected such information in RSL's stock price.  Under these
circumstances, all purchasers of RSL's common stock during the Class Period suffered similar
injury through their purchase of stock at artificially inflated prices, and a presumption of reliance
applies.

## STATUTORY SAFE HARBOR

99.    The federal statutory safe harbor provided for forward-looking statements under
certain circumstances does not apply to any of the allegedly false statements pleaded in this
Complaint.  Further, none of the statements pleaded herein which were forward-looking
statements were identified as "forward-looking statements" when made.  Nor was it stated that
actual results "could differ materially from those projected." Nor were the forward-looking
statements pleaded accompanied by meaningful cautionary statements identifying important

-36-

factors that could cause actual results to differ materially from the statements made therein.

Defendant is liable for the forward-looking statements pleaded because, at the time each of those

forward-looking statements was made, the speaker knew the forward-looking statement was

false and/or misleading and the forward-looking statement was authorized and/or approved by an

executive officer of the Defendant who knew that those statements were false when made.

## CLAIMS FOR RELIEF

### COUNT I

**(Against Lehman For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder)**

100.    Plaintiffs repeat and reallege each and every allegation set forth above.

101.    During the Class Period, Defendant Lehman made untrue statements of material

fact and omitted to disclose material facts, that were intended to and did: (i) deceive the

investing public, including Plaintiffs and the other members of the Class, as alleged herein; (ii)

artificially inflated and maintained the market price of RSL common stock; and (iii) caused

Plaintiffs and the other members of the Class to purchase or otherwise acquire RSL stock at

artificially inflated prices.

102.    The Defendant made untrue statements of material fact and/or omitted to state

material facts necessary to make the statements made, in light of the circumstances under which

they were made, not misleading, all in violation of section 10(b) of the Exchange Act and Rule

10b-5. Defendant's material misrepresentations and omissions concerned, inter alia: (i) the fact

their ratings did not reflect the analysts' true opinions of RSL; (ii) that Lehman had an

undisclosed internal policy to never issue "underperform" or "sell" recommendations on Internet

companies, including RSL, thereby converting a published five-point rating scale into a de-facto

three-point system; (iii) that the challenged ratings and reports on RSL failed to disclose that

Lehman's ratings were tarnished by an undisclosed conflict of interest in that the research

analysts were acting as quasi-investment bankers for RSL and the companies at issue, often

initiating , continuing, and/or manipulating research coverage for the purpose of attracting and

keeping investing banking business with RSL and other covered clients, thereby producing

misleading ratings that were neither objective nor independent, as they purported to be; and (iv)

Defendant's failure to comply with the rules and regulations of the SEC, NASD and other

regulatory authorities regarding communications to the investing public.

103.    Defendant's material misrepresentations and/or omissions were done knowingly

or recklessly and for the purpose and effect of obtaining lucrative investment banking business

from RSL.  Specifically, the analysts' reports were represented to be both positive and objective,

while internal Lehman e-mails have shown that the ratings and recommendations in the reports

were both artificially inflated and given merely in the hopes of obtaining future banking

business.

104.    Defendant, however, knew or recklessly disregarded that their statements

concerning the integrity and objectivity of their securities research and ratings system were false

at the time they made these statements, because those statements were flatly contradicted by the

Defendant's unlawful plan, scheme and course of conduct alleged herein.

105.    Defendant was required to comply with all relevant SEC and NASD regulations.

In addition, said Defendant had a duty to fully disclose the truth concerning their business

practices alleged herein by virtue of their issuance of research reports to investors, as a result of

Defendant Lehman's status as a registered U.S. broker/dealer and its wrongful activities in such

capacity alleged herein, and as a result of the integrated disclosure provisions of the SEC as

embodied in SEC Regulations S-X, [17 C.F.R.; § 210.0, et seq.], S-K [ 17 C.F.R.; § 299.10, et seq.], and other SEC regulations.

106.    Throughout the Class Period, Defendant's material misrepresentations and omissions induced a disparity between the market  price and the true "investment quality" of RSL securities.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of RSL securities were artificially inflated during the Class Period, and Plaintiffs and the Class were deceived as to the true investment quality of RSL securities.  In ignorance of the fact that the market price of RSL securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendant Lehman, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendant but not disclosed in public statements by Defendant during the Class Period, Plaintiffs and the other members of the Class acquired RSL securities during the Class period at artificially inflated prices and were damaged thereby.

107.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class known of the omitted material facts, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired RSL securities, or if they had acquired RSL securities, they would not have done so at the artificially inflated prices.

108.    Plaintiffs and the other members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendant's material misrepresentations and omissions.  Absent Defendant's wrongful conduct, Plaintiffs and the other members of the Class would not have been injured.

-39-

109.    By virtue of the foregoing, Defendant Lehman violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

110.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of RSL securities in an amount to be proved at trial.

**WHEREFORE**, Plaintiffs on their own behalf and on behalf of the other Class members demand judgment against Defendant as follows:

i)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against the Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

ii)    Certification that the Plaintiffs and the other Class members constitute a single class;

iii)    Appointment of the undersigned attorneys as Class Counsel

iv)    Appointment of Plaintiffs as Class Representatives and payment of reasonable compensation to them for their services as such

v)    An allowed administrative priority claim under 11 U.S.C. § 503 for the reasonable attorney's fees and the costs and disbursements that the Plaintiffs incurs in prosecuting this action; and

iv)    Such other and further relief as the Court may deem just and proper

## .<u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

DATED: September 23, 2009

Respectfully submitted,

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _____

Curtis V. Trinko
Kinny W. Chan
16 West 46th Street
7th Floor
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158
Email:  ctrinko@trinko.com

**Attorneys for Plaintiffs**

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

**WE, LAWRENCE FOGARAZZO** and **CAROLYN FOGARAZZO,** hereby certify as

follows:

1.    We have reviewed the complaint prepared for us concerning RSL

Communications, Inc., brought under the federal securities laws, and have authorized the filing

of such an action .

2.    Plaintiffs did not purchase, or otherwise acquire, the securities of RSL

Communications, Inc. that are the subject of this action, at the direction of plaintiffs' counsel, or

in order to participate in any action arising under the federal securities laws.

3.    We are willing to serve as representative parties on behalf of the class and will

provide testimony at a deposition and/or at trial, if necessary.

4.    Plaintiffs' transactions in the securities that are the subject of this litigation during

the class period set forth in the complaint are, as follows:

a.    Plaintiffs purchased 1,000 shares of RSL Communications, Inc. common

stock on March 6, 2000 at $22.85064 per share;

b.    Plaintiffs purchased 200 shares of RSL Communications, Inc. common

stock on May 10, 2000 at $14.38315 per share;

c.    Plaintiffs purchased 500 shares of RSL Communications, Inc. common

stock on May 15, 2000 at $13.56616 per share; and

d.    Plaintiffs still hold 1,700 shares of RSL Communications, Inc. common

stock.

5.    During the three years prior to the date hereof, plaintiffs have not filed an action in which they have sought to serve, or have served, as representative parties for a class in any action filed under the federal securities laws.

6.    Plaintiffs will not accept any payment for serving as representative parties on behalf of the class beyond their pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.


We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge and belief. Executed this ___9___ day of July, 2003 at Manchester Center, Vermont.


LAWRENCE FOGARAZZO


CAROLYN FOGARAZZO

2

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

**I, DONALD ENGEL,** hereby certify as follows:

1.    I have reviewed the complaint prepared for Plaintiffs Lawrence and Carolyn Fogarazzo against Lehman Brothers, Inc. concerning RSL Communications, Inc., brought under the federal securities laws, and have authorized the filing of such an action.

2.    I did not purchase, or otherwise acquire, the securities of RSL Communications, Inc. that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any action arising under the federal securities laws.

3.    I am willing to serve, along with the other plaintiffs named in this action, as representative parties on behalf of the class and will provide testimony at a deposition and/or at trial, if necessary.

4.    My transactions in RSL Communications, Inc. common stock, which are the subject of this litigation, made during the class period set forth in the complaint, are as follows:

| Date | Transaction | Volume | Amount Paid |
|---|---|---|---|
| 09/21/1999 | Buy | 2,500 | $42,025.00 |
| 09/21/1999 | Buy | 2,500 | $42,181.25 |
| 09/21/1999 | Buy | 100 | $1,693.50 |
| 09/21/1999 | Buy | 4,900 | $83,293.10 |
| 10/11/1999 | Buy | 4,000 | $82,995.35 |
| 10/11/1999 | Buy | 1,000 | $20,560.00 |
| 03/08/2000 | Buy | 5,000 | $131,550.00 |
| 03/08/2000 | Buy | 2,000 | $52,120.00 |
| 03/08/2000 | Buy | 3,000 | $77,992.50 |
| 03/27/2000 | Buy | 6,000 | $141,735.00 |
| 03/27/2000 | Buy | 14,000 | $329,842.35 |

| 03/28/2000 | Buy | 10,000 | $258,725.00 |
|---|---|---|---|
| 04/04/2000 | Buy | 4,500 | $87,457.50 |
| 04/04/2000 | Buy | 500 | $9,030.00 |
| 04/04/2000 | Buy | 4,000 | $72,240.00 |
| 04/04/2000 | Buy | 2,500 | $49,212.50 |
| 04/04/2000 | Buy | 2,000 | $38,370.00 |
| 04/04/2000 | Buy | 500 | $8,842.50 |
| 04/04/2000 | Buy | 500 | $8,842.50 |
| 04/04/2000 | Buy | 500 | $9,873.75 |
| 05/04/2000 | Sell | 5,000 | $78,872.36 |
| 05/04/2000 | Sell | 2,000 | $31,548.94 |
| 05/04/2000 | Sell | 3,000 | $47,323.42 |
| 05/04/2000 | Sell | 10,000 | $157,744.72 |
| 05/04/2000 | Sell | 4,500 | $70,985.12 |
| 05/04/2000 | Sell | 500 | $7,887.24 |
| 09/20/2000 | Sell | 4,000 | $13,398.34 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 2,00 | $6,699.17 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 500 | $1,674.79 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 2,500 | $8,373.97 |
| 09/20/2000 | Sell | 100 | $334.96 |
| 09/20/2000 | Sell | 4,000 | $16,412.97 |
| 09/20/2000 | Sell | 4,000 | $13,398.34 |
| 09/20/2000 | Sell | 1,000 | $3,349.59 |
| 09/20/2000 | Sell | 6,000 | $20,087.52 |
| 09/20/2000 | Sell | 14,000 | $46.894.21 |

5.    During the three years prior to the date hereof, I have not filed an action in which I have sought to serve, or have served, as a representative party for a class in any action filed under the federal securities laws.

6.    I will not accept any payment for serving as a representative party on behalf of the class beyond a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __20__ day of August, 2003, at New York, New York.


**DONALD ENGEL**

3

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, STEPHEN LOUIS HOPKINS, hereby certify as follows:

1.      I have reviewed the complaint prepared for Plaintiffs Lawrence and Carolyn Fogarazzo against Lehman Brothers, Inc. concerning RSL Communications, Inc., brought under the federal securities laws, and have authorized the filing of such an action .

2.      I did not purchase, or otherwise acquire, the securities of RSL Communications, Inc. that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any action arising under the federal securities laws.

3.      I am willing to serve, along with the other plaintiffs named in this action, as representative parties on behalf of the class and will provide testimony at a deposition and/or at trial, if necessary.

4.      My transactions in RSL Communications, Inc. common stock, which are the subject of this litigation, made during the class period set forth in the complaint, are as follows:

   a.      I purchased 200 shares of RSL Communications, Inc. common stock on October 12, 1999 at $19.6875 per share;

   b.      I sold 200 shares of RSL Communications, Inc. common stock on October 18, 1999 at $20.00 per share;

   c.      I purchased 300 shares of RSL Communications, Inc. common stock on December 14, 1999 at $18.50 per share; and

   d.      I purchased 400 shares of RSL Communications, Inc. common stock on December 20, 1999 at $17.00 per share.

   e.      I purchased 200 shares of RSL Communications, Inc. common stock on December 31, 1999 at $15.75 per share;

   f.      I purchased 100 shares of RSL Communications, Inc. common stock on December 31, 1999 at $15.75 per share;

g.  I sold 1000 shares of RSL Communications, Inc. common stock on February 4, 2000 at $22.625 per share;

h.  I purchased 500 shares of RSL Communications, Inc. common stock on April 19, 2000 at $16.125 per share;

i.  I purchased 500 shares of RSL Communications, Inc. common stock on April 26, 2000 at $13.875 per share; and

j.  I purchased 300 shares of RSL Communications, Inc. common stock on June 1, 2000 at $12.1875 per share.

k.  I purchased 400 shares of RSL Communications, Inc. common stock on June 5, 2000 at $11.75 per share.

l.  I purchased 300 shares of RSL Communications, Inc. common stock on June 16, 2000 at $11.625 per share.

m.  I purchased 1000 shares of RSL Communications, Inc. common stock on July 17, 2000 at $7.3125 per share.

n.  I purchased 900 shares of RSL Communications, Inc. common stock on July 24, 2000 at $5.875 per share.

o.  I purchased 100 shares of RSL Communications, Inc. common stock on June 24, 2000 at $5.875 per share.

p.  I purchased 300 shares of RSL Communications, Inc. common stock on August 16, 2000 at $3.1875 per share.

q.  I purchased 700 shares of RSL Communications, Inc. common stock on August 16, 2000 at $3.1875 per share.

3.  During the three years prior to the date hereof, I have not filed an action in which I have sought to serve, or have served, as a representative party for a class in any action filed under the federal securities laws.

4.  I will not accept any payment for serving as a representative party on behalf of the class beyond a pro rata share of any recovery, or as ordered or approved by the Court,

2

including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _21_ day of August, 2003 at Highland Haven, Texas.

STEPHEN LOUIS HOPKINS

3