exhaust any right to take any action against Lehman or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with the Issuer as those made by Lehman pursuant to Section 4.1 of the Agreement, at the times set forth therein, except that references therein to "Lehman" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall remain in full force and effect and be binding upon Guarantor and its successors and permitted assigns and inure to the benefit of the Issuer and its successors and permitted assigns until all amounts payable by Lehman under the Agreement have been satisfied in full.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 745 Seventh Avenue, New York, NY 10019 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products at 745 Seventh Avenue, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____
Name:
Title:

**EXHIBIT G**

| Deposit Date[*] | Bond Payment Date[*] | Scheduled Reserve Amount |
|---|---|---|
| 12/03/03 | 06/01/04 | $221,582,343.75 |
| 06/01/04 | 12/01/04 | $221,582,343.75 |
| 12/01/04 | 06/01/05 | $221,582,343.75 |
| 06/01/05 | 12/01/05 | $221,582,343.75 |
| 12/01/05 | 06/01/06 | $221,582,343.75 |
| 06/01/06 | 12/01/06 | $221,582,343.75 |
| 12/01/06 | 06/01/07 | $221,582,343.75 |
| 06/01/07 | 12/01/07 | $221,582,343.75 |
| 12/01/07 | 06/01/08 | $221,582,343.75 |
| 06/01/08 | 12/01/08 | $221,582,343.75 |
| 12/01/08 | 06/01/09 | $221,582,343.75 |
| 06/01/09 | 12/01/09 | $221,582,343.75 |
| 12/01/09 | 06/01/10 | $221,582,343.75 |
| 06/01/10 | 12/01/10 | $221,582,343.75 |
| 12/01/10 | 06/01/11 | $221,582,343.75 |
| 06/01/11 | 12/01/11 | $221,582,343.75 |
| 12/01/11 | 06/01/12 | $221,582,343.75 |
| 06/01/12 | 12/01/12 | $221,582,343.75 |
| 12/01/12 | 06/01/13 | $221,582,343.75 |
| 06/01/13 | 12/01/13 | $221,582,343.75 |
| 12/01/13 | 06/01/14 | $221,582,343.75 |
| 06/01/14 | 12/01/14 | $221,582,343.75 |
| 12/01/14 | 06/01/15 | $221,582,343.75 |
| 06/01/15 | 12/01/15 | $221,582,343.75 |
| 12/01/15 | 06/01/16 | $221,582,343.75 |
| 06/01/16 | 12/01/16 | $221,582,343.75 |
| 12/01/16 | 06/01/17 | $221,582,343.75 |
| 06/01/17 | 12/01/17 | $221,582,343.75 |
| 12/01/17 | 06/01/18 | $221,582,343.75 |
| 06/01/18 | 12/01/18 | $221,582,343.75 |
| 12/01/18 | 06/01/19 | $221,582,343.75 |
| 06/01/19 | 12/01/19 | $221,582,343.75 |
| 12/01/19 | 06/01/20 | $221,582,343.75 |
| 06/01/20 | 12/01/20 | $221,582,343.75 |
| 12/01/20 | 06/01/21 | $221,582,343.75 |
| 06/01/21 | 12/01/21 | $221,582,343.75 |

[*] Deposit Date or Bond Payment Date will be the Business Day immediately preceding such date.

| Deposit Date[*] | Bond Payment Date[*] | Scheduled Reserve Amount |
|---|---|---|
| 12/01/21 | 06/01/22 | $221,582,343.75 |
| 06/01/22 | 12/01/22 | $221,582,343.75 |
| 12/01/22 | 06/01/23 | $221,582,343.75 |

---

[*] Deposit Date or Bond Payment Date will be the Business Day immediately preceding such date.

B

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman") has entered into a Reserve Fund Agreement dated as of December 2, 2003 (the "Agreement") by and among Lehman, TOBACCO SETTLEMENT FINANCING CORPORATION (the "Issuer") and THE BANK OF NEW YORK, as Trustee (the "Trustee"). For value received, and in consideration of the financial accommodations accorded to Lehman by the Issuer under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally and irrevocably guarantees to the Issuer the due and punctual payment of all amounts payable by Lehman under the Agreement when and as Lehman's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Lehman to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by the Issuer, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable. In the event that any amounts paid by Lehman under the Agreements are rescinded or must otherwise be returned for any reason whatsoever, the Guarantor shall remain liable hereunder in respect of such amounts as if such payment had not been made.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Lehman (other than as a result of the unenforceability thereof against the Issuer), the absence of any action to enforce Lehman's obligations under the Agreement, any waiver or consent by the Issuer with respect to any provisions thereof, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Lehman could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any default or potential default in respect of the Issuer, but only to the extent such right is provided to Lehman under the Agreement.

(d)    Guarantor shall be subrogated to all rights of the Issuer against Lehman in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Lehman under the Agreement, shall have been paid in full.

(e)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that the Issuer exhaust any right to take any action against Lehman or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with the Issuer as those made by Lehman pursuant to Section 4.1 of the Agreement, at the times set forth therein, except that references

therein to "Lehman" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall remain in full force and effect and be binding upon the Guarantor and its successors and permitted assigns and inure to the benefit of the Corporation and its successors and permitted assigns until all amounts payable by Lehman under the Agreements have been satisfied in full.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 399 Park Avenue, New York, NY 10022 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products at 745 Seventh Avenue, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:

Name:

Title:

Oliver Budde
Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.
OFFICER'S CERTIFICATE

In connection with the insolvency opinion dated December 2, 2003 (the "Opinion") to be delivered by Cadwalader, Wickersham & Taft LLP, in connection with the issuance of Tobacco Settlement Financing Corporation of the State of New York Asset-Backed Revenue Bonds, Series 2003B (State Contingency Contract Secured) and the Reserve Fund Agreement, dated as of December 2, 2003, among Lehman Brothers Special Financing Inc., The Bank of New York, as Trustee, and Tobacco Settlement Financing Corporation of the State of New York, the undersigned hereby certifies that, to the best of his or her knowledge after due inquiry and review of the Opinion:

1.     The undersigned understands that Cadwalader, Wickersham & Taft LLP is relying on this Certificate in connection with the execution and delivery of the Opinion.

2.     The facts and assumptions contained in the section of the Opinion entitled "Facts and Assumptions" insofar as they pertain to Lehman Brothers Special Financing Inc. are true and correct as of the date hereof.

3.     The undersigned has no reason to believe that any statement or fact expressed in the section of the Opinion entitled "Facts and Assumptions" is untrue, inaccurate or incomplete.

4.     I have been duly authorized to execute this Certificate on behalf of Lehman Brothers Special Financing Inc.

Dated: December 2, 2003

LEHMAN BROTHERS SPECIAL
FINANCING INC.,

By: _____
Name:   T. Courtney Jenkins
Title:    Vice President

# LEHMAN BROTHERS

December 2, 2003

Cadwalader Wickersham & Taft LLP
100 Maiden Lane
New York, New York 10038

Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation,
       Asset-Backed Revenue Bonds, Series 2003B (State Contingency Contract
       Secured)

Ladies and Gentlemen:

In connection with the above-referenced transaction, we hereby advise you that
you may rely on our opinion, dated December 2, 2003, attached hereto as Exhibit A (the
"Opinion"), as though the Opinion were addressed to you on the date thereof.

Very truly yours,

C



*Hawkins, Delafield & Wood*
*67 Wall Street, New York 10005*

December 2, 2003

The Bank of New York
101 Barclay Street, Floor 21W
New York, NY 10286

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019

      Re:    Tobacco Settlement Financing Corporation, Asset-Backed Revenue
             Bonds, Series 2003B (State Contingency Contract Secured)

Ladies and Gentlemen:

        We have acted as counsel to the Tobacco Settlement Financing Corporation (the
"Issuer") in connection with its execution and delivery of the Reserve Fund Agreement, dated as
of December 2, 2003 (the "Agreement"), by and among the Issuer, The Bank of New York (the
"Trustee"), and Lehman Brothers Special Financing Inc. (the "Provider") and its execution and
delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not
defined herein have the respective meanings given to them in the Agreement.

        In rendering this opinion, we have examined, among other things, copies of the
Agreement and the Indenture.

        In connection with the foregoing, we have also examined originals or copies
satisfactory to us of all such corporate records, agreements, certificates and other documents as
we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In
such examination we have assumed the genuineness of all signatures, the authenticity of all
documents submitted to us as originals, and the conformity with the original documents of all
documents submitted to us as copies.

        The scope of this opinion is expressly limited to the matters set forth herein and
we express no opinion with respect to the laws of any state other than the State of New York (the
"State").

        Based upon the foregoing examination and review, we are of the opinion that:

        (i)     The Issuer has full legal right, power and authority to enter into the
Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the

Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)    The Agreement and the Indenture have been duly authorized, executed and delivered by the Issuer.

(iii)    Each of the Agreement and the Indenture is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies and subject, as to enforceability, to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(iv)    The Issuer's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of the Indenture or any other agreement, instrument, law, judgment, injunction or order applicable to it or any of its property.

(v)    All consents, authorizations and approvals requisite for the Issuer's execution, delivery and performance of this Agreement and the Indenture have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

(vi)    The Agreement is an Eligible Investment as defined in the Indenture.

(vii)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement brought validly ex contractu in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(viii)    The Trustee is obligated to replenish the Reserve Fund solely through the application of available funds, if any, on deposit in the Pledged Revenues Account (as defined in the Indenture) as provided in Section 4.03(a)(4) of the Indenture.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

*Hawkins, Delafield & Wood*

439386.1 026563 OPN



# CADWALADER

*Cadwalader, Wickersham & Taft LLP*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

New York
Charlotte
Washington
London

December 2, 2003

To the Addressees Listed on
The Attached Schedule A

Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation, Asset-Backed
Revenue Bonds, Series 2003B (State Contingency Contract Secured)

Ladies and Gentlemen:

We have acted as special counsel to Lehman Brothers Special Financing Inc., a
corporation organized under the laws of Delaware ("LBSF") and Lehman Brothers Holdings
Inc., a Delaware corporation ("Guarantor") in connection with the execution and delivery by
LBSF of the Reserve Fund Agreement, dated as of December 2, 2003 (the "Agreement"),
among LBSF, The Bank of New York, as Trustee (the "Trustee") and Tobacco Settlement
Financing Corporation ("TSFC") and by the Guarantor of the Guarantee, dated as of
December 2, 2003 (the "Guarantee") delivered in connection with the Agreement.

In connection with this opinion, we have examined an executed copy of each of
the Agreement and the Guarantee and such corporate documents and records of LBSF and of
the Guarantor, certificates of public officials and officers of LBSF and of the Guarantor, and
such other documents as we have deemed necessary or appropriate for the purposes of this
opinion. In such opinion, we have assumed the genuineness of all signatures, the authenticity
of all documents submitted to us as originals, the conformity to authentic original documents
of all documents submitted to us as certified, conformed or photostatic copies, and the due
execution and delivery, pursuant to due authorization, of the Agreement and of the Guarantee
by each party thereto.

The opinions expressed herein are limited to matters concerning the federal laws
of the United States of America, the laws of the State of New York and the General
Corporation Law of the State of Delaware. With respect to the opinions set forth in
paragraphs 1 and 2 below, we have, with your consent, relied solely upon the opinion of
counsel of LBSF and the Guarantor, a copy of which is attached as Schedule B.

NYLIB5 742700.1

To the Addressees Listed on
The Attached Schedule A                    -2-                    December 2, 2003

Based upon the foregoing, we are of the opinion that:

1.    Each of LBSF and the Guarantor is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

2.    The execution, delivery and performance of the Agreement by LBSF and of the Guarantee by the Guarantor are within its respective corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provisions of it's respective articles of incorporation or by-laws.

3.    The Agreement, in the case of LBSF, and the Guarantee, in the case of the Guarantor, has been duly executed and delivered by it and constitutes its legally valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

We are admitted to practice in the State of New York, and except as expressly set forth above, this opinion is limited to the laws of the State of New York. The opinions expressed herein are limited to the laws and facts as presently in existence. We undertake no obligation to revise, supplement or update this opinion after the date hereof for any reason.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

Cadwalader, Wickersham & Taft LLP

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York 10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

Schedule B

Opinion of Counsel of LBSF and the Guarantor

# CADWALADER

*Cadwalader, Wickersham & Taft LLP*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

New York
Charlotte
Washington
London

December 2, 2003

To the Addressees Listed on
The Attached Schedule A

> Re:   Reserve Fund Agreement-Tobacco Settlement Financing Corporation,
> Asset-Backed Revenue Bonds, Series 2003B (State Contingency Contract
> Secured)

Ladies and Gentlemen:

We have acted as special counsel to Lehman Brothers Special Financing Inc., a corporation organized under the laws of Delaware ("Lehman"), in connection with the Reserve Fund Agreement, dated as of December 2, 2003 (the "Agreement"), among Lehman, The Bank of New York, as Trustee (the "Trustee"), and Tobacco Settlement Financing Corporation (the "Issuer"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

You have requested our opinion as to whether, under present reported decisional authority and statutes applicable to federal bankruptcy cases, if Lehman were to become a debtor in a case under the Bankruptcy Code[1], a federal bankruptcy court, which acted reasonably and correctly applied the law to the facts as set forth herein after full consideration of all relevant factors, would hold that (i) Eligible Securities transferred to the Trustee in accordance with the Agreement prior to the commencement of a bankruptcy case of Lehman and payments thereunder and proceeds thereof are not property of the estate of Lehman under Bankruptcy Code section 541(a)(1) and (ii) the automatic stay arising pursuant to Bankruptcy Code section 362(a) upon the commencement of a bankruptcy case of Lehman is not applicable to payments to the holders of the Bonds from proceeds of such Eligible Securities.

## FACTS AND ASSUMPTIONS

In rendering this opinion, we have examined and relied upon originals or copies, certified or otherwise identified to our satisfaction, of such certificates, corporate or other records, and other documents as we have deemed appropriate for the purpose of rendering this opinion. We have examined and relied upon, among other things, the Request for Bids for Debt

---

[1]    11 U.S.C. §§ 101 1330.

NYLIB5 742704.1

To the Addresses Listed on
The Attached Schedule A                    -2-                        December 2, 2003

Service Reserve Account Agreement, dated November 17, 2003 (the "RFB"), the Agreement, the
Indenture (collectively, the "Applicable Documents") and the certificates, opinions, agreements
and other documents (including exhibits thereto) delivered in connection with the Applicable
Agreements.

        We have assumed that no party to any of the Applicable Documents has entered
into any agreement or understanding, either written or oral, inconsistent with the terms of any of
the Applicable Documents or the assumptions or discussion in this opinion or that is otherwise
related to the subject matter of the Agreement, or which otherwise pertains to the forward sale
commitment of Lehman with respect to Eligible Securities to be purchased by the Trustee on the
dates specified in the Agreement for purposes of investing funds in the Reserve Fund other than
as expressly set forth in such documents or in this opinion.

        The opinions expressed herein are based upon and subject to the assumed
compliance by Lehman, the Trustee and the Issuer with the facts and assumptions set forth
herein.

        We have assumed and relied upon the genuineness and due authorization of all
signatures, the authenticity of all documents submitted to us as originals, the conformity to
original documents of all documents submitted to us as copies, and the authenticity of the
originals of all documents submitted to us as copies.

        We have been advised of the following facts by Lehman. In rendering our
opinion, we have relied upon the documents reviewed as described above and the certificate of
an officer of Lehman in which such officer represents that the applicable facts set forth herein are
accurate. We have not made any independent inquiry with regard to the accuracy of the matters
stated in such certificate or in the documents reviewed. In rendering our opinion, we have
assumed, without independent verification, that the facts and assumptions outlined below are
correct.

        The RFB indicated that the Issuer anticipated investing the funds available for
deposit in the Reserve Fund for the Bonds, potentially in multiple separate forward purchase
agreements with two or more separate providers to reduce the exposure to a single provider and
to maximize the earnings to be derived from the funds invested. The Issuer requested bids, for
an earnings rate on the funds invested under any such forward purchase agreement, where the
term of such forward purchase agreement will be identical to the term of the Bonds, June 1, 2023
(although the Bonds are expected to all be paid by June 1, 2016), and where if a forward
purchase agreement is terminated early because of the retirement of all of the Bonds due to a
clean up call of the Bonds a termination amount would be determined and due from the
applicable party. For each bid, the bidder was required to provide the earnings rate the bidder
would agree to provide for the amount of funds invested, on the dates and for the periods
specified in the RFB. Bids were due on November 18, 2003, and on November 18, 2003
Lehman was advised that it was the successful bidder with respect to a Scheduled Reserve Fund
Amount ultimately determined to be $221,582,343.75 out of the total amount in the Reserve
Fund to be invested, having bid a guaranteed earnings rate equal to 4.687% (the "Lehman Bid").

To the Addresses Listed on
The Attached Schedule A                    -3-                    December 2, 2003

Morgan Stanley Capital Services Inc. was the successful bidder, pursuant to its bid (the "MSCS Bid"), with respect to the remainder of the funds in the Reserve Fund to be invested.

In furtherance of the Lehman Bid and the MSCS Bid, Lehman will enter into the Agreement with the Trustee and the Issuer, and MSCS will enter into a similar forward purchase agreement with the Trustee and the Issuer. Pursuant to the Agreement, Lehman will satisfy its forward commitment, in accordance with the Lehman Bid, with respect to the sale of Eligible Securities to the Trustee on the dates and for the periods, and otherwise upon the terms and conditions, specified in the Agreement. Lehman Brothers Holdings Inc. will guaranty the obligations of Lehman under the Agreement.

Pursuant to Section 2.1 of the Agreement, (i) Lehman shall cause a Qualified Dealer (which may or may not be an affiliate of Lehman) to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirement set forth in Section 2.2 of the Agreement, Qualified Securities selected by Lehman or the Qualified Dealer, and (ii) assuming that Lehman has caused such delivery to be made, the Trustee shall, out of funds available in the Reserve Fund, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable in accordance with Section 2.2 of the Agreement, an amount equal to the Purchase Price thereof.

Pursuant to Section 2.2 of the Agreement, (i) all Qualified Securities delivered shall be delivered to the Trustee to a specified account, in such manner as at the time is generally acceptable for delivery of Qualified Securities, (ii) all Qualified Securities shall be delivered to the Trustee on a "delivery versus payment" basis, (iii) Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities specifying, at a minimum, the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security, (iv) concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall (subject to clause (v) below) pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any, (v) Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee, and (B) to Lehman, the Differential, to a specified account, and (vi) all payments to be made by the Trustee in accordance with the foregoing shall be made in immediately available funds by means of a bank or Federal funds wire. As indicated in clause (i) of the preceding sentence, we assume that all actions that would be requisite to effecting the transfer of ownership to the Trustee of each Qualified Security delivered to the Trustee pursuant to the Agreement (including but not limited to re-registration of each such Qualified Security in the name of the Trustee) will be taken.

Section 2.3 of the Agreement deals with circumstances under which funds constituting a portion of the Scheduled Reserve Amount become available to the Trustee prior to a Bond Payment Date (for example, upon the maturity of a Qualified Security sold to the Trustee on the related Deposit Date) and, subject to certain conditions, Lehman is entitled to sell additional Qualified Securities to the Trustee in respect of such available funds. Any deliveries of Qualified Securities made pursuant to Section 2.3 shall conform to the requirements of

To the Addresses Listed on
The Attached Schedule A                          -4-                          December 2, 2003

Section 2.2 described above.  Section 2.3 expressly provides that Lehman shall have no right to substitute Qualified Securities for any Qualified Securities previously sold under the Agreement.

Section 2.4 of the Agreement deals with a failure by Lehman to cause a Qualified Dealer to deliver Qualified Securities when required, and a potential cure by Lehman by means of a late delivery.

Qualified Securities means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3, 2.4 or 2.5 (c) of the Agreement, Eligible Securities which, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is (A) with respect to a delivery in connection with a Deposit Date, as close as possible to but does not exceed the related Scheduled Reserve Amount, (B) with respect to a delivery pursuant to Section 2.3 of the Agreement, equal to the Maturity Amount of the relevant Qualified Securities which have so matured (or as applicable, the amount of a Coupon Payment) and (C) with respect to a delivery pursuant to Section 2.5(c) of the Agreement, equal to the pro rata portion of the replenishment amount.    Accordingly, all Eligible Securities which Lehman causes to be delivered to and purchased by the Trustee in accordance with the Agreement will mature while held by the Trustee.

Purchase Price means, (i) for any Eligible Security delivered under the Agreement other than pursuant to Section 2.3 thereof, that price for such Qualified Security, as set forth in the Delivery Notice, which will produce a rate of return on such Qualified Security for the period from (and including) the Deposit Date to (but excluding) the immediately succeeding Bond Payment Date equal to the Guaranteed Rate and (ii) for any Eligible Security delivered pursuant to Section 2.3, the Maturity Amount thereof.

The Differential, if any, in connection with any delivery of Qualified Securities, which will be paid by the Trustee to either the Qualified Dealer as agent for Lehman or directly to Lehman, as specified in the related Delivery Notice, means the amount, if any, by which the Purchase Price of any Qualified Security delivered under the Agreement exceeds the Market Value thereof.

Each delivery of a Qualified Security to the Trustee which Lehman causes to be made, together with the actions requisite to a transfer of ownership of such Qualified Security, and the simultaneous payment by the Trustee of the Purchase Price therefor, all in accordance with the Agreement, is referred to herein as a "Transfer".

Lehman, the Trustee and the Issuer intend that each Transfer be a sale from (or caused by) Lehman to, and a purchase by, the Trustee.  Lehman, the Trustee and the Issuer, as applicable, will treat each Transfer as a sale for accounting and tax purposes.

The Purchase Price for the Eligible Securities related to each Transfer reflect the good faith determination of Lehman and the Issuer, based on the Lehman Bid and the other bids submitted pursuant to the RFB, of the fair value of, and fair consideration for, such Eligible Securities delivered and purchased in satisfaction of the parties' rights and obligations under the Agreement, and is reasonably equivalent to the prices that the parties believe would be paid in

To the Addresses Listed on
The Attached Schedule A                    -5-                    December 2, 2003

other sales of such Eligible Securities between non-affiliated entities pursuant to forward purchase agreements comparable to the Agreement, as evidenced by the MSCS Bid and the other bids submitted pursuant to the RFB. No provision exists whereby such consideration for the Eligible Securities may be modified subsequent to each Transfer, and Lehman will have no obligation to repay such consideration, or interest thereon, to the Trustee.

　　　　　Pursuant to the Agreement, Lehman will irrevocably transfer and relinquish (or will cause the irrevocable transfer and relinquishment of) all rights with respect to the Eligible Securities upon each Transfer thereof and, specifically, will have no right to sell, pledge or otherwise dispose of the Eligible Securities once transferred to the Trustee. The Trustee will be free to deal with all such Eligible Securities as its property. Pursuant to the Agreement, Lehman will transfer (or will cause the transfer of) the Eligible Securities without recourse and will have no obligation to deliver other property to the Trustee either in substitution for or in addition to the Eligible Securities in the event of a credit loss or decline in value of the Eligible Securities.

　　　　　Neither Lehman nor any of its affiliates will own, hold or have any interest in the Eligible Securities subsequent to each Transfer thereof. The Trustee will no right or obligation to transfer any of the Eligible Securities back to Lehman. Lehman will not have any right or obligation to reacquire any of the Eligible Securities subsequent to each Transfer thereof. Consequently, with respect to each Transfer, Lehman will have transferred (or will have caused the transfer of) the benefits and risks of ownership of the Eligible Securities to the Trustee and, ultimately, to the holders of the Bonds.

　　　　　Lehman will not transfer (or cause the transfer) of any of the Eligible Securities in contemplation of insolvency or with a design to prefer one or more creditors to the exclusion in whole or in part of others or with an intent to hinder, delay or defraud any of its creditors.

### DISCUSSION

　　　　　Were Lehman to become a debtor in a case under the Bankruptcy Code, the Eligible Securities transferred to the Trustee prior to the commencement of such case would not be property of the estate of Lehman or subject to the automatic stay arising upon the commencement of the bankruptcy case of Lehman if each Transfer constitutes a sale.

　　　　　While courts ultimately look to the economic substance of a transaction to determine whether it constitutes a sale or a pledge, the judicial analysis has typically proceeded on a case-by-case basis. The cases have not developed a prescribed formula which can be applied in a mechanical fashion. Rather, as the Third Circuit explained in a leading case, courts "have examined the parties' practices, objectives, business activities and relationships and determined whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of the transaction." Major's Furniture Mart, Inc. v. Castle Credit Corporation, Inc., 602 F.2d 538, 545 (3d Cir. 1979). The determination of the "true nature" of a transaction is thus usually based on an analysis of the facts and circumstances present in the particular transaction, rather than on the application of consistently applied or well-established legal doctrines. In re Golden Plan of California, Inc., 829 F.2d 705, 709 (9th Cir. 1987). See also Sarf v. Leff (In re Candy Lane Corp.), 38 B.R. 571, 576 (Bankr. S.D.N.Y. 1984) (true sale

To the Addresses Listed on
The Attached Schedule A                    -6-                        December 2, 2003

determination should be "based upon an examination of the substance of the documents in the context of the surrounding transaction").

Moreover, the published cases generally involve relatively small-scale commercial transactions or consumer claims whose fact patterns are not closely analogous to the transaction at issue here. While cases have addressed other market transactions in Eligible Securities, we are not aware of any published decision that has addressed the "true sale" issue in the context of a transfer of assets to a trustee for purposes of investing funds in a reserve fund pursuant to an agreement such as the Agreement.

The reported decisions indicate that no single factor or combination of factors is dispositive and, due to the "facts and circumstances" nature of the analysis, are not conclusive as to the relative weight to be accorded to the factors that are present in this transaction. We also note that the cases are not uniform in their treatment of the factors considered. For example, six cases involving a similar fact pattern produced inconsistent results. In two cases, the original sale characterization of the transaction was upheld while four cases recharacterized a purported sale as a financing. Compare In re Lemons & Assocs., Inc., 67 B.R. 198 (Bankr. D. Nev. 1986) (transfer of mortgage loan participations treated as a sale notwithstanding that return to transferee not related to return on transferred asset and transferee's ability to put transferred assets back to transferor) and Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgt. Corp.), 67 B.R. 557 (D.N.J. 1986) (sale treatment for repurchase agreement upheld notwithstanding transfer of asset at arbitrary, not fair market prices, payment by transferee to transferor not related to value of transferred asset, obligation to reverse the transfer on a specified date and full recourse to transferor for default on underlying asset) with In re Coronet Capital Co., 142 B.R. 78 (Bankr. S.D.N.Y. 1992) (transfer of participation treated as financing arrangement; return to transferees not related to return on transferred assets); Fireman's Fund Ins. Cos. v. Grover (In re The Woodson Co.), 813 F.2d 266 (9th Cir. 1987) (same); Ables v. Major Funding Corp. (In re Major Funding Corp.), 82 B.R. 443 (Bankr. S.D. Tex. 1987) (same); and In re S.O.A.W. Enter., Inc., 32 B.R. 279 (Bankr. W.D. Tex. 1983) (same).[2] In addition, in certain decisions, transactions with facts which are also present in this transaction were characterized as loans, but we believe that those cases are distinguishable in the context of this transaction.

The existing case law thus does not provide consistently applied general principles with which to analyze all of the factors present in this transaction.

We do note that the courts accord respect to the stated intent of the parties and tend to defer to the structure selected by the parties, unless the structure of the transaction is clearly inconsistent with that stated intent, or unless giving effect to the structure of the transaction would result in an evasion of public policy or perpetrate an injustice on one of the

---

[2]   In Lemons, Major Funding, Coronet Capital, S.O.A.W. and Woodson, the debtors were mortgage brokers which had assigned interests in mortgage loans to various investors, including individuals. The transactions were documented and advertised to potential investors as sales, but the investors were promised a fixed return on their investment regardless of the rate on, or performance of, the assigned loan.

To the Addresses Listed on
The Attached Schedule A                    -7-                    December 2, 2003

parties.[3]    Several cases have expressly articulated this concept, stating that in transactions between sophisticated parties which have elements of both loan and sale, the stated intent of the parties is the "controlling consideration." In re Bevill, Bresler & Schulman Asset Mgt. Corp., 67 B.R. at 597. See also Goldstein v. Madison Nat'l Bank of Washington, D.C., 89 B.R. 274, 277 (D.D.C. 1988) (language of agreement demonstrating an intent to create an absolute assignment supported the finding of a sale despite the presence of countervailing factors); Lyon v. Ty-Wood Corp., 239 A.2d 819 (Super. Ct. Pa. 1967) (same). But see In re The Woodson Co., 813 F.2d at 272 ("Simply calling transactions 'sales' does not make them so. Labels cannot change the true nature of the underlying transactions"); In re Joseph Kanner Hat Co., 482 F.2d 937, 940 (2d Cir. 1973) ("courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen"); In re Evergreen Valley Resort, Inc., 23 B.R. 659, 661 (Bankr. D. Me. 1982) ("the label attached to the transaction by the parties does not control"). In this regard, we note that the parties intend each Transfer to be a sale and will so treat each Transfer for accounting and tax purposes, and that there is no attempt to evade public policy or accomplish an objective which would be prohibited if a Transfer were a financing.

A comparison of the factors present in the Transfers with the factors generally considered by courts supports the conclusion that the Transfers constitute sales rather than pledges.

The economic substance of each Transfer is a sale. We note, for example, that in each case there is a complete and irrevocable transfer of the rewards and risks of ownership of the Eligible Securities. Lehman relinquishes (or causes the relinquishment of) all rights with respect to the Eligible Securities subject to each Transfer and, specifically, has no right to sell, pledge, or otherwise dispose of any of such Eligible Securities upon the consummation of each Transfer. Any change in the value of the Eligible Securities, whether due to changes in interest rates or otherwise, would not be for the benefit or loss of Lehman.

In addition, we note that in each case Lehman (or the Qualified Dealer effecting delivery of the Eligible Securities in satisfaction of the parties' obligations under Article II of the Agreement) will receive the entire consideration for the applicable Eligible Securities at the time of each Transfer, and that such consideration represents the fair value for such Eligible Securities. There will not be any post-closing adjustment of the Purchase Prices and Lehman does not have any right or obligation to transfer additional property to the Trustee. In these circumstances, Lehman relinquishes (or causes the relinquishment of) the benefits and risks associated with ownership of the Eligible Securities.

---

[3]    In the similar context of sale-and-leaseback transactions involving realty, courts have required a "showing by clear and convincing evidence . . . that the transaction should be deemed a disguised financing transaction" before they will exercise their power to "look through form to substance in determining the true nature of a transaction." In re Omne Partners II, 67 B.R. 793, 795 (Bankr. D.N.H. 1986) (quoting Fox v. Peck Iron & Metal Co., 25 B.R. 674, 688 (Bankr. S.D. Cal. 1981) and Pepper v. Litton, 308 U.S. 295, 304 (1939) (internal quotations omitted)).

To the Addresses Listed on
The Attached Schedule A                    -8-                    December 2, 2003

These factors, and the other aspects of the transaction, indicate that the Transfers constitute sales rather than pledges.

## CONCLUSION

Based on the foregoing facts, advice, representations, statements, and assumptions being correct at all relevant times, and based on the discussion and analysis above, it is our opinion that, under present reported decisional authority and statutes applicable to federal bankruptcy cases, and in a properly presented case, if Lehman were to become a debtor in a case under the Bankruptcy Code, a federal bankruptcy court, which acted reasonably and correctly applied the law to the facts as set forth herein after full consideration of all relevant factors, would hold that (i) the Eligible Securities transferred to the Trustee in accordance with the Agreement prior to the commencement of a bankruptcy case of Lehman and payments thereunder and proceeds thereof are not property of the estate of Lehman under Bankruptcy Code section 541(a)(1) and (ii) the automatic stay arising pursuant to Bankruptcy Code section 362(a) upon the commencement of a bankruptcy case of Lehman is not applicable to payments to the holders of the Bonds from proceeds of such Eligible Securities.

## QUALIFICATIONS

The foregoing opinion assumes that the facts, representations, statements, and assumptions set forth above will be those that exist at the time a federal bankruptcy court considers the issues.

While we believe that our opinion respecting sections 541 and 362 of the Bankruptcy Code is supported by sound analysis of existing law, we have found no statutes or reported judicial authority that discuss directly whether transfers such as the Transfers would be treated as sales or pledges and have found no reported judicial authority which has considered a transaction containing all the material facts and circumstances that are present in the Transfers. In rendering our opinion, we have thus relied on cases discussing certain of the facts and circumstances that are present in the Transfers and cases discussing more generally whether the transfer of an asset was a transfer of ownership or a transfer of a more limited interest. Accordingly, our opinion is not based on directly controlling precedent but rather on what we believe to be a sound analysis of existing authorities. Also, the analysis of Bankruptcy Code sections 541 and 362 and opinions thereon contained herein are based on general principles of law derived from a review of a significant body of case law and are not based on the laws of any particular state. Therefore, no opinion is rendered as to the laws of any jurisdiction other than the laws of the United States of America and we express no opinion as to the laws of any state or jurisdiction, other than the present laws of the state of New York as and to the extent we believe they may be applied or given effect by a federal bankruptcy court having jurisdiction of the bankruptcy proceeding of Lehman. Whether any particular transfer is a sale or a pledge will be generally a matter of state law and may be governed by the laws of a particular state. Most cases determining the matter in a context of a federal bankruptcy case, however, are decided on the basis of general principles of law and an analysis of the economic substance of the transaction.

To the Addresses Listed on
The Attached Schedule A                    -9-                    December 2, 2003

We express no opinion with respect to whether, if Lehman were to become a debtor in a case under the Bankruptcy Code, any Eligible Securities that are repurchased or otherwise acquired by Lehman (notwithstanding the provisions of the Agreement which do not contemplate or permit any such repurchase or acquisition) would be property of the estate of Lehman.

We express no opinion with respect to whether, if Lehman were to become a debtor in a case under the Bankruptcy Code, any of the Transfers would be avoided by the court as a fraudulent conveyance or based on other similar theories under the Bankruptcy Code or applicable state law.

We express no opinion as to the availability or effect of a preliminary injunction, temporary restraining order or other such temporary relief, or equitable remedies.

The opinions expressed above are limited to the present federal laws of the United States of America and the present laws of the state of New York as and to the extent we believe they may be applied or given effect by a federal court having jurisdiction over the bankruptcy proceeding of Lehman and to present judicial interpretations thereof.

The opinions expressed herein are not a guaranty as to what any particular court would actually hold, but an opinion as to the decision a court would reach if the issues are competently presented to it and the court followed existing precedent as to legal and equitable principles applicable in bankruptcy cases. In this regard, we note that legal opinions on bankruptcy law matters unavoidably have inherent limitations that generally do not exist in respect of other issues on which opinions to third parties are typically given. These inherent limitations exist primarily because of the pervasive equity powers of courts having jurisdiction over bankruptcy cases, the overriding goal of reorganization to which other legal rights and policies may be subordinated, the potential relevance to the exercise of judicial discretion of future arising facts and circumstances, and the nature of the bankruptcy process. The recipients of this opinion should take these limitations into account in analyzing the bankruptcy risks associated with the transactions described herein.

The opinions expressed above are given to you solely for your own benefit, are not binding on any court, and may not be quoted in whole or in part or otherwise referred to in any legal opinion, document, or other report to be furnished to another person or entity without our prior written consent.

Very truly yours,

Cadwalader, Wickersham & Taft LLP

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York  10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

LEHMAN BROTHERS SPECIAL FINANCING INC.
OFFICER'S CERTIFICATE

In connection with the insolvency opinion dated December 2, 2003 (the "Opinion") to be delivered by Cadwalader, Wickersham & Taft LLP, in connection with the issuance of Tobacco Settlement Financing Corporation of the State of New York Asset-Backed Revenue
Bonds, Series 2003A (State Contingency Contract Secured) and the Reserve Fund Agreement, dated as of December 2, 2003, among Lehman Brothers Special Financing Inc., The Bank of New York, as Trustee, and Tobacco Settlement Financing Corporation of the State of New York, the undersigned hereby certifies that, to the best of his or her knowledge after due inquiry and review of the Opinion:

1.    The undersigned understands that Cadwalader, Wickersham & Taft LLP is relying on this Certificate in connection with the execution and delivery of the Opinion.

2.    The facts and assumptions contained in the section of the Opinion entitled "Facts and Assumptions" insofar as they pertain to Lehman Brothers Special Financing Inc. are true and correct as of the date hereof.

3.    The undersigned has no reason to believe that any statement or fact expressed in the section of the Opinion entitled "Facts and Assumptions" is untrue, inaccurate or incomplete.

4.    I have been duly authorized to execute this Certificate on behalf of Lehman Brothers Special Financing Inc.

Dated: December 2, 2003

LEHMAN BROTHERS SPECIAL
FINANCING INC.,


By:_____
    Name:
    Title:

NYLIB5 742704.1

# STADTMAUER BAILKIN LLP

## COUNSELORS AT LAW

850 THIRD AVENUE
NEW YORK, NY 10022

TELEPHONE: 212.751.8600
FACSIMILE: 212.980.9578

December 2, 2003

The Bank of New York
101 Barclay Street, Floor 21 W
New York, New York 10286

Tobacco Settlement Financing Corporation of the State of New York
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019

Re:    $2,240,415,000 Tobacco Settlement Financing Corporation (State of New York)
       Asset-Backed Revenue Bonds, Series 2003A (State Contingency Contract Secured)

Ladies and Gentlemen:

We have acted as counsel to The Bank of New York (the "Trustee") in connection with the execution and delivery by the Trustee of the Reserve Fund Agreement, dated as of December 2, 2003 (the "Agreement"), by and among the Trustee, Tobacco Settlement Financing Corporation (the "Issuer") and Lehman Brothers Special Financing Inc.. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of New York.

The Bank of New York
Tobacco Settlement Financing Corporation of the State of New York
Lehman Brothers Special Financing Inc.
December 2, 2003
Page 2.

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Trustee has full legal right, power and authority to enter into the Agreement.

(ii)    The Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)    The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(v)    The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

STADTMAUER BAILKIN LLP

*Stadtmauer Bailkin LLP*

# CADWALADER

*Cadwalader, Wickersham & Taft LLP*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

New York
Charlotte
Washington
London

December 2, 2003

To the Addressees Listed on
The Attached Schedule A

Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation, Asset-Backed
       Revenue Bonds, Series 2003B (State Contingency Contract Secured)

Ladies and Gentlemen:

We have acted as special counsel to Lehman Brothers Special Financing Inc., a corporation organized under the laws of Delaware ("LBSF") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor") in connection with the execution and delivery by LBSF of the Reserve Fund Agreement, dated as of December 2, 2003 (the "Agreement"), among LBSF, The Bank of New York, as Trustee (the "Trustee") and Tobacco Settlement Financing Corporation ("TSFC") and by the Guarantor of the Guarantee, dated as of December 2, 2003 (the "Guarantee") delivered in connection with the Agreement.

In connection with this opinion, we have examined an executed copy of each of the Agreement and the Guarantee and such corporate documents and records of LBSF and of the Guarantor, certificates of public officials and officers of LBSF and of the Guarantor, and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies, and the due execution and delivery, pursuant to due authorization, of the Agreement and of the Guarantee by each party thereto.

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the General Corporation Law of the State of Delaware. With respect to the opinions set forth in paragraphs 1 and 2 below, we have, with your consent, relied solely upon the opinion of counsel of LBSF and the Guarantor, a copy of which is attached as Schedule B.

NYLIB5 742700.1

To the Addressees Listed on
The Attached Schedule A                    -2-                    December 2, 2003

Based upon the foregoing, we are of the opinion that:

1.    Each of LBSF and the Guarantor is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

2.    The execution, delivery and performance of the Agreement by LBSF and of the Guarantee by the Guarantor are within its respective corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provisions of it's respective articles of incorporation or by-laws.

3.    The Agreement, in the case of LBSF, and the Guarantee, in the case of the Guarantor, has been duly executed and delivered by it and constitutes its legally valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

We are admitted to practice in the State of New York, and except as expressly set forth above, this opinion is limited to the laws of the State of New York.  The opinions expressed herein are limited to the laws and facts as presently in existence.  We undertake no obligation to revise, supplement or update this opinion after the date hereof for any reason.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon.  This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

Cadwalader, Wickersham & Taft LLP

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York 10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

Schedule B

Opinion of Counsel of LBSF and the Guarantor

# CADWALADER

### *Cadwalader, Wickersham & Taft LLP*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

New York
Charlotte
Washington
London

December 2, 2003

To the Addressees Listed on
The Attached Schedule A

Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation,
Asset-Backed Revenue Bonds, Series 2003B (State Contingency Contract
Secured)

Ladies and Gentlemen:

We have acted as special counsel to Lehman Brothers Special Financing Inc., a corporation organized under the laws of Delaware ("Lehman"), in connection with the Reserve Fund Agreement, dated as of December 2, 2003 (the "Agreement"), among Lehman, The Bank of New York, as Trustee (the "Trustee"), and Tobacco Settlement Financing Corporation (the "Issuer"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

You have requested our opinion as to whether, under present reported decisional authority and statutes applicable to federal bankruptcy cases, if Lehman were to become a debtor in a case under the Bankruptcy Code[1], a federal bankruptcy court, which acted reasonably and correctly applied the law to the facts as set forth herein after full consideration of all relevant factors, would hold that (i) Eligible Securities transferred to the Trustee in accordance with the Agreement prior to the commencement of a bankruptcy case of Lehman and payments thereunder and proceeds thereof are not property of the estate of Lehman under Bankruptcy Code section 541(a)(1) and (ii) the automatic stay arising pursuant to Bankruptcy Code section 362(a) upon the commencement of a bankruptcy case of Lehman is not applicable to payments to the holders of the Bonds from proceeds of such Eligible Securities.

## FACTS AND ASSUMPTIONS

In rendering this opinion, we have examined and relied upon originals or copies, certified or otherwise identified to our satisfaction, of such certificates, corporate or other records, and other documents as we have deemed appropriate for the purpose of rendering this opinion. We have examined and relied upon, among other things, the Request for Bids for Debt

---

[1]    11 U.S.C. §§ 101 1330.

To the Addresses Listed on
The Attached Schedule A                    -2-                    December 2, 2003

Service Reserve Account Agreement, dated November 17, 2003 (the "RFB"), the Agreement, the Indenture (collectively, the "Applicable Documents") and the certificates, opinions, agreements and other documents (including exhibits thereto) delivered in connection with the Applicable Agreements.

We have assumed that no party to any of the Applicable Documents has entered into any agreement or understanding, either written or oral, inconsistent with the terms of any of the Applicable Documents or the assumptions or discussion in this opinion or that is otherwise related to the subject matter of the Agreement, or which otherwise pertains to the forward sale commitment of Lehman with respect to Eligible Securities to be purchased by the Trustee on the dates specified in the Agreement for purposes of investing funds in the Reserve Fund other than as expressly set forth in such documents or in this opinion.

The opinions expressed herein are based upon and subject to the assumed compliance by Lehman, the Trustee and the Issuer with the facts and assumptions set forth herein.

We have assumed and relied upon the genuineness and due authorization of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies, and the authenticity of the originals of all documents submitted to us as copies.

We have been advised of the following facts by Lehman. In rendering our opinion, we have relied upon the documents reviewed as described above and the certificate of an officer of Lehman in which such officer represents that the applicable facts set forth herein are accurate. We have not made any independent inquiry with regard to the accuracy of the matters stated in such certificate or in the documents reviewed. In rendering our opinion, we have assumed, without independent verification, that the facts and assumptions outlined below are correct.

The RFB indicated that the Issuer anticipated investing the funds available for deposit in the Reserve Fund for the Bonds, potentially in multiple separate forward purchase agreements with two or more separate providers to reduce the exposure to a single provider and to maximize the earnings to be derived from the funds invested. The Issuer requested bids, for an earnings rate on the funds invested under any such forward purchase agreement, where the term of such forward purchase agreement will be identical to the term of the Bonds, June 1, 2023 (although the Bonds are expected to all be paid by June 1, 2016), and where if a forward purchase agreement is terminated early because of the retirement of all of the Bonds due to a clean up call of the Bonds a termination amount would be determined and due from the applicable party. For each bid, the bidder was required to provide the earnings rate the bidder would agree to provide for the amount of funds invested, on the dates and for the periods specified in the RFB. Bids were due on November 18, 2003, and on November 18, 2003 Lehman was advised that it was the successful bidder with respect to a Scheduled Reserve Fund Amount ultimately determined to be $221,582,343.75 out of the total amount in the Reserve Fund to be invested, having bid a guaranteed earnings rate equal to 4.687% (the "Lehman Bid").

To the Addresses Listed on
The Attached Schedule A                      -3-                      December 2, 2003

Morgan Stanley Capital Services Inc. was the successful bidder, pursuant to its bid (the "MSCS Bid"), with respect to the remainder of the funds in the Reserve Fund to be invested.

In furtherance of the Lehman Bid and the MSCS Bid, Lehman will enter into the Agreement with the Trustee and the Issuer, and MSCS will enter into a similar forward purchase agreement with the Trustee and the Issuer. Pursuant to the Agreement, Lehman will satisfy its forward commitment, in accordance with the Lehman Bid, with respect to the sale of Eligible Securities to the Trustee on the dates and for the periods, and otherwise upon the terms and conditions, specified in the Agreement. Lehman Brothers Holdings Inc. will guaranty the obligations of Lehman under the Agreement.

Pursuant to Section 2.1 of the Agreement, (i) Lehman shall cause a Qualified Dealer (which may or may not be an affiliate of Lehman) to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirement set forth in Section 2.2 of the Agreement, Qualified Securities selected by Lehman or the Qualified Dealer, and (ii) assuming that Lehman has caused such delivery to be made, the Trustee shall, out of funds available in the Reserve Fund, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable in accordance with Section 2.2 of the Agreement, an amount equal to the Purchase Price thereof.

Pursuant to Section 2.2 of the Agreement, (i) all Qualified Securities delivered shall be delivered to the Trustee to a specified account, in such manner as at the time is generally acceptable for delivery of Qualified Securities, (ii) all Qualified Securities shall be delivered to the Trustee on a "delivery versus payment" basis, (iii) Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities specifying, at a minimum, the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security, (iv) concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall (subject to clause (v) below) pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any, (v) Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee, and (B) to Lehman, the Differential, to a specified account, and (vi) all payments to be made by the Trustee in accordance with the foregoing shall be made in immediately available funds by means of a bank or Federal funds wire. As indicated in clause (i) of the preceding sentence, we assume that all actions that would be requisite to effecting the transfer of ownership to the Trustee of each Qualified Security delivered to the Trustee pursuant to the Agreement (including but not limited to re-registration of each such Qualified Security in the name of the Trustee) will be taken.

Section 2.3 of the Agreement deals with circumstances under which funds constituting a portion of the Scheduled Reserve Amount become available to the Trustee prior to a Bond Payment Date (for example, upon the maturity of a Qualified Security sold to the Trustee on the related Deposit Date) and, subject to certain conditions, Lehman is entitled to sell additional Qualified Securities to the Trustee in respect of such available funds. Any deliveries of Qualified Securities made pursuant to Section 2.3 shall conform to the requirements of

To the Addresses Listed on
The Attached Schedule A                    -4-                    December 2, 2003

Section 2.2 described above.  Section 2.3 expressly provides that Lehman shall have no right to substitute Qualified Securities for any Qualified Securities previously sold under the Agreement.

Section 2.4 of the Agreement deals with a failure by Lehman to cause a Qualified Dealer to deliver Qualified Securities when required, and a potential cure by Lehman by means of a late delivery.

Qualified Securities means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3, 2.4 or 2.5 (c) of the Agreement, Eligible Securities which, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is (A) with respect to a delivery in connection with a Deposit Date, as close as possible to but does not exceed the related Scheduled Reserve Amount, (B) with respect to a delivery pursuant to Section 2.3 of the Agreement, equal to the Maturity Amount of the relevant Qualified Securities which have so matured (or as applicable, the amount of a Coupon Payment) and (C) with respect to a delivery pursuant to Section 2.5(c) of the Agreement, equal to the pro rata portion of the replenishment amount.   Accordingly, all Eligible Securities which Lehman causes to be delivered to and purchased by the Trustee in accordance with the Agreement will mature while held by the Trustee.

Purchase Price means, (i) for any Eligible Security delivered under the Agreement other than pursuant to Section 2.3 thereof, that price for such Qualified Security, as set forth in the Delivery Notice, which will produce a rate of return on such Qualified Security for the period from (and including) the Deposit Date to (but excluding) the immediately succeeding Bond Payment Date equal to the Guaranteed Rate and (ii) for any Eligible Security delivered pursuant to Section 2.3, the Maturity Amount thereof.

The Differential, if any, in connection with any delivery of Qualified Securities, which will be paid by the Trustee to either the Qualified Dealer as agent for Lehman or directly to Lehman, as specified in the related Delivery Notice, means the amount, if any, by which the Purchase Price of any Qualified Security delivered under the Agreement exceeds the Market Value thereof.

Each delivery of a Qualified Security to the Trustee which Lehman causes to be made, together with the actions requisite to a transfer of ownership of such Qualified Security, and the simultaneous payment by the Trustee of the Purchase Price therefor, all in accordance with the Agreement, is referred to herein as a "Transfer".

Lehman, the Trustee and the Issuer intend that each Transfer be a sale from (or caused by) Lehman to, and a purchase by, the Trustee.  Lehman, the Trustee and the Issuer, as applicable, will treat each Transfer as a sale for accounting and tax purposes.

The Purchase Price for the Eligible Securities related to each Transfer reflect the good faith determination of Lehman and the Issuer, based on the Lehman Bid and the other bids submitted pursuant to the RFB, of the fair value of, and fair consideration for, such Eligible Securities delivered and purchased in satisfaction of the parties' rights and obligations under the Agreement, and is reasonably equivalent to the prices that the parties believe would be paid in

To the Addresses Listed on
The Attached Schedule A                    -5-                              December 2, 2003

other sales of such Eligible Securities between non-affiliated entities pursuant to forward purchase agreements comparable to the Agreement, as evidenced by the MSCS Bid and the other bids submitted pursuant to the RFB. No provision exists whereby such consideration for the Eligible Securities may be modified subsequent to each Transfer, and Lehman will have no obligation to repay such consideration, or interest thereon, to the Trustee.

Pursuant to the Agreement, Lehman will irrevocably transfer and relinquish (or will cause the irrevocable transfer and relinquishment of) all rights with respect to the Eligible Securities upon each Transfer thereof and, specifically, will have no right to sell, pledge or otherwise dispose of the Eligible Securities once transferred to the Trustee. The Trustee will be free to deal with all such Eligible Securities as its property. Pursuant to the Agreement, Lehman will transfer (or will cause the transfer of) the Eligible Securities without recourse and will have no obligation to deliver other property to the Trustee either in substitution for or in addition to the Eligible Securities in the event of a credit loss or decline in value of the Eligible Securities.

Neither Lehman nor any of its affiliates will own, hold or have any interest in the Eligible Securities subsequent to each Transfer thereof. The Trustee will no right or obligation to transfer any of the Eligible Securities back to Lehman. Lehman will not have any right or obligation to reacquire any of the Eligible Securities subsequent to each Transfer thereof. Consequently, with respect to each Transfer, Lehman will have transferred (or will have caused the transfer) of the benefits and risks of ownership of the Eligible Securities to the Trustee and, ultimately, to the holders of the Bonds.

Lehman will not transfer (or cause the transfer) of any of the Eligible Securities in contemplation of insolvency or with a design to prefer one or more creditors to the exclusion in whole or in part of others or with an intent to hinder, delay or defraud any of its creditors.

## DISCUSSION

Were Lehman to become a debtor in a case under the Bankruptcy Code, the Eligible Securities transferred to the Trustee prior to the commencement of such case would not be property of the estate of Lehman or subject to the automatic stay arising upon the commencement of the bankruptcy case of Lehman if each Transfer constitutes a sale.

While courts ultimately look to the economic substance of a transaction to determine whether it constitutes a sale or a pledge, the judicial analysis has typically proceeded on a case-by-case basis. The cases have not developed a prescribed formula which can be applied in a mechanical fashion. Rather, as the Third Circuit explained in a leading case, courts "have examined the parties' practices, objectives, business activities and relationships and determined whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of the transaction." Major's Furniture Mart, Inc. v. Castle Credit Corporation, Inc., 602 F.2d 538, 545 (3d Cir. 1979). The determination of the "true nature" of a transaction is thus usually based on an analysis of the facts and circumstances present in the particular transaction, rather than on the application of consistently applied or well-established legal doctrines. In re Golden Plan of California, Inc., 829 F.2d 705, 709 (9th Cir. 1987). See also Sarf v. Leff (In re Candy Lane Corp.), 38 B.R. 571, 576 (Bankr. S.D.N.Y. 1984) (true sale

To the Addresses Listed on
The Attached Schedule A                    -6-                    December 2, 2003

determination should be "based upon an examination of the substance of the documents in the context of the surrounding transaction").

Moreover, the published cases generally involve relatively small-scale commercial transactions or consumer claims whose fact patterns are not closely analogous to the transaction at issue here. While cases have addressed other market transactions in Eligible Securities, we are not aware of any published decision that has addressed the "true sale" issue in the context of a transfer of assets to a trustee for purposes of investing funds in a reserve fund pursuant to an agreement such as the Agreement.

The reported decisions indicate that no single factor or combination of factors is dispositive and, due to the "facts and circumstances" nature of the analysis, are not conclusive as to the relative weight to be accorded to the factors that are present in this transaction. We also note that the cases are not uniform in their treatment of the factors considered. For example, six cases involving a similar fact pattern produced inconsistent results. In two cases, the original sale characterization of the transaction was upheld while four cases recharacterized a purported sale as a financing. Compare In re Lemons & Assocs., Inc., 67 B.R. 198 (Bankr. D. Nev. 1986) (transfer of mortgage loan participations treated as a sale notwithstanding that return to transferee not related to return on transferred asset and transferee's ability to put transferred assets back to transferor) and Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgt. Corp.), 67 B.R. 557 (D.N.J. 1986) (sale treatment for repurchase agreement upheld notwithstanding transfer of asset at arbitrary, not fair market prices, payment by transferee to transferor not related to value of transferred asset, obligation to reverse the transfer on a specified date and full recourse to transferor for default on underlying asset) with In re Coronet Capital Co., 142 B.R. 78 (Bankr. S.D.N.Y. 1992) (transfer of participation treated as financing arrangement; return to transferees not related to return on transferred assets); Fireman's Fund Ins. Cos. v. Grover (In re The Woodson Co.), 813 F.2d 266 (9th Cir. 1987) (same); Ables v. Major Funding Corp. (In re Major Funding Corp.), 82 B.R. 443 (Bankr. S.D. Tex. 1987) (same); and In re S.O.A.W. Enter., Inc., 32 B.R. 279 (Bankr. W.D. Tex. 1983) (same).[2] In addition, in certain decisions, transactions with facts which are also present in this transaction were characterized as loans, but we believe that those cases are distinguishable in the context of this transaction.

The existing case law thus does not provide consistently applied general principles with which to analyze all of the factors present in this transaction.

We do note that the courts accord respect to the stated intent of the parties and tend to defer to the structure selected by the parties, unless the structure of the transaction is clearly inconsistent with that stated intent, or unless giving effect to the structure of the transaction would result in an evasion of public policy or perpetrate an injustice on one of the

---

[2]    In Lemons, Major Funding, Coronet Capital, S.O.A.W. and Woodson, the debtors were mortgage brokers which had assigned interests in mortgage loans to various investors, including individuals. The transactions were documented and advertised to potential investors as sales, but the investors were promised a fixed return on their investment regardless of the rate on, or performance of, the assigned loan.

parties.[3]    Several cases have expressly articulated this concept, stating that in transactions between sophisticated parties which have elements of both loan and sale, the stated intent of the parties is the "controlling consideration." In re Bevill, Bresler & Schulman Asset Mgt. Corp., 67 B.R. at 597. See also Goldstein v. Madison Nat'l Bank of Washington, D.C., 89 B.R. 274, 277 (D.D.C. 1988) (language of agreement demonstrating an intent to create an absolute assignment supported the finding of a sale despite the presence of countervailing factors); Lyon v. Ty-Wood Corp., 239 A.2d 819 (Super. Ct. Pa. 1967) (same). But see In re The Woodson Co., 813 F.2d at 272 ("Simply calling transactions 'sales' does not make them so. Labels cannot change the true nature of the underlying transactions"); In re Joseph Kanner Hat Co., 482 F.2d 937, 940 (2d Cir. 1973) ("courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen"); In re Evergreen Valley Resort, Inc., 23 B.R. 659, 661 (Bankr. D. Me. 1982) ("the label attached to the transaction by the parties does not control"). In this regard, we note that the parties intend each Transfer to be a sale and will so treat each Transfer for accounting and tax purposes, and that there is no attempt to evade public policy or accomplish an objective which would be prohibited if a Transfer were a financing.

A comparison of the factors present in the Transfers with the factors generally considered by courts supports the conclusion that the Transfers constitute sales rather than pledges.

The economic substance of each Transfer is a sale. We note, for example, that in each case there is a complete and irrevocable transfer of the rewards and risks of ownership of the Eligible Securities. Lehman relinquishes (or causes the relinquishment of) all rights with respect to the Eligible Securities subject to each Transfer and, specifically, has no right to sell, pledge, or otherwise dispose of any of such Eligible Securities upon the consummation of each Transfer. Any change in the value of the Eligible Securities, whether due to changes in interest rates or otherwise, would not be for the benefit or loss of Lehman.

In addition, we note that in each case Lehman (or the Qualified Dealer effecting delivery of the Eligible Securities in satisfaction of the parties' obligations under Article II of the Agreement) will receive the entire consideration for the applicable Eligible Securities at the time of each Transfer, and that such consideration represents the fair value for such Eligible Securities. There will not be any post-closing adjustment of the Purchase Prices and Lehman does not have any right or obligation to transfer additional property to the Trustee. In these circumstances, Lehman relinquishes (or causes the relinquishment of) the benefits and risks associated with ownership of the Eligible Securities.

---

[3]    In the similar context of sale-and-leaseback transactions involving realty, courts have required a "showing by clear and convincing evidence . . . that the transaction should be deemed a disguised financing transaction" before they will exercise their power to "look through form to substance in determining the true nature of a transaction." In re Omne Partners II, 67 B.R. 793, 795 (Bankr. D.N.H. 1986) (quoting Fox v. Peck Iron & Metal Co., 25 B.R. 674, 688 (Bankr. S.D. Cal. 1981) and Pepper v. Litton, 308 U.S. 295, 304 (1939) (internal quotations omitted)).

08-13555-mg    Doc 5281-5    Filed 09/25/09    Entered 09/25/09 13:24:41    Exhibit D
Part 2    Pg 40 of 44

To the Addresses Listed on
The Attached Schedule A                    -8-                         December 2, 2003

These factors, and the other aspects of the transaction, indicate that the Transfers constitute sales rather than pledges.

## CONCLUSION

Based on the foregoing facts, advice, representations, statements, and assumptions being correct at all relevant times, and based on the discussion and analysis above, it is our opinion that, under present reported decisional authority and statutes applicable to federal bankruptcy cases, and in a properly presented case, if Lehman were to become a debtor in a case under the Bankruptcy Code, a federal bankruptcy court, which acted reasonably and correctly applied the law to the facts as set forth herein after full consideration of all relevant factors, would hold that (i) the Eligible Securities transferred to the Trustee in accordance with the Agreement prior to the commencement of a bankruptcy case of Lehman and payments thereunder and proceeds thereof are not property of the estate of Lehman under Bankruptcy Code section 541(a)(1) and (ii) the automatic stay arising pursuant to Bankruptcy Code section 362(a) upon the commencement of a bankruptcy case of Lehman is not applicable to payments to the holders of the Bonds from proceeds of such Eligible Securities.

## QUALIFICATIONS

The foregoing opinion assumes that the facts, representations, statements, and assumptions set forth above will be those that exist at the time a federal bankruptcy court considers the issues.

While we believe that our opinion respecting sections 541 and 362 of the Bankruptcy Code is supported by sound analysis of existing law, we have found no statutes or reported judicial authority that discuss directly whether transfers such as the Transfers would be treated as sales or pledges and have found no reported judicial authority which has considered a transaction containing all the material facts and circumstances that are present in the Transfers. In rendering our opinion, we have thus relied on cases discussing certain of the facts and circumstances that are present in the Transfers and cases discussing more generally whether the transfer of an asset was a transfer of ownership or a transfer of a more limited interest. Accordingly, our opinion is not based on directly controlling precedent but rather on what we believe to be a sound analysis of existing authorities. Also, the analysis of Bankruptcy Code sections 541 and 362 and opinions thereon contained herein are based on general principles of law derived from a review of a significant body of case law and are not based on the laws of any particular state. Therefore, no opinion is rendered as to the laws of any jurisdiction other than the laws of the United States of America and we express no opinion as to the laws of any state or jurisdiction, other than the present laws of the state of New York as and to the extent we believe they may be applied or given effect by a federal bankruptcy court having jurisdiction of the bankruptcy proceeding of Lehman. Whether any particular transfer is a sale or a pledge will be generally a matter of state law and may be governed by the laws of a particular state. Most cases determining the matter in a context of a federal bankruptcy case, however, are decided on the basis of general principles of law and an analysis of the economic substance of the transaction.

NYLIB5 742704.1

To the Addresses Listed on
The Attached Schedule A                    -9-                    December 2, 2003

       We express no opinion with respect to whether, if Lehman were to become a debtor in a case under the Bankruptcy Code, any Eligible Securities that are repurchased or otherwise acquired by Lehman (notwithstanding the provisions of the Agreement which do not contemplate or permit any such repurchase or acquisition) would be property of the estate of Lehman.

       We express no opinion with respect to whether, if Lehman were to become a debtor in a case under the Bankruptcy Code, any of the Transfers would be avoided by the court as a fraudulent conveyance or based on other similar theories under the Bankruptcy Code or applicable state law.

       We express no opinion as to the availability or effect of a preliminary injunction, temporary restraining order or other such temporary relief, or equitable remedies.

       The opinions expressed above are limited to the present federal laws of the United States of America and the present laws of the state of New York as and to the extent we believe they may be applied or given effect by a federal court having jurisdiction over the bankruptcy proceeding of Lehman and to present judicial interpretations thereof.

       The opinions expressed herein are not a guaranty as to what any particular court would actually hold, but an opinion as to the decision a court would reach if the issues are competently presented to it and the court followed existing precedent as to legal and equitable principles applicable in bankruptcy cases. In this regard, we note that legal opinions on bankruptcy law matters unavoidably have inherent limitations that generally do not exist in respect of other issues on which opinions to third parties are typically given. These inherent limitations exist primarily because of the pervasive equity powers of courts having jurisdiction over bankruptcy cases, the overriding goal of reorganization to which other legal rights and policies may be subordinated, the potential relevance to the exercise of judicial discretion of future arising facts and circumstances, and the nature of the bankruptcy process. The recipients of this opinion should take these limitations into account in analyzing the bankruptcy risks associated with the transactions described herein.

       The opinions expressed above are given to you solely for your own benefit, are not binding on any court, and may not be quoted in whole or in part or otherwise referred to in any legal opinion, document, or other report to be furnished to another person or entity without our prior written consent.

       Very truly yours,

       Cadwalader, Wickersham & Taft LLP

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York  10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

# LEHMAN BROTHERS

December 2, 2003

Tobacco Settlement Financing Corporation
New York, NY

The Bank of New York
New York, NY

Re:    $2,240,415,000 Asset-Backed Revenue Bonds, Series 2003B (State Contingency
       Contract Secured)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the in connection with the execution and delivery by Lehman of the Reserve Fund Agreement dated as of December 2, 2003 (the "Agreement") by and among Lehman, The Bank of New York, as Trustee (the "Trustee") and Tobacco Settlement Financing Corporation (the "Issuer") and the guarantee of the Guarantor (the "Guarantee") delivered in connection with the Agreement.  Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Agreement executed by Lehman, the Guarantee and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman and Guarantor as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Each of Lehman and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and each has the corporate power and authority to execute and deliver the Agreement, in the case of Lehman, and the Guarantee, in the case of Guarantor, and to perform its obligations thereunder.

2.    Each of the Agreement, in the case of Lehman, and the Guarantee, in the case of Guarantor, has been duly and validly authorized, executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

3.    Lehman's and the Guarantor's execution and delivery of the Agreement and the Guarantee and the performance of its respective obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property (other than such conflicts, defaults or violations would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

4.    All consents, authorizations and approvals requisite for its execution, delivery and performance by Lehman of the Agreement and by the Guarantor of the Guarantee have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance (except for such consents, authorizations and approvals which the failure to obtain would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by the Trustee and the Issuer, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,