**Hearing Date and Time:  October 14, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  October 9, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

--------------------------------------------------------------------x

### NOTICE OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Special Financing, Inc. (the "Debtor"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, for entry of an order authorizing certain discovery from First Data Corporation, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 14, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal &

Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq., Richard W. Slack, Esq., and Robert J. Lemons, Esq., attorneys for the Debtor; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York, 10004, Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York, 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be received no later than **October 9, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: September 29, 2009
New York, New York

/s/ Richard W. Slack
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

2

**Hearing Date and Time:  October 14, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  October 9, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
                                          :
-------------------------------------------------------------------x
```

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Special Financing, Inc. ("LBSF"), as debtor and debtor

in possession (the "Debtor" and, collectively with its non-debtor affiliates, "Lehman"),

hereby moves for entry of an order pursuant to Rule 2004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing certain discovery from First

Data Corporation ("First Data"), and respectfully represents:

## PRELIMINARY STATEMENT

1.        This motion seeks basic and necessary information from a
derivative counterparty to allow LBSF to determine whether the valuation of a terminated
derivative contract by First Data was proper.  Although the Debtor typically seeks this
information cooperatively in the first instance (and hundreds of counterparties who have
terminated and then provided valuation statements have provided the Debtor with similar
information voluntarily), the counterparty here, First Data, has refused to provide it.

2.        The background of the agreement with First Data is
straightforward.  On October 8, 2007, LBSF entered into an interest rate swap transaction
with First Data.  On October 29, 2008, following the bankruptcy of LBSF, First Data
terminated the swap transaction (the "Terminated Transaction").

3.        Based on the underlying value of the Terminated Transaction at the
time of termination, LBSF was "in-the-money" with respect to the Terminated
Transaction.  Thus, upon termination LBSF expected that First Data would owe it
millions of dollars based on the market value of the Terminated Transaction.  The
agreement between LBSF and First Data provided that First Data, as the non-defaulting
party, would have the ability to control the valuation process and calculate the amounts
due to LBSF under the Terminated Transaction (the "Termination Amount").  First Data
determined that it owed LBSF approximately $14.3 million, which was less than the
amount that LBSF believes it is entitled to receive with respect to the Terminated
Transaction.

4.        Typically, a defaulting party will want to confirm that the non-
defaulting party reasonably determined in good faith the amount owed after termination,

2

and understand the non-defaulting party's basis for arriving at this amount. It is common

for a non-defaulting party to share information and confer in good faith with the

defaulting party concerning the calculation when requested. Although First Data has

provided LBSF with some limited information regarding its calculation of the

Termination Amount, the materials it provided were neither complete nor sufficient for

LBSF to understand and verify First Data's calculation of the Termination Amount.

Despite requests, First Data has refused to share with LBSF complete and sufficient

information regarding the steps that First Data took to determine the amount it says it

owes LBSF.

5.      As an estate in bankruptcy, LBSF has an obligation to its creditors

to make sure that derivative counterparties properly value swap agreements. The

information sought from First Data is designed to help LBSF meet that duty. Since First

Data has refused to provide information to LBSF on a voluntary basis, this Motion is

necessary. The Court should therefore grant the Motion authorizing discovery from First

Data pursuant to Bankruptcy Rule 2004.

## BACKGROUND

6.      Beginning on September 15, 2008 and periodically thereafter

(as applicable, the "Commencement Date"), Lehman Brothers Holdings, Inc. ("LBHI")

and certain of its subsidiaries commenced with this Court voluntary cases under chapter

11 of title 11 of the United States Code (the "Bankruptcy Code"). LBSF commenced its

chapter 11 case on October 3, 2008. LBSF and LBHI's chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to

Bankruptcy Rule 1015(b). LBSF is authorized to operate its businesses and manage its

3

properties as debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

7.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of

unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

## JURISDICTION

8.    This Court has subject matter jurisdiction to consider this matter

pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §

157(b).

## RELIEF REQUESTED

9.    By this Motion, the Debtor requests entry of an order pursuant to

Bankruptcy Rule 2004:

   a.    directing First Data to produce responsive, non-privileged
         documents requested on the attached Exhibit F hereto for
         examination by the Debtor; and

   b.    directing First Data to designate an individual or
         individuals with knowledge of the matters described below
         in paragraph 20 and to produce that individual(s) to be
         examined by the Debtor under oath on such date and time
         and such location as may be designated in writing by the
         Debtor on not less than 14 days notice.

## THE TRANSACTION

10.    LBSF and First Data entered into an interest rate swap

transaction (the "Transaction"), the terms of which were documented by a trade

confirmation (the "Confirmation") dated October 8, 2007.  (A copy of the Confirmation

4

is attached hereto as Exhibit A.)   The Confirmation provides that it is subject to the terms

of the standard form 1992 ISDA Master Agreement (the "Master Agreement," together

with the Confirmation, the "Agreement").[1]   The Master Agreement provides the basic

terms of the parties' contractual relationship and the Confirmation provides the economic

terms of the specific transaction agreed to by the parties.   (A copy of the Master

Agreement is attached hereto as Exhibit B.)

        11.        Section 5(a)(vii)(4) of the Master Agreement provides that the

commencement of a bankruptcy case by LBSF is an event of default.   First Data

delivered a letter dated October 29, 2008 (the "Termination Notice") to LBSF, stating

that an event of default had occurred under Section 5(a)(vii)(4) of the Master Agreement.

(A copy of the Termination Notice is attached hereto as Exhibit C.)   The Termination

Notice purportedly designated October 29, 2008 as the early termination date (the

"Termination Date") for the Transaction.

        12.        Pursuant to the Agreement, a termination amount is calculated

whenever transactions under the Agreement are subject to early termination.   The

Agreement specifies that "Second Method" and "Market Quotation" be used to determine

which party owes and how much it owes.   The Agreement provides in relevant part that if

the Second Method and Market Quotation apply,

        an amount will be payable equal to (A) the sum of the [s]ettlement
        [a]mount (determined by the [non-defaulting party]) in respect of the

---

[1] The Confirmation states that it shall supplement, form part of, and be subject to an agreement in the form of a 1992 version of the preprinted ISDA Master Agreement (Multicurrency – Cross Border) (New York law version) "as if we had both executed an agreement on such form on the Trade Date of the first such Transaction between us . . . with the schedule thereto," with certain changes set forth in the Confirmation.

> Terminated Transactions and the [t]ermination [c]urrency [e]quivalent of
> the Unpaid Amounts owing to the [non-defaulting party] less (B) the
> [t]ermination [c]urrency [e]quivalent of the Unpaid Amounts owing to the
> [defaulting party]. If that amount is a positive number, the [defaulting
> party] will pay it to the [non-defaulting party]; if it is a negative number,
> the [non-defaulting party] will pay the absolute value of that amount to the
> [defaulting party].

<u>See</u> Section 6(e)(i)(3) of the Agreement. The Agreement defines the Unpaid Amounts

owing to any party as

> the aggregate of … in respect of all Terminated Transactions, the amounts
> that became payable … to such party … on or prior to such [e]arly
> [t]ermination [d]ate and which remain unpaid as at such [e]arly
> [t]ermination [d]ate … together with … interest … from (and including)
> the date such amounts or obligations were or would have been required to
> have been paid or performed to (but excluding) such [e]arly [t]ermination
> [d]ate, at the [a]pplicable [r]ate ….

<u>See</u> Section 14 of the Agreement. The Agreement further provides in relevant part that

the settlement amount means the sum of the Market Quotations for each Terminated

Transaction. "Market Quotation" is defined in the Agreement as

> an amount determined on the basis of quotations from Reference Market-
> makers. Each quotation will be for an amount, if any, that would be paid
> to [the party making the determination] (expressed as a negative number)
> or by such party (expressed as a positive number) in consideration of an
> agreement between such party … and the quoting Reference Market-
> maker to enter into a transaction (the "<u>Replacement Transaction</u>") that
> would have the effect of preserving for such party the economic
> equivalent of any payment or delivery … that would, but for the
> occurrence of the relevant [e]arly [t]ermination [d]ate, have been required
> after that date ….

<u>See</u> Section 14 of the Agreement. The Agreement defines "Reference Market-makers" as

> four leading dealers in the relevant market selected by the party
> determining a Market Quotation in good faith (a) from among dealers of
> the highest credit standing which satisfy all the criteria that such party
> applies generally at the time in deciding whether to offer or to make an
> extension of credit and (b) to the extent practicable, from among such
> dealers having an office in the same city.

6

<u>See</u> Section 14 of the Agreement.

13.    Attached to the Termination Notice, First Data also delivered to LBSF a two-page statement (the "<u>Calculation Statement</u>") pursuant to Section 6(d)(i) of the Agreement containing First Data's determination of the Termination Amount payable to LBSF, as the party in-the-money on the Termination Date.  <u>See</u> Exhibit C.

14.    The Calculation Statement informed LBSF that based on First Data's calculations, the Termination Amount was $14,349,300.  First Data calculated the Termination Amount by calculating the value of the Terminated Transaction at the time of termination (by First Data's calculation, $14,360,000), and subtracting therefrom certain costs and expenses, which it says were appropriate.

15.    Specifically, First Data said that it requested quotations from four Reference Market-makers in connection with the Transaction.  First Data then listed the four quotations it received for the Transaction.  Pursuant to the definition of Market Quotation, First Data disregarded the highest and lowest quotations it received from the four Reference Market-makers evaluating the Transaction, and averaged the remaining two quotations, which yielded an amount of  $14,360,000, payable to LBSF.  First Data then subtracted the legal fees and other expenses supposedly incurred by First Data of $10,070, thereby arriving at the Termination Amount of $14,349,300.

16.    First Data did not provide LBSF with any details regarding or any documentation to support its claim of $10,070 in legal fees and expenses.

17.    On February 10, 2009, following a request by Lehman, First Data provided Lehman with certain e-mails containing the quotations that it had received

7

from the Reference Market-makers.  On March 25, 2009, Lehman asked First Data if it

had replaced the Transaction, and if so, whether it could provide Lehman with a copy of a

confirmation for the new trade so that Lehman could properly value the Terminated

Transaction.  In response, First Data stated that it would not provide such information.

18.        By letter, dated April 3, 2009 (the "April 3, 2009 Letter"),

LBSF requested that First Data provide LBSF with information and documents in nine

specific categories relevant to the determination of the Termination Amount. (A copy of

the April 3, 2009 letter is attached hereto as Exhibit D.)  These categories were designed

to provide LBSF with the information necessary to verify First Data's calculation of the

Termination Amount.  For example, LBSF requested documents that would support the

specific fees and expenses that had been deducted from the Termination Amount by First

Data, as well as information regarding any replacement transaction or transactions that

First Data had entered into to replace the Transaction.

19.        First Data responded to LBSF by letter, dated April 17, 2009

(the "April 17, 2009 Letter"), informing LBSF that First Data would not provide the

information requested in the April 17, 2009 Letter.  (A copy of the April 17, 2009 Letter

is attached hereto Exhibit E.)

## THE SCOPE OF INFORMATION REQUESTED

20.        Exhibit F hereto contains a list of the types of documents that

the Debtor requires from First Data.  The list includes documents and information

relating to First Data's determination of the Termination Amount.  The list includes

documents concerning (as that word is defined in Southern District of New York Local

Civil Rule 26.3(c)(7)):

8

(i) any valuation of the Terminated Transaction;

(ii) the requests by or on behalf of First Data for quotations from Reference Market-makers or other persons concerning or related to the Terminated Transaction;

(iii) unpaid amounts with respect to the Terminated Transaction;

(iv) transactions executed in order to replace the Terminated Transaction;

(v) communications related to quotations, unpaid amounts, and/or replacement transactions in connection with the Terminated Transaction;

(vi) persons involved with respect to valuations and/or replacement transaction;

(vii) fees and expenses allegedly incurred by First Data;

(viii) financial/accounting entries made on First Data's books and records as a result of the termination of the Terminated Transaction;

(ix) market information for the Terminated Transaction; and

(x) documentation of the Terminated Transaction.

21.    The general scope of questions to be asked of the individual(s) designated by First Data to be examined under oath will relate to the subjects covered by the requests identified in Exhibit F and the documents which are produced in response thereto.

## **ARGUMENT**

22.    Bankruptcy Rule 2004(a) states that on "motion of any party in interest, the court may order the examination of any entity." FED. R. BANKR. P. 2004(a).

9

23.     The scope of an examination sought under Bankruptcy Rule 2004 may relate to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." See FED. R. BANKR. P. 2004(b).  Thus, a "party in interest may use Rule 2004 to determine the nature and extent of a bankruptcy estate and to ascertain whether wrongdoing has occurred." In re Hilsen, 2008 WL 2945996, *4 (Bankr. S.D.N.Y., July 25, 2008) (Peck, J.) (citations omitted); see also In re Recoton Corp., 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("The purpose of a Rule 2004 examination is to assist a party in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions, and assessing whether wrongdoing has occurred."; In re Coffee Cupboard, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("The purpose of a Rule 2004 examination 'is to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved.'") (citing Cameron v. U.S., 231 U.S. 710, 714 (1914)).

24.     The granting of a motion under Bankruptcy Rule 2004 is within the discretion of the Court.  See In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("As the permissive language of the rule suggests, the Court has the discretion to grant a request for a 2004 examination . . .") (citations omitted).  Bankruptcy Rule 2004 is "debtor-centric and allows considerable leeway for all manner of so-called fishing expeditions provided that there is a reasonable nexus to the debtor and the administration of the debtor's case".  In re Hilsen, 2008 WL 2945996, at *1.  Bankruptcy Rule 2004 requires a court to "balance the competing interests of the parties, weighing the relevance

10

of and necessity of the information sought by examination." In re Drexel Burnham

Lambert Group, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).

        25.    The identification of any assets that are potentially property of

LBSF's estate, and the evaluation of potential claims related to such assets, is important

in ensuring that all available sources of value are located and pursued for the benefit of

LBSF's creditors.  The amount that LBSF is owed under the Agreement is property of the

estate, and thus, it is important that LBSF confirm that First Data properly valued the

Termination Amount under the Agreement.  The discrete categories of documents and

other information sought by LBSF in this Motion are targeted to provide it with

information needed to evaluate First Data's valuation and determine whether its estate

has a claim against First Data for additional amounts.

### NO PRIOR REQUEST FOR RELIEF

        26.    No prior motion for the relief requested herein has been made to

this Court or any other court.

### NOTICE

        27.    No trustee has been appointed in these chapter 11 cases.  The

Debtor, in accordance with the procedures set forth in the amended order entered on

February 13, 2009 governing case management and administrative procedures for these

cases [Docket No. 2837], has served notice of this Motion on (i) the U.S. Trustee; (ii) the

attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission;

(iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District

of New York; (vi) First Data, and (vii) all parties who have requested notice in these

chapter 11 cases.  The Debtor submits that no other or further notice need be provided.

WHEREFORE, for the reasons stated herein, the Debtor respectfully requests that the Court enter an order, pursuant to Bankruptcy Rule 2004, granting the relief requested in this Motion in its entirety and such other and further relief as may be just and proper.

Dated: September 29, 2009
New York, New York

/s/ Richard W. Slack
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

# Exhibit A

# LEHMAN BROTHERS

| | |
|---|---|
| Date: | October 8, 2007 |
| To: | First Data Corporation |
| Attention: | Tagar Olson |
| Our Reference: | Risk ID: 1670749L / Effort ID: N1656930 / Global Deal ID: 3402798 |
| Re: | **Interest Rate Swap Transaction** |

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between Lehman Brothers Special Financing Inc. ("LBSF") and First Data Corporation ("Counterparty") on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Agreement specified below.

The definitions and provisions contained in the 2006 ISDA Definitions (the "Definitions") as published by the International Swaps and Derivatives Association, Inc. are incorporated by reference herein. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

For the purpose of this Confirmation, all references in the Definitions or the Agreement to a "Swap Transaction" shall be deemed to be references to this Transaction.

1. This Confirmation evidences a complete and binding agreement between LBSF and Counterparty as to the terms of the Transaction to which this Confirmation relates. This Confirmation, together with all other documents referring to the ISDA Form (as defined below) (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form part of, and be subject to an agreement in the form of a 1992 version of the preprinted ISDA Master Agreement (Multicurrency-Cross Border) (New York law version) (the "ISDA Form") as if we had both executed an agreement in such form on the Trade Date of the first such Transaction between us (the "Agreement") with the Schedule thereto (i) specifying that (a) the governing law is the laws of the State of New York without reference to choice of law doctrine and (b) the Termination Currency is U.S. Dollars; (ii) incorporating the amendment to the definition of "Indemnifiable Tax" contained in (page 49 of) the "User's Guide to the 2002 ISDA Master Agreements"; and (iii) with any other modifications or additions to the ISDA Form set forth below. All provisions contained or incorporated by reference in that agreement will govern this Confirmation and in the event of any inconsistency between the terms of this Confirmation and the terms of that agreement, this Confirmation will prevail for the purposes of this Transaction.



LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

2. The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Notional Amount: | USD 500,000,000.00 |
| Trade Date: | 04 October, 2007 |
| Effective Date: | 09 October, 2007 |
| Termination Date: | 24 September, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Rate Payer: | Counterparty |
| Fixed Rate Payer Payment Dates: | The 24th calendar day of each March, June, September, and December, from and including 24 December, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate Payer Period End Dates: | The 24th calendar day of each March, June, September, and December, from and including 24 December, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.76% per annum |
| Fixed Rate Day Count Fraction: | 30/360 |

**Floating Amounts:**

| | |
|---|---|
| Floating Rate Payer: | LBSF |
| Floating Rate Payer Payment Dates: | The 24th calendar day of each March, June, September, and December, from and including 24 December, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Payer Period End Dates: | The 24th calendar day of each March, June, September, and December, from and including 24 December, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate for initial Calculation/Compounding Period: | 5.24375% |

Risk ID: 1670749L / Effort ID: 1656930 / Global Deal ID: 3402798

Page 2 of 7

10/8/2007 11:21 AM    PAGE    4/008    Fax Server

| | |
|---|---|
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 3 months |
| Spread: | None |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first Business Day in each Calculation Period or Compounding Period, if Compounding is applicable |
| Compounding: | Inapplicable |
| Business Days: | New York and London |

3.   Account Details:

USD LBSF Payment Instructions:
Account With:        JPMorgan Chase Bank, New York
SWIFT Code:          ABA # 021000021
Favor Of:            A/C of Lehman Brothers Special Financing Inc.
Account Number:      A/C # 066-143-543

USD Counterparty Payment Instructions:

Please advise our Operations Control Supervisor, reachable by telephone 212-526-0200

4.   Offices:

The Office of LBSF for this Transaction is not applicable.

The Office of Counterparty for this Transaction is not applicable.

5.   Calculation Agent:                    LBSF

6.   Representations and Acknowledgements

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter

Risk ID: 1670749L / Effort ID: 1656930 / Global Deal ID: 3402798



into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    Assessment and Understanding. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(iii)    Status of Parties. The other party is not acting as a fiduciary for, or an adviser to it in respect of this Transaction.

(iv)    Eligible Contract Participant. It is an "eligible contract participant" within the meaning of the Commodity Exchange Act, Section 1a(12).

7.    Additional Termination Events:   It shall constitute an Additional Termination Event, with Counterparty being the sole Affected Party, if at any time (i) LBSF is not secured to the same extent and by the same collateral as secures, or guaranteed to the same extent as the guarantee(s) that support, the obligations of the obligor(s) to pay principal and interest under the most senior tranche, if any, of the primary first-lien senior credit facilities of Counterparty, if any, as in effect from time to time (including any amended or successor facility) (the "Senior Credit Facilities"), in each case on terms customary for securing hedging obligations provided in the principal first-lien senior credit facilities for a major sponsor leveraged acquisition, or (ii) any parent holding company or subsidiary of Counterparty or any combination thereof holds a portion of the obligations under the Senior Credit Facilities equal to eighty percent (80%) of the amount sufficient to amend, waive, modify or otherwise take or direct actions with respect to the Senior Credit Facilities without the consent of any other holder thereof (other than with respect to matters requiring the consent of all holders or all affected holders thereof).

8.    If one entity does not directly or indirectly succeed to seventy-five percent (75%) or more of the Relevant Obligations (as defined in the 2003 ISDA Credit Derivatives Definitions) of Counterparty by way of a Succession Event (as defined in the 2003 ISDA Credit Derivatives Definitions), the result of which is (i) no reference obligations of Counterparty exist or (ii) no substitute reference obligations exist with respect to any credit default swap which LBSF has entered into with respect to the Transaction, LBSF shall have the right to renegotiate an appropriate modification to the Fixed Rate reasonably determined by LBSF.

9.    Other Terms.

- Specified Entities will not apply.

- Default under Specified Transaction will not apply.

- Cross Default will apply to both parties.  Threshold amount will be the amount specified as the cross default materiality threshold in the Senior Credit Facilities for Counterparty and 3% of stockholder's equity for LBSF.

- Section 5(a)(vi) shall be amended such that the words ", or becoming capable at such time of being declared," will be deleted.



Risk ID: 1670749L / Effort ID: 1656930 / Global Deal ID: 3402798

- Section 5(a)(vi) of the ISDA Master Agreement is amended by the addition of the following after the semicolon: 'provided, however, that an Event of Default shall not occur under either (1) or (2) above if the default, event of default, or other similar condition or event referred to in (1) or the failure to pay referred to in (2) is caused not by the unavailability of funds but is caused solely due to a technical or administrative error which has been remedied within three Business Days after a notice of such failure is given to the party.'

- The standard ISDA Definition of Specified Indebtedness will apply, provided, however, Specified Indebtedness shall exclude, in relation to LBSF, any deposits received in the ordinary course of business.

- The standard ISDA Definition of Specified Transaction will not apply.

- Credit Event Upon Merger will not apply to either party.

- The "Automatic Early Termination" provision in Section 6(a) will not apply.

- Market Quotation and Second Method will be used for the purposes of computing amounts payable on Early Termination.

- Notwithstanding Section 7 of the ISDA Form, LBSF may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Counterparty of the guarantee by Holdings, in favor of Counterparty, of the obligations of such Affiliate.

- Counterparty may assign its position in the Interest Rate Swap (in whole or in part) to any other third party with LBSF's consent, which will not be unreasonably withheld or delayed to any third party investment grade broker dealer with which LBSF has executed an ISDA Master Agreement and credit support annex. Notwithstanding the foregoing, no assignment hereunder shall be permitted hereunder if, as a result thereof, any payment hereunder would become subject to any deduction or withholding for or on account of any tax which would not have arisen had such assignment not been effective. In addition, it shall be considered reasonable for LBSF to withhold consent if such assignment would result in any material costs and expenses relating to a change in the mark-to-market value of the Transaction directly from such assignment (unless an appropriate adjustment is made to the terms of the Transaction to compensate LBSF for any such costs or expenses).

- *There will be no credit support annex or credit support providers.

**10. Set-off.** Section 6(f) of the ISDA Form is amended and restated in its entirety to read as follows:

"(f) Without affecting the provisions of the ISDA Form requiring the calculation of certain net payment amounts, all payments under this Transaction will be made without set-off or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set-off, counterclaim, or otherwise withhold payment) under applicable law, the Non-defaulting Party or the party that is not the Affected Party (in either case, "X") may, without prior notice to any person, set off any sum or obligation (whether or not arising under this Agreement, whether matured or unmatured and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X to the Defaulting Party or Affected Party (in either case, "Y") (the "X Set-Off Amount") against any sum or obligation irrespective of the currency, place of

10/8/2007  11:21 AM  PAGE  77008  Fax Server

payment or booking office of the sum or obligation) then due and owing by Y (the "Y Set Off Amount"). X will give notice to the other party of any set off effected under this Section 6(f).

For this purpose, either the X Set Off Amount or the Y Set Off Amount (or the relevant portion of such set off amounts) may be converted by X into the currency in which the other set off amount is denominated at the rate of exchange at which X would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

Nothing in this Section 6(f) shall be effective or deemed to create any charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other rights to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

LBSF shall only have such rights under this Section 6(f) as are permitted by the Credit Documentation, and the exercise of any such rights such be subject to the limitations and requirements of the Credit Documentation."

11. **Netting of Payments.**  Subparagraph (ii) of Section 2(c) of the ISDA Form will not apply to any Transaction between the parties hereto.

12. **Waiver of Trial By Jury.**  Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder.

12. Please confirm that the foregoing correctly sets forth the terms of our agreement by having an authorized officer sign this Confirmation and return it via facsimile to:

|  |  |
|---|---|
| Attention: | Anatoly Kozlov |
| Telephone: | 212-526-9961 |
| Facsimile: | 646-885-9551 |
| E-mail: | akozlov@lehman.com |

This message will be the only form of Confirmation dispatched by us. If you wish to exchange hard copy forms of this Confirmation, please contact us.

Risk ID: 1670749L / Effort ID: 1656930 / Global Deal ID: 3402798

Yours sincerely,

Confirmed as of the date first written above:

**Lehman Brothers Special Financing Inc.**

**First Data Corporation**

By: _Dina Masterpalo-Harris_

Name: Dina Masterpalo-Harris
Title: Authorized Signatory

By: _Michael Jacobs_
Name:
Title:

MICHAEL A. JACOBS
SENIOR VICE PRESIDENT AND TREASURER

Risk ID: 1670749L / Effort ID: 1656930 / Global Deal ID: 3402798

# Exhibit B

(Multicurrency — Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of .......................................

...…………………………………..…………..…… and …………..……………….....……………………........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.      Interpretation**

(a)      *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions*.

   (i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

   (ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

   (iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    **Deduction or Withholding for Tax.**

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

    (ii)    *Liability*. If: —

        (1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)   X does not so deduct or withhold; and

        (3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.**    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

    (i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)   any other documents specified in the Schedule or any Confirmation; and

   (iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.       Events of Default and Termination Events**

(a)       *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)       *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)       *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)       *Credit Support Default*.

(1)       Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)       the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)       the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)       *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)       *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction. (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)       *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: ——

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: ——

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    **Calculations.**

(i)    **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    **Events of Default.** If the Early Termination Date results from an Event of Default: —

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*.  If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y, and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10

**ISDA® 1992**

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)      *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)      *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

13                                                             **ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"*Non-default Rate*"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"*Non-defaulting Party*"** has the meaning specified in Section 6(a).

**"*Office*"** means a branch or office of a party, which may be such party's head or home office.

**"*Potential Event of Default*"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"*Reference Market-makers*"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"*Relevant Jurisdiction*"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"*Scheduled Payment Date*"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"*Set-off*"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"*Settlement Amount*"** means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"*Specified Entity*"** has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

.................................................................          ..................................................................
(Name of Party)                                                 (Name of Party)

By: .............................................................          By: ...........................................................
    Name:                                                            Name:
    Title:                                                              Title:
    Date:                                                              Date:

**ISDA® 1992**

# Exhibit C

RECEIVED OCT 3 0 2008

October 29, 2008

<u>Via Facsimile and Hand Delivery</u>

<u>Fax No. 212 526 7672</u>

Lehman Brothers Special Financing Inc.
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019
Attn: Documentation Manager

<u>Re: Designation of an Early Termination Date Under ISDA Agreement</u>

Ladies and Gentlemen:

Reference is made to the letter agreement dated October 8, 2007 entered into between you and us (the "Confirmation"), and the 1992 ISDA Master Agreement and Schedule thereto deemed to have been entered into between you and us pursuant to Section 1 of the Confirmation (as amended to date, the "ISDA Master Agreement"). Terms used but not defined herein are used as defined in the ISDA Master Agreement.

Pursuant to Section 6(a) of the ISDA Master Agreement, we hereby designate October 29, 2008 as the Early Termination Date with respect to the Transaction to which the Confirmation relates (which constitutes the only Transaction between you and us that is governed by the ISDA Master Agreement).

Such Early Termination Date is being designated as a result of the Event of Default under Section 5(a)(vii) of the ISDA Master Agreement resulting from the institution of a proceeding under Chapter 11 of the United States Bankruptcy Code by you on October 3, 2008 in the United States Bankruptcy Court in the Southern District of New York.

Furthermore, pursuant to Section 6(d)(i) of the ISDA Master Agreement, attached is a statement showing our calculation of the Settlement Amount referred to in Section 6(e)(i)(3) of the Master Agreement and the amount payable by us to you with respect to termination of the Transactions subject to the ISDA Master Agreement as of the Early Termination Date (the "Section 6(e) Amount"). As set forth in such statement, the Section 6(e) Amount is $14,349,300. Please note that, in calculating the Section 6(e) Amount, we have exercised our right to set-off all reasonable out-of-pocket expenses incurred by us by reason of the enforcement and protection of our rights under the ISDA Master Agreement or by reason of the early termination of any Transaction ("Expenses"). This letter constitutes notice of demand for payment of such Expenses under Section 11 of the ISDA Master Agreement and notice of our election to set-off the amount of such Expenses pursuant to Sections 6(e) and 6(f) of the ISDA Master Agreement.

CH1 4441899v.3

#79101FDAC

Pursuant to Section 6(e)(ii) of the ISDA Master Agreement, the Section 6(e) Amount payable to you is being remitted to the following account:

|  |  |
|---|---|
| Account With: | JPMorgan Chase Bank, New York |
| SWIFT Code: | ABA # 021000021 |
| Favor Of: | A/C of Lehman Brothers Special Financing Inc. |
| Account Number: | A/C # 066-143-543 |

We reserve all rights and remedies available to us under the ISDA Master Agreement, under other agreements and otherwise at law or in equity.

Very truly yours,

FIRST DATA CORPORATION

By: _____

Name: Michael A. Jacobs

Title:   Senior Vice President and Treasurer

2

### First Data Corporation

**Statement of Calculations Contemplated By Section 6(e)**
**of ISDA Master Agreement Between First Data Corporation ("FDC")**
**and Lehman Brothers Special Financing Inc. ("LBSF")[1]**

1.    Calculation of Settlement Amount:

A.    Each of the following Reference Market-Makers was requested to provide a quotation, as of 11 a.m. Mountain Time on the Early Termination Date of October 29, 2008, for an amount, if any, that would be paid to FDC (expressed as a negative number) or by FDC (expressed as a positive number) in consideration of an agreement between FDC and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for FDC the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) of the ISDA Master Agreement in respect of the Terminated Transaction that would, but for the occurrence of the Early Termination Date, have been required after that date. Each Reference Market-Maker was instructed to assume that FDC's obligations under the Replacement Transaction would be secured to the same extent and by the same collateral as secures, and guaranteed to the same extent as guarantee(s) that support, the obligations of the obligor(s) to pay principal and interest under the most senior tranche of the primary first-lien senior credit facilities of FDC.

> Citibank N.A.
> Goldman Sachs Capital Markets, L.P.
> Morgan Stanley Capital Services Inc.
> Wells Fargo Bank N.A.

B.    Pursuant to such requests, the Reference Market-Makers provided the following quotations:

| | | |
|---|---|---|
| Citibank N.A. | - | $15,650,000 |
| Goldman Sachs Capital Markets, L.P. | - | $12,585,000 |
| Morgan Stanley Capital Services, Inc. | - | $13,070,000 |
| Wells Fargo Bank N.A. | - | $15,900,000 |

C.    Pursuant to the definition of Market Quotation, the Market Quotation is negative $14,360,000, which is the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values.

---

[1] Capitalized terms used but not defined herein have the meanings set forth in or referred to in the attached letter dated October 29, 2008.

D.    Pursuant to the definition of Settlement Amount, the Settlement Amount is negative $14,360,000.

2.    Expenses incurred by FDC and indemnified by LBSF pursuant to Section 11 of the ISDA Master Agreement consist of $10,700 of legal fees.

3.    The Section 6(e) Amount payable by FDC to LBSF is calculated as follows:

| | |
|---|---|
| Absolute Value of Settlement Amount[2] | $14,360,000 |
| Less Expenses | $   10,700 |
| Section 6(e) Amount | $14,349,300 |

---

[2] As there are no Unpaid Amounts, the amount payable by FDC to LBSF pursuant to Section 6(e)(i)(3) of the ISDA Master Agreement is equal to the absolute value of the Settlement Amount.

2

Exhibit D

# LEHMAN BROTHERS

April 3, 2009

VIA EMAIL AND FEDEX

First Data Corporation
6200 South Quebec Street
Greenwood Village, CO 80111
Attention:    Michael Jacobs
              Senior Vice President and Treasurer

Ladies and Gentlemen:

Reference is made to: (i) the 1992 ISDA Master Agreement (Multicurrency-Cross Border) published by the International Swaps and Derivatives Association, Inc. and the Schedule thereto deemed to have been entered into between you and us pursuant to the Confirmation (as defined herein)(as amended, supplemented or modified, and including all schedules, annexes and exhibits thereto, and all confirmations exchanged pursuant to the Transactions entered into in connection therewith, the "ISDA Master Agreement") between Lehman Brothers Special Financing Inc. ("Lehman") and First Data Corporation, formerly known as American Express Information Services Corporation ("Counterparty"), (ii) the letter agreement dated October 8, 2007 entered into between you and us in connection with the Transaction (the "Confirmation"), (iii) the letter, dated October 29, 2008, from the Counterparty to Lehman designating an Early Termination Date with respect to the Transaction to which the Confirmation relates (the "Early Termination Notice") and containing a calculation statement for payment on early termination of the ISDA Master Agreement (the "Calculation Statement"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the ISDA Master Agreement.

Lehman is in the process of reviewing the Early Termination Notice and the Calculation Statement and wishes to consolidate its requests for information relative to those communications by means of this letter. Accordingly, Lehman is seeking the following information:

1.    Valuation Methodology and Quotations with respect to Terminated Transactions.

(a) Please provide a narrative description of the methodology used to determine the valuations of Terminated Transactions, including how quotations, if any, were utilized and all other inputs, assumptions, values and applicable parameters.

(b) Please provide documentation to support any and all requests by or on behalf of Counterparty for quotations from Reference Market-makers or other persons concerning or otherwise related to the Terminated Transactions (including specifying to whom and when such requests were made, the form of request that was made, in what manner the Reference Market-makers responded and the nature of any follow-up requests).

April 3, 2009
Page 2

2.    Unpaid Amounts.  Please specify any Unpaid Amounts included in Counterparty's calculations of any amounts due with respect to Terminated Transactions.

3.    Replacement Transactions.  Please provide documentation evidencing any transactions executed in order to replace any Terminated Transactions, including specifying any cash (or other consideration) paid or received by or to any person to replace the Terminated Transactions, the name of each entity that effectuated a replacement and when any such transactions were effected.

4.    Communications related to Market Quotations, Unpaid Amounts and/or Replacement Transactions.  Please provide all internal and external communications (including all transaction confirmations, other documents, e-mails, text messages, screen-shots, voice recordings, Bloomberg or other electronic texts, tapes, quotations requested and/or received or any other writings or information) evidencing or concerning the requests, responses, follow-up requests, determinations (including methodology used in such determinations), Unpaid Amounts and replacement transactions referred to in items 1, 2 and 3 above.

5.    Persons involved with respect to valuations and/or replacement transactions.  Please provide the names, contact information (including telephone numbers, facsimile numbers and e-mail addresses) and description of the roles of each person (whether such person is inside or outside your organization, including any financial advisors, companies, entities or other persons consulted in connection with any Terminated Transactions) who was involved in the valuation of any Terminated Transactions or in the replacement of any Terminated Transactions.  Please provide all communications (including all documents, e-mails, text messages, screen-shots, voice recordings, tapes, quotations requested and/or received or any other writings or information) with, between and/or within any financial advisors, companies, entities or other persons outside your organization consulted with respect to valuation or replacement of any Terminated Transactions.

6.    Fees and expenses.  Please provide supporting documents and/or other information related to all fees, expenses or other ancillary items incurred by Counterparty with respect to Terminated Transactions.

7.    Financial/Accounting Entries.  Please provide any profit, loss, valuation or other financial or accounting entries made on Counterparty's books and records as a result of the termination of each Terminated Transaction, and all supporting documents or other information related to the determination of such amounts.

8.    Market information.  Please provide the historical bid/offer spread and midpoint (or estimate) for each Terminated Transaction as of the close of business for each day from and including September 12, 2008 to and including the Early Termination Date designated by Counterparty for each Terminated Transaction.  Please provide Counterparty's internal valuation models and external sources (e.g., screen shots from Bloomberg or other financial services) evidencing these amounts.

April 3, 2009
Page 3

        9.    <u>Documentation of Terminated Transactions</u>.  Please provide copies of all master agreements, other agreements, confirmations and other documents related to Terminated Transactions, including with respect to rebooking of Terminated Transactions.

        Please forward the information requested herein as soon as possible, and in any case no later than April 24, 2009.  Please note that if you do not provide the requested information described above, Lehman may pursue legal avenues to obtain such information from you.  This letter in no way constitutes an admission or acknowledgment by Lehman that the Terminated Transactions were actually terminated or were terminated properly, that the amount set forth in the Calculation Statement has been accurately calculated or is due or owing by Lehman, or that such amount accrues interest.

        The foregoing information requests are without waiver of or prejudice to any and all of the rights and remedies of Lehman in connection with the above transactions, including under each applicable ISDA Master Agreement and with respect to your purported termination and valuation calculation and under any applicable law.

        Please contact me on (646) 333-9836 or ddownie@lehman.com with any questions related to the foregoing.

Very truly yours,

/s/ David C. Downie

David C. Downie

# Exhibit E



April 17, 2009

<u>VIA EMAIL and FEDEX</u>

Lehman Brothers Special Financing Inc.
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019
Attn: David C. Downie

Dear Mr. Downie:

Reference is made to the letter agreement dated October 8, 2007 entered into between you and us (the "Confirmation"), the 1992 ISDA Master Agreement and Schedule thereto deemed to have been entered into between you and us pursuant to Section 1 of the Confirmation (as amended to date, the "ISDA Master Agreement"), and our letter to you dated October 29, 2008 designating an Early Termination Date and the accompanying Calculation Statement. Terms used but not defined herein are used as defined in the ISDA Master Agreement.

We received your letter dated April 3, 2009, requesting additional information. We note that much of the request is for information that is not provided for under our agreement and irrelevant. However, there is some relevant information that is responsive to certain of the requests. Although we have previously provided the relevant information to you, we have included another copy with this response.

Very truly yours,

FIRST DATA CORPORATION

By: _____
Name: Michael A. Jacobs
Title: Senior Vice President and Treasurer

# Exhibit F

# **EXHIBIT F**

# **SCHEDULE OF DOCUMENTS TO BE PRODUCED**

## **DEFINITIONS**

The terms used herein shall have the meanings ascribed to them in the definitions set forth below.

1.      "Concerning" shall have the meaning set forth in Southern District of New York Local Civil Rule 26.3(c)(7).

2.      "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and includes, without limitation, reports, correspondence, minutes, emails, instant messages, spreadsheets, memoranda, notes and all other writings, Bloomberg screenshots, drawings, graphs, charts, photographs, sound recordings and electronic or computerized data compilations from which information can be obtained and/or translated, if necessary, through electronic detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of this term. The word "including" means including, but not limited to.

3.      The terms "Debtor," "Debtors," "LBHI" or "LBSF" shall mean Lehman Brothers Holdings, Inc. or Lehman Brothers Special Financing, Inc.

4.      "First Data," "You," and "Your" shall mean First Data Corporation and any person acting on its behalf or under its control, including any of its agents, subsidiaries, affiliates, predecessors, successors, or representatives.

5.      The terms "and" and "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of this request all documents which might otherwise be considered to be outside of that scope.

6.      The word "each" shall mean both "each" and "every", and the word "every" shall mean both "each" and "every," as appropriate in order to bring within the scope of this Request documents which might otherwise be beyond its scope.

7.      The term "Calculation Statement" shall mean the statement attached to the letter from First Data, dated October 29, 2008.

8.      The term "Market Quotation" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

9.      The term "Master Agreement" shall mean the standard form 1992 ISDA Master Agreement and the schedule thereto, subject to the terms and conditions of the October 8, 2007 Confirmation entered into by First Data and LBSF.

10.      The term "Reference Market-makers" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

11.      The term "Replacement Transaction" shall mean any transaction entered into by First Data to replace the Terminated Transaction.

12.      The term "Terminated Transaction" means the Transaction terminated by First Data in its October 29, 2008 letter to LBSF.

13.      The term "Unpaid Amounts" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

## **EXHIBIT F**

## **SCHEDULE OF DOCUMENTS TO BE PRODUCED**

### **DEFINITIONS**

The terms used herein shall have the meanings ascribed to them in the definitions set forth below.

1.      "Concerning" shall have the meaning set forth in Southern District of New York Local Civil Rule 26.3(c)(7).

2.      "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and includes, without limitation, reports, correspondence, minutes, emails, instant messages, spreadsheets, memoranda, notes and all other writings, Bloomberg screenshots, drawings, graphs, charts, photographs, sound recordings and electronic or computerized data compilations from which information can be obtained and/or translated, if necessary, through electronic detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of this term. The word "including" means including, but not limited to.

3.      The terms "Debtor," "Debtors," "LBHI" or "LBSF" shall mean Lehman Brothers Holdings, Inc. or Lehman Brothers Special Financing, Inc.

4.      "First Data," "You," and "Your" shall mean First Data Corporation and any person acting on its behalf or under its control, including any of its agents, subsidiaries, affiliates, predecessors, successors, or representatives.

5.      The terms "and" and "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of this request all documents which might otherwise be considered to be outside of that scope.

6.      The word "each" shall mean both "each" and "every", and the word "every" shall mean both "each" and "every," as appropriate in order to bring within the scope of this Request documents which might otherwise be beyond its scope.

7.      The term "Calculation Statement" shall mean the statement attached to the letter from First Data, dated October 29, 2008.

8.      The term "Market Quotation" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

9.      The term "Master Agreement" shall mean the standard form 1992 ISDA Master Agreement and the schedule thereto, subject to the terms and conditions of the October 8, 2007 Confirmation entered into by First Data and LBSF.

10.     The term "Reference Market-makers" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

11.     The term "Replacement Transaction" shall mean any transaction entered into by First Data to replace the Terminated Transaction.

12.     The term "Terminated Transaction" means the Transaction terminated by First Data in its October 29, 2008 letter to LBSF.

13.     The term "Unpaid Amounts" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

## GENERAL INSTRUCTIONS

The following General Instructions apply to each request set forth herein.

1.    Each request seeks production of each Document, in its entirety, without abbreviation or expurgation, and all drafts and non-identical copies of each Document.

2.    If any Document requested herein was formerly in Your possession, custody or control (or that of Your Representative) and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

3.    If any Document requested herein is withheld on the basis of any claim of privilege, You are requested to submit, in lieu of any such Document, a written statement (a) identifying the person(s) who prepared or authored the Document, and, if applicable, the person(s) to whom the Document was sent or shown, (b) specifying the date on which the Document was prepared or transmitted, (c) describing the nature of the Document (e.g., letter, telegram, etc.), (d) stating briefly why the Document is claimed to be privileged or to constitute work product, and (e) identifying the paragraph of this request to which the Document relates.

4.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, those portions of the Document subject to the claim of privilege shall be deleted or redacted from the Document, the instructions in the preceding paragraph shall be applicable, and the rest of the Document shall be produced.

5.      All Documents are to be produced as kept in the usual course of business or are to be organized and labeled to correspond with the categories in this request.  The method for production of each category is to be identified at the time of production.  Documents are to be produced in full and unexpurgated form.

6.      Each page of each document should be numbered consecutively. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

7.      Documents attached to each other (physically or via electronic mail) should not be separated.

8.      In producing the requested documents, even though the requests are directed to "you," furnish all documents which are available to you, including documents in the possession of any of your officers, directors, employees, agents, attorneys, investigators, accountants or consultants and not merely such documents in your possession.

9.      The requests which follow are to be regarded as continuing, and First Data is requested to provide by the way of supplementary compliance herewith, such additional documents as First Data may hereafter obtain, which will augment the documents now produced in response to the requests below.  Such additional documents

are to be produced at the offices of Weil, Gotshal & Manges LLP promptly after receipt

thereof.

          10.     At a future date, the Debtor may request the production of

additional documents based on information revealed during this document request.

          11.     At a future date, the Debtor may request to depose additional

individuals based on information revealed during this document request.

## **RELEVANT TIME PERIOD**

          Unless otherwise stated, the relevant time period for each of the following

requests is from and including October 29, 2008 through the present.

## **REQUESTS FOR PRODUCTION**

REQUEST NO. 1

          All documents concerning any valuation of the Terminated Transaction,

including, but not limited to, the valuation contained in the Calculation Statement.

REQUEST NO. 2

          All documents containing or reflecting a description, in whole or in part,

of the methodology used by First Data to determine the value of the Terminated

Transaction, including any documents describing how quotations, if any, were utilized.

REQUEST NO. 3

          All documents reflecting requests by or on behalf of First Data for

quotations from Reference Market-makers or any other persons, and all responses from

Reference Market-makers and any other persons thereto.

REQUEST NO. 4

All documents concerning any Unpaid Amounts, including accrued

interest thereon, due with respect to the Terminated Transaction.

REQUEST NO. 5

All documents concerning any Replacement Transaction, including, but

not limited to, documents concerning (i) any consideration paid or received in connection

with a Replacement Transaction, (ii) the names of any entity which effectuated a

replacement, and (iii) when any such transaction was effected.

REQUEST NO. 6

All documents concerning any communications between and among, or on

behalf of, First Data and any third party, including First Data's representatives, advisors,

agents, accountants, and counsel related to Market Quotations from Reference Market-

makers, Unpaid Amounts, and/or Replacement Transactions in connection with the

Terminated Transaction.

REQUEST NO. 7

Documents sufficient to identify all persons who were involved in the

valuation of the Terminated Transaction or in the replacement of the Terminated

Transaction and their roles in connection therewith.

REQUEST NO. 8

All documents concerning fees, expenses, interest, or other ancillary items

incurred by First Data with respect to the Terminated Transaction.

REQUEST NO. 9

All documents sufficient to identify any financial or accounting entries

made on First Data's books and records as a result of the termination of the Terminated

Transaction, and all supporting documents or other information related to the

determination of such amounts.

REQUEST NO. 10

          Documents sufficient to identify the historical bid/offer spread and mid-

point (or estimate) for the Terminated Transaction as of the close of business for each day

from and including September 12, 2008 to and including October 31, 2008, and First

Data's internal valuation models and external sources evidencing these amounts.

REQUEST NO. 11

          Documents sufficient to identify all master agreements, other agreements,

confirmations and other documents constituting the Agreement between the parties in

connection with the Terminated Transaction.