UNITED STATES DISTRICT COURT-SDNY

*original chambers*

In Re: Lehman Brothers Holdings, etc et al.   Ch 11 Case # 08-13555(JMP)

Debtor

---

Objection of William Kuntz, III to Fairpoint & Suncal Proposed Adventures by Lehman Commercial Paper

Now comes William Kuntz, III who appears here Pro Se and respectfully submit's the following for the Court's Consideration:

1) About 10 days ago, Objectant requested a paper copy of the Suncal Motion. This was declined.

2) Subsequent to this, Objectant wrote to Attorney Reeder[1] of the New York State Comptroller's Office of Unclaimed Funds. To date, no answer has been forthcoming to me and no Pleadings from Albany appears to have been filed with regards to the Cash Escrow Fund Lehman Commercial Paper absconded with from the Grand Union Ch 11 in NJ or the Proposal's before the Court to expend Estate Funds to Attempt to Salvage Pre-Petition Wreckage in FairPoint or Suncal.

3) As the Court may now be aware, having received, but apparently then not had an opportunity to read, Objectants Papers, a few days ago which contained the Opinion of District Judge Martini. Clearly now is the fact that Weil, Gotshal was Co-Counsel to the Debtor Grand Union. I say this now so the Court will be spared more Legal Smog and the true facts developed and displayed instead of a red-herring.

I am sure that had the Court been fully and fairly informed of what antic's Lehman and Weil Gotshal are up to in trying to evade simple determinations, it would not be so quick to approve without Thoughtful Consideration the Proposal-of-the-Day which it seems is becoming SOP.

---

[1] Attorney Reeder took over from William Dugan, Esq who had been corresponding with Objectant on the Grand Union Capital Corp and other Funds already on Deposit with the Comptrollers Office since Sept, 2006.

4) Debtor's Counsel wants the Court to Approve Millions and Millions of Dollars of Remittances cloaked under the So-Called called Business Decision Rule. <u>Fairpoint</u>

The Court must now accept the Fact that the Prior Management of Lehman is gone and the present Management of the Debtor is more of less the Alter-Ego of Weil, Gotshal. To Suggest that the Debtor's Management has any Judgment further that being pliable to the wishes of Weil, Gotshal would be an understatement.

5) As far as Objectant can determine in reading the Available Public[2] Records, Lehman Commercial Paper has some $25 Billion in Assets And $500 Million in Cash. Out of the $24.5 Billion in Assets there appears to be a hodge-podge of dubious assets which in time may or may not have value and against that there are reports in the News[3] of Claims in excess of $150 Billion overall the Lehman Entities.

"condition and the capital structure of FairPoint. LCPI believes it is possible that the FairPoint Loan will be trading at significantly higher values within the next eighteen months..." FairPoint Application @ 23

"It is Possible" hardly sounds like a Business Judgment. It's more like somebody telling the Cunard Line that there are Icebergs. According to the Application, Lehman Commercial Paper would expend 10% of it's Cash to fund what may well turn out to be another money pit. If this is such a good deal perhaps Weil, Gotshal should cash it's recently paid Fee Check of $50 Million and use it to buy this for a Retirement Fund.

<u>This should be Denied.</u>

---

[2] The Court should be mindful that there is no-paper file available to the Public in Room 511 and the Computer Terminals there are perhaps 4 Generations out of Date. Further, Transcripts are embargoed and restricted under the apparent guise of 'protecting' Court Reporters Income. The Epiq System itself has shortcoming. For example, Docket # 3551 which is the Court's Memo-Decision on the 12th of May, 2009 in the Dnb NOR is not available.
[3] <u>**Lehman claims could reach £61 billion - Yahoo! News UK**</u>
NEW YORK, Sept 14 (Reuters) - New York State claims it is owed around $1.22 billion

6) So if the FairPoint Motion might be considered a leap into a Money Pit
then the SunCal Proposal is more like a Journey to the Center of the Earth.

Newspapers in California and National News Services have recently
explored this Debtor's Mis-Adventures in Western US Real Estate (Ex1-3)

Among other notable accomplishments was the Purchase of a Parcel of
Land "twice the size of Boston" and " outbid Donald Trump for a site in
Los Angeles…". The Court can assess the Articles for what it may, but
It is clear that there is much going on that clearly is not disclosed to
the Court and pumping the Cash of the Estate into another Floundering
Bankruptcy Case well before any Plan in this Case is even proposed
is folly.

This should also be Denied.

7) It would be constructive for the Court to Clearly Understand my
Position in this Case. Weil, Gotshal would imply that I have little to do and
thus amuse myself by having to take a train all night from Boston to
arrive in Court on Time or read verbose Documents prepared by
Lawyers who get paid huge sums out of the Debtor's Estate.

That could not be further from the Truth. Years ago, when I saw
that I was going to be in conflict with Lehman I sold my few shares.
In 2007, Lehman deposited my remaining funds with the State Comptroller
as set forth. (Ex 4)

In 2006, I located Funds of the Grand Union Capital Corp on Deposit
With the State Comptroller's Office[4] and filed Claims to those Funds
as a Creditor of Grand Union Capital Corp. (Ex 5) A Review reveals that
the 2 Bank Account were sent to Albany long before this Case Commenced.

---

[4] The Position of the State Comptroller is that I must be a Judgment Creditor of Grand Union
Capital Corp to have these funds released to me. In addition, from papers filed in Delaware, there
are some $13 million of inter-company assets ' out there' somewhere. While the Grand Union
Company Case was Confirmed in Delaware, Grand Union Capital and Grand Union Holding
<guarantor of Grand Union Capital> Cases were dismissed by Judge Peter J Walsh without any
plan. Subsequently those Companies were Dissolved without any Notice to Creditors or any
Distribution to the Creditors.

As page 14 of my Original Motion reveals, I was writing Lehman months before the Collapse and in what I can only call 'imperial smugness' I never had an answer much less any ethical action to release the absconded Escrow Funds.

I take the Position that as a Practical Matter, those Funds should have been and should even now be deposited in Albany with the State Comptroller.
8) As the Claims Docket now reflects, I have filed Proof's of Claims and subsequent amendments having to refine the compound interest figures and correct the Case Number which was in the microscopic table of cases on the Claims Form.

It is quite apparent that the Claims are skewed by the compounding of Interest. Upon information and belief, under the terms of the Notes, Interest was to be paid out @ 15% starting in 1999 and unpaid interest began compounding there-after. Since the actual obligation underlying this Claim is not between this Debtor, it would also appear that Post-Petition Interest[5] *continues to Accrue* @ 15%. It is my understanding that as the Financial Tortfeasor, having absconded with the Escrow Fund, Lehman must suffer all those consequences it assumed when it took the Escrow.

Respectfully,

William Kuntz, III
India St
PO Box 1801
Nantucket Island, Ma 02554-1801
508-775-5225

Sept 29, 2009
Hyannis, Ma

---

[5] Administrative Claim?



### Bloomberg.com

### Lehman, SunCal Fight for California Luxury Home Sites (Update1)

Share | Email | Print | A A A

By Edvard Pettersson

Sept. 23 (Bloomberg) -- Overlooking the Pacific Ocean south of Los Angeles sits a neighborhood of streets without houses, a nascent development for 313 luxury homes and a prize in a court battle between **Lehman Brothers Holdings Inc.** and **SunCal Cos.**

SunCal, the California developer, and Lehman, the New York- based investment bank, were allies for a decade in turning land into homes for sale. Lehman put up the money, and SunCal bought sites and readied them. Now, in the wake of Lehman's collapse last year, 18 SunCal projects are in bankruptcy court in California, including the **oceanside lots** in San Clemente.

At a hearing yesterday in Santa Ana, California, SunCal lawyers argued that Lehman's claims in the projects should be thrown out as they are based on about $1.5 billion in loans the bank sold shortly before it filed for Chapter 11 itself last year. Lehman failed to disclose in its proofs of claim that it no longer owned the loans and was acting as the agent of the current owners, Fenway Capital LLC, SunCal argued.

"You're not supposed to play fast and loose with proofs of claim," SunCal lawyer **Louis "Skip" Miller** said. "There has to be expressed authorization" from the loans' owners.

Lawyers for Lehman argued that the loan transfers weren't sales and that in any case, under the loan agreements, they are the authorized agent for whoever happens to own them. It's common when debt is traded for the originator of the loan to continue acting as the agent for buyer of the loan, Lehman said.

Lehman's Stance

"This is what happens in hundreds of transactions," Lehman's lawyer Richard Pachulski said. "You would negate the trading of bank debt" by disallowing Lehman to proceed as the authorized agent.

U.S. Bankruptcy Judge **Erith A. Smith** said she will try to rule by Oct. 15.

In a tentative ruling on Sept. 21, the judge had said she would grant SunCal's request to strike the claim in part because Lehman had "failed to disclose who they truly represented when filing the claims."

SunCal, based in Irvine, California, blames Lehman for the insolvency of its projects. It is trying to prevent Lehman from using its $2 billion claim as a secured creditor to bid for eight of the properties.

SunCal prefers the cash offer by the investment firm **D.E. Shaw & Co.**, a partner on other company projects, which would give preferential treatment to unsecured creditors over Lehman. Shaw's $195 million offer for nine projects would be subject to higher bids.

The Real Money

"The only real money on the table is the D.E. Shaw offer," Miller said in a Sept. 16 phone interview. "Lehman has not offered any money, and this is the only way the creditors, cities like San Clemente and contractors, are going to get paid."

SunCal argues that Lehman, lacking standing as a creditor or authorized agent for the owner of the loans, can't oppose the proposed sale to D.E. Shaw or use the claims to bid in an auction.

On Sept. 21, lawyers for the Chapter 11 trustee for the nine properties that were subject to the proposed D.E. Shaw offer, said in a court filing they had reached a settlement with Lehman, giving no details. Smith scheduled a hearing on the proposed settlement for Oct. 18.

Pachulski declined to comment on the settlement after yesterday's hearing.

Separate Accord

One site that was part of the D.E. Shaw offer will go to Denmark's Danske Bank A/S under a separate settlement, the bankruptcy trustee said Sept. 18. Shaw will revise its bid accordingly, the trustee said. Both settlements need court approval.

Lehman has filed its own competing bankruptcy plan, arguing that SunCal intends to sell the projects at below-market **prices** on terms requiring the buyer to assume bond obligations of SunCal Chief Executive Officer **Bruce Elieff**.

Lehman's plan calls for one or more auctions by a liquidation trustee, which it says would maximize the value of the assets. For example, Lehman values the San Clemente project at $187 million, compared with SunCal's $74 million.

Any good-faith buyer will take over the land and be responsible for completing the projects and assuming Elieff's bond obligations, Miller said.

SunCal, started 70 years ago by Elieff's father, Boris, a Macedonian immigrant, is the largest closely held development company in the western U.S., according to its Web site.

Streets, Permits

The family-owned company specializes in acquiring parcels of undeveloped land for which it creates master plans that include streets, parks, and sites for schools and businesses. It then obtains local-government approvals.

Once a plan is approved, sometimes after years, SunCal provides the grading and the infrastructure, including streets and utilities, then sells the parcels to homebuilders.

The Marblehead project on the Pacific in San Clemente, in Orange County, is to have 313 residences on 248 acres. It includes 69 lots that were priced up to $5 million, for which buyers can design their own houses.

A second project is a 10,625-acre site for up to 7,200 homes in Palmdale, north of Los Angeles. SunCal values it at $27 million, compared with Lehman's $43 million appraisal.

The project acquired by Copenhagen-based Danske Bank is a Los Angeles site on Santa Monica Boulevard near Beverly Hills, for which SunCal paid a reported $110.2 million in 2006, outbidding **Donald Trump**.

Condominium Tower

The French architect **Jean Nouvel** was hired to design a $400-million condominium tower close to Beverly Hills High School. Three years later, the lot sits fenced and vacant, valued at $39 million by SunCal and $51 million by Lehman.

In Oakland, the abrupt halt to a project on the site of a former naval hospital is creating a public health hazard, according to claims filed by a neighborhood association in Lehman's bankruptcy case.

The 167-acre development was abandoned leaving 90 partly demolished buildings that are occupied by transients and vandals, the association said. The site now forms a fire hazard and could result in a similar disaster as the 1991 Oakland Firestorm, the group said.

Donald Mitchell, president of the Sequoyah Hills/Oak Knoll Neighborhood Association, filed $115 million in claims for nuisance and negligence.

Starting in 1997, Lehman, through its Global Real Estate Group, became a major investor in SunCal's projects.

By 2007, the investment bank had become SunCal's biggest source of funding, with 70 percent of the developer's debt financing coming from units Lehman ALI Inc. and Lehman Commercial Paper Inc., SunCal said in court filings.

Equity Stake

Lehman acquired equity interests in some developments, including those SunCal wants to sell to D.E. Shaw.

SunCal sued Lehman in January, claiming that in 2007 and 2008 the investment bank ceased to fund projects after promising to keep them moving forward.

The motive was to prop up Lehman's "weakening stock price for the benefit of the securities markets and to entice potential investors LBHI was pursuing to fortify its faltering finances" is it moved toward collapse in September 2008 SunCal said in the complaint.

SunCal wanted to stop or slow down work on the developments in 2007 because of the plunging real estate market, Elieff, the CEO, said in a July 21 declaration to the Santa Ana court.

Lehman insisted that the work proceed because the bank didn't want the projects "to appear to be in a distressed situation," Elieff said.

Lehman Assurances

Mark Walsh, head of Lehman real estate group, assured Elieff that Lehman would pay vendors and keep development moving forward, according to the filing.

SunCal was "effectively drained of liquidity" when Lehman stopped paying contractors and fees of SunCal Management, the affiliate managing the projects, Elieff said.

SunCal's complaint lacks any specific allegations of "gross and egregious conduct," Lehman said in an April 27 motion to dismiss the lawsuit.

"Those allegations simply reflect that the Lehman lenders acted as other cautious lenders would when faced with troubled loans," Lehman said in the filing. SunCal's "basic complaint is that the Lehman lenders restricted the funding available when the projects' value began to plummet, and eventually ceased funding and pursued their contractual rights to foreclose," Lehman said.

Kimberly MacLeod, a Lehman spokeswoman, said the bank doesn't comment on litigation beyond its court filings.

The bankruptcy case is In re Palmdale Hills Property LLC, 8:08-bk-17206, and SunCal's lawsuit is 8:09-ap-01005, U.S. Bankruptcy Court, Central District of California (Santa Ana).

To contact the reporter on this story: Edvard Pettersson in Los Angeles at epettersson@bloomberg.net.

Last Updated: September 23, 2009 17:02 EDT



©2009 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EAST BAY EXPRESS

Printed from the East Bay Express Web site:
http://www.eastbayexpress.com/news/lehman__suncal__and_alameda_point/Content?oid=835404

# Lehman, SunCal, and Alameda Point
*What will the company's bankruptcy mean for two long-stalled local developments?*

By Rin Kelly

September 24, 2008

Buried on the web site of major West Coast developer SunCal Companies is the story of a little girl named Courtney Faye Smith. Courtney has spinal muscular atrophy and cannot play on area playgrounds because none of them can accommodate her wheelchair. But SunCal flush with cash from its partner Lehman Brothers and newly named the master developer at Alameda Point is going to do something about that. It is going to build "Courtney's Sandcastle," a wheelchair-accessible wonderment of wind chimes, topiary creatures, and plants that "emit aromas when touched." The playground will boast an interactive musical pathway, a castle ringed by a moat, a ship sailing a simulated ocean, a sea serpent or two, a mist-breathing dragon, and a "rock mountain that comes to life with sensor-activated water features." It will all be part of San Clemente's new master-planned Marblehead Coastal development and will serve as a draw to the 8.5-acre park that SunCal "will begin building for the public this fall."



Alameda Point still needs major infrastructure improvements before it can be developed.

That article is dated July 2007. The playground has not been built. And according to the mayor of San Clemente, the rest of Marblehead Coastal is a "quagmire." The public infrastructure and street improvements that SunCal pledged to complete have been so far behind schedule that in March the city authorized its attorney to sue the company if it did not see progress.



Project manager Pat Keliher says Lehman will continue to fund SunCal's Oak Knoll project.

SunCal's troubles in Orange County mirror the troubles the company has encountered elsewhere in California, from a bankrupt project in Bakersfield to a scotched development at Bethel Island, shuttered when the market slumped and then left to languish indefinitely. At Bethel Island, dug-up dirt blows downwind into houses and the company has to send in water trucks to dampen the stuff on windier days.

In recent years, SunCal has set its sites on the western East Bay, where the housing market isn't as bad as many other areas of the state. SunCal is the master developer at two of the region's biggest base conversions, the massive Alameda Point project, and the Oak Knoll Naval Hospital in the Oakland hills.



SunCal asked for an extension on various deadlines for Alameda Point in April.

At Alameda Point, SunCal is in the planning stages of an ambitious effort to transform the toxic former Naval air station into a vast mixed-use development powered by a solar farm. At Oak Knoll, already in the middle of a long and costly process, the company hopes to build 960 units of housing, with 300 to 400 units potentially opening as early as 2010. That project has seen its share of delays, but SunCal remains hopeful that the market will rebound.

Gretchen Wenner/courtesy of the Californian

SunCal boasts of being the largest privately owned land developer in the West and currently has more than fifty projects in various stages of development throughout California and New Mexico. But for all its size and scope, some of SunCal's recent publicity has been as toxic as the assets it bid big on in the years before the real estate bubble burst. And in the wake of the collapse of its biggest backer, the investment bank Lehman Brothers, SunCal's spotlight at the center of the current crisis has some Alameda officials worried that yet another developer might have to walk away from its promise to develop the Point.



SunCal's Greg Norman-designed McAllister Ranch golf course is now a home to grazing sheep after the developer defaulted on the project southwest of Bakersfield.

Observers such as Alameda City Councilman Frank Matarrese are watching SunCal's travails as the planning process for Alameda Point moves into the next phase. "We have to be concerned about the entire health of the company if they've got these projects that are all taking hits," he said. "We can't afford the same scenario. We can't go forward without infrastructure improvements because the roads, the sewers, the electrical out there is just not suitable. It's not serviceable. And that has to happen in order to develop the land."

SunCal says it's committed to moving forward in Oakland and Alameda and that the issues with other projects have no bearing on its work in the East Bay. As word of Lehman's collapse broke, the company began firing off press releases to communities across the West with assurances that all of its projects are separate entities. Some, in fact, are not funded by Lehman at all; its largest project is backed by hedge fund D.E. Shaw.

But even those who are eager to see the company's projects succeed have cause to worry. SunCal has missed some of its early deadlines in the planning phase at Alameda Point, and as the process has progressed, it has had to obtain assistance from Shaw.

The question is what impact the developer's woes will have on the long-stalled developments at Oak Knoll and Alameda Point.



With greenbacks from Lehman Brothers often in hand, SunCal had developed a reputation for big thinking and bigger bids. It put up $100.5 million for Oak Knoll, a move that left local developers "astounded and amazed," according to the *San Francisco Business Times*. It outbid Donald Trump for a site in Los Angeles; grabbed up $250 million dollars worth of land in the now-troubled Inland Empire; planned a 25,000-home development that would have tripled the population of Barstow; and scored a 57,000-acre land grant twice the size of Boston west of Albuquerque.

The credit crisis has hit all developers hard, and like its industry peers, SunCal has suffered. Yet, it has been in the news more than others in its industry. The company has seen increased scrutiny ever since its partner Lehman Brothers announced in June that it had lost $2.8 billion in the second quarter of 2008.

"Projects With SunCal Drive Part of Lehman's Big Loss" was the headline of a subsequent story from the *Orange County Business Journal*, where reporter Mark Mueller follows the Irvine-based developer closely. He documented staff cuts and attempts to restructure loans on some thirty projects, and reported a "buzz in the industry" that Lehman was negotiating to take over some of SunCal's projects. "A number of developers and distressed-asset investors were believed to be considering bids for some of the Lehman-SunCal projects," Mueller wrote. Of course, that was before the infamous conference call that signaled the beginning of the end for the nation's fourth-largest investment bank.

And with that ugly call, the national press started paying attention to SunCal. *Fortune*'s "How Lehman lost its way" instructed readers that "to understand what went wrong with Lehman Brothers, leave the canyons of Wall Street and head to the flatlands of Bakersfield." There, readers would find the stalled

SunCal development McAllister Ranch pitched as a 6,000-home community built around a golfer's Eden designed by Greg Norman himself stretching for three square miles of "almost lunar landscape punctuated by a half-finished clubhouse and a golf course gone to weeds."

Earlier this month, in *The Wall Street Journal*, "Lehman's Bet on a California Developer Yields a Lesson on the Downside of a Boom" revealed that the besieged bank was scrambling to unload SunCal assets in advance of the end of its third quarter. One of the company's last-ditch efforts to stay afloat was a scheme to spin off its real estate portfolio into a new company apparently nicknamed "SpinCo" inside Lehman's harried halls. It's a tactic known by the term "good bank/bad bank," with the idea being that the bad bank would end up possessing SunCal's real estate assets.

When the bubble finally burst, both SunCal and Lehman were splattered. Through its SunCal partnerships, its investments in mortgage-backed securities, and its spectacularly unprofitable $22.2 billion purchase of apartment company Archstone-Smith, Lehman risked more of its own capital on real estate than did its competitors who didn't exactly escape the mortgage meltdown themselves. Due in part to doubts about the value of Lehman's holdings in SunCal, outspoken hedge fund honcho David Einhorn even made a show of betting against SunCal's stock. Lehman reduced the value of those holdings down by $600 million before finally collapsing into bankruptcy September 15.

Just a few days earlier, as Lehman was struggling to find a savior, creditors of Lehman-SunCal developments in Southern California filed involuntary bankruptcy petitions against a master Lehman-SunCal partnership and three of its entities, which were scheduled to foreclose at the end of the week. One of those entities was the partnership behind McAllister Ranch, the moonscape golf course now overtaken by weeds. The development finally got some tenants, but they weren't concerned about the auction. According to a story in the *Bakersfield Californian*, the first and only residents of the ambitious master-planned community were a herd of sheep.

SunCal spokesman Joe Aguirre said the company is unable to comment on the bankruptcy filings or the three affected properties. But he emphasized that SunCal, as a privately owned company, finances each of its projects independently.

But evidence suggests that in the wake of Lehman's financial woes, that may no longer be the case. Indeed, SunCal's new financial backer has reportedly even asked the city for the right to replace the Alameda Point developer at its own discretion.

Local project manager Pat Keliher said last week that the financing for SunCal's Oak Knoll project comes through Lehman. And Keliher said he's been assured that Lehman plans to continue to provide that funding.

Keliher said he could not provide details as to how the funding will work within the larger context of the Lehman bankruptcy. "It's so dynamic," he said of what was happening within the firm and the US financial system as a whole. "I know that Oak Knoll is one of their crown jewels. It's such a great piece of property that I think they're very committed. It's not just Lehman it's Lehman and SunCal that are continuing to fund it."

Aguirre of SunCal also indicated that Lehman expects to be able to continue funding all its partnerships: "We can tell you that Lehman has since assured us that they will fund ongoing construction and entitlement efforts at the projects they are involved in," Aguirre wrote in a Saturday evening e-mail.

Meanwhile, Alameda Point has a new financial backer. SunCal had been self-financing the project through the early phases of its negotiations with the city. But in the last few months, the company made it known to city officials that it wanted to complete the entitlement process with the assistance of D.E. Shaw. "I'm really excited that we have a capital partner, especially one as qualified as D.E. Shaw," Keliher

said. "It'll allow us a kind of seamless transition. ... I'm very excited about that, especially in this market."

Not so excited is Alameda Councilman Doug deHaan, who said he originally voted to select SunCal as master developer in the 2007 council vote in large part because of its supposed autonomy. Now he says he is rethinking the wisdom of his choice.

"They really played that very hard," he said of SunCal's pitch. "That they could make the daily judgment calls immediately. In other words, they did not have to go back and get the mother-may-I vote from higher up. The other portion was there weren't stockholders involved that had to see profit all the time. That was one of their selling points. I kept on asking when I had personal conversations, 'Can you last the long haul? Do you have the funding to last at least the two years of the initial project?' And they assured us, 'Yes,' they had that money and they did not have to answer to anyone. In hindsight, that's not the case."

Councilman Matarrese who voted for a different developer also recalls SunCal selling itself as capable of going it alone throughout the first phase. "This is what I remember: they were going to be by themselves there. They didn't need anybody. They were self-fundable and they could write a check for a hundred million dollars right now. And then, of course, the economy continued to slide and they had to bring in Shaw."

DeHaan said it became clear to some Alameda city officials at the beginning of 2008 that SunCal was struggling with funding. "They went cold they had an inability to make the project go forward. They had no expenditures for almost six months." And then April came and they asked the city for an extension on various deadlines.

Right about that time, recalls Assistant City Manager David Brandt, SunCal stopped making payments to its consultants. "Things weren't progressing," he said. "They weren't doing the activity that was leading to progress. And at that point we kind of confronted them saying, you know, 'What's going on?' And that's the point where it became clear they needed an extension." SunCal was late on a scheduled payment to the city, although only by a couple days, Brandt noted.

"This was at the same time that we were learning about Lehman Brothers going into the tubes," he said. "And they had also stopped spending money, so we were wondering if they were having difficulties. And they pretty much acknowledged that they were looking for a new partner at that time. And that's when they came up with D.E. Shaw."

Brandt recalls SunCal advertising itself as having close ties to Lehman, and he, unlike some members of council, always expected it to eventually pair with an investor in the early planning phase.

The terms of the D.E. Shaw partnership that SunCal wanted apparently didn't sit right with city employees. It raised a number of issues that would need to be resolved before the city would agree to amend its negotiating agreement with its chosen master developer. Among the concerns were D.E. Shaw's unilateral right to sack SunCal and bring in an entirely new developer, its ability to take action on behalf of any new developer, and its desire to merge the funding for Alameda Point in a "$250-$300 million portfolio of seven to ten SunCal projects." Moreover, SunCal considers the arrangement between it and D.E. Shaw confidential and has declined to reveal details of its portfolio to city officials. And if any nosy citizen wants to sue to see what's in the term sheet, SunCal itself will have to shell out the legal fees.

Brandt said the portfolio apparently combines eight to ten of the developer's projects. "But we don't know which ones they are," he added. According to an accounting by the *Wall Street Journal* earlier this month, D.E. Shaw & Co. has a debt investment of around $200 million involving nineteen SunCal projects.

Brandt said he told SunCal representatives that if they wanted to bring in D.E. Shaw, they would have to amend their terms to comply with the city's requests. He said he felt that SunCal was willing to make

those changes.

Is he concerned about pairing with Shaw while not being allowed to see what's in their portfolio? "Not really," he says. "More than likely the Alameda project is one of the more risky projects in that portfolio. And our deal is going to be structured so it doesn't really matter what happens to the other projects. If SunCal doesn't perform, they'll be out. And if they do perform they'll stay in."

But deHaan, on the other hand, is extremely perturbed about the new partnership and has brought it up at recent council meetings. "The hedge fund really bothers me," he said in an interview. "What really concerned me and should concern everyone else is that this really is a high-profit investment to be in a hedge fund. There are certain driving forces that mean they have to make money. To make extraordinarily high returns. And that bothers me, because it can drive your project in a different direction instead of letting it mellow in the right way."

That's not an invalid concern, says Dennis M. Williams, a lecturer at UC Berkeley's Haas Real Estate Group and managing director of real estate investment banking firm Northmarq Capital. "The issue with a lot of the hedge funds is if they don't have really good real-estate expertise, that can be a problem," Williams said. "Oftentimes they're looking just for market dislocation, if you will. So they'll just jump on something because it looks like a good opportunity, but if they end up actually being stuck holding it, that's not really what they want to do."

Indeed, SunCal recently proposed a massive change in scale of the project, from the 1,800 homes long envisioned by city planners to between 4,200 and 6,000 higher-density units. Alameda voters would have to amend the city's long-standing Measure A growth limits to permit a development of that scale.

DeHaan also points to Shaw's relationship with Lehman as an issue requiring further investigation. Lehman holds a 20 percent stake in Shaw.

Williams said this should not be cause for concern: "The fact is they're an investor, and bankruptcy isn't going to trigger anything. It would be no different than if you owned a stock and you declared personal bankruptcy that in and of itself isn't going to affect the stock. But clearly in this mess they're in, they're not going to be able to come up with additional dollars, so Lehman as a financial partner might be less capable of bringing a struggling project to fruition because they can't bring additional capital to the table. I would think that would be your biggest issue."

But deHaan insists that Alameda can't afford to marry its project to a company heavily invested in peddling the very financial instruments that wrecked the housing market in the first place. After all, D.E. Shaw announced earlier this month that it was starting a new group devoted to mortgage-backed securities, the very thing that led to the nation's current economic woes in the first place. Although many investors have been afraid to buy such securities, *The New York Times* noted that Shaw is undaunted. It sees a "major opportunity in the seized-up market for mortgage-backed securities" and is ready to step up its bidding on these complex securities that have been "punching holes in the balance sheets of many Wall Street firms, including Lehman, that still held these assets on their books."

And who will be heading this new group? Richard McKinney, fresh off his stint as the head of the securitized products division at Lehman Brothers.

**SFGate**.com

# Neighbors sue Lehman Bros. over Oak Knoll site

Chip Johnson
Friday, September 25, 2009

A coalition of Oakland hills homeowner groups has filed a lawsuit against the Lehman Bros. financial empire, which collapsed last year and took down with it the funds that backed an Orange County development firm's plans to redevelop the site of the old Oak Knoll Naval Hospital.

The Sequoyah Hills/Oak Knoll Neighborhood Association, on behalf of about 4,500 homeowners, filed claims totaling $115 million with a U.S. bankruptcy court in New York this week, said Don Mitchell, president of the association.

At the heart of the neighbors' claim is the site: a tangle of high weeds, old buildings and rubble piles left behind last October - a month after the Lehman bankruptcy - when the developer halted work to prepare buildings for demolition. In July, the site was tagged by city inspectors as blighted property and an imminent fire danger to nearby homes.

The neighborhood association wants Lehman to pay the $15 million estimated cost to clean up the site. A separate claim seeks $100 million for nuisance and negligence.

Because of Oakland's history, specifically the mammoth hillside conflagration in 1991 that destroyed more than 3,000 homes and with fire season upon us, the threat of another urban blaze is a legitimate concern.

The history of the old naval hospital property since it closed in 1996 is as winding as the roads in the hillside neighborhood.

After its closure under the federal base closures act, Navy officials offered the property to the city as a public conveyance. Two years later, the city presented a public proposal to build an 18-hole golf course and lavish senior housing at the site.

Navy officials rejected the plan as an unacceptable public use, and dismissed a paltry $1.6 million offer from city officials in 2000 and withdrew their offer.

After an Oakland church unsuccessfully tried to purchase the property for $22.5 million in 2002, the federal government put it on the open market.

In 2005, SunCal Companies, a real estate development company based in Irvine, purchased the property for a whopping $100 million in an online auction. But when the developer's financial backers, Lehman Bros., filed for bankruptcy in September 2008, SunCal lost its financial partner in 20 real estate construction projects across California, including the Oak Knoll. The rapid

devaluation in Lehman's commercial real estate holdings, which fell alongside the housing market, was identified as one of the reasons for the company's collapse.

Separately, SunCal has filed a lawsuit against Lehman in a central California court in an attempt to stem its losses and liabilities. SunCal is also the developer at Alameda Point, the new development planned at the former Alameda Naval Air Station.

Oakland City Attorney John Russo said his office is preparing a legal motion asking for a court order to compel a court-appointed trust handling Lehman Bros. bankruptcy to pay for the cleanup of the site.

The blighted property, which includes more than a dozen buildings stripped to the studs, has become a haven for transients and the site of makeshift squatter's camps, neighbors and city officials have said.

"This is really about how Wall Street greed is jeopardizing the safety of real people in real cities like Oakland, Russo said. "And now that the site has been tagged as a fire hazard, we cannot allow them to be negligent and ignore their responsibilities," he said.

Because of its own budget problems, city officials can't afford to hire a company to clean up the site and then recover its expense through legal proceedings against the property owners.

As it stands now, the Oak Knoll redevelopment project, which for years and years promised a financial windfall, has become yet another mishandled public policy issue, a nonperforming asset and an albatross around the city's neck.

Chip Johnson's column appears in the Chronicle on Tuesday and Friday. E-mail him at chjohnson@sfchronicle.com.

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2009/09/25/BAEH19RLRH.DTL

This article appeared on page **D - 1** of the San Francisco Chronicle

**Name:** KUNTZ WILLIAM A
**Address:** BOX 461, LAKE PLACID, NY 12946

**Account #:** 033073395/027130763
**Type of Property:** MUTUAL FUNDS/DIVIDEND REINVEST BOOK SHRS

**Reported By:** LEHMAN BROTHERS HOLDINGS INC
**Year Reported:** 2007

#4

**Name:** GRAND UNION CAP
**Address:** C/O THE PENN TRAFFIC COMPANY
411 THEODOR, E FREMD AVE, RYE, NY 10580
**Reported By:** DEUTSCHE BANK TRUST CO
AMERICAS

**Account #:** 028111433/022135771
**Type of Property:** DEMAND DEPOSIT
ACCOUNT(S)
**Year Reported:** 2005

**Name:** GRAND UNION CAPITALCORP
**Address:** C/O THE PENN TRAFFIC COMPANY
411 THEODOR, E FREMD AVE, RYE, NY 10580
**Reported By:** MORGAN GUARANTY TRUST CO
OF NY

**Account #:** 000404287/000449480
**Type of Property:** DEMAND DEPOSIT
ACCOUNT(S)



# USPS



UNITED STATES POSTAL SERVICE®

Home | Help | Sign In

## Track & Confirm

Track & Confirm    FAQs

### Search Results

Label/Receipt Number: 7006 2150 0002 1041 7378
Detailed Results:
- **Delivered,** May 08, 2008, 8:04 am, NEW YORK, NY 10019
- Arrival at Unit, May 08, 2008, 6:36 am, NEW YORK, NY 10019
- Acceptance, May 02, 2008, 4:20 pm, NANTUCKET, MA 02554

( < Back )    ( Return to USPS.com Home > )

### Track & Confirm

Enter Label/Receipt Number.

( Go > )

### Notification Options

Track & Confirm by email
Get current event information or updates for your item sent to you or others by email. ( Go > )

---

Site Map
Contact Us
Gov't Services
Forms
Jobs
Privacy Policy
Terms of Use
National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.
No FEAR Act EEO Data    FOIA

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

NEW YORK NY 10019 OFFICIAL

| | | |
|---|---|---|
| Postage | $ | $0.80 |
| Certified Fee | | $2.65 |
| Return Receipt Fee (Endorsement Required) | | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $3.45 |

Postmark Here   NANTUCKET MA 02554   04 MAY   05/02/2008

Sent To _[signature]_
Street, Apt. No.; _745 5th Ave_
or PO Box No.
City, State, ZIP+4  _New York, NY_

7006 2150 0002 1041 7378

7006 2150 0002 1041 7378

#6 E43