Marc Abrams
Roger Netzer
Dan C. Kozusko
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
rnetzer@willkie.com

*Hearing Date: October 14, 2009, at 10:00 a.m.*
*Objection Deadline: October 5, 2009, at 4:00 p.m.*

*Attorneys for AIG CDS, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                :

**In re:**                                    :     **Chapter 11**

**LEHMAN BROTHERS HOLDINGS, INC.,**  :     **Case No. 08-13555 (JMP)**
*et al.,*                             :
                  **Debtors.**    :     **(Jointly Administered)**

------------------------------------------------------------x

**<u>OBJECTION OF AIG CDS, INC. TO THE MOTION OF DEBTOR AND DEBTOR IN POSSESSION PURSUANT TO SECTIONS 105(a), 362, AND 363 OF THE BANKRUPTCY CODE, TO COMPEL PERFORMANCE BY AIG CDS, INC. OF ITS OBLIGATIONS UNDER AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        AIG CDS, Inc. ("<u>AIG CDS</u>"), by and through its undersigned counsel, Willkie

Farr & Gallagher LLP, hereby files this Objection (the "<u>Objection</u>") to the Motion Of Debtor

And Debtor In Possession Lehman Brothers Special Financing Inc. ("<u>LBSF</u>") Pursuant To

Sections 105(a), 362, And 363 Of The Bankruptcy Code, To Compel Performance By AIG CDS,

Inc. Of Its Obligations Under An Executory Contract And To Enforce The Automatic Stay, dated

August 7, 2009 (Docket No. 4728) (the "<u>Motion</u>"). The Motion seeks to compel AIG CDS "to

perform its obligations under an executory contract, namely the ISDA Master Agreement, dated

as of July 14, 2004 (the "Master Agreement" and together with the Schedule and various

Confirmation[s] entered into thereunder, the "Swap Agreement") between it and LBSF, and to

enforce the automatic stay." (Mot. at 1-2 (emphasis added).)  In support of this Objection, AIG

CDS respectfully states:

### Preliminary Statement

1.    AIG CDS is aware of this Court's ruling on a prior motion by LBSF to

compel performance by Metavante Corporation ("Metavante"), a counterparty to a derivative

transaction with LBSF (the "Metavante Motion").  AIG CDS does not seek to re-litigate in this

Motion any of the issues decided by this Court's September 15, 2009 bench ruling on the

Metavante Motion or its subsequent Order, dated September 17, 2009 (Docket No. 5209), which

compelled Metavante to perform its obligations under the ISDA agreement between Metavante

and LBSF.  There are, however, significant factual distinctions between the derivative

transaction involved in the Metavante Motion and the credit default swap in the instant Motion

as well as significant differences in the context and circumstances of the two motions.

2.    Despite LBSF's attempts to cast this Motion as merely a carbon-copy of

the issues presented by the Metavante Motion -- indeed, LBSF makes the exact same arguments

in support of both Motions -- that is simply not the case.  To the contrary, this Motion differs

from the Metavante Motion in two material respects.

3.    First, the default that occurred here, i.e., LBSF's failure to make payments

due under the Swap Agreement for more than a year, presents an entirely different question than

those at issue in the Metavante Motion.  Whereas Metavante argued that it was relieved of its

payment obligation by virtue of the bankruptcy filings of LBSF and its credit support provider,

Debtor Lehman Brothers Holdings Inc. ("LBHI"), AIG CDS relies instead on the failure of

LBSF to make premium payments due under the Swap Agreement.

5159940.5

4.    <u>Second</u>, unlike the Metavante Motion, LBSF has made this Motion with unclean hands.  LBSF's actions here -- "taking no action whatsoever" to make approximately one year's worth of required premium payments to AIG CDS under the Swap Agreement, while "riding the market" until credit events occurred and that Agreement became "in the money" for LBSF -- represents precisely the same conduct for which this Court admonished Metavante, declaring it "simply unacceptable."  (See 9/15/09 Hr'g Tr. at 109-110[1]; 7/14/09 Hr'g Tr. (Mot., Ex. 1) at 56 ("you need to pay to play.").)

5.    Despite LBSF's failing to "pay to play," AIG CDS is, subject to certain assurances, ready and willing to honor its obligations under the Swap Agreement by paying the net amount presently due.  Before it transfers any money to LBSF, however, AIG CDS is entitled to adequate assurance that LBSF will in fact honor its ongoing obligations under the Swap Agreement until such time as it determines whether to accept or reject the Swap Agreement pursuant to section 365 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>").  This assurance is necessary because of LBSF's continuing default under the Swap Agreement and because of its status as a liquidating Debtor.  AIG CDS has always been, and still is, willing to consider any number of options that will provide it with that adequate assurance -- options which will in no way prejudice any of LBSF's rights.[2]  Because the relief requested by the Motion contains no such assurance, AIG CDS is compelled to object.

---

[1]    True and correct excerpts of the transcript of the hearing held before this Court in the above-captioned action on September 15, 2009, are attached hereto as Exhibit A.

[2]    See, e.g., Metavante Mot. to Amend (Docket No. 5284) ¶ 16 (Depositing those funds into an "interest-bearing escrow account" is "an accepted method of protecting both parties' interests when future events may affect the parties' respective interests.").

5159940.5

## Background

6.      In July of 2004, LBSF and AIG CDS entered into the Swap Agreement, which governs approximately 125 separate credit derivative transactions. Unlike the ISDA in Metavante, which was an interest-rate swap, the Swap Agreement is a credit default swap.

7.      Credit derivative transactions involve contracts that afford protection against the risk of a default by a specified entity, referred to as the "reference entity." In a credit derivative transaction or "credit default swap," the buyer of credit protection makes periodic fixed payments to the seller of the credit protection for the specified term of the credit derivative transaction or until a "credit event" occurs. Those fixed payments are commonly referred to as "premiums." The "credit events" for a credit derivative transaction are enumerated in the related Swap Agreement, and typically include the bankruptcy of the related reference entity or that reference entity's failure to pay debt service on debt obligations specified in that Agreement.

8.      Upon the occurrence of a "credit event" with respect to any credit derivative transaction, if the protection buyer satisfies certain conditions set forth in the Swap Agreement, the protection buyer, on a date designated pursuant to the Swap Agreement (the "Settlement Date"), is required to deliver debt obligations to the protection seller, in exchange for which the protection seller must pay the protection buyer a sum that is equal to the outstanding principal amount of those debt obligations.

9.      Under the Swap Agreement here, LBSF was the credit protection buyer from AIG CDS with respect to 97 of the 125 credit derivative transactions at issue. In the remaining 28 credit derivative transactions, AIG CDS was the credit protection buyer from LBSF. The premium payments due for that credit protection were calculated on a net basis, i.e., the premiums due by AIG CDS to LBSF for the 28 transactions in which it was the credit protection buyer were subtracted from the premiums owed by LBSF to AIG CDS on the 97

- 4 -

5159940.5

transactions in which LBSF was the credit protection buyer. That calculation resulted in net fixed premium payments due from LBSF to AIG CDS of more than $800,000 over the course of each quarter, the vast majority of which LBSF was required to pay on or about March 21, June 21, September 21, and December 21 of each year, with the remaining premiums paid on a semi-annual basis. The duration of LBSF's obligation to make the premium payments due under the Swap Agreement differs with respect to each credit derivative transaction, although the majority of those obligations terminate in 2011 or 2012, with some in place until as late as 2014.[3]

10.    Prior to filing for bankruptcy, LBSF failed to make an approximately $900,000 quarterly premium payment that came due to AIG CDS in September of 2008. Since the bankruptcy filing of LBSF, it has failed to make any of the post-petition premium payments that became due (which, as of the date of this Motion, are in excess of $3 million).

11.    Under the Swap Agreement, "credit events" have occurred with respect to four reference entities as to which LBSF was the credit protection buyer: General Motors Corporation ("GM"), Washington Mutual, Inc. ("WaMu"), Abitibi-Consolidated Inc. ("Abitibi"), and Station Casinos, Inc. ("Station Casinos"). Those credit events occurred when GM, WaMu, and Abitibi filed for bankruptcy and when Station Casinos defaulted on certain debt obligations.

12.    Following the occurrence of those credit events, LBSF, on July 23, 2009, tendered a Notice of Physical Settlement to AIG CDS, in which it asserted that, no later than July 28, 2009, AIG CDS would be required to pay to LBSF $12,500,000, representing the aggregate physical settlement amount for the credit events that had occurred with respect to GM, WaMu, Abitibi, and Station Casinos, less $3,369,294.00, which represented the net amounts owed by

---

[3]    LBSF's obligations to make those payments with respect to particular credit derivative transactions, however, would terminate earlier, in the event that a credit event were to occur with respect to any reference entity that was the subject of a credit derivative transaction.

- 5 -

5159940.5

LBSF to AIG under the Swap Agreement at that time, for a total amount owed to LBSF of $9,130,706.00. (Mot. ¶ 22.) According to LBSF, it has "spent approximately $5 million of assets of [its] estate" to purchase the debt obligations that LBSF alleges that it is required to furnish to AIG CDS in connection with that Notice of Physical Settlement. (Id. ¶ 21.)

13.     Neither the Notice of Physical Settlement nor any other documentation submitted by LBSF to AIG CDS in connection with these four credit events (or at any other time) contained any assurance that LBSF would make the past due or subsequent premium payments that would come due to AIG CDS under the Swap Agreement. Nor has LBSF supplied any assurance whatsoever to AIG CDS that it will honor its obligations under the Swap Agreement in the event that a credit event occurs with respect to a credit derivative transaction as to which AIG CDS is the credit protection buyer and LBSF the credit protection seller.

14.     On August 7, 2009, two weeks after LBSF delivered the Notice of Physical Settlement and approximately one week after the Settlement Date, LBSF filed the Motion, which seeks to compel AIG CDS to perform it obligations under the Swap Agreement.

15.     Since LBSF made the Motion, it failed to make two additional premium payments to AIG CDS: (i) a semi-annual payment of $30,166.67, which came due on or about August 21, 2009; and (ii) a quarterly payment in the net amount of $685,067.21, which came due on or about September 21, 2009. (That quarterly premium payment was lower than previous ones because LBSF was no longer required to pay premiums in connection with several credit derivative transactions that had matured recently or on which a credit event had occurred.) Subtracting those premium payments from the $9,130,706.00 net obligation amount set forth in paragraph 22 of the Motion reduces that latter amount to $8,415,472.12.

5159940.5

16.    LBSF had originally designated an objection deadline of October 1, 2009.

(Mot. at 1.) On a September 25, 2009 phone call with counsel for AIG CDS, LBSF's counsel

orally agreed to extend that deadline until October 5, 2009.

### Argument

17.    For the reasons stated below, LBSF is not entitled to the relief it seeks, as

requested in the Motion. Instead, any relief that this Court may award should be conditioned on

LBSF providing AIG CDS with adequate assurance that it will perform its future obligations

under the Swap Agreement as they come due.

**I.    The Metavante Motion Is Distinguishable Because AIG CDS Does Not Contend
That A Default Has Occurred On Account Of The Bankruptcy Of LBSF Or LBHI.**

   A.    LBSF Defaulted On Its Obligations Under The Swap Agreement By Failing To
         Make Required Premium Payments.

18.    LBSF attempts to create the impression that the issues presented by this

Motion are nothing but a carbon-copy of those already decided by the Court in the Metavante

Motion. That is, LBSF's Motion is predicated entirely on the assumption that AIG CDS takes

the same legal position as Metavante did, i.e., that the bankruptcy filings of both LBSF and

LBHI, its credit support provider, constitute a default under the parties' ISDA, which relieves the

non-defaulting counterparty of any obligation to perform under that agreement. (Mot. ¶ 1 ("The

sole basis that AIG [CDS] is expected to rely upon to excuse its failure to make the required

payments is the bankruptcy filings of LBSF and ... LBHI.").) Indeed, LBSF makes the exact

same legal arguments here as it did in the Metavante Motion. (Compare id. ¶¶ 31-49 with

Metavante Mot. (Docket No. 3691) ¶¶ 23-34.) On the basis of this assumption, LBSF's counsel

has argued that this Court's express rejection of Metavante's interpretation of the event of default

clause in those parties' ISDA as an impermissible *ipso facto* clause under the Bankruptcy Code

should be dispositive of the instant Motion, as well.

- 7 -

5159940.5

19.    But LBSF is attacking a straw man.  LBSF's default under the Swap

Agreement, unlike that alleged by Metavante (see Metavante Objection (Docket No. 3951) ¶¶

16-17), is not predicated upon the bankruptcy filings of LBSF and LBHI.  Rather, LBSF is in

default of its obligations under the Swap Agreement because it has failed to make required post-

petition premium payments to AIG -- a total arrearage that is in excess of $3 million.  (Swap

Agreement (Mot., Ex. 2) ¶ 2(a).)  LBSF would be in default under the Swap Agreement on the

basis of that arrearage even if neither LBSF nor LBHI had ever filed for bankruptcy.[4]  (See id.)

20.    By contrast, in the Metavante Motion, LBSF had not failed to make any

payments to Metavante, for the simple reason that the terms of the parties' ISDA, an interest-rate

swap, only imposed a payment obligation on the Net Obligor (as defined therein).  (9/15/09 Hr'g

Tr. at 109-10 (It is "the net obligor [who] actually makes a payment after the parties['] respective

positions are calculated on a quarterly basis.").)  Throughout the relevant time period for that

Motion, only Metavante was the Net Obligor, not LBSF.  (Id. at 103.)  As a result, Metavante

relied solely on "the bankruptcies of LBSF and LBHI" to support its contention that an event of

default on the part of LBSF has occurred.  (See id. at 106; Metavante Objection ¶¶ 16-17.)

21.    Thus, because the default at issue here is not the bankruptcy filings of

LBSF and LBHI, the sole purported default alleged in the Metavante Motion (see Metavante

Objection ¶¶ 16-17), but rather LBSF's failure to make required premium payments to AIG

CDS, the Metavante Motion does not address the question presented in this Motion, much less is

it dispositive here, as LBSF contends.

---

[4]    LBSF has not contended that declaring a default on account of its failure to make premium payments to
AIG CDS is based on its "insolvency or financial condition," and therefore an impermissible *ipso facto*
clause under 11 U.S.C. § 365(e)(1).  (See Mot. ¶¶ 36-46.)

5159940.5

B.    The Bankruptcy Code Requires LBSF To Make Premium Payments In Order To
Receive The Benefit Of Its Bargain Under The Swap Agreement.

22.    Nor can there be any doubt that the Bankruptcy Code requires LBSF, in

light of its moving to compel receipt of the benefit of its bargain under the Swap Agreement, to

continue to perform its obligations under that executory contract by making the required

premium payments set forth in that Agreement.[5] NLRB v. Bildisco & Bildisco, 465 U.S. 513,

531 (1984) ("If the debtor-in-possession elects to continue to receive benefits from the other

party to an executory contract pending a decision to reject or assume the contract, the debtor-in-

possession is obligated to pay for the reasonable value of those services."). Indeed, LBSF's own

argument to this Court in the Metavante Motion says as much: "while LBSF is determining

whether to assume or reject the Agreement, the unilateral cessation of required payments is

prohibited." (Metavante Mot. ¶ 5.)

23.    "The contract rate is presumed to set the reasonable value, but either party

may offer evidence to prove a different reasonable value." In re Kollel Mateh Efraim, LLC, No.

04-16410, 2009 Bankr. LEXIS 2236, at *21-22 (Bankr. S.D.N.Y. Aug. 18, 2009). Here, LBSF

has not offered any evidence to rebut that presumption; to the contrary, the Motion does not

dispute that AIG CDS is entitled to offset any amounts owed to LBSF by the full amount of the

premium payments that LBSF failed to make. (See Mot. ¶ 22.) Accordingly, LBSF, in order to

---

[5]    Although the Motion correctly states that an executory contract may not be enforced against a Debtor prior
to its assumption or rejection (Mot. ¶ 33), that rule of law does not permit a Debtor to receive the benefits
of such a contract without paying for them, as the very authority relied on by the Court in deciding the
Metavante Motion makes clear. Bildisco, 465 U.S. at 531 (cited in 9/15/09 Hr'g Tr. at 110); see also In re
Payless Cashways, Inc., 305 B.R. 303, 308 (Bankr. W.D. Mo. 2004) ("[A]fter a debtor commences a
Chapter 11 proceeding, but before executory contracts are assumed or rejected, those contracts remain in
existence 'enforceable by the debtor but not against the debtor.' But if the debtor chooses to receive the
benefit of such a contract post petition, it is obligated to pay for doing so.").

5159940.5

receive the credit protection that it bargained for under the Swap Agreement, must remit the

contractually mandated premium payments to AIG CDS.[6]  See, e.g., Bildisco, 465 U.S. at 531.

**II.   LBSF's Conduct Here Is Similar To Metavante's Because It "Rode The Market"
For Over A Year Without Performing Its Obligations Under The Swap Agreement.**

24.     In hearing and ruling on the Metavante Motion, this Court made plain that

parties to derivative contracts "need to pay to play" (7/14/09 Hr'g Tr. (Mot., Ex. 1) at 56), that is,

they may not simply "ride the market" for over a year, "while taking no action whatsoever" to

perform their obligations under those agreements, in the hope that those contracts will

subsequently turn in their favor.  (9/15/09 Hr'g Tr. at 110.)  Indeed, this Court could not have

been clearer when it declared that such conduct "is simply unacceptable."  (Id.; accord 7/14/09

Hr'g Tr. at 56) ("[Y]ou're choosing to not pay and play at the same time.  That's a problem.

And I think that's where [Metavante's] hands are just a little soiled.").)

25.     In that regard, the conduct of LBSF here is similar to that of Metavante.

Like Metavante, LBSF defaulted on its payment obligations under the Swap Agreement for

approximately a year, choosing instead to ride the market, hoping that the Agreement would

swing in its favor.  (See Argument Point I, supra.)  Fortuitously for LBSF, that wait paid off, as

the Swap Agreement became "in the money" for it roughly a year later, after four credit events

occurred with respect to credit derivative transactions in which it was the protection buyer.

(Mot. ¶¶ 18-22.)  Metavante, on the other hand, was not so lucky, as its interest-rate swap with

---

[6]     Moreover, requiring LBSF to make premium payments in full is consistent with how courts have
interpreted executory insurance contracts, see, e.g., In re Sharon Steel Corp., 161 B.R. 934, 937 (Bankr.
W.D. Pa. 1994) ("Here, the Debtor elected to continue to receive the benefits under the Policy pending its
decision to assume or reject.  Accordingly, the obligation arises from a transaction with the debtor-in-
possession and the Debtor has an obligation to pay the premiums as an administrative expense.") --
agreements that have substantial similarity to credit default swaps such as the Swap Agreement. See, e.g.,
Merrill Lynch Int'l v. XL Capital Assurance Inc., 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008) ("A credit
default swap is an arrangement similar to an insurance contract."); Deutsche Bank AG v. AMBAC Credit
Prods., LLC, No. 04 Civ. 5594, 2006 WL 1867497, at *2 (S.D.N.Y. July 6, 2006) ("credit default swap[s]
… are akin to insurance policies").

- 10 -

LBSF only became even more "out of the money" as it rode the market. (9/15/09 Hr'g Tr. at 103.) The Court's admonition to parties to derivative contracts who fail "to pay to play" drew no distinction, however, between those who "ride the market" successfully and those who do not. (See id. at 110; 7/14/09 Hr'g Tr. at 56). Thus, while LBSF's luck may have been better than Metavante's, its hands are no less unclean.

26.    LBSF's unclean hands therefore create a further distinction between this Motion and the Metavante Motion, where LBSF was not in default under any provision of the contract under which it moved to compel performance (aside from those struck down by this Court as invalid *ipso facto* clauses). (See 9/15/09 Hr'g Tr. at 112.) Despite having engaged in conduct here that, according to this Court, renders its "hands [] just a little soiled" (7/14/09 Hr'g Tr. at 56), LBSF nevertheless asks this Court to award it exactly the same relief that the Court ordered in connection with the Metavante Motion, including default interest.[7] (Compare Mot. at 18 with Metavante Mot. at 13.) Yet, the Motion offers no assurance whatsoever that LBSF will not continue to engage in this "simply unacceptable" course of conduct (9/15/09 Hr'g Tr. at 110) should the Court grant the requested relief. (See Proposed Order (Mot., Ex. 5) at 1-2.) Absent adequate assurance that LBSF will honor its obligations under the Swap Agreement by making payments to AIG CDS as they come due in the future, LBSF, because of its unclean hands, should not be awarded the relief sought in the Motion.

---

[7]    LBSF has cited no authority for the award of default interest to a party with unclean hands, especially one who defaulted first and remains in default over a year later, in order to ride the market in the hope that the Swap Agreement would turn in its favor. (See Mot. ¶ 28.) Alternatively, in the event that the Court does award LBSF default interest, that amount should be offset by the default interest that LBSF owes to AIG CDS for failing to make premium payments.

5159940.5

**III.    AIG CDS Is Willing To Make Payments Due Under The Swap Agreement, Provided
That It Receives Adequate Assurance That LBSF Will Perform Its Future
Obligations Under That Contract.**

27.    AIG CDS is ready and willing to pay the net amount due under the Swap

Agreement.  As of the date of this Objection, that amount is $8,415,472.12, following LBSF's

failure to make premium payments that came due to AIG CDS on or about August 21, 2009 and

September 21, 2009.

28.    Before it pays that amount, however, AIG CDS seeks adequate assurance

that LBSF, following receipt of that payment, will not simply continue its current course of

conduct, i.e., fail to make required premium payments to AIG CDS and "ride the market" until a

credit event occurs in its favor, so as to offset that arrearage and make the Swap Agreement "in

the money" for LBSF once again.  Likewise, as the Motion acknowledges, AIG CDS has also

bought credit protection from LBSF under the Swap Agreement (Mot. ¶ 13) and therefore

requires adequate assurance from LBSF that it will tender the Physical Settlement Amounts due

to AIG CDS upon the occurrence of a credit event in its favor and the satisfaction of the

conditions specified in the Swap Agreement.  AIG CDS's need for adequate assurance is all the

more important because LBSF is a liquidating Debtor.

29.    Indeed, the assurance that AIG CDS is requesting here is no different than

that which LBSF must provide to AIG CDS in the event that it chooses to assume the Swap

Agreement, rather than reject it.  See 11 U.S.C. § 365(b)(1)(c); In re M. Fine Lumber Co., 383

B.R. 565, 575 (Bankr. E.D.N.Y. 2008) (holding that "in order to provide adequate assurance of

future performance, the Debtor must provide ... a sufficient security deposit" in an amount equal

to the "payments" due to its counterparty until such time as the agreement was assumed and

assigned).  Given that the Swap Agreement has "a significant market value in favor of LBSF"

5159940.5

(Mot. ¶ 2) and therefore constitutes a valuable asset of its estate, there is no reason to believe that LBSF will reject that Agreement, absent a dramatic change in market conditions.

30.    As detailed below, AIG is amenable to a number of different options that would provide it with adequate assurance that LBSF will perform its obligations under the Swap Agreement in the future, but that, at the same time, would protect the assets of LBSF's estate.

31.    One option would require AIG CDS to deposit the net amount due to LBSF, together with any additional net amounts that may come due to LBSF in the future, into an interest-bearing escrow account until such time as LBSF determines whether to assume or reject the Swap Agreement, at which time the proceeds of that account would be distributed to the parties according to their net positions. Indeed, Metavante has asked this Court to amend its Order, dated September 17, 2009, to provide for such relief, noting that an escrow agreement is "an accepted method of protecting both parties' interests when future events may affect the parties' respective interests." (See Metavante Mot. to Amend ¶ 16.)

32.    Another option would involve AIG CDS holding back a portion of the net payment that is presently due to LBSF, in an amount equal to the sum of (i) the premium payments that are scheduled to come due from LBSF to AIG CDS between now and the time that LBSF reasonably expects to decide whether to assume or reject the Swap Agreement; and (ii) payments reasonably expected to come due to AIG CDS in connection with credit derivative transactions in which AIG CDS has purchased credit protection from LBSF, in which credit events are reasonably expected to occur prior to the time that LBSF determines whether to assume or reject the Swap Agreement. LBSF would hold any funds that it receives under this arrangement in constructive trust for AIG CDS's benefit in the event that LBSF does not assume

- 13 -

5159940.5

or reject the Swap Agreement within the specified time period. At the time that LBSF decides

whether to assume or reject that contract, AIG CDS and LBSF would settle up, with interest.

33.    A third option would entail AIG CDS making a payment to LBSF of the

$8,415,472.12 net amount that it presently owes, with AIG CDS receiving an administrative

claim against LBSF's estate, pursuant to section 503(b) of the Bankruptcy Code, for any net

amounts that become due and owing from LBSF in the future. Indeed, this approach is one that

LBSF and another derivative counterparty, MEG, agreed to in a Stipulation that this Court so-

ordered on September 17, 2009. (So-Ordered Stipulation (Docket No. 5214) ¶ 8 ("Any claims of

MEG that arise after the Effective Time pursuant to the [ISDA] Agreement shall be postpetition

administrative expense claims against LBSF pursuant to section 503(b) of the Bankruptcy

Code."). That So-Ordered Stipulation, moreover, has been held up by this Court as a model for

resolving disputes between LBSF and counterparties to derivative contracts such as the Swap

Agreement. (See 9/15/09 Hr'g Tr. at 68 (parties should "take heed" of that Stipulation), 105 (the

terms of this Stipulation "indicate[] that parties who are willing to settle can").)

34.    Accordingly, AIG CDS respectfully requests that, as part of any Order that

compels it to make payment of net amounts due under the Swap Agreement, the Court include a

provision, such as those discussed in the foregoing paragraphs, that will provide AIG CDS with

adequate assurance that LBSF will make pay premiums and other amounts that subsequently

come due from LBSF to AIG CDS, until such time as LBSF determines whether to assume or

reject the Swap Agreement, pursuant to section 365 of the Bankruptcy Code.

5159940.5

## Conclusion

35.     For all of the foregoing reasons, AIG CDS respectfully requests that the

Court enter an Order that (i) denies the relief sought in the Motion, (ii) conditions any payment

by AIG CDS of net amounts due pursuant to the Swap Agreement upon LBSF providing

adequate assurance that, until such time as it assumes or rejects that executory contract, it will

perform its obligations thereunder as they come due, and (iii) awards AIG CDS such other and

further relief as is just and proper.


Dated: New York, New York
        October 5, 2009

                            Respectfully submitted,

                            WILLKIE FARR & GALLAGHER LLP


                            By: _____
                                Roger Netzer
                                (A Member of the Firm)

                            787 Seventh Avenue
                            New York, New York 10019
                            (212) 728-8000
                            rnetzer@willkie.com

                            *Attorneys for AIG CDS, Inc.*