# EXHIBIT A

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01258

Adv. Case No. 08-01743

Adv. Case No. 09-01242

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                Debtors.

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                Debtor.

- - - - - - - - - - - - - - - - - - - - -x

NEUBERGER BERMAN, LLC,

                Plaintiff,

      -against-

PNC BANK, NATIONAL ASSOCIATION,

LEHMAN BROTHERS INC., AND LEHMAN

BROTHERS COMMERICAL CORPORATION,

                Defendants.

- - - - - - - - - - - - - - - - - - - - -x

VERITEXT REPORTING COMPANY

212-267-6868                                                         516-608-2400

67

1  that's an issue of law or fact to be determined, that it's the

2  kind of thing that will be differently determined if it ends up

3  in litigation.  In fact, informed judgment would suggest that

4  you settle something because you're reasonably confident that a

5  thoughtful finder of fact and law will find it a certain way

6  even if it's not the way you want it to be.  And --

7              MR. BIENENSTOCK:  That's my point, Your Honor, that

8  you want to have that data that goes to those issues --

9              THE COURT:  Necessarily that data will have to be in

10 front of the parties to the mediation if they're going to reach

11 an agreement, assuming they're represented by you.

12             Now, I don't know who's going to represent every

13 counterparty.  I don't know whether any of these issues in

14 every -- are even pertinent to some of these disputes.  Some of

15 these disputes may simply be ornery obdurate behavior, the

16 behavior of parties who need to pay, who want to hold onto

17 their cash for as long as possible.  Indeed, I suspect that

18 that is the principal common issue of law or fact that unites

19 all of these disputes.

20             Like every other bankruptcy case you've ever been in,

21 when you owe money, hold onto it for as long as you can.  It's

22 better in your pocket than the debtor's.  It's not written down

23 anywhere, but that's how people behave.  That's the behavior

24 we're seeking to get to right now, to get to an ADR process

25 that encourages parties to write checks, because the money's in

1  fact owed.  And even if you can come up with some creative
2  reasons as to why the number might be different, get to the
3  table quickly.
4       So with that being what I consider the most important
5  common issue, I think these ADR procedures are quite
6  appropriately framed.
7       Now, as to the discovery issue which you mentioned, I
8  believe the mediator is the best party to coordinate the
9  sharing of information.  And I see absolutely no reason why
10 there need to be black-letter requirements for disclosure from
11 the debtor, particularly in cases, and I'm not suggesting that
12 this is true of any of your clients or, frankly, any other
13 client represented in the room, but particularly in cases where
14 the only issue is delay.
15      There really aren't any major issues of dispute.  This
16 is a process designed to facilitate the kind of settlement that
17 was achieved in item number 6 on today's agenda.  Nine-plus
18 million dollars is being paid over to the estate that should
19 have been paid a while ago.  I think there are a lot of
20 counterparties that should take heed, and they can save money
21 ultimately by not participating in ADR but simply writing
22 checks.  I'm not suggesting, by the way, that anybody should do
23 that in a situation in which there's a good-faith dispute.
24 That dispute can be resolved in mediation; and if not, here;
25 and if not here, some higher court.

1    that it has been presented and will make some judgments as to
2    the identity of the mediators in consultation with counsel for
3    the debtors and for the creditors' committee who have been so
4    active in developing these procedures.
5         I recognize that a lot of people who are in court at
6    this moment are here for the ADR procedures, and I'm going to
7    give people who want to leave an opportunity to leave.  I'm
8    also going to give everybody an opportunity for a break.  But
9    because of the congestion of this docket, I think I'm going to
10   go until 1 o'clock.  So let's take a break for ten minutes, and
11   then resume, and then go until 1 o'clock and then break for
12   lunch.  We're adjourned until then.
13        MR. GRUENBERGER:  Thank you, Your Honor.
14        (Recess from 12:12 p.m. to 12:28 p.m.)
15        THE COURT:  Be seated please.  Number 11, Metavante.
16        MR. SLACK:  Your Honor, Richard Slack from Weil,
17   Gotshal for the debtors.  We're here on the debtors' motion to
18   compel performance of Metavante Corporation.  As Your Honor
19   knows, two months ago we had argument, after fully briefing the
20   issue.  Your Honor is in receipt of letters from both
21   Metavante's counsel and from the debtors, which I think
22   provides the status of where we are in terms of discussions,
23   which is, essentially, that the parties have not had
24   substantial discussions, as the letters which are docketed
25   state.

100

1    The debtors were requested to make a proposal to
2    resolve it, which we did.  We have not received a proposal from
3    Metavante in the two months since the hearing, and Metavante
4    has not responded to our proposal that we've made.
5        Your Honor has mentioned Metavante a couple of times
6    today, and so Your Honor may have a plan for the conference,
7    but it is the debtors' position that this matter should be
8    considered and decided, at the Court's discretion, obviously.
9        THE COURT:  Understood.  I'm ready to rule today.
10       MR. ARNOLD:  May it please the Court, mindful of that
11   comment, I want you to know why we wrote the letter, so that
12   you have in mind that parties do take into account the risks of
13   not settling, and you were quite clear at the hearing on July
14   14th that there was an opportunity for the parties to consider
15   resolving this matter.
16       For the Court's information, neither Lehman nor its
17   counsel have been obdurate, ornery, or in any fashion
18   unprofessional.  Our dealings have been quite, to the contrary,
19   exceptional throughout the history of our relationships.  I
20   reached out to counsel for the debtors to explain how it is
21   that an impending transaction which will close on October 1st
22   would, in my judgment, have a favorable impact on the
23   likelihood of this matter resolving consensually.  That was the
24   singular purpose for us writing the letter to the Court.  We
25   are not here today to reargue the motion.  The Court heard

101

1    extensive oral argument. It has been well briefed. The issues
2    have come up again in, frankly, in other instances and motions
3    and adversary proceedings. I wanted the Court to know that it
4    was not by design, neglect or deliberately ignoring your
5    comments on July 14th that the settlement has not proceeded
6    further than it has. About a week ago we received a settlement
7    proposal. I am authorized to state by both Fidelity and
8    Metavante that post-closing of the merged entity we expect to,
9    and intend to, and will make a settlement proposal, but we're
10   also mindful that it hasn't been settled, and if it is the
11   Court's desire to rule on the matter today, we govern ourselves
12   accordingly. I just wanted the Court to know what I've done
13   since July 14th to try to move this matter on.
14              THE COURT: Okay. Thank you for that update.
15              MR. ARNOLD: Thank you, Your Honor.
16              THE COURT: The Metavante matter consumed the better
17   part of an afternoon's oral argument. My best recollection is
18   that we specially listed it on the afternoon before the July
19   omnibus hearing. Candidly, I don't recall why it was specially
20   listed all by itself, but it's just as well that it happened,
21   because it took a lot of time.
22              It's correct that I encouraged the parties to attempt
23   to resolve this consensually, and I appreciate the fact that
24   large enterprises, particularly those that are involved in
25   major transactions in which acquisitions are literally weeks

1    away from being consummated, may be distracted or may have

2    other priorities.  But I also believe that when I suggested

3    that this be listed for the September 15th omnibus hearing it

4    was with the notion that, in effect, time would be up.

5           I'm also mindful of the fact that on today's calendar

6    a matter very similar to this, item 6, has been consensually

7    resolved, involving the payment of fifty percent more dollars

8    to the debtors than are at issue in this current dispute.

9           I am prepared to rule and will do so now.  Recognize

10   that what I'm about to do will take some time and will probably

11   take us to the lunch hour.  If there is anyone here who doesn't

12   want to hear the ruling in this case I'd like you to be free to

13   both leave, because I won't be offended, or, if at some point

14   during my rendition of this ruling you say to yourself this is

15   something I don't need to hear, you're also free to leave at

16   that point.

17          LBSF requests that the Court compel Metavante to

18   perform its obligations under that certain 1992 ISDA Master

19   Agreement dated as of November 20, 2007, defined as the "Master

20   Agreement".  And that certain trade confirmation dated December

21   4, 2007, defined as the "Confirmation", and together with the

22   Master Agreement, the "Agreement".

23          The Master Agreement provides the basic terms of the

24   parties' contractual relationship and contemplates being

25   supplemented by trade confirmations that provide the economic

103

1  terms of the specific transactions agreed to by the parties.
2  Under the Master Agreement, Metavante and LBSF entered into an
3  interest rate swap transaction, the terms of which were
4  documented pursuant to the Confirmation.
5        LBHI is a credit support provider for LBSF's payment
6  obligations under the Agreement.
7        Due to declining interest rates the value of LBSF's
8  position under the Agreement has increased.  As of May 2009,
9  under the payment terms of the Agreement, Metavante owed LBSF
10  in excess of 6 million dollars, representing quarterly payments
11  due November, 2008, February, 2009 and May, 2009, plus default
12  interest in excess of 300,000 dollars.
13        It is possible that due to current market conditions
14  and to the quarterly payment schedule prescribed by the
15  Agreement the amounts that Metavante owes to LBSF as of today
16  are even higher than those stated in the motion.  Metavante has
17  refused to make any payments to LBSF.  In fact, it has refused
18  to perform its obligations under the Agreement, as of November
19  3, 2008.  Instead, Metavante claims that LBSF and LBHI, via the
20  filing of their respective Chapter 11 cases, each caused an
21  event of default under the Agreement.
22        Metavante argues that due to such events of default it
23  has the right, but not the obligation, under the safe harbor
24  provisions of the Bankruptcy Code, to terminate all outstanding
25  derivative transactions under the Agreement.  Metavante also

104

1   maintains that it is not otherwise required to perform under
2   the Agreement.
3           The parties presented their arguments to the Court at
4   a hearing held on July 14, 2009.  Notably at the hearing
5   counsel to Metavante stated that, quote, "the opportunity to
6   settle the matter", is a possibility.  The reference in the
7   transcript is page 58, lines 18 to 19.  The Court took the
8   matter under advisement and suggested that it be calendared for
9   the September 15, 2009 omnibus hearing for purposes of either a
10  bench ruling or a status conference on any progress the parties
11  may have made towards a resolution.
12          I want to make clear that I am proceeding with this
13  ruling because I view the letter described by counsel for
14  Metavante, which talked about a possible settlement
15  counterproposal occurring sometime after the closing of a
16  merger on October 1, as being an insufficient commitment to a
17  timely settlement.
18          On September 14, 2009 the Court received letters from
19  counsel to each of the parties.  Counsel to Metavante requests
20  an adjournment to October 14.  Counsel states that an
21  adjournment will facilitate the parties' settlement
22  negotiations but explains that Metavante may not make a
23  counterproposal to LBSF's September 5, 2009 settlement proposal
24  until after the proposed October 1, 2009 closing of a merger.
25  Counsel also suggests that an adjournment will allow the Court

1   to put the motion on the same track as two other motions

2   currently pending before the Court.  Which motions, counsel

3   claims, raise similar issues to the motion?  Counsel to LBSF

4   and LBHI maintain that inasmuch as Metavante has done nothing

5   since July 14, 2009 to settle this matter other than asking

6   LBSF and LBHI to make a settlement proposal, the parties are no

7   closer to settlement than they were at the hearing, and,

8   therefore, the status conference should go forward as planned.

9           While each of the matters reference by counsel to

10  Metavante may have overlapping issues with those presented in

11  the current dispute, each matter involves its own distinct set

12  of fats.  Moreover, each of the two referenced matters is in

13  its infancy.  No response has been filed in either one, which

14  may further delay resolution here.

15          This is a dispute that has been fully briefed and

16  argued and is ripe for determination.  Moreover, I note that

17  the settlement that was achieved with MEG Energy that was

18  referenced this morning indicates that parties who are willing

19  to settle can, and do.

20          Under the Agreement LBSF is obligated to pay the

21  floating three month USD LIBOR BBA interest rate on a notional

22  amount of 600 million dollars, which notional amount declines

23  over time, beginning in May, 2010.  Metavante, in turn, is

24  obligated to pay a fixed interest rate, 3.865 percent, on the

25  notional amount.  The Agreement is set to expire on February 1,

1    2012.  The Agreement defines event of default to include the

2    bankruptcy of any party or credit support provider.  Under the

3    terms of the Agreement, upon an event of default the non-

4    defaulting party may designate an early termination date.  Upon

5    termination a final payment is calculated and paid in order to

6    put the parties into the same economic position as if the

7    termination had not occurred.

8        In the instant case Metavante has refused to perform

9    under the Agreement on account of the event of default that has

10   occurred, and is continuing, on account of the bankruptcies of

11   LBSF and LBHI.  Metavante has not, however, attempted to

12   terminate the Agreement.  Instead, Metavante entered into a

13   replacement hedge covering the period from November 3, 2008

14   through February 1, 2010.

15       LBSF and LBHI argue that the Agreement is an executory

16   contract because material performance, specifically payment

17   obligations, remain due by both LBSF and Metavante.  Under

18   Bankruptcy Code Section 365(a) a debtor in possession may,

19   "subject to the court's approval, assume or reject any

20   executory contract".  The case law makes clear, however, that

21   while a debtor determines whether to assume or reject an

22   executory contract the counterparty to such contract must

23   continue to perform.

24       LBSF and LBHI further argue that the safe harbor

25   provisions do not excuse Metavante's failure to perform.

1    Indeed, the safe harbor provisions permit qualifying non-debtor
2    counterparties to derivative contracts to exercise certain
3    limited contractual rights triggered by, among other things, a
4    Chapter 11 filing.  They're available, however, only to the
5    extent that a counterparty seeks to one, liquidate, terminate
6    or accelerate its contracts or two, net out its positions.  All
7    other uses of ipso facto provisions remain unenforceable under
8    the Bankruptcy Code.
9                Notably, Metavante does not dispute that it has failed
10   to perform under the Agreement.  Instead, Metavante argues that
11   the occurrence of an event of default under the Agreement gives
12   rise to its right, as the non-defaulting party, to terminate
13   under the safe harbor provisions.  According to Metavante the
14   occurrence of an event of default does not, however, create the
15   obligation for it to terminate under the safe harbor
16   provisions.  Metavante emphasizes the term, quote, "condition
17   precedent" set forth in Sections 2(a), 1 and 3 of the
18   Agreement, which subject payment obligations to the condition
19   precedent that no event of default with respect to the party
20   has occurred and is continuing.
21               Metavante argues that under New York State contract
22   law a failure of a condition precedent excuses a party's
23   obligation to perform.  Metavante states that its unequivocal
24   right to suspend payments until the termination of the
25   Agreement is fundamental to the manner in which swap parties

108

1  government themselves.  Metavante takes issue with LBSF and
2  LBHI in asking the Court to treat the Agreement like a garden
3  variety executory contract, arguing that it cannot be compelled
4  to pay because LBSF and LBHI cannot provide the essential item
5  of value Metavante bargained for, namely an effective
6  counterparty.
7       Metavante further argues on information and belief
8  that LBSF and LBHI also are in default under certain
9  unspecified indebtedness that allegedly may have created a
10 cross default under the Agreement, asserting, as a result, an
11 alleged need to engage in the discovery process.
12      It is clear that the filing of bankruptcy petitions by
13 LBHI and LBSF constitute events of default under the Agreement.
14 Specifically, Section 5(a)(vii) of the Agreement provides that
15 it shall constitute an event of default should a party to the
16 Agreement or any credit support provider of such party
17 institute a proceeding seeking a judgment of insolvency or
18 bankruptcy, or any other relief under any bankruptcy insolvency
19 law or similar law affecting creditors' rights.
20      Section 2(a)(i) and 3 of the Agreement, in turn,
21 subject payment obligations to the condition precedent that no
22 event of default with respect to the other party has occurred
23 and is continuing.  It is also clear, however, that the safe
24 harbor provisions, primarily Bankruptcy Code Sections 560 and
25 561, protect a non-defaulting swap counterparty's contractual

1   rights solely to liquidate, terminate or accelerate one or more
2   swap agreements because of a condition of the kind specified in
3   Section 365(e)(1), or to "offset or net out any termination
4   values or payment amounts arising under or in connection with
5   the termination, liquidation or acceleration of one or more
6   swap agreements".  That language comes from Section 560.
7       In the instant matter Metavante has attempted neither
8   to liquidate, terminate or accelerate the Agreement, nor to
9   offset or net out its position as a result of the events of
10  default caused by the filing of bankruptcy petitions by LBHI
11  and LBSF.  Metavante simply is withholding performance, relying
12  on the conditions precedent language in Sections 2(a)(i) and
13  (iii) under the Agreement.
14      The question presented in this matter and the issue
15  that was argued by the parties at the hearing is whether
16  Metavante's withholding of performance is permitted, either
17  under the safe harbor provisions or under terms of the
18  Agreement itself.  It is not.
19      Although complicated at its core the Agreement is, in
20  fact, a garden variety executory contract, one for which there
21  remains something still to be done on both sides.  Each party
22  to the Agreement still is obligated to make quarterly payments
23  based on a floating or fixed interest rate of a notional
24  amount, it being understood that the net obligor actually makes
25  a payment after the parties respective positions are calculated

1   on a quarterly basis, in February, May, August and November of
2   each calendar year.
3       Under relevant case law it is clear that while an un-
4   assumed executory contract is not enforceable against a debtor,
5   see NLRB v. Bildisco & Bildisco, 465 US 513 at 531, such a
6   contract is enforceable by a debtor against the counterparty.
7   See McLean Industries, Inc. v. Medical Laboratory Automation,
8   Inc., 96 B.R. 440 at 449 (Bankr. S.D.N.Y. 1989).  Metavante
9   relies on In re Lucre, Inc., 339 BR 648 (WD Mich.) for the
10  proposition that a debtor's uncured pre-petition breach of its
11  executory contract, here the event of default caused by the
12  bankruptcy filings of LBHI and LBSF, will, in and of itself,
13  justify continued nonperformance by the non-debtor
14  counterparty, and mere commencement of bankruptcy proceedings
15  and the imposition of the automatic stay does not empower the
16  debtor to compel performance from a non-debtor party.
17      The Court rejects the Lucre decision as nonbinding and
18  non-persuasive.  While Metavante's argument for the events of
19  default caused by the bankruptcy filings of LBHI and LBSF do
20  create an obligation for it to terminate the Agreement under
21  the safe harbor provisions, that's a tenable argument.  Its
22  conduct of riding the market for the period of one year, while
23  taking no action whatsoever, is simply unacceptable and
24  contrary to the spirit of these provisions of the Bankruptcy
25  Code.

111

1          First, inasmuch as the Bankruptcy Code trumps any
2  state law excuse of nonperformance, Metavante's reliance on New
3  York contract law is misplaced.  Moreover, legislative history
4  evidences Congress's intent to allow for the prompt closing out
5  or liquidation of open accounts upon the commencement of a
6  bankruptcy case.  Citation is to the Congressional history of
7  this, H.R. Rep. 97-420 at 1 (1982), as well as its stated
8  rationale that the immediate termination for default and the
9  netting provisions are critical aspects of swap transactions
10 and are necessary for the protection of all parties in light of
11 the potential for rapid changes in the financial markets.
12 Citation to the Senate Report number 101-285 at 1 (1990).
13         The safe harbor provisions specifically permit
14 termination solely, quote, "because of a condition of the kind
15 specified in Section 365(e)(1) that is the insolvency or
16 financial condition of the debtor and the commencement of a
17 bankruptcy case.  See also In re Enron Corp., 2005. WL 3874285,
18 at *4, Judge Gonzalez's case, 2005.  Noting that a
19 counterparty's action under the safe harbor provisions must be
20 made fairly contemporaneously with the bankruptcy filing, less
21 the contract be rendered just another ordinary executory
22 contract.
23         The Court finds that Metavante's window to act
24 promptly under the safe harbor provisions has passed, and while
25 it may not have had the obligation to terminate immediately

112

1   upon the filing of LBHI or LBSF, its failure to do so, at this
2   juncture, constitutes a waiver of that right at this point.
3              Metavante's references to defaults under certain
4   unspecified indebtedness that allegedly may have created a
5   cross default under the Agreement are of no moment.  First,
6   Metavante failed to set forth the basis, either in its papers
7   or at the hearing, for its information and belief that such a
8   default may have occurred.  Its assertion that such a default
9   may have occurred indicates that Metavante is not aware of any
10  such default, and, therefore, did not rely on that default in
11  its refusal to perform under the Agreement or lacks knowledge
12  of what that default may be.
13             Additionally, the argument that LBSF or LBHI may have
14  defaulted under other specified indebtedness, as that term is
15  defined in the Agreement, relies upon the financial condition
16  of bankruptcy debtors to withhold performance.  That is also
17  unenforceable as an ipso facto clause that may not be enforced
18  under the Bankruptcy Code Section 365(e)(1)(A).
19             LBSF and LBHI are entitled to continued receipt of
20  payments under the Agreement.  Metavante's attempts to control
21  LBSF's right to receive payment under the Agreement constitute,
22  in effect, an attempt to control property of the estate.  See
23  In re Enron Corp., 300 B.R. 201 at 212 (S.D.N.Y. 2003),
24  recognizing that contract rights are property of the estate and
25  that therefore those rights are protected by the automated

113

1    stay.

2             This is a violation of the automatic stay imposed by

3    Code Section 362.  Accordingly, for the reasons set forth in

4    LBSF's and LBHI's papers, for the reasons stated on the record

5    at the hearing and for the reasons stated on the record today,

6    pursuant to Bankruptcy Code Sections 105(a), 362 and 365,

7    Metavante is directed to perform under the Agreement until such

8    time as LBSF and LBHI determine whether to assume or reject.

9    That's the ruling of the Court.

10            MR. KRASNOW:  Good afternoon, Your Honor.  Richard

11   Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

12   We are close to the end of this morning's agenda, but not quite

13   there as yet.  The next item, Your Honor, is number 12.  It is

14   the motion of DnB Nor Bank described in the agenda.  Your

15   Honor, that matter has been fully submitted to the Court, fully

16   briefed, arguments held on November 5th, and today is the

17   scheduled status conference.

18            THE COURT:  Okay.  I'm ready to rule on that, but

19   given the hour I'm not going to take the time to do that now.

20   But we'll issue a short memorandum in due course.  So as to not

21   create any undue suspense for those parties who are here in

22   connection with the DnB Nor matter, I am deciding that in favor

23   of the debtors and against DnB Nor, denying DnB Nor's motion

24   for allowance of an administrative expense claim, substantially

25   for the reasons set forth in the committee's papers.