JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Aviva Warter Sisitsky
Benjamin Rosenblum

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                      :
In re:                                :    Chapter 11
                                      :
LEHMAN BROTHERS HOLDINGS INC., et al.,:    Case No. 08-13555 (JMP)
                                      :
                     Debtors.         :    (Jointly Administered)
                                      :
------------------------------------------------------------x
```

### REPLY IN SUPPORT OF MOTION OF DEBTOR AND DEBTOR IN POSSESSION PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE, TO COMPEL PERFORMANCE BY AIG CDS, INC. OF ITS OBLIGATIONS UNDER AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), files this reply in response to the objection (the "Objection") of AIG CDS, Inc. ("AIG") to the Motion for an Order pursuant to sections 105(a), 362 and 365 of the Bankruptcy Code compelling AIG to perform its obligations under an executory contract, namely the ISDA Master Agreement, dated as of July 14, 2004 (the "Master Agreement" and together with the Schedule and various Confirmations entered into

thereunder, the "Swap Agreement") between it and LBSF, and to enforce the automatic stay (the "Motion").[1]  In support of the Motion, LBSF respectfully states as follows:

## Preliminary Statement

1.      On September 15, 2009, this Court ruled in *Metavante*, among other things, that a counterparty to a swap agreement is not permitted to withhold performance of its obligations under the safe harbor provisions or under the swap agreement itself, if it elects not to exercise its right to terminate, liquidate or accelerate payment under the swap agreement within a reasonable time.  (9/17/09 Hr'g Transcript ("Tr.") 109:14-109:18, 111:18-112:2).[2]  Under *Metavante*, Debtors' Motion must be granted.

2.      Notwithstanding the clear holding in *Metavante*, AIG seeks to avoid the application of *Metavante* on the basis of purported factual differences between *Metavante* and the instant case.  (Objection at ¶¶ 3, 4).

3.      AIG asserts that there are two principal factual differences; namely, that unlike *Metavante* (i) AIG is not relying on the Debtor's bankruptcy filings to excuse its failure to perform, and (ii) LBSF has "unclean hands" because it failed to make the fixed payments required under the Swap Agreement to AIG following the commencement of the case.  AIG's position is inconsistent with its own previous statements and not supported by the facts.

4.      AIG claims that LBSF is "attacking a straw man" because "LBSF's default under the Swap Agreement, unlike that alleged by *Metavante* . . . is not predicated upon the filings of LBSF and LBHI." (Objection at ¶ 19) (emphasis added).  However, prior to the Court's decision in *Metavante*, AIG's principal basis for not performing under the Swap

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

[2] The September 15, 2009 bench ruling is hereinafter referred to as "*Metavante*."  Familiarity with the facts and circumstances surrounding the ruling are assumed.

Agreement *was* the commencement of Debtors' bankruptcy proceeding.  In an August 21, 2009

letter to LBSF, after this motion was filed but before the Court ruled in *Metavante*, AIG claimed

that:

> Section 2(a)(iii) of the Master Agreement however provides that,
> *inter alia*, 'Each obligation of each party under Section 2(a)(i) is
> subject to (1) the condition precedent that no Event of Default or
> Potential Event of Default with respect to the other party has
> occurred . . .'
>
> On or about September 15, 2008 your Credit Support Provider
> filed a voluntary petition under chapter 11 of the bankruptcy code,
> which is an Event of Default under the Master Agreement.[3]

5.      Thus, AIG's first attempt to distinguish this motion from *Metavante* must

fail.  This motion is indistinguishable from *Metavante* and AIG should be compelled to perform

in accordance with this prior Court's ruling.

6.      AIG's alternative theory fares no better.  Specifically, in its Objection,

AIG attempts to circumvent *Metavante* by arguing that the failure by LBSF to make a fixed

quarterly payment two weeks prior to LBSF's filing of its chapter 11 case distinguishes this

motion from *Metavante*.  (Objection at ¶ 10).

7.      That is a distinction without a difference.  This Court expressly noted that

the counterparty in *Metavante* attempted to justify its conduct by arguing that the Debtors "are

also in default under certain unspecified indebtedness that allegedly may have created a cross

default under the Agreement . . . ."  (Tr. 108:7-108:11).  Such assertion by the counterparty in

*Metavante* was no different than the assertions made by AIG here.  In fact, AIG's assertion has

---

[3] A true and correct copy of the August 21, 2009 letter from AIG to the Debtor is attached hereto as Exhibit A.

even less merit because the Debtors here have cured any missed payments owed to AIG by seeking performance solely on a net basis.[4]

8.      That is, LBSF on its own initiative, and without prompting from AIG, has sought performance from AIG solely on a net basis; any premiums that AIG asserts it is owed by LBSF currently will be netted against the credit protection payments and premium payments that AIG owes to LBSF.  As a result, AIG would receive a dollar-for-dollar benefit equal to the amount it currently asserts it is owed by the Debtor under the Swap Agreement.

9.      AIG has done nothing but suspend its performance for over a year.  AIG was content to ride the market in the hope that the value of the Swap Agreement, which at all times was, and still is, significantly in favor of LBSF, would shift in AIG's favor.  AIG has attempted neither to liquidate, terminate or accelerate the Swap Agreement, nor to offset or net-out its position as a result of the *ipso facto* events of default.  Like Metavante, AIG is simply withholding performance, relying on the conditions precedent language in Sections 2(a)(i) and (iii) under the Agreement.  (*See e.g.,* Exhibit A).  AIG could have declared an Event of Default on the basis of the single missed premium or the bankruptcy filing under the Swap Agreement, but has elected not to do so for over a year.  If AIG's position were to be sustained, it would seriously undermine this Court's ruling in *Metavante* and produce a result which this Court expressly rejected in *Metavante*.

10.      At bottom, AIG's position conflicts with this Court's reasoning in *Metavante* and the well-established principle that an executory contract can be enforced by, but

---

[4] AIG claims two additional premium payments have become due and owed by LBSF to AIG under the Swap Agreement after this motion was filed.  (Objection at ¶ 15.)  Because LBSF seeks performance on a net basis, to the extent there are payments that have become due and owed to AIG during the pendency of this motion, LBSF is willing to reduce the performance it seeks by the aggregate amount of any accrued but unpaid payments.  In that regard, LBSF does not dispute AIG's calculation of the $30,166.67 semi-annual payment, but LBSF does dispute, and hereby reserves the right to challenge, AIG's calculation of the $685,067.21 quarterly payment amount.

not against, the debtor, and thus LBSF was well within its rights, pending assumption or rejection, not to perform on the contract. If AIG's assertions were to be sustained, the right of debtors, such as LBSF, to consider in an orderly fashion whether to accept or reject an executory contract would be materially limited.

11.     Recognizing the futility of relitigating *Metavante*, AIG devotes much of its Objection to a misguided effort to have this Court place conditions on AIG's performance. AIG does not, because it cannot, cite to a single authority supporting the imposition of such an extraordinary condition at this time. Such a request is neither supported by the law nor justifiable as an equitable matter, particularly in light of the fact that the Debtors seek performance now, and would continue to seek payment in the future, solely on a net basis, *i.e.*, after giving AIG credit for any payments or performance owed to AIG by LBSF.

12.     Debtors have offered AIG a resolution that would address directly, in a fair and equitable fashion, the principal concerns of AIG. (*See* paragraph 29, below.) AIG has rejected the offer.

## Argument

**I.     *Metavante* Is Equally Applicable To This Instant Motion And Mandates That AIG Perform Its Contractual Obligations**

### A.     Executory Contracts Are Enforceable By, But Not Against, A Debtor

13.     In direct contravention of *Metavante*, AIG has refused to perform under the Swap Agreement and such refusal directly contravenes the well-established principle of bankruptcy law that, pending assumption or rejection, an executory contract is enforceable by, but not against, a debtor in possession. (Tr. 110:3-110:8); *see also, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *McLean Indus. Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989); *Calpine Energy Servs. v.*

*Reliant Energy Elec. Solutions (In re Calpine Corp.)*, No. 05-60200 (BRL), ADV. 08-1251

(BRL), 2009 WL 1578282, *6 (Bankr. S.D.N.Y. May 7, 2009).

14.     As this Court has previously determined, a counterparty's attempts to

control a debtor's right to receive payment under a swap agreement in the gap period[5] constitute,

in effect, an attempt to control property of the debtor's estate.  (Tr. 112:18-113:1) (citing *In re*

*Enron Corp.*, 300 B.R. 201, 212 (S.D.N.Y. 2003)); *see also* 11 U.S.C. § 362(a)(3) (prohibiting

"any act to obtain possession of property of the estate or of property from the estate or to

exercise control over property of the estate").

### B.     AIG, Like The Counterparty In Metavante, Cannot Withhold Its Performance Under The Swap Agreement

15.     Disregarding the above principles, AIG argues that one missed premium

payment, due two weeks prior to LBSF's bankruptcy filing, is an event of default which justified

its non-performance.  (Objection at ¶10).

16.     AIG, however, opted not to exercise any right it claims it may have had to

ripen an Event of Default on account of the single missed premium payment and to declare an

Early Termination Date under the Swap Agreement.  Had AIG done so, it would have had to pay

the Debtor the value of the Swap Agreement, which was significantly in favor of LBSF.

17.     To claim now, as it does in its Objection that *Metavante* is distinguishable

from the Motion because LBSF is in default for failure to make premium payments is an

irrelevant distinction because the performance sought by the Debtors is net of any outstanding

payments owed by LBSF to AIG.

---

[5] The period between the commencement of a bankruptcy case and the debtor in possession's decision to assume or reject a contract is sometimes referred to as the "gap" period.  *See, e.g.*, *Calpine*, 2009 WL 1578282, at *6.

18.     Furthermore, AIG's argument that "[n]either the Notice of Physical Settlement nor any other documentation submitted by LBSF to AIG CDS in connection with these four credit events (or at any other time) contained any assurance that LBSF would make past due or subsequent premium payments," is simply not true. (Objection at ¶ 13 and Exhibit A.)

19.     In compliance with the strict terms of the Swap Agreement, and as it is entitled to do under Section 2(c) of the Swap Agreement, LBSF delivered Credit Event Notices ("CENs") to AIG on June 29, 2009.  In the CENs, LBSF expressly stated that the amount due LBSF from AIG had been calculated on a net basis, subtracting from the amount owed by AIG the aggregate premium amount owed by LBSF to AIG under the Swap Agreement.

20.     Specifically LBSF stated that:

> For the avoidance of doubt, the amount owed to us upon settlement of the Short Transactions shall be equal to (i) the aggregate of the Physical Settlement Amounts due to us in respect of the Short Transactions, net of the aggregate of the Physical Settlement Amounts, if any, due to you in respect of the Long Transactions as the result of your delivery of Deliverable Obligations on the same day as we deliver Deliverable Obligations to you, minus (ii) any periodic fixed payment amounts that we owe you under the Master Agreement, net of any periodic fixed payment amounts that you owe us under the Master Agreement.

A true and correct copy of the CEN (without the exhibits) is attached hereto as Exhibit B.

21.     The Notice of Physical Settlement ("NOPS") delivered to AIG on July 23, 2009 reiterated that the amount AIG owed to LBSF was "net" of any outstanding fixed payments that LBSF would have owed to AIG under the Swap Agreement but for Debtors' chapter 11 filings.  A true and correct copy of the NOPS is attached hereto as Exhibit C.

22.     Thus, any alleged past failure by LBSF to make premium payments to

AIG —whether the Debtor was required to make them or not — is moot and cannot be relied on

by AIG as a basis for its continued failure to perform its obligations under the Swap Agreement.

## II.     AIG is Not Entitled to Adequate Assurances As A Matter Of Law

23.     In its Objection, AIG improperly asks this Court to require the Debtor to

provide "adequate assurances" that it will continue to perform its payment obligations under the

Swap Agreement.[6]  This request is both procedurally improper and without merit.  *See* FED. R.

BANKR. P. 9013 and 9014.[7]

24.     AIG concedes, as it must, that it is bound by its contractual obligations

under the Swap Agreement and that the Swap Agreement is enforceable by, but not against,

LBSF.  Yet, it states that it is only willing to honor these contractual obligations if it receives

"adequate assurances."

25.     AIG does not, because it cannot, cite a single authority in support of its

contention that LBSF is required to provide it with such assurances.  Neither the Bankruptcy

Code nor New York law (which governs the Swap Agreement here) entitles AIG to unilaterally

condition its performance on receipt of "adequate assurances."[8]

---

[6]  AIG also requests that any default interest it owes to LBSF be offset by the default interest that LBSF owes to AIG "for failing to make premium payments."  (Objection at FN 7).  This request must be denied because unmatured interest is not allowed against a Debtor in bankruptcy.  11 U.S.C. §502(b).

[7]  AIG's insistence on adequate assurances is also curious given AIG's past failure to demand performance from LBSF.  As noted in LBSF's Motion, LBSF served CENs on all relevant transactions, as it is entitled to under the Swap Agreement, including those transactions wherein LBSF had sold credit protection to AIG.  (See LBSF's Motion at FN 8).  Once LBSF triggered those credit events, AIG was required to take affirmative steps under the Swap Agreement to ripen its right to demand credit protection payment from LBSF.  AIG failed to do so and is now barred from doing so under the terms of the Swap Agreement.  It is telling that on its first opportunity to demand performance of credit protection payments from LBSF, AIG stood by and elected to do nothing.  Such inaction belies AIG's professed need for this Court to now impose onerous burdens on LBSF under the guise of seeking "adequate assurances of performance."

[8]  Adequate assurances of future performance are required under the Bankruptcy Code only where either (i) the debtor is seeking to assume an executory contract that is in default, 11 U.S.C. § 365(b), or (ii) where the debtor is

26.     Indeed, in a case cited by AIG in its Objection, *Merrill Lynch Intern. v. XL Capital Assur. Inc.*, 564 F.Supp.2d 298, 306 (S.D.N.Y. 2008), the court refused to extend the doctrine of adequate assurances to a credit default swap under New York law.

27.     AIG's request to make the payments that it owes to the estate conditional on the receipt of adequate assurances, is contrary to applicable bankruptcy and state law, and should be denied.

## III.     AIG Will Not Be Prejudiced By An Order Compelling It To Perform Its Contractual Obligations

28.     LBSF has indicated to AIG that it is willing to take a number of discrete actions to address the concerns articulated by AIG in its Objection.  For example, as more fully set forth in Paragraph 29, LBSF has extended an offer that would have reduced significantly the exposure of AIG to the future performance of LBSF.  AIG has rejected the offer made by LBSF and indicated its determination to pursue the relief requested in its Objection.

29.     Following receipt of the Objection, on October 8, 2009, LBSF offered to address AIG's concerns as follows:

- *First*, with respect to already accrued premium payments, LBSF has offered to reduce the credit protection payments owed to AIG by the aggregate amount of the premium payments currently owed by LBSF to AIG.

- *Second*, LBSF offered to address the concern of AIG with respect to the payment of future premiums by LBSF by agreeing that any future credit protection payments required to be paid by AIG would be reduced by the aggregate amount of any unpaid premium payments that become due and owed to AIG.  AIG would thus receive, in effect, dollar-for-dollar premium payments as credit events

---

(continued…)

seeking to assign an executory contract, whether or not such agreement is in default, 11 U.S.C. § 365(f).  Through this Motion, the Debtors are seeking neither assumption nor assignment.  AIG's citation to the MEG Order demonstrates this point.  Debtor actually assumed the MEG Swap Agreement and provided assurances in that context.

occur.[9]  Alternatively, if AIG prefers to receive periodic premium payments on a current basis, AIG could readily achieve that result by permitting LBSF to assign the Swap Agreement to a third party.  AIG has previously objected to this course of action.  [*See* Docket No. 5060].

- *Third*, LBSF has offered to mutually terminate those Transactions with respect to which LBSF is the credit protection seller at a valuation amount ascribed by AIG in respect of those Credit Derivative Transactions.  Payment of such amount would be effected by reducing the amount currently owed by AIG to LBSF.  This would eliminate the exposure of AIG to LBSF under the Transactions with respect to which AIG purchased protection from LBSF.

- *Finally*, to provide further comfort to AIG, LBSF is also willing to agree to stipulate that, pending assumption or rejection, AIG would be entitled to an administrative claim for payments owed by LBSF to AIG.[10]

30.     Inexplicably, AIG rejected in its entirety the offer made by LBSF, which

addresses the concerns AIG expressed in its Objection about LBSF's future performance.

---

[9] As discussed more fully in LBSF's moving papers, the transactions governed by the Swap Agreement are Credit Derivative Transactions.  When a credit event occurs with regard to a Reference Entity, the protection buyer tenders the debt obligations to the protection seller to physically settle the Credit Derivative Transaction (both parties bought and sold protection under the Swap Agreement, but as described in the Motion, LBSF is the net purchaser of protection).  In order to settle the credit events and to comply with its obligations under the Swap Agreement, LBSF was required to go into the market to purchase the debt obligations, which cost the estate $5 million.  Here, LBSF had to move it or lose it:  If LBSF had not triggered the credit event relating to GM's bankruptcy, that Credit Derivative Transaction would have expired, resulting in the value of the credit protection payment being lost to the estate.  Thus LBSF had no choice but to seek payment from AIG in respect of that Transaction at this time.

[10]     The Objection makes reference to potential postpetition claims being entitled to administrative expense status.  (Objection at ¶ 33).  This issue, while part of the offer rejected by AIG after the filing of its Objection, is not properly before this Court, and it is premature to prejudge the status of AIG's asserted claims at this time.  AIG's rights are what they are, and a determination on those issues is not necessary to establishing the straightforward proposition that a contract is enforceable by, but not against, a debtor in possession during the gap period — something this Court has already addressed in *Metavante*.

## **Conclusion**

WHEREFORE, LBSF respectfully requests that the Court (i) overrule the

Objection, (ii) enter an order compelling AIG's performance under the Swap Agreement, and

(iii) grant such other and further relief as the Court may deem proper.


Dated: New York, New York           Respectfully submitted,
      October 13, 2009

  /s/ Jayant W. Tambe
Jayant W. Tambe
Aviva Warter Sisitsky
Benjamin Rosenblum

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR DEBTOR AND DEBTOR IN
POSSESSION

**EXHIBIT A**

AIG Markets, Inc.

August 21, 2009
Via Facsimile and Overnight Delivery

Lehman Brothers Special Financing, Inc.
c/o Derivatives Legal
Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 40th Floor
New York, NY 10020
Attention:  Locke McMurray
Telephone:    212-526-7186
Facsimile:    212-526-7672

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019
Attention:     Documentation Manager
               Tel: 212-526-7187
               Fax: 212-526-7672

Re:    ISDA Master Agreement between AIG CDS, Inc. and Lehman Brothers Special
       Financing, Inc., dated as of July 14, 2004 (the "Master Agreement")

Dear Sir or Madam:

We received your letters dated as of July 23, 2009 and August 18, 2009 regarding various
credit derivatives under the Master Agreement.

In your letter dated August 18, 2009, you noted that in respect of certain credit
derivatives that have experienced a credit event, "[i]n accordance with Section 2(a)(i) of
the Master Agreement, Counterparty was required to pay to Lehman …." Section
2(a)(iii) of the Master Agreement however provides that, *inter alia*, "Each obligation of
each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of
Default or Potential Event of Default with respect to the other party has occurred and is
continuing…."

On or about September 15, 2008 your Credit Support Provider filed a voluntary petition
under chapter 11 of the bankruptcy code, which is an Event of Default under the Master
Agreement. Since September 15, 2008, you have failed to make premium payments

pursuant to the terms of the Master Agreement which is an additional Event of Default under the Master Agreement.

On August 7th, 2009 Lehman filed a motion to compel performance (the "Motion") by AIG CDS, Inc. [Docket No. 4728] of its obligations under the ISDA Agreement. We intend to file a response on or before the response deadline, October 1, 2009. A hearing on the Motion is currently scheduled for October 14, 2009 at 10:00 a.m.

In addition, we are consulting our legal counsel on our rights and remedies under the Master Agreement and intend to pursue those rights to the fullest extent possible including our right of set off. The Master Agreement provides that, as non-defaulting party, we may set off any amounts we owe you under this Master Agreement against any amounts that you owe us or one of our affiliates under another agreement.

If you have any questions, please feel free to contact Alan Stewart at 1-212-770-9544.

Very truly yours,

AIG Markets, Inc. (f/k/a AIG CDS, Inc.)

By:_____
Name: Alan Stewart
Title: Vice President

# **EXHIBIT B**

# LEHMAN BROTHERS

*June 29, 2009*

To:       AIG CDS, Inc.
c/o AIG Global Investment Corp
70 Pine Street, 13th Floor
New York, NY 10270
Attention: Investment Grade Credit Group
Telephone: (212) 770-9349
Facsimile: (212) 770-9453

Copy to:   American International Group, Inc.
70 Pine Street
New York, NY 10270
Attention: Secretary
Facsimile: (212) 514-6894

From:    Lehman Brothers Special Financing Inc.
c/o Derivatives Legal
Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 40th Floor
New York, NY 10020
Attention: Locke McMurray
Telephone: (212) 526-7186
Facsimile: (212) 526-7672

## CREDIT EVENT NOTICE
## AND
## NOTICE OF PUBLICLY AVAILABLE INFORMATION

Re:    Credit Derivative Transactions described below

Dear Sir or Madam:

Reference is made to the Credit Derivative Transactions described below (the "Long Transactions") between Lehman Brothers Special Financing Inc., as Seller, and AIG CDS, Inc., as Buyer:

| Trade Date | Effective Date | Scheduled Termination Date | Reference Entity | Lehman DTCC Ref #/ Global Deal ID | AIG CDS DTCC Ref # |
|---|---|---|---|---|---|
| September 20, 2007 | March 21, 2007 | June 20, 2012 | 1. Federal National Mortgage Association<br>2. Federal Home Loan Mortgage Corporation<br>3. Washington Mutual Inc (each, a component of CDX.NA.IG.8 index) | 3368013 | SPT1044A |
| March 5, 2008 | September 21, 2007 | December 20, 2012 | 1. Federal National Mortgage Association<br>2. Federal Home Loan Mortgage Corporation<br>3. Washington Mutual Inc (each, a component of CDX.NA.IG.9 index) | 3693922 | F1ZO4-SN-PQK |
| March 26, 2008 | March 21, 2008 | June 20, 2013 | 1. Federal National Mortgage Association<br>2. Federal Home Loan Mortgage Corporation<br>3. Washington Mutual Inc (each, a component of CDX.NA.IG.10 index) | 20175617 | F21E7-SN-RDZ |
| April 10, 2008 | March 21, 2008 | June 20, 2013 | 1. Federal National Mortgage Association<br>2. Federal Home Loan Mortgage Corporation<br>3. Washington Mutual Inc (each, a component of CDX.NA.IG.10 index) | 3767821 | F22FZ-SN-SGD |

Reference is further made to the Credit Derivative Transactions described below (the "Short Transactions", and together with the Long Transactions, the "Transactions") between AIG CDS, Inc., as Seller, and Lehman Brothers Special Financing Inc., as Buyer:

| Trade Date | Effective Date | Scheduled Termination Date | Reference Entity | Lehman DTCC Ref #/ Global Deal ID | AIG CDS DTCC Ref # |
|---|---|---|---|---|---|
| January 5, 2006 | January 6, 2006 | March 20, 2011 | Abitibi-Consolidated Inc. | 2360952 | SPH402FX |
| February 27, 2007 | February 28, 2007 | March 20, 2012 | Washington Mutual Inc | 2906649 | SPG4049T |

| April 27, 2007 | April 28, 2007 | June 20, 2009 | General Motors Corporation | 3027121 | SPS503FH |
|---|---|---|---|---|---|
| May 17, 2007 | May 18, 2007 | June 20, 2012 | Station Casinos, Inc. | 3060219 | SPS103YT |

Capitalized terms used and not otherwise defined in this letter shall have the meanings set forth in the confirmation for the relevant Transaction.

This letter is our Credit Event Notice to you that:

1. a Bankruptcy Credit Event occurred with respect to each of Federal National Mortgage Association and Federal Home Loan Mortgage Corporation on or about September 7, 2008, when the Federal Housing Finance Agency ("FHFA") was appointed to be the conservator of each of Federal Home Loan Mortgage Corporation and Federal National Mortgage Association in accordance with the Federal Housing Finance Regulatory Reform Act of 2008 (Public Law 110-289) and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. 4501, et seq., as amended), as further described in the Statement of FHFA Director James B. Lockhart dated September 7, 2008;

2. a Bankruptcy Credit Event occurred with respect to Washington Mutual Inc on or about September 26, 2008, when Washington Mutual Inc filed a petition for Chapter 11 protection in the U.S. Bankruptcy Court in the District of Delaware;

3. a Failure to Pay Credit Event occurred with respect to Station Casinos, Inc. on or about March 3, 2009, when Station Casinos, Inc. failed to make an interest payment on February 1, 2009, for USD 450,000,000.00 6.5% Senior Subordinated Notes due February 1, 2014, which required interest payment was in excess of USD 1,000,000, and such failure to make the interest payment continued through the expiration of the Grace Period of thirty (30) days;

4. a Bankruptcy Credit Event occurred with respect to Abitibi-Consolidated Inc. on or about April 17, 2009, when (a) Abitibi-Consolidated Inc., its parent AbitibiBowater Inc. and various affiliates filed a petition seeking protection under the Companies' Creditors Arrangement Act in the Commercial Division of the Superior Court of the District of Montreal, Province of Quebec, Canada, which petition also sought recognition of any automatic stay issued pursuant to proceedings initiated in the U.S. Bankruptcy Court in the District of Delaware by a petition for Chapter 11 protection filed by AbitibiBowater Inc. and various affiliates on April 16, 2009, and (b) Abitibi-Consolidated Inc. subsequently filed a Chapter 15 petition in the U.S. Bankruptcy Court for the District of Delaware seeking recognition of the Canadian proceedings; and

5. a Bankruptcy Credit Event occurred with respect to General Motors Corporation on or about June 1, 2009, when General Motors Corporation filed a petition for Chapter 11 protection in the U.S. Bankruptcy Court in the Southern District of New York.

This letter also comprises our Notice of Publicly Available Information with respect to these Credit Events. Accordingly, we provide the Publicly Available Information attached hereto as Exhibits 1 through 5.

This letter also is our notice that our account information for the purpose of receiving any and all payments under the ISDA Master Agreement (Multi-Currency – Cross Border) (the "Master Agreement"), dated as of July 14, 2004, between Lehman Brothers Special Financing Inc. and AIG CDS, Inc. (including without limitation any and all payments in connection with settlement of the Transactions) is the following:

> Pay Citibank N.A., New York
> Swift CITIUS33
> ABA 021-000-089
> For Lehman Brothers Special Financing Inc. – DIP
> a/c 3078-4731
> Reference: [Include our name and applicable trade identifier]

For the avoidance of doubt, the amount owed to us upon settlement of the Short Transactions shall be equal to (i) the aggregate of the Physical Settlement Amounts due to us in respect of the Short Transactions, net of the aggregate of the Physical Settlement Amounts, if any, due to you in respect of the Long Transactions as the result of your delivery of Deliverable Obligations on the same day as we deliver Deliverable Obligations to you, <u>minus</u> (ii) any periodic fixed payment amounts that we owe you under the Master Agreement, net of any periodic fixed payment amounts that you owe us under the Master Agreement.

Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Transactions.

*[Signature appears on following page.]*

Sincerely,

LEHMAN BROTHERS SPECIAL
FINANCING INC.,
    as Seller under the Long Transactions and
    as Buyer under the Short Transactions

By:

Name: _Daniel Ehrmann_

Title: _Authorized Signatory_

**EXHIBIT C**

# LEHMAN BROTHERS

*July 23, 2009*

To:        AIG CDS, Inc.
              c/o AIG Global Investment Corp
              70 Pine Street, 13th Floor
              New York, NY 10270
              Attention:     Investment Grade Credit Group
              Telephone:    (212) 770-9349
              Facsimile:     (212) 770-9453

Copy to:    American International Group, Inc.
              70 Pine Street
              New York, NY 10270
              Attention:     Secretary
              Facsimile:     (212) 514-6894

From:      Lehman Brothers Special Financing Inc.
              c/o Derivatives Legal
              Lehman Brothers Holdings Inc.
              1271 Avenue of the Americas, 40th Floor
              New York, NY 10020
              Attention:     Locke McMurray
              Telephone:    (212) 526-7186
              Facsimile:     (212) 526-7672

## NOTICE OF PHYSICAL SETTLEMENT

      Re:     Credit Derivative Transactions described below

Dear Sir or Madam:

Reference is made to the following Credit Derivative Transactions described below (the "Relevant Transactions") between AIG CDS, Inc., as Seller, and Lehman Brothers Special Financing Inc., as Buyer:

| Trade Date | Effective Date | Scheduled Termination Date | Reference Entity | Lehman DTCC Ref #/ Global Deal ID | AIG CDS DTCC Ref # |
|---|---|---|---|---|---|
| January 5, 2006 | January 6, 2006 | March 20, 2011 | Abitibi-Consolidated Inc. | 2360952 | SPH402FX |
| February 27, 2007 | February 28, 2007 | March 20, 2012 | Washington Mutual Inc | 2906649 | SPG4049T |
| April 27, 2007 | April 28, 2007 | June 20, 2009 | General Motors Corporation | 3027121 | SPS503FH |
| May 17, 2007 | May 18, 2007 | June 20, 2012 | Station Casinos, Inc. | 3060219 | SPS103YT |

Reference is also made to the Credit Event Notice and Notice of Publicly Available Information, dated June 29, 2009, and previously delivered to you on June 29, 2009 (the "Credit Event Notice").

This letter constitutes a Notice of Physical Settlement with respect to the Relevant Transactions. Any capitalized term not otherwise defined in this letter will have the meaning, if any, assigned to such term in the confirmation for the respective Relevant Transaction or, if no meaning is specified therein, in the 2003 ISDA Credit Derivatives Definitions (the "Credit Derivatives Definitions").

We hereby confirm that we will settle the Relevant Transactions and require performance by you in accordance with the Physical Settlement Method.

**Settlement Details:**

1. *Delivery.* Subject to the terms of the Relevant Transactions, we will deliver to you on or before the Physical Settlement Date the following Deliverable Obligations, each with an outstanding principal balance equal to the outstanding principal balance specified below opposite such Deliverable Obligation:

| Issuer | Coupon | Maturity | CUSIP | Outstanding Principal Balance to be Delivered |
|---|---|---|---|---|
| Abitibi-Consolidated Inc. | 8.850% | 8/1/2030 | 003924AH0 | USD 1,500,000.00 |
| Washington Mutual Inc | 4.000% | 1/15/2009 | 939322AL7 | USD 5,000,000.00 |

| | | | | |
|---|---|---|---|---|
| General Motors Corporation | 8.800% | 3/1/2021 | 370442AJ4 | USD 3,000,000.00 |
| Station Casinos, Inc. | 6.875% | 3/1/2016 | 857689AT0 | USD 3,000,000.00 |

2. *Payments.* Pursuant to Section 8.1 of the Credit Derivatives Definitions and market practice, on the latest Delivery Date with respect to the Deliverable Obligations specified above (the "Payment Date"), Seller is required to pay Buyer the amount of USD 9,130,706.00 (the "Payment Amount"), which amount is equal to:

    a. USD 12,500,000.00 (the aggregate of the Physical Settlement Amounts corresponding the Deliverable Obligations specified above)

    <u>minus</u>

    b. USD 3,369,294.00 (the amount of periodic fixed amount payments required pursuant to Section 2(a)(i) of the ISDA Master Agreement (Multi-Currency – Cross Border) (the "Master Agreement"), dated as of July 14, 2004, between Lehman Brothers Special Financing Inc. ("Party A") and AIG CDS, Inc. ("Party B") to be paid by Party A to Party B that are unpaid as of the date hereof, net of the amount of periodic fixed amount payments required pursuant to Section 2(a)(i) of the Master Agreement to be paid by Party B to Party A that are unpaid as of the date hereof);

*provided that*, for the avoidance of doubt, the Payment Amount may be adjusted to reflect (x) any Physical Settlement Amounts owing on the Payment Date from Lehman Brothers Special Financing Inc., as Seller (the "Long Seller"), to AIG CDS, Inc., as Buyer (the "Long Buyer"), under the Long Transactions as the result of delivery on the Payment Date in accordance with the terms of each applicable confirmation of a Long Transaction of Deliverable Obligations described in one or more effective Notices of Physical Settlement from the Long Buyer to the Long Seller, with each capitalized term used in this clause (x) but not otherwise defined in this letter defined as set forth in the Credit Event Notice, such applicable confirmation for a Long Transaction or the Credit Derivatives Definitions, as the case may be, and (y) any applicable determinations made in good faith and a commercially reasonable manner by the respective Calculation Agent under the confirmation of each Transaction under the Master Agreement.

*[Signature appears on following page.]*

Sincerely,

LEHMAN BROTHERS SPECIAL
FINANCING INC.,
    as Buyer

By: _____

    Name: _Daniel Ehrmann_____

    Title: _Authorized Signatory___