# 2008 AMENDED AND RESTATED NOTE PURCHASE AGREEMENT

Amended and Restated Note Purchase Agreement by and between the 2008 Trust and the Purchasers named therein.

**EXECUTION VERSION**

**VARIABLE FUNDING TRUST 2008-1**

Variable Rate Senior Secured Revolving Credit Facility

_____

# AMENDED AND RESTATED NOTE PURCHASE AGREEMENT

_____

Dated as of September 30, 2009

A/73042765.13

# TABLE OF CONTENTS

Page

1.   AMENDMENT AND RESTATEMENT ........................................................ 1

2.   TERMINATION OF COMMITMENTS ...................................................... 1

3.   ORIGINAL FACILITY CLOSING; INITIAL ADVANCE .......................... 1

4.   ORIGINAL CLOSING DATE CONDITIONS TO CLOSING; INITIAL
     ADVANCE ................................................................................................. 2

5.   REPRESENTATIONS AND WARRANTIES ............................................... 2
     5.1.   Organization; Power and Authority; Status of the Trust Company ...... 2
     5.2.   Authorization, Etc. by the Trust Company ........................................ 2
     5.3.   Compliance with Laws, Other Instruments, Etc. by the Trust Company ........ 2
     5.4.   Trust Company Governmental and Third Party Authorizations, Etc .... 3
     5.5.   Organization; Power and Authority; Status of the Trust ................... 3
     5.6.   Authorization, Etc. by the Trust ....................................................... 3
     5.7.   Material Adverse Effect ..................................................................... 3
     5.8.   Ownership of the Trust etc ................................................................ 3
     5.9.   No Assets or Liabilities; Conduct of Business; ERISA ..................... 3
     5.10.  Compliance with Laws, Other Instruments, Etc ................................ 4
     5.11.  Trust Governmental and Third Party Authorizations, Etc ................. 4
     5.12.  Litigation; Observance of Agreements, Statutes and Orders ............. 4
     5.13.  Private Offering by the Trust ............................................................ 4
     5.14.  Use of Proceeds; Margin Regulations ............................................... 5
     5.15.  Foreign Assets Control Regulations, Etc .......................................... 5
     5.16.  Taxes .................................................................................................. 5
     5.17.  Title to Property ................................................................................ 6
     5.18.  Security Interest ................................................................................ 6
     5.19.  Asset Purchase and Related Transactions .......................................... 6
     5.20.  Status under Investment Company Act .............................................. 6
     5.21.  Intentionally omitted ......................................................................... 6
     5.22.  Obligors Representations ................................................................... 6

6.   INTENTIONALLY OMITTED ..................................................................... 7

7.   INFORMATION AS TO THE TRUST ......................................................... 7
     7.1.   Financial and Business Information .................................................... 7
     7.2.   Access to Accountants ....................................................................... 7

8.   INTEREST; PAYMENT AND PREPAYMENT OF ADVANCES ................ 8
     8.1.   Interest on Advances .......................................................................... 8
     8.2.   Payment at Maturity ......................................................................... 10
     8.3.   Mandatory Prepayment ..................................................................... 10

i

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 8.4. | Optional Prepayment | 10 |
| 8.5. | Allocation of Partial Prepayments to Noteholders | 11 |
| 8.6. | Intentionally Omitted | 11 |
| 8.7. | Intentionally Omitted | 11 |
| 8.8. | Intentionally Omitted | 11 |
| 8.9. | Maturity; Surrender, Etc | 11 |
| **9.** | **AFFIRMATIVE COVENANTS** | 11 |
| 9.1. | Compliance with Law | 11 |
| 9.2. | Payment of Taxes | 11 |
| 9.3. | Legal Status; Trust Information | 12 |
| 9.4. | Books and Records | 12 |
| 9.5. | Terrorism Sanctions Regulations; Anti-Money Laundering Compliance | 12 |
| 9.6. | Note Asset Covenants | 12 |
| **10.** | **NEGATIVE COVENANTS** | 12 |
| 10.1. | Trust's Business Activities; Indebtedness | 12 |
| 10.2. | Merger, Consolidation, Etc | 13 |
| 10.3. | Liens | 13 |
| 10.4. | Intentionally Omitted | 13 |
| 10.5. | Sale of Assets | 13 |
| 10.6. | Amendments to Certain Agreements | 13 |
| 10.7. | Administration Agreement | 13 |
| **11.** | **EVENTS OF DEFAULT** | 13 |
| **12.** | **REMEDIES ON DEFAULT, ETC** | 16 |
| 12.1. | Acceleration | 16 |
| 12.2. | Other Remedies | 16 |
| 12.3. | No Waivers or Election of Remedies, Expenses, Etc | 16 |
| **13.** | **REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES** | 17 |
| 13.1. | Registration of Notes | 17 |
| 13.2. | Transfer and Exchange of Notes | 17 |
| 13.3. | Replacement of Notes | 18 |
| **14.** | **PAYMENTS ON NOTES** | 18 |
| 14.1. | Place of Payment | 18 |
| 14.2. | Home Office Payment | 18 |
| **15.** | **EXPENSES, ETC** | 19 |

ii

## TABLE OF CONTENTS
### (continued)

Page

15.1.   Transaction Expenses...................................................................................... 19
15.2.   Survival ............................................................................................................ 19

16.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE
AGREEMENT ............................................................................................................. 19

17.   AMENDMENT AND WAIVER ................................................................................... 20
17.1.   Requirements ................................................................................................... 20
17.2.   Information as to Modifications....................................................................... 20
17.3.   Binding Effect, Etc........................................................................................... 20
17.4.   Notes Held by Trust, Etc.................................................................................. 20

18.   NOTICES ..................................................................................................................... 21
18.1.   Metropolitan Life Insurance Company to Receive Communications on
Behalf of Noteholders ..................................................................................... 21
18.2.   Notices Generally............................................................................................ 21

19.   REPRODUCTION OF DOCUMENTS.......................................................................... 21

20.   MISCELLANEOUS ..................................................................................................... 22
20.1.   Successors and Assigns.................................................................................... 22
20.2.   Payments Due on Non-Business Days.............................................................. 22
20.3.   Accounting Terms............................................................................................. 22
20.4.   Severability ...................................................................................................... 22
20.5.   Construction, Etc.............................................................................................. 22
20.6.   Counterparts .................................................................................................... 23
20.7.   Governing Law ................................................................................................ 23
20.8.   Jurisdiction and Process; Waiver of Jury Trial .............................................. 23
20.9.   Limitation of Liability of the Owner Trustee .................................................. 24

A/73042765.13

| | | |
|---|---|---|
| Schedule A | -- | Information Relating to the Purchasers |
| Schedule B | -- | Defined Terms |
| Exhibit 1 | -- | Form of Variable Rate Senior Secured Revolving Note |
| Exhibit 2 | -- | Form of Parent Guarantee |
| Exhibit 3 | -- | Form of Collateral Trust Agreement |
| Exhibit 4(a) | -- | Form of Security Agreement |
| Exhibit 4(b) | -- | Form of UK Security Agreement |
| Exhibit 5 | -- | Form of Equity Interest Pledge Agreement |
| Exhibit 6 | -- | Form of Administration Agreement |
| Exhibit 7(a)-1 | -- | Form of Master Assignment Agreement |
| Exhibit 7(a)-2 | -- | Form of UK to US Assignment Agreement |
| Exhibit 7(b) | -- | Form of Master Participation Agreement |
| Exhibit 8 | -- | Note Asset Covenants |

## VARIABLE FUNDING TRUST 2008-1

### c/o U.S. Bank Trust National Association
### 300 Delaware Avenue, 9th Floor
### Wilmington, Delaware 19801

### Variable Rate Senior Secured Revolving Credit Facility

September 30, 2009

TO EACH OF THE PURCHASERS
LISTED IN THE ATTACHED SCHEDULE A

Ladies and Gentlemen:

**Variable Funding Trust 2008-1**, a Delaware statutory trust formed and existing under 12 *Del. C.* §3801 et seq. (the **"Trust"**) agrees with each of the Purchasers listed in Schedule A attached hereto (the **"Purchasers"**), and each other holder from time to time of Notes (as hereinafter defined) issued hereunder as reflected in the register maintained by the Trust pursuant to Section 13.1 hereof (including the Purchasers, each, a **"Noteholder"**) as follows:

## 1.    AMENDMENT AND RESTATEMENT.

This document sets forth the amendment and restatement of the terms of that certain Note Purchase Agreement, dated as of May 9, 2008 (the "**Existing Note Agreement**"), by and between the Trust and the Noteholders, which amendment and restatement has been effected pursuant to that certain 2008 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**Restructuring Agreement**"), dated as of September 30, 2009, by and among the Obligors, the Noteholders, the Collateral Trustee and certain other parties thereto.   Certain capitalized and other terms used in this Agreement are defined in Schedule B; and references to a "**Schedule**" or an "**Exhibit**" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.

## 2.    TERMINATION OF COMMITMENTS.

All of the commitments and the obligations of the Noteholders to make Advances under this Agreement are hereby terminated.

## 3.    ORIGINAL FACILITY CLOSING; INITIAL ADVANCE.

The closing of the facility contemplated hereby (the "**Closing**") occurred at the offices of Cadwalader, Wickersham & Taft LLP, New York, New York 10281, at 10:00 a.m., Eastern time, on May 9, 2008 (the "**Closing Date**").   At the Closing the Trust delivered to each Purchaser a Variable Rate Senior Secured Revolving Note in the amount set forth in Schedule A hereto in the form of a single note, substantially in the form set out in Exhibit 1 (such note, the "**Initial Note**", together with any such notes issued in substitution or exchange therefor pursuant to Section 13, as any of such notes may be amended, restated or otherwise modified from time to time, the

A/73042765.13

"**Notes**"), dated the Closing Date and registered in such Purchaser's name or in the name of its nominee, against delivery by such Purchaser to the Trust or its order of immediately available funds in the amount of the Advance (such Advance, the "**Initial Advance**") made on the Closing Date hereunder by wire transfer of immediately available funds for the account of the Trust.

## 4.   ORIGINAL CLOSING DATE CONDITIONS TO CLOSING; INITIAL ADVANCE.

The conditions to closing in the Existing Note Agreement were satisfied or waived and the Purchasers fulfilled their obligation to make the Initial Advance.

## 5.   REPRESENTATIONS AND WARRANTIES.

The Trust and Trust Company made various representations and warranties to each Purchaser under the Existing Note Purchase Agreement on the original Closing Date including, without limitation, the following:

### 5.1.   Organization; Power and Authority; Status of the Trust Company.

The Trust Company is a national banking association, duly organized, validly existing and in good standing under the laws of the United States of America. The Trust Company has the requisite power and authority to act as the sole owner trustee of the Trust, to execute and deliver this Agreement in its individual capacity and the Owner Trust Agreement in its capacity as Owner Trustee and to perform the provisions of the Owner Trust Agreement.

### 5.2.   Authorization, Etc. by the Trust Company.

This Agreement and the Owner Trust Agreement have been duly authorized by all necessary action on the part of the Trust Company. This Agreement and the Owner Trust Agreement constitutes a legal, valid and binding obligation of the Trust Company enforceable against the Trust Company in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

### 5.3.   Compliance with Laws, Other Instruments, Etc. by the Trust Company.

The execution, delivery and performance by the Trust Company of this Agreement and the Owner Trust Agreement is within its corporate and trust powers and will not (i) contravene or result in the creation of any Lien in respect of any Collateral under the Trust Company's governing organizational documents, (ii) violate any order, judgment or decree of any court or Governmental Authority binding upon the Trust Company, or (iii) to the best knowledge of the Trust Company, violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Trust Company.

A/73042765.13

### 5.4.    Trust Company Governmental and Third Party Authorizations, Etc.

No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority having jurisdiction over the Trust Company is required in connection with the execution, delivery or performance by the Trust Company of this Agreement or the Owner Trust Agreement.

### 5.5.    Organization; Power and Authority; Status of the Trust.

The Trust is a Delaware statutory trust duly formed under 12 *Del. C.* §3801 et seq., and is validly existing and in good standing under the laws of Delaware, and is duly qualified as a foreign entity and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Trust has the requisite power and authority to execute and deliver the Financing Documents to which it is a party and to perform the provisions thereof. The Trust's exact legal name is as set forth on the signature page hereto, and its sole place of business and mailing address are as set forth in Section 18 hereof. The Trust's organizational identification number is 4545209 or such other number identified to the Collateral Trustee and the Noteholders in compliance with Section 9.3 hereof.

### 5.6.    Authorization, Etc. by the Trust.

The Financing Documents have been duly authorized by all necessary action on the part of (or on behalf of) the Trust, and each Financing Document constitutes a legal, valid and binding obligation of the Trust enforceable against the Trust in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

### 5.7.    Material Adverse Effect.

To the best knowledge of the Owner Trust, no event has occurred or condition exists that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

### 5.8.    Ownership of the Trust etc.

There is at least one Person that owns, directly or indirectly, 10% or more of the aggregate beneficial interests of the Trust. As of the Closing Date, the Pledgor owns 100% of such interests. The Trust has no Subsidiaries.

### 5.9.    No Assets or Liabilities; Conduct of Business; ERISA.

Immediately prior to the Closing Date the Trust had no assets, liabilities or operations. The Trust does not maintain, sponsors or contributes to any Plan and the Trust has no employees. On such Funding Date and thereafter, the Trust has, and will have, no assets, liabilities or

operations other than under or in connection with the Operative Documents and activities directly related thereto. The execution and delivery of this Agreement, the issuance and sale of the Notes and the making of the Advances hereunder will not involve any transaction that is a non-exempt prohibited transaction under section 406(a) of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code. The representation by the Trust to each Noteholder in the immediately preceding sentence is made in reliance upon and subject to the accuracy of such Noteholder's representation in Section 6.2 of the Existing Note Agreement as to the sources of the funds used to make the Advances hereunder.

### 5.10.  Compliance with Laws, Other Instruments, Etc.

The execution, delivery and performance by the Trust of the Financing Documents to which it is a party will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Trust under its governing organizational documents, or any agreement (other than the Security Documents) to which it is a party, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Trust, or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Trust.

### 5.11.  Trust Governmental and Third Party Authorizations, Etc.

No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority or other Person is required in connection with the execution, delivery or performance by the Trust of the Financing Documents to which it is a party that has not been obtained.

### 5.12.  Litigation; Observance of Agreements, Statutes and Orders.

There are no actions, suits, investigations or proceedings pending or, to the knowledge of the Trust or the Administrative Agent, threatened against or affecting the Trust in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

The Trust is not in default under any term of any agreement or instrument to which it is a party or by which it is bound, or any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or is in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority, which default or violation, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

### 5.13.  Private Offering by the Trust.

Neither the Trust nor anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any person other than the Purchasers, who were offered the Notes at a private sale for investment. Neither the Trust nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the

registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

### 5.14.    Use of Proceeds; Margin Regulations.

The Trust will apply the proceeds of the Advances to purchase Approved Note Assets. Without limitation of the foregoing, no part of the proceeds from any Advance hereunder will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221), or for the purpose of buying or carrying or trading in any securities under such circumstances as to involve the Trust in a violation of Regulation X of said Board (12 CFR 224) or to involve any broker or dealer in a violation of Regulation T of said Board (12 CFR 220).

### 5.15.    Foreign Assets Control Regulations, Etc.

(a)    The Trust has procedures in place which are reasonably designed to comply, in all material respects with, the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(b)    Neither the Owner Trustee nor the Trust nor any holder of beneficial interests in the Trust (i) is a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti Terrorism Order or (ii) engages in any dealings or transactions with any such Person.   The Trust has procedures in place which are reasonably designed to comply, in all material respects, with all applicable anti-money laundering laws and regulations, including, without limitation, the USA Patriot Act (collectively, "**Anti-Money Laundering Laws**").

(c)    No part of the proceeds of any Advance hereunder will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to the Trust.

### 5.16.    Taxes.

The Trust has filed all income tax returns that are required to have been filed in any jurisdiction, and have paid all taxes shown to be due and payable on such returns and all other taxes and assessments payable by it, to the extent such taxes and assessments have become due and payable and before they have become delinquent, except for any taxes and assessments the amount of which is not individually or in the aggregate material.

A/73042765.13

### 5.17.   Title to Property.

The Trust has good and sufficient title to each Note Asset (other than any Note Asset in which it holds a participation interest, in which event the grantor under the relevant participation agreement has good and sufficient title to such interest), including, without limitation, the Approved Note Assets, in each case free and clear of Liens other than those in favor of the Collateral Trustee. The Trust has no interest in assets or properties other than those subject to the Collateral Trust Agreement.

### 5.18.   Security Interest.

The Security Documents create (and on such Funding Date, the Collateral Trustee has), a valid and perfected first priority Lien in all of the Trust's right, title and interest in and to the Collateral in favor of the Collateral Trustee, subject to no other Liens, upon (i) the filing of financing statements as therein provided and (ii) delivery to the Collateral Trustee of any original instruments evidencing the Approved Note Assets (together with an assignment in blank in the case of any Mortgage Note assigned to the Collateral Trustee).

### 5.19.   Asset Purchase and Related Transactions.

The Trust has provided to MetLife or to its counsel true, correct and complete copies (or access to true, correct and complete copies) of the Note Asset Documentation required to be delivered hereunder relating to all of the Approved Note Assets. The transactions contemplated by such documentation have been consummated in accordance with the terms thereof. There is no agreement or understanding between the Trust and any other party to such documentation except as set forth therein. On each Funding Date, each of the representations and warranties, if any, made by the Trust under such documentation (to the extent such documentation relates to the Approved Note Assets to be acquired by the Trust using the proceeds of an Advance to be made by the Noteholders on such Funding Date) and, to the best knowledge of a Responsible Officer, the other parties thereto is true and correct in all material respects.

### 5.20.   Status under Investment Company Act.

Assuming all of the Noteholders are "qualified purchasers" within the meaning of Section 3(c)(7) of the Investment Company Act of 1940, the Trust is not subject to regulation thereunder.

### 5.21.   INTENTIONALLY OMITTED.

### 5.22.   Obligors Representations.

The representations and warranties of the Obligors set forth in the Financing Documents in addition to this Agreement are true and correct as of such Funding Date.

**6.    INTENTIONALLY OMITTED.**

**7.    INFORMATION AS TO THE TRUST.**

### 7.1.    Financial and Business Information.

The Trust shall deliver to each Noteholder:

(a)    <u>Monthly Cash Flow Report</u> - on the 15th day of each calendar month, a report setting forth the payments received by the Trust in respect of its interest in each Note Asset held by the Trust during the prior calendar month (by amount and payor name and the nature of such payment (principal, interest, fee, escrowed amount or otherwise)), and setting forth any payments made by the Trust during such month (by amount, payee name and account and purpose);

(b)    <u>Notice of Certain Material Events</u> -- without limitation of the Trust's obligation to provide certain notices under the covenants set forth in <u>Exhibit 8</u>, promptly, and in any event within five Business Days after a Responsible Officer becoming aware thereof, written notice of any event or condition that could reasonably be expected to result in a Material Adverse Effect;

(c)    <u>Notice of Default or Event of Default</u> -- promptly, and in any event within five Business Days after a Responsible Officer becoming aware of the existence of any Default or Event of Default, a written notice specifying the nature and period of existence thereof and what action the Trust is taking or proposes to take with respect thereto; and

(d)    <u>Requested Information</u> -- with reasonable promptness, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Trust or relating to the ability of the Trust to perform its obligations under this Agreement and under the Notes as from time to time may be reasonably requested by MetLife.

### 7.2.    Access to Accountants.

To the extent that the Trust has employed independent public accounts in connection with the preparation of its financial statements and related matters, the Trust shall permit the representatives of MetLife:

(a)    <u>No Default</u> -- if no Default or Event of Default then exists, upon reasonable prior notice to the Trust, to discuss its affairs, finances, assets and accounts with the Trust's independent public accountants, all at such reasonable times and as often as may be reasonably requested in writing; and

(b)    <u>Default</u> -- if a Default or Event of Default then exists, to discuss its affairs, finances, assets and accounts with the Trust's independent public accountants, all at such times and as often as may be requested.

A/73042765.13

By this provision the Trust authorizes said accountants to discuss the affairs, finances, assets and accounts of the Trust.

## 8.   INTEREST; PAYMENT AND PREPAYMENT OF ADVANCES.

### 8.1.   Interest on Advances.

**(a)   Interest Rate and Scheduled Interest Payment Dates.**

**(i)   Payment of Interest.** Subject to clause (ii) of this Section 8.1(a) and Sections 8.1(b) and 8.1(c), on each Scheduled Interest Payment Date, the Trust shall pay to each Noteholder interest on its Notes for the Interest Period ending on such date in an amount equal to the product of (i) the average outstanding principal amount of such Notes during such Interest Period, (ii) the LIBOR Based Rate in effect for such Interest Period and (iii) a fraction with a numerator equal to the number of days in such Interest Period and a denominator equal to 360.

"**Scheduled Interest Payment Date**" shall mean each March 31, June 30, September 30 and December 31 occurring on or prior to the Maturity Date, commencing June 30, 2008.

**(ii)   Capitalized Interest.** Notwithstanding the provisions of clause (i) above, in lieu of making the entire interest payment on the Notes in cash on any Scheduled Interest Payment Date occurring on or after March 31, 2009 (other than in respect of interest accrued during the calendar month of January 2009), the Trust may at its option:

(A)   pay on such Schedule Interest Payment Date, in cash, that portion of the interest accrued on the outstanding principal amount of such Note (including previous Capitalized Interest Amounts (as defined below)) as of such Scheduled Interest Payment Date as would have accrued at a rate equal to 2.50% plus LIBOR for the Interest Period ending on such Scheduled Interest Payment Date; and

(B)   add to the outstanding principal amount of the Notes on such Scheduled Interest Payment Date the portion of such interest as has accrued on the Notes at a rate per annum in excess of the rate per annum equal to 2.50% plus LIBOR for the Interest Period ending on such Scheduled Interest Payment Date falls (including any such interest accruing at the applicable Default Rate, if any) (each such addition with respect to the Notes, a "**Capitalized Interest Amount**"); provided, however, that the Trust shall be deemed to have chosen the option set forth in this clause (ii) in respect of the interest payment due on March 31, 2009 (except as noted above with respect to interest accrued on the Notes during the calendar month of January 2009) and with respect to each interest payment due thereafter on any Scheduled Interest Payment Date occurring on or prior to the Restructuring Effective Date.

A/73042765.13

Interest shall begin to accrue on each Capitalized Interest Amount beginning on and including the Scheduled Interest Payment Date on which such Capitalized Interest Amount is added to the principal amount of the Notes, and such interest shall accrue and be paid, together with the interest on the remaining principal amount of the Notes, on the Maturity Date in accordance with the terms of the this Agreement and the Notes.  Notwithstanding anything herein to the contrary, all interest due and payable on the date that the entire then outstanding principal amount of the Notes becomes due and payable, whether on the Maturity Date, by acceleration or otherwise, shall be due and payable in full in cash on such date. All Capitalized Interest Amounts will for all purposes of the Financing Documents constitute outstanding principal on the Notes.

**(b)    Default Interest.**

Any overdue payment of interest on the outstanding principal amount of any Note, and any other overdue amount (including any overdue prepayment of principal) payable in accordance with the terms of this Agreement (regardless of whether the failure to make such payment constitutes an Event of Default), shall bear interest, payable quarterly on each Scheduled Interest Payment Date in each year (or, at the option of the Noteholder or Noteholders with respect to which such payment is overdue, on demand), for each day from and including the date payment thereof was due to and including the date of actual payment, at a rate per annum equal to the Default Rate; provided, however, that during the Restructuring Period, interest shall accrue at such rate per annum only in respect of payments that become overdue during the Restructuring Period and not in respect of any payment that remains overdue under the terms of this Agreement from any period prior to the Restructuring Period.

**(c)    Inability to Determine LIBOR.**

(i)    If the basis for determining the LIBOR ceases to be reported on the Bloomberg Financial Markets Service Page BBAM-1 (or if such page is not available, the Reuters Screen LIBO Page) at a time when the LIBOR Based Rate is required to be determined in accordance with the terms hereof and if MetLife shall have reasonably determined (which determination shall be conclusive absent manifest error) that, by reason of circumstances affecting the relevant market, other adequate and reasonable means do not exist for ascertaining LIBOR to be applied to any Interest Period, then MetLife shall forthwith give notice thereof to the Trust.  If such notice is given, (A) the interest rate applicable to the Notes for such Interest Period shall be a rate determined by agreement of MetLife and the Trust, which shall be determined and effective as of the first day of such Interest Period, (B) each reference herein and in the Notes to the "LIBOR Based Rate" shall be deemed thereafter to be a reference to such rate, and (C) such substituted rate shall thereafter be determined by MetLife in accordance with the terms hereof.  Until notice contemplated by clause (ii) of this Section 8.1(c) is furnished by MetLife, the LIBOR Based Rate (defined without giving effect to clause (B) of this paragraph above) shall not apply to the Notes.  In the event MetLife gives such a notice, the Trust and MetLife will negotiate in good faith for a period of 20

A/73042765.13

days to determine an interest rate to be applied to the Notes in accordance with the terms of this Section 8.1(c)(i). If the Trust and MetLife are in good faith unable to agree on such a rate within such 20-day period, the Trust shall, on or prior to the fifth Business Day following such 20-day period, prepay the Notes in full, together with accrued and unpaid interest thereon and any other amounts payable under the terms of the Financing Documents.

(ii)    If at any time there has been an interest rate substituted for the LIBOR Based Rate in accordance with clause (i) of this Section 8.1(c) and if the circumstances causing such substitution have ceased, then MetLife shall promptly notify the Trust in writing of such cessation, and on the first day of the next succeeding Interest Period the LIBOR Based Rate shall be determined as originally contemplated hereby (without giving effect to this Section 8.1(c)). Nevertheless, thereafter the provisions of this Section 8.1(c) shall continue to be effective.

## 8.2.    Payment at Maturity.

### (a)    Payment at Maturity.

The entire unpaid principal balance of the Notes shall be due and payable on the Maturity Date (as hereinafter defined), together with accrued and unpaid interest thereon.

### (b)    Maturity.

The maturity date of the Notes shall be June 30, 2010, which date shall be referred to herein as the "**Maturity Date**".

## 8.3.    Mandatory Prepayment.

At any time the Trust shall have received any cash payment or proceeds constituting amounts payable in respect of any Note Asset, or amounts received upon the sale, disposition or other liquidation of any Note Asset, the Trust shall immediately pay to Collateral Trustee for the benefit of the Noteholders, and there shall become immediately due and payable, an amount equal to the amount of such cash payments or proceeds as is to be applied to the 2008 Facility Obligations (as defined in the Collateral Trust Agreement) in accordance with the terms of the Collateral Trust Agreement.

## 8.4.    Optional Prepayment.

The Trust may, at its option, upon notice as provided below, prepay at any time all, or from time to time any part of, the outstanding principal balance of the Notes, in an amount (in the case of a partial prepayment) not less than $100,000 at a price equal to 100% of the principal amount so prepaid, plus in each case, interest accrued thereon to the prepayment date. The Trust will give each Noteholder written notice thereof not less than 10 days and not more than 30 days prior to the date fixed for such prepayment. Each such notice shall specify such date (which shall be a Business Day), the aggregate principal amount of the Advances to be prepaid on such date, the outstanding principal amount of the Notes of such Noteholder to be prepaid (determined

-10-

in accordance with Section 8.5) and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

### 8.5.    Allocation of Partial Prepayments to Noteholders.

Subject to the provisions of Section 8.8 which contemplate the possibility of an individual Noteholders being prepaid, in the case of each partial prepayment of the Notes, the principal amount of the Notes to be prepaid shall be allocated to each Noteholder in accordance with the aggregate principal amount of the Notes held by such Noteholder that are at the time outstanding, in proportion (as nearly as practicable) to the respective unpaid principal amounts of all Notes then outstanding.

### 8.6.    Intentionally Omitted.

### 8.7.    Intentionally Omitted.

### 8.8.    Intentionally Omitted.

### 8.9.    Maturity; Surrender, Etc.

In the case of each prepayment of Advances pursuant to this Section 8, the percentage of the principal amount of each Advance to be prepaid shall mature and become due and payable on the date fixed for such prepayment (which shall be a Business Day), together with interest on such principal amount accrued to such date.

## 9.    AFFIRMATIVE COVENANTS.

The Trust covenants that so long as any Notes are outstanding:

### 9.1.    Compliance with Law.

Without limiting Section 10.6, the Trust has procedures in place which are reasonably designed to comply with all laws, ordinances or governmental rules or regulations to which it is subject, including, without limitation, the USA Patriot Act, and will obtain and maintain in effect any governmental authorizations necessary to the ownership of its properties or to the conduct of its business.

### 9.2.    Payment of Taxes.

To the extent applicable, the Trust will file all income tax or similar tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, or levies payable by it, to the extent the same have become due and payable and before they have become delinquent, provided that the Trust need not pay any such tax, assessment, charge or levy if the nonpayment of all such taxes, assessments, charges and levies in the aggregate could not reasonably be expected to have a Material Adverse Effect.

A/73042765.13

### 9.3.    Legal Status; Trust Information.

The Trust will at all times preserve and keep in full force and effect its existence as a Delaware statutory trust formed under 12 *Del. C.* §3801 et seq.. The Trust (a) will not, without providing at least thirty (30) days prior written notice to MetLife and the Collateral Trustee, change its name, its place of business or mailing address or organizational identification number (if it has one), and (b) if the Trust does not have an organizational identification number and later obtains one, will forthwith notify the Collateral Trustee and MetLife of such organizational identification number.

### 9.4.    Books and Records.

The Trust will maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Trust. The Trust will maintain all such books and records separate from any Affiliate and file its own tax returns.

### 9.5.    Terrorism Sanctions Regulations; Anti-Money Laundering Compliance.

Each Obligor has established and will maintain (a) procedures reasonably designed to prevent such Obligor from (i) becoming a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order, (ii) engaging in any dealings or transactions with any such Person or (iii) violating any Anti-Money Laundering Law, including without limitation (with respect to this clause (iii)), an adequate anti-money laundering compliance program as required by the Anti-Money Laundering Laws, pursuant to which such Obligor will maintain sufficient information to identify the applicable obligor or obligors in respect of the Mortgage Notes and Commercial Loan Notes underlying (or constituting) Note Assets for purposes of such laws.

### 9.6.    Note Asset Covenants.

The Trust will comply with the obligations concerning maintenance of its rights under the Note Asset Documentation as more particularly set forth in <u>Exhibit 8</u>.

## 10.    NEGATIVE COVENANTS.

The Trust covenants that so long as any of the Notes are outstanding:

### 10.1.    Trust's Business Activities; Indebtedness.

The Trust shall not engage in any business (including, without limitation, entering into any contracts or agreement) other than the activities related to the transactions contemplated by the Operative Documents and shall not at any time have any Subsidiaries. The Trust shall not (a) create, incur, assume or permit to exist any Indebtedness or other liabilities other than the Indebtedness incurred by the Trust under and in respect of the Notes issued hereunder and other liabilities incurred in accordance with the terms of the Operative Documents (including, without limitation, the Indebtedness in respect of the Guarantee of 2007 Notes), or (b) own any right, title

-12-

or interest in any asset or property other than (i) the Note Assets and the Note Asset Documentation relating thereto and (ii) cash and Cash Equivalents on deposit in the Collection Account or the Revolver Holding Account and any payments in respect of the Trust's interest in Note Assets being directed to such accounts.

### 10.2.   Merger, Consolidation, Etc.

The Trust will not consolidate with or merge with any other Person or sell, convey, transfer or lease all or substantially all of its property in a single transaction or series of transactions to any Person.

### 10.3.   Liens.

The Trust will not, directly or indirectly create, incur, assume or permit to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any property or asset, whether now owned or held or hereafter acquired, other than any Lien in favor of the Collateral Trustee securing the Trust's obligations in respect of the Notes, the Guarantee of 2007 Notes and the other Financing Documents.

### 10.4.   Intentionally Omitted.

### 10.5.   Sale of Assets.

The Trust will not, at any time, sell, convey, transfer or lease any Note Asset unless such sale, conveyance, transfer or lease shall be made without recourse to, or representation or warranty by, the Trust and shall be made in accordance with the terms of the Restructuring Agreement.

### 10.6.   Amendments to Certain Agreements.

The Trust will not, at any time, amend, modify or supplement the Owner Trust Agreement, the Master Assignment Agreement, or the Master Participation Agreement in any manner adverse to the interests of the Noteholders or the Collateral Trustee without the prior written consent of MetLife.

### 10.7.   Administration Agreement.

The Trust will not, at any time, amend, waive, modify or supplement the Administration Agreement in any manner adverse to the interests of the Noteholders or the Collateral Trustee, or cancel or terminate the Administration Agreement (or permit the suspension of any material services thereunder), or release the Administrative Agent from its obligations thereunder, or agree to any assignment of the Administrative Agent's obligations thereunder, unless the same is done in writing and with the prior written consent of MetLife.

## 11.    EVENTS OF DEFAULT.

An "**Event of Default**" shall exist if any of the following conditions or events shall occur and be continuing:

(a)    the Trust defaults in the payment of any principal or premium (if any), on any Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; or

(b)    the Trust defaults in the payment in cash of any interest on any Note or the payment of any fee to be paid hereunder for more than five (5) Business Days after the same becomes due and payable; or

(c)    the Trust defaults in the performance of or compliance with any term contained in:

(i)    Section 7.1(d), 10.2 or 10.5 or Section 5 of the Restructuring Agreement; or

(ii)    Section 10.1, 10.3, 10.6 or 10.7 and such default is not remedied within 5 days or

(iii)    Section 9.3 and such default is not remedied within 10 days; or

(d)    [Intentionally Omitted];

(e)    the Trust defaults in the performance of or compliance with any term contained herein (other than those referred to in Sections 11(a), (b) and (c)) and such default is not remedied within 30 days after the earlier of (i) a Responsible Officer obtaining actual knowledge of such default and (ii) the Trust receiving written notice of such default from any holder of a Note (any such written notice to be identified as a "notice of Section 11(e) default"); or

(f)    any representation or warranty made in writing by or on behalf of any Obligor or the Administrative Agent or by any officer of any Obligor or the Administrative Agent in any Financing Document or in any writing furnished in connection with the transactions contemplated hereby proves to have been false or incorrect in any material respect on the date as of which made; or

(g)    the occurrence of any "Event of Default" under and as defined in the 2007 Note Purchase Agreement; or

(h)    the Trust or the 2007 Issuer (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property (with respect to the Trust, other than in connection with its status as a Delaware statutory trust or in connection with the appointment of the Collateral Trustee under the Collateral Trust Agreement and with respect to the 2007 Issuer, other than in connection with its status as

A/73042765.13

a Delaware statutory trust or in connection with the appointment of the 2007 Collateral Trustee under the 2007 Collateral Trust Agreement), (v) is adjudicated as insolvent or to be liquidated, or (vi) takes action for the purpose of any of the foregoing; or

(i)     a court or Governmental Authority of competent jurisdiction enters an order appointing, without consent by either the Trust or the 2007 Issuer, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of any such Person, or any such petition shall be filed against any such Person and such petition shall not be dismissed within 60 days; or

(j)     either Guarantee ceases to be in full force and effect or is declared to be null and void in whole or in material part by a court or other governmental or regulatory authority having jurisdiction or the validity or enforceability thereof shall be contested by the applicable Guarantor or the applicable Guarantor renounces such Guarantee, defaults in the performance of or breaches any provision thereof or denies that it has any or further liability thereunder; or

(k)     (i) any Security Document shall cease to be in full force and effect for any reason whatsoever (other than in accordance with its terms) or shall be declared by any court or other Governmental Authority of competent jurisdiction to be void, voidable or unenforceable against the grantor thereunder, (ii) the validity or enforceability of any Security Document against the grantor thereunder shall be contested by such grantor, (iii) any grantor under any Security Document shall default in the performance of any obligation under such Security Document or shall deny that it has any liability or obligation under, or shall contest the validity or enforceability of, such Security Document, (iv) any Security Document shall fail or cease to create a valid and perfected and, except to the extent permitted by the terms of the Security Documents, first priority Lien in favor of the Collateral Trustee or the 2007 Collateral Trustee, as the case may be, for the benefit of the Noteholders on any Collateral purported to be covered thereby, or (v) the Trust challenges the validity, perfection or priority of any such Lien; or

(l)     the Administration Agreement shall cease to be in full force and effect for any reason whatsoever or the Trust shall cease to be entitled to (and have) the benefit thereof for any reason, unless an agreement providing the same or similar services with the same or another service provider acceptable to MetLife shall have been entered into within 30 days thereof, which agreement shall be in form and substance satisfactory to MetLife; or

(m)     there is not at least one Person (other than a Noteholder) that owns, directly or indirectly, 10% or more of the aggregate beneficial interests of the Trust.

A/73042765.13

## 12.    REMEDIES ON DEFAULT, ETC.

### 12.1.    Acceleration.

(a)    If an Event of Default with respect to the Trust described in Section 11(h) or (i) (other than an Event of Default described in clause (i) of Section 11(h) or described in clause (vi) of Section 11(h) by virtue of the fact that such clause encompasses clause (i) of Section 11(h)) has occurred, then the principal amount of the Notes then outstanding shall automatically become immediately due and payable.

(b)    If any other Event of Default has occurred and is continuing, MetLife may at any time at its option, by notice or notices to the Trust, declare the principal amount of the Notes then outstanding to be immediately due and payable (and upon such declaration, such Advances shall be and become immediately due and payable.

Upon the principal amount of any Notes becoming due and payable under this Section 12.1, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes (including, without limitation, Capitalized Interest Amounts), plus all accrued and unpaid interest thereon (including, but not limited to, interest accrued thereon at the Default Rate) in respect of such principal amount, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.

### 12.2.    Other Remedies.

If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 12.1, MetLife may proceed to protect and enforce the rights of the Noteholders by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein, in any Note or in any other Financing Document, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise; provided, however, that any remedy with respect to the Collateral shall be exercised only through the Collateral Trustee in accordance with the terms of the Collateral Trust Agreement and any foreclosure or sale of Collateral shall be subject to Section 5.5 of the Restructuring Agreement.

### 12.3.    No Waivers or Election of Remedies, Expenses, Etc.

No course of dealing and no delay on the part of MetLife in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice MetLife's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by any Note upon MetLife shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise. Without limiting the obligations of the Trust under Section 15, the Trust will pay to MetLife, each other Noteholder and the Collateral Trustee on demand such further amount as shall be sufficient to cover all reasonable costs and expenses of such holder incurred in any enforcement or collection under this Section 12, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

## 13.    REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.

### 13.1.    Registration of Notes.

The Trust shall (a) keep at its principal executive office a register for the registration and registration of transfers of Notes and (b) provide the Collateral Trustee with a copy of said register on the Closing Date and provide the Collateral Trustee with an updated copy of said register contemporaneously with any entry made thereto whether as a result of the issue of new Notes or transfers of existing Notes or otherwise. The name and address of each Noteholder, each transfer of its Notes and the name and address of each transferee of Notes shall be registered in such register. Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Trust shall not be affected by any notice or knowledge to the contrary. The Trust shall give to any Noteholder that is an Institutional Investor promptly upon request therefor, a complete and correct copy of the names and addresses of all registered holders of Notes.

### 13.2.    Transfer and Exchange of Notes.

Any Noteholder may transfer its Notes (together with the aggregate principal amount of Advances made by such Noteholder thereunder) to an Institutional Investor that is both (a) a "qualified purchaser" within the meaning of the Investment Company Act of 1940 and (b) an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of the Securities Act, so long as it has provided the Trust 10 days prior written notice of such transfer, and provided that the Trust has given its prior written consent (other than in the case of a transfer from MetLife to one of its Affiliates, in which event no such consent shall be necessary), such consent not to be unreasonably withheld. Upon surrender of any Note to the Trust at the address and to the attention of the designated officer or Person (all as specified in Section 18.2(ii)), for registration of any transfer in compliance with the terms hereof or any exchange (and in the case of a surrender for registration of any such transfer accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof), within ten Business Days thereafter (provided that the Collateral Trustee has authenticated such Note prior to such time), the Trust shall execute and deliver, at the Trust's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the aggregate outstanding principal balance of the surrendered Note. Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit 1. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon. The Trust may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes. Notes shall not be transferred in denominations of less than $500,000, provided that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $500,000. Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have made the representations set forth in Section 6 of the Existing Note Agreement.

### 13.3.    Replacement of Notes.

Upon receipt by the Trust at the address and to the attention of the designated officer or Person (all as specified in Section 18.2(ii)) of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note (which evidence shall be, in the case of an Institutional Investor, notice from such Institutional Investor of such ownership and such loss, theft, destruction or mutilation), and

> (a)    in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it (provided that if the holder of such Note is, or is a nominee for, MetLife or a Qualified Institutional Buyer, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), or

> (b)    in the case of mutilation, upon surrender and cancellation thereof,

within ten Business Days thereafter (provided that the Collateral Trustee has authenticated such Note prior to such time), the Trust at its own expense shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

## 14.    PAYMENTS ON NOTES.

### 14.1.    Place of Payment.

Subject to Section 14.2, payments of principal, fees and interest becoming due and payable on the Notes shall be made at the designated corporate trust office of the Collateral Trustee. The Trust may at any time, by notice to each Noteholder, change the place of payment of the Notes so long as such place of payment shall be either the principal office of the Trust in such jurisdiction or the principal office of a bank or trust company in such jurisdiction.

### 14.2.    Home Office Payment.

So long as any Purchaser or its nominee shall be the holder of any Note, and notwithstanding anything contained in Section 14.1 or in such Note to the contrary, the Trust will pay all sums becoming due on such Note for principal, fees and interest by the method and at the address specified for such purpose below such Purchaser's name in Schedule A, or by such other method or at such other address as such Purchaser or any transferee of such Note shall have from time to time specified to the Trust in writing for such purpose, without the presentation or surrender of such Note or the making of any notation thereon, except that upon written request of the Trust made concurrently with or reasonably promptly after payment or prepayment in full of any Note, the holder of such Note shall surrender such Note for cancellation, reasonably promptly after any such request, to the Trust at its principal executive office or at the place of payment most recently designated by the Trust pursuant to Section 14.1.  Prior to any sale or other disposition by any Noteholder of any Note, such Noteholder will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such Note to the Trust in exchange for a new Note or Notes pursuant to

-18-

Section 13.2. The Trust will afford the benefits of this Section 14.2 to any Institutional Investor that is the direct or indirect transferee of any Note purchased by a Purchaser under this Agreement and that has made the same agreement relating to such Note as such Purchaser has made in this Section 14.2.

## 15.    EXPENSES, ETC.

### 15.1.    Transaction Expenses.

Whether or not the transactions contemplated by the Financing Documents are consummated, the Trust will pay all costs and expenses (including reasonable attorneys' fees of a special counsel and, if reasonably required by MetLife, local or other counsel) incurred by MetLife, the other Noteholders and the Collateral Trustee in connection with such transactions and in connection with any amendments, waivers or consents initiated by an Obligor under or in respect of the Financing Documents whether or not such amendment, waiver or consent becomes effective (if in connection with the Closing, the making of any other Advance hereunder, or in connection with any amendment, waiver or consent that becomes effective hereunder, on the date of such Closing such Advance or the effectiveness of such amendment, waiver or consent, provided in each case that the Trust has received a statement therefor prior to such time, and otherwise, within 30 days of receipt of a statement therefor), including, without limitation: (a) the costs and expenses incurred in perfecting any Lien on the Collateral, in enforcing or defending (or determining whether or how to enforce or defend) any rights under the Financing Documents or in responding to any subpoena or other legal process or informal investigative demand issued in connection with the Financing Documents, or by reason of being a holder of any Note, (b) the costs and expenses, including financial advisors' fees, incurred in connection with the insolvency or bankruptcy of any Obligor or in connection with any work-out or restructuring of the transactions contemplated hereby and by the Financing Documents, and (c) any costs and expenses (other than overhead) incurred by MetLife or any other Noteholder in connection with the administration of the provision of the Financing Documents. The Trust will pay, and will save each Noteholder harmless from, all claims in respect of any fees, costs or expenses if any, of brokers and finders (other than those, if any, retained by a Noteholder in connection with its purchase or sale of the Notes).

### 15.2.    Survival.

The obligations of the Trust under this Section 15 will survive the payment of all Advances in respect of, or transfer of, any Note, the enforcement, amendment or waiver of any provision of this Agreement or the Notes, and the termination of this Agreement.

## 16.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Notes, the purchase or transfer by any Noteholder of any Note or portion thereof or interest therein and the payment of all Advances made under any Note, and may be relied upon by any subsequent holder of a Note, regardless of any investigation made at any time by or on behalf of such Noteholder or any other Noteholder. All statements

contained in any certificate or other instrument delivered by or on behalf of the Trust pursuant to the Financing Documents shall be deemed representations and warranties of the Trust under this Agreement. Subject to the preceding sentence, the Financing Documents embody the entire agreement and understanding between MetLife and the Trust and supersede all prior agreements and understandings relating to the subject matter hereof.

## 17.    AMENDMENT AND WAIVER.

### 17.1.    Requirements.

This Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), with (and only with) the written consent of the Trust and MetLife.

### 17.2.    Information as to Modifications.

The Trust will provide MetLife with sufficient information, sufficiently far in advance of the date a decision is required, to enable MetLife to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of the Notes. The Trust will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Section 17 to MetLife promptly following the date on which it is executed.

### 17.3.    Binding Effect, Etc.

Any amendment or waiver consented to as provided in this Section 17 applies equally to all Noteholders and is binding upon them and upon each future Noteholder and upon the Trust without regard to whether such Note has been marked to indicate such amendment or waiver. No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon. No course of dealing between the Trust and any Noteholder nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any Noteholder. As used herein, the term this "**Agreement**" and references thereto shall mean this Agreement as it may from time to time be amended or supplemented.

### 17.4.    Notes Held by Trust, Etc.

Solely for the purpose of determining whether the holders of the requisite percentage of the aggregate principal amount of Notes then outstanding approved or consented to any amendment, waiver or consent to be given under this Agreement or the Notes, or have directed the taking of any action provided herein or in the Notes to be taken upon the direction of the holders of a specified percentage of the aggregate principal amount of Notes then outstanding, Notes directly or indirectly owned by the Trust or any of its Affiliates shall be deemed not to be outstanding.

A/73042765.13

## 18.    NOTICES.

### 18.1.    Metropolitan Life Insurance Company to Receive Communications on Behalf of Noteholders.

Metropolitan Life Insurance Company hereby is, and shall be, designated by each Noteholder (as to any subsequent holder of any Note, by its acceptance of such Note) to receive all notices, financial statements, certificates, reports and other communications to such Noteholder hereunder (including all Advance Requests, notices of prepayments and items delivered to the Noteholders pursuant to Section 7), on such Noteholder's behalf, and Metropolitan Life Insurance Company shall forward such items to each such Noteholder to the address most recently specified by such Noteholder to Metropolitan Life Insurance Company in writing promptly upon the receipt of the same from the Trust.

### 18.2.    Notices Generally.

All notices and communications provided for hereunder shall be in writing and sent (a) by telecopy if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (with charges prepaid).  Any such notice must be sent:

      (i)    if to MetLife or any other Noteholder, to MetLife at the address specified for such communications in <u>Schedule A</u>, or at such other address as MetLife shall have specified to the Trust in writing,

      (ii)    if to the Trust, to the Owner Trustee at the address set forth at the beginning hereof, or at such other address as the Trust shall have specified to each Noteholder and the Collateral Trustee in writing.

Notices under this Section 18 will be deemed given only when actually received.

## 19.    REPRODUCTION OF DOCUMENTS.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by MetLife at the Closing or by any Noteholder in connection with the making of any other Advances hereunder (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to MetLife or any other Noteholder, may be reproduced by MetLife or such other Noteholder by any photographic, photostatic, electronic, digital, or other similar process and MetLife or such other Noteholder may destroy any original document so reproduced.  The Trust agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by MetLife or such other Noteholder in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.  This Section 19 shall not prohibit the Trust, MetLife or any

A/73042765.13

other Noteholder from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

## 20. MISCELLANEOUS.

### 20.1. Successors and Assigns.

All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent holder of a Note) whether so expressed or not.

### 20.2. Payments Due on Non-Business Days.

Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or interest on any Advance that is due on a date other than a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day; provided that if the maturity date of the Notes is a date other than a Business Day, the payment otherwise due on such maturity date shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

### 20.3. Accounting Terms.

All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP. Except as otherwise specifically provided herein, all computations made pursuant to this Agreement shall be made in accordance with GAAP.

### 20.4. Severability.

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

### 20.5. Construction, Etc.

Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant. Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

A/73042765.13

For the avoidance of doubt, all Schedules and Exhibits attached to this Agreement shall be deemed to be a part hereof.

### 20.6.  Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

### 20.7.  Governing Law.

This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

### 20.8.  Jurisdiction and Process; Waiver of Jury Trial.

(a)    The Trust and MetLife irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or the Notes.  To the fullest extent permitted by applicable law, the Trust and MetLife irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    The Trust consents to process being served by or on behalf of MetLife or any other Noteholder in any suit, action or proceeding of the nature referred to in this Section 21.8 by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 18 or at such other address of which MetLife or such other Noteholder shall then have been notified pursuant to said Section.  The Trust agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.  Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(c)    Nothing in this Section 21.8 shall affect the right of MetLife or any other Noteholder to serve process in any manner permitted by law, or limit any right that MetLife or any other Noteholder may have to bring proceedings against the Trust in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

A/73042765.13

(d)      The parties hereto hereby waive trial by jury in any action brought on or with respect to this Agreement, the Notes or any other document executed in connection herewith or therewith.

### 20.9.   Limitation of Liability of the Owner Trustee.

It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally, but solely as Owner Trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein (including, without limitation, those set forth in the exhibits hereof) made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose for binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other related documents. All amounts due by the Trust under any Financing Document or the Collateral Trust Agreement shall be paid solely from the trust assets of Trust in accordance with the Collateral Trust Agreement.   MetLife acknowledges that the Owner Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the Trust in this Agreement.

**[Remainder of page left intentionally blank.  Next page is signature page.]**

A/73042765.13

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Trust, whereupon this Agreement shall become a binding agreement between you, the Trust and the Trust Company.

Very truly yours,

**VARIABLE FUNDING TRUST 2008-1**
By:    U.S. Bank Trust National Association, not in
       its individual capacity but solely as Owner
       Trustee of the above trust


By: _____
Name:
Title:


**U.S. BANK TRUST NATIONAL ASSOCIATION,
(solely with respect to Sections 5.1 through 5.4
hereof), not in its individual capacity but solely as
Owner Trustee**


By: _____
Name:
Title:

This Agreement is hereby
accepted and agreed to as
of the date thereof.

**METROPOLITAN LIFE INSURANCE COMPANY**


By:_____
Name:
Title:


**METLIFE INSURANCE COMPANY OF
CONNECTICUT
METLIFE REINSURANCE COMPANY OF SOUTH
CAROLINA TRUST B
METLIFE REINSURANCE COMPANY OF
CHARLESTON
METLIFE REINSURANCE COMPANY OF
CHARLESTON TRUST B**

**By:      Metropolitan Life Insurance Company, as
investment manager for each of the above
entities**


By:_____
Name:
Title:

## Schedule A

## Information Relating To Purchasers

| Purchaser Name | METLIFE INSURANCE COMPANY OF CONNECTICUT |
|---|---|
| Name in which to register Note | METLIFE INSURANCE COMPANY OF CONNECTICUT |
| Note registration number; principal amount | R-1; $90,000,000 |
| Payment on account of Note | |
|      Method | Federal Funds Wire Transfer |
|      Account information | Bank Name:    JPMorgan Chase Bank<br>ABA Routing #:  021-000-021<br>Account No.:    304-614270<br>Account Name:  MetLife Insurance Company of Connecticut<br>Ref:          Variable Funding Trust 2008-1 FRN due 6/30/2013<br><br>with sufficient information to identify the source and application of such funds, including issuer, PPN#, interest rate, maturity and whether payment is of principal, interest, make whole amount or otherwise. |
| | Name of Issuer:      VARIABLE FUNDING TRUST 2008-1<br><br>Description of Security:      Variable Rate Senior Secured Revolving Credit Note<br><br>PPN:          92217@ AA2<br><br>Due date and application (as among principal, premium and interest) of the payment being made. |
| Address / Fax # for all notices and communications | **MetLife Insurance Company of Connecticut**<br><br>c/o Metropolitan Life Insurance Company<br><br>Investments, Private Placements<br><br>P.O. Box 1902<br><br>10 Park Avenue<br><br>Morristown, New Jersey 07962-1902<br><br>Attention: Director<br><br>Facsimile (973) 355-4250<br><br><br>With a copy **OTHER than with respect to deliveries of financial statements** to:<br><br>**MetLife Insurance Company of Connecticut**<br><br>c/o Metropolitan Life Insurance Company |

| | |
|---|---|
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention: Chief Counsel-Securities Investments (PRIV) |
| | Facsimile (973) 355-4338 |
| Email addresses for notices and reports expressly permitted by email (send email notices to all addressees) | mirenberg@metlife.com<br>ethorne@metlife.com<br>singlis@metlife.com<br>dzablocki@metlife.com<br>jryvicker@metlife.com |
| Instructions re Delivery of Notes | **MetLife Insurance Company of Connecticut**<br>c/o Metropolitan Life Insurance Company<br>Securities Investments, Law Department<br>P.O. Box 1902<br>10 Park Avenue<br>Morristown, New Jersey 07962-1902<br>Attention:  Kevin M. Budd, Esq. |
| Signature Block | METLIFE INSURANCE COMPANY OF CONNECTICUT<br>By:  Metropolitan Life Insurance Company, as investment manager<br><br>By:_____<br>Name:<br>Title: |
| Tax identification number | 06-0566090 |

Schedule A-2

| Purchaser Name | **METLIFE REINSURANCE COMPANY OF CHARLESTON** |
|---|---|
| Name in which to register Note | METLIFE REINSURANCE COMPANY OF CHARLESTON TRUST B |
| Note registration number; principal amount | R-2; $30,000,000 |
| Payment on account of Note | |
|     Method | Federal Funds Wire Transfer |
|     Account information | Bank Name:    US Bank<br><br>ABA Routing #:  021-000-022<br><br>Account No.:    19-5986<br><br>Account Name:    MetLife Reinsurance Company of Charleston Trust B<br><br>Ref:        Variable Funding Trust 2008 due 6/30/2013<br><br>Attn:        Denise Fultz<br><br>with sufficient information to identify the source and application of such funds, including issuer, PPN#, interest rate, maturity and whether payment is of principal, interest, make whole amount or otherwise. |
| Accompanying information | Name of Issuer:      VARIABLE FUNDING TRUST 2008-1<br><br>Description of<br><br>Security:      Variable Rate Senior Secured Revolving Credit Note<br><br>PPN:      92217@ AA2<br><br>Due date and application (as among principal, premium and interest) of the payment being made. |
| Address / Fax # for all notices and communications | **MetLife Reinsurance Company of Charleston**<br><br>c/o Metropolitan Life Insurance Company<br><br>Investments, Private Placements<br><br>P.O. Box 1902<br><br>10 Park Avenue<br><br>Morristown, New Jersey 07962-1902<br><br>Attention:  Director<br><br>Facsimile (973) 355-4250<br><br>With a copy **OTHER than with respect to deliveries of financial statements** to:<br><br>**MetLife Reinsurance Company of Charleston**<br><br>c/o Metropolitan Life Insurance Company<br><br>P.O. Box 1902<br><br>10 Park Avenue<br><br>Morristown, New Jersey 07962-1902 |

A/73042765.13

| | Attention: Chief Counsel-Securities Investments (PRIV) |
| | Facsimile (973) 355-4338 |
| Email addresses for notices and reports expressly permitted by email (send email notices to all addressees) | rnirenberg@metlife.com<br>ethorne@metlife.com<br>singlis@metlife.com<br>dzablocki@metlife.com<br>jryvicker@metlife.com |
| Instructions re Delivery of Notes | **MetLife Reinsurance Company of Charleston**<br>c/o Metropolitan Life Insurance Company<br>Securities Investments, Law Department<br>P.O. Box 1902<br>10 Park Avenue<br>Morristown, New Jersey 07962-1902<br>Attention: Kevin M. Budd, Esq. |
| Signature Block | METLIFE REINSURANCE COMPANY OF CHARLESTON TRUST B<br>By: Metropolitan Life Insurance Company, as investment manager<br><br>By:_____<br>Name:<br>Title: |
| Tax identification number | 20-5819518 |

Schedule A-4

| Purchaser Name | **METLIFE REINSURANCE COMPANY OF CHARLESTON** |
|---|---|
| Name in which to register Note | METLIFE REINSURANCE COMPANY OF CHARLESTON |
| Note registration number; principal amount | R-3; $10,000,000 |
| Payment on account of Note | |
|     Method | Federal Funds Wire Transfer |
|     Account information | Bank Name:    JPMorgan Chase Bank |
| | ABA Routing #:  021-000-021 |
| | Account No.:   304-910848 |
| | Account Name:  MetLife Reinsurance Company of Charleston |
| | Ref:          Variable Funding Trust 2008-1 FRN due 6/30/2013 |
| | with sufficient information to identify the source and application of such funds, including issuer, PPN#, interest rate, maturity and whether payment is of principal, interest, make whole amount or otherwise. |
| Accompanying information | Name of Issuer:        VARIABLE FUNDING TRUST 2008-1 |
| | Description of Security:  Variable Rate Senior Secured Revolving Credit Note |
| | PPN:                   92217@ AA2 |
| | Due date and application (as among principal, premium and interest) of the payment being made. |
| Address / Fax # for all notices and communications | **MetLife Reinsurance Company of Charleston** |
| | c/o Metropolitan Life Insurance Company |
| | Investments, Private Placements |
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention:  Director |
| | Facsimile (973) 355-4250 |
| | With a copy **OTHER than with respect to deliveries of financial statements** to: |
| | **MetLife Reinsurance Company of Charleston** |
| | c/o Metropolitan Life Insurance Company |
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention: Chief Counsel-Securities Investments (PRIV) |
| | Facsimile (973) 355-4338 |

Schedule A-5

A/73042765.13

| Email addresses for notices and reports expressly permitted by email (send email notices to all addressees) | rnirenberg@metlife.com<br><br>ethorne@metlife.com<br><br>singlis@metlife.com<br><br>dzablocki@metlife.com<br><br>jryvicker@metlife.com |
|---|---|
| Instructions re Delivery of Notes | **MetLife Reinsurance Company of Charleston**<br><br>c/o Metropolitan Life Insurance Company<br><br>Securities Investments, Law Department<br><br>P.O. Box 1902<br><br>10 Park Avenue<br><br>Morristown, New Jersey 07962-1902<br><br>Attention: Kevin M. Budd, Esq. |
| Signature Block | METLIFE REINSURANCE COMPANY OF CHARLESTON<br><br>By: Metropolitan Life Insurance Company, as investment manager<br><br>By:_____<br>Name:<br>Title: |
| Tax identification number | 20-5819518 |

Schedule A-6

| Purchaser Name | **METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA** |
|---|---|
| Name in which to register Note | METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA TRUST B |
| Note registration number; principal amount | R-4; $30,000,000 |
| Payment on account of Note | |
|     Method | Federal Funds Wire Transfer |
|     Account information | Bank Name:    US Bank |
| | ABA Routing #:  091000022 |
| | Account No.:    19-5983 |
| | Account Name:  MetLife Reinsurance Company of South Carolina |
| |     Trust B |
| | Ref:    Variable Funding Trust 2008-1 due 6/30/2013 |
| | Attn:    Denise Fultz |
| | with sufficient information to identify the source and application of such funds, including issuer, PPN#, interest rate, maturity and whether payment is of principal, interest, make whole amount or otherwise. |
| Accompanying information | Name of Issuer:    VARIABLE FUNDING TRUST 2008-1 |
| | Description of |
| | Security:    Variable Rate Senior Secured Revolving Credit Note |
| | PPN:    92217@ AA2 |
| | Due date and application (as among principal, premium and interest) of the payment being made. |
| Address / Fax # for all notices and communications | **MetLife Reinsurance Company of South Carolina** |
| | c/o Metropolitan Life Insurance Company |
| | Investments, Private Placements |
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention:  Director |
| | Facsimile (973) 355-4250 |
| | With a copy **OTHER than with respect to deliveries of financial statements** to: |
| | **MetLife Reinsurance Company of South Carolina** |
| | c/o Metropolitan Life Insurance Company |
| | P.O. Box 1902 |

Schedule A-7

| | |
|---|---|
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention: Chief Counsel-Securities Investments (PRIV) |
| | Facsimile (973) 355-4338 |
| Email addresses for notices and reports expressly permitted by email (send email notices to all addressees) | rnirenberg@metlife.com |
| | ethorne@metlife.com |
| | singlis@metlife.com |
| | dzablocki@metlife.com |
| | jryvicker@metlife.com |
| Instructions re Delivery of Notes | **MetLife Reinsurance Company of South Carolina** |
| | c/o Metropolitan Life Insurance Company |
| | Securities Investments, Law Department |
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention:  Kevin M. Budd, Esq. |
| Signature Block | METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA TRUST B |
| | By:  Metropolitan Life Insurance Company, as investment manager |
| | By:_____ |
| | Name: |
| | Title: |
| Tax identification number | 20-1452630 |

A/73042765.13

| Purchaser Name | **METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA** |
|---|---|
| Name in which to register Note | METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA TRUST B |
| Note registration number; principal amount | R-5; $5,000,000 |
| Payment on account of Note | |
| Method | Federal Funds Wire Transfer |
| Account information | Bank Name:    US Bank |
| | ABA Routing #:  091000022 |
| | Account No.:    19-5984 |
| | Account Name:  MetLife Reinsurance Company of South Carolina |
| | Trust B |
| | Ref:    Variable Funding Trust 2008-1 due FRN 6/30/2013 |
| | Attn:    Denise Fultz |
| | with sufficient information to identify the source and application of such funds, including issuer, PPN#, interest rate, maturity and whether payment is of principal, interest, make whole amount or otherwise. |
| Accompanying information | Name of Issuer:    VARIABLE FUNDING TRUST 2008-1 |
| | Description of |
| | Security:    Variable Rate Senior Secured Revolving Credit Note |
| | PPN:    92217@ AA2 |
| | Due date and application (as among principal, premium and interest) of the payment being made. |
| Address / Fax # for all notices and communications | **MetLife Reinsurance Company of South Carolina** |
| | c/o Metropolitan Life Insurance Company |
| | Investments, Private Placements |
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention:  Director |
| | Facsimile (973) 355-4250 |
| | With a copy **OTHER than with respect to deliveries of financial statements** to: |
| | **MetLife Reinsurance Company of South Carolina** |
| | c/o Metropolitan Life Insurance Company |
| | P.O. Box 1902 |

A/73042765.13

|  | 10 Park Avenue |
|  | Morristown, New Jersey 07962-1902 |
|  | Attention: Chief Counsel-Securities Investments (PRIV) |
|  | Facsimile (973) 355-4338 |
| Email addresses for notices and reports expressly permitted by email (send email notices to all addressees) | rnirenberg@metlife.com |
|  | ethorne@metlife.com |
|  | singlis@metlife.com |
|  | dzablocki@metlife.com |
|  | jryvicker@metlife.com |
| Instructions re Delivery of Notes | **MetLife Reinsurance Company of South Carolina** |
|  | c/o Metropolitan Life Insurance Company |
|  | Securities Investments, Law Department |
|  | P.O. Box 1902 |
|  | 10 Park Avenue |
|  | Morristown, New Jersey 07962-1902 |
|  | Attention:  Kevin M. Budd, Esq. |
| Signature Block | METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA TRUST B |
|  | By:  Metropolitan Life Insurance Company, as investment manager |
|  | By:_____ <br> Name: <br> Title: |
| Tax identification number | 20-1452630 |

Schedule A-10

| Purchaser Name | **METROPOLITAN LIFE INSURANCE COMPANY** |
|---|---|
| Name in which to register Note | METROPOLITAN LIFE INSURANCE COMPANY |
| Note registration number; principal amount | R-6; $335,000,000 |
| Payment on account of Note<br><br>        Method<br><br>        Account information | Federal Funds Wire Transfer<br><br>Bank Name:     JPMorgan Chase Bank<br><br>ABA Routing #:  021-000-021<br><br>Account No.:    002-2-410591<br><br>Account Name:  Metropolitan Life Insurance Company<br><br>Ref:              Variable Funding Trust 2008-1 FRN due 6/30/2013<br><br>with sufficient information to identify the source and application of such funds, including issuer, PPN#, interest rate, maturity and whether payment is of principal, interest, make whole amount or otherwise. |
| Accompanying information | Name of Issuer:         VARIABLE FUNDING TRUST 2008-1<br><br>Description of<br><br>Security:               Variable Rate Senior Secured Revolving Credit Note<br><br>PPN:                   92217@ AA2<br><br>Due date and application (as among principal, premium and interest) of the payment being made. |
| Address / Fax # for all notices<br><br>and communications | **Metropolitan Life Insurance Company**<br><br>Investments, Private Placements<br><br>P.O. Box 1902<br><br>10 Park Avenue<br><br>Morristown, New Jersey 07962-1902<br><br>Attention:  Director<br><br>Facsimile (973) 355-4250<br><br>With a copy **OTHER than with respect to deliveries of financial statements** to:<br><br>**Metropolitan Life Insurance Company**<br><br>P.O. Box 1902<br><br>10 Park Avenue<br><br>Morristown, New Jersey 07962-1902<br><br>Attention: Chief Counsel-Securities Investments (PRIV)<br><br>Facsimile (973) 355-4338 |
| Email addresses for notices and reports expressly permitted by email (send    email    notices    to    all | rnirenberg@metlife.com<br><br>ethorne@metlife.com |

Schedule A-11

| | |
|---|---|
| addressees) | singlis@metlife.com |
| | dzablocki@metlife.com |
| | jryvicker@metlife.com |
| Instructions re Delivery of Notes | **Metropolitan Life Insurance Company** |
| | Securities Investments, Law Department |
| | P.O. Box 1902 |
| | 10 Park Avenue |
| | Morristown, New Jersey 07962-1902 |
| | Attention:  Kevin M. Budd, Esq. |
| Signature Block | METROPOLITAN LIFE INSURANCE COMPANY |
| | By:_____ <br> Name: <br> Title: |
| Tax identification number | 13-5581829 |

Schedule A-12

## Schedule B

## Defined Terms

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**Administration Agreement**" means that certain Administration Agreement substantially in the form of Exhibit 6 hereto, by and between the Trust and the Administrative Agent, as the same may be amended, restated or otherwise modified from time to time, together with any agreement entered into in substitution or replacement thereof in accordance with the terms of the Financing Documents.

"**Administrative Agent**" means Lehman Commercial Paper Inc., a New York corporation, together with its successors and assigns in such capacity under the Administration Agreement.

"**Advance**" means a borrowing made by the Trust pursuant to a single Advance Request in accordance with the terms of the Existing Note Agreement.

"**Advance Request**" means a request by the Trust for a borrowing pursuant to and in accordance with the terms of the Existing Note Agreement.

"**Affiliate**" means, at any time, and with respect to any Person, any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person. As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Unless the context otherwise clearly requires, any reference to an "Affiliate" is a reference to an Affiliate of the Trust.

"**Agreement, this**" is defined in Section 17.3.

"**Anti-Money Laundering Laws**" is defined in Section 5.15(b).

"**Anti-Terrorism Order**" means Executive Order No. 13,224 of September 23, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49079 (2001), as amended.

"**Approved Foreign Note Asset**" means a Foreign Note Asset that is an Approved Note Asset.

"**Approved Note Asset**" means, at any time, any Note Asset that has been approved by MetLife as complying with the Eligibility Criteria.

A/73042765.13

"**Authorized Officer**" means, in respect of any Person, an individual officer or official of such Person who is authorized to take the action referred to in connection with the use of the term Authorized Officer as set forth herein.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York are required or authorized to be closed.

"**Capitalized Interest Amount**" is defined in Section 8.1(a)(ii).

"**Capital Lease**" means, at any time, a lease with respect to which the lessee is required concurrently to recognize the acquisition of an asset and the incurrence of a liability in accordance with GAAP.

"**Cash Equivalents**" means United States Governmental Securities maturing within 365 days from the date of acquisition thereof and approved by MetLife in its sole discretion.

"**Closing**" is defined in Section 3.

"**Closing Date**" is defined in Section 3.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collateral**" means all of the property, rights and interests of the Obligors that are or are intended to be subject to the Liens created by the Security Documents.

"**Collateral Trust Agreement**" means that certain Collateral Trust Agreement substantially in the form of Exhibit 3 hereto, by and between the Trust and The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.), as the same may be amended, restated or otherwise modified from time to time.

"**Collateral Trustee**" means The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company), together with its successors and assigns as collateral trustee under the Collateral Trust Agreement.

"**Collection Account**" is defined in the Collateral Trust Agreement.

"**Commercial Loan Note**" means a promissory note or any other document or agreement evidencing a commercial loan, which note (and all of the right, title and interest of the original payee in respect thereof and the related security) which is intended to be or has been assigned to the Trust, as such note, document or agreement is amended, restated, modified, supplemented or replaced from time to time, together with any such note, document or agreement evidencing any extension or renewal thereof.

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

A/73042765.13

"**Default Rate**" means, at any time with respect to any Note, a rate of interest per annum equal to 4% per annum above the rate of interest that would otherwise be in effect at such time with respect to such Note.

"**Dollars**" or "**$**" or "**US$**" shall mean lawful money of the United States of America.

"**Eligibility Criteria**" means the original Eligibility Criteria with respect to the Note Assets set forth in Exhibit 12 to the Existing Note Agreement.

"**Equity Interest Pledge Agreement**" means that certain Equity Interest Pledge Agreement substantially in the form of Exhibit 5 hereto, made by the Pledgor in favor of the Collateral Trustee, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is treated as a single employer together with the Trust under section 414 of the Code.

"**Event of Default**" is defined in Section 11.

"**Existing Note Agreement**" is defined in Section 1.

"**Fair Market Value**" means, at any time with respect to any Note Asset or property securing a Note Asset, an amount calculated in the currency in which such Note Asset (or, if such Note Asset is a participation interest, the underlying Mortgage Note or Commercial Loan Note relating to such Note Asset) is denominated equal to the sale value thereof that would be realized in an arm's-length sale between an informed and willing buyer and an informed and willing seller (neither being under a compulsion to buy or sell), as most recently determined in by MetLife in its sole discretion.

"**Financing Documents**" means this Agreement, the Notes, the Parent Guarantee, the 2007 Issuer Guarantee, the Restructuring Agreement and the Security Documents.

"**Foreign Note Asset**" means a Note Asset denominated in a currency other than Dollars in respect of which an obligor has a primary place of business, and substantially all of its assets (including, without limitation, Underlying Mortgaged Real Property) are located, in a Permitted Jurisdiction.

"**Funding Date**" means the Closing Date and any other date on which an Advance is made.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States of America.

Schedule B-3

"**Governmental Authority**" means

the government of

the United States of America or any State or other political subdivision thereof, or

any other jurisdiction in which any Obligor (or any obligor in respect of any Mortgage Note or Commercial Loan Note underlying (or constituting) any Note Asset) owns property or conducts all or any part of its business, or which asserts jurisdiction over any properties of any of such Persons, or

any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government.

"**Guarantee of 2007 Notes**" means that certain Guarantee Agreement, dated as of the date hereof, by the Trust in favor of the holders of the 2007 Notes, as amended, restated or otherwise modified from time to time.

"**Guarantees**" means the Parent Guarantee and the 2007 Issuer Guarantee.

"**Guarantors**" means the Parent Guarantor and the 2007 Issuer.

"**Guaranty**" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other Person in any manner, whether directly or indirectly, including (without limitation) obligations incurred through an agreement, contingent or otherwise, by such Person:

      (a)    to purchase such indebtedness or obligation or any property constituting security therefor;

      (b)    to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

      (c)    to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation; or

      (d)    otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guaranty, the indebtedness or other obligations that are the subject of such Guaranty shall be assumed to be direct obligations of such obligor.

A/73042765.13

"**holder**" means, with respect to any Note, the Person in whose name such Note is registered in the register maintained by the Trust pursuant to Section 13.1.

"**Indebtedness**" with respect to any Person means, at any time, without duplication,

      (a)     its liabilities for borrowed money and its redemption obligations in respect of mandatorily redeemable Preferred Stock;

      (b)     its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

      (c)     (i) all liabilities appearing on its balance sheet in accordance with GAAP in respect of Capital Leases and (ii) all liabilities which would appear on its balance sheet in accordance with GAAP in respect of Synthetic Leases assuming such Synthetic Leases were accounted for as Capital Leases;

      (d)     all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities);

      (e)     all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money); and

      (g)     any Guaranty of such Person with respect to liabilities of a type described in any of clauses (a) through (f) hereof.

"**Initial Advance**" is defined in Section 3.

"**Initial Note**" is defined in Section 3.

"**Institutional Investor**" means (a) any Purchaser or any Affiliate thereof, (b) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (c) any Related Fund of any Noteholder.

"**Interest Period**" means the period (a) commencing on (and including) the Closing Date and ending on (and including) the next Scheduled Interest Payment Date occurring thereafter, (b) beginning on (but not including) such Scheduled Interest Payment Date and each successive Scheduled Interest Payment Date and ending on (and including) the immediately following Scheduled Interest Payment Date occurring thereafter and (c) beginning on (and not including) the Scheduled Interest Payment Date immediately preceding the date the Notes are paid in full and ending on (and not including) such date.

"**Lehman Entity**" means the Obligors and the Note Asset Transferors.

"**LIBOR**" means, for any Interest Period, (a) the LIBOR Index Rate for such Interest Period determined on the date two (2) London Business Days before the commencement of such Interest Period, if such rate is available, and (b) if the LIBOR Index Rate cannot be determined for such Interest Period in accordance with the foregoing clause (a), an interest rate per annum equal to the London Interbank Offered Rate for deposits in Dollars for a period equal to 3 months, as published or announced two (2) London Business Days prior to the commencement of such Interest Period in the Money Rates Section of The Wall Street Journal (Eastern Edition), or, if the London Interbank Offered Rate for such 3-month period is not so published or announced at such time, any other source selected by mutual agreement of MetLife and the Trust, provided that if MetLife and the Trust cannot so agree on such other source within two Business Days following the necessity to agree thereon, then such other source shall be selected by MetLife.

"**LIBOR Based Rate**" means:

(a)    for any Interest Period ending on or prior to January 31, 2009, a rate per annum equal to 2.50% plus LIBOR for such Interest Period;

(b)    for the portion of any Interest Period which occurs any day in January 2009, a rate per annum equal to 2.50% plus LIBOR for the Interest Period in which such month falls;

(c)    for any portion of the Interest Period referred to in clause (b) of this definition which occurs after January 2009, and for each Interest Period ending thereafter, a rate per annum equal to 4.50% plus LIBOR for such Interest Period.

"**LIBOR Index Rate**" means, for any Interest Period, the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in Dollars for a period equal to 3 months which appears on the Bloomberg Financial Markets Service Page BBAM-1 (or if such page is not available, the Reuters Screen LIBO Page) as of 10:00 a.m. (New York City, New York time) on the date 2 London Business Days before the commencement of the Interest Period in respect of which the LIBOR Index Rate is being determined. "*Reuters Screen LIBO Page*" means the display designated as the "LIBO" page on the Reuters Monetary Money Rates Service (or such other page as may replace the LIBO page on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Banker's Association Interest Settlement Rates for Dollar deposits).

"**Lien**" means, with respect to any Person, any mortgage, lien, pledge, negative pledge, charge, security interest or other encumbrance, purchase option, right of first offer, right of first refusal, or any interest or title of any vendor, lessor, lender or other Person under any conditional sale or other title retention agreement or Capital Lease, upon or with respect to any property or asset of such Person (including in the case of stock, stockholder agreements, voting trust agreements and all similar arrangements).

"**London Business Day**" means a day on which dealings in Dollars are carried on in the London inter-bank eurodollar market.

Schedule B-6

"**Master Assignment Agreement**" means that certain Master Assignment Agreement substantially in the form of Exhibit 7(a)-1 hereto, by and between the Trust and the Pledgor, as the same may be amended, restated or otherwise modified from time to time.

"**Master Participation Agreement**" means that certain Master Participation Agreement substantially in the form of Exhibit 7(b) hereto, by and between the Trust and Lehman Commercial Paper Inc., a New York corporation, as the same may be amended, restated or otherwise modified from time to time.

"**Material Adverse Effect**" means a material adverse effect on (a) at least five percent (5%) in outstanding principal amount of the Approved Note Assets (including, without limitation, the Fair Market Value thereof), (b) the business, operations, affairs, financial condition, assets or properties of any Obligor, taken as a whole, (c) the ability of any Obligor to perform its obligations under the Financing Documents to which it is a party, (d) the ability of the applicable Lehman Entity to perform its obligations under the Master Assignment Agreement, the US to UK Assignment Agreement or the Master Participation Agreement, as the case may be, (e) the validity or enforceability of the Financing Documents or the Administration Agreement or (f) the validity or enforceability of the Liens in favor of the Collateral Trustee securing the obligations of the Obligors under the Financing Documents.

"**Maturity Date**" is defined in Section 8.2(b).

"**MetLife**" means Metropolitan Life Insurance Company, together with each Noteholder that is an Affiliate of Metropolitan Life Insurance Company.

"**Mortgage Note**" means a promissory note or any other document or agreement secured by a mortgage, deed of trust or similar instrument, which note or other document or agreement (and all of the right, title and interest of the original payee in respect thereof and the related security) is intended to be or has been assigned to the Trust, as such note, document or agreement is amended, restated, modified, supplemented or replaced from time to time, together with any such note, document or agreement evidencing any extension or renewal thereof.

"**NAIC**" means the National Association of Insurance Commissioners or any successor thereto.

"**Note Asset**" means all of the Trust's right, title and interest in and to any Mortgage Note or Commercial Loan Note (including any participation or similar interest held by the Trust in any Commercial Loan Note).

"**Note Asset-Company Transfer Documentation**" means:

(a)    with respect to any Mortgage Note, the Master Assignment Agreement and (if the transferor of such Mortgage Note is an entity other than the Pledgor, a UK to US Assignment Agreement) and the following documents relating to such Mortgage Note substantially in the forms attached to the Master Assignment Agreement: (i) the omnibus assignment, (ii) the assignment of assignment of leases and rents with respect to each

Underlying Mortgage securing such Mortgage Note, (iii) the assignment of mortgage/deed of trust with respect to each Underlying Mortgage securing such Mortgage and (iv) the allonge to be attached to such Mortgage Note;

(b)     with respect to any Commercial Loan Note, the Master Participation Agreement and the participation letter relating to such Commercial Loan Note substantially in the form attached to the Master Participation Agreement; and

(c)     any other documentation reasonably required by MetLife under the local law of any jurisdiction in connection with the transfer of a Note Asset to the Trust, in form and substance satisfactory to MetLife.

"**Note Asset Documentation**" means, with respect to any Note Asset, the documents, agreements, instruments and other writings evidencing, securing or guaranteeing the same or executed in connection therewith, including, without limitation, (a) document or instruments evidencing such Note Asset itself, (b) in the case of the Trust's interest in any Mortgage Note, the related Underlying Mortgages, and (c) the Note Asset-Company Transfer Documentation relating to such Note Asset.

"**Note Asset Transferor**" means the Pledgor and each other Person, if any, that is a seller-party to a UK to US Assignment Agreement, as approved by MetLife.

"**Note Asset-Owner Trustee Transfer Documentation**" means any instrument of transfer or related documentation reasonably required by MetLife or the Collateral Trustee under the local law of any jurisdiction in connection with the transfer of the Trust's interest in a Note Asset to the Collateral Trustee.

"**Noteholder**" is defined in the first paragraph of this Agreement.

"**Notes**" is defined in Section 3.

"**Obligations**" shall have the meaning ascribed to it in the Security Agreement.

"**Obligors**" means the Trust, the Pledgor and the Guarantors.

"**Officer's Certificate**" means a certificate of an officer of the Administrative Agent whose responsibilities extend to the subject matter of such certificate.

"**Operative Documents**" means the Financing Documents, the Note Asset Documentation and the Administration Agreement.

"**Owner Trustee**" means U.S. Bank Trust National Association, not in its individual capacity but solely in its capacity as Owner Trustee acting on behalf of the Trust under the Owner Trust Agreement, together with its successors and assigns in such capacity.

A/73042765.13

"**Owner Trust Agreement**" means that certain Amended and Restated Trust Agreement of the Trust Company, dated the date hereof, in form and substance satisfactory to MetLife, and as amended, restated or otherwise modified from time to time.

"**Parent Guarantee**" means that certain Parent Guarantee Agreement substantially in the form of <u>Exhibit 2</u> hereto, executed by the Parent Guarantor, as the same may be amended, restated or otherwise modified from time to time.

"**Parent Guarantor**" means Lehman Brothers Holdings Inc., a Delaware corporation, together with its successors and assigns.

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority.

"**Plan**" means an "employee benefit plan" (as defined in section 3(3) of ERISA) subject to Title I of ERISA that is or, within the preceding five years, has been established or maintained, or to which contributions are or, within the preceding five years, have been made or required to be made, by the Trust or any ERISA Affiliate or with respect to which the Trust or any ERISA Affiliate may have any liability.

"**Pledgor**" means Lehman Commercial Paper Inc., a New York corporation.

"**Preferred Stock**" means any class of capital stock of a Person that is preferred over any other class of capital stock (or similar equity interests) of such Person as to the payment of dividends or the payment of any amount upon liquidation or dissolution of such Person.

"**property**" or "**properties**" means, unless otherwise specifically limited, real or personal property of any kind, tangible or intangible, choate or inchoate.

"**Qualified Institutional Buyer**" means any Person who is a "qualified institutional buyer" within the meaning of such term as set forth in Rule 144A(a)(1) under the Securities Act.

"**Related Fund**" means, with respect to any Noteholder, any fund or entity that (i) invests in Securities or bank loans, and (ii) is advised or managed by such Noteholder, the same investment advisor as such Noteholder or by an affiliate of such Noteholder or such investment advisor.

"**Responsible Officer**" means any senior officer of the Administrative Agent with responsibility for the administration of the Trust's rights and obligations under this Agreement.

"**Restructuring Agreement**" is defined in Section 1.

"**Restructuring Effective Date**" has the meaning ascribed to the term "Effective Date" in the Restructuring Agreement.

A/73042765.13

"**Restructuring Period**" means the period beginning on (and including) March 2, 2009 and ending on May 31, 2009.

"**Revolver Holding Account**" is defined in the Collateral Trust Agreement.

"**Scheduled Interest Payment Date**" is defined in Section 8.1(a)(i).

"**Securities**" or "**Security**" shall have the meaning specified in Section 2(1) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Security Agreement**" means that certain Security Agreement substantially in the form of Exhibit 4(a), executed and delivered by the Trust to the Collateral Trustee, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Security Documents**" means the Security Agreement, the UK Security Agreement, the Collateral Trust Agreement, the 2007 Collateral Trust Agreement, Equity Interest Pledge Agreement, any US Custodial Agreement, any UK Custodial Agreement, the Note Asset-Owner Trustee Transfer Documentation and, to the extent securing the obligations of the 2007 Issuer under the 2007 Issuer Guarantee, the 2007 Security Documents, together with any other agreement, document or instrument from time to time entered into granting a Lien in favor of the Collateral Trustee for the benefit of the Collateral Trustee and the Noteholders securing the obligations of any Obligor under the Financing Documents, and all other instruments, documents, filings and recordings required to be made, executed or delivered pursuant to any Security Document.

"**SVO**" means the Securities Valuation Office of the NAIC or any successor to such Office.

"**Synthetic Lease**" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for United States federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Trust**" is defined in the introductory sentence hereto.

"**Trust Company**" means U.S. Bank Trust National Association, in its individual capacity and not in its capacity as Owner Trustee under the Owner Trust Agreement.

"**2007 Collateral Trust Agreement**" means that certain Collateral Trust Agreement, dated as of November 30, 2007, by and among the 2007 Issuer and The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.), as amended, restated or otherwise modified from time to time.

"**2007 Collateral Trustee**" means The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.), in its capacity as Collateral Trustee under the 2007 Collateral Trust Agreement, together with its successors and assigns in such capacity.

"**2007 Financing Documents**" means the "Financing Documents" as defined in the 2007 Note Purchase Agreement, as such documents are amended, restated or otherwise modified from time to time.

"**2007 Issuer**" means Variable Funding Trust 2007-1, a Delaware statutory trust formed and existing under 12 *Del. C* §3801 et seq.

"**2007 Issuer Guarantee**" means that certain Guarantee Agreement, dated as of the date hereof, by the 2007 Issuer in favor of the holders of Notes, as amended, restated or otherwise modified from time to time.

"**2007 Note Purchase Agreement**" means that certain Note Purchase Agreement, dated as of November 30, 2007, by and among the 2007 Issuer, MetLife and the other holders from time to time of notes issued thereunder, as amended, restated or otherwise modified from time to time.

"**2007 Notes**" means the "Notes" as defined in the 2007 Note Purchase Agreement.

"**2007 Security Documents**" means the "Security Documents" as defined in the 2007 Note Purchase Agreement, as such documents are amended, restated or otherwise modified from time to time.

"**UK Co-Collateral Trustee**" means the Bank of New York Mellon, London Branch (f/k/a The Bank of New York, London Branch), not in its individual capacity but in its capacity as co-collateral agent appointed by the Collateral Trustee under the terms of the Collateral Trust Agreement, together with its successor and assigns in such capacity.

"**UK Custodial Agreement**" means an agreement among the Trust, the Collateral Trustee and one or more holder or holders of Note Asset Documentation relating to English Foreign Note Assets, relating to the custody and delivery of certain of such Note Asset Documentation, in form and substance satisfactory to MetLife and the Collateral Trustee, and as such agreement may be amended, restated or otherwise modified from time to time.

"**UK Security Agreement**" means that certain Owner Deed of Charge substantially in the form of Exhibit 4(b) hereto, by and among the Trust, the Collateral Trustee, the UK Co-Collateral Trustee and the Note Asset Transferors, as amended, restated, supplemented or otherwise modified from time to time.

"**UK to US Assignment Agreement**" shall mean a loan sale agreement between the owner-transferor of an underlying Mortgage Note to be acquired with the proceeds of an Advance, as seller, and the Pledgor, as buyer, in the form attached hereto as Exhibit 7(a)-2, as amended, restated or otherwise modified from time to time.

Schedule B-11

"**Underlying Mortgage**" means any mortgage, deed of trust or similar instrument securing the obligations of an obligor or obligors under a Mortgage Note.

"**Underlying Mortgaged Real Property**" means any real property subject to an Underlying Mortgage.

"**USA Patriot Act**" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**US Custodial Agreement**" shall mean a custodial agreement, in form and substance satisfactory to MetLife and the Collateral Agent, entered into from time to time among the Trust, the Collateral Agent, the Administrative Agent and a custodian acceptable to MetLife and the Collateral Agent, relating to the custody and delivery of Note Asset Documentation, as amended, restated or otherwise modified from time to time.

Schedule B-12

**Exhibit 1**

[Form of Note]

## VARIABLE FUNDING TRUST 2008-1

### Variable Rate Senior Secured Revolving Note

No. [_____]                                                                                              [Date]

$[_____] plus Capitalized Interest Amounts                                    PPN: 92217@ AA2

 **For Value Received**, the undersigned, **Variable Funding Trust 2008-1**, a Delaware statutory trust formed and existing under 12 *Del. C.* §3801 et seq. (the "**Trust**"), hereby promises to pay to [_____], or registered assigns, the principal sum of [_____] **Dollars ($_____**) (as such amount may be increased from time to time by Capitalized Interest Amounts), or so much thereof as shall be outstanding, on the Maturity Date, together with interest payable at a rate per annum and at the times provided in (and computed in accordance with the provisions of) the Note Purchase Agreement referred to below, from the date hereof until the principal hereof shall have become due and payable, including, without limitation, interest at the Default Rate (as defined in the Note Purchase Agreement referred to below) as provided in Section 8.1(b).

 Payments of principal of and interest on this Note are to be made in lawful money of the United States of America at U.S. Bank Trust National Association or at such other place as the Trust shall have designated by written notice to the holder of this Note as provided in the Note Purchase Agreement referred to below.

 This Note is one of a series of Variable Rate Senior Secured Notes (herein called the "**Notes**") issued pursuant to the Note Purchase Agreement, dated as of May 9, 2008 (as from time to time amended, the "**Note Purchase Agreement**"), among the Trust, the Trust Company and the Purchasers named therein and is entitled to the benefits thereof. Unless otherwise indicated, capitalized terms used in this Note shall have the respective meanings ascribed to such terms in the Note Purchase Agreement.

 This Note is a registered Note and, as provided in the Note Purchase Agreement, upon surrender of this Note for registration of a transfer made in compliance with the terms of Section 13.2 thereof, accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for a like principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Trust may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Trust will not be affected by any notice to the contrary.

 This Note is subject to optional prepayment, in whole or from time to time in part, at the times and on the terms specified in the Note Purchase Agreement, but not otherwise.

Exhibit 1-1

If an Event of Default occurs and is continuing, the principal amount of Advances made under this Note may be declared or otherwise become due and payable in the manner, at the price and with the effect provided in the Note Purchase Agreement.

The payment and performance of the obligations of the Trust under this Note and the other Financing Documents are guaranteed by (a) Lehman Brothers Holdings Inc., a Delaware corporation pursuant to the terms of the Parent Guarantee and (b) Variable Funding Trust 2007-1, a Delaware statutory trust formed and existing under 12 *Del. C.* §3801 et seq. (the "**2007 Issuer**") pursuant to the terms of the 2007 Issuer Guarantee, and such obligations and the obligations of the 2007 Issuer under the 2007 Issuer Guarantee are secured by Liens granted in favor of the 2007 Collateral Trustee for the benefit of the holder from time to time of this Note pursuant to the 2007 Security Documents.

This Note shall be construed and enforced in accordance with, and the rights of the Trust and the holder of this Note shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

**VARIABLE FUNDING TRUST 2008-1**

**By: U.S. Bank Trust National Association, not in its individual capacity but solely as Owner Trustee of the above trust**

By:_____
Name:
Title:

This Note has the benefit of the rights of the holders of Notes as provided under the Collateral Trust Agreement dated as of May 9, 2008 between The Bank of New York Mellon Trust Company, N.A. and the Trust, as amended from time to time.

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, not in its individual capacity, but solely as Collateral Trustee

By:_____
Name:
Title:

Exhibit 1-2

**Exhibit 2**

**[Form of Parent Guarantee]**

For original Parent Guarantee see Exhibit 2 to the Existing Note Agreement

<u>**Exhibit 3**</u>

**[Form of Collateral Trust Agreement]**

For original form of Collateral Trust Agreement see Exhibit 3 to the Existing Note Agreement

**Exhibit 4(a)**

**[Form of Security Agreement]**

For original Security Agreement see Exhibit 4(a) to the Existing Note Agreement

**Exhibit 4(b)**

**[Form of UK Security Agreement]**

For original UK Security Agreement see Exhibit 4(b) to the Existing Note Agreement

**Exhibit 6**

**[Form of Administration Agreement]**

For original Administration Agreement see Exhibit 6 to the Existing Note Agreement

**Exhibit 7(a)-1**

**[Form of Master Assignment Agreement]**

For original Master Assignment Agreement see Exhibit 8(a)-1 to the Existing Note Agreement

**Exhibit 7(a)-2**

**[Form of UK to US Assignment Agreement]**

For original Master Assignment Agreement see Exhibit 8(a)-2 to the Existing Note Agreement

**<u>Exhibit 7(b)</u>**

**[Form of Master Participation Agreement]**

For original Master Participation Agreement see Exhibit 8(b) to the Existing Note Agreement

**Exhibit 8**

## COVENANTS OF THE TRUST CONCERNING
## NOTE ASSETS AND NOTE ASSET DOCUMENTATION

### SECTION 1. AFFIRMATIVE COVENANTS.

The Trust covenants that so long as any of the Notes are outstanding:

**Section 1.1.**  The Trust shall take such action, at its sole cost and expense, as may be necessary to perfect, and to maintain the perfection of, the Liens in favor of the Collateral Trustee on the Note Assets, and the Note Asset Documentation relating thereto.  Without limiting the foregoing, the Trust hereby authorizes the Collateral Trustee, at the sole cost and expense of the Trust, to execute and file or cause to be filed any financing statement, registration or charge, and to take such other action, which the Collateral Trustee deems necessary or desirable to perfect such Liens.

**Section 1.2.**  Subject to the restrictions set forth in Section 2 of this Exhibit 8, the Trust shall cause Administrative Agent to service all Note Assets as directed by MetLife, or absent such direction, as provided in accordance with the terms of the Administration Agreement.

**Section 1.3.**  Intentionally Omitted.

**Section 1.4.**  The Trust shall, or shall cause Administrative Agent to, notify within 30 days all holders of Notes and the Collateral Trustee of any material default under any of the Note Asset Documentation of which it becomes aware, which notice shall specify the nature of such default.

**Section 1.5.**  The Trust shall, or shall cause Administrative Agent to, promptly notify all holders of Notes and the Collateral Trustee of any amendment, waiver or other modification (or proposed amendment, waiver or other modification) of any Note Asset Documentation, of which it becomes aware.

**Section 1.6.**  The Trust shall, or shall cause Administrative Agent to,  promptly notify all holders of Notes and the Collateral Trustee upon the Trust becoming aware of the occurrence of any damage or other casualty to any improvements on any Underlying Mortgaged Real Property, of which the cost to repair such damage or casualty will, in the Trust's reasonable judgment, exceed 35% of the value of such Underlying Mortgaged Real Property immediately prior to the occurrence of such damage or casualty.

**Section 1.7.**  The Trust shall promptly notify all holders of Notes and the Collateral Trustee of the Trust's receipt of written notice from or on behalf of a Person primarily liable for repayment of Indebtedness under a Commercial Loan Note or Mortgage Note underlying (or constituting) a Note Asset that such Person intends to prepay such Indebtedness (a "Prepayment Notice"), which notice from the Trust shall include a copy of such Prepayment Notice.

1

A/73042765.13

**Section 1.8.**  Upon the written request of MetLife, the Trust shall provide all holders of Notes with such information concerning the Note Assets and the Note Asset Documentation relating thereto as may be requested by MetLife and which the Trust may have within its possession or control.  Without limiting the foregoing, the Trust shall cause the Administrative Agent to permit the Collateral Trustee and the Noteholders access to the Trust's books, records and files concerning the Note Assets in accordance with the terms of the Administration Agreement.

**Section 1.9.**  The Trust shall promptly notify all holders of Notes and the Collateral Trustee upon the Trust's or the Administrative Agent's receipt of any written notice from any Person contesting the enforceability of any provisions of the Note Asset Documentation, the amount of underlying Indebtedness outstanding in respect of the Commercial Loan Note or Mortgage Note underlying (or constituting) the applicable Note Asset or the perfection or priority of any Lien securing such Indebtedness, asserting any defense, offset, claim or counterclaim with respect to any Note Asset (or the underlying obligation in respect thereof), Note Asset Documentation, or asserting any breach by the Trust or any predecessor-in-interest to the Trust as holder of a Note Asset of the Trust's or such holder's obligations under or in connection with any Note Asset Documentation.

## SECTION 2. NEGATIVE COVENANTS.

The Trust covenants that so long as any of the Notes are outstanding:

**Section 2.1.**  The Trust shall not grant or permit any Lien upon the Note Assets or Note Asset Documentation, other than the Liens granted in favor of the Collateral Trustee, and shall not transfer, assign, sell or grant a participation interest in any Note Asset or Note Asset Documentation.

**Section 2.2.**  No Person shall be released from any Indebtedness incurred under any Note Asset Documentation without the prior written consent of MetLife.

**Section 2.3.**  No Property that secures the Indebtedness under any Commercial Loan Note or Mortgage Note underlying (or constituting) a Note Asset shall be released as security, except for releases of Property to which the owner of such Property is entitled to as a matter of right under the Note Asset Documentation relating thereto and which are effected in accordance with the terms of such Note Asset Documentation.

**Section 2.4.**  The Trust shall not forgive, waive, compromise, settle or otherwise discharge any Indebtedness outstanding under any Commercial Loan Note or Mortgage Note underlying (or constituting) any Note Asset without the prior written consent of MetLife.

**Section 2.5.**  The Trust shall not waive, subordinate or otherwise impair any Lien it holds or has the benefit of as security for any Indebtedness under any Commercial Loan Note or Mortgage Note underlying (or constituting) a Note Asset.

2

**Section 2.6.**  The Trust shall not consent to any additional Liens on any Property that secures any Indebtedness under any Commercial Loan Note or Mortgage Note underlying (or constituting) any Note Asset or consent to the incurrence of any debt by any Person, where such Liens or incurrence of debt is prohibited or restricted under any Note Asset Documentation without the Trust's consent, unless such Note Asset Documentation provides the Trust may not unreasonably withhold such consent, in which case the Trust may give its consent if in the Trust's good faith judgment it would be unreasonable to withhold such consent.

**Section 2.7.**  In the event the Trust provides its consent to any matter described in Section 2.6, the Trust will promptly notify the Collateral Trustee and all holders of Notes of such consent.

**Section 2.8.**  The Trust shall not waive any default under any of the Note Asset Documentation without the prior written consent of MetLife at such time, nor waive any of its rights or remedies for the enforcement of any of the Note Asset Documentation.

**Section 2.9.**  No Note Asset Documentation shall be amended, restated or otherwise modified without the prior written consent of MetLife at such time.

**Section 2.10.**  The Trust shall not take or permit any action that would void, terminate or otherwise impair its rights under any title insurance policy insuring the Lien of an Underlying Mortgage.

3

## 2008 AMENDED AND RESTATED COLLATERAL TRUST AGREEMENT

Amended and Restated Collateral Trust Agreement executed by the 2008 Trust, the Collateral Trustee, the Noteholder and the Co-Collateral Trustee.

**EXECUTION VERSION**

VARIABLE FUNDING TRUST 2008-1

———————————————————

AMENDED AND RESTATED COLLATERAL TRUST AGREEMENT

———————————————————

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
as Collateral Trustee

Dated as of September 30, 2009

A/73038410.17

### Amended and Restated Collateral Trust Agreement

This Amended and Restated Collateral Trust Agreement (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of September 30, 2009, is among Variable Funding Trust 2008-1, a Delaware statutory trust formed and existing under 12 Del. C. §3801 *et seq.* (together with its successors and assigns, the "**Trust**") and The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.), a national banking association, (in its capacity as collateral trustee, together with its successors and assigns in such capacity, herein referred to as the "**Collateral Trustee**", and in its individual capacity, the "**Bank**"). All capitalized terms used herein have the respective meanings ascribed thereto in the Recitals and in Section 1.

### Recitals

WHEREAS, pursuant to a certain Note Purchase Agreement, dated as of May 9, 2008 (as amended, restated or otherwise modified from time to time, the "**2008 Note Purchase Agreement**"), by and among the Trust and the investors identified on Schedule A thereto (the "**2008 Purchasers**"), the 2008 Purchasers purchased Variable Rate Senior Secured Revolving Notes issued by the Trust in the aggregate principal amount of up to $500,000,000 (such notes, together with all such notes issued in exchange or substitution for such notes in each case in accordance with the 2008 Note Purchase Agreement, and as such notes may be amended, supplemented or otherwise modified from time to time in accordance with the 2008 Note Purchase Agreement, shall be referred to herein as the "**2008 Notes**"; and the holders from time to time of the 2008 Notes, including, on the date hereof, the 2008 Purchasers, shall be referred to herein as the "**2008 Noteholders**");

WHEREAS, pursuant to a certain Note Purchase Agreement, dated as of November 30, 2007 (as amended, restated or otherwise modified from time to time, the "**2007 Note Purchase Agreement**"), by and between Variable Funding Trust 2007-1, a Delaware statutory trust formed under 12 Del. C. §3801 et seq. (the "**2007 Issuer**") and the investor identified on Schedule A thereto ("**MetLife**"), MetLife purchased a Variable Rate Senior Secured Revolving Note issued by the 2007 Issuer in the aggregate principal amount of $500,000,000 (such note, together with all such notes issued in exchange or substitution for such note, in each case in accordance with the 2007 Note Purchase Agreement, and as such notes may be amended, supplemented or otherwise modified from time to time in accordance with the 2007 Note Purchase Agreement, shall be referred to herein as the "**2007 Notes**"; and the holders from time to time of the 2007 Notes, including, on the date hereof, MetLife, shall be referred to herein as the "**2007 Noteholders**", and together with the 2008 Noteholders, the "**Noteholders**");

WHEREAS, on the date hereof (a) the Trust and the 2008 Noteholders are entering into a certain 2008 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**2008 Restructuring Agreement**") pursuant to which the parties are restructuring the obligations of the Trust in respect of the 2008 Notes and (b) the 2007 Issuer and the 2007 Noteholders are entering into a certain 2007 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**2007 Restructuring Agreement**") pursuant to which the parties are restructuring the obligations of the 2007 Issuer in

respect of the 2007 Notes, in each case in view of the bankruptcy of Lehman Brothers Holdings Inc., the parent guarantor of the 2008 Notes and the 2007 Notes;

WHEREAS it is a condition precedent to (a) the restructuring of the obligations of the Trust in respect of the 2008 Notes under the 2008 Restructuring Agreement, that the 2007 Issuer guarantee the obligations of the Trust in respect of the 2008 Notes pursuant to a Guarantee Agreement (as amended, restated or otherwise modified from time to time, the "**2007 Guarantee of 2008 Obligations**") and (b) the restructuring of the obligations of the 2007 Issuer in respect of the 2007 Notes under the 2007 Restructuring Agreement, that the Trust guarantee the obligations of the 2007 Issuer in respect of the 2007 Notes pursuant to a Guarantee Agreement (as amended, restated or otherwise modified from time to time, the "**2008 Guarantee of 2007 Obligations**") of even date herewith;

WHEREAS it is a further condition precedent to the restructuring of such obligations of the 2007 Issuer that the Collateral Trust Agreement, dated as of May 9, 2008, by and between the Trust and the Collateral Trustee (as amended, restated or otherwise modified from time to time, the "**Existing Collateral Trust Agreement**"), be amended and restated as set forth herein; including, without limitation, to provide for the appointment by the 2007 Noteholders of the Bank to act as Collateral Trustee on their behalf and to include the 2008 Guarantee of 2007 Obligations as obligations secured by the Collateral (as hereinafter defined) constituting the Trust Estate (as hereinafter defined);

WHEREAS, all acts and proceedings required by law and by the certificates or articles of incorporation and bylaws, or other organizational or constitutive documents, of each party hereto necessary to constitute this Agreement a valid and binding agreement for the uses and purposes set forth herein, in accordance with its terms, have been done and taken, and the execution and delivery hereof has been in all respects duly authorized.

NOW THEREFORE, THIS AGREEMENT WITNESSETH, that to secure the prompt and complete payment of the Obligations and the performance and observance by the Trust of its respective covenants, obligations and conditions to be performed and observed in each of the 2008 Financing Documents, including, without limitation, the Security Agreement as originally executed and amended from time to time, and in the 2008 Guarantee of 2007 Obligations, and in consideration of the promises and of the covenants contained herein and of the purchase of the 2008 Notes by the 2008 Purchasers (and any other or subsequent holders thereof) and of the purchase of the 2007 Notes by MetLife (and any other or subsequent holders thereof) and the sum of ten dollars ($10.00) paid to the Bank by the Trust at or before the delivery hereof, the receipt and sufficiency whereof is hereby acknowledged:

## REAFFIRMATION OF EXISTING TRUST:

Pursuant to the terms of the 2008 Security Documents (as in effect immediately prior to the effectiveness of the 2008 Restructuring Agreement) the Trust granted Liens on certain property to the Collateral Trustee and the Bank does hereby reaffirm its agreement under the Existing Collateral Trust Agreement to hold in trust any and all right, title or interest in property and any and all other rights, interests and positions (including all Liens) granted to the Collateral Trustee or in its favor in accordance with the provisions of each such 2008 Security Document

- 2 -

and any and all other property and any and all other rights, interests and positions (including all Liens) granted to the Collateral Trustee in accordance with the provisions of the Existing Collateral Trust Agreement and pursuant to or in connection with the provisions of the Existing Financing Documents (excepting any right of the Bank to indemnification or the payment or reimbursement of fees and expenses in its individual capacity) as security for, and as additional sources of payment of, the Existing Obligations, subject to the terms and provisions set forth in the Existing Collateral Trust Agreement.

DECLARATION OF TRUST:

Pursuant to the terms of the 2008 Security Documents, including, without limitation, the Security Agreement as originally executed and amended from time to time, the Trust has granted Liens on certain property to the Collateral Trustee, and the Collateral Trustee does hereby agree to hold in trust hereunder any and all right, title or interest in property and any and all other rights, interests and positions (including all Liens) granted to the Collateral Trustee or in its favor in accordance with the provisions of the 2008 Security Documents (collectively, the "**Collateral**") and any and all other property and any and all other rights, interests and positions (including all Liens) granted to the Collateral Trustee in accordance with the provisions hereof and pursuant to or in connection with the provisions of the 2008 Financing Documents (excepting any right of the Bank to indemnification or the payment or reimbursement of fees and expenses in its individual capacity) (collectively, the "**Trust Estate**");

TO HAVE AND TO HOLD all and singular, the Trust Estate as security for, and as additional sources of payment of, the Obligations, and for the uses and purposes and subject to the terms and provisions set forth herein;

IN TRUST NEVERTHELESS, under and subject to the terms and conditions set forth herein and for the equal and ratable benefit of the holders from time to time of the Obligations and for the enforcement of the prompt and complete payment when due of all sums due in connection with the Obligations and for the performance and observance by the Obligors of their covenants, obligations and conditions to be performed and observed in each of the 2008 Financing Documents; and

IT IS HEREBY FURTHER COVENANTED AND AGREED that the Trust Estate is to be held and applied by the Collateral Trustee, subject to the further covenants, conditions, uses and trust hereafter set forth.

AGREEMENT FOR BENEFIT OF HOLDERS OF ALL OBLIGATIONS:

IT IS HEREBY FURTHER COVENANTED AND AGREED that the Trust does hereby covenant and agree with the Collateral Trustee and its successors in trust, for the benefit of all present and future Noteholders, or any of them, as follows:

SECTION 1.  **DEFINED TERMS.**

As used in this Agreement, and unless the context requires a different meaning, the following terms have the respective meanings indicated below, all such definitions to be equally applicable to the singular and plural forms of the terms defined. Other capitalized terms used but

- 3 -

not defined herein shall have the meanings ascribed to them in the 2008 Note Purchase Agreement.

"**Affected Noteholder**" – has the meaning ascribed to such term in Section 3.6(b).

"**Agreement**" – has the meaning ascribed to such term in the introductory paragraph hereof.

"**Bank**" – has the meaning ascribed to such term in the introductory paragraph hereof.

"**Bankruptcy Proceeding**" – means, with respect to any Person, a general assignment by such Person for the benefit of its creditors, or the institution by or against such Person of any proceeding seeking relief as debtor, or seeking to adjudicate such Person as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of such Person or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property.

"**Co-Collateral Trustee**" – has the meaning ascribed to such term in Section 5.11 (and includes the UK Co-Collateral Trustee).

"**Collateral**" – has the meaning ascribed to such term in the first paragraph of the Declaration of Trust hereof.

"**Collateral Trustee**" – has the meaning ascribed to such term in the introductory paragraph hereof unless and until a successor Collateral Trustee shall have been appointed pursuant to Section 5.6 hereof, and thereafter *"Collateral Trustee"* shall mean such successor Collateral Trustee.

"**Collection Account**" – has the meaning ascribed to such term in Section 3.3(a) of this Agreement.

"**Creditors' Committee**" -- means the Official Committee of Unsecured Creditors of Lehman Brothers, et al..

"**Custodian**" – means any custodian from time to time appointed by the Collateral Trustee or any Co-Collateral Trustee to hold Note Asset Documentation from time to time.

"**Elevation Documents**" -- means the document described on Schedule 3.7 to the 2008 Restructuring Agreement.

"**Enforcement**" – means the commencement by or against any Grantor of any enforcement, collection (including judicial or non-judicial foreclosure) or similar proceeding with respect to any Collateral. "Enforcement" shall not include the acceleration of obligations or the imposition of a default rate of interest.

"**Environmental Laws**" – means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including but not limited to those related to Hazardous Materials.

- 4 -

"**Existing Collateral Trust Agreement**" has the meaning ascribed to such term in the fifth WHEREAS clause hereof.

"**Existing Financing Documents**" has the meaning ascribed to the term "Financing Documents" in the 2008 Note Purchase Agreement, as in effect immediately prior to the effectiveness of the 2008 Restructuring Agreement.

"**Existing Obligations**" – has the meaning ascribed to the term "Obligations" in the Security Agreement, as in effect immediately prior to the effectiveness of the 2008 Restructuring Agreement.

"**Foreign Collateral**" – has the meaning ascribed to such term in Section 5.11 of this Agreement.

"**Fully Funded Interest Amount**" - means, at any time, the amount of accrued and unpaid interest on the 2008 Notes that would be due on the next Scheduled Interest Payment Date assuming the outstanding principal balance of the 2008 Notes remains the same as it existed on the then most recent Scheduled Interest Payment Date (after giving effect to any principal payments made on the 2008 Notes on such date), which amount shall be set forth in a written notice from MetLife to the Collateral Trustee on each Scheduled Interest Payment Date for the period from (but not including) such date to (and including) the next succeeding Scheduled Interest Payment Date.

"**Funding Date**" – has the meaning ascribed to such term in Section 3.5(c)(i) of this Agreement.

"**Grantor**" – means each of the Trust, the Pledgor and any other Person who grants a Lien in any property to the Collateral Trustee under any 2008 Security Document or who guarantees any of the Obligations.

"**Hazardous Materials**" – means any and all pollutants, toxic or hazardous wastes or other substances that might pose a hazard to health and safety, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration of which is or shall be restricted, prohibited or penalized by any applicable law including, but not limited to, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum, petroleum products, lead based paint, radon gas or similar restricted, prohibited or penalized substances.

"**Interest Reserve Account**" has the meaning ascribed to such term in Section 3.4(a) of this Agreement.

"**Lien**" – means, with respect to any Person, any interest granted by such Person in any real or personal property which secures payment or performance of any obligation and shall include any mortgage, security deed, deed of trust, pledge lien, security interest, charge, hypothecation or other voluntary encumbrance of any kind, whether now existing or hereafter created, acquired or arising by contract, as a matter of law, by judicial process or otherwise.

"**Maximum Aggregate Revolving Loan Asset Balance**" -- means the result of (a) $107,441,733.20 minus (b) the aggregate amount of all permanent reductions in the Trust's commitment to advance funds in respect of any Revolving Loan Asset occurring after December

- 5 -

31, 2008. The Administrative Agent shall provide written notice of such amount to the Collateral Agent and MetLife on the date hereof and within 5 Business Days of any change in such amount.

"**MetLife**" – has the meaning ascribed to such term in the second WHEREAS clause hereof.

"**Noteholders**" – has the meaning ascribed to such term in the second WHEREAS clause hereof.

"**Notes**" – means the 2008 Notes and the 2007 Notes.

"**Obligations**" – shall have the meaning ascribed to such term in the 2008 Security Agreement.

"**Owner Collateral Deed of Charge**" – has the meaning ascribed to such term in Section 5.11(b).

"**Owner Trust Agreement**" - means that certain Amended and Restated Trust Agreement between Lehman Commercial Paper Inc., a New York corporation, as depositor, and the Owner Trustee relating to the Trust, and as amended, restated or otherwise modified from time to time.

"**Owner Trustee**" – has the meaning ascribed to such term in Section 8.9.

"**Person**" – means any individual, corporation, limited liability company, partnership, trust, unincorporated association, joint venture, business or other legal entity and any government or governmental authority or political subdivision thereof.

"**Proceeds**" – means "proceeds" (as such term is defined in Article 9 of the Uniform Commercial Code as in effect in the State of New York on the date of this Agreement) of the Collateral and, in any event, includes (a) any and all proceeds of any collection, sale or other disposition of the Collateral, (b) any and all amounts from time to time paid or payable under or in connection with any of the Collateral, (c) any amount collected by any 2008 Noteholder by way of set-off, deduction or counterclaim, (d) any interest on amounts from time to time held on deposit in the Collection Account, (e) amounts received by the Collateral Trustee from the 2007 Collateral Trustee for application to the 2008 Facility Obligations in accordance with the terms of the 2007 Restructuring Agreement and (f) for the avoidance of doubt, amounts received by the Collateral Trustee pursuant to Section 8.3 of the Note Purchase Agreement and Section 5.8 of the 2008 Restructuring Agreement.

"**property**" – means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Repayment Event**" – has the meaning ascribed to such term in Section 3.6 of this Agreement.

"**Responsible Officer**" – when used with respect to the Collateral Trustee, means any officer (a) within the corporate trust department of the Collateral Trustee including any vice president, assistant vice president, treasurer, assistant treasurer, trust officer or any other officer of the Collateral Trustee who customarily performs functions similar to those performed by the

- 6 -

persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and (b) who shall have direct responsibility for the administration of this Agreement.

"**Revolver Funding**" – has the meaning ascribed to such term in Section 3.5(c) of this Agreement.

"**Revolver Holding Account**" – has the meaning ascribed to such term in Section 3.5(a) of this Agreement.

"**Revolving Loan Asset**" means the Trust's interest in a Commercial Loan Note which evidences a revolving credit facility pursuant to which the obligor on such Commercial Loan Note is permitted to borrow, repay and reborrow amounts from the holder of such Commercial Loan Note.

"**Trust**" – has the meaning ascribed to such term in the introductory paragraph hereof.

"**Trust Estate**" – has the meaning ascribed to such term in the first paragraph of the Declaration of Trust hereof.

"**2007 Collateral Trustee**" – means the "Collateral Trustee" (as defined in the 2007 Note Purchase Agreement).

"**2007 Event of Default**" – means an "Event of Default" or a "Default" or the equivalent thereof as defined in any 2007 Financing Document.

"**2007 Facility Obligations**" – means (a) the "Guaranteed Obligations" under and as defined in the 2008 Guarantee of 2007 Obligations and (b) the obligations described in clause (a) of the definition of "Obligations" in the 2007 Security Agreement.

"**2007 Financing Documents**" – means the "Financing Documents" under and as defined in the 2007 Note Purchase Agreement.

"**2007 Guarantee of 2008 Obligations**" – has the meaning ascribed to such term in the fourth WHEREAS clause hereof.

"**2007 Issuer**" – has the meaning ascribed to such term in the second WHEREAS clause hereof.

"**2007 Note Purchase Agreement**" – has the meaning ascribed to such term in the second WHEREAS clause hereof.

"**2007 Noteholders**" – has the meaning ascribed to such term in the second WHEREAS clause hereof.

"**2007 Notes**" – has the meaning ascribed to such term in the second WHEREAS clause hereof.

"**2007 Restructuring Agreement**" – has the meaning ascribed to such term in the third WHEREAS clause hereof.

"**2007 Security Agreement**" – means the "Security Agreement" (as defined in the 2007 Note Purchase Agreement).

- 7 -

"**2007 Security Documents**" – means the "Security Documents" (as defined in the 2007 Note Purchase Agreement) to which the 2007 Collateral Trustee is a party.

"**2008 Event of Default**" – means an "Event of Default" or a "Default" or the equivalent thereof as defined in any 2008 Financing Document.

"**2008 Facility Obligations**" – means (a) the "Guaranteed Obligations" under and as defined in the 2007 Guarantee of 2008 Obligations and (b) the obligations described in clause (a) of the definition of "Obligations" in the 2008 Security Agreement.

"**2008 Financing Documents**" – means the "Financing Documents" (as defined in the 2008 Note Purchase Agreement).

"**2008 Guarantee of 2007 Obligations**" – has the meaning ascribed to such term in the fourth WHEREAS clause hereof.

"**2008 Note Purchase Agreement**" – has the meaning ascribed to such term in the first WHEREAS clause hereof.

"**2008 Noteholders**" – has the meaning ascribed to such term in the first WHEREAS clause hereof.

"**2008 Notes**" – has the meaning ascribed to such term in the first WHEREAS clause hereof.

"**2008 Purchasers**" – has the meaning ascribed to such term in the first WHEREAS clause hereof.

"**2008 Restructuring Agreement**" – has the meaning ascribed to such term in the third WHEREAS clause hereof.

"**2008 Security Agreement**" – means the "Security Agreement" (as defined in the 2008 Note Purchase Agreement).

"**2008 Security Documents**" means the "Security Documents" (as defined in the 2008 Note Purchase Agreement) to which the Collateral Trustee is a party.

"**UK Co-Collateral Trustee**" – has the meaning ascribed to such term in Section 5.11(b).

SECTION 2. **DECISIONS RELATING TO ADMINISTRATION AND EXERCISE OF REMEDIES VESTED IN METROPOLITAN LIFE INSURANCE COMPANY.**

*Section 2.1.    Duties of Collateral Trustee.*  The Collateral Trustee agrees to administer the 2008 Security Documents and the Collateral as directed in writing by MetLife, to collect and disburse funds as provided herein, and to make such demands and give such notices under the 2008 Security Documents as MetLife may from time to time request in writing, and to take such action to enforce the 2008 Security Documents and to realize upon, collect and dispose of the Collateral or any portion thereof as may be directed in writing by MetLife (in each case regardless of whether any other Noteholder agrees, disagrees or abstains with respect to such direction), *provided,* in each instance, such action does not conflict with the terms of this Agreement, the other 2008 Security Documents or the 2008 Restructuring Agreement.  The Collateral Trustee agrees that it will not (a) commence Enforcement without direction of MetLife, or (b) release Liens or Collateral without prior written direction from (i) MetLife that

- 8 -

such Collateral has been disposed of in compliance with Section 5.5 and 5.6 of the 2008 Restructuring Agreement or (ii) each of the Trust and MetLife in the case of any other release.

Section 2.2.    *Notice of Enforcement.*  The Collateral Trustee shall give prompt notice to each Noteholder of any action taken pursuant to the instructions of MetLife to enforce any 2008 Security Document; *provided* that the failure to give any such notice shall not create any liability or cause of action against the Collateral Trustee or impair the right of the Collateral Trustee to take any such action or the validity of any action so taken.

Section 2.3.    *Directions to Collateral Trustee.*  The Collateral Trustee may at any time request directions from MetLife as to any course of action or other matter relating hereto or relating to any 2008 Security Document or the 2008 Restructuring Agreement.  Except as otherwise provided in this Agreement, written directions given by MetLife to the Collateral Trustee hereunder shall be binding on all Noteholders for all purposes hereunder.

Section 2.4.    *Action under Financing Documents.*  Nothing contained in this Agreement shall affect the right (if any) of (a) any 2008 Noteholder to give the Obligors or any other Grantor notice of any default or to accelerate or make demand for payment of its 2008 Facility Obligations and (b) any 2007 Noteholder to give the "Obligors" or any other "Grantor" (as such terms are defined in the 2007 Note Purchase Agreement) notice of any default or to accelerate or make demand for payment of the 2007 Facility Obligations.

Section 2.5.    *Release of Collateral.*  The Collateral Trustee shall upon the written request of MetLife (or upon satisfaction of the conditions for release of Liens or Collateral specified in Section 2.1), release any Collateral under any 2008 Security Document which is required to be released pursuant to the terms of the 2008 Restructuring Agreement and execute and deliver such releases as may be necessary to terminate of record the Collateral Trustee's security interest (for the benefit of the Noteholders) in such Collateral.  In addition, the Collateral Trustee shall release all Collateral upon receipt of written notice from MetLife that all 2008 Facility Obligations and all 2007 Facility Obligations have been paid in full (other than any such obligations arising under provisions of the 2008 Financing Documents or the 2007 Financing Documents which by their terms survive termination thereof) and which notice instructs the Collateral Trustee to so release the Collateral.

Section 2.6.    *Possession of Collateral.*  The Collateral Trustee agrees that it will maintain possession of any Collateral delivered to it in New York or Illinois in such states, and it will give MetLife prompt written notice if the Collateral Trustee moves such collateral to a different state of the United States.  In no event shall the Collateral Trustee move such Collateral outside of the states of the United States without prior written consent from MetLife.

Section 2.7.    *Delivery of Participation Elevation Documents to MetLife.*  The Collateral Trustee shall hold the Elevation Documents delivered to it by the Trust pursuant to Section 3.7 of the 2008 Restructuring Agreement in safe keeping in accordance with Section 5.1 hereof.  No later than the Business Day following the earlier of the date the Collateral Trustee becomes aware of the occurrence and continuance of a 2008 Event of Default or is provided written notice thereof from MetLife, it shall provide written notice to Lehman Commercial Paper, Inc. and to the Creditors' Committee that, in accordance with the terms of this Section 2.7, the Elevation Documents will be delivered to MetLife three (3) Business Day's following the date of such notice.  On such third Business Day, the Collateral Trustee shall deliver such Elevation

- 9 -

Documents to MetLife, and such documents may thereafter be delivered by or on behalf of MetLife and the 2008 Noteholders to all appropriate parties required to effect the elevation of the participation interest or interests held by the Trust to a direct assignment interest in the underlying loan or loans.

## SECTION 3.  **APPLICATION OF PROCEEDS.**

*Section 3.1.    Payment Priorities.*    Any and all Proceeds, and other amounts paid pursuant to Section 8.4 of the Note Purchase Agreement, in each case as received by the Collateral Trustee (other than amounts to be deposited by the Collateral Trustee into (a) the Interest Funding Account in accordance with the terms of Section 3.4 and (b) the Revolver Holding Account in accordance with the terms of Section 3.5, but including amounts released from such accounts for application in accordance with this Section 3.1), together with any amounts on deposit in the Collection Account shall be applied no later than the Business Day after receipt thereof by the Collateral Trustee (except as provided in Section 3.3(b)), as follows:

*First:*  To the ratable payment of (i) the reasonable costs and expenses of any sale, collection or other realization incurred by the Owner Trustee, the Collateral Trustee, any Co-Collateral Trustee, any Custodian or any Noteholder, (ii) the fees and expenses of counsel to the Owner Trustee, the Collateral Trustee, any Co-Collateral Trustee, any Custodian and counsel to the Noteholders, (iii) all reasonable expenses, liabilities and advances made or incurred by the Owner Trustee, the Collateral Trustee, any Co-Collateral Trustee, any Custodian or any Noteholder in connection with such sale, collection or realization, and all other amounts due to the Owner Trustee, the Collateral Trustee, any Co-Collateral Trustee or any Custodian in their respective capacities as such (including, without limitation, with respect to the Owner Trustee, amounts due to it under indemnification obligations of the Trust or the Noteholder in the 2008 Financing Documents or the Owner Trust Agreement);

*Second:*  To the ratable payment (as provided in Section 3.2) of principal on the 2008 Notes together with accrued interest on the principal amount of 2008 Notes so paid;

*Third:*  To the ratable payment (as provided in Section 3.2) of any other 2008 Facility Obligations then due and owing to the 2008 Noteholders (other than those items paid pursuant to clause First of this Section 3.1); and

*Fourth:*    After indefeasible payment in full of all 2008 Facility Obligations owing to the 2008 Noteholders, *first*, to the 2007 Collateral Trustee until all 2007 Facility Obligations owing to the 2007 Noteholders have been paid in full, and *second*, to the payment to or upon the order of the applicable Grantor, or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such Proceeds or amounts or then remaining in the Interest Reserve Account or the Revolver Holding Account.

*Section 3.2.    Ratable Application.*    Payment of any amount by the Collateral Trustee to (a) each 2008 Noteholder pursuant to clause *Second* of Section 3.1 shall be based upon the

- 10 -

proportion which the principal amount of the 2008 Notes held by such 2008 Noteholder immediately prior to such payment bears to the aggregate principal amount of 2008 Notes then outstanding, (b) each 2008 Noteholder pursuant to clause *Third* of Section 3.1 shall be based upon the proportion which the amount of the 2008 Facility Obligations owing to such 2008 Noteholder immediately prior to such payment bears to the total amount of all 2008 Facility Obligations then owing to all 2008 Noteholders and (c) each 2007 Noteholder pursuant to clause *Fourth* of Section 3.1 shall be based upon the proportion which the amount of the 2007 Facility Obligations owing to such 2007 Noteholder immediately prior to such payment bears to the total amount of all 2007 Facility Obligations then owing to all 2007 Noteholders, in each case as determined in accordance with Section 4 hereof.

Section 3.3.    *Collection Account.*

(a)    The Collateral Trustee established a non-interest bearing trust account maintained at the Bank for the purposes provided herein (the "**Collection Account**") identified as the "Variable Funding Trust 2008-1 Collection Account". The Collateral Trustee and its agents shall have exclusive control and the sole right of withdrawal with respect to the Collection Account for the purpose of making deposits in and withdrawals from the Collection Account in accordance with this Collateral Trust Agreement. All monies and other property deposited or held from time to time in the Collection Account shall be held by the Collateral Trustee in trust for the exclusive benefit of the Noteholders and for distribution as herein provided, including (and subject to) any priority of payments provided for herein. Upon the written direction of the Trust, the Collateral Trustee shall invest such monies in open-end regulated investment companies that limit their investments to short-term securities issued by the United States of America and agencies thereof (which regulated investment companies may include those managed by the Bank or any of its affiliates). All interest and other amounts earned shall become part of the Collateral and shall be distributed at the times and as otherwise provided in this Section 3. The Collateral Trustee shall not be liable for any loss on any investment of monies or the liquidation of any investment pursuant to any provision of this Agreement or any instructions provided under this Agreement. Deposits into the Collection Account may be made in Dollars, subject to prior notice to the Collateral Trustee, or in a currency other than Dollars which the Collateral Trustee is able to accept into the Collection Account. The Collateral Trustee or the Co-Collateral Trustee shall establish any sub-accounts of the Collection Account or any other account as are necessary to accept the deposit of such non-Dollar currencies of which it has been notified and is able to accept. For the avoidance of doubt, any amounts received in a currency other than Dollars will be held in such currency, and shall be distributed from the Collection Account (or, as the case may be such sub-account or other account) in such currency, and the Collateral Trustee shall not be responsible for effecting any foreign exchange transactions to convert such currency into Dollars.

(b)    The Collateral Trustee shall, unless otherwise directed by MetLife, distribute the full amount on deposit in the Collection Account in accordance with the priorities set forth in Section 3.1 on each Scheduled Interest Payment Date and at any time when the amount on deposit therein is at least $100,000.

(c)    Notwithstanding anything to the contrary in Section 3.4, Section 3.5 or elsewhere in this Agreement, if at any time a payment is received into the Collection Account which constitutes a permanent reduction of the Trust's commitment to advance funds in respect of any

- 11 -

Revolving Loan Asset, the Trust shall promptly notify the Collateral Trustee thereof and the amount of such payment shall remain in the Collection Account for distribution in accordance with Section 3.3(b) above (and, for the avoidance of doubt, will not be deposited to the Interest Reserve Account or the Revolver Holding Account).

Section 3.4.    *Interest Reserve Account.*

(a)    The Collateral Trustee has established a non-interest bearing trust account maintained at the Bank for the purposes provided herein (the "**Interest Reserve Account**") identified as the "Variable Funding Trust 2008-1 Interest Reserve Account." The Collateral Trustee and its agents shall have exclusive control and the sole right of withdrawal with respect to the Interest Reserve Account for the purpose of making deposits in and withdrawals from the Interest Reserve Account in accordance with this Collateral Trust Agreement. All monies and other property deposited or held from time to time in the Interest Reserve Account shall be held by the Collateral Trustee in trust for the exclusive benefit of the Noteholders (subject to clause (b) below) and for distribution as herein provided, including (and subject to) any priority of payments provided for herein. Upon the written direction of the Trust, the Collateral Trustee shall invest such monies in open-end regulated investment companies that limit their investments to short-term securities issued by the United States of America and agencies thereof (which regulated investment companies may include those managed by the Bank or any of its affiliates). All interest and other amounts earned shall become part of the Collateral and shall be distributed at the times and as otherwise provided in this Section 3. The Collateral Trustee shall not be liable for any loss on any investment of monies or the liquidation of any investment pursuant to any provision of this Agreement or any instructions provided under this Agreement.

(b)    At any time that the Interest Reserve Account contains funds and investments in an aggregate amount less than the Fully Funded Interest Amount at such time and (i) the Collateral Trustee receives a payment with respect to any Note Asset for which the information required to be provided to the Collateral Trustee under Section 3.3(a)(ii) of the Administration Agreement is not provided concurrently therewith, the full amount of such payment (up to the Fully Funded Interest Amount) shall be deposited to the Interest Reserve Account until the earlier of (A) the date such information is so provided, in which event such payment shall be allocated as set forth in subclause (ii) of this clause (b) and (B) the Scheduled Interest Payment Date next succeeding the date such payment is received by the Collateral Trustee, on which date such amount shall be applied in accordance with clause (c) of this Section 3.4 below, or (ii) the Collateral Trustee receives a payment with respect to any Note Asset for which the information required to be provided to the Collateral Trustee under Section 3.3(a)(ii) of the Administration Agreement is provided prior to the Scheduled Interest Payment Date next succeeding the date such payment is received by the Collateral Trustee, (A) if such payment contains or constitutes interest (either alone or together with some other amount that is not principal relating to such interest), the amount of such interest shall be deposited to the Interest Reserve Account and any such other amounts shall be applied as set forth in the succeeding subclause (B), and (B) if (and to the extent) such payment constitutes principal on a Note Asset together with interest on the principal amount so paid, or constitutes principal (without interest thereon), a fee or other amount (that is not interest) in respect of a Note Asset, the amount of such payment shall be applied in accordance with Section 3.5(b) or Section 3.1, as the case may be. At any time the Interest Reserve Account contains funds and investments in an aggregate amount equal to or in excess of the Fully Funded Interest Amount at such time, amounts received by the Collateral

- 12 -

Trustee in respect of Note Assets shall be applied on the Business Day following receipt thereof in accordance with Section 3.5(b) or Section 3.1, as the case may be.

(c)     On each Scheduled Interest Payment Date, the Collateral Trustee shall disburse the entire balance standing to the credit of the Interest Reserve Account to the 2008 Noteholders to pay accrued and unpaid interest on the 2008 Notes due and owing on such date.   Such payment shall be made ratably to each 2008 Noteholder based upon the proportion which the principal amount of the 2008 Notes held by such 2008 Noteholder immediately prior to such payment bears to the aggregate principal amount of 2008 Notes outstanding on such date, all as set forth in a written notice from MetLife to the Collateral Trustee delivered at least 3 Business Days prior to such Scheduled Interest Payment Date.

Section 3.5.    Revolver Holding Account.

(a)     The Collateral Trustee has established a non-interest bearing trust account maintained at the Bank for the purposes provided herein (the "**Revolver Holding Account**") identified as the "Variable Funding Trust 2008-1 Revolver Holding Account."   The Collateral Trustee and its agents shall have exclusive control and the sole right of withdrawal with respect to the Revolver Holding Account for the purpose of making deposits in and withdrawals from the Revolver Holding Account in accordance with this Collateral Trust Agreement.   All monies and other property deposited or held from time to time in the Revolver Holding Account shall be held by the Collateral Trustee in trust for the exclusive benefit of the Noteholders (subject to clause (b) below) and for distribution as herein provided, including (and subject to) any priority of payments provided for herein.   Upon the written direction of the Trust, the Collateral Trustee shall invest such monies in open-end regulated investment companies that limit their investments to short-term securities issued by the United States of America and agencies thereof (which regulated investment companies may include those managed by the Bank or any of its affiliates).   All interest and other amounts earned shall become part of the Collateral and shall be distributed at the times and as otherwise provided in this Section 3.   The Collateral Trustee shall not be liable for any loss on any investment of monies or the liquidation of any investment pursuant to any provision of this Agreement or any instructions provided under this Agreement.

(b)     At any time that the Interest Reserve Account contains funds and investments in an aggregate amount equal to or in excess of the Fully Funded Interest Amount at such time, the Collateral Trustee shall deposit to the Revolver Holding Account all principal repayments and other amounts received by it in respect of Revolving Loan Assets until the Revolver Holding Account contains funds and investments in an aggregate amount equal to or in excess of the Maximum Aggregate Revolving Loan Asset Balance.   At all times when the funds and investments held in the Revolver Holding Account equals or exceeds the Maximum Aggregate Revolving Loan Asset Balance all other amounts received by the Collateral Trustee in respect of Revolving Loan Assets (other than amounts deposited to the Interest Reserve Account in accordance with Section 3.4 above that have not been released from such account in accordance with the terms of such Section) shall be applied in accordance with Section 3.1 above.

(c)     The Trust may from time to time request that an amount on deposit in the Revolver Holding Account up to, but not exceeding, the Maximum Aggregate Revolving Loan Asset Balance at such time, be released by the Collateral Trustee from the Revolver Holding Account to fund an obligation of the Trust to make a revolving loan (a "**Revolver Funding**")

- 13 -

under the Note Asset Documentation relating to any Revolving Loan Asset; provided that the following conditions are met in connection therewith:

(i)    such request is made to the Collateral Trustee in writing at least 2 Business Days prior to the date (the "**Funding Date**") such Revolver Funding is required to be made under the terms of the Note Asset Documentation relating thereto, which request shall identify:

(A)    the underlying borrower and the facility pursuant to which such Revolver Funding is so required to be made;

(B)    the amount of the Revolver Funding so requested;

(C)    the Funding Date; and

(D)    wiring instructions for an account of the borrower to which the Revolver Funding is to be deposited in accordance with the terms of such Note Asset Documentation; and

(ii)    under the terms of such Note Asset Documentation, the Trust shall be required to provide such Revolver Funding in the amount so requested and the Trust shall have certified as to the same to the Collateral Trustee.

Provided such conditions are met, and the Collateral Trustee has not become aware (and has not been provided with notice) of the existence of any 2007 Event of Default or 2008 Event of Default that is continuing, the Collateral Trustee will disburse the Revolver Funding on the Funding Date in accordance with the wiring instructions so provided.

(d)    The Collateral Trustee, pursuant to the direction of MetLife, shall make distributions to the 2008 Noteholders or to the 2007 Collateral Trustee for distribution to the 2007 Noteholders (in accordance with the priorities set forth in Section 3.1) from the Revolver Holding Account (i) at any time when the amount on deposit therein exceeds the Maximum Aggregate Revolving Loan Asset Balance at such time by at least $100,000, and (ii) if any amount in excess of the Maximum Aggregate Revolving Loan Asset Balance at any time is on deposit therein and the Collateral Trustee has not made a distribution therefrom within the previous 90 days, in each case in an amount equal to the amount of such excess over the Maximum Aggregate Revolving Loan Asset Balance at such time.

Section 3.6.    *Invalidated Payments.*    Each Noteholder, by its acceptance of any payment pursuant to this Agreement, shall be deemed to have agreed with the Collateral Trustee, and the Collateral Trustee hereby agrees, that if the Collateral Trustee or any Noteholder receives any amount pursuant to this Agreement that is subsequently required to be returned or repaid by the Collateral Trustee or such Noteholder to the Obligors, any other Grantor or any Affiliate thereof or their respective representatives or successors in interest, whether by court order, settlement or otherwise (a "**Repayment Event**"), then

(a)    if the Repayment Event results in the Collateral Trustee being required to return or repay any amount distributed by it to the Noteholders under this Agreement, each Noteholder to which such amount was distributed shall, forthwith upon its receipt of a notice thereof from the Collateral Trustee, pay the Collateral Trustee an amount equal to its ratable share (based on the amount distributed to such Noteholder) of the amount required to be returned or repaid

- 14 -

A/73038410.17

relating to such Repayment Event, together with its ratable share (determined in the same manner) of any interest required to be paid on the amount so returned or repaid,

(b)  if the Repayment Event results in any Noteholder being required to return or repay any amount received by it for its own account under this Agreement to the Obligors, any other Grantor or any Affiliate thereof or their respective representatives or successors in interest (any such Noteholder, an "**Affected Noteholder**") and such Repayment Event is not the direct result of such Affected Noteholder's willful misconduct, each other Noteholder shall, forthwith upon its receipt of a notice thereof from the Affected Noteholder, pay the Collateral Trustee an amount for distribution to such Affected Noteholder such that, after giving effect to such payment and distribution, all Noteholders shall have received such proportion of the amount distributed by the Collateral Trustee hereunder as they would have received had the original payment which gave rise to such Repayment Event not occurred (such payment by each other Noteholder to be accompanied by such Noteholder's ratable share (based on the amount received by such Noteholder) of any interest which the Affected Noteholder is required to pay on the amount so returned or repaid), and

(c)  in either case, the Collateral Trustee shall thereafter apply amounts received hereunder in a manner consistent with the terms of this Agreement such that all Noteholders receive such proportion of such amounts as they would have received had the original payment which gave rise to such Repayment Event not occurred; it being understood that if any Noteholder shall fail to promptly pay any such amount to the Collateral Trustee, the Collateral Trustee shall deduct such amount from any amount payable thereafter to such Noteholder under this Agreement.  It is agreed and understood that to the extent any Noteholder returns an amount paid to it as a result of a Repayment Event, the Trust will remain liable to pay to such Noteholder all such amounts so returned.

*Section 3.7.    Monthly Payment Report.*    The Collateral Trustee shall provide to the Noteholders on or prior to the fifth Business Day of each calendar month, a report setting forth any payments made from the assets of the Trust Estate under this Section 3 during the immediately preceding month (by amount, payee name, account and purpose).  The Noteholders acknowledge that the Collateral Trustee shall incur no liability for any delay in the delivery of such reports absent the gross negligence or willful misconduct of the Collateral Trustee.

SECTION 4.  **INFORMATION.**

If the Collateral Trustee proceeds to enforce any 2008 Security Document or is to make a distribution pursuant to Section 3, or proposes, or is directed or requested, to take any other action pursuant to or contemplated by this Agreement, each Noteholder, by its acceptance of a Note secured by the Collateral comprising the Trust Estate, shall be deemed to have agreed that it shall promptly from time to time, upon the written request of the Collateral Trustee, (a) notify the Collateral Trustee of the outstanding 2008 Facility Obligations or 2007 Facility Obligations owed to such Noteholder, as the case may be, as at such date as the Collateral Trustee may specify and (b) notify the Collateral Trustee of any payment received thereafter by such Noteholder to be applied to satisfy the 2008 Facility Obligations or 2007 Facility Obligations, as the case may be, owing to such Noteholder.  Until such time as the Collateral Trustee has received information it has requested from the Noteholders or the Administrative Agent pursuant

- 15 -

to the foregoing sentence, it shall not be required to take any action which is dependent on its having such information.

## SECTION 5.  COLLATERAL TRUSTEE DUTIES, RESPONSIBILITIES, INDEMNITY, ETC.

*Section 5.1.    Certain Duties and Responsibilities of Collateral Trustee.*

(a)    If no 2008 Event of Default or 2007 Event of Default shall have occurred and be continuing:

(i)    the Collateral Trustee undertakes to perform, and shall perform, such duties and only such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Collateral Trustee; and

(ii)    in the absence of bad faith on its part, the Collateral Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Collateral Trustee and conforming to the requirements hereof or of the other 2008 Financing Documents; but in the case of any such certificates or opinions that by any provision hereof are specifically required to be furnished to the Collateral Trustee, the Collateral Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements hereof (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(b)    If a 2008 Event of Default or 2007 Event of Default has occurred and is continuing, the Collateral Trustee shall exercise such of the rights and powers vested in it hereby for the benefit of the Noteholders, and in such exercise use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of its own affairs.

(c)    No provision hereof shall be construed to relieve the Collateral Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of Section 5.1(a) hereof;

(ii)    the Collateral Trustee shall not be liable for any error of judgment made in good faith by an officer or by an employee of the Collateral Trustee delegated responsibility for such judgment with due care, unless it shall be proved that the Collateral Trustee, such officer or such employee was negligent in ascertaining the pertinent facts;

(iii)    the Collateral Trustee shall not be liable to any Noteholder with respect to any action taken or omitted to be taken by it, in good faith in accordance with the direction of MetLife as provided herein (and any action taken or failure to act pursuant thereto, shall be binding on all Noteholders); and

(iv)    the Collateral Trustee shall not be liable to any Noteholder with respect to failure of the Collateral Trustee to take any action under this Agreement or any of the other 2008 Financing Documents that the Collateral Trustee is directed to take by MetLife, if such action, in the good faith opinion of the Collateral Trustee, would be unlawful or contrary to the terms and provisions hereof or the other 2008 Financing Documents.

- 16 -

(d)    No provision hereof shall require the Collateral Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)    Whether or not therein expressly so provided, every provision hereof relating to the conduct or affecting the liability of or affording protection to the Collateral Trustee shall be subject to the provisions of this Section.

(f)    The Collateral Trustee shall mail to each Noteholder and each Obligor written notice of each and every 2008 Event of Default or 2007 Event of Default of which a Responsible Officer shall have actual knowledge as soon as possible and, in any event, within five Business Days of the gaining of such knowledge.

(g)    The Collateral Trustee shall mail to each Noteholder a copy of all correspondence, notices, opinions and other documents received by the Collateral Trustee from any Guarantor as soon as possible and, in any event, within five Business Days of such receipt (unless, with respect to any such holder, the copy of such document received by the Collateral Trustee indicates that, or the Collateral Trustee otherwise reasonably determines that, copies of such document have also been sent to such holder).

(h)    Whether or not a 2008 Event of Default or 2007 Event of Default shall exist, the Collateral Trustee shall enter into such amendments to any one or more of the 2008 Financing Documents to which it is a party as may be requested by MetLife (subject to Section 7.1); *provided,* that no such amendment shall adversely affect the rights and duties of the Collateral Trustee without its consent.

*Section 5.2.    Collateral Trustee's Rights to Compensation and Indemnification.*

(a)    The Trust will:

(i)    pay to the Collateral Trustee from time to time, and the Collateral Trustee shall be entitled to, such compensation for all services rendered by the Collateral Trustee in the execution of the trusts created hereby and in the exercise and performance of any of the powers and duties of the Collateral Trustee hereunder as the Trust or such Grantor and the Collateral Trustee shall from time to time agree in writing, which compensation shall not be limited by any provisions of law in regard to the compensation of a trustee of an express trust, and if a 2008 Event of Default or 2007 Event of Default shall occur and be continuing, the Collateral Trustee shall be entitled to receive reasonable compensation with respect to its additional responsibilities hereunder;

(ii)    indemnify and save harmless the Collateral Trustee and the Bank from and against any liability and damage that the Collateral Trustee or the Bank may incur or sustain, in the exercise and performance of any of the duties, rights or remedies of the Collateral Trustee hereunder in good faith and without negligence, including, but not limited to, the cost and expenses of defending the Collateral Trustee against any claim or liability in connection with the exercise or performance of any of its powers or duties under this Agreement or under any of the other 2008 Financing Documents to which it is a party, and any loss, liability, expenses or claim arising out of its possession, management or control of the Trust Estate; and

- 17 -

(iii)   pay to the Collateral Trustee, from time to time upon demand, all fees, costs and expenses of the Collateral Trustee (including, without limitation, the reasonable fees and disbursements of such special or local counsel as the Collateral Trustee elects to retain and of any other Person not in its regular employ) (A) incurred by any Person in becoming the Collateral Trustee, (B) arising in connection with the enforcement of any of the provisions of this Agreement or the other 2008 Financing Documents to which the Collateral Trustee is a party, (C) incurred or required to be advanced in connection with the performance of its obligations hereunder, the administration of the Collateral or the 2008 Security Documents, the sale or other disposition of the Trust Estate and the preservation, protection or defense of the Collateral Trustee's rights under this Agreement and the other 2008 Financing Documents to which it is a party and in and to the Trust Estate, or (D) incurred in connection with the receipt or disbursement of other funds hereunder.

(b)   The Collateral Trustee agrees that it shall have no right against any Noteholder for the payment of compensation for its services hereunder or any expenses or disbursements incurred in connection with the exercise and performance of its powers and duties hereunder (other than its right to indemnification prior to taking action pursuant to Section 5.3(e) hereof) or any indemnification against liability that the Collateral Trustee may incur in the exercise and performance of such powers and duties, but on the contrary, the Collateral Trustee agrees that it shall look solely to the Obligors for such payment and indemnification; *provided* that it shall have a Lien on and security interest in the Trust Estate, prior to the Lien securing the Obligations and other obligations secured by the Trust Estate, as security for such compensation, expenses, disbursements and indemnification (except against liability of the Collateral Trustee if any be conclusively established to have resulted from its failure to perform its obligation hereunder or its negligence or willful misconduct).

(c)   The provisions of this Section 5.2 shall survive termination of this Agreement and payment or prepayment of the Obligations.

*Section 5.3.   Exculpation; Other Rights of Collateral Trustee.*

(a)   The Collateral Trustee shall not be responsible for any recitals or representations of any Obligor herein, or for insuring the Trust Estate, nor shall the Collateral Trustee be bound to ascertain or inquire as to the performance or observance of any covenants, conditions or agreements contained herein, and, except in the case of a 2008 Event of Default or a 2007 Event of Default of which the Collateral Trustee has actual knowledge, the Collateral Trustee shall be deemed to have knowledge of a 2008 Event of Default or a 2007 Event of Default only upon receipt of written notice thereof from any Obligor or one of the Noteholders.

(b)   The Collateral Trustee makes no representation or warranty as to the validity, sufficiency or enforceability with respect to any Obligor of this Agreement, the Obligations, the other 2008 Financing Documents, or any instrument included in the Trust Estate, or as to the value, title, condition, fitness for use of, or maintenance or adequacy of insurance on, or otherwise with respect to, any tangible collateral or any substitute therefor included within the Trust Estate. The Collateral Trustee shall not be accountable to anyone for the use or application of any of the Obligations or the proceeds thereof or for the use or application of any property, or the proceeds thereof that shall be released from the Lien and security interest of the Trust Estate in accordance with the provisions hereof. The Collateral Trustee makes no representation or warranty as to the original attachment, perfection or priority of the security interests and Liens

- 18 -

contemplated by this Agreement, the Obligations, the other 2008 Financing Documents, or any instrument included in the Trust Estate.

(c)     The Collateral Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document believed by it, in good faith, to be genuine and to have been signed or presented by the proper party or parties.

(d)     The Collateral Trustee may consult with counsel, appraisers, engineers, accountants and other skilled persons to be selected by the Collateral Trustee, and the advice of any thereof shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder, in good faith and in reliance thereon.

(e)     The Collateral Trustee shall be under no obligation to take any action to protect, preserve or enforce any rights or interests in the Trust Estate or to take any action toward the execution or enforcement of the trusts hereunder or any 2008 Security Document, whether on its own motion or on the request of any other Person, that in the opinion of the Collateral Trustee may involve loss, liability or expense to it, unless one or more Obligors or one or more holders of the Obligations or other obligations secured hereby shall offer and furnish security or indemnity reasonably satisfactory to the Collateral Trustee against loss, liability and expense to the Collateral Trustee.

(f)     The Collateral Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document, unless requested in writing to do so by any Noteholder.

(g)     The Collateral Trustee may execute any of the trusts or powers hereunder or perform any duties under this Agreement either directly or by or through agents or attorneys, and the Collateral Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed by it with due care.

(h)     Whenever pursuant to the provisions hereof or of any of the other 2008 Financing Documents it is required that any Obligor obtain the consent or approval of the Collateral Trustee, or that any matter prove satisfactory to the Collateral Trustee, the Collateral Trustee, prior to giving any such consent or approval or indicating the satisfaction of the Collateral Trustee with any such matter, may, but shall not be required to, consult with the Noteholders in a manner deemed reasonable by the Collateral Trustee, and the Collateral Trustee shall be fully protected in following any direction of MetLife.

(i)     The Collateral Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement.

(j)     In no event shall the Collateral Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)     In no event shall the Collateral Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or

- 19 -

indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(l)     The Collateral Trustee may request that MetLife, the Trust, the Administrative Agent and any other Grantor deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Agreement.

Section 5.4.    *Showings Deemed Necessary by Collateral Trustee.* Anything elsewhere herein contained to the contrary notwithstanding, the Collateral Trustee shall have the right, but shall not be required, to demand in respect of (a) the release of any Collateral, (b) the withdrawal of any cash, (c) the release of any property, (d) the subjection of any after-acquired property to the Liens of any of the 2008 Financing Documents to which it is a party, or (e) any other action whatsoever within the purview hereof, any showings, certificates, opinions, appraisals or other information by the Collateral Trustee deemed necessary or appropriate in addition to the matters by the terms hereof required as a condition precedent to such action.

Section 5.5.    *Determination of Noteholders; Subsequent Noteholders Bound.* The Collateral Trustee may deem and treat the holder of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof, signed by such holder and in form reasonably satisfactory to the Collateral Trustee, shall have been filed with the Collateral Trustee. Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the holder of any Note or other evidence of indebtedness or obligation shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note and of any Note or Notes issued in exchange therefor.

Section 5.6.    *Resignation and Removal.* The Person acting as Collateral Trustee may resign at any time by giving at least 30 days prior written notice thereof to the Trust and the Noteholders. The Person acting as Collateral Trustee may be removed as the Collateral Trustee at any time by (i) MetLife in its sole discretion, or (ii) by the Trust if it shall have notified MetLife in writing that it reasonably believes the Collateral Trustee is not fully performing its obligations thereunder. In the event of any such resignation or removal (whether at the request of MetLife or the Trust) of the Person acting as Collateral Trustee, MetLife shall thereupon have the right to appoint a successor Collateral Trustee. If no successor Collateral Trustee shall have been so appointed by MetLife and shall have accepted such appointment within thirty (30) days after the notice of the intent of the Person acting as Collateral Trustee to resign or the removal of the Collateral Trustee, a successor Collateral Trustee may be appointed, upon application of the retiring Collateral Trustee or MetLife, by any court of competent jurisdiction. Any successor Collateral Trustee appointed pursuant to this clause shall be a commercial bank, trust company or other financial institution organized under the laws of the United States of America or any state thereof, have capital, surplus and undivided profit aggregating at least $500,000,000, and have long-term debt obligations (or if such successor shall not have long-term debt obligations and such successor is a subsidiary of a holding company, such holding company shall have long-term debt obligations) having a rating of "A" or better from a rating agency of national reputation. Any new Collateral Trustee shall execute, acknowledge and deliver to the Trust and

- 20 -

each Noteholder an instrument accepting its appointment in such capacity and thereupon such new Collateral Trustee, without any further act, deed or conveyance, shall become vested with all the estates, properties, rights, powers and trusts of its predecessor in the rights under this Agreement with like effect as if originally named as Collateral Trustee herein; but, nevertheless upon the written request of the Trust, MetLife or of the successor Collateral Trustee and payment of all amounts then owing to the Collateral Trustee ceasing to act, the Collateral Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Collateral Trustee, upon the trusts expressed herein, all the estates, properties, rights, powers and trusts of the Collateral Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by such Collateral Trustee to the successor Collateral Trustee so appointed in its place. Upon acceptance of appointment by a successor trustee as provided in this Section 5.6, the Trust shall give to all holders of Notes and other obligations secured by the Trust Estate written notice of the succession of such trustee to the trusts under this Agreement, by mail, first-class postage prepaid. Neither failure so to mail nor any defect in the notice so mailed shall affect the sufficiency of the proceedings in question. After any retiring Collateral Trustee's resignation or removal hereunder, the provisions of Section 5 shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Trustee.

Section 5.7. *Instructions Regarding Ambiguous Provisions.* If, with respect to any proposed action to be taken by it, the Collateral Trustee shall determine in good faith that the provisions of this Agreement relating to the functions or powers of the Collateral Trustee are or may be ambiguous or inconsistent, the Collateral Trustee shall notify MetLife identifying the proposed action and the provisions it considers to be ambiguous or inconsistent, and may decline either to perform such function or responsibility or to exercise such power unless it has received the written confirmation of MetLife that MetLife concurs that the action proposed to be taken by the Collateral Trustee is consistent with the terms of this Agreement or is otherwise appropriate. The Collateral Trustee shall be fully protected in acting or refraining from acting upon the confirmation of MetLife in this respect, and such confirmation shall be binding upon all Noteholders.

Section 5.8. *Limitation on Duty of Collateral Trustee in Respect of Collateral.*

(a)     Beyond the exercise of reasonable care in the custody thereof, the Collateral Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto, and the Collateral Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Trustee in good faith.

(b)     The Collateral Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or

- 21 -

omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Trust to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Collateral Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or any other document by the Trust or any other Obligor or any Noteholder.

Section 5.9.    *Assumption of Rights, Not Assumption of Duties.*    Notwithstanding anything to the contrary contained herein:

(a)    each of the parties thereto will remain liable under each of the 2008 Security Documents (other than this Agreement) to the extent set forth therein to perform all of their respective duties and obligations thereunder to the same extent as if this Agreement had not been executed;

(b)    the exercise by the Collateral Trustee of any of its rights, remedies or powers hereunder will not release such parties from any of their respective duties or obligations under the other 2008 Financing Documents or under any 2007 Financing Document; and

(c)    the Collateral Trustee will not be obligated to perform any of the obligations or duties of any of the parties thereunder other than the Collateral Trustee.

Section 5.10.    *No Liability for Clean Up of Hazardous Materials.*    In the event that the Collateral Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Collateral Trustee's sole discretion may cause the Collateral Trustee to be considered an "owner or operator" under any environmental laws or otherwise cause the Collateral Trustee to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Trustee reserves the right, instead of taking such action, either to resign as Collateral Trustee or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Collateral Trustee will not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Trustee's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any Hazardous Materials into the environment.

Section 5.11.    *Concerning the Collateral Trustee and the Collateral.*

(a)    The Collateral Trustee shall have no duty to act outside of the United States in respect of any Collateral located in a jurisdiction other than the United States ("**Foreign Collateral**") but shall at the specific request of MetLife appoint a Person or Persons (each such Person, a "**Co-Collateral Trustee**") to act on behalf of the Noteholders with respect to such Foreign Collateral. The Trust and any Co-Collateral Trustee shall, *provided* the same are reasonably acceptable to the Collateral Trustee, enter into a collateral assignment, pledge agreement, mortgage, enforcing document or other security agreement purporting to relate to the Lien or security interest in such item of Foreign Collateral pursuant to which such Co-Collateral Trustee shall exercise the rights and remedies of the Collateral Trustee and Noteholders in the

- 22 -

A/73038410.17

Collateral for their respective benefit. The duties and responsibilities of the Collateral Trustee with respect to any Co-Collateral Trustee and any Foreign Collateral are limited to those set forth in this Section 5.

(b)    Pursuant to and in accordance with this Section 5.11, MetLife has directed, and hereby confirms such direction to, the Collateral Trustee to appoint The Bank of New York Mellon, London Branch (f/k/a The Bank of New York, London Branch) (the "**UK Co-Collateral Trustee**"), and the Collateral Trustee has directed, and hereby confirms such direction to, appoint the UK Co-Collateral Trustee, to act as a Co-Collateral Trustee with respect to the Foreign Collateral identified in, and in accordance with the terms of, that certain Trust Deed of Charge, dated September 30, 2009, entered into among Lehman Commercial Paper, Inc., Lehman Commercial Mortgage Conduit Limited, the Trust, the Collateral Trustee and the UK Co-Collateral Trustee (as amended, restated or otherwise modified from time to time, the "**Owner Collateral Deed of Charge**"). In furtherance, and not in limitation, of the UK Co-Collateral Trustee's rights under the Owner Collateral Deed of Charge, all of the rights, privileges, protections, immunities and benefits given to the Collateral Trustee hereunder, including its right to be indemnified, are extended to, and shall be enforceable by, the UK Co-Collateral Trustee under the Owner Collateral Deed of Charge as if set forth therein in full.

> Section 5.12.    *Resignation of the UK Co-Collateral Trustee.*

(a)    The UK Co-Collateral Trustee may resign and appoint one of its affiliates acting through an office in the United Kingdom as successor by giving notice to the Collateral Trustee and to the Trust.

(b)    Alternatively, the UK Co-Collateral Trustee may resign by giving notice to the Collateral Trustee and the Trust, in which case the Collateral Trustee may appoint a successor UK Co-Collateral Trustee.

(c)    If the Collateral Trustee has not appointed a successor UK Co-Collateral Trustee in accordance with paragraph (b) above within 30 days after notice of resignation was given, the UK Co-Collateral Trustee (after consultation with the Collateral Trustee) may appoint a successor UK Co-Collateral Trustee (acting through an office in the United Kingdom).

(d)    The retiring UK Co-Collateral Trustee shall, at its own cost, make available to the successor UK Co-Collateral Trustee such documents and records and provide such assistance as the successor UK Co-Collateral Trustee may reasonably request for the purposes of performing its functions as UK Co-Collateral Trustee under the 2008 Financing Documents.

(e)    The UK Co-Collateral Trustee's resignation notice shall only take effect upon the appointment of a successor.

(f)    Upon the appointment of a successor, the retiring UK Co-Collateral Trustee shall be discharged from any further obligation in respect of any of the 2008 Financing Documents but shall remain entitled to the benefit of this Section 5.12. Its successor and each of the other parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original party.

SECTION 6.    **REPRESENTATIONS AND WARRANTIES.**

Each of the Trust and the Collateral Trustee represents and warrants that (i) the execution, delivery and performance of this Agreement (A) have been duly authorized by all

- 23 -

requisite corporate or other action, as applicable, on its part and, in the case of the Collateral Trustee, by the Noteholders and (B) do not conflict with or result in any breach or contravention of any provision of its organizational documents or any agreement or other instrument binding upon it; and (ii) this Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

## SECTION 7. **SUPPLEMENTAL AGREEMENTS; WAIVERS.**

*Section 7.1.     No Supplemental Trust Agreements Without Consent.* This Agreement and any other 2008 Financing Document to which the Collateral Trustee is a party may be amended, supplemented, waived or otherwise modified only in accordance with the provisions of Section 7.2 below.

*Section 7.2.     Waivers and Consents; Supplemental Agreements with Consent.* Upon the written waiver or consent of MetLife:

(a)     the Collateral Trustee shall execute an appropriate instrument permitting any Person to take any action prohibited, or omit the taking of any action required, by any of the provisions hereof or any 2008 Financing Document to which the Collateral Trustee is a party; and

(b)     any Obligor and the Collateral Trustee may enter into a written agreement or agreements, executed by both of such parties, modifying or amending any 2008 Security Document to which the Collateral Trustee is a party;

*provided* that no such waiver, consent or amending or modifying agreement shall, without the written consent and agreement of the Collateral Trustee and all of the Noteholders, modify the rights, duties or immunities of the Collateral Trustee.

## SECTION 8. **MISCELLANEOUS.**

*Section 8.1.     Notices.* All notices and other communications provided for herein shall be in writing and may be sent by overnight air courier or facsimile communication and shall be deemed to have been given when delivered by overnight air courier or upon receipt of facsimile communication. For the purposes hereof, the address of each party hereto for notices shall be as forth below:

| | |
|---|---|
| Collateral Trustee: | The Bank of New York Mellon Trust Company, N.A. |
| | 2 North LaSalle Street |
| | Suite 1020 |
| | Chicago, Illinois 60602 |
| | Attn.: Global Corporate Trust |
| | Telecopier No.: (312) 827-8542 |
| | Telephone No.: (312) 827-8618 |

or at such other address as the Collateral Trustee shall have furnished in writing to the Trust (on behalf of itself and the other Obligors) and the Noteholders;

- 24 -

The Trust:                  Variable Funding Trust 2008-1
                            c/o U.S. Bank Trust National Association
                            300 Delaware Avenue, 9th Floor
                            Wilmington, Delaware 19801
                            Attn.: David Kolibachuk, Vice President
                            Telecopier No.: (212) 809-5469
                            Telephone No.: (212) 361-2459

or at such other address as the Trust shall have furnished in writing to the Collateral Trustee and
all of the Noteholders;

MetLife or any 2008 Noteholder:  to MetLife at the address specified for such
communications in accordance with Section 18 of the 2008 Note Purchase Agreement, or at such
other address as MetLife may designate by notice duly given in accordance with this Section 8.1
to the Collateral Trustee and the Trust (which other address shall be entered into the register
maintained in accordance with Section 8.3);

Any 2007 Noteholder: to such 2007 Noteholder at the address specified for such
communications in accordance with Section 18 of the 2007 Note Purchase Agreement, or at such
other address as such 2007 Noteholder may designate by notice duly given in accordance with
this Section 8.1 to the Collateral Trustee and the Trust (which other address shall be entered into
the register maintained in accordance with Section 8.3);

The Administrative Agent:

                            Lehman Commercial Paper, Inc.
                            1271 Avenue of the Americas,
                            39th Floor
                            New York, New York 10020
                            Attention: Mr. Al Picallo
                            Phone: 646-285-9072
                            Fax:   646-834-0541

; and

The Creditors' Committee:   Official Committee of Unsecured Creditors of
                            Lehman Brothers, et al.
                            c/o Milbank, Tweed, Hadley & McCloy LLP
                            1 Chase Manhattan Plaza
                            New York, New York 10005
                            Attn: Dennis F. Dunne, Esq., Dennis O'Donnell,
                            Esq. and Evan Fleck, Esq.

Section 8.2.    Successors and Assigns.  This Agreement shall be binding upon and inure
to the benefit of the parties hereto and their respective successors and assigns.  Each transferee of
Notes shall take such Notes subject to the provisions of this Agreement and to any request made,
waiver or consent given or other action taken or authorized hereunder by each previous holder of
such Notes prior to the receipt by the Collateral Trustee of written notice of such transfer from
the transferee or in accordance with Section 8.3; and, except as expressly otherwise provided in
such notice, the Collateral Trustee shall be entitled to assume conclusively that the transferee

- 25 -

named in such notice shall thereafter be vested with all rights and powers as a Noteholder under this Agreement (unless and until notified otherwise). Upon the written request of any Noteholder, the Collateral Trustee will provide such Noteholder with copies of any written notices of transfer received pursuant hereto.

Section 8.3.    *Note Register.*    The Trust will provide to the Collateral Trustee, upon the initial issuance of the Notes and each transfer of any Note, a copy of the register for the registration and transfer of the Notes maintained by the Trust pursuant to Section 13.1 of the 2008 Note Purchase Agreement or the 2007 Note Purchase Agreement, as the case may be, and will provide the Collateral Trustee with updated copies thereof as contemplated thereby. The name and address of each holder of one or more Notes, the principal amount thereof, each transfer thereof and the name and address of each transferee of one or more Notes, will be registered in the register. Upon request of the Trust as contemplated by said Section 13.1 the Collateral Trustee will authenticate each 2008 Note issued pursuant to the 2008 Note Purchase Agreement in the form set forth in Exhibit 1 thereto.

Section 8.4.    *Continuing Effectiveness.*    This Agreement shall continue to be effective even though a case or proceeding under any bankruptcy or insolvency law or any proceeding in the nature of a receivership, whether or not under any insolvency law, shall be instituted with respect to the Trust or any other Grantor or any portion of the property or assets of the Trust or any other Grantor, and all actions taken by the Noteholders with respect to the Collateral or the Collateral Trustee with regard to such proceeding shall be determined by MetLife; *provided, however,* that nothing herein shall be interpreted to preclude any Noteholder from filing a proof of claim with respect to its 2008 Facility Obligations or 2007 Facility Obligations, as the case may be, or from casting its vote, or abstaining from voting, for or against confirmation of a plan of reorganization in a case of bankruptcy, insolvency or similar law in its sole discretion.

Section 8.5.    *Counterparts.*    This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart. A facsimile of the signature of any party on any counterpart shall be effective as the signature of the party executing such counterpart for purposes of effectiveness of this Agreement.

Section 8.6.    *Effectiveness.*    This Agreement shall become effective immediately upon execution by the Collateral Trustee and the Trust and shall continue in full force and effect until 91 days following the date upon which all 2008 Facility Obligations and all 2007 Facility Obligations are irrevocably paid in full.

Section 8.7.    *Governing Law.*    This Agreement shall be construed and enforced in accordance with, and the rights of the parties hereto shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such state that would require the application of the laws of a jurisdiction other than such state.

Section 8.8.    *Jurisdiction and Process; Waiver of Jury Trial.*

(a)    Each party hereto irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent permitted by applicable law, each party irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any

- 26 -

such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    Each party hereto consents to process being served by or on behalf of any other party in any suit, action or proceeding of the nature referred to in Section 8.8(a) by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it, at its address as set forth in Section 8.1, (or in the event of any change in the address of any such person) at such other address of which such person has notified the parties hereto in writing in accordance with Section 8.1. Each party hereto agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it. Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(c)    Nothing in this Section 8.8 shall affect the right of any party hereto to serve process in any manner permitted by law, or limit any right that any party may have to bring proceedings against any other party in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(d)    The parties hereto hereby waive trial by jury in any action brought on or with respect to this Agreement or any other document executed in connection herewith.

*Section 8.9.    Limitation of Liability.*    It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally, but solely as owner trustee of the Trust (the "**Owner Trustee**"), in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose for binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other related documents. All amounts due by the Trust under any 2008 Financing Document or this Agreement shall be paid solely from the trust assets of Trust in accordance with this Agreement. The Collateral Trustee acknowledges that the Owner Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the Trust in this Agreement.

*Section 8.10.    Failure or Delay; No Waiver of Rights.*    Neither any failure nor any delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and a single or partial exercise thereof shall not preclude any other or further exercise or the exercise of any other right, power or privilege.

- 27 -

Section 8.11.  *Headings.*  Headings of sections of this Agreement have been included herein for convenience only and should not be considered in interpreting this Agreement.

Section 8.12.  *No Implied Beneficiaries.*  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon or give to any Person other than the Noteholders any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation herein contained.

Section 8.13.  *Severance.*  If any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 8.14.  *Delivery of Amendments to Financing Documents.*  The Trust agrees to promptly deliver to the Collateral Trustee any amendment, modification or supplement to any 2008 Financing Document to which it is not a party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; NEXT PAGE IS SIGNATURE PAGE.]

- 28 -

IN WITNESS WHEREOF, the Trust has caused this Agreement to be executed by an authorized officer, and the Bank, in evidence of its acceptance of the trusts hereby created, has caused this Agreement to be executed by an authorized officer, all as of the day and year first above written.

VARIABLE FUNDING TRUST 2008-1

By:    U.S. Bank Trust National Association, not individually but solely as owner trustee


By:_____
Name:
Title:


THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., not in its individual capacity, but solely as collateral trustee


By:_____
Name:
Title:

MetLife hereby, in accordance with Section 5.11(b) hereof, directs the Collateral Trustee to appoint The Bank of New York Mellon, London Branch as UK Co-Collateral Trustee and directs the UK Co-Collateral Trustee to enter into the Owner Collateral Deed of Charge.

METROPOLITAN LIFE INSURANCE
COMPANY


By:_____
Name:
Title:

A/73038410.17

The Bank of New York Mellon, London Branch hereby accepts its appointment pursuant to Section 5.11(b) hereof as UK Co-Collateral Trustee.

THE BANK OF NEW YORK MELLON,
LONDON BRANCH, not in its individual capacity
but solely as UK Co-Collateral Trustee


By:_____
Name:
Title:

# AMENDED AND RESTATED 2008 SECURITY AGREEMENT

Amended and Restated Security Agreement executed by the 2008 Trust and the Collateral Trustee.

**EXECUTION VERSION**

## AMENDED AND RESTATED SECURITY AGREEMENT

This Amended and Restated Security Agreement (this "**Agreement**"), dated as of September 30, 2009, Variable Funding Trust 2008-1, a Delaware statutory trust formed under 12 Del. C. §3801 et seq. (the "**Trust**"), and The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.), in its capacity as collateral trustee for the benefit of the Noteholders (defined below) (in such capacity, together with its successors and assigns in such capacity, herein referred to as the "**Collateral Trustee**"), under that certain Collateral Trust Agreement, of even date herewith, between the Trust and The Bank of New York Mellon Trust Company, N.A. (as amended, restated or otherwise modified from time to time, the "**Collateral Trust Agreement**").

## RECITALS

WHEREAS, pursuant to a certain Note Purchase Agreement, dated as of May 9, 2008 (as amended, restated or otherwise modified from time to time, the "**Note Purchase Agreement**"), by and between the Trust and the investors identified on Schedule A thereto (the "**2008 Purchasers**"), the 2008 Purchasers purchased Variable Rate Senior Secured Revolving Notes issued by the Trust in the aggregate principal amount of up to $500,000,000 plus Capitalized Interest Amounts (such notes, together with all such notes issued in exchange or substitution for such notes, in each case in accordance with the Note Purchase Agreement, and as such notes may be amended, supplemented or otherwise modified from time to time in accordance with the Note Purchase Agreement, shall be referred to herein as the "**Notes**"; and the holders from time to time of the Notes, including, on the date hereof the 2008 Purchasers, shall be referred to as the "**2008 Noteholders**");

WHEREAS, pursuant to a certain Note Purchase Agreement, dated as of November 30, 2007 (as amended, restated or otherwise modified from time to time, the "**2007 Note Purchase Agreement**"), by and between Variable Funding Trust 2007-1, a Delaware statutory trust formed under 12 Del. C. §3801 et seq. (the "**2007 Issuer**") and the investor identified on Schedule A thereto ("**MetLife**"), MetLife purchased Variable Rate Senior Secured Revolving Notes issued by the 2007 Issuer in the aggregate principal amount of $500,000,000 (such notes, together with all notes issued in exchange or substitution for such notes, in each case in accordance with the 2007 Note Purchase Agreement, and as such notes may be amended, supplemented or otherwise modified from time to time in accordance with the 2007 Note Purchase Agreement, shall be referred to herein as the "**2007 Notes**"; and the holders from time to time of the 2007 Notes, including, on the date hereof, MetLife, shall be referred to herein as the "**2007 Noteholders**", and together with the 2008 Noteholders, the "**Noteholders**");

WHEREAS, it was a condition precedent to the Initial Advance under the Note Purchase Agreement that the Trust grant to the Collateral Trustee, for the benefit of the 2008 Noteholders and the Collateral Trustee, a security interest in all of its properties and assets (including, without limitation, a pledge all of its right, title and interest in and to the Pledged Note Assets) pursuant to a security agreement in the form hereof;

WHEREAS, on the date hereof (a) the Trust and the 2008 Noteholders are entering into a certain 2008 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**2008 Restructuring Agreement**") pursuant to which the parties are

restructuring the obligations of the Trust in respect of the Notes and (b) the 2007 Issuer and the 2007 Noteholders are entering into a certain 2007 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**2007 Restructuring Agreement**") pursuant to which the parties are restructuring the obligations of the 2007 Issuer in respect of the 2007 Notes, in each case in view of the bankruptcy of Lehman Brothers Holdings Inc., the parent guarantor of the Notes and the 2007 Notes;

WHEREAS it is a condition precedent to (a) the restructuring of the obligations of the Trust in respect of the Notes under the 2008 Restructuring Agreement, that the 2007 Issuer guarantee the obligations of the Trust in respect of the Notes pursuant to a Guarantee Agreement (as amended, restated or otherwise modified from time to time, the "**2007 Guarantee of 2008 Obligations**") of even date herewith, and (b) the restructuring of the obligations of the 2007 Issuer in respect of the 2007 Notes under the 2007 Restructuring Agreement, that the Trust guarantee the obligations of the 2007 Issuer in respect of the 2007 Notes pursuant to a Guarantee Agreement (as amended, restated or otherwise modified from time to time, the "**2008 Guarantee of 2007 Obligations**") of even date herewith;

WHEREAS, it is a further condition precedent to the restructuring described above that the Security Agreement (the "**Original Security Agreement**"), dated as of May 9, 2008, by the Trust in favor of the 2008 Noteholders be amended and restated as set forth herein; including, without limitation, to provide that the 2008 Guarantee of 2007 Obligations be secured by the Collateral (as hereinafter defined);

WHEREAS, the Trust wishes to reaffirm its original grant of a security interest to the Collateral Trustee to secure the "Obligations" (as defined in the Original Security Agreement, as so defined, the "**Original Obligations**") and to grant a security interest in the Collateral to secure the Obligations (as hereinafter defined), including, without limitation, the obligations of the Trust under the 2008 Guarantee of the 2007 Obligations; and

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  DEFINITIONS.

All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Note Purchase Agreement.  All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein.  However, if a term is defined in Article 9 of the Uniform Commercial Code of the State differently than in another Article of the Uniform Commercial Code of the State, the term has the meaning specified in Article 9.  The term "electronic document" applies in the event that the 2003 revisions to Article 7, with amendments to Article 9, of the Uniform Commercial Code, in substantially the form approved by the American Law Institute and the National Conference of Commissioners on Uniform State Laws, are now or hereafter adopted and become effective in the State or in any other relevant jurisdiction.

2

In addition, as used herein:

"**Account Control Agreement**" means, with respect to any deposit account, securities account or commodities account in the name of the Trust with any financial institution, an agreement among the Trust, such financial institution and the Collateral Trustee, providing for the ability of the Collateral Trustee to control the account as necessary to perfect its security interest therein under applicable law, or any other agreement required under applicable law (including without limitation, a charges over bank accounts agreement) required to create and perfect a Lien in favor of the Collateral Trustee for the benefit of the Noteholders and the Collateral Trustee in such account, in form and substance satisfactory to the Collateral Trustee and MetLife, as any such agreement is amended, restated or otherwise modified from time to time.

"**Agreement**" means this Security Agreement, as amended, restated or otherwise modified from time to time.

"**Applicable Law**" means and includes the applicable statutes and rules of the State of New York or of any other applicable jurisdiction and all applicable regulations promulgated thereunder and interpretations thereof by any governmental authority charged with the administration or the interpretation thereof, and all applicable common law and orders, requests, directives, instructions and notices of any governmental authority of the State of New York or of any other applicable jurisdiction.

"**Assigned Agreements**" means and includes:

   (a)    the Administration Agreement;

   (b)    the Master Assignment Agreement;

   (c)    the Master Participation Agreement;

   (d)    the Note Asset Documentation; and

   (e)    all other contracts, permits, licenses, franchises and other agreements to which the Trust is or becomes a party or pursuant to which the Trust has been or will be granted rights, together with any and all intangibles in connection therewith.

"**Collateral**" is defined in Section 2.1.

"**Collateral Trust Agreement**" is defined in the introductory paragraph hereto.

"**Collateral Trustee**" is defined in the introductory paragraph hereto.

"**Instrument**" means any contract, agreement, indenture, mortgage or other document or writing (whether by formal agreement, letter or otherwise) under which any obligation is evidenced, assumed or undertaken, or any right to any lien is granted or perfected.

"**MetLife**" is defined in the second WHEREAS clause hereof.

3

"**Noteholders**" is defined in the second WHEREAS clause hereof.

"**Note Purchase Agreement**" is defined in the first WHEREAS clause hereof.

"**Note Payments**" means, collectively, (a) all principal payments of every kind whatsoever which shall become due and payable on or in respect of any Pledged Note Asset, (b) all interest payments of every kind whatsoever which shall become and be due and payable on or in respect of any Pledged Note Asset, (c) all other payments which shall become and be due and payable or be made on account of the purchase, redemption, repurchase or other retirement of any Pledged Note Asset, and (d) all other payments of every kind whatsoever which shall become and be due and payable on or in respect of any Pledged Note Asset (including, without limitation, escrow and reserve payments in respect of collateral).

"**Notes**" is defined in the first WHEREAS clause hereof.

"**Obligations**" means (a) all of the indebtedness, obligations, fees, expenses and liabilities of the Trust to the Collateral Trustee and the 2008 Noteholders, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under or in respect of the Financing Documents to which it is a party, and (b) all obligations of the Trust under the 2008 Guarantee of 2007 Obligations.

"**Original Obligations**" is defined in the seventh WHEREAS clause hereof.

"**Original Security Agreement**" is defined in the sixth WHEREAS clause hereof.

"**Pledged Note Assets**" is defined in Section 2.1.

"**State**" means the State of New York.

"**Third Party Control Agreements**" means, an agreement among the Trust, any financial institution and any Person (other than the Collateral Trustee) with respect to any deposit account, securities account or commodities account in the name of the Trust with such financial institution, providing for the ability of such Person to control the account as necessary to perfect its security interest therein under applicable law, or any other agreement required under applicable law (including without limitation, a charges over bank accounts agreement) required to create and perfect a Lien in favor of such Person in such account (with respect to any such agreement entered into on the Closing Date or thereafter).

"**Trust**" is defined in the introductory paragraph hereto.

"**2007 Financing Documents**" means the "Financing Documents" under and as defined in the 2007 Note Purchase Agreement.

"**2007 Guarantee of 2008 Obligations**" is defined in the fifth WHEREAS clause hereof.

"**2007 Issuer**" is defined in the second WHEREAS clause hereof.

"**2007 Noteholders**" is defined in the second WHEREAS clause hereof.

4

"**2007 Note Purchase Agreement**" is defined in the second WHEREAS clause hereof.

"**2007 Notes**" is defined in the second WHEREAS clause hereof.

"**2007 Restructuring Agreement**" is defined in the fourth WHEREAS clause hereof.

"**2008 Guarantee of 2007 Obligations**" is defined in the fifth WHEREAS clause hereof.

"**2008 Noteholders**" is defined in the first WHEREAS clause hereof.

"**2008 Purchasers**" is defined in the first WHEREAS clause hereof.

"**2008 Restructuring Agreement**" is defined in the fourth WHEREAS clause hereof.

SECTION 2.   GRANT OF SECURITY INTEREST.

*Section 2.1.    Grant; Collateral Description.*   The Trust hereby (a) reaffirms its grant to the Collateral Trustee, for the benefit of the 2008 Noteholders and the Collateral Trustee, of a security interest in the Collateral to secure the Original Obligations and (b) grants to the Collateral Trustee, for the benefit of the Noteholders and the Collateral Trustee, to secure the payment and performance in full of all of the Obligations, a security interest in and pledges, assigns, charges and mortgages to the Collateral Trustee, for the benefit of the Noteholders and the Collateral Trustee, all properties, assets and rights of the Trust, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "**Collateral**"), including, without limitation: all personal and fixture property of every kind and nature including all goods (including inventory, equipment and any accessions thereto), instruments (including all Note Assets and other promissory notes and similar rights (collectively, the "**Pledged Note Assets**"), and hereby delivers and transfers to the Collateral Trustee, for the benefit of the Noteholders, all of the Trust's rights, title and interests in, to and under the Pledged Note Assets), documents (including, if applicable, electronic documents), accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights (including, without limitation, under the Assigned Agreements) or rights to the payment of money (including, without limitation, all Note Payments), insurance claims and proceeds, and all general intangibles (including all payment intangibles).

*Section 2.2.    Commercial Tort Claims.*   The Collateral Trustee acknowledges that the attachment of its security interest in any commercial tort claim as original collateral is subject to the Trust's compliance with Section 4.6.

*Section 2.3.    Pledge and Delivery of Pledged Note Assets.*   All certificates or instruments representing or evidencing the Pledged Note Assets to be delivered from time to time shall be:

(a)    delivered to and held by or on behalf of the Collateral Trustee, for the benefit of the Collateral Trustee and the Noteholders, pursuant hereto;

5

(b)    in suitable form for transfer by delivery; and

(c)    accompanied by all necessary endorsements, instruments of transfer or assignment, duly executed in blank, all in form and substance satisfactory to the Collateral Trustee and MetLife.

*Section 2.4.    Security Interests Absolute.*    All rights and security interests of the Collateral Trustee granted hereunder, and all obligations of the Trust hereunder, shall be absolute and unconditional, irrespective of, and shall not be impaired or affected by:

(a)    any lack of validity or enforceability of the Note Purchase Agreement, any other Financing Document or 2007 Financing Document or any Instrument relating to any thereof, any of the Obligations, or any other obligations of any other Person primarily or secondarily liable on any of the Obligations;

(b)    any change in the legal existence, structure or ownership of the Trust, or any bankruptcy or insolvency proceeding affecting the Trust or any property of the Trust, or any resulting release or discharge of any obligation contained in the Note Purchase Agreement or any other Financing Document or 2007 Financing Document;

(c)    the failure of the Collateral Trustee or any Noteholder to

(i)    assert any claim or demand or to enforce any right or remedy against the Trust or any other Person party, under the provisions of this Agreement, the Note Purchase Agreement, the other Financing Documents, the 2007 Financing Documents or any other Instrument relating to any thereof or under any Applicable Law, or

(ii)    exercise any right or remedy against any Collateral;

(d)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other obligations of any other Person primarily or secondarily liable on the Obligations, or any other amendment to, rescission, waiver or other modification of, or any consent to any departure from, the Note Purchase Agreement, any other Financing Document, any 2007 Financing Document or any other Instrument relating to any thereof;

(e)    any increase, reduction, limitation, impairment or termination of the Obligations or any other obligations of any other Person primarily or secondarily liable on the Obligations, for any reason, including any claim of waiver, release, surrender, alteration or compromise, and any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, ungenuineness, irregularity, compromise, or unenforceability of, or any other event or occurrence affecting, any of the Obligations or any other obligations of any other Person primarily or secondarily liable on the Obligations (and the Trust hereby waives any right to or claim of any such defense or set off, counterclaim, recoupment or termination);

6

(f)    any amendment to, rescission, waiver or other modification of, or any consent to departure from, any of the terms of the Note Purchase Agreement, any other Financing Document, any 2007 Financing Document or any other Instrument relating to any thereof;

(g)    any sale, exchange, release, surrender or non-perfection of any of the Collateral or any release of or amendment or waiver of or consent to departure from, any guaranty held by the Collateral Trustee or any other Noteholder securing or guaranteeing all or any of the Obligations or any other obligations of any other Person primarily or secondarily liable on the Obligations;

(h)    any defense, set off or counterclaim which may at any time be available to or be asserted by the Trust or any of its Affiliates against the Collateral Trustee or any Noteholder; or

(i)    any other circumstances which might otherwise constitute a suretyship or other defense available to, or a legal or equitable discharge of, the Trust.

SECTION 3.    AGREEMENT TO FILE FINANCING STATEMENTS.

The Trust shall, at its own expense, file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Trust or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State or such other jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Trust is an organization, the type of organization and any organizational identification number (including the Trust's employer identification number, if any) issued to the Trust. The Trust agrees to furnish copies of any such filings to the Collateral Trustee promptly after the filing thereof. The Trust also ratifies the filing in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

SECTION 4.    OTHER ACTIONS.

Further to insure the attachment, perfection and first priority of and the ability of the Collateral Trustee to enforce the Collateral Trustee's security interest in the Collateral, the Trust agrees, in each case at the Trust's expense, to take the following actions with respect to the following Collateral and without limitation on the Trust's other obligations contained in this Agreement:

*Section 4.1.    Pledged Note Assets and Tangible Chattel Paper.*  If the Trust shall, now or at any time hereafter, hold or acquire any certificates or instruments evidencing Pledged Note Assets or tangible chattel paper, the Trust shall give written notice to the Collateral Trustee within 3 Business Days thereof and shall forthwith endorse, assign and deliver the same to the

7

Collateral Trustee, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Trustee may from time to time specify.

Section 4.2.    *Deposit Accounts*.    The Trust shall not open or maintain any deposit account which is not subject to an Account Control Agreement without the prior written consent of the Collateral Trustee, acting at the direction of MetLife. The Trust shall, at the Collateral Trustee's request and option, acting at the direction of MetLife, pursuant to an agreement in form and substance satisfactory to the Collateral Trustee and MetLife, either (a) cause the depositary bank with respect to any such deposit account to enter into an Account Control Agreement with the Trust and the Collateral Trustee, or (b) arrange for the Collateral Trustee to become the customer of the depositary bank with respect to the deposit account, with the Trust being permitted, only with the consent of the Collateral Trustee, to exercise rights to withdraw funds from such deposit account. The provisions of this paragraph shall not apply to a deposit account for which the Collateral Trustee is the depositary bank and is in automatic control.

Section 4.3.    *Investment Property*.    If the Trust shall, now or at any time hereafter, hold or acquire any certificated securities (including, without limitation any certificates or instruments representing Pledged Note Assets), the Trust shall forthwith endorse, assign and deliver the same to the Collateral Trustee, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Trustee may from time to time specify. If any securities now or hereafter acquired by the Trust are uncertificated and are issued to the Trust or its nominee directly by the issuer thereof, the Trust shall immediately notify the Collateral Trustee thereof and, at the Collateral Trustee's request and option, acting at the direction of MetLife, pursuant to an agreement in form and substance satisfactory to the Collateral Trustee and MetLife, either (a) cause the issuer to agree to comply without further consent of the Trust or such nominee, at any time with instructions from the Collateral Trustee as to such securities, or (b) arrange for the Collateral Trustee to become the registered owner of the securities. If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by the Trust are held by the Trust or its nominee through a securities intermediary or commodity intermediary, the Trust shall immediately notify the Collateral Trustee thereof and, at the Collateral Trustee's request and option, acting at the direction of MetLife, pursuant to an Account Control Agreement in form and substance satisfactory to the Collateral Trustee and MetLife, either (i) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply, in each case without further consent of the Trust or such nominee, at any time with entitlement orders or other instructions from the Collateral Trustee to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Collateral Trustee, acting at the direction of MetLife, to such commodity intermediary, or (ii) in the case of financial assets or other investment property held through a securities intermediary, arrange for the Collateral Trustee to become the entitlement holder with respect to such investment property, with the Trust being permitted, only with the consent of the Collateral Trustee, acting at the direction of MetLife, to exercise rights to withdraw or otherwise deal with such investment property. The provisions of this paragraph shall not apply to any financial assets credited to a securities account for which the Collateral Trustee is the securities intermediary.

8

Section 4.4.    *Electronic Chattel Paper and Transferable Records.*  If the Trust, now or at any time hereafter, holds or acquires an interest in any electronic chattel paper, any electronic document or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, the Trust shall promptly notify the Collateral Trustee thereof and, at the request and option of the Collateral Trustee, acting at the direction of MetLife, shall take such action as the Collateral Trustee, acting at the direction of MetLife, may reasonably request to vest in the Collateral Trustee control, under Section 9-105 of the Uniform Commercial Code of the State or any other relevant jurisdiction, of such electronic chattel paper, control, under Section 7-106 of the Uniform Commercial Code of the State or any other relevant jurisdiction, of such electronic document or control, under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.  The provisions of this Section 4.4 relating to electronic documents and "control" under UCC Section 7-106 apply in the event that the 2003 revisions to Article 7, with amendments to Article 9, of the Uniform Commercial Code, in substantially the form approved by the American Law Institute and the National Conference of Commissioners on Uniform State Laws, are now or hereafter adopted and become effective in the State or in any other relevant jurisdiction.

Section 4.5.    *Letter-of-credit Rights.*  If the Trust is, now or at any time hereafter, a beneficiary under a letter of credit now or hereafter, the Trust shall promptly notify the Collateral Trustee thereof and, at the request and option of the Collateral Trustee, acting at the direction of MetLife, the Trust shall, pursuant to an agreement in form and substance satisfactory to the Collateral Trustee and MetLife, either (a) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Trustee of the proceeds of the letter of credit or (b) arrange for the Collateral Trustee to become the transferee beneficiary of the letter of credit.

Section 4.6.    *Commercial Tort Claims.*  If the Trust shall, now or at any time hereafter, hold or acquire a commercial tort claim seeking damages in excess of US$10,000 (or its equivalent in other currencies), the Trust shall immediately notify the Collateral Trustee in a writing signed by the Trust of the particulars thereof and, if requested by the Collateral Trustee, acting at the direction of MetLife, grant to the Collateral Trustee, for the benefit of the Noteholders and the Collateral Trustee, in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Collateral Trustee and the Noteholders.

Section 4.7.    *Other Actions as to any and all Collateral.*  The Trust further agrees, at the Trust's sole expense, to take any and all other actions as may be necessary or useful for the attachment, perfection and first priority with respect to all of the Collateral, and the ability of the Collateral Trustee to enforce, the Collateral Trustee's security interest in any and all of the Collateral, including, without limitation, (a) furnishing to the Collateral Trustee all financing statements, certificates, legal opinions and other documents and giving all such notices as the Collateral Trustee may request in order to give full effect to this Agreement and to maintain, preserve, safeguard and continue at all times all or any of the rights, remedies, powers and privileges of the Collateral Trustee under this Agreement or any other Security Document to

9

which it is a party, (b) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Collateral Trustee to enforce, the Collateral Trustee's security interest in such Collateral, (c) obtaining governmental and other third party waivers, consents and approvals, in form and substance satisfactory to the Collateral Trustee and the Noteholders, including, without limitation, the consent to the collateral assignment of the Trust's rights under any agreement (including, without limitation, under the Assigned Agreements) or Instrument, and (d) taking all actions under any earlier versions of the Uniform Commercial Code or under any other law, as determined by the Collateral Trustee to be applicable in any relevant Uniform Commercial Code or other jurisdiction, including any foreign jurisdiction.

SECTION 5.  REPRESENTATIONS AND WARRANTIES CONCERNING COLLATERAL, ETC.

The Trust further represents and warrants to the Noteholders and the Collateral Trustee as follows:  (a) the Trust is the owner of or has other rights in or power to transfer its respective Collateral, free from any right or claim of any person or any adverse Lien, except for the security interest created by this Agreement, (b) no Collateral is in the possession or control of any Person other than itself or the Collateral Trustee and (c) the Trust has not entered into any Third Party Control Agreements.

SECTION 6.  COVENANTS CONCERNING ASSIGNED AGREEMENTS.

The Trust further covenants with the Noteholders and the Collateral Trustee as follows: (a) the Trust will faithfully abide by, perform and discharge each and every obligation, covenant, condition, duty and agreement pursuant to each or any of the Assigned Agreements which is necessary to the conduct of its business or the non-performance of which could have an adverse effect upon the ability of the Collateral Trustee, on behalf of the Noteholders, to collect the aggregate amount of the Obligations from the proceeds of the Collateral or the ability of the Trust to pay the aggregate amount of the Obligations, (b) the Trust shall not amend, modify, otherwise change or terminate any Assigned Agreement if such amendment, modification, other change or termination could have an adverse effect upon the ability of the Collateral Trustee, on behalf of the Noteholders, to collect the aggregate amount of the Obligations from the proceeds of the Collateral or the ability of the Trust to pay the aggregate amount of the Obligations, (c) at the Trust's sole cost and expense, the Trust will appear in and defend any action or proceeding arising under, growing out of or in any manner connected with the obligations, covenants, conditions, duties, agreements or liabilities of the Trust under any of the Assigned Agreements which is necessary to the conduct of its business or the non-performance of which would have an adverse effect upon the ability of the Collateral Trustee, on behalf of the holders of the Obligations, to collect the aggregate amount of the Obligations from the proceeds of the Collateral or the ability of the Trust to pay the aggregate amount of the Obligations and (d) should the Trust fail to make any payment, do any act or refrain from any act under or in respect of any Assigned Agreement which this Agreement or any other Financing Document to which it is a party or the 2008 Guarantee of 2007 Obligations requires the Trust to make, do or refrain from, then the Collateral Trustee may, but shall have no obligation to (and shall not thereby release the Trust from any obligation to), make, do or prevent the same in such manner and to such extent as the Collateral Trustee may deem necessary or advisable to protect the security provided hereby, which rights of the Collateral Trustee shall specifically include, without

10

limiting the Collateral Trustee's general powers herein granted, the right to appear in and defend any action or proceeding purporting to affect the security hereof and the rights or powers of the Collateral Trustee hereunder (or any of them), and also the right, if an Event of Default exists, to perform and discharge each and every one, or any one or more, of the obligations, covenants, conditions, duties and agreements of the Trust contained in any one or more of the Assigned Agreements.

SECTION 7.   COVENANTS CONCERNING PLEDGED NOTE ASSETS, NOTE PAYMENTS AND OTHER COLLATERAL, ETC.

The Trust further covenants with the Noteholders and the Collateral Trustee as follows: (a) except for the security interest herein granted, the Trust shall be the owner of or have other rights in the Collateral free from any right or claim of any other person or any Lien, and the Trust shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Collateral Trustee or any of the Noteholders, (b) the Trust shall not permit any Collateral to be in the possession or control of any Person other than the Collateral Trustee or its agents, other than books and records relating to Pledged Note Assets located at the officers of the Administrative Agent or the Owner Trustee specified to the Collateral Trustee and MetLife in writing (and, in furtherance of the foregoing, shall not permit the proceeds of any Pledged Note Assets to be deposited into an account not subject to an Account Control Agreement other than as specifically provided for in the Note Purchase Agreement); (c) the Trust shall promptly deliver (properly endorsed where required hereby or requested by the Collateral Trustee) all Note Payments and all other proceeds received by the Trust in respect of the Collateral to the Collateral Trustee, all of which shall be held by the Collateral Trustee as additional Collateral and/or apply such payments and proceeds to the Obligations in accordance with the terms of the Collateral Trust Agreement, and (d) the Trust shall not enter into any Third Party Control Agreements.

SECTION 8.   COLLATERAL PROTECTION EXPENSES; PRESERVATION OF COLLATERAL.

*Section 8.1.    Expenses Incurred by Collateral Trustee.*  At any time after the occurrence and during the continuance of a Default or Event of Default, in the Collateral Trustee's discretion, the Collateral Trustee may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, maintain any of the Collateral, pay any necessary filing fees or insurance premiums, in each case if the Trust fails to do so.  The Trust agrees to reimburse the Collateral Trustee on demand for all expenditures so made.  The Collateral Trustee shall have no obligation to the Trust to make any such expenditures, nor shall the making thereof be construed as a waiver or cure of any Default or Event of Default.

*Section 8.2.    Collateral Trustee's Obligations and Duties.*  Anything herein to the contrary notwithstanding, the Trust shall remain obligated and liable under each contract or agreement (including, without limitation, the Assigned Agreements) comprised in the Collateral to be observed or performed by the Trust thereunder.  Neither the Collateral Trustee nor any Noteholder shall have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Collateral Trustee or any Noteholder of any payment relating to any of the Collateral, nor shall the Collateral Trustee or any Noteholder be obligated in any manner to perform any of the obligations of the Trust under or pursuant to

11

any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Collateral Trustee or any Noteholder in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Collateral Trustee or to which the Collateral Trustee or any Noteholder may be entitled at any time or times. The Collateral Trustee's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as the Collateral Trustee deals with similar property for its own account.

SECTION 9.  SECURITIES AND DEPOSITS.

At any time after the occurrence and during the continuance of an Event of Default, the Collateral Trustee may at any time transfer to itself or any nominee, for the benefit of the Noteholders, any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations in accordance with the terms of the Collateral Trust Agreement. Whether or not any Obligations are due, at any time after the occurrence and during the continuance of an Event of Default, the Collateral Trustee may demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from the Collateral Trustee or any Noteholder to the Trust may at any time be applied to or set off against any of the Obligations in accordance with the terms of the Collateral Trust Agreement.

SECTION 10.  NOTIFICATION TO ACCOUNT DEBTORS AND OTHER PERSONS OBLIGATED ON COLLATERAL.

In accordance with the terms of the 2008 Restructuring Agreement, the Trust has notified account debtors and other Persons obligated on any of the Collateral of the security interest of the Collateral Trustee in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Collateral Trustee or to any financial institution designated by the Collateral Trustee as the Collateral Trustee's agent therefor. The Trust shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Trust as trustee for the Collateral Trustee, for the benefit of the Noteholders and the Collateral Trustee, without commingling the same with other funds of the Trust and shall turn the same over to the Collateral Trustee in the identical form received, together with any necessary endorsements or assignments. The Collateral Trustee shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Collateral Trustee to the Obligations in accordance with the terms of the Collateral Trust Agreement, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

12

SECTION 11. POWER OF ATTORNEY.

*Section 11.1. Appointment and Powers of Collateral Trustee.* The Trust hereby irrevocably constitutes and appoints the Collateral Trustee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Trust or in the Collateral Trustee's own name, for the purpose (subject to Section 5.5 of the 2008 Restructuring Agreement) of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of the Trust, without notice to or assent by the Trust, to do the following:

(a)   upon the occurrence and during the continuance of a Default or an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State or any other relevant jurisdiction and as fully and completely as though the Collateral Trustee were the absolute owner thereof for all purposes, and to do, at the Trust's expense, at any time, or from time to time, all acts and things which the Collateral Trustee deems necessary or useful to protect, preserve or realize upon the Collateral and the Collateral Trustee's security interest therein, in order to effect the intent of this Agreement, all no less fully and effectively as the Trust might do, including, without limitation, (i) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; and

(b)   to the extent that the Trust's authorization given in Section 3 is not sufficient, to file or cause to be filed such financing statements with respect hereto, with or without the Trust's signature, or a photocopy of this Agreement in substitution for a financing statement, as the Collateral Trustee may deem appropriate and to execute in the Trust's name such financing statements and amendments thereto and continuation statements which may require the Trust's signature.

*Section 11.2. Ratification by the Trust.* To the extent permitted by law, the Trust hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable until the Obligations have been indefeasibly paid in full.

*Section 11.3. No Duty on Collateral Trustee.* The powers conferred on the Collateral Trustee under this Agreement are solely to protect the interests of the Collateral Trustee and the Noteholders in the Collateral and shall not impose any duty upon the Collateral Trustee to exercise any such powers. The Collateral Trustee shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Trust for any act or failure to act, except for the Collateral Trustee's own gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction).

13

SECTION 12. RIGHTS AND REMEDIES.

If an Event of Default shall have occurred and be continuing, the Collateral Trustee, without any other notice to or demand upon the Trust, shall have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies (but subject to Section 5.5 of the 2008 Restructuring Agreement), the rights and remedies of a secured party under the Uniform Commercial Code of the State or any other relevant jurisdiction and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral. The Collateral Trustee may in its discretion (but subject to Section 5.5 of the 2008 Restructuring Agreement) require the Trust to assemble all or any part of the Collateral (including any books and records relating thereto) at such location or locations within the jurisdiction(s) of the Trust's principal office(s) or at such other locations as the Collateral Trustee may designate, and shall have the right to exercise any and all rights of the Trust under the Assigned Agreements by giving written notice of its intent to do so to the Trust; including, without limitation, the right to make any amendments, waivers and agreements relating thereto, to give all notices, consents and releases, to take all action upon the happening of any default or other breach thereunder and to do any and all other things whatsoever that the Trust is entitled to do thereunder or in respect thereof. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Collateral Trustee shall give to the Trust at least 10 days prior written notice of the time and place of any public sale of its respective Collateral or of the time after which any private sale or any other intended disposition is to be made. The Trust hereby acknowledges that 10 days prior written notice of such sale or sales shall be reasonable notice. In addition, the Trust waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Collateral Trustee's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

Without limitation of the above, the Collateral Trustee may, without prior notice to the Trust, take all or any of the following actions (subject to its obligations under Section 5.5 of the 2008 Restructuring Agreement):

(a)    transfer all or any part of the Pledged Note Assets into the name of the Collateral Trustee or its nominee, with or without disclosing that such Pledged Note Assets are subject to the Lien;

(b)    take in its own name or in the name of the Trust such action as the Collateral Trustee may determine to be necessary or reasonably advisable to protect or enforce any of the rights, powers, privileges or remedies of the Trust under any Pledged Note Asset;

(c)    enforce collection of any of the Note Payments or other Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto;

14

(d)      endorse any checks, drafts or other writings in the Trust's name to allow collection of the Note Payments and other Collateral;

(e)      take control of any products or proceeds of the Collateral;

(f)      execute (in the name, place and stead of the Trust) endorsements, assignments, and other instruments of conveyance or transfer with respect to the Pledged Note Assets or any other Collateral; and

(g)      generally, do all such other acts and things as may be considered incidental or conducive to any of the matters or powers mentioned in the foregoing provisions of this Section 12.1 and which the Collateral Trustee may or can do lawfully and to use the name of the Trust for such purposes and in any proceedings arising therefrom.

*Section 12.2.   Purchase at Sale.*  The Collateral Trustee on behalf of the Noteholders (or any Noteholder individually) shall have the right to bid and buy any part or all of the Collateral at any public or private sale.   In connection therewith, the Collateral Trustee and each Noteholder shall have the right to apply any amounts due to it under the Collateral Trust Agreement to the purchase price for such Collateral.

*Section 12.3.   Application of Proceeds.*  All cash proceeds received by the Collateral Trustee in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral, and all Note Payments and other cash proceeds and moneys received by the Collateral Trustee pursuant hereto, shall be applied by the Collateral Trustee against the Obligations in the manner and in the order provided in the Collateral Trust Agreement.

*Section 12.4.   Remedies Cumulative.*   The rights and remedies provided herein are cumulative, and not exclusive of rights and remedies which may be granted or provided by Applicable Law.

SECTION 13. STANDARDS FOR EXERCISING RIGHTS AND REMEDIES.

To the extent that Applicable Law imposes duties on the Collateral Trustee to exercise remedies in a commercially reasonable manner, the Trust acknowledges and agrees that it is not commercially unreasonable for the Collateral Trustee (a) to fail to incur expenses reasonably deemed significant by the Collateral Trustee to prepare Collateral for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to fail to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Trust, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional

15

auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Collateral Trustee against risks of loss, collection or disposition of Collateral or to provide to the Collateral Trustee a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Collateral Trustee, to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Collateral Trustee in the collection or disposition of any of the Collateral.    The Trust acknowledges that the purpose of this Section 13 is to provide non-exhaustive indications of what actions or omissions by the Collateral Trustee would fulfill the Collateral Trustee's duties under the Uniform Commercial Code of the State or any other relevant jurisdiction in the Collateral Trustee's exercise of remedies against the Collateral and that other actions or omissions by the Collateral Trustee shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this Section 13. Without limitation upon the foregoing, nothing contained in this Section 13 shall be construed to grant any rights to the Trust or to impose any duties on the Collateral Trustee that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 13.

SECTION 14. NO WAIVER BY COLLATERAL TRUSTEE, ETC.

The Collateral Trustee shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by the Collateral Trustee with the consent of MetLife.  No delay or omission on the part of the Collateral Trustee in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All rights and remedies of the Collateral Trustee with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as the Collateral Trustee deems expedient.

SECTION 15. MARSHALLING.

Neither the Collateral Trustee nor any Noteholder shall be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the rights and remedies of the Collateral Trustee or any Noteholder hereunder and of the Collateral Trustee or any Noteholder in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, the Trust hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Trustee's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of

16

the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Trust hereby irrevocably waives the benefits of all such laws.

SECTION 16. INDEMNITY; EXPENSES, ETC.

The Trust hereby indemnifies and holds harmless the Collateral Trustee and the Noteholders, and the shareholders, officers, directors, employees, agents, subsidiaries and affiliates of each of the Collateral Trustee and the Noteholders (each, an "**Indemnified Party**"), from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including the enforcement thereof), except for any portion of such claims, losses or liabilities which a court of competent jurisdiction has found, in a final, nonappealable order, resulted by reason of such Indemnified Party's gross negligence or willful misconduct. The Trust shall pay to the Collateral Trustee on demand any and all expenses, including attorneys' fees and disbursements, incurred or paid by the Collateral Trustee in connection with the performance of any of its obligations under any Security Document, including without limitation, in connection with protecting, preserving or enforcing the Collateral Trustee's and the Noteholders' rights and remedies under or in respect of any of the Obligations, this Agreement or any other Security Document or any of the Collateral. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to the Trust. In the absence of final payment and satisfaction in full of all of the Obligations, the Trust shall remain liable for any deficiency.

SECTION 17. OVERDUE AMOUNTS.

Until paid, all amounts due and payable by the Trust hereunder shall be a debt secured by the Collateral and shall bear interest, whether before or after judgment, at the Default Rate as set forth in the Note Purchase Agreement provided, however, that during the Restructuring Period (as defined in the 2008 Restructuring Agreement, interest shall accrue on such amounts at the Default Rate only in respect of payments that become overdue during the Restructuring Period and not in respect of any payment that remains overdue under the terms of this Agreement from any period prior to the Restructuring Period.

SECTION 18. GOVERNING LAW; CONSENT TO JURISDICTION.

THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.

SECTION 19. JURISDICTION AND PROCESS; WAIVER OF JURY TRIAL.

*Section 19.1. Jurisdiction.* The Trust irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent permitted by applicable law, the Trust irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject

17

to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 19.2.   *Service of Process.*   The Trust consents to process being served by or on behalf of the Collateral Trustee in any suit, action or proceeding of the nature referred to in Section 19.1 by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 18 of the Note Purchase Agreement or at such other address of which such holder shall then have been notified pursuant to said Section. The Trust agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.   Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

Section 19.3.   *No Waiver.*   Nothing in this Section 19 shall affect the right of the Collateral Trustee to serve process in any manner permitted by law, or limit any right that the Collateral Trustee may have to bring proceedings against the Trust in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

Section 19.4.   *Waiver of Jury Trial.*   The parties hereto hereby waive trial by jury in any action brought on or with respect to this Agreement, any rights or obligations hereunder or the performance of any such rights or obligations. Except as prohibited by law, the Trust waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.   The Trust (i) certifies that neither the Collateral Trustee, the Noteholders, nor any representative, agent or attorney of the any of them has represented, expressly or otherwise, that any of them would not, in the event of litigation, seek to enforce the foregoing waivers, and (ii) acknowledges that, in entering into the Note Purchase Agreement, the other Financing Documents to which any of them is a party and the 2007 Financing Documents to which any of them is a party, the Collateral Trustee and the Noteholders are relying upon, among other things, the waivers and certifications contained in this Section 19.4.

SECTION 20.  COLLATERAL TRUSTEE.

Any and all rights granted to the Collateral Trustee under this Agreement are to be held and exercised by the Collateral Trustee as agent for the benefit of the Noteholders pursuant to the provisions of the Collateral Trust Agreement. Each of the Noteholders shall be a beneficiary of the terms of this Agreement.  Any and all obligations under this Agreement of the parties to this Agreement, and the rights and indemnities granted to the Collateral Trustee under this Agreement, are created and granted subject to, and in furtherance (and not in limitation) of, the terms of the Collateral Trust Agreement and the rights and indemnities of the Collateral Trustee and Noteholders contained therein shall apply equally to this Agreement.  Nothing in this Agreement expressed or implied is intended or shall be construed to give to any Person other

18

than the Trust, the Noteholders and the Collateral Trustee any legal or equitable right, remedy, or claim under or in respect of this Agreement or any covenant, condition, or provision herein contained; and all such covenants, conditions and provisions are and shall be held to be for the sole and exclusive benefit of the Trust, the Noteholders and the Collateral Trustee. Notwithstanding anything herein to the contrary, the Collateral Trustee shall exercise its rights and powers in accordance with the terms of the Collateral Trust Agreement.

SECTION 21. EFFECT ON ASSIGNED AGREEMENTS.

This Agreement is executed as security for the Obligations, and, therefore, the execution and delivery of this Agreement shall not subject the Collateral Trustee to, or transfer or pass to the Collateral Trustee, or in any way affect or modify, the liability of the Trust under any or all of the Assigned Agreements, it being understood and agreed that notwithstanding this Agreement or any subsequent assignment, all of the obligations of the Trust to each and every other party under each and every one of the Assigned Agreements shall be and remain enforceable by such other party, its successors and assigns, against, but only against, the Trust or Persons other than the Collateral Trustee, the Noteholders and their respective successors and assigns.

SECTION 22. COUNTERPARTS.

Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. This Agreement may be executed in any number of counterparts and shall be effective when at least one counterpart shall have been executed by each party to this Agreement, and each set of counterparts which, collectively, show execution by each party to this Agreement shall constitute one duplicate original.

SECTION 23. FINANCING DOCUMENT.

This Agreement is a Financing Document executed pursuant to the Note Purchase Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

SECTION 24. SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon the Trust and its successors, and shall inure to the benefit of the Collateral Trustee and the Noteholders and their respective successors, transferees and assigns. The Trust may not assign any of its obligations hereunder.

SECTION 25. AMENDMENTS AND WAIVERS.

No amendment or waiver of any provision of this Agreement nor consent to any departure by the Trust therefrom shall be effective unless the same shall be in writing and signed by the Collateral Trustee with the consent of MetLife, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given. No delay, act or omission on the part of the Collateral Trustee of any of its rights hereunder shall be deemed a waiver of any rights hereunder unless also contained in a writing

19

signed by the Collateral Trustee, nor shall any single or partial exercise of, or any failure to exercise, any right, power or privilege preclude any other or further or initial exercise thereof or of any other right, power or privilege.

SECTION 26. NOTICES.

All notices and other communications called for hereunder shall be made in the manner set forth in Section 8.1 of the Collateral Trust Agreement.

SECTION 27. LIMITATION OF LIABILITY.

It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally, but solely as Owner Trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose for binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other related documents. All amounts due by the Trust under any Financing Document or the Trust Agreement shall be paid solely from the trust assets of Trust in accordance with the Trust Agreement. The Collateral Trustee acknowledges that the Owner Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the Trust in this Agreement.

SECTION 28. REINSTATEMENT.

This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Obligations or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any holder of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

SECTION 29. AMENDMENT AND RESTATEMENT OF PRIOR SECURITY AGREEMENT.

This Agreement amends and restates in full the Original Security Agreement; provided, however, that nothing contained in this Agreement shall impair, limit or affect the Liens heretofore granted, pledged and/or assigned to the Collateral Trustee for the benefit of the holders of Notes and the Collateral Trustee.

20

SECTION 30. MISCELLANEOUS.

This Agreement constitutes the entire agreement between the Collateral Trustee and the Trust with respect to the matters set forth herein. The rights and remedies herein provided are cumulative and not exclusive of any remedies provided by law or any other agreement, and this Agreement shall be in addition to any other guaranty of or collateral security for any of the Obligations. The invalidity or unenforceability of any one or more sections of this Agreement shall not affect the validity or enforceability of its remaining provisions. Captions are for the ease of reference only and shall not affect the meaning of the relevant provisions. The meanings of all defined terms used in this Agreement shall be equally applicable to the singular and plural forms of the terms defined.

*[Remainder of page intentionally left blank; next page is signature page.]*

In Witness Whereof, intending to be legally bound, the Trust and the Collateral Trustee have caused this Agreement to be duly executed as of the date first above written.

TRUST

VARIABLE FUNDING TRUST 2008-1

By:   U.S. Bank Trust National Association,
      not in its individual capacity but solely as
      Owner Trustee of the above trust


By:_____
Name:
Title:


SECURED PARTY

THE BANK OF NEW YORK MELLON TRUST
    COMPANY, N.A., not in its individual
    capacity, but solely as Collateral Trustee


By:_____
Name:
Title:

# 2007 ISSUER GUARANTEE AGREEMENT

2007 Issuer Guarantee Agreement executed by the
2007 Trust and delivered to the Noteholder.

EXECUTION VERSION

## GUARANTEE AGREEMENT

**THIS GUARANTEE AGREEMENT**, dated as of September 30, 2009 (as amended, restated or otherwise modified from time to time, this "**Guarantee**"), by **Variable Funding Trust 2007-1**, a Delaware statutory trust formed under 12 Del. C. §3801 et seq. (together with its successors and assigns, referred to herein as the "**Guarantor**") is in favor of each of the Noteholders (as such term is hereinafter defined).

## 1.    PRELIMINARY STATEMENT

(a)    Pursuant to a certain Note Purchase Agreement, dated as of May 9, 2008 (as amended, restated or otherwise modified from time to time, the "**Note Purchase Agreement**"), by and between Variable Funding Trust 2008-1, a Delaware statutory trust formed under 12 Del. C. §3801 et seq. (the "**Trust**") and the investors identified on Schedule A thereto (the "**Purchasers**"), the Purchasers purchased Variable Rate Senior Secured Revolving Notes issued by the Trust in the aggregate principal amount of up to $500,000,000 plus Capitalized Interest Amounts (such notes, together with all such notes issued in exchange or substitution for such notes, in each case in accordance with the Note Purchase Agreement, and as such notes may be amended, supplemented or otherwise modified from time to time in accordance with the Note Purchase Agreement, shall be referred to herein as the "**Notes**"; and the holders from time to time of the Notes, including, on the date hereof, the Purchasers, shall be referred to herein as the "**Noteholders**").

(b)    Pursuant to a certain Note Purchase Agreement, dated as of November 30, 2007 (as amended, restated or otherwise modified from time to time, the "**2007 Note Purchase Agreement**"), by and between the Guarantor and the investor identified on Schedule A thereto ("**MetLife**"), MetLife purchased a Variable Rate Senior Secured Revolving Note issued by the Guarantor in the aggregate principal amount of up to $500,000,000 (such note, together with all such notes issued in exchange or substitution for such note, in each case in accordance with the 2007 Note Purchase Agreement, and as such notes may be amended, supplemented or otherwise modified from time to time in accordance with the 2007 Note Purchase Agreement, shall be referred to herein as the "**2007 Notes**"; and the holders from time to time of the Notes, including, on the date hereof, MetLife, shall be referred to herein as the "**2007 Noteholders**").

(c)    On the date hereof (i) the Guarantor and MetLife are entering into a certain 2007 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**2007 Restructuring Agreement**") pursuant to which the parties are restructuring the obligations of the Guarantor in respect of the 2007 Notes and (ii) the Trust and the Noteholders are entering into a certain 2008 Omnibus Restructuring Agreement (as amended, restated or otherwise modified from time to time, the "**Restructuring Agreement**") pursuant to which the parties are restructuring the obligations of the Trust in respect of the Notes, in each case in view of the bankruptcy of

Lehman Brothers Holdings Inc., the parent guarantor of the Notes and the 2007 Notes (collectively, the "**Restructuring**").

(d)     It is a condition precedent to the Restructuring that the Guarantor guarantee the obligations of the Trust in respect of the Notes pursuant to a Guarantee Agreement in the form hereof and that the Trust guarantee the obligations of the Guarantor in respect of the 2007 Notes pursuant to a guarantee agreement in substantially the same form.

(e)     The Guarantor will receive direct and indirect economic, financial and other benefits from providing this Guarantee, including, without limitation, the restructuring of its obligations in respect of the 2007 Notes pursuant to the Restructuring and therefore the provision of this Guarantee is in the best interests of the Guarantor. The Guarantor and the Trust have induced the Noteholders and the 2007 Noteholders agree to the Restructuring based in part upon the provision of this Guarantee and the corresponding guarantee provided by the Trust, without which guarantees the Noteholders and the 2007 Noteholders would not have agreed to the Restructuring.

(f)     All acts and proceedings required by law and by the organizational documents of the Guarantor necessary to constitute this Guarantee a valid and binding agreement for the uses and purposes set forth herein in accordance with its terms have been done and taken, and the execution and delivery hereof has been in all respects duly authorized.

## 2.     GUARANTEE AND OTHER RIGHTS AND UNDERTAKINGS

### 2.1.     Guaranteed Obligations.

The Guarantor, in consideration of the Restructuring, the other premises set forth herein and other good and valuable consideration, hereby irrevocably, unconditionally and absolutely guarantees, on a continuing basis, to each Noteholder, as and for the Guarantor's own debt, until final and indefeasible payment has been made in cash:

(a)     the due and punctual payment of the principal of and accrued and unpaid interest (including, without limitation, interest which otherwise may cease to accrue by operation of any insolvency law, rule, regulation or interpretation thereof) and Breakage Cost Indemnity, if any, and any other fees and expenses, on the Notes at any time outstanding and the due and punctual payment of all other amounts payable, and all other indebtedness owing, by the Trust to the Noteholders under the Note Purchase Agreement, the Notes and the other Financing Documents, in each case when and as the same shall become due and payable, whether at maturity, pursuant to optional prepayment, by acceleration or otherwise, all in accordance with the terms and provisions hereof and thereof, including, without limitation, overdue interest, indemnification payments and all reasonable costs and expenses incurred by the Noteholders in connection with enforcing any obligations of the Trust under the Note Purchase Agreement, the Notes and the other

Financing Documents; it being the intent of the Guarantor that the guarantee set forth herein shall be a continuing guarantee of payment and not a guarantee of collection; and

(b)    the prompt and complete payment, on demand, of any and all reasonable costs and expenses incurred by the Noteholders in connection with enforcing the obligations of the Guarantor hereunder, including, without limitation, the reasonable fees and disbursements of the Noteholders' special or local counsel.

All of the obligations set forth in clauses (a) and (b) of this Section 2.1 are referred to herein as the **"Guaranteed Obligations"** and the guarantee thereof contained herein is referred to herein as the **"Unconditional Guarantee."** The Unconditional Guarantee is a primary, original and immediate obligation of the Guarantor and is an absolute, unconditional, continuing and irrevocable guaranty of payment and performance and shall remain in full force and effect until the full, final and indefeasible payment in cash of the Guaranteed Obligations.

### 2.2.    Performance Under the Note Purchase Agreement.

In the event the Trust fails to pay, perform. keep, observe, or fulfill any Guaranteed Obligation specified in clause (a) of Section 2.1 in the manner provided in the Financing Documents, the Guarantor shall cause forthwith to be paid the moneys in respect of which such failure has occurred in accordance with the terms and provisions of the Financing Documents. In furtherance of the foregoing, if an Event of Default shall exist, the Guaranteed Obligations shall, in the manner and subject to the limitations provided in the Note Purchase Agreement for the acceleration of the Notes, forthwith become due and payable without notice, regardless of whether the acceleration of the Notes shall be stayed, enjoined, delayed or otherwise prevented.

### 2.3.    Releases.

The Guarantor consents and agrees that, without notice to or by the Guarantor and without impairing, releasing, abating, deferring, suspending, reducing, terminating or otherwise affecting the obligations of the Guarantor hereunder, each Noteholder, in the manner provided herein, by action or inaction, may:

(a)    compromise or settle, renew or extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not, enforce, or may, by action or inaction, release all or any one or more parties to, any one or more of the Notes, the Note Purchase Agreement, any other Financing Document, any other guarantee thereof or agreement or instrument related thereto or hereto;

(b)    assign, sell or transfer, or otherwise dispose of, any one or more of the Notes;

(c)    grant waivers, extensions, consents and other indulgences to the Trust or any other guarantor or guarantors in respect of any one or more of the Notes, the Note Purchase Agreement, any other Financing Document, any other guarantee thereof or any agreement or instrument related thereto or hereto;

(d)    amend, modify or supplement in any manner and at any time (or from time to time) any one or more of the Notes, the Note Purchase Agreement, any other Financing Document any other guaranty thereof or any agreement or instrument related thereto or hereto;

(e)    release or substitute any one or more of the endorsers or guarantors of the Guaranteed Obligations whether parties hereto or not; and

(f)    sell, exchange, release, surrender or enforce, by action or inaction, any property at any time pledged or granted as security in respect of the Guaranteed Obligations, whether so pledged or granted by the Trust, the Guarantor or another guarantor of the Trust's obligations under the Note Purchase Agreement, the Notes, any other Financing Document, any other guaranty thereof or any agreement or instrument related thereto or hereto.

## 2.4.    Waivers.

To the fullest extent permitted by law, the Guarantor does hereby waive:

(a)    any notice of:

(i)    acceptance of the Unconditional Guarantee;

(ii)    any purchase of the Notes under the Note Purchase Agreement, or the creation, existence or acquisition of any of the Guaranteed Obligations, or the amount of the Guaranteed Obligations, subject to the Guarantor's right to make inquiry of each Noteholder to ascertain the amount of the Guaranteed Obligations owing to such Noteholder at any reasonable time;

(iii)    any adverse change in the financial condition of the Trust or any other fact that might increase, expand or affect the Guarantor's risk hereunder;

(iv)    presentment for payment, demand, protest, and notice thereof as to the Notes or any other instrument;

(v)    any Default or Event of Default; and

(vi)    any notice or demand of any kind or nature whatsoever to which the Guarantor might otherwise be entitled (except if such notice or demand is specifically otherwise required to be given to the Guarantor pursuant to the terms of this Guarantee);

(b)    any right, by statute or otherwise, to require any Noteholder to institute suit against the Trust or any other guarantor or to exhaust the rights and remedies of any Noteholder against the Trust or any other guarantor, the Guarantor being bound to the

payment of each and all Guaranteed Obligations, whether now existing or hereafter accruing, as fully as if such Guaranteed Obligations were directly owing to the Noteholders by the Guarantor;

(c)     the benefit of any stay (except in connection with a pending appeal), valuation, appraisal, redemption or extension law now or at any time hereafter in force which, but for this waiver, might be applicable to any sale of property of the Guarantor made under any judgment, order or decree based on this Guarantee, and the Guarantor covenants that it will not at any time insist upon or plead, or in any manner claim or take the benefit or advantage of, such law; and

(d)     any defense or objection to the absolute, primary, continuing nature, or the validity, enforceability or amount of the Unconditional Guarantee, including, without limitation, any defense based on (and the primary, continuing nature, and the validity, enforceability and amount of the Unconditional Guarantee shall be unaffected by), any of the following:

(i)     any change in future conditions;

(ii)     any change of law;

(iii)     any invalidity or irregularity with respect to the issuance or assumption of any obligations (including, without limitation, the Note Purchase Agreement, the Notes or any agreement or instrument related hereto) by the Trust or any other Person;

(iv)     the execution and delivery of any agreement at any time hereafter (including, without limitation, the Note Purchase Agreement, the Notes or any agreement or instrument related hereto) of the Trust or any other Person;

(v)     the genuineness, validity, regularity or enforceability of any of the Guaranteed Obligations;

(vi)     any default, failure or delay, willful or otherwise, in the performance of any obligations by the Trust or any other guarantor;

(vii)     any creditors' rights, bankruptcy, receivership or other insolvency proceeding of the Trust, the Guarantor or any other guarantor, or sequestration or seizure of any property of the Trust, the Guarantor or any other guarantor, or any merger, consolidation, reorganization, dissolution, liquidation or winding up or change in corporate constitution or corporate identity or loss of corporate identity of the Trust, the Guarantor or any other guarantor;

(viii)     any disability or other defense of the Trust or any other guarantor to payment and performance of all Guaranteed Obligations other than the defense

that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid in cash;

(ix)    the cessation from any cause whatsoever of the liability of the Trust, the Guarantor or any other guarantor in respect of the Guaranteed Obligations (other than due to the fact that the Guaranteed Obligations have been fully and finally performed and indefeasibly paid in cash), and any other defense that any Guarantor may otherwise have against the Trust or any Noteholder;

(x)    impossibility or illegality of performance on the part of the Trust, the Guarantor or any other guarantor under any Financing Document;

(xi)    any change of the circumstances of the Trust, the Guarantor, any other guarantor or any other Person, whether or not foreseen or foreseeable, whether or not imputable to the Trust or any guarantor, including, without limitation, impossibility of performance through fire, explosion, accident, labor disturbance, floods, droughts, embargoes, wars (whether or not declared), civil commotions, acts of God or the public enemy, delays or failure of suppliers or carriers, inability to obtain materials, economic or political conditions, or any other causes affecting performance, or any other force majeure, whether or not beyond the control of the Trust, the Guarantor or such other guarantor or Person and whether or not of the kind hereinbefore specified;

(xii)    any attachment, claim, demand, charge, Lien, order, process, encumbrance or any other happening or event or reason, similar or dissimilar to the foregoing, or any withholding or diminution at the source, by reason of any taxes, assessments, expenses, indebtedness, obligations or liabilities of any character, foreseen or unforeseen, and whether or not valid, incurred by or against any Person, or any claims, demands, charges, Liens or encumbrances of any nature, foreseen or unforeseen, incurred by any Person, or against any sums payable under the Note Purchase Agreement, the Notes, the other Financing Documents or any agreement or instrument related hereto so that such sums would be rendered inadequate or would be unavailable to make the payment as herein provided;

(xiii)    any change in the ownership of the equity securities of the Trust, the Guarantor, any other guarantor or any other Person liable in respect of the Notes; or

(xiv)    any other action, happening, event or reason whatsoever that shall delay, interfere with, hinder or prevent, or in any way adversely affect, the performance by the Trust, the Guarantor or any other guarantor of any of their obligations under the Note Purchase Agreement, the Notes or the other Financing Documents.

### 2.5.   Certain Waivers of Subrogation, Reimbursement and Indemnity.

The Guarantor hereby acknowledges and agrees that:

(a)    the Guarantor shall not have any right of subrogation, contribution, reimbursement, or indemnity whatsoever in respect of the Guaranteed Obligations, and no right of recourse to or with respect to any assets or property of the Trust;

(b)    the Guarantor will not file any claims against the Trust or the estate of the Trust in the course of any proceeding under any applicable bankruptcy or insolvency law in respect of the rights referred to in this Section 2.5; and

(c)    each holder of Notes may specifically enforce the provisions of this Section.

### 2.6.   Indemnity.

As a separate, additional and continuing obligation, the Guarantor unconditionally and irrevocably undertakes and agrees with the Noteholders that, should the Guaranteed Obligations not be recoverable from the Guarantor for any reason whatsoever (including, without limitation, by reason of any provision of the Note Purchase Agreement, the Notes or any other agreement or instrument executed in connection therewith being or becoming void, unenforceable or otherwise invalid under any applicable law) then, notwithstanding any knowledge thereof by any Noteholder at any time, the Guarantor as sole, original and independent obligor, upon demand by the Noteholders, will make payment of the Guaranteed Obligations to the Noteholders by way of a full indemnity in such currency and otherwise in such manner as is provided in the Note Purchase Agreement, the Notes and the other Financing Documents.

### 2.7.   Invalid Payments.

The Guarantor further agrees that, to the extent the Trust makes a payment or payments to any Noteholder, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required, for any of the foregoing reasons or for any other reason, to be repaid or paid over to a custodian, trustee, receiver or any other party or officer under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, state or federal law, or any common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made and the Guarantor shall be primarily liable for such obligation.

### 2.8.   Marshaling.

The Guarantor consents and agrees that each Noteholder, and each Person acting for the benefit of each Noteholder, shall be under no obligation to marshal any assets in favor of the Guarantor or against or in payment of any or all of the Guaranteed Obligations.

**2.9.    Subordination, Subrogation, Etc.**

The Guarantor agrees that any present or future indebtedness, obligations or liabilities of the Trust to the Guarantor shall be fully subordinate and junior in right and priority of payment to any present or future indebtedness, obligations or liabilities of the Trust to the Noteholders. The Guarantor waives any right of subrogation to the rights of the Noteholders against the Trust or any other Person obligated for payment of the Guaranteed Obligations and any right of reimbursement, contribution or indemnity whatsoever (including, without limitation, any such right as against any other guarantor) arising or accruing out of any payment that the Guarantor may make pursuant to this Guarantee, and any right of recourse to security for the debts and obligations of the Trust, unless and until the entire amount of the Guaranteed Obligations shall have been paid in full.

**2.10.    Subordination of Affiliate Obligations.**

In the event that, for any reason whatsoever, the Trust or a Person obligated in respect of the Guaranteed Obligations pursuant to another guarantee, is now or hereafter becomes indebted to the Guarantor in any manner (an **"Affiliate Obligation"**), the Guarantor agrees that the amount of such Affiliate Obligation, interest thereon, and all other amounts due with respect thereto, shall, at all times, be subordinate as to time of payment and in all other respects to all the Guaranteed Obligations, and that the Guarantor shall not be entitled to enforce or receive payment thereof until all sums then due and owing to the Noteholders in respect of the Guaranteed Obligations shall have been paid in full. If any other payment, other than pursuant to the immediately preceding sentence, shall have been made to the Guarantor by the Trust or such indebted Person on any such Affiliate Obligation and there are Guaranteed Obligations outstanding, the Guarantor shall hold in trust all such payments, to the extent of all amounts owing with respect to this Guarantee, for the benefit of the Noteholders.

**2.11.    Set-off, Counterclaim or Other Deductions.**

Except as otherwise required by law, each payment by the Guarantor shall be made without set-off, counterclaim or other deduction.

**2.12.    Election by Guarantors to Perform Obligations.**

Any election by the Guarantor or any other guarantor to pay or otherwise perform any of the obligations of the Trust under the Notes, the Note Purchase Agreement or any agreement or instrument related hereto shall not release the Trust, the Guarantor or any other guarantor from such obligations or any of such Person's other obligations under the Notes, the Note Purchase Agreement or any agreement or instrument related thereto or hereto.

**2.13.    No Election of Remedies by Noteholders.**

Each Noteholder shall, individually or collectively, have the right to seek recourse against the Guarantor to the fullest extent provided for herein for the Guaranteed Obligations. No election to proceed in one form of action or proceeding, or against any party, or on any

obligation, shall constitute a waiver of such Noteholder's right to proceed in any other form of action or proceeding or against other parties unless such Noteholder has expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by any Noteholder against the Trust, the Guarantor or any other guarantor under any document or instrument evidencing obligations of the Trust, the Guarantor or such other guarantor to such Noteholder shall serve to diminish the liability of the Guarantor under this Guarantee, except to the extent that such Noteholder finally and unconditionally shall have realized payment by such action or proceeding.

### 2.14.   Separate Action; Other Enforcement Rights.

Each of the rights and remedies granted under this Guarantee to each Noteholder in respect of the Notes held by such Noteholder may be exercised by such Noteholder with notice by such Noteholder to, but without the consent of or any other action by, any other Noteholder; provided, however, that the maturity of the Notes may only be accelerated in accordance with the provisions of the Note Purchase Agreement or operation of law. Each Noteholder may proceed to protect and enforce the Unconditional Guarantee by suit or suits or proceedings in equity, at law or in bankruptcy, and whether for the specific performance of any covenant or agreement contained herein or in execution or aid of any power herein granted or for the recovery of judgment for the obligations hereby guarantied or for the enforcement of any other proper, legal or equitable remedy available under applicable law.

### 2.15.   Noteholder Set-off.

Each Noteholder shall have, to the fullest extent permitted by law and this Guarantee, a right of set-off against any and all credits and any and all other property of any or all of the Guarantor or any other Person, now or at any time whatsoever, with or in the possession of, such Noteholder, or anyone acting for such Noteholder, to ensure the full performance of any and all obligations of the Guarantor hereunder.

### 2.16.   Delay or Omission; No Waiver.

No course of dealing on the part of any Noteholder and no delay or failure on the part of any such Person to exercise any right hereunder shall impair such right or operate as a waiver of such right or otherwise prejudice such Person's rights, powers and remedies hereunder. Every right and remedy given by the Unconditional Guarantee or by law to any Noteholder may be exercised from time to time as often as may be deemed expedient by such Person.

### 2.17.   Restoration of Rights and Remedies.

If any Noteholder shall have instituted any proceeding to enforce any right or remedy under the Unconditional Guarantee or under any Note held by such Noteholder, and such proceeding shall have been dismissed, discontinued or abandoned for any reason, or shall have been determined adversely to such Noteholder, then and in every such case each such Noteholder, the Trust and the Guarantor shall, except as may be limited or affected by any determination (including, without limitation, any determination in connection with any such

dismissal) in such proceeding, be restored severally and respectively to its respective former positions hereunder and thereunder, and thereafter, subject as aforesaid, the rights and remedies of such Noteholders shall continue as though no such proceeding had been instituted.

### 2.18.   Cumulative Remedies.

No remedy under this Guarantee, the Note Purchase Agreement or the Notes is intended to be exclusive of any other remedy, but each and every remedy shall be cumulative and in addition to any and every other remedy given pursuant to this Guarantee, the Note Purchase Agreement or the Notes.

### 2.19.   Notices in Respect of Payments.

If any Guarantor shall pay to any Noteholder any amount in respect of the Guaranteed Obligations, the Guarantor, within five (5) Business Days after making such payment, shall provide notice of such payment to each other Noteholder.

### 2.20.   Limitation on Guaranteed Obligation.

Notwithstanding anything in Section 2.1 or elsewhere in this Guarantee, the Note Purchase Agreement, the Notes or any other Financing Document to the contrary, the obligations of the Guarantor hereunder shall at each point in time be limited to an aggregate amount equal to the greatest amount that would not result in such obligations being subject to avoidance, or otherwise result in such obligations being unenforceable, at such time under applicable law (including, without limitation, to the extent, and only to the extent, applicable to the Guarantor, Section 548 of the Bankruptcy Code of the United States of America and any comparable provisions of the law of any other jurisdiction, any capital preservation law of any jurisdiction and any other law of any jurisdiction that at such time limits the enforceability of the obligations of the Guarantor hereunder).

## 3.    INTERPRETATION OF THIS GUARANTEE

### 3.1.    Terms Defined.

For purposes of this Guarantee, the following terms have the meanings specified below or provided for in the Section of this Guarantee referred to immediately following such term (such definitions to be equally applicable to both the singular and plural forms of the terms defined). Capitalized terms used herein and not otherwise defined herein have the meaning specified in the Note Purchase Agreement.

**Affiliate Obligation** — Section 2.10.

**Guarantee** — has the meaning assigned to such term in the introductory paragraph hereof.

**Guaranteed Obligations** — Section 2.1.

**Guarantor** — has the meaning assigned to such term in the introductory paragraph hereof.

**MetLife** — Section 1(b).

**Note Purchase Agreement** — Section 1(a).

**Noteholders** — Section 2.1.

**Notes** — Section 1(a).

**Person** — means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

**Purchasers** — Section 1(a).

**Restructuring** — Section 1(c).

**Restructuring Agreement** — Section 1(c).

**Trust** — Section 1(a).

**2007 Note Purchase Agreement** — Section 1(b).

**2007 Noteholders** — Section 1(b).

**2007 Notes** — Section 1(b).

**2007 Restructuring Agreement** — Section 1(c).

**Unconditional Guarantee** — Section 2.1.

*3.2.*    **Section Headings and Construction.**

The titles of the Sections appear as a matter of convenience only, do not constitute a part hereof and shall not affect the construction hereof. The words "herein," "hereof," "hereunder" and "hereto" refer to this Guarantee as a whole and not to any particular Section or other subdivision. Each covenant contained herein shall be construed (absent an express contrary provision herein) as being independent of each other covenant contained herein, and compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with one or more other covenants.

4.    **WARRANTIES AND REPRESENTATIONS**

The Guarantor represents and warrants that:

### 4.1.    Organization and Qualification.

The Guarantor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. The Guarantor has the power and authority and all necessary licenses, permits and franchises to issue this Guarantee and to own its assets and conduct its business as presently conducted. The Guarantor is duly licensed or qualified to do business and is in good standing in all jurisdictions where it is required to be qualified except where the failure to be so qualified could not reasonably be expected to cause a Material Adverse Effect.

### 4.2.    Authorization; Enforceability.

The making, execution, delivery and performance of this Guarantee by the Guarantor has been duly authorized by all necessary action. The valid execution, delivery and performance of this Guarantee and the transactions contemplated hereby are not subject to any approval, consent or authorization of any Government Authority other than such approvals, consents or authorizations that have been obtained. This Guarantee is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

### 4.3.    Absence of Conflicting Obligations.

The making, execution, delivery and performance of this Guarantee by the Guarantor and compliance by the Guarantor with the terms hereof do not violate or constitute a default, breach or violation under any requirements of law or any covenant, indenture, deed, lease, contract, agreement, mortgage, deed of trust, note or instrument to which the Guarantor is a party or by which it is bound.

### 4.4.    Economic Benefit.

The Restructuring provides a direct economic benefit to the Guarantor and the issuance by the Guarantor of the Guarantee in connection therewith (as required by the Noteholders as a condition precedent to the Restructuring) is in the best interests of the Guarantor. The owner trustee and the beneficiaries of the Guarantor have deemed it advisable and in the best interest of the Guarantor that the Guarantor enter into this Guarantee.

### 4.5.    Reliance on Noteholders.

The Guarantor has not relied on any information supplied by any one or more of the Noteholders, and the Guarantor acknowledges and agrees that the Noteholders have no duty to advise the Guarantor of information at any time known to the Noteholders regarding the financial condition or affairs of the Trust or any other guarantor.

### 4.6. No Representation By Noteholders.

None of the Noteholders nor any trustee or agent acting on behalf of a Noteholder has made any representation, warranty or statement to the Guarantor to induce the Guarantor to execute this Guarantee.

## 5. GENERAL COVENANTS

The Guarantor covenants and agrees that on and after the date hereof and so long as any of the Guaranteed Obligations shall be outstanding:

### 5.1. Payment and Maintenance of Offices.

The Guarantor will punctually pay, or cause to be paid, all of the Guaranteed Obligations when due and all other payment obligations required of it hereunder and will maintain an office at its address as set forth pursuant to Section 6.3 where notices, presentations and demands in respect of this Guarantee may be made upon it. Such office will be maintained at such address until such time as the Guarantor shall notify the Noteholders of any change of location of such office.

### 5.2. Further Assurances.

The Guarantor will cooperate with the Noteholders and execute such further instruments and documents as the Noteholders shall reasonably request to carry out, to the reasonable satisfaction of the Noteholders, the transactions contemplated by the Note Purchase Agreement, the Notes and this Guarantee.

## 6. MISCELLANEOUS

### 6.1. Successors and Assigns.

(a)    Whenever the Guarantor or any of the parties to the Note Purchase Agreement is referred to, such reference shall be deemed to include the successors and assigns of such party, and all the covenants, promises and agreements contained in this Guarantee by or on behalf of the Guarantor shall bind the successors and assigns of the Guarantor and shall inure to the benefit of each of the Noteholders from time to time whether so expressed or not and whether or not an assignment of the rights hereunder shall have been delivered in connection with any assignment or other transfer of Notes.

(b)    The Guarantor agrees to take such action as may be reasonably requested by any Noteholder in connection with the transfer of the Notes of such Noteholder in accordance with the requirements of the Note Purchase Agreement in connection with providing an executed copy of this Guarantee to the new Noteholder or Noteholders of such Notes; provided, however, that no additional obligations of the Guarantor shall thereby be created (beyond what is provided by this Guarantee).

**6.2.    Partial Invalidity.**

The unenforceability or invalidity of any provision or provisions hereof shall not render any other provision or provisions contained herein unenforceable or invalid.

**6.3.    Communications.**

All communications hereunder shall be in writing, shall be delivered in the manner required by the Note Purchase Agreement, and shall be addressed, if to the Guarantor, at the applicable address set forth on Annex 1 hereto, and if to any of the Noteholders:

(a)    if such Noteholder is a Purchaser, at the address for such Noteholder set forth on Schedule A to the Note Purchase Agreement, and further including any parties referred to on such schedules (which are required to receive notices in addition to such Noteholder), and

(b)    if such Noteholder is not a Purchaser, at the address for such Noteholder set forth in the register for the registration and transfer of Notes maintained pursuant to Section 13.1 of the Note Purchase Agreement,

or to any such party at such other address as such party may designate by notice duly given in accordance with this Section 6.3.  Notices shall be deemed given only when actually received.

**6.4.    Governing Law.**

**THIS GUARANTEE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE.**

**6.5.    Effective Date.**

This Guarantee shall be effective as of the date first written above.

**6.6.    Benefits of Guaranty Restricted to Noteholders.**

Nothing express or implied in this Guarantee is intended or shall be construed to give to any Person other than the Guarantor and the Noteholders any legal or equitable right, remedy or claim under or in respect hereof or any covenant, condition or provision therein or herein contained; and all such covenants, conditions and provisions are and shall be held to be for the sole and exclusive benefit of the Guarantor and the Noteholders.

### 6.7.    Survival of Representations and Warranties.

All representations and warranties contained herein or made in writing by the Guarantor in connection herewith shall survive the execution and delivery hereof.

### 6.8.    Expenses.

(a)    The Guarantor shall pay when billed the reasonable costs and expenses (including reasonable attorneys' fees) incurred by the Noteholders in connection with the consideration, negotiation, preparation or execution of any amendments, waivers, consents, standstill agreements and other similar agreements with respect hereto (whether or not any such amendments, waivers, consents, standstill agreements or other similar agreements are executed).

(b)    At any time when any of the Trust, the Guarantor and the Noteholders are conducting restructuring or workout negotiations in respect hereof, or a Default or Event of Default exists, the Guarantor shall pay when billed the reasonable costs and expenses (including reasonable attorneys' fees of one firm of attorneys and the reasonable fees of one firm of professional advisors) incurred by the Noteholders in connection with the assessment, analysis or enforcement of any rights or remedies that are or may be available to the Noteholders.

(c)    If the Guarantor shall fail to pay when due any principal of, or interest on, or any other amount due in respect of any Note, the Guarantor shall pay to each Noteholder, to the extent permitted by law, such amounts as shall be sufficient to cover the costs and expenses, including but not limited to reasonable attorneys' fees, incurred by such Noteholder in collecting any sums due on the Notes.

### 6.9.    Amendment.

This Guarantee may be amended only in a writing executed by the Guarantor and each Noteholder.

### 6.10.    Survival.

So long as the Guaranteed Obligations and all payment obligations of the Guarantor hereunder shall not have been fully and finally performed and indefeasibly paid, the obligations of the Guarantor hereunder shall survive the transfer and payment of any Note and the payment in full of all the Notes.

### 6.11.    Entire Agreement.

This Guarantee constitutes the final written expression of all of the terms hereof and is a complete and exclusive statement of those terms.

*6.12.* **Duplicate Originals.**

Two or more duplicate counterpart originals hereof may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

*6.13.* **Waiver of Jury Trial; Consent to Jurisdiction; Etc.**

(a)    **Waiver of Jury Trial.**    THE    PARTIES    HERETO VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTEE OR ANY OF THE DOCUMENTS, AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY.

(b)    **Consent to Jurisdiction.** ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR ANY OF THE DOCUMENTS, AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY OR ANY ACTION OR PROCEEDING TO EXECUTE OR OTHERWISE ENFORCE ANY JUDGMENT IN RESPECT OF ANY BREACH UNDER THIS GUARANTEE OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY MAY BE BROUGHT BY SUCH PARTY IN ANY FEDERAL DISTRICT COURT LOCATED IN NEW YORK CITY, NEW YORK, OR ANY NEW YORK STATE COURT LOCATED IN NEW YORK CITY, NEW YORK AS SUCH PARTY MAY IN ITS SOLE DISCRETION ELECT, AND BY THE EXECUTION AND DELIVERY OF THIS GUARANTEE, THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE NON-EXCLUSIVE IN PERSONAM JURISDICTION OF EACH SUCH COURT, AND EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES AND AGREES NOT TO ASSERT IN ANY PROCEEDING BEFORE ANY TRIBUNAL, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, ANY CLAIM THAT IT IS NOT SUBJECT TO THE IN PERSONAM JURISDICTION OF ANY SUCH COURT IN ADDITION, EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY DOCUMENT, AGREEMENT OR TRANSACTION CONTEMPLATED HEREBY BROUGHT IN ANY SUCH COURT, AND HEREBY IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    **Service of Process.** EACH PARTY HERETO IRREVOCABLY AGREES THAT PROCESS PERSONALLY SERVED OR SERVED BY U.S. REGISTERED MAIL AT THE ADDRESSES PROVIDED HEREIN FOR NOTICES SHALL CONSTITUTE, TO THE EXTENT PERMITTED BY LAW, ADEQUATE SERVICE OF PROCESS IN ANY SUIT, ACTION OR

PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY DOCUMENT, AGREEMENT OR TRANSACTION CONTEMPLATED HEREBY, OR ANY ACTION OR PROCEEDING TO EXECUTE OR OTHERWISE ENFORCE ANY JUDGMENT IN RESPECT OF ANY BREACH HEREUNDER OR UNDER ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY. RECEIPT OF PROCESS SO SERVED SHALL BE CONCLUSIVELY PRESUMED AS EVIDENCED BY A DELIVERY RECEIPT FURNISHED BY THE UNITED STATES POSTAL SERVICE OR ANY COMMERCIAL DELIVERY SERVICE.

(d)    Other Forums. NOTHING HEREIN SHALL IN ANY WAY BE DEEMED TO LIMIT THE ABILITY OF ANY HOLDER OF NOTES TO SERVE ANY WRITS, PROCESS OR SUMMONSES IN ANY MANNER PERMITTED BY APPLICABLE LAW OR TO OBTAIN JURISDICTION OVER ANY GUARANTOR IN SUCH OTHER JURISDICTION, AND IN SUCH OTHER MANNER, AS MAY BE PERMITTED BY APPLICABLE LAW.

*6.14.*    Limitation of Liability of Owner Trustee.

It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally, but solely as Owner Trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein (including, without limitation, those set forth in the exhibits hereof) made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose for binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other related documents.    All amounts due by the Trust under any Financing Document or the Trust Agreement shall be paid solely from the trust assets of Trust in accordance with the Collateral Trust Agreement.  MetLife acknowledges that the Owner Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the Trust in this Agreement.

**[Remainder of page intentionally left blank. Next page is signature page.]**

**IN WITNESS WHEREOF,** the Guarantor has caused this Guarantee to be executed on the Guarantor's behalf by a duly authorized officer of its owner trustee.

**VARIABLE FUNDING TRUST 2007-1**
By:   U.S.   Bank   Trust   National
Association, not in its individual capacity
but solely as Owner Trustee of the above
trust

By:_____
Name:
Title:

[Signature Page to Guaranty Agreement]

# ANNEX 1

## ADDRESS OF GUARANTOR

VARIABLE FUNDING TRUST 2007-1
c/o U.S. Bank Trust National Association
300 Delaware Avenue, 9th Floor
Wilmington, Delaware 19801

# AMENDED AND RESTATED MASTER PARTICIPATION AGREEMENT

Amended and Restated Master Participation Agreement

**EXECUTION VERSION**

## AMENDED AND RESTATED
## MASTER PARTICIPATION AGREEMENT

**AMENDED    AND    RESTATED    MASTER    PARTICIPATION AGREEMENT**, dated as of September 30, 2009 (this "Participation Agreement"), between the **VARIABLE FUNDING TRUST 2008-1**, a Delaware statutory trust, (the "Participant") and **LEHMAN COMMERCIAL PAPER INC.**, a New York corporation (the "Grantor").

WHEREAS, the Grantor and the Participant have previously entered into a certain Master Participation Agreement dated as of May 9, 2008 (the "Original Participation Agreement"), pursuant to which the Grantor sold to the Participant, and the Participant purchased from the Grantor, certain Participated Assets (as defined in the Original Participation Agreement); and

WHEREAS, the Grantor and the Participant have agreed to amended and restate the Original Participation Agreement in its entirety.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the Grantor and the Participant hereby agree that the Original Participation Agreement is hereby amended and rested to read in its entirety as follows:

## ARTICLE 1

## DEFINITIONS; INTERPRETATION

Section 1.1    Definitions.    Capitalized terms used herein and not otherwise defined herein shall have the meaning specified below or, to the extent not specified below, shall have the meaning specified in the Amended and Restated Trust Agreement, dated as of September 30, 2009, between Lehman Commercial Paper Inc., a Delaware corporation, and U.S. Bank Trust National Association, a national banking association, (the "Trust Agreement"), the Amended and Restated Collateral Trust Agreement, dated as of September 30, 2009, among the Participant and the Collateral Trustee (the "Collateral Trust Agreement"), or the Amended and Restated Note Purchase Agreement, dated as of September 30, 2009, among the Participant, Metropolitan Life Insurance Company and the other purchasers parties thereto (collectively, the "Purchasers") and U.S. Bank Trust National Association (the "Note Purchase Agreement"), as applicable, in each case as may be amended from time to time.

"2008 Restructuring Agreement" means the 2008 Omnibus Restructuring Agreement , dated as of September 30, 2009, among the Participant, the Grantor, the Collateral Trustee, the Purchasers, Lehman Commercial Paper Inc. and Lehman Brothers Holdings, Inc., as may be amended from time to time.

"Adverse Claim" means a lien, security interest, charge, encumbrance or other right or claim of any Person.

A/73109803.6

"Collateral Trustee" means The Bank of New York Mellon Trust Company N.A., not individually but in its capacity as collateral trustee under the Collateral Trust Agreement, and its successors and assigns as such collateral trustee.

"Custodial Agreement" means the custodial agreement, dated as of May 9, 2008, by and among the Participant, Lehman Commercial Paper Inc., Lehman Brothers Inc., The Bank of New York Mellon Trust Company N.A. and LaSalle Bank National Association, as amended by letter agreement dated as of September 30, 2009.

"Disposition Proceeds" means the proceeds received by the Grantor from the sale or other disposition of a Participated Asset or any part thereof.

"Obligor" means any Person obligated to make payments to the Grantor in connection with a Participated Asset.

"Original Participation Agreement" has the meaning specified in the recitals above.

"Participation" has the meaning provided in Section 2.1.

"Participation Transaction Documents" has the meaning provided in Section 2.1.

"Participated Asset" has the meaning specified in the recitals above.

"Person" means an individual, corporation, business trust, partnership, joint venture, association, joint stock company, limited liability company, trust or unincorporated association.

"Purchase Price" means, in respect of any Participated Asset, the amount payable by the Participant to the Grantor as the "Purchase Price " for such Participated Asset pursuant to the Original Participation Agreement.

## ARTICLE 2

## PARTICIPATIONS

Section 2.1    Grant of Participations.  The Grantor and the Participant hereby acknowledge and agree that, pursuant to the Original Participation Agreement, the Grantor has sold, and the Participant has purchased and currently owns, an undivided ownership interest of 100% in all of the Grantor's right, title and interest in and to each Participated Asset more specifically described on **Schedule A** attached hereto and made a part hereof (each such undivided ownership interest being referred to as a "Participation"), including but not limited to (i) the documents, agreements, instruments, certificates, insurance policies and indemnities evidencing, securing, guarantying or otherwise executed and delivered in connection with each Participated Asset (collectively, the "Participation Transaction Documents"), (ii) the right to receive from the Grantor the payments owed to the Grantor from time to time in respect of the Participated Assets, in the currency in which such payment is paid to the Grantor, and (iii) all

-2-

A/73109803.6

claims, suits, causes of action and any other right of the Grantor (in its capacity as holder of the Participated Asset), whether known or unknown, against each Obligor in respect of each Participated Asset or any of its affiliates, agents, representatives, contractors, advisors or any other Person arising under or in connection with the Participation Transaction Documents or that is in any way based on or related to any of the foregoing or the loan transactions governed thereby, including contract clams, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and purchased pursuant to the Original Participation Agreement. As of the date hereof, the Participant is the sole owner of the Participation in each Participated Asset. The Grantor's sale and the Participant's purchase of a Participation was an outright sale and purchase and not a loan by the Participant to the Grantor.

Section 2.2   Security Interest. In the event, however, that notwithstanding the intent expressed in Section 2.1 above, any sale and purchase of a Participation is determined not to be a sale and purchase of the Grantor's interest in any Participated Asset, or any Participation is determined not to be a sale and purchase of such interest in any Participated Asset, the Grantor hereby reaffirms the grant in the Original Participation Agreement by the Grantor to the Participant of a first priority security interest in such Participated Asset as collateral security (the "Collateral") for repayment of all consideration paid by the Participant in respect of all Participated Assets. The Grantor agrees to take, and authorizes Participant and the Collateral Trustee to take, any actions necessary to perfect the Participant's security interest in the Collateral, including, without limitation, filing a Uniform Commercial Code Financing Statement with the Secretary of State of Delaware, identifying the Grantor as debtor and the Participant as secured party, and describing the Collateral as the collateral covered thereby.

Section 2.3   Consideration. The Grantor hereby acknowledges its receipt of the Purchase Price for each Participated Asset. To the extent the fair market value of such asset exceeded such Purchase Price, such excess shall be a deemed capital contribution by the Grantor to the Participant.

Section 2.4   Pledge of Participations by the Participant. The Grantor acknowledges that the Participant has granted a security interest in the Participations and its rights hereunder in favor of the Collateral Trustee, for the benefit of the Purchasers, and the Grantor has consented thereto.

Section 2.5   Loan Note. The Grantor has delivered all promissory notes or other instruments, if any, evidencing all or any part of any Participated Asset to the Collateral Agent, duly endorsed in blank by an effective endorsement. In addition, to the extent not previously delivered, the Grantor shall deliver to the Custodian copies of all Participation Transaction Documents relating to each Participated Asset in accordance with the terms of the Custodial Agreement and the Eligibility Criteria.

Section 2.6   No Further Sales or Purchases of Participations. The Grantor and the Participant hereby acknowledge and agree that there shall be no further sales by the Grantor or purchases by the Participant of Participations hereunder

-3-

A/73109803.6

Section 2.7    Termination.  This Participation Agreement shall terminate on, but only upon, the day that the Note Purchase Agreement has been terminated and no obligations of the parties thereto remain outstanding and all Notes, together with all other indebtedness of the Participant owed to the holders of Notes and the Collateral Trustee in connection with the Note Purchase Agreement have been indefeasibly paid in full, and written confirmation of such termination has been received by the Grantor and the Participant from the Collateral Trustee.

## ARTICLE 3

## [RESERVED]

## ARTICLE 4

## DISTRIBUTIONS TO THE PARTICIPANT

Section 4.1    Distributions to the Participant.    The Grantor shall hold any payments which it may receive or collect (whether by set-off or otherwise, and expressly including Disposition Proceeds) with respect to the Participated Assets as agent for the benefit of the Participant. No later than the last day of the calendar month following the month in which the Grantor collects or receives any such payment (excluding Disposition Proceeds), the Grantor shall promptly pay to the Collateral Trustee, an amount equal to such payment, in the same or similar funds received or collected by the Grantor.  Within five (5) Business Days after the Grantor's knowledge of its receipt or collection of any Disposition Proceeds, the Grantor shall promptly pay to the Collateral Trustee an amount equal to such Disposition Proceeds, in the same or similar funds received or collected by the Grantor.  Payments by the Grantor to the Collateral Trustee shall be in accordance with the wire instructions set forth on Exhibit A attached hereto, or as Collateral Trustee may direct in writing from time to time.  Such funds shall be held and distributed by the Collateral Trustee in accordance with the provisions of the Collateral Trust Agreement.

## ARTICLE 5

## STATUS OF PARTICIPATION; RESPONSIBILITY OF THE GRANTOR

Section 5.1    Status of Participation.

(a)    Except as provided herein, the Grantor does not transfer or assign to the Participant any rights or obligations in respect of the Participated Assets.

(b)    The right of the Participant to receive payments from the Grantor is restricted to the extent of any payments received by the Grantor or to which it is entitled with respect to the Participated Assets and all such payments received by or payable to the Grantor shall be paid to the Participant in accordance with Section 4.1 of this Participation Agreement. The Grantor does not represent, warrant or guaranty that any such payments shall be made by the Obligors of the Participated Assets.

-4-

(c)    The Participant shall not be subrogated to or substituted in respect of the Grantor's claims by virtue of any payment under this Participation Agreement, and the Participant shall have no direct contractual relationship with or rights against any other party in respect of the Participated Assets as a result of this Participation Agreement.

(d)    If on any day the amount of principal or interest due on a Participated Asset is reduced or cancelled as a result of any setoff or claim asserted by any Obligor other than with respect to the related Participation, the Grantor shall pay to the Collateral Trustee, for the benefit of the Participant, an amount equal to the amount of such reduction or cancellation, in accordance with the provisions of Section 4.1.

(e)    Any provisions of this Agreement to the contrary notwithstanding, the Participant shall have no obligation to fund any advances or other payments required to be made by the Grantor in respect of the Participated Assets under the terms of the Participation Transaction Documents pertaining thereto, except to the extent (i) the Grantor in fact funds such advances and payments and (ii) the Participant is entitled to releases of funds from the Revolver Holding Account pursuant to Section 3.5 of the Collateral Trust Agreement.

Section 5.2    Responsibility of the Grantor.

(a)    None of the Grantor's officers, directors, employees, shareholders, agents, affiliates or attorneys shall have any responsibility for any mistake, error of judgment or action taken or omitted in connection with this Participation Agreement, or the Participated Assets, except for its or their own gross negligence or willful misconduct.

(b)    Each of the Grantor's officers, directors, employees, shareholders, agents or attorneys shall be entitled to rely in good faith on the opinions and statements of legal counsel and other professional advisors selected by it, in good faith, and on any communication or document believed by it to be genuine and correct and to have been sent or signed by such proper person or persons, and none of such Persons shall have any responsibility for any consequence of any such reliance.

(c)    The Grantor will be receiving as agent for the benefit of the Participant the amounts the Grantor is required to distribute to the Participant hereunder; however, the Grantor is not a trustee or other fiduciary for the Participant, and neither this Participation Agreement nor any action taken by the Grantor hereunder shall constitute between the Grantor and the Participant a partnership, association, joint venture or other common enterprise. The Grantor shall not be subject to any duties or obligations hereunder or in respect of any Participated Assets, other than those expressly provided for herein or in the Operative Documents.

(d)    Notwithstanding any other provision of this Participation Agreement, the Participant hereby acknowledges and agrees that the Grantor's obligations hereunder will be solely the obligations of the Grantor, and the Participant will not have any recourse to any of the directors, officers, employees, shareholders, agents, attorneys or affiliates of the Grantor with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby or in the Operative Documents. Notwithstanding

-5-

anything to the contrary herein, the Grantor's obligation to make payments to the Participant due from it hereunder shall be conditional on the Grantor receiving payments with respect to the Participated Assets, except as provided in Section 5.1(d).

(e)      [Reserved].

(f)      After any default or event of default under any Transaction Document actually known to the Grantor, the Grantor shall give to the Participant and the Collateral Trustee prompt notice of such default. Subject to the provisions of the Financing Documents, Participant shall determine whether and when to exercise any remedies with respect to any default, and shall promptly notify the Grantor of the decision the Grantor shall be required to make with respect thereto.

(g)      The Participant and the Collateral Trustee, upon reasonable advance notice to the Grantor, shall have the right to an accounting for all money and other property received by the Grantor in connection with each Participated Asset with respect to which it has sold a Participation to the Participant.

(h)      The Grantor shall not sell or grant any interest or participation in any Participated Asset other than the Participation granted and sold to Participant in such Participated Asset, except for sales of Participated Assets permitted by, and completed strictly in accordance with, the provisions of the 2008 Restructuring Agreement.

(i)      The Grantor represents and warrants to the Participant that:

(i)      Immediately prior to each sale of a Participation to the Participant, the Grantor was the legal and beneficial owner of record of the related Participated Asset, free and clear of any Adverse Claim. Upon each sale of a Participation, the Participant was conveyed a 100% undivided ownership interest in the related Participated Asset, free and clear of any Adverse Claim (except as created pursuant to the Participation Transaction Documents). No third party has any interest in any Participated Asset other than the Participant, excluding interests by Persons claiming through the Participant.

(ii)      During the prior five years, the Grantor has not been known as or used any legal name other than the name of the Grantor appearing on the signature page hereto, and in the case of a change in legal name after the date hereof, such other legal name as has been notified to the Participant pursuant to paragraph (m) below. The federal employer identification number of the Grantor is 13-2501865.

(j)      The Grantor shall perform each of its obligations under the Participation Transaction Documents and comply in all material respects with all federal, state and local laws and regulations applicable to it and the Participated Assets, including those relating to truth in lending, fair credit reporting, equal credit opportunity, fair debt collection practices, privacy, licensing, taxation, ERISA and labor matters and environmental laws; provided, Participant

-6-

expressly acknowledges that the Grantor may not have funded all of its obligations under those Participated Assets consisting of interests in revolving loans, and the Grantor may elect, in its good faith judgment, not to fund such obligations after the date hereof.

(k)    Except as provided herein, the Grantor shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to or create any Adverse Claim upon (including, without limitation, the filing of any financing statement) or with respect to, or assign any other interest in, any Participated Asset or assign any right to receive income in respect thereof.

(l)    [Reserved].

(m)    The Grantor will promptly notify Participant and the Collateral Trustee of any change in its legal name, identity, company, structure or jurisdiction of organization.

(n)    The Participant may at any time following the occurrence of a "Conversion Event" (as defined below), require the Grantor to absolutely assign to Participant all of the Grantor's legal title and remaining interests, if any, in and to any or all of the Participated Assets upon at least three (3) Business Days' prior written notice. In furtherance thereof, the Grantor and the Participant have executed and delivered to the Collateral Trustee assignments (the "Assignments") of the Grantor's legal title and remaining interests, if any, in all Participated Assets and all related rights and obligations (under the Participation Transaction Documents or otherwise), such Assignments to be held by the Collateral Trustee in accordance with the provisions of the Collateral Trust Agreement. The Grantor acknowledges and agrees that any such Assignments delivered to the Collateral Trustee shall be effective at such time as a Conversion Event occurs and the Collateral Trustee notifies the Grantor and the Participant that, pursuant to the Collateral Trust Agreement, it has exercised its rights in respect of those Assignments designated by it.   None of the Participant, the Collateral Trustee or any other Person shall be required to pay any additional amount to the Grantor in consideration of any such Assignment.   The parties agree to take such actions, provide such notices and execute such documents as either party or the Collateral Trustee may reasonably request to effectuate any such Assignment.   "Conversion Event" means an Event of Default under the Note Purchase Agreement.

(o)    The Grantor and the Participant each agree that from time to time, at the Grantor's expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may be necessary, or that the Participant may reasonably request, to perfect, protect, defend or more fully evidence the ownership interest of the Participant (and its assigns) in the Participations. The Grantor hereby authorizes the Participant to file financing statements and other filing or recording documents with respect to the Participant's interest in the Participated Assets (including any amendments thereto, or continuation or termination statements thereof), without the signature or other authorization of the Grantor, in such form and in such offices as the Participant reasonably determines appropriate to perfect or maintain the perfection of the interest of the Participant in the Participated Assets. The Grantor approves, authorizes and ratifies any filings or recordings made by or on behalf of the Participant in

-7-

connection with the perfection of the interests in favor of the Participant in the Participated Assets.

(p)    The Grantor will cause the Participated Assets to be serviced by Administrative Agent pursuant to the terms and conditions of the Administration Agreement.

## ARTICLE 6

## GENERAL

Section 6.1    <u>Governing Law</u>.  This Participation Agreement shall be construed and interpreted in accordance with the law of the State of New York, which shall govern this Participation Agreement and any controversy or claim arising out of or relating to this Participation Agreement, without regard to conflict of laws principles.

Section 6.2    <u>Binding Effect; Assignments</u> .  This Participation Agreement shall be binding upon and inure to the benefit of the Grantor and the Participant and their respective successors and permitted assigns.  The Grantor shall not assign its rights or obligations hereunder with respect to any Participation or Participated Asset or any interest herein with respect to a Participation or Participated Asset without the prior written consent of the Participant and the Collateral Trustee.  Participant shall not assign its rights or obligations hereunder without the prior written consent of the Grantor except pursuant to the terms of the Financing Documents and the exercise of the rights of the Collateral Trustee thereunder.

Section 6.3    <u>Integration of Terms; Amendments</u>.  This Participation Agreement contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.  This Participation Agreement may not be amended or modified except in a writing signed by both parties hereto and the Collateral Trustee.

Section 6.4    <u>Counterparts</u>.  This Participation Agreement may be executed in any number of counterparts, and all the counterparts taken together shall be deemed to constitute one and the same instrument.

Section 6.5    <u>No Petition</u>.  Each of the parties hereto hereby agrees that it shall not institute against, or join any other Person in instituting against, the Participant any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding, under any federal or state bankruptcy or similar law, for one year and one day after the latest maturing Note issued by the Participant is paid in full and the Note Purchase Agreement has been terminated and no obligations or rights of either party thereunder shall exist; <u>*provided*</u> that, the Grantor shall be entitled at any time to participate in any such proceeding against Participant so long as such proceeding was instituted by a Person other than the Grantor. The provisions of this Section shall survive the termination of this Participation Agreement.

Section 6.6    <u>[Reserved]</u>.

-8-

Section 6.7    <u>Limitation of Liability</u>.  It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally, but solely as Owner Trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose for binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement or any other related documents.  All amounts due hereunder by the Trust shall be paid solely from the trust assets of the Trust in accordance with the Trust Agreement.  The Grantor acknowledges that the Owner Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the Trust in this Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

A/73109803.6

**IN WITNESS WHEREOF,** the, parties have caused this Amended and Restated Master Participation Agreement to be duly executed as of the date first written above.

**LEHMAN COMMERCIAL PAPER INC.**, as the Grantor

By:    _____

Name:
Title:

**VARIABLE FUNDING TRUST 2008-1**, as the Participant

By:    U.S. Bank Trust National Association, not individually but solely as Owner Trustee

By:    _____

Name:
Title:

*[Signature Page to Amended and Restated Master Participation Agreement]*

A/73109803.6

# SCHEDULE A

## DESCRIPTION OF PARTICIPATED ASSETS

A/73109803.6

# EXHIBIT A

## COLLATERAL TRUSTEE'S WIRE INSTRUCTIONS

## SCHEDULE A

## DESCRIPTION OF PARTICIPATED ASSETS

**TERM LOANS**

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| Credit Agreement dated as of October 26, 2007 among Bausch & Lomb Incorporated, as Parent Borrower, Bausch & Lomb B.V., as Dutch Subsidiary Borrower, WP Prism Inc., as Holdings, Credit Suisse, as Administrative Agent, Swing Line Lender and L/C Issuer and each lender from time to time a party thereto, as Lenders. | Parent Term Loan | $6,865,684 | 0.5721% | 100.00% | May 9, 2008 |
| $8,000,000,000 Amended and Restated Credit Agreement dated as of March 18, 1999, as amended and restated as of March 6, 2007, among Charter Communications Operating, LLC, as Borrower, CCO Holdings, LLC, as Holdings, JPMorgan Chase Bank, N.A., as Administrative Agent, JPMorgan Chase Bank, N.A. and Bank of America, N.A., as Syndication Agents, Citigroup North America, Inc., Deutsche Bank Securities Inc, General Electric Capital Corporation and Credit Suisse Securities (USA) LLC, as Revolving Facility Co-Documentation Agents, Citicorp North America, Inc., Credit Suisse Securities (USA) LLC, General Electric Capital Corporation and Deutsche Bank Securities Inc., as Term Facility Co-Documentation Agents, and the several banks and other financial institutions or entities from time to time parties thereto, as Lenders. | Term Loan | $28,001,017 | Cannot Be Determined* *A/R Credit Agreement does not describe the full amount of the total commitment, which is based, in part, on the principal balance of the Term Loans on the date of amendment and restatement | 100.00% | May 9, 2008 |
| Term Facility and Credit Agreement dated as of January 31, 2008 among Dana Holding Corporation, as Borrower, each of the direct and indirect subsidiaries of Borrower, as Guarantors, the Initial Lenders and the other banks, financial institutions and other institutional lenders a party thereto, as Lenders, Citicorp USA, Inc., as Administrative Agent and Collateral Agent, Citigroup Global Markets, Inc. and Lehman Brothers Inc., as Joint Lead Arrangers, Citigroup Global Markets, Inc., Lehman Brothers Inc. and Barclays Capital, as Joint Bookrunners, Lehman Brothers Inc., as Syndication Agent, and Barclays, as Documentation Agent, as amended on November 21, 2008 and April 30, 2009. | Term Facility | $35,886,868 | 2.5096% | 100.00% | May 9, 2008 |

A/73153495.4

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| First Lien Credit Agreement dated as of May 4, 2007 among Dresser Intermediate Holdings, Inc., as Holdings, CRFRC-D Merger Sub, Inc., as Initial U.S. Borrower, Dresser, Inc., as Borrower, D.I. Luxembourg S.A.R.L., as Euro Borrower, the Lenders a party thereto from time to time, Lehman Commercial Paper Inc., as Term Administrative Agent for the Term B Loan Facility and as Collateral Agent, Wells Fargo Bank, National Association, as Administrative Agent for the Revolving Facility, Morgan Stanley Senior Funding, Inc., as Syndication Agent, Credit Suisse Securities (USA) LLC and UBS Securities LLC, as Co-Documentation Agents, and Lehman Brothers Inc., Morgan Stanley & Co. Incorporation, Credit Suisse Securities (USA) LLC and UBS Securities LLC, as Joint Lead Arrangers and Joint Bookrunners. | Term B Loan Facility | $2,632,156 | 0.2025% | 100.00% | May 9, 2008 |
| Credit Agreement dated as of March 31, 2008 among Fairpoint Communications, Inc. and Northern New England Spinco Inc., as Borrowers, the Lenders from time to time a party thereto, Bank of America, N.A., as Syndication Agent, Morgan Stanley Senior Funding, Inc. and Deutsche Bank Securities Inc., as Co-Documentation Agents, and Lehman Commercial Paper Inc., as Administrative Agent. | A Term Facility | $59,284,919 | 11.8570% | 100.00% | May 9, 2008 |
| Credit Agreement dated as of September 24, 2007, as amended and restated as of September 28, 2007, among First Data Corporation, as Borrower, the lending institutions from time to time a party thereto, as Lenders, Credit Suisse, Cayman Islands Branch, as Administrative Agent, Swingline Lender and Letter of Credit Issuer, Citibank, N.A., as Syndication Agent and Credit Suisse Securities (USA) LLC, Citigroup Global Markets, Inc., Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P., HSBC Securities (USA) Inc., Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Joint Lead Arrangers and Bookrunners. | Initial Tranche B-1 Term Loan | $49,497 | 0.0011% | 100.00% | May 9, 2008 |

Schedule A-2

A/73153495.4

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| Credit Agreement dated as of September 24, 2007, as amended and restated as of September 28, 2007, among First Data Corporation, as Borrower, the lending institutions from time to time a party thereto, as Lenders, Credit Suisse, Cayman Islands Branch, as Administrative Agent, Swingline Lender and Letter of Credit Issuer, Citibank, N.A., as Syndication Agent and Credit Suisse Securities (USA) LLC, Citigroup Global Markets, Inc., Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P., HSBC Securities (USA) Inc., Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Joint Lead Arrangers and Bookrunners. | Initial Tranche B-2 Term Loan | $359,806 | 0.0083% | 100.00% | May 9, 2008 |
| Credit Agreement dated as of September 24, 2007, as amended and restated as of September 28, 2007, among First Data Corporation, as Borrower, the lending institutions from time to time a party thereto, as Lenders, Credit Suisse, Cayman Islands Branch, as Administrative Agent, Swingline Lender and Letter of Credit Issuer, Citibank, N.A., as Syndication Agent and Credit Suisse Securities (USA) LLC, Citigroup Global Markets, Inc., Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P., HSBC Securities (USA) Inc., Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Joint Lead Arrangers and Bookrunners. | Initial Tranche B-3 Term Loan | $4,501,659 | 0.1501% | 100.00% | July 23, 2008 |
| First Lien Credit Agreement dated as of December 20, 2005 among Georgia-Pacific Corporation, as U.S. Borrower, Georgia-Pacific Canada, Consumer Products, Inc., as Canadian Borrower, Georgia-Pacific Expansion S.A.S., as French Borrower, Georgia-Pacific S.A.R.L., as Luxembourg Borrower, Georgia-Pacific, LLC, as Parent, Georgia-Pacific Holdings, LLC, as Holdings, the Issuers is party thereto, Citicorp North America, Inc., as Administrative Agent and as Collateral Agent, as amended by Amendment No. 1 dated as of February 14, 2006, as amended by Amendment No. 2 dated as of December 29, 2006, as amended by Amendment No. 3 dated as of March 12, 2007, as amended by Amendment No. 4 dated as of December 19, 2008, as amended by Amendment No. 5 dated as of July 6, 2009. | Term B Facility | $865,520 | 0.0138% *based on amount described in "Principal Amount" column and calculated after giving effect to Amendment No. 5, which post-dates the participation letter | 100.00% | May 9, 2008 * A portion of the participation interest in Term B Facility was converted to an interest in the Term C Facility on July 6, 2009 |

A/73153495.4

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| First Lien Credit Agreement dated as of December 20, 2005 among Georgia-Pacific Corporation, as U.S. Borrower, Georgia-Pacific Canada, Consumer Products, Inc., as Canadian Borrower, Georgia-Pacific Expansion S.A.S., as French Borrower, Georgia-Pacific S.À.R.L., as Luxembourg Borrower, Georgia-Pacific, LLC, as Parent, Georgia-Pacific Holdings, LLC, as Holdings, the Issuers a party thereto, Citicorp North America, Inc., as Administrative Agent and as Collateral Agent, as amended by Amendment No. 1 dated as of February 14, 2006, as amended by Amendment No. 2 dated as of December 29, 2006, as amended by Amendment No. 3 dated as of March 12, 2007, as amended by Amendment No. 4 dated as of December 19, 2008, as amended by Amendment No. 5 dated as of July 6, 2009. | Term C Facility | $476,673 | 0.0477% *based on amount described in "Principal Amount" column and calculated after giving effect to Amendment No. 5, which post-dates the participation letter | 100.00% | May 9, 2008[*] *A portion of the participation interest in Term B Facility was converted to an interest in the Term C Facility on July 6, 2009 |
| Credit Agreement dated as of January 28, 2008 among Hamlet Merger, Inc., as Holdings, Harrah's Operating Company, Inc., as Borrower, the Lenders a party thereto from time to time, Bank of America, N.A., as Administrative Agent and Collateral Agent, Deutsche Bank AG New York Brand, as Syndication Agent, and Citibank, N.A., Credit Suisse, Cayman Islands Branch, JPMorgan Chase Bank, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporation, Goldman Sachs Credit Partners L.P., Morgan Stanley Senior Funding, Inc. and Bear Stearns Corporate Lending Inc., as Documentation Agents. | Term B-1 Facility | $21,049,239 | 0.9460% | 100.00% | May 9, 2008 |
| Credit Agreement dated as of January 28, 2008 among Hamlet Merger, Inc., as Holdings, Harrah's Operating Company, Inc., as Borrower, the Lenders a party thereto from time to time, Bank of America, N.A., as Administrative Agent and Collateral Agent, Deutsche Bank AG New York Brand, as Syndication Agent, and Citibank, N.A., Credit Suisse, Cayman Islands Branch, JPMorgan Chase Bank, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporation, Goldman Sachs Credit Partners L.P., Morgan Stanley Senior Funding, Inc. and Bear Stearns Corporate Lending Inc., as Documentation Agents. | Term B-2 Facility | $413,483 | 0.0138% | 100.00% | May 9, 2008 |

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| Credit Agreement dated as of November 17, 2006 among HCA Inc., as Parent Borrower, HCA UK Capital Limited, as European Subsidiary Borrower, the lending institutions from time to time parties thereto, as Lenders, Bank of America, N.A., as Administrative Agent, Swingline Lender and Letter of Credit Issuer, JPMorgan Chase Bank, N.A. and Citicorp North America, Inc., as Co-Syndication Agents, Banc of America Securities LLC, J.P. Morgan Securities Inc., Citigroup Global Markets Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporation, as Joint Lead Arrangers and Bookrunners, Deutsche Bank Securities Inc. and Wachovia Capital Markets LLC, as Joint Bookrunners and Merrill Lynch Capital Corporation, as Documentation Agent, as amended by Amendment No. 1, dated as of February 16, 2007, as amended by Amendment No. 2, dated as of March 2, 2009, as amended by Amendment No. 3, dated as of June 18, 2009. | Tranche A-1 Term Loan Facility | $1,477,997 | 0.0537% | 100.00% | May 9, 2008 |
| Credit Agreement dated as of November 17, 2006 among HCA Inc., as Parent Borrower, HCA UK Capital Limited, as European Subsidiary Borrower, the lending institutions from time to time parties thereto, as Lenders, Bank of America, N.A., as Administrative Agent, Swingline Lender and Letter of Credit Issuer, JPMorgan Chase Bank, N.A. and Citicorp North America, Inc., as Co-Syndication Agents, Banc of America Securities LLC, J.P. Morgan Securities Inc., Citigroup Global Markets Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporation, as Joint Lead Arrangers and Bookrunners, Deutsche Bank Securities Inc. and Wachovia Capital Markets LLC, as Joint Bookrunners and Merrill Lynch Capital Corporation, as Documentation Agent, as amended by Amendment No. 1, dated as of February 16, 2007, as amended by Amendment No. 2, dated as of March 2, 2009, as amended by Amendment No. 3, dated as of June 18, 2009. | Tranche B-1 Term Loan Facility | $5,738,489 | 0.0649% | 100.00% | May 9, 2008 |
| Credit Agreement dated as of July 31, 2007 among InterGen N.V., as Borrower, the Guarantors a party thereto, the Lenders a party thereto, the Issuing Banks a party thereto, the Swing Line Banks a party thereto, and Calyon New York Branch, as Administrative Agent. | Term Facility (as a Term Sterling Lender) | £22,063,722 | 4.4839% | 100.00% | May 9, 2008 |

Schedule A-5

A/73153495.4

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| Credit Agreement dated as of November 1, 2007, among Metavante Technologies, Inc., as Holdings, Metavante Corporation, as Borrower, the several banks and other financial institutions or entities from time to time parties thereto, as Lenders, Lehman Commercial Paper Inc. and Baird Financial Corporation, as Documentation Agents, Morgan Stanley Senior Funding Inc., as Syndication Agent, and JPMorgan Chase Bank, N.A., as Administrative Agent. | Term Loan | $1,974,937 | 0.4647% | 100.00% | May 9, 2008 |

**REVOLVING LOANS**

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| Initial Bank Debt Facility Agreement dated as of July 26, 2007 among Qatar Liquefied Gas Company Limited (4), as Borrower, the Senior Debt Holders described therein, as the Initial Bank Debt Lenders, and Calyon, as Initial Bank Debt Facility Agent. | Initial Bank Debt Term Loan | $41,254,508 | 1.4734% | 100.00% | May 9, 2008 |
| Agreement (Multi Currency Revolving Credit Facility) originally dated August 1, 2005, among Telecom Italia S.p.A., as Borrower, Telecom Italia S.p.A., as Guarantor, Banca Intesa S.p.A, Banco Bilbao Vizcaya Argentaria S.A., JP Morgan plc, Mediobanca – Banca di Credito Finananziario S.p.A. and Unicredit Banca Mobiliare S.p.A., as Initial Mandated Lead Arrangers and Bookrunners, J.P. Morgan Europe Limited, as Agent, Competitive Bid Agent and Euro Swingline Agent, JPMorgan Chase Bank, N.A., as Dollar Swingline Agent and the Lenders a party thereto, as amended by Amendment Letter dated January 12, 2007. | Facility | €20,250,000.00 | 0.1985% | 100.00% | May 9, 2008 |

Schedule A-6

| Credit Agreement | Loan Tranche | Principal Amount (as of 9/30/2009) | Percent of Loan Tranche Commitment | Percent of Participation | Date of Participation |
|---|---|---|---|---|---|
| Agreement dated October 31, 2005 among Telefónica Europe B.V., as Borrower, Telefónica, S.A., as Parent, Banco Santander Central Hispano, S.A., Citigroup Global Markets Limited, Deutsche Bank AG, London Branch, Société Générale, S.A. and The Royal Bank of Scotland PLC, as Bookrunners, the Lenders and Citibank International PLC as Agent, as amended by a syndication and amendment agreement dated December 14, 2005, as amended by a syndication and amendment agreement dated February 10, 2006, as amended by an amendment and restatement agreement dated December [   ], 2006. | Facility E | £6,197,731 | 0.2951% | 100.00% | May 9, 2008 |
| Sixth Amended and Restated Credit Agreement dated as of June 24, 2009 among TRW Automotive Holdings Corp., as Holdings, TWO Automotive Intermediate Holdings Corp., as Intermediate Holdings, TRW Automotive Inc., as U.S. Borrower, certain Foreign Subsidiary Borrowers a party thereto, the Lenders a party thereto from time to time, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, and Bank of America, N.A., as Syndication Agent. | Global Revolving Facility | $0.00 | 0.0000% | 100.00% | May 9, 2008 |
| Third Amended and Restated Credit Agreement dated as of February 22, 2008 among Westar Energy, Inc., as Borrower, the several banks and other financial institutions or entities from time to time parties thereto, as Lenders, JPMorgan Chase Bank, N.A., as Administrative Agent, Citibank, N.A., as Syndication Agent, The Bank of New York, Union Bank of California, N.A., Wachovia Bank, National Association and Bank of America, N.A., as Documentation Agents. | Revolving Loan | $1,466,667 | 0.1955% | 100.00% | May 9, 2008 |

Schedule A-7

A/73153495.4

# AMENDED AND RESTATED TRUST AGREEMENT

Amended and Restated Trust Agreement.

**EXECUTION VERSION**

**AMENDED AND RESTATED TRUST AGREEMENT**

This AMENDED AND RESTATED TRUST AGREEMENT, dated as of September 30, 2009 (the "Trust Agreement"), is hereby executed by and between Lehman Commercial Paper Inc., a New York corporation, as depositor (the "Depositor") and U.S. Bank Trust National Association, a national banking association, as owner trustee (the "Owner Trustee").

In consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree, that this Agreement shall amend and restate in its entirety that certain Trust Agreement, dated as of May 9, 2008, between the Depositor and the Owner Trust (the "Original Trust Agreement"), and further agree as follows:

**ARTICLE I**

**DEFINITIONS**

Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in that certain Amended and Restated Collateral Trust Agreement, dated as of September 30, 2009, between the Trust (as defined herein) and The Bank of New York Mellon Trust Company N.A. (f/k/a The Bank of New York Trust Company, N.A.) (the "Collateral Trustee") (as may be amended, supplemented or modified from time to time the "Collateral Trust Agreement"), and the Amended and Restated Note Purchase Agreement, dated as of September 30, 2009, among the Trust, the Owner Trustee, Metropolitan Life Insurance Company and the other purchasers parties thereto (as may be amended, supplemented or modified from time to time the "Note Purchase Agreement"), which also contain rules of construction that shall be applicable herein. Further, the following terms shall have the following definitions:

"Agreement" means this Amended and Restated Trust Agreement, as amended, supplemented or otherwise modified from time to time.

"Administration Agreement" shall mean the Amended and Restated Administration Agreement, dated as of the date hereof, by and among the Trust, MetLife, the UK Co-Collateral Trustee and Lehman Commercial Paper Inc., as administrative agent, as amended, supplemented or otherwise modified from time to time.

"Administrative Agent" means Lehman Commercial Paper Inc., in its capacity as administrative agent under the Administration Agreement.

"Certificateholder" means Lehman Commercial Paper Inc., and thereafter, the owner of the Trust Certificate representing beneficial interests in the Trust.

"Collateral Trust Agreement" shall have the meaning ascribed to it in the first paragraph of Article I of this Agreement.

"Custodial Agreement" means any custodial agreement, entered into from time to time, by and among Lehman Commercial Paper Inc., Lehman Brothers Inc., U.S. Bank Trust National

Association, the Collateral Trustee and the custodian thereunder relating to possession of parts of the Trust Estate.

"Deed of Charge" shall mean the Trust Deed of Charge, as amended by an Amendment and Restatement Deed, both dated as of the date hereof, by and among The Bank of New York Mellon Trust Company, N.A., The Bank of New York Mellon, London Branch, Lehman Commercial Paper Inc., Lehman Commercial Paper Inc., London Branch, and the Trust, as amended, supplemented or otherwise modified from time to time.

"Depositor" shall have the meaning ascribed to such term in the caption to this Agreement.

"Interest Pledge Agreement" shall mean the Equity Interest Pledge Agreement, dated as of May 9, 2008, by and between Lehman Commercial Paper Inc., and The Bank of New York Mellon Trust Company N.A. (f/k/a The Bank of New York Trust Company, N.A.), as amended, supplemented or modified from time to time.

"Lehman Guarantee Agreement" shall mean that certain Guarantee Agreement of Lehman Brothers Holdings Inc., dated as of May 9, 2008, delivered to MetLife, as amended, supplemented or otherwise modified from time to time, including that certain amendment dated the date hereof.

"Master Assignment Agreement" shall mean the Master Loan Assignment Agreement, dated as of May 9, 2008, by and between Variable Funding Trust 2008-1 and Lehman Commercial Paper Inc., as amended, supplemented or otherwise modified from time to time, including that certain amendment dated the date hereof.

"Master Participation Agreement" shall mean the Amended and Restated Master Participation Agreement, dated as of the date hereof, by and between the Trust and Lehman Commercial Paper Inc., as amended, supplemented or otherwise modified from time to time.

"Notes" means the Variable Rate Senior Secured Revolving Notes issued pursuant to the Note Purchase Agreement.

"Noteholder" means any holder of a Note.

"Obligations" shall have the meaning ascribed to it in the Lehman Guarantee Agreement.

"Original Trust Agreement" shall have the meaning ascribed to such term in the second paragraph hereof.

"Security Agreement" shall mean the Amended and Restated Security Agreement, dated as of the date hereof, by and between the Trust and The Bank of New York Mellon Trust Company N.A. (f/k/a The Bank of New York Trust Company, N.A.), as amended, supplemented or otherwise modified from time to time.

"Transaction Documents" means collectively, the Note Purchase Agreement, the Collateral Trust Agreement, the 2008 Restructuring Agreement, the Lehman Guarantee

2

Agreement, the 2008 Issuer Guarantee, the Security Agreement, the Interest Pledge Agreement, the Custodial Agreement, the Administration Agreement, the Master Participation Agreement, the Master Assignment Agreement, the Deed of Charge and any other Operative Document to which the Trust is a party.

"Trust" shall have the meaning ascribed to such term in Section 2.01 of this Agreement.

"Trust Estate" shall have the meaning ascribed to such term in the Collateral Trust Agreement.

"Trust Certificate" shall have the meaning ascribed to such term in Section 3.01 of this Agreement.

"2008 Issuer Guarantee" shall mean that certain Guarantee Agreement, dated as of the date hereof, by the Trust in favor of the holders of Notes of Variable Funding Trust 2008-1, as amended, restated or otherwise modified from time to time.

## ARTICLE II

## ORGANIZATION

2.01    General. The trust continued hereby shall be known as the "Variable Funding Trust 2008-1" (and shall be referred to herein as the "Trust"), in which name the Trust may conduct the activities contemplated hereby, make and execute contracts and other instruments and sue and be sued. The Trust was formed as a statutory trust under Chapter 38 of Title 12 of the Delaware Code, 12 Del Code §3801 et seq (the "Delaware Statutory Trust Act"), pursuant to a certificate of trust filed with the Secretary of the State of Delaware on May 9, 2008.

2.02    Office. The office of the Trust shall be in care of the Owner Trustee, addressed to U.S. Bank Trust Company National Association, 300 Delaware Avenue, 9th Floor, Wilmington, DE 19801 (the "Corporate Trust Office") or at such other address as the Owner Trustee may designate by notice to the Depositor.

2.03    Purposes and Powers. The purpose of the Trust is to engage in the following activities:

   (i) to accept contributions of assets from and distributions to the Certificateholder with respect to the Trust Estate from time to time;

   (ii) to enter into and perform its obligations under the Transaction Documents to which it is to be a party;

   (iii) to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

3

(iv)    subject to compliance with the Transaction Documents, to engage in such other activities as may be required in connection with conservation of the Trust Estate.

The Trust is not established as a business and shall not engage in any activity other than as required or authorized by the terms of this Agreement or the other Transaction Documents.

2.04    <u>Appointment of the Owner Trustee</u>. The Depositor hereby reconfirms the appointment of the Owner Trustee as trustee of the Trust as of May 9, 2008 to have all the rights, powers and duties set forth herein and in the Delaware Statutory Trust Act. The Owner Trustee acknowledges receipt in trust from the Depositor as of May 9, 2008, of the sum of one dollar, which constituted the initial Trust Estate.

2.05    <u>Declaration of Trust</u>. The Owner Trustee hereby declares and reaffirms that it has and will hold the Trust Estate in trust upon and subject to the conditions set forth herein for the use and benefit of the Depositor. It is the intention of the parties hereto that the Trust constitute a statutory trust under the Delaware Statutory Trust Act and that this Agreement constitutes the governing instrument of the Trust.

2.06    <u>Situs of Trust</u>. The Trust will be located and administered in the States of Delaware or New York. All bank accounts maintained by the Owner Trustee on behalf of the Trust shall be located in the State of Delaware or New York. The Trust's only office is and will be at the office of the Owner Trustee as set forth herein.

2.07    <u>Liability of Certificateholder</u>. The Certificateholder shall be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the general corporation law of the State of Delaware.

2.08    <u>Title to Trust Property</u>. Legal title to the Trust Estate shall be vested at all times in the Trust as a separate legal entity except where applicable law in any jurisdiction requires title to any part of the Trust Estate to be vested in a trustee or trustees, in which case title shall be deemed to be vested in the Owner Trustee, a co-trustee and/or a separate trustee, as the case may be.

## ARTICLE III

## TRUST CERTIFICATES AND TRANSFER OF INTEREST

3.01    <u>Issuance of Trust Certificate</u>. On May 9, 2008, the Owner Trustee issued and delivered on behalf of the Trust to the Certificateholder a Trust Certificate in the form of <u>Exhibit A</u> to the Original Trust Agreement (the "<u>Trust Certificate</u>") registered in the name of the Depositor evidencing 100% of the beneficial interest in the Trust. The Owner Trustee shall keep or cause to be kept, at the office or agency, a certificate register for the Trust Certificate in which, subject to such reasonable regulations as it may prescribe, the Owner Trustee shall provide for the registration of the Trust Certificate and of transfers and exchanges of the Trust Certificate as provided herein.

4

3.02    Limitation on Transfer of Ownership Rights. Notwithstanding anything herein or in any other Transaction Document to the contrary, the Certificateholder shall not (i) sell, assign, grant, transfer, pledge, mortgage or convey any or all of its beneficial interest in the Trust or the Trust Certificate unless each prospective transferee of an interest in the Trust Certificate delivers to the Owner Trustee a letter from the prospective transferee stating that it is an Institutional Investor that is both (a) a "qualified purchaser" within the meaning of the Investment Company Act of 1940, as amended and (b) an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of the Securities Act and an opinion of counsel satisfactory to the Owner Trustee that such prospective transfer is exempt from registration under the Securities Act and state securities law or (ii) assign all or any part of its right to receive distributions hereunder, except as provided in Section 11.03 of this Agreement. Additionally, such transferee shall represent to the Owner Trustee that it is not, and is not using the assets of, an employee benefit plan subject to section 406 of ERISA or a plan subject to Section 4975 of the Code or a plan or employee benefit plan that is subject to any federal, state or local law that is materially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or an entity whose underlying property includes plan assets by reason of investment in the entity by such a plan or employee benefit plan.

## ARTICLE IV

## CONCERNING THE CERTIFICATEHOLDER AND OTHER MATTERS

4.01    Action by Certificateholder Trustee with Respect to Certain Matters.

(a)    Subject to the terms of this Agreement and in accordance with the terms of the Transaction Documents, the Certificateholder may by written instruction direct the Owner Trustee in the management of the Trust but only to the extent consistent with the limited purpose of the Trust. Such direction may be exercised at any time by written instruction of the Certificateholder.

(b)    The Owner Trustee shall take such action or actions as may be specified in any instructions delivered in accordance with Section 4.01(a) hereof; provided, however, that the Owner Trustee shall not be required to take any such action if the Owner Trustee shall have reasonably determined, or shall have been advised by counsel, that such action (A) is contrary to the terms hereof or of any document contemplated hereby to which the Owner Trustee or the Trust is a party or is otherwise contrary to law or (B) is likely to result in liability on the part of the Owner Trustee, unless the Certificateholder shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking such action.

(c)    [Reserved].

(d)    No Petition, Etc. In addition to the foregoing, none of the Owner Trustee, the Depositor and the Certificateholder shall have the power to:

(i)    institute proceedings to have the Trust declared or adjudicated bankrupt or insolvent,

A/73145577.5

(ii)    consent to the institution of bankruptcy or insolvency proceedings against the Trust,

(iii)    file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy,

(iv)    consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the assets of the Trust,

(v)    make any assignment for the benefit of the Trust's creditors,

(vi)    cause the Trust to admit in writing its inability to pay its debts generally as they become due, or

(vii)    take any action, or cause the Trust to take any action, in furtherance of any of the foregoing (each a "Bankruptcy Action");

provided, however, if the foregoing limitation is finally determined by a court of competent jurisdiction not to be enforceable under the United States Bankruptcy Code (the "Bankruptcy Code") or applicable state law, then the Owner Trustee shall not be authorized to take the actions specified in the preceding clauses (i) through (vii), or any of them, unless the Owner Trustee receives, at the sole expense of the Certificateholder, (A) the written consent thereto of the Certificateholder, who shall be required at such time to certify to the Owner Trustee that the Trust is then "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code, (B) the written confirmation by independent accountants to the Trust as to the "sum of the Trust's debts", (C) the written confirmation by an outside valuation expert, having reasonable expertise in the valuation of assets, as to the value of "all of the Trust's property, at a fair valuation" and (D) a written opinion by outside counsel to the Trust, having reasonable expertise in practice under the Bankruptcy Code, as to the validity of any exclusions from such valuation that are asserted to be applicable pursuant to said Section 101(32) and stating that the conditions precedent set forth in clauses (A) through (C) above have been satisfied. The Owner Trustee shall be fully protected in relying upon the documents referred to in the preceding clauses (A) through (D) and shall have no duty to verify or investigate the conclusions stated therein. The Owner Trustee, by entering into this Agreement, hereby covenants and agrees that it will not at any time institute against the Trust, or join in any institution against the Trust of, any Bankruptcy Action in connection with any obligations relating to this Agreement or any of the other Transaction Documents.

4.02    Tax Treatment, Tax Elections and Other Matters. It is the intention of the parties hereto that the Trust shall not be treated for U.S. federal income tax purposes as an association (or publicly-traded partnership) taxable as a corporation. Neither the Depositor, the Trust, nor the Owner Trustee shall cause the Trust to be treated as an association taxable as a corporation for U.S. federal income tax purposes. It is the intention of the parties hereto that the Trust shall be treated as a disregarded entity for U.S. federal income tax purposes. All provisions of this Agreement shall be construed and the affairs of the Trust shall be conducted to achieve the

A/73145577.5

aforementioned treatment for U.S. federal income tax purposes, and the Certificateholder agrees that all transactions contemplated by this Agreement will be reported on all applicable tax returns consistently with the aforementioned treatment.

4.03    No Contrary Actions. The Certificateholder shall not direct the Owner Trustee to take or refrain from taking any action if such action or inaction would be contrary to any obligation of the Trust or the Owner Trustee under this Agreement or any of the Transaction Documents or would be contrary to Sections 2.03 or 4.01, nor shall the Owner Trustee be obligated to follow any such direction, if given.

4.04    Instructions. In the event that the Owner Trustee is unsure as to the application of any provision of this Agreement, or such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or this Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the Certificateholder, requesting instructions as to the course of action to be adopted, and to the extent the Owner Trustee acts in good faith in accordance with written instructions received from the Certificateholder, the Owner Trustee shall not be liable on account of such action to any Person. If the Owner Trustee shall not have received appropriate instructions within fifteen days of such notice (or within such shorter period of time as reasonably may be specified in such notice) it may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement, as it shall deem to be in the best interests of the Certificateholder, and shall have no liability to any Person for such action or inaction.

4.05    Representations and Warranties and Covenants of the Depositor. The Depositor hereby represents and warrants to the Owner Trustee as follows:

(a)    The Depositor hereby represents and warrants to the Owner Trustee that the Depositor acquired its Trust Certificate for its own account as principal and not with a view to the distribution thereof in whole or in part.

(b)    The Trust is not an "Investment Company" or under the "control" of an "Investment Company," as such terms are defined in the Investment Company Act of 1940, as amended.

(c)    This Agreement has been duly and validly authorized, executed and delivered by, and constitutes a valid and binding agreement of, the Depositor, enforceable in accordance with its terms.

(d)    The Depositor hereby covenants that, for so long as any of the Obligations remain outstanding, it shall not instruct the Owner Trustee to take any Bankruptcy Action with respect to the Trust.

4.06    Representations and Warranties of the Owner Trustee. The Owner Trustee hereby represents and warrants to the Depositor, for the benefit of the Certificateholder, as follows:

A/73145577.5

(a)    The Owner Trustee is a national banking association validly existing and in good standing under the laws of the United States and has all requisite powers and all material governmental licenses, authorizations, consents and approvals required under the laws of the United States to carry on its trust activities as now conducted.

(b)    The execution, delivery and performance by the Owner Trustee of this Agreement and the issuance of the Trust Certificate by the Owner Trustee on behalf of the Trust pursuant to the Original Trust Agreement are and were within the corporate power of the Owner Trustee and have been duly authorized by all necessary corporate action on the part of the Owner Trustee (no action by its shareholders being required), and this Agreement constitutes the valid and legally binding agreement of the Owner Trustee, enforceable in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles; and such actions do not and will not (i) violate or contravene any judgment, injunction, order or decree binding on the Owner Trustee, (ii) violate, contravene or constitute a default under any provision of the certificate of incorporation or by-laws of the Owner Trustee or of any material agreement or instrument binding on the Bank, or (iii) result in the creation or imposition of any lien attributable to the Owner Trustee on the Trust Estate except as contemplated by this Agreement.

(c)    No consent, approval, authorization, or order of, or filing with, any court or regulatory, supervisory or governmental agency or body is required under Delaware law or federal law governing the banking and trust powers of the Owner Trustee in connection with the execution, delivery and performance by the Owner Trustee, in its individual capacity, of this Agreement other than the filing of the certificate of trust under the Delaware Statutory Trust Act.

## ARTICLE V

## [RESERVED]

## ARTICLE VI

## AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

6.01    General Authority. The Owner Trustee is authorized, but shall not be obligated, to take all actions required or permitted to be taken by it pursuant to the terms of the Transaction Documents. The Owner Trustee is further authorized to take such actions as the Administrator recommends.

6.02    Specific Authority. The Owner Trustee is hereby authorized and directed to (i) execute and deliver the 2008 Restructuring Agreement and each of the other documents to be executed and delivered by the Trust in connection therewith, including the Transaction Documents, and each certificate or other document attached as an exhibit to or contemplated by the 2008 Restructuring Agreement or such other documents to be executed and delivered by the Trust, and (ii) countersign and deliver the 2007 Restructuring Agreement.

6.03    General Duties. It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of this Agreement and to

administer the Trust in the interest of the Certificateholder. The duties of the Owner Trustee shall also include (a) accepting legal process served on the Trust in the State of Delaware and (b) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act.

Notwithstanding the foregoing, the Owner Trustee shall be deemed to have discharged its duties and responsibilities hereunder and under the Transaction Documents to the extent the Administrator has agreed in the Administration Agreement to perform any act or to discharge any duty of the Owner Trustee or the Trust hereunder or under any Transaction Document, and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement or to monitor its performance thereunder.

6.04    [Reserved].

6.05    Signature of Returns. Subject to the terms of this Agreement, the Owner Trustee shall sign on behalf of the Trust any tax returns and other periodic filings of the Trust presented to it by the Depositor, unless applicable law requires the Certificateholder to sign such documents, in which case, so long as the Depositor is the Certificateholder and applicable law allows the Depositor to sign any such document, the Depositor shall sign such document. At any time that the Depositor is not an Certificateholder, or is otherwise not allowed by law to sign any such document, then the Certificateholder required by law to sign such document shall sign.

6.06    No Duties Except as Specified in this Agreement or in Instructions. The Owner Trustee shall not have any duty or obligation to manage, make any payment in respect of, register, record, sell, dispose of or otherwise deal with the Trust Estate, prepare or file any tax, qualification to do business or securities law filings or reports or to otherwise take or refrain from taking any action under, or in connection with, any document contemplated hereby to which the Owner Trustee is a party, except as expressly provided by the terms of this Agreement, and no implied duties or obligations shall be read into this Agreement against the Owner Trustee. The Owner Trustee nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Trust Estate which result from claims against the Owner Trustee personally that are not related to the ownership or the administration of the Trust Estate or the transactions contemplated by the Transaction Documents.

6.07    No Action Except Under Specified Documents or Instructions. The Owner Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Agreement.

## ARTICLE VII

## CONCERNING THE TRUSTEE

7.01    Acceptance of Trusts and Duties. The Owner Trustee accepts the trusts hereby created and agrees to perform its duties hereunder with respect to the same but only upon the terms of this Agreement. The Owner Trustee shall not be personally liable under any

9

circumstances, except (i) for its own willful misconduct, bad faith or gross negligence, (ii) for liabilities arising from the failure by the Owner Trustee to perform obligations expressly undertaken by it in the last sentence of <u>Section 6.06</u> hereof, or (iii) for taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received by the Owner Trustee in connection with any of the transactions contemplated by this Agreement or the Transaction Documents. In particular, but not by way of limitation:

(a)    The Owner Trustee shall not be personally liable for any error of judgment made in good faith by an Authorized Officer of the Owner Trustee;

(b)    The Owner Trustee shall not be personally liable with respect to any action taken or omitted to be taken by the Owner Trustee in good faith in accordance with the instructions of the Certificateholder or the Administrative Agent;

(c)    No provision of this Agreement shall require the Owner Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder, if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(d)    Under no circumstance shall the Owner Trustee be personally liable for any indebtedness of the Trust under any Transaction Document; and

(e)    The Owner Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by the Depositor, or for the form, character, genuineness, sufficiency, value or validity of any Trust Estate, or for or in respect of the validity or sufficiency of the Transaction Documents.

(f)    the Owner Trustee shall not be liable for the default or misconduct of the Administrative Agent, the Certificateholder, the Depositor or the Collateral Trustee or any other party under any Transaction Document or otherwise, and the Owner Trustee shall not have any obligation or liability to perform the obligations of the Trust under any Transaction Document.

7.02    <u>Furnishing of Documents</u>.  The Owner Trustee shall furnish to the Certificateholder, promptly upon receipt thereof, duplicates or copies of all material reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Owner Trustee hereunder (other than documents originated by or otherwise furnished to the Certificateholder).

7.03    <u>Reliance; Advice of Counsel</u>.

(a)    The Owner Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed

10

herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or any assistant treasurer or the secretary or any assistant secretary of the relevant party, as to such fact or matter, and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(b)  In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Transaction Documents, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it, and the Owner Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.

7.04    Not Acting in Individual Capacity.

(a)  Except as expressly provided in this Article VII, in accepting the trusts hereby created the Owner Trustee acts solely as trustee hereunder and not in its individual capacity, and all Persons having any claim against the Owner Trustee by reason of the transactions contemplated by this Agreement or the Transaction Documents shall look only to the Trust Estate for payment or satisfaction thereof.

(b)  In no event shall the Owner Trustee be liable for (i) special, consequential or punitive damages or (ii) any losses due to forces beyond its control, including without limitation, strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear or natural catastrophes or acts of God and interruptions, loss or malfunction of utilities, communications or computer (software and hardware) services provided to the Owner Trustee by third parties.

(c)  Notwithstanding anything contained herein to the contrary, the Owner Trustee shall not be required to take any action in any jurisdiction other than in the United States or any state in which the Trustee is incorporated or formed and any state in which the Owner Trustee is qualified to do business (the "State of Qualification") if the taking of such action may: (1) require the consent, approval, authorization or order of or the giving of notice to, or the registration with or the taking of any other action in respect of, any state or other governmental authority or agency of any jurisdiction other than a State of Qualification; (2) result in any fee, tax or other governmental charge under the laws of any jurisdiction or any political subdivisions thereof (other than a State of Qualification) in existence on the date hereof becoming payable by the Owner Trustee; or (3) subject the Trustee to personal jurisdiction in any jurisdiction other than a State of Qualification for causes of action arising from acts unrelated to the consummation of the transactions contemplated hereby. In the event that the Owner Trustee does not take any action because such action may result in the consequences described in the preceding sentence, the Owner Trustee will use reasonable efforts at the expense of the Trust to appoint a co-agent or separate agent pursuant to Section 10 hereof to proceed with such action.

11

(d)     The Owner Trustee shall have no responsibility for preparing or filing any financing or continuation statement (or other instrument or document) in any public office at any time or to reflect the sale of the Trust Estate to the Trust or the ownership interest of the Trust therein, nor shall the Owner Trustee have any responsibility to prepare or file any Securities and Exchange Commission filing, report to exchanges or 144A information with respect to the Trust Estate or the Certificate or to record this Trust Agreement or any other Transaction Document. The Owner Trustee nevertheless agrees that it shall sign any financing statement or continuation statement (or other instrument or document) provided to it that it or MetLife reasonably believes is necessary or desirable to accomplish any such results.

(e)     It is expressly understood and agreed by the parties hereto that insofar as any document, agreement or certificate is executed on behalf of the Trust by the Owner Trustee, including the Transaction Documents, (i) such document, agreement or certificate is executed and delivered by the Owner Trustee, not in its individual capacity but solely as Owner Trustee under this Trust Agreement in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, covenants, undertakings and agreements made on the part of the Trust is made and intended not as representations, warranties, covenants, undertakings and agreements by the Owner Trustee in its individual capacity but is made and intended for the purpose of binding only the Trust, (iii) under no circumstances shall the Owner Trustee in its individual capacity be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Trust Agreement, the Transaction Documents or any other document, agreement or certificate delivered in connection therewith and (iv) the Trustee shall not be responsible for monitoring the Trust's duties and obligations under the Transaction Documents or ensuring its compliance with, or performance of, the terms thereof.

## ARTICLE VIII

## COMPENSATION OF TRUSTEE

8.01    <u>Owner Trustee's Fees and Expenses</u>. Pursuant to Section 3.16 of the 2008 Restructuring Agreement, the Owner Trustee will receive compensation from the Trust for its services hereunder. The Owner Trustee shall be entitled to be reimbursed by the Trust for its reasonable expenses hereunder, including, without limitation, the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Transaction Documents.

8.02    <u>Indemnification</u>. The Trust shall be liable for, and hereby agrees to indemnify the Owner Trustee and its successors, assigns, agents and servants (collectively, the "<u>Indemnified Persons</u>"), from and against, any and all liabilities, obligations, losses, damages, taxes (other than taxes incurred as the result of the payment of fees and expenses pursuant to <u>Section 8.01</u> hereof), claims, actions, suits, costs, expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever (collectively, "<u>Expenses</u>") which may be imposed on, incurred by or asserted at any time against the Indemnified Persons (whether or not indemnified against by other parties) in any way relating to or arising out of this Agreement, any Transaction Document, the administration of the Trust Estate or the action or inaction of the Owner Trustee

12

hereunder, except only that the Trust shall not be required to indemnify the Owner Trustee for Expenses arising or resulting from any of the matters described in the second and third sentences of <u>Section 7.01</u>. The indemnities contained in this <u>Section 8.02</u> shall survive the resignation or removal of the Owner Trustee or the termination of this Agreement. The indemnities contained in this <u>Section 8.02</u> extend only to the Owner Trustee in its individual capacity and shall not be construed as indemnities of the Trust Estate.

8.03    <u>Payments to the Owner Trustee</u>. Any amounts paid to the Owner Trustee from the Trust Estate pursuant to this <u>Article VIII</u> shall be deemed not to be part of the Trust Estate immediately after such payment.

## ARTICLE IX

## TERMINATION OF TRANSFEROR TRUST

9.01    <u>Termination of Trust</u>.

(a)    The Trust shall dissolve and the Trust Estate shall, subject to compliance with Section 3808 of the Delaware Statutory Trust Act, be distributed to the Certificateholder upon the sale or other final disposition by the Owner Trustee of the Trust Estate and the final distribution by the Owner Trustee of all moneys or other property or proceeds of the Trust Estate in accordance with the terms of this Agreement and the Transaction Documents. Upon the dissolution of the Trust, after paying or making reasonable provision for the payment of all liabilities of the Trust in accordance with applicable law, the Owner Trustee shall file a certificate of cancellation with the Delaware Secretary of State and, thereupon, the Trust shall terminate and this Agreement (other than <u>Article VIII</u>) shall be of no further force or effect.

(b)    The bankruptcy, death or incapacity of the Certificateholder shall not operate to terminate this Agreement, nor entitle the Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Estate, nor otherwise affect the rights, obligations and liabilities of the parties hereto.

9.02    <u>No Termination by Depositor or Certificateholder</u>. Except as provided in <u>Section 9.01</u> hereof, neither the Depositor nor the Certificateholder shall be entitled to terminate or revoke the trust established hereunder.

## ARTICLE X

## SUCCESSOR TRUSTEES AND ADDITIONAL TRUSTEES

10.01    <u>Resignation of Owner Trustee; Appointment of Successor</u>.

(a)    The Owner Trustee may resign at any time without cause by giving at least thirty (30) days' prior written notice to the Certificateholder, such resignation to be effective upon the acceptance of appointment by a successor owner trustee under <u>Section 10.01(b)</u> below. In addition, the Certificateholder may at any time remove the Owner Trustee without cause by an instrument in writing delivered to the Owner Trustee, such removal to be

13

effective upon the acceptance of appointment by a successor owner trustee under Section 10.01(b) below. In case of the resignation or removal of the Owner Trustee, the Certificateholder may appoint a successor owner trustee by an instrument signed by the Certificateholder. If a successor owner trustee shall not have been appointed within 30 days after the giving of written notice of such resignation or the delivery of the written instrument with respect to such removal, the Owner Trustee or the Certificateholder may apply to any court of competent jurisdiction to appoint a successor owner trustee to act until such time, if any, as a successor owner trustee shall have been appointed as provided above. Any successor owner trustee so appointed by such court shall immediately and without further act be superseded by any successor owner trustee appointed as above provided within one year from the date of the appointment by such court.

(b)     Any successor owner trustee, however appointed, shall execute and deliver to the predecessor Owner Trustee an instrument accepting such appointment, and thereupon such successor owner trustee, without further act, shall become vested with all the estates, properties, rights, powers, duties and trust of the predecessor Owner Trustee in the trusts hereunder with like effect as if originally named the Owner Trustee herein; but nevertheless, upon the written request of such successor owner trustee and payment of all amounts due and owing to it, such predecessor Owner Trustee shall execute and deliver an instrument transferring to such successor owner trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Owner Trustee, and such predecessor Owner Trustee shall duly assign, transfer, deliver and pay over to such successor owner trustee all moneys or other property then held or subsequently received by such predecessor Owner Trustee upon the trusts herein expressed.

(c)     The Owner Trustee shall at all times be a corporation or association (i) meeting the requirements of Section 3807(a) of the Delaware Statutory Trust Act and (ii) being subject to supervision or examination by federal or state authorities. If the Owner Trustee shall publish reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purpose of this Section, the combined capital and surplus of the Owner Trustee shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Owner Trustee shall cease to be eligible in accordance with the provisions of this Section, the Owner Trustee shall resign immediately in the manner and with the effect specified in this Section.

(d)     Any Person into which the Owner Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any Person to which substantially all the corporate trust activities of the Owner Trustee may be transferred, shall, subject to the terms of Section 10.01(c) hereof, be the Owner Trustee under this Agreement without further act.

10.02  Appointment of Additional Owner Trustees. At any time or times for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Estate may at the time be located, the Owner Trustee, by an instrument in writing, may appoint one or more individuals or corporations to act as separate trustee or separate trustees of all or any part of the Trust Estate to the full extent that local law makes it necessary or appropriate for such separate trustee or separate trustees to act alone.

A/73145577.5

## ARTICLE XI

### WAIVER

The obligations in Section 11.01(g) of the Original Trust Agreement are hereby waived in their entirety.

## ARTICLE XII

### MISCELLANEOUS

12.01  Supplements and Amendments.

(a)    This Agreement may be amended by the Depositor and the Owner Trustee without the prior written consent of MetLife; *provided, however*, that such action shall not adversely affect the interests of the Noteholders or cause the Trust to be classified as an association (or a publicly traded partnership) taxable as a corporation for federal income tax purposes.

(b)    Subject to (a) above and (c) and (d) below, this Agreement may be amended only by a written instrument signed by the Owner Trustee and the Certificateholder at the time of such amendment; *provided, however*, that if, in the opinion of the Owner Trustee, any instrument required to be so executed adversely affects any right, duty or liability of, or immunity or indemnity in favor of, the Owner Trustee under this Agreement or any of the documents contemplated hereby to which the Owner Trustee is a party, or would cause or result in any conflict with or breach of any terms, conditions or provisions of, or default under, the charter documents or by-laws of the Owner Trustee or any document contemplated hereby to which the Owner Trustee is a party, the Owner Trustee may in its sole discretion decline to execute such instrument.

(c)    Subject to (a) above, this Agreement may be amended by the Depositor and the Owner Trustee without the consent of the Certificateholder, to cure any ambiguity or to correct any provisions in this Agreement; *provided, however*, that such action shall not, as evidenced by an opinion of counsel, adversely affect in any material respect the interests of the Certificateholder.

(d)    Subject to (a) above, this Agreement may also be amended from time to time by the Depositor and the Owner Trustee with the consent of the Certificateholder, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Certificateholder.

(e)    Promptly after the execution of any such amendment or consent, the Owner Trustee shall furnish written notification of the substance of such amendment or consent to the Certificateholder and MetLife.

(f)    Prior to the execution of any amendment to this Agreement without the consent of the Certificateholder, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that the execution of such amendment is authorized or permitted by

15

this Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Agreement or otherwise.

12.02   The Certificateholder shall not have legal title to any part of the Trust Estate. No transfer, by operation of law or otherwise, of any right, title, and interest of the Certificateholder to and in its undivided beneficial interest in the Trust Estate shall operate to terminate this Agreement, annul, dissolve or terminate the Trust or the trusts hereunder or entitle any transferee to an accounting or to the transfer to it of legal title to any part of the Trust Estate.

12.03   <u>Pledge of the Trust Estate by Trust is Binding</u>.

(a)     The pledge of the Trust Estate and the payments hereunder to the Collateral Trustee shall bind the Certificateholder and shall be effective to transfer or convey the rights of the Trust and the Certificateholder in and to such Trust Estate and the right to receive payments in accordance with the Transaction Documents. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such pledge or as to the application of any proceeds with respect thereto by the Trust.

(b)     Notwithstanding anything to the contrary contained herein, for so long as any amounts remain outstanding under the Obligations, the Owner Trustee shall not, without the prior written consent of the MetLife, issue and shall not permit the issuance of any additional Trust Certificates or beneficial interests in the Trust other than its initial issuance of the Trust Certificate and beneficial interest made on or prior to the date of this Agreement.

12.04   <u>Limitations on Rights of Others</u>. Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Owner Trustee, the Depositor and the Certificateholder any legal or equitable right, remedy or claim in the Trust Estate or under or in respect of this Agreement or any covenants, conditions or provisions contained herein.

12.05   <u>Notices</u>. Unless otherwise expressly specified or permitted by the terms hereof all notices shall be in writing and delivered by hand or mailed by certified mail, postage prepaid, if to the Owner Trustee, addressed to U.S. Bank Trust National Association, 300 Delaware Avenue, 9th Floor, Wilmington, DE 19801, with a copy to U.S. Bank National Association, 100 Wall Street, Suite 1600, New York, NY 10005 or to such other address as the Owner Trustee may have set forth in a written notice to the Certificateholder; and if to the Certificateholder, addressed to it at the address set forth for the Certificateholder in the register maintained by the Owner Trustee. Whenever any notice in writing is required to be given by the Owner Trustee hereunder, such notice shall be deemed given and such requirement satisfied seventy-two (72) hours after such notice is mailed by certified mail, postage prepaid, addressed as provided above; any notice given by the Certificateholder to the Owner Trustee shall be effective upon receipt by an Authorized Officer of the Owner Trustee.

12.06   <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof; and any

16

such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.07  <u>Separate Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

12.08  <u>Successors and Assigns</u>. All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Owner Trustee and its successors and assigns and the Certificateholder and its successors and permitted assigns, all as herein provided. Any request, notice, direction, consent, waiver or other instrument or action by the Certificateholder shall bind the successors and assigns of the Certificateholder.

12.09  <u>Headings</u>. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

12.10  <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance. Sections 3540 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

*[Remainder of page intentionally left blank.  Next page is a signature page.]*

17

**IN WITNESS WHEREOF**, the parties hereto have caused this Amended and Restated Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

LEHMAN COMMERCIAL PAPER INC., as Depositor, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13900

By:_____
Name:
Title:

ACKNOWLEDGED AND AGREED:

U.S. BANK TRUST NATIONAL ASSOCIATION, as Owner Trustee

By:_____
Name:
Title:

A/73145577.5

## AMENDED AND RESTATED ADMINISTRATION AGREEMENT

Amended and Restated Administration Agreement executed by the 2008 Trust, the Administrative Agent and the Noteholder.

EXECUTION COPY

ADMINISTRATION AGREEMENT

between

VARIABLE FUNDING TRUST 2008-1
as Issuer

and

LEHMAN BROTHERS INC.
as Administrative Agent

and

METROPOLITAN LIFE INSURANCE COMPANY and certain of its affiliates,
as Purchasers

Dated as of May 9, 2008

A/73147195.1

## ADMINISTRATION AGREEMENT

**THIS ADMINISTRATION AGREEMENT**, dated as of May 9, 2008 (this "**Agreement**"), is hereby executed by and among Variable Funding Trust 2008-1, a statutory trust created under the laws of the State of Delaware (the "**Issuer**"), and Lehman Brothers Inc. ("**Lehman**"), as administrative agent (in such capacity, the "**Administrative Agent**") and Metropolitan Life Insurance Company, a New York corporation, and certain of its affiliates (the "**Purchasers**").

## RECITALS

WHEREAS, the Issuer is governed by that certain Trust Agreement dated as of May 9, 2008 (the "**Trust Agreement**") between U.S. Bank Trust National Association and Lehman Commercial Paper Inc. ("**LCPI**").

WHEREAS, the Issuer has entered into a master loan assignment agreement of even date herewith (the "**Master Loan Assignment Agreement**") with the Issuer, as the assignee and LCPI, as the assignor, pursuant to which LCPI desires to grant to the Issuer, and LCPI desires to receive from LCPI from time to time, an assignment consisting of certain mortgage loans owned by LCPI;

WHEREAS, the Issuer has entered into a master participation agreement of even date herewith (the "**Participation Agreement**") with the Issuer, as the participant and LCPI, as the grantor, pursuant to which LCPI desires to grant to the Issuer, and the Issuer desires to receive from LCPI from time to time, a participation consisting of a one hundred percent (100%) undivided participation interest in certain commercial loans owned by LCPI;

WHEREAS, the Issuer has entered into a variable funding note purchase agreement of even date herewith (the "**Note Purchase Agreement**") with the Purchasers, pursuant to which the Issuer shall fund its purchase of Note Assets by issuing and selling Notes to, and requesting Advances from, the Noteholders thereunder from time to time;

WHEREAS, the Issuer has entered into a collateral trust agreement of even date herewith (the "**Collateral Trust Agreement**") between the Issuer and The Bank of New York Trust Company, N.A., pursuant to which the Issuer will secure its obligations under the Transaction Documents (as defined in the Trust Agreement);

WHEREAS, the Issuer has entered into certain other Transaction Documents as set forth in the Trust Agreement; and

WHEREAS, the Issuer wishes to appoint the Administrative Agent as its agent to, among other things, perform certain obligations for and on behalf of the Issuer pursuant to the Transaction Documents to which it is a party upon the terms and subject to the conditions set out in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereby agree as follows:

1.    DEFINITIONS AND INTERPRETATION

    1.1    <u>Defined Terms</u>.  Unless otherwise defined herein, capitalized terms shall have the respective meanings set forth in the Note Purchase Agreement or if not defined therein, in the Collateral Trust Agreement.

2.    APPOINTMENT OF THE ADMINISTRATIVE AGENT

    The Administrative Agent agrees to perform all its duties as Administrative Agent and agrees to cause the performance of all the duties and obligations of the Issuer to the extent not specifically provided in the Trust Agreement. In addition, the Administrative Agent shall consult with the Owner Trustee regarding the duties of the Issuer under the Transaction Documents. The Administrative Agent shall monitor the performance of the Issuer and shall advise the Owner Trustee when action is necessary to comply with the respective duties of the Issuer under the Transaction Documents. The Administrative Agent shall prepare for execution by the Issuer, or shall cause the preparation by other appropriate persons of, all such documents, reports, notices, filings, instruments, certificates and opinions that it shall be the duty of the Issuer to prepare, file or deliver pursuant to the Transaction Documents to the extent not specifically provided in the Trust Agreement. In furtherance of the foregoing, the Administrative Agent shall take (or, in the case of the immediately preceding sentence, cause to be taken) all appropriate action that the Issuer is required to take pursuant to the Transaction Documents including, without limitation, the matters specifically set forth below.

3.    CERTAIN SPECIFIC DUTIES OF THE ADMINISTRATIVE AGENT

    3.1    Duties in relation to Note Assets:

        (a)    The Administrative Agent may, from time to time, direct the Issuer to purchase Note Assets.

        (b)    If the Administration Agent on behalf of the Issuer agrees to acquire Note Assets, the Administrative Agent shall:

            (i)    liaise with the seller of the relevant Note Asset to finalize all documentation required to effect the acquisition of the relevant Note Asset and, as soon as it is in final form, procure that such documentation is delivered to the Issuer for execution by the Issuer;

            (ii)    provide advice and assistance to the Issuer in respect of the closing of the acquisition;

            (iii)    arrange for the purchase price or participation amount, as the case may be, to be made available to the Issuer and to be paid to the seller of the relevant Note Asset, as appropriate, from the proceeds of an Advance pursuant to the Note Purchase Agreement; and

    (iv)      determine whether the conditions precedent to the purchase of Note Assets set forth in the Note Purchase Agreement are satisfied and, if the Administrative Agent is satisfied that the conditions precedent have been satisfied or that the grant of a waiver of one or more conditions precedent would not materially prejudice the Issuer then, on behalf of the Issuer, it shall consent to the release of the funds to the relevant seller.

3.2     Duties in relation to Notes under the Note Purchase Agreement

The Administrative Agent shall arrange for the Issuer to borrow sufficient funds from the Noteholders pursuant to the Note Purchase Agreement to fund its obligations in connection with the acquisition of each Note Asset that the Issuer agrees to purchase. Accordingly, the Administrative Agent shall prepare and execute, on behalf of the Issuer, requests for Advances in accordance with and containing the information prescribed by the Note Purchase Agreement and deliver the request to the Noteholders, together with any information required by the Noteholders to consider such request, in accordance with the terms of the Note Purchase Agreement and in sufficient time to enable the Noteholders to make the requested Advance prior to the date on which the Issuer is due to pay the acquisition price for the Note Asset to be acquired with the proceeds of such Advance.

3.3     Duties in relation to cash management

    (a)      The Administrative Agent shall, acting on behalf of the Issuer, from time to time:

        (i)      deposit any amounts received by it representing the proceeds of Note Assets in accordance with the provisions of the Transaction Documents;

        (ii)     provide to the Collateral Trustee all information required to make the distributions contemplated by Section 3 of the Collateral Trust Agreement;

        (iii)    agree with the bank at which any account of the Issuer is maintained on the rate of interest applicable to balances standing to the credit of such account from time to time;

        (iv)    deposit any amounts received by it on behalf of the Issuer under or in respect of the Note Assets or any of the Transaction Documents on the same Business Day or within a commercially reasonable timeframe of receipt of such amounts in accordance with the requirements of the Transaction Documents and, in the meantime, hold such amounts in trust for the Noteholders; and

        (v)     perform such other duties and obligations related or incidental to the performance of its duties or obligations or the exercise of

its rights under any of the Transaction Documents as the Issuer
may reasonably require or the Administrative Agent may deem
necessary or advisable.

3.4    Duties in relation to the administration of Note Assets

The Administrative Agent shall, on behalf of the Issuer, and in connection with the
Issuer's maintenance of Note Assets:

(a)    monitor the performance of the Note Assets and give prompt notice to the
Issuer, the Purchasers and the Collateral Trustee if it becomes aware of
any default under a Note Asset; and

(b)    make reasonable efforts to obtain the prior consent of the Collateral
Trustee with respect to the disposal of any Note Asset and the release of
the security over the relevant Note Asset.

3.5    Duties in connection with administrative arrangements

The Administrative Agent's duties on behalf of the Issuer in connection with the Issuer's
administrative arrangements shall be to:

(a)    hold, maintain and preserve original copies of all Transaction Documents
upon receipt thereof from the Issuer (if applicable) and originals or copies
of all material agreements entered into by the Issuer in connection with the
purchase, origination and/or holding of Note Assets, except to the extent
such agreements are required to be delivered to the Collateral Trustee or a
Custodian pursuant to the Financing Documents;

(b)    provide all clerical and bookkeeping services necessary and appropriate
for the Issuer in connection with the Transaction Documents;

(c)    take such actions as may be necessary or appropriate and always in
compliance with applicable laws to enable the Issuer to perform its
obligations, comply with its covenants, warranties and exercise its rights
and remedies under any Transaction Document and the terms and
conditions of each Note Asset including, without limitation, Section 8 of
the Note Purchase Agreement;

(d)    provide all clerical and bookkeeping services necessary to the Issuer's tax
matters and the preparation of the Issuer's accounts; and

(e)    maintain original copies of, and forward to the Issuer copies of, all
statements, reports, notices and other documentation provided by any bank
where any accounts of the Issuer are maintained.

3.6    General

The Administrative Agent may take, at its discretion, at any time, any other action on behalf of the Issuer which is incidental or reasonably necessary to carry out the activities contemplated in this Section 3 or in the other Transaction Documents.

3.7    Control

For the avoidance of doubt, the Administrative Agent is not appointed to, and may not, undertake any acts or services in relation to the assets or finances of the Issuer other than those provided for or contemplated by this Agreement or by the other Transaction Documents without the prior written consent of the Issuer. The Issuer shall not be required or obliged at any time to comply with any proposals which the Administrative Agent may submit with respect to the operating and financial policies of the Issuer, and the Administrative Agent acknowledges that all powers to determine such policies are, and shall at all times remain, vested in the Issuer, and none of the provisions of this Agreement, or of the other Transaction Documents, shall be construed in a manner which is inconsistent with this proviso.

4.    REPRESENTATIONS AND WARRANTIES

4.1    The Issuer hereby represents and warrants to the Administrative Agent and the Purchasers as follows:

(a)    it is duly formed and validly existing under the laws of the jurisdiction of its organization with full power (i) to own its property and assets, (ii) to conduct its business as presently being conducted and is duly qualified to carry on such business and (iii) to execute and deliver this Agreement and each other Transaction Document to which it is a party and to undertake and perform the obligations expressed to be assumed by it herein and therein;

(b)    to the best of its knowledge and belief, there is no litigation, arbitration, governmental investigation, proceeding or inquiry pending or, to its knowledge after reasonable inquiry, threatened against or affecting it, or any of its properties or rights;

(c)    it has the authority and legal right to execute and deliver this Agreement and all other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. This Agreement and all other Transaction Documents to which it is a party have been duly authorized by it and, when executed and delivered by it, will constitute its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditor's rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or law)), and the execution and delivery of this Agreement and all other Transaction Documents to which it is a party and the performance of its obligations hereunder and thereunder will not

infringe any laws or regulations of any governmental or regulatory body currently in effect and is not contrary to its constitutional documents and will not result in any breach of any terms of or constitute a default under any deed agreement or other instrument to which it is a party or by which its property is bound; and

(d)    neither the execution and delivery by it of this Agreement and any other Transaction Document to which it is a party, nor compliance with the provisions hereof and thereof, will (i) violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on it including regulations issued by an administrative agency or other governmental authority having supervisory powers over it, (ii) other than in respect of the registration of Liens, require any consent of, notice to, license from or registration with any such administrative agency or governmental authority other than those already obtained or (iii) result in a breach of its constitutional documents or the provisions of any deed, indenture, instrument or agreement to which it is a party or is subject, or by which it, or its property, is bound, or conflict with or constitute a default thereunder.

4.2    The Administrative Agent hereby represents and warrants to the Issuer and the Purchasers as follows:

(a)    it is duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation with the requisite power (i) to own its property and assets, (ii) to conduct its business as presently being conducted and is duly qualified to carry on such business and (iii) to execute and deliver this Agreement and to undertake and perform the obligations expressed to be assumed by it herein;

(b)    it is in compliance with all statutes, ordinances, rules and regulations of Governmental Authorities applicable to it except to the extent that the failure to comply therewith would not, individually or in the aggregate, reasonably be expected to have a material adverse effect upon its ability to perform its obligations hereunder;

(c)    it has obtained all necessary consents, approvals and authorizations required for the execution and delivery of this Agreement and for the performance of all its obligations hereunder, and such consents, approvals and authorizations remain in full force and effect;

(d)    it has the requisite power and authority and legal right, and has taken all necessary corporate action, to execute and deliver this Agreement and perform its obligations hereunder;

(e)    this Agreement has been duly authorized by it and, when executed and delivered by it, will constitute its legal, valid, binding and enforceable obligations and the execution and delivery of this Agreement and the

performance of its obligations hereunder will not infringe any laws or regulations of any governmental or regulatory body currently in effect and is not contrary to its constitutional documents and will not result in any breach of any terms of or constitute a default under any deed agreement or other instrument to which it is a party or by which its property is bound; and

(f)    neither the execution and delivery by it of this Agreement, nor compliance with the provisions thereof, will or did (i) violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Administrative Agent including regulations issued by an administrative agency or other governmental authority having supervisory powers over it, (ii) require any consent of, notice to, license from or registration with any such administrative agency or governmental authority other than those already obtained or (iii) result in a breach of its constitutional documents or the provisions of any deed, indenture, instrument or agreement to which it is a party or is subject, or by which it, or its property, is bound, or conflict with or constitute a default hereunder.

(g)    it is not a party to any indenture, loan or credit agreement, mortgage, deed of trust, lease, instrument or other agreement or is subject to any restriction in its governing organizational documents or any other corporate or organizational restrictions that would reasonably be expected, whether individually or in the aggregate, to have a Material Adverse Effect; and

(h)    this Agreement sets forth the entire agreement between the Administrative Agent and the Issuer with respect to the services to be provided by the Administrative Agent to the Issuer.

5.    COVENANTS

5.1    <u>Covenants of the Administrative Agent</u>.  Unless the Issuer and the Purchasers shall otherwise consent to in writing or as required by any applicable law, the Administrative Agent covenants with the Issuer (and to the extent necessary, the Issuer consents and agrees) and the Purchasers that:

(a)    it shall comply with all requirements of any law, rule or regulation of any Governmental Authority to which it is subject, except to the extent that the failure to comply therewith would not, individually or in the aggregate, reasonably be expected to have a material adverse effect upon its ability to perform its obligations hereunder;

(b)    it shall maintain its existence under the laws of the jurisdiction of its incorporation and shall qualify, and maintain its qualification, in every jurisdiction where the nature of its business requires it to so qualify;

(c)     it shall maintain all consents, approvals, permits, licenses, privilege, franchises and authorizations necessary for the performance of its obligations under this Agreement; provided, however, that the Administrative Agent shall not be required to maintain any consent, approval, permit, license, franchise or authorization if the board of directors (or the persons performing similar functions) of the Administrative Agent shall determine in good faith that the maintenance thereof is no longer desirable in the conduct of the business of the Administrative Agent, and that the loss thereof is not disadvantageous in any material respect to the Administrative Agent or the Noteholders or, solely in the case of any such permit, franchise, license or qualification to do business as a foreign corporation in any jurisdiction, that the loss thereof, either individually or in the aggregate, would not reasonably be expected, whether individually or in the aggregate, to have a material adverse effect on the Administrative Agent's ability to perform its obligations hereunder;

(d)     it shall not resign as the Administrative Agent unless and until a replacement Administrative Agent has been appointed as provided in Section 9;

(e)     it shall not charge, require or accept any direct or indirect compensation for the provision of the services provided by it under this Agreement other than as provided in Section 7 without the prior written consent of the Purchasers;

(f)     it shall provide the Purchasers or the Collateral Trustee with such information as may reasonably be requested relating to the servicing of any Note Asset serviced by the Administrative Agent or any of its affiliates.

## 6. FURNISHING OF SERVICES

All services to be furnished by the Administrative Agent under this Agreement may be furnished by an officer, agent or employee of the Administrative Agent. The Administrative Agent may employ any sub-agent to perform any such service, but such employment shall not relieve the Administrative Agent of its obligations hereunder.

## 7. COMPENSATION

The Issuer shall reimburse the Administrative Agent for any expenses, including any out-of-pocket expenses, reasonably and properly paid or incurred by the Administrative Agent in connection with this Agreement and the services called for herein (the "Expenses") upon written request of the Administrative Agent. The Administrative Agent shall not be entitled to receive any other compensation from the Issuer, the Purchasers, the Collateral Trustee or any Noteholder, and the Issuer shall not pay to the Administrative Agent or any other Person, for the Administrative Agent's services rendered hereunder, and any compensation received by the

Administrative Agent in violation of the foregoing restriction shall be held by the Administrative Agent in trust for the benefit of the Noteholders and promptly paid or delivered directly to the Collateral Trustee to be allocated among the Noteholders in accordance with the terms of the Collateral Trust Agreement.

8.    PAYMENTS

8.1    On each day on which a payment is required to be made by a party to this Agreement to another party to this Agreement, such payment shall be made in immediately available, freely transferable funds to such account as the recipient shall have previously specified for such purpose to the payer in writing, provided that all payments due to be made by the Issuer shall be subject to Section 3 of the Collateral Trust Agreement.

8.2    All payments shall be made hereunder without reference to any set-off or counterclaim and shall be made free and clear of and without any deduction for or on account of any set-off or counterclaim.

9.    TERM

9.1    This Agreement shall continue in force until the termination of the Issuer, upon which event this Agreement shall automatically terminate.

> (a)    Subject to Sections 9.1(c), the Administrative Agent may resign its duties hereunder by providing the Issuer with at least 30 days' prior written notice.

> (b)    Subject to Sections 9.1(c), so long as an Event of Default has occurred and is continuing under the Note Purchase Agreement, the Issuer, acting at the direction of the Required Holders (as hereinafter defined), may remove the Administrative Agent by providing the Administrative Agent with written notice; provided that if the Administrative Agent is removed for cause, the Purchaser or an Affiliate of the Purchaser may be the successor Administrative Agent. The Administrative Agent hereby irrevocably waives and releases the Purchasers, the Noteholders and the Collateral Trustee from any and all claims and liability in connection with such removal (including, without limitation, any claims for breach of contract, wrongful termination and interference).

> (c)    No resignation or removal of the Administrative Agent pursuant to this Section shall be effective until (i) a successor Administrative Agent shall have been appointed by the Purchasers and reasonably satisfactory to the Owner Trustee and (ii) such successor Administrative Agent shall have agreed in writing to be bound by the terms of this Agreement in the same manner as the Administrative Agent is bound hereunder.

> (d)    In the event of the termination of this Agreement pursuant to Section 9.1(b), or the resignation of the Administrative Agent, the Administrative Agent shall provide reasonable cooperation to the Purchasers and any

subsequent Administrative Agent, if any, designated by the Purchasers or the Collateral Trustee, to facilitate an orderly transition of the administration of the Note Assets. Without limiting the foregoing, upon receipt of written notice from the Issuer terminating this Agreement pursuant to Section 9.1(b), the Administrative Agent shall promptly deposit with the Purchaser or, at the Purchaser's written direction, the Collateral Trustee or other Person, all funds then held by or under the control of the Administrative Agent.

(e)     As used herein, "Required Holders" means, at any time, (i) the Noteholders who, collectively at such time hold at least a majority of the Aggregate Commitments at such time, or (ii) if the Aggregate Commitment has been terminated at such time, the Noteholders who, collectively at such time hold at least a majority in aggregate principal amount of Advances outstanding at such time (exclusive of Notes, and any related Commitment or Advances, then owned by the Trust or any of its Affiliates).

## 10.    ACKNOWLEDGMENT OF SECURITY INTEREST.

10.1    <u>Acknowledgement of Collateral Assignment</u>.    The Administrative Agent acknowledges that the Issuer has conditionally assigned this Agreement to the Collateral Trustee as additional security for performance by the Issuer of its obligations under the Financing Documents. To the extent the Administrative Agent's consent is required, the Administrative Agent hereby consents to that conditional assignment and to the exercise by the Collateral Trustee of any of its rights, powers, privileges and remedies with respect thereto.

10.2    <u>Liability for Company Obligations</u>.    Notwithstanding such conditional assignment, neither the Collateral Trustee nor any Noteholder shall be responsible for performance of any obligations under or relating to this Agreement unless and until the Collateral Trustee has succeeded to the Issuer's interest in this Agreement, and the Collateral Trustee then shall be responsible for performance of only those obligations that arise after the date of its succession to the Issuer's interest in this Agreement.

## 11.    ACCESS TO BOOKS AND RECORDS

11.1    The Administrative Agent shall, at the request of the Collateral Trustee, the Purchasers or the Issuer, furnish to the requesting party such information as it may be reasonable for such party to request in connection with the performance by the Administrative Agent of its duties under this Agreement, provided, that the Administrative Agent shall not provide any information which results in a breach or any relevant data protection legislation applicable to it in relation to its role as Administrative Agent.

11.2    The Issuer shall permit the Administrative Agent and the Purchasers to inspect the records of the Issuer relating to this Agreement and any other Transaction Document, upon reasonable request by the Administrative Agent or the Purchasers.

11.3    The Issuer shall further, at the request of the Administrative Agent, prepare and furnish to it such information as it may be reasonable for it to request in connection with the performance by it of its duties under this Agreement.

## 12.    STANDARD OF CARE

12.1    The Administrative Agent shall perform its duties hereunder with the same degree of care that it exercises or would exercise in connection with the administration of its own or similar operations. The Administrative Agent shall not, in performing its obligations hereunder, knowingly take any action that would cause the Issuer to be in violation of any law, rule or regulation applicable to it or of any provision of the constitutional documents of the Issuer or any Transaction Document to which the Issuer is a party.

12.2    The Administrative Agent, in its capacity as such, assumes no liability hereunder for anything other than to render or stand ready to render the services called for herein, and neither the Administrative Agent nor any of its directors, officers, employees or Affiliates shall be responsible for any action of the Issuer, or the directors, officers or employees of the Issuer. Except for the performance of its obligations hereunder and subject to Section 13.1, the Administrative Agent shall not be liable for nor shall it have any obligation with regard to any of the liabilities, whether direct or indirect, absolute or contingent, of the Issuer.

12.3    The Issuer recognizes that the accuracy and completeness of the records maintained and the information supplied by the Administrative Agent hereunder are dependent upon the accuracy and completeness of the information obtained by the Administrative Agent from the Purchasers and the Issuer, and the Administrative Agent shall not be responsible for any inaccuracy in the information so obtained or for any inaccuracy in the records maintained by the Administrative Agent hereunder that may result therefrom, other than any inaccuracy attributable to the Administrative Agent's negligence or willful misconduct.

12.4    All calculations and determinations made by the Administrative Agent pursuant to this Agreement, whether or not expressed to be conclusive, shall be made in a commercially reasonable manner, having regard, where practicable, to any then current market practices or procedures for making such calculations or determinations.

## 13.    INDEMNITY

13.1    The Issuer shall indemnify the Administrative Agent and its shareholders, directors, officers and employees (each an "**Administrative Agent Indemnified Party**"), upon demand, against all losses, claims, damages, penalties, judgments, liabilities and expenses (including all lawyer's fees and expenses) incurred by an Administrative Agent Indemnified Party as a result of, or in connection with this Agreement and the other Transaction Documents, unless such losses, claims, damages, penalties, judgments, liabilities and expenses result from such Administrative Agent Indemnified Party's own fraud, bad faith or willful misconduct in performing (or failing to perform) its obligations under this Agreement and the other Transaction Documents to which it is a party.

13.2    The provisions of this Section 13 shall survive the termination of this Agreement.

14.    NO RESTRICTIONS

14.1    Nothing in this Agreement shall limit or restrict the right of any director, officer or employee of the Administrative Agent or any director, officer, employee or partner of any of its Affiliates to engage in any other business or to devote his time and attention to the management or other aspects of any other business, whether of a similar or dissimilar nature, nor to limit or restrict the right of any such Person to engage in any other business or to render services of any kind to any other Person.

14.2    It is understood and agreed that, notwithstanding anything contained herein to the contrary, the Administrative Agent, in addition to its relationship with the Issuer pursuant to this Agreement and any other Transaction Document to which the Issuer is a party, shall be entitled to engage in any other kind of business, agency or trust relationship with the Issuer, and to perform all services in connection therewith, as if it were not acting as the Administrative Agent hereunder. The Administrative Agent shall not, by virtue of its acting in any other capacity under any other agreement or arrangement with the Issuer or in connection with its other relationships with the Issuer, be deemed to have duties or responsibilities hereunder or be deemed to be held to a standard of care in connection with the performance of its duties as Administrative Agent hereunder, other than as expressly provided in this Agreement. The Administrative Agent may act as Administrative Agent hereunder without regard to and without additional duties or obligations arising from its acting in any other capacity under any other agreement or arrangement with the Issuer or in connection with its other relationships with the Issuer.

15.    NO PARTNERSHIP OR JOINT VENTURE

Nothing in this Agreement:

(a)    shall constitute the Issuer, the Purchasers and the Administrative Agent members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity; or

(b)    shall be construed to impose any liability as such on any of them. Without limiting the foregoing, the Administrative Agent's relation to the Issuer shall be that of an independent contractor.

16.    ENTIRE AGREEMENT

16.1    The parties hereby agree that any instruments, agreements or other documentation to be entered into pursuant to the terms hereof or of the other Transaction Documents may be executed by facsimile signature. The parties hereby agree that transmission of the executed final version of any such instrument, agreement or other documentation by facsimile or in portable document format (.pdf) shall constitute a valid signature by the relevant party and shall have the same validity and effect as though signed by hand by such party.

16.2    This Agreement constitutes the entire agreement among the parties hereto with respect to the matters covered hereby and supersedes all prior agreements and understandings among the parties with respect to such matters; provided, nothing contained herein shall be deemed to amend, modify, waive, negate or otherwise supersede any provisions of the

Transaction Documents, and in the event of any conflict or inconsistency between any provision of this Agreement and any provision of any Transaction Document, the provision of the Transaction Document shall govern and control.

## 17.    MISCELLANEOUS

17.1    No delay or omission of any party hereto to exercise any right hereunder or under any of the Transaction Documents shall impair such right or be construed to be a waiver of any default or an acquiescence therein. Any single or partial exercise of any such right shall not preclude any other or further exercise thereof or the exercise of any other right.

17.2    Any person into which the Administrative Agent merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Administrative Agent shall be a party, or any person succeeding to the business of the Administrative Agent shall to the extent permitted by applicable law, constitute a successor of the Administrative Agent hereunder, without the need for execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding, whereupon the parties hereto and such successor shall thereafter have the same rights and obligations among them as would have been the case had they entered into an agreement in a form mutatis mutandis of this Agreement. Notice of any such merger, conversion or consolidation shall forthwith be given by such successor to the other party hereto.

17.3    The rights of each of the parties to this Agreement (a) may be exercised as often as necessary, (b) are cumulative and not exclusive of its rights under general law and (c) may be waived only in writing and then only to the extent specifically set forth in such writing.

17.4    Notwithstanding any other provisions of this Agreement, the Administrative Agent shall not at any time exercise or seek to enforce any claim, right or remedy to set-off or counter-claim against all or any funds or other assets of the Issuer.

## 18.    PERFORMANCE BY THE ADMINISTRATIVE AGENT; NO WAIVER OR RELEASE OF ISSUER

18.1    Each Purchaser consents to the appointment of the Administrative Agent hereunder and the delegation by the Issuer to the Administrative Agent of certain of the Issuer's rights and obligations under the Transaction Documents, and agrees that it shall accept performance by the Administrative Agent of the Issuer's obligations under the Transaction Documents as though such performance was tendered by the Issuer. However, neither such appointment and such Purchaser's consent thereto, nor Purchaser's acceptance of such performance, shall release or waive the timely payment and performance, in full, of all of the Issuer's obligations under the Transaction Documents, for which the Issuer remains fully and primarily liable.

## 19.    POWER OF ATTORNEY

The Issuer hereby constitutes and appoints the Administrative Agent and any officer, employee or agent of the Administrative Agent or any of its subsidiaries or Affiliates who has been authorized for such purpose by the Administrative Agent, as the Issuer's true and lawful

attorney and attorneys, for the Issuer and in its name and on its behalf, from time to time in the Administrative Agent's discretion, to complete, execute and deliver on behalf of the Issuer any documents, instruments, certificates, notices or demands which in the Administrative Agent's discretion are necessary or proper in connection with, among other things, the purchase, origination, maintenance and/or divestment by the Issuer of any Note Assets. The Issuer hereby ratifies, confirms and adopts and agrees to ratify, confirm and adopt all that the Administrative Agent shall lawfully do, cause to be done or purport to do on behalf of the Issuer by virtue hereof. At any time after the termination of this Agreement, the power granted under this Section 19 may be revoked by the sole and unreviewable action of the Issuer.

20.    NOTICES

Except as otherwise specifically provided for in this Agreement, all notices and other communications between or among the parties hereto shall be given in writing (including by facsimile) and shall be either hand delivered or mailed by registered or certified mail, postage prepaid, return receipt requested, or by facsimile (with receipt confirmed and with a hard copy sent promptly), Federal Express, or any other overnight couriers providing receipts or electronic mail to any party to the applicable address for notices specified for such party below (or such other address as such party shall specify in a written notice to the other party hereto).

(i)    as to the Issuer:

Variable Funding Trust 2008-1
c/o U.S. Bank Trust National Association
300 Delaware Avenue, 9th Floor Wilmington, Delaware 19801
Telephone:    (212) 361-2459
Fax:            (212) 809-5459
Attention: David Kolibachuk

(ii)    as to the Administrative Agent:

Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019
Telephone:    (212) 526-7000
Fax:            (201) 524-2080
Attention: Transaction Management

21.    AMENDMENTS; ASSIGNMENTS

21.1    No amendment shall be made to this Agreement nor shall the Issuer enter into any new Agreement unless it is in writing signed by the parties hereto.

21.2    The rights arising under this Agreement may not be assigned by one party to a third party without the prior written consent of the other parties, and any attempted or purported assignment of the same, either in whole or in part, without such consent shall be void.

21.3    Prior notice of any amendment to this Agreement shall be delivered to S&P. Any amendment shall be subject to confirmation from S&P that such action will not result in the withdrawal, reduction or other adverse action with respect to the then-current rating on the Notes.

## 22.    WAIVER OF RIGHTS

No waiver by a party of a failure by any other party to perform any provision of this Agreement operates as, or is to be construed as, a waiver in respect of any other failure, whether of a like or different character. The rights of any party shall not be prejudiced or restricted by any indulgence or forbearance extended to the other party.

## 23.    INVALIDITY

If any provision of this Agreement is or is held to be invalid or unenforceable, then so far as it is invalid or unenforceable it has no effect and is deemed not to be included in this Agreement. This shall not invalidate any of the remaining provisions of this Agreement. The parties shall then use all reasonable efforts to replace the invalid or unenforceable provision by a valid and enforceable provision the effect of which is as close as possible to the intended effect of the invalid or unenforceable provision.

## 24.    FURTHER ASSURANCE

Each party agrees that it will cooperate fully with the other parties hereto to do all such further acts and things and execute any further documents as may be necessary or desirable to give full effect to the arrangements contemplated by this Agreement.

## 25.    COUNTERPARTS

This Agreement may be executed in separate counterparts and by each party separately on a separate counterpart, and each such counterpart, when so executed, shall be an original. Such counterparts shall together constitute one and the same instrument.

## 26.    GOVERNING LAW AND JURISDICTION; WAIVER OF JURY TRIAL

26.1    This Agreement is governed by, and shall be construed in accordance with, the laws of the State of New York.

26.2    With respect to any claim or action arising hereunder, the parties (i) irrevocably submit to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in The City of New York, New York, and appellate courts from any thereof and (ii) irrevocably waive any objection which such party may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any such court, and irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum

26.3    THE PARTIES TO THIS AGREEMENT KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE PARTIES HERETO ACKNOWLEDGE THAT THE PROVISIONS OF THIS SECTION 26.3 HAVE BEEN BARGAINED FOR AND THAT EACH SUCH PARTY HAS BEEN REPRESENTED BY COUNSEL IN CONNECTION HEREWITH.

27.    <u>Limitation of Liability</u>.  It is expressly understood and agreed by the parties hereto that (a) this agreement is executed and delivered by u.s. bank trust national association, not individually or personally, but solely as owner trustee of the issuer, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the trust is made and intended not as personal representations, undertakings and agreements by u.s. bank trust national association but is made and intended for the purpose for binding only the issuer, (c) nothing herein contained shall be construed as creating any liability on u.s. bank trust national association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any person claiming by, through or under the parties hereto and (d) under no circumstances shall u.s. bank trust national association be personally liable for the payment of any indebtedness or expenses of the trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the issuer under this agreement or any other related documents. all amounts due hereunder by the issuer shall be paid solely from the trust assets of the issuer in accordance with the trust agreement. the administrative agent acknowledges that the owner trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the issuer in this Agreement.

**IN WITNESS WHEREOF** this Agreement has been executed by the parties hereto as of the date first above written.

**VARIABLE FUNDING TRUST 2098-1**

By:    U.S. Bank Trust National Association, not
individually but solely as Owner Trustee

By:    _____
       Name:
       Title:

**LEHMAN BROTHERS INC.,**
as Administrative Agent

By:    _____
       Name:
       Title:

**METROPOLITAN LIFE INSURANCE
COMPANY**

By:    _____
       Name:
       Title:

**METLIFE INSURANCE COMPANY OF
CONNECTICUT
METLIFE REINSURANCE COMPANY OF
SOUTH CAROLINA TRUST B
METLIFE REINSURANCE COMPANY OF
CHARLESTON
METLIFE REINSURANCE COMPANY OF
CHARLESTON TRUST B**

By:    Metropolitan Life Insurance Company, as
investment manager for each of the above
entities

By:    _____
       Name:
       Title:

IN WITNESS WHEREOF this Agreement has been executed by the parties hereto as of the date first above written.

**VARIABLE FUNDING TRUST 2098-1**

By:    U.S. Bank Trust National Association, not individually but solely as Owner Trustee

By:    _____
          Name:
          Title:

**LEHMAN BROTHERS INC.,**
as Administrative Agent

By:    _____
          Name:
          Title:

**METROPOLITAN LIFE INSURANCE COMPANY**

By:    _____
          Name:
          Title:

**METLIFE INSURANCE COMPANY OF CONNECTICUT**
**METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA TRUST B**
**METLIFE REINSURANCE COMPANY OF CHARLESTON**
**METLIFE REINSURANCE COMPANY OF CHARLESTON TRUST B**

By:    Metropolitan Life Insurance Company, as investment manager for each of the above entities

By:    _____
          Name:
          Title:

IN WITNESS WHEREOF this Agreement has been executed by the parties hereto as of the date first above written.

**VARIABLE FUNDING TRUST 2098-1**

By:    U.S. Bank Trust National Association, not individually but solely as Owner Trustee

By:    _____
          Name:
          Title:

**LEHMAN BROTHERS INC.,**
as Administrative Agent

By:    _____
          Name:
          Title:

**METROPOLITAN LIFE INSURANCE COMPANY**

By:    _____
          Name:
          Title:

**METLIFE INSURANCE COMPANY OF CONNECTICUT
METLIFE REINSURANCE COMPANY OF SOUTH CAROLINA TRUST B
METLIFE REINSURANCE COMPANY OF CHARLESTON
METLIFE REINSURANCE COMPANY OF CHARLESTON TRUST B**

By:    Metropolitan Life Insurance Company, as investment manager for each of the above entities

By:    _____
          Name:
          Title:

# TERMINATION AGREEMENT

Termination Agreement terminating the FX Swap Agreement and TRS Swap Agreement re: 2008 Trust by and among the 2008 Trust, Lehman Brother Special Financing Inc. and LBHI.

**EXECUTION VERSION**

**TERMINATION AGREEMENT**

This Termination Agreement (the "Termination Agreement") is made and entered into as of September 30, 2009 by and among Variable Funding Trust 2008-1 ("Counterparty"), Lehman Brothers Special Financing Inc. ("Lehman") and Lehman Brothers Holdings Inc. ("Holdings") as credit support provider (each of the foregoing a "Party" and collectively the "Parties").

RECITALS:

WHEREAS, the Parties entered into one or more transactions (each a "Transaction") that were governed by those certain ISDA Master Agreements, dated as of May 9, 2008, between Lehman and Counterparty, which included related schedules, documents, confirmations and a guaranty of the obligations of Lehman by Holdings (collectively, the "Agreement Documents")

WHEREAS, commencing on September 15, 2008 and thereafter, Holdings and certain of its affiliates, including Lehman, each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (collectively, the "Bankruptcy Cases").

WHEREAS, the Parties wish to terminate and/or acknowledge the termination of each Transaction under the Agreement Documents as of the date hereof.

WHEREAS, on December 16, 2008 the court having jurisdiction over the Bankruptcy Cases entered an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption or Assignment of Prepetition Derivative Contracts (the "Order").

WHEREAS, as of the date hereof, the Parties have agreed that no settlement amount is due and payable by Lehman or Holdings to Counterparty or by Counterparty to Lehman or Holdings in respect of any purported claims arising under the Agreement Documents.

NOW, THEREFORE, in consideration of the recitals set forth above and promises made herein, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

Section 1. Release. In consideration of each other Party's execution of this Termination Agreement, each Party on behalf of itself and any other party, person or entity claiming under or through it, hereby generally releases, discharges and acquits each other Party, and its respective current and former agents, trustees, servants, officers, directors, shareholders, employees, subsidiaries, divisions, branches, units, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, a "Released Party"), from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or

otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such releasing Party ever had or claimed to have, or now has or claims to have presently or at any future date, against any Released Party arising solely under or related to the Agreement Documents or the Transactions thereunder, their negotiation, execution, performance, any breaches thereof, or their termination.

Section 1A. <u>Withdrawal of Claims.</u>  Upon the execution of this Termination Agreement the Counterparty shall withdraw any proofs of claim filed in the Bankruptcy Cases relating to any Transaction.  For the avoidance of doubt, the foregoing does not relate to any proofs of claim made by The Metropolitan Life Insurance Company and any one or more holders of notes issued by the Swap Counterparty, in each case in respect of such notes and any guarantees thereof.

Section 2. <u>Representations.</u> Each Party represents and warrants to each other Party that (i) the execution, delivery, and performance by such Party of this Termination Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) this Termination Agreement has been duly executed and delivered by such Party and constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations or agreements other than those expressly set forth in this Termination Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Termination Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts and is relying upon its own knowledge and the advice of its counsel, (vi) it has no expectation that any of the other Parties will disclose facts material to the Agreement Documents or this Termination Agreement and (vii) it knowingly waives any and all claims that this Termination Agreement was induced by any misrepresentation or non-disclosure and knowingly waives any and all rights to rescind or avoid this Termination Agreement based upon presently existing facts, known or unknown. Additionally, Lehman and Holdings represent and warrant to Counterparty that this termination agreement is being entered into in accordance with the terms of the Order. The Parties agree and stipulate that each Party is relying upon the representations and warranties in this Section in entering into the Termination Agreement. Furthermore, the Parties agree that these representations and warranties are a material inducement for entering into this Termination Agreement. These representations and warranties shall survive the execution of this Termination Agreement indefinitely without regard to statutes of limitations.

Section 3.    <u>Limited Scope.</u>    For the avoidance of doubt the foregoing releases, representations and warranties do not in any manner relate to any other transactions between and/or among the Parties, including, without limitation, those contemplated by the Note Purchase Agreement dated as of May 9, 2008 between the Counterparty and the purchasers of Notes issued thereunder, as may be amended and restated from time to time.

Section 4. <u>Execution in Counterparts.</u> This Termination Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

2

Section 5. <u>Effectiveness.</u> This Termination Agreement shall become effective upon execution hereof by each of the Parties. The Transactions that are not already terminated according to their terms will terminate as of the effective date of this Termination Agreement.

Section 6. <u>Governing Law.</u> This Termination Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York.

Section 7.     <u>Special Provision for Unknown Claims.</u> All rights under Section 1542 of the California Civil Code, or any analogous state or federal law, are hereby expressly waived, if applicable, with respect to any of the claims, injuries, or damages described in the Release in Section 1. Section 1542 of the California Civil Code reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

Section 8. <u>Successors and Assigns.</u> The provisions of this Termination Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

Section 9. <u>Amendment.</u> This Termination Agreement may only be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

Section 10. <u>Entire Agreement.</u> This Termination Agreement constitutes the entire agreement and understanding of the Parties relating to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.

Section 11. <u>Construction.</u> This Termination Agreement has been negotiated by the Parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Termination Agreement or any of its provisions against the Party responsible for drafting this Termination Agreement will not apply in any construction or interpretation of this Termination Agreement.

Section 12. <u>Confidentiality.</u> Counterparty shall not disclose this Termination Agreement or its terms (<u>"Confidential Information"</u>) to any person other than to holders of notes issued by the Counterparty or the directors, trustees, officers, employees, counsel and other advisors of any of the foregoing (hereinafter, collectively, the <u>"Related Parties"</u>), in each case who need to know such information solely for the purpose of effecting this Termination Agreement (it being understood that such Related Parties will be informed in advance of the confidential nature of the Confidential Information and will be directed to treat such Confidential Information confidentially), except as may be required by law, including but not limited to as may be required by United States federal securities laws or any law or regulation governing the affairs of the holders of notes issued by the Counterparty which, in particular, may require disclosure to the National Association of Insurance Commissioners.

If the Counterparty becomes legally obligated (whether by court or regulatory order or otherwise), other than due to Counterparty's compliance with United States federal securities

A/73149389.5

laws, to disclose any of the Confidential Information, Counterparty will endeavor to provide Lehman, if permitted by law, with prompt notice so that Lehman may seek a protective order or other appropriate remedy. If such a protective order or other protective remedy is not obtained, Counterparty will furnish only that portion of the Confidential Information which is legally required, in the opinion of its own counsel, and Counterparty will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information.

      Section 13. <u>Limitation of Liability of the Owner Trustee</u>.  It is expressly understood and agreed by the Parties that (a) this Termination Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally, but solely as owner trustee of the Counterparty (in such capacity, together with its successors and assigns in such capacity, the "<u>Owner Trustee</u>"), in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Counterparty is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose for binding only the Counterparty, (c) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any person or entity claiming by, through or under the Parties and (d) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Counterparty or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Counterparty under this Termination Agreement or any other related documents.  The Parties acknowledge that the Owner Trustee has not made any independent investigation into the facts or matters stated in the representations and warranties and covenants given by the Counterparty in this Termination Agreement.

*[Remainder of page intentionally left blank.  Next page is a signature page.]*

A/73149389.5

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Termination Agreement on the date first written above.

LEHMAN BROTHERS SPECIAL FINANCING INC. as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (Jointly Administered)


By:_____
Name:
Title:


VARIABLE FUNDING TRUST 2008-1

By:  U.S. Bank Trust National Association, not in its individual capacity but solely as Owner Trustee of the above trust



By:_____
Name:
Title:


LEHMAN BROTHERS HOLDINGS INC. as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555


By:_____
Name:
Title:

5