**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                                       )
In re:                                                 )   Chapter 11
                                                       )
LEHMAN BROTHERS HOLDINGS INC.                          )   Case No. 08-13555 (JMP)
                                                       )
                                                       )
                                                       )
        Debtor.                                        )   (Jointly Administered)
-------------------------------------------------------x
```

NOTICE OF TRANSFER OF CLAIM
PURSUANT TO FRBP RULE 3001(e)(2)

1.    TO:          **BOULTBEE (VÄSTERÅS) AB** ("Transferor")
                   c/o EFM (Sverige) AB
                   PO Box 730
                   SE-721 20 Västerås Sweden
                   Attention: Managing Director and Clive Boultbee Brooks
                   Telefax + 46 (0)21 415 125

2.    Please take notice that the transfer in the amount of 100% of your claim against LEHMAN BROTHERS SPECIAL FINANCING INC., Case No. 08-13888 (JMP) in the above referenced consolidated proceedings arising from and relating to Claim No. 4147 (attached in Exhibit A hereto), has been transferred to:

                   **BOULTBEE (HELSINKI) AB** ("Transferee")
                   c/o EFM (Sverige) AB
                   PO Box 730
                   SE-721 20 Västerås Sweden
                   Attention: Managing Director and Clive Boultbee Brooks
                   Telefax + 46 (0)21 415 125

       An evidence of transfer of claim is attached hereto as Exhibit B. All distributions and notices regarding the transferred portion of the claim should be sent to the Transferee at the instructions attached in Exhibit C.

3.    No action is required if you do not object to the transfer of your claim. However, **IF YOU OB-JECT TO THE TRANSFER OF YOUR CLAIM, WITHIN 20 DAYS OF THE DATE OF THIS NOTICE, YOU MUST:**

547865.1/153-05237

--    **FILE A WRITTEN OBJECTION TO THE TRANSFER** with:

United States Bankruptcy Court
Southern District of New York
Attn: Clerk of Court
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004-1408

--    **SEND A COPY OF YOUR OBJECTION TO THE TRANSFEREE.**

--    Refer to **INTERNAL CONTROL NO.** _____ in your objection and any further
correspondence related to this transfer.

4.    If you file an objection, a hearing will be scheduled. **IF YOUR OBJECTION IS NOT
TIMELY FILED, THE TRANSFEREE WILL BE SUBSTITUTED FOR THE TRANSFEROR ON
OUR RECORDS AS A CLAIMANT IN THIS PROCEEDING.**

CLERK

--------------------------------------------------------------------------------

**FOR CLERK'S OFFICE USE ONLY:**
This notice was mailed to the first named party, by first class mail, postage prepaid on _____,
2005.
INTERNAL CONTROL NO._____
Copy: (check) Claims Agent ___ Transferee ___ Debtor's Attorney ___

Deputy Clerk

547865.1/153-05237

## EXHIBIT A

## PROOF OF CLAIM

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Lehman Brothers Special Financing Inc. | Case Number:<br>08-13888 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Boultbee (Västerås) AB, corporate registration number 556682-1483 | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>Boultbee (Västerås) AB<br>C/o EFM (Sverige) AB, Box 49166, SE-100 20 Stockholm, Sweden<br><br>Telephone number:<br>(468) 692-6900 | Court Claim Number:_____<br>(If known)<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| 1. Amount of Claim as of Date Case Filed:        $              13,509,815.39<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim. |
| 2. Basis for Claim:  Pls see Exhibit 1<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. Last four digits of any number by which creditor identifies debtor:_____<br><br>3a. Debtor may have scheduled account as:_____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____  Basis for perfection:_____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | business, whichever is earlier – 11 U.S.C. §507 (a)(4).<br><br>☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| 7. Documents: Attach red[…]<br>orders, invoices, itemized st[…]<br>You may also attach a sum[…]<br>a security interest. You may<br><br>DO NOT SEND ORIGINAL<br>SCANNING.<br><br>If the documents are not avail[…], please explain: | Filed: USBC - Southern District of New York<br>Lehman Brothers Holdings Inc., Et Al.<br>08-13555 (JMP)    0000004147 | […]ssory notes, purchase<br>security agreements.<br>[…]rfection of<br>[…]e.)<br><br>[…]YED AFTER | Amount entitled to priority:<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| | FOR COURT USE ONLY |
|---|---|
| Date: 4 May 2009<br>Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Bo Falk        Christian Olofsson | FILED / RECEIVED<br><br>MAY 0 5 2009<br><br>EPIQ BANKRUPTCY SOLUTIONS, LLC |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

**EXHIBIT 1**

<u>To</u>:

United States Bankruptcy Court
Southern District of New York

<u>Case</u>:

08-13888

<u>Creditor</u>:

Boultbee (Västerås) AB
c/o EFM (Sverige) AB
P.O. Box 49166
100 29 Stockholm
Sweden

<u>Debtor</u>:

Lehman Brothers Special Financing Inc.

4 May 2009

Dear Sirs:

**Proof of claim;**
**regarding 1992 ISDA Master Agreement, Credit Support Annex and Confirmations between Lehman Brothers Special Financing Inc. and Boultbee (Västerås) AB dated 15 July 2008 (the "Agreement")**

Reference is made to the Agreement and our notices, dated 9 December 2008 and 15 December 2008, respectively, copies of which are enclosed hereto as **Exhibit 2**. Capitalized terms and definitions have the same meaning given to them in the Agreement, unless otherwise defined in this letter.

We, Boultbee (Västerås) AB, terminated the Agreement and in accordance with Section 6(a) of the Agreement designated 11 December 2008 as the Early Termination Date. In accordance with Section 6 of the Agreement, as modified by Part 4.14 of the Schedule, we proceeded by determining the Settlement Amount in respect of the Terminated Transactions (in the Termination Currency (Swedish Kronor)) and conducted the requisite calculations. The total amount payable by Lehman Brothers Special Financing Inc to Boultbee (Västerås) AB is SEK **97,036,951**. This amount has been converted to US dollars as per 3rd October 2008 and its equivalent is **13,509,815.39** US dollars.

The debtor is the Counterparty under the Agreement. This is the basis for claim against the debtor.

Yours faithfully,
**BOULTBEE (VÄSTERÅS) AB**

By: _____
Name:
Title:       *Bo Falk*       *Christian Olofsson*

B104928509

Page    1

## **:.: Bolagsverket**
### Swedish Companies Registration Office

CERTIFICATE OF REGISTRATION



Registration number:    556682-1772

Date of registration:    2005-06-21

Company name:            Boultbee (Uppsala) AB

Address:

                    Box 730
                    721 20  VÄSTERÅS

Registered office:      Västerås

Share capital:          SEK 100 000

The company is registered as a private limited liability company

**BOARD MEMBER, MANAGING DIRECTOR, CHAIRMAN OF THE BOARD**
600527-0233 Falk, Bo Gunnar, Rasbo Trevlinge, 755 96 UPPSALA

**BOARD MEMBERS**
630722      Boultbee-Brooks, Clive, Welcheston Court Broadmoor Common,
           Woolhope, HEREFORD, HR14QU, STORBRITANNIEN OCH NORDIRLAND
650511-4659 Nilsson, Per Ludvig, Erik Rödes Gata 18, 253 62 HELSINGBORG
780204-4078 Olofsson, Bert Ola Christian, Ted Gärdestads plats 7,
           191 38 SOLLENTUNA

**DEPUTY MEMBERS OF THE BOARD**
760709-2751 Badur, Assur, Glasbergavägen 42, 152 59 SÖDERTÄLJE
650809      Roberts, Lee, 5 Ridge Field, Herefordshire, WD174TZ WATFORD,
           STORBRITANNIEN OCH NORDIRLAND
751129-1416 Sundin, Bengt Anders, Malörtsvägen 16, 725 91 VÄSTERÅS

**AUDITORS**
590602-0317 Pettersson, Ulf Bertil Folke, Torsgatan 21,
           113 97 STOCKHOLM

**SIGNATORY POWER**
In addition to the board of directors,
any two jointly of
      the board members

or any one of
      the board members
in combination with any one of
      the deputy members

are entitled to sign on behalf of the company.

B104928509

 **Bolagsverket**
Swedish Companies Registration Office

 CERTIFICATE OF REGISTRATION

Registration number:    556682-1772

Date of registration:   2005-06-21

Company name:           Boultbee (Uppsala) AB

Furthermore, the Managing Director, in his normal business activities,
is also entitled to sign on behalf of the company.

**FINANCIAL YEAR**
Registered financial year: 0101 - 1231
Latest annual report submitted covers financial
period 20070101-20071231

**DATE OF REGISTRATION OF CURRENT AND PREVIOUS COMPANY NAMES**
2005-12-12 Boultbee (Uppsala) AB
2005-07-22 Boultbee Holding (Uppsala) AB
2005-06-21 Goldcup D 852 AB

SUNDSVALL 2009-04-06
Ex officio

Bente Ohlsson

From:  Boultbee (Västerås) AB
       c/o EFM AB
       P.O. Box 49166
       100 29 Stockholm
       Sweden

To:    Lehman Brothers Special Financing Inc.
       c/o Lehman Brother Inc.
       Capital Markets Contracts – Legal
       Legal, Compliance and Audit
       745 Seventh Avenue
       New York, NY 10019
       U.S.A.
       Attn: Documentation Manager

With a copy to:

       Lehman Brothers International (Europe)
       Legal Transaction Management (FID)
       25 Bank Street
       London E14 5LE
       United Kingdom
       Attn: Legal – Fixed Income

With a copy to:

       Lehman Brothers Holdings, Inc.
       399 Park Avenue
       11th Floor
       New York, New York 10022
       U.S.A

       Attn: Corporate Counsel

**Delivered by hand**

                                              15 December 2008
Dear Sirs:

**Re: 1992 ISDA Master Agreement, Credit Support Annex and Confirmations between Lehman Brothers Special Financing Inc. and Boultbee (Västerås) AB dated 15 July 2008 (the "Agreement")**

Reference is made to the Agreement and our notice, dated 9 December 2008, a copy of which is enclosed hereto as **Exhibit 1**, pursuant to which we in accordance with Section 6(a) of the Agreement designated 11 December 2008 as the Early Termination Date.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

We are now writing to advice you as follows:

In accordance with Section 6 of the Agreement, as modified by Part 4.14 of the Schedule, we have proceeded by determining the Settlement Amount in respect of the Terminated Transactions (in the Termination Currency (Swedish Kronor)) and conducted the requisite calculations.

No Market Quotations have been communicated to Party B which were capable of becoming legally binding upon its acceptance (i.e. Firm Offers).  Pursuant to Part 4.14(ii)(2) of the Schedule, the Settlement Amount has therefore been determined by reference to the Loss of Party B (without reference to any Unpaid Amounts).  For the purpose of determining such Loss, quotations as of the Early Termination Date have in good faith been obtained by Party B from four leading dealers (SEB, Nordea, Barclays Capital and RBS) in the relevant market.  The lowest and highest of such quotations have been ignored and the arithmetic mean of the remaining quotations (Nordea and RBS) has been used when determining the Settlement Amount.  Since Loss has been used as a fallback provision, the Unpaid Amounts owed by or owing to the parties have been considered separately.  Full details of the calculations made are set out in the enclosed copy of a letter, dated as of the Early Termination Date, to us from J.C. Rathbone Associates Limited, **Exhibit 2 a -e**. Please note that it has not been possible to obtain any quotation in respect of the Credit Support Annex, and the value thereof has therefore been determined to nil (nor was ever any collateral posted under this annex).

The Termination Currency Equivalent of the Settlement Amount owing to Party B amounts to SEK 97,507,618.  To this amount should the Termination Currency Equivalent of the Unpaid Amounts owing to Party B (SEK 606,153) be added and the Termination Currency Equivalent of the Unpaid Amounts owing to Party A (SEK 1,161,820) be subtracted.  This results in an aggregate amount payable to Party B by Party A of **SEK 96,951,951**.

Further, and by reference to Section 11 of the Agreement, Party B demands to be indemnified for and against the expenses incurred by it by reason of the early termination of the Terminated Transactions in an amount of SEK 85,000 (cf. see enclosed invoice from J.C. Rathbone Associates Limited, **Exhibit 3**).

The total amount payable by Party A to Party B is thus **SEK 97,036,951**.  This amount, together with any interest accruing thereon pursuant to Section 6(d)(ii) of the Agreement from (and including) the Early Termination Date to (but excluding) the date such amount is paid at the Applicable Rate (currently 6.5 per cent), shall be paid into our account at:

| | |
|---|---|
| Bank: | SEB |
| Address: | P.O. Box 43 |
| | 721 04 Västerås |
| | Sweden |
| IBAN: | SE2050000000053801021777 |
| BIC: | ESSESESS |
| Accountholder: | Boultbee (Västerås) AB |
| Account name: | Rental Income Account |

We reserve all rights and remedies available to us under the Agreement, under other agreements, and otherwise at law or in equity.

Yours faithfully,
**BOULTBEE (VÄSTERÅS) AB**

By:
Name: Bo Falk          Per Nilsson
Title: Director          Director

*Exhibit 1*

From:   Boultbee (Vasteras) AB
       c/o EFM AB
       Box 49166
       100 29 Stockholm
       Fleminggatan 48, Stockholm

To:   Lehman Brothers Special Financing Inc.
       c/o Lehman Brother Inc.
       Capital Markets Contracts – Legal
       Legal, Compliance and Audit
       745 Seventh Avenue
       New York, NY 10019
       Attn: Documentation Manager

With a copy to:

       Lehman Brothers International (Europe)
       Legal Transaction Management (FID)
       25 Bank Street
       London
       E14 5LE
       Attn: Legal – Fixed Income

With a copy to:

       Lehman Brothers Holding Inc.
       399 Park Ave
       11th Floor
       New York, New York 10022

       Attn: Corporate Counsel

**Hand Delivered**

9 December 2008

Dear Sirs:

### Re:  Designation of an Early Termination Date under ISDA Master

Reference is made to the Euro 147,900,722.79 facility agreement entered into between, among others, Boultbee (Sverige) AB as the Parent, the Original Borrower, the Original Guarantor, Lehman Brothers Europe Limited as Arranger and Agent, the Original Lenders and Lehman Brothers Special Financing Inc as Original Counterparty (as such terms are defined therein) dated 28 June 2005 and restated on 15 July 2008 (the "Facility Agreement").

Reference is also made to the 1992 ISDA Master Agreement, Credit Support Annex, and Confirmations between Lehman Brothers Special Financing Inc. and Boultbee (Vasteras) AB dated 15 July 2008 (copy enclosed; the "Agreement").  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

Pursuant to Section 6(a) of the ISDA Master, we designate 11 December 2008 as the Early Termination Date with respect to all Transactions constituted by the Agreement.

Such Early Termination Date is being designated as a result of the Event of Default under Section 5(a)(vii) of the Agreement resulting from the well-publicized institution of a proceeding under Chapter 11 of the United States Bankruptcy Code involving your company in the US Bankruptcy Court in the Southern District of New York. We will be back to you as soon as reasonably practicable with a statement setting forth the early termination payment owed to or by you, as applicable. For your convenience, attached please find copies of the Transactions that are being terminated under the Agreement.

We reserve all rights and remedies available to us under the Agreement, under other agreements, and otherwise at law or in equity.

Yours faithfully,

Boultbee (Vasteras) AB

By:
Name:
Title: Director   Bo Falk     Clive Boulthor   Brooks
Date:  9/12-08                        9/12/08

*Exhibit 2 a*



**J.C. Rathbone Associates Limited**
Financial Risk Consultants

11th December 2008

Chris Ogle
Boultbee (Vasteras) AB
c/o EFM AB
Box 49166
100 29 Stockholm
Fleminggatan
Sweden

Dear Chris,

We refer to the determination of a Market Quotation in respect of the two swaps between Boultbee (Vasteras) AB and Lehman Brothers Special Financing Inc (LBSF).

Four banks provided quotations as at 11am, London time, on 11th December, the Early Termination Date. Under the terms of the ISDA Master Agreement, the Market Quotation will be arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values.

Also under the terms of the ISDA between the two parties, the quotations for the two swaps will be offset.

The letters providing the quotations are attached and are summarised below:

|  |  | Reference 3865377 | Reference 3865302 | Net |
|---|---|---|---|---|
|  |  | SEK | SEK | SEK |
| SEB |  | (48,328,124) | 121,424,766 | 73,096,642 |
| RBS |  | (46,269,156) | 140,489,392 | 94,220,236 |
| Nordea |  | (46,602,000) | 147,397,000 | 100,795,000 |
| Barclays |  | (46,900,000) | 183,700,000 | 136,800,000 |

The arithmetic mean of the RBS and Nordea quotations is SEK 97,507,618.



Head Office:          Regional Offices:

London              Birmingham          Leeds              Manchester          Edinburgh          Aberdeen
12 St. James's Square   Cornwall Buildings   13 Park Place      10a Portland Tower   Forsyth House       7 Queens Gardens
London              45 Newhall Street    Leeds              Portland Street     93 George Street    Aberdeen
SW1Y 4LB            Birmingham           LS1 2SJ            Manchester          Edinburgh          AB15 4YD
                    B3 3QR                                  M1 3LF              EH2 3ES

Tel: +44 (0)20 7493 3310   Tel: +44 (0)121 212 9180   Tel: +44 (0)113 245 8228   Tel: +44 (0)161 236 8422   Tel: +44 (0)131 240 1273   Tel: +44 (0)1224 619369
Fax: +44 (0)20 7493 3340   Fax: +44 (0)121 212 9190   Fax: +44 (0)113 245 8208   Fax: +44 (0)161 236 6108   Fax: +44 (0)131 240 1271   Fax: +44 (0)1224 626227

E-Mail: info@jcra.co.uk      Website: www.jcra.co.uk      Registered in England No. 02646268  Group VAT No. 577723305  Authorised and regulated by the Financial Services Authority

Items shown in brackets represent amounts due to LBSF and those without represent amounts due from LBSF.

As at the Early Termination Date, entitlements accrued but not settled amounted to SEK 555,667 which was due to LBSF.  The calculation of this amount is set out in Appendix I.

Yours sincerely,

John Walker
Director

J.C. Rathbone Associates Limited

*Exhibit 2b*

**Boultbee (Vasteras) AB**                    **Appendix I**

### Entitlements due on 15th October 2008 but not settled

### Cross Currency Swap

**EUR/SEK Spot rate for 15/10/08**              9.9806

**Lehman Brothers Special Financing Inc. - Pay floating EURIBOR**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| 3mth EURIBOR fix: | 4.957% |
| Floating Spread | 1.25% |
| EUR Notional: | 107,385,049.08 |
| Accrued EUR amount: | 1,703,377.44 |
| SEK Equivalent | 17,000,728.91 |

**Boultbee (Vesteras) AB - Pay floating STIBOR**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| 3mth STIBOR fix: | 5.10% |
| Floating Spread | 1.25% |
| SEK Notional: | 1,010,278,541.77 |
| Accrued SEK amount: | 16,394,575.67 |

| | |
|---|---|
| Net due from LBSF | 606,153.24 |

### Interest Rate Swap

**Lehman Brothers Special Financing Inc. - Pay floating STIBOR**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| 3mth STIBOR fix: | 5.100% |
| SEK Notional: | 1,010,278,541.77 |
| Accrued SEK amount: | 13,167,296.99 |

**Boultbee (Vestersa) AB - Pay fixed**

| | |
|---|---|
| Period Start: | Tue 15/07/2008 |
| Period End: | Wed 15/10/2008 |
| Accrued days: | 92 |
| Fixing Date: | Fri 18/07/2008 |
| Fixed Rate | 5.55% |
| SEK Notional: | 1,010,278,541.77 |
| Accrued SEK amount: | 14,329,117.32 |

| | |
|---|---|
| Net due to LBSF: | 1,161,820.32 |

| | |
|---|---|
| **Aggregate net due to LBSF** | **555,667** |

*Exhibit 2c*

# S|E|B

Stockholm 11 December 2008

## Valuation

As of 12.00 CET, the 11th December 2008, SEB values the swaps as follows:

Interest Rate Swap (Reference Global Id 3965377) market value for the client would be minus SEK 48 328 124 (i.e. client would pay)

Currency swap (Reference Global Id 3965302) market value for the client would be SEK 121 424 766 (i.e. client would receive)

Youre sincerely,

Mats Ericsson

Mats Ericsson
SEB Interest Rate Derivatives Sales
Merchant Banking

Tel +46 8 506 230 53
Fax +46 8 611 51 86
Kungsträdgardsgatan 8, Stockholm
E-mail: mats.ericsson@seb.se
www.seb.se/mb

Merchant Banking

| Mailing Address | Telephone | Fax | Internet |
|---|---|---|---|
| 106 40 STOCKHOLM | | | |
| Office Address | | | |
| Kungsträdgårdsgatan 8 | +46 771 621000 | | www.seb.se/mb |

A unit within Skandinaviska Enskilda Banken AB (publ). Corporate Identity Number: 502032-9081. Registered Office: Stockholm.

*Exhibit 2d*



**The Royal Bank of Scotland**

11 December 2008

To: Chris@Boultbee.co.uk
cc: mmoss@jcra.co.uk

Boultbee – Market Quotations

Please see market quotation, as 11am 11th December 2008

**Cross Currency Swap**

Current Roll: 15/10/08
End: 15/07/10
Notional: see attached
Lehman's pay 3m Euribor + 126bps
Boultbee pay 3m Stibor + 125bps
Final Exchange
A/360, quarterly, preceding
Holidays: NYC, LDN, TARGET, STK

*MTM: SEK 140,489,392 in the money to Boultbee

**Interest Rate Swap**

Current Roll: 15/10/08
End: 15/07/10
Notional: see attached
Lehman's pay 3m Stibor
Boultbee pay 5.55%
A/360, quarterly, preceding
Holidays: NYC, LDN, TARGET, STK

*MTM: SEK 46, 269,156 in the money to Lehman's

**DISCLAIMER**

* "This pricing is provided to you by The Royal Bank of Scotland plc ("RBS") to assist you in calculating a
Market Quotation for the purposes of the 1992 ISDA Master Agreement. It is not intended for any other
purpose and is not for the benefit of, and must not be relied on by, any other party. Provision of this
pricing does not constitute either a bid or an offer to enter into any transaction with you. RBS assumes
no liability for the pricing set out herein, and specifically disclaims all liability for any use you may make of
such pricing. However, this shall not restrict, exclude or limit any duty or liability to any person under any
applicable laws or regulations of any jurisdiction which may not lawfully disclaimed.

The Royal Bank of Scotland plc. Registered in Scotland No. 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority.
The Royal Bank of Scotland plc is an authorised agent of ABN AMRO Bank N.V.

*Exhibit 2e*



JC Rathbone Associates Limited
12 St James Square
London SW1Y 4 LB
UK

**Valuation of swaps**

We have valued 2 swaps with Global ID 3965302 and 3965377 on request from J C
Rathbone Associates Limited. The swaps are traded between Lehman Brothers and
Boultbee AB.

The market value as per December 11 2008 (12:00 CET)
(from Boultbee:s perspective) was:

ID 3965302    SEK 147.397.000
ID 3965377    SEK -46.602.000

Kind Regards

Pontus Ekelöf
Nordea Markets Västsverige
405 09 Göteborg
E-post: pontus.ekelof@nordea.com
Tel: +46-31-7716521 Fax: +46-31-7716230
Mobil: +46 70 2655183

*Exhibit 2e*



# BARCLAYS CAPITAL

Barclays Capital
5 The North Colonnade
Canary Wharf
London
E14 4BB

Tel: +44 (0)20 7623 2323

11 December 2008

John/Chris,

These levels are indicative and based on the economic information in the confirmations provided. It does not take in to account other factors (CSA, credit etc). We are not in a position to replace the transactions as the client has not gone through our KYC process or credit sanctioning. Disclaimer below.

Interest Rate Swap 3965377:  Barclays pays SEK 46.9 mil

Balance Guaranteed Cross-currency Swap 3965302:  Barclays receives SEK 183.7 mil

Regards,

Ashley

Ashley Branch
Corporate Risk Advisory

You have requested Barclays Bank plc ("Barclays") to provide this indicative quotation. You have informed us you intend to use this indicative quotation to calculate a Market Quotation for the purposes of the 1992 ISDA Master Agreement. The provision of this indicative quotation is not intended for any other purpose and is not for the benefit of, and must not be relied on by, any other party. Provision of this indicative quotation does not constitute either a firm bid or a firm offer to enter into any transaction with you. Barclays assumes no liability for the indicative quotation set out herein, and specifically disclaims all liability for any use you may make of such indicative quotation. However, this shall not restrict, exclude or limit any duty or liability to any person under any applicable laws or regulations of any jurisdiction which may not lawfully be disclaimed.

*Exhibit 3*

# JCRA

**J.C. Rathbone Associates Limited**
Financial Risk Consultants

11th December 2008

Chris Ogle
Boultbee Property Investment Company
Cadogan Pier
London
SW3 5RQ

Dear Chris,

We have pleasure in enclosing our invoice in respect of the determination of the Market Quotations for the Swaps with Lehman Brothers Special Financing Inc.

Yours sincerely,

**John Walker**



| Head Office | Regional Offices | | | | |
|---|---|---|---|---|---|
| **London** | **Birmingham** | **Leeds** | **Manchester** | **Edinburgh** | **Aberdeen** |
| 12 St. James's Square | Cornwall Buildings | 13 Park Place | 10a Portland Tower | Forsyth House | 7 Queens Gardens |
| London | 45 Newhall Street | Leeds | Portland Street | 93 George Street | Aberdeen |
| SW1Y 4LB | Birmingham | LS1 2SJ | Manchester | Edinburgh | AB15 4YD |
| | B3 3QR | | M1 3LF | EH2 3ES | |
| Tel: +44 (0)20 7493 3310 | Tel: +44 (0)121 212 9180 | Tel: +44 (0)113 245 8228 | Tel: +44 (0)161 236 8422 | Tel: +44 (0)131 240 1273 | Tel: +44 (0)1224 619369 |
| Fax: +44 (0)20 7493 3340 | Fax: +44 (0)121 212 9190 | Fax: +44 (0)113 245 8208 | Fax: +44 (0)161 236 6108 | Fax: +44 (0)131 240 1272 | Fax: +44 (0)1224 626227 |

E.Mail: info@jcra.co.uk    Website: www.jcra.co.uk    Registered in England No. 02646268    Group VAT No. 577723309    Authorised and regulated by the Financial Services Authority

# JCRH

### J.C. Rathbone Holdings Limited

**INVOICE**

Boultbee (Vasteras) AB
c/o EFM AB
Box 49166
100 29 Stockholm
Fleminggatan
Sweden

For the attention of The Accounts Department

| Date of Issue and Tax Point: | 11/12/2008 | | Invoice Number: | 4837/1208/1 |
|---|---|---|---|---|
| VAT REGISTRATION NO: 577 7233 05 | | | Matter Ref : | 4837-0002 |
| VAT CODE | Z | RATE | 0.00% | Account Code | 813 |
| EU VAT Registration no: | SE556682148301 | | | |

| DESCRIPTION | AMOUNT |
|---|---|
| Professional services in connection with the determination of the Market Quotation in respect of the Company's interest rate swap Ref: 3965377 and currency swap Ref: 3965302 with Lehman Brothers Special Financing Inc.<br><br>Agreed fee | £7,000.00 |
| Sub-Total | £7,000.00 |
| VAT | £0.00 |
| TOTAL | £7,000.00 |

Terms: Strictly net 14 days from date of invoice

Note: This invoice has been assigned from J.C. Rathbone Associates Limited to J.C. Rathbone Holdings Limited. Payment of the invoice is to be made to J.C. Rathbone Holdings Limited, whose receipt will be in full settlement of the amount paid to them on behalf of J.C. Rathbone Associates Limited.

**Payment to be forwarded to the Head Office**
**Bank Details:** A/C Name: J.C. Rathbone Holdings Limited (Bank of Scotland)
Sort Code: 12-11-03 Account Number: 00782796
IBAN: GB80 BOFS 1211 0300 7827 96 SWIFT: BOFSGB21238

JCRH

| Head Office: | Regional Offices: | | | | |
|---|---|---|---|---|---|
| London | Birmingham | Leeds | Manchester | Edinburgh | Aberdeen |
| 12 St. James's Square | Cornwall Buildings | 13 Park Place | 10a Portland Tower | Forsyth House | 7 Queens Gardens |
| London | 45 Newhall Street | Leeds | Portland Street | 93 George Street | Aberdeen |
| SW1Y 4LB | Birmingham | LS1 2SJ | Manchester | Edinburgh | AB15 4YD |
| | B3 3QR | | M1 3LF | EH2 3ES | |
| Tel: +44 (0)20 7493 3310 | Tel: +44 (0)121 212 9180 | Tel: +44 (0)113 246 8228 | Tel: +44 (0)161 236 8422 | Tel: +44 (0)131 240 1273 | Tel: +44 (0)1224 619369 |
| Fax:+44 (0)20 7493 3340 | Fax:+44 (0)121 212 9190 | Fax:+44 (0)113 246 8208 | Fax:+44 (0)161 236 6108 | Fax:+44 (0)131 240 1272 | Fax: +44 (0)1224 626227 |

E.Mail: info@jcra.co.uk    Website: www.jcra.co.uk    Registered in England No. 02646268 Group VAT No. 577233305

# LEHMAN BROTHERS

**Transaction**

| | |
|---|---|
| Date: | 15 July, 2008 |
| To: | Boultbee (Vasteras) AB |
| | Attention:    Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Europe Limited |
| | Confirmations Group |
| | Facsimile:    (+1) 646-885-9564 (United States of America) |
| | Phone:         (+44) 207-102-7661 (United Kingdom) |
| | E-Mail:        IncomingStructured@lehman.com |
| Effort Id: | |
| Global Id: | 3965302 |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Boultbee (Vasteras) AB ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 15 July, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Trade Date | 15 July 2008 |
| Effective Date: | 15 July 2008 |
| Termination Date: | The earlier to occur of: |
| | (i)    an Early Termination Date; and |
| | (ii)   15 July 2010. |

**Floating Amounts I:**

| | |
|---|---|
| Floating Amount I Payer: | Party A |
| Floating Amount I Payer Currency Amount: | In respect of each Calculation Period, an amount equal to the quotient of (a) the current Floating Amount II Payer Currency Amount and (b) the FX Rate. |
| FX Rate: | 9.408 |
| Floating Amount I Payer Payment Dates: | The 15th calendar day of each January, April, July and October, from and including 15 October 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Floating Rate Option: | EUR-EURIBOR-Reuters provided, however, that Section 7.1.(f)(i) and Section 7.1.(f)(iv) of the Definitions will be amended so that any references therein to "on the day that is two TARGET Settlement Days preceding that Reset Date" shall be replaced with references to "on that Reset Date". |
| Designated Maturity: | 3 months |
| Spread: | 1.25 per cent. |
| Floating Rate Day Count Fraction: | With respect to each Calculation Period, the "Day Count Fraction" shall be the fraction |

|                     |                                                                                                                                                                     |
|---------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                     | specified in the section entitled "Day Count Fraction" in Appendix A corresponding to such Calculation Period.                                                       |
| Reset Dates:        | With respect to each Calculation Period, the "Reset Date" shall be date specified in the section entitled "Reset Dates" in Appendix A corresponding to such Calculation Period, provided, however, that if such day is not a TARGET Settlement Day, the Reset Date for such day shall be the immediately preceding TARGET Settlement Day. |

**Floating Amounts II:**

| | |
|---|---|
| Floating Amount II Payer: | Party B |
| Floating Amount II Payer Currency Amount: | SEK 1,010,278,571.77 (subject to adjustment in accordance with Appendix A attached hereto and the "Balance Guarantee" provision below). |
| Floating Amount II Payer Payment Dates: | The 15th calendar day of each January, April, July and October, from and including 15 October 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Floating Rate Option: | SEK-STIBOR-SIDE provided, however, that Section 7.1.(x)(ii) and Section 7.1.(x)(iv) of the Definitions will be amended so that any references therein to "on the day that is two Stockholm Banking Days preceding that Reset Date" shall be replaced with references to "on that Reset Date". |
| Designated Maturity: | 3 months |
| Spread: | 1.25 per cent. |
| Floating Rate Day Count Fraction: | With respect to each Calculation Period, the "Day Count Fraction" shall be the fraction specified in the section entitled "Day Count |

|                                  | Fraction" in Appendix A corresponding to such Calculation Period. |
|----------------------------------|---|
| Reset Dates:                     | With respect to each Calculation Period, the "Reset Date" shall be date specified in the section entitled "Reset Dates" in Appendix A corresponding to such Calculation Period, provided, however, that if such day is not a Stockholm Settlement Day, the Reset Date for such day shall be the immediately preceding Stockholm Settlement Day. |
| Business Days:                   | London, New York, Stockholm and TARGET Settlement Day |
| Initial Exchange:                | Not Applicable |
| **Interim Exchange:**            | |
| Interim Exchange Dates:          | Each Payment Date on which the Floating Amount II Payer Currency Amount is reduced for the immediately following Calculation Periods as specified in Appendix A, or as detailed under the Balance Guarantee provision below. |
| Party A Interim Exchange Amount: | The excess of (a) the Floating Amount I Payer Currency Amount effective on the relevant Payment Date over (b) the Floating Amount I Payer Currency Amount effective for the immediately following Calculation Period. |
| Party B Interim Exchange Amount: | The excess of (a) the Floating Amount II Payer Currency Amount effective on the relevant Payment Date over (b) the Floating Amount II Payer Currency Amount effective for the immediately following Calculation Period. |
| **Final Exchange:**              | Applicable |
| Final Exchange Date:             | The Termination Date |
| Floating Amount Payer I Final Exchange Amount: | The Floating Amount I Payer Currency Amount effective as of the Termination Date. |

| | |
|---|---|
| Floating Amount Payer II Final Exchange Date: | The Floating Amount II Payer Currency Amount effective as of the Termination Date. |
| Balance Guarantee: | On or prior to the first day of any Floating Amount I Calculation Period, Party B shall provide notice to Party A, of the Loan Amount which will be outstanding as a result of an unexpected amortisation at the commencement of the relevant Floating Amount II Payer Calculation Period (the "**Outstanding Loan Amount**"). |
| | Upon receipt of such notice, the Floating Amount II Payer Currency Amount of this Transaction shall be reduced to an amount equal to the Outstanding Loan Amount effective as of the first day of the relevant Floating Amount II Payer Calculation Period and the relevant Floating Amount I Calculation Period. |
| | "**Loan Amount**" means with respect to the Floating Amount II Payer initial Calculation Period, SEK 1,010,278,541.77, and thereafter, an amortising amount as determined by Party B. |
| **Miscellaneous:** | |
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office |

**Additional Provisions:**

Party A and Party B acknowledge that part of the consideration for entering into this Transaction is the (i) fixed rate payable under the interest rate swap transaction entered into between Party A and Party B on or about the date hereof and (ii) a payment made by Lehman Commercial Paper Inc. to Party B on or about the date hereof.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to:

Lehman Brothers Special Financing Inc.    Boultbee (Vasteras) AB

R. Sandilands.

By: _____
Name:
Title:

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Special Financing Inc.

Accepted and agreed to:

Boultbee (Vasteras) AB

By:
Name:
Title: *Christian Olofsson*

| Appendix A | | | | |
|---|---|---|---|---|
| Each Calculation Period from and including the Calculation Period scheduled to commence on the relevant Period End Date (or Effective Date) (the "Start Date") to and including the Calculation Period scheduled to end on the next applicable Period End Date (or Termination Date) (the "End Date"): | | | | |
| Start Date: | End Date: | Reset Date: | Day Count Fraction: | Notional Amount: |
| 15 July 2008 | 15 October, 2008 | 18 July, 2008 | 92/360 | SEK 1,010,278,541.77 |
| 15 October 2008 | 15 January, 2009 | 20 October, 2008 | 93/360 | SEK 1,010,278,541.77 |
| 15 January, 2009 | 15 April, 2009 | 21 January, 2009 | 89/360 | SEK 1,010,278,541.77 |
| 15 April, 2009 | 15 July, 2009 | 20 April, 2009 | 91/360 | SEK 1,007,038,729.77 |
| 15 July, 2009 | 15 October, 2009 | 20 July, 2009 | 92/360 | SEK 1,003,950,189.77 |
| 15 October, 2009 | 15 January, 2010 | 20 October, 2009 | 95/360 | SEK 1,000,148,617.77 |
| 15 January, 2010 | 15 April, 2010 | 21 January, 2010 | 87/360 | SEK 996,449,667.77 |
| 15 April, 2010 | 15 July, 2010 | 20 April, 2010 | 91/360 | SEK 991,819,518.77 |

*subject to adjustment in accordance with the relevant Business Day Convention.

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 15 July, 2008 |
| To: | Boultbee (Vasteras) AB |
| | Attention:     Documentation Unit |
| | |
| From: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Europe Limited |
| | Confirmations Group |
| | Facsimile:     (+1) 646-885-9564 (United States of America) |
| | Phone:          (+44) 207-102-7661 (United Kingdom) |
| | E-Mail:         IncomingStructured@lehman.com |
| | |
| Effort Id: | |
| Global Id: | 3965377 |

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Boultbee (Vasteras) AB ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 15 July, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of this Confirmation, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 15 July, 2008 |
| Effective Date: | 15 July, 2008 |
| Termination Date: | 15 July, 2010 |
| Notional Amount: | SEK 1,010,278,541.77 – subject to adjustment in accordance with Appendix A attached hereto. |

**Fixed Amount:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Date: | The 15th calendar day of each January, April, July and October, form and including the 15 October, 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Fixed Rate: | 5.55% |
| Fixed Rate Day Count Fraction: | With respect to each Calculation Period the "Day Count Fraction" corresponding to such Calculation Period, as specified in Annex A attached hereto. |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 15th calendar day of each January, April, July and October, form and including the 15 October, 2008 to and including the Termination Date, subject to adjustment in accordance with the Preceding Business Day Convention. |
| No Adjustment to Period End Dates: | Applicable |
| Floating Rate Option: | SEK-STIBOR-SIDE provided, however that Section 7.1.(x)(ii) and Section 7.1.(x)(iv) of the Definitions will be amended so that any references therein to "on the day that is two Stockholm Banking Days preceding that Reset Date" shall be replaced with references to "on that Reset Date". |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | With respect to each Calculation Period the "Day Count Fraction" corresponding to such Calculation Period, as specified in Annex A attached hereto. |

| | |
|---|---|
| Reset Dates: | With respect to each Calculation Period the "Reset Date" corresponding to such Calculation Period, as specified in Annex A attached hereto, provided, however, that if such day is not a Stockholm Settlement Day, the Reset Date for such day shall be the immediately preceding Stockholm Settlement Day. |
| Business Days: | London, New York, Stockholm and TARGET Settlement Day |

Miscellaneous:

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers Special Financing Inc.

*R. Sandlands*

Accepted and agreed to:

Boultbee (Vasteras) AB

By: _____
Name:
Title:

| | |
|---|---|
| Reset Dates: | With respect to each Calculation Period the "Reset Date" corresponding to such Calculation Period, as specified in Annex A attached hereto, provided, however, that if such day is not a Stockholm Settlement Day, the Reset Date for such day shall be the immediately preceding Stockholm Settlement Day. |
| Business Days: | London, New York, Stockholm and TARGET Settlement Day |

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9564 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

Lehman Brothers Special Financing Inc.    .    Boultbee (Vasteras) AB

By:
Name:    *Christian Olofsson*
Title:

| Appendix A | | | | |
|---|---|---|---|---|
| Each Calculation Period from and including the Calculation Period scheduled to commence on the relevant Period End Date (or Effective Date) (the "Start Date") to and including the Calculation Period scheduled to end on the next applicable Period End Date (or Termination Date) (the "End Date"): | | | | |
| Start Date: | End Date: | Reset Date: | Day Count Fraction: | Notional Amount: |
| 15 July 2008 | 15 October, 2008 | 18 July, 2008 | 92/360 | SEK 1,010,278,541.77 |
| 15 October 2008 | 15 January, 2009 | 20 October, 2008 | 93/360 | SEK 1,010,278,541.77 |
| 15 January, 2009 | 15 April, 2009 | 21 January, 2009 | 89/360 | SEK 1,010,278,541.77 |
| 15 April, 2009 | 15 July, 2009 | 20 April, 2009 | 91/360 | SEK 1,007,038,729.77 |
| 15 July, 2009 | 15 October, 2009 | 20 July, 2009 | 92/360 | SEK 1,003,950,189.77 |
| 15 October, 2009 | 15 January, 2010 | 20 October, 2009 | 95/360 | SEK 1,000,148,617.77 |
| 15 January, 2010 | 15 April, 2010 | 21 January, 2010 | 87/360 | SEK 996,449,667.77 |
| 15 April, 2010 | 15 July, 2010 | 20 April, 2010 | 91/360 | SEK 991,819,518.77 |

*subject to adjustment in accordance with the relevant Business Day Convention.

(Bilateral Form - Transfer)[1]                    (ISDA Agreements Subject to English Law)[2]



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of .................................. 15 July 2008

between

LEHMAN BROTHERS SPECIAL
...FINANCING INC................    and    BOULTBEE (VASTERAS) AB
("Party A")                                      ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

**Paragraph 1. Interpretation**

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1]    This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2]    This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.

UK/717370/01                                                    Office/OFFICE

provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

**Paragraph 2. Credit Support Obligations**

(a)    *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

   (i)    the Credit Support Amount

   exceeds

   (ii)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)    *Return Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

   (i)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

   exceeds

   (ii)    the Credit Support Amount.

**Paragraph 3. Transfers, Calculations and Exchanges**

(a)    *Transfers.* All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

   (i)    in the case of cash, by transfer into one or more bank accounts specified by the recipient;

2

(ii)     in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)    in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)     *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)     *Exchanges.*

(i)     Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)     If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

ISDA® 1995

**Paragraph 4. Dispute Resolution**

(a)    *Disputed Calculations or Valuations.* If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

    (1)    the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

    (2)    in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

    (3)    the parties will consult with each other in an attempt to resolve the dispute; and

    (4)    if they fail to resolve the dispute by the Resolution Time, then:

        (i)    in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(c), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

            (A)    utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

            (B)    calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

            (C)    utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

        (ii)    in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

4

ISDA® 1995

(b)    *No Event of Default.* The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

**Paragraph 5. Transfer of Title, No Security Interest, Distributions and Interest Amount**

(a)    *Transfer of Title.* Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)    *No Security Interest.* Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)    *Distributions and Interest Amount.*

(i)    *Distributions.* The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

(ii)    *Interest Amount.* Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

**Paragraph 6. Default**

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

5

ISDA® 1995

**Paragraph 7. Representation**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

**Paragraph 8. Expenses**

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

**Paragraph 9. Miscellaneous**

(a)    *Default Interest.*    Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Good Faith and Commercially Reasonable Manner.*    Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)    *Demands and Notices.*    All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)    *Specifications of Certain Matters.*    Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 10. Definitions**

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

6

ISDA® 1995

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11 (b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

(x)    the amount of cash in such currency on that day; multiplied by

(y)    the relevant Interest Rate in effect for that day; divided by

(z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

(i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

(ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

8

ISDA® 1995

(iii)    in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)    in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the *"Recalculation Date"* means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(c)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance or, as the case may be, the Value of such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

9

ISDA® 1995

*"Valuation Percentage"* means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

*"Valuation Time"* has the meaning specified in Paragraph 11(c)(iii).

*"Value"* means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

    (i)    Eligible Credit Support comprised in a Credit Support Balance that is:

        (A)    an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

        (B)    a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

    (ii)    items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

ISDA® 1995

Execution version

## CREDIT SUPPORT ANNEX

to the Schedule to the

ISDA Master Agreement

dated as of 15 July 2008

between

**Lehman Brothers Special**                    and                    **Boultbee (Västerås) AB**
**Financing Inc.**

("Party A")                                                    ("Party B")


**Paragraph 11. Elections and Variables**

(a)    **Base Currency and Eligible Currency.**

    (i)    "Base Currency" means Euro.

    (ii)    "Eligible Currency" means the Base Currency.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount.**

        (A)    "Delivery Amount" has the meaning specified in Paragraph 2(a), as amended (I) by deleting the words "upon a demand made by the Transferee on or promptly following a Valuation Date" and inserting in lieu thereof the words "not later than the close of business on each Valuation Date" and (II) by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

        The "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the greatest of:

        (1)    the amount by which (a) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date exceeds (b) the Value (determined using the applicable Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date); and

        (2)    the amount by which the S&P Credit Support Amount exceeds the Value (determined using the S&P Valuation Percentages as the Valuation Percentage) of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

        Provided that, in respect of any Valuation Date, the Value of the Eligible Credit Support to be transferred under Paragraph 2(a) shall be calculated using the

applicable Valuation Percentages for the rating agency whose criteria have resulted in the greatest amount under (1) and (2) above.

Provided further that if, in respect of any Valuation Date, the Delivery Amount is equal to or greater than the Transferor's Minimum Transfer Amount, the Transferor will transfer to the Transferee sufficient Eligible Credit Support to ensure that, immediately following such transfer, none of the amounts calculated under (1) and (2) of this Paragraph 11(b)(i)(A) shall be greater than zero.

(B)  "Return Amount" has the meaning as specified in Paragraph 2(b), as amended by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

The "Return Amount" applicable to the Transferee for any Valuation Date will equal the least of:

(1)  the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date; and

(2)  the amount by which (a) the Value (determined using the S&P Valuation Percentages as the Valuation Percentage) of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the S&P Credit Support Amount.

Provided that, in respect of any Valuation Date, the Value of the Eligible Credit Support to be transferred under Paragraph 2(b) shall be calculated using the applicable Valuation Percentages for the rating agency whose criteria have resulted in the lowest amount under (1) and (2) of this Paragraph 11(b)(i)(B).

Provided further that in no event shall the Transferee be required to transfer any Equivalent Credit Support under Paragraph 2(b) if, immediately following such transfer, any of the amounts calculated under (1) and (2) of Paragraph 11(b)(i)(A) (Delivery Amount) would be greater than zero.

(C)  "Credit Support Amount" has the meaning specified under the relevant definition of Ratings Criteria.

(ii)  **Eligible Credit Support.**  Eligible Credit Support and the applicable Valuation Percentages are as set out in the Appendix.

"S&P Valuation Percentages" means, in respect of a Valuation Date in relation to each item of Eligible Credit Support listed in Part 2 of Appendix A hereto,

(1) for so long as Party A's Credit Support Provider is a financial institution and its Short-term Debt is rated lower than A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than A+ by S&P) the corresponding percentage for such Eligible Credit Support in the column headed "Un-stressed Collateral Posting"; or

(2) if (i) an S&P Downgrade Event has occurred and is continuing and (ii) either such S&P Downgrade Event was continuing when this Credit Support Annex was

executed or 10 or more Business Days (as defined in the Confirmation for the swap transaction under this Agreement) have elapsed since such S&P Downgrade Event first occurred, the corresponding percentage for such Eligible Credit Support in the column headed "Stressed Collateral Posting", provided that upon agreement between Party A and S&P of Valuation Percentages (**"Revised Valuation Percentages"**) which reflect the fact that the Valuation Date is defined below as being each Local Business Day, Party A shall notify Party B of such Revised Valuation Percentages, and with effect from the date of such notice, the Revised Valuation Percentages will replace those listed in Part 2 of Appendix A hereto and shall forthwith constitute the S&P Valuation Percentages.

(iii) **Thresholds.**

(A)    **"Independent Amount"** means, with respect to Party A and Party B, zero.

(B)    **"Threshold"** means, for Party A:

infinity, provided that (A) (i) if at least 10 Business Days have elapsed since Party A's Credit Support Provider's Short-term Debt was rated below A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt was rated lower than A+ by S&P), OR (B) no Relevant Entity has the Moody's First Trigger Required Ratings and either (i) no Relevant Entity has had the Moody's First Trigger Required Ratings since this Annex was executed or (ii) at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Moody's First Trigger Required Ratings, as the case may be, then its Threshold shall be zero.

**"Threshold"** means, for Party B: infinity

(C)    **"Minimum Transfer Amount"** means, with respect to Party A and Party B, EUR 100,000.

(D)    **"Rounding"** The Delivery Amount will be rounded up to the nearest integral multiple of EUR 10,000. The Return Amount will be rounded down to the nearest integral multiple of EUR 10,000.

(c)    **Valuation and Timing.**

(i)    **"Valuation Agent"** means, Party A in all circumstances.

(ii)    **"Valuation Date"** means the first Local Business Day in each calendar week.

(iii)    **"Valuation Time"** means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, provided that the calculations of Value and Credit Support Amount will, as far as practicable, be made as of approximately the same time on the same date.

(iv)    **"Notification Time"** means by 4:00 p.m., London time, on a Local Business Day.

(d)    **Exchange Date.** "Exchange Date" has the meaning specified in paragraph 3(c)(ii).

(e)    **Dispute Resolution.**

(i)    **"Resolution Time"** means 4:00 p.m., London, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 4.

(ii)   "**Value**"  For the purpose of Paragraph 4(a)(4)(i)(C) and 4(a)(4)(ii), on any date the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated as follows:

    (A)   with respect to any Eligible Credit Support or Equivalent Credit Support comprising securities ("Securities") the Base Currency Equivalent of the sum of (a)(x) the last bid price on such date for such Securities on the principal national securities exchange on which such Securities are listed, multiplied by the applicable Valuation Percentage; or (y) where any Securities are not listed on a national securities exchange, the bid price for such Securities quoted as at the close of business on such date by any principal market maker (which shall not be and shall be independent from the Valuation Agent) for such Securities chosen by the Valuation Agent, multiplied by the applicable Valuation Percentage; or (z) if no such bid price is listed or quoted for such date, the last bid price listed or quoted (as the case may be), as of the day next preceding such date on which such prices were available, multiplied by the applicable Valuation Percentage; plus (b) the accrued interest where applicable on such Securities (except to the extent that such interest shall have been paid to the Transferor pursuant to Paragraph 5(c)(ii) or included in the applicable price referred to in subparagraph (a) above) as of such date; and

    (B)   with respect to any Cash, the Base Currency Equivalent of the amount thereof.

(iii)   "**Alternative**"  The provisions of Paragraph 4 will apply.

(f)   **Distribution and Interest Amount.**

(i)   "**Interest Rate**"  The "*Interest Rate*" will be the weighted average rate of interest earned by the Transferee in respect of the portion of the Credit Support Balance comprised of cash.

(ii)   "**Transfer of Interest Amount**"  The transfer of the Interest Amount will be made on the second Local Business Day following the end of each calendar month and on any other Local Business Day on which Equivalent Credit Support in the form of cash is transferred to the Transferor pursuant to Paragraph 2(b), in each case to the extent that a Delivery Amount would not be created or increased by that transfer, provided that Party B shall not be obliged to so transfer any Interest Amount unless and until it has earned and received such interest.

(iii)   "**Alternative to Interest Amount**"  The provisions of Paragraph 5(c)(ii) will apply.

(iv)   "**Interest Amount**"  The definition of "*Interest Amount*" shall be deleted and replaced with the following:

"*Interest Amount*" means, with respect to an Interest Period and each portion of the Credit Support Balance comprised of cash in an Eligible Currency, the sum of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period by the Valuation Agent by reference to the following calculation:

    (x)   the amount of such currency comprised in the Credit Support Balance at the close of business for general dealings in such currency on such day (or, if such day is not a Local Business Day, on the immediately preceding Local Business Day); multiplied by

    (y)   the relevant Interest Rate for that day; divided by

    (z)   360 (or in the case of pounds sterling, 365).

provided that no such interest shall be included in the "Interest Amount" unless and until it is received by Party B.

(v)    **"Distributions"** means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property received by the Transferee from time to time.

(vi)    **"Distribution Date"** means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which Distributions are received by the Transferee or, if that date is not a Local Business Day, the next following Local Business Day.

(g)    Addresses for Transfers.

Party A: To be notified to Party B by Party A at the time of the request for the transfer.

Party B: To be notified to Party A by Party B upon request by Party A.

(h)    **Other Provisions.**

(i)    **Transfer Timing.**

(A)    The following words shall be inserted at the end of the final paragraph of Paragraph 3(a):

"Provided that any transfer of Eligible Credit Support by the Transferor pursuant to Paragraph 2(a) shall be made in accordance with sub-paragraph (i), (ii) or (iii) (as applicable) of paragraph 3(a) not later than the close of business on the relevant Valuation Date, regardless of whether any demand for transfer is received"

(ii)    **Early Termination.**

The heading for Paragraph 6 shall be deleted and replaced with "Early Termination" and the following shall be added after the word "Default" in the first line of Paragraph 6, "in relation to all transactions or a Termination Event in relation to all Transactions".

(iii)    **Costs of Transfer on Exchange.**

Notwithstanding Paragraph 8, the Transferor will be responsible for, and will reimburse the Transferee for, all transfer and other taxes and other costs involved in the transfer of Eligible Credit Support either from the Transferor to the Transferee or from the Transferee to the Transferor pursuant to Paragraph 3(c).

(iv)    **Cumulative Rights.**

The rights, powers and remedies of the Transferee under this Annex shall be in addition to all rights, powers and remedies given to the Transferee by the Agreement or by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of the Transferee in the Credit Support Balance created pursuant to this Annex.

(v)    **Single Transferor and Single Transferee.**

For the avoidance of doubt, Party A shall always be the Transferor and Party B shall always be the Transferee.

(vi)    **Exposure**

"Exposure" has the meaning specified in Paragraph 10, except that:

(1)    after the word "Agreement" the words "(assuming, for the purpose only, that Part 4.14 of the Schedule is deleted)" shall be inserted; and

(2)    at the end of the definition of Exposure, the words "with terms substantially the same as those of this Agreement" shall be added; and

(3)    if a S&P Rating Event has not occurred, for the purposes of Paragraph 11(b)(i)(A)(1) and Paragraph 11(b)(i)(B)(1) the words "Transactions (other than the Transaction constituted by this Annex)" in the fourth line of the definition in Paragraph 10 shall be deleted and replaced with "Interest Rate Swap Transactions entered into pursuant to this Agreement".

(vii)  Pledge Agreement

Party A shall have no obligation to transfer collateral under this Annex unless and until such time as Party B has entered into a pledge agreement (1) on the terms described in clause 20.13(d) of the Loan Agreement in favour of the Agent and (2) in a form and substance satisfactory to Party A.

(viii) Ratings Criteria

"Ratings Criteria" means, the criteria published by S&P ("S&P Criteria") on 8 May, 2007, entitled "Revised Framework For Applying Counterparty and Supporting Party Criteria" and the criteria published by Moody's ("Moody's Criteria") on 10 May 2007 entitled "Framework for De-linking Hedge Counterparty Risk from Global Structured Finance Cashflow Transactions; Moody's Methodology" each as specified below for the purposes of determining the amount of Eligible Credit Support that Party A is required to transfer hereunder.

*Moody's Criteria:*

"Credit Support Amount" means, for any Valuation Date: zero, unless the Threshold for Party A is zero by virtue of paragraph (B) thereof and (1) the Second Rating Trigger Requirements do not apply or (2) less than 30 Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply, in which case the Credit Support Amount shall be the greater of:

(i)    zero; and

(ii)   the sum of (x) the Transferee's Exposure and (y) the aggregate of the Moody's First Trigger Additional Amounts in respect of such Valuation Date for all Transactions (other than the Transaction constituted by this Annex); and

if the Second Rating Trigger Requirements apply and 30 or more Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply, the greater of:

(i)    zero;

(ii)   the aggregate amount of the Next Payments (each determined based on the rates prevailing on such Valuation Date) for all Next Payment Dates; and

(iii)  the sum of (x) the Transferee's Exposure and (y) the aggregate of the Moody's Second Trigger Additional Amounts in respect of such

Valuation Date for all Transactions (other than the Transaction constituted by this Annex).

"**Moody's First Trigger Additional Amount**" means, for any Valuation Date:

(A)    In respect of any Transaction that is a cross-currency hedge, the lesser of (x) the sum of (1) the product of the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's First Trigger Cross Currency Notional Amount Lower Multiplier and (2) the product of the Moody's First Trigger Cross Currency DV01 Multiplier and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's First Trigger Cross Currency Notional Amount Higher Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; and

(B)    in respect of any Transaction that is not a cross-currency hedge, the lesser of (x) the product of the Moody's First Trigger Single Currency DV01 Multiplier and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's First Trigger Single Currency Notional Amount Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date.

"**Moody's First Trigger Cross Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 10 and (B) otherwise, 20.

"**Moody's First Trigger Cross Currency Notional Amount Higher Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.025 and (B) otherwise, 0.05.

"**Moody's First Trigger Cross Currency Notional Amount Lower Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.01 and (B) otherwise, 0.02.

"**Moody's First Trigger Single Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 15 and (B) otherwise, 25.

"**Moody's First Trigger Single Currency Notional Amount Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.02 and (B) otherwise, 0.04.

"**Moody's Second Trigger Additional Amount**" means, for any Valuation Date:

(A)    in respect of any Transaction that is both a cross-currency hedge and an Optionality Hedge, the lesser of (x) the sum of (1) the product of Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier and (2) the product of the Moody's Second Trigger Cross Currency DV01 Multiplier (Optionality) and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier (Optionality) and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;

(B)    in respect of any Transaction that is a cross-currency hedge and is not an Optionality Hedge, the lesser of (x) the sum of (1) the product of Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier and (2) the Moody's Second

Trigger Cross Currency DV01 Multiplier and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;

(C)     in respect of any Transaction that is not a cross-currency hedge and is an Optionality Hedge, the lesser of (x) the product of the Moody's Second Trigger Single Currency DV01 Multiplier (Optionality) and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Single Currency Notional Amount Multiplier (Optionality) and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; and

(D)     in respect of any Transaction that is neither a cross-currency hedge nor an Optionality Hedge, the lesser of (x) the product of the Moody's Second Trigger Single Currency DV01 Multiplier and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Single Currency Notional Amount Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date.

"**Moody's Second Trigger Cross Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 15 and (B) otherwise, 25.

"**Moody's Second Trigger Cross Currency DV01 Multiplier (Optionality)**" means, (A) if each Local Business Day is a Valuation Date, 30 and (B) otherwise, 40.

"**Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.09 and (B) otherwise, 0.1.

"**Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier (Optionality)**" means, (A) if each Local Business Day is a Valuation Date, 0.11 and (B) otherwise, 0.12.

"**Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.06 and (B) otherwise, 0.07.

"**Moody's Second Trigger Single Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 50 and (B) otherwise, 60.

"**Moody's Second Trigger Single Currency DV01 Multiplier (Optionality)**" means, (A) if each Local Business Day is a Valuation Date, 65 and (B) otherwise, 75.

"**Moody's Second Trigger Single Currency Notional Amount Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.08 and (B) otherwise, 0.09.

"**Moody's Second Trigger Single Currency Notional Amount Multiplier (Optionality)**" means, (A) if each Local Business Day is a Valuation Date, 0.10 and (B) otherwise, 0.11.

"**Next Payment**" means, in respect of each Next Payment Date, the greater of (i) the Base Currency Equivalent of any payments due to be made by Party A under Section 2(a) on such Next Payment Date less the Base Currency Equivalent of any payments due to be made by Party B under Section 2(a) on such Next Payment Date and (ii) zero.

"**Next Payment Date**" means each date on which the next scheduled payment under any Transaction (other than the Transaction constituted by this Annex) is due to be paid.

"**Optionality Hedge**" means any Transaction that is a cap, floor, swaption, or a ransaction-Specific Hedge.

"**Transaction Cross Currency DV01**" means, with respect to a Transaction and any date of determination, the greater of (i) the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve (denominated in the currency of Party A's payment obligations under such Transaction) on such date and (ii) the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve (denominated in the currency of Party B's payment obligations under such Transaction) on such date, in each case as determined by the Valuation Agent in good faith and in a commercially reasonable manner in accordance with the relevant methodology customarily used by the Valuation Agent.

"**Transaction Notional Amount**" means (A) in respect of any Transaction that is a cross currency hedge, the Base Currency Equivalent of the Currency Amount applicable to Party A's payment obligations and (B) in respect of any other Transaction, the Base Currency Equivalent of the Notional Amount.

"**Transaction Single Currency DV01**" means, with respect to a Transaction and any date of determination, the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve on such date, as determined by the Valuation Agent in good faith and in a commercially reasonable manner in accordance with the relevant methodology customarily used by the Valuation Agent.

"**Transaction-Specific Hedge**" means any Transaction in respect of which the Transaction Notional Amount for each Calculation Period is "balance guaranteed" or otherwise not an amount that is fixed at the inception of the Transaction.

*S&P Criteria:*

"**Credit Support Amount**" (and "**S&P Credit Support Amount**") shall mean with respect to a Transferor on a Valuation Date:

(i)    if the Threshold is infinity, zero;

(ii)    if at least 10 Business Days have elapsed since Party A's and Party A's Credit Support Provider's Short-term Debt was rated below A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt was rated lower than A+ by S&P) and for so long as such ratings continue to be below such levels the greater of:

(i) the product of:

(1) the mark-to-market value of the outstanding Transactions as determined by the Transferor in good faith on each Local Business Day; and

(2) 100%, if Party A or Party A's Credit Support Provider is a financial institution, or 125 % if Party A or Party A's Credit Support Provider is not a financial institution; and

(ii) zero.

(iii)    for so long as an S&P Downgrade Event has occurred and is continuing, the greater of (i) the product of the mark-to-market value of the outstanding Transactions as determined by the Transferor in good faith on each Local Business Day and 125%, and (ii) 0.

(ix)  **Additional Definitions**

"**Eligible Guarantee**" means an unconditional and irrevocable guarantee that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to withholding for Tax and such opinion has been delivered to Moody's (B) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required or (C) in the event that any payment under such guarantee is made net of deduction or withholding for Tax, Party A is required, under Section 2(a)(i), to make such additional payment as is necessary to ensure that the net amount actually received by Party B from the guarantor will equal the full amount Party B would have received had no such deduction or withholding been required.

"**First Trigger Required Ratings**" means (A) where the relevant entity is the subject of a Moody's Short-term Rating, such rating is "Prime-1" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

"**Long-term Debt**" means long-term, unsecured and unsubordinated debt.

"**Moody's**" means Moody's Investors Service Limited and includes any successors thereto.

"**Moody's Short-term Rating**" means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

"**Rating Agencies**" means S&P and Moody's (each a "**Rating Agency**").

"**Relevant Entities**" means Party A, any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement and, so long as Party A is Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc.

"**S&P**" Standard and Poor's Rating Services, a division of The McGraw-Hill Companies Inc. and includes any successors thereto.

"**S&P Downgrade Event**" means (i) Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than BBB+ by S&P) and Party A (or Party A's Credit Support Provider) is a financial institution or (ii) Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than A+ by S&P) and Party A (or Party A's Credit Support Provider) is not a financial

institution.

"*S&P Eligible Entity*" means (i) an entity whose (or whose Credit Support Provider's) Short-term Debt is rated at least A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least A+ by S&P) or (ii) where such entity (or its Credit Support Provider) is deemed to be a financial institution by S&P, its Short-term Debt is rated at least A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least BBB+ by S&P) and such entity undertakes to post collateral equal to 100% of the mark-to-market value of all Transactions hereunder in accordance with the terms of the Credit Support Annex hereto).

"*Second Trigger Required Ratings*" means (A) where such entity is the subject of a Moody's Short-term Rating, such rating is "Prime-2" or above or its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

"*Short-term Debt*" means short-term, unsecured and unsubordinated debt.

(x)   **Demands and Notices**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, save that any demand, specification or notice shall be given to or made at the following addresses:

If to Party A:

| | |
|---|---|
| Name: | Lehman Brothers Special Financing Inc. |
| Address: | c/o Lehman Brothers Inc. |
| | Capital Market Contracts - Legal |
| | 745 Seventh Avenue |
| | New York, New York 10019 |

| | |
|---|---|
| Telephone: | +(212) 526-7187 |
| Facsimile: | +(212) 526-2726 |

With a copy to:

| | |
|---|---|
| Name: | Lehman Brothers International (Europe) |
| Address: | 25 Bank Street |
| | London |
| | E14 5LE |
| Attention: | Legal - Fixed Income |
| Telephone: | +44 (0) 207 102 1000 |
| Facsimile: | +44 (0) 207 067 8388 |

with a copy to:

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc.<br>399 Park Avenue<br>11th Floor<br>New York, New York 10022 |
| Attention: | Corporate Counsel |
| Facsimile: | +1 (212) 520 0176 |

If to Party B:

| | |
|---|---|
| Name: | Boultbee (Västerås) AB |
| Address: | c/o EFM (Sverige) AB<br>Box 49166,<br>100 29 Stockholm<br>Fleminggatan 48, Stockholm |
| Attention: | Managing Director |
| Facsimile: | +46 (0) 8 692 69 97 |

LEHMAN BROTHERS SPECIAL
FINANCING INC.

BOULTBEE (VÄSTERÅS) AB

.........................................
(Name of Party)

.........................................
(Name of Party)

By: ...........................................

By: ...........................................

Name:

Name:

Title:

Title:

Date:

Date:

LEHMAN BROTHERS SPECIAL                BOULTBEE (VÄSTERÅS) AB
FINANCING INC.


..........................................              ..........................................
(Name of Party)                                          (Name of Party)


By: ...........................................          By: ...........................................
      Name:                                                   Name:   *Christian Olofsson*
      Title:                                                  Title:
      Date:                                                   Date:

APPENDIX A

Part 1

Moody's Eligible Credit Support

| INSTRUMENT | FIRST TRIGGER Posting Weekly | SECOND TRIGGER Posting Weekly |
|---|---|---|
| Sterling Cash | 98% | 96% |
| EURO Cash | 100% | 100% |
| US Dollar Cash | 97% | 93% |
| USD denominated Fixed-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department with Remaining Maturity | | |
| < 1 Year | 97% | 93% |
| 1 to 2 years | 97% | 92% |
| 2 to 3 years | 97% | 91% |
| 3 to 5 years | 97% | 90% |
| 5 to 7 years | 97% | 88% |
| 7 to 10 years | 97% | 87% |
| 10 to 20 years | 97% | 83% |
| > 20 years | 97% | 81% |
| USD denominated Floating-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department | | |
| All Maturities | 97% | 92% |
| USD denominated Fixed-Rate U.S. Agency Debentures with Remaining Maturity | | |
| < 1 Year | 97% | 92% |
| 1 to 2 years | 97% | 91% |
| 2 to 3 years | 97% | 90% |
| 3 to 5 years | 97% | 89% |
| 5 to 7 years | 97% | 87% |
| 7 to 10 years | 97% | 86% |
| 10 to 20 years | 97% | 82% |
| > 20 years | 97% | 80% |
| USD denominated Floating-Rate U.S. Agency Debentures | | |

| | | |
|---|---|---|
| All Maturities | 97% | 91% |

| EUR denominated Fixed-Rate Euro-Zone Government Bonds Rated Aa3 or Above with Remaining Maturity | | |
|---|---|---|
| < 1 Year | 100% | 100% |
| 1 to 2 years | 100% | 99% |
| 2 to 3 years | 100% | 98% |
| 3 to 5 years | 100% | 96% |
| 5 to 7 years | 100% | 94% |
| 7 to 10 years | 100% | 93% |
| 10 to 20 years | 100% | 88% |
| > 20 years | 100% | 86% |

| EUR denominated Floating-Rate Euro-Zone Government Bonds Rated Aa3 or Above | | |
|---|---|---|
| All Maturities | 100% | 99% |

| Sterling denominated Fixed-Rate United Kingdom Gilts with Remaining Maturity | | |
|---|---|---|
| < 1 Year | 98% | 95% |
| 1 to 2 years | 98% | 94% |
| 2 to 3 years | 98% | 93% |
| 3 to 5 years | 98% | 92% |
| 5 to 7 years | 98% | 91% |
| 7 to 10 years | 98% | 90% |
| 10 to 20 years | 98% | 85% |
| > 20 years | 98% | 84% |

| Floating-Rate United Kingdom Gilts | | |
|---|---|---|
| All Maturities | 99% | 95% |

For the purpose of the above table, (I) the column headed "First Trigger" shall apply for as long as (1) the Second Rating Trigger Requirements do not apply; or (2) less than 30 Local Business Days have elapsed since the last time the Second Trigger Required Ratings did not apply and (II) the column headed "Second Trigger" shall apply for as long as the Second Rating Trigger Requirements do apply and 30 or more Local Business Days have elapsed since the Second Trigger Required Ratings did not apply.

**Part 2**

**Standard & Poor's Eligible Credit Support**

S&P Eligible Credit Support

S&P Valuation Percentages

| | Un-stressed Collateral Posting Base Currency | Stressed Collateral Posting Base Currency | Un-stressed Collateral Posting Non-Base Currency | Stressed Collateral Posting Non-Base Currency |
|---|---|---|---|---|
| Cash in Euro | 100% | 80% | n/a | n/a |
| U.S. treasuries (current coupon, constant maturity), AAA U.S. agencies, AAA covered bonds (floating), AAA sovereign bonds (floating), AAA, AA credit ABS (floating), AAA, AA auto ABS (floating), and AAA U.S. student loan ABS (floating) | 98.04% | 78.43% | 92.49% | 73.99% |
| Less than 5 years | | | | |
| U.S. treasuries (current coupon, constant maturity), AAA U.S. agencies, AAA covered bonds (floating), AAA sovereign bonds (floating), AAA, AA credit ABS (floating), AAA, AA auto ABS (floating), and AAA U.S. student loan ABS (floating) | 92.59% | 74.07% | 87.35% | 69.88% |
| Greater than or equal to 5 years and less than or equal to 10 years | | | | |
| AAA covered bond (fixed), AAA sovereign bonds (fixed), A credit card ABS (floating), A auto ABS (floating), AAA CMBS (floating), AAA CDO (floating), AA or A U.S. student loan ABS (floating), and AAA or AA corporate bonds (fixed or floating) | 95.24% | 76.19% | 89.85% | 71.88% |

Less than 5 years

| | | | | |
|---|---|---|---|---|
| AAA covered bond (fixed), AAA sovereign bonds (fixed), A credit card ABS (floating), A auto ABS (floating), AAA CMBS (floating), AAA CDO (floating), AA or A U.S. student loan ABS (floating), and AAA or AA U.S. and European corporate bonds (fixed or floating) | 86.96% | 69.57% | 82.03% | 65.63% |

Greater than or equal to five years and less than or equal to 10 years

| | | | | |
|---|---|---|---|---|
| BBB credit card ABS (floating), BBB auto ABS (floating), AA, A CDO (floating), BBB U.S. student loan ABS (floating), and A corporate bonds (fixed or floating) | 80.00% | 64.00% | 75.47% | 60.38% |

Less than 5 years

| | | | | |
|---|---|---|---|---|
| BBB credit card ABS (floating), BBB auto ABS (floating), AA, A CDO (floating), BBB U.S. student loan ABS (floating), and A corporate bonds (fixed or floating) | 71.43% | 57.14% | 67.39% | 53.91% |

Greater than or equal to five years and less than or equal to 10

(Multicurrency — Cross Border)



# MASTER AGREEMENT

dated as of ..15 JULY 2008......

LEHMAN BROTHERS SPECIAL
FINANCING INC. ("Party A")............ and BOULTBEE (VASTERAS) AB ("Party B")......

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.     Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.     Obligations**

(a)     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

*ISDA® 1992*

(ii)  *Liability.* If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)   *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                    ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                    ISDA© 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all, or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992



BANKRUPTCY SOLUTIONS, LLC

"o BROTHERS HOLDING CLAIMS PROCESS

757 THIRD AVENUE, 3RD FLOOR

NEW YORK
NY 10017

## EXHIBIT B

**EVIDENCE OF TRANSFER OF CLAIM**

### EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, Boultbee (Västerås) AB ("Assignor") hereby unconditionally and irrevocably sells, transfers and assigns to Boultbee (Helsinki) AB (the "Assignee") 100% of its right, title, interest, claims and causes of action in and to, or arising under or in connection with, its claim (as such term is defined in Section 101(5) of the U.S. Bankruptcy Code), against Lehman Brothers Special Financing Inc. ("LBSF"), (the "Debtor"), the debtor in Case No. 08-13888 ("Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and the relevant portion of any and all proofs of claim (No. 28488, which amends Nos. 4147 and 14057) filed by Assignor with the Bankruptcy Court in respect of the foregoing claim.

Assignor hereby waives any objection to the transfer of the claim to Assignee on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law.  Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring to Assignee the foregoing claim, recognizing Assignee as the sole owner and holder of the claim, and directing that all payments or distributions of money or property in respect of the claim be delivered or made to the Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 13 day of October 2009.

BOULTBEE (VÄSTERÅS) AB

By: _____
Name: *Bo Falk*          *Christian Olofsson*
Title: Director            Director

BOULTBEE (HELSINKI) AB

By: _____
Name: *Bo Falk*          *Christian Olofsson*
Title: Director            Director

546677.1/153-05237

**EXHIBIT C**

<u>Address for Notices</u>:

Boultbee (Helsinki) AB
c/o EFM (Sverige) AB
PO Box 730
SE-721 20 Västerås Sweden
Attention: Managing Director and Clive Boultbee Brooks
Telefax + 046 (0)21 415 125

<u>Wire Instructions</u>:

Bank: SEB
Account: USD 5696 82 054 08
Iban-no: SE9250000000050908205408
Blc-code: ESSESESS