JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
William J. Hine
Jayant W. Tambe

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*   :    Case No. 08-13555 (JMP)
                                                             :
                          Debtors.                   :    (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**NOTICE OF FILING OF UNSEALED**
**DEBTOR'S RULE 60 MOTION AND RELATED APPENDIXES**

     **PLEASE TAKE NOTICE** that on September 15, 2009, Lehman Brothers

Holdings Inc. (the "Debtor") filed the Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P.

60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting

Other Relief (Docket No. 5148) (the "Rule 60 Motion") and five volumes of related appendixes

(Docket Nos. 5149-5151, 5154 and 5156) (the "Appendixes").

     **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Confidentiality

Stipulation and Protective Order Between the Examiner, Debtors, Trustee, the Official

Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee") and

Barclays Capital Inc. (Docket No. 4524) (the "Protective Order"), portions of the Rule 60

Motion and Appendixes were filed under seal and, therefore, were electronically filed in redacted form only.

PLEASE TAKE FURTHER NOTICE that, pursuant to a Stipulation Between the Debtors, Trustee, Committee and Barclays Capital Inc. Concerning the Discovery Parties' Unsealing Motions, so-ordered by the Court on October 14, 2009 (Docket No. 5481) (the "Unsealing Stipulation"), certain information and exhibits contained in the redacted Rule 60 Motion and Appendixes were unsealed, and the Debtor was expressly authorized to file such documents (to the extent unsealed) in an unredacted form.

PLEASE TAKE FURTHER NOTICE that the Debtor hereby files the Rule 60 Motion and the Appendixes containing the information and exhibits that have been unsealed pursuant to the Unsealing Stipulation.

Dated:  October 15, 2009                         Respectfully submitted,
      New York, New York

      /s/ Robert W. Gaffey
      Robert W. Gaffey
      Jayant W. Tambe
      William J. Hine
      JONES DAY
      222 East 41st Street
      New York, New York  10017
      Telephone:  (212) 326-3939
      Facsimile:  (212) 755-7306

      ATTORNEYS FOR DEBTOR AND DEBTOR
      IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 |
| Debtors. | (Jointly Administered) |

**DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. CIV. P. 60**
**AND FED. R. BANKR. P. 9024, MODIFYING THE SEPTEMBER 20, 2008**
**SALE ORDER AND GRANTING OTHER RELIEF**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 3

JURISDICTION AND VENUE ......................................................................................... 9

STATEMENT OF FACTS ................................................................................................ 10

    A.    Background and The Principal Negotiators .......................................................... 10

    B.    The Undisclosed $5 Billion Discount .................................................................. 12

    C.    Lehman's Lawyers And Others Are Never Told About The Discount .............. 23

    D.    Lehman's Boards Are Told The Deal Is A "Wash" And Approve A
        Transaction On That Basis .................................................................................... 28

    E.    The 9/16/08 Financial Schedule Upon Which The Asset Purchase
        Agreement Was Based ........................................................................................... 29

        1.    The Deliberate Understatement of Assets ................................................ 29

        2.    The Inflation of Assumed Liabilities ........................................................ 33

    F.    The Distortions In The 9/16/08 Financial Schedule And The Asset
        Purchase Agreement Were Embedded In The Transaction Presented to the
        Court ...................................................................................................................... 38

    G.    The Court's Approval of the Sale Transaction .................................................... 42

    H.    The Use of the Repurchase Agreement To Convey $5 Billion To Barclays ....... 47

        1.    The Disclosed Use Of The Repurchase Agreement As A Funding
            Vehicle For LBI .................................................................................... 47

        2.    The Undisclosed Manipulation of the Repurchase Agreement to
            Deliver the Discount to Barclays .......................................................... 50

    I.    The Last Minute Search For Even More Assets To Give To Barclays ............... 55

        1.    Barclays' Demand For More Assets ......................................................... 55

        2.    The Scramble For Assets To Satisfy Barclays' Demand......................... 57

        3.    The Net Effect of the Search for Additional Value ................................. 60

    J.    The Material Changes To The Sale Transaction In The "Clarification
        Letter," Finalized After The Sale Order Is Entered ............................................ 61

    K.    The December 2008 Settlement Agreement ........................................................ 64

    L.    The Net Effect Of The Undisclosed Deal Modifications.................................... 66

ARGUMENT ................................................................................................................... 66

I.    BARCLAYS' RECEIPT OF VALUE IN EXCESS OF WHAT THE COURT
      AUTHORIZED IS INCONSISTENT WITH THE BANKRUPTCY CODE AND
      SHOULD BE REMEDIED ........................................................................................ 66

      A.    Barclays Received Transfers of Estate Property that Were Not Authorized
            by the Sale Order or the Code and Such Property Therefore May Be
            Recovered Pursuant to Sections 549 and 550 of the Code ................................. 68

      B.    The Excess Value that Barclays Retained by Terminating the Repurchase
            Agreement Is Property of the Sellers' Estates under Section 559 of the
            Code and Must Be Returned by Barclays Pursuant to Section 542 of the
            Code ..................................................................................................................... 70

      C.    To the Extent the Undisclosed Transfers of Estate Property Effected by the
            Clarification Letter Are Deemed Authorized by the Sale Order, the Sellers
            Are Entitled To Relief from the Sale Order under Bankruptcy Rule 9024
            and Rule 60(b) of the Federal Rules of Civil Procedure ..................................... 72

II.   LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO
      MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT ................................... 75

      A.    Barclays Received An Undisclosed Multi-Billion Dollar Discount On Its
            Purchase Price .................................................................................................... 76

      B.    Barclays Failed To Pay To Former Lehman Employees All The Bonuses It
            Contracted To Pay Under The Asset Purchase Agreement ................................. 77

      C.    Barclays Did Not Assume $1.5 Billion In Contract Cure Liabilities As
            Presented To The Court ....................................................................................... 79

III.  LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO
      NEWLY DISCOVERED EVIDENCE THAT COULD NOT HAVE BEEN
      UNCOVERED BEFORE THE SALE ORDER'S ENTRY .......................................... 81

IV.   LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO
      MISREPRESENTATION (WHETHER INNOCENT OR INTENTIONAL) ................ 82

V.    LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER AND FURTHER
      DISCOVERY DUE TO POTENTIAL OCCURRENCE OF MISCONDUCT OR
      FRAUD .................................................................................................................... 84

CONCLUSION ................................................................................................................. 87

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Cryovac, Inc.,*
862 F.2d 910 (1st Cir. 1988)..................................................................82

*Bros Inc. v. W.E. Grace Manufacturing Co.,*
351 F.2d 208 (5th Cir. 1965) ...........................................................83 n.67

*Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble, Wagner,*
*Heine, Underberg, Manley, Myerson & Casey),*
130 F.3d 52 (2d Cir. 1997)..................................................................69

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*
722 F.2d 1063 (2d Cir. 1983)..............................................................68

*Hadden v. Rumsey Prods., Inc.,*
196 F.2d 92 (2d Cir. 1952).................................................................73

*In the Matter of Emergency Beacon Corp.,*
666 F.2d 754 (2d Cir. 1981)...........................................................74, 82

*In the Matter of Lintz West Side Lumber, Inc.,*
655 F.2d 786 (7th Cir. 1981) ..............................................................74

*In re 310 Assocs.,*
346 F.3d 31 (2d Cir. 2003)............................................................75, 76

*In re American Freight System, Inc.,*
126 B.R. 800 (D. Kan. 1991) ..............................................................74

*In re BCD Corp.,*
119 F.3d 852 (10th Cir. 1997) .......................................................73, 74

*In re CADA Investments, Inc.,*
664 F.2d 1158 (9th Cir. 1981) ............................................................74

*In re Center Wholesale, Inc.,*
795 F.2d 1440 (9th Cir. 1985) ............................................................74

*In re Chrysler LLC,*
--- F.3d ----, 2009 WL 2382766 (2d Cir. Aug. 5, 2009) ......................................68

*In re Eads,*
135 B.R. 380 (Bankr. E.D. Ca. 1991) ....................................................69

*In re Enron Corp.*,
    284 B.R. 376 (Bankr. S.D.N.Y. 2002) ................................................................................66

*In re F.A. Potts & Co., Inc.*,
    86 B.R. 853 (Bankr. E.D. Pa. 1988), *aff'd*, 93 B.R. 62 (E.D. Pa. 1988), *aff'd without
    op.*, 891 F.2d 280 (3d Cir. 1989) ........................................................................................68

*In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*,
    77 B.R. 15 (Bankr. E.D. P.a. 1987) ...................................................................................70

*In re Lundy*,
    110 B.R. 300 (N.D. Ohio 1990) ........................................................................................74

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    140 B.R. 969 (N.D. Ill. 1992) ...........................................................................................67

*In re Metaldyne Corp.*,
    --- B.R. ----, No. 09-13412 (MG), 2009 WL 2244602 (Bankr. S.D.N.Y. July 28,
    2009) ............................................................................................................................66, 67

*In re Metzger*,
    346 B.R. 806 (N.D. Cal. 2006) ..........................................................................................74

*In re New York Trap Rock Corp.*,
    42 F.3d 747 (2d Cir. 1994) ................................................................................................69

*In re Ngan Gung Rest.*,
    254 B.R. 566 (Bankr. S.D.N.Y. 2000) ..............................................................................66

*In re UAL Corp.*,
    411 F.3d 818 (7th Cir. 2005) .............................................................................................68

*In re Zilog, Inc.*,
    450 F.3d 996 (9th Cir. 2006) .............................................................................................68

*Lamont v. Grass*,
    453 F. Supp. 608 (N.D.N.Y. 1978) ...................................................................................74

*Lasky v. Continental Prods. Corp.*,
    804 F.2d 250 (3d Cir. 1986) ..............................................................................................73

*Lawrence v. Wink*,
    293 F.3d 615 (2d Cir. 2002) ..............................................................................................73

*Leber-Krebs, Inc. v. Capitol Records*,
    779 F.2d 895 (2d Cir. 1985) ..............................................................................................85

*Loloee v. GMAC*,
    241 B.R. 655 (9th Cir. 1999) ....................................................................................74

*Londsdorf v. Seefeldt*,
    47 F.3d 893 (7th Cir. 1995) .....................................................................................82

*Marshall v. Monroe & Sons, Inc.*,
    615 F.2d 1156 (6th Cir. 1980) .................................................................................73

*Matter of Futuronics Corp.*,
    5 B.R. 489 (S.D.N.Y. 1980).....................................................................................75

*Matter of Georgia Steel, Inc.*,
    25 B.R. 790 (Bankr. M.D. Ga. 1982).......................................................................75

*McKinney v. Boyle*,
    404 F.2d 632 (9th Cir. 1968) ...................................................................................82

*Metlyn Realty Corp. v. Esmark, Inc.*,
    763 F.2d 826 (7th Cir. 1985) ...................................................................................82

*Olle v. Henry & Wright Corp.*,
    910 F.2d 357 (6th Cir. 1990) ...................................................................................82

*Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.)*,
    596 F.2d 1092 (2d Cir. 1979)...................................................................................75

*Pearson v. First NH Mortgage Corp.*,
    200 F.3d 30 (1st Cir. 1999)......................................................................................85

*Ross v. Kirschenbaum (In re Beck Indus., Inc.)*,
    605 F.2d 624 (2d Cir. 1979).....................................................................................70

*Tew v. Ariz. State Ret. Sys.*,
    69 B.R. 608 (S.D. Fla. 1987), *rev'd on other grounds*, 873 F.2d 1400 (11th Cir. 1989) ........71

*Toibb v. Radloff*,
    501 U.S. 157 (1991) .................................................................................................66

*Ty Inc. v. Softbelly's, Inc.*,
    353 F.3d 528 (7th Cir. 2003) ...........................................................................83 n.67

*U.S. v. Cirami*,
    563 F.2d 26 (2d Cir. 1977).............................................................................82 n.66

*U.S. v. Int'l Bhd of Teamsters*,
    247 F.3d 370 (2d Cir. 2001).............................................................................73, 81

*U.S. v. One (1) Douglas A-26B Aircraft,*
    662 F.2d 1372 (11th Cir. 1981) ...................................................................83

*Universal Oil Prods. Co. v. Root Refining Co.,*
    328 U.S. 575 (1946)..................................................................................85

*Whitaker v. Assoc. Credit Servs., Inc.,*
    946 F.2d 1222 (6th Cir. 1991) ..................................................................73

**STATUTES**

11 U.S.C. § 101.................................................................................................2

11 U.S.C. § 105(a)............................................................................................1

11 U.S.C. § 363.................................................................................................1

11 U.S.C. § 363(n)...........................................................................................69

11 U.S.C. § 363(b)...........................................................................................67

11 U.S.C. § 365.................................................................................................1

11 U.S.C. § 542...............................................................................................71

11 U.S.C. § 542(a).............................................................................6, 70, 71, 72

11 U.S.C. § 549.........................................................................................68, 69

11 U.S.C. § 550(a)...........................................................................................69

11 U.S.C. § 559....................................................................6, 7, 70, 71, 84

28 U.S.C. § 157(b)............................................................................................9

28 U.S.C. § 1334...............................................................................................9

28 U.S.C. § 1409...............................................................................................9

**OTHER AUTHORITIES**

Federal Rule of Bankruptcy Procedure 2002...................................................1

Federal Rule of Bankruptcy Procedure 2004...................................................3

Federal Rule of Bankruptcy Procedure 6004...................................................1

Federal Rule of Bankruptcy Procedure 6006...................................................1

Federal Rule of Bankruptcy Procedure 9024 ........................................................................1, 72

Federal Rule of Civil Procedure 60(b) ................................................................ 1, 72-77, 79-84

Federal Rule of Civil Procedure 60(d) ......................................................................72, 85, 86

*Moore's Federal Practice 3d*, § 60.24[1] (2009) ..................................................................73

*Moore's Federal Practice 3d* § 60.21[4][a] (2009) ..............................................................85

*Moore's Federal Practice 3d* § 60.21[4][f] (2009) .............................................................85

*Moore's Federal Practice* 2d ¶ 60.27[2] (1975) ...........................................................82 n.65

Lehman Brothers Holdings Inc. (the "Debtor" or "LBHI") hereby moves pursuant to Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy Procedure, for an order modifying the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order"). In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated as of September 16, 2008 ("Asset Purchase Agreement") and related agreements, modifications and purported "clarification[s]" thereof.

As described in more detail below, the Sale Order was entered on an inaccurate record due to mistake, inadvertence or misrepresentations to the Court. There were multiple factors that led to that result. At its simplest, they were: (i) the failure of certain Lehman and Barclays representatives to disclose key components of the transaction as it was originally presented to the Court on September 17, 2008; (ii) the failure to disclose critical changes in the deal that took place between September 17, 2008 and the hearing held on Friday, September 19, 2008 to approve the Sale Transaction (the "Sale Hearing"); and (iii) the failure to disclose critical changes in the deal that were made after the Court issued the Sale Order and before the transaction closed on September 22, 2008.

In particular, LBHI seeks (i) to modify the Sale Order by removing from the definition of "Purchased Assets" certain assets, which by reason of mistake, inadvertence or misrepresentation were not intended by the Court to be covered by its authorization of sale and for which Barclays paid nothing; (ii) to amend other provisions of the Sale Order as appropriate; (iii) further discovery, fact finding or hearings as necessary to assess the transaction on an accurate and complete record; and (iv) such other relief as the Court deems appropriate and just.

In addition, LBHI seeks to modify the Sale Order by (i) inserting a provision providing that, notwithstanding any finding of fact or conclusion of law presently contained therein, the Sellers and other interested parties may, in their discretion, pursue claims arising from the Sale Transaction, including, without limitation, claims for breach of contract, quasi-contract, conversion, breach of fiduciary duty claims, aiding and abetting breach of fiduciary duty, or related actions, as well as appropriate claims arising under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), including claims for unauthorized transfer of Sellers' assets, (ii) striking the Sale Order's reference to the so-called Clarification Letter, which was not before the Court, and in fact not even completed, when the Sale Order was signed, and which purported to effect substantial and material amendments to the transaction the Court had previously approved, and (iii) declaring that transfers made pursuant to amendments effected by the Clarification Letter are void and unauthorized and should be carved out of the Sale Order.

NYI-4215277v1

# PRELIMINARY STATEMENT[1]

1.     This motion arises from the sale to Barclays of Lehman assets under circumstances that were difficult and unprecedented.  LBHI does not question the procedures followed by the Court or the need for expedition given the difficult economic circumstances in which Lehman found itself a year ago.  The Court acted appropriately based on the facts disclosed to it at the time, but the exigent circumstances surrounding the sale led to inappropriate consequences effected by mistake, inadvertence and/or misrepresentation.  Discovery, taken pursuant to the Court's Rule 2004 Order issued on LBHI's motion on June 25, 2009, has now revealed that (i) material components of the transaction were not disclosed to the Court before and at the Sale Hearing; and (ii) the transaction that purported to close on September 22, 2008 differed materially from the transaction explained to and approved by the Court at the Sale Hearing.  Throughout the week, information conveyed to the Court suggested that Barclays was effectively paying fair value for the assets it was acquiring.  Indeed, when Barclays' purported assumption of liabilities as an integral part of the transaction was factored into the mix, all information conveyed to the Court indicated that Barclays was providing significant value to the Debtors' estates.  The information upon which the Court was asked to rely was wrong.

2.     The fact is that the deal was actually structured to give Barclays an immediate and enormous windfall profit.  Certain Lehman executives agreed to give Barclays an undisclosed $5 billion discount off the book value of securities transferred to Barclays, and later agreed to

---

[1]  The facts set out in this motion were developed by LBHI independently and through discovery which LBHI, LBI, the Creditors Committee and the Examiner have conducted pursuant to the Court's order entered June 25, 2009 authorizing discovery under Bankruptcy Rule 2004.  The documents and testimony cited are annexed in an Appendix to this motion (submitted to the Court in five volumes).  References to that record are annotated herein as "A.__."  Owing to the strictures of a Confidentiality Stipulation and Order upon which Barclays insisted before it would produce any information, the publicly-filed version of this Motion has been heavily redacted, which reflects Barclays excessive application of "Highly Confidential" and "Confidential" designations to testimony and documents.  It is LBHI's intention to engage in further discussions with Barclays to have many, if not most, of those designations removed or, alternatively, to ask the Court to do so in the interests of transparency.

give billions more in so-called "additional value" that Barclays demanded, but the Court never approved. This immediate windfall to Barclays (i) was not disclosed to the boards of LBHI or LBI, (ii) was not revealed in the agreement the Court was asked to approve, and (iii) was never disclosed to the Court until now.

3.      To right the wrong that resulted, it is not necessary for the Court to undo the sale. Rather, the Court needs only to require Barclays to return to the Sellers' estates the value it took in excess of what the Sellers were entitled to convey based on the record before the Court. That will require modification of the Sale Order, including the elimination of the reference to the so-called "Clarification Letter." Never submitted to the Court for approval, the Clarification Letter purported to significantly alter the Asset Purchase Agreement.

4.      The tumultuous circumstances that led to the Sale Transaction also cannot explain away the manipulation of the numbers or the fact that everyone other than a few "negotiators" was kept in the dark about material aspects of the transaction. Whether these executives acted under mistake or inadvertence, or actually knew what they were doing, the result is the same: an undisclosed, unwarranted and inequitable loss to the Sellers' estates of many billions of dollars, and a huge financial windfall to Barclays.

5.      Evidence discovered since the Sale Transaction demonstrates that the sale was, from the beginning, based on an undisclosed distortion of the book value of the securities to be transferred to Barclays. The Asset Purchase Agreement submitted to the Court expressly stated that those securities had a "book value" of approximately $70 billion as of September 16, 2008. The actual book value was $5 billion higher. From September 16, 2008, when the Asset Purchase Agreement was signed, through September 22, 2008, when the deal closed, and notwithstanding the changes to the deal during that week, this $5 billion discount remained

buried within the transaction. To make matters worse, as the size of the pool of securities available for sale to Barclays diminished during the week, the notional amount of discount always remained at $5 billion. Thus, the percentage of the discount against the assets transferred grew much, much larger.

6. By Friday, September 19th, when the Sale Hearing commenced, individuals negotiating the Sale Transaction had essentially abandoned the original structure set forth in the Asset Purchase Agreement and had, without any meaningful disclosure, decided instead to deliver securities to Barclays by simply terminating a certain executory repurchase agreement entered into between LBI and Barclays on September 18, 2008 (the "Repurchase Agreement"). It was never mentioned in any agreement or other document put before the Court that termination of the Repurchase Agreement had become the facility to transfer the securities to Barclays at a discounted price. To the contrary, the Repurchase Agreement was described to the Court only as a means of providing temporary funding so LBI could operate until the filing of its planned liquidation proceeding at the end of the week.

7. Pursuant to the Repurchase Agreement, Barclays transferred $45 billion in cash to LBI on September 18th in exchange for approximately $50 billion of securities, subject to LBI's right and obligation to repurchase those same securities from Barclays at a later date for $45 billion. By mid-week, certain Lehman and Barclays executives decided that, rather than mark down the value of the securities on Lehman's books to fit the undisclosed discount (their original plan), the better way to deliver the discount to Barclay's would be to terminate the executory Repurchase Agreement, leaving all $50 billion of the securities in Barclays' hands. Changing the deal in this way orchestrated an exchange of $50 billion in securities for a payment

of only $45 billion, thus giving Barclay's the agreed upon $5 billion undisclosed discount.  The

following testimony of Lehman's former CFO Ian Lowitt is illustrative:

> Q:      Well if the repo is used to deliver assets to Barclays at a
> specific price and Barclays gave $45 billion and received 50 billion
> in collateral, does that mean Barclays bought 50 billion in
> collateral for $45 billion?
>
> A:      If the – if they received all their collateral and that was the
> cash that came to [LBI] . . . then, yes, they received $49 billion of
> collateral – $50 billion of collateral for the cash.

(A. 19 [Lowitt] 138:18–139:3.)

     8.     The use of the Repurchase Agreement to make this gratuitous transfer of estate

property to Barclays contravened the statutory requirements for terminated repo transactions

under Section 559 of the Bankruptcy Code.   Right after LBI's liquidation proceeding was filed

on Friday, September 19th Barclays "liquidate[d] [its] repurchase agreement[] with a debtor," as

expressly contemplated by 11 U.S.C § 559, by sending a Notice of Termination of the

Repurchase Agreement to LBI.  (A. 68.)  Pursuant to Section 559, upon Barclay's liquidation of

the Repurchase Agreement, the "excess of the market prices" of the assets subject to the

Repurchase Agreement over the "stated repurchase prices" for those same securities should have

been "deemed property of the estate," 11 U.S.C. § 559, obligating Barclays to return the excess

$5 billion of estate property to Sellers' estates pursuant to Section 542(a) of the Code.  Some of

the Lehman and Barclays negotiators, however, attempted to make this Section 559 problem

disappear after the Sale Order was entered by (i) purporting to "rescind" the Notice of

Termination retroactively (as if it never had existed), (ii) changing the definition of "Purchased

Assets" in the Asset Purchase Agreement to substantiate the assets subject to the Repurchase

Agreement, (iii) declaring that Barclays would purportedly "have no further obligations" under

the Repurchase Agreement (including "any payment or delivery obligations"), and then

(iv) "terminating" the Repurchase Agreement, all presumably to avoid the mandate of Section 559. They did this in two paragraphs in the Clarification Letter that was finalized and signed only after the Sale Order was entered. These major changes to the deal were never brought to the attention of the Court or the creditors.

9.      The undisclosed gains for Barclays did not end with the delivery to Barclays of this $5 billion windfall. Evidence uncovered in discovery also shows that on the day the Sale Hearing was conducted, and into the weekend following issuance of the Sale Order, a scramble was going on inside Lehman to find billions more in assets to turn over to Barclays, without additional consideration and without disclosure. On the purported basis that Lehman had fallen short of what it was supposed to deliver under the Asset Purchase Agreement – which, of course, did not take the undisclosed discount into account – Barclays executives demanded even more assets. Lehman executives agreed to turn over an *additional* $5 billion in assets to Barclays. These assets consisted of approximately $800 million in so-called "15c3-3 assets" and at least $1.9 billion worth of unencumbered assets contained in so-called "clearance boxes." In addition, by inserting various clauses in the post-hearing Clarification Letter, additional assets, worth approximately $2.3 billion more, supposedly were transferred to Barclays, also without consideration, disclosure or the Court's approval.

10.      Discovery also has revealed that -- from the very beginning -- the consideration Barclays was to pay in the Sale Transaction, in the form of assumed liabilities, was significantly and intentionally inflated. The Court was told that, as consideration in the Sale Transaction, Barclays would assume approximately $2 billion in 2008 bonus liabilities to Lehman employees who transferred to Barclays. The accrual upon which this assumed liability was based had, in fact, been deliberately inflated by $1 billion. And, in any event, Barclays ultimately paid no

more than about ____ in 2008 bonuses to transferred Lehman employees, allowing

Barclays to pocket the difference. (*See* A. 9 [Exall] 108:11-109:9; A. 137 (spreadsheet showing

approximately ____ paid in 2008 bonuses, excluding payroll items, taxes, severance and

other non-bonus items).) Documents produced in discovery by Barclays reveal that this was its

plan all along.

11. Similarly, the Court was told Barclays would assume liability for contract cure

payments in a range of up to $1.5 billion. This number, too, was intentionally inflated and, in

any event, Barclays actually paid only about $238 million for contract cures. (*See* A. 136.)

12. The Sale Transaction was described to the Court as an equivalent exchange of

value, or a net benefit to Lehman. Instead, because of these undisclosed and unauthorized

features of the deal, Barclays received billions more than the value it paid. Because discovery

has not been completed since LBHI first brought this issue before the Court late in June, LBHI

cannot calculate at this point the precise amount of Barclays' windfall. On the record developed

thus far, the available evidence indicates that Barclays received approximately $8.2 billion in

excess Lehman assets, between (i) at least $5 billion in excess collateral in the Repurchase

Agreement; (ii) $2.7 billion in so-called "additional value" added to the deal at Barclays'

demand while the Sale Hearing was in progress; and (iii) $2.3 billion in OCC margin deposits

added after the sale hearing ended, less (iv) the $1.738 billion in liabilities Barclays actually

assumed. The number may be even larger. According to one Barclays document, for example,

Barclays estimated its receipt of excess collateral on the Repurchase Agreement alone at

$7,190,000,000. (A. 77; *see also* A. 75 (haircut summary putting excess value at $7.17 billion).)

13. Given what has now been revealed in discovery, it is not particularly surprising

that, in February 2009, Barclays announced it had enjoyed a gain of $4.2 billion "on acquisition"



of the Lehman assets. This immediate gain – in Barclays' own words – was attributable to "*[t]he excess of the fair value of net assets acquired over consideration paid . . . on acquisition.*" (A. 130 at 95 (emphasis added).) In fact, the available evidence suggests that this announced "gain on acquisition" was understated by over $6 billion because of various post-closing valuation adjustments that Barclays elected to make. But what is certain is that any such immediate gain for Barclays, derived from paying less than fair value was never disclosed and never approved. As one key Lehman executive put it, such a gain was "[a]bsolutely not" contemplated by the deal described to the Court. (A. 20 [McDade] 158:25-159:7)

14. The foregoing is exacerbated by the fact that many of the Lehman decision-makers who "negotiated" the transaction with Barclays had at the same time been offered lucrative Barclays employment contracts conditioned on the closing of the Sale Transaction. This not only calls into serious question the arms length nature of the transaction but evidences that the circumstances surrounding the Sale Order mandate a thorough review of the record on which it was based.

15. In sum, the evidence demonstrates that the transaction that ultimately closed was materially different from the Sale Transaction the Court approved, and the Sale Order was the product of mistake, inadvertence or, misrepresentation. The Court can, and should, revise the Sale Order to reflect the transaction that was actually disclosed at the Sale Hearing, *i.e.*, to enable the return to the Sellers' estates of the billions in extra value given to Barclays as a result of undisclosed features of the deal or post-hearing amendments to it.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## STATEMENT OF FACTS

### A.    Background and The Principal Negotiators

17.    In the week before LBHI filed for bankruptcy, Lehman and Barclays held discussions about a possible Barclays acquisition of all of Lehman but the talks did not result in an agreement. (A. 2 [Berkenfeld] 51:9-52:10; A. 19 [Lowitt] 15:6-11; A. 25 [Shapiro] 15:17-16:4; A. 14 [Kelly] 29:14-24; A. 21 [McGee] 18:6-21; A. 23 [Ricci] 13:10-14:2.) On the evening of September 14, 2008, the night before LBHI filed for bankruptcy (Docket No. 1), Barclays again began discussions with Lehman, seeking to purchase its North American broker-dealer business. (A. 20 [McDade] 16:8-17:25.) This time, Barclays and the Sellers negotiated a post-bankruptcy sale very quickly. The negotiations took place throughout the day of September 15 and into the early morning hours of September 16, 2008, when a deal was reached. (A. 25 [Shapiro] 46:2-12; A. 14 [Kelly] 38:12-39:20; A. 2 [Berkenfeld] 30:6-14.)

18.    The primary negotiators for Lehman appear to have been Bart McDade (President),[2] Hugh ("Skip") McGee (Global Head of Investment Banking)[3] and, until he quit abruptly on September 18, Mark Shafir (Global Co-Head of Mergers and Acquisitions). (A. 20 [McDade] 18:22-19:6.)[4] They were assisted by other senior Lehman executives, including

---

[2]  On September 16, Barclays prepared an offer of employment to McDade worth approximately REDACTED (A. 56.) McDade testified he did not sign an employment agreement with Barclays, but said he worked for transitional purposes at Barclays until December 31, 2008 and during that time continued to receive only his "Lehman salary" while at Barclays. (A. 20 [McDade] 61:2-10, 62:15-63:8, 197:10-15, 259:21-260:14.)

[3]  McGee is now employed by Barclays as Head of the Global Investment Banking Division. Barclays paid McGee REDACTED (A. 146.)

[4]  The principals do not agree about their role as negotiators. McDade testified that he was "one of three" negotiators and McGee was "absolutely" dealing with all aspects of the deal. (A. 20 [McDade] 33:3-34:6.) McGee, on the other hand, minimized his role, testifying that he only addressed employee compensation issues. (A. 21 [McGee] 10:25-11:24, 34:19-35:22, 61:7-16, 70:14-24.)



Gerald Donini (Global Head of Equities),[5] Ian Lowitt (Chief Financial Officer and Co-Chief Administrative Officer),[6] Paolo Tonucci (Global Treasurer),[7] Michael Gelband (Global Head of Capital Markets), Eric Felder (Global Co-Head of Fixed Income),[8] Mark Shapiro (Head of Restructuring),[9] Martin Kelly (Managing Director & Global Financial Controller),[10] Alex Kirk (Head of Principal Investing)[11] and Steven Berkenfeld (Head of Legal, Compliance and Audit

---

[5] Donini is now employed by Barclays as Managing Director and Head of Equities. Under Donini's employment contract, dated September 24, 2008, he was entitled to receive compensation

REDACTED

(A. 142.)

[6] On September 18, the day before the Sale Hearing, Lowitt signed an offer letter, accepting a position at Barclays which entitled him to compensation '
REDACTED

(A. 19 [Lowitt] 9:6-11, 19:21-20:10, 30:25–32:8; A. 138.)

[7] Tonucci is now Head of Group Balance Sheet of Global Operations for Barclays. (A. 26 [Tonucci] 6:5-16, 7:23-7:11.) Tonucci knew on September 19 that he would receive an offer of employment from Barclays. (Id. at 65:19-23, 66:4-15.) Over the weekend of September 20-21, Tonucci received a written offer of employment from Barclays which included
REDACTED

(Id. at 68:24-69:4, 70:16-23, 71:7-12; A. 141.)

[8] Felder is now Head of Global Credit Trading at Barclays. (A. 10 [Felder] 10:9-13.) Felder met with Robert Diamond and Jerry Del Missier of Barclays on the morning of September 16 to discuss Felder's role and compensation at Barclays. (Id. at 38:15-39:20), and signed an employment contract with Barclays on September 21. Felder received (Id. at 39:21-40:13, 42:3-43:11; A. 140.)     REDACTED

(A. 140.)

[9] Shapiro is now Head of Restructuring and Finance at Barclays. (A. 25 [Shapiro] 7:14-18.) Under his employment contract dated September 25, Shapiro received

REDACTED     (A. 145.)

[10] Kelly is now Chief Financial Officer at Barclays Capital U.S. (A. 14 [Kelly] 8:2-9.) Under his contract, Kelly received     REDACTED

(A. 147.)

[11] Kirk worked for a few months at Barclays after the sale until November 2008. (A. 16 [Kirk] 8:15-9:22.) Upon his departure after this short stint, Barclays gave Kirk     REDACTED
Id. at 11:4-21, 18:12-19:20.)



Division).[12] (A. 25 [Shapiro] 46:13-53:9; A. 14 [Kelly] 52:13-53:14; A. 21 [McGee] 11:25-13:19.)[13] Several of these individuals -- McGee, Donini, Lowitt, Gelband and Felder -- were among eight senior Lehman executives whose transfer was a condition to the deal and who were offered employment contracts under which they stood to gain a collective total of

                                                                if the transaction closed.  (A. 19 [Lowitt] 16:15-24; A. 2 [Berkenfeld] 16:4-23; A. 20 [McDade] 60:9-18, 64:21-25; A. 12; A. 140; A. 145; A. 139; A. 146; A. 147; A. 144; A. 138; A. 56.)

19.     The primary negotiators for Barclays appear to have been Robert E. Diamond (Barclays' CEO and President), Richard Ricci (Barclays' COO), and Michael Klein, an outside consultant to Barclays. (A. 20 [McDade] 19:7-11; A. 21 [McGee] 24:21-25:6; A. 25 [Shapiro] 47:17-48:3; A. 23 [Ricci] 22:13-25.)[14]

## B.     The Undisclosed $5 Billion Discount

20.     The Asset Purchase Agreement submitted to the Court on September 17, 2008 stated explicitly that securities included within the "Purchased Assets" were being transferred at Lehman's "book value as of [September 16]." (A. 30 at 6.).  That was not true.  The economic

---

[12] Berkenfeld is now Managing Director of Investment Banking at Barclays Capital. (A. 2 [Berkenfeld] 20:7-12.) His employment agreement with Barclays is dated September 22, 2008. (A. 143.) In February or March 2009, Berkenfeld received from Barclays                     (A. 2 [Berkenfeld] 22:7-24; A. 143.)
                                                            REDACTED

(A. 2 [Berkenfeld] 57:21-58:4; A. 143.)

[13] Although public descriptions of the negotiations and internal e-mail indicate otherwise, many of these former Lehman executives testified that they played only limited or supporting roles, providing information or otherwise assisting the primary negotiators. (See, e.g., A. 14 [Kelly] 41:18-24, 50:22-51:9; A. 19 [Lowitt] 22:2-19; A. 10 [Felder] 107:9-108:19; A. 26 [Tonucci] 26:11-16, 26:25-27:5; A. 25 [Shapiro] 47:17-49:19.)

[14] Like their counterparts at Lehman, these negotiators also cannot seem to agree who were Barclays' negotiators. Barclays President Diamond, for example, denied any detailed role, and pointed repeatedly to Chief Operating Officer Ricci as a substitute. (A. 8 [Diamond] 45:11-50:24, 68:11-71:8, 97:11-98:3, 130:23-131:3.) Ricci, on the other hand, identified Diamond as a principal negotiator (A. 23 [Ricci] 10:17-11:12; 14:20-15:11; 22:13-23:5) Klein, identified by several witnesses as one of Barclays key negotiators, claimed not to have known, or have been involved in, negotiations about price or the assets to be transferred, said he had not seen the Asset Purchase Agreement at the time it was signed, and had not reviewed the Clarification Letter; essentially Klein limited his role to broad strategic issues. (A.17 [Klein] 48:22-50:9; 57:20-58:13; 69:12-19; 122:24-123:18.]



terms to which the negotiators agreed required Lehman to transfer these assets to Barclays at prices significantly below their book value, *i.e.*, Lehman agreed to give Barclays a $5 billion discount.

21.     Lowitt, the CFO responsible for the accuracy of Lehman's books, testified that Lehman's books fairly reflected the value of the assets on September 15 and 16:

> Q:     Did Lehman's books at that time fairly reflect the value of the assets according to how they were trading at the time?
>
> A:     Yes, I believe they did.
>
> Q:     ***So it was your understanding on the 15th and 16th of September 2008, that Lehman's books carried accurate marks for securities that were recorded therein; is that correct?***
>
> A:     ***Yeah.  The assets that were on Lehman's books were, particularly LBI, were securities, and securities are priced based on, you know, market sources, and our books and records were accurate.***

Lowitt conceded, however, that Lehman agreed to sell the assets to Barclays for $5 billion less, purportedly to reflect the size of the purchase and market volatility:

> Q: . . .  [W]hen you learned on the Tuesday morning that there was a deal, what is your memory of the terms that you learned?
>
> A:     I didn't know all of the – I wasn't party to all of the terms. You know, I was aware that the – that ***Barclays was going to purchase a substantial block of assets for less than the amount that we had on our books*** to reflect a sort of bid offer that reflected both the size of the purchase, as well as the inherent volatility in the market, which was significant that week

(A. 19 [Lowitt] 41:8-42:16 (emphasis added); *see also id.* at 43:12-22 ("The shorthand for it could be discount.").)

22.     Martin Kelly, Lehman's Managing Director of Financing and Administration, described the agreed discount in an e-mail to Lowitt and Lehman Treasurer Paolo Tonucci at 5:10 a.m. on September 16, 2008, in which he described the terms of the deal as follows:

13

Well it took all night and lots of back and forth but the deal is done and ready for the Board. ***Final price did not change meaningfully - approx a $5b all in economic loss versus our marks*** and $3.6b of resi assets left behind. Assume we can fund this after everything else winds down but Paolo [Tonucci] you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI. Took 745 [real estate asset] for $1b and several data centers for $400mm. Bart [McDade] reviewed all of it before final agreement. ...."

(A. 37 (emphasis added).)[15]

23.     Kelly, like Lowitt, acknowledged that the marks at which Lehman carried its assets on its books reflected their actual value. (A. 14 [Kelly] 65:19-22.) But he, too, conceded that Lehman sold the assets to Barclays for less than book value:

> Q:     . . . Did you have an understanding, sir, that the agreement, the pricing of the agreement was that Barclays would pay Lehman $5 billion less than Lehman had thought the assets were worth?
>
> A:     My understanding was that the negotiated sales price across all those asset portfolios resulted in a $5 billion, approximately $5 billion less to Lehman relative to its marks at that time.

(A. 14 [Kelly] 66:7-16; *see also id.* at 46:11-17 ("I recall the $5 billion represents the difference between the negotiated price and the value of those assets on Lehman's books"), 143:14-144:2 (same), 156:5-18 (same), 158:21-159:12 (same).)

24.     Paolo Tonucci, Lehman's Treasurer and one of the two recipients of Kelly's e-mail, was also aware of the $5 billion discount.

> Q:     . . . You understood the 5 billion dollars all in economic loss versus our marks to be a reference to a discount off the marks, correct?

_____

[15]   In testimony the Court might need to assess for credibility, Kelly professed at his deposition to have absolutely no memory, specific or general, about this description of the deal terms, other than admitting that he wrote it. (A. 14 [Kelly] 39:21-45:2.) This utter failure of recollection about the terms of what undoubtedly was the biggest event in his professional life was consistent with similar failures of recollection throughout his deposition. (*See, e.g.,* A. 14 [Kelly] 18:20-21, 21:25-22:25, 26:1-28:16 (when employment began at Barclays), 35:23-39:13 (substance of pre-deal meeting about sale), 81:24-84:3 (conversations with McDade the week of September 15, 2008), 86:9-88:19 (involvement in compensation expense and accrued bonuses estimates).)

14

A:      Yes.

(A. 26 [Tonucci] 27:22-28:2.)

25.      Similarly, Gerald Reilly, Lehman's Head Global Product Controller, wrote in an

e-mail on September 16, 2008:

> My understanding of the deal is that they will purchase our assets
> that remain in LBI on the closing date which will not be the same
> as the assets on the 12th. ***That purchase will be at a fixed
> discount on the assets that remain*** to reflect the bulk size of the
> purchase."

(A. 51 (emphasis added).)[16]

26.      While Lehman's Chief Financial Officer Lowitt testified unambiguously that

Lehman's books carried accurate marks on Monday and Tuesday, September 15 and 16 (A. 19

[Lowitt] 41:8-16), its President McDade testified differently, saying Lehman had not marked its

books since the previous Friday, September 12.  (A. 20 [McDade] 30:22-31:7.)  He

acknowledged, however, that Lowitt had better knowledge of the issue.  (*Id.* at 76:17-77:21.)

Either way, McDade's testimony brought the facts to the same place; Lehman agreed to give

Barclays a $5 billion cut from the value shown on Lehman's books, based on a negotiated price,

not actual book value.  (*Id.* at 30:18-31:25 ("the approximate value would have been $5 billion"),

55:12-57:23 ("reflects the market price or the price agreed to by the individuals, the sellers and

the buyer").)  McDade described a process in which traders from Lehman and Barclays

negotiated prices to substitute for book value.  (*Id.* at 25:6-27:7.)  According to McDade, these

negotiations were headed up by Gelband and also included Felder and Donini, all three of whom

---

[16]  Reilly reported to Lowitt.  (A. 19 [Lowitt] 14:7-10.)  Reilly was not deposed.  He died in December
2008.

already had discussions with Barclays about lucrative post-deal employment with Barclays. (*See id.* at 59:19-60:25, 75:4-76:7.)

27.     Ultimately, McDade agreed that Kelly's e-mail description, including a "$5 bn all in economic loss versus our marks" was an accurate description of the transaction. (*Id.* at 41:6-42:2; *see* A. 37.)  Moreover, despite the plain language of the Asset Purchase Agreement that the assets were being transferred at "book value as of" September 16, McDade testified that, without regard to the agreement itself, the "Long Position" described in the agreement was in fact being conveyed at a negotiated price, below book value. (*See* A. 20 [McDade] 85:18-22; *see also id.* at 68:4-70:14 ("book value" in the Asset Purchase Agreement actually reflected "what our traders and the Barclays traders came up with . . .")

28.     Barclays signed an agreement informing the Court it would buy assets at Lehman's book value, but its officers admitted it was never Barclays' intention to do so. According to its President, Diamond, "it was always a given" that if Barclays was going to do a deal with any investment bank it would be at "a distressed price as opposed to a premium or book value price." (A. 8 [Diamond] 11:24-14:5; 17:16-18:19; *see also id.* at 32:15-23 (Diamond emphasized Barclays would only pay a "very, very distressed price[.]").)  John Varley, Barclays' Chief Executive who had the "responsibility for taking the strategy of the acquisition of the Lehman North American businesses to the [Barclays] board," testified that he was "certainly very fixated on the need to have a substantial discount." (A. 27 [Varley] 6:18-7:25, 7:17-19, 36:8-37:2.)  In fact, one document Varley selected to keep in his personal file about the transaction refers expressly and clearly to a "negotiated discount – 5 [billion]." (A. 42; A. 28 [Varley] 154:25-157:3 (admitting that this referred to a $5 billion "haircut or buffer or delta, a discount to the asset price paid by us for the Lehman transaction."); *see also* A. 4 [Clackson]

39:23-41:10 (testimony regarding negotiated "valuation adjustments").)  Richard Ricci,

Barclays' COO and one of its principal negotiators, testified he "would think there would have

been a discount [] of Lehman assets – the Lehman marks on their assets."  (A. 23 [Ricci] 45:11-

19.)

29.    Indeed, in a conference call with analysts on September 17, 2008, Varley,

Diamond and other senior executives at Barclays lauded the lucrative deal they had struck.  (A.

46) (Barclays-generated transcript of analyst call).)  During the conference call, these senior

executives noted that (a) "[t]he transaction is structured as we wanted it to be" (*id.* at 6-7), and

(b) "we have been very deliberate in our choices [of assets]."  (*Id.*)  Varley and the others then

assured the analysts that Barclays expected to "preserve the buffer" in valuation because of the

manner in which they had marked the assets and how they had calculated the "negative

goodwill," *i.e.,* profit attributable to the assets being purchased.  (*Id.* at 2-5, 13; *see also* A. 27

[Varley] 70:15-20 ("the expectation is to preserve it [the buffer] in the transaction").)  The

"buffer" Barclays disclosed in the analyst call was as follows: it was purchasing $72 billion in

assets for $68 billion.  (A. 46 at 2-3; A. 27 [Varley] 63:9-22 ("we had created an appropriate

delta between asset and liability values"); *see* A. 23 [Ricci] 125:4-20 (Barclays created a

"cushion" in the deal through, among other things, a "liquidity premium").)  In announcing that

"buffer" to the street, Barclays was careful not to disclose that the valuations used were not

Lehman's book valuations, as the Asset Purchase Agreement presented to the Court had

expressly stated.  Instead, they were Barclays' values, the product of efforts earlier in the week to

mark down the book value of assets on Lehman's books.  (A. 27 [Varley] 63:14-22; A. 13

[Keegan] 27:3-30:19 (describing process of proposed haircuts and valuations adjustments

between Barclays and Lehman).)

30.     Varley personally prepared a set of talking points for the analysts call in which he took great pains to note the "capital accretive" nature of the transaction as well as the "negative goodwill." (*See* A. 42 at BCI-EX-166333-339).

31.     In Varley's talking points, he noted:

- The transaction is capital accretive without additional equity issuance

- The source of that accretion is the negative goodwill from the transaction, which amounts to some US $2 billion, post tax

\* \* \*

- The transaction meets our financial tests with significant margin for error

- We expect it to be immediately economic profit positive

(*Id.* at BCI-EX-166336-38.)

32.     When asked if the Purchase Agreement's description of the "Long Position" as having a "book value as of [September 16] of approximately 70 billion" was an accurate description of assets Barclays agreed to buy from Lehman, Barclays President Diamond essentially refused to answer the question, saying instead that he wanted the deal to be "capital accretive" for Barclays, he would "stick to that answer rather than try to do anything else" and then he filibustered. (A. 8 [Diamond] 61:13-68:12.) In fact, although neither the Asset Purchase Agreement nor anything else submitted to the Court said anything about it, and Diamond could not say whether anyone mentioned it to Lehman, Diamond insisted that a "condition to the deal from the beginning was capital accretion" for Barclays. (A. 8 [Diamond] 66:13-19; *see also id.* at 82:7-84:4, 87:23-92:9, 98:15-101:15, 104:5-105:15, 128:7-129:5.)[17]

---

[17] Diamond at least conceded that the estimated value shown to Barclays' board was $75 billion, not $70 billion. (A. 8 [Diamond] 147:24-150:5; *see* A. 35; A. 36.)

18

33.     Barclays documents also address the discount from Lehman's book value.  On

September 16, 2008, even as the Asset Purchase Agreement was being finalized, Varley led a

meeting of the Barclays Board in which he sought approval to proceed with the transaction.   In a

summary he gave the Board, Varley noted that Barclays was purchasing assets with a value of

"**$75 billion**" and expected to yield a pre-tax negative goodwill of about $3 billion.  (*See* A. 27

[Varley] 48:5-49:9, 50:15-53:7; *see also* A. 35; A. 36 (Powerpoint presentation to Board at

"Executive Summary");[18] A. 23 [Ricci] 128:8-129:19 (Clackson or someone on his team

calculated this negative goodwill number), *id.* at 97:3-98:9 (negative goodwill meant that "the

assets would have exceeded the liabilities [Barclays] assumed").)[19]  According to Varley,

"negative goodwill" is an accounting concept that "most people would refer to as a discount."

(A. 27 [Varley] 42:14-43:8.)  Similarly, Barclays' Chief Financial Officer, Chris Lucas, and the

CFO of Barclays Capital, Patrick Clackson, both deemed negative goodwill to be accounting

profit.  (A. 4 [Clackson] 41:12-42:12 (negative goodwill "rolls up into consolidated profit at a

group level"); *see also* A. 123 (Lucas e-mail noting negative goodwill is "accounting profit").)

34.     Other Barclays documents confirm that Barclays understood that, because it had

bought the assets at a discount, it would have an immediate gain on acquisition.  In a Barclays e-

mail addressing how the acquisition would be treated for U.S. taxation purposes, Beatrice

Montondy (Finance/NYK) wrote:

> The context to this question was that, during the asset purchase
> price negotiations, it was essential to the valuation calculation that

---

[18] As described below at ¶¶ 33-35, 48-49, at about the same time Varley told the Barclays' board about the immediate gain built into the deal for Barclays, the LBHI and LBI boards were being told the deal was a "wash — with Barclays assuming liabilities . . . basically equivalent to the assets."  (A. 39 at 4.)

[19] Varley testified that he strived to achieve the $3 billion pre-tax negative goodwill even as the specifics of the transaction were changing and evolving because of market conditions.  (A. 27 [Varley] 52:14-53:7.)  This desire to preserve the "buffer" he had described to the Board was effected, in part, by a last-minute asset grab on Friday, September 19 and the ensuing weekend, as Lehman employees scrambled to identify billions more in assets to transfer to Barclays, at Barclays' demand.   (*See* discussion below at ¶¶ 105-117.)

the ***"discount" between the value of the assets acquired and the purchase price*** not be subject to the 46% marginal U.S. tax rate applicable to BCI.

(A. 61 (emphasis added).)

35.     According to Montondy, the immediate gain for Barclays (as to at least a portion of the acquired portfolios) was in the range of $2.5 billion.  She wrote:

> U.S. Tax recognized immediately Wednesday am that U.S. Equities acquired to be used as part of BAU EDG would need to be booked in BSCL and gains subject to 46% tax as a result of current transf[e]r pricing. ***The gain on the equities is day one $2.5 billion USD.***

(*Id.* (emphasis added).)  One Barclays e-mail attributes at least part of the gain, estimated at $2.7 billion, to the fact that the $4.25 billion in assumed liabilities for compensation and cure -- upon which the Sale Transaction was premised--would in reality be only $1.3 billion, leaving $2.7 billion for "negative goodwill," *i.e.*, an immediate gain for Barclays.  (A. 71.)[20]  Another Barclays' document indicates an even larger immediate gain.  *See* A. 134 at BCI-EX-00109160 (spreadsheet Barclays sent to its auditors showing $4.701 billion in "negative goodwill" *i.e.*, the amount paid over fair market value, as a result of the Lehman acquisition).)[21]

36.     Similarly, on Sunday, September 21, 2008, the night before the transaction closed, Lehman's Robert Azerad (who worked for Kelly) circulated an "Opening Balance Sheet" to Barclays and Lehman personnel showing Barclays would have $3.38 billion in "Equity," *i.e.*,

---

[20]  Kelly appears to have put the amount of the windfall, just based on the Purchase Agreement itself, higher.  Kelly testified that Barclays valued the securities (and related short positions) it ultimately received at approximately $50 billion and his comparison of Lehman's book value to Barclays "proceeds" indicated that, once the inflated compensation liability was taken into account, the loss to Lehman on the transaction (and, thus, Barclays' gain) was approximately $5.25 billion.  (A. 14 [Kelly] 214:8-23, 221:2-229:13 (referring to A. 44 (Kelly's notes)).)

[21]  A July 31, 2009 cover letter from Barclays' counsel described the spreadsheet as "[a] spreadsheet containing information that was provided to Barclays' auditors relating to the acquisition balance sheet." (A. 131.)  Barclays produced a "corrected" spreadsheet in the middle of depositions, but this "negative goodwill" number remained the same.  (A. 135.)

profit, on the very first day. (A. 104.) McDade testified he had not seen this document at the time, but that if it accurately reflected that Barclays gained $3.38 billion in equity it would not be consistent with the deal he made, or the deal described to the Court:

> Q:      If there were an equity component in the deal on the opening day, sir, of $3.38 billion, that deal would not be in balance is that right?
>
> * * *
>
> A:      That's correct.
>
> Q:      And the deal you made was one to be in balance; is that right?
>
> * * *
>
> A:      That's correct.
>
> Q:      So if the opening day balance sheet for the deal reflected that Barclays had $3.38 billion in equity, that's not the deal you made, is it?
>
> A:      That's correct.
>
> * * *
>
> Q:      And it wouldn't be consistent with the deal you made, would it?
>
> A.      It would not be consistent, that's correct.

(A. 20 [McDade] 216:23-217:23 (objections omitted); *see also id.* at 107:3-11 (the deal would be a wash with liabilities equivalent to assets).)[22] McDade also recognized that, given the description of the Sale Transaction to the Court, an immediate gain to Barclays should have been disclosed:

---

[22] McDade's counterpart at Barclays said exactly the opposite. Barclays President, Diamond, testified that "the asset liability mismatch had to have a mismatch in favor of a positive capital accretion [for Barclays] or we weren't authorized to do the deal." (A. 8 [Diamond] 86:14-87:5; *see id.* at 87:23-90:5.)

21

> Q:     And given what you heard in the bankruptcy hearing on the
> 19th of September, where you heard the deal described to the judge
> as essentially a balance –
>
> A:     Right.
>
> Q:     -- it would have been important in your view, sir, to tell the
> judge if it was not in balance because that's a different deal, is it
> not?
>
> A:     Most definitely, yes, sir.

(*Id.* at 185:20-186:5.)[23]

37.     Discovery to date has not revealed precisely how Barclays accounted for the

windfall it received on Lehman's discounted assets.  What is clear is that, on a deal described to

the Court and creditors as a balanced exchange of equivalent value (or as a net benefit to

Lehman) there was in fact an enormous embedded gain for Barclays.  By February 2009,

Barclays had calculated the gain at £2.62 billion (approximately \$4.2 billion).  Barclays

announced:

> The excess of the fair value of net assets acquired [from Lehman]
> over consideration paid [to Lehman] resulted in £2,262 m[illion] of
> gains on acquisition.

(A. 130 ("Barclays PLC Results Announcement, Figures 2008") at 95.)[24]

---

[23] Again, Diamond testified differently.  He claimed not to know whether the "capital accretion" to
Barclays caused by the imbalance had been disclosed to the Court, saying "I have never had a discussion with Judge
Peck."  (A. 8 [Diamond] 66:13-24.)

[24] Gary Romain, Barclays Head of Technical Account and Private Equity Finance, testified about Barclays'
announced gain on acquisition and revealed that post-closing accounting adjustments Barclays made had the effect
of reducing Barclays' announced gain by over \$6 billion.  (A. 24 [Romain] 18:13-20:6, 82:11-18 (testimony
regarding write-downs on assets after receipt and after the Sale Transaction closed); *see also* A. 135 ("final version"
of acquisition balance sheet showing \$4.17 billion gain); A. 132 (Barclays' write-down of assets received from
Lehman, through Bank of New York, by \$4.4 billion from BONY valuations), A. 133 (Barclays write-down of
assets transferred through JP Morgan Chase by \$2 billion from September 2008 values); *see also* A. 131 (a July 31,
2009 cover letter from Barclays' counsel describing the spreadsheets at A. 132 and A. 133 as "[t]wo spreadsheets
containing information that were provided to Barclays' auditors relating to values that Barclays booked for the
securities received from Lehman and JPM").)  Absent these internal adjustments to third-party valuations, Barclays'
announced gain on acquisition would have been billions of dollars more.  When these marked down assets are sold
Barclays stands to earn a trading gain of several billion dollars.

38.     Shown Barclays' announcement and asked if that type of gain was contemplated by the deal he made with Barclays or described to the Court, McDade testified "No, absolutely not." (A. 20 [McDade] 157:16-158:20.) McDade also testified:

> Q:     . . . Was it contemplated there would be a gain on acquisition?
>
> A:     No, it was not.
>
> Q:     Was it contemplated that the price paid by Barclays would be less than the fair value of the net assets acquired?
>
> A:     Absolutely not.

(*Id.* at 158:25-159:7.) As McDade, who testified at the Sale Hearing on September 19, attested at his deposition "[t]he deal was described [to the Court] as a transaction where the assets and the liabilities matched." (*Id.* at 160:2-20.) And McDade also confirmed that, from the time the deal was first described on September 16, 2008 through the time it closed on September 22, 2008, there was never supposed to be an embedded gain for Barclays on day one. (*Id.* at 157:4-9.)

## C.     Lehman's Lawyers And Others Are Never Told About The Discount

39.     The agreement to sell Lehman's assets for less than book value was not known to all the Lehman executives involved in the deal, and it was not communicated to lawyers charged with documenting the agreement and making disclosures to the Court.

40.     Kelly, the author of the only Lehman document that actually discusses the discount openly, could not recall talking to anyone about it other than McDade, Lowitt, Tonucci and Reilly. (A. 14 [Kelly] 69:22-76:19, 81:6-82:17.)[25] The testimony of other senior Lehman executives, if credited, indicates that the agreement to sell assets at a $5 billion loss was not

---

[25] Kelly went to some lengths at his deposition to distance himself from this pivotal feature of the agreement. Lowitt, his direct supervisor, responded "You are a hero. Well done" when Kelly sent his e-mail describing the terms. (A. 37.) Tonucci responded "Fantastic. Great work." (*Id.*) But Kelly professed to have "no view" about why his boss and his close colleague gave those compliments. (A. 37 [Kelly] 67:24-69:5.) He claimed that he could not "recall" whether he had anything to do with reaching the deal terms he pronounced in his e-mail were "ready for the Board." (A. 37; A. 14 [Kelly] 69:10-21.)

widely shared.  For example, McGee, Lehman's Global Head of Investment Banking (and identified by others as one of the "lead negotiators" of the transaction)[26] claimed to have no knowledge of a discount from book value being given to Barclays.  (A. 21 [McGee] 70:8-13.) Shapiro, Lehman's Head of Restructuring, who was also described by others as one of the principal negotiators,[27] testified that he knew nothing about any discount on the securities to be sold.  (A. 25 [Shapiro] 105:12-108:3 (". . . no, there was no discount because obviously it was a book value.").)  Felder, Lehman's Head of Fixed Income, also testified that he never heard that Barclays had been given a discount in its purchase of Lehman assets.  (A. 10 [Felder] 95:18-96:16.)  Similarly, Kirk, Blackwell, Hraska, Denig and Azerad, all of whom played important roles for Lehman in the transaction, each testified they never heard about a discount from book value.  (A. 16 [Kirk] 38:24-39:5; A. 3 [Blackwell] 44:14-45:22, 71:5-9; A. 12 [Hraska] 66:5-23; A. 7 [Denig] 72:5-17; A. 1 [Azerad] 57:16-20.)

41.     Steven Berkenfeld also testified that he had no knowledge of any "discount" off the value of the assets "being part of the deal."  (A. 2 [Berkenfeld] 64:9-15.)  This is of particular importance, because Berkenfeld was one of the drafters of the Asset Purchase Agreement, involved primarily in "lawyering" the deal.  (*Id.* at 27:7-17.)  In fact, Berkenfeld signed the Asset Purchase Agreement on Lehman's behalf.  (A. 30 at 43.)  And Berkenfeld thought that the contract he signed reflected an agreement to sell the assets at Lehman's actual book value.  (A. 2 [Berkenfeld] 88:25-89:10, 63:12-18, 64:2-5, 70:10-19.)  This is not surprising because, as Berkenfeld himself noted, "[t]he purchase agreement *says* that what's being transferred over is approximately $70 billion of *book value*."  (*Id.* at 89:8-10 (emphasis added); *see* A. 30 at 6

---

[26]  A. 2 [Berkenfeld] 18:15-23, 27:18-22; A. 20 [McDade] 33:3-34:6.

[27]  *See* A. 2 [Berkenfeld] 27:18-28:6; *see also* A. 73 (Shapiro describing himself as "lead[ing] the bankruptcy filing and sale to Barclays"); A. 48 (Shapiro "had to quarterback the rescue").

(Asset Purchase Agreement, describing "Purchased Assets" to include securities "with a ***book value*** as of the date hereof of approximately $70 billion[.]" (emphasis added)).)

42.     Berkenfeld also testified that there was "nothing in the Asset Purchase Agreement that addressed a discount on assets," and he was not aware of any part of the structure of the transaction that contemplated a bulk discount for Barclays.  (A. 2 [Berkenfeld] 70:10-19, 72:9-14.)  Indeed, Berkenfeld testified – quite emphatically – that he was aware of no discount or any other component of the agreement that contained any "embedded" benefit for Barclays.  For example:

> Q:     Was it your understanding that the economics of the transaction involved a $5 billion overall loss to Lehman versus its marks?
>
> A:     I have never been informed of that.
>
> Q:     Have you ever seen any document that says that?
>
> A:     Not that I recall.
>
> Q:     So when you were involved in the drafting of the agreement . . . you did not have an understanding there was to be a discount given to Barclays off the value of the assets transferred; is that right?
>
> A:     I did not have that knowledge.

(*Id.* at 64:2-15.)

43.     Berkenfeld also was quite clear that the Asset Purchase Agreement was not designed to give Barclays an immediate gain on acquisition:

> Q:     And nobody looking at that agreement, at least from the point of view of the man who signed it, would read that to say there was a discount being given to Barclays for what it was buying?

* * *

25

> A.  I didn't believe at the time when I signed this agreement that the intent of the agreement was to deliver assets with a material embedded gain to them, to Barclays.

(*Id.* at 122:17-123:2 (objection omitted); *see also id.* at 110:23-111:21 ("I did not have an understanding at the time that the transaction was signed or as it evolved post-signing into the closing that there was any embedded gain on the part of Barclays around specific positions"), 112:7-25 ("My understanding of the transaction is that, on acquisition, as reflected in the Asset Purchase Agreement, it was not intended that Barclays would have an immediate excess value in the assets that they were bringing over").)[28]

44.  Berkenfeld was also clear that, if "getting a discount off of the valuation at the time under the current market" was "part of the business deal agreed to by the parties, then [he] would have expected that to be disclosed to the lawyers who were preparing the document and the lawyers who were presenting to the bankruptcy court." (*Id.* at 75:22-77:2.)  But no one made any such disclosure:

> Q:  And one of the lawyers involved in preparing [the Asset Purchase Agreement] was you?
>
> A:  That is correct.
>
> Q:  And you were the man who signed the document, correct?
>
> A:  That is correct.
>
> Q:  And did anyone ever make such a disclosure to you?
>
> A:  No.

(*Id.* at 77:3-11.)

---

[28]  Berkenfeld's view was, of course, consistent with McDade's testimony that the transaction described to the Court was a "transaction where the assets and liabilities matched." (A. 20 [McDade] 160:14-20.)

45.     Berkenfeld testified that "none of the lawyers involved in the drafting were aware of any loss on assets." (*Id.* at 70:20-71:2.) He confirmed that all the lawyers were kept in the dark:

> Q:     To your knowledge, were any of the lawyers involved or other people involved in the drafting of the Asset Purchase Agreement given any indication there would be a bulk discount of some kind given to Barclays?
>
> * * *
>
> A:     Not to my knowledge.

(A. 2 [Berkenfeld] 72:15-21 (objection omitted).)

46.     Indeed, Berkenfeld confirmed that the lawyers were effectively prevented from disclosing the discount to the Court:

> Q:     And to your knowledge, sir, were any of the people responsible for making disclosures to the bankruptcy court told that there would be some kind of bulk discount given to Barclays?
>
> * * *
>
> A:     Not to my knowledge.
>
> Q:     I asked that latter question with respect to at any point during the bankruptcy proceedings from the original notification to the court [that] there was an agreement through the point where the closing documents were filed with the court on September 22. That would be the period from the 16th through the 22nd of September.
>
> A:     Again, not to my knowledge.
>
> Q:     And, to your knowledge, did anybody make any disclosure like that to the Court after September 22?
>
> * * *
>
> A:     I don't have knowledge of that.

NYI-4215277v1

(*Id.* at 72:22-73:17 (objections omitted); *see also id.* at 133:25-134:13 ("I'm not aware of anything in the contract or anything that was presented to the bankruptcy court that should be characterized accurately as the block discount.").)[29]

47.     Whether this failure to disclose was by accident or design, it effectively eliminated any means of informing the Court or interested parties about the discount either in the proceedings or the filings that followed.

**D.    Lehman's Boards Are Told The Deal Is A "Wash" And Approve A Transaction On That Basis**

48.     At approximately 6:00 a.m. on September 16, 2008, an agreement with Barclays was presented for approval at an extraordinary meeting of the combined boards of LBHI and LBI.  The deal described to the Boards was an exchange of equivalent assets, with $1.45 billion paid for real estate, $250 million paid for the Lehman Brothers name and "[f]or LBI . . . a wash – with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets."  (A. 39 at 4.)  The Boards of LBHI and LBI approved the deal described to them and authorized the preparation of the documents necessary to reflect it.  (*See* i*d.* at 6-7.)

49.     The minutes reflect that Lowitt also attended the meeting, and told the Boards that, if the transaction were not approved that day, LBI would not be able to fund itself through the day and would have to file bankruptcy immediately.  (*Id.* at 4.)[30]  Less than an hour before the meeting, Lowitt had received, and responded to, Kelly's e-mail saying the deal was "ready for the Board" and describing the "[f]inal price" as including a "5b all in economic loss versus

_____

[29] Lehman President McDade acknowledged, of course, that an imbalance in Barclays' favor would "most definitely" have been important to disclose to the Court.  (A. 20 [McDade] 185:20-186:5.)

[30] At his deposition, Lowitt said he has no memory of attending this pivotal meeting, although he conceded it is "possible" he did.  (A. 19 [Lowitt] 49:17-25.)

our marks." (*See* A. 37 (time stamped 5:10 a.m.).) However, the minutes do not reflect that Lowitt said anything about the discount to the Boards. (A. 39, *passim*.) McDade's deposition testimony raised even greater doubts about whether the Lehman boards were properly informed about the components of the transaction they were asked to approve. He testified that he does not know what the boards were told, or when the boards were told anything (A. 20 [McDade] 34:23-36:19), but he was quite emphatic that an agreement was not reached until about 1 p.m. on the afternoon of September 16, long after the boards had already met. (*Id.* at 32:17-33:2, 36:19-38:25, 51:21-52:25.)

**E.** **The 9/16/08 Financial Schedule Upon Which The Asset Purchase Agreement Was Based**

50.     To guide the documentation of the deal, a financial schedule was prepared purporting to show the value of certain assets that would be transferred to Barclays and the liabilities Barclays would assume. (A. 31 ("9/16/08 Financial Schedule").) As described below, the 9/16/08 Financial Schedule materially understated the value of the assets and materially inflated the value of the liabilities.

**1.** **The Deliberate Understatement of Assets**

51.     The 9/16/08 Financial Schedule, according to Berkenfeld, was "guidance for what was meant in the Asset Purchase Agreement when there was a reference to purchased assets." (A. 2 [Berkenfeld] 50:15-24; *see also* A. 20 [McDade] 53:2-55:18.) Kelly and Tonucci "presented it to [Berkenfeld]." (A. 2 [Berkenfeld] 34:2-14; *see id.* at 48:2-22 (Kelly and Tonucci gave the "final sign off" on the schedule).) The lawyers who were documenting the transaction "were relying on [Kelly and Tonucci] to put together the list of assets that were estimated at the time would be transferred over to Barclays." (*Id.* at 36:3-37:12.) The $70 billion "Long Position" described in the Asset Purchase Agreement as "book value as of" September 16 was

derived from this schedule. (*Id.* at 78:10-82:15; A. 30 at 6; A. 31.) Berkenfeld's understanding of the 9/16/08 Financial Schedule was that the asset values it reflected were based on Lehman's marks. (A. 2 [Berkenfeld] 62:20-63:11.) This, as it turned out, was not true. Thus, the description of the "Long Positions" in the Asset Purchase Agreement filed with the Court, which described the position as reflecting "book value," was also not true.

52.     The 9/16/08 Financial Schedule is reproduced below:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Gov & Ag | $40.0 | ST Borrowings | $0.0 |
| Commercial Paper | 1.1 | Gov & Ag | 21.0 |
| Mortgages | 2.7 | Commercial Paper | 0.0 |
| Total Corp Debt | 4.9 | Mortgages | 0.0 |
| Corp Equity | 8.8 | Corp Debt | 2.1 |
| Derivatives | 4.5 | Corp Equities | 6.3 |
| Cash | 0.7 | Derivatives | 4.5 |
| Total | $62.7 | Total | $33.9 |
| Collateralized ST Agr | 10.0 | Collateralized ST Fund | 34.5 |
| Receivables | 0.0 | Payables | 0.0 |
| Other Assets | 0.0 | Deposits | 0.0 |
| Inv in Con Subs | 0.0 | Due to Subs | 0.0 |
| Due From Subs | 0.0 | Sub Notes | 0.0 |
| Total | 10.0 | Total | 34.5 |
| | | Total | 68.4 |
| | | Cure pmt | 2.25 |
| | | Comp | 2.0 |
| Adj. Total Assets | $72.65 | Total | 72.65 |

(A. 31.)

53.     Kelly testified that he helped to prepare the 9/16/08 Financial Schedule. (A. 14 [Kelly] 97:15-98:16.) [31] He admitted that it did not reflect the book value of the assets. Instead the schedule listed deliberately *reduced* values to accommodate the agreed $5 billion discount for Barclays. (*Id.* at 105:25-108:16; *see also id.* at 120:5-11; A. 45.)

---

[31] Berkenfeld also identified Tonucci as being involved in the preparation of the 9/16/08 Financial Schedule. (A. 2 [Berkenfeld] 34:2-14, 36:3-37:12.) Tonucci stated he had no such role. (A. 26 [Tonucci] 76:14-77:14.)

30

54. In particular, Kelly admitted that, in the aggregate, the value of the classes of securities listed on the 9/16/08 Financial Schedule was understated on the schedule by $5 billion:

> Q:    As far as you know, sir, for these asset classes, exclusive of cash, were they shown on Lehman books at an amount higher than $62 billion at or about the time this schedule was prepared?
>
> A:    My understanding is yes, they were, in aggregate.
>
> Q:    Were they $5 billion higher; is that your understanding?
>
> A:    Approximately $5 billion higher.

(A. 14 [Kelly] 108:7-16.)[32]  Kelly also conceded that the write downs incorporated in the schedule were done only by "classes" of assets, not even with regard to particular assets.  (*Id.* at 104:19-106:12.)

55. Lowitt, too, was "involved in the iterative work product that led up to this particular piece of paper."  (A. 19 [Lowitt] 80:19-24.)  He confirmed that the 9/16/08 Financial Schedule deliberately understated by $5 billion the amount shown in Lehman's books for the assets:

> Q:    . . . Were the amounts attributed to each of those asset classes the values shown on Lehman's books for each of those asset classes?
>
> * * *
>
> A:    My understanding of what was reflected in these asset values would be the amount that Barclays would be paying for assets in those asset categories.

---

[32]  There may be more to be learned from Kelly about the 9/16/08 Financial Schedule when his deposition resumes.  After a day full of lapsed recollection and over 50 requests from the witness himself for read backs of questions, his counsel terminated the deposition and the witness abruptly left seven hours after it began, his counsel contending that the deposition was "over."  (A. 14 [Kelly] 251:25-254:8.)  Among other areas of inquiry that remain to be pursued, LBHI was unable to ask Kelly about such things as many of his contemporaneous notes about the preparation of the schedule and drafts of the schedule.  (A. 44; A. 45 (spreadsheet apparently showing a "mark down" followed by $73.9 billion total); A. 43 at BCI-EX-00115299 ("[n]eed $5b. to cover expenses").)  Counsel for the SIPA Trustee, the Creditors' Committee and the Examiner were unable to ask any questions, at all, before Kelly left.

31

> Q:     So that roughly $5 billion number that we talked about
> before is recognized in this document,  Exhibit 19, correct?
>
> * * *
>
> A:     It is not recognized in this, in the sense that these -- these
> asset numbers are post that -- reflect what Barclays were willing to
> pay for $72 billion worth, $72.65 billion worth of assets, *which
> was less for reasons that we talked about earlier than the amount
> they were on Lehman's books for, and the amount less is
> probably the 5 billion that you referenced.*

(A. 19 [Lowitt] 81:18-82:13 (objections omitted; emphasis added); *see also* A. 20 [McDade]

55:12-18 (9/16/08 Financial Schedule did not reflect book value; "[t]his reflects the market price

or the price agreed to by the individuals, the sellers and the buyer").)

56.     Lowitt's testimony also illustrates that the agreed $5 billion discount was just an

agreement to sell assets for $5 billion, in the aggregate, less than they were worth.  Asked if the

reduction was agreed in terms of a percentage or in a raw number, Lowitt said "[m]y recollection

is that it was a number, not a percentage."  (A. 19 [Lowitt] 45:8-17.)  Moreover, contrary to a

description Kelly gave of the process, suggesting there was an examination of the assets at issue

(A. 14 [Kelly] 104:25-107:6), Lowitt described a vague "top down" and "bottoms up" process, in

which the number was just agreed.  (A. 19 [Lowitt] 44:9-46:3; *but see* A. 15 [King] 17:20-20:4,

27:6-32:4.)  Ultimately, Lowitt admitted that the "overall goal" was to reflect an agreed

reduction, without regard to particular assets.  (A. 19 [Lowitt] 89:11-90:15.)[33]

57.     Lowitt acknowledged that, when the discount had been incorporated into

September 16 into the 9/16/08 Financial Schedule, there had been no "asset-by-asset"

---

[33]     Barclays has produced documents that also support the conclusion that the markdown was not done on
an asset-by-asset basis but rather by asset category and, to some extent, without regard to any particular asset.  For
example, in a document discussing the $75 billion valuation in the September 16, 2008 Board Presentation, a
Barclays employee identified a generic $1.5 billion markdown that is described as "Unallocated deduction" and is
not identified with any particular asset or asset class.  (*See* A. 40 at BCI-EX-00023814; *see also* A. 24 [Romain]
44:5-9.)

information "necessary to effect the transaction." (*Id.* at 129:9-16.)  So the books were being marked down the next day, after the fact.  Indeed, a particularized review of the assets involved did not even *begin* until September 17, 2008, after the 9/16/08 Financial Schedule was finalized and after the Asset Purchase Agreement had been signed.  On September 17, Lowitt wrote an e-mail to Reilly asking if things were "set up" for "barcap to mark the positions further."  (A. 55.) Reilly responded "[w]e are going to send last nights assets and marks over [to Barclays] so they can see [the] mix and marks."  (*Id.*)  As Lowitt testified about his e-mail:

> Q:     And was that process being conducted on an asset-by-asset level on the 17th?  Is that what you are referring to here?
>
> A:     On the 17th we were believing what we needed to do was to mark the positions to a level that was consistent with what Barclays were willing to purchase them at.

(A. 19 [Lowitt] 129:17-23; *see also id.* at 131:11-135:13.)

58.     Kelly also testified that the original plan was to retrofit the agreed purchase price into Lehman's books.  (A. 14 [Kelly] 52:21-24 ("As part of the process to reflect the transaction in Lehman's books and records, the assets would have been marked to the negotiated sale price."); *see also id.* at 52:13-53:10.)  In addition, although Lowitt denied it, the documentary evidence indicates that Barclays was actually invited to participate in this markdown process. (A. 55 (e-mail from Lowitt asking Reilly whether things were "set up" for "barcap to mark the positions further"); *see also* A. 19 [Lowitt] 127:18-129:16 (testimony regarding A. 55.))

## 2.     The Inflation of Assumed Liabilities

59.     The evidence adduced in discovery also demonstrates that the distortions in the deal went beyond understated asset values.  The 9/16/08 Financial Schedule also intentionally inflated the liabilities that Barclays would assume as an integral part of the consideration it gave for Lehman's assets.  When these inflated liabilities were incorporated, but not disclosed, in the

deal described to the Court, the consideration that Barclays was supposed to give was thus significantly overstated.

60.    The 9/16/08 Financial Schedule sets out "liabilities" that Barclays would assume for "Comp" and "Cure" at $2 billion and $2.25 billion, respectively. (A. 31.) As Kelly revealed in his September 16 e-mail to Lowitt and Tonucci, however, the terms of the deal were based on a deliberate inflation of the assumed liability for compensation by "an extra $1 b[illion] of comp beyond our accrual[.]" (A. 37.)

61.    At his deposition, Kelly admitted that the "compensation" accrual had been inflated by $1 billion solely for the purposes of the transaction. (A. 14 [Kelly] 56:17-23, 109:23-110:4, 116:19-117:14.) Lowitt, too, admitted that the $2 billion accrual for compensation was not derived from Lehman's books, but was in fact an "agreed" number between Lehman and Barclays. (A. 19 [Lowitt] 212:23-214:18.) McDade asserted that the $2 billion number for "comp" was not even Lehman's accrual; it was, according to McDade at least, a number Barclays came up with. (A. 20 [McDade] 44:4-45:5, 73:14-18, 100:5-22, 105:3-8.) McDade, however, had no basis to determine whether $2 billion was a good faith estimate because he never saw any calculations from the Barclays "model." (*Id.* at 46:2-15, 100:10-101:20.)[34]

62.    At first, Kelly denied any knowledge about why the assumed liabilities were inflated. (A. 14 [Kelly] 60:15-61:11.) Later in his deposition, however, Kelly remembered that McDade had told him that $2 billion was for compensation liabilities was a "negotiated" amount. (*Id.* at 81:15-23.) Kelly denied any memory of details about this conversation, except that he claimed he did not ask McDade why this was being done. (*Id.* at 82:18-84:3.)

_____

[34] Barclays CFO Clackson denied that Barclays put together the $2 billion number. (A. 4 [Clackson] 75:24-77:7.)

63.     Moreover, the evidence demonstrates that Barclays knew the compensation accrual was just a plug number on the 9/16/08 Financial Statement, designed to make assets and liabilities appear to be balanced.  In fact, the evidence shows Barclays depended upon the compensation number being inflated.  Commenting on an assertion that the Asset Purchase Agreement required Barclays to pay $2 billion in bonuses based on the accrual on the 9/16/08 Financial Schedule, Barclays' Chief Financial Officer, Clackson, wrote to Ricci, Barclays COO, and complained that he had relied upon the compensation accrual being inflated by at least $650 million:

> This is a problem, they have $2bn in the agreement, I was relying on you guys telling me I needed $1.35bn which gave me $650m of the goodwill but the para[graph] below says we have to pay it the them/can't use[.]

(A. 54.)  Ricci, copying Archibald Cox on his reply, wrote:  "Never agreed to it.  Archie this is the problem.  We can't have this clause I don't think."  (*Id.*; *see also* A. 23 [Ricci] 52:25-54:15 ("We were hoping ... we wouldn't have to pay all of it"); A. 65; A. 54; A. 73.)  Thus, Barclays' own writings indicate it never planned actually to pay the full "assumed" liability for compensation.  (*See* A. 23 [Ricci] 35:6-38:13 ("What [w]e had agreed was that we would assume a liability related to compensation. . . . but we didn't agree that we would pay the whole thing out"), 125:4-20 (this was one way to achieve Barclays' desired "cushion" in the deal).)[35]

64.     And, as it turned out, Barclays failed to pay the full $2 billion in "bonuses" to Transferred Employees as called for in the Asset Purchase Agreement.  Barclays produced in discovery a spreadsheet purporting to show that, in the aggregate, it has paid to transferred

---

[35] Consistent with Clackson's desire for at least $650 million of inflation in the compensation accrual, Paul Exall (the Barclays executive in charge of coordinating the compensation to be paid to former Lehman employees who transferred to Barclays) was planning after the transaction on aggregate compensation of only $1.4 billion.  (*See* A. 121 at 2; A. 122 at 2; A. 9 [Exall] 199:24-201:12; A. 23 [Ricci] 38:14-40:16 ($1.35 billion was Barclays' estimate of what would have to be paid), 52:25-54:18.)

Lehman employees approximately          in compensation.          But Paul Exall,

Barclays' witness on compensation issues, testified that most of the entries on the spreadsheet

did not involve bonuses (as called for in Paragraph 9.1(c) in the Asset Purchase Agreement), but

rather related to severance payments (A. 9 [Exall] 110:22-115:18), base salary payroll (*id.* at

78:22-84:3), payroll taxes (*id.* at 124:22-125:6, 141:5-19, 151:15-23) and, in one instance, a

performance compensation arrangement with an individual trader. (*Id.* at 128:8-137:7.)

And an entry for          on the spreadsheet involves Barclays' compensating former

Lehman employees for Barclays' failure to declare and pay bonuses on time (not a form of bonus

for their work while at Lehman, but rather to make them whole for Barclays' post-closing

mistake). (*Id.* at 141:20-144:12.) While discovery has not yet been completed as to the

underlying documentary support for Exall's spreadsheet, by Barclays' admission the aggregate

amount of bonuses paid to transferred Lehman employees appears to be no higher than

(A. 137.)

65.     Likewise, the estimate of cure liabilities that the Court was told Barclays was

wildly inflated. In the end, Barclays admits it assumed only $238 million in contract cure

liabilities, out of the $2.25 billion shown on the 9/16 Financial Schedule and the $1.5 billion

figure that was presented to the Court. (*See* A. 136 (schedule of cure amounts paid by Barclays

with July 16, 2009 cover letter from Barclays' counsel describing it as showing "aggregate cure

payments").) Emails produced in discovery indicate that Barclays never, in fact, intended to

assume anything close to $1.5 billion or $2.25 billion in cure liabilities. (A. 71; *see also* A. 125.)

Similarly, although he denied a clear memory about the document at this deposition, notes made

by Cox on the 9/16/08 Financial Schedule refer to "$200 [million]" as an estimate for contracts

that would be "mission critical," providing further evidence that it was never Barclays' intention

**REDACTED**

to assume the $1.5 billion estimate the Court had been given for contract cure liabilities or the $2.25 billion shown on the 9/16 Financial Schedule. (A. 41; *see* A. 6 [Cox] 50:24-62:16.) No one, however, informed the Court that this estimate had no basis in reality.

66.     Kelly, who was involved in preparing the 9/16 Financial Schedule, conceded that the $2.25 billion liability for contract cure payables on the schedule overstated any reasonable estimate of that liability by as much as $1 billion, and said he brought this to McDade's attention during the week. (A. 14 [Kelly] 133:10-136:14.) Kelly testified that, when he told this to McDade, McDade replied "[w]e just left $1 billion on the table." (*Id.* at 136:2-14.) McDade claimed to have no recollection of this particular conversation (A. 20 [McDade] 94:10-96:8), although he did recall that through the week, in his dealings with Kelly and others, he learned the cure number was overstated and "kept moving down." (*Id.* at 96:9-20.)

67.     Documents Kelly created, or that were created for him, also show the deliberate inflation of both the compensation and cure liabilities as "transaction adjustments," not based on actual accruals.[36] (*See* A. 62 (email transmitting balance sheet on 9/18/08 at 5:32 p.m.) at 3 ($1 billion inflation as "transaction adjustment" for "compensation payable"; $383 million inflation of "trade liabilities"); A. 63 (email transmitting balance sheet on 9/18/08 at 7:27 p.m.) at 3 ($1.5 billion increase as "transaction adjustment" for "bonus payable"; $304 million increase for "trade liabilities"); A. 64 (email transmitting balance sheet on 9/18/08 at 11:33 p.m. GMT) at 3 (with $1.5 billion write-up for "bonus payable"; $286 million write-up for "trade liabilities"); A. 69

---

[36] McDade identified Kelly as the person "responsible" for calculating the potential liability for cure amounts (A. 20 [McDade] 49:8-17, 73:19-24, 97:14-98:2) and denied any knowledge about a deliberate inflation of assumed liabilities that these documents show. (*Id.* at 50:2-14.) In fact, McDade could not offer a single reason why the accrual for cure would need to be inflated. (*Id.* at 153:23-154:15.) And he vehemently denied ever discussing such a write up or seeing any work product that indicated the number had been written up. (*Id.* at 155:7-22.) He agreed, however, that if the liability for cure had been inflated it would be inconsistent with the deal. (*Id.* at 155:23-156:14.) McDade also acknowledged that, if the assumed liabilities were inflated, Barclays should have had to pay more in other consideration, including cash consideration for each inflated dollar. (*Id.* at 144:15-145:21.)

(email dated September 19, 2008 at 12:33 a.m. (4:30 a.m. GMT)) ($2 billion "transaction

adjustment" for "bonus payable" and $1.645 billion write up as "transaction adjustment" for

"Cure payments/accounts payable"); A. 47 at BCI-EX-00115130 (handwritten notes on 9/17/08

balance sheet showing "transaction adjustment" inflating compensation from $1.5 billion to $2

billion).)[37]

68.    In sum, the 9/16/08 Financial Schedule -- upon which the Sale Transaction was

based and described to the Court -- distorted the facts.  It understated by at least $5 billion the

consideration Barclays was receiving in the Sale Transaction and overstated by billions more the

consideration Barclays was giving in assumed liabilities.  With the undisclosed $5 billion

discount, and inflated liabilities equally hidden from view, the Asset Purchase Agreement and

associated 9/16/08 Financial Schedule gave the appearance that the transaction involved an

exchange of equal value, which is how the deal was described to the LBHI and LBI boards

earlier that day, or later, to the Court, where it was described as "a transaction where the assets

and liabilities matched."  (A. 20 [McDade] 159:23-160:20.)  That was not true.

## F.    The Distortions In The 9/16/08 Financial Schedule And The Asset Purchase Agreement Were Embedded In The Transaction Presented to the Court

69.    Berkenfeld saw the 9/16/08 Financial Schedule, and he initialed its final version

for use in the Sale Transaction on the same day he signed the Asset Purchase Agreement.  (A. 2

[Berkenfeld] 46:10-47:11.)[38]  However, no one told the lawyers that the 9/16/08 Financial

Schedule understated the value of the assets being transferred and overstated the liabilities

Barclays would assume.  (*Id.* at 63:14-64:25, 69:18-23, 70:10-71:2, 78:10-83:24.)

---

[37] LBHI was not able to obtain testimony from Kelly about all of these documents because he terminated his deposition before it was able to do so.  (*See supra* n. 32.)

[38] In fact, the 9/16/08 Financial Schedule is expressly referenced in one paragraph of the Asset Purchase Agreement.  Paragraph 9.1(c) governs Barclays' assumption of liability to pay 2008 bonuses to transferred Lehman employees and the amount of that liability is set forth in the referenced 9/16/08 Financial Schedule.  (A. 30, ¶ 9.1(c).)

38

70.     After the LBHI and LBI Boards approved the transaction, the Asset Purchase

Agreement, derived from the distorted schedule, was finalized, and signed by Berkenfeld for

Lehman and Gerald LaRocca for Barclays.  (A. 30.)  Nothing in the terms of the Asset Purchase

Agreement revealed the $5 billion discount or the overstated assumption of liabilities.  (*Id.*,

*passim; see also* A. 2 [Berkenfeld] 70:10-19, 122:17-123:2; A. 55 (email between Reilly and

Lowitt recognizing that discount is not reflected in the contract).)  On the contrary, the Asset

Purchase Agreement memorialized what appeared to be an equivalent exchange that provided

real value to the Sellers' estates.  As Berkenfeld testified, the Asset Purchase Agreement

indicated there was an essentially equal exchange of value with $70 billion of book value being

conveyed to Barclays.  (A. 2 [Berkenfeld] 107:21-112:25, 121:12-123:2, 242:12-21, 281:13-

282:5.)  Shapiro testified that he, too, believed the $70 billion "Long Position" described in the

Asset Purchase Agreement was a rough approximation of the value of the securities based on

Lehman's marks.  (A. 25 [Shapiro] 105:16-107:11.)[39]

71.     Paragraph 1.1(d) of the Asset Purchase Agreement (A. 30 at 6) defined the

"Purchased Assets" to include securities in various classes "with a book value on the date hereof

of approximately $70 billion," collectively defined as "Long Positions."[40]  This did not disclose

that the "book value" had, in fact, been discounted by about $5 billion.

---

[39]  Lowitt, who also was aware that $70 billion understated the "Long Positions" by $5 billion, denied that
he saw the Asset Purchase Agreement.  (A. 19 [Lowitt] 51:17-53:3.)  Tonucci, similarly aware of the discount, also
denied seeing the Asset Purchase Agreement before the closing.  (A. 26 [Tonucci] 41:15-23.)  McGee, identified by
some witnesses as a member of Lehman's deal team, testified that his familiarity with the Asset Purchase
Agreement is limited to Article IX, the paragraph dealing with compensation of Transferred Employees and that he
played no role in assessing the value of assets transferred to Barclays or negotiating the terms of the agreement
regarding the purchase of assets.  (A. 20 [McGee] 13:20-14:7, 22:13-23:6.)

[40]  Berkenfeld ascribed the difference between the $70 billion quantification of the "Long Positions" in the
Asset Purchase Agreement and the $72.65 shown on the 9/16/08 Financial Schedule to the fact that under the Asset
Purchase Agreement the $2.7 billion in mortgage backed securities that were going to Barclays were addressed in
separate sections of the agreement.  (A. 2 [Berkenfeld] 79:4-82:15; *see* A. 30 (Asset Purchase Agreement definition
of "Purchased Assets") at 6 (¶ 1.1(a) and (e)).)

72.     Paragraph 2.3 of the Asset Purchase Agreement (A. 30 at 11-12) described the liabilities Barclays was to assume under the Sale Transaction.  The "Assumed Liabilities" were to include, *inter alia*, "(b) all Liabilities of Seller [Lehman] under the Purchased Contracts arising after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code," "(c) all Liabilities assumed under Article IX" (*i.e.,* the provisions concerning compensation to Transferred Employees) and (i) approximately $69 billion in "Short Positions", *i.e.,* the liabilities associated with the Long Positions.  This did not disclose the inflation of the assumed liabilities.

73.     With regard to the Assumed Liabilities for Purchased Contracts, Paragraph 2.5 of the Asset Purchase Agreement, entitled "Cure Amounts," provided that, for a period of 60 days after Closing, Barclays would designate contracts relating to the assets purchased as either a Purchased Contract or not a Purchased Contract.  (*Id.* at 13.)  This provision, however, did not disclose that the obligation was premised on an inflated estimate.  (*See* A. 25 [Shapiro] 55:19-68:13 (describing genesis of the initial cure amount estimate).)

74.     With regard to the Assumed Liabilities "under Article IX," entitled "Employees and Employee Benefits" (A. 30 at 34-35), Barclays assumed, among other things, an obligation to pay transferred Lehman employees in a specified aggregate amount, *i.e.,* $2 billion in bonuses for their 2008 services to Lehman.[41]  In particular, Paragraph 9.1(c) of the Asset Purchase Agreement provided that the Purchaser "shall" pay to each Transferred Employee an annual bonus for the 2008 Fiscal Year that, in the aggregate, was equal to the amount reflected on the 9/16/08 Financial Schedule.  Under Paragraph 9.1(c), such bonuses were required to be awarded

---

[41]  Barclays also assumed certain obligations for severance, but in a separate provision (¶ 9.1(b)) not linked to the 9/16/08 Financial Schedule.  (*See* A. 30 at 34.)

on or before March 15, 2009, so that the aggregate amount awarded equaled the accrued "08 FY Liability" referred to in the Asset Purchase Agreement. The "financial schedule" referred to in this Paragraph 9.1(c) was the 9/16/08 Financial Schedule initialed by Berkenfeld. (A. 2 [Berkenfeld] 85:22-86:25.) Nothing in Paragraph 9.1(c) mentions that the compensation accrual on that schedule was inflated by $1 billion.

75. The Asset Purchase Agreement also described the consideration Barclays was to pay Lehman under the Sale Transaction, and included the various assumed liabilities. Paragraph 3.1 stated: "The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser." (A. 30 at 14.) The Cash Amount was defined as "an amount in cash equal to the sum of (i) $250 million, [and (ii – iv) the appraised value of the real estate assets in question, less reasonable market commission payable on Closing]." (*Id.*) This paragraph concluded, "[f]or illustrative purposes only, the parties note that as of the date hereof they expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned assumed commissions)." (*Id.*)

76. Paragraph 3.3 of the Asset Purchase Agreement contained a Purchase Price Adjustment, providing for post-closing adjustments to the Cash Amount that would allow Lehman to share in any upside in the value of the Long Position, up to a cap of $750 million, within the first year following the Closing, if Barclays unwound or sold a Position (defined as either a Short or Long Position under the Asset Purchase Agreement) and realized either a profit or loss. (*Id.* at 14.) If Barclays' profits exceeded its losses on such Positions, Paragraph 3.3 of the Asset Purchase Agreement provided a mechanism whereby Lehman would be paid some or part of such aggregate profits up to a cap of $750 million. (*Id.*) Barclays would keep the remainder of any profits made on the securities it was acquiring. Nothing in this "true-up"

clause revealed that, if a payment had to be made by Barclays, it would be funded by the cushion the discount and inflated liabilities provided.

77.     Thus, to an objective reader of the Asset Purchase Agreement, without independent knowledge of the discount and inflated liabilities, it appeared that, net of the consideration for appraised real estate, Barclays was giving Lehman approximately $70 billion in value in exchange for $70 billion worth of assets, as follows:

| Lehman Delivers | Barclays Delivers |
|---|---|
| $70,000,000,000 (Long Positions) | $69,000,000,000 (Short Positions) |
| | 250,000,000 (Cash) |
| | 750,000,000 (Potential True-Up) |
| $70,000,000,000 | $70,000,000,000 |

(*See* A. 30 at 6, 12 (¶ 2.3(i)), and 14 (¶¶ 3.1 and 3.3).)

78.     And, of course, if the assumed liabilities for compensation and cure had been real (not inflated) and were taken into account, the Sale Transaction could not have resulted in a gain for Barclays since those liabilities, if accurately stated, would have exceeded the balanced exchange, to Barclays detriment, between $3.45 and $4.25 billion.

**G.     The Court's Approval of the Sale Transaction**

79.     On September 17, 2008, the morning after the Asset Purchase Agreement was signed, LBHI and LB 745 LLC filed a motion seeking Court approval for the sale (the "Sale Motion").  The Sale Motion described the Sale Transaction and the Purchased Assets and stated that the sale was to be consummated on the terms and conditions set forth in the Asset Purchase Agreement.  (*See* A. 148 [Docket No. 60] at ¶ 5.)  The Sale Motion, of course, disclosed neither the discounted price nor the inflated assumed liabilities apparently known only to a small number of Lehman's executives.  A final version of the Asset Purchase Agreement was attached to the Sale Motion, including the $70 billion, book value, definition of "Long Positions" discussed

above.  The moving papers also broadly described the assumption of liabilities by Barclays ($2 billion for bonuses and, now, $1.5 billion for cure payments).  (*Id.* at ¶¶ 10, 14, 20.)

80.     Documents Barclays has produced show that Barclays gave high level attention to *how* the consideration was portrayed to the Court, with an emphasis on making the price appear as high as possible.  On September 17, 2008, Diamond wrote that "[i]t is very important to the bankruptcy court to see the larger number.  It is not credible and very harmful I think!! [t]o be seen trying to show lower."  (A. 49.)  Similarly, when Barclays CFO Clackson saw an internal analysis on September 19, 2008 indicating that the actual costs for compensation and cure liabilities would be in the range of $1.3 billion (which is far less than the Court was told), he responded by informing James Trevelyan that the "official line" would be that the compensation number related to "deferred plans" and the cure payments were "optional."  (A. 71.)[42]

81.     At the September 17 hearing, the purported value of the proposed Sale Transaction was first described to the Court when the Court was asked to approve a break up fee based on the full value of the deal.  (A. 148 [Docket No. 60] ¶¶ 15-18; A. 149 [Docket No. 352], 9/17/08 Tr. at 22:4-7.)  Among other things, the Court was told at the September 17 hearing, and apparently relied on the fact that as part of the value given by Barclays in the transaction, Barclays (i) would pay in the aggregate $2 billion to Lehman employees who transferred to Barclays and (ii) would also assume approximately $1.5 billion in contract cure costs.  The Court took these assumed liabilities, in full, into account in assessing the value of the sale to the estate.

82.     The discussion of the value of the deal was as follows:

> MR. MILLER:  Now, Your Honor, we are talking about a transaction that has, as I said, many parts.  But looking at it from the net of this transaction, there will be approximately

---

[42] Clackson followed the "official line," and called it that, at his deposition.  (A. 4 [Clackson] 167:20-169:12.)

1,700,000,000 yielded out of this transaction. …. And in the negotiations, quite properly, with all of the efforts that they have put into it, there was a request, almost a demand, for a break up fee. …

THE COURT: May I ask a question … about how to equate that break up fee and expense reimbursement with the purchase price? And I've attempted to assess the notional value of the transaction because in addition to the 1.7 billion dollars, there's a reference to 1.5 billion dollars in cure amounts and possibly as much as 2.5 billion dollars in certain employee related … severance expenses which may or may not be triggered …. How should I view the fair value of the overall transaction?

MR. MILLER: I think, Your Honor, if you start with the billion seven hundred million dollars [the amount paid for real estate assets], which is the cash component, … there will be an exposure for 2.5 billion in connection with the retention of these 10 to 12,000 employees. In addition to that, Your Honor, in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts, are estimated to be a billion five hundred million dollars. So we have four billion dollars right there, Your Honor. In addition, Your Honor, the purchaser is paying 250 million dollars for the goodwill of LBI. So there you have 4,250,000,000 dollars in that respect, Your Honor.

And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed. In addition, if this goes forward, there will be a support agreement for this interim period of two or three days where Barclays Capital will be on the premises, will be offering oversight and in the sole discretion, may be willing to advance some monies in the interim period.

(A. 149 [Docket No. 352], 9/17/08 Tr. at 22:8-24:17; *see also id.* at 36:8-12.)

83.     When debtor's counsel, unaware of the $5 billion discount in Barclays' favor or

the inflated liabilities, informed the Court that "looking at it from the net of this transaction, there

will be approximately 1,700,000,000 dollars yielded for Lehman out of this transaction" the

description indicated that, net of the real estate, the deal was a wash, just as the Boards had been

told the prior morning (*Id.* at 22) and just as the Asset Purchase Agreement misleadingly suggested.

84.     Two days later, at the Sale Hearing on September 19, the Court was told that the proposed transaction had changed somewhat.  Counsel for the Debtor stated that, while the assets being sold originally had a value of $70 billion because "the markets dropped"[43] the Sellers were now seeking to sell assets having a value of only "$47.4 billion."  (A. 150 [Docket No. 318], 9/19/08 Tr. at 47:19-48:4.)  Counsel also stated that Barclays would be assuming $45.5 billion in liabilities in connection with those assets.  (*Id.* at 48:5-7.)  Counsel also noted that Barclays still would assume the same cure amounts and employee compensation amounts as had previously been described.  (*Id.* at 48:11-15.)

85.     As counsel for the Debtor Ms. Fife described the new transaction:

> Let me try to summarize the changes that were made to the transaction.  In terms of the economic changes, they result largely because of the markets, unfortunately.  And from the time that the transaction was actually entered into till now, the markets dropped and the value of the securities dropped as well.
>
> So, originally, we were selling assets that had a value of seventy – approximately seventy billion dollars.  And today, Your Honor, we're only selling assets that have a value of 47.4 billion dollars.
>
> Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets.  So that has not changed from the original transaction.  There was an upside sharing in the original transaction.  There was going to be a true-up twelve months later on and that has been eliminated from this transaction.
>
> Barclays is still agreeing to pay the cure amounts on any leases that it assumes or that we assume and assign to it.  Barclays is also agreeing to the same employee compensation arrangements.  And it is also agreeing to pay the 250 million dollars of goodwill to LBI.

---

[43] In fact, the notional value of the deal had shrunk principally because the "types of assets and amounts of assets changed throughout the course of the week" and because a question of "title and/or possession" as to some of the assets precluded Lehman from being able to transfer them.  (A. 14 [Kelly] 126:2-128:15.)

(A. 150 [Docket No. 318], 9/19/08 Tr. at 47:20-48:15.)[44]

86.     And for the first time, the Court learned about -- but was not shown -- a so-called

"Clarification Letter" that the parties were working on:

> MS. FIFE:  Some other changes that were made to the contracts
> affect what are called purchase assets and what are excluded assets.
> There was some confusion as to which subsidiaries, if any, were
> being sold.  And we've clarified in a clarification letter which
> we're hoping to finalize and actually present to Your Honor
> whenever it comes down here.  But in that letter, we're going to
> clarify that the only subsidiaries that are being purchased by
> Barclays are Lehman Brothers Canada Inc., Lehman Brothers
> Sudamerica SA and Lehman Brothers Uruguay SA.  The latter two
> subsidiaries that I just referred to relate to a business that is called
> PIM, or Private Investment Management Business, which is a
> business that was not part of the original deal but is now being
> purchased by Barclays.

(*Id.* at 49:5-17.)

87.     There were no further discussions about the Clarification Letter at this hearing,

and it was not presented to the Court.  (*See id.* at 134:21-138:14 (Debtor counsel offers the Asset

Purchase Agreement and First Amendment into evidence).)  In fact, and as described in more

detail below, the Clarification Letter was not finalized until three days after the Sale Hearing

concluded.  And when it was finished, the misnamed "Clarification Letter" effected material

changes to the deal that purported to transfer to Barclays billions of dollars in additional assets

that went far beyond those authorized by the Court in the Sale Order based on the evidence

before it at the September 19, 2008 Sale Hearing.

---

[44] Indeed, the deal as presented to the Court at the Sale Hearing was supposed to be more favorable to the
Sellers than a "wash."  Leaving to one side the real estate, which was purchased at the assessed value, the Court was
told that Barclays would purchase $47.4 billion in assets, for which it would pay $250 million for goodwill and
assume liabilities of $45.5 billion plus cure and compensation liabilities of $1.5 and $2.5 billion, respectively.  Far
from conveying an immediate gain for Barclays, the deal as disclosed to the Court involved Barclays paying or
assuming liabilities that exceeded $9 billion, substantially in excess of the assets it was acquiring.

46

**H.** **The Use of the Repurchase Agreement To Convey $5 Billion To Barclays**

   **1.** **The Disclosed Use Of The Repurchase Agreement As A Funding Vehicle For LBI**

88.     While the Asset Purchase Agreement was being negotiated, signed and first presented to the Court for approval, LBI was able to keep its doors open through temporary financial support provided by the Federal Reserve.  In particular, after LBHI filed its bankruptcy petition, it kept its brokerage subsidiary, LBI, out of bankruptcy for a few days (based on instructions from the New York Fed) to avoid undue disruption in the financial markets and to enable support of the broker-dealer while Lehman's trading positions and brokerage accounts were unwound or transferred.  (*See* [Leventhal Decl.] ¶ 6-7.)[45]  To keep LBI viable over this short term, the New York Fed provided overnight financing in the form of a repurchase agreement during the early part of the week of September 15 (the "Fed Repo").  (A. 12 [Hraska] 27:11-28:24; A. 3 [Blackwell] 55:11-17.)

89.     As part of the Fed Repo, LBI had to post collateral to the Fed.  (A. 3 [Blackwell] 55:11-17; A. 12 [Hraska] 27:11-28:24.)  The Fed required LBI to post as collateral securities valued in excess of the principal amount of the cash the Fed advanced (effectively discounting the then-stated market value of the securities).[46]  By the night of Wednesday, September 17, the Fed had required LBI to post as collateral securities valued at approximately $50.62 billion in exchange for which the Fed advanced to LBI approximately $46.22 billion in cash.  (A. 151, Leventhal Decl. ¶ 9.)  This excess collateral reflected a $4.4 billion "haircut" on the market value of such securities.  (*See* A. 26 [Tonucci] 17:5-15; *see also* A. 34 (Fed haircuts on 9/15/08).)

---

[45]   The Declaration of Shari D. Leventhal In Support of Trustee's Motion for Entry of an Order Approving Settlement Agreement ("Leventhal Decl.") was filed with the Court in connection with the SIPA Trustee's motion to approve a December 2008 Settlement Agreement between SIPA, Barclays and JPMorgan Chase (A. 151 [Docket No. 387]), discussed in Section J below.

[46]   This excess collateral is referred to colloquially as the "haircut."

90.     When the Fed learned that Barclays was to buy Lehman's broker-dealer operations, it insisted that it be relieved of this short-term financing role and that Barclays instead provide financing to LBI.  (A. 151, Leventhal Decl. ¶ 7; *see also* A. 52; A. 53; A. 57.) This was accomplished through a Repurchase Agreement between Lehman and Barclays.  Under that agreement, Barclays agreed to provide LBI money so it could pay-off the New York Fed and terminate the Fed Repo.  (A. 12 [Hraska] 49:8-18, 61:5-20, 62:3-19; A. 16 [Kirk] 66:5-67:23.) Barclays' financing of LBI would then be effected in the Repurchase Agreement between Barclays and LBI, secured by the collateral that had secured the Fed Repo.  (A. 57; A. 15 [King] 56:16-21, 68:9-71:6.)

91.     On the morning of September 18, steps were initiated to effect the transition from the Fed Repo to the Repurchase Agreement.  First, the Fed's overnight financing was unwound, with LBI returning to the Fed assets it had transferred to LBI and the Fed returning to LBI the securities LBI had pledged as collateral.  Later that day, pursuant to the Repurchase Agreement, Barclays forwarded to LBI approximately $45 billion in cash and LBI was to post collateral valued at approximately $50 billion in securities, reflecting an approximate $5 billion discount, or "haircut," in the value of LBI's collateral.  (*See* A. 18 [LaRocca] 40:2-41:17; A. 12 [Hraska] 58:14-22, 60:15-61:4; A. 19 [Lowitt] 78:4-9, 138:18-139:3, 186:12-187:7; A. 22 [Petrie] 77:12-78:6; *see also* A. 79; A. 75 (haircut summary).)[47]

92.     Barclays e-mails produced in discovery, however, actually put the value of excess LBI collateral delivered to Barclays much, much higher.  In an e-mail dated September 19, 2008

---

[47]   Due to problems in transferring the collateral, by the close of business on September 18th LBI had only posted $42.9 billion in collateral to the Repurchase Agreement.  (A. 12 [Hraska] 56:18-57:7; A. 85.)  To make up the difference, LBI took a so-called "box loan" of $7 billion, which loan was provided by Chase and secured by an equivalent amount of securities held in Chase's "clearance boxes."  (A. 12 [Hraska] 52:16-54:13, 57:2-4; A. 66, A. 80, A. 96, A. 72.)  The full cash proceeds of this loan, *i.e.*, $7 billion, were to be given to Barclays as a replacement for the portion of collateral that could not be transferred on September 18.  (A. 12 [Hraska] 50:8-22.)

(12:04 P.M.) from Marty Malloy (a trader in Barclays stock loan area (A. 18 [LaRocca] 65:4-8)) to Gerard LaRocca (Chief Administrative Officer of Barclays) Malloy described the "Repo Cash amount" as "45.00" billion, and the total "Securities/Cash" Barclays received as collateral as "52.19" billion. (A. 77.) Thus, at least at that point, Barclays internally valued the "excess collateral" it had received at "7.19" billion, constituting a "margin" of "14%." (*Id.*)

93.     Other evidence supports the conclusion that the excess collateral in the Repurchase Agreement was in the range of $7 billion. (*See id.*) Not all of the collateral that was to be transferred from the Fed Repo on September 18th made it into the Repurchase Agreement. As noted, $7 billion of the collateral had to be replaced with cash from the Chase box loan. As for the collateral that was successfully transferred, Lehman placed a $42.9 billion value on those securities (A. 89; A. 88; A. 101; A. 12 [Hraska] 116:25-117:7.) The Bank of New York ("BONY") – the third party custodial agent actually charged with valuing the collateral in the Repurchase Agreement – valued the collateral at $45 billion. (A. 103 at 1; A. 114; A. 94.) Hraska testified that there were only minor discrepancies in the two lists of securities so any difference in value must have resulted from differing pricing methods employed by Lehman and BONY. (A. 12 [Hraska] 129:16-131:5; A. 126.) These documents support the conclusion that the amount of collateral transferred to Barclays under the Repurchase Agreement (cash and securities) was $52 billion, instead of $50 billion, which would mean it provided a $7 billion discount to Barclays.[48]

94.     Moreover, the evidence indicates that the collateral Lehman posted to secure the Repurchase Agreement was not only greater in amount, but also lower risk than the collateral that had secured the Fed Repo. Barclays provided Lehman with a list of so-called "excluded

---

[48] Certain Barclays witnesses, however, dispute these higher valuations. (See A. 15 [King] 72:25-74:4, 75:4-77:20; A. 29 [Yang] 28:6-30:25, 44:21-52:7.)

assets" which Barclays refused to accept as collateral, even though those assets had been used to secure the Fed Repo Barclays was replacing. (A. 12 [Hraska] 191:2-193:5; A. 7 [Denig] 52:5-15, 123:9-124:5; A. 60; *see also* A. 50 ("I think the Barclays folks picked the assets. I recall them saying they didn't want the auction securities …"); A. 59 ("The Barclays guys chose the assets we did not have anything to do with it.").)[49] In this way Barclays was able to exclude from the Repurchase Agreement $5 billion in so-called RACER securities and many securities backed by residential mortgage obligations, all of which were considered riskier or less secure than the substitute collateral that Lehman was required to post. (A. 12 [Hraska] 186:8-194:18; A. 7 [Denig] 139:11-140:8.) Thus, to assert (as some have) that Barclays "stepped into the shoes" of the Fed is not accurate. Barclays received a larger haircut and was secured by less risky assets.

### 2. The Undisclosed Manipulation of the Repurchase Agreement to Deliver the Discount to Barclays

95. The Repurchase Agreement between LBI and Barclays was described to the Court only as a means to continue short term financing so LBI could get through the week, not as a mechanism by which assets would be transferred to Barclays. (A. 149 [Docket No. 352], 9/17/08 Tr. at 23-24 ("And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing those repos to be settled and financed...").) However, by mid-week, the

---

[49] Petrie, who ran the repo desk for Barclays in the U.S., denied knowledge of this "exclusion list" and its import. (*See* A. 22 [Petrie] 106:24-110:4.) He also denied that Barclays sought to exclude from the collateral posted under the Repurchase Agreement certain assets that had previously supported the Fed Repo. (*Id.* at 110:5-112:4 (testifying about A. 70, which he received and which stated: "A list of the cusips to be excluded has been provided to ensure collateral we are not purchasing, is excluded in this transfer.").) Stephen King also disputed that the excluded asset list applied to the Repurchase Agreement. (A. 15 [King] 167:21-171:25.) Even so, the Lehman executives charged with transferring collateral to the Repurchase Agreement understood and applied this list to exclude select groups of assets from the Barclays financing. (A. 12 [Hraska] 191:2-193:5; A. 7 [Denig] 52:5-15, 123:9-124:5.)

NYI-4215277v1

Repurchase Agreement had become much more than an interim financing vehicle. Certain executives at Lehman and Barclays had decided to use the Repurchase Agreement not only for the purpose the Court had been told, *i.e.*, interim financing, but also as a mechanism to transfer discounted assets to Barclays.

96.     As Lowitt put it, the deal as consummated actually changed to center on the Repurchase Agreement:

> Q:     The deal ultimately becomes giving to Barclays the collateral that is in the repo, yes?
>
> A:     The deal was that Barclays would keep the collateral that was in the repo, and those were the assets that Barclays was going to take in the transaction.

(A. 19 [Lowitt] 47: 9-16; *see also id.* 138:18-139:3.)

97.     One thing never changed, however. Barclays was still getting the undisclosed, minimum, $5 billion discount that had been agreed at the beginning of the week. The only difference was the mechanism for doing so; now the Repurchase Agreement, described to the Court only as a short term financing device, was to be used as a conduit to give Barclays some $50 billion in assets in return for only $45 billion. Thus, the parties agreed that (i) LBI would default on the Repurchase Agreement and, (ii) when it did, Barclays would keep not only the $45 billion in collateral it held against the $45 billion in cash it had given LBI, but also the $5 billion "haircut," i.e., the discount, in the Repurchase Agreement.[50]

98.     The plan to use the Repurchase Agreement to deliver the discount appears to have had its genesis in an e-mail Reilly wrote on September 18th at 6:04 a.m. before Barclays and LBI executed the Repurchase Agreement. Reilly wrote to Lowitt, Gelband, Tonucci and Kelly,

---

[50]   Indeed, Stephen King (a Barclays managing director involved in risk management) testified that he understood even before the Repurchase Agreement was executed that there was going to be a default and he was planning even then for Barclays' receipt of the collateral and how to manage the risk associated with these securities once Barclays received them. (A. 15 [King] 78:22-92:3.)

suggesting that the Repurchase Agreement presented the best mechanism to deliver the "discount" to Barclays:

> I need some help resolving these issues today …
>
> 3) Not clear on the amount of block discount or how we make it happen. ***Defaulting on repo could be the best as discount could be taken from haircut.*** If not that then we need to give business an allocation of block discount so they can mark down the books tonight. Does this create a problem as it could tip the broker early? ***Would we rather have that be in the sale price tomorrow?***

(A. 58 (emphasis added).)[51]

99.    In the end, that is exactly what happened. On September 19, 2008, LBI was placed in liquidation, which constituted an event of default under the Repurchase Agreement. (A. 33 (Master Repurchase Agreement) at ¶¶ 2(a), 11; A. 68 (Notice of Termination).) Barclays issued a Notice of Default that afternoon. (A. 68.) That left in Barclays' hands not only $45 billion in collateral to offset the $45 billion in cash it had provided under the Repurchase Agreement, but also all of the excess collateral, the "haircut," of approximately $5 billion.[52] By Barclays' estimate, the excess collateral received was actually "$7.19 billion." (A. 77; *see also* A. 75 (Barclays' "haircut summary" indicating excess collateral of $7.17 billion); A. 90 (opening balance sheet spreadsheet circulated to Barclays executives, valuing Repurchase Agreement

---

[51]    Alex Kirk responded to this e-mail, saying that this "[t]hird question is definitely for cogs," referring to John Coghlan, who he copied on the email. (A. 58.) Coghlan, considered the most knowledgeable among senior Lehman management about repurchase transactions (A. 20 [McDade] 129:22-130:9; A. 16 [Kirk] 90:10-19; A. 10 [Felder] 84:17-85:8, 86:24-87:2, 126:21-127:9), repeatedly denied any knowledge or memory about this email chain, the "discount," or the use of a default on the Repurchase Agreement to provide it, which suggests he may have been deliberately bypassed on the question, despite Kirk's suggestion. (A. 5 [Coghlan] 66:17-67:15, 152:19-22, 154:4-7, 165:9-22, 177:22-178:10.)

[52]    At the time, this approximate $50 billion in collateral was still in the form of $42.9 billion in securities plus the $7 billion in cash provided through the box loan from Chase.

assets at $44.8 billion (securities) plus $7 billion (cash), A. 93 (same); A. 102 (same).)[53]  This pivotal event was not disclosed to the Court at the Sale Hearing conducted on the very same day.

100.    The undisclosed decision to use the Repurchase Agreement to deliver the discount conveniently solved a problem people within Lehman were having trying to make the discount retroactively fit into the Asset Purchase Agreement.  As discussed above, the original plan was for Lehman to mark down its books to reflect the negotiated price.  (*See* ¶¶ 20-38.)  Reilly had spotted a problem with this plan:  the Asset Purchase Agreement did not *provide* for a discount from book value:

> I went thru all docs and did not see reference to the price haircut.
> If we want conservative marks to reflect block nature we need to
> know how much and then can allocate to most logical assets.

(A. 55.)  In response, Lowitt commiserated: "Since not in contract [it is] hard to see what to d[o]." (*Id.*)

101.    Reilly's suggestion that "d]efaulting on [the] repo could be the best as [the] discount could be taken from the haircut" solved the problem (at least from a process if not from a legal point of view) that the Asset Purchase Agreement did not provide for marking down the books.  Thus, Lowitt testified that the "asset by asset level" project to mark down the books was not completed because:

> I think the transaction changed when the repo was effected and
> because the repo was effected the transaction itself changed.

(*See* A. 19 [Lowitt] 129:9-130:5.)

---

[53]  Not surprisingly, Barclays' witnesses now try to walk away from these estimates and question the actual value of the securities posted as collateral under the Repurchase Agreement.  (*See* A. 15 [King] 72:25-74:4, 75:4-77:20; A. 29 [Yang] 28:6-30:25, 44:21-52:7.)  But even King admitted that the Repurchase Agreement was adequately collateralized (A. 15 [King] 99:14-100:7, 76:20-77:20) and at the time he wrote to Ricci that "the current best estimate is the portfolio inc 7 billion cash is 48.5 to 49 billion." (A. 108; A. 23 [Ricci] 172:16-173:25.)  In the end, Barclays own conduct in going forward with the Repurchase Agreement confirms that it was comfortable with the value of the collateral at the time.

102.    In essence, the Repurchase Agreement *became* the Sale Transaction by

September 19, although nothing before the Court at the Sale Hearing indicated that fact.  Lowitt

testified:

> I think what was clear on the Friday, in part because of the
> difficulties that we have talked about, but also because the repo
> was now in place, that the repo represented – was part of what any
> new transaction was going to be and that what you had in the repo
> addressed many of the operational questions that we were not sure
> how to address, which was which of the assets Barclays was going
> to acquire, because clearly the ones in the repo became the basis of
> what they were going to acquire, as well as what was the financing
> haircut associated with that.

(*Id.* at 135:17-136:10.)

103.    The "financing haircut" to which Lowitt referred was the excess collateral

Lehman had pledged in the Repurchase Agreement above the $45 billion Barclays had given for

the assets.  Thus, whether by coincidence or design, this excess collateral made defaulting on the

Repurchase Agreement a handy substitute for delivering the still undisclosed discount to

Barclays.  Testifying about Reilly's proposal that "[d]efaulting on [the] repo could be the best as

the discount could be taken from the haircut" (A. 58), Lowitt said:

> Again, I don't have a recollection of this on the Thursday, but in
> reading the e-mail here, you know, what Jerry is suggesting is that
> the repo transaction is a way in which we could deliver collateral
> to Barclays and that, as a basic concept, ***the financing haircut is a
> similar concept to the item we were talking about earlier, which
> is Barclays buying collateral for less than the marks to reflect the
> size of their purchase and the volatility of the underlying assets.***

(A. 19 [Lowitt] 137:14-138:4 (emphasis added); *see also id.* at 138:18-139:3.).)

104.    Lowitt was not the only witness to concede that the Repurchase Agreement was

employed to ensure that Barclays got its extra $5 billion.  Tonucci testified:

> Q:    Would it also be fair to say, therefore, that the discount was
> embedded in the haircut on the repo transaction?

> A:    In a repo transaction there is a haircut, a difference between the market value and the cash value received.  You could view that as a discount.  *I think in this case it is fair to say that was the settlement mechanics and therefore the way that the differences between market value and cash paid was accomplished.  There was in that sense a discount.*

(A. 26 [Tonucci] 32:4-34:18 (emphasis added).)

## I.    The Last Minute Search For Even More Assets To Give To Barclays

105.    The delivery of excess Lehman assets to Barclays did not end with the delivery of billions in extra collateral in the Repurchase Agreement.  As Lowitt testified, he was instructed on the morning of Friday, September 19, to search for billions more in "additional value" to transfer to Barclays.[54]

### 1.    Barclays' Demand For More Assets

106.    That morning, Lowitt was instructed by both his present and future bosses, McDade and Ricci, in separate meetings, "to identify potential sources of value" to transfer to Barclays that would be "elements" of a different deal than the one that had been reached on "Monday and Tuesday."  (A. 19 [Lowitt] 59:7–61:23.)  These were assets over and above the assets in the Repurchase Agreement.  (A. 20 [McDade] 138:18-140:25; (A. 26 [Tonucci] 118:5-22, 119:9-18; A. 23 [Ricci] 172:16-173:25.))  Lowitt claimed he was not told why it was necessary to locate more assets to transfer (A. 19 [Lowitt] 60: 10-16), but he knew it was

---

[54]    Some of these additional assets were turned over to Barclays on Friday, September 19, apparently as part of the then existing Repurchase Agreement.  As James Hraska (the Lehman executive in charge of transferring the collateral under the Repurchase Agreement) explained, due to Lehman's inability to transfer on September 18 all the expected $50 billion in collateral LBI was forced to provide to Barclays $7 billion in cash, which it obtained through the "box loan" from Chase.  (A. 12 [Hraska] 50:8-22, 53:13-54:10, 57:2-4.)  On September 19, Hraska (apparently acting on his own) transferred an extra $1.035 billion in securities to Chase (which, in turn, was supposed to transfer it to Barclays).  Hraska hoped to secure the return of that amount of cash to pay off part of the box loan.  (*Id.* at 49:19-51:18, 102:7-103:24, 104:15-105:7, 252:7-260:15, 264:23-265:8.)  But the $1.035 billion in cash was not returned to LBI and the outstanding amount LBI owed Chase under the box loan was not returned as Hraska expected.  (*Id.* at 50:23-53:16, 102:7-103:24.)  Over the weekend (and continuing after the September 22 closing), this $1.035 billion in securities made its way onto Schedule B of the Clarification Letter, which (as noted below) reflected so-called "unencumbered assets" transferred to Barclays.  (*Id.* at 47:12-17, 139:23-148:4, 222:13-20, 241:11-242:11, 306:22-308:2; A. 127.)

"important" and worked on the project "on the Friday and through the weekend." (*Id.* at 63:24-64:8; *see also id.* at 64:17-65:2, 148:8-16 ("The whole exercise of identifying additional collateral, which as we talked about was a result of a conversation with Bart as well as with Rich Ricci, was a very important exercise for us on the Friday, which is why I think I would have talked about it in this way.").)

107.     According to McDade, Barclays demanded this 11th-hour addition of more assets because it was "uncomfortable with the new aspect of what they now had . . . agreed upon." (A. 20 [McDade] 164:23-165:13; *see* A. 16 [Kirk] 65:24-67:18; A. 23 [Ricci] 156:9-157:22 (He became "uncomfortable" because he believed Barclays did not have enough "cushion" in the transaction given market uncertainties).) McDade asked Kirk to help with this issue. (A. 16 [Kirk] 43:25-45:10.) Kirk worked with Lowitt, Tonucci and Kelly to satisfy Barclays' demand for more. (A. 20 [McDade] 164:23-165:21; *see also* A. 19 [Lowitt] 60:10-63:14; A. 26 [Tonucci] 54:24-56:20; A. 14 [Kelly] 129:6-130:2.) Kirk testified that Barclays, at about 3 p.m. on September 19, demanded still more value from Lehman. (A. 16 [Kirk] 100:10-101:6.) Asked about this demand at his deposition, Barclays President Diamond was steadfastly unwilling to answer one way or the other whether Barclays demanded more assets, preferring instead to suggest that Lehman was "scrambling," apparently spontaneously, to add more value for Barclays. (A. 8 [Diamond] 129:11-136:15.) Barclays advisor Michael Klein, however, testified that he was instructed by his client "to go in and express that we needed more assets." (A. 17 [Klein] 94:3-18.)

108.     Although Barclays said there was a "shortfall," when it made its last minute demand it did not even say how *much* difference had to be made up, only that, without more, it would not close. (A. 16 [Kirk] 101:7-102:24; A. 23 [Ricci] 121:8-123:5; *see* A. 17 [Klein] 95:2-

97:20.) McDade could not remember giving any target this team had to reach, only that "[i]t was very clear that Barclays still wanted more value in terms of assets." (A. 20 [McDade] 172:2-22.) Ultimately, it appears the only real goal was to keep adding assets until Barclays, which had decided for itself that there was an unspecified "shortfall," either pronounced itself satisfied or Lehman had nothing left to give. (A. 16 [Kirk] 112:10-24; A. 20 [McDade] 174:18-175:17.) Kirk wrote to McDade that Ricci, one of Barclays negotiators "just told me he won't blow up the deal by being a pig." (A. 81; see A. 16 [Kirk] 185:24-189:14.) Ricci explained that, when Kirk told him there were no more available assets to give, he told Kirk "we're not going to be pigs and go after every last nickel." (A. 23 [Ricci] 158:4-159:8.)[55]

### 2. The Scramble For Assets To Satisfy Barclays' Demand

109.    In their search for additional value, Lowitt and the others apparently scoured all possible sources. Lowitt kept McDade abreast of his progress in the hunt for extra value. (*See* A. 78 ("CLS money all snarfed up by Citi. The 15c3 lock up looks ok at $1.3 bn. Good faith not. So we are short $1.7 bn. The TBA and FX settlement did not work. We did find $5 bn of exchange listed options which we are investigating"); *see also* A. 19 [Lowitt] 151:2-5 ("Q: So you're basically looking in every corner for this extra value, right? A: We were looking in a number of places to determine – to find extra value."); A. 26 [Tonucci] 54:24-56:20; A. 14 [Kelly] 128:16-130:15.)[56]

---

[55] Lowitt remembered he was given a "target" by McDade of $3 to $4 billion that had to be identified, but, remarkably, he did not remember if he asked why this huge amount was necessary. (A. 19 [Lowitt] 62:16-63:8.) Documents Lowitt generated at the time support his testimony that he was looking for $3 to $4 billion more. (*See* A. 78.) ("The 15c3 lockup looks ok at 1.3 bn . . . so we are short 1.7 bn"); *see also* A. 19 [Lowitt] 151:2-9 ("my recollection is between 3 and 4, and the math here in A. 78 suggests that what we were targeting was $4 billion."); A. 26 [Tonucci] 203:23-204:10 (expectation after Friday's court hearing was $3 billion in unencumbered and 15c3-3 assets).)

[56] Lehman executives also searched in the so-called "clearance boxes" maintained for its benefit by JP Morgan Chase and other entities, such as the Depository Trust Corporation. Lehman executives also performed detailed "depot analysis" and database reviews to try to locate assets that could be sent to Barclays. (A. 98

57

110.     Lowitt and his colleagues, who continued their search into the weekend after the

Sale Hearing (A. 19 [Lowitt] 152:19-153:4), located assets in (i) a so-called "15c3 lock up," *i.e.*,

funds no longer needing to be segregated with respect to customer accounts, and (ii) other

"unencumbered collateral in LBI." (*Id.* at 59:17-60:2.)  According to Lowitt, these sources of

additional value totaled at least $2.7 billion more for Barclays:

> Q:     And what, as best you recall, is the value of those
> additional elements, dollar value?
>
> A:     The dollar value of the unencumbered collateral was in and
> around $2 billion, and, you know, the 15c3 excess, my
> understanding of the deal that was reached vis-a-vis the 15c3
> excess was round $750 million to 800 million dollars.

(*Id.* at 60:3-9; *see* A. 97 (September 20 update on search of assets); A. 100 (identifying $2.3

billion in potentially transferable assets).)

111.     The so-called "15c3-3 lock-up" involves a regulatory requirement that brokerages

keep on hand assets sufficient to cover a specified percentage of their customer portfolio.  During

this period, Lehman was recalculating this number over the weekend of September 20-21.  (A. 3

[Blackwell] 139:214-140:11.)  Over this weekend, Lehman executives tried to determine

whether, due to the decline in the value of many of their customer accounts, there were extra

such assets they could free up to give to Barclays.  In the end, they promised Barclays an

additional $769 million in 15c3-3 securities to the extent there was an available excess.  (*See* A.

---

(continued…)

(Lehman's 9/21/08 "depot analysis"), A. 99; A. 12 [Hraska] 48:9-12, 107:18-108:5, 212:5-215:23; A. 7 [Denig]
64:17-65:18, 105:10-108:14.)

58

NYI-4215277v1

23 [Ricci] 165:18-25; A. 32 ¶ 8 (valuing 15c3-3 assets at $769 million and directing their transfer to Barclays), A. 119 (same), A. 84; A. 93; A. 76; A. 113; A. 107; A. 109-112.)[57]

112.　In addition, Lehman executives foraged on Friday, and over the weekend after the Sale Hearing, for so-called "unencumbered assets," *i.e.*, assets that had not been pledged for other purposes and therefore could be given to Barclays. (*See* A. 12 [Hraska] 34:14-19; A. 115; A. 116; A. 100; A. 117; A. 87; *see also* A. 12 [Hraska] 50:23-51:18, 145:13-21, 296:11-19.) This extra value totaled at least $1.9 billion, although some evidence puts the total as high as $2.3 billion. (A. 12 [Hraska] 223:4-14, 267:19-270:18, 293:9-300:2, 304:17-308:2; A. 23 [Ricci] 164:16-165:25 (on Friday, Ricci and McDade agreed that Barclays would accept $1.9 billion in "additional assets"); A. 91 ("Goal is 1.9 billion in unencumbered"), A. 92 (same), A. 95; A. 132; A. 67; A. 100; A. 127; A. 118.)

113.　The seemingly final list of unencumbered assets that were either transferred to Barclays (or to which Barclays now claims ownership) was assembled over the weeks following the closing. Tellingly, the list of these additional assets later filed with the Court listed no market values (Docket No. 2303), although prior versions had contained such information. The list, with the market values removed, was also filed under seal (*see* Docket Nos. 430, 2303). Even now, apparently, Barclays (and the transferred Lehman executives who now work at Barclays) has not given up the hunt for still more assets. As recently as July 2009 a search has been directed at locating more securities to substitute for assets Barclays claims it should have received. (A. 12 [Hraska] 145:13-21, 245:5-246:20, 296:11-19.)[58]

---

[57] Only the securities, and not cash from the 15c3-3 lock-up, were committed to Barclays, ostensibly to comply with representations made to the Court at the September 19 hearing. (A. 150 [Docket No. 318] 9/19/08 Tr. at 54:24-25 ("There's no cash that's being transferred to Barclays").)

[58] Hraska testified that the Barclays has identified around 800 CUSIPS from Schedule B that have not been transferred to Barclays (A. 12 [Hraska] 157:4-17), and from October 2008 through July 2009 Barclays has been trying to identify additional unencumbered assets that could be transferred from Lehman to Barclays as

114. In addition to the 15c3-3 assets and unencumbered assets, over the weekend, Lehman executives also looked into certain margin accounts maintained by Lehman at the Options Clearing Corporation ("OCC") as yet another possible source of assets. (*See* A. 78 ("We did find $5 bn of exchange listed options which we are investigating"); A. 106; A. 105; A. 78; *see also* A. 11 [Fleming] 132:21-133:11, 137:6-138:3.) Lehman's account statements showed that these margin accounts contained excess assets. (A. 120.) In the execution copy of the Clarification Letter, prepared several days after the Sale Hearing, the parties added for the first time a clause (A. 32 at ¶ 1(a)(ii)(C)) purporting to authorize the transfer to Barclays of those assets, too, totaling an additional $2.3 billion worth of securities and cash. (*See* A. 134 (valuing OCC assets to be transferred at $2.3 billion).) McDade claimed no one even told him about this multi-billion dollar addition to the deal. (A. 20 [McDade] 275:3-278:4.)

### 3. The Net Effect of the Search for Additional Value

115. By Saturday, September 20, Lowitt apparently thought his asset search team had met its goal. He wrote to Tonucci and Berkenfeld to thank them for their help in "getting us over the goal line." (A. 86.) Even then, however, he urged Tonucci (who, like Lowitt, had a lucrative job offer from Barclays) to "stay close" to ensure the assets made their way to their future employer, Barclays, because: "If we don't succeed *you and I are toast* despite our heroics." (*Id.* (emphasis added).)[59]

116. Lowitt's concern that he and Tonucci would be "toast," as it turned out, was a phantom concern. The billions more in additional value was delivered to Barclays, allowing

---

(continued…)

substitutes. (A. 12 [Hraska] 145:13-21, 245:5-246:20, 296:11-19.) He estimated that Barclays claims it is still owed about $600-700 million in such securities. (*Id.* at 246:24-247:9, 224:23-225:12.)

[59] Lowitt claimed that when he wrote "you and I are toast" to Tonucci he actually meant he was expressing concern for the "whole franchise and all the employees of Lehman Brothers[.]" (*see* A. 19 [Lowitt] 177:21-178:11.)

Barclays' advisor Michael Klein (who had made the demand that led to the addition of the 15c3 assets and the unencumbered assets) to crow, in an e-mail to Barclays' CEO Bob Diamond sent in the early morning of September 20, shortly after the Sale Hearing ended:

> Great day.
>
> *We clawed back 3B more of value in the transaction* and cut the building prices by 160 mm.

(A. 82 (emphasis added).)

117.    Klein was unduly modest.  In the end, with this $2.7 billion in additional value identified on September 19 over the following weekend, plus the additional $2.3 billion in OCC assets, plus the at least $5 billion in excess collateral extracted through the Repurchase Agreement, the transaction bore little or no relation to the exchange of equivalent value the Court was told about at the Sale Hearing, where none of these critical additions in Barclays' favor was disclosed.  As Kirk conceded at his deposition, "[t]his transaction was very different than what had been previewed [to the Court] two days before, and it would have to be explained why it came up."  (A. 16 [Kirk] 82:18-83:25; *see also* A. 19 [Lowitt] 59:7-60:16.)  But it never was explained to the Court.  At the Sale Hearing on September 19, there was no description given of the frantic search for assets going on back at Lehman's offices even while the hearing was going on.

**J.    The Material Changes To The Sale Transaction In The "Clarification Letter," Finalized After The Sale Order Is Entered**

118.    After the Court approved the Sale Transaction on September 19, and after it issued the Sale Order, Barclays and Lehman executives decided to materially alter the written terms of the Sale Transaction over the weekend after the Court issued the Sale Order.  On or about September 22, 2008, at the closing, the parties to the Asset Purchase Agreement executed the "Clarification Letter," dated "as of September 20, 2008," which, despite its benign name,

61

purported to make fundamental changes to the deal that had been presented to the Court. The Clarification Letter was never put before the Court for approval. It was simply filed, as an exhibit, without explanation, in the afternoon of September 22, along with the Asset Purchase Agreement and a First Amendment that the Court *had* seen and approved at the hearing. (Docket No. 280.)

119.   Among other things, the Clarification Letter completely changed the definitions of "Purchased Assets," including for the first time the securities transferred a few days before under the Repurchase Agreement. In this major change, all references to the "Long Positions" to be sold under the Asset Purchase Agreement were now erased. Instead, the definition of "Purchased Assets" was changed to include "the securities owned by LBI and transferred to [Barclays] or its Affiliates under the Barclays Repurchase Agreement . . . as specified on Schedule A previously delivered by Seller and accepted by [Barclays]. (A. 32 at ¶ 1(a)(ii).)[60]

120.   The post-hearing Clarification Letter also purported to add to "Purchased Assets" the "additional value" that Lowitt, Kelly and Tonucci had scrambled to assemble on September 19, while the Sale Hearing was going on and during the following weekend. These unauthorized additions to the deal made their way into the revised definition of "Purchased Assets" as "(B) such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B

---

[60] This erasure of the "Long Positions" and substitution of the assets transferred under the Repurchase Agreement first emerged in a draft of the Clarification Letter generated on September 20, 2008 at 2:39 p.m., after the Court issued the Sale Order. (A. 83 ¶ 1(a).) In a draft the prior evening, at approximately 7:30 p.m., the Clarification Letter still included the "Long Positions," but stated it was "understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion." (A. 74 ¶ 1(a).) Of course, a "book value" of $70 billion had never been correct; the purchase price of $70 billion had been agreed to reflect the $5 billion discount from the actual book value.

previously delivered by Seller and accepted by [Barclays] . . ." (A. 32 at ¶ 1(a)(ii).)[61]  The

Clarification Letter also now contained a post-hearing reference to "exchange-traded derivatives"

that purported to enable the transfer of the OCC margin accounts.

121.    Finally, to put the finishing touches on the switch from the disclosed transaction

to the different transaction that had actually closed, the Clarification Letter purported to

terminate the Repurchase Transaction retroactively.  Paragraph 13 of the letter provided:

> Barclays Repurchase Agreement.  Effective at Closing, (i) all
> securities and other assets held by Purchaser under the September
> 18, 2008 repurchase arrangement among Purchaser and/or its
> Affiliates and LBI and/or its Affiliates and the Bank of New York
> as collateral agent (the "Barclays Repurchase Agreement") shall be
> deemed to constitute part of the Purchased Assets in accordance
> with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be
> deemed to have no further obligations to each other under the
> Barclays Repurchase Agreement (including, without limitation,
> any payment or delivery obligations), and (iii) the Barclays
> Repurchase Agreement shall terminate.  Additionally, the Notice
> of Termination relating to the Barclays Repurchase Agreement
> dated September 19, 2008 is hereby deemed rescinded and void *ab
> initio* in all respects.

(*Id.* at ¶ 13.)  With this effort to make the Repurchase Agreement disappear, the Clarification

Letter purported to give *all* the collateral in the Repurchase Agreement -- including all the excess

collateral -- to Barclays.  Along with the change in the definition of Purchased Assets, this

effectively awarded to Barclays, at no additional cost, the excess collateral LBI had posted in

connection with the Repurchase Agreement.

122.    In total, these post-Sale Order modifications, which were never explained to the

Court, resulted in Barclays receiving (i) at least $5 billion, and perhaps as much as $7 billion, in

excess collateral from the Repurchase Agreement, plus (ii) at least $2.7 billion in "additional

---

[61]  This change, too, did not exist in any draft of the Clarification Letter until the Saturday after the Sale
Order was issued.  (*See* A. 74 at ¶ 1(a).)

value" in 15c3-3 and "unencumbered assets" that Lowitt, Tonucci, Kelly, and Reilly had located on September 19th to throw into the deal, plus (iii) a further $2.3 billion in securities and cash located in OCC margin accounts.

## K.     The December 2008 Settlement Agreement

123.    The failure to make full disclosure about the changes effected by the Clarification Letter did not end with the September 22, 2008 closing.  Indeed, it was only through operation of a December 5, 2008 "Settlement Agreement" that Barclays was able to collect some of the proceeds of the undisclosed deal.  At the hearings on that settlement, which was purportedly to resolve Barclays' assertion that it did not receive assets it was supposed to get under the Sale Order, no disclosure was made about the excess assets Barclays previously had obtained.[62]

124.    The parties had experienced logistical problems in transferring to Barclays on the night of September 18 all $50 billion of the collateral contemplated under the Repurchase Agreement.  (See 151 [Docket No. 387] Leventhal Decl. ¶¶ 13-14.)  To correct the situation, they agreed on September 19, 2008 that LBI would pay Barclays $7 billion in cash to complete the transaction, provided by the Chase "box loan."  But, for reasons that are irrelevant here, Chase did not transfer that $7 billion into Barclays' account.  Barclays claims that it first realized this after it had closed the Sale Transaction on September 22 and after it had signed the Clarification Letter.  (See Leventhal Decl. ¶¶ 19-21.)[63]  Accordingly, Barclays sought the assistance of the Fed

---

[62]  LBHI is not a party to the Settlement Agreement.  LBHI's counsel explained to the Court that, among other things, there were questions about assets transferred to Barclays about which discovery might be needed.  (A. 152 [Docket No. 2420], 12/22/08 Tr. at 32:6-34:21.)  At the hearing, the Court itself observed that additional factual inquiry would be appropriate about assets transferred under the Sale Order.  (Id. at 50:8-52:7.)

[63]  Notably, the Clarification Letter never mentioned the parties' purported agreement to transfer this $7 billion to Barclays.  (See A. 32.)  One would have thought that a document purporting to "clarify" issues associated with the Asset Purchase Agreement would have at least mentioned an agreement of this magnitude.  Rather, the first mention of this agreement in Court filings was in the motion to approve the December 2008 Settlement.

in securing delivery of the collateral and cash it says it was supposed to have received. (*See* Leventhal Decl. ¶ 21.)

125.    A December 5, 2008 Settlement Agreement between Barclays, Chase and LBI (which LBHI did not sign) reflects the purported resolution of these matters. Pursuant to that agreement, certain securities held by the Fed (listed in Annex A to the Settlement Agreement), plus $1.25 billion in cash (A. 151 [Docket No. 387]), were transferred to Barclays, along with an additional $7.1 million in cash representing proceeds of securities that were inadvertently liquidated by Chase. (Leventhal Decl. ¶ 22; *see also* A. 133 (showing value of securities was $5.99 billion on 9/30/08.) This cash and securities came from LBI's account at Chase. And Chase agreed to release a lien it held on the account to effect this settlement.[64]

126.    Evidence developed in discovery shows that Barclays was anxious to reach the Settlement Agreement with knowledge that there was a risk that its use of the Repurchase Agreement to purchase $50 billion in collateral for only $45 billion would be exposed. An October 11, 2008 letter from the CEO of Chase to John Varley, Barclays Group CEO, noted that the Court had not been apprised of this exchange. (A. 128.) And it appears also to have been important to Barclays that LBHI be kept in the dark about the settlement while it was being negotiated. In an email sent in November 2008, Barclays' counsel chastised counsel for Chase about the fact that settlement negotiations had leaked to LBHI, asking "When did Chase tell

---

[64] Among other things, the Settlement Agreement is not consistent with the Clarification Letter itself. The Clarification Letter provided for the elimination of all obligations under the Repurchase Agreement. It stated: that "Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations)." (A. 32.) Notwithstanding this express disclaimer of any further obligations under the Repurchase Agreement, Barclays later sought (with the active help of the Fed) to enforce some of the terms of the "terminated" Repurchase Agreement. Thus, a provision intended to insulate Barclays from future claims relating to this repurchase agreement (and which, under its terms, should also have provided protection to Lehman) was ignored once Barclays realized it needed to reopen this issue.

65

LBHI of a settlement, what was said and why was this done? This could be quite explosive as to Barclays Capital." (A. 129.)

**L.    The Net Effect Of The Undisclosed Deal Modifications**

In the end, the value of the securities and cash ultimately transferred to Barclays under the post-Sale Order modifications was far in excess of what Barclays was supposed to receive under the sale transaction as it was described to and authorized by the Sellers' boards of directors and as it was described to and approved by the Court. The machinations undertaken to transfer additional assets to Barclays (after the Court had approved the deal) had the net effect of causing an undisclosed transfer to Barclays of property from the Sellers' estates. That property appears to have been between $8 billion and $10 billion of value, to the substantial detriment of the creditors of those estates.

## ARGUMENT

**I.    BARCLAYS' RECEIPT OF VALUE IN EXCESS OF WHAT THE COURT AUTHORIZED IS INCONSISTENT WITH THE BANKRUPTCY CODE AND SHOULD BE REMEDIED**

127.    The very underpinnings of Chapter 11, and the principal aim of the Bankruptcy Code itself, require that both the value of the estate and return to the creditors be maximized. *See Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (Chapter 11 "embodies the general Code policy of maximizing the value of the bankruptcy estate"); *In re Enron Corp.*, 284 B.R. 376, 405 (Bankr. S.D.N.Y. 2002) ("one of the principal aims of the Bankruptcy Code is to maximize value for creditors"), *abrogated by In re Enron Corp.*, 317 B.R. 629 (Bankr. S.D.N.Y. 2004.); *In re Ngan Gung Rest.*, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000) ("clear purpose" of Chapter 11 is "to maximize value for the general benefit of all creditors" (citation and quotations omitted)); *In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL 2244602, at *5 (Bankr. S.D.N.Y. July 28, 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate.")

(citing *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992)); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 976 (N.D. Ill. 1992) ("Bankruptcy is a collective proceeding, one in which creditors divide claims while the court attempts to maximize the total value of the assets."). With having transferred estate property to Barclays that was as much as $8.2 billion, and perhaps more, above the amount disclosed to and approved by the Court, the mandate of Chapter 11 of the Code cannot be met unless that excess amount is returned to the Sellers' estates.

128. The urgency attendant to the sale to Barclays does not excuse this mandate. The Sellers, the Court and the creditors acted in what they thought was the best interests of all the stakeholders, but they were kept in the dark about the ultimate structure and true economic impact of the Sale Transaction. Acting on the information presented to them, the boards of directors of the Sellers authorized the sale, and the Court approved the sale under Section 363(b) of the Code, based on the premise that the transfer of LBI's cash and securities to Barclays was at least a "wash" – *i.e.*, that while the net value of the cash and securities to the estate was being transferred to Barclays, the loss of that value to the estate was offset by the value of the other estate liabilities that Barclays had agreed to assume (including, critically, the contract cure amounts and the accrued compensation amounts). Unbeknownst to the Sellers' directors, many of its key officers, the creditors, and the Court, however, the undisclosed discount, the inflated liabilities and the post-Sale Order changes to the structure and economics of the sale effected by the Clarification Letter actually resulted in the transfer of estate property to Barclays that exceeded the value of the liabilities assumed by Barclays by up to $8 billion, and possibly more.

67

129. Thus, while it was appropriate for the Court to find that there was a "reasonable business justification" for the immediate sale of these assets as required by the Second Circuit, *see Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009), that finding was made based on a skewed record that indicated there was an equivalent exchange of consideration when, in fact, a correct record would have shown that was not so.

130. As a result, Barclays obtained a multi-billion dollar windfall, to the overwhelming detriment of the Sellers' estates and their creditors. No justification exists in either law or equity to permit Barclays to retain the benefits of this windfall at the hands of innocent creditors. *See In re UAL Corp.*, 411 F.3d 818, 824 (7th Cir. 2005) ("If the mistake is not corrected, the cost will be borne not by its maker-United-but by creditors no less innocent than the airplanes' owners. A refusal to correct would serve no deterrent or punitive purpose; it would merely redistribute wealth among creditors capriciously."); *In re F.A. Potts & Co.*, 86 B.R. 853, 863 (Bankr. E.D. Pa. 1988) ("[I]t is of overwhelming importance that the rights of creditors in a concern in bankruptcy should be protected and that a disposal of property on terms which violate this rule should not be permitted to stand." (citation and quotation omitted)), *aff'd*, 93 B.R. 62 (E.D. Pa. 1988), *aff'd without op.*, 891 F.2d 280 (3d Cir. 1989); *see also In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006) (the burdens of error or malfeasance must be borne by those who caused it, rather than by innocent creditors who were misled thereby).

A. **Barclays Received Transfers of Estate Property that Were Not Authorized by the Sale Order or the Code and Such Property Therefore May Be Recovered Pursuant to Sections 549 and 550 of the Code**

131. Section 549 of the Bankruptcy Code provides, with exceptions not relevant here, "the trustee may avoid a transfer of property of the estate -- (1) that occurs after the commencement of the case; and ... (B) that is not authorized under this title or by the court."

11 U.S.C. § 549. Section 550, in turn, permits recovery of such unauthorized transfers. In particular, that section provides, in pertinent part, that "to the extent that a transfer is avoided under section … 549 … of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]" 11 U.S.C. § 550(a). "Section 550(a)(1) groups initial transferees with 'entit[ies] for whose benefit such transfer was made' and subjects both groups to strict liability." *Christy v. Alexander & Alexander of N.Y. Inc., (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997). Thus, even good faith on the part of the recipient will not insulate it from its obligation to return the property or its value. *Id.*

132.     The Sellers are authorized by Sections 549 and 550 of the Bankruptcy Code to obtain the return of the undisclosed – and thus unauthorized – transfer of more than $8 billion of value from their estates. Indeed, it is well-established, for example, that secret agreements among bidders are simply unacceptable in bankruptcy; judicial sales require open and honest disclosure. *See* 11 U.S.C. § 363(n) (providing that "if the sale price was controlled by an agreement among potential bidders at such sale," the trustee "may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated …."); *see also In re N.Y. Trap Rock Corp.*, 42 F.3d 747, 754 (2d Cir. 1994) (recognizing that secret agreements "deprive the selling debtor of full market value."); *In re Eads*, 135 B.R. 380, 387 (Bankr. E.D. Ca. 1991).

133.     The same corrective action is appropriate here, where a small group of executives negotiated a sale transaction without disclosing the true market value of the assets transferred. Collusion between fiduciaries of the debtor and a prospective purchaser is certainly no less

69

offensive to the central purpose of the Bankruptcy Code than collusion among bidders. "Bankruptcy courts do not tolerate such conduct even from those who are not fiduciaries, much less from one who is." *Ross v. Kirschenbaum (In re Beck Indus., Inc.)*, 605 F.2d 624, 363 (2d Cir. 1979) (citation omitted); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (denying approval of sale that included a "sweetheart" employment agreement that raised the specter that contract had no other effect but to subsidize the executive personally and to reduce the purchase price).

**B.    The Excess Value that Barclays Retained by Terminating the Repurchase Agreement Is Property of the Sellers' Estates under Section 559 of the Code and Must Be Returned by Barclays Pursuant to Section 542 of the Code**

134.    Additional statutory authority to seek return of the undisclosed transfer of value from the Sellers' estates is provided by sections 559 and 542(a) of the Code. The manipulation of the Repurchase Agreement that was undertaken in the Clarification Letter after the Sale Order had already been entered was an undisclosed attempt to make an end run around Section 559's treatment of an executory repurchase agreement terminated as a result of the filing of a bankruptcy proceeding. Section 559 of the Code expressly *requires* that excess collateral on such a repo default to be returned to the debtor's estate. Section 559 allows a party that has received property in a repo from a counter-party that files while the repo is pending to keep, under a "safe harbor" provision, the principal amount of the repo. But it also requires that excess collateral (such as the $5 billion "haircut" under the Repurchase Agreement at issue here) must be returned to the debtor's estate. Section 559 states in relevant part:

> . . . In the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, *any excess of the market prices* received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time

70

of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) *over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to the available rights of setoff."*

11 U.S.C. § 559 (emphasis added).

135.    In short, Section 559 prohibits the non-debtor counterparty from pocketing the excess collateral when the debtor commences a bankruptcy proceeding.

136.    Here, right after LBI's liquidation proceeding was filed on Friday, September 19th, Barclays "liquidate[d] [its] repurchase agreement[] with a debtor," as expressly contemplated by 11 U.S.C § 559, by sending a Notice of Termination of the Repurchase Agreement to LBI.  (A. 68.)  Pursuant to Section 559, upon Barclay's liquidation of the Repurchase Agreement, the "excess of the market prices" of the assets subject to the Repurchase Agreement over the "stated repurchase prices" for those same securities "shall be deemed property of the estate," 11 U.S.C. §559, which thereby obligated Barclays to return this excess $5 billion of estate property to LBI's estate pursuant to section 542(a) of the Code.  *See Tew v. Ariz. State Ret. Sys.*, 69 B.R. 608, 609 (S.D. Fla. 1987) (Sections 542 and 559 require turnover of excess repo collateral), *rev'd on other grounds*, 873 F.2d 1400 (11th Cir. 1989).

137.    While some of the Lehman and Barclays negotiators apparently attempted to circumvent these statutory requirements by purporting to "rescind" the Notice of Termination retroactively and instead simply declaring in the post-Sale Order Clarification Letter that Barclays shall "have no further obligations" under the Repurchase Agreement (including "any payment or delivery obligations"), their efforts were never disclosed to or authorized by the Court.  As a result, the "excess value" of the assets that are the subject of the Repurchase Agreement – value that is at least $5 billion and may be even higher – remains "property of the

estate" of the Sellers pursuant to Section 559, and that property must be returned by Barclays to

the Sellers' estates pursuant to Section 542(a) of the Code.

**C.   To the Extent the Undisclosed Transfers of Estate Property Effected by the Clarification Letter Are Deemed Authorized by the Sale Order, the Sellers Are Entitled To Relief from the Sale Order under Bankruptcy Rule 9024 and Rule 60(b) of the Federal Rules of Civil Procedure**

138.   The undisclosed transfer of more than $8 billion of value from the Sellers' estates

was accomplished in the case by material changes made to the Clarification Letter after the Sale

Order was entered by this Court.  To the extent these changes accomplished by the Clarification

Letter are deemed to have been authorized (unknowingly and in advance) by the Sale Order

entered by the Court, then the Sellers are entitled to relief from the Sale Order pursuant to Rule

60(b) of the Federal Rules of Civil Procedure, which is made applicable by Bankruptcy Rule

9024.

139.   Federal Rule of Civil Procedure 60(b) sets out the grounds upon which a party can

seek relief from a final judgment or order, including:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . .
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).[65]  Rule 60(d) also provides that the Rule does not limit the Court's power

to entertain an independent action for relief from an order or to set aside a judgment for fraud on

the court.  Fed. R. Civ. P. 60(d).

---

[65] Federal Rule of Bankruptcy Procedure 9024 states that Rule 60 applies in proceedings under the Bankruptcy Code, except for in limited circumstances not applicable here.  Fed. R. Bankr. P. 9024.

140.    To secure relief under Rule 60, the movant need not prove its entire case in the motion.  It must show only that it satisfies one of the above criteria and that it has a meritorious claim or defense.  *See* James W. Moore, *Moore's Federal Practice* § 60.24[1] (3d ed. 2009) (citing *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir. 1983) and other cases).  This "does not mean that the moving party must show that he or she is likely to prevail"; the movant "must make allegations that, if *established at trial*, would constitute a valid claim or defense."  *Id.* § 60.24[2] (citations omitted).

141.    Whether or not to grant relief under Rule 60 is left to the sound discretion of the court.  *See, e.g., Lasky v. Cont'l Prods. Corp.*, 804 F.2d 250, 256 (3d Cir. 1986); *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1160 (6th Cir. 1980).  In exercising its discretion, the Court may consider applicable principles of equity.  *See Whitaker v. Assoc. Credit Servs., Inc.*, 946 F.2d 1222, 1224 (6th Cir. 1991).  Under Rule 60, a court can fashion the relief it deems proper, including (i) ordering further discovery, *see, e.g., Hadden v. Rumsey Prods., Inc.*, 196 F.2d 92, 96 (2d Cir. 1952) (remanding for further discovery in response to Rule 60 motion); (ii) requiring further briefing and hearings, *see, e.g., U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 379 (2d Cir. 2001) (referring Rule 60 motion to Independent Review Board which required further briefing); (iii) referring the dispute to an evidentiary or adversary proceeding, *see, e.g., Lawrence v. Wink (In re Lawrence)*, 293 F.3d 615, 618-19 (2d Cir. 2002) (adversary proceeding initiated to adjudicate ownership of shares in dispute); *In re BCD Corp.*, 119 F.3d 852, 855 (10th Cir. 1997) (affirming bankruptcy court's grant of Rule 60 relief after four-day hearing); and (iv) sequestering assets for later use in satisfying the modified judgment or order.  *See, e.g., Lawrence*, 293 F.3d at 618-19 (bankruptcy court amended sale order to impound proceeds of sale pending proceedings to determine ownership).

142.     The flexibility provided by Rule 60 is particularly germane in cases like this, where a bankruptcy court is asked to modify its own sale order. *See, e.g., In re Emergency Beacon Corp.*, 666 F.2d 754, 761 (2d Cir. 1981) (vacating a portion of order under Rule 60(b)(6)); *GMAC Mortgage Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655, 663 (B.A.P. 9th Cir. 1999) (where sale was not subject to reversal, suggesting damages award to compensate movant); *Owens-Corning Fiberglass Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.)*, 795 F.2d 1440, 1451 (9th Cir. 1985) (holding that voiding the bankruptcy court's order did not require that movant "be placed in the precise position it would have occupied" had the court never approved the order, and suggesting that bankruptcy court grant movant superpriority interest as an alternate remedy); *Doolittle v. County of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (voiding part of sale order and stating "[t]he Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts"); *In re Lundy*, 110 B.R. 300, 304 (N.D. Ohio 1990) (granting relief under Rule 60 from selected portions of bankruptcy court's order). In other cases, courts have vacated bankruptcy court sale orders in their entirety. *See Taylor v. Lake (In re CADA Invs., Inc.)*, 664 F.2d 1158, 1163 (9th Cir. 1981); *Golfland Entm't Ctrs., Inc. v. Peak Inv., Inc. (In re BCD Corp.)*, 119 F.3d 852, 862 (10th Cir. 1997); *In re Lintz W. Side Lumber, Inc.*, 655 F.2d 786, 792 (7th Cir. 1981); *Lamont v. Grass (In re Lamont)*, 453 F. Supp. 608, 609-10 (N.D.N.Y. 1978), *aff'd*, 603 F.2d 213 (2d Cir. 1979).

143.     Here, if the undisclosed transfers to Barclays are deemed to have been authorized by the Sale Order, relief under Rule 60(b) is appropriate to obtain from Barclays the return of the undisclosed transfers. *See Road Runner Freight Sys., Inc. v. Am. Freight Sys., Inc. (In re Am. Freight Sys., Inc.)*, 126 B.R. 800, 805 n.2 (D. Kan. 1991) (noting "the purpose of the finality rule

74

is to obtain the highest price for the debtor's assets, for the benefit of the debtor's estate and ultimately, the creditors" and cautioning against strict adherence to the finality rule where it would "require a result contrary to the rule's underlying purpose of achieving the highest possible price."). *See also Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1101 (2d Cir. 1979) (holding that "[t]he test is whether, upon granting the motion to reconsider, the court will be able to reestablish the rights of the opposing party as they stood when the original judgment was rendered"); *Georgia Steel, Inc. v. Citizens and S. Nat'l Bank (In re Georgia Steel, Inc.)*, 25 B.R. 790, 794 (Bankr. M.D. Ga. 1982) (adopting *Texlon* test); *In re Futuronics Corp.*, 5 B.R. 489, 498 (S.D.N.Y. 1980) (adopting *Texlon* test).

144. As detailed below, to the extent the Sale Order is deemed to have authorized the undisclosed transfers, the Sellers are entitled to relief under four of the subsections of Rule 60(b).

## II. LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT

145. To provide relief, the Court need not reach the issue of whether the failure to make disclosures to the Court was intentional, because Rule 60(b)(1) allows for relief from orders on the grounds of mistake, inadvertence, surprise or excusable neglect. Thus, for example, if in the tumult of the week of September 15, 2008, the reason the news of the $5 billion discount or the inflated liabilities did not reach lawyers drafting the Asset Purchase Agreement was miscommunication, and not by design, relief is still warranted because these critical facts still were not disclosed to the Court. The Advisory Committee Notes to Rule 60 make clear that this provision was amended to allow for relief based on "the mistake or neglect of others," and not just the mistakes or neglect of the party seeking relief. Fed. R. Civ. P. 60(b) Advisory Committee Notes; *see also Moore's Federal Practice* § 60.41[3]. Even a mistake by the Court is a basis for relief under Rule 60(b)(1). *See In re 310 Assocs.*, 346 F.3d 31, 34-35 (2d

Cir. 2003) (bankruptcy court has authority under Rule 60(b)(1) to set aside its order approving payment of breakup fee to potential purchasers).

146.    Considering this Motion under either the mistake, inadvertence or the excusable neglect provisions of the Rule all lead to the same conclusion.  There are ample grounds for modifying the Sale Order and fashioning relief to correct the undisclosed and unauthorized transfer of billions of dollars in assets to Barclays at the expense of the Sellers' estates and their creditors, or at least to conduct further examination of these issues.

### A.    Barclays Received An Undisclosed Multi-Billion Dollar Discount On Its Purchase Price

147.    The combined effect of the undisclosed discount, inflated liabilities, Repurchase Agreement, the September 19-21 additions of value for Barclays, and Clarification Letter was an attempt to transfer to Barclays, at no additional cost, an undisclosed value of up to $10 billion. This was never explained to the Court either in the Asset Purchase Agreement or during the Sale Hearing.  It was not even explained after the parties filed the Clarification Letter on September 22, 2008 or during the December 2008 proceedings concerning the Settlement Agreement.  Whether this failure to disclose was an accident caused by the rush of events during the week of September 15, or was intentional, the Sale Order requires modification to the extent it approved of the Barclays windfall based on mistake, inadvertence or excusable neglect.

148.    As but one example, the Sale Order's reference to the "Clarification Letter" has no basis in the record developed at the Sale Hearing.  The Clarification Letter -- which effected major amendments to the Sale Transaction -- was not shown or explained to the Court.  It could not have been shown or explained to the Court; it was not completed when the Sale Order was entered and even the drafts in existence during the Sale Hearing were changed substantially over the following weekend to make further material changes in the transaction.

76

149.    Similarly, as explained to the Court throughout the week, the Sale Transaction was portrayed, at the least, as a "wash" transaction whereby Barclays was to acquire Lehman's broker-dealer assets for an equivalent amount in cash and assumed liabilities.  But, the undisclosed discount and inflated liabilities -- which remained at the core of the deal even as it changed over the week -- skewed this balance in Barclays favor at every step.  This multi-billion dollar benefit to Barclays was never revealed to the Court, interested parties or, for that matter, to potential competing bidders for Lehman's assets.  Again, whether by mistake or by design, this was a material omission warranting relief under file 60(b).

150.    Given the huge disparity between the value the Court ascribed to the transaction and the value the Estate ended up receiving after giving effect to the post-approval changes described in detail above Rule 60 relief is still appropriate here.  That disparity, in the aggregate, approached at least $8.2 billion (after taking account of the liabilities Barclays actually did assume) and represents an unjustified windfall for Barclays.  This is particularly so given the fact that, at each stage, the deal was described as an equivalent exchange of value with no embedded, immediate gain built in for Barclays.

### B.    Barclays Failed To Pay To Former Lehman Employees All The Bonuses It Contracted To Pay Under The Asset Purchase Agreement

151.    One of the key assumptions upon which the Court relied in approving the Sale Transaction and issuing the Sale Order was the assurance, embodied in the express terms of the Asset Purchase Agreement, that Barclays would pay, in the aggregate, $2 billion in bonuses to former-Lehman employees who transferred to Barclays.  Paragraph 9.1(c) of the Asset Purchase Agreement states expressly that Barclays

> *shall* ... pay each Transferred Employee an annual bonus (the "08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive

> compensation (but not base salary) and reflected on the financial
> schedule delivered to Purchaser on September 16, 2008 and
> initialed by an officer of each of Holdings and Purchaser (the
> "Accrued 08 FY Liability").  *Such 08 Annual Bonuses shall be*
> *awarded … so that the aggregate amount awarded shall equal the*
> *Accrued 08 FY Liability.*

(A. 30 § 9.1(c) (emphasis added).)

152.    The 9/16/08 Financial Schedule, to which the Asset Purchase Agreement
expressly refers, shows the "Accrued '08 FY Liability" to have been $2.0 billion. (A. 31.) As
shown above, however, that Assumed Liability was inflated from the start and, in fact, Barclays
has not paid that full amount, and there is significant evidence indicating it never intended to do
so. (*See supra* ¶¶ 59-64.)

153.    At the Sale Hearing, however, the Court was told several times that Barclays
would assume this $2.0 billion in liabilities. (A. 150 [Docket No. 318], 9/19/08 Tr. at 100:22-25;
*id.* at 101:1-4; *see* A. 149 [Docket No. 352], 9/17/08 Tr. at 23:5-24:8), and the Court took that
number into account, in full, to assess the Sale Transaction. In particular, in evaluating the
breakup fee requested by Barclays, and so the Court could calculate the full value of the deal, the
Court was told that "there will be an exposure for 2.5 billion dollars in connection with the
retention of these 10 to 12,000 employees." (*Id.* at 23:23-25; *see also id.* at 36:9-14 (ascribing
approximately $5.7 billion value to the proposed transaction)) Even after the deal changed
(purportedly warranting the Clarification Letter), the Court was told that "Barclays is also
agreeing to the same employee compensation arrangements." (A. 150 [Docket No. 318], 9/19/08
Tr. at 48:13-14; *see also id.* at 100:22-25.)

154.    While Barclays' failure to pay a full $2 billion in bonuses as required under the
Asset Purchase Agreement constitutes a breach of contract (and LBHI reserves its right to bring
such claim against Barclays), it also provides ample basis for the Court to modify its Sale Order

under Rule 60(b)(1). Putting aside how this failure to pay came about and whether the $2 billion figure was reasonable or derived in good faith, and without regard to whether any of the parties had nefarious intent, the simple fact is that this "accrued liability" was overstated. As Lowitt, Kelly and McDade all have conceded, the accrual was deliberately increased by $1 billion, as an "agreed" number. Without knowledge of this inflation, however, the Court noted that Barclays' assumption of this amount of liability was an integral part of the consideration Lehman was to receive. And the Court relied on this assumption of this liability in assessing the overall value of the deal to the Estate.

### C. Barclays Did Not Assume $1.5 Billion In Contract Cure Liabilities As Presented To The Court

155. During the hearings leading up to the issuance of the Sale Order, the Court was also informed that Barclays would be assuming contract cure liabilities in an amount estimated at up to $1.5 billion. (*See* A.149 [Docket No. 352], 9/17/08 Tr. at 24:1-5, 36:9-12; A. 150 [Docket No. 318], 9/19/08 Tr. at 101:1-4, 48:11-14) The financial schedule upon which the Asset Purchase Agreement was premised placed LBHI's total liabilities for such "cure" amounts even higher, at $2.25 billion.

156. While it was disclosed that the $1.5 billion figure presented to the Court for contract cure liabilities was an estimate (A. 149 [Docket No. 352], 9/17/08 Tr. at 24:1-5; A. 150 [Docket No. 318], 9/19/08 Tr. at 101:1-4), it was not disclosed that this purported estimate was not even close to the mark, and, like the compensation item, had been deliberately written up. The Court also considered this estimate, in full, in assessing the overall value of the proposed transaction to the Estate.

157. At no time, however, was the Court informed (either prior to issuing the Sale Order, in any later proceedings, or in connection with the follow-on procedures whereby

Barclays designated contracts it was to assume) that Barclays was only going to pay approximately $238 million in contract cure liabilities. (*See supra* ¶¶ 65-68.) At no time was the Court informed that the $1.5 billion estimate originally presented to the Court was off by some $1.3 billion, or that the actual figure for Barclays assumed cure liabilities was less than 15% of the parties' estimate. But that is in fact the case. Barclays has paid only $238 million for contract cures, demonstrating that the estimate of cure liability upon which the deal was based was wildly exaggerated.

158.     Thus, the $1.5 billion estimate for contract cures was, at best, a large mistake. Whether the mistake was made in deriving the figure, or in how it was presented to the Court, or even in the Court's reliance on it, does not matter for this purpose. The fact is, it was a mistake in an amount that was material to the transaction. And the end result of this mistake was that (i) the Court was given an inflated view of the value of the proposed Sale Transaction to the Estate (*i.e.,* expecting that the Estate would be relieved of liabilities of this magnitude) at the time it issued the Sale Order, and (ii) the Estate ended up bearing the liability for the contract cure amounts not assumed by Barclays derived from some $1.3 billion in total, pre-filing, dollars. This changed the consideration Barclays was expected to pay under the Sale Transaction and, at the very least, the Court's estimate of the value of that transaction.

## III.    LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO NEWLY DISCOVERED EVIDENCE THAT COULD NOT HAVE BEEN UNCOVERED BEFORE THE SALE ORDER'S ENTRY

159.     To warrant relief under Rule 60(b)(2), based on newly discovered evidence, the movant must demonstrate:

> (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it

80

probably would have changed the outcome, and (4) the evidence
must not be merely cumulative or impeaching.

*U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

160.    The test is easily satisfied in this case.  As described above, the Sale Transaction was negotiated, approved and closed within a very short period of time.  The only people informed about the specifics of the proposed transactions were employees of Barclays and a limited set Lehman employees, many whom have now transferred to and secured lucrative employment with Barclays as a result of the transaction.  The disclosures made to the Court failed to disclose the key issues on which this motion is premised – *i.e.*, the discount, the inflated liabilities, the use of the Repurchase Agreement as a conduit, the "additional value" collected on September 19 and Barclays' failure to pay $2 billion in bonuses to former Lehman employees.

161.    Especially because counsel was never informed of the discount and inflated liabilities that skewed the deal from the start, these facts could not have been discovered at the time the Sale Order was issued.  There was insufficient time to examine these questions thoroughly and properly evaluate the amounts of the liabilities in question or the value of the securities and other assets involved in the Repurchase Agreement, the Clarification Letter and Settlement Agreement.  The Debtor acted with due diligence at the time (to the extent that was even possible under the time constraints and financial circumstances at the time), and has acted with due diligence since then in investigating potential assets and claims belonging to the Sellers' estates.  The facts presented above are not merely cumulative.  Rather, they were material and likely would have changed the Court's and the parties' assessment of the value of the Sale Transaction had they been known to all concerned and presented at the hearings leading to the Sale Order.  For these reasons, the requested relief is also warranted under Rule 60(b)(2).

NYI-4215277v1

## IV. LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER DUE TO MISREPRESENTATION (WHETHER INNOCENT OR INTENTIONAL)

162.    The relief requested is also authorized by Rules 60(b)(3), which addresses, among other things, misrepresentations, whether innocent or intentional. Rule 60(b)(3) allows for relief from orders based on the fraud, misrepresentation or misconduct of an adverse party. Fed. R. Civ. P. 60(b)(3). Courts have held that Rule 60(b)(6) can provide similar relief when the fraud, misrepresentation or misconduct is that of someone other than an adverse party. *See, e.g., Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 832-33 (7th Cir. 1985) ("Unless the false testimony can be traced to the adverse party, the case must be decided under the residual category of Rule 60(b)(6)") (Easterbrook, C.J.); *McKinney v. Boyle*, 404 F.2d 632, 634 (9th Cir. 1968) (Rule 60 motion based on alleged fraud by one's own counsel was brought under section (b)(6) of the rule; *see also Olle v. Henry & Wright Corp.*, 910 F.2d 357, 364-66 (6th Cir. 1990) (challenge to bankruptcy court's sale order under Rule 60(b)(6) can be brought if no other section of Rule 60(b) is applicable). Indeed, the Court's discretion "is especially broad under subdivision (6), because relief under it is to be granted when 'appropriate to accomplish justice.'" *In re Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir. 1981) (affirming bankruptcy court's Rule 60 modification of its order).[66]

163.    Unlike for claims of fraud, misrepresentations or misconduct under Rule 60(b) can include *unintentional* acts, not just misrepresentations or omissions prompted by scienter or an intent to defraud. *See Londsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995) ("[Rule] 60(b)(3) applies to both intentional and unintentional misrepresentations"); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988) ("'Misconduct' [under Rule 60(b)(3)] does not demand

---

[66] As the Second Circuit recognized, "[c]lause (6) … has been described by Professor Moore as 'a grand reservoir of equitable power to do justice in a particular case when the relief is not warranted by the preceding clauses,' 7 *Moore's Federal Practice* ¶ 60.27(2), at 375 (2d ed. rev. 1975), which, in a proper case, is to be 'liberally applied.' *Id.* at 352." *U.S. v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977).

proof of nefarious intent or purpose as a prerequisite to redress. . . . The term can cover even accidental omissions"); *U.S. v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372, 1375 n.6 (11th Cir. 1981) ("Were the term 'misrepresentation' as used in Rule 60(b)(3) interpreted to encompass only false statements made with an intention to deceive, the behavior described by that word would be wholly subsumed within the category of behavior that the same subsection of the rule refers to as 'fraud.'").[67]

164.    The scope and effect of such misrepresentations and omissions, whether or not they were intentional, goes to basic aspects of the Sale Transaction.  For example, in this case to effect the proposed sale, the parties drafted the Asset Purchase Agreement, which misdescribed the "Long Positions" as stating "book value" on September 16 and also used the 9/16/08 Financial Schedule upon which it is based.  (*See supra* ¶¶ 53-58.)  The 9/16/08 Financial Schedule misrepresented the "Long Position" as if it showed book value when, in fact, it was marked down to include -- but not to show -- the $5 billion discount.  The 9/16/08 Financial Schedule also included compensation and contract cure liabilities of $2.0 billion and $2.25 billion, respectively, both inflated.  (*See supra* ¶¶ 59-68.)  These misrepresentations made their way into the Asset Purchase Agreement submitted to the Court and interested parties, who relied upon them, both in approving the proposed transaction and in forming objections or, perhaps, deciding not to object when they otherwise would have done so.  The Asset Purchase Agreement includes both of these categories of misstatements.

165.    In addition, neither the Court nor the parties in interest to the Sellers' proceedings were ever told of the effects of the Clarification Letter and Repurchase Agreement.  Among other things, the Court was not told that:

---

[67]  See also *Ty Inc. v. Softbelly's, Inc.*, 353 F.3d 528, 536 (7th Cir. 2003) (misconduct not involving deceit is covered by Rule 60(b)(3)); *Bros Inc. v. W.E. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir. 1965).

NYI-4215277v1

- The parties intended all along for Barclays to acquire Lehman assets at a negotiated price $5 billion less than their book value (*see supra* ¶¶ 53-58);

- The liabilities Barclays was to assume under the Asset Purchase Agreement had been inflated (*see supra* ¶¶ 59-68);

- The value of the collateral Lehman posted to secure the Repurchase Agreement exceeded the value of the funds Barclays had advanced thereunder by at least $5 billion and the Repurchase Agreement was used to replace the Asset Purchase Agreement as a vehicle to give the $5 billion discount to Barclays (*see* pp. *supra* ¶¶ 95-104);

- The Clarification Letter, which was filed after the closing of the Sale Transaction and after issuance of the Sale Order, purported to make material changes to the definitions of Purchase Assets and Assumed Liabilities and provided substantial amounts of additional assets to Barclays (*see supra* ¶¶ 118-122);

- The post-approval changes made to the Sale Transaction in the Clarification Letter allowed Barclays to avoid having to face the strictures of section 559 of the Bankruptcy Code with respect to the extra collateral Lehman had posted under the Repurchase Agreement, wrongfully giving that collateral to Barclays, rather than returning it to Sellers estate (*see supra* ¶¶ 134-37).

166.    Each of these items was material to the issues before the Court at the time the Sale order was issued and should have been subject to judicial scrutiny as well as the scrutiny of creditors. These issues went to the very heart of the proposed Sale Transaction.

## V.    LBHI IS ENTITLED TO RELIEF FROM THE SALE ORDER AND FURTHER DISCOVERY DUE TO POTENTIAL OCCURRENCE OF MISCONDUCT OR FRAUD

167.    If it were to determine that there was neither mistaken nor innocent misrepresentation, the Court still has grounds under Rule 60 to issue relief, pursuant to Rule 60(b)(3) based on fraud. As an independent basis for this application for relief from the Sale Order, Rule 60(d) also allows a movant to seek relief from an order or judgment where there has been a "fraud on the court." Fed. R. Civ. P. 60(d). In this regard, fraud on the court can be defined as including "egregious conduct involving a corruption of the judicial process itself." C.

Wright, A. Miller & M. Kane, 11 *Federal Practice and Procedure* § 2870 (2d ed. 2009) (citation omitted); *see Moore's Federal Practice* § 60.21[4][a] ("Fraud on the court must involve more than injury to a single litigant; it is limited to fraud that 'seriously' affects the integrity of the normal process of adjudication.") (citation omitted). Fraud on the court is not limited to situations in which a party commits fraud, nor does a party have to benefit from the fraud to have it qualify as fraud on the court. *Moore's Federal Practice* § 60.12[4][e].

168. Evidence developed in discovery could support a finding that there was a deliberate plan to hide the discount and the inflated liabilities, and to add additional value for Barclays without disclosure and after the Hearing. However, whether there has been a fraud on the court should be decided based on a full record in an adversary proceeding, after full discovery. *See Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). *See Moore's Federal Practice* § 60.21[4][f]. For present purposes, it is enough that a Rule 60 movant need only make a "colorable" showing of fraud to warrant the court's permitting further discovery and evidentiary proceedings. *See Pearson v. First NH Mortgage Corp.*, 200 F.3d 30, 35 (1st Cir. 1999). And the Court has great flexibility in fashioning the relief it deems appropriate to correct the fraud perpetrated against the court. *See Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 900 (2d Cir. 1985) ("In tracing the development of a court's equity power to combat fraud in the enforcement of judgments, the Supreme Court [in *Hazel-Atlas*] recognized that the relief devised may '[take] several forms: [including] setting aside a judgment to permit a new trial, altering the terms of a judgment, or restraining the beneficiaries of a judgment from taking any benefit whatever from it.'").

169. In this case, the facts readily would support a "colorable" claim of fraud. Evidence exists from which the Court could conclude that the discount for Barclays, the inflated

liabilities, and material undisclosed changes in the deal, all were affirmatively hidden from the Court by self-interested Lehman executives who elevated their employment prospects at Barclays over Lehman's interests.

170.    If there were a fraud, the Court's ability to administer the estate fairly, and to protect the interests of the estate and its creditors, was corrupted by it being kept in the dark about crucial aspects of the Sale Transaction.  The failure to make critical disclosures in this case prevented the Court from properly protecting the interests of creditors and the Sellers' estates as the transaction ended up providing a huge windfall to Barclays, about which, without disclosure, no one could have been aware.  Leaving this in Barclays' hands would constitute a grave inequity by rewarding a subterfuge at the expense of others who relied on the Court to look out for their interests.  Relief would therefore be appropriate, in a form and amount to be determined after full discovery and an evidentiary hearing under Rule 60(d).

NYI-4215277v1

## CONCLUSION

171.    For the foregoing reasons, LBHI respectfully requests that the Court issue an

order modifying the Sale Order as indicated herein (*see* pp. 1-2, *supra*) and granting such other

relief as the Court deems just and proper.

Dated: September 15, 2009                          Respectfully submitted,
      New York, New York

                                           /s/ Robert W. Gaffey
                                         Robert W. Gaffey
                                         Jayant W. Tambe
                                         William J. Hine
                                         JONES DAY
                                         222 East 41st Street
                                         New York, New York 10017
                                         Telephone:  (212) 326-3939

                                         ATTORNEYS FOR DEBTOR AND DEBTOR
                                         IN POSSESSION

NYI-4215277v1