# A. 1 (B)

HIGHLY CONFIDENTIAL - R. AZERAD

1   
2   I remember that there was some -- that
3   the unwind of a position at -- the unwind of a
4   transfer of a termination of a transfer at OCC
5   was not as smooth as what it should have been.
6   **Q.   Looking at the balance sheet draft in**
7   **Exhibits 178 and 179, in the assets that are**
8   **included in these two spreadsheets you have not**
9   **made any provision for this OCC margin; is that**
10   **right?**
11   A.   Again, I don't remember what -- what
12   derivative and other contractual, I'm assuming
13   agreements, that's typically how it would have
14   been represented on the Lehman balance sheet, of
15   80 million represents, but assuming that it's --
16   assuming that this is not related to the OCC
17   margin, I don't recall having the OCC margin
18   being part of this opening balance, being part
19   of this opening balance sheet.
20   **Q.   When is the first time you remember**
21   **having any discussions with anyone, other than**
22   **lawyers, about the OCC margin, as you understand**
23   **it?**
24   A.   I think it must have been an informal
25   discussion I may have had -- I don't remember --

HIGHLY CONFIDENTIAL - R. AZERAD

1   
2   Let me step back.  What is your
3   question?  If you can repeat it.
4   (Record read.)
5   A.   I don't remember who was the first
6   person.
7   **Q.   The question was when, not who.**
8   A.   I don't remember when was -- who was
9   the first person and when did -- or when did the
10   first discussion happen.
11   **Q.   And in connection with the first**
12   **discussion, do you recall, about OCC margin, did**
13   **that discussion concern adding the OCC margin as**
14   **an asset or an addition to the balance sheet for**
15   **Barclays?**
16   A.   No, what I -- no, what I recall about
17   the OCC margin, the first discussion was what I
18   previously disclosed, which was the fact that
19   it -- that it was frozen.  I don't remember by
20   whom.
21   **Q.   Going back to 178, and the calculation**
22   **for the inventory total, page 2 of Exhibit 178?**
23   A.   Yes.
24   **Q.   The valuation information that you**
25   **would have included in this spreadsheet was as**

1   **HIGHLY CONFIDENTIAL - R. AZERAD**
2   of what date?
3   A.   Again, I don't recall.  There was an
4   e-mail that you showed me earlier that would
5   have -- that had some specific dates, which I
6   think was -- but I don't remember when was this
7   value being calculated.
8   **Q.   In your day-to-day operations for a**
9   **repo that was done on the 18th --**
10   A.   Uh-huh.
11   **Q.   -- would you have calculated values as**
12   **of the 18th or some other day?**
13   MR. STERN:  Objection to the form.
14   A.   Generally, to my -- to the best of my
15   knowledge, in a normal repo transaction, I
16   believe that the custodian -- actually, I don't
17   even know it for a fact so I prefer not to say.
18   I prefer to say that I don't recall.
19   But I do want to repeat that we had at
20   that point significant data issue at Lehman for
21   a variety of reasons, but chief among them the
22   fact that JPMorgan did not provide us with the
23   information.
24   (Exhibit 180, an e-mail chain, the
25   first in time from M. Kelly to R. Azerad,

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   dated September 21, 2008, marked for
3   identification, as of this date.)
4   MR. STERN:  What is your sense of
5   timing in terms of lunch break?
6   MR. TAMBE:  Probably shortly after
7   this exhibit and maybe some follow-up
8   questions.
9   MR. STERN:  Okay.
10   **Q.   I handed you a three-page document**
11   **marked as Exhibit 180.  Take a moment to look at**
12   **that and let me know when you're done.**
13   A.   Sure.
14   (Document review.)
15   A.   I've read Exhibit 180.
16   **Q.   And this exhibit touches on this issue**
17   **of the data valuation, right?**
18   A.   Uh-huh.
19   **Q.   Right?**
20   A.   Yes, that's correct.
21   **Q.   And just to make sure I'm**
22   **understanding this, is it the case that you had**
23   **valued the repo transaction for the collateral**
24   **transferred on Thursday as of Thursday closing**
25   **prices?**

Page 122

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        MR. STERN: Objection to the form.
3     A.   Let's hear the question again.
4        (Record read.)
5     A.   I was not involved in the valuation.
6     Q.   But --
7     A.   What this e-mail -- this e-mail
8    traffic says I was asking confirmation from
9    Martin Kelly and other people about which source
10   of prices to use to do the analysis, but I was
11   not part of the exercise that was done to price
12   the securities.
13    Q.   Okay.  Does this, having reviewed this
14   e-mail chain, can you confirm that the prices
15   you in fact did use for the balance sheet that
16   you prepared for the Thursday transfer were
17   using Thursday prices and for the Friday
18   transfers used the Friday prices?
19    A.   That's what Jim Hraska in the e-mail
20   sent at 12:26 said.
21    Q.   Subsequent to receiving these e-mails,
22   have you any reason to believe that Mr. Hraska
23   wasn't accurate in describing the valuation?
24    A.   I don't --
25        MR. STERN: Objection to the form.
TSG Reporting - Worldwide (877) 702-9580

Page 123

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2     A.   I don't recall seeing an e-mail from
3    Jim Hraska changing what he said in the e-mail
4    at 12:26.
5     Q.   So the answer to my question is no,
6    you're not aware of any reason?
7     A.   I don't recall.
8        MR. STERN: Objection to the form.
9     Q.   After you joined Barclays in September
10   2008, were you involved with any effort to
11   revalue the collateral that had been transferred
12   from Lehman to Barclays?
13    A.   Yes, I --
14        MR. STERN: If this involves work you
15   did for counsel --
16        THE WITNESS: Counsel.
17        MR. STERN: Don't identify the work
18   you did for counsel, and I'll instruct you
19   not to answer.
20    A.   I will follow my attorney's
21   recommendation.
22        MR. TAMBE: And Jack, what's the basis
23   of the objection?  Is it attorney-client
24   privilege?
25        MR. STERN: It's work product and
TSG Reporting - Worldwide (877) 702-9580

Page 124

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    attorney-client privilege.
3     Q.   Can you identify the lawyers who asked
4    you to do the work in revaluing the collateral?
5        MR. STERN: Objection.  I'm going to
6    instruct you not to answer because answering
7    it would reveal work product.
8     Q.   And sir, could you tell me when you
9    were asked to do this by the lawyers?
10        MR. STERN: Objection.  I'm going to
11   instruct you not to answer.
12    Q.   And other than yourself, did other
13   people assist with this project of revaluing the
14   collateral?
15        MR. STERN: I instruct you not to
16   answer.
17        MR. TAMBE: What basis?
18        MR. STERN: I'm not going to allow the
19   witness --
20        MR. TAMBE: Just state the basis.  I
21   don't need a speech.  Just state the basis.
22   State it for the record.
23        MR. STERN: Work product and
24   attorney-client privilege.
25        MR. TAMBE: Let's take a lunch break
TSG Reporting - Worldwide (877) 702-9580

Page 125

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    now.
3        (Luncheon Recess; Time Noted: 12:39
4    P.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
TSG Reporting - Worldwide (877) 702-9580

Page 126

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        AFTERNOON SESSION
3        (Time Noted: 1:32 P.M.)
4    ROBERT AZERAD, resumed and
5        testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. TAMBE:
8        Q.   Good afternoon, Mr. Azerad.
9        A.   Good afternoon.
10       Q.   I wanted to revisit one of the
11   documents we've been talking about this morning
12   which was marked as Exhibit 175, I believe.
13       A.   Are you talking about this document?
14       Q.   Yes, this is the multi-page document
15   that had not been assembled properly. We have
16   assembled it in Bates order now. I want to ask
17   you a couple of questions about it.
18           First, if you could take a moment to
19   look at the cover e-mail and the attached
20   spreadsheets.
21       A.   Okay, it's a multi-page attached
22   spreadsheet. Is it okay if I just have a
23   cursory look at the attached spreadsheet,
24   assuming that most of your questions will be
25   focused on the beginning, your first three
         TSG Reporting - Worldwide (877) 702-9580

Page 127

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    pages?
3        Q.   That's a fair assumption, but I might
4    ask you about particular columns, so why don't
5    you take a cursory look at the spreadsheet. Let
6    me know when you're done.
7            (Document review.)
8        A.   I've read the e-mail.
9        Q.   Turning your attention to this e-mail
10   and the exhibits, are you generally familiar
11   with this document?
12       A.   I don't recall seeing it at that time,
13   but clearly the e-mail sent at 4:46 on Friday
14   morning was sent to me, among other people.
15       Q.   Okay. And you were working at the
16   office overnight Thursday night into Friday
17   morning the week of the bankruptcy, right?
18       A.   That particular night, the night of
19   the -- between the 18th and the 19th, I was in
20   the office.
21       Q.   And I think you described in the
22   morning session that among the various things
23   you were doing was identifying assets available
24   for transfer to Barclays, correct?
25       A.   That could be transferred to Barclays.
         TSG Reporting - Worldwide (877) 702-9580

Page 128

1    HIGHLY CONFIDENTIAL - R. AZERAD
2        Q.   That could be transferred to Barclays.
3            And as you did a cursory review of the
4    spreadsheet, did you see that the various assets
5    that are identified in this spreadsheet have a
6    column "Available for Transfer," do you see
7    that?
8        A.   Yes, I see that. Column F, I believe.
9        Q.   And is it your understanding that the
10   document at page 3 of this exhibit, Bates number
11   ending in 4635 --
12       A.   Uh-huh.
13       Q.   -- that is a summary or roll-up of the
14   information contained in the subsequent
15   spreadsheets?
16       A.   I don't recall the document, so what
17   I -- to be able to answer your question, I would
18   need to look at the document in Excel
19   spreadsheet and actually do some validation of
20   the column, do a validation of a summary.
21       Q.   But generally, having seen this
22   document, do you recall having been involved in
23   the preparation of a spreadsheet that identified
24   the Cusips and the amounts available to be
25   transferred to Barclays in that time period,
         TSG Reporting - Worldwide (877) 702-9580

Page 129

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    18th or 19th of September?
3        A.   There were many efforts going on, some
4    of them being led by my team, some of them being
5    led by Operations, and some of them also being
6    led by Product Control to try to understand what
7    could be transferred to Barclays. I believe
8    that the spreadsheet was sent by Chris Mincak to
9    Gerry Reilly, so this is a part of stream of
10   effort coming from Product Control.
11       Q.   There's various listings of Cusips
12   also contained in column D, which is titled
13   "Balance Sheet"?
14       A.   Yes.
15       Q.   Do you see that?
16       A.   Uh-huh.
17       Q.   Do you have an understanding --
18           MR. STERN: I'm sorry, column D?
19           MR. TAMBE: D, yeah.
20           MR. STERN: D, as in dog?
21           MR. TAMBE: Dog.
22           MR. STERN: Oh, I see. You're not
23   referring to the third page, you're
24   referring to the fourth page.
25           MR. TAMBE: Yes, fourth page onward,
         TSG Reporting - Worldwide (877) 702-9580

Page 130

HIGHLY CONFIDENTIAL - R. AZERAD

1 the various spreadsheets which have the
2 listing of particular securities.
3     MR. STERN: Okay. Fine.
4     A.  Yes.
5     Q.  What is your understanding of the
6 information that's contained in that column, the
7 "Balance Sheet" column?
8     A.  Again, I was not involved in the
9 creation of that spreadsheet, so I cannot
10 comment with confidence on what that column
11 means, meaning it appears to me, looking at this
12 document now, that this refers to balance sheet
13 numbers.
14     Q.  Would that be market value numbers for
15 these securities?
16     A.  Typically balance sheet numbers refer
17 to market values.
18     Q.  And looking at the spreadsheet in
19 Exhibit 175, does it identify the source of the
20 price information that appears in the balance
21 sheet column?
22     A.  I don't remember when I looked, but
23 again, I had a cursory look at the spreadsheet,
24 so I may have missed it, but I don't remember

TSG Reporting - Worldwide (877) 702-9580

Page 131

HIGHLY CONFIDENTIAL - R. AZERAD

1 seeing the source of information.
2     Q.  If you could also turn your
3 attention -- you can set that one aside.  If you
4 can turn your attention back to 151A that we
5 discussed this morning.
6     A.  Yes.
7     Q.  This was an e-mail concerning the
8 preparation of the opening balance sheet.  Do
9 you remember?
10     A.  I remember.
11     Q.  In your e-mail dated September 20 at
12 10:27, you had an item concerning 1.9 billion of
13 collateral.  Do you see that?
14     A.  Yes.  That's item number 2?
15     Q.  Item number 2 in that e-mail, right.
16 If you could put before you Exhibit 178 and 179
17 that we discussed this morning.
18     A.  It's not a problem.  Let me try to
19 find them.
20     Q.  Do you have them?  Looking at the
21 attachment to 178, it's a two-page exhibit?
22     A.  Uh-huh.  Yes.
23     Q.  There is a draft balance sheet
24 attached?

TSG Reporting - Worldwide (877) 702-9580

Page 132

HIGHLY CONFIDENTIAL - R. AZERAD

1     A.  Yes.
2     Q.  The $1.9 billion component in the
3 e-mail which is Exhibit 151A?
4     A.  Yes.
5     Q.  Where is that -- well, let me ask you,
6 is that included in the valuation of assets that
7 you have on page 2 of Exhibit 178?
8     MR. STERN: Objection to the form.
9     A.  Complicated here.  Let me just --
10     I'm sorry, can you repeat the
11 question?
12     (Record read.)
13     A.  Let me understand.
14     MR. STERN: Objection to the form.
15     A.  It's -- it's hard for me to tell.  The
16 1.9 billion of Exhibit 151A was sent to me as
17 of -- was sent by me, sorry, as of 10:27.  I'm
18 assuming all these are based on New York time,
19 not GMT, in New York time.  And the 178, the
20 exhibit in 178 was sent to me at 8:39 P.M. on
21 the Saturday.
22     What I was trying to explain this
23 morning is, starting on September 19, the
24 Friday, there was a fair amount of uncertainty

TSG Reporting - Worldwide (877) 702-9580

Page 133

HIGHLY CONFIDENTIAL - R. AZERAD

1 about the information that Lehman had access to
2 as it relates to the inventory of LBI -- or,
3 securities held by LBI, I should say, and so all
4 the analysis we did was done on the best effort
5 basis.
6     It could be that, in between these two
7 e-mails, there were some additional refinement I
8 received in terms of the data, which means that
9 the 1.9 billion that I referred to as of 10:27
10 may or may not become some other numbers as of
11 8:39 P.M. that day.
12     Q.  Let's try it another way.  Looking at
13 Exhibit 178, which has the balance sheet, if you
14 turn to page 2?
15     A.  Uh-huh.  Yes.
16     Q.  And looking at the listing of assets
17 that are included in that balance sheet, do you
18 know whether those include items which would
19 have been in the non-actionable box?
20     A.  This is where I have an issue about
21 answering accurately to your question.  I
22 mentioned earlier that, I think in one of my
23 previous answers in one of your previous
24 questions this afternoon, that there were, to

TSG Reporting - Worldwide (877) 702-9580

Page 134

HIGHLY CONFIDENTIAL - R. AZERAD
1    the best of my recollection, three streams of
2    work being done to ascertain the assets that
3    could be transferred to Barclays. There was one
4    by Product Control, there was one by Treasury,
5    and one by Operations.
6         One led by Treasury, the effort led by
7    Treasury essentially fizzled because we didn't
8    have good information. We eventually, I don't
9    know when exactly the decision was made, we
10    relied on the file provided by Operations, I
11    believe Jim Hraska or someone working for Jim
12    Hraska.
13         My vague recollection is that the
14    amounts were about the same, may have been
15    slightly different, but I think that they were
16    roughly kind of roughly in the same ballpark,
17    and so when you ask me the question of is the
18    1. -- is there a 1.9 and does it refer to the
19    same 1.9 that you refer to in Exhibit 151A, I
20    have trouble answering the question.
21         Q.   Okay. Were you aware of any
22    discussions in connection with preparation of
23    Exhibit 178A about --
24         A.   You mean 178?
25
TSG Reporting - Worldwide (877) 702-9580

Page 135

HIGHLY CONFIDENTIAL - R. AZERAD
1         Q.   178. Let me start again.
2         Were you aware of any discussions in
3    connection with the preparation of Exhibit 178
4    about including or excluding the non-actionable
5    box from the calculation of assets?
6         A.   My understanding and my recollection,
7    I should say, is that the non-actionable box,
8    which again refers to the ability in a normal
9    market environment to finance assets in a
10    secured basis, that's what it means by
11    non-actionable, was not a determining factor on
12    whether or not assets in that box could or could
13    not be transferred to Barclays.
14         Q.   Were the items in that box included in
15    the assets that are set forth in Exhibit 178A --
16    178?
17         A.   Again --
18         MR. STERN: Why don't you take your
19    time and read 178 and think about the
20    question.
21         A.   I mean, if I look at Exhibit 178 and
22    the e-mail from Brett Beldner to Martin Kelly,
23    item number 1 in that e-mail talks about 2
24    billion of assets that may be -- that may not --
25
TSG Reporting - Worldwide (877) 702-9580

Page 136

HIGHLY CONFIDENTIAL - R. AZERAD
1    that may be locked up. In between parentheses
2    it says "can be transferred."
3         That seems to indicate, again, reading
4    this e-mail today, that we're still talking
5    about the same 1.9 billion that I referred to as
6    of Exhibit 151A, because at that point we knew
7    that the quality of the work that was done by
8    Treasury -- we knew that the work that was being
9    done by Treasury to look -- to create the list
10    of assets that could be transferred to Barclays
11    was relying on information that may or may not
12    be correct. That's because at that point we
13    didn't have, I believe, good information in GFS,
14    which was the source of information for
15    Treasury.
16         But it looks as if, based on the
17    e-mail from Brett Beldner in paragraph 1, that
18    we're still talking about the same 1.9 billion.
19    So if this is correct, then to go back to your
20    earlier question, then, yes, 1.9 referred to in
21    151A, based on my interpretation in Brett's
22    e-mail, would have been included in the
23    spreadsheet found on page 2 of Exhibit 178.
24         Q.   And in the answer you just gave you
25
TSG Reporting - Worldwide (877) 702-9580

Page 137

HIGHLY CONFIDENTIAL - R. AZERAD
1    discussed the quality of the GFS information?
2         A.   That's correct.
3         Q.   What were the problems you were having
4    with the GFS information that weekend?
5         A.   The primary issue from a Treasury
6    standpoint is that we had not ascertained which
7    securities were kept by JPMorgan and which
8    securities were being allocated to Barclays, and
9    there were also, besides Barclays, there were
10    also I believe two or three repo counterparts
11    which also were funding LBI as of Friday night.
12         I don't remember, I believe one of
13    them was BGI, Barclays Global Investors, but
14    that was separate from the transaction that we
15    had with Barclays. That was a long-standing
16    repo transaction. One of them was Dresdner Bank
17    and I don't remember the name of the third repo
18    counterpart.
19         So because we didn't have the, what we
20    call the allocation file from JPMorgan, it was
21    difficult for us in Treasury to understand what
22    assets were -- could be transferred to Barclays.
23    What was -- what happened is Operations, which
24    was looking at actual depot position, was able
25
TSG Reporting - Worldwide (877) 702-9580

Page 138

HIGHLY CONFIDENTIAL - R. AZERAD

1  to kind of provide a better picture of the
2  assets that were left unencumbered and,
3  therefore, could be transferred to Barclays.
4     Q.  I just want to better understand these
5  different sources of information. The Treasury
6  work stream looked to the GFS information as the
7  reasons you just stated, found it to be not
8  complete or reliable for its purposes that
9  weekend, correct?
10    A.  That's correct.
11    Q.  And I think you said ultimately the
12  work stream that provided the data that was
13  relied on was the Ops, Operations Work Team; is
14  that correct?
15    A.  That's correct.
16    Q.  You said they had visibility of what
17  was in the depot, is that right?
18    A.  That is correct.
19    Q.  What do you mean by that? What
20  information were they seeing that was not being
21  captured by GFS?
22    A.  Well, the way that -- let me try to
23  be -- what they had access to was actual
24  position held by depot -- what Operations had
25
TSG Reporting - Worldwide (877) 702-9580

Page 139

HIGHLY CONFIDENTIAL - R. AZERAD

1  access to was actual information provided by
2  depot, such as DTC being one of them, being
3  probably the primary of them, but there were
4  other depot as well that LBI had in the U.S. and
5  outside the U.S.
6     There were typically -- I don't
7  believe, again, I'm not an expert in GFS, how --
8  why this information was not fed in GFS on the
9  kind of day-to-day basis, but the information
10  from GFS, as it was explained to me that week
11  and that weekend, was dependent on getting
12  information from JPMorgan Chase on what -- on
13  which securities they were -- they allocated and
14  which securities were left at the Lehman account
15  at JPMorgan Chase.
16    Q.  And again --
17    A.  Now, depot --
18       MR. STERN:  Wait for a question.
19    Q.  Have you finished your answer?
20    A.  No.  No.  Please, continue.
21    Q.  Was there someone at Lehman who told
22  you that weekend that there were problems with
23  the GFS information?
24    A.  I'm sure I heard it.  I don't remember
25
TSG Reporting - Worldwide (877) 702-9580

Page 140

HIGHLY CONFIDENTIAL - R. AZERAD

1  who told me that there was issue with the GFS
2  information.
3     Q.  And did the people that told you there
4  was problems with the GFS information tell you
5  what other data should be used, for example, the
6  Ops data stream?
7     A.  No, that's not the way I believe that
8  it -- I don't believe this is how it happened.
9  I think that they were -- I don't know when
10  operations started its effort, but product
11  control and Treasury I think worked side-by-side
12  almost as a dual track project.
13    I don't know when Operations kind of
14  started its own effort, but what I do know is
15  that, at the end, the data, the source data for
16  the information came from Operations. So,
17  therefore, the analysis, I'm sorry, came from
18  Operations.
19    Q.  In describing the problem at GFS, I
20  think you described a problem with identifying
21  particular securities, identifying specific
22  Cusips, was that part of the problem?
23    A.  Yeah.  Let me give you an example, for
24  instance.  I think in one of the previous
25
TSG Reporting - Worldwide (877) 702-9580

Page 141

HIGHLY CONFIDENTIAL - R. AZERAD

1  exhibits that you showed me this morning there
2  were a series of repo transactions between LBI
3  and LBIE, and I believe that GFS was still
4  showing this transaction as still being
5  outstanding even though our assessment at that
6  time, and I don't know, at least assessment of
7  Treasury, not necessarily senior management or
8  legal assessment, but the assessment of Treasury
9  is that these repos had failed, meaning LBI in
10  their return of cash back to LBI, they were
11  never going to be settled in a normal way, but I
12  believe that GFS still had this information as
13  if they were still outstanding and still ready
14  to be settled.  That would be one of the issues
15  that we had with GFS.
16    Q.  Did you also have an issue with GFS
17  about the valuation in the GFS system for a
18  particular security?
19    A.  Treasury was never -- was never
20  involved in the valuation of the assets.  We
21  rely on either GFS or other source of data as
22  directed to value the securities.  I think that
23  you showed me this morning an exhibit that
24  the -- with some e-mail between myself and I
25
TSG Reporting - Worldwide (877) 702-9580

Page 142

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   think either Paolo Tonucci or Martin Kelly where
3   I was asking which source of data -- which
4   source of pricing I should be using.
5        Q.   Now, the third work stream that you
6   described, you talked about Treasury, talked
7   about Operations and the third was PCG, correct,
8   Product Control Group?
9        A.   That's exhibit -- whatever was the big
10  exhibit that you showed me at the beginning.
11  175, I believe.  I'm not sure, but it's -- it
12  came from Product Control.
13       Q.   175 did?
14       A.   Yes.
15       Q.   And how do you know that?
16       A.   Because I know Chris Mincak and I know
17  Gerry Reilly.
18       Q.   And they were with Product Control?
19       A.   They were in Product Control.
20       Q.   Would the pricing information that
21  feeds into GFS come from the Product Control
22  Group?
23       A.   I'm not an expert.  I'm not familiar
24  enough with the valuation process at Lehman to
25  be able to answer your question.  Product
        TSG Reporting - Worldwide (877) 702-9580

Page 143

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   Control was involved.  I don't know whether -- I
3   don't know which other parties would have been
4   involved in the valuation process.
5        Q.   The information that Operations had
6   access to, the actual positions held by DTC and
7   other custodians?
8        A.   Yes.
9        Q.   Did that information also carry with
10  it valuation information?
11       A.   I can't answer your question.  I
12  haven't seen the source -- I haven't seen the
13  source document from DTC so I don't remember
14  whether or not the valuation came from DTC or
15  came from Lehman.  What we were using -- the
16  value of information from Treasury's standpoint
17  from DTC was knowing which Cusip and the
18  quantity of the Cusip.  I don't remember the
19  valuation where it came from.
20       Q.   Is it possible that you used the DTC
21  information for identifying the Cusip and the
22  quantity, but obtained pricing of value
23  information from another source?
24       MR. STERN:  Objection to the form.
25       A.   It was an e-mail that you showed me
        TSG Reporting - Worldwide (877) 702-9580

Page 144

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   this morning which I think said that that was
3   obtained, the pricing information at least from
4   one of the file, from Operations.  I don't
5   remember what -- which source of information
6   Operations used.
7        Q.   At any time during the weekend of
8   September 20th or thereafter, did you
9   prepare a valuation using pricing information
10  from the Bank of New York?
11       MR. STERN:  Objection to the form.
12       A.   Sorry, can you repeat the question?
13       (Record read.)
14       A.   What do you mean by "valuation"?
15       Q.   Did you ever calculate a value of the
16  assets transferred from Lehman to Barclays using
17  Bank of New York prices?
18       MR. STERN:  Objection to the form.
19       A.   Again, I was not involved in the
20  valuation process at Lehman.  What I -- what I
21  recall was, as part of another stream of work I
22  was involved with, was trying to understand the
23  assets being transferred -- the assets which had
24  been transferred from Lehman to Barclays, we
25  received I think it was one of your e-mail
        TSG Reporting - Worldwide (877) 702-9580

Page 145

1    HIGHLY CONFIDENTIAL - R. AZERAD
2   exhibits from this morning a file from Barclays.
3   I don't know which source of which pricing
4   information that file had, but there may have
5   been comparison between Cusip and prices between
6   Lehman and -- between Lehman and Barclays, but
7   not valuation per se, just comparison of
8   numbers.
9        Q.   Look at Exhibit 147A and also have
10  before you Exhibit 178.  If you look at the
11  second page of Exhibit 147A, that's the e-mail
12  from Jasen to you and others, do you see that?
13       A.   Yes.
14       Q.   There's a reference in that e-mail to
15  a BONY market value, B-O-N-Y market value, of
16  approximately it says 45 million, do you see
17  that?
18       A.   Yes.
19       Q.   Do you understand that at least in
20  this e-mail to be a reference to 45 billion?
21       A.   That would be my understanding, yes.
22       Q.   So, taking that as a reference to BONY
23  market value of approximately 45 billion, if you
24  now turn to Exhibit 178, there that draft
25  balance sheet, opening balance sheet, shows
        TSG Reporting - Worldwide (877) 702-9580

Page 146

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  **HIGHLY CONFIDENTIAL - R. AZERAD**
2  **total cash and inventory of what, 51.8 billion?**
3      MR. STERN: I'm sorry, what are you
4  looking at?
5      A.  I'm sorry, I don't see 51.8.
6      **Q.  I'm adding two numbers.  I'm adding**
7  **the cash and the 44.8 billion.**
8      A.  Oh, okay, but you don't include the
9  receivables.
10     **Q.  I'm not including the receivables, no.**
11     A.  Then, yes, it should be 51.8.
12     **Q.  Okay.  Did you ever hear about a $6**
13 **billion discrepancy between the BONY valuation**
14 **and any valuations that you had been using for**
15 **calculating the value of assets transferred from**
16 **Lehman to Barclays?**
17     MR. STERN: Objection to the form.
18     A.  I don't recall hearing about the 6
19 billion.
20     **Q.  Have you heard of any significant**
21 **pricing discrepancies between the BONY pricing**
22 **for the Lehman assets transferred to Barclays**
23 **and the values that were used by Lehman in**
24 **transferring those assets to Barclays?**
25     A.  I'm sorry, can you repeat the
       TSG Reporting - Worldwide (877) 702-9580

Page 147

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  question?
3      (Record read.)
4      A.  What do you mean by "significant"?
5      **Q.  Well, anything above a billion**
6  **dollars.**
7      A.  That there were pricing differences
8  probably, yes.  I don't remember the amount of
9  the pricing differences.
10     **Q.  If there had been a pricing**
11 **discrepancy of say 10 percent of the value of**
12 **the assets, is that something that would have**
13 **caught your attention?**
14     MR. STERN: Objection to the form.
15     A.  The charge for us and I believe, from
16 my recollection, is we did not -- that there was
17 disagreement between us and Barclays about the
18 actual securities transferred, so we had -- we
19 thought we had transferred some securities which
20 Barclays claimed never to have received and
21 vice-versa, and so when you talk about valuation
22 in general, it's hard for me to answer this
23 question.
24     **Q.  The disagreements that you recall**
25 **between Lehman and Barclays over the securities**
       TSG Reporting - Worldwide (877) 702-9580

Page 148

1  **HIGHLY CONFIDENTIAL - R. AZERAD**
2  **transferred, was the magnitude of that**
3  **disagreement in the several billion dollars?**
4      MR. STERN: Objection to the form.
5      A.  I don't remember the exact amount.  I
6  know that we had been in -- I had -- I know that
7  I had exchanged e-mails with Operations and with
8  Barclays trying to create kind of a -- create a
9  list of assets that had been transferred between
10 Lehman and Barclays, and I do remember that it
11 was a very difficult exercise.
12     **Q.  Was the process that you talked about**
13 **earlier, the process on September 19th of**
14 **identifying additional assets to transfer to**
15 **Barclays, part of this disagreement?**
16     MR. STERN: Objection to the form.
17     A.  No.  What I said and what I continue
18 saying is not to transfer, but could be
19 transferred to Barclays.  I was not -- I was not
20 part of the negotiation between Lehman and
21 Barclays, so I don't know which assets had been
22 discussed as part of the transfer.
23     **Q.  Identifying the assets to be**
24 **transferred to Barclays, whether or not they**
25 **were actually transferred, identifying the**
       TSG Reporting - Worldwide (877) 702-9580

Page 149

1  **HIGHLY CONFIDENTIAL - R. AZERAD**
2  **assets that could be transferred to Barclays on**
3  **September 19, was that because Barclays believed**
4  **it had not received enough value in the assets**
5  **that were transferred from Lehman to Barclays?**
6      MR. STERN: Objection to the form.
7      A.  I don't know.  That is a question I
8  think which is best asked with Barclays.  I was
9  just asked to continue working on the list of
10 assets that could be transferred to Barclays.
11     **Q.  Do you recall hearing from anyone on**
12 **Friday, September 19, that Barclays was asking**
13 **for additional assets and collateral because**
14 **they thought they hadn't gotten enough?**
15     A.  I don't recall precisely.  I -- I
16 recall that on the -- that during that night,
17 the night between the 18th and the 19th,
18 Barclays had to deposit cash, I believe 7
19 billion, which is based on this balance sheet,
20 at JPMorgan Chase, which would seem to indicate
21 that they were expecting more securities to be
22 transferred.
23     MR. STERN: Could you repeat the
24 question, please?
25     (Record read.)
       TSG Reporting - Worldwide (877) 702-9580

Page 150

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      A.   What I do recall, and again, not --
3      MR. STERN:  The question asks if you
4  recall anyone telling you that.
5      A.   I don't --
6      Q.   Answer the question.
7      A.   I don't recall specifically someone
8  telling me that.
9      Q.   Were you ever given a target amount of
10  assets to identify on September 19 as additional
11  assets or collateral to be made available for
12  transfer to Barclays?
13      A.   Not to the best of my recollection.  I
14  think that we were trying to come up with a list
15  of assets that could be transferred to Barclays,
16  but I don't recall hearing about a target.
17      Q.   So you just had to keep looking for
18  assets until there were no more defined?
19      MR. STERN:  Objection to the form.
20      Q.   Was that your instruction?
21      A.   Well, it was -- you made it sound as
22  if every asset that were identified was going to
23  be transferred to Barclays.  That I don't know
24  and I don't know now and I didn't know at the
25  time.  My job was more narrowly focused on just

Page 151

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  trying to understand which assets could be
3  transferred to Barclays.
4      Q.   And there was no dollar amount that
5  you were provided as to when you could stop
6  trying to identify additional assets, correct?
7  You had to just keep identifying as many assets
8  as you could that could be transferred to
9  Barclays?
10      MR. STERN:  Objection to the form.
11      A.   I mean, they --
12      I'm sorry, can you repeat the
13  question?
14      (Record read.)
15      A.   Yes, although what's -- that's not the
16  way that I -- that's not the way that I, going
17  back to that week, it's not the way that I felt
18  about it.  What happened is that we had a series
19  of assets left at Chase and so we had -- the
20  purpose of a lot of this exercise was trying to
21  find assets outside of Chase that could be
22  transferred to Barclays.
23      Q.   And as part of that exercise of trying
24  to find these assets outside of Chase, there was
25  no limit set on a number that you were shooting

Page 152

1  HIGHLY CONFIDENTIAL - R. AZERAD
2  for, is that your testimony?
3      A.   There was no -- I don't recall hearing
4  about a limit.
5      Q.   Sir, I've handed you a one-page
6  document marked Exhibit 164A.  Take a moment to
7  look at it.  Let me know when you're done.
8      (Document review.)
9      A.   I'm done.
10      Q.   Have you seen this document before
11  today?
12      A.   I don't recall, but you show it no me
13  and clearly I am on some of -- I am both on the
14  "to" and on the "from" line, so I must have seen
15  the document at that time.
16      Q.   The document concerns a discussion,
17  the subject line says "Box Summary versus Spero
18  Report," do you see that?
19      A.   Yes.
20      Q.   Does the term "box summary" have any
21  meaning to you?
22      A.   "Box" is a term which is very loosely
23  used.  It has -- it has multiple meanings, and
24  in that particular context, I don't remember
25  what "box summary" means.

Page 153

1  HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.   How about the phrase "Spero report,"
3  does that have any meaning to you?
4      A.   Spero was an employee of Lehman
5  Brothers, and I don't recall what the Spero
6  report means.
7      Q.   And then there's a calculation set out
8  at the bottom of that e-mail chain from John
9  Vergel de Dios to you and Henry Domenici?
10      A.   Yes.
11      Q.   Do you understand the information
12  contained in that e-mail?
13      A.   I'm afraid I don't recall what it
14  means.  The numbers -- I'm not sure what it
15  means.
16      Q.   You respond to that e-mail by
17  forwarding it to Paolo Tonucci and you state,
18  "FYI - 3.$2 billion of risk.  I'm
19  double-checking the numbers."  Do you see that?
20      A.   Yes.
21      Q.   Do you have any understanding as you
22  sit here about what you meant by that?
23      A.   I'm afraid not.
24      MR. STERN:  At some point if we could
25  take a really short break, whenever it's

Page 154

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   convenient.
3      MR. TAMBE: Ten, fifteen minutes.
4      Q.  Sir, I've handed you a one-page
5   document marked Exhibit 169A?
6      A.  Yes.
7      Q.  Have you seen this document
8   previously?
9      A.  Again, I don't recall, but clearly I'm
10  listed in the "to" and "from" line.
11     Q.  There's two e-mails on there.  The
12  bottom e-mail is from Irina Veksler to you, do
13  you see that?
14     A.  Yes.
15     Q.  And the subject line states, "PL on
16  the 9/18 - It is only 1.9 billion."  Do you see
17  that?
18     A.  Yes.
19     Q.  Do you know what that's a reference
20  to?
21     A.  No, the e-mail -- I believe, both
22  Irina's email and my e-mail has an attachment to
23  Book2.xls.  It would be helpful to look at this
24  attachment if you have, because I don't recall
25  exactly the discussion listed on that e-mail.
       TSG Reporting - Worldwide (877) 702-9580

Page 155

1      HIGHLY CONFIDENTIAL - R. AZERAD
2      Q.  Okay.  In Irina's e-mail to you, she
3   states, "Robert, we found only $1.9 billion.  I
4   heard from Paolo that you're expecting $3.1
5   billion.  Do you know where this number is
6   coming from?"  Do you see that?
7      A.  Yes.
8      Q.  Was there a $3.1 billion item that you
9   were expecting on the 20th or 21st of September?
10     A.  I don't remember what the 3.1 or the
11  1.9 refer to.  As a general context, this e-mail
12  was sent on Sunday, and as I previously stated,
13  there was a lot of uncertainty about the LBI
14  numbers from a --
15        (Exhibit 181, a document bearing Bates
16  Nos. BCI-EX-00115093 through 115098, marked
17  for identification, as of this date.)
18     Q.  Sir, I've handed you a six-page
19  document marked Exhibit 181.  Take a moment to
20  review it and I will ask you some questions
21  about it.  Let me know when you're done.
22        (Document review.)
23        MR. STERN:  This obviously has a lot
24  of information on it.
25     A.  I don't also remember seeing it,
       TSG Reporting - Worldwide (877) 702-9580

Page 156

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   but --
3      Q.  Let me ask some questions.  Are you
4   done sort of flipping through it?
5      A.  Yes, I'm done flipping through it,
6   yes.
7      Q.  Let me start with the first question.
8   Have you ever seen this document before today?
9      A.  As I was previously saying, I don't
10  remember seeing this document before.
11     Q.  Okay.  Can you tell by the form of
12  this document whether it's a form of document
13  that you recall seeing at Lehman?
14     A.  It says Lehman Brothers in the first
15  page and it has the slide format for a Lehman
16  slide.
17     Q.  Can you tell by looking at any of
18  these pages whether you were involved in the
19  preparation of this document in any way?
20     A.  No, I can't.  It's very hard for me to
21  see what the purpose of this document was.  I do
22  see on page 2 that whoever wrote the document
23  listed the fact that they had issues with
24  Lehman's systems, which I previously mentioned.
25  But no, I don't know, I don't know how this
       TSG Reporting - Worldwide (877) 702-9580

Page 157

1      HIGHLY CONFIDENTIAL - R. AZERAD
2   document had been prepared.
3      MR. STERN:  Can we take a break?
4      MR. TAMBE:  Sure.
5      (Recess; Time Noted:  2:24 P.M.)
6      (Time Noted:  2:39 P.M.)
7      MR. STERN:  We're looking at Exhibit
8   86B.
9      MR. TAMBE:  Yes, it's a three-page
10  exhibit previously marked Exhibit 86B.
11  BY MR. TAMBE:
12     Q.  Take a moment to take a look at it and
13  I'll ask you a couple of questions about it.
14        (Document review.)
15     A.  I'm ready.
16     Q.  Okay.  Are you familiar with this
17  document, sir, 86B?
18     A.  No, I'm not.
19     Q.  At any time were you asked to prepare
20  spreadsheets containing information provided to
21  Barclays' auditors related to the acquisition?
22        MR. STERN:  Is this --
23     A.  This is part --
24        MR. STERN:  Is this post-acquisition
25  activity you're talking about?  Is that what
       TSG Reporting - Worldwide (877) 702-9580

Page 158

HIGHLY CONFIDENTIAL - R. AZERAD
1
2   your question calls for?
3       MR. TAMBE:  Yes, Barclays has produced
4   certain documents that I think were
5   identified in a letter from your office,
6   Jack, as spreadsheets containing information
7   provided to Barclays' auditors relating to
8   values that Barclays booked for the
9   securities relating to acquisition balance
10  sheets.
11      MR. STERN:  I think you can answer the
12  narrow question.  The narrow question is
13  whether at any time you were asked to
14  prepare spreadsheets containing information
15  provided to Barclays' auditors relating to
16  the acquisition.
17  A.   Can you repeat the question?
18      (Record read.)
19  A.   Can I have a --
20      MR. STERN:  Sure.  Do you have a
21  question?  Let me just consult with the
22  witness.  This may involve a privilege
23  issue.
24      (The witness and Mr. Stern leave the
25  room to confer.)

TSG Reporting - Worldwide (877) 702-9580

Page 159

HIGHLY CONFIDENTIAL - R. AZERAD
1
2       MR. STERN:  I understand from Mr.
3   Azerad that he did certain work with counsel
4   for Barclays relating to assessing certain
5   claims and that any involvement which
6   relates to the subject matter of this
7   question would have been a part of that
8   work, and accordingly, I'm going to instruct
9   him not to answer.
10  BY MR. TAMBE:
11  Q.   Let's go back to Exhibit 86B.  You
12  played no role in the preparation of that
13  exhibit; is that correct?
14  A.   To the best of my knowledge, yes.
15  Q.   Sir, I've handed you a one-page
16  document marked Exhibit 87B.  If you would take
17  a moment to look at that.  Let me know when
18  you're done.
19      (Document review.)
20  A.   I'm done.
21  Q.   Are you familiar with this document,
22  sir?
23  A.   I'm not familiar with this document.
24  Q.   Do you know if you played any role in
25  the preparation of this document?

TSG Reporting - Worldwide (877) 702-9580

Page 160

HIGHLY CONFIDENTIAL - R. AZERAD
1
2   A.   To the best of my knowledge, no.
3   Q.   There's a column C titled "FO Value,"
4   do you see that?
5   A.   Yes.
6   Q.   Does that phrase have any meaning to
7   you?
8   A.   I don't know what "FO Value" means.
9   Q.   That's not a phrase that you use in
10  your daily work?
11  A.   It's not -- it's not a phrase, it's
12  not an expression that I use in my daily work.
13  Q.   Sir, I've handed you a multi-page
14  document marked Exhibit 88B.
15  A.   Yes.
16  Q.   Take a moment to look through that
17  document.  I'll ask you a couple questions.
18      (Document review.)
19  A.   I'm done.
20  Q.   Are you familiar with this document,
21  Exhibit 88B?
22  A.   No, I'm not.
23  Q.   And in reviewing Exhibit 88B, do you
24  believe you played any role in the preparation
25  of this exhibit?

TSG Reporting - Worldwide (877) 702-9580

Page 161

HIGHLY CONFIDENTIAL - R. AZERAD
1
2   A.   To the best of my knowledge, no.
3   Q.   Do you know, generally, sir, if
4   Barclays has sold or otherwise disposed of the
5   assets it acquired from Lehman?
6   A.   To the best of my knowledge, I don't
7   know.
8   Q.   Who at Barclays would know if any of
9   those assets have been sold and, if so, at what
10  value?
11  A.   I don't -- I cannot answer your
12  question.  I don't know.
13  Q.   Are you familiar, sir, with a
14  settlement involving LBI and Barclays in or
15  about December of 2008?
16  A.   LBI and Barclays?
17  Q.   Yes.
18  A.   I'm not aware.
19  Q.   Does the phrase "Annex A" have any
20  meaning to you?
21  A.   It doesn't, to the best of my
22  knowledge.
23  Q.   After the September transaction, are
24  you aware of any subsequent transfer or
25  agreement to transfer collateral from LBI to

TSG Reporting - Worldwide (877) 702-9580

Page 162

HIGHLY CONFIDENTIAL - R. AZERAD

1 Barclays?
2    A.  I'm sorry, can you repeat the
3 question?
4    (Record read.)
5    A.  What do you mean by "September
6 transaction"?
7    **Q.  The Asset Purchase Agreement, the sale**
8 **of assets approved by the court after that.  Are**
9 **you aware of any transfers of collateral from**
10 **LBI to Barclays?**
11    A.  Sorry, can you -- I'm sorry to make
12 you repeat the question the second time.
13    (Record read.)
14    A.  I believe that -- when you mean
15 September transaction, you mean Asset Purchase
16 Agreement which was I believe signed the
17 beginning of the week of September 22nd, if I
18 remember correctly?
19    **Q.  Yes, after that transaction.**
20    A.  I believe, to the best of my
21 knowledge, there were subsequent asset transfers
22 from LBI to Barclays after, after that date.
23    **Q.  And is your understanding that those**
24 **subsequent transfers were all pursuant to the**

TSG Reporting - Worldwide (877) 702-9580

Page 163

HIGHLY CONFIDENTIAL - R. AZERAD

1 Asset Purchase Agreement that you say was signed
2 early the week of September 22?
3    MR. STERN: Objection to the form.
4    A.  I don't recall at that time seeing the
5 asset purchase transaction, so I cannot answer
6 your question.
7    **Q.  Are you aware of any agreement between**
8 **Barclays and JPMorgan for the transfer of assets**
9 **from JPMorgan to Barclays concerning the Lehman**
10 **transaction?**
11    MR. STERN: Objection to the form.
12    **Q.  Let me ask you:  JPMorgan and Barclays**
13 **may do a lot of business, okay?  I don't care**
14 **about that business.  Are you aware of any**
15 **business they have done in connection with**
16 **Lehman Brothers and the settlement of the Lehman**
17 **Brothers transaction?**
18    MR. STERN: Objection to the form.
19    You can answer if you understand.
20    A.  I believe that there was -- and again,
21 I'm not a lawyer, so I would use this word in
22 the loosest definition of the term -- some
23 disagreement between Barclays and JPMorgan which
24 delayed the repayment of 7 billion of cash that

TSG Reporting - Worldwide (877) 702-9580

Page 164

HIGHLY CONFIDENTIAL - R. AZERAD

1 Barclays left with JPMorgan I believe the night
2 of the -- the night of September 18th.
3    **Q.  And do you know how that disagreement**
4 **was resolved?**
5    A.  They -- my recollection was that this
6 disagreement was resolved by JPMorgan sending to
7 Barclays some cash and some securities.
8    **Q.  Did you play any role in the**
9 **resolution of that disagreement?**
10    A.  I did not play a role in the
11 resolution of the disagreement.
12    **Q.  Did you play any role in the**
13 **disagreement in any way, in terms of identifying**
14 **assets or identifying schedules or the like?**
15    A.  No, I did not play a role in the way
16 that you described it.
17    **Q.  And did you play any role?**
18    A.  My knowledge of this disagreement, of
19 the resolution of this disagreement primarily
20 came as a result of my group being responsible
21 for understanding the liquidity position of
22 Barclays' North American operations.
23    **Q.  How did this disagreement affect or**
24 **have some impact on Barclays' -- the liquidity**

TSG Reporting - Worldwide (877) 702-9580

Page 165

HIGHLY CONFIDENTIAL - R. AZERAD

1 position of Barclays' North American operations?
2    A.  While the cash was held by JPMorgan,
3 it was clearly not available to Barclays to
4 dispose of or to act upon it, and so it did have
5 an impact on Barclays' liquidity position in the
6 sense that it became, in Treasury parlance, an
7 illiquid asset.
8    **Q.  The assets that were transferred from**
9 **Lehman to Barclays, in your role at Barclays,**
10 **did you use those assets as collateral to secure**
11 **financing for Barclays' North American**
12 **operations?**
13    MR. STERN: Objection to the form.
14    A.  I don't know.  The -- we do not
15 distinguish, when we look at the assets being
16 funded by Barclays on a secured basis, their
17 origin.
18    **Q.  You didn't seek to exclude the Lehman**
19 **assets from your liquidity arrangements,**
20 **correct?**
21    A.  What do you mean?
22    **Q.  Well, the assets you got from Lehman,**
23 **you just rolled them in with all the other**
24 **assets that Barclays North America had and you**

TSG Reporting - Worldwide (877) 702-9580

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  got secured financings against those assets,
2  correct?
3  MR. STERN: Objection to the form.
4  A.  I'm not sure. Some of these assets
5  may have been -- may have been pledged. Some
6  may not have been. I don't know which one --
7  which ones were pledged, which ones were not
8  pledged to secure secured -- to get secured
9  financing.
10  Q.  If you go back to 86B and 87B, looking
11  at 86B first, which is the three-page document,
12  on page 1 there's a column F titled "PCG
13  Liquidity Value"?
14  A.  Yes.
15  Q.  Do you have any understanding of what
16  that term "PCG liquidity value" means?
17  A.  No, I don't.
18  Q.  Is that a term that you use in your
19  day-to-day business?
20  A.  No, it's not a term that we use.
21  Q.  On Exhibit 87B --
22  A.  Yes.
23  Q.  -- there's a column F titled "MV w
24  Liquidity." Do you see that?
25  TSG Reporting - Worldwide (877) 702-9580

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  A.  Yes.
2  Q.  Is that a phrase you're familiar with?
3  A.  No, it's not.
4  Q.  Not a phrase that you use in your
5  day-to-day business, correct?
6  A.  That's correct.
7  MR. TAMBE: I want to take a short
8  break. I think I'm almost done with my line
9  of questioning. Let me check.
10  (Recess; Time Noted: 2:58 P.M.)
11  (Time Noted: 3:04 P.M.)
12  BY MR. TAMBE:
13  Q.  Just a couple of questions, Mr.
14  Azerad. Stephen King, was Mr. Stephen King at
15  Barclays? Is that a name you're familiar with?
16  A.  The name is familiar. He was involved
17  in the transfer -- in the transfer of assets. I
18  believe he works in the group at Barclays called
19  PMTG.
20  Q.  Do you know what "PMTG" stands for?
21  A.  I don't know.
22  Q.  In late September were you involved in
23  the preparation of Schedules A and B to the
24  Asset Purchase Agreement?
25  TSG Reporting - Worldwide (877) 702-9580

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  A.  I was involved.
2  Q.  Will you describe that process, the
3  preparation of Schedules A and B?
4  A.  To the best of my recollection,
5  Schedule A referred to the asset transfers on
6  Thursday night and Schedule B was part of the
7  exercise of trying to identify assets that could
8  be transferred to Barclays.
9  Q.  And that's the process that you had
10  talked about earlier in your deposition about
11  having taken place in September 19 and later; is
12  that right?
13  A.  That is correct.
14  Q.  And what's listed in Schedule B then
15  is a listing of the assets that actually were
16  transferred or to be transferred to Barclays
17  pursuant to that process?
18  MR. STERN: Objection to the form.
19  A.  I'm sorry, can you repeated the
20  question?
21  (Record read.)
22  A.  No, that's -- that's not what I said.
23  I said that the exercise that we did for
24  Schedule B was a list of assets that could be
25  TSG Reporting - Worldwide (877) 702-9580

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  transferred to Barclays.
2  Q.  Were any of the assets on Schedule B
3  actually transferred to Barclays?
4  A.  I don't know. The work that Treasury
5  did on Schedule B, as I mentioned in one of my
6  previous answers, didn't generate good results
7  and so we switched to the list provided by
8  Operations. To the best of my knowledge, we
9  never tried to reconcile the two lists, so it
10  may well be, I don't know.
11  Q.  Do you have any understanding of any
12  Schedules A and B being filed with the court?
13  A.  As I mentioned earlier, I haven't seen
14  the -- in September, I hadn't seen the Asset
15  Purchase Agreement.
16  Q.  As you sit here today, are you aware
17  of Schedules A and B having been filed with the
18  court?
19  A.  I'm not aware of it.
20  Q.  As you sit here today, are you aware
21  of a Schedule B that definitively lists the
22  assets that actually were transferred to
23  Barclays?
24  A.  I'm not aware of it.
25  TSG Reporting - Worldwide (877) 702-9580

## Page 170

HIGHLY CONFIDENTIAL - R. AZERAD

1  
2      MR. TAMBE:  Subject to production of
3  documents and rulings of the court and
4  privilege invocations that have been made
5  today, I want to pass the witness to the
6  other counsel.
7  EXAMINATION BY
8  MR. ROTHMAN:
9      Q.   Good afternoon, Mr. Azerad.  My name
10  is Seth Rothman.  I represent the Trustee.
11      A.   Good afternoon.
12      Q.   I'd like to start by marking as the
13  next exhibit an e-mail string.  The top e-mail
14  is -- doesn't involve you.  It's from Mr.
15  Tonucci to Mr. Blackwell.  You'll see the first
16  e-mail in the string is from Mr. Tonucci to you
17  and others.
18          (Exhibit 182, an e-mail chain, the
19      earliest in time from P. Tonucci to R.
20      Azerad and others, dated September 20, 2008,
21      marked for identification, as of this date.)
22      Q.   Why don't you take a minute to review
23  that.  I'm only going to ask you about the
24  bottom-most e-mail on the page.
25          (Document review.)

TSG Reporting - Worldwide (877) 702-9580

## Page 171

HIGHLY CONFIDENTIAL - R. AZERAD

1  
2      A.   I'm ready.
3      Q.   Do you recall receiving this e-mail
4  from Mr. Tonucci?
5      A.   I don't recall, but I was clearly
6  listed as one of the recipients.
7      Q.   Okay.  The e-mail is -- the subject
8  line is "Non-actionable box," correct?
9      A.   Yes.
10      Q.   First line he writes, "We need to go
11  through where all of this is.  Some may be in
12  the DTC box which may be mixed up with the
13  tri-party pledge on Thursday."
14          That's what the Mr. Tonucci wrote in
15  his e-mail, correct?
16      A.   Yes.
17      Q.   Do you know what he meant by the "DTC
18  box"?
19      A.   Not specifically.
20      Q.   Is that a phrase with which you are
21  familiar, "DTC box"?
22      A.   It's a phrase with which I'm familiar,
23  or at least I've used in the past.  Lehman had
24  more than one DTC boxes, and by "Lehman," I
25  meant LBI.

TSG Reporting - Worldwide (877) 702-9580

## Page 172

HIGHLY CONFIDENTIAL - R. AZERAD

1  
2      Q.   When you say -- you said before, I
3  think, that the word "box" has different
4  meanings depending on context.  When you say
5  that LBI had different boxes of DTC, how are you
6  using that term "box"?
7      A.   As a synonym for accounts.
8      Q.   So one of the accounts at the DTC
9  would be the O74 account; is that correct?
10      A.   That's how it was referred to within
11  Lehman.
12      Q.   And when you talk about the
13  non-actionable box, and I know you explained
14  this already today, but in that context, you're
15  not referring to the non-actionable box as an
16  account, are you?
17      A.   No, that would have a different
18  definition.  By in the context of non-actionable
19  box, "box" is meant to be synonym with a
20  portfolio or a list of unencumbered securities.
21      Q.   So let me just see if I understand
22  whether there's a relationship between the DTC
23  account and the non-actionable box.
24          Is it the case that there may be
25  securities in the DTC box that are also counted

TSG Reporting - Worldwide (877) 702-9580

## Page 173

HIGHLY CONFIDENTIAL - R. AZERAD

1  
2  toward the portfolio that would represent the
3  non-actionable box?
4      A.   It may -- it very well may be.
5      Q.   And there may also be securities in
6  the DTC boxes that would not be within the
7  non-actionable box, is that also true?
8      A.   It may very well be.
9      Q.   And what distinguishes between the
10  securities that are in the non-actionable box
11  and the ones that aren't?  Is it that they're
12  not encumbered and can be pledged?
13      A.   No, the non-actionable box is a Lehman
14  expression which refers back to the Lehman
15  funding framework and it refers to a set of
16  securities which Lehman on a -- was funded on an
17  unsecured basis.  Therefore, they would have
18  been left unencumbered.
19      Q.   If we can return to Exhibit 182.  Mr.
20  Tonucci again in his e-mail says, "We need to go
21  through where all of this is."  Did you
22  understand him to be referring to the
23  non-actionable box when he said that?
24      A.   That's my understanding today.  I
25  don't remember how on September 20th, when

TSG Reporting - Worldwide (877) 702-9580

## Page 174

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  presumably I read this e-mail, I understood this
3  sentence to mean.
4      Q.   Did you do anything to go through
5  where all of this is in response to this e-mail?
6      A.   To the best of my recollection, this
7  was -- this was part of the stream of work that
8  Treasury was involved with to determine a list
9  of assets that could be transferred to Barclays,
10  and I think the way that I read Paolo's e-mail
11  today, which again, may have been different from
12  the way I read it at that time, was that some of
13  these non-actionable box, meaning securities,
14  that would have been funded unsecured may have
15  been left at JPMorgan Chase.
16      Q.   Why do you say that?  Is that -- what
17  part of the e-mail are you referring to?
18      A.   The second paragraph, "their box loans
19  with these positions."
20      Q.   Okay.  Are those securities physically
21  located at the DTC?
22      A.   Not necessarily.  It's, as we
23  previously discussed, the term "box" used in the
24  context of non-actionable box just means a list
25  of securities irrespective of their locations.

TSG Reporting - Worldwide (877) 702-9580

## Page 175

HIGHLY CONFIDENTIAL - R. AZERAD

1
2      Q.   Okay.  And in the third paragraph of
3  his e-mail he says, "We will need to ensure that
4  nothing more than was in the box loan file was
5  taken from DTC O74."  Do you have an
6  understanding of what that means?
7      A.   No, I don't recall.
8      Q.   As you sit here today, do you have any
9  idea what that means?
10      A.   No, I don't recall even today.
11      Q.   That's it for that exhibit.
12      I'm going to mark as Exhibit 183 an
13  e-mail string.  The top e-mail is from Mr.
14  Lowitt to you dated Saturday, September 20,
15  2008.
16      (Exhibit 183, an e-mail string, the
17  first in time from A. Blackwell to I.
18  Lowitt, dated September 20, 2008, marked for
19  identification, as of this date.)
20      MR. STERN:  Seth, I just want to
21  confirm these documents that you're marking
22  with new numbers have not been marked in
23  previous depositions.
24      MR. ROTHMAN:  Not as far as I can
25  tell.  I can't guarantee you that they

TSG Reporting - Worldwide (877) 702-9580

## Page 176

HIGHLY CONFIDENTIAL - R. AZERAD

1
2  haven't, but we're trying -- if they have
3  been marked --
4      MR. STERN:  We're trying to avoid
5  duplication.
6      MR. ROTHMAN:  If they have been marked
7  before, we'll try to use the prior version.
8      A.   I have read the exhibit.
9      Q.   Okay.  I want to direct your attention
10  to the middle e-mail, which is from Mr. Lowitt
11  to you dated Saturday, September 20, 2008.  Do
12  you see that e-mail?
13      A.   Yes.  At 6:26 P.M.?
14      Q.   Yes.  Do you have any -- do you recall
15  receiving this e-mail from Mr. Lowitt?
16      A.   I don't recall, but clearly I was
17  listed on the -- as a "from," so I must have
18  sent it.
19      Q.   Okay.  So he asks if you can please
20  check the "calc," correct?
21      A.   Yes.
22      Q.   He's referring to the 15c3
23  calculation?
24      A.   That's the way that I understand this
25  e-mail today.

TSG Reporting - Worldwide (877) 702-9580

## Page 177

HIGHLY CONFIDENTIAL - R. AZERAD

1
2      Q.   Okay.  And he asks you if you are able
3  to do that, and your response in the e-mail
4  above is, "Probably not, but I can try."  Do you
5  recall why you said that in response?
6      A.   The 15c3 calculation is a very complex
7  calculation and I didn't think that I was
8  qualified to verify the calculation.
9      Q.   Did you try to verify it?
10      A.   I don't recall.
11      Q.   Was that the only reason you told him
12  probably not, was because you didn't think you
13  were qualified to do it?
14      A.   That's the way that I read this e-mail
15  today.  Again, I don't recall how I -- how --
16  what I meant by "probably not, but I can try" on
17  September 20th.
18      Q.   Let's mark as Exhibit 184 an e-mail
19  from -- an e-mail string.  The top e-mail is
20  from you to Mr. Lowitt and Mr. Tonucci dated
21  Saturday, September 20, 2008.
22      (Exhibit 184, an e-mail string from R.
23  Azerad to I. Lowitt and P. Tonucci dated
24  September 20, 2008, marked for
25  identification, as of this date.)

TSG Reporting - Worldwide (877) 702-9580

Page 178

HIGHLY CONFIDENTIAL - R. AZERAD

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   (Document review.)
3   A.   I've read the e-mail.
4   Q.   Let's start with the bottom e-mail,
5   which is from you to Mr. Tonucci.  You write,
6   "Found 700 million in DTC box."  Is that
7   correct?
8   A.   That's what it says.
9   Q.   Do you recall what that refers to?
10  A.   No, I don't recall specifically what
11  it refers to.
12  Q.   Was this part of the effort to find
13  assets that could be transferred to Barclays?
14  MR. STERN: Objection to the form.
15  You can answer.
16  A.   Reading this e-mail today, that's how
17  I understand the sentence to mean.  I don't
18  remember what I meant at that time.
19  Q.   And you say you expect to find
20  approximately 400 million in LBI's foreign
21  depots and other DTC depots, correct?
22  A.   That's what it says.
23  Q.   What are the LBI foreign depots?
24  A.   To my recollection, LBI had some
25  foreign depots, I believe one in Canada and
TSG Reporting - Worldwide (877) 702-9580

Page 179

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   there may have been one in Europe. I'm not a
3   hundred percent certain about it.
4   Q.   And how are you distinguishing between
5   other DTC depots and the DTC box?
6   A.   I don't recall what I meant at that
7   time.
8   Q.   Are you finished?
9   A.   Yes, I'm finished.
10  Q.   The next part of the e-mail you write,
11  "Key question is whether they can count the 800
12  million delivered to Barclays on Friday."
13  What did you mean by that?
14  A.   I don't recall what I meant by that
15  and why it was a key question.
16  Q.   Do you know what the 800 million
17  refers to?
18  A.   It says in the e-mail "delivered to
19  Barclays on Friday," but so that's the only --
20  based on my understanding today, it must have
21  been related to some asset transfers, but I
22  don't know what I meant at that time.
23  Q.   Do you know where that 800 million was
24  physically located at the time that you sent
25  this e-mail to Mr. Tonucci?
TSG Reporting - Worldwide (877) 702-9580

Page 180

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   A.   No, I don't.
3   Q.   Let me show you what has been marked
4   as Exhibit 48 at a prior deposition. If it
5   helps speed things along, I'm only going to ask
6   you about the top two e-mails on the first page.
7   A.   If you don't mind --
8   Q.   You can read the whole thing,
9   absolutely.
10  A.   I would like to read to understand the
11  origin of the e-mail traffic.
12  (Document review.)
13  A.   I've read the e-mail.
14  Q.   I'd like to focus on the second e-mail
15  on the first page, the one from Monty Forrest,
16  and you're a CC on that e-mail. It's the --
17  A.   The one being sent 8:38 P.M., the
18  20:38?
19  Q.   Yeah, although -- correct.
20  So Mr. -- in point 1, Mr. Forrest
21  talks about 800 million at BONY. That's Bank of
22  New York, correct?
23  A.   That's correct.
24  Q.   Do you know if that's the same 800
25  million that was mentioned on the previous
TSG Reporting - Worldwide (877) 702-9580

Page 181

1   HIGHLY CONFIDENTIAL - R. AZERAD
2   exhibit?
3   A.   I don't remember if it is the same.
4   Q.   And then in point 3, he reports, "We
5   have identified 435 million in Canada." Does
6   that help refresh your recollection as to
7   whether the foreign depot was indeed the depot
8   in Canada?
9   A.   I was aware that LBI had a depot in
10  Canada, so again, based on what I'm seeing
11  today, that seems a logical implication. I
12  don't remember whether this was the same or not.
13  Q.   And then in the e-mail above, Mr.
14  Forrest reports -- and again, you're a CC on
15  that e-mail -- that the Canadian seems to be
16  mostly encumbered?
17  A.   Uh-huh.
18  Q.   And that refers to this 435 million?
19  A.   That's a question -- that's a question
20  best asked to Monty Forrest.
21  Q.   You don't know if that's the case?
22  A.   I mean, that's -- that's what the
23  e-mail seems to imply. I'm not the author of
24  this e-mail.
25  Q.   Okay. In point 4, he notes that, "We
TSG Reporting - Worldwide (877) 702-9580

Page 182

HIGHLY CONFIDENTIAL - R. AZERAD

1  have identified another 300 million of mortgages
2  in 636." Is that another box at the DTC?
3      A.   That's another account at the DTC.
4      Q.   That's all I have for that e-mail.
5  Thank you.
6          We saw, sir, on a draft balance sheet
7  that we looked at before that you had listed a
8  $1 billion receivable from the 15c3 lockup?
9      A.   That's correct.
10     Q.   Remember that?
11     A.   Yes, I do remember that.
12     Q.   Where did that $1 billion figure come
13 from, do you recall?
14     A.   I don't recall precisely.
15     Q.   Was that a product of a 15c3
16 computation that was done at or around this
17 time?
18     A.   I don't recall precisely. I mean,
19 we -- I recall that LBI did several calculations
20 of a 15c3-3 that week, the week of September
21 15th.
22     Q.   I'm going to mark as Exhibit 185 an
23 e-mail from you to Martin Kelly dated Sunday,
24 9/21/2008, and it has an attachment to it.

TSG Reporting - Worldwide (877) 702-9580

Page 183

HIGHLY CONFIDENTIAL - R. AZERAD

1          (Exhibit 185, an e-mail from R. Azerad
2  to M. Kelly dated September 21, 2008, with
3  attachment, marked for identification, as of
4  this date.)
5          (Document review.)
6      A.   I've read the attachment.
7      Q.   Do you recognize it?
8      A.   Yes, I do.
9      Q.   Can you tell me what it is?
10     A.   It was, as of September 21, which is a
11 Sunday, an analysis, a high-level analysis of
12 the 15c3 lockup on specifically the cushion,
13 which in a what I would call the perfect unwind
14 scenario should return to LBI.
15     Q.   Did you prepare the three-page
16 attachment?
17     A.   I believe I -- I believe that I wrote
18 the three-page attachment. Clearly other people
19 helped me prepare it.
20     Q.   Who helped you prepare it?
21     A.   Tony Stucchio's group. Tony, Anthony
22 Stucchio, as I mentioned in one of the earlier
23 questions, was the head of the Regulatory
24 Reporting Group at Lehman and his group was

TSG Reporting - Worldwide (877) 702-9580

Page 184

HIGHLY CONFIDENTIAL - R. AZERAD

1  involved in the calculation, in fact, was
2  responsible for the calculation of the 15c3-3
3  formula.
4      Q.   So he is providing you with the
5  numbers for this presentation; is that right?
6      A.   That is correct.
7      Q.   And you are responsible for the text?
8      A.   I may have had also other -- advised
9  some other people. Legal may have helped,
10 because, reading the text, there's clearly some
11 legal claims being made and I don't pretend to
12 be a lawyer in any sense of the word.
13     Q.   Is there a reason why you prepared
14 this attachment?
15     A.   To the best of my recollection, this
16 attachment must have been used as part of a
17 justification and part of the backup for the 1
18 billion claim which was on the opening balance
19 sheet which was mentioned earlier.
20     Q.   The attachment is a PowerPoint
21 presentation, correct?
22     A.   This is a -- I believe it is a
23 PowerPoint presentation, yes.
24     Q.   Were you asked to give a presentation

TSG Reporting - Worldwide (877) 702-9580

Page 185

HIGHLY CONFIDENTIAL - R. AZERAD

1  to somebody about the 15c3 lockup?
2      A.   I don't recall how this presentation
3  was being used after I sent to Martin Kelly.
4      Q.   Did Mr. Kelly ask you to prepare this?
5      A.   I don't recall.
6      Q.   You don't recall the purpose of this
7  presentation beyond what you've already told me?
8      A.   That is the best of my recollection.
9      Q.   Do you recall if this was meant to be
10 presented to Barclays or sent to Barclays?
11     A.   I don't recall.
12     Q.   I know you've told us this already,
13 but what was Mr. Kelly's position at Lehman?
14     A.   He was the Global Head of Financial
15 Control.
16     Q.   Do you know if he was familiar with
17 15c3?
18     A.   Anthony Stucchio reported to him. I
19 don't recall, directly or indirectly, but that
20 was -- he was -- this was part of his
21 responsibility.
22     Q.   You told me before this is a top line
23 presentation, correct?
24     A.   That is correct.

TSG Reporting - Worldwide (877) 702-9580

Page 186

HIGHLY CONFIDENTIAL - R. AZERAD
1
2     Q.   So you weren't doing this to educate
3   Mr. Kelly?
4     A.   I don't recall Martin Kelly's
5   knowledge of the 15c3-3, so ...
6     Q.   Okay.  Let me ask you about the
7   third -- sorry, withdrawn.  Is this your -- do
8   you know if this is your first draft of the
9   presentation?  I'll represent to you that there
10  is a subsequent draft of this.
11    A.   It's -- I don't recall.  It's very
12  rare that I can -- that's a general point -- I
13  can get a presentation right the first time.
14    Q.   Do you recall if you got any comments
15  from Mr. Kelly about the presentation?
16    A.   I don't recall.
17    Q.   Do you recall if you got comments from
18  anybody about this draft presentation?
19    A.   I don't recall.
20    Q.   Let me direct your attention to the
21  third bullet.  You write, "Lockup is segregated
22  in the form of cash and securities (treasuries
23  and Ginnie Mae securities) in specifically
24  designated segregated accounts, which are not
25  part of the bankruptcy proceedings because they

Page 187

HIGHLY CONFIDENTIAL - R. AZERAD
1
2   are held for the benefits of customers."
3         That's what you wrote?
4     A.   That's what it says.
5     Q.   And what did you mean to convey by
6   that bullet point?
7     A.   To the best of my recollection, what
8   the bullet point says, which is that the --
9   which is three points: It's held in the form,
10  but the lockup is held in the form of cash and
11  securities, securities being either Treasury
12  securities or Ginnie Mae securities, second
13  point that they are held in specifically
14  designated segregated accounts, and the third
15  point was that they were not part of the
16  bankruptcy proceedings because they are held for
17  benefit of customers.
18    Q.   What did you mean by the "bankruptcy
19  proceedings"?  Are you still talking here about
20  whether or not the assets can be conveyed to
21  Barclays?
22         MR. STERN:  Objection to the form.
23         Which question are you asking?  There
24  are two questions.
25    Q.   Why don't we take them in order.

Page 188

HIGHLY CONFIDENTIAL - R. AZERAD
1
2         MR. STERN:  What did you mean by
3   bankruptcy?
4     Q.   What did you mean by "part of the
5   bankruptcy proceedings"?
6     A.   I don't recall what I meant at that
7   point.  The e-mail was sent on September 21, at
8   which time I believe that LBI has or was about
9   to file for receivership.
10    Q.   Let's take the second part of the
11  question.  Can the lockup be conveyed to
12  Barclays?
13    A.   It's a legal question, so I don't
14  think I can, I can answer that question on
15  what -- what I was -- let me end the answer like
16  this.  It is a legal question.  I'm not
17  qualified to answer this question.
18    Q.   I understand.  And I'm not asking you
19  to give me a legal interpretation, but is it
20  what you meant to say in this presentation that,
21  to the extent that cash and securities are
22  locked up in segregated accounts, they're not
23  eligible to be conveyed to Barclays?
24         MR. STERN:  Objection to the form.
25    A.   I'm sorry, can you repeat?  Can you

Page 189

HIGHLY CONFIDENTIAL - R. AZERAD
1
2   repeat the question?
3         (Record read.)
4     Q.   And all I'm asking for is your
5   understanding.
6         MR. STERN:  Objection to the form.
7     A.   Again, I'm just going to repeat my
8   previous answer that it's -- I take it as a
9   legal question and I'm not qualified to answer
10  it.
11    Q.   Okay.  In the next bullet point you
12  refer to the excess of customer payables over
13  customer receivables?
14    A.   Uh-huh.
15    Q.   And you note that that represents real
16  customer claims that cannot be returned to
17  Lehman Brothers/Barclays in a liquidation
18  scenario; is that right?
19    A.   That's what it says in the
20  presentation.
21    Q.   What did you mean when you wrote that?
22  Can you explain that to me?
23         MR. STERN:  Objection to the form.
24    Q.   In terms of whether this -- whether
25  this excess can be conveyed to Barclays?

**HIGHLY CONFIDENTIAL - R. AZERAD**

1    A.    I think that the best way for me to
2  answer this question is to refer back to a
3  previous answer I gave this morning that, from
4  the Treasury perspective, and I'm not trying to
5  make any legal claim or any legal
6  interpretation, the 15c3-3 lockup was -- had two
7  parts: Parts representing customer claim and,
8  as in a perfect unwind scenario, the excess
9  should return to the customers; and another part
10  which represented assets being provided by LBI
11  and, in a perfect unwind scenario where there is
12  no more reason to do the 15c3-3 calculation,
13  these assets should return to LBI, but that's --
14  that's just from the -- that's my -- that's a
15  view from the funding perspective and not -- was
16  not from any legal perspective.
17    Q.    Are those assets that should return to
18  LBI, is that what you referred to as the
19  cushion?
20    MR. STERN:  Objection to the form.
21    A.    That's, I believe, what I referred to
22  this morning as the cushion, that's correct.
23    Q.    Mark as -- let's mark as Exhibit 186
24  an e-mail from you to Mr. Kelly.  It again has a

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  **PowerPoint presentation on the 15c3 lockup.**
2  **(Exhibit 186, an e-mail from R. Azerad**
3  **to M. Kelly dated September 21, 2008, with**
4  **attachment, marked for identification, as of**
5  **this date.)**
6  **(Document review.)**
7    A.    Okay.
8    Q.    Do you recognize Exhibit 186?
9    A.    Yes, I do.
10    Q.    Is that a revised version of your
11  presentation which we previously marked as
12  Exhibit 185?
13    A.    It appears to be.
14    Q.    On the covering e-mail it appears to
15  be version 2 of the presentation; is that right?
16    A.    That's the reason why I said it
17  appears to be.
18    Q.    You don't have any independent
19  recollection of this presentation?
20    A.    I don't have any -- that is correct, I
21  can't remember which presentation -- which
22  version came first.
23    Q.    Now, in the first version, Exhibit
24  185, you had estimated the cushion that could be

**HIGHLY CONFIDENTIAL - R. AZERAD**

1  **released in a liquidation to be approximately**
2  **1.2 billion, correct?**
3    A.    That's --
4    MR. STERN:  Objection to the form.
5    A.    That's what it says at the bottom of
6  page 1.
7    Q.    And now in Exhibit 186, do you have an
8  estimate of the cushion?
9    A.    I don't recall.  Reading this
10  PowerPoint presentation today, it appears as if
11  this was still being calculated.
12    Q.    And by the "this," you mean the
13  cushion part of it?
14    A.    By "this" I meant page 2 and the title
15  of page 2.
16    Q.    Which, for the record, is Cushion
17  Against Failed Trades, correct?
18    A.    No, the title is dollar $X.X billion
19  Cushion Against Failed Trades," with "X.X" being
20  typically a shortcut version that I use when I
21  don't have a number.
22    Q.    Okay.  If you look at the previous
23  page, the fourth bullet point.
24    A.    Page 1 of --

HIGHLY CONFIDENTIAL - R. AZERAD

1    Q.    Page 1 of --
2    A.    -- of Exhibit 18 --
3    Q.    6.
4    A.    Make sure I have the right one, if you
5  don't mind.
6    Q.    It's actually the second page of the
7  presentation.
8    A.    But it says page 1?
9    Q.    Correct.
10    You refer to a calculation of the 15c3
11  lockup done on Wednesday, September 17, correct?
12    A.    That's what the first sentence seems
13  to refer to, yes.
14    Q.    The amounts segregated on that date
15  were 1.769 billion for the customers and 492
16  million for the PAIB?
17    A.    That's what the sentence says.
18    Q.    What is PAIB?
19    A.    I used to know it and I don't
20  remember.  I believe that you can probably
21  find -- it's not -- it's not a Lehman
22  expression.  It's an S.E.C. expression, so I'm
23  sure it can be found without my help.
24    Q.    Are those brokers, the PAIB?

Page 194

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    A.    Again, I used to know the answer, but
3    I don't remember now what PAIB stands for.
4    Q.    Okay. And then you say, "During this
5    weekend, we recalculated the lockup as of Friday
6    September 19," correct?
7    A.    That's what it says.
8    Q.    And "the amounts to be segregated as
9    of Friday have gone down from the amounts that
10   had to be segregated as of Wednesday"; is that
11   correct?
12   A.    That's what the last sentence of that
13   paragraph seems to indicate.
14   Q.    And the reduction is in the total
15   amount of 1.123 billion?
16   A.    That's what it says.
17   Q.    And then you say "which can be
18   immediately transferred to Barclays," correct?
19   A.    That's what it says.
20   Q.    What's the basis for your writing that
21   it can be immediately transferred to Barclays?
22       MR. STERN: Objection. Seth, I don't
23   want to object to every single question, but
24   you are presuming that Mr. Azerad wrote
25   every word of this presentation and I don't

TSG Reporting - Worldwide (877) 702-9580

Page 195

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    know that you have established that. So I
3    object, but you can answer, and I'll just
4    state that as a continuing objection so I
5    don't have to continue to object.
6        MR. ROTHMAN: That's fine.
7    Q.    Do you recall writing that sentence?
8    A.    I don't recall specifically writing
9    that sentence.
10   Q.    Do you have any reason to believe that
11   somebody else wrote that sentence?
12   A.    This presentation as a whole was a
13   group effort. As I mentioned, as I believe I
14   stated previously, I did not do the calculation
15   of the 15c3-3 formula, so I had to rely on other
16   people, primarily Tony Stucchio's group, for the
17   calculation.
18       I did not and I do not claim any legal
19   knowledge of bankruptcy proceedings, so I must
20   have relied on someone else if I did write this
21   presentation for the third bullet point on page
22   1. So whether I was the scribe of various
23   people's opinions or I wrote the presentation,
24   meaning I took responsibility for it, I -- I
25   don't know.

TSG Reporting - Worldwide (877) 702-9580

Page 196

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    Q.    Okay. Well, I mean, as you sit here
3    today and look at the presentation, do you have
4    any understanding of whether the reduction of
5    1.123 billion could have been immediately
6    transferred to Barclays?
7    A.    Again, I don't recall how I -- how I
8    read this sentence back in September of 2008,
9    but your question is about me sitting here
10   today, and to the extent that the -- that the
11   regulators allowed Lehman to reduce its -- the
12   amount held in segregation for the benefit of
13   the 15c3-3, that would have resulted in
14   increasing the list of unencumbered assets which
15   can be, as it says on page 1, transferred to
16   Barclays.
17   Q.    Is it your understanding that you need
18   regulatory approval to do that?
19   A.    That was my recollection at that time,
20   that we -- that throughout the week, whenever we
21   did the recalculation of the 15c3-3 formula, and
22   we did the calculation more than once, we had
23   meetings with I recall the S.E.C., there may
24   have been other regulators, and there was -- and
25   it was only after these meetings took place and

TSG Reporting - Worldwide (877) 702-9580

Page 197

HIGHLY CONFIDENTIAL - R. AZERAD

1    HIGHLY CONFIDENTIAL - R. AZERAD
2    after receiving approval that we were able to
3    adjust the requirement of the amount to be
4    segregated.
5    Q.    I'll mark as Exhibit 187 an e-mail
6    string and an attachment that you're free, of
7    course, to read the entire exhibit. I'm only
8    going to ask you about the attachment.
9        (Exhibit 187, an e-mail string, the
10   first in time from J. Potenciano to W. Burke
11   and others, dated September 17, 2008, with
12   attachment, marked for identification, as of
13   this date.)
14   A.    I've read the e-mail.
15   Q.    Have you looked at the attachment to
16   the e-mail?
17   A.    I've looked at the attachment of the
18   e-mail.
19   Q.    Is the attachment in a form of
20   schedule that you're familiar with?
21   A.    It's typically not the form in which a
22   15c3-3 formula is presented. There was this
23   morning another attachment which had the
24   normal -- well, normal -- the normal Lehman way
25   of presenting the 15c3-3.

TSG Reporting - Worldwide (877) 702-9580

Page 198

HIGHLY CONFIDENTIAL - R. AZERAD

1     The first e-mail, the e-mail at the
2  top, seems to -- again, reading it today, but I
3  don't recall how I read it at that time -- seems
4  to indicate why this is not the usual form.
5     Q.  Did you understand what the attachment
6  is purporting to show?  Can you walk me through
7  these different items?
8     A.  Well, I did not create this attachment
9  so I don't think that I'm particularly qualified
10 to explain to you what this attachment -- what
11 this attachment means.
12    Q.  Let me ask it this way.  Do you know
13 what "total customer credits items," do you know
14 what that refers to?
15    A.  Not specifically if you ask me.
16    Q.  How about generally, is that -- does
17 that just mean credits that are potentially owed
18 to customers, do you know?
19    A.  I don't know how Joel Potenciano, who
20 sent this e-mail, assuming with the attachment,
21 understood the word "total customer credit
22 items" to mean.
23    Q.  Okay.  I mean, this is the
24 consolidated reserve formula as of September 17,

TSG Reporting - Worldwide (877) 702-9580

Page 199

HIGHLY CONFIDENTIAL - R. AZERAD

1  2008, correct?
2     A.  That's what it says at the top.
3     Q.  And it shows a customer lockup of
4  1.769 billion, correct?
5     A.  That's what it -- that's what it says
6  at the bottom.
7     Q.  That's the same number that we just
8  saw in your presentation, correct?
9     A.  That -- if I remember correctly,
10 without referring back to the exhibit, yes.
11    Q.  And so this exhibit doesn't include
12 the PAIB piece, correct?
13    A.  That's what it appears to be.
14    Q.  Let me mark as Exhibit 188 another
15 e-mail string with a different form of
16 spreadsheet attached.
17       (Exhibit 188, an e-mail string, the
18    earliest in time from M. Kelly to G. Romain
19    and others, dated September 21, 2008, with
20    attachment, marked for identification, as of
21    this date.)
22    Q.  Once again, sir, you're free to read
23 the entire e-mail string.  I'm only going to ask
24 you about the attached schedule.

TSG Reporting - Worldwide (877) 702-9580

Page 200

HIGHLY CONFIDENTIAL - R. AZERAD

1     A.  I've read the exhibit.
2     Q.  You are forwarding the spreadsheet to
3  a bunch of people and you note the numbers are
4  still preliminary, correct?
5     A.  That's what it says in my e-mail.
6     Q.  And if you look at the attachment in
7  the upper left-hand corner, it says "final."  Do
8  you know why that is?
9     A.  The format is the normal format, at
10 least a format that I'm accustomed to in how
11 Lehman used to show 15c3-3 calculation.  I do
12 not know what final is at the top.  If you
13 exclude the word "final," the rest of the -- the
14 rest of the column is a standard column.
15    Q.  And are you familiar with this form of
16 schedule?
17    A.  Well, the 15c3-3 formula is one of the
18 most complex formulas that I have encountered in
19 my -- during my career at Lehman, so I would not
20 claim that I was familiar with every items on
21 that page.  I relied on Tony Stucchio's group to
22 provide the calculation, and I provided also --
23 I also relied on Tony Stucchio or people under
24 him to help me with the interpretation of the

TSG Reporting - Worldwide (877) 702-9580

Page 201

HIGHLY CONFIDENTIAL - R. AZERAD

1  schedule.
2     Q.  I take it you did not prepare this
3  schedule that we're looking at, correct?
4     A.  To the best of my recollection, yes.
5     Q.  Did you recall reviewing this schedule
6  before you forwarded it in the e-mail that's
7  attached?
8     A.  I don't recall.  I don't recall
9  reviewing the schedule.
10    Q.  Well, let me give this a shot anyway.
11 You said that the rest of the first column is in
12 the normal form that you're familiar with; is
13 that right?
14    A.  This is the normal -- this is
15 generally how Tony Stucchio's group, the
16 Regulatory Reporting Group, typically showed the
17 detail behind a 15c3-3 calculation.  That's what
18 I meant.
19    Q.  Okay.  The top half of this page shows
20 the customer reserve analysis, correct?
21    A.  That's correct.
22    Q.  And then it's broken up into data
23 systems, correct?
24    A.  MTS, ADP, ITS are all data systems

TSG Reporting - Worldwide (877) 702-9580

Page 202

HIGHLY CONFIDENTIAL - R. AZERAD

1 within Lehman, that's correct.
2     Q.   If you look under the ADP --
3     A.   Yes.
4     Q.   -- column, there's an entry marked
5 "Other"?
6     A.   Yes.
7     Q.   And then it has pending adjustments in
8 parentheses of 3.9 billion, do you see that?
9     A.   I see that.
10    Q.   Do you know what that is?
11    A.   I don't recall.
12    Q.   Okay.  I'm going to mark as Exhibit
13 189 an e-mail string.  The top e-mail is from
14 Mark Lee to Martin Kelly.  I don't think you're
15 listed on this string, and I see that there's
16 another e-mail attached to it.
17        (Exhibit 189, an e-mail string, the
18        earliest in time from J. Potenciano to W.
19        Burke and others, dated September 21, 2008,
20        with attached e-mail string, marked for
21        identification, as of this date.)
22    A.   There seems to be -- there appears to
23 be two -- there's one series of e-mails, and
24 then after the blue page there's another series
25     TSG Reporting - Worldwide (877) 702-9580

Page 203

HIGHLY CONFIDENTIAL - R. AZERAD

1 of e-mails.
2     Q.   Yes, the e-mail string attached,
3 behind the blue page was attached to the e-mail
4 that's in front of the blue page.
5        MR. STERN:  So focus first on the
6     front of the blue page and then after that.
7     Q.   I'm only going to, if it helps, I'm
8 only going to ask you about the e-mail that's in
9 front of blue page, but go ahead and read the
10 whole thing if you like.
11        (Document review.)
12    A.   Okay, I've read the exhibit.
13    Q.   The first e-mail is from Mark Lee to
14 Martin Kelly.  Can you tell me who Mark Lee is?
15    A.   Mark Lee was a Lehman employee and in
16 September of 2008 was asked, I don't remember by
17 whom, to work on the 15c3-3 reserve formula.
18        Let me be more -- let me be more
19 precise.  He was not part of Tony Stucchio's
20 group, but he was -- he was acting I guess as an
21 interface between Martin Kelly and the Reg.
22 Reporting Group, the Regulatory Reporting Group.
23    Q.   Do you know what group he was in?
24    A.   I don't recall precisely which group.
25     TSG Reporting - Worldwide (877) 702-9580

Page 204

HIGHLY CONFIDENTIAL - R. AZERAD

1 It's -- he had something to do with finance and
2 information technology.
3     Q.   He notes in his e-mail, "Just spoken
4 to Robert."  Do you see that?
5     A.   Yes.
6     Q.   Do you know if he's referring to you?
7     A.   I don't remember if I spoke to Mark
8 Lee September 22nd in the evening.  I was also
9 involved in -- in this effort, as you can infer
10 from some of the e-mails sent on here.
11    Q.   About three lines down he writes, "So
12 Robert is going to take the last Joel file and
13 make some assumptions.  The guys are working to
14 bring to 2.3 billion down so we have to take
15 some hit for this now."
16        Does seeing that give you any
17 indication one way or the other as to whether
18 the Robert he's referring to is you?
19    A.   To the best of my recollection, it
20 must have been me.  I don't remember any -- any
21 other Robert working on this project.
22    Q.   Do you know what the Joel file is?
23    A.   I believe what he's referring to is
24 the file sent by Joel Potenciano.
25     TSG Reporting - Worldwide (877) 702-9580

Page 205

HIGHLY CONFIDENTIAL - R. AZERAD

1     Q.   Do you know what the 2.3 billion
2 refers to?
3     A.   No, I don't recall.
4     Q.   It says in the second line, "The
5 numbers are taking too long to move
6 significantly and there is now misassumptions re
7 the ADI required to remain (see attached)."
8        That's the first part of that
9 sentence.  Do you know what that refers to?
10    A.   The attachment is what you have after
11 the blue page?
12    Q.   Yes.
13    A.   Okay.  I'm sorry.
14    Q.   As far as I can tell, I mean ...
15    A.   I'm sorry, can you repeat the
16 question?
17    Q.   I just want to know if you understand
18 what he meant when he wrote that.
19    A.   Not precisely.
20    Q.   Do you have a general understanding?
21    A.   My general understanding is that the
22 calculation of the 15c3-3 formula, I don't know
23 at which point, whether it started prior or
24 after September 19, became more and more
25     TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD

1  difficult for a variety of reasons, but to the
2  best of my understanding, primarily because it
3  was, when I had a discussion with someone from
4  the Reg. group, and I don't remember which
5  person, it was explained to me that the 15c3-3
6  formula was supposed to apply to a going concern
7  entity, not an entity which had filed for
8  bankruptcy or receivership.
9     Q.   He refers to the ADI. Do you know
10 what that stands for?
11    A.   I believe A and D stands for aggregate
12 debit. I'm not sure what the "I" --
13    Q.   Items?
14    A.   -- stands for.
15    Q.   That's a portion of the calculation
16 that needs to be locked up; is that correct?
17    A.   That's my understanding. That's my
18 understanding.
19          I recall that at that time in
20 September we sometimes used ADI to identify a
21 part of the cushion which I referred to earlier,
22 which is cash or securities provided by LBI as
23 part of a 15c3 -- as part of a lockup required
24 by the calculation.

HIGHLY CONFIDENTIAL - R. AZERAD

1     Q.   So if the cushion gets released, does
2  the ADI also get released, or does it remain?
3     MR. STERN:  Objection to the form.
4     A.   I'm not an expert of the -- of the
5  15c3-3 formula. My understanding is the ADI is
6  part of a formula driving the assets to be
7  segregated. To the extent that the formula
8  changes, then you may have adjustments upward or
9  downward to the assets that needs to be
10 segregated. But it doesn't sound natural to me
11 to talk about the ADI being released. The ADI
12 is just an item in the formula.
13    Q.   If you look at the e-mail just below
14 the one that we're looking at, it's an e-mail
15 from Martin Kelly to Mark Lee, he writes, "We
16 need to get for ourselves and give to Barclays
17 comfort that the ADP balances will be
18 meaningfully reduced. We put in 3.9 billion as
19 a placeholder." That's what Mr. Kelly's e-mail
20 says, correct?
21    A.   That's what it says, yes.
22    Q.   I realize this is something that he
23 wrote, but do you have any understanding as you
24 sit here today as to what that means?

HIGHLY CONFIDENTIAL - R. AZERAD

1     A.   No, I don't recall.
2     Q.   Do you recall any discussions about a
3  $3.9 billion placeholder?
4     A.   I don't recall.
5     Q.   Do you recall anything about an effort
6  to reduce the ADP balances?
7     A.   Not specifically. The thrust of the
8  efforts as I recall around the 15c3-3 formula
9  and lockup at that time was since LBI -- this
10 was, again, either -- I don't remember when LBI
11 filed for receivership, it was either shortly
12 before or shortly after, was to provide for the
13 unwind of the -- of the items requiring for a
14 segregation of under a 15c3-3 formula in the way
15 that was as expeditious as possible, but I don't
16 recall specific discussion around the ADP.
17    MR. STERN:  Want to take a short
18 break?
19    MR. ROTHMAN:  Sure.
20    (Recess; Time Noted: 4:25 P.M.)
21    (Exhibit 190, an e-mail chain, the
22 earliest in time from R. Azerad to P.
23 Tonucci and others dated September 21, 2008,
24 marked for identification, as of this date.)

HIGHLY CONFIDENTIAL - R. AZERAD

1     (Exhibit 191, an e-mail chain, the
2  earliest in time from J. Potenciano to W.
3  Burke and others, dated September 21, 2008,
4  with attachment, marked for identification,
5  as of this date.)
6     (Exhibit 192, an e-mail from R. Azerad
7  to P. Tonucci dated September 22, 2008,
8  marked for identification, as of this date.)
9     (Time Noted:  4:38 P.M.)
10 BY MR. ROTHMAN:
11    Q.   While we were the off the record, I
12 marked three exhibits. We'll take them in
13 order. Exhibit 190, which you have in front of
14 you, Mr. Azerad, is an e-mail string. The top
15 e-mail is from Martin Kelly to Mark Lee dated
16 Monday, 9/22/2008. The e-mail below that is the
17 one I'm going to ask you about. That's from
18 Mark Lee to you. It's dated Sunday, September
19 20.
20    A.   I've read Exhibit 190.
21    Q.   Okay. I just direct your attention to
22 the line in the e-mail from Mr. Lee to you where
23 he writes, "The guys are focused on the 2.3
24 billion now and reducing this as priority."

Page 210

**HIGHLY CONFIDENTIAL - R. AZERAD**

1   **Do you see that?**
2   A.   Yes, I see that.
3   **Q.   My question to you is whether that**
4   **refreshes your recollection at all as to what**
5   **the 2.3 billion was?**
6   A.   I'm afraid not.
7   **Q.   You can put aside Exhibit 190.**
8   **Exhibit 191 is an e-mail string with a**
9   **number of attachments. The first e-mail in the**
10  **string is from Joel Potenciano to Mark Lee, you,**
11  **and others, dated Monday, 9/22/2008.**
12  **(Document review.)**
13  MR. STERN:   As he reviews this, is
14  there any particular part you're going to
15  focus on?
16  MR. ROTHMAN:   I am going to ask him
17  about the middle e-mail on the first page,
18  the first attachment, and then one quick
19  question about the first page of the second
20  attachment.
21  A.   Okay.
22  MR. STERN:   Take your time.
23  A.   So I just want to point out that on
24  the, I guess the third attachment, the one after

TSG Reporting - Worldwide (877) 702-9580

Page 211

**HIGHLY CONFIDENTIAL - R. AZERAD**

1   the second blue page, there are a series of
2   numbers which are shaded, at least on my copy,
3   appears hard to read.
4   MR. STERN:   Yes.
5   **Q.   I was going to ask you to read those.**
6   **No, I'm just kidding. I'm not going**
7   **to ask you about any of the shaded numbers, but**
8   **your point is well-taken.**
9   A.   There are also similar things
10  throughout this e-mail.
11  Okay. I've read the first attachment,
12  the first two attachments. I have only perused
13  the last attachment of this exhibit.
14  **Q.   Okay. Why don't we start with the**
15  **covering e-mail string. The middle e-mail is**
16  **from Mark Lee that you sent on Sunday, September**
17  **21, at 8:31 P.M. Do you see that e-mail?**
18  A.   I see that e-mail.
19  **Q.   And Mark Lee addresses it to Joel**
20  **Potenciano, correct?**
21  A.   Yes.
22  **Q.   Did you, when you received this**
23  **e-mail, did you read it?**
24  A.   I don't recall reading it, but it was

TSG Reporting - Worldwide (877) 702-9580

Page 212

**HIGHLY CONFIDENTIAL - R. AZERAD**

1   clearly sent to me as well.
2   **Q.   Do you understand what Mark is telling**
3   **Joel in the first paragraph?**
4   A.   The first paragraph being the
5   paragraph beginning "need" and finishing with
6   "down"?
7   **Q.   Correct.**
8   A.   Again, just reading this e-mail,
9   reading this e-mail today, it appears to me that
10  there are multiple requests that Mark is making
11  to Joel, not just one. So I'm not sure I
12  understand your question.
13  **Q.   What are those requests that Mark is**
14  **making to Joel?**
15  A.   Well, at the very least, the first
16  sentence is one request, which is "need to
17  reproduce an equivalent for 19th," and the
18  second request is Mark instructing Joel not to
19  make an assumption. I mean, that's how I read
20  it today. Those are at least two requests.
21  **Q.   What does he mean by "equivalent," do**
22  **you know?**
23  A.   There are two attachments to this
24  e-mail, I believe.

TSG Reporting - Worldwide (877) 702-9580

Page 213

**HIGHLY CONFIDENTIAL - R. AZERAD**

1   **Q.   Yes.**
2   A.   Is the attachment -- I don't know what
3   he meant. I mean, it's -- reading this e-mail
4   today, Joel Potenciano appears to be referring
5   to the 17th formula and he's asking for an
6   equivalent for the 19th, which appears to be two
7   days in September. But again, that's just me
8   reading the e-mail today.
9   **Q.   Okay. In the second paragraph Mark**
10  **again refers to the 2.3 billion. My question**
11  **for you is the same as the last time. Does**
12  **that -- does looking at this e-mail refresh your**
13  **recollection at all as to what that 2.3 billion**
14  **refers to?**
15  A.   I'm afraid not.
16  **Q.   Okay. Take a look at the first**
17  **attachment to the e-mail. It purports to be a**
18  **consolidated 15c3-3 reserve formula as of**
19  **September 19, 2008, correct?**
20  A.   It appears similar in format to an
21  exhibit that you showed me before the break, I
22  believe, and I think that at that point you
23  made -- you made the point that this did not
24  include the PAIB.

TSG Reporting - Worldwide (877) 702-9580

Page 214

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    Q.   Exhibit 191 doesn't include the PAIB
3    either, correct?
4    A.   Again, I was not -- I did not create
5    this schedule. I'm just linking this exhibit to
6    another exhibit.
7    Q.   Okay. The prior exhibit was one that
8    showed the reserve formula as of September 17,
9    correct?
10    A.   I would have to go back to the
11    previous exhibit, but --
12        MR. STERN: Well, let him point it
13        out. If he wants to, he knows how to do
14        that.
15    Q.   On the exhibit that's in front of
16    you --
17    A.   On Exhibit --
18    Q.   -- Exhibit 191, the first attachment
19    shows a customer lockup total of 3,118,033,000,
20    correct?
21    A.   That's what it says on the page.
22    Q.   Now, if you turn to the second
23    attachment, and you look down at the bottom line
24    for the customer portion of the reserve analysis
25    where it says "Amount Segregated," do you see
TSG Reporting - Worldwide (877) 702-9580

Page 215

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    that?
3    A.   Right above the "PAIB" line?
4    Q.   Correct. The first number is a $4.2
5    billion number?
6    A.   If that's what it says.
7    Q.   And then there are -- there's an
8    adjustment of just over $2 million?
9    A.   That's what it says.
10    Q.   And so the adjusted lockup is, it's a
11    little hard to read, but it looks like 2.1
12    billion, correct?
13        MR. STERN: Objection to the form.
14    A.   It's, as you say, it's hard to read,
15    but it appears to be the correct number on the
16    page.
17    Q.   Can you explain to me why the first
18    attachment lists in the customer lockup the $2.1
19    billion number and the number on the second
20    attachment is different?
21        MR. STERN: Objection to the form.
22    A.   I cannot answer this question. I
23    cannot explain.
24    Q.   You don't have any idea why that is?
25        MR. STERN: Objection to the form.
TSG Reporting - Worldwide (877) 702-9580

Page 216

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.   I -- I don't recall.
3    Q.   Looking at these two exhibits as you
4    sit here today, can you tell me how they fit
5    together?
6        MR. STERN: What two exhibits?
7        MR. ROTHMAN: The two attachments to
8        Exhibit 191.
9        MR. STERN: Objection to the form.
10    A.   I don't know.
11    Q.   You can put those away. Take a look
12    at Exhibit 192. It's an e-mail from you to Mr.
13    Tonucci sent on Monday, 9/22/2008. The subject
14    of the e-mail -- let me first ask you, do you
15    recall sending this e-mail?
16    A.   I don't recall, but it was clearly
17    sent by me to Paolo.
18    Q.   The subject line on the e-mail says,
19    "15c3 issues seems to have been solved." Do you
20    recall what you meant by that?
21    A.   No, I don't recall.
22    Q.   Not looking at the exhibit, but just
23    asking you whether you have any independent
24    recollection, do you have a recollection of the
25    c3 issue having been solved?
TSG Reporting - Worldwide (877) 702-9580

Page 217

HIGHLY CONFIDENTIAL - R. AZERAD
1
2    A.   No, I don't have any recollection of
3    the 15c3 issue having been solved.
4    Q.   Do you have any idea what the subject
5    line of your e-mail referred to?
6    A.   I don't recall.
7    Q.   I'm handing you what has been marked
8    at a previous deposition as 156B. This is a
9    letter from Lindsee Grandfield at Cleary
10    Gottlieb Steen & Hamilton to James Kobak at
11    Hughes Hubbard & Reed. It's dated March 6,
12    2009.
13        You can go ahead and read the entire
14    letter if you like, sir. I'm going to ask you
15    mostly about the two exhibits to the letter,
16    Exhibits A and B, and they're referenced --
17    A.   In the letter.
18    Q.   -- on the bottom of the second page.
19    A.   Okay.
20        (Document review.)
21    Q.   Are you finished reviewing the
22    document?
23    A.   The letter, yes. I have only perused
24    the spreadsheet. Should I spend more time
25    perusing the spreadsheet?
TSG Reporting - Worldwide (877) 702-9580

Page 218

HIGHLY CONFIDENTIAL - R. AZERAD

Q. It's entirely up to you. I'm not going to drill down into the specifics of the spreadsheets. I will tell you that if you need them, we have an enlarged version of the spreadsheet. If you want to refer to that, just let me know and we'll dig it out.

A. Okay.

Q. Were you involved in preparing Exhibits A and B to this letter which we have marked as Exhibit -- what has been marked as Exhibit 156B?

MR. STERN: You can answer yes or no.

A. Yes.

Q. Who else was involved? Did you have help doing that?

A. Yes.

Q. Who helped you?

A. There were -- I don't recall the complete list of people, but there were -- there were people from the Operations Group which was involved in creating Exhibit A and Exhibit B.

Q. This is the Operations Group at Barclays?

A. This -- this is where I'm -- I don't

Page 219

HIGHLY CONFIDENTIAL - R. AZERAD

have -- let me step back. Yes, but I don't remember whether they were part of what is -- what we refer to at Barclays as the TSA Team versus the people outside the TSA Team, the TSA Team being not being people working primarily on kind of Lehman, Lehman issues. It's part of the --

MR. STERN: Transition services?

A. Transition Services Agreement.

MR. STERN: Transition Services Agreement.

THE WITNESS: Yeah, I wasn't sure what the "T" stood for. I knew that "SA" stood for "services agreement."

Q. Do you know -- tell me who in the Operations Group at Barclays helped you prepare Exhibits A and B?

MR. STERN: Objection to the form.

A. I don't remember -- I don't remember precisely. It must have been worked -- it must have been working for Neal Ullman, but I don't remember the exact name of the people involved in doing the work.

Q. Your lawyer made a good objection

Page 220

HIGHLY CONFIDENTIAL - R. AZERAD

because you didn't say that you had prepared these exhibits, you just said you were involved in preparing the exhibits.

Can you tell me the extent of your involvement in preparing these exhibits? What did you do?

A. I think that, looking at, to the best of my recollection, looking at the exhibit that you attached -- of the spreadsheet that you attached to this exhibit, I had a more -- I cannot, per Alan Kaplan's instruction --

MR. STERN: No, you can't testify to what your conversations were with lawyers. Let me just see what the question is. The question is, "Can you tell me the extent of your involvement in preparing the exhibits?" If the answer is I took instructions from lawyers, that's the answer. I just don't know what your answer is.

A. That is the answer. That is the answer.

Q. Just so the record is clear, your answer is that you took instruction from a lawyer?

Page 221

HIGHLY CONFIDENTIAL - R. AZERAD

A. That is correct.

Q. As part of what you did in connection with preparing Exhibits A and B to this letter did you review what we referred to here today as Schedule B?

A. I'm sorry, can you be more specific on what you mean by "Schedule B"?

Q. At the very end of the questions that you were asked into this afternoon, you gave some testimony about a Schedule B, do you recall that?

A. Do you mean that -- yes, yes, I believe so.

Q. That the first lawyer asked you?

A. The first lawyer asked me, that is correct.

Q. Okay. And do you now know what Schedule B is or Schedule -- I think it was referred to this afternoon as Schedule B to the Asset Purchase Agreement?

MR. STERN: Objection to the form.

Q. It's actually --

A. No, let me be --

I'm sorry, can you repeat the

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  question?
3        (Record read.)
4        MR. STERN: Objection to the form.
5    A.    What I did back in September of 2008
6  was, and I believe I said it this morning, was
7  to create or help create or try to create a list
8  of assets that could be transferred to Barclays,
9  and I think that that was what I referred to as
10  Schedule B, not necessarily what you refer to as
11  Schedule B.
12    Q.    Okay. Let's talk about the list of
13  assets that you helped create. Did you refer
14  back to that list when you did your work in
15  connection with Exhibits A and B to the letter
16  we have marked as Exhibit 156B?
17    A.    Exhibit A and Exhibit B here I believe
18  had different meaning than what Schedule A and
19  Schedule B had in September of 2008.
20    Q.    Okay. What is the different meaning?
21    A.    Well, Schedule -- my understanding
22  about Schedule A as of September 2008 is that it
23  referred to the assets transferred to Barclays
24  as of September 18. The letter to be provided
25  as part of Exhibit 156, it describe exhibits,

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  that's the last paragraph of the second page, as
3  undelivered clearance box assets. So that's
4  only one difference between the two.
5    Q.    Are there other differences that you
6  had in mind?
7        MR. STERN: Objection to the form.
8        You can answer if you understand the
9  question.
10    A.    I'm not sure I understand the
11  question.
12    Q.    Let me ask a different question.
13        Did you refer to the list of assets
14  that you helped create when you did your work on
15  Exhibits A and B to this letter?
16    A.    I'm sorry, can you repeat the
17  question? I'm not sure I understand it.
18        (Record read.)
19    Q.    Back in September you told me you
20  helped create a list of assets?
21    A.    I tried to create a list of assets.
22    Q.    Did you succeed?
23    A.    Did not. That was -- that was a point
24  I was making this afternoon and this morning,
25  that the information that I had access to was

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  not dependable.
3    Q.    Okay. When you did your work on
4  Exhibits A and B to this letter, did you refer
5  back to any schedules or any documents?
6    A.    I don't -- well, I'm sorry, any
7  schedule or any documents? Can you be more
8  specific?
9    Q.    I'm trying to figure out what work you
10  did on this without getting into any discussions
11  that you had with Mr. Kaplan.
12        MR. STERN: Let me see if I can come
13  up with a solution to this. If we can just
14  take a quick little recess, I may be able
15  to --
16        MR. ROTHMAN: Sure.
17        (The witness and Mr. Stern leave the
18  room to confer.)
19        MR. ROTHMAN: I'll ask you a new
20  question once your counsel makes his
21  statement.
22        MR. STERN: I think what we can do to
23  address this dilemma is that Mr. Azerad can
24  testify to what he knows and remembers
25  concerning the mechanics of creating the

1    HIGHLY CONFIDENTIAL - R. AZERAD
2  Exhibit A and Exhibit B to Ms. Grandfield's
3  March 6, 2009 letter without disclosing his
4  communications with counsel.
5        In allowing this line of questions, in
6  no way do I intend to waive the privilege.
7  Let's try it that way.
8        So I think the question is really just
9  a general question, if he can tell you what
10  he remembers about the mechanics of how
11  these exhibits were put together.
12  BY MR. ROTHMAN:
13    Q.    I'll adopt that question. Can you
14  tell me that?
15    A.    They were -- this exhibit which are
16  attached to the letter in Exhibit 156B were done
17  by looking at Lehman Brothers, Inc. box
18  position, and by "box," I mean the DTC account,
19  other accounts, plus also physical -- but also
20  physical securities, which I think I describe on
21  this exhibit as being physical box, and trying
22  to understand for these securities whether there
23  was a claim by LBI and/or a claim by an LBI
24  customer.
25        The difference between list A and list

| | |
|---|---|
| Page 226 | Page 227 |

**Page 226**

1     HIGHLY CONFIDENTIAL - R. AZERAD
2 B is list A, as described under this letter, is
3 that there was -- we believe there was no
4 customer claim, and list B, there was an LBI and
5 a customer claim in the same securities.
6     **Q. Okay. You said that you or somebody**
7 **else that was working on this looked at the DTC**
8 **account. Were you referring to the O74 account**
9 **when you said that or --**
10     A. I don't remember precisely, but
11 looking at the exhibit attached, some of these
12 securities appear to be at DTC O74.
13     **Q. Did you look at the other accounts at**
14 **DTC?**
15     A. I don't recall.
16     **Q. You said you also looked at other**
17 **accounts. What other accounts did you look at?**
18     A. Again, I think that looking at the
19 spreadsheet attached to the exhibit, under the
20 column called "Depot" there are other,
21 quote/unquote, depot -- which, again, the word
22 "depot" used in a somewhat loose sense here --
23 besides DPO74.
24     **Q. From a mechanical point of view, how**
25 **do you look at these accounts? Is there a**
    TSG Reporting - Worldwide (877) 702-9580

**Page 227**

1     **HIGHLY CONFIDENTIAL - R. AZERAD**
2 **system that you use to do that?**
3     A. I did not do the work myself. I
4 was -- I was told that there was a system.
5     MR. STERN: I'm just going to
6 interrupt you here. I'm a little bit
7 concerned about the privilege and what you
8 were told. So let's just confer.
9     (Mr. Stern confers with the witness.)
10     A. I didn't --
11     MR. STERN: Let's repeat the question.
12     "From a mechanical point of view, how
13 do you look at these accounts? Is there a
14 system that you used to that?"
15     A. I did not do the data retrieval.
16     **Q. Do you know which system was used to**
17 **do the data retrieval?**
18     MR. STERN: I'm going to instruct you
19 not to answer on the basis that much of what
20 you learned in this process was learned from
21 counsel. So I'll just instruct you not to
22 answer.
23     **Q. Was there a particular person at**
24 **Barclays who was the primary draftsperson of**
25 **these exhibits?**
    TSG Reporting - Worldwide (877) 702-9580

| | |
|---|---|
| Page 228 | Page 229 |

**Page 228**

1     **HIGHLY CONFIDENTIAL - R. AZERAD**
2     MR. STERN: You can answer that if you
3 know.
4     A. I'm sorry, can you repeat the
5 question?
6     (Record read.)
7     A. Can you clarify what you mean by --
8     **Q. Is there somebody who took ownership**
9 **of preparing these two exhibits?**
10     MR. STERN: Objection to the form.
11     Is there a businessperson on who
12 created them?
13     A. It depends what you mean by
14 "exhibits." If you -- if you're referring to
15 the exhibits attached to these documents, I was
16 the person who created this exhibit, but I used
17 other documents to create these exhibits, other
18 spreadsheets to create these exhibits.
19     **Q. Okay. So when you created these**
20 **exhibits, was it your intention to include only**
21 **unencumbered assets on these two exhibits?**
22     A. That was my -- how do you define that
23 particular -- for purposes of that particular
24 question the term "unencumbered assets"?
25     **Q. Whether there were any liens on the**
    TSG Reporting - Worldwide (877) 702-9580

**Page 229**

1     **HIGHLY CONFIDENTIAL - R. AZERAD**
2 **assets.**
3     A. I think, as I previously answered,
4 some of these assets had claims by Lehman
5 customers. So I don't know how you define these
6 claims by the customers on these assets.
7     **Q. How did you, again, from a mechanical**
8 **standpoint, how did you go about determining**
9 **whether there were claims by Lehman customers on**
10 **some of these assets?**
11     A. Again, I did not do the -- I did not
12 do the analysis which led to this exhibit. I
13 was given a file and asked to just, for lack of
14 a better word, reformat the file.
15     **Q. Did you ask somebody to prepare that**
16 **file or was it just given to you?**
17     A. I don't recall precisely who asked the
18 file to be prepared in that particular way, the
19 source document to this exhibit.
20     **Q. Was it you?**
21     A. I repeat my answer. I don't recall
22 precisely whether it -- who was that person. It
23 may have been me. It may have been someone
24 else.
25     **Q. Okay. I'm just trying to understand**
    TSG Reporting - Worldwide (877) 702-9580

## Page 230

HIGHLY CONFIDENTIAL - R. AZERAD

1  in what direction the instructions flowed. Did
2  you instruct somebody to go prepare that file or
3  did somebody just bring it to you and say "here
4  it is"?
5      A.   No, what I meant by that, the file did
6  not materialize by itself one morning. What I
7  meant by that is that there were many people
8  involved in that exercise. Some people -- and
9  so I don't recall precisely, and I was -- and I
10  was not the project leader on that effort, so I
11  don't recall precisely who gave instructions for
12  the file to be prepared the way that they were.
13      Q.   Was the project leader on that effort
14  a businessperson?
15      A.   By -- what do you mean by
16  "businessperson"?
17      Q.   Not a lawyer. I'm just asking you a
18  yes or no question.
19      A.   From my understanding, the answer is
20  no.
21      Q.   Just so I'm clear, the project leader
22  was a lawyer?
23      A.   That is, from my understanding, the
24  project leader was a lawyer.
25
      TSG Reporting - Worldwide (877) 702-9580

## Page 231

HIGHLY CONFIDENTIAL - R. AZERAD

1      MR. ROTHMAN: Counsel, I assume if I
2  ask about the instructions given by the
3  project leader, you would assert the
4  privilege and instruct him not to answer?
5      MR. STERN: That's correct.
6      MR. ROTHMAN: Let me take a one-minute
7  break just to confer.
8      (Pause in the proceedings.)
9      MR. ROTHMAN: We're finished.
10      MR. STERN: If there are no further
11  questions, I think we'll go off the record.
12      Thank you.
13      (Time Noted: 5:29 P.M.)
14                oOo
15
16
17
      _____

      ROBERT AZERAD

18  Subscribed and sworn to
19  before me this     day
20  of      2009.

      _____
21
22
23
24
25
      TSG Reporting - Worldwide (877) 702-9580

## Page 232

HIGHLY CONFIDENTIAL - R. AZERAD

1      CERTIFICATE
2  STATE OF NEW YORK )
3              : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That ROBERT AZERAD, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 17th day of August, 2009.
25  ------------------------------------
      TSG Reporting - Worldwide (877) 702-9580

## Page 233

HIGHLY CONFIDENTIAL - R. AZERAD
INDEX

WITNESS:          EXAMINATION BY          PAGE
R. AZERAD      Mr. Tambe        5
      Mr. Rothman        170
EXHIBITS:                    PAGE
Exhibit 174, an e-mail from R. Azerad      10
dated 9/22/08
Exhibit 175, a document bearing Bates      76
Nos. BCI-EX-00054633 through 55046
Exhibit 176, a document bearing Bates      84
Nos. 10331692
Exhibit 177, a document bearing Bates      106
Nos. 303398 with attachment
Exhibit 178, an e-mail from M. Kelly to      111
R. Azerad dated September 20, 2008, with
attachment
Exhibit 179, an e-mail chain, the earliest      115
in time from G. Reilly to K. Wong, dated
September 22, 2008, with attachment
Exhibit 180, an e-mail chain, the first      120
in time from M. Kelly to R. Azerad, dated
September 21, 2008
Exhibit 181, a document bearing Bates      155
Nos. BCI-EX-00115093 through 115098
      TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
INDEX (Cont'd.)

EXHIBITS:                                          PAGE

Exhibit 182, an e-mail chain, the earliest    170
in time from P. Tonucci to R. Azerad and
others, dated September 20, 2008

Exhibit 183, an e-mail string, the first    175
in time from A. Blackwell to I. Lowitt,
dated September 20, 2008

Exhibit 184, an e-mail string from R.    177
Azerad to I. Lowitt and P. Tonucci dated
September 20, 2008

Exhibit 185, an e-mail from R. Azerad to    183
M. Kelly dated September 21, 2008, with
attachment

Exhibit 186, an e-mail from R. Azerad to    191
M. Kelly dated September 21, 2008, with
attachment

Exhibit 187, an e-mail string, the first    197
in time from J. Potenciano to W. Burke
and others, dated September 17, 2008, with
attachment

Exhibit 188, an e-mail string, the earliest    199
in time from M. Kelly to G. Romain and others,
dated September 21, 2008, with attachment

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
INDEX (Cont'd.)

EXHIBITS:                                          PAGE

Exhibit 189, an e-mail string, the earliest    202
in time from J. Potenciano to W. Burke and
others, dated September 21, 2008, with
attached e-mail string

Exhibit 190, an e-mail chain, the earliest    208
in time from R. Azerad to P. Tonucci and
others dated September 21, 2008

Exhibit 191, an e-mail string, the earliest    209
in time from J. Potenciano to W. Burke and
others, dated September 21, 2008, with
attachment

Exhibit 192, an e-mail from R. Azerad to    209
P. Tonucci dated September 22, 2008

REQUEST FOR PRODUCTION:
Page 11, Line 2

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
INDEX (Cont'd.)

DIRECTIONS NOT TO ANSWER:
Page 40, Line 12
Page 56, Line 17
Page 104, Line 18
Page 124, Line 15
Page 124, Line 5
Page 124, Line 10
Page 159, Line 2
Page 227, Line 19

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - R. AZERAD
NAME OF CASE:  In re Lehman Brothers
DATE OF DEPOSITION:  August 17, 2009
NAME OF WITNESS:  Robert Azerad
Reason Codes:
  1. To clarify the record.
  2. To conform to the facts.
  3. To correct transcription errors.
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Lme _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

                    _____
                         ROBERT AZERAD
TSG Reporting - Worldwide (877) 702-9580