# A. 2 (A)

Page 1

1          HIGHLY CONFIDENTIAL - S. BERKENFELD

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

       ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF STEVEN BERKENFELD

14              New York, New York

15              August 6, 2009

16

17

18

19

20

21

22

23      Reported by:

24      KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25      JOB NO. 24035

## Page 2

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    August 6, 2009
3    9:30 a.m.
4
5    HIGHLY CONFIDENTIAL deposition
6    of STEVEN BERKENFELD, held at Jones
7    Day, LLP, 222 East 41st Street, LLP,
8    New York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public
13   of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

## Page 3

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2
3    A P P E A R A N C E S:
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7    222 East 41st Street
8    New York, New York 10017-6702
9    BY: ROBERT W. GAFFEY, ESQ.
10   BRIDGET CRAWFORD, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays Capital
14   and the Witness
15   575 Lexington Avenue - 7th Floor
16   New York, New York 10022
17   BY: JACK G. STERN, ESQ.
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

## Page 4

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A P P E A R A N C E S: (Cont'd.)
3    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
4    Attorneys for the Creditors Committee
5    865 S. Figueroa Street, 10th Floor
6    Los Angeles, California 90017
7    BY: ERICA P. TAGGART, ESQ.
8
9    JENNER & BLOCK, LLC
10   Attorneys for the Examiner
11   330 N. Wabash Avenue
12   Chicago, Illinois 60611-7603
13   BY: ROBERT L. BYMAN, ESQ.
14
15   HUGHES, HUBBARD & REED, LLP
16   Attorneys for the SIPA Trustee
17   One Battery Park Plaza
18   New York, New York 10004-1482
19   BY: NEIL J. OXFORD, ESQ.
20   AMINA HASSAN, ESQ.
21   JOHN F. WOOD, ESQ.
22
23   Also Present:
24   THOMAS E. HOMMEL, Lehman Brothers
25   PHILIP E. KRUSE, Alvarez & Marsal

TSG Reporting - Worldwide  (877) 702-9580

## Page 5

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    (Witness sworn.)
3    MR. STERN: I should just state on the
4    record before we start that, in terms of
5    confidentiality, we on behalf of Barclays
6    will designate this transcript as highly
7    confidential for today, and then within
8    seven days of receipt of the transcript we
9    will designate appropriate sections as
10   either highly confidential, confidential, or
11   not confidential.
12   MR. GAFFEY: I think, you know, we
13   can -- that's the agreement from Felder.
14   Let's do that for all of these.
15   MR. STERN: Agreed.
16   MR. GAFFEY: Everybody agree to that?
17   STEVEN BERKENFELD, called as a
18   witness, having been duly sworn by a Notary
19   Public, was examined and testified as
20   follows:
21   EXAMINATION BY
22   MR. GAFFEY:
23   Q.    Good morning, Mr. Berkenfeld.
24   A.    Good morning.
25   Q.    We met briefly before.  My name is Bob

TSG Reporting - Worldwide  (877) 702-9580

Page 6

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Gaffey. I'm with Jones Day. We're special
3    counsel to the estate of Lehman Brothers
4    Holdings, Inc.
5        As you know, the topics that we're
6    going to address today will revolve around the
7    transaction that took place in September of 2008
8    in which Barclays purchased certain assets of
9    Lehman Brothers Holdings, Inc. and LBI.
10       Let me get some background information
11   on you first, sir. You're qualified as a
12   lawyer; is that correct?
13   A.   Yes.
14   Q.   Columbia Law School?
15   A.   Yes.
16   Q.   Is your license up to date? Do you
17   maintain an active registration?
18   A.   Yes, I believe my registration is up
19   to date.
20   Q.   There was a time when you worked for
21   Lehman. Can you give me a brief resumé of your
22   Lehman career? When you started, when you left,
23   and what titles you held?
24   A.   I started in January of 1987 and was
25   there through the transaction. I had many
     TSG Reporting - Worldwide  (877) 702-9580

Page 7

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    titles, but at the time of the transaction, I
3    was a managing director.
4    Q.   And what was your area of
5    responsibility when you were a managing
6    director?
7    A.   There were, over the years, there were
8    a number of different areas of responsibility.
9    Q.   Okay. Give me, if you would, the last
10   category before you left Lehman. I'm obviously
11   particularly interested in September of 2008,
12   but that segment.
13   A.   I was chairman of the, what we
14   referred to as the Transaction Approval
15   Committees, I was Chief Investment Officer for
16   the Private Equity Division, and I was head of
17   the Legal, Compliance and Audit Division.
18   Q.   And were you head of the Legal,
19   Compliance and Audit Division in September of
20   2008?
21   A.   Yes.
22   Q.   And just for completeness, before
23   Lehman, you were an associate at Fried Frank,
24   correct?
25   A.   Yes.
     TSG Reporting - Worldwide  (877) 702-9580

Page 8

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   And were you essentially involved in
3    mergers and acquisitions?
4    A.   Yes.
5    Q.   Now, you said that you held these
6    positions at Lehman through the transaction.
7    When exactly did you leave the employ of --
8    actually, withdrawn.
9        Were you employed by Lehman Brothers
10   Holdings, Lehman Brothers, Inc., some
11   combination of both? What was the entity that
12   employed you?
13   A.   I don't know.
14   Q.   Okay. And when exactly did you leave
15   the employ of Lehman?
16   A.   That's actually a good question,
17   because it's not really precise. I don't know
18   that I could give you a specific date on that.
19       MR. STERN: You can describe why it's
20   not precise.
21   A.   There was everything from -- there was
22   sort of a transitional period where many people
23   were performing services for both Lehman and
24   starting to perform services for Barclays, too.
25   Q.   Okay. That would be --
     TSG Reporting - Worldwide  (877) 702-9580

Page 9

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   So it was kind of a transitional
3    period.
4    Q.   As opposed, sir, to the -- I
5    understand that after the transaction closed,
6    there would be transitional work where you had
7    your old Lehman hat on in terms items of
8    knowledge or necessities.
9        My question, though, is who employed
10   you and when? Who was your employer on
11   September 22, 2008?
12   A.   September 22, 2008. I don't recall.
13   I'd have to take a look at where the paychecks
14   came from.
15   Q.   And the reason I picked September 22,
16   2008, that's the date the transaction closed,
17   correct?
18   A.   Yes.
19   Q.   Okay. And in the period prior to the
20   transaction closing on September 22, had you had
21   any discussions with Barclays about moving into
22   their employ?
23   A.   No.
24   Q.   When did you first begin to have
25   discussions with Barclays about moving into the
     TSG Reporting - Worldwide  (877) 702-9580

Page 10

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  employ of Barclays?
3    A.  It was sometime after the closing.
4    Q.  How far after the closing?
5    A.  A matter of days.
6    Q.  Had there been any discussion at all
7  of the possibility of you being employed at
8  Barclays after the transaction?  Had there
9  been -- withdrawn.
10    Prior to the closings, had there been
11  any discussion at all of you working for
12  Barclays after the transaction?
13    A.  Not that I recall.
14    Q.  When you did have discussions about
15  joining Barclays?  With whom did you have them?
16    A.  Ian Lowitt.
17    Q.  And when you had those discussions
18  with Mr. Lowitt, was he employed by Lehman or
19  was he employed by Barclays?
20    A.  I don't think I can answer that.
21    Q.  Because?
22    A.  I just don't know what his status was.
23    Q.  Can you give me a sense of when that
24  was?
25    A.  My sense would be it would be the
    TSG Reporting - Worldwide  (877) 702-9580

Page 11

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  middle of the next week.
3    Q.  We all talk like that in this case.
4  By "the next week," you mean after the closing?
5    A.  After the 22nd, so I would -- my best
6  recollection would be in the Tuesday, Wednesday
7  timeframe.
8    Q.  Okay.  Now, when you spoke to Mr.
9  Lowitt about working for Barclays, just so I can
10  sort of get in a capsule what the discussion was
11  about, was that about terms of employment,
12  compensation, title, that type of thing, or --
13    A.  Yes.
14    Q.  So, moving backwards from that, before
15  you have that discussion, there is a discussion
16  with an employer about the possibility of
17  working for them at all before you get to terms,
18  correct?
19    A.  Can you repeat the question?
20    Q.  Well, you're talking to Lowitt in the
21  week after the transaction about terms, what
22  you'll be paid, what your duties and
23  responsibilities will be, what your title will
24  be.  At some point prior to that, presumably you
25  had a discussion about going to Barclays at all
    TSG Reporting - Worldwide  (877) 702-9580

Page 12

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  in any capacity?
3    MR. STERN:  Objection to the form.
4    A.  I don't recall any discussions before
5  that and the discussions with Ian were not as
6  broad-based as you've described.
7    Q.  Tell me about the discussions with
8  Ian.  Describe them to me, please.
9    A.  They were really just more on terms.
10    Q.  So if there's point in the week
11  following the transaction where you're talking
12  about terms with Ian Lowitt, was there a point
13  prior to that where you discussed going to work
14  for Barclays at all?  People don't start talking
15  about their salary until they have decided to go
16  work someplace.
17    MR. STERN:  Objection to the form.
18    A.  I don't recall any conversations
19  before that.
20    Q.  What's your recollection of the first
21  conversation you had with anyone about working
22  for Barclays?
23    A.  My recollection is Ian coming in to
24  see me about being offered employment by
25  Barclays post-closing.
    TSG Reporting - Worldwide  (877) 702-9580

Page 13

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Just so I have a clear record, Ian
3  coming to see you post-closing?
4    MR. GAFFEY:  Could you read the last
5  answer back, please?
6    (Record read.)
7    Q.  When you say post-closing, are you
8  modifying when Ian came to see you or when you
9  would be employed?
10    A.  Both.
11    Q.  Both, okay.

REDACTED

15    MR. STERN:  This is all highly
16  confidential so you can feel free to answer.

REDACTED

    TSG Reporting - Worldwide  (877) 702-9580

Page 14

1   **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2       MR. STERN:  Objection to the form, but
3   you can answer.

**REDACTED**

21      Q.  Now, in the, let's say the two weeks
22  prior to the closing on September 22, to your
23  knowledge were other officers or executives of
24  Lehman Brothers in conversations with Barclays
25  about moving over there to work?

Page 15

1   **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2       A.  In what timeframe?
3       **Q.  In the two weeks before the closing.**
4       A.  In the two weeks before the closing?
5       **Q.  Yes.**
6       A.  No, not during the two weeks before
7   closing.
8       **Q.  Okay.  What about one week before the**
9   **closing?**
10          Let me withdraw the question.  To your
11  knowledge, were any officers or directors of
12  Lehman involved in discussions about going over
13  to Barclays at any time before the closing?
14      A.  Officers or directors of Lehman
15  Brothers Holdings or Lehman Brothers, Inc.?
16      **Q.  Either.**
17      A.  I believe there were discussions that
18  some senior officers had between the period of
19  signing and closing.  It might have been between
20  the period from the initiation of negotiations
21  that Monday morning after the our bankruptcy to
22  the closing.
23      **Q.  And again, you're using the same**
24  **vernacular I was, but the Monday, September 15,**
25  **correct?**

Page 16

1   **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2       A.  Yes.
3       **Q.  Who?**
4       A.  To my knowledge, there was a very
5   small group of senior executives who were
6   approached around signing up to join Barclays
7   prior to the closing.
8       **Q.  Who were they?**
9       A.  I don't think I recall all of them,
10  but I believe that they included Eric Felder,
11  Skip McGee, I believe Jerry Donini, Hyung Lee,
12  Ian Lowitt.  I'm not sure of the remainder.
13      **Q.  Approximately how many more were**
14  **there?**
15      A.  I believe there were eight.
16      **Q.  Now, when the agreement was made and**
17  **during that week, there was a group of eight**
18  **people who were deemed critical to the**
19  **transaction, correct?  And Mr. Felder, Mr.**
20  **McGee, Mr. Donini and Mr. Lowitt were among**
21  **those eight; is that right?**
22      A.  That's my understanding.  My
23  recollection.
24      **Q.  That's why you focused on the eight.**
25  **What about beyond the eight?  To your**

Page 17

1   **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2   knowledge, were there discussions with Holdings
3   or LBI senior executives other than those eight
4   people?
5       A.  Not that I know of.
6       **Q.  There were none with you?**
7       A.  None that I recall.
8       **Q.  Okay.  Did you have any conversations**
9   **with Mr. Lowitt during that week between signing**
10  **and closing?**
11      A.  Not that I recall.
12      **Q.  Was there a reason that you didn't**
13  **have those discussions?**
14      A.  Was there a reason?  Could you be more
15  precise?
16      **Q.  Well, the company you've worked for**
17  **since 1987 has filed bankruptcy.  It's about to**
18  **disappear.  You're not going to have a job.**
19          Were you talking to anybody about what
20  **you were going to do next?**
21      A.  I was really focused on trying to get
22  us from bankruptcy into some sort of
23  transaction.
24      **Q.  Is that a yes or a no?  Were you**
25  **thinking about where you were going to go next?**

Page 18

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1    A.  I'm sure I was thinking about it, but
2  I wasn't actively doing anything about it.
3    **Q.  Were you having conversations with**
4  **anyone about it?**
5    A.  Nothing specific that I can recall.
6    **Q.  Did you make a decision not to have**
7  **that conversation with anyone until after the**
8  **closing?**
9    A.  I wouldn't characterize it as a
10  deliberate decision. I think I was just focused
11  on trying to get everything that was going on
12  and the chaos that was underway somewhat under
13  control.
14    **Q.  The six of the eight that you**
15  **mentioned, Felder, McGee, Donini, Lee and**
16  **Lowitt, were any of them involved in the**
17  **negotiations with Barclays at the transaction?**
18    A.  I believe that was five.
19    **Q.  You're absolutely right.**
20    A.  I believe Skip McGee was involved in
21  the negotiation. I don't know if any of the
22  others were.
23    **Q.  Were any of the others playing any**
24  **supporting role in connection with the**

Page 19

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1  **transaction, if not face-to-face negotiations**
2  **with Barclays?**
3    A.  I don't know the role that others on
4  Barclays were playing.
5    **Q.  Do you have any clue the role Mr.**
6  **Lowitt may have played or not played?**
7    A.  I don't recall.
8    **Q.  Any recollection of it at all?**
9    A.  No.
10    **Q.  Any recollection at all of the role**
11  **that Mr. Donini played or not?**
12    A.  I don't know of any role that he
13  played.
14    **Q.  And no recollection at all of any role**
15  **that Mr. Felder may have played?**
16    A.  I don't know of any role that Eric may
17  have played.
18    **Q.  And you're currently employed by**
19  **Barclays, correct?**
20    A.  Correct.
21    **Q.  What entity of Barclays?**
22    A.  Barclays Capital.
23    **Q.  And forgive me if I'm repeating**
24  **myself, but do you have a recollection of when**

Page 20

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1  **you entered on duty, when you began your**
2  **employment there?**
3    A.  I signed an agreement to begin
4  employment somewhere around September 27 or
5  September 28, I recall.
6    **Q.  What's your title at Barclays Capital?**
7    A.  Managing director.
8    **Q.  And what's your area of**
9  **responsibility?**
10    A.  I'm in the Investment Banking
11  Division.
12    **Q.  What's your job there?  What do you**
13  **do?**
14    A.  I chair a few committees to approve
15  equity transactions, fairness opinions, and I'm
16  involved in various different capacities in
17  investment banking transaction development.
18    **Q.  And to whom do you report?**
19    A.  To Skip McGee and Steve Hash.
20    **Q.  Is Mr. Hash one of the eight?**
21    A.  I don't believe so.
22      (Exhibit 17, a document bearing Bates
23    Nos. BCI-EX-00077288 through 77290, marked
24    for identification, as of this date.)

Page 21

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    **Q.  Mr. Berkenfeld, I've placed before you**
2  **what the court reporter has marked as Exhibit**
3  **17.  Do you recognize the document?**
4    A.  Yes.
5    **Q.  What is it?**
6    A.  It's my employment agreement with
7  Barclays Capital.
8    **Q.  And if you'd turn to the last page of**
9  **the document bearing Bates number BCI-EX-77290?**
10    A.  Yes.
11    **Q.  Is that your signature at the bottom?**
12    A.  Yes.
13    **Q.  And the date you'll see is September**
14  **29, '08?**
15    A.  Yes.
16    **Q.  That's the date on which you accepted**
17  **Barclays offer of employment?**
18    A.  Correct.
19    **Q.  If you would look at the first page of**
20  **the document, it's dated September 22, you see**
21  **that?**
22    A.  Yes.
23    **Q.  Is that the date on which Barclays**
24  **offered you employment?**

## Page 22

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

2    A.    I don't recall. I don't believe this
3    was given to me on the 22nd.
4        **Q.    Is there a reason it's dated the 22nd**
5    **that you know?**
6    A.    No.

REDACTED

## Page 23

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

3    A.    I don't know that I can answer that
4    question why Barclays was doing it. Could you
5    be more precise on the question?

REDACTED

8    A.    Yes.
9        **Q.    Why did they give you that?**
10    A.    I don't know why, what motivated them
11    to do it.
12        **Q.    To your knowledge, was that in some**
13    **part required by the Asset Purchase Agreement**
14    **that you signed on September 16?**
15    A.    To my knowledge, it was not required
16    by the Asset Purchase Agreement for them to pay
17    me this amount.

REDACTED

## Page 24

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

REDACTED

17    A.    Can you repeat the question?
18        (Record read.)
19    A.    I believe there were a group of
20    employees that were identified by others from
21    Lehman who received offers of employment and
22    written employment agreements.
23        **Q.    How large was that group?**
24    A.    That's speculation on my part.
25        **Q.    What's your best estimate?**

## Page 25

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

2    A.    About 150.

REDACTED

10    A.    That was my understanding.
11        **Q.    And was it your understanding that**
12    **that payment of bonuses that they didn't get**
13    **from Lehman was in any way connected to the**
14    **Asset Purchase Agreement?**
15    A.    In any way connected?
16        MR. STERN:  I'll object to the form,
17    but you can answer, if you understand the
18    question.
19    A.    I am aware that the Asset Purchase
20    Agreement had a provision in it that created an
21    obligation on the part of Barclays to pay a
22    certain amount of compensation to employees.
23    That compensation took the form, many different
24    forms, including severance payments and bonus
25    payments.

Page 26

1    HIGHLY CONFIDENTIAL - S. BERKENFELD

**REDACTED**

10    Q.  I hear that.
11        What was the total amount that
12    Barclays was obliged to pay under that
13    provision, do you recall?
14    A.    That's a more complicated question,
15    but the provision made reference to an amount of
16    estimated amount of 2 billion.
17    Q.    And your understanding, sir, is that
18    estimated amount of 2 billion was for bonuses
19    and severance and other types of compensation; I
20    think that's what you said?
21    A.    Correct.
22    Q.    Not just limited to bonuses?
23    A.    Correct.
24    Q.    We'll come to that agreement.
25    Obviously, I'm going to spend some time with it

Page 27

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    today, but do you have a general recollection --
3    let me ask you, were you involved in the
4    negotiations of Asset Purchase Agreement?
5    A.    I was involved in the preparation and
6    drafting of the Asset Purchase Agreement.
7    Q.    Okay.  Those are different verbs than
8    I asked.  Let me -- I want to get the best idea
9    I can of --
10    A.    The distinction I'm drawing is that
11    the negotiation of the Asset Purchase Agreement
12    covers, in my mind, negotiation of the business
13    deal.  I was not involved in the negotiation of
14    the business deal.  I was involved in the
15    lawyering of the Asset Purchase Agreement.
16        That's another verb, but I think that
17    best describes it.
18    Q.    Thank you.  Who was involved in
19    negotiating the business deal on Lehman's
20    behalf?
21    A.    To my recollection, Bart McDade, Skip
22    McGee, and Mark Shafir.
23    Q.    Would you spell "Shafir" for the
24    reporter, please?  Is it S-H-A-F-I-R.
25    A.    S-H-A-F-I-R.

Page 28

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.    Thank you.
3        Anyone else?
4    A.    I believe Mark Shapiro was involved.
5    Jim Seery was involved.  Alex Kirk I believe was
6    involved.
7    Q.    Kirk?
8    A.    Kirk.  K-I-R-K.
9        There may be a few additional bankers
10    that were involved but in more secondary roles.
11    Q.    Who were they?
12    A.    To my recollection, Jeff Weiss may
13    have been involved.  Brad Whitman may have been
14    involved.  That's recollection, and that may not
15    be --
16    Q.    There could be others, you just don't
17    remember?
18    A.    And their role may have been minor.
19    Q.    Now, in order to do the --
20    A.    Excuse me.  And -- just to finish --
21    and there may have been others that I don't
22    recall.
23    Q.    Yeah, that's what I said, there may
24    have been more.  Just so our record is clear,
25    that may not be a complete list.  That's the

Page 29

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    best you can recall as you sit here?
3    A.    That's correct.  It may not be a
4    complete list.  There may have been others.
5    Q.    When you say Dave McGee and Shapiro,
6    who you identified as -- never mind.  The record
7    is clear.
8        Now, can you give me a little more
9    detail on what your role was when you say you
10    were involved in the drafting and the, to use
11    your verb, lawyering of the APA?
12    A.    After the bankruptcy filing, as you
13    can imagine, there were hundreds, thousands of
14    issues that no one had ever considered or had
15    prepared for.  Over the course of the next few
16    days, after the bankruptcy filing, I was trying
17    to deal with as many of those issues as
18    possible.
19        While I was spending much of my time
20    doing that, negotiations had commenced with
21    Barclays on a proposed asset purchase.  Over the
22    course of Monday and Tuesday, I became more
23    involved in those negotiations or lawyering, not
24    in the negotiations of the business deal but in
25    the preparation of the documentation, and at

Page 30

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  some point on Tuesday was able to join the
3  drafting session that was going on with the
4  attorneys for both Lehman and Barclays and try
5  to put together an Asset Purchase Agreement.
6    Q.   When was the business deal negotiated?
7    A.   I believe it was negotiated over the
8  course of Monday and Tuesday.
9    Q.   Did the negotiations of the business
10  deal take place through the night on Monday and
11  into Tuesday morning?
12    A.   I don't recall exactly how late they
13  went and when they might have been recessed or
14  interrupted.
15    Q.   Do you know a man named Martin Kelly?
16    A.   Yes.
17    Q.   Who is Martin Kelly?
18    A.   Martin Kelly I believe was the
19  controller for Lehman Brothers at the time of
20  the bankruptcy.
21    Q.   Did he play any role in the
22  negotiation of the business deal?
23    A.   Not that I know of.
24    Q.   Did he work for anybody who did play a
25  role?

TSG Reporting - Worldwide  (877) 702-9580

Page 31

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   Martin work for Ian Lowitt, and I
3  don't know what Ian Lowitt's role was in the
4  negotiation of the business deal.
5    Q.   In order to do the work that you
6  described in connection with putting the paper
7  together for the deal, you needed to understand
8  the business terms, correct?
9    A.   The lead on putting the papers
10  together for the business deal was taken by Weil
11  Gotshal.  They were the ones that were in the
12  lead role and needed to document what was being
13  told to them by the business people.
14    Q.   By the time you joined, on Tuesday,
15  joined the drafting folks, did you have an
16  understanding of the business terms?
17    A.   I was playing catch-up in trying to
18  understand what the business terms were.
19    Q.   Did there come a point on that day
20  when you did understand what the business terms
21  were?
22    A.   I believe so.
23    Q.   When you say you believe so, do you
24  have some doubt that you understood them at the
25  time, or you have a lack of recollection?

TSG Reporting - Worldwide  (877) 702-9580

Page 32

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   I'd say I think I understood the
3  business terms at the time.
4    Q.   What did you understand them to be?
5    A.   I understood that Barclays was paying
6  a certain amount for the real estate of Lehman;
7  they were paying a certain amount for the going
8  concern value of Lehman Brothers, the franchise
9  value; they were taking on a certain amount of
10  assets and assuming certain liabilities, and
11  liabilities that were being assumed included
12  compensation obligations and obligations for
13  cure payments.
14    Q.   Again, I'll have documents for you in
15  a while, sir, but do you recall what they were
16  to pay for the real estate?
17    A.   I recall that there was an estimated
18  amount, but it was subject to adjustment for
19  appraisal.
20    Q.   Apart from the real estate, do you
21  recall the certain amount that was to be paid
22  for what you called going certain value of the
23  franchise?
24    A.   I believe it was, the best of my
25  recollection, it was approximately 250 million.

TSG Reporting - Worldwide  (877) 702-9580

Page 33

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Okay.  And were the assets that
3  Barclays was taking on identified in any way
4  with some degree of specificity?
5    A.   At what time?
6    Q.   I'm still at the point where you've
7  come into the room and you have an understanding
8  of the terms of the deal.
9    A.   I think that the -- it was very much a
10  dynamic process and there were attempts being
11  made to estimate a pool of assets, but that was
12  still a very fluid process.
13    Q.   When you were able to join the folks
14  that were drafting on Tuesday, did you have an
15  understanding of what the range was at that
16  point of the value of that pool of assets?
17    A.   Yes.
18    Q.   What was your understanding?
19    A.   My understanding was that the pool of
20  assets that were being acquired was
21  approximately 72 billion.
22    Q.   And who had put together that -- who
23  had determined that number?  Who was involved in
24  that?
25    A.   I don't know.

TSG Reporting - Worldwide  (877) 702-9580

Page 34

1     HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Do you have any recollection of who
3  was involved in valuing the assets that were to
4  be transferred? Was there a team put together?
5  Was there somebody in charge of it?
6    A.  I don't know who arrived at that
7  number.
8    Q.  Okay.
9    A.  That it should be 72 instead of 62 or
10  50 or 12. I don't know. I do know that a
11  schedule that was being prepared was being
12  presented to me by I believe Martin Kelly/Paolo
13  Tonucci. It may have been one or other or a
14  combination. I don't recall exactly.
15    Q.  So I get a sense of the corporate
16  hierarchy, who works for who amongst Martin
17  Kelly and Paolo Tonucci, who's more senior?
18    A.  I think at the time at Lehman Brothers
19  they were about the same.
20    Q.  About the same?
21    A.  About the same.
22    Q.  And do you have a -- I know you
23  wouldn't know what they were doing minute to
24  minute, there was a lot going on that day, but
25  do you have a general sense of what Martin

Page 35

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Kelly/Paulo Tonucci did to come up with that
3  schedule?
4    A.  I don't.
5    Q.  Do you have any idea at all?
6    A.  No, I don't.
7    Q.  Did they never talk to you about the
8  process that they used to come up with that
9  schedule?
10    A.  About the process, no, they did not.
11    Q.  Did they talk to you about what steps,
12  if any, were taken to go through different asset
13  classes and determine their value?
14    A.  They did not.
15    Q.  Do you know if the schedule came from
16  Lehman's marks at the time of those asset
17  classes?
18    A.  I don't know where the schedule came
19  from.
20    Q.  You're being sort of emphatic about
21  the "I don't know." Let me see if I can push
22  that.
23    Did anybody in the drafting room need
24  to know that fact?
25    MR. STERN: Objection to the form. I

Page 36

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  don't know what that means.
3    Q.  I'm looking for -- let me withdraw.
4  Let me explain what I'm looking for, and he's
5  going to object to the form, but that's fine. I
6  might be able to move through this a little more
7  quickly.
8    What I'm trying to do, Mr. Berkenfeld,
9  is to get a sense of who's doing what on
10  Tuesday. Who's figuring out whats assets are
11  going, who is figuring out what document you
12  need to do it, you know? So who's -- and you've
13  told me Kelly and Tonucci put together this
14  schedule.
15    Tell me what you know about what they
16  did to get that schedule put together.
17    A.  Tuesday was a very, as was Monday,
18  crazy and hectic day.
19    Q.  I'll ask you later which was worse.
20    A.  And people were involved in different
21  tasks --
22    Q.  Uh-huh.
23    A.  -- in somewhat of a vertical approach.
24  You might have been involved in many different
25  verticals, but this was "all hands on deck."

Page 37

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Right.
3    A.  Paulo Tonucci, who was the treasurer
4  of Lehman, and Martin Kelly, was the controller,
5  were two of the most senior people on the
6  finance staff. So the people in the room,
7  myself, the outside counsel, Weil Gotshal,
8  Simpson Thacher on behalf of Lehman Brothers,
9  were relying on them to put together the list of
10  assets that were the assets that were estimated
11  at the time would be transferred over to
12  Barclays.
13    Q.  Give me a sense of the physical
14  setting. Was there a war room set up somewhere?
15    A.  We were all camped out on the 32nd
16  floor of Lehman Brothers' offices. The 32nd
17  floor is the executive dining rooms, so there's
18  a series of rooms that can be used as conference
19  rooms there.
20    Q.  Right.
21    A.  Tables and chairs. Activity was going
22  on throughout the floor. There was a lot of
23  discussions going on in the main reception area.
24  There were discussions going on in the hallways.
25  The drafting session occurred in a corner

Page 38

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  conference room which had a relatively large
3  table, a lot of chairs around it, and kind of a
4  sitting area right outside it, and so the
5  activity was occurring in -- the drafting
6  activity was occurring in that seating area in
7  that conference room, which smaller than this,
8  tighter than this. Table little smaller. Walls
9  a little smaller.
10    **Q. Where is the, for lack of a better**
11  **term, add-up-the-assets room? Where are Kelly**
12  **and Tonucci? Are they on the 32nd floor?**
13    A.  Martin and Paolo would bring things to
14  the 32nd floor --
15    **Q. Okay.**
16    A.  -- would come to the 32nd floor, but
17  my belief was they were working in their
18  offices.
19    **Q. And do you remember who, if anyone**
20  **else, was working with Martin Kelly and Paolo**
21  **Tonucci on estimating the assets that were to be**
22  **transferred?**
23    A.  I don't know who else they had on
24  their teams.
25    **Q. That's a sort of vertical entry.**
TSG Reporting - Worldwide  (877) 702-9580

Page 39

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2  **Anybody else at their level involved in that?**
3  **Any other senior executives involved other than**
4  **Martin Kelly and Paolo Tonucci?**
5    MR. STERN: Objection to the form.
6    A.  Involved in what, precisely?
7    **Q. In estimating the assets that were**
8  **going to be transferred?**
9    A.  In estimating the assets?
10    **Q. That's our verb, not mine, sir, so**
11  **that's why I'm using it.**
12    A.  When you say "estimating assets," are
13  you asking me estimating the value of the
14  assets?
15    **Q. Yes.**
16    A.  Not that I know of.
17    **Q. And I asked you a few moments ago who**
18  **was involved in negotiating the business terms.**
19  **Who was involved on the drafting side? There**
20  **was you and who else?**
21    A.  The drafting was led principally by
22  the outside counsel.
23    **Q. What names do you remember?**
24    A.  Mr. Lubowitz of Weil Gotshal. I
25  believe -- I don't remember the rest of the Weil
TSG Reporting - Worldwide  (877) 702-9580

Page 40

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Gotshal team that was there. John Findley and
3  Andy Keller from Simpson Thacher. There was
4  counsel representing Barclays.
5    **Q. Who do you recall representing**
6  **Barclays? It's Cleary Gottlieb, right?**
7    A.  Cleary Gottlieb.
8    **Q. Who from Cleary?**
9    A.  Victor Lewkow, I believe. And Jay
10  Layton from Sullivan Cromwell.
11    **Q. Remember anyone else on that side of**
12  **the table?**
13    A.  I wouldn't know their names.
14    **Q. And the usual assortment of suits and**
15  **yellow pads, right? But those are the two you**
16  **recall being involved in the discussions, the**
17  **drafting?**
18    A.  Victor was the lead on that.
19    **Q. And who, you know, delivered to this**
20  **group the business terms that needed to be**
21  **written up?**
22    A.  I don't know.
23    **Q. Who delivered to the Lehman side of**
24  **the table the business terms that needed to be**
25  **written up, do you know?**
TSG Reporting - Worldwide  (877) 702-9580

Page 41

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.  I don't know.
3    **Q. To whom were those business terms**
4  **delivered, do you know?**
5    A.  Speculating, I believe they were
6  delivered to Mike Lubowitz.
7    **Q. There comes a point on that Tuesday**
8  **morning where you, you learn the business terms,**
9  **correct?**
10    A.  Yes.
11    **Q. Okay. Who told them to you?**
12    A.  I don't recall if anyone specifically
13  went through them with me or if I learned them
14  through the process of joining the discussions
15  and reviewing the agreement.
16    **Q. Okay. On a more general level, and**
17  **I'm still on the Tuesday morning, do you have a**
18  **recollection of talking to any Lehman people**
19  **about the business terms?**
20    A.  I don't have a recollection.
21    **Q. I'm sort of separating that from what**
22  **they said to you, but talking to McGee, for**
23  **example, finding out this is the deal?**
24    A.  I just --
25    MR. STERN: Objection to the form. I
TSG Reporting - Worldwide  (877) 702-9580

Page 42

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    don't know if there's a question.
3       Q.    Do you have a recollection of talking
4    to anyone about the business terms, McGee, for
5    example?
6       A.    With everything going on, I just don't
7    recall.
8       Q.    Do you have any knowledge as to
9    whether it was one of the three that you
10   mentioned to me, McDade, McGee or Shafir?
11      A.    I don't recall.
12      Q.    Do you have a general recollection of
13   talking to Shapiro, Seery, Kirk about the
14   business terms?  Again, I'm on the Tuesday.
15      A.    I don't specifically recall --
16      Q.    Right.
17      A.    -- a conversation with anyone on the
18   business side.  I can't say that it didn't
19   happen.  I just don't recall.
20      Q.    I'm getting a sense that this room is
21   not exactly calm and cool.  There's a lot of
22   activity going.  There's lawyers in the corner
23   drafting, there's people running schedules
24   upstairs, there's people in the reception area,
25   so I understand the questions are a little
        TSG Reporting - Worldwide  (877) 702-9580

Page 43

1       HIGHLY CONFIDENTIAL - S. BERKENFELD
2    precise for that atmosphere.
3          What I'm trying to press for here is
4    even your general recollection of a point where
5    somebody -- where you came to understand this is
6    the deal we're making.
7       A.    And my response is that I don't recall
8    a moment of realization.
9       Q.    Okay.  No lightbulb?
10      A.    Not to be -- it's just there was so
11   much going, and at some point on Tuesday, which
12   could have been at 2 in the afternoon or could
13   have been at 6 in the evening, could have been
14   10 o'clock at night, I was involved enough to
15   understand what the transaction was.
16      Q.    Okay.
17      A.    And I just don't recall when that was.
18          (Exhibit 18, a document bearing Bates
19      Nos. BCI-CG00033789, which has a date and
20      time stamp in the lower right-hand corner
21      9/16/2008, 10:09 A.M., marked for
22      identification, as of this date.)
23          (Exhibit 19, one-page document,
24      showing columns of assets and liabilities,
25      and in the lower right-hand corner says
        TSG Reporting - Worldwide  (877) 702-9580

Page 44

1       HIGHLY CONFIDENTIAL - S. BERKENFELD
2    9/16/2008, 11:18 A.M., marked for
3       identification, as of this date.)
4       Q.    Mr. Berkenfeld, I've put before you a
5    document that was marked at a prior deposition,
6    which is marked as Exhibit 1, and for the
7    record, I've also had put before you these two
8    newly marked exhibits.
9          What has been marked as Exhibit 18 is
10   a one-page document marked "Confidential"
11   bearing Bates number BCI-CG00033789, which has a
12   date and time stamp in the lower right-hand
13   corner reading 9/16/2008, 10:09 A.M., and we've
14   marked as Exhibit 19 a document with no Bates
15   number, one-page document, showing columns of
16   assets and liabilities, and in the lower
17   right-hand corner says 9/16/2008, 11:18 A.M.
18          Now, if you would turn, sir, to the
19   document previously marked as Exhibit 1, the
20   Asset Purchase Agreement.  You've seen that
21   before, I take it?
22      A.    Yes.
23      Q.    And just so our record is a good one,
24   could you turn to the last page of that
25   document, please?  And does your signature
        TSG Reporting - Worldwide  (877) 702-9580

Page 45

1       HIGHLY CONFIDENTIAL - S. BERKENFELD
2    appear under the block "Lehman Brothers
3    Holdings, Inc."?
4       A.    Yes.
5       Q.    And does your signature also appear
6    under the block "Lehman Brothers, Inc."?
7       A.    Yes.
8       Q.    Does that help your recollection of
9    which entity employed you?
10      A.    No.
11      Q.    Okay.  You were, though, a Vice
12   President of Lehman Brothers Holdings, Inc., I
13   take it?
14      A.    Yes.
15      Q.    And you were a Managing Director of
16   Lehman Brothers, Inc., correct?
17      A.    Yes.
18      Q.    And when did you put your signature to
19   that document?  Actually, you know what?
20   Withdrawn.
21          There was a version of this document
22   with a lot of handwritten interlineations.  This
23   is not the one.  This is taken from a filing.
24   So let me just ask you generally without
25   reference to that document.  When did you sign
        TSG Reporting - Worldwide  (877) 702-9580

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    the Asset Purchase Agreement?
3       A.   I don't remember precisely when.
4       **Q.   Was it on the Tuesday?**
5       A.   I believe it was late -- I know it was
6    late in night, early in the morning.
7       **Q.   Uh-huh.  Okay.  On or around the**
8    **Tuesday?**
9       A.   Yes.
10      **Q.   And take a look, please, sir, at what**
11   **we've marked as Exhibit 18.  Tell me if you**
12   **recognize that document.**
13      A.   Yes.
14      **Q.   What is that document?**
15      A.   That is a schedule of assets and
16   liabilities.
17      **Q.   And there's an annotation in the upper**
18   **right-hand corner of that document which appears**
19   **to read "9/16/08" and, to me, "SB," do you see**
20   **that?**
21      A.   Yes.
22      **Q.   Are those your initials?**
23      A.   Yes.
24      **Q.   Tell me what you remember the**
25   circumstances putting your initials on that

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    document.
3       A.   We discussed previously schedules that
4    were being prepared by Martin/Paolo --
5       **Q.   Uh-huh.**
6       A.   -- that were being provided.  There
7    were a number of drafts of these schedules being
8    produced.  So at some point, to document a final
9    draft, I initialed a schedule.
10      **Q.   To separate it from working drafts?**
11      A.   Exactly.
12      **Q.   Now, you'll see, sir, that -- take a**
13   **look at 19.**
14      A.   Yes.
15      **Q.   And again, at the top says "SB."**
16   **Those are your initials as well, correct?**
17      A.   Yes.
18      **Q.   Okay.  And this also says 9/16/08?**
19      A.   Yes.
20      **Q.   And --**
21      A.   Final.
22      **Q.   And final.**
23          **Is that your handwriting at the top**
24   **where it says "final" as well?**
25      A.   Yes.

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2       **Q.   Okay.  What's the story with these two**
3    **documents?  Why does one have your initials and**
4    **the other say same initials, same date, and this**
5    **one -- and 19 says final?**
6       A.   The second exhibit, Exhibit 19 --
7       **Q.   Uh-huh.**
8       A.   -- was produced later and superseded
9    the earlier exhibit.  So it again was signed to
10   acknowledge that it was final and actually
11   annotated as final when we had the sign-off from
12   Finance that this was the final schedule.
13      **Q.   "This" being 19?**
14      A.   "This" being 19.
15      **Q.   And when you say you got the sign-off**
16   **from Finance, who in Finance?**
17      A.   Martin/Paolo.
18      **Q.   And tell me everything you remember**
19   **about getting the sign-off from Martin/Paolo**
20   **that these were the final numbers?**
21      A.   I don't remember much more them saying
22   this is the final schedule.
23      **Q.   Do you remember who they handed it to?**
24   **To you, I take it?**
25      A.   They handed it to the room.

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2       **Q.   Okay.  And what did they say when they**
3    **handed it to the room?**
4       A.   I don't recall.
5       **Q.   How did they describe this document**
6    **when they handed it to the room?**
7       A.   I don't recall.
8       **Q.   What did you understand the document**
9    **to be when they handed it to the room?**
10      A.   The final estimated schedule.
11      **Q.   Okay.  And the final estimated**
12   **schedule of the assets that were to be**
13   **transferred and the liabilities that were to be**
14   **undertaken in the transaction, correct?**
15      A.   No, I wouldn't characterize it that
16   way.  I would characterize it as the final
17   schedule of the estimate of assets and
18   liabilities that would be transferred over.  I'm
19   not sure I was clear on that, but the schedule
20   was not part of the agreement.
21      **Q.   Uh-huh.  There is one point in the**
22   **agreement where it's referred to, correct?  In**
23   **the employment section in the bonus and**
24   **compensation provision we were talking about**
25   **before?**

---

Page 50

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.    If you would like, we can take a look
3    at that provision.
4    **Q.    I'll get to it later.  But I don't**
5    **want you to make a misstatement about the**
6    **section I know is in there.**
7    **It's not attached to the agreement as**
8    **a schedule, right?**
9    A.    That's what I said.
10   **Q.    Is there a reason --**
11   A.    I believe that's what I said.
12   **Q.    Is there a reason it was not attached?**
13   A.    It wasn't attached because it wasn't
14   meant to be a part of the agreement.
15   **Q.    The estimate of the asset values in**
16   **here was the estimate upon which the transaction**
17   **was based, correct?**
18   A.    The estimate of the assets was an
19   estimate of assets that would be transferred
20   over.  At that point in time, the belief of the
21   assets that would be transferred over to
22   Barclays kind of as guidance for what was meant
23   in the Asset Purchase Agreement when there was a
24   reference to purchased assets.
25   (Recess; Time Noted:  10:20 A.M.)

TSG Reporting - Worldwide  (877) 702-9580

---

Page 51

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    (Time Noted:  10:36 A.M.)
3    BY MR. GAFFEY:
4    **Q.    Mr. Berkenfeld, before I go back to**
5    **this topic of the assets and the schedules, I**
6    **wanted to go back to the negotiation process**
7    **again because there's a time period I neglected**
8    **to cover.**
9    **Prior to the bankruptcy filing, to**
10   **your knowledge had there been discussions**
11   **between Lehman and Barclays concerning a**
12   **potential transaction?**
13   A.    Yes.
14   **Q.    When did those take place?**
15   A.    Thursday, Friday into Saturday,
16   Sunday.
17   **Q.    And that's the Thursday, Friday,**
18   **Saturday, Sunday, before the 15th?**
19   A.    Yes.
20   **Q.    Were you involved in those**
21   **discussions?**
22   A.    Some of them, yes.
23   **Q.    What was the nature of your**
24   **involvement, generally?**
25   A.    As a senior lawyer for Lehman.

TSG Reporting - Worldwide  (877) 702-9580

---

Page 52

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    **Q.    Were you involved in discussions,**
3    **negotiations of business terms in those -- that**
4    **prior set of negotiations?**
5    A.    No, I was not.
6    **Q.    And those negotiations, as I**
7    **understand it, did not come to fruition?  No**
8    **deal resulted from those, that set of prior**
9    **negotiations, correct?**
10   A.    That's correct.
11   **Q.    In the drafting in connection with the**
12   **transaction that's brought us here today, in**
13   **connection with the drafting of the September**
14   **16th, 2008 Asset Purchase Agreement, were any**
15   **documents that had been generated in connection**
16   **with the prior transactions used, any draft**
17   **agreements, any schedules, that kind of thing?**
18   A.    I don't believe so.  The original
19   transaction was set up more as a public company
20   merger and a document was being prepared through
21   Simpson Thacher.  Once Lehman filed for
22   bankruptcy --
23   **Q.    I got it.**
24   A.    -- the lead role for the transaction
25   was taken over by Weil Gotshal for Lehman, and I

TSG Reporting - Worldwide  (877) 702-9580

---

Page 53

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    believe a whole different -- different form of
3    agreement with different counsel taking the
4    lead.
5    **Q.    Was there any need to estimate or**
6    **calculate the value of the particular asset**
7    **classes in connection with the prior**
8    **negotiations?**
9    A.    In the prior negotiations, there was
10   no need to calculate the value of assets or
11   liabilities.  It would have just been relevant
12   in terms of the purchaser's due diligence.
13   **Q.    Was any schedule like Exhibits 18 or**
14   **19 put together in connection with the prior**
15   **transaction?**
16   A.    Not that I'm aware of.
17   **Q.    So, as far as you can say, as far as**
18   **you know, the schedules that we have marked as**
19   **18 and 19 were put together in connection with**
20   **the transaction that actually occurred, the one**
21   **that was signed during the week of the 15th?**
22   A.    That's correct.
23   **Q.    And just another follow-up on**
24   **something we talked about before the break, and**
25   **that's the issue of people moving from Lehman to**

TSG Reporting - Worldwide  (877) 702-9580

Page 54

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  Barclays, were there lists put together of
3  people who would be offered employment or
4  recommended to be offering employment at
5  Barclays?
6     A.  I believe there were.
7     Q.  Were you involved in putting those
8  lists together?
9     A.  I was only involved as it related to
10 people I was responsible for managing.
11    Q.  And did you put together lists like
12 that?
13    A.  Yes.
14    Q.  And during what period of time did you
15 put those lists together?
16    A.  I don't remember.
17    Q.  Do you recall sending over a list to
18 Barclays on or about September 19?
19    A.  I don't remember the date, and it
20 would not have been to Barclays. I was working
21 with our HR Department.
22    Q.  Okay.
23    A.  I believe the HR Department was the
24 one who was assembling the list with input --
25    Q.  Okay.

Page 55

HIGHLY CONFIDENTIAL - S. BERKENFELD
2     A.  -- from me and other managers.
3     Q.  And to your knowledge, were those
4  lists sent, the lists that were being assembled,
5  then sent over to Barclays?
6     A.  To my knowledge, they were.
7     Q.  Did people who were on those lists get
8  told they were on those lists?
9     A.  Eventually, yes.
10    Q.  You put together lists for people for
11 whom you were responsible, for departments for
12 which you were responsible. Who put together
13 similar lists for other groups or departments?
14    A.  I don't know.
15    Q.  Did you have any knowledge at all?
16    A.  I would speculate that it was the
17 people who were responsible for those
18 departments.
19    Q.  Was that process being done prior to
20 the closing?
21    A.  I don't recall exactly when it was
22 done.
23    Q.  And again, a little follow-up from
24 this morning. Your employment agreement, which
25 we marked as Exhibit 17, were the numbers in

Page 56

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  there negotiated?
3     A.  Between who?
4     Q.  Between you and Barclays.
5     A.  No.
6     Q.  Was there any negotiation at all
7  between you and Barclays of the terms of the
8  agreement?
9     A.  No.
10    Q.  Did you just take the numbers that
11 they put in an offer letter to you?
12    A.  I had a decision to make on the
13 numbers that were presented to me in the offer
14 letter, that's correct.
15    Q.  And prior to seeing the numbers in the
16 offer letter, had you had any discussions with
17 anybody about what those numbers would be?
18    A.  The discussion I had was with Ian
19 Lowitt, who told me what the terms of the offer
20 would be.

REDACTED

Page 57

HIGHLY CONFIDENTIAL - S. BERKENFELD
1

REDACTED

1    HIGHLY CONFIDENTIAL - S. BERKENFELD

REDACTED

9    Q.  Now, you started -- we talked about
10   the exact date, and I don't care -- you started
11   sometime in September of 2008, correct?
12   A.  The agreement actually says the
13   employment commences on or before October 31.
14   Q.  Okay.  A date -- so we haven't hit
15   your first anniversary yet?
16   A.  That's correct.

REDACTED

1    HIGHLY CONFIDENTIAL - S. BERKENFELD

REDACTED

12   Q.  Take a look, please, at Exhibit 19.
13   That's the one marked "final."
14   A.  Yes.
15   Q.  All right.  Is that an accurate
16   description?  Were there any drafts of this
17   after the one that you initialed and marked as
18   final?
19   A.  Not that I'm aware of.
20   Q.  And down in the lower right-hand
21   corner in the Liabilities column there's an item
22   called Comp 2.0, do you see that?
23   A.  Yes.
24   Q.  I take it the numbers on this are in
25   billions?

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  That's correct.
3    Q.  Okay.  So is that a $2 billion accrual
4    for compensation?
5    MR. STERN:  Objection to the form.
6    A.  It's a number that's listed as 2
7    billion for comp.  I don't know that it's an
8    accrual.
9    Q.  Do you know what it is?
10   A.  It's a liability for -- of 2 billion
11   for comp that's estimated on the schedule.
12   Q.  Do you know the source of that $2
13   billion liability for comp that's listed on the
14   schedule?
15   A.  The source of all the numbers on this
16   schedule were the same source.  From our Finance
17   Department.
18   Q.  That would be Kelly/Tonucci?
19   A.  Correct.
20   Q.  Now, do you know if the 2 billion
21   listed for comp on that schedule bore any
22   relation to the amount accrued for bonuses as of
23   August of 2008 for Lehman employees?
24   A.  I don't have any direct knowledge.
25   Q.  Do you have any indirect knowledge?

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  No.
3    Q.  Do you have any knowledge at all?
4    MR. STERN:  Objection to form.
5    Q.  About that?
6    A.  Just hearsay.
7    Q.  Tell me what that is.  What hearsay do
8    you have?
9    A.  I just -- well, there was an
10   understanding as this came through that this
11   related to what was accrued, but I don't have
12   any direct knowledge of it.
13   Q.  From whom did you gain -- did you
14   garner that understanding?
15   A.  I think in the delivery of the
16   schedule at the time of the signing.
17   Q.  And did you understand it to be an
18   accrual for bonuses or an accrual for more than
19   bonuses?
20   A.  I understood it to be relevant to the
21   provisional compensation in the Asset Purchase
22   Agreement.
23   Q.  You make a fair point.  I think you
24   told me it's not an accrual, so let me rephrase
25   the question.

Page 62

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    Did you understand it to be an
3    estimate or a calculation of some kind --
4    withdrawn. Did you have any knowledge one way
5    or the other when you saw this schedule as to
6    whether it bore -- the $2 billion number for
7    comp bore any relation to accruals for bonus
8    liability?
9        A.    I understood it as an estimate of the
10    obligation that was set out in the Asset
11    Purchase Agreement in the compensation section.
12        Q.    Okay. The compensation section of the
13    Asset Purchase Agreement covers severance and
14    covers bonuses, correct?
15        A.    As I recall.
16        Q.    Okay. Was it your understanding that
17    this estimate related to both severance and to
18    bonuses?
19        A.    That is correct.
20        Q.    Again, for 19, sir, do you know if the
21    figures there on the asset side for these asset
22    classes of government agency, commercial paper,
23    et cetera, bore any relation to the marks at
24    which they were shown on Lehman's books?
25        A.    My understanding is that they were
TSG Reporting - Worldwide  (877) 702-9580

Page 63

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    based on the marks.
3        Q.    How did you get that understanding?
4        A.    From the same source. Again, in the
5    delivery of the schedule from Martin and Paolo.
6        Q.    Did they say something to you?
7        A.    I don't recall exactly what they said.
8        Q.    Yeah.
9        A.    But it was in the delivery of the
10    schedule and what it represented as an estimate
11    for purchased assets and assumed liabilities.
12        Q.    To your knowledge, sir, was any
13    component of the business terms that were
14    agreed -- withdrawn. To your knowledge, did any
15    component of the business terms that were agreed
16    include a discount off of those marks?
17        A.    I'm not aware of any discount off of
18    the marks.
19        Q.    Did you ever have any discussion with
20    anyone on the Lehman side of the table about a
21    discount off of the marks?
22        A.    Not that I recall.
23        Q.    Was there any discussion that you ever
24    heard about a bulk discount?
25        A.    Not that I recall.
TSG Reporting - Worldwide  (877) 702-9580

Page 64

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.    Was it your understanding that the
3    economics of the transaction involved a $5
4    billion overall loss to Lehman versus its marks?
5        A.    I have never been informed of that.
6        Q.    Have you ever seen any document that
7    says that?
8        A.    Not that I recall.
9        Q.    So when you were involved in the
10    drafting of the agreement, it was not part of
11    your knowledge that -- you did not have an
12    understanding there was to be a discount given
13    to Barclays off the value of the assets
14    transferred; is that right?
15        A.    I did not have that knowledge.
16        Q.    Do you know if, when Mr. Kelly or
17    people under his supervision prepared this
18    schedule, they in fact did discount off of the
19    marks shown on Lehman's books for those assets?
20        A.    I have no knowledge of that.
21        Q.    Do you have any knowledge of a
22    discount in the range of $5 billion being
23    calculated before this schedule was put
24    together?
25        A.    I have no knowledge of that.
TSG Reporting - Worldwide  (877) 702-9580

Page 65

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.    Have you ever had a discussion with
3    Mr. Kelly about that?
4        A.    I have not.
5        Q.    Have you ever --
6        A.    That I recall.
7        Q.    -- had a discussion with Mr. Tonucci
8    about that?
9        A.    I have not.
10        Q.    If you wanted to know the answer to
11    those questions, who would you ask?
12        MR. STERN:  Objection to the form.
13        A.    I would ask Mr. Kelly and Mr. Tonucci.
14        Q.    Anyone else you think would have
15    knowledge of that fact, whether the business
16    terms included a $5 billion discount to
17    Barclays?
18        A.    I would ask the principal negotiators
19    of the deal.
20        Q.    And that would be Dave Shafir and
21    McGee?
22        MR. STERN:  Objection to the form.
23        A.    That's probably where I would start.
24        Q.    Who would you ask on the Barclays side
25    of the table?
TSG Reporting - Worldwide  (877) 702-9580

Page 66

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    A.    I would ask Rich Ricci.
3    Q.    Anyone else?
4    A.    I would ask Gerard LaRocco, I would
5    ask Archie Cox, and I would ask Michael Klein,
6    who was not a Barclays employee, but who was
7    acting as an advisor.
8    Q.    Now, are Mr. Ricci, LaRocco, Cox and
9    Klein, would you describe them as the chief
10   negotiators for Barclays?
11   A.    I would describe the chief negotiators
12   as Ricci, Cox and Klein.
13   Q.    Do you know where Mr. Klein works
14   today?
15   A.    I do not.
16   Q.    Do you know where he lives?
17   A.    I do not.
18   Q.    Do you know if anyone at Barclays has
19   contact with him?
20   A.    I don't know.
21   Q.    What was his role? How did he come to
22   be an advisor for Barclays, do you know?
23   A.    I don't know how he became an advisor.
24   He was acting as an advisor for Barclays.
25   Q.    Did you have any discussions with him

Page 67

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2    at the time the drafting was going on of the
3    Asset Purchase Agreement?  By "him," I mean Mr.
4    Klein.
5    A.    I had discussions with Mr. Klein, but
6    I don't recall any specific discussion around
7    the terms of the Asset Purchase Agreement.
8    Q.    And did you have any discussion around
9    the terms of the Asset Purchase Agreement at the
10   time with Mr. Ricci, Mr. LaRocco, Mr. Cox?
11   A.    Not that I recall.
12   Q.    Was Mr. Diamond -- would you
13   characterize Mr. Diamond as one of the
14   negotiators?
15   A.    I don't know.
16   Q.    Was he around the 32nd floor?
17   A.    I don't have a recollection of him
18   being there.
19   Q.    Do you have a recollection of seeing
20   Mr. Ricci, Mr. LaRocco, Mr. Cox and Mr. Klein?
21   A.    Yes.
22   Q.    Did you have any discussion with Mr.
23   Diamond?
24   A.    No.
25   (Exhibit 20, a document bearing Bates

Page 68

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Nos. 132841, marked for identification, as
3    of this date.)
4    Q.    Mr. Berkenfeld, I have put before you
5    what we have marked as Exhibit 20, a one-page
6    document bearing document number 132841, lower
7    right-hand corner, which appears to be an e-mail
8    sent from Paolo Tonucci to Ian Lowitt and Martin
9    Kelly and then an e-mail chain below that.
10   Let me know when you've had a chance
11   to look through and to read that document.
12   MR. STERN:  Please read it carefully.
13   I don't think it's a document you've seen
14   before.
15   MR. GAFFEY:  Thanks for answering my
16   next question, Jack.  Please don't do that.
17   MR. STERN:  I said I think.
18   A.    I'm under oath.
19   Q.    I understand that.
20   (Document review.)
21   A.    Okay.
22   Q.    Okay.  Have you ever seen that
23   document before?
24   A.    I have not.
25   Q.    At any time?

Page 69

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.    At any time.
3    Q.    Now, you'll see in the bottom
4    e-mail -- and so the record will make some sense
5    when we read it later on, I'm going to read the
6    e-mail into the record:
7    "Well, it took all night and lots of
8    back and forth, but the deal is done and ready
9    for the board.  Final price did not change
10   meaningfully.  Approx a $5b all in economic loss
11   versus our marks and $3.60b of resi assets left
12   behind."
13   I'll stop reading there.  Do you have
14   any idea what Mr. Kelly was describing to Mr.
15   Lowitt and Mr. Tonucci when he spoke about a 5
16   billion all in economic loss versus our marks?
17   A.    I do not.
18   Q.    Have you ever heard before today that
19   there may have been a $5 billion all in economic
20   loss versus Lehman marks --
21   A.    I have not.
22   Q.    -- in the asset purchase?
23   A.    I have not.
24   Q.    If you did understand that to be true,
25   that there was a $5 billion all in economic loss

Page 70

1   **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2   **versus the marks, would that be consistent with**
3   **your understanding of the business terms?**
4        MR. STERN: Objection to the form.
5    A.  Could you repeat the question?
6        (Record read.)
7    A.  I don't think it would be
8   inconsistent. I don't think it would be
9   inconsistent.
10   **Q.  To your knowledge, in the drafting**
11   **that you were involved in of the Asset Purchase**
12   **Agreement, was there anything in that agreement**
13   **that suggested there would be a $5 billion**
14   **discount off the actual value of the assets**
15   **transferred?**
16       MR. STERN: Objection to the form.
17   A.  There was, to my knowledge, nothing in
18   the Asset Purchase Agreement that addressed a
19   discount on assets.
20   **Q.  To your knowledge, were any of the**
21   **lawyers involved in the drafting told anything**
22   **about a $5 billion overall economic loss to**
23   **Lehman against the marks?**
24   A.  To my knowledge, none of the lawyers
25   involved in the drafting were aware of any loss

Page 71

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   on assets.
3    **Q.  To your knowledge, were any of the**
4   **lawyers involved in the drafting told anything**
5   **about a discount being given to Barclays off of**
6   **the value of the assets being transferred?**
7    A.  Not to my knowledge.
8    **Q.  You understood that the terms of the**
9   **transaction would have to be disclosed to the**
10   **bankruptcy court, correct?**
11   A.  Correct.
12   **Q.  To your knowledge, was anyone who was**
13   **responsible for making those disclosures to the**
14   **bankruptcy court told that there was a discount**
15   **to be given to Barclays off of the value of the**
16   **assets transferred?**
17       MR. STERN: Objection to the form.
18   A.  Not to my knowledge.
19   **Q.  When you say that giving a discount**
20   **would not have been inconsistent with the**
21   **agreement --**
22       Well, let's look at the agreement.
23   **You have the Asset Purchase Agreement in front**
24   **of you. It's marked as Exhibit 1. When you**
25   **signed the agreement, sir, you were confident, I**

Page 72

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2   **take it, that you had an understanding of its**
3   **terms, correct?**
4    A.  Correct.
5    **Q.  And normally I don't have to ask this**
6   **question of a lawyer, but you read it carefully**
7   **before you signed it?  You read the whole thing?**
8    A.  Correct.
9    **Q.  Before, again, before we get to the**
10   **terms, was there any concept, sir, was there any**
11   **part of the structure of the transaction that**
12   **contemplated giving a bulk discount to Barclays**
13   **from the value of the assets transferred?**
14   A.  Not that I was aware of.
15   **Q.  To your knowledge, were any of the**
16   **lawyers involved or other people involved in the**
17   **drafting of the Asset Purchase Agreement given**
18   **any indication there would be a bulk discount of**
19   **some kind given to Barclays?**
20       MR. STERN: Objection to the form.
21   A.  Not to my knowledge.
22   **Q.  And to your knowledge, sir, were any**
23   **of the people responsible for making disclosures**
24   **to the bankruptcy court told that there would be**
25   **some kind of bulk discount given to Barclays?**

Page 73

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2        MR. STERN: Objection to the form.
3    A.  Not to my knowledge.
4    **Q.  I asked that latter question with**
5   **respect to at any point during the bankruptcy**
6   **proceedings from the original notification to**
7   **the court there was an agreement through the**
8   **point where the closing documents were filed**
9   **with the court on September 22.  That would be**
10   **the period from the 16th through the 22nd of**
11   **September.**
12   A.  Again, not to my knowledge.
13   **Q.  And to your knowledge, did anybody**
14   **make any disclosure like that to the court after**
15   **September 22?**
16       MR. STERN: Objection to the form.
17   A.  I don't have knowledge of that.
18       (Exhibit 21, a document bearing Bates
19   Nos. 10309627, marked for identification, as
20   of this date.)
21   **Q.  I have marked and put before you, Mr.**
22   **Berkenfeld, as Exhibit 21 a one-page document**
23   **bearing the number 10309627, which appears to be**
24   **an e-mail at the top, an e-mail from Alex Kirk**
25   **to Gerard Reilly and a list of other people, and**

Page 74

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  at the bottom of that is an e-mail from Reilly
3  to Lowitt.
4        And I'd ask you to take a look at the
5  bottom of that. Let me know when you've had a
6  chance to read through the items marked 1, 2 and
7  3 in the body of the e-mail.
8    A.   I will.
9        (Document review.)
10   Q.   Have you had a chance to read through
11  the e-mail, sir?
12   A.   Yes, I have.
13   Q.   Have you ever seen that document
14  before?
15   A.   I have not.
16   Q.   You've never seen it at any time?
17   A.   No, I have not.
18   Q.   Referring to the paragraph numbered 3
19  in Mr. Reilly's e-mail to Mr. Lowitt, "Not clear
20  on amount of block discount or how we make it
21  happen. Defaulting on repo could be the best as
22  discount could be taken from haircut."
23  Actually -- period. Next sentence reads, "If
24  not that, then we need to give business an
25  allocation of block discount so they can mark
TSG Reporting - Worldwide  (877) 702-9580

Page 75

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  down the books tonight." Do you see that?
3    A.   Yes, I do.
4    Q.   Did it ever come to your attention
5  during the week of September 15 or 16 that there
6  was going to be a markdown of books to give
7  Barclays a discount?
8        MR. STERN: Objection to the form.
9    Q.   You can answer, I think.
10   A.   Not that I recall.
11   Q.   As the signatory to the Asset Purchase
12  Agreement, if it contemplated a block discount
13  be given to Barclays, or any kind of discount
14  being given to Barclays, after the value of the
15  long position that was being transferred, would
16  you have expected someone to tell you?
17       MR. STERN: Objection to the form.
18   A.   I'm -- I'm not sure that these e-mails
19  mean precisely, I've never seen them before, but
20  I don't believe they mean what you are
21  suggesting them to mean.
22   Q.   The question I asked was a little
23  different. Not with reference to those two
24  documents. The question I asked was whether, as
25  the signatory to the Asset Purchase Agreement
TSG Reporting - Worldwide  (877) 702-9580

Page 76

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  that was filed with the bankruptcy court, if
3  part of the business terms were that Barclays
4  was to be given a discount off the value of the
5  long position transferred, would you have
6  expected someone to tell you that?
7        MR. STERN: Objection to the form.
8    A.   If there was a business deal to give a
9  discount over then accurate valuations of
10  positions as agreed to by the parties so that
11  both parties said, this is the valuation in the
12  current market, with everything that was going
13  on Monday and Tuesday, as opposed to Friday and
14  Thursday pre-bankruptcy, and everyone said these
15  assets are worth X in today's market, given
16  their size, given their illiquidity, what their
17  fair market value is, they're worth X, and the
18  deal is that we're going to sell them to you for
19  something less than X so that you will be
20  getting a discount off of the valuation at the
21  time under the current market, and if that was
22  part of the business deal agreed to by the
23  parties, then I would have expected that to be
24  disclosed to the lawyers who were preparing the
25  document and the lawyers who were presenting to
TSG Reporting - Worldwide  (877) 702-9580

Page 77

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  the bankruptcy court.
3    Q.   And one of the lawyers involved in
4  preparing the document was you?
5    A.   That is correct.
6    Q.   And you were the man who signed the
7  document, correct?
8    A.   That is correct.
9    Q.   And did anyone ever make such a
10  disclosure to you?
11   A.   No.
12   Q.   We can take those two e-mails and put
13  them to the side. And if you would take a look,
14  please, at the Asset Purchase Agreement marked
15  as Exhibit 1.
16       Now, the first place I would ask you
17  to take a look, sir, in the asset agreement is
18  at page 6, which contains the definition of
19  "purchased assets." Tell me when you get there.
20   A.   Okay.
21   Q.   Okay, you with me? Now, the purchased
22  assets as set out in the agreement on the
23  16th -- we're going to cover some changes that
24  came during the week, but right now I'm asking
25  about what was in mind on the 16th -- referred
TSG Reporting - Worldwide  (877) 702-9580

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    **to in subsection D, "government securities,**
3    **commercial paper, corporate debt, corporate**
4    **equity, exchange traded derivatives and**
5    **collateralized short-term agreements with a book**
6    **value as of the date hereof approximately of $70**
7    **billion (collectively long positions)." You see**
8    **that?**
9    A.   Yes.
10   **Q.   Is there a relation, sir, between the**
11   **description of the long positions having a book**
12   **value of approximately $70 billion and the**
13   **calculations on the financial statement --**
14   **financial schedule we have marked as Exhibit 19?**
15   A.   Yes, there is a relationship.
16   **Q.   Okay.  Describe that for me.**
17   A.   The best way to describe it is that
18   the schedule, Exhibit 19, was meant -- was not
19   part of the Asset Purchase Agreement and, of
20   course, could have been referred to in this
21   section by the lawyers and incorporated into the
22   purchase agreement.  It was not.
23       The best description is that it is
24   meant as guidance of what was included in that
25   very general description of 70 billion of, as

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    defined, long positions in that section of the
3    purchase agreement.
4    **Q.   So where the schedule calculates**
5    **assets, adjusted total assets at 72.65 billion,**
6    **that's put at approximately 70 billion in the**
7    **agreement?**
8    A.   There's also Section E, which is 50
9    percent of each position in the residential real
10   estate mortgage securities.  So there's also a
11   mortgage item here --
12   **Q.   Okay.**
13   A.   -- that's not in the list in D.  So,
14   government securities, commercial paper, it
15   skips to corporate debt, corporate equity,
16   derivatives, collateralized short-term
17   agreements.
18   **Q.   Right.**
19   A.   No mortgages.  Mortgages are mentioned
20   in Section E.
21   **Q.   Okay.  So if I cut the mortgage piece**
22   **by half, I get closer to 70; is that what you're**
23   **telling me?  I'm in 19, right?**
24   A.   No, if you deduct the number of
25   mortgages, 2.7, on the schedule from 72.65, you

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    get to approximately 70 billion.
3    **Q.   Well, if I only took 50 percent of**
4    **them, I wouldn't deduct the whole amount, would**
5    **I?**
6    A.   The amount, I believe, on the schedule
7    represents the 50 percent, not 100 percent.
8    **Q.   So the 2.7, it may actually be a**
9    **number more like 5.4?**
10   A.   I believe that is correct.  I don't
11   specifically recall.
12   **Q.   Okay.  If the 2.7 is 50 percent of the**
13   **resis, of the residential real estate mortgage**
14   **securities, then isn't Subsection E already**
15   **accounted for in the schedule?  Maybe I'm not**
16   **understanding your answer.**
17       MR. STERN:  Objection to the form.
18   A.   There is a gap between 70 billion and
19   72.65 --
20   **Q.   Uh-huh.**
21   A.   -- that is approximately the 2.7 that
22   is listed on the mortgages.  The 2.7 that's
23   listed on the mortgages is not in subsection D
24   of Purchased Assets.
25   **Q.   Uh-huh.**

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.   It's referred to in Subsection E of
3    Purchased Assets.
4    **Q.   Well, again, sir, just -- and this is**
5    **my math skills, I guess, but if I added 2.7 back**
6    **into the asset side of schedule 19 to account**
7    **for the other 50 percent on mortgages, I come up**
8    **with 65.4 as a total for those assets, which**
9    **would give you an adjusted total of 75.4, or are**
10   **we missing each other still?**
11       MR. STERN:  Objection to the form.
12   A.   I believe we're missing each other
13   still.
14   **Q.   Okay.**
15   A.   If you take all of the items listed in
16   Section D --
17   **Q.   Uh-huh.**
18   A.   -- they approximate 70 billion.  Just
19   add them up.
20   **Q.   Got it.  Now I understand what you're**
21   **saying.**
22   A.   41.1, 4.9, 8.8, 4.5, .7, 10.
23   **Q.   All right.  Got it.  Thank you.**
24       Now, so what that means is, once
25   **you've made that adjustment for the items D and**

HIGHLY CONFIDENTIAL - S. BERKENFELD

2  E that you just discussed to me, the so-called
3  long positions add up to the 70 that this
4  schedule marked as Exhibit 19 would show?
5     A.   To be precise, you also need to
6  include A, cash.
7     Q.   Right, because you've got that $700
8  million cash item on here, yes?  On the
9  schedule?
10    A.   I would characterize Exhibit 19, the
11 schedule, as being guidance for what was being
12 referred to in words and not cross-referenced to
13 a schedule, not with the schedule incorporated,
14 in the definition of "purchased assets" under
15 Section A, D and E.
16    Q.   Okay.  And is it safe for me -- well,
17 let me ask you this:  Covering a little bit of
18 what we talked about this morning, you -- it's
19 correct that you do not have any knowledge about
20 the process by which this schedule marked as
21 Exhibit 19 was assembled?
22    A.   I do not have any knowledge of the
23 process that our finance staff went through to
24 come up with these numbers.
25    Q.   Okay.

HIGHLY CONFIDENTIAL - S. BERKENFELD

2     A.   I have no knowledge whether these
3  represent all of those positions that were on
4  the books and records or how the valuations were
5  calculated.  I don't have any information about
6  the process.
7     Q.   Nor do you have any information about
8  whether this accurately reflects what's shown as
9  the marks on the books?
10    A.   I don't have any information or
11 knowledge about how these numbers relate to the
12 marks on the books as of any particular date,
13 whether that was close of business on Friday,
14 close of business on Monday or Tuesday, as
15 markets were moving very significantly and there
16 was a tremendous amount of volatility.
17    Q.   And other than the -- well, if you
18 have Exhibit 18 there, it's the slightly earlier
19 version of the schedule, it's the one with the
20 time of 10:09.  Okay?  You recall being given
21 the schedule marked as Exhibit 18, that's the
22 10:09 A.M. schedule, by Kelly or Tonucci,
23 correct?
24    A.   Correct.
25    Q.   Okay.  And then at or sometime

HIGHLY CONFIDENTIAL - S. BERKENFELD

2  slightly after -- or sometime after 11:18 A.M.,
3  you're given the modified version of that
4  schedule which we have marked as Exhibit 19 and
5  which you signed off on as final, correct?
6     A.   Correct.
7     Q.   Was there any explanation given to you
8  for the modification of the schedule?
9     A.   Not that I recall.
10    Q.   Did you ask for one?
11    A.   No, I don't recall.
12    Q.   So I'm clear on what your recollection
13 is or isn't, are you saying you don't recall one
14 way or the other whether you had the discussion
15 or you don't recall, you don't think you had the
16 discussion?
17       MR. STERN:  Objection to the form.
18    A.   I think the best answer is I don't
19 think I had a discussion.  I didn't see the
20 differences between the two schedules as
21 significant.  One was 73.15.  The other was
22 72.65.  On a percentage basis, it was not a
23 significant difference.
24    Q.   I'm just being suggestive with this
25 question.  It's not based on anything anybody

HIGHLY CONFIDENTIAL - S. BERKENFELD

2  else has told me, but you've got a lot going on,
3  you're doing the deal, they're giving you the
4  schedule the calculations are going to be based
5  on, and in a space of about 45 minutes, it's
6  changed.
7       Do you suggest to anyone in sum or
8  substance, are you guys going to get me a final
9  one?  I mean, are you concerned with the fact
10 that it's changing at that pace?
11    A.   I wanted to document which was the
12 final schedule to provide the guidance.
13    Q.   Right.
14    A.   So I wouldn't have dated it and put
15 "final" on it and initialed it unless there was
16 a desire on my part to sort of put some kind of
17 finality --
18    Q.   Okay.
19    A.   -- at that point in time --
20    Q.   Got it.
21    A.   -- on what this estimate was.
22    Q.   Would you turn, please, to page 35 of
23 the agreement.  That will put us in Article 9,
24 in Section 9.1(C).
25       MR. STERN:  Page 35?

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        MR. GAFFEY: Page 35 of Exhibit 1.
3        MR. STERN: And which article? We're
4    looking at 9.1(C)?
5        MR. GAFFEY: Yes.
6        Q.   I just want to direct your
7    attention -- I'm going to come back to the
8    section with some questions about its terms, but
9    I direct your attention, sir, within 9.1(C),
10   which is on page 35, there's a reference
11   starting four lines down to "the financial
12   scheduled delivered to purchaser on September
13   16." With me?
14       A.   Uh-huh.
15       Q.   That's a reference to, "The financial
16   schedule delivered to purchaser on September 16,
17   2008, and initialed by an officer of each of
18   Holdings and Purchaser," and then the liability
19   to which it refers is defined.  Do you see that
20   sentence there?
21       A.   Yes, I do.
22       Q.   All right.  Now, is the schedule that
23   we've marked as Exhibit 19 the schedule to which
24   9.1(C) refers?
25       A.   Yes, I believe so.
         TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.   Okay.  Given the express reference to
3    that schedule in 9.1(C), which has to do with
4    certain compensation to transferred employees
5    issues, is there a reason the schedule was not
6    attached to the agreement that was filed with
7    the court?
8        MR. STERN: Objection to the form.
9        A.   I don't remember any discussion among
10   all of the lawyers that said we're not going to
11   attach the schedule for these reasons.
12       Q.   Okay.
13       A.   I think that each lawyer might have
14   had different views on why it wasn't attached.
15       Q.   Uh-huh.
16       A.   I don't recall a consensus, should we
17   attach it or not.
18       Q.   Okay.
19       A.   As far as I know, this is only
20   reference to the agreement.
21       Q.   All right.
22       A.   In the agreement to the schedule.
23       Q.   It is.  I agree with you there.
24       A.   I haven't reread the agreement, so I
25   don't remember.
         TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.   I have.
3        A.   But I do know as a lawyer and as an
4    M&A lawyer by early training, that with all the
5    drafts going on it would have been very easy to
6    refer to the same schedule in the purchased
7    assets or the assumed liabilities or other
8    sections of the agreement.
9        Q.   Right.
10       A.   And again, this is consistent with my
11   characterization of this as guidance.
12       Q.   "This" being this schedule?
13       A.   The schedule, excuse me, Exhibit 9.
14   Let me be more precise. It's guidance for what
15   was meant in the Asset and Liability sections of
16   the Purchase Agreement, but not to be thought of
17   as definitive enough to be included as part of a
18   schedule to the agreement that said it's these
19   assets and these liabilities that are being
20   transferred over.
21       MR. STERN: You said Exhibit 9. You
22   meant Exhibit 19?
23       THE WITNESS: 19. I'm sorry. Exhibit
24   19.
25       Q.   Now, so without regard to the exhibit,
         TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the free-standing -- to the schedule, the Asset
3    Purchase Agreement tells the reader that
4    approximately $70 billion book value of the long
5    position is being transferred, correct?  That's
6    what the reader should rely on for the value of
7    the deal, $70 billion in long position, yes?
8        A.   The purchase agreement says that
9    what's being transferred over is approximately
10   70 billion of book value.
11       Q.   Uh-huh.
12       A.   As of that date.
13       Q.   Right.
14       A.   Of long positions in a variety of
15   assets.
16       Q.   Now, under the agreement, Barclays was
17   going to, I think you said before, and we've all
18   read the agreement, was going to purchase the
19   assets by paying a certain amount in cash and
20   then assume certain liabilities, correct?
21       A.   I don't think I said it that way.  I
22   said that there were certain assets that were
23   being purchased for cash, including real estate
24   and goodwill or franchise value.
25       Q.   Right.
         TSG Reporting - Worldwide  (877) 702-9580

Page 90

HIGHLY CONFIDENTIAL - S. BERKENFELD
2  A.   And then there was going to be a
3 transfer over of assets and liabilities.
4   Q.   Okay.  Now, with respect to the
5 transfer of the assets, was there ever any
6 discussion of a so-called matched book, you
7 know, there was a matched book concept in this
8 deal that the liabilities that Barclays assumed
9 in connection with the transferred assets would
10 roughly equal the transferred assets?
11       MR. STERN: Objection to the form.
12   A.   I don't recall any specific
13 discussions around a matched book.
14   Q.   What I want to know is whether that
15 term was used, "matched book," to your
16 knowledge.
17   A.   To my recollection, I don't remember
18 if the term was used or not.
19   Q.   Okay.  Now, if you would turn, please,
20 Mr. Berkenfeld, to page 11.  It's Article 2,
21 entitled Purchase and Sale of Assets, Assumption
22 of Liabilities?
23   A.   Yes.
24   Q.   Now, one of the agreements that
25 Barclays made in this contract was set out in

TSG Reporting - Worldwide  (877) 702-9580

Page 91

HIGHLY CONFIDENTIAL - S. BERKENFELD
2 Section 2.3 entitled Assumption of Liabilities.
3 Do you see that?
4   A.   Yes.
5   Q.   And there are in subsections "A"
6 through "I" descriptions of the liabilities that
7 Barclays would assume, correct?
8   A.   Correct.
9   Q.   And the assumption of those
10 liabilities, to your understanding as the
11 signatory to the agreement, was part of the
12 consideration that Barclays gave for the assets
13 purchased, correct?
14   A.   Yes.
15   Q.   And among the liabilities that
16 Barclays agreed to assume were all liabilities
17 assumed under Article 9, and I'm referring there
18 to Section 2.3, subsection C, you with me?
19   A.   Yes.
20   Q.   Okay.  And Article 9 brings us back to
21 page —
22       MR. STERN: 34.
23   Q.   -- 34, entitled Employees and Employee
24 Benefits, yes?
25   A.   Yes.

TSG Reporting - Worldwide  (877) 702-9580

Page 92

HIGHLY CONFIDENTIAL - S. BERKENFELD
2   Q.   And in Article 9(B), there is a
3 reference -- there's a description and a
4 discussion of severance payments and benefits
5 that Barclays would give to terminated
6 transferred employees.  By "transferred
7 employees," I mean people who meant from Lehman
8 to Barclays.  Is that right?
9   A.   9.1(B), you said?
10   Q.   9.1(B).
11   A.   Yes.
12   Q.   Put in short form, 9.1(B) deals with
13 severance benefits, yes?
14   A.   Yes.
15   Q.   And 9.1(C) deals with bonuses?
16   A.   I would have to read 9.1(C) again.
17   Q.   Take your time and read it.
18       (Document review.)
19   A.   Okay.
20   Q.   Okay.  Now, you've had a chance to
21 look through the language of 9.1(C)?
22   A.   Yes.
23   Q.   My question was 9.1(C) deals with
24 bonuses, correct?
25   A.   That is correct.

TSG Reporting - Worldwide  (877) 702-9580

Page 93

HIGHLY CONFIDENTIAL - S. BERKENFELD
2   Q.   Okay.  And as between 9.1(B) and
3 9.1(C), the only one that refers to the
4 schedule, the financial schedule, the one we've
5 marked as Exhibit 19, is 9.1(C), correct?
6   A.   Correct.
7   Q.   So, using the logic that or the
8 reasoning that you gave to me with respect to
9 the definitions of "purchased assets" and the --
10 and not mentioning the schedule there, would you
11 agree with me, sir, that that must mean that the
12 financial schedule we have marked as Exhibit 19
13 bears no relation to the requirements of Section
14 9.1(B) regarding severance?
15       MR. STERN: Objection to the form.
16   A.   No, I don't agree with that.
17   Q.   Okay.  So not referring to it in the
18 definition of "purchased assets" has meaning,
19 but not referring to it in Section 9.1(B)
20 doesn't -- requires a different analysis?  Could
21 you explain that?
22       MR. STERN: Objection to the form.
23   A.   I think you have to look at the words
24 very carefully.  Purchaser shall or shall cause
25 it subs to pay each transferred employee an

TSG Reporting - Worldwide  (877) 702-9580

Page 94

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   annual bonus. In respect of 2008, that in the
3   aggregate are equal in amount to 100 percent of
4   the bonus pool amounts. Accrued and respect
5   amounts payable in respect of compensation and
6   reflected, reflected on the financial schedule
7   delivered to.
8       Q.   Uh-huh. And the amount --
9       A.   Not set forth on the financial
10  schedule, not in the amount specified, but
11  reflected. So I believe that you are reading
12  too much into the schedule to say that comp
13  means bonuses.
14      Q.   How much time did you spend when you
15  were drafting this document deliberately
16  choosing the precise verb "reflected" to make
17  sure that that was what was meant by that
18  provision, sir?
19          MR. STERN: Objection to the form.
20      Q.   Did you spend a lot of time on that?
21          MR. STERN: Objection to the form.
22      Q.   Is that the verb that M&A lawyers use
23  to mean the schedule might mean less than it
24  says?
25          MR. STERN: Objection to the form.
          TSG Reporting - Worldwide  (877) 702-9580

Page 95

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   You can answer if you remember.
3       Q.   Do you remember? It's not a remember
4   question. It's a drafting technique question.
5       A.   Which question? I think you asked
6   four or five.
7       Q.   How deliberate was your choice of the
8   verb "reflecting" --
9           MR. STERN: Objection to the --
10      Q.   -- when you agreed to it when you
11  signed the Asset Purchase Agreement, as opposed
12  to the other verbs that you pointed out are not
13  used here?
14      A.   I don't believe I choose the verb
15  "reflecting."
16      Q.   Do you know who did choose the verb
17  "reflecting"?
18      A.   I don't know.
19      Q.   So is your assessment of the meaning
20  of the verb "reflecting" a sort of retroactive
21  assessment? I wasn't one you were involved in
22  at the time of the drafting of the agreement; is
23  that right?
24          MR. STERN: Object to the form.
25      A.   I think that's a mischaracterization
          TSG Reporting - Worldwide  (877) 702-9580

Page 96

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   of the point I made earlier that the schedule
3   was meant as guidance. It was referred to in
4   the section.
5       Q.   Right.
6       A.   But it was never attached to the
7   agreement, and even in this provision -- let me
8   finish -- could have been attached to the
9   agreement or the number itself could have been
10  put in the agreement, that wouldn't have taken
11  too much difficulty, instead of writing all
12  these extra words that say in the financial
13  schedule or so and so. They could have just, if
14  your interpretation was correct, said 2 billion.
15      Q.   All right. So --
16      A.   So that was not done. This schedule,
17  again, was meant as guidance. It had
18  significance because in a very short timeframe
19  we were trying to pull a deal together, and
20  there were provisions in this agreement that
21  didn't have schedules attached where an
22  agreement customarily would say these are
23  specifically the assets you are buying, these
24  are specifically the liabilities you are
25  assuming.
          TSG Reporting - Worldwide  (877) 702-9580

Page 97

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2       Q.   Right.
3       A.   As an unnecessary and gratuitous
4   remark, you can compare this purchase agreement
5   to many other purchase agreements done in a
6   normal timeframe that would have attached to
7   them --
8       Q.   A schedule?
9       A.   -- hundreds of pages of schedules that
10  would list every piece of furniture and
11  equipment that might go on a particular
12  transaction.
13      Q.   Okay.
14      A.   So I'm answering your question beyond
15  where I think you asked it, but to kind of maybe
16  take a step forward instead of going around it.
17      Q.   No, I appreciate that.
18      A.   We could have --
19          Please let me finish.
20      Q.   Sure.
21      A.   We could have put specific numbers in
22  this agreement. We could have attached specific
23  schedules to this agreement. Even this
24  reference to the schedule is done in a fairly
25  imprecise way --
          TSG Reporting - Worldwide  (877) 702-9580

Page 98

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  Uh-huh.
3    A.  -- where it could have set forth as
4    schedule X, right?  And that wasn't done either.
5        So the provision is -- receives
6    guidance from the schedule, but the provision
7    wasn't meant to be a specific attachment or
8    cross-reference to a number on a particular
9    schedule.
10    Q.  One other reason you might not have
11    attached it is you didn't want it filed in the
12    court; that's another possibility, isn't it?
13        MR. STERN: Objection to the form.
14    Q.  That's just -- I'm speculating too,
15    but that is another reason you might choose not
16    to put it the agreement?
17    A.  I have no knowledge of that.
18    Q.  So, if I have this guidance point
19    right, because it's not referred to at all in
20    the "purchased assets" definition, it's
21    guidance.  Because it's only referred to but not
22    attached in 9.1(C), it's also guidance.  In
23    order to be governing, it has to be attached, is
24    that --
25        MR. STERN: Objection to the form.
     TSG Reporting - Worldwide  (877) 702-9580

Page 99

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  -- correct?
3    A.  I would rephrase it again as saying
4    you have a schedule here with some very rounded
5    numbers, including 2.0 for comp.
6    Q.  Uh-huh.
7    A.  I don't know firsthand, but I would
8    doubt that accrued bonuses at that point in time
9    happened to just be exactly --
10    Q.  2 billion?
11    A.  -- 2 billion.
12        So I believe that the schedule was
13    again meant as guidance to say that there were
14    approximately 70 billion of assets of those type
15    of assets plus cash and mortgages and
16    approximately another number of assumed
17    liabilities -- we haven't looked at that section
18    of the agreement yet -- and approximately this
19    much of comp that is referred to in Article 9.
20    The liability that Barclays was taking on was
21    the entire liability of Section 9, which include
22    bonuses and severance.
23        MR. STERN: On Exhibit 19, have you
24    located a copy that was initialed by --
25        MR. GAFFEY: Jack, why don't we wait
     TSG Reporting - Worldwide  (877) 702-9580

Page 100

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    until we take my deposition. Ask your
3    client. Don't take my time with this. If
4    you want to take him out and coach him, go
5    ahead, but don't do it on the record. It's
6    just wasting everybody's time.
7        MR. STERN: I would just ask because
8    we have not located a copy. I don't know if
9    you have one that was initialed by anybody
10    from Barclays.
11        MR. GAFFEY: I have shown him the one
12    with his initials, okay? When you want to
13    have a discussion about document production,
14    let's do it in more fruitful time. You know
15    that's improper.
16    Q.  Do you want to change any of your
17    answer about that being the governing schedule?
18        MR. STERN: This doesn't relate --
19        MR. GAFFEY: Let me finish. I want to
20    ask the witness a question.
21    Q.  Is there any part of your answer you
22    want to change based on what Mr. Stern just
23    said? Any of your answers?
24        MR. STERN: I'm going to instruct you
25    not to answer. That's improper.
     TSG Reporting - Worldwide  (877) 702-9580

Page 101

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        MR. GAFFEY: So is coaching your
3    witness. Don't do it, Jack. Come on.
4        MR. STERN: I'm asking you --
5        MR. GAFFEY: You know better than
6    that.
7        MR. STERN: -- if you have a different
8    version of this.
9        MR. GAFFEY: If I have a different
10    version, I'll get to it. We're not done yet
11    today, are we?
12        MR. STERN: No, we're not.
13        MR. GAFFEY: And if it's not his
14    initials on it, I might show it to --
15        MR. STERN: There's no reason to --
16    I'm not coaching the witness.
17        MR. GAFFEY: Of course there is.
18    You're blatantly violating the rules by
19    coaching the witness.
20        MR. STERN: I'm not coaching the
21    witness.
22        MR. GAFFEY: You know what you're
23    doing. Don't do it.
24        MR. STERN: I'm asking about the
25    exhibit at a time when we're focusing on the
     TSG Reporting - Worldwide  (877) 702-9580

---

Page 102

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  exhibit.
3        MR. GAFFEY: Are you done?
4        MR. STERN: I am.
5     Q.  Now, back to your testimony, the
6  definition of "purchased assets" uses the word
7  "approximately," do you recall that, the
8  definition of the long position?
9        MR. STERN: What section are you
10  referring to?
11        MR. GAFFEY: I'm in section --
12        MR. STERN: Definition of Purchased
13  Assets?
14        MR. GAFFEY: Yeah, Definition of
15  Purchased Assets, Section 1(B).
16     Q.  That does use the word
17  "approximately," right?
18     A.  Yes.
19     Q.  But the reference in 9.1(C) to the
20  schedule does not use the word "approximately,"
21  does it?  Is that a deliberate choice?
22        MR. STERN: We're on page 35?
23        MR. GAFFEY: Yes.
24     A.  It was not a deliberate choice by me.
25     Q.  Was it a deliberate choice by anybody?

---

Page 103

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2     A.  I wouldn't know.
3     Q.  Okay.  Do you know if the comp number
4  on 19 was increased beyond the actual accrual
5  shown on Lehman's books for comp?
6     A.  I have no knowledge of how the number
7  itself was arrived at.
8        MR. GAFFEY: Jack, could you put
9  Exhibit 20 back in front of Mr. Berkenfeld.
10        MR. STERN: Sure.
11     Q.  Exhibit 20 is Mr. Kelly's e-mail to
12  Mr. Lowitt dated September 16, and there's a
13  reference in it, sir, to "an extra 1 billion of
14  comp beyond our accrual."
15        That's why I asked the question.  Not
16  because it's in this e-mail, that's why I
17  thought to ask the question.  You have no
18  knowledge one way or the other about whether
19  that 2 billion is actually $1 billion of comp
20  beyond Lehman's accrual?
21     A.  I have no knowledge one way or the
22  other.
23     Q.  Have you seen any work sheets prepared
24  by Mr. Kelly or someone under his supervision
25  that show a $1 billion transaction adjustment to

---

Page 104

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  the comp accrual on Lehman's books?
3     A.  I have not.
4     Q.  Have you ever seen a schedule or
5  worksheet prepared by Mr. Kelly or anyone under
6  his supervision that reflects an adjustment to
7  the values shown on the assets side of the
8  financial schedule we have marked as Exhibit 19?
9     A.  I'm sorry.  Can you read back that
10  question, please?
11        (Record read.)
12     A.  I have not.
13     Q.  Did anyone ever suggest to you in sum
14  or substance, sir, when you saw the financial
15  schedule marked as Exhibit 19 that the comp and
16  cure numbers were just plug numbers to make it
17  balanced?
18     A.  To my recollection, no one had ever
19  suggested that to me.
20     Q.  Was it the contemplation, was it part
21  of the structure of the transaction that
22  Barclays was in fact going to undertake to
23  assume liabilities in roughly the amounts guided
24  by the schedule marked as Exhibit 19?
25     A.  I believe it was the understanding

---

Page 105

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  that Barclays would assume liabilities that were
3  at the time estimated roughly to be in this
4  amount.
5     Q.  Okay.  And that the liabilities that
6  Barclays -- I don't want to hold you to the
7  exact cent of the number, that level of
8  specificity, but the liability that Barclays
9  would assume would be roughly in the
10  neighborhood of the cure and comp -- for cure
11  and comp would be roughly in the neighborhood of
12  the cure and comp amounts shown on the financial
13  schedule as guidance?
14        MR. STERN: Objection to the form.
15     A.  As of the date of this agreement, I
16  believe it was the understanding that there were
17  liabilities being assumed by Barclays, some of
18  which could be estimated with more precision
19  than others.  Certain of the securities
20  positions, for instance, could be estimated with
21  more precision, but that the obligations of
22  Barclays were going to be set forth in the
23  Purchase Agreement, not determined by the
24  schedule.
25     Q.  Did the obligation to assume by

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1  **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2  **Barclays bear any relation at all to what was**
3  **set out in the schedule?**
4      MR. STERN: Objection to the form.
5      A.  I believe that the agreement refers to
6  assumed liabilities --
7  **Q.  Uh-huh.**
8      A.  -- of securities positions of
9  approximately 69 billion.
10  **Q.  Right.**
11      A.  Which is the number that --
12  **Q.  That's the short position that we see**
13  **in the agreement?**
14      A.  -- is reflected in the exhibit.
15  **Q.  Right. What about the numbers**
16  **reflected in the exhibit for liabilities for**
17  **cure and comp, are they roughly -- was that also**
18  **guidance as to roughly the levels they would be**
19  **at?**
20      A.  It was -- under the agreement the
21  amount to be paid in comp refers to the
22  schedule, and that was rough guidance of what
23  would be paid.
24  **Q.  Okay.**
25      A.  With regard to cure payments, I think

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  it's covered separately by the agreement.
3      **Q.  It's a little different because of the**
4  **provisions to cure.**
5      MR. STERN: I think he needs to finish
6  his answer. I don't think he finished his
7  answer.
8      **Q.  Did you finish your answer? Sorry.**
9      A.  I believe the cure payments were
10  covered separately by the agreement in a
11  separate provision.
12  **Q.  Right.**
13      A.  That does not make reference to the
14  schedule.
15      MR. STERN: Can we take another short
16  break?
17      MR. GAFFEY: Sure.
18      (Recess; Time Noted: 11:42 A.M.)
19      (Time Noted: 11:49 A.M.)
20  BY MR. GAFFEY:
21      **Q.  Going back to this concept, Mr.**
22  **Berkenfeld, of the schedule being guidance, one**
23  **aspect of the schedule, though, is that they**
24  **balance; assets equal liabilities on these**
25  **financial schedules, correct?**

1  **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2      A.  Approximately.
3      **Q.  I mean, there's a difference between**
4  **18 and 19 because of the change in the numbers,**
5  **but internally, the assets are supposed to match**
6  **the liabilities as part of the structure of the**
7  **deal, correct?**
8      MR. STERN: Objection to the form.
9      A.  The schedule indicates assets and
10  liabilities that are the same.
11  **Q.  Okay. Was that a feature of the**
12  **structure of the transaction?**
13      MR. STERN: Objection to the form.
14      A.  Again, the schedule -- I think that's
15  reading too much into the schedule as providing
16  guidance to what certain of the provisions of
17  the agreement meant. I would like to the Asset
18  Purchase Agreement as what the deal was, we
19  covered that earlier in my testimony, as opposed
20  to the schedule being the deal. The agreement
21  was the deal. The schedule was not even part of
22  it.
23      But it was something that the guidance
24  we thought would be helpful and we did document
25  it as a final schedule.

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      **Q.  Quite apart from the schedule, let's**
3  **push them to the side. I want to get your**
4  **understanding of the deal that you signed.**
5      **Was the deal structured in a way -- on**
6  **the 16th when you signed the deal, was it**
7  **contemplated as part of that deal that either --**
8  **that Lehman would enjoy a net benefit, a gain**
9  **from the deal, or Barclays would, or it would be**
10  **a wash?**
11      A.  There were certain -- there was
12  consideration being paid for assets of Lehman
13  Brothers, for the real estate, for the going
14  concern.
15      Your question was, was that gain? I
16  don't know. I imagine at some point in time we
17  thought that the franchise of Lehman Brothers
18  was worth more than $250 million and the real
19  estate may have been worth more than what was
20  ultimately paid for it, too.
21      So there was that component of the
22  transaction, and there were assets that were
23  being moved over as employees were being moved
24  over who managed those positions, and there was
25  an estimated amount of liabilities in the form

Page 110

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  of both security positions that moved over again
3  that to some extent had relationship with the
4  assets, and there were a bunch of other
5  liabilities that Barclays was assuming in the
6  transaction and that were no longer going to be
7  liabilities of Lehman Brothers of the estate of
8  the bankrupt company, including liabilities for
9  compensating employees that they were hiring
10  through the whole year, not from closing on, and
11  for severance of employees who otherwise would
12  have been without severance and would have been
13  terminated by the estate without any, you know,
14  benefits, healthcare, worker's comp, T & E that
15  they were owed. It was that simple.
16    So it was a big value to being able to
17  take all those employees off of the estate's
18  responsibility and onto Barclays, and then there
19  were a number of things like accounts payable
20  and contracts that were going to be assumed that
21  had liabilities associated with them. And that
22  was my understanding of the transaction.
23    **Q.   Was it your understanding of the**
24  **transaction that, at the end of the transaction**
25  **that you agreed to, Barclays would enjoy a gain**
    TSG Reporting - Worldwide  (877) 702-9580

Page 111

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2  **based on the excess of the fair value of net**
3  **assets acquired over the consideration that it**
4  **paid?**
5    A.   I did not have an understanding at the
6  time that the transaction was signed or as it
7  evolved post-signing into the closing that there
8  was any embedded gain on the part of Barclays
9  around specific positions.
10    I would like to clarify that I
11  certainly thought that over time they would
12  realize more than $250 million of value for the
13  Lehman Brothers franchise. I worked there for a
14  long time. I believed that the franchise and
15  all the employees it made up was worth something
16  more than $250 million in a normal market, but
17  there was no normal market and that value would
18  have become zero very quickly if this
19  transaction hadn't happened.
20    So you specifically said, you know,
21  gain and value.
22    **Q.   Gain on acquisition is actually what I**
23  **said.**
24    A.   Gain on acquisition. And so my answer
25  is that this had a potential to be a very
    TSG Reporting - Worldwide  (877) 702-9580

Page 112

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  positive and valuable transaction to Barclays,
3  but it depended on what happened afterwards and
4  it depended on their ability to retain the
5  employees that they were hiring and the
6  franchise value of those employees.
7    **Q.   I'm not actually asking about the**
8  **long-term value. If it operates what it bought**
9  **well, it makes money in the long-term, great.**
10  **I'm asking whether it was -- whether the**
11  **transaction was, in your mind when you signed**
12  **it, was it structured so that Barclays would**
13  **enjoy a gain because of the excess of the fair**
14  **value of the net assets it acquired over the**
15  **consideration that Barclays paid?**
16    MR. STERN: Objection to the form.
17    **Q.   Not whether it was going to long-term**
18  **be successful operating the business. On**
19  **acquisition.**
20    MR. STERN: Objection to the form.
21    A.   My understanding of the transaction is
22  that, on acquisition, as reflected in the Asset
23  Purchase Agreement, it was not intended that
24  Barclays would have an immediate excess value in
25  the assets that they were bringing over.
    TSG Reporting - Worldwide  (877) 702-9580

Page 113

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    **Q.   Okay. Was that intended in any part**
3  **of the deal as it evolved between the 16th of**
4  **September and when it closed on the 22nd?**
5    MR. STERN: Objection to the form.
6    A.   To my knowledge, it was not.
7    **Q.   Now, the Asset Purchase Agreement --**
8  **and I'm at page 12. I want to get to the**
9  **definition of "short positions," which is**
10  **Section 2.3(i). You with me?**
11    A.   Yes.
12    **Q.   Okay. And have you had a chance to**
13  **read through that, please?**
14    A.   Yes.
15    **Q.   Okay. And that puts the short**
16  **positions, that would be the liabilities side,**
17  **at 69 billion, approximately 69 billion, yes?**
18    A.   That's correct.
19    **Q.   Okay. And then I ask you to take a**
20  **look at the -- I want to take a look, please, at**
21  **Section 3.3, which is found at page 14 and is**
22  **entitled Adjustment to Cash Amount.**
23    **Let me know when you've had enough**
24  **time to familiarize, you know, remind yourself**
25  **of the terms of Section 3.3.**
    TSG Reporting - Worldwide  (877) 702-9580

---

Page 114

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.   Okay.
3    Q.   Okay. Now, in substance, sir, Section
4    3.3 provided that if the value of the long
5    position increased over the 12 months after the
6    deal, that Lehman could enjoy the benefit of
7    that, the upside of that up to a cap of $750
8    million. Is that more or less the essence of
9    the provision?
10   A.   The essence of the provision is that
11   there was a profit-sharing --
12   Q.   Uh-huh.
13   A.   -- provision so that if the value of
14   the long positions had changed over the -- or
15   the value of the short positions, but so that
16   the combination of the positions transferred
17   over led to a gain of more than a certain
18   amount --
19   Q.   Right.
20   A.   -- actually any amount, they would be
21   transferred over to the seller and it was
22   capped, yes.
23   Q.   Why was that provision originally
24   included in the agreement you signed on
25   September 16?
     TSG Reporting - Worldwide  (877) 702-9580

---

Page 115

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.   Because there was an appreciation for
3    the volatility of the market, both after the
4    Lehman bankruptcy and the week before, too, very
5    volatile situation, and the amount of risk and
6    potentially opportunity in the positions and an
7    expectation that the positions could move
8    significantly, and that it would be difficult to
9    put any sort of stake in the ground and say
10   these positions are worth this and when they're
11   realized that's what you'll get from them
12   because of that volatility.
13        So that if it turned out that there
14   was more value to the positions than had been
15   estimated at the time, that there was an
16   opportunity for the purchaser -- excuse me, for
17   the seller to recapture some of that value.
18   Q.   Now, ultimately, and we'll cover some
19   of the details of this in a while, but
20   ultimately that Adjustment to Cash Amount
21   provision is stricken from the agreement by an
22   amendment, correct?
23   A.   Ultimately, there were a series of
24   amendments when people had somewhat more time
25   that dramatically changed a lot of this
     TSG Reporting - Worldwide  (877) 702-9580

---

Page 116

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    agreement.
3    Q.   Now, but going back to the agreement
4    as it looked on the 16th, if you take the real
5    estate and put it to the side, okay? X amount
6    is being paid for three buildings. Then you're
7    left with a $70 million long position being
8    transferred to Barclays, correct, approximately?
9    A.   Correct.
10   Q.   And a $250 million cash payment being
11   made by Barclays to Lehman, correct?
12   A.   Correct.
13   Q.   And a $69 billion short position being
14   assumed by Barclays; that's the short position
15   against the long position, yes?
16   A.   Correct.
17   Q.   And a potential $750 million upside
18   sharing pursuant to paragraph 3.3, correct?
19   A.   Correct.
20   Q.   And if you look at it from that
21   perspective, if you take the real estate and put
22   it to the side, you get into balance, don't you?
23   A.   No.
24   Q.   You said roughly $70 billion?
25   A.   Well, you left out the other
     TSG Reporting - Worldwide  (877) 702-9580

---

Page 117

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    liabilities that were being assumed by Barclays.
3    Q.   I wanted to go to where the other
4    liabilities assumed by Barclays go. The
5    schedule is they are -- you tell me they're
6    guidance. How do the other liabilities, the
7    comp and the cure liabilities, fit into that,
8    that undertaking?
9        Does that mean that Barclays is in the
10   hole when this is done? Barclays should be --
11   if short position and long position roughly
12   match, and cash plus the upside makes it an
13   exact match, that 70 to 70, doesn't that mean
14   this is structured so Barclays has a net loss on
15   the deal, not a gain?
16   MR. STERN: Objection to the form.
17   A.   I wasn't really thinking of it as loss
18   or gain. I was thinking of it that they were
19   assuming certain liabilities to keep the
20   business intact, and those liabilities were
21   liability to employees and liabilities in the
22   ordinary course of operations is the way of
23   explaining --
24   Q.   So when you add --
25   MR. STERN: Let him finish.
     TSG Reporting - Worldwide  (877) 702-9580

Page 118

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.  -- payables and things like that.
3    Q.  So when you add those comp and cure
4    assumed liabilities on top of the elements I
5    just gave you, there's certainly no gain on
6    acquisition for Barclays, if those numbers are
7    real?
8        MR. STERN: Objection to the form.
9    A.  Well, again, no one was actually --
10   I'm repeating my answer a little bit.  No one
11   was saying this schedule, Exhibit 19, is the
12   deal and see how all these numbers add up.  The
13   deal was the Asset Purchase Agreement.  This was
14   meant as some guidance for that as what we meant
15   as 70 billion of assets.  For instance, 70
16   billion of assets could have been 69 billion of
17   governments --
18   Q.  Okay.
19   A.  -- and 1 billion of other stuff, or it
20   could have been 69 billion of corporate equity
21   and 1 billion of governments, right?  So we
22   needed to -- because we didn't specify any of
23   that in the text.  It was just 70 billion of all
24   this stuff.  And this gives you a little bit
25   better sense of what that stuff is.
         TSG Reporting - Worldwide  (877) 702-9580

Page 119

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.  I'm sorry.
3    A.  I'm sorry, "this" being Exhibit 19.
4    Q.  Right.
5    A.  Because that 70 billion could have
6    been in any kind of allocation among those
7    different kind of asset classes.
8        So the schedule had value in that
9    sense and was worth putting together and worth
10   memorializing as a final one because it helped
11   provide guidance on that that when Lehman
12   transferred assets to Barclays -- again, this is
13   all superseded by what happened, but Barclays
14   didn't say, guess what?  I just got 70 billion
15   of corporate equities which are going down 5
16   percent a day because of what's going on in the
17   market.
18       So it was meant the bucket of assets
19   that were going over were estimated at around
20   this level.  So the schedule has a role to play,
21   but it's not the deal.
22   Q.  Okay.
23   A.  And the deal is, yeah, you know,
24   assets, liabilities.  No one was thinking of it
25   as embedded gain or loss, right?  They're
         TSG Reporting - Worldwide  (877) 702-9580

Page 120

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    positions that moved over because it made sense
3    for them to move over with the employees that
4    were moving over instead of all those positions
5    being left behind with a bankrupt estate with
6    nobody to manage them at the time.  And what
7    they were doing was paying some amount for
8    value, but also assuming certain liabilities
9    which at the time, in the course of a, you know,
10   a day or so, day and a half, were difficult to
11   estimate what they would be.
12       There was a sense that there was an
13   idea of what compensation would be and there
14   might have been some guesses at what it would
15   mean to take on accounts payable, but remember,
16   a lot of this depended on what contracts were
17   going to be assumed and, again, that was all a
18   post-signing, post-closing determination.
19       So the deal was assumption of this
20   list of liabilities, and I don't think anyone
21   thought at the time that we could be precise of
22   what the value of those liabilities would be.
23       MR. STERN: And you're referring to
24   the --
25       MR. GAFFEY: Agreement.
         TSG Reporting - Worldwide  (877) 702-9580

Page 121

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        MR. STERN: -- Asset Purchase
3    Agreement, Exhibit 1?  In your last answer
4    you were pointing to the agreement?
5        THE WITNESS:  I was pointing to the
6    Asset Purchase Agreement, yes.
7    Q.  That actually is the point I wanted to
8    follow up on.
9    A.  I speak with my hands.
10   Q.  So do I.  That's why we're not
11   videoed.
12       Now, to a person on the 17th of
13   September looking at the agreement, without
14   having access to the schedules, that's what I
15   want to ask you about, the agreement -- go back
16   to the numbers I went through before.  The
17   agreement shows a rough balance in the numbers
18   shown of a $70 billion long position being
19   transferred to Barclays and a 69 billion -- and
20   on the other side, a $69 billion short position
21   being undertaken, a $250 million cash payment
22   being made, and a potential $750 million upside
23   sharing with Lehman, which brings you to 70.
24       So someone looking at the agreement
25   without access to the schedule would see this as
         TSG Reporting - Worldwide  (877) 702-9580

Page 122

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    **an agreement roughly in balance; is that right?**
3        MR. STERN: Objection to the form.
4    A.   I think that if someone could
5    certainly shorthand it and sound-byte it. But
6    if someone was looking at what the agreement
7    was, you would have to say, okay, purchased
8    assets; how much cash was going over.
9    **Q.   Uh-huh.**
10   A.   What were the value of the 50 percent
11   of the residential mortgages that were going,
12   which go beyond the 70 billion. On the other
13   hand, there's 69 of short positions, but what is
14   the actual compensation obligation that's being
15   undertaken and what do we think is the
16   obligation on the assumed contracts.
17   **Q.   And nobody looking at that agreement,**
18   **at least from the point of view of the man who**
19   **signed it, would read that to say there was a**
20   **discount being given to Barclays for what it was**
21   **buying?**
22       MR. STERN: Objection to the form.
23   A.   I didn't believe at the time when I
24   signed this agreement that the intent of the
25   agreement was to deliver assets with a material

TSG Reporting - Worldwide  (877) 702-9580

Page 123

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    embedded gain to them, to Barclays.
3    **Q.   And you didn't believe -- let me ask**
4    **you: Did you believe that this agreement was**
5    **designed to transfer to Barclays assets for less**
6    **than their fair value?**
7        MR. STERN: Objection to the form.
8    A.   I could repeat the answer from the
9    last one, but to try to give you another answer,
10   I think that one of the considerations was that
11   fair market value at the time, right? Day or
12   two after Lehman bankruptcy was very difficult
13   thing to determine, and what things might have
14   been on our books and records going into the
15   weekend before a Lehman bankruptcy and the risk
16   of, not to sound too dramatic, of financial
17   Armageddon is different than what the value of
18   those assets might be.
19       I think you have to keep in mind that
20   this transaction was done in not only the chaos
21   of an unprecedented bankruptcy of Lehman
22   Brothers, but also a chaos in the markets that
23   is -- I would say it was somewhat unprecedented,
24   too, and which lasted for quite a while.
25       And therefore, you know, to say that

TSG Reporting - Worldwide  (877) 702-9580

Page 124

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    here are -- and it goes both ways, right? Here
3    are a bunch of government securities that we can
4    know with precision are worth 40 billion and
5    they're going to be worth 40 billion tomorrow
6    when everybody was taking their money and
7    putting it into treasuries, and here's a bunch
8    of corporate equity that we can say with
9    certainty is worth 8.8 and it's going to be
10   worth anything with certainty at 8.8 tomorrow or
11   the next day or the day after that is not a
12   reasonable assessment of the situation at the
13   time.
14       You know, there was an estimate that
15   was made of a book of assets and a book of
16   liabilities that would go over, but the deal
17   itself was not intended to, as to my knowledge,
18   deliberately create any sort of embedded
19   bankable gain on the part of Barclays.
20   **Q.   While we're digging out, let me ask**
21   **you: You made a reference to this before and**
22   **I'm sort of telling you where a substantial part**
23   **of the rest of your deposition is going to go,**
24   **but this deal changed a lot over the next week,**
25   **didn't it?**

TSG Reporting - Worldwide  (877) 702-9580

Page 125

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.   Yes, it did.
3    **Q.   Just give me the overall. How did it**
4    **change over the next week between the deal that**
5    **you signed and the deal that you closed?**
6    A.   To my understanding, in no particular
7    order of importance. Cash was not being
8    transferred over. The residential mortgages
9    were not being transferred over, I believe, and
10   we used to deal with other issues that Lehman
11   had to address on the trading side, on the
12   settlement side, and that the pool of assets and
13   liabilities that were being transferred over
14   changed dramatically so that more assets and
15   liabilities were being retained by the estate.
16   **Q.   Any others? Just, again, at the sort**
17   **of global level, any big categories of changes?**
18   A.   As we go through it, other things may
19   come to mind, but right now I'm not recalling
20   anything.
21       (Exhibit 22, Barclays PLC Results
22       Announcement, Figures 2008, marked for
23       identification, as of this date.)
24   **Q.   Just if you'll go back briefly to a**
25   **topic we were discussing a moment ago. I put**

TSG Reporting - Worldwide  (877) 702-9580

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    **before you what we have marked as Exhibit 22, a**
3    **copy of Barclays PLC Results Announcement,**
4    **Figures 2008, and I'd ask you, sir, to turn to**
5    **page 95 of that document, which describes the**
6    **acquisition of Lehman Brothers North American**
7    **businesses?**
8    A.  Yes.
9    **Q.  Okay.  And the second paragraph from**
10   **the bottom that says, "The excess of the fair**
11   **value of net assets acquired over consideration**
12   **paid resulted in 2,262,000 pound of gains on the**
13   **acquisition," do you see that?**
14   A.  Yes.
15   **Q.  And if I understand your testimony**
16   **from this morning correctly, the deal that you**
17   **agreed to on the 16th did not -- was not**
18   **intended to have that sort of embedded gain on**
19   **acquisition?**
20        MR. STERN:  Objection to the form.
21   **Q.  Is that right?**
22        MR. STERN:  Objection to the form.
23   A.  I've never seen this document before.
24   **Q.  Okay.**
25   A.  I've never seen this section of the
     TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    document.  I have no idea whatsoever what this
3    "excess of fair market value net assets" means
4    and how it was calculated, so let me preface my
5    answer with that.
6    Q.  Sure.
7    A.  So I can't speak to this at all.
8        But I would reiterate that it was not
9    the intention at the time of signing of the
10   Asset Purchase Agreement that the transaction
11   included as an element of it that there were --
12   there was certainty of any kind of embedded gain
13   in assets that were being transferred over --
14   and assets, in this case, I mean specifically
15   security positions as opposed to intangibles,
16   franchise value -- that there was any kind of
17   embedded gain in the tangible assets that were
18   being transferred over to Barclays.
19   **Q.  Okay.  Thanks.  I'm done with that**
20   **document.**
21        **Was it contemplated that during the**
22   **week of the 16th that there would be an**
23   **opportunity for Barclays to be involved in the**
24   **marking of Lehman positions, that is, before the**
25   **closing?**
     TSG Reporting - Worldwide  (877) 702-9580

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.  Could you repeat the question?
3    **Q.  Was it contemplated during the week of**
4    **the 15th -- withdrawn.  Was it contemplated that**
5    **after the Asset Purchase Agreement was signed**
6    **but before it closed, between signing and**
7    **closing, that there would be any role played by**
8    **Barclays in the marking or remarking of Lehman**
9    **positions on its books?**
10   A.  I don't know.
11   **Q.  Have you ever heard a suggestion that**
12   **that was contemplated or that it took place?**
13   A.  I don't know of any remarking of the
14   Lehman book by Barclays.
15   **Q.  Do you know of any remarking of the**
16   **Lehman book at all after -- between the signing**
17   **but before the closing?**
18   A.  I believe we still had an obligation
19   to continue to mark our book as we had, you
20   know, in the ordinary course under very
21   extraordinary circumstances.  I don't know what
22   we were able to do during that period of time.
23   **Q.  Right.**
24   A.  And so I don't know what actually was
25   undertaken by our -- the people responsible, the
     TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Finance staff and Operations staff, of that.  I
3    don't know.
4        (Exhibit 23, a document bearing Bates
5    Nos. 70283, marked for identification, as of
6    this date.)
7    **Q.  I have put before you, Mr. Berkenfeld,**
8    **what we have marked as Exhibit 23, a one-page**
9    **document bearing Bates numbers 70283, an e-mail**
10   **chain between Ian Lowitt and Gerard Reilly.**
11        **Let me know when you've had a chance**
12   **to take a look through that document?**
13   A.  Uh-huh.
14        (Document review.)
15   A.  Okay.
16   **Q.  Okay.  Have you ever seen this e-mail**
17   **chain before?**
18   A.  I have not.
19   **Q.  Do you have any clue what Mr. Lowitt**
20   **would be talking about to Mr. Reilly when he**
21   **says at the bottom of it, "Are we set up to do**
22   **the marking of positions?" and then clarifies**
23   **saying, "What I meant was for BarCap to mark the**
24   **positions further"?**
25   A.  I have no knowledge of what Ian
     TSG Reporting - Worldwide  (877) 702-9580

Page 130

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  intended.
3    **Q.   Given your role in signing the**
4  **agreement and your involvement in the**
5  **transaction, would it have surprised you to**
6  **discover a role for Barclays in determining what**
7  **the Lehman mark should be?**
8    MR. STERN: Objection to the form.
9    A.   It would not have surprised me to know
10  that, after the signing of the agreement,
11  Barclays would continue to do due diligence on
12  the assets and liabilities that it was assuming.
13   **Q.   You would -- well, okay, fair comment.**
14  **But are you reading the phrase "BarCap to mark**
15  **the positions further" to be a reference,**
16  **possibly a reference to due diligence?**
17    **I know you're speculating.**
18    MR. STERN: Objection to the form.
19    A.   I am speculating. I don't know what
20  was intended by Ian, but I, if I had to
21  interpret this, I would say that Barclays didn't
22  have a lot of time to do due diligence before
23  the signing of the purchase agreement, they
24  didn't have much time to do due diligence even
25  before the bankruptcy when we were involved in
TSG Reporting - Worldwide   (877) 702-9580

Page 131

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  original discussions, and that they would have
3  wanted to have their team of guys taking a
4  closer look at what was being transferred over
5  in those positions before they got to the
6  closing date and things were at that point
7  irreversible.
8    **Q.   Now, if you could take look at the**
9  **e-mail conversation that's taking place between**
10  **Mr. Lowitt and Mr. Reilly at the top of the**
11  **page, and here I am at from Reilly to Lowitt,**
12  **September 17, 2008, 9:41 P.M.  You see where I**
13  **am on the page?**
14    A.   Yes.
15    **Q.   Okay.  And this is what Mr. Reilly**
16  **wrote:  "I went through all docs and did not see**
17  **reference to the price haircut.  If we want**
18  **conservative marks to reflect block nature, we**
19  **need to know how much and then can allocate to**
20  **most logical assets."**
21    **Do you understand that to be -- and**
22  **then so, for completeness, then Mr. Lowitt**
23  **responds:  "Since not in contract, hard to see**
24  **what to" -- it says "DP," but I'm reading that**
25  **as "do," period, "Ian."**
TSG Reporting - Worldwide   (877) 702-9580

Page 132

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    **Do you understand this to be a**
3  **communication between Mr. Reilly and Mr. Lowitt**
4  **about a haircut or a block discount on the**
5  **assets being transferred to Barclays?**
6    MR. STERN: Objection to the form.
7    A.   I again don't know what was in Ian's
8  or Jerry's mind and what they were talking
9  about.
10   **Q.   Sure.**
11    A.   I do focus on the "since not in
12  contract" part of this, but I don't know what
13  they meant. And again, it's speculation.
14  There's a lot of assets going over.  They were
15  never marked on the Lehman books as though you
16  were going to transfer all of those assets in
17  bulk. They were marked position by position in
18  a very volatile time.
19    So they -- there was always a question
20  in hindsight about the accuracy of those marks
21  given what happened subsequently.  But when you
22  mark a position like 8.78 in corporate equity --
23    **Q.   Referring to Exhibit 19?**
24    A.   Referring to Exhibit 19, 8.8 in
25  corporate equity or 4.5 in derivatives, and you
TSG Reporting - Worldwide   (877) 702-9580

Page 133

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  were interested in the fair market value, if you
3  were trying to find a buyer as a marked position
4  for someone who would buy the whole 8.8 billion
5  of corporate equities, which was stock-by-stock,
6  company-by-company, but you want someone to buy
7  the whole bulk of it, there would be some sort
8  of discount for the illiquidity and bulk nature
9  of that.
10    **Q.   And you would expect that concept to**
11  **be reflected in the agreement that was signed,**
12  **would you not?**
13    MR. STERN:  Objection.
14    **Q.   If that was part of the deal?**
15    MR. STERN:  Object to the form.
16    **Q.   As you said, you took note of the**
17  **phrase "not in contract"?**
18    A.   Again, I go back to what I had said
19  before, that the schedule and the values was not
20  the agreement.  The agreement was, here's this
21  pool of assets, here's this pool of liabilities
22  that are going to go over, this gives some
23  guidance as to it, but the deal was not
24  contemplating an embedded gain.
25    **Q.   I'll phrase the question roughly the**
TSG Reporting - Worldwide   (877) 702-9580

Page 134

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    same way, but with a different premise. If you
3    could just forget the schedules for a minute.
4          From the perspective of what was filed
5    with the bankruptcy court, which was the
6    agreement, there's no reflection of the type of
7    block discount that you're talking about now?
8          MR. STERN: Objection to the form.
9    **Q.   Correct?**
10   A.   I'm not aware of anything in the
11   contract or anything that was presented to the
12   bankruptcy court that should be characterized
13   accurately as the block discount.
14   **Q.   Okay.**
15         MR. GAFFEY: Let's go off the record
16   for a second.
17         (Luncheon Recess; Time Noted: 12:22
18   P.M.)
19
20
21
22
23
24
25
         TSG Reporting - Worldwide  (877) 702-9580

Page 135

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    AFTERNOON SESSION
3          (Time Noted: 1:03 P.M.)
4    STEVEN BERKENFELD, resumed and
5          testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8    **Q.   Before the break, Mr. Berkenfeld, we**
9    **were -- I sort of introduced a topic of changes**
10   **in the deal that occurred between signing and**
11   **closing, and I was trying to get a sort of**
12   **overall sense of what factors caused those**
13   **changes.**
14         **(Exhibit 24, First Amendment to the**
15   **Asset Purchase Agreement, marked for**
16   **identification, as of this date.)**
17         **(Exhibit 25, a letter dated September**
18   **20, 2008, marked for identification, as of**
19   **this date.)**
20   **Q.   I've put two documents before you, Mr.**
21   **Berkenfeld. When you've had a chance to look**
22   **through them both, let me know and then I'll**
23   **describe them for the record and ask you some**
24   **questions about them.**
25   A.   Okay.
         TSG Reporting - Worldwide  (877) 702-9580

Page 136

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    **Q.   We've marked as Exhibit 24, sir, a**
3    **document entitled First Amendment to Asset**
4    **Purchase Agreement, and it's a three-page --**
5    **it's a four-page document.**
6          **Do you recognize the document?**
7    A.   Yes.
8    **Q.   And on the third page, is that your**
9    **signature under the heading "Lehman Brothers**
10   **Holdings" and under "Lehman Brothers, Inc."?**
11   A.   Yes.
12   **Q.   And the second exhibit we have marked**
13   **is in letter form, typed across, center,**
14   **"Barclays Capital Inc.," dated as of September**
15   **20, 2008, and on six pages from the back,**
16   **there's a signature page for Lehman Brothers**
17   **Holdings; is that your signature there?**
18   A.   Yes.
19   **Q.   Okay. Could you tell me what the two**
20   **documents are by reference to their exhibit**
21   **numbers?**
22   A.   Exhibit 24 is an amendment to an Asset
23   Purchase Agreement, the Asset Purchase Agreement
24   that had been signed a few days earlier, and
25   Exhibit 25 is another agreement that amends the
         TSG Reporting - Worldwide  (877) 702-9580

Page 137

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    purchase agreement in the First Amendment.
3    **Q.   For clarity on the record, can I ask**
4    **you, the second document, the one marked as**
5    **Exhibit 25, that was referred to, as it was**
6    **being developed and until it was signed, as the**
7    **clarification letter; is that right?**
8    A.   I don't recall.
9    **Q.   Okay. Can we agree that, at least for**
10   **purposes of this record, if I refer to the**
11   **document as the clarification letter, I will be**
12   **referring to Exhibit 25?**
13   A.   That's fine.
14   **Q.   Okay. So it's a tumultuous week and**
15   **things are changing and people are running**
16   **around the 32nd floor and elsewhere and the deal**
17   **is getting amended and then amended further and**
18   **the clarification letter.**
19         **Are there any particular events during**
20   **that week, and again, I'm sort of at a top level**
21   **on this, but any events during that week that**
22   **required the deal to be changed?**
23   A.   I do recall that we had issues with
24   DTC and our ability to settle that required and
25   were the reason for the First Amendment. I
         TSG Reporting - Worldwide  (877) 702-9580

Page 138

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  remember very little of the specific details and
3  back and forth, but there certainly was DTC
4  coming in as an interested party that forced the
5  renegotiation of the transaction.
6      Q.   Is it fair to say that, in essence,
7  the DTC issue was that DTC had some resistance
8  or some reluctance to effect account transfers
9  over to Barclays without DTC getting some kind
10  of protection?
11     A.   I would say that DTC was concerned
12  about its responsibility if the securities
13  didn't transfer or a settlement didn't occur. I
14  don't remember much of what was their objective.
15     Q.   And another event, as I understand it,
16  that occurred during that week is that the
17  Federal Reserve which had been supplying Lehman
18  with financing through a Repurchase Agreement
19  made it known that it wanted Barclays to step
20  into the shoes of the Fed repo, is that -- does
21  that ring a bell?  Do you have any recollection
22  of that?
23     A.   Vague recollection. I really wasn't a
24  part of those discussions.
25     Q.   Do you have a recollection of, just as
         TSG Reporting - Worldwide  (877) 702-9580

Page 139

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  an event as opposed to its implications, Lehman
3  and Barclays entering into a certain Repurchase
4  Agreement on or around September 18 of that
5  week?
6      A.   Don't recall that.
7      Q.   Do you have any recollection of a
8  Repurchase Agreement between Barclays and Lehman
9  playing any role or having any implications with
10  respect to the structure of the transaction?
11     A.   I don't recall the specifics around
12  the repo agreement or the financing with
13  Barclays. I wasn't involved in the discussions
14  around it or the crafting of it.
15     Q.   Okay.
16     A.   And didn't know going into the end of
17  the week the implications it would have for the
18  purchase agreement.
19     Q.   Okay. We'll come back to that in a
20  little more detail, but if you would take a look
21  at the clarification letter, that is, Exhibit
22  25, and in particular, if you would look at
23  paragraph 1 entitled "Purchased Assets; Excluded
24  Assets," all right?
25         And generally, sir, you'll see that
         TSG Reporting - Worldwide  (877) 702-9580

Page 140

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  that paragraph addresses the purchased assets
3  and changes, the purchased assets provisions of
4  the September 16th Asset Purchase Agreement.
5         Do you have any recollection of that
6  being, again, globally, that being an issue that
7  had to be addressed?
8      A.   I have recollection of an issue that
9  had to be addressed, yes.
10     Q.   And in paragraph 1(a)(ii), you'll see
11  it says as follows: "With respect to clauses
12  (a), (d) and (e) of the definition of 'Purchased
13  Assets' in the Original Agreement, instead of
14  the items referred to in such clauses, (A) the
15  securities owned by LBI and transferred to
16  purchaser or to its affiliate under the Barclays
17  Repurchase Agreement (as defined below) as
18  specified on Schedule A previously delivered by
19  Seller and accepted by Purchaser" -- let me just
20  stop there.
21         Does the reference to the Barclays
22  Repurchase Agreement in that new definition of
23  "purchased assets" refresh your recollection as
24  to whether the Barclays repo played any role or
25  had any implications with respect to the Asset
         TSG Reporting - Worldwide  (877) 702-9580

Page 141

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Purchase Agreement?
3      A.   I don't recall the financing
4  arrangement in the repo.
5      Q.   Uh-huh.
6      A.   I certainly have seen the
7  clarification agreement before --
8      Q.   Sure.
9      A.   -- and knew that that was the
10  amendment substituting for the purchased asset
11  provisions of the Asset Purchase Agreement. So
12  I'm not sure what you're asking me.
13     Q.   I guess -- let me put it another way.
14  Do you know why that amendment was needed?
15     A.   No.
16     Q.   Okay. Let me back up a little bit.
17  Describe for me what your role was at the time
18  in connection with the negotiation and drafting
19  and conclusion of the clarification letter.
20     A.   Very minimal from the time of the
21  signing of the Asset Purchase Agreement. I was
22  more involved in a bunch of other things. There
23  were a whole bunch of other assets that weren't
24  transferring. There were employee issues,
25  counterparty issues.
         TSG Reporting - Worldwide  (877) 702-9580

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2         So my area of expertise was not repo
3    financing and I was not involved in how the
4    financing of the positions would occur and the
5    transfer of it from the Fed to Barclays and what
6    would be in that pool.
7      Q.   Right.
8      A.   So I had very little involvement with
9    this agreement I would say until the weekend,
10   the following weekend when the deal was being
11   put in a position for closing after the hearing
12   on the 19th.
13     Q.   Okay. I'll show you during the day,
14   and I won't take time with it now, but I'm going
15   to show you during the day, during today, some
16   drafts of the clarification letter that crossed
17   your screen, that did come across on e-mail.
18   That's why I asked that question. I want to get
19   a sense of whether you're involved in it or
20   scanning it, if you see the differentiation I'm
21   making.
22     A.   It may even be a different description
23   than that.
24     Q.   What would it --
25     A.   It may even less than a scan.
       TSG Reporting - Worldwide  (877) 702-9580

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.   All right. Who did negotiate the
3    business terms of the clarification letter?
4      A.   Bart was still very much involved. To
5    the best of my recollection, I believe that Mark
6    Shapiro and Jim Seery were very much involved.
7    I don't remember who else, though.
8      Q.   Do you remember there may have been
9    others, but you remember --
10     A.   I should, by the way, very much so add
11   Weil Gotshal.
12     Q.   That's in the negotiation of the
13   business terms or the drafting of the business
14   terms that are agreed? That's the distinction
15   we talked about this morning with respect to the
16   APA.
17     A.   I would say on the negotiation of the
18   business terms.
19     Q.   Who at Weil Gotshal?
20     A.   Tom Roberts in particular. Harvey
21   Miller. There was a shifting as Lehman went
22   into bankruptcy over who took responsibility for
23   negotiation of business terms.
24     Q.   Well, a shifting from whom to whom?
25     A.   A shifting to Weil Gotshal attorneys.
       TSG Reporting - Worldwide  (877) 702-9580

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.   From?
3      A.   From more involvement from Lehman
4    employees.
5      Q.   Okay. Now, do you have a, as the
6    signatory to both agreements -- and by that I
7    mean the Asset Purchase Agreement dated
8    September 16 on the one hand and the
9    clarification letter dated as of September 20 --
10   do you have a sense of whether there were big
11   changes, material changes, significant changes
12   from one to the other?
13       MR. STERN: Objection to the form.
14     A.   I have a sense of some of the changes
15   that were made. I think you could characterize
16   them in a few different ways, but they were not
17   immaterial.
18     Q.   Not to quibble, but does "not
19   immaterial" mean material? I just want to get
20   some terms we can use in the questions.
21       MR. STERN: Objection to the form.
22     A.   I think it depends on the change.
23     Q.   What do you remember as being the not
24   immaterial changes that were made from the Asset
25   Purchase Agreement dated September 16th via the
       TSG Reporting - Worldwide  (877) 702-9580

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2    clarification letter dated as of September 20?
3      A.   Primarily the transfer of assets and
4    assumptions of liabilities.
5      Q.   How did that change?
6      A.   It changed in size and amount.
7      Q.   And give me your best recollection of
8    the quantification of the difference in size and
9    amount.
10     A.   My best recollection is from the 72
11   billion or so, 70 billion of assets -- excuse
12   me, 70 billion to more in the neighborhood of 42
13   billion or so.
14     Q.   And what caused the change, the change
15   in value from roughly 70 billion to something
16   around 42 billion?
17     A.   I don't know.
18     Q.   No clue?
19     A.   "No clue" would be a good enough
20   answer. I wouldn't have used it myself, but no
21   clue.
22     Q.   That's why they invented leading
23   questions.
24       Was it because of a drop in value of
25   the body of collateral or a diminution in the
       TSG Reporting - Worldwide  (877) 702-9580

Page 146

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 HIGHLY CONFIDENTIAL - S. BERKENFELD
2 collection of collateral -- of assets that was
3 being done?
4     A.   I don't know.
5     Q.   You don't know, okay.
6         How did you learn about the change in
7 value?
8     A.   I was -- I don't recall how I first
9 learned.  I know it was part of the hearing in
10 front of, you know, in front of bankruptcy
11 court.
12     Q.   We both know apparently that that
13 change was told to the judge on Friday at the
14 sale hearing.  Is that what you're referring to?
15     A.   Yes.  I don't have any recollection --
16     Q.   Uh-huh.
17     A.   -- of knowing about that before the
18 hearing.
19     Q.   Okay.  That's anticipating my next
20 question.  I wanted to get -- we have Tuesday,
21 Wednesday, Thursday, right?  The 16th, the 17th
22 and 18th.
23         As your best recollection, if I
24 understand your answer correctly, your best
25 recollection is that you learned of the 20th.

TSG Reporting - Worldwide  (877) 702-9580

Page 147

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 HIGHLY CONFIDENTIAL - S. BERKENFELD
2 diminution in value when it was told to the
3 court on Friday?
4     A.   I don't recall knowing about it before
5 then.
6     Q.   Okay.  Were you in court on the
7 Friday?
8     A.   Yes.
9     Q.   All day and night?
10     A.   From the start till the concluding
11 statement by Judge Peck, yes.
12     Q.   Okay.  So you were there for the
13 applause at the end at 20 after midnight?
14     A.   It's probably beyond what I have to
15 say, but yes, I was perhaps someone that might
16 have been applauding.
17     Q.   When you learned about the drop in the
18 number from 70 to about 42, did you follow up?
19 Did you ask anyone what accounted for that
20 change?
21     A.   I don't recall any conversations on
22 it.
23     Q.   So my question was did you ask anyone.
24 Your answer was you don't recall any
25 conversations.  Let me just close that circle.

TSG Reporting - Worldwide  (877) 702-9580

Page 148

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 HIGHLY CONFIDENTIAL - S. BERKENFELD
2         You neither asked nor do you recall
3 overhearing somebody talk about it?
4     MR. STERN:  Objection to the form.
5     A.   I don't recall asking or being given
6 any information or overhearing a discussion
7 about it.
8     Q.   By the time that you signed -- when
9 did you actually sign the clarification letter?
10 It's dated as of the 20th.
11     A.   What day was the 20th?
12     MR. STERN:  Objection to the form.
13     Q.   The 20th is a Saturday.
14     A.   Best of my recollection, would have
15 been at some point on Sunday.
16     Q.   Signed on the Sunday?
17         I want to be fairly precise with this.
18 Do you recall if you signed it on a Sunday or if
19 you signed it at the closing on the Monday?
20     A.   I don't recall.
21     Q.   Do you recall if the clarification
22 letter was complete, was put in final by the
23 Sunday?
24     A.   I don't recall.
25     Q.   By the time that you signed it,

TSG Reporting - Worldwide  (877) 702-9580

Page 149

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 HIGHLY CONFIDENTIAL - S. BERKENFELD
2 whether it be the Sunday or the Monday, did you
3 have an understanding, by whatever means, the
4 reason for the difference in the value -- the
5 difference from 70 to about 42?
6     A.   No.
7     Q.   And by the time that you signed it --
8 at the time that you signed it, did you have an
9 understanding as to why the definition of
10 "purchased assets" was changed to, among other
11 things, make to include the "securities owned by
12 LBI and transferred to purchaser or its
13 affiliates under the Barclays Repurchase
14 Agreement"?
15     A.   No.
16     Q.   Did it come to your attention at any
17 point in the week between signing on the Tuesday
18 and closing on the Monday that Barclays had
19 issued a Notice of Termination regarding the
20 Repurchase Agreement?
21     A.   No, I don't think so.
22     Q.   Did the fact that Barclays had
23 terminated the Repurchase Agreement on Friday
24 the 19th hit your screen, come to your attention
25 in the course of the clarification letter being

TSG Reporting - Worldwide  (877) 702-9580

Page 150

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1  finalized and your signing it?
2     A.  No, I don't think so.  I don't recall
3  it.
4     Q.  Do you recall that being a topic of
5  discussion at all?
6     A.  I recall the financing being a topic
7  of conversation over that weekend.
8     Q.  Okay.  My question is a little more
9  specific and I want to make sure we're
10 understanding each other.
11    Do you recall the topic of the
12 termination of the repo by Barclays coming up in
13 connection with the clarification letter?
14    A.  I don't recall.
15    Q.  At any time, be it that week or any
16 other time, have you formed an understanding as
17 to the implications of a terminated repo with
18 regard to a company that has already filed
19 bankruptcy?
20    MR. STERN:  Objection to the form.
21    A.  No.
22    Q.  That's a -- we should actually take
23 that question out and shoot it.  Let me try
24 another one.

TSG Reporting - Worldwide  (877) 702-9580

Page 151

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1     Was the termination of the repo an
2  issue that needed to be addressed in the
3  structure or the form or the content of the
4  clarification letter?
5     A.  I don't know.
6     Q.  You don't know, okay.
7     By the time that you signed the
8  agreement on, whether it be the Sunday night or
9  the Monday, you had an understanding of the
10 terms of the clarification agreement that you
11 signed, correct?
12    A.  Yes.
13    Q.  And did you have an understanding of
14 the reason for each of the terms of the
15 clarification letter?
16    A.  No.
17    Q.  Did you ask?
18    A.  I didn't ask the reason for the terms.
19 I had conversations with Bart McDade and with
20 Weil Gotshal --
21    Q.  Okay.
22    A.  -- that it reflected the business deal
23 as amended.
24    Q.  Okay.  That --

TSG Reporting - Worldwide  (877) 702-9580

Page 152

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1     A.  The clarification agreement broadly
2  and didn't -- I don't recall any conversation
3  around the repo or financing provisions in
4  particular.
5     Q.  As to its terms in whole, in
6  general -- let me give you a spectrum.  We'll
7  sort of set the stages for the questions that
8  follow.
9     Somewhere between "sign this, we need
10 this," with no explanation, and a session where
11 you go through each and every provision and
12 somebody tells you "this is what it means and
13 this is why we did it," give it to me on that
14 scale of how much explanation you got of the
15 terms of the clarification letter before you
16 signed it.
17    A.  I think it depends on the provision,
18 but it was more along the side of the spectrum
19 of this is the new business deal that's been
20 agreed to.
21    Q.  Was there a new deal that was agreed
22 to by the time the clarification letter was
23 signed?
24    A.  What do you mean by "new deal"?

TSG Reporting - Worldwide  (877) 702-9580

Page 153

HIGHLY CONFIDENTIAL - S. BERKENFELD

1     Q.  Well, would it be fair to describe the
2  deal reflected in the clarification letter that
3  you signed as a new deal, as a different deal
4  than the one that you signed on the 16th?
5     MR. STERN:  Objection to the form.
6     Are you asking new or different?
7     MR. GAFFEY:  I'll take different.
8     A.  I would characterize it as an amended
9  deal.
10    Q.  Significant amendment?  Minor
11 amendment?
12    A.  Significant in some respects.  Minor
13 in others.
14    Q.  I promise I'm going to show you the
15 letter in a minute just as soon as I find my
16 marked up one, but any independent recollection
17 of any significant -- any topics that were the
18 subject of significant amendments?
19    A.  In the topic of the assets and the
20 liabilities and the financing, which I had
21 nothing to do with, "nothing" was a bit of an
22 overstatement, but hardly anything to do with,
23 was a significant category.  There were a lot of
24 other things in the agreement that I believe

TSG Reporting - Worldwide  (877) 702-9580