# A. 2 (B)

Page 154

HIGHLY CONFIDENTIAL - S. BERKENFELD
1  were less significant.
2
3     Q.   In the weekend, that's the Saturday
4  the 20th and Sunday the 21st, were there
5  significant changes made in the terms over the
6  weekend leading to the Monday?
7     A.   Not that I recall.
8     Q.   Just to pick an example, and I'm going
9  to go through a couple of these, but to pick an
10  example of changes affected by the clarification
11  letter, would you take a look please at
12  paragraph 9 entitled Deletion of Purchase Price
13  Adjustment Provisions.  Okay?
14        And you probably, Mr. Berkenfeld, may
15  as well reach into the pile of exhibits and pull
16  out the Asset Purchase Agreement itself because
17  we're going to be doing some comparisons.
18        Now, Section 3.3, you see that
19  paragraph 9 of the clarification letter deletes
20  in its entirety -- well, says, in full, "Section
21  3.3 of the Original Agreement is hereby deleted
22  in its entirety and shall be of no effect ab
23  initio."  See that?
24     A.   Yes.
25     Q.   And for context, if you take a look at

Page 155

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  3.3 of the Asset Purchase Agreement, that's that
3  adjustment to cash amount provision we talked
4  about before with the $750 million cap?
5     A.   Yes.
6     Q.   Right?  Why did that come out?
7     A.   I don't know.
8     Q.   Any clue at all?
9     A.   No.
10     Q.   Did you have an idea at the time as to
11  why that came out?
12     A.   No.
13     Q.   Would you consider a $750 million, the
14  possibility of a $750 million benefit to Lehman
15  to be significant in the context of this overall
16  deal?
17     A.   It's just an opinion.  I don't know
18  that I'm in a position to answer that.
19     Q.   I'll take that.  We'll worry
20  admissibility later.  What's your opinion?
21     A.   It really depends on likelihood of
22  whether that amount was ever going to be paid.
23     Q.   Okay.  Would you have been in a
24  position to assess that likelihood on the 20th
25  of September, four days after the Asset Purchase

Page 156

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  Agreement?
3     A.   I don't think anyone in the world
4  would be.
5     Q.   Okay.  So you have a letter dated as
6  of September 20 that eliminates that provision
7  from an agreement made four days before.  With
8  that as context, can you recall when you signed
9  this agreement you had a sense of whether this
10  was a material or significant change?
11     A.   I don't recall.
12     Q.   Do you know when that -- I'll show
13  them to you, but we talked about drafts of the
14  clarification letter.  Do you know when in the
15  sequence of events between the 17th and the 22nd
16  that provision was added to the clarification
17  letter?
18     A.   I don't.
19     Q.   Do you know at whose behest it was
20  added?
21     A.   I don't.
22     Q.   Do you know which side of the table at
23  whose behest was it?  Was it a Lehman
24  requirement or a Barclays requirement?
25     A.   I don't.

Page 157

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2     Q.   Do you know why the letter is dated as
3  of September 20?
4     A.   No.
5     Q.   Do you have a recollection of any
6  discussion of dating it as of September 20 as
7  opposed to the date on which it was signed?
8     A.   No recollection.
9     Q.   Do you recall seeing a draft dated
10  September 21?
11     A.   I don't recall.
12     Q.   Were you party to any discussion about
13  whether or not the terms of the clarification
14  letter should be submitted for approval by the
15  court?
16     A.   I was not part of any of those
17  discussions.
18     Q.   Did you hear any discussion along
19  those lines?
20     A.   No.
21     Q.   Is that an issue that occurred to you
22  when you signed the agreement?
23     A.   Not that I recall, no.
24     Q.   Do you know what was done by way of
25  bringing the clarification letter to the court's

Page 158

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    attention?
3        A.   I don't.
4            MR. STERN:  To the extent that you ask
5    questions that may call for disclosure of
6    privileged conversations, that's your call
7    as to whether you ask those questions.
8            MR. BYMAN:  Could you speak up just a
9    little bit?
10           MR. STERN:  Yeah.  Sure.  To the
11   extent that you ask questions that may call
12   for disclosure of privileged conversations,
13   that's your call as counsel for Lehman.  I
14   just want to put on the record that we will
15   take the position that that constitutes a
16   subject matter waiver and we'll reserve our
17   rights in that regard.
18           MR. GAFFEY:  I think you're reserving
19   rights about an event that hasn't happened
20   yet.  I'll deal with it if it happens, okay?
21           I get the point.  I know that's an
22   issue.  I'm not trying to be glibly about
23   this, but let's deal with it when it occurs.
24           MR. STERN:  Well, you asked a question
25   about any discussions about whether

TSG Reporting - Worldwide  (877) 702-9580

Page 159

1        HIGHLY CONFIDENTIAL - S. BERKENFELD
2    something should be presented to the court
3    of a Lehman executive pre-acquisition.
4    That's all I'm saying.  I'm just alerting
5    you to it.
6            MR. GAFFEY:  Okay.  And all I'm saying
7    is I neither agree or disagree with you.
8    I'm not taking a position yet.  I'll deal
9    with it when we have an issue.
10           MR. STERN:  Fair enough.
11           (Exhibit 26, Notice of Filing of
12   Purchase Agreement, marked for
13   identification, as of this date.)
14       Q.   Mr. Berkenfeld, I have put before you
15   a document entitled "Notice of Filing of
16   **Purchase Agreement Approved by Order Under 11**
17   **U.S.C.," et cetera, et cetera, et cetera.**
18           Have you seen that document before?
19       A.   I don't think I have.
20       Q.   Do you know when it was filed?
21       A.   I don't know when it was filed.
22       Q.   Nothing further about that.
23           Now, back into the purchase -- I'm
24   sorry, the clarification letter, sir.  There's,
25   and again, in paragraph 1(A) subsection 2,

TSG Reporting - Worldwide  (877) 702-9580

Page 160

1        **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    concerning the definition of "purchased assets,"
3    when the agreement speaks -- when the
4    clarification letter speaks in terms of
5    securities owned by LBI and transferred,
6    transferred to purchaser or its affiliates under
7    the Barclays Repurchase Agreement, do you know
8    if that verb was selected deliberately?
9        A.   This is in, I'm sorry, which section
10   again?
11       Q.   We're in 1(A)(ii)?
12       A.   (A)(ii).
13       Q.   On the first page concerning purchased
14   assets.
15       A.   "Transferred," the word "transferred"
16   in which section?
17       Q.   1(A)(ii).
18       A.   But in which sub clause?  Right in the
19   third line?
20       Q.   Sub clause capital A.
21       A.   Okay.
22       Q.   Which refers to securities owned by
23   LBI and, quote/unquote, transferred?
24       A.   No, I don't.  I don't know why that
25   word was chosen.

TSG Reporting - Worldwide  (877) 702-9580

Page 161

1        HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.   And there's a reference in that same
3    paragraph to a Schedule A and a Schedule B.  Do
4    you see that?
5        A.   Yes.
6        Q.   Okay.  Do you know what those are
7    references to?
8        A.   No.
9        Q.   Have you any understanding of what --
10   either with or without regard to the
11   clarification letter, do you have any
12   understanding of what Schedule A and Schedule B
13   were in connection with the assets transferred
14   from Lehman to Barclays?
15       A.   All I know is what I'm reading in the
16   agreement.
17       Q.   Okay.  Did you have any involvement in
18   or knowledge of the assembly of schedules of
19   assets that were -- Schedule A, which were
20   assets that were contained within the Repurchase
21   Agreement, and Schedule B, which were additional
22   assets, to show what was transferred from Lehman
23   to Barclays?
24       A.   No, I did not.
25       Q.   Is that an event or an activity or an

TSG Reporting - Worldwide  (877) 702-9580

Page 162

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  issue that has crossed your screen, that has
3  come to your attention at any point since?
4      A.  Not that I recall.
5      Q.  So would you know who I would ask, who
6  would -- who would know about the assembly and
7  the contents of Schedule A and Schedule B?
8      A.  I think that Jim Seery. John Coughlin
9  might know.
10     Q.  Uh-huh.
11     A.  Bart may know. I don't know.
12     Q.  When you signed the agreement, did you
13  know what Schedule A and Schedule B were that
14  were described in but not attached to the
15  clarification letter?
16     A.  Just as it represented in the section.
17  Nothing more than what's in the agreement.
18     Q.  Nothing more than the language of the
19  agreement?
20     A.  Yes.
21     Q.  You know, with respect to both the --
22  actually, all three of the Asset Purchase
23  Agreement, the First Amendment, which we marked
24  as Exhibit 24, and the clarification letter,
25  which is marked as Exhibit 25, why did you sign

TSG Reporting - Worldwide  (877) 702-9580

Page 163

1  them? Why are you the guy who signs them?
2      A.  I signed the Asset Purchase Agreement
3  because at the time there was nobody else who
4  was an authorized officer of Lehman Brothers
5  Holdings available to sign it there present who
6  could sign it, and to some extent, I think the
7  amendments and the clarification letter were
8  brought to me by the counsel just for
9  consistency after that.
10     Q.  Now, you said there was no other one
11  authorized to sign on behalf of LBHI present who
12  could sign it. I note the distinction there.
13         Was from someone on behalf of LBI
14  present who could sign it? Withdrawn.
15     A.  Yes.
16     Q.  Actually, that question is misleading
17  as it stands. Let me withdraw it.
18         On the 16th, that is, before Lehman
19  Brothers, Inc. files for bankruptcy protection,
20  so on the 16th --
21     A.  That wasn't before we filed.
22     Q.  Let me be -- I've confused this record
23  and this is entirely my fault. Let me give you
24  two dates to deal with. One is Lehman Brothers

TSG Reporting - Worldwide  (877) 702-9580

Page 164

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Holdings, Inc. files on the 15th. Lehman
3  Brothers, Inc., the broker-dealer, files on the
4  19th, okay? So I want to just be on the 16th
5  where the state of play is LBHI is filed, but
6  LBI is not.
7          The negotiators included Mr. McDade.
8  Was he not authorized to sign on behalf of LBHI?
9      A.  He was.
10     Q.  Was he not present?
11     A.  He wasn't present at the time the
12  document was ready to be signed.
13     Q.  Let me back this up a little bit.
14  This is -- I'm sort of curious about this.
15  Where are you when you sign this? Who is in the
16  room?
17     A.  We are --
18         MR. STERN: "This" is?
19     Q.  Good point. "This" is the Asset
20  Purchase Agreement.
21     A.  We're in that conference room that I
22  had described earlier.
23     Q.  Okay.
24     A.  In the corner of the 32nd floor.
25     Q.  Right.

TSG Reporting - Worldwide  (877) 702-9580

Page 165

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      A.  And day goes into night and night goes
3  into day, but at the time when the agreement had
4  been finalized by the lawyers and ready for
5  signature, Bart McDade and other potential
6  signatories for Lehman Brothers Holdings were
7  not still there as the lawyers were finishing up
8  the drafting of the document.
9      Q.  Okay.
10     A.  Just to make this easier for you,
11  there are not a lot of authorized signatures of
12  Lehman Brothers Holdings, Inc.
13     Q.  Okay.
14     A.  I don't know who was employees and
15  what payroll they were on that had other reasons
16  for that, but the employees of Lehman were not
17  technically, not from necessarily a tax
18  standpoint, but they were officers of Lehman
19  Brothers, Inc. So anyone who was a managing
20  director of Lehman Brothers was a managing
21  director of Lehman Brothers, Inc.
22     Q.  Right. But not necessarily Holdings?
23     A.  Lehman Brothers Holdings was our
24  public company, so it included Dick Fuld, it
25  included Bart McDade, it included Ian Lowitt,

TSG Reporting - Worldwide  (877) 702-9580

Page 166

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  and then others who you would see as potential
3  16 files. But there is a relatively small group
4  of officers of Holdings who could sign for the
5  parent company.
6  Q. Okay. So --
7  A. So Skip McGee, for instance, was not
8  an officer of Lehman Brothers Holdings.
9  Q. I gotcha. And you sign it on the
10 16th, early morning of the 16th? "It" being the
11 Asset Purchase Agreement.
12 A. 16th is Tuesday?
13 Q. Yes.
14 A. I don't recall if it was early morning
15 or later in the day after an all-nigher. I
16 don't remember the exact time.
17 Q. I'm going to give you something I
18 never go anywhere without. It's a blank
19 calendar of the week. It's of the month of
20 September 2008. I'll show you which are the
21 Tuesdays and which are the Wednesdays.
22 A. All right. I don't remember what
23 point of the day on the 16th, but it needed to
24 be signed --
25 Q. Right.

TSG Reporting - Worldwide  (877) 702-9580

Page 167

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  A. -- so that it was signed for the
3  hearing, the bankruptcy court hearing on that
4  day.
5  Q. Okay. Okay.
6  A. So we were under some time pressure to
7  actually have a signed document to go into court
8  with.
9  Q. All right. Now, and then when the
10 time comes during the week for the First
11 Amendment to be signed and either on the Sunday
12 or Monday the clarification letter to be signed,
13 the reason you signed it is consistency; you
14 signed the first one?
15 A. Weil Gotshal brings, you signed the
16 first one, here's the amendment, here's the
17 clarification. To clarify, there were some
18 elements of the clarification that I had more
19 involvement in, but I was much -- and not the
20 part you were asking about, not the financings
21 and the repo and the assets that are going over,
22 but things along the lines of should this
23 subsidiary go in or be out, what businesses are
24 transferring.
25 Q. Right.

TSG Reporting - Worldwide  (877) 702-9580

Page 168

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  A. I spent a lot more time, my time,
3  during that week with things that, you know, in
4  hindsight, might seem not all that significant,
5  but were the South American retail businesses
6  going, was Eagle Energy going, was the Israeli
7  office going.
8  Q. Canada was another issue?
9  A. IMD, Canada. So there was a lot of my
10 time on what were the, not the securities
11 position, but what were the businesses that were
12 being brought into the deal.
13 Q. Now, when IMD was an issue, whether or
14 not IMD was going over, there was an issue as to
15 whether additional employees from IMD should be
16 included in the preexisting bonus pool that was
17 referred to or whether additional funds would be
18 set aside; is that right?
19 A. I don't recall that. I was not part
20 of those discussions.
21 Q. Well, let's go through some changes --
22 some provisions in the clarification letter.
23 Let me get a sense of what your knowledge is of
24 both the reason for these and the history of
25 them, okay?

TSG Reporting - Worldwide  (877) 702-9580

Page 169

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  We dealt with paragraph 9. Let's take
3  a look at paragraph 13, please. It's at page 5.
4  Let me know when you've had a chance to read
5  that page.
6  (Document review.)
7  A. Okay.
8  Q. Okay. You've had chance to look that
9  through?
10 A. Yes.
11 Q. You see in there the following
12 language: "Effective at closing, all" -- let me
13 start that at closing (i) all
14 securities and other assets held by Purchaser
15 under the September 18, 2008 Repurchase
16 Agreement among Purchaser and/or its Affiliates
17 and LBI and/or its Affiliates and Bank of New
18 York as Collateral Agent, defined as the
19 Barclays Repurchase Agreement, shall be deemed
20 to constitute part of the Purchased Assets in
21 accordance with paragraph 1(A)(ii) above." And
22 that's only part of the paragraph.
23 Any knowledge, sir, as to why the
24 assets that were with the collateral agent for
25 the Barclays Repurchase Agreement were deemed to

TSG Reporting - Worldwide  (877) 702-9580

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  constitute part of the purchased assets?
3    A.   No.
4    Q.   None at all?  You're pausing a little
5  bit there.
6    A.   No, not really.  I mean, the provision
7  seemed to fit, but I'm reading the agreement the
8  same as you are.  I don't have any other
9  knowledge of it.
10   Q.   Okay.  And further down, there is the
11  following quote: "Additionally, the Notice of
12  Termination relating to the Barclays Repurchase
13  Agreement dated September 19, 2008, is hereby
14  deemed rescinded and void ab initio in all
15  respects."  You see that language?
16   A.   Yes.
17   Q.   Do you have any understanding as to
18  why the Notice of Termination needed to be
19  rescinded and void ab initio in all respects?
20   A.   No.
21       (Exhibit 27, a document bearing Bates
22  Nos. BCI-EX-00109164 through 109165, marked
23  for identification, as of this date.)
24   Q.   I have marked as Exhibit 27, Mr.
25  Berkenfeld, a two-page document bearing Bates

TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  number BCI-EX-00109164 through 65.
3       Take a look at it, please, and tell me
4  if you've ever seen this document before.
5    A.   I've never seen it before.
6    Q.   You can put it aside.  Nothing further
7  on that.
8       Do you have any recollection of when,
9  if at all, during the -- I keep calling it a
10  week, but during the six days between Tuesday,
11  the 16th, and Monday, the 22nd, at the closing,
12  when during that week a concept of terminating
13  or otherwise adjusting the parties' rights under
14  a Repurchase Agreement was an issue?
15   A.   I don't recall at all.  I really had
16  very little -- no involvement in the whole
17  financing, repo arrangement.
18   Q.   Do you have any knowledge of whether
19  the repo arrangement was used as a mechanism to
20  transfer to Barclays Lehman assets at a
21  discount?
22   A.   I have no knowledge.
23   Q.   Would you take a look at Exhibit 21,
24  which is in the pile in front of you.
25   A.   Oh, Exhibit 21?

TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Yes.  That's the September 18 e-mail
3  from Reilly to Lowitt, and again, I'm directing
4  your attention down to its paragraph 3.  We
5  talked about this before.  It had the language
6  about a block discount.  You see where I am?
7    A.   Uh-huh.
8    Q.   And there's this sentence -- well,
9  let's me read the first two sentences of that
10  paragraph.  "Not clear on the amount of block
11  discount or how we make it happen.  Defaulting
12  on repo could be the best, as discount could be
13  taken from the haircut."
14       Any understanding of what that
15  sentence means?
16   A.   None.
17   Q.   I might be able to give you what my
18  partner calls the gift of time with the
19  following question.
20       Do you know how repo works?
21   A.   Generally.
22   Q.   Okay.  Was that within your area of
23  responsibility?
24   A.   No.
25   Q.   And so I'm clear, was it within your

TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  area of responsibility back in the days before
3  the bankruptcy, or the responsibilities that you
4  had in connection with the bankruptcy and the
5  making of these agreements?
6    A.   In the 21 years I was at Lehman, it
7  was never in the area of my responsibility.  It
8  was an area, a specialized area, that I really
9  had very little familiarity with.
10       MR. STERN:  Bob, at some point if you
11  want to take a break to sort through notes.
12       MR. GAFFEY:  Now might not be a bad
13  time, because I think, based on the last
14  couple of minutes, I may be able to cut some
15  stuff out.
16       (Recess; Time Noted: 1:48 P.M.)
17       (Time Noted: 1:54 P.M.)
18  BY MR. GAFFEY:
19   Q.   I think you made a reference earlier
20  today, Mr. Berkenfeld, and if not, let me
21  introduce the topic:  Was there a point in
22  between the 16th and the 22nd where it became
23  evident or known to you or told to you that
24  Lehman would not be able to deliver to Barclays
25  all of the assets that had been considered for

TSG Reporting - Worldwide  (877) 702-9580

Page 174

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    transfer as part of the Asset Purchase
3    Agreement, that they couldn't get their hand on
4    what was supposed to go over to Barclays?
5        A.    I really wasn't a part of all of those
6    discussions --
7        Q.    Uh-huh.
8        A.    -- resolving those issues.
9        Q.    Right.
10       A.    So I don't recall really being in the
11   loop on that.
12       Q.    What we talked about a bit before is
13   you discovered in court on the 19th the change
14   from 70 to what you thought was about 42, right?
15   And I think I asked you, and rather than go look
16   for it, I think I asked you if you had a sense
17   of that was a diminution in value of the
18   existing classes of assets or a reduction in the
19   total number of assets being transferred, and
20   you didn't know one way or the other?
21       A.    I wouldn't know one way or the other.
22       Q.    There were -- and again, for the sake
23   of efficiency, I'll set a factual basis here so
24   you'll understand the topic that I want to ask
25   you about.
         TSG Reporting - Worldwide  (877) 702-9580

Page 175

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        We've seen some documents that discuss
3    efforts to find additional collateral,
4    additional securities to send over to Barclays.
5    Is that a topic that hit your screen that you
6    were involved with in any way?
7        A.    I wasn't involved with it.
8        Q.    Do you have any knowledge about, for
9    example, looking for what are called 15c3
10   securities?
11       A.    I wasn't involved in any of that.  I
12   was not involved in any of that.
13       Q.    Did you hear anything about that?
14       A.    Nothing that I can recall
15   specifically.
16       Q.    Similarly, were you involved or did
17   you come to have any knowledge about an effort
18   to find securities in clearance boxes that could
19   be turned over from Lehman to Barclays?
20       A.    I wasn't involved in any of those
21   discussions.
22       Q.    So, back to the clarification letter,
23   in paragraph 1(A)(ii), where the definition of
24   "purchased assets" is changed to include, and
25   now I'm quoting, "(B) such securities and other
         TSG Reporting - Worldwide  (877) 702-9580

Page 176

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    assets held in LBI's clearance boxes as of the
3    time of closing, which at the close of business
4    on September 21, 2008 were as specified on
5    Schedule B, previously delivered by Seller and
6    accepted by Purchaser," blah, blah, blah.
7        When you signed the letter, did you
8    have an understanding of what was meant by the
9    "assets held in LBI's clearing boxes"?
10       A.    No more so than it's described in the
11   agreement.
12       Q.    And the agreement itself says "no
13   extraneous knowledge of it"?
14       A.    No.  That's a good way to put it.
15   Thank you.
16       Q.    As you sit here today, do you know
17   what clearance boxes are being referred to
18   there?
19       A.    I do not.
20       Q.    As you sit here today, have you ever
21   seen the Schedule B to which the letter you
22   signed referred?
23       A.    Not that I recall.
24       Q.    And as you sit here today, have you
25   ever seen the Schedule A that the clarification
         TSG Reporting - Worldwide  (877) 702-9580

Page 177

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    letter you signed refers to?
3        A.    I don't recall.
4        Q.    Take a look, if you would -- I'm over
5    on page 2 at subsection 3 of paragraph 1(A),
6    referring to the equity of Lehman Brothers
7    Canada, Lehman Brothers South America, Lehman
8    Brothers Uruguay, S.A., you see that?
9        A.    Yes.
10       Q.    That's one of the issues you were
11   involved in, what's going, what's not going?
12       A.    Yes.
13       Q.    But when you were involved in what's
14   going and what's not going, it was not with
15   respect to the securities that were transferred,
16   it was respect to other things, which parts of
17   the business that were going?
18       A.    It was, when I was involved, the
19   business points of this clarification letter
20   that I was involved in had more to do with what
21   businesses were going.
22       Q.    Okay.
23       A.    Meaning was the Canadian business
24   going, was the South American business going.
25   That happened to be housed in these
         TSG Reporting - Worldwide  (877) 702-9580

Page 178

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  subsidiaries. Like, in order to transfer the
3  business, you needed to transfer the
4  subsidiaries.
5        I didn't really have -- I didn't have
6  involvement in the securities that were being
7  transferred and the financing of it and what was
8  happening with the Fed and JPMorgan and
9  Barclays. I didn't have any involvement in
10  that.
11    Q.  During the weekend of the 20th and the
12  21st, did it come -- withdrawn. At any time in
13  between the signing and the closing, did it come
14  to your attention that there were -- there was
15  an issue with respect to -- just answer this yes
16  or no, please -- that there was an issue with
17  respect to JPMorgan that could be an obstacle to
18  completing the closing?
19    A.  Yes.
20    Q.  And describe for me, if you would,
21  what the issue was, as you understood it?
22    A.  That's difficult to do because it's a
23  while ago and I wasn't directly involved, but I
24  was at Weil Gotshal on Sunday and there were
25  three-way negotiations going on between the Fed,

Page 179

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  JPMorgan and Barclays that to some extent it
3  would be fairly characterized as Lehman not
4  really being at the table on those.
5        But, as a matter of fact, there were
6  negotiations going on in separate rooms between
7  Barclays and JPMorgan to sort that out that no
8  representative of Lehman Brothers was included
9  in. So I don't know what the nature of the
10  issue really was.
11        MR. STERN: When your questions ask
12    about the time period between the signing
13    and the closing --
14        MR. GAFFEY: Between the 16th and
15    22nd.
16        MR. STERN: Okay.
17    Q.  Were there also separate discussions,
18  not involving Lehman, between Barclays and DTC?
19    A.  I wouldn't know firsthand. I believe
20  there were, but I don't know what they were and
21  when they were.
22    Q.  Why do you believe there were?
23    A.  I just believe there were. I don't
24  know why.
25    Q.  Totally apart from anything else I

Page 180

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  have asked you up till now, I should have asked
3  you this before, since you went over to
4  Barclays, and other than in conversations with
5  Barclays' counsel, which I don't want to know
6  about, have you had discussions with Barclays
7  personnel, Barclays legacy personnel that didn't
8  transfer over from Lehman, about the deal and
9  the events of that week and how the deal went
10  and whether Barclays got what it paid for and
11  other similar topics?
12    A.  No. No, I have not. I can't recall
13  any conversations like that.
14    Q.  And again, you're being a little
15  emphatic with your answer on that. Is that
16  because -- have you deliberately not had those
17  conversations or it just hasn't happened?
18    A.  It's not because I deliberately
19  haven't had it. I just was never -- no one on
20  the other side ever had those conversations with
21  me.
22    Q.  And in the initial period of your
23  employ by Barclays, let's call it the first week
24  or two after you go over to Barclays, are you
25  drawn into or involved in any discussions about

Page 181

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  implementation issues: Did the assets make it
3  over here? Did the right people get over here?
4    A.  I spent a lot of my time initially
5  after the closing on continuing Lehman issues,
6  for instance, negotiating the Neuberger
7  transaction. Again, this was a situation where
8  there was no one else that was interested in
9  doing it or willing to do it, so I spent another
10  week at Weil Gotshal on that transaction.
11        Later on, a few weeks later, I was
12  involved to some extent, and for a limited
13  period of time, on the issue of clients'
14  securities getting moved over and the issue with
15  the DTC there. It was really about -- it was
16  really about client issues.
17    Q.  Right.
18    A.  Client accounts that might not have
19  gotten whatever, the munis or the treasuries,
20  that were supposed to go over and where were
21  those securities and how were we going to deal
22  with that particular issue.
23    Q.  Generally put, so I can maybe move
24  this off the table of things I need to ask you
25  about, when you say that, you're talking about

Page 182

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  the segregated assets that are in client
3  accounts, making sure they were safely ACATed
4  other otherwise moved over to Barclays?
5      A.    There was issues with the S.E.C., with
6  Hughes Hubbard, with DTC, you know, all that,
7  were the clients' assets in their accounts being
8  made whole. So I was involved in that part of
9  it, but if I understand your question correctly,
10  it's not what you were asking about.
11      I really wasn't involved at all on
12  whether -- I didn't switch hats and become part
13  of Barclays and say where are those assets that
14  should have come from Lehman? I wasn't involved
15  in anything like that.
16      Q.    I don't mean taking Barclays' side of
17  anything.
18      A.    No, I mean I wasn't involved in that
19  on either side.
20      Q.    I'm going to give you a series of
21  drafts of the clarification letter and ask you
22  to look through them and then, in one form or
23  another, let's go through them and you can just
24  tell me if you've seen them before and if it
25  refreshes your recollection about some stuff.
TSG Reporting - Worldwide  (877) 702-9580

Page 183

HIGHLY CONFIDENTIAL - S. BERKENFELD
1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  That's what I want to do for the next sort of
3  sequence here, but I want all the documents in
4  front of you at once, okay?
5      A.    Okay.
6      (Exhibit 28, a document bearing Bates
7  Nos. BCI-CG00011047 through 11050, marked
8  for identification, as of this date.)
9      (Exhibit 29, a document bearing Bates
10  Nos. 10284821 through 10279830, marked for
11  identification, as of this date.)
12      (Exhibit 30, an e-mail string, the
13  first of which from P. Dowd to A. Keller, et
14  al., marked for identification, as of this
15  date.)
16      (Exhibit 31, a document bearing Bates
17  Nos. 10279029 through 10279862, marked for
18  identification, as of this date.)
19      (Exhibit 32, a document bearing Bates
20  Nos. BCI-EX-00059913 through 59929, marked
21  for identification, as of this date.)
22      (Exhibit 33, a document bearing Bates
23  Nos. 10284801 through 10286514, marked for
24  identification, as of this date.)
25      (Exhibit 34, a document bearing Bates
TSG Reporting - Worldwide  (877) 702-9580

Page 184

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Nos. 10279028 through 10279851, marked for
3  identification, as of this date.)
4      (Exhibit 35, a document bearing Bates
5  Nos. 10284822 and 10279863 through 10279864,
6  marked for identification, as of this date.)
7      (Exhibit 36, a document bearing Bates
8  Nos. BCI-CG00024252 through 24271, marked
9  for identification, as of this date.)
10      (Exhibit 37, a document bearing Bates
11  Nos. BCI-CG00024954 through 24973, marked
12  for identification, as of this date.)
13      (Exhibit 38, a document bearing Bates
14  Nos. 10283756 with attachments, marked for
15  identification, as of this date.)
16      A.    Okay.
17      Q.    Okay.
18      A.    Certainly got a lot longer.
19      Q.    The letter?
20      A.    Yes.
21      Q.    Well, somebody's shown you my outline.
22      The first one that I have put before
23  you which we have marked as Exhibit 28 is a
24  draft of the clarification letter under an
25  e-mail from a Lillian Raben dated September 17,
TSG Reporting - Worldwide  (877) 702-9580

Page 185

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  2008 to Archie Cox, Steven Berkenfeld and others
3  from Victor Lewkow. Bears Bates numbers
4  BCI-CG00011047 through 11050.
5      Any independent recollection of seeing
6  that document before, Mr. Berkenfeld?
7      A.    It's e-mailed to me, but I don't know
8  that I spent any time substantively with it.
9      Q.    Okay. And two things I wanted to ask
10  you about that. One is compared to the final
11  that you signed on either the Sunday night or
12  the Monday, it's a much shorter clarification
13  letter, correct?
14      A.    Yes.
15      Q.    And I take note of the fact that a
16  clarification letter of any kind is being
17  prepared as early as September 17. Is there a
18  reason a clarification letter started to be
19  prepared that soon after the signing of the
20  Asset Purchase Agreement?
21      A.    I don't recall. I don't recall why it
22  was started that early.
23      Q.    Okay. And I will tell you, although,
24  you know, we're all sort of still looking for
25  and at documents, this is the earliest version I
TSG Reporting - Worldwide  (877) 702-9580

Page 186

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 have found, and it is a Cleary Gottlieb draft,
2 as denoted by its header.
3       Does that refresh -- well, do you have
4 any knowledge, sir, of whose idea it was that a
5 clarification letter would need to be done?  Did
6 it emanate with Cleary?
7    A.   I don't recall.
8    Q.   Now, the next exhibit, number 29, is a
9 draft of the clarification letter under an
10 e-mail from David Murgio at Weil to Berkenfeld,
11 Steven, and then a distribution list.  And it
12 attaches in the bottom e-mail, there's a
13 redaction of a communication from Mr. Murgio to
14 you, but in the e-mail at the bottom, he simply
15 is forwarding an e-mail that he also sent to
16 Lillian with their Weil comments on that letter.
17       Again, any independent recollection of
18 seeing this?
19    A.   Independent recollection as I sit here
20 now, no.
21    Q.   Other than the fact that it reflects
22 it was sent to you as an e-mail?
23    A.   Yes.  And I do have recollection over
24 the course of that week about the back and forth

TSG Reporting - Worldwide  (877) 702-9580

Page 187

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 about is Canada included, is IMD included, and
2 that's reflected in some of these letters.
3    Q.   In the drafts?
4    A.   Yes.
5    Q.   Now, the next document you have should
6 be marked as Exhibit 30, and it should be a
7 draft dated -- or an e-mail dated September 18,
8 2008 at 6:43 P.M. from Andy Keller to Steve
9 Berkenfeld entitled Revised Clarification
10 Letter?
11    A.   Uh-huh.
12    Q.   And it transmits an e-mail that was
13 sent both to Weil and to personnel at Barclays
14 with further revisions of the letter.  Same
15 question:  Any independent recollection apart
16 from the fact that it reflects it was an e-mail
17 sent to you?
18    A.   No, no independent recollection, and I
19 don't recall whether I was staying current with
20 the drafts as they were coming through.
21    Q.   Okay.  And if you would, please, take
22 a look at Exhibit 31, which should be an e-mail
23 from David Murgio at Weil to Victor Lewkow at
24 Cleary and others, including you in the CCs,

TSG Reporting - Worldwide  (877) 702-9580

Page 188

HIGHLY CONFIDENTIAL - S. BERKENFELD

1 with a document number of 10279029 and an
2 attachment entitled WGM Comments, September 18,
3 7:30.
4       Same questions:  Any independent
5 recollection apart from the fact that it
6 reflects it was sent to you as an e-mail?
7    A.   No independent recollection of this
8 draft.
9    Q.   Now, take a look, please, at what we
10 have marked as Exhibit 32, which is an e-mail
11 containing a draft of a clarification letter,
12 bearing Bates Nos. BCI-EX00059913 through 929.
13 It's an e-mail from Jonathan Hughes to Rich
14 Ricci and others at Barclays, and there's an
15 e-mail chain below that.
16       Now, you're not on this chain, so --
17 I'm going to ask you anyway, have you seen this
18 before?
19    A.   Not this e-mail, no.
20    Q.   Okay.  During that time period, now
21 we're on the 19th, we're at the Friday, is there
22 a point where you ceased -- where you're not
23 getting each draft, where you're sort of out of
24 that loop?

TSG Reporting - Worldwide  (877) 702-9580

Page 189

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    A.   These are all Barclays people on this
2 list.  So this is a draft that's sent from David
3 Murgio --
4    Q.   Right.
5    A.   -- to Victor Lewkow, Cleary Gottlieb,
6 counsel for Barclays.  He forwards it to
7 Barclays' attorneys, Richard Smith in
8 particular.  Richard Smith focuses it to other
9 attorneys and Jonathan Hughes gets it and gives
10 it over to the, I guess, in his view, the key
11 business people.
12    Q.   Right.  The reason I asked the
13 question, go to the last e-mail in the sequence,
14 which would be at the end of it at page 59914.
15    A.   Uh-huh.
16    Q.   Okay, you've got Murgio to Lewkow at
17 Cleary, copy a bunch of people at Cleary?  See
18 where I am?
19    A.   Yep.
20    Q.   And you're not in that list, and it
21 says, "Please find the redraft of the clarifying
22 letter," right?
23    A.   I don't know why I'm not on the list.
24    Q.   This is sort of a more general

TSG Reporting - Worldwide  (877) 702-9580

Page 190

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  question that springs out of this document, at
3  least in my mind. Is there a point where you're
4  no longer seeing drafts? As opposed to, you
5  know, maybe not seeing a draft here and there,
6  is there a point where the drafts stop coming to
7  you?
8    A.  I don't recall.
9    Q.  Okay. Do you have any recollection of
10  that occurring to you at the time?
11    A.  I don't recall any deliberate event or
12  demarcation that said don't send me drafts
13  anymore. I don't know why.
14    Q.  Actually, that's a better question
15  than the one I'm asking. Did you ever say I
16  don't want to see drafts of this any more?
17    A.  No, I did not.
18    Q.  Exhibit 33 should be an e-mail dated
19  September 19, 2008 from Andy Keller to
20  Berkenfeld and Emma Bailey regarding CGSH
21  comments on the clarifying letter, and it simply
22  forwards an e-mail from Robert Davis to Robert
23  Murgio and others, including people at both
24  Barclays and Lehman.
25       This has got attached to it a
       TSG Reporting - Worldwide  (877) 702-9580

Page 191

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  handwritten CGSH markup of 9:19 A.M. Do you see
3  that?
4    A.  I do.
5    Q.  This one at least looks different than
6  the others. Any recollection of seeing that
7  document?
8    A.  No, no recollection.
9       At this point, also, at 1:20 on
10  Friday, I'm not sure when things started at
11  bankruptcy court.
12    Q.  Okay. That's a good point. I mean, I
13  guess you're in bankruptcy court from the
14  beginning to the end of the hearing. We
15  established that before, right?
16    A.  Yes.
17    Q.  And the hearing I think started at
18  least midmorning. It's not an afternoon
19  hearing?
20    A.  I don't remember when it started.
21    Q.  Okay.
22       MR. STERN: I'm sorry. Let's go off
23  the record for a second.
24       (Discussion off the record.)
25    A.  I left earlier to get down there. It
       TSG Reporting - Worldwide  (877) 702-9580

Page 192

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  was all the way down on Bowling Green, and
3  people were there pretty far ahead of the actual
4  commencement of the proceeding.
5    Q.  When you're down there, are you -- did
6  you ask anybody where are we on the
7  clarification letter?
8    A.  Not that I recall. I also had my
9  BlackBerry checked with security.
10    Q.  You had one with a phone?
11    A.  Uh-huh.
12    Q.  Okay. If you take a look, Mr.
13  Berkenfeld, at Exhibit 34, it should be an
14  e-mail from Keller to Berkenfeld forwarding an
15  e-mail from Messineo to Lewkow and a
16  distribution list. The text of that e-mail
17  says, quote --
18       Well, actually, the same question.
19  Seen it before? Any independent recollection?
20    A.  No independent recollection.
21    Q.  The text of the e-mail that Mr. Keller
22  is forwarding says, "Please see the current
23  draft. The exhibit must be revised to reflect
24  the latest deal with DTC. This is being
25  distributed separately. A copy marked to show
       TSG Reporting - Worldwide  (877) 702-9580

Page 193

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  the changes made from the last draft we
3  distributed is attached."
4       Do you know what is meant by a
5  reference to the latest deal with DTC?
6    A.  I don't.
7    Q.  Any clue at all what that's a
8  reference to?
9    A.  No.
10    Q.  I take it from your answers about
11  these that you would not have any idea at what
12  point in the sequence it was determined to take
13  the price adjustment provision out, right,
14  whether it was the Wednesday or the Thursday or
15  the Saturday or the Sunday?
16    A.  I have no recollection of that.
17    Q.  And if you would look, please -- we're
18  up to Exhibit 35, yes?
19    A.  Yes.
20    Q.  Exhibit 35 should be an e-mail from
21  Murgio dated September 19, 2008, 9:15 P.M.,
22  Greenwich Mean Time, to Dowd, P. Martelli,
23  Steven Berkenfeld, Victor Lewkow at Cleary, and
24  others.
25       Same questions: Any independent
       TSG Reporting - Worldwide  (877) 702-9580

Page 194

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    recollection of seeing it?
3    A.   No independent recollection.
4    Q.   And the text of that e-mail refers to,
5    "A revised version of the clarification letter
6    reflecting our conversation this afternoon."
7        Were you part of any such conversation
8    on the afternoon of Friday, September 19?
9    A.   Not that I recall.  This is an e-mail
10   that went to both Lehman and Barclays personnel
11   and counsel for both sides, so I don't know what
12   conversation he's referring to.
13   Q.   Okay.  Take a look at Exhibit 36, an
14   e-mail from Robert Messineo to Victor Lewkow,
15   bearing Bates No. BCI-CG00024252 through 24271.
16       Again, sir, you're not reflected as a
17   recipient of this e-mail, but my question is
18   have you ever seen this version of it before?
19   A.   I don't know.  I don't have
20   independent memory of it.
21   Q.   Okay.  Now we're into Saturday,
22   however.  The hearing is over.  It's 2:39 P.M.
23   on Saturday.
24       Are you in any way back involved in
25   reviewing drafts of the clarification letter now
        TSG Reporting - Worldwide  (877) 702-9580

Page 195

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    that the hearing is over?
3    A.   I don't recall at this point whether I
4    was involved on Saturday or whether I didn't get
5    involved again until Sunday.
6    Q.   Okay.
7    A.   I just don't recall.
8    Q.   All right.  And would you take a look
9    at Exhibit 37.
10   A.   Yes.
11   Q.   37 is an e-mail from David -- I can't
12   pronounce that -- Leinwand, Linewand, to Andy
13   Keller, David Murgio, some folks at Sullivan and
14   Cromwell, some folks at Barclays, and some folks
15   at Cleary, but again, you're not shown as having
16   seen this e-mail bearing a date of Saturday,
17   September 20, at 11:13 P.M.  Any recollection of
18   seeing it?
19   A.   No recollection.
20   Q.   Any recollection of activity going on
21   with respect to changes in the -- with respect
22   to the clarification letter as late as September
23   20th, 11:13 P.M.?
24   A.   I don't know what it would have been
25   covering.
        TSG Reporting - Worldwide  (877) 702-9580

Page 196

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   Now, Exhibit 38, Mr. Berkenfeld,
3    before you is an e-mail from Steven Berkenfeld
4    at Lehman.com to berkenf@optonline.com, and
5    attaches a draft of the clarification letter
6    entitled WGM Draft, September 19, 2008, 7:30
7    P.M.
8        And the e-mail reflects your -- I take
9    it this is you sending a copy to your personal
10   e-mail address?
11   A.   My home address, correct.
12   Q.   And this reflects that that was sent
13   on Sunday, September 21, at 11:19 A.M.  Do you
14   have any recollection of sending a copy of the
15   clarification letter to yourself?
16   A.   I don't recall, but I would do this so
17   I could print it out.  From my work e-mail to my
18   home so I could print it out and read it.
19   Q.   I assume at some point you got to get
20   some sleep and you got to head home every once
21   in a while.  Do you recall leaving on the Sunday
22   at about 11:19, sending stuff to yourself at
23   home in preparation for leaving and being at
24   home?
25   A.   No, I think it was -- my recollection
        TSG Reporting - Worldwide  (877) 702-9580

Page 197

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    is it was the other way around.  I was printing
3    stuff out in anticipation of going back in to
4    Weil Gotshal.
5    Q.   Okay.  So you're home, you sign onto
6    your Lehman e-mail, you send it to your
7    optonline and print it out?
8    A.   My BlackBerry, but, yeah, I sent it to
9    my memo, print it out, and was expecting to go
10   in later that day.
11   Q.   Physically, it's most likely you're at
12   home when you do this?
13   A.   That's most likely right.
14   Q.   The draft that you have sent to
15   yourself here on Sunday, September 21, at 11:19
16   is the Weil Gotshal draft from September 19,
17   2008.  The last couple of exhibits that we have
18   looked at have been sent over the Saturday and
19   the Sunday.  The 19th is the Friday.
20       Does that -- I shall say "refresh,"
21   but does that refresh or freshen your view about
22   whether you saw copies of the clarification
23   letter over the weekend?
24   A.   It's speculation.
25   Q.   Uh-huh.
        TSG Reporting - Worldwide  (877) 702-9580

Page 198

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  A.   I don't remember, but it would have
2  been most likely to have sent to myself the last
3  draft I had.
4     Q.   That you had, okay.
5        Now, tell me what happens-tow lowing
6  is on the Monday, the day the 22?
7     A.   As I recall, yes, very early in the
8  morning.
9     Q.   And where was the closing?
10    A.   At Weil Gotshal.
11    Q.   Did you go to the closing?
12    A.   Yes.
13    Q.   When you got to the closing, when you
14  got to the closing, do you recall if you signed
15  the clarification letter there?  We talked
16  before about whether you might have signed it
17  Sunday night.  But now having gone through this
18  sequence, do you have a better recollection of
19  when you signed it?
20    A.   Both Sunday night and Monday morning
21  were at Weil Gotshal.
22    Q.   Uh-huh.
23    A.   Then it changed locations.  So I went
24  in to Weil Gotshal on Sunday and stayed there

TSG Reporting - Worldwide  (877) 702-9580

Page 199

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  through the night until the closing Monday
2  morning.
3     Q.   Okay.  When you put your signature to
4  the clarification letter, is there a point at
5  which you say to someone, what changes does this
6  make to the deal I signed on the 16th?
7     A.   I don't recall having a conversation.
8  I recall having read that the -- a letter and
9  going through it with counsel from Simpson and
10  Weil Gotshal.
11    Q.   Uh-huh.  Just answer this yes or no.
12  Did you ask about each and every section of the
13  letter before you signed it?
14    A.   Just yes or no?
15    Q.   Yes.
16    A.   No.
17    Q.   Do you know a Beth Rudofker?
18    A.   Yes.  Rudofker.
19    Q.   Who's Beth Rudofker?
20    A.   Beth Rudofker was the head of Audit at
21  Lehman Brothers.
22    Q.   Right.
23    A.   And is now in the Compliance
24  Department at Barclays.

TSG Reporting - Worldwide  (877) 702-9580

Page 200

HIGHLY CONFIDENTIAL - S. BERKENFELD

1     Q.   Is Beth Rudofker a lawyer?
2     A.   No, she's not.
3        (Exhibit 39, e-mail from S. Berkenfeld
4  to Beth Rudofker dated Saturday, September
5  20, at 1:07 P.M., marked for identification,
6  as of this date.)
7     Q.   Mr. Berkenfeld, I've shown you what we
8  have marked as Exhibit 39.  It's a two-page
9  e-mail and it, at the top of the first page, it
10  reflects an e-mail from you to Beth Rudofker
11  dated Saturday, September 20, at 1:07 P.M., and
12  there follows an e-mail chain below that.  Have
13  you had a chance to look through that?
14    A.   Yes.
15    Q.   Do you recall this e-mail exchange
16  with Ms. Rudofker?
17    A.   I don't recall the e-mail exchange.
18    Q.   I note that the earliest of the
19  e-mails, which of course would be the last one
20  on the last page, sent Friday, September 19, at
21  4:46, that is, 16:46, simply says in the subject
22  line, "The whole structure of what we were
23  planning has changed and there is huge
24  confusion."  Do you recall receiving that

TSG Reporting - Worldwide  (877) 702-9580

Page 201

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  message from Ms. Rudofker?
2     A.   I don't, but reading this, I guess I
3  didn't get it till -- it's done in European
4  time.  I didn't respond until 2:28 in the
5  morning.
6     Q.   Okay.  Now, at 2:28 on the morning of
7  Saturday, September 20, the hearing has ended,
8  right?  It ended shortly after midnight.  And
9  presumably because this is a response from you
10  to Ms. Rudofker, you're back in front of a
11  screen of some kind, a BlackBerry or you're in
12  front of a computer screen somewhere.  You're no
13  longer in court, right?
14    A.   I think that's a fair assumption, yes.
15    Q.   And you respond to Ms. Rudofker in
16  response to her note, "The whole structure of
17  what we were planning has changed and there is
18  huge confusion," you write only, "Still,"
19  question mark.  What are you referring to when
20  you write to her?
21    A.   I don't recall.
22    Q.   Okay.
23    A.   I just didn't understand what the
24  issue was.

TSG Reporting - Worldwide  (877) 702-9580

Page 202

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Q.  Well, "still" suggests to me there was
3  a point of confusion that you had some earlier
4  knowledge of?
5  A.  I wouldn't interpret it that way.
6  Q.  How would you interpret it?
7  A.  Just, you know, at this point we still
8  have issues. Not that there was an issue
9  before, just at this point there's still an
10  issue.
11  Q.  Well, as a man who had been working
12  virtually nonstop on this deal since the 15th,
13  doing all-nighters, and you get a message after
14  you've come out of the bankruptcy court that
15  says only, "The whole structure of what we were
16  planning has changed and there is huge
17  confusion," that would have been a matter of
18  some significant concern to you, would it not?
19  MR. STERN: Objection to the form.
20  A.  Not necessarily.
21  Q.  So, as you sit here today, do you have
22  any recollection of learning sometime late
23  Friday, early the Saturday that the whole
24  structure of what you were planning had changed
25  and there was huge confusion?
TSG Reporting - Worldwide  (877) 702-9580

Page 203

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  A.  I don't have any recollection on late
3  Friday. I don't have any recollection early in
4  the morning Saturday. To some extent, you asked
5  me if I know Beth, and I do know Beth, and I
6  would have not necessarily thought that this was
7  a significant issue, knowing Beth.
8  Q.  Okay. Does Beth tend to write -- do
9  you tend to discount a note like that from Beth
10  until you get details; is that what you're
11  telling me?
12  A.  I would characterize Beth as sometimes
13  being somewhat of an alarmist over the many
14  years I've known her, and that a note like this
15  could easily be exaggerated because she might
16  not have been in the loop on something that was
17  being done somewhere else or away from her.
18  So I would not have taken a note from
19  Beth at face value that if she said there's huge
20  confusion, that there truly was huge confusion,
21  that there just might have been confusion in her
22  mind. So that's why I said not necessarily.
23  Q.  All right. Now, let me just focus
24  your attention. If you turn to the first page
25  of the exhibit, which is the last two e-mail
TSG Reporting - Worldwide  (877) 702-9580

Page 204

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  exchanges in the sequence, you write to Beth,
3  "How to reach you?" And she responds with a
4  telephone number, correct?
5  A.  Correct.
6  Q.  Do you recall having a telephone
7  conversation with her on the afternoon of
8  Saturday?
9  A.  I don't recall having it. I would
10  expect that I did because I would have called
11  her, but I don't recall the conversation.
12  Q.  Thanks.
13  (Exhibit 40, a document bearing Bates
14  Nos. STB-LEH0000272 through 277, marked for
15  identification, as of this date.)
16  Q.  We've marked as Exhibit 40, Mr.
17  Berkenfeld, a multi-page document bearing Bates
18  numbers STB-LEH0000272 through 277.
19  Take a look through that and tell me
20  whether you have seen that before. It is, for
21  the record, an e-mail at the top of the -- on
22  the first page it reflects an e-mail from Robert
23  Davis at Cleary Gottlieb to David Murgio at
24  Weil, CC, Alvin Brown, A. Kohn, Archie Cox,
25  others, and sberkenfeld@lehmanbrothers.com?
TSG Reporting - Worldwide  (877) 702-9580

Page 205

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  MR. STERN: This is a fairly lengthy
3  series of e-mails and it's a little
4  difficult to read. Is there a particular
5  section you want to focus on or do you
6  want -- should he just read the whole thing
7  and then --
8  MR. GAFFEY: Actually, most of --
9  Q.  What I would like you to do, Mr.
10  Berkenfeld, is do whatever you need to do to
11  answer the question which you know I'm going to
12  ask, which is have you seen this before. You
13  don't need to study each part of it.
14  MR. GAFFEY: And then I have some
15  questions about the last e-mail in the
16  sequence, Jack. That's the last one at the
17  top of the first page.
18  A.  I don't have any recollection of this
19  independently.
20  Q.  You see there are four numbered items
21  in Mr. Davis' e-mail to Murgio and the people
22  who received copies of this?
23  A.  Yes.
24  Q.  And one of them is an issue you
25  mentioned before, the PIM business. That's an
TSG Reporting - Worldwide  (877) 702-9580

Page 206

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    issue you were -- whether the PIM business was
3    going or not going is an issue that you were
4    addressing in some fashion at this time, right?
5        A.    It was an issue I was involved in.
6        Q.    And there's a reference in Mr. Davis'
7    e-mail to Mr. Murgio about the PIM business
8    including an additional nine real estate leases.
9    Did you get at that level of detail in what or
10   who in the PIM business was moving over?
11       A.    Not to the extent of how many leases
12   were going, but on kind of a broader basis.
13   Were they taking the whole PIM business.
14       Q.    The same question I'll ask you with
15   respect to paragraph 2 that refers to IRA
16   accounts of PIM employees, but no preclosing IRA
17   liabilities?
18       A.    Yeah, I don't recall that issue.
19       Q.    And then there's a reference on the
20   signed contracts, but what I really want to ask
21   you about is paragraph 4:  "The business people
22   at Barclays have yet to confirm to me anything
23   about the new deal," and that's in quotes, "on
24   the tri-party repo you described before."
25            Does that refresh your recollection
         TSG Reporting - Worldwide  (877) 702-9580

Page 207

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    about what whether anybody talked about the
3    Barclays/Lehman tri-party Repurchase Agreement
4    to you?
5        A.    It does not.  This is an e-mail to
6    lots of people who would not have no involvement
7    with that.  Alvin Brown's an employee benefit
8    lawyer, for instance.  That was just, again, not
9    an issue that I was directly involved in.
10       Q.    One of the CCs on this is Archie Cox,
11   who you had described as one of the main
12   Barclays negotiators, correct?
13       A.    Yes.
14       Q.    And you're on there as well.  Who is
15   Richard Smith?  He's on there as well.
16       A.    Richard Smith is a lawyer at Barclays,
17   in-house lawyer.
18       Q.    And you're on this list of several
19   people as well, correct?
20       A.    Yes.
21       Q.    Had you seen this document at or
22   around the time it was sent, September 19, 9:56
23   P.M., and there was a reference to a new deal on
24   a tri-party repo, would that have been an issue
25   that would have caught your attention?
         TSG Reporting - Worldwide  (877) 702-9580

Page 208

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2        A.    I -- I don't know.  Again, this was at
3    9:56 that Friday, so I don't know when I would
4    have seen it.
5        Q.    And --
6        A.    I never focused on it.
7        Q.    -- at 9:56 on Friday, you would have
8    still been in court?
9        A.    I was still in court.
10       Q.    And when you come out of court, you
11   would review your e-mails?
12       A.    Yes.
13       Q.    And any recollection on seeing an
14   e-mail when you came out of court that night
15   that referred to a new deal?
16       A.    I don't even have a recollection of
17   how I got home that night.
18       Q.    Okay.
19            (Exhibit 41, a document bearing Bates
20       Nos. 10266839 with attachment, marked for
21       identification, as of this date.)
22       Q.    Mr. Berkenfeld, I have put before you
23   what we have marked as Exhibit 41, an e-mail
24   from Anthony Collerton to Steven Berkenfeld
25   entitled "Retention Est.xls," and it's got a
         TSG Reporting - Worldwide  (877) 702-9580

Page 209

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    spreadsheet attached to it, sent on Monday,
3    September 15th, at 4:26 P.M. GMT, which I'm told
4    would put it at about 26 minutes past noon.
5    There's a four-hour forward time difference, I'm
6    just telling you.
7        A.    This is when our e-mail switched over
8    to Barclays or something?
9        Q.    You know, it's either that or -- yeah,
10   I don't know.  I don't know.  I just know it's
11   GMT.
12       A.    Okay.
13       Q.    And what Mr. Collerton appears -- do
14   you recall communicating with Mr. Collerton at
15   that time very early on on September 15 about
16   retention issues?
17       A.    I do.
18       Q.    And Mr. Collerton had some HR function
19   at Lehman; is that correct?
20       A.    Yes, he was one of the senior HR
21   people.
22       Q.    And he's sharing what he calls here
23   some really rough thoughts on retention payments
24   and severance.  Do you see that?
25       A.    Yes.
         TSG Reporting - Worldwide  (877) 702-9580

Page 210

HIGHLY CONFIDENTIAL - S. BERKENFELD
1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   Q.   Do you recall this particular e-mail
3   or the spreadsheet?
4   A.   Not specifically.
5   Q.   Do you have a more general
6   recollection of communicating with Mr. Collerton
7   about such issues as retention and severance?
8   A.   Yes.
9   Q.   Okay.  I can see from his title why
10   he's in that conversation.  Why are you in it?
11   A.   After the bankruptcy and, as I
12   mentioned earlier, a lot of issues that were
13   going on included how to deal with employees --
14   Q.   Uh-huh.
15   A.   -- and how to manage Lehman if we were
16   really just going to be in bankruptcy and trying
17   to do -- I'll put this in quotes, please -- an
18   orderly wind-down is being requested of us from
19   the regulators.  We didn't have any idea what
20   that meant, how we could possibly do an orderly
21   wind-down, but we were trying to do the best we
22   could.
23        What we needed to try to calculate is
24   how you get people to stick around and be part
25   of an orderly wind-down.  So some of the
    TSG Reporting - Worldwide  (877) 702-9580

Page 211

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   discussions I had over those couple of days is
3   what's our, you know, biweekly payroll that
4   we're paying out, how much cash would you need
5   to be able to keep people employed over two-week
6   periods so that you could keep them in their
7   seats, engaged in whatever was necessary for us
8   to do as we were sort of figuring it out.
9        So this would have been an analysis
10   that was done assuming that we were in
11   bankruptcy and we had all these positions and we
12   needed to wind them down and what would it take
13   to keep people from, without trying to be overly
14   dramatic, taking their stuff, putting it in
15   boxes, and walking out of the building at
16   midnight Sunday night.
17   Q.   If you would take a look at the
18   schedule that is annexed to Mr. Collerton's
19   e-mail to you, I guess the issue you're talking
20   about, keeping people in their seats for the
21   next couple of weeks for an orderly wind-down,
22   but this document appears to be talking in terms
23   of bonus amounts and calculation of 50 percent
24   of prior year bonus, that type of thing, if
25   you'll look across the headings at the top, you
    TSG Reporting - Worldwide  (877) 702-9580

Page 212

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   see that?
3   A.   Yes.
4   Q.   And it's divided between two
5   categories of entities.  There would be entities
6   under Holdings.  I take it that's LBIH, right?
7   And the LBI categories, Lehman Brothers, Inc.
8   categories, yes?
9   A.   Yes.
10   Q.   And as you look at this, this e-mail
11   that -- I'm sorry, this spreadsheet that Mr.
12   Collerton sent to you, do you see that there's,
13   in column E, there's a calculation called bonus?
14   A.   Yes.
15   Q.   All right.  And the entities that are
16   listed in column B, "CORP," "EQ," "FID," that's
17   corporate equities, fixed income, investment
18   banking, investment management, those are
19   different divisions of Holdings and LBI,
20   correct?
21   A.   Yes.
22   Q.   And the bonuses that are set out in
23   Exhibit E for LBI appear to total $2.163
24   billion, do you see that?
25   A.   No, I don't.  I'm sorry.  I lost you.
    TSG Reporting - Worldwide  (877) 702-9580

Page 213

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   Q.   Column E?
3   A.   Yeah.
4   Q.   Grand total at the bottom of the LBI
5   box, $2,163,511,000?
6   A.   2,163,000,000.
7   Q.   You with me?
8   A.   Yes.
9   Q.   And the total as between both Holdings
10   and LBI comes to 2.4 billion in comp, correct?
11   A.   Yes.
12   Q.   Now, to your knowledge, is this broken
13   down at all by the categories of employees who
14   would transfer to Barclays?  I mean, did all
15   these business units go over to Barclays?
16   A.   I don't think this had anything at all
17   to do with Barclays in terms of transfers.  I
18   don't even know if this was -- that just the
19   U.S. or global or how many businesses it
20   included that weren't going to be moving over.
21   I don't know.
22   Q.   Right.  Well, what I think it does
23   indicate, or tell me if you agree or disagree
24   with me, is whatever it is this spreadsheet is
25   about, it's not about paying people for the next
    TSG Reporting - Worldwide  (877) 702-9580

Page 214

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  two weeks, right?
3      A.  No.
4      Q.  So --
5      A.  But I was not answering specifically
6  around the schedule when I answered that
7  question.  It was specifically about some of the
8  issues we were trying to resolve.
9      Q.  Okay.  Okay.  And the reason I wanted
10  to move you into the schedule is because I want
11  to ask were you talking to Mr. Collerton at or
12  around September 15 about what the bonus number
13  would need to be for employees that Barclays
14  wanted to retain?
15      A.  No, I was not.
16      Q.  Do you have any knowledge as to why
17  Mr. Collerton was sending you a spreadsheet
18  entitled "Potential Retention and Severance
19  Estimates" that calculated bonus and then such
20  things as one-third of population get 50 percent
21  of prior year's bonus?
22      A.  I don't know for sure.  I'm
23  speculating that we were thinking that we needed
24  one-third of the staff to manage the bankrupt
25  entity and you had to pay them a bonus to keep
        TSG Reporting - Worldwide  (877) 702-9580

Page 215

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2  them to stay.
3      Q.  Would you pay them 50 percent of their
4  prior year's bonus to stay for a couple of weeks
5  for an orderly wind-down?
6      A.  I don't think we were making an
7  assessment about what it would take.  We were
8  just trying to plug some numbers and see what it
9  would look like.  No one had made a decision
10  that anyone was going to be paying 50 percent.
11      As time went by, which we didn't have
12  as of Monday, we had the benefit of A & M coming
13  in here and taking on a significant role and
14  deciding who they needed and who they didn't
15  need to.  And I have no idea how many people
16  they actually have employed.
17      But as of Monday, in conversations
18  with Anthony, it's like, we're bankrupt, what do
19  we do and how do we manage this thing?  And so a
20  lot of my time over the first few days was spent
21  trying to figure these things out.
22      Q.  Okay.  Was any of your time, though,
23  spent on trying to come up with a calculation of
24  how much would have to be set aside for bonuses
25  for transferred employees in respect of their
        TSG Reporting - Worldwide  (877) 702-9580

Page 216

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2  service at Lehman?
3      A.  No, it was not.
4      Q.  At all?  Ever?
5      A.  I don't recall any involvement in any
6  discussion like that.
7      Q.  You give that answer with a degree of
8  certitude.  The document suggests that Mr.
9  Collerton seems to think you're interested in
10  calculating what the bonuses would be for all
11  the employees, and I say it that way just to see
12  if it refreshes your recollection about whether
13  you were having any discussion with Mr.
14  Collerton about coming up with a way to
15  calculate what would be needed for bonuses for
16  transferred employees once they were at
17  Barclays?
18      A.  I did not have the conversation with
19  Anthony that I recall about any bonuses for
20  transferred employees.  Just by way of specific
21  example, I believe LBB stands for Lehman
22  Brothers Bank, which was never part of the
23  transaction at all with Barclays.
24      Q.  So it's possible when you see "LBB" on
25  here that these calculations that -- let's talk
        TSG Reporting - Worldwide  (877) 702-9580

Page 217

1      HIGHLY CONFIDENTIAL - S. BERKENFELD
2  about the LBI section of that spreadsheet.  LBI
3  begins with "CORP," ends with "PS," and comes to
4  the $2,163,000,000 number?
5      A.  Uh-huh.  Yes.
6      Q.  And LBB is included in there, so
7  that's 6 billion of it, or closer to 7 billion
8  of it, right?
9      A.  No, that's 6 million.
10      Q.  6 million, okay.
11      A.  7 million.
12      Q.  Let's just use that as an example.
13  That's an entity that was not contemplated as
14  going over to Barclays and did not go over to
15  Barclays in the deal that was discussed
16  post-bankruptcy, correct?
17      A.  I believe that the bank could not move
18  over for regulatory reasons and was never
19  contemplated that it would.
20      Q.  Okay.  And in the week prior to the
21  bankruptcy filing, there had been discussions
22  between Barclays and Lehman.  I think you said
23  they were merger discussions, but they
24  contemplated a combination of all of Lehman
25  globally with Barclays, correct?
        TSG Reporting - Worldwide  (877) 702-9580

Page 218

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   Well, I do not recall what would have
3    been done with some of the assets that created
4    regulatory issues.  There might have been
5    provisions in there of divestitures and things
6    like that.  I don't know.
7    Q.   But at a more general level, the
8    discussion is going on before the bankruptcy is
9    a global combination and the discussion going on
10   after the bankruptcy is North American
11   operations only, correct?
12   A.   On a global basis, before the
13   bankruptcy, it was a merger and an acquisition
14   of the holding company.
15   Q.   Okay.
16   A.   And after the bankruptcy, and that
17   might have taken many complicated forms,
18   depending on what assistance was going to be
19   provided by the federal government or the rest
20   of Wall Street, so it's hard to say this is what
21   the structure would have been before.  But
22   afterwards, it was a discussion about
23   principally about buying U.S. investment banking
24   and capital markets businesses.
25   Q.   In the period before the bankruptcy,

TSG Reporting - Worldwide  (877) 702-9580

Page 219

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    when the more worldwide, the global discussions
3    were on the table, was there, to your knowledge,
4    any calculation of what the global bonus accrual
5    might be?
6    A.   Not that I know of.
7    Q.   To your knowledge, is the schedule
8    that's attached to this exhibit a calculation of
9    what the global bonus liability was for LBI and
10   put to the 2,163,000,000?
11   A.   Repeat the question.  I'm sorry.
12   Q.   The 2,163,000,000 number that we
13   focused on before for LBI, is that a, to your
14   knowledge, is that a calculation of the global
15   accrual, the accrual for employees around the
16   world, not just North America?
17   A.   I have no knowledge of what that
18   number is.
19   Q.   Do you have any recollection of any
20   conversations with Mr. Collerton about this
21   potential retention and severance estimates
22   spreadsheet that he sent to you on September 15?
23   A.   I don't specifically recall the
24   conversation.  I do recall having conversations
25   with Anthony about how we would manage as a

TSG Reporting - Worldwide  (877) 702-9580

Page 220

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    bankrupt entity and how we would deal with the
3    employee issue.
4    Q.   Okay.  Did you have discussions with
5    Anthony about which employees would transfer
6    from Lehman to Barclays as part of the
7    post-bankruptcy transaction?
8    A.   I don't know if the discussions were
9    with Anthony.  As I mentioned earlier, I had
10   discussions with HR, could have been Ros Coffey,
11   who was our HR representative, I don't know,
12   about which employees from Legal, Compliance and
13   Audit would transfer over, but did not have a
14   conversation about transfer of employees
15   generally, other than, again, throughout this
16   week there were specific discussions around
17   things like Eagle Energy, the Israeli office,
18   Canada.
19   Q.   Right.
20   A.   Kind of one-off discussions.  And
21   those discussions did not, in my recollection,
22   include the issue of accrued bonus or comp.
23   Q.   The reason I'm showing you this
24   document and maybe a couple others that I will
25   show you is to see if it refreshes your view,

TSG Reporting - Worldwide  (877) 702-9580

Page 221

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    your recollection about whether any of the work
3    you did played a role in the calculation of that
4    $2 billion comp number we saw on the September
5    16 financial schedule that you signed.
6    A.   To my knowledge, it did not.
7    (Exhibit 42, a document bearing Bates
8    Nos. 10283125 with attachment, marked for
9    identification, as of this date.)
10   Q.   Now, I have put before you, Mr.
11   Berkenfeld, a document marked Exhibit 42, an
12   e-mail from Eric Umlauf to Steven Berkenfeld and
13   others at Lehman entitled "LB Cash Flow
14   Forecast_150908.xls - for our discussion," and
15   there's an attachment, which is also reproduced
16   here.
17   Have you seen this document before?
18   A.   I don't specifically recall it.
19   Q.   Do you have a general recollection of
20   seeing it?
21   A.   General recollection I think I do
22   have.
23   Q.   And what's your general recollection
24   of the circumstances under which you were sent
25   this document and why it was sent to you?

TSG Reporting - Worldwide  (877) 702-9580

Page 222

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.  I think that this document, again, was
3    to help us calculate what cash we were going to
4    have available to continue to operate in
5    bankruptcy.
6    Q.  When Mr. Umlauf refers to "for our
7    discussion" in the subject, does that trigger
8    your recollection as to whether there was a
9    discussion with him or others in which you were
10   involved about the spreadsheet?
11   A.  No, it doesn't trigger a special
12   recollection.
13   Q.  Could you take a look at the
14   spreadsheet, if you would, and the first page of
15   it, in particular.  Now, down under -- in line
16   number 12, where it says Payroll, September
17   2008, local employees only, and you have got a
18   $4,267,000 number there.  You with me?
19   A.  Which number?
20   Q.  12.
21   A.  A 12, yes.
22   Q.  Now, is that the type of thing you
23   were talking about, what's my payroll for the
24   next couple of weeks while we get this,
25   quote/unquote, orderly wind-down done?
     TSG Reporting - Worldwide  (877) 702-9580

Page 223

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.  Generally, yes.  I don't remember
3    discussion on things like travel and
4    entertainment and whatnot.  So I don't remember
5    any specific conversation on this.  Just looking
6    at these items, some of it just doesn't make
7    sense to me, so I don't recall discussion
8    actually working through these items.  I'm not
9    sure who we were entertaining then.
10   Q.  Who you were, I'm sorry?
11   A.  Who we were entertaining then.
12   Q.  Other than the world at large,
13   perhaps, but I take it the golf stuff had all
14   stopped and the --
15   A.  Yes.  So I don't know what we ever did
16   with this and what the conclusion that came from
17   it, and I don't recall specific discussions
18   among this group about it.
19   Q.  So I take it you're not the guy I
20   should ask about why Charles Tyrwhitt
21   Shirtmakers are on the list of contracts?
22   A.  Were they listed as a -- what's the
23   expression here?  Critical unpaid vendor or
24   non-critical?
25   Q.  That I don't know.  I'm done with
     TSG Reporting - Worldwide  (877) 702-9580

Page 224

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    that.
3        (Exhibit 43, a document bearing Bates
4    Nos. 10270558, marked for identification, as
5    of this date.)
6    Q.  Marked as Exhibit 43, Mr. Berkenfeld,
7    is an e-mail from you to Tracy Binkley.  It's a
8    one-page document bearing document number
9    10270558, and it reflects an e-mail exchange
10   starting with an e-mail from Ms. Binkley to you
11   and your response to her.  Would you read
12   through that, please?
13   A.  You want me to read -- what do you
14   want me to read?
15   Q.  Just read it enough to tell me whether
16   you remember seeing the document.
17   A.  Yes.  I have.
18   Q.  You do remember seeing it?
19   A.  Do I remember this document?  No, I
20   don't have a specific recollection of this
21   document.
22   Q.  In the bottom e-mail, Ms. Binkley
23   writes to you on the night of -- at about 11
24   minutes after 5 P.M. on September 18, an e-mail
25   entitled "A schedule referred to in the Purchase
     TSG Reporting - Worldwide  (877) 702-9580

Page 225

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    Agreement," and she writes, "The HR director at
3    Barclays called to try to get a schedule that
4    was supposed to be initialed by the parties and
5    is a financial schedule related to bonuses
6    (accrued '09 FY liability).  It sounds like his
7    team is concerned about getting that document
8    before closing.  Do you know what he's referring
9    to and where to get his hands on it?"  And then
10   you respond to Ms. Binkley, "I don't.  Check
11   with Bart and Skip."
12       Do you recall her asking you for a
13   copy of the 9/16/08 financial schedule?
14   A.  I don't specifically recall.
15   Q.  Do you recall the financial schedule
16   going missing for a while and a lot of people
17   asking for it?
18   A.  No.
19   Q.  Why, as best you can tell, would you
20   have told Ms. Binkley to check with Bart and
21   Skip?
22   A.  I think that I would probably
23   characterize this as a misunderstanding or
24   miscommunication.
25   Q.  Okay.
     TSG Reporting - Worldwide  (877) 702-9580

## Page 226

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2     A.   Coming from Tracy Binkley, who was one
3  of the co-heads of HR, I don't know -- I don't
4  remember exactly whether Anthony reported to her
5  or vice-versa, but they were the two senior
6  people in human resources, so she was looking
7  for a financial schedule related to bonuses.
8          I didn't consider that schedule, the
9  exhibit that we were referring to before,
10  remember, Exhibit 19, I would never have
11  described that as a financial schedule related
12  to bonuses. To me that sounded like an actual
13  human resource produced document about what
14  bonuses were going to be paid out to who.
15     Q.   Uh-huh.
16     A.   So I thought she was asking for
17  actually a schedule of bonuses as opposed to a
18  financial schedule related to bonuses because
19  there would be no reason for her to have that
20  whole schedule just for that one item or for the
21  director, HR director at Barclays, to need that
22  whole schedule of assets and liabilities to know
23  what the, quote/unquote, accrued '08 FY
24  liability was.
25          So I thought she was asking for some

TSG Reporting - Worldwide  (877) 702-9580

## Page 227

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  sort of actual schedule of bonuses that might
3  have been part of this discussion between the
4  business people about how you were going to
5  compensate and retain employees, and that was
6  not anything that I was aware of.
7     Q.   Okay. You didn't understand that to
8  mean the one-sheet financial schedule we were
9  talking about before?
10     A.   It wouldn't have made sense to me that
11  Tracy would be asking for that schedule just for
12  that information. It seemed, again, within the
13  context of knowing Tracy, I read it to
14  understand that she was looking for actually
15  some sort of schedule of bonuses.
16          (Exhibit 44, a document bearing Bates
17     Nos. 459686, marked for identification, as
18     of this date.)
19     Q.   You have before you what we've marked
20  as Exhibit 44, a one-page document bearing
21  number 459686, an e-mail from Beth Rudofker to
22  you, Ian Lowitt, Alastair Blackwell, Bridget
23  O'Connor, with a copy to Bart McDade.
24          Take a look through it and tell me
25  whether you remember seeing this document

TSG Reporting - Worldwide  (877) 702-9580

## Page 228

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  before.
3     A.   I don't specifically recall this
4  document.
5     Q.   Do you have a general recollection of
6  it?
7     A.   Not of this document, no.
8     Q.   Can you tell me who Bridget O'Connor
9  is?
10     A.   Bridget O'Connor was the head of
11  technology at Lehman.
12     Q.   And in this e-mail Ms. Rudofker writes
13  to you, "Here's what I think we are around --
14  here's where I think we are around big issues,"
15  and then lists three of them with some
16  subheadings, right? The first one, complete
17  purchase agreement, refers to a Barclays
18  assessment of mortgage TBA risk in a DTC box, et
19  cetera, et cetera.
20          Do you have any idea what that's
21  referring to?
22     A.   I do not.
23     Q.   At all?
24     A.   At all.
25     Q.   The second with regard to "Day 1

TSG Reporting - Worldwide  (877) 702-9580

## Page 229

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  business," the second item below there says,
3  "Resolve 15c3 lockup. Meetings happening now."
4  Do you see that?
5     A.   Uh-huh.
6     Q.   Do you know what --
7     A.   Yes, I do.
8     Q.   -- that's a reference to?
9     A.   To the 15c3 issue mentioned before,
10  but I don't have any specifics around what the
11  issue was.
12     Q.   Does this refresh your recollection as
13  to what the 15c3 issue was?
14     A.   No, it does not.
15     Q.   As you sit here today, do you have any
16  idea, any clue what the 15c3 issue was?
17     A.   No, I do not.
18          (Exhibit 45, a one-page e-mail from
19     Ian Lowitt to Steven Berkenfeld, Bart
20     McDade, Alex Kirk, Paolo Tonucci, CC to
21     James Seery, dated 9/22/08 at 7:23 A.M.
22     entitled "Looks Like We're All Set," marked
23     for identification, as of this date.)
24     Q.   Mr. Berkenfeld, Exhibit 45, which is
25  before you, is a one-page e-mail from Ian Lowitt

TSG Reporting - Worldwide  (877) 702-9580

Page 230

HIGHLY CONFIDENTIAL - S. BERKENFELD

1     HIGHLY CONFIDENTIAL - S. BERKENFELD
2  to Steven Berkenfeld, Bart McDade, Alex Kirk,
3  Paolo Tonucci, CC to James Seery, dated 9/22/08
4  at 7:23 A.M. entitled "Looks Like We're All
5  Set."
6          Do you recall this e-mail?
7     A.  I do.
8     Q.  Okay.  There's two e-mails in there.
9  There's the one from you to McDade, Lowitt, et
10 al., to which Mr. Lowitt responds, "Hooray!!!
11 Ian." It's the original one I want to ask you
12 about:  "JPMorgan blinked.  They agreed to
13 cancel the $7.4 billion collateral purchase.  We
14 are starting the closing."
15         What did you mean when you wrote
16 "JPMorgan blinked"?
17    A.  A few things about this.  One, if Bart
18 and Ian were no longer at Weil, which this
19 implied, I'm e-mailing it to them, they had gone
20 home, might have again meant I was the only one
21 available to sign anything when the closing came
22 around, if the clarification was signed at
23 Monday morning.  I don't remember when it was,
24 but one more reason why I would have been forced
25 to sign it.
          TSG Reporting - Worldwide  (877) 702-9580

Page 231

1     HIGHLY CONFIDENTIAL - S. BERKENFELD
2     I have also mentioned before that
3  there was this negotiation going on away from us
4  between JPMorgan and Barclays that Lehman was
5  not a part of and we were wondering whether it
6  was going to disrupt the transaction and prevent
7  the closing.
8          At 7:19 in the morning, or
9  thereabouts, we finally had a resolution between
10 JPMorgan and Barclays on that issue.  The
11 details of it I don't remember much more than
12 what this says, I just don't have a
13 recollection, but it was to tell them what was
14 holding up the closing, which was the dispute
15 with JPMorgan, there had been a concession,
16 there had been an agreement, and we're starting
17 the closing process.
18    Q.  Your e-mail refers to JPMorgan saying,
19 "They agreed to cancel the $7.4 billion
20 collateral purchase."  Do you know anything more
21 about what the JPMorgan issue was than it
22 involved $7.4 billion collateral purchase?
23    A.  Sorry.  I don't recall at this point.
24    Q.  Any recollection at all of a $7.4
25 billion issue holding up your closing?
          TSG Reporting - Worldwide  (877) 702-9580

Page 232

1     HIGHLY CONFIDENTIAL - S. BERKENFELD
2     A.  I remember that the collateral issue
3  between JPMorgan and Barclays was holding up the
4  closing, but we were kept out of the discussion,
5  so I didn't know much about the details then and
6  I don't recall much more about it now.
7     Q.  When you learned that it had been
8  resolved, did you learn any information other
9  than it was resolved?
10    A.  Not that I recall.
11    Q.  Did you learn any details of any
12 agreement between Barclays and JPMorgan?
13    A.  No, I don't believe that I have.
14    Q.  Even if as you sit here now yet you
15 don't have a firm recollection of what it was,
16 do you remember if you did have a firm
17 recollection, you know, a better, a more
18 detailed grasp of what the issue was at the
19 time?
20    A.  I'm confident I had a better
21 recollection of the issue at the time.
22    Q.  Uh-huh.
23    A.  Had been around there in a lot of dead
24 time all night and had been an observer of some
25 bigger conference calls that had happened, but I
          TSG Reporting - Worldwide  (877) 702-9580

Page 233

1     HIGHLY CONFIDENTIAL - S. BERKENFELD
2  couldn't provide any more insight at this point,
3  and there were many people who were much, much
4  closer to the issues than I was who could give
5  you more.
6         (Exhibit 46, a document bearing Bates
7      Nos. BCI-CG00034704 through 34707, marked
8      for identification, as of this date.)
9     Q.  I've given you, Mr. Berkenfeld, what
10 we have marked as Exhibit 46, a document bearing
11 Bates Nos. BCI-CG00034704 through 707, which on
12 its first page reflects an e-mail from Harvey
13 Miller at Weil.com to Lindsee Grandfield at
14 CGSH.com, entitled "Barclays/Lehman (JPMorgan),"
15 and below that you'll see an e-mail from Lindsee
16 Grandfield to Harvey Miller, copy to Bart
17 McDade, Joanne Pflaum, Lori Fife, Michael
18 Lubowitz, Richard Krasnow, Rod Miller,
19 sberkenfeld@lehman.com, and some others.
20         Would you take a look through that
21 e-mail, Mr. Berkenfeld, and tell me if it
22 refreshes your recollection about what the
23 nature of the issue was with JPMorgan in light
24 of an e-mail, you know, in light of the e-mail
25 that Cleary Gottlieb is spending to you and
          TSG Reporting - Worldwide  (877) 702-9580

Page 234

1   **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2   others about the issue?
3       A.   Okay.
4       Q.   Does that refresh your recollection
5   about what the JPMorgan issue may have been?
6       A.   Somewhat.
7       Q.   Okay.  How does it refresh your
8   recollection?
9       A.   I just remember more that some of the
10  impediment to the original transaction that we
11  had come up with and we agreed to in the Asset
12  Purchase Agreement was perhaps best put more
13  conceptual than practical and that we didn't
14  really have a time to figure out how it was
15  going to work to transfer all these assets and
16  liabilities and how the clearing bank's role
17  would be affected and what -- if it had liens on
18  the assets and all the complications around
19  JPMorgan being our clearing agent for our
20  securities transactions.
21      Q.   Did Lehman have to make any concession
22  or change with respect to what it was giving
23  Barclays as a result of the JPMorgan piece that
24  we're talking about now?
25      A.   I don't know.
TSG Reporting - Worldwide   (877) 702-9580

Page 235

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2       Q.   Have any recollection of Lehman having
3   to agree to give 7 billion in cash to Barclays?
4           MR. STERN:  I'll object to the form.
5       A.   Between bankruptcy and the closing?
6       Q.   Yes.
7       A.   I don't recall whether we had to give
8   additional cash to JPMorgan during that time
9   period.
10      Q.   Not JPMorgan.  To Barclays.
11      A.   I think you asked JPMorgan.
12      Q.   Then I got it wrong.  That's okay.
13  I'll give you a new question and we'll have a
14  question and answer on the transcript.
15          Do you recall if Lehman agreed to give
16  Barclays 7 billion in cash?
17          MR. STERN:  Objection to the form.
18      A.   I don't recall and I would -- wasn't
19  part of the direct participation in these
20  negotiations.
21          (Exhibit 47, a document bearing Bates
22  Nos. BCI-CG00035134 through 35955, marked
23  for identification, as of this date.)
24          MR. STERN:  Given the size of this
25  exhibit, are there any particular sections
TSG Reporting - Worldwide   (877) 702-9580

Page 236

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   you want to focus his attention?
3           MR. GAFFEY:  Yeah, the e-mail.  I
4   don't need to go into the -- most of that
5   exhibit is the --
6           MR. STERN:  The e-mails start on --
7           MR. GAFFEY:  -- attachment.
8           The e-mails start at 35137, Jack.
9   That's the last page.
10      Q.   Mr. Berkenfeld, we've marked as
11  Exhibit 47 a quite large document bearing Bates
12  Nos. BCI-CG00035134 through 35955, and it
13  consists of an e-mail of a couple of pages and
14  then a large set of -- a large spreadsheet
15  that's attached to it.
16          Do you recall receiving this e-mail
17  entitled "Delivering other assets to Barclays,"
18  which is the name of each of the e-mails in the
19  chain?
20      A.   Right, I don't specifically recall
21  this e-mail, no.
22      Q.   These e-mails all are dated on
23  Saturday the 20th, with the earliest of them
24  being 20 September 2008 at 11:29.
25          MR. STERN:  No.  No.  No.  Wait.
TSG Reporting - Worldwide   (877) 702-9580

Page 237

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2           MR. GAFFEY:  Yeah.
3           MR. STERN:  11:22.
4           MR. GAFFEY:  I beg your pardon.
5   You're right.
6       Q.   The earliest is from Paolo Tonucci to
7   Rod Miller, Azerad, et cetera, et cetera, and
8   ultimately this winds up being forwarded to the
9   V. Lewkow at Cleary.
10          Do you recall generally on the
11  Saturday, the 20th, an issue about delivering
12  other assets to Barclays?
13      A.   I recall generally an issue of we've
14  got some mechanical issues to deal with on some
15  of this stuff --
16      Q.   Okay.
17      A.   -- and we've got to figure out how to
18  do that.  And that was something that, as we
19  worked through our verticals, was going to be in
20  the hands of finance working with Rod Miller.
21  And I actually do recall arranging to have Rod
22  Miller, a lawyer at Weil Gotshal, at the request
23  of finance guys, being kind of a dedicated
24  lawyer for these sort of issues with Finance.
25      Q.   And by "Finance," you mean Paolo
TSG Reporting - Worldwide   (877) 702-9580

Page 238

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Tonucci?
3        A.   I mean everyone on this list, Robert
4    Azerad and Lowitt, Dan Fleming.  They were all
5    members of the Finance Division.  So I do recall
6    them saying we have these mechanical issues,
7    it's complicated, we need help, who can we rely
8    on, and arranging to have Rod Miller be their
9    point person.
10       Q.   Did your understanding at the time go
11   any deeper than there were mechanical issues?
12   Did you know the nature of the issues?
13       A.   Very superficially.
14       Q.   Now, within the chain of e-mails, and
15   I guess I'm on page BCI35135, there's an e-mail
16   from Miller to Tonucci, copy Azerad, Fleming,
17   Berkenfeld, subject, "Delivering other assets to
18   Barclays," and it says, "We still have the 50
19   percent of residentials to transfer at closing,
20   right?  Those were not thrown into the repo,
21   right?"  Do you see that?
22       A.   Yes.
23       Q.   Any clue what that means?
24       A.   No.
25       Q.   At all?
     TSG Reporting - Worldwide  (877) 702-9580

Page 239

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        A.   Well, I had a clue that we're talking
3    about the resis that were -- excuse me.
4        MR. STERN:  Objection to form.  The
5    question is whether he has any clue?  Object
6    to the form.
7        A.   Do I have any clue?
8        Q.   Any idea of what that means?
9        A.   I have no idea.  Clue just might be
10   that it refers to the resi provisions that had
11   been in the Asset Purchase Agreement and it was
12   the issue of transferring 50 percent of the
13   resis.
14       Q.   Now, that 50 percent resi provision in
15   the Asset Purchase Agreement came out in the
16   clarification letter, do you recall that?
17       A.   I do recall that.
18       Q.   Okay.  So would you have known the
19   answer to this question, "Do we still have the
20   50 percent of residentials to transfer at
21   closing?"
22       A.   At that point in time I would not have
23   known the answer to that.
24       MR. GAFFEY:  Let's take a five-minute
25   break.
     TSG Reporting - Worldwide  (877) 702-9580

Page 240

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        (Recess; Time Noted:  3:23 P.M.)
3        (Time Noted:  3:30 P.M.)
4        MR. GAFFEY:  I have no further
5    question.)
6    EXAMINATION BY
7    MR. OXFORD:
8        Q.   Mr. Berkenfeld, we met off the record
9    earlier.  My name is Neil Oxford.  I'm with
10   Hughes, Hubbard & Reed and we represent the SIPA
11   Trustee.
12       As Mr. Gaffey said, he's given you the
13   gift of time and he's asked a lot of questions
14   that I was going to ask, so I will try and not
15   ask any of the questions he's already asked, but
16   apologize in advance if I do retread some
17   ground.
18       MR. STERN:  He did use the term
19   "gift."  It doesn't really feel like a gift,
20   but go ahead.
21       MR. OXFORD:  Perhaps not --
22       A.   I wasn't sure what he was referring to
23   when he said that.
24       Q.   Perhaps not when he gives it to me,
25   it's not.
     TSG Reporting - Worldwide  (877) 702-9580

Page 241

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Mr. Berkenfeld, you said that you did
3    not recall hearing about any changes in the
4    terms of the deal between the signing of the APA
5    on the 16th and the 19th of September until such
6    time as you got into court?
7        MR. STERN:  Objection to the form.
8        Q.   Is that a fair statement of your
9    testimony?
10       MR. STERN:  Objection to the form.
11       A.   I think it would be fair to say that I
12   wasn't aware of significant financial changes to
13   the deal.  I knew and, as I testified, that
14   there were discussions going on around what
15   businesses would be included and some of the
16   other non-financial elements, but I didn't know
17   about specific changes to the financial deal, I
18   think, until court.  But I don't recall.  I
19   don't recall knowing about it beforehand.
20       Q.   Okay.  Tell me what you recall
21   learning in court that day on the 19th.
22       MR. STERN:  Objection to the form.
23       Q.   My question is specifically with
24   respect to the financial changes to the deal as
25   reflected in the APA?
     TSG Reporting - Worldwide  (877) 702-9580

Page 242

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2        A.   I think I principally learned about
3    the size of the bucket of assets and liabilities
4    that were being transferred over.
5        Q.   What --
6        A.   The amount of them.
7        Q.   **What did you learn about the size of**
8    **the bucket?**
9        A.   That it had been -- the overall
10   quantum had changed from the 72 billion or so to
11   the 42 billion or so.
12       Q.   **Did you understand that the balance**
13   **between assets purchased and liabilities assumed**
14   **were still roughly equal as it was under the**
15   **APA?**
16       MR. STERN: Objection to the form.
17       A.   I understood that there was rough
18   equivalency in the amounts of assets and
19   liabilities. Not between the signing and what
20   happened at the hearing, but between the assets
21   and the liabilities.
22       Q.   **Do you remember which lawyers were in**
23   **court making those disclosures?**
24       A.   I recall Harvey Miller and Lori Fife
25   presenting to the court.

TSG Reporting - Worldwide  (877) 702-9580

Page 243

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        Q.   **Do you recall anybody else presenting**
3    **to the court?**
4        A.   I vaguely recall that there was
5    another Weil Gotshal lawyer presenting to the
6    court. I don't remember which one. Might have
7    been Shai. I may have that wrong.
8            There were certainly presentations to
9    the court by a number of lawyers, Mr. Novikoff,
10   he presented to the court. There was lawyers
11   Creditors Committee. There was lawyers for
12   SIPAC. I believe there might have been lawyers
13   for Hughes Hubbard. I don't recall all of them,
14   but there was a lengthy proceeding.
15       Q.   **Do you recall at some point that there**
16   **was a break in proceedings and Judge Peck went**
17   **off the record to allow the terms of the deal to**
18   **be explained to the gallery?**
19       A.   I don't recall Judge Peck going off
20   the record and him being present.
21       Q.   **Do you remember him going off the**
22   **bench?**
23       A.   I recall him leaving the bench at some
24   point and I do recall some meeting between the
25   Weil Gotshal lawyers, and I don't know who else

TSG Reporting - Worldwide  (877) 702-9580

Page 244

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    was involved, but representatives of the
3    creditors.
4        Q.   **Were you present for that meeting?**
5        A.   I was not.
6        Q.   **What were you doing at this time?**
7        A.   I was in the courtroom or in the
8    hallways.
9        Q.   **Who else from Lehman was present in**
10   **court? And I'm not talking about outside**
11   **counsel at the moment. I'm talking about the**
12   **business people.**
13       A.   I will tell you Hillary Clinton -- not
14   Hillary, Chelsea Clinton was there.
15           From Lehman, Bart McDade, Jim Seery,
16   Mark Shapiro. Mike Konigsberg was there. J.F.
17   Astier was there. Kevin Genirs was there. The
18   last three in more of just an observer role.
19           Who else was there? I don't recall
20   anyone else specifically.
21       Q.   **What role was Mr. McDade there in?**
22       A.   Bart was there as a representative of
23   Lehman Brothers and his testimony was being
24   proffered to the court.
25       Q.   **What about Mr. Seery, what role was he**

TSG Reporting - Worldwide  (877) 702-9580

Page 245

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    **there fulfilling?**
3        A.   I'm not sure Jim was there in any
4    formal capacity.
5        Q.   **Same question for Mr. Shapiro?**
6        A.   I don't think Mark was there in any
7    formal capacity either. I think that both of
8    them and myself had been involved in various
9    aspects of the transaction, and frankly, that's
10   where the action was that day and we felt that
11   we wanted to witness it and thought we should be
12   there in case it was necessary for us to be
13   there.
14       Q.   **On the Barclays side, do you recall**
15   **who was in court for Barclays?**
16       A.   Barclays' counsel was there from
17   Cleary, and I recall that Archie Cox and Michael
18   Klein were in the courtroom. I don't have a
19   recollection of anyone else from Barclays being
20   there.
21       Q.   **And where physically in the courtroom**
22   **were you? Were you in Judge Peck's courtroom?**
23       A.   Yes.
24       Q.   **Because I understand there was a**
25   **number of overflow rooms.**

TSG Reporting - Worldwide  (877) 702-9580

Page 246

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1
2    A.   Yes, it was a pretty packed
3 courthouse, but I actually went down --
4        I remember somebody else from Lehman
5 who was there. Chris O'Meara.
6        -- went down to the courthouse by
7 subway with Chris O'Meara and Brian Marsal from
8 A&M, and I can't remember how, but somehow we
9 were able to get into the courtroom. Somebody
10 there kind of reserved a spot for us or so,
11 because it was already pretty full.
12       And if you know the courtroom, if
13 you're looking at the bench, there's a -- some
14 seats all the way on the right-hand side against
15 the wall, and we were sitting/standing/leaning
16 over there by the windows.
17   **Q.   And were you sitting/standing beside**
18 **the Lehman people or the Barclays people or**
19 **both?**
20   A.   It was just everybody was standing
21 next to everyone.  There were not sections.
22 Actually, I think it was pretty close to the
23 Trustee.
24   **Q.   At any point during the court hearing**
25 **did you recall a discussion about additional**
TSG Reporting - Worldwide  (877) 702-9580

Page 247

**HIGHLY CONFIDENTIAL - S. BERKENFELD**

1
2 **assets being transferred to Barclays from**
3 **Lehman?**
4    A.   Somewhat, yes.
5    **Q.   Tell me what you recall about that,**
6 **please.**
7    A.   I recall, and some of this is
8 recollection that might have been refreshed from
9 reading sections of the transcripts in
10 preparation for deposition, but I recall
11 discussions around some of the, for instance,
12 the subsidiaries that were going, Uruguay and
13 Canada, the IMD business being transferred over.
14       So maybe I should have drawn a
15 distinction between the question on assets and
16 what I recall, which is more around businesses.
17   **Q.   Just so I understand your answer, do**
18 **you have any recollection of a discussion in**
19 **court about the transfer of additional assets to**
20 **Barclays?**
21   A.   Could you clarify what you mean
22 "assets"?  Do you mean businesses or do you mean
23 securities positions?
24   **Q.   Securities positions.**
25   A.   I don't recall a discussion of
TSG Reporting - Worldwide  (877) 702-9580

Page 248

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2 security positions, additional security
3 positions being transferred, I don't recall
4 that.
5    **Q.   Do you recall any discussion about the**
6 **value of the deal to Barclays having fallen and**
7 **that additional assets of any type being**
8 **transferred to them to compensate them for that?**
9    A.   I don't recall that.
10   **Q.   Fair to say you don't recall any**
11 **discussion of assets in Barclays' clearings box**
12 **being transferred -- I'm sorry, Lehman's**
13 **clearings box being transferred to Barclays?**
14   A.   My answer again is I don't recall.
15   **Q.   Do you recall any discussion about the**
16 **transfer of any margin at the options clearing**
17 **corporation?**
18   A.   I don't --
19       I'm sorry.
20   **Q.   Or any other exchange being**
21 **transferred to Barclays?**
22   A.   I don't recall discussion of that.
23 Again, I don't know whether it was.  I just
24 don't recall it.
25       MR. OXFORD:  Could I have what has
TSG Reporting - Worldwide  (877) 702-9580

Page 249

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2 been previously marked as Exhibit 11,
3 please.
4       (Document placed before the witness.)
5    **Q.   You have in front of you, Mr.**
6 **Berkenfeld, what's previously been marked as**
7 **Exhibit 11.  It's an e-mail from Peter**
8 **Schellbach to Daniel Kamensky and a number of**
9 **others at Lehman, and the top e-mail is sent on**
10 **Saturday, September 20, 12:37 GMT.  The e-mail**
11 **below is an e-mail sent from Daniel Kamensky on**
12 **September 19 at 6:37 P.M. to Eric Felder and**
13 **others.**
14       **Do you recall seeing this e-mail**
15 **before?**
16   A.   No, I have not seen this e-mail
17 before. Let me read it.
18       (Document review.)
19   A.   Okay.
20   **Q.   Mr. Kamensky did not appear to check**
21 **his BlackBerry like you did when he got to**
22 **court?**
23   A.   I found that some of the people who
24 are used to going to bankruptcy court knew that
25 you could get around the rules.
TSG Reporting - Worldwide  (877) 702-9580

---

Page 250

HIGHLY CONFIDENTIAL - S. BERKENFELD

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.  Mr. Kamensky says in the third
3  paragraph, "Weil lawyers a bit out of whack, but
4  granted timing here not unexpected.  They didn't
5  explain the balance sheet change as well, but
6  then a Barclays lawyer came in and gave a much
7  better explanation."
8          Does that refresh your recollection
9  about any of the disclosures that were made by
10  either of the Weil lawyers or the Barclays
11  lawyers about the balance sheet changes to the
12  deal?
13      A.  It does not.
14      Q.  Mr. Berkenfeld, you said in response
15  to one of Mr. Gaffey's questions that one of the
16  changes you did remember in the deal between the
17  signing of the APA on September 16th and the
18  19th was that there would be no cash going to
19  Barclays, do you remember that?
20      A.  Yes.
21      Q.  How is it that you came to understand
22  that that was a change to the business terms of
23  the deal?
24      A.  I should answer the reason I
25  remembered that was reading through the

TSG Reporting - Worldwide  (877) 702-9580

---

Page 251

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2  transcript in preparation for depositions, that
3  that had changed between signing and the
4  hearing.  I don't know that I would have had
5  independently remembered whether cash had been
6  pulled out or not.
7      Q.  Do you remember discussing that change
8  to the deal with anybody?
9      A.  I don't recall.
10      Q.  You don't remember having any
11  discussions about the existence of cash in the
12  deal from the date of the bankruptcy hearing
13  through the signing of the clarification letter?
14      A.  My recollection from, again, reading
15  the transcript was that the cash that was
16  included in the Asset Purchase Agreement as one
17  of the purchased assets was pulled out and that
18  was reflected in the clarification letter, and I
19  believe it's disclosed in the transcript to the
20  court.  I don't remember any change in that
21  between the hearing and the signing of the
22  clarification letter.
23          (Exhibit 48, an e-mail from Monty
24      Forrest to Alastair Blackwell and others,
25      marked for identification, as of this date.)

TSG Reporting - Worldwide  (877) 702-9580

---

Page 252

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.  Can you let me know when you've had a
3  chance to read that?
4          (Document review.)
5      A.  Okay.
6      Q.  Mr. Berkenfeld, you have in front of
7  you what I have marked as Exhibit 48, which is
8  an e-mail from Monty Forrest to Alastair
9  Blackwell and others.  You're not on the final
10  chain, but you do appear in the original couple
11  of entries in the chain, and it's those that I
12  would like to ask you about.
13          For the record, I'll identify this as
14  being sent from Mr. Forrest on Sunday, 21st, and
15  says 1:38 A.M., but that's a GMT time, I'll
16  represent for the record, so it's 9:38 P.M. on
17  Saturday, the 20th.
18          If you go to the end of the chain,
19  that's what I would like to ask you about.
20      A.  Yes.
21      Q.  Do you see that Mr. Lowitt sent you an
22  e-mail September 20 at 5:53 A.M. and he sends it
23  to you and to Mr. McDade, copying Mr. Tonucci.
24  See that?
25      A.  Yes.

TSG Reporting - Worldwide  (877) 702-9580

---

Page 253

1  HIGHLY CONFIDENTIAL - S. BERKENFELD
2      Q.  And it says, "Did the court accept the
3  lockup -- the 15c3 lockup and unencumbered box
4  make it through the BarCap?"
5          Do you know what that question means,
6  Mr. Berkenfeld?
7      A.  Not really.  I mean vaguely, but no
8  more so than you would.
9      Q.  Tell me what it means to you.
10      A.  What it means to me is -- well, not
11  much.  About transfer of assets over -- which
12  assets could be transferred over to Barclays,
13  but I don't understand the details of it and
14  specifically what Ian was asking.
15      Q.  Do you know why Mr. Lowitt was asking
16  you?
17      A.  He was asking me and Bart, I believe,
18  because we were at the hearing.  I mean, I'm
19  assuming 5:53 A.M. is 12 A.M., 1 A.M.
20      Q.  Actually, these are in Eastern
21  Standard Time.  It's only the last --
22      A.  Okay.  So it would have been early in
23  the morning after the hearing.  So he was
24  looking for a report on whether this had been
25  specifically addressed and resolved by the

TSG Reporting - Worldwide  (877) 702-9580

Page 254

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    court, and I don't recall whether it happened.
3      Q.    Okay. So you don't know the answer to
4    this question sitting here today?
5      A.    No, I delegated it to, at least the
6    second part of it about getting the lawyers
7    working on getting it done, to Beth Rudofker.
8      Q.    Do you know why Mr. Lowitt wanted to
9    make sure that the documentation was very tight?
10     A.    No, I do not.
11     Q.    Did you have any conversations with
12    Mr. Lowitt about his e-mail?
13     A.    No, not that I recall.
14     Q.    Did you have any conversations with
15    Mr. McDade about his e-mail?
16     A.    No, I did not.
17     Q.    You'll see two chains up Beth Rudofker
18    sends an e-mail to you, Saturday, September 20,
19    at 6:11 P.M., do you see that?
20     A.    Yes.
21     Q.    It says, "Alastair and Neil are
22    working on getting it ringfenced/moved if
23    needed." Is that Alastair -- is "Alastair"
24    Alastair Blackwell?
25     A.    I would presume so since he is CC'd
       TSG Reporting - Worldwide  (877) 702-9580

Page 255

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    above.
3      Q.    Okay. Who is Neil?
4      A.    I would assume that Neil is Neil
5    Ullman who is CC'd above.
6      Q.    Do you know why they were working on
7    getting it ringfenced or moved?
8      A.    I do not.
9      Q.    Beth Rudofker says she's working on --
10    withdrawn -- that Mr. Blackwell and Mr. Ullman
11    are working on getting it ringfenced/moved, if
12    needed, you see that?
13     A.    Yes.
14     Q.    Does that suggest to you that there's
15    some uncertainty as to whether or not these
16    assets will be moved to BarCap?
17     A.    It doesn't suggest anything to me in
18    particular.
19     Q.    Turning again to the OCC margin just
20    briefly, do you recall any discussion with
21    anyone at any time about the inclusion of margin
22    at the OCC or any other exchanges in the
23    transaction with Barclays?
24     A.    I don't recall.
25     Q.    To the best of your knowledge, does
       TSG Reporting - Worldwide  (877) 702-9580

Page 256

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the APA that you signed on the 16th transfer
3    that margin to Barclays?
4      A.    I don't really have knowledge on that.
5    I'd have to go back and do the same analysis. I
6    don't have any recollection. It just would be
7    my reading of the contract.
8      Q.    And what is your reading of the
9    contract, if you have one, on that question of
10    whether or not --
11     A.    I don't have one.
12     Q.    If I were to put the APA and the
13    definition of "purchased assets" in front of
14    you, would you be able to give me a reading?
15     A.    I don't know.
16         MR. STERN: Neil, I just ask the
17    source of Exhibit 48.
18         MR. OXFORD: Whose file it came from?
19         MR. STERN: Well, as in who produced
20    it.
21         MR. OXFORD: I don't believe it's been
22    produced.
23         MR. STERN: What's the source? Is
24    this from Lehman's files?
25         MR. OXFORD: I think it's from an Iron
       TSG Reporting - Worldwide  (877) 702-9580

Page 257

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Mountain file.
3         MR. STERN: Well, I just want to point
4    out that you have marked a Lehman document
5    that arguably contains communications that
6    would be considered attorney work product
7    and potentially attorney-client
8    communications, and I'll state again our
9    position that, to the extent that either LBI
10    or LBHI asks about or discloses partially
11    such communications, it's our position that
12    constitutes a subject matter waiver.
13         MR. OXFORD: Your position is noted,
14    Jack. I don't agree that we have waived
15    anything by showing this document to this
16    witness, but we can address the matter if it
17    becomes an issue later on.
18         MR. GAFFEY: I should say Lehman
19    Brothers Holdings, Inc. does not waive any
20    privilege.
21         MR. STERN: Well, Lehman Brothers
22    Holdings may have through your questions.
23    That's not something we can resolve sitting
24    here today, but I just want to state our
25    position on the record.
       TSG Reporting - Worldwide  (877) 702-9580

Page 258

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        (Exhibit 49, a document bearing Bates
3    Nos. BCI-CG00024954 through 24972, marked
4    for identification, as of this date.)
5    Q.    Mr. Berkenfeld, you have in front of
6    you what I have marked as Exhibit 49, which is a
7    document produced to me by Barclays bearing the
8    Bates range BCI-CG00024954 through 24973.
9        If you would take a moment to read
10   that document and let me know when you're done,
11   please.
12   A.    Okay.
13       MR. OXFORD:  I have marked a different
14   version that's a black-lined version, which
15   is why I marked it again.
16   A.    Okay.
17   Q.    I'd like to direct your attention to
18   page number 4 of the black line, which has the
19   Bates range 24967.
20       Mr. Gaffey, as I mentioned, marked a
21   clean running version of this document and you
22   said that you had no recollection of seeing it
23   before.  Do you have any recollection of seeing
24   the black lined version of this?
25   A.    I have no specific recollection of any

TSG Reporting - Worldwide  (877) 702-9580

Page 259

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    particular draft of any of the clarification
3    letters.
4    Q.    Understood.  Just one question on
5    this, and I presume that you don't have any
6    recollection of subparagraph 2 of clause 8 that
7    reads, "In connection therewith, Purchaser shall
8    receive cash, cash equivalence, bank deposits or
9    similar cash items maintained (A) by or on
10   behalf of LBI pursuant to Rule 15c3 of the
11   Securities Exchange Act of 1934 or otherwise, or
12   by or on behalf of any clearing agency or
13   clearing organization to collateralize,
14   guarantee, secure (whether as margin, guarantee
15   fund, deposit or in any other form) the
16   obligations of LBI or any other person in an
17   account maintained by or on behalf of LBI."
18       MR. STERN:  The question is, "I
19   presume you don't have any recollection of
20   that subparagraph"?
21   Q.    The question is, is my presumption
22   correct?  Does this refresh your recollection
23   that you have seen this draft?
24   A.    It does not.
25   Q.    Do you have any idea why this language

TSG Reporting - Worldwide  (877) 702-9580

Page 260

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    was inserted in this draft?
3    A.    I do not.
4    Q.    Did you have any discussions with
5    anyone at any time about the insertion of this
6    language into this draft?
7    A.    Not that I recall.
8        MR. STERN:  Let me just note that that
9    calls for privileged communications.
10       MR. OXFORD:  It calls for a yes --
11       MR. STERN:  No, it calls for
12   privileged communications so I'm just noting
13   for the record that you're asking questions
14   about privilege communications.
15       MR. OXFORD:  I disagree with your
16   interpretation, but we can have that
17   argument at a later stage.
18   A.    Not that I recall.
19       (Exhibit 50, a document bearing Bates
20   Nos. BCI-CG00027138 through 27148, marked
21   for identification, as of this date.)
22   Q.    You have in front of you, Mr.
23   Berkenfeld, Exhibit 50, which is -- I think
24   actually Bob did previously mark --
25   BCI-CG0027138 through 148, and it's a version of

TSG Reporting - Worldwide  (877) 702-9580

Page 261

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    the clarification letter that was circulated
3    by -- is circulated by Michael Mazzuchi to Isaac
4    Montal with a list of CCs at 6:03 A.M. on
5    Monday, September 22.
6        This is approximately two hours before
7    you signed the clarification letter; is that
8    right?
9    A.    I don't recall when I signed the
10   clarification letter precisely.
11   Q.    Do you recall whether it was sometime
12   early in the morning before the markets
13   closed -- before the markets opened, rather, on
14   Monday, the 22nd?
15   A.    I believe that the latest I would have
16   signed it would have been at closing.  I don't
17   remember the exact time of closing.
18   Q.    If you turn to page 4 and to the same
19   paragraph, "Transfer of Customer Accounts," do
20   you see paragraph 8?
21   A.    Yes.
22   Q.    And do you see that the language about
23   margin that I read into the record from the
24   previous draft, Exhibit 49, has been deleted?
25   A.    I'm not comparing this word-for-word

TSG Reporting - Worldwide  (877) 702-9580

Page 262

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  of the last one -- the last one I read, excuse
3  me.
4    Q.   Would you have Exhibit 49 in front of
5  you and just put them side-by-side, please.
6    A.   Yes.
7    Q.   And do you see that the language about
8  margin has been deleted from the 6:03 A.M.
9  draft?
10    MR. STERN:  Which specific phrase are
11  you referring to?
12    MR. OXFORD:  I'm referring to the
13  deletion of the language "or buy or on
14  behalf of any clearing agency or clearing
15  organization to collateralize, guarantee,"
16  et cetera.
17    MR. STERN:  You're looking at the
18  redline of Exhibit 49?
19    MR. OXFORD:  Yes.  I'm looking at the
20  language that was redlined in Exhibit 49 and
21  does not appear in Exhibit 50.  It's a
22  clumsy way to do it, but I don't have a
23  redline, unfortunately.
24    MR. STERN:  And again, for my benefit,
25  the precise phrase you're saying was
TSG Reporting - Worldwide  (877) 702-9580

Page 263

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  deleted?
3    MR. OXFORD:  Is the language that
4  appears five lines up in the draft that I
5  marked as Exhibit 49:  "Or by or on behalf
6  of any clearing agency or clearing
7  organization to collateralize, guarantee,
8  secure (whether as margin, guarantee fund,
9  deposit, or in any other form) the
10  obligations of LBI or any other person in an
11  account maintained by or on behalf of LBI."
12    MR. STERN:  Okay.  Thanks.
13    Q.   I apologize for the painful
14  questioning, Mr. Berkenfeld, but you see that
15  the language has been deleted between the draft
16  that's marked as 49 and the draft that's marked
17  as Exhibit 50?
18    A.   Yes.
19    Q.   Staying with Exhibit 50, I'll direct
20  you to paragraph 1(a)(ii), which appears on the
21  page 1 and goes over to page 2 of the document.
22    A.   Yes.
23    Q.   And do you see that that clause reads,
24  "with respect to clauses (a), (d) and (e) of the
25  definition of 'Purchased Assets' in the Original
TSG Reporting - Worldwide  (877) 702-9580

Page 264

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  Agreement, instead of items referred to in such
3  clauses," and then it goes on to say, "(A) the
4  securities owned by LBI."  Mr. Gaffey asked you
5  about that language.
6    A.   Yes.
7    Q.   I'm just interested in the language at
8  over the page at subsection C.  Purchased assets
9  shall include "exchanged-traded derivatives and
10  collateralized short-term agreements."  Do you
11  see that phrase?
12    A.   Yes.
13    Q.   Do you understand what the business
14  deal was that is reflected in that agreement?
15    A.   I do not.
16    Q.   If you could just keep that version,
17  number 50, in front of you, there's one more
18  question and then I'll move on.  Could you have
19  in front of you what's previously been marked as
20  Exhibit 25, please?
21    MR. STERN:  The final clarification
22  letter?
23    MR. OXFORD:  The final version of the
24  clarification letter, Jack.
25    A.   Yes.
TSG Reporting - Worldwide  (877) 702-9580

Page 265

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    Q.   If you could turn to page 2 and read
3  just to yourself for the moment subparagraph C
4  that we just read in Exhibit 50.
5    A.   Yes.
6    Q.   And do you see between the draft
7  that's marked as Exhibit 50 and the final
8  version that you signed that was marked as
9  Exhibit 25, you'll see a parenthetical has been
10  added?
11    A.   Yes.
12    Q.   You see that instead of reading in
13  Exhibit 50 "exchange-traded derivatives and
14  collateralized short-term agreements," it now
15  reads, "exchange-traded derivatives (and any
16  property that may be held to secure obligations
17  under such derivatives) and collateralized
18  short-term agreements."
19    A.   I see that, yes.
20    Q.   Do you see that change?  Do you have
21  any understanding of the business deal that is
22  reflected in that change?
23    A.   I do not.
24    Q.   I think I'm done with the
25  clarification letter, I'm sure you'll be pleased
TSG Reporting - Worldwide  (877) 702-9580

Page 266

HIGHLY CONFIDENTIAL - S. BERKENFELD

1      to know.
2
3      Have you ever heard of a document
4 called a Transfer and Assumption Agreement, Mr.
5 Berkenfeld, that was signed between the OCC,
6 Barclays and the SIPA Trustee in connection with
7 this transaction?
8      A.   I was very briefly shown that
9 document, I believe, in preparation for
10 deposition, but I had not seen it before then
11 that I could recall.
12      Q.   I'm just going to mark it and then
13 move on.
14      (Exhibit 51, Transfer and Assumption
15      Agreement, marked for identification, as of
16      this date.)
17      Q.   Okay. Mr. Berkenfeld, I have marked
18 as Exhibit 51 what I'll represent to you is the
19 final version of the Transfer and Assumption
20 Agreement between Barclays Capital, the OCC and
21 the SIPA Trustee. Is this a document that you
22 saw in preparation for your deposition?
23      A.   I believe it is.
24      Q.   Have you seen it at any time prior to
25 that?

TSG Reporting - Worldwide  (877) 702-9580

Page 267

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2      A.   Not that I recall.
3      Q.   Do you recall discussing this document
4 with anybody prior to your deposition
5 preparation?
6      A.   I do not.
7      Q.   That's all I have on that document.
8      Can you tell me, please, what your
9 role was, if any, with respect to the
10 involvement of DTC in the closing of the
11 transaction between Lehman and Barclays?
12      MR. STERN: Objection to the form.
13      A.   As I testified earlier, I had some
14 involvement with DTC after the closing of the
15 transaction around the issue of client accounts,
16 customer accounts in transferring positions in
17 that, but prior to the closing, I don't recall
18 any involvement with DTC and DTC -- well, any
19 involvement with the DTC. I don't recall any.
20      Q.   Did you at any point come to
21 understand that DTC wanted Barclays to step into
22 Lehman's shoes at the DTC?
23      A.   I have a vague recollection of that.
24      Q.   Can you tell me what you recall?
25      A.   Not that much more than that, other

TSG Reporting - Worldwide  (877) 702-9580

Page 268

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2 than just conversation that had come up that
3 that's what -- and it might have been after --
4 it might have been post-closing conversation,
5 too. It might have been around the issue of
6 customer accounts.
7      Q.   To the best of your recollection, you
8 don't recall having any discussions with anyone
9 about DTC over the weekend of September 20 and
10 September 21?
11      A.   I do not recall that.
12      Q.   Do you recall discussing with anybody
13 a letter agreement between DTC, the Trustee, and
14 Barclays?
15      A.   I don't recall that.
16      Q.   I'm just going mark it and we can move
17 on.
18      (Exhibit 52, a letter dated September
19      22, 2008, from DTC, marked for
20      identification, as of this date.)
21      A.   Yes.
22      Q.   Did you ever see that letter before?
23      A.   Not that I recall.
24      Q.   Do you ever recall discussing the
25 subject matter of this letter with anybody?

TSG Reporting - Worldwide  (877) 702-9580

Page 269

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2      A.   I do not.
3      Q.   Did you understand that there was a
4 different team negotiating this letter than you
5 negotiating the clarification letter that you
6 signed?
7      A.   A different team from?
8      Q.   A different team of personnel,
9 different lawyers?
10      A.   I don't know. There could have been
11 some overlap on who was involved in it. I don't
12 know --
13      Q.   You just have no idea?
14      A.   I don't know.
15      (Exhibit 53, a document bearing Bates
16      Nos. BCI-EX-(S)-00007181, marked for
17      identification, as of this date.)
18      Q.   Mr. Berkenfeld, I have put in front of
19 you a one-page document produced to me by
20 Barclays, Bates No. BCI-EX-(S)00007181. If you
21 could take a look at it and let me know when
22 you've had a chance to read through it.
23      (Document review.)
24      A.   I've read through it, yes.
25      Q.   Who is Scott Willoughby?

TSG Reporting - Worldwide  (877) 702-9580

Page 270

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    A.   Scott Willoughby is a -- he was an
3    attorney at Lehman Brothers who ran our Capital
4    Markets Contracts Group, or previously known as
5    Transaction Execution Group. So this was a
6    documentation effort, and he transferred over to
7    Barclays and left the Legal Department there and
8    I believe he's working in the Prime Brokerage
9    Department, I believe.
10   Q.   And Marlisa -- I'm going to murder
11   this -- Vinciguerra?
12   A.   Exactly. She was a lawyer at Lehman
13   Brothers that was head of the Equities Division
14   legal effort, legal coverage effort, the general
15   counsel of Equities, and she is now employed by
16   Barclays and is an attorney for Barclays.
17        MR. STERN: I just want to note for
18   the record this may be a document that we
19   produced inadvertently. It may be
20   privileged communication. I'll just need to
21   consult with one of my partners on whether
22   we produced this inadvertently and, if so,
23   whether it's something we need to claw back.
24        MR. OXFORD: Okay.
25        MR. STERN: I'll look into that.

TSG Reporting - Worldwide  (877) 702-9580

Page 271

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2         MR. OXFORD: Once you've done that,
3    Jack, we can have the appropriate
4    discussion.
5         MR. STERN: Right.
6    **Q.   But, meantime, I'll note for the**
7    **record, this is an e-mail sent to you, Mr.**
8    **Berkenfeld, by Mr. Willoughby on Tuesday,**
9    **September 30, 2008, at 3:49 in the afternoon. I**
10   **guess that's Greenwich Mean Time, so that's**
11   **11:49 Eastern Standard Time.**
12        **Mr. Willoughby writes to you, "Steven,**
13   **I have spoken to Paolo Tonucci and Alan Kaplan,**
14   **an attorney at BarCap, regarding the transfer of**
15   **OCC positions and required margin from LEH's**
16   **account at JPMorgan to BarCap. The main open**
17   **question from Paolo's perspective is whether**
18   **BarCap is entitled only to the minimum margin**
19   **necessary to carry the position and as of when**
20   **that amount is calculated."**
21        **He goes on, "He feels that we will**
22   **need to discuss it with an 'expert' on the APA.**
23   **Please let me know if there's someone I should**
24   **liaise with in Legal with respect to this issue.**
25   **Paolo is waiting on data from Vincent Chiaravino**

TSG Reporting - Worldwide  (877) 702-9580

Page 272

1    **HIGHLY CONFIDENTIAL - S. BERKENFELD**
2    **from BarCap, so we don't have adequate specifics**
3    **yet. Thanks."**
4         MR. STERN: What's the question?
5    **Q.   Do you recall receiving this e-mail?**
6    A.   I don't recall.
7    **Q.   Do you know why Mr. Willoughby would**
8    **e-mail this question to you?**
9    A.   I'm speculating, but he had reported
10   to me when he was at Lehman and was looking for
11   guidance on who might have been closest to these
12   issues that he can get some interpretation from.
13   **Q.   Do you agree with Mr. Willoughby's**
14   **interpretation of what Mr. Tonucci says, that**
15   **it's an open question whether BarCap is**
16   **entitled --**
17   A.   I have --
18   **Q.   -- to the minimum margin?**
19   A.   I have no view on that. I'm sorry.
20   **Q.   Do you think Mr. Willoughby is asking**
21   **you because he considers you an expert on the**
22   **APA?**
23   A.   No, I think --
24        MR. STERN: Objection. Objection to
25   the form.

TSG Reporting - Worldwide  (877) 702-9580

Page 273

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   I think he's asking me to direct him
3    to an expert. That's exactly what it says.
4    Otherwise, he just would have asked me the
5    question.
6    **Q.   You don't recall discussing this**
7    **e-mail with anybody?**
8    A.   I don't recall discussing it.
9    **Q.   You don't know what happened to his**
10   **request?**
11   A.   I don't know what happened to his
12   request.
13   **Q.   As best you know, the trail ended**
14   **cold?**
15        MR. STERN: Objection to the form.
16   A.   No, I just don't recall. I would
17   imagine we had a conversation, but I don't
18   recall what it was.
19        (Exhibit 54, a document bearing Bates
20   Nos. BCI-EX-(S)-00007197 through 7201,
21   marked for identification, as of this date.)
22   **Q.   This is the last document I have, Mr.**
23   **Berkenfeld, marked Exhibit 54, Bates range**
24   **BCI-EX-(S)-00007197 through 7201.**
25        **Could you take a look at it and let me**

TSG Reporting - Worldwide  (877) 702-9580

Page 274

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  know when you've had a chance to review it,
3  please.
4       (Document review.)
5    A.   Yes.
6    Q.   Do you recall seeing this document
7  before?
8    A.   I recall the base document. I don't
9  precisely recall the handwritten markup to the
10  document, but I do recall sending this document
11  over to David for his comments.
12    Q.   Was the base document, as you describe
13  it, which appears to be a one-page section of
14  prose entitled "General Information Regarding
15  the Lehman Transaction" followed by three pages
16  of a chart? That's the base document you
17  referred to?
18    A.   Yes.
19    Q.   Was the base document something you
20  created?
21    A.   It was not.
22    Q.   Was it something that was created for
23  you?
24    A.   It was not created for me at my
25  request. It was -- it wasn't created -- I
     TSG Reporting - Worldwide  (877) 702-9580

Page 275

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  didn't request it. It was created by someone in
3  Barclays Legal, I don't recall who, who then
4  circulated it for comments. It was meant to be
5  a relatively simple and summary version of what
6  was transferred in the transaction.
7    Q.   Okay. For what purpose was it sent to
8  you, if you know?
9    A.   It was sent to me for my comments.
10    Q.   And did you have comments on it?
11    A.   Yes, I did.
12    Q.   Did you review it?
13    A.   Yes.
14    Q.   Did you mark it up?
15    A.   Yes.
16    Q.   These are not your markups, correct?
17    A.   No, they are not.
18    Q.   These appear to be Mr. Murgio's
19  markup, right?
20    A.   They appear to be that way.
21    Q.   Did you mark it up by hand or in some
22  electronic form?
23    A.   By hand.
24    Q.   And what did you do with it when you
25  marked it up?
     TSG Reporting - Worldwide  (877) 702-9580

Page 276

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   I sent it back to whoever originally
3  prepared it.
4    Q.   To Barclays' attorney, whose name you
5  don't recall?
6    A.   It's not the name I don't recall. I
7  just don't remember who was doing the document
8  back then. It's not that I have forgotten their
9  names. I just don't remember who was the author
10  of it. And when I did it, since I marked it up
11  by hand, I would have faxed it back to someone,
12  but I didn't keep the fax cover page. So I
13  didn't do it electronically in an e-mail, as far
14  as I know.
15       I just don't remember who was the
16  original author. I know that I marked it up. I
17  don't recall whether David's markup was of the
18  original document or the document after I had
19  already submitted my modifications to it.
20    Q.   That's my next two questions. Do you
21  recall discussing this document with anyone?
22    A.   Not specifically, other than saying to
23  someone my markup's coming over.
24    Q.   Did you forward it to Mr. Murgio for
25  his comments?
     TSG Reporting - Worldwide  (877) 702-9580

Page 277

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    A.   Yes.
3    Q.   Why did you do that?
4    A.   Because he was our -- Lehman's counsel
5  on the transaction, and I thought a document
6  that would be used as a summary of the
7  transaction for internal purposes would benefit
8  from an outside counsel's review of it and
9  outside counsel who have been involved in the
10  preparation of the basic transaction documents.
11    Q.   It appears from the e-mail that you
12  are sending it to yourself at your home account,
13  is that an accurate statement?
14    A.   Yes.
15    Q.   Do you remember why you sent it to
16  yourself at home?
17    A.   This is GMT.
18    Q.   That's what it says.
19    A.   So it would have been at -- so it
20  would have been at the middle in the afternoon,
21  right?
22    Q.   Yes, 2:34 Eastern.
23    A.   Yeah, I don't know why I would have
24  sent it to my home at that time. I can't
25  explain, unless I wasn't in the office that day.
     TSG Reporting - Worldwide  (877) 702-9580

Page 278

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        MR. OXFORD: I don't have any further
3    questions for you at this time, Mr.
4    Berkenfeld.
5    EXAMINATION BY
6    MS. TAGGART:
7        Q.   Hi again. I'm Erica Taggart and I
8    represent the Committee. I want to ask you a
9    couple questions about the definition of
10   "purchased assets" and it might help if you get
11   in front of you Exhibit 1, which is the APA.
12       A.   Exhibit 1 or Exhibit 11?
13       Q.   I think it's originally Exhibit 1.
14   Then the schedule at Exhibit 19 and
15   the clarification letter at Exhibit 25.
16       So on the APA, which is Exhibit 1, in
17   particular, in the definition of "purchased
18   assets," I think you answered a lot of questions
19   about Section D, which is about the approximate
20   $70 billion of government securities, commercial
21   paper, et cetera, and I think that you said that
22   that valuation was an estimate that was
23   reflected on the schedule at Exhibit 19, but
24   that Exhibit 19 was merely guidance and it
25   didn't define the assets or the value that would
         TSG Reporting - Worldwide  (877) 702-9580

Page 279

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    be transferred; is that right?
3        MR. STERN: Objection to the form.
4        A.   Substantially correct, yes.
5        Q.   And I think you also said there was --
6    it was an estimate of the value of assets that
7    would be transferred as guidance for what was
8    meant in the APA when it referred to purchased
9    assets; does that sound about right?
10       MR. STERN: Objection to the form.
11       A.   That one I didn't follow as carefully.
12       Q.   Well, let me ask this: At the time
13   that you signed the APA, was it your
14   understanding that there had been any selection
15   of assets that were going to be transferred?
16       MR. STERN: Objection to the form.
17       A.   It was my understanding at the time of
18   signing the APA that there was a sense of the
19   bucket of assets would be transferred, the
20   estimated amount and estimated allocation. I
21   don't know if anyone had figured out specific
22   Cusip numbers at that point.
23       Q.   What was your understanding of what
24   was the sense of the bucket of assets that would
25   be transferred when you signed the APA?
         TSG Reporting - Worldwide  (877) 702-9580

Page 280

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2        A.   It was along the lines as set forth on
3    Exhibit 19. Just by way of example, 40 billion
4    of government securities, 1.1 of commercial
5    paper.
6        Q.   Well, was it your understanding that
7    the sense was that the value of those assets
8    would be as described in the value, or that
9    there were assets that were actually picked out
10   that at that time had that value?
11       MR. STERN: Objection to the form.
12       Can we have that reread?
13       (Record read.)
14       A.   My sense was that it wasn't
15   necessarily that precise; that someone could
16   create a specific schedule by Cusip and by
17   specific attributable value. I think that there
18   was a good idea of the assets that would
19   comprise the 70 billion, and that there was
20   probably more specificity in some of these
21   categories than others, but I didn't get the
22   sense that anyone was in a position at that
23   point to say here are the specific securities.
24       Q.   Where did your sense come from?
25       A.   Came from the discussions around the
         TSG Reporting - Worldwide  (877) 702-9580

Page 281

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2    table.
3        Q.   Do you remember what anyone said in
4    particular about the bucket of assets that had
5    been considered at that time?
6        MR. STERN: Objection to the form.
7        A.   I don't remember anything specific.
8        Q.   And do you remember anything specific
9    that was said about the value of the assets
10   beyond what we see in just Exhibit 19?
11       A.   No, I don't remember anything
12   specific.
13       Q.   Was there a determination when you
14   signed the APA that the assets would be roughly
15   equal to the liabilities that Barclays was
16   assuming?
17       MR. STERN: Objection to the form.
18       A.   When I signed the Asset Purchase
19   Agreement, the understanding was that there
20   would be purchased assets, transferred assets
21   that had a book value as of that date of
22   approximately 70 million, and that there would
23   be liabilities transferred, assumed liabilities,
24   of approximately -- I'm just trying to remember
25   if I put 69 or 68 -- 69 billion, and that there
         TSG Reporting - Worldwide  (877) 702-9580

Page 282

HIGHLY CONFIDENTIAL - S. BERKENFELD

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   would be other liabilities that were assumed by
3   Barclays in the transaction. And of course
4   there were other -- there was other
5   consideration that was being paid.
6    Q.   When was the first time that you think
7   that assets that were going to be transferred
8   were determined?
9    A.   The specific assets that were going to
10   be transferred?
11    Q.   Yes.
12    A.   I don't know.
13    Q.   Do you think that that happened before
14   or after the September 19 court sale hearing?
15    A.   Given everything that happened over
16   the weekend, the specific assets I would think
17   might have happened afterwards, but I don't
18   know.
19    Q.   We talked about how you learned at the
20   court hearing how the value of assets that would
21   be transferred had gone down between the signing
22   of the APA and the court hearing, right?
23    A.   I said that that's the first time that
24   I recall knowing that the aggregate value would
25   go down. I think you said the value of the
TSG Reporting - Worldwide  (877) 702-9580

Page 283

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   assets had gone down. I didn't know if the
3   value of the assets had gone down. It was along
4   the lines of a question that had been asked
5   before. You asked the question as though
6   valuation had come down.
7    Q.   What was your understanding of what
8   went down from a 70-something billion figure to
9   a 40-something billion figure between the
10   signing of the APA and the court hearing?
11    MR. STERN: Objection to the form.
12    A.   It was not my understanding that a
13   bucket of assets that on Tuesday were believed
14   to be worth 70 billion were now worth 42 billion
15   or so, whatever the number was. So I think that
16   answers your question.
17    I don't think that there was a loss of
18   value of 28 billion of the same securities. I
19   think that the securities that were being
20   transferred over were a different bucket. Some
21   of it might have been around value. Some of it
22   might have been around what was in the bucket.
23    Q.   What's your understanding based on
24   that there was a bucket of securities that had
25   changed between the Tuesday signing of the APA
TSG Reporting - Worldwide  (877) 702-9580

Page 284

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   and the Friday court hearing?
3    A.   My understanding was based on a number
4   of things, including difference in the value,
5   and not any information or knowledge of any
6   reassessment of the value or a mark of that --
7   of all of those positions.
8    Q.   And between the time that you signed
9   the APA and the court hearing, did you discuss
10   with anyone about what was the current bucket of
11   assets that were going to be transferred in the
12   agreement that you signed?
13    A.   I don't recall a conversation along
14   those lines.
15    Q.   I think you also mentioned -- there
16   was a lot of discussion about how Exhibit 19 had
17   guidance but was not actually part of the APA,
18   right?
19    A.   Correct.
20    Q.   And that it was the APA itself that
21   was going to govern what was being transferred
22   as far as the assets, right?
23    A.   As of the date of the signing of the
24   APA, yes.
25    Q.   What criteria do you believe is in the
TSG Reporting - Worldwide  (877) 702-9580

Page 285

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   APA about what assets were agreed to be
3   transferred?
4    MR. STERN: Objection to the form.
5    A.   I haven't gone back and read the whole
6   agreement, but as far as I know, it's the
7   definition of "purchased assets" in this
8   particular case, subparagraph D.
9    Q.   Well, do you believe that there was an
10   agreement that the assets that would be
11   transferred, whatever they were, would
12   approximate a value of $70 billion?
13    A.   You want to repeat the question?
14    I can read it off the screen.
15    (LiveNote review.)
16    A.   My understanding was that there was an
17   agreement that the purchased assets would have
18   an estimated value at the time of the Asset
19   Purchase Agreement of $70 billion.
20    Q.   So you believe when you were signing
21   the APA Lehman was agreeing to transfer assets
22   that had a value as of the date of the APA of
23   $70 billion?
24    A.   I believe that that was the estimated
25   value of the assets that were going to be
TSG Reporting - Worldwide  (877) 702-9580

Page 286

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  transferred over, yes.
3    Q.   And you believed that was -- that
4  actually was the estimated value, but I kind of
5  want to know what was agreed to be binding.
6       Let me ask it this way:  I think
7  you're saying there weren't ever schedules or
8  there weren't schedules for the APA that said
9  exactly what securities were going to be
10  transferred, right?
11    A.   No, there were not.
12    Q.   But was there agreement that whatever
13  those assets that would be transferred would be
14  valued at $70 billion as of the value -- sorry
15  as of the date that you signed the APA?
16    MR. STERN:  Objection to the form.
17       I just think, in fairness to the
18  witness, since you're asking him about terms
19  of APA, he should be allowed to refer to the
20  APA.
21    MS. TAGGART:  He may refer to the APA.
22    A.   I'm sorry, the problem I have with
23  your question is it's a little unclear.  So let
24  me restate it.  I think the understanding was
25  that there would be assets transferred that had
      TSG Reporting - Worldwide  (877) 702-9580

Page 287

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  an estimated book value as of the date of the
3  APA of 70 billion.  I think you may have asked
4  the question was there an agreement that $70
5  billion worth of assets were transferred -- I'm
6  adding the words "at closing," you didn't say
7  that, and that's not correct.
8    Q.   Right.
9    A.   It was that there was a bucket of
10  assets that were going to be transferred that,
11  as of the date of the Asset Purchase Agreement,
12  had a value of approximately 70 billion.  What
13  their value might have been whenever the closing
14  occurred, that was not something that the APA
15  addressed.
16    Q.   So the APA you think does not specify
17  what the value of the assets has to be upon
18  closing, right?
19    A.   I don't believe it says that there has
20  to be -- that this bucket of assets has to
21  retain its value at 70 billion.
22    Q.   And it's your understanding the APA
23  also does not say what particular assets need to
24  be transferred by closing, right?
25    A.   The APA does not specify the specific
      TSG Reporting - Worldwide  (877) 702-9580

Page 288

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  assets to be transferred.
3    Q.   So when you signed it, do you believe
4  that there is any limitation in the APA that
5  would govern exactly what assets are going to be
6  transferred?
7    A.   Any limitation?
8    MR. STERN:  Objection to the form.
9    A.   Yes, I think there's some limitations
10  on the assets that would be transferred.  As I
11  mentioned before, I don't think there was the
12  ability to transfer 70 billion worth of
13  corporate equity or 70 billion worth of
14  derivatives.  I think there was a sense that
15  this bucket of 70 billion would approximate the
16  allocations that were set forth on the schedule.
17       By the way, I should just note we
18  talked about 70 in the schedules.  It's 72.65.
19  We went through that before.  But we'll just for
20  ease of reference make it 70 billion in this
21  subparagraph D.
22    Q.   Yeah, we'll just focus on the
23  subparagraph D, which is the 70 billion.  And I
24  think that you just said that you do believe as
25  part of the APA that there would be an
      TSG Reporting - Worldwide  (877) 702-9580

Page 289

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  approximate allocation that was the same as
3  Exhibit 19?
4    MR. STERN:  Objection to the form.
5    A.   It was my understanding that there
6  would be a transfer of assets that approximated
7  the allocations on Exhibit 19.
8    Q.   Are there any other criteria that you
9  believe were contractual criteria that were
10  agreed to in the APA as to what assets would be
11  transferred from Lehman to Barclays?
12    A.   When you're referring to assets, you
13  mean assets of the type in D?  Not all -- not
14  furniture and equipment and all the other
15  assets, you mean these long positions as
16  defined?
17    Q.   Yes.
18    A.   I have not read through the agreement
19  again.  At this point in time, I'm not aware of
20  any other provision, but there could be
21  something in here in the reps and warranties or
22  some other provision that might also be
23  relevant.
24    Q.   Now, for the clarification letter that
25  you ultimate signed, you know that there were
      TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  attached schedules, a Schedule A and B, that is
3  referred to in Section 1(ii), right?
4    A.  So I understand, yes.
5    Q.  And I believe you testified you never
6  saw those schedules?
7    A.  I don't recall seeing the schedules.
8    Q.  Do you know when they were prepared?
9    A.  I don't know when they were prepared
10 and I did not testify I never saw them.  I just
11 don't recall whether I saw them.
12   Q.  Do you know whether they existed
13 before you signed the clarification letter?
14   A.  I do not recall.
15   Q.  Did you ever see any schedule that
16 actually listed assets that would be
17 transferred?
18   A.  I think in one of the exhibits earlier
19 today I saw -- it's probably this big fat one
20 that showed me a bunch of securities.  I don't
21 recall whether I had seen lists earlier.
22   Q.  Do you know whether the list, the
23 first time there was any list of assets that
24 would be transferred, do you know whether that
25 was in existence before or after the court
     TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  hearing on September 19?
3    A.  I don't know.
4    Q.  Do you know whether there was any
5  selection of any assets that were being valued
6  at the time of the court hearing on September
7  19?
8        MR. STERN:  Objection to the form.
9    A.  I don't know.
10   Q.  The final deal is reflected with the
11 clarification letter.  Do you have an
12 understanding of what was the value of the
13 assets that actually were transferred from
14 Lehman to Barclays?
15   A.  I don't think I do have direct
16 knowledge of that.
17   Q.  Did you ask before you signed the
18 clarification letter what were the value of the
19 assets that Lehman was transferring?
20   A.  I do not recall asking that question.
21 I recall the statement made in court by Weil
22 Gotshal about the value of the assets were being
23 transferred.  I do not know the basis for the
24 statement made by Weil, and I do know that I had
25 the confirmation from the attorneys at Weil that
     TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  this reflected the agreement that had been
3  reached.
4    Q.  Do you know whether the value of the
5  assets that were transferred ultimately, as
6  reflected in the clarification letter and
7  schedules, was more or less than what was told
8  to the court on the 19th?
9    A.  I have no idea.
10   Q.  Do you know if ultimately the assets
11 that were transferred from Lehman had a value
12 that was equal to the liabilities that were
13 assumed by Barclays in the final deal?
14   A.  Let me just read through the question
15 again.
16       I do not know.
17   Q.  Did you ask anyone whether anything
18 about the relationship between the assets that
19 would be transferred and the liabilities assumed
20 before you agreed to sign the clarification
21 letter?
22       MR. STERN:  Objection to the form.
23   A.  Not that I recall.
24   Q.  Do you remember asking at any time
25 after signing the APA whether the assets that
     TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2  were contemplated would be transferred to
3  Barclays were -- what the relationship was
4  between that value and the value of the
5  liabilities that Barclays was assuming?
6    A.  I don't recall a conversation with
7  anyone specifically about how the assets
8  measured against the liabilities after the
9  signing of the APA.
10   Q.  And when you signed the clarification
11 letter, it's your recollection you never asked
12 whether the assets were matching the
13 liabilities?
14   A.  I don't recall any conversation about
15 a matched book or whether the assets matched
16 liabilities.
17   Q.  And is it right you've never seen any
18 valuation of the assets that were actually
19 transferred?
20   A.  I don't recall ever seeing a valuation
21 of the assets that were actually transferred.
22   Q.  Do you know whether there was any
23 valuation that happened of the assets being
24 transferred following the September 19 hearing?
25   A.  I don't know.
     TSG Reporting - Worldwide  (877) 702-9580

HIGHLY CONFIDENTIAL - S. BERKENFELD

Q.   And do you know whether the -- I think I asked this, but I'll make sure:  Do you know whether the assets that were ultimately transferred had a value that was greater or less than what was represented to the court on the 19th?

A.   I don't know.

Q.   Do you know who would know that?

A.   I think that Paolo Tonucci and Martin Kelly would be a good place to start.  Weil Gotshal may know that.

Q.   Do you have any reason to think that the value of assets would have changed between a Friday hearing and the signing of the clarification letter?

MR. STERN:  Objection to the form.

A.   Do I have any reason to think that the value would have changed?  Well, there were quite a few discussions over that weekend around the financing and JPMorgan, and so would I have a reason to think there might have been a change in the value?  I'd have a reason to think there might have been.  I have no knowledge whether there was and how all of those discussions over

HIGHLY CONFIDENTIAL - S. BERKENFELD

the weekend to get to closing actually affected the value of the securities, but I would have reason to think that there may have been some change.

Q.   Was there any factors that would have changed the market value of an asset between the closing of the market on the end of the day on Friday and before the market opened in the morning of Monday?

A.   The market value of the assets?  Yeah, I think there probably were some factors, including that the closing of the deal happened before the market opened in New York but not before the market opened in Asia and Europe.

So I don't know -- and there may have been other events that happened over the weekend.  There were other events that were happening over the weekend politically from a regulatory standpoint that also might have affected the value of things, like U.S. treasuries.

Q.   Did Lehman have a pattern and practice of marking the value of securities on a daily basis when the market was opened?

HIGHLY CONFIDENTIAL - S. BERKENFELD

A.   Yes, Lehman had that practice.

Q.   And did it have any practice of changing those marks when the market was closed over the weekend?

A.   I am not familiar enough to know what the full practice of our marking of our books and records to know the timing of when positions were marked and whether positions were revised over the weekend.  I don't know.

I would comment that our normal practices did not contemplate the volatility that was in the market during this period of time.

Q.   I think you also said when Mr. Gaffey was questioning that you had no intention when you signed the APA that Barclays was receiving an embedded gain in the assets?

MR. STERN:  Objection.

Q.   Is that correct?

MR. STERN:  Objection to the form.

A.   I don't recall exactly what I said, but I said that it was not my understanding with everyone sitting around the table that there was a common held view that there were assets being

HIGHLY CONFIDENTIAL - S. BERKENFELD

transferred to Barclays to create some sort of -- at a discount to create some sort of embedded gain.

Q.   Is the same true when you signed the clarification letter?

A.   As far as I know, when the clarification letter was signed, the -- all of the people around the room, all of the attorneys involved did not have an understanding that there was an intent to transfer a discount, an embedded gain to Barclays.

Q.   And you, in particular, as the person who signs the clarification letter, did you believe that there was any intent to transfer a discount for the assets that were going to Barclays?

MR. STERN:  Objection to the form.

A.   I did not believe that there was any intent to transfer securities at a discount to create a gain for Barclays.

MS. TAGGART:  That's all the questions I have.  Thank you.

THE WITNESS:  Thank you.

(Discussion off the record.)

Page 298

HIGHLY CONFIDENTIAL - S. BERKENFELD

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   EXAMINATION BY
3   MR. GAFFEY:
4       Q.   Mr. Berkenfeld, Exhibit 50 reflects
5   that there were -- there was still drafting
6   going on with respect to the clarification
7   letter at 6:03 A.M. on Monday, September 22.  Do
8   you see that?  Just based on the date of the
9   e-mail.
10      MR. STERN:  I'll object to the form.
11  That's a statement.  Are you asking him if
12  he agrees?
13      MR. GAFFEY:  Yes.
14      MR. STERN:  That there was still
15  drafting going on?
16      A.   I don't know enough about what form
17  Michael sent over to this group, which was a
18  group that was a different distribution group,
19  included SIPAC and Hughes Hubbard, so I don't
20  know if he was sending him the latest version of
21  the agreement at the time or if he was
22  sending -- it said current version, but it could
23  have been a draft that was hours old.  I don't
24  know.
25      Q.   Does the suggestion of this document

TSG Reporting - Worldwide  (877) 702-9580

Page 299

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   that there was a working draft in existence at
3   6:03 A.M. on Monday morning refresh your
4   recollection as to whether you signed the
5   clarification letter on Sunday night or Monday
6   at the closing?
7       A.   I don't recall specifically, but if
8   you ask for my best recollection, it would have
9   been at about the time of the closing.
10      Q.   And Ms. Taggart asked you about
11  Lehman's pattern and practice with respect to
12  marking securities.  Do you know whether all
13  types of securities were marked every day?
14      A.   I do know that not all types of
15  securities were marked every day.  We did not
16  mark our entire book of securities on a daily
17  basis.  We owned lots of level 3 securities,
18  esoteric securities, and so we didn't go through
19  a daily process of marking those.  Some of those
20  positions would be marked on a monthly or even a
21  quarterly basis.
22      MR. GAFFEY:  I have nothing else.
23  EXAMINATION BY
24  MR. STERN:
25      Q.   You were asked some questions about

TSG Reporting - Worldwide  (877) 702-9580

Page 300

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2   whether --
3       A.   Are you allowed to ask me questions?
4       Q.   I am, sir.
5       You were asked some questions about
6   whether there was an intent to transfer an
7   embedded gain and an intent to transfer
8   securities at a discount, and I believe, correct
9   me if I'm wrong, that you testified that you
10  were not aware that all the parties around the
11  table had any understanding, any common
12  understanding, that the values were such that
13  there was a discount or an embedded gain.  Can
14  you explain what you mean by that?
15      A.   In terms of the security positions, it
16  was my understanding that everyone sitting
17  around the table preparing the agreement, the
18  lawyers for the two parties at the time, were
19  not of the common understanding that part of the
20  transaction was to deliver securities at a
21  discount to their then value to Barclays.
22      Q.   And do you have any knowledge
23  concerning whether there was any discussion
24  among the business term negotiators concerning
25  the possibility of such a discount?

TSG Reporting - Worldwide  (877) 702-9580

Page 301

1   HIGHLY CONFIDENTIAL - S. BERKENFELD
2       A.   I have no knowledge.
3       MR. STERN:  I have nothing else.
4       MR. GAFFEY:  Thanks for your time.
5       (Time Noted: 4:57 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
                    _____
                    STEVEN BERKENFELD
20
21  Subscribed and sworn to
    before me this    day
22  of     2009.
23
                    _____
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 302

HIGHLY CONFIDENTIAL - S. BERKENFELD
CERTIFICATE
STATE OF NEW YORK )
: ss
COUNTY OF NEW YORK)
    I, Kathy S. Klepfer, a Registered
Merit Reporter and Notary Public within and
for the State of New York, do hereby
certify:
    That STEVEN BERKENFELD, the witness
whose deposition is herein before set forth,
was duly sworn by me and that such
deposition is a true record of the testimony
given by such witness.
    I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.
    I further certify that neither the
deponent nor a party requested a review of
the transcript pursuant to Federal Rule of
Civil Procedure 30(e) before the deposition
was completed.
    In witness whereof, I have hereunto
set my hand this 6th day of August, 2009.

        ---------------------------
        KATHY S. KLEPFER, RPR, RMR, CRR, CLR
    TSG Reporting - Worldwide  (877) 702-9580

Page 303

HIGHLY CONFIDENTIAL - S. BERKENFELD
INDEX
WITNESS:        EXAMINATION BY    PAGE
S. BERKENFELD    Mr. Gaffey    5, 298
            Mr. Oxford    240
            Ms. Taggart    278
            Mr. Stern    299
EXHIBITS:            PAGE
Exhibit 17, a document bearing Bates    20
Nos. BCI-EX-00077288 through 77290
Exhibit 18, a document bearing Bates Nos.    43
BCI-CG00033789
Exhibit 19, one-page document, showing    43
columns of assets and liabilities, dated
9/16/2008 at 11:18 A.M.
Exhibit 20, a document bearing Bates    67
Nos. 132841
Exhibit 21, a document bearing Bates    73
Nos. 10309627
Exhibit 22, Barclays PLC Results    125
Announcement, Figures 2008
Exhibit 23, a document bearing Bates    129
Nos. 70283
Exhibit 24, First Amendment to the Asset    135
Purchase Agreement
    TSG Reporting - Worldwide  (877) 702-9580

Page 304

HIGHLY CONFIDENTIAL - S. BERKENFELD
INDEX (Cont'd.)
EXHIBITS:                PAGE
Exhibit 25, a letter dated September    135
20, 2008
Exhibit 26, Notice of Filing of    159
Purchase Agreement
Exhibit 28, a document bearing Bates    183
Nos. BCI-CG00011047 through 11050
Exhibit 29, a document bearing Bates    183
Nos. 10284821 through 10279830
Exhibit 30, an e-mail string, the first    183
of which from P. Dowd to A. Keller, et al.
Exhibit 31, a document bearing Bates    183
Nos. 10279029 through 10279862
Exhibit 32, a document bearing Bates    183
Nos. BCI-EX-00059913 through 59929
Exhibit 33, a document bearing Bates    183
Nos. 10284801 through 10286514
Exhibit 34, a document bearing Bates    183
Nos. 10279028 through 10279851
Exhibit 35, a document bearing Bates    184
Nos. 10284822 and 10279863 through
10279864
    TSG Reporting - Worldwide  (877) 702-9580

Page 305

HIGHLY CONFIDENTIAL - S. BERKENFELD
INDEX (Cont'd.)
EXHIBITS:                PAGE
Exhibit 36, a document bearing Bates    184
Nos. BCI-CG00024252 through 24271
Exhibit 37, a document bearing Bates    184
Nos. BCI-CG00024954 through 24973
Exhibit 38, a document bearing Bates    184
Nos. 10283756 with attachments
Exhibit 39, e-mail from S. Berkenfeld    200
to Beth Rudofker dated Saturday, September
20, at 1:07 P.M.
Exhibit 40, a document bearing Bates    204
Nos. STB-LEH0000272 through 277
Exhibit 41, a document bearing Bates    208
Nos. 10266839 with attachment
Exhibit 42, a document bearing Bates    221
Nos. 10283125 with attachment
Exhibit 43, a document bearing Bates    224
Nos. 10270558
Exhibit 44, a document bearing Bates    227
Nos. 459686
    TSG Reporting - Worldwide  (877) 702-9580

Page 306

1          HIGHLY CONFIDENTIAL - S. BERKENFELD
2                  INDEX (Cont'd.)
3      EXHIBITS:                    PAGE

4      Exhibit 45, a one-page e-mail from Ian     229
5      Lowitt to Steven Berkenfeld, Bart McDade,
6      Alex Kirk, Paolo Tonucci, CC to James
7      Seery, dated 9/22/08 at 7:23 A.M. entitled
8      "Looks Like We're All Set"
9      Exhibit 46, a document bearing Bates     233
10     Nos. BCI-CG00034704 through 34707
11     Exhibit 47, a document bearing Bates     235
12     Nos. BCI-CG00035134 through 35955
13     Exhibit 48, an e-mail from Monty Forrest   251
14     to Alastair Blackwell and others
15     Exhibit 49, a document bearing Bates Nos.  258
16     BCI-CG00024954 through 24972
17     Exhibit 50, a document bearing Bates Nos.  260
18     BCI-CG00027138 through 27148
19     Exhibit 51, Transfer and Assumption Agrmt.  266
20     Exhibit 52, a letter dated September 22,    268
21     2008, from DTC
22     Exhibit 53, a document bearing Bates Nos.  269
23     BCI-EX-(S)-00007181
24     Exhibit 54, a document bearing Bates Nos.  273
25     BCI-EX-(S)-00007197 through 7201

         TSG Reporting - Worldwide   (877) 702-9580