# A. 5 (A)

Page 1

1        HIGHLY CONFIDENTIAL - J. COGHLAN

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF JOHN COGHLAN

14           New York, New York

15           August 13, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24122

**Page 2**

1　　HIGHLY CONFIDENTIAL - J. COGHLAN
2　　　　　August 13, 2009
3　　　　　　9:30 a.m.
4
5　　　HIGHLY CONFIDENTIAL deposition
6　of JOHN COGHLAN, held at Jones Day
7　LLP, 222 East 41st Street, LLP, New
8　York, New York, before Kathy S.
9　Klepfer, a Registered Professional
10　Reporter, Registered Merit Reporter,
11　Certified Realtime Reporter, Certified
12　Livenote Reporter, and Notary Public
13　of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1　　HIGHLY CONFIDENTIAL - J. COGHLAN
2
3　　　A P P E A R A N C E S:
4
5　JONES DAY, LLP
6　Attorneys for Lehman Brothers, Inc.
7　　222 East 41st Street
8　　New York, New York  10017-6702
9　BY:  WILLIAM J. HINE, ESQ.
10　　　GEORGE E. SPENCER, ESQ.
11
12　BOIES, SCHILLER & FLEXNER, LLP
13　Attorneys for Barclays
14　　575 Lexington Avenue - 7th Floor
15　　New York, New York  10022
16　BY:  JACK G. STERN, ESQ.
17
18　SCARING & BRISSENDEN, PLLC
19　Attorneys for the Witness
20　　666 Old County Road
21　　Ste. 501
22　　Garden City, New York  11530-2004
23　BY:  STEPHEN P. SCARING, ESQ.
24
25

**Page 4**

1　　HIGHLY CONFIDENTIAL - J. COGHLAN
2
3　　　A P P E A R A N C E S: (Cont'd.)
4
5　QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
6　Attorneys for the Creditors Committee
7　　51 Madison Avenue
8　　22nd Floor
9　　New York, New York  10010
10　BY:  ERIC M. KAY, ESQ.
11
12　JENNER & BLOCK, LLP
13　Attorneys for the Examiner
14　　330 N. Wabash Avenue
15　　Chicago, Illinois  60611-7603
16　BY:  DAVID C. LAYDEN, ESQ.
17
18　HUGHES, HUBBARD & REED, LLP
19　Attorneys for the SIPA Trustee
20　　One Battery Park Plaza
21　　New York, New York  10004-1482
22　BY:  NEIL J. OXFORD, ESQ.
23
24　Also Present:
25　　RAJESH ANKALKOTI, Alvarez & Marsal

**Page 5**

1　　HIGHLY CONFIDENTIAL - J. COGHLAN
2　JOHN COGHLAN, called as a
3　　witness, having been duly sworn by a Notary
4　　Public, was examined and testified as
5　　follows:
6　EXAMINATION BY
7　MR. HINE:
8　　Q.   Good morning, Mr. Coghlan.
9　　A.   Good morning.
10　　Q.   We met briefly off the record just
11　before this, but my name is Bill Hine.  I'm from
12　the firm of Jones Day and we are special counsel
13　to the Lehman Brothers Holdings, Inc. in
14　connection with the pending bankruptcy
15　proceedings.  This deposition is to take some
16　discovery in connection with that effort.
17　　　　Have you ever been deposed before?
18　　A.   I have.
19　　Q.   You have not?
20　　A.   I have.
21　　Q.   You have, okay.  So you know the
22　drill, generally.  I'm going to ask you some
23　questions.
24　　A.   Uh-huh.
25　　Q.   You're going to give me answers.  On

Page 6

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2 occasion, your counsel might state objections
3 for the record or to instruct me that he thinks
4 my questions are unclear or something wrong with
5 my question. That doesn't relieve you of the
6 obligation to answer the question.
7     A.   Uh-huh.
8     Q.   It just gives me a chance to correct
9 it.
10       In that vein, throughout the course of
11 the day, undoubtedly I will misuse a word or
12 some technical term or some acronym that you
13 folks use every day in your business, so I would
14 ask you to just correct me or ask me to
15 clarify --
16     A.   Uh-huh.
17     Q.   -- any questions you think I might not
18 be getting the concept or might be asking an
19 unclear question. I think it's in everyone's
20 interests to have clear questions so you can
21 answer them.
22     MR. STERN: Let me just point out the
23     reporter is noting your "uh-hum" comments.
24     So going forward, "yes" or "no."
25     Q.   Okay. The reporter takes down -- can

Page 7

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2 only take down verbal answers, so when you nod
3 your head, she can't note that.
4     Can we start off briefly with your
5 previous employment at Lehman Brothers? Were
6 you an employee of LBI?
7     A.   I was.
8     Q.   Okay. And could you tell me what your
9 last position you held at LBI was.
10     A.   I worked in the prime broker. I was a
11 managing director and I was responsible for the
12 secured financing of the firm.
13     Q.   When you say "prime broker," is
14 that -- I see references in some of the
15 documents to Prime Services?
16     A.   Prime Services, yes.
17     Q.   Can you just explain to me what that
18 is?
19     A.   Prime Services has several businesses
20 within it. From a -- the primary businesses or
21 the major businesses are financing businesses,
22 both in fixed income and equities. There is a
23 futures business resides in prime broker, where
24 there are fees for execution and settlement.
25 There is other execution and settlement activity

Page 8

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2 that goes on in prime brokerage relative to
3 equity executions as well. So the piece I was
4 responsible for was the financing piece within
5 the prime brokerage.
6     Q.   Could you explain to me what that
7 means?
8     A.   Yes. The firm basically has two types
9 of assets that it needs to finance on a daily
10 basis. It has assets that it owns as principal
11 that we have bought and put into our position.
12     Q.   Okay.
13     A.   Those trading decisions and those
14 positions are managed outside of the prime
15 brokerage business. And within the prime
16 brokerage business there is a financing business
17 which basically does lending and borrowing of
18 money, collateralized normally by securities,
19 with the objective of making a spread in between
20 the borrowing and the lending on the money. So
21 that's the activity that I manage.
22     Q.   Okay. And you have a team of folks
23 that work for you in that activity, I take it?
24     A.   Yes, I do.
25     Q.   And does that activity entail use of

Page 9

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2 repo transactions or repurchase transactions?
3     A.   It does.
4     Q.   So if we use the term "repo," you will
5 understand what that means throughout this
6 deposition?
7     A.   Yes.
8     Q.   And can you explain to me generally
9 what a repo transaction is?
10     A.   Repo transaction is when I either --
11 well, when I lend money to a third party, I
12 normally do that by lending the money and they
13 will give me some sort of collateral to secure
14 that loan.
15     Q.   Right.
16     A.   Normally, the collateral that they
17 would post are relatively liquid marketable
18 securities. Normally, I'm taking more
19 collateral than I'm lending money so I have some
20 sort of over collateralization protection, and
21 so that would be one leg of the transaction.
22     Once I lend that money, I have to take
23 those securities and repledge them to someone
24 else who will give me money. And so that is the
25 basic dynamic of a repo transaction.

Page 10

1         HIGHLY CONFIDENTIAL - J. COGHLAN
2        Q.    And how Lehman makes money by the
3    difference in --
4        A.    Where I borrow the money and when I
5    loan the money.
6          MR. STERN:  Wait.  He has to finish
7      the question.  Let's let him finish the
8      question.
9        Q.    I just want to understand.  The goal
10   of your department is to make money on these
11   seemingly opposite transactions, right?
12       A.    That's one of the objectives of the
13   department, yes.
14       Q.    So you say you were managing director
15   of this department?
16       A.    Yes.
17       Q.    Okay.  And how long have you held that
18   position?
19       A.    In that department, I believe it was
20   four years.
21       Q.    So roughly since 2004?
22       A.    I believe that's the date, yes.
23       Q.    And what was your position before
24   that?
25       A.    My position immediately before that is

Page 11

1         HIGHLY CONFIDENTIAL - J. COGHLAN
2    I had a similar position running just the fixed
3    income piece of repo.
4        Q.    And how long --
5        A.    Whereas this position included both
6    fixed income, financing and equity financing.
7        Q.    I gotcha.  And how long were you in
8    charge of the fixed income piece of repo?
9        A.    Probably since 1998, I believe.
10       Q.    Prior to that?
11       A.    What was I doing before that?
12       Q.    Yes.
13       A.    Before that, I was running the
14   Investment Grade and High Grade Division for
15   Lehman.
16       Q.    Did that involve repo transactions as
17   well?
18       A.    It did not.
19       Q.    How long have you worked for Lehman?
20       A.    I was there 27 years.
21       Q.    Okay, you started -- do you recall
22   what year you started?
23       A.    1981.
24       Q.    Okay.  The two positions that you just
25   discussed with me, are those the only positions

Page 12

1         HIGHLY CONFIDENTIAL - J. COGHLAN
2    you held that involved repo transactions?
3        A.    Yes.
4        Q.    Is it fair to say --
5        A.    Well, let me clarify.  I did have
6    supervisory responsibility for a year of repo,
7    but I can't recall the date.
8        Q.    Okay.
9        A.    It was in the mid '90s.  So I
10   supervised it for a period of time, moved on to
11   a different position, and then came back in
12   1998.
13       Q.    Fair to say you're very familiar with
14   repo transactions?
15       A.    Yes.
16       Q.    Among the senior management team at
17   Lehman, are you the guy they would usually go to
18   with a question about repo transactions if
19   something came up?
20       A.    I wouldn't be the only person because
21   there are other people that are familiar with
22   the repo business and there are other senior
23   people within it, but, you know, they would
24   obviously ask me questions at times.  But not
25   exclusively.

Page 13

1         HIGHLY CONFIDENTIAL - J. COGHLAN
2        Q.    Okay.  Now I just want to talk about
3    the last position you held, which is the
4    managing director position that you described.
5    Who did you report to in that position?
6        A.    I reported to John Wickham.
7        Q.    Anyone else?
8        A.    No.
9        Q.    And who reported directly to you?
10       A.    Who reported directly?  In that
11   position, David Lohuis, John Nicholson, John
12   Feraca, Janet Hurley, Ian Maynard.
13       Q.    Are these folks traders?
14       A.    Yes.
15       Q.    So your department handles the trades
16   that are involved in effecting a repo
17   transaction, is that fair to say?
18       A.    Yes.
19       Q.    Can you explain to me the
20   difference --
21       A.    Well, repo and stock loan.  So the
22   normal phrase for fixed income financing
23   transactions is repo.  The normal phrase for
24   equity financing transactions is stock loan.
25       Q.    Okay.

## Page 14

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2   A.   They both are financing transactions
3   where we are lending money versus collateral and
4   then relending the collateral to get the money.
5   Q.   Okay.  Again, I'm not trying to
6   mischaracterize.  Is it fair to say it's
7   generally the same mechanics of the transaction,
8   you just call it two different things for those
9   two different types of securities?
10  A.   Yes.
11  Q.   Can you explain to me the difference
12  between what your department does and what Mr.
13  Blackwell's department does as they relate to
14  repo transactions?
15  A.   Well, I can describe what I do.  What
16  I do is, as I said, I manage all the collateral
17  that needs to be financed both for the firm and
18  for the financing business --
19  Q.   Okay.
20  A.   -- in a way I just described, by
21  buying and borrowing and lending money.  And,
22  you know, the kind of the settlement of those
23  transactions are handled by, you know, the
24  treasury.  And Alastair Blackwell has a group of
25  operations people that work with Treasury to

## Page 15

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2   settle trades.
3   Q.   When you say "settle trades," what
4   does that mean?
5   A.   To make sure that the securities go to
6   where they're supposed to go and the cash goes
7   to where it's supposed to go to, make sure all
8   the securities and cash move to their proper
9   locations.
10  Q.   I've heard the phrase "back office."
11  Is that what you would consider what you just
12  described?
13  A.   That's the phrase, yes, that would
14  describe it, yes.
15  Q.   Does your organization that you
16  head -- and again, I'm talking about your time
17  at Lehman.
18  A.   Uh-huh.
19  Q.   Well, let's just take a step back.
20     There came a time when you left
21  Lehman; is that right?
22  A.   Yes.
23  Q.   And when was that?
24  A.   September of 2008.
25  Q.   Okay.  Was it on the date of the

## Page 16

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2   closing of the sales transaction whereby LBI's
3   assets were sold to Barclays?
4      MR. STERN:  Objection to the form.
5   A.   Yeah, I --
6   Q.   Do you know an exact date when you
7   considered yourself to have become a Barclays
8   employee?
9   A.   I do not have an exact date.  I became
10  a Barclays employee, you know, as a result of
11  the Lehman result with Barclays.
12  Q.   Okay.  And what position do you hold
13  at Barclays now?
14  A.   I am in Prime Services business at
15  Barclays.  I'm a managing director and I run the
16  secured financing in the Prime Brokerage.
17  Q.   Does that entail the same type of
18  duties and responsibilities as you previously
19  held at Lehman?
20  A.   It's similar, but not identical.
21  Q.   What's the difference?
22  A.   There were certain parts of my
23  responsibility at Lehman that are not part of my
24  responsibilities at Barclays.
25  Q.   Okay.  And do you report to someone at

## Page 17

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2   Barclays?
3   A.   I do.
4   Q.   Who is that?
5   A.   Ajay Nagpal.
6   Q.   Nagpal?
7   A.   N-A-G-P-A-L.
8   Q.   Anybody else that you directly report
9   to?
10  A.   No.
11  Q.   And who reports to you directly at
12  Barclays?
13  A.   Dave Lohuis, John Feraca, Janet
14  Hurley, John Nicholson, Rich Coffin.
15  Q.   What was the last name?
16  A.   Rich Coffin, C-O-F-F-I-N.
17  Q.   Is it fair to say as a general matter
18  your team moved from Lehman to Barclays with you
19  still in charge of them?
20  A.   In New York, the team moved, yes.
21  Q.   Okay.  I take it Barclays had an
22  existing team elsewhere that did a similar
23  function?
24  A.   Yes.
25  Q.   Okay.

Page 18

HIGHLY CONFIDENTIAL - J. COGHLAN

1

2   A.   Yes. They didn't take LBIE and they
3   didn't take LBJ, so the people that are
4   operating those seats at Barclays are the people
5   that are operating those seats today.
6       Q.   Okay. Fair enough. Now I want to
7   talk about your last position you held at Lehman
8   again.
9       Does your, the group that you managed,
10  which I take it are a group of traders
11  primarily, are they responsible for putting
12  values on securities that you work with?
13      A.   In a lending relationship, we would
14  value securities and mark the securities to
15  market in order to determine what margin
16  requirements are necessary.
17      Q.   So in a typical repo transaction your
18  team would be responsible for assigning a value
19  to the securities that were being assigned as
20  collateral; is that right?
21      A.   Yes.
22      Q.   Okay. I understand that in most repo
23  transactions there's someone called -- someone
24  who serves as a custodian?
25      A.   Uh-huh.

Page 19

HIGHLY CONFIDENTIAL - J. COGHLAN

1

2       Q.   And does the custodian typically place
3   a value on the securities as well?
4       A.   Yes.
5       Q.   Why --
6       A.   In the tri-party relationship. When
7   they're acting on behalf of -- in a custodian
8   capacity, when there's another counterparty
9   involved, they would be valuing those securities
10  on behalf of both parties.
11      Q.   Okay. Why is it necessary for you and
12  the custodian to place values on the securities?
13      MR. STERN:  Objection to the form.
14      I just want to make a statement so
15  that I don't have to object repeatedly.
16      MR. HINE:  Sure.
17      MR. STERN:  And that is that Mr.
18  Coghlan, to the best of my knowledge, is not
19  an attorney and his testimony is concerning
20  his business understanding of these
21  transactions, not the legalities of them.
22      Is that a fair --
23      MR. HINE:  Fair enough. I'm not --
24      Q.   Mr. Coghlan, I'm not trying to inquire
25  into your -- any conversations you've had with

Page 20

HIGHLY CONFIDENTIAL - J. COGHLAN

1

2   counsel, which would be privileged, or your
3   legal understanding. I'm trying to understand
4   your business.
5       A.   Okay.
6       Q.   We'll come back to this valuation
7   question. I just wanted to --
8       MR. STERN:  There was a pending
9       question:
10      Why is it necessary for you as a
11  custodian to place values on the securities?
12  I objected to the form, but you can answer.
13      A.   You know, what the role of a tri-party
14  agent is is not directly my responsibility, that
15  is managed through Treasury, and so the
16  framework of tri-party operations, you know,
17  does not report to me.
18      Q.   Okay.
19      A.   So I don't know if I have enough
20  knowledge to describe that.
21      Q.   Okay. Could you explain to me the
22  difference between a tri-party repo and the ones
23  you were previously discussing?
24      A.   In the ones I was previously
25  discussing, they could have settled through

Page 21

HIGHLY CONFIDENTIAL - J. COGHLAN

1

2   tri-party. In the repo market, there's
3   basically two types of transactions that you can
4   do.
5       You can do a bilateral transaction
6   where Party A and Lehman faced off together and
7   we settle that directly. So I would send or the
8   firm would send collateral to whoever we were
9   instructed, the other party would send cash to
10  where we were instructed, and that would be one
11  way of settling the trade.
12      Q.   Okay.
13      A.   In a tri-party situation, there is a
14  custodian appointed, for Lehman Brothers, it was
15  Chase, and they would be responsible for
16  settling that trade for the benefit of Lehman
17  Brothers and the counterparty. So some trades
18  settle bilaterally and some trades settle
19  through the tri-party.
20      Q.   Okay. I'm going to come back to your
21  repo experience in a minute, but I apologize for
22  being intrusive, but I do need to ask you some
23  questions about your compensation at both Lehman
24  and Barclays.
25      MR. STERN:  This is designated as

Page 22

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   highly confidential.
3       THE WITNESS:  Okay.
4       MR. HINE:  Yes.

REDACTED

24      (Exhibit 115, a document bearing Bates
25   Nos. BCI-EX-00077294 through 77295, marked

Page 23

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   for identification, as of this date.)
3       Q.   Mr. Coghlan, I'm handing you a
4   document which I have marked as Exhibit 115,
5   which appears to be an agreement between
6   Barclays and yourself.  It's Bates-stamped
7   BCI-EX-00077294 through 296.
8          My first question is do you recognize
9   this document?
10      A.   Yes, I do.
11      Q.   What is this?
12      A.   I believe this is a document that I
13   needed to sign as a condition of employment at
14   Barclays.
15      Q.   Is this your employment contract with
16   Barclays?
17      A.   I don't know -- I don't know the
18   definition of an employment contract, so ...
19      Q.   Well, do you consider this document to
20   lay out the amounts that you were expected to be
21   paid when you went to work at Barclays?
22      A.   Yes.

REDACTED

Page 24

1       HIGHLY CONFIDENTIAL - J. COGHLAN

REDACTED

Page 25

1       HIGHLY CONFIDENTIAL - J. COGHLAN

REDACTED

Page 26

1    HIGHLY CONFIDENTIAL - J. COGHLAN

REDACTED

Page 27

1    HIGHLY CONFIDENTIAL - J. COGHLAN

REDACTED

Page 28

1    HIGHLY CONFIDENTIAL - J. COGHLAN

REDACTED

13    Q.  Well, when did you first see this
14 document from Barclays?
15    A.  Somewhere around this date. I can't
16 remember exactly what date.
17    Q.  When you say "this date," you're
18 pointing to September 24, 2008?
19    A.  24, 2008.
20    Q.  Did you have any discussions with
21 folks at Barclays during the week of September
22 15 about your going to work for Barclays after
23 the sale transaction?
24    A.  I can't recall.
25    Q.  Now, throughout this deposition we're

Page 29

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2 going to talk about the week of September 15,
3 and just to reorient you, and I'm sure you're
4 familiar with this, I'm talking about the week
5 from September 15 when LBHI declared bankruptcy
6 until the end of that week. I believe on that
7 Friday LBI declared bankruptcy.
8    A.  Uh-huh.
9    Q.  And then when I talk about the closing
10 of the sale transaction, I believe that took
11 place on the following Monday.
12    A.  Uh-huh.
13    Q.  Okay? So what I'm interested in is in
14 the week from September 15 to the closing of the
15 sale transaction. Did you have any
16 conversations with anyone about the possibility
17 of you going to work for Barclays?
18    A.  There were conversations about going
19 to work at Barclays, and I had those
20 conversations with John Wickham, but I can't put
21 a date on when those conversations were held.
22    Q.  Do you think they were during that
23 week that we just talked about?
24    A.  I don't know. I don't recall.
25    Q.  Okay. What do you recall about those

## Page 30

HIGHLY CONFIDENTIAL - J. COGHLAN

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  conversations?
3      A.  At some point in time, you know, John
4  indicated to me that, you know, I was going to
5  go to Barclays as a Barclays employee, that
6  there would be some sort of compensation
7  associated with that.
8      Q.  Okay.
9      A.  And then, additionally, we had some
10 conversations about the employees that work for
11 me and would they be treated similarly.
12     Q.  Did you have any expectations during
13 that week about what your compensation would be
14 when you went to work for Barclays?
15     MR. STERN: Objection to the form.  He
16     said he didn't know when those conversations
17     took place and now your question
18     incorporates that week.
19     Q.  Okay. You can answer the question.
20     A.  Could you restate the question,
21 please?
22     Q.  Did you have any expectations during
23 the week of September 15 about what you might be
24 paid should you move to Barclays?
25     A.  I -- I can't put the timing of it.

## Page 31

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.  Okay.
3      A.  I would say that any conversations
4  relative to compensation were held either late
5  on the week, something like that.  So in the
6  beginning there were no expectation
7  conversations or --
8      Q.  Okay.
9      A.  There was, you know, there was no
10 communication whatsoever.
11     Q.  Okay.  When is the first time -- well,
12 at some point you spoke with someone from
13 Barclays about you going to work for Barclays,
14 correct?
15     A.  Yes. Yep.
16     Q.  And who was that?
17     A.  Ivan Ritossa, who was on the -- who
18 was an employee at BarCap who was supervising
19 the prime brokerage business at BarCap.
20     Q.  Okay.
21     A.  And I had a conversation with him.
22     Q.  Do you recall when that was?
23     A.  I don't have the exact date.  I don't
24 have the exact date.
25     Q.  Do you recall if it was after the

## Page 32

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  closing of the sale transaction?
3      A.  Yes. I can't -- I don't -- I don't
4  remember the closing date, so whether it was
5  before the closing or after closing, I can't
6  say.
7      Q.  Do you recall if it was after Monday,
8  September 22?
9      A.  I can't recall the date that I had
10 this conversation.
11     Q.  Okay.  And what was -- what do you
12 recall about the conversation?
13     A.  We had a breakfast.  Some of the
14 people that work for me attended.  Ivan was
15 there, and he basically discussed that he was
16 looking forward for us to come and join Barclays
17 and, you know, we discussed some of the things
18 that we needed to do in order to make that
19 transition work effectively.
20     Q.  Did he discuss compensation?
21     A.  Not at breakfast, no.
22     Q.  When did you first discuss
23 compensation with Barclays?
24     A.  Again, I can't put a date on when that
25 first happened.

## Page 33

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.  I guess I'm trying to find out, Mr.
3  Coghlan, was there a negotiation with respect to
4  your compensation between you and Barclays --
5      A.  No.
6      Q.  -- at some point?
7      A.  No.  No, there was no negotiation.  I
8  was told at some point this is the terms,
9  similar to what's outlined in this letter, and,
10 you know, I needed to sign the document and get
11 it back, you know, with a certain date, which,
12 again, I can't remember, you know, in order to
13 finalize the paperwork.
14     Q.  And who told you that?
15     A.  John Wickham.

**REDACTED**

## Page 34

HIGHLY CONFIDENTIAL - J. COGHLAN

REDACTED

5  Q.   Okay.  You're aware that there was an
6  Asset Purchase Agreement signed between Barclays
7  and Lehman, correct?
8       MR. STERN:  Objection to the form.
9  A.   I don't know the definition of asset
10 agreement.
11 Q.   Okay.  Well, we're going to look at it
12 in a minute, but I guess my general question is
13 if you could describe for me your role in the
14 early negotiations, if any, between Barclays and
15 Lehman.  And I'm talking, when I say "early" --
16 let's break it into two different periods.
17      As I understand it, there was some
18 negotiation between Barclays and Lehman prior to
19 LBHI filing bankruptcy.  Are you aware of that?
20 A.   Yes.
21 Q.   Were you involved in those
22 negotiations at all?
23 A.   I was not.
24 Q.   Do you have any understanding of what
25 took place in those negotiations?

## Page 35

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2       MR. STERN:  Objection to the form.
3  A.   I do not recall.
4  Q.   Okay.  Do you have any understanding
5  or recollection about any terms that might have
6  been discussed at that time?  And again, I'm
7  talking about prior to LBHI's filing bankruptcy.
8       MR. STERN:  Objection to the form.
9  A.   Can you repeat the question?
10 Q.   Again, I'm looking at the period prior
11 to --
12 A.   Uh-huh.
13 Q.   -- September 15, prior to LBHI filing
14 bankruptcy, I understood that Barclays and
15 Lehman had some meetings about a possible
16 transaction.  So my question is, do you have any
17 understanding or recollection about any terms
18 that might have been discussed during that
19 period?
20 A.   No, I do not.
21 Q.   And is it fair to say you did not
22 participate in those discussions?
23 A.   That is correct.
24 Q.   Now let's talk about the period
25 immediately after the filing of LBHI's

## Page 36

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  bankruptcy going forward.
3  A.   Uh-huh.
4  Q.   You're aware, aren't you, that at some
5  point in time Barclays and Lehman came to some
6  agreement with respect to a transaction between
7  the two entities, correct?
8  A.   Correct.
9  Q.   Okay.  And were you involved in the
10 initial negotiations of that agreement?
11 A.   I was not.
12 Q.   Were you called in to assist in any
13 meetings relating to that negotiation?
14 A.   I was asked to provide certain
15 information -- certain information.
16 Q.   What types of information?
17 A.   Michael Gelband, who ran Capital
18 Markets, was asking me what -- what was the
19 balance sheet of the financing business going to
20 look like at, you know, at the end of the week.
21 Q.   At the end of the week of September
22 15?
23 A.   Yes.
24 Q.   And what did you tell him?
25 A.   $40 billion.

## Page 37

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  Q.   And I just want to understand what you
3  just told me now.  The balance sheet of the
4  financing business includes what?
5  A.   Both the fixed income matched book and
6  the stock loan business.  When you borrow in
7  securities and move cash, it creates assets on
8  the balance sheet.
9  Q.   Okay.
10 A.   So Michael wanted to know what the
11 size of that balance sheet was going to be at
12 the end of business that week.
13 Q.   Okay.  And you took that to mean the
14 Friday after September 15?
15 A.   Yes.
16 Q.   And how did you come up with the $40
17 billion number?
18 A.   I circled the traders.  We were, you
19 know, during the week, the firm and the matched
20 book was downsizing very rapidly and, you know,
21 we were, you know, customers wanted their
22 collateral back.
23      MR. STERN:  Excuse me.  I just think
24 the reporter -- I want to make sure the
25 reporter has what you said right.  Did you

Page 38

HIGHLY CONFIDENTIAL - J. COGHLAN
1   say the firm and the matched book or the
2   firm in the matched book.
3   A.   No, the firm and the matched book were
4   both -- both returning collateral and returning
5   cash in the matched book as, you know, in rather
6   rapid fashion, and the firm was trying to
7   dispose of assets in a rapid fashion.
8   Q.   When you say "the firm," are you
9   referring to LBI or are you referring to a
10  larger Lehman entity?
11  A.   No, there's two businesses that I
12  touch.  One is the financing business and the
13  other is I financed firm positions.  So when the
14  firm buys a security, I have to repledge that to
15  raise cash to pay for that security.
16  Q.   Okay.
17  A.   So that activity, which does not
18  report to me, was also downsizing as well.
19  Q.   So the $40 billion figure that you
20  gave to Mr. Gelband reflected both of those
21  businesses?
22      MR. STERN:  Objection to the form.
23  A.   No.  The $40 billion was relative to
24  the financing business, where I was responsible

Page 39

HIGHLY CONFIDENTIAL - J. COGHLAN
1   for and managed the balance sheet for the
2   financing business.
3   Q.   Okay.  And was the $40 billion figure
4   that you gave in a projection of a figure that
5   was declining during that week?
6   A.   Yes.
7   Q.   And so you were estimating that by
8   Friday it would be at $40 billion?
9   A.   Yes.
10  Q.   What did you base that estimate on?
11  A.   In looking at, you know, those
12  securities and those transactions where we
13  thought we could return the cash end of the
14  collateral where there was liquidity in the
15  secondary markets that we could unwind trades,
16  and so I worked with the people that work for me
17  and tried to, you know, project where we thought
18  we would be at the end of the week.
19  Q.   So was the decline in this value the
20  result of market declines in the values of the
21  securities, or were you -- and again, I'm going
22  to probably misstate something, but -- or were
23  you unwinding positions and just getting rid of
24  securities?

Page 40

HIGHLY CONFIDENTIAL - J. COGHLAN
1   A.   We basically were returning collateral
2   back to clients and cash to clients.  So the
3   amount of transactions that sat in the business
4   was declining as a result of primarily credit
5   considerations by clients wanting to exit their
6   relationship with LBI as quickly as possible.
7   Q.   And do you know what the amount of
8   that --
9      MR. STERN:  Excuse me.  The business,
10  what are you referring to, the business?
11  Financing business?
12      THE WITNESS:  Yes, the financing
13  business.
14      MR. HINE:  Jack, you'll get a chance
15  to do follow-up questions.
16      MR. STERN:  I just want the record to
17  be clear.  Let's go off the record for a
18  second.
19      (Discussion off the record.)
20  BY MR. HINE:
21  Q.   We previously were discussing the
22  estimate they gave Mr. Gelband about a $40
23  billion figure by Friday.  What was the level of
24  this business on Monday?

Page 41

HIGHLY CONFIDENTIAL - J. COGHLAN
1   A.   I don't recall.
2   Q.   Could you give me an estimate or do
3   you have any general understanding?
4   A.   I don't recall where we were on
5   Monday.
6   Q.   Okay.  And what did Mr. Gelband do
7   with this figure?
8   A.   I don't know.
9   Q.   Did you have any further conversations
10  with him about this estimate?
11  A.   No.
12  Q.   Did you have any discussions with
13  anyone else involved in the negotiations of the
14  transaction between Barclays and Lehman?  And
15  let's just talk about it say on Monday, the
16  15th.
17  A.   To the best of my knowledge, I did not
18  discuss -- have any conversations with people
19  negotiating.  That being said, I don't know who
20  exactly were the negotiators and who was playing
21  what role.
22  Q.   Okay.
23  A.   So, inadvertently, but not -- not in a
24  capacity of discussing an identified person

Page 42

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  negotiating the transaction, you know, giving
3  them information one way or the other.
4    Q.   Okay.  So I understand what you said,
5  but, I mean, other than this one incident with
6  Mr. Gelband, is it correct to say that's the
7  only incident where you recall being called in
8  to provide some information that is going to be
9  used in some negotiation?
10    MR. STERN:  Objection to the form.
11    A.   Could you repeat the question?
12    Q.   Let's try that again.  Were you aware
13  on Monday, the 15th, that there was some
14  discussions going on between Barclays and
15  Lehman?
16    A.   I don't recall what I knew about the
17  Barclays situation on Monday.
18    Q.   Okay.  But at some point on Monday you
19  were called by Mr. Gelband and asked this
20  question that we previously discussed?
21    A.   I don't know if it was Monday.  I
22  don't recall if it was that Monday.  It was
23  during the week at some point he asked me that
24  question.
25    Q.   Do you have any understanding -- let's

Page 43

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  just step back a minute.  Do you have any
3  understanding of what the actual transaction was
4  that was signed on Monday, the 15th, between
5  Lehman and Barclays?
6    A.   No.
7    Q.   Did you ever review the Asset Purchase
8  Agreement that was entered into between Lehman
9  and Barclays on Monday?
10    A.   No, I did not.
11    Q.   Have you ever seen the Asset Purchase
12  Agreement?
13    A.   No, I have not.
14    Q.   Do you have an understanding of what
15  its terms were?
16    A.   No, I do not.
17    Q.   Well, let me just take a minute and
18  let's mark -- let's just use Exhibit 1.
19    MR. STERN:  You want Mr. Coghlan to
20  sit here and read this now?
21    MR. HINE:  No, I do not.  I'm going to
22  refer to specific pages.
23    Q.   Mr. Coghlan, I'm handing you a copy of
24  what has been previously marked as Exhibit 1.
25  That's a document entitled Asset Purchase

Page 44

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  Agreement among several of these entities and
3  Barclays Capital.  And my question is have you
4  ever seen this document before?
5    A.   To the best of my knowledge, I have
6  not.
7    Q.   And is it fair to say you did not see
8  it during that week of September 15th, I take
9  it, right?
10    A.   Again, to the best of my knowledge, I
11  have not seen this document.
12    Q.   Okay.  And is it fair to say that,
13  while you might have some ancillary role in
14  providing information to people who were
15  involved in this negotiation, you were really
16  not involved in the negotiation of this
17  agreement or any such agreement between Barclays
18  and Lehman, is that right?
19    A.   I don't recall being part of any
20  negotiation relative to this agreement.
21    Q.   Were you involved in any later
22  negotiations between Barclays and Lehman?
23    And let me be more specific with my
24  question.  Were you involved in negotiations
25  surrounding what has been called a clarification

Page 45

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  letter later in that week?
3    A.   Rephrase the question.
4    Q.   We see a document which has been
5  called a clarification letter which was entered
6  into over the following weekend at some point.
7    Were you involved in any negotiations
8  relating to the terms of that letter?
9    A.   To the best of my knowledge, no.
10    Q.   Okay.  Were you involved in any
11  negotiations relating to a First Amendment to
12  this Asset Purchase Agreement later during that
13  week?
14    A.   Again, to the best of my knowledge,
15  no.
16    Q.   Okay.  Is it fair to say that during
17  the week of September 15 you were not directly
18  interacting with anyone at Barclays?
19    A.   Say the question again.
20    Q.   I'm just trying to identify any
21  contacts or interactions you might have had
22  during the week of September 15 with folks at
23  Barclays.
24    Do you recall if you had any?
25    A.   Yeah, I had some contact with a

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   gentleman named Marty Malloy.
3       Q.   Okay.
4       A.   And Marty Malloy was a BarCap
5   employee. He was the head of the Prime
6   Brokerage over there.
7       Q.   Okay.
8       A.   And he was on the premises and we had
9   a few conversations relative to the business,
10  you know, what the business looked like. We had
11  some conversations about, you know, the
12  business.
13      Q.   Do you recall when this -- let me just
14  back up a second. Was this one meeting with Mr.
15  Malloy?
16      A.   No, there was more than one meeting.
17      Q.   Okay. Do you recall --
18      A.   Probably like two, maybe three.
19      Q.   Do you recall when these meetings
20  were?
21      A.   They were in the earlier part of the
22  week. I don't recall the exact day.
23      Q.   Can we drill down a little on the
24  specifics of what you discussed? Was the
25  discussion about specific securities that

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   comprise collateral with respect to any
3   agreements or --
4       A.   The discussion was, you know, were we
5   going to transfer any of the assets that were in
6   the matched book over to BarCap and, to the
7   extent that we did that, how would we do that.
8       Q.   All right. When you say "that," are
9   you talking about the mechanics of doing that
10  transition?
11      A.   I'm talking, yeah, about the
12  mechanics, how do we move securities and the
13  positions and the books and records, et cetera,
14  over to BarCap.
15      Q.   Did you discuss with him the value of
16  the collateral that was going to be moved and
17  the securities?
18      A.   No, I did not.
19      Q.   Did you discuss with him the
20  composition of the pool of securities that was
21  going to be moved?
22      A.   No, I did not.
23      Q.   Okay. Did you discuss with him any
24  asset classes that might or might not be moved
25  to Barclays?

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2       A.   No, because, you know, basically Marty
3   was indicating that we were not going to
4   transfer the assets over to BarCap, that they
5   would not be transferred.
6       Q.   And so what was he asking about, then?
7       A.   When I was discussing with him was my
8   impression was that perhaps some of the matched
9   book positions in LBI would be transferred to
10  BarCap and discussed if we were going to do that
11  and, if so, how, he was indicating that he was
12  under the belief that the assets that are in the
13  financing business were not going to be
14  transferred.
15      Q.   Did he say anything else about that?
16      A.   I don't recall.
17      Q.   Is he the only person at Barclays that
18  you had direct interaction with during the week
19  of September 15?
20      A.   I don't recall.
21      Q.   You've used the phrase "matched book"
22  several times. Could you explain to me what
23  that means?
24      A.   So there's two phrases. One is called
25  matched book. That normally is a

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   characterization of fixed income financing book.
3   The equity financing book is described normally
4   as stock loan.
5       Q.   Okay.
6       A.   A matched book is basically a
7   combination of reverse repos and repos
8   collateralized by various fixed income
9   instruments that we, you know, that we manage
10  with the objective of making a financing spread
11  between the borrowing and the lending of the
12  money and the collateral.
13      Q.   And is it -- again, I'm getting close
14  to my limit of knowledge here, but I think you
15  just said your goal is to make the financing
16  spread between repos and reverse repos; is that
17  right?
18      A.   Yes.
19      Q.   Generally?
20      A.   In the fixed income matched book.
21      Q.   And in that matched book, when you say
22  "matched," does that mean that you try to have
23  the amount or value of the repos equal to the
24  amount of the reverse repos?
25      A.   Not necessarily, because some of the

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2  repos you would finance with firm cash.
3      Q.   Okay.
4      A.   Some of the repos may reside in other
5  Lehman entities.  So it would not necessarily --
6  a better way to describe it is probably that the
7  assets and the liabilities would be similar, but
8  not necessarily the reverses and repos.
9      Q.   Okay.  I understand.
10         Now, I've seen the phrase "long
11 positions" and "short positions"?
12     A.   Uh-huh.
13     Q.   Is that a surrogate for what you just
14 called assets and liabilities in this context?
15         MR. STERN:  Objection to the form.
16     Q.   Let me rephrase it.  What does the
17 term "long position" mean in this context?
18     A.   Well, there would be two types of
19 longs that I would describe.
20     Q.   Okay.
21     A.   One would be in firm inventory.  So a
22 trader buys some sort of security, whether it's
23 a convertible bond, investment grade bond,
24 listed equity --
25     Q.   Okay.

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.   -- et cetera.
3         When a trader buys those, he is long.
4      Q.   Right.
5      A.   Similarly, if a trader sells those, he
6  is short.
7      Q.   Okay.
8      A.   In the financing or the matched book,
9  the reverses would be an equivalent of a long,
10 although a different risk characteristic, and
11 the repos would be equivalent of a short.
12     Q.   Okay.
13     A.   One being on the asset side of the
14 balance sheet, one being on the liability side
15 of the balance sheet.
16     Q.   So in your matched book is it correct
17 to say that you try to balance the size of the
18 long positions with the size of the short
19 positions, as a general matter?
20         MR. STERN:  Objection to the form.
21     A.   No, as I said earlier, the -- the
22 assets and liabilities would be similar, not
23 necessarily identical, because there's margins.
24 But they would be similar, but it would not
25 necessarily be reverses and repos, because we

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2  would have, on occasion, securities financed
3  with firm cash, securities financed in other
4  legal entities, i.e., a bank, so it would not
5  necessarily be all reverses and repos.
6      Q.   Okay.  Mr. Coghlan, could you turn to
7  page 6 of this document, and again, I'm just
8  going to ask a particular document.
9         You can review the document, but you
10 see in the middle of page 6, you see something
11 called Purchased Assets?
12     A.   Uh-huh.
13     Q.   And then scrolling down, you will see
14 item D?
15     A.   Uh-huh.
16     Q.   Which lists several different
17 securities and it talks about those securities
18 having a book value as of the date hereof of
19 approximately 70 billion and they're defined as
20 long positions, do you see that?
21     A.   Uh-huh.  Uh-huh.
22     Q.   Early in the week of September 19, did
23 you have any discussions with anyone about the
24 size of your long positions?
25         MR. STERN:  Objection to the form.

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.   The conversation I had that we -- I
3  described to Mike Gelband what I thought the
4  balance sheet was going to look like in the
5  financing of that business.
6      Q.   Okay.
7      A.   The concept of this number, I don't
8  know.  The concept of long positions, I, as I
9  described, I understand the jargon of long
10 positions.
11     Q.   Right.
12     A.   How long positions fit into this
13 document I don't know.
14     Q.   Okay.  When you say the financing
15 business, the projection you gave to Mr.
16 Gelband, is there another business that would be
17 outside of your financing business that would
18 have long positions?
19     A.   Yes.
20     Q.   And what business is that?
21     A.   Many, many of the Lehman Brothers --
22 as I said, the Equity Division could be long,
23 the Fixed Income Division could be long.  Again,
24 it's important to differentiate inventory, where
25 the firm is taking principal risk on that

Page 54

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   security, and the financing business, where the
3   firm is lending money on a collateralized basis.
4       Q.   Okay.  And when you say "inventory,"
5   you're talking about securities that the firm
6   buys and holds for whatever reason --
7       A.   Yes.
8       Q.   -- is that correct?
9       Okay.  And is that typically larger or
10  smaller than the pool of financing business that
11  you were managing?
12      MR. STERN:  Objection to the form.
13      A.   I don't -- I can't recall.
14      Q.   Okay.  I realize I might be asking
15  some naïve questions here, but I'm trying to
16  understand where this $70 billion came from, and
17  before you answer it, if you might turn to page
18  12, you'll see a reference to item little (i) to
19  69 billion in short positions.
20      So my question to you is, I'm trying
21  to understand what those two numbers entail.
22      MR. STERN:  Objection to the form.
23      Q.   If you know.
24      A.   I can't -- I can't opine what those
25  numbers entail.  I have no involvement in this

Page 55

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   document.  I don't know --
3       Q.   I understand.
4       A.   This is the first time I've seen it,
5   so I would be -- I don't know.
6       Q.   Could you tell me what the size of
7   your long and short positions were within the
8   aspect of the firm that you managed on Monday,
9   the 19th?
10      A.   I don't recall.
11      MR. STERN:  Objection to the form.
12      Monday the 19th?
13      MR. HINE:  I'm sorry, Monday the 15th.
14      A.   I don't recall.
15      Q.   On Monday, the 15th, were the long
16  positions in the segment of the firm that you
17  managed $70 billion?
18      A.   I don't recall.
19      Q.   Does it sound like it could have been
20  $70 billion?
21      MR. STERN:  Objection to the form.
22      A.   I don't recall.
23      Q.   Let me ask you this way:  You have
24  previously said you gave Mr. Gelband an estimate
25  of a $40 billion number --

Page 56

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2       A.   Uh-huh.
3       Q.   -- as an estimate for the following
4   Friday.
5       Was the decline in value of that pool
6   of assets so great that it would have declined
7   from 70 billion on Monday to 40 billion on
8   Friday?
9       MR. STERN:  Objection to the form.
10      A.   I don't -- I just don't recall.
11      Q.   Okay.
12      A.   I just don't have that --
13      Q.   Okay.  When you use the term "matched
14  book," is that used outside of just your
15  department as well?
16      MR. STERN:  Objection to the form.
17      A.   The phrase "matched book" generally
18  refers to fixed income financing trades which
19  are, you know, which I supervise.
20      Q.   Uh-huh.  Well, let me just see if I
21  can understand this.  We had talked about the
22  financing business which you supervise versus
23  the firm inventory and the other businesses that
24  the firm was engaged in.
25      Would those other businesses employ a

Page 57

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2   concept of a matched book, to your knowledge?
3       A.   They may have done, independent of our
4   group, repurchase or reverse repos, yes.
5       Q.   Okay.  So is it correct to say that,
6   as an entire entity, Lehman would try to
7   maintain a matched book, as a general matter?
8       MR. STERN:  Objection to the form.
9       A.   Can you repeat the question?
10      Q.   I understand you said that within your
11  finance business you tried to maintain a matched
12  book as a general matter?
13      A.   Uh-huh.
14      Q.   Correct?
15      MR. STERN:  Objection to the form.
16      A.   Can you repeat the question again?
17      Q.   Within your finance business, you
18  mentioned the notion of a matched book, correct?
19      MR. STERN:  Objection to the form.
20      A.   In the finance business, I described
21  that normally the assets and the liabilities,
22  absent some variations, because of margin and
23  some other cash flows, would be somewhat
24  similar, and that's the way, you know, the
25  composition of the matched book would be.

Page 58

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2     MR. STERN: Can we take a short break?
3     MR. HINE: Sure.
4     (Recess; Time Noted: 10:33 A.M.)
5     (Time Noted: 10:38 A.M.)
6  BY MR. HINE:
7    Q.  Mr. Coghlan, I have -- if you could
8  look at page 6 of that document again. And
9  again, I apologize, I know you didn't see this
10  document, but if you look on the Purchased
11  Assets, item D, the item we were talking about
12  previously on long positions?
13    A.  Uh-huh.
14    Q.  If you look through that list of
15  different types of securities, could you tell me
16  which ones fall within the purview of your
17  financing business?
18     MR. STERN: Objection to the form.
19    You can answer.
20    A.  There's two types of these types of
21  securities that -- these securities could be in
22  two ways. They could be in the firm inventory.
23  Again, a government trader could have bought a
24  government bond.
25    Q.  Okay.

Page 59

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.  And so those securities could be part
3  of the government trading business or those
4  could be securities that I borrowed to make a
5  loan and then repo on the other side to raise
6  cash.
7    Q.  Okay. So am I correct to say that
8  each of these types of securities could reside
9  both in your part of the business as well as the
10  inventory part of the business you have
11  discussed?
12     MR. STERN: Objection to the form.
13    You can answer if you understand the
14    question.
15    A.  Well, why don't you repeat the
16  question again. I'm sorry.
17    Q.  Let me try it this way. Are there any
18  securities listed here, types of securities
19  listed here, that would not be in your financing
20  part of the business?
21    A.  Perhaps exchange-traded derivatives
22  and perhaps collateralized short-term
23  agreements, because I don't know what those
24  definitions mean.
25    Q.  Okay. When you say "perhaps," you're

Page 60

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2  just not --
3    A.  I don't know what the definitions,
4  what -- I don't know what section D means when
5  it describes those.
6    Q.  Okay. Let's try Exhibit 19. Mr.
7  Coghlan, I'm handing you a copy of a document
8  marked as Exhibit 19, which is a single-page
9  document with a Bates range BCI-CG-00033789?
10     MR. STERN: Hang on one second. Where
11  do you see that Bates number?
12    Q.  Let me redescribe it then. Mine has a
13  Bates number. The exhibit 19, what's been
14  previously marked as Exhibit 19, is a balance
15  sheet of some sort. My question to you is if
16  you've ever seen this document before.
17    A.  I have.
18    Q.  You have, okay. And when did you see
19  this?
20    A.  I saw this document two days ago when
21  prepping for this meeting with counsel.
22    Q.  Okay. Other than that meeting, have
23  you ever seen this document before?
24    A.  I have not.
25    Q.  You see the date in the upper

Page 61

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2  right-hand corner is 9/16/08, you see that?
3    A.  I do.
4    Q.  Again, I'm wrestling with the same
5  issue. Are there entries on a balance sheet
6  like this that would apply solely to your
7  financing business as a general matter?
8     MR. STERN: Objection to the form.
9    A.  Say the question again. I'm sorry.
10    Q.  We've discussed the distinction
11  between the financing business at Lehman and
12  other businesses at Lehman?
13    A.  Uh-huh.
14    Q.  And my question is, on balance sheets
15  that were typically generated at Lehman, did
16  your financing business typically fall within
17  certain of these categories that are listed on a
18  document like this?
19     MR. STERN: Objection to the form.
20    Q.  Very awkward question, but --
21     MR. STERN: I'm going to object to
22  every question until you establish whether
23  he knows anything about this document, so...
24    A.  Yeah, I -- when I saw this document
25  for the first time, I don't know what this

Page 62

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2  document is. I haven't seen -- I just don't
3  know what it means.
4      Q.  Okay. Have you ever seen a balance
5  sheet in this form generated at Lehman?
6      A.  Not to the best of my memory.
7      Q.  Have you ever seen a balance sheet at
8  all during your years at Lehman?
9      A.  I have seen balance sheets in the
10 financial statements, yes.
11     Q.  Understand that you've never seen --
12 you haven't seen this document prior to your
13 meeting with counsel. Is there any way you can
14 tell me just by looking at these lists of assets
15 whether there's a way to divide this between the
16 financing business that you run and the other
17 entities at Lehman?
18     A.  I don't know how -- I don't know what
19 the document means, so I don't -- I can't answer
20 that question.
21     Q.  Okay. On September 15 or 16, did you
22 have any understanding that the level of assets
23 at Lehman was in the range of $70 billion?
24     A.  No, I did not.
25     Q.  Did you have any understanding about

Page 63

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2  the overall level of assets at Lehman at that
3  period of time?
4      A.  No, I did not.
5      Q.  And so is it fair to say that your
6  understanding of the asset levels of Lehman at
7  that time would relate solely to the financing
8  business that you ran?
9      A.  Say the question again. I'm sorry.
10     Q.  At that time, September 15 or 16?
11     A.  Uh-huh.
12     Q.  Would you have had any knowledge or
13 did you have any knowledge of the amounts of
14 assets at Lehman in other businesses other than
15 the one that you ran?
16     A.  I don't recall having knowledge of
17 that.
18     Q.  Do you have any recollection of any
19 discussions about $70 billion worth of assets at
20 that time?
21     A.  Say the question one more time. I'm
22 sorry.
23     Q.  Do you have any recollections of any
24 discussions during the week of September 15th
25 about --

Page 64

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.  I don't.
3      Q.  -- a figure in the ballpark of around
4  $70 billion worth of assets?
5      A.  I don't recall having conversations
6  about that.
7      Q.  Did you ever hear that mentioned
8  anywhere during that week?
9      A.  I don't recall that.
10     Q.  Did you ever hear the figure $$69
11 billion in liabilities mentioned during that
12 week?
13     A.  I did not hear that. I don't recall
14 hearing that.
15     Q.  Okay. While we're marking that, let
16 me ask you another question, too, on that one
17 document.
18     MR. STERN: On 19?
19     MR. HINE: Yes.
20     Q.  You see in the lower right-hand corner
21 of that document, Mr. Coghlan, the two entries,
22 one for cure payment and one for comp? Do you
23 see that?
24     A.  Yes, I do.
25     Q.  Did you have any discussions during

Page 65

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2  that week, and that's the week of September 15,
3  about issues relating to cure payments?
4      A.  No, I did not.
5      Q.  Is that something that would normally
6  fall within your purview of your business?
7      A.  No, it does not.
8      Q.  Do you recall any discussions during
9  that week about agreements between Barclays and
10 Lehman as to compensation?
11     A.  I don't recall if the compensation
12 discussions that I had with Barclays occurred
13 during that week.
14     Q.  Okay. And let me draw a distinction
15 between the compensation discussions we
16 discussed earlier about your own personal
17 compensation and just the compensation for a
18 pool of Lehman employees that were eventually
19 going to go to Barclays.
20     So do you recall any discussions
21 during that week about an aggregate type of
22 agreement between Lehman and Barclays as to
23 compensation?
24     A.  I don't recall that, no.
25     Q.  Do you recall any discussion or ever

Page 66

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2 hear any mention of a $2 billion figure relating
3 to compensation?
4     A.    I do not recall hearing that.
5     Q.    Did you hear or have any understanding
6 that that figure had been bandied about?
7         MR. STERN:  Objection to the form.
8     A.    Not to the best of my knowledge, no.
9     Q.    Did you have any understanding during
10 that week at all about a $2 billion figure
11 relating to compensation?
12     A.    No, I did not.
13     Q.    Mr. Coghlan, do you -- again, I'm
14 asking you to put yourself back in the week of
15 September 15.
16     A.    Uh-huh.
17     Q.    Did you have any understanding or did
18 you ever hear any mention that there was going
19 to be some sort of discount involved in the
20 transaction between Barclays and Lehman?
21     A.    I did not hear that, no.
22     Q.    Did you ever hear any mention of the
23 notion that Barclays was going to pay $5 billion
24 less than the value of Lehman's marks?
25     A.    I did not hear that, no.

Page 67

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2     Q.    Did you ever hear any -- again, I'm
3 not asking you if you heard that phrase in
4 particular, but did you hear any general
5 discussions about a discount with respect to the
6 transaction between Barclays and Lehman?
7     A.    I did not.
8     Q.    Did you ever hear the phrase "block
9 discount" used with respect to a transaction
10 between Barclays and Lehman?
11     A.    I have not heard that.
12     Q.    Did you ever hear any discussions of
13 the use of the phrase "haircut" with respect to
14 the transaction between Barclays and Lehman?
15     A.    I did not hear that, no.
16     Q.    In your business, what is the term
17 "haircut" typically used for?
18     A.    Normally in a lending relationship, a
19 haircut is the amount of over-collateralization
20 you would receive in order to give you a better
21 credit protection.  As an example, if I was
22 doing a trade with mortgage securities and a
23 financial institution wanted to borrow $100
24 million from me, I would probably take $105
25 million worth of collateral, mortgage

Page 68

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2 collateral, from that financial institution as
3 over-collateralization.
4         So that difference between $100
5 million lent and market value of securities of
6 105 million, that 5 million is called the
7 over-collateralization.
8     Q.    And using your hypothetical, the
9 over-collateralization of 5 million is called
10 the haircut, typically?
11     A.    Yes.
12     Q.    And in a repurchase transaction -- I'm
13 sorry, was your hypothetical involving a
14 repurchase transaction?
15     A.    Yes.
16     Q.    I just want to draw some distinctions
17 about some terms.  Using your hypothetical, the
18 buyer would pay $100 million and receive $105
19 million worth of collateral; is that right?
20     A.    I would lend money to a financial
21 institution, for example.
22     Q.    Okay.
23     A.    I would lend him $100 million.
24     Q.    Right.
25     A.    Financial Institution A.

Page 69

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2     Q.    Right.
3     A.    They would have to give me collateral.
4     Q.    Okay.
5     A.    Because I don't do business unsecured.
6 So I would require them to post a margin, and
7 like in mortgage securities, that would be
8 probably something like 5 percent, which would
9 result in them giving me $105 million worth of
10 collateral against the $100 million loan.
11     Q.    When you say "margin," is that the
12 same as haircut?
13     A.    Yes.
14     Q.    Okay.  And now, to unwind that
15 transaction, is there something called a
16 repurchase price that allows that institution to
17 buy back its collateral?
18     A.    A repurchase price that would allow
19 them to buy back?
20     Q.    Well, I'm trying -- how would you
21 typically unwind that transaction --
22     A.    So --
23     Q.    -- when it ended?
24     A.    I would return the $105 million worth
25 of collateral, he would give me my $100 million

Page 70

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2 back, and the trade would unwind.
3     Q.   And how does Lehman make money on
4 that?
5     A.   Because I -- I would that I collateral
6 from the financial institution and I would
7 borrow money to pay for that collateral, and
8 hopefully the money I lent to the financial
9 institution is higher than what I borrowed from
10 the lender to me.
11     Q.   I guess what I'm trying to find out
12 is, what does the term "repo rate" mean?
13     A.   I don't know that legal definition.
14     Q.   Okay.  No, I didn't think it was a
15 legal definition.  I have seen it in documents.
16 I was wondering what your understanding of the
17 term "repo rate" means.
18     A.   I don't understand that definition.
19     Q.   Okay.  In some repurchase transactions
20 isn't it the case that the party that lent the
21 collateral initially has to buy it back at a
22 higher price than it was provided in the loan?
23     A.   I don't understand the question.
24     Q.   Okay.  Have you seen repo transactions
25 where -- let's use your hypothetical.

Page 71

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2     A.   Uh-huh.
3     Q.   Institution A gives you $105 million
4 worth of collateral --
5     A.   Uh-huh.
6     Q.   -- and you pay them $100 million.
7     A.   Uh-huh.
8     Q.   Again, I'm beyond my area of expertise
9 here, but I understand that in some repo
10 transactions if Institution A wants to unwind
11 that transaction, he has the right to buy back
12 that $105 million --
13     A.   Uh-huh.
14     Q.   -- worth of collateral, but instead of
15 paying 100, he might have to pay 101.
16     Is that ever the case?
17     MR. STERN:  Objection to the form.
18     A.   I don't know that.  I just don't
19 understand the question.
20     Q.   Okay.  Have you ever seen what's
21 called a repurchase price in a repo transaction?
22     A.   I don't know the definition of a
23 "repurchase price."
24     Q.   That's not a term you would see in the
25 normal course of your business?

Page 72

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2     A.   No.
3     (Exhibit 116, a document bearing Bates
4 Nos. 10303063, marked for identification, as
5 of this date.)
6     Q.   Mr. Coghlan, I'm handing you a
7 document marked as Exhibit 116, which has the
8 number at the bottom 10303063, and it appears to
9 be an e-mail dated September 15, 4:22 A.M.,
10 Greenwich Mean Time, between Mr. Feraca and
11 yourself.
12     Am I correct to say that 4 A.M.
13 Greenwich Mean Time would be Sunday night here
14 in the U.S.?
15     A.   I don't know.
16     Q.   Okay.  My question about this e-mail,
17 it says -- you'll read in the e-mail it says,
18 "By his estimate, the amount of tri-party
19 maturities for tomorrow plus all tri-party
20 financings on open amounts to about 102 billion.
21 This includes all current tri-party products in
22 LBI only."
23     Do you recall this e-mail, Mr.
24 Coghlan?
25     A.   No, I don't.

Page 73

1     HIGHLY CONFIDENTIAL - J. COGHLAN
2     Q.   Can you tell by looking at it what
3 he's talking about with that $102 billion
4 figure?
5     A.   "... to about 102 billion."
6     Q.   Yeah.
7     A.   That probably means that we have to
8 have raised $102 billion in tri-party to, you
9 know, to do a financing of trades.
10     Q.   Okay.  So this is he's talking about
11 you're financing part of the business, right?
12     A.   Yes.
13     Q.   And he works for you, correct?
14     A.   John Feraca, yes.
15     Q.   Okay.  You remember previously we
16 talked about the $40 billion estimate you gave
17 to Mr. Gelband about Friday, the value of the
18 business as of Friday?
19     A.   Uh-huh.
20     Q.   The upcoming Friday?
21     A.   Uh-huh.
22     MR. STERN:  Objection to the form.
23     Q.   I'm just trying to get you back to
24 that testimony.
25     Does this $102 billion figure

Page 74

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   mentioned here on the previous Sunday or Monday
3   relate in any way to the estimate that you gave
4   Mr. Gelband about the $40 billion?
5          MR. STERN: Objection to the form.
6      A.   I don't recall this document.
7      Q.   Right.
8      A.   So I can't say how this document foots
9   to the information, if at all, to the numbers I
10  gave Mr. Gelband.
11     Q.   Okay. Does this refresh your
12  recollection in any way about the level of the
13  value of the business as of the Monday?
14     A.   No, it does not.
15         MR. STERN: Objection to the form.
16     Q.   Okay.
17         MR. STERN: When you say "the
18  business," I assume you are referring, Mr.
19  Hine, to the financing business?
20         MR. HINE: I was.
21     Q.   Mr. Coghlan, I'd like to ask one
22  follow-up question about the previous exhibit,
23  the APA, the $70 billion figure that we had
24  looked at previously, and the balance sheet,
25  which is Exhibit 19. So it will be Exhibits 1

Page 75

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   and 19, if you just open them to page 6 of
3   Exhibit 1 and page 19.
4      A.   Uh-huh.
5      Q.   And I understand your limited or lack
6   of access to these two documents, but could you
7   just -- is there any way you could tell me --
8          Here's my problem: I see on Exhibit
9   19 the figure $73 billion in assets, do you see
10  that?
11     A.   Yes, I do.
12     Q.   And I'm trying to reconcile that with
13  the $70 billion long position that's mentioned
14  in the other document. Is there any way you
15  could speculate or hazard a guess as to how
16  those numbers could be different?
17         MR. STERN: Objection to the form.
18  Calls for speculation.
19     Q.   You can answer.
20     A.   No, I don't know.
21     Q.   Same question with respect to the
22  liabilities. You wouldn't know either?
23         MR. STERN: Same objection.
24     A.   No, I don't know.
25     Q.   Okay. That's all I have with those

Page 76

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   exhibits.
3          Mr. Coghlan, do you have any role in
4   the preparation of LBHI's or LBI's bankruptcy
5   filing?
6      A.   No, I did not.
7      Q.   Were you consulted as to anything
8   with respect to those filings?
9      A.   Not to the best of my knowledge.
10     Q.   I take it you never appeared in court
11  with respect to the bankruptcy proceedings of
12  either of those entities?
13     A.   That's true.
14     Q.   Okay. Could we just talk for a minute
15  about repo agreements in general? As I
16  understand it, there's something called a Master
17  Repurchase Agreement?
18     A.   There is.
19     Q.   And what is the role of that
20  agreement, if you know?
21     A.   It documents the terms of the repo
22  agreement between an institution, such as
23  Lehman, and counterparties that we do financing
24  transfers.
25     Q.   So there would be a master agreement

Page 77

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   between Lehman and Barclays, for example?
3      A.   There could be, yes.
4      Q.   I'm not trying to trick you. I'm
5   going to introduce an exhibit here. I just want
6   to not so much ask you questions about this
7   exhibit, I just don't want to be seen to try to
8   be misleading here. So I'm going to give you
9   the agreement and ask you if you've seen it
10  before.
11         (Exhibit 117, Master Purchase
12         Agreement, marked for identification, as of
13         this date.)
14     Q.   Mr. Gelband, I'm handing you two
15  documents. One is Exhibit 117, which is
16  entitled Master Repurchase Agreement.
17         MR. STERN: This is Mr. Coghlan.
18         MR. HINE: Oh, I'm sorry. You
19  apologize. I got Mr. Gelband on the brain.
20     Q.   Mr. Coghlan, I'm handing you Exhibit
21  117, which is entitled Master Repurchase
22  Agreement, and you'll see it's dated as of July
23  23, 1998.
24         Have you ever seen that document
25  before?

Page 78

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    A.    No, I have not.
3    Q.    Is it fair to say that this document
4    is not something you normally use in the course
5    of your business?
6    A.    It's not something that I would
7    personally review or, you know, and execute,
8    yes.
9    Q.    And fair to say that you're not
10    involved in negotiating the terms of this
11    agreement?
12    A.    To the best of my knowledge, I did not
13    negotiate terms of this agreement.
14    Q.    I also handed you a document which has
15    been previously marked as 57B.
16    A.    Uh-huh.
17    Q.    Which is entitled Amendment Agreement,
18    dated as of September 15.  Do you see that?
19    A.    Yes, I do.
20    Q.    Have you ever seen this document
21    before?
22    A.    Not to the best of my knowledge.
23    Q.    I take it, then, you were not involved
24    in any kind of negotiations or discussions
25    around this amendment, which is filed on Monday

Page 79

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    or dated as of Monday, the 15th?
3    A.    Not to the best of my knowledge.
4    Q.    Do you have any understanding of why
5    an amendment was entered into on that Monday
6    with respect to the master agreement?
7    A.    I do not know why.
8    Q.    Did you ever hear an amendment to the
9    Master Repurchase Agreement being discussed?
10    A.    Not to the best of my knowledge.
11    Q.    Ever hear any mention of any kind of
12    amendments to the Repurchase Agreements?
13    A.    Not to the best of my knowledge.
14    Q.    Is this something that would be
15    handled by another department?
16    MR. STERN:  Objection to the form.
17    Q.    Let me rephrase that.  Is the
18    documenting of the Master Repurchase Agreement
19    and amendments generally something that's
20    handled by another department within Lehman?
21    A.    The GMRAs and amendments to the GMRAs
22    normally would be handled by contract -- a group
23    called Contract Finance that do the
24    documentation work.  Whether they did that in
25    this case I don't know.

Page 80

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    Q.    That's within the Legal Department?
3    A.    Yes.
4    Q.    My question wasn't who handles the
5    documentation, but who would decide -- who
6    generally enters -- decides when an amendment is
7    needed?
8    A.    I don't know.
9    Q.    Okay.  Does your department ever get
10    involved in amending the MRA?
11    A.    There may be times when there's
12    certain issues brought to my attention that they
13    would want my opinion about if we were going to
14    make, not necessarily an amendment, but any sort
15    of adjustment in the MRA, GMRA.
16    Q.    Do you recall any discussions during
17    the week of September 15 about making any
18    adjustments to the MRA?
19    A.    I do not recall having any of those
20    conversations.
21    Q.    Did you hear any mention during that
22    week of any kind of adjustments that were going
23    to be made to the MRA?
24    A.    I did not.
25    Q.    Do you have any understanding of why

Page 81

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    an amendment was made to the MRA on September
3    15?
4    A.    I have no understanding why an
5    amendment was executed.
6    Q.    If I walk you through various
7    provisions of this agreement, I would take it
8    you would not know why they were -- why those
9    provisions were changed?
10    A.    I haven't seen this document.  I don't
11    know the framework on which the document was
12    negotiated.
13    Q.    Fair enough.
14    A.    So --
15    Q.    Let me ask you, if you turn to the
16    page which is marked at the top Schedule VIII.A
17    in Roman numeral VIII.A?
18    MR. STERN:  Where is this?
19    MR. HINE:  In the upper left-hand
20    corner it says Schedule VIII.A.
21    MR. SCARING:  I'm sorry, what
22    agreement are you referring to?  What
23    exhibit?
24    MR. HINE:  Same Exhibit, 57B.  I'm
25    sorry.  The seventh page of 57B entitled

Page 82

HIGHLY CONFIDENTIAL - J. COGHLAN

"Schedule VIII.A."

Q. You see in paragraph 2, Mr. Coghlan, there's an amendment to paragraph 7 of Annex VIII and it deals with the rights of the buyer in purchased securities, and I know you have never seen this document before.

Do you recall any discussions during the week of September 15 about any reason to amend or change the rights of buyers in purchased securities?

A. I don't recall, no.

Q. You don't have any understanding of why that might have been done during that week?

A. No, I do not. No.

Q. Could you turn two more pages to something called "Schedule A dated as of September 15." Have you ever seen a schedule like this to an MRA?

A. Yes.

Q. And what are these schedules typically used for?

A. To talk about the haircuts that the parties proposed.

Q. So when I see the column that says

Page 83

HIGHLY CONFIDENTIAL - J. COGHLAN

"Margin Percentage," is that a haircut? Is that the haircut?

A. Yes.

Q. And previously we talked about the word "margin" versus "haircut." They're used simultaneously in this context?

A. Yes.

Q. Now, with respect to this particular Schedule A, do you recall any discussions during the week of September 15 about amending Schedule A to the MRA?

A. I don't recall having any conversations.

Q. Was there any need during that week to amend this schedule with respect to any repos that you were working on during that time?

A. Could you say that -- repeat?

Q. Let me try again. Do you recall during that week any need or discussions or suggestion that Schedule A to the agreement between -- the Master Agreement between Lehman and Barclays would have to be amended in some way?

A. I don't recall having any of those

Page 84

HIGHLY CONFIDENTIAL - J. COGHLAN

discussions.

Q. Any mention or understanding of the -- discussions about a haircut between -- with respect to the Lehman/Barclays Repurchase Agreements?

A. Not that I can recall.

Q. Okay. Does this list here look like the haircuts that were being used during that week?

MR. STERN: Objection to the form.

A. I can't recall.

Q. Do you recall if the haircuts were much larger that week than this, this type of level?

MR. STERN: Objection to the form.

Q. Or no recollection at all?

A. No recollection.

Q. Am I correct to say that a Schedule A like this would also be used to list the types of collateral that could be eligible -- I'm sorry, the types of securities that could be considered eligible to be used as collateral in a repo agreement?

A. This is a tri-party agreement.

Page 85

HIGHLY CONFIDENTIAL - J. COGHLAN

Q. Okay.

A. And there's a concept called Schedule A --

Q. Right.

A. -- which lists the collateral that the counterparty will take and the haircut associated with it.

Q. Okay. And that's typical of a tri-party agreement?

A. To the best of my knowledge, yes.

Q. Is it not typical of a regular repo?

MR. STERN: Objection to the form.

A. I --

Q. I guess let me rephrase it. I'm trying to understand why you said this is a tri-party agreement.

Is there something distinct with respect to Schedule A between tri-party repos and other types of repos?

A. As I said earlier, some repos are bilateral, so they would -- the haircuts would be negotiated at the point of transaction.

Q. Right.

A. Here, the transaction is settled

Page 86

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   through a tri-party, where the tri-party agent
3   is settling the trade and the parties agree to
4   what the terms are, you know, at the initiation
5   of the tri-party level and the tri-party agent
6   would operate and settle trades based on this
7   schedule.
8      Q.   Okay. I see. Do you recall any
9   discussions on the week of September 15 about
10  redefining what could be considered eligible
11  collateral for the Lehman/Barclays repo
12  agreement?
13     A.   I don't recall having any of those
14  conversations.
15     Q.   Who at Lehman would have been involved
16  in this type of amendment to the MRA?
17       MR. STERN: Objection.
18     Q.   If you know?
19       MR. STERN: Objection to the form.
20     A.   As I said, there was a group of people
21  called -- described as Contract Finance --
22     Q.   Okay.
23     A.   -- that would handle negotiations and
24  documentation. I don't know if this document
25  was part of that because I was not privy to

Page 87

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   that.
3      Q.   Is a Mr. Guglielmo part of that group?
4      A.   He's an employee in that group, yes.
5      Q.   Mr. Coghlan, I'm handing you a
6   document that's previously been marked as
7   Exhibit 56. On the front cover is an e-mail, in
8   which I believe you're not involved, but I would
9   direct your attention to the document that
10  starts on page 3 which is entitled "Custodial
11  Undertaking in Connection With Master Repurchase
12  Agreement."
13       MR. STERN: Are you going to give him
14     an opportunity to review this document?
15     Q.   You can if you like, but my real
16  question is have you ever seen this document
17  before?
18     A.   I have not.
19     Q.   I think I can save you the time to
20  review it if I can just ask you a couple of
21  questions.
22       Were you involved in any discussions
23  during the week of September 15 with respect to
24  a custodial undertaking agreement involving
25  Lehman and Barclays and JPMC?

Page 88

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.   To the best of my knowledge, no.
3      Q.   Would that be handled by the same
4   group you just mentioned, the Contract Group?
5      A.   I don't know.
6        MR. STERN: Objection to the form.
7      Q.   Do you recall any discussions or
8   rumors or any understanding you might have had
9   during that week about the need to amend or
10  change a custodial undertaking agreement
11  involving JPMC during that week?
12       MR. STERN: Objection to the form.
13     A.   Could you repeat that again? I'm
14  sorry.
15     Q.   Do you recall any understanding or
16  rumors you might have heard about why a
17  custodial undertaking agreement involving JPMC
18  was going to be amended or -- during that week?
19       MR. STERN: Objection to the form.
20     A.   I do not recall hearing anything about
21  any documentation adjustments with Barclays.
22     Q.   Okay. This involves JPMC as well, who
23  is apparently the custodian?
24     A.   I do not recall.
25     Q.   Just as a general matter, JPMC was

Page 89

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2   Lehman's custodial agent in repos; is that
3   correct?
4      A.   It was one of them.
5      Q.   Okay. And was Bank of New York
6   Barclays' custodial agent?
7      A.   It was one of them.
8      Q.   Can we just talk generally? Am I
9   correct to say you really don't have any
10  familiarity with this document?
11     A.   I have never seen the document. I've
12  never heard the phrase "custodial undertaking,"
13  so I've never seen this document before.
14     Q.   Okay. Fair enough.
15       I want to just talk generally about
16  the different -- some of the different
17  financings during this week. Were you involved
18  in securing financing from the Fed for LBI
19  during the week of September 15?
20     A.   I was not directly involved.
21     Q.   Okay. And would that have been
22  handled by a department outside of your
23  financing business?
24     A.   It would have been the responsibility
25  of Treasury to do that.

Page 90

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  Q.  Okay.
3  A.  There were probably people in my group
4  that helped them, but the, you know, the
5  settlement of the securities and the tri-party
6  was managed by Treasury.
7  Q.  Okay.  This was a new financing for
8  LBI during that week; is that right?
9  A.  I believe it was, yes.
10  Q.  And do you recall why LBI undertook
11  this financing arrangement with the Fed?
12  A.  I do not know why, no.
13  Q.  Do you recall any discussions about a
14  decision to try to keep LBI open during that
15  week while LBHI declared bankruptcy?
16  A.  Could you say the question again?
17  Q.  Do you recall any discussions or
18  understanding about an effort to keep LBI open
19  or in business during that week while LBHI --
20  A.  I was not part of any discussions
21  about that.
22  Q.  Okay.  Do you have any understanding
23  of why LBI did not file bankruptcy until the
24  following Friday, when other entities filed on
25  Monday?

Page 91

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  A.  I do not know why.
3  Q.  Do you know why LBI entered into this
4  Fed financing arrangement?
5  A.  No, I don't.  I do not know why.
6  Q.  Were you involved in the efforts
7  during the middle of the week to substitute this
8  Fed financing with a different financing vehicle
9  involving Barclays?
10  A.  I was not --
11  MR. STERN:  Objection to the form.
12  A.  I was not directly involved.
13  Q.  Do you have understanding what was
14  supposed to take place in that regard?
15  A.  I don't recall.
16  Q.  Did you have any understanding during
17  that week that Barclays was going to enter into
18  a tri-party repo with Lehman and Bank of New
19  York that was supposed to replace financing that
20  had been provided during the early part of the
21  week by the Fed?
22  MR. STERN:  Objection to the form.
23  A.  I understood that there was going to
24  be -- the collateral was going to be moved out
25  of Chase into Bank of New York.  So I understood

Page 92

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  that that was going to happen.
3  Q.  Do you know the value of the
4  collateral that was posted to the Fed financing?
5  A.  No, I don't.
6  Q.  Would your team have been involved in
7  determining that value?
8  A.  I don't believe so.
9  Q.  Who do you think would have been
10  involved in that?
11  A.  I don't know.
12  Q.  Did you have any involvement in
13  selecting the collateral that was posted in
14  support of the Fed financing?
15  A.  No.
16  Q.  Do you know who was involved in that?
17  A.  No, I do not.
18  Q.  Would it have been anyone within your
19  business group?
20  A.  To the best of my knowledge, no.
21  Q.  But you have to have some knowledge of
22  what collateral is -- has been pledged to the
23  Fed, correct, at that time?
24  MR. STERN:  Objection to the form.
25  A.  No, I would not necessarily know that.

Page 93

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  Q.  Well, let me ask you a question:  If a
3  certain pool of collateral gets pledged to the
4  Fed on Monday, the 15th?
5  A.  Uh-huh.
6  Q.  Is that collateral no longer something
7  that you can use in your matched book financing
8  arrangements?
9  MR. STERN:  Objection to the form.
10  A.  You know, that collateral would have
11  been already financed, so it would not be
12  required for me to finance that if the Fed was
13  financing that.
14  Q.  Okay.  I'm trying to get a distinction
15  between the financing business that we talked
16  about earlier versus the other businesses.
17  A.  Uh-huh.
18  Q.  Was the collateral that was posted to
19  the Fed finance -- or, used to collateralize the
20  Fed financing on September 15, did that come out
21  of the pool of collateral that you would
22  normally manage in your matched book?
23  A.  I don't know.
24  Q.  Who would know that?
25  A.  Probably Treasury.

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Q.    Okay.
3    A.    Would know what collateral was pledged
4    to the Fed.
5    Q.    That's Mr. Tonucci's group?
6    A.    I believe so, yes.
7    Q.    So if it had come out of -- had the
8    collateral that was pledged to the Fed come out
9    of the assets that you would normally be
10   managing, would that have had some impact on
11   your ability to manage your balanced book?
12       MR. STERN:  Objection to the form.
13   A.    If the firm had pledged collateral to
14   the Fed, that would be collateral that I would
15   not have to finance.  We would already have
16   raised cash against it.
17   Q.    Okay.
18   A.    So the amount of cash I would have to
19   raise would go down because the Fed would be
20   lending us money as opposed to other third
21   parties.
22   Q.    Okay.  Now, were you involved in the
23   transferring of the collateral that was posted
24   to the Fed financing to this new repo -- let's
25   just get some terms here first.

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2        If I talk about the Fed financing,
3    you'll understand that I'm talking about the
4    financing that was entered into earlier in the
5    week --
6    A.    Uh-huh.
7    Q.    -- involving the Fed, correct?
8    A.    Uh-huh.
9        MR. STERN:  Objection to the form.
10   Q.    Then I would like to refer you to the
11   shorthand to refer to the Barclays repo, which
12   in my parlance is a repurchase -- a tri-party
13   agreement between Barclays, Bank of New York,
14   and Lehman.
15       MR. STERN:  What's your basis for that
16   assertion?
17       MR. HINE:  Well, I'm not asserting
18   anything.  I just want to -- let's --
19       MR. STERN:  Well, wait.  Look.  Look.
20   Look.
21       MR. HINE:  Let me ask the question
22   again, Jack, okay?
23       MR. STERN:  Well, if you have a
24   question about whether it's a tri-party,
25   that's fine, but to make an assertion --

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2        MR. HINE:  I'm not making an
3    assertion.  I'm trying to clarify something.
4    So let me fix -- I hear your objection.  Let
5    me just fix it.
6        MR. STERN:  I'm curious what caused
7    you to say it was a tri-party between
8    Barclays, Bank of New York and Lehman.  I'm
9    very interested in --
10       MR. HINE:  Jack, do you have an
11   objection you want to put on the record?
12   Otherwise, stop coaching the witness.
13       MR. STERN:  I'm not coaching the
14   witness.  I'm asking you, can you ask him a
15   question?
16       MR. HINE:  I will.
17   Q.    Mr. Coghlan, are you aware of any
18   financings during that week between Barclays and
19   Lehman?  And I mean the week of September 15.
20   A.    Barclays and Lehman?  No, I'm not
21   aware of one.
22   Q.    Are you aware of any repo agreements
23   between Barclays and Lehman during the week of
24   September 15?
25   A.    Not that I can recall.

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Q.    Okay.  Are you aware of any efforts to
3    take the collateral from the Fed financing and
4    place it into another repo arrangement involving
5    Barclays during the week of September 15?
6    A.    I was aware that we were moving
7    collateral from the Fed financing to Bank of New
8    York, and I was aware of that.
9    Q.    Okay.  And did that involve a repo
10   arrangement with Barclays?
11   A.    I don't know.  I don't recall.
12   Q.    And why were you moving collateral
13   from the Fed financing to Bank of New York?
14   A.    I don't know why we did that.  I don't
15   recall.
16   Q.    What was your role in that?
17   A.    My role in that was limited in the
18   sense that I was not involved in that operation,
19   if you would, and -- other than one of my
20   employees was working long hours to help in that
21   transfer from -- from the Fed to the Bank of New
22   York.
23   Q.    And who was that?
24   A.    John Feraca.
25   Q.    Feraca?

Page 98

HIGHLY CONFIDENTIAL - J. COGHLAN

1   A.   John Feraca.
2   Q.   Okay.  And what was he doing in that
3   context?
4   A.   Helping identify collateral and what
5   collateral, you know, we were transferring and
6   getting kind of books and records right and
7   working with others in Treasury and Operations
8   to get it right.
9   Q.   Was he involved in placing values on
10  that collateral?
11  A.   Not to my knowledge, no.
12  Q.   Did Bank of New York place values on
13  that collateral?
14  A.   I don't know that information.
15  Q.   So what was your understanding of why
16  the collateral was being transferred to Bank of
17  New York --
18        MR. STERN:  Objection to the form.
19  Q.   -- during that week?
20        MR. STERN:  Objection to the form.
21  A.   I was not part of the decision to do
22  that.  It was simply a decision that was made
23  by -- I don't know who.  Treasury and the normal
24  settlement groups were doing their normal job of

Page 99

HIGHLY CONFIDENTIAL - J. COGHLAN

1   settling a trade from one place to another.  So
2   that was consistent.
3        One of the employees that worked for
4   me that could be helpful in this worked, you
5   know, extensive hours to help facilitate the
6   transfer to BoNY, Bank of New York.
7   Q.   After it was transferred to Bank of
8   New York, did you have any understanding what
9   happened to it after that?
10  A.   No, I do not.
11  Q.   Do you have any understanding how that
12  collateral might have been transferred to
13  Barclays eventually?
14  A.   Not that I -- no, I do not.
15        (Exhibit 118, a document bearing Bates
16  Nos. 10297296 and 10300641, marked for
17  identification, as of this date.)
18  Q.   Mr. Coghlan, I'm handing you a copy of
19  an exhibit marked 118, which is an e-mail dated
20  September 15, and you are not a party to the
21  e-mail.
22        My question involves the chart that's
23  attached as the second page.  I was wondering if
24  you have ever seen a chart like this before.

Page 100

HIGHLY CONFIDENTIAL - J. COGHLAN

1   A.   I've never seen this document before.
2   Q.   Okay.  Have you ever seen a chart that
3   listed Fed haircuts in another form?
4        MR. STERN:  Objection to the form.
5   A.   Repeat the question, please.
6   Q.   You see the entry in there entitled
7   "Fed Haircut"?
8   A.   Uh-huh.
9   Q.   Do you have any awareness of what the
10  Fed's haircut was in connection with its
11  financing provided the week of September 15?
12  A.   No, I do not know what the haircuts
13  were.
14  Q.   Did you have any understanding of what
15  the Fed typically would ask for a haircut in
16  connection with financings like this?
17  A.   I do not know that.
18  Q.   If you look at the same chart, you see
19  the title "Current Haircut" at one of the
20  columns?
21  A.   Yes.
22  Q.   Do you have any understanding what
23  that might be referring to?
24  A.   No, I do not.  I've never seen this

Page 101

HIGHLY CONFIDENTIAL - J. COGHLAN

1   document before, so I don't know what that
2   means.
3   Q.   I understand that.  Do you have any
4   understanding of the haircuts that Chase was
5   demanding in its -- or, getting in its
6   transactions during this period?
7   A.   No, that would -- I didn't handle the
8   tri-party, so that would be handle by Paolo
9   Tonucci.  So I would not be privy to that.
10  Q.   When you said the "tri-party," you're
11  talking about the Fed financing?
12        MR. STERN:  Objection to the form.
13  A.   No, I'm talking about the tri-party
14  relationship between Lehman Brothers and Chase,
15  and I would not be privy to that.
16  Q.   Okay.  Just so I understand what you
17  just said, the tri-party to which you are not
18  privy would be between Lehman Brothers, Chase
19  and Barclays?
20        MR. STERN:  Objection to the form.
21  A.   No.  No, that's not correct.
22  Q.   Okay.  I'm not trying to
23  mischaracterize what you said.
24  A.   I'm referring to this document.  This

Page 102

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  document is a tri-party haircut schedule.
3    Q.   Right.
4    A.   What I'm saying is, if those haircuts,
5  if they applied to Lehman Brothers, would have
6  been negotiated, if you would, and understood by
7  Paolo Tonucci.
8    Q.   Okay.  And this is outside of the
9  financing business that you run?
10   A.   Yes.
11   Q.   I apologize.  I have to show you a
12 bunch of documents during our deposition, but...
13   A.   That's fine.
14      (Exhibit 119, a document bearing Bates
15   Nos. 10302495, marked for identification, as
16   of this date.)
17   Q.   Mr. Coghlan, I'm handing you a
18 document marked as Exhibit 119, which is --
19 appears to be an e-mail dated September 17
20 between Mr. Azerad and Mr. Tonucci.
21    I direct your attention to the first
22 line, which says, "We need to have a meeting
23 with Coughlin," and then it goes on to describe,
24 "Lista is starting to unwind some term repos for
25 commercial reasons (e.g., State Street), which

Page 103

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  is going to use liquidity (increased haircuts)."
3     My first question is, do you recall
4  this -- actually, I take it that since you're on
5  this e-mail, you don't recall it?
6    A.   Correct.
7    Q.   My question is, do you recall having a
8  meeting at or about Wednesday of that week
9  between either Mr. Azerad or Mr. Tonucci about
10 this topic?
11   A.   I don't recall.
12   Q.   Could you explain to me what this
13 topic is?
14     MR. STERN:  Objection to the form.
15   A.   I don't know.  I never saw this
16 before.  I don't know what it means.
17   Q.   Okay.  Could I ask just a technical
18 question.  What does the phrase "State Street"
19 mean?
20   A.   State Street is a securities lender
21 that would have been a counterparty to LBI,
22 where we would have borrowed securities with
23 them and we would have maybe borrowed money with
24 them.
25   Q.   Do you understand who Lista is?

Page 104

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   Yes.
3    Q.   Who is that?
4    A.   He was the head of short-term sales at
5  Lehman Brothers at the time.
6    Q.   What's his full name, do you know?
7    A.   William.
8    Q.   William Lista?
9    A.   William Lista.
10   Q.   It mentions him starting to unwind
11 some term repos for commercial reasons.  Do you
12 understand what that could be referring to?
13   A.   No, I do not.
14   Q.   Previously you had, when we talked
15 about the $40 billion estimate you gave to Mr.
16 Gelband --
17   A.   Uh-huh.
18   Q.   -- you had talked about, as -- and I'm
19 not trying to mischaracterize your testimony --
20 I thought you had talked about unwinding repos
21 because counterparties wanted to move the assets
22 elsewhere or for whatever reason?
23   A.   Uh-huh.
24   Q.   Could this be referring to that
25 process?

Page 105

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   I don't -- it might.  I just don't
3  know.
4    Q.   Okay.  Does the phrase "which is going
5  to use liquidity" have any meaning to you in
6  this context?
7    A.   No, it does -- I just don't know what
8  this document -- I just don't know what it
9  means.
10   Q.   And you don't recall any discussions
11 around that week between either yourself and Mr.
12 Tonucci or Azerad about this issue?
13   A.   No, I don't recall.
14   Q.   Can we just take a minute and just
15 take a step back about what you were doing
16 during this week?
17   A.   Uh-huh.
18   Q.   I know we've talked about the APA that
19 was entered on Monday, but I was just wanting to
20 see if you could give me a general description
21 of what you were doing during this week.
22 Whether it relates to the Barclays/Lehman
23 transaction or not --
24   A.   Uh-huh.
25   Q.   -- I just want to kind of get a

HIGHLY CONFIDENTIAL - J. COGHLAN

1    picture of what your involvement was, if any.
2       A.   Well, the primary occupation of the
3    group, if you would, that reports to me in the LBI,
4    we were basically being -- we were basically
5    unwinding trades.  We were sending back
6    collateral and cash.  And so that was what the
7    primary objective of the business was, was to
8    try to downsize and return collateral and return
9    cash.
10      Q.   And why was that?
11      A.   Because, primarily -- there was two
12   primary reasons:  Customers wanted their cash
13   and collateral back.  That was one reason.  And
14   second of all, given all what happened at the
15   holding company, you know, it was obvious that
16   we were going to have a difficult time financing
17   ourselves.  So we needed to get the positions
18   smaller and minimize the financing risk.
19      Q.   And did there come a point when you
20   could no longer finance yourself?
21      A.   I don't recall that happening.
22      Q.   So now, all right, is that correct to
23   say that that was the primary focus of you and
24   your department during that period of time?

HIGHLY CONFIDENTIAL - J. COGHLAN

1       A.   Yes.
2       Q.   Did you have any -- I'm just trying to
3    get a general sense of the role you might have
4    played in any dealings between Lehman and
5    Barclays during that period.
6       A.   Uh-huh.
7       Q.   Do you recall any involvement in that?
8       A.   No, other than the conversations I
9    have referenced with Marty Malloy, to the best
10   of my recollection, I did not have any
11   conversations with anybody at Barclays.
12      Q.   Were you involved at all in any kind
13   of -- again, we might have asked this already,
14   I'm just trying to get a sense of what you're
15   doing -- were you involved in any way in efforts
16   to transfer collateral to Barclays either during
17   that week or the following weekend?
18      A.   I was not directly involved.  Again,
19   that's the role of Treasury, and John Feraca,
20   who works for me, was engaged in trying to be
21   helpful.  But the responsibility for that and
22   the decision-making and control was Treasury.
23      Q.   Okay.  Were you involved in any
24   efforts during the weekend -- and I guess that's

HIGHLY CONFIDENTIAL - J. COGHLAN

1    September 21 -- 20th and 21st -- to locate
2    unencumbered assets that could be transferred to
3    Barclays?
4       A.   No.
5       Q.   Were you involved in any efforts
6    during that weekend with respect to a 15c3
7    calculation?
8       A.   No, I was not.
9       Q.   Were you involved in any efforts
10   during that weekend with respect to a
11   transaction -- OCC-related transactions?
12      A.   I don't know what OCC-related
13   transactions are.  So, to the best of my
14   knowledge, no.
15      Q.   Were you involved in anything during
16   that weekend, or were you home having a nice
17   weekend?
18      A.   I don't believe I was involved in
19   business relative to that weekend.  Now, at some
20   point, you know, we did start discussion of
21   compensation, and I don't know if it was that --
22   and the transition and things like that.  I
23   don't know if that was over the weekend or -- I
24   was out of town over the weekend, and I don't

HIGHLY CONFIDENTIAL - J. COGHLAN

1    know if that began over the weekend or Monday,
2    Tuesday, when.
3       Q.   So where were you on the weekend?
4       A.   I was out of town.
5       Q.   Where was that?
6       A.   Philadelphia.
7       Q.   And do you know when you left?
8       A.   Friday afternoon.
9       Q.   I assume it wasn't a business-related
10   trip?
11      A.   Right.
12      Q.   Okay.  And when did you get back to
13   town?
14      A.   Sunday afternoon.
15      Q.   Sunday afternoon?
16      A.   Uh-huh.
17      Q.   Were you involved in the closing of
18   the sale transaction between Barclays and Lehman
19   in any way?
20      A.   No, I was not.
21      Q.   Okay.  I'm just trying to limit my
22   questions and see what -- were you contacted
23   over the weekend when you were out of town by
24   anyone involved in the transaction between

---

HIGHLY CONFIDENTIAL - J. COGHLAN

1. Barclays and Lehman?
2.    A.   Not to the best of my knowledge, no.
3.    Q.   Were you ever asked to provide any
4. information to that -- to the group involved in
5. that?
6.    A.   Not to the best of my knowledge, no.
7.     (Exhibit 120, an e-mail string, the
8. first one in time dated September 17, 2008,
9. at 6:31 P.M., marked for identification, as
10. of this date.)
11.    Q.   Mr. Coghlan, I'm handing you a copy of
12. an exhibit marked as 120, which appears to be an
13. e-mail string dated September 17, in which you
14. are CC'd on a bunch of e-mails.  If you wouldn't
15. mind just taking a second, take whatever time
16. you need to review that document.
17.     (Document review.)
18.    A.   Uh-huh.
19.    Q.   Have you had a chance to look at the
20. document?
21.    A.   I have.
22.    Q.   Before we get to the document, are you
23. sometimes referred to as "Cogs"?
24.    A.   Yes.

---

HIGHLY CONFIDENTIAL - J. COGHLAN

1.    Q.   That's a nickname that your colleagues
2. use, that name?
3.    A.   Yes.
4.    Q.   If we could -- if you wouldn't mind,
5. let's start from the bottom up.
6.    A.   Okay.
7.    Q.   Which is how --
8.     (Discussion off the record.
9.     (Recess; Time Noted:  11:36 A.M.)
10.     (Time Noted:  11:41 A.M.
11. BY MR. HINE:
12.    Q.   Mr. Coghlan, before we get to this
13. document, your counsel clarified something for
14. me off the record.  I just wanted to make sure
15. it doesn't change some of the testimony you
16. previously gave.
17.     I think we talked about the
18. transfer -- an effort to transfer collateral
19. from the Fed financing to Bank of New York; do
20. you recall that testimony?
21.    A.   Say that one more time.  I'm sorry.
22.    Q.   I think we previously talked about an
23. effort during the week of September 15 to
24. transfer collateral from the Fed financing to

---

HIGHLY CONFIDENTIAL - J. COGHLAN

1. the Bank of New York?
2.    A.   Correct.
3.    Q.   And I might have misstated the notion
4. that it might have been a tri-party repo
5. involved.
6.    A.   Uh-huh.
7.    Q.   Do you have any understanding of what
8. type of vehicle was involved in that effort with
9. respect to the Bank of New York?
10.    A.   No, the only thing I, as I said, I was
11. indirectly involved because one of my employees
12. was involved --
13.    Q.   Okay.
14.    A.   -- was transferring collateral to the
15. Bank of New York.
16.    Q.   Okay.
17.    A.   Under what documents, I don't --
18.    Q.   So do you have any knowledge of
19. whether that was a bilateral repo arrangement?
20.    A.   I don't, no.  I don't know if it was
21. tri-party, repo, I don't know.
22.    Q.   Is it correct to say that that,
23. whatever the arrangement was, it was handled by
24. the Treasury Department at Lehman?

---

HIGHLY CONFIDENTIAL - J. COGHLAN

1.    A.   I don't know.  Normally, they would
2. handle the tri-party.
3.    Q.   Okay.
4.    A.   You know, but given the circumstances
5. of discussions with Barclays, someone else may
6. have done that.
7.    Q.   Okay.  If you could turn your
8. attention to Exhibit 20.
9.     Have you had a chance to look through
10. that?
11.    A.   Yes, I have.
12.     MR. STERN:  Exhibit 120.
13.    Q.   I'm sorry, Exhibit 120.  First of all,
14. do you recall this e-mail exchange at all?
15.    A.   No, I do not.
16.    Q.   Do you recall any discussions along
17. these lines that you might have had with either
18. Mr. Lowitt or Tonucci during this period?
19.    A.   No, I do not.
20.    Q.   Do you recall any discussions you ever
21. had with Mr. Lowitt during the week of September
22. 15?
23.    A.   No, I do not recall.
24.    Q.   Do you ever recall meeting with him?

---

| Page 114 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    A.  I don't recall meeting with him.
3    Q.  Do you ever recall him talking to you
4 on the phone about his dealings with the
5 Lehman/Barclays transaction?
6    A.  No, I never talked to him about the
7 Lehman/Barclays transaction.
8    Q.  How about Mr. Tonucci, do you recall
9 meeting with him during that week?
10    A.  No, I don't recall meeting with him.
11    Q.  Do you recall speaking on the phone
12 with him at all?
13    A.  No, I don't recall having, no,
14 speaking with him on the phone.
15    Q.  Do you recall speaking with him in any
16 way or communicating with him in any way during
17 that week?
18    A.  No, I don't recall.
19    Q.  If we look at the title of this
20 e-mail, it says, "If we had to novate the OMO
21 transactions rather than have them collapsed,
22 does that matter?"
23    Does that refresh your recollection at
24 all about any discussions you might have had on
25 this topic?

| Page 115 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    A.  No. I -- no, it does not.
3    Q.  Do you understand OMO transactions to
4 be the Fed financing?
5    A.  No, I do not.
6    Q.  Do you know what the term "OMO" refers
7 to?
8    A.  No, I do not.
9    Q.  Do you understand what "collapsing"
10 that transaction might have referred to?
11    A.  No, I do not.
12    Q.  If you read further up on the second
13 page, it says, "It has left us short financing"
14 (sic). "We may need to ask JP to cover."
15    Do you have an understanding what that
16 was referring to?
17    A.  No.
18    Q.  Could you speculate about what it
19 might be referring to?
20    MR. STERN:  Objection to the form.
21 Calls for speculation.
22    Q.  You can still do it.
23    MR. STERN:  Objection.
24    A.  It probably means that there's a cash
25 deficit that JP Morgan would have to cover.

| Page 116 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Q.  And do you have any understanding why
3 there might be a cash deficit?
4    A.  No, I will not.
5    Q.  Do you know why they're copying you on
6 this e-mail exchange?
7    A.  No, I do not.
8    Q.  Further up on that page it says,
9 "Current plan, as I understand it, is to have
10 trades with OMO unwind and take the collateral
11 to Barclays."
12    Does that remind you in any way of any
13 discussions on that topic?
14    A.  No.  This is the first I've heard of
15 OMO.
16    Q.  Can you -- okay.  Can you speculate or
17 suggest any explanation for what they're talking
18 about when they're saying "take the collateral
19 to Barclays"?
20    A.  I -- no, I couldn't.  I just don't
21 know.
22    Q.  If we turn to the first page of this
23 exhibit, it says here, "I think" -- "This is
24 different I think.  It is a trade with State
25 Street that they matured early."

| Page 117 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Do you have any understanding of what
3 trades with State Street might have been
4 maturing early during that week?
5    A.  I don't know the transaction.  It
6 probably references that State Street had a
7 financing trade that they matured early, but I
8 don't know it firsthand.  I'm just referencing
9 what the language says.
10    Q.  I understand.  What is normally the
11 consequence of when a financing matures early?
12 What does that mean?
13    A.  There's usually some sort of mark to
14 market event.  Sometimes there's a penalty-type
15 event.
16    Q.  Trades with State Street are typically
17 repos?
18    A.  They would be borrows.  Probably
19 borrows with State Street.  We were borrowing
20 collateral from them.
21    Q.  So you would borrow securities from
22 State Street and pay a fee?
23    A.  Yes.
24    Q.  And "maturing early" suggests that the
25 securities now have to go back to State Street?

| Page 118 | Page 119 |
|---|---|
| HIGHLY CONFIDENTIAL - J. COGHLAN | HIGHLY CONFIDENTIAL - J. COGHLAN |

**Page 118**

1 HIGHLY CONFIDENTIAL - J. COGHLAN
2     A.   Yes, so they probably had a term lend
3 to LBI that they wanted back immediately after
4 the holding company bankruptcy.  They wanted it
5 back.
6     Q.   And then when you give them back their
7 securities, they would give you back --
8     A.   Cash.
9     Q.   -- the cash?  Okay.
10          If you'll read further up, it talks
11 about, "Plan is to early terminate the OMO and
12 TSLF transaction."
13     A.   Uh-huh.
14     Q.   Do you know what "TSLF" is?
15     A.   It is one of the Fed liquidity
16 programs.
17     Q.   Okay.
18     A.   Which one I can't recall off the top
19 of my head, but it was a program established by
20 the Fed to provide financing.
21     Q.   Okay.  And do you recall any
22 discussions of early terminating that financing?
23     A.   No.
24     Q.   Or that transaction?
25     A.   No, I don't recall.

**Page 119**

1 HIGHLY CONFIDENTIAL - J. COGHLAN
2     Q.   Is that TSLF transaction something
3 that was not handled by your department?
4     A.   The TSLF transaction, we would have
5 given the collateral to the TSLF and we would
6 have used the TSLF and given them the
7 collateral.  We would have executed the trade.
8          So I forget what the mechanism is, but
9 whatever where you get the collateral into the
10 TSLF and some of these were different types of
11 auction process, we would have gone into the
12 TSLF, we would have put the bid in, and if we
13 were successful in raising the cash, we would
14 have given the TSLF, we would have pledged the
15 money to TSLF.
16     Q.   When you say "we," you're talking
17 about your Financing Department?
18     A.   The decision to use TSLF was made by
19 Treasury, so we would tell them we want to go
20 and use that.  They would agree.  We would
21 execute the trade off the desk that works for
22 me.  The settlement of the trade would be
23 through the normal settlement procedures.
24     Q.   Okay.  So do you select the collateral
25 that would be used in this trade?

**Page 120**

1 HIGHLY CONFIDENTIAL - J. COGHLAN
2     A.   Well, the TSLF only takes certain
3 collateral.
4     Q.   Okay.
5     A.   So we would be limited in the types of
6 collateral they would take.  Relative to those
7 guidelines, we would give the collateral into
8 them.  We would determine what collateral goes
9 in.
10     Q.   And where do you find those
11 guidelines?
12     A.   They were published by the Fed.
13     Q.   And so, within those guidelines, your
14 department selected the securities that were
15 going to go into that trade?
16     A.   No, we would put the types of
17 securities.  So if they were mortgage-backed
18 securities, we would say, okay, we want to
19 borrow a billion dollars.  The actual settlement
20 would be taken through the normal settlement
21 processes.
22     Q.   When you say "the actual settlement,"
23 you mean the actual selecting of particular
24 securities?
25     A.   Right, that bond is going to go, that

**Page 121**

1 HIGHLY CONFIDENTIAL - J. COGHLAN
2 bond is going to go, and that bond is going to
3 go, and that bond is not going to go.  That was
4 done by the settlement people.
5     Q.   And just to remind me, who were the
6 settlement people again?  Was that Mr. Hraska?
7     A.   No, that would be both Paolo's group
8 and Alastair Blackwell's group.
9     Q.   Okay.  If you read further up -- well,
10 okay, and then further in that sentence it says,
11 "And then all the collateral to Barclays, so no
12 ongoing Fed financing of Lehman."
13          Do you recall any discussion of ending
14 the Fed financing of Lehman during that week?
15     A.   I don't recall any of the -- any
16 conversation relative to the Fed financing other
17 than that the Fed -- I was told that the Fed
18 wanted Barclays to step in as opposed to the Fed
19 stepping in.
20     Q.   And what were you told about that?
21     A.   When was I told about that?
22     Q.   What were you told about that?
23     A.   When John Feraca got involved in the
24 settlement process, he said that the motivation
25 is to get Barclays to face the Fed as opposed to