# A. 5 (B)

| Page 122 |
| --- |

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  have Lehman Brothers face the Fed, and so I did
3  know that there was a motivation to restructure
4  the relationship so the Fed was facing Barclays
5  as opposed to facing Lehman.
6    Q.   Were you told anything about how that
7  was going to take place?
8    A.   No.  No, I was not told.
9    Q.   Do you have any understanding of how
10  that was going to take place?
11    A.   No, I didn't have any input,
12  communication around that.
13    Q.   Did you ever hear anything about how
14  that was going to take place?
15    MR. STERN:  Objection to the form.
16    A.   What I knew about it was that we were
17  working hard to transfer collateral over to Bank
18  of New York and we were trying to facilitate
19  that.
20    Q.   That's all you knew about the whole
21  effort to have Barclays --
22    A.   To the best of my knowledge, yes.
23    Q.   If you read a little further up, it
24  talks about -- it mentions two different things.
25  One is the Chase acceleration.

| Page 123 |
| --- |

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Do you understand what that phrase
3  means?
4    A.   No, I do not.
5    Q.   You ever heard that phrase during that
6  week?
7    A.   No, I did not.
8    Q.   Did you have anything -- did you
9  speculate about what it might be referring to?
10    MR. STERN:  Objection to the form.
11    A.   "Chase accelerate" -- no, I don't know
12  what that means.
13    Q.   If you read further on in that
14  sentence, it says, "Perhaps that is State
15  Street.  PCDF will get bigger as a result."
16    Do you have any understanding what
17  that could be referring to?
18    A.   I don't understand what the reference
19  to State Street is.  The PCDF was another Fed
20  program, so if these two things happened, which
21  I don't understand what these two things are,
22  it's too vague, the result would be that we
23  would be borrowing more from the Fed.
24    Q.   Oh, I see.  Okay.  I gotcha.
25    You might as well keep that e-mail,

| Page 124 |
| --- |

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  because this is a continuation, it appears to
3  me.
4    (Exhibit 121, an e-mail string, the
5    first one in time dated September 17, 2008,
6    at 6:25 P.M., marked for identification, as
7    of this date.)
8    Q.   Mr. Coghlan, I'm handing you an
9  exhibit marked 121, which appears to be a
10  continuation of the same e-mail stream we've
11  been discussing, only it looks like in the most
12  recent two e-mails you're no longer a CC.  Do
13  you see where I'm referring to?
14    Oh, I correct that.  You are still a
15  CC on the second-to-last one.
16    A.   Which two --
17    Q.   Let me rephrase that.
18    MR. STERN:  You mean the
19    third-to-last?
20    Q.   You'll notice, if you compare it to
21  the prior e-mail, the prior e-mail stream ends
22  with, "Got it.  I am dealing with the State
23  Street issue."  Do you see that?
24    A.   Yes.
25    Q.   And then there are two more e-mails

| Page 125 |
| --- |

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  above that, do you see that?
3    A.   Uh-huh.
4    Q.   The first one says, "OK'd to increase
5  PCDF.  Ian."  Do you have any understanding what
6  he's referring to there?
7    A.   I don't see that.
8    (Mr. Stern indicating.)
9    Q.   Do you see it now?
10    A.   Yes, I'm sorry.  Rephrase the
11  question.  Restate the question again.  I'm
12  sorry.
13    Q.   Do you see the message that says,
14  "OK'd to increase PCDF.  Ian."  Do you see that?
15    A.   Yes.
16    Q.   Do you have any understanding what
17  that's referring to?
18    A.   Well, the PCDF, as I said, was a Fed
19  program.
20    Q.   Right.
21    A.   And somebody okayed an increase in
22  borrowing through the PCDF program.
23    Q.   Was that in fact done?
24    A.   I don't know.
25    Q.   Did you have a role in monitoring the

Page 126

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2 level of borrowing from the PCDF program?
3     A.   No, that was controlled by Treasury.
4     Q.   Further up on the e-mail it says --
5 this is now an e-mail in which you are not a
6 party, or you're not copied, apparently, but it
7 says, "Hoping to do more with Barclays to avoid
8 haircut impact."
9          Do you have any idea what that could
10 be referring to?
11          MR. STERN:  Objection to the form.
12     A.   No, I do -- I don't know what that
13 means.
14     Q.   Could that be referring to the haircut
15 impact of borrowing more from the PCDF?
16     A.   That could be an outcome.
17     Q.   Okay.  I'm going to hand you one more
18 exhibit which involves the same e-mail stream,
19 so you might as well keep those in front of you.
20          (Exhibit 122, an e-mail string, the
21          first one in time dated September 17, 2008
22          at 6:39 P.M., marked for identification, as
23          of this date.)
24     Q.   Mr. Coghlan, I'm handing you an
25 Exhibit marked 122, which appears to be a

Page 127

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2 further continuation of the same e-mail stream.
3 The most recent messages appear to not include
4 you as a CC, but I refer to you midway down
5 on the first page.  It says, "Hope to do more
6 with Barclays to avoid haircut impact."
7          Do you see that?
8     A.   Yes.
9     Q.   If we continue up the page, you'll see
10 a reference eventually to a statement that says,
11 "Barclays thinks they can get cash ... need
12 approval from Gerard.  Can you ask him?  $2.8
13 billion versus equities."
14          Do you have any understanding what
15 that could be referring to?
16          MR. STERN:  Objection to the form.
17     A.   Well, I mean, a couple of things.
18 Take it that -- one piece is obvious Barclays
19 thinks they can raise some cash.  They need to
20 get approval from Gerard LaRocco, who is a
21 senior official at BarCap.
22     Q.   Okay.
23     A.   And I don't know what the "2.8 billion
24 versus equities" means.
25     Q.   Any recollection of Barclays raising

Page 128

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2 2.8 billion for any reason during that week?
3     A.   No, I don't recall that.
4     Q.   If you go further up on the page, it
5 says, "Spoke to Barclays.  They can raise the
6 money and will do the trade with us for 2.8
7 billion."
8          Does that refresh your recollection at
9 all about the 2.8 billion?
10     A.   No, it does not.
11     Q.   Do you recall doing any kind of trade
12 with Barclays for 2.8 billion during that week?
13     A.   No, I don't recall.
14     Q.   Okay.  Would that be done in your
15 group or --
16          MR. STERN:  Objection to the form.
17     A.   The discussions with Barclays and the
18 settlement and the transfer out of the Fed into
19 BoNY was handled outside my group.
20     Q.   Okay.
21     A.   The only role my group would play
22 would be coordinating with Treasury on the
23 settlement of whatever was negotiated.
24     Q.   Okay.
25          (Exhibit 123, a document bearing Bates

Page 129

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2 Nos. 68985, marked for identification, as of
3 this date.)
4     Q.   Mr. Coghlan, I'm handing you an
5 exhibit marked 123, which is an e-mail string
6 from Thursday, September 18, and if you -- you
7 do not appear to have been CC'd on this e-mail,
8 but if you look in the second message down, it
9 says, "Do you want me to talk to Coghlan about
10 not doing any more repo unwinds?"
11          I would like to give you a chance just
12 to review the document first, but I want to
13 point you to that sentence just to see if it
14 triggers any recollections.
15          MR. STERN:  Please read the document.
16     A.   Okay.
17     Q.   Do you have any recollection of
18 speaking with either Mr. Tonucci or Mr. Azerad
19 during that week about this issue?
20          MR. STERN:  Objection to the form.
21     A.   There's a lot of issues covered in
22 this, so it's hard to --
23     Q.   Okay.  Well, my question is it says,
24 "Do you want me to talk to Mr. Coghlan," meaning
25 yourself, I take it, about some of the issues in

Page 130

HIGHLY CONFIDENTIAL - J. COGHLAN
1 the e-mails below. So my question is, did you
2 have any discussions with these individuals, Mr.
3 Tonucci or Mr. Azerad, about any of the issues
4 raised in the e-mail below?
5     MR. STERN: Objection to the form.
6     A. I did not talk to Mr. Tonucci. I
7 don't recall talking to Mr. Tonucci or Mr.
8 Azerad about any of the specific haircut changes
9 and cash impact changes outlined in the e-mail.
10 I don't recall having those conversations.
11    Q. Did you recall speaking to them in
12 general about haircut changes or --
13    A. I did talk to Paolo briefly about, as
14 we unwound repo trades, the impact that the cash
15 movements would have, and I had spoken to him
16 about, you know, how many unwinds are we
17 supposed to do.
18    Q. Can you explain to me what you meant
19 by what you just said?
20    A. Sure. In places where we had positive
21 margin, okay, where people were posting
22 collateral and cash to us, that created a cash
23 surplus. As we started to unwind trades, that
24 sometimes affected the cash surplus. So we had

Page 131

HIGHLY CONFIDENTIAL - J. COGHLAN
1 to be thoughtful about what trades we could
2 unwind because we couldn't -- we didn't want to
3 go into negative cash flows.
4     Q. Okay. You spoke to Mr. Tonucci about
5 that topic sometime during that week?
6     A. Yes.
7     Q. And what did he say about it?
8     A. He said that we should, you know, get
9 as much -- we should get many of the financing
10 trades eliminated but try not to do ones that we
11 are positively cash flow. So try to do the ones
12 where it would be cash neutral or cash additive.
13    Q. When you say "cash additive," what
14 does that mean?
15    A. If I do a repo on a mortgage product
16 for $100 million and I have $105 million worth
17 of collateral, I can take that extra 5 percent,
18 that 5 million, and I can pledge it and raise
19 cash. When that trade goes back to the client,
20 he takes his 105 million, I get my 100 million
21 of cash, but that 5 million of surplus I have
22 created by pledging his 5 percent is no longer
23 there.
24    Q. So would that be cash additive?

Page 132

HIGHLY CONFIDENTIAL - J. COGHLAN
1     A. No, cash negative.
2     Q. So those are the ones you would want
3 to unwind?
4     A. No, we wouldn't want to unwind.
5     Q. Okay. I understand.
6     So you proceeded to unwind various
7 transactions based on those instructions from
8 Mr. Tonucci?
9     A. Yeah, those were broad guidelines, I
10 would say.
11    Q. And was that your mandate during that
12 week with respect to unwinding transactions?
13    A. That was kind of the guideline that
14 Paolo told me to follow, you know, where
15 possible.
16    Q. Did that change at all during toward
17 the end of the week?
18    A. Not to the -- not to the best of my
19 knowledge.
20    Q. Okay.
21    (Exhibit 124, a document bearing Bates
22 Nos. 10303258, marked for identification, as
23 of this date.)
24    Q. Mr. Coghlan, I'm handing you a

Page 133

HIGHLY CONFIDENTIAL - J. COGHLAN
1 document marked as Exhibit 124, which is an
2 e-mail stream dated September 18, in which you
3 are a recipient from Mr. Feraca.
4     Do you recall seeing this e-mail at
5 all?
6     A. No, I do not.
7     Q. Have you had a chance to take a look
8 at it briefly.
9     (Document review.)
10    A. I've looked at it now, yes.
11    Q. In the first phrase toward the top, it
12 says, "This is a process that was agreed to by
13 Ops, BCI, JPM, and BONY late last night to
14 transfer the positions funded by the Fed's three
15 financing programs (OMO, TSLF and PDCF) to
16 Barclays for funding CLB today."
17    And my question is were you involved
18 in those discussions that night?
19    A. No, I was not.
20    Q. Do you know anything about what took
21 place that night with respect to those
22 discussions?
23    A. No, I do not.
24    Q. Okay. If you look further down the

Page 134

HIGHLY CONFIDENTIAL - J. COGHLAN

1  e-mail, which contains a list of the
2  logistics -- it's entitled Logistics of
3  Collateral Movements?
4      A.  Uh-huh.
5      Q.  Do you see that?  And it's a listing
6  of seven items.
7          Were you involved in any of those
8  logistical efforts to move collateral?
9      A.  I'm sorry, can you repeat the
10  question?
11     Q.  Do you know what these seven items are
12  referring to?
13     A.  No.
14     Q.  Were you involved in any of the items
15  or in trying to give effect to any of the items
16  listed in this list?
17     A.  No, I was not involved.
18     Q.  If you look at number 6, it mentions
19  book free repos.  Do you see that?
20     A.  Yes, I do.
21     Q.  Can you tell me what free repos are?
22     A.  I don't know how it applies here.  The
23  notion of free repo is that you normally are
24  delivering without getting payment at the same

Page 135

HIGHLY CONFIDENTIAL - J. COGHLAN

1  time.  So you would give collateral before you
2  get paid.
3      Q.  Okay.
4      A.  I don't know if that's what this is
5  referring to.  So I know what a free repo is.  I
6  just don't know how it relates to this
7  transaction.
8      Q.  And under what context have you seen
9  "free repos" used?
10     A.  I can't recall.
11     Q.  Okay.  How about further down where it
12  says, "Funding Considerations" and then it
13  mentions "shell trades."  Is that a phrase you
14  have ever used in your work at Lehman?
15     A.  Yeah, the shell normally refers to the
16  collateral types that people -- that we were
17  going to pledge, and the shell normally refers
18  to kind of like the schedule of collateral that
19  we are going to book.  But again, I don't know
20  how that phrase fits into this protocol.
21     Q.  Fair to say you had no involvement in
22  this protocol mentioned in this e-mail?
23     A.  Yes, that's accurate.
24     Q.  Is it also fair to say that the group

Page 136

HIGHLY CONFIDENTIAL - J. COGHLAN

1  that you managed at Lehman was not involved in
2  this protocol?
3      A.  No, there would be people that, you
4  know, know settlements and know operations that
5  would have been, you know, involved and helpful
6  to, you know, understanding what is the best way
7  to get this transaction settled.
8          So, as I said, John Feraca, you know,
9  clearly was involved.  There's another guy,
10  Larry Servidio.  So my people know the
11  settlement processes, but they're not
12  responsible for the settlement itself.
13     Q.  So --
14     A.  So they would take their knowledge and
15  ask for input and advice about how to get some
16  of these things done.
17     Q.  And so were they reporting to people
18  within the Treasury Department with respect to
19  doing this?
20     A.  No, they would be reporting to me.
21     Q.  But you weren't really monitoring what
22  they were doing with respect to this
23  transaction?
24     A.  No, because the responsibility for

Page 137

HIGHLY CONFIDENTIAL - J. COGHLAN

1  this trade would have been in Treasury.
2      Q.  Okay.
3      A.  It would have been, you know, through
4  Ian Lowitt, Paolo Tonucci, Robert Azerad.  My
5  folks were there just to provide advice, provide
6  input, have suggestions, because they do have an
7  understanding of all this.
8      Q.  Okay.  Did you ever have discussions
9  with your people, Mr. Feraca or Mr. Servidio,
10  about this process?
11     A.  I've talked to John Feraca about it.
12     Q.  Uh-huh.
13     A.  I didn't talk about this process per
14  se, but the general process, and the only -- the
15  primary input was the amount of effort it was
16  taking to get this done, the amount of people
17  that needed to be involved, and the time, you
18  know, the late nights that everyone was working
19  to facilitate this result.
20     Q.  Did he mention any problems that arose
21  during the course of this transaction?
22     A.  Not specifically, no.
23     Q.  Did he mention generally any problems
24  that arose during this effort?

Page 138

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   Not specific ones.  Not specifically,
3    no.
4    Q.   I meant did he mention any general
5    problems that arose during that transaction?
6    A.   No, he didn't bring any of the
7    specific problems or the general problems to me.
8    Q.   Was he there all that weekend while
9    you were out of town?
10    A.   I don't know.
11    Q.   Okay.
12    (Exhibit 125, covering e-mail with
13    chart with the heading "Booking Amounts,"
14    marked for identification, as of this date.)
15    Q.   Mr. Coghlan, I'm going to hand you two
16    exhibits.  One has previously been marked as
17    Exhibit 60B and the other one was marked as
18    Exhibit 125.
19    I understand your name does not appear
20    on these, the covering e-mails.  My questions
21    are really directed at the two charts that are
22    attached to them.  So if you might take a second
23    or a minute just to look at the two charts.
24    MR. STERN:  Well, look at the whole
25    document.  Start with 60B --

Page 139

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   Which one am I going to --
3    MR. STERN:  Start with 60B.
4    Q.   Have you had a chance to look at the
5    two documents?
6    A.   I have.
7    Q.   Let's turn to the one attached to
8    Exhibit 60B.  Have you ever seen this chart
9    before?
10    A.   No, I have not.
11    Q.   Have you ever seen a chart like this
12    before?
13    A.   No, I have not.
14    Q.   Do you have any understanding what
15    this could be relaying?
16    MR. STERN:  Objection to the form.
17    Calling for speculation.
18    A.   No, I -- I'm trying to -- I just don't
19    understand it.
20    Q.   Do you have any understanding of the
21    phrase "Anticipated Prefunding Dollar Amount"
22    used in the upper right-hand corner?
23    A.   No.
24    Q.   Have you ever heard that phrase
25    used --

Page 140

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   No.
3    Q.   -- in connection with the Fed funding?
4    Do you have any understanding of the
5    amounts that were pledged as collateral to the
6    Fed during the week of September 15?
7    A.   No.
8    Q.   Do you have any understanding of the
9    phrase, what the phrase "Paydown Amount" could
10    mean in this context?
11    A.   That's the first I've heard of it.
12    Q.   Turn to the chart attached to the next
13    exhibit.  Have you ever seen this chart before?
14    A.   No, I have not.
15    Q.   You have any understanding what the
16    phrase "booking amounts" would mean in
17    connection with this chart?
18    MR. STERN:  Objection.
19    A.   I'm sorry.  Rephrase the question.
20    Q.   Do you have any understanding what the
21    phrase "booking amounts" could mean with respect
22    to this chart?
23    A.   No, I do not.
24    Q.   Do you know who at Lehman or if you
25    could suggest who at Lehman might have been

Page 141

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    handling charts like this for this Fed funding
3    program?
4    A.   No, I don't know who would be putting
5    these things together.
6    Q.   Okay.  Fair enough.
7    Mr. Coghlan, I'm handing you a copy of
8    an exhibit previously marked as Exhibit 21,
9    which is an e-mail stream dated September 18 in
10    which you are a recipient.
11    A.   Uh-huh.
12    Q.   If you could take a minute just to
13    review the document.
14    MR. STERN:  Start from the bottom.
15    (Document review.)
16    A.   Okay.
17    Q.   Have you had a chance to look at the
18    document?
19    A.   Yes, I have.
20    Q.   Have you ever seen this document
21    before?
22    A.   Not to my -- not to my best
23    recollection.
24    Q.   Do you recall receiving this e-mail?
25    A.   No, I do not.

Page 142

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Q.   On or about September 18?
3    A.   No, I do not.
4    Q.   Let's look down at the bottom where
5    you have an e-mail from Mr. Reilly to Mr. Lowitt
6    and Gelband.  Do you see the e-mail I'm talking
7    about?
8    A.   Yes.
9    Q.   It says "open issues on deal"?
10   A.   Uh-huh.
11   Q.   The first issue that he mentions
12   involves auction rate book, and it says, "We
13   have been making the assumption this is going.
14   I am not sure BarCap knows that and assume there
15   could be no auction process if it stayed.  Can
16   we leave it behind?"
17        Do you recall any discussions during
18   this week about the auction rate book?
19   A.   No.
20   Q.   Did you have any discussions with Mr.
21   Tonucci or Reilly or Lowitt or Gelband about
22   that topic?
23   A.   To the best of my knowledge, no.
24   Q.   Is that a topic -- what is the auction
25   rate book?

Page 143

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    A.   Auction rate securities are securities
3    that are long dated securities that coupon or
4    the dividend reset on a 30-day, 60-day,
5    whatever, you know, on a short-term basis.  So
6    you have this process where you auction the
7    coupon or the dividend and the auction
8    determines what that coupon or the dividend is.
9    That's a book that's not under my jurisdiction.
10   It was managed ultimately by Eric Felder.
11   Q.   That was going to be my question.
12   That is not a book that's involved in your
13   financing business?
14   A.   No.  No.  It's an inventory position
15   that the firm would own, and that, you know,
16   book is managed not by Eric himself, but for
17   people that work for Eric.
18   Q.   So if we look up toward the top of the
19   page, it says, "Eric should dig in on auction
20   rates."  Do you take that to be referring to
21   Eric Felder?
22   A.   Yes.
23   Q.   Okay.  So that would be an issue that
24   he would probably handle?
25   A.   Uh-huh.

Page 144

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Q.   Okay.  The second item on the list
3    toward the bottom mentions something called "PB
4    financing balances" --
5    A.   Uh-huh.
6    Q.   -- "left in LBI."
7        What are PB financing balances?
8    A.   Those would be equity financing that
9    we've done where we're financing long positions
10   for clients in the equity financed space.  So
11   this would be referring that there was still
12   client balances that have not been returned.  So
13   that's what the PB financing balances would be.
14   Q.   What does "PB" stand for?
15   A.   Prime brokerage.
16   Q.   Okay.  And it says, "Looks like we
17   will have PB financing balances left in LBI, and
18   according to Cogs, they do not want it."
19        That "Cogs" is referring to you,
20   correct?
21   A.   I would believe so, yes.
22   Q.   And do you recall any discussions as
23   to this issue?
24   A.   The conversation I do recall is the
25   one I talked about with Marty Malloy in the

Page 145

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    beginning of the week, that I approached him, as
3    I said, to discuss, you know, what positions
4    would be transferred over to Barclays and, you
5    know, got a response from him that they would
6    not be taking the positions over.
7        So this is, I think, referring to me
8    relaying that information that, you know, the PB
9    balances or the PB financing positions would not
10   be transferring to Barclays.
11   Q.   Okay.  I guess I misunderstood your
12   prior testimony.  I thought you said it was
13   mainly a discussion about transitioning the
14   business.  Did you actually go over --
15       MR. STERN:  Objection to the form.
16   Q.   -- go over the securities they did or
17   did not want to be transferred to Barclays?
18   A.   No, we did not get into that detail,
19   no.
20   Q.   Okay.  And why did you think that Mr.
21   Malloy or Barclays did not want the PB financing
22   balances?
23   A.   I don't know --
24       Could you restate the question?
25   Q.   You might have just said it.  I just

Page 146

HIGHLY CONFIDENTIAL - J. COGHLAN

1 want to understand it. Is it correct to say
2 that you got the impression based on your
3 meeting with Mr. Malloy that Barclays did not
4 want the PB financing balances transferred to
5 it?
6 A.   Yes.
7 Q.   And why was that?
8 A.   I was not given a reason. I was just
9 told that it was Marty's understanding that the
10 fixed income repo and the PB financing would not
11 be going over to Barclays, you know, when the
12 deal closed.
13 Q.   So your understanding that you got
14 from Mr. Malloy was that not just -- they did
15 not just want the PB financing; they didn't want
16 the other three items you just mentioned,
17 correct?
18        MR. STERN: Objection to the form.
19 A.   I --
20 Q.   Let me rephrase the question.
21       Did the position that you understood
22 after your conversation with Mr. Malloy relate
23 only to PB financings or other types of
24 securities?

Page 147

HIGHLY CONFIDENTIAL - J. COGHLAN

1 A.   All financings. All the financings
2 that were residing in LBI, fixed income and
3 equities.
4 Q.   So that would be all the financings
5 that are managed by your group?
6 A.   Yes.
7 Q.   And you understood, based on your
8 conversations with him, that Barclays was not
9 going to be taking them over?
10 A.   Correct.
11 Q.   Okay. If you see that line goes
12 further, it says, "What does it mean to leave it
13 behind?"
14       Do you have any understanding what the
15 discussion was on that point?
16 A.   I do not recall.
17 Q.   Do you recall any discussions with any
18 of these folks here, Mr. Reilly, Lowitt,
19 Gelband, Tonucci or Kelly, about this issue?
20 A.   No, I don't remember any conversations
21 relative to this.
22 Q.   Would you have told Mr. Reilly this,
23 because he says "according to Cogs"?
24 A.   Mr. Reilly was the CFO for Capital

Page 148

HIGHLY CONFIDENTIAL - J. COGHLAN

1 Markets, so, you know, he may have had a
2 conversation with me or I may have had a
3 conversation with him, you know, reflecting, you
4 know, what I learned after speaking to Marty
5 Malloy, but I don't recall that specifically.
6 Q.   Okay. Is it likely that you reported
7 back to him based on your conversation -- about
8 what took place in your conversation with Mr.
9 Malloy?
10 A.   It's likely that I told somebody that
11 Barclays was not going to be taking the
12 financing positions. Who I reflected that to I
13 can't recall.
14 Q.   Okay. If you look further up on the
15 e-mail, it says, "Wickham should answer PB."
16       What do you understand that to mean?
17 A.   Well, John ran the prime brokerage.
18 So I would think they're just trying to say, you
19 know, Wickham should provide the answer about
20 what to do about the PB balances that are left.
21 Q.   And do you recall what answer he
22 provided?
23 A.   No, I do not.
24 Q.   Were you party to any further

Page 149

HIGHLY CONFIDENTIAL - J. COGHLAN

1 discussions about the PB balances after this
2 e-mail?
3 A.   Not that I recall.
4 Q.   Okay. If you continue on that line,
5 it says -- toward the end, it says, "Third
6 question is definitely for Cogs." That's you,
7 right?
8 A.   Uh-huh.
9 Q.   Let's look at the third question.
10 "Not clear on the amount of block discount or
11 how we make it happen."
12       Do you understand what that means?
13 A.   No.
14 Q.   If you read this whole item number 3,
15 do you have any recollection about discussions
16 on any of these issues mentioned there?
17 A.   No, I do not recall having any
18 conversations on these issues.
19 Q.   Do you have any understanding of what
20 these issues are referring to?
21 A.   No, I don't -- I don't understand what
22 this paragraph means.
23 Q.   Well, "The third question is
24 definitely for Cogs," was this question posed to

Page 150

HIGHLY CONFIDENTIAL - J. COGHLAN

1  you?
2
3      A.   I don't recall.
4      Q.   Did you have to take any action after
5  receiving this e-mail because the third question
6  was definitely for you?
7          MR. STERN:  Objection to the form.
8      A.   I don't recall having any discussion
9  relative to the issues over which is discussed
10  in this paragraph.  I don't --
11      Q.   My question was, did you take any
12  action as a result of receiving this e-mail
13  which points to the third question as being
14  definitely for you?
15      A.   I don't recall that we took any
16  action.
17      Q.   Did you have any meetings with anyone
18  about this e-mail?
19      A.   I don't recall.
20      Q.   So let's look at number 3.  It says,
21  "Not clear on the amount of the block discount."
22      Do you know what block discount that's
23  referring to?
24      A.   I never heard that phrase before.
25      Q.   You've never heard the phrase "block

Page 151

HIGHLY CONFIDENTIAL - J. COGHLAN

1  discount"?
2
3      A.   No, I don't know what that means.
4      Q.   Did you ask someone when you received
5  this e-mail, what does "block discount" mean?
6      A.   I don't recall that, no.
7      Q.   Would you have asked someone what are
8  you talking about when you referred this
9  question to me?
10          MR. STERN:  Objection to the form.
11      A.   I don't recall acting on this -- on
12  this issue.  I don't understand what it means in
13  this e-mail and I don't recall addressing it
14  during the week of the, whatever, the 15th.
15      Q.   Did you ask anyone what this means?
16          MR. STERN:  Objection to the form.
17      A.   I don't recall discussing this issue.
18  First of all, I'm not sure what this issue is on
19  the e-mail, and I don't -- discuss -- I don't
20  remember -- recall discussing this issue.
21      Q.   Do you have any understanding what the
22  phrase "block discount" means in this context?
23          MR. STERN:  Objection.  Asked and
24  answered.
25      A.   I don't know what the phrase "block

Page 152

HIGHLY CONFIDENTIAL - J. COGHLAN

1  discount" means.
2
3      Q.   Did you have any understanding?
4      A.   No.
5      Q.   Can you speculate about what it's
6  referring to in this context?
7          MR. STERN:  Objection.  Calls for
8  speculation.
9      A.   I couldn't speculate.  I don't know.
10      Q.   You have absolutely no idea what the
11  phrase "block discount" means in this context?
12          MR. STERN:  Objection.
13      A.   This is the first I've ever heard the
14  term "block discount," so I have no
15  understanding of what that term means.
16      Q.   Let's go to the next sentence.  Well,
17  let's go to the remainder of that sentence where
18  it talks to "how we make it happen."
19      Do you recall any discussions about
20  how we -- how Lehman could make happen any kind
21  of discount?
22      A.   No.
23      Q.   Do you have any understanding what
24  that was referring to about "how we make it
25  happen"?

Page 153

HIGHLY CONFIDENTIAL - J. COGHLAN

1      A.   I don't have any recollection of
2  how -- what that means or having any discussion
3  about it.
4      Q.   The next sentence says, "Defaulting on
5  repo could be the best, as discount could be
6  taken from haircut."
7      What does that mean?
8          MR. STERN:  Objection to the form.
9      A.   I don't know.  I mean, I -- it's very
10  confusing.  I don't know what it means.
11      Q.   Do you recall any discussion about
12  defaulting on a repo during this week, the week
13  of September 15?
14      A.   I'm sorry, say the question again.
15      Q.   Do you recall having any discussions
16  with anyone about defaulting on a repo during
17  the week of September 15?
18      A.   We did have situations where we were
19  defaulting not on repo, but on stock loans, and
20  so we had situations where we did default and
21  people put us in default, but that was third
22  parties defaulting us for failure to operate
23  under the contract.
24      But it had -- it has nothing to do

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  with what's being -- I don't even know what's
3  being discussed here, what this is referring to.
4     Q.   How do you know it has nothing to do
5  with it?
6     A.   Because I don't understand what
7  this -- what this means.
8     Q.   Let's just take a step back from this.
9  On a normal repo, what happens when the party
10  who transferred the collateral defaults?
11     A.   So --
12     Q.   Let's just posit a situation like we
13  talked about earlier.  One party A is going to
14  give you $50 million in collateral?
15     A.   Uh-huh.
16     Q.   And you're going to give me $45
17  million in cash?
18     A.   Right.
19     Q.   What happens if I default under normal
20  circumstances?
21     A.   I'm sorry, can you just go through --
22  your party?
23     Q.   If I'm the party that is giving you
24  have $50 million in collateral?
25     A.   You're giving me collateral.  I'm

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  going to give you cash.
3     Q.   You're giving me 45 million in cash?
4     A.   Right.
5     Q.   What happens under normal
6  circumstances if I default?
7     A.   If you -- the person who borrowed the
8  cash?
9     Q.   Yes.
10     A.   The party that has the collateral
11  would take the collateral, liquidate the
12  collateral, and pay off the loan.
13     Q.   And do you get to keep the haircut?
14     A.   Only to the extent that it covers your
15  principal.  To the extent that it's larger than
16  your principal, you're required to return that.
17     Q.   Why are you required to do that?
18     A.   Because the collateral is there only
19  to pay down principal.
20     Q.   So, just so I understand, in our
21  hypothetical if I defaulted, you would liquidate
22  the $50 million in collateral and then do what?
23     A.   Well, normally what I would have is
24  I'd have -- let's go back to my example.  I
25  would give you $100 million in cash and you

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  would give me $105 million in collateral.  You
3  default.  I call you up and say give me back my
4  cash.
5     Q.   Right.
6     A.   You said I can't do that.  So I put
7  you in default.
8     Q.   Okay.
9     A.   I take your collateral, I sell it,
10  okay?  And liquidate it.
11     Q.   Okay.
12     A.   And I use that extra 5 percent to pay
13  off my principal, my 100 million that I lent
14  you.
15     Q.   Do you pay off anything else with it?
16     A.   No.  I just have to pay that off.
17        Now, to the extent there's a deficit,
18  I take a loss.  So if your collateral is only
19  worth 98 million, I lose money; and if your
20  collateral is worth still 105, I would have to
21  return the 5 million excess to you.
22     Q.   Okay.  That's the normal course of
23  business in the event of a default?
24     A.   Yes.
25     Q.   Does that change at all in the event

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  of a bankruptcy?
3     A.   Well, no, because what I described was
4  a situation where the governing document would
5  have been a GMRA or, you know, or a stock loan
6  agreement.
7        In the bankruptcy, those contracts are
8  no longer valid.  The bankruptcy court is, you
9  know, running the outcome.  So, in an event of a
10  bankruptcy, I believe it's different.
11     Q.   How is it different?
12     A.   I'm not a lawyer.  I don't know.
13     Q.   How do you believe it differs?
14     A.   Because if the entity is bankrupt, it
15  can't operate any longer, it can't honor the,
16  you know, move cash and collateral back and
17  forth and so your rights, you know, under that
18  are different because, you know, I think the
19  bankruptcy proceedings are different.
20        What I described is when an entity is
21  still operating and they just default under the
22  agreement.
23     Q.   So whose rights are different in the
24  bankruptcy context?
25        MR. SCARING:  I'm going to object to

## Page 158

HIGHLY CONFIDENTIAL - J. COGHLAN

1  that.
2      A.   I'm not qualified -- what I described
3  to you is the normal operating procedure in
4  entities that are still viable that are governed
5  by traditional financing contracts.
6      Q.   Okay.
7      A.   What happens in bankruptcies, I'm not
8  qualified to discuss what -- I just don't know.
9      Q.   Do you have any experience in
10 bankruptcies other than the one that we're
11 talking about here?
12     A.   No.
13     Q.   Okay.  Do you have any experience in
14 defaults in the bankruptcy context other than
15 the Lehman situation?
16     A.   No.
17     Q.   Okay.  Did you ever discuss with
18 anyone during this week what happens to the
19 collateral in the event of a default?
20         MR. STERN:  Objection to the form.
21     What week?
22     Q.   The week of September 15.
23     A.   Well, as I said, we were -- LBI was
24 still operating.

## Page 159

HIGHLY CONFIDENTIAL - J. COGHLAN

1      Q.   Right.
2      A.   We had contracts that govern our
3  behavior.  To the extent that we could not
4  operate as per the requirements of the contract,
5  parties were able to put us in default.  That in
6  fact happened.
7      Q.   Which parties put you in default?
8      A.   I don't know off the top of my --
9  various securities lenders.  Other
10 counterparties that did trades with us.
11     Q.   Could you name any of them?
12     A.   I -- I don't recall which ones did and
13 didn't.
14     Q.   So, in those default situations that
15 you mentioned, was Lehman the lender of the
16 collateral or was Lehman --
17     A.   Both.  Lehman would be both.
18     Q.   So, in the situations where Lehman was
19 lending collateral and it was declared in
20 default, did Lehman get back any excess
21 collateral after it was liquidated?
22     A.   I -- I don't know.  I don't -- I just
23 can't answer that question.  I mean, there's so
24 many transactions that are going through during

## Page 160

HIGHLY CONFIDENTIAL - J. COGHLAN

1  the course of the day, you know, the speed is --
2  so to know exactly what the cash flows were on a
3  trade-by-trade basis would be difficult to
4  monitor, you know, given the circumstances.
5      Q.   Do you know of any situation where
6  Lehman was put in default during that week and
7  received back part of the haircut?
8      A.   I don't know that.  I don't recall,
9  no.
10     Q.   Who would know that?
11     A.   I don't know.
12     Q.   Were there any situations during that
13 week where Lehman was the provider of the cash
14 in the transaction where Lehman was declared in
15 default?
16     A.   Yes, I believe so.
17     Q.   Do you know which entities declared
18 Lehman in default in that context?
19     A.   I don't know off, you know, off the
20 top of my head, no.
21     Q.   And what happened in those situations?
22 Did Lehman liquidate the collateral?
23     A.   No, the counterparty would be
24 liquidating us.  If we lent them the cash, if we

## Page 161

HIGHLY CONFIDENTIAL - J. COGHLAN

1  couldn't get back, they would take out cash back
2  and then they would just buy us in.
3      Q.   What do you mean, what does "buy us
4  in" mean?
5      A.   In a stock trade, for example, if you
6  are State Street and you gave me $100 million
7  worth of IBM, you would put us in default
8  because I can't return the IBM.  I may not have
9  been able to return the IBM because I couldn't
10 get it back from the person I lent it to.
11         So then I couldn't deliver back to a
12 State Street -- this is just an academic
13 example -- State Street that collateral.  So
14 they would have the right to put us in default
15 because I couldn't make delivery, and then they
16 would buy us in the collateral that we owed
17 them.
18     Q.   I guess I just don't understand the
19 phrase "buy us in."  What does that mean?
20     A.   So they gave me $100 million worth of
21 IBM, and they would have to go back and buy it,
22 you know, because I couldn't make delivery to
23 them.  They want it back.  I couldn't make
24 delivery to them.  So they would go into the

Page 162

HIGHLY CONFIDENTIAL - J. COGHLAN

1    marketplace on the exchange, buy $100 million
2    worth of IBM, and hopefully they had enough
3    margin to make sure that they were made whole.
4        Q.    And if they had extra, what would they
5    do?
6        A.    I believe they over time would have to
7    return it to us, but, you know, again, that's
8    something for counsel to discuss.
9        Q.    I understand that. I'm not asking a
10   legal question.
11       Do you recall any questions -- any
12   discussions during this week about the issues
13   you and I have just been talking about?
14       A.    I -- can you restate the question,
15   please?
16       Q.    Do you recall any discussions during
17   this week of September 15th through the closing
18   of the sale transaction the following Monday
19   concerning what happens in the event of a
20   default of a repo?
21       A.    I'm sorry, I just don't understand the
22   question.
23       Q.    Did you have any discussions with
24   anyone at Lehman during this week of November --

Page 163

HIGHLY CONFIDENTIAL - J. COGHLAN

1    of September 15 about what happens to the
2    collateral in the event of a default of a repo?
3        A.    No. I would say we hadn't talked
4    about the collateral, no.
5        Q.    Did you have any discussion with
6    anyone at Lehman during this week about anything
7    to do with what happens in the event of a
8    default on the repo?
9        A.    Yes, I was talking to counsel around
10   some of the defaults and, you know, and what,
11   you know, do we need to do relative to defaults.
12       Q.    Okay.
13       A.    So I was letting counsel know that we
14   were, you know, defaulting and then we were
15   getting notices to support those defaults.
16       Q.    Now you're talking about Lehman's
17   in-house counsel?
18       A.    Yes.
19       Q.    I don't want to talk about --
20   conversations with counsel are privileged
21   conversation. I want to talk about any
22   conversation you might have had with business
23   people at Lehman about the consequences of an
24   event of default under a repo.

Page 164

HIGHLY CONFIDENTIAL - J. COGHLAN

1        MR. STERN: I assume you want to
2    finish this line of questions, but at some
3    point we should figure out a time for lunch.
4        MR. HINE: Yeah.
5        Q.    Are you okay for a little bit?
6        A.    Sure. Sure.
7        Q.    So, putting aside conversations you
8    might have had with counsel during that week,
9    did you have any conversations with business
10   people, including Mr. Reilly or Lowitt or
11   Gelband or Tonucci or Kelly, about the
12   consequences of a default under a repo?
13       A.    I don't recall having those
14   conversations, no.
15       Q.    Do you have any recollection of these
16   folks talking amongst themselves or this being
17   an issue for consideration during that week?
18       A.    Not to the best of my knowledge. I
19   just don't know.
20       Q.    Why do you think he would be writing
21   you an e-mail about -- which discusses
22   defaulting on repos?
23       A.    I --
24       MR. STERN: Objection to the form.

Page 165

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Calls for speculation.
2        A.    Well, it's unclear to me what this
3    says and what it means. That's one issue. And
4    the second issue is I never -- I don't recall
5    having conversations about defaulting on repos
6    as it relates to the Barclays transaction or the
7    transfer of assets.
8        Q.    Could this possibly suggest that they
9    were discussing whether defaulting on the repo
10   could be used as a means to give Barclays a
11   discount because the assets would be taken from
12   the haircut?
13       MR. STERN: Objection to the form.
14       A.    I don't -- I don't have an
15   understanding of what this says. I don't recall
16   discussing this, so what this means as a --
17   relative to the Barclays transaction -- I don't
18   even know if it's related to the Barclays
19   transaction, per se. So it would be impossible
20   for me to -- to know the answer to that
21   question.
22       Q.    Could you speculate at all about what
23   this sentence means? I'm talking about the
24   sentence that starts, "Defaulting on repo could

Page 166

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  be the best as discount could be taken from
3  haircut."
4          MR. STERN: Objection to the form.
5  Calls for speculation.
6      A.  I don't know what this means. I don't
7  know what they're proposing. I don't know --
8      Q.  Could you posit any plausible
9  explanation for what this means?
10          MR. STERN: Objection. Calls for
11      speculation.
12      A.  I don't have -- I don't know what it
13  means. I -- I can't surmise what it means.
14      Q.  You're the guy at Lehman that they
15  would ask repo questions to, right?
16      A.  Absolutely.
17          MR. STERN: Objection to the form.
18      Q.  Why would they --
19          MR. STERN: That's a
20      mischaracterization of what he said.
21      Q.  And they clearly identified this
22  question as definitely for you, right?
23          MR. STERN: Objection to the form.
24      A.  In the e-mail it says that, "The third
25  question is definitely one that should be

Page 167

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  reviewed with Cogs."
3      Q.  And you have no recollection of ever
4  reviewing this question with anyone?
5      A.  I do not have any recollection.
6      Q.  Do you think you ever reviewed this
7  question with anyone?
8      A.  To the best of my knowledge, no.
9      Q.  You think you ever tried to address
10  any portions of this question with anyone?
11      A.  To the best of my knowledge, no.
12      Q.  Let's continue on the item number 3.
13  It says, "If not that" --
14          MR. STERN: Excuse me, Bill. How much
15      longer are you going to go on this? Because
16      we should have a chance to take a lunch
17      break, I think.
18          MR. HINE: I'm planning on taking a
19      lunch break. Can we go another five, ten
20      minutes?
21          MR. STERN: Five, ten minutes? Okay.
22          MR. HINE: I would like to exhaust
23      this one topic.
24          MR. STERN: I think you have, but go
25      ahead.

Page 168

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.  The next sentence says, "If not that,
3  then we need to give business an allocation of
4  block discount so they can mark down the books
5  tonight."
6          Does that ring any bells about what
7  was being discussed on this issue?
8      A.  No. Again, I don't know what the
9  phrase "block discount" means.
10      Q.  Do you recall any recollection of
11  people talking about marking down the books
12  tonight?
13      A.  I do not recall that.
14      Q.  Did Lehman mark down any of its books
15  during the week of September 15, to your
16  knowledge?
17      A.  Not to my knowledge.
18      Q.  Did --
19      A.  I don't know if they did or they
20  didn't.
21      Q.  Okay. Would you know that under
22  normal circumstances?
23      A.  No. Not necessarily, no.
24      Q.  When it says "mark down the books,"
25  what books would that be referring to?

Page 169

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2          MR. STERN: Objection. Calls for
3      speculation.
4      A.  I don't know.
5      Q.  Could you posit any explanation for
6  what that sentence might mean?
7          MR. STERN: Objection. Calls for
8      speculation.
9      A.  No, there was something about marking
10  down books, you know, and marking the books,
11  which is obviously in here, but, you know,
12  again, it's -- I just don't know what it means.
13  I can't really put it into context and, you
14  know, when they say "give business," I don't
15  know what business means. There were literally
16  dozens of business in Lehman Brothers. So it
17  may not even be referencing the financing
18  business.
19      Q.  Well, it's talking about allocating a
20  discount among businesses, some businesses,
21  right?
22          MR. STERN: Objection to the form.
23      A.  Ask the question again.
24      Q.  It's talking about allocating some
25  sort of discount among businesses, correct?

43

Page 170

HIGHLY CONFIDENTIAL - J. COGHLAN

1    MR. STERN: Objection to the form.
2    A.  The letter says something to the
3 effect of an allocation of a block discount.
4 Where and how that's done I have no
5 recollection. I have no understanding of how,
6 you know, the asset transfer, you know, took
7 place. I wasn't involved in those discussions,
8 so I don't understand because I wasn't part of
9 it, you know, what this, I think, refers to.
10    Q.  As the manager of one of Lehman's
11 businesses, were you ever allocated any form of
12 discount during that week?
13    A.  Not to my knowledge, no.
14    Q.  Were you ever asked to mark down any
15 of your books during that week?
16    A.  Not to my knowledge, no.
17    Q.  Did you ever mark down any of your
18 books that week?
19    A.  I -- not to my knowledge. I don't
20 know.
21    Q.  Who would know about within your
22 financing business?
23    A.  In the normal course of business, we
24 would mark to market positions. Given the fact

Page 171

HIGHLY CONFIDENTIAL - J. COGHLAN

1 that the goal was to return collateral as
2 quickly as possible, we were more focused on
3 that. And I'm not sure, I don't recall what
4 marking we were doing on an overnight basis
5 during that week.
6    Q.  So you have no recollection of marking
7 down any of your books during that week?
8    A.  No, I do not.
9    Q.  The next sentence in that number 3
10 says, "Does that create a problem as it could
11 tip the broker early?" Do you have any
12 understanding what that could be referring to?
13    MR. STERN: Objection. Calls for
14 speculation.
15    A.  No.
16    Q.  Could that be talking about tipping
17 the broker, meaning LBI, into bankruptcy early?
18    MR. STERN: Objection. Calls for
19 speculation.
20    A.  I don't -- I don't know.
21    Q.  Is that a possible reading of that
22 sentence?
23    A.  It is a possible reading of that
24 sentence.

Page 172

HIGHLY CONFIDENTIAL - J. COGHLAN

1    MR. STERN: Objection. Objection.
2 Calls for speculation.
3    Q.  Do you have any knowledge one way or
4 another whether that's a viable reading of that
5 sentence?
6    MR. STERN: Objection.
7    A.  I have no knowledge one way or the
8 other.
9    Q.  Okay. In the last sentence in that
10 number, number 3, says, "Would we rather have
11 that be in the sale price tomorrow?"
12    Do you have any understanding what
13 that is talking about?
14    A.  No.
15    Q.  Do you know, have any understanding
16 that tomorrow is the hearing before the
17 bankruptcy court?
18    A.  No, I was not aware of that.
19    Q.  Do you have any understanding that the
20 sale price relates in any way to the APA or the
21 transaction between Barclays or Lehman?
22    A.  No, I do not.
23    Q.  Do you have any recollection of any
24 discussions along those lines during that week?

Page 173

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.  Can you rephrase the question?
2    Q.  Do you have any recollection of any
3 discussions along the lines of changing the sale
4 price?
5    A.  No, I do not recall any of those
6 conversations.
7    Q.  Do you have any, any recollection of
8 any discussions about the sale price that might
9 be presented in a court hearing?
10    A.  No, I was not involved in any of that.
11    MR. HINE: Why don't we take a break
12 for lunch.
13    (Recess; Time Noted: 12:47 P.M.)

Page 174

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    AFTERNOON SESSION
3    (Time Noted: 1:43 P.M.)
4  JOHN COGHLAN, resumed and
5    testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. HINE:
8    Q.   Good afternoon, Mr. Coghlan. I'd like
9  you to turn back to Exhibit 21, which is the
10  e-mail chain we discussed just before lunch, if
11  you would.
12    MR. STERN: This is 121?
13    MR. HINE: Yes.
14    MR. SPENCER: No, I'm sorry, it's
15  Exhibit 21.
16    Q.   I'm sorry, Exhibit 21, which is the
17  exhibit we just discussed previously.
18    MR. STERN: 21 is a previously marked
19  exhibit?
20    MR. HINE: It's the last exhibit we
21  looked at.
22    Q.   Do you have the exhibit in front of
23  you?
24    A.   Yes, I do.
25    Q.   And you recall our questions before

Page 175

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  lunch about this exhibit?
3    MR. STERN: Objection to the form.
4    Q.   Mr. Coghlan, is there any reason you
5  have no recollection about this exhibit at all?
6    MR. STERN: Objection to the form.
7    A.   Can you restate the question?
8    Q.   Well, not to be flip, it just seems
9  odd that in a transaction as big as the
10  Lehman/Barclays transaction, when you receive an
11  e-mail like this, that you have no recollection
12  at all about it. So I'm asking you, is there
13  any reason why you have no recollection at all
14  about it?
15    MR. STERN: Objection to the
16  commentary and objection to the form.
17    You can try to answer why you have no
18  recollection about this.
19    A.   There is no specific reason why I
20  don't recall this, no.
21    Q.   You didn't ignore this e-mail, did
22  you?
23    A.   I don't recall receiving the e-mail so
24  I don't know how I can, you know -- I don't
25  recall receiving it.

Page 176

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Okay. Mr. Kirk is a more senior
3  officer at Lehman than you were?
4    A.   Correct.
5    Q.   I take it it's not your normal
6  practice to ignore e-mails from senior officers,
7  correct?
8    A.   Normally if a senior officer asks some
9  information, I would provide information, yes.
10    Q.   You weren't otherwise distracted for
11  any reason that would cause you not to recall
12  this e-mail, is that correct?
13    MR. STERN: Objection to the form.
14    A.   It was a very busy period of time,
15  yes, and things were moving very, very rapidly.
16  So the environment was such, you know, I just
17  don't recall whether I saw this e-mail or not.
18    Q.   Fair to say you didn't get a lot of
19  e-mails from Mr. Kirk during this period?
20    MR. STERN: Objection to the form.
21    A.   I don't recall if I saw e-mails from
22  Mr. Kirk.
23    Q.   Since you moved to Barclays, have you
24  learned anything or developed any kind of
25  understanding about any of the issues we

Page 177

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  previously discussed about this e-mail?
3    MR. STERN: I think you can answer
4  provided you don't disclose any discussions
5  with counsel, if you have -- I don't know if
6  you've had such discussions with counsel,
7  but you can answer subject to that, if you
8  understand what I'm saying.
9    THE WITNESS: No, I don't.
10    Q.   I'm not asking you about any
11  conversations you've had with counsel.
12    A.   Uh-huh.
13    Q.   So let's put those conversations
14  aside.
15    A.   Uh-huh.
16    Q.   Other than those types of
17  conversations, since you moved to Barclays, have
18  you developed any understanding, heard any
19  discussions about the issues we discussed
20  concerning item number 3 on this e-mail?
21    A.   No, I have not.
22    Q.   So, and not to belabor this, you have
23  not, since you moved to Barclays, you have not
24  heard any discussions or developed any
25  understanding about a block discount associated

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   with the Barclays/Lehman transaction?
3    A.  I have not heard that phrase before,
4   no.
5    Q.  And since moving to Barclays, have you
6   heard any conversations or developed any
7   understanding about defaulting on a repo as it
8   related to the Barclays/Lehman transaction?
9    A.  No, I have not heard anything to that
10   effect.
11    Q.  Okay.  Let's mark this exhibit.
12    (Exhibit 126, an e-mail stream, the
13   first one in time dated September 18, 2008,
14   at 6:18 A.M., marked for identification, as
15   of this date.)
16    Q.  Mr. Coghlan, I'm handing you a copy of
17   an exhibit marked as 126, which is an e-mail
18   stream dated September 18, 2008, and appears to
19   be a continuation of the open issues on the
20   e-mail that we previously discussed.
21    If you could take a minute just to
22   review this before I ask you a question.
23    (Document review.)
24    Q.  Do you see in the middle of the page
25   there's an e-mail from Mr. Lowitt to Mr. Reilly

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   and Gelband in which he says, "Also, need to
3   figure out how to shrink down matched book
4   (unless Gerry that hasn't yet been reflected in
5   balance sheet we looked at yesterday)."
6    Do you see that?
7    A.  Uh-huh.
8    Q.  The message continues, "Gerry, please
9   sit with Cogs and Mike to figure out what we
10   need to do and if balance sheet showing matched
11   book at 40 is right."
12    Do you see that?
13    A.  Yes, I do.
14    Q.  That Cogs refers to you, correct?
15    A.  I believe so.
16    Q.  And is it fair to assume that "Mike"
17   is Mike Gelband in that sentence?
18    A.  I don't know.
19    Q.  Okay.  Do you recall any -- I
20   understand you're not copied on this part of the
21   e-mail, but do you recall any discussions along
22   these lines at or about Thursday, September 18,
23   or thereafter?
24    A.  I don't remember conversations on
25   Thursday afternoon specifically about the size

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   of the matched book.
3    Q.  How about at some other time?
4    A.  Well, as I stated earlier, the
5   instructions I got on Monday was to try to get,
6   you know, the matched book as small as possible.
7    Q.  Right.
8    A.  So that was a guideline I was given on
9   Monday and a guideline that we operated with
10   throughout the week.  That was always the goal.
11    The second issue about sitting down
12   and finalizing the matched book being at 40, I
13   don't specifically remember having conversations
14   with Gerry about that.
15    Q.  Just so I understand what you just
16   said, do you understand the phrase in the first
17   sentence, "shrink down the matched book," to be
18   referring to the effort that you were undergoing
19   during that week to reduce the size of the book
20   that you managed?
21    A.  I haven't -- I have never seen this
22   before and I wasn't copied on it, but getting
23   the matched book smaller was an instruction I
24   did receive earlier in the week.
25    Q.  Can you --

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.  So this may or may not be consistent
3   with that, I don't know.
4    Q.  Can you think of any other thing that
5   the phrase "shrink down the matched book" could
6   be referring to?
7    A.  No, it -- I was told to get the
8   matched book smaller.  The phrase "shrinking the
9   matched book" is consistent with that.
10    Q.  Okay.
11    A.  But I'm not a hundred percent certain
12   how it's used in this context since I wasn't
13   privy to some of the --
14    Q.  But were you privy to any
15   conversations that followed this e-mail about
16   that topic?
17    A.  Well, I did have one conversation, as
18   said, with Gelband when he asked me where I
19   thought the matched book would be, you know, at
20   the end of the week.  I gave him that number we
21   discussed, and I remember having those two
22   conversations about the matched book.
23    Q.  Which two?  The one --
24    A.  The first one about getting the
25   matched book smaller at the beginning of the

HIGHLY CONFIDENTIAL - J. COGHLAN

1    week and the second conversation about what I
2    thought the projected size of the matched book
3    would be at the end of the week which I
4    reflected to Gelband.
5        Q.    I might have misunderstood your prior
6    testimony. I just want to clarify something.
7            When you gave Gelband the projection
8    of 40 billion?
9        A.    Uh-huh.
10       Q.    What day of the week was it that you
11   gave it to him?
12       A.    I don't recall, but it was -- it was
13   Wednesday or Tuesday.
14       Q.    Okay. So that would be prior to this
15   e-mail?
16       A.    Yes.
17       Q.    Correct?
18           And so, just so I understand your
19   conversation, you had one conversation early in
20   the week about shrinking the matched book
21   generally?
22       A.    Yes.
23       Q.    And one conversation on either Tuesday
24   or Wednesday where you gave Mr. Gelband a $40

HIGHLY CONFIDENTIAL - J. COGHLAN

1    billion figure?
2        A.    Yes.
3        Q.    Other than those two conversations, do
4    you recall any other conversations that week
5    about shrinking the matched book or the subjects
6    mentioned in this e-mail?
7        A.    No, I -- I don't recall having other
8    conversations.
9        Q.    Do you think you might have had
10   another conversation after this e-mail?
11       A.    They may have called me and asked to
12   verify where I thought the number would be.
13   That may have happened.
14       Q.    Okay.
15       A.    I don't recall, though.
16       Q.    Was the matched book in fact at 40 at
17   this time?
18       A.    I don't recall.
19       Q.    Do you know what it ended up at on
20   Friday?
21       A.    I do not. I don't recall.
22       Q.    Would you have expected to have
23   recalled if it was radically different from 40?
24       A.    Can you repeat the question?

HIGHLY CONFIDENTIAL - J. COGHLAN

1        Q.    Well, I mean, you gave a projection --
2        A.    Right.
3        Q.    -- earlier in the week to Mr. Gelband.
4            Do you have any recollection that your
5    projection was off?
6        A.    I don't recall. I don't remember.
7        Q.    Do you have any recollection of him
8    saying -- call on you and saying, How could you
9    have given me that projection? It was way off?
10       A.    No, I don't recall that.
11       Q.    So is it your understanding that your
12   projection was probably close to accurate?
13       A.    I don't recall. I don't know where
14   the matched book ended up at the close of
15   business that Friday.
16       Q.    Okay. And now, whatever it ends up on
17   the close of business that Friday, it wouldn't
18   change on Saturday or Sunday, correct?
19       A.    Correct.
20       Q.    So it would reopen the following
21   Monday morning at the same level?
22       A.    But we never reopened, so ...
23       Q.    Okay. Had you --
24       A.    Had we reopened, yes.

HIGHLY CONFIDENTIAL - J. COGHLAN

1        Q.    How do I find out what the matched
2    book closed at that Friday?
3        A.    I don't know. I don't know.
4        Q.    Is there some kind of report that's
5    generated on the weekend that showed what the
6    matched book was that week?
7        A.    I don't know. You'd have to ask the
8    financial people what, you know, documents they
9    would -- they kept and preserved and what have
10   you, what information they had.
11       Q.    And the financial, by "financial
12   people," you mean who?
13       A.    Gerry Reilly's group, et cetera, and
14   people that work for him, you know, would report
15   the balance sheet for Fixed Income and for
16   Capital Markets. So they would be the people
17   that would have that information.
18       Q.    Okay. So when this sentence says,
19   "Gerry" -- it's questioning Gerry about whether
20   this has been reflected on the balance sheet,
21   that -- is it reasonable to take that as meaning
22   the balance sheet that his group prepares?
23       A.    I believe that Gerry prepares the
24   balance sheet information, so I would think that

Page 186

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  this means, Gerry, please, see if your numbers
3  and the numbers I anticipated to hit would check
4  out.
5      Q.   Okay.  Then if we go up to the next
6  e-mail in the chain, if you'll take a look,
7  you'll see that it's talking about, "Practically
8  the issue of what goes is complicated by the LBI
9  cash position and who is going to fund the
10  remaining assets.  It is either the Fed, which
11  they will not take, or Barclays."
12      Do you have any understanding of what
13  that's referring to?
14      A.   No, I don't.
15      Q.   Do you have any understanding of
16  whether the phrase "what goes" is talking about
17  assets that would go to Barclays?
18      A.   Could you ask that question again?
19  I'm sorry.
20      Q.   You see the use of the term "what
21  goes"?
22      A.   I don't know what that means.
23      Q.   Okay.  Is it possible that it's
24  referring to what assets would go to Barclays?
25      A.   I -- it could be possible.  I don't

Page 187

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  know.
3      Q.   Okay.
4      A.   I don't know what that -- how that's
5  used in the context of that, but ...
6      Q.   It continues, the e-mail continues,
7  "So I think auction rates may be impossible to
8  exclude."
9      Do you recall any discussions about
10  excluding auction rates?
11      A.   No, I do not.
12      Q.   In any context?
13      A.   No, I do not.
14      Q.   Any understanding that auction rate
15  securities were not going to be transferred to
16  Barclays during that week?
17      A.   No, I had no knowledge of what was
18  going on with auction rates.
19      Q.   Did you ever subsequently develop any
20  knowledge about what was going on, what happened
21  with auction rates?
22      A.   There were a few auction rate
23  securities that were transferred in the
24  transaction.  There were a few auction rate
25  securities that were transferred.  That I know.

Page 188

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      Q.   Do you have any estimate of the amount
3  of the value of those securities?
4      A.   No, I do not.
5      Q.   Previously you said that -- we talked
6  about whether the matched book at close of
7  business Friday is the same as the value the
8  following Monday?
9      A.   Uh-huh.
10      Q.   And you said we didn't open Monday.
11      How did -- was the matched book
12  transferred to Barclays ultimately?
13      A.   My understanding was it did not get
14  transferred.
15      Q.   So what got transferred within the
16  shop that you were working in?
17      A.   The division I was in, I believe
18  nothing got transferred.
19      Q.   So your understanding is the --
20      A.   I was not told to transfer anything.
21  There was no protocol set up to do transfer, so
22  I'm surmising that nothing was transferred.  I
23  certainly did not knowingly transfer assets to
24  Barclays.
25      Q.   Okay.  And when you went to work for

Page 189

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  Barclays, were the same assets there that you
3  had previously been working on in Lehman?
4      A.   Not to my recollection, no.
5      Q.   So what did you do at Barclays?  Start
6  a whole new book?
7      A.   Barclays already had an existing
8  business that was operating and trading.  So
9  they continued to operate and trade under their
10  normal business structure and continued to do
11  business at Barclays as an operating
12  institution.
13      Q.   So you, in your current capacity at
14  Barclays, is it your belief that you're working
15  with a completely new book of business than what
16  you were working at when you were at Lehman?
17      A.   Actually, I was not -- on day one, it
18  wasn't agreed or who was going to be responsible
19  for what going forward.
20      Q.   Uh-huh.
21      A.   So I actually had very little standing
22  at Barclays, so I wasn't really operating the
23  business.  I was helping in transition, people,
24  things like that, discussing technology
25  transitions, but in terms of operating the

Page 190

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  business, I had no authority to do so.
3    Q.  I thought earlier you said your
4  responsibilities are essentially the same at
5  Barclays?
6    A.  It took time to get to that.  It took
7  several weeks for those decisions to be made.
8    Q.  And now do you have an understanding
9  of whether your Lehman book of business stayed
10  with Lehman?
11    A.  I believe that the Lehman book of
12  business, based on what I know, stayed at
13  Lehman.
14    Q.  Okay.  And when you say that, you're
15  talking about the book of business within your
16  financing --
17    A.  Correct.
18    Q.  -- business at Lehman?
19    A.  Correct.
20    Q.  Okay.
21    (Exhibit 127, an e-mail stream, the
22    first one in time dated September 18, 2008,
23    at 6:04 A.M., marked for identification, as
24    of this date.)
25    Q.  Mr. Coghlan, I'm handing you a

Page 191

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  document marked as Exhibit 127, which again
3  appears to be a different continuation from the
4  e-mail we've been discussing for a while here,
5  so I direct your attention if you want to take
6  some time to read the upper portion, which
7  appears to be a new portion.
8    (Document review.)
9    A.  I've read the document.
10    Q.  Okay.  I understand you're not copied
11  on the newer portion of these e-mails, but I was
12  wondering if they remind you or suggest anything
13  to you about what was being discussed at this
14  time?
15    A.  No, I have not seen this e-mail and I
16  don't know what would be being discussed other
17  than what the letter says, which is open issues.
18  I don't know.
19    Q.  You see the reference to a meeting --
20  "Please set up a meeting" -- or it says, "Gerry,
21  please set up a meeting first thing this morning
22  to work through these issues with Mike, Eric and
23  Hyung."
24    Do you recall any such meeting that
25  morning?

Page 192

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.  No, I do not.
3    Q.  Can you speculate on what they might
4  have been meeting about?
5    A.  No.  I mean, they were meeting
6  relative to open issues on the deal.  What those
7  issues were I do not know.
8    Q.  Do you know if that meeting had to do
9  with issue number 3 at the bottom?
10    A.  I do not know if that had to be part
11  of that.
12    Q.  At the very top it says, "Barclays
13  guys chose the assets.  We did not have anything
14  to do with it."
15    Do you know what that's referring to
16  at all?
17    A.  No.
18    Q.  Do you know who chose the assets that
19  ultimately got transferred to Barclays?
20    A.  No, I do not.
21    Q.  Do you know if Barclays did versus
22  Lehman?
23    A.  I do not know.
24    Q.  Did you have any involvement in what
25  assets ultimately got transferred to Barclays?

Page 193

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.  To the best of my knowledge, no.
3    Q.  Did you have any discussions along the
4  lines of who chose the particular assets that
5  went to Barclays?
6    A.  No, I did not hear those discussions.
7    Q.  Since moving to Barclays, have you
8  learned anything that would suggest who chose
9  the assets that Barclays ultimately acquired?
10    A.  No, I do not know who chose the
11  assets.
12    Q.  You haven't heard anything since
13  you've been at Barclays about that?
14    A.  No, I have not heard.
15    Q.  Have you heard anything since you've
16  been at Barclays about how the assets were
17  transferred to Barclays?
18    A.  No, I have not heard about the asset
19  transfer, no.
20    Q.  Since you've been at Barclays, have
21  you heard anything about the terms of the
22  transaction between Lehman and Barclays?
23    A.  No.  No.  I mean, the things I knew
24  about the terms were that they bought the
25  building.  I know that.  And away from that, I

Page 194

HIGHLY CONFIDENTIAL - J. COGHLAN

1    wasn't really sure how the asset transfer or
2    asset sale or whatever legal definition
3    surrounded the deal would happen beyond that,
4    but I did know the building was bought.
5        Q.   Since you've been at Barclays, have
6    you develop an understanding about what assets
7    Barclays now has that previously were at Lehman?
8        A.   No, I do not know.
9        Q.   Since you've been at Barclays have you
10   developed an understanding of what assets
11   Barclays thinks it's still owed from Lehman?
12       A.   No, I do not know.
13       Q.   Have you ever heard any discussion
14   about what Barclays thinks it's still owed from
15   Lehman?
16       A.   No, I have not heard anything like
17   that.
18       Q.   Okay. Mr. Coghlan, I'm handing you a
19   copy of a document that's previously been marked
20   as Exhibit 66B. It's an e-mail stream dated
21   Friday, the 19th, September 19th, and you'll see
22   your name towards the top of the e-mail as a
23   recipient.
24       Do you see your name?

Page 195

HIGHLY CONFIDENTIAL - J. COGHLAN

1        A.   I see my name. December 19 at 12:51.
2        Q.   Correct. Could you please take a
3    moment to review this document?
4        (Document review.)
5        A.   Okay.
6        Q.   Do you see the phrase in the -- toward
7    the bottom half of the page where Mr. Aronow
8    writes, "Barclays operations team has
9    recalculated the value of the collateral that
10   they received from us last night and they are
11   more than fully collateralized, including the
12   haircuts applied." Do you see that?
13       A.   Yes.
14       Q.   Do you have any understanding of what
15   that's referring to?
16       A.   I'm sorry, could you ask the question
17   again?
18       Q.   Do you have any understanding what
19   that sentence is referring to?
20       A.   Not specifically, no.
21       Q.   How about generally?
22       A.   No. No. No. Again, no, I don't --
23   it may be referring to this BoNY transfer, but I
24   don't know that for sure.

Page 196

HIGHLY CONFIDENTIAL - J. COGHLAN

1        Q.   When you say "the BoNY transfer," what
2    are you talking about?
3        A.   There was a period of time during the
4    week where we moved assets out of the Fed
5    account and forwarded to BoNY, which was
6    Barclays' clearing agent, and this may be
7    referring to that transfer.
8        Q.   Okay. Is that the transaction we
9    discussed earlier this morning?
10       A.   I believe so, yes. It may be the
11   transfer.
12       Q.   Is it your understanding that that was
13   not a tri-party repo arrangement?
14       A.   As I said --
15       MR. STERN: Objection to the form.
16       A.   As I said, I don't know what form of
17   transfer took place. The only thing that I was
18   aware of the people on my team were working on
19   was helping the Treasury Department, you know,
20   settle the trade. So whether it was done in
21   tri-party, bilaterally, or some other
22   documentation, I just don't know what the
23   relationship between the parties were.
24       Q.   Well, if it was not a tri-party, would

Page 197

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Barclays' operations team have had any interest
2    in what the collateral that was transferred?
3        MR. STERN: Objection to the form.
4        A.   That I wouldn't know. I mean, I
5    wasn't even a member of BarCap at the time, so I
6    wouldn't even -- I wouldn't know what their
7    collateral requirements were or weren't.
8        Q.   Well, do you have any understanding at
9    all, whether during the week of September 19 --
10   September 15th or that you've developed later,
11   as to Repurchase Agreements involving BarCap,
12   Barclays Capital, and Lehman?
13       MR. STERN: Objection to the form.
14       A.   Can you rephrase?
15       Q.   Do you know of any repurchase repo
16   arrangements between Barclays and Lehman during
17   this period of time?
18       A.   No, I didn't know how this -- what was
19   going on between Barclays and Lehman and how --
20   what was happening with the transfer of assets
21   other than, as I said, helping people settle
22   whatever was agreed to. So I didn't -- again, I
23   don't know if it was done in repo or tri-party
24   or whatever form, you know, sale, I just don't

HIGHLY CONFIDENTIAL - J. COGHLAN

1    know,
2    Q.  Do you have any understanding of any
3    financing arrangements between Barclays and
4    Lehman during this period of time?
5    A.  Well, I don't have any understanding
6    of the financing relationship between the
7    parties. I was -- people that worked for me
8    helped settle whatever financing arrangement, if
9    any, was negotiated between the parties.
10   Q.  When you say "settle," that entails
11   the transfer of some securities?
12   A.  Collateral, yeah, collateral and
13   getting collateral available to settle the
14   trade.
15   Q.  Have you ever heard of anything called
16   the replacement transaction?
17   A.  No, I have not.
18   Q.  Have you ever heard of anything called
19   the September 18 Repurchase Agreement?
20   A.  No, I have not.
21   Q.  Do you know of any transaction
22   involving Barclays that took place on September
23   18, which is the Thursday of that week?
24   A.  No, I do not.

*(numbering: 1-25)*

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Q.  Do you know why Mr. Aronow would be
2    copying you on this e-mail?
3    A.  No, I do not. I don't know.
4    Q.  What is Mr. Aronow's position?
5    A.  David was in Customer Service in the
6    Prime Broker, but David's background was a heavy
7    operations background and settlement background,
8    so he may have been asked to help out given his
9    knowledge and experience.
10   Q.  Was David part of your team?
11   A.  No, he does not report to me.
12   Q.  He's a separate report to Mr. --
13   A.  He did not report directly to John
14   Wickham, but indirectly he reported to John.
15   Q.  You see on the following line of this
16   e-mail it says, "Senior management at Barclays I
17   am told are very satisfied with the results of
18   the effort."
19   Do you have any knowledge about senior
20   management at Barclays satisfaction with respect
21   to anything during that week?
22   A.  No, I don't know what the management
23   was thinking or opining.
24   (Exhibit 128, an e-mail stream, the

*(numbering: 1-25)*

HIGHLY CONFIDENTIAL - J. COGHLAN

1    first in time dated September 19, 2008, at
2    2:44 P.M., marked for identification, as of
3    this date.)
4    Q.  Mr. Coghlan, I'm handing you a copy of
5    Exhibit 128, which appears to be an e-mail with
6    multiple recipients dated September 19 at 10
7    P.M. If you look through the list of
8    recipients, your name is in the top third of the
9    page, I believe. Do you see it?
10   A.  I see that, yes.
11   Q.  My first question is, do you recall
12   seeing this e-mail before?
13   A.  I don't recall seeing this specific
14   e-mail.
15   Q.  Do you have an understanding of why
16   you were included in this lengthy list of
17   recipients here?
18   A.  Yes. ESEP was an old Lehman Brothers
19   deferred compensation program, and I was a
20   participant in that as an employee of Lehman
21   Brothers.
22   Q.  Okay.
23   A.  So I was a participant in that
24   program.

*(numbering: 1-25)*

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Q.  And who was Craig Schiffer?
2    A.  Craig Schiffer is a former Lehman
3    employee, and I'm not sure exactly what his role
4    in all this was.
5    Q.  Do you have any understanding why he's
6    sending this large group of people an e-mail
7    that Friday night?
8    A.  Yes. There is some, in this program,
9    there's some sort of credit exposure to Lehman
10   Brothers. So, to get your benefit, it's
11   somehow, and I don't know the structure
12   specifically, somehow you have credit exposure
13   to Lehman Brothers.
14   When the LBI filed, the value of this
15   benefit diminished, potentially significantly,
16   depending on what the recovery rate on the debt
17   is. So there is a Working Committee formed to
18   try to figure out where the ESEP program fits
19   into the bankruptcy proceedings, and Craig was
20   one of the first people to get involved.
21   Q.  Okay. So am I correct to say that
22   this is just a report to your group about what
23   took place at the court hearing on Friday?
24   A.  I don't know what this document

*(numbering: 1-25)*

## Page 202

HIGHLY CONFIDENTIAL - J. COGHLAN

specifically says. I haven't had a chance to
read it.

Q. Well, take --

MR. STERN: Why don't you read the
whole thing.

Q. Take your chance to review it.

(Document review.)

A. Okay.

Q. So does it appear to you to be a
report of what took place at the court that
Friday night?

A. Yes, it appears that certain
participants in the ESEP program attended the
bankruptcy hearing and are reporting back the
information they learned at the bankruptcy
hearing.

Q. This was sent at 10 P.M. on Friday
night.

Are you already in Philadelphia by
then?

A. I believe so, yes.

Q. Any reason you went to Philadelphia
that weekend?

A. I had a family affair, yes.

## Page 203

HIGHLY CONFIDENTIAL - J. COGHLAN

Q. It wasn't to seek employment
elsewhere?

A. No.

Q. Okay. My question has to do with the
third entry in this report, where it says, "The
assets of the deal dropped from 70 billion to 47
billion, mostly due to dealers not returning the
repos." Do you see that?

A. Yes.

Q. Do you have any understanding about
whether the assets of the deal in fact dropped
from 70 billion to 47 billion?

A. I do not.

Q. Do you have any understanding of
whether there was a problem associated with
dealers not returning repos?

A. I -- there were certain dealers that
were not returning repos. How it affected the
outcome of the deal I don't know.

Q. What does "not returning repos" mean?

A. They didn't want to give us back
collateral and get cash because they were afraid
that they would not get the cash back. So they
just took the collateral and put us in default.

## Page 204

HIGHLY CONFIDENTIAL - J. COGHLAN

Q. Okay. So it's not renewing repos,
it's --

A. It's just, I'll keep what I have and,
you know, and I'm not giving it back to you,
because if I give it back to you, you may have
my cash and my collateral.

Q. Okay. So was that a problem at this
period of time, do you think?

A. I know that it was occurring. How
much of that in terms of volume I don't know.

Q. Okay. It says further in that entry,
"Barclays is assuming 45 billion of
liabilities."

Do you have any knowledge about the
amount of liabilities Barclays was assuming?

A. No.

Q. Fair to say that this -- the level of
assets and liabilities in the Barclays/Lehman
deal is not something that you were working on
at the time?

A. Can you say the question again?

Q. Is it fair to say that you, at the
time, you didn't have any knowledge of the level
of assets and liabilities that were being

## Page 205

HIGHLY CONFIDENTIAL - J. COGHLAN

transferred between Barclays and Lehman?

A. I had no knowledge of that, no, sir.

Q. Did you later obtain any knowledge
after you moved to Barclays about that?

A. No, I did not.

Q. Do you have any understanding as you
sit here today about how many assets were
transferred to Barclays?

A. I can't recall, no.

Q. Do you have any understanding as you
sit here today about how many liabilities were
transferred to Barclays?

A. No, I do not.

Q. Do you have any understanding of how
Barclays was able to declare a gain on
acquisition of some $4 billion shortly after
acquiring Lehman assets?

A. Say the question again.

Q. Do you have any understanding as we
sit here today how Barclays was able to declare
a $4 billion gain on this acquisition?

A. No, I do not know.

Q. Do you have any -- in the context of
your work for Barclays, have you ever had any

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  dealings with the calculation of a gain on the
3  acquisition?
4      A.  No, I have not.
5      Q.  Have you ever had any discussions with
6  anyone about input that would go into the
7  calculation of a gain on acquisition?
8      A.  Not that I know of, no.
9      Q.  Do you know who at Barclays would work
10  on that calculation?
11      A.  I do not know.
12      Q.  Is it fair to say you've never had
13  conversations with people where they asked you
14  for some input with respect to what was going to
15  go into the Barclays balance sheet after the
16  acquisition?
17      A.  I'm sorry, I don't understand the
18  question.  Would you ask that again, please?
19      Q.  Is it fair to say that you have not
20  had any conversations with anyone where they
21  asked you for input into any calculations that
22  were going to go into the Barclays balance sheet
23  after the acquisition?
24      A.  To the best of my knowledge, that's
25  true, yes.  Best of my knowledge, I have not had

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  conversations about what was going into the
3  balance sheet after the acquisition.
4      Q.  Fair enough.
5          (Exhibit 129, an e-mail stream, the
6      first one in time dated September 19, 2008,
7      at 2:26 P.M., marked for identification, as
8      of this date.)
9      Q.  Mr. Coghlan, I'm handing you a copy of
10  an exhibit marked 129, which is an e-mail stream
11  dated September 19 between Mr. Aronow, Mr.
12  Hraska and some others.
13          As far as I can tell, you're not a
14  participant in the e-mail stream, but if you
15  look towards the upper middle part of the page,
16  Mr. Aronow is saying, "I will be with Coghlan
17  from 3:30 to 5."  Do you see that?
18      MR. STERN:  Why don't you take the
19      time to read the document.
20          (Document review.)
21      A.  Okay.
22      Q.  Do you see the reference to a meeting
23  between -- or, Mr. Aronow being with you from
24  3:30 to 5 o'clock?
25      A.  Yes.

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.  Do you recall having a meeting with
3  Mr. Aronow at that time?
4      A.  No, I don't recall.
5      Q.  Do you recall having a meeting with
6  Mr. Aronow at any time during this week?
7      A.  I don't recall having a meeting with
8  him, no.
9      Q.  Do you recall any discussions you
10  might have had with Mr. Aronow during that week?
11      MR. STERN:  I'm sorry, Bill, are you
12      referring to a meeting with Aronow?  Maybe
13      I'm confused about this e-mail message.
14      MR. HINE:  I think you're right.  I
15      think I misspoke.
16      Q.  Let's start again.  Mr. Coghlan, you
17  see the reference -- apparently it's an e-mail
18  from Jim Hraska to Mr. Aronow where he mentioned
19  that he will be with Coghlan from 3:30 to 5, do
20  you see that?
21      A.  Yes.
22      Q.  So do you recall having any kind of
23  meetings with Mr. Hraska at that time?
24      A.  No, I do not recall.
25      Q.  Do you recall any meetings with Mr.

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  Hraska during that week of September 15?
3      A.  No, I don't recall any meetings with
4  Jim.
5      Q.  Do you have any recollection of any
6  conversations you might have had with Mr. Hraska
7  during that week?
8      A.  No, I don't recall any specific
9  conversations.
10      Q.  Do you recall generally whether you
11  had any conversations with Mr. Hraska?
12      A.  No, I don't recall having
13  conversations with Jim.
14      Q.  If you look further down into the
15  e-mail chain, you will see a reference to --
16  looks like an e-mail from Mr. Palchynsky where
17  he says, toward the bottom, "Chase has agreed to
18  replace last night's unauthorized $15.8 billion
19  Barclays tri-party trade with a JPChase bank
20  loan."  Do you see that?
21      A.  Yes.
22      Q.  Do you have any understanding of what
23  those transactions were?
24      A.  I don't know.
25      Q.  Do you have any understanding of any

Page 210

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    kind of Barclays tri-party trade during this
3    week?
4        A.    No, I was not aware of any tri-party
5    trade with Barclays.
6        Q.    So if there was such a trade, it's not
7    something that you were working on during that
8    week?
9        A.    No, the one trade I was aware of is
10    that we were moving collateral from the Fed to
11    BoNY.  Again, the legal relationship and how
12    that was structured, I was just working on the
13    settlement side with a bunch of other settlement
14    people.
15        Q.    Okay.
16        A.    I was aware of that, but I was not --
17    I didn't know it was tri-party, I don't know
18    15.8, I don't know what date, et cetera.
19        Q.    Are you aware of any Chase bank loan
20    that was effected during that week?
21        A.    No, I was not aware of it.
22        Q.    Is that something you would normally
23    work on, or is that handled by a different
24    party.
25        A.    That would normally be handled by cash

Page 211

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    management and Paolo, Dan Fleming and Paolo
3    Tonucci.
4        Q.    Fair enough.
5            (Exhibit 130, an e-mail dated
6    September 19, 2008, at 3:22 P.M., marked for
7    identification, as of this date.)
8        Q.    Mr. Coghlan, I'm handing you a copy of
9    an exhibit marked 130, which is an e-mail stream
10    dated September 19, in which you are a
11    recipient.  Take a minute just to look at that
12    e-mail.
13        A.    Okay.
14            (Document review.)
15        A.    Okay.
16        Q.    Do you see the reference in the middle
17    of the page to a statement that says, "Our LBI
18    positions are not moving today.  The intent is
19    for us to start business from scratch as
20    Barclays on Monday morning."  Do you see that?
21        A.    Yes, I do.
22        Q.    Do you have any recollection or
23    understanding of what that's referring to?
24        A.    No, I -- no, I -- I'm not sure what
25    that -- what that means.  I don't recall.

Page 212

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2        Q.    Do you have any guess about what it
3    means?
4        A.    Well, it's consistent with what I
5    understood that the matched book -- the
6    financing books were not moving.  So to the
7    extent that LBI positions are not moving and
8    that we were going to start from scratch as
9    Barclays on Monday would be consistent with the
10    understanding that I had, and whether this is
11    referencing that I'm not a hundred percent sure.
12        Q.    Where it says -- well, who is Carlos
13    Recalde?
14        A.    He was an Operations person.
15        Q.    He doesn't work in your department?
16        A.    He doesn't work in my department.  He
17    did work in Prime Brokerage and reported to --
18    in to John Wickham, again, indirectly through
19    layers of management, but was not part of my
20    reporting line.
21        Q.    Where it says, "Our LBI positions are
22    not moving today," does that suggest that they
23    moved some other day?
24        A.    No, I don't -- no, I wouldn't -- I
25    don't think that's what that means.

Page 213

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2        Q.    What positions do you think he's
3    referring to?
4        A.    The -- I think he's referring to
5    financing positions in the either equity finance
6    or fixed income repo.
7        Q.    So the positions that you would manage
8    in your book?
9        A.    Yes.
10        Q.    If you would read down towards the
11    bottom, it says, "We may still need the service
12    LBI assets on Monday.  This part is still in
13    flux."  You see that?
14        A.    Yes.
15        Q.    Do you have any understanding of what
16    that could mean?
17        A.    No, I do not.
18        Q.    If you moved your operations to
19    Barclays on Monday and started anew, would there
20    be any need to service assets that had been left
21    back at LBI?
22        A.    We may have had to support SIPC.  I
23    don't know.  That's not my area of expertise.
24    But there may have been people dedicated to
25    support the SIPC positions that were being made.

Page 214

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Your crew was not involved in that?
3    A.   Not to my knowledge, no.
4        (Exhibit 131, an e-mail stream, the
5    first one in time dated September 19, 2008,
6    at 11:03 A.M., marked for identification, as
7    of this date.)
8    Q.   Mr. Coghlan, I'm handing you a copy of
9    an exhibit marked 131, another e-mail stream
10   dated on the 19th of September.
11       After you've had a chance to look at
12   it, I'm going to ask you if you have any
13   recollection about the topic.
14   A.   No.
15   Q.   "No," meaning no recollection?
16   A.   No recollection about --
17       MR. STERN:  Have you read the whole
18   thing?
19       THE WITNESS:  I didn't see the part up
20   there.
21       MR. STERN:  Read from the bottom up.
22   Usually that's the way these go.
23   Q.   Mr. Coghlan, have you had a chance to
24   look at the document?
25   A.   I have.

Page 215

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Do you have any recollection about
3    what was being discussed in this e-mail stream?
4    A.   I don't remember this e-mail
5    specifically.
6    Q.   Do you have any recollection about
7    what was being discussed in this e-mail stream?
8    A.   I don't remember this e-mail
9    specifically.  There was discussion about
10   whether FICC was going to continue to clear
11   trades.
12   Q.   What is FICC?
13   A.   It's an interdealer clearing and
14   settlement engine and, you know, we wanted them
15   to continue to clear trades for us so we could
16   continue to wind-down positions.  And so I do
17   remember having -- getting posted, you know, is
18   FICC still clearing for us.
19   Q.   And were they?
20   A.   I believe at the open of business
21   on -- they cleared up through the opening of
22   business on Friday.
23   Q.   And at some point did they stop
24   clearing?
25   A.   I don't recall.  I don't recall.

Page 216

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Do you recall any other further
3    discussions about that issue?
4    A.   I'm sorry?
5    Q.   Do you recall any other discussions
6    you might have had about that issue?
7    A.   No, you know, we just wanted to make
8    sure that FICC was going to continue to clear
9    trades because we needed them to do that to be
10   able to shrink, you know, get the matched book
11   to be smaller.
12   Q.   Okay.
13       (Exhibit 132, an e-mail stream, the
14   first one in time dated September 20, 2008,
15   at 5:43, marked for identification, as of
16   this date.)
17   Q.   Mr. Coghlan, I'm handing you a
18   document marked as Exhibit 132, which is an
19   e-mail stream from Sunday, September 21, in
20   which you are a CC recipient.  If you would take
21   a minute just to review this.
22       (Document review.)
23   A.   Uh-huh.  I've reviewed this document.
24   Q.   Do you have any recollection of what's
25   being discussed in this e-mail stream?

Page 217

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   No, I do not.
3    Q.   Do you have any understanding of, when
4    it's talking about segregated funds, and
5    specifically I'm looking at the bottom of the
6    second page where it says, "We are obligated by
7    CFTC regs to return 100 percent of segregated
8    funds to our futures customers."  Do you see
9    that?
10   A.   Yes.
11   Q.   Any understanding what is being
12   discussed there?
13   A.   It has to do with, I believe, the
14   rules of the Futures Trading Commission relative
15   to the segregation of funds, customer funds, and
16   what behavior is required under the rules of the
17   exchange.
18   Q.   Do you have any recollection of
19   discussions during this period about that issue?
20   A.   No, that's not my -- this was in Prime
21   Services, but it was part of the futures
22   business.  It was run by Jeff Jennings.
23   Q.   Why would you be CC'd on this?
24   A.   I don't know.  I don't know.
25   Q.   Further up in that e-mail chain, the

Page 218

HIGHLY CONFIDENTIAL - J. COGHLAN

1  next e-mail says, "In part, the only alternative
2  would be to repo the assets to Barclays if they
3  were amenable." Do you see that?
4      A.  Yes.
5      Q.  Do you recall any discussions about
6  repoing assets to Barclays during this period?
7      A.  No, I do not.
8      Q.  We're done with the e-mails, but I do
9  have a couple more questions. I'll try to make
10  it as quick as possible.
11         Mr. Coghlan, I'm handing you a copy of
12  a document marked -- previously marked as
13  Exhibit 25, which is a letter dated as of
14  September 20, 2008, and after you've had a
15  chance to look at it, my first question is did
16  you ever see this document before.
17         (Document review.)
18      A.  I have never seen this document
19  before.
20      Q.  Okay. If you look on the first page,
21  you'll see at the bottom there's a clause two
22  little ii?
23      A.  Uh-huh.
24      Q.  And it mentions in it Schedule A and

Page 219

HIGHLY CONFIDENTIAL - J. COGHLAN

1  then you'll see later it mentions a Schedule B.
2         Do you see that?
3      A.  Okay, yeah.
4      Q.  Do you have any understanding of what
5  Schedule A and Schedule B is in connection with
6  the Barclays/Lehman transaction?
7      A.  I do not.
8      Q.  Have you ever heard those terms
9  before?
10      A.  In terms of the Barclays transaction,
11  I've never heard those terms before.
12      Q.  You meant the Barclays/Lehman --
13      A.  I mentioned to you earlier, in the
14  tri-party, they have a Schedule A in the
15  tri-party. I've heard of that --
16      Q.  Okay.
17      A.  -- in the context of tri-party. In
18  terms of -- I've never heard the phrase
19  "Schedule B," but in terms of the transaction
20  between Lehman and Barclays, I've never heard
21  the phrase "Schedule A" and "Schedule B."
22      Q.  Have you ever heard of the phrase
23  "clarification letter" with respect to the
24  Barclays/Lehman transaction?

Page 220

HIGHLY CONFIDENTIAL - J. COGHLAN

1      A.  No, I have not.
2      Q.  When you read about Schedule A, it
3  talks about -- and I'm reading at the bottom of
4  page 1 -- "Securities owned by LBI and
5  transferred to purchaser, or its affiliates,
6  under the Barclays Repurchase Agreement."
7         Have you ever seen anything that
8  reflected a schedule of securities that were
9  going to be transferred to Barclays?
10      A.  Have I ever seen a schedule of
11  securities? I don't believe so, no.
12      Q.  Have you ever -- have any of your
13  people in your segment of Lehman, were any of
14  them involved in preparing a schedule of
15  securities that were to be transferred to
16  Barclays?
17      A.  As I said, you know, some of the
18  people that work for me helped settling.
19      Q.  Right.
20      A.  So they might have some knowledge of
21  the securities that were going, but I did not
22  directly have any knowledge and I can't opine
23  whether they did have firsthand knowledge.
24      Q.  Okay. Fair to say that if any of your

Page 221

HIGHLY CONFIDENTIAL - J. COGHLAN

1  people did have knowledge of such a schedule,
2  you were not involved in supervising their
3  efforts?
4      A.  That's correct.
5      Q.  Okay. Were any of your -- okay.
6  Scratch that. Do you know which entity within
7  Lehman was responsible for preparing schedules
8  of securities that were going to be transferred
9  to Barclays?
10      A.  I do not know who did that, no.
11      Q.  If you could turn to page 5 of this
12  agreement. Would you look at paragraph 13. It
13  refers to a September 18, 2008 repurchase
14  arrangement among the purchaser and/or its
15  affiliates and LBI and/or its affiliates and
16  Bank of New York, as collateral agent.
17         MR. STERN: I think if you're going to
18  ask about this, he should have a chance to
19  read the whole paragraph.
20         MR. HINE: He can.
21         MR. STERN: Why don't you take your
22  time.
23         MR. HINE: But I just want to direct
24  his attention to that definition of what's

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    termed the "Barclays Repurchase Agreement."
3    Q.   Do you see that, Mr. Coghlan?
4    A.   I see that, yes.  In parentheses,
5    correct?
6    Q.   Yes.  Take your time to read that
7    paragraph.
8         (Document review.)
9    A.   Okay.
10   Q.   Do you have any understanding of what
11   the Barclays Repurchase Agreement is?
12   A.   No, I've never heard -- no, I do not
13   know.
14   Q.   I think we've danced around this issue
15   today.  I just want to make sure that we're on
16   the same page here.
17        You had previously talked about
18   transferring, being involved in
19   transferring assets to Bank of New York,
20   correct?
21   A.   Yes.
22   Q.   Did you have any understanding of
23   whether that transfer had to do with a Barclays
24   Repurchase Agreement, as described here?
25   A.   No, I had no knowledge of a Barclays

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Repurchase Agreement existing or what its terms
3    and conditions would be.
4    Q.   Okay.  So you don't know one way or
5    another whether that transfer that you were
6    doing towards Bank of New York was in connection
7    with that agreement or not; is that right?
8    A.   Correct.
9    Q.   Am I correct to say all you were --
10   you were involved in the actual settling and
11   transferring of those assets, of those
12   securities, not in the agreement itself?
13   A.   Correct.
14   Q.   Okay.  If you read further down in
15   that paragraph, you see reference to a Notice of
16   Termination relating to the Barclays Repurchase
17   Agreement, you see that?  Last sentence of that
18   paragraph?
19   A.   "Additionally notice" -- okay.
20   Q.   Do you have any understanding of
21   whether Notice of Termination was ever sent out
22   during this week?
23   A.   I have -- I have no knowledge of that.
24   I have no knowledge of what the terms and
25   conditions of that.

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Okay.  As a general matter, what's a
3    Notice of Termination with respect to a repo?
4    A.   I don't -- I don't know what that term
5    means per se.  I don't know.  I don't know what
6    a Notice of Termination would be.
7    Q.   Okay.  Have you ever, in your
8    experience with repos, have you ever come across
9    a Notice of Termination at all?
10   A.   No, I've never --
11   Q.   Fair enough.
12        MR. STERN:  I'm sorry, did you
13   complete your answer?
14   A.   I said I have never, to my
15   recollection, I have never been involved with a
16   Notice of Termination.
17   Q.   Mr. Coghlan, I have a -- oh, I'm
18   sorry, I have one more document I need to show
19   you before I get to my last --
20        (Exhibit 133, a document bearing Bates
21   Nos. BCI-EX-00079850 and 79849, marked for
22   identification, as of this date.)
23   Q.   Mr. Coghlan, I handed you a copy of an
24   exhibit marked 133, and I just have a brief
25   question about that.

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2         (Document review.)
3    Q.   Mr. Coghlan, have you had a chance to
4    look at the document?
5    A.   I have.
6    Q.   My question relates to the chart
7    that's on the second page.  Previously we had
8    discussed haircuts for the Fed repo, and my
9    question is, have you ever seen a chart like
10   this during your days at Lehman?
11   A.   No, I have not.
12   Q.   Does this look like the form of a
13   chart that may have been prepared by your
14   department?
15   A.   I don't recall my department ever
16   preparing, you know, preparing this information.
17   Q.   Okay.  Do you see up at the top it
18   says "Fed Facility" and then it has a column
19   that says "Haircut"?
20   A.   Uh-huh.
21   Q.   We had previously talked about what
22   kind of haircut the Fed was insisting on in its
23   financing that was provided to Barclays during
24   this period.
25        Do you have any understanding of

Page 226

```
1          HIGHLY CONFIDENTIAL - J. COGHLAN
2   whether those are the haircut amounts that the
3   Fed used in connection with that financing?
4       A.   No, I --
5          MR. STERN:  I just need to -- let me
6   just --
7          Can you read that question?
8          (Record read.)
9          MR. STERN:  You can answer.
10      A.   I don't know of these -- how these
11  haircuts compared to the Fed haircuts.
12      Q.   Okay.  Is it fair to say that's not an
13  issue that you were working on at the time?
14      A.   The haircuts at the Fed are determined
15  by the Fed.
16      Q.   Right.
17      A.   To borrow money from the Fed, you have
18  to post the required haircuts.
19      Q.   Right.
20      A.   So there's no -- it's a, you know,
21  standard schedule.  What these haircuts are, I
22  don't know what they -- I don't know what these
23  haircuts refer to.
24      Q.   Okay.
25      A.   I don't know what facility they're
```

Page 227

```
1          HIGHLY CONFIDENTIAL - J. COGHLAN
2   talking about and what the data means relative
3   to the facility.
4       Q.   Mr. Coghlan, did you ever hear any
5   reference during the week of September 15 to a
6   HIC loan in connection with the Barclays/Lehman
7   transaction?
8       A.   Between Barclays and Lehman?  A HIC
9   loan?
10      Q.   No, just in relation to that
11  transaction in any way.
12      A.   No, I did not hear anything.
13      Q.   HIC loan, what does that mean?
14      A.   Hold in custody.  So what it means is
15  you lend me money, but instead of me delivering
16  the collateral to where you would like it
17  delivered, the counterparty holds it in custody
18  for your behalf.
19      Q.   Did you have any understanding of any
20  HIC loans that were being entered into during
21  that week of September 15?
22      A.   I did not know of any HIC loans being
23  originated during that week.
24      Q.   Is that something that would have
25  fallen within your department, or elsewhere?
```

Page 228

```
1          HIGHLY CONFIDENTIAL - J. COGHLAN
2       A.   We at times traded hold in custody,
3   yes, at times we would have hold in custody
4   arrangements with counterparties in my business
5   and to finance the firm.  I was not aware of any
6   hold in custody as it related to the Barclays
7   transaction.
8       Q.   Okay.  Are you aware of any
9   discussions involving residential mortgages that
10  related in any way to the Barclays/Lehman
11  transaction?
12      A.   No, I was not privy to any
13  conversations relative to residential mortgages.
14      Q.   Okay.  Mr. Coghlan, I'm very close to
15  the end here.  I just wanted to go over a couple
16  of documents to see if you could help me with
17  respect to just understanding some of the
18  systems at Lehman.
19      A.   Okay.
20      Q.   In your department did you work with
21  something called an MTS system?
22      A.   MTS was a system that we used.
23      Q.   And what is that system?
24      A.   It's one of the systems used to
25  support financing and firm market-making
```

Page 229

```
1          HIGHLY CONFIDENTIAL - J. COGHLAN
2   activities.  It's a settlement -- it's a system
3   to help settle those types of transactions.
4       Q.   And are you familiar with that system?
5       A.   I'm familiar with that we use the
6   system.  I would not view myself as an expert in
7   what the system does and doesn't do.
8       Q.   Okay.  How about something that's
9   known as a blotter; is that a term you've heard
10  used at Lehman?
11      A.   I don't recall hearing that term.
12      Q.   Okay.  Have you ever heard of anything
13  referred to as an MTS blotter?
14      A.   I've heard of the term "MTS."  I'm not
15  certain what an MTS blotter would be.
16      Q.   Okay.  I'm going to parade out a huge
17  exhibit right now and I just want to see if you
18  have any knowledge of it.  And please don't get
19  scared by its size.
20      A.   Oh, ghees.  Okay.
21      Q.   You're welcome to page through it as
22  you like, but I just have a couple of questions
23  about it.
24          (Exhibit 134, MTS Blotter, marked for
25  identification, as of this date.)
```

Page 230

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Mr. Coghlan, it's a huge exhibit. I
3  don't expect you to be familiar with everything
4  in it. My question is, have you ever seen a
5  document or a spreadsheet like this?
6        My understanding it's known as MTS
7  blotter, so I wanted to see if you have ever
8  seen anything like this.
9    A.   I have not seen this report before.
10   Q.   Okay. I don't mean to limit your
11 question to a printed out version of this
12 report. Does this look like a database that
13 would be maintained on the MTS system?
14   A.   I don't know. I just don't know.
15   Q.   Are you not sufficiently familiar with
16 the MTS system to answer that question?
17   A.   Yeah, I -- I would say that's
18 accurate. That's true.
19   Q.   Okay. Are there others at Lehman that
20 I could more fruitfully ask questions about the
21 MTS system?
22   A.   I'm sure there are people that know
23 the MTS system. Who those people are I don't
24 know off the top of my head.
25   Q.   Let me ask it this way: Is the folks

Page 231

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  that work for Mr. Blackwell, like Mr. Hraska,
3  would he be familiar with the MTS system, do you
4  think?
5    A.   I believe so.
6    Q.   Do you think he uses that on a regular
7  basis?
8    A.   I don't know how often he was involved
9  in it.
10   Q.   Okay. If I asked you questions about
11 this document, do you have any familiarity with
12 the entries in the different columns?
13   A.   I'll try to answer as best I can.
14        This is not my area of knowledge.
15   Q.   Okay. I understand.
16   A.   So I --
17   Q.   I'm not trying to do anything cute
18 here. I'm just trying to better understand the
19 systems at Lehman.
20   A.   There are people more qualified than
21 I --
22   Q.   Okay.
23   A.   -- to do that. I mean, again, I'm
24 happy to answer your questions.
25   Q.   Well, maybe you can -- let's just try

Page 232

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2  a couple and then we'll see where it goes.
3        On the front page, there's a series of
4  entries leading down to -- in the column
5  entitled "Net Amount," there's a series of
6  entries that appear to total --
7    A.   Uh-huh.
8    Q.   -- to a $44.9 billion number, do you
9  see that?
10   A.   Uh-huh. Uh-huh.
11   Q.   And then there's followed by a series
12 of entries with zeros in that column. Are those
13 free repos, the ones that are denominated with a
14 zero?
15   A.   I, from this report, I couldn't tell.
16   Q.   You couldn't tell. Okay.
17        In the left hand, toward the left-hand
18 side, there's something called "Security
19 Descriptor," and you see terms like -- two
20 terms: "Specified Corporate" and the other one
21 is "AGY Secured Cash for Carry."
22   A.   I'm sorry, we're looking at where?
23   Q.   I'm in the fourth column which is
24 entitled "Security Descriptor"?
25   A.   Yes.

Page 233

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Do those terms mean anything to you,
3  "Specified Corporates"?
4    A.   No.
5    Q.   How about A --
6        MR. STERN: Let's go off the record
7  for a second.
8        (Discussion off the record.)
9    Q.   Does that other entry on that column
10 entitled "AGY Secured Cash for Carry" mean
11 anything to you, Mr. Coghlan?
12   A.   No, I don't know what that means.
13   Q.   Okay. Let's put that exhibit aside.
14        (Exhibit 135, screen shot from the MTS
15 system, marked for identification, as of
16 this date.)
17   Q.   Mr. Coghlan, I'm handing you a copy of
18 an exhibit marked 135, which appears to be a
19 screen shot of some sort from what I believe to
20 be the MTS system, but I wanted to ask you if
21 you recognize this.
22   A.   I do not recognize this.
23   Q.   Okay. This is not a screen shot that
24 you would be familiar with in the normal course
25 of your business?

Page 234

HIGHLY CONFIDENTIAL - J. COGHLAN

1  A.   No, I've never seen this before.
2  Q.   Okay. Fair enough.
3      Mr. Coghlan, just one or two more
4  questions. Does Barclays run a matched book now
5  that you have been there?
6  A.   Yes, they do.
7  Q.   So the same -- you had previously
8  described for me what a matched book is. The
9  same effort to maintain a matched book to a
10 certain extent is being undertaken by Barclays
11 today?
12     MR. STERN: Objection to the form.
13 Q.   That was a bad question. Let me try
14 again.
15     In your current function at Barclays,
16 is it your general understanding that you're
17 trying to maintain a matched book?
18     MR. STERN: Objection to the form.
19 A.   We run a matched book, and as I
20 described, similarly, it means that the assets
21 and the liabilities are fairly close to each
22 other, other than haircuts and things like that,
23 and to that extent that it's, quote, matched
24 assets and liabilities, it would be similar to

Page 235

HIGHLY CONFIDENTIAL - J. COGHLAN

1  what the matched book activities were at Lehman.
2  Q.   Okay. And is Stephen King involved in
3  that activity?
4  A.   Stephen?
5  Q.   A man named Stephen King?
6  A.   No, he's not.
7  Q.   Do you know what his role is at
8  Barclays?
9  A.   I do not know what he does.
10 Q.   Okay. Do you know him?
11 A.   I know the name.
12 Q.   Do you have any understanding of how
13 Barclays valued the assets that it acquired from
14 Lehman?
15 A.   No, I have no understanding of that.
16 Q.   Okay. Do you have any understanding
17 of whether they adopted the valuations placed in
18 those assets by Bank of New York?
19 A.   I do not know what the valuations are,
20 so I wouldn't know how -- the difference, if
21 any, between Bank of New York and Barclays.
22 Q.   Do you know the name of someone at
23 Barclays that I could ask who might have
24 knowledge about how Barclays valued the assets

Page 236

HIGHLY CONFIDENTIAL - J. COGHLAN

1  that it received from Lehman?
2  A.   I don't know who did that firsthand.
3  I assume we could go back and find out, but I
4  don't know who -- I don't know who did that.
5  Q.   Do you know what department did that?
6  A.   No, I do not.
7      MR. HINE: Mr. Coghlan, I have no
8  further questions. I think some of my
9  colleagues might, but we're done.
10     MR. KAY: No questions from the
11 Committee.
12     MR. LAYDEN: No.
13     MR. STERN: Let's take a little break.
14 I may have some questions.
15     (Pause in the proceedings.)
16 EXAMINATION BY
17 MR. STERN:
18 Q.   I have just a few clarifying
19 questions. Mr. Coghlan, you were asked some
20 questions earlier concerning your understanding
21 as to how excess collateral is treated in
22 certain repo default situations.
23     What was the basis for the
24 understanding you testified to?

Page 237

HIGHLY CONFIDENTIAL - J. COGHLAN

1  A.   The answer given was based on
2  conversations I've had with counsel on several
3  occasions at Lehman Brothers.
4  Q.   Do you recall the specific Repurchase
5  Agreements or arrangements Lehman counsel was
6  considering when you received that legal advice?
7      MR. HINE: Objection. You are not
8  authorized to waive privilege with respect
9  to those conversations with counsel.
10     MR. STERN: I'm just asking whether he
11 recalls what those agreements were. It's a
12 yes or no answer.
13 Q.   Let me restate the question. Do you
14 recall the specific Repurchase Agreements or
15 arrangements that Lehman counsel was considering
16 when you received that legal advice, yes or no?
17 A.   No.
18 Q.   Have you had any personal experience
19 where, in actual practice, excess collateral was
20 returned after a repo default?
21 A.   Not that I can recall.
22 Q.   You were asked questions earlier about
23 running a matched book. Can you describe to us
24 what you understand that term "matched book" to

Page 238

HIGHLY CONFIDENTIAL - J. COGHLAN

1  mean?
2     A.   The matched book was a business at
3  Lehman that was a revenue-generating department
4  whose revenues were generated by the lending of
5  cash and collateral with counterparties, with
6  the intent of making a positive spread on that
7  lending activity.
8        MR. STERN:  I have no further
9  questions.
10        MR. HINE:  I have no further
11  questions.
12        MR. KAY:  No questions.
13        MR. STERN:  Thank you, Mr. Coghlan.
14  We're off the record.
15        MR. HINE:  Thank you very much.
16        (Time Noted:  3:11 P.M.)
17              oOo
18
19
20
21     _____
21              JOHN COGHLAN
22
22  Subscribed and sworn to
23  before me this      day
23  of      2009.
24
25  _____

Page 239

HIGHLY CONFIDENTIAL - J. COGHLAN

1        CERTIFICATE
2  STATE OF NEW YORK )
3                   : ss
   COUNTY OF NEW YORK)
4       I, Kathy S. Klepfer, a Registered
5  Merit Reporter and Notary Public within and
6  for the State of New York, do hereby
7  certify:
8       That JOHN COGHLAN, the witness whose
9  deposition is herein before set forth, was
10  duly sworn by me and that such deposition is
11  a true record of the testimony given by such
12  witness.
13       I further certify that I am not
14  related to any of the parties to this action
15  by blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17       I further certify that neither the
18  deponent nor a party requested a review of
19  the transcript pursuant to Federal Rule of
20  Civil Procedure 30(e) before the deposition
21  was completed.
22       In witness whereof, I have hereunto
23  set my hand this 13th day of August, 2009.
24
25  ------------------------------

Page 240

HIGHLY CONFIDENTIAL - J. COGHLAN
INDEX

1
2
3  TESTIMONY OF J. COGHLAN:          PAGE
4  Examination by Mr. Hine ...................   5
5  Examination by Mr. Stern ...................  236
6
7  EXHIBITS:                        PAGE
8  Exhibit 115, a document bearing Bates ......   22
9  Nos. BCI-EX-00077294 through 77295
10  Exhibit 116, a document bearing Bates ......   72
11  Nos. 10303063
12  Exhibit 117, Master Purchase Agreement .....   77
13  Exhibit 118, a document bearing Bates ......   99
14  Nos. 10297296 and 10300641
15  Exhibit 119, a document bearing Bates ......  102
16  Nos. 10302495
17  Exhibit 120, an e-mail string, the first ...  110
18  one in time dated September 17, 2008, at
19  6:31 P.M.
20  Exhibit 121, an e-mail string, the first ...  124
21  one in time dated September 17, 2008, at
22  6:25 P.M.
23  Exhibit 122, an e-mail string, the first ...  126
24  one in time dated September 17, 2008 at
25  6:39 P.M.

Page 241

HIGHLY CONFIDENTIAL - J. COGHLAN
INDEX (Cont'd.)

1
2
3  EXHIBITS:                        PAGE
4  Exhibit 123, a document bearing Bates .....  128
5  Nos. 68985
6  Exhibit 124, a document bearing Bates  .....  132
7  Nos. 10303258
8  Exhibit 125, covering e-mail with chart ....  138
9  with the heading "Booking Amounts"
10  Exhibit 126, an e-mail stream, the first ...  178
11  one in time dated September 18, 2008,
12  at 6:18 A.M.
13  Exhibit 127, an e-mail stream, the first ...  190
14  one in time dated September 18, 2008,
15  at 6:04 A.M.
16  Exhibit 128, an e-mail stream, the first ...  199
17  in time dated September 19, 2008, at
18  2:44 P.M.
19  Exhibit 129, an e-mail stream, the first ...  207
20  one in time dated September 19, 2008, at
21  2:26 P.M.
22  Exhibit 130, an e-mail dated September 19,   211
23  2008, at 3:22 P.M.
24
25

Page 242

```
1          HIGHLY CONFIDENTIAL - J. COGHLAN
2                 INDEX (Cont'd.)
3     EXHIBITS:                    PAGE
4     Exhibit 131, an e-mail stream, the first  ...   214
5     one in time dated September 19, 2008, at
6     11:03 A.M.
7     Exhibit 132, an e-mail stream, the first  ...   216
8     one in time dated September 20, 2008,
9     at 5:43
10    Exhibit 133, a document bearing Bates .......   224
11    Nos. BCI-EX-00079850 and 79849
12    Exhibit 134, MTS Blotter ....................   229
13    Exhibit 135, screen shot from the MTS system   233
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 243

```
1          HIGHLY CONFIDENTIAL - J. COGHLAN
2     NAME OF CASE:  In re Lehman Brothers
3     DATE OF DEPOSITION:  August 13, 2009
4     NAME OF WITNESS:  John Coghlan
5     Reason Codes:
6         1. To clarify the record.
          2. To conform to the facts.
7         3. To correct transcription errors.
8     Page _____ Line _____ Reason _____
      From _____ to _____
9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25
```