# A. 7 (A)

Page 1

1

2           UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    -----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS         Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,   (Jointly Administered)

9                Debtors.

10   -----------------------x

11

12           * * *HIGHLY CONFIDENTIAL* * *

13           DEPOSITION OF NANCY DENIG

14               New York, New York

15               August 21, 2009

16

17   Reported by:

18   MARY F. BOWMAN, RPR, CRR

19   JOB NO. 24044

20

21

22

23

24

25

## Page 2

1
2
3
4
5        August 21, 2009
6        9:35 a.m.
7
8
9        Deposition of NANCY DENIG, held at
10   the offices of Jones Day, LLP, 222 East 41st
11   Street, New York, New York, before Mary F.
12   Bowman, a Registered Professional Reporter,
13   Certified Realtime Reporter, and Notary Public
14   of the State of New York.
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2                  APPEARANCES:
3    JONES DAY, LLP
4    Attorneys for Lehman Brothers, Inc.
5        222 East 41st Street
6        New York, New York   10017-6702
7    BY:  WILLIAM J. HINE, ESQ.
8        GEORGE E. SPENCER, ESQ.
9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12       5301 Wisconsin Ave. NW
13       Washington, DC 20015
14   BY:  JONATHAN M. SHAW, ESQ.
15
16   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17   Attorneys for the Creditors Committee
18       51 Madison Avenue
19       New York, New York  10010
20   BY:  ROBERT K. DAKIS, ESQ.
21
22
23
24
25

## Page 4

1
2
3    JENNER & BLOCK, LLC
4    Attorneys for the Examiner
5        330 N. Wabash Avenue
6        Chicago, Illinois  60611-7603
7    BY:  DAVID C. LAYDEN, ESQ.
8
9    HUGHES, HUBBARD & REED, LLP
10   Attorneys for the SIPA Trustee
11       One Battery Park Plaza
12       New York, New York   10004-1482
13   BY:  NEIL J. OXFORD, ESQ.
14       FARA TABATABAI, ESQ.
15
16   Also Present:
17       RAJESH ANKALKOTI, Alvarez & Marsal
18
19
20
21
22
23
24
25

## Page 5

1
2
3
4
5            IT IS HEREBY STIPULATED AND AGREED, by
6    and between the attorneys for the respective
7    parties herein, that filing and sealing be
8    and the same are hereby waived.
9            IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15            IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25

Page 6

DENIG - CONFIDENTIAL

1
2   NANCY DENIG,
3      called as a witness by the parties,
4      having been duly sworn, testified as
5      follows:
6   EXAMINATION BY
7   MR. HINE:
8      Q.   Good morning, Ms. Denig. How are you?
9      A.   Good.
10     Q.   I introduced myself before, but my
11  name is Bill Hine. I am from the firm of Jones
12  Day, which is special counsel to Lehman Brothers
13  Holdings, Inc. in connection with all the
14  bankruptcy proceedings that are going on.
15        So your deposition today is in
16  connection with those proceedings and some
17  discovery that we are taking in those proceedings.
18  Have you ever been deposed before?
19     A.   I have not.
20     Q.   Very simple. I am going to ask you a
21  bunch of questions. You are under oath, you are
22  going to give me truthful answers.
23        On occasion your counsel will raise an
24  objection or interpose an objection. He is either
25  doing that for any number of reasons, but I just

Page 7

DENIG - CONFIDENTIAL

1
2   wanted to let you know that it doesn't relieve you
3   of the obligation to answer the question. You
4   still have to answer the question, unless of
5   course your counsel instructs you not to answer
6   the question, which he may do on occasion as well.
7         I think all the other counsel around
8   the table will introduce themselves as they get up
9   to ask you questions, if they have any, but if you
10  have any questions -- unless you have any
11  questions, we can get started.
12        One point of clarification before we
13  get started. I see e-mails addressed to N. Bayne.
14  Is that you?
15     A.   That is my maiden name.
16     Q.   So if I see --
17     A.   Unfortunately when you were at Lehman,
18  when I got married -- my user profile before I got
19  married was N. Bayne, which was my maiden name.
20  When I got married, in order for them to change
21  the user name, they would have had to delete me
22  from the system altogether and I would have to
23  reapply for all my applications, which I didn't
24  want to do because I was already four years into
25  the company, so I left my user name as N. Bayne.

Page 8

DENIG - CONFIDENTIAL

1
2      Q.   If I see an e-mail addressed to
3   N. Bayne at Lehman --
4      A.   That's me.
5      Q.   Could you tell me how long you worked
6   for Lehman?
7      A.   15 years.
8      Q.   So that's starting in --
9      A.   1994, January 20.
10     Q.   OK. And could you kind of briefly
11  walk me through the progressions of positions you
12  held up until the end?
13     A.   I started as an analyst in customer
14  service, which dealt with like trade discrepancies
15  for fixed income products.
16        Moved to P&L in the finance division,
17  where I supported the repo desk for central
18  funding for all types of fixed income assets.
19        I then took on various different
20  groups throughout the life, sales support, trade
21  support, P&L, structured repo, EMG, trade and
22  sales support, and probably that was pretty much
23  it. So I pretty much stayed on the fixed income
24  side pretty much all my career.
25     Q.   What was the last position you held?

Page 9

DENIG - CONFIDENTIAL

1
2      A.   Last position, regional head for fixed
3   income repo, middle office, so that was trade
4   support, so we supported the traders in the daily
5   transactions that they executed.
6         We did sales support, which also
7   supported any trade confirmations, sales
8   confirmations, trade discrepancies with regards to
9   the salespeople.
10        We did -- we reported the P&L to the
11  business lines, and, you know, some various little
12  odds and ends, but nothing that needs to be
13  clarified.
14     Q.   Who did you report to in that
15  position?
16     A.   Jim Hraska.
17     Q.   Any other people that you reported to
18  directly?
19     A.   No.
20     Q.   How long have you held this position?
21     A.   Three years of all that. I just kept
22  getting more stuff added to me as my career
23  progressed. So I started with one group and got
24  another one, another, another, another. But
25  basically all in the same business line.

Page 10

DENIG - CONFIDENTIAL
1
2    Q.   So the description you just gave me of
3  your job --
4    A.   With everything was about three years
5  that I had that.
6    Q.   For about three years?
7    A.   Yeah.
8    Q.   And who reported directly to you in
9  the last three-year period?
10   A.   Carroll Schirmacher, Anthony
11  D'Agostino, Anthony Rivera, who was -- job
12  elimination at some point during the layoffs at
13  Lehman Brothers, Tom Rogers and Dave Regan. And
14  that was pretty much it.
15   Q.   I believe you said, you mentioned the
16  phrase "repo" in your description of your job.
17  Could you just -- did you focus primarily on
18  repurchase transactions?
19   A.   Yes. As it related -- well, I
20  wouldn't say repo transactions. The desk was
21  defined that we supported as the repo desk, but
22  they had different facets of the business. They
23  had a business -- they did plain vanilla swaps.
24  They did outright trades. They did other
25  disciplines.

Page 11

DENIG - CONFIDENTIAL
1
2    But for the most part, the name of the
3  department was the financing desk that dealt with
4  repos.
5    Q.   OK. And at some point in time, you
6  went to work for Barclays, correct? When was
7  that?
8    MR. SHAW: You need to answer things
9  orally. They can't get a head shake or nod.
10   A.   September 22nd.
11   Q.   And when -- you are still at Barclays?
12   A.   I am.
13   Q.   What's your position at Barclays?
14   A.   Pretty much the same. Same role
15  without P&L.
16   Q.   Without P&L meaning --
17   A.   We had a middle office construct in
18  Lehman that included the reporting of P&L. At
19  Barclays they don't have that model, so basically
20  it is just the support.
21   Q.   Where is the P&L operation run?
22   A.   In finance.
23   MR. SHAW: You need to let him finish
24  his answer, and give me a chance to get an
25  objection in if I need to.

Page 12

DENIG - CONFIDENTIAL
1
2    Q.   Who is the head of finance at Barclays
3  that runs the P&L department?
4    A.   In our division, it is Kevin Horan.
5    Q.   Above him?
6    A.   I don't remember his name. Martin
7  Kelly. Martin Kelly.
8    Q.   And when you did the P&L work during
9  your time at Lehman, did you -- did that work get
10  provided to Martin Kelly?
11   A.   No. Ultimately with Ian Lowitt.
12   Q.   I just want to take a quick diversion
13  here. I don't mean to pry into personal matters,
14  but I do have to ask you about your compensation.
15   MR. SHAW: Just so you know, this is
16  all highly confidential, so you can feel
17  free to speak about that.
18   Q.   Do you have an employment contract
19  with Barclays?
20   A.   No. Well, except for the "can" letter
21  that every employee received on the Monday morning
22  of September 22nd, that we accepted or rejected.
23   Q.   And you accepted?
24   A.   I accepted.
25   Q.   You sent in an e-mail that said

Page 13

DENIG - CONFIDENTIAL
1
2  accepted?
3    A.   Yes.

REDACTED

Page 14

1    DENIG - CONFIDENTIAL

REDACTED

Page 15

1    DENIG - CONFIDENTIAL

REDACTED

Page 16

REDACTED

21    Q.   Throughout this deposition, we are
22    going to talk about different dates, so let's get
23    some of them out of -- I believe you mentioned
24    September 22, which is the Monday that the sale
25    transaction closed, correct -- let me just clarify

Page 17

1    DENIG - CONFIDENTIAL
2    that.
3        You understand that at some point in
4    time, Lehman sold its North American broker/dealer
5    business to Barclays, correct?
6        A.   Yes.
7        Q.   And that closed, the closing of that
8    transaction was on September 22, 2008, right?
9        A.   Yes.
10       Q.   And so my question has to do with your
11   compensation.  Did you have any conversations with
12   anyone at Barclays about your going to work for
13   Barclays prior to September 22, 2008?
14       A.   No.
15       Q.   Did you have any conversations with
16   anyone at Lehman about the possibility of you
17   moving over and becoming a Barclays employee
18   before September 22?
19       A.   No.
20       Q.   When did you first -- so on
21   September 22, did you have any expectation that
22   you would become a Barclays employee?
23       A.   I was hopeful, but no.
24       Q.   Did you hear any rumors around Lehman
25   the week before September 22 about what was going

Page 18

```
1         DENIG - CONFIDENTIAL
2   to happen to all the Lehman employees?
3        A.  No.  We -- as far as we were told, we
4   were all to be retained.
5        Q.  Who told you that?
6        A.  TV, CNN, documents that were posted on
7   Reuters and Bloomberg.
8        Q.  Did you hear that from any senior
9   executives at Lehman?
10       A.  No.  Again, all hopeful.  Everybody
11  was hopeful.
12       Q.  And so was there any -- when you --
13  when September 22 came around, you were hopeful of
14  getting a job, but you had no guarantee of getting
15  a job until you received an offer from Barclays?
16       A.  Yes.
17       Q.  What did that offer consist of?
18       A.  A "can" letter just saying that you
19  were to retain employment until December 31 of
20  2009 -- 8.  Basically it was a three-month
21  contract.
22       Q.  Did that letter contain any
23  description of the compensation that was going to
24  be paid to you?
25       A.  No, it did not.
```

Page 19

```
1         DENIG - CONFIDENTIAL
2        Q.  So you clicked on e-mail and accepted
3   the employment?
4        A.  Yes.
5        Q.  Not knowing how much you were going to
6   be paid?
7        A.  Yes.
```

REDACTED

Page 20

```
1         DENIG - CONFIDENTIAL
```

REDACTED

```
15       Q.  We are going to leave your
16  compensation.  Can I take a step back and get a
17  sense of your role in this whole Lehman Barclays
18  transaction which encompasses several different
19  aspects.  I think it will just make the deposition
20  go quicker.
21       Let's go to a date.  September 15 of
22  2008, which is the Monday prior to the closing,
23  which we understand to be the date -- well, that
24  is the date when Lehman Brothers Holdings, Inc.
25  filed for bankruptcy.
```

Page 21

```
1         DENIG - CONFIDENTIAL
2        Did you have any -- prior to that
3   date, did you have any knowledge that Barclays and
4   Lehman had been in some kind of discussions about
5   a transaction?
6        A.  CNN over the weekend, and we were --
7   basically 7 p.m. we were told that Barclays PLC
8   could not do the whole company or they were on the
9   table as one company that was going to be
10  interested in buying Lehman, and then at 7:30 the
11  Sunday night before, we were told that they
12  weren't able to get -- do the deal.
13       Q.  And you were told through what means?
14       A.  E-mails and phone calls from Jim.
15       Q.  From Jim Hraska?
16       A.  Yes.
17       Q.  Did you -- so let's talk about the
18  period before you're told that.  Any involvement
19  at all with those discussions between Barclays and
20  Lehman?
21       A.  No.
22       Q.  Were you asked to provide any
23  information in support of those discussions?
24       A.  No.
25       Q.  Ever called into a conference room and
```

Page 22

DENIG - CONFIDENTIAL

1  asked, or asked to provide a spreadsheet or
2  anything?
3      A.  Not before the 15th of September.
4      Q.  OK.  Then on the 15th, Lehman Holdings
5  files for bankruptcy.  Did you have any role in
6  preparing the bankruptcy filing?
7      A.  No.
8      Q.  Did you have any role in providing
9  information to those who were preparing a
10  bankruptcy filing?
11     A.  No.
12     Q.  Did the bankruptcy filing come as a
13  surprise to you that Monday?
14     A.  No.
15     Q.  Why not?
16     A.  Just from what we heard throughout the
17  weekend.  It was all over CNN and, you know,
18  everybody and every one of my friends calling me,
19  giving me updates as to what was going on with
20  Lehman.
21     Q.  OK, but internally from your superiors
22  at Lehman --
23     A.  No --
24     Q.  -- you didn't hear anything?

Page 23

DENIG - CONFIDENTIAL

1      MR. SHAW:  Let him finish.
2      Q.  Now, there comes a time on the 15th
3  when Barclays comes back and starts speaking to
4  Lehman again about a transaction.  Did you have
5  any role in that negotiations between Barclays and
6  Lehman?
7      A.  No.
8      Q.  Well, could you describe generally
9  what you did that week, the week of October --
10  from September 15th to the 22nd?
11     A.  Well, starting on September 15, it was
12  just a matter of trying to keep the broker/dealer,
13  LBI portion of it running, going.  Supporting the
14  traders that were trying to get liquidity within
15  the firm.
16         And Barclays was a big part of that,
17  as far as providing additional funding, where
18  other liquidity providers stopped giving us the
19  cash and the Fed basically -- the Fed programs
20  that were available at the time were being used to
21  do that facilitation.  And we were just very close
22  to it.
23         My job was just to make sure that all
24  the positions that we had were settling, that all

Page 24

DENIG - CONFIDENTIAL

1  the lines of communication between our group, the
2  traders and settlements was open, and that
3  everything was being transacted properly so we
4  wouldn't have any misbookings.
5      Q.  You said a lot there so I am going to
6  take it piece by piece.
7         You said there was an effort during
8  that week to keep the broker arm, LBI, going.
9      A.  Yes.
10     Q.  Now, why did they want to keep LBI
11  going?  Do you know?
12         MR. SHAW:  Objection, foundation.
13     Q.  You can answer.
14     A.  Well, at that point, we didn't know
15  any other -- that we felt the broker/dealer was
16  going to stay as a going concern.
17     Q.  OK.  Had you had any idea that the
18  broker/dealer would file for bankruptcy later that
19  week?
20     A.  No, not on Monday.
21     Q.  Did you later learn that?
22     A.  Yes.
23     Q.  When did you learn that?
24     A.  Wednesday.

Page 25

DENIG - CONFIDENTIAL

1      Q.  What did you hear about that?
2      A.  That we were going to be -- that the
3  Fed was going to be stepping out of the
4  transaction of all the collateral that we had
5  being funded by them.  That they wanted Barclays
6  to take over that transaction.
7      Q.  How did that relate to the LBI filing
8  for bankruptcy?
9      A.  Because -- at that particular time, if
10  we got rid of everything we had, the only funding
11  we were getting was from the Fed, and Barclays was
12  now going to have it, we would have nothing to
13  go -- we would have nothing to be able to continue
14  going as a going concern.  We would have no
15  assets.
16     Q.  So did you surmise that LBI was going
17  bankrupt or were you told that that was going to
18  take place?
19     A.  I don't know if I was told outright.
20  I think there was sort of speculation that that
21  was the way it was going until, say, Thursday,
22  when it was definitive that that was what was
23  going to happen.
24     Q.  And what did you hear on Thursday that

Page 26

DENIG - CONFIDENTIAL

1 made you think it was definitive?
2     A.    I think they said that Barclays was
3 going to file Chapter 11 or Chapter 7 for the
4 broker/dealer.
5     Q.    Barclays?
6     A.    Yes.
7     Q.    Not LBI?
8     A.    No.  I think Barclays was going to
9 file for -- I think they owned it at that
10 particular time, and they were going to file for
11 bankruptcy on behalf of the broker/dealer.
12     Q.    OK.  Let me just step back and try to
13 piece some of this together.
14         You mentioned the Fed program.
15     A.    Um-hm.
16     Q.    Tell me what your role was in
17 connection with the Fed program again.
18     A.    Well, there were three specific Fed
19 programs that were available to broker/dealers.
20 And my groups were responsible for booking the
21 transactions and then reconciling them with the
22 Fed on a daily basis.
23     Q.    So these are overnight financings,
24 correct?

Page 27

DENIG - CONFIDENTIAL

1     A.    Yes, except for the TSLF, which is
2 more term.  There is a 30-day term or 28-day term
3 program.
4     Q.    That's TCLF?
5     A.    TSLF.
6     Q.    Are you familiar with the term
7 "haircut" in connection with the Fed transaction?
8     A.    Am I familiar with the word "haircut"
9 as it relates to --
10     Q.    Yes.
11     A.    Yes.
12     Q.    What does a haircut mean when you're
13 talking about these Fed programs?
14     A.    It would be an amount in addition to
15 the par value of the securities that you would
16 have to give them in order to do the transaction.
17         So -- do you need a for instance?
18     Q.    Yeah.
19     A.    If you have a 100 million trade that's
20 worth 100 million in price, the Fed would require
21 you to pay 2 percent more for that transaction.
22     Q.    So meaning you would have to --
23     A.    Pay 102 million for the same
24 transaction.

Page 28

DENIG - CONFIDENTIAL

1     Q.    Just so I can finish my -- just so I
2 can understand, in your hypothetical, if you
3 wanted the Fed to pay you 100 million, you would
4 have to post 102 million in collateral?
5     A.    Yes.
6     Q.    So in connection with these Fed
7 programs that you were working on to support LBI,
8 what was the haircut that the Fed insisted on?
9         MR. SHAW: Objection.  Foundation.
10         Go ahead.
11     Q.    You can answer.
12     A.    It depended.
13     Q.    On what?
14     A.    On the collateral itself.
15     Q.    Can you explain that?
16     A.    Different types of collateral had more
17 favorable haircuts than the more exotic or toxic
18 type of assets.
19     Q.    When you say more favorable, you mean
20 lower percentage?
21     A.    Lower grade like Treasuries, agencies,
22 mortgage collateral, was more liquid in the
23 market, and you wouldn't -- they didn't make you
24 pay as much for them.

Page 29

DENIG - CONFIDENTIAL

1     Q.    And then some more exotic
2 instruments --
3     A.    Yes.
4     Q.    -- you would have to pay a higher
5 haircut?
6     A.    Yes.
7     Q.    Is that right?
8     A.    Yes.
9     Q.    Was there an aggregate haircut that
10 you folks calculated as relates to all these Fed
11 programs in connection with your financing of LBI?
12         MR. SHAW: Objection, foundation.
13     A.    I don't remember actually.
14     Q.    I've seen references to a 20 percent
15 haircut in some of the e-mails.  Does that ring a
16 bell or is that --
17     A.    With regards to the actual Fed
18 programs?
19     Q.    Yeah.
20     A.    It could be for the PDCF, which is a
21 primary dealer credit facility.  They were all
22 corporate and exotic type of assets, so I would
23 say yes.  But the TSLF and our overnight program,
24 I would think that was way too high.

## Page 30

DENIG - CONFIDENTIAL

Q. So they were much smaller for those two programs?

A. Yeah.

Q. Is -- I apologize if I am outside my area of expertise here. I am trying to understand the business that you guys consider everyday activity.

But if -- am I correct to say that the Fed -- in connection with these Fed programs, by Wednesday, you had posted about 50 billion dollars in collateral in exchange for 45 billion in cash for the Fed; is that right?

A. I don't know if that was the final figure from the Fed. What I do know is that we got a file from Chase that told us what the individual collateral was that we had to the Fed and what they anticipated market value of it was.

Q. And what was that market value?

A. The first file that we received was 42,2.

Q. Now, why is --

A. 44,2. 42,2 or 44,2.

Q. Well, tell you what. You mentioned this file. I think I have seen that, so let me

## Page 31

DENIG - CONFIDENTIAL

try to find a copy and we can talk about that, because that was going to be one of my questions.

Ms. Denig, I am handing you a copy of an exhibit that we previously marked as 125.

MR. SHAW: Take whatever time you need to look at it.

Q. Please take a moment to look at it. I have a question once you're ready.

A. I am ready.

Q. You have had a chance to look at that?

A. Yes.

Q. Is this the document to which you were just referring?

A. Yes.

Q. And can you tell me what this document is? Again, I'm not so much concerned about the covering e-mail but the one-page chart that's attached that's entitled "Booking Amounts."

A. Yes. This is not the original that we received from Chase. This is my version of what the denominations were of the trades that my guys booked that day. But the totals are exactly the same that we received from Chase.

Q. So this started as a document from

## Page 32

DENIG - CONFIDENTIAL

Chase?

A. Yes.

Q. Why is Chase sending this document?

A. They were our custodian.

Q. In connection with the Fed financings?

A. Yes.

Q. And what was the purpose of Chase sending this to you?

A. To tell us what each facility that we had on with the Fed, what the value of it was worth.

Q. And Chase was placing its own value on those securities?

A. I can't be sure of where they came up with the market value.

Q. And was it the same as the values you folks placed on those securities?

MR. SHAW: Objection, foundation.

A. We -- well, the way we booked it is a lot different than actually assigning market values, which we didn't do. The transfer of or the delivery of these securities were booked with no value on them.

And, you know, I don't know if you

## Page 33

DENIG - CONFIDENTIAL

want to get into that now or just concentrate on this document first, but I mean the way we booked the trade is a lot different than probably your understanding of it.

Q. I would like to understand what's the difference. Why the difference?

A. So typically when you book a DVP transaction and there would be a par value, a principal value based on a price, and when you make delivery, the assets go and cash is received, and it is a simultaneous transaction.

For these that was not the case. We actually booked the trades for par value, delivered them for free to a particular -- a BoNY location of where Barclays' accounts were, and we booked separately the cash that they sent us.

Q. Are you talking about the Fed program now or Barclays?

A. Well, we stepped into the Barclays role. This, this particular transaction, it was related to how we booked the trade to Barclays. This spreadsheet was how we booked the trade to Barclays. The original amounts is what we had at Chase.

Page 34

DENIG - CONFIDENTIAL

1
2      Q.   Let me just understand this chart and
3  then we can talk about -- when you say booking
4  amounts, what does that refer to?
5      A.   This is on September 18.
6      Q.   OK.
7      A.   Which is the day we booked the trade
8  and Fed stepped out of the trade, and now Barclays
9  was our liquidity provider for these securities.
10  These are the amounts that I booked. So these
11  amounts were to Barclays. But the -- this column,
12  the second -- this column here with the par
13  amounts was given to us by Chase.
14      Q.   OK, let's just step back for a second.
15  On the 18th, you were involved in the transferring
16  of the securities from the Fed program to a new
17  repo that was executed with Barclays?
18      A.   Yes.
19      Q.   Correct?
20      A.   Yes.
21      Q.   So going forward, can we call that the
22  September 18 repo, just so we are on the same
23  page?
24      A.   Sure.
25      Q.   And Bank of New York was the --

Page 35

DENIG - CONFIDENTIAL

1
2      A.   Custodian for Barclays.
3      Q.   And who was your custodian?
4      A.   Chase.
5      Q.   So on the 18th, you are -- when you
6  talk about booking, you are talking about
7  transferring assets or securities that were
8  previously in the Fed program held by Chase,
9  correct?
10      A.   Yes, um-hm.
11      Q.   Into what, an account at BoNY for the
12  benefit of Barclays?  Is that right?
13      A.   Yes.
14      Q.   You talked about a bunch of columns.
15  I just want to get it clear on the record.
16          The second column, second large column
17  on this chart, which starts with 7.1 billion
18  dollars, do you see that?
19      A.   Yes.
20      Q.   That, those numbers are what?
21      A.   Those are the par value of the assets
22  that were in the OMO program with the Fed.
23      Q.   And what's the column to the left of
24  that which talks about 109,406,353?  Do you see
25  that?

Page 36

DENIG - CONFIDENTIAL

1
2      A.   This is the market value that Chase
3  put on it.
4      Q.   So that column, which totals 47,
5  approximately 47.5 billion dollars, is the --
6  reflects the market value that Chase ascribed to
7  the securities that were in the Fed program?
8      A.   That's correct.
9      Q.   Now, let's continue on the chart a
10  little to the right, and again, I'm not trying to
11  be laborious here, I just need to get a clear
12  record.
13          The column which starts with
14  108.49 billion -- million, do you see that?
15      A.   Yes.  Million.  These are actual
16  figures.
17      Q.   OK.  Now, that totals down to 44.2
18  billion dollars.  Do you see that column?
19      A.   Yes.
20      Q.   What does that column reflect?
21      A.   The par value -- I am sorry, the cash
22  value that we booked the trades at.
23      Q.   Can you explain that to me?
24      A.   So they came and said that the
25  projected value -- again, this is not the original

Page 37

DENIG - CONFIDENTIAL

1
2  that we received from Chase.  This is after I
3  determined how I was going to physically book the
4  trades.  This is my breakout of how we physically
5  booked them to Barclays.
6          The total that -- of this forty-four
7  two was the projected value of the collateral that
8  Chase gave it as far as the cash.  This is --
9  includes market value and haircuts.  This 42,2 was
10  what the cash value, projected cash value was that
11  Barclays was going to pay us.
12      Q.   You pointed to different columns.
13  When you're testifying, we have to do it a little
14  formally here.  So I think you just pointed to the
15  column that had the 47.5 and said --
16      A.   Yes.
17      Q.   And said that is Chase's market value
18  for those securities, right?
19      A.   Yes, yes.
20          MR. SHAW:  Let him finish the
21      questions.  We have time, we will get
22      through all of it.
23      Q.   The column that totals the 44.2 is the
24  amount of cash that Barclays was going to convey
25  to Lehman in exchange for posting those securities

Page 38

DENIG - CONFIDENTIAL

1
2  as collateral?
3    A.   Yes.
4    Q.   So the difference in the two is the
5  haircut for the September 18 repo?
6    A.   For all intents and purposes, yes.
7    Q.   And now the column on the far right
8  has 108-some-odd million dollars.  That's the
9  first entry.  Do you see that?
10    A.   Yes.
11    Q.   And what is that?
12    A.   That is the cash ticket that I booked.
13    Q.   So that's to reflect an actual receipt
14  of cash?
15    A.   Yes.
16    Q.   So --
17    A.   So the same 42,2 was broken down into
18  the column -- all the way over to the right, those
19  are the individual specific trades that I booked.
20  So there is one, two, three, four, five, six,
21  seven, eight, nine, ten trades that I booked cash
22  value-wise that totaled the forty-four two.
23    Q.   So you ultimately did book into
24  Lehman's system 44.2 billion dollars?
25    A.   Yes.

Page 39

DENIG - CONFIDENTIAL

1
2    Q.   And that's the cash that Lehman
3  received from Barclays on the 18th?
4    A.   The cash was 45 million (sic)
5  eventually, but --
6    Q.   Well --
7    A.   This was the original, this was the
8  original pass that we got.  When it was determined
9  that it was going to be 45 billion, those numbers
10  did get changed, so this is not the final
11  document.
12    Q.   OK.  This is sometime --
13    A.   This was about 1 o'clock on Thursday
14  afternoon that this was put together.
15    Q.   On Thursday afternoon?
16    A.   Right, for September 18th.
17    Q.   Then ultimately 45 billion was
18  transferred to Lehman?
19    A.   Yes.
20    Q.   From Barclays?
21    A.   Yes.
22    Q.   Why the difference?
23    A.   No idea.
24    Q.   No idea, OK.  So did you -- so this
25  is -- is this one of several spreadsheets you

Page 40

DENIG - CONFIDENTIAL

1
2  prepared during the day to reflect all this?
3    A.   Yes.
4    Q.   So is there -- there probably exists
5  somewhere another spreadsheet that totals to
6  45 billion?
7    A.   Yes.
8    Q.   OK.  Did the valuations in the
9  left-hand column change at all during the day, the
10  ones that total to 47.5 billion?
11    A.   I do not believe it did.
12    Q.   OK.  I apologize but some of today is
13  going to be walking through spreadsheets that we
14  are just trying to understand.  So I want to show
15  you another document, which is marked as
16  Exhibit 60B, which was previously marked as
17  Exhibit 60B, which appears to me, as the
18  uninitiated, a similar type of spreadsheet, so I
19  wanted to see if you could explain to me the
20  difference between the two.
21        First of all, take a minute to look at
22  Exhibit 60B.  Have you had a chance to look at
23  that?
24    A.   Yes, I have.
25    Q.   Can you tell me what this -- again, I

Page 41

DENIG - CONFIDENTIAL

1
2  am not so much concerned about the covering e-mail
3  but the chart that consists of page 2 of this
4  document, could you tell me what this is?
5    A.   This is the actual trades that Chase
6  had on its books and records of the program
7  facilities that we had out to the Fed the end of
8  day 17th, September 17th.  So Wednesday, end of
9  day Wednesday, this is what they had in the
10  program.
11    Q.   So this is a chart prepared by Chase?
12    A.   Yes.
13    Q.   As your -- as the custodian for the
14  Fed programs?
15    A.   Yes.
16    Q.   And now could we just walk through the
17  columns here.
18        Par amount is just a par value that
19  Chase ascribes to all the securities posted to
20  those programs?
21    A.   Yes.
22    Q.   Current market value is the -- the
23  column that's marked "current market," what is
24  that?
25    A.   That would be the market value that it

Page 42

DENIG - CONFIDENTIAL

1  assigned to those securities.
2  Q.  "It" being Chase?
3  A.  Yes.
4  Q.  And now pay-down amount, what is that?
5  A.  I'm not sure.  But the anticipated
6  prefunded dollar amount, that was what technically
7  they were saying that the -- to be conservative,
8  that's what Barclays was going to pay us for those
9  assets.
10  Q.  OK.  And do you have any idea why that
11  number is different than the pay-down amount?
12  A.  No.
13  Q.  Could pay-down amount be the amount
14  that the Fed was expecting to get paid back when
15  it released the securities?
16  MR. SHAW:  Objection, foundation.
17  A.  I'm not sure.
18  Q.  OK.  Do you know if the haircut for
19  the Barclays -- for the September 18 repo was any
20  different than the haircut used in the Fed
21  programs?
22  A.  No.
23  Q.  No, you don't know, or no, it was not
24  different?

Page 43

DENIG - CONFIDENTIAL

1  A.  No, it was not different.
2  Q.  It was not different?
3  A.  No.
4  Q.  So my -- so to your understanding, the
5  same haircut was applied -- let's step back.
6  I thought you said there were
7  different haircuts applied to different types of
8  securities in the Fed program, correct?
9  A.  Yes.
10  Q.  Were the same haircuts applied to the
11  same types of securities for the September 18
12  repo?
13  MR. SHAW:  Objection, foundation.
14  A.  Yes, yes.
15  Q.  Yes, to your knowledge?
16  A.  To my knowledge.
17  Q.  Do you have any -- were you involved
18  in any negotiations and discussions about the
19  amounts of haircuts?
20  A.  I'm sure there was e-mails, but no, I
21  wasn't the one determining any -- if anything, I
22  was cc'd on mails to the traders.
23  Q.  OK.
24  (Exhibit 232, document Bates stamped

Page 44

DENIG - CONFIDENTIAL

1  10303555, two pages, marked for
2  identification, as of this date.)
3  Q.  Ms. Denig, I am handing you a copy of
4  a document we have marked as Exhibit 232, which is
5  an e-mail stream dated Monday, September 15, in
6  which you are a recipient.  If you could take a
7  moment to look at that.
8  A.  OK.
9  Q.  Do you recall receiving this e-mail at
10  all?
11  A.  Yes.
12  Q.  Can you just generally describe for me
13  what the debate was that's going on in connection
14  with this e-mail?
15  A.  I'm not sure it is a debate.  I think
16  it is more informational purposes, just to tell
17  them relatively based on asset class what type of
18  haircuts are provided.
19  As I explained before, I said that
20  better collateral, like agencies and U.S.
21  Treasuries, mortgages, have a lower haircut.
22  Private labels, asset backs and equity corporates
23  have higher haircuts.
24  So he basically is explaining that in

Page 45

DENIG - CONFIDENTIAL

1  here.  So it looks like haircuts 20 percent for
2  nongovernment agency, and equities and corporates
3  are 15 percent wider, which means that they are
4  going to be higher than general liquid assets.
5  And at the last one, where it says for
6  all AAA and AA, which is around corporates and
7  equities, 10 percent higher than this 20 percent,
8  and for all others flat to lower than 15 percent,
9  which means that for Treasuries and agencies you
10  are either going to have no haircut or up to 10
11  percent based on the type of collateral it is.
12  And basically everybody on here are
13  senior people that understand that that's the
14  nature of how the collateral works and haircuts
15  work.
16  Q.  At the bottom it says -- one e-mail
17  from Mr. Tonucci, it says, "Do you have haircuts
18  from Fed versus our normal haircuts?"  Are the
19  haircuts you just described --
20  A.  Yes.
21  Q.  -- abnormal?
22  A.  No.  The ones that I -- these
23  10 percent, 20 percent, no, they are very normal.
24  Q.  They are very normal?

1           DENIG - CONFIDENTIAL
2      A.   Yes.
3      Q.   Did the -- do you have any notion of
4  the types of securities that were posted to the
5  Fed, were they predominantly the safer securities
6  that you have discussed or the ones with the lower
7  haircuts?
8      A.   I would say it was a 50/50 mix.
9  Actually maybe more, more liquid assets.
10     Q.   More liquid assets which would mean a
11 higher haircut?
12     A.   No, lower haircut. These would be
13 assets that are no problem being funded on the
14 street. Even based on this, you could see that.
15     Q.   Let me ask -- this is my outsider's
16 question so I apologize if this sounds naive, but
17 I understand to the Fed program, Lehman posted
18 about 50 billion dollars in collateral and
19 received 45 billion dollars in cash. Does that
20 sound about right to you?
21     A.   Yes.
22     Q.   Doesn't that 5 billion dollar haircut
23 reflect about a 10 percent haircut, 5 over 50?
24     A.   Yes.
25     Q.   So that seems lower than the numbers

1           DENIG - CONFIDENTIAL
2  you're talking about in this e-mail chain?
3      A.   Well, if it was an average, then it
4  would make sense.
5      Q.   How is that?
6      A.   Because the higher -- the worse the
7  collateral is, like the corporate bonds that are,
8  you know, BBB rated and lower, equities and, you
9  know, some of the mortgage type of assets have a
10 much higher haircut than general collateral, which
11 would be liquid markets, U.S. Treasuries and
12 agencies, which would have 2 percent, versus the
13 equities and stuff would have, say, anywhere from
14 15 to 35 percent haircut.
15     So I guess as an average, that
16 20 percent would sort of make sense.
17     Q.   Well, it comes to 10 percent.
18     A.   I am sorry, 10 percent would make
19 sense.
20     Q.   The 10 percent suggests that the
21 majority of the collateral posted to the Fed was
22 the more -- the safer assets, right?
23     MR. SHAW: Objection to form.
24     A.   Um-hm, yes.
25     Q.   Was there any difference between the

1           DENIG - CONFIDENTIAL
2  collateral that was posted to the Fed and
3  collateral that ultimately made it into the
4  September 18 repo?
5      A.   The individual CUSIPs? Yes.
6      Q.   What was -- can you describe for me
7  the difference?
8      A.   Well, for the Fed programs, they
9  basically take whatever is left in the box at the
10 custodian, at Chase. After all of the regular
11 delivery versus payment activity is finished for
12 the day, which is done at probably by 3:30 in the
13 middle of a regular business day, OK, from that
14 point going forward, we see what we have left and
15 they book trades to reflect the values of the
16 collateral that were going into the Fed.
17     Q.   OK, I think you're losing me here.
18     A.   OK. So say, for instance, you have
19 50 billion left in collateral. We would write
20 tickets that would go down to Chase, and Chase
21 would fill these -- they are called shells, with
22 certain types of assets based on the shell we
23 booked.
24     At the end of day, that's what we
25 would do. After everything was done, that is

1           DENIG - CONFIDENTIAL
2  business as usual.
3      Q.   This gets done on Monday night,
4  Tuesday night and then Wednesday night?
5      A.   Yes.
6      Q.   All right. Finish your -- I didn't
7  mean to interrupt your story. Keep going.
8      A.   At the end of Wednesday we got a list
9  of collateral, individual pieces that went into
10 the Fed programs, that was what we thought was
11 going to be what we sent to Barclays on Thursday.
12     Q.   Right.
13     A.   On Thursday when we started booking to
14 transactions, it became clear very quickly that we
15 didn't have the assets on our books that we were
16 booking, and there is systems within the front-end
17 trader systems that would reflect where the
18 position sat. So as I booked them, their
19 positions get decremented or increased depending
20 on the direction.
21     Here I was booking repo transactions,
22 which was sells, and it was showing they are short
23 instead of flat.
24     Q.   You are talking about Thursday you are
25 doing this?

Page 50

DENIG - CONFIDENTIAL

1    A.   Yes, yup.
2    Q.   So you're -- just so I can understand
3  this, you're trying to book a transaction that
4  would post this collateral to the Bank of New York
5  account on behalf of Barclays, correct?
6    A.   Yes.
7    Q.   And you're finding out that some of
8  the collateral is not available for you to do
9  that, right?
10    A.   That's correct.
11    Q.   What types of collateral is not
12  available for you to do that?
13    A.   Fed deliverable collateral.
14    Q.   And what does that mean?
15    A.   Treasuries, agencies, mortgages.
16    Q.   So those were -- a group of those were
17  not available for you to post to Barclays, right?
18    A.   That's correct.
19    Q.   And how much were you unable to post
20  to Barclays?
21    A.   8 billion.
22    Q.   8 billion.  OK.  And so what did you
23  do instead?
24    A.   We reached out to the settlements

Page 51

DENIG - CONFIDENTIAL

1  group and we asked them what they had long in the
2  box, versus trade -- pending deliveries or actual
3  trades that were booked, and substituted the
4  collateral that we originally booked.
5    Q.   Now, you say the settlements group.
6  Is that at Chase?
7    A.   No.  At Lehman.
8    Q.   Who was that?
9    A.   Lenny Legotte.
10    Q.   Who does he work for?
11    A.   He worked for Jack Fondacaro, who
12  ultimately worked for Neal Ullman.
13    Q.   Just trying to get people's positions.
14    A.   Sure.
15    Q.   What type of collateral was ultimately
16  substituted for this 8 billion that you were
17  unable to transfer?
18    A.   Same type, Treasuries, agencies.
19    Q.   Were there certain types of collateral
20  that Barclays would not accept into their
21  September 18 repo?
22    A.   Yes.
23    Q.   Like what?
24    A.   Lehman paper, real estate type of

Page 52

DENIG - CONFIDENTIAL

1  CUSIPs, certain equities, just more toxic, no
2  value, you know, not able to determine a market
3  value, they didn't want it.
4    Q.   So they excluded the more toxic
5  securities from their September 18 repo?
6    A.   Yes, yes, yes.
7    Q.   Were some of those assets previously
8  posted to the Fed for their financing?
9    A.   I wouldn't be able to tell that.
10    Q.   How do you know what Barclays
11  excluded?
12    A.   We received a list.
13    Q.   OK.  From who?
14    A.   Jim Hraska.
15    Q.   This is not going in the order I
16  planned so I have to get a new exhibit.
17         So other than this 8 billion dollars
18  in securities, were you able to transfer all the
19  securities from the Fed financings to the Barclays
20  September 18 repo?
21    A.   No.  Because there were other issues
22  throughout the day that were pending deliveries
23  of -- you know, there was a regular day of
24  transactions going on, and there were pending

Page 53

DENIG - CONFIDENTIAL

1  deliveries that were queued up at Chase.  So when
2  this transaction started, or when they gave us the
3  first 5 billion, they were -- the cash came in,
4  Chase would release the securities to the free box
5  to start making the deliveries over to BoNY, but
6  because there were other pending deliveries out
7  there, some -- those securities were made on those
8  deliveries instead of to BoNY, again, creating the
9  same problem, that we needed to substitute the
10  collateral that was originally expected to go.
11    Q.   So am I correct, just so I can
12  understand this, the trading desk was in the
13  process of doing their normal trades, so they took
14  priority over some of the assets that were
15  released by Chase?
16    A.   I wouldn't think it was priority.
17    Q.   This is just a queue system?
18    A.   It's just a queued system.
19    Q.   What did you do to make up that
20  shortfall?
21    A.   Same type of scenario.  Went to the
22  clearance folks, they went to the DTC terminals to
23  try to determine what collateral was available.
24    Q.   Were you able to make up the entire

Page 54

DENIG - CONFIDENTIAL

1  shortfall?
2      A.  We weren't.
3      Q.  And so what did you do then?
4      A.  Because we basically ran out of time,
5  the Fed and the DTC depositories ended up shutting
6  down at a particular time and we didn't get
7  everything that we wanted to over, because it
8  wasn't enough time to do all the research.
9      Q.  And you're talking about Thursday
10  evening?
11      A.  Thursday evening around 11 o'clock.
12      Q.  So what was the shortfall by the time
13  of -- by the time you ended on Thursday night?
14      A.  I am not 100 percent sure of what the
15  final figure was, but I want to say it was
16  42 billion is what they received.
17      Q.  OK.  So 42 is not the shortfall, 42 is
18  what ultimately did make it?
19      A.  Yeah.
20      Q.  Was there a 7 or 8 billion dollar
21  shortfall, do you recall?
22      A.  Yes.
23      Q.  Is that the genesis of what I have
24  seen referred to as box loan?

Page 55

DENIG - CONFIDENTIAL

1      A.  Yes.
2      Q.  And can you tell me what that is?
3      A.  Well, because we didn't -- we couldn't
4  make the rest of the collateral, because of the
5  timing, they didn't receive the value of
6  7 million -- 7 billion worth of collateral.  So
7  Chase lent Lehman 7 billion dollars to give back
8  to -- to give to Barclays to make up that.
9      Typically you wouldn't collateralize
10  cash with cash, but at that late hour, that was
11  really the only way to facilitate that so that
12  Barclays was made whole.
13      Q.  And what secured that loan?
14      A.  Chase.  The assets that we still had
15  in the box, that Lehman still had in the box.
16      Q.  And the box meaning what?
17      A.  Our free collateral box, meaning any
18  assets that didn't get delivered over to BoNY and
19  was still in the possession of Lehman Brothers,
20  Inc.
21      Q.  And is that the 074 box?
22      A.  No, it was a Chase box.
23      Q.  OK.  074 box is separate?
24      A.  That's a DTC box.

Page 56

DENIG - CONFIDENTIAL

1      Q.  I understand.  OK.
2      So now you have gotten us through
3  Thursday night.  What did you do Friday morning or
4  Friday during the day?
5      A.  Well, we -- there was a lot of --
6      Q.  I just mean Friday, the 19th of
7  September.
8      A.  19th.  So first thing in the morning,
9  what we thought was pulled, what they were short
10  collateral that we didn't finish, to try to get as
11  much collateral that we knew was available in the
12  DTC, because at this point the Fed collateral was
13  all exhausted.  We didn't have Treasuries,
14  agencies.  They went.  They were delivered and
15  they were reconciled with Barclays, that they
16  received them.
17      The assets that we ran out of time to
18  send were the DTC, what you referenced as 074
19  collateral, 636 collateral, which are the two DTC
20  boxes that Lehman Brothers, Inc. owned.
21      The traders were basically using their
22  front-end capture system to determine what the
23  positions were that they had available and what
24  they knew as unencumbered, and they delivered

Page 57

DENIG - CONFIDENTIAL

1  those via pledge mechanism to DTC, a DTC box for
2  BoNY, which was owned technically by Barclays.
3      Q.  And how much collateral was
4  transferred to the BoNY box in connection with
5  that effort?
6      A.  A billion dollars, a billion and
7  change.
8      Q.  And now what was the purpose of
9  transferring that to that BoNY box?
10      MR. SHAW:  Objection, foundation.
11      A.  We were under the impression we were
12  still short market value.
13      Q.  So that was short market value in
14  connection with the September 18 repo?
15      A.  Yes.
16      Q.  So was that billion and change to
17  substitute in for the cash that had been placed in
18  the repo through the box loan?
19      MR. SHAW:  Objection, foundation.
20      A.  It wasn't my -- it wasn't my
21  understanding, no.
22      Q.  What did you understand it to be for?
23      A.  It was just that BoNY said that they
24  didn't have enough market value, you need to give

Page 58

DENIG - CONFIDENTIAL

1  us more collateral to make up for the 45 billion.
2
3       Q.   That's the 45 billion that we had
4  talked about previously on these charts?
5       A.   Yes.
6       Q.   So -- well, so is it your
7  understanding that the -- OK.  So that was your
8  work on Friday, to transfer a billion one into the
9  BoNY box in support of the September 18 repo?
10      A.   Yes.
11           MR. SHAW:  Objection to form.
12      Q.   And what ended up happening to the
13  September 18 repo?
14           MR. SHAW:  Objection.  Vague.
15      A.   Yeah, I -- what do you mean by that?
16      Q.   Well, was it terminated, defaulted, or
17  do you recall what ultimately happened to all the
18  collateral that was posted toward the September 18
19  repo?
20           MR. SHAW:  Objection, foundation.
21      A.   On the 19th, no.  But the 22nd, yes.
22      Q.   What happened on the 22nd?
23      A.   They said that the repo went into
24  default.
25      Q.   Who is "they"?

Page 59

DENIG - CONFIDENTIAL

1
2       A.   Barclays to my senior management to
3  me.
4       Q.   What did that mean as far as where the
5  collateral went?
6       A.   The collateral was there at Barclays
7  already.  We had trade bookings in Lehman Brothers
8  of a repo transaction that went from September 18
9  to September 25.  The fact that they deemed the
10  repo to be in default, we had to term the trade
11  earlier than -- and put an end date of
12  September 22 on it.
13      Q.   OK, I was -- I'm seeing -- we are
14  going to bring out a chart which I think is what
15  you're talking about.  Are you talking about on
16  the MTS system how you booked the trades?
17      A.   Yes, yes.
18      Q.   And so how -- the original, back to
19  Thursday, how is that booked?  What was the end
20  date for the repo on Thursday?
21      A.   September 25.
22      Q.   And then when did you change it to the
23  22nd?
24      A.   Monday.
25      Q.   On the 22nd itself?

Page 60

DENIG - CONFIDENTIAL

1
2       A.   Yes.
3       Q.   And were there any other changes made
4  to it?
5           MR. SHAW:  Objection, foundation.
6       A.   Yes, because the original value of the
7  cash was forty-four two.  We had to adjust it to
8  45 billion.
9       Q.   And why did -- where did that 45 come
10  from?
11      A.   That's what Barclays ended up
12  physically paying us for the assets.  Where that
13  figure came up with -- I was just told to change
14  the total cash values to be -- to equal 45 billion
15  instead of the forty-four two which was originally
16  given to me.
17      Q.   OK.  Forty-four two is the number we
18  talked about earlier?
19      A.   Yes.
20           MR. SHAW:  Whenever you reach a good
21  stopping point, we have been going about an
22  hour.
23           MR. HINE:  Sure, let's take a break.
24           (Recess)
25  BY MR. HINE:

Page 61

DENIG - CONFIDENTIAL

1
2       Q.   Ms. Denig, I just want to follow up on
3  a couple things we talked about.  I guess I am
4  trying to understand the 1 point -- one and change
5  billion dollars that you said was transferred on
6  Friday.  What was the total amount that was
7  supposed to have been transferred to the September
8  18 repo in terms of collateral?
9       A.   The 49 and change billion market
10  value.
11      Q.   And so how much did you transfer as of
12  Thursday night?
13      A.   I don't actually know the final
14  figure.  So basically it was communicated to me
15  Monday morning that we still needed -- there was a
16  shortfall and we needed to get more to them.
17      Q.   So you understood from that
18  communication that the amount that had been
19  transferred Thursday night plus the box loan was
20  not enough to cover what was supposed to have been
21  transferred to the repo?
22      A.   Yes.
23      Q.   And who determined that?
24      A.   I don't know who determined it.  I
25  just know I was told by my boss that we were

Page 62

DENIG - CONFIDENTIAL

1 short.
2 short.
3    Q.   And who placed a value on these
4 securities?
5    MR. SHAW: Objection, foundation.
6    A.   I don't know.
7    Q.   Well, let's go back.  The 42 and
8 change, whatever was transferred Thursday night,
9 is that figure Lehman's valuation of those -- of
10 that collateral?
11    MR. SHAW: Objection, foundation.
12    A.   I don't believe -- I don't believe so.
13    Q.   Whose do you think it was?
14    A.   I think it was between Chase and BoNY.
15    Q.   OK.  Do you recall any differences
16 between the BoNY valuation -- I have seen e-mails
17 referencing the BoNY valuations or Bank of New
18 York valuations.  Do you recall any differences --
19 differences between the Bank of New York
20 valuations and the Lehman, the values Lehman had
21 placed on these securities?
22    A.   I don't, I don't recall.
23    Q.   Do you recall any discussions or
24 documents suggesting that Bank of New York placed
25 a value of about 45 billion on securities that

Page 63

DENIG - CONFIDENTIAL

1 Lehman valued in the 42 billion dollar range?
2 Lehman valued in the 42 billion dollar range?
3    A.   I don't recall, sorry.
4    Q.   Would you know why the two entities
5 would come up with different valuations?
6    A.   No.
7    Q.   Do you have a -- could you speculate?
8 What do you think?
9    MR. SHAW: Objection, calls for
10 speculation.
11    Don't speculate.
12    Q.   You can speculate.
13    A.   Yeah, I don't know.  I don't know what
14 the models they use in each bank to come up, or
15 determine what their market values are.
16    Q.   You mentioned the 1 billion and change
17 that was transferred Friday.
18    A.   Um-hm.  Yes.
19    Q.   I've seen references in some of the
20 e-mails to an effort to locate unencumbered assets
21 on -- starting I guess Friday into Saturday.  Is
22 that -- were you involved in that at all?
23    A.   Yes, I was.
24    Q.   Is that -- I've seen e-mails
25 suggesting there was a goal of 1.9 billion dollars

Page 64

DENIG - CONFIDENTIAL

1 at some point.  Do you recall that?
2 at some point.  Do you recall that?
3    A.   Yes.
4    Q.   Is that different than the 1 billion
5 and change that you mentioned earlier?
6    A.   No.
7    MR. SHAW: Objection to form.
8    A.   No.
9    Q.   Let me rephrase here.
10    Were you ever told Friday through the
11 weekend, you were supposed to be looking for
12 unencumbered assets?
13    A.   Yes.
14    Q.   What did you understand that to be
15 for?
16    A.   A shortfall from the repo transaction.
17    Q.   OK.  And so what did you do in
18 connection with searching for unencumbered assets?
19    A.   We received files from our GFS
20 technology, which is a system that did an
21 aggregation of all the collateral we had broken
22 down to individual trading accounts, and the
23 definitions of those trading accounts were to --
24 able to let us determine whether or not it was
25 firm inventory or customer inventory.

Page 65

DENIG - CONFIDENTIAL

1    So based on the information that we
2    So based on the information that we
3 received from our -- the books and records that
4 Lehman had at the time, we were potentially able
5 to determine what was not customer collateral and
6 that would be free and clear to deliver to
7 Barclays.
8    Q.   Free and clear is unencumbered?
9    A.   Yes.
10    Q.   Is that what I see referred to as the
11 O74 and the 636 boxes?
12    A.   Yes.
13    Q.   So were you ever told at any point
14 that there was a goal of getting 1.9 billion in
15 unencumbered collateral?
16    A.   Yes.
17    Q.   Who told you that?
18    A.   Jim.
19    Q.   Did that goal change over time?
20    MR. SHAW: Objection, foundation.
21    Q.   Over the weekend?
22    A.   Not over that weekend, no.
23    Q.   So once you -- what did you understand
24 the 1.9 billion goal came from?  Or where the
25 1.9 billion dollar goal came from?

Page 66

DENIG - CONFIDENTIAL

1
2       A.    We were under the impression it was a
3   shortfall of the market value of the repo.
4       Q.    So that -- so the September 18 repo?
5       A.    Yes.
6       Q.    And did you, you folks in fact find
7   1.9 billion dollars in unencumbered assets?
8       A.    We did.
9       Q.    And what happened with those assets?
10          MR. SHAW: Objection, foundation.
11      A.    They were to be delivered to Barclays
12  after we determined whether or not they really
13  were unencumbered.
14      Q.    And were they delivered to Barclays?
15          MR. SHAW: Objection, foundation.
16      A.    I believe they were.
17      Q.    And how much of those unencumbered --
18  what was the value of the unencumbered assets that
19  were delivered to Barclays?
20      A.    That I do not know.
21      Q.    Do you think that's different than the
22  one billion and change you mentioned earlier that
23  was transferred Friday?
24          MR. SHAW: Objection, form.
25      A.    I wouldn't know that.

Page 67

DENIG - CONFIDENTIAL

1
2       Q.    You wouldn't know that?
3       A.    No.
4       Q.    Were these unencumbered assets that we
5   just talked about transferred to Barclays over the
6   weekend?
7       A.    No.
8       Q.    When were they transferred?
9       A.    There were some that were transferred
10  on the 29th of September.  There were some that
11  were transferred on the 30th of September.  And
12  then sometime in December, there was more assets.
13  But literally my role ended after probably the
14  next -- after the end of the next week, I wasn't
15  involved anymore.
16      Q.    Let me get some dates here.  So the
17  closing is on Monday, the 22nd?
18      A.    Um-hm.
19      Q.    So there is an effort even after the
20  closing to find unencumbered assets?
21      A.    Yes, yes.
22      Q.    And those assets were transferred on
23  the 29th and 30th of September to Barclays?
24      A.    Yes, they were.
25      Q.    And do you recall the amount of those

Page 68

DENIG - CONFIDENTIAL

1
2   assets that were transferred on the 29th and 30th?
3       A.    I remember one box was 235 millionish,
4   the other box wasn't as much, just under 200.
5       Q.    And those boxes you are talking about
6   are 074 box and 636 box?
7       A.    Yes.
8       Q.    You say there were further securities
9   transferred in December?
10      A.    I heard that.  So I wasn't involved at
11  all in that determination, but I knew that there
12  was another delivery at some point.
13      Q.    Am I correct to say your involvement
14  in that search for unencumbered assets ended at or
15  around the 29th and 30th of September?
16      A.    I would say yes.
17      Q.    And then someone else did it
18  thereafter?
19      A.    Yes.
20      Q.    Did you ever hear of anything called
21  Schedule B?
22      A.    Yes.
23      Q.    What is it?
24      A.    I don't know actually.  I knew there
25  was another schedule.  I know that Jim had

Page 69

DENIG - CONFIDENTIAL

1
2   forwarded me the schedule a few times or list of
3   assets to cut up in different ways so that he
4   could determine things, but as far as determining
5   anything, it was just me playing around with the
6   spreadsheet and sending it back to him.
7       Q.    Let me ask you this.  Did you ever see
8   the asset purchase agreement that -- relating to
9   the transaction between Lehman and Barclays?
10      A.    The physical agreement?
11      Q.    Yeah.
12      A.    No.
13      Q.    Did you have any understanding during
14  the week of September 15 what its terms were?
15      A.    No.
16      Q.    Did you have any understanding during
17  the week of September 15 what the deal was in
18  general between Barclays and Lehman?
19      A.    No.
20      Q.    What did you think was going on with
21  all this activity between Barclays and Lehman
22  during that week?
23      A.    That we were to -- that they were
24  purchasing our assets.
25      Q.    But you weren't -- you had no

## Page 70

DENIG - CONFIDENTIAL

1 understanding of what assets; is that right?

2    A.    Just the list that -- the

3 understanding that we had was the Fed was stepping

4 out of the transaction, Barclays was going to take

5 it in. The fact that we had no other liquidity

6 providers besides the Fed at that particular time

7 and Barclays, that was all -- basically once we

8 transferred the assets, we would have nothing left

9 of the company.

10    Q.    So you understood the September 18

11 repo was -- part of the reason you had entered

12 into that would be to transfer assets to Barclays?

13        MR. SHAW: Objection to form.

14    A.    Yes.

15    Q.    And did you ever hear any discussions

16 about defaulting on the repo, on that repo?

17    A.    Not that week.

18    Q.    What did you hear the following week?

19    A.    That we went bankrupt, they filed for

20 bankruptcy at -- on Friday at 4 o'clock and that

21 the repo was now in default.

22    Q.    Did you ever hear any discussions or

23 mention of a possibility of terminating the repo

24 on, say, Friday the 19th?

## Page 71

DENIG - CONFIDENTIAL

1    A.    No.

2    Q.    Did you ever see a notice of

3 termination issued for that repo?

4    A.    No.

5    Q.    Did you ever hear anything about a

6 notice of termination being issued for that repo?

7    A.    No.

8    Q.    Did you ever hear any discussions

9 about changing the September 18 repo into a sale

10 of assets?

11    A.    It wouldn't be a sale. We did reflect

12 in Lehman's books the fact that they are no longer

13 on our books because the trade became a default,

14 like they kept the assets at that particular time,

15 and that's by nature how a default is transacted.

16    Q.    What do you mean?

17    A.    Because we delivered securities to

18 them, they delivered us cash, they now have the

19 assets. When the company goes bankrupt, they

20 can't return the assets because we are no longer a

21 company.

22        So they go out to the open market to

23 raise the cash that they lost or what they paid

24 for the assets.

## Page 72

DENIG - CONFIDENTIAL

1    Q.    Do they get to keep all the assets or

2 do they have to return the haircut?

3    A.    No. They get to keep all the assets.

4    Q.    Did you ever hear any discussion

5 during the week of September 15 about a discount

6 being granted to Barclays as to the assets they

7 were going to buy?

8    A.    No.

9    Q.    Did you ever hear any discussion or

10 mention of the notion of using the repo as a means

11 of giving Barclays a discount on those assets?

12    A.    No.

13    Q.    Did you ever hear any discussions or

14 mention of the notion of Barclays keeping the

15 haircut portion of the September 18 repo?

16    A.    No.

17    Q.    How about since you have been at

18 Barclays, have you ever heard any discussions

19 about any of those things?

20    A.    No.

21    Q.    Since you have been at Barclays,

22 anyone mention the notion of a discount associated

23 with the Lehman/Barclays transaction?

24    A.    No.

## Page 73

DENIG - CONFIDENTIAL

1    Q.    Since you have been at Barclays, has

2 anyone said, hey, we got a good deal on those

3 assets, we got them at a discount?

4    A.    No.

5    Q.    Or words to that effect?

6    A.    No.

7    Q.    Can I just ask you a question about

8 the M -- I think it's called MTS system. Can you

9 tell me what that is generally?

10    A.    It is our official books and records.

11 It's our settlement system. It is how we had

12 connectivity to all our custodians and -- what are

13 they called -- depositories.

14    Q.    So you use this system all the time?

15    A.    Yes.

16        MR. SHAW: Can we clarify the

17 difference between use at Lehman, use at

18 Barclays.

19    Q.    Yeah, let's do that. When you were

20 working for Lehman, you regularly used this MTS

21 system?

22    A.    Yes.

23    Q.    How is that different from GFS?

24    A.    GFS was an aggregator of information.

Page 74

DENIG - CONFIDENTIAL

1  MTS was how deliveries were physically transmitted
2  to our custodians.
3      Q.   Did you have any role in valuing
4  securities in your position?
5      A.   No.
6      Q.   Again I am talking about in your days
7  at Lehman.
8      A.   Yes.
9      Q.   Who placed the values on these, all
10  the securities we have been talking about that
11  were used to post as collateral?
12      A.   I have no idea.  I am assuming very
13  higher-up people.  The fact that we -- we booked
14  the trades at no value and we received in cash, as
15  a bifurcated transaction.
16      Q.   Ms. Denig, I am going to show you a
17  document which I think relates to what you just
18  told me, but I'm not sure.  It has been previously
19  marked as Exhibit 134.
20      And I'm not sure you have seen it in
21  this form, in written form, but I believe this is
22  a printout from this MTS system we are talking
23  about, and so my first question is, does this look
24  like what I just -- does this look like the

Page 75

DENIG - CONFIDENTIAL

1  information contained on the MTS system?
2      MR. SHAW:  Take whatever time you need
3  to make sure that you are comfortable
4  answering the question on the basis of that.
5      Q.   I'm not going to ask you -- you can
6  review the document as much as you want.  I am not
7  going to ask you detailed information about all
8  the entries other than probably the first page.  I
9  just want to get an understanding of what this is.
10      A.   Can you repeat your question.
11      Q.   Is this the type of information that's
12  contained in the MTS system?
13      A.   Yes, it is.
14      Q.   Does this look like a printout of the
15  MTS system that you would use in your position at
16  Lehman?
17      A.   Our historical database, yes.
18      Q.   That's a portion of the MTS system?
19      A.   Yes.
20      Q.   If you look on the first page, you
21  will see a series of entries that -- I am looking
22  under the net amount column.  You will see a
23  series of entries that total down to approximately
24  44.99 billion dollars.  Do you see that?

Page 76

DENIG - CONFIDENTIAL

1      A.   Yes.
2      Q.   Below that is a series of entries with
3  zero in that column.  Do you see that?
4      A.   Yes.
5      Q.   Is that the booking of that zero cost
6  you were talking about?
7      A.   Yes.
8      Q.   Can you tell me again why you do it
9  this way?
10      A.   We don't typically do it this way.
11  Because they were the specific assets that went to
12  the Fed program, and that's basically what we were
13  to transfer to Barclays as part of this repo, to
14  ensure that's the assets we were sending, we did
15  them as a one-for-one security delivery instead of
16  letting Chase's triparty allocation system do it
17  for us.
18      Q.   Is that what they call free repos?
19      A.   These are booked as free repos, but
20  the transaction was traditionally papered as a
21  triparty transaction.
22      Q.   So am I correct to understand what you
23  just said, rather than having Chase allocate the
24  approximately 45 billion dollars to individual

Page 77

DENIG - CONFIDENTIAL

1  repos which amounted to -- or individual
2  securities which amounted in the thousands, I
3  imagine, you just booked it this way for
4  simplicity purposes?
5      A.   No.  As a matter of fact, it was a lot
6  more arduous booking it this way.  We booked
7  individual trades, where typically you just book a
8  shell and Chase's allocation system fills the
9  shell.
10      Q.   So why did you want to do it this way
11  then?
12      A.   We needed specific assets to go.  We
13  didn't want a random mix.  We wanted -- these are
14  the -- this is the securities that were supposed
15  to go.  This is what we needed to book.
16      Q.   OK.  So in other words, the excluded
17  securities you didn't want included in here, so
18  you had to go CUSIP by CUSIP?
19      A.   Yes.
20      Q.   OK.  When you see towards the
21  right-hand column of this, when you see something
22  called product subtype -- do you see that?
23      A.   Yes.
24      Q.   Third-to-last column, and then it

Page 78

1    DENIG - CONFIDENTIAL
2  refers to -- some of the entries say HIC and
3  others say receipts.
4    A.  Yes.
5    Q.  Do you know what that means, those two
6  entries?
7    A.  No.
8    Q.  Do you ever --
9    A.  I know what a HIC is, a HIC
10  transaction, but why they are classified as such,
11  I don't know.
12    Q.  See where it says -- toward the
13  right-hand side of the column is a column entitled
14  "Fin Rate." Finance rate, I assume?
15    A.  Yes.
16    Q.  And it has "4" under it for a lot of
17  the entries.  Do you see that?
18    A.  Yes.
19    Q.  Is that the repo rate?
20    A.  Yes.
21    Q.  So that's the repo rate for the
22  September 18 repo?
23    A.  Yes.
24    Q.  And then further to the right you see
25  something called clear date?

Page 79

1    DENIG - CONFIDENTIAL
2    A.  Yes.
3    Q.  What is that?
4    A.  That's the date that the settlement
5  took place.
6    Q.  So this is booked on the 18th.  It
7  says the 18th there?
8    A.  Well, it is booked on the 18th to
9  settle on the 18th -- and it was settled on the
10  18th.
11    Q.  Why is the first one booked on the
12  23rd then?
13    A.  It could have been modified.
14  Remember, I had to modify the amounts from
15  forty-four two to 45 billion.  That might have
16  been the day that I did that transaction.  It
17  is -- because if you look in entry date, which is
18  E/D --
19    Q.  E/D.
20    A.  -- that trade was entered -- trade
21  date the 18th to settle on the 18th, but it was
22  entered on the 23rd, so that had to be cleared on
23  the 23rd.
24    Q.  And that's 8.7 billion dollars?
25    A.  Yes.

Page 80

1    DENIG - CONFIDENTIAL
2    Q.  And tell me again why you were doing
3  that on that date?
4    A.  Because we originally booked the trade
5  cash value to total forty-four billion two.  I was
6  told to modify it to 45 billion.
7    Q.  And this was on the 23rd after the
8  closing?
9    A.  Yes.
10    Q.  You don't know why you were told to
11  modify it like that?
12    A.  Barclays physically paid us
13  45 billion.  That was why.
14    Q.  That's the distinction between the
15  45 billion and forty-four two we talked about
16  earlier?
17    A.  Yes.
18    Q.  If you turn to the second blue sheet,
19  in the first -- the page right behind the first
20  blue sheet in this document.
21    A.  Blue sheet.
22    Q.  It is about a third of the way down
23  the document.  Do you see -- I don't have a Bates
24  number on this page, but it is a similar type of
25  spreadsheet, and you will see, if you look at the

Page 81

1    DENIG - CONFIDENTIAL
2  net amount column, it adds down to 44.9 billion
3  midway through it, and further down it adds to
4  45 billion.  Do you see that?
5    A.  I do.
6    Q.  Can you tell me why that's the case?
7    A.  I don't know.
8    Q.  If you look in the E/D column, now you
9  see a lot of entries saying September 30, 2008.
10  Do you see that?
11    A.  Um-hm.
12    Q.  Were you entering new data on
13  September 30?
14    A.  No.  We changed the end dates.
15    Q.  So E/D is end date?
16    A.  E/D is entry date.  But the
17  modifications were -- we needed to term the trade
18  early, so they had to modify the original trade
19  that we booked.
20    Q.  Why did you change the end date?
21    A.  Because it defaulted on the 22nd
22  instead of the 25th, so we had to change the end
23  date from the original repo date from the 25th to
24  the 22nd.
25    Q.  Just so I understand, originally when

Page 82

DENIG - CONFIDENTIAL
1
2    you booked it, it had an end date of the 25th?
3        A.    Yes.
4        Q.    And then on the 22nd, after you
5    learned it had defaulted on the 22nd, you changed
6    the end date to what?
7        A.    To the 22nd.
8        Q.    OK.  And why did you do that, just --
9        A.    Because that was the day that they
10    deemed the repo to be in default.
11        Q.    OK.  Now, the values on this, these
12    charts, where it says principal amount or even net
13    amount, where are those values taken from?
14        MR. SHAW:  Objection, foundation.
15        A.    MTS.
16        Q.    So this is -- these are Lehman values?
17        A.    Oh, no, no.  I am sorry.  These are --
18    these are all the -- these are the cash trades.  I
19    booked these trades.  I put the cash values on
20    these.
21        Q.    When you say "these," are you talking
22    about the --
23        A.    These groupings of trades that you are
24    talking about --
25        Q.    Right.

Page 83

DENIG - CONFIDENTIAL
1
2        A.    -- were all in relation to the repo
3    transaction from the 18th.
4        Q.    OK.  So the 44.9 billion dollars that
5    you will see a net amount, it totals to 44.9 in
6    the upper half of the chart.
7        A.    Yup.
8        Q.    What is that?
9        A.    That was the cash value of the
10    collateral that we were to have given Barclays in
11    this transaction, and that was the cash that they
12    paid us.
13        Q.    And why does -- why is it in a
14    separate series of entries that total the 45.004
15    billion?
16        A.    I don't recall, to be honest with you.
17    As far as my understanding, it was still supposed
18    to be 45.
19        Q.    OK.  Ms. Denig, I am going to show you
20    two or three exhibits that have been previously
21    marked.  The first one I am going to give you is
22    Exhibit 135.  And then I am going to mark as a new
23    exhibit a separate document, which we will mark as
24    Exhibit 233.
25        (Exhibit 233, screen shot marked for

Page 84

DENIG - CONFIDENTIAL
1
2    identification, as of this date.)
3        Q.    The two exhibits, 135 and 233, appears
4    to be screen shots from what I believe to be your
5    MTS system or Lehman's MTS system, and I just have
6    a few questions about it after you have had a
7    chance to take a look at it.
8        A.    OK.
9        Q.    I think this has to do with what we
10    just talked about.  If you look on Exhibit 135, it
11    says end date, 9/25/08.  Do you see that?
12        A.    Yes.
13        Q.    And I realize there's different
14    CUSIPs, but we just took shots of the ones we
15    could get a clear shot of.
16        When it says 9/25, that's how this was
17    originally booked as an end date of 9/25; is that
18    right?
19        A.    Yes.
20        Q.    If you look at Exhibit 233, it looks
21    like the end date was changed to 9/19.
22        MR. SHAW:  Objection, assumes facts
23    not in evidence.
24        Q.    Do you see the entry end date 9/19/08?
25        A.    Yes.

Page 85

DENIG - CONFIDENTIAL
1
2        Q.    Was it changed to 9/19?  I thought you
3    previously said it was changed to 9/22?
4        A.    It was changed to 9/19 originally
5    because that was the date we thought it was going
6    to be, and then we found out Barclays defaulted it
7    on the 22nd, and we had to modify it again to the
8    22nd.
9        Q.    When was it changed to the 19th?
10        A.    I don't recall the exact date.
11        Q.    Could you tell from this chart, in the
12    upper right-hand column -- I'm sorry.
13        Is there any way to tell from this
14    chart when those entries were changed?
15        A.    From the chart, yes.  From here, no.
16        Q.    Can you tell me from the chart when
17    the dates were changed to the 19th?
18        A.    23rd.
19        Q.    So just so I understand it, originally
20    the end dates were the 25th?
21        A.    Yes.
22        Q.    On the 23rd, you originally changed
23    the end dates to the 19th because you thought that
24    was the date it defaulted?
25        A.    Yup.  Yes.

Page 86

DENIG - CONFIDENTIAL

1  Q.   And eventually you were told to change
2  them to the 22nd as the default date?
3  A.   Yes.
4  Q.   Why all these changes?
5  A.   Because the management told us to do
6  it. That Barclays defaulted the repo on the 22nd,
7  not the 19th. We originally thought the default
8  was on the 19th, so that's why we transacted it
9  that way.
10  Q.   Who from Barclays management told you
11  this?
12  A.   Not me personally, so I can't -- my
13  orders came from Jim.
14  Q.   Do you know -- do you have any
15  understanding why all these changes?
16  A.   Nope.
17  Q.   Were you involved in any way in
18  assisting Barclays in preparing its opening
19  balance sheets after the closing of the
20  transaction?
21  A.   No.
22  Q.   Were you involved in any way in
23  assisting Barclays in preparing its financial
24  statements that reflect the Lehman/Barclays

Page 87

DENIG - CONFIDENTIAL

1  transaction?
2  A.   No.
3  Q.   Do you have any role now or during the
4  week of the 22nd in providing financial or --
5  information at all to the folks at Barclays who
6  prepare their financial statements?
7  A.   No.
8  MR. SHAW:  You need to speak up a
9  little bit.
10  A.   No.
11  Q.   So this change was just as a result
12  of -- changes of the end dates were as a result of
13  you being told by Jim Hraska that they wanted it
14  done?
15  A.   Yes.
16  Q.   Did you make any other changes to
17  the -- to this Exhibit 1 -- entries in Exhibit 134
18  after the closing?
19  A.   This shows a history of all the
20  changes that were made along the way.
21  Q.   So is this a chronological history?
22  In other words, if I read from the top to the
23  bottom, I am going in time?
24  A.   I can't tell based on this. I have to

Page 88

DENIG - CONFIDENTIAL

1  flip through it to see.
2  Q.   Could you see whether you can
3  ascertain that.
4  A.   Sure.
5  Q.   Just to clarify the question maybe, we
6  put in blue sheets halfway through, and I'm not
7  sure they are entries on different dates or if you
8  can just tell me.
9  MR. SHAW:  Do you know if this is a
10  complete --
11  MR. HINE:  No, I don't. No, I don't.
12  I am just trying to get a sense of how the
13  system works.
14  A.   As I see it, this is in chronological
15  order, but you definitely don't have a completed
16  list here. And the reason I could tell that is
17  from the entry dates, because there were multiple
18  changes to the original trade booking.
19  Q.   OK. That's what you previously
20  described from originally the 18th and then to the
21  19th and then to the 22nd.
22  A.   And then to change the money on the
23  trades from 44 to 45 million, so there was
24  multiple modifications to the original trade

Page 89

DENIG - CONFIDENTIAL

1  booking.
2  Q.   This is after the closing?
3  A.   Yes.
4  Q.   And other than the changing the
5  forty-four two to 45 billion, were there any other
6  changes made to the valuations of the securities
7  that were transferred to Barclays?
8  MR. SHAW:  Objection.
9  A.   No.
10  Q.   While I am trying to find a couple of
11  exhibits, Ms. Denig, were you involved in any way
12  in the calculation of the 15c3 calculation as it
13  relates to collateral that was being transferred
14  to Barclays?
15  A.   I was not.
16  Q.   Do you have any understanding of how
17  that calculation was changed or modified during
18  the course of the week of the 15th?
19  A.   No.
20  Q.   I see you copied on an e-mail or two
21  involving the 15c3 calculation. Why would you be
22  copied on that?
23  MR. SHAW:  Objection to form.
24  A.   Regularly business as usual, I would

Page 90

```
 1          DENIG - CONFIDENTIAL
 2    be cc'd on what the 15c3 lock-up was going to be
 3    so we would know how much Ginnie Mae collateral we
 4    would have to lock up.  That was an acceptable
 5    form of payment or lock-up amount.
 6        Q.   Lock up meaning you couldn't use it
 7    for any other purposes?
 8        A.   That's correct.
 9        Q.   Is it correct to say you would receive
10    periodic reports on what that amount was?
11        A.   Weekly.
12        Q.   And during the week of the 15th on
13    into the following week, do you recall any
14    discussions about redoing that calculation to see
15    if we can find any more assets to transfer to
16    Barclays?
17        A.   No.
18        Q.   Do you recall any efforts at all to
19    recalculate the 15c3 amount?
20        A.   For what time period?
21        Q.   During those two weeks.
22        A.   I think they were doing it every day
23    at that point.
24        Q.   Why?
25        A.   Because of the nature of the issue
```

Page 91

```
 1          DENIG - CONFIDENTIAL
 2    going on.
 3        Q.   So would you be receiving reports
 4    every day during that period?
 5        A.   Yes.
 6        Q.   Do you have any understanding of why
 7    they were doing it every day?
 8        A.   No.  No one told me.
 9        Q.   Did you have an understanding of
10    whether any assets were ultimately transferred to
11    Barclays as a result of changes in the 15c3
12    calculation?
13        A.   I was not aware.
14        Q.   OK.  I want to show you a, several
15    spreadsheets, just because I want to understand
16    the genesis of what you were doing in the
17    different spreadsheets, because we have seen
18    dozens of them.  I just want to try to get a sense
19    of that.
20        A.   This exhibit, by the way, is a data
21    dump into a report writer.  So it is -- this is
22    the transaction that was booked, this is just a
23    reflection of what it looked like in individual
24    columns.
25        Q.   When you're -- we have to make the
```

Page 92

```
 1          DENIG - CONFIDENTIAL
 2    record clear, you are pointing to Exhibit 233?
 3        A.   233.
 4        Q.   That's the transaction that was
 5    actually booked?
 6        A.   Yes.
 7        Q.   That's the screen shot?
 8        A.   Yes.
 9        Q.   And the other exhibit you pointed to
10    is 134, and that's what?
11        A.   That's just the database that housed
12    this information, and it was spit out to you in a
13    report form.
14        Q.   So the person entering the transaction
15    enters it on the screen similar to those in
16    Exhibit 233, right?
17        A.   No.  It goes from a trader input
18    screen, this -- and it has throughput to our
19    settlement system, which is this.
20        Q.   So Exhibit 233 is your settlement
21    system?
22        A.   Yes.
23        Q.   And Exhibit 134 is just a large
24    database containing every entry?
25        A.   Yes.
```

Page 93

```
 1          DENIG - CONFIDENTIAL
 2        Q.   OK.  Let's mark this.
 3             (Exhibit 234, document Bates stamped
 4        10031692 with attachment marked for
 5        identification, as of this date.)
 6        Q.   Ms. Denig, I am handing you a copy of
 7    an exhibit marked 234, which is an e-mail stream
 8    on Friday, the 19th, with an attached spreadsheet.
 9             My question to you is, do you recall
10    this e-mail?
11        A.   Yes.
12        Q.   What do you recall about what's going
13    on at this time in connection with this e-mail?
14        A.   They were trying to figure out what
15    prices that Lehman had at the time.
16        Q.   Prices of what?
17        A.   The market value of the individual
18    CUSIPs that were sent to Barclays.
19        Q.   In connection with the September 18
20    repo?
21        A.   Yes.
22        Q.   So if you turn to the attachment,
23    which is a spreadsheet, were you involved in
24    preparing that spreadsheet?
25        A.   No, I was not.
```

Page 94

DENIG - CONFIDENTIAL

1  
2   Q. Who prepared this?
3   A. The technology guy from GFS.
4   Q. And do you know what this spreadsheet
5  is meant to reflect?
6   A. Details of the individual positional
7  data, with quantities and prices and the pricing
8  sources and what the total market values were.
9   Q. Of what pool of securities?
10   A. The securities that were sent to
11  Barclays.
12   Q. So we have talked about a lot of
13  different securities. Is this the securities --
14   A. That were physically sent to Barclays.
15   Q. On the --
16   A. 18th.
17   Q. When you say sent to Barclays, you
18  mean posted into the BoNY account on behalf of
19  Barclays in connection with the September 18 repo?
20   A. Yes.
21   Q. Where does this pricing data come
22  from? You will see to the left --
23   A. For this, it is GFS. But where GFS
24  gets its pricing from, it is multiple sources, and
25  that's defined here in the price source column,

Page 95

DENIG - CONFIDENTIAL

1  
2  and then each system, TMS has a pricing hierarchy,
3  MTS has a pricing hierarchy.
4   Sometimes you see Chase is one of the
5  things. That's when there is no price in MTS or
6  TMS.
7   Q. So most of these prices are coming
8  from MTS, correct?
9   A. Yes.
10   Q. Do you know what use, to what use this
11  spreadsheet was put?
12   A. No.
13   Q. Do you recall discussions with
14  Mr. Forrest on Friday about the spreadsheet?
15   A. No.
16   Q. Why is he copying you? Why is he
17  sending the copy to you?
18   MR. SHAW: Objection, foundation.
19   A. I had the relationship with the
20  technology folks from GFS.
21   Q. So is he asking you to make sure they
22  got it right or is he --
23   A. He is making sure that they got it not
24  particularly right, but that they were able --
25  that Bill was able to provide the values.

Page 96

DENIG - CONFIDENTIAL

1  
2   Q. Let's mark this.
3   (Exhibit 235, document Bates stamped
4  10253250 with attachment marked for
5  identification, as of this date.)
6   Q. Ms. Denig, I am handing you a copy of
7  a document marked Exhibit 235, which is an e-mail
8  stream from Friday, September 19, also with an
9  attachment.
10   My -- so my question to you is, have
11  you ever seen this e-mail?
12   A. I do.
13   Q. And what is this?
14   A. It was a download from GFS of all the
15  individual securities that we physically sent to
16  Barclays with what GFS determined is the market
17  value.
18   Q. So the market value prices on these
19  securities were determined by GFS?
20   A. Yes.
21   Q. And if we look on the first page of
22  this, of the attachment, do you see the little
23  chart of collateral, market value? Do you see
24  that?
25   A. Um-hm, yes.

Page 97

DENIG - CONFIDENTIAL

1  
2   Q. And so is that -- what does that chart
3  reflect?
4   A. The market value for the collateral
5  that was -- it was Fed deliverable securities like
6  U.S. Treasuries, agencies, was worth 28 billion
7  based on the information that GFS came up with.
8  The collateral that was sent from the DTC
9  location, 074, valued 10 million.
10   The DTC -- the value of the collateral
11  that was in DTC location 636 was worth the
12  4 billion, and the TP cash was the 7 billion in
13  cash.
14   Q. So this totals to 49.9 billion. Is
15  that -- does that reflect all the collateral and
16  cash that was posted to the September 18 repo?
17   A. Not based on Friday, no. This was
18  missing data.
19   Q. What was it missing?
20   A. The stuff we did Friday morning and
21  any subsequent data, any other subsequent
22  deliveries.
23   Q. So as of Friday, this is the amount
24  that had been posted to the September 18 repo?
25   A. Yup, yes.

Page 98

DENIG - CONFIDENTIAL

1
2    Q.   And when you see --
3    A.   That little summary was my summary
4  based on this information.
5    Q.   Well, here is my question.  I am
6  trying to figure out what's the difference between
7  Exhibit 235 and Exhibit 234.
8    A.   What's 235?  And 234?
9    Q.   234 is the one we previously looked
10  at.
11   A.   I don't think anything.  I think it
12  was the same stuff.  I think I took the same file
13  and just made it more in a way that people
14  understood what it was.  Deleted some columns and
15  only included the things I needed.
16   Q.   Well, it is ten times as thick as
17  Exhibit 234.  How could it be the same data?
18   A.   This is the whole file here?
19   Q.   That's what we received.  I don't know
20  if it was --
21   A.   Oh, then this.  This is definitely not
22  the whole file.
23   Q.   That was my question.
24   A.   Yeah.
25   Q.   So 234 is incomplete?

Page 99

DENIG - CONFIDENTIAL

1
2    A.   Yes.
3    Q.   235, Exhibit 235 is a complete file
4  reflecting the collateral that was posted to this
5  September 18 repo?
6    A.   It was a complete file based on the
7  stuff that actually physically got delivered, yes.
8    Q.   As of Thursday --
9    A.   As of Thursday evening.
10   Q.   And the 7 billion for TP cash is the
11  amount of the box loan that went to that repo?
12   A.   Yes, it was.
13   Q.   As to this set of collateral, and I'm
14  not talking about stuff that was transferred
15  later, as to this set of collateral, did the
16  valuation of any of it change over the weekend?
17   A.   I have no idea.
18       MR. SHAW:  Objection to form.
19   A.   I have no idea.
20   Q.   Because I see --
21   A.   Just to clarify, like the market
22  values that are done here is just based on what we
23  are getting spitted out.  It is not anything that
24  we are determining.  It is not anything that we
25  are manipulating.  It was literally a data dump

Page 100

DENIG - CONFIDENTIAL

1
2  from our GFS system.
3    Q.   That's the GFS system that you guys
4  use in the regular course of business?
5    A.   It is.
6         But market values, market value is
7  only needed to determine exposure with clients,
8  not really any other value.
9         With repos, it is all about the cash
10  that gets actually transferred to and from.  So we
11  always cared about the physical principal value of
12  what was transacted on the day that the trade
13  settled.
14   Q.   I'm not sure I understood that.  You
15  mean the party receiving the collateral cares how
16  much it is worth, they have a haircut associated
17  with it?
18   A.   And they have like an everyday
19  exposure calculation that gets done, so that's the
20  only thing where market value comes into play.
21   Q.   Well, this is the market value that
22  your GPS system --
23   A.   GFS.
24   Q.   GFS system spit out when you asked for
25  a list of all the collateral that had been posted

Page 101

DENIG - CONFIDENTIAL

1
2  to the September 18 repo, correct?
3    A.   That's correct.
4    Q.   That's the market value that was
5  carried on your system in the normal course of
6  business?
7    A.   For that day, yes.
8    Q.   And so did you adjust it, did you
9  adjust the market value based on the amount of
10  cash that was paid for these securities?
11   A.   I did not touch the market value of
12  anything.  This is literally a determined field
13  that was spit out to us.  We didn't touch that.
14   Q.   I guess I am trying to understand your
15  explanation previously about all that matters is
16  the amount of cash.
17   A.   But the cash was booked as 45 billion.
18  We delivered everything with zero value.  You know
19  that.
20   Q.   So you're saying when you posted the
21  transaction, you posted the actual amount of cash
22  and ascribed a zero value to the collateral?
23   A.   That's correct.
24   Q.   OK.  So again just taking this list of
25  collateral that you assembled either Thursday

Page 102

DENIG - CONFIDENTIAL

1   DENIG - CONFIDENTIAL
2   night or Friday morning and not including the
3   things that were transferred later, right, but to
4   your knowledge, did this list of collateral change
5   at all over the weekend?
6       MR. SHAW:  Just so we are clear, you
7   are indicating Exhibit 235?
8       MR. HINE:  Yes.
9       MR. SHAW:  Objection to form.
10      A.   Why would it -- why and how could it
11  change?  This was physically delivered to the
12  client.
13      Q.   This list was physically delivered to
14  the client?
15      A.   Yeah.
16      Q.   By the client, you mean Barclays?
17      A.   Barclays.
18      Q.   Ms. Denig, I see you reference in some
19  e-mails to something called a depot analysis.
20  What is that?
21      A.   I don't know, I have to see it.
22      Q.   Do you have a recollection of the term
23  "TMS depot analysis"?
24      A.   Yes.
25      Q.   What do you recall?  While we are

Page 103

1   DENIG - CONFIDENTIAL
2   pulling out the chart.
3       A.   It was securities that we were to --
4   where we thought we were able to determine as
5   unencumbered, and then a -- give it to the
6   clearance folks to look into DTC terminals
7   directly to determine whether or not it was in
8   fact unencumbered.
9       Q.   So this is in connection with the
10  search for unencumbered assets that were
11  eventually going to be transferred to Barclays?
12      A.   Yes.
13      Q.   So just so --
14      A.   I think.
15      Q.   See if I understand.  A depot --
16      A.   I don't know, to be honest with you.
17  I really shouldn't have answered it.
18      Q.   Let me have the document.
19      (Exhibit 236, document Bates stamped
20      10328102 with attachment marked for
21      identification, as of this date.)
22      Q.   Ms. Denig, I am handing you a copy of
23  a document marked as Exhibit 236, which is a
24  September 20th e-mail from yourself, and the
25  subject is "TMS Depot Analysis Detail, Main."  And

Page 104

1   DENIG - CONFIDENTIAL
2   it has a lengthy spreadsheet attached to it.
3       Have you ever seen this document
4   before?
5       A.   This is -- this document was provided
6   to us by the Treasury, Rob Azerad and John Vergel
7   de Dios, and I just forwarded it to Jim.
8       Q.   And what is your understanding of what
9   this document is supposed to reflect?
10      A.   Everything we knew in some depot that
11  was still belonging to LBI.
12      Q.   Depot meaning --
13      A.   Depot.
14      Q.   What is that?
15      A.   Depository -- I don't know how to
16  explain it to you.  Box, they call it boxes.
17      Q.   Does that include the 074 box?
18      A.   Yes.
19      Q.   Does it include the 636 box?
20      A.   Yes, it does.
21      Q.   And any other boxes or possible
22  location where Lehman could have some securities,
23  correct?
24      A.   Yes.
25      Q.   So this, does this depot analysis, is

Page 105

1   DENIG - CONFIDENTIAL
2   this the starting point for the effort to locate
3   unencumbered assets?
4       A.   Yes, it was.
5       Q.   So in other words, whoever was engaged
6   in that effort would look through these securities
7   and try to figure out which ones were
8   unencumbered?
9       A.   Yes.
10      Q.   We have to be careful not to talk over
11  each other when we are answering questions.
12      Ms. Denig, I am handing you a copy of
13  the document previously marked as Exhibit 145B.
14  If you could take a moment to look at it.
15      Have you had a chance to look at it?
16      A.   Um-hm.
17      Q.   Have you ever seen this document
18  before?
19      A.   Yes.
20      Q.   Can you tell me what it is?
21      A.   It is what we determined that night to
22  be what we felt, based on the information that we
23  had at the time, to be unencumbered assets.
24      Q.   This is Sunday night?
25      A.   Saturday night to Sunday morning.

| Page 106 | Page 107 |
|---|---|
| DENIG - CONFIDENTIAL | DENIG - CONFIDENTIAL |

**Page 106**

1         DENIG - CONFIDENTIAL
2     Q.   So it is Saturday night, September 20?
3     A.   September 20 to 4:30 in the morning on
4  Sunday, the 21st.
5     Q.   So this, it is entitled "Depot
6  Analysis," and who was making the determination
7  that you just described?
8     A.   Do you mean whether these assets were
9  available?
10    Q.   I thought you just said that this is a
11 spreadsheet reflecting what you thought as of the
12 end of Saturday, the 20th, might be unencumbered
13 assets; is that right?
14    A.   Yes.
15    Q.   Who made that determination?
16    A.   Jim Hraska, myself and Bill Panneillo.
17    Q.   And is it in fact -- let me back up.
18        If you turn to page 2, you will see a
19 small spreadsheet which totals market value of
20 1.19 billion.  Do you see that?
21    A.   Yes.
22    Q.   Is that the 1 billion and change that
23 you discussed earlier in your testimony that was
24 transferred to Barclays on Friday?
25    A.   No, it was not.

**Page 107**

1         DENIG - CONFIDENTIAL
2     Q.   How is this different?
3     A.   This is in addition to that.
4     Q.   All right.  So this, just so I
5  understand the sequence, that 1 billion and change
6  is transferred on Friday, and then there is a
7  continuing effort to find unencumbered assets
8  after that?
9     A.   Yes.
10    Q.   This is as of Saturday night, you or
11 whoever had determined that there was a
12 1.19 billion in unencumbered assets available?
13    A.   As far as we could tell from the
14 information that we had.
15    Q.   And did you find further unencumbered
16 assets later?
17    A.   I wasn't involved after this, as far
18 as trying to locate them.  I was involved in
19 trying to determine the ones that we felt were,
20 and work with settlements to determine whether or
21 not they were in fact, but any further
22 determination of assets, I was not a part of
23 anymore.
24    Q.   I thought you said you were involved
25 up until the 29th and 30th of September?

**Page 108**

1         DENIG - CONFIDENTIAL
2     A.   For these.
3     Q.   For the ones that -- on this chart?
4     A.   Yes.
5     Q.   And were these, were these 1.19
6  billion in assets eventually transferred to
7  Barclays?
8        MR. SHAW:  Objection, foundation.
9     A.   I don't know for sure.
10    Q.   They could have been but you don't
11 know either way?
12    A.   That's right.
13    Q.   You can't tell from this chart?
14    A.   No.
15    Q.   Let's try this.
16        (Exhibit 237, document Bates stamped
17 10252914 with attachment marked for
18 identification, as of this date.)
19    Q.   Ms. Denig, I am handing you a copy of
20 a document marked Exhibit 237, which is an e-mail
21 dated September 22, which forwards an earlier
22 e-mail in which you are the author and also
23 attaches a chart of some -- a spreadsheet of some
24 sort.
25        After you have had a chance to look at

**Page 109**

1         DENIG - CONFIDENTIAL
2  that, let me know.
3     A.   OK.
4     Q.   Have you had a chance to look at that?
5     A.   I did.
6     Q.   Have you seen this document before?
7     A.   I have.
8     Q.   Can you tell me what it is?
9     A.   It is a file from BoNY telling us what
10 was pledged Friday morning.
11    Q.   So this chart, this spreadsheet was
12 prepared by BoNY?
13    A.   Yes.
14    Q.   And the values on here are values that
15 BoNY assigned to the securities in question?
16        MR. SHAW:  Objection, foundation.
17    A.   I assume so.
18    Q.   Now, again I'm just trying to
19 understand it in terms of all the other pools of
20 securities we have been talking about.  This is
21 what BoNY reports was transferred to its account
22 from Lehman on Friday?
23    A.   Yes.
24    Q.   Is this -- to your understanding, is
25 this the 1 billion plus securities that we talked

Page 110

DENIG - CONFIDENTIAL

1 about earlier?
2
3     A.    Yes.
4     Q.    Is that the only pool of securities
5 that you know of that was transferred on Friday?
6     A.    Yes.
7     Q.    OK, OK.  Do you know why BoNY was
8 sending you this?
9     A.    We asked for it.
10    Q.    And what -- why did you want it?
11    A.    Because we wanted to be able to
12 reflect on, through our reconciliation process,
13 which securities physically did go to Barclays.
14    Q.    As to the securities that went on
15 Friday morning, was there any difference between
16 the pool of securities that BoNY had identified
17 and the ones that you thought went?
18    A.    No, I don't know if I can answer that
19 question.
20    Q.    Well, in the reconciliation -- you had
21 a reconciliation process?
22    A.    Yes.
23    Q.    After the 22nd, between -- to try to
24 reconcile the securities that had been transferred
25 in connection with the September 18 repo; is that

Page 111

DENIG - CONFIDENTIAL

1 right?
2
3     A.    Yes.
4     Q.    And you were involved in that?
5     A.    Yes.
6     Q.    Did you ultimately successfully
7 reconcile all the transfers?
8     A.    All but five I think.
9     Q.    And was there a great disparity
10 between what BoNY had reported and what Lehman had
11 reported?
12    A.    No.
13    Q.    So it was fairly straightforward --
14    A.    It was a three-way rec.  It was a rec.
15 that BoNY sent us, a rec. that Barclays knew on
16 their books and Lehman knew on their books, so it
17 was all three reconciled.  There was five
18 discrepancies originally.
19    Q.    The scope of the reconciliation was
20 the assets that were transferred on the Thursday,
21 the 18th, as well as what was transferred on
22 Friday, the 19th?
23    A.    Yes, it was.
24    Q.    Were there any other transfers that
25 were part of that reconciliation?

Page 112

DENIG - CONFIDENTIAL

1
2     A.    No, there was not.
3     Q.    So just those two days worth of
4 transfers?
5     A.    Yes.
6     Q.    I apologize about walking through all
7 these spreadsheets, but I am trying to understand
8 what happened during that week.
9     OK, Ms. Denig, I am handing you a copy
10 of an exhibit marked 146B, which is an e-mail with
11 several spreadsheets attached to which you were a
12 recipient.
13    Have you ever seen that document
14 before?
15    A.    Um-hm.
16    MR. SHAW:  You need to say yes or no.
17    A.    Yes.
18    Q.    What is this document?
19    A.    To be honest with you, right from the
20 get-go, we are like what are you talking about?
21 We knew five securities being reconciled, so I
22 don't know what his list, what he is calling
23 Lehman referred to.
24    Q.    "He" meaning Mr. Azerad?
25    A.    Yes.

Page 113

DENIG - CONFIDENTIAL

1
2     Q.    Do you recall a discussion about
3 reconciling 1,165 CUSIPs?
4     A.    No.  I think we alleviated the fact
5 that the records that he had was to try to
6 determine what he was talking about, because it
7 wasn't the reconciliation that we had already
8 performed at this particular time, and we were
9 reconciled.
10    Q.    This is September 28, so in your view,
11 you and Mr. Hraska had already reconciled the
12 transactions from the Thursday and Friday,
13 correct?
14    A.    Yes.
15    Q.    So this is a --
16    A.    With Barclays, with BoNY, so --
17    Q.    This is after the fact, Mr. Azerad
18 raising an issue?
19    A.    Um-hm.
20    Q.    How did it end up?
21    A.    That I don't recall actually.
22    Q.    If you turn to behind the first blue
23 sheet, you will see a kind of summary spreadsheet.
24 Do you see that?
25    Do you have an understanding of what

Page 114

DENIG - CONFIDENTIAL

1  this chart means?
2      A.  I have a vague recollection of seeing
3  it. I don't remember what it was about.
4      Q.  Does this whole -- is it fair to say
5  this whole e-mail proved not to be a very big
6  issue and was reconciled in the end?
7      A.  I would believe so, yes.
8      Q.  Maybe you could answer me a question
9  while we wait for the exhibit. I see -- I am
10  fascinated with the titles of the different
11  spreadsheets that we see here, and we are trying
12  to figure out what they are.
13      I see some spreadsheets entitled
14  "Book 1" and "Book 2," "Book 3," all the way up to
15  Book 10. Do you recall what they were?
16      A.  Yes. Book 1, when you create a
17  spreadsheet and you don't save it with any
18  particular name, it will save as Book 1, and if
19  you had multiple books open on your machine, it
20  will save whatever sequence of numbers there is or
21  there are at the time.
22      Q.  It is not booking transactions, it is
23  a name that the system ascribes to it?
24      A.  Automatically.

Page 115

DENIG - CONFIDENTIAL

1
2      Q.  OK, I've got you. That is no longer
3  an issue in the case anymore.
4      Let's mark this.
5      (Exhibit 238, document Bates stamped
6      BCI-EX4324 with attachment marked for
7      identification, as of this date.)
8      Q.  Ms. Denig, I am handing you a copy of
9  a document marked 238, which is an e-mail dated
10  September 27. The subject is "Fed Collateral with
11  Original Face." Take a minute and take a look at
12  it.
13      Have you had a chance to look at it?
14      A.  Yes.
15      Q.  Have you ever seen this before?
16      A.  Um-hm, yes.
17      Q.  What is it?
18      A.  The original download that GFS gave or
19  when -- Paolo's group was doing the same type of
20  reconciliation that we were with the more senior
21  folks at Barclays. Mine were with the ops folks
22  at Barclays. They -- the file that -- when they
23  downloaded it, they didn't include something
24  called original face. So when you have a mortgage
25  security, you have an original face, and then

Page 116

DENIG - CONFIDENTIAL

1
2  there is a factor associated to it, and then a
3  current face and then the principal value or
4  market value.
5      Here our system, the GFS system only
6  took in the current face and not the original
7  face, or it was a separate column. It was just
8  not a column that they deemed -- they took in when
9  they did, built the query in GFS.
10      Q.  Face meaning face value?
11      A.  Yes, par value or whatever.
12      Q.  So this was Mr. Tonucci asking you to
13  provide him some additional data on the face
14  value, the original face values of certain
15  securities that he was trying to reconcile?
16      A.  Yes. So basically they took the
17  original list and said, they had a column called
18  "Quantity," OK, but the quantity was technically
19  current face, which would be the par value times
20  any factor, and then that would deposit into the
21  column named "Quantity" in GFS.
22      So they needed to include "Original
23  Face" as the column heading, so I just did it. I
24  literally took the same query.
25      Q.  Do you know why they wanted that?

Page 117

DENIG - CONFIDENTIAL

1
2      A.  Because I think that was -- ended up
3  being the 1100 discrepancies they had with
4  Barclays.
5      Q.  You are referring to the 1100
6  discrepancies on Exhibit 146?
7      A.  Yes.
8      Q.  So just to understand this
9  reconciliation process, you and Mr. Hraska were
10  involved in -- am I correct to say you and
11  Mr. Hraska were involved in reconciling between
12  the three entities the CUSIPs and actual pool of
13  securities that went over?
14      A.  It was me.
15      Q.  OK. And did you -- did your
16  reconciliation involve at all the pricing for
17  those securities?
18      A.  No, it did not.
19      Q.  Or valuation of those securities?
20      A.  It did not.
21      Q.  Was Mr. Tonucci's crew engaged in a
22  reconciliation that had to do with the valuation
23  of these securities?
24      A.  I believe they did.
25      Q.  And were you involved in that at all?

Page 118

DENIG - CONFIDENTIAL

1
2    A.  I was not.
3    Q.  Is it fair to say that you were
4  providing data to Mr. Tonucci as he needed it, but
5  you weren't involved in reconciling the prices of
6  the securities that went over to Barclays?
7    A.  That's correct.
8    Q.  Let's mark this, please.
9       (Exhibit 239, document Bates stamped
10      BCI-EX13384 through 86 marked for
11      identification, as of this date.)
12   Q.  Ms. Denig, I am handing you a copy of
13  a document marked Exhibit 239, which is an e-mail
14  stream from September 23, 2008. I will note that
15  you are not on this e-mail stream. But I did have
16  a question about it.
17       In particular, my question is going to
18  have to do with the e-mail from Mr. Vergel de Dios
19  on the first page.
20       Have you had a chance to look at the
21  document?
22   A.  Yup. I don't understand it, to be
23  honest with you.
24   Q.  I just wanted to ask you a question
25  about the sentence in the middle of the page where

Page 119

DENIG - CONFIDENTIAL

1
2  it says, "We do see a large position break which
3  leads to the conclusion that there are price
4  factor differences between Lehman and Barclays,"
5  and then it is followed by a chart. Do you see
6  that?
7    A.  OK.
8    Q.  Do you see where I am referring to?
9    A.  The 19 billion you're talking about?
10   Q.  Well, there is a chart that shows
11  position, 92 billion, and then there is a Barclays
12  position of 92 billion, and there is a Lehman
13  position of 72 billion. Do you see that?
14   A.  Yes.
15   Q.  Do you have any understanding of what
16  this is reflecting?
17   A.  I believe it is because they did not
18  take into account quantity. They were taking into
19  account current value, which is a --
20   Q.  Who is "they"?
21   A.  Paolo Tonucci's team.
22       When querying the data from GFS, you
23  have to define the fields that you are going to
24  take in. If they were taking in quantity, it was
25  current -- like the definition GFS had was that it

Page 120

DENIG - CONFIDENTIAL

1
2  was current face and not the original par value.
3       In order -- the reconciliation that I
4  did was original par value. What they were trying
5  to determine included a factor -- the factors,
6  which was wrong, which I think they subsequently,
7  very quickly realized that.
8    Q.  So this was --
9    A.  Based on some communications.
10   Q.  This eventually became --
11   A.  A non-event.
12   Q.  A non-event? OK.
13       Were you involved, Ms. Denig, in
14  preparing what has been called Schedule A in
15  connection with the Barclays/Lehman sale
16  transaction?
17   A.  I was not involved in preparing it,
18  no.
19   Q.  Do you know what it is?
20   A.  I was under the assumption it was
21  regarding the repo transaction or the collateral
22  that went in the repo.
23   Q.  Do you have any other understanding?
24   A.  No.
25   Q.  Did you ever hear of anything called

Page 121

DENIG - CONFIDENTIAL

1
2  the clarification letter in connection with the
3  Lehman/Barclays transaction?
4    A.  No.
5    Q.  Did you have any understanding that
6  Schedule A was a schedule to a clarification
7  letter of any kind?
8    A.  No.
9    Q.  What is -- would it be fair to say
10  that your role in connection with what became
11  Schedule A was simply preparing the spreadsheets
12  we have been going over?
13   A.  In most cases I did not prepare them.
14   Q.  OK.
15   A.  I received them.
16   Q.  OK, but -- let me try it this way.
17  Other than what you have described for us today as
18  to your role during that week, particularly
19  Thursday, Friday, on into the following week, did
20  you have any role in preparing what later became
21  known as Schedule A?
22   A.  I guess so.
23   Q.  In what way?
24   A.  Because I was -- after the
25  reconciliations, then we got our files from BoNY

Page 122

DENIG - CONFIDENTIAL

1
2  as to what they physically received. That is what
3  was communicated upstream to management.
4      Q.  So you were -- wasn't that part of the
5  reconciliation process?
6      A.  Um-hm, yes.
7      Q.  So BoNY communicated to you what they
8  had received, you compared that to what you
9  thought you had sent --
10     A.  Was booked.
11     Q.  And Barclays compared it to what they
12 recorded as well?
13     A.  That's correct.
14     Q.  So the net effect, the net result of
15 that reconciliation process is a list of
16 securities that all parties agreed were
17 transferred on either Thursday or Friday of the
18 week of the 15th?
19     A.  That's correct.
20     Q.  And is it your understanding that that
21 becomes Schedule A?
22     A.  That was my understanding.
23     Q.  I think we might have asked this
24 earlier. Do you have any understanding of what
25 Schedule B is to the clarification letter?

Page 123

DENIG - CONFIDENTIAL

1
2      MR. SHAW:  Asked and answered.
3      A.  No.
4      Q.  Did you have any role in assembling
5  pieces of information for anything that you
6  understood to be Schedule B?
7      A.  No.
8      MR. SHAW:  Asked and answered.
9      Q.  A follow-up on a question we had
10 earlier. If I could show you a copy of what has
11 been previously marked as Exhibit 143B. I'm not
12 sure if you have ever seen this before, Ms. Denig,
13 but my question has to do with the spreadsheet
14 that's attached to this e-mail and whether you
15 have ever seen that before.
16     Have you ever seen that spreadsheet
17 before?
18     A.  I have.
19     Q.  What is that?
20     A.  It was a list given to us by Barclays
21 saying that these are the assets they don't want.
22     Q.  So this is the list of excluded assets
23 that you were not allowed to put into the
24 September 18 repo?
25     A.  That's correct.

Page 124

DENIG - CONFIDENTIAL

1
2      Q.  Did you ever have any discussions with
3  folks at Barclays about why they didn't want those
4  assets?
5      A.  No, I did not.
6      (Exhibit 240, document Bates stamped
7      BCI-EX18553 with attachment marked for
8      identification, as of this date.)
9      Q.  Ms. Denig, I am handing you a copy of
10 an exhibit marked 240, which is an e-mail dated
11 Monday, the 29th, from yourself to several people
12 with an attached file.
13     And after you have had a second to,
14 minute to look at it, I want to ask you questions
15 about it.
16     A.  OK.
17     Q.  Have you ever seen this document
18 before?
19     A.  Yes.
20     Q.  What is this?
21     A.  This is the list of CUSIPs that were
22 reconciled between Lehman and Barclays as part of
23 the 9/18 repo transaction.
24     Q.  This is -- is this what we previously
25 talked about, you had this three-way

Page 125

DENIG - CONFIDENTIAL

1
2  reconciliation, and this is the agreed-upon list
3  of the securities that were transferred on the
4  Thursday and Friday of the week of the 15th?
5      A.  Yes.
6      Q.  And it says here master file of CUSIP,
7  so is this -- is it your understanding that this
8  is the final list of the securities that were
9  transferred on those two dates?
10     A.  Yes, it was.
11     Q.  You see in this chart it says market
12 price? Do you see that?
13     A.  Yup.
14     Q.  Where did that price come from?
15     A.  GFS.
16     Q.  That's the Lehman GFS price?
17     A.  Yes.
18     Q.  OK. Thank you.
19     Let's mark this, please.
20     (Exhibit 241, document Bates stamped
21     BCI-EX17607 and 08 with attachment marked
22     for identification, as of this date.)
23     Q.  I am handing you a copy of a document
24 marked as Exhibit 241, which is an e-mail from
25 Monday, September 29, and an attached spreadsheet.

Page 126

DENIG - CONFIDENTIAL

1  When you get a chance to look at it, let me know.
2  I have a question or two about it.
3       Have you had a chance to look at that?
4       A.  I have.
5       Q.  Have you ever seen this before?
6       A.  Yes.
7       Q.  Could you tell me what it is?
8       A.  It is CUSIPs that we determined to be
9  unencumbered on the weekend of -- or the 20th,
10  Saturday, the 20th, and the 21st.  This was then
11  sent to our securities clearance area for them to
12  determine whether or not in fact they were
13  unencumbered, and then they went ahead and made
14  delivery of these.
15       Q.  So this -- am I correct to say this --
16  you will see the spreadsheet reflects 269 million
17  dollars worth of securities, correct,
18  approximately?
19       A.  Market value.
20       Q.  Yes.
21       A.  Yes.
22       Q.  And those securities were, in fact,
23  transferred to Barclays?
24       A.  As my -- I believe they were.

Page 127

DENIG - CONFIDENTIAL

1       Q.  Is this the sum total of the
2  securities that were found in the 636 box in
3  connection with the unencumbered, search for
4  unencumbered assets that we talked about before?
5       MR. SHAW:  Objection to form.
6       A.  Yes, it was.
7       Q.  Do you recall after this whether any
8  further securities were found in the 636 box?
9       A.  No idea.
10       Q.  No?
11       You see in the e-mail toward the
12  bottom, it talks about getting the chill listed on
13  two CUSIPs.  Do you see that?
14       A.  Yes.
15       Q.  What does that refer to?
16       A.  It is an action that DTC takes with
17  regard to certain securities.  If -- when they put
18  something on a chill, that means that they are
19  subject to a corporate action.  Once the corporate
20  action is either deemed to not be valid or they
21  are not going to -- or they have transacted the
22  corporate action, they take it off of chill and
23  now it is available for deliveries.
24       Q.  So if the chill is removed, it becomes

Page 128

DENIG - CONFIDENTIAL

1  unencumbered?
2       A.  Yes.
3       Q.  And now, when you see toward the top,
4  there is an e-mail from Mr. Hraska saying, "Here
5  is additional collateral from 636 today delivered
6  by the administrator."
7       And maybe you have answered this
8  already.  Is this the -- you had previously talked
9  about a delivery of collateral to Barclays on the
10  29th, right?
11       A.  Yes.
12       Q.  And so this is the collateral that was
13  delivered on the 29th, to your understanding?
14       A.  Yes.
15       MR. HINE:  We can take a break for
16  lunch.
17       (Recess)

Page 129

DENIG - CONFIDENTIAL
AFTERNOON SESSION
12:48 p.m.

1  BY MR. HINE:
2       Q.  Good afternoon, Ms. Denig.
3       A.  Good afternoon.
4       Q.  Hope you had a nice lunch.
5       A.  I did.
6       Q.  If you wouldn't mind, I would like to
7  continue through a parade of a couple of
8  documents, ask you some questions about them.
9       Let's mark this as 242.
10       (Exhibit 242, document Bates stamped
11  BCI-EX17576 marked for identification, as of
12  this date.)
13       Q.  I am handing you a copy of a document
14  marked as Exhibit 242, which is an e-mail dated
15  September 29th from Mr. Hraska, cc to you.  If you
16  could take a minute and just review it.
17       A.  OK.
18       Q.  Have you had a chance to look at that?
19       A.  Yes.
20       Q.  Have you seen this document before?
21       A.  Yes.
22       Q.  What is this document about?

Page 130

DENIG - CONFIDENTIAL

1
2    A.   It is just about how we are going to
3    adjust Lehman's books and records for the fact
4    that the defaulted repo no longer exists on their
5    books.
6    Q.   Do you see the title or subject talks
7    about balance sheet reduction?  What does that
8    mean?
9    A.   It means that as a reverse repo or I
10   mean as a repo transaction, because it is a loan,
11   the inventory still sits on the balance sheet of
12   Lehman Brothers.  What we are trying to do here
13   is, the fact that Barclays took ownership of those
14   securities due to the defaulted repo, we had to
15   remove those assets from Lehman's books.
16   Q.   So this is removing them from Lehman's
17   balance sheet?
18   A.   That's correct.
19   Q.   Is this part of helping Barclays
20   establish an opening balance sheet for the Lehman
21   assets it has now acquired?
22   A.   No.  This was strictly on the Lehman
23   side.
24   Q.   Did the result of this exercise get
25   somehow translated into Barclays' books?

Page 131

DENIG - CONFIDENTIAL

1
2    MR. SHAW: Objection.
3    A.   No.
4    Q.   Did you have any role -- I think we
5    might have covered this before.  Did you have any
6    role in how Barclays accounted for the
7    transaction?
8    A.   No, I did not.
9    Q.   Did you have any role in how Barclays
10   accounts for the securities that it acquired in
11   the -- through the September 18 repo?
12   A.   No.
13   Q.   Do you know how Barclays values the
14   securities that it acquired through the
15   September 18 repo?
16   A.   No.
17   Q.   You see in this e-mail there is a
18   section called "Fed Eligible Collateral"?  Do you
19   see that?
20   A.   Yes.
21   Q.   The first item talks about reconciling
22   the Fed deliverable securities sent on the 18th.
23   Do you see that?
24   A.   Yes.
25   Q.   I thought you said your reconciliation

Page 132

DENIG - CONFIDENTIAL

1
2    was completed by early in that week.
3    A.   Yes, it was.
4    Q.   So what is this referring to?
5    A.   I think he was just listing out all
6    the steps that are taken to do this.
7    Q.   So that step had been completed by
8    Monday, the 29th?
9    A.   It was.
10   Q.   Next it talks about unwinding cash
11   only, I guess that means cash only trades in MTS
12   that represent triparty cash total.  Do you see
13   that?
14   A.   Yes.
15   Q.   What does that mean?
16   A.   The way that we booked the
17   transaction, where the securities were booked for
18   free for the individual CUSIPs, and we represented
19   the cash via the shell tickets.
20   Q.   Um-hm.
21   A.   Those are considered the cash only
22   ticket, so they had a problem reconciling to Chase
23   because Chase wasn't giving us certain records as
24   to what the -- all the cash unwinding was about.
25   I wasn't involved in that

Page 133

DENIG - CONFIDENTIAL

1
2    reconciliation.  That was done by cash management.
3    Q.   So that the cash only trades are the
4    way you booked them in Exhibit 134 that we talked
5    about earlier?
6    A.   Yes.
7    Q.   Now, unwinding them has to do with
8    problems associated with Chase?
9    A.   Yes.
10   Q.   And you weren't involved in that?
11   A.   I was not.
12   Q.   Do you have any understanding of how
13   they are unwound?
14   A.   The same way we did ours, just putting
15   the end dates of the 22nd on all the transactions
16   and then reconciling the cash that physically
17   moved from Barclays that came into Chase, and then
18   it is supposed to clear it against the actual
19   securities that we have booked at Lehman.
20   That reconciliation, because it is not
21   a traditional delivery versus payment type of
22   scenario, that they need you to represent that
23   somehow.  I don't know how they did their
24   reconciliation, though.
25   Q.   You weren't involved in their --