# A. 7 (B)

Page 134

DENIG - CONFIDENTIAL

1
2     A.   I was not.  I was involved in just the
3  transfer of assets.
4     Q.   Do you have any understanding of the
5  dispute that arose involving Chase over the
6  weekend of the 21st?
7     A.   Heard things, but not definitively.
8     Q.   What did you hear?
9     A.   That they were basically stuck -- they
10  kept all the -- they took ownership of our Lehman
11  box and they were going to try to sell the
12  securities to raise cash, to recoup some of the
13  box loan scenario that they had.  Because there
14  was more to it than just the 7 billion.  There was
15  an additional -- we were short cash -- Lehman was
16  short cash at the end of that night as well.
17     Q.   When you said "they," you were talking
18  about Chase?
19     A.   Yeah, yes.
20     Q.   That night is Friday night?
21     A.   Saturday -- sorry, Thursday,
22  September 18.
23     Q.   In addition to the 7 billion dollars
24  box loan that we talked about earlier, Lehman was
25  short cash of an additional amount?

Page 135

DENIG - CONFIDENTIAL

1
2     A.   Yes.
3     Q.   Is that due to the failure of a
4  rollover of a repo that Barclays had previously
5  supplied every night?
6     A.   Well, the fact that they provided
7  funding for the additional assets that were in our
8  box, yes, so we didn't have the cash to represent
9  that.
10     Q.   Do you know how much cash we are
11  talking about?
12     A.   15 billionish.
13     Q.   Just so I can understand it, and there
14  is two separate repos here, a September 18 repo
15  that we have been talking about?
16     A.   Yes.
17     Q.   And then Barclays had an individual
18  nightly repo starting on Monday, the 15th; is that
19  right?
20     A.   Yes.
21     Q.   And that's the repo that failed to
22  roll over into Thursday?
23     A.   I wouldn't call it failed to roll
24  over.  They didn't provide us funding for the
25  additional assets.

Page 136

DENIG - CONFIDENTIAL

1
2     Q.   And that came as a surprise to you
3  guys?
4     A.   A little bit.
5     Q.   How did you learn about that?
6     A.   It wasn't until probably in the wee
7  hours of the night that that wasn't done.
8     Q.   And what -- do you have any
9  understanding of why it wasn't done?
10     A.   No.
11     Q.   So what actions did you take to -- I
12  assume the failure to provide that funding caused
13  you folks some troubles, right?
14     A.   Yes, it did.
15     Q.   What problems did that cause, that
16  night?
17     A.   The fact that there was no more cash
18  to collateralize that.  Chase was basically short
19  the cash.  They had the assets that we had, but we
20  had no cash to back those assets from anybody.
21     Q.   So what does that cause?
22     A.   Basically the inability to function as
23  a broker/dealer.
24     Q.   OK.  And so what did you do, what did
25  Lehman do to correct that?

Page 137

DENIG - CONFIDENTIAL

1
2     A.   They took a box loan from Chase.
3     Q.   So this is now in addition to the
4  7 billion dollar box loan we talked about earlier?
5     A.   Yes, yes.
6     Q.   So, and how much was this other box
7  loan?
8     A.   I want to say 21 billionish, because
9  there was 5 billion in assets we knew we weren't
10  going to be sending over, and then the 15 billion
11  and change that -- of the repo that we thought we
12  were going to be doing.
13     Q.   Just as of Thursday night then, you
14  had a 7 billion dollar box loan in support of the
15  September 18 repo and you had an additional box
16  loan with Chase in the low 20s?
17     A.   Um-hm.
18     Q.   For just operating capital?
19     A.   Yeah.
20        (Exhibit 243, e-mail dated September
21     19, 2008 at 1:43 a.m. marked for
22     identification, as of this date.)
23     Q.   Ms. Hraska -- Ms. Denig, I am handing
24  you a copy of a document marked as Exhibit 243.  I
25  apologize.

Page 138

DENIG - CONFIDENTIAL

2    A.    That's OK.
3    Q.    It is an e-mail dated September 19.
4  If you could take a moment to look at it before I
5  ask you a question.
6    A.    OK.
7    Q.    Have you ever seen this e-mail stream
8  before?
9    A.    Yes.
10   Q.    Am I correct in assuming that this
11  e-mail stream is reflecting what we just talked
12  about as far as the need for a box loan?
13   A.    Yes.
14   Q.    If you look at the top of the first
15  page, Mr. Hraska writes, "Ties out.  This is a
16  15.8 tri."  Do you see that?
17   A.    Yes.
18   Q.    That's referring to a 15.8 triparty
19  repo between Lehman, Barclays and --
20   A.    Lehman, Barclays.
21   Q.    Why is it called a triparty then?
22   A.    It is a triparty transaction, to tell
23  you how the trade was transacted -- was papered
24  basically.
25   Q.    But there is no custodian?

Page 139

DENIG - CONFIDENTIAL

2    A.    Well, Chase is the custodian.
3    Q.    OK.
4    A.    Sorry.
5    Q.    So that's the third party, Chase?
6    A.    Well, yeah, yes.
7    Q.    So that is the triparty transaction
8  that failed to roll over to the following day on
9  Thursday?
10   A.    Yes.
11   Q.    When it says RACER 5 billion, do you
12  see that?
13   A.    Yes.  That was a security that we had
14  on the books and records of Lehman that they
15  definitely did not want?
16   Q.    "They" meaning?
17   A.    Barclays.  That was never going to go
18  to them.
19   Q.    RACER securities had been in the Fed
20  program?
21   A.    Yes.
22   Q.    And Barclays did not want them?
23   A.    Did not.
24   Q.    Why not?
25       MR. SHAW:  Objection to form, calls

Page 140

DENIG - CONFIDENTIAL

2  for speculation, foundation.
3    A.    I don't know.
4    Q.    You don't know?
5    A.    I don't know why they didn't want it.
6    Q.    Do you have any understanding of why
7  they didn't want it?
8    A.    No.
9    Q.    Can you speculate about why they
10  didn't want it?
11       MR. SHAW:  Objection, calls for
12  speculation.
13   A.    No.
14   Q.    No idea why they didn't want it?
15   A.    Well, it was Lehman-backed RACER.
16   Q.    When I read this e-mail, now back to
17  the e-mail, the box loan was approximately
18  21 billion to cover those two shortfalls, if you
19  will?
20   A.    Well, the value, what was deemed the
21  value of the collateral that we still had in the
22  box, that was not funded, meaning that nobody
23  extended us cash to represent that collateral.
24   Q.    Maybe I am misunderstanding.  The
25  RACER securities were part of the 8 billion

Page 141

DENIG - CONFIDENTIAL

2  shortfall that we talked about earlier?
3    A.    No.
4    Q.    No?
5    A.    No.
6    Q.    So we talked earlier about the Fed
7  collateral that was being placed into the
8  September 18 repo, right?
9    A.    Yes.
10   Q.    And you said there was an 8 billion
11  dollar shortfall, approximately?
12   A.    Yes.
13   Q.    That does not include the RACER?
14   A.    That does not.  We substituted all
15  that collateral and made up the difference, so --
16   Q.    For what?
17   A.    For other types like collateral.
18   Q.    Well, wait.  I am missing -- I'm
19  mixing things.  You substituted collateral for the
20  8 billion shortfall?
21   A.    Yes.
22   Q.    What did you do about the RACER?
23   A.    There was nothing to do.  RACER had
24  nothing to do with anything.  We were never giving
25  the RACER as part of the transaction.  The RACER

Page 142

DENIG - CONFIDENTIAL

1  was part of the excluded list.
2      Q.   So the RACER was in the Fed program
3  and just went back into Lehman's box?
4      A.   Yes.
5      Q.   OK.  And then the 7 billion dollar box
6  loan was to make up for the difference between --
7  it was to make up for what you were unable to put
8  into the September 18 repo, right?
9      A.   That's correct.
10     Q.   Now, this other box loan that we are
11 talking about in this e-mail is just to provide
12 operating funding for Lehman?
13     A.   It's what was left, the collateral
14 that was left in the box that we did not get any
15 additional funding for from anybody on the street,
16 because we didn't have any more liquidity
17 providers.  We didn't have the Fed programs.  We
18 had no more ways to raise cash with the assets
19 that we had in the box.  So technically, Lehman
20 didn't have any cash.
21     Q.   OK.  So you borrowed against the box?
22     A.   Yes.
23     Q.   Approximately 21 billion dollars?
24     A.   Correct.

Page 143

DENIG - CONFIDENTIAL

1      Q.   And to what use was that money put?
2          MR. SHAW:  Objection, foundation.
3      A.   I have no idea.  What do you mean?
4  Like -- it was just to collateralize the assets
5  that we had, to --
6      Q.   Why do you have to do that?
7      A.   You won't be able to operate without
8  it.
9      Q.   So that's operating funds?
10     A.   They won't be able to make any
11 deliveries the next day if we didn't have cash to
12 represent those assets.
13     Q.   Now, that box loan, was that box loan,
14 the 21 billion dollar one, eventually paid off?
15     A.   They seized all the assets.
16     Q.   Who is "they"?
17     A.   Chase.
18     Q.   So Chase was effectively paid off by
19 seizing the assets that provided security for that
20 loan?
21     A.   That's correct.
22     Q.   So those -- so the security,
23 securities that supported the 15.8 billion dollar
24 triparty transaction as well as the RACER was

Page 144

DENIG - CONFIDENTIAL

1  eventually taken by Chase?
2      A.   That's correct.
3      Q.   So that effectively satisfied that 21
4  billion dollar box loan obligation?
5      A.   That's correct.
6      Q.   Could you just turn to the last page
7  of this document.  I just want to try to
8  understand what this e-mail that you are writing
9  to Mr. Hraska means.
10         It says, "Jim, the total cash booked
11 is still 44.2 billion dollars."  Do you see that?
12     A.   Yes.
13     Q.   That's the figure we talked about
14 earlier on the booked amounts chart?
15     A.   Yes.
16     Q.   And it says, "Even though we took the
17 TIBs out, we replaced it with other collateral,
18 and I am pretty sure at the end of the day, the
19 Fed collateral wasn't the problem."
20         What are you referring to there?
21     A.   Well, being -- at 1:30 in the morning,
22 they basically said that there is a problem with
23 the whole transaction that we did after pens were
24 down.  I basically started driving home, I got a

Page 145

DENIG - CONFIDENTIAL

1  phone call, log on when I get home, don't really
2  kind of know what's going on at that particular
3  time.  All I know, that there was a problem with
4  the trade.
5          So I was basically giving him an
6  Overview, saying we delivered all the assets from
7  the Fed -- I have all the delivery settlement
8  instructions saying that they did go, so it wasn't
9  the Fed deliverable type of collateral that was
10 potentially a problem.  I didn't know what the
11 problem was.
12         At the end of the day we knew we were
13 short cash, we didn't know how that happened.  So
14 I was saying it wasn't from my bookings.
15     Q.   This is the 7 billion dollar shortfall
16 you are talking about?
17     A.   No, this is that -- via phone call, he
18 basically said that there is a problem with -- we
19 are short cash and we potentially have to take
20 this 20 billion dollar box loan.
21     Q.   So this relates to the 20 billion
22 dollar box loan, not the 7 billion dollar
23 shortfall?
24     A.   No, no.  That was all finished at that

Page 146

1          DENIG - CONFIDENTIAL
2   particular point.
3        Q.   Is it correct --
4        A.   I went home after that 7 billion was
5   satisfied.
6        Q.   That's done and now this issue comes
7   up?
8        A.   Yes.
9        Q.   Is it probably safe to assume
10  Mr. Hraska was trying to figure out why there was
11  a shortfall at this time?
12       A.   That's right.
13       Q.   And he wasn't aware of the failure of
14  the triparty to roll over?
15       A.   We didn't know it didn't roll at that
16  point, yes.
17       Q.   Any idea --
18       A.   As the e-mails were going on, we were
19  also on the phone, so there was a few things kind
20  of going on.  So you are missing some context
21  here.
22       Q.   Did you eventually figure out even
23  after you went to Barclays why they didn't roll
24  over that triparty?
25       A.   No.

Page 147

1          DENIG - CONFIDENTIAL
2        Q.   No?  Did you ever say, hey, you guys
3   caused us a lot of problems, why didn't you do it?
4        A.   At that point we were bankrupt, so we
5   were employees of Barclays and it was never
6   really -- it didn't matter anymore.
7        Q.   You never found out subsequently why
8   it wasn't rolled over?
9        A.   Nope.
10            (Exhibit 244, document Bates stamped
11       BCI-EX18095 marked for identification, as of
12       this date.)
13       Q.   Ms. Denig, I am handing you a document
14  marked as Exhibit 244, which is an e-mail from
15  September 24 from Mr. Hraska to yourself.
16            My question is, have you ever seen
17  that before?
18       A.   Yes.
19       Q.   Can you -- it says here in the subject
20  line, he is saying to you apparently that you
21  don't say that BoNY is not reputable.  Can you
22  give me some context here of what he was talking
23  about?
24       A.   Yes.  We were in a meeting and they
25  were taking about prices, whose prices were good,

Page 148

1          DENIG - CONFIDENTIAL
2   because they were trying to determine where are we
3   getting prices from, how a trade is being booked,
4   based on what prices.  The files that we had up
5   until that point had only been provided to us from
6   BoNY.  We didn't have anything from Chase.
7            Somebody had made mention from
8   Barclays that Barclays -- that BoNY's prices
9   sometimes are not reputable, and I repeated it in
10  a meeting, and he basically just was e-mailing me
11  you can't say those types of things at meetings,
12  as a boss to a junior.
13       Q.   He is --
14       A.   He is my boss.  He is just giving me
15  advice, don't make these generalizations in
16  meetings with these type of people in it, which
17  were senior folks.
18       Q.   This is a meeting after -- you're now
19  working for Barclays?
20       A.   Yes.
21       Q.   And what's the meeting about?
22       A.   It is just, they are trying to -- they
23  are -- the Treasury folks, which is Paolo Tonucci
24  and his team, they are trying to come up with a
25  reasonable price of where they are coming -- you

Page 149

1          DENIG - CONFIDENTIAL
2   know, to value the assets that they had.
3            So the -- we were providing them what
4   our systems were saying and the files that we had,
5   and they were asking me where did you get the
6   prices?  And I said I got them from BoNY, but I
7   said I don't know if BoNY's prices are very
8   reputable.
9            And when I said that, Jim e-mailed me,
10  don't say that because I don't know that.
11       Q.   These are the prices for what?
12       A.   Market value of the assets.
13       Q.   Assets that supported the September 18
14  repo?
15       A.   That's correct.
16       Q.   And BoNY valued them because they had
17  a custodial role in that transaction?
18       A.   Yes.
19       Q.   And this is -- is this Barclays trying
20  to figure out how to value these assets?
21       A.   No.
22            MR. SHAW:  Objection.
23       Q.   What is --
24       A.   These were Lehman folks that were
25  asking the questions.

1        DENIG - CONFIDENTIAL
2        Q.  And why are they trying to determine
3  the value?
4        MR. SHAW: Objection to form. Calls
5  for speculation. Foundation.
6        A.  Why are who?  The Lehman folks?
7        Q.  In this meeting.  This is
8  Mr. Tonucci's crew trying to figure out --
9        A.  They are asking from the files that
10 were sent from me, where did you come up with the
11 prices, similar to how you are asking, and I was
12 basically saying BoNY had them.  Those are the
13 prices that BoNY provided.
14       Q.  OK.  So these are the securities that
15 were transferred on Thursday, Friday that week?
16       A.  Yeah.  This is the determination that
17 they came up with the market value, and then I
18 made that comment, well, BoNY's prices potentially
19 are not reputable.  And he basically said you
20 can't say that.
21       Q.  Did you think that was true when you
22 said that?
23       A.  Well, that was what I was -- I know,
24 and that's basically why I was saying it, because
25 sometimes I make generalizations without having

1        DENIG - CONFIDENTIAL
2  the full facts.  Chase was our custodian for 15
3  years of the company that I have been working for.
4  BoNY has never been.  So how can I make that
5  general statement about their prices?
6        Q.  You don't know one way or the other
7  whether their prices were good or bad?
8        A.  No.
9        Q.  Or reputable or not?
10       A.  No.
11       Q.  I asked you a lot of questions about
12 prices here.  Is there any kind of chart or
13 something that you could point me to that allows
14 me to reconcile the different prices?
15       A.  That I know was being done like at a
16 much higher level.
17       Q.  How do you -- for example, on
18 Exhibit 134, this big thing, you booked the cash
19 in the transaction, right?
20       A.  Yes.
21       Q.  And you break it down into about eight
22 or ten different entries, right?
23       A.  Yes.
24       Q.  Is there any valuation that you used
25 to break it down in that way?

1        DENIG - CONFIDENTIAL
2        A.  Yes, based on the -- what Chase came
3  to us as what the value was to the individual Fed
4  programs that we had on the previous night.
5        Q.  So those entries are tied to
6  particular Fed programs?
7        A.  Yes.
8        Q.  For particular days?
9        A.  Yes, they are.
10       Q.  So that's --
11       A.  For a particular day.  That was from
12 September 17.  The end of day September 17.
13       Q.  The Fed programs vary from Monday,
14 Tuesday, Wednesday?
15       A.  Yes.  This was end of day Wednesday's
16 information.  I don't know what exhibit it was,
17 but the one that had sixteen million one, 7.1, and
18 the total was 44.2.
19       Q.  Right.
20       A.  That was -- that I broke up the
21 bookings, those ten bookings, based on that file
22 that they sent me.
23       Q.  So those are Chase prices that you
24 used in -- into the -- you put that into the MTS
25 system?

1        DENIG - CONFIDENTIAL
2        A.  That's correct.
3        Q.  Those are Chase prices?
4        A.  Not Chase prices.  It was what Chase
5  values were.  I booked shell tickets to represent
6  the cash.
7        Q.  I understand, I understand.
8        So then -- I guess I don't understand.
9  You have Chase prices on some securities or on
10 those.  You have MTS prices for other securities
11 that we have talked about during the day.  You
12 have BoNY prices for a different set of
13 securities.
14        Which price does Barclays eventually
15 use when it is booking all this stuff?
16       MR. SHAW: Objection to form. Calls
17 for speculation, foundation.
18       A.  I have no idea.  Like that was done
19 way away from us.  Our role was to transfer these
20 par values to this particular place, and that's
21 what we did.  As far as what the market value was
22 of these, each of these assets, were done at a
23 much higher level.
24       Q.  Higher level or separate level?  I
25 mean is it in the treasury department at Barclays?

Page 154

DENIG - CONFIDENTIAL

1
2      A.   Yes. Well, not Barclays. As far as I
3  knew, it was Paolo Tonucci's team that was dealing
4  with whomever at Barclays to come up to an
5  agreement as to what the value of those assets
6  were.
7      Q.   Now, you're now working at Barclays
8  and do they have a system like MTS or an analogue
9  to MTS?
10     A.   Now?
11     Q.   Yes.
12     A.   Yes.
13     Q.   So the securities that came across
14  from Barclays from the September 18 repo, have the
15  prices changed in the Barclays booking system
16  versus what they were at in the Lehman system?
17     MR. SHAW: Objection, foundation.
18     A.   I have no idea because it wasn't part
19  of my role. That's still not part of my role here
20  at Barclays.
21     Q.   So you get on -- nowadays at Barclays,
22  you get on and book transactions, right, and do
23  what you used to do?
24     A.   No. The way they do it here at
25  Barclays is that there is a separate group that

Page 155

DENIG - CONFIDENTIAL

1
2  has the ability to type the trades directly into
3  the mainframe, that they only receive information
4  from the front-end system. So the front-end
5  trader system flows down to the back-end system,
6  which is something they call Impact. But we as
7  trade support people are not allowed to have the
8  ability to book directly into the back end.
9      MTS, there was -- infrastructure was
10  very different at Lehman than it is at Barclays,
11  and there was a two-way pipe, so that anytime you
12  did something in one system, it would reflect it
13  back to the front-end system.
14     There is only a one-way pipe here at
15  Barclays, so there is a conflict of interest, and
16  they don't allow us to affect the books and
17  records in the role that we have now.
18     Q.   Only the traders at Barclays can
19  affect the books and records?
20     A.   And the back office settlements area
21  can book. We are middle office. So we help the
22  traders transact their trades, so they felt it was
23  a conflict of interest, and they don't allow us to
24  be able to go into the system and book anything
25  directly into the system.

Page 156

DENIG - CONFIDENTIAL

1
2      Q.   What do you mean by front, middle and
3  back office, just so I -- I hear those terms all
4  the time.
5      A.   Front office represents the traders,
6  salespeople, the people that are licensed that are
7  physically executing the trades.
8      Middle office does the confirmations
9  and ensures that the trades make it from the
10  front-end system to the back-end system.
11     And the back office, it gives you the
12  ability to fix any of the problems that might
13  happen through the throughput.
14     Q.   So you are in the middle office?
15     A.   I am in the middle office.
16     Q.   Can you get on the Sparkly system and
17  see whether the securities that came over from
18  Lehman are priced any different than they were
19  then?
20     A.   Well, they booked them the same way we
21  did.
22     Q.   Meaning what?
23     A.   They booked it as a free security
24  receipt.
25     Q.   There is no price in the Barclays

Page 157

DENIG - CONFIDENTIAL

1
2  system?
3      A.   There is no price. They have zero on
4  their trades as well. And they built cash tickets
5  to represent the cash that they paid.
6      Q.   So they have the opposite entries that
7  you would have, they have cash going out of
8  45 billion, and then they have all the securities
9  booked at zero price?
10     A.   Yes.
11     Q.   Is there any way, any document that
12  you could point me to, anything that I could ask
13  your counsel to produce in this case that would
14  let me determine whether a security that was
15  booked on the Lehman system as part of the
16  September 18 repo, what it is now priced at in the
17  Barclays system?
18     MR. SHAW: Objection to form.
19  Foundation, calls for speculation.
20     A.   I have no idea. I have no idea how
21  that -- how you would do that. First of all, they
22  probably don't have them anymore, because a lot of
23  them were liquid assets. They are not sitting on
24  our books and records anymore, because they have
25  been sold subsequently.

Page 158

DENIG - CONFIDENTIAL

1
2    Q.   Do you know how many of those, of the
3  assets that came over from Lehman, have now been
4  sold?
5    A.   No.
6    Q.   Is there some kind of report generated
7  that would show that?
8        MR. SHAW: Objection, form. Calls for
9  speculation.
10   A.   Probably, but you would need, you
11  would need the list of CUSIPs and someone would
12  have to go in and one by one see that.
13   Q.   So it is theoretically possible to
14  trace those securities and see what happened to
15  them since they went over to Barclays?
16   A.   I guess it would be possible.
17   Q.   Do you know, to the extent securities
18  were sold after they -- by Barclays after they
19  went over from Lehman, do you know what prices
20  they were sold at?
21   A.   I do not.
22   Q.   Is there a report or some way to find
23  that out?
24       MR. SHAW: Objection to form. Calls
25  for speculation, foundation.

Page 159

DENIG - CONFIDENTIAL

1
2    A.   I'm sure there is.
3    Q.   You don't have any knowledge of that?
4    A.   Nope.
5    Q.   That's not something that you deal
6  with?
7    A.   We do not.
8    Q.   Do you know of any programs at
9  Barclays to liquidate these securities that they
10  just acquired from Lehman?
11   A.   Not that I am aware of.
12   Q.   Ms. Denig, I just want to show you a
13  couple of spreadsheets now.  I'm not sure whether
14  you are -- I don't know if they are Lehman
15  spreadsheets, Barclays spreadsheets or any other
16  entity's spreadsheets.  I just want to see if you
17  can help me out and try to identify them.
18       (Exhibit 245, document Bates stamped
19       BCI-EX99802 through 807 and 862 through 865
20       marked for identification, as of this date.)
21   Q.   Ms. Denig, I am handing you a document
22  marked as Exhibit 245.  And my question is if you
23  have ever seen this document before.
24   A.   I have not.
25   Q.   Let me describe it for the record.  It

Page 160

DENIG - CONFIDENTIAL

1
2  was marked with the Bates stamps BCI-EX00099802
3  through 865.
4       Did I hear you correctly you have
5  never seen this before?
6    A.   I have not.
7    Q.   Did I hear -- can you tell me whether
8  it is a Barclays spreadsheet or Lehman
9  spreadsheet?
10   A.   Yes.
11   Q.   What --
12   A.   It is a Barclays spreadsheet.
13   Q.   If you look on the third page, there
14  appears to be a series of columns carrying over
15  three pages, and on the third page it talks about
16  price sold, and then market value, sales.  Do you
17  see those entries?
18   A.   Yes.
19   Q.   Does this appear to be some kind of
20  analysis of the sales that they might have made of
21  securities after they went from Lehman to
22  Barclays?
23       MR. SHAW: Objection to form.  Calls
24  for speculation, foundation.
25   A.   I couldn't, I couldn't be sure.

Page 161

DENIG - CONFIDENTIAL

1
2    Q.   Could you speculate about what the
3  spreadsheet is?
4        MR. SHAW: Same objections.
5    A.   It could be that or it could be what
6  we sold -- what they booked the sale on their
7  books at with the default of the repo.
8        No, I really wouldn't be able to tell.
9    Q.   OK. Ms. Denig, I am handing you a
10  copy of a document previously marked as
11  Exhibit 207, and I wanted to ask you if you have
12  ever seen that document.
13       Again, just for the record, this is
14  document Bates stamped BCI-EX00099493 through 517.
15   A.   OK.
16   Q.   Have you had a chance to look at that?
17   A.   Yes.
18   Q.   Is this -- have you seen this document
19  before?
20   A.   I have not.
21   Q.   Can you tell whether it is a Barclays
22  or Lehman document?
23   A.   Yes.
24   Q.   Which one is it?
25   A.   Barclays.

Page 162

DENIG - CONFIDENTIAL

2    Q.   If you look at the last page, it
3  totals to about 5.9 billion dollars in value.  I
4  wonder if that figure reminds you in any way of
5  what this could be about.
6    A.   Nope.  It looks like it was assets
7  that went to a PDCF.
8    Q.   PDCF is a Fed program?
9    A.   A Fed program.
10    Q.   So assets that came from PDCF?
11    A.   No.  It looks like ones that probably
12  went to PDCF.
13    Q.   Assets posted as collateral to PDCF by
14  Lehman on the 15th?
15    A.   I think this is Barclays, because
16  remember Fed was out of the transaction with
17  Lehman, so Barclays basically took the assets and
18  then they did a trade with the Fed.
19    Q.   Can you explain that to me?
20    A.   So we originally were getting
21  liquidity from the Fed via these type of programs.
22  When we transferred all the assets from Lehman
23  Brothers to Barclays, Barclays then did the trade
24  with the Fed.
25    Q.   Does Barclays still do trades with the

Page 163

DENIG - CONFIDENTIAL

2  Fed?
3    A.   Yes.
4    Q.   So they still get financing through
5  the PDCF?
6    A.   No, not the PDCF but PSLF.
7    Q.   So this might relate to that?
8    A.   Yeah, that's what it looks like.
9    Q.   Thank you.
10      In that regard, were they using the
11  same assets that they had acquired from Lehman?
12      MR. SHAW: Objection, foundation.
13    A.   That was my understanding.
14    Q.   And do you know if they got the same
15  haircut that Lehman got?
16      MR. SHAW: Objection, foundation.
17    A.   I have no idea.
18    Q.   Do you know whose value, valuation
19  they used on those assets in posting them to the
20  Fed program?
21    A.   Barclays?  No idea.
22    Q.   Who is their custodian in connection
23  with the Fed program?
24    A.   BoNY.
25    Q.   BoNY?  OK.

Page 164

DENIG - CONFIDENTIAL

2      Do you know how much Fed funding
3  Barclays has secured in connection with any of the
4  Fed programs?
5    A.   Currently?
6    Q.   Yeah.
7    A.   Not much.
8    Q.   At any time?
9    A.   I'm not understanding that question.
10    Q.   Well, you said, I think you said that
11  once Lehman exited the Fed program, Barclays
12  itself engaged in securing financing from the Fed
13  program, right?
14    A.   Right.
15    Q.   Do you know how much Barclays secured
16  in that way?
17    A.   I do not.  I don't know what their
18  total numbers were.
19    Q.   Do you have any approximate amounts?
20    A.   Not at that time.  Currently, I know
21  what they have currently, which is probably around
22  6 billion.
23    Q.   Was that -- what is -- did Barclays
24  use any of the funds that it secured from the Fed
25  in connection with the sale transaction between

Page 165

DENIG - CONFIDENTIAL

2  Lehman and Barclays?
3      MR. SHAW: Objection, foundation.
4    A.   And I would like you to repeat the
5  question.  Sorry.
6    Q.   What did Barclays use the money for
7  that it got from the Fed?
8      MR. SHAW: Objection, foundation.
9    A.   I have no idea.  I'm not privy to that
10  conversation or those conversations.
11    Q.   Let's mark this one, please.
12      (Exhibit 246, document Bates stamped
13  BCI-EX108184 through 189 marked for
14  identification, as of this date.).
15    Q.   Ms. Denig, I am handing you a copy of
16  a document marked as 246, another spreadsheet.  I
17  ask you if you had ever seen this before.
18    A.   I have not.
19    Q.   Does this appear to be a Barclays
20  document?
21    A.   Yes, it does.
22    Q.   Do you have any speculation, best
23  guess about the purpose of this spreadsheet?
24      MR. SHAW: Objection, form, calls for
25  speculation, foundation.

Page 166

DENIG - CONFIDENTIAL

1
2      A.   No idea.
3      Q.   OK.  Could you think of who at
4  Barclays we should ask about this?
5          MR. SHAW:  Same objection.
6      Q.   Who at Barclays might know what --
7      A.   Might know what the -- what this is?
8      Q.   Yeah.
9          MR. SHAW:  Same objection.
10     A.   Where did you get the file from?
11     Q.   From Barclays.
12     A.   Neal Ullman potentially.  I mean
13  looking at the list, it is all Lehman Brothers
14  assets.  I know that Delta was in default, Solar
15  Cap was in default.  So it could be securities
16  that they got that they really didn't want.
17  That's my only speculation.
18     Q.   OK, thank you.
19         (Exhibit 247, document Bates stamped
20      BCI-EX108708 marked for identification, as
21      of this date.)
22     Q.   Ms. Denig, I am handing you a copy of
23  a document marked Exhibit 247.  It is a one-page
24  spreadsheet.
25         And my question is if you have ever

Page 167

DENIG - CONFIDENTIAL

1
2  seen this before.
3      A.   No.
4      Q.   Any idea what this is?
5          MR. SHAW: Objection to form.  Calls
6      for speculation, foundation.
7      Q.   You can still answer.
8      A.   It is a list of the type of assets
9  that are still in the box that they, Barclays now
10  funds.
11     Q.   So when you say that, you mean assets
12  acquired from Lehman?
13     A.   It doesn't appear to be that.
14     Q.   These are the types of assets that
15  were acquired from Lehman, where it says asset
16  type?
17         MR. SHAW:  Same objection, objection
18      to form, speculation, foundation.
19     A.   There were all these asset types on
20  the transfer.
21     Q.   The second column says "Sum of P3 Face
22  Value."  Do you see that?
23     A.   Yeah.  I don't know what that means.
24     Q.   You don't know what P3 means?
25     A.   No.

Page 168

DENIG - CONFIDENTIAL

1
2      Q.   The next column says "Sum of PCG MV."
3  Do you see that?
4      A.   Um-hm.
5      Q.   Is that a Lehman valuation?
6      A.   It is not.
7      Q.   What does PCG stand for?
8      A.   Product control group.  So it would be
9  Barclays Finance.
10     Q.   PCG is a Barclays entity?
11     A.   Yes, it is.
12     Q.   There was no product control group at
13  Lehman?
14     A.   There was but this is not a Lehman
15  doc.
16     Q.   Could that be the valuation from the
17  Lehman PCG that they are reflecting in the chart?
18         MR. SHAW: Objection, calls for
19      speculation, foundation.
20     A.   No idea.
21     Q.   I have seen several charts that talk
22  about PCG value.  Am I understanding you correctly
23  there is a PCG at Lehman?
24     A.   We didn't call it PCG.  Barclays calls
25  it PCG.

Page 169

DENIG - CONFIDENTIAL

1
2      Q.   Barclays refers to the Lehman entity
3  as PCG?
4          MR. SHAW:  Objection.
5      A.   No.
6          MR. SHAW:  Mischaracterizes the
7      testimony.
8          Go ahead.
9      A.   The product controllers who are the
10  people that are employed in the finance division
11  within Barclays, everybody at Barclays calls that
12  division PCG, product control group.
13         Lehman Brothers people, yes, we had
14  product controllers, but we didn't call them PCG.
15  We called them something completely different.  So
16  that would be finance group or something to that
17  effect.
18         The fact that this is a Barclays
19  document and says "Sum of PCG Market Value," is
20  probably market value that they got from their
21  financial controllers.
22     Q.   But does Barclays refer to the same
23  function at Lehman as PCG?
24     A.   Yes.
25     Q.   And what is -- what did you guys call

Page 170

1          DENIG - CONFIDENTIAL
2    that function at Lehman?
3       A.    Finance.
4       Q.    Finance?
5       A.    Yes.
6       Q.    Is that -- OK.  And who runs that?
7       A.    Who ran it at Lehman?
8       Q.    Who ran it at Lehman?
9       A.    The ultimately?  It was --
10      Q.    Yeah.
11      A.    Ian Lowitt.
12      Q.    Ian Lowitt.  OK.
13            You see two columns over it talks
14   about liquidity?  Do you see that?
15      A.    Yes.
16      Q.    Where it says "Sum of MV-2-22 with
17   liquidity."  Any idea what liquidity means?
18            MR. SHAW:  MV-12-22.
19      Q.    Yes, I am sorry.  I am sorry.
20      A.    Yes, I know what liquidity is.  It is
21   probably what they actually received in cash for
22   those values.
23      Q.    Did you ever hear of anything called
24   the liquidity discount?
25      A.    No.

Page 171

1          DENIG - CONFIDENTIAL
2       Q.    In the valuing of any of the
3    securities, did you guys ever apply a liquidity
4    discount?
5       A.    No.
6            (Exhibit 248, document Bates stamped
7    BCI-EX00107848 through 939 marked for
8    identification, as of this date.).
9       Q.    Ms. Denig, I am handing you a copy of
10   what's marked as Exhibit 248, which is marked with
11   the Bates stamp BCI-EX00107848 through 7939.
12      A.    OK.
13      Q.    My question is, have you ever seen
14   this spreadsheet before?
15      A.    I have not.
16      Q.    Any idea what this is?
17            MR. SHAW:  Objection to form, calls
18   for speculation, foundation.
19      A.    It looks like a repo transaction, or
20   this -- the desk here is a trading book that
21   belongs to the repo desk at Barclays.
22      Q.    OK.
23      A.    These could be free collateral that
24   they booked.
25      Q.    When you say it could be free

Page 172

1          DENIG - CONFIDENTIAL
2    collateral that they booked, in connection with
3    what?
4       A.    Lehman purchase.
5       Q.    In other words -- well, if you see on
6    the top of the first page, it has a total of
7    42.1 billion dollars.  Do you see that?
8       A.    Yes.
9       Q.    Does this suggest any kind of
10   connection with the collateral they received from
11   Lehman?
12            MR. SHAW:  Objection to form.  Calls
13   for speculation.  Foundation.
14      A.    I would agree, yeah, it could have
15   been, but there is no way for me to 100 percent
16   know that.
17      Q.    Does this appear to be some Barclays
18   booking of the collateral associated with the
19   Lehman transaction?
20            MR. SHAW:  Objection to form.
21      A.    It does.
22      Q.    If you turn to page 3, the third page,
23   you will see there is a series of columns that
24   mention auctions or auction values.  Do you see
25   that?

Page 173

1          DENIG - CONFIDENTIAL
2       A.    Yes.
3       Q.    Do you have any understanding of what
4    that could be talking about?
5            MR. SHAW:  Objection to form.
6       A.    I know what an auction is, and when
7    you don't have like a price from Bloomberg or any
8    other reputable pricing source, they take these
9    securities and go out to the street and try to get
10   a bid as far as what value and who would take it,
11   and these could be -- that's what an auction is.
12   But I don't -- I don't know what the prices are,
13   or where they come from.
14      Q.    Do you have any understanding that
15   Barclays went out and tried to secure pricing in
16   that method, in that manner, in connection with
17   the securities they received from Lehman?
18      A.    I'm not aware that they did that.
19      Q.    Would you be in a position to have
20   heard that if they had?
21      A.    Yes.  Now in my current role, yes.
22      Q.    And despite holding that position, you
23   haven't heard anything to that effect?
24      A.    Not at that time, no.  Not even after.
25      Q.    How about now?

Page 174

DENIG - CONFIDENTIAL
1
2    A.   No.
3        (Exhibit 249, document Bates stamped
4    BCI-EX99522 through 532 marked for
5    identification as of this date.)
6    Q.   Ms. Denig, I am handing you a copy of
7    a document marked as Exhibit 249, Bates stamped
8    BCI-EX99522 through 532.
9    A.   OK.
10   Q.   My question is if you have ever seen
11   that before.
12   A.   I have not, no.
13   Q.   Do you have any idea what it could be?
14       MR. SHAW:  Objection to form.  Calls
15   for speculation.  Foundation.
16   A.   I can't be sure, because I don't even
17   know like what these values are representing, what
18   denomination, and these are -- they are in
19   millions, thousands or whatever.  So --
20   Q.   You're pointing to something.  What
21   are you pointing to?
22   A.   Just the whole spreadsheet in general.
23   Q.   You're looking at the third page of
24   this document?
25   A.   Yes, yes.

Page 175

DENIG - CONFIDENTIAL
1
2    Q.   Do you have any idea what adjusted PCG
3    value is in the last column?
4    A.   I do not.
5    Q.   So this is a completely foreign
6    document to you?
7    A.   It is.
8    Q.   Ms. Denig, were you involved in
9    sending any information to Barclays' auditors
10   after you have been at Barclays?
11   A.   Not related to this.
12   Q.   Have you ever sent any reports to the
13   auditors about the value of the securities that
14   were transferred over from Lehman?
15   A.   No, I did not.
16   Q.   No interaction at all with Barclays'
17   auditors?
18   A.   No, not with regards to Lehman.
19   Q.   OK.  Do you have any idea how Barclays
20   was able to declare a 4 billion dollar gain on
21   their acquisition of Lehman?
22   A.   No.
23   Q.   Do you have any -- did you ever hear
24   anything since you have been at Barclays about how
25   they were able to declare such a large gain after

Page 176

DENIG - CONFIDENTIAL
1
2    acquiring Lehman?
3    A.   No, I have not.  This is the first
4    time I am hearing it.
5    Q.   Do you review Barclays' financial
6    statements?
7    A.   No.  Not recently.
8    Q.   You haven't heard any scuttlebutt
9    around Barclays about what a great deal the Lehman
10   acquisition was?
11   A.   No.
12   Q.   No?  OK.
13   A.   Was it?
14   Q.   I don't know.  I am asking you, have
15   you heard anything in the hallways, at the water
16   cooler or anything, people talking about, raving
17   about the acquisition of Lehman at Barclays?
18   A.   No.  No.  I seriously haven't.
19   Q.   In the interest of trying not to show
20   you every document in my collection here, have
21   you -- you are aware of the master repurchase
22   agreement that Lehman had with Barclays before
23   September 15?
24   A.   Yes.
25   Q.   Did you have any role in negotiating

Page 177

DENIG - CONFIDENTIAL
1
2    that agreement or making amendments to that
3    agreement?
4    A.   No.
5    Q.   Did you ever hear anything during the
6    week of September 15 that that agreement was going
7    to be amended in any way?
8    A.   Not that I recall.
9    Q.   Do you recall any discussions about
10   amending any custodial agreements relating to
11   repos that Lehman was going to enter into with
12   Barclays?
13   A.   Not that I recall.
14   Q.   Absolutely no discussions at all about
15   amendments or modifications to any underlying repo
16   transactional documents; is that fair to say?
17   A.   The only thing that I vaguely
18   recollect is that they may have adjusted the
19   schedule of the allowable collateral they could
20   take.
21   Q.   And "they" meaning --
22   A.   Barclays.
23   Q.   So those --
24   A.   It could be more broad.  So when you
25   set up a triparty arrangement or a repo agreement,

Page 178

1          DENIG - CONFIDENTIAL
2    you identify the type of assets that you will
3    accept --
4        Q.   OK.
5        A.   -- as collateral.
6        Q.   OK.
7        A.   I think there was an amendment based
8    on, as you are just seeing it, that they could
9    amend the allowable collateral that they would --
10   you know, they could make it more broad range,
11   which I think --
12       Q.   Do you recall that taking place?
13       A.   I do recall that.
14       Q.   Is that what is called Schedule A to
15   the MRA?
16       A.   Yes, it is.
17       Q.   And have you ever seen that document
18   before?
19       A.   A schedule, a Schedule A or --
20       Q.   No, the Schedule A that was amended
21   that week.
22       A.   I did not, no.
23       Q.   So is it correct to say that your
24   understanding was that it was amended to allow for
25   more types of collateral to be posted towards the

Page 179

1          DENIG - CONFIDENTIAL
2    September 18 repo?
3        A.   Yes.
4        Q.   And what was added to the list of
5    allowable collateral?
6        A.   That I don't know.  I don't know what
7    was originally on the list versus what they added.
8    I don't know.  There is a -- you know,
9    documentation group handles that.
10       Q.   Who was that?
11       A.   Rob Guglielmo, Lisa-Lynn Boron.
12       Q.   Do you have any sense of whether it
13   was to allow less secure types of collateral to be
14   posted?
15       A.   Yes.
16       Q.   Yes, you have an understanding, or
17   yes, it was?
18       A.   That's my understanding.
19       Q.   That it was amended to allow less
20   secure types of collateral to be posted than
21   previously?
22       A.   Yes.
23       Q.   Do you know if the amendment was in
24   any way to set haircuts for those particular types
25   of collateral?

Page 180

1          DENIG - CONFIDENTIAL
2        A.   I do not know that.
3        Q.   Is that what typically is done in a
4    Schedule A?
5        A.   I don't think so.  Not on the
6    haircuts.
7        Q.   So it's just --
8        A.   Allowable collateral.
9        Q.   OK.  Now, was that done in conjunction
10   with Barclays preparing an excluded list of
11   collateral or list of excluded collateral that we
12   talked about earlier?
13       MR. SHAW:  Objection, foundation.
14       A.   I have no idea.
15       Q.   Not something that you would be
16   dealing with every day?
17       A.   No.
18       (Exhibit 250, document Bates stamped
19       10328232 marked for identification, as of
20       this date.)
21       Q.   Ms. Denig, I'm handing you a copy of a
22   document marked as Exhibit 250.  It is just a
23   one-page document dated September 16, which
24   appears to be an e-mail in which you are involved.
25       And my question is, first of all, have

Page 181

1          DENIG - CONFIDENTIAL
2    you ever seen this e-mail before?
3        A.   Yes.
4        Q.   And what is this e-mail discussing?
5        A.   It is telling one of my guys to book
6    the overnight repo with Barclays.
7        Q.   So this is -- is this -- am I correct
8    in reading this is about 5.5 billion dollars worth
9    of securities?
10       A.   Yes.
11       Q.   So this was the Tuesday night repo and
12   they are booking it that night and you're
13   instructing them to do it?
14       A.   Yes.
15       Q.   This has nothing to do with the
16   September 18 repo or anything else.  This is the
17   individual nightly repos that Barclays had with
18   Lehman, correct?
19       A.   Yes.
20       Q.   That is all I have.  I just wanted to
21   understand what that was.
22       (Exhibit 251, document Bates stamped
23       102378755 (7 pages) marked for
24       identification, as of this date.)
25       Q.   Ms. Denig, I am handing you a copy of

Page 182

1          DENIG - CONFIDENTIAL
2    a document marked Exhibit 251, which is an e-mail,
3    and it is -- this is a subject and attachment
4    which discusses cash user/generator report.
5          So after you have had a chance to look
6    at it, my first question is whether you have ever
7    seen this before.
8       A.   Yes.
9       Q.   Have you had a chance to look at that?
10      A.   Yes.
11      Q.   And you have seen this before?
12      A.   Yes.
13      Q.   What is this?
14      A.   It is a document that we used to
15   provide to the Lehman traders on trades that would
16   have generated cash or used cash based on asset
17   type.
18         So if we reverse securities in, you
19   would be paid a certain value.  So if you had
20   100 million in and we paid 100 million for it and
21   we sold it or repo'd it out for 100 million but
22   paid 102, we actually paid out or received in cash
23   of 2 percent, and that would be considered a cash
24   generator trade.
25      Q.   OK.  You completely lost me there.

Page 183

1          DENIG - CONFIDENTIAL
2       A.   So the traders -- or the traders have
3    a business, it is called matchbook trading.
4       Q.   Is this Mr. Coughlin's group?
5       A.   Yes, this is Coughlin's financial
6    traders.
7       Q.   OK.
8       A.   So they would repo or reverse repo in
9    certain collateral and then repo out certain
10   collateral.  And the spread differential on the
11   transaction would be how they would make money.
12      Q.   Right.
13      A.   So in the event that you borrowed in
14   and repo'd out or loaned out the same value of the
15   collateral, the cash differential would determine
16   whether you were a cash generator or user.  So at
17   this point it had nothing to do with the assets
18   themselves.  It had all to do with the cash that
19   was generated from these transactions.
20         So I will give another example.  When
21   we buy something, or reverse something in, we buy
22   it.  So we buy the assets, take in the assets,
23   send out cash.  We have to pay interest on that
24   cash or the customer has to pay us interest on the
25   cash that we gave them.

Page 184

1          DENIG - CONFIDENTIAL
2          Then we lend out the same securities,
3    and they send us in cash, and whoever we sent that
4    to, there is a cash representation there.  The
5    difference between them would be a cash usage or
6    generation, and the difference between the rates
7    would be how the traders make their money.
8          If the value of the collateral that we
9    got in exceeds the value of the collateral that we
10   put out, it would be a generator, and vice versa,
11   and you would be a user.
12         And then there is another unsecured --
13   it is considered unsecured cash, which then we
14   would have to go try to get -- take it and do
15   something else with it, and there is a rate that's
16   applied to that.
17      Q.   So this is not a report that's
18   generated within your shop at Lehman?
19      A.   At Lehman it was.  At Barclays it is
20   not.
21      Q.   But it relates primarily to how well
22   the traders are doing in either making money on
23   the spread or not?
24      A.   Yes.
25      Q.   And is it in any way related to the

Page 185

1          DENIG - CONFIDENTIAL
2    September 18 repo?
3       A.   It is not.
4       Q.   So it is --
5       A.   This is business as usual.
6       Q.   When I look at the bottom and see
7    51 billion dollars in cash on page 2, the fact
8    that that's in the ballpark with the numbers we
9    are talking about is purely circumstantial?
10      A.   It is, to the extent that the only
11   liquidity providers we had at that particular
12   moment was the Fed, and ultimately if that is all
13   we had in the Fed, then it makes sense that that's
14   what we had.
15      Q.   Just so I understand what you just
16   said, this is Wednesday of that week, so the only
17   liquidity provider you have is the Fed who has
18   given you approximately 45 billion in cash, right?
19      A.   Yeah.  And then there was other little
20   transactions that we had there, here and there.
21      Q.   Barclays has a repo of about 5 billion
22   at that time?
23      A.   On the end of Tuesday, yes.  They get
24   increased -- each day it increased.  I just don't
25   remember what the final -- what the increments

Page 186

DENIG - CONFIDENTIAL

1    were on a daily basis.
2    Q.    So this report basically models what
3    Lehman is doing with that cash that all these
4    liquidity providers are giving it, right?
5    A.    Yes.
6        (Exhibit 252, document Bates stamped
7    10302702 marked for identification, as of
8    this date.)
9    Q.    Ms. Denig, I am handing you a copy of
10    a document marked Exhibit 252, which is an e-mail
11    stream dated September 17, 2008.
12        My question is, have you ever seen
13    that document before?
14    A.    I vaguely recollect this e-mail.
15    Q.    Could you just describe for me in your
16    own terms what this is, what the issue is here in
17    these e-mails?  This is something to do with
18    intercompany trades?
19    A.    LBI provides the funding for --
20    provided the funding for a majority of the legal
21    entities that Lehman owned.  When they do the
22    transactions, they are repo transactions, in order
23    to fund those securities.  So if they are sitting
24    long in one entity, they would do an intercompany

Page 187

DENIG - CONFIDENTIAL

1    trade to move the assets over to LBI so they could
2    get funded via triparty, via repo client,
3    something like that.
4        When you do that, do we pay a haircut?
5    Sometimes we did and sometimes you didn't, and
6    that would be determined based on the trader at
7    the time.  So sometimes you just did a flat
8    haircut.  They don't really care.  It is
9    intercompany, it is from one pocket to another.
10        So I think they were trying to
11    determine, based on the fact that the Holdings
12    company was now bankrupt, these -- that they
13    wanted to make sure that any intercompany trades
14    that were still being transacted, they would
15    get -- they were paying a haircut on.
16    Q.    And that haircut --
17    A.    Was equivalent to what we were getting
18    from the Fed.
19    Q.    And was that eventually determined
20    that that was being done properly?
21    A.    I honestly don't remember.  I am
22    sorry.
23    Q.    OK.  Ms. Denig, do you ever recall
24    hearing early in the week of September 15 any

Page 188

DENIG - CONFIDENTIAL

1    mention of the fact that Lehman was going to be
2    selling to Barclays about 70 billion dollars in
3    assets?
4    A.    No.
5    Q.    Do you recall any mention during that
6    week or ever having any understanding that
7    70 billion dollars was the value of Lehman's
8    assets?
9    A.    I did not hear 70 billion.
10    Q.    Did you ever hear that number used
11    during this two-week period?
12    A.    No, no.
13    Q.    How about the notion that Lehman was
14    at 69 billion dollars in liabilities?
15    A.    No.
16    Q.    You never heard that number used
17    during the two-week period from September 15 on?
18    A.    I did not.
19    Q.    I think I am done with my questions,
20    so thank you very much.  Some of my colleagues I'm
21    sure will have some more questions for you, and if
22    I think of any while I am taking a break, I might
23    come back to ask you, but thank you very much.
24        MR. HINE:  Do we want to take a break?

Page 189

DENIG - CONFIDENTIAL

1        (Recess)
2    EXAMINATION BY
3    MR. OXFORD:
4    Q.    Good afternoon, Ms. Denig.  We met off
5    the record.  As you know, my name is Neil Oxford.
6    I work with Hughes, Hubbard & Reed, and we
7    represent the SIPA trustee in this action.
8        Following up on some of the questions
9    that Mr. Hine asked you, do you recall testifying
10    about the search for additional unencumbered
11    assets on the 19th, 20th and 21st of September?
12    A.    It was the 20th and the 21st.
13    Q.    You do not recall looking for
14    additional unencumbered assets on the 19th?
15    A.    That's correct.  We didn't receive the
16    file until about 4 o'clock on the afternoon on
17    Saturday.
18    Q.    Which file did you not receive?
19    A.    There was a file, I think it was
20    labeled "DTC Collateral Analysis" or something
21    like that in one of the exhibits.
22    Q.    Until you received that file, on the
23    afternoon of Saturday, the 20th, it is your
24    recollection that you did not have any involvement

Page 190

```
1              DENIG - CONFIDENTIAL
2    in a search for additional unencumbered
3    collateral; is that correct?
4         A.   That's correct.
5         Q.   Did you have an understanding of why
6    you were looking for this additional unencumbered
7    collateral?
8         MR. SHAW:   Objection, asked and
9    answered.
10        A.   My impression was that we were -- we
11   had a shortfall in the delivery of the original
12   repo, and we were just trying to find the rest of
13   the -- the collateral to make up the shortfall in
14   market value.
15        Q.   Again, I am a little confused.  Is the
16   shortfall in the market value of assets that were
17   delivered -- withdrawn.  I'll try that question a
18   better way.
19        Can you be more specific about the
20   shortfall in the market value of securities that
21   were delivered that you just told me about?
22        A.   Sure.  When pens went down on the end
23   of September 18, they came back to us, and who,
24   I'm not really sure who, but saying -- and it was
25   communicated down to us that we were short in the
```

Page 191

```
1              DENIG - CONFIDENTIAL
2    value, in I believe the 1.9 billion dollar range.
3         A billion of it was transferred Friday
4    morning, which we didn't know what the total
5    market value of that was until Monday, the 22nd,
6    but on Saturday, those assets were not reflected
7    in any of the documentation that anybody had at
8    that point, because we didn't receive the file
9    from BoNY until Monday morning.
10        So Saturday basically we were told to
11   look for -- we were told, tasked to look for
12   1.9 billion.  We kept referring to a billion of it
13   was delivered already, so we were really on the
14   search for 900 million odd.
15        Q.   And your understanding about what you
16   were looking for and why came from conversations
17   with Mr. Hraska; is that correct?
18        A.   Mr. Hraska and Mr. Forrest.
19        Q.   Did anyone ever tell you, Ms. Denig,
20   that one of the reasons that additional collateral
21   was transferred to BoNY on Friday, the 19th, was
22   because Lehman had had to transfer cash as part of
23   the repo?
24        A.   I knew Lehman transferred cash as part
25   of the repo, so I wasn't sure how that was going
```

Page 192

```
1              DENIG - CONFIDENTIAL
2    to be reconciled.  I thought that potentially
3    Chase and BoNY were kind of discussing that and
4    working that out.  I wasn't sure that they -- they
5    segregated that collateral and were going to just
6    deliver it the very next day, if Barclays would
7    have given us the cash -- given Chase the cash
8    back, and then they were given collateral worth
9    that value.
10        I wasn't sure how they were going to
11   make that whole or whether they were just going to
12   leave it as cash.
13        Q.   When Mr. Hraska testified last week,
14   he told me that the reason additional collateral
15   was transferred on the 19th from Lehman to BoNY
16   for the benefit of Barclays, it was with the
17   intention of releasing some of the cash that had
18   been pledged as part of the September 18 repo.
19   Did Mr. Hraska ever tell that information to you?
20        MR. SHAW:   Objection, form,
21   mischaracterizes Mr. Hraska's testimony.
22        But you can answer the question.
23        A.   As far as my recollection was, it was
24   to satisfy the shortfall of collateral.  How that
25   was -- the 7 billion really didn't come more clear
```

Page 193

```
1              DENIG - CONFIDENTIAL
2    to me or people told me about it until later on,
3    but not at that particular time, no.
4         Q.   Have you ever heard at any time that
5    the reason additional unencumbered collateral was
6    moved to BoNY on the Friday, the 19th, was to
7    release the cash that had been transferred as part
8    of the repo on the 18th?
9         A.   I did not.
10        Q.   Do you have in front of you what has
11   previously been marked as Exhibit 237?
12        A.   Yes.
13        Q.   I am also handing you what has
14   previously been marked as Exhibit 150B.  I don't
15   think Mr. Hine marked that this morning.
16        You will see, Ms. Denig, that both
17   Exhibit 237 and Exhibit 150B have attachments; is
18   that right?
19        A.   Yes.
20        Q.   And both the attachments appeared out
21   of the file name TRI09192008.xls?
22        A.   Yes.
23        Q.   But Exhibit 237 appears to be
24   version 3 of a spreadsheet with that same file
25   name; is that correct?
```

Page 194

DENIG - CONFIDENTIAL

1    A. OK, OK.
2    Q. Do you have any understanding of the
3    difference between those two spreadsheets? I am
4    obviously not expecting you to go through them
5    line by line, CUSIP by CUSIP, but just if you
6    could take a moment to look at them and tell me
7    whether you have any understanding of the
8    difference between the two, if any.
9    A. I don't see a difference.
10   Q. Just looking for the moment at
11   Exhibit 237. Is that the spreadsheet that you
12   created?
13   A. No.
14   Q. It appears to be sent from you to
15   Kendall McLaughlin, William Bach and Bob Azerad?
16   A. Correct, but I did receive it from the
17   Magics technology team. It is either Magics or
18   BoNY, to be honest with you. No, it was
19   definitely Magics.
20   Q. Can you explain what you mean by
21   Magics?
22   A. Magics is a front-end system that
23   would have been the mechanism that we did the
24   pledges. So a trader inputs the information in,

Page 195

DENIG - CONFIDENTIAL

1    feeds into a trader system, feeds down to a
2    settlement system, and then a delivery is made.
3    So according to the front-end system,
4    this is what the individual CUSIPs were that were
5    sent to BoNY on the 19th, the morning of the 19th.
6    And the market value -- where I wanted to see if
7    it is different is that the values on the last
8    page of both equal the same amount of money, one
9    billion eighty.
10   One of them is a warrant which they
11   didn't want, so I think they ended up delivering
12   that back. So in Exhibit 237, you see how the
13   last page, you have a total market value of
14   1,035,000,000, and then there is this one line
15   that says 54 million?
16   Q. Um-hm.
17   A. And if you look at the file on the
18   last page of Exhibit 150, the total value was
19   1,090,059,000. If you add up the two, it is the
20   same value. So I'm assuming that the information
21   is consistent, that it reflects the same
22   information.
23   Q. OK.
24   A. The different version could just be

Page 196

DENIG - CONFIDENTIAL

1    the fact that something, you know, was shuffled
2    around a little bit.
3    Q. And the market values that you see
4    reflected on these two spreadsheets, Ms. Denig, is
5    a market value that's assigned by Lehman, correct?
6    A. Yes.
7    Q. And if I understand your testimony
8    correctly, these were CUSIPs that were transferred
9    out from Lehman's box of DTC to BoNY for the
10   benefit of Barclays on the 19th?
11   A. That's correct.
12   Q. And do you know whether or not the
13   CUSIPs reflected in Exhibits 150B and 237 were
14   ever returned to DTC's clearance boxes?
15   A. I think this one asset was. I think
16   that's why it is highlighted. I'm pretty sure my
17   recollection is this was on the excluded list so
18   they kicked it back. So in --
19   Q. Just so we have a clear record --
20   A. In Exhibit 237, you see there was this
21   one security, the last page that's highlighted,
22   and it is called the warrant, that's the type of
23   product it is. Usually that was not something
24   that you can go raise cash for. And it had a

Page 197

DENIG - CONFIDENTIAL

1    market value of 54 million. I think that was on
2    the excluded list and they did kick it back.
3    Q. With the exception of that one warrant
4    worth 54 million dollars, is it correct that the
5    assets reflected in Exhibit 237 were not held in
6    LBI's clearance boxes as of the close of business
7    on the 19th of September?
8    A. That's correct.
9    Q. And is it also correct that, again
10   with that one exception of that one line item, the
11   54 million dollars, the assets reflected on
12   Exhibit 237 were not at any time after close of
13   business on September 19 ever included in LBI's
14   clearance boxes?
15   MR. SHAW: Objection to form,
16   foundation.
17   A. And I'm not 100 percent sure that
18   there weren't other discrepancies, but as of this
19   particular moment, when this particular file was
20   done, this is the only one that we knew of that
21   got kicked back. In subsequent reconciliations
22   there could have been others.
23   Q. Let me try it this way. As of close
24   of business on Friday, with that one exception we

Page 198

1      DENIG - CONFIDENTIAL
2   have talked about, the CUSIPs that are reflected
3   on 237 were not in Lehman's clearance box,
4   correct?
5      A.   That's correct.
6      Q.   As of Monday morning, again with this
7   one exception, the CUSIPs reflected on 237 were
8   not contained in Lehman's clearance boxes,
9   correct?
10      A.   That's correct.
11      Q.   Thank you.  That is all I have for
12   those documents at the moment, I think.
13          (Exhibit 253, document Bates stamped
14      BCI-EX-S-00018190 through 191 marked for
15      identification, as of this date.)
16      Q.   Ms. Denig, you have in front of you
17   what has been marked as Exhibit 253, which is a
18   two-page document I'll identify for the record as
19   bearing the Bates range BCI-EX-S-00018190 through
20   91.
21          If you'd just take a moment to
22   familiarize yourself with that and let me know
23   when you have finished doing so.
24          OK.  Do you see below the --
25   Mr. Hraska's emoticon?

Page 199

1      DENIG - CONFIDENTIAL
2      A.   Is that what it is called?
3      Q.   I believe so.  It is the first time I
4   have had a chance to say "emoticon" on the record
5   anywhere.
6          It is an e-mail from you, Ms. Denig,
7   to John Rodefeld at Barclays, Wednesday, September
8   24th.
9      A.   Yes.
10      Q.   With a re: line "Just to summarize."
11          Can you explain to me the context in
12   which you sent this e-mail to Mr. Rodefeld,
13   please?
14      A.   Yes.  Jim asked me to follow up with
15   the clearance folks to find out if, in fact, we
16   did pledge this particular CUSIP to Barclays.
17   They didn't have it on their books anywhere, and I
18   didn't have it as a discrepancy on my
19   reconciliation with John.
20          So we went to the clearance folks, who
21   was this guy Ed Steffens.  He went -- which is the
22   original one.  He said this to Jim, which is
23   basically a reflection of what was in each box for
24   these three CUSIPs, so he was saying 074, there
25   was nothing in the box.  In 636 we had 20 billion,

Page 200

1      DENIG - CONFIDENTIAL
2   210 in the box and nothing in the other two.
3          I was telling him in this e-mail that
4   we already did pledge to him, which isn't
5   reflected anywhere else in the e-mail, that at 70
6   million, 210, and that we had additional 200 -- 20
7   million, 210 in the box.
8      Q.   Do you know at which point these
9   CUSIPs were pledged to Barclays?
10      A.   For the 70 million, 210, it was done
11   on -- it could have been done on a combination of
12   the 18th and the 19th, because ultimately my list
13   ended up being combined and I only knew of one
14   list, so I combined those as could have been
15   delivered on either date.  Though we could -- it
16   could be looked to see where.
17      Q.   And that answered my question with
18   respect to the 70 million.  The 20 million figure?
19      A.   Yes.
20      Q.   Is that the same answer?  Was it
21   pledged on either the 18th or the 19th?
22      A.   No, it was not.  It was still as of
23   September 24 sitting in the DTC box, 22 -- 636,
24   which is LBI's DTC box location.
25      Q.   At any point did that CUSIP get

Page 201

1      DENIG - CONFIDENTIAL
2   transferred or pledged to Barclays?
3          MR. SHAW:  Objection, foundation.
4      A.   I can't be sure.
5      Q.   To the best of your knowledge, was it
6   ever pledged or transferred to Barclays?
7      A.   I think so.
8      Q.   And when do you believe it was pledged
9   or transferred to Barclays?
10      A.   On the 29th or the 30th.
11      Q.   Thank you.  That is all I have about
12   that document.
13          (Exhibit 254, document Bates stamped
14      BCI-EX-S-18206 with attachment marked for
15      identification, as of this date.)
16      Q.   Ms. Denig, I have handed you what has
17   been marked as Exhibit 254, which is a one-page
18   e-mail having the Bates range BCI-EX-S-00018206,
19   and it has an attachment that was produced to us
20   in native form, and the place holder is
21   BCI-EX-S-00018207.
22          My question to you is a simple one,
23   Ms. Denig:  Do you know what this document is?
24      A.   It looks like a dump of information
25   that was in our DTC boxes as of 9/24 based on what

Page 202

DENIG - CONFIDENTIAL

1
2  GFS knew.
3      Q.  Is there any information in this
4  spreadsheet that tells you whether the assets are
5  encumbered or unencumbered?
6      A.  It could be -- you can't be sure based
7  on this information because it was corrupted after
8  the 19th, because we didn't get all our records in
9  from Chase, and there were stock record breaks of
10 things that were done.
11     So this information is only as good as
12 the systems he was retrieving the data from, and
13 at that time, there were problems.
14     So on September 24, there was not a
15 good clean record of what we had in our box
16 without physically looking in the box.
17     So based on the best of our abilities,
18 based on this report, in a regular common
19 environment, yes, you would be able to tell what
20 was unencumbered from this report.  But this is
21 not a common environment, and the information that
22 we had we know was not 100 percent correct.
23     Q.  I am understanding --
24     A.  So if we could determine if anything
25 was unencumbered, then we would have to look in

Page 203

DENIG - CONFIDENTIAL

1
2  DTC to verify, because there was no way to verify
3  from here.
4      Q.  Do you have an understanding,
5  Ms. Denig, of why Mr. Panneillo sent you this?
6      A.  Yes.
7      Q.  Tell me what that is, please.
8      A.  I was asked to ask this technology guy
9  who was in the GFS technology team to provide me a
10 list of all assets that were in accounts that
11 began with the prefix of 931.
12     Q.  Does the prefix 931 have any
13 significance to you?
14     A.  That is supposed to represent firm
15 collateral.
16     Q.  Is there a reason you qualified your
17 answer with "supposed to"?
18     A.  No.  No, I don't, actually.  That is
19 my -- there is a few exceptions to it, but for the
20 most part, that would be firm collateral.
21     Q.  Are you aware of any transfers --
22     withdrawn.
23     Is 931 a particular location in DTC?
24     A.  No.  It was just a range where you
25 booked the trades in another front end system.  So

Page 204

DENIG - CONFIDENTIAL

1
2  for equities and corporate collateral, and they
3  would be looked in a settlement system called
4  TMS -- not MTS but TMS.  TMS hooked up to DTC,
5  whereas the MTS sort of hooked up to DTC and
6  Chase.  Here, they didn't.
7      When you booked a trade in TMS, there
8  was a trader book that is referenced and a trader
9  books that began with 931 were to be firm
10 inventory.
11     Q.  Is TMS a proprietary Lehman system?
12     A.  Yes, it is.
13     Q.  What does TMS stand for?
14     A.  Trade Management System.  MTS was
15 Management Trading System and ITS was
16 International Trading System.  Nothing fancy.
17     Q.  It all sounds pretty fancy to me.
18     Do you know, Ms. Denig, whether any
19 securities that are designated with the prefix
20 "931" were transferred from -- Lehman to Barclays
21 on the 19th of September 2008?
22     A.  Yes.
23     Q.  You know that CUSIPs with that prefix,
24 931, were, in fact, transferred?
25     A.  Yes.

Page 205

DENIG - CONFIDENTIAL

1
2      Q.  Do you know whether securities with
3  that prefix, 931, were transferred from Lehman to
4  Barclays subsequent to the 19th of September?
5      A.  Yes.
6      Q.  And were those the transfers on the
7  29th and 30th of September that you referenced
8  earlier in your discussions with Mr. Hine?
9      A.  They were.
10     Q.  Thank you.  That is all I have for
11 that exhibit.
12     (Exhibit 255, document Bates stamped
13 BCI-EX-S 18278 through 79 with attachment
14 marked for identification, as of this date.)
15     Q.  Ms. Denig, do you have in front of you
16 what has been marked as Exhibit 255?  Which I will
17 identify for the record as bearing Bates range
18 BCI-EX-S-00018278 through 279 and then there is a
19 four-page spreadsheet which was produced to us in
20 native form and has no Bates range.
21     If you could take a moment to look at
22 both the e-mail and the attachment and let me
23 know when you have done that and I will ask
24 some questions for you.
25     Do you recognize this document,

Page 206

DENIG - CONFIDENTIAL

1
2  Ms. Denig?
3      A.  I do.
4      Q.  The initial chain is an e-mail from Ed
5  Steffens, is that correct?
6      A.  Yes.
7      Q.  Did you tell me earlier he works at
8  DTC?
9      A.  He works in clearance but he was a
10  manager for DTC clearance.
11      Q.  When you say he works in clearance --
12      A.  In Lehman, at Lehman.
13      Q.  And at the -- this e-mail is dated
14  September 25.  Had he transferred to Barclays at
15  this stage?
16      A.  He did.  He doesn't currently have a
17  Barclays role but he is working on the unwind with
18  Deloitte & Touche at Barclays though, employed at
19  Barclays though.
20      Q.  Is he part of that ring fence team?
21      A.  Yes, he was.
22      Q.  Mr. Steffens writes, "Ricky, we had a
23  call this morning surrounding firm assets in 636."
24  Do you see that?
25      A.  Yes.

Page 207

DENIG - CONFIDENTIAL

1
2      Q.  636 is a reference to one of Lehman's
3  boxes at DTC, correct?
4      A.  That's correct.
5      Q.  Were you on this conference call?
6      A.  I don't recall, but most likely.
7      Q.  Mr. Steffens goes on to say, "There is
8  an effort to confirm what those assets are and if
9  the positions in the box match up against what we
10  know to be firm inventory.  A similar exercise was
11  done for the 074 box with Jim and Nancy, got a
12  file from DTCC of the positions and now that is
13  needed for the 636 box.  Thanks."
14      He goes on, "Nancy, Jim, is that
15  essentially what we are looking for."
16      Can you explain to me the exercise, to
17  the extent you're aware of it, that
18  Mr. Steffens is talking about in this e-mail?
19      A.  So based on the effort that was done
20  on the weekend of the 20th and the 21st, we
21  identified what we thought or it looked like was
22  firm inventory that we would be able to send over
23  to Barclays, unencumbered in the box.  We needed
24  to do an exercise to say take these assets in DTC
25  box location 074 and tell me exactly what's in

Page 208

DENIG - CONFIDENTIAL

1
2  there.  We can't be 100 percent sure that the
3  records we have were valid, so we needed to
4  physically go into the terminal at DTC and tell us
5  what's in there.
6      So what we determined was -- and I
7  think that's what the color coded are, color-coded
8  were.  It says CUSIPs in yellow, I believe, are
9  contra, which -- the reds are no longer in the
10  box; greens are additions; and orange, the balance
11  is changed; yellows means that you could go.
12  Yellow securities are valid.
13      Q.  OK, what does the phrase "contra
14  CUSIPs" mean to you?
15      A.  How do I explain this?  I don't know
16  how to explain this to you.
17      Q.  In terms that I have half a chance of
18  understanding.
19      A.  Let's see.  How do I explain this.
20  Let me see if I can determine which ones they are.
21      I can't explain that to you in a way
22  that would make any sense.
23      Q.  I hesitate to say this, do you want to
24  try me?
25      A.  It is a CUSIP that DTC -- let's see,

Page 209

DENIG - CONFIDENTIAL

1
2  how do I -- I don't even know.  I can't answer the
3  question.  I am sorry.  I don't know how to -- how
4  to -- contra CUSIPs?
5      MR. SHAW:  Can you give us a
6  definition of what the words "contra CUSIP"
7  or the phrase "contra CUSIP" means to you?
8  Not in context of this document, just
9  generally.
10      THE WITNESS:  I know I am trying to
11  think.
12      MR. SHAW:  Use whatever technical
13  language you need to use and he can ask for
14  explanations if he doesn't understand.
15      A.  I honestly can't find the words to
16  describe it.  I can't answer the question.  I am
17  sorry.
18      Q.  Well, why don't we come back to it.
19      A.  We will come back to that.  It will be
20  bothering me so.
21      Q.  If at any point during the rest of my
22  questions the definition comes back to you, feel
23  free to hold up your hand and blurt it out.
24      A.  See, so for red, the red ones we said,
25  our files showed that they were in the box, but

53

Page 210

1          DENIG - CONFIDENTIAL
2   when we went to actual DTC terminal, they were
3   not, that's why it says red ones are no longer.
4   Green CUSIPs are stuff that were deemed to be in
5   the box that we didn't have in the original file,
6   and the orange, the balance is changed from what
7   we knew from JFS to the end.
8       Q.   What do you mean when you use the
9   phrase in that last answer "original file"?
10      A.   The file that was given to us on
11  Saturday evening, on September 20.
12      Q.   The one that was marked as an exhibit
13  by Mr. Hine?
14      A.   Yes.
15      Q.   I forget the exhibit number, but we
16  are talking about the same thing?
17      A.   Yes, um-hm.
18      Q.   If you can put that to one side and
19  when we come back to contra CUSIPs, we can pick it
20  up.
21          (Exhibit 256, document Bates stamped
22          BCI-EX-S-18241 marked for identification, as
23          of this date.)
24      Q.   Ms. Denig, you have in front of you
25  that I have marked as Exhibit 256, a one-page

Page 211

1          DENIG - CONFIDENTIAL
2   e-mail were the Bates range is BCI-EX-S-00018241.
3   If you would take a moment to look at that and let
4   me know when you're ready.
5       A.   OK.
6       Q.   This appears to be an e-mail
7   discussion about the same spreadsheet that was
8   attached to what I marked as Exhibit 255.  Does
9   that seem accurate?
10      A.   It seems accurate.
11      Q.   And just -- I think I have one
12  question only with respect to this document.  In
13  the chain just below where you are copied, you
14  will see that someone called Marielena Russo
15  writes to Ed Steffens asking if he wants the
16  available or total positions.  Do you see that?
17      A.   Um-hm, yes.
18      Q.   Do you have an understanding of what
19  that means?
20      A.   Yes.  So in the DTC box location that
21  is owned by LBI, we also have a prime service
22  business and a wealth business that would just be
23  a segregated position that -- but is owned by
24  somebody else.  We don't have the legal rights to
25  use that collateral.  It is locked up to be given

Page 212

1          DENIG - CONFIDENTIAL
2   to somebody else.  So those are still sitting in
3   our box that is owned by LBI but is not available
4   for delivery.
5          Also, if there is a corporate action
6   pending on a particular CUSIP, that would also be
7   segregated out where we wouldn't be able to make
8   delivery.  And then there is another type where if
9   there is a stock record break on the any of the
10  positions, they would also freeze it so you
11  couldn't make delivery.  So if there were any
12  pending adjustments that potentially would affect
13  the position in that box, you couldn't send it.
14         So there is a total position that
15  wasn't seg'd. which was available and then
16  there is the total position overall that would
17  include stock record breaks, wealth client
18  assets, and prime broker.  Prime broker
19  positions, in essence, not ours, they are not
20  our positions.
21      Q.   Was part of the analysis of the CUSIP
22  with the 931 prefix, was part of that analysis to
23  determine whether or not those assets were truly
24  unencumbered?
25      A.   Yes.

Page 213

1          DENIG - CONFIDENTIAL
2       Q.   And I think we have a clear record on
3   it, but can you explain to me whether or not you
4   and the team you worked on did anything to
5   determine whether or not those assets were
6   unencumbered other than look into DTC boxes?
7       A.   No, we just looked in the DTC boxes.
8       Q.   And when you say you looked in the DTC
9   boxes, can you explain in a little more detail
10  what you mean by that?
11      A.   So the people that are referenced
12  here, Steffens and Marielena, they worked in the
13  clearance area of Lehman Brothers or Barclays at
14  the time.  And she had access to a DTC terminal
15  that's tied into the actual custodian of DTC and
16  they looked to see what the available positions
17  were referencing.  If you put the CUSIP in the DTC
18  box location, you would be able to tell what it
19  is.  There is certain codes within the clearance
20  screens that tell you if it is available or if it
21  is seg'd or if it is a break, if it is a corporate
22  action.  There are specific codes on there so you
23  are able to -- you determine by the DTC screens
24  what the real position is.
25      Q.   You made reference a couple of times

Page 214

1       DENIG - CONFIDENTIAL
2    today, Ms. Denig, that the quality of the
3    information in Lehman's systems over the week
4    following the filing of the holding company
5    bankruptcy on the 15th carrying through I think
6    the weekend of the 20th and 21st of September was
7    imperfect.
8        A.   It didn't get imperfect until the
9    18th.
10       Q.   OK, thank you for the clarification.
11   From the 18th through the 22nd, the information in
12   Lehman's systems was imperfect, correct?
13       A.   Yes.
14       Q.   Was the information in DTC's systems
15   about the assets in Lehman's boxes also imperfect?
16       A.   No.   That's why we went to them as a
17   second check.
18       Q.   Can you explain to me why DTC's
19   systems didn't suffer from the same imperfections
20   as Lehman's internal systems?
21       A.   Because Chase, who is our custodian
22   who handled the deliveries from our Chase box to
23   DTC's boxes, didn't provide us the files necessary
24   to determine whether or not the assets were even
25   there, were there.   DTC now received them from

Page 215

1       DENIG - CONFIDENTIAL
2    Chase.   Chase was our main -- like our generator
3    of all our information.   So they sent us the
4    position files of anything they would have done
5    via pledging securities, delivering securities on
6    behalf of Lehman Brothers.   The fact that we did
7    not receive any files on the night of the 18th and
8    the 19th from Chase definitely screwed up our
9    records.
10       Q.   Do you know at what point DTC received
11   the information from Chase that you at Lehman did
12   not?
13       A.   DTC is an actual depository and is a
14   true reflection of what securities are sitting in
15   there.   Same as Chase was.   And the only way to
16   get the information is to get the reports from
17   them.
18            We didn't get reports from DTC.   We
19   got all of our reports and files from Chase.   That
20   would be up loaded to our stock record and then
21   would tie to the boxes, the individual boxes, and
22   that was -- like the back office would do that
23   type of reconciliation on a daily basis.
24            After the 19th, we couldn't do that
25   reconciliation because the fact that we never

Page 216

1       DENIG - CONFIDENTIAL
2    received any files from Chase.   So the only way to
3    really determine if the assets were there were
4    from looking into the boxes directly.   And we
5    didn't get access to DTC right away either.   It
6    took us until like the middle of the week in order
7    to get it because we were now Barclays employees
8    and they were LBI's boxes.   So we needed somebody
9    to approve that.
10       Q.   How was it, Ms. Denig, that you and
11   the others who were working with you were able to
12   identify to any unencumbered collateral at DTC's
13   boxes over the weekend?
14       A.   Experience in the firm, experience on
15   the Lehman infrastructure, experience on how the
16   trades were executed and the nature of what all
17   the trade rules mean.
18       Q.   Are you able to estimate the degree to
19   which you were correctly able, over the weekend of
20   the 20th and 21st, to identify securities that
21   were, in fact, unencumbered at DTC?
22       A.   Were unencumbered you said?   They were
23   easy to -- more easy to determine because we
24   didn't touch them.   Let's -- let me put it another
25   way.   If it was a segregated position, it was

Page 217

1       DENIG - CONFIDENTIAL
2    never on any list to be going over; therefore,
3    even if we didn't receive any files from Chase,
4    the positions were there.
5        Q.   Right, I think we are talking past
6    each other a little bit.   I'm sure it is me asking
7    a bad question.
8            Let's try it this way.   Over the
9    weekend with others in your team, you were
10   tasked with identifying unencumbered collateral
11   within DTC's boxes, correct?
12       A.   Yes.
13       Q.   And you were hampered in that effort
14   by Chase's failure to send over certain important
15   data as to transactions affecting those
16   securities, correct?
17       A.   That's correct.
18       Q.   Nevertheless, you managed to
19   accomplish some sort of conclusion as to the
20   existence and extent of unencumbered collateral in
21   Lehman's DTC boxes over that weekend of the 20th
22   and 21st, correct?
23       A.   Yes.
24       Q.   You later appeared to have undertaken
25   an effort to reconcile that with the true records

Page 218

DENIG - CONFIDENTIAL

1
2  at DTC, correct?
3      A.   That's correct.
4      Q.   How close did you get over the
5  weekend?
6      A.   Oh, well, we had -- we thought we
7  identified about 900 something million and I think
8  it was 485 million that was actually good.
9  Verified.
10     Q.   So 50?
11     A.   Fifty percent.
12     Q.   And that 900 million, just so we are
13 clear, that you believe you identified is over and
14 above the -- what you described as the billion and
15 change that was transferred ostensibly under the
16 repo on the 19th, correct?
17     A.   Yes.
18         MR. SHAW:  Objection to form.
19     A.   Yes.
20         (Exhibit 257, document Bates stamped
21     BCI-EX-S-18293 through 294, with attachment,
22     marked for identification, as of this date.)
23     Q.   Ms. Denig, I have placed in front of
24 you what I have marked as 257 which is identified
25 for the record as BCI-EX-S-00018293 through 294,

Page 219

DENIG - CONFIDENTIAL

1
2  294 is a place holder for the attachment which was
3  produced in native form.
4          Ms. Denig, have you had a chance to
5  look at 257?
6      A.   Yes.
7      Q.   Do you recognize that document?
8      A.   Yes.
9      Q.   Can you tell me what it is, please.
10     A.   After those steps taken when we were
11 looking at one file from GFS, asked the clearance
12 folks to determine whether or not we didn't have,
13 in fact, have the assets in the box and this was
14 the ultimate result which was on page 4 of this
15 document.
16     Q.   By page 4 of the document, are you
17 referring to the page following?
18     A.   Yes.
19     Q.   18294?
20     A.   Yeah.
21     Q.   That's has some headings at the top,
22 CUSIP, what I am assuming is security description?
23     A.   Correct.
24     Q.   S&P Moody quality and Lehman market
25 value?

Page 220

DENIG - CONFIDENTIAL

1
2      A.   That's correct.
3      Q.   For the record, that is a spreadsheet
4  that has a total in the last column of
5  269,921,368?
6      A.   Correct.
7      Q.   Ms. Denig, you write to Mr. Hraska,
8  Monty Forrest and Neal Ullman, if my math is
9  right, at 3 o'clock eastern on the 25th of
10 September.  "OK, this should be everything in 636
11 and 074.  No issues on 636 collateral.  All not
12 highlighted.  Can do."  Do you see that?
13     A.   Yes, very grammatically incorrect, but
14 yes.
15     Q.   I don't think anybody writes
16 grammatically correct e-mail these days.
17     A.   I was tired.
18     Q.   When you say, "This should be
19 everything in 636 and 074," what do you mean?
20     A.   Everything we could have determined
21 was good to go to Barclays.  Based on the assets
22 that we were able to determine were unencumbered
23 and after the verification that we had with the
24 clearance folks, this was my e-mail to my bosses
25 saying go ahead, you can deliver these.  These

Page 221

DENIG - CONFIDENTIAL

1
2  guys then had other steps and Jim and Monty had to
3  go through other steps getting certain approvals,
4  getting other people involved, and they were
5  basically hounding me all day to get me this list
6  so that's kind of where it comes from, like OK,
7  this should be everything.  At that time.  That's
8  the whole thing.  On this particular day, based on
9  the information that we did already, based on the
10 assets that we were able to determine, this is
11 everything that should be able to go.
12     Q.   When you say no issues on 636
13 collateral, what do you mean?
14     A.   Everything we determined in 636, there
15 were no issues with the availability of that
16 collateral.
17     Q.   I notice you don't tell Mr. Hraska
18 that there are no issues with 074.
19     A.   Um-hm.
20     Q.   Was that --
21     A.   That is why I said on the highlighted
22 ones will go, so the ones that are highlighted had
23 issues.
24     Q.   And they were part of the 074 box at
25 DTC, is that right?

Page 222

DENIG - CONFIDENTIAL

1
2       A.   Yes.
3             OK, thought of a way to describe
4    contra CUSIP.
5       Q.   OK, the whole table is on the edge of
6    its seat.
7       A.   It is an identifier that DTC would
8    use, but it is not a street CUSIP that's used.  So
9    another shop can have a different name for it
10   basically, but DTC would have a generic one.
11            So it is different from a regular
12   CUSIP where it is a street CUSIP, everyone uses
13   the same one.  We can call it something and
14   somebody else could call it something
15   different.  There is no -- those are hard to
16   determine are they real or not.  That's why we
17   didn't put them in the list to go and they were
18   highlighted we need further investigation on
19   it.
20            I don't know how to explain it.  It is
21   very hard to explain.  They are dummy CUSIPs in
22   essence.  How it that.
23      Q.   Did you say dummy CUSIPs?
24      A.   Dummy, they are not street-used
25   CUSIPs.

Page 223

DENIG - CONFIDENTIAL

1
2       Q.   Are you aware of whether or not any of
3    the contra CUSIPs that were referred to in this
4    earlier exhibit were ever transferred from Lehman
5    to Barclays?
6       A.   It is not my -- I have no idea.  I
7    don't know for sure.
8       Q.   Do you have an understanding of what
9    the issues were with the highlighted entries on
10   the spreadsheet marked as Exhibit 257?
11        MR. SHAW:  Objection, compound.
12      A.   And there was a reference earlier in
13   another exhibit, ones that were highlighted in
14   certain colors.  Here, in Exhibit 255.  Where we
15   say CUSIPs in yellow I believe would be contra;
16   red are no longer in the box; green are in
17   additions; and orange is balances, we didn't want
18   to muddy the waters.  We just wanted the pure and
19   simple clean ones, based on the records that we
20   had versus records that DTC had, and anything that
21   needed further research and I guess the time was
22   of the essence because, again, they are basically
23   saying get us the list, get us the list, get us
24   the list.  So they needed information quickly and
25   so these were done, we knew that these were there,

Page 224

DENIG - CONFIDENTIAL

1
2    these could go, these can go right now.  The
3    others need to be more -- investigated a little
4    bit further.
5       Q.   When you say they were saying get us
6    the list, who is the they?
7       A.   Monty and Jim and Alastair.
8       Q.   Alastair is Alastair Blackwell?
9       A.   Yes.
10      Q.   And did you have any understanding of
11   why they were so impatient to receive your list?
12      A.   I was assuming that Barclays was
13   impatient in receiving the assets.
14      Q.   Is it your understanding that the
15   CUSIPs listed in Exhibit 257 were not part of any
16   repo transaction?
17            Withdrawn, withdrawn.  Let me ask a
18   better question.  Is it your understanding that
19   the securities listed in Exhibit 257 that you
20   are saying are good to go, presumably to
21   Barclays, yes?
22      A.   Yes.
23      Q.   Were not part of the repo transaction
24   on the 18th and 19th of September?
25      A.   See, I still -- me, personally still

Page 225

DENIG - CONFIDENTIAL

1
2    thought that this was the true-up piece of the 1.9
3    billion.  This was my understanding at the time
4    still.  Again, no -- I didn't have any idea about
5    the schedule B thing, but this was still trying to
6    determine that 1.9 billion that they asked us to
7    find that night.  So still all in relation to
8    that.
9       Q.   Have you subsequently come to a
10   different understanding with respect to whether or
11   not these securities are part of the repo or not?
12      A.   Yes.
13      Q.   Can you tell me from whom you gained
14   that understanding?
15      A.   Jim Hraska.
16      Q.   And what did Jim Hraska tell you?
17      A.   That there is a schedule B out there.
18      Q.   And did he tell you about the schedule
19   B that was out there?
20      A.   They were to get all unencumbered
21   assets and not just the repo.
22      Q.   When did you have that conversation
23   with Mr. Hraska?
24      A.   I can't be sure of the exact date.
25   But it was after this.

Page 226

DENIG - CONFIDENTIAL

1
2    Q.    And by this, you mean after the date
3    of --
4        A.    September 25. September 25, 2008.
5        Q.    The securities listed in 257 total,
6    according to Lehman's marks, just south of 270
7    million, is that correct?
8        A.    That's correct. Yes.
9        Q.    Was this 270 million a portion of the
10   450 million, the approximately half that you ended
11   up determining?
12       A.    Yes.
13       Q.    That's a terrible question.
14       A.    But I understand what you are saying.
15       Q.    You testified earlier that you
16   believed of the 900 million in additional
17   unencumbered collateral that you and your team
18   identified over the weekend of September 20 and
19   21st, your subsequent reconciliations confirmed
20   that approximately half, in the region of 450
21   million, turned out to be truly unencumbered,
22   correct?
23       A.    Correct.
24       Q.    And is this 260.9 million that's
25   referenced in Exhibit 257 part of that 450

Page 227

DENIG - CONFIDENTIAL

1
2    million?
3        A.    Yes, it is.
4            (Exhibit 258, document Bates stamped
5    BCI-EX-S 16935, with attachment, marked for
6    identification, as of this date.)
7        Q.    Ms. Denig, you have in front of you
8    what I have marked as Exhibit 258 which is an
9    e-mail bearing the Bates number BCI-EX-S-00016935
10   and it has an attachment which is one page. Do
11   you recognize this document?
12       A.    I do.
13       Q.    Can you tell me what it is please?
14       A.    It is the assets in 636 that were
15   being delivered, that we were telling Barclays
16   that you're getting.
17       Q.    And the assets in 636, are those the
18   same 269.9 million dollars worth of collateral
19   that you had told Mr. Hraska was unencumbered and
20   OK to send to Barclays in Exhibit 257?
21       A.    Yes.
22       Q.    Do you see in the second paragraph of
23   his e-mail to John Rodefeld, Mr. Hraska says, "In
24   addition can you provide the market value of the
25   DTC collateral taken in by yourselves on 9/19/08.

Page 228

DENIG - CONFIDENTIAL

1
2    We want to compare to our figures and evaluate for
3    additional requirements."
4        Do you know whether Mr. Rodefeld or
5    anyone else at Barclays ever provided information
6    in response to that request from Mr. Hraska?
7        A.    I don't recall.
8        Q.    OK, that is all I have for that
9    exhibit.
10           (Exhibit 259, document Bates stamped
11   BCI-EX-S18485 through 486 marked for
12   identification, as of this date.)
13       Q.    Ms. Denig, you have in front of you
14   what I have marked as Exhibit 259 which has the
15   Bates range BCI-EX-S-00018485 through 486. Do you
16   recognize this document?
17       A.    I do.
18       Q.    Focusing in particular on the e-mail
19   from John Haley at Barclays to Jim Hraska, which
20   is the penultimate entry in the chain, Mr. Haley
21   writes, "Jim, can you take a look at these CUSIPs
22   on Monday. BoNY has said they returned these to
23   you on 9/19." Do you see that?
24       A.    Yes.
25       Q.    Can you tell me if you know what

Page 229

DENIG - CONFIDENTIAL

1
2    Mr. Haley is asking Mr. Hraska to do?
3        A.    Yes. On 9/18, we were reflecting them
4    on our books and records or reflecting them as a
5    pledge that we sent them. It is one of -- there
6    is four -- these four discrepancies were part of
7    the reconciliation that we did. Upon further
8    reconciliation on their part, they went to BoNY
9    and said Lehman says they delivered them to you,
10   and BoNY came back and said oh, no, we DK'd them,
11   meaning the next day, meaning we didn't know them,
12   and we kicked them back to the box.
13       We still at this particular moment
14   didn't show that. They have references on when
15   BoNY released the shares back to Lehman at 636,
16   but I -- it is not seen in this, but at the end
17   of the day, we looked and said DTC and we
18   didn't see the same reflection they told us.
19       Remember, they were five CUSIPs in
20   question. These four of them were -- four of
21   the five were these that we had issues with.
22       Q.    Those were the five CUSIPs that were
23   referenced I believe in an exhibit that was marked
24   I think had been created by Mr. Azerad?
25       A.    Yes.

Page 230

DENIG - CONFIDENTIAL

1
2    Q.   Were these transfers to BoNY transfers
3  made out on the 18th?
4    A.   They were.  And you can see here like
5  this is technically a screen shot from a DTC
6  terminal or their DTC terminal saying that this
7  was paid to Lehman, 636 pledge, to BoNY's 855 at
8  this particular time on 9/18.  Then they come back
9  and say on 9/19, BoNY released these shares to
10 Lehman 636 at 231.
11       Lehman didn't take them in.  So they
12 could have released them to it, but we never --
13 like the boxes, 636 never took the securities
14 in.  So this basically went back to them for
15 further review.  It is almost like saying here,
16 throw the ball, and you are throwing it right
17 back to me and that's basically what happened
18 with these.  BoNY threw them to us and we
19 kicked them back.
20    Q.   So the CUSIPs that are listed in
21 Exhibit 259, the four sets of CUSIPs were rejected
22 by BoNY on the 19th?
23    A.   No.  Well, they were -- they were
24 accepted on the 18th, they took it into their box,
25 and on the 19th, they tried to deliver them back

Page 231

DENIG - CONFIDENTIAL

1
2  to Lehman's LBI box, 636.  Lehman never took them
3  in.
4    Q.   So they were not, these four CUSIPs
5  were not in Lehman's clearance box?
6    A.   They did not go to Lehman's box.
7    Q.   On the 19th?
8    A.   On the 19th.
9    Q.   Are you aware if they went to Lehman's
10 clearance box any time after the 19th?
11   A.   They were not and that has
12 subsequently come out in other reconciliations
13 they just basically had incomplete data.  You had
14 this, this, and one showing that Lehman went back
15 to them and then they kept them.
16   Q.   Thank you.  That is all I have for
17 that.
18       (Exhibit, 260ationu , document Bates
19       stamped BCI-EX-S-18577 through 78 marked for
20       identification, as of this date.)
21   Q.   Ms. Denig, you have in front of you
22 what I have marked as Exhibit 260 which is a
23 two-page e-mail, BCI-EX-S-00018577 through 78.  If
24 you can just let me know when you have had a
25 chance to review that.  Do you recognize this

Page 232

DENIG - CONFIDENTIAL

1
2  document?
3    A.   I have a.
4
5  Vague recollection.,  Can you tell me what
6  your vague recollection is, please?
7    A.   That they supposedly got, received
8  money from, that was for LBI and they didn't know
9  what it was for.
10   Q.   And who is the "they"?
11   A.   They, I am sorry, Barclays operational
12 folks said that they received cash from Chase that
13 particular night and they didn't know why.  Jim is
14 reaching out to Dan and Craig who are on the
15 Treasury area or were in the Treasury area of
16 Lehman, now are in the Treasury area of Barclays.
17   Q.   Did you ever understand that there was
18 a final resolution as to the reason why these
19 funds had been received from Chase?
20   A.   No.
21   Q.   That is all I have for that document.
22       (Exhibit 261, document Bates stamped
23       BCI-EX-S-18505 and 06 with attachment marked
24       for identification, as of this date.)
25   Q.   Ms. Denig, you have in front of you

Page 233

DENIG - CONFIDENTIAL

1
2  what I have marked as Exhibit 261, which is a
3  two-page e-mail BCI-EX-S-00018505 to 506.  And
4  then there is a very substantial spreadsheet,
5  probably two spreadsheets attached to it.  Do you
6  recognize this document?
7    A.   I don't, believe it or not.  I don't
8  remember this.
9    Q.   At the bottom of the e-mail chain,
10 someone called Duane McLaughlin writes to a large
11 group of people, not to you at this stage.  He
12 says, "Attached please find two files which
13 include what Barclays believes should be included
14 on schedules A and B.  Please reflect conversation
15 with Paolo over the weekend and we believe are
16 agreed between Barclays and Lehman."  He goes on
17 to say at the bottom, "Please provide your
18 sign-off on these files as soon as possible so
19 they can be filed under seal with the bankruptcy
20 court in the morning."  Do you see that?
21   A.   Um-hm.
22   Q.   And do you see then Mr. Tonucci
23 forwards this to Mr. Azerad?
24   A.   Um-hm.
25       MR. SHAW:  Say yes.

Page 234

DENIG - CONFIDENTIAL

1
2    A.    Yes.
3    Q.    Saying, "Can you check this
4    correspondence to our version of the schedules."
5    Do you see that?
6    A.    Yes.
7    Q.    Do you know what Mr. Tonucci is
8    referring to as "our version of the schedules"?
9    A.    No.
10    Q.    He says, "I believe there are some of
11    differences, open (five CUSIPs that didn't make it
12    and five that seem to be replacements)." Do you
13    see that?
14    A.    Yes.
15    Q.    Do you believe those are the five
16    CUSIPs you testified about earlier?
17    A.    Yes.
18    Q.    Mr. Azerad sends this e-mail on to you
19    about 29th of September at 1:39 in the afternoon
20    GMT, so 9:39 in the morning.
21    A.    Um-hm.
22    Q.    Do you have an understanding of why
23    Mr. Azerad forwarded this document to you?
24        MR. SHAW: Objection, foundation.
25    A.    Knowing that I was the one that did

Page 235

DENIG - CONFIDENTIAL

1
2    the reconciliation with Barclays, is potentially
3    why he sent it to us, though he seemed to have
4    done his own reconciliation. And as far as
5    schedules As and Bs, I didn't -- I just knew of
6    schedule A really and that there was a B being
7    constructed.
8    Q.    Do you recall doing any -- withdrawn.
9        You don't recall after reading this
10    e-mail again receiving it?
11    A.    I don't recall, no. Obviously I did,
12    but I don't remember. I don't remember it.
13    Q.    Is it safe then to assume that you did
14    not -- you don't recall doing any work on or
15    analysis of the file that was attached to this
16    e-mail?
17    A.    No. I do remember getting a file --
18    but it is not what's referenced here -- from him
19    with Barclays' positions and Lehman's positions on
20    it and my same discrepancies he had as
21    discrepancies, but that doesn't seem to be this
22    file. That's what I thought it was at first but
23    I'm not sure it was.
24    Q.    The file you remember receiving was a
25    document marked by Mr. Hine this morning, is that

Page 236

DENIG - CONFIDENTIAL

1
2    correct?
3    A.    It could have been.
4    Q.    You said in an answer to one of
5    Mr. Hine's questions that you recall receiving a
6    spreadsheet that you believed to be schedule B
7    from Mr. Hraska, is that correct?
8    A.    Yes.
9    Q.    And I think I wrote down that what you
10    did with it was play around with it. Can you be a
11    little more precise?
12    A.    He wasn't very Excel savvy. So
13    sometimes he would send me spreadsheets and I
14    would cut them up for him and send them back so he
15    could see what he was working with. He would say
16    here is a file, fix -- cut out just 931 accounts
17    and, you know, put just include this range, just
18    include these type of securities that begin with
19    these three letters. He doesn't know how to do
20    that, so he would give me instructions on what to
21    do with it.
22        There was a set to determining and the
23    same with the unencumbered assets that we worked
24    on that weekend, there was a particular method
25    that we used to try to pertain -- to know what it

Page 237

DENIG - CONFIDENTIAL

1
2    is and that's based on knowing what the CUSIPs
3    are, what the trading accounts are within Lehman
4    Brothers, certain descriptions from -- for
5    collateral and there were certain subtypes that we
6    knew to exclude and not to exclude and he was
7    doing -- he went on further to determine what the
8    schedule B was with Paolo Tonucci and Azerad and
9    John Virgel del Dios which I was not doing
10    anymore, he was doing with them. Once in a while,
11    he would send me a spreadsheet to play with, to
12    sort in essence.
13    Q.    So I am clear, it is your
14    understanding that Mr. Hraska along with
15    Mr. Tonucci and the other individuals you
16    mentioned were working on a spreadsheet that you
17    believed to be called schedule B, is that correct?
18    A.    Yes.
19    Q.    And that at Mr. Hraska's direction,
20    you manipulated that spreadsheet?
21    A.    I wouldn't say manipulated. I just
22    sorted it in a different way. I didn't touch
23    anything or delete any columns. I just literally
24    shifted the -- shifted things around a little bit.
25    Q.    So the presentation of the data was --

Page 238

DENIG - CONFIDENTIAL

1
2    A.   Was more favorable for him.  He had
3  columns, he had filters, upon filters, upon
4  filters.
5    Q.   But you, yourself did no independent
6  analysis or editing or manipulation of this
7  document?
8    A.   No.  Or yes.
9    Q.   Let me ask it a better way.  Did you,
10  other than following instructions of Mr. Hraska,
11  do anything that with this spreadsheet that you
12  believed to be called schedule B?
13    A.   No.
14    Q.   Ms. Denig, the last document, at least
15  from me, I have handed you what has previously
16  been marked as Exhibit 155B.  Can you take a
17  moment to review both the spreadsheet that's
18  attached to the e-mail and the e-mail itself and
19  let me know when you have done that, please.
20    A.   OK.
21    Q.   Actually independent of this document,
22  I have one more general question.  The securities
23  of 1 billion and change that has been much
24  discussed today that were transferred on the 19th
25  from Lehman to BoNY for Barclays, did you

Page 239

DENIG - CONFIDENTIAL

1
2  understand that those were included in what we
3  have been discussing as schedule B?
4    A.   No.  It was -- I thought it was part
5  original repo transaction.  That was my
6  understanding at that time.  I know that's not the
7  case now but at that time, I thought it was
8  part -- to satisfy the additional shortcomings for
9  the repo.
10    Q.   Have you subsequently gained an
11  understanding that that billion and change
12  transferred on the 19th was part of schedule B?
13    A.   Yes.
14        MR. SHAW:  Asked and answered.
15    Q.   Thank you.
16        Do you recognize the document that I
17  have marked as 155?  Do you recognize Exhibit
18  155B?
19    A.   I do.
20    Q.   And can you tell me how it is that you
21  recognize it?
22    A.   The fact that my boss' boss put this
23  out to different people basically saying that of
24  the 1.95 billion, we have made all deliveries to
25  them, that satisfied that.

Page 240

DENIG - CONFIDENTIAL

1
2    Q.   When you say you have made all
3  deliveries and satisfied that, do you mean to say
4  that it is your understanding that 1.95 billion of
5  additional collateral had been moved to Barclays?
6    A.   Yeah, but actually, the last page says
7  362 didn't go.
8    Q.   And you're looking at the last page of
9  the spreadsheet that has the heading summary of
10  collateral moved, is that correct?
11    A.   Yup.
12    Q.   The column "MV" stands for market
13  value, is that correct?
14    A.   Yes.
15    Q.   Do you have an understanding of
16  whether market value here reflects Lehman's market
17  value or Barclays'?
18    A.   I don't know.  I'm assuming it is
19  Lehman's.
20    Q.   And what's the basis for that
21  assumption, Ms. Denig?
22    A.   Because the two -- I see the 269 and
23  the 161 were the market values of -- Lehman had
24  determined in subsequent files that we looked
25  at today.  Like this one.  Like the one before

Page 241

DENIG - CONFIDENTIAL

1
2  that last one.  That, that column, that totaled
3  the 269, it had a column heading called Lehman
4  market value.
5    Q.   And that 269.9 million is the same
6  figure as the 269.9 that you see reflected on this
7  last page?
8    A.   Yes.
9    Q.   155?
10    A.   Yes.
11    Q.   The line below that 269.9 million
12  reads 074-transferred 9/30/09.  Do you see that?
13    A.   Yes.
14    Q.   I am assuming -- I hadn't noticed it
15  before, that that's an error and the date should
16  be 9/30/08?
17    A.   Oh, yeah.  All of them.
18    Q.   And just so we have a clear record, it
19  is your understanding that the dates reflected on
20  the last page of Exhibit 55B have an error?
21    A.   Yes.
22    Q.   And is it your understanding that the
23  days of 9/19, 9/29 and 9/30 are not as reflected
24  here, 2009, but actually 2008?
25    A.   That's correct.

Page 242

DENIG - CONFIDENTIAL

1
2    Q.    The line entry 074 transferred 9/30/09
3    or 9/30/08, do you understand that to be a
4    transfer from Lehman's DTC box 074 to Barclays of
5    a little over 161 million dollars worth of
6    securities?
7    A.    Yes.
8    Q.    Were you involved in that transfer,
9    Ms. Denig?
10    A.    I was not.
11    Q.    Do you know who at Lehman was?
12    A.    Neal Ullman.
13    Q.    Is there a reason that you are aware
14    of that you were not involved in that transfer?
15    A.    Well, at this particular time, I was
16    on to my next project or working on getting the
17    asset, rid the assets off of Lehman's books, so
18    I -- it was passed to somebody else at that point.
19    Q.    Can you give me a little more detail
20    on your next project getting rid of the assets --
21    A.    Meaning we had reflected the sale of
22    defaulted repo on Lehman books and records to
23    reduce the balance sheet of that.
24    Q.    The entry for BoNY tripledge in 9/19,
25    what should be 08 is 1.155,820,860 billion?

Page 243

DENIG - CONFIDENTIAL

1
2    A.    Um-hm.
3    Q.    Do you have any understanding of
4    whether that's an accurate number or not?
5    A.    I do not and in the previous
6    documents, it was 1 billion, 035.
7    Q.    So if I wanted to know if that was
8    accurate or not, would I have to talk to
9    Mr. Forrest?
10    A.    You would.
11    Q.    Do you have any involvement in
12    transfers of assets at the options clearing
13    corporation from Lehman to Barclays?
14    A.    No.
15    MR. SHAW:    You need to speak.
16    A.    I did speak first.
17    MR. OXFORD:    Ms. Denig, thank you very
18    much for your testimony.  I appreciate your
19    time.  I don't have any further questions at
20    this time.
21    A.    Great, thank you.
22    (Recess)
23    EXAMINATION BY
24    MR. DAKIS:
25    Q.    My name is Robert Dakis from the law

Page 244

DENIG - CONFIDENTIAL

1
2    firm of Quinn, Emanuel, Urquhart, Oliver & Hedges.
3    We represent the committee of unsecured creditors.
4    I am going to ask you a few follow-up questions to
5    something that Mr. Hine asked you about today.  If
6    you could look at 243 in front of the witness,
7    could you take a second to look at it.
8    A.    OK.
9    Q.    I believe you testified earlier that
10    this e-mail string started as series of phone
11    calls between you and Mr. Hraska when you were
12    driving home?
13    A.    Yes.
14    Q.    Do you remember the subject of those
15    phone calls?
16    A.    Yes.
17    Q.    Could you just tell us what was
18    changed?
19    A.    Basically we had no cash, that after
20    everything was all said and done, there was a
21    shortfall of cash in the 21 billion range.
22    Q.    Did you have any --
23    A.    We thought, like my original thought
24    pattern was we messed up on some type of booking.
25    He was asking me about that and when I got back, I

Page 245

DENIG - CONFIDENTIAL

1
2    checked over everything and came back and said no,
3    all our deliveries made and there were no other
4    additional issues.  Then we come to realize it was
5    these other factors that came about.
6    Q.    And what do you mean by you checked
7    over everything?
8    A.    When I got home I logged on to my
9    machine, we have remote access at work.  I looked
10    over the contracts we had, literally by paging
11    down and looking at the delivery instructions if
12    they made or not based on MTA, at that point MTA
13    and all our systems were still good.
14    Q.    You were able to tell that night how
15    much cash went in and what securities went out?
16    A.    I can tell what securities went out.
17    The cash I didn't have any reflection of.  And
18    that's what the cash tickets still in fail means.
19    It says, "All cash tickets are still in fail,"
20    that was because cash management would clear
21    those.  I verified that we made delivery of all
22    the collateral that we had to.
23    Q.    During this period late at night, did
24    you have any phone calls with anyone else at
25    Lehman Brothers?

Page 246

DENIG - CONFIDENTIAL

1
2    A.    I did not.
3    Q.    Did you have any phone calls with
4    anyone at Barclays?
5    A.    I did not.
6    Q.    Could you turn to page 3 of the
7    exhibit, the second sentence of the e-mail string
8    on page 3, and this is an e-mail from you to Jim
9    Hraska and says, "Even though we took the TIBs
10   out, we replaced it with other collateral." Could
11   you just explain to me what you meant by we took
12   the TIBs out?
13   A.    TIBs is a particular type of asset.
14   They are Treasury Inflationary Bonds.  They
15   were -- they were part of the 8 billion shortfall.
16   When originally we delivered -- from the original
17   list of assets that we were supposed to send to
18   Barclays because we come to realize that those
19   assets were GCF collateral that went back to FICC
20   in the morning, we gave them something different
21   in return.
22   Q.    We need to slow down and pretend I
23   know absolutely nothing about finance for the
24   minute.
25   A.    As part of the original repo, there

Page 247

DENIG - CONFIDENTIAL

1
2    was a list that we got from somebody saying, OK,
3    deliver these assets.  My guys went and booked all
4    the trades, but then it reflected that we didn't
5    actually have position in a lot of these cases
6    because of subsequent issues with the way the
7    collateral is financed.
8         So we substituted them for different
9    ones, but like collateral, worth around the same.
10   So what I was telling him is what we substituted
11   was for the same value.  So that's not the
12   problem, and they -- and those, in fact, did get
13   delivered.
14   Q.    And this is all being caused by the 8
15   billion dollars of securities that Barclays didn't
16   want to take delivery of or is this a different
17   issue?
18   A.    This was a different issue, start of
19   the day.  When we first started doing the
20   transaction, we realized this.
21   Q.    Turning now to page 1 of the e-mail
22   string, the first e-mail on this page, Mr. Hraska
23   writes to you "ties out" and then has underneath a
24   couple of figures.  Do you understand what he
25   meant by "ties out"?

Page 248

DENIG - CONFIDENTIAL

1
2    A.    Meaning, yes, mean it reconciles,
3    saying that we gave them everything we had in the
4    box, via the repo transaction.  What we had left
5    was 15 billion that we didn't do with the repo,
6    there was an overnight repo that was being done.
7    That didn't get put on.  It didn't get booked
8    again.  And then there was 5 billion worth of
9    racers that were definitely not going.
10        So "ties out" is the collateral, the
11   value of the collateral that Barclays took the
12   night before, they didn't take this time, so
13   that got left in the box and this 5 billion
14   dollars worth of racer trades also got left in
15   the box.  That's the 21 billion.  We didn't
16   have any other liquidity providers giving us
17   cash for that collateral, so we were short cash
18   which we needed a box loan for.
19   Q.    And if I remember correctly, Chase
20   provided that box loan?
21   A.    They did.
22   Q.    And the 15 billion dollars of
23   collateral that's left in the box, 8 billion of
24   that is the collateral that Barclays said that
25   they didn't want as part of the repo?

Page 249

DENIG - CONFIDENTIAL

1
2    A.    Oh, I have no idea.  That part I
3    don't -- you mean the excluded part?
4    Q.    Yeah?
5    A.    The exclusion?  Yeah, I wasn't privy
6    to that.
7    Q.    Do you know who would know that?
8    A.    The -- probably the Treasury folks,
9    paolo Tonucci and his teams.
10   Q.    One more sort of general question, at
11   the time this e-mail string is being drafted, you
12   said there was -- I believe it says, "The cash
13   booked is still 44.2 billion dollars."  That's on
14   page 3?
15   A.    That's right.
16   Q.    We have been saying today that the
17   cash at some point increased from 44.2 to 45
18   billion, correct?
19   A.    That's correct.
20   Q.    Do you know when Barclays paid that
21   other 800 million?
22   A.    They paid it on 9/18.  They paid the
23   whole 45 billion which is why I needed to reflect
24   that on my trades.
25   Q.    At 1 o'clock in the morning on the

Page 250

DENIG - CONFIDENTIAL
1   DENIG - CONFIDENTIAL
2   19th, you said the cash was still at 44.2?
3       A.   Meaning I knew they paid 45 and I
4   didn't change them.  I hadn't changed it yet
5   because it was 1:35 in the morning and I didn't
6   feel like it.
7       Q.   Understandable.
8           MR. DAKIS:  I have nothing further.  I
9   understand Mr. Hine has a few more
10  questions.
11  EXAMINATION BY
12  MR. HINE:
13      Q.   I have a series of fairly ministerial
14  questions about a couple of documents I want to
15  run past you.  We talked all during the day about
16  pricing and where different prices come from.
17  Some come from Chase.  Some come from BoNY.  Some
18  come from the GPS system.  So I wanted to see if
19  we could nail down different documents and where
20  that pricing came from if you could.
21          So let me start with what has
22  previously been marked as Exhibit 234, which is a
23  spreadsheet after -- but when you get past the
24  e-mail, the spreadsheet is entitled, "BarCap,
25  9/18/08 with price and MV.XLS."  Do you see that?

Page 251

DENIG - CONFIDENTIAL
1   DENIG - CONFIDENTIAL
2   Do you know the source of the valuation data
3   that's embodied in that spreadsheet?
4       A.   There is a pricing source in the
5   second to last column.
6       Q.   Right?
7       A.   Right?  You mean how MTS has its
8   pricing hierarchy.
9       Q.   These are MTS prices, correct?
10      A.   MTS -- TMS in a lot of cases --
11  sometimes it reflects Chase, if Chase is the one.
12      Q.   There is no Chase entries there?
13      A.   I don't see any Chase entries.
14      Q.   So that chart is based on MTS pricing
15  data?
16      A.   Yes.
17      Q.   That is all I have for that chart.
18  Let's mark this.
19          (Exhibit 262, document Bates stamped
20  74-636.XLS marked for identification, as of
21  this date.)
22      Q.   Ms. Denig, I have handed you a
23  document marked as Exhibit 262 which is a new
24  document.  I wanted to give you a second to look
25  at it.  I will ask you a similar question once you

Page 252

DENIG - CONFIDENTIAL
1   DENIG - CONFIDENTIAL
2   have had a chance to look at it.
3       A.   Are these different documents?
4       Q.   Well, I was going to ask you that
5   question.  First of all, have you ever seen this
6   document before?
7       A.   No.
8       Q.   No?
9       A.   I guess I had to, I sent it, but I
10  don't --
11      Q.   Let me --
12      A.   Is it broken up into different
13  columns?
14      Q.   I don't know.  This is how we received
15  it.
16      A.   It is funny because I recognize the
17  first before the first blue, but the two middle
18  sections here, I don't recognize, and then I
19  recognize the last section.
20      Q.   Let's take them one at a time then.
21  First of all, the attachment is entitled
22  74-636.XLS?
23      A.   Um-hm.
24      Q.   Do you have any familiarity with that
25  spreadsheet, a spreadsheet entitled that?

Page 253

DENIG - CONFIDENTIAL
1   DENIG - CONFIDENTIAL
2       A.   Yes.
3       Q.   And what is that?
4       A.   It is just basically all the
5   collateral that -- individual pieces that went to
6   Barclays.
7       Q.   OK.
8       A.   And all the details, basically all the
9   trade details.
10      Q.   From those two boxes?
11      A.   Yeah.
12      Q.   Is that the first spreadsheet we see
13  here attached?
14      A.   Yes, I don't -- I don't know -- I
15  can't insure that this is complete, but that's
16  what it looks like.  I don't know what this is.
17      Q.   OK, we will get to -- take it section
18  by section.  In the first section in front of the
19  first blue sheet, you say you recognize the
20  spreadsheet but you can't determine whether it is
21  complete?
22      A.   Right.
23      Q.   Do you know what the source of the
24  pricing data is for that spreadsheet?
25      A.   GFS.

Page 254

DENIG - CONFIDENTIAL

1
2    Q.    Lehman's GFS system?
3    A.    Yes.
4    Q.    If we turn to the second spreadsheet
5    which is behind the first blue tab and you say you
6    don't recognize that spreadsheet?
7    A.    I don't.  And the only thing that is
8    throwing me off is the "deal MOP" in the first
9    column.  I never -- I never saw that before.
10    Q.    So you couldn't tell me what the
11    source is for this pricing data?
12    A.    No, I am sorry.
13    Q.    OK.  Let's turn to the third
14    spreadsheet which is behind the second blue tab
15    and I have the same question for you.
16    A.    The GFS.
17    Q.    You do recognize this spreadsheet?
18    A.    Yes.
19    MR. SHAW:  I think you skipped one.
20    A.    This one?  Yeah, I don't recognize
21    this either.
22    Q.    So you don't know the source of that
23    pricing data?
24    A.    I don't.
25    Q.    Let's skip to the fourth spreadsheet

Page 255

DENIG - CONFIDENTIAL

1
2    in the packet which is behind the third blue tab.
3    Do you recognize that one?
4    A.    Yes, I do.
5    Q.    Is that also part of a spreadsheet
6    titled 74-636?
7    A.    I can't be sure.  I really can't be
8    sure.  I don't think so because the column
9    headings are different.
10    Q.    Do you know the source of pricing
11    data?
12    A.    This is definitely GFS, the data
13    coming from here are the column headings that I
14    get from GFS.
15    Q.    So this data is from the GFS system?
16    A.    Yes.
17    Q.    Finally we have the last spreadsheet
18    in this package.  Do you recognize this one?
19    A.    Yes.
20    Q.    What's the source of that pricing
21    data?
22    A.    GFS.
23    Q.    Do you know what this spreadsheet is
24    in particular?
25    A.    Yes.

Page 256

DENIG - CONFIDENTIAL

1
2    Q.    What is it?
3    A.    Well, in particular, no.  But it is
4    along the same lines that it was produced out of
5    GFS and it is something that I did.
6    Q.    OK.  Very good.
7    A.    The signature and column heading.
8    Q.    OK.  Let's mark this.
9    (Exhibit 263, e-mail dated September
10    19, 2008 at 4:26 p.m. marked for
11    identification, as of this date.)
12    Q.    Handing you a copy of another document
13    which was marked as Exhibit 263 which is an e-mail
14    dated September 19 and attached to it is a
15    spreadsheet as well.  My first question is do you
16    recognize this document?
17    A.    Yes.
18    Q.    And what is this document?
19    A.    This document again is all the assets
20    that -- just a data dump of old assets that we
21    knew were delivered on 9/18 to Barclays.
22    Q.    And the title of this attachment is
23    "BarCap 9/18/08" with price and
24    "MV-074-636-revised price.XLS," correct?
25    A.    That's correct.

Page 257

DENIG - CONFIDENTIAL

1
2    Q.    What is the source of the pricing
3    information for this --
4    A.    GFS.
5    Q.    Spreadsheet?
6    A.    GFS.
7    Q.    Finally, if you could turn to an
8    exhibit previously marked as 146B.  I am going to
9    ask you a similar question first based on perhaps
10    if you could tell me from the title of the
11    documents.  Do you see -- if you need to look at
12    the underlying spreadsheets, I can give you them
13    too.  First page there is a spreadsheet which is
14    referenced with the title, "Barclays financing
15    collateral list (bark ops) 09-20-2008.XLS."  Do
16    you see that?
17    A.    Um-hm.
18    Q.    Are you familiar with that
19    spreadsheet?
20    A.    I am not.
21    Q.    Let me give you a copy of it then and
22    see if it refreshes your recollection.  I am
23    handing you a copy of an exhibit that previously
24    has been marked as 84B which I understand to
25    contain that spreadsheet and you will see the

Page 258

DENIG - CONFIDENTIAL

1   first page, it references the title of the
2   attachment with that same title.  Do you see that?
3       A.   Um-hm.  Yes.
4       Q.   If you turn to the spreadsheet, my
5   first question is, have you ever seen that
6   spreadsheet before?
7       A.   I can't say that I have.
8       Q.   Could you tell from the spreadsheet
9   whether it is generated through the Lehman system
10  or the Barclays system?
11      A.   It is generated in the Barclays
12  system.
13      Q.   OK.
14      A.   I can tell from the trading books that
15  these are booked into.
16      Q.   OK.  If you look on the fourth column,
17  column D of the spreadsheet, next to market value,
18  do you see that?
19      A.   Yes.
20      Q.   Do you know what the source is of that
21  pricing data?
22      A.   No idea.  This is mortgage collateral.
23  It would be Impact, which is Barclays' settlement
24  system, and they had their own pricing hierarchy.

Page 259

DENIG - CONFIDENTIAL

1       Q.   So is it correct to say --
2       A.   I just know from working at Barclays
3   now but not from -- I don't know from this
4   particular spreadsheet that that's what it was
5   used.  But if this is a dump from the settlement
6   system at Barclays, then Impact, which is their
7   settlement system, also has its own pricing
8   hierarchy which is where their pricing mode and
9   models would have come from.
10      Q.   It is the Barclays' comparable to the
11  GPS system --
12      A.   GFS system --
13      Q.   -- GFS system that Lehman would have
14  used?
15      A.   Yes.
16      Q.   This would not be BoNY numbers or
17  Chase numbers?
18          MR. SHAW:  Objection, foundation.
19      A.   Yeah, I wouldn't be able to 100
20  percent say.  It is a spreadsheet.
21      Q.   So referring back to Exhibit 146B
22  which is the e-mail Mr. Azerad sent you and James
23  Hraska in connection with your reconciliation
24  efforts, does that refresh in any way your

Page 260

DENIG - CONFIDENTIAL

1   recollection of --
2       A.   I do, I remember getting this e-mail,
3   going what the hell is he talking about, we had
4   five discrepancies, not a 1,065.  So I don't
5   remember even opening it up.  It killed my e-mail
6   box because it was 500 megabytes and I didn't
7   think that the information was proper.  So I don't
8   think I did anything with it.
9       Q.   Aside from the death of your e-mail
10  box, does it refresh your recollection as to the
11  source of the pricing in any way that would be
12  contained in that?
13      A.   For the Lehman stuff, in the
14  beginning, when we started looking at prices, we
15  took everything.  We really took every price from
16  GFS in every way we could.
17      Q.   But this spreadsheet --
18      A.   This spreadsheet is from GFS for the
19  Lehman, for the Lehman side of the scenario and
20  that would be from GFS.
21      Q.   I think you're paging through as you
22  speak you are referring to the spreadsheet
23  attached to Exhibit 146B, correct?
24      A.   That's correct.

Page 261

DENIG - CONFIDENTIAL

1       Q.   And if I look on the cover page of
2   146B, I see a spreadsheet at the bottom entitled
3   "LEH/BARReconciliation.XLS," do you see that?
4       A.   Yes.
5       Q.   Do you see that on the first page of
6   that exhibit?
7       A.   Um-hm.  Bar rec.  Yup.
8       Q.   So that spreadsheet is based on Lehman
9   pricing data?
10      A.   Yes, it is.
11      Q.   Do you have any knowledge of the first
12  spreadsheet, whether that's based on -- I believe
13  you said you think it is based on Barclays pricing
14  data?
15      A.   Yes.
16      Q.   But you're not sure?
17      A.   I am not sure.
18      Q.   So now if we go one last, look further
19  down on that cover e-mail, it talks about a
20  corrected spreadsheet.  Do you see the spreadsheet
21  entitled, "Corrected Thursday transfers to
22  Barclays BONY, agreed."  Do you see that?
23      A.   Yes.  It means that it is included
24  9/19's -- what do you call it.  9/19's transfers

Page 262

1      DENIG - CONFIDENTIAL
2  as well which is probably why it was corrected.
3      Q.   But do you have any understanding of
4  where the pricing data came from for that
5  corrected spreadsheet?
6      A.   No.  That spreadsheet came from
7  Magics, so I don't know how magic gets its
8  pricing.
9      Q.   Magic is what?
10     A.   Front end system within Lehman.
11     Q.   Lehman or Barclays?
12     A.   Lehman.
13     Q.   So the corrected spreadsheet came from
14  the Lehman system?
15     A.   Yes.
16     Q.   But you are not familiar with how it
17  was derived?
18     A.   Right.
19     Q.   When you say Magics, is that different
20  than the GPS prices?
21     A.   Yes.  GFS.
22     Q.   I am sorry.  Magics has -- Magic is a
23  Lehman system, correct?
24     A.   Yes.
25     Q.   And it has pricing data in it?

Page 263

1      DENIG - CONFIDENTIAL
2      A.   Yes.
3      Q.   Is that pricing data different from
4  the pricing data from the GFS system?
5      A.   It could be.
6      Q.   So that's --
7      A.   There is no consistent pricing source.
8      Q.   OK.  So the pricing information that
9  went into this corrected spreadsheet entitled
10  "Corrected Thursday transfers" was from the Magic
11  system within Lehman?
12     A.   That's correct.
13         MR. HINE:  Thank you, that is all I
14  have.  Unless, Jonathan, you have any
15  questions.
16         (Continued on next page for jurat)
17
18
19
20
21
22
23
24
25

Page 264

1      DENIG - CONFIDENTIAL
2          MR. SHAW:  Nope.
3      Anyone else have any questions?
4          MR. HINE:  I think we are concluded.
5      (Time noted:  3:55 p.m.)
6
7              _____
              NANCY DENIG
8
9  Subscribed and sworn to
10  before me this     day
11  of     , 2009.
12
13         _____
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1      DENIG - CONFIDENTIAL
2
3              CERTIFICATE
4  STATE OF NEW YORK )
5                   )ss:
6  COUNTY OF NEW YORK)
7      I, MARY F. BOWMAN, a Registered
8  Professional Reporter, Certified Realtime
9  Reporter, and Notary Public within and for
10  the State of New York, do hereby certify:
11      That NANCY DENIG, the witness whose
12  deposition is hereinbefore set forth, was
13  duly sworn by me and that such deposition is
14  a true record of the testimony given by such
15  witness.
16      I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage and that I am in no way
19  interested in the outcome of this matter.
20      In witness whereof, I have hereunto
21  set my hand this 21st day of August, 2009.
22
23         _____
              MARY F. BOWMAN, RPR, CRR
24
25

DENIG - CONFIDENTIAL

INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| N. Denig | Mr. Hine | 6, 250 |
| | Mr. Oxford | 189 |
| | Mr. Dakis | 244 |

EXHIBITS

| Exhibit No. | Marked |
|---|---|
| Exhibit 232 document Bates stamped 10303555, two pages, | 44 |
| Exhibit 233 screen shot | 84 |
| Exhibit 234 document Bates stamped 10331692 with attachment | 93 |
| Exhibit 235 document Bates stamped 10253250 with attachment | 96 |
| Exhibit 236 document Bates stamped 10328102 with attachment | 103 |
| Exhibit 237 document Bates stamped 10252914 with attachment | 108 |
| Exhibit 238 document Bates stamped BCI-EX4324 with attachment | 115 |
| Exhibit 239 document Bates stamped BCI-EX13384 through 86 | 118 |
| Exhibit 240 document Bates stamped BCI-EX18553 with attachment | 124 |
| Exhibit 241 document Bates stamped BCI-EX17607 and 08 with attachment | 125 |
| Exhibit 242 document Bates stamped BCI-EX17576 | 129 |
| Exhibit 243 e-mail dated September 19, 2008 at 1:43 a.m. | 137 |
| Exhibit 244 document Bates stamped BCI-EX18095 | 147 |
| Exhibit 245 document Bates stamped BCI-EX99802 through 807 and 862 through 865 | 159 |

DENIG - CONFIDENTIAL

EXHIBITS

| Exhibit No. | Marked |
|---|---|
| Exhibit 246 document Bates stamped BCI-EX108184 through 189 | 165 |
| Exhibit 247 document Bates stamped BCI-EX108708 | 166 |
| Exhibit 248 document Bates stamped BCI-EX00107848 through 939 | 171 |
| Exhibit 249 document Bates stamped BCI-EX99522 through 532 | 174 |
| Exhibit 250 document Bates stamped 10328232 | 180 |
| Exhibit 251 document Bates stamped 102378755 (7 pages) | 181 |
| Exhibit 252 document Bates stamped 10302702 | 186 |
| Exhibit 253 document Bates stamped BCI-EX-S-00018190 through 191 | 198 |
| Exhibit 254 document Bates stamped BCI-EX-S-18206 with attachment | 201 |
| Exhibit 255 document Bates stamped BCI-EX-S 18278 through 79 with attachment | 205 |
| Exhibit 256 document Bates stamped BCI-EX-S-18241 | 210 |
| Exhibit 257 document Bates stamped BCI-EX-S-18293 through 294, with attachment, | 218 |
| Exhibit 258 document Bates stamped BCI-EX-S 16935, with attachment, | 227 |
| Exhibit 259 document Bates stamped BCI-EX-S18485 through 486 | 228 |
| Exhibit 260 document Bates stamped BCI-EX-S-18577 through 78 | 231 |
| Exhibit 261 document Bates stamped BCI-EX-S-18505 and 06 with attachment | 233 |
| Exhibit 262 document Bates stamped 74-636.XLS | 251 |
| Exhibit 263 e-mail dated September 19, 2008 at 4:26 p.m. | 256 |

NAME OF CASE:
DATE OF DEPOSITION:
NAME OF WITNESS:
Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________
Page ______ Line ______ Reason ______
From ____________________ to ____________________

_____________________