# A. 8

Page 1

1

2                 UNITED STATES BANKRUPTCY COURT

3                   SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                               Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9                   Debtors.

10     ------------------------x

11

12            * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF ROBERT EDWARD DIAMOND, JR.

14                   New York, New York

15                   September 11, 2009

16

17     Reported by:

18     MARY F. BOWMAN, RPR, CRR

19     JOB NO. 24378

20

21

22

23

24

25

Page 2

September 11, 2009
10:35 a.m.


Deposition of ROBERT DIAMOND, held
at the offices of Jones Day, LLP, 222 East 41st
Street, New York, New York, before Mary F.
Bowman, a Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public
of the State of New York.

Page 3

APPEARANCES:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
   222 East 41st Street
   New York, New York   10017-6702
BY:  ROBERT GAFFEY, ESQ.
   BRIDGET CRAWFORD, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays and The Witness
   5301 Wisconsin Avenue, NW
   Washington, DC   20015
BY:  HAMISH HUME, ESQ.
   JONATHAN SCHILLER, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee
   51 Madison Avenue
   New York, New York   10010
BY:  ROBERT DAKIS, ESQ.

Page 4

APPEARANCES:
JENNER & BLOCK, LLC
Attorneys for the Examiner
   330 N. Wabash Avenue
   Chicago, Illinois   60611-7603
BY:  DAVID C. LAYDEN, ESQ.

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
   One Battery Park Plaza
   New York, New York   10004-1482
BY:  WILLIAM MAGUIRE, ESQ.
   FARA TABATABAI, ESQ

Also Present:
   THOMAS E. HOMMEL, ESQ.
   Lehman Brothers Holdings

Page 5

IT IS HEREBY STIPULATED AND AGREED, by
and between the attorneys for the respective
parties herein, that filing and sealing be
and the same are hereby waived.
   IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.


   IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized to
administer an oath, with the same force and
effect as if signed and sworn to before the
Court.

PAGES 6 – 9 REDACTED

Page 10

1   DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 11

1   DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

24   me cut ahead, and I will ask you about the
25   conversation with Mr. Varley, but was there a

---

Page 12

1   DIAMOND - HIGHLY CONFIDENTIAL
2   group of people that you called to tell?  Was it
3   more than Mr. Varley who you let know about the
4   call?  You said he was the first conversation.
5       A.  Well, over time, up until today, there
6   was certainly other conversations, but in the
7   immediate aftermath, which is what I suspect you
8   are asking --
9       Q.  It is.
10      A.  -- my conversation was with John.
11      Q.  And what did you say to Mr. Varley and
12  what did he say to you?
13      A.  I can only give you a sense of what I
14  said, because I think it is impossible to recall
15  the words or the exact --
16      Q.  Sure.  I am really looking for sum or
17  substance.
18      A.  I think the sum or substance was, it's
19  a positive that we were considered when thoughts
20  like this are going through the minds of people of
21  the Treasury, so the fact that Barclays is being
22  consulted and called is a positive.
23          Two, I most likely asked what his
24  visceral reaction was and provided my visceral
25  reaction, and my visceral reaction was, you know,

---

Page 13

1       DIAMOND - HIGHLY CONFIDENTIAL
2   prior to Bear Stearns-JP Morgan, it had never
3   dawned on me that there would be an opportunity
4   for an acquisition, deal, whatever the terminology
5   would be, with one of the U.S. bulge-bracket firms
6   at a distressed price.  And while Bear Stearns
7   wasn't in my mind one of the bulge-bracket firms,
8   it was a big U.S. firm that was at a distressed
9   price, so it would warrant thinking through.
10          And I think the context of that that's
11  important is, we had had many calls over the years
12  at Barclays and at Barclays Capital about were we
13  interested in doing things that were strategic
14  between Barclays Capital and other firms,
15  certainly from Bear Stearns over the years, and we
16  never had an interest, because the history was
17  very clear that combining two investment banks had
18  no success background.  They were generally very
19  poor deals.
20          I think the new information that was
21  coming in the wake of Bear Stearns, or actually
22  through Bear Stearns and in the wake of Bear
23  Stearns, is if in fact it happens at a distressed
24  price as opposed to a premium or book value price,
25  does that change the opportunity.

Page 14

DIAMOND - HIGHLY CONFIDENTIAL

1
2    And that was the sum and substance of
3    the conversation with John, as opposed to Lehman
4    versus someone else.  It was more, the paradigm
5    shift was around distress.

REDACTED

Page 15

DIAMOND - HIGHLY CONFIDENTIAL

1

REDACTED

Page 16

DIAMOND - HIGHLY CONFIDENTIAL

1

REDACTED

Page 17

DIAMOND - HIGHLY CONFIDENTIAL

1

REDACTED

16        How big a focus was it for you and
17    Mr. Varley that if you were going to do a deal
18    with anybody, it would be at a distressed price as
19    opposed to a book value or premium price?
20        A.    I think it was always a given.  You
21    need to put it in the context of -- it is not like
22    we spent much time over the years thinking about
23    acquisitions, because it was kind of a given that
24    mergers in investment banking don't work, CSFB and
25    DLJ probably being the poster child for value

| Page 18 | Page 19 |
|---|---|
| DIAMOND - HIGHLY CONFIDENTIAL<br>1<br>2 destruction, Citi-Salomon to some extent being<br>3 another one.<br>4　　　So every deal that was out there<br>5 had -- and John and I had been committed, while I<br>6 was CEO of BarCap and during the various times<br>7 when we were on the executive committee together<br>8 and he was head of retail banking and chief<br>9 financial officer and then the chief executive and<br>10 my boss, and while we were both on the board, had<br>11 always been very focused on organic growth and had<br>12 built the whole plan around it.<br>13　　　And so I used that word "dismissive"<br>14 which is probably wrong, but in a sense we,<br>15 because of the history, had just always kind of<br>16 put -- never considered a strategic deal in<br>17 investment banking.  We had done strategic deals<br>18 in retail banking, for example, in Spain and in<br>19 the U.K., but not in investment banking.<br><br>REDACTED | 1    DIAMOND - HIGHLY CONFIDENTIAL<br><br><br>REDACTED |
| Page 20 | Page 21 |
| 1    DIAMOND - HIGHLY CONFIDENTIAL<br><br>REDACTED | 1    DIAMOND - HIGHLY CONFIDENTIAL<br><br>REDACTED |

PAGES 22 – 29 REDACTED

Page 30

1          DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

Page 31

1          DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

Page 32

1          DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

15        Q.    And in that meeting with Dick Fuld,
16    again in sum and essence, can you tell me what was
17    the nature of the discussion, what did you say and
18    what did he say, as best you remember?
19        A.    After the normal platitudes, my
20    message was, in sum and essence, we have an
21    interest if this is a rescue situation, meaning if
22    this is a very, very distressed price.  That will
23    make it very difficult for you.

Page 33

1          DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

PAGES 34 – 57 REDACTED

Page 58

1         DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 59

1         DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 60

1         DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 61

1         DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

13         Have you had a chance to look through
14    definition Subsection D?  And you see it
15    describes -- I'm quoting -- "Government
16    securities, commercial paper, corporate debt,
17    corporate equity, exchange traded derivatives and
18    collateralized short-term agreements with a book
19    value as of the date hereof of approximately
20    70 billion collectively long positions."
21         Does that accurately describe assets
22    that Barclays agreed to buy from Lehman?
23    A.    The agreement that Barclays made was
24    that we would take a group of assets and a group
25    of liabilities with the -- with an additional and

Page 62

DIAMOND - HIGHLY CONFIDENTIAL

1    DIAMOND - HIGHLY CONFIDENTIAL
2    important commitment to our board that
3    notwithstanding all the risk associated with this,
4    and the difficult valuations, it would be capital
5    accretive.
6         I'll stick to that answer rather than
7    try and do anything else.
8         Q.  Well, my question doesn't go -- I will
9    ask you, and I will spend some time on it today,
10   what it was you spoke to your board about, but my
11   question goes to what agreement Barclays made with
12   Lehman.
13        A.  I think I have said to you that the
14   document here was the responsibility of Rich.  I
15   think you had an opportunity to do his deposition.
16        I can tell you what the agreement that
17   I was involved in discussing was, which I just
18   did.
19        Q.  OK.  Was the agreement that you were
20   involved in discussing, did it include the
21   purchase of government securities, commercial
22   paper, corporate debt, corporate equity, exchange
23   traded derivatives and collateralized short-term
24   agreements with a book value as of September 16th
25   of approximately 70 billion dollars?

Page 63

1    DIAMOND - HIGHLY CONFIDENTIAL
2         A.  The -- there was a group of assets and
3    a group of liabilities, and there was the
4    condition that notwithstanding the risk in the
5    markets and the difficult valuations in the
6    markets, that at the end of this we had a
7    commitment that to the best of our ability --
8    again, nothing could be guaranteed -- that it
9    would be capital accretive.
10        Q.  Do you have any knowledge, sir, as to
11   whether the bankruptcy court was informed in any
12   way that it was a condition of the agreement that
13   notwithstanding the risk in the markets and
14   difficult valuations in the markets, that at the
15   end, this had to be a commitment that to the best
16   of your ability would be capital accretive?  Was
17   that told to the bankruptcy court?
18        MR. HUME:  Objection, lacks
19   foundation.
20        Q.  You can answer.
21        A.  I wasn't at that session.
22        Q.  Did you ever learn if the bankruptcy
23   court was told that it was a condition to the deal
24   that it had to be capital accretive to Barclays?
25   Other than from lawyers?

Page 64

1    DIAMOND - HIGHLY CONFIDENTIAL
2         MR. HUME:  Objection, misstates the
3    testimony and lack of foundation.
4         A.  The transaction that we were agreeing
5    to at all steps and every step in a very clear
6    way, notwithstanding all the risks,
7    notwithstanding all the valuation difficulties,
8    notwithstanding all the holes in data, capital
9    accretion was a condition that was very important
10   to agreeing to a deal for our board and giving us
11   the authority.
12        I was not a part of the specific
13   meeting that you are referring to.
14        Q.  As a general matter -- I know you
15   didn't talk to the judge, but did it come to your
16   attention whether or not the bankruptcy court was
17   told it was a condition of the deal that it be
18   capital accretive?
19        MR. HUME:  Objection, asked and
20   answered.
21        MR. GAFFEY:  Asked.
22        Q.  You can answer the question, sir.
23        A.  I did.
24        Q.  Respectfully, sir, I don't think you
25   did.

Page 65

1    DIAMOND - HIGHLY CONFIDENTIAL
2         Do you know if the bankruptcy court
3    was told it was a condition of the deal that it
4    had to be capital accretive to Barclays?
5         A.  I'll take one more shot.
6         Q.  I will take as many as it takes, sir.
7         A.  I was not at the meeting.
8         Q.  You were not at the meeting with the
9    judge?  Is that what you mean when you say --
10        A.  What meeting are you referring to?
11        Q.  Sir, you're telling me you weren't at
12   the meeting.  What meeting are you telling me you
13   weren't at?
14        A.  What meeting did you just ask me?
15        Q.  Sir, in any way, in sum or essence --
16        A.  I am trying to help you, so I don't
17   know why you are laughing and doing all the
18   shenanigans.  If you can ask the question
19   straight, I will give you a straight answer.  But
20   you don't need all the drama.
21        Q.  I think you can leave it to your
22   lawyer to suggest whether I am laughing or not.  I
23   am actually not laughing, sir.  This is a very
24   serious matter.
25        My question is whether the bankruptcy

Page 66

DIAMOND - HIGHLY CONFIDENTIAL
1
2  judge who approved this deal was told it was a
3  condition of the deal that it would be capital
4  accretive to Barclays.  Do you have any knowledge
5  about that one way or the other?
6       MR. HUME:  I object to the use of the
7       word "condition" as vague and ambiguous, and
8       I object because the question has been asked
9       and answered.
10      Q.   You can answer the question, sir.
11      A.   I was not present at any discussions
12  personally.
13      Q.   Did you ever learn indirectly whether
14  the bankruptcy court was told it was a condition
15  to the deal that it be capital accretive to
16  Barclays?
17      A.   The condition to the deal from the
18  beginning was capital accretion.  I have explained
19  this many times.
20      Q.   Did you ever learn indirectly whether
21  the bankruptcy court was told, whether Judge Peck
22  was told about that condition to the deal?
23      A.   I never had a discussion with Judge
24  Peck.
25      Q.   Did anyone ever relay to you any

Page 67

DIAMOND - HIGHLY CONFIDENTIAL
1
2  report of the hearings that took place before
3  Judge Peck?  Just answer that yes or no.
4       MR. HUME:  Objection.  Can I just
5       object.
6       To the extent it calls for any
7       discussion with counsel, we instruct you not
8       to answer.  So any discussions about the
9       hearing with someone other than counsel is
10      what you are asking, what the question is.
11      A.   In a summary way, not a detailed way
12  certainly.
13      Q.   And in is summary way, when you had
14  these summary descriptions, did you learn one way
15  or the other whether Judge Peck was told that it
16  was a condition to the deal that it be capital
17  accretive to Barclays?
18      MR. HUME:  Objection.  I think the use
19      of the word "condition" in these questions
20      is highly ambiguous.  The witness has
21      testified that it was an internal condition.
22      He didn't testify to anything beyond that.
23      Q.   Could you answer the question,
24  Mr. Diamond?
25      A.   I think I have been very, very clear

Page 68

DIAMOND - HIGHLY CONFIDENTIAL
1
2  with you that the agreement was the responsibility
3  of Rich, and that I wasn't at the bankruptcy
4  proceedings here.  You are asking me something
5  that I -- you are asking me about a conversation
6  where I wasn't there.
7       Q.   Is the answer that you don't know one
8  way or the other directly or indirectly?
9       A.   I think I have answered the question.
10  I will stand by my answer.
11      Q.   Did you -- were you personally engaged
12  in any of the negotiations with personnel at

REDACTED

Page 69

DIAMOND - HIGHLY CONFIDENTIAL
1

REDACTED

PAGES 70 – 81 REDACTED

Page 82

DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

7    Q.   As best you can, sir, and we will
8  spend more time on this today, what's your --
9  outline for me, please, the deal that was made.
10  What were the components of the deal?
11         MR. HUME:  Objection, vague.
12    A.   Sorry.
13    Q.   You can answer.
14    A.   The question is what was the deal?
15    Q.   What were the components of the deal
16  in your mind?
17    A.   We were acquiring the U.S.
18  broker/dealer operation of Lehman Brothers with
19  commitments from, as discussed, people, and a
20  group of assets and a group of liabilities, which
21  notwithstanding the uncertainty in valuations,
22  notwithstanding the uncertainty in information and
23  the gaps, notwithstanding the volatility in the
24  market, gave us great confidence that we could say
25  to our board that the deal would be capital

Page 83

DIAMOND - HIGHLY CONFIDENTIAL

1  accretive.  Because the environment we were in,
3  the share price would be attacked if we were not
4  capital accretive, and that was the -- that was
5  what the board required of me.
6         Now, I did say to the board, and I
7  want to be fair, there are no guarantees in this,
8  because it was -- I don't know -- it was, it was
9  very difficult to agree to a transaction when
10  there kept being misinformation, lack of
11  information, assets that couldn't be found,
12  information that couldn't be found, antagonism and
13  difficulty with clearing agents and clearing
14  mechanisms, and just the volatility in the market.
15         And you may recall that once we had
16  the idea Sunday night and early Monday morning
17  that potentially even post bankruptcy we might be
18  able to do a deal for the U.S. broker/dealer, you
19  know, by this time there was buzz all over the
20  market that there was a U.S. Government rescue of
21  AIG, Merrill Lynch was joining with Bank of
22  America, Wachovia was on the rocks, Morgan Stanley
23  was on the rocks.  It was an incredibly -- as
24  Chairman Bernanke has said, it was the week of
25  most stress in the history of the financial

Page 84

DIAMOND - HIGHLY CONFIDENTIAL
2  markets.
3         So that was the deal.  And we were
4  willing to go forward with that.

REDACTED

Page 85

DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 86

1          DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

14          Let me ask you a bit -- ask you, sir,
15    what you mean by capital accretive.  Can you
16    explain that term to me.
17          A.    The regulators that we are responsible
18    to, the Financial Services Authority in the U.K.,
19    holds us to specific capital standards, so for
20    example, core equity, tier 1 equity, and it was
21    becoming increasingly clear during this time that
22    they were focusing more on core equity than tier 1
23    equity, and they were thinking the banks would
24    potentially have to hold higher core equity.
25          So when I say capital accretive,

Page 87

1          DIAMOND - HIGHLY CONFIDENTIAL
2    accretive to the capital ratios, which means that
3    the asset liability mismatch had to have a
4    mismatch in favor of a positive capital accretion
5    or we weren't authorized to do a deal.

**REDACTED**

23          Q.    Describe to me what you meant when you
24    said there had to be a mismatch between assets and
25    liabilities in favor of capital accretion.  Which

Page 88

1          DIAMOND - HIGHLY CONFIDENTIAL
2    had to be higher?
3          A.    I would ask you to go to an accountant
4    for that.  But you can't have -- you can't have --
5    I'm not a very good accountant.
6          Q.    It is a fair fight.  Neither am I.
7          A.    Which is why I relied on the team to
8    do this.
9          I think clearly the mismatch is what
10    creates the capital accretion, and, you know,
11    listen, fair enough.  I have said it before in
12    other situations and I'll say it again.  It's not
13    that there was certainty in valuations, not that
14    there was certainty in the information, and it is
15    clear that the volatility of the market -- even if
16    there was certainty in valuation that day and
17    certainty in information, of which there was
18    neither, when the equity market is swinging around
19    500 points a day, you can imagine the volatility.
20          So this was a very stressful
21    situation, for me as a main board member, to be
22    able to say to my board that you have the highest
23    certainty possible of capital accretion as we are
24    showing it to you, notwithstanding the
25    uncertainty, the lack of valuations, lack of

Page 89

1          DIAMOND - HIGHLY CONFIDENTIAL
2    information and the volatility in the market, and
3    I was -- to be fair, we could only do the best we
4    could.  There were no guarantees.
5          Q.    Let me press back a little bit,
6    because I want to make sure that I understand what
7    you are talking about with the mismatch in capital
8    accretion.
9          In layman's terms, because I'm a lousy
10    accountant too, are you saying that assets had to
11    exceed liability -- you needed as much confidence
12    as you could get in these circumstances that
13    assets exceeded liabilities?  That's the mismatch
14    you are talking about?
15          MR. HUME:  Objection to form.
16          A.    I think, you know, not being an
17    accountant, I would ask you to talk to -- and I
18    know you have been able to depose Rich and Patrick
19    and others who were doing the accounting.  I think
20    I will stick to my level of knowledge.
21          Q.    A few answers ago it is a phrase you
22    used, sir, the mismatch between assets and
23    liabilities, so I will take whatever explanation
24    you can give me of what you meant when you talked
25    about a mismatch between assets and liabilities.

Page 90

DIAMOND - HIGHLY CONFIDENTIAL

1  How were they mismatched?
2      A.  To provide capital accretion. I'm
3  sure someone who knows more than I can tie those
4  together for you.
5      Q.  When you talk about the mismatch, you
6  are talking about assets exceeding liabilities,
7  yes? Not liabilities exceeding assets. Is that
8  right?
9      A.  As I said, I am not an accountant. I
10  am not going to get into accounting terms. There
11  is a good reason why they don't let me do the
12  accounting.
13      Q.  Let me try it another way. In order
14  to have capital accretion, sir, did you have to
15  pay less for what you got? Did you have to get
16  more in value than you paid? Is that what leads
17  to capital accretion?
18      A.  I think there is --
19          MR. HUME: I will object to the
20  question as vague.
21      A.  I -- my answer is somewhat associated
22  with the objection, which is that there is no one
23  way to do anything. So again, I think I made
24  clear I'm not the right person to go into the

Page 91

DIAMOND - HIGHLY CONFIDENTIAL

1  details, and, you know, I had a staff that
2  prepared us very well and prepared the documents
3  for the executive committee and for the board.
4      But I'm not comfortable in answering
5  questions that seem to me to be of an accounting
6  nature, which I have no expertise in. And I'm
7  kind of glad I don't.
8      Q.  Did you have a sense when the deal was
9  agreed that Barclays was going to have a gain as
10  opposed to a loss on the deal?
11      A.  I was highly confident,
12  notwithstanding the environment we were in, that I
13  could hold my head up to the board and say yes, it
14  is capital accretive. But I knew there was risk,
15  and particularly in this environment where there
16  were so many gaps up until the last minute of
17  information, assets and liabilities that are
18  turning out to be different than what were first
19  reported, valuations that were different than they
20  had been recorded on the books for, valuations
21  that were changing minute to minute because of the
22  volatility in the markets, and information coming
23  in to us from clearing agents and clearing
24  organizations that were different than we were

Page 92

DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

Page 93

DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

24

Page 94

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 95

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 96

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 97

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 98

```
 1              DIAMOND - HIGHLY CONFIDENTIAL




                        REDACTED




15       Q.  Has Mr. Varley ever shown you a
16   document that refers to a negotiated discount of
17   5 billion dollars in the price?
18       A.  Not to my recollection.
19       Q.  Do you recall hearing any discussion
20   with Mr. Varley or anyone else on the senior team
21   about there being a negotiated 5 billion dollar
22   discount on the price?
23       A.  I think I answered that in the
24   question before the last.
25       Q.  The question before was just
```

Page 99

```
 1              DIAMOND - HIGHLY CONFIDENTIAL
 2   Mr. Varley.  I am broadening it out.
 3            Any discussion with anyone on the
 4   senior team about a negotiated 5 billion dollar
 5   discount on the price?
 6       A.  I have no recollection of that phrase.
 7       Q.  Is it your understanding that there
 8   was a negotiated discount on the price?
 9       A.  I told you what my understanding was.
10   And I didn't lie.
11       Q.  I'm not suggesting you did.  I truly
12   am not.  I am just trying to get a --
13       A.  My understanding was, we needed to
14   have capital accretion, a group of assets, group
15   of liabilities.  We talked about the buildings.
16   Those are my understandings.
17            And I just said I don't recall that
18   phrase, so obviously I don't recall conversation.
19       Q.  Let me not nail it to that phrase, and
20   I truly don't mean to suggest you are not being
21   truthful, sir.  I am trying to get an
22   understanding so we can follow up here.
23            Apart from the phrase negotiated
24   discount of 5 billion dollars on the price, did
25   you have an understanding that the price paid was
```

Page 100

```
 1              DIAMOND - HIGHLY CONFIDENTIAL
 2   less than the market value of the assets acquired?
 3       A.  I had a very clear understanding that
 4   this deal would be, to the extent we could
 5   guarantee it, capital accretive.  That's the
 6   phraseology that I am most comfortable with.
 7            If you feel those are saying the same
 8   things, that's fine, but I'm not an accountant.
 9       Q.  Let me see if they are saying the same
10   things, and I can move on to something else.
11            By capital accretive, do you mean that
12   the price paid was less than the market value of
13   the assets acquired?  Does one relate to the
14   other?
15       A.  You know what?  I think anybody can
16   figure out capital accretive.
17       Q.  You may have met the only man who
18   can't.
19       A.  I would get some experts.
20       Q.  Does capital accretive --
21       A.  I am not an accountant, and I am not
22   going to get sucked into trying to define
23   accounting terms.
24       Q.  I am asking you what you mean by your
25   use of the term "capital accretive."
```

Page 101

```
 1            DIAMOND - HIGHLY CONFIDENTIAL
 2       A.  I'm sure there is a very specific
 3   clarity around what we mean by capital accretive.
 4   It meant it was accretive to the core equity
 5   capital of Barclays, so that everything else being
 6   equal, this transaction, the core equity ratio
 7   would be positive, would have a delta that's
 8   positive, not negative.
 9       Q.  Did Barclays have a gain on
10   acquisition when this deal was completed?
11       A.  I know there was -- I don't know --
12   how would I say this.  My understanding is, in our
13   financial reporting at the end of the year, there
14   was a gain on acquisition.  That's my
15   understanding.




                        REDACTED
```

Page 102

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 103

1
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 104

1          DIAMOND - HIGHLY CONFIDENTIAL
2
3          REDACTED
4
5          Q.   We talked at some length before the
6    break, Mr. Diamond, about this concept that the
7    deal needed to be capital accretive. Did you
8    personally tell anyone at Lehman that the deal had
9    to be capital accretive to Barclays?
10         A.   I didn't have any of the discussions
11   about the deal with anyone from Lehman. Could
12   that phrase have come up at some point? I can't
13   imagine it. I have no recollection. But I was
14   definitely not one of the people who actually
15   discussed it.
16         Q.   So when you say it could have come up,
17   I just want to probe what's your memory and what
18   might be speculation.
19         A.   Let me say it more clear. I have
20   absolutely no recollection, and I can't imagine,
21   but I just -- I might have used the phrase in an
22   unofficial way with someone, because capital
23   accretion was so important to us, but I don't
24   think I did, and I can't imagine it, and I wasn't
25   on the front line of the negotiation at all. I

Page 105

1          DIAMOND - HIGHLY CONFIDENTIAL
2    was very much behind.
3          Q.   To your knowledge, did anyone who was
4    on the front line of the negotiation for Barclays
5    tell anyone at Lehman that the transaction had to
6    be capital accretive to Barclays?
7          A.   That would be speculation on my side.
8    But I would imagine that they did.
9          Q.   Apart from speculating --
10         A.   I'm just speculating.
11         Q.   You have no knowledge one way or the
12   other of whether anyone did?
13         A.   No.
14         Q.   Is that right?
15         A.   That's correct.

REDACTED

PAGES 106 – 125 REDACTED

Page 126

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 127

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 128

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

7      Q.   The deal as it ultimately closed, was
8   that deal capital accretive to Barclays, after all
9   this tumult?
10      A.   On what date?
11      Q.   On the 22nd of September, 2008.
12      A.   I am trying to think if we actually do
13   capital reporting on that date.  What it depends
14   on is in a market such as the market we were
15   operating in, with the value that day of the
16   assets and the liabilities of the organization,
17   but we had agreed to deal -- again I am sorry to
18   say it this way -- to the best of our ability to
19   deliver to the board what they required of us, it
20   was a deal that was capital accretive, but it
21   depends on what day you say you are valuing all
22   those securities.
23      Q.   When the deal closed, on the day the
24   deal closed, the 22nd of September, were you able
25   to report to your board that you satisfied the

Page 129

1          DIAMOND - HIGHLY CONFIDENTIAL
2   demand that it be capital accretive?
3      A.   That's my understanding.  I don't
4   recall a report going in, but that would be my
5   understanding.

REDACTED

11      Q.   You mentioned in your answer a moment
12   ago, as the deal went through the week, there was
13   a need to find other assets and other liabilities?
14      A.   Lehman was scrambling quite a bit, not
15   Barclays, but Lehman was scrambling quite a bit.
16   It wasn't a Barclays request.  It was -- sadly,
17   very sadly, Lehman Brothers was in chaos and out
18   of control.  So very often things that they would
19   report they could do they actually couldn't do,
20   because they couldn't locate them or a clearing
21   agent had taken them away.
22          So it was very, very touch and go
23   whether or not we would complete this transaction,
24   and Barclays never changed anything.  But Lehman
25   Brothers was changing second to second and minute

| Page 130 | Page 131 |
|---|---|

Page 130

DIAMOND - HIGHLY CONFIDENTIAL

1  to minute.
2  Q.  Are you quite certain in your memory,
3  sir, as you sit here, that it was not a Barclays
4  request?
5  A.  If you can tell me the request, I'm
6  happy to answer it.
7  Q.  The request that additional assets be
8  found.  Are you quite certain that that request
9  did not come from Barclays?
10  A.  As I said, I was not involved -- what
11  I said, and I would prefer my words don't get
12  twisted, what I said is the changes were driven by
13  Lehman's inability to deliver the things that they
14  had assured that they could deliver.
15  They were finding that assets that
16  they thought were there weren't there, that
17  clearing agents or clearing firms had taken them,
18  and it was in chaos, and it was very difficult for
19  the people from Lehman Brothers to deliver on what
20  they had hoped to be able to deliver on.  That's
21  what I said.
22  Q.  Did Barclays request that Lehman add
23  additional assets to the transaction?
24  A.  I wasn't a part of any specific

Page 131

DIAMOND - HIGHLY CONFIDENTIAL

1  negotiation, so I think you may have had a chance
2  to discuss that with Rich.
3  Q.  To your knowledge, to your knowledge,
4  did Barclays ask or demand that Lehman add assets
5  to the transaction?
6  A.  To my knowledge and understanding,
7  there was always a group of assets and a group of
8  liabilities that when we settled the deal needed
9  to give us the highest chance of having capital
10  accretion or I couldn't approve the deal.
11  The specifics of that between Lehman
12  and Barclays were negotiated by Rich and his team,
13  and I wasn't involved, so I can't comment on that.
14  I think you have had an opportunity to talk to
15  Rich and his staff.
16  Q.  I get it about how you don't have the
17  specifics.  I understand that.  I know you are a
18  chief executive.
19  A.  President actually.
20  Q.  President.  You're up there.  OK.
21  I am not going to ask you what the
22  particular assets were.  But did it come to your
23  attention during the week that additional assets
24  were needed to complete the transaction?

| Page 132 | Page 133 |
|---|---|

Page 132

DIAMOND - HIGHLY CONFIDENTIAL

1  MR. HUME:  Objection, asked and
2  answered.
3  A.  I will try one more time.
4  Q.  I am doing the best I can to
5  understand you, sir.
6  A.  OK.  Can you understand the fact that
7  Lehman was in chaos?  Do you disagree with that?
8  Q.  We talked about this before, sir.  I
9  ask the questions, you answer them.
10  A.  You said you were doing the best you
11  could to understand it.
12  Q.  Do you need the question read back,
13  sir?
14  A.  One, Lehman was in chaos.  They
15  couldn't locate things that they said they could
16  deliver to us.  They couldn't understand the value
17  of many things.  They had misstated values.  I
18  could go on and on and on and on.  It was in
19  chaos, and they were under attack from their
20  counterparties and their clearing agents.
21  So we had to be flexible, and I'm sure
22  there were discussions with our team and their
23  team about how we were going to resolve this, and
24  I know they were making changes and suggestions to

Page 133

DIAMOND - HIGHLY CONFIDENTIAL

1  the collateral right up to the 11th hour.
2  Q.  Did it ever come to your attention
3  while all this was going on that there might be
4  insufficient assets for Barclays to close the
5  deal?
6  A.  There were many times leading right up
7  until getting to the bankruptcy hearing when it
8  was unclear whether or not the things that Lehman
9  felt they could provide, they could provide, and
10  they were continuing, continuing right up until
11  the 11th hour, to look for assets so they could
12  satisfy the pool of assets and liabilities that we
13  had talked about in concept and the accretion that
14  we had talked about in concept.
15  And yes, that was being worked on
16  until very, very late Friday, so much so that I
17  recall it was a period when we thought we might
18  not be able to complete the transaction and a
19  period when we weren't sure that Lehman would get
20  to the bankruptcy hearing on time.
21  Q.  When was the point?  When was the
22  point you just described?  When during the week
23  did it appear that they might not be able to get
24  enough assets?

Page 134

DIAMOND - HIGHLY CONFIDENTIAL

1
2   A.   Many times.
3   Q.   Do you recall a meeting on Friday
4   morning devoted to that topic?  Friday, the 19th?
5   A.   I remember many conversations on
6   Friday that these situations were going on.
7   Q.   And on that Friday, the 19th, did it
8   come to your attention that personnel at Barclays
9   told Lehman that they needed to find additional
10  assets to add into the deal?
11  A.   I knew Lehman was still looking for
12  assets on Friday.  That is all I can say.
13  Q.   When you say that is all you can say,
14  I think we are missing each other a little bit
15  here.  My question is, did it come to your
16  attention that anyone from Barclays said to anyone
17  at Lehman you need to find more assets?
18  A.   I know Lehman was not able to deliver
19  on some assets that they promised and therefore
20  they had to get others, and I'm not privy to any
21  conversations from Barclays.
22  Q.   Do you know one way or another,
23  whether you were privy to conversations or have
24  knowledge direct or indirect, do you know whether
25  anyone at Barclays demanded from Lehman on Friday,

Page 135

DIAMOND - HIGHLY CONFIDENTIAL

1
2   September 19th, that Lehman add assets to the
3   transaction?
4   A.   My patience is doing a great job so I
5   am going to try one more time.
6   There were many times on Friday and
7   many times during the week from Tuesday through
8   Friday where the people from Lehman were screwing
9   around trying to find assets.  I didn't have any
10  direct conversations with someone from Barclays.
11  You keep asking me to confirm
12  something from Barclays.  What I can confirm to
13  your question is Lehman was in chaos and Lehman
14  was scrambling to find enough assets to complete
15  the deal, and that was happening from the moment
16  we signed Tuesday right through the 11th hour
17  Friday.  It was very sad.
18  Q.   You don't know one way or the other
19  whether someone from Barclays said to someone from
20  Lehman on Friday, the 19th, you need to get more
21  assets?
22  A.   I am not going to speculate who said
23  what, but I certainly answered that very, very
24  directly.  Lehman was looking for assets until the
25  11th hour.  Whether it was asked for or not asked

Page 136

DIAMOND - HIGHLY CONFIDENTIAL

1
2   for, Lehman was still trying to fulfill the
3   assets.
4   Q.   Do you know if it was --
5   A.   Let me finish, please.
6   Q.   Sure.
7   A.   Don't interrupt me.
8   And I don't have any specific
9   inclusion in any requests made from Barclays in
10  terms of the negotiation of the assets.  I think
11  that answers the question directly.
12  Q.   Do you have any general recollection
13  of any requests made from Barclays in terms of the
14  negotiation of the assets?
15  A.   I wasn't involved.

REDACTED

Page 137

DIAMOND - HIGHLY CONFIDENTIAL

1

REDACTED

PAGES 138 – 145 REDACTED

Page 146

1   DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

Page 147

1   DIAMOND - HIGHLY CONFIDENTIAL

**REDACTED**

24   Q.   Then the second subpoint within that
25   bullet point says, "We would acquire 75 billion of

Page 148

1   DIAMOND - HIGHLY CONFIDENTIAL
2   assets and liabilities.  The business would
3   include risk-weighted assets of 13.5 billion."
4       Do you see that?
5   A.   I see that.
6   Q.   Is the 75 billion dollar number
7   attributed to the assets and liabilities an
8   accurate description of the deal that was
9   contemplated?
10      MR. HUME:  Objection, lacks
11      foundation.
12  A.   I mean this isn't a deal document.
13  This is kind of a setting the context with very
14  round, broad numbers, 13 and a half billion in
15  RWAs, so if you will notice as you look through
16  this, this is a document where every number is
17  2 billion, 3 billion, 1 and a half, 75.  This is a
18  planning document as opposed to a deal document.
19  And it is giving at this point the gist of the
20  deal that we were contemplating.
21      As far as I can tell, this didn't go
22  to the board.  This was a planning document being
23  prepared for the board.  Whether it went to the
24  board or not, I'm not sure.
25  Q.   Is the gist that it is telling you

Page 149

1   DIAMOND - HIGHLY CONFIDENTIAL
2   that the approximate value of the assets to be
3   purchased was 75 billion dollars?
4   A.   I think the gist was in the last
5   penultimate bullet, this will be subject to U.S.
6   legal process which is unpredictable.  Sorry, just
7   trying to get a little humor in there.
8   Q.   That's OK.
9       Now that we both had our giggle, can
10  we go back to whether the gist of it, as you
11  understand it, was approximately 75 billion
12  dollars in assets was being purchased?
13  A.   Well, they are using the 75 billion
14  here for what I have described as a pool of assets
15  and a pool of liabilities, and it is an
16  approximate number.
17  Q.   So was it your understanding on the
18  morning of the 16th that the pool of assets to be
19  purchased had an approximate value of 75 billion
20  dollars?
21      MR. HUME:  Objection, asked and
22      answered.
23  A.   I am a bit confused.
24  Q.   Are you looking for something in the
25  exhibits?

Page 150

1          DIAMOND - HIGHLY CONFIDENTIAL
2      A.   Tuesday?
3      Q.   Yeah, Tuesday, the 16th.
4      A.   That's the estimate used in this
5   document, is all I can say.

REDACTED

Page 151

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 152

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

Page 153

1          DIAMOND - HIGHLY CONFIDENTIAL

REDACTED

PAGES 154 – 237 REDACTED

| | Page 238 |
|---|---|
| 1 | DIAMOND - HIGHLY CONFIDENTIAL |

**REDACTED**

10    (Time noted:  4:18 p.m.)

12    _____
13    ROBERT EDWARD DIAMOND, JR.
14  Subscribed and sworn to
15  before me this      day
16  of September, 2009.

18    _____

| | Page 239 |
|---|---|

DIAMOND - HIGHLY CONFIDENTIAL
INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| R. Diamond | Mr. Gaffey | 6 |
| | Mr. Maguire | 185 |
| | Mr. Dakis | 233 |

EXHIBITS

| Exhibit No. | Marked |
|---|---|
| Exhibit 412-A Document Bates stamped | 153 |
| BCI-EX-S 25413 | |
| Exhibit 413-A Document Bates stamped | 164 |
| BCI-EX-S 79546 | |

| | Page 240 |
|---|---|

1    DIAMOND - HIGHLY CONFIDENTIAL

3    CERTIFICATE
4  STATE OF NEW YORK )
5    )ss:
6  COUNTY OF NEW YORK)
7    I, MARY F. BOWMAN, a Registered
8  Professional Reporter, Certified Realtime
9  Reporter, and Notary Public within and for
10  the State of New York, do hereby certify:
11    That ROBERT EDWARD DIAMOND, JR., the
12  witness whose deposition is hereinbefore set
13  forth, was duly sworn by me and that such
14  deposition is a true record of the testimony
15  given by such witness.
16    I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage and that I am in no way
19  interested in the outcome of this matter.
20    In witness whereof, I have hereunto
21  set my hand this 11th day of September,
22  2009.

24    _____
25    MARY F. BOWMAN, RPR, CRR

| | Page 241 |
|---|---|

1    DIAMOND - HIGHLY CONFIDENTIAL
2    * * *ERRATA SHEET* * *
3  NAME OF CASE:  In Re: Lehman
4  DATE OF DEPOSITION: 9/11/09
5  NAME OF WITNESS:  ROBERT EDWARD DIAMOND, JR.
6  Reason codes:
7    1. To clarify the record.
    2. To conform to the facts.
8    3. To correct transcription errors.

10  Page ____ Line ____ Reason____
    From _____ to_____

12  Page ____ Line ____ Reason____
    From _____ to_____

14  Page ____ Line ____ Reason____
    From _____ to_____

16  Page ____ Line ____ Reason____
    From _____ to_____

18  Page ____ Line ____ Reason____
    From _____ to_____

20  Page ____ Line ____ Reason____
    From _____ to_____

22  Page ____ Line ____ Reason____
    From _____ to_____

24  ROBERT EDWARD DIAMOND, JR.