# A. 10

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------x

In Re:

Chapter 11

LEHMAN BROTHERS Case No. 08-13555(JMP)

HOLDINGS, INC., et al, (Jointly Administered)

Debtors.

-------------------------x

* * *HIGHLY CONFIDENTIAL* * *

DEPOSITION OF ERIC JONATHAN FELDER

New York, New York

July 31, 2009

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 24018

July 31, 2009
9:35 a.m.

Deposition of ERIC JONATHAN FELDER, held at the offices of Jones Day, LLP, 222 East 41st Street, New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

APPEARANCES:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
222 East 41st Street
New York, New York 10017-6702
BY: DAVID L. CARDEN, ESQ.
KELLY CARRERO, ESQ.
JENNIFER DEL MEDICO, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays and The Witness
575 Lexington Avenue - 7th Floor
New York, New York 10022
BY: JACK G. STERN, ESQ.

DEBEVOISE & PLIMPTON, LLP
Attorneys for The Witness
919 Third Avenue
New York, New York 10022
BY: ANDREW J. CERESNEY, ESQ.
JULIE SUH, ESQ.

APPEARANCES:

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
BY: ERICA P. TAGGART, ESQ.

JENNER & BLOCK, LLC
Attorneys for the Examiner
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
BY: ROBERT L. BYMAN, ESQ.

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
One Battery Park Plaza
New York, New York 10004-1482
BY: WILLIAM R. MAGUIRE, ESQ.
NEIL J. OXFORD, ESQ.

Also Present:
Rajesh Ankalkoti, Alvarez & Marsal

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

FELDER - HIGHLY CONFIDENTIAL

ERIC JONATHAN FELDER, called as a witness by the parties, having been duly sworn, testified as follows:

MR. CARDEN: Good morning, Mr. Felder. My name is David Carden. I represent the estate of Lehman Brothers, and I think what we ought to do is go around the table and have everybody identify who they are before we begin, and then, Jack, you have a statement, right?

MR. STERN: Yes.

MR. CARDEN: I already introduced myself. My colleague, Kelly Carrero and Jennifer Del Medico.

MR. ANKALKOTI: My name is Rajesh Ankalkoti. I am with Alvarez & Marsal.

MS. TAGGART: I'm Erica Taggart with Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, for the creditors committee.

MR. MAGUIRE: Bill Maguire and Neil Oxford from Hughes, Hubbard & Reed for the trustee.

MR. BYMAN: Robert Byman, Jenner &

FELDER - HIGHLY CONFIDENTIAL

Block, on behalf of the examiner.

MS. SUH: Julie Suh with Debevoise & Plimpton on behalf of the witness.

MR. CERESNY: Andrew Ceresney from Debevoise representing Mr. Felder personally.

MR. STERN: Jack Stern, Boies, Schiller & Flexner on behalf of Barclays Capital and Mr. Felder.

Before we begin the questioning, I just want to state on the record, to avoid time-consuming discussions of confidentiality, we have a confidentiality order in place. What I would like to do is make a general designation of, anything in the record that should be treated as highly confidential or confidential under the terms of the confidentiality order will be so designated automatically, and more specifically, to the extent that there are questions concerning Mr. Felder's personal compensation, those are deemed highly confidential under the confidentiality order.

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

MR. CARDEN: I don't think I have a problem with that. I am wondering what you think the mechanism ought to be for those aspects which are not highly confidential and confidential, sort of getting out from underneath that designation?

MR. STERN: I think the best way for us to deal with that is to address that after the deposition off the record.

MR. CARDEN: Anybody have any issues with that?

MR. MAGUIRE: Everything is considered highly confidential until anybody sees the need --

MR. CARDEN: I think Jack is concerned that we don't slow things down. So long as we have a mechanism that, and we can contest the highly confidential designations in any event, so long as we have a designation to get out from underneath that rubric that is not cumbersome, and so long as I have your representation that all this is doing is to sort of accommodate the speed of the deposition and we will deal with this in

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

good faith thereafter, I don't have a serious problem with it.

Does anyone else?

MS. TAGGART: I don't have an objection, although it would be helpful if you would, right after the deposition, say the parts you thought were confidential and highly confidential, then we can deal with it elsewhere. It might be good to have that specific.

MR. STERN: Understood.

MR. CARDEN: Maybe just to give it a little rigor, unless there is some particular cause for doing it otherwise, shall we say sometime within a week you will have written, having the page numbers of the depositions and the exhibits and the like, and designate what you think ought to be highly confidential and confidential. Therefore, we have a kind of a program, if you will.

MR. STERN: I think that is fair, and I think what Bill said makes sense as a practical matter; designate the entire

TSG Reporting - Worldwide (877) 702-9580

Page 10

FELDER - HIGHLY CONFIDENTIAL

transcript as highly confidential, and within a week, we will dedesignate as appropriate under the order.

EXAMINATION BY

MR. CARDEN:

**Q. Good morning, Mr. Felder.**

A. Good morning.

**Q. You are currently employed by Barclays, correct?**

A. Correct.

**Q. What is your current position, sir?**

A. I'm the head of global credit trading.

**Q. And how long have you held that position?**

A. Since September '08.

**Q. And as head of global trading, just generally speaking, what are your responsibilities?**

A. Responsible for secondary trading of cash corporate bonds, credit default swaps, loans, and the municipal securities business rolls into credit.

**Q. Prior to being employed by Barclays, you were cohead of fixed income at Lehman**

TSG Reporting - Worldwide (877) 702-9580

Page 11

**FELDER - HIGHLY CONFIDENTIAL**

**Brothers, correct?**

A. Correct.

**Q. Starting on September 9 or thereabouts of 2008?**

A. I believe it was September 8.

**Q. I am sorry, I meant that -- that's exactly what I meant to say actually.**

**Prior to that, what was your -- what was your previous title and job?**

A. I was global head of global credit products, since June of '08.

**Q. And in that position, what were your responsibilities?**

A. The businesses that rolled up into global credit products were high-grade, high-yield CDOs, municipals, and the credit portion of emerging markets, the corporate credit portion of emerging markets.

**Q. In connection with your responsibilities as global head of credit products, did you have any responsibilities of any kind with regard to repos?**

A. No.

**Q. And when you took over as head of**

TSG Reporting - Worldwide (877) 702-9580

Page 12

**FELDER - HIGHLY CONFIDENTIAL**

**fixed income on September 8, 2008, what were your responsibilities?**

A. They were never specifically told to me.

**Q. Did you have an understanding as to what they were to be?**

A. We had -- I had a brief conversation with Mike Gelband, with Hyung Lee, who is my cohead, about how the portfolio would be split up between the two of us in a normal business environment, and I was going to be responsible for -- or focus on the credit portion and the mortgage portion, and then Hyung would focus on FX and commodities and more focus outside of the U.S. with my focus in the U.S., because he came from Asia.

**Q. I would like you to tell me what you consider to have been in the fixed income area at Lehman Brothers as of the time that you had that conversation.**

A. In fixed income, you would have had rates, commodities, foreign exchange, credit, mortgages, emerging markets, and financing would have been part of fixed income, or it might have

TSG Reporting - Worldwide (877) 702-9580

Page 13

FELDER - HIGHLY CONFIDENTIAL

been a JV with equity. I don't know exactly how it was set up because you obviously finance more than just fixed-income product. And commercial real estate.

**Q. I'm just going to read you a list of asset classes and if you tell me whether you consider them to have been in the fixed income area at Lehman as of September 2008. All right? And I'm just reading now what legends I have been given, so these might not be completely fulsome.**

**CDs and other money market instruments?**

A. Yes.

**Q. Total -- corporate obligations and spot?**

A. I don't know what that means.

**Q. OK. Corporate stocks and options?**

A. No.

**Q. Derivatives and other -- and it is cut off so I can't -- it would have been some derivative products.**

A. There would have been some, yeah.

**Q. Some. OK.**

**Governments and agencies would have**

TSG Reporting - Worldwide (877) 702-9580

Page 14

FELDER - HIGHLY CONFIDENTIAL

**been a fixed income, correct?**
A. Correct.
**Q. Mortgages and -- any mortgage-backed securities would have been as well, correct?**
A. Correct.
**Q. Now, when you had the conversation concerning how to divide the fixed income portfolio, was it -- it was divided along product lines or asset classes as well as geography?**
A. That was the initial intention. It was -- nothing was ever put into --
**Q. It never functioned?**
A. Because, you know, that week was the -- when the firm ultimately went under.
**Q. Let's talk about that week. We are now talking about the week of -- I brought a calendar so we have a, as I said before, a prop. Why don't you avail yourself of it as you wish. I don't see any need to mark it. The dates are what they are from time immemorial to the end of time.**
**You were made the head of fixed income on Monday, the 8th of September, correct?**
A. Correct.
**Q. At some time that week there began to**

TSG Reporting - Worldwide (877) 702-9580

Page 15

FELDER - HIGHLY CONFIDENTIAL

**be discussions concerning the sale of the entire firm?**
A. Correct.
**Q. Were you involved in any of those conversations?**
A. I was involved in, if people needed information, I was there to help gather information that would have been needed.
**Q. OK. Let's talk -- is there any other way in which you were -- strike that.**
**I take it you weren't negotiating for the firm in any respect?**
A. I was not negotiating.
**Q. You were providing a support, support for those who needed information in connection with the negotiations that were ongoing at the time with Bank of America and perhaps others, correct?**
A. Correct.
**Q. Was there anyone in particular that was asking you for information during that week?**
A. There would be a number of people that would say go get a particular person and send them to a room or tell -- relay instructions throughout

TSG Reporting - Worldwide (877) 702-9580

Page 16

FELDER - HIGHLY CONFIDENTIAL

that -- really from Friday on.
**Q. Are we talking about Friday the 12th?**
A. Correct.
**Q. So your first conversations concerning any transaction in which the firm was to be sold to B of A or anyone else began on that Friday?**
A. I never had a conversation about a transaction. It was -- I was told to go to a legal office and help in providing and gathering any information that would have been needed for a due diligence.
**Q. What kind of information were you asked to get?**
A. In most cases, it was to get a product expert around a specific asset class that either Barclays or Bank America wanted to discuss. Or specifically, within -- within credit, where that business had rolled up in to me, if I had any risk reports or specific information that was asked.
**Q. Were you asked to provide any valuations or assist in the obtaining of valuations of any asset classes?**
A. No.
**Q. Were any of the people with whom you**

TSG Reporting - Worldwide (877) 702-9580

Page 17

FELDER - HIGHLY CONFIDENTIAL

**worked to your knowledge asked to provide valuations on any asset classes?**
A. I would be assuming.
**Q. Let's go back to who asked you to help on that Friday. Can you give me any names of people who were involved?**
A. Mike Gelband.
**Q. What was Mike's position at the time?**
A. He was global head of all of debt and equity. So all -- excuse me, all of fixed income and equity.
**Q. Did you report to him?**
A. I reported to Mike.
**Q. Anyone else, anyone other than Mike ask you to provide any information on that Friday the 12th?**
A. I believe Ian Lowitt, who was the CFO, and not specifically information but Bart McDade would tell people where to go and be ready for any, you know, any questions or requests. And I'm sorry, also Alex Kirk.
**Q. I was going to ask you about Alex. What was Alex's position at that time?**
A. I don't know the exact definition of

TSG Reporting - Worldwide (877) 702-9580

Page 18

FELDER - HIGHLY CONFIDENTIAL

it, but he was brought back by Bart and he was on the executive committee, and I believe his title at that time was head of principal investing. He -- but he had been the prior co-COO of fixed income, and so it -- he had a -- he had an institutional knowledge of a broad array of the asset classes within fixed income.

**Q. And you said that Bart brought him back. Did he bring him back from outside the firm?**

A. He had left the firm in early '08.

**Q. When did Bart bring him back?**

A. I believe it was June. At the same time he brought Mike Gelband back. They came back together.

**Q. Do you have any recollection as to any specific information that either Mike or Ian, Bart, Alex asked you to provide? I'm talking about documentary information as opposed to simply going to some room at some point.**

A. It was generally around position -- it was around the business heads bringing position sheets or risk reports.

**Q. So at some time on the 12th, do you**

TSG Reporting - Worldwide (877) 702-9580

Page 19

FELDER - HIGHLY CONFIDENTIAL

**have a recollection of having been asked to provide the position sheets for some particular area in the fixed income department?**

A. On Friday, I don't remember the law firm, but I was with the Bank America people and they asked to look at credit positions. They didn't seem focused on any of the investment grade securities. They wanted to look at the leveraged loans.

So I had Jim Seery, who ran leveraged loans, come to the law offices and then proceed with those conversations.

**Q. Do you have a recollection of having provided any printouts of positions in the fixed income area to B of A? Not personally but I mean in connection with the work you were doing on behalf of the firm?**

A. There were definitely risk reports in these meetings. I don't know if they were turned over to Bank America or reviewed there and then kept.

**Q. What are you calling a risk report? Are they position reports, the positions that the firm had, long and short positions?**

TSG Reporting - Worldwide (877) 702-9580

Page 20

FELDER - HIGHLY CONFIDENTIAL

A. It depends on the asset class, how the risk reports are, are set up. I'm only knowledgeable really about the credit-specific risk reports. But they generally give a broad overview and will list top positions as opposed to a very detailed line-by-line summary of the business.

**Q. When you say top positions, are you talking about, say, the top 100 positions that the firm is maintaining? Or how are you characterizing that?**

A. Within a business -- the individual risk manager would set it up however they reviewed the risk themselves. So it might be the top 20 longs and the top 20 shorts, or it might be the top jump to default positions or the top current positions, depending on how you would look at the risk. There would be different buckets.

**Q. How are the valuations on the positions in such reports established by the firm or how were they established?**

A. Traders mark their positions each day.

**Q. You didn't have any responsibility for valuations, I take it?**

TSG Reporting - Worldwide (877) 702-9580

Page 21

FELDER - HIGHLY CONFIDENTIAL

A. The traders within the business that I run had to mark their positions.

**Q. But you didn't do it personally?**

A. I did not mark positions.

**Q. But you were overseeing those who were marking positions to establish valuations for the positions in the area where you had responsibility, correct?**

A. I was overseeing desk heads who were overseeing the traders who were marking.

**Q. Now, I have seen a phrase used about a dirty valuation. What's a dirty valuation? Does that phrase mean anything to you?**

A. Dirty price means something to me, not dirty valuation.

**Q. OK, dirty price?**

A. That would be a security without accrued interest.

**Q. Did you ever have occasion during the time that Lehman was speaking to B of A to look at any of the valuations for the positions within your area of responsibility?**

MR. CERESNY: To clarify, when you say valuations, you mean marks?

TSG Reporting - Worldwide (877) 702-9580

THE WITNESS: Yes.

(Record read)

A. I saw -- I could see the marks on positions within credit.

**Q. When you say the positions within credit, would you amplify upon that for me? What do you mean by that?**

A. Cash corporate bonds, credit default swaps.

**Q. Treasuries?**

A. Treasuries are in -- would be used as a hedge within the credit space, and any marks on Treasuries would be automatically fed from the Treasury group that marked them.

**Q. But at Lehman, Treasuries were not within fixed income?**

A. They were within fixed income.

**Q. In the credit area of fixed income?**

A. Correct. They were in the interest rate business.

**Q. You said you were having a meeting or had a meeting with B of A on the Friday. Was this -- let's talk a little bit about your meetings with B of A. Did you have more than one?**

A. I was there throughout the day. And there were -- there were different meetings throughout the day.

**Q. What was your role in those meetings?**

A. I was gathering information for, as I mentioned earlier, for example, when they wanted to talk about leveraged loans, I would go get Jim Seery. I gave a brief overview of our credit business.

And then away from that, I was really facilitating getting the right people to the location in order to have -- for them to have the more detailed conversations by asset class.

**Q. And did your meetings with B of A continue through the weekend or was it only on the Friday?**

A. It was just Friday.

**Q. Did you have any meetings of any kind with regard to the sale of the firm on the weekend of the 13th and 14th of September?**

A. I had similar -- I went to a different law firm on Saturday where the Barclays team was and had a similar function, where I was there to try to facilitate anything that people would --

information people would have needed.

**Q. Do you recall with whom at Barclays you were meeting?**

A. It was Jerry Del Missier, Eric Bommensath, and I believe Mike Keegan.

**Q. Did you have meetings with any B of A people on Sunday? Pardon me, I apologize. Did you have any meetings with any Barclays people on Sunday?**

A. I don't believe so.

**Q. So your meeting with Del Missier, Bommen -- how do you say his name?**

A. Bommensath.

**Q. And Keegan on Saturday, at a law firm?**

A. Yes.

**Q. Did you or someone underneath your area of responsibility provide any position lists of any kind to the Barclays people?**

A. I would assume so.

**Q. But you don't recall?**

A. They -- there were risk reports again that were -- that were at the meetings.

**Q. OK, let's -- I want to get to the week of the 15th, and before we step off on Monday**

**morning, did you have any other meetings of any kind with anybody at Lehman or Barclays or B of A on that weekend in a -- that you haven't spoken about just generally now?**

A. Just at the law firm on Friday and Saturday.

**Q. Let's start Monday morning. You arrive at the office on Monday morning, and tell me -- you know, I want to get -- I am going to let you do something I don't like to do. I would like a narrative of what you ended up doing that week, so it will maybe short focus our questions and maybe shorten this up a little bit.**

**Why don't you tell me what happened Monday morning when you got into the office, and we will start off.**

A. It was -- I got to -- I got to the office Monday morning. I believe I went to Mike Gelband to ask for instructions as to what I was supposed to be doing, what I was supposed to be directing people to be doing, given the firm had filed for bankruptcy. I was trying to keep people calm and be supportive, you know, and obviously in a tough time.

Page 26

FELDER - HIGHLY CONFIDENTIAL

And then at some point in the middle of the day, I was told to go up to the 32nd floor because there was a chance that Barclays would -- there might be a way for Barclays to buy just the broker dealer of Lehman Brothers, and serve a similar function as I previously described, to be there for any information or to be a -- you know, to help bring people that people -- that people would have needed to speak to.

So I was up there waiting for -- just waiting for a long time, and bringing people in as people were needed. So there were a lot of people in different rooms having meetings, and at different points I would have been asked to go get someone or tell someone to come up.

**Q. I want to try to break that down as much as I can. I know it is difficult to do, but I know there are a lot of people meeting in a lot of different rooms.**

**Were you reporting most immediately to Mike Gelband during that day?**

A. It -- he is who I was trying to get direction from, but at different points, Bart would walk out and say, go get someone or send

TSG Reporting - Worldwide (877) 702-9580

Page 27

FELDER - HIGHLY CONFIDENTIAL

someone up here, or Ian Lowitt would say, go get someone and send someone up here, or Alex. That group would -- it wasn't an organized way to communicate, so --

**Q. Let's try it this way. I take it Bart for the most part was in one room for most of the day, so far as you know?**

A. I actually don't know.

**Q. Was there one main area, one main conference room where people were congregating as -- I'll call it a center?**

A. It seemed to me to be split up by different -- I don't know what they -- what the different -- it seemed to be split up. There were -- it was a bunch of different rooms. I do remember that HR people went to one room, and I was in -- I was sending -- I was sending people to one room in particular. I don't remember what the number of it was.

**Q. OK. Do you know who generally was in that room and why you were sending people to that room, what was going on in there?**

A. It would be a -- asset class by asset class, people discussing or answering questions

TSG Reporting - Worldwide (877) 702-9580

Page 28

FELDER - HIGHLY CONFIDENTIAL

that folks from Barclays would have. So I would -- I remember Charlie Spero, for example, who ran mortgages, at one point I was asked to have Charlie come up to the floor and I sent him into that room.

**Q. Were you ever in the room yourself?**

A. I generally didn't stay if it wasn't an asset class or something I could add any value, because I wanted to make sure that I was available if people needed me to get other stuff, other things.

So for Charlie, I remember I was there at the very beginning and then left.

Kaushik Amin also was called up, who ran our rates and FX businesses, and commodities, actually. So I sent an e-mail to him and said, you should come up, and he came up.

And then for credit specifically, I would have -- I was there.

**Q. You were staying in the room?**

A. Yes.

**Q. And presenting information and providing --**

A. Answering questions that people had.

TSG Reporting - Worldwide (877) 702-9580

Page 29

FELDER - HIGHLY CONFIDENTIAL

**Q. Who else was in the room when you were doing that, to your recollection?**

A. Mike Keegan. Then I believe there were a bunch of the product control type people.

**Q. Who were the product control people?**

A. Like the middle office folks. So they were coming and going. So I think, I believe I saw Gilles Aublin up there. He was in product control. Then there were a lot of people I didn't know from Barclays.

**Q. Right. Do you recall anybody else from Lehman that was in the room when you were making those presentations or answering questions?**

A. No.

**Q. Where was Mike Gelband during that time period, if you remember?**

A. I don't know. I would see him walking in the hall. He was definitely up there at different points, but I don't know.

**Q. Did you ever make a presentation of any kind or provide any information to anyone other than in that room, you personally, on the Monday, the 15th?**

A. No.

TSG Reporting - Worldwide (877) 702-9580

Page 30

FELDER - HIGHLY CONFIDENTIAL

**Q. And did you ever direct anyone with regard to any of the asset classes that you mentioned to any room other than the room you have just described on the Monday?**

A. On the Monday? I don't know if they ended up in other rooms. I would say, come up to the 32nd floor, and then there were just so many people going around that it's possible that someone ended up in a different room than that room.

**Q. I understand. I am asking if you recall having directed anybody else to a different room that day.**

A. No, I don't.

**Q. How long were you at the firm on that Monday, the 15th?**

A. I was there until I believe, I believe 5 or 6 o'clock. It might have been a little bit later. Everyone was -- there were still a lot of people there, and the requests for me to do things had stopped, so I was just sort of waiting up there. So I went -- so I left.

**Q. You went home?**

A. I might have gone and grabbed a drink

TSG Reporting - Worldwide (877) 702-9580

Page 31

FELDER - HIGHLY CONFIDENTIAL

and then gone home.

**Q. I understand. But did you come back to the office that day?**

A. No.

**Q. The next time you came to the office was when?**

A. Was Tuesday.

**Q. First thing in the morning?**

A. I believe Tuesday was the day that I met with Jerry Del Missier and Bob Diamond about my role specifically, and I don't recall if I went directly to the Barclays building at 200 Park or to the old Lehman -- I don't recall which I went to first.

**Q. When you say your role, you are talking about your role to be at Barclays, if Barclays purchased --**

A. If there was -- yes.

**Q. If there was a transaction?**

A. Correct.

**Q. Let's hold on that for just a moment. That was on the Tuesday, you believe?**

A. I believe it was on the Tuesday.

**Q. So it would have been Tuesday, the**

TSG Reporting - Worldwide (877) 702-9580

Page 32

**FELDER - HIGHLY CONFIDENTIAL**

**16th, correct?**

A. Correct.

**Q. Did you have any conversations with anybody at Lehman Brothers or Barclays the evening of Monday on the telephone?**

A. Bart called me and told me that Bob and Jerry would be reaching out to me over the next day to set up a meeting and I should be expecting that.

**Q. Were there any other calls from anyone at Lehman Brothers or Barclays on the evening of Monday, September 15?**

A. I believe I spoke to Tom Humphrey.

**Q. You called Tom or he called you?**

A. I don't recall.

**Q. Now, Tom Humphrey was one of the people who worked underneath you in the fixed income area, correct?**

A. No. He was the global head of fixed income sales.

**Q. That was not within your area of responsibility as cohead of global -- pardon me, of global fixed income?**

A. That wasn't -- at different points,

TSG Reporting - Worldwide (877) 702-9580

Page 33

FELDER - HIGHLY CONFIDENTIAL

the global head of fixed income sales either reported to the head of fixed income or didn't. Sometimes it was separate up into Steve Lessing, who ran all distribution.

So I had never -- I wasn't -- I had never been told specifically whether Tom reported to me or not.

**Q. All right, fine.**

**Did -- I am sorry, maybe you said this. Did you call Tom or did he call you?**

A. I don't recall.

**Q. Do you remember what you spoke to Tom about?**

A. I asked him how is it going -- he was still there.

**Q. Still at the firm?**

A. Still physically at 745 Seventh. So I was trying throughout the night -- I don't think I went to sleep. I was trying to find out are things -- how are things going. And he -- I remember he gave me an update, and he said it seems like things were going OK.

**Q. You were checking in with him to check the status of what was happening?**

TSG Reporting - Worldwide (877) 702-9580

Page 34

FELDER - HIGHLY CONFIDENTIAL

A. Yes.

**Q. When you left the office on Monday, was it your understanding that Barclays was going to purchase the broker dealer or was going to purchase certain assets of Lehman Brothers?**

A. All I --

MR. STERN: Objection to the form.

**Q. Go ahead.**

A. What does that mean?

MR. STERN: It means --

**Q. It means I didn't ask a particularly good question on this particular question, but it is good enough for the present purposes.**

MR. STERN: Let's hear the question again.

(Record read).

MR. CARDEN: I would say Lehman Brothers, the assets -- pardon me, the broker dealer is not an asset of Lehman Brothers, so I think the question is fine, but I will rephrase it if you really want me to.

MR. STERN: Yeah.

**Q. When you left on Monday, was it your**

TSG Reporting - Worldwide (877) 702-9580

Page 35

FELDER - HIGHLY CONFIDENTIAL

**understanding that the negotiations were still to purchase the entire broker dealer or purchase some specific positions or other assets of Lehman Brothers?**

A. I didn't have specific knowledge.

**Q. Did you have any general knowledge at all? Had you heard anything?**

A. All I had heard during the day was that there was the possibility that Barclays could buy the broker dealer.

**Q. When you left on Monday, so far as you knew, that was the conversation that was taking place, it was the purchase of the broker dealer?**

MR. STERN: Objection to the form.

A. I didn't have any new -- I didn't have any new specifics of the details.

**Q. OK. Now, on Tuesday, did there come a time when you understood that Barclays was considering purchasing something less than the entire broker dealer of Lehman Brothers?**

A. No.

**Q. Did there ever come a time during the week of September 15 when you understood that Barclays was going to be purchasing certain**

TSG Reporting - Worldwide (877) 702-9580

Page 36

FELDER - HIGHLY CONFIDENTIAL

**specific assets, meaning positions, asset classes and the like of Lehman Brothers?**

A. I had always heard it was the broker dealer.

**Q. When did you first learn that it wasn't the broker dealer that Barclays had purchased?**

A. I actually thought they did purchase the broker dealer.

**Q. To this day?**

A. Yes.

**Q. OK.**

A. Is that not --

MR. STERN: There is a distinction between the assets of the broker dealer and the stock of LBI, so --

MR. CARDEN: OK.

MR. STERN: That's I think where the confusion lies. There really shouldn't be any confusion. Not that you shouldn't be confused, but rather there shouldn't be any confusion on the record because the agreement is a matter of public record.

**Q. Let's goes to Tuesday when you're**

TSG Reporting - Worldwide (877) 702-9580

Page 37

FELDER - HIGHLY CONFIDENTIAL

**having your conversation with Mr. Diamond and Mr. Del Missier, right? That was at Barclays?**

A. Correct.

**Q. Was anyone else present other than the three of you?**

A. I believe Michael Evans was there.

**Q. Who is Michael Evans?**

A. He runs human resources for Barclays. But I'm not positive.

**Q. Do you recall whether that was the morning of the 16th?**

A. I believe it was the morning.

**Q. You can't recall whether you went straight there or whether you went to the office of Lehman Brothers first?**

A. Correct.

**Q. How long did you meet with Mr. Diamond and Mr. Del Missier?**

A. It was probably about 45 minutes.

**Q. Do you know if anyone else at Lehman Brothers was meeting with them as well?**

A. I don't.

**Q. Did you see any Lehman Brothers people waiting to meet with them?**

TSG Reporting - Worldwide (877) 702-9580

Volume I - A. 10 Pg 12 of 38

Page 38

**FELDER - HIGHLY CONFIDENTIAL**

A. No. But I do know that other Lehman people met with them the night before.

**Q. Do you know who met with them the night before?**

A. I believe Tom Humphrey sent me, I believe, an e-mail saying that he had met with them. But away from that, I didn't know anyone specifically.

**Q. Did you ever learn that other people at Lehman Brothers had met with Mr. Diamond at some point on the Monday or the Tuesday?**

A. Jerry Donini told me that he met with them. I don't recall when.

**Q. Tell me as best you can what Mr. Diamond and Mr. Del Missier said to you and what you said to them in that meeting on the morning of September 16.**

A. They said that they would like for me to join the firm running the credit business. Then we got into specifics of what that actually meant. And so it was -- they spoke about that it is credit trading, just high grade, high yield. We were comparing it to my function at Lehman. So not CDOs, not emerging markets.

TSG Reporting - Worldwide (877) 702-9580

Page 39

FELDER - HIGHLY CONFIDENTIAL

They explained the structure of the firm, how sales trading and research all roll up in separate verticals as opposed to having the whole business, and that I would be running the trading portion of the credit business.

We spoke about that for a while, because I thought that was a major structural difference, so we spoke about that for a while.

Then we spoke about what compensation they would be willing to offer me.

REDACTED

TSG Reporting - Worldwide (877) 702-9580

Page 40

FELDER - HIGHLY CONFIDENTIAL

REDACTED

TSG Reporting - Worldwide (877) 702-9580

Page 41

FELDER - HIGHLY CONFIDENTIAL

REDACTED

And then -- I am trying to think if there are any other things. And then I wanted to make sure that most importantly, that I was going to be able to bring -- that the people in the credit business at Lehman, I was going to be able to make sure that they had jobs and that they were coming also, so we could keep the whole business together, and that I would have some ability to decide who of the people would have -- would be in each seat. So that I was actually empowered in

TSG Reporting - Worldwide (877) 702-9580

the business, so that we spoke about that.

REDACTED

REDACTED

**Q. Did there ever come a time when you**

**heard that a specific pool of money had been set aside for the purposes of bringing people over from Lehman to Barclays?**

A. Only when I read it in the New York Post.

**Q. All right. So you have your meeting with Diamond and Del Missier on Tuesday morning, and following that meeting, you went back to Lehman, I take it?**

A. Yes.

**Q. And I would like you to describe for me your day, if you will, in general terms, and then we will come back as to what you were doing on Tuesday, the 16th.**

A. Really for the rest of that week, it was just trying to keep the people together. People were out interviewing, people were getting job offers from other firms. There was a lot of uncertainty.

And I was also trying to relay any instructions that were given around what people sitting in the seats should be doing and that was -- that was the rest -- pretty much the rest of the week.

**Q. Did you ever see a copy of the asset purchase agreement that was entered into between Lehman and Barclays on Tuesday, the 16th?**

A. I believe -- there was some document that was made public. I don't remember what day, whether it was Tuesday or Wednesday or Thursday. And I do remember it had -- it was -- it was up on the Web, and I remember it had like hand-scribbled notes all over it on the Web. That got e-mailed around everywhere. I don't know if that is that document, but there was some document that --

**Q. Did you read it?**

A. That I -- I -- I glanced through it. I didn't specifically --

**Q. Do you recall anything about it?**

A. I recall that there was -- there was a connotation of specific numbers of people that had to come to Barclays as part of the arrangement, or part of whatever the deal was.

**Q. Did you ever see the master repurchase agreement between Lehman and Barclays?**

A. No.

**Q. Did you ever know there was one?**

A. No.

Page 46

FELDER - HIGHLY CONFIDENTIAL

**Q. Just so we are not in terrible doubt, we will find out whether it was the APA you looked at.**

A. OK.

**Q. You don't know anything else about the document that you saw online that had all the handwriting on it that would help me determine what it was you might have seen?**

A. I remember it got sent to me, because this concept of eight people, like they started calling it the elite eight, whatever document that was in was getting sent around at the firm. So that, whatever that document was --

**Q. That's the document?**

A. That would have been the one.

**Q. And you were one of the elite eight, correct?**

A. I wasn't aware that I was.

**Q. The document didn't identify the eight?**

A. I was never told that I --

**Q. No, but when you read the document, was your name in it?**

A. No, I didn't see my name.

TSG Reporting - Worldwide (877) 702-9580

Page 47

FELDER - HIGHLY CONFIDENTIAL

(Exhibit 1, asset purchase agreement dated September 16, 2008 marked for identification, as of this date.)

MR. CARDEN: I think what -- who knows how we will end up with this, but we will make this Felder Exhibit 1. I think we will end up with depositions being taken simultaneously at some point later in the schedule, which will make it awkward if we do it any other way.

MR. STERN: What we had proposed, to avoid duplicate exhibits, we have a system of numerical numbering sequential, and when we have multiple depositions, we just say this deposition will take from 200 to 300.

MR. CARDEN: That's fine.

MR. STERN: This is the first deposition. Why don't we start out that way and see how it works.

MR. CARDEN: OK. So what we will do is, 1 through 25, if we get that far, will be Mr. Felder. OK, that's fine by me.

So it is Exhibit 1. Not Felder 1, just Exhibit 1.

TSG Reporting - Worldwide (877) 702-9580

Page 48

FELDER - HIGHLY CONFIDENTIAL

**Q. Have you ever seen this document before, Mr. Felder?**

A. No, not -- the document I saw had hand notes on it. So this --

**Q. This clearly was not the document that was the elite eight, I appreciate that. The question is not whether this is that document, the question is, have you ever seen this one before?**

A. This document, no.

**Q. OK. I would like to direct your attention to page 6, and subparagraph D at the end there, do you see the reference to government securities approximating 70 billion?**

A. Yes.

**Q. Do you ever recall having heard from anybody that Barclays was going to purchase approximately 70 billion in government securities from Lehman Brothers?**

MR. STERN: Objection to the form.

**Q. That's commercial paper, corporate debt. I'm just talking about --**

MR. STERN: What it says in section D.

**Q. Whatever it says in section D. I will rephrase that.**

TSG Reporting - Worldwide (877) 702-9580

Page 49

**FELDER - HIGHLY CONFIDENTIAL**

**Did you ever hear from anyone that Barclays was going to purchase those types of securities identified in subparagraph D which approximated $70 billion?**

A. No. I heard they were going to purchase the broker dealer, which I assumed had assets. I didn't know the exact numbers.

**Q. You never heard a number 70 billion?**

A. I don't recall.

**Q. For that matter, you never heard a number 72 billion?**

A. I don't know.

**Q. Did you ever hear at any time a specific number of the value given to the assets that were purchased by Barclays from Lehman Brothers?**

A. After the fact -- after everything, I do recall Eric Bommensath, people throwing around the number 50 billion afterwards.

**Q. So this is after the transaction closed, Mr. -- I am having trouble with the name?**

A. Bommensath.

**Q. Bommensath.**

A. I do recall him throwing out the

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

number 50 billion.

**Q. 50 billion of assets had been purchased by Barclays?**

A. I recall that.

**Q. Did he say that to you personally?**

A. I was -- I don't know if it was just me and him or whether it was a group. I remember, I remember him saying we have 50 billion worth of assets.

**Q. And do you remember when he told you that?**

A. It was already over at 200 Park. It was probably in October.

**Q. Do you remember what occasioned him to have this conversation with you? Were you talking about the transaction?**

A. We were going through, we were going through the, you know, set -- he wanted to set up a series of reports to keep track of -- that the sales force was working on selling, once the firms were together, and I asked the question is there anything that, is there anything that now that we are up and running, that the sales force should be working on, and those -- he said, well, that, that

FELDER - HIGHLY CONFIDENTIAL

50 billion is off in a different -- the 50 billion is off in a different group basically.

**Q. So the 50 billion in assets that had been purchased by Barclays were not in your group --**

A. Right, exactly.

**Q. -- for the purposes of the sale?**

A. Exactly.

MR. STERN: Let him finish the question.

Can I hear the question?

(Record read)

MR. STERN: Objection to the form.

You can answer.

A. They weren't in, they weren't in the credit business that I was going to be responsible for.

**Q. Did he tell you where they were?**

A. It was in a group called P -- PMTG.

**Q. Do you know who -- do you know what that group is, what it does?**

A. I believe it is -- I believe PMTG stands for principal mortgage -- I don't know the last two letters. So it was principal positions.

FELDER - HIGHLY CONFIDENTIAL

**Q. Do you know who is head of that group at Barclays?**

A. It is either Stephen King or I believe at the time it was David Martin. It was one -- David Martin is no longer with the firm. It is one of those two people, and it might roll up into John Mann now. I don't know the exact setup.

**Q. Do you have an understanding of what that group at Barclays does?**

A. Not with precision. I know that they have assets and that they -- and that they trade in the securities.

**Q. Am I right in understanding what you are saying is that that group deals with proprietary positions at Barclays?**

A. I don't know if it was proprietary. I have only heard the word "principal."

**Q. So you don't have an understanding of whether that's a category of investments, or pardon me, a category of assets that are considered proprietary assets to Barclays?**

A. I don't know how they categorize it.

**Q. Before that conversation with Mr. Del Missier in which he said there had been**

**FELDER - HIGHLY CONFIDENTIAL**

**$50 billion dollars assets --**

MR. STERN: Objection, objection.

A. Mr. Bommensath.

**Q. I'm sorry, Mr. Bommensath.**

MR. STERN: Objection to the form.

**Q. Before the conversation with Bommensath in which he told you there had been $50 billion of assets purchased by Barclays, did you have any conversations with anyone in which the value of the assets purchased by Barclays was discussed?**

A. No, just those -- the meetings that I had mentioned over the weekend.

**Q. Let's make this Exhibit 2.**

**(Exhibit 2, e-mail with attachment dated September 18, 2008 marked for identification, as of this date.)**

**Q. Have you ever seen Exhibit 2 before, Mr. Felder? Let me rephrase.**

**Have you ever seen any part of Exhibit 2 before, if you haven't seen the whole?**

A. No, I don't recall seeing this.

**Q. Have you ever seen a document like page 2? This chart, summary chart?**

**FELDER - HIGHLY CONFIDENTIAL**

A. I would have summary risk reports for my business -- for the businesses. But it was credit. We hadn't gotten to the point in fixed income where -- because it was only four days.

**Q. Which of the areas identified on page 2, if you could tell me, were the areas for which you had responsibility, which asset classes?**

A. At what -- when?

**Q. The week of September 15, or the last days of the week before, if you weren't really doing anything the 15th. Let me say it another way.**

**Which of these asset classes were, given your understanding of what position you were to have starting on September 8, would have been within your areas of responsibility?**

A. Total CDs and nonmoney market.

**Q. OK.**

A. I don't know what the second term means with "spot." If it is just corporate bonds, then it would, but I don't know what the term "spot" --

**Q. Are you talking about total corp. obligations and spot, that category?**

**FELDER - HIGHLY CONFIDENTIAL**

A. Yeah. If it is corporate credit risk and bonds, then it would. But I don't know what corporate obligations -- I don't know what that phrase means.

**Q. OK.**

A. A portion of derivatives, if it was within fixed income.

**Q. OK.**

A. And this would have been in my role as cohead of fixed income if I had been told what I would have been responsible for. Governments and agencies and mortgages and mortgage backs.

**Q. Do you ever remember participating in any effort to create a balance sheet for just LBI itself?**

A. No.

**Q. And did you ever do any kind of calculations to determine the value, the marks of the positions if you will, that were within your area of responsibility?**

A. No.

**Q. And do you know if there at page 2 of this exhibit is, in fact, an effort to do just that as to certain aspects of the portfolio?**

**FELDER - HIGHLY CONFIDENTIAL**

A. I don't know.

**Q. Do you recognize the spreadsheets that follow page 2 as being listings of the investments or the securities within the various asset classes and the summary page 2?**

MR. STERN: Objection to the form.

A. It looks like a list of securities to me.

**Q. And the valuations that are provided would have been provided by the various traders on the desks in question, correct, whoever was trading these particular securities?**

A. I don't know what the data -- where this -- where the data from this report would have come from.

**Q. Could the valuations have come from anyone other than the traders?**

MR. STERN: Objection to the form.

A. I don't know.

**Q. And in any event, you didn't provide any valuations?**

A. No.

**Q. To any of these positions?**

A. No.

FELDER - HIGHLY CONFIDENTIAL

**Q. Now, did there ever come a time, Mr. Felder, where you were asked to help prepare Mr. McDade for his testimony on Friday before the bankruptcy court?**

A. No.

**Q. Did there come a time when you were asked to provide a fire sale liquidation price for the positions within your area of responsibility?**

A. No.

(Exhibit 3, document Bates stamped 1029780 marked for identification, as of this date.)

**Q. Mr. Felder, I show you what has been marked as Exhibit 3, which is an e-mail from Mr. Kirk to some unknown address. But it has with it underneath an e-mail that was sent from -- by Mr. Flores to a group of people including yourself on Thursday evening at 8:40.**

**Do you recall having gotten this e-mail, sir?**

A. I don't.

**Q. Do you have an understanding of what is meant by the phrase a fire sale liquidation of the securities that are being transferred to**

FELDER - HIGHLY CONFIDENTIAL

**Barclays?**

MR. STERN: Objection to the form.

A. Can you repeat the question.

(Record read)

A. My understanding of the term "fire sale" would be someone who had to sell securities in a very short time frame.

**Q. Most of the securities in your area of responsibility were very high grade, were they not?**

A. In credit, there was high grade, there was high yield, there was distressed. There were different types of securities within credit.

**Q. Would you just go back to Exhibit 2 for a moment and look at the summary chart. The listing there for total governments and agencies at 37.6 billion long, do you see that?**

A. Yes.

**Q. Those are very high grade, are they not?**

A. I don't know what's in there, but if it is -- if it was U.S. Government bonds, that would be very high grade. If it was senior agency paper, that would be very high grade, that would

FELDER - HIGHLY CONFIDENTIAL

be high quality. But if it was subordinated, it might not be.

**Q. Anything else that would be very high grade that would be within the asset classes that were in your area of responsibility, other than those two?**

A. Investment grade corporate bonds would be high quality. And then I would assume that there is some very high quality mortgage paper, but I'm not a mortgage expert.

**Q. The sale of those kinds of high-grade securities, does it ever -- strike that.**

**The markets for those very high grade securities that you just articulated are quite large, are they not?**

A. The aggregate markets, yes.

**Q. And the amounts that are listed here of 37 billion, if that includes all of them, that's not a very big number in terms of the overall market in those securities, is it?**

A. No.

**Q. The market can easily absorb those sales without changing the market, couldn't it?**

A. It would depend on -- it would depend

FELDER - HIGHLY CONFIDENTIAL

on the securities. If there were ten-year Treasuries, the market could withstand that, yes.

**Q. Could you contemplate a situation in which there would ever be a fire sale price for the sale of ten-year securities -- ten-year Treasuries? I mean you would have to actually sell it for a lower price because the market couldn't bear it?**

A. There have been times in history where even the government market had has been very illiquid, like around long-term capital management, for example.

**Q. OK. That wasn't the case on the week of September 15, though, was it?**

A. The markets were certainly very volatile, given everything that happened to Lehman. But government bonds were trading liquidly, I believe.

**Q. Do you have any understanding or recollection of what was meant then in connection with the phrase "fire sale liquidation" when -- I know you don't remember getting the e-mail, I'm not trying to suggest that.**

MR. STERN: Can I hear the question.

FELDER - HIGHLY CONFIDENTIAL

**Q. It really is -- I have got to rephrase it.**

**I'm trying to understand, if you can assist me, Mr. Felder, what possibly could have been meant by that "fire sale liquidation" phrase on that Thursday night in this memo.**

MR. STERN: Objection to the form.

A. I can only make a -- I can only make an assumption, if I had -- what I would think, not what the writer meant.

**Q. Of course. Tell me what you think. You -- I mean after all, you presumably were -- let me start again.**

**Someone asked you to make this assumption for the purposes of valuing a portion of the portfolio for which you had responsibility, correct? That's what this is asking you for?**

MR. CERESNY: Objection.

MR. STERN: Objection to the form.

What's the question?

(Record read)

**Q. Let me be more precise. Mr. Daniel Flores asked you on Thursday evening, September 18, to assume a fire sale scenario for**

**the purposes of valuing the portfolio for which you had responsibility, did he not?**

A. That's what this e-mail looks like it requested.

**Q. So what you thought "fire sale liquidation" meant means something to me. How would you have understood this when you received it? Even if you don't recall now having gotten it, what would be your assumption as to what was meant?**

MR. STERN: Objection to the form. I think he has already answered that.

But you can answer again.

A. I would say it would mean what would the price be for selling the securities in a very short time frame.

**Q. What time frame?**

A. Basically instantaneously -- like -- close to instantaneously.

**Q. Would the need to sell U.S. Treasuries instantaneously, let's call it on Friday morning, the 19th, have resulted in significantly or any lower price for the Treasuries in your mind?**

A. I'm not a Treasury expert.

**Q. Let me ask it this way. Of the asset classes for which you had responsibility on Friday morning, September 19, which, if any, would have had a reduction in their value as a consequence of having to sell them instantaneously, given the quantities involved and the asset classes involved?**

A. I don't -- I can really talk about credit.

**Q. Talk about what you can talk about, Mr. Felder.**

A. I think credit, credit, there would be a credit -- the liquidity in the credit market is substantially lower than the government bond market. So that there would be, in my opinion, a discount to move a block of corporate credit in an instantaneous fashion.

**Q. Without regard to the quantity?**

MR. STERN: Objection.

Have you finished your answer?

I mean there was a question pending and an answer being given. Can I get the question?

(Record read)

THE WITNESS: What was my answer?

(Record read)

MR. STERN: Did you finish?

THE WITNESS: Yes, I am finished.

**Q. Finished? OK.**

**Look at Exhibit 2, if you will, on the summary chart that has been helpful to us in the past. Can you tell us which securities to which you were just referring were corporate credits?**

A. I don't know what these definitions are.

**Q. OK.**

A. As I have said. So if the definition of this second bucket, corporate obligations, would be corporate credit, then I would say that that would -- that would be an example.

**Q. You are referring now to the second entry there in the column "Total Corporate Obligations and Spot," which shows a long position of 4 -- about 4.9 billion?**

A. That's what it looks like.

**Q. Are there any other securities on this chart that you think would, if they had to be sold instantaneously on Friday morning, have resulted**

**in a diminution in their value in the market?**

MR. STERN: Objection to the form.

A. I'm really only comfortable talking about credit, because that's the market I knew.

**Q. OK. But you did have responsibility for derivatives, right? In the fixed income area.**

A. For credit derivatives.

**Q. Credit derivatives?**

A. Correct.

**Q. Would they have had significant diminution in their value on Friday morning as a consequence of the need to sell them instantaneously?**

A. They would trade like a credit product, so there would be -- to move a big block of CDS would definitely create -- you would need some discount.

**Q. What would you mean by a big block?**

A. I would say north of 2 billion.

**Q. OK. What kind of discount would you give it?**

MR. STERN: Objection to the form.

A. It would depend on the names that were in the portfolio.

Page 66

FELDER - HIGHLY CONFIDENTIAL

**Q. Can you give me a range? I'm just trying to get a feel, half a percent, 20 percent? I'm trying to get a feel for what the discount would be in your mind.**

A. It would depend -- the market trades on spread, so it would depend on which the specific credits were and then what the aggregate size was.

So, for example, financials were under a tremendous amount of pressure at this point. If it was an entire financial credit portfolio, that would be very difficult to move.

**Q. Would your answer be different if they were exchange traded? And by that I mean would the discount be either nonexistent or small in the disposition of an exchange-traded derivative on an instantaneous basis the morning of September 19?**

A. If it was a liquid product traded on -- if there was more liquidity in the product based on it being on an exchange, then the answer would be yes.

**Q. Yes, that there would be --**

A. If the product were more liquid because it was on an exchange, then a discount

TSG Reporting - Worldwide (877) 702-9580

Page 67

FELDER - HIGHLY CONFIDENTIAL

would be lower if there was more liquidity because of that.

**Q. Why would there be a discount at all on -- you would either be able to sell it on the exchange or you couldn't. Why would there be a discount in any respect with regard to the exchange-traded derivative?**

A. What I mean by discount, if you went to go on -- in any market, there is a size on let's say the bid or the offer, and if you go to transact, when you're done transacting, the price isn't necessarily at the same spot that you started.

**Q. OK.**

A. So I would mean the average price that you ultimately sold compared to where it started could be different, even on an exchange.

**Q. OK, OK. Let's go back to our chart here for a moment. You covered corporate obligations and you covered the derivatives. You say you don't --**

MR. STERN: Objection to the form.

**Q. You say you don't have specific or personal knowledge of the Treasuries, but the**

TSG Reporting - Worldwide (877) 702-9580

Page 68

FELDER - HIGHLY CONFIDENTIAL

**Treasuries is a huge market and the -- clearly there would not be any meaningful discount with regard to the disposition of those on an emergency basis, would there?**

A. I would say for on-the-run Treasuries, I wouldn't think there would be, but I assume there are some Treasury securities that have less liquidity than others. But in aggregate the U.S. Treasury market is a very, very liquid market.

**Q. Let me ask it this way. Did there ever come a time, Mr. Felder, where you asked your traders to price the securities in Exhibit 2 as though they were going to be sold on a fire sale basis on Friday, September 19?**

A. I don't recall doing that.

**Q. Do you recall having been asked by anybody to do that?**

A. I don't, because I don't recall that e-mail.

**Q. Is there -- do you have any explanation for me at all as to why anybody would have wanted you to do that?**

A. I can make an assumption.

**Q. Tell me.**

TSG Reporting - Worldwide (877) 702-9580

Page 69

FELDER - HIGHLY CONFIDENTIAL

A. That to put a theoretical price on a pool of assets that would be a worst-case scenario.

**Q. But you never recall having done that?**

A. No.

**Q. Or having talked to Mr. McDade or Mr. Flores or Mr. Kirk about having done so?**

A. No.

**Q. Did you ever hear anybody else at the firm had done so with regard to the portfolios for which they had responsibility?**

A. I recall getting a -- I recall getting an e-mail around the -- around mortgages and around a discount, a discount to the market price for mortgages, and I believe I forwarded it to Mike Gelband. I do remember that.

**Q. From whom did you get it?**

A. I don't remember. I would just have to assume that Charlie Spero would have been on it because he ran mortgages.

**Q. Did you ever get an explanation for why that -- strike that.**

**OK. Let's soldier on here with regard to Thursday night.**

TSG Reporting - Worldwide (877) 702-9580

Page 70

FELDER - HIGHLY CONFIDENTIAL

MR. STERN: How are we doing in terms of taking a break? It is about 11. Are you at a point --

MR. CARDEN: Yeah, maybe in about 15 minutes. Is that OK?

THE WITNESS: I'm fine.

**Q. You told me you don't remember getting Exhibit 3, which was Thursday night, right? Do you remember whether you were in the office on Thursday evening, the 18th?**

A. I don't.

**Q. You note in Exhibit 3, it references a list of top 100 positions, which is going to be left on the desks of each of the people to whom the e-mail is addressed. Do you see that?**

**Do you recognize or can you tell me if Exhibit 2 is in fact a list of the 100 largest securities in the area for which you had responsibility?**

A. I -- only the cover e-mail says, "Here are the position level details for the top hundred longs and shorts," so I can only assume that this document is that.

**Q. I will draw your attention to the fact**

TSG Reporting - Worldwide (877) 702-9580

Page 71

FELDER - HIGHLY CONFIDENTIAL

**that Exhibit 3, which is in Greenwich Mean Time, with the hour difference then I can tell you is four hours. Do you remember that time period? There's about a week or two in the year where the time change is four hours. We are in that period right here.**

**So to start again, I will tell you that Exhibit 3 is 8:41 in the evening on Thursday.**

A. OK.

**Q. And you can observe -- actually this is in Greenwich Mean Time as well, but Exhibit 2 is at 7:17. So it is within an hour or so, the same time period. Do you see that?**

MR. STERN: You are asking if he sees what?

**Q. Well, let me ask it this way. Do you know, Mr. Felder, whether Exhibit 2 is the list of securities, your portion of it, that was left on your desk or was going to be left on your desk pursuant to the paragraph in Exhibit 3?**

A. I know that this says, "Here are position level details for top hundred longs and shorts," so I would assume that's what this is.

**Q. That's what I had done, but you don't**

TSG Reporting - Worldwide (877) 702-9580

Page 72

FELDER - HIGHLY CONFIDENTIAL

**have a recollection of it?**

A. No.

**Q. And you don't remember having sat at your desk at Thursday evening and have somebody come in and say, here is the hundred largest positions in your area, go value them?**

A. No, no.

**Q. And you have no recollection of having told anyone in your area to go do that?**

A. No.

**Q. Would there have been anyone else in your area that would have done that for you if you weren't available?**

A. The people below me, there is always a chance that someone like Alex would have reached out to someone directly if he didn't get me and there was something that was time sensitive.

**Q. You carry a BlackBerry, right?**

A. Yes.

**Q. So there is no doubt in your mind, is there, that you would have seen Exhibit 3 on or about the time it was sent to you, right?**

A. If I was looking at my BlackBerry, I would have seen it.

TSG Reporting - Worldwide (877) 702-9580

Page 73

FELDER - HIGHLY CONFIDENTIAL

**Q. And you have no recollection of having asked for anybody to assist you in responding to the request in Exhibit 3 then?**

A. I don't recall doing that.

**Q. It is a total blank?**

A. I don't remember doing it.

**Q. OK. Do you remember anything about Friday morning, the 19th, where you were, what you were doing?**

A. I believe I had breakfast with Tom Montag that morning.

**Q. Who is Tom Montag?**

A. He runs capital markets at Merrill Lynch. Or Merrill Lynch, B of A.

**Q. Why were you having breakfast with him?**

A. He expressed interest in having me come and run the credit business over there.

**Q. Now, by Friday morning, the 19th, had you received a contract from Barclays?**

A. I believe I got a draft on Friday, but I don't believe it was Friday morning. I don't recall exactly.

**Q. Do you recall having gotten a draft**

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

**dated the 18th?**

A. I don't recall the exact date.

**Q. Do you recall where you were when you got the draft?**

A. I believe it was e-mailed to me, not hard copy.

**Q. Was it on a personal e-mail as opposed to an office e-mail?**

A. No, it was an office e-mail.

**Q. Do you remember when you had breakfast on Friday morning with the gentleman from Merrill Lynch?**

A. I don't remember the exact time.

**Q. Do you remember there having been a meeting with Mr. McDade on Friday morning at 7 a.m.?**

A. I don't remember. I definitely went to the office first and then to the breakfast.

**Q. Do you recall having gotten requested by Mr. Kirk to come to Mr. McDade's office on Friday morning?**

A. I don't remember specifically.

MR. STERN: If we could just take a break for five minutes, I would appreciate

FELDER - HIGHLY CONFIDENTIAL

it.

MR. CARDEN: I will be done here in just a second and then we will have a logical spot here, if we can do that.

Mark this as Exhibit 4.

(Exhibit 4, e-mail dated September 19, 2008 at 1:30 p.m. marked for identification, as of this date.)

**Q. Have you ever seen Exhibit 4 before, Mr. Felder?**

A. It looks like an e-mail that -- or series of e-mails to and from me. I don't remember it specifically.

**Q. Do you recall Mr. Kirk having asked you to come see him in 3E that morning?**

A. I don't recall specifically.

**Q. And do you recall having been over at Barclays that morning, which is your response here?**

A. I don't recall.

**Q. This is the last one.**

**(Exhibit 5, e-mail dated September 19, 2008 at 10:34 a.m. marked for identification, as of this date.)**

FELDER - HIGHLY CONFIDENTIAL

**Q. I realize Exhibit 5 is not addressed to you, but I am wondering whether you have ever seen it before.**

A. I haven't seen it before.

**Q. Do you -- does it assist you in recalling at all about having been requested to participate in a meeting with Mr. McDade on Friday morning?**

A. No.

**Q. And on Friday morning, is it still your belief that the entire broker dealer is being sold, not specific inventory?**

MR. STERN: Objection to the form.

A. I still thought, I still thought that's what was sold.

**Q. Do you recall having met with Mr. McDade on Friday before he testified in the bankruptcy court?**

A. I don't believe that I did.

MR. CARDEN: Mark the last one, I think.

(Exhibit 6, document Bates stamped 10242982 marked for identification, as of this date.)

FELDER - HIGHLY CONFIDENTIAL

**Q. You have seen Exhibit 6 before, right?**

A. Yes. This is that e-mail I was referring to.

**Q. Correct.**

**Mr. Haseruck, is that how you say his name?**

A. I don't know who he is.

**Q. You don't know who he is?**

A. No.

**Q. He writes to you on Thursday, the 18th, about 6:14, about some mortgage inventory, questioning essentially why it has been -- well, what's your understanding of what he is questioning?**

A. He is questioning what he deems material write-downs on the portfolio.

**Q. Significant write-downs on the mortgage portfolio being acquired by Barclays, correct?**

A. He wrote "material."

**Q. And he is questioning -- why is he writing to you?**

A. I'm the head of fixed income.

**Q. This is within your area?**

Page 78

FELDER - HIGHLY CONFIDENTIAL

A. And so he sent -- so he sent it to me and put all the other people on it.

**Q. Are you in a position, Mr. Felder, to tell me whether or not you think on a fire sale basis the mortgage inventory being purchased by Barclays should have been marked down to this degree?**

MR. STERN: Objection to form.

A. I'm not expert enough -- I'm not expert in the mortgage asset class or the specifics of the positions to say.

**Q. Are you in a position to -- strike that.**

**When you got this, did you have any reaction to the size of the markdown?**

MR. STERN: Objection to form.

A. I just wanted to make sure that I got it to someone above me, which is why I got it to Mike Gelband, who had run mortgages prior. He was the old head of fixed income.

**Q. Who are these other people who were cc'd, Charles Spero, James Guarino?**

A. Charlie Spero ran mortgages. I don't know who James Guarino is. Jeff Goodman was in

TSG Reporting - Worldwide (877) 702-9580

Page 79

FELDER - HIGHLY CONFIDENTIAL

the, I believe in the risk group. I don't know who Kieron Keating is. I don't know Rajat Malhotra. Gary is a product controller. And I don't know who Joseph Sapia is.

**Q. OK, let's take a break.**

**(Recess)**

**BY MR. CARDEN:**

**Q. Do you remember having met with anyone from Barclays on Friday, September 19?**

A. I don't remember.

**Q. I do draw your attention to one of the exhibits that I gave you that says you were over at Barclays. That was not a trick question. Do you remember -- let's rephrase.**

**Do you recall with whom you were meeting at Barclays on the morning of September 19?**

A. I don't.

**Q. And you have no recollection as to why you went over there?**

MR. STERN: Objection to the form.

A. I don't.

**Q. Do you remember having met with anybody at Barclays at Lehman Brothers on**

TSG Reporting - Worldwide (877) 702-9580

Page 80

FELDER - HIGHLY CONFIDENTIAL

**September 19?**

A. No.

**Q. Do you have any memory at all, Mr. Felder, of what you were doing on September 19?**

A. The one -- I do remember going to that, I believe going to that breakfast.

**Q. The Merrill breakfast?**

A. Yes.

**Q. Now, to help you perhaps remember, it was the evening of September 19 when the transaction was presented to the bankruptcy court for approval. Do you recall that?**

A. I recall that.

**Q. You weren't there, though, were you?**

A. I was not there.

**Q. Where were you when that was happening?**

A. I wasn't in the office, but I don't remember where I was.

**Q. I am sorry, you were --**

A. I was not at the office.

**Q. Did you ever read the transcript of that hearing before the bankruptcy court?**

TSG Reporting - Worldwide (877) 702-9580

Page 81

FELDER - HIGHLY CONFIDENTIAL

A. No.

**Q. Did you ever get a summary of it from anyone?**

A. People were -- would send around like e-mail updates as to how things were going. I remember that.

**Q. And you received some of those?**

A. I recall receiving some of those, yes.

**Q. Do you recall there had been a hearing before the bankruptcy court on Wednesday, the 17th of September?**

A. I knew -- I remember Bart going to court, and I think it was on his anniversary, which is why I remember it, or his birthday. And it was that week.

**Q. But you don't --**

A. I don't know what it was.

**Q. You don't remember what day or --**

A. No.

**Q. You never went to the bankruptcy court that --**

A. No.

**Q. Let's mark this as Exhibit 7.**

**(Exhibit 7, document Bates stamped**

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

BCI-EX70957 marked for identification, as of this date.)

Q. Mr. Felder, showing you what has been marked as Exhibit 7, which is an e-mail from Mr. Lowitt to three people, I think, including yourself. Do you see that?

A. Yes.

Q. Maybe that's four people.

Do you recall having gotten this e-mail?

A. No, not specifically.

Q. Well, do you remember generally having met with anybody at Barclays, now that you have seen this, on September 19th, to talk about positions and marks?

A. No.

Q. Do you remember having received, in the early morning hours of September 19 and into the morning, spreadsheets reflecting positions in areas for which you had responsibility?

A. Not specifically.

Q. Let's mark a couple of them here. Mark this as Exhibit 8.

(Exhibit 8, e-mail September 19, 2008

FELDER - HIGHLY CONFIDENTIAL

at 10:51 a.m. with attachment marked for identification, as of this date.)

Q. Have you ever seen Exhibit 8 before?

A. No.

(Exhibit 9, e-mail dated September 19, 2008 at 2:06 p.m. with attachment marked for identification, as of this date.)

Q. Mr. Felder, showing you what has been marked as Exhibit 9, which is an e-mail from Mr. Kirk to, again, an address that is unrecognizable, but it has attached to it an e-mail from Mr. McGarvey to a group of people including yourself on Friday morning at 10 o'clock.

Do you remember having gotten this e-mail?

A. I don't.

Q. And I take it you have no recollection of having gotten the attachment?

A. Correct.

Q. And this CD and MM pricing, CD and MM, that would be in your area, right? That would be money market and CDs. That was something that you identified previously as being something that was

FELDER - HIGHLY CONFIDENTIAL

in fixed income?

A. That would have been in fixed income.

Q. Does this document assist you in any respect in recalling what was taking place on Friday morning with regard to the valuation of positions that were within your area of responsibility?

A. No. I don't recall being in the meeting.

Q. And it is still your recollection -- strike that.

It is still the fact that you don't recall having met with anybody from Barclays about pricing of any of these securities?

A. I don't recall.

Q. Going back to Exhibit 7 for just a moment. Would there have been anyone else in -- among Mr. Amin and Mr. Donini and Mr. Spero who would have understood or known the process of providing valuations for assets within your area?

A. Hyung Lee was the cohead of fixed income, and then within the different asset classes, Jim Seery or Fred Orlan would have been a high yield or leveraged loan person. Charlie

FELDER - HIGHLY CONFIDENTIAL

would have been a mortgage person.

Q. Charlie?

A. Charlie Spero.

Kaushik would have been rates, commodities and FX. John Coughlin would have been repo or anything short term, and Mike Gelband and Alex would have been the other two.

Q. What about corporates? Who would have --

A. Anything for corporates, for corporates, it would have been me.

Q. So pricing for any corporate obligations would have been something that you would have been most familiar with as opposed to the people you just mentioned?

A. Yes. If they asked for a price on an investment grade corporate bond that -- they would have come to me or someone below me.

Q. What was happening in -- let's take it a step at a time. If you go back to, I think it was Exhibit 2, just as a frame of reference, this summary of asset classes, is it possible for you to assist me as to what was going on in the market in a general respect from, say, the end of the

**FELDER - HIGHLY CONFIDENTIAL**

**week of September 15 for each of these asset classes?**

A. I could really only talk to the credit side.

**Q. OK, give me that.**

A. Spreads were widening significantly on the back of the Lehman bankruptcy, specifically within financials.

We weren't -- we weren't trading so I could -- because we were bankrupt, so there weren't -- you could only just watch your Bloomberg screen, so obviously the equity markets were going down a lot. There was a lot of volatility, and in general, spreads were significantly wider.

**Q. No way for you to quantify that in any general respect or -- did it change through the week? Did it spike, did it flatten, did it --**

A. No. I -- I don't remember the exact numbers on things, but there were some things that were north of a hundred basis points wider over the course of that week.

**Q. You said Coughlin was responsible for repos? I think that's what you said in passing.**

**FELDER - HIGHLY CONFIDENTIAL**

A. He ran financing for fixed income.

**Q. Let's go back to Tuesday. We were talking about Tuesday, September 16, and what you were doing that day.**

**If you had come into the office, I would like you to tell me as best you can, just try to walk through the week as to what else you were doing on that Tuesday and the Wednesday and Thursday as well.**

A. On the Tuesday, there was the meeting with, I believe it was Tuesday, with Jerry and --

**Q. That's where we left you, we left you with Mr. Diamond and Mr. Del Missier.**

A. Right.

I recall that most of the rest of the week was trying to keep the team together and talking to all the individual people within the credit business who were out interviewing and getting job offers to try to keep the team together.

**Q. Were you meeting with Barclays during that time period on what I'll characterize as, you know, the asset classes for which you had responsibility or anything else? Other than your**

**FELDER - HIGHLY CONFIDENTIAL**

**compensation.**

A. Yeah. I had coffee with Eric Bommensath, I don't remember which day it was, it was either -- I believe it was Tuesday or Wednesday, who was going to be my boss. And we started -- he wanted the names of what I deemed to be the top people within the credit space. So we spent time going through that and just talking about the business overall.

Away from that, I don't recall any specific meetings with Barclays.

**Q. Did you meet with any lawyers that week? Going on from Tuesday or the Tuesday meeting with Mr. Diamond, after that --**

A. Right.

**Q. -- did you meet with any lawyers?**

A. No.

**Q. Did you ever meet privately with Mr. McDade?**

A. I don't recall meeting with him privately.

**Q. Did you ever have a private meeting with Mr. Kirk concerning the transaction and, you know, what had been agreed upon by the parties?**

**FELDER - HIGHLY CONFIDENTIAL**

A. No.

**Q. What about Mr. Kelly? Did you have any conversation with Mr. Kelly that week? Martin Kelly?**

A. Martin -- no.

**Q. Do you even know Martin Kelly?**

A. I know the name.

**Q. Who do you know him to be?**

A. I knew him to be sort of a -- I don't know what his exact function is, but I knew him to be sort of a right-hand person to the CFO, to Ian. But I couldn't tell you exactly what his function is.

**Q. Did you ever tell or write to anybody that Barclays was cherry-picking assets?**

A. I don't recall doing that.

**Q. Do you recall ever having written anybody to the effect that Barclays was choosing the assets which they wanted to purchase?**

A. I did think that Barclays was choosing and pricing assets. That was just the impression -- that was the impression.

**Q. What was that impression based on?**

A. I guess I remember Mike Keegan at --

in one of the meetings, I think it was, I guess that Monday.

**Q. Monday, the 15th?**

A. I believe. Just the way he asked about -- on the corporate side, I remember him asking about auction rate securities and saying like what -- like are you comfortable with these, and I remember saying, yes, we were comfortable with them.

**Q. Anything else?**

A. No, that's what I -- I remember that.

**Q. It may be my confusion, I apologize if it is, but I thought I understood you to say that you thought that Barclays was buying the entire broker dealer. How does that square with the fact that they are selecting assets to purchase? I don't understand how those things are consistent. Maybe they are, but I don't understand.**

MR. STERN: Objection to the form.

A. I don't know that -- I just know what I had heard about what the transaction was, that they were looking at buying the broker dealer. I don't know the specifics of how a transaction like this would occur.

**Q. But you also knew during that week, did you not, that Barclays was picking the assets they wanted to purchase?**

A. I knew they were looking at the -- at all the different assets and forming opinions on them.

(Exhibit 10, e-mail dated September 17, 2008 at 12:34 p.m. marked for identification, as of this date.)

**Q. Mr. Felder, I show you what has been marked as Exhibit 10. Midway on the first page, there is an e-mail from you to a collection of people where you are stating that the Barclays folks picked the assets and recall them saying they didn't want the auctions carries, but I wasn't in the meeting.**

**Do you see that?**

A. Um-hm.

**Q. You mentioned about the auction rates in your conversation.**

A. Because I remember -- yes.

**Q. Does this document refresh your recollection to any extent that Barclays was interested in only purchasing certain assets of**

**Lehman Brothers as opposed to the entire broker dealer?**

MR. STERN: I think you should take a chance to read the document.

THE WITNESS: OK.

A. What was the question?

(Record read)

A. I just remember them asking opinions on things which led me to believe that a decision process was being made.

**Q. OK. Do you remember them asking you about anything or speaking about anything other than auction rates?**

A. That was all I recall being asked.

**Q. Did you ever have a conversation with anybody at Barclays about the valuations of any of the positions or asset classes in the area of your responsibility?**

A. What do you mean by value -- by valuation?

**Q. Marks.**

A. Like where are things marked? Around the auctions, based on the -- where the prices were, I remember them -- I remember Mike Keegan

asking, you know, what do you think of these securities at these prices?

**Q. OK.**

A. And I recall saying to him that I think you're going to get -- ultimately people would get their money back on these securities from -- because they were at a discount. They weren't marked at par anymore, given what went on in that market. But that over time, those assets would -- you would ultimately get your money back.

**Q. Were the auction rates within your area of responsibility, within fixed income?**

A. Yes.

**Q. And you know they didn't move to Barclays, right?**

MR. STERN: Objection, objection to form.

A. I don't know that they didn't move to Barclays.

**Q. The conversation that you had with Mr. Keegan on Monday about -- you think it was Monday -- about the auction rates, was this a face-to-face meeting that you had with him?**

A. Yes. It was in that -- it was up on

Page 94

FELDER - HIGHLY CONFIDENTIAL

32.

**Q. In that room where you were escorting some people in and occasionally staying yourself?**

A. Correct.

**Q. Do you recall having spoken about any other asset classes or any other types of assets other than auction rates in that room to Barclays people with regard to marks?**

A. No.

**Q. Were you aware during the week that there was a real interest or focus on the marks that were being placed on the asset classes, or the positions rather, in your area of responsibility?**

A. Well, based on -- based on, for example, that mortgage e-mail, there was focus -- the -- I don't want there to be a disconnect between my technical area of responsibility, given the job that I had gotten four days before, and what I -- what I really had a knowledge of, which was the credit piece. So I -- I did have the sense that there was focus on the marks of positions, but they weren't my areas of expertise.

**Q. Did you ever instruct any traders**

TSG Reporting - Worldwide (877) 702-9580

Page 95

FELDER - HIGHLY CONFIDENTIAL

**within any area of fixed income during the week of September 15 to provide you marks on any positions?**

A. I don't recall specifically asking for marks from people.

**Q. Did you ever instruct any traders within your area of responsibility to mark down any assets within the fixed income area?**

A. I don't recall instructing anyone to mark.

**Q. Can you tell me who would have had the conversation with the trader concerning the mortgages that you have seen previously in terms of providing marks for those?**

A. It would have gone through Charlie Spero.

**Q. OK. Did you ever have a conversation with anyone at Lehman Brothers, Mr. Felder, about a discount being provided to Barclays on its purchase of Lehman assets?**

A. I don't recall any specific conversations.

**Q. Did you ever hear generally that Barclays had been provided a discount in its**

TSG Reporting - Worldwide (877) 702-9580

Page 96

FELDER - HIGHLY CONFIDENTIAL

**purchase of Lehman assets?**

A. Well, that mortgage e-mail, for example, would give that indication, so that would be an example of something that --

**Q. OK, thank you for that. Other than the indication and the specific instance concerning the mortgages, did you ever hear of any, I'll call it global discount given to Barclays for -- in purchase of the Lehman assets?**

A. No, I don't recall hearing about that.

**Q. Did you ever read anywhere or hear from anyone that Barclays had purchased certain valuation or value of Lehman assets for a discount?**

A. No, not specifically.

**Q. Were you aware that on Tuesday morning, Mr. Diamond and I think others at Barclays had an analyst conversation, telephone conversation?**

A. Analysts?

**Q. Yeah. They had a telephone conversation with various people?**

A. No.

**Q. You weren't on it, in any event?**

TSG Reporting - Worldwide (877) 702-9580

Page 97

FELDER - HIGHLY CONFIDENTIAL

A. No. What do you mean by analyst?

**Q. Not analysts, they were investors. It was an investor call and a collection -- I don't know who got access to the call. All I've seen is a transcript, there was an investor call --**

A. No.

**Q. -- of some kind, and my question is, were you on that call?**

A. No.

MR. STERN: Just so the record is clear, I think in one of the previous answers Mr. Felder referred to "that mortgage e-mail," and I believe he was referring to Exhibit 6, just to avoid any confusion.

MR. CARDEN: Let's mark this Exhibit 11.

(Exhibit 11, document Bates stamped 10284073 marked for identification, as of this date.)

**Q. Have you seen Exhibit 11 before, Mr. Felder?**

A. I believe Dan was the one who was sending out the updates. He was a lawyer, so he

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

was sending out updates on the court process.

**Q. Who was Mr. Schellbach?**

A. Pete ran the distressed trading business.

**Q. Do you remember having gotten this e-mail?**

A. Not specifically, but I -- you know, now that I see it, I'm remembering asking him for updates that Friday night.

**Q. Do you remember any other conversations concerning what Barclays was actually purchasing and at what values? Does this cause you to have a recollection as to that?**

A. No.

(Exhibit 12, three-page letter dated September 18, 2008 marked for identification as of this date.)

**FELDER - HIGHLY CONFIDENTIAL**

REDACTED

FELDER - HIGHLY CONFIDENTIAL

REDACTED

**FELDER - HIGHLY CONFIDENTIAL**

REDACTED

MR. CARDEN: We now have the exhibit, so we will mark it. Let's take a break here for just a moment and see where we are.

(Recess)

(Exhibit 14, document Bates stamped 10292661 marked for identification, as of this date.)

**Q. Mr. Felder, I am going to show you what has been marked as Exhibit 14, Mr. Felder, which is one of these e-mail chains. I want to draw your attention to the one at the bottom here from Mr. Lowitt to you and Mr. Gelband and Mr. Kirk on Wednesday, the 17th, at around 10 in**

FELDER - HIGHLY CONFIDENTIAL

**the evening, or 5 rather. No, 10.**

**Do you recall having gotten this?**

MR. STERN: Let's read it first.

A. I don't recall it specifically.

**Q. Well, do you recall generally there being any conversation about the need to shrink the matched book?**

A. I don't recall that. I recall the -- I recall instructions from Ian to make sure that the traders weren't doing things that sent cash out of the firm. I remember that as a broad instruction that he gave.

**Q. Do you have an understanding of what is meant by shrinking the matched book in this e-mail from Mr. Lowitt?**

A. A matched book is a repo book where it is matched, so there are two sides to it. So if you shrunk a matched book, you would eliminate both sides and then the aggregate size would be smaller.

**Q. Do you have any memory at all as to why there was a need in his mind to shrink the matched book?**

A. No.

FELDER - HIGHLY CONFIDENTIAL

**Q. Did you have any conversations with anybody about needing to shrink the matched book during the week of September 15?**

A. Not that I recall.

**Q. What did you mean when you wrote here, "What about the line from BACR," that's Barclays credit? Is that what that is supposed to mean?**

A. I would assume that's Barclays.

**Q. What did you mean by that?**

A. I had -- I -- guess I was asking whether there was -- whether Barclays was going to finance Lehman, whether that was --

**Q. Were you aware at or about this time that the Fed had done a repo with Lehman?**

A. No.

**Q. So I take it you're not aware of whether Barclays was going to take over the Fed's position in connection with that repo?**

A. No, not aware of that.

MR. CARDEN: I'm done.

_ _ _ _

FELDER - HIGHLY CONFIDENTIAL

EXAMINATION BY

MS. TAGGART:

**Q. My name is Erica Taggart. I represent the creditors committee.**

**I have some question, mostly directed to finding out who might have some of the information you didn't know.**

**Did you work at all -- I believe Mr. Carden asked you that you weren't involved in any repurchase agreement with the Federal Reserve, right?**

A. Correct.

**Q. Do you know anyone who was involved from Lehman in dealing with the Federal Reserve in connection with the primary dealer credit facility?**

A. I can only make an assumption as to who it would be.

**Q. OK. Who do you know that that might fall under their responsibilities at Lehman?**

A. I would think it would fall within the Treasury function. So either Ian Lowitt or Paolo Tonucci, who would be the treasurer. Those would be the two people.

FELDER - HIGHLY CONFIDENTIAL

**Q. Did you speak with Mr. Lowitt or Mr. Tonucci about anything related to the Federal Reserve at this time?**

A. No. Not that I recall.

**Q. Did you speak to anyone related to the repurchase agreement related to the Federal Reserve?**

A. No.

**Q. Now, I understand that you didn't prepare any witnesses for the sale hearing; is that correct?**

A. I am sorry, prepare any?

**Q. Witnesses for the sale hearing that happened on September 19.**

A. No.

**Q. Do you know anyone at Lehman who did prepare anyone for the sale hearing?**

A. No.

**Q. Did you ever have any interaction with JP Morgan during the week of September 15?**

A. No.

**Q. Do you know who at Lehman did have any interaction with JP Morgan at this time?**

A. I would only be assuming again. I can

give you a list of people who it might be, but I don't know.

**Q. Who are the people at Lehman that it was your understanding within their responsibilities would be working with JP Morgan prior to the sale transaction?**

A. I would think it would be Ian and Paolo, again.

**Q. Besides the people that you mentioned earlier today, do you know anyone else at Lehman who was involved in valuing any assets or securities that became part of the sales transaction?**

A. Not specifically.

**Q. Is there anybody else besides those that you have mentioned today who it was within their area of responsibility to do valuations of securities or assets at Lehman?**

A. Can you repeat the question.

(Record read)

A. What do you mean by -- obviously traders mark --

**Q. Right. Besides the traders, I think you said that the traders then give their**

**information to the different department heads. You deal with the credit and fixed income. Is there anyone else that you know of who during this time was collecting information from traders about valuation of assets that might go to Barclays?**

A. The -- oh, specifically -- no, not specifically.

**Q. And it is my understanding you weren't involved in the negotiation of any of the contracts that related to the sale of assets to Barclays, correct?**

A. Correct.

**Q. Who do you know at Lehman who was involved in that negotiation?**

A. I could only -- I could only make an assumption. I don't know specifically.

**Q. Who were the people that you believe might have been involved in negotiations with Barclays over the sale?**

A. Bart McDade, Alex Kirk, Mike Gelband. These are just -- this is just -- would be my assumption.

Potentially Skip McGee, ran investment banking. Mark Schaefer.

**Q. What was Mark Schaefer's role?**

A. He -- I think he was head of M&A.

**Q. Did you ever speak to anybody about any terms or conditions about the sale transaction?**

A. No.

**Q. Did you ever have any involvement with the DTC, Depository Trust and Clearing Corporation?**

A. No.

**Q. Do you know who at Lehman was interacting with the DTC at this time?**

A. I don't.

**Q. Were you involved at all in the decision about what amount, if any, of the residential mortgage backed securities would be part of that transaction?**

A. No.

**Q. Do you know who was involved in those decisions?**

A. I don't.

**Q. The weekend between -- the weekend of September 20 and 21, were you involved in any meetings with Barclays during that time?**

A. Weekend of the 20th and 21st? I was -- that weekend I was working with Eric Bommensath around coming up with contracts for the people that would be on the team in credit.

**Q. Any other meetings with anyone from Barclays?**

A. No.

**Q. Were you involved at all in the assessment of the value of the goodwill of LBI that was purchased by Barclays?**

A. No.

**Q. Do you know who was involved in that valuation?**

A. No.

**Q. Were you involved in any valuation of real estate?**

A. No.

**Q. Do you know who would be involved in that valuation?**

A. Mark Walsh ran our real estate group, but I don't know who was involved in valuing it.

(Exhibit 15, document Bates stamped BCI-EX30865 with attachment marked for identification, as of this date.)

**Q. Exhibit 15 goes from the numbers BCI-EX30865 -- actually that's the cover e-mail, and then there is a number of documents of a spreadsheet that are attached to it, and it was an e-mail from Stephen King dated September 17, 2008.**

**Have you ever seen Exhibit 15?**

A. No, I don't recall seeing it.

**Q. Who is Stephen King?**

A. Steven works at Barclays. He -- and at least now he is in -- he was in that PMTG group.

**Q. And it is to C. Spero. Is it your understanding that's Charles Spero?**

A. Yeah, that's what it looks like.

**Q. Who is Jasen Yang?**

A. I don't know.

**Q. You will see in the middle of this e-mail, it says, "I am going to have to do the same on the rest of the portfolio. I guess that is Felder, right?" Do you see that?**

A. Yes.

**Q. Is it your understanding that's referring to you?**

A. It looks that way, yes.

**Q. Did any of these people, Stephen King, Charles Spero or Jasen Yang ever contact you about doing any work with the portfolio that is described here?**

A. No. Not that I recall.

**Q. Do you have an understanding under "BB takes" what's being described here?**

A. "BB takes." BB -- well, it says takes and leaves, so I assume it is securities being taken and securities being left.

**Q. Were you involved in putting together these numbers that are on Exhibit 15?**

A. No.

(Exhibit 16, e-mail dated September 18, 2008 at 12:23 p.m. marked for identification, as of this date.)

**Q. The next exhibit, 16, is an e-mail from Gilles Aublin dated September 18, 2008, to Fred Orlan and others, I believe you are on the cc line, with the subject "Asset Transfer Update."**

**Do you remember receiving this e-mail?**

A. I don't recall specifically.

**Q. Is that your e-mail address on the cc line?**

A. Yes.

**Q. And who is Gilles Aublin?**

A. He was in product control for credit.

**Q. You will see that in the first of the bullet points, it says, "You will be provided later today the updated final list of assets that will be carried over to the new entity."**

**Do you see that?**

A. Yes.

**Q. Were you provided with an updated final list of assets that would be carried over to the new entity?**

A. I don't recall.

**Q. Do you know what this is referring to?**

A. Only just what it says in the e-mail.

**Q. Did you receive any list from Mr. Aublin or his team that reflected assets that were carried over to the new entity?**

A. I don't recall specifically getting one.

**Q. Then you see in the third bullet point it says, "Today it is critical that all positions are marked carefully, as this mark will be the basis of the transfer." Do you see that?**

A. Yes.

**Q. Were you involved at all in marking the assets on or about September 18?**

A. No.

**Q. And did you speak to Mr. Aublin at all about the issues of valuation of the asset transfer?**

A. No.

REDACTED

Page 114

FELDER - HIGHLY CONFIDENTIAL

**Q. In the presentations that you were making to the room of people on Monday, the 15th, regarding the credit positions, did you present any documents at that meeting?**

MR. STERN: Objection to the form.

A. On Monday. There were some risk reports there, I believe.

**Q. And you -- did you present those risk reports to the people in the group?**

A. I gave -- I gave them to the Barclays folks.

**Q. Did they have a -- the document have a title on them?**

A. I don't recall a specific title.

**Q. About how long were the documents that you presented?**

A. I don't remember specifically.

**Q. Was there further discussion about your presentation?**

A. It wasn't a -- it wasn't a presentation. It was -- we -- I remember handing over risk reports, and then any questions that got asked, we would try to answer. Because I remember the specific auction rate question, for example.

TSG Reporting - Worldwide (877) 702-9580

Page 115

FELDER - HIGHLY CONFIDENTIAL

**Q. What was the specific auction rate question that you remember?**

A. What, what is your opinion of the -- of these securities?

**Q. What was your answer?**

A. I believe it was that I was -- based on the prices that they were at over time and the credit quality, that we would expect that we would get par back, that you could expect that you would get par back on the securities.

**Q. At the time of September 15, had you been valuing them at par?**

A. I don't remember all the individual levels, but in general, they were not at par.

**Q. In general, is it correct that the auction rate securities that you were presenting were valued at that time at a discount?**

A. Yes, at a discount to par.

**Q. Approximately how much of the discount to par at that time?**

A. I don't recall specifically, because there were different types. I don't recall the exact numbers.

**Q. What were the different types?**

TSG Reporting - Worldwide (877) 702-9580

Page 116

**FELDER - HIGHLY CONFIDENTIAL**

A. There were XXX securities. There were contingent capital securities. There were DPC securities.

**Q. I am sorry?**

A. DPC. There were -- then I guess there were munis and taxable munis.

**Q. What was the approximate value that you were presenting for that total group of auction rate securities?**

A. I didn't present any values.

**Q. Why had you discounted those securities?**

MR. STERN: Objection to the form.

A. I didn't discount securities. These were the marks from the traders that were on the risk report.

**Q. What was your basis for saying that you believed that Barclays could eventually get par back from those securities?**

A. It was based on my opinion of the credit quality of the underlying securities from the work that had been done by the -- our hybrid capital team that was responsible for those securities.

TSG Reporting - Worldwide (877) 702-9580

Page 117

FELDER - HIGHLY CONFIDENTIAL

**Q. Who were you referring to as part of the hybrid capital team that had done work related to these securities?**

A. Anthony Bugliari. Gia Rys, R-Y-S. Those would be the main people.

**Q. You testified earlier today that you didn't remember any private meetings with Bart McDade. Did you meet at all with Bart McDade the week of September 15?**

A. I definitely saw him around. I don't -- I don't recall a specific meeting, though.

MS. TAGGART: I don't have any more questions.

MR. MAGUIRE: Mr. Felder, I don't have any questions for you. I would make a request of your Barclays counsel that with respect to Exhibit 11, which I believe you were provided with, that makes a reference to a Barclays lawyer coming in and making an explanation. I believe that's in the context of the hearing, the proceedings associated with the bankruptcy court hearing on September 19. I would ask that Barclays

TSG Reporting - Worldwide (877) 702-9580

Page 118

FELDER - HIGHLY CONFIDENTIAL

provide us with the record of that explanation.

MR. STERN: Are you suggesting there is something other than the transcript of the hearing?

MR. MAGUIRE: If there is nothing other than the transcript, if you could confirm that, that would be fine. If there is anything other than the transcript, if you could provide us with the record.

MR. STERN: Sure, we will definitely look into that.

MR. MAGUIRE: Thank you.

EXAMINATION BY MR. BYMAN:

**Q. Mr. Felder, you and I have met before. I am Bob Byman for the examiner. I just want to follow up on the risk reports that you were talking about that were present on September 15. Could you describe those in a little more detail, who prepared them, what risks were they evaluating, what type of information was conveyed in them?**

A. If I recall, they were the broad risk

TSG Reporting - Worldwide (877) 702-9580

Page 119

FELDER - HIGHLY CONFIDENTIAL

reports for the credit business which would have been produced by Luan Sha La, L-U-A-N, S-H-A, L-A, and Hans Chunk. They were -- they sat within the risk management function, and they were our -- the standard risk reports that were delivered either on a daily or weekly basis that gave a broad overview as to the credit risk and the credit business.

**Q. So these were routine reports that happened to have been generated that you brought with you?**

A. Correct.

**Q. As opposed to something that you created for the meeting?**

A. Correct.

**Q. In these routine reports, can you give somebody like me, who is a total layman who doesn't know how you calculate risk or what you do with it, what do these things show? Do they take the asset and say how much the asset will be downgraded or down-valued?**

A. No. It was summarize the current position using metrics within the credit space, such as DVO1, which is dollar value of a basis

TSG Reporting - Worldwide (877) 702-9580

Page 120

FELDER - HIGHLY CONFIDENTIAL

point, how much a position would move based on the basis point shift in yield.

VOD, which stands for value on default, meaning how much you would lose if that position defaulted and recovered. 40 cents is the market standard for recovery within corporates.

There would also be a VOD zero column, which would be how much would you lose if there was a default and the security went to zero.

And then there would be lists of top, long and short positions based on that DVO1 metric which I mentioned and also that VOD metric which I mentioned. There would also be portfolio statistics, such as, BAR, that would be shown and those types of general metrics.

**Q. Are you familiar with the concept of risk appetite?**

A. Yes.

**Q. Did these reports quantify the amount of risk appetite usage the businesses that you were responsible for were consuming?**

A. There would be some -- I don't know if in those reports risk appetite was on there.

**Q. Were there routine reports that your**

TSG Reporting - Worldwide (877) 702-9580

Page 121

**FELDER - HIGHLY CONFIDENTIAL**

**businesses generated that did track the amount of risk appetite usage?**

A. Yeah, I would think there would. It wasn't a metric that was -- it wasn't a metric within credit that the risk management folks focused on, because it didn't give, didn't give a -- it didn't give a real sense as to how the -- that portfolio would -- those credit specific risk metrics were the more important risk metrics in managing the credit book.

**Q. Focusing just on the credit business, which I take it you have a further understanding of than the business you were only in charge of for four and a half days.**

A. Correct.

**Q. Were you assigned a certain amount of risk appetite usage at any point in a fiscal year?**

A. I would assume that there were limits. I don't recall being given a specific number.

**Q. Do you recall ever being told you were over or under or comfortably within whatever your usage was?**

A. Not specifically.

**Q. Do you recall at any time any concern**

TSG Reporting - Worldwide (877) 702-9580

Page 122

**FELDER - HIGHLY CONFIDENTIAL**

**in any of the businesses that you bumped into about whether or not the business was within its risk appetite limits?**

A. I do recall Alex Kirk saying -- and I couldn't tell you when, this is going back pre-September, I do recall Alex saying that his business had to get risk appetite lower.

**Q. And which business would he have been talking about?**

A. This was when he was the co-COO of fixed income. So --

**Q. So it was the fixed income division that had to get limits lower?**

A. I recall him saying that.

**Q. Usage lower or limits lower?**

A. Risk appetite usage.

**Q. OK. Thank you. I don't have any further questions.**

MR. CARDEN: We have been admirably efficient, but I have a few more questions. Won't take long.

\- - - -

TSG Reporting - Worldwide (877) 702-9580

Page 123

FELDER - HIGHLY CONFIDENTIAL

EXAMINATION BY

MR. CARDEN:

**Q. The traders who are responsible for certain aspects of the fixed income portfolio are the ones who do the marks every night, correct?**

A. Correct.

**Q. How many traders, just roughly speaking, were there within the fixed income area in the days when you were the cohead, who would have prepared such marks?**

A. Oh, I don't know how many specific trade -- I know there were about 3,000 people in fixed income. And I think that the split was about a third, a third, a third, sales, trading, research, so I would give an estimate without real knowledge specifically of maybe about a thousand.

**Q. A lot of people?**

A. A significant number.

**Q. And those people, when they did their marks for the portfolios for which they were responsible, did they have a responsibility to provide those marks up to an immediate supervisor every day?**

**Or said another way, how were they**

TSG Reporting - Worldwide (877) 702-9580

Page 124

**FELDER - HIGHLY CONFIDENTIAL**

**input into the system?**

A. No, the traders input their own marks.

**Q. On the evening of Thursday, I know you don't recognize, or pardon me, don't recall having gone forth to get valuations.**

A. Right.

**Q. But had you done so and just don't remember, who would you have asked to provide the marks for the portions of the portfolio that were provided to you Thursday evening?**

A. I would -- if I had to ask that question, I probably would have asked someone like a Gilles in product control, because product control was responsible for month-end variance testing, so they had -- they could get all of the different marks all together in one spot. Each trader would only have their book. So the only place where you could go to get an aggregate list of marks would be out of product control.

**Q. That would only be on a once monthly basis, correct? You had to go back to the end of August, or is that done on a --**

A. Product control could get all the marks on any given day.

TSG Reporting - Worldwide (877) 702-9580

Page 125

FELDER - HIGHLY CONFIDENTIAL

**Q. So I know you, again, you don't remember, I'm just trying to get what the process would have been.**

**When you're given -- if you were given the sheet that had the hundred largest positions in fixed income on the evening of Thursday or Friday morning, and you had to get fire sale marks for those positions, is it your testimony that you would have gone to Gilles?**

MR. STERN: Objection to the form.

A. No. If things had already been marked and I was asked to get what are the marks, I would go to Gilles.

**Q. Fair enough.**

**If you were asked to get fair sale marks for those same positions on late Thursday night or Friday morning, to whom would you have gone to get those fire sale marks?**

A. Within credit?

**Q. Yes.**

A. The people under me in credit would have been Fred Orlan, who ran the high-yield business. Within the investment grade business, it would have been Jason Quinn and Anthony

TSG Reporting - Worldwide (877) 702-9580

Page 126

FELDER - HIGHLY CONFIDENTIAL

Bugliari.

Within the CDO business it would have been Peter Hornick. Within the municipal business it would have been Jerry Rizzieri, and within emerging markets it would have been Mohammed Grimeh.

Those would have been the heads of those businesses who would then, if they had to do that, go to the traders underneath them or desk heads underneath them to do that kind of a --

**Q. Is it possible they could have -- they would have known what the existing marks were already so they wouldn't have needed to go to product control?**

A. They wouldn't have needed to go to product control.

**Q. As to those aspects of the fixed income division that were not credit related --**

A. Right.

**Q. -- to whom would you have gone, if you know, to provide fire sale marks on that, those aspects or those assets in the fixed income division?**

A. I could just give you the heads of the

TSG Reporting - Worldwide (877) 702-9580

Page 127

FELDER - HIGHLY CONFIDENTIAL

businesses.

**Q. OK.**

A. So Charlie Spero ran mortgages. Kaushik Amin ran rates, FX and commodities. John Coughlin was anything that was financing or short dated. Jim Murley would have been anything within the syndicate functions, which also included commercial paper.

Let's see. FX, commodities -- Mohammed Grimeh would have been emerging markets. And I guess Mark Walsh would have been commercial real estate.

**Q. Look back at Exhibit 2 for me for just a moment. I think we have already established, or in any event, there is some indication that this is the sheet of the 100 largest positions in fixed income that was discussed in the e-mail traffic on Thursday evening.**

MR. STERN: Objection to the form. I don't think any such thing has been established. I think the transcript will reflect Mr. Felder's uncertainty concerning this document and the categories within this document.

TSG Reporting - Worldwide (877) 702-9580

Page 128

FELDER - HIGHLY CONFIDENTIAL

But if you have a question, go ahead.

MR. CARDEN: I'm --

MR. STERN: I just object to the statement and characterization of the testimony.

MR. CARDEN: I think it is an accurate characterization, but I will eliminate it from the question so we won't have any problem with it.

MR. STERN: Thank you.

**Q. Looking at Exhibit 2, Mr. Felder, had you wanted to go forward and you had this document in your possession, to provide fire sale valuations for these positions, to whom would you have gone?**

MR. STERN: Objection to the form.

**Q. Take a look at the positions, because they may or may not all be in the areas you have already previously described.**

A. That list of people that I gave you would -- I believe that would incorporate --

**Q. The difference between my question is --**

MR. STERN: Wait, incorporate what? I

TSG Reporting - Worldwide (877) 702-9580

Page 129

FELDER - HIGHLY CONFIDENTIAL

don't hear a complete answer.

A. I think that list of people would have had a responsibility for -- assuming that these are positions from within fixed income at Lehman, that group of people would have had responsibility for the ultimate people that would have marked these securities.

**Q. On a fire sale basis?**

MR. STERN: Objection to the form.

A. They would -- those would be the people that if they were asked to do that, would have the knowledge level of the security to do that.

**Q. OK. Let me make certain that we are understanding one another. Had you been given this list on Thursday, September 18, in the evening or early Friday morning on September 19 and been asked to provide fire sale prices for those positions which were in fixed income, the people to whom you would have gone would have been those which you previously described as in charge of those specific areas, correct?**

A. Correct.

**Q. All right. Do you have -- strike**

TSG Reporting - Worldwide (877) 702-9580

**that.**

**Would there be any way that you could have avoided going to each and every one of them in order to make the process more efficient? In other words, is there some one person above all of them to whom you might have gone to say get this done and that they in turn would have gone to the collection of people you described? Or is that person you?**

A. Can you repeat the question.

**Q. Yeah, I am happy to rephrase the question.**

**I know you don't have a recollection of this, I am simply trying to determine what you would have done if it in fact happened.**

**You were asked to give fire sale prices for the securities in Exhibit 2. You have got to find the people who are in a position to do it. You have described to me the people in each of the various asset classes who are in a position to talk to the relevant traders and get those fire sale marks, correct?**

A. Correct.

MR. STERN: Objection to the form.

Wait. Objection to the form, because the question incorporates all kinds of statements.

MR. CARDEN: That's fine. I am happy with the question. You can object to the form.

**Q. So the question I have for you now is, is there --**

MR. STERN: The point is if you are creating a misleading record, I just can't let that stand. So what exactly are you asking?

MR. CARDEN: We have done beautifully this far. I am perfectly happy with the answer. I am just trying to identify people who are involved. Let's just move on. I am happy to stand by the question. I have reformulated questions in the past when I thought you were correct. I thought you were mistaken about this. I don't really care about this.

**Q. What I really want to know, Mr. Felder, is, if you had chosen to do so and were asked to provide fire sale prices for a wide**

**collection of positions in the fixed income area, is there some one person you could have called as opposed to contacting all the people that you have described?**

A. I could have gone to one person who would have gone to those people. So Mike Gelband would know all of those people, Alex Kirk would know all of those people.

**Q. But at the end of the day, what you are saying to me, in order to provide the fire sale prices, you would have had to have gone back to the people that you have identified to get those prices, correct? Somebody would have had to have gone to them?**

A. That would be the process I would go through.

**Q. That's what I am asking for. OK.**

**And it is your testimony you have no recollection of having done that on Thursday night or Friday morning?**

A. I have no recollection of having done that.

**Q. OK, thank you, sir.**

EXAMINATION BY
MS. TAGGART:

**Q. I will ask a couple of follow-up questions to this.**

**When you talk about the traders are the ones who put together marks, do they do that on a routine basis?**

A. They mark their books every day.

**Q. And what's involved in marking the books every day?**

A. For what type of a trader?

**Q. It varies from trade to trade? Let me ask this: Where do they put the information on a daily basis, or did they at this time?**

A. Whatever the front office system of that asset class is would be where the marks would be put in.

**Q. When you say a front office system, are you talking about a computerized database?**

A. An application. There were different applications for different products, that would all feed into the middle office or the back office of the firm. So depending on what the product was, whatever system that was used would be the --

Page 134

FELDER - HIGHLY CONFIDENTIAL

would be -- that is where they would put the prices into.

**Q. When you talk about a system, a computerized system?**

A. Computerized system.

**Q. So every day traders would be entering marks for the securities that they were involved in on some sort of computer system; is that correct?**

A. To my knowledge, that -- a computer system was used in the products I knew.

**Q. Did you ever personally access on a computer system daily marks?**

A. In risk systems, you can see -- you can see the marks of securities.

**Q. How do you see them?**

A. On the computer screen.

**Q. Did the computer screen -- is there a database that you remember, a name of a database where you personally could go and access daily marks?**

A. In -- within credit, our main risk system was called ICE, I-C-E. And that consolidated the derivative systems and the cash

TSG Reporting - Worldwide (877) 702-9580

Page 135

FELDER - HIGHLY CONFIDENTIAL

systems.

**Q. Did marks ever change from the close of the market on Friday to the opening of the market on Mondays?**

A. From the close on a Friday to the open on a Monday?

**Q. Yes.**

A. I don't think you could do -- I don't think the system would let you -- you can get an end-of-day mark, and then I don't think you could go in and change -- as far as I know, you couldn't go in and change a mark once it was committed for that day until the mark for the next day.

**Q. In particular on the weekend of September 19 -- from the close of the market on September 19 to the opening of the market on September 22, would there be any reason for any of the marks from the credit business to change over that weekend?**

A. Not that I would be aware of.

**Q. OK, that is all.**

----

TSG Reporting - Worldwide (877) 702-9580

Page 136

FELDER - HIGHLY CONFIDENTIAL

EXAMINATION BY

MR. BYMAN:

**Q. I apologize. Every time somebody asks a question, somebody else thinks of another question.**

**When the traders do their marks, and I understand, I think, that process, is there any other group such as the product control group that does an independent analysis of where they think certain assets should be valued?**

A. That would be done monthly, and there would be variance reports. I only know this specifically within credit because I hadn't gone through that process in the other asset classes. So within credit, we had a monthly variance meeting with product control to go through any positions that they felt -- they got external data from third parties and they compared the marks to that external data, and then the desk heads would sit down with product control, and then ultimately I would sit down to make sure that the business was properly marked from the product control -- from a -- essentially a third party's perspective.

**Q. So I want to make sure that I**

TSG Reporting - Worldwide (877) 702-9580

Page 137

FELDER - HIGHLY CONFIDENTIAL

**understand the process then. So on a daily basis, the traders would mark the assets that they were responsible for. On a monthly basis, product control would do its own evaluation. To the extent there was a variance, it would escalate to you, and you would decide who was right or whether it was someplace in the middle?**

A. No. The product controllers ultimately had the -- you couldn't overrule a product controller because they had the third-party data. So if they said this, this is off, then the book just got marked down by where it was.

If there was a situation where -- if there was a situation where there was other data in the market that the product controllers didn't have, for example, then --

**Q. You would reason with them, but you couldn't overrule them?**

A. Right. That was my experience within credit.

**Q. And so far as you know, is that the same system that other businesses use within Lehman?**

TSG Reporting - Worldwide (877) 702-9580

FELDER - HIGHLY CONFIDENTIAL

A. I don't know.

**Q. How close to this monthly review by the product controllers would you do your sit down to look at the variance reports? Would that be done within a day or two?**

A. It would usually take them a week or two to put it all together.

MR. BYMAN: OK, thanks.

MS. TAGGART: I do have another.

EXAMINATION BY MS. TAGGART:

**Q. Just who are the product controllers that were at Lehman doing this process, the monthly evaluation, prior to the sale? That you know of.**

A. I just know Gilles within credit. There is a whole product control function, and they were set up by asset class, so I would assume that there are product controllers for each asset class.

**Q. OK.**

MR. CARDEN: We have given you the gift of time, Mr. Felder.

THE WITNESS: I sincerely appreciate





FELDER - HIGHLY CONFIDENTIAL

it.

(Time Noted: 1:05 p.m.)

____________________

ERIC JONATHAN FELDER

Subscribed and sworn to before me this day of July, 2009.

____________________





FELDER - HIGHLY CONFIDENTIAL

INDEX:


| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| E. Felder | Mr Carden | 10, 123 |
| | Ms. Taggart | 104, 133, 138 |
| | Mr Byman | 118, 136 |


EXHIBITS


| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 1 | asset purchase agreement dated September 16, 2008 | 47 |
| Exhibit 2 | e-mail with attachment dated September 18, 2008 | 53 |
| Exhibit 3 | document Bates stamped 1029780 | 57 |
| Exhibit 4 | e-mail dated September 19, 2008 at 1:30 p.m. | 75 |
| Exhibit 5 | e-mail dated September 19, 2008 at 10.34 a.m. | 75 |
| Exhibit 6 | document Bates stamped 10242982 | 76 |
| Exhibit 7 | document Bates stamped BCI-EX70957 | 81 |
| Exhibit 8 | e-mail September 19, 2008 at 10:51 a m. with attachment | 82 |
| Exhibit 9 | e-mail dated September 19, 2008 at 2.06 p.m. with attachment | 83 |
| Exhibit 10 | e-mail dated September 17, 2008 at 12:34 p.m. | 91 |
| Exhibit 11 | document Bates stamped 10284073 | 97 |
| Exhibit 12 | three-page letter dated September 18, 2008 | 98 |
| Exhibit 13 | Letter dated September 21, 2008 | 99 |
| Exhibit 14 | document Bates stamped 10292661 | 101 |
| Exhibit 15 | document Bates stamped BCI-EX30865 with attachment | 109 |
| Exhibit 16 | e-mail dated September 18, 2008 at 12 23 p.m. | 111 |






FELDER - HIGHLY CONFIDENTIAL

CERTIFICATE

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK)

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That ERIC JONATHAN FELDER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 31st day of July, 2009.

____________________

MARY F. BOWMAN, RPR, CRR

FELDER - HIGHLY CONFIDENTIAL

* * *ERRATA SHEET* * *

NAME OF CASE: In Re: Lehman Brothers

DATE OF DEPOSITION: 7/31/09

NAME OF WITNESS: ERIC JONATHAN FELDER

Reason codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ____ Line ____ Reason____
From ___________________ to_________________

Page ____ Line ____ Reason____
From ___________________ to_________________

Page ____ Line ____ Reason____
From ___________________ to_________________

Page ____ Line ____ Reason____
From ___________________ to_________________

Page ____ Line ____ Reason____
From ___________________ to_________________

Page ____ Line ____ Reason____
From ___________________ to_________________

Page ____ Line ____ Reason____
From ___________________ to_________________

_______________________
ERIC JONATHAN FELDER