# A. 11 (A)

Confidential

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               )
7    HOLDINGS, INC., et al.,   )
                               )
8              Debtors.        )
     --------------------------)

9

10

11

12

13

14

15       HIGHLY CONFIDENTIAL DEPOSITION OF

16          DANIEL JOSEPH FLEMING

17            New York, New York

18         Friday, August 28, 2009

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR, CLR

25   JOB NO. 24123

Confidential

Page 2

```
 1
 2
 3
 4                    August 28, 2009
 5                    9:28 a.m.
 6
 7
 8          Highly Confidential Deposition of
 9   DANIEL JOSEPH FLEMING, held at the offices
10   of JONES DAY, LLP, 222 East 41st Street,
11   New York, New York, before Kristin Koch, a
12   Registered Professional Reporter,
13   Registered Merit Reporter, Certified
14   Realtime Reporter, Certified Livenote
15   Reporter and Notary Public of the State of
16   New York.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4
 5      JONES DAY, LLP
 6      Attorneys for Lehman Brothers, Inc.
 7         222 East 41st Street
 8         New York, New York 10017-6702
 9      BY:  BART GREEN, ESQ.
10           KELLY A. CARRERO, ESQ.
11
12
13      BOIES, SCHILLER & FLEXNER, LLP
14      Attorneys for Barclays and Daniel Joseph
15      Fleming
16         333 Main Street
17         Armonk, New York 10504
18      BY:  CHRISTOPHER M. GREEN, ESQ.
19
20
21      QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
22      Attorneys for Creditors Committee
23         865 South Figueroa Street - 10th floor
24         Los Angeles, California 90017
25      BY:  TYLER WHITMER, ESQ. (Via telephone)
```

Page 4

```
 1
 2   A P P E A R A N C E S :  (Continued)
 3
 4
 5   JENNER & BLOCK LLP
 6   Attorneys for Examiner
 7      330 North Wabash Avenue
 8      Chicago, Illinois 60611-7603
 9   BY:  VINCENT LAZAR, ESQ.
10
11
12   HUGHES HUBBARD & REED LLP
13   Attorneys for SIPA Trustee
14      One Battery Park Plaza
15      New York, New York 10004-1482
16   BY:  SETH D. ROTHMAN, ESQ.
17        AMINA HASSAN, ESQ.
18
19
20   ALSO PRESENT:
21
22      PHIL KRUSE, Alvarez & Marsal
23
24
25
```

Page 5

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6        IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19
20                  - oOo -
21
22
23
24
25
```

Confidential

Page 6

1
2 D A N I E L   J O S E P H   F L E M I N G,
3     called as a witness, having been duly sworn
4     by a Notary Public, was examined and
5     testified as follows:
6 EXAMINATION BY
7 MS. CARRERO:
8     Q.   Good morning, Mr. Fleming.  My name
9 is Kelly Carrero.  I am with Jones Day.  We are
10 special counsel to the estate of Lehman
11 Brothers Holding, Inc.  With me is my
12 colleague, Bart Green, and I will have everyone
13 else in the room introduce themselves on the
14 record.
15     MR. ROTHMAN:  Seth Rothman, Hughes
16 Hubbard & Reed.  We represent the SIPA
17 trustee.
18     MS. HASSAN:  Amina Hassan, Hughes
19 Hubbard & Reed.
20     MR. LAZAR:  Vince Lazar from
21 Jenner & Block.  We represent the Examiner
22 appointed in the Lehman Brothers case.
23     MR. KRUSE:  Phil Kruse with
24 Alvarez & Marsal on behalf of LBHI.
25     MR. C. GREEN:  Christopher Green

Page 7

1     Fleming - Highly Confidential
2 with Boies, Schiller & Flexner on behalf of
3 Barclays Capital and the witness.
4 BY MS. CARRERO:
5     Q.   Mr. Fleming, have you been deposed
6 before?
7     A.   No.
8     Q.   Then I will go over some background
9 rules, housekeeping.  It will go easier and
10 smoother if when I ask a question you let me
11 finish the question before you start your
12 response and if you will give verbal answers
13 rather than any nods of the head so that the
14 court reporter can take down every word that
15 you say.
16     If you need to take a break, if you
17 can wait until we find a reasonable place to
18 stop, just let me know, let your counsel know
19 and we will work with each other.
20     A.   Okay.
21     Q.   So if we could start with some
22 background information in terms of education,
23 work experience.  Let's start with your
24 educational experience.
25     A.   Education, I attended the University

Page 8

1     Fleming - Highly Confidential
2 of Hartford and St. John's University for
3 approximately two and a half years.  Did not
4 graduate.  In terms of work experience, would
5 you like me to start backwards?
6     Q.   Start with your earliest work
7 experience after you finished at University of
8 Hartford and St. John's.
9     A.   First employment was with EF Hutton
10 working in the mortgage-backed security
11 accounting group.
12     I subsequently was hired by Shearson
13 Lehman Hutton, moved into their regulatory
14 group for a short period.
15     I subsequently left and joined, I
16 believe, what was Chemical Bank, again, working
17 in mortgage-backed security accounting.
18     Subsequent to that I left the
19 industry and worked out of industry as a
20 controller for a wholesale distributor out on
21 Long Island.
22     Then I came back into the industry.
23 I worked for a firm named East Bridge Capital
24 and East Bridge Asset Management, which was --
25 East Bridge Capital was a primary dealer owned

Page 9

1     Fleming - Highly Confidential
2 by Nippon Credit Bank.  In that space I worked
3 in accounting for both the broker/dealer and
4 for the asset management business.
5     Subsequent to that I worked at DE
6 Shaw for a short while in their operations
7 accounting group.
8     And then I moved over to Lehman
9 Brothers in and around 1998 where I joined the
10 cash and collateral management team in New York
11 reporting in to at the time the U.S. head of
12 cash and collateral management.
13     I subsequently took over the role of
14 U.S. head of cash and collateral management.
15     Subsequent to that I was --
16     Q.   I'm sorry, if I could stop you
17 there.  What year are we talking that you
18 became U.S. head of cash and collateral
19 management?
20     A.   2001, 2002, thereabouts.
21     Q.   And when you began at Lehman in 1998
22 in the cash and collateral group, was that part
23 of the treasury group?
24     A.   Yes.
25     Q.   And who did you report to starting

Confidential

## Page 10

1    Fleming - Highly Confidential
2  in 1998?
3      A.   I reported in to an individual by
4  the name of Robert Murack.
5      Q.   And was there a time when that
6  changed and you started to report to someone
7  else or did you report --
8      A.   Yes.  Robert left the organization.
9  I was then reporting in to an individual by the
10  name of Kathy Bopp Flynn, who was in charge of
11  cash and collateral management, as well as
12  network management and possibly some other
13  functions.  I don't recall.  She was a direct
14  report to the treasurer at the time who was
15  Daniel Minerva.  Kathy Bopp Flynn moved into a
16  new role at some point after I was reporting in
17  to her.  A new individual by the name of Robert
18  van Zwieten was hired.  Robert was responsible
19  for global cash management as well as some
20  other functions.  Upon Robert --
21      Q.   Go ahead.  Finish.
22      A.   Upon Robert's departure -- I don't
23  recall exactly when that was, it was probably
24  2005, 2006.  2006.  At that time I was named
25  the global head of cash and collateral

## Page 11

1    Fleming - Highly Confidential
2  management reporting in to Ian Lowitt, who at
3  the time was the treasurer.
4      Q.   So if I can just step back to
5  clarify, in 2001, 2002 you became the U.S. head
6  of cash and collateral management and then in
7  2006 you became the global head of cash and
8  collateral management; is that correct?
9      A.   That sounds approximately correct,
10  yes.
11      Q.   And at the time that you were the
12  U.S. head of cash and collateral management,
13  were you reporting to the then global head of
14  cash and collateral management or directly to
15  the treasurer?
16      MR. C. GREEN:  Object to form.
17      You can answer.  Go right ahead.
18      A.   There was a change in organizational
19  structure during my time at Lehman Brothers.
20  When I first joined, there was no global head.
21  Each region ran their own treasury group.  At
22  some point, I don't exactly remember when that
23  was, they created global heads for each
24  function within treasury.
25      Q.   So to clarify, when you were going

## Page 12

1    Fleming - Highly Confidential
2  through the people you reported to prior to
3  becoming global head, Kathy Bopp Flynn, at the
4  time that you reported to her, what was her
5  title?
6      A.   She was senior vice president.  That
7  was her official title.
8      Q.   Let's move on.  Let's go back to you
9  became global head of cash and collateral
10  management in 2006.  What were your duties as
11  global head?
12      A.   Most of my time was spent focusing
13  on the U.S. operations of Lehman Brothers.  I
14  did have global responsibility.  In that
15  capacity I was responsible for overseeing
16  strategic direction and objectives of the team,
17  but each of my directs -- I had a direct in
18  Europe and a direct in Asia -- reported in to
19  the treasurer of those respective regions and
20  the day-to-day operations were managed within
21  the region.
22      Q.   And did you have direct reports in
23  the U.S.?
24      A.   Yes, I did.
25      Q.   Could you name those individuals?

## Page 13

1    Fleming - Highly Confidential
2      MR. C. GREEN:  I'm sorry, at the
3      time he became global head or throughout
4      the period of time that he was global head?
5      Q.   Why don't we say at the time you
6  became global head, how many direct reports did
7  you have?
8      A.   I don't really recall.  It could
9  have been three.  I don't remember exactly what
10  it was.
11      Q.   Did it change substantially over
12  time?
13      A.   I think towards the end there were
14  two direct reports in the U.S.
15      Q.   And at the end who were those two
16  direct reports?
17      A.   Craig Jones and Mandeep Seekond.
18      Q.   Could you spell the last name?
19      A.   S-E-E-K-O-N-D.
20      Q.   Were you and your two direct
21  reports, Craig Jones and Mandeep Seekond, the
22  only members of the U.S. cash and collateral
23  management team?
24      A.   No.
25      Q.   Who else would have comprised

Confidential

Page 14

1       Fleming - Highly Confidential
2  membership in that team in the end, around
3  September 2008?
4       A.   There were approximately thirty
5  people in the U.S.
6       Q.   Could you break down those thirty
7  people in terms of function or sub-groups?
8       A.   Yes.  There was one group of
9  individuals that we described their function as
10 cash control.
11      Q.   Could you explain what cash control
12 means?
13      A.   These individuals were responsible
14 for managing what we call the queues, the
15 payment queues, which is the release of payment
16 messages out to banks at certain times during
17 the day.  They were responsible for the
18 investigation if there was any delay in the
19 transfer of those messages.  They were
20 responsible for viewing and applying incoming
21 money that were received into our bank
22 accounts, and they were responsible for
23 investigations as it relates to payments made
24 in error, funds received in error, those types
25 of things.  That's generally what they were

Page 15

1       Fleming - Highly Confidential
2  responsible for.
3       Q.   And what would be the next sub-group
4  within the cash and collateral management
5  group?
6       A.   The funding team.
7       Q.   And what did the funding team do?
8       A.   The funding team was responsible for
9  projecting cash and collateral availability at
10 the beginning of the day, providing front
11 office traders with some indication of assets
12 available to be financed, monitoring settlement
13 activity throughout the course of the day, both
14 cash settlements and security settlements,
15 liaising with the trading desk to advise them
16 of events that would occur throughout the
17 course of the day that they may not have
18 complete transparency into.  Cash
19 concentration, consolidating cash amongst a
20 wide network of bank accounts for purposes of
21 investment.  We did not execute any
22 investments.  That was a front office function.
23 You know, and balancing our fund position on a
24 daily basis.
25      Q.   Are there any other sub-groups

Page 16

1       Fleming - Highly Confidential
2  within the cash and collateral management
3  group?
4       A.   There was another team that we
5  defined as the MIS and analytics team,
6  production of MIS information related to bank
7  balances, funding activity, collateral
8  position, residual collateral positions at the
9  end of the day.
10      Q.   Could you explain to me what MIS
11 stands for?
12      A.   MIS is an acronym that's widely used
13 in our industry for management information
14 systems is what the acronym stands for, which
15 is reporting basic information.
16      Q.   Is there anything else that the MIS
17 and analytics team did?
18      A.   Post-settlement reconciliation,
19 trying to understand, you know, why certain
20 things happened throughout the course of the
21 day, why we ended up at the end of the day
22 where we did.  They would work on special
23 projects, you know, and ad-hoc analysis as
24 required.
25      Q.   Are there any other groups within

Page 17

1       Fleming - Highly Confidential
2  the cash and collateral management group?
3       A.   Yes.  That was all -- what I
4  described there was Craig Jones'
5  responsibility.
6       Q.   And did you also have responsibility
7  for this group as global head?
8       A.   I don't understand the question.
9       Q.   Did you also have responsibility for
10 the MIS and analytics team as global head or
11 did Craig Jones alone?
12          MR. C. GREEN:  Object to form.
13          MS. CARRERO:  You can answer.
14      A.   It ultimately rolled up to me.
15      Q.   Are there any other sub-groups
16 within the cash and collateral management
17 group?
18      A.   There is the role that Mandeep
19 Seekond performed.
20      Q.   And what was that role?
21      A.   That was -- there were two roles.
22 One was he was responsible for the build and
23 deployment of a global cash management and
24 funding application.  Second is he was
25 responsible for the treasury technology budget

Confidential

| Page 18 | Page 19 |
|---|---|
| 1    Fleming - Highly Confidential | 1    Fleming - Highly Confidential |
| 2  and enhancement process. | 2  performed. |
| 3    Q.   Is that it? | 3    Q.   And you had ultimate responsibility |
| 4    A.   Uh-huh. | 4  for those functions? |
| 5    Q.   Are there any other sub-groups | 5    A.   Yes. |
| 6  within the cash and collateral management | 6    Q.   Were any of the four functions or |
| 7  group? | 7  teams your specialty or your personal |
| 8    A.   No. | 8  responsibility? |
| 9    Q.   And you had ultimate responsibility | 9    MR. C. GREEN:  Object to form. |
| 10  for all four teams within the cash and | 10    A.   I'm not sure I fully understand what |
| 11  collateral management group? | 11  you are trying to -- |
| 12    MR. C. GREEN:  Object to form. I'm | 12    Q.   Sure.  Let me rephrase. |
| 13  not sure he has testified they were four | 13    On a day-to-day basis were any of |
| 14  teams. | 14  these four functions or teams where you spent |
| 15    MS. CARRERO:  You could answer, but | 15  the majority of your time? |
| 16  just for the record, I just want to -- | 16    A.   It would depend on the time or the |
| 17  withdrawn. | 17  situation at hand.  There were certainly |
| 18    Q.   Are the four sub-groups or teams | 18  periods of time where I spent, you know, |
| 19  within the cash and collateral management group | 19  focused more attention, spent more time with |
| 20  cash control funding team, MIS and analytics | 20  different groups.  So if it was -- if we were, |
| 21  team, and Mandeep's two roles, would that | 21  you know, rolling out a technology solution, |
| 22  accurately sum up the functions of the cash and | 22  you know, and there was a cut-over on the |
| 23  collateral management group? | 23  weekend that week, you know, I was probably |
| 24    A.   In the U.S., yes, that would | 24  spending more time with Mandeep and his group. |
| 25  accurately describe the functions that were | 25  If there was some issue, you know, with funding |

| Page 20 | Page 21 |
|---|---|
| 1    Fleming - Highly Confidential | 1    Fleming - Highly Confidential |
| 2  that caused, you know, a funding problem, some | 2  Brothers.  It was a different type of function. |
| 3  amount of inefficiency or something, I may be | 3  However, I had experience working on |
| 4  spending more time with the funding team.  If | 4  technology.  I had experience working with |
| 5  audit is in and they are focusing on, you know, | 5  financing traders.  You know, so some of the |
| 6  SOX reviews for payment, you know, release, I | 6  experience I had was applicable to the role at |
| 7  might be spending more time.  So it really | 7  Lehman, but I did not have extensive and |
| 8  depended on the situation. | 8  prolonged experience in the field of treasury |
| 9    Q.   Historically or -- scratch that. | 9  operations prior to joining Lehman Brothers. |
| 10    Prior to becoming global head, was | 10    Q.   And could you explain to me how the |
| 11  your experience with one of these teams greater | 11  cash and collateral management group fits |
| 12  than with others or did you have experience | 12  within the larger treasury group? |
| 13  with all of them? | 13    A.   At what point? |
| 14    MR. C. GREEN:  Object to form. | 14    Q.   Let's say September of 2008. |
| 15    MS. CARRERO:  You can answer. | 15    A.   The global head of cash and |
| 16    MR. C. GREEN:  You can go ahead and | 16  collateral management reported in to the global |
| 17  answer, if you understand the question. | 17  treasurer. |
| 18    A.   I don't think I had more experience | 18    Q.   The global treasurer at the time was |
| 19  with one over the other. | 19  Paolo Tonucci; is that correct? |
| 20    Q.   You had worked at one point or | 20    A.   2008, yes. |
| 21  another in all four functions or with all four | 21    Q.   In terms of other groups within |
| 22  teams? | 22  treasury, what was cash and collateral |
| 23    MR. C. GREEN:  Object to form. | 23  management's function versus other groups |
| 24    A.   If you look at my prior experience, | 24  within the treasury department? |
| 25  it does -- it is not what I was doing at Lehman | 25    MR. C. GREEN:  Object to form. |

Confidential

Page 22

```
1         Fleming - Highly Confidential
2         Do you understand the question?
3     A.   I'm not sure I completely
4  understand.
5     Q.   How many other groups are there
6  within the treasury group?
7         MR. C. GREEN:  This is as of
8  September 2008?
9         MS. CARRERO:  As of September 2008.
10    A.   I will list them for you.  There was
11 the network management team.  There was the
12 asset and liability management team.  There was
13 the interest control team.  There was the FP&A,
14 financial planning and analysis team, and there
15 was, I believe, the treasury funding team, I
16 believe, was a direct report into Paolo as
17 well.
18    Q.   And did the cash and collateral
19 group work with all other groups within
20 treasury?
21        MR. C. GREEN:  Object to form.
22    A.   There was interaction with, you
23 know, each one of those teams at certain
24 points.  Some groups more than others.
25    Q.   For instance, what sort of
```

Page 23

```
1         Fleming - Highly Confidential
2  interaction would there have been between the
3  cash and collateral group and the treasury
4  funding group within treasury?
5         MR. C. GREEN:  As of September 2008?
6         MS. CARRERO:  Yes, as of September
7  2008.
8     A.   There was a close working
9  relationship on a day-to-day basis between the
10 cash and collateral management group, which
11 is -- let's define it as a back office
12 function, and the treasury funding desk, which
13 was a front office function, both of which were
14 dealing with similar, if not the same,
15 information.
16    Q.   When you say they are dealing with
17 the same information, could you expand upon
18 that?
19    A.   The cash and collateral management
20 funding team supported the treasury funding
21 desk in terms of providing traders with
22 information to allow them to perform their
23 functions.
24    Q.   What sort of information would they
25 provide?
```

Page 24

```
1         Fleming - Highly Confidential
2         MR. C. GREEN:  Object to form.  You
3  mean the cash and collateral team would
4  provide?
5         MS. CARRERO:  Yes.
6     Q.   What information would the cash and
7  collateral group supply to the treasury and
8  funding group?
9     A.   Cash positions, real-time balances
10 and other settlement activity that could
11 ultimately affect the cash position for the
12 treasury funding desk.
13    Q.   Going back to the functions of the
14 cash and collateral group, would that fall
15 within the funding team?
16        MR. C. GREEN:  Object to form.
17    Q.   Would the funding team within the
18 cash and collateral group be the team to supply
19 the treasury funding desk with the information
20 that you listed?
21    A.   Yes.
22    Q.   Would the cash and collateral team
23 also supply similar information to other
24 trading desks within Lehman?
25        MR. C. GREEN:  Object to form.
```

Page 25

```
1         Fleming - Highly Confidential
2         You can answer, if you understand
3  the question.  If you don't, you should ask
4  her to clarify the question.  I am just
5  objecting for the record.
6     A.   Can you restate, say it again,
7  repeat it.
8     Q.   Let me rephrase that for you.
9         The sort of information that the
10 cash and collateral group is supplying to the
11 treasury funding team, would they supply
12 similar information to any other desks within
13 Lehman?
14    A.   They would provide information to
15 what's described as or labeled as the repo desk
16 which resided in the fixed income business
17 front office at Lehman.  It was not the same
18 information.  It differed than the information
19 provided to the treasury desk.  One could
20 describe it as similar type of information, but
21 it was not the same.
22    Q.   Let's start with how the information
23 differs between the treasury funding desk and
24 the repo desk.
25        MR. C. GREEN:  Is there a question?
```

Confidential

Page 26

1          Fleming - Highly Confidential
2      Q.   How does the information differ
3   between what's supplied to the treasury funding
4   desk and the repo desk?
5      A.   First, we could start by the legal
6   entity dynamics. The treasury funding desk was
7   managing the cash of the holding company, LBHI,
8   so the information that was communicated to the
9   treasury funding desk was -- had more to do
10  with cash and intercompany activity and, you
11  know, deposits, commercial paper issuance,
12  things of that nature. The information
13  provided to the repo desk was largely related
14  to repo transactions and the underlying assets
15  supporting those repo transactions, which
16  primarily would consist of fixed income assets.
17     Q.   Would the treasury funding desk also
18  transact repos of some sort similar to how the
19  repo desk would?
20          MR. C. GREEN:  Object to form.
21     Q.   Let me state it simpler.  Do both
22  desks, both the treasury funding desk and the
23  repo desk, both perform repos?
24          MR. C. GREEN:  Object to form.
25     A.   I think there is a lot of detail

Page 27

1          Fleming - Highly Confidential
2   behind that question, so I don't think I can
3   give you an answer to that.  My understanding
4   is that the repo desk was responsible for
5   trading, repo trading, and that the treasury
6   funding desk was not.  Now, there were,
7   however, what I believe was repo transactions
8   between the treasury funding desk and the repo
9   desk as a form or a means of investing holding
10  company cash.  Let me clarify that that was an
11  internal transaction and I do not know whether
12  that was legally a repo under, you know, repo
13  guidelines and legal documentation.  I know
14  that it was executed as a repo, but I cannot
15  tell you whether it was truly, in fact, a repo
16  transaction.
17     Q.   And in that situation, would that be
18  what's known as a reversed repo where the
19  treasury funding desk would give cash to the
20  repo desk and the repo desk would give
21  securities, pledge securities to the treasury
22  funding desk?
23          MR. C. GREEN:  Object to form.
24          Assumes facts not in evidence.
25          I am just stating an objection for

Page 28

1          Fleming - Highly Confidential
2   the record.  You can go ahead and answer
3   the question, if you understand the
4   question.  If you don't, you should ask her
5   to rephrase the question.
6      A.   So someone has described to you a
7   transaction between the repo desk and the
8   treasury funding desk.  Any repo transaction
9   has both the lender and the borrower.  The
10  lender of cash is executing a reverse repo and
11  the borrower of cash is executing a repo
12  transaction.  It's the same transaction.  It's
13  just two sides of the same transaction.  So in
14  the case where LBHI was investing its cash in
15  fixed income assets, it would be doing so in
16  the form of a reverse repo.
17     Q.   And when the securities under that
18  scenario were pledged to the treasury funding
19  desk, what would the treasury funding desk do
20  with them?
21     A.   It is my understanding that the
22  treasury desk was investing their cash and that
23  they were not re-hypothecating or lending those
24  securities back out, that they basically would
25  just hold on to them.

Page 29

1          Fleming - Highly Confidential
2      Q.   Does the treasury group or the
3   treasury funding desk in general only hold cash
4   or does it have an inventory of securities as
5   well?
6          MR. C. GREEN:  Object to form.
7      A.   I don't know the composition of the
8   holding company balance sheet.  I can't say.
9      Q.   My question is really, I think, a
10  little simpler than that.  I am trying to
11  understand the different sorts of information
12  that are being supplied to the treasury funding
13  desk versus what's being supplied to the repo
14  desk.  I believe you had suggested the repo
15  desk information is different because your
16  group is supplying information about the
17  underlying assets of the group.
18          MR. C. GREEN:  Object to form.
19     Q.   Is that correct?
20     A.   The information provided to the
21  treasury funding desk was information on cash,
22  as previously stated.  Cash balances, projected
23  cash balances, settlement activity, things of
24  that nature.  The information provided to the
25  repo desk, there was an element of cash,

Confidential

Page 30

1     Fleming - Highly Confidential
2  information that was provided, but there was
3  also an emphasis on collateral, what type of
4  collateral, how much collateral and the value
5  of that collateral. The information provided
6  to the repo desk was specific to Lehman
7  Brothers, Inc., the broker/dealer, and the
8  information provided to the treasury funding
9  desk was largely associated with LBHI. I am
10 not saying in totality, but that was the core
11 focus.
12     Q.   What system was used to generate the
13 reports or information provided to the treasury
14 funding and repo desks?
15     A.   There were numerous systems in place
16 that provided different pieces of information.
17 I don't know exactly what, you know, all of
18 those systems are by name.
19     Q.   For example, you mentioned reports
20 dealing with types of collateral and the value
21 of that collateral. What system would generate
22 such a report?
23     A.   There was a -- I'm not sure -- I
24 don't want -- the definition of "system," I am
25 not a hundred percent sure what that is, but

Page 31

1     Fleming - Highly Confidential
2  there was what we described as an application
3  called RTA, which stood for real-time
4  availability, which was the system that the
5  cash and collateral management team used to
6  derive projected cash and collateral positions
7  at the start of day.
8     Q.   And how was the RTA application
9  populated with information?
10     A.   That's a very technical question and
11 I can't answer that question. Now we are
12 talking code and logic, business logic, things
13 of that nature.
14     Q.   More simply stated, how would the
15 values for any piece of collateral within that
16 system come to be?
17     MR. C. GREEN: Object to form. How
18 would the values come to be?
19     Q.   Do you need me to clarify?
20     A.   Yes, please.
21     Q.   Was there someone who entered values
22 for each piece of collateral into the RTA
23 application?
24     A.   It is my understanding that the
25 positions were marked, meaning there was a

Page 32

1     Fleming - Highly Confidential
2  market, a current market value applied. Where
3  that information was sourced from, I cannot
4  answer that question.
5     Q.   Would it be sourced from different
6  people depending on the type of collateral?
7     MR. C. GREEN: Object to form. He
8  said he doesn't know the source.
9     A.   I cannot tell you where that
10 information -- where the pricing information
11 was sourced from. What I can tell you is that
12 I am aware that the firm received pricing feeds
13 from vendors. I am also aware that in the
14 normal course traders mark their positions, but
15 I cannot tell you whether it was a vendor price
16 or a trader price that populated this
17 information.
18     Q.   And how does the RTA application
19 differ from the GFS system?
20     MR. C. GREEN: Object to form.
21     A.   The GFS application -- it's my
22 understanding that the GFS application had many
23 purposes, most of which I am not familiar with,
24 but have a general understanding where it would
25 provide post-settlement information such as

Page 33

1     Fleming - Highly Confidential
2  residual collateral left in depos and I believe
3  there was cash capital information that was
4  provided by GFS.
5     Q.   Did you use the GFS system in the
6  cash and collateral management group?
7     A.   I believe that there was a small
8  piece of information that we extracted from
9  GFS, but it was -- in relation to all the data
10 that we had it was a very small piece.
11     Q.   Could you tell me the names of the
12 individuals on the treasury funding desk?
13     MR. C. GREEN: In September 2008?
14     MS. CARRERO: In September 2008.
15     A.   Steven Engel, David Forsyth, and I
16 believe Scott Alvey, although I can't say for
17 certain that he was part of that group at that
18 time.
19     Q.   And could you list for me the names
20 of the individuals on the repo desk?
21     MR. C. GREEN: In September 2008?
22     MS. CARRERO: In September 2008.
23     A.   The individual that we communicated
24 with most frequently was Larry Servidio and he
25 had someone who worked with him by the name of

Confidential

Page 34

1      Fleming - Highly Confidential
2  Joseph Bellingeri. That does not constitute
3  the whole repo desk. There were many other
4  things that the repo desk was doing that we
5  were not liaising with them on, so those two
6  individuals were our primary contacts and those
7  two individuals were the ones that were
8  executing the bulk of Lehman Brothers, Inc.'s
9  secured financing.
10     Q.   And were Servidio and Bellingeri the
11 individuals to whom your group would send
12 reports?
13     MR. C. GREEN:  Object to form.
14     A.   The information that we provided, I
15 believe, went to a broader distribution than
16 just those two individuals.
17     Q.   If you could take me through
18 starting September 12th, 2008, the weekend
19 before Lehman Brothers Holdings, Inc. filed for
20 bankruptcy, what you were doing that weekend
21 before the filing.
22     MR. C. GREEN:  Object to form.
23     A.   The weekend prior to bankruptcy, the
24 holding company bankruptcy?
25     Q.   Yes.

Page 35

1      Fleming - Highly Confidential
2      MR. C. GREEN:  This would be the
3  weekend of the 13th and 14th?
4      MS. CARRERO:  Yes, September 13th
5  and 14th.
6      A.   I don't recall.  I don't remember if
7  I was working or not working.
8      Q.   Do you have any recollection of
9  being involved in any sort of negotiations
10 either directly or indirectly for the sale of
11 any part of Lehman that weekend?
12     A.   No.
13     Q.   Were you ever involved in any
14 negotiations for the sale of any part of Lehman
15 or its assets?
16     A.   No.
17     Q.   Do you recall generally what you
18 were doing on September 15th, the date that
19 Lehman Brothers Holding had filed for
20 bankruptcy?
21     A.   That would be Monday?
22     Q.   That would be Monday, September
23 15th.
24     A.   I mean, generally speaking, we were
25 trying to figure out how we were going to

Page 36

1      Fleming - Highly Confidential
2  continue to run LBI.
3      Q.   And what decisions were made in
4  terms of how to continue running LBI?
5      MR. C. GREEN:  Object to form.  What
6  decisions were made by him?
7      Q.   Do you have any recollection of what
8  decisions were made in terms of running LBI?
9      MR. C. GREEN:  By whom?
10     Q.   On the 15th what's your
11 recollection -- you had testified that on the
12 15th what was going on was conversations in
13 terms of how to run LBI.  Could you expand upon
14 that, please.
15     MR. C. GREEN:  Object to form.
16     A.   Okay.  So the thought that -- Lehman
17 Brothers was an integrated organization,
18 meaning that legal entities were not simply
19 stand-alone entities, that it was an integrated
20 organization.  Systems were integrated,
21 processes were integrated.  The notion that,
22 you know, the 15th of September that we can say
23 that, you know, the holding company is bankrupt
24 and the broker/dealer is not and people just go
25 about their day is just not a reality, so

Page 37

1      Fleming - Highly Confidential
2  trying to shut down the holding company and its
3  subsidiaries, which, quite frankly, at the time
4  there was ambiguity around which legal entities
5  were in bankruptcy and which ones were not, and
6  trying to run LBI required a tremendous amount
7  of coordination and effort between operations,
8  technology, finance, treasury, right, to
9  effectively shut down the pipes and plumbing as
10 we could for that portion of the business that
11 we believed was in bankruptcy while keeping
12 within that same grid the portion that we
13 thought was still a functioning entity open for
14 business and being able to satisfy the
15 obligations that came about on Monday morning.
16 We had issued checks.  We had -- there were
17 debit cards clients were using.  The banks are
18 coming to us Monday morning saying, you know,
19 how are you going to pay for this, how are you
20 going to do this, how are you going to do that.
21 So that was what I was spending the bulk of my
22 time on, in addition to fielding questions from
23 many, many different people internally and
24 externally as it related to our ability to
25 remit payment or fund for certain types of

Confidential

**Page 38**

1      Fleming - Highly Confidential
2    activities.
3      Q.   At any point on September 15th did
4    you become aware of negotiations for the sale
5    of certain LBI assets?
6      A.   I was not aware of any negotiations,
7    so the answer to that question is no.
8      Q.   Were you asked for any information
9    either directly or indirectly that you believe
10   was used in the negotiations for the sale?
11     MR. C. GREEN:  Object to form.
12     A.   Again, I don't know anything about
13   the negotiations.  I wasn't involved in
14   negotiations.  I wasn't asked to participate in
15   negotiations.  I wasn't asked to review any
16   information related to the negotiations or the
17   agreement, so I can't answer that question.
18     Q.   When did you first become aware of
19   either the negotiations or the sale, the actual
20   deal?
21     MR. C. GREEN:  Object to form.  And
22   which deal is it you are talking about?
23     MS. CARRERO:  The deal between
24   Lehman and Barclays for the sale of certain
25   LBI assets.

**Page 39**

1      Fleming - Highly Confidential
2      A.   I don't recall exactly.  I believe
3    it was, you know -- I came to realize that when
4    it was, you know, announced in the press.
5      Q.   Do you recall on Monday, September
6    15th, being involved with any financing being
7    derived from the Fed?
8      MR. C. GREEN:  Object to form.
9      A.   I was located at 1301, I believe, on
10   that Monday and the days leading up to
11   bankruptcy.  The rest of my team is located at
12   70 Hudson, so the day-to-day activities, you
13   know, the detailed activities in terms of what
14   financing trades were doing and the like, I was
15   not engaged in at that time, so I was not aware
16   of the Fed trades that were being put on.
17     Q.   Would your group generally be
18   involved in any financing transactions with the
19   Fed?
20     A.   My team would have -- would
21   understand, yes, what trades were being put on
22   with the Fed.
23     Q.   In what capacity would they know
24   what trades were put on?
25     MR. C. GREEN:  Object to form.

**Page 40**

1      Fleming - Highly Confidential
2      Do you understand the question?
3      A.   I will just describe --
4      MR. C. GREEN:  All right.
5      A.   The team was responsible for
6    tracking the funding position of the
7    broker/dealer, which includes all of the
8    activity, secured financing activity, and cash
9    flow, so as a matter of course they would know
10   all of the tri-party repo trades that were
11   booked to settle, and it is my understanding
12   that the Fed trades were facilitated through
13   the tri-party repo system.
14     Q.   And do you know if it would have
15   been the treasury funding desk or the repo desk
16   that would have entered into funding
17   transactions with the Fed?
18     MR. C. GREEN:  Object to form.
19     A.   I would not know in that specific
20   instance who executed those transactions.
21     (Exhibit 294B, e-mail dated
22   September 15, 2008, Bates stamped 10302690,
23   and Chase Tri-Party Haircut Summary, Bates
24   stamped 10308382, marked for
25   identification.)

**Page 41**

1      Fleming - Highly Confidential
2      Q.   Mr. Fleming, you have before you
3    what's been marked as Exhibit 294B, if you
4    could take a moment and look it over.
5      MR. C. GREEN:  Not to interrupt, but
6    may I ask you, A, where these documents
7    came from, and B, if you believe the
8    attachment or the second page was actually
9    the attachment to the first page when it
10   was transmitted as an e-mail?  Because the
11   Bates numbers or identification numbers are
12   unfamiliar to me and not sequential.
13     MS. CARRERO:  The documents come
14   from Lehman's system and the system -- the
15   vendor system links the documents, so we do
16   know them to be an e-mail and its
17   attachment and different document numbers
18   are assigned to each.
19     MR. C. GREEN:  Okay.  So you are
20   representing that this second page was the
21   attachment to the e-mail that is on the
22   first page?
23     MS. CARRERO:  Yes, I am.
24     Q.   Mr. Fleming, have you had an
25   opportunity to review the document?

Confidential

Page 42

1        Fleming - Highly Confidential
2        A.   Yes.
3        Q.   Do you recall receiving this
4    document?
5        A.   I don't specifically recall
6    receiving this, no.
7        Q.   Does it surprise you that you would
8    have received a document like this on the 15th?
9        MR. C. GREEN:  Object to form.
10       A.   When you say "surprise," what do you
11   mean by that?
12       Q.   Do you generally receive documents
13   with haircut amounts?
14       MR. C. GREEN:  Object to form.
15       A.   This document doesn't look familiar
16   to me, so this certainly would not be something
17   that I had received on a frequent basis.
18       Q.   My question, more generally, is
19   whether your group would receive the haircut
20   amounts on any funding transactions.
21       A.   No, I would say generally not.
22       Q.   Is the haircut amount on a security
23   collateralizing a repo generally within the
24   system -- scratch that.
25       Are haircut amounts listed on the

Page 43

1        Fleming - Highly Confidential
2    reports that you generate for the treasury
3    funding desk or the repo desk?
4        MR. C. GREEN:  Object to form.
5        Do you have the question in mind?
6        THE WITNESS:  I'm just thinking.
7        A.   I believe there was some form of
8    haircut information that was produced within my
9    team to help us understand why our cash
10   position would change day over day.
11       Q.   And when you say your cash position
12   would change day over day, is that because the
13   higher the haircut, the more expensive any
14   transaction becomes?
15       MR. C. GREEN:  Object to form.
16       Assumes facts not in evidence.
17       Q.   Let me phrase it differently.
18       Could you explain to me why you
19   would care about the haircuts?
20       A.   The higher the haircut, the less
21   cash that you will generate from that asset.
22       Q.   And your group would monitor the
23   amount of cash that could be generated from any
24   asset?
25       MR. C. GREEN:  Object to form.

Page 44

1        Fleming - Highly Confidential
2        A.   Our team was interested in
3    understanding all of the dynamics that affected
4    our cash positions, haircuts being one.
5        Q.   Could that be one reason why you
6    received the PDCF haircuts on September 15th?
7        MR. C. GREEN:  Object to form.
8        Calls for speculation.
9        A.   I don't recall receiving this e-mail
10   and I don't know what the intent was.
11       Q.   If you could look at Sindy
12   Aprigliano's e-mail where she writes the
13   estimated impact is approximately 4 billion.
14   Do you see that?
15       A.   Uh-huh, yes.
16       Q.   Is that consistent with your
17   testimony about the cash and collateral group
18   being interested in the effect of haircuts on
19   cash position?
20       MR. C. GREEN:  Object to form.  I
21       think it mischaracterizes his testimony to
22       the extent that he has said he doesn't
23       remember seeing this e-mail, so I'm not
24       certain he can testify whether her
25       statement is consistent with his testimony

Page 45

1        Fleming - Highly Confidential
2    about his group's function.  If he can
3    answer the question, he should go ahead.
4        A.   Can you repeat it, the question.
5        Q.   I am simply asking if Sindy
6    Aprigliano's statement that the estimated
7    impact is approximately 4 billion is similar to
8    your suggestion that your group was interested
9    in the impact of haircuts on cash position?
10       MR. C. GREEN:  Object to form.
11       A.   Again, this was -- to my knowledge,
12   this was not something that was, you know,
13   normally distributed, this information.  The
14   information that we viewed around haircuts was
15   away from this.  So we had -- you know, in my
16   team we had other information and other data
17   that we used to look at changes in haircuts and
18   assess, you know, the impact on cash positions.
19   If someone was telling us that at some point in
20   the future something was going to happen that
21   was going to affect your cash position, then
22   I'm sure it would have been of interest to us,
23   but again, I don't recall this e-mail and I
24   don't necessarily know what the intent of it
25   was, whether it's accurate, whether it's not

Confidential

Page 46

1    Fleming - Highly Confidential
2    accurate. I just don't know.
3    Q.    Do you have any recollection of the
4    PDCF trade on the 15th?
5    A.    No.
6    Q.    Do you have any recollection of
7    anything else you were doing that week of the
8    15th?
9        MR. C. GREEN:  Object to form. Does
10    he have any recollection of anything else
11    he was doing during the week?
12    Q.    Day to day the week that LBHI filed
13    for bankruptcy, do you recall coming in to the
14    office every morning and what your functions
15    were during that week?
16    A.    I remember chaos is what I remember.
17    There was nothing normal about what was
18    happening that week. There was nothing
19    standard about what was happening that week. I
20    recall fielding many, many questions and
21    dealing with banks, dealing with issues of
22    credit, dealing with issues of funding, dealing
23    with people who I have never spoken with
24    before, very senior people, either within the
25    organization or outside the organization that

Page 47

1    Fleming - Highly Confidential
2    were concerned about the status of Lehman
3    Brothers, Inc. and the ability to settle some
4    of its obligations.
5    Q.    Do you recall the senior people
6    within Lehman that you spoke to that week?
7        MR. C. GREEN:  Object to form.
8    A.    I don't remember all of them. I'm
9    sure you have had a chance to take a look at my
10    e-mails. Within those e-mails you could either
11    see the e-mails that I received from people or
12    my admin advising me that people were on the
13    phone. She would shoot me e-mails. I think
14    that's probably the best source of that
15    information.
16    Q.    At some point in that week of
17    September 15th, 2008 did you become aware of a
18    repo transaction between Lehman and Barclays?
19    A.    I became aware of a transfer of
20    assets. I do not know whether that was under a
21    repo agreement or any other form of legal
22    agreement between the two organizations, but I
23    was aware that there was a transfer.
24    Q.    And when did you become aware of
25    that transfer?

Page 48

1    Fleming - Highly Confidential
2    A.    I don't recall the specific time.
3    It was either, you know, Wednesday at some
4    point during the day or early Thursday. It was
5    more likely that it was Wednesday.
6    Q.    Did you learn about the transfer
7    around the same time you learned about the
8    Lehman/Barclays deal?
9        MR. C. GREEN:  Object to form.
10    A.    I don't recall the specifics on
11    either one of them, you know, specifically the
12    date or time of either. It probably was in and
13    around the same time, give or take a few days.
14    Q.    And do you recall how you learned
15    about the transfer of assets to take place?
16        MR. C. GREEN:  Object to form.
17    A.    I don't. That transfer was largely
18    done away from myself and from my group.
19    Q.    What role, if any, did your group
20    have in the transfer of assets?
21        MR. C. GREEN:  This is the transfer
22    from Lehman to Barclays?
23        MS. CARRERO:  Yes. The transfer
24    that Mr. Fleming learned about on Wednesday
25    or Thursday of the week of the 15th.

Page 49

1    Fleming - Highly Confidential
2    A.    We had a very limited role. We
3    basically were throughout the course of the day
4    on Thursday trying to figure out what was going
5    on.
6    Q.    When you say "trying to figure out
7    what was going on," what do you mean?
8    A.    Generally in normal course when you
9    are executing something of this size, you
10    gather the appropriate people, you document
11    what needs to happen. It's very clear the
12    steps that need to be taken, what to expect,
13    how to react to situations. None of that
14    happened as it relates to this transfer. I was
15    not engaged. I was not asked to engage. I do
16    not believe that the people in my team were
17    asked to engage. So we really didn't know what
18    was going on. We were trying to figure out
19    along the way on Thursday what was happening to
20    our cash position, what was happening to our
21    collateral position and what to expect at the
22    end of the day.
23    Q.    Would you have expected your group
24    to have been more involved in a transfer of the
25    sort that was taking place on Thursday,

Confidential

Page 50

1        Fleming - Highly Confidential
2    September 18th?
3            MR. C. GREEN:  Object to form.
4        A.    In normal course I would have been
5    actively engaged in a transfer of this size and
6    complexity.
7        Q.    And do you have any understanding of
8    why you weren't engaged in a transfer of this
9    size and complexity?
10            MR. C. GREEN:  Object to form.
11        A.    I do not.
12        Q.    Do you know who was involved in the
13    transfer transaction you have described?
14        A.    I cannot say for certain who was
15    involved or what their involvement was.  I had
16    a general understanding that there were some
17    folks in the operations clearance department,
18    the individuals, you know, responsible for
19    actually moving securities that were involved
20    to some degree, but again, because I didn't
21    have involvement, I can't really comment too
22    much on that.
23        Q.    Mr. Fleming, you have before you
24    what has previously been marked as
25    Exhibit 142B.

Page 51

1        Fleming - Highly Confidential
2        A.    Yes.
3        Q.    I will give you a minute to take a
4    look.
5            (Document review.)
6            MR. C. GREEN:  I'm sorry, I was not
7    at the deposition where this exhibit was
8    previously marked.  Was it the same case
9    with this exhibit that the second through
10    ending pages are attachments to the first
11    page when it was transmitted?
12            MS. CARRERO:  Yes.
13        Q.    Mr. Fleming, do you know what this
14    document is before you, Exhibit 142B?
15        A.    I have never seen this before.  I
16    don't recall.
17        Q.    Have you seen in the past similar
18    types of documents as what is attached to the
19    e-mail of Exhibit 142B?
20        A.    Are you referring to page numbered
21    466143?
22        Q.    Yes.  I am talking about the
23    attachments which are titled Schedule A
24    dated -- I'm not looking for -- scratch that.
25            Have you seen a similar type of

Page 52

1        Fleming - Highly Confidential
2    Schedule A before?
3        A.    My team was not responsible for
4    documentation or in the setup of any of the
5    tri-party arrangements.  However, I am familiar
6    with what a Schedule A is, what it represents,
7    and I have seen examples in the past.
8        Q.    And do you have any understanding as
9    to why you would receive a copy of a Schedule A
10    to Master Purchase Agreement?
11            MR. C. GREEN:  Object to form.
12        A.    I don't know the relevance of this
13    being sent to me.
14        Q.    For instance, would it, as you have
15    testified earlier today, be of interest to your
16    group, the haircut amounts on certain asset
17    classes for purposes of monitoring the cash
18    position?
19            MR. C. GREEN:  Object to form.
20        A.    I don't believe there is anything
21    that my group would have done with this
22    documentation to augment, you know, their
23    procedures or their projections or anything
24    like that.
25        Q.    Prior to the transfer that we spoke

Page 53

1        Fleming - Highly Confidential
2    of earlier between Lehman and Barclays, were
3    you aware of any other Lehman and Barclays
4    repos that were on the week of September 15th?
5            MR. C. GREEN:  Object to form.  Was
6    he aware prior to the transfer of any other
7    or was he aware of any others prior to the
8    transfer?
9        Q.    Let me rephrase.
10            In addition to the transfer that we
11    discussed earlier that took place on September
12    18th, were you aware of any other transactions
13    between Lehman and Barclays, specifically repo
14    transactions?
15            MR. C. GREEN:  Object to form.
16        A.    At what point?
17        Q.    The week of September 15th, are you
18    aware of there having been any repo between
19    Lehman and Barclays?
20        A.    At any point during that week was I
21    made -- did I become aware of any other repo?
22    Is that the question?
23        Q.    Yes.
24        A.    Yes, I did.
25        Q.    And how did you become aware of

Confidential

Page 54

1      Fleming - Highly Confidential
2  another repo?
3      MR. C. GREEN:  Object to form to the
4  extent that the question implies that the
5  prior transaction was, in Mr. Fleming's
6  mind, a repo.  He testified he didn't know
7  whether it was a repo or not.  So when you
8  say "another repo," there is a repo that he
9  said he is aware of.
10      MS. CARRERO:  Let me rephrase.
11      Q.   When did you become aware of a repo,
12  other than the September 18 transfer we
13  discussed earlier?
14      A.   It was sometime either the evening
15  of Thursday -- was Thursday the 18th?
16      MR. C. GREEN:  Yes.
17      A.   Or the early morning of Friday the
18  19th when I was advised that we had a funding
19  shortfall.  That's when I was notified.  That's
20  when I became aware.
21      Q.   And when you say that you were
22  advised of a funding shortfall, can you
23  explain?
24      MR. C. GREEN:  Could he explain
25  what?

Page 55

1      Fleming - Highly Confidential
2      Q.   What you mean by a funding
3  shortfall.
4      A.   As of close of business on Thursday,
5  the 18th, which actually wound up closing early
6  Friday morning, but on that close of business
7  that day Lehman Brothers, Inc. was short cash
8  and that is what I mean by a funding shortfall.
9      Q.   Why did you become short cash on
10  Thursday, September 18th?
11      MR. C. GREEN:  Object to form.
12      A.   I can't answer the question why.  I
13  can describe to you the events as they were
14  explained to me, which is that the asset
15  transfer was executed in a non-traditional
16  fashion which rendered our systems of
17  monitoring cash and collateral positions, it
18  rendered it basically useless.  We did not have
19  good visibility into what was happening on an
20  intra-day basis because of the way that the
21  asset transfer was affected.  We were
22  so-called, quote unquote, flying blind in terms
23  of where our funding position was.  As
24  previously stated, I was advised either late
25  Thursday night, early Friday morning that we

Page 56

1      Fleming - Highly Confidential
2  had a shortfall of cash and that we had a
3  corresponding long collateral position.  It was
4  explained to me that there had been a tri-party
5  repo on between LBI and I don't know which
6  legal entity at Barclays, so I will just call
7  it Barclays, for approximately $15 billion and
8  that at some point on Thursday, the 18th, that
9  that trade had matured, termed, rolled off, I
10  don't know the correct terminology to use other
11  than to say that it was not there Thursday
12  night.  The individuals in my team did not know
13  that that was happening, so that when we went
14  to balance with the bank at the end of day, it
15  came as a surprise to everyone that we didn't
16  have that $15 billion of tri-party cash.  So
17  that is how I became aware of the situation.
18      Q.   And what happened as a consequence
19  of the shortfall in cash?
20      A.   The consequence of that is that we
21  had to advise JPMorgan Chase as our clearing
22  bank that we were short cash and required a
23  secured box loan.
24      Q.   And could you explain what a secured
25  box loan is?

Page 57

1      Fleming - Highly Confidential
2      A.   A box loan is a term that's used to
3  describe when a broker/dealer or client of a
4  clearing bank borrows cash from that clearing
5  bank versus collateral or assets that are
6  sitting in that client's clearance account.
7      Q.   You had described the asset transfer
8  as being done in a non-traditional manner.
9      Could you explain what you meant by
10  "non-traditional manner"?
11      A.   Again, I was not at 70 Hudson with
12  the people performing the day-to-day function,
13  so I am providing you -- this is second-hand
14  information that I am providing to you.  I
15  didn't have access to information.  But the
16  transfer that was done, I believe, was done
17  between JPMorgan Chase and the Bank of New York
18  as opposed to a transfer between Lehman
19  Brothers and Barclays, and the mechanics of
20  that settlement meant that the information that
21  we normally derive from our clearing bank,
22  JPMorgan, in terms of viewing information on
23  screens and looking at our accounts at JPMorgan
24  Chase which tell us what our cash and
25  collateral position is, that those screens were

Page 58

1    Fleming - Highly Confidential
2   not reflecting the activities of the transfer.
3         MR. C. GREEN:  I don't mean to
4    interrupt, but we have been going about an
5    hour and a half and I wonder if we might be
6    able to take a break at a good opportunity.
7         MS. CARRERO:  Sure.  Let's just
8    finish this up and we can break in a couple
9    of minutes.
10    Q.   I'm trying to understand your last
11   answer regarding the transaction or the
12   transfer being between JPMorgan and BONY as
13   opposed to a transfer between Lehman and
14   Barclays.  Could you explain -- withdrawn.
15        In a normal or traditional transfer
16   as opposed to the non-traditional manner you
17   have described, what sort of feeds would
18   normally come through to your system?
19        MR. C. GREEN:  Object to form.
20    A.   In normal course if we delivered out
21   collateral, we would see our collateral
22   position decrease and we would see a cash
23   credit on the account.  We did not -- we could
24   not see that or we did not see that, as
25   described to me from the people who were

Page 59

1    Fleming - Highly Confidential
2   working at 70 Hudson, on the screens that we
3   use or used normally to view this activity.
4         MS. CARRERO:  Why don't we take a
5    break now.
6         MR. C. GREEN:  Okay.
7         (Recess was taken from 11:02 to
8    11:13.)
9   BY MS. CARRERO:
10    Q.   Before the break we were talking
11   about the September 18th asset transfer and you
12   had described it as being done in a
13   non-traditional manner.  Do you recall that?
14    A.   Yes.
15    Q.   Do you recall the terms of the
16   transfer?
17        MR. C. GREEN:  Object to form.
18    A.   No.
19    Q.   Do you know if Lehman as a
20   consequence of the transfer received a certain
21   amount of cash?
22    A.   I don't understand your question.
23   Can you rephrase it?
24    Q.   Was a term of the transfer that
25   Lehman was to receive cash?

Page 60

1    Fleming - Highly Confidential
2         MR. C. GREEN:  Object to form.  I
3    think he has already testified he doesn't
4    know the terms of the transfer or doesn't
5    recall them.
6    Q.   Mr. Fleming, I am putting before you
7   what's been marked previously as Exhibit 60B.
8   Do you see your name in the "to" line?
9    A.   Yes.
10    Q.   And you received this e-mail from
11   Ray Stancil at JPMorgan; is that correct?
12    A.   That's what it appears.
13    Q.   Do you know what this document is?
14        MR. C. GREEN:  Are you referring to
15   the second page of this exhibit?
16        MS. CARRERO:  I am referring to the
17   e-mail attaching an exhibit labeled
18   Lehman - Barcap - BONY Transition - 091808.
19        MR. C. GREEN:  And this BONY
20   Transition Anticipated Prefunding document
21   is the attachment that was recovered with
22   the e-mail from your document system?
23        MS. CARRERO:  Yes.
24        MR. C. GREEN:  Do you have the
25   question in mind?

Page 61

1    Fleming - Highly Confidential
2         Is there a question pending?
3         MS. CARRERO:  Could you repeat it.
4         (Record read.)
5    A.   I don't recall accessing this
6   document.
7    Q.   Is this a document -- is this type
8   of document one that you would receive in the
9   normal course of business?
10        MR. C. GREEN:  When you say
11   "document," you are referring to the
12   attachment; correct?
13        MS. CARRERO:  Yes.
14    A.   No, I would not normally receive a
15   document such as this in the normal course of
16   business.
17    Q.   Do you think this document was
18   created specifically with respect to the
19   September 18th asset transfer?
20        MR. C. GREEN:  Object to the form.
21   Calls for speculation.
22        MS. CARRERO:  Go ahead and
23   speculate.
24    A.   It would appear, as I look at it
25   today, that this document was in relation to

Confidential

| Page 62 | Page 63 |
|---|---|

**Page 62**

1      Fleming - Highly Confidential
2  the transfer.
3      Q.   Was it your understanding that
4  the -- scratch that.
5          Did you have any understanding with
6  respect to the collateral being transferred on
7  September 18th?
8      MR. C. GREEN:  Object to form.
9      A.   Can you repeat that.
10     Q.   Do you have any understanding what
11  collateral was being transferred on September
12  18th?
13     A.   No.
14     Q.   Would your group have normally been
15  aware of the types of collateral being pledged
16  under a funding transaction?
17     MR. C. GREEN:  Object to form.
18     A.   Can you clarify what type of funding
19  transaction you are referring to?
20     Q.   Let's just say a repo, for instance.
21     A.   Can you describe what type of repo?
22     Q.   A repo whereby Lehman would be
23  pledging assets in exchange for cash.
24     A.   Not in all cases.
25     Q.   In what cases would you not be aware

**Page 63**

1      Fleming - Highly Confidential
2  of the types of collateral being pledged?
3      A.   In a deliverable repo.
4      Q.   Could you explain what you mean by
5  "deliverable repo"?
6      A.   Deliverable repo is where the repo
7  is settled through the Federal Reserve's
8  Fed Wire system and that was something that we
9  would monitor the cash effect of those repos,
10  but we would not actively monitor the
11  underlying collateral associated with those
12  repos.
13     Q.   Is that because of the -- withdrawn.
14         Is there some sort of automatic
15  allocation system for Fed wirable securities
16  that's the reason why you wouldn't know?
17     MR. C. GREEN:  Object to the form.
18     A.   What's the question?  I'm not
19  sure -- it doesn't make sense.
20     Q.   Let me rephrase.
21         Is there a reason why there is a
22  distinction between Fed Wire and other types of
23  securities with respect to being able to --
24  withdrawn.
25     MS. CARRERO:  Can we mark this as

| Page 64 | Page 65 |
|---|---|

**Page 64**

1      Fleming - Highly Confidential
2  295B.
3          (Exhibit 295B, e-mail dated
4      9-18-2008, marked for identification.)
5      Q.   Mr. Fleming, you have before you
6  what's been marked as Exhibit 295B.  Have you
7  had a chance to review it?
8      A.   I was actually still reading through
9  it.
10     Q.   I will give you a minute.
11     MR. C. GREEN:  You should read
12  the -- unless there is a specific part of
13  the exhibit you want to focus his attention
14  on, I think he should read the entire
15  exhibit thoroughly.
16     MS. CARRERO:  That's fine.
17         (Document review.)
18     A.   Okay.
19     Q.   Mr. Fleming, do you see yourself as
20  a recipient of both the bottom e-mail from
21  David Aranow on September 18th at 12:53 a.m. as
22  well as the top e-mail from Paolo Tonucci on
23  September 18th at 7:07 a.m.?
24     A.   I see that I was -- it was
25  addressed -- the bottom was addressed to me,

**Page 65**

1      Fleming - Highly Confidential
2  but I was CC'd on the top section, so it wasn't
3  the top.  Paolo's e-mail was not addressed to
4  me.
5      Q.   Were you a recipient of both?
6      A.   Yes.
7      Q.   Were you involved in any of the
8  logistics with respect to the Barclays
9  collateral move that is the subject of
10  Exhibit 295B?
11     MR. C. GREEN:  Asked and answered.
12  Object to form.
13     A.   No.
14     Q.   Do you recall whether or not you had
15  any conversations with anyone at Barclays or
16  BONY or JP Chase the evening before the
17  transaction?
18     MR. C. GREEN:  Object to form.
19  Which evening are you referring to
20  specifically?
21     MS. CARRERO:  I am referring to in
22  the bottom e-mail that representatives from
23  Barclays, Lehman, BONY and JP Chase met to
24  discuss the Barclays collateral move.
25     MR. C. GREEN:  And you want to know

Confidential

**Page 66**

1      Fleming - Highly Confidential
2 if Mr. Fleming participated in those
3 meetings?
4      Q.   If you participated in those
5 meetings or if you had any conversations with
6 anyone who participated in those meetings.
7      A.   Not that I recall.
8      Q.   Do you at all recall learning at the
9 time or later how the collateral move was to
10 take place?
11      MR. C. GREEN: Object to form.
12      A.   Sorry. Say that again.
13      MS. CARRERO: Could you.
14      (Record read.)
15      A.   At what time?
16      Q.   Did you then or later learn the
17 logistics of what is dubbed in this e-mail as
18 the Barclays collateral move?
19      MR. C. GREEN: Object to form.
20      A.   I don't recall receiving this.
21      Q.   Do you at all recall learning of any
22 of the logistics that are set forth in this
23 e-mail at any other point or in any other
24 manner?
25      A.   No.

**Page 67**

1      Fleming - Highly Confidential
2      Q.   Turn your attention to the later
3 e-mail from Paolo Tonucci where he writes: "I
4 would like the RACERs to not be funded by
5 Barclays. We need to work out if that is
6 possible."
7      Do you recall there being an issue
8 with the RACERs in connection with the asset
9 transfer?
10      MR. C. GREEN: Object to form.
11      A.   You said there was an issue -- you
12 said was there an issue? Was that the
13 question?
14      Q.   Yes.
15      MR. C. GREEN: Do you recall if
16 there was an issue with the RACERs?
17      A.   I'm not sure how we would define
18 "issue." I do recall that there was -- and I
19 don't recall when this was, but I do recall
20 learning that there was, as stated here, that
21 the RACER was not to be part of the asset
22 transfer.
23      Q.   Do you know why the RACER was not to
24 be part of the transfer?
25      A.   I do not.

**Page 68**

1      Fleming - Highly Confidential
2      Q.   Do you know if it had previously
3 been funded by either Barclays or the Fed prior
4 to the asset transfer?
5      MR. C. GREEN: Object to form. You
6 are asking him if the RACER had previously
7 been funded?
8      MS. CARRERO: Yes.
9      A.   With either the Fed or Barclays, I
10 cannot confirm whether it was or not.
11      Q.   Do you know why you would be CC'd on
12 an e-mail saying that the RACER should not be
13 funded by Barclays?
14      MR. C. GREEN: Object to form.
15 Calls for speculation.
16      MS. CARRERO: Go ahead.
17      A.   Paolo CC'd me on anything that -- he
18 CC'd me on many things, so -- there is no
19 action on my part based on this e-mail.
20      Q.   Do you recall receiving any other
21 requests either verbally or in writing
22 regarding assets that should or should not be
23 pledged or transferred to Barclays on the 18th?
24      MR. C. GREEN: Object to form.
25      A.   No.

**Page 69**

1      Fleming - Highly Confidential
2      Q.   Were you involved in the selection
3 of assets to be transferred to Barclays?
4      MR. C. GREEN: Asked and answered.
5 Object to form.
6      A.   No.
7      (Exhibit 296B, e-mail dated
8 September 18, 2008, Bates stamped 10303223,
9 marked for identification.)
10      Q.   Mr. Fleming, you have before you
11 what's been marked as Exhibit 296B. Take a
12 moment to review, particularly the second
13 e-mail down.
14      MR. C. GREEN: I would caution you
15 to review the entire chain, Mr. Fleming.
16      (Document review.)
17      A.   Okay.
18      Q.   Mr. Fleming, I direct your attention
19 to the second e-mail down on Exhibit 296B.
20 It's an e-mail message from James Hraska.
21      Could you tell me who James Hraska
22 is?
23      A.   James Hraska works in the -- what we
24 describe as the middle office.
25      Q.   And how do the middle office and

Confidential

Page 70

```
1        Fleming - Highly Confidential
2   your cash and collateral management group
3   interact?
4        MR. C. GREEN:  Object to form.
5        A.   Predominantly for normal, you know,
6   issue resolution.
7        Q.   Issue resolution with any particular
8   types of transactions?
9        A.   Generally for, you know, trade
10  entry, you know, issues.
11       Q.   And do you know why James Hraska is
12  e-mailing you what I'll read into the record as
13  "we are going to be cancelling 8.5 to 10 B of
14  Fed deliverable collateral we lost due to GCF
15  and other factors.  We should be getting 10
16  billion in collateral from GCF."
17       MR. C. GREEN:  Do you want to read
18       the entire e-mail or is your question
19       focused on the first sentence?
20       MS. CARRERO:  Yes, it's focused on
21       the first sentence.
22       MR. C. GREEN:  Okay.  Object to
23       form.  Calls for speculation.
24       You may answer, if you have an
25       answer.
```

Page 71

```
1        Fleming - Highly Confidential
2        A.   I'm not sure what James is
3   communicating in this e-mail.
4        Q.   Does this e-mail chain in general
5   refresh your recollection regarding what assets
6   were being transferred on September 18th?
7        A.   No.
8        Q.   Do you have any recollection that
9   the assets to be transferred were some of or
10  all of the assets that had been pledged to the
11  Fed on the evening of September 17th?
12       MR. C. GREEN:  Object to form.
13       A.   It would appear based on this memo
14  that that is the case.
15       Q.   But that's not your personal
16  recollection right now here today?
17       MR. C. GREEN:  Asked and answered.
18       Object to form.
19       A.   I don't have a recollection of what
20  was transpiring at that time.  Based on this
21  e-mail it would appear that that is the case.
22       Q.   And based on this e-mail does it
23  appear as though 8.5 to 10 billion of the
24  collateral was being cancelled due to GCF and
25  other issues?
```

Page 72

```
1        Fleming - Highly Confidential
2        MR. C. GREEN:  Object to form.
3        A.   As I read this today, I don't
4   understand it.  This doesn't make sense to me.
5        Q.   Who would you expect to have
6   knowledge of what was transferred under the
7   repo?
8        MR. C. GREEN:  I'm sorry, when you
9        say "repo," you mean this transaction
10       between Lehman and Barclays?
11       Q.   I mean the transfer between -- on
12  September 18th.
13       A.   It would be speculation.
14       Q.   Who would you expect, by speculation
15  or otherwise, to have been involved with the
16  selection of assets to be transferred?
17       A.   The CEO, CFO.
18       (Exhibit 297B, e-mail dated
19       9-18-2008, marked for identification.)
20       Q.   Mr. Fleming, you have before you
21  what's been marked as Exhibit 297B.  Do you see
22  yourself as a recipient of this e-mail?
23       A.   Yes.
24       Q.   Do you have any recollection of the
25  substance of this e-mail?
```

Page 73

```
1        Fleming - Highly Confidential
2        MR. C. GREEN:  Object to form.
3        A.   I'm sorry, can you repeat the
4   question.
5        Q.   Have you had an opportunity to read
6   the e-mail?
7        A.   Yes.
8        Q.   After reading this e-mail, do you
9   have any recollection of the substance of what
10  you have read?
11       A.   I don't recall, you know -- I don't
12  recall this particular instance.
13       Q.   So you don't recall that on the
14  evening of September 18th there was collateral
15  left to be funded and a question of whether it
16  was to be moved to Barclays?
17       MR. C. GREEN:  Object to form.  Is
18       that your characterization of this e-mail?
19       Q.   With or without this e-mail, do you
20  have any recollection on September 18th of
21  there being collateral available to be
22  transferred to Barclays that Barclays did not
23  want?
24       A.   That Barclays did not want?  I am
25  aware that some amount of assets did not
```

Confidential

Page 74

1    Fleming - Highly Confidential
2  transfer over to Barclays.
3    Q.  Do you know why those specific
4  assets were not transferred over to Barclays?
5    A.  I do not.
6    (Exhibit 298B, e-mail dated
7  9-21-2008, marked for identification.)
8    Q.  Mr. Fleming, you have before you
9  what's been marked as Exhibit 298B.
10    (Document review.)
11    Q.  Have you had an opportunity to
12  review the e-mail?
13    A.  I need another minute.
14    (Document review.)
15    A.  Okay.
16    Q.  Do you recall this e-mail exchange
17  with David Aranow?
18    A.  Not specifically.
19    Q.  Do you recall the substance of the
20  questions and answers being had in the e-mail?
21    MR. C. GREEN:  Object to form.
22    A.  I recall the substance.
23    Q.  What do you recall?
24    A.  Trying to understand what happened.
25    Q.  Can you explain that a little bit

Page 75

1    Fleming - Highly Confidential
2  more?
3    A.  As previously described, the nature
4  of the transfer rendered our systems of
5  monitoring activity obsolete.  It is -- we were
6  attempting to recreate what had happened, what
7  had transpired.
8    Q.  And how were you attempting to do
9  that?
10    A.  Trying to understand how much money
11  was paid.
12    Q.  And why was there a question as to
13  how much money was paid?
14    MR. C. GREEN:  Object to form.
15    A.  Why was there a question?  Because
16  we didn't have visibility into the transaction.
17    Q.  In terms of not having visibility,
18  was that only on the cash side or the
19  collateral side as well?
20    MR. C. GREEN:  Object to form.
21    A.  I believe it was both.
22    Q.  And was the lack of visibility a
23  consequence of the transaction not being booked
24  into a certain system?
25    MR. C. GREEN:  Object to form.

Page 76

1    Fleming - Highly Confidential
2    Asked and answered.
3    A.  I don't know the answer to that.
4  Again, I was located at 1301.  The team
5  managing the details behind this are located at
6  70 Hudson.  So I don't know why -- I don't know
7  how the transaction was facilitated and I don't
8  have an answer as to why we couldn't view it.
9    Q.  In the ordinary course for you to
10  view or to have visibility of a transaction,
11  would it have to be booked into a specific
12  system?
13    MR. C. GREEN:  Object to form.
14    A.  Yes.
15    Q.  What system would it need to be
16  booked into?
17    A.  I don't know the answer to that.  It
18  depends on how they affected or facilitated the
19  transfer, but if the transaction settled, then
20  it would have had to have been booked
21  somewhere.  Whether that's by Chase, whether
22  it's by the Fed, I can't -- I don't know the
23  answer to that.
24    Q.  I'm sorry.  Maybe you misunderstood
25  my question.  My question was for your team to

Page 77

1    Fleming - Highly Confidential
2  have visibility of the amount of cash
3  transferred and the collateral being
4  transferred, is there a Lehman internal system
5  in which it would need to be booked?
6    A.  No.
7    Q.  So the visibility your group would
8  get would be through third parties; is that
9  correct?
10    MR. C. GREEN:  Object to the form.
11    A.  Through access to our account
12  activity at our clearing bank.
13    Q.  So it would be Chase as Lehman's
14  clearing bank that would provide the feed
15  enabling your group to have visibility; is that
16  correct?
17    MR. C. GREEN:  Object to the form.
18    A.  Normally that's what would occur.
19    Q.  And normally the visibility you
20  would have, would that -- withdrawn.
21    Did Lehman ever come to have
22  visibility any time after September 18th with
23  respect to the transaction and -- I'm sorry,
24  withdrawn.
25    Did Chase ever provide the feed

Confidential

Page 78

1      Fleming - Highly Confidential
2  necessary to have visibility of the September
3  18th transfer?
4        MR. C. GREEN:  Object to form.
5      A.   Not to my knowledge.
6      Q.   And do you know why not?
7      A.   I do not.
8        MR. C. GREEN:  Object to the form.
9  Calls for speculation.
10     Q.   In the ordinary course when Chase
11 did provide a feed enabling visibility, would
12 it include market values for the collateral
13 being pledged?
14     A.   I can't answer that question.  I
15 didn't manage the day-to-day.  I didn't view
16 these screens each day.  I wasn't that close to
17 it, so those type of detailed questions I am
18 not going to be able to answer.
19     Q.   Is there any link between the Chase
20 feeds and the application you have described
21 earlier today called the RTA, real-time
22 availability application?
23     A.   Can you repeat the question again.
24        (Record read.)
25     A.   No.

Page 79

1      Fleming - Highly Confidential
2      Q.   Could you explain the difference
3  between the two?
4      A.   One is an internal Lehman
5  application and the other is an access into a
6  clearing system.
7      Q.   Are the numbers in the internal
8  application system not dependent on the figures
9  being ascertained from the -- from accessing
10 the clearing system?
11        MR. C. GREEN:  Object to form.
12     A.   I'm not sure I understand what that
13 question means.
14     Q.   I am trying to understand how the
15 two are related, if at all.  If the RTA system
16 or application generates reports with cash and
17 collateral positions, I am trying to understand
18 where that information comes from and if it
19 comes from the feeds being obtained from
20 Lehman's clearing bank.
21        MR. C. GREEN:  Object to the form.
22     A.   One is a start-of-day projection.
23 One of them is a real-time view into positions.
24     Q.   The start-of-day projection being
25 generated by the RTA application; is that

Page 80

1      Fleming - Highly Confidential
2  correct?
3      A.   Yes.
4      Q.   The end-of-day view from Lehman's
5  custodian, Chase, would not affect the start of
6  day projection in the RTA system?
7        MR. C. GREEN:  Object to form.
8      Q.   Is that correct?
9      A.   There was no direct link between the
10 two.
11     Q.   Do you have any recollection of what
12 collateral remained with Lehman and was not
13 transferred to Barclays?
14        MR. C. GREEN:  Object to form.
15 Asked and answered.
16     A.   I don't know.
17     Q.   Neither the quantity or the types of
18 classes that might not have transferred?
19        MR. C. GREEN:  Same objection.
20     A.   That's correct, I don't know.
21     Q.   Back to Exhibit 298B, is it your
22 recollection that Barclays transferred 45
23 billion to Lehman on September 18th?
24     A.   That is what this e-mail indicates.
25     Q.   But as you sit here today, you have

Page 81

1      Fleming - Highly Confidential
2  no recollection as to the amount of cash
3  transferred to Lehman on September 18th in
4  connection with the asset transfer we
5  discussed?
6        MR. C. GREEN:  Object to form.
7      A.   I don't know what that amount was.
8  I think it's clear by this e-mail that we
9  didn't know what that amount was even
10 subsequent to the transfer.
11     Q.   Do you have reason to believe that
12 the number was not 45 billion -- withdrawn.
13        Could you tell me who David Aranow
14 is?
15     A.   David Aranow is an employee of
16 Lehman Brothers.
17     Q.   And do you know his function or
18 title at Lehman Brothers?
19     A.   At what point?
20     Q.   In September of 2008.
21     A.   You would need to confirm this with
22 David, but I believe that he was working in the
23 prime services business as a senior vice
24 president.
25     Q.   The prime services division is the

Confidential

Page 82

1    Fleming - Highly Confidential
2    division in which the repo desk is situated;
3    correct?
4        A.    Yes.
5        Q.    And do you know who Dave Petrie is?
6        A.    Other than him being a Barclays
7    employee, I do not know what his role is or
8    was.
9        Q.    In Exhibit 298 B you write to Monty
10    Forrest and David Aranow asking for Dave
11    Petrie's contact info.  Is that correct?
12        A.    Yes.
13        Q.    Do you know if you ever contacted
14    him subsequent to this e-mail?
15        A.    I do not believe so.
16        Q.    And do you recall why you were
17    looking for his contact information?
18        A.    I don't recall why I requested his
19    contact info on the 21st.
20        Q.    Do you recall if you ever had any
21    conversations with Dave Petrie?
22        MR. C. GREEN:  Object to the form.
23    Asked and answered, I believe.
24        MS. CARRERO:  Go ahead and answer.
25        A.    I do not believe so.

Page 83

1    Fleming - Highly Confidential
2        Q.    Mr. Fleming, you have before you
3    what's been previously marked as Exhibit 139A.
4    Please take a moment and look it over.  I would
5    like to specifically turn your attention to the
6    e-mail at the top of the e-mail chain.
7        (Document review.)
8        A.    Okay.
9        Q.    Did you receive this message?
10        A.    I don't recall if I read it.  I see
11    that I was CC'd on it.
12        Q.    Do you recall the substance of this
13    message which is a message from James Hraska
14    where he writes: "Agreed.  In addition, I just
15    want to make sure that everyone is clear that
16    $7 billion that was locked up for Barcap in tri
17    was returned to JP Chase.  If anyone has any
18    questions, please call me."
19        A.    I do recall the issue of the 7
20    billion.  Not specifically as it relates to
21    this e-mail.
22        Q.    What do you recall about the issue
23    of 7 billion?
24        A.    It's my understanding that there was
25    a shortfall in the amount of assets pledged as

Page 84

1    Fleming - Highly Confidential
2    part of the asset transfer to the tune of 7
3    billion and that the cash that had been
4    transferred for that 7 billion and residing at
5    Chase was -- it was agreed that that cash would
6    be put in a Barclays account at JPMorgan Chase.
7        Q.    And was that cash, in fact, put into
8    an account, a Barclays account, at JPMorgan
9    Chase?
10        MR. C. GREEN:  Object to form.
11        A.    I don't know.
12        Q.    Do you have any recollection of any
13    events that transpired after -- withdrawn.
14        So as you sit here today, you have
15    no knowledge or recollection of whether the 7
16    billion cash was, in fact, transferred to
17    Barclays; is that correct?
18        MR. C. GREEN:  Object to form.  You
19    mean placed in an account on Barclays'
20    behalf?  I think that's what he testified
21    about, it was agreed that the cash would be
22    put in a Barclays account at JPMorgan
23    Chase.
24        Q.    Let me rephrase.
25        As you sit here today, do you have

Page 85

1    Fleming - Highly Confidential
2    any knowledge or recollection as to whether 7
3    billion in cash was transferred to Barclays?
4        MR. C. GREEN:  Object to form.
5        A.    On this day?  Is that the question?
6        Q.    On this day or after.
7        A.    I do not know whether there was a
8    transfer of cash into a Barclays account on
9    this day, this day being close of business
10    Thursday the 18th.
11        Q.    Do you know if there were any
12    attempted or actual transfers of 7 billion in
13    cash after Thursday, September 18th?
14        MR. C. GREEN:  Object to form.
15        A.    I'm not aware of any transfer of
16    $7 billion of cash from JPMorgan to Barclays.
17        Q.    Is it your group that would be
18    responsible for liaisoning with both Barclays
19    and JPMorgan Chase with respect to a cash
20    transfer like the 7 billion contemplated?
21        MR. C. GREEN:  Object to form.
22        A.    I don't believe so.  I believe that
23    was a transaction between JPMorgan Chase and
24    Barclays.
25        Q.    Could you explain why you describe

Confidential

Page 86

1       Fleming - Highly Confidential
2   it as a transaction between JPMorgan Chase and
3   Barclays?
4       A.   It is my understanding that Barclays
5   had sent some money to the tune of $7 billion
6   to JPMorgan and did not get assets in return.
7       Q.   Is it your understanding that the 7
8   billion Barclays sent to JPMorgan remained with
9   JPMorgan then?
10      A.   It was my understanding at the time
11  that JPMorgan put that cash into a Barclays
12  account held at JPMorgan.
13      Q.   So when you say there was no
14  transfer of 7 billion on September 18th from
15  JPMorgan into Barclays' account, I am trying to
16  understand how to reconcile that with your
17  later answer that the 7 billion delivered from
18  Barclays to JPMorgan Chase went into a Barclays
19  account at JPMorgan Chase.
20      MR. C. GREEN:  Object to form.  I
21  think you may want to try that question
22  again.
23      Q.   Just to simplify it, I am not quite
24  sure I understand your last answer about 7
25  billion being delivered by Barclays to JPMorgan

Page 87

1       Fleming - Highly Confidential
2   Chase which subsequently went into a Barclays
3   account at JPMorgan Chase.  Could you explain?
4       A.   It's my understanding that Barclays
5   had paid for something that they didn't
6   receive, so, in effect, JPMorgan had received
7   funds that they weren't entitled to, that they
8   were Barclays' funds, until such time that
9   assets were transferred over to the Barclays
10  account.  Given the timing of the transfer and
11  the fact that this was, you know, probably
12  around midnight and that no more transfers were
13  due to transpire for that Thursday, Barclays --
14  I'm probably not the right person to describe
15  this, because at the time I was not a Barclays
16  employee, but, you know, Barclays, you know,
17  viewed that they were out of pocket $7 billion
18  and requested that JPMorgan take that 7 billion
19  that they had and to put it into an account,
20  into a Barclays account.  So it is almost as
21  though it was, you know, Barclays transferred 7
22  to JPMorgan and then JPMorgan put it into a
23  Barclays account.  So Barclays should have --
24  you know, based on the description should have
25  been, you know, protected, so to speak.  I'm

Page 88

1       Fleming - Highly Confidential
2   not sure that's the proper word, but...
3       Q.   I am confused about where Lehman
4   fits into the equation with respect to the 7
5   billion.  Could you clarify for me why you
6   describe the $7 billion dispute between
7   JPMorgan Chase and Barclays when it's the
8   Lehman securities that were failed to be
9   delivered?
10      MR. C. GREEN:  Object to the form of
11  the question.
12      A.   I can't, because I wasn't party to
13  the whole asset transfer structuring of how it
14  was mechanically going to work.  From my
15  perspective I viewed this as a transfer of
16  assets between Bank of New York and JPMorgan
17  Chase.
18      Q.   As custodian banks for Lehman and
19  Barclays?
20      MR. C. GREEN:  Object to the form.
21      A.   I don't think that they were
22  stepping in as principal at any point during
23  this transaction, but it was -- if Lehman still
24  had their assets, 7 billion of assets, and
25  Barclays paid money to JPMorgan Chase, then

Page 89

1       Fleming - Highly Confidential
2   JPMorgan Chase owes that money to Barclays, not
3   Lehman.  It was almost as though you could
4   consider that as funds paid in error that were
5   due to be returned.
6       Q.   And does that mean that 7 billion
7   should be subtracted from the amount of cash
8   Lehman received under the transfer?
9       MR. C. GREEN:  Object to the form of
10  the question.  Calls for speculation.
11      You can answer, if you have an
12  answer.
13      A.   I don't know what should have
14  happened.
15      Q.   But you viewed it as 7 billion
16  transferred in error; is that correct?
17      A.   Lehman did not get credited for that
18  7 billion.
19      (Exhibit 299B, e-mail dated
20  9-19-2008, marked for identification.)
21      Q.   Mr. Fleming, you have before you
22  what's been marked as Exhibit 299B.  It's an
23  e-mail from you to Paolo Tonucci on September
24  19 at 4:42 p.m.
25      You write:  "Bob Diamond is speaking

Confidential

Page 90

1      Fleming - Highly Confidential
2    to JPM about the 7 billion of cash allocated to
3    Barclays in tri-party last night." Do you
4    recall sending this message?
5       A.   I do recall sending this message.
6       Q.   Do you recall the circumstances
7    around which you sent it?
8         MR. C. GREEN: Object to form.
9       A.   I do not know or do not recall how I
10   learned of this. I certainly did not speak to
11   Bob Diamond. It was secondhand at best. It
12   was, you know, an attempt to communicate
13   whatever information was available. I do not
14   know whether this actually happened.
15      Q.   Meaning you do not know if Bob
16   Diamond actually spoke with JPM about the 7
17   billion of cash?
18      A.   I cannot definitively say that that
19   occurred.
20      Q.   Was it your understanding that the 7
21   billion of cash was a reference to the 7
22   billion of cash that had been transferred in
23   error and resulted in a shortfall to Barclays?
24        MR. C. GREEN: Object to form. To
25   Barclays?

Page 91

1      Fleming - Highly Confidential
2         MS. CARRERO: Let me rephrase that.
3       Q.   Is it your recollection that the 7
4    billion of cash is in reference to the 7
5    billion transferred by Barclays under the
6    September 18 asset transfer in which there was
7    a $7 billion collateral shortfall?
8       A.   Yes, it's my understanding that this
9    is in reference to the same 7 billion, the 7
10   billion that we previously discussed.
11      Q.   And do you recall how you heard that
12   Bob Diamond was speaking to JPM?
13        MR. C. GREEN: Object to form.
14   Asked and answered.
15      A.   I do not recall.
16      Q.   Do you know why there was a
17   collateral shortfall on September 18th in
18   connection with the asset transfer?
19        MR. C. GREEN: Object to form.
20   Asked and answered.
21      A.   I do not know why the assets did not
22   transfer over.
23      Q.   Did you come to learn that the
24   assets that had been transferred on September
25   18th from Lehman to Barclays were part of the

Page 92

1      Fleming - Highly Confidential
2    larger asset sale that had been agreed to
3    earlier that week?
4         MR. C. GREEN: Object to form.
5    Calls for a legal conclusion.
6         You may answer, if you have an
7    answer.
8       A.   I am not, again, subject to the
9    terms of those agreements, so I would not be
10   able to draw any conclusions on the transfer of
11   assets as it relates to whether they were
12   related to any legal agreement that I was not a
13   party to.
14      Q.   I am not asking you for any legal
15   opinion. I am just asking did you -- was it
16   your understanding at some point that week that
17   Barclays was purchasing the assets being
18   transferred on September 18?
19      A.   At some point that became apparent,
20   but I don't recall when that was.
21      Q.   Do you recall how it became apparent
22   to you?
23      A.   I don't.
24      Q.   Do you recall if it became apparent
25   before September 22nd?

Page 93

1      Fleming - Highly Confidential
2         MR. C. GREEN: Object to form. I'm
3    sorry. When you say "it became apparent,"
4    you are referring to what?
5       Q.   The purchase. Do you recall roughly
6    when the purchase became apparent? Was it in
7    sometime the week of September 15th, was it the
8    next week, sometime the week of September 22nd,
9    was it months later?
10        MR. C. GREEN: And just to make sure
11   the record is clear, when you say
12   "purchase," you are referring to the
13   purchase of the assets that were
14   transferred on the 18th --
15        MS. CARRERO: Yes.
16        MR. C. GREEN: -- from JPMorgan to
17   Bank of New York?
18        MS. CARRERO: Or, more specifically,
19   assets that were owned by Lehman and
20   purchased by Barclays.
21        MR. C. GREEN: Do you have the
22   question in mind, Mr. Fleming?
23      A.   I don't recall. I don't recall when
24   that realization occurred.
25      Q.   Were you at any time involved in

Confidential

Page 94

1        Fleming - Highly Confidential
2   putting together a list of the collateral that
3   had been transferred from Lehman to Barclays on
4   September 18th?
5        A.   Not that I recall.
6        Q.   Do you recall ever receiving such
7   lists?
8        A.   I don't have specific recollection
9   of receiving a list.
10        Q.   Do you recall any issues with
11   reconciling the positions that had been
12   transferred on September 18th between Lehman
13   and Barclays and its custodians?
14        MR. C. GREEN:  Object to form.
15        A.   Can you repeat that question.
16        Q.   Do you recall there being a process
17   of reconciliation between the collateral list
18   setting forth the positions that had been
19   transferred on September 18th between Lehman,
20   Barclays and their respective custodians,
21   JPMorgan Chase and BONY?
22        MR. C. GREEN:  Object to form.
23        A.   I recall there being a significant
24   effort post the 18th to reconcile the books and
25   records.

Page 95

1        Fleming - Highly Confidential
2        Q.   And do you recall what that process
3   of reconciliation entailed?
4        A.   I didn't -- I wasn't responsible for
5   reconciliations at Lehman Brothers, so what it
6   entailed, I couldn't answer that question.
7        Q.   I am putting in front of you what
8   has been previously marked as Exhibit 47.
9        Mr. Fleming, do you recall receiving
10   a collateral schedule similar to the one
11   attached to Exhibit 47 or Exhibit 47 itself?
12        MR. C. GREEN:  Mr. Fleming, take a
13   moment to review the e-mail at the front of
14   Exhibit 47.  Make sure you have read the
15   entire thing before we proceed, please.
16        (Document review.)
17        MR. C. GREEN:  I don't mean the
18   entire exhibit, I mean the entire e-mail,
19   just for the record.
20        MS. CARRERO:  I understand.  Yes,
21   you may read the four-page e-mail.
22        A.   Okay.
23        Q.   Do you recall receiving this
24   collateral schedule or a collateral schedule
25   similar to this at any point the week of

Page 96

1        Fleming - Highly Confidential
2   September 15th or afterwards?
3        A.   I don't recall receiving anything
4   like this.
5        Q.   Turn your attention to the e-mail
6   dated September 20th at 11:38 a.m. asking if
7   50 percent of residentials were transferred
8   through the repo or if they had to be
9   transferred at closing.
10        Does that accurately summarize
11   Mr. Miller's September 20th e-mail?
12        MR. C. GREEN:  Are you asking
13   Mr. Fleming if your characterization
14   accurately summarizes Mr. Miller's e-mail?
15        MS. CARRERO:  Withdrawn.
16        Q.   Do you recall whether 50 percent of
17   residential mortgages were transferred on
18   September 18th to Barclays or if they were to
19   be transferred at the closing?
20        MR. C. GREEN:  Object to form.
21        Asked and answered, but you may answer it
22   again.
23        A.   No, I don't.
24        Q.   Again, you have no recollection of
25   what collateral was transferred on September

Page 97

1        Fleming - Highly Confidential
2   18th; is that correct?
3        A.   No.  There is many e-mails out
4   there, some of which I didn't even read.  I
5   certainly didn't --
6        Q.   Do you know why you are being copied
7   on this e-mail and others asking about what
8   collateral is transferred on September 18th?
9        MR. C. GREEN:  Object to form.
10        Calls for speculation and assumes facts not
11   in the record.
12        You may answer, if you have an
13   answer.
14        A.   I don't know the answer.  Clearly --
15   what would I possibly do with this document?
16        Q.   If you could turn to page Bates
17   numbered BCICG 00035138.  This document appears
18   to be a summary of the market value of the
19   positions transferred on September 18th
20   totaling, according to this sheet,
21   49,902,924,897.20.
22        Did you ever have any sort of
23   understanding as to the market value of the
24   positions being transferred on September 18th,
25   if not the specific CUSIPs that were being