# A. 11 (B)

Confidential

Page 98

1    Fleming - Highly Confidential
2    transferred on the 18th?
3        MR. C. GREEN: I would suggest,
4    Mr. Fleming, that you answer the question,
5    not the characterization of this document.
6        MS. CARRERO: That's fine.
7        MR. C. GREEN: If you have an answer
8    to the question.
9    A.    I believe that at the time I was
10    given a general indication of the proceeds to
11    be received as a result of the asset transfer.
12    I don't recall at this point what that number
13    was. And I do vaguely recall that there was
14    some reference to market value. That was an
15    irrelevant number to me, so I wouldn't have
16    paid attention.
17    Q.    So when you say "proceeds," you mean
18    the cash to be received or the value of the
19    collateral to be pledged?
20        MR. C. GREEN: Object to form.
21    A.    The cash to be received.
22    Q.    And in learning about the cash to be
23    received, it would have been conveyed to you
24    the market value of the assets to be pledged?
25        MR. C. GREEN: Is that a question?

Page 99

1    Fleming - Highly Confidential
2    Q.    To clarify, I am asking if in
3    learning the amount of proceeds to be received
4    if ordinarily you would also be told the market
5    value of the assets to be pledged?
6        MR. C. GREEN: Object to form.
7        You may answer.
8    A.    There was nothing ordinary about
9    what was happening with this, so I can't
10    comment on that. I do believe that at the time
11    I was given an indication of both the cash
12    proceeds and the market value.
13    Q.    And do you recall either of those
14    two numbers?
15    A.    I do not recall those numbers today,
16    no.
17    Q.    And do you recall generally the
18    spread between those two numbers or the
19    haircut?
20        MR. C. GREEN: Object to form.
21    Assumes facts not in evidence, but you may
22    answer.
23    A.    I don't remember what that was.
24    Q.    Would that be information that you
25    would need to know in order to manage the cash

Page 100

1    Fleming - Highly Confidential
2    and collateral position of the firm?
3    A.    We would need to understand the cash
4    amount, the proceeds to be received. I think
5    by that point in time we had lost control over
6    understanding collateral valuations and
7    collateral availability.
8    Q.    And, again, lost control of
9    collateral valuations and collateral
10    availability, by that you mean you no longer
11    had visibility of those positions and values;
12    is that correct?
13        MR. C. GREEN: Object to form.
14    A.    I would say that's a fair
15    description. We lost visibility, really didn't
16    understand what was available.
17    Q.    And loss of visibility being only
18    because of the failure to receive feeds from
19    Chase or other reasons?
20        MR. C. GREEN: Object to form.
21    A.    I think it was -- had to do with the
22    very sudden and abrupt change in business
23    activities during that week post the holding
24    company bankruptcy that caused us to --
25    possibly our tools were not sophisticated

Page 101

1    Fleming - Highly Confidential
2    enough to be able to respond as quickly as
3    changes were occurring, which led us to, in
4    some ways, lose control over that information.
5    Q.    Were you involved at all in
6    assessing Lehman's asset -- withdrawn.
7        Were you involved at all in an
8    exercise to determine the availability of the
9    assets on Lehman's balance sheet for purchase?
10    A.    No.
11        MR. C. GREEN: Object to form.
12    Q.    Are you aware of any sort of
13    exercise to determine what positions were
14    available for purchase?
15        MR. C. GREEN: Object to form. And
16    can you give us a time frame on this
17    question?
18    Q.    Were you aware any time after
19    September 12th of an exercise to create a list
20    of Lehman assets available for purchase?
21    A.    No. I was not -- I was not informed
22    as to any aspects of a purchase agreement.
23    Q.    Have you ever seen a copy of the
24    Asset Purchase Agreement that was signed on
25    September 16th and closed on September 22nd

Confidential

Page 102

1    Fleming - Highly Confidential
2    between Lehman and Barclays?
3         MR. C. GREEN: Object to form. I'm
4    not certain the characterization is
5    correct.
6         You can answer, if you are able to.
7    A.   Not that I recall.
8    Q.   Have you ever seen the financial
9    schedule attached to the September 16 Asset
10   Purchase Agreement between Lehman and Barclays
11   setting forth assets and liabilities at Lehman?
12   I am trying to save time here. I can get them
13   all out.
14   A.   No, I'm not.
15        MR. C. GREEN: Would it help if we
16   took a short break? We have been going for
17   quite a while.
18        MS. CARRERO: I would say if we
19   could in ten minutes take the break?
20        MR. C. GREEN: Take a break in ten
21   minutes you mean?
22        MS. CARRERO: Yes.
23        MR. C. GREEN: That would be fine.
24   It would be fine with me.
25        Would it be all right with you,

Page 103

1    Fleming - Highly Confidential
2    Mr. Fleming?
3         THE WITNESS: It's fine.
4    Q.   Was it your understanding that when
5    assets were transferred from Lehman to Barclays
6    on Thursday, September 18th, that they would be
7    returned to Lehman?
8         MR. C. GREEN: Object to form.
9    A.   I didn't know the terms of the
10   transfer.
11   Q.   Are you aware of a process on
12   Friday, September 19th, to locate additional
13   assets to transfer to Barclays in addition to
14   those that were transferred September 18th?
15        MR. C. GREEN: Object to form.
16   A.   I was aware of a reconciliation
17   process under way. I was aware that there was
18   some form of shortfall. I don't know what that
19   form was. So that I was aware of.
20   Q.   When you say "some form of
21   shortfall," do you mean under the terms of the
22   asset sale from Lehman to Barclays?
23        MR. C. GREEN: Object to form.
24   Calls for a legal conclusion.
25        You may go ahead.

Page 104

1    Fleming - Highly Confidential
2    A.   As it relates to what I described as
3    the asset transfer.
4    Q.   To clarify, the search for
5    additional assets on Friday, September 19th,
6    what you have described as a shortfall you saw
7    to be related to the September 18th transfer;
8    is that correct?
9         MR. C. GREEN: I just want to make
10   sure, he hasn't testified that there was a
11   search for additional assets at this point.
12   I think he just said he was aware of a
13   shortfall. So maybe --
14   A.   I cannot say that it was -- I had a
15   general understanding that there was a
16   shortfall, but I was not advised or informed as
17   to what that shortfall specifically referenced.
18   Q.   And as a consequence of the
19   shortfall, do you know what happened?
20   A.   I'm aware of, you know, a
21   reconciliation process that was launched. I
22   don't know the exact date. I don't know
23   whether it was Friday or it was Saturday, but
24   shortly after the -- probably either Thursday,
25   Thursday or Friday, to reconcile our cash and

Page 105

1    Fleming - Highly Confidential
2    collateral positions.
3    Q.   And by reconcile cash and collateral
4    positions, what do you mean?
5    A.   I'm not sure how to respond.
6    Reconcile, you know, our books and records to
7    bank statements and depository statements.
8    Q.   What was the intended outcome of the
9    reconciliation process?
10        MR. C. GREEN: Object to the form of
11   the question. Calls for speculation.
12        MS. CARRERO: Go ahead. Answer.
13   A.   To determine, you know, what
14   happened and where we ended up.
15   Q.   Was the reconciliation process also
16   to determine if there were additional assets
17   that could be transferred to Barclays?
18        MR. C. GREEN: Object to the form of
19   the question.
20   A.   I believe one of the goals of the
21   reconciliation was to determine what excess was
22   available.
23   Q.   And do you know if the outcome of
24   the reconciliation determined that there was
25   excess available?

Confidential

## Page 106

1       Fleming - Highly Confidential
2      MR. C. GREEN: Object to form.
3     A.  I didn't perform the
4 reconciliations, my group wasn't responsible
5 for the reconciliations and I didn't access the
6 reconciliations, so I am really not in a
7 position to comment on the reconciliations
8 themselves.
9     Q.  Do you know if as a consequence of
10 the reconciliations or otherwise excess
11 collateral or cash was discovered that was to
12 be transferred to Barclays?
13      MR. C. GREEN: Object to the form.
14     A.  I'm not aware of -- I can't recall
15 if there were additional transfers made after
16 that Thursday, the 18th.
17      MS. CARRERO: Why don't we break.
18      MR. C. GREEN: Would you like to
19 break for lunch or --
20      MS. CARRERO: I think that makes
21 sense.
22      MR. C. GREEN: Okay. Off the
23 record.
24      (Lunch recess was taken from 12:54
25 to 1:57.)

## Page 107

1       Fleming - Highly Confidential
2 CONTINUED EXAMINATION BY
3 MS. CARRERO:
4     Q.  Good afternoon, Mr. Fleming.
5     Before we broke for lunch we were
6 talking about whether there were additional
7 transfers made from Lehman to Barclays after
8 September 18th. Do you recall that discussion?
9     A.  Yes.
10     Q.  I am putting before you what has
11 previously been marked as Exhibit 177. Take a
12 moment and read it, please.
13      (Document review.)
14     A.  Okay.
15     Q.  Starting with the last e-mail and
16 earliest in time on the last page of the
17 exhibit, do you recall a process of preparing
18 an opening balance sheet for Barclays to use on
19 day 1?
20      MR. C. GREEN: Object to the form.
21     A.  No, I was not part of that exercise.
22     Q.  Skipping to, I believe, the first
23 e-mail in the chain that you are CC'd on from
24 Paolo Tonucci to many and CC'ing you dated
25 September 20th at 10:31 a.m., do you recall

## Page 108

1       Fleming - Highly Confidential
2 being asked to determine whether there were
3 15C3 assets to be transferred to Barclays?
4     A.  I recall being asked to provide some
5 information as it relates to the assets that
6 were segregated according to 15C3.
7     Q.  Could you explain briefly what 15C3
8 segregated assets are?
9      MR. C. GREEN: Object to the extent
10 it calls for a legal conclusion.
11     You may answer the question.
12     A.  I'm not the regulatory expert when
13 it comes to this, but I can give you a
14 general -- my general understanding of what the
15 segregation requirement pertains to, and that
16 is fully paid for customer assets whereby a
17 broker/dealer needs to on a weekly basis
18 calculate what that amount is as of close of
19 business each Friday and reserve for that
20 amount of assets on the following Tuesday and
21 it's a weekly calculation that's performed.
22     Q.  More generally, what is your role
23 with 15C3 segregated assets?
24     A.  My team, upon instruction from our
25 regulatory group, would perform the calculation

## Page 109

1       Fleming - Highly Confidential
2 and advise us what the net change was. My
3 group was responsible for affecting movements
4 into or out of the reserve accounts for the
5 actual week-over-week net change.
6     Q.  And by reserve account, you mean
7 15C3 reserve accounts; is that correct?
8     A.  There are designated accounts set up
9 for the exclusive benefit of customers that
10 have agreements associated with them whereby
11 the banks have no right or lien against the
12 assets for the customer, so those specific
13 accounts, you have to have the reserve assets
14 in those types of accounts.
15     Q.  In Mr. Tonucci's September 20th
16 e-mail he indicates: "Dan, the collateral that
17 was locked up for 15C3 needs to be transferred
18 over the Barclays." I imagine he meant to
19 Barclays.
20     Do you recall if 15C3 collateral was
21 transferred to Barclays?
22     A.  I think I already answered this
23 question earlier. This e-mail, I believe, was
24 already distributed as one of the exhibits. I
25 will respond again. I am not aware of any

Confidential

## Page 110

1    Fleming - Highly Confidential
2  transfer of 15C3 assets to Barclays.
3    Q.   Are you aware of calculation of 15C3
4  assets available to transfer to Barclays?
5      MR. C. GREEN:  You mean other than
6  is discussed in this e-mail?
7    Q.   Other than what is discussed in this
8  e-mail.
9    A.   I recall an exercise to reconcile
10  our books and records post Thursday, the 18th,
11  for purposes of determining excess assets that
12  resided in the broker/dealer.  You know, what
13  would be done with those assets was not
14  described to me and certainly was not clear.
15    Q.   15C3 assets being one component of
16  those assets potentially available for
17  transfer; is that accurate?
18      MR. C. GREEN:  Object to form.
19      You may answer.
20    A.   I believe that there was a
21  calculation, a recalculation of the reserve
22  formula as of close of business most likely
23  Friday, the 19th, but I'm not sure of the exact
24  date, but I do know that whatever that last
25  date was, they wanted to perform the

## Page 111

1    Fleming - Highly Confidential
2  calculation to determine what the proper amount
3  of segregation was or should be.
4    Q.   Were you ever given a figure you
5  were trying to reach with respect to the
6  reconciliation?
7      MR. C. GREEN:  Object to form.
8    A.   I'm not aware of any amount related
9  to the rec.  The reconciliation should result
10  in zero breaks.  That's what a reconciliation
11  ultimately is.
12    Q.   If the reconciliation ultimately
13  results in a positive number, is that a
14  consequence of more assets being segregated
15  than necessary under the rules?
16      MR. C. GREEN:  Object to form.
17      Do you understand the question?
18    A.   The question doesn't make sense to
19  me.
20    Q.   Could you explain for me, is there
21  more than one type of 15C3 reserve account, one
22  for customer -- withdrawn.
23      MS. CARRERO:  Give me one moment.
24      All right.
25      (Exhibit 300B, e-mail dated

## Page 112

1    Fleming - Highly Confidential
2  September 23, 2008, Bates stamped
3  BCI-EX-(S)-00019269 and
4  BCI-EX-(S)-00019270, marked for
5  identification.)
6    Q.   Mr. Fleming, you have before you
7  what's been marked Exhibit 300B, if you could
8  take a moment to review it, particularly the
9  first e-mail in the chain.
10      (Document review.)
11    A.   Okay.
12    Q.   In this document marked Exhibit 300B
13  there is a reference to PAIB reserve accounts
14  and customer reserve bank accounts.  Could you
15  explain the difference?
16    A.   There is two types of reserves.  One
17  is the EBOC reserve, which is for the exclusive
18  benefit of customers.  There is a second
19  calculation for PAIB, which is the proprietary
20  accounts of introducing brokers.  Again, I'm
21  not an expert in the calculation, but I believe
22  that they are very similar in nature.  They are
23  just covering two different types of customers.
24    Q.   And the reconciliation process
25  taking place I believe you said either that

## Page 113

1    Fleming - Highly Confidential
2  Thursday or Friday, September 18th, 19th, was
3  with respect to both the EBOC and the PAIB
4  accounts; is that correct?
5      MR. C. GREEN:  Object to the form of
6  the question.
7    A.   The reconciliation that was being
8  performed was not -- to my understanding, was
9  not a reconciliation of the reserve accounts.
10  It was a reconciliation of our operating, our
11  normal operating bank accounts.
12    Q.   Which included the reserve accounts
13  or excluded them entirely?
14      MR. C. GREEN:  Object to the form.
15    A.   I believe it would have excluded
16  them.
17    Q.   Was there a separate recalculation
18  process with respect to the EBOC and PAIB
19  accounts?
20    A.   I believe so.
21    Q.   Were you involved in that
22  recalculation process?
23    A.   That was the responsibility of the
24  regulatory group.
25    Q.   Do you know the outcome of the

Confidential

Page 114

1    Fleming - Highly Confidential
2 recalculation of the PAIB and EBOC accounts?
3    A.   I do not recall the outcome of
4 those.
5    Q.   And you do not recall whether any
6 excess in the EBOC and PAIB accounts subject to
7 release were transferred to Barclays; is that
8 correct?
9        MR. C. GREEN:  Object to the form.
10    A.   I do not recall.
11    Q.   Going back to Exhibit 300B, there is
12 a reference to Chase being instructed not to
13 communicate with Lehman.
14        Do you recall if that was, in fact,
15 the case as of September 23rd?
16    A.   Yes.
17    Q.   Do you know the circumstances under
18 which they had been instructed not to
19 communicate with Lehman?
20        MR. C. GREEN:  Object to form.
21    A.   I guess I would say no, I don't.  I
22 just knew that they were instructed not to take
23 our phone calls and not to communicate with us.
24    Q.   Is this related to the situation you
25 described on September 18th with respect to

Page 115

1    Fleming - Highly Confidential
2 feeds not going through to your systems and
3 allowing visibility of the September 18th
4 transfer?
5        MR. C. GREEN:  Object to form.
6    A.   This relates to the exercise of
7 reconciling our books and records.
8    Q.   Can you turn back to Exhibit 177.
9 Turn to the second page, the first complete
10 e-mail at the top from you dated September 20th
11 at 5:01 p.m.
12    A.   Uh-huh.
13    Q.   Do you recall sending that message?
14    A.   Now that I look at it, I do.  I do
15 recall sending this.
16    Q.   Do you recall why you sent it?
17    A.   I believe that I was requested to
18 provide the balances in the reserve accounts.
19    Q.   And are the balances in the reserve
20 accounts only those that are in excess of what
21 is required under the rules?
22        MR. C. GREEN:  Object to the form of
23 the question.
24    A.   I'm not sure I follow you.
25    Q.   My question is the balances in the

Page 116

1    Fleming - Highly Confidential
2 EBOC and PAIB accounts, are those amounts still
3 required to be segregated or are they available
4 for other uses?
5        MR. C. GREEN:  Object to the form of
6 the question.
7    A.   The calculation is what determines
8 the requirement.  This is just collateral to
9 satisfy the requirement.  So you need to look
10 at the calculation itself.
11    Q.   My question is are these amounts the
12 excess over the requirements or is it the total
13 amount in the accounts?
14        MR. C. GREEN:  I'm sorry, these
15 amounts you are referencing are on page 2
16 of Exhibit 177?
17    Q.   Exactly.  The amounts being for EBOC
18 a total of 1.73 billion, which is comprised of
19 both cash and securities, and then securities
20 totaling 492,707,260.65.
21        MR. C. GREEN:  Object to the form of
22 the question.
23    A.   Without knowing what the requirement
24 was, there is no way to determine whether there
25 was excess or deficit based on this

Page 117

1    Fleming - Highly Confidential
2 information.
3    Q.   Is your e-mail suggesting an attempt
4 to transfer the cash and securities -- I'm
5 sorry.  Withdrawn.
6        Is your e-mail suggesting an attempt
7 to transfer the cash then at Wells Fargo to
8 somewhere?
9        MR. C. GREEN:  Object to the form of
10 the question.
11    Q.   Let me rephrase.
12        There is mention in this e-mail to
13 moving the cash.  Do you recall where it was to
14 be moved to?
15    A.   I believe that this e-mail is
16 referencing an attempt to release cash from the
17 lock-up at a prior date, not necessarily the
18 transfer of cash somewhere else.
19    Q.   And how about the statement
20 regarding moving the securities at JPM, what is
21 that a reference to?
22    A.   That is in reference to the extent
23 that there was instructions provided to move
24 the securities somewhere, wherever that may be,
25 it was unclear to me how that could be affected

Confidential

Page 118

1    Fleming - Highly Confidential
2    given that JPMorgan had blocked us out of their
3    system and wasn't communicating with us.
4       Q.   I guess I am just not understanding
5    how the e-mail below regarding transferring the
6    15C3 over to Barclays is not related to the
7    movement of cash and securities in your
8    response e-mail.  Am I understanding correctly?
9           MR. C. GREEN:  Object to the form of
10       the question.
11      A.   I really can't comment on the prior
12    e-mail from Mr. Tonucci referencing the
13    transfer of the 15C3 over to Barclays.
14      Q.   So you have no recollection if you
15    responded to his message with the EBOC and PAIB
16    balances because there was an intention to move
17    those over to Barclays?
18          MR. C. GREEN:  Object to the form.
19      A.   I was responding to Mr. Tonucci and
20    advising him of what was in the account.
21      Q.   Mr. Tonucci later asks you for a
22    contact at Wells.  Do you recall if you
23    provided that contact information?
24      A.   I believe I did.
25      Q.   And after you provided the

Page 119

1    Fleming - Highly Confidential
2    information regarding the accounts, is it your
3    understanding that it was then determined a
4    recalculation was needed?
5       A.   Can you say that one more time,
6    repeat that?
7       Q.   If I understand your testimony
8    correctly, you were providing in your 5:01 p.m.
9    e-mail of September 20th the information you
10    had on the EBOC and the PAIB accounts.  Is that
11    correct?
12      A.   Correct.
13      Q.   Mr. Tonucci then asks you for your
14    contact at Wells and you believe you did
15    provide that contact information; is that
16    correct?
17      A.   I believe that to be the case, yes.
18      Q.   And then later on in the chain it
19    appears as though there is a request for a
20    recalculation to be done immediately.  Do you
21    recall there being a recalculation following?
22          MR. C. GREEN:  Following this
23       request by Mr. Blackwell?
24          MS. CARRERO:  Following this request
25       by Mr. Blackwell, yes.

Page 120

1    Fleming - Highly Confidential
2          MR. C. GREEN:  Do you have the
3       question in mind, Mr. Fleming?
4       A.   I do recall that there was a reserve
5    calculation performed, yes.
6       Q.   And turning back to Exhibit 300B, do
7    you recall if the outcome of the recalculation
8    was a determination that there was 769 million
9    of qualified collateral in the customer reserve
10    bank account?
11      A.   I think there is some confusion with
12    regards to the calculation and the assets that
13    are in reserve accounts.  The calculation is
14    based on a variety of different things, largely
15    driven by books and records of client balances
16    and that calculation is performed.  Part of
17    that calculation involves the reconciliation of
18    our operating accounts, our stock record, our
19    bank accounts, and there is a calculation and a
20    result from that.  The collateral that's in the
21    reserve accounts that we are describing --
22    that's being described in these e-mails is the
23    collateral that was there from the prior
24    calculation.  So it's the request for
25    information on what is in the account and then

Page 121

1    Fleming - Highly Confidential
2    the -- what I consider to be normal course, to
3    do a re-calc.  There is -- I'm not -- I'm
4    getting a little bit confused with what we are
5    trying to get at with the question, I guess.
6       Q.   What was your understanding of why a
7    re-calc was being done?  Did it have to do with
8    Mr. Tonucci's request regarding transfer of
9    15C3 over to Barclays?
10          MR. C. GREEN:  Object to the form of
11       the question.  May call for speculation.
12          You can answer, if you have an
13       answer.
14      A.   In my opinion, the purpose of the
15    calculations is to determine proper client
16    segregation.
17      Q.   Did you have any understanding of
18    what would be done with any excess cash or
19    collateral no longer needed to be segregated?
20      A.   No.
21      Q.   Were you involved in any sort of
22    process around that same time to locate assets
23    in the non-actionable box that could be
24    transferred over to Barclays?
25          MR. C. GREEN:  Object to the form of

Confidential

Page 122

1        Fleming - Highly Confidential
2    the question.
3        Do you understand the question,
4    Mr. Fleming?
5        THE WITNESS: I am thinking.
6        A.    I think I previously stated that I
7    wasn't involved in the -- you know, the
8    location or that reconciliation process to
9    identify unencumbered assets.
10       Q.    Do you know the term Schedule B with
11   respect to the asset sale by Lehman to
12   Barclays?
13       MR. C. GREEN: Object to the form.
14       A.    I've heard it referenced, but that's
15   the extent of it.
16       Q.    Do you know the type of securities
17   that are listed on Schedule B?
18       A.    No.
19       Q.    Do you know of a process to locate
20   unencumbered assets for transfer to Barclays?
21       MR. C. GREEN: During what period of
22   time?
23       MS. CARRERO: During the week of
24   September 15th, specifically after
25   September 18th.

Page 123

1        Fleming - Highly Confidential
2        A.    I'm aware of an effort to reconcile
3    and identify unencumbered assets.
4        Q.    Did you participate in that process?
5        MR. C. GREEN: Object to the form.
6    Asked and answered.
7        A.    No.
8        Q.    Do you know if unencumbered assets
9    were identified at the end of that
10   reconciliation process for transfer to
11   Barclays?
12       MR. C. GREEN: Objection to form.
13       A.    I don't recall the outcome of those
14   reconciliations.
15       Q.    And do you recall if any
16   unencumbered assets were later transferred to
17   Barclays?
18       A.    I do not recall that.
19       (Exhibit 301B, e-mail dated
20   September 21, 2008, Bates stamped 10307085,
21   marked for identification.)
22       Q.    Mr. Fleming, you have in front of
23   you what's been marked as Exhibit 301B.  Please
24   take a moment to look a over.
25       (Document review.)

Page 124

1        Fleming - Highly Confidential
2        A.    Okay.
3        Q.    Starting with the last e-mail in the
4    chain or the earliest in time, do you recall
5    there being a call on September 20th, 2008
6    regarding the unencumbered assets?
7        A.    I don't recall this specific call.
8    There many calls occurring.
9        Q.    Do you recall a series of calls
10   taking place around that time of September 20th
11   regarding a reconciliation process to determine
12   the amount of unencumbered assets that could be
13   transferred over to Barclays?
14       MR. C. GREEN: Object to the form.
15   Kelly, I'm sorry, excuse me, I am
16   wondering, do you have a copy of this
17   e-mail chain that has the entire chain?  It
18   says on the second page of this document
19   that the original message is truncated and
20   it appears to break off in mid sentence.  I
21   am just wondering do you have a more
22   complete version?  If you don't, you don't.
23       MS. CARRERO: Five minutes.  I think
24   we can find out.
25       MR. C. GREEN: Off the record for a

Page 125

1        Fleming - Highly Confidential
2    minute then.
3        (Recess was taken from 2:37 to
4    2:38.)
5    BY MS. CARRERO:
6        Q.    Mr. Fleming, what is your
7    understanding of the types of collateral that
8    would constitute unencumbered assets?
9        A.    My understanding of unencumbered
10   assets are those assets that are free and clear
11   of any lien or segregation and available for
12   use.
13       Q.    And any free and clear assets could
14   be found in a number of different Lehman
15   accounts; is that correct?
16       MR. C. GREEN: Object to the form.
17       A.    There could be unencumbered assets
18   in multiple locations.
19       Q.    And what would those locations be?
20       A.    Depository accounts.
21       Q.    Would depository accounts be the
22   same thing as DTC accounts?
23       A.    Yes.
24       Q.    And would those DTC accounts be
25   designated -- withdrawn.

Confidential

Page 126

1      Fleming - Highly Confidential
2      Could you tell me your understanding
3   of what type of assets are in DTC box 074?
4      MR. C. GREEN:  As of what point in
5   time?
6      MS. CARRERO:  As of the time of the
7   reconciliation searching for unencumbered
8   assets.
9      MR. C. GREEN:  That would be this
10  weekend of the 20th and the 21st?
11     MS. CARRERO:  Starting September
12  18th through the 22nd of September.
13  A.   I don't know specifically what
14  assets were in that account.  It could have
15  been any DTC eligible asset.
16  Q.   And was it your understanding that
17  the unencumbered assets in DTC 074 were being
18  transferred to Barclays?
19     MR. C. GREEN:  Object to the form of
20  the question.  I think it mischaracterizes
21  his testimony or at least does not take
22  account of his prior testimony.  He said he
23  doesn't know specifically what assets were
24  in that account, his prior answer.
25  Q.   Answer, if you can.

Page 127

1      Fleming - Highly Confidential
2   A.   Can you repeat it.
3      (Record read.)
4      MR. C. GREEN:  Same objection.
5   A.   I'd have to answer the question as
6   no, it was not my understanding.  I did not
7   have an understanding of what assets were being
8   transferred.
9      (Exhibit 302B, e-mail dated
10  September 22, 2008, Bates stamped
11  BCI-EX-(S)-00018817, marked for
12  identification.)
13  Q.   Mr. Fleming, you have before you
14  what's been marked Exhibit 302B.
15     Do you recall learning at some point
16  on September 22nd that Barclays would not fund
17  or back DTC box 074?
18  A.   I don't remember this specifically.
19  Q.   In Mr. Blackwell's e-mail to you and
20  Mr. Tonucci on September 22nd at 9:29 a.m. what
21  do you think he meant by saying "how do we fund
22  this"?
23     MR. C. GREEN:  Object to the form of
24  the question.  Calls for speculation.
25  A.   I would interpret this to mean how

Page 128

1      Fleming - Highly Confidential
2   do we satisfy the net settlement obligations
3   for that account.
4   Q.   Do you know whether Barclays
5   ultimately funded or backed settlement
6   obligations in DTC 074?
7   A.   I don't remember.  I don't recall.
8   Q.   Were you involved in any
9   communications with DTC regarding funding of
10  any Lehman accounts there?
11     MR. C. GREEN:  On or after September
12  22nd or at any time or --
13     MS. CARRERO:  Any time from
14  September 18th onward.
15  A.   I'm not sure of the exact date, but
16  I was contacted by DTC.  I think it was the
17  chairman of DTC who was trying to get in touch
18  with me about the -- about satisfying the
19  obligations on the account.  I don't recall
20  what day it was, but I do recall that they were
21  trying to get in touch with me and I do believe
22  I spoke to him.  I believe it was Mr. Donohue.
23  Q.   Were you involved in any
24  negotiations regarding -- withdrawn.
25     Were you involved in negotiations

Page 129

1      Fleming - Highly Confidential
2   with either Barclays or DTC regarding
3   settlement of trades at DTC?
4      MR. C. GREEN:  Object to the form.
5   A.   No, not that I recall.
6      (Exhibit 303B, e-mail dated
7   September 19, 2008, Bates stamped 465433,
8   marked for identification.)
9   Q.   Mr. Fleming, you have before you
10  what's been marked Exhibit 303B.  Take a moment
11  to review it.
12     (Document review.)
13  A.   Okay.
14  Q.   Do you recall a pledge of about 800
15  million in market value to Barcap on Friday,
16  September 19th?
17  A.   I mean, I don't recall it
18  specifically where that was.
19  Q.   Do you know why you would be copied
20  on an e-mail regarding a transfer on Friday,
21  September 19th?
22     MR. C. GREEN:  Object to the form of
23  the question to the extent it calls for
24  speculation.
25  A.   I think I was being CC'd on most

Confidential

Page 130

1    Fleming - Highly Confidential
2  cash and collateral transfers.
3      Q.  Going back to Exhibit 301B, the top
4  e-mail references an 800 number asking if it
5  should be included in the reconciliation or
6  unencumbered number that's being generated on
7  September 21st.
8      Do you know if the 800 is a
9  reference to the Friday transfer?
10     MR. C. GREEN:  Object to your
11  characterization of the e-mail.  The e-mail
12  speaks for itself.
13     You may answer.
14     A.  I do not know whether the 800
15  referenced in 301B is the same 800 referenced
16  in 303B.
17     Q.  Do you know if the 800 referenced in
18  301B was, in fact, included in the
19  reconciliation resulting in an unencumbered
20  asset number?
21     MR. C. GREEN:  Object to the form of
22  the question.
23     A.  I do not know.
24     Q.  As one of the functions of the
25  collateral -- cash and collateral management

Page 131

1    Fleming - Highly Confidential
2  group, did the group deal with the margin
3  requirements -- withdrawn.
4      Is the cash and collateral
5  management group responsible for monitoring
6  margin requirements of the exchanges?
7      A.  The cash and collateral management
8  team was responsible for satisfying the
9  requirements at certain exchanges.
10     Q.  And which exchanges are those?
11     A.  I can't say with precision, but I
12  believe the FICC, the NBSCC, the OCC.  That's
13  all I can recall right now.  There may have
14  been -- I don't know whether -- I don't recall
15  whether the futures exchanges were included,
16  like the CME or the CBOT.  I don't recall
17  whether those were included or not.
18     Q.  And could you explain to me the
19  process by which your group would handle margin
20  to those exchanges?
21     MR. C. GREEN:  Object to the form.
22     A.  We would receive the margin
23  statement from the exchange each morning and we
24  would then either withdraw or place additional
25  collateral with the exchange.

Page 132

1    Fleming - Highly Confidential
2      Q.  Do you know if any of the margin
3  posted to the exchanges was transferred over to
4  Barclays?
5      MR. C. GREEN:  Object to the form.
6      A.  I don't know for certain what
7  happened with the exchanges.
8      (Exhibit 304B, e-mail dated
9  September 17, 2008, Bates stamped 10306758,
10  with attached spread sheet, Bates stamped
11  10306405, marked for identification.)
12     Q.  Mr. Fleming, you have before you
13  what has been marked as Exhibit 304B.  Please
14  take a moment to review.
15     (Document review.)
16     Q.  Have you had an opportunity to
17  review?
18     A.  One more minute.
19     (Document review.)
20     A.  Okay.
21     Q.  Is the attachment to Exhibit 304B a
22  spread sheet that is generated in the normal
23  course of business?
24     MR. C. GREEN:  Object to the form.
25     A.  I believe the answer to that is no.

Page 133

1    Fleming - Highly Confidential
2  The cash and collateral management team had a
3  schedule for the exchanges that they were
4  responsible for funding.  The futures team
5  within operations was responsible for funding a
6  whole host of other margin exchanges.  I think
7  primarily international exchanges.  I believe
8  that this report is one that was created in and
9  around that week of the 15th for us to try to
10  get a consolidated view as to what all of our
11  exchange margin was.
12     Q.  If you would turn your attention to
13  the second page of the attachment to
14  Exhibit 304B, lines 58, 59 and 60.
15     A.  Okay.
16     Q.  Regarding OCC accounts, could you
17  tell me the difference between the customer and
18  the house OCC accounts?
19     MR. C. GREEN:  You mean as reflected
20  on this exhibit or --
21     Q.  As reflected on this exhibit or if,
22  in fact, there were two separate accounts, one
23  for a customer account and one house account.
24     A.  It's my understanding that there
25  were two accounts.

Confidential

Page 134

1      Fleming - Highly Confidential
2      Q.   And could you explain to me the
3  difference between the two OCC margin accounts?
4      A.   I'm not an expert in the margin.  I
5  didn't control the OCC processing.  My
6  understanding is that the house represents the
7  proprietary positions and that the customer
8  represents customer positions or the margin
9  associated with each.
10     Q.   And would Lehman funds be used to
11 post margin to the customer margin accounts at
12 OCC?
13         MR. C. GREEN:  Object to the form of
14     the question.
15         Do you have the question in mind?
16         THE WITNESS:  Am I supposed to be
17     answering the question?
18         MR. C. GREEN:  Do you want to read
19     back the question.
20         (Record read.)
21     A.   We would use firm assets to pledge
22 to the customer requirement.  There is no
23 correlation between the customer margin and the
24 margin that's actually collected from clients,
25 because the margin treatment that we give

Page 135

1      Fleming - Highly Confidential
2  clients, such as New York Stock Exchange
3  portfolio margin treatment, allows for the
4  netting of options and other types of
5  instruments that are housed within the client's
6  account whereby the OCC is only looking at the
7  option position, so there never is a
8  correlation, so you could never locate the
9  client asset applicable to a margin -- I
10 shouldn't say never.  We couldn't.  We didn't.
11 So it was firm assets that were pledged to the
12 OCC.
13     Q.   And if you would turn your attention
14 to column F, which is entitled IM Excess
15 Deficit, could you explain for me what column F
16 is tracking?
17     A.   IM stands for initial margin, which
18 is determined by the exchange.
19     Q.   If there is an excess under IM
20 excess deficit, is the excess available to be
21 returned to Lehman?
22     A.   I believe so.
23     Q.   If you turn your attention to
24 column H of Exhibit 304B, the column is headed
25 Exchange Margin Available.

Page 136

1      Fleming - Highly Confidential
2      Do you have any understanding as to
3  the meaning of the numbers in that column?
4      A.   I don't know.
5      Q.   And do you know if the excess margin
6  in the OCC customer and house accounts, which
7  can be found in lines 58, 59 and 60, were
8  growing on the 16th as opposed to the numbers
9  on the 15th if you turn to the fourth page of
10 the attachment and look at the same lines 58,
11 59 and 60?
12         MR. C. GREEN:  Object to the form of
13     the question.
14     Q.   Because of any particular event?
15     A.   I'm not sure I'm looking at the
16 right thing.  So the second --
17     Q.   So page 2 of the attachment, lines
18 58 through 60, and then page 4 of the
19 attachment to Exhibit 304B, lines 58 through
20 60.
21     A.   And which columns?
22     Q.   I'm sorry, column K on page 4.
23     A.   So column F is the equivalent of
24 column K?  Is that what --
25         MS. CARRERO:  Off the record.

Page 137

1      Fleming - Highly Confidential
2      (Discussion off the record.)
3         MS. CARRERO:  Withdraw the pending
4     question.
5  BY MS. CARRERO:
6      Q.   Mr. Fleming, are you aware of excess
7  margin growing in the margin accounts at OCC
8  over the week of September 15th?
9         MR. C. GREEN:  Object to the form of
10     the question.
11     A.   I would say that I was -- nothing
12 stood out or nothing was brought to my
13 attention as it related to issues with -- let
14 me rephrase that.  I was not aware of issues
15 with a growing amount of excess in the
16 accounts, so I think it's fair to say that
17 there was always some amount of excess in the
18 accounts.  I also think it's fair to say that
19 there was a tremendous amount happening during
20 that time frame, not only as it relates to, you
21 know, positions that we were trading in or
22 clients were trading in, but the market in
23 general.  So the volatility of, you know, the
24 positions, not the positions but the value of
25 those positions, was very, very significant, so

Confidential

Page 138

1    Fleming - Highly Confidential
2    the fact that we had excess there doesn't come
3    as a surprise.
4        Q.   If there is excess in the account,
5    does that suggest any volatility in the market
6    was in Lehman's favor in aggregate?
7          MR. C. GREEN:  Object to the form.
8        A.   I wouldn't draw any conclusion like
9    that.  All I am saying is there was, you know,
10   unprecedented volatility in the marketplace.
11       Q.   Could you explain to me how the
12   margin accounts at an exchange like OCC work in
13   tandem with the position accounts?
14         MR. C. GREEN:  Object to the form.
15       A.   I cannot describe to you the
16   calculation of margin at the exchanges that
17   they perform.  I don't know what that
18   calculation consists of.
19       Q.   Could you explain to me how the
20   margin account is related to any account
21   holding exchange-traded derivatives?
22         MR. C. GREEN:  Object to the form.
23       A.   There is a margin calculation based
24   on the positions and then there is a designated
25   account whereby qualified assets need to be

Page 139

1    Fleming - Highly Confidential
2    deposited to satisfy the margin requirement.
3        Q.   So for the customer margin account
4    at OCC there would be a related account holding
5    any exchange-traded derivatives; is that
6    accurate?
7          MR. C. GREEN:  Object to the form.
8        A.   There would be customer trades that
9    correspond to the customer margin.
10         (Exhibit 305B, e-mail dated
11   September 23, 2008, Bates stamped
12   BCI-EX-(S)-000191987 through
13   BCI-EX-(S)-000191194, marked for
14   identification.)
15       Q.   Mr. Fleming, you have before you
16   what's been marked Exhibit 305B.
17       A.   Yes.
18       Q.   Do you know what this document is?
19       A.   This appears to be a statement from
20   the OCC.
21       Q.   Do you recall receiving these
22   statements on September 23rd from Susie Chen?
23       A.   Not specifically, but it shows here
24   that -- well, there is a memo here.  I don't
25   recall actually reviewing or doing anything

Page 140

1    Fleming - Highly Confidential
2    with these statements.
3        Q.   Do you recall attending a meeting
4    regarding OCC margin around September 23rd?
5        A.   I don't.  There were a lot of
6    meetings happening at the time and I didn't --
7    I wasn't actively managing the day-to-day
8    business, the detail, so it's likely that
9    someone else would have been attending those
10   meetings who was more familiar with the
11   details.
12       Q.   Do you have any idea of who would
13   have been attending those meetings?
14         MR. C. GREEN:  Object to the form of
15   the question.  When you say "those
16   meetings," you mean this particular meeting
17   you are referring to or --
18         MS. CARRERO:  Mr. Fleming said that
19   it was likely that somebody else would have
20   been attending those meetings who was more
21   familiar with the details.  I am asking him
22   to clarify who those individuals might have
23   been.
24         MR. C. GREEN:  He said there were a
25   lot of meetings.

Page 141

1    Fleming - Highly Confidential
2        Q.   Particularly with respect to OCC
3    margin, who, if not you, would have attended
4    any meetings taking place on the issue?
5        A.   It's conceivable that Craig Jones
6    may have attended the meeting you are
7    referencing.
8        Q.   And at this point on September 23rd
9    are you employed by Lehman or are you employed
10   by Barclays at this point?
11         MR. C. GREEN:  Object to the form.
12       A.   I don't know.  I don't know.
13       Q.   Do you recall if at any point during
14   the week of September 15 you received an offer
15   of employment from Barclays?
16       A.   I recall receiving an offer of
17   employment.  I don't recall what day it was
18   that that occurred.
19       Q.   Do you recall how you received that
20   offer of employment?
21       A.   I received a phone call from
22   Mr. Lowitt advising me that Barclays would like
23   to hire me.
24       Q.   And do you recall if you received a
25   written offer following Mr. Lowitt's call?

Confidential

## Page 142

1        Fleming - Highly Confidential
2        A.   I did.
3        Q.   Do you recall if you received both
4   an e-mail as well as a letter?
5        A.   I do recall that there was e-mails
6   sent out to a number of individuals within my
7   team, some of which received e-mails for
8   employment, others did not.  I don't recall
9   when that e-mail was distributed or the date
10   that I received the call from Mr. Lowitt.  I'm
11   not sure which one occurred first.
12        (Exhibit 306B, e-mail dated
13   September 22, 2008, Bates stamped 10295071,
14   marked for identification.)
15        (Exhibit 307B, letter dated
16   September 22, 2008, Bates stamped
17   BCI-EX-00077308 through BCI-EX-00077310,
18   marked for identification.)
19        Q.   Mr. Fleming, you have before you
20   what's been marked as Exhibits 306B and 307B.
21   Are these the acceptance and offer of Barclays
22   employment that you recall?
23        A.   This is the contract that I signed.
24        MR. C. GREEN:  And you are referring
25   to Exhibit 307B?

## Page 143

1        Fleming - Highly Confidential
2        A.   307B.
3        Q.   And turning to the signature page,
4   do you recall if you signed it on September
5   27th, 2008?
6        A.   I believe I received it on a Friday.
7   I don't know whether that was the 27th of
8   September or not.
9        Q.   The letter is dated September 22nd.
10   Do you recall if you received it closer to the
11   22nd or around the time that you signed on the
12   27th?
13        MR. C. GREEN:  Object to the form of
14   the question.  I believe his answer was he
15   received it on a Friday, he thinks.
16        Q.   Turning your attention to
17   Exhibit 306B, which is dated September 22nd,
18   Eastern Standard Time 8:27 a.m., do you recall
19   having accepted employment at Barclays by means
20   of this e-mail at that time?
21        A.   Monday would have been -- I guess
22   based on this e-mail, yes, I accepted at this
23   time.
24        Q.   And turning back to 307B, your offer
25   letter, does this letter accurately reflect the

## Page 144

1        Fleming - Highly Confidential
2   terms of your employment at Barclays?
3        A.   Yes, it appears so.

REDACTED

## Page 145

1        Fleming - Highly Confidential

**REDACTED**

8        MR. C. GREEN:  Just for the record,
9   I would like to assure Mr. Fleming that we
10   have an agreement that the entire
11   transcript is to be designated highly
12   confidential under the protective order,
13   including this testimony about
14   compensation, and then the parties will
15   revisit that as necessary within a week.
16        That comports with your
17   understanding, doesn't it, Kelly?
18        MS. CARRERO:  Yes.
19        Q.   Going back to what has been marked
20   as Exhibit 305B, does the review of your offer
21   and acceptance of Barclays employment refresh
22   your recollection whether as of September 23rd
23   you were already an employee of Barclays?
24        MR. C. GREEN:  Do you understand the
25   question?

Confidential

Page 146

1      Fleming - Highly Confidential
2         THE WITNESS:  No.
3         MR. C. GREEN:  Do the documents you
4   just looked at refresh your recollection
5   that as of the 23rd you were or were not an
6   employee of Barclays?  Do they change your
7   recollection as to that question?
8      A.   Not 305B.
9      Q.   You can answer the question without
10  305B.  My question is as of September 23rd had
11  you begun employment with Barclays?
12     A.   It would appear, yes, that as of the
13  22nd of September is when I accepted the offer
14  of employment from Barclays.
15     Q.   And looking at 305B, can you walk me
16  through some of the information on the OCC
17  account statements starting with the account
18  information in the left-hand corner, the first
19  being OCC 00074 C.
20        MR. C. GREEN:  Is there a question?
21     Q.   Do you know if this is the OCC
22  customer account we had discussed with
23  reference to Exhibit 304B?
24     A.   Again, I'm not -- I didn't deal with
25  these statements on a day-to-day basis.  It

Page 147

1      Fleming - Highly Confidential
2   would appear to me based on my read of this
3   document at this time that the second page to
4   305B is representative of the 074 customer
5   account.
6      Q.   The second page being tier account
7   074 F, as in Frank?
8      A.   That would appear to me to be 074
9   firm, which I will make a leap of faith is
10  equivalent to what is also described as house.
11     Q.   And 074 C, which I have as the first
12  page of the exhibit, of the attachment to the
13  exhibit, would be the customer?
14        MR. C. GREEN:  Object to the form.
15     Q.   Is that correct?
16     A.   That's what it would appear to be at
17  this time, yes.  Again, I was not the
18  individual who was managing this process, nor
19  reviewing these documents on a day-to-day
20  basis.
21        (Exhibit 308B, e-mail dated
22  September 25, 2008, Bates stamped
23  BCI-EX-(S)-00011649 through
24  BCI-EX-(S)-00011651, marked for
25  identification.)

Page 148

1      Fleming - Highly Confidential
2      Q.   Mr. Fleming, you have before you
3   what has been marked as Exhibit 308 B.  Please
4   take a moment to review.
5         (Document review.)
6      A.   Okay.
7      Q.   Mr. Fleming, do you recall learning
8   at some point that all the margin previously
9   posted to the OCC with respect to accounts
10  number 74, 84 and 273 would be transferred to
11  Barclays?
12        MR. C. GREEN:  Object to the form of
13     the question.
14     A.   I recall at the time that there was
15  some ambiguity and uncertainty as to the status
16  of the OCC accounts.  It was something that I,
17  you know, was not actively engaged in.
18     Q.   Do you know who would have been
19  actively engaged in any ambiguity regarding the
20  OCC accounts?
21        MR. C. GREEN:  Object to the form of
22     the question.  I think you mischaracterized
23     his testimony.  I don't think he was
24     stating that people were actively engaged
25     in an ambiguity, but perhaps he was.

Page 149

1      Fleming - Highly Confidential
2         Do you have the question in mind,
3   Mr. Fleming?
4      A.   It is possible that some of the
5   others listed on this e-mail may, in fact, have
6   more information, who could provide more
7   clarity around some of the discussions that
8   were going on at that time.  I do know that
9   there was a significant amount of
10  reconciliation that was going on at that time.
11  I believe that there was an option expiration
12  date on Friday, I believe it was the 19th, and
13  again, you know, our books and records were
14  not -- you know, were not reconciled.  There
15  was a lot of effort to try and figure out,
16  again, what our positions were at close of
17  business the 19th.
18     Q.   Do you recall being asked for any
19  information about the margin amounts in the
20  accounts on the 19th or prior to the 22nd in
21  order to transfer additional value to Barclays?
22        MR. C. GREEN:  Object to the form.
23     A.   I recall there being a lot of
24  questions around the OCC, broadly.
25     Q.   Could you give me examples of the

Confidential

Page 150

1    Fleming - Highly Confidential
2  type of questions being asked about the OCC?
3      A.   There were questions that were being
4  asked as to, you know, what our requirements
5  were, you know, what collateral was posted.
6  The status of the accounts in terms of, you
7  know, were they active, were they not active.
8  Who had ownership of the accounts.  Were they a
9  Lehman account, were they a Barclays account.
10 The individuals that I had spoken to were back
11 office people similar to myself who were not
12 party to any discussions around agreements that
13 had been made, so...
14     Q.   Around what time were these
15 questions about the OCC accounts being made?
16     MR. C. GREEN:  Mr. Fleming, I just
17     want to caution you that if there were any
18     inquiries of you from counsel for Barclays,
19     lawyers for Barclays about these issues or
20     any other issues, those inquiries should be
21     left out of your testimony, because they
22     are privileged.
23     MS. CARRERO:  We are talking prior
24     to the 22nd at this point.
25     MR. C. GREEN:  I thought you were

Page 151

1    Fleming - Highly Confidential
2  asking about the week of the 22nd after
3  Mr. --
4      Q.   I am currently asking about when
5  these questions about the OCC accounts arise,
6  which I believe your prior testimony indicates
7  it was around the 19th, but I would like to
8  clarify exactly when these discussions are
9  taking place.
10     MR. C. GREEN:  Let me just make
11     clear for the record then I would like for
12     you to not testify about any discussions
13     you had after you became a Barclays
14     employee with lawyers for Barclays about
15     the OCC or anything else.
16     That said, you can go ahead and
17     answer the question to the extent you are
18     able to do so.
19     So your question is about before the
20     22nd is the question that's pending?
21     Q.   My question pending is regarding
22 questions being asked about the OCC accounts.
23 When do those questions begin to arise?
24     A.   I can't say for certain.  I think
25 post -- post the 19th.

Page 152

1    Fleming - Highly Confidential
2      Q.   That weekend prior to the closing of
3  the sale to Barclays?
4      A.   I don't know when the sale closed.
5  I don't know the term --
6      Q.   Prior to your becoming an employee
7  at Barclays?
8      A.   I can't say.  I can't say when.  I
9  mean, there was many, many questions about many
10 different topics.  Certainly in the week
11 leading up to the 19th close of business, you
12 know, we were just trying to get a handle on
13 what the positions were, what was happening and
14 so forth.  You know, subsequent to that then
15 after the SIPC bankruptcy there were questions
16 around reconciliation and other things like
17 that.
18     Q.   Going back to Exhibit 305B, if we
19 could go to the third page of the attachment,
20 do you know what the M after account 074 stands
21 for?
22     A.   I believe the M stands for market
23 maker.
24     Q.   And how is the market maker account
25 different from the customer and house accounts?

Page 153

1    Fleming - Highly Confidential
2      A.   I don't know.
3      Q.   Do you know how account 74 differs
4  from account 84 which starts on the next page
5  of the attachment to Exhibit 305B?
6      MR. C. GREEN:  Object to the form.
7      A.   I don't.
8      Q.   Same question with respect to
9  account 273, which begins a couple of pages
10 later in the attachment to 305B?
11     MR. C. GREEN:  I'm sorry, I don't
12     see that in the copy that I have.  Oh, 273.
13     I'm sorry.  I have it now.
14     Q.   I am referencing the page that's
15 Bates stamped BCI-EX-(S)-00019193 which has
16 account 273.
17     A.   I don't know what 273 C is
18 representative of.
19     Q.   And looking at the information on
20 any of these pages in the attachment, could you
21 explain to me the excess deficit line and the
22 meaning of it?
23     MR. C. GREEN:  Object to the form.
24     The meaning of the line on each of these
25     pages?

Confidential

Page 154

1        Fleming - Highly Confidential
2        MS. CARRERO:  Yes.
3        A.   No.  Again, I was not dealing with
4    these statements on a day-to-day basis.  It
5    would be speculation for me to provide an
6    explanation on what that line item actually
7    means.
8        Q.   So it's your testimony that you are
9    unaware of what at the time these statements
10   are sent on September 23 the excess margin in
11   any of the three accounts, 074, 084 and 273,
12   with respect to both customer and firm accounts
13   were at that time?
14        MR. C. GREEN:  Object to the
15   question.  I think it mischaracterizes his
16   testimony.
17        You may answer.
18        A.   I cannot say with certainty what the
19   figures represent.
20        Q.   But my question is a little
21   different.  Are you aware of there having been
22   excess in any of the OCC margin accounts
23   reflected on these statements as of September
24   23rd?
25        MR. C. GREEN:  Object to the form.

Page 155

1        Fleming - Highly Confidential
2        Do you have that question in mind,
3    Mr. Fleming?  That's a different question.
4        A.   I am trying to interpret that.  Can
5    you repeat that one more time?  I'm sorry.
6        MS. CARRERO:  Can you.
7        (Record read.)
8        A.   At the time I don't recall being
9    aware of the fact that there was, you know,
10   excess in the amount of the figures listed in
11   this document.
12        Q.   Did you later become aware that
13   there were excess in the accounts at OCC?
14        A.   I don't recall it being, you know,
15   an issue that was brought to my attention.
16        Q.   We should be wrapping up.  The last
17   questions I wanted to ask you were about your
18   current employment.
19        Are you currently employed by
20   Barclays?
21        A.   Yes.
22        Q.   And what is your position there?
23        A.   I am the U.S. head of treasury
24   operations.
25        Q.   And what are your duties as U.S.

Page 156

1        Fleming - Highly Confidential
2    head of treasury operation?
3        A.   They are similar to that of the
4    function performed at Lehman as described in
5    the early part of this interview.
6        Q.   And who do you report to?
7        A.   I report to Fraser MacKenzie, who is
8    the global head of treasury operations.
9        Q.   And did you receive by the date
10   indicated in your offer letter, which was
11   Exhibit 307B, the compensation enumerated
12   therein that was to be paid in February 2009?
13        A.   The 2008 guaranteed cash bonus, yes.
14        MS. CARRERO:  Give me five minutes.
15        (Recess was taken from 3:57 to
16   4:07.)
17        MS. CARRERO:  Mr. Fleming, I think
18   we are done for the day.  I am going to
19   pass along the deposition to Hughes
20   Hubbard, counsel for the SIPA trustee.
21   EXAMINATION BY
22   MR. ROTHMAN:
23        Q.   Good afternoon.
24        A.   Good afternoon.
25        Q.   My name is Seth Rothman.  We met

Page 157

1        Fleming - Highly Confidential
2    earlier.  I represent the trustee that's been
3    appointed to liquidate LBI under the SIPA
4    statute.
5        I'd like to follow up and ask you a
6    few questions about the transaction between
7    Barclays and Lehman Brothers by which Barclays
8    purchased certain assets of LBI.  Do you know
9    the transaction that I mean?
10        A.   Again, as previously stated, I
11   wasn't party to any of those conversations
12   surrounding the asset purchases.
13        Q.   Understood, but as you sit here
14   today, you are aware that there was in
15   September of 2008 a deal by which Barclays
16   purchased certain assets of Lehman Brothers;
17   right?  I just want to make sure we are on the
18   same page.
19        A.   Yes, I am aware that there was a
20   purchase.
21        Q.   Okay.  And you have told us already
22   that you had no involvement in negotiating that
23   deal; correct?
24        A.   That is correct.
25        Q.   And I think you said that as best

Confidential

Page 158

Fleming - Highly Confidential

1    you can recall you learned of that deal when it
2    was announced in the press. Is that true?
3    A.   I believe that to be the case.
4    Q.   And you have never seen a copy of
5    the Asset Purchase Agreement?
6    A.   I don't believe so.
7    Q.   Does the term "Clarification Letter"
8    mean anything to you?
9    A.   I've heard it used, but it doesn't
10   mean anything to me.
11   Q.   Have you ever seen a copy of the
12   Clarification Letter?
13   A.   Not that I'm aware of.
14   Q.   You said that you have seen it used?
15   A.   I've heard it.
16   Q.   While you were at Lehman Brothers?
17   A.   I don't remember when, but it
18   probably was when I was with Barclays. I don't
19   recall the term "Clarification Letter" being
20   used when it was still Lehman.
21   Q.   Do you recall the context in which
22   it came up?
23   A.   I don't.
24   Q.   Do you remember who mentioned it to

Page 159

Fleming - Highly Confidential

1    you?
2    A.   I don't.
3    MR. C. GREEN:  Give me a minute to
4    object.
5    THE WITNESS:  Sorry.
6    MR. C. GREEN:  Not that his
7    questions aren't great, but...
8    Q.   While you were still at Lehman did
9    you have any understanding of the economics of
10   the deal?
11   A.   No.
12   Q.   You didn't know what Barclays was
13   going to be paying in the deal?
14   A.   I knew what everyone else knew
15   publicly. The timing of that, whenever that
16   came out in the press.
17   Q.   What did you learn when you saw it
18   in the press? You say you knew what everybody
19   else new publicly, so tell me what you knew.
20   MR. C. GREEN:  Object to the form.
21   A.   That Barclays had purchased Lehman
22   Brothers' North American investment banking
23   operations.
24   Q.   Did you have any knowledge with

Page 160

Fleming - Highly Confidential

1    respect to what they were paying for those
2    operations?
3    MR. C. GREEN:  Object. Asked and
4    answered.
5    A.   I don't recall the exact amount. I
6    believe it was a billion and three quarters or
7    something to that effect, I think.
8    Q.   Did you have any understanding of
9    what assets Barclays was going to be getting?
10   MR. C. GREEN:  You mean -- excuse
11   me. Do you mean other than he obtained
12   from the press?
13   Q.   At all. While you were at Lehman
14   did you have any understanding of what assets
15   Barclays was going to be getting in the deal?
16   A.   While at Lehman? I don't believe
17   so, no.
18   Q.   Did you have any understanding about
19   what liabilities Barclays might be assuming as
20   part of the deal?
21   A.   While at Lehman Brothers?
22   Q.   While you were at Lehman Brothers.
23   A.   I don't believe so, no.
24   Q.   After you left Lehman Brothers and

Page 161

Fleming - Highly Confidential

1    joined Barclays, did you learn any of these
2    things?
3    MR. C. GREEN:  Object to the form.
4    A.   There is certainly rumors and
5    hearsay, but I cannot confirm, because there
6    was not a source that was providing me this
7    information who was close enough to the actual
8    negotiation or details to provide that
9    information.
10   Q.   Do you have anything particular in
11   mind that you were referring to when you say
12   that there were rumors that you heard?
13   A.   The building, 745 Seventh Avenue,
14   was part of the deal, it came along with the
15   operations. There was the I guess what would
16   be considered furniture, fixtures, technology,
17   that all was part of the deal.
18   Q.   Anything else that you heard?
19   A.   It was rumored that there was
20   liabilities associated with compensation that
21   went along with the purchase agreement.
22   Q.   Anything else?
23   A.   Not that I can recall.
24   Q.   While you were at -- I think I know

Confidential

Page 162

1        Fleming - Highly Confidential
2    the answer to this, but while you were at
3    Lehman Brothers I take it you never saw any
4    kind of balance sheet or scorecard showing the
5    assets and the liabilities that would be
6    involved in the deal?
7        MR. C. GREEN:  Object to the form.
8        Asked and answered.
9        A.   No.
10        Q.   Did you ever hear there was a court
11    hearing relating to the deal?
12        A.   While an employee at Lehman?
13        Q.   At any time.
14        MR. C. GREEN:  Putting aside if you
15        will, please, what you have learned solely
16        from counsel.
17        A.   The question is was I aware that
18    there were --
19        Q.   Did you ever hear anything about a
20    court hearing relating to the deal?
21        A.   I read about that in the paper.
22        Q.   After it happened?  It's not a trick
23    question.
24        A.   After it happened they talked about
25    there needing to be follow-up with Judge Peck

Page 163

1        Fleming - Highly Confidential
2    and bankruptcy court, things of that nature.
3        Q.   While you were at Lehman did you
4    have an understanding that the bankruptcy court
5    needed to approve the deal?
6        A.   I was aware of that at some point,
7    but I don't know exactly when that was.
8        Q.   Let's change topics and talk a
9    little bit more about the 15C3 calculation.
10        (Exhibit 309B, e-mail dated
11    9-20-2008, marked for identification.)
12        Q.   I will mark as Exhibit 309B an
13    e-mail string.  It's three pages long.  The top
14    e-mail is an e-mail from you to Emil Cornejo,
15    among other people, and it's dated Saturday,
16    September 20th, 2008.
17        MR. C. GREEN:  Take your time,
18        Mr. Fleming, to read the entire string.
19        Q.   Feel free to read the entire e-mail.
20    I am only going to ask you about the top e-mail
21    on the first page.
22        (Document review.)
23        A.   Okay.
24        Q.   Who is -- first of all, do you
25    recall sending this e-mail to Mr. Cornejo?

Page 164

1        Fleming - Highly Confidential
2        A.   Yes, I do.
3        Q.   And who is Mr. Cornejo?
4        A.   Mr. Cornejo worked in the creditor
5    relations group within the treasury
6    organization at Lehman Brothers.
7        Q.   Do you remember why you e-mailed
8    Mr. Cornejo?
9        A.   We were attempting to get a contact
10    at Wells Fargo.
11        Q.   And this was the $1 billion in cash
12    that was at Wells Fargo?
13        MR. C. GREEN:  Object to the form of
14        the question.
15        A.   We were seeking a contact at Wells
16    Fargo in relation to the 1 billion deposit of
17    cash that we had with them for 15C3.
18        Q.   Wells Fargo had a money market
19    account; correct?
20        MR. C. GREEN:  Object to the form.
21        A.   I don't recall the form of it.  15C3
22    can take many forms.  It's possible that we had
23    a money market fund.
24        Q.   Do you recall there was an MMDA
25    account at Wells Fargo?

Page 165

1        Fleming - Highly Confidential
2        A.   That sounds right.  That sounds
3    right.
4        Q.   And you write to Mr. Cornejo:  "We
5    have the SEC prepared to support our request."
6    Do you see that?
7        A.   Yes, I do.
8        Q.   Why are you telling that to
9    Mr. Cornejo?
10        A.   I guess because Wells had indicated
11    that they would not release funds.
12        Q.   Do you need the SEC to authorize the
13    release of these funds?
14        A.   The SEC, in particular Mike
15    Macchiaroli, was working alongside of us in the
16    days prior to bankruptcy, so it is not unusual
17    here for me to be referencing the SEC.  They
18    were on site.  Mr. Macchiaroli was up from
19    Washington.  He was in our offices.  We were
20    liaising with them on a daily basis.  That is
21    not usual.  It's very unusual.  They had a
22    staff of people in our building.
23        Q.   The 15C3 funds were locked up for
24    the protection of customers; correct?
25        A.   That is correct.

Confidential

Page 166

1         Fleming - Highly Confidential
2       Q.   Do you ordinarily need the
3    permission of the SEC to release funds from
4    those accounts?
5       A.   No.
6       Q.   Did you need permission from the SEC
7    at this point in time, September 20th?
8       A.   I don't recall what the outcome of
9    this was. I do know that Wells Fargo had
10   indicated to us that they would not be able to
11   release funds upon our request.
12      Q.   I think you said you thought that
13   was because of the bankruptcy filing?
14      MR. C. GREEN:   Object to the form.
15   I'm not certain he did say that.
16      MR. ROTHMAN:   That's why I am
17   asking.
18      A.   Can you repeat the question.
19      Q.   Do you have any understanding or
20   knowledge as to why Wells Fargo wasn't
21   releasing those funds?
22      MR. C. GREEN:   Apart from what's
23   indicated in this e-mail?
24      Q.   As you sit here today.  Do you
25   remember why it was that the funds weren't

Page 167

1         Fleming - Highly Confidential
2    released?  Did you ever hear a reason for that?
3       A.   Yes.  I am trying to recall what was
4    said.  I do believe that it was in reference
5    to, you know, SIPC and/or, you know, bankruptcy
6    filing.
7       Q.   Did you hear that from somebody?
8       A.   I believe I heard that from somebody
9    from Wells.
10      Q.   Do you remember who?
11      A.   I do not.
12      Q.   Okay, you can put that document to
13   the side.
14          Let me ask you to dig out of your
15   pile the exhibit that was marked as Exhibit 177
16   at a prior deposition.  The first e-mail is
17   from Alastair Blackwell to a group of people.
18      A.   All right.
19      Q.   If you turn to the top of the second
20   page -- of course, feel free to look back over
21   the entire string, if you need to, but I am
22   only going to ask you about the e-mail at the
23   top.  This is from Paolo Tonucci to you.  He
24   tells you: "Mike Macchiaroli has agreed to
25   release and there is a letter to provide to

Page 168

1         Fleming - Highly Confidential
2    them."  Do you see that?
3       A.   Yes, I do.
4       Q.   And do you recognize Mike
5    Macchiaroli as the Mike at the SEC?
6       A.   Yes, I do.
7       Q.   Did you ever see a letter from him
8    relating to the release of the funds at Wells
9    Fargo?
10      A.   I don't recall seeing a letter.
11      Q.   Did you follow up with Wells Fargo
12   regarding the release of those funds?
13      A.   I don't believe I did.
14      Q.   Do you know if anybody did?
15      A.   I don't recall.
16      MR. ROTHMAN:   You can put that
17   document to the side.
18          Let me mark as the next exhibit it
19   will be an e-mail from Paolo Tonucci.  It's
20   a string.  The top e-mail is from
21   Mr. Tonucci to you and Anthony Savoca.
22   Just for the record, the Bates stamp on the
23   first page is 19297.
24      (Exhibit 310B, e-mail dated
25   September 23, 2008, Bates stamped

Page 169

1         Fleming - Highly Confidential
2    BCI-EX-(S)-00019297 and
3    BCI-EX-(S)-00019298, marked for
4    identification.)
5       MR. C. GREEN:   Take your time.
6       (Document review.)
7       THE WITNESS:   Okay.
8       Q.   The first e-mail in the string is
9    from Anthony Savoca to -- the e-mail is
10   addressed to Mr. Burke, you, and I assume
11   that's Mr. Stucchio.  Is that correct?
12      A.   That's correct.
13      Q.   And also to Mr. Tonucci?
14      A.   Yes.
15      Q.   Mr. Savoca actually addresses the
16   text of the e-mail to Mr. Burke; correct?
17      A.   That's what it appears.
18      Q.   Who is Bill Burke?
19      A.   Mr. Burke worked in the regulatory
20   team at Lehman Brothers.
21      Q.   That's the same team as
22   Mr. Stucchio?
23      A.   That is correct.
24      Q.   Do you see in the first line of his
25   e-mail Mr. Savoca refers to a conversation that

Confidential

Page 170

1       Fleming - Highly Confidential
2    took place that morning, and my only question
3    to you about that is were you -- did you
4    participate in that conversation?
5       A.   I don't recall participating in that
6    conversation.
7       Q.   Do you recall having any
8    conversations with Mr. Savoca regarding the
9    15C3 customer and PAIB reserve bank accounts?
10      A.   I do not.
11      Q.   Do you see in Mr. Savoca's e-mail to
12   Mr. Burke, which is then -- he then forwards on
13   to you and Mr. Fleming, he writes: "LBI is in
14   SIPC liquidation and based upon that no moneys
15   and/or securities may be removed from the
16   above-stated reserve bank accounts without the
17   approval of Mr. John Gibbons, the SIPC trustee
18   for LBI." Do you see that?
19      A.   Yes, I do.
20      Q.   Was that your understanding at this
21   time?
22      MR. C. GREEN:  The time being
23   September 23rd?
24      MR. ROTHMAN:  Correct.
25      A.   Yes.

Page 171

1       Fleming - Highly Confidential
2       Q.   Even though he writes "Mr. John
3    Gibbons," I will represent to you that the
4    trustee is actually named Jim Giddens.  Did you
5    know that?
6       A.   Yes, I did.
7       MR. ROTHMAN:  You can put that
8    aside, Mr. Fleming.  We will move on.
9       Mark as the next exhibit a
10   multi-page document.  It's an e-mail from
11   Kendall McLaughlin to Alex Crepeau and
12   Alastair Blackwell at the top and there is
13   an attachment.  The Bates number on the
14   first page is 4061.
15      Q.   Mr. Fleming, you can take as much
16   time as you need to look through this.  I am
17   going to mostly ask you about the e-mail, but I
18   will have a couple of questions about the
19   attachment.
20      (Exhibit 311B, e-mail dated
21   September 23, 2008, Bates stamped
22   BCI-EX-(S)-00004061 and
23   BCI-EX-(S)-00004062, with attached Lehman
24   Brothers, Inc. Customer/PAIB Reserve
25   Analysis, marked for identification.)

Page 172

1       Fleming - Highly Confidential
2       (Document review.)
3       A.   Okay.
4       Q.   On the cover page there is an e-mail
5    from Bill Burke to Mr. Stucchio and a number of
6    people to which you are a CC; is that correct?
7       A.   Yes.
8       Q.   This is on Monday, September 22nd?
9       A.   That's what it appears, yes.
10      Q.   Do you recall receiving this
11   particular e-mail from Mr. Burke?
12      A.   This doesn't stick out in memory.
13      Q.   You see he starts off by telling
14   everyone that: "The following are the latest
15   results for our customer and PAIB reserve
16   calculations as of September 19th." Then he
17   gives some figures, and beneath the figures he
18   notes: "The following assumptions or open
19   issues are relevant to the above calculations."
20   Do you see number 1 there?
21      A.   Yes.
22      Q.   Okay.  That talks about an MTS
23   computation not including 42 billion
24   overdrafts with Chase.
25      Can you tell me what an MTS

Page 173

1       Fleming - Highly Confidential
2    computation is?
3       A.   MTS is a system.
4       Q.   And the information in that system
5    is part of the 15C3 computation?
6       A.   I'm not responsible for the comp,
7    nor are my people responsible for the comp, so
8    I can't answer that definitively.
9       Q.   It says: "The internal records
10   reflect a book credit and those of Chase are
11   inconclusive." Do you understand what that
12   means?
13      A.   I believe so.
14      Q.   What does that mean to you?
15      A.   It means that the internal records
16   reflect a book credit and the information Chase
17   was providing to us was inconclusive, that they
18   were erratic and unreliable.
19      Q.   The next sentence says: "Dan
20   Fleming and Paolo" -- that's Mr. Tonucci;
21   correct?
22      A.   I would assume so, yes.
23      Q.   "Had represented that these amounts
24   should represent secure financing and are
25   probably not an overdraft with the bank," and

Confidential

Page 174

1    Fleming - Highly Confidential
2  then this parentheses it says "overdrafts are a
3  formula credit item," close parentheses.
4        As you sit here today, do you have
5  any recollection of making a representation
6  along these lines?
7    A.   I explained to -- and I don't know
8  who it was, it may have been Mr. Stucchio, it
9  may have been Mr. Burke.  I explained to people
10 that we had taken out a $32 billion loan with
11 JPMorgan Chase on Thursday, close of business
12 Thursday, the 18th, which wound up being early
13 morning Friday, and that Friday morning Chase
14 locked us out of their systems and stopped
15 communicating with us.  What happened on Friday
16 at Chase, I could not tell you what happened,
17 because I did not have access to that
18 information, and that was my description of the
19 events.  The 42 number, I told him I don't know
20 how you get to 42.  I know a number of -- I'm
21 sorry, it was 23.  Approximately 23 is what I
22 told him.
23     MR. C. GREEN:  So you are saying
24 instead of 32 it was 23?
25   A.   It wasn't 32, it was 23, that's

Page 175

1    Fleming - Highly Confidential
2  correct.
3    Q.   So Thursday night, just so we are
4  clear, LBI obtained a $23 billion loan from
5  JPMorgan Chase?
6    A.   That was my understanding,
7  approximately 23 billion.
8    Q.   How do you know that?  Were you
9  involved in obtaining that loan?
10   A.   Yes.
11   Q.   What did you do?
12   A.   I requested a loan from JPMorgan
13 Chase.
14   Q.   Why did you do that?
15   A.   Because we were short cash.
16   Q.   Short for a particular purpose or
17 just in general?
18   A.   I wouldn't describe it as a purpose.
19 I would say that there were some events that
20 led to that, being short cash, long collateral
21 position.
22   Q.   Did somebody ask you to obtain this
23 loan from Chase?
24   A.   Requesting loans from Chase was part
25 of the responsibilities of the cash and

Page 176

1    Fleming - Highly Confidential
2  collateral management team at the end of the
3  day after we balanced and we figured out what
4  our position was, if there was a shortfall, we
5  would request a loan.  If there was excess,
6  then there were some other options that we had
7  available to us to earn a return on that cash.
8    Q.   Did you have to pledge any
9  collateral in exchange for this approximately
10 $23 billion loan?
11   A.   Yes, there was collateral that was
12 pledged.
13   Q.   Do you recall the value of that
14 collateral or the amount of that collateral?
15   A.   I recall it was right around the
16 amount that we needed, the cash that we needed.
17   Q.   And what was the nature of that
18 collateral?  Securities?
19   A.   Securities.
20   Q.   Were they proprietary securities of
21 LBI?
22   A.   I think that that's a fair
23 description, although without knowing the
24 detail, you know, I couldn't answer that, you
25 know, definitively.

Page 177

1    Fleming - Highly Confidential
2     MR. C. GREEN:  Mr. Rothman, I'm
3  sorry to interrupt, do you think that we
4  could take a short break?  I don't want
5  to --
6     MR. ROTHMAN:  Absolutely.
7     MR. C. GREEN:  I just want to take a
8  short break to check with the witness about
9  a clarification that I am uncertain of.
10    MR. ROTHMAN:  Okay.
11    MR. C. GREEN:  And then we will be
12 right back.
13    (Recess was taken from 4:45 to
14 4:50.)
15 BY MR. ROTHMAN:
16   Q.   Mr. Fleming, I understand you want
17 to clarify one of your prior answers.  Is that
18 right?
19   A.   Yes.
20   Q.   Go ahead and do that.
21   A.   I had previously stated that I had
22 made a request to JPMorgan Chase for a loan in
23 the amount of 23 billion.  That request was
24 denied.  I was told that we could not have a
25 loan for $23 billion.  I proceeded to explain

Confidential

Page 178

Fleming - Highly Confidential
1  to JPMorgan Chase how we wound up being short
2  $23 billion and long $23 billion of collateral,
3  which was basically two things. One, was that
4  7 billion of assets had not been transferred
5  over to Barclays and subsequently Lehman
6  Brothers had not been paid $7 billion. Second
7  was that there was a $15 billion repo that had
8  been on the prior day that came off that we
9  were unaware of until we balanced in the early
10  morning of Thursday close of business. The
11  combination of those two events caused us to be
12  short cash $23 billion long collateral.
13  JPMorgan decided that they were going to book
14  what's called a held-in-custody repo for
15  $15 billion between Lehman Brothers, Inc. and
16  Barclays Capital, and that they were going to
17  represent that the money due from Barclays
18  failed. Then they would book a $7 billion loan
19  with Lehman. That is how we closed out the
20  night.
21        The next morning when we got on a
22  conference call with everyone, with Barclays,
23  with Lehman, with JPMorgan, the first order of
24  business that JPMorgan wanted to get to was to

Page 179

Fleming - Highly Confidential
1  discuss the $15 billion money fail and the
2  held-in-custody repo. Barclays advised that
3  they were not aware of that trade and were not
4  honoring that trade, at which point Chase
5  disabled our access to their systems and
6  stopped communicating with us.
7        It is my understanding, and I don't
8  recall how I obtained this understanding, that
9  JPMorgan Chase subsequently cancelled that HIC
10  repo trade between Lehman Brothers, Inc. and
11  Barclays and booked it as a loan with Lehman
12  getting us to the 23 billion loan. Now --
13     Q.   That's the 15 billion piece?
14     A.   I'm sorry?
15     Q.   The HIC loan is the 15 billion
16  piece?
17     A.   Yes. I cannot confirm to you today
18  that that is what JPMorgan reflects on their
19  books and records as what occurred on the
20  evening of Thursday the 18th, but that is what
21  I believe to be the events of that day.
22     Q.   You mentioned in that answer that
23  $7 billion in assets had not been transferred
24  over to Barclays.

Page 180

Fleming - Highly Confidential
1     A.   Yes.
2     Q.   That was on Thursday night, the
3  18th?
4     A.   Yes.
5     Q.   Was the $7 billion in cash meant to
6  be a replacement for those 7 billion assets
7  that did not go on the 18th?
8        MR. C. GREEN: Object to the extent
9     it calls for speculation, but you may
10     answer, if you know.
11     A.   I'm not sure which 7 billion of
12  assets, what the underlying assets were, but
13  it's my understanding that 7 billion of
14  assets -- an additional 7 billion of assets
15  would have moved over and Lehman Brothers, Inc.
16  would have received $7 billion in cash.
17     Q.   If you turn back to Exhibit 311B.
18  We were talking about Mr. Burke's comment about
19  whether the 42 billion, according to him,
20  represented secure financing and probably not
21  an overdraft with the bank, and I think you
22  said you had discussions about this, you
23  couldn't recall whether it was with Mr. Burke,
24  but when you had discussions on this, did you

Page 181

Fleming - Highly Confidential
1  represent the significance of whether the money
2  was a secured financing or an overdraft to the
3  C3 calculation?
4        MR. C. GREEN: Object to the form of
5     the question.
6     A.   I explained the events as I knew
7  them. It was not my role to be making a
8  determination of those events as it relates to
9  the computation of the 15C3 reserve
10  requirements.
11     Q.   Did you know at the time you were
12  making -- the time you were giving the
13  explanation that you were giving, did you know
14  that overdrafts are not a formulaed credit
15  item?
16        MR. C. GREEN: Object to the form of
17     the question.
18     Q.   Just basically asking you if that is
19  something that you would have known.
20     A.   They are a formula credit.
21     Q.   And is that something that you --
22     A.   I was aware of that fact, yes.
23     Q.   If you look at the bottom of that
24  e-mail, Mr. Burke writes: "Senior staff at

Confidential

Page 182

1      Fleming - Highly Confidential
2   both the SEC and FINRA have stated that the
3   firm cannot withdraw any funds or securities
4   from the reserve accounts without their staff
5   reviewing the calculation and their approval."
6   Do you see that?
7      A.   Yes, I do.
8      Q.   Did you have that understanding at
9   or around September 23rd, 2008?
10     A.   I believe so, yes.
11     Q.   If you would take a look at the
12  first page of the attachment, the top left-hand
13  corner of the document notes that it's a draft
14  as of 7:00 p.m.
15       Is this document the type of
16  document or form that you were familiar with?
17     A.   This is not a document that I
18  produced.  It is, I believe, a document
19  produced by the regulatory group.
20     Q.   But you received documents that look
21  like this?
22     A.   I may have.
23     Q.   Do you recognize this to be an
24  analysis of the 15C3 reserves?
25     A.   It would appear to be, yes.

Page 183

1      Fleming - Highly Confidential
2      Q.   And it's divided into the customer
3   portion and the PAIB portion; correct?
4      A.   Yes.
5      Q.   And then across the top it compares
6   the amounts reserved on 9-17-08 in the second
7   column; correct?
8      A.   Yes.
9      Q.   To the amounts that they are
10  calculating for 9-19-08 in the first column?
11     A.   That's what it appears, yes.
12     Q.   So if you go down to the very
13  bottom, the total segregated, they are saying
14  that there is a $1.4 billion variance between
15  9-17 and 9-19.  Is that how you understand this
16  document?
17     A.   For PAIB, that's what it appears to
18  be.
19     Q.   I think the last line actually
20  aggregates the PAIB and the customer.
21     A.   Okay.
22     Q.   Now, if you look in the middle of
23  the column under the customer portion and then
24  under ADP, there is an entry for OCC
25  proprietary qualified collateral.  Do you see

Page 184

1      Fleming - Highly Confidential
2   that?
3      A.   Yes, I do.
4      Q.   Do you know what that is?
5      A.   I can't say for certain.  I have
6   some general thoughts.
7      Q.   What are those thoughts?
8      MR. C. GREEN:  Object to the extent
9   it calls for speculation.
10     A.   This would -- you know, again,
11  Mr. Burke and/or the individuals producing this
12  document are probably best to describe, you
13  know, what each one of these different
14  categories represents.  I don't want to
15  speculate.
16     Q.   Do you think this relates to the OCC
17  margin deposit?
18     A.   Again, I'd be speculating if I
19  answered that question.
20     Q.   Do you know if a portion of the OCC
21  margin deposit is able to be counted toward the
22  reserve requirement under 15C3?
23     MR. C. GREEN:  Object to the extent
24  it calls for a legal conclusion.
25     You can answer, if you know.  Do you

Page 185

1      Fleming - Highly Confidential
2   have the question in mind?
3      THE WITNESS:  I'm sorry, are you
4   waiting for me?
5      MR. C. GREEN:  I think there is a
6   question pending.
7      Q.   The question was do you know if a
8   portion of the OCC margin deposit is able to be
9   counted toward the reserve requirement under
10  15C3 and counsel objected to the extent that
11  that called for a legal conclusion.  We were
12  waiting for you to give your understanding.
13     A.   I think that in certain cases
14  collateral posted to the OCC would be counted
15  as a debit in the formula.
16     Q.   You testified previously that your
17  group would sometimes withdraw funds from the
18  OCC margin deposits; correct?
19     A.   Correct.
20     Q.   Do you know if you are able to
21  withdraw funds from the OCC margin deposit that
22  are counted towards the C3 requirement?
23     MR. C. GREEN:  Object to the extent
24  it calls for a legal conclusion.
25     You may answer, if you know.

Confidential

Page 186

1      Fleming - Highly Confidential
2      A.   The withdrawal or addition of margin
3  to the OCC was done, you know, without any
4  involvement with the reserve formula.
5      Q.   Would the people in your group
6  compare the OCC margin requirements with the
7  amounts that the regulatory department would
8  post with customer margin in the 15C3
9  calculation?
10     A.   No.
11         MR. ROTHMAN:  Mark as Exhibit 312B
12     an e-mail from Mr. Tonucci to Mr. Jones.
13     You are a CC on the e-mail and it's got a
14     Bates stamp 21746.
15         (Exhibit 312B, e-mail dated
16     September 27, 2008, Bates stamped
17     BCI-EX-(S)-00021746, with attached OCC
18     Summary, marked for identification.)
19         (Document review.)
20     Q.   Have you had a chance to look over
21  the document?
22     A.   Yes.
23     Q.   So the bottom e-mail on the page
24  Mr. Jones writes to Mr. Tonucci with a copy to
25  you and Richard Golaszewski.

Page 187

1      Fleming - Highly Confidential
2      Q.   Can you tell me who Richard
3  Golaszewski is?
4      A.   Richard is an analyst who worked for
5  Craig.
6      Q.   This is Friday, September 26.  Are
7  you now at Barclays or are you still at Lehman?
8      A.   I think based on the -- I think
9  Barclays at that point.
10     Q.   Is Mr. Golaszewski a Barclays
11  employee?
12     A.   Yes, he is.
13     Q.   And did Mr. Jones also move from
14  Lehman to Barclays?
15     A.   Yes, he did.
16     Q.   When you were at Lehman, were you an
17  employee of LBHI, LBI, or both?
18         MR. C. GREEN:  Object to the extent
19     it calls for a legal conclusion.
20     Q.   What did you consider yourself; do
21  you know?
22     A.   I don't remember what my pay stub
23  said.  I don't remember.
24     Q.   Did you distinguish between the
25  different Lehman entities?

Page 188

1      Fleming - Highly Confidential
2         MR. C. GREEN:  You mean as an
3     employee or --
4         MR. ROTHMAN:  Yes.
5     A.   For what purpose?
6     Q.   Withdrawn.
7         So Mr. Jones writes to Mr. Tonucci,
8  copying you and Mr. Golaszewski, and attaching
9  a summary of the OCC margin requirements and
10  associated collateral postings, and he writes:
11  "I have a call in to regulatory to reconcile
12  the 500 million they have posted for customer
13  margin in the 15C3 calculation versus the 336
14  million we reflect at the exchange."  Do you
15  see that?
16     A.   Uh-huh, yes.
17     Q.   When you got this e-mail, did you
18  know what Mr. Jones was referring to when he
19  wrote that?
20     A.   I don't recall this e-mail
21  specifically.
22     Q.   Are you still doing the 15C3
23  calculation for 9-19 at this point in time?
24         MR. C. GREEN:  Object to the form.
25     Q.   By "you" I mean the people at the

Page 189

1      Fleming - Highly Confidential
2  regulatory group that did that.
3     A.   I don't know at this point in time,
4  the 26th of September, where the regulatory
5  group was in terms of their calculations.
6     Q.   Do you know if there was ever a
7  final calculation for 9-19?
8     A.   I don't know for certain.  I would
9  assume so.
10     Q.   Did you hear that there were
11  difficulties in doing that calculation?
12         MR. C. GREEN:  Object to the form.
13     Do you mean the final calculation that he
14     is uncertain about?
15         MR. ROTHMAN:  No, the 9-19
16     calculation that we saw a draft of a few
17     documents ago.
18     A.   It is my understanding that there
19  were difficulties in reconciling everything.
20  There is a lot of information that feeds into
21  the reserve formula, so if there is general
22  reconciliation issues, it's going to impact the
23  reserve calculation.
24     Q.   When you refer to general
25  reconciliation issues, those are the issues you

Confidential

Page 190

1       Fleming - Highly Confidential
2   have already told us about?
3       A.   Yes.
4       Q.   It was difficult to see certain
5   data, is that one of the problems?
6       A.   Yes, information that in normal
7   course would be fed in electronically into our
8   systems, processes would be run and
9   reconciliations would be automatically
10  generated, those files were not sent in.  Those
11  automatic reconciliations didn't occur.  I'm
12  not even sure whether they are done reconciling
13  9-19 today.
14      Q.   Do you know if the issue that
15  Mr. Jones raises in his e-mail was ever
16  reconciled?
17      A.   I don't.
18      Q.   If you look at the first page of the
19  attachment to Mr. Jones' e-mail, it's an OCC
20  summary.  The first page.  And under the
21  customer -- the top box is Lehman Brothers
22  positions.  Do you see that?
23      A.   Yes.
24      Q.   And in the customer column he has
25  got treasuries and there is a figure of 336.20.

Page 191

1       Fleming - Highly Confidential
2       A.   Yes.
3       Q.   Do you know if that's the 336
4   million he refers to -- Mr. Jones refers to in
5   his e-mail?
6       A.   I don't know for certain.  I don't
7   know that.
8       Q.   Are treasuries qualified securities
9   under 15C3; do you know?
10      A.   I believe so, yes.
11          MR. ROTHMAN:  Let me show you what I
12      am going to mark as Exhibit 313B, an e-mail
13      from Mr. Tonucci to a number of people and
14      you are shown as a carbon copy.
15          Mr. Fleming, feel free to read
16      through the entire e-mail string.  I am
17      only going to ask you about the first
18      e-mail in the string, which is from Martin
19      Kelly to Mr. Lowitt and others.
20          For the record, the first page of
21      the exhibit is Bates stamped 3945.
22          We will withdraw that exhibit.  Just
23      for the record, we are going to withdraw
24      that exhibit because it had some
25      handwritten annotations on it that our team

Page 192

1       Fleming - Highly Confidential
2   had -- meaning the Hughes Hubbard team had
3   added to the document.  We will move on to
4   the next one.
5          We will mark as Exhibit 313B an
6   e-mail from Mr. Tonucci to Mr. Blackwell,
7   Mr. Fleming and Mr. Ullman and Mr. Dorogoff
8   with a Bates stamp of 4784.
9          (Exhibit 313B, e-mail dated October
10      1, 2008, Bates stamped BCI-EX-(S)-00004784,
11      marked for identification.)
12      Q.   This e-mail is dated October 1 of
13  2008.  Do you recall receiving this from
14  Mr. Tonucci?
15      A.   It doesn't stick out as a memorable
16  e-mail.
17      Q.   Do you know what this e-mail relates
18  to?
19      A.   I believe so.
20      Q.   What do you believe it relates to?
21      A.   I believe this relates to a customer
22  who has purchased securities on margin that has
23  requested an account transfer to another
24  broker.
25      Q.   What was the issue with the

Page 193

1       Fleming - Highly Confidential
2   collateral that had been pledged against the
3   debt?
4          MR. C. GREEN:  Object to the form.
5       A.   I don't know whether there was an
6   issue.  I think this was a question.
7       Q.   What was Mr. Tonucci asking?  Do you
8   have any understanding of what he was trying to
9   determine?
10          MR. C. GREEN:  Object to the form.
11      Calls for speculation.
12      A.   I believe he was asking whether BCI
13  gets reimbursed for the margin loan when an
14  account is transferred to another broker.
15      Q.   This is the margin loan that BCI
16  would have made to its customer as opposed to
17  the margin deposit that BCI would post at the
18  OCC?
19      A.   I believe this is in reference to
20  Reg T margin.
21      Q.   Do you know what a clearing fund
22  deposit is?  Does that phrase have any meaning
23  to you?
24      A.   Yes.
25      Q.   What is that?

Confidential

Page 194

1      Fleming - Highly Confidential
2      A.   My understanding is it's an initial
3  deposit that is made to support the clearing
4  activities of the customer.
5      Q.   Who makes the deposit?
6      A.   The firm that holds the account with
7  the clearing org.
8          MR. ROTHMAN:  Let's mark as
9      Exhibit 314B an e-mail from Mr. Tonucci to
10     you dated September 21st, 2008.
11         (Exhibit 314B, e-mail dated 9-21-08,
12     marked for identification.)
13     Q.   The second e-mail on the page is
14  from you to Mr. Tonucci, the subject is cash,
15  and you ask: "Can we look to the 1 billion
16  Citi CLS clearing deposit in LBI as a source of
17  funds for Barcap."
18     Do you recall sending this e-mail to
19  Mr. Tonucci?
20     A.   Yes, I do.
21     Q.   Can you tell me why you were asking
22  him this question?
23     A.   I was asking him what the status of
24  this -- what is described in here as a clearing
25  deposit with Citibank.

Page 195

1      Fleming - Highly Confidential
2      Q.   Was it a clearing deposit at
3  Citibank?
4      A.   I don't believe that it would fall
5  under the technical definition of a clearing
6  deposit. This was a mandated additional
7  deposit that we had to make in the days leading
8  up to bankruptcy.
9      Q.   Mandated by Citi?
10     A.   That's correct, Citi as our CLS
11  settlement agent.
12     Q.   What does CLS stand for?
13     A.   It stands for continuous linked
14  settlement, which is a foreign exchange netting
15  facility.
16     Q.   And there is 1 billion -- I'm sorry.
17  This additional deposit that you -- withdrawn.
18         This additional deposit was in the
19  amount of a billion dollars; is that right?
20     A.   That's correct.
21     Q.   And is it property that's held to
22  secure obligations under the exchange-traded
23  derivatives?
24         MR. C. GREEN:  Object to the extent
25     the question calls for a legal conclusion.

Page 196

1      Fleming - Highly Confidential
2      You may answer.
3      A.   It was my understanding that this
4  additional $1 billion of cash was to protect
5  Citibank against the intra-day exposures
6  associated with fails in the foreign exchange
7  market.
8      Q.   You are asking Mr. Tonucci if it
9  could be a source of funds for Barcap. Why are
10  you asking him that particular question?
11     A.   I was aware of the fact that there
12  was a shortfall of some sort as it related to
13  the transfer and, you know, as a result, a
14  reconciliation process was initiated to try to
15  locate unencumbered assets and, in my opinion,
16  if we had settled our obligations with
17  Citibank, this would constitute an unencumbered
18  asset.
19     Q.   By the transfer you mean the
20  transfer that occurred on the Thursday, the
21  20th?
22     A.   Yes.
23     Q.   The transfer of securities to
24  Barclays in exchange for the loan that came
25  back to --

Page 197

1      Fleming - Highly Confidential
2          MR. C. GREEN:  I object to the form.
3      A.   Well, let me rephrase that. I
4  don't -- I did not know whether it was specific
5  to that transfer. I was aware of a general
6  shortfall, but I was not advised of the details
7  behind it and what it pertained to.
8      Q.   Mr. Tonucci writes back to you: "We
9  have put them on this."
10         Do you know what he meant by that?
11         MR. C. GREEN:  Object to the form.
12     Calls for speculation.
13     A.   I'm not sure what that means.
14     Q.   Did LBI get the 1 billion clearing
15  deposit released from Citi?
16         MR. C. GREEN:  Object to the extent
17     it mischaracterizes his testimony. I think
18     he said it was not a true clearing deposit.
19         MR. ROTHMAN:  But his e-mail calls
20     it a clearing deposit. I don't want to
21     quibble.
22     Q.   Did you get this $1 billion deposit
23  back from Citi?
24     A.   Not to my knowledge.
25     Q.   Do you know what happened to that

Confidential

Page 198

1        Fleming - Highly Confidential
2    $1 billion deposit?
3        A.    No, I do not.
4        Q.    This is a document that was marked
5    at a prior deposition as Exhibit 182.
6            As always, Mr. Fleming, feel free to
7    look through the whole thing.  I am only going
8    to ask you questions about the bottom-most
9    e-mail on the page.
10            (Document review.)
11        A.    Okay.
12        Q.    The bottom e-mail is from
13    Mr. Tonucci to you and Mr. Azerad dated
14    Saturday, September 20, 2008.
15            Do you recall receiving this e-mail
16    from Mr. Tonucci?
17        A.    I don't recall this.
18        Q.    The subject of the e-mail is the
19    non-actionable box.  I apologize if you have
20    already explained this to us, but could you
21    tell me what that is?
22            MR. C. GREEN:  Object to the form.
23        A.    In the normal course of business the
24    non-actionable box represented assets that
25    could not be financed.

Page 199

1        Fleming - Highly Confidential
2        Q.    Does the non-actionable box refer to
3    a specific depository?
4        A.    No.
5        Q.    And so the assets that cannot be
6    financed could be in various places; is that
7    correct?
8        A.    That is correct.
9        Q.    And Mr. Tonucci is saying some may
10    be in the DTC box which may be mixed up with
11    the tri-party pledge on Thursday.  Do you see
12    that?
13            MR. C. GREEN:  Object to the form of
14        the question.
15        A.    I see that.
16        Q.    Do you know what that means or what
17    it means to you?
18        A.    That means that -- my interpretation
19    of this is that we wanted to confirm that
20    JPMorgan Chase didn't seize more assets than
21    they were entitled to as a result of the box
22    loan.
23        Q.    Are you saying that JPMorgan was
24    trying to determine whether JPMorgan seized
25    more assets than they were entitled to from the

Page 200

1        Fleming - Highly Confidential
2    DTC box?
3            MR. C. GREEN:  Object to the form.
4        A.    The way that this typically works is
5    that your assets at DTC are pledged to JPMorgan
6    for purposes of JPMorgan uploading them into
7    their system to be available as collateral for
8    financing transactions, so it is conceivable
9    that we pledged over more assets than what we
10    had financed and that Chase could have
11    conceivably seized those assets.
12        Q.    I am going to show you what's been
13    marked in a prior deposition as Exhibit 152B.
14            MR. C. GREEN:  Rothman, do you have
15        any idea how much longer you expect to be?
16            MR. ROTHMAN:  I have one left after
17        this.
18            MR. C. GREEN:  One exhibit?
19            MR. ROTHMAN:  Yes.
20        Q.    Have you had a chance to look at
21    Exhibit 152B?
22        A.    Yes.
23        Q.    The e-mail at the bottom is from
24    Mr. Tonucci to Mr. Hraska copying you and
25    Mr. Blackwell.  Do you see that?

Page 201

1        Fleming - Highly Confidential
2        A.    Yes, I do.
3        Q.    Mr. Tonucci tells Mr. Hraska: "You
4    should plan on moving all the unencumbered
5    collateral in the DTC box first thing."
6            Do you have any understanding of
7    what Mr. Tonucci is telling Mr. Hraska to do
8    here?
9            MR. C. GREEN:  Object to the extent
10        it calls for speculation.
11        A.    I do not know the location to which
12    he is referring to in terms of moving the
13    collateral.
14        Q.    Underneath he writes: "Should
15    correspond as closely as possible to list
16    agreed with Barclays over the weekend."
17            I was going to ask you if you knew
18    what the list is or was.
19        A.    I don't know what the list was.  I
20    can tell you that people were seizing
21    collateral left, right and center.  DTC, Chase,
22    just about everybody.  We were very mindful of
23    that.  Not only our securities, but our cash
24    positions too were being seized by the banks
25    and there was an effort to try to safeguard

Confidential

Page 202

1      Fleming - Highly Confidential
2    some of those assets. I'm not sure whether
3    this was in reference to that, whether they
4    were trying to put it into a location that we
5    knew wouldn't be seized by any of the creditors
6    or any of the banks or anything like that. I
7    just don't -- I don't know -- I don't recall
8    what he is referencing in this.
9          MR. ROTHMAN: Let's mark as
10     Exhibit 315B an e-mail from you to
11     Mr. Tonucci dated September 21, 2008.
12        (Exhibit 315B, e-mail dated
13     9-21-2008, marked for identification.)
14        (Document review.)
15        THE WITNESS: Okay.
16     Q.   The first e-mail in the string you
17    write to Mr. Tonucci: "The statement from the
18    OCC reflects a large excess position in house
19    and customer. House has excess of 444 million
20    and customer 244. I do not know how accessible
21    this is." Do you see that?
22     A.   Yes, I do.
23     Q.   When you wrote "I do not know how
24    accessible this is," what did you mean?
25     A.   I believe what I was referring to

Page 203

1      Fleming - Highly Confidential
2    was that if there was a request to access that
3    excess margin, I don't know whether we would
4    have been able to execute against that request.
5     Q.   Why don't you know that?
6          MR. C. GREEN: Object to the form of
7     the question.
8          THE WITNESS: Answer?
9          MR. C. GREEN: Oh, yes, you can go
10     ahead and answer. I'm sorry.
11     A.   Because of the uncertainty at that
12    point. That was Sunday night after we filed
13    for bankruptcy. There was a tremendous amount
14    of uncertainty in every aspect of what we were
15    doing.
16     Q.   Are you telling me that there was
17    uncertainty as to whether there was, in fact, a
18    large excess position in house and customer?
19     A.   I think there was uncertainty as to
20    why there was excess that much.
21     Q.   Is that unusual for there to be
22    excess of that much?
23     A.   I think in normal course that may be
24    considered a lot of excess in the account. As
25    I had stated earlier, that excess was a normal

Page 204

1      Fleming - Highly Confidential
2    event, but I would say that 600, 700 million of
3    excess was a lot.
4     Q.   Is there an amount of excess in the
5    ordinary course that you try to keep in the
6    account?
7          MR. C. GREEN: Object to the form of
8     the question.
9     A.   There was not a target amount that
10    we kept as excess. We didn't have a target
11    amount.
12     Q.   I think you testified before that
13    there were ambiguities regarding the OCC margin
14    deposit around this time? Do you recall that?
15     A.   Yes, I do.
16     Q.   Was one of the ambiguities over who
17    would own the excess margin amount?
18          MR. C. GREEN: Object to the form of
19     the question.
20     A.   No, that was not something that --
21    that was not a question posed to me. That was
22    not something that I was dealing with.
23     Q.   What did you mean by "ambiguities"?
24     A.   What I meant was there was
25    unreconciled positions. There was an option

Page 205

1      Fleming - Highly Confidential
2    expiration on that Friday. That, again, we
3    were locked out of our systems. Our books and
4    records weren't updated and reflected properly.
5    Not just as it relates to OCC, but across the
6    board in, I would say, every asset class.
7     Q.   I think you testified earlier that
8    there were uncertainty about whether certain
9    accounts were LBI's or Barclays'. Do you
10    recall that?
11     A.   Was this in relation to what, to the
12    OCC?
13     Q.   That's my next question.
14     A.   Okay. I don't remember what that
15    comment --
16     Q.   What the context was for that
17    comment?
18          MR. C. GREEN: I don't remember that
19     comment, not to volunteer information,
20     but...
21     Q.   I mean, I will just ask you. Around
22    this time period that we have been talking
23    about, the weekend of September 20th, 21st,
24    22nd, was there any uncertainty as to any
25    accounts, whether they were owned at that point

Confidential

Page 206

1      Fleming - Highly Confidential
2   by LBI or whether they were going to be owned
3   by Barclays?
4        MR. C. GREEN: You are asking him
5      was he uncertain or was there uncertainty
6      generally?
7        MR. ROTHMAN: Did he hear about any
8      uncertainty.
9      A.   There was uncertainty. Okay. The
10  terms of the agreement had not been
11  communicated, to my knowledge, to anyone in the
12  back office. The status of our DTC accounts,
13  the status of our Chase accounts, the status of
14  our OCC accounts or, for that matter, any other
15  margin exchange was not clear to us.
16     Q.   Did you ever hear that the DTC was
17  concerned about LBI's open positions, who was
18  going to fund the fails?
19     A.   I recall there being some
20  discussions as it related to the DTC.
21     Q.   What do you recall about that?
22     A.   There were concerns, I believe,
23  about the NSCC positions that were due to
24  settle. I don't -- I'm not, you know, an
25  expert in the mechanics of NSCC and the

Page 207

1      Fleming - Highly Confidential
2   relationship between NSCC and DTC, but I
3   believe there were some concerns around that
4   set of activity.
5      Q.   Whose concerns? You are talking
6   about Lehman having concerns or are you talking
7   about the clearing agencies having concerns?
8      A.   I thought it was the DTC themselves.
9      Q.   Do you know what those concerns
10  were?
11     A.   I don't know the specific details of
12  exactly what their concerns were.
13     Q.   Do you know generally what their
14  concerns were?
15     A.   I believe it had to do with NSCC
16  trades that were due to settle post bankruptcy.
17     Q.   Was there a concern about whether
18  those trades actually would settle?
19     A.   Again, that's the general concern
20  that I was aware of, but the detailed specifics
21  behind it either I wasn't made aware of or I
22  can't remember at this point.
23        MR. ROTHMAN: Thank you,
24  Mr. Fleming. That's all the questions I
25  have.

Page 208

1      Fleming - Highly Confidential
2        MR. C. GREEN: Does anyone else have
3   any questions?
4        MS. CARRERO: We are done.
5        MR. C. GREEN: I might have one or
6   two questions. I just need to look at the
7   transcript.
8   EXAMINATION BY
9   MR. C. GREEN:
10     Q.   Mr. Fleming, can you get
11  Exhibit 314B.
12     A.   Yes.
13     Q.   Do you remember Mr. Rothman asking
14  you about the 1 billion Citi CLS clearing
15  deposit that is referenced in that exhibit? Do
16  you remember he asked you some questions about
17  that?
18     A.   Yes.
19     Q.   Do you remember you testified that
20  "it was my understanding that this additional 1
21  billion of cash was to protect Citibank against
22  the intra-day exposures associated with fails
23  in the foreign exchange markets," do you recall
24  that testimony?
25     A.   Yes.

Page 209

1      Fleming - Highly Confidential
2      Q.   Was that amount deposited with
3   Citibank as collateral?
4      A.   That was collateralizing the
5   intra-day exposure that Citibank had as
6   settlement agent for Lehman Brothers, Inc.
7        MR. C. GREEN: I don't have any
8   further questions.
9        MR. ROTHMAN: Nothing further for
10  me.
11        MS. CARRERO: Nothing further.
12        MR. WHITMER: No questions.
13        (Time noted: 5:57 p.m.)
14
15
16        ---------------------
17        DANIEL JOSEPH FLEMING
18
19  Subscribed and sworn to before me
20  this      day of           2009.
21
22  --------------------------------------
23
24
25

Confidential

## Page 210

```
 1
 2                C E R T I F I C A T E
 3
 4   STATE OF NEW YORK  )
 5                      ) ss.:
 6   COUNTY OF NASSAU   )
 7
 8        I, KRISTIN KOCH, a Notary Public
 9   within and for the State of New York, do
10   hereby certify:
11        That DANIEL JOSEPH FLEMING, the
12   witness whose deposition is hereinbefore
13   set forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of
20   this matter.
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 28th day of August, 2009.
23        -------------------------
24              KRISTIN KOCH, RPR, RMR, CRR, CLR
25
```

## Page 211

```
 1
 2   -----------I N D E X----------
 3
     WITNESS      EXAMINATION BY      PAGE
 4
     DANIEL JOSEPH FLEMING    MS. CARRERO    6
 5
 6              MR. ROTHMAN   156
 7              MR. C. GREEN  208
 8   ----------EXHIBITS----------
 9   NUMBER              PAGE LINE
10
     Exhibit 294B
11   E-mail dated September 15, 2008,
     Bates stamped 10302690, and Chase
12   Tri-Party Haircut Summary Bates
     stamped 10308382...... ... .... 40  21
13
     Exhibit 295B
14   E-mail dated 9-18-2008.............. 64  3
15   Exhibit 296B
     E-mail dated September 18, 2008,
16   Bates stamped 10303223.. .......... 69  7
17   Exhibit 297B
     E-mail dated 9-18-2008............. 72  18
18
     Exhibit 298B
19   E-mail dated 9-21-2008.. ........... 74  6
20   Exhibit 299B
     E-mail dated 9-19-2008..... .. ... 89  19
21
     Exhibit 300B
22   E-mail dated September 23, 2008,
     Bates stamped BCI-EX-(S)-00019269
23   and BCI-EX-(S)-00019270 .. ... ... 111  25
24   Exhibit 301B
     E-mail dated September 21, 2008,
25   Bates stamped 10307085 ... ...... 123  19
```

## Page 212

```
 1
 2   -----------EXHIBITS----------
 3
 4   NUMBER              PAGE LINE
 5   Exhibit 302B
     E-mail dated September 22, 2008,
 6   Bates stamped BCI-EX-(S)-00018817. . 127  9
 7   Exhibit 303B
     E-mail dated September 19, 2008,
 8   Bates stamped 465433........ .. ..... 129  6
 9   Exhibit 304B
     E-mail dated September 17, 2008,
10   Bates stamped 10306758, with
     attached spread sheet, Bates
11   stamped 10306405.... .. .. ... 132  8
12   Exhibit 305B
     E-mail dated September 23, 2008,
13   Bates stamped BCI-EX-(S)-000191987
     through BCI-EX-(S)-000191194... 139  10
14
     Exhibit 306B
15   E-mail dated September 22, 2008,
     Bates stamped 10295071.......... 142  12
16
     Exhibit 307B
17   Letter dated September 22, 2008,
     Bates stamped BCI-EX-00077308
18   through BCI-EX-00077310... ... ... 142  15
19   Exhibit 308B
     E-mail dated September 25, 2008,
20   Bates stamped BCI-EX-(S)-00011649
     through BCI-EX-(S)-00011651......... 147  21
21
     Exhibit 309B
22   E-mail dated 9-20-2008......... 163  10
23   Exhibit 310B
     E-mail dated September 23, 2008,
24   Bates stamped BCI-EX-(S)-00019297
     and BCI-EX-(S)-00019298.............. 168  24
25
```

## Page 213

```
 1
 2   --------------EXHIBITS------------------
 3
 4   NUMBER              PAGE LINE
 5   Exhibit 311B
     E-mail dated September 23, 2008,
 6   Bates stamped BCI-EX-(S)-00004061
     and BCI-EX-(S)-00004062, with
 7   attached Lehman Brothers, Inc.
     Customer/PAIB Reserve Analysis....... 171  20
 8
     Exhibit 312B
 9   E-mail dated September 27, 2008,
     Bates stamped BCI-EX-(S)-00021746,
10   with attached OCC summary........... 186  15
11   Exhibit 313B
     E-mail dated October 1, 2008, Bates
12   stamped BCI-EX-(S)-00004784.......... 192  9
13   Exhibit 314B
     E-mail dated 9-21-08................ 194  11
14
     Exhibit 315B
15   E-mail dated 9-21-2008.............. 202  12
16
17
18
19
20
21
22
23
24
25
```

Confidential

Page 214

```
1
2          ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:       In re:  Lehman Brothers
     Dep. Date:       August 28, 2009
4    Deponent:        Daniel Joseph Fleming
5          CORRECTIONS:
6    Pg. Ln.  Now Reads      Should Read     Reason
7    ___ ___  _____   _____   _____
8    ___ ___  _____   _____   _____
9    ___ ___  _____   _____   _____
10   ___ ___  _____   _____   _____
11   ___ ___  _____   _____   _____
12   ___ ___  _____   _____   _____
13   ___ ___  _____   _____   _____
14   ___ ___  _____   _____   _____
15   ___ ___  _____   _____   _____
16   ___ ___  _____   _____   _____
17   ___ ___  _____   _____   _____
18
19             _____
20             Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS____DAY OF_____, 2009.
23
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```