# A. 12 (A)

1        HIGHLY CONFIDENTIAL - J. HRASKA

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF JAMES HRASKA

14           New York, New York

15           August 14, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24039

Page 2

HIGHLY CONFIDENTIAL - J. HRASKA

1
2      August 14, 2009
3          9:25 a.m.
4
5          HIGHLY CONFIDENTIAL deposition
6  of JAMES HRASKA, held at Jones Day
7  LLP, 222 East 41st Street, LLP, New
8  York, New York, before Kathy S.
9  Klepfer, a Registered Professional
10 Reporter, Registered Merit Reporter,
11 Certified Realtime Reporter, Certified
12 Livenote Reporter, and Notary Public
13 of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

HIGHLY CONFIDENTIAL - J. HRASKA

1
2
3          A P P E A R A N C E S :
4
5  JONES DAY, LLP
6  Attorneys for Lehman Brothers, Inc.
7      222 East 41st Street
8      New York, New York  10017-6702
9  BY: WILLIAM J. HINE, ESQ.
10     GEORGE E. SPENCER, ESQ.
11
12 BOIES, SCHILLER & FLEXNER, LLP
13 Attorneys for Barclays and the Witness
14     5301 Wisconsin Avenue, N.W.
15     Washington, D.C.  20015
16 BY: JONATHAN M. SHAW, ESQ.
17
18 QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19 Attorneys for the Creditors Committee
20     51 Madison Avenue
21     22nd Floor
22     New York, New York  10010
23 BY: ERIC M. KAY, ESQ.
24
25

Page 4

HIGHLY CONFIDENTIAL - J. HRASKA

1
2
3      A P P E A R A N C E S :  (Cont'd.)
4
5  JENNER & BLOCK, LLP
6  Attorneys for the Examiner
7      330 N. Wabash Avenue
8      Chicago, Illinois  60611-7603
9  BY: DAVID C. LAYDEN, ESQ.
10
11 HUGHES, HUBBARD & REED, LLP
12 Attorneys for the SIPA Trustee
13     One Battery Park Plaza
14     New York, New York  10004
15 BY: NEIL J. OXFORD, ESQ.
16     AMINA HASSAN, ESQ.
17
18
19 Also Present:
20     RAJESH ANKALKOTI, Alvarez & Marsal
21
22
23
24
25

Page 5

HIGHLY CONFIDENTIAL - J. HRASKA

1
2  JAMES HRASKA, called as a
3      witness, having been duly sworn by a Notary
4      Public, was examined and testified as
5      follows:
6  EXAMINATION BY
7  MR. HINE:
8      Q.  Good morning, Mr. Hraska.
9      A.  Good morning.
10     Q.  We met just briefly before the
11 deposition.  My name is Bill Hine.  I'm from the
12 firm of Jones Day and we are special counsel to
13 Lehman Brothers Holdings, Inc., in connection
14 with the pending bankruptcy proceeding.  And so
15 your deposition is being taken today pursuant to
16 that discovery that we're taking in that case.
17     There's several other counsel around
18 the table who will introduce themselves as they
19 get up to take turns questioning.
20     Have you ever had a deposition taken
21 before?
22     A.  I have not.
23     Q.  So, just by way of a little ground
24 rules, I'm going to ask you a bunch of
25 questions.  You're under oath.  You're going to

Page 6

**HIGHLY CONFIDENTIAL - J. HRASKA**
1   **answer the questions.**
2
3           **On occasion, your counsel will state**
4   **an objection or, you know, make some kind of**
5   **objection for the record.  That doesn't relieve**
6   **you of the obligation to answer the question.**
7   **It's just him trying to either correct a portion**
8   **of my question or preserve an objection.**
9           **In that regard, throughout the day, I**
10  **am undoubtedly going to a misuse a word or some**
11  **kind of acronym or some technical term that you**
12  **folks use every day in your line of business**
13  **which I'm not as familiar with as you are,**
14  **obviously, so please correct me if I misuse a**
15  **word or I ask a question that's misleading in**
16  **any way or you just don't understand the**
17  **question because I would like to ask a clear**
18  **question so you can answer it.**
19          **Is that okay?**
20  A.   That's fine.  Thank you.
21       MR. SHAW:  Just before we begin,
22  again, I want to put on the record our
23  understanding that we will designate the
24  entire transcript highly confidential and
25  then we'll go back and redesignate.

Page 7

1   HIGHLY CONFIDENTIAL - J. HRASKA
2       MR. HINE:  Yes.  That's true.  That's
3   fine.
4       **Q.   One other thing before we get started,**
5   **Mr. Hraska.  I imagine you're aware that you've**
6   **been designated as what's called a 30(b)(6)**
7   **witness by your employer, by Barclays, as to**
8   **particular topics, and they relate to Schedules**
9   **A and B which we'll discuss later.  So when we**
10  **get to that portion of the deposition, I'll let**
11  **you know and we'll treat that portion as a**
12  **30(b)(6) deposition, but I'll let you know as we**
13  **get there.**
14       MR. SHAW:  Just so we're, again,
15  clear, Bill, as I think you know, he is one
16  of several witnesses who's been designated
17  as partially responsive to those particular
18  topics.
19       MR. HINE:  I understand.
20       **Q.   So, unless you have any questions, we**
21  **can get started.**
22       A.   No, I'm fine.
23       **Q.   Okay.  Can we just review briefly your**
24  **employment history with Lehman?  What was the**
25  **last position you held at Lehman?  I'm talking**

Page 8

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2   **about in the period of September 2008.**
3       A.   I was senior vice president from a
4   corporate title perspective and I managed the
5   Secured Financing Operations Group.
6       **Q.   And can you just describe for me what**
7   **that means?  What were your responsibilities and**
8   **duties in that position?**
9       A.   The Financing Operations, also known
10  as a financing middle office, is a group that
11  sits between a bunch of groups, but primarily
12  trading and sales individuals and clearance and
13  settlements folks, and we do tasks such as, you
14  know, monitoring positions, reconciling
15  differences, dealing with, you know, customer,
16  you know, concerns, bringing the attention of
17  customers' concerns to either sales staff or
18  trading staff.
19          We also deal with legal and compliance
20  and regulatory on certain matters.  If there
21  are, you know, questions or queries as to the
22  nature of the transactions, if somebody needs
23  some technical expertise on, we usually provide
24  that expertise as to the structure of the
25  transactions and things like that.

Page 9

1       HIGHLY CONFIDENTIAL - J. HRASKA
2       **Q.   And who did you report to in that**
3   **position?**
4       A.   At Lehman Brothers at the time, I was
5   reporting to Monty Forrest.
6       **Q.   Did you report directly to anyone**
7   **else?**
8       A.   No, under that structure I was a
9   direct report of Monty Forrest.
10      **Q.   And who were your direct reports?**
11      A.   My direct reports now or at the time?
12      **Q.   At the time in September of 2008.**
13      A.   Okay, my direct reports in the U.S.
14  were Nancy Denig, D-E-N-I-G, and Paul Lindner.
15      **Q.   Prior to this position -- or, let me**
16  **ask you another question.  How long were you in**
17  **this senior vice president position?**
18      A.   Approximately five to six years.  I
19  don't remember the exact date, actually.  I
20  don't remember the exact date when I got my
21  senior vice presidentship.
22      **Q.   Okay.  How long had you been in the**
23  **position of managing the secured financing?**
24      A.   It began in 2001, but it began in a
25  much smaller scale.  I only managed a portion of

Page 10

HIGHLY CONFIDENTIAL - J. HRASKA

1  it and over time it grew into a larger and
2  larger responsibility. At the point of
3  September, I was managing both equity and fixed
4  income. I was managing that globally as well.
5      Q.   Okay. When did you join Lehman?
6      A.   August of '93.
7      Q.   So you held this management position
8  since 2001, you said?
9      A.   That particular one related to
10  Financing Operations since 2001, yes.
11     Q.   What did you do before that at Lehman?
12     A.   I did a host of different roles, all
13  in derivatives-based. I worked in Derivative
14  Settlements, I worked in Derivatives Middle
15  Office, and I also worked in a Structured
16  Products and Reinsurance Middle Office as well.
17     Q.   Okay:
18     A.   And over the period of time I also
19  held management positions in those roles as
20  well.
21     Q.   When you say middle office, could you
22  just tell me what that means?
23     A.   Middle office is similar to the way I
24  described it before for financing, only it was

Page 11

HIGHLY CONFIDENTIAL - J. HRASKA

1  for derivative-related products. So same types
2  of trader inquiries, sales inquiries, customer
3  resolutions to problems, things like that.
4      Q.   Did there come a point when you left
5  Lehman and moved to Barclays?
6      A.   Yeah, I mean after the -- after the
7  declaration of bankruptcy, Barclays extended an
8  offer of employment to me, which I accepted.
9      Q.   Okay. And when did you start working
10  for Barclays, do you recall the date?
11     A.   I don't know, I can't for certain be
12  given the official date. When I started, I was
13  extended an employment contract, which I signed,
14  and I believe I signed that sometime in October,
15  but I don't know what the specific date that
16  Barclays considers me an official employee
17  versus when I stopped my Lehman employment.
18         Like I was never out of work for a
19  period of time. I mean, I continued to show up
20  every day. I'm just not sure what point in time
21  they considered me officially a Barclays
22  employee.
23     Q.   I understand. When did you consider
24  yourself to be working for Barclays?

Page 12

HIGHLY CONFIDENTIAL - J. HRASKA

1      A.   I mean, I guess I considered myself to
2  be working for Barclays in the week after the
3  declaration of bankruptcy.
4      Q.   Okay. We're going to be talking about
5  these weeks for the whole deposition, so the
6  week of September 15 is the week you're
7  referring to as the week where they declared
8  bankruptcy; is that right?
9      A.   The week is when -- September 15 is
10  when Lehman declared bankruptcy. I wasn't
11  completely confident that I was a Barclays
12  employee until I guess the week of the 22nd,
13  because I was still working, you know, with LBI
14  in the U.S. broker-dealer, so I wasn't actually
15  sure of my status at that point, to be
16  completely honest.
17     Q.   I understand. Okay. So that
18  September 22 was a Monday, correct?
19     A.   I believe so, yeah.
20     Q.   Had you had any discussions with folks
21  at Barclays prior to September 22 about the
22  possibility of you going to work for Barclays?
23     A.   No.
24     Q.   When do you recall first speaking to

Page 13

HIGHLY CONFIDENTIAL - J. HRASKA

1  anyone at Barclays about you becoming a Barclays
2  employee?
3      A.   I would say it was in that week of the
4  22nd.
5      Q.   Okay. Had you spoken to any folks at
6  Lehman prior to September 22 about the
7  possibility of you moving over and becoming a
8  Barclays employee?
9      A.   Well, wait. Could I just go back to
10  that previous question?
11     Q.   Sure.
12     A.   When I spoke on that week of September
13  22, like I had never had any employment
14  conversations with a legacy Barclays employee.
15  All my conversations were with legacy Lehman
16  employees, so either my manager, which was Monty
17  Forrest, or Alastair Blackwell.
18         So like nobody from like Barclays HR
19  had approached me or had offered me any
20  conversations prior to my conversations with my
21  legacy Lehman managers. I don't know if that's
22  important or not.
23     Q.   No, I just want to make sure we're all
24  on the same page here.

Page 14

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2        **So when you say legacy Lehman**
3    **managers, you're talking about people who were**
4    **previously employed with Lehman who may now be**
5    **employed with Barclays?**
6        A.    Yes.
7        **Q.    Okay.  So am I correct to say that,**
8    **prior to September 22, you had had no**
9    **conversations with anyone who was -- who had**
10   **always been a Barclays employee as to your**
11   **possibility of you going over working for**
12   **Barclays; is that right?**
13       A.    That's correct.
14       **Q.    So had you had conversations with**
15   **legacy Lehman employees or people who were**
16   **employed with Lehman at the time prior to**
17   **September 22 about the possibility of you going**
18   **to work for Barclays?**
19       A.    No.
20       **Q.    Okay.  Do you recall any conversations**
21   **with Mr. Forrest or anyone in your chain of**
22   **command about the possibility of you going to**
23   **work for Barclays?**
24       MR. SHAW:  Asked and answered.
25       A.    No.

Page 15

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        **Q.    Okay.  Before I forget, what is your**
3    **current position at Barclays?**
4        A.    I am in a very similar role.
5    Corporate title-wise I'm a director, which is
6    equivalent to SVP.  I manage, again, Secured
7    Financing Operations for both equities globally
8    and fixed income in North America.
9        **Q.    Is it fair to say your role is -- your**
10   **duties and responsibilities are relatively the**
11   **same as you had when you were at Lehman?**
12       A.    Responsibilities are reasonably the
13   same, not quite as extensive as they were at
14   Lehman from a global perspective.
15       **Q.    Who do you report directly to now?**
16       A.    I have a dual reporting line.  From a
17   product perspective, I still report to Monty
18   Forrest.  And Barclays is structured a little
19   bit different, so from a regional perspective, I
20   report to Alastair Blackwell.
21       **Q.    And who are your direct reports?**
22       A.    My direct reports now are still Nancy
23   Denig, Paul Lindner, and a gentleman by the name
24   of Henry Duarte, D-U-A-R-T-E.
25       **Q.    Okay.  Anyone else?**

Page 16

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2        A.    No.  Not direct reports, no.
3        (Exhibit 136B, a document bearing
4    Bates Nos. BCI-EX-00077317 through 77319,
5    marked for identification, as of this date.)
6        **Q.    Mr. Hraska, I apologize, I'm not**
7    **trying to be intrusive here, but I need to ask**
8    **you some questions about your compensation.**
9        A.    That's fine.
10       **Q.    So I'm handing you a copy of Exhibit**
11   **136B, which appears to be an agreement between**
12   **yourself and Barclays dated September 22, 2008,**
13   **and my question to you is, have you ever seen**
14   **this document before?**
15       MR. SHAW:  Take a minute to look at as
16   much of it as you need to.
17       A.    Yes, I've seen this before.
18       **Q.    What is this document?**
19       A.    This was the document offering me
20   employment at Barclays.
21       **Q.    Okay.  And is this your current**
22   **employment contract with Barclays?**
23       A.    It is, yes.
24       **Q.    Okay.  Did you sign it on September**
25   **22?**

Page 17

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2        A.    I don't believe so.
3        No, on October 2, when it's dated.
4        **Q.    Okay.  Any understanding of why it's**
5    **dated September 22, but you didn't sign it until**
6    **October 2?**
7        MR. SHAW:  Foundation.
8        A.    I have no idea.  I mean, I'm -- I
9    signed it September 22nd because that's when I
10   decided to agree to the terms.
11       **Q.    Okay.  Was there any negotiations**
12   **between you and Barclays as to the compensation**
13   **part of your employment?**
14       A.    No.
15       **Q.    Okay.  How did it take place?  Did**
16   **they just give you a copy of this letter and ask**
17   **you to sign it?**
18       A.    The letter was sent to me via
19   interoffice mail.
20       **Q.    Uh-huh.**
21       A.    It was preceded by a phone call which
22   said, you know, you're a key employee that we
23   would like to retain, we're going to be sending
24   you a letter for, you know, an offer to join
25   Barclays.  We would like you to review it and,

Page 18

1         HIGHLY CONFIDENTIAL - J. HRASKA
2    you know, if you would like to come work for us,
3    you know, accept it, which is, at the time, I
4    was happy to be offered a job, so -- with what
5    was going on in the market, so I took it.
6    **Q.   Who was that phone call from?**
7    A.   Ian Lowitt.

REDACTED

Page 19

1         **HIGHLY CONFIDENTIAL - J. HRASKA**

REDACTED

Page 20

1         **HIGHLY CONFIDENTIAL - J. HRASKA**

REDACTED

Page 21

1         HIGHLY CONFIDENTIAL - J. HRASKA

REDACTED

12   **Q.   Okay.  Stepping aside from your own**
13   **personal compensation now, throughout the period**
14   **of September -- the week of September 15 to the**
15   **22, did you have any understanding of the**
16   **compensation-related provisions embodied in the**
17   **transaction that was taking place between**
18   **Barclays and Lehman at the time?**
19   **A.   No, I did not.**
20   **Q.   Let me just take a step back and I**
21   **would like to get a little sense of your**
22   **involvement in that transaction during that**
23   **week, if you don't mind.  I'd like to just kind**
24   **of go day-by-day for a minute here just to**
25   **understand what you were involved in during that**

Page 22

**HIGHLY CONFIDENTIAL - J. HRASKA.**

week.

On September 15, 2008, when Lehman Brothers Holdings declared bankruptcy, did you have any involvement in the preparation of the filing or the preparation of any kind of bankruptcy proceedings?

A.   No.

Q.   Did you know that they were going to file bankruptcy before that Monday?

A.   No.

Q.   Did it come as a surprise to you?

A.   It was a -- it was a surprise to me, yeah. The right answer is yes.

Q.   The weekend prior to the bankruptcy filing -- and I'm talking about September 13th and 14th or so?

A.   Uh-huh.

Q.   I understand there was some discussions between Barclays and Lehman, and my question is, did you have any involvement in those discussions?

A.   No.

Q.   Did you have any knowledge that such discussions were taking place?

Page 23

**HIGHLY CONFIDENTIAL - J. HRASKA**

A.   Yes.

Q.   What had you heard about them?

A.   That there were discussions taking place and they were at the levels of Bart McDade, Dick Fuld, those types of individuals.

Q.   Fair to say you were not involved in those negotiations?

A.   Yes.

Q.   Were you called at any time during that weekend to provide information to the people who were involved in the negotiations?

A.   Could I ask you to clarify? Regarding information regarding the negotiations or information about other topics?

Q.   Well, I'm not talking about run-in-the-mill information that you would normally be dealing with, but did anyone contact you seeking information that you perceived to be involved in the negotiations?

A.   No.

Q.   Did you have any conversations with Mr. McDade or senior officers during that weekend?

A.   No.

Page 24

HIGHLY CONFIDENTIAL - J. HRASKA

Q.   Okay. Because you asked for the clarification, I just want to know, did you have some communications that your -- well, let me scratch that.

Did you provide information to anyone during that weekend as to the value of securities in Lehman's books?

A.   So let me clarify that. I provided information as to the location and availability of securities, not the value of securities.

Q.   Okay. What information did you provide?

A.   I provided lists of securities that would be eligible to place into financing transactions.

Q.   And who did you provide that to?

A.   Well, I was asked for it by my manager, which is Monty Forrest, but I believe that information was disseminated to multiple people after I provided it, so ...

Q.   You don't really know where it went after you gave it to Monty?

A.   I know that it was sent to Alastair. I know that it was sent to Paolo Tonucci. I

Page 25

HIGHLY CONFIDENTIAL - J. HRASKA

don't know beyond that where it was subsequently forwarded to.

Q.   And just so I understand what type of information, this is information about the types of securities that would be eligible to be pledged as collateral for a financing; is that right?

A.   Yes, that's correct.

Q.   Okay. And do you know what purpose that financing was to serve?

A.   Could you clarify what you mean by that?

Q.   Do you know what type of financing they were talking about?

A.   They were talking about like secured financing transactions, which are normal course for what I support, so ...

Q.   I guess my question is, you're aware that during the following week the Fed provided some financing to Lehman, correct?

A.   Right.

Q.   Were the lists that you were providing to be used towards that type of financing, do you think?

Page 26

**HIGHLY CONFIDENTIAL - J. HRASKA**

1      MR. SHAW: If you know.
2      A.  It was used -- it was to be used for
3  anybody who would provide us secured financing.
4  In the end, it ended up being the Fed, but --
5      **Q.  Did you have any understanding during**
6  **that weekend that there were discussions between**
7  **Lehman and the Fed about providing financing?**
8      A.  No, not specifically.
9      **Q.  Okay. Let's just continue through the**
10 **week briefly and then we'll come back to**
11 **different topics.**
12     **On the Monday of the 15th, were you**
13 **involved in any negotiations between Barclays**
14 **concerning the sale transaction that ultimately**
15 **took place between Barclays and Lehman?**
16     A.  No.
17     **Q.  Were you asked to provide any**
18 **information to those who were involved in those**
19 **negotiations?**
20     A.  No.
21     **Q.  Were you involved in negotiations with**
22 **the Fed about the Fed financing that was**
23 **provided during that week?**
24     A.  No.

Page 27

HIGHLY CONFIDENTIAL - J. HRASKA

1      **Q.  Were you asked to provide information**
2  **in support of that financing?**
3      A.  No.
4      **Q.  Okay. What did you do ultimately on**
5  **that Monday, if you recall?**
6      A.  A year ago?
7      **Q.  Well, it's a big day. It's an**
8  **eventful day in Lehman's history, correct?**
9      A.  It is.
10     **Q.  What do you recall doing the Monday**
11 **when Lehman Holdings filed for bankruptcy?**
12     A.  Well, I mean, I guess the first thing
13 to do was, you know, talk to my manager and ask
14 him, you know, kind of what our next steps were.
15 Do we carry on as normal, do we do something
16 different, or do we wait for further
17 instructions or, you know, basically what do we
18 do.
19     Q.  Okay.
20     A.  He advised me that we were going to
21 carry on as normal. We were, at the time, we
22 were still trying to preserve the liquidity and
23 functioning of the broker-dealer, and as far as
24 financing transactions, just to clarify, you

Page 28

HIGHLY CONFIDENTIAL - J. HRASKA

1  know, our involvement was to find collateral and
2  those -- that financing to the Fed that you
3  referred to was -- those programs are open to
4  every broker-dealer, and every broker-dealer at
5  the time -- the market was in a very, you know,
6  as you know, very turbulent situation -- every
7  broker-dealer was taking advantage of those
8  programs so it was normal course for us to
9  figure out what assets we could finance with the
10 Fed that potentially wouldn't be financeable
11 with other counterparties.
12     And that was our focus that week, was
13 to try to locate all the collateral that we had
14 available to finance that the Fed would deem
15 acceptable in their programs.
16     **Q.  Okay. And so were you involved in the**
17 **selection of the securities that were ultimately**
18 **pledged to the Fed?**
19     A.  I wasn't involved in the selection of
20 what was pledged to the Fed. I was involved in
21 identifying assets which were not encumbered and
22 could be used as collateral to be pledged to the
23 Fed.
24     **Q.  Okay. And who actually selects which**

Page 29

**HIGHLY CONFIDENTIAL - J. HRASKA**

1  **collateral was pledged to the Fed?**
2      A.  The Fed programs are, at least the
3  ones we used for financing, were tri-party
4  transactions.
5      **Q.  Right.**
6      A.  And the actual selection criteria
7  itself was done by the tri-party agent.
8      **Q.  Who was that?**
9      A.  JPChase. JPMorgan.
10     **Q.  And can you describe for me your role,**
11 **if any, in supporting the financing that was**
12 **provided by the Fed?**
13     A.  My role was to communicate between
14 the -- between the trading desks and the
15 tri-party operations groups and just coordinate,
16 you know, the availability of collateral and the
17 booking of the transactions which would
18 ultimately represent that financing.
19     Q.  Okay.
20     A.  So the trading desk basically books
21 the transaction onto a system. My group's role
22 is to ensure that that booking makes it all the
23 way through the front-end booking system all the
24 way through to the system that is the books and

Page 30

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    records and what transmits that transaction to
3    our tri-party agent and that there's no
4    discrepancies, everything matches with what the
5    traders know to have raised from a financing
6    perspective.
7         And then we coordinate with the
8    tri-party operations folks to make sure that
9    there were no mechanical difficulties in the
10   allocation that's performed by the tri-party
11   agent, that there wasn't any shortfalls of
12   collateral and things of that nature, and then
13   report back to the trading desk.
14        Q.  Do you have any involvement in how
15   that collateral is valued?
16        A.  No.
17        Q.  Who does that?
18        A.  The tri-party agent.
19        Q.  And that would be Chase?
20        A.  JPChase, yes.
21        Q.  Does Lehman --
22        A.  Going forward, should we just refer to
23   it as Chase?  Because I'm not sure JPMorgan
24   Chase, JPChase.
25        Q.  That's fine.  We'll use Chase as a

Page 31

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    shorthand.
3         A.  That's fine.
4         Q.  So, to your knowledge, with respect to
5    that Fed financing of the week of September 15,
6    Chase placed a value on the collateral that was
7    used?
8         A.  That's correct.
9         Q.  Did Lehman place its own value on that
10   collateral?
11        MR. SHAW:  Objection.  Vague.
12        A.  I don't know that -- Lehman, as a
13   normal broker-dealer would have their own marks
14   for collateral on their books and records.
15        Q.  Right.
16        A.  The final determinant of that
17   collateral with respect to the financing
18   transaction would be the responsibility of the
19   tri-party agent.
20        Q.  Okay.  And do you know if there's
21   any -- were there any differences in the
22   valuations that Lehman would -- placed on that
23   collateral versus what Chase placed on that
24   collateral during that week?
25        A.  I don't know.

Page 32

1    HIGHLY CONFIDENTIAL - J. HRASKA
2         Q.  Okay.  Would you be involved in that
3    normally?
4         A.  No.
5         Q.  Okay.  Before we go further on in that
6    week, do you have any understanding of the
7    actual sale transaction, the terms of the sale
8    transaction between Lehman and Barclays?
9         A.  No, I don't.
10        Q.  Did you ever have a chance to look at
11   what's known as the Asset Purchase Agreement?
12        A.  No, I didn't.
13        Q.  Did you ever have any understanding
14   about the terms of the transaction whereby
15   Lehman assets were going to be transferred to
16   Chase -- I mean to Barclays?
17        MR. SHAW:  Objection to form.
18        A.  At what point in time are you
19   referring to?
20        Q.  Okay.  Let's break it down.  Early in
21   the week, Monday, Tuesday?
22        A.  Of the week of the 15th?
23        Q.  Of the week of the 15th.
24        Did you have any understanding of the
25   terms of the deal between Lehman and Barclays?

Page 33

1    HIGHLY CONFIDENTIAL - J. HRASKA
2         A.  I did not.
3         Q.  Did you have any understanding that
4    the Asset Purchase Agreement called for the sale
5    of $70 billion in long positions to Barclays?
6         A.  I did not.
7         Q.  Had you ever heard that phrase used?
8         A.  No.  That number is a completely new
9    number to anything I've had heard.
10        Q.  You never heard that number during
11   that week?
12        A.  During -- to this day.
13        Q.  Okay.  I'm just trying to get a sense
14   of what you were involved in.
15        A.  That's fine.
16        Q.  Had you ever heard during that week
17   that the transaction involved the transfer of
18   $69 billion in short positions to Barclays?
19        A.  No.
20        Q.  Okay.  Going further on in the week,
21   did there come a time when you learned some of
22   the terms of the transaction between Lehman and
23   Barclays?
24        A.  During that week, no.
25        Q.  After moving to Barclays, have you

Page 34

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **learned some of the terms of the transaction**
3    **between Lehman and Barclays?**
4        A.    At a much later time, yes.
5        **Q.    What have you learned about it?**
6        A.    I learned that Barclays has purchased
7    the unencumbered assets -- the way I understand
8    it is they purchased the unencumbered assets of
9    Lehman Brothers' clearance boxes.
10        **Q.    Anything else that Barclays purchased?**
11        A.    The building at 745.
12        **Q.    Anything else?**
13        A.    No.
14        **Q.    When you say "unencumbered assets,"**
15    **what do you mean by that?**
16        A.    An unencumbered asset, from my
17    perspective, as an operations professional, is
18    an asset which does not have a lien on it by any
19    other party, primarily customers.
20        **Q.    And when you say "in the clearance**
21    **boxes," what are you referring to?**
22        A.    Clearance boxes are -- it's a loose
23    term that can be defined in two ways: A
24    clearance box can be a location at a depository
25    institution, such as DTC, or it can be a

Page 35

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    clearance or -- a location at a clearing bank,
3    such as a JPChase or Bank of New York, or it can
4    refer to the record of your having those
5    accounts on your stock records.  So basically
6    your stock record represents your position of
7    those locations at those outside agents.  So
8    it's used intermittently, depending upon the use
9    or the person using it.
10        **Q.    And what is your understanding of the**
11    **amount or the value of the assets that were**
12    **transferred from Lehman to Barclays?**
13        MR. SHAW:  Objection.  Just for
14    clarification, do you mean as unencumbered
15    assets or overall?
16        MR. HINE:  Whatever assets he thinks.
17        **Q.    Let me clarify that.  Let's take out**
18    **the real estate.**
19        A.    Okay.
20        **Q.    What is your understanding of the**
21    **value of the assets other than the real estate**
22    **that were transferred from Lehman to Barclays?**
23        A.    At what point in time?
24        **Q.    Now.**
25        A.    As of today?

Page 36

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        **Q.    Yes.**
3        A.    As of today, my understanding is that
4    the value of unencumbered collateral that was
5    transferred was approximately 1.4 billion.
6        **Q.    Have you heard the term "Schedule B"?**
7        A.    I have, yes.
8        **Q.    And what is your understanding of what**
9    **that is?**
10        A.    Schedule B, to my understanding, is
11    the schedule of assets which were part of the
12    transaction between Barclays and Lehman
13    Brothers.
14        **Q.    And is the 1.4 billion that you just**
15    **mentioned, is that the approximate amount of the**
16    **assets on Schedule B?**
17        A.    The 1.4 -- the short answer is I don't
18    know.
19        **Q.    Okay.**
20        A.    You had asked me what had been
21    transferred to date.  So what had been
22    transferred is approximately 1.4.
23        **Q.    Okay.  Are you drawing a distinction**
24    **between transferred and some other -- other --**
25        A.    Originally, yes, because you

Page 37

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    originally asked what had been transferred.
3        **Q.    Right.**
4        A.    And based on, you know, transactions,
5    1.4 or so billion had been transferred.
6        **Q.    Right.**
7        A.    There may have been a different total
8    value on Schedule B.  I can't be certain what
9    that value is.  There's been people who have
10    talked about a number.
11        **Q.    Okay.**
12        A.    So I have a general sense, but I
13    wouldn't testify that I knew a hundred percent
14    what that value of Schedule B was.
15        **Q.    Do you have any knowledge of what has**
16    **been called Schedule A with respect to that**
17    **transaction?**
18        A.    Schedule A, as I understood it, was
19    related to a transaction prior to that
20    transaction which was the financing between
21    Lehman Brothers and Barclays.
22        **Q.    Okay.  And do you have any --**
23        A.    I'm not sure, is it all part of the
24    same transaction?  I don't know that it's part.
25    I view those as distinctly different

Page 38

HIGHLY CONFIDENTIAL - J. HRASKA

1  transactions, Schedule A and what became
2  Schedule B, but...
3  
4  **Q. Okay. Well, I just want to understand**
5  **what your understanding is.**
6  A. Okay.
7  **Q. So let me just try to understand. You**
8  **mentioned a separate transaction between**
9  **Barclays and Lehman that eventually led to a**
10 **collection of securities that has been known as**
11 **Schedule A; is that right?**
12 A. That's correct.
13 **Q. Okay. And what was the transaction**
14 **that you understood took place that led to**
15 **Schedule A?**
16 A. There was a secured financing
17 transaction, a repo transaction -- from Lehman's
18 perspective, it was a repo transaction with
19 Barclays which took place on the 18th of
20 September, and the assets related to that
21 transaction became Schedule A.
22 **Q. Okay. And is it all right -- was that**
23 **a tri-party repo?**
24 A. That transaction was a -- was a repo.
25 There were -- it was sort of a unique

Page 39

HIGHLY CONFIDENTIAL - J. HRASKA

1  transaction. It was one that took on elements
2  of tri-party as well as a bilateral contract,
3  but it was governed under the documents of a
4  tri-party repo, yes.
5  **Q. And who is the agent with respect to**
6  **that transaction?**
7  A. There was -- well, that's what made it
8  unique. There were two tri-party agents
9  involved. There was Chase, who was a tri-party
10 agent, who held our collateral with the Fed that
11 we had pledged to the Federal Reserve, and then,
12 in effecting the transaction, according to the
13 tri-party terms, there was Bank of New York, who
14 was the agent for Barclays.
15 **Q. I see reference in some of the**
16 **documents to the BONY tri-party?**
17 A. Uh-huh.
18 **Q. Is that the tri-party we're -- is that**
19 **the transaction we're talking about?**
20 A. Yes, that's correct. We moved the
21 assets from JPChase, who was our tri-party
22 agent, to Bank of New York, who was, as I
23 mentioned, Barclays' agent.
24 **Q. Just so I understand the sequence,**

Page 40

HIGHLY CONFIDENTIAL - J. HRASKA

1  **tell me if I'm wrong here. There was a**
2  **financing with the Fed in which there was a**
3  **certain amount of collateral posted by Lehman,**
4  **correct?**
5  A. That's correct.
6  **Q. At some point in time, that collateral**
7  **gets transferred to Chase? Withdrawn. Let me**
8  **start again.**
9  **At some point in time that collateral**
10 **gets transferred to Bank of New York in**
11 **connection with this transaction you have just**
12 **described?**
13 A. That's correct.
14 **Q. Okay. And were you involved in that**
15 **transfer of collateral from the Fed program to**
16 **Bank of New York?**
17 A. I was, yes.
18 **Q. You were, okay. And did all the**
19 **collateral make it from the Fed program to the**
20 **Bank of New York?**
21 A. It did not.
22 **Q. And do you know -- do you recall how**
23 **much made it and how much didn't?**
24 A. I can't give you the figure of exactly

Page 41

HIGHLY CONFIDENTIAL - J. HRASKA

1  how much that was in the Fed program made it to
2  Barclays of the original collateral because
3  there were difficulties in the collateral all
4  moving over to Barclays.
5  I can tell you how much collateral,
6  approximately, made it to Barclays, but it
7  wouldn't necessarily be all of the same
8  collateral that was with the Fed.
9  **Q. Okay. Did you mean to say Bank of New**
10 **York or Barclays?**
11 A. Well, it was to Barclays -- I'm sorry,
12 to the Bank of New York for the benefit of
13 Barclays.
14 **Q. Okay. So how much made it to the Bank**
15 **of New York in connection with that transfer**
16 **from the Fed program?**
17 A. On the night of the 18th,
18 approximately $42 billion worth of collateral.
19 **Q. And that figure is based on a**
20 **valuation of the collateral provided by who?**
21 A. By Bank of New York.
22 **Q. So $42 billion is how Bank of New York**
23 **valued the amount of money -- the amount of**
24 **collateral that was transferred from the Fed**

Page 42

HIGHLY CONFIDENTIAL - J. HRASKA

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **program to it on the 18th?**
3        A.   From the Fed -- that was the way that
4    they valued the collateral that was transferred
5    to them, not necessarily just from the Fed,
6    because as I mentioned earlier, not all from the
7    Fed program, because there was collateral which
8    was not part of the Fed program which was
9    transferred to Barclays as well.
10       **Q.   Okay.  Can you explain to me**
11   **generally -- I think I understand what you said,**
12   **but where did the rest of the collateral come**
13   **from that made it to Bank of New York?**
14       A.   It was other unencumbered collateral
15   in Lehman's clearance boxes.
16       **Q.   Okay.  Are you referring to what I've**
17   **seen referred to as an O74 box?**
18       A.   It was -- that was one of the sources
19   of collateral, yes.
20       **Q.   Where else did it come from?**
21       A.   It came from another DTC location,
22   which was 636, and it also came from our
23   government clearance location.  Chase was also a
24   government clearance custodian, so from our
25   government clearance box.

Page 43

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        **Q.   Does that have a number?**
3        A.   It does, but it has an acronym number
4    that I'm not familiar with off the top of my
5    head.
6        **Q.   Okay.  So were you involved -- let me**
7    **just -- I want to get a sense of your**
8    **involvement now.  You were involved in the**
9    **transfer of collateral from the Fed program to**
10   **Bank of New York, and were you then involved in**
11   **the efforts to unwind that September 18 repo**
12   **arrangement?**
13       A.   Unwind from the perspective of a deal
14   negotiation or unwind from the perspective of
15   the mechanics of --
16       **Q.   I'm trying to get a sense of what your**
17   **involvement was.  What did you do, after the**
18   **collateral made it to Bank of New York, what was**
19   **your role in connection with getting that**
20   **collateral eventually to Barclays?**
21       A.   We didn't have any more involvement
22   with getting that collateral to Barclays.  Once
23   Bank of New York took possession of it --
24       **Q.   Uh-huh.**
25       A.   -- Bank of New York got the collateral

Page 44

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    to Barclays.
3        **Q.   Okay.  Did you have any role in**
4    **preparing what has been called Schedule A with**
5    **respect to that collateral?**
6        A.   I did not prepare Schedule A.  What
7    I -- what I did provide is I provided
8    information which reflected the assets that
9    Lehman knew to have transferred to Barclays in
10   respect to that transaction, or to Bank of New
11   York for the benefit of Barclays.
12       **Q.   Okay.  Well, from September 18 through**
13   **that weekend, I think I've seen in some**
14   **documents some efforts to find additional assets**
15   **that were eventually going to be transferred to**
16   **Barclays; is that correct?**
17       A.   That is correct.
18       **Q.   And were you involved in that effort**
19   **to locate additional assets that were going to**
20   **be transferred to Barclays?**
21       A.   I was, yes.
22       **Q.   What did you do in connection with**
23   **that?**
24       A.   I pretty much performed the same role.
25   I looked across the stock record for assets that

Page 45

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    didn't have liens on them by customers,
3    primarily.
4        **Q.   Okay.  How many assets were located in**
5    **that effort?**
6        A.   I don't know a specific number.  I
7    know there were -- there were significant number
8    of individual securities which were located.
9        **Q.   Okay.  Was that securities that came**
10   **out of the O74 box and 636 box?**
11       A.   Those were securities that, yes, out
12   of O74 and 636, yes.
13       **Q.   Previously you had said there were $42**
14   **billion transferred to Bank of New York.  Did**
15   **that include assets from the O74 and 636 box?**
16       A.   On the night of the 18th?
17       **Q.   Yes.**
18       A.   Yes, those assets were sourced from
19   those two boxes as well, yes.
20       **Q.   Okay.  And then were there -- is it**
21   **correct to say there were additional assets**
22   **found over the weekend in those two boxes that**
23   **were also later sent to Barclays?**
24       A.   At a later date, yes, there were
25   assets from those two boxes that were sent.

Page 46

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Q.   So when you add up all these assets
3    that were eventually made their way to Barclays,
4    do you have a number that would reflect the
5    value of those assets?
6    A.   I don't know what the value of those
7    assets are today.  I know that there was a value
8    assigned to the assets on the night of the 18th
9    for what made it, which were -- what was $42
10   billion.  My approximate evaluation of what was
11   subsequently transferred was about 1.4 billion
12   of physically moving from Lehman to Barclays.
13        So those are the two figures that I'm
14   reasonably comfortable with.  And the market
15   valuation of those things has been changing over
16   time, being that it's a year later and things
17   like that.
18   Q.   I just want to get a -- just so I
19   understand your perspective on this, from your
20   perspective, there was $42 billion moved to Bank
21   of New York which eventually makes its way to
22   Barclays, correct?
23   A.   That's correct.
24   Q.   And there's a separate amount of 1.4
25   billion which is gathered sometime late in the

Page 47

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    week and that eventually makes it to Barclays as
3    well, correct?
4    A.   That's correct.
5    Q.   And is the 1.4 billion what's called
6    Schedule B?
7    A.   The 1.4 --
8        MR. SHAW: Objection.  Asked and
9    answered.  Mischaracterizes prior testimony.
10       MR. HINE: I didn't say anything about
11   his prior testimony.
12   Q.   I'm just trying to figure out, do you
13   consider the 1.4 billion the assets that are on
14   Schedule B?
15   A.   I have subsequently learned that the
16   1.4 billion are assets that are on Schedule B,
17   yes.
18   Q.   And were you involved in preparing
19   Schedule B?
20   A.   I was not involved in preparing the
21   official Schedule B.  I provided assets which
22   were used as the securities that would be later
23   selected and placed on Schedule B, but I didn't
24   prepare the official Schedule B.
25   Q.   Who selected the assets ultimately

Page 48

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    that would become part of Schedule B?
3    A.   I provided that information through my
4    manager at the time.  I don't recall whether I
5    had sent it to Monty or to Alastair, but
6    nonetheless, they forwarded it to Paolo Tonucci
7    and I believe Paolo sort of crystallized the
8    official Schedule B.
9    Q.   Is it fair to say over that weekend
10   your role was to just find unencumbered assets
11   that they could possibly decide what to do with?
12   A.   That's correct.
13   Q.   Okay.  Did you have an understanding
14   of why you were doing that?
15   A.   No.
16   Q.   Did anyone tell you that there was any
17   kind of shortfalls in what Barclays was
18   expecting to receive at the end of that week?
19   A.   My understanding at the time was that
20   I was still trying to complete the repo
21   transaction, and part of that repo transaction
22   was we had placed cash as well as an asset to
23   Barclays, and, you know, my understanding at the
24   time was that I was looking to, in addition
25   to -- I was looking for assets that would be

Page 49

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    able to be sent to Barclays for the purposes of
3    also substituting that cash.
4    Q.   When you say the repo transaction, are
5    you talking about the September 18 transaction
6    that we previously discussed?
7    A.   Involving the Federal Reserve, yes.
8    Q.   I think I just misunderstood you.  The
9    September 18 transaction was between Barclays,
10   Lehman and BONY, right?
11   A.   It was Barclays, Lehman and BONY, but
12   it was -- well, yes, it was Lehman.  It was
13   basically like I guess a transaction where I
14   guess the collateral that Lehman had on finance
15   with the Fed was being -- instead now being
16   financed with Barclays and Barclays was then I
17   guess going to finance that transaction with the
18   Fed.  So that's why I referenced the Fed.
19   Q.   Okay.  When you said you were
20   concerned with the repo at that time, what were
21   you doing with respect to the repo?  Again, I'm
22   talking Friday of that week.
23   A.   Friday of that week, I -- it was my
24   understanding that we were looking to substitute
25   the cash that we had placed on deposit for the

HIGHLY CONFIDENTIAL - J. HRASKA

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  benefit of Barclays with assets as opposed to
3  leaving cash, because it's not efficient from a
4  lending transaction to collateralize a cash loan
5  with cash. So we were looking to find available
6  assets which were suitable under the repo
7  agreement to substitute.
8      **Q.  How much cash are we talking about?**
9      A.  On the night of the 18th, Lehman
10 Brothers placed $7 billion on deposit for the
11 benefit of Barclays.
12     **Q.  Just so I understand it, in layman's
13 terms -- well, before I ask that, let me -- was
14 that cash part of the $42 billion that you
15 mentioned?**
16     A.  It was not. 42 billion was the value
17 of the assets, physical securities, that had
18 made it to Bank of New York for the benefit of
19 Barclays.
20     **Q.  And so there was $7 billion in cash on
21 top of that?**
22     A.  Yes.
23     **Q.  And so am I correct to say you were
24 trying to locate other assets that could be
25 transferred to Barclays so Lehman could keep the**

1  **HIGHLY CONFIDENTIAL - J. HRASKA**
2  cash portion?
3      A.  So, yes, Lehman could get a return of
4  the cash in lieu of assets. So a substitution
5  of one asset for another.
6      **Q.  And were you able to come up with any
7  assets to do that?**
8      A.  Yes, I was. On Friday.
9      **Q.  How much?**
10     A.  Approximately a billion, just a little
11 over a billion. Something like a billion-34,
12 -35, something along those lines.
13     **Q.  Okay. And did those assets in fact
14 get substituted in and make their way to
15 Barclays?**
16     A.  Well, they made their way into
17 Barclays. My expectation of a return of the
18 cash never occurred.
19     **Q.  Why is that?**
20     A.  Well, with the mechanics and
21 everything that happened with the relationship
22 with Chase that day, Chase didn't return any of
23 the cash at that point.
24     **Q.  Can you explain to me the problems you
25 had with the relationship with Chase that day?**

1  **HIGHLY CONFIDENTIAL - J. HRASKA**
2      A.  The morning of the 19th, Chase had
3  effectively shut down our clearing accounts and
4  stopped having communication with anything other
5  than I think some very senior folks in Lehman
6  Brothers.
7      **Q.  And why did they do that?**
8          MR. SHAW: Objection. Foundation.
9      A.  I don't know particularly why they do
10 that. I mean, there was, you know, there was
11 some speculation as to why they did that because
12 of the status of our situation from a credit
13 perspective and things like that, but I don't
14 know if there was a particular trigger that
15 caused them to do that.
16     **Q.  Did you have any conversation with
17 folks at Chase about this?**
18     A.  On the morning of the 19th, no.
19     **Q.  At any time?**
20     A.  I mean, I had conversations with folks
21 at Chase all through the night on the 18th,
22 actually, technically, I guess into the morning
23 of the 19th while we were trying to finalize the
24 transaction. And after the morning of the 19th,
25 I guess the very early morning, like in the 1, 2

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  o'clock range, that was the last conversation I
3  had with anybody at Chase.
4      **Q.  What was that about?**
5      A.  That was primarily about --
6          The last conversation or the last
7  series of conversations?
8      **Q.  Last series of conversations?**
9      A.  The last series of conversations were
10 in relation to securing a loan to create the $7
11 billion which we placed on deposit with
12 Barclays.
13     **Q.  I see something referred to in the
14 documents as a box loan. Is that the loan
15 you're talking about?**
16     A.  The 7 billion was a box loan, yeah.
17 Lehman took a box loan from Chase and let -- as
18 a result, Chase puts a lien on the assets for
19 that $7 billion in cash, yes.
20     **Q.  What assets was that lien on?**
21     A.  There were assets which were
22 unencumbered assets sitting in Lehman's
23 clearance boxes at Chase.
24     **Q.  Is that an identifiable set of assets
25 that now has a lien on them from Chase?**

Page 54

**HIGHLY CONFIDENTIAL - J. HRASKA**

1    MR. SHAW: When you say "now," you
2    mean as we sit here?
3    Q.    As a result of that box loan, is there
4    now a lien on a particular set of assets,
5    identifiable set of assets in Lehman's box?
6    MR. SHAW: Objection to form.
7    A.    Chase, in extending the loan to us,
8    selected the assets that they thought suitable
9    for collateralization on that loan.
10    Q.    Did Lehman have any say in the
11    selection of those assets?
12    A.    No.
13    Q.    Let me go back.  I think I have a
14    general sense of what you were working on at the
15    time.  I just want to go back with a couple of
16    particular questions.
17        I wanted to go back to the Fed
18    financing for a minute.  Do you know what the
19    repo rate was for that financing?
20    A.    I don't know.
21    Q.    What is a repo rate?
22    A.    A repo rate is the rate of interest
23    that you pay for the extension of the cash loan.
24    Q.    Have you ever seen any schedules of

Page 55

**HIGHLY CONFIDENTIAL - J. HRASKA**

1    repo rates with respect to the Fed financing?
2    A.    Schedules of rates, no.
3    Q.    So you don't -- I think you just said
4    you don't know the repo rate for that Fed
5    financing program?
6    A.    Well, to be clear, there was more than
7    one program.
8    Q.    Right.
9    A.    And I didn't know the rates on any of
10    the programs.
11    Q.    What was the repo rate on the
12    September 18 transaction we've been talking
13    about?
14    A.    I don't recall.
15    Q.    What is a repurchase price with
16    respect to a repo?
17    MR. SHAW: Objection.  Calls for a
18    legal conclusion, but you can answer.
19    THE WITNESS: Okay.
20    A.    A repurchase price -- a repo
21    transaction is a collateralized loan.  It's
22    based on an initial sale of collateral and a
23    repurchase of collateral.  The price of that
24    collateral on both, what are called both legs,

Page 56

HIGHLY CONFIDENTIAL - J. HRASKA

1    which is the on leg, or start leg, or the off
2    leg, or maturity leg, are the same thing.  So
3    the repurchase price would have been the price
4    that was assigned to that collateral on the
5    start of the transaction.  There's no difference
6    between the repurchase price and the initial
7    price.
8    Q.    What was the, just -- what was the
9    initial price on the September 18 repo we've
10    been talking about?
11    A.    Well --
12    MR. SHAW: Objection.  Foundation.
13    A.    There were, if you're asking me about
14    prices, prices of securities, there were prices
15    on something along the lines of 10,000
16    securities.  So...
17    Q.    No, I'm asking the aggregate price on
18    the September 18 repo.  Am I correct to say
19    that --
20    A.    Well, it --
21    Q.    -- Barclays, through bank of New York
22    on behalf of Barclays, received collateral
23    valued at $42 billion, correct?
24    A.    Right.

Page 57

HIGHLY CONFIDENTIAL - J. HRASKA

1    Q.    And they also received $7 billion in
2    cash pursuant to the box loan, right?
3    A.    That's correct.
4    Q.    What did Barclays give to Lehman?
5    A.    Barclays gave to Lehman $45 billion of
6    cash.
7    Q.    And is that the price that you were
8    just referring to when you talked about the
9    on --
10    A.    No.
11    Q.    Okay.
12    A.    That's the -- that's what's known as
13    the repo principal or the loan amount.
14    Q.    Okay.  And so how is that different
15    from the prices you were just talking about?
16    A.    Prices are the prices of the
17    underlying collateral that securitized that
18    loan.
19    Q.    And how are they different from the
20    principal of the loan?
21    A.    The principal of the loan is the
22    extension of the dollar amount or what the
23    value -- what the value of cash that's being
24    extended is.  That's the loan principal.

Page 58

HIGHLY CONFIDENTIAL - J. HRASKA

Q.   Right.

A.   The price, the prices, are the prices of the individual collateral that make up that loan, and in order for a loan to be effective, the value of the price times the par amount of the collateral should exceed the principal extended.

Q.   Okay. Is that what's known as the haircut, the amount by which it exceeds?

A.   The amount by which it would exceed the loan is known as the haircut, that's correct.

Q.   And so what was the haircut associated with the September 18 repo?

A.   There wasn't a -- there wasn't a specific stated haircut. There was a total loan amount, which was this $45 billion, and the total collateral value that we were trying to transfer over to Barclays or what we were directed to transfer over to Barclays was approximately $50 billion.

Q.   And that $50 billion was comprised of the approximately $42 billion in securities that you mentioned earlier plus the cash?

Page 59

HIGHLY CONFIDENTIAL - J. HRASKA

A.   It turned out that that was the case. It was initially intended to be all collateral, but the market value of what we were to transfer initially was $50 billion.

Q.   Okay. And Barclays was, after the -- after they received the proceeds of the loan and the collateral, was Barclays satisfied that it had received the entire amount of collateral that it was expecting with respect to that repo?

MR. SHAW: Objection. Foundation.

A.   Yeah, I don't know whether they were satisfied or not. I mean, we completed the securities transfers until the point that we couldn't make any transfers because the system had been shut down, and we were requested at that point to deliver an additional 7 billion in cash, which we did.

Q.   Okay. When was that transferred, approximately?

A.   The 7 billion in cash?

Q.   Yes.

A.   Somewhere between 2 and 3 o'clock in the morning on the 19th.

Q.   Friday?

Page 60

HIGHLY CONFIDENTIAL - J. HRASKA

A.   Well, it was -- it was -- we worked through the night of the 18th. So I guess it was very, very early in the 19th. So it was the morning of the 19th at like maybe 2 o'clock in the morning or something like that.

Q.   So, back to the notion of a haircut, the haircut for that transaction is the difference between the approximate $50 billion in collateral and cash that was transferred to Bank of New York and the 45 billion that Barclays transferred to Lehman, correct?

A.   Could you repeat that one more time? I'm sorry.

Q.   I'm just trying to figure out what the haircut is for that transaction. I thought you said that approximately 50 billion was transferred to Bank of New York or Barclays?

A.   That's correct.

Q.   In the form of either collateral or cash?

A.   Uh-huh.

Q.   And that Barclays gave Lehman 45 billion in cash?

A.   Right, that's correct.

Page 61

HIGHLY CONFIDENTIAL - J. HRASKA

Q.   So that makes the haircut approximately $5 billion?

A.   That would be correct.

Q.   Do you know what the haircut was for the Fed program earlier in that week?

A.   I don't. Again, the haircut, each security class had its own individual haircut, so there would have been a, I guess what's called a synthetic haircut, which, you know, would equate to something similar to what you did there, you know, so -- and I believe it was similar because the transaction was described to me as we were going to take the extension of financing that the Fed had offered to Lehman and we were going to help effect the transfer of that to Barclays so that Barclays could then step back into that transaction. So I believe it was similar. I don't know exactly what the haircut was.

Q.   Okay. And who described the transaction to you like that?

A.   John Rodefeld, who was held of North American Operations at the time, had contacted Alastair and myself to talk about the

Page 62

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  transaction.
3  Q.   And what did he say about it?
4  A.   He basically told us that Barclays had
5  been contacted by the Fed and Barclays was asked
6  to provide a credit, a counterparty credit
7  upgrade to the Fed, in essence.  They were fine
8  with financing the collateral basket that they
9  were financing, but they would prefer not to
10  have Lehman as a counterparty on the other side
11  of that.
12       They asked Barclays to basically
13  intermediate a transaction where Barclays
14  offered Lehman the same financing that they had
15  been -- that the Fed had been financing with
16  them throughout that week, and then that
17  Barclays would take that collateral and place it
18  back on deposit with the Fed to make them whole
19  on the cash transaction.
20  Q.   I think I understand what you just
21  said.
22       What else did Mr. Rodefeld say on that
23  call?
24  A.   Well, that call was on the 17th, and
25  they initially were looking to actually effect

Page 63

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  that transaction the same day on the 17th.  And
3  then, you know, with some subsequent
4  conversations, it just became -- it basically
5  became an impossibility not just for Lehman
6  Brothers, but for Bank of New York, JPChase,
7  Barclays to do a transaction of that magnitude
8  in the course of a day.
9       So from the 17th through the --
10  basically the whole 17th into the night of the
11  17th and even morning of the early 18th, we
12  discussed the mechanics on how we would effect
13  that transfer in the most efficient manner.
14  Q.   So do you recall anything else about
15  what Mr. Rodefeld told you on that call?
16  A.   Not other than what I just described
17  to you.
18  Q.   So am I correct to say that the
19  initial intent was to have this transaction take
20  place on the Wednesday of that week?
21  A.   From the first phone call, yes, it was
22  intended to take place on Wednesday, but...
23  Q.   And just why mechanically was that not
24  possible?
25  A.   There were numerous reasons from each

Page 64

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  of the parties.  Purely from the size of the
3  transaction, it was an extremely large
4  transaction, and the number of securities
5  involved were in the multiple thousand range,
6  you know, I would say in the double-digit
7  thousand range.  So that was one of the issues.
8       So not just from a transactional
9  perspective, but also from a static perspective
10  on the Bank of New York's side, they didn't have
11  a lot of these securities set up on their
12  systems.  It was going to take them time to set
13  the securities up to be able to set up receipts
14  for these securities and things along that
15  nature.
16  Q.   So how was it possible to do it on
17  Thursday as opposed to Wednesday?
18  A.   People were working 24 hours a day to
19  get it done and bunches of people were brought
20  in to help set things up and there were
21  technologists brought in on all different sides
22  to help do away from ordinary type transactions
23  and things like that to get the securities
24  transferred.
25  Q.   So am I correct to say that you

Page 65

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  learned of the possibility of this transaction
3  sometime on Wednesday, late Wednesday, and then
4  people worked through Wednesday night and then
5  all the way through Thursday night to get it
6  done?
7  A.   That's correct.
8  Q.   Okay.  Did the nature of that transfer
9  change at all?  In other words -- let me
10  rephrase that.
11       You just described what Mr. Rodefeld
12  told you about the transaction.  Did that
13  transaction change at all over the course of
14  that Wednesday into Thursday?
15       MR. SHAW:  Objection.  Foundation.
16  A.   The nature of the transaction itself,
17  the spirit of the transaction, nothing changed,
18  no.
19  Q.   Okay.  That makes sense.
20  A.   Could I -- I apologize.
21       (Discussion off the record.)
22       (Recess; Time Noted:  10:31 A.M.)
23       (Time Noted:  10:38 A.M.
24  BY MR. HINE:
25  Q.   Mr. Hraska, I just want to take a

Page 66

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2    second to just talk again about your
3    understanding of the transaction between
4    Barclays and Lehman.
5          Did you ever have any understanding
6    that there was supposed to be a discount
7    associated with that transaction?
8       A.   Which transaction?  The repo
9    transaction?
10      Q.   No.  No, the sale transaction between
11   Barclays and Lehman.
12      A.   I didn't have any knowledge as to what
13   the terms of that transaction were.
14      Q.   Did you ever hear the phrase "block
15   discount" used in connection with either that
16   transaction or the repo that we have been
17   talking about?
18      A.   No.
19      Q.   Did you ever have any understanding
20   that Barclays was going to be paying less than
21   full value for the assets that it was buying
22   from Lehman?
23      A.   No.
24      Q.   Did you ever hear any discussion about
25   the possibility of defaulting on the repo that

Page 67

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2    we have been discussing?
3       A.   There was discussions related to that
4    topic on the week of the 22nd.
5       Q.   Tell me what you recall about that,
6    those discussions.
7       A.   Well, there was -- it was news that
8    obviously LBI had filed for I guess SIPC
9    protection.  So the margin folks had contacted
10   me on the morning of -- I don't know which
11   morning, I believe it was on the 22nd, but if
12   not, on the 23rd, to ask me if that transaction
13   was being considered a default by Barclays.  And
14   at the time, I didn't know, but there was -- I
15   then had conversations about whether that was
16   going to be treated as default with my manager,
17   and at the time, you know, we didn't actually
18   know when it was or if it was going to be
19   treated as in default.
20      Q.   When we talk about "it," we're talking
21   about the September 18 repo?
22      A.   Repo itself, yes.
23      Q.   And LBI filed for bankruptcy on
24   Friday, the 19th?
25      A.   That's my understanding.

Page 68

1       HIGHLY CONFIDENTIAL - J. HRASKA
2       Q.   And so you had conversations the
3    following Monday about this?
4       A.   Yes.
5       Q.   And who were the conversations with?
6       A.   I don't recall specifically.  Somebody
7    from the Margin Group.  I don't recall
8    specifically who it was from the Margin Group
9    that I had a conversation with.  And I also had
10   a conversation with Monty Forrest, which is my
11   manager.
12      Q.   The Margin Group at Barclays?
13      A.   The Margin Group at legacy Lehman
14   Brothers.
15      Q.   Do you recall the names of the
16   individuals that you spoke to?
17      A.   No, I just said I didn't recall it.
18      Q.   To your understanding, was the
19   September 18 repo unwound in some way?
20      A.   To my understanding, it was defaulted
21   and the collateral that was put up to securitize
22   that loan was seized by Bank of New York for the
23   benefit of Barclays.
24      Q.   Okay.  And did Bank of New York also
25   seize the cash that had been posted?

Page 69

1       **HIGHLY CONFIDENTIAL - J. HRASKA**
2       MR. SHAW:  Objection.  Foundation.
3    The cash itself was not in an account
4    that or in a position for Bank of New York to
5    seize.  The cash itself was being held for the
6    benefit of Barclays at JPChase.
7       Q.   Okay.  And what happened to that cash?
8       MR. SHAW:  Foundation.
9       A.   Barclays, because the cash was put
10   into the account of their benefit, they -- later
11   I understood, and it would make sense, that they
12   claimed ownership of that cash.  What happened
13   to the cash after that, I sort of was removed
14   from the transaction after they laid ownership
15   claim to that cash.
16      Q.   Okay.  I guess do you understand that
17   there was an ensuing dispute between Chase and
18   Barclays as to the ownership of that cash, among
19   other things?
20      A.   I did, yes.
21      Q.   And were you involved in that
22   resolution of that dispute?
23      A.   My only -- not in the resolution, no.
24      Q.   What was your involvement in
25   connection with that dispute?

Page 70

HIGHLY CONFIDENTIAL - J. HRASKA
1
2     A.   To do some fact-finding to describe
3  how that cash --
4         MR. SHAW: Actually, let me just stop
5  you here.  If this was any work you did for
6  counsel, I don't want you to get into the
7  details of it.
8         THE WITNESS: Okay.
9     A.   It was purely to describe how that
10 cash got there, why was there cash in a repo
11 transaction.
12    Q.   And who were you describing that for?
13    A.   My initial conversation on that was
14 with -- was with the Treasury folks, and that
15 was more so just to -- was more so just to
16 review sort of what happened on that evening
17 and --
18    Q.   When you say "the Treasury folks," are
19 you talking about Mr. Tonucci?
20    A.   Mr. Tonucci and his organization,
21 yeah.
22    Q.   Okay.  And so am I understanding you
23 correctly that you explained to them the genesis
24 of the box loan that we just previously
25 discussed and how the cash came to be involved

Page 71

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  in that transaction?
3     A.   Yes.
4     Q.   And did you have any other involvement
5  in the dispute between Barclays and Chase over
6  that cash?
7     A.   No.
8     Q.   Okay.  I would like to revisit some of
9  the things we talked about earlier.
10        There was a pool of collateral that
11 was used to secure the Fed financing early in
12 the week, correct?
13    A.   That's correct.
14    Q.   And I think you told me you weren't
15 aware of the value of that pool; is that right?
16    A.   That's correct.
17    Q.   At some point that pool was supposed
18 to be transferred to Bank of New York for the
19 benefit of Barclays, but not all of it makes it,
20 right?
21    A.   That's correct.
22    Q.   And now do you know why it didn't make
23 it, that portion of it didn't make it?
24    A.   There were multiple reasons why not
25 all the collateral made it.

Page 72

HIGHLY CONFIDENTIAL - J. HRASKA
1
2     Q.   Can you tell me what they are?
3     A.   I can tell you the ones that I'm aware
4  of.  I may not tell you every reason, but ...
5         The first reason was that some of the
6  collateral that was pledged to the Bank of New
7  York -- I'm sorry, that was pledged to the Fed
8  was obtained through a program called GCF, which
9  stands for General Collateral Financing.
10    Q.   Uh-huh.
11    A.   As a result of this program, you
12 obtain collateral.  It's basically it's a
13 dealer-to-dealer tri-party program.  So you
14 obtain collateral, which is credited on a
15 book-entry-only basis to your clearing bank, and
16 that clearing bank -- you can use that
17 collateral to -- you can basically rehypothecate
18 that collateral.  You can use it as collateral
19 for an ongoing transaction.
20        The transference of that collateral is
21 purely governed by the Fixed Income Clearing
22 Corporation, or FICC, in conjunction with the
23 two clearing banks, Bank of New York and
24 JPChase.  So when a transaction is agreed and
25 it's put on and when it's unwound, what happens

Page 73

HIGHLY CONFIDENTIAL - J. HRASKA
1
2  is is that the transference of that collateral
3  is purely governed, as I mentioned, by FICC.
4         And so we had previously purchased
5  collateral under that program and we were using
6  some of that collateral purchased under that
7  program, and when the morning of the 18th hit,
8  some of those programs had matured, and as a
9  result of that maturity, that collateral was
10 taken out of our clearance boxes on an automated
11 fashion away from us having any involvement in
12 or being able to even stop that.  Because just
13 as part of the program, collateral comes in and
14 goes out.
15        So what was previously sourced from
16 that program and listed as a rehypothecated
17 asset to the Fed on the morning of the 18th was
18 no longer available for us to actually transfer
19 to Bank of New York.
20    Q.   And do you know the value of the
21 collateral that was — falls into that category?
22    A.   I don't know the value of specifically
23 the GCF collateral.  I know that there was -- it
24 was a significant value.  There was a value
25 of -- GCF collateral is typically Fed-eligible

Page 74

1        HIGHLY CONFIDENTIAL - J. HRASKA
2    collateral. We had a discrepancy of
3    approximately 8 billion in Fed-eligible
4    collateral, but I don't know whether that
5    discrepancy -- I can't say for certain whether
6    that discrepancy was purely related to GCF or
7    not.
8        Q.   When you say 8 billion, is that the
9    amount that didn't make it from the Fed program
10   to the Bank of New York?
11       A.   That was the amount at the time when
12   we tried to effect the transfer of the Cusips
13   that were out there that we were unable to
14   transfer on the 18th.
15       Q.   And so am I correct to say there was
16   approximately $8 billion in collateral that was
17   not able to transfer on the 18th from the Fed
18   program to Bank of New York; is that right?
19       A.   Yeah, initially, yes.
20       Q.   Okay. And a portion of that 8 billion
21   wasn't able to transfer due to this --
22       A.   GCF.
23       Q.   -- GCF issue that you just described?
24       A.   Yes.
25       Q.   Do you know what portion of it falls

Page 75

1        HIGHLY CONFIDENTIAL - J. HRASKA
2    into that category?
3        A.   I don't, unfortunately.
4        Q.   Do you know if it's most of it or only
5    a small portion?
6        A.   I don't think it's most of it, but
7    it's somewhere between most and small. It's
8    probably somewhere in midrange. I don't
9    honestly know.
10       Q.   I'm not trying to get you --
11       A.   It's not insignificant, but I don't
12   think it's most of it.
13       Q.   So that leaves another portion of the
14   8 billion that didn't make it. Why did the rest
15   of it not make it?
16       A.   All right. So there were other things
17   that were happening on that day. Collateral
18   over securities that were moving were securities
19   that were also traded by our inventory traders,
20   proprietary traders at Lehman. They were also
21   securities that, you know, customers maybe were
22   asking to move out of their accounts and move to
23   other broker-dealers.
24           When all these transactions take
25   place, there are a queue of deliveries that get

Page 76

1        HIGHLY CONFIDENTIAL - J. HRASKA
2    built out of the delivery boxes, and when there
3    becomes availability, there's no way without
4    manually intervening in every single delivery to
5    say, okay, wait a minute, this Security A goes
6    to Customer A and Security A goes to Customer B
7    or C.
8           So what was happening, unfortunately,
9    is many of the securities that were going --
10   that had deliveries onward to Bank of New York
11   for the benefit of Barclays also had onward
12   delivery instructions for other people as well.
13   So when the availability -- when the securities
14   became available, some of those securities were
15   first delivered to other onward obligations.
16       Q.   Do you know approximately how the
17   amount of securities that fall into that
18   category?
19       A.   I don't. I actually have no idea on
20   that because that was -- that was a non-stop
21   request of, you know, customer transfers, new
22   trades and, you know, inventory traders were
23   trying to sell assets to raise cash. So it was
24   just an enormous amount of transactions in a
25   particular time period.

Page 77

1        HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.   Did those securities, I think I
3    understood what you said, they got used for
4    other purposes, basically, and is that -- does
5    that relate to the winding down of the matched
6    book that was managed by the Finance Department,
7    the Financial Department within Lehman?
8        A.   I wouldn't attribute it to a winding
9    down of the matched book. All I can say is that
10   there were -- there were trades booked in the
11   system that were, you know, outward-going
12   deliveries. They could have multiple sources.
13          So, as the securities came in, they
14   just made on those deliveries and they could
15   have multiple reasons why they were pending for
16   delivery.
17       Q.   I think you were describing reasons
18   that some of the collateral didn't make it to
19   BONY. Are there any other reasons?
20       A.   There is one other reason in my mind
21   that was a reason of the initial -- there was an
22   initial shortfall, right? And that was because
23   we were initially going to do the transfer in
24   increments of $5 billion, and Barclays had
25   forwarded the first $5 billion and our tri-party

Page 78

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  agent was then, upon receipt of that $5 billion,
3  supposed to released $5 billion worth of
4  collateral that was previously held in the Fed
5  program.
6        They had sent in a request to Lehman
7  Brothers, "they" being JPChase sent in a request
8  to Lehman Brothers as to which securities -- or
9  did we have a preference as to which securities
10  were released first.  The response back was
11  there was no particular order that needs to be
12  released first.  However, just release the
13  securities that are in the program.
14        Unfortunately, there was a
15  miscommunication and JPChase understood that to
16  be any $5 billion, and it released also some
17  securities that were not in the program.
18    Q.   When you say "the program," you're
19  talking about --
20    A.   "The program," meaning that were being
21  financed by the Fed the previous evening.
22    Q.   And so I interrupted your story, but
23  continue.
24    A.   So, as a result of that release, those
25  securities had some onward obligations as well

Page 79

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  because they were subject to other transactions,
3  as we described earlier, and those securities as
4  well had gone out away from Bank of New York,
5  and as a result of all these different things
6  taking place, the first delivery of collateral
7  only accomplished somewhere in the neighborhood
8  of around probably 2 billion or less.
9    Q.   Can you explain that?  I mean Chase
10  thinks they're releasing 5 billion?
11    A.   Uh-huh.
12    Q.   And only 2 billion or less makes it to
13  BONY?
14    A.   Right.
15    Q.   And how does the rest get diverted?
16  Just automatic?
17    A.   Well, per the process we just talked
18  about, those assets get released to our
19  availability, and because there were pending
20  deliveries in our clearance locations at both
21  DTC, 636, O74, the Fed box, when those
22  securities became available, they were
23  immediately delivered on other obligations and
24  they weren't available any more to be delivered
25  to Bank of New York.

Page 80

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    Q.   So, just to continue the story, Chase
3  thinks it's delivering 5 billion, but they get
4  diverted to other purposes and only a little
5  less than 2 billion makes it to BONY out of that
6  first delivery?
7    A.   Chase releases their lien on 5
8  billion, and as a result, yes, Lehman, through
9  it's clearance relationships, only delivered 2
10  billion.  I think it was under 2 billion, but I
11  just don't -- somewhere under 2 billion I think
12  is the figure.
13    Q.   So what happens next?
14    A.   At that point in time we were
15  contacted by John Rodefeld, who was representing
16  operations at Barclays.  He said we were going
17  to suspend -- we were going to suspend the next
18  increment of $5 billion in cash being wired
19  because Barclays didn't feel comfortable in
20  wiring another 5 billion when they hadn't fully
21  received the assets on the first 5 billion, and
22  he asked us to hold off until we heard back from
23  him with further instructions.
24    Q.   And did you eventually get further
25  instructions?

Page 81

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    A.   We did very late in the day, I would
3  say somewhere in the neighborhood of between 4
4  and 5 o'clock.  He said that it was decided that
5  Barclays was going to extend the remainder of
6  the loan balance in a single transaction, which
7  would have been the $40 billion, and at that
8  point in time, you know, expect to have, you
9  know, Chase release the availability of the
10  remaining 40 billion, I think, or of 40 billion
11  that they had, and we were asked to coordinate
12  with the clearance folks, to the best that they
13  could, to try to monitor assets going and give
14  priority of the assets to Barclays.
15        And that was -- it was a difficult
16  task, but they, you know, they brought in extra
17  people and tried to watch deliveries and that
18  kind of thing.  It was all on a manual basis so
19  it was very difficult to do that, but they did
20  the best they could with, you know, being that
21  it was manual in nature.
22    Q.   Why, if Chase was -- I mean, if --
23  excuse me.  If Barclays was concerned about not
24  sending the next 5 billion, why did they decide
25  to go ahead and send 40 billion instead?

Page 82

**HIGHLY CONFIDENTIAL - J. HRASKA**

1    A.    I honestly don't know.
2    Q.    And so were you eventually successful
3 **in releasing the remainder of the collateral**
4 **that Barclays was expecting?**
5    A.    Well, as we discussed a little bit
6 earlier, the -- we did manage to get over a
7 total of 42 billion out of the 50 billion in
8 collateral that we were expecting to send over.
9    Q.    Okay. Am I correct to say that 42
10 **billion -- they had 2 billion from the initial**
11 **release from Chase and then so there was an**
12 **additional 40 transferred over?**
13    A.    Rough approximation, that's correct.
14    Q.    So now you're continuing to tell me
15 **the reasons that not all the Fed collateral made**
16 **it to BONY. Are there any other reasons that**
17 **you know of?**
18    A.    No, those are the primary items.
19    Q.    Okay.
20    A.    At least the ones that I was aware of.
21 There might have been something else that I'm
22 not aware of.
23    Q.    I believe you said that approximately
24 **8 billion did not make it from the Fed program**

Page 83

**HIGHLY CONFIDENTIAL - J. HRASKA**

1 **to Bank of New York, correct?**
2    A.    There was, yes, that's correct.
3    Q.    And so I know you don't know the exact
4 **numbers, but is 3 billion of that 8 billion the**
5 **result of this initial shortfall problem that**
6 **you just described?**
7    A.    I wouldn't have any way to determine
8 that.
9    Q.    I thought you said the initial release
10 **from Chase was supposed to be 5 billion and only**
11 **about 2 billion made it to BONY out of that**
12 **release; is that right?**
13    A.    That's correct.
14    Q.    So --
15    A.    But I don't know if what you're asking
16 me is the -- is the 3 billion shortfall
17 comprised of, you know, these GCF and whatever
18 assets. I don't know what percentage of that
19 was GCF or other deliveries or other
20 transactions. That's, unfortunately, I have no
21 way of knowing that.
22    Q.    Okay. Was any of the 8 billion
23 **shortfall later transferred to BONY?**
24    A.    Well, what was transferred was a total

Page 84

**HIGHLY CONFIDENTIAL - J. HRASKA**

1 of 42 billion. I mean, there was 8 billion of
2 the Fed program, and those were Fed -- we
3 probably need to make a distinction between the
4 Fed program securities and what are deemed Fed
5 wirable or Fed securities, right?
6        So there was, you know, what was held
7 in the program, which were DTC-eligible
8 securities, Fed wirable securities and that kind
9 of thing. So the 8 billion shortfall, it was
10 not only a shortfall of what was in the Fed
11 program, it was basically a shortfall of Fed
12 wirable security types.
13        So we found substitutes of a good
14 portion of that 8 billion. I couldn't tell you
15 the exact quantities, but that's why we were
16 able to, you know, to manage to get, you know, a
17 good portion of the collateral over to Bank of
18 New York.
19    Q.    I think I understood what you just
20 **said, but let me see if I can see if I got that**
21 **right.**
22        **$8 billion does not make it for any**
23 **number of reasons to the BONY in the course of**
24 **this transfer over Thursday night, and are you**

Page 85

**HIGHLY CONFIDENTIAL - J. HRASKA**

1 **saying --**
2    A.    Well, let me clarify that. 8 billion
3 that was initially intended to be transferred --
4    Q.    Right.
5    A.    -- was not going to be eligible to be
6 transferred for various reasons.
7    Q.    Okay. Then you relayed that 42
8 **billion in securities ultimately did make it to**
9 **BONY, right?**
10    A.    Uh-huh. Yes, that's correct.
11    Q.    Now, was some of that 42 substitute
12 **securities for the 8 billion?**
13    A.    Yes, it was.
14    Q.    Do you know how much?
15    A.    I don't. I mean, we managed to make
16 up as much as we could. I don't know the
17 percentages of what was substituted from the
18 original 8. I mean, at that point we knew 8 and
19 there were other things that were causing
20 problems. And then the goal became you need to
21 get the $50 billion worth of collateral over and
22 make sure you get every collateral that doesn't
23 have lien on it or unencumbered collateral
24 that's eligible for the Barclays transaction

Page 86

1       HIGHLY CONFIDENTIAL - J. HRASKA
2    over there.
3       So, you know, it stopped being about
4    this pool or that pool or this type of
5    collateral or that type of collateral.  You
6    know, there were specific, you know, buckets and
7    things, but at a certain point in time, we were
8    instructed by John Rodefeld to deliver all
9    eligible collateral that fit the criteria to
10   Barclays in as most efficient, quick manner as
11   possible.
12      Q.   I had one question.  I know we're
13   talking round numbers here, but if you were
14   supposed to deliver 50 and you delivered 42, how
15   does the 7 billion box loan make up the entire
16   difference?  Was there -- seems to be another
17   billion dollars missing.
18      A.   Again, it was 42 and change that made
19   it and there was I think it might have been just
20   under 50.  It was 49 and some mid to high
21   change.
22      Q.   So the --
23      A.   You know, what's a half a billion
24   between friends?
25      Q.   So I just want to make sure I wasn't

Page 87

1       HIGHLY CONFIDENTIAL - J. HRASKA
2    missing a billion here or there.
3      A.   No.  No.
4      Q.   It's really the 50 billion that was
5    supposed to make it, made it in the form of
6    approximately 42 and change --
7      A.   Yeah.
8      Q.   -- in securities, and the balance was
9    the box loan?
10     A.   Yes, that's correct.
11     Q.   What securities were used to secure
12   the box loan?
13     A.   I don't know the specific securities.
14   I'm sure that could be provided by --
15     Q.   Well --
16     A.   I mean, if you're asking me like -- I
17   think we talked a little bit about this before.
18   There were securities which were unencumbered
19   still at our clearance box at Chase.  So Chase
20   looked at the securities that were available and
21   said, you know, you have market value that, you
22   know, far exceed 7 billion.
23      So we requested a loan.  They, you
24   know -- we basically booked the transaction for
25   a 7 billion loan on our books and Chase went

Page 88

1       HIGHLY CONFIDENTIAL - J. HRASKA
2    ahead and allocated securities that they deemed
3    appropriate that were being held in their
4    clearance box.
5      Q.   Am I correct to say that the assets
6    used to secure that box loan had nothing to do
7    with the assets you have just described that
8    were supposed to go from the Fed program to
9    BONY?
10     A.   I wouldn't know specifically whether
11   there were any circumstances where there might
12   have been a Cusip that was or a security that
13   was the same that were on the initial intended
14   list.  It's possible.  I wouldn't know for sure.
15     Q.   Okay.  I see reference in some of the
16   documents to something called fails on around
17   Thursday.  What is that term meant to entail, in
18   your understanding?
19     A.   The general term "fails" or --
20     Q.   Well, I see it in the Thursday night
21   e-mail traffic, and I just wondered how that
22   term is used in connection with what we're just
23   talking about, if at all.
24     A.   Okay.  Well, a fail is an interesting
25   term, actually.  It, for most operations

Page 89

1       HIGHLY CONFIDENTIAL - J. HRASKA
2    professionals, a security transaction is booked,
3    and until the point of delivery, it's considered
4    a fail.
5      So that may mean if I book a
6    transaction let's call it last night, 8 o'clock
7    in the morning I haven't delivered it yet, it's
8    still failing.  You know, I may make delivery by
9    the end of the day, and at that point, you know,
10   it becomes cleaned up.
11      Other people in the industry refer to
12   fails as, you know, after settlement date, but
13   from an operations perspective, which is
14   probably a good part of the mail you see, fails
15   are related to undelivered securities at a
16   particular point in time.
17      So on that day we had a enormous
18   amount, as we talked about those, sort of those
19   trades that were queued up before that I
20   referenced, those were all pending deliveries or
21   fails.  So over the course of time, as
22   availability -- as securities became available,
23   those fails were getting cleaned up.  So there
24   were --
25     Q.   Okay.

Page 90

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **(Exhibit 137B, a document bearing**
3    **Bates Nos. 10294679 with attached**
4    **spreadsheets, marked for identification, as**
5    **of this date.)**
6    **Q.    Mr. Hraska, I'm handing you a copy of**
7    **a document marked as Exhibit 137B, which is an**
8    **e-mail chain from September 18, 2008, on which**
9    **you are a CC recipient, and attached to it is a**
10   **spreadsheet and sheet of some sort.**
11   **Please take a minute to look at it and**
12   **I have a question or two about the spreadsheet.**
13   A.    Okay.
14   (Document review.)
15   A.    Okay.
16   **Q.    Have you had a chance to look at the**
17   **document?**
18   A.    Uh-huh.
19   **Q.    I know we were talking about fails**
20   **previously, so I just wanted to get a sense of**
21   **what this type of report is.**
22   **Could you tell me what this document**
23   **is?  I'm talking about the report that's**
24   **attached to it.**
25   A.    I mean, I'm not sure of the generation

Page 91

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    of this report.  This is a listing of trades
3    that are currently in fail status.  So I don't
4    know whether this was -- what system it was
5    taken out of, but it is, looking at the data
6    itself, is it is fail information.
7    **Q.    So am I correct to say that, during**
8    **the course of this Thursday when you are trying**
9    **to transfer all these securities, people would**
10   **periodically get reports of what had failed and**
11   **then they would try to clean them up?**
12   A.    My group, along with the Clearance
13   Group, was monitoring the status of failed
14   trades or not in trying to, yes, effect those
15   transfers and clean up the fails, yeah.
16   **Q.    And the 8 billion that you described**
17   **earlier that didn't make it to BONY, those would**
18   **all show up as fails that eventually could not**
19   **be cleared up?**
20   MR. SHAW:  Just so we're clear, you
21   mean on this list or --
22   MR. HINE:  No, I'm not talking about
23   the list now.
24   A.    They would have initially been booked
25   as transactions which would have showed as a

Page 92

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    fail status.
3    **Q.    Okay.**
4    A.    And then prior -- or, as a result of
5    them not be being available, then, yes, they
6    would have had to have been cleaned up.
7    **Q.    Okay.  Thanks.  That's all I have for**
8    **that document.**
9    **(Exhibit 138B, an e-mail chain, the**
10   **first one in time bearing a date of**
11   **September 18, 2008, at 5:40 P.M., marked for**
12   **identification, as of this date.)**
13   **Q.    Ready to continue?**
14   A.    Sure.
15   **Q.    Mr. Hraska, I've handed you a copy of**
16   **a document marked Exhibit 138B, which appears to**
17   **be an e-mail chain dated September 18, 2008 in**
18   **which you are a participant.**
19   **Could you just take a moment and just**
20   **review this real quick and then I have a few**
21   **questions.**
22   (Document review.)
23   **Q.    Have you had a chance to look at the**
24   **document?**
25   A.    Yes, I have.

Page 93

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    **Q.    Mr. Hraska, I was wondering if you can**
3    **just explain to me generally what the issue is**
4    **that's being discussed in this series of e-mails**
5    **with respect to fails, if you recall.**
6    MR. SHAW:  Objection to form.
7    A.    Yeah, I don't recall the issue being
8    discussed.  This -- it's a long time ago, but I
9    believe this was forwarded to me just because I
10   was involved in a transfer of collateral of some
11   assets, and I think anybody that had any
12   involvement with asset transfers for fails or
13   anything, you know, were being kept apprized of
14   all types transactions going on.
15   So, like I said earlier, I didn't
16   really sort of know what was going on in some of
17   these other negotiations.  My role in this, not
18   to dumb it down, was kind of like more to do
19   with the mechanics of the financing, right?  So
20   kind of move assets from one place to another
21   and talk to the trading desk.  So I'm not a
22   hundred percent sure as to what was going on
23   here with this stuff.
24   **Q.    Okay.  My question was were you**
25   **involved in any discussions with Barclays about**

Page 94

HIGHLY CONFIDENTIAL - J. HRASKA

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **whether they were going to assume liabilities**
3    **associated with fails?**
4        A.   No, unfortunately not.
5        **Q.   Did you hear anything about that or**
6    **recall hearing anything about that at the time?**
7        A.   I remember this mail. I don't
8    remember any other -- like I wasn't
9    participating in any conversations about it or
10   anything like that.
11       **Q.   Okay. Before I forget, I wanted to**
12   **ask you, were you -- do you have any involvement**
13   **in -- during the week of September 15th, 2008,**
14   **did you have any involvement in any amendments**
15   **to the Master Repurchase Agreement that were**
16   **being made?**
17       A.   Which one? There's -- let me -- let
18   me clarify my response. Master Repurchase
19   Agreement is usually between two counterparties,
20   the repo buyer and repo seller. So there
21   were -- we have thousands, so I mean --
22       **Q.   Well, I see there's a Master**
23   **Repurchase Agreement between Barclays and Lehman**
24   **during that week, correct?**
25       A.   There is, that's correct.

Page 95

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2        **Q.   Do you recall any discussions or did**
3    **you have any involvement in any efforts to amend**
4    **that agreement --**
5        A.   No.
6        **Q.   -- during that week?**
7            **Do you have any understanding of why**
8    **an amendment might have to be made to that**
9    **agreement during that week?**
10       A.   There was an amendment made to the
11   agreement. There were amendments made. I'm not
12   sure of the specifics of the amendments, but
13   there were amendments because Barclays was
14   providing some financing to Lehman on a
15   tri-party basis, but ...
16       **Q.   So was --**
17       A.   Not related to the transaction on the
18   18th. There was -- Barclays was providing
19   financing prior to the 18th to Lehman as a
20   liquidity provider, no different than Fidelity
21   or Merrill Lynch.
22       **Q.   Okay. So did you have any role in**
23   **that financing?**
24       A.   The role I would have had there is no
25   different than the role I would have had with

Page 96

HIGHLY CONFIDENTIAL - J. HRASKA

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    any other liquidity provider. Once the
3    agreement was signed and the, you know, the
4    appropriate schedules were put in place with
5    JPMorgan Chase, then, you know, my team would
6    have been involved again in helping the desk
7    find appropriate collateral that would have fit
8    that schedule and things like that.
9        **Q.   Okay. So that is separate and**
10   **distinct from the September 18th repo that we've**
11   **been talking about, right?**
12       A.   That's correct.
13       **Q.   And what was that financing known as**
14   **among you folks during that week?**
15       A.   It was just a tri-party repo
16   transaction with Barclays. That was probably --
17   I mean, that's best classified as a generic
18   tri-party repo transaction. It was as true to
19   form as they come. It was a transaction with a
20   schedule, collateral. JPChase handled the
21   allocations of the collateral.
22       **Q.   The collateral used to support that**
23   **financing was separate and distinct from the**
24   **collateral used to support the September 18th**
25   **repo, right?**

Page 97

HIGHLY CONFIDENTIAL - J. HRASKA

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2        A.   The collateral that was used to
3    support that transaction was available
4    collateral in the clearance boxes during the
5    course of that week. Each day that transaction
6    was an overnight transaction that went on and
7    came off.
8            I wouldn't say that the collateral was
9    separate and distinct. It was just collateral
10   that was available in the boxes.
11       **Q.   But the collateral could not support**
12   **both -- same piece of collateral could not**
13   **support both financings, right?**
14       A.   Well, that's correct, but at what
15   point in time are we talking? This transaction,
16   the transaction I'm discussing now was in place
17   earlier on in the week prior to the 18th. So
18   prior to the 18th, it -- any piece of collateral
19   in the box would have been available.
20           Now, on the 18th, that transaction
21   ceased to exist. So, you know, so there was no
22   time -- there was no point in time when those
23   transactions were both on at the same time.
24       **Q.   Thank you. So why did that**
25   **transaction cease to exist on the 18th?**

Page 98

**HIGHLY CONFIDENTIAL - J. HRASKA**
1    MR. SHAW: Objection. Foundation.
2    A.   I don't know. I mean, that's a
3    trading decision as between I guess Barclays and
4    Lehman's trading desk as to whether or not they
5    were going to roll that transaction to the 18th.
6    **Q.   Did you ever hear any discussions**
7    **about why that transaction was not rolled into**
8    **the following day?**
9    A.   I don't know why it wasn't rolled. I
10   know that it was not rolled, but I don't know
11   why it wasn't rolled, no.
12   **Q.   Did the failure of it to roll affect**
13   **in any way the September 18th repo that we've**
14   **been talking about?**
15   MR. SHAW: Objection. Foundation.
16   A.   It did not affect the repo itself.
17   The repo of September 18 had been completed on,
18   you know, whatever that last transaction was, a
19   deposit of cash, at 2, 3 o'clock in the morning
20   point.
21       It was at that point that that was the
22   main focus. Everybody at the firm was
23   collateralizing that repo and, you know, Lehman
24   believed at the time that that other transaction

Page 99

HIGHLY CONFIDENTIAL - J. HRASKA
1    was also rolling and we were going to just
2    finish that up after completing the other -- the
3    large transaction, $50 billion transaction.
4        But as it turns out, you know, at that
5    late hour, we found out that Barclays hadn't in
6    fact -- because in order to roll that
7    transaction, they would have had to deposit 14
8    or 15 billion dollars in cash. So JPChase had
9    informed us that, you know, as of that time,
10   that cash had not yet come back in.
11       And at that point it was when we
12   realized that, you know -- we didn't know what
13   was Barclays' intention. We still assumed
14   Barclays' intention was to roll it and that
15   there was an operational problem or something
16   with not sending those funds in. You know, we
17   reached out and tried to contact some Barclays
18   folks at the time, but we were unable to, so ...
19   **Q.   And how was this issue ever resolved?**
20   **Do you know?**
21   A.   The issue on that evening, JPMorgan
22   asked us what Barclays' intention was and, you
23   know, we didn't know. We can only tell them
24   what our intention was, and our intention is

Page 100

HIGHLY CONFIDENTIAL - J. HRASKA
1    that we were -- we were rolling the transaction
2    for an additional day.
3        They suggested that we, you know, that
4    we book a "held in custody" transaction, in
5    which case, you know, JPChase would be looking
6    to collect 15 billion that should have been, you
7    know, delivered in if they were going to roll
8    the transaction. JPChase would, you know, put a
9    lien against the assets for the benefit of
10   Barclays until the next morning.
11   **Q.   Are we talking Thursday night into**
12   **Friday morning now?**
13   A.   Thursday night, yeah. This was done
14   very late Thursday night or somewhere in the 2
15   to 3 o'clock hour of Friday morning, and the
16   expectation was is that, you know -- or, Chase's
17   expectation was is that we and/or them would
18   contact Barclays and have them send in the
19   payment with a back valuation adjustment for the
20   18th.
21   **Q.   Did that ever happen?**
22   A.   No.
23   **Q.   Did you ever find out later why they**
24   **didn't roll that loan?**

Page 101

**HIGHLY CONFIDENTIAL - J. HRASKA**
1    A.   Not specifically. Just found out that
2    it was not their intent to roll that loan for
3    that date.
4    **Q.   Have any general understanding of why?**
5    A.   No, not specifically. I mean ...
6    **Q.   So am I correct to say that, because**
7    **they didn't roll that loan, Lehman was forced to**
8    **take this HIC loan from Chase?**
9    A.   Well, Chase forced Lehman into that
10   position. What happened is, you know, Chase
11   said, you know, we are, in essence, liening on
12   those assets now until you come up with the 14
13   and change, 15 billion, I guess for round
14   numbers, cash. And they basically seized the
15   assets and put themselves on as the
16   counterparty. Very similar to the -- it would
17   have looked from a transactional perspective
18   very similar to the box loan that was put on for
19   the 7 billion.
20   **Q.   So, in the end, there is a HIC loan**
21   **effected over that night, correct?**
22   A.   Over that night, there was a HIC loan
23   that was booked with Barclays as a beneficiary.
24   That beneficiary was changed by JPMorgan Chase

Page 102

HIGHLY CONFIDENTIAL - J. HRASKA

1  on the morning of the 19th, somewhere in before
2  noon. I don't know exactly when it was.
3  **Q. Changed to who?**
4     A. Changed to Chase being the
5  beneficiary.
6     **Q. Can we discuss for a couple minutes**
7  **the -- what happens to the September 18 repo**
8  **after it's now been collateralized and the box**
9  **loan has been granted? So there's a bunch of**
10 **collateral supporting that loan. What happens**
11 **on Friday with respect to that loan?**
12    MR. SHAW: Foundation.
13    A.  With respect to the overall loan, in
14 other words, the whole repo transaction, or the
15 loan to support the 7 billion in cash?
16    **Q. The whole repo transaction.**
17    A.  The whole repo transaction, okay. So
18 as a result of the fact that we deposited the 7
19 billion in cash, you know, normal course is for
20 my group to work with tri-party operations to
21 try to maximize the efficiency of our
22 collateral.
23    So it's typical -- it's not typical to
24 leave cash on deposit as collateral. I mean,

Page 103

HIGHLY CONFIDENTIAL - J. HRASKA

1  it's done on tri-party transactions in, you
2  know, somewhat normal course, but, you know,
3  ideally you try to substitute collateral.
4     So I had worked with the trading desk
5  and the Tri-Party Ops folks and we started
6  looking for collateral to substitute for that 7
7  billion. So that's I think we referenced a
8  little bit earlier the billion-35 that we had
9  come up with.
10    **Q. Okay.**
11    A.  And again, the intent was to deliver
12 the billion-35 in and to receive a portion of
13 the cash -- equivalent market value of cash
14 back.
15    **Q. And what ended up happening?**
16    MR. SHAW: Objection. Foundation.
17    A.  Yeah, I mean what ended up happening
18 was we lived up to our part, we delivered the
19 collateral in, and then there was some, you
20 know, some dispute about the cash and, you know,
21 some other things, and at the end of the day,
22 you know, we never got returned the cash by
23 Chase.
24    **Q. Okay. On Friday of that week, LBI**

Page 104

**HIGHLY CONFIDENTIAL - J. HRASKA**

1  **files for bankruptcy, correct?**
2     A.  That's correct.
3     **Q. And do you recall any discussions**
4  **about whether that would cause a default of the**
5  **September 18 repo?**
6     A.  I think we talked about that a little
7  bit. I mean, you know, I started thinking about
8  it over the weekend, but I didn't have any real
9  conversations about it until I got a call from
10 the margin folks and until I sat down with Monty
11 and we talked about whether that was going to
12 trigger a default or not. Our assumption was
13 that it was going to.
14    **Q. At some point over that weekend, you**
15 **work on transferring the collateral that was**
16 **used to support the September 18 repo to**
17 **Barclays, correct?**
18    A.  Not over the weekend, but --
19    **Q. When --**
20    A.  The collateral was all transferred on
21 the night of the 18th, and then there was that
22 additional piece that we just talked about,
23 which was transferred on the 19th.
24    **Q. Right.**

Page 105

**HIGHLY CONFIDENTIAL - J. HRASKA**

1     A.  On the weekend we worked to try to
2  locate additional collateral that would be
3  eligible for a transfer.
4     **Q. And that's the 1.4 billion we talked**
5  **about earlier?**
6     A.  That's the 1.4 billion, yeah.
7     **Q. I had a question about that. Is that**
8  **1.4 billion as of that weekend; that's the value**
9  **of that collateral over that weekend?**
10    A.  That was --
11    MR. SHAW: Objection. Foundation.
12    A.  Again, that was -- the 1.4 billion is
13 the assets that were actually transferred over a
14 period of time, ending I believe on the 29th of
15 September, and it was based off of values that
16 were -- I actually don't know what the value,
17 what they were based off of.
18    I think they were based off of some
19 initial list, but they wouldn't have been based
20 off of the date of transfer. Like nobody was --
21 I wasn't involved in any repricing of assets or
22 anything like that, so I believe they were based
23 off of initial pricing.
24    **Q. You say you identified a pool of**

Page 106

**HIGHLY CONFIDENTIAL - J. HRASKA**

1      **HIGHLY CONFIDENTIAL - J. HRASKA**
2   assets that were approximately worth 1.4
3   billion. Was that -- did Barclays end up
4   getting all those assets?
5     A.  Let me just --
6       MR. SHAW: Mischaracterizes prior
7   testimony.
8     **Q.  Go ahead, Mr. Hraska.**
9     A.  I identified the list that I think was
10  probably greater than 1.4 billion. The 1.4
11  billion was only the securities that truly made
12  the transfer over. So, you know, we identified
13  the list of everything that we thought was
14  unencumbered and available for transfer. What
15  was physically able to be transferred equaled
16  approximately the 1.4 billion.
17     **Q.  And what happened to the rest of the**
18  **assets that you identified? Were they ever**
19  **transferred to Barclays?**
20     A.  They were hot.
21     **Q.  Does Barclays thinks it's entitled to**
22  **those assets?**
23       MR. SHAW: Objection. Foundation.
24     A.  I honestly don't know.
25     **Q.  Since you've been working at Barclays,**

Page 107

1     **HIGHLY CONFIDENTIAL - J. HRASKA**
2   have you heard any discussions about whether
3   they should be getting those assets?
4     A.  I was instructed to continue to search
5   for available collateral that was to be
6   transferred to Barclays as part of the larger
7   transaction between Barclays and Lehman, which I
8   continue to do in my capacity in working with
9   the Treasury folks and things like that, but I
10  don't know specifically whether it was those
11  same assets.
12     At that point in time, again, things
13  had changed a little bit. You know, we stopped
14  focusing on the repo because that had sort of
15  been taking care of already and it was a matter
16  of looking -- helping to continue to look for
17  unencumbered assets.
18     **Q.  So, just so I understand, you**
19  **identified a list of unencumbered assets that**
20  **was, to your mind, worth more than 1.4, but only**
21  **1.4 made it to Barclays; is that right?**
22     A.  That's correct, yes.
23     **Q.  Do you know how much more than 1.4 the**
24  **assets were that you identified?**
25       MR. SHAW: Objection. Asked and

Page 108

1     HIGHLY CONFIDENTIAL - J. HRASKA
2   answered.
3     A.  I -- I know that it was probably in
4   the neighborhood of around 2 billion, but I
5   don't know how much more than that.
6     **Q.  Okay.**
7     A.  We had a lot of discussions about the
8   assets that, you know, and I can't recall
9   whether it was what is -- what ended up being
10  the list was assets that are only in the DTC
11  boxes or, you know, we were looking across
12  international boxes and all that stuff. So
13  there was just so much going and I know it was
14  north 1.4. I want to say it was 2 billion, but
15  I can't be sure.
16     **Q.  Were you involved, since you've been**
17  **at Barclays, have you been involved in any**
18  **efforts to prepare an opening balance sheet that**
19  **would relate to the Lehman/Barclays transaction?**
20     A.  No.
21     **Q.  Did you have any role in connection**
22  **with their declaration -- or, let me withdraw**
23  **that. Do you have any knowledge of or**
24  **understanding of how Barclays was able to**
25  **declare a $4.2 billion gain on acquisition as a**

Page 109

1     **HIGHLY CONFIDENTIAL - J. HRASKA**
2  **result of this transaction?**
3     A.  No.
4     **Q.  Do you have any current role in the**
5  **preparation of Barclays' balance sheets?**
6     A.  No, the typically balance sheet and
7   things like that are performed by the Finance
8   folks and Product Control folks, which is
9   completely aware from Operations.
10     **Q.  Do you give them any input during the**
11  **course of their preparation of the balance**
12  **sheets?**
13     A.  If they have questions as to the
14  nature of transaction -- are we talking related
15  to the transaction between LBI and --
16     **Q.  Yes.**
17     A.  Okay. I have provided information as
18  to that transaction on the 18th and what assets
19  were transferred over, and I provided some
20  information around 1.4 billion as to what those
21  assets were that made it to Barclays, but as far
22  as determination of balance sheet or if those
23  assets were eligible for balance sheet, I don't
24  have any knowledge of that.
25     **Q.  Okay. When you say -- who did you**

1        **HIGHLY CONFIDENTIAL - J. HRASKA**
2   **provide that information to?  The Treasury**
3   **Department?**
4        A.    That would have been, yeah, Paolo and
5   his team.
6        **Q.    How did you come to be involved in**
7   **what we have called Schedule A and Schedule B?**
8        A.    Well, I guess I provided the assets
9   that ultimately became -- I provided lists of
10  assets that ultimately became Schedule A and
11  Schedule B.  I was asked to provide schedules of
12  the assets that made it to Bank of New York,
13  which we did, and then as well as, you know --
14  you know, and over a period of dates, right?
15       So, to be very simple, I basically
16  provided a spreadsheet with tabs that said on
17  this date we moved these assets, on this date we
18  moved these assets, and those subsequently
19  became categorized as either Schedule A or
20  Schedule B, depending on I guess the timing of
21  the transfer.
22       **Q.    Do you have any knowledge of what has**
23  **been called a clarification letter in connection**
24  **with this transaction?**
25       A.    I've had -- I've heard the term, but

1        HIGHLY CONFIDENTIAL - J. HRASKA
2   honestly I don't know what it means.
3        **Q.    Have you ever read anything called a**
4   **clarification letter?**
5        A.    No.
6        **Q.    You have to say verbally say no?**
7        A.    I'm sorry.  No.
8        **Q.    Did you have any understanding when**
9   **you were preparing these schedules that that**
10  **would become Schedules A and B to a**
11  **clarification letter?**
12       A.    No.
13       **Q.    Did you have any understanding of the**
14  **purpose of this clarification letter?**
15       A.    No.
16       **Q.    I want to spend a little time going**
17  **through these schedules.  Do you want to take a**
18  **break before we do that?**
19       MR. SHAW:  Why don't we take a short
20  break before we do that.
21       THE WITNESS:  Thank you.
22       (Recess; Time Noted:  11:33 A.M.)
23       (Time Noted:  11:40 A.M.)
24  BY MR. HINE:
25       **Q.    Mr. Hraska, I now want to talk about**

1        **HIGHLY CONFIDENTIAL - J. HRASKA**
2   **Schedules A and B, so this is going to be the**
3   **30(b)(6) portion of your deposition because**
4   **that's the two topics that you have been**
5   **designated in part to cover.**
6        **So what I'd like to do is walk through**
7   **some of the different schedules that I have seen**
8   **and discuss them in connection with Schedules A**
9   **and B.**
10       A.    Okay.
11       (Exhibit 139B, Printout of Schedules,
12  marked for identification, as of this date.)
13       **Q.    Mr. Hraska, I'm handing you a document**
14  **which I've marked as Exhibit 139B.**
15       A.    Okay.
16       **Q.    Which is a voluminous printout of**
17  **schedules of some sort.  It is marked with the**
18  **Bates stamps BCI-EX-00009798 through 10368.**
19       MR. SHAW:  I'm not suggesting you read
20  this cover to cover, but take whatever time
21  you need to review.
22       **Q.    I'm not going to ask you questions**
23  **about detailed entries in here, but I'm going to**
24  **ask you questions primarily about the first two**
25  **pages, but take whatever time you need just to**

1        **HIGHLY CONFIDENTIAL - J. HRASKA**
2   **familiarize yourself with the document.**
3        A.    Thank you.
4        (Document review.)
5        A.    Okay.
6        **Q.    Have you had a chance to review it**
7   **briefly?**
8        A.    I have, yes.
9        **Q.    Have you ever seen this document**
10  **before?**
11       A.    Yes, I have.  I created it.
12       **Q.    And is this a -- or, well, let's start**
13  **this way.  What is this document?**
14       A.    This is an e-mail to John Rodefeld,
15  who was Barclays, as we mentioned, Operations,
16  and Kevin Caffrey, who is the managing director
17  at Bank of New York in charge of like clearing,
18  custody, tri-party, things like that.
19       And what I was looking to do here was
20  to confirm what Lehman believed that, you know,
21  they transferred as a result of the repo
22  transaction on the 18th.  We wanted to
23  reconcile -- we wanted to do a three-way
24  reconciliation.  Basically, we wanted Lehman's
25  books to tie out with both Barclays and with

Page 114

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  Bank of New York so that we could confirm the
3  secured identifiers, the par amounts, and things
4  like that of the transaction.
5        And so the spreadsheet itself attached
6  was my department's collaboration of what we
7  believed we transferred on the 18th, and then
8  the last point here is me reaching out to Kevin
9  to talk about, you know, clearance relationships
10  going forward for the broker-dealer, LBI.
11    **Q.   That's point number 4 on the e-mail**
12  **you're talking about?**
13    A.   That's point number 4 on the e-mail,
14  yes.
15    **Q.   Can you turn to the second page of**
16  **this document?**
17    MR. SHAW:  That's the one with the
18  Bates number ending in 9799?
19    MR. HINE:  Correct.
20    **Q.   That's a very small chart with columns**
21  **A and B, do you see that?**
22    A.   Uh-huh.
23    **Q.   Now, I think I understand what this**
24  **is, but could you explain to me what you**
25  **understand this chart to be capturing?**

Page 115

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    A.   This chart was my group's attempt to
3  summarize the market value on the collateral in
4  these appropriate buckets just to give people an
5  understanding of the composition of the
6  collateral and market value that we associated
7  with that.
8        So the Fed collateral would be -- the
9  Fed wirable type collateral, as I defined
10  earlier, and then 74 and 636 would have been the
11  positions that came out of the Depository Trust
12  Company.
13        And then what's referred to as TP cash
14  is the 7 billion pure cash that we talked about
15  as well.
16    **Q.   Okay.  The TP cash is the proceeds**
17  **from the box loan that we talked when earlier?**
18    A.   Yes, that's correct.
19    **Q.   And when you say "Fed wirable," that**
20  **is the -- that is securities that were**
21  **successfully transferred from the Fed program to**
22  **BONY on Thursday; is that right?**
23    A.   No, let me clarify that.  Those are
24  the securities that were transferred that were
25  Fed wirable security types because the

Page 116

1    HIGHLY CONFIDENTIAL - J. HRASKA
2  securities that were transferred were this
3  entire list other than TP cash.
4    **Q.   Okay.**
5    A.   Because these other two are included
6  in the Fed program.  So this was Fed program
7  securities that were Fed wire eligible.  That's
8  what that first line is.
9    **Q.   What does "Fed wire eligible" mean?**
10    A.   Well, Fed wire eligible is a type of
11  security that's transferred on the Federal
12  Reserve's book entry transfer system.  So
13  examples are U.S. Treasuries, Fannie Maes, Ginne
14  Maes, collateral types of those classes.
15        Other types of collateral are
16  typically transferred through DTC, which is
17  represented by the participant IDs here, DTC
18  participant IDs.
19    **Q.   Just to harken back to our prior**
20  **discussion, this reflects the approximately 42**
21  **billion in securities plus the 7 billion in cash**
22  **that was ultimately transferred under the**
23  **September 18th repo, correct?**
24    A.   That's correct.
25    **Q.   Now, how were these market values**

Page 117

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2  **determined?**
3    A.   I don't know how they were determined.
4  They were provided from what Lehman had in their
5  systems at the time.
6    **Q.   So these are Lehman's values?**
7    A.   I know those to be Lehman's values.
8    **Q.   And I think we might have touched on**
9  **this before, but Bank of New York ascribed its**
10  **own values to those securities?**
11    A.   They did, yes.
12    **Q.   So am I correct to say that this chart**
13  **and spreadsheet would not include Bank of New**
14  **York valuations, but only included the Lehman**
15  **valuations?**
16    A.   That would be correct, yes.
17    **Q.   Okay.  Now, did you get -- your**
18  **covering e-mail asks I presume Mr. Rodefeld and**
19  **Mr. Caffrey to verify the positions.  Did they**
20  **in fact try to do that?**
21    A.   Yes, we did that.  They sent us back
22  files and we reconciled all the positions.
23    **Q.   Okay.  Let me show you another chart.**
24  **I think it'll relate to the story, but I'm not**
25  **sure.**

**HIGHLY CONFIDENTIAL - J. HRASKA**

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2      Mr. Hraska, I hand you an exhibit
3    that's previously been marked as Exhibit 83B,
4    which is an e-mail dated Sunday, September 21st.
5      MR. SHAW:  Do you have a copy which is
6    not cut off on the side?
7      MR. HINE:  We'll try to locate one.
8      MR. SHAW:  He needs one that's
9    complete rather than ...
10      (Document handed.)
11    A.  Okay.
12    Q.  Mr. Hraska, have you had a chance to
13    look at the document?
14    A.  I have.
15    Q.  Have you ever seen this document
16    before?
17    A.  No.
18    Q.  To your knowledge, are the people
19    listed in the "to" and "from" portions of the
20    e-mail Barclays employees, generally?
21    A.  Primarily, yes.
22    Q.  You'll see in the first -- the first
23    bullet point in the text that says, "We should
24    book all positions from the Lehman financing
25    facility to BCI (approximately 45 billion)

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    securities.  See attached files."  Do you see
3    that?
4    A.  I do see that, yes.
5    Q.  When you had this effort to reconcile
6    your position with Barclays and BONY, did you
7    ever hear the figure of approximately 45 billion
8    used as the value for the securities that were
9    in the September 18 repo?
10    A.  No, not specifically 45 billion.
11    Q.  Do you have any knowledge of where
12    this figure might have come from?
13    A.  Unfortunately, no.  I don't think I'm
14    CC'd on here.  I didn't see myself and I don't
15    recognize it.
16    Q.  No, you're not CC'd.  I'm just
17    wondering, in your discussions between at or
18    about, you know, Saturday, Sunday that weekend,
19    if you heard any use of a number of about 45
20    billion in connection with the securities that
21    were listed in your prior exhibit?
22      MR. SHAW:  Objection.  Asked and
23    answered.
24    A.  I hadn't heard any discussions related
25    to 45 billion securities.  People mistakenly,

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    like we were talking terms earlier, referred to
3    the $45 billion in cash.  So it's possible that
4    somebody was referring to the cash and not
5    securities here, but I'm speculating on that.  I
6    don't really know.
7    Q.  Can you describe for me the
8    reconciliation process that took place with
9    respect to these securities?  Was there a debate
10    as to the value assigned to the securities?
11      MR. SHAW:  Objection to form.
12    A.  There was --
13      MR. SHAW:  And foundation.
14    A.  There was -- from an operations
15    perspective, our primary objective was to make
16    sure that the quantities and the Cusips all
17    matched.  You know, as we talked about the
18    market values that we knew were based off of
19    Lehman's systems, there was some discussion
20    about the value of the securities.
21      I wasn't privy to the actual
22    discussions.  I knew there was going to be a
23    value -- a discussion about value of securities
24    because Bank of New York informed me that they
25    didn't agree with some of the pricing that we

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    had attached to some of these securities.
3    Q.  And what did they tell you about that?
4    A.  Very generically, they basically said
5    that we're going to have to review these prices,
6    we don't necessarily agree with these, and at
7    that point it kind of went out of my camp,
8    because, again, I don't really deal with the
9    pricing side of it.  I just have to make sure
10    the securities make it, the right quantities
11    make it, there's no stock record breaks and all
12    that kind of stuff.
13    Q.  Who deals with the pricing part of it?
14    A.  The pricing part at both Barclays and
15    at Lehman would be handled by the Financial
16    Control folks.  So I would say like, you know,
17    in the current organization, I guess Marty Klein
18    and those folks, and at Lehman it would have
19    been Gerry Reilly's organization.
20    Q.  Okay.  Is there any, in this
21    reconciliation effort that you talked about, is
22    there a reconciliation as to price or is it just
23    the identifying Cusips and the particular
24    securities that were transferred?
25    A.  My reconciliation was purely to

Page 122

1   HIGHLY CONFIDENTIAL - J. HRASKA
2   securities quantities, that kind of thing. And
3   like I said, I know that the finance teams were
4   going back and forth on the pricing issue, but,
5   unfortunately, I didn't really partake in those
6   discussions.
7       Q.   Do you know how -- what price they
8   arrived at at the end?
9       A.   I don't, unfortunately.
10      Q.   It appears in some documents that the
11  BONY pricing was higher than the prices ascribed
12  to the securities on your -- on the prior
13  exhibit.  Do you have any idea why that would be
14  the case?
15      MR. SHAW:  Objection to form.
16      A.   I don't.  It's actually very
17  surprising to me as well, because the initial
18  conversation that I just referenced a few
19  minutes ago from Bank of New York that we
20  had over-valued a few securities and, therefore,
21  they were concerned about the total market value
22  that we had sent them.  So, you know...
23      Q.   Do you recall any discussions about
24  writing down the value of securities during this
25  period?

Page 123

1       HIGHLY CONFIDENTIAL - J. HRASKA
2       MR. SHAW:  Objection to form.
3       A.   During -- could I ask a clarification?
4   During which period?  During the period at any
5   point in time after the transaction, or during
6   like a period of the week, or what point in
7   time?
8       Q.   Let's break it down.  Let's talk about
9   this -- during this reconciliation period that
10  you mentioned, which I take it is from Friday,
11  the 19th, through the weekend, correct?
12      A.   Okay.
13      Q.   So were there any discussions during
14  that period about writing down the value of
15  securities?
16      MR. SHAW:  Just so we're clear,
17  because this is a 30(b)(6), are there
18  discussions that he participated in?
19      MR. HINE:  That he's aware of.
20      A.   I'm aware there were discussions about
21  the values of the securities.  As to writing up
22  or down, I wasn't made privy to that.
23      Q.   At any time during this week were you
24  privy to any discussions where the possibility
25  of writing down the value of securities was

Page 124

1       HIGHLY CONFIDENTIAL - J. HRASKA
2   discussed?
3       A.   No.
4       Q.   So, back to Exhibit 83B, based on your
5   experience, is it fair to assume that this is
6   probably a document generated by Barclays in
7   connection with that reconciliation effort that
8   you were discussing?
9       A.   I would assume that's the case, yes.
10      Q.   Okay.  But you have no specific
11  knowledge about how this document was prepared
12  or --
13      A.   I don't, unfortunately, no.
14      Q.   Mr. Hraska, I'm handing you a copy of
15  a document marked as Exhibit 84B.  If you
16  wouldn't mind taking a moment to review it.
17  Just for the record, the document is
18  Bates-stamped BCI-008149 through 8670.
19      (Document review.)
20      A.   Presentation of these is definitely
21  not user-friendly.
22      Q.   Forced to print them out for purposes
23  of a deposition.
24      A.   I understand that.
25      (Document review.)

Page 125

1   HIGHLY CONFIDENTIAL - J. HRASKA
2       A.   Okay.
3       Q.   Have you had a chance to look at the
4   document?
5       A.   I have.
6       Q.   Have you ever seen this document
7   before?
8       A.   No.  Well, actually, I have seen this
9   in the preparation to my -- this portion of the
10  deposition.
11      Q.   Okay.
12      A.   I actually reviewed some files, and I
13  believe this is one of the ones on that list.
14  I'm not a hundred percent sure, but I think it
15  is.
16      Q.   Okay.  Other than your preparation for
17  this deposition, do you recall seeing this
18  document at all?
19      A.   No.
20      Q.   I noticed they misspelled your name on
21  the front.  Is that a possible reason why you
22  might have not received this document?
23      A.   Yeah, because it wouldn't have gone to
24  my e-mail, if that's the case.
25      Q.   Would it be fair to say you have no

Page 126

**HIGHLY CONFIDENTIAL - J. HRASKA**

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **familiarity with how this document was prepared?**
3    A.    That's true.
4    **Q.    Okay. And the covering e-mail says --**
5    **it's an e-mail from Mr. Yang, which says, "I've**
6    **attached a schedule produced by Barclays' Ops of**
7    **the collateral currently held at BONY under the**
8    **repo financing provided to Lehman." It**
9    **continues to say that -- it says "a total BONY**
10    **market value of approximately 45 billion." You**
11    **see that?**
12    A.    I do, yes.
13    **Q.    Is it probably safe to assume that**
14    **this was prepared in connection with your**
15    **reconciliation effort between Lehman and Bank of**
16    **New York and Barclays as to the securities that**
17    **were involved in the September 18 repo?**
18    MR. SHAW: Objection. Foundation.
19    Calls for speculation.
20    A.    Yeah, I guess it's fair to assume
21    then.
22    **Q.    Again, do you see the number of 45**
23    **billion?**
24    A.    Uh-huh.
25    **Q.    Does this refresh your recollection at**

Page 127

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **all or does this remind you of anything in**
3    **connection with how Bank of New York valued this**
4    **pool of securities?**
5    MR. SHAW: Objection to form.
6    A.    Unfortunately, not. I mean, I -- the
7    only 45 billion that I was aware of was the
8    actual principal value, and I don't remember
9    assets being referred to as 45 billion in any of
10    the conversations that I had.
11    **Q.    Okay. And when you say the principal**
12    **value, you're talking about the amount of --**
13    A.    Cash extended on the transaction.
14    **Q.    Okay. So is it correct to say that in**
15    **this reconciliation process that you discussed**
16    **you don't recall anyone ever mentioning a value**
17    **of this pool of securities being about $45**
18    **billion?**
19    MR. SHAW: Asked and answered.
20    A.    That's correct.
21    **Q.    So, just to complete the record, you**
22    **have no way of explaining how this value in this**
23    **document would differ with the $42.9 billion**
24    **number in Exhibit -- in the prior exhibit that**
25    **you looked at; is that right?**

Page 128

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    MR. SHAW: Prior exhibit, are you
3    referring to 139B?
4    **Q.    139B. Let me rephrase the question.**
5    A.    Okay.
6    **Q.    In Exhibit 139B --**
7    A.    Right, that's my document.
8    **Q.    -- which is the document you prepared,**
9    **has a value of 42.9 billion, approximately?**
10    A.    Right.
11    **Q.    This one seems to ascribe a value of**
12    **45 billion.**
13    A.    Okay.
14    **Q.    Do you have any way to -- any**
15    **explanation for why they would come to different**
16    **values?**
17    MR. SHAW: Objection. Calls for
18    speculation.
19    A.    My opinion is that the Lehman pricing
20    was different than the Bank of New York pricing.
21    **Q.    In what way?**
22    A.    Well, in the tune of $3 billion. I
23    mean -- I mean, I'm not trying to be sarcastic.
24    I mean, you know, to the extent that they're
25    valuing a pool of collateral at 45 and we're

Page 129

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    valuing it at 42, the average price on a basket
3    basis would mean that they valued the basket
4    higher. I'm sure there were multiple assets
5    where there were pricing differentials, but as
6    an aggregate, it appears that they gave higher
7    values to most securities.
8    **Q.    Let me ask you this. In this**
9    **reconciliation -- well, scratch that. The**
10    **difference could arise, could it not, either**
11    **from how you value individual securities or**
12    **whether you have the same pool of securities**
13    **that you're looking at, correct?**
14    A.    That's correct. I thought the -- yes,
15    okay.
16    **Q.    Well, my question is, in this**
17    **reconciliation process, did it end up that there**
18    **was a vast difference in the pool of securities**
19    **that were being considered?**
20    A.    That's a different question.
21    **Q.    Between the Barclays folks and your**
22    **list?**
23    A.    From a security delivery perspective,
24    we tied out completely to the number of
25    securities and the security identifiers that we

Page 130

HIGHLY CONFIDENTIAL - J. HRASKA

1   delivered versus what Bank of New York and
2   Barclays knew.
3   **Q.   When you say "tied out"?**
4       A.   "Tied out," meaning we reconciled that
5   there were no discrepancies.
6       **Q.   So the difference in any values would**
7   **have to be in the method of pricing, then,**
8   **correct?**
9       A.   Yes, the one thing, we tied out -- the
10  tieout process took a few days, so I don't know
11  whether on September 22 we were completely tied
12  out, but the initial tieout itself, though,
13  there were minimal, minimal discrepancies.  I
14  would say, you know, probably less than a
15  hundred.
16      **Q.   So would you agree with me, then, that**
17  **if there is a difference in pricing, it would**
18  **probably be the result of how you price**
19  **individual securities instead of --**
20      A.   And not so much --
21      **Q.   -- the composition of the pool?**
22      MR. SHAW:  Objection to form.  You
23  need to let him finish his question and then
24  let me object so we have a clean record.

Page 131

HIGHLY CONFIDENTIAL - J. HRASKA

1       A.   So then could you repeat the question?
2       (Record read.)
3       MR. SHAW:  Objection to form.
4       A.   Yes.
5       **Q.   Okay.**
6       (Exhibit 140B, a document bearing
7   Bates Nos. BCI-CG00052538 through 53173,
8   marked for identification, as of this date.)
9       **Q.   Mr. Hraska, I'm handing you a document**
10  **that's been marked as Exhibit 140B.**
11      A.   Okay.
12      **Q.   Again, another voluminous schedule**
13  **with Bates Nos. BCI-CG-00052538 through 53173.**
14  **And again, it's a voluminous schedule, but take**
15  **your time to review it.**
16      A.   Uh-huh.
17      **Q.   I was really going to ask you about**
18  **the, primarily, the first and last page.**
19      A.   Okay.
20      (Document review.)
21      A.   Okay.
22      **Q.   Mr. Hraska, have you had a chance to**
23  **look at it briefly?**
24      A.   I have, yes.

Page 132

HIGHLY CONFIDENTIAL - J. HRASKA

1       **Q.   You'll see the -- first of all, have**
2   **you ever seen this document before?**
3       A.   In preparation for the deposition,
4   yes, but other than that, no.
5       **Q.   Okay. You'll see on the cover page**
6   **that this is dated Friday, September 26?**
7       A.   Uh-huh.
8       **Q.   And at the bottom of the covering**
9   **e-mail it mentions Schedule A, you see that?**
10      A.   Okay.
11      **Q.   It says here, "Our guys are still**
12  **running the reconciliation to confirm that there**
13  **are no errors in the Barclays list."  Do you see**
14  **that?**
15      A.   Uh-huh.
16      **Q.   And then if you turn to the last tab**
17  **in the document, it's a lengthy schedule which**
18  **concludes with a number, a figure on the last**
19  **page --**
20      A.   The last page?
21      **Q.   -- of 44, of approximately $44.1**
22  **billion, do you see that?**
23      A.   I do, yes.
24      **Q.   And so my question is, do you have any**

Page 133

HIGHLY CONFIDENTIAL - J. HRASKA

1   understanding of why the value of this schedule
2   of the securities embodied in the schedule is
3   now at this point in time at $44.1 billion as
4   opposed to the 42.9 that we saw earlier?
5       A.   No is the short answer.  We talked
6   earlier about pricing differentials.  So, to me,
7   I don't know whether this is a Lehman-produced
8   or Barclays produced it.  It doesn't appear to
9   me to be a Lehman-produced, so ...
10      **Q.   When you say it doesn't appear to be a**
11  **Lehman-produced document, are you referring to**
12  **the last tab, which is purportedly Schedule A?**
13      A.   Well, this is an e-mail I wasn't
14  included on.
15      **Q.   Right.**
16      A.   So it doesn't look like the format of
17  any of the files that I produced, so that's why
18  I'm assuming -- well, me being Lehman at the
19  time, Lehman-produced.
20      **Q.   Okay. Do you recall the figure $44.1**
21  **billion ever being used in connection with the**
22  **value of the securities on Schedule A?**
23      A.   No.
24      **Q.   And I think you said earlier, but I**

Page 134

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **just want to get a clarification, that other**
3    **folks, if there was a reconciliation as to**
4    **value, it was being done by other people other**
5    **than yourself?**
6        A.    The two finance organizations.
7        Q.    **And I think you gave me names, but I**
8    **forgot them.  Is that Mr. Reilly?**
9        A.    Mr. Reilly's organization, right, and
10   then I know it's Marty Klein now.  I'm not sure
11   who was head -- if it was Marty.  I think Marty
12   Klein was legacy Lehman, so I'm not sure who was
13   in the finance organization at the time.  I
14   think you had Jason Yang or some of those guys.
15   Yeah, Jason Yang was involved.
16       Q.    **So am I correct in assuming that you**
17   **really don't have any knowledge as to the -- how**
18   **this $44.1 billion figure was arrived at?**
19       A.    That's correct.
20       Q.    **Okay.**
21           (Exhibit 141B, a document bearing
22       Bates Nos. BCI-CG00055192 through 55629,
23       marked for identification, as of this date.)
24       Q.    **Mr. Hraska, I'm handing you a copy of**
25   **a document marked as Exhibit 142B.**

Page 135

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2        A.    Mine is marked 141.  Do I have the
3    wrong one?
4        Q.    **141B, I apologize.  It's Bates-stamped**
5    **BCI-CG-0055192 through 55629.  Please take a**
6    **minute to review it.  If it helps in your**
7    **review, my questions are going to involve the**
8    **cover page and the page marked 55519, which is a**
9    **little more than halfway through the document.**
10           (Document review.)
11       A.    Could you please repeat the middle
12   page you said you wanted me to read?
13       Q.    **The page ending in 55519.**
14           MR. SHAW:  You mean 55319?
15           MR. HINE:  No, 55519.
16       A.    Okay.
17       Q.    **So CG55519.**
18       A.    Okay.
19       Q.    **Have you had a chance to look at the**
20   **document briefly?**
21       A.    I have, yes.
22       Q.    **Have you ever seen this document**
23   **before?**
24       A.    Again, not before the preparation for
25   this deposition.

Page 136

1        HIGHLY CONFIDENTIAL - J. HRASKA
2        Q.    **Okay.  Does this look like a schedule**
3    **that was prepared by Lehman or Barclays?**
4        A.    It does not look like it's a schedule
5    that I prepared, so ...
6        Q.    **Okay.  You'll see on the cover page it**
7    **mentions the fact that this includes two**
8    **attachments, one of which is Schedule A and one**
9    **a Schedule B, do you see that?**
10       A.    I do.
11           MR. SHAW:  Objection.
12   Mischaracterizes the document.
13       Q.    **Okay.**
14           MR. SHAW:  Schedule B, Part 1.
15           MR. HINE:  Okay.
16       Q.    **Mr. Hraska, what is Schedule B, Part**
17   **1?**
18       A.    I honestly don't know.
19       Q.    **Have you ever seen Schedule B broken**
20   **into Parts 1 or 2?**
21       A.    No.
22       Q.    **If you could turn to the page we had**
23   **been discussing, which is the one ending in**
24   **Bates stamp 55519, you'll see this comes to a**
25   **$42.9 billion figure, correct?**

Page 137

1        **HIGHLY CONFIDENTIAL - J. HRASKA**
2        A.    That's correct.
3        Q.    **Now, my question is along the lines of**
4    **the prior questions:  Do you have any**
5    **explanation of how, after a few weeks of**
6    **discussion, the figure appears to have gotten**
7    **back to $42.9 billion after there were previous**
8    **iterations where the numbers of 45 and 44**
9    **billion bandied about?**
10       A.    Well, what I can tell you is that 42.9
11   is the number that I recognize, which is I
12   believe we confirmed in the previous documents.
13   So this number to me is familiar, and I would
14   agree that that was what I knew the value to be.
15       I don't know how it got back to that.
16   I don't know -- this is just -- because it's a
17   large document.  It could be that somewhere else
18   it's referenced still 44.  I haven't gone
19   through every page.  But I can tell you that
20   this number is the number that I recognized and
21   I maintain to recognize as the value of what we
22   transferred.
23       Q.    **So in your -- again, I'm not trying to**
24   **trick you.**
25       A.    No.  No.

Page 138

HIGHLY CONFIDENTIAL - J. HRASKA

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  Q. I know you're not -- you didn't
3  recognize some of the other numbers we just
4  talked about. So, in your mind, approximately
5  42.9 billion is the value of the securities on
6  Schedule A, correct?
7  MR. SHAW: Objection.
8  Mischaracterizes. You can --
9  A. It was the value that I knew at the
10 time of transfer, and whether or not that value
11 changed or was subsequently discussed, I don't
12 know, but it was the value that I knew at the
13 time of transfer.
14 Q. Okay. And you weren't involved in any
15 discussions about other values with respect to
16 that schedule, correct?
17 A. No.
18 Q. And do you think that's the value in
19 your mind of the final version of Schedule A?
20 MR. SHAW: Objection to form.
21 A. Again, I don't know if it was the
22 final version. I know it was the value when I
23 transferred it.
24 Q. Maybe that was a bad question. Did
25 Schedule A change in composition, to your

Page 139

HIGHLY CONFIDENTIAL - J. HRASKA

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  knowledge, from the original chart that we
3  looked at?
4  A. In composition of securities? The
5  number of securities and things like that? The
6  schedule did not change. The pricing may have
7  changed.
8  Q. Okay. But you don't have any
9  knowledge of whether the pricing changed?
10 A. Other than the knowledge of looking at
11 these documents here, there's obviously a
12 discrepancy, but no upfront knowledge that it
13 changed.
14 Q. And you don't have any knowledge of
15 the value of any securities on Schedule A being
16 written down in connection with this
17 reconciliation process?
18 A. No. You asked that earlier, right?
19 No.
20 Q. Do you recall what the par value was
21 for the security listed on Schedule A?
22 A. I don't, no.
23 Q. Okay. That's all I have with that
24 document.
25 Mr. Hraska, you were involved in

Page 140

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  preparing Schedule B, correct?
3  A. I was involved in giving a list of
4  unencumbered collateral, which I understand some
5  of which became Schedule B.
6  Q. But you're not familiar with the terms
7  Part 1 and Part 2 of Schedule B; is that right?
8  A. No.
9  Q. Are you familiar with any kind of
10 discussions about the valuation of the
11 securities that are on Schedule B?
12 A. Well, there was the valuation that I
13 knew to have transferred, which is 1.4 billion.
14 I don't know what the ultimate valuation of that
15 or the -- I don't know what the final version of
16 that list was or the market value associated
17 with that, so ...
18 Q. Do you recall any discussions about
19 any discrepancies in the valuation of the
20 securities that comprised Schedule B?
21 A. I remember there being discussions in
22 valuation of those securities, discrepancies in
23 general. I don't know whether they were
24 specifically Schedule B or if they were just
25 purely related to the repo we were discussing

Page 141

1  HIGHLY CONFIDENTIAL - J. HRASKA
2  earlier, so ...
3  Q. Well, I guess I'm just trying to --
4  was there a reconciliation process that went on
5  with respect to the securities in Schedule B?
6  A. There was a a -- there was a
7  reconciliation process from the standpoint of we
8  were asked what securities were delivered, which
9  we provided to the Finance folks, and the
10 Finance folks did a spreadsheet compared to what
11 they knew to be Schedule B and at one point told
12 us something along the lines of -- I don't
13 remember whether it was 800 Cusips or 800
14 million in value, but there was a number of 800,
15 which whatever was the discrepancy on that. I
16 believe it was Cusips.
17 Q. 800 Cusips?
18 A. 800 Cusips or security identifiers
19 which weren't delivered.
20 Q. And was that reconciled in some way?
21 MR. SHAW: Objection to form.
22 A. The Cusips in question were looked at
23 by the Clearance folks and my teams as to
24 whether they were delivered or whether they
25 could be delivered, and we verified that in fact

Page 142

HIGHLY CONFIDENTIAL - J. HRASKA
1    they were not delivered.
2    Q.  And was there any effort to then
3    deliver them later?
4    A.  There was an effort to see if they
5    were available for delivery, and in most
6    instances, they were actually not available for
7    delivery.
8    Q.  So was any further action taken on
9    that?
10   A.  For that -- for the particular
11   securities on that list, no.
12   Q.  Were substitute securities delivered
13   instead?
14   A.  Substitute securities were not
15   delivered.
16        Let me just think about that.  Yeah,
17   no, there was no substitute securities delivered
18   after that, no.
19   Q.  Was that possibility considered?
20        MR. SHAW:  Objection to form,
21   foundation.
22   A.  That possibility was considered.
23   There was conversations that I had with the
24   Treasury folks, who were prior legacy Lehman,

Page 143

HIGHLY CONFIDENTIAL - J. HRASKA
1    but now, as a result of the timing, were now
2    employed by Barclays, so Robert Azerad and those
3    folks, as to whether or not there were other
4    securities which were unencumbered that could be
5    substituted for the securities that could not be
6    delivered on the original Schedule B.
7    Q.  And what was the result of that
8    discussion?
9    A.  The result of that discussion was is
10   that we went through yet again another
11   identification process to try to locate
12   unencumbered securities that were available or
13   that could be made available to transfer.  At
14   that point in time, by then, we no longer had
15   capability to just go ahead and make a transfer.
16   It would have been subject to approval by
17   Deloitte and a few other folks before anything
18   could be done.
19   Q.  So where does that effort now stand?
20   A.  The effort basically concluded with a
21   subsequent set of lists that, you know, we feel
22   are securities that are eligible to be
23   transferred to Barclays.
24   Q.  And why have they not been

Page 144

HIGHLY CONFIDENTIAL - J. HRASKA
1    transferred?
2        MR. SHAW:  Objection to form and
3    foundation.
4    A.  The clearance boxes in which they
5    reside are presently under administration.  So,
6    as Barclays employees, we wouldn't have the
7    ability to go and make those transfers without
8    the administration's approval.
9    Q.  So does Barclays thinks it's entitled
10   to these securities?
11   A.  I'm not a hundred percent sure what
12   Barclays thinks.  I was asked to go find
13   something that was unencumbered in the Lehman
14   boxes, which I did.  I would speculate that
15   Barclays would think they're entitled if they
16   asked me to do that exercise.
17   Q.  Who would know at Barclays whether
18   they think they're entitled to those securities?
19        MR. SHAW:  Objection to form,
20   foundation.
21   A.  I would start with the Treasury team
22   and possibly the Legal team.
23   Q.  And who is the Treasury team to which
24   you are referring?

Page 145

HIGHLY CONFIDENTIAL - J. HRASKA
1    A.  Robert Azerad would be the point
2    person that I would use, or Alan Kaplan in
3    Legal.
4    Q.  Can you tell me an approximate value
5    for those securities that are -- that you
6    identified that were not able to be transferred?
7    A.  I would say 6 to 7 hundred million.
8    Q.  And that's based on Lehman valuations?
9    A.  Based on Lehman valuations at a
10   particular point in time, which was November 17
11   of 2008.
12   Q.  Just so I have a little clarity, this
13   effort to identify these additional securities
14   took place after you transferred over to
15   Barclays?
16   A.  That's correct.
17   Q.  Did it start during the weekend of
18   September 20th at all?
19   A.  This particular exercise, no.  It
20   started I would say early October.
21   Q.  Okay.  We had -- in discussing
22   Schedule A, I think you said there was a
23   reconciliation effort, but to the extent there
24   was an effort to reconcile the values, that's

Page 146

**HIGHLY CONFIDENTIAL - J. HRASKA**

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **really not something that fell under your**
3    **purview; is that right?**
4        A.   That's correct.
5        **Q.   Now, is that the same case for**
6    **reconciliation efforts related to Schedule B?**
7        A.   With regards to the valuation?
8        **Q.   Yes.**
9        A.   Yes.
10       **Q.   So who would I ask about that if I**
11   **wanted to learn about efforts to reconcile**
12   **values related to Schedule B?**
13       A.   Robert Azerad would be your best
14   source.
15       **Q.   Am I correct to say that you were, to**
16   **the extent you were involved in reconciling**
17   **anything with respect to Schedule B, it would be**
18   **related to locating securities and Cusips**
19   **numbers and identifying what would comprise the**
20   **pool of Schedule B; is that right?**
21       A.   Yes, we reconciled what was given
22   to -- well, we were given an exception list of
23   what was, you know, what we believe was
24   delivered versus what was on the original
25   Schedule B, and we were asked to verify that

Page 147

1    HIGHLY CONFIDENTIAL - J. HRASKA
2    those securities were in fact delivered.
3        **Q.   And were they?**
4        A.   They were not.  Well, securities that
5    were delivered were delivered, but the
6    securities that were given as an exception were
7    not delivered.
8        **Q.   And that's the 800 Cusips you**
9    **mentioned?**
10       A.   That's approximately 800, somewhere in
11   that number.
12           MR. SHAW:  Does it make sense to take
13   a lunch break sometime soon?
14           MR. HINE:  Let me just finish up on
15   this.
16       **Q.   Other than those 800 Cusips that you**
17   **mentioned, were there any other discrepancies**
18   **that you came across in your efforts to**
19   **reconcile the transfer of securities under**
20   **Schedule B?**
21       A.   Under Schedule B, no.
22       **Q.   So am I correct to say -- I think**
23   **previously you used the phrase "tie-in."  Did**
24   **your -- Lehman's records of the transfers for**
25   **Schedule B securities tie in with the Barclays**

Page 148

1    **HIGHLY CONFIDENTIAL - J. HRASKA**
2    **records other than this 800 Cusips that you**
3    **mentioned?**
4        A.   Yes.
5            MR. HINE:  Why don't we break for
6    lunch.
7            THE WITNESS:  Okay.  That would be
8    great.  Thanks.
9            (Recess; Time noted: 12:34 P.M.)

Page 149

1    HIGHLY CONFIDENTIAL - J. HRASKA
2           AFTERNOON SESSION
3        (Time Noted:  1:19 P.M.)
4    JAMES HRASKA, resumed and
5        testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. HINE:
8        **Q.   Good afternoon, Mr. Hraska.**
9        A.   Good afternoon.
10       **Q.   I just had a couple of follow-up**
11   **questions with some of the schedules we talked**
12   **about.  Just look briefly at 84B.  That's the**
13   **one where your name is misspelled on the front**
14   **page.  You see that?**
15       A.   Okay.  That's correct.
16       **Q.   I think I see some e-mails that**
17   **suggest you did eventually get this document; is**
18   **that right?**
19       A.   I may have.  I, honestly, I don't
20   know.
21       **Q.   You don't recall?**
22       A.   No.
23       **Q.   Okay.  That's fine.  That's all I had**
24   **on this one.  I just wanted to clarify that one**
25   **issue.**

Page 150

**HIGHLY CONFIDENTIAL - J. HRASKA**

1 **If we look at Exhibit 141B, Mr.**
2 **Tonucci's name at the top. You see that?**
3 A. Yes.
4 Q. **I think you testified that you didn't**
5 **recognize the format of some of the schedules we**
6 **were talking about, but I just wanted to ask you**
7 **a question. If you look at the front of the**
8 **e-mail on the first page, it has attachments**
9 **with titles, look likes there's titles of**
10 **attachments. You see that?**
11 A. It says -- are you referring to Friday
12 transfers, BONY records agreed?
13 Q. **Yes.**
14 A. Okay.
15 Q. **Are those titles, do those look like**
16 **titles that would be prepared by Lehman?**
17 A. They weren't titles that would have
18 been prepared by me. I don't know if they were
19 prepared by anybody else at Lehman.
20 Q. **Well, do you know if Mr. Tonucci's**
21 **crew or anyone else at Lehman was preparing**
22 **schedules in this reconciliation effort that we**
23 **discussed earlier?**
24 MR. SHAW: Objection to form.

Page 151

HIGHLY CONFIDENTIAL - J. HRASKA

1 A. No. No, I don't know.
2 Q. **You don't know one way or the other?**
3 A. Yeah.
4 Q. **Okay. So do those titles -- for**
5 **example, it says, "Corrected Thursday transfers**
6 **to Barclays. BONY agreed." Is that a file that**
7 **you're familiar with?**
8 A. It's not, no.
9 Q. **How about the first title, "Friday**
10 **Transfers. BONY records agreed," do you have**
11 **any recollection being familiar with that title?**
12 A. No.
13 Q. **Okay. If you look at Exhibit 140B,**
14 **same question: If you look in the attachments**
15 **it has some titles to various attachments, and**
16 **my question is are you familiar with any of**
17 **those attachments or the titles to those**
18 **attachments?**
19 A. I recognize terms in the title, but I
20 don't recall if those were particular titles
21 specifically that I was familiar with.
22 Q. **Did you prepare any other schedules**
23 **other than the one that we first looked at?**
24 MR. SPENCER: 139B.

Page 152

HIGHLY CONFIDENTIAL - J. HRASKA

1 Q. **Other than the schedules that's in**
2 **139B, did you prepare any other schedules with**
3 **respect to this reconciliation effort that we**
4 **talked about?**
5 A. Schedules, no. I mean, we worked on
6 the differences, but there were no other like
7 schedules. This is what we knew to have taken
8 place or transferred on the night of the 18th.
9 Q. **Did you prepare any schedules relating**
10 **to what we've been calling the Schedule B**
11 **assets?**
12 MR. SHAW: Objection. Asked and
13 answered.
14 A. Yeah, I -- I provided information to
15 Schedule B. I didn't prepare Schedule B.
16 Q. **Okay. So, referring back to the cover**
17 **page of 140B, Exhibit 140B, do you know one way**
18 **or the other whether the schedules that are**
19 **referenced by title on that page were prepared**
20 **by Lehman or Barclays?**
21 A. Definitively, no.
22 Q. **Generally?**
23 A. Generally, these participant IDs are
24 Lehman participant IDs. So it would make sense

Page 153

HIGHLY CONFIDENTIAL - J. HRASKA

1 someone from Lehman had prepared them.
2 Q. **Okay.**
3 A. But I don't know who.
4 Q. **Okay. Not you, I take it?**
5 A. It was not me.
6 Q. **Do you think that people in Mr.**
7 **Tonucci's shop would have been preparing some**
8 **kind of schedules in connection with this**
9 **reconciliation effort?**
10 MR. SHAW: Objection. Calls for
11 speculation.
12 A. It would seem reasonable, but I don't
13 know --
14 Q. **Okay.**
15 A. -- specifically.
16 Q. **Back to the schedule that you did in**
17 **fact produce.**
18 A. 139, something?
19 Q. **139B. The values that are contained**
20 **in that schedule, can you describe for me where**
21 **you got them from within the Lehman system?**
22 A. They were taken from a system called
23 GFS.
24 Q. **And how do you find them within the**

Page 154

HIGHLY CONFIDENTIAL - J. HRASKA

1  GFS system?
2     A.   They were extracted out of GFS.  They
3  were existing prices that were -- that were I
4  guess downloaded into a spreadsheet.
5     Q.   And where were they downloaded from?
6     A.   From GFS.
7     Q.   Okay.  But where does GFS get them, do
8  you know?  I mean, I'm trying to find out what's
9  the origin of those prices.  I understand you
10 downloaded them from the GFS system.
11    A.   Right.
12    Q.   Where does the GFS system get those
13 prices?
14    A.   I can tell you generically it gets
15 pricing -- it gets its pricing from various
16 vendor sources and there's a hierarchy of vendor
17 selection.
18    Q.   Uh-huh.
19    A.   And to the extent there's no price,
20 typically the Product Control organization would
21 talk to traders to get traders' marks.
22    Q.   Okay.  So where there's no market
23 information, the traders themselves can do -- do
24 they use a model of some sort?

Page 155

HIGHLY CONFIDENTIAL - J. HRASKA

1     A.   How they would determine the marks I
2  don't know, unfortunately.
3     Q.   Okay.  Any other sources of data that
4  would go into that pricing?
5     A.   From my prospective, no.
6     Q.   When you actually prepared that
7  spreadsheet, how did you instruct the GFS system
8  to give you those prices?
9     A.   Well, I -- actually, the spreadsheet
10 itself was created by somebody who works for me,
11 which is Nancy Denig.
12    Q.   Okay.
13    A.   And I know the methodology in how she
14 got the prices, but if you're asking me
15 specifically how did I mechanically pull the
16 prices, I don't know, because unfortunately --
17    Q.   She would know?
18    A.   Yeah.
19    Q.   I guess I'm trying to understand, if I
20 wanted to recreate those prices, how would I go
21 about doing it if I had access to the GFS
22 system, do you know?
23    A.   You would look to the data from that
24 specific date and you would want to download the

Page 156

HIGHLY CONFIDENTIAL - J. HRASKA

1  pricing from that date, if it was available.
2     Q.   But Nancy Denig is the one who
3  actually did that downloading to prepare this
4  spreadsheet?
5     A.   She obtained the prices.  I don't know
6  whether it was her that downloaded it or a
7  technologist that provided it or -- but she
8  obtained the pricing for it.
9     Q.   Did any of those values come from any
10 source other than the GFS system, do you know?
11    A.   That I wouldn't know.  I mean, what I
12 know is that we got it from GFS.  Other than the
13 methodology of how GFS got them other than what
14 I have described, I mean, I don't really know.
15    Q.   Okay.  Very good.
16        Mr. Hraska, you were talking about the
17 800 Cusips that you identified but never made it
18 to Barclays?
19    A.   Uh-huh.
20    Q.   Remember that testimony?
21    A.   Uh-huh.
22        MR. SHAW:  You need to say yes or no.
23    A.   I'm sorry.  Yes.
24    Q.   Where were those Cusips residing

Page 157

HIGHLY CONFIDENTIAL - J. HRASKA

1  before you identified them?
2     A.   Could you be more specific?
3     Q.   Well, when did you identify the 800
4  Cusips?
5        MR. SHAW:  Objection to form.
6     A.   The 800 Cusips were not actually
7  identified by me.  They were identified by the
8  Finance organization as Cusips which were on
9  Schedule B but were not on the list of
10 securities that we had transferred over to
11 Barclays.
12    Q.   So where are those Cusips now?
13    A.   From a location perspective or a --
14    Q.   Well, where are those securities now?
15    A.   The securities themselves?  They would
16 be still in Lehman clearance boxes.
17    Q.   Okay.  Do you know which boxes or --
18    A.   Well, various boxes.
19    Q.   Okay.  You don't know specific --
20 well, let me ask you this way:  Is there a list
21 somewhere of these 800 Cusips?
22    A.   Well, the list of the 800 Cusips is
23 the list.  I'm sorry, I'm not --
24    Q.   Is there a file in Barclays that has a