# A. 12 (B)

Page 158

HIGHLY CONFIDENTIAL - J. HRASKA

**list of these 800 Cusips?**
A. Yeah, that would have been the file that the Finance organization had sent to me that they asked me to look at these 800.
**Q. So if I find an e-mail -- I would find an e-mail, presumably, with an attachment of 800 Cusips addressed to you?**
A. Yeah, that's reasonable. If not to me, it would have been to somebody either in my organization or to my manager, who subsequently forwarded it to me.
**Q. And how do I find out what boxes those 800 Cusips are in now?**
A. I honestly don't know.
**Q. Were you involved at all since your time at Barclays in any efforts to sell any of the securities that came over to Barclays as part of Schedules A or B?**
A. No.
**Q. Do you have any knowledge about any efforts to sell those securities?**
A. No.
**Q. Do you have any understanding about whether they were sold or not?**

Page 159

HIGHLY CONFIDENTIAL - J. HRASKA

A. No.
**Q. Do you have any understanding about whether they were sold at prices differing from the ones that are on your sheet?**
A. No.
**Q. Who would I ask those types of questions to? Who would know that at Barclays?**
MR. SHAW: Objection. Foundation. Answer if you know.
A. Trading desk at Barclays.
**Q. Who's in charge of the trading desk at Barclays?**
A. Fixed Income would be Harry Harrison.
**Q. Okay. Is it fair to say that you have no involvement in the sale of those securities since you've been at Barclays?**
A. That's true.
**Q. Do you have any involvement in -- and I think I might have asked this previously, but I just want to close this loop -- do you have any involvement in how Barclays accounts for the assets that came over on Schedules A and B?**
A. The accounting treatment of the assets?

Page 160

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Yes.**
A. No.
**Q. Do you have any involvement in how Barclays translated the values of those securities to its balance sheet?**
A. No.
**Q. Okay. I think we'll conclude the 30(b)(6) portion of the deposition, but I still have a few more questions to ask you, unfortunately.**
A. That's okay.
**Q. Mr. Hraska, I'm handing you a copy of an exhibit that's previously been marked as number 25. It's what we have been referring to as the clarification letter. And I know you testified earlier that you had no real familiarity with this, but I wanted to see if you'd just take a minute to review it so I can confirm that.**
A. Okay.
(Document review.)
A. I can confirm this is not familiar to me. I haven't seen this document.
**Q. Let me just ask it for the record.**

Page 161

HIGHLY CONFIDENTIAL - J. HRASKA

**Have you ever seen this document before?**
A. No.
**Q. If I recall correctly, is it correct to say you have no understanding of why this clarification letter was prepared in connection with the Barclays/Lehman transaction?**
A. That's correct.
**Q. If you look on page -- the paragraph that ends at the bottom of page 1 and continues on to page 2?**
A. Okay.
**Q. You'll see references to Schedule A and a Schedule B. You see where I'm referring to?**
A. The A and B in parentheses -- oh, no, further down. "As specified in Schedule A," okay.
**Q. I know we've been talking about those schedules, but did you have any understanding when you were working on those schedules that they would somehow comprise purchased assets under the agreement between Barclays and Lehman?**
A. No.
**Q. Okay. If we turn to the next --**

41 (Pages 158 to 161)

HIGHLY CONFIDENTIAL - J. HRASKA

**continuation of that paragraph in item C, you'll see references to exchange-traded derivatives and collateralized short-term agreements, do you see that?**

A. Yeah.

**Q. Did you do any work over the week of September 15th on through the weekend in connection with exchange-traded derivatives and collateralized short-term agreements?**

A. No.

**Q. Do you recall any efforts to identify assets of this type that were to make its way to Barclays?**

A. I know there were conversations being had about it, but I wasn't involved with any of them.

**Q. That was not something that was assigned to you to work on; is that right?**

A. That's correct.

**Q. What do you recall about the conversations?**

A. I recall that I was supposed to attend the conference that got delayed because there was a conference going on about exchanged-traded

HIGHLY CONFIDENTIAL - J. HRASKA

derivatives. That's the only thing I really recall about that.

**Q. Okay. Did you do any work during that week, or even since you've gone to Barclays, with respect to OCC, the OCC or any assets at OCC that are supposed to go to Barclays?**

A. No.

**Q. If you continue on this document to page 3, item D, you'll see a reference to a First Amendment. Do you see that?**

A. Yes.

**Q. Do you have any understanding of what -- of anything about the First Amendment to the Asset Purchase Agreement between Barclays and Lehman?**

A. No.

**Q. Did you know there was such a First Amendment?**

A. I didn't.

**Q. If you read further into that paragraph, you'll see the mention of a purchaser paying $250 million in cash to the DTC, you see that?**

A. Yeah. Yes.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. You see that? Do you recall any discussions during the week of September 15 or thereafter about Barclays paying $250 million to the DTC?**

A. No.

**Q. About paying any amount of cash to the DTC?**

A. No.

**Q. About Lehman paying any amount of cash to the DTC?**

A. No.

**Q. Do you recall any discussion of a $250 million figure in connection with a dispute involving the DTC?**

A. No.

**Q. Did you ever have any understanding about a dispute concerning the DTC during that week?**

A. No. No.

**Q. If you continue on to page 4 of this agreement, if you look at paragraph 9, it mentions the deletion of a purchase price adjustment provision. Do you see that?**

A. I do.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Do you have any understanding of what that's referring to?**

A. No.

**Q. Do you recall any discussions during that week about deleting a purchase price adjustment clause?**

A. No.

**Q. As it related to the Barclays/Lehman transaction?**

A. No.

**Q. Continue on to the next page. You see item 13 days Barclays Repurchase Agreement?**

A. Okay.

**Q. And it refers to a repo agreement on September 18, do you see that?**

A. I do.

**Q. Is this the first time you've seen this paragraph?**

A. It is.

**Q. Do you recall any discussions about terminating that September 18th repo?**

A. None that I was a part of. Not terminating it, no.

**Q. How about defaulting under it?**

Page 166

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: Objection. Asked and answered.

A. Yeah, we -- we discussed that it would -- that we were curious as to whether it would be declared in default in the early part of the week of September 22.

**Q. Okay. Prior to that, any discussions about whether Lehman would be a default under that agreement?**

A. No.

**Q. You ever hear any discussions about whether -- what would happen if Lehman were to be in default under that agreement?**

A. No.

**Q. Under the normal circumstance, what happens when a party that has provided collateral in a repo defaults?**

MR. SHAW: Can you read that one back?

(Record read.)

A. Normally, the receiver of the collateral retains the collateral in lieu of the repayment of their cash that they had previously extended.

**Q. Does he get to retain all of the**

Page 167

HIGHLY CONFIDENTIAL - J. HRASKA

**collateral?**

A. Yes. To the best of my knowledge, yes.

**Q. So would that include the haircut portion of the collateral?**

A. The entire basket of collateral which was placed, so, yes.

**Q. And that's, based on your experience, that's the normal course of business if the provider of the collateral defaults?**

A. If the provider of the collateral defaults, yes.

**Q. And does that change in bankruptcy in any way, do you know?**

A. I wouldn't know.

MR. SHAW: Objection. Calls for legal conclusion.

**Q. Do you recall any discussions during this week of the 15th and on through the following weekend about that issue?**

A. No. As I said earlier, the first time we started discussing that was in the week of the 22nd.

**Q. Did you ever have any understanding**

Page 168

HIGHLY CONFIDENTIAL - J. HRASKA

**during that week about whether Barclays would be entitled to keep the collateral if Lehman were in default on the September 18 repo?**

MR. SHAW: Objection to form. Which week are we talking about, the 15th or 22nd?

MR. HINE: 15th.

A. The week of the 15th?

**Q. Yes.**

A. No.

**Q. Did you have any discussions the following week about that issue?**

A. Yes.

**Q. And what do you recall about those discussions?**

A. Well, there was primarily two discussions. The first discussion is the one I referenced as to whether there would be declared a fall. The second was when the Clearance Team had let us know that Bank of New York had seized the assets that were pledged under the repo. So, at that point, the only time that they can actually take that action is if there's an event of default declared.

So, once an event of default is

Page 169

HIGHLY CONFIDENTIAL - J. HRASKA

declared, the clearance bank can actually seize the assets which were pledged under the terms of a normal repo.

**Q. I just want to understand the context of these discussions. You had two discussions and this is the week of September 22, correct?**

A. That's correct.

**Q. And the first discussion, just remind me again, was about --**

A. Was about whether or not the repo was going to be declared in default.

**Q. And is that on Monday, the 22nd?**

A. I don't recall the date. I believe it's Monday.

**Q. And is that in connection with the closing of the sale transaction between Lehman and Barclays?**

A. No. At that point, I really wasn't privy to the -- to that transaction. I was, again, my responsibilities are around the repo, so I was focused on the repo itself.

**Q. Who did you have these discussions with?**

MR. SHAW: Asked and answered.

43 (Pages 166 to 169)

Page 170

HIGHLY CONFIDENTIAL - J. HRASKA

A. My manager, Monty Forrest.

**Q. Anyone else?**

A. We had a conversation, as I mentioned earlier, with someone from the Margin Team, but I just can't recall who that person was, and Alastair Blackwell.

**Q. Did this discussion involve how Barclays was going to get the collateral that had been posted to the repo?**

A. No, this -- the first discussion was just whether or not an event of default would occur. Lehman didn't need to discuss how Barclays was going to get the collateral because all the collateral except for the 7 billion in cash was in Bank of New York's control.

So, once it legally became a default or the property of Barclays, that was between Barclays and Bank of New York to work out how Barclays took possession.

**Q. And the event of default would be as a result of LBI's declaring bankruptcy?**

MR. SHAW: Objection. Calls for speculation. Foundation. Legal conclusion.

A. I don't know.

Page 171

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Well, in connection with your discussions, what event of default were you folks talking about?**

A. Yeah, we were -- based on the fact that LBI had declared, that was what we were speculating on, whether or not it would be -- it would call the repo transaction to be in default or not.

**Q. Okay. And did they ever do that?**

A. Well, based --

MR. SHAW: Objection. Foundation.

A. I mean, based on the fact that Bank of New York seized the collateral and they moved out of our clearance locations, I concluded that they did, but I didn't see an official document declaring they did.

**Q. I understand. What else do you recall about that conversation you had on that Monday?**

A. The only other thing was is that we weren't to take any further action until we were advised to do so.

**Q. Further action in respect of what?**

A. In anything at that point. We -- typically, there's maintenance events with repo

Page 172

HIGHLY CONFIDENTIAL - J. HRASKA

transactions, and we talked earlier about substitutions and things like that. Sometimes, you know, there's -- well, maintenance events, in general, would happen to the repo. So at that point we were told to not take any further action on that trade until we knew the status of that trade.

**Q. And were you ultimately told that BONY had seized that collateral?**

A. Yes.

**Q. And so does that conclude the repo? Is the repo terminated as a result of that?**

MR. SHAW: Objection. Calls for legal conclusion.

You can answer if you know.

A. In my opinion, I concluded that as a result of the assets being taken by BONY.

**Q. And so you did no other -- is it correct to say that you did no further work as to with respect to that repo after that?**

A. With regards to the pledge to Barclays or the transfer of assets, that's correct.

**Q. Okay.**

A. The only other thing that we did is my

Page 173

HIGHLY CONFIDENTIAL - J. HRASKA

group helped facilitate the reclassification on the books, because once the repo had terminated, the inventory had to be adjusted to reflect the fact that the repo was no longer on and, instead, the collateral was seized by Barclays.

So there was a series of bookkeeping entries that took place to reflect that the repo was now over and that the assets had been seized subsequently by Barclays.

**Q. Are you talking about LBI's books?**

A. LBI's books, yes.

**Q. And so your team helped LBI close its books with respect to that repo?**

A. Yes, that's correct.

**Q. Okay. And so just continue about your conversations. You had a second conversation I think you related, and please remind me what that was about. You were talking about conversations you had concerning --**

A. So the first conversation was about whether we -- this would be declared defaulted or not, and the second conversation was with the Clearance Team, who had advised me that assets were being currently seized from the Lehman

44 (Pages 170 to 173)

Page 174

HIGHLY CONFIDENTIAL - J. HRASKA

clearance boxes, which led them to believe, and myself as well, that the repo was now considered in default.

**Q. And when was this conversation?**

A. I honestly don't recall a specific date. It was during that week. I don't know which of the days.

**Q. Okay. And who was that conversation with?**

A. It was with the Clearance Department. I don't remember specifically which person. I mean, I was on the phone with all of them multiple times throughout all these days.

**Q. The Clearance Department is LBI's Clearance Department or Barclays Clearance Department?**

A. LBI's Clearance Department.

**Q. So this is in a period of time where you said you weren't sure whether you were a Barclays employee yet? You were still assisting LBI in some of its efforts; is that right?**

A. Yes, that's true.

**Q. Okay. Anything else you recall about that conversation?**

Page 175

HIGHLY CONFIDENTIAL - J. HRASKA

A. No.

**Q. Okay. Other than the work you've just described, did you do any more work on the September 18 repo after those two conversations?**

A. No.

**Q. Do you recall any discussions or do you have any understanding about the issuance of a Notice of Termination as to the September 18 repo?**

A. No.

**Q. Let me direct your attention back to paragraph 13. You'll see a --**

A. What page?

**Q. Page 5.**

A. Okay.

**Q. You'll see on page 5, three little I, under paragraph 13 talks about the Repurchase Agreement terminating, and then if you continue to read, it says the Notice of Termination relating to that Repurchase Agreement is hereby rescinded, do you see that?**

A. Yes, I see that.

**Q. Do you have any knowledge or understanding about a Notice of Termination that**

Page 176

HIGHLY CONFIDENTIAL - J. HRASKA

**was issued in connection with that Repurchase Agreement?**

A. I don't, no.

**Q. Did you ever hear any rumors to that effect or have any understanding as to a Notice of Termination with respect to that agreement?**

A. I made a conclusion that one would have been issued; otherwise, Bank of New York wouldn't have been able or shouldn't have taken the action they did. But as to when it was done and how it was done, I didn't have any knowledge of that.

**Q. Okay. Would you normally get like a report or something sent to you if a notice of termination had been sent?**

A. Myself normally, no. Typically, that would go through the legal teams.

**Q. Okay. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 27, which is Bates-marked BCI-EX-00109164 through 165.**

**This is a document I understand to be the Notice of Termination I was just talking about. So I just wanted to ask you if you have ever seen this before.**

Page 177

HIGHLY CONFIDENTIAL - J. HRASKA

A. Can I have a minute to --

**Q. Sure.**

**(Document review.)**

**Q. Ever seen that document before?**

A. No.

**Q. This doesn't remind you of anything about -- seeing it now doesn't refresh your recollection at all about a Notice of Termination issued at or about that time?**

A. Well, as I mentioned earlier, it wouldn't be common practice for me to get a Notice of Termination, or at least not during the course of the transaction.

**Q. Okay. So you had no knowledge at the time that such a notice had been issued, correct?**

A. No.

**Q. Okay. I have to walk you through a couple e-mails that happened during this week just to see if I could ask a couple questions about select issues. You have given me a lot of testimony here, but I just wanted to touch base on a couple of issues.**

A. Okay.

45 (Pages 174 to 177)

HIGHLY CONFIDENTIAL - J. HRASKA

(Exhibit 142B, a document bearing Bates Nos. 465401 and 466143, marked for identification, as of this date.)

**Q. Mr. Hraska, I'm handing you a copy of a document marked Exhibit 142B. It's an e-mail dated September 16 in which you are a recipient, and attached to it is a document on page 3, titled Schedule A. That's the document I will be asking you about, so if you take a minute and just review this.**

A. Okay.

MR. SHAW: For the record, did you say September 15 or 16?

MR. HINE: I said 16th.

MR. SHAW: Okay. Well, just for the record, he was a recipient on an e-mail on the 15th and it was forwarded to other people, but he's not on the forwarded e-mail on the 16th.

MR. HINE: Fair enough.

(Document review.)

A. Is there a possibility of stapling error? It looks like the last two pages are duplicated. Or are they different? They appear

HIGHLY CONFIDENTIAL - J. HRASKA

to be the same, but I just --

**Q. It could be a stapling error, but I believe --**

A. Can you confirm how many pages it's supposed to be? I don't want to have to see if there's a difference between the two.

**Q. Why don't we ignore the last two pages. We'll just treat it as a four-page document.**

MR. SHAW: The fax cover page seems to indicate a five-page fax.

MR. HINE: I don't know, but I don't think my questions are going to trip you up on that score. Let's ignore the last two pages.

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have, yes.

**Q. My question has to do with Schedule A, which is the third page of the document. Have you ever seen this Schedule A before?**

A. I have, yes.

**Q. In what context?**

A. I was a recipient of that e-mail at

HIGHLY CONFIDENTIAL - J. HRASKA

the time, so I had reviewed what the Schedule was.

**Q. Okay. What is this schedule for?**

A. This schedule is the schedule of the acceptable collateral types in the margins that Barclays was willing to accept on a tri-party transaction, the tri-party transaction that we spoke about earlier in the beginning of the week of the 15th.

**Q. I just want to clarify which transaction we're talking about. That is not the September 18th transaction, correct?**

A. This schedule is the schedule that was provided by Barclays for the transaction which was done earlier in the week, the week of the 15th, so it was not the 18th, yes, that's correct.

**Q. Does this schedule also govern the transaction that was entered into on the 18th?**

MR. SHAW: Objection. Calls for legal conclusion, foundation, calls for speculation, but if you know, you can answer.

A. I don't know.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. I think you said earlier, but I just want to ask you, we had talked about Master Repurchase Agreements, do you recall that?**

A. Yes.

**Q. And I thought you said, and I'm asking you to correct me if I'm wrong, that in early in the week when Barclays wanted to -- or, somehow they decided to effect this tri-party financing that was to start on Monday and go through most of the week, that in order to do that, they have to amend the MRA; is that right?**

A. The MRA is -- is a document governing a repo transaction.

**Q. Right.**

A. It's not specific to a tri-party transaction. With a tri-party transaction, there's a separate agreement called a tri-party agreement.

**Q. Right.**

A. That's between, well, as the name suggests, three parties, the seller, which is the dealer, the tri-party agent, and the liquidity provider. That was a document that we were -- or, that I was referring to needed to be

Page 182

HIGHLY CONFIDENTIAL - J. HRASKA

amended at that time.

**Q. And is a Schedule A like this typically used to confirm which types of collateral could be posted towards that agreement?**

A. Towards a tri-party agreement. Schedule A is typically a firm -- is a form that's used in a tri-party relationship on a tri-party document.

**Q. Okay. And when I see this schedule, you see the column that says "Margin Percentage"?**

A. Yes.

**Q. Is that the haircut that can be applied to these different classes of securities?**

A. Yes.

**Q. Okay. Do you know if in fact that was the haircut that was applied to these securities with respect to the financing that Barclays provided the week of the 19 -- the week of the 15th?**

MR. SHAW: Objection. Are we talking about the one on the 18th or the one before

Page 183

HIGHLY CONFIDENTIAL - J. HRASKA

that?

**Q. Let me clarify. I think we had previously distinguished between two different transactions, one being the repo on the -- on September 18th, right? And the other being a tri-party arrangement between Barclays, Lehman and Chase that started on the 15th and went for a couple days?**

A. That's correct.

**Q. And eventually was not rolled over, correct?**

A. That's correct.

**Q. And am I correct to understand your testimony that this Schedule A applied to the latter of the two, meaning the one that -- the tri-party that provided overnight financing for three or four days?**

A. That's correct.

**Q. My question then is, are these the margins that were in fact applied to that agreement?**

A. The responsible party for applying the margin would have been the tri-party agent in that particular deal. These are the terms that

Page 184

HIGHLY CONFIDENTIAL - J. HRASKA

were agreed, but the tri-party agent would have actually carried out the application of the margin.

**Q. Now, do these haircut percentages, did they also apply to the September 18 repo?**

MR. SHAW: Objection, foundation. Calls for legal conclusion.

A. I don't know definitively.

**Q. Do you know if there's -- would I expect to find a separate Schedule A with respect to that agreement?**

MR. SHAW: Objection. Form.

A. I wouldn't expect it, but -- but I don't know because I wasn't part of the documentation on that second agreement.

**Q. Okay. You wouldn't expect it why?**

A. It was a tri-party-type program and we delivered the assets to BONY under tri-party premises, even though it was a little bit of a hybrid because of the mechanics. So, based on the fact that it -- and it was documented as tri-party, I would expect from an operations perspective that the same schedule would apply, but whether or not there were any exceptions

Page 185

HIGHLY CONFIDENTIAL - J. HRASKA

made because, again, it was a unique transaction, I don't know.

**Q. And do you know in fact what haircut was applied to the September 18 repo?**

A. Only based on the numbers that we discussed earlier. I know that there was approximately a 5 billion, there was 45 billion in cash extended, and about just under 50 billion of assets.

**Q. Okay.**

A. That ties out to some of the schedules we had looked at as well.

**Q. I understand. You haven't seen any document, have you, that would break that $5 billion haircut into different asset classes, have you?**

A. No.

**Q. Okay. I want to skip --**

A. On this document still or --

**Q. All done.**

**I want to skip ahead a little bit to your efforts to transfer collateral from the Fed to the Bank of New York in connection with the September 18 transaction. You remember you**

47 (Pages 182 to 185)

Page 186

HIGHLY CONFIDENTIAL - J. HRASKA

**testified about that earlier?**
A. Yes.
MR. SHAW: Object. Just so we're clear, I don't think he testified there was a transfer from the Fed to the Bank of New York, unless I misunderstood it.
**Q. I think you testified there was a movement of collateral from the Fed financing to the Bank of New York financing?**
MR. SHAW: Right. The question is whether Chase was --
**Q. I understand. I'm not trying to mischaracterize your testimony. I just want to bring you to that period of time where you were working on the transfer of collateral that had previously supported the Fed to now supporting the September 18 repo; do you recall your testimony on that?**
A. Yes.
**Q. Okay. Were there any assets that were supposed to be excluded from that?**
MR. SHAW: Objection. Foundation. Calls for speculation. Calls for legal conclusion.

Page 187

HIGHLY CONFIDENTIAL - J. HRASKA

A. There were -- there was a list of eligible collateral types and there was one particular Cusip that was very specifically supposed to be excluded.
**Q. Which was what?**
A. It was called a Racer Note.
**Q. Okay. Who wanted it excluded?**
A. Barclays.
**Q. Okay. So am I correct to say Barclays would not accept that as a form of collateral for the September 18 repo?**
A. Yes, that's correct.
**Q. Did they have any other restrictions on the types of collateral that could be posted toward the September 18 repo?**
MR. SHAW: Objection to form.
A. They -- there was a list that was provided, and I believe we referenced the list as we were -- as we were searching for available collateral.
**Q. What types of collateral were excluded?**
A. Honestly, we didn't look at the collateral type so much as we focused on the

Page 188

HIGHLY CONFIDENTIAL - J. HRASKA

body of Cusips, and we kept doing look-ups against that body of Cusips to make sure that we were not including those Cusips.
**Q. Why did Barclays not want the racer securities --**
MR. SHAW: Objection. Foundation.
**Q. -- posted as collateral?**
MR. SHAW: Calls for speculation.
A. In my opinion, racer note is something that is backed partially by the credit of Lehman. So if you're extending credit to somebody, you wouldn't want to take collateral of the same credit.
**Q. Okay. Is that the only reason?**
A. That's my opinion.
MR. SHAW: Same objection.
A. I don't -- I assume Barclays made the same conclusion, but I don't know.
**Q. Okay. Was Barclays unwilling to accept as collateral securities that were tied to mortgages?**
MR. SHAW: Objection to form.
A. There, back to what I said earlier, there may have been mortgages or mortgage-type

Page 189

HIGHLY CONFIDENTIAL - J. HRASKA

collateral on that Cusip exclusion list.
**Q. Do you know one way or the other whether there was?**
A. Definitively, no.
**Q. When we talk about mortgages, I see the phrase "resis," R-E-S-I-S. Is that a term you are familiar with?**
A. Well, mortgage collateral is a pretty wide array. A resi, a residential mortgage, is a type of mortgage security, yes.
**Q. Okay. And did Barclays exclude residential mortgages from the list of acceptable collateral?**
MR. SHAW: Objection to form.
A. I don't know whether they excluded it as a complete asset class or not.
**Q. Do you recall any discussions about whether residential mortgages, mortgage-backed securities could be transferred to Barclays during that week?**
A. I remember there was a discussion of it. I don't remember the outcome of it.
**Q. Okay. Do you have any recollection at all about it?**

48 (Pages 186 to 189)

Page 190

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. The only recollection I have is that the person who ran the middle office at the time was -- was involved with looking at the residential portfolio, but other than that, I don't -- I don't know what the outcome of that was.

(Exhibit 143B, an e-mail chain, the first in time dated September 17, 2008, at 2:42, with attachment, marked for identification, as of this date.)

**Q. Mr. Hraska, I'm handing you a document marked as Exhibit 143B, which is an e-mail stream dated September 18, 2008, and an attachment. Will you please take a moment to review the document?**

A. Sure.

(Document review.)

A. Okay.

**Q. Have you had a chance to look at the document?**

A. I did.

**Q. Have you ever seen this document before?**

A. Yes, I have.

Page 191

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. What is this?**

A. This was an e-mail string that was sent to me and then I forwarded it on to one of the financing traders on the trading desk.

**Q. That's Mr. Webb?**

A. That's Mr. Webb.

**Q. And what's the attachment to this document?**

A. The attachment to this doc was a file that was a file of assets that Barclays did not want, included on the pledge of the repo.

**Q. Is this the list you had previously mentioned about excluded assets?**

A. Yes.

**Q. And this was a list provided by Barclays to Lehman?**

A. Well, it was provided to me from Lehman. I think the person who originated this is David Petrie. Yes, Dave Petrie was Barclays. So the answer to that would be yes.

**Q. So, as I understand it, this was a list prepared by Barclays of the items of securities that they would not want -- would not accept as collateral in support of the September**

Page 192

**HIGHLY CONFIDENTIAL - J. HRASKA**

**18 repo?**

MR. SHAW: Objection to form.

A. That's my understanding of what it was.

**Q. And is this the list you then used to review the collateral that you were posting to make sure it wasn't on this list?**

A. We used the list that looked like this. I don't know if this was the final list, but a list that looked like this, yes, was used.

**Q. At the subject line of your e-mail, it says, "Excluded mortgage asset files." You see that?**

A. Uh-huh.

**Q. Are these Cusips on this list primarily mortgaged -- mortgage-related securities?**

A. They were primarily mortgage and asset-backed-related securities on this list.

**Q. So why were they to be excluded as collateral?**

MR. SHAW: Objection to form.

A. I don't know. I was given a list to use in the selection criteria and was told to

Page 193

HIGHLY CONFIDENTIAL - J. HRASKA

exclude them, so I don't know.

**Q. Do you have any understanding of why they might be excluded?**

A. No.

**Q. Now, when these are excluded, is it correct to say that these securities had been posted as collateral to the Fed but were not allowed to be posted as collateral to the September 18 repo?**

A. I never cross-referenced the two, so I don't know for certain.

**Q. Do you know if the Fed in its financing excluded mortgage-backed assets like this as being eligible collateral?**

A. The Fed excluded certain classes and ratings of mortgages, but in general, the Fed would accept mortgage collateral.

**Q. Okay. So is it correct to say that this list, this list reflects a change in the type of collateral that Barclays would accept in connection with the September 18 repo from the collateral that had been posted to the Fed financing?**

A. Well, without knowing whether these

49 (Pages 190 to 193)

specific assets were pledged to the Fed or not, I wouldn't know that, whether it represented a change.

**Q. Okay. What do you think?**

MR. SHAW: Objection. Calls for speculation.

A. I don't know, honestly.

**Q. Okay. Do you recall any discussions -- is it possible that these mortgage-related securities were just considered too risky by Barclays to be accepted as collateral?**

MR. SHAW: Objection. Calls for speculation.

A. It would be a logical conclusion. I don't know why, but it would be a logical conclusion.

**Q. Okay. Do you recall any other discussions during the week of September 15th about what types of collateral Barclays would not accept in support of the September 18 repo?**

A. I don't know.

**Q. Do you have any understanding about whether there were any differences in the types**

**of collateral that could be posted to the Fed financing as opposed to the collateral that could be used to support the September 18 repo?**

A. No.

**Q. Do you have any understanding about whether the collateral that was posted to support the Fed repo was in any way riskier or less risky than the collateral that was posted toward the September 18 repo?**

A. Well, I don't typically determine risk, so I wouldn't really necessarily be able to determine whether one set of assets is riskier than another, to tell you the truth, so...

**Q. Okay.**

**(Exhibit 144B, a document bearing Bates Nos. 10297377 through 10300510, marked for identification, as of this date.)**

**Q. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 144B. I have very few questions about the document, but essentially it involves just getting an understanding of what this database includes.**

**So if you might take a minute to**

**review it, I'll ask you a question or two.**

A. Sure.

(Document review.)

**Q. Have you had a chance to look at it?**

A. I have.

**Q. You'll see, Mr. Hraska, on the front there's an attachment with the title "BAR-PDCF-074.XLS." Does that -- well, can you explain to me the convention for titling databases like this? What is that meant to encompass, if you know?**

MR. SHAW: Objection. Assumes facts not in evidence. Calls for speculation.

**Q. Let me withdraw that question. Let's start again.**

**Have you ever seen this document before?**

A. I have, yes.

**Q. And what is this?**

A. This is an e-mail that I had -- that I had forwarded on to Peter Hadingham, who was on the trading desk, the financing trading desk.

**Q. And what is this attachment?**

A. This is a file of collateral that was

sourced from clearance box O74 and had been -- I believe it had been previously deposited to the Fed under the PDCF program.

**Q. Okay. And was this collateral eventually transferred or posted as collateral for the September 18 repo?**

A. This was collateral that we had -- that we had contemplated posting. I can't verify that all of this collateral was posted, but the intention was to take this collateral and post it to Barclays.

**Q. Okay. If you look on page 2 of the document, you'll see three headings under columns E, F and G. I just wanted to get your understanding of what they mean.**

**The first one is entitled "Market Price Factored." Can you explain to me what that means?**

A. I don't specifically know what it means on this file. I know what "price factoring" means, but it doesn't seem, from the data in this file, doesn't seem to mean what price factoring is.

**Q. What is it typically?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Typically a price factoring is on a mortgage asset, which is a paydown percentage, and you take par and price and multiple it times the factor to get the market value.

In this case, what appears to be happening is that these prices are in -- they're in bond conventions, and to the extent there's an equity Cusip here, the price has been moved over by two decimal places.

So what this is basically I think trying to do is to get you to the same pricing convention so when you multiply times the quantity, you come up with a true market value.

**Q. Okay. And the two columns entitled "Market Price Clean" and "Market Price Dirty," do you know what those two are meant to signify?**

MR. SHAW: Objection. Mischaracterizes the document. You misread the second column.

MR. HINE: I apologize.

**Q. The column F is "Market Price Clean." Column G says "Market Value Dirty." Do you see that?**

A. I do, yes.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Can you explain to me what those columns are meant to signify?**

A. Yes, I can. A clean price is a price not taking into account a accrued interest. A dirty price is one that takes into account accrued interest. Column G is the value with accrued interest being taken into effect.

**Q. I gotcha. Thank you very much.**

A. You're welcome.

**Q. Mr. Hraska, I'm going to hand you a document that's previously been marked as Exhibit 60B. If you wouldn't mind taking a moment to look at it.**

A. Sure.

**Q. In particular, I'm going to ask you about the second page.**

**(Document review.)**

**Q. Have you had a chance to look at it?**

A. Yes.

**Q. Have you ever seen this document before?**

A. Yes, I have.

**Q. Could you tell me what it is?**

A. Sure. This was an e-mail forwarded

HIGHLY CONFIDENTIAL - J. HRASKA

from Ray Stancil at JPMorgan. It was the anticipated list of collateral that was going to be transferred from Lehman Brothers to Barclays with connection to the September 18 repo that we discussed earlier.

**Q. Okay. And this is on Wednesday of that week?**

A. This one's actually I believe it was on the -- well, the 18th I think was Thursday morning, I think, was when he sent this. We discussed it on Wednesday, but I'm pretty sure the final version of this was sent on Thursday morning.

**Q. Okay. Just could you explain, I want to -- along the left-hand side of this chart, I'm looking at the chart on page 2.**

A. Okay.

**Q. It has the abbreviations TSLF, PDCF and OMO, do you see that?**

A. Yes.

**Q. And those are the various Fed programs that this financing was provided under, correct?**

A. Yes.

**Q. Along the top you see a bunch of**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**columns, the first being "Par Amount" and the second one is "Market Column," do you see that?**

A. Yes.

**Q. What does that reflect?**

MR. SHAW: Objection. Compound.

A. The market value is the, as we were talking about earlier, the dirty market value, which is the securities value including accrued interest.

**Q. So am I correct to say that's the market value of the collateral that had been posted to the Fed programs, correct?**

A. As calculated by Chase, yes.

**Q. Okay. And that total calculation is approximately $49.7 billion, correct?**

A. That's correct.

**Q. Okay. Now, if you look at the next column, it talks about "paydown amount," you see that?**

A. Yes.

**Q. What is that column meant to signify?**

MR. SHAW: Objection to form.

A. I'm familiar with the term "paydown." The way this data is displayed, it wouldn't be

Volume I - A. 12 (B) Pg 13 of 44

Page 202

HIGHLY CONFIDENTIAL - J. HRASKA

the way I define "paydown," but you can see that it's a lesser value. So, you know, my impression of what this was was the -- was the -- was the cash that was being extended on this as a result of the program from the night before, but I can't be sure.

**Q. I'm not sure I understood what you meant. Are you talking about the program from the night before meaning the Fed program that had rolled over another night?**

A. The Fed program that was on for the night of the 17th.

**Q. That is Wednesday night?**

A. That's Wednesday night, yes.

**Q. Okay. So I'm not sure I understood your explanation. What is paydown amount?**

A. Paydown amount would be the -- paydown amount would be the proceeds that would be -- I guess, simply put, it would be the value that was given to the securities after haircut, probably the simplest way to put it. So this amount would -- in other words, this amount of securities, 49 million, would support a loan in the value of 43,457,000.

Page 203

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. And then if you see the next column, it talks about "Anticipated Prefunding Dollar Amount." Do you see that?**

A. Yes.

**Q. And now -- and that totals to 44.2 billion, you see that?**

A. Yes.

**Q. What does that column signify?**

MR. SHAW: Objection to form.

A. I don't know. Actually, I questioned that at the time. My impression was that was the amount that was going to be wired to Chase to release the collateral, but it turned out not to be the case and I was never explained as to why that was not the case. Because, as you know, it turned out to be 45 billion, so I don't know.

**Q. So you, just so I understand what you are saying, you, at the time, you thought 44.2 billion would be the amount that had to be wired to Chase to release the Fed collateral that was then going to be transferred to the September 18th repo?**

A. Being that this was provided by Chase,

Page 204

HIGHLY CONFIDENTIAL - J. HRASKA

and these were their requirements to release the collateral, the way I read this was that that was the case, and having discussions with Chase, I found out that, no, that was not the case, that they were expecting an amount of 45 billion.

**Q. And did they ever explain to you why the difference?**

A. No.

**Q. Did they ever explain to you what this column was to signify in their view?**

A. No.

**Q. Okay.**

MR. SHAW: We've been going over an hour, Bill, if we could take a short break.

MR. HINE: Sure.

(Recess; Time Noted: 2:28 P.M.)

(Time Noted: 2:39 P.M.)

BY MR. HINE:

**Q. Mr. Hraska, could you pull out the exhibit we were talking about before we broke, which I think was Exhibit 18.**

MR. SHAW: 60B?

**Q. I'm sorry, 60B.**

Page 205

**HIGHLY CONFIDENTIAL - J. HRASKA**

**Because you might want to refer to that when I hand you the next exhibit. So I don't have any questions on that specifically, but let me hand you another document that's been marked as Exhibit 125. If you could take a moment to review that before I ask you a question, I would appreciate it.**

**(Document review.)**

A. Okay.

**Q. Have you had a moment to look at it?**

A. Yes.

**Q. Mr. Hraska, turning to Exhibit 125, have you ever seen in document before?**

A. Yes.

**Q. What is this document?**

A. This is a document that was prepared by Nancy, who works for me. It was how we had broken up the -- how we had broken up what we called the tri-party shells or how we had assembled the baskets of collateral that we were going to be pledging over to Barclays.

**Q. Can you explain to me what you mean by that, tri-party shells?**

A. In a tri-party transaction, you are --

52 (Pages 202 to 205)

HIGHLY CONFIDENTIAL - J. HRASKA

you're lending securities based off of, as we talked about, the schedules and typically according to asset classes and requirements. So you typically book the money amount that's going to be associated with a generic bucket of securities that will fit these criterias, and that loan amount or that dollar amount is -- what you book is called typically a shell. By some firms, it's known as a loan amount.

So it's sort of the dollar value that you're going to associate a various basket of securities to.

**Q. Okay. And is that what's called the booking amount?**

A. These -- the booking amounts would be the dollar value of the loan, yes.

**Q. And the baskets of securities, are those listed on the left-hand column coming from various Fed programs; is that right?**

A. That's correct, yes.

**Q. And could you just walk me through the different columns on this chart and explain to me what each column signifies? We can start with the column that totals down to $47.5**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**billion. Do you see that column?**

A. Yes.

**Q. Do you know what that column is supposed to represent?**

A. The total market value of the securities.

**Q. And these are the securities that have been posted to the Fed financing programs?**

A. These were the securities that we had that we were anticipating pledging over to the Barclays transaction for the 18th.

**Q. So this document that we had previously talked about how $8 billion never made it, we had long discussions about that, but this chart is prepared prior to that?**

A. This was prepared prior to that.

**Q. So this is what you are anticipating being able to take from the Fed programs over to BONY; is that right?**

A. Actually, looking at the date of this, this -- this was prepared later that evening. So this must have been where we were at a particular point in time, or where we -- what we had booked at a particular point in time, not

HIGHLY CONFIDENTIAL - J. HRASKA

necessarily what was delivered yet at that particular point in time.

**Q. I guess, could you explain that to me in terms of the different columns?**

A. These columns represent items that were actually booked on our systems. That trade, as we talked about, there were different collateral classes and substitutions that happened all day based on deliveries, available in the box, that kind of thing.

So we were using this spreadsheet to try to capture all of the collateral that we were looking and the market value that we were booking, so these were the amounts that were being booked. From the time stamp, I can see it was 7 o'clock, so it was -- we weren't done until much later in the evening, so it was a -- this is an interim file, basically. It's not the beginning file. And it's not at the end of the day. It's not the ending file either. It was an interim step around 7 o'clock.

**Q. So if I found a file entitled BarCapSummary.xls, later than this, I would eventually get to a final file?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

MR. SHAW: Objection to form.

A. There is a final file, yes.

**Q. Okay. And it would have the same title as this file?**

MR. SHAW: Objection to form.

A. I don't know whether it would have the same title.

**Q. Okay. Would Ms. Denig probably know that?**

MR. SHAW: Objection to form.

A. She would know whether she prepared a file. Again, whether it was the final file she may not necessarily know.

**Q. Was she charged with monitoring this process?**

A. Yes.

**Q. Okay. So is she the originator of this chart?**

A. She is the originator of, yes, this format.

**Q. This chart is a snapshot at some point during that day of this transfer?**

A. Yes, that's correct.

**Q. Okay. Now, just so I understand the**

Page 210

HIGHLY CONFIDENTIAL - J. HRASKA

**different columns, the first column that totals to $47.5 billion, approximately, is the market value of the securities that had been posted to the Fed programs?**

A. That's what I believe that to be, yes.

**Q. Okay. What is the next column, which starts with $7.1 billion, what is that column?**

A. To be honest, I actually don't recall what that specific amount is. I can venture a guess, but I would rather not.

**Q. Venture a guess, if you don't mind.**

MR. SHAW: Calls for speculation.

A. My guess is it's the par amount of the -- of the securities.

**Q. And then the next column totals to $44.2 billion, you see that?**

A. Yes.

**Q. And do you know what that column represents?**

A. That would have represented the principal proceeds of the repo or the amount after haircut.

**Q. Okay. And what does the last column represent, do you know?**

Page 211

HIGHLY CONFIDENTIAL - J. HRASKA

A. No, unfortunately, I actually don't know what the next column is.

**Q. The $44.2 billion that you just testified about, does that relate in any way to the $44.2 billion on the previous exhibit?**

MR. SHAW: Objection to form.

A. It was what we believed we need to fund over to Chase as per the column of this previous spreadsheet. So in our initial bookings that's where we were trying to get collateral that ultimately totaled the amount equal to that amount.

**Q. And later you learned that it had to be 45 billion?**

A. That's correct.

**Q. Mr. Hraska, in the interest of trying to save you looking through another chart, I see one spreadsheet that's entitled Depot Analysis. Do you recall what that is?**

A. No, not off the top of my head.

**Q. Let me show it to you then.**

**(Exhibit 145B, a document bearing Bates Nos. 10328099 through 10319396, marked for identification, as of this date.)**

Page 212

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Mr. Hraska, I'm handing you a documents marked as Exhibit 145B.**

A. Okay.

**Q. And as promised, it's -- it has the attachment entitled Depot Analysis. Do you see that?**

A. I do, yes.

**Q. If you wouldn't mind taking a moment to take a look at this document.**

**Just for the record, it's an e-mail dated September 21, 2008, from Mr. Hraska to Monty Forrest and Mark Lee.**

**(Document review.)**

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have, yes.

**Q. Have you ever seen this document before?**

A. Yes.

**Q. Will you tell me what it is?**

A. This is a document that -- the e-mail's a document that I created with an attachment that I worked on with Nancy Denig and Bill Parrinello over the weekend of the 20th and

Page 213

HIGHLY CONFIDENTIAL - J. HRASKA

21st. It was -- it was our analysis of available unencumbered assets that we had referenced earlier in the testimony.

**Q. Okay. Is this -- okay. You testified I think earlier about an effort to locate unencumbered assets, and this is an analysis you did in that regard?**

A. Yes.

**Q. Is this the list of unencumbered assets that you came up with?**

A. This is a list. On the course of that weekend, there was I would say over a dozen lists that were as we went through it and we revised it and things like that. I mean, it was -- this list was created or sent at 7:36 in the morning. I'm not sure that this is the final list, but this was a later version of the list, yes.

**Q. Why is it called Depot Analysis?**

A. A depot is another name for a clearance box, depository, depot. It's just an industry slang term. The 9/19 date was referencing the fact that this was the close of business 9/19.

54 (Pages 210 to 213)

**Q. When I see the title, it says "9/19/2008.5." Does this suggest that it's a version 5 of this analysis?**

A. I would say yes.

**Q. And would it be your expectation that if I looked through the files, I should find later versions of this analysis?**

A. I don't know for certain. I know that we worked all through Sunday, so it's a -- there's a good chance there may be a different file later, but ...

**Q. Okay. Does this analysis ultimately identify the $1.4 billion worth of securities that we talked about earlier that were transferred to Barclays?**

A. No.

**Q. Okay. What is the end product of this analysis? I'm trying to understand how this analysis fits into the testimony you gave earlier about the 1.4 billion and the 800 Cusips. So I'm just trying to understand what is the end product of this analysis?**

A. The end product of this analysis is that this was sent over as available collateral

to be transferred. I can't confirm a hundred percent that the assets that are in the 1.4 list are all on this list.

**Q. Okay. I think you testified earlier that you sent a list over of unencumbered assets. Am I correct to say that $1.4 billion worth of those assets on that list eventually did make it to Barclays, right?**

A. I sent over a list of unencumbered assets and 1.4 billion of assets made it to Barclays. I can't be sure that it's the same 1.4 that was on the final list that I sent over.

**Q. Okay. And is the list that you sent over entitled Depot Analysis or was that a separate list?**

A. I don't recall what the final name was.

**Q. Okay. What is the analysis part of it?**

A. The analysis was trying to determine whether the securities were available or unencumbered.

**Q. Did the analysis entail valuing those securities at all?**

A. No.

**Q. If you look on page 2 of this document?**

A. Uh-huh.

**Q. I just wonder if you can explain to me the last two columns -- I'm sorry.**

A. Page 2 or a different page?

**Q. The first page of the chart.**

A. This is what I've got. Summary, that page? Or the spreadsheet first page?

MR. SHAW: Use the Bates numbers.

**Q. Let me see if I'm referring to the correct document. I have a misprint in my document.**

**Page 3 of the chart.**

A. Okay.

**Q. You see column F says "Firm DTC MV"?**

A. Yes.

**Q. What does that column represent?**

A. That represents a market value which was held in GFS, which is the system we referenced earlier.

**Q. Okay.**

A. So that would have been the market

value that GFS had assigned to that position.

**Q. Why does it say "DTC"?**

A. GFS was a database storage of multiple pricing sources, and in addition to Lehman's marks, in some instances we -- GFS also took in how the depository knew the value of the collateral to be.

**Q. Okay. And the previous column says "Firm DTC POS," you see that?**

A. Yes.

**Q. What does that column represent?**

A. Those represent the firm positions.

**Q. "Positions" meaning numbers of securities or dollar value?**

A. Numbers of securities.

**Q. Okay. Now, if you turn to the second page of the chart, you'll see a chart which totals $1.19 billion, you see that?**

A. The second page of the document, not of the chart?

**Q. Yes, I'm sorry. You're right.**

**Is 1.19 billion the value of the list of unencumbered assets that you sent over to Barclays?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. It was the market value that GFS assigned at the time of the creation of this particular file.

**Q. Okay. But you don't know if this is the final list, correct?**

A. I don't know.

**Q. At this particular time, GFS assigned that value to this list of securities; is that right?**

A. That's correct.

**Q. Mr. Hraska, I'm handing you a copy of a document previously marked as Exhibit 75B, which is an e-mail stream dated September 20.**

**Please take a moment to take a look at it.**

**(Document review.)**

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have.

**Q. Have you ever seen this document before?**

A. Yes, I have.

**Q. What is this?**

A. This is an e-mail that I was a

HIGHLY CONFIDENTIAL - J. HRASKA

recipient on. It was one of the -- one of the status updates when we were trying to identify unencumbered collateral in various sources.

**Q. If you look -- so am I correct this is in connection with your efforts to identify unencumbered assets that could be transferred to Barclays?**

A. Yes.

**Q. If you look at the bottom of the first page, it says, "Goal is 1.9 billion in unencumbered." You see that?**

A. I do.

**Q. Was that the goal you folks were shooting for at the time?**

A. That was the goal as it was described to me, yes.

**Q. Who described it to you like that?**

A. Monty Forrest.

**Q. Okay. And where did that goal come from?**

A. I don't know.

**Q. I thought I heard you say previously that the effort was simply to find as many unencumbered assets as possible; is that right?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Yes, that's correct.

**Q. How does the $1.9 billion goal fit in with that? It seems like a very specific target to be shooting for.**

A. I don't know where specifically that number came from. In my mind, I was looking for as many unencumbered collateral pieces that I could because I still was unsure of the status of that repo transaction that we talked about, the September 18 repo, where we pledged the 7 billion in cash.

So in my mind I needed to come up with assets that would continue to be able to substitute that collateral versus cash, and at that point, I was still unsure whether or not anything further was going to happen on that transaction or not. So I was looking for an unencumbered collateral. You know, they gave us this goal of 1.9 billion, but, you know, in my line of work, it's, you know, to the extent that you are given a task to find an unencumbered collateral, it's usually best to find the entire population. And to the extent somebody gives you 1.9, you say, great, I've done it. If it

HIGHLY CONFIDENTIAL - J. HRASKA

turns to 2.9, you have to do it again.

**Q. So was the search for unencumbered collateral an effort to find replacement collateral for the cash?**

MR. SHAW: Objection to form.

A. I was looking to find unencumbered collateral. You know, the firm may have had its own specific goal of the 1.9, in which I was trying to ascertain at least 1.9, because that's what they were looking for. But I was specifically not tied to 1.9 as, you know, the only thing that I was going to find. I was looking to find as many unencumbered collateral as I could.

**Q. I guess I want to understand what -- I thought you had previously said that you found $1 billion in unencumbered collateral that was then posted towards the $7 billion in cash and you had hoped to receive the $7 billion or some of that cash back, right?**

A. That's correct.

**Q. Now, was that effort to find unencumbered collateral different from this goal of 1.9 billion?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. I've subsequently learned that this 1.9 was different than the effort to search for unencumbered collateral on this weekend. At the time of that weekend, you know, I was again searching for unencumbered collateral in its entirety. So, in my mind, you know, we still needed to do a substitution on that cash event.

**Q. Okay.**

A. And until I was told otherwise, I was going to try to find collateral that potentially fit the bill for that.

**Q. Okay. What did you learn subsequently that was different than what you understood at the time?**

A. Well, you know, subsequently, I was made aware of, you know, Schedule B, which had some, you know, 1.9 to 2 billion dollars worth of, you know, collateral on it. But at the time, I wasn't aware of that.

**Q. Okay. So now it's your understanding that the $1.9 billion goal was in connection with preparing the Schedule B?**

MR. SHAW: Objection. Mischaracterizes prior testimony.

HIGHLY CONFIDENTIAL - J. HRASKA

A. I'm sorry, could you repeat the question?

**Q. Is it now your understanding, notwithstanding what you understood at the time, is it now your understanding that the $1.9 billion goal was, with respect to the search for unencumbered collateral, was to prepare securities that would go to Barclays under Schedule B?**

MR. SHAW: Objection to form.

A. Could you read back to me --

(Record read.)

A. Yes.

**Q. Okay. Now, further up on this e-mail we see a report apparently by Mr. Forrest of the latest status, or some form of status report. Can we just go through those items and tell me what you recall about those items?**

**It says 800 million at BONY. Do you see that?**

A. Yes.

**Q. And what's that referring to?**

A. Honestly, I don't recall what that 800 million was.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. And did that 800 million eventually make its way to Barclays?**

MR. SHAW: Objection. Foundation.

A. Stating that it's at BONY would have indicated that fact, because we didn't have -- Lehman didn't have a relationship with BONY, so...

**Q. Okay. Then further down, number 2, you see it references 746 million in O74, see that?**

A. Yes.

**Q. And what does that reflect?**

A. That's referring to, at the time of this, it was believed that there was 746 million in market value in securities unencumbered in O74.

**Q. And did that collateral make its way to Barclays?**

MR. SHAW: Objection to form.

A. I don't know whether that 746 reference here made it to Barclays or not.

**Q. Do you know whether the collateral in the O74 account was -- made its way to Barclays?**

A. Some collateral in O74 made it to

HIGHLY CONFIDENTIAL - J. HRASKA

Barclays, yes.

**Q. Some did not?**

A. That's correct.

**Q. How much did not?**

MR. SHAW: Asked and answered.

A. There's a portion in O74 that's still outstanding, hasn't made it to Barclays.

**Q. Do you know how much?**

MR. SHAW: Asked and answered.

A. I believe that amount to be somewhere in the neighborhood of 6 to 7 hundred million.

**Q. Is that the 800 Cusips that you mentioned earlier?**

A. No, as I had mentioned earlier, there was the original list which had the discrepancy of 800 Cusips, and there was a separate analysis which produced different collateral that was available, potentially, to be transferred.

**Q. Okay. And that's the 6 or 7 hundred million that you're discussing that you just mentioned did not make it to Barclays?**

A. That's correct.

**Q. Then we see in item number 3 a reference to 435 million in Canada, do you see**

Page 226

HIGHLY CONFIDENTIAL - J. HRASKA

**that?**

A. Yes.

**Q. What is that referencing?**

A. Unencumbered market value in our Canadian depository.

**Q. And did those securities make it to Barclays?**

A. No.

**Q. Where are they now? Still in that same depository?**

A. I don't know for certain, but it would be my assumption, yes.

**Q. Does Barclays think they're entitled to that collateral?**

MR. SHAW: Objection to form. Calls for speculation.

A. I don't know.

**Q. And you see the next item, number 4, 300 million in mortgages in 636. Do you see that?**

A. Yes.

**Q. What is that referring to?**

A. Market value of securities held in our depository at DTC Number 636.

Page 227

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And did that collateral make it to Barclays?**

A. I don't know how much of that or if any of that collateral made it to Barclays.

**Q. Okay. Then the next line says a total -- this totals to 2.18 billion. You see that?**

A. I do, yes.

**Q. Does that mean you made your goal of 1.9 billion?**

A. That would indicate that we had enough collateral to satisfy the collateral requirement, yes.

**Q. Do you recall any discussions about whether you made the goal of 1.9 billion?**

A. No.

**Q. Did you think at the time that you had achieved the goal of 1.9 billion?**

A. Based on this mail, I thought that I achieved what was asked from me by Monty, yes.

**Q. Did anyone call you up and say, congratulations, you made the goal of 1.9 billion?**

A. No.

Page 228

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. So how did it end? Did you think you had to continue searching?**

A. This was pretty early on in the weekend. It was only Saturday at 8:30 P.M. So, you know, this continued to go on because there were -- I don't remember what the nature of the circumstances are, but I remember we continued to search for collateral for pretty much the whole rest of the weekend.

**Q. So the 1.9 billion goal was put aside and just kept searching?**

A. I don't believe that the 1.9 billion goal was set aside. It was just a matter of there might have been some either additional problems in the collateral that we identified or we were doing verification exercises like looking at securities in depositories and accounts on our stock record to make sure that everything tied out. And so throughout some of those additional reconciliations, some of the previous things that had been identified had to be revised.

**Q. Okay. I wanted to ask you one follow-up question about I think we previously**

Page 229

HIGHLY CONFIDENTIAL - J. HRASKA

**were discussing the list of excluded assets. Do you recall that testimony?**

A. Yes.

**Q. That was a list of assets that Barclays would not accept as collateral for the September 18th repo, right?**

A. Yes.

**Q. And one of the assets that they would not accept are the racer notes that you mentioned, right?**

A. That's correct.

**Q. Do you know the value of those racer notes at the time?**

A. Approximately 5 billion.

**Q. 5 billion?**

A. Yes.

**Q. Okay. Do you know the value of the pool of excluded assets that had been posted to the Fed financing but Barclays would not accept in the September 18 repo?**

A. No.

**Q. Did you make an effort to look through the collateral that had been posted to the Fed and exclude out those items that Barclays would**

58 (Pages 226 to 229)

Page 230

HIGHLY CONFIDENTIAL - J. HRASKA

**not accept as collateral for the 9/18 repo?**

A. Yes, we did look-ups on the securities we were going to pledge to make sure that they were not on that excluded list.

**Q. Okay. And did you have any sense of the value of the ones that were excluded because of that review?**

A. No. Once they were excluded, we didn't keep track of what was excluded. It was, in our mind, there was no need to because we weren't going to pledge it.

**Q. Do you recall if it was a substantial amount of securities?**

A. Well, we didn't do it as one exercise. As we went and found baskets of securities in groups, we might have found exceptions in that exercise with multiple iterations. So I don't honestly recall how many were on that list.

(Exhibit 146B, a document bearing Bates Nos. BCI-EX-(S)-00014389 through 14393 with attachment, marked for identification, as of this date.)

**Q. Mr. Hraska, I've handed you a copy of a document marked as Exhibit 146B. It is**

Page 231

HIGHLY CONFIDENTIAL - J. HRASKA

**Bates-stamped BCI-EX-(S)00014389 through 14393, and then there are a series of attachments which don't have Bates stamps.**

A. Okay.

**Q. Have you had a chance to take a look at the document?**

A. Sure.

(Document review.)

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have, yes.

**Q. Have you ever seen this document before?**

A. Yes, I have.

**Q. Can you tell me what it is?**

A. This was an e-mail sent by Robert Azerad who's on Paolo Tonucci's team in the Treasury Department. He had been given a file that Barclays had worked on comparing it to -- comparing what they believed to be what Lehman knew to deliver versus what Barclays had known was delivered, and there were a few discrepancies in the Fed items versus a few hundred discrepancies in the DTC bucket of

Page 232

HIGHLY CONFIDENTIAL - J. HRASKA

collateral. So he asked us to look into it and try to reconcile through why there was these particular discrepancies.

**Q. And were you able to do that?**

A. We were, yes.

**Q. Why were there such discrepancies?**

A. I'm not sure why there were discrepancies with the information provided. We -- we verified that the information that we had originally provided was correct, so I don't know the sourcing of the file that -- or of the information that they relied on when they created this.

**Q. Now, is this -- I take it this e-mail is sent in connection with your reconciliation effort that you talked about earlier?**

A. We had -- we had done a reconciliation -- well, there were, to be clear, there were multiple reconciliation efforts that were done after this transaction, but my group had performed a reconciliation effort with -- with the Bank of New York and the Operations folks at Barclays, you know, prior to receiving this and we were -- we were reconciled with

Page 233

HIGHLY CONFIDENTIAL - J. HRASKA

respect to the number of securities and the Cusip identifiers, as we had talked a little bit earlier about.

**Q. And you said that your records tied in with Barclays records on that score, right?**

A. That's correct, yes.

**Q. And so why did this come up later?**

A. I honestly don't know.

**Q. Are these from a different set of records?**

A. My presumption is that, yes, and they were, in my opinion, incomplete records because they were missing securities.

**Q. So the Barclays records which appear to show a thousand-some-odd Cusips missing were incomplete?**

A. I don't think there was a thousand missing.

MR. SHAW: Objection. Mischaracterizes the document.

**Q. Let's read through this e-mail here for a second. It says you'll see in the larger -- largest paragraph on the first page it says, "For DTC settled securities, there are**

59 (Pages 230 to 233)

Volume I - A. 12 (B) Pg 21 of 44

Page 234

HIGHLY CONFIDENTIAL - J. HRASKA

**1,165 Cusips that are in the Barclays file but not in the Lehman file, and 1,563 Cusips that are in the Lehman file but not in the Barclays file." Do you see that?**

A. That's correct. Okay. So when I read that earlier, I took the difference between the two, not looking that they were different in totals between the two.

**Q. But so you looked into that issue, right?**

A. Yes.

**Q. And you concluded that Lehman's records were correct and Barclays had incomplete files; is that right?**

A. I concluded that the records that Lehman had that we compared to the records that Barclays Operations folks had were in line. I don't know the source of the file for this comparison, but I found this comparison to be faulty.

**Q. Okay. So you were still satisfied that the initial reconciliation that you did with the Operations folks at Barclays is correct?**

Page 235

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

**Q. Okay. And did you report that back to Mr. Azerad?**

A. I did, yes.

**Q. And any further action on this score?**

A. No.

**Q. Have you heard about this issue again?**

A. No.

**Q. Okay. So is it your understanding that it's been resolved?**

A. I never heard about it again, so from my perspective, it's resolved.

**Q. Okay. What explains the five Cusip difference in the Fed settled securities that are referenced in the first paragraph?**

A. I don't recall specifically what those differences were or even if there were differences just as there really weren't, in my opinion, differences here on the DTC securities.

**Q. Okay. If you turn to the first attachment, which is a one-page attachment after the first blue sheet in the document.**

A. Okay.

**Q. Can you explain to me what this chart**

Page 236

HIGHLY CONFIDENTIAL - J. HRASKA

**is showing?**

A. What this chart is showing is the substantiation of the records that are listed on the first page in this paragraph that you just referenced.

The left side are the Fed settled securities on the top, and to the left are what Barclays, according to this analysis, knew and here what Lehman knew. And similarly, further on to the right, for DTC settled assets, the same thing.

**Q. So am I correct in reading this that, with respect to the Fed settled Cusips, the amount in dispute was 186, approximately $186 million?**

A. Market value, according to this analysis, that's what this document would indicate, yes.

**Q. And the amount of the value of the Cusips in dispute on the DTC settled side was 20-some-odd million dollars?**

A. According to this document, yes.

**Q. Do you have any knowledge one way or the other whether that's correct or not?**

Page 237

HIGHLY CONFIDENTIAL - J. HRASKA

A. I just testified that I didn't think the value of this analysis was worth anything. So, in my opinion, it's not valid.

**Q. Okay. Do you know if any adjustments were made in the valuations of securities as a result of your reconciliation of this issue?**

A. I don't know.

**Q. Okay. Could you just identify for me the next two items behind the next two blue sheets, the first --**

A. So this is the first blue sheet?

**Q. The first blue sheet which says -- up in the upper left-hand column which says, Source: Barclays," you see that?**

A. Yes.

**Q. What is this spreadsheet?**

A. This --

**Q. Let me ask it a different way maybe.**

A. Okay.

**Q. Is this one of the spreadsheets that are referenced on the first page of the first e-mail?**

A. Yes, this appears to be the supporting documentation that supports the summary totals

60 (Pages 234 to 237)

Page 238

HIGHLY CONFIDENTIAL - J. HRASKA

that we just discussed.

**Q. Okay. If I look on the front page of the e-mail, the first e-mail, it references looks like a file entitled "Barclays Financing Collateral Lists, BARC Ops," is that this database?**

A. I don't know.

**Q. Okay. How about the last database behind the final blue sheet, do you know what that document is?**

A. Again, I'd have to speculate that it's the supporting documentation to the other summary totals.

**Q. Okay. Do you know which one -- I see on the opening e-mail there's a document entitled "Corrected Thursday Transfers to Barclays. BONY Agreed." You see that?**

A. I do, yes.

**Q. Is that one of these two lengthy databases at the end, do you know?**

A. I don't know.

MR. HINE: Okay. I think, Mr. Hraska, I have no further questions for you. Thank you very much for your time. I think some

Page 239

HIGHLY CONFIDENTIAL - J. HRASKA

of my colleagues might.

(Discussion off the record.)

(Recess; Time Noted: 3:26 P.M.)

(Time Noted: 3:31 P.M.)

EXAMINATION BY

MR. OXFORD:

**Q. Mr. Hraska, we met off the record, but let me introduce myself on the record. I'm Neil Oxford and I'm with Hughes, Hubbard & Reed. We represent the SIPA Trustee.**

A. Okay.

**Q. You testified that sometime after the closing of the transaction you learned that Barclays purchased the unencumbered assets of LBI's clearance boxes, correct?**

A. Can you specify, when you say "the closing of the transaction," which transaction you're referring to?

**Q. I mean the closing of the sale of LBI's assets to Barclays on the 22nd of September?**

A. Okay. So I'm sorry, can I ask you to repeat the whole question based on that?

(Record read.)

Page 240

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct.

**Q. From whom did you learn that?**

A. Paolo Tonucci.

**Q. When did Mr. Tonucci advise you of this?**

A. I don't recall a specific date.

**Q. Do you recall whether it was shortly after the closing on the 22nd of September?**

MR. SHAW: What do you mean by "shortly after"?

**Q. Well, was it within a week, within a month of that closing?**

A. It was within a month, yes.

**Q. Can you tell me anything else you remember about that conversation with Mr. Tonucci?**

A. I remember that he had said that, as a result of this transaction, we were to search for all of the assets that were considered unencumbered in the Lehman boxes.

**Q. From whom did you get your instructions over the weekend of the 20th and 21st to search for unencumbered assets? Was that Mr. Forrest?**

Page 241

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. My direct instructions came from Mr. Forrest as my supervisor, yes.

**Q. Did you talk to anybody else about what your instructions were that weekend with respect to identifying unencumbered assets in LBI's clearance boxes?**

A. With respect to identifying the assets and instructions, no, those all came from Mr. Forrest.

**Q. The 1.4 billion, approximately, in assets that you believe were transferred from LBI's clearance boxes, do you believe that they include the assets that were transferred on the 18th of September?**

A. No.

**Q. Why do you say that?**

A. Because, from my previous testimony, all the assets that were transferred on the 18th were reconciled through, and the assets that we delivered from the 18th onward -- like I have a record of all the assets that were transferred beyond the 18th, and so when I surmise that it was 1.4 billion, it was based off of the assets that were transferred subsequent to the 18th

61 (Pages 238 to 241)

Page 242

HIGHLY CONFIDENTIAL - J. HRASKA

from my records.

**Q. Does the 1.4 billion figure you have testified about include assets that were transferred on the 19th of September?**

A. Yes, it does.

**Q. And what's the approximate value, to your knowledge, of the assets that were transferred on the 19th?**

A. A little bit over a billion. I believe it's like 1.034 or 35 billion.

**Q. You said that you looked across stock records the weekend of the 20th and 21st for assets over which there was no lien; is that correct?**

A. That's correct.

**Q. Is it fair to conclude that the results of your search for unencumbered assets or assets with no lien was the results were imperfect?**

A. That's fair to say, yes.

**Q. And it's fair to say because of the 800 or so Cusips that you testified earlier were identified to you as actually encumbered or other than unencumbered, correct?**

Page 243

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct, yes.

**Q. Can you tell me how you went about identifying --**

A. Can I just clarify something?

**Q. Of course.**

A. They were identified as -- on the system as not movable or encumbered, but we needed to do some more investigation because we didn't know whether they truly needed to remain encumbered or whether they were erroneously encumbered.

**Q. And did you do that investigation?**

A. I didn't personally do that investigation. There was -- there was a reconciliation effort that took place that reconciles stock record breaks which then later helped unencumber some of that collateral.

**Q. So, as I understand this, you were given a list that you called an exception list; is that correct?**

A. That's correct, yes.

**Q. Who gave you that exception list?**

A. I don't recall the person. I remember it came from Finance.

Page 244

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And Finance is?**

A. Finance is like product control. Finance -- those are the names of the organization, Product Control Finance. I believe it's managed now by Martin Kelly and his team here at Barclays.

**Q. And can you tell me what an exception list is, please?**

A. The exception list as defined by what we're discussing was the Schedule B list versus -- the official Schedule B list versus the actual collateral delivered to Barclays subsequent to the 18th.

**Q. And at some point did you get a list of 800 Cusips that had not been delivered? Are we talking about the same list?**

A. That's the same list, yes.

**Q. And a reconciliation effort was then undertaken; is that correct?**

A. There was a reconciliation effort -- well, there was two things that were done. There was a verification to see whether or not those, in fact, those 800 were or were not delivered. We verified that those 800 were not

Page 245

HIGHLY CONFIDENTIAL - J. HRASKA

delivered, and then there was a reconciliation just in general to resolve stock breaks at the firm which was done.

**Q. Of the 800 Cusips that you have verified or your team had verified were not delivered, did you determine whether or not any of those securities were in fact unencumbered?**

A. I didn't determine that, no.

**Q. Do you know if such a determination was made?**

A. I don't, no.

**Q. When were you given this exception list?**

A. I don't recall, honestly.

**Q. Can you give me any idea as the whether it was 2008 or 2009?**

A. Honestly, no.

**Q. Was it around the same time, Mr. Hraska, that you were asked to go and find additional unencumbered assets in Lehman's clearance boxes?**

A. Yes, but I was asked that multiple times at multiple stages. We talked about it over the weekend and then there was times where

62 (Pages 242 to 245)

Page 246

HIGHLY CONFIDENTIAL - J. HRASKA

much further beyond that. So when you're referring to -- at what period of time were you referring to?

**Q. The period of time that you can't remember where you were given the exception list.**

A. Yes, so around that time, yes.

**Q. Do you recall who asked you, at around the time you were given the exception list, who asked you to go and find additional unencumbered assets in Lehman's clearance boxes?**

A. At that time, it would have been Robert Azerad.

**Q. Did Mr. Azerad tell you why he wanted you to go and find these additional unencumbered assets?**

A. It was in connection with the -- with the Asset Purchase Agreement between Barclays and Lehman.

**Q. Did he give you any more detail than that?**

A. No.

**Q. I think you testified that you went on to identify an additional amount of unencumbered**

Page 247

**HIGHLY CONFIDENTIAL - J. HRASKA**

**assets in response to Mr. Azerad's request; is that correct?**

A. Yes, that's correct.

**Q. And the figure I have written down is approximately 6 to 7 hundred million dollars of unencumbered assets that you previously had not identified; is that correct?**

A. That's correct.

**Q. Can you tell me how you went about, over the weekend of the 20th and 21st of September, identifying unencumbered assets?**

A. Sure. We -- we relied primarily on GFS, which we talked about a little bit earlier, which is a system that was a database aggregator that took information from multiple mainframes which represented the books and records of Lehman Brothers.

We then took that data and we looked for primarily assets which were held in firm trading accounts, and we compared the firm asset side versus the balances which were held in the depositories to make sure that there was enough assets in the depositories to support that inventory balance, and if there was enough, we

Page 248

HIGHLY CONFIDENTIAL - J. HRASKA

deemed that be to be unencumbered assets.

**Q. Did you take any steps to determine whether or not the assets you identified could have been owned by Lehman's customers?**

A. The accounts we searched in were firm trading accounts and stock loan borrow accounts, and in either of these accounts it would have been deemed as inventory because it as in a firm inventory trading ledger, or if it was in a stock loan account, it would have been as a result of having rehypothecation rights. We would have been allowed to borrow it so we would have used that as a source for collateral.

**Q. Is it possible that, taking the hypothetical example of 100 shares of IBM stock that's sitting in the DTC box at O74, is it possible that there could be a claim on that, those 100 shares by both a Lehman customer and by Lehman?**

MR. SHAW: Objection, form.

**Q. Do you understand my question?**

A. Could you repeat it, please?

**Q. Yes. If there are -- if there's a particular Cusip or set of Cusips sitting in**

Page 249

**HIGHLY CONFIDENTIAL - J. HRASKA**

**Lehman's DTC box O74 --**

A. Okay.

**Q. -- is it possible that there could be a claim on those Cusips by both Lehman as a firm and by Lehman's customers?**

MR. SHAW: Objection to form.

A. In your first question, you specified a quantity and you specified whether each of those could have lay to the same claim for that quantity.

Is that still your question, or is your question now in general could -- could customers and firm have claim to the same Cusip number, meaning the identifier, not the actual number of shares?

**Q. The actual number of shares. I meant to reask my first question.**

A. Okay. So if the stock record is reconciled, you would not have situation where you would have both the firm and customer having a claim to the same number of shares at the depository.

**Q. Were Lehman stock records reconciled fully over the weekend of September 20 and 21?**

63 (Pages 246 to 249)

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. No, which is what led to the inconsistencies you referenced on my set of files that I first produced.

**Q. Those are those 800 Cusips that were not delivered, many of which were in fact determined ultimately to be encumbered, not unencumbered securities, correct?**

A. Yes.

**Q. Why were Lehman's stock records not fully reconciled over that weekend?**

A. Well, as I'm sure you're aware, the financial markets were going through down -- quite of a meltdown in that period and, more specifically, Lehman Brothers. There was an inordinate amount of activity going through our clearance boxes, through our front ends and back ends processing systems.

In addition to that, there were relationship troubles with JPMorgan Chase, and as a result of that, there was information that was typically received, like file transfers that represent statement balances and things like that, that we would normally expect to receive from your custodians which were not sent to

HIGHLY CONFIDENTIAL - J. HRASKA

Lehman Brothers on either the night of the 19th or during bat cycles on the 20th. So it was very difficult to do a reconciliation without a complete set of data.

**Q. Did you ever get to have a complete set of data such that you could make that reconciliation?**

A. The firm received additional data. I personally wasn't in charge of those reconciliations. So, as to the nature of its completeness, I couldn't testify to that.

**Q. Who was in charge of any subsequent reconciliations of the firm's stock records? And my question is with respect to Schedule B or subsequent iterations of Schedule B, as far as you're aware, sir.**

A. Well, that's two questions. So there's a group that's responsible for the stock record reconciliations, which is the firm Balancing Department, which I don't remember who was in charge of it at the time, but it would have been the firm Balancing Department that's responsible for that in conjunction with the Clearance folks.

HIGHLY CONFIDENTIAL - J. HRASKA

They focused on putting the stock record back in balance, but I don't know whether there was any reconciliation once the stock record was back in balance to the original Schedule B.

**Q. The securities that were transferred from Lehman to Barclays on the 19th?**

A. Yes.

**Q. Was it your idea to transfer those or was that the idea of someone you reported to?**

A. It wasn't that it was a unique idea of my own. What it was, it was a normal course transaction, which we had previously deposited cash as a result of the problems we had the night before.

And in a repo transaction, I think I mentioned earlier, you typically wouldn't deposit cash to get cash. So it's, you know, it's a normal course transaction and it was a situation where you're not using your collateral efficiently to try to find substitute collateral. Especially in a tri-party arrangement, you have full rights to go ahead and do that, and that type of transaction is

HIGHLY CONFIDENTIAL - J. HRASKA

typically affected by Operations personnel, not Trading personnel.

So, you know, I discussed with the folks at Barclays the previous night and, you know, and at Lehman that we were going to, you know, the next morning we were going to look to do exactly that and replace the cash with, you know, substitute collateral.

**Q. Can you be more specific about the names of the people you discussed this with?**

A. At Barclays I spoke to John Rodefeld about it, and at Lehman I would have spoke to Monty Forrest and Alastair Blackwell about it.

**Q. And did Mr. Forrest and Mr. Blackwell approve of this transaction?**

A. Yes, they understood it to be a normal course function that I would have done at any other point in time.

**Q. So I'm clear, it was something that -- this transfer of approximately $1.1 billion was done on your initiative, correct?**

A. That's correct, yes.

**Q. But what you say is this is something that was --**

Page 254

HIGHLY CONFIDENTIAL - J. HRASKA

A. Commonplace.
**Q. -- commonplace in this commercial situation?**
A. Yes.
**Q. And the underlying commercial contract that governed this transaction was the tri-party repo that you've testified about today?**
A. Yes.
**Q. And just so the record is clear, no cash was ever returned to Lehman in return for this transfer of $1.1 billion in additional unencumbered collateral to Bank of New York on the 19th of September, correct?**
A. To my knowledge, that's correct.
**Q. I have a few documents to show you.**
**(Exhibit 147B, an e-mail sent from Mr. Hraska to Paolo Tonucci, copying others, on Friday, the 19th of September, 2008, marked for identification, as of this date.)**
**Q. Showing you, Mr. Hraska, what I've marked as Tab 147B. Let me know when you've had a chance to look at that document.**
**(Document review.)**
A. Okay.

Page 255

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. I'll identify this for the record as an e-mail sent from Mr. Hraska to Paolo Tonucci, copying others, on Friday, 19th of September, and at this time written here 2:28 P.M. is in GMT. So in Eastern Standard Time, that's about 10:30 in the morning.**
A. Uh-huh.
**Q. Do you recognize this document, sir?**
A. I do.
**Q. The subject is pledges. It says, "Paolo," and you write to Mr. Tonucci, "We managed to pledge over about 800 MM in MV to BarCap." What does that mean?**
A. "MM" is a term that means millions, and "MV" is market value. So the assets that we had pledged over up to that point were, in our estimation, from the, you know, our systems, the way we had them marked, was worth about 800 million in value.
**Q. So the 800 in MV is Lehman's marks?**
A. Those are Lehman's marks, yes.
**Q. And was this a transfer that you had instructed on Friday morning, the 19th?**
A. That was part of it. Being that it's

Page 256

HIGHLY CONFIDENTIAL - J. HRASKA

only 800 million, I don't believe it was all of it that ultimately ended up getting transferred over.
**Q. Is this 800 million part of the 1.1 million we have just been discussing that was transferred that same day, the 19th?**
A. It would have been, yes.
**Q. You go on to say, "We may have identified another 500 million, but I wanted to check with you first before pledging it to them."**
A. Yes.
**Q. Do you recall whether Mr. Tonucci replied to you?**
A. I don't recall.
**Q. That's all I have for that document.**
**(Exhibit 148B, an e-mail chain, the first in time dated September 19, 2008, at 3:43 P.M., marked for identification, as of this date.)**
**Q. I've handed you a document I have marked as Exhibit 148B. Tell me when you've had a chance to look through it.**
**(Document review.)**

Page 257

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Of course, you are welcome to look at the whole document. It's really the original e-mail at 3:43 P.M. that I'm going to focus my questioning on. It's a two-page document. It's double-sided.**
A. I didn't realize it was double-sided. I'm sorry.
(Document review.)
A. Okay.
**Q. At 3:43 P.M. on Friday, 19th, you write to Mr. Feraca, Mr. Aronow, and others, on the subject of an urgent tri unwind. You say, "We pledged only 800 million of new collats to BarCap. All is frozen."**
A. Are we talking about the same document?
(Indicating.)
A. Oh, on the very last sentence. I'm sorry. Okay. I'm sorry. Go ahead.
**Q. Do you see where it says, "We pledge only 800 million of new collat to BarCap. All is frozen"?**
A. I do, yes.
**Q. Does that refresh your recollection**

65 (Pages 254 to 257)

HIGHLY CONFIDENTIAL - J. HRASKA

**about the amount of collateral you posted with Barclays on the 19th of September?**

A. It may have been the market value at that particular point in time. We are still able to pledge through -- at 3:43 it would have been a time that we still technically would have been able to pledge assets from DTC to Barclays if we determined there was availability.

So at the time, I'm comfortable that that's what it was, but as it determined later, we moved more than 800 million worth of securities.

**Q. What do you mean "all is frozen"?**

A. I don't know. Looking at it now, I don't really recall the context of what I was referring to with "frozen." I apologize.

**Q. Does it perhaps refer to your earlier testimony and to Chase freezing the movement of any further cash?**

A. To be honest, I don't know.

**Q. Okay.**

MR. SHAW: Are you done with this one?

MR. OXFORD: Yes.

(Exhibit 149B, an e-mail from Gene Lempert, to Mr. Hraska, Sunday, September 21, at 3:38 A.M. GMT, or 11:38 P.M. EST, marked for identification, as of this date.)

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Did you have an understanding, Mr. Hraska, that the 800 million of collateral we have just been discussing was of particular importance to the deal?**

A. Can you specify the deal you're referring to?

**Q. The transaction between Lehman and Barclays, the purchase transaction.**

A. At that point in time, the significance of that transaction to me was that we were trying to do a substitution for part of the 7 billion that we had pledged over the previous night in cash.

**Q. And what was the purpose of the substitution of this collateral for cash?**

A. The purpose was purely efficiency of collateral usage. If you're going to obtain financing on a secured loan, you typically get cash, right? You pledge an asset. It wouldn't make sense to get cash and pledge cash right back again, so that's why we were looking to

HIGHLY CONFIDENTIAL - J. HRASKA

substitute securities as opposed to cash on that repo transaction.

**Q. Was Lehman trading that day, the 19th?**

A. Lehman was -- was trading, yes.

**Q. And was the cash needed for any particular activity?**

A. I don't know that I could effectively comment on that. I mean, they were trading. They would have had cash requirements. So but as to whether it was for a particular activity, I don't know.

**Q. No one articulated a particular need or purpose behind this cash?**

A. No.

**Q. If you look at what I have marked as Exhibit 149B, please.**

A. Sure.

**Q. And let me know when you've had a chance to look at it.**

**(Document review.)**

MR. OXFORD: For the record, I'll identify this as an e-mail from Gene Lempert, to Mr. Hraska, Sunday, September 21, at 3:38 A.M. GMT, or 11:38 P.M. EST.

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: The previous night.

MR. OXFORD: Yes, previous night. Thank you.

A. Okay.

**Q. Do you recall this document, sir?**

A. I do, yes.

**Q. It appears from the document that some technical staff were trying to restore a database; is that correct?**

A. Yes, that's correct.

**Q. And that's the database called Magics?**

A. That's correct.

**Q. What is the particular file that the technical people are trying to restore, if you know?**

A. This was the file of the assets transferred on the 19th which made up the 1.0345 million.

**Q. Do you have an understanding of why there was an attempt made to restore this file?**

A. At some point in time, I don't recall who it was, but somebody had asked that we made sure we were able to retain records of everything that we had transferred over or were

HIGHLY CONFIDENTIAL - J. HRASKA

we sure that all the records that we had were going to be able to prove out what we transferred over.

For the assets that were held in the O74, the mechanism that we used to transfer was the front end system Magics connected to our O74 DTC depo, and because we were delivering them to the Bank of New York, which was not anyplace that we had delivered prior to the 18th, we weren't 100 percent sure that these records would have been stored in the database. So I was double-checking to make sure the database hadn't been overwritten because it was a brand-new process.

I testified a little bit earlier we had no connectivity to the Bank of New York prior to the 18th, so that was me confirming that we in fact would have had the records available to us.

**Q. If I understand your testimony correctly, it was your idea to have the file restored; is that correct?**

A. Yes, that's correct.

**Q. Do you see on the front page of the**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**document I have marked as the exhibit that you write to Mr. Lempert at 11:17 P.M. on Saturday, do you see that?**

A. Yes.

**Q. It says you're working through the night, as I imagine a number of other people were. The second paragraph says, "The BarCap purchase of us hinges on us having enough collateral to cover shortfall."**

**What did you mean by that?**

A. Honestly, I don't know. I assume it was based off of a comment that somebody had made to me, but I just don't remember the particular context of that. I'm sorry.

**Q. Do you know what "shortfall" means in this context?**

A. I don't. I mean, prior to seeing this, I didn't remember making that comment, so I don't.

**Q. If I understand your testimony correctly, your having restored a file that relates to the transfer of a billion dollars of collateral that's already gone to BarCap?**

A. That's true, yes.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. I guess your comment doesn't make any sense to me in that context. Why would the restore of a file for a transfer of a billion dollars of data that's already -- I'm sorry, a billion dollars of collateral that's already been transferred relate to the question of whether or not you have enough collateral to cover a shortfall?**

MR. SHAW: Objection to form.

A. I honestly don't know. If I could remember the context of why I wrote the sentence, I would be able to answer you, but I just don't remember why I put this in here.

**Q. Maybe if you hadn't been up all night, you would remember.**

**The next sentence says, "This 800 million is critical to the deal." Do you recall writing that?**

A. I don't recall writing it. Obviously I did write it, but I don't recall writing it, no.

**Q. Sitting here today, do you know what you meant when you told Mr. Lempert that this 800 million is critical to the deal?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. No. Quite honestly, I'm confused on the number of 800 because it doesn't tie into any of the other things we were talking about in this. I know that on that day we transferred -- on the 19th, we transferred a billion-35. So I honestly don't know where that 800 number ties in.

(Exhibit 150B, Mr. Lempert to J. Hraska and others, Sunday, 9/21, at 1:34 A.M. GMT, marked for identification, as of this date.)

**Q. I'm handing you what I have marked as Exhibit 150B, which is an e-mail from Mr. Lempert to you and others, Sunday, 9/21, at 1:34 A.M. GMT, which is 9:34 P.M. Eastern, on Saturday. Let me know when you've had a chance to look through that document.**

**(Document review.)**

A. Okay.

**Q. This is an e-mail that I think relates to the same topic as Exhibit 149. On the second page there's an entry in the string at 8:19 P.M. There's an e-mail from you to Mr. Lempert and others. It says, "Mike, I urgently need to get**

**a hold of a file that shows all the items we pledged to BONY 885 on Friday. Pete says it was around about 800 million MV. Need this for Paolo. Please send to Nancy and I."**

**Is this your original request for the restore to Mr. Lempert?**

A. It is, yes.

**Q. What's BONY 885?**

A. This is the Bank of New York pledge location at DTC.

**Q. You say, "Need this for Paolo."**

A. I believe --

MR. SHAW: There's no question pending.

**Q. What do you believe? Was this something that Mr. Tonucci had asked you for?**

A. I believe that Paolo had requested that we make sure we had complete records of everything that we transferred on the deal, which is why I needed it for Paolo.

**Q. You'll see there's a file attached to this document and the file is named Tri49192008.XLS, you see that?**

A. I'm sorry.

**Q. It's the attachment on --**

A. Right. Okay. And this file behind it -- that's it, right.

**Q. Is it that file?**

**Do you believe that this is the restored file of the unencumbered collateral that you had transferred to the Bank of New York for the benefit of Barclays on September 19, 2008?**

A. Yes.

**Q. That's all I had for that document.**

**(Exhibit 151B, an e-mail from Monty Forrest to Mr. Lowitt, Mr. Blackwell, Mr. Ullman and J. Hraska, copying Mr. Tonucci and others, sent on Sunday, 9/21, at 9:16 A.M. GMT, marked for identification, as of this date.)**

**Q. Mr. Hraska, I've handed you a document marked Exhibit 151B, which I'll identify for the record as an e-mail from Monty Forrest to Mr. Lowitt, Mr. Blackwell, Mr. Ullman and you, copying Mr. Tonucci and others, sent on Sunday, 9/21, at 9:16 A.M., GMT, or 5:16 A.M. eastern. Let me know when you've had a chance to review**

**that.**

**(Document review.)**

A. Okay.

**Q. Do you recall this document?**

A. I do.

**Q. First of all, if I can direct your attention to the e-mail that begins at the bottom of page 1, the top of page 2, from Mr. Lowitt that is sent to you, Monty Forrest, Alastair Blackwell and Neal Ullman.**

**Do you recall receiving that e-mail from Mr. Lowitt?**

A. I remember this string. I don't particularly remember this particular blurb.

**Q. Did you attend the 7 A.M. meeting?**

A. I did not, no.

**Q. Mr. Lowitt says, "Good luck getting additional collateral, but to get accurate presentation of the collateral is also critical as we will append to the agreement," do you see that?**

A. I do, yes.

**Q. Do you recall reading that at the time?**

A. No.

**Q. Did you have any understanding at the time you received this e-mail or at any time over the weekend that the work you did to identify additional collateral would be appended to any type of agreement?**

A. No, unfortunately. The weekend, as we discussed previously, I mean, I can't even tell you how many hundreds of e-mails I got. So it's conceivable that I didn't see everything in every e-mail, so... I just don't recall this passage.

**Q. Monty Forrest replies to the chain and he says, "We have analyzed any unencumbered assets in all boxes that were not picked up by financing systems." Do you know what that means?**

MR. SHAW: Objection to form.

A. I don't know what he means by that phrase. It wouldn't have been the way I would have phrased it, but ...

**Q. How would you know how to phrase it if you don't know what he means?**

A. Well, he provides a market value of

Page 270

HIGHLY CONFIDENTIAL - J. HRASKA

the collateral, and those market values came from the work that me and my team did. So I don't know why he's referencing finance systems here. These were collateral pieces that were based in the mainframe which was picked up by GFS. I'm just not sure what he's referring to by "financing systems."

**Q. So you see there's a total there, Mr. Hraska, of close to $2.3 billion?**

A. Yes.

**Q. Does that represent the unencumbered assets that, at least as of the date of this e-mail, you and your team had been able to identify?**

MR. SHAW: Objection to form.

A. I can't be certain. I can't be a hundred percent certain. I don't know.

**Q. Did you look for unencumbered assets in any location other than those listed in the e-mail from Mr. Forrest here?**

A. We looked for all unencumbered assets in the stock records. These were the ones that we thought that had the highest probability of having unencumbered assets in them. They were

Page 271

HIGHLY CONFIDENTIAL - J. HRASKA

our primary clearance boxes.

**Q. Were you looking for physical securities as well, Mr. Hraska, that weekend?**

A. We had, yes, we had looked through some of the clearance locations for physical securities, but based on the analysis, we, over the course of that weekend, weren't confident enough that we could determine whether those assets were unencumbered or not so we left them off of this analysis.

**Q. Did you leave physical securities off not just this analysis, but any analysis of unencumbered assets you provided to Mr. Forrest?**

MR. SHAW: Objection. Vague as to time.

**Q. My question is specifically with respect to this weekend of the 20th and 21st of September.**

A. We did an analysis of this weekend. Based on that analysis, we didn't forward any value of unencumbered securities which were physical.

**Q. You see the paragraph immediately following the 2.3 billion number?**

Page 272

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Uh-huh.

**Q. Relates to BONY Tri Pledge line item?**

A. Yes.

**Q. Does that refresh your recollection about any of your prior testimony about the reason the file was restored?**

A. Well, it was restored because we wanted to maintain records, but according to this, it appears that complete restore maybe wasn't possible. But I wouldn't change my reason to have requested the restore on the file.

**Q. After reading this e-mail, is it still your testimony that the transfer of approximately $1.1 billion from Lehman to BONY pledged to Barclays on the 19th of September settled?**

A. Yes.

**Q. That's all I have with that exhibit.**

**I'm handing you, Mr. Hraska, a one-page document that's previously been marked Exhibit 93B. If you can take a look at that and let me know when you've reviewed it, please.**

**I'm sorry, it's a two-page document.**

Page 273

**HIGHLY CONFIDENTIAL - J. HRASKA**

**(Document review.)**

**Q. I'll direct your attention to item 1 in the box, and if you would just identify for the record. This document is entitled "Management of Unencumbered Asset Gap."**

**Actually, let me first direct your attention to the first line that says, "Objective: Delivery to BCI of 1.95 billion of unencumbered collateral by COB Friday, September 19." Do you see that?**

A. I do, yes.

**Q. Were you aware of any objective to deliver 1.95 billion of unencumbered collateral to Barclays by the close of business on Friday, the 19th?**

A. No.

**Q. Item 1 in the box that's headed "Current Status Summary" is "Actual Delivery EOD Friday." Do you see that?**

A. I do.

**Q. Do you believe that refers to the approximately $1.1 billion of collateral that we've been discussing that was transferred from Lehman to Bank of New York on Friday, 19th?**

69 (Pages 270 to 273)

Page 274

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Yes.

**Q. It says, "Outstanding Actions: Validation of settled versus unsettled of tri-party at BONY."**

**Do you know what that means?**

A. It means that I was expected to validate whether or not those securities actually made it to Bank of New York.

**Q. And consistent with your previous testimony, you did actually at some point confirm that transactions settled and those securities made it to Bank of New York, correct?**

A. Yes, that's correct.

**Q. Okay. That's all I have for that document.**

**(Exhibit 152B, an e-mail from Alastair Blackwell to Monty Forrest and to J. Hraska, copying Mr. Tonucci dated Monday, 22nd of September, 10:35 A.M. GMT, marked for identification, as of this date.)**

**Q. Handing you, Mr. Hraska, a one-page document marked Exhibit 152B, which I'll identify for the record as an e-mail from Alastair Blackwell to Monty Forrest and to you,**

Page 275

**HIGHLY CONFIDENTIAL - J. HRASKA**

**copying Mr. Tonucci dated Monday, 22nd of September, 10:35 A.M., GMT, 6:35 A.M. Eastern.**

A. Okay.

**Q. Do you see that Mr. Tonucci originally writes to you at approximately 4 A.M. on Monday, 22nd of September, on the subject of DTC box?**

A. Yes.

**Q. He says, "You should plan on moving all the unencumbered collateral in the DTC box first thing. Should correspond as closely as possible to list agreed with Barclays over the weekend." And you reply, "Understood." Withdrawn. Mr. Blackwell replies.**

**Do you know what the reference is to the list that was agreed with Barclays over the weekend?**

A. I don't really know what was agreed to Barclays over that weekend. I know that there was a list, and I took this to be move everything that we identified on our list to Barclays. Again, I don't know what was agreed from that list to Barclays or not because I wasn't involved in those discussions.

**Q. Did you give your list of unencumbered**

Page 276

**HIGHLY CONFIDENTIAL - J. HRASKA**

**collateral that you had identified to anybody other than Mr. Forrest?**

A. I gave it to Mr. Forrest. We would have to see who was CC'd on there, if there was anybody on that list. I'm sure Mr. Forrest had passed it on at some point, but I don't recall giving it directly to anybody else besides Mr. Forrest.

**Q. And you weren't involved in any discussions with anybody at Barclays about the content of that list over the weekend?**

A. No.

**Q. That's all I have for that.**

**(Exhibit 153B, a document bearing Bates Nos. BCI-EX-00003796, marked for identification, as of this date.)**

**Q. I'm handing you, Mr. Hraska, what I have marked as Exhibit 153B. It's a document produced by Barclays with a Bates range BCI-EX-00003796, and it has an attachment that I believe was produced in native form which is one of the attachments that I have marked that doesn't have any Bates numbers.**

**Do you recall this document, sir?**

Page 277

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. May I have a minute just to review it?

**Q. Of course. Take your time.**

**(Document review.)**

A. Okay.

**Q. Do you recall this document, sir?**

A. Yes, I do. Well, I recall the e-mail. The document I'm unable to tell that it's the attachment, but I'm assuming that it's been printed from this e-mail, so ...

**Q. The e-mail at the bottom of the chain is from you to Mr. Rodefeld at Barclays, correct?**

A. That's correct, yes.

**Q. It's also to Mr. John Haley?**

A. Yes.

**Q. Who is Mr. John Haley?**

A. Mr. Haley used to work for Mr. Rodefeld. Rodefeld ran Operations in North America at Barclays at the time and John Haley ran the Fixed Income side of the Operations for him at the time.

**Q. Do you know where Mr. Haley is employed today?**

A. He's still employed at Barclays. I

70 (Pages 274 to 277)

Page 278

HIGHLY CONFIDENTIAL - J. HRASKA

believe he's in the Wealth Division.

**Q. Do you know who Mr. Jim Beckenhaupt --**

A. Beckenhaupt.

**Q. Is he still employed at Barclays?**

A. He is.

**Q. And you copy Mr. Monty Forrest. The subject is Friday pledge. The e-mail reads, "John, as per your request, here's a list of the assets pledged Friday."**

A. Yes.

**Q. And again, it's got another attachment TRI09192008.**

A. Yes, so that's referring to the file we've been discussing that got pledged, you know, on the 91th.

**Q. And then you write again to John Rodefeld, saying, "John, here is a list of what was scheduled to come today. We're seeing that the collateral from O74 is shorter than we expected by 400 million."**

**Do you know why the collateral from O74 was shorter than you expected by 400 million?**

A. I remember there being a problem in

Page 279

HIGHLY CONFIDENTIAL - J. HRASKA

the morning of the 22nd with DTC, with the settlements folks, but as to why it was 400 million, I don't recall.

**Q. What was the problem with the settlement folks at DTC?**

A. The problem was is that they had indicated to me that there were a bunch of stock record breaks and there were a bunch of problems with their records in O74, so our initial look at the list that we had provided showed based on that that we didn't have availability of approximately 400 million.

**Q. Do you know whether that 400 million relates in any way to the 800 Cusips that were on the exception list you testified about earlier?**

A. I don't know specifically whether these -- because I never really reconciled this out to see whether or not they were related. Honestly, I don't know.

**Q. Okay. That's all I have for that document. Thanks.**

**(Exhibit 154B, a document bearing Bates Nos. BCI-EX-00007930 through 7931,**

Page 280

HIGHLY CONFIDENTIAL - J. HRASKA

**marked for identification, as of this date.)**

**Q. Handing you a document, Mr. Hraska, marked Exhibit 154B.**

A. Okay.

**Q. Which is an e-mail from you to Mr. Rodefeld, Mr. Haley, Mr. Beckenhaupt, Monday, 22nd of September, 7:34 P.M., produced to me by Barclays, BCI-EX-00007930 through 7931. Nothing interesting on the second page.**

**This appears to be a reply to the e-mail we just looked at, which was 153B. Mr. Rodefeld replies, "Jim, Hi. Thanks for this. Do we have the schedule for the securities quantities that were teed up to go today via DTC but were subsequently blocked."**

**Do you recall this e-mail?**

A. I do recall the e-mail, yes.

**Q. He goes on to say, "The schedule from Friday indicates that we moved approximately 1.1 billion in collateral. Is that accurate and is the part that you still need to deliver (assuming the pipes open up) worth approximately 900 million?"**

**Mr. Rodefeld asked two questions to**

Page 281

HIGHLY CONFIDENTIAL - J. HRASKA

**you there. Do you know what the answers to those two questions are?**

A. The answer to the first question is yes. The answer to the second question I don't know.

**Q. Okay. You say, "We would" -- withdrawn. "We most likely would need to do some substituting once DTC takes us out of the box."**

**What did you mean when you wrote that?**

A. Which part particularly are you referring to?

**Q. The part that I just read, "We most likely would need to do some substituting once DTC takes us out of the box"?**

A. Well, we had talked about the situation before where we had identified assets that we were going to try to move, and partially because the stock record, we couldn't move those, but also DTC at some point in the day had frozen our account. So for a period of time, and I don't recall whether it was for the whole day or not or a temporary situation, but at the time of this mail, we weren't able to do any

71 (Pages 278 to 281)

Page 282

HIGHLY CONFIDENTIAL - J. HRASKA

transfers.

**Q. That's all I have for that document.**

**Could you pick out Exhibit 140B and maybe 141B while you're at it.**

A. Would these have been much earlier or were these exhibits marked earlier on?

**Q. These would have been exhibits marked by Mr. Hine.**

A. What was the number?

**Q. 140B and 1401B.**

A. You said 140B and 141B?

**Q. 140 and 141.**

A. Okay.

**Q. Let's do 140B first.**

A. Okay. Did you have any involvement in preparing any of the schedules that are attached to this document?

MR. SHAW: Asked and answered.

**Q. And the answer was no?**

A. The answer is no.

**Q. Are you able to identify what the first spreadsheet attached here is, either by reference to the spreadsheet itself or by reference to the e-mail? And if it helps, the**

Page 283

HIGHLY CONFIDENTIAL - J. HRASKA

**fourth paragraph of the e-mail says, "The attached document entitled DTC O74 and 636 available. Call," is the second part of Schedule B.**

A. No, these file names don't appear familiar to me. By looking at this file, this doesn't look like a file that I produced.

**Q. If you look at Bates range ending 52704?**

A. 52704?

**Q. Which is just before the second blue piece of paper.**

A. Okay.

**Q. Do you see that?**

A. 52704? Yes.

**Q. Do you see at the bottom of the column headed "Lehman Market Value" there's a figure approximately $269 million?**

A. Yes, right.

**Q. Does that refresh your recollection about what this spreadsheet refers to?**

A. 269 million was approximately one of the market values from one of the DTC boxes. I don't recall which, but that's what that would

Page 284

HIGHLY CONFIDENTIAL - J. HRASKA

have -- that's what that would have referred to.

**Q. I take it since you were not involved in the preparation of this document you are not able to tell me whether or not these records included the 800 Cusips that were on the exception list we've previously discussed?**

A. No.

**Q. Okay. That's all I have for that document.**

**Can you have 141 in front of you, please? Sorry, 141B. Same question. I just wanted to make sure I understood your testimony.**

**So you were not involved in the preparation of these attachments?**

A. I was not involved in the preparation of these.

**Q. And from a review of the e-mail on the attachments themselves quickly, are you able to tell me what they are?**

A. Based off the e-mail, they appear to be Schedule A and B, but I --

**Q. But beyond that, you have no independent knowledge?**

A. No. Sorry.

Page 285

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Thanks. That's all I have for that.**

**I'm handing you a document that's previously been marked as Exhibit 85B. If you could take a moment to look at the e-mail, and in particular to the first page behind the blue sheet, which is entitled "Lehman Brothers/Barclays APA Lead Sheet."**

**And let me know when you've had a chance to do that, please. The Bates range of 85B is BCI-EX-S-00004396 through 4675.**

**(Document review.)**

A. Okay.

**Q. Do you recognize this document, sir?**

A. Only from the preparation I did for my deposition of my 30(b)(6).

**Q. Other than in preparation for your deposition, have you ever seen this before?**

A. No.

**Q. Do you know who the people are who are identified on this e-mail chain from Mary Korycki sent September 29 at 8:19 P.M.?**

MR. SHAW: Are you going to go through each person and say who they are?

MR. OXFORD: Uh-huh.

72 (Pages 282 to 285)

HIGHLY CONFIDENTIAL - J. HRASKA

A. Fogerty I do not know. Will Gordon I do not know. Jeffrey Donaldson I don't know. Al Lakhani I do not know. William Fox I do not know. Mary Korycki I don't know, but I see from her title she's from A & M, but I don't know her. Paolo Tonucci I know. Alex Kirk I know. Lori Fife I do not know. Robert Messino I do not know. Rob Miller I do not know.

**Q. How about Danielle Pitts?**

A. I'm sorry, I missed that. I do not know Danielle.

**Q. I take it you were not involved in an APA schedules meeting on the 30th of September?**

A. No, sir.

**Q. Do you know who was involved in compiling these --**

A. No.

**Q. -- these documents?**

A. Unfortunately, I don't.

**Q. Given the hour, it may be fortunate.**

**Can I ask you to turn your attention to the lead sheet?**

MR. SHAW: That's the page beyond the blue sheet.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Bates range is Bates number is 4398.**

A. 4398?

**Q. Do you see that?**

A. Yes, sir.

**Q. And I'm interested in the section beginning "Unencumbered box as of Sunday, 9/21/08." Do you have any understanding of the data that's on this schedule beginning with the legend "Unencumbered Box"?**

A. Are you asking me as to whether I would understand the terms and how they would relate to what these things mean, or am I -- are you asking whether would validate these numbers if they're accurate?

I've never seen the document. If you want me to opine as to what something says here as a generic term, I can do that. I don't -- like I didn't help create any of these numbers or these categories, but I can --

**Q. Have you done any independent work to determine whether or not these figures are accurate?**

A. I have not, no.

**Q. Have you spoken to anybody to**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**determine whether or not these figures are accurate?**

A. No.

**Q. What does "positions not with no memo seg mean"?**

A. That means somebody made a typo. I'm not trying to be sarcastic, but it's a double negative. If I had -- I'm assuming positions without memo seg or with no memo seg is what they were referring to, meaning positions that would be unencumbered positions with memo seg.

Memo seg is a -- a "seg" refers to -- it's a short for "segregation," which would mean -- "memo seg" is a shortened abbreviation of segregation, which would mean that it's encumbered.

**Q. Okay. You see there's a figure of 269,921 --**

A. Yes.

**Q. -- 343?**

A. Uh-huh.

**Q. Does that appear to be the same 269 million figure that we looked at that was the total of one of the spreadsheets attached to**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**Exhibit 140B?**

MR. SHAW: Objection to form.

A. Can you redirect me to where in 140B you asked me that question before?

**Q. Yes. It's 5274.**

A. Yes, it's the same figure.

**Q. Okay. Does that help you identify in any way what that entry of 269 million refers to?**

A. The legend on the left refers to 636, which is a DTC depository.

**Q. You'll see at the left-hand side there's an entry that reads, "Friday 9/26 Transfers." You see that?**

A. Yes.

**Q. And it appears to be a total of a little over $1 billion, 1.035 billion?**

A. Yes, that's correct.

**Q. Do you know what that figure represents?**

A. I recognize the amount. It's the amount we've referenced earlier in the testimony, but I believe, again, you have another typo, because to the best of my

Page 290

HIGHLY CONFIDENTIAL - J. HRASKA

knowledge, there were no transfers on 9/26. I believe that's the market value of the positions that were transferred on 9/19.

**Q. If there were transfers from the DTC box of Lehman to Barclays on 9/26, would you know about it?**

MR. SHAW: Objection to form.

A. I don't know.

**Q. Would you expect to know about it?**

MR. SHAW: Objection to form. Incomplete hypothetical.

A. I would hope to know about them.

**Q. The next set of entries relates to Monday transfers. Do you see those?**

A. Yes.

**Q. Are you aware of any transfers from Lehman to Barclays of unencumbered securities on Monday, September 29?**

A. Yes, I am.

**Q. Are those transfers the transfers that are reflected in this lead sheet totaling approximately 333 million?**

A. I recognize the 269. I can't confirm the 63.

Page 291

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. How is it you recognize the 269?**

A. I recognize the 269 as positions that we had in 636.

**Q. I notice that the figure that you say you recognize of a Monday transfer of $269,921,368 is similar to the figure above?**

A. Yes.

**Q. At 36 -- sorry, 636?**

A. Right.

**Q. But not identical?**

A. Yes, that's true.

**Q. Do you believe the relationship between these figures is anything other than coincidental?**

A. I'm sorry, could you repeat that one more time?

**Q. Do you believe there's any relationship between those two figures of 269 million as they appear on this page?**

MR. SHAW: Objection to form.

A. I believe they are the same block of securities, meaning that this is what was deemed to be available and this was when it was actually transferred.

Page 292

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And you believe those to be unencumbered securities that were in Lehman's 636 box at DTC as of Monday, September 29, 2008, correct?**

A. As of Monday, I'm sorry, which date?

**Q. As of Monday, September 29.**

A. Yes, that's correct.

**Q. Do you have any information about the figure that appears below the 269, the second 269 million figure we've been looking at, $63,569,597?**

A. No, that figure is not familiar to me.

**Q. If you wanted to find out what that figure referred to, who would you ask?**

A. Well, in relation to this document, I would ask one of the people CC'd on this e-mail.

**Q. There's a reference in Footnote 1 to chilled securities, do you see that?**

A. Yes.

**Q. Do you know what that chilled securities are?**

A. Yes, I know what chilled securities are.

**Q. What are they?**

Page 293

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. They are securities which have their movement between DTC locations restricted for one reason or another.

**Q. That's all I have for this document.**

**(Exhibit 155B, a document bearing Bates Nos. BCI-EX-S-00017385 and 7386, marked for identification, as of this date.)**

**Q. I'm handing you, Mr. Hraska, what I have marked as Exhibit 155B, a document marked BCI-EX-S-00017385 and 7386. The attachment was produced to me in native form, which is why it doesn't have a Bates range.**

MR. SHAW: So that's also why a number of columns are truncated.

**Q. If you could let me know when you've had a chance to review that, Mr. Hraska, I've got a couple questions.**

**(Document review.)**

A. Okay.

**Q. Do you recognize this document?**

A. I do, yes.

**Q. It appears to be a document e-mailed by Mr. Forrest to Alastair Blackwell and Mr. Tonucci, copying you, on the subject of**

74 (Pages 290 to 293)

Page 294

HIGHLY CONFIDENTIAL - J. HRASKA

**"additional collateral moved to BarCap." Is that right?**

A. That's correct, yes.

**Q. There's an attachment to this document. Were you involved in creating it?**

A. My team provided the data to create it, but we didn't actually create it.

**Q. When you say "your team," who do you mean by "your team"?**

A. Meaning myself, and this particular data was provided by myself and Nancy Denig.

**Q. Do you have a recollection of providing this data specifically to Mr. Forrest on or around September 30, 2008?**

A. Yes.

**Q. Do you know the purpose for which you were providing this data to Mr. Forrest?**

A. He had asked me for a summary of collateral that we had transferred to Barclays from the 19th to present day that we actually physically were able to move from the Lehman depositories over to Barclays.

**Q. Where did you find the information to provide to Mr. Forrest?**

Page 295

HIGHLY CONFIDENTIAL - J. HRASKA

A. They were from spreadsheet records that I had kept in my group. The same spreadsheet records which we referenced earlier had been reconciled with both the Barclays Operations folks and Bank of New York.

**Q. Are these spreadsheets you took with you when you moved to Barclays?**

A. The spreadsheets are saved in a common drive somewhere. I don't know that I still have access to them or not.

**Q. "Mr. Hraska, here is a summary of the what has been moved in order to satisfy the additional collateral move of 1.95 billion to BarCap. I had also shown the outstanding amount due. We will continue to identify available unencumbered collateral as the stock record breaks clean up."**

**Do you see that?**

A. Yes.

**Q. Do you know what Mr. Forrest meant when he said, "We will continue to identify available unencumbered collateral as the stock record breaks clean up"?**

A. Yes. When we had spoke a little

Page 296

HIGHLY CONFIDENTIAL - J. HRASKA

earlier about the inconsistencies with the stock record and the initial collateral availability lists that were provided not being accurate, so after we had moved over some of the collateral, and as the stock record breaks cleared up, we kept looking for -- looking at the stock record and trying to find additional available collateral that was now unencumbered as a result of resolution of the breaks.

**Q. Do you recall for how long you were engaged in that effort to find additional unencumbered collateral?**

A. During which timeframe?

**Q. At any time post the closing of the transaction between Lehman and Barclays on the 22nd of September, 2008?**

A. I was involved in an effort up until probably approximately a month ago.

**Q. Who else was involved in that effort?**

A. Robert Azerad's team.

**Q. Who is on Mr. Azerad's team with respect to this effort?**

A. Well, he's no longer on the team anymore. It would have been a gentleman by the

Page 297

HIGHLY CONFIDENTIAL - J. HRASKA

name of Colin Telmer, T-E-L-M-E-R. He's still employed at Barclays. He's just not working with Mr. Azerad anymore.

**Q. Anybody else?**

A. There was another gentleman initially involved, but he subsequently left the firm, and as well Mr. Telmer took over his work and continued -- his name was John Virgil Del Dios, I believe. I'm not exactly a hundred percent sure of the spelling of that. I believe it's D-E-L D-I-O-S, but best I can do.

**Q. Do you understand that this effort to identify additional collateral to move from Lehman to Barclays is still ongoing within Barclays, or do you believe that it's complete?**

A. From my perspective, I believe it's complete. I haven't been asked to do anything else in probably at least a month or so's time.

**Q. Who asked you to identify this additional collateral?**

A. Robert Azerad.

**Q. These requests at any time from September 30th or thereabouts, 2008, until about a month ago all came from Mr. Azerad?**

75 (Pages 294 to 297)

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Yes.

**Q. Did you have any conversations with anybody other than Mr. Azerad, Mr. Telmer, and Mr. Del Dios about your ongoing efforts to identify additional unencumbered assets to be moved from Lehman's clearance boxes to Barclays?**

A. I had conversations just to keep them informed of my activities with both Messieurs Forrest and Blackwell.

**Q. Could you take a look at the last page of the spreadsheet that I have marked as Exhibit 155B.**

A. Uh-huh.

**Q. This spreadsheet includes data that you provided to Mr. Forrest?**

A. Yes, that's correct.

**Q. Do you believe that data is accurate?**

A. Yes. The one thing that -- the one thing that I'm not sure is accurate is the market value of the BONY, the BONY pledge. I knew that value to be a little bit less, so I'm not sure why that's not a billion-035 that we've been discussing.

**Q. And the second entry is the $269**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**million transfer from Box 636 on the 29th of September that we discussed previously, yes?**

A. Yes, that's correct.

**Q. There's another entry under Summary of Collateral Moved from O74?**

A. Yes.

**Q. A transfer on 9/30/09, do you see that?**

A. Yes.

**Q. That transfers, as reflected here, is of $161,482,771, do you see that?**

A. Yes.

**Q. Do you know anything about that transfer?**

A. That was the value of the assets that were transferred on the 30th from O74 to Barclays.

**Q. And were you involved in that transfer?**

A. Yes.

**Q. What was your involvement in that transfer?**

A. My involvement was can you help identify the assets and coordinate with the

HIGHLY CONFIDENTIAL - J. HRASKA

settlement teams to get that transferred.

**Q. Did you or anyone on your team do any due diligence to satisfy yourself that those assets were not encumbered?**

A. Yes.

**Q. Can you tell me briefly what that was?**

A. Myself and the Settlements Team headed by Neal Ullman verified that those were in fact unencumbered and those transfers both for 636 and O74 were verified by Deloitte.

**Q. Who at Deloitte verified them?**

A. Ultimately, Margo -- I forgot her last name.

**Q. Marlo.**

A. Marlo Karp.

**Q. And it's your testimony that Marlo Karp verified them as transfers of Lehman's proprietary assets that were to be transferred from Lehman to Barclays under the purchase agreement?**

A. I know that Marlo was involved in the approval. I don't know if she was specifically the one that did the verification. I know that she was aware of it and someone from her team

HIGHLY CONFIDENTIAL - J. HRASKA

did the verification.

**Q. Do you have an understanding as to when this verification that you say happened by Deloitte, do you understand when it happened?**

A. It would have happened a few days prior to the transfer dates.

**Q. If you were to learn that Deloitte was not engaged by the trustee as of the date of this supposed transfer, would that change your testimony?**

A. No.

**Q. You still think even though they weren't engaged they still did the verification?**

A. I know for a fact that they approved these transfers.

**Q. How is it you can be so certain? Did you talk to someone about it?**

A. Well, I had conversations with Neal Ullman, who said that that transfer was approved, and I believe I have e-mails stating that fact. But I'm not a hundred percent certain, but I believe I do.

**Q. So the basis of your -- because you just testified that you were certain Deloitte**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**approved these transfers a few days prior to the 29th and 30th. That was your testimony, correct?**

A. Yes, it was.

**Q. And the basis of your sworn testimony is that Mr. Ullman told you this?**

A. Yes.

**Q. And you're sure that Mr. Ullman told you Deloitte approved them?**

A. I'm -- I thought, unless it was the trustee approved them. They were definitely approved, according to him, so -- it's my recollection that it was Deloitte, but I -- it's possible that it was the trustee itself and not -- not Deloitte.

**Q. And any information you have about the approval of these transfers, whether by Deloitte or the trustee or the trustee's staff, comes from which sources, Mr. Ullman?**

A. Mr. Ullman, yes.

**Q. Any other source?**

A. No. I didn't see, if you're asking for approval, I didn't see an approval document from Deloitte or the trustee themselves.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Have you seen any correspondence reflecting that Deloitte or the trustee approved this transfer?**

A. I can't be certain about that.

**Q. By this transfer, that was a bad question, but I meant both the transfers on the 29th and the 30th that are reflected in this document?**

A. Yes.

**Q. So, apart from this conversation with Mr. Ullman, you have no independent basis to testify that Deloitte or the trustee approved these transfers on these dates, correct?**

A. That would be correct.

**Q. Do you remember when the conversation with Mr. Ullman took place?**

A. It should have taken place on the -- prior to the transfers. Period of a few days prior to the transfers. I can give you a range. I don't know specifically what date.

**Q. That's fine. Thank you.**

**Is it possible that those transfers relate to the repo transaction? And "those transfers," again, I'm referring to the**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**transfers on the 29th and 30th of September from the 636 and O74 boxes at DCT that are reflected on the spreadsheet attached to Exhibit 155B.**

A. So you're referring to the 29th and 30th, these transfers?

**Q. Yes.**

MR. SHAW: Objection to form.

A. I'm sorry, could you read back the question?

(Record read.)

A. No.

**Q. How is it you can be sure of that?**

A. Because the repo had a maturity date of September 25th, and prior to the maturity date, the repo had been declared in default.

**Q. Just moving down that summary page, sir, it reads, "Amount identified to be moved to BarCap, $1.95 billion." Was that a figure that you provided to Mr. Forrest?**

A. No.

**Q. So this -- the math here about the delta between the 1.95 billion and the total of the amount of unencumbered security transferred of 1.587 billion, that's Mr. Forrest's math?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Yes.

**Q. Do you believe that that figure of total pledged/transferred that appears in this spreadsheet we're looking at is an accurate reflection of the collateral moved from Lehman's unencumbered box to Barclays between the 19th and 30th of September, 2008?**

MR. SHAW: Objection. Asked and answered.

A. Yes, with the exception of the discrepancy on market value, that I believe the market value to be a billion-035.

**Q. Right. I appreciate that clarification. You did say that.**

**You testified in response to one of Mr. Hine's questions that you believed that there was an additional amount of somewhere between 6 and 7 hundred million dollars of unencumbered securities --**

A. Uh-huh.

**Q. -- that you understand was due from Lehman to Barclays?**

A. Yes, that's correct.

**Q. That's obviously a different number to**

Page 306

HIGHLY CONFIDENTIAL - J. HRASKA

**this delta figure of 362 million here?**

A. Yes, that's correct.

**Q. Do you have any understanding of the reason for the difference?**

A. Well, this is purely a delta of the two figures that Mr. Forrest provided. The 600 to 700 million that I was referring to were based off an analysis of unencumbered securities in the Lehman boxes at a later date and time. So I think that's where there's a discrepancy because of the timing.

**Q. Are you able to estimate a total of the unencumbered securities in the various Lehman clearance boxes that you reviewed, either over the weekend of the 20th and 21st of September or subsequently, are you able to give me a total of the unencumbered securities that you believe you identified?**

A. On that weekend? Or, when you say "subsequently"?

**Q. At any time subsequently. Obviously you identified a figure that fluctuated, as we saw in the documents that we looked at and you looked at with Mr. Hine of approximately 1.9 to**

Page 307

HIGHLY CONFIDENTIAL - J. HRASKA

**2 billion dollars?**

A. Yes.

**Q. And you've subsequently identified additional collateral you say of at least a few hundred million?**

A. That's correct.

**Q. Correct. Are you able to give me, just in broad terms, an estimate of the total amount of unencumbered collateral that you believe you have identified?**

A. That would be available let's say as of today if nothing had happened in the clearance box?

**Q. Yes. That's a much better question than I would have been able to articulate. Thank you.**

A. Yes, that's the 6 to 7 hundred million dollar figure.

**Q. And the total would be the 6 to 7 hundred million dollar figure plus this $1.587 billion figure that has already been transferred subject, of course, to your caveat that you believe the BONY Tri Pledge number may be off by a factor of 10 percent or so, is that correct?**

Page 308

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct, yes.

**Q. Last document.**

**(Exhibit 156B, a letter from Cleary Gottlieb Stein & Hamilton is James Kobak at Hughes Hubbard dated October 6, 2009, marked for identification, as of this date.)**

**(Discussion off the record.**

**(Recess; Time Noted: 5:24 P.M.)**

**(Time Noted: 5:30 P.M.)**

BY MR. OXFORD:

**Q. You testified in response to a question from Mr. Hine that you had been involved, Mr. Hraska, in efforts to refine Schedule B, do you remember saying that?**

A. Yes.

**Q. Can you tell me briefly about those efforts to refine Schedule B?**

A. I don't know that I testified that I was involved in an effort to refine Schedule B but, rather, to identify additional assets that perhaps were not on the original Schedule B that were unencumbered.

**Q. And you were also involved, I think you testified, in ascertaining that certain**

Page 309

HIGHLY CONFIDENTIAL - J. HRASKA

**assets that were on the exception list were in fact encumbered and unavailable for delivery; is that correct?**

A. I'm sorry, could you repeat that question or just read it back to me?

(Record read.)

A. That they were unavailable for delivery. I can't be certain that they were unencumbered; just they were unavailable for delivery.

**Q. Why would they be unavailable for delivery other than the fact that they are encumbered?**

A. It's possible that at a point in time a particular asset wouldn't have been in the actual box itself. So, in other words, there might have been an inventory position versus a break account instead of versus the actual repository.

**Q. Can you take a look at what I've marked as 156B?**

A. Sure.

**Q. Which is a letter from Cleary Gottlieb Stein & Hamilton is James Kobak at Hughes**

78 (Pages 306 to 309)

HIGHLY CONFIDENTIAL - J. HRASKA

**Hubbard dated October 6, 2009.**

**Do you see that there are certain attachments to that letter? There are two spreadsheets attached to that letter at the back.**

**If you could take a moment to review the spreadsheets and let me know, first of all, if you need a magnifying glass and, second of all, if you had any involvement in preparing these spreadsheets.**

**(Document review.)**

A. The spreadsheets are not titled like the content of the spreadsheet.

**Q. There's the description on the last paragraph of page 2 going into page 3.**

A. Okay. Last paragraph of page 2, you're saying, right?

**Q. Yes. The second line reads, "The revised spreadsheet attached hereto as Exhibit A lists undelivered clearance box assets having Cusip numbers in which no LBI customers had long positions on September 20, 2008."**

MR. SHAW: Why don't you take a minute to read that paragraph of the letter.

HIGHLY CONFIDENTIAL - J. HRASKA

Were you serious about the offer of a magnifying glass? Because I could use one.

MR. OXFORD: I actually think I have larger copies, which I don't intend to mark.

A. I can't tell where Schedule A and B are cut off.

**Q. Exhibits A and B?**

A. I'm sorry, Exhibits A and B.

(Document handed.)

MR. SHAW: What is this you have handed us? Is this A, B, or --

MR. OXFORD: These are blown up versions of Exhibits A and B to the Cleary letter dated March 6. I don't think Cleary marked them as either Exhibits A or B.

**Q. Mr. Hraska, I don't mean to cut short your time to review these documents, but maybe we can short-circuit it a little bit this way.**

**Do you recall being involved in the preparation of these documents or any analysis to determine lists of undelivered clearance box assets having Cusip numbers in which no LBI customers had long positions as of September 22, 2008?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

**Q. Tell me about your involvement in that process.**

A. Sometime in October, we had changed the sourcing of our search from unencumbered collaterals from GFS to the pure stock record of ADP, and the reason we did that is that we felt that to be a more accurate source at that time because, by that time, a lot of the stock record breaks had been resolved and we were going to go -- and the other mainframe, the MTS mainframe, we felt was exhausted so there was no need to use GFS to try to aggregate all that data together at that point.

Also, GFS became a system that was purchased or became part of the property that was purchased by Barclays, so we thought it was better just to refer to the pure mainframe, which was considered books and records. And the methodology used was that we took a download of the data from the technology folks of everything on the stock record, and the logic that was employed was that the first query was to return us all the situations where there was a firm

HIGHLY CONFIDENTIAL - J. HRASKA

inventory long offset by a depo short, which would be the depository, you know, off side of that position, and where the Cusip had no other position reflected on the stock record. So, therefore, no customer positions or anything of that nature.

So, in our mind, we felt that that was very clearly firm inventory only, there was no chance that there was customer collateral in that mix, and as long as there was a depo short which offset to the asset long, we felt confident that that would be considered a firm unencumbered asset.

The next query was, there were Cusips where there were a mix of firm inventory ledgers long and customer account longs. Those positions would have been offset by, again, a position in depo. Every long has a short in an amount in the stock record. And the -- to be as conservative as possible on the second list -- so the first list became known as List A in our terms, right? The second list became known as B and we had to subdivide it. So it became -- there is a B1 and a B2.

Page 314

HIGHLY CONFIDENTIAL - J. HRASKA

B1 was the situation where we compared the total amount of customer positions into the total amount in the depo, and we reduced the amount of the depo balance by the customer long position, and to the extent that anything was left after reducing that balance down by what the customer was long, we took that to be firm unencumbered assets.

So just to -- because there's a lot just to recoup that. So there was positions where we had inventory in customer longs that were mixed. To be conservative, we secured the customer positions regardless of them having debit balances or not. We said, to be the most conservative, just reserve the amount of customer long position, take it out of the position in the depo, and whatever was left in the depo would be considered List B1.

The B2 list was, looking at that same population, we said, as a lender of cash or an extension of credit to clients, you're entitled to rehypothecate up to 140 percent of the debit balance. So what we did then is we looked at situations where clients had long positions but

Page 315

HIGHLY CONFIDENTIAL - J. HRASKA

they were running a debit balance, and to the extent that they ran a debit balance, we claimed that we had entitlement to a hundred percent of the debit balance of the securities that were long in those customers' accounts, and that became B2.

And the last sample population was scenarios where the only positions on the stock record were customer long versus the depo position, and those scenarios, using the same rules I just described about the margin debit balances, we looked at customer margin debit balances, and to the extent that they had margin debit balances, we took 100 percent of the market value, or we took market value equal to 100 percent of the debit balance. That became list C.

**Q. That's B3. That's the --**

A. Well, the way I classified them is the way I knew them. So there was A, there was B1 and B2, and C. There was some discussions about, because of the margin debit balance calculation, there was some discussion about combining B2 and C into one list by Robert

Page 316

HIGHLY CONFIDENTIAL - J. HRASKA

Azerad's team. I don't know if they ever combined those lists or not. That may have become, as you reference, either B3 or a C list, I don't know.

**Q. In the analysis that you have just described for me, did you make any distinction between customers whose accounts were transferred to Barclays and customers whose accounts were not transferred to Barclays?**

A. In the analysis that we did, we used the stock record of Lehman Brothers, Inc. prior to those customers being put on the stock record. The -- well, wait. Let me clarify that.

The stock record we used was a solely Lehman Brothers stock record. The stock record that Barclays now owns as a result of the technology that it had purchased in the Lehman acquisition is a different stock record. So it's the same -- it's the same mainframe and it's the same vendor provider, but it's a completely different set of records from Lehman Brothers.

**Q. Are you able to summarize for me how**

Page 317

**HIGHLY CONFIDENTIAL - J. HRASKA**

**it's different?**

A. The Lehman Brothers stock record only has the Lehman Brothers entity and the -- and all the Lehman Brothers stock record data, whereas the new stock record is purely the activity that's in the new Barclays Wealth Entity and the Barclays activity that resides on ADP Company 224.

The legal entities on ADP are known as these company codes. So 224 is a BCI company code on ADP, and that stock record is related to the BCI entity on ADP. The company code for LBI was 012, and it was, again, held on a different version of ADP.

So the vendor basically copied the functionality that he provided us under Lehman Brothers and provided a new instance of the package and the software and everything else, but it was a completely different entity and it was a different software.

**Q. Who else was involved with you in this effort to create lists A, B and C?**

A. Robert Azerad, Colin Telmer. There was some -- there was some Barclays Finance

80 (Pages 314 to 317)

Page 318

HIGHLY CONFIDENTIAL - J. HRASKA

folks who were also reviewing some of the spreadsheets that we had produced over that period. I don't recall who was on the Barclays finance side, but I'm sure Robert would.

And to the extent we had questions about a particular status of a clearance box or anything like that, Neal Ullman would have been consulted.

**Q. Do you believe, Mr. Hraska, that the work you, along with Mr. Azerad and others, did to create lists A, B and C are ultimately reflected in the spreadsheets that are attached to the Cleary letter of March 6?**

A. These are versions of the spreadsheets it looks like in form that we used. I'm not a hundred percent certain that these are the final spreadsheets that Colin and I agreed that came up to the total in assets.

List A appears to have all 931 accounts on it, and the 931 range that -- the prefix of this account, are all firm inventory ledgers. So it appears to be the list that's first described in that letter. However, I can't be a hundred percent certain since I

Page 319

HIGHLY CONFIDENTIAL - J. HRASKA

didn't actually provide it.

**Q. Are you able to draw any similar conclusions about the second spreadsheet that is attached to the Cleary letter and any work that you and your team did in preparing the data that may have gone into it?**

A. This was one of the initial data spreadsheets that was used to analyze the B1, B2 relationship, but there was a summary document which was prepared based on the findings which, you know, broke out what we felt was B1 and which I, being conservative, reserving customer assets versus there was a separate schedule which then broke out what we thought, based off of margin debit balances, what the entitlements would be for that B2 and C. That doesn't appear to be included in these documents, at least the way I understood them to be.

**Q. Was there any other documentation provided or created by you and your team as a result of the effort to identify lists A, B and C as you've testified?**

A. Nothing more than what I just described to you, no.

Page 320

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. That's all I have on those.**

**I'm hoping -- I think we're all hoping the answer to this is no. Did you have any involvement in the calculation or recalculation of Lehman's 15c3-3 requirements over the weekend of September 20th and 21st?**

A. No.

(Continued on the next page to include the jurat.)

Page 321

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Did you have any discussions with anybody about the recalculation of Lehman's 15c3-3 requirement?**

A. No.

MR. OXFORD: I've got nothing further for you, Mr. Hraska. Thank you.

THE WITNESS: You're welcome.

MR. KAY: No questions.

MR. HINE: I think we're done, unless you have any, John.

MR. SHAW: Tempting though it is, I will declare this deposition closed.

MR. OXFORD: Thank you very much.

THE WITNESS: Thank you.

(Time Noted: 5:53 P.M.)

____________________

JAMES HRASKA

Subscribed and sworn to before me this day of 2009.

____________________

81 (Pages 318 to 321)

HIGHLY CONFIDENTIAL - J. HRASKA

CERTIFICATE

STATE OF NEW YORK )
: ss
COUNTY OF NEW YORK)

I, Kathy S. Klepfer, a Registered Merit Reporter and Notary Public within and for the State of New York, do hereby certify:

That JAMES HRASKA, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

I further certify that neither the deponent nor a party requested a review of the transcript pursuant to Federal Rule of Civil Procedure 30(e) before the deposition was completed.

In witness whereof, I have hereunto set my hand this 14th day of August, 2009.

-------------------------------

KATHY S. KLEPFER, RPR, RMR, CRR, CLR

HIGHLY CONFIDENTIAL - J. HRASKA

INDEX

WITNESS: EXAMINATION BY PAGE
J. HRASKA Mr. Hine 5
Mr. Oxford 239

EXHIBITS: PAGE
Exhibit 136B, a document bearing Bates Nos. BCI-EX-00077317 through 77319 16
Exhibit 137B, a document bearing Bates Nos. 10294679 with attached spreadsheets 90
Exhibit 138B, an e-mail chain, the first one in time bearing a date of September 18, 2008, at 5:40 P.M. 92
Exhibit 139B, Printout of Schedules 112
Exhibit 140B, a document bearing Bates Nos. BCI-CG00052538 through 53173 131
Exhibit 141B, a document bearing Bates Nos. BCI-CG00055192 through 55629 134
Exhibit 142B, a document bearing Bates Nos. 465401 and 466143 178
Exhibit 143B, an e-mail chain, the first in time dated September 17, 2008, at 2:42, with attachment 190
Exhibit 144B, a document bearing Bates Nos. 10297377 through 10300510 195

HIGHLY CONFIDENTIAL - J. HRASKA

INDEX

EXHIBITS: PAGE
Exhibit 145B, a document bearing Bates Nos. 10328099 through 10319396 211
Exhibit 146B, a document bearing Bates Nos. BCI-EX-(S)-00014389 through 14393 with attachment 230
Exhibit 147B, an e-mail sent from Mr. Hraska to Paolo Tonucci, copying others, on Friday, the 19th of September, 2008 254
Exhibit 148B, an e-mail chain, the first in time dated September 19, 2008, at 3:43 P.M. 256
Exhibit 149B, an e-mail from Gene Lempert, to Mr. Hraska, Sunday, September 21, at 3:38 A.M. GMT, or 11:38 P.M. EST 259
Exhibit 150B, Mr. Lempert to J. Hraska and others, Sunday, 9/21, at 1:34 A.M. GMT 265
Exhibit 151B, an e-mail from Monty Forrest to Mr. Lowitt, Mr. Blackwell, Mr. Ullman and J. Hraska, copying Mr. Tonucci and others, sent on Sunday, 9/21, at 9:16 A.M. GMT 267

HIGHLY CONFIDENTIAL - J. HRASKA

INDEX

EXHIBITS: PAGE
Exhibit 152B, an e-mail from Alastair Blackwell to Monty Forrest and to J. Hraska, copying Mr. Tonucci dated Monday, 22nd of September, 10:35 A.M. GMT 274
Exhibit 153B, a document bearing Bates Nos. BCI-EX-00003796 276
Exhibit 154B, a document bearing Bates Nos. BCI-EX-00007930 through 7931 279
Exhibit 155B, a document bearing Bates Nos. BCI-EX-S-00017385 and 7386 293
Exhibit 156B, a letter from Cleary Gottlieb Stein & Hamilton is James Kobak at Hughes Hubbard dated October 6, 2009 308

Page 326

```
1          HIGHLY CONFIDENTIAL - J. HRASKA
2     NAME OF CASE:  In re Lehman Brothers
3     DATE OF DEPOSITION:  August 14, 2009
4     NAME OF WITNESS:  James Hraska
5     Reason Codes:
6        1.  To clarify the record.
         2.  To conform to the facts.
7        3.  To correct transcription errors.
8     Page _____ Line _____ Reason _____
      From _____ to _____
9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
               _____
25             JAMES HRASKA
```