# A. 14 (A)

Page 1

1              HIGHLY CONFIDENTIAL – M. KELLY

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                     Debtors.

10

      ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13         DEPOSITION OF MARTIN KELLY

14            New York, New York

15             August 18, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24042

Page 2

1    HIGHLY CONFIDENTIAL - M. KELLY
2    August 19, 2009
3    9:30 a.m.
4
5    HIGHLY CONFIDENTIAL deposition
6    of MARTIN KELLY, held at Jones
7    Day, LLP, 222 East 41st Street,
8    New York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public
13   of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    HIGHLY CONFIDENTIAL - M. KELLY
2
3    A P P E A R A N C E S:
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6       222 East 41st Street
7       New York, New York  10017-6702
8    BY:  ROBERT W. GAFFEY, ESQ.
9       DAVID L. CARDEN, ESQ.
10      BRIDGET CRAWFORD, ESQ.
11
12   WILLKIE, FARR & GALLAGHER, LLP
13   Attorneys for the Witness
14      1875 K Street, NW
15      Washington, D.C.  20006-1238
16   BY:  RICHARD D. BERNSTEIN, ESQ.
17      - AND -
18   WILLKIE, FARR & GALLAGHER, LLP
19      787 Seventh Avenue
20      New York, New York  10019-6099
21   BY:  KELLY M. HNATT, ESQ.
22
23
24
25

Page 4

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A P P E A R A N C E S:  (Cont'd.)
3    BOIES, SCHILLER & FLEXNER, LLP
4    Attorneys for Barclays Capital
5       5301 Wisconsin Avenue, NW
6       Suite 800
7       Washington, D.C.  20015
8    BY: HAMISH HUME, ESQ.
9
10   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
11   Attorneys for the Creditors Committee
12      865 S. Figueroa Street, 10th Floor
13      Los Angeles, California 90017
14   BY:  ERICA P. TAGGART, ESQ.
15
16   JENNER & BLOCK, LLP
17   Attorneys for the Examiner
18      330 N. Wabash Avenue
19      Chicago, Illinois  60611-7603
20   BY: DAVID C. LAYDEN, ESQ.
21
22
23
24
25

Page 5

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A P P E A R A N C E S:  (Cont'd.)
3
4    HUGHES, HUBBARD & REED, LLP
5    Attorneys for the SIPA Trustee
6       One Battery Park Plaza
7       New York, New York  10004-1482
8    BY:  NEIL J. OXFORD, ESQ.
9       FARA TABATABAI, ESQ.
10
11   Also Present:
12      RAJESH ANKALKOTI, Alvarez & Marsal
13      THOMAS E. HOMMEL, Lehman Brothers
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1      HIGHLY CONFIDENTIAL - M. KELLY
2    MARTIN KELLY, called as a
3       witness, having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8       Q.   Mr. Kelly, good morning.  My name is
9    Bob Gaffey.  We met briefly before.  I'm with
10   Jones Day and we are special counsel to the
11   estate of Lehman Brothers Holdings, Inc., and as
12   you may know, probably know, we're looking into
13   certain matters concerning the transaction that
14   took place between Lehman and Barclays in
15   September of 2008.
16          Let me just start by getting a brief
17   description of your background, sir.  Could you
18   tell me what your education is since high
19   school, after high school?
20      A.   Sure.  I have a undergraduate degree
21   in commerce with a major in accounting and
22   finance from the University of New South Wales
23   in Sidney, Australia.  I have -- I'm an
24   associate of the Securities Institute of
25   Australia.  I qualified as a chartered

Page 7

1      HIGHLY CONFIDENTIAL - M. KELLY
2    accountant in Australia, and I became a
3    certified practicing accountant in the United
4    States.
5       Q.   When did you take your degree, your
6    first degree?
7       A.   '88 would have been -- yeah, I
8    completed in '88.
9       Q.   And other than as a chartered
10   accountant in Australia and a CPA in the United
11   States, have you taken any other professional
12   licenses?
13      A.   Yes, I have.  I've taken licenses
14   under the FINRA regulations, so Series 7, Series
15   24, Series 27, and I believe Series 63.
16      Q.   And do you keep your license current
17   as a CPA?
18      A.   No.
19      Q.   And --
20      A.   My licenses -- I keep my FINRA
21   licenses current.
22      Q.   Your FINRA licenses are current, your
23   CPA is dormant, and what about the Australia
24   license; is that dormant or current?
25      A.   I'm not sure, actually.

Page 8

1      HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   By whom are you currently employed?
3       A.   By Barclays Capital.
4       Q.   How long have you been employed there?
5       A.   Since late September of '08.
6       Q.   And what's your title at Barclays
7    Capital?
8       A.   I'm a Managing Director and I'm the
9    Chief Financial Officer in the Americas.
10      Q.   And is that the position you have held
11   since you joined Barclays in September of '08?
12      A.   No, it's not.  No, my --
13      Q.   Go ahead.
14      A.   My title has remained the same.  My
15   position changed in March, and upon going into
16   Barclays from Lehman, I had three different
17   positions.  The first was the Financial
18   Controller for Barclays Capital on an interim
19   basis, and that was a London-based position.
20   Second position was the head of Finance for
21   Structured Capital Markets.
22      Q.   Also in London?
23      A.   Also in London.  The third position
24   was head of Americas Financial Decision Support.
25      Q.   Financial Decision Support?

Page 9

1      HIGHLY CONFIDENTIAL - M. KELLY
2       A.   Support, yeah.
3       Q.   Was that in London or in the Americas?
4       A.   That was an Americas-based role.
5       Q.   Are you based in New York?
6       A.   I am.  I have remained living in New
7    York.  I commuted to London for that period of
8    time between September and March.
9       Q.   Okay.
10      A.   I should also say that, in addition to
11   being CFO of the Americas now, I retained the
12   second of those three positions, so I remain
13   head of Finance for Structured Capital Markets
14   today.
15      Q.   And prior to your employment by
16   Barclays Capital, by whom were you employed?
17      A.   By Lehman Brothers.
18      Q.   For approximately what period of time
19   were you employed by Lehman Brothers?
20      A.   I was employed from approximately
21   August 2000 through approximately May 2005, and
22   then from January 2006 until September 2008.
23      Q.   And what did you do during the
24   interval between your two stints at Lehman?
25      A.   I was not employed.

Page 10

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.    And why did you leave Lehman the first
3    time in May of '05?
4    A.    I left to consider a move, a
5    relocation back to Australia.
6    Q.    Was the departure from Lehman in May
7    of '05 voluntary?
8    A.    Yes.
9    Q.    And why did you come back in January
10   of '06?
11   A.    My wife and I decided that we wanted
12   to make New York our home permanently and I
13   enjoyed working at Lehman, so...
14   Q.    Briefly, sir, can you tell me what --
15   give me the sequence of the jobs you held at
16   Lehman between January of '06 and September of
17   '08.
18   A.    Sure.  In -- in January of '06, I
19   returned to assume effectively the same role I
20   had had previously prior to leaving.
21   Q.    Which was?
22   A.    And that was a role in Investment
23   Banking in a group called Global Finance
24   Solutions.  During 2007, I moved into the Hedge
25   Fund Coverage Group, also within Investment

Page 11

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Banking, and then effective December 1 of '08 --
3    sorry, of '07, I assumed the role of the firm's
4    Global Financial Control.
5    Q.    And when you refer to the firm --
6    withdrawn.  When you held the job as Global
7    Financial Controller, is that the job you held
8    until your departure in September of '08?
9    A.    Yes.
10   Q.    And when you were Global Financial
11   Controller, were you an employee of Lehman
12   Brothers, Inc. or Lehman Brothers Holdings, Inc.
13   or both?  What was the structure there, do you
14   know?
15   A.    I don't know.
16   Q.    When you say you were the firm's
17   Global Financial Controller, are you referring
18   to the firm, as the term suggests, globally,
19   worldwide?
20   A.    Yes.
21   Q.    And what were your duties as Global
22   Financial Controller?
23   A.    The primary responsibilities were
24   reporting related to financial and regulatory
25   reporting of the firm's results, externally and

Page 12

1    HIGHLY CONFIDENTIAL - M. KELLY
2    internally.
3    Q.    And in September of '08 to whom did
4    you report?
5    A.    Ian Lowitt.
6    Q.    You were a direct report to Lowitt?
7    A.    Yes.
8    Q.    And what was Lowitt's title?
9    A.    Ian was the firm's chief financial
10   officer.
11   Q.    And did you have a series of direct
12   reports below you?
13   A.    Yes, I did.
14   Q.    Approximately how many direct reports?
15   A.    Approximately seven directs.
16   Q.    Can you tell me who they were in
17   September of '08, best you recall?
18   A.    Yeah, Brian Travesari, Marie Stewart,
19   Kristi Wong, Tony Stucchio, Jim Elman on a
20   partial basis, meaning he reported to someone
21   else as well, and then someone in each of London
22   and Tokyo, whose names I can't recall.
23   Q.    Okay.  Can we go off the record for a
24   second?
25        (Discussion off the record.)

Page 13

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.    What was Kristi Wong's job?
3    A.    Kristi headed the financial reporting
4    function.  I should -- I should say Legal Entity
5    Reporting I think was the official title.
6    Q.    Legal Entity Reporting?
7    A.    Legal Entity Reporting.
8    Q.    And what was involved in her job as
9    head of Legal Entity Reporting?
10   A.    She was responsible for the process by
11   which the firm's results were compiled for each,
12   each of the individual legal entities in the
13   group.

REDACTED

23        MR. BERNSTEIN:  By the way, I
24   understand there is an order making the
25   entire deposition highly confidential and

Page 14

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2   then somebody gets a week to decide what
 3   they really want or something like that.
 4        Is the witness's counsel part of that
 5   process?
 6        MR. GAFFEY:  Yes, I believe so.
 7   Hamish?
 8        MR. HUME:  Yes.
 9        MR. GAFFEY:  I should say it's not,
10   just for total clarity.  We have a
11   confidentiality order.  It does not deem all
12   depositions to be completely highly
13   confidential, but we made an agreement
14   amongst counsel that the first deposition of
15   Eric Felder that we would do that.
16        We will treat the entire transcript as
17   highly confidential and you have, and I
18   forget what period we agreed to, some period
19   of time to more precisely designate, but the
20   order doesn't exactly require that.
21        MR. BERNSTEIN:  We would like to
22   participate in that as his counsel.
23        MR. GAFFEY:  We'll follow the Felder
24   agreement and, yes, I think you're within
25   that, is that right?
```

Page 15

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2        MR. BERNSTEIN:  Yes.  Because we will
 3   certainly, among other things, designate
 4   matters about his compensation as
 5   confidential.
 6        MR. HUME:  Highly confidential.
 7        MR. BERNSTEIN:  Highly confidential.
 8   BY MR. GAFFEY:
```

REDACTED

Page 16

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
```

REDACTED

```
12        Q.   And when were you first offered a job
13   at Barclays Capital?
14        A.   I don't recall exactly when.
15        Q.   Was it during September of 2008?
16        A.   I believe so.
17        Q.   Was it during the beginning or the end
18   of September 2008?
19        MR. BERNSTEIN:  Objection to the form.
20   Ambiguous.
21        Q.   You can answer.
22        A.   I need a minute, please.
23        MR. BERNSTEIN:  You can answer his
24   question.  I don't think "the beginning or
25   the end" is as precise a question as it
```

Page 17

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2   should be.
 3        Q.   But you can still answer.
 4        MR. BERNSTEIN:  But you can answer.
 5   I'll instruct you when, for reasons of
 6   privilege or otherwise, you shouldn't
 7   answer.  Otherwise, I'm just making
 8   objections for the record.
 9        THE WITNESS:  Okay.
10        Q.   Do you have the question in mind?
11        A.   Yes.  Repeat the question, please.
12        Q.   Beginning or end of September of '08?
13        A.   More towards the end than the
14   beginning.
15        Q.   And before you were offered a job at
16   Barclays, did you have conversations with anyone
17   at Barclays about going to work there?  I'm
18   trying get a sense of when discussions began
19   between you and Barclays about going to work
20   over there.
21        A.   No, I don't believe so.
22        Q.   I think we're missing each other.
23        Prior to being offered a job?
24        A.   Uh-huh.
25        Q.   Had you had any discussions with
```

Page 18

```
1        HIGHLY CONFIDENTIAL - M. KELLY
2    anyone at Barclays about going to work at
3    Barclays before you were actually offered a
4    position?
5        A.   Well, what do you mean by "offered a
6    position"?
7        Q.   "Would you like to come and work
8    here?"
9        A.   I don't recall.
10       Q.   Do you have any recollection at all of
11   when you began discussions with anybody at
12   Barclays about going to work at Barclays?
13       A.   Not specifically.
14       Q.   Generally?
15       A.   Generally towards the end of
16   September.
17       Q.   And what is your compensation at
18   Barclays?  What was your compensation at
19   Barclays for the period -- withdrawn.
20           When did you start work at Barclays?
21       A.   I don't recall the specific date.
22       Q.   In between the time that you started,
23   whenever it was, and the end of the year, what
24   was your compensation at Barclays?
25       A.   My compensation for the '08 year was
```

Page 19

```
1        HIGHLY CONFIDENTIAL - M. KELLY
2    outlined in an employment contract.
3        Q.   And did that contract also outline
4    your compensation for '09?
5        A.   No.


             REDACTED


10       Q.   Do you have any written agreement
11   covering your employment at Barclays for 2009?
12       A.   No.
13       Q.   Have you had conversations with anyone
14   at Barclays similar to the ones you had with
15   Ms. Callum at Lehman where you've been given to
16   understand what you can expect for the year
17   2009?
18       A.   Yes.
19       Q.   And with whom did you have those
20   conversations?
21       A.   Patrick Clackson.
22       Q.   And what did Mr. Clackson tell you?
23       A.   We didn't discuss a specific number.
24       Q.   Did you discuss a general number?
25       A.   Didn't discuss any number.
```

Page 20

```
1        HIGHLY CONFIDENTIAL - M. KELLY




             REDACTED
```

Page 21

```
1        HIGHLY CONFIDENTIAL - M. KELLY



             REDACTED


11           (Exhibit 193, a document bearing Bates
12       Nos. BCI-EX-00077323 through 77325, marked
13       for identification, as of this date.)
14       Q.   Mr. Kelly, I have put in front of you
15   what we have marked as deposition Exhibit 193, a
16   multi-page document bearing Bates No.
17   BCIEX00077323 through 325.
18           Do you recognize the document?
19       A.   Yes.
20       Q.   And what is it?
21       A.   It's my employment contract.
22       Q.   And that's your signature on the last
23   page, is it?
24       A.   Yes.
25       Q.   Now, I note the document is dated
```

Page 22

1        HIGHLY CONFIDENTIAL - M. KELLY
2    October 10 and your signature also bears a
3    handwritten date next to it of October 10 of
4    '08.  Is October 10 of '08 when you entered on
5    duty, started working at Barclays, or had you
6    been working there for some period before then?
7        A.   I don't recall when I started working
8    at Barclays.
9        Q.   Do you recall a break in between the
10   time you stopped working at Lehman and the time
11   you started working at Barclays?
12       A.   No.
13       Q.   Were you working continuously during
14   the months of September and October for someone?
15       A.   I -- yes, I was.  I took a few days
16   off, but that was -- that was vacation in
17   October.
18       Q.   The contract reflects in its first
19   page that your employment "shall commence on or
20   before October 31, 2008."  Do you see that?
21       A.   Yes.
22       Q.   Does that refresh your recollection at
23   all as to when you actually started working at
24   Barclays?
25       A.   No.

Page 23

1        HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   Had you negotiated any terms of this
3    agreement prior to seeing the October 10 version
4    that you signed?
5        A.   Yes.
6        Q.   And with whom did you negotiate those
7    terms?
8        A.   Anna Morfe in Barclays' HR Department.
9        Q.   Could you spell that last name,
10   please?
11       A.   I think it's M-O-R-F-E.
12       (Exhibit 194, a document bearing Bates
13       Nos. BCI-EX-00077326 through 77327, marked
14       for identification, as of this date.)
15       Q.   I should just go back, if you would,
16   to Deposition Exhibit 193 before we move on to
17   194.
18           Does that contract accurately state
19   your compensation agreement with Barclays for
20   the year 2008?
21       A.   Yes.

REDACTED

Page 24

REDACTED

17       Q.   If you would take a look at what I
18   also put before you, Mr. Kelly, marked as
19   Deposition Exhibit 194.  Tell me if you
20   recognize that document.
21       A.   I do.  This is a partial version of an
22   earlier draft.
23       Q.   Okay.  And this earlier draft, it's
24   two pages, and it doesn't contain any version of
25   the signature page.  It's dated September 25,

Page 25

1        HIGHLY CONFIDENTIAL - M. KELLY
2    2008?
3        A.   Uh-huh.
4        Q.   These handwritten interlineations in
5    the document, are those in your handwriting?
6        A.   Under the "Termination Other Than for
7    Cause," yes.
8        Q.   Where it says or "upon death or
9    disability," that's your handwriting?
10       A.   Yes.
11       Q.   And what about the notes at the bottom
12   in the section "For Cause"?
13       A.   The word "otherwise" is not my
14   handwriting.
15       Q.   Okay.
16       A.   The words "upon notice and with
17   reasonable opportunity to cure" is my
18   handwriting.
19       Q.   Uh-huh.  And the phrase "material
20   provision of," that's your handwriting?
21       A.   That is my handwriting.  And I believe
22   the other word "material," I think it says.
23       Q.   Right, the ones crossed out at the
24   top?
25       A.   Looks like it's my handwriting, yeah.

Page 26

```
1        HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Does the date on this document,
3  September 25, 2008, give you any sharper
4  recollection, sir, of when you first began to
5  talk to Barclays about going to work there?
6       A.   No.
7       Q.   Was it at some point before September
8  25, 2008, the date that this document bears?
9       A.   I don't recall.
10      Q.   Well, do you recall the process here?
11 Do you recall if there were discussions about
12 your working at Barclays and then you got a
13 proposed written contract, or if it just all
14 began with a written contract?
15      MR. BERNSTEIN:  Objection.  Compound.
16      Q.   You can answer, I think.
17      A.   I can or --
18      Q.   You can, yes.
19      MR. BERNSTEIN:  You can if you
20 understand it.
21      A.   I don't understand the question.
22      MR. GAFFEY:  Please don't do that.
23 You know that's -- that constitutes coaching
24 the witness and I'm going to ask you not to
25 do it again.
```

Page 27

```
1        HIGHLY CONFIDENTIAL - M. KELLY
2       MR. BERNSTEIN:  No, it doesn't.
3       Q.   No understanding at all of the
4  question?
5       A.   Could you please repeat the question?
6       (Record read.)
7       A.   I think there are multiple questions
8  in the one.  Could you ask a single question?
9       Q.   Do you recall if your discussions with
10 Barclays began with the arrival of a written
11 contract?
12      A.   I believe I had a brief conversation
13 with Patrick Clackson prior to receiving that
14 contract.
15      Q.   What do you remember about that
16 conversation with Mr. Clackson?  What did he
17 say?  What did you say?
18      A.   It was a brief conversation.  I
19 remember him saying he'd like me to be a member
20 of the team.  There was no discussion about the
21 role.
22      Q.   Was there any discussion of
23 compensation?
24      A.   No.
25      Q.   And when did you have this
```

Page 28

```
1        HIGHLY CONFIDENTIAL - M. KELLY
2  conversation with Mr. Clackson?
3       A.   I don't recall.
4       Q.   Just to push this point a little more,
5  forgive me for this, that conversation takes
6  place at some point before you received a draft
7  we marked as 194, dated September 25, correct?
8       A.   I believe so.
9       Q.   Was it in person with Mr. Clackson or
10 over the phone?  How was the conversation held?
11      A.   I believe it was by phone.
12      Q.   I'm going to move on to something else
13 in a second, but did he -- who initiated the
14 conversation?  Did you call him to express
15 interest in a job or did he call you?
16      A.   My recollection is that he called me.
17      Q.   Now, you're aware, sir, that there
18 were -- there was a transaction concluded
19 between Lehman and Barclays in September of 2008
20 under which Barclays purchased certain assets of
21 Lehman; is that correct?
22      A.   Correct.
23      Q.   And did you have any involvement in
24 the negotiation of that agreement?
25      A.   Not in the negotiation.
```

Page 29

```
1        HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Can you describe for me, did you work
3  at all, did you have any involvement in the
4  agreement at all?
5       A.   With the agreement, meaning the legal
6  agreement?
7       Q.   Meaning the sale, sir.  Did you just
8  go about your regular work or were you involved
9  at all in the transaction?
10      MR. BERNSTEIN:  Objection.  Compound.
11      MR. HUME:  I'd also object as vague.
12      A.   Could you clarify the question,
13 please?
14      Q.   When did you first learn there was
15 going to be a transaction between Lehman and
16 Barclays?
17      A.   Well, we had been working with the
18 Barclays team prior to our filing bankruptcy and
19 conducting, as they conducted, due diligence.
20 Those conversations ended prior to our filing
21 for bankruptcy, and my recollection is that the
22 morning -- the morning that we filed, I learned
23 that negotiations were recommencing with
24 Barclays around a possible transaction.
25      Q.   Are you done with your answer?
```

Page 30

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    Yes.
3    Q.    Who's the "we" that you were referring
4 to?  When you said "we were working with
5 Barclays prior to the bankruptcy"?
6    A.    It was a large, relatively large team
7 of people.
8    Q.    What was your role on that relatively
9 large team of people?
10    A.    My role was to assist the Barclays
11 team in coordinating responses to their requests
12 for information as part of their due diligence,
13 with an emphasis on finance-related matters.
14    Q.    Just so we have a time period, we're
15 talking about the period before the filing of
16 the Lehman bankruptcy, correct?
17    A.    Correct.
18    Q.    And can we agree that that filing took
19 place on the early morning of Monday, September
20 15?
21    A.    Yes.
22    Q.    You recall that event?
23    A.    Yes.
24    Q.    And the discussions with Barclays that
25 you're talking about at some point came to an

Page 31

HIGHLY CONFIDENTIAL - M. KELLY
1
2 end before the filing of the bankruptcy,
3 correct?
4    A.    Correct.
5    Q.    When did the discussions with Barclays
6 in that phase come to an end?
7        MR. HUME:  Objection.  Lack of
8 foundation.
9    A.    Could you rephrase the question,
10 please?
11    Q.    Do you not understand the question?
12        MR. BERNSTEIN:  Objection.  Badgering
13 the witness.
14    Q.    You did not understand the question,
15 Mr. Kelly?
16    A.    I need a minute with my lawyers,
17 please.
18    Q.    Sure.
19        MR. BERNSTEIN:  Let's go off the
20 record.
21        (Pause in the proceedings.  Time
22 noted:  10:07 A.M.)
23        (Time Noted:  10:09 A.M.)
24 BY MR. GAFFEY:
25    Q.    Sir, the question, Mr. Kelly, is when

Page 32

HIGHLY CONFIDENTIAL - M. KELLY
1
2 did those discussions in that phase with
3 Barclays come to an end?
4    A.    I'm not aware when the discussions
5 ended.
6    Q.    You know only that they ended sometime
7 prior to the filing of the Lehman bankruptcy,
8 correct?
9    A.    Correct.
10    Q.    And did discussions with Barclays
11 resume after the filing of the Lehman
12 bankruptcy?
13    A.    Yes, they did.
14    Q.    Tell me what you remember about the
15 resumption of the discussions with Barclays
16 after the filing of the Lehman bankruptcy.
17    A.    My recollection is that I learned on
18 the Monday morning after I came back to the
19 office that negotiations had commenced around a
20 sale of a portion of the business or portion of
21 the firm.
22    Q.    And from whom did you learn this?
23    A.    I don't recall.
24    Q.    And did you play any role in the
25 activities that followed once those negotiations

Page 33

HIGHLY CONFIDENTIAL - M. KELLY
1
2 had recommenced between Barclays and Lehman?
3    A.    Yes.
4    Q.    Describe your role.
5    A.    The role was largely related to
6 continuing to assist the Barclays finance team
7 with their due diligence efforts.
8    Q.    Did you do anything else other than
9 assist the Barclays team with their due
10 diligence efforts?
11    A.    There was a lot -- there was a lot
12 going on, so likely, yes.
13    Q.    Tell me as much as you remember what
14 you did in respect of the transaction on that
15 first day, on Monday, the 15th.
16    A.    I don't recall specifically what else
17 I was doing.
18    Q.    Do you have a general recollection?
19    A.    Generally, we were helping to gather
20 information for both ourselves and the Barclays
21 team.
22    Q.    And that's on the Monday, the 15th?
23    A.    Correct.
24    Q.    Did there come a time when you learned
25 that an agreement had been reached between

Page 34

HIGHLY CONFIDENTIAL - M. KELLY

1   Barclays and Lehman?
2   A.   There were different points in time
3   throughout that week when I was aware of
4   agreements having been reached.
5       MR. GAFFEY:  I'm sorry, can you read
6       that back?
7       (Record read.)
8   Q.   Describe the first point in time when
9   you became aware an agreement had been reached.
10   A.   My recollection is that early on the
11   Tuesday morning an agreement had been reached
12   between Lehman and Barclays.
13   Q.   How did you learn that on the early
14   Tuesday morning an agreement had been reached
15   between Lehman and Barclays?
16   A.   I participated in part of the meeting
17   between the bankers to both Barclays and Lehman
18   early that morning.
19   Q.   What was the nature of your
20   participation in the meeting between the bankers
21   for the Barclays and Lehman early that morning?
22   A.   My participation was related to
23   assembling information that had been used as
24   part of the negotiations.

Page 35

HIGHLY CONFIDENTIAL - M. KELLY

1   Q.   What type of information?
2   A.   The information was largely related to
3   assets that would be sold to Barclays.
4   Q.   Who was in attendance at the portion
5   of the meeting between the bankers for Lehman
6   and Barclays in which you participated?
7   A.   I recall Mark Shapiro and Mark Shafir
8   representing Lehman were in attendance.  I
9   recall that Michael Klein representing Barclays
10   was in attendance.
11   Q.   Anyone else for Barclays?
12   A.   I recall that Marie Stewart
13   participated in a part of that meeting.  There
14   were other people.  I don't recall.
15   Q.   You don't remember who they were?
16   A.   Correct.
17   Q.   And Marie Stewart is on the Barclays
18   side of the table?
19   A.   No.  She was one of my direct reports.
20   Q.   What was her role in the meeting?
21   A.   She was assisting me.
22   Q.   And as specifically as you can tell
23   me, Mr. Kelly, could you describe your
24   activities related to the assets that would be

Page 36

HIGHLY CONFIDENTIAL - M. KELLY

1   sold to Barclays, determining the assets being
2   sold to Barclays?
3       MR. HUME:  Objection.  Vague.
4   A.   Could you rephrase the question,
5   please?
6   Q.   Did you not understand the question?
7       MR. BERNSTEIN:  Let me make an
8   objection that I think will be helpful.  Do
9   you mean at this meeting?  Over the next
10   three weeks?
11       MR. GAFFEY:  I'm still at the meeting.
12       MR. BERNSTEIN:  Okay.  That was not in
13   the question.
14   Q.   With that clarification, can you
15   answer the question?
16   A.   Can you repeat the question?
17       (Record read.)
18   Q.   And that question, sir, as your
19   counsel knows, goes to the meeting we've been
20   talking about, the one on Tuesday morning.
21   A.   My recollection is that I was helping
22   to assemble information around asset classes and
23   values of those assets that had been discussed
24   between -- between that variety of Barclays and

Page 37

HIGHLY CONFIDENTIAL - M. KELLY

1   Lehman representatives.
2   Q.   Do you have any broader recollection
3   of that than you have just described of what you
4   did with regard to helping assemble information
5   about asset classes and values of those assets?
6   Do you remember anything else about your
7   activities?
8   A.   No.
9   Q.   That's it?  That's all you remember as
10   you sit here today?
11   A.   I don't recall anything else.
12   Q.   Do you have any greater recollection
13   of what it is Marie Stewart was doing in
14   connection with assembling information about
15   asset classes and the value of those assets?
16   A.   No.
17   Q.   In the course of your attendance at
18   that meeting and the -- how early on Tuesday,
19   how early in the morning was the part of the
20   meeting that you attended?
21   A.   I don't recall.
22   Q.   Had you worked all night the night
23   before?
24   A.   Meaning Sunday night?

Page 38

HIGHLY CONFIDENTIAL - M. KELLY

1   Q.   Meaning the Monday night into the
2   Tuesday.
3   A.   Well, we're talking about the same
4   night, so that is -- the discussions continued
5   through that night. I do recall going home --
6   Q.   Okay.
7   A.   -- at some point.
8   Q.   Just so we're on the same page, I want
9   to clarify what nights we're talking about.
10  A.   Yes.
11  Q.   In the early morning hours of Monday,
12  that is, shortly after midnight into Monday, the
13  15th, Lehman files for bankruptcy?
14  A.   Correct.
15  Q.   Discussions take place beginning at
16  some point on the 15th between Lehman and
17  Barclays, correct?
18  A.   That's my understanding.
19  Q.   Okay. Now I want to move into the
20  night of the Monday and over midnight into
21  Tuesday.
22  A.   Correct.
23  Q.   The meetings that you've been telling
24  me about that you had this participation in took

Page 39

HIGHLY CONFIDENTIAL - M. KELLY

1   place in the early hours of Tuesday, the 16th,
2   correct?
3   A.   Correct.
4   Q.   And how early in the early hours of
5   Tuesday, the 16th?
6   A.   I don't recall.
7   Q.   And had you worked overnight from the
8   Monday into the early hours of the Tuesday
9   morning?
10  A.   Yeah. We're still talking about the
11  same night, so yes. Yes, I did go home at some
12  point, but it was close to dawn.
13  Q.   By the time you went home close to
14  dawn on the Tuesday, did you have an
15  understanding as to whether an agreement had
16  been reached between Lehman and Barclays?
17  A.   My understanding was that an agreement
18  had been reached subject to approval by the
19  respective boards.
20  Q.   And at that point what was your
21  understanding of the terms of the agreement that
22  had been reached subject to approval by the
23  respective boards?
24  MR. HUME: Could you read back the

Page 40

HIGHLY CONFIDENTIAL - M. KELLY

1   question, please?
2   (Record read.)
3   MR. HUME: I'll object as vague to the
4   extent it calls for a legal conclusion.
5   A.   Could you be more specific around what
6   you mean by "terms," please?
7   Q.   Did you have an understanding of what
8   the deal was by the time you left around dawn on
9   Tuesday morning?
10  A.   Not a complete understanding.
11  Q.   Did you have any kind of
12  understanding, complete or incomplete?
13  A.   I had an understanding that certain
14  asset classes or, sorry, certain assets with an
15  attached value would be sold to Barclays,
16  together with an understanding that Barclays
17  would assume certain businesses in what was the
18  Lehman North American franchise.
19  Q.   Done with your answer, sir?
20  A.   Yes.
21  Q.   Did you let anyone else know in the
22  early morning of Tuesday what your understanding
23  was of the terms of the transaction?
24  MR. BERNSTEIN: Objection. Vague.

Page 41

HIGHLY CONFIDENTIAL - M. KELLY

1   A.   I didn't have a complete understanding
2   of the terms of the transaction.
3   Q.   That's not my question. My question
4   is, did you let anyone else know in the early
5   morning of Tuesday what your understanding was
6   of the terms of the transaction?
7   A.   I -- I advised my manager of my
8   understanding of certain of the terms that I
9   understood at that point in time.
10  Q.   Who is the manager to whom you are
11  referring?
12  A.   Ian Lowitt.
13  Q.   And by what means did you advise
14  Mr. Lowitt of your understanding of certain of
15  the terms? Talk to him? Send him an e-mail?
16  A.   By e-mail.
17  Q.   Apart from the e-mail to Mr. Lowitt,
18  did you advise anyone else of what your
19  understanding was of certain of the terms of the
20  deal in the early morning hours of Tuesday, the
21  16th?
22  A.   No. I wasn't representing the firm in
23  the negotiations.
24  Q.   That wasn't my question, I think. We

## Page 42

HIGHLY CONFIDENTIAL - M. KELLY

1    may be missing each other here.
2        Did you advise anyone other than
3    Mr. Lowitt of what your understanding was of the
4    terms?
5    A.    No.
6    Q.    While we look for the exhibit,
7    Mr. Kelly, before this overnight -- before this
8    deal was reached in the early morning hours of
9    Tuesday, in that time period prior to that had
10   you done any work to try and figure out what the
11   total bonus accrual was for LBI or Lehman
12   Brothers Holdings, Inc.?
13       Withdraw that. Let me ask a more
14   general question. Had you had been involved at
15   all in trying to figure out information
16   concerning compensation of Lehman employees?
17   And again, I'm in that period prior to the early
18   morning hours of Tuesday when you learned the
19   deal has been reached.
20       MR. BERNSTEIN: Objection. Vague and
21   ambiguous.
22   A.    I was aware of compensation accruals
23   generally.
24   Q.    Were compensation accruals generally

## Page 43

HIGHLY CONFIDENTIAL - M. KELLY

1    within your area of responsibility?
2    A.    Partly.
3    Q.    Mr. Kelly, I'm showing you what has
4    been marked at a prior deposition as Exhibit
5    136A. It's a one-page document. Tell me if you
6    recognize it, sir.
7        (Document review.)
8    A.    Yes, I do.
9    Q.    What is the document?
10   A.    It's the e-mail I was referring to in
11   the answer to my prior question.
12   Q.    And this is the e-mail -- well, take a
13   look, if you would, at the bottom in the chain
14   where you're writing. It's from Martin Kelly to
15   Ian Lowitt, but there's a CC as well to Paolo
16   Tonucci.
17       Does that refresh your recollection as
18   to whether you informed anyone other than
19   Mr. Lowitt?
20   A.    Yeah, I don't recall that, but
21   evidently I did.
22   Q.    Okay. And as you sit here today, can
23   you think of any reason you would be informing
24   Mr. Tonucci as well as Mr. Lowitt?

## Page 44

HIGHLY CONFIDENTIAL - M. KELLY

1    A.    Paolo was as involved -- well, Paolo
2    was very involved in the transaction.
3    Q.    In the e-mail, Mr. Kelly, you say in
4    the first sentence, "Well it took all night and
5    lots of back and forth, but the deal is done and
6    ready for the board." You see that sentence?
7    A.    Yes.
8    Q.    And had you been involved all night?
9    I know you said you went home for -- after dawn,
10   so I'm trying to figure out were you there, you
11   know, were you involved all night?
12   A.    I was there until this point in time.
13   Q.    I didn't hear that.
14   A.    Sorry. I was there until this point
15   in time.
16   Q.    And this e-mail is sent at
17   approximately 5:10 A.M. on the morning of the
18   16th, and you had been there continually all
19   night when you sent the e-mail?
20   A.    I'd been in the office continually,
21   yes.
22   Q.    And you say there that there had been
23   lots of back and forth. What did you mean when
24   you wrote to Mr. Lowitt and Mr. Tonucci that

## Page 45

HIGHLY CONFIDENTIAL - M. KELLY

1    there was lots of back and forth?
2    A.    I recall a series of discussions
3    negotiating the values of the assets to be sold
4    and -- including the real estate assets.
5    Q.    In addition to the real estate assets,
6    what, generally speaking, what type of assets?
7    A.    Generally speaking, the inventory of
8    securities that was being sold to Barclays.
9    Q.    And you go on in your e-mail to write,
10   "Final price did not change meaningfully -
11   approx. a 5B," 5 billion, "all in economic loss
12   versus our marks and 3.6B of resi assets left
13   behind." Do you see that sentence?
14   A.    Yes.
15   Q.    Okay. When you refer to the final
16   price not changing meaningfully, can you explain
17   to me what you meant when you wrote that to
18   Mr. Kelly and Mr. Lowitt?
19   A.    To Mr. Tonucci and Mr. Lowitt.
20   Q.    I beg your pardon, to Mr. Tonucci and
21   Mr. Lowitt.
22   A.    I don't recall.
23   Q.    Do you recall having knowledge of some
24   back and forth about what the final price would

Page 46

HIGHLY CONFIDENTIAL - M. KELLY

1    be?
2    A.   There were conversations throughout
3    the night on prices of different components of
4    the transaction.
5    Q.   When you say "different components of
6    the transaction," are you talking about the real
7    estate and, generally speaking, the inventory of
8    securities?
9    A.   Correct.
10   Q.   When you wrote, "Approx. a 5 billion
11   all in economic loss versus our marks," what did
12   you mean by that?
13   A.   I recall that the 5 billion represents
14   the difference between the negotiated price and
15   the values of those assets on Lehman's books.
16   Q.   So was the agreement, as you
17   understood it, to give Barclays a $5 billion
18   discount off the values of those assets as shown
19   on Lehman's books?
20   MR. HUME: Objection, vague.
21   MR. BERNSTEIN: Objection.
22   A.   No.
23   Q.   Please describe for me what you meant
24   when you said there would be a 5 billion

Page 47

HIGHLY CONFIDENTIAL - M. KELLY

1    economic loss versus the marks?
2    MR. BERNSTEIN: Objection. Asked and
3    answered.
4    A.   The 5 billion represents or
5    represented the difference between the
6    negotiated sales price and the value of the
7    assets on Lehman's books prior to the sale.
8    Q.   Forgive me for being a little slow,
9    but the Lehman -- the assets are carried on
10   Lehman's books at a total of X, correct?  And
11   the agreement was to sell them to Barclays for 5
12   billion less than X, is that what you mean?
13   A.   Well, the 5 billion represents a sum
14   of Xs and a sum of Ys negotiated
15   portfolio-by-portfolio.
16   Q.   On a sort of sum-total level?  The sum
17   total is the securities are carried at X and the
18   deal is to sell them for 5 billion less than the
19   total of X, correct?
20   A.   Well, the 5 billion was a consequence
21   of a series of discussions conducted at a
22   portfolio level.
23   Q.   Describe those discussions as best you
24   can.  Tell me everything you remember about

Page 48

HIGHLY CONFIDENTIAL - M. KELLY

1    those discussions conducted at portfolio level.
2    A.   I did not participate in those
3    discussions.  Those discussions were occurring
4    throughout the course of the night.  My
5    recollection is that a Lehman representative and
6    a Barclays representative being experts in those
7    particular asset classes were discussing the
8    contents of the portfolio and negotiating an
9    appropriate value for the assets to be sold.
10   Q.   Who were the Lehman representatives or
11   representatives and the Barclays representative
12   or representatives you just referred to?
13   A.   There were a series of discussions
14   occurring simultaneously, so I don't -- I don't
15   know all of the representatives.  I do recall
16   Eric Felder and Stephen King representing Lehman
17   and Barclays respectively.  I'm not aware of who
18   was negotiating other asset classes.
19   Q.   There were people negotiating other
20   asset classes, you just don't remember who they
21   were?
22   A.   That's my understanding, yes.
23   Q.   And what asset class or classes, to
24   your knowledge, were Mr. Felder and Mr. King

Page 49

HIGHLY CONFIDENTIAL - M. KELLY

1    talking about?
2    A.   My understanding is they were
3    discussing the credit assets.  They may have
4    been discussing other asset classes.
5    Q.   Do you remember anything else about
6    these discussions between Lehman representatives
7    and Barclays representatives who were experts
8    about these asset classes?
9    A.   Sorry, could you repeat the question?
10   Q.   Withdrawn.  You mentioned before that
11   there were discussions between Lehman
12   representatives and Barclays representatives
13   with respect to different asset classes, and you
14   described them as experts in the asset classes?
15   A.   Uh-huh.
16   Q.   And you told me about Felder and King
17   and you don't remember who else may have been
18   discussing other asset classes, that's I think
19   where we are right now.
20   What else, if anything, do you
21   remember about those discussions?  Where did
22   they take place?  How long did they take?  Did
23   you learn about their outcome?
24   MR. BERNSTEIN: Just to be clear, this

| | |
|---|---|
| Page 50 | Page 51 |

**Page 50**

1  HIGHLY CONFIDENTIAL - M. KELLY
2  is all on this evening/morning of the 16th?
3       MR. GAFFEY: I'm up to 5:10 A.M. on
4  the morning of Tuesday when you wrote this
5  e-mail. Thank you.
6       A.  Sure.  So for the period of time up
7  until then?
8       Q.  Yes.
9       A.  I believe they were occurring on the
10  32nd floor of the Lehman office.  My
11  understanding is that Bart was involved, Bart
12  McDade was involved in some portion of those
13  discussions.
14       Q.  Do you remember anything else?
15       A.  I do recall that Gerry Donini was
16  involved in those discussions.
17       Q.  Anything else?
18       A.  No.
19       Q.  And what's the basis of your
20  understanding that Mr. McDade was involved in
21  those discussions?
22       A.  My understanding is that Bart was
23  responsible for negotiating the transaction
24  representing Lehman.
25       Q.  What's the basis of that

**Page 51**

1  HIGHLY CONFIDENTIAL - M. KELLY
2  understanding?  Did you see him negotiating?
3  Did somebody tell you?  Did you sit next to him
4  while he was doing it?  How did you know that?
5       A.  I did not see him negotiate.  I did
6  not participate in the negotiations.
7       Q.  How do you know Mr. McDade was
8  involved in that part of the negotiations?
9       A.  I don't know.
10       Q.  When you wrote this e-mail that's been
11  marked as Exhibit 136A, did it, in full, did
12  it -- withdrawn.  When you wrote this e-mail
13  that's marked as Exhibit 136A, did it fairly and
14  accurately characterize your understanding of
15  the deal that had been reached?
16       A.  It fairly characterized the components
17  of the deal that I was aware of.
18       Q.  Did you then, or at any time after
19  that, develop an understanding, Mr. Kelly, of
20  how his 5 billion all in economic loss versus
21  Lehman marks was going to be implemented?
22       A.  Can you describe what you mean by
23  "implemented"?
24       Q.  Well, the books are at X, right?  They
25  globally show X as the value of those, total

| | |
|---|---|
| Page 52 | Page 53 |

**Page 52**

1  HIGHLY CONFIDENTIAL - M. KELLY
2  value of those asset classes, correct?  We
3  talked about this a minute ago, right?
4       A.  Correct.
5       Q.  And the $5 billion all in loss is the
6  difference between X and the price that Barclays
7  was going to pay, right?  Is that right?
8       A.  Correct.
9       Q.  Well, were the books going to be
10  marked down to reflect that $5 billion
11  difference?
12       A.  I don't know.
13       Q.  Did you ever get an understanding of
14  whether or not there was going to be a markdown
15  on the books to reflect that difference?
16       A.  Yeah, at some point subsequent to
17  then, yes.
18       Q.  Tell me when you got that
19  understanding and what your understanding was?
20       A.  I don't recall when I got that
21  understanding.  As part of the process to
22  reflect the transaction in Lehman's books and
23  records, the assets would have been marked to
24  the negotiated sale price.
25       Q.  And who was in charge of the process

**Page 53**

1  HIGHLY CONFIDENTIAL - M. KELLY
2  that you just described?
3       A.  Can you describe specifically the
4  process, what you mean by "the process"?
5       Q.  Yes, the process to reflect the
6  transaction in Lehman's books and records that
7  the assets would be marked down to reflect the
8  negotiated sale price.
9       A.  It was unclear who was responsible for
10  that.
11       Q.  Were you in any part responsible for
12  that process?
13       A.  Not for reflecting the markdowns in
14  the assets.
15       Q.  Did you have any role in connection
16  with that process?  Withdrawn.
17       I think I understand from your last
18  answer you're telling me you weren't actually
19  involved in marking down the asset classes, is
20  that correct?
21       A.  Correct.
22       Q.  Okay.  Did you have to do any work
23  consequent to the marking down of the asset
24  classes?
25       A.  Some work around what specifically?

Page 54

1     HIGHLY CONFIDENTIAL - M. KELLY
2     Q.   Well, did you prepare balance sheets,
3  for example, that reflected the markdown of the
4  asset classes?  You or anyone under your
5  supervision?
6     A.   We commenced a process to reflect the
7  transaction -- to prepare a closing balance
8  sheet which reflected the transaction.
9     Q.   Okay.  And describe for me what you --
10 who is the "we" you're talking about there?
11    A.   It was a broad group of people.
12    Q.   Were you the head of that group of
13 people?
14    A.   No, I wouldn't say I was head of that
15 group.
16    Q.   Who was the head of that group?
17    A.   I think I would say Ian, Ian Lowitt,
18 was responsible overall.
19    Q.   And what was it that group of people
20 did in connection with the --
21    A.   Well, the process --
22       MR. BERNSTEIN:  Objection.  Vague and
23 ambiguous.
24    Q.   You can finish your answer.
25    A.   A process commenced to determine

Page 55

1     HIGHLY CONFIDENTIAL - M. KELLY
2  Lehman's balance sheet immediately prior to the
3  sale of assets to Barclays and then to reflect
4  the sale of those assets.
5     Q.   My interest is a little more specific.
6  I'm back at the "$5 billion all in economic loss
7  versus our marks."  Can you describe for me what
8  process was in place that you understood to
9  reflect the $5 billion all in economic loss
10 versus our marks on Lehman's books?
11       MR. BERNSTEIN:  Objection.  Lacks
12 foundation.
13    A.   I'm not aware of the process.
14    Q.   Any understanding of it at all,
15 directly or indirectly?
16       MR. BERNSTEIN:  Objection.  Vague and
17 ambiguous.
18    A.   No.
19    Q.   Talk to anybody about it at the time?
20    A.   Responsibility for reflecting the
21 marks resided under the Product Control
22 function.
23    Q.   Did you talk to anybody about it at
24 the time?
25    A.   I don't recall conversations.

Page 56

1     HIGHLY CONFIDENTIAL - M. KELLY
2     Q.   Who in Products Control were you
3  referring to a moment ago?
4     A.   Ultimately Gerry Reilly was
5  responsible for Product Control globally.
6     Q.   Did you have any conversations with
7  Mr. Reilly about it?
8     A.   I don't recall.
9     Q.   Did you have any e-mail communications
10 with Mr. Reilly about it?
11    A.   I don't recall.
12    Q.   Further into the e-mail, you write,
13 "Also, an extra 1 billion of comp beyond our
14 accrual and assuming of all trade payables in
15 LBI and LBHI," do you see that?
16    A.   Yes.
17    Q.   What did you mean when you wrote "an
18 extra 1 billion of comp beyond our accrual"?
19    A.   I believe that means that the
20 liability that Barclays would recognize for all
21 forms of compensation would be a billion dollars
22 more than what Lehman had reflected on its books
23 for certain components of compensation.
24    Q.   You referred to the liability for all
25 forms of compensation, but when you talk about

Page 57

1     HIGHLY CONFIDENTIAL - M. KELLY
2  Barclays, you said certain components of that
3  compensation.  Is there a difference between
4  those two formulations?
5       MR. BERNSTEIN:  Objection.
6  Mischaracterizes his testimony.
7     A.   Can you repeat the question, please?
8       (Record read.)
9     Q.   With the read-back, sir, can you
10 answer that last question?
11       MR. BERNSTEIN:  Same objection.
12    A.   No, I can't, actually.
13    Q.   What did you mean when you said
14 "certain components of compensation"?
15    A.   I think your question has referred to
16 certain components of compensation in a Barclays
17 context, which is not what I said in my answer.
18    Q.   I may be just confused here, but
19 that's what I thought I heard you say.
20       (Record read.)
21    Q.   Okay.  You've heard your answer read
22 back there.
23    A.   Uh-huh.
24    Q.   You see what I mean, you referred to
25 the liability that Barclays would recognize for

Page 58

1        HIGHLY CONFIDENTIAL - M. KELLY
2    all forms of compensation, but when you spoke
3    about Lehman you said certain components of
4    compensation.
5        What I'm trying to find out,
6    Mr. Kelly, is the difference between those two,
7    if there is any?
8        A.   I just want to clarify the prior
9    question you asked, because I think you used
10   "certain components of compensation," referring
11   to Barclays, and I think that's --
12       Q.   Okay.  I'll take the blame for this
13   one, too.  I'm just trying to -- there was an
14   accrual on the LBI books for compensation,
15   correct, that you're referring to your
16   e-mail, 1 billion of comp beyond our accrual,
17   yes?
18       A.   There was accrual on Lehman's, the
19   firm's books for compensation.
20       Q.   Difference between Lehman and the
21   firm?
22       A.   Lehman, the firm, by "the firm," I
23   mean the group, the group of companies globally.
24       Q.   That's everything?
25       A.   Yes.

Page 59

1        HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   Within Lehman?
3        A.   And LBI, meaning the broker-dealer
4    specifically.
5        Q.   The accrual, "the 1 billion of comp
6    beyond our accrual," the accrual you referred to
7    there, were you talking about the accrual for
8    the firm globally?
9        A.   Correct.  Well, sorry, no.  Can you
10   repeat the question, please?
11       Q.   The "1 billion of comp beyond our
12   accrual" that you are referring to in this
13   Exhibit 136A, were you referring to the accrual
14   of the firm globally?
15       A.   No.
16       Q.   You were referring to the accrual for
17   which entity within the firm?
18       A.   I believe what I was referring to was
19   an estimate of an accrual for or related to
20   those individuals that would become employees of
21   Barclays.
22       Q.   Did you have an understanding of why
23   that would be increased $1 billion beyond the
24   Lehman accrual?
25       MR. BERNSTEIN:  Objection to the form.

Page 60

1        HIGHLY CONFIDENTIAL - M. KELLY
2    No foundation.
3        A.   I wasn't party to those negotiations.
4        Q.   You described this in your e-mail to
5    your supervisor, Mr. Lowitt, and also to
6    Mr. Tonucci.  Did you have an understanding of
7    the phrase, you know, what you meant when you
8    said "an extra 1 billion of comp beyond our
9    accrual"?
10       A.   I meant that, or I recall that I meant
11   that the compensation liability to be assumed by
12   Barclays would exceed an estimate of what we had
13   recognized on Lehman's books by a billion
14   dollars.
15       Q.   When you wrote this e-mail to
16   Mr. Lowitt, did you have an understanding of why
17   the compensation liability would be assumed by
18   Barclays would exceed an estimate that Lehman
19   had on its books by about a billion dollars?
20       A.   No.
21       Q.   None at all?
22       A.   I wasn't party to those negotiations.
23       Q.   That's not my question.  My question
24   is did you have any understanding.  None at all?
25   You had no other understanding?

Page 61

1        HIGHLY CONFIDENTIAL - M. KELLY
2        A.   No.
3        MR. BERNSTEIN:  Objection.  Asked and
4    answered.
5        Q.   Other than the actual words you here
6    wrote on this document, sir, did you have any
7    understanding of the $1 billion comp beyond
8    accrual?
9        A.   I can't recall what I understood at
10   this point in time versus subsequent to this
11   point in time.
12       Q.   Did your understanding change over
13   time?
14       A.   I can't recall.
15       Q.   You don't remember if -- what your
16   understanding was at the time and you don't
17   remember if it's changed over time, is that your
18   testimony?
19       A.   Yes.
20       Q.   And other than the actual words on
21   this piece of paper, do you have any
22   understanding of what $1 billion of comp beyond
23   accrual was?
24       MR. BERNSTEIN:  Objection.  Asked and
25   answered for the fourth time and the last

Page 62

1    HIGHLY CONFIDENTIAL - M. KELLY
2    time. You can answer it one more time and
3    then we're taking a break.
4        MR. GAFFEY: Okay. You might remind
5    him he's under oath on the break.
6        MR. BERNSTEIN: You know, one more
7    time like that...
8        MR. GAFFEY: And?
9        MR. BERNSTEIN: And I think more
10   highly of your firm than to make remarks
11   like that.
12   Q.    Answer the question, please.
13   A.    Can you repeat the question, please?
14       (Record read.)
15   A.    Can you repeat the question, please?
16   Q.    Read it back.
17       (Record read.)
18   A.    As I previously stated, my
19   understanding was that the compensation
20   liability to be assumed related to a set of
21   employees and represented all forms of
22   compensation or liability for all forms of
23   compensation.
24   Q.    Bonus, salary, is that what you mean
25   when you say "all forms of compensation" to the

Page 63

1    HIGHLY CONFIDENTIAL - M. KELLY
2    components compensation?
3    A.    All components. All components,
4    meaning salary, cash, stock and any other forms
5    of compensation.
6    Q.    Okay. And the group of people you're
7    talking about are the so-called transferred
8    employees who went from the Lehman entities over
9    to Barclays?
10   A.    The approximately 10,000 people that I
11   understood were moving over to Barclays.
12       MR. GAFFEY: Let's take a break.
13       (Recess; Time Noted: 10:56 A.M.)
14       (Time Noted: 11:09 A.M.)
15   BY MR. GAFFEY:
16   Q.    Mr. Kelly, in the e-mail -- we're
17   still on 136A -- who told you about the lots of
18   back and forth all night that you referred to in
19   there? Who told you there was lots of back and
20   forth?
21   A.    I witnessed the back and forth.
22   Q.    And when you witnessed the back and
23   forth, who were you witnessing having the back
24   and forth? Who were you -- who was in the room
25   at the time?

Page 64

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A.    It wasn't a single room. It was a
3    series of conversations between different
4    representatives of Lehman and Barclays.
5    Q.    And these are the conversations about
6    the different asset classes that you were
7    telling me about before the break?
8    A.    Yes.
9    Q.    And I take it there were also
10   conversations about other terms of the deal
11   apart from the $5 billion overall loss versus
12   Lehman's marks, right? Comp, for example,
13   compensation?
14   A.    Could you repeat that question,
15   please?
16   Q.    Well, you talked before the break
17   about adjusting the marks on various asset
18   classes and different people being involved in
19   those conversations.
20       Putting that aside for a moment, there
21   were other topics that were the subject of back
22   and forth, right, like compensation terms in the
23   agreement, yes?
24   A.    Well, I think the conversations that I
25   referred to are not centered on adjusting the

Page 65

1    HIGHLY CONFIDENTIAL - M. KELLY
2    marks, they were centered on what was an
3    appropriate sale price for the assets being
4    sold.
5    Q.    When you say it was an appropriate
6    sale price for the assets being sold, is
7    there -- what was your sense of whether it was
8    appropriate to sell the assets for 5 billion
9    less than Lehman showed them on their books?
10       MR. BERNSTEIN: Objection. No
11   foundation.
12   A.    I wasn't part of those negotiations.
13   Q.    Did you have a view? Did you think
14   Barclays got a pretty good deal?
15       MR. BERNSTEIN: Objection. Compound.
16   A.    I don't have a view.
17   Q.    Did you have a view at the time?
18   A.    No, I didn't.
19   Q.    Did you have any reason at the time to
20   believe that the marks at which Lehman carried
21   those assets were inaccurate?
22   A.    No.
23   Q.    Did you have any understanding as to
24   why those marks would be marked down by $5
25   billion to achieve the sale price to Barclays?

Page 66

1      HIGHLY CONFIDENTIAL - M. KELLY
2          MR. BERNSTEIN: Objection. No
3    foundation.
4          A.   As I previously mentioned, the $5
5    billion was an aggregation across a series of
6    portfolios.
7          Q.   Uh-huh. Did you have an
8    understanding, sir, that the agreement, the
9    pricing of the agreement was that Barclays would
10   pay Lehman 5 billion less than Lehman had
11   thought the assets were worth?
12         A.   My understanding was that the
13   negotiated sales price across all those asset
14   portfolios resulted in a $5 billion,
15   approximately $5 billion loss to Lehman relative
16   to its marks at that time.
17         Q.   And Lehman's marks at that time were,
18   as far as you knew, maintained in a way that
19   they were Lehman's best view of the value of
20   those assets across those classes, correct?
21         MR. BERNSTEIN: Objection. No
22   foundation.
23         A.   The values were determined in
24   accordance with valuation policies and under
25   U.S. GAAP.

Page 67

1      HIGHLY CONFIDENTIAL - M. KELLY
2          Q.   So, to go back to whether you had a
3    view at 5:10 A.M. when you sent this e-mail to
4    Mr. Lowitt and Mr. Tonucci, did you have a view
5    about whether Barclays was getting a good deal
6    paying 5 billion less than Lehman was carrying
7    these assets for on its books?
8          A.   No.
9          Q.   Did you ever express a view to
10   anybody?
11         A.   No.
12         Q.   Did anybody express any view to you?
13         A.   No.
14         Q.   As you sit here now, do you think
15   Barclays got a pretty good deal?
16         MR. BERNSTEIN: Objection. That's not
17   a factual question. That's calling for his
18   opinion, and I don't think he's being
19   compensated as an expert.
20         MR. GAFFEY: I'll take the answer and
21   worry about admissibility later.
22         Q.   You can answer the question.
23         A.   I don't have a view.
24         Q.   Now, in response to your e-mail,
25   Mr. Lowitt responds, "You are a hero. Well

Page 68

1      HIGHLY CONFIDENTIAL - M. KELLY
2    done. Ian." Do you see that?
3          A.   Yes.
4          Q.   Did you have a sense that Ian thought
5    you were in some part responsible for the terms
6    of the transaction that you described in your
7    e-mail?
8          A.   No.
9          Q.   Did you wonder why Ian was describing
10   you as a "hero"?
11         A.   I don't recall thinking about it.
12         Q.   Do you recall asking him about it?
13         A.   No.
14         Q.   And when Ian says, "Well done," did
15   you have a sense that your boss was telling you
16   you had done a good job in coming up with these
17   terms?
18         A.   I don't have a view on that.
19         Q.   Did you have a sense at the time when
20   you got a "well done" from your boss about the
21   terms of a contract you described, that he
22   thought you were responsible for those terms?
23         MR. BERNSTEIN: Objection asked and
24   answered, but --
25         A.   No.

Page 69

1      HIGHLY CONFIDENTIAL - M. KELLY
2          Q.   Did he say anything to you to indicate
3    that he thought you had something to do with
4    reaching these terms with Barclays?
5          A.   No.
6          Q.   And I take it your testimony is you
7    had nothing to do with reaching these terms with
8    Barclays?
9          A.   Not that I can recall.
10         Q.   At the top of the e-mail chain,
11   Mr. Tonucci writes to Mr. Lowitt and to you, in
12   that order, Mr. Lowitt and to you, "Fantastic.
13   Great work."
14              Did you have a sense Mr. Tonucci was
15   congratulating you on great work for reaching
16   this kind of deal with Barclays?
17         A.   No.
18         Q.   What did you understand -- who did you
19   understand Mr. Paolo was complimenting for great
20   work when you received that e-mail?
21         A.   I don't recall what I thought.
22         Q.   Did you have any conversations with
23   Mr. Tonucci about the terms that you describe in
24   your e-mail to him and to Mr. Lowitt?
25         A.   I recall generally discussing those

Page 70

HIGHLY CONFIDENTIAL - M. KELLY

1   terms --
2   Q.   Tell me --
3   A.   -- the following day.
4   Q.   With whom did you have the discussion?
5   Mr. Tonucci?
6       I'm sorry, I may not have -- let me
7   rephrase the question.  I may not have heard
8   your last answer properly.  You had a discussion
9   the next day.  With whom?
10  A.   I don't recall specifically.
11  Q.   Do you recall generally?
12  A.   I'm not sure how I can answer
13  generally if you're asking me for specific
14  names.
15  Q.   You recall having a discussion about
16  these terms with someone the next day, someone
17  or some person or persons the next day, correct?
18  A.   Yes.
19  Q.   And as you sit here, do you have any
20  recollection of who that person or those people
21  were?
22  A.   There was a large group of people --
23  Q.   Do you remember --
24  A.   -- working on this transaction.

Page 71

HIGHLY CONFIDENTIAL - M. KELLY

1   Q.   Do you remember --
2   A.   So I don't recall specifically who I
3   discussed it with.
4   Q.   But you do recall you had a discussion
5   with someone or some people about the terms that
6   you described in your e-mail to Mr. Lowitt and
7   Mr. Tonucci?
8   A.   Yes.
9   Q.   And when you had those discussions
10  with whoever it was, did you talk about the $5
11  billion all in economic loss versus Lehman's
12  marks?
13  A.   Yes.  In all likelihood, yes.
14  Q.   Why do you say "in all likelihood"?  I
15  don't want you to speculate or to guess.  Why do
16  you say in all likelihood you had a conversation
17  about the $5 billion all in economic loss versus
18  Lehman's marks?
19  A.   There were many conversations taking
20  place over many days and a large group of people
21  who had been working long hours, and it's
22  difficult to pinpoint specifically or precisely
23  with absolute clarity what I recall.
24  Q.   Do you have a general recollection of

Page 72

HIGHLY CONFIDENTIAL - M. KELLY

1   conversations with someone the next day about
2   the $5 billion all in economic loss versus
3   Lehman's marks, correct?
4   A.   Can you repeat the question, please?
5   Q.   You have a general recollection of a
6   conversation with someone the next day about the
7   $5 billion all in economic loss versus Lehman's
8   marks; is that correct?
9   A.   Yes, I would say some people, not
10  someone.
11  Q.   And as you sit here, you have no
12  recollection who any of those people were?
13  A.   I don't recall the specifics of the
14  conversation, so I would have to speculate.
15  Q.   I didn't ask you about the content of
16  the conversation.  I'm asking you as you sit
17  here today do you have any recollection who any
18  of those people were about a $5 billion loss to
19  the company you had been working for, any
20  recollection at all?
21  A.   Not specifically.
22  Q.   Generally?
23  A.   Generally, yes.
24  Q.   Who?

Page 73

HIGHLY CONFIDENTIAL - M. KELLY

1   A.   I can't answer a general question by
2   giving you specific names.
3   Q.   Why don't you give me the candidates.
4   Who's in the room when you're talking about
5   this?
6       MR. BERNSTEIN:  Well, objection.
7   Compound.  Which question do you want him to
8   answer?  Who's in the room when you're
9   talking about this or why don't you give me
10  the candidates?  Those are two very
11  different questions.
12  Q.   You got them both in mind, sir?
13  A.   I'm sorry, can you repeat that,
14  please?
15  Q.   You want the long objection repeated
16  or the question?
17  A.   Yes, I do.
18  Q.   Let me withdraw the objection because
19  the objection accomplished its purpose.
20      Do you have any recollection of
21  whether these conversations took place over the
22  phone or in a meeting?
23  A.   It was most likely in meetings.
24  Q.   Do you remember who you were in

## Page 74

HIGHLY CONFIDENTIAL - M. KELLY
1
2  meetings with the next day?
3      A.   About what topics?
4      Q.   I'll take any meeting on any topic.
5      A.   I have -- I have difficulty
6  time-stamping conversations, specific
7  conversations at that point in time.
8      Q.   Let me try it in a more general way
9  and then we'll see if we can drill down a little
10  bit.
11          Over the course of the next week
12  between the 16th of September at 5:10 A.M. when
13  you wrote this e-mail and when the deal closed
14  on Monday, the 22nd of September, with whom did
15  you have any discussion at all about the $5
16  billion loss against Lehman's marks at any time?
17      A.   I can't give you specific names with
18  absolute clarity.
19      Q.   I'm not asking for absolute clarity.
20  I'm asking for your best recollection over that
21  whole week.
22      A.   My recollection is that I discussed
23  this with Gerry Reilly, Ian Lowitt, Paolo
24  Tonucci, and likely others.
25      Q.   Did you talk to Mr. McDade about it?

## Page 75

HIGHLY CONFIDENTIAL - M. KELLY
1
2      MR. HUME: Objection. Vague.
3      A.   I don't recall conversations with
4  Mr. McDade after this point in time on this
5  matter.
6      Q.   Did you talk to Mr. McGee about it,
7  Skip McGee?
8      A.   Not that I can recall.
9      Q.   Did you talk to Mr. Felder about it?
10      A.   Not that I can recall.
11      Q.   Did you talk to Mr. Berkenfeld about
12  it?
13      A.   I don't recall.
14      Q.   Did you talk to Mr. Shapiro about it?
15      A.   After 5:10 A.M. is your question?
16      Q.   Yes.
17      A.   Not that I can recall.
18      Q.   Did you talk to Mr. Shafir about it?
19      A.   Not that I can recall.
20      Q.   Did you talk to anybody who worked for
21  Barclays about it?
22      A.   Not that I can recall.
23      Q.   Did you talk to Marie Stewart about
24  it?
25      A.   I don't recall.

## Page 76

HIGHLY CONFIDENTIAL - M. KELLY
1
2      Q.   Did you talk to Kristi Wong about it?
3      A.   I don't recall.
4      Q.   Did you talk to Robert Azerad about
5  it?
6      A.   I don't recall.
7      Q.   As we've gone through these names,
8  does this refresh your recollection as to anyone
9  you talked to about it beyond Mr. Reilly,
10  Mr. Lowitt and Mr. Tonucci?
11      A.   No.
12      Q.   Can you think of a reason, sir, you
13  would have spoken only to Mr. Reilly, Mr. Lowitt
14  and Mr. Tonucci about it?
15      A.   I'm sorry, what's the question?
16      Q.   Can you think of a reason you would
17  have spoken only to Mr. Reilly, Mr. Lowitt and
18  Mr. Tonucci about it?
19      A.   No.
20      Q.   Did it come to your attention during
21  the week beginning on the 15th of September that
22  there were several hearings before the
23  bankruptcy court in connection with the
24  agreement with Barclays?
25      A.   I remember becoming aware of the court

## Page 77

HIGHLY CONFIDENTIAL - M. KELLY
1
2  hearing on the Friday at some point prior to
3  that hearing.
4      Q.   And how did you become aware of that,
5  Mr. Kelly?
6      A.   I don't recall.
7      Q.   Did you attend that hearing?
8      A.   No.
9      Q.   Do you know if at that hearing anybody
10  told the judge about a $5 billion all in
11  economic loss versus Lehman's marks in the deal?
12      A.   I was not at the hearing.
13      Q.   Did you ever follow up to see if
14  anyone did tell the court about a $5 billion all
15  in economic loss versus Lehman marks in the
16  deal?
17      A.   No.
18      Q.   Do you know if the agreement with
19  Barclays was ever reduced to writing, written
20  agreement?
21      A.   Yes, I became aware that there were --
22  there was a written agreement between Lehman and
23  Barclays.
24      Q.   And how did you become aware of that?
25      A.   I was provided a copy of it at some

Page 78

HIGHLY CONFIDENTIAL - M. KELLY

1  point.
2     Q.   I want to focus on the point at which
3  you saw the agreement.  Did you see the
4  agreement at or around the time you wrote this
5  e-mail?  Within the next day or so?
6     I'm asking that to sort of
7  differentiate from you saw it last week or you
8  saw it a month ago.  Did you see it at or around
9  the times we're talking about, September of
10 2008?
11    MR. BERNSTEIN:  Objection.  Compound,
12    vague and ambiguous.
13    A.   I can't recall specifically when I saw
14 it.
15    Q.   Do you have a general recollection of
16 when you first saw it?
17    A.   I generally recall I saw it sometime
18 during that week.
19    Q.   And when you saw it sometime during
20 that week, did you look to see whether it
21 reflected the $5 billion all in economic loss
22 versus Lehman's marks that you had written about
23 in your e-mail to Mr. Tonucci and Mr. Lowitt?
24    A.   I don't know.  I don't.  But that was
25

Page 79

HIGHLY CONFIDENTIAL - M. KELLY

1  not a term that would be of relevance to
2  Barclays.
3     Q.   What do you mean when you say -- I
4  don't understand.  What do you mean it's a term
5  that would not be of relevance to Barclays?
6     A.   The value that the assets were
7  recorded on Lehman's books at was not a relevant
8  matter for Barclays.  What was relevant was the
9  agreement, was the sales price that was agreed.
10    Q.   Which Barclays was going to be
11 concerned about what it was paying, yes?
12    MR. HUME:  I don't think he finished
13    his answer.
14    MR. BERNSTEIN:  I agree.
15    Q.   I beg your pardon.  Was Barclays -- is
16 there anything you wanted to add to your last
17 answer?
18    A.   Can you repeat my last answer, please?
19    MR. BERNSTEIN:  And the question,
20    please.
21    (Record read.)
22    Q.   I may have interrupted you.
23    A.   Between Barclays and Lehman.
24    Q.   During the due diligence we talked
25

Page 80

HIGHLY CONFIDENTIAL - M. KELLY

1  about at the beginning of the day with Barclays,
2  do you know if Barclays had access to Lehman's
3  books so it could see the marks at which Lehman
4  carried these assets?
5     A.   I don't know.
6     Q.   Do you have any reason to know one way
7  or the other, sir, whether Barclays knew that
8  the sale price reflected at $5 billion all in
9  economic loss versus Lehman's marks, do you know
10 that one way or the other?
11    A.   No.
12    Q.   Did you ever talk to Barclays, anybody
13 from Barclays about the $5 billion loss against
14 Lehman's marks in the deal?
15    A.   Not that I can recall.
16    Q.   Now, you say in the e-mail, and again,
17 I'm on Exhibit 136A, "Bart reviewed all of it
18 before final agreement."
19    Did you see Bart review it all before
20 final agreement?
21    A.   I don't recall.  I surmise that he did
22 based on my e-mail.
23    Q.   Were you surmising at the time that
24 you wrote the e-mail?
25

Page 81

HIGHLY CONFIDENTIAL - M. KELLY

1     A.   No, I'm surmising now.
2     Q.   Were you surmising at the time you
3  wrote the e-mail?
4     A.   I don't believe so.
5     Q.   Did you have a basis for personal
6  knowledge as to whether Bart reviewed all of it
7  before final agreement when you wrote it in your
8  e-mail to Mr. Lowitt and Mr. Tonucci?
9     A.   There were a series of conversations
10 with Bart throughout the course of that night.
11    Q.   Were those conversations in which you
12 took part?
13    A.   Several of those discussions, yes.
14    Q.   What discussions did you have with
15 Mr. McDade?
16    MR. BERNSTEIN:  On that night?
17    MR. GAFFEY:  Yes.
18    A.   I remember discussing generally the
19 assets being sold and the differences between
20 the agreed sales price and the Lehman book
21 values.  I also remember being advised by Bart
22 of the negotiated compensation amount.
23    Q.   Tell me everything you can remember
24 about discussing with Mr. McDade generally the

Page 82

HIGHLY CONFIDENTIAL - M. KELLY
1   assets being sold and the difference between the
2   agreement sales price and the Lehman book value.
3   A.   I'm sorry, was that a question?
4   Q.   Yes.
5   A.   Sorry, can you repeat the question?
6        (Record read.)
7   A.   I don't have specific recollection of
8   those discussions.
9   Q.   Any general recollection?
10  A.   Not beyond what I just told you.
11  Q.   So, as you sit here today, the only
12  thing you remember is the fact that you had a
13  discussion with him about that topic, but you
14  remember nothing about the content of the
15  conversation, is that your testimony?
16  A.   Yes.
17  Q.   You said you were advised by Bart of
18  the negotiated terms regarding compensation.
19  What do you remember about conversations with
20  Bart about negotiations concerning compensation?
21  A.   I remember being advised by Bart that
22  the compensation accrual that had been
23  negotiated related to the transferring employees
24  would be $2 billion.

Page 83

HIGHLY CONFIDENTIAL - M. KELLY
1   Q.   When he told you that it would be $2
2   billion, did Mr. McDade allow as how that was a
3   billion dollars of comp beyond accrual or is
4   that something you inferred at the time you
5   wrote your e-mail marked as Exhibit 136A?
6   A.   I don't recall.
7   Q.   Any general recollection at all?
8   A.   No.
9   Q.   The accruals for compensation that
10  existed at the time that you wrote your e-mail,
11  would that be a number you would have known?
12  A.   For the firm as a whole, and
13  approximately, yes.
14  Q.   Did you ask Mr. McDade why Barclays
15  had agreed to pay $2 billion, that is, 1 billion
16  more than the accrual for the firm as a whole?
17  A.   No.
18  Q.   Other than the fact that the
19  negotiated amount was, for that component, was
20  $2 billion, did Mr. McDade give you any
21  information at all about that component of the
22  transaction?
23  A.   Not that I can recall.
24  Q.   You have no recollection at all as you

Page 84

HIGHLY CONFIDENTIAL - M. KELLY
1   sit here; that's your testimony?
2   A.   Yes.
3        (Exhibit 195, a document bearing Bates
4   Nos. 10252949, marked for identification, as
5   of this date.)
6   Q.   Mr. Kelly, I have put before you a
7   one-page exhibit which we have marked as
8   Deposition Exhibit 195. Can you tell me what
9   that document is?
10       MR. BERNSTEIN: Can I just object?
11       MR. GAFFEY: Sure.
12       MR. BERNSTEIN: Are you asking him
13  about including the two lines at the top?
14       MR. GAFFEY: No, actually, that's a
15  good point.
16  Q.   I should say that at the top where it
17  says "unknown" and "sent March 25," those are
18  lines that were put on by our document vendor
19  when they print this out. That's a good point.
20  Thank you.
21       Just take from "from" through at the
22  bottom where it says "edmond.cuko@Lehman.com."
23  A.   Can you repeat the question, please?
24  Q.   Do you recognize the document?

Page 85

HIGHLY CONFIDENTIAL - M. KELLY
1   A.   No.
2   Q.   Do you recall having an e-mail
3   exchange with Mr. -- do you know who Edmond Cuko
4   is?
5   A.   No.
6   Q.   Is the name familiar to you at all?
7   A.   No.
8   Q.   Any idea why you would be exchanging
9   e-mails with an Edmond Cuko about LBI comp
10  expense on or about September 15, 2008?
11  A.   I can only infer.
12  Q.   Okay. Tell me what your inference is
13  and I'll try, understanding that that's what it
14  is, tell me what your inference is and maybe
15  I'll follow up on that.
16  A.   Well, based on the signature of Edmond
17  Cuko, and being a part of the Corporate Strategy
18  Group, my inference is that he works for Tim
19  Lyons, who was also involved as part of the
20  process.
21  Q.   Mr. Cuko writes to you on September 15
22  at 3:26 P.M., I'm in the bottom e-mail in the
23  chain: "Martin, who was the source of the comp
24  expense estimates we used for LBI last night?"

Page 86

```
 1         HIGHLY CONFIDENTIAL - M. KELLY
 2         Do you see that?
 3    A.   Yes.
 4    Q.   Looking at that, does that refresh
 5  your recollection as to whether you and Edmond
 6  Cuko were involved in comp expense estimates for
 7  LBI the night before?
 8    A.   No.
 9    Q.   Were you involved in comp expense
10  estimates on or around say the 14th or 15th of
11  September?
12    A.   I don't recall.
13    Q.   Do you recall -- and again, I'm
14  alluding to what Mr. Cuko writes here -- do you
15  recall getting a bonus number -- well, he says,
16  "We're getting a bonus number of
17  associated with the headcount at LBI and wanted
    to make sure we're being consistent."
19         As you see that line, does it trigger
20  any memory at all, sir, what it is Mr. Cuko,
21  whoever he is, may be talking about to you?
22    A.   No.
23    Q.   In the e-mail above that which is from
24  you to Edmond Cuko, subject, "LBI comp expense,"
25  you say, "Go back to Anthony Collerton. This
```

REDACTED

Page 87

```
 1         HIGHLY CONFIDE    M. KELLY
 2  number does not seem right. Cash bonus for
 3  entire firm is         Do you see that?
 4    A.   Yes.
 5    Q.   Who's Anthony Collerton?
 6    A.   Anthony was a senior guy in HR and was
 7  responsible for the firm's compensation.
 8    Q.   And around this time had you been in
 9  any discussions with Mr. Collerton about
10  assessing what the accrued bonus was for the
11  headcount in LBI?
12    A.   I don't recall.
13    Q.   And seeing this direction that you
14  apparently give to this man Mr. Cuko to go back
15  to Anthony Collerton doesn't trigger any memory
16  at all, sir?
17    A.   No.
18    Q.   Do you know if the cash bonus for the
19  entire firm was around       at the time
20  you wrote this? As you sit here now, do you
21  know?
22    A.   As I sit here now?
23    Q.   Yes.
24    A.   I don't think I know anything more now
25  than I did at the time.
```

REDACTED

REDACTED

Page 88

```
 1         HIGHLY CONFIDENTIAL - M. KELLY
 2    Q.   Is that a number you would have known,
 3  you would have known at the time in the course
 4  of your duties?
 5    A.   Approximately, yes.
 6    Q.   What I'm asking about is what's within
 7  the scope of your responsibility, not whether
 8  the number is right.
 9    A.   I understand.
10    Q.   That's something that would be within
11  your area of responsibility, to know or able to
12  discern that number, yeah?
13    A.   Yes.
14    Q.   And with that in mind, does that
15  refresh your recollection as to whether you were
16  having an e-mail conversation with some man
17  named Edmond Cuko about the total bonus estimate
18  for the firm?
19    A.   No.
20    Q.   If you go back to Exhibit 136, please,
21  Mr. Kelly, that's your e-mail to Mr. Lowitt and
22  Mr. Tonucci, you refer in there to 3.6 billion
23  of resi, R-E-S-I, assets left behind, end quote.
24  Do you see that portion of your e-mail?
25    A.   Yes.
```

Page 89

```
 1         HIGHLY CONFIDENTIAL - M. KELLY
 2    Q.   What were you referring to when you
 3  wrote that in your e-mail to Mr. Lowitt and
 4  Mr. Tonucci?
 5    A.   My recollection is that there were
 6  some residential mortgage assets that Barclays
 7  was not acquiring from Lehman.
 8    Q.   Do you recall if it was taking some
 9  residential mortgage assets?
10    A.   No.
11    Q.   Probably a bad question on my part.
12         No, you don't remember if they were
13  taking some or, no, they weren't taking any?
14    A.   The first. I don't recall if they
15  were taking some.
16    Q.   Now, in the days that followed the --
17  in the time that followed the point at 5:10 A.M.
18  on the 16th of September when you wrote this
19  e-mail, did -- were any of your activities in
20  the following days directed toward the $5
21  billion all in economic loss versus Lehman's
22  marks that you referred to in your e-mail?
23         MR. BERNSTEIN: Objection. Vague and
24  ambiguous.
25    A.   I'm not sure what you mean by
```

Page 90

1      HIGHLY CONFIDENTIAL - M. KELLY
2    "activities directed to."
3        Q.   Well, did you prepare balance sheets
4    that reflected the difference between where
5    things were carried on Lehman's marks and the
6    purchase price?  Did you consult with people who
7    were marking down the asset value on the books?
8    Did you do anything in connection with a $5
9    billion economic loss to Lehman against its
10   marks?
11       MR. BERNSTEIN: Objection. Compound.
12   Vague and ambiguous.
13       Q.   But still you can answer it.
14       A.   I'd like you to rephrase the question
15   and break it down, please.
16       Q.   Do you not understand it as I've asked
17   it?
18       A.   There's multiple parts to the
19   question.
20       Q.   That's not my question.  Do you not
21   understand the question, sir, is that what
22   you're telling me?
23       MR. BERNSTEIN: Objection. Badgering.
24       A.   I'm not sure I understand the
25   question.

Page 91

1      HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   Okay.  There's a surprise.
3        (Exhibit 196, a document bearing Bates
4    Nos. 464234 and 466133, marked for
5    identification, as of this date.)
6        Q.   Okay.  Mr. Kelly, I have put before
7    you what we have marked as Deposition Exhibit
8    196.  Tell me when you've had a chance to look
9    through the document and, when you have, whether
10   you recognize it.
11       (Document review.)
12       A.   I recognize the second page.
13       Q.   So the cover e-mail you don't, but
14   the --
15       A.   I don't.
16       Q.   But the financial schedule that's
17   attached you do?
18       A.   Yes.
19       Q.   Okay.  Just if you can go back to the
20   cover sheet.  The e-mail that is the cover sheet
21   appears to come from James Walker at Barclays
22   Capital, do you see that?
23       A.   Yes.
24       Q.   And there's a CC to Chris Weidler,
25   W-E-I-D-L-E-R, at Barclays Capital, see that?

Page 92

1      HIGHLY CONFIDENTIAL - M. KELLY
2        A.   Yes.
3        Q.   Do you know either Mr. Walker or
4    Mr. Weidler?
5        A.   Yes, I know them both.
6        Q.   And what's Mr. Walker's role at
7    Barclays Capital?
8        A.   Mr. Walker's left the firm.  He was
9    the CFO in the Americas at the time of the
10   transaction.
11       Q.   The job you have now is the job Walker
12   had then?
13       A.   I have two roles now.
14       Q.   Uh-huh.
15       A.   Yeah, one of those roles is the job
16   that James held at the time of the transaction.
17       Q.   Okay.  And do you know where
18   Mr. Walker works today, by the way?
19       A.   I believe he went to Credit Suisse.
20       Q.   Here in New York?
21       A.   Yes.
22       Q.   And Mr. Weidler, do you know
23   Mr. Weidler?
24       A.   Yes, I do.
25       Q.   And does Mr. Weidler work for

Page 93

1      HIGHLY CONFIDENTIAL - M. KELLY
2    Barclays?
3        A.   Yes.
4        Q.   What does Mr. Weidler do?
5        A.   Chris runs the Financial Reporting
6    Team in London and reported to me for a period
7    of time.
8        Q.   Reported -- this is in your Barclays
9    team?
10       A.   In my Barclays role.  In one of those
11   three roles that I held for a period of time, he
12   reported to me in one of those capacities.
13       Q.   I just want to be clear.  We're back
14   in September of '08.  He's not reporting to you
15   then?
16       A.   Correct, he's a Barclays employee.
17       Q.   Now, in the e-mail Mr. Walker refers
18   to the balance sheet that I'll ask you about in
19   a moment, but he described it as "used by the
20   LEH side in the overnight discussions of
21   Monday."  Do you see that?
22       A.   Yes.
23       Q.   And he also says, "I believe Chris
24   Weidler spoke to you earlier.  Team are looking
25   for backup details, including position level

Page 94

HIGHLY CONFIDENTIAL - M. KELLY
1   info to tie into the attached."
2
3       You see that portion of the e-mail?
4       A.   Yes.
5       Q.   Had you spoken to Weidler about
6   getting backup details, position level info to
7   tie into the attached, that is, this financial
8   schedule?
9       A.   I don't recall.
10      Q.   Any recollection at all of talking to
11  Mr. Weidler about this financial schedule?
12      A.   No.
13      Q.   Do you recall a summary balance sheet
14  being used by the LEH side in the overnight
15  discussions of Monday?
16      A.   I recall an initial estimate of
17  certain of the assets and liabilities to be sold
18  or assumed to or from -- to or by Barclays.
19      Q.   Okay.  Take a look, if you would, at
20  the second page of the document, which you said
21  you did recognize.  Tell me what that is,
22  please.
23      A.   That's the schedule that I'm referring
24  to.  It's -- I should clarify.  That is a
25  version of the schedule that I'm referring to.

Page 95

HIGHLY CONFIDENTIAL - M. KELLY
1   I'm not sure it was in typewritten form on
2   Monday night.
3
4       Q.   Do you know if the schedule you're
5   looking at within Exhibit 196 was the final
6   schedule that was used in connection with the
7   transaction on Tuesday?
8       MR. HUME:  Objection.  Vague.
9       Q.   You said there were other versions.
10  Do you know if that one was the final, the one
11  you're looking at now?
12      MR. HUME:  Same objection.
13      A.   What do you mean by "the transaction"?
14      Q.   The sale of the assets of Lehman
15  Brothers to Barclays that we've been talking
16  about today, that transaction.
17      A.   Can you repeat the question, please?
18      (Record read.)
19      A.   No.
20      Q.   Did you or anyone under your
21  supervision prepare the schedule that is within
22  Exhibit 196?
23      A.   I don't recall specifically who
24  prepared this schedule.
25      Q.   Do you have any general recollection

Page 96

HIGHLY CONFIDENTIAL - M. KELLY
1   about the preparation of this schedule?
2       A.   There were a number of people from
3   Lehman who participated in preparing the
4   schedule.
5       Q.   Who were they?
6       A.   My recollection is that Ian Lowitt,
7   Gerry Reilly, Paolo Tonucci, Marie Stewart had
8   some involvement in preparing this schedule.
9       Q.   Marie Stewart reported to you?
10      A.   Correct.
11      Q.   That would be a person under your
12  supervision?
13      A.   Yes.
14      Q.   So did you have any participation in
15  preparing this schedule, you yourself?
16      A.   Yes.
17      Q.   Describe your participation in the
18  preparation of this schedule.  What did you do?
19      A.   I don't recall my participation,
20  specifically.
21      Q.   Do you have any general recollection
22  of it?
23      A.   As a general matter, all of the people
24  I mentioned, including myself, participated in

Page 97

HIGHLY CONFIDENTIAL - M. KELLY
1   preparing this schedule.
2       Q.   That's a different question.  This
3   question is, what did you do?  What steps, if
4   any, did you take yourself, Martin Kelly, toward
5   the preparation of this schedule attached as an
6   exhibit -- attached as page 2 of Exhibit 196?
7       A.   I think you asked me a general
8   question.  Can you repeat the question, please?
9       Q.   Withdraw.  I'll ask another question.
10      You did participate in some fashion,
11  sir, in the preparation of this schedule,
12  correct?
13      A.   Correct.
14      Q.   Describe for me what you did in terms
15  of your participation in the preparation of this
16  schedule.
17      A.   I don't recall specifically.
18      Q.   Describe for me generally what you did
19  in terms of the preparation of this schedule.
20      A.   As a general matter, I was involved in
21  assembling onto this schedule components of the
22  transaction that I was aware of.
23      Q.   Any particular components of this
24  schedule that you were responsible for

Page 98

HIGHLY CONFIDENTIAL - M. KELLY
1 assembling?
2    A.   Specifically, no.
3    Q.   Generally?
4    A.   As a general matter, the group of
5 people I mentioned were responsible.
6    Q.   That's not the question. The question
7 is, as a general matter, do you remember which
8 components you were responsible for?
9    A.   No.
10   Q.   So as you sit here today you have no
11 specific recollection of what you did to
12 participate in the preparation of this schedule
13 and no general recollection; you only remember
14 you did participate, is that your testimony?
15   A.   Yes.
16      MR. GAFFEY: Let's take a ten-minute
17   break.
18      (Recess; Time Noted: 11:59 A.M.)
19      (Time Noted: 12:11 P.M.)
20 BY MR. GAFFEY:
21   Q.   The schedule, Mr. Kelly, which is the
22 second page of Exhibit 196, does that schedule
23 reflect the $5 billion all in economic loss
24 versus Lehman's marks that you wrote about in

Page 99

HIGHLY CONFIDENTIAL - M. KELLY
1 your e-mail to Mr. Lowitt and Mr. Tonucci?
2    A.   Sorry, can you repeat the question?
3       (Record read.)
4    A.   The $5 billion economic loss
5 represents the difference between the agreed
6 sales price for the assets and the book values
7 of those assets on Lehman's books. So --
8       I'll stop there.
9    Q.   Well, do you know what the price was
10 in the deal? As of this time we're talking
11 about, this -- let's call it as of September 16,
12 the Tuesday. Do you know what the price was?
13      MR. HUME: Objection. Vague.
14   A.   What do you mean by "price"?
15   Q.   How much was Barclays going to pay for
16 the assets shown on this schedule.
17   A.   I don't recall.
18   Q.   Did you know at the time?
19   A.   I don't recall.
20   Q.   You know, just generally with respect
21 to, and I'm back again at Exhibit 136A, your
22 e-mail, but had you spoken to Mr. Shapiro about
23 the final deal before you wrote this e-mail?
24   A.   Can you clarify what you mean by

Page 100

HIGHLY CONFIDENTIAL - M. KELLY
1 "final deal"?
2    Q.   Sure. It would be, by "final deal," I
3 mean when the deal is done and ready for the
4 board, okay? It had a final price, that is what
5 you're referring to in your e-mail. That's what
6 I mean by "final deal."
7       Did you talk to Mr. Shapiro before
8 about the deal before you wrote this e-mail?
9       MR. HUME: Objection. Vague.
10   A.   I'm not sure specifically what you're
11 asking.
12   Q.   Whether you spoke to Mr. Shapiro about
13 the terms of the deal before you wrote this
14 e-mail at 5:10 A.M. on September 16, 2008.
15   A.   I participated in a meeting with
16 Mr. Shapiro where certain aspects of the
17 transaction were discussed.
18   Q.   Who told you that the price included a
19 $5 billion all in economic loss versus Lehman's
20 marks?
21   A.   I don't recall.
22   Q.   Any recollection at all?
23   A.   I don't recall.
24   Q.   Any general recollection?

Page 101

HIGHLY CONFIDENTIAL - M. KELLY
1    A.   No.
2    Q.   Any idea who the candidates might be
3 for who would have told you about a $5 billion
4 all in economic loss against Lehman's marks?
5       MR. BERNSTEIN: Objection. Calls for
6   speculation.
7    A.   I would have to speculate.
8    Q.   I'm sorry, did you both say calls for
9 speculation?
10   A.   I would have to speculate.
11   Q.   Okay. Go ahead. Speculate for me.
12 Tell me who it is you think might have told you
13 there was a $5 billion all in economic loss
14 versus the marks.
15      MR. BERNSTEIN: Objection.
16   A.   I'm not prepared to speculate.
17   Q.   I don't think that's your option.
18 It's not a basis not to answer the question.
19      Give me your best guess as to who told
20 you that.
21   A.   Well, my speculation is that it could
22 have been some or all of Bart McDade, Ian
23 Lowitt, or other Lehman individuals negotiating
24 part of the transaction that night.

Page 102

1      HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   So it could have been McDade, could
3    have been Lowitt, or it could have been others.
4           Now, if it had been Lowitt, why would
5    you be telling Lowitt what the terms were when
6    you wrote this e-mail at 5:10 A.M., September
7    16?
8      A.   I can only infer.
9      Q.   I'll take that.
10     A.   I can't recall.
11     Q.   Well, does that help refresh your
12   recollection as to whether it was Mr. Lowitt who
13   told you there was a $5 billion all in economic
14   loss versus Lehman's marks, the fact that you
15   were writing to Mr. Lowitt and telling him at
16   5:10 A.M.?
17     A.   It doesn't refresh my recollection as
18   to whether he told me.
19     Q.   So does the language that you used in
20   your e-mail, sir, where you say, "Well, it took
21   all night and lots of back and forth, but the
22   deal is done and ready for the board.  Final
23   price did not change meaningfully.
24   Approximately a $5 billion all in economic loss
25   versus our marks and 3.6 billion of resi assets

Page 103

1      HIGHLY CONFIDENTIAL - M. KELLY
2    left behind."
3           That does not refresh your
4    recollection as to whether you were repeating
5    back to Mr. Lowitt something he had already told
6    you?
7      A.   No.
8      Q.   Can you think of a reason why you
9    would be writing to Mr. Lowitt to tell him what
10   he had already told you?
11          MR. HUME:  Objection.
12   Mischaracterizes testimony.
13     A.   Can you repeat the question, please?
14     Q.   Read it back, please.
15          (Record read.)
16     A.   No.
17     Q.   Do you know if -- who told you about
18   the back and forth that you refer to in your
19   e-mail?
20          MR. HUME:  Objection.  Asked and
21   answered.
22          MR. BERNSTEIN:  Objection.  Ditto.
23     A.   I previously stated that I observed
24   discussions throughout the course of the night.
25     Q.   And did the discussions that you

Page 104

1      HIGHLY CONFIDENTIAL - M. KELLY
2    observed address specifically the topic of the
3    economic loss versus its marks that Lehman was
4    willing to take in the purchase price?  Did you
5    witness any of those discussions?
6      A.   I, as I previously stated, I observed
7    discussions between different representatives
8    for Lehman and Barclays negotiating the sales
9    price of individual portfolios of assets.
10     Q.   And do you have any knowledge as to
11   how those individual suggestions regarding
12   particular classes of assets added up to exactly
13   $5 billion?
14          MR. HUME:  Objection.
15   Mischaracterizes the document.
16          MR. BERNSTEIN:  Objection.
17     A.   I referred to approximately $5 billion
18   in my e-mail.
19     Q.   Do you know the process by which it
20   was added up so that you understood it was an
21   approximate total of $5 billion?
22     A.   My recollection is that it was an
23   aggregation.
24     Q.   And in the parts of these various
25   discussions that you did see, did anybody have a

Page 105

1      HIGHLY CONFIDENTIAL - M. KELLY
2    schedule of particular assets, lists of Cusips
3    or lists of particular securities?
4      A.   I don't recall seeing this.
5      Q.   Did you see anyone going through
6    particular lists of particular securities and
7    negotiating over what any particular security
8    was worth?
9      A.   No.
10     Q.   So were the agreement about the
11   difference between what was carried on Lehman's
12   marks and what wound up in the purchase price,
13   was that as a general matter for each class, you
14   know, what are we going to do with corporate
15   equities, what are we going to do with mortgage
16   backs, that kind of thing?
17     A.   Can you repeat the question, please.
18          MR. BERNSTEIN:  Objection to the form.
19   Compound and vague.
20          (Record read.)
21     A.   Can you repeat the question again,
22   please?
23          (Record read.)
24     A.   I don't recall.
25     Q.   Do you recall if writedowns were done

Page 106

1    HIGHLY CONFIDENTIAL - M. KELLY
2  with regard to whole classes of securities as
3  opposed to the particular securities within that
4  class?
5    MR. BERNSTEIN: Objection. Vague and
6  ambiguous.
7    A.  My recollection is that sales prices
8  were negotiated for individual classes of
9  assets.
10    Q.  By class, not by the individual
11  components of that class, yes?
12    A.  By class, yes.
13    Q.  And if you can go back to the schedule
14  that's attached to Exhibit 196 on the asset side
15  of the schedule, government and agencies,
16  commercial paper, mortgages, do you see where I
17  am?
18    A.  Yes.
19    Q.  Are those the asset classes that were
20  being discussed?
21    A.  They were. I'm not sure there was a
22  separate discussion for each line item, but they
23  were the asset classes in aggregate that were
24  being discussed.
25    Q.  Okay. You're not sure there was a

Page 107

1    HIGHLY CONFIDENTIAL - M. KELLY
2  separate negotiation with respect to each of the
3  six classes of securities that are described
4  here? I'm excluding cash.
5    A.  I'm not sure if it was six separate
6  meetings or some lesser number.
7    Q.  And did the asset values ascribed to
8  these classes of securities reflect the
9  aggregate $5 billion all in economic loss versus
10  Lehman's marks?
11    MR. BERNSTEIN: Objection. Vague and
12  ambiguous.
13    A.  Can you repeat the question, please?
14    (Record read.)
15    A.  Can you repeat the question again,
16  please?
17    (Record read.)
18    A.  The $5 billion economic loss was a
19  consequence of the negotiated sales price for
20  each of these classes of assets.
21    Q.  Could you answer the question I asked
22  you? Is it reflected in this financial
23  schedule? Is that $5 billion loss shown in this
24  schedule?
25    A.  What's the question, please?

Page 108

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.  Is the $5 billion loss shown on the
3  schedule you're holding in your hands?
4    MR. HUME: Objection. Vague.
5    A.  I'm not sure I understand the question
6  when you say "reflected."
7    Q.  As far as you know, sir, for these
8  asset classes, exclusive of cash, were they
9  shown on Lehman books at an amount higher than
10  $62 billion at or about the time this schedule
11  was prepared?
12    A.  My understanding is yes, they were, in
13  aggregate.
14    Q.  Were they $5 billion higher; is that
15  your understanding?
16    A.  Approximately $5 billion higher.
17    MR. GAFFEY: It would be a good time
18  to take a lunch break. I'm starting to move
19  on to another topic.
20    (Luncheon Recess; Time Noted: 12:27
21  P.M.)
22
23
24
25

Page 109

1    HIGHLY CONFIDENTIAL - M. KELLY
2    AFTERNOON SESSION
3    (Time Noted: 1:38 P.M.)
4  MARTIN KELLY, resumed and
5    testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. GAFFEY:
8    Q.  Mr. Kelly, I have a couple more
9  questions about Exhibit 136A. That's your
10  e-mail that we talked about a bit this morning.
11    This morning you mentioned that you
12  were -- you saw different sets of people dealing
13  with different asset classes. My question to
14  you is who added it up to $5 billion for you to
15  put in that e-mail?
16    A.  I don't recall.
17    Q.  Did you?
18    A.  I don't recall myself doing it.
19    Q.  Do you have any recollection of who it
20  was who conveyed to you the fact that it was $5
21  billion in total?
22    A.  No.
23    Q.  Do you have any recollection of who
24  conveyed to you that it was an extra 1 billion
25  of comp beyond Lehman's accrual?

HIGHLY CONFIDENTIAL - M. KELLY

1  
2      A.    The conversation with comp was with
3  Bart McDade and that conversation referred to
4  compensation being agreed at $2 billion.
5      Q.    And in reflecting on the fact that it
6  was Bart McDade who told you that it was a $2
7  billion agreement with respect to comp, does
8  that refresh your recollection as to whether
9  perhaps it was Mr. McDade who told you the $5
10  billion total for the economic loss?
11      A.    No.
12      Q.    Do you have a recollection as to
13  whether it was one or more than one person who
14  conveyed to you the information that you
15  collected in this e-mail that you sent out to
16  Mr. Lowitt and Mr. Tonucci?
17      A.    No, I don't.
18      Q.    I asked you a bit this morning about a
19  conversation with Mr. Shapiro and this is a
20  loose end or two I need to follow up on, but did
21  you talk to Mr. Shapiro about what the deal was
22  before you sent this e-mail out?
23      A.    Well, there were many aspects of the
24  transaction, and as I mentioned, I participated
25  in a meeting where certain aspects of the

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  transaction were discussed with Mr. Shapiro in
3  the same meeting and there may have been other
4  discussions.
5      Q.    The meeting that you're talking about
6  that you had with Mr. Shapiro, that was, just so
7  we're on timing on the same page, is before you
8  send out this e-mail?
9      A.    Correct.
10      Q.    And do you recall, as best you recall,
11  who else was in that meeting with Mr. Shapiro
12  that you were in before you sent out this
13  e-mail?
14      A.    It's the individuals I referred to
15  earlier.
16      Q.    McDade?
17      A.    No, not McDade.  It was Mark Shapiro
18  and Mark Shafir, Michael Klein and Marie Stewart
19  and others whose names I can't recall.
20      Q.    And as you reflect on the fact that
21  you were in a meeting with Shapiro, Shafir,
22  Klein and Marie Stewart, do you recall if it was
23  that group of people or some subset of that
24  group of people who conveyed to you the terms of
25  the deal that was reached before you sent out

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  this e-mail?
3      A.    No.
4      Q.    Did anyone ask you to put this
5  information together in your e-mail and send it
6  out?
7      A.    I don't believe so.
8      Q.    Did anyone comment to you one way --
9  about the fact that you had sent the e-mail
10  after you sent the e-mail out?
11      A.    I don't recall that being the case.
12      Q.    Whoever it was, whether it was one
13  person or a group of people who talked to you
14  about what ultimately wound up in your e-mail,
15  did they describe a negotiating process where
16  there was back and forth about the price?
17          MR. HUME:  Objection.  Lacks
18  foundation.
19      A.    Could you repeat the question, please?
20      (Record read.)
21      A.    I don't recall anyone telling me that.
22      Q.    One of the reasons I asked that is the
23  phrase you have in your mail about there being
24  lots of back and forth, do you see that?  Who is
25  it -- how is it you learned that there was lots

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  of back and forth before you sent out your
3  e-mail?
4      A.    That was my observation of a variety
5  of conversations that occurred throughout the
6  course of that night.
7      Q.    And in your observations throughout
8  the course of that night, did you see anybody at
9  Lehman pushing back with respect to the price
10  that he paid for these various asset classes?
11      A.    I didn't participate directly in
12  negotiations on any one asset class.
13      Q.    Okay.
14      A.    I did observe conversations taking
15  place.
16      Q.    So, as the witness to the
17  conversations, as you observed them, you heard
18  them, did you hear any negotiation back and
19  forth about what the price would be?
20          MR. BERNSTEIN:  Objection.  Lack of
21  foundation.
22      A.    Let me just finish what I was saying.
23          I observed discussions around the
24  prices of individual asset portfolios and I
25  observed a conversation in the meeting that

Page 114

HIGHLY CONFIDENTIAL - M. KELLY
1  HIGHLY CONFIDENTIAL - M. KELLY
2  included Mark Shapiro and Mark Shafir and
3  Michael Klein whereby the value of the real
4  estate assets was debated, as was the commission
5  for -- oh, as was a reasonable commission that
6  would relate to such a sale.
7     Q.   The commission relating to the real
8  estate aspect of the sale, yes?
9     A.   Correct.
10    Q.   Okay. My questions go to the other
11  assets, to the securities, the various classes
12  of securities we've been discussing.
13    Did you see a similar debate take
14  place about the overall economic loss Lehman
15  would have against its marks?
16    A.   No.
17    Q.   As you sit here today, do you have any
18  knowledge at all, sir, about the negotiating
19  process that went into what turned out to be an
20  aggregate $5 billion all in economic loss versus
21  Lehman's marks?
22    A.   Nothing beyond what I've already
23  described today.
24    Q.   Was there a point where you did know
25  more? I'm trying to figure out how much of it

Page 115

1  HIGHLY CONFIDENTIAL - M. KELLY
2  may be lapsed memory and how much you knew at
3  the time.
4     Was there a time when you did know
5  more about a negotiating process concerning the
6  overall economic loss against Lehman's marks?
7     A.   I -- I don't believe so.
8     Q.   Okay. If you wanted an answer to who
9  would know about a haggling or a negotiating
10  process concerning the overall loss to Lehman's
11  marks, who would you ask?
12    A.   Sorry, can you repeat the question,
13  please?
14    (Record read.)
15    A.   I would start with Bart McDade as the
16  person who I understood to be leading the
17  negotiations for Lehman.
18    Q.   And who else would you ask? You would
19  start with Mr. McDade. Who else would you ask?
20    A.   I would ask the two individuals, the
21  two bankers to the transaction, Mark Shapiro and
22  Mark Shafir.
23    Q.   Can we go back to the balance sheet
24  that was attached to the financial schedule
25  that's attached to Exhibit 196, and directing

Page 116

1  HIGHLY CONFIDENTIAL - M. KELLY
2  your attention to the liability side of that
3  financial schedule, and in particular,
4  Mr. Kelly, down to the lower right-hand corner
5  where it refers to cure payment and comp, do you
6  see that?
7     A.   Yes.
8     Q.   What was the source of the 2.25 number
9  for cure payment?
10    A.   I don't recall.
11    Q.   Did you ever know? Was there a time
12  when you did know what the source of the 2.25
13  for cure payment was?
14    A.   I don't know.
15    Q.   Do you have any idea as you sit here
16  today what the -- how the assessment cure
17  payment came to 2.25?
18    A.   No.
19    Q.   Is it your understanding that the
20  entries on the liability side of this schedule
21  for cure payment for comp represent liabilities
22  that Barclays was going to assume in the
23  transaction?
24    MR. HUME: Objection. Vague.
25    A.   Can you repeat the question, please?

Page 117

1  HIGHLY CONFIDENTIAL - M. KELLY
2     (Record read.)
3     A.   My recollection is that these amounts
4  were initial estimates of liabilities that
5  Barclays was to assume.
6     Q.   Well, the comp number of 2 billion was
7  an agreed number, correct?
8     A.   Yes, that was my understanding.
9     Q.   And it was your understanding that the
10  2 billion comp number that was agreed was a
11  billion dollars over the accrual that Lehman
12  carried on its books for comp, correct?
13    A.   It was approximately a billion dollars
14  over the cash component of the accrual.
15    Q.   And do you know how anybody went about
16  estimating the amount for cure payment? How did
17  that number come to be on this schedule?
18    A.   No.
19    Q.   Do you know if the 2.25 billion that's
20  estimated for cure payment on there bore any
21  relation to the actual potential liability for
22  trade payables that Lehman had at the time?
23    A.   Sorry. Can you repeat the question,
24  please?
25    (Record read.)