# A. 14 (B)

Page 118

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.   At what point in time?
3    Q.   At the time that this was prepared.
4  It's dated September 16, 2008, 11:18 A.M.
5    A.   No.
6    Q.   No, you don't know or, no, it didn't?
7        Sorry, the question might have got
8  lost in there.
9    A.   Can you ask the question again,
10  please?
11    Q.   I'll put another question.
12        Do you know if the 2.25 billion number
13  for cure payment reflected on the liability side
14  of this schedule dated September 16, 2008 bore
15  any relation to the actual potential liability
16  for trade payables that Lehman had on its books
17  at the time?
18        MR. BERNSTEIN: Objection. Asked and
19  answered.
20    A.   I'm sorry, I need the question again.
21        (Record read.)
22    A.   No.
23    Q.   You don't know or it didn't bear a
24  relation to the amount accrued?
25    A.   I think the question was "do you

Page 119

HIGHLY CONFIDENTIAL - M. KELLY
1
2  know."
3    Q.   You're telling me you don't know, is
4  that right?
5    A.   Correct.
6    Q.   Okay. What, if any, connection was
7  there, sir, between the figures on this
8  financial schedule and the pricing of the
9  transaction as it was agreed by the 16th of
10  September?
11    A.   This schedule was intended to reflect
12  an initial estimate of the assets to be acquired
13  and the liabilities to be assumed, and my
14  understanding is that the agreed price was
15  negotiated based on an agreement as to the price
16  of each of these individual items.
17    Q.   And the agreed price was based on the
18  estimates, on the estimates in this schedule?
19    A.   I don't know.
20    Q.   Were you asked to put this schedule
21  together?
22    A.   I don't recall.
23    Q.   Were you involved in putting this
24  schedule together?
25    A.   Yes.

Page 120

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   Do you know why you were involved? Do
3  you know why this schedule was put together?
4        MR. BERNSTEIN: Objection. Compound.
5    Q.   Withdrawn. Do you know why this
6  schedule was put together?
7    A.   The purpose of the schedule, as I
8  understand it, was to reflect the agreed asset
9  value that had been negotiated for assets to be
10  sold to Barclays and an estimate of the value of
11  liabilities to be assumed by Barclays.
12    Q.   The agreed asset value is the asset
13  value including the $5 billion element we talked
14  about this morning, correct?
15        Withdrawn. This is a timing issue
16  that I'm trying to sort out. This schedule is
17  dated and timed on the 16th of September, 2008
18  at 11:18 A.M., correct? You see that?
19    A.   I see that.
20    Q.   So, by that time -- and I'm indicating
21  your e-mail of 5:10 A.M., by -- of that day --
22  by the time this schedule is prepared, the deal
23  is done and ready for the board, correct?
24    A.   Well, not correct, as it turned out.
25  That was my understanding at the time I wrote

Page 121

HIGHLY CONFIDENTIAL - M. KELLY
1
2  this e-mail.
3    Q.   What was incorrect about it? What did
4  you learn was incorrect about it?
5    A.   I recall being woken up at home
6  sometime around 7 and being advised that the
7  deal had changed and that I needed to come back
8  into the office.
9    Q.   That's 7 on the morning of the 16th?
10    A.   Or thereabouts, approximately.
11    Q.   Who advised you of that?
12    A.   Ian Lowitt called me.
13    Q.   Tell me what Mr. Lowitt said to you
14  and what you said to him in that call?
15    A.   I don't recall the -- I don't recall
16  the contents of that conversation.
17    Q.   Did Mr. Lowitt say to you anything
18  other than the deal had changed and you had to
19  come back into the office?
20    A.   I don't believe so.
21    Q.   Did Mr. Lowitt at any point explain to
22  you how the deal had changed?
23    A.   I don't recall.
24    Q.   Do you remember how the deal had
25  changed?

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.   No.
3    Q.   Did you talk to anyone other than
4  Mr. Lowitt about the deal changing?
5    A.   I don't recall.
6    Q.   Did you come into the office?
7    A.   Yes.
8    Q.   What did you do when you got to the
9  office?
10   A.   I went immediately to the 32nd floor.
11   Q.   Okay.  And what happened then?  Did
12 you talk to anybody?
13   A.   I looked for Ian Lowitt and found him.
14   Q.   You found him, okay.  And when you
15 found him, was he by himself or was he with
16 other people?
17   A.   I don't recall.
18   Q.   Did you speak to Mr. Lowitt when you
19 found him?
20   A.   My recollection is that I did.
21   Q.   What's your recollection of what you
22 said to him and what he said to you?
23   A.   I don't recall.
24   Q.   Do you have any recollection at all of
25 the content of that conversation?

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.   No.
3    Q.   Do you have any recollection at all
4  about how the deal changed?
5    A.   No.
6    Q.   As you sit here today do you know if
7  it changed at any point, the manner in which it
8  changed at any point after you wrote your
9  e-mail?
10   A.   Can you repeat the question, please?
11   Q.   Let me withdraw the question.  You get
12 a call from Mr. Lowitt saying the deal's
13 changed, you have to come into the office.  You
14 get that call about 7 o'clock that morning, yes?
15   A.   Correct.
16   Q.   And you come into the office and you
17 see Mr. Lowitt, yes?
18   A.   Correct.
19   Q.   And you understand generally that the
20 deal has changed, correct?
21   A.   Correct.
22   Q.   And there came a point I take it where
23 you learned the manner -- the nature in which
24 the deal had changed?
25   A.   I don't recall.

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   You don't recall if you learned at
3  that time how the deal had changed?  You knew
4  only that it had changed; is that your
5  testimony?
6    A.   That's correct.
7    Q.   And did there come a point after that
8  initial meeting with Mr. Lowitt where you
9  learned how the deal had changed?
10   A.   The deal changed multiple times
11 throughout the course of the week, so I can't
12 recall what the specific change at this point in
13 time was.
14   Q.   Do you have any recollection,
15 generally, specific, or otherwise, about the
16 nature of the change in the deal that Mr. Lowitt
17 told you about on the morning of the 16th?
18      MR. BERNSTEIN:  Objection.  Asked and
19 answered.
20   A.   No.
21   Q.   Do you recall talking to anybody else
22 about the fact that the deal had changed on the
23 morning of the 16th other than Mr. Lowitt?
24   A.   No.
25   Q.   Did you talk to Mr. McDade about the

HIGHLY CONFIDENTIAL - M. KELLY
1
2  fact that the deal had changed on the 16th?
3    A.   I don't recall that I did.
4    Q.   Did you have a sense of whether the
5  deal had changed in a major or an insignificant
6  way?
7    A.   I don't recall.
8    Q.   You have no recollection at all?
9    A.   That's correct.
10   Q.   Okay.  Just to press on this a little
11 bit, the company you're working for has filed an
12 incredibly high-profile bankruptcy.  Barclays
13 shows up and is going to buy the assets and it
14 may save 10,000 jobs, including yours.
15      It's your testimony you have no
16 recollection of how that deal changed on the
17 16th of September, 2008?
18      MR. BERNSTEIN:  Objection.  Asked and
19 answered and argumentative.
20   Q.   You can answer.
21   A.   Can you repeat the question, please?
22      (Record read.)
23   A.   I don't recall how the deal changed
24 specifically related to the conversation with
25 Ian around about 7 o'clock that morning.

## Page 126

HIGHLY CONFIDENTIAL - M. KELLY

2    Q.   Tell me as best you recall generally
3 how the deal changed over the week.  What
4 changes were made, when were they made between
5 your writing of this e-mail, marked as 136A, and
6 the closing of the deal on the 22nd of
7 September.  Give me as much detail about that as
8 you can, sir.
9    A.   My general recollection is that both
10 the types of assets and the amounts of assets
11 changed throughout the course of the week, and I
12 generally recall that there were issues in
13 obtaining or confirming title and/or possession
14 to the assets and, therefore, the ability for
15 Lehman to sell the assets in the amounts that
16 had been agreed to early on the Tuesday.
17    Q.   You need a verb there.  What about the
18 ability for Lehman to sell the assets?  Lehman
19 was not able to convey title to the assets, is
20 that what you mean?
21    A.   I think it's just the word "of" for
22 the word "for."  "The ability of Lehman to sell
23 the assets."
24    Q.   So what steps were taken to account
25 for this event, these events that Lehman was --

## Page 127

HIGHLY CONFIDENTIAL - M. KELLY

2 that there were issues in obtaining or
3 confirming title or possession to the assets?
4    A.   There were a series of conversations
5 and meetings throughout the course of the week
6 involving a large number of people to validate
7 securities available to be sold.
8    Q.   And this series of conversations
9 concerning a lot of people throughout the week
10 to validate the securities available to be sold,
11 did that result in a reduction of the amount of
12 securities that were available to be sold?
13    A.   It resulted in an absolute reduction
14 and also changes to the components.
15    Q.   What was the absolute reduction?
16    A.   I don't recall.
17    Q.   Do you have any recollection of its
18 range, the range of the absolute reduction?
19    A.   No.
20    Q.   What were the changes to the
21 components?
22    A.   I don't recall specifically.
23    Q.   Do you have any general recollection
24 of the changes to the components?
25    A.   Not beyond what I've already provided.

## Page 128

HIGHLY CONFIDENTIAL - M. KELLY

2    Q.   Well, all you've told me so far, sir,
3 is there were changes to the components.  Do you
4 have anything to add to that?  Do you have any
5 knowledge other than that there were changes to
6 the components?
7    A.   There were changes in both the amounts
8 by component and of the components themselves.
9    Q.   What do you mean when you say there
10 were changes "of the components themselves"?
11 Changes to what?
12    A.   To the types of assets that had
13 initially been agreed.  I'm sorry, I should say
14 to the types of asset classes that had initially
15 been agreed.
16    Q.   Anything else other than changes in
17 the types of asset classes that originally had
18 been agreed?
19    A.   At what point in time?
20    Q.   Over the week.
21    A.   Until?  Until what point in time?
22    Q.   Closing.
23    A.   There was an effort to identify other
24 assets that could be sold to Barclays.
25    Q.   Those were other assets over and above

## Page 129

HIGHLY CONFIDENTIAL - M. KELLY

2 the ones identified on the financial schedule?
3    MR. HUME:  Objection.  Vague and
4 mischaracterizes the testimony.
5    A.   No.
6    Q.   What do you mean when you say there
7 was an effort to identify other assets?  What
8 other assets are you talking about?
9    A.   My recollection is that there was an
10 effort to identify whether there was a surplus
11 in funds segregated under the 15c3 requirement.
12    Q.   Apart from the effort to find a
13 surplus in funds, the segregated funds under
14 15c3, were there other types of assets that were
15 being searched for to transfer to Barclays?
16    A.   My recollection is there was a general
17 effort to identify unencumbered and pledgeable
18 assets.
19    Q.   Were you involved in that general
20 effort?
21    A.   No.
22    Q.   Who was?  I know there were a lot of
23 people.  Who was in charge of that general
24 effort?
25    A.   My understanding was that Ian Lowitt

Page 130

HIGHLY CONFIDENTIAL - M. KELLY
1 was leading that effort.
2
3    Q.    And that's the Ian Lowitt you reported
4 to, right?  Did he engage you in that effort at
5 all?
6    A.    Not that I can recall.
7    Q.    And were there any other classes, any
8 other types of assets, apart from 15c3 funds,
9 that were being identified in the course of that
10 project?
11    A.    I'm not aware of any others.
12    Q.    Are you aware of any effort to find
13 excess funds in connection with what's called
14 OCC?
15    A.    No.
16    Q.    By "unencumbered assets," do you mean
17 unencumbered assets other than surplus in the
18 15c3 area?
19    A.    Potentially.
20    Q.    And where were people looking for
21 unencumbered assets in addition to the 15c3 type
22 of assets?
23    MR. HUME:  Objection.  Lacks
24 foundation.
25    A.    I don't know.

Page 131

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.    Did you know at the time?  I'm trying
3 to find out, do you not remember or did you not
4 know?
5    A.    Did I know what at the time?
6    Q.    Did you know at the time of other
7 types of unencumbered assets apart from 15c3
8 that people were looking for?
9    A.    I don't recall.
10    Q.    Do you know if Barclays paid any
11 additional consideration for these additional
12 types of assets, 15c3 or the other unencumbered
13 assets that were identified?
14    MR. HUME:  Objection.  Vague.
15    A.    Can you repeat the question, please?
16    (Record read.)
17    A.    I wouldn't -- wouldn't characterize
18 them as additional assets.
19    Q.    How would you characterize them?
20    A.    I would characterize them as partial
21 replacement for other assets that were not
22 available.
23    Q.    When did this effort to identify
24 additional replacement assets begin?
25    A.    I don't recall specifically.

Page 132

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.    Do you recall generally?
3    A.    Sometime during that week.
4    Q.    Beginning or the end of the week?
5    A.    I don't recall.
6    Q.    No recollection at all?
7    A.    No.
8    Q.    Could it have been -- it wasn't right
9 after you wrote your e-mail at 5:10, right?
10    A.    I don't recall.
11    Q.    Was there a target quantity of such
12 assets that needed to be identified?
13    A.    Not that I was aware of.
14    Q.    Were you aware at the time whether
15 there was a target people were trying to reach
16 of such assets?
17    A.    Not that I was aware of.
18    Q.    Do you have a sense of what the -- my
19 term -- the shortfall was between the amount of
20 assets that needed to be made up?
21    A.    No.
22    Q.    Did you have a sense of that at the
23 time?
24    A.    I don't recall.
25    Q.    Did the -- again, I'm back at the

Page 133

HIGHLY CONFIDENTIAL - M. KELLY
1
2 financial schedule -- did the assumption of
3 liabilities for comp and cure change at any
4 point over that week?
5    MR. HUME:  Objection.  Vague.
6    A.    I don't recall that the accrual for
7 comp changed throughout the course of that week.
8    Q.    It stayed at 2 billion?
9    A.    That's my recollection.
10    Q.    What about the accrual for cure, did
11 that change during the week, over the course of
12 the week?
13    A.    My recollection is that the estimate
14 for the cure payment did change.
15    Q.    How did it change?
16    A.    Can you rephrase the question?
17    Q.    Did it go up?  Did it go down?
18    A.    The estimate went down.
19    Q.    By how much did it go down?
20    A.    My recollection is that the estimate
21 reduced to approximately a billion dollars.
22    Q.    To a billion dollars or by a billion
23 dollars?
24    A.    To approximately $1 billion.
25    Q.    And who calculated -- who made the

## Page 134

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2    necessary calculations to reduce that estimate
3    from 2 and a quarter to $1 billion?
4        A.    I don't recall.
5        Q.    Why was it reduced from 2 and a
6    quarter to $1 billion?
7        A.    It was reduced after a review of the
8    schedule that Ian, Ian Lowitt, and I undertook
9    at some point during that week whereby we
10   observed that the estimated liability appeared
11   to be high relative to the expense run rate of
12   the firm.
13       Q.    And was it you and Mr. Lowitt who made
14   that determination that it was high relative to
15   the expense run rate?
16       A.    My recollection is that it was Ian and
17   I that made that observation.
18       Q.    And at what point in the week did you
19   and Mr. Lowitt make that observation? Early in
20   the week? Late in the week?
21       A.    I can't recall.
22       Q.    Was it before Friday of the week?
23       A.    I believe it was before Friday, but
24   I'm not certain.
25       Q.    And when you made that determination,

## Page 135

1    HIGHLY CONFIDENTIAL - M. KELLY
2    did you or Mr. Lowitt communicate it to anyone?
3        A.    Yes. Ian and I spoke with Bart.
4        Q.    Tell me the circumstances under which
5    you spoke to Bart and everything that you can
6    remember about the conversation.
7        MR. BERNSTEIN: Objection. Compound.
8        A.    Can you ask one question at a time,
9    please?
10       Q.    When did you speak to Bart?
11       A.    I don't recall the date, the day
12   specifically, but it was shortly after observing
13   that the accrual appeared high.
14       Q.    Where were you when you spoke to Bart?
15       A.    I recall that we met in Bart's office.
16       Q.    Bart was in the office, too?
17       A.    We met with Bart.
18       Q.    In his office?
19       A.    Correct.
20       Q.    And Ian Lowitt was in the office with
21   you and Bart, correct?
22       A.    That's my recollection.
23       Q.    Was anyone else present in the office
24   with you and Bart and Ian Lowitt?
25       A.    I don't believe so.

## Page 136

1    HIGHLY CONFIDENTIAL - M. KELLY
2        Q.    Tell me what you said, what Mr. Lowitt
3    said, and what Mr. McDade said in that meeting.
4        A.    My recollection is that I explained
5    the observation that we had, meaning that the
6    liability estimate appeared high relative to the
7    run rate. I don't recall what Ian said in that
8    meeting. And I recall Bart's reaction to that
9    as being: We just left a billion dollars on the
10   table.
11       Q.    Are those the words that Mr. McDade
12   used?
13       A.    Words to that effect. I can't -- I
14   can't say that they were specifically the words.
15       Q.    As best you can -- we'll work from
16   there, but as best you can, tell me the words
17   that he used, as best you remember.
18       A.    They are the words as best I can.
19       Q.    And what did you say in response to
20   him saying that?
21       A.    I don't recall if there was a
22   succeeding conversation.
23       Q.    When you had this conversation with
24   Bart, did you show him any analysis or documents
25   of any kind reflecting your view that the

## Page 137

1    HIGHLY CONFIDENTIAL - M. KELLY
2    liability for cure was high -- withdrawn.
3        Did you show him any documents to
4    explain your point at that meeting?
5        A.    I don't think so.
6        Q.    Had you prepared any documents that
7    led to you coming to that conclusion?
8        A.    I don't recall.
9        Q.    Did you prepare any documents that
10   reflected that conclusion?
11       A.    I don't recall.
12       Q.    Did you ever cause a financial
13   schedule similar to the one in front of you to
14   be prepared that reflected that change?
15       A.    I believe it was reflected on a -- on
16   a later version of this schedule.
17       Q.    Do you know what the schedule -- if
18   that schedule or one like it was used at the
19   closing of the transaction on September 22?
20       MR. BERNSTEIN: Objection. Vague and
21   ambiguous.
22       A.    I wasn't at the closing, so no. No, I
23   don't know, to answer the question.
24       Q.    Did you ever ask anyone if an amended
25   schedule was used when the transaction was

Page 138

HIGHLY CONFIDENTIAL - M. KELLY

1  closed?
2      A.   I don't recall.
3      Q.   I'm showing you, sir, what was marked
4  at a previous deposition as Exhibit 19, and if
5  you compare that to the schedule that's attached
6  to Exhibit 196, sir, you'll see that it's the
7  same except for an annotation at the top
8  right-hand corner.  Take a moment to satisfy
9  yourself that that's so, would you, please?
10      (Document review.)
11      A.   I agree with that.
12      Q.   Okay, you agree with that.  Have you
13  ever seen this version that was previously
14  marked as Exhibit 19, the one with the
15  handwritten annotation in the upper right-hand
16  corner?
17      A.   At what point in time?
18      Q.   Ever before today.
19      A.   I need a minute with my lawyers,
20  please.
21      Q.   I prefer you answer the question,
22  unless there's a privilege issue.
23      Can you answer the question?
24      MR. BERNSTEIN:  Maybe if we can modify

Page 139

HIGHLY CONFIDENTIAL - M. KELLY

1  the question.  Are you talking about in
2  your --
3      MR. GAFFEY:  I see the issue.
4      MS. HNATT:  Other than perhaps the
5  preparation for the deposition.
6      Q.   Apart from what you may have reviewed
7  with your lawyers to prepare for your
8  deposition, sir, have you ever seen that piece
9  of paper before today?
10      A.   I don't recall having seen this piece
11  of paper apart from preparation for the
12  deposition.
13      Q.   Do you have any knowledge, sir, of
14  whether the one marked as Exhibit 19 was
15  referred to in the Asset Purchase Agreement?
16      A.   No.
17      MR. HUME:  Objection.  Lack of
18  foundation.
19      Q.   Do you have any knowledge, sir,
20  whether anyone ever brought to the court's
21  attention a change in the assumed liability
22  that's shown on the schedule dated September 16,
23  2008, the one in front of you?
24      MR. HUME:  Objection.  Lacks

Page 140

HIGHLY CONFIDENTIAL - M. KELLY

1  foundation.
2      MR. BERNSTEIN:  Could you modify the
3  question to be other than what you may have
4  learned from your lawyers?
5      Q.   Yes, all my questions are modified by
6  other than what you may have learned with your
7  lawyers, okay?
8      MR. GAFFEY:  Does that satisfy the
9  concern?
10      MR. BERNSTEIN:  At least for this
11  question, sure.
12      A.   No.
13      Q.   So do you know, Mr. Kelly, when the
14  deal was finally done, what was the amount of
15  assumed liabilities that Barclays took on for
16  compensation and for cure?
17      MR. HUME:  Objection, compound.  And
18  calls for legal conclusion.  I object on
19  that ground as well.
20      MR. GAFFEY:  I think "objection to
21  form" probably suffices and keeps you within
22  the rules, Hamish, but...
23      MR. HUME:  I wanted to give a reason
24  for the objection.

Page 141

HIGHLY CONFIDENTIAL - M. KELLY

1      MR. GAFFEY:  I don't --
2      Q.   Do you have my question in mind, sir?
3      A.   I'd like the question again, please.
4      (Record read.)
5      A.   No.
6      Q.   When the schedule was prepared --
7  actually, just so we're not confusing each
8  other.  Hand me back 19, please.  I want you to
9  focus on the one that was marked as 196.
10      When that schedule was prepared, the
11  one that's the second page of 196, was it your
12  view, sir, that the numbers for assumed
13  liabilities for cure and compensation were --
14  they were real numbers in the sense that they
15  were the best estimates that could be made at
16  the time?
17      A.   At what point in time?
18      Q.   At the time this was prepared on the
19  16th of September, 2008.
20      A.   These numbers reflected estimates at
21  that point in time, yes.
22      Q.   And they were estimates based on
23  actual data; they weren't just picked to make
24  the schedule balanced, correct?

Page 142

HIGHLY CONFIDENTIAL - M. KELLY

1       A.    To the best of my knowledge, yes.
2       Q.    Did you ever have any discussion with
3   anyone about that topic, about whether those
4   liabilities were calculated at those levels
5   simply to make this schedule balance; whether
6   they were plug numbers?
7       A.    You're specifically referring to the
8   cure and the comp?
9       Q.    Correct, sir.
10      A.    No.
11      Q.    At the time on the 16th of September
12  when you were involved in preparing this
13  schedule and seeing these conversations, was
14  it -- about negotiating and reaching the deal,
15  was it your understanding, sir, that the
16  assumption of liabilities in an amount of $4.25
17  billion was a part of the price of the
18  transaction?
19          MR. HUME:  Objection.  Vague.
20      A.    I wasn't part of the negotiations, so
21  I don't know.
22      Q.    I've heard you, sir, when you say you
23  weren't actually negotiating, but I've also
24  heard you say you were around them a lot, you

Page 143

HIGHLY CONFIDENTIAL - M. KELLY

1   were like a witness to the negotiations.
2          So my question goes to whether you
3   heard or saw anything that gave you that view,
4   that the amounts shown here for cure and comp
5   were part of the price that Barclays was paying
6   in the transaction?
7       A.    I don't know how the price was agreed
8   to.
9       Q.    Do you know if the $5 billion overall
10  economic loss against the marks could fairly be
11  described as a bulk discount?
12      A.    Could you repeat the question, please?
13      Q.    Actually, let me rephrase the
14  question.  Was the $5 billion overall loss on
15  the economics marks a fixed discount on the
16  assets?
17          MR. BERNSTEIN:  Objection.  Vague and
18  ambiguous.
19      A.    Can you repeat the question, please?
20          (Record read.)
21      A.    $5 billion, the approximately $5
22  billion, represented the difference between the
23  negotiated price for the assets and their book
24  values on the books of Lehman prior to the

Page 144

HIGHLY CONFIDENTIAL - M. KELLY

1   transaction.
2       Q.    And over the course of the week, the
3   amount of securities that could be conveyed
4   reduced to an absolute number, correct?
5       A.    That's my recollection.
6       Q.    Did the difference in price between
7   what was shown on the marks and what was paid as
8   a purchase price stay at $5 billion?
9       A.    I don't know.
10      Q.    Do you know one way or the other?
11      A.    I don't know.
12      Q.    To go back to the question I
13  originally asked you, could it fairly be
14  described as a fixed discount on the assets?
15          MR. BERNSTEIN:  Objection.  Asked and
16  answered.
17      A.    Can you ask the question -- repeat the
18  question, please?
19          (Record read.)
20      A.    I don't believe it was -- my
21  understanding is that the amount was neither
22  fixed nor a discount.
23      Q.    Let me show you what was marked
24  previously as Exhibit 148A at a prior

Page 145

HIGHLY CONFIDENTIAL - M. KELLY

1   deposition.  Let me know when you've had a
2   chance to look through the document, sir.
3          (Document review.)
4       A.    Okay.
5       Q.    Have you had a chance to look it
6   through?
7       A.    Yes.
8       Q.    Do you remember this set of e-mails
9   reflected in Exhibit 148A?
10      A.    No.
11      Q.    Directing your attention to the
12  bottom, that is, the earliest e-mail in the
13  chain, it's from a Daniel Flores to you and to
14  Austin Taylor on September 17.  Who's Daniel
15  Flores?
16      A.    I don't know.
17      Q.    Do you have any recollection of that
18  name?
19      A.    No.
20      Q.    How about Austin Taylor, do you
21  remember an Austin Taylor?
22      A.    No, I don't.
23      Q.    No, you don't?
24      A.    No, I don't.

Page 146

HIGHLY CONFIDENTIAL - M. KELLY

1
2  Q.   Any idea why they would be writing to
3  you about diligence items on September 17, 2008?
4  A.   Now or then?
5  Q.   I'll take either.
6  A.   At the time, no.
7  Q.   Do you have a recollection now?
8  A.   I don't have a recollection.
9  Q.   Do you have an understanding now?
10  A.   I don't have an understanding.
11  Q.   In the e-mail to you from Mr. Flores
12  he refers to "items like Lazard has requested
13  that George Mack and I discussed with you
14  yesterday."  Who is George Mack?
15  A.   I don't know.
16  Q.   Any recollection of knowing or
17  speaking to a man named George Mack?
18  A.   No.
19  Q.   Mr. Flores refers to two items.  One
20  is as follows: "Price variance report for
21  trading books going with deal to reflect changes
22  between Friday, 9/12 close and Monday, 9/15
23  close."
24      Do you have an understanding of what
25  that means?

Page 147

HIGHLY CONFIDENTIAL - M. KELLY

1
2  A.   The term "price variance report" is
3  not a term I'm familiar with, so no.
4  Q.   Do you have any understanding what
5  that means apart from whether the term "price
6  variance report" is a term of art?
7  A.   I could speculate, but, no.
8  Q.   Can you do that?  Why don't you
9  speculate.
10  A.   My speculation would be that the price
11  variance report is intended to refer to change
12  in the market price of the securities between
13  those two dates.
14  Q.   Now, in your response to Mr. Flores,
15  you write -- well, for completeness, the second
16  item that Mr. Flores wrote to you about, that's
17  at the bottom, "The balance sheet of what's
18  being sold as well as what is remaining behind."
19      Do you see that?
20  A.   Uh-huh.
21  Q.   And then you respond to Mr. Flores.
22  "Number one is Gerry, CC'd.  Number two is me.
23  We are working on that now."
24      Do you understand that to mean you
25  were working on the balance sheet that is the

Page 148

HIGHLY CONFIDENTIAL - M. KELLY

1
2  second item in Mr. Flores' e-mail?
3  A.   We were working on a balance sheet
4  of -- of Lehman subsequent to the transaction.
5  Q.   Okay.  And is your e-mail to
6  Mr. Flores fairly understood to mean that Gerry,
7  it would be Gerry Reilly is working on the price
8  variance report item?
9  A.   I think that's reasonable.
10  Q.   And then in the next e-mail in the
11  chain, we have Gerard Reilly --
12      Mr. Reilly has passed away; is that
13  correct?
14  A.   That's correct.
15  Q.   We have Mr. Reilly writing to you and
16  Mr. Flores with a copy to Mr. Taylor and saying,
17  "The first question is very difficult.  My
18  understanding of the deal is that they will
19  purchase our assets that remain in LBI on the
20  closing date, which will not be the same as the
21  assets on the 12th.  That purchase will be at a
22  fixed discount on the assets that remain to
23  reflect the bulk size of the purchase."
24      Do you see that sentence?
25  A.   Yes.

Page 149

HIGHLY CONFIDENTIAL - M. KELLY

1
2  Q.   Did you note at the time that
3  Mr. Reilly was describing the purchase is
4  involving a fixed discount on the assets?
5  A.   I'm sorry, what's the question,
6  please?  Can you repeat?
7  Q.   Let me withdraw the question.
8      Is Mr. Reilly's description of the
9  deal to be a "purchase at a fixed discount on
10  the assets that remain to reflect the bulk size
11  of the purchase" an accurate description of the
12  deal as you understood it on the 17th of
13  September?
14  A.   I don't know.
15  Q.   You have no idea one way or the other?
16  A.   Correct.
17  Q.   If I were to tell you today that the
18  deal as it stood on September 17, 2008 was that
19  a fixed discount on the assets that remain at
20  closing, would you agree or disagree with that
21  as a characterization of the deal as you
22  understood it?
23      MR. BERNSTEIN:  Objection.  Vague and
24  ambiguous.
25      MR. HUME:  Objection.  Vague and

Page 150

HIGHLY CONFIDENTIAL - M. KELLY

1  ambiguous.
2
3  A.  I don't know.
4  Q.  You have no view one way or the other?
5  A.  Correct.
6  Q.  You have no view one way or the other
7  as to whether the deal involved a fixed discount
8  on the assets?
9      MR. BERNSTEIN:  Objection.  Asked and
10  answered.
11  A.  Correct.
12  Q.  And you have no recollection of this
13  e-mail?
14  A.  Correct.
15  Q.  Or who Mr. Flores or Mr. Taylor are?
16  A.  Correct.
17  Q.  You do remember Mr. Reilly, though,
18  right?
19  A.  Yes.
20  Q.  We got that, okay.
21      And did you correspond with Mr. Reilly
22  from time to time about matters relating to the
23  transaction?
24  A.  Yes.
25  Q.  Do you recall ever talking to

Page 151

HIGHLY CONFIDENTIAL - M. KELLY

1
2  Mr. Reilly about his expression of the deal in
3  terms of a fixed discount on the assets?
4  A.  No.
5  Q.  Mr. Reilly continues in his e-mail to
6  you to say, "We can track our PL by assets
7  category, which gives some indication of how
8  much we have moved the marks."  Do you see that?
9  A.  Yes.
10  Q.  What do you understand Mr. Reilly to
11  have been saying to you in this e-mail when he
12  talks about some indication of how much we have
13  moved the marks?
14  A.  It's unclear to me what he's referring
15  to.
16  Q.  Is it a fair reading in your view that
17  he's referring to changing the marks to reflect
18  the price agreed with Barclays for those asset
19  classes we talked about this morning?
20      MR. HUME:  Objection.  Calls for
21  speculation.
22  A.  I don't know.
23  Q.  Do you have any recollection of
24  speaking to or corresponding with Mr. Reilly
25  about that topic apart from the e-mail that's in

Page 152

HIGHLY CONFIDENTIAL - M. KELLY

1
2  front of you, sir, just an independent
3  recollection?
4  A.  I don't recall.
5  Q.  You don't recall one way or the other?
6  A.  Correct.
7  Q.  Given the task that you had to do
8  during the week between the 16th of September
9  and the closing on the 22nd of September, was
10  whether or not the deal was at a fixed discount,
11  would that have been a matter of some concern to
12  you in order to do your job?
13  A.  I think that's most relevant to the
14  negotiation and the terms of the transaction,
15  which I wasn't party to.
16  Q.  In order to do the tasks you needed to
17  do during that week, sir, would you have needed
18  to know whether or not the deal was at a fixed
19  discount?
20  A.  I'm not sure I can describe what my
21  responsibilities and tasks that I was
22  responsible for were during that week.
23  Q.  You're not sure you can describe what
24  your job was that week, sir; is that what you're
25  telling me?

Page 153

HIGHLY CONFIDENTIAL - M. KELLY

1
2  A.  Yes.
3  Q.  You were around for the negotiation,
4  seeing all these negotiations.  You were there
5  all night overnight from Monday to Tuesday, yes?
6  A.  I was not part of the negotiations.
7  Q.  Why were you there?  What were you
8  doing there?
9      MR. BERNSTEIN:  Objection.  Asked and
10  answered and badgering.
11  A.  As I described earlier, my primary
12  responsibility was gathering information to
13  allow the Barclays Finance Team to do their due
14  diligence.
15  Q.  And in order to let the Barclays
16  Finance Team do their due diligence, would you
17  need to know whether the deal involved a fixed
18  discount?
19  A.  I don't know.
20      MR. BERNSTEIN:  I need to take a
21  break.
22      MR. GAFFEY:  Yes.
23      (Recess; Time Noted:  2:39 P.M.)
24      (Time Noted:  2:54 P.M.)
25  BY MR. GAFFEY:

Page 154

1      HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   This difference between the price that
3  Barclays paid and the amount shown on Lehman's
4  marks, was that done in terms of an actual
5  amount or was it done as a percentage?
6      MR. BERNSTEIN: Objection. No
7  foundation.
8      Q.   Let me withdraw the question and let
9  me see if I can put a couple questions and
10 explain while I'm asking that.
11     Over the course of the week, the raw
12 amount, the total amount of assets that could be
13 delivered shrinks, correct?
14     A.   Yes.
15     Q.   And there was an agreement at the
16 beginning of the week to give to Barclays --
17 there was an agreement at the beginning of the
18 week that the difference between the price
19 Barclays paid for those classes of assets and
20 what they were shown at was $5 billion. We
21 talked about that this morning, correct?
22     MR. BERNSTEIN: Objection.
23 Mischaracterizes his testimony.
24     A.   I need to ask you to repeat the
25 question.

Page 155

1      HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   The 5 billion is the difference
3  between the price Barclays paid for those asset
4  classes and the values shown for those asset
5  classes on Lehman's books, correct?
6      MR. BERNSTEIN: Objection.
7      A.   Can you repeat the question, please?
8  (Record read.)
9      A.   The $5 billion represents the
10 difference between the agreed sales price and
11 the value that they were recognized at on the
12 books of Lehman.
13     Q.   Okay. And on the 16th, given the
14 collection of assets that had been considered at
15 that time, that difference was $5 billion,
16 correct, between the agreed sale price and the
17 value they were recorded -- the value at which
18 they were recorded on Lehman's books?
19     A.   It was approximately $5 billion for
20 the assets agreed to at that point. And I
21 should clarify that was, when you refer to the
22 16th, that's the early morning hours of the
23 16th.
24     Q.   Yeah, I'm back at the now familiar
25 e-mail marked as 136A.

Page 156

1      HIGHLY CONFIDENTIAL - M. KELLY
2      A.   Yes.
3      Q.   Was that $5 billion the expression of
4  a percentage against the total, or was it an
5  agreed number of $5 billion?
6      MR. BERNSTEIN: Objection. No
7  foundation.
8      A.   I don't believe it was either. I
9  don't believe it was either.
10     Q.   Well, how did it come to be
11 approximately $5 billion?
12     MR. BERNSTEIN: Objection. Asked and
13 answered.
14     A.   The approximately $5 billion amount
15 was determined by aggregating by asset class the
16 difference between the agreed sales price and
17 the value on Lehman's books prior to the
18 transaction.
19     Q.   And later in the week when the total
20 amount of assets that Lehman was able to convey
21 shrunk, did what had been the $5 billion number,
22 did that change to another number?
23     A.   I don't know.
24     Q.   At the beginning of the week when
25 there was that then existing class of assets,

Page 157

1      HIGHLY CONFIDENTIAL - M. KELLY
2  was the 5 billion, within each asset class, was
3  it expressed as a percentage of the value shown
4  for that asset class on Lehman's books?
5      MR. BERNSTEIN: Objection. Vague and
6  ambiguous.
7      A.   I don't believe so.
8      Q.   It was a raw number as opposed to a
9  percentage?
10     MR. BERNSTEIN: Objection.
11 Mischaracterizes his testimony.
12     A.   It was an aggregation.
13     Q.   And the aggregation of raw number for
14 each asset class, correct?
15     A.   Yes.
16     Q.   And did that aggregated raw number for
17 each asset class change over the course of the
18 week?
19     MR. BERNSTEIN: Objection. Asked and
20 answered.
21     A.   I don't know.
22     Q.   The exercise you described before of
23 looking for additional assets to convey, the
24 15c3 funds, for example, was that to make up the
25 difference in an amount that needed to be

Page 158

1    HIGHLY CONFIDENTIAL - M. KELLY
2  delivered to Barclays?
3    A.   Can you explain what you mean by
4  "difference"?
5    Q.   Well, the difference, as I'm hearing
6  it, starts out at 5 billion, right, with respect
7  to the assets?
8    Take the real estate. Put it aside
9  for a moment. The difference is 5 billion with
10  respect to those classes of assets, correct?
11    MR. HUME: Objection. Vague. Vague
12  and ambiguous.
13    A.   I'm not sure what you're asking. I'm
14  sorry.
15    Q.   Are people running around looking for
16  assets at the end of the week to still deliver
17  the 5 billion?
18    MR. HUME: Objection.
19    A.   I'm not sure what you mean by
20  delivering 5 billion.
21    Q.   You agree with me Barclays get a $5
22  billion benefit on the deal that was structured
23  at the beginning of the week?
24    MR. HUME: Objection.
25  Mischaracterizes.

Page 159

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A.   No.
3    Q.   It's paying $5 billion less than the
4  assets aggregated are carried on Lehman's books?
5    A.   No, I don't agree with that.
6    Q.   Why not?
7    A.   The $5 billion represented the
8  difference between the agreed sales price and
9  the book values.
10    Q.   Okay. And the agreed sales price is
11  $5 billion less than the book values, yes?
12    A.   In aggregate, yes.
13    Q.   So, in aggregate, that would present a
14  $5 billion benefit to Barclays, would it not?
15    A.   No, I don't believe so.
16    Q.   Were the book values at which Lehman
17  carried the assets accurate?
18    MR. BERNSTEIN: Objection. Asked and
19  answered.
20    A.   The book values recognized by Lehman
21  were calculated in accordance with valuation
22  policies and calculated under U.S. GAAP.
23    Q.   And Barclays was paying 5 billion less
24  than that amount of those classes of assets in
25  aggregate, correct?

Page 160

1    HIGHLY CONFIDENTIAL - M. KELLY
2    MR. BERNSTEIN: We're talking now on
3  the 16th?
4    MR. GAFFEY: Yes.
5    MR. BERNSTEIN: So "was paying" is --
6    Q.   That was the deal on the 16th, yes?
7    MR. BERNSTEIN: "Was going to pay."
8  Okay.
9    Q.   Is that right?
10    A.   Barclays was paying $5 billion less
11  than the value that they had been recognized at
12  by Lehman.
13    Q.   At the end of the week when the body
14  of available assets reduced capable of being
15  transferred over to Barclays, was Barclays still
16  paying 5 billion less than the book value of
17  that body of assets?
18    MR. BERNSTEIN: Objection. Asked and
19  answered.
20    Go ahead.
21    A.   I don't know.
22    Q.   Who would I ask if I wanted to know
23  that?
24    A.   The individuals negotiating the
25  transaction.

Page 161

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.   That would be Mr. McDade, among
3  others?
4    A.   My understanding is it would be Bart
5  McDade.
6    (Exhibit 197, a document bearing Bates
7  Nos. 10292661, marked for identification, as
8  of this date.)
9    Q.   Mr. Kelly, I have put before you a
10  one-page document we have marked as Exhibit 197,
11  and I'll ask you, sir, if you have seen that
12  document before.
13    And again, it's with a disclaimer that
14  where it says "unknown and sent Wednesday, May
15  20," just ignore that part. That's put on by
16  our document vendor.
17    (Document review.)
18    A.   Okay.
19    Q.   Have you seen the document before?
20    A.   I don't recall seeing this document.
21    Q.   The first e-mail in the chain, the
22  earlier one, the one at the bottom of the page,
23  is from Ian Lowitt to Michael Gelband, Alex
24  Kirk, Eric Felder, with copies to Paolo Tonucci,
25  Gerard Reilly and Martin Kelly, and it's

Page 162

1        HIGHLY CONFIDENTIAL - M. KELLY
2   entitled "Funding Tomorrow" and in it Mr. Lowitt
3   writes, "Today was very bad with very large
4   number of surprise and increased requirement of
5   7 or so billion."
6        Do you know as you sit here what
7   Mr. Lowitt would have been referring to when he
8   referred to the "increased requirement of 7 or
9   so billion"?
10   A.   No.
11   Q.   Mr. Lowitt also writes, and this is in
12   the second paragraph of that e-mail, "Also need
13   to shrink matched book, which as of yesterday
14   was much larger than expected.  Gerry and Martin
15   have details. Ian."  Do you see that?
16   A.   Yes.
17   Q.   Could you explain what's meant by
18   "shrink the matched book"?
19   A.   The matched book is a component of the
20   repo business and I'm not sure what this means,
21   "need to shrink the matched book."
22   Q.   Do you have an understanding of what
23   it means to shrink a matched book?
24   A.   No.
25   Q.   Do you know why Ian would be writing

Page 163

1        HIGHLY CONFIDENTIAL - M. KELLY
2   that you and Gerry have the details of that?
3   A.   No, I don't.
4   Q.   Would you have had the details of that
5   at the time this was written, September 17,
6   2008?
7   A.   I don't recall.
8   Q.   And do you have any idea at all what
9   Mr. Lowitt was referring to when he talked about
10   "an increased requirement of 7 or so billion"?
11   A.   No.
12   Q.   Now, you mentioned the Repurchase
13   Agreement.  Did there come a time during the
14   week of -- beginning September 16th through the
15   22nd when Barclays and Lehman and Bank of New
16   York entered into a tri-party Repurchase
17   Agreement?
18        MR. HUME:  Objection.  Calls for a
19   legal conclusion.
20   A.   Can you repeat the question, please?
21   Q.   You won't need that document, sir.
22   It's independent of the document.
23        (Record read.)
24   A.   I don't recall.
25   Q.   Do you have any general recollection,

Page 164

1        HIGHLY CONFIDENTIAL - M. KELLY
2   sir, the Federal Reserve had funded Lehman
3   day-to-day through a Repurchase Agreement and
4   Barclays stepped into the shoes of the Fed at
5   some point during that week?
6   A.   I have a general recollection that the
7   Fed was in some capacity funding Lehman, and I
8   have a general recollection that Barclays
9   assumed part -- part or all of that repurchase
10   facility.
11   Q.   And apart from what you just told me,
12   do you have any other knowledge about Barclays
13   assuming part or all of that repurchase
14   facility?
15   A.   No.
16   Q.   Did you have any involvement in
17   negotiating such a repurchase facility?
18   A.   No.
19   Q.   Did you have any involvement in
20   assessing or valuing assets that were delivered
21   to Barclays pursuant to that repurchase
22   facility?
23   A.   No.
24   Q.   Do you have any knowledge as to
25   whether that repurchase facility played any role

Page 165

1        HIGHLY CONFIDENTIAL - M. KELLY
2   in the transaction as it finally closed on the
3   22nd of September, 2008?
4        MR. HUME:  Objection.  Vague and
5   ambiguous.
6   A.   Would you repeat the question, please?
7        (Record read.)
8   A.   I'm aware that there were discussions
9   around how to close the transaction in view of
10   the repo, but I'm not aware of if the
11   transaction was or how the transaction was
12   amended, if it was, to take account of the repo.
13   Q.   Who was involved in discussions about
14   how to close the transaction in view of the
15   repo?
16   A.   I recall Ian and Paolo discussing the
17   repo.
18   Q.   Were you present at those discussions?
19   A.   I don't recall.
20   Q.   Well, what do you recall about Ian and
21   Paolo discussing the repo?
22   A.   I don't recall the specifics of that
23   conversation.
24   Q.   What do you recall about it?
25   A.   I generally recall confusion about

## Page 166

HIGHLY CONFIDENTIAL - M. KELLY

1 which assets were available and where and how
2 they were being financed, and I recall
3 conversations about how to take possession of
4 those securities and to close out the repos.
5    Q.   About how who would take possession of
6 those securities and close out the repo?  Who
7 would take possession?
8    A.   Lehman.
9    Q.   What do you recall about -- how did
10 you come to that understanding, that there
11 was -- people were addressing how Lehman would
12 come into possession and close out the repo?
13    A.   Sorry, can you repeat the question,
14 please?
15       (Record read.)
16    Q.   Withdraw that question.  Let me put a
17 different question.  What do you recall about
18 conversations about how Lehman would take
19 possession of the securities and close out the
20 repo?
21    A.   I don't recall details of that
22 conversation.
23    Q.   Do you recall, have any general
24 recollection of that conversation?

## Page 167

HIGHLY CONFIDENTIAL - M. KELLY

1    A.   I recall conversations about a
2 possible default on a repo, but I'm not aware of
3 who the parties to that repo were.
4    Q.   Who was engaged in the conversations
5 about a possible default on a repo?
6    A.   My recollection is that it was Ian and
7 Paolo.
8    Q.   Were you involved in those
9 conversations about a possible default on a
10 repo?
11    A.   I became aware of the conversations.
12    Q.   How did you become aware of the
13 conversation?
14    A.   Most likely through -- through
15 conversation with Ian or Paolo or both.
16    Q.   What did you come to understand about
17 a possible default on the repo?
18    A.   Not much beyond the -- a default on
19 the repo being a possible means of settling out
20 the contract.
21    Q.   Tell me, if you would, sir, everything
22 you do remember about any discussions regarding
23 a default on the repo as a possible means of
24 settling out the contract.

## Page 168

HIGHLY CONFIDENTIAL - M. KELLY

1    A.   I don't recall anything beyond what
2 I've just stated.
3    Q.   You recall nothing beyond the fact
4 that there was a discussion about a default on
5 the repo as a possible means of settling out the
6 contract?
7    A.   That's my recollection, yes.
8    Q.   Do you know if ultimately there was a
9 default on a repo as a means of settling out the
10 contract?
11    A.   No.
12    Q.   Did you ever learn one way or the
13 other whether there was a default on the repo as
14 a means of settling out the contract as opposed
15 to remembering it today?
16    A.   I don't recall.
17    Q.   Mr. Kelly, I'm showing you what we
18 previously marked as Exhibit 126 at a prior
19 deposition.  The top is an e-mail addressed from
20 Paolo Tonucci to Ian Lowitt, Gerard Reilly,
21 Michael Gelband, with a copy to Martin Kelly.
22       Take a look through the document,
23 please, sir, and tell me if you have any
24 recollection of seeing it before.

## Page 169

HIGHLY CONFIDENTIAL - M. KELLY

1       (Document review.)
2    A.   I have a vague recollection of seeing
3 this before.
4    Q.   When do you recall seeing it before?
5 At or about the time it's dated, September 18?
6    A.   I don't recall.
7    Q.   Do you see at the bottom of the e-mail
8 there's -- at the bottom of the page there's an
9 e-mail from Gerry Reilly to Ian Lowitt, Michael
10 Gelband, copy Paolo Tonucci, Martin Kelly.
11       Directing your attention to that lower
12 e-mail, and in particular to paragraph 3:  "Not
13 clear on the amount of block discount or how we
14 make it happen.  Defaulting on repo could be the
15 best, as discount could be taken from haircut.
16 If not that, then we need to give business an
17 allocation of block discount so they can mark
18 down the books tonight.  Does that create a
19 problem as it could tip the broker early?  Would
20 we rather have that be in the sale price
21 tomorrow?"
22       Do you see that?
23    A.   Yes.
24    Q.   Did you have an understanding when you

HIGHLY CONFIDENTIAL - M. KELLY

1 got this e-mail from Mr. Reilly about what he
2 was referring to when he was referring to the
3 block discount?
4     A.   No.
5     Q.   None at all?
6     A.   Not that I recall.
7     Q.   Do you have any understanding as you
8 look at it today what he meant when he wrote to
9 you about the amount of block discount?
10         MR. BERNSTEIN: Objection. No
11 foundation.
12     A.   Can you repeat the question, please?
13     Q.   Do you know what Mr. Reilly was
14 referring to when he referred to the block
15 discount?
16     A.   No, it's not a term that we -- that
17 I'm familiar with.
18     Q.   When Mr. Reilly wrote to you, among
19 others, "Defaulting on repo could be the best,
20 as discount could be taken from haircut." Did
21 you have an understanding of what he meant
22 there?
23     A.   No.
24     Q.   Do you know what a haircut is when the

HIGHLY CONFIDENTIAL - M. KELLY

1 term is used in connection with a repo?
2     A.   As a general matter, yes.
3     Q.   What's your understanding?
4     A.   My understanding of a haircut is that
5 it's the difference between the amount of
6 financing provided under a repo and the market
7 value of the securities pledged under that repo.
8     Q.   And it would be your understanding
9 that a haircut refers to the difference
10 between -- that the amount of the repo financing
11 is less than the amount of collateral pledged,
12 correct?
13     A.   Yes, that's generally
14 over-collateralization.
15     Q.   So the haircut would be the amount by
16 which the repo facility is over-collateralized,
17 correct?
18     A.   Yes.
19         MR. HUME: Objection.
20     Q.   Do you understand Mr. Reilly's e-mail
21 to mean that defaulting on the repo could be a
22 means of delivering to Barclays the difference
23 between the amount financed in a Repurchase
24 Agreement and the amount pledged?

HIGHLY CONFIDENTIAL - M. KELLY

1         MR. BERNSTEIN: Objection. No
2 foundation.
3     A.   Sorry, can you repeat the question,
4 please?
5         (Record read.)
6     A.   I'm not sure what to make of that
7 statement.
8     Q.   When there is a default on a repo,
9 sir, do you have any understanding of who gets
10 the excess collateral?
11     A.   No.
12     Q.   Did you ever have an understanding of
13 what happens on a defaulted repo with regard to
14 who gets the excess collateral?
15     A.   No.
16     Q.   Did you understand Mr. Reilly's e-mail
17 to be a proposal to convey the excess collateral
18 in the repo to Barclays by Lehman defaulting on
19 the repo?
20         MR. HUME: Objection. Asked and
21 answered. Lack of foundation.
22     A.   Can you repeat the question, please?
23         (Record read.)
24     A.   I don't recall what I thought or my

HIGHLY CONFIDENTIAL - M. KELLY

1 reaction to this e-mail.
2     Q.   My question was a little different.
3 It's what did you understand it to mean, not
4 what you thought or how you reacted.
5         What did you understand it to mean?
6 Did you understand it to mean it was a proposal
7 that Lehman default on a repo and thereby
8 deliver the excess collateral to Barclays?
9     A.   I don't recall.
10     Q.   When Mr. Reilly wrote, "If not that,
11 then we need to give business an allocation of
12 block discount so they can mark down the books
13 tonight." Did you have an understanding of what
14 Mr. Reilly meant when he wrote those words to
15 you on September 18?
16     A.   Not that I can recall.
17     Q.   As you sit here today, you have
18 absolutely no recollection of what that meant to
19 you when you got this e-mail? That's your
20 testimony?
21     A.   Not that I can recall.
22     Q.   I think just to get --
23     A.   Yes, that's my testimony.
24     Q.   Thank you.

Page 174

HIGHLY CONFIDENTIAL - M. KELLY
1
2      When Mr. Reilly wrote, "Does that
3  create a problem, as it could tip the broker
4  early," did you understand what he meant there?
5      A.   No.
6      Q.   Did you understand Mr. Reilly to have
7  meant that if Lehman Brothers, Inc., the
8  broker-dealer, defaulted on the repo, it would
9  tip it into bankruptcy earlier than planned?
10      A.   Can you repeat the question, please?
11      (Record read.)
12      A.   I don't recall.
13      Q.   Do you recall if you had an
14  understanding at the time?
15      A.   No, I don't recall.
16      Q.   And when Mr. Reilly wrote, "Would we
17  rather have that be in the sale price tomorrow,"
18  What did you understand the nature of the
19  alternative that Mr. Reilly was proposing to be?
20      A.   I don't know.
21      Q.   Did the date of September 19 have any
22  significance with respect to the transaction
23  that was being conducted between Lehman and
24  Barclays?
25      MR. BERNSTEIN:  Can we just clarify,

Page 175

HIGHLY CONFIDENTIAL - M. KELLY
1
2  are you asking now if it had significance or
3  if on the 18th --
4      MR. GAFFEY:  That's a good point.
5      Q.   Let's ask on the 18th and then I'm
6  going to ask you now.  On the 18th did you have
7  an understanding of whether the date of the 19th
8  was particularly significant in connection with
9  the transaction between Lehman and Barclays?
10      A.   Yeah, I don't know.
11      Q.   Did you know when the sale hearing was
12  planned to take place?
13      A.   I knew at a point in time prior to the
14  sale hearing.
15      Q.   Okay.
16      A.   I don't recall exactly when I became
17  aware of it.
18      Q.   And the sale hearing was on Friday,
19  the 19th.  So would that mean that you -- you
20  knew sometime before the 19th that the sale
21  hearing was on the Friday, correct?
22      A.   It may have been that morning, but I
23  knew before the hearing.
24      Q.   Okay.  Do you have a recollection of
25  whether you knew on the 18th that the sale price

Page 176

HIGHLY CONFIDENTIAL - M. KELLY
1
2  was tomorrow, that it was the 19th?
3      A.   My recollection is that at some point
4  on the Thursday night I understood the sale
5  hearing to be the following day.
6      Q.   So when Mr. Reilly wrote to you at
7  6:35 in the morning on the 18th -- I beg your
8  pardon.  When he wrote to you at 6:03 A.M. on
9  the 18th, would you have had an understanding
10  that when he referred to the "sale price
11  tomorrow," he was referring to the sale price to
12  be described at the sale hearing before the
13  bankruptcy court?
14      A.   I don't recall.
15      Q.   Do you recall anything else, sir,
16  about discussions revolving around default on a
17  repo as a means of settling the contract between
18  Lehman and Barclays?
19      MR. HUME:  Objection.  Asked and
20  answered.
21      A.   No, not beyond my prior statement.
22      Q.   And beyond your prior statement, do
23  you recall anything else about whether or not in
24  fact a default on the repo was used as a means
25  of settling the contract between Lehman and

Page 177

HIGHLY CONFIDENTIAL - M. KELLY
1
2  Barclays?
3      A.   No.
4      MR. HUME:  Objection.
5      Q.   Did you ever learn whether defaulting
6  on a repo was used as a means of settling the
7  contract between Lehman and Barclays at any
8  time?  Did you ever learn that at any time?
9      A.   Until what point in time?
10      Q.   Two seconds ago.  Up till the present.
11  Apart from anything you've learned from your
12  lawyers.
13      A.   I understand that that was the
14  mechanism, defaulting on the repo was the
15  mechanism.
16      Q.   And how did you come to have the
17  understanding that defaulting on the repo was
18  the mechanism?
19      A.   I don't know.
20      Q.   Do you have any recollection at all as
21  to how you came to understand that defaulting on
22  the repo was the mechanism?
23      A.   No.
24      Q.   Did you come to understand that
25  defaulting on the repo was a mechanism for

Page 178

1    HIGHLY CONFIDENTIAL - M. KELLY
2  delivering a block discount, as Mr. Reilly
3  describes in this e-mail?
4    MR. HUME: Objection. Vague and
5  ambiguous.
6    A.  Can you repeat the question?
7    Q.  Let me withdraw the question. Do you
8  know what -- did you learn what was exchanged
9  between Barclays and Lehman as a result of the
10 default on the repo? Who got what? Who kept
11 what?
12   A.  At what point in time?
13   Q.  Did you learn it at any point in time?
14   A.  I'm concerned there may be a privilege
15 issue in responding to that question.
16   Q.  Let me exclude from the question
17 anything you have learned from your lawyers.
18   A.  I'm excluding that.
19   Q.  Okay.
20   A.  I still have a concern.
21   Q.  Okay. I guess if you need to talk
22 about privilege, let's take a break.
23   MR. BERNSTEIN: Yes, let's talk about
24 it for a minute or two and we'll be right
25 back.

Page 179

1    HIGHLY CONFIDENTIAL - M. KELLY
2    MR. GAFFEY: Sure.
3    (Pause in the proceedings. Time
4  Noted: 3:30 P.M.)
5    (Time Noted: 3:34 P.M.)
6    MR. GAFFEY: Do we have a privilege
7  issue we have to deal with?
8    MR. BERNSTEIN: There is a privilege
9  issue in response to the question, yes.
10   MR. GAFFEY: Are you instructing him
11 not to answer? I'll want to inquire into
12 what the privilege is at some point.
13   MR. BERNSTEIN: I think you can ask
14 the question and he'll give you an answer,
15 and if you feel you should ask further
16 questions, you can.
17   MR. GAFFEY: Read the question.
18   (Record read as follows:
19   "Q  Did you learn what was exchanged
20 between Barclays and Lehman as a result of the
21 default on the repo? Who got what? Who kept
22 what?")
23   MR. BERNSTEIN: You can answer that
24 yes or no.
25   THE WITNESS: Yes, I know.

Page 180

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.  Did you learn that from anyone other
3  than the lawyers representing you here today?
4    MR. BERNSTEIN: You can answer that
5  yes or no.
6    Q.  Answer that yes or no, please.
7    A.  I'm sorry, let's go back. I'm not
8  sure what my answer was to the prior question.
9    MR. BERNSTEIN: I think your answer
10 is --
11   A.  I said, "Yes, I know" in response to
12 Rich.
13   MR. BERNSTEIN: Oh. I'm sorry.
14   A.  So can we just go back?
15   MR. BERNSTEIN: We got to go all the
16 way back to the question.
17   MR. GAFFEY: I'm thoroughly confused
18 now. Let's re-read the question that was
19 pending when you left the room.
20   MR. BERNSTEIN: Certain of these
21 questions I'm going to instruct you you may
22 answer, but you have to limit your answer to
23 yes or no. That's what I was trying to make
24 clear. So go ahead and re-read the
25 question.

Page 181

1    HIGHLY CONFIDENTIAL - M. KELLY
2    (Record read as follows:
3    "Q  Did you learn what was exchanged
4  between Barclays and Lehman as a result of the
5  default on the repo? Who got what? Who kept
6  what?")
7    MR. BERNSTEIN: You may give a yes or
8  no to that question.
9    A.  Yes, in general terms.
10   Q.  And did you learn that in general
11 terms from any source other than the lawyers who
12 are representing you here today? Exclude
13 anything they may have told you. Did you learn
14 it from any other source?
15   MR. BERNSTEIN: You can answer that
16 yes or no.
17   A.  Yes.
18   Q.  Who?
19   MR. BERNSTEIN: You can give names,
20 but you should limit your answer to the
21 names -- name or names, to the extent you
22 recall.
23   A.  I recall conversations with James
24 Walker and Gary Romain, both of Barclays, in the
25 period subsequent to the closing.

Page 182

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.   Tell me what you learned --
2    A.   Sorry.  In my capacity as a Barclays
3 employee.
4    Q.   And tell me what you learned in your
5 conversations with Mr. Walker and Mr. Romain?
6    A.   I learned of a general understanding
7 of the assets acquired as part of the
8 transaction.
9    Q.   Tell me what you learned.  What's your
10 understanding of the assets acquired as part of
11 the transaction?
12        MR. HUME:  Can I just state for the
13    record, to the extent any of these
14    conversations took place in the presence of
15    Barclays' counsel, including in-house
16    counsel, that Barclays would assert the
17    privilege over those conversations.
18        MR. GAFFEY:  And I take it if counsel
19    is not present, you don't have an objection
20    to him answering this question, right?  If
21    it's just, as he said, Mr. Walker and
22    Mr. Romain, he can answer it, is that right,
23    Hamish?  You're not asserting a privilege
24    there, are you, if it's just Mr. Walker and

Page 183

HIGHLY CONFIDENTIAL - M. KELLY

1 Mr. Romain, which is what his testimony is?
2        MR. HUME:  I wasn't clear to me that
3    he had finished answering the question.
4        MR. GAFFEY:  It was pretty clear to
5    me.  He said Mr. Walker and Mr. Romain.  If
6    it's just Mr. Walker and Mr. Remain, do you
7    have an objection to him answering the
8    question?
9        MR. HUME:  There's no need to lose
10    your temper.
11        MR. GAFFEY:  You haven't seen me lose
12    my temper.  This isn't even close.
13        MR. BERNSTEIN:  The witness has a
14    limited amount of time.
15        MR. GAFFEY:  If it's Mr. Walker and
16    Mr. Romain, do you have an objection to him
17    answering the question?
18        MR. HUME:  Proceed.
19    Q.   There's no objection asserted, sir.
20 What did Mr. Walker and Mr. Romain tell you?
21    A.   I'd like to go back to the prior
22 question.
23    Q.   I'd like you to answer the question I
24 asked you.  What did Mr. Walker and Mr. Romain

Page 184

HIGHLY CONFIDENTIAL - M. KELLY

1 tell you?
2    A.   I need to clarify my response to a
3 prior question.
4    Q.   Sure.
5    A.   There were conversations over an
6 extended period of time with Barclays' counsel.
7    Q.   When you told me before that
8 Mr. Walker and Mr. Romain told you, gave you a
9 general understanding of the assets that were
10 acquired, were you referring to a conversation
11 in which counsel was present?
12    A.   There were conversations with those
13 two individuals both with and without counsel.
14    Q.   Tell me what you learned --
15    A.   So it is difficult to delineate those
16 conversations when counsel was present.
17    Q.   Let's do the best we can.  Tell me
18 what you learned from Mr. Walker and Mr. Romain
19 in conversations where counsel were not present
20 about the assets that were acquired?
21        MR. HUME:  Again, we assert the
22    privilege over any conversation where
23    counsel was present.
24    A.   I find it difficult to delineate those

Page 185

HIGHLY CONFIDENTIAL - M. KELLY

1 sets of discussions, and so I'm not certain as
2 to what conversations I had with those two
3 individuals without counsel present.
4    Q.   When is the last time you spoke to
5 Mr. Walker and Mr. Romain about what assets were
6 acquired where counsel were not present?
7    A.   I don't recall.
8    Q.   How many conversations have you had
9 with Mr. Walker and Romain where the topic of
10 what assets were acquired in which counsel were
11 not present?
12    A.   I don't recall.
13    Q.   There were some, though, right?
14    A.   There were some.
15    Q.   And when you had these conversations
16 with Mr. Walker and Mr. Romain without counsel
17 present, was it both Mr. Walker and Mr. Romain,
18 or were they separate conversations with Walker
19 and then separate conversations with Romain?
20    A.   They were both.  Separate
21 conversations and conversations together.
22    Q.   And what was the purpose of the
23 conversations you had with either Walker or
24 Romain or both, without counsel present, where

Page 186

HIGHLY CONFIDENTIAL - M. KELLY
1    HIGHLY CONFIDENTIAL - M. KELLY
2    you discussed what assets were acquired?
3    A.   The broad purpose of those
4    conversations were to reflect the transaction on
5    the books and records of Barclays.
6    Q.   And did you gain an understanding in
7    those conversation as to what Barclays had
8    acquired in the transaction?
9    A.   Yes.
10   Q.   What's that understanding?
11   A.   I obtained a general understanding of
12   the types of securities that were acquired by
13   Barclays. Regarding other assets or possibly
14   including certain securities, I'm not able to
15   identify specific conversations independent of
16   counsel being present.
17   Q.   When counsel were present, were they
18   asked for legal advice or did they give any in
19   these conversations with Romain and Walker where
20   in-house counsel for Barclays were present?
21        MR. HUME: I object to the question.
22   Instruct you not to answer on grounds of
23   privilege.
24        MR. GAFFEY: I just want a yes or no
25   as to the fact of whether legal advice was

Page 187

1    HIGHLY CONFIDENTIAL - M. KELLY
2    solicited or communicated, which I think I'm
3    entitled to inquire about to determine the
4    validity of your assertion of privilege
5    under the local rules.
6        MR. HUME: Under the local rules? You
7    have a rule to tell me?
8        MR. GAFFEY: Under the rules of the
9    Southern District of New York.
10       MR. HUME: There's a specific written
11   rule on that subject?
12       MR. GAFFEY: Yes.
13       MR. HUME: I'd like to see it.
14       MR. GAFFEY: It's the same rule as the
15   privilege logs. In any event, I'm entitled
16   to inquire. You want to instruct him not to
17   answer?
18       MR. HUME: Are you saying in any
19   event? I'm not sure the witness is
20   qualified to identify what the legal advice
21   is. Are you asking whether he was asking
22   for legal advice?
23       MR. GAFFEY: Are you kidding me?
24   Q.   Was any legal advice -- did the
25   lawyers who were in the room act like lawyers or

Page 188

1    HIGHLY CONFIDENTIAL - M. KELLY
2    did they break into song, sir? Did they give
3    you legal advice or did anybody ask them for
4    legal advice? Do you know what legal advice is?
5        Withdraw my questions. Do you know
6    what I mean when I say "legal advice"? Having
7    any problem with that concept?
8    A.   In what context?
9    Q.   In the context where there's lawyers
10   in the room and there's businesspeople in the
11   room and they're talking about a topic. Let's,
12   hypothetically, let's have Mr. Romain in the
13   room, Mr. Walker in the room, and some lawyers
14   in the room. Okay? And we're talking about
15   what assets were acquired in the transaction.
16   The conversations you've been telling me about.
17       In the conversations where the lawyers
18   were there, were they acting like lawyers, did
19   they give legal advice, or were they asked for
20   legal advice? Can you tell me yes or no?
21       MR. BERNSTEIN: I just object. Are we
22   now asking hypothetically or are we
23   asking --
24       MR. GAFFEY: No, I'm back to real
25   life.

Page 189

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.   In the meeting with Walker, Romain and
3    the in-house lawyers, did anybody ask for legal
4    advice? Did anybody give legal advice?
5        MR. BERNSTEIN: I'm going to object as
6    compound and vague and ambiguous.
7    Q.   But I think you can answer it yes or
8    no.
9    A.   Can you repeat the question?
10       MR. GAFFEY: Read the question.
11       (Record read.)
12   A.   On what set of assets?
13   Q.   On any issue during the meeting. Did
14   the lawyers give legal advice or were they asked
15   for legal advice?
16       MR. BERNSTEIN: Same objections.
17   A.   If you're asking about any of the
18   assets acquired as part of the transaction by
19   Barclays, then yes, at times the lawyers gave
20   legal advice. At other times, the lawyers
21   explained the mechanics of the transaction.
22       MR. HUME: Which Barclays would assert
23   is legal advice, because explaining the
24   mechanics of the transaction is interpreting
25   a contract, which I am saying to you, as

Page 190

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2  Barclays' representative, is legal advice.
3  So we instruct the witness not to answer
4  questions involving such conversations.
5    Q.  Who were the lawyers?  What were their
6  names?
7    A.  At various times the lawyers included
8  Jonathan Hughes, as general counsel, and Alan
9  Kaplan, and there may have been others.
10    Q.  May have been other lawyers?
11    A.  Yes.
12    Q.  Okay.
13    A.  Stop for a minute, please.
14    Q.  Sure.
15    A.  Okay.
16    Q.  Now, apart from meetings where Hughes
17  or Kaplan or the other lawyers gave a
18  description of the transaction or rendered legal
19  advice, apart from those meetings, do you have
20  an understanding of what Barclays acquired in
21  the transaction?
22    MR. HUME:  Asked and answered.
23    A.  I have an understanding of what
24  Barclays acquired as a result of a series of
25  meetings, some including, some excluding the

Page 191

1  HIGHLY CONFIDENTIAL - M. KELLY
2  lawyers.
3    Q.  Okay.  And what's your understanding?
4    MR. BERNSTEIN:  Are you objecting as
5  privileged?
6    MR. HUME:  Yes.  We are asserting the
7  privilege and instructing the witness not to
8  answer on any conversations involving the
9  lawyers.
10    MR. GAFFEY:  I don't think you can,
11  Hamish.  Respectfully, I don't think you can
12  do that, unless -- it's your burden to prove
13  the objection.  I don't think you can do
14  that unless you can show it's a result of
15  the legal advice.
16    It's not enough for him to say I had a
17  bunch of meetings, lawyers were at some of
18  them, so therefore, I can't tell you what I
19  know about the topic at all.  I just don't
20  think that's a basis for a privilege
21  assertion.
22    MR. HUME:  His answer was I have an
23  understanding of what Barclays acquired as a
24  result of a series of meetings, some
25  including, some excluding the lawyers.

Page 192

1    HIGHLY CONFIDENTIAL - M. KELLY
2    MR. GAFFEY:  Right.  And I don't think
3  it's enough for you to block off his entire
4  knowledge about this because in some of the
5  meetings lawyers may have been there.  I
6  just don't think that's a sufficient basis
7  for you to assert the privilege.
8    MR. HUME:  And I don't think I have
9  asserted the privilege in that manner.  I
10  have asserted the privilege to the extent
11  that the witness has learned what was
12  covered by the transaction as a result of
13  conversations with lawyers in which they
14  explained what he called the mechanics of
15  the transaction, which is what the contract
16  says, which is legal advice, he should not
17  answer.  If he --
18    MR. GAFFEY:  That's not my point.  My
19  point is --
20    MR. HUME:  If he has an understanding
21  based upon conversations not involving
22  lawyers, not involving lawyers explaining
23  the mechanics of the transaction, and he can
24  delineate those from his conversations with
25  lawyers, he may answer as to that

Page 193

1    HIGHLY CONFIDENTIAL - M. KELLY
2  understanding.
3    MR. GAFFEY:  That's where we differ.
4  I don't think you're entitled to say if he
5  can delineate those.  I think if he can't
6  say this was in the privileged context, he's
7  got to give it to me.  I don't think you've
8  got a basis to say, because some of it might
9  be privileged, none of it can be answered.
10  I just think you're wrong, Hamish.  So I
11  would ask you to reconsider.
12    MR. HUME:  So if he cannot delineate,
13  your view is just --
14    MR. GAFFEY:  Then he can't assert a
15  privilege.
16    MR. HUME:  Then he should assert his
17  entire understanding.
18    MR. GAFFEY:  Yeah, I think I can't --
19  I'm not allowed to elicit which part of that
20  did you get from the lawyers, what did the
21  lawyers say to you, I can't have that.  But
22  I'm allowed to have his understanding.  If
23  he can't delineate it's a product of legal
24  advice, then you can't assert the privilege
25  as to all of it.  That's where I think we

Page 194

HIGHLY CONFIDENTIAL - M. KELLY

1  HIGHLY CONFIDENTIAL - M. KELLY
2  have disagreement.
3      MR. HUME:  Why don't we go off the
4  record for a minute and allow me to
5  reconsider it.
6      MR. GAFFEY:  Go off the record for a
7  minute?
8      MR. HUME:  Can we go off the record?
9      MR. GAFFEY:  Sure.
10     (Pause in the proceedings.  Time
11 Noted:  3:49 P.M.)
12     (Time Noted:  3:58 P.M.)
13     MR. HUME:  We will permit the witness
14 to answer your question even though we have
15 this disagreement about the delineation
16 point, but we will do it if you will agree
17 that this is not waiving any privilege on
18 this or any other issue.
19     MR. GAFFEY:  Yes, I'll agree to that.
20     MR. BERNSTEIN:  Is that waiver on
21 behalf -- is the agreement on non-waiver
22 applicable to the other constituencies?
23     MS. TAGGART:  We agree.
24     MR. HUME:  Trustee agree?
25     MR. OXFORD:  Sure.

Page 195

1  HIGHLY CONFIDENTIAL - M. KELLY
2      MR. HUME:  Examiner?
3      MR. LAYDEN:  I agree.
4      MR. HUME:  Thank you.
5  BY MR. GAFFEY:
6      Q.   So what was your understanding of the
7  assets acquired by Barclays?
8      MR. BERNSTEIN:  You said what was.
9  You want to give us a point in time?
10     MR. GAFFEY:  Good point.
11     Q.   What is your understanding of the
12 assets acquired by Barclays as you sit here
13 today?
14     A.   My general understanding is that the
15 assets acquired by Barclays included a
16 collection of securities, certain rights to
17 operate the former Lehman businesses represented
18 by intangible assets, including customer lists,
19 and certain hard assets, including the property
20 at 745 Seventh Avenue and certain data centers.
21     Q.   What was the value of the securities
22 it acquired?
23     A.   I don't recall.
24     Q.   Do you have any understanding of the
25 range?  Did you estimate the number from any of

Page 196

1  HIGHLY CONFIDENTIAL - M. KELLY
2  the value of the securities that Barclays
3  acquired?
4      A.   Sorry.  Can you repeat the question?
5      (Record read.)
6      MR. BERNSTEIN:  Objection.  Compound.
7      Q.   Withdrawn.  Can you estimate the value
8  of the securities that Barclays acquired?
9      MR. HUME:  Objection.  Lacks
10 foundation.
11     A.   At what point in time?
12     Q.   Right now.
13     A.   I can't estimate that right now.
14     Q.   Are you capable as you sit here today
15 of estimating the value of the assets that
16 Barclays acquired when the transaction closed on
17 the 22nd of September, 2008?
18     A.   No.
19     Q.   Were you ever in a position to make
20 that calculation?  Did you ever know?
21     MR. BERNSTEIN:  Objection.  Compound.
22     A.   I was familiar with an approximate
23 value.  However, I don't recall that value.
24     Q.   Just forgot it?
25     A.   I don't recall it.

Page 197

1  HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   Between the time you knew and today,
3  you just forgot it?
4      A.   I don't recall the value today.
5      Q.   Do you have any recollection of the
6  range of the value that you knew once but you
7  don't recall today?  Is it a zillion dollars?
8  Is it one dollar?  Can you give me any kind of
9  range?
10     MR. HUME:  I'm going to object that
11 that calls for speculation and expert
12 testimony.
13     Q.   You can answer the question.
14     A.   I don't recall sitting here today.
15     Q.   Without telling me the substance of
16 the conversation, when was the most recent
17 meeting you had either with Mr. Walker or
18 Mr. Romain or the Barclays lawyers or some
19 combination of them about this topic?  Just give
20 me a date.
21     MR. HUME:  This topic?
22     Q.   The value of the assets acquired by
23 Barclays in the transaction.
24     A.   We discussed the value of certain of
25 the assets --

Page 198

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   I don't want --
3    A.   -- acquired.
4    Q.   I don't want the content. I just want
5    the date. I want to be careful not to tread on
6    what I agree with Mr. Hume is privileged.
7         Just tell me the last time you had a
8    meeting where one of the topics discussed was
9    the value of the assets acquired by Barclays. I
10   want to get a sense whether it was two days ago,
11   a month ago, six months ago, but I just need you
12   to give me a time period.
13   A.   I don't recall a meeting when we
14   discussed the aggregate value of the assets, if
15   that's what you're asking. If that's not, I'll
16   try and answer the question.
17   Q.   I'm not sure why you just added the
18   word "aggregate" in there.
19        Have you had any meetings where you
20   discussed the value of what Barclays acquired
21   from Lehman; and, if so, tell me the last one
22   that you had, date of the last one that you had.
23        MR. BERNSTEIN: I'm going to object as
24   vague and ambiguous.
25   A.   To answer --

Page 199

HIGHLY CONFIDENTIAL - M. KELLY
1
2         MR. HUME: Just a minute. You're
3    asking about a meeting that contains certain
4    content, including with the lawyer, and
5    saying when did you last talk to your lawyer
6    about this content.
7         MR. GAFFEY: Yeah, I get -- what I'm
8    trying to do is press the complete and utter
9    lack of recollection of any number
10   whatsoever, the biggest deal this man ever
11   did in his life. So I want to push this
12   point a little bit to see if we can get some
13   sort of testimony where he gets closer to
14   remembering something other than he doesn't
15   remember.
16        So it's really just to refresh his
17   recollection, you know, the date. I don't
18   want the content of the meeting. I just
19   want to see if I can press his complete
20   failure of recollection of the value of the
21   assets that Barclays acquired.
22        I think that's okay, isn't it?
23        MR. HUME: I think you're being
24   argumentative and badgering the witness, and
25   I think a legitimate objection, if you're

Page 200

HIGHLY CONFIDENTIAL - M. KELLY
1
2    saying you may have talked to your lawyer
3    about X, when was the last time you talked
4    to him about X, that's requiring the witness
5    to reveal a conversation --
6         MR. GAFFEY: Let me see if I can get
7    around that.
8    Q.   When was the last time you had a
9    meeting of any kind with anyone where the topic
10   of the value acquired by Barclays in the
11   transaction came up before today?
12   A.   On or around about mid July, 2009.
13   Q.   Okay. And having had that meeting
14   about a month ago, sometime in the last month,
15   is it still your testimony you have absolutely
16   no recollection of even an estimate of the
17   number of the value that Barclays acquired in
18   the transaction?
19        MR. BERNSTEIN: Hold on. I'm going to
20   object because it mischaracterizes his
21   testimony, and if you'll permit me, I think
22   you're talking past each other and I don't
23   think you're listening to what he's told
24   you.
25        I think what he's -- you keep asking

Page 201

HIGHLY CONFIDENTIAL - M. KELLY
1
2    about the number or a number, but then you
3    ask about a topic. Does your question
4    include discussing a portion of the value or
5    does your question only include discussing
6    the absolute, total, complete aggregate
7    number? I think if you clarify that, we may
8    get somewhere.
9         MR. GAFFEY: I'll take any piece of
10   it, Richard. If I could elicit something
11   that would let me follow up on that, that
12   would be fine. If he wants to qualify it,
13   that would be fine. But I have to get an
14   answer first. If he knows the total, great.
15   If he only knows the subtotal, fine. But
16   he's got to give me an answer before we can
17   move on.
18        MR. HUME: But you're tying to get him
19   to say he knows something when he says he
20   doesn't know. You're just trying to get him
21   to speculate.
22        MR. GAFFEY: I'm just doing what I'm
23   entitled to do, which is press the
24   credibility of a denial of any recollection
25   at all.

Page 202

1       HIGHLY CONFIDENTIAL - M. KELLY
2       MR. BERNSTEIN: See, I'm trying to be
3   helpful.
4       MR. GAFFEY: I get it. I get the
5   point.
6       MR. BERNSTEIN: Okay. I've made the
7   point.
8       MR. GAFFEY: Okay.
9       MR. BERNSTEIN: You can do what you
10  wish. Please ask your question. See if we
11  can get an answer.
12      THE WITNESS: I need a minute with my
13  lawyers, please.
14      MR. GAFFEY: Sure.
15      (Pause in the proceedings. Time
16  noted: 4:07 P.M.)
17      (Time Noted: 4:17 P.M.)
18      MR. BERNSTEIN: I think it would be
19  best to allow Mr. Kelly to start, because I
20  believe your question did refresh a
21  recollection, and I want to make sure that
22  we don't move on to another subject before
23  getting that refreshed recollection on the
24  record.
25      MR. GAFFEY: Okay.

Page 203

1       HIGHLY CONFIDENTIAL - M. KELLY
2   BY MR. GAFFEY:
3       Q.   Mr. Kelly, anything you want to
4   answer?
5       A.   Yes, please. So your recent questions
6   refreshed in my mind a recollection that the
7   value of assets received by Barclays was
8   approximately $50 billion resulting from the
9   transaction.
10      Q.   So your recollection is that Barclays
11  received about $50 billion resulting from the
12  transaction. Is the transaction that you're
13  referring to the repo we've been talking about?
14      A.   No, the entire transaction.
15      Q.   The entire transaction. And could you
16  break down for me as best you recall what the
17  components of that 50 billion are?
18      A.   I can describe in broad terms the
19  components. I can't estimate the value ascribed
20  to each component or an approximate value
21  ascribed to each component.
22      Q.   Give me the best you can, all right?
23      A.   The components are similar to what I
24  described in an earlier question, so the
25  components include a collection of securities,

Page 204

1       HIGHLY CONFIDENTIAL - M. KELLY
2   the rights to operate the business, comprising
3   intangible assets and certain hard assets,
4   including real estate.
5       Q.   Now, although you told me you can't
6   delineate it by category, when you say 50
7   billion total, does that include the real
8   estate, the value of the real estate conveyed?
9       A.   My approximate $50 billion amount
10  includes all of the assets.
11      Q.   And do you have a sense of what, I
12  think I'm pushing a little bit where you told me
13  you're not able to go, but what the approximate
14  value of the real estate was. I'm trying to get
15  the subtotal of the securities.
16      A.   My recollection is that the real
17  estate comprised approximately $1.5 billion.
18      Q.   Which would leave it to about 48.5 for
19  the value of the securities and the intangible
20  assets, is that about right?
21      A.   Approximately.
22      Q.   And this 48.5 is a value, and I --
23  it's a value as of what time? At the time of
24  closing?
25      MR. HUME: Objection. Lacks

Page 205

1       HIGHLY CONFIDENTIAL - M. KELLY
2   foundation.
3       I've seen this happen with other
4   witnesses where you're trying to get people
5   to talk about these numbers after they told
6   you they didn't know what the numbers were
7   at the time, they weren't the negotiator,
8   and you want to make a record that's going
9   to be completely distorted.
10      MR. GAFFEY: Can you read the question
11  back, please?
12      (Record read.)
13      Q.   Can you answer the question, please?
14      A.   Are you asking is it my recollection
15  at the time of the closing or the value of the
16  assets at the time of the closing?
17      Q.   The value of the assets at the time of
18  the closing.
19      A.   Well, certain of the assets were
20  received after the closing.
21      Q.   That would be --
22      A.   So I believe it reflects more than one
23  date.
24      Q.   What proportion of the assets were
25  received after the closing?

Page 206

1          HIGHLY CONFIDENTIAL - M. KELLY
2       A.   I don't recall.
3       Q.   What was the reason those assets were
4   not received until after the closing?
5       A.   I believe they were held by the
6   custodian pending resolution of certain issues.
7       Q.   Was the custodian JPMorgan Chase?
8       A.   I believe so.
9       Q.   Do you recall the amount, roughly?
10  Any range in your head?
11          MR. HUME:  Objection.  Vague and
12      ambiguous.  Calls for speculation and lack
13      of foundation.
14      A.   When you say "amount," what are you
15  referring to?
16      Q.   Quantum.
17      A.   Of what at what date?
18      Q.   There was a certain amount of
19  securities that were not transferred by JPMorgan
20  Chase to Barclays, correct?
21      A.   That's my recollection.
22      Q.   What was the value at the time of the
23  closing of that amount of securities, of those
24  securities?
25          MR. HUME:  Determined at the time of

Page 207

1          HIGHLY CONFIDENTIAL - M. KELLY
2   the closing?  Determined after the closing?
3   Closing of the settlement?  Closing of the
4   transaction?
5       I object.  Vague and ambiguous.
6       Q.   Go with my question.  Do you need it
7   read back?
8       A.   Yes, please.
9          MR. GAFFEY:  Read it back, please.
10         (Record read.)
11         MR. HUME:  Objection.  Vague and
12      ambiguous in numerous respects.
13      A.   I'm not sure if I -- of what you mean
14  by "those securities."
15      Q.   Let's look at your notes.
16         (Exhibit 198, a document bearing Bates
17      Nos. BCI-EX-00115167 through 5173, arked for
18      identification, as of this date.)
19         THE WITNESS:  I would like to request
20      a break in about five or ten minutes.
21         MR. GAFFEY:  Whenever you want.  You
22      want to take it now?
23         THE WITNESS:  Sure.
24         MR. GAFFEY:  You want to take a
25      ten-minute break now before we start this

Page 208

1          HIGHLY CONFIDENTIAL - M. KELLY
2   line of questioning?
3          THE WITNESS:  Sure.
4          MR. GAFFEY:  Okay.
5          (Recess; Time Noted:  4:25 P.M.)
6          (Time Noted:  4:33 P.M.)
7   BY MR. GAFFEY:
8       Q.   I've put before you, Mr. Kelly, what
9   we have marked as Exhibit 198, a set of
10  handwritten notes, bearing Bates Nos.
11  BCI-EX-00115167 through 5173.  Would you look
12  through those and tell me if you recognize the
13  document and if that's your handwriting.
14         (Document review.)
15      A.   I recognize the handwriting.  It's my
16  handwriting on all pages except the second page.
17      Q.   The second page is not your
18  handwriting?
19      A.   The left-hand side of the second page
20  is not my handwriting.
21      Q.   Under where it says, or appears to
22  say, "goes"?
23      A.   "Goes," yeah.  The boxed -- the two
24  number 7s there.
25      Q.   Uh-huh.

Page 209

1          HIGHLY CONFIDENTIAL - M. KELLY
2       A.   May be.
3       Q.   Okay.
4       A.   Looks like my number.  The negative 4
5   I don't recognize as my handwriting.
6       Q.   Okay.  Do you recognize the writing on
7   the left-hand side?
8       A.   I think it's Ian's, but I'm not sure.
9       Q.   I'm sorry, I didn't hear that.
10      A.   Ian, Ian Lowitt's.
11      Q.   You know, just before we get into
12  these notes, just to go back to a topic we were
13  talking about before the break, I asked you --
14  we talked for some time about the amount that
15  Barclays, you know, the value that Barclays
16  received in the transaction, regardless of when
17  it received it.
18         How much did Barclays pay in the
19  transaction?
20         MR. HUME:  Objection.  Lacks
21      foundation.
22      A.   Are you asking me today, as my
23  knowledge today, or at the time?
24      Q.   What was your knowledge at the time?
25  And then I'm going to ask you what your

Page 210

HIGHLY CONFIDENTIAL - M. KELLY

1    knowledge is today.
2        A.    I don't recall my knowledge at the
3    time --
4        Q.    Okay.
5        A.    -- of the transaction.
6            My understanding today is that
7    Barclays paid $250 million in addition to
8    assuming a variety of liabilities as part of the
9    consideration for the assets.
10        Q.    And what was the value of the
11    liabilities assumed?  Can you put a number on
12    that?
13        A.    When are you asking me as of?
14        Q.    Both times.  What was your
15    understanding at the time?  What's your
16    understanding today?
17        A.    I don't recall what it was at the time
18    of the transaction.
19        Q.    Uh-huh.
20        A.    I could only deduce the value of the
21    liabilities today based on my understanding of
22    the purchase price.
23        Q.    Okay.
24        A.    And the value of the assets, which I

Page 211

HIGHLY CONFIDENTIAL - M. KELLY

1    previously explained.
2        Q.    Okay.  I'll take that.
3        A.    So, based on that deduction, it would
4    be approximately $50 billion.
5        Q.    So your understanding, there was no
6    gain for Barclays on the acquisition?
7        A.    No, that's not correct.
8        Q.    50 worth of assets goes to Barclays;
9    Barclays gives 50 worth of cash and assumed
10    liabilities?
11        A.    It depends from whose perspective you
12    are valuing the assets and the liabilities.
13        Q.    Can you explain what you mean by that?
14        A.    The assets -- certain of the assets
15    were valued differently by Barclays than they
16    had been by Lehman.  Certain of the assets were
17    not recognized by Lehman in that they were not
18    permitted to be recognized under U.S. GAAP, and
19    I'm not familiar with how each party valued the
20    liabilities, excluding the comp and the cure,
21    which we previously discussed.
22        Q.    Which assets did Barclays value
23    differently?
24        A.    Well, Barclays valued or ascribed a

Page 212

HIGHLY CONFIDENTIAL - M. KELLY

1    value to intangible assets that Lehman had
2    ascribed no value to.  Barclays ascribed a value
3    to buildings and other real estate that were
4    different from the values Lehman had ascribed to
5    them.  And Barclays marked the securities and
6    other inventory using its own valuation
7    policies.
8        Q.    And when Barclays marked the
9    securities using its own valuation policies, was
10    the valuation higher or lower than Lehman had
11    given those securities?
12            MR. HUME:  Objection.  Lack of
13    foundation.
14        A.    At what point in time?
15        Q.    Well, I guess let's start with at the
16    time of the closing.
17            MR. HUME:  The valuation at the time
18    of the closing or the knowledge at the time
19    of the closing?
20        Q.    Do you have my question in mind?
21        A.    Can you repeat your question, please?
22            (Record read.)
23        A.    Well, certain of the securities were
24    not received until after the closing date, and I

Page 213

HIGHLY CONFIDENTIAL - M. KELLY

1    don't know how the ultimate value ascribed by
2    Barclays compared with the Lehman value.
3        Q.    You're aware, sir, that Barclays
4    announced in the early part of 2009 a gain on
5    acquisition of approximately $4 billion?
6        A.    Yes.
7        Q.    Can you give me an explanation for the
8    components of that gain on acquisition that
9    Barclays announced?
10        A.    Not specifically.
11        Q.    Give me the best you can.
12        A.    I can describe it in general terms.
13    The specifics are provided in the annual filing.
14        Q.    Okay.  As best you can describe it.
15        A.    The gain of approximately 4 billion
16    represented the difference between the value
17    allocated to the assets and the sum of the value
18    allocated to the liabilities and the
19    consideration paid.
20            A portion of the $4 billion was
21    derived from assets that had no valuation, had
22    no book valuation by Lehman, and the remaining
23    portion of the $4 billion was derived from
24    differences between the asset -- the values of

| Page 214 |
|---|

HIGHLY CONFIDENTIAL - M. KELLY
1 the assets acquired and the liabilities assumed.
2
3     Q.   What portion was derived from assets
4 that had no book value ascribed by Lehman?
5     A.   I don't -- I don't recall the specific
6 amount, but it's generally related to intangible
7 assets.
8     Q.   When you testified that the value of
9 the assets received by Barclays was
10 approximately $50 billion as a result of the
11 transaction, was that based on how Lehman valued
12 the assets or on how Barclays valued the assets?
13     A.   Can you repeat the question, please?
14     (Record read.)
15     MR. HUME:  I would like to register an
16 objection that mischaracterizes the
17 witness's testimony.
18     A.   Can you repeat the question again,
19 please?
20     (Record read.)
21     A.   My recollection is that the
22 approximately $50 billion amount refers to the
23 value of the assets recognized by Barclays.
24     Q.   Let's go back to your notes.  Do you
25 recall when you made this set of notes we have

| Page 215 |
|---|

HIGHLY CONFIDENTIAL - M. KELLY
1
2 marked as Exhibit 198?
3     A.   I can't specifically because there's
4 no dates on any of these pages.
5     Q.   Were the notes made at or around the
6 time that financial schedule we marked
7 before was being made?
8     You referred earlier this morning to,
9 when I showed you the financial schedule that
10 was within Exhibit 196 --
11     A.   Uh-huh.
12     Q.   -- you made a reference of some kind,
13 I can't quote you, but you made a reference to
14 when the schedule was typed up and that there
15 had been some handwritten versions ahead of
16 time.  At least that's how I understood your
17 answer.
18     I'm wondering if these notes represent
19 notes you made in connection with what became
20 the financial schedule that's within Exhibit
21 196.
22     MR. BERNSTEIN:  Is that the question?
23     MR. GAFFEY:  Yes.
24     A.   Sorry, what's the question?
25     Q.   Are these, the notes that are in front

| Page 216 |
|---|

HIGHLY CONFIDENTIAL - M. KELLY
1
2 of you, were they made in connection with the
3 financial schedule that's marked within Exhibit
4 196?
5     A.   Well, my recollection is that there
6 were different versions of this schedule as the
7 week progressed which reflected changes in our
8 estimates, so I have difficulty determining or
9 time-stamping the series of handwritten notes
10 relative to that schedule.
11     Q.   Okay.  Can you tell me if you look at
12 it what the annotations at the bottom of each of
13 the two columns -- there's two columns at the
14 top of the first page, do you see those?
15     A.   Uh-huh.
16     Q.   Maybe I need a little help with your
17 handwriting first.  "Long" is the first row
18 there, yes?
19     A.   Yep.
20     Q.   And what does that say below that?
21     A.   It looks like "reverse."
22     Q.   And what does that mean?
23     A.   That would mean reverse repos.
24     Q.   Okay.  And then "shorts," is that what
25 that says?

| Page 217 |
|---|

HIGHLY CONFIDENTIAL - M. KELLY
1
2     A.   I believe so.
3     Q.   And then "repos," is that what that
4 says?
5     A.   Yes.
6     Q.   And then does that say "plus comp"?
7     A.   It looks to, yes.
8     Q.   Yes?
9     A.   I believe so.
10     Q.   Okay.  And "plus other," is that what
11 that says?
12     A.   Yes.
13     Q.   All right.  Now, can you tell me what
14 this schedule is meant to show?
15     A.   I believe this is -- this schedule's
16 intended to show some version of an estimate of
17 the assets to be sold and the liabilities to be
18 assumed.
19     Q.   Is that the estimate of the values to
20 be sold before the adjustment of the value of
21 the security classes to reflect the $5 billion
22 we talked about this morning?
23     A.   I can't determine that from this.
24     Q.   Do you have an understanding of what
25 the 78 versus the 68 is there, what those two

Page 218

HIGHLY CONFIDENTIAL - M. KELLY

1    columns are meant to show?
2        A.    It would appear that they're different
3    versions of the same estimates, although I would
4    note that the "Liability" section doesn't add in
5    the second column.
6        Q.    That doesn't add up to 68, is that
7    what you're saying?
8        A.    Correct.
9        Q.    I probably made this clear by now, but
10    I'm a bit innumerate, so can you take me through
11    the first column, the asset side, and get me to
12    78?  65 plus 10?  How does this work?
13        A.    I believe what this schedule is
14    showing is an estimate of asset values of 75,
15    comprising long, long assets, long securities of
16    65, a reverse of repo assets of 10, and then on
17    the liability side, a collection of liabilities
18    that also add -- that, sorry, that add to 78.
19    So securities that have been sold short, repo
20    liabilities.
21        Q.    They add to 68, not 78, right?  58
22    plus the 10?
23        A.    Sorry.  I'm in the first column.
24        Q.    I beg your pardon.  I thought you

Page 219

HIGHLY CONFIDENTIAL - M. KELLY

1    moved up to the liability side.
2        A.    The first column, that's the first two
3    lines, are assets, and then the next four lines
4    are liabilities.
5        Q.    Okay.
6        A.    And then the second column is another
7    version of assets and liabilities.
8        Q.    Okay.  And why are you in these notes
9    putting together two columns of assets, one at
10    78 and one at 68?
11        A.    I don't recall.
12        Q.    Does that in any way reflect the
13    difference in the marks at which Lehman held the
14    assets on its books and the price that Barclays
15    paid?
16        A.    I don't know.
17        Q.    Is there any relation between these
18    two columns and the values that eventually are
19    shown on the asset side of the financial
20    schedule?
21        MR. BERNSTEIN:  Can we just be
22    specific what exhibit you mean by "the
23    financial schedule"?
24        Q.    I'm sorry.  Is there any relation

Page 220

HIGHLY CONFIDENTIAL - M. KELLY

1    between the calculation shown on Exhibit 198 and
2    the assets shown on the financial schedule
3    within Exhibit 196?
4        MR. BERNSTEIN:  Objection.  Asked and
5    answered.
6        A.    I don't know.
7        Q.    Take a look at the next page of the
8    notes.  You said this at the left-hand side of
9    this is Ian's handwriting.  By that you mean Ian
10    Lowitt; is that right?
11        A.    I believe it's Ian Lowitt's
12    handwriting.
13        Q.    Any idea why Ian Lowitt is writing the
14    phrase "no consideration" on these notes?
15        A.    No.
16        Q.    Do you recall a time when Mr. Lowitt
17    was writing on your notebook?  Perhaps in a
18    discussion with Mr. Lowitt or in some other
19    context?
20        A.    I don't recall it, but it's possible.
21        Q.    Why do you say it's possible?
22        A.    It's possible because we continued to
23    make revisions to estimates as additional
24    information became known to us.

Page 221

HIGHLY CONFIDENTIAL - M. KELLY

1        Q.    Turn to the next page, please.  Is
2    this all your handwriting on this page?
3        A.    I'm not sure I recognize what appears
4    to be a 61.9 figure at the top of the page, but
5    I believe the rest of it is my handwriting.
6        Q.    Okay.  A little bit, about three
7    inches down the page, there's three columns.
8    Can you -- what's this first column?  Is that a
9    "BV"?
10        A.    "BV," yes.
11        Q.    What does "BV" stand for?
12        A.    I believe "BV" would stand for book
13    value.
14        Q.    Okay.  And the next column, what does
15    that say?
16        A.    "Proceeds."
17        Q.    And what does the next column say
18    after that, "Loss/Gain"?
19        A.    Yes.
20        Q.    What is this calculation meant to
21    show?
22        A.    I believe this is intended to show an
23    estimate of the assets and liabilities being
24    sold to Barclays together with their book values

Page 222

HIGHLY CONFIDENTIAL - M. KELLY
1
2  and the value allocated to them as part of the
3  transaction.
4      Q.   Can you take me through how it shows
5  that?  Can you explain each column and where I
6  find the conclusion that it shows.
7      A.   Well, I believe the first column is
8  intended to show what the book value of each of
9  those items was on the books and records of
10  Lehman immediately prior to the transaction.
11     Q.   Okay.  So the inventory is carried at
12  65, the reverse repo at 10, yes?
13     A.   Yes.
14     Q.   Shorts at 56, repo at 10; is that what
15  turns out to be collateralized short-term
16  agreements on financial schedules?  Is that the
17  same thing?
18     A.   No, repo is a liability.  So that
19  would be on the other side of the page.
20     Q.   I got it.  And "comp payable," that's
21  the $1 billion number you talked about before
22  that you told Mr. McDade was closer to the
23  actual running rate?
24     A.   I don't recall having any discussion
25  was Mr. McDade about the comp, the comp payable.

Page 223

HIGHLY CONFIDENTIAL - M. KELLY
1
2      Q.   Okay.  That was trade payables, you're
3  right.
4          The comp payable, that's the 1 billion
5  before the agreed $2 billion number, right?
6  That's the number actually carried on Lehman's
7  books?
8      A.   Yeah, I believe that that was an
9  estimate of the cash component of the bonus.
10     Q.   Okay.
11     A.   Associated with some estimate of the
12  number of employees moving to Barclays.
13     Q.   Now, take me down the next column,
14  "Proceeds," all right?  What accounts for the
15  difference between the 65 shown in inventory in
16  the "Book Value" column and the 58.75 shown in
17  the "Proceeds" column?
18     A.   I believe that the difference -- well,
19  sorry.  I believe that the "Proceeds" column
20  refers to the value that was negotiated and
21  agreed between Barclays and Lehman.
22     Q.   And in the right-hand column, then,
23  the 6.25 is the difference between those two
24  numbers, correct?
25         No, it's not.  Yeah, it is.  That's

Page 224

HIGHLY CONFIDENTIAL - M. KELLY
1
2  the different between 65 and the 58.75, correct?
3      A.   Yes, it would appear that that is the
4  resulting loss or gain.
5      Q.   Okay.  And it's a loss to whom?
6      A.   Well, my recollection is this is from
7  Lehman's perspective, so it would be a loss to
8  Lehman.
9      Q.   Now, the reverse repo, let's work
10  across that line, that's shown on -- they are
11  shown on Lehman's books at 10 billion, yes?
12     A.   According to this schedule.
13     Q.   And for the purposes of the
14  transaction there, they're also -- the
15  negotiated value is 10 billion, correct?
16     A.   According to the schedule.
17     Q.   So there's no loss, there's no gain?
18     A.   According to the schedule.
19     Q.   Same with shorts, they both stay at
20  56, correct?  Moving from "Book Value" to
21  "Proceeds" to "Loss and Gain," correct?
22     A.   According to the schedule.
23     Q.   And then repo again, 10, stays at 10,
24  resulting in zero in the "Loss/Gain" column,
25  yes?

Page 225

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.   According to this schedule.
3      Q.   And then when we get to "Comp
4  Payable," the difference is 1 billion between
5  the 1 billion on the book value and the 2
6  billion negotiated number for the transaction,
7  correct?
8      A.   Sorry, can you ask the question again?
9      Q.   I'm on the "Comp Payable" line.  It's
10  shown at 1 billion in the "Book Value" column,
11  yes?  You see that?
12     A.   Uh-huh.  Yes.
13     Q.   And it's shown at 2 billion in the
14  "Proceeds" column, see that?
15     A.   Yes.
16     Q.   Does that difference reflect the
17  agreement to put -- an agreement to put comp
18  payable at 2 billion when it was carried on
19  Lehman's books at 1?
20         MR. HUME:  Objection.  Vague and
21  ambiguous.
22     A.   I believe that the $1 billion number
23  reflects an estimate of what we believed the
24  cash component of the compensation was.
25     Q.   We're in the "Book Value" column now?

## Page 226

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  A.  Correct.
3  Q.  What does the 2 billion number
4  represent in the "Proceeds" column?
5      MR. HUME:  I'm not sure you let the
6  witness finish his answer.
7  Q.  Were you done, sir?
8  A.  Can you repeat, please, the question
9  and answer?
10     (Record read.)
11  A.  Let me continue.  I believe that the
12  $2 billion amount represents the compensation
13  liability agreed to between Bart McDade and the
14  Barclays team.
15  Q.  All right.  And the payable -- now
16  we're in the "Payables" line.  2.25 billion on
17  book value, yes?
18  A.  Yes.
19  Q.  That's an estimate of the payables as
20  shown on Lehman's books, correct?
21  A.  I believe this is intended to show an
22  estimate of 2.25 billion for payables.
23  Q.  And no change between that column,
24  "Book Value," and the "Proceeds" column,
25  correct?  They're both at 2.25?

## Page 227

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  A.  Yeah, that appears that there's no
3  difference between the two.
4  Q.  Hence, a flat result in the "Loss and
5  Gain" column, yes?
6  A.  Yes, as a derivation of that.
7  Q.  All right.  Now, can you tell me what
8  the 5.25 at the bottom of the "Loss/Gain" column
9  is meant to show?
10  A.  I believe it was intended to show the
11  loss on sale -- sorry, the estimated loss on
12  sale to Lehman of the transaction.
13  Q.  Now, down at the bottom left-hand
14  corner of these notes, sir, there are a series
15  of debits shown, "Cash," "Comp," "Payables," and
16  "Shorts," do you see that?
17  A.  Yes.
18  Q.  And a credit for a $65 billion long
19  position, you see that?
20  A.  Yes.
21  Q.  And then the last entry there is "DR,"
22  debit less on sale, 5.75?
23  A.  Yes.
24  Q.  You with me?
25  A.  Yes.

## Page 228

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  Q.  What is that meant to indicate?
3  A.  Well, I believe it's intended to
4  represent the loss on sale to Lehman of the
5  transaction.  However, it doesn't correspond
6  with the 5.25 figure above.
7  Q.  You're kind of at my next question.
8  Can you account the difference -- for the
9  difference between the loss on sale to Lehman of
10  2.25 billion in the "Loss/Gain" column and the
11  loss on sale to Lehman at the bottom of 5.75?
12  A.  No, I can't.
13  Q.  The only thing I can suggest, sir, is
14  there's a debit without a figure in there for
15  cash.  Would that somehow account for the
16  difference?  You see where I am in DR cash item?
17     MR. BERNSTEIN:  Objection.  No
18  foundation.
19  A.  I don't know.
20  Q.  Okay.  Now, having gone through this
21  page, does this refresh your recollection at all
22  about the setting in which you were making these
23  notes at the time and the circumstances under
24  which you were making them?
25  A.  No, it doesn't.

## Page 229

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  Q.  Is it fair to say that the -- now I'm
3  back in the "Loss/Gain" column, the 5.25 loss to
4  Lehman.  Did that calculate -- is it fair to say
5  that's primarily a function of the difference
6  between the book value of the inventory and the
7  value negotiated -- and the negotiated value in
8  the contract for the securities?
9      MR. HUME:  Objection.  Vague and
10  ambiguous.
11  A.  It may.  It may.  It likely accounts
12  for the difference based on these estimates at
13  this point in time.
14  Q.  Now, would you turn two pages later in
15  these notes.  I'm at Bates page 115171.
16     I'm going to need a little more help
17  with your handwriting here.  Is that your
18  handwriting on the page?
19  A.  Yes.
20  Q.  Can you tell me what that says in the
21  top center?  Looks to me like it says "what
22  locked up"?  You see where I am?
23  A.  Yes.
24  Q.  Can you read that top -- that entry at
25  the top center of the page, please?

## Page 230

HIGHLY CONFIDENTIAL - M. KELLY

1    A.  It says, "What locked up? How much
2  to" -- I can't make out the next word, and then
3  it looks like it says "rep. to calculation."
4    Q.  I guess we could both struggle that
5  word that you can't read, but let me just
6  suggest, does that say "reserve" or "recover"?
7    A.  I don't think so.
8    Q.  Okay.
9    A.  I think the second to last word is an
10  "S."
11    Q.  Okay. Let's not both guess at it and
12  we'll both go find our elementary school
13  teachers and they can talk about our
14  handwriting.
15    A.  That's fair.
16    Q.  There's some names on here, including
17  Gary Romain. See that?
18    A.  Yes.
19    Q.  Having looked at this portion, does
20  this refresh your recollection as to the
21  circumstances under which you took these notes,
22  made these notes?
23    A.  Well, it would appear to be after the
24  Monday night because there's a reference to

## Page 231

HIGHLY CONFIDENTIAL - M. KELLY

1  Alvarez on the top right.
2    Q.  Okay. And why does that tell you
3  that's after the Monday night?
4    A.  I don't believe we had any
5  conversations about or with Alvarez until after
6  the Monday night.
7    Q.  Okay. And had you had conversations
8  with Gary Romain before the Monday night?
9    A.  Yes.
10    Q.  Now, below that is an entry that
11  says -- just tell me if I'm reading this
12  correctly -- "Ian, 15c3 lockup calc"; is that
13  right?
14    A.  Yes.
15    Q.  Getting better at your handwriting.
16  What is that a reference to?
17    A.  I believe that's a reference to funds
18  segregated under the 15c3 requirement.
19    Q.  Now, I want to go back generally,
20  without regard to the notes, to this topic we
21  talked about before about looking for available
22  assets to transfer over to Barclays. 15c3 is
23  what sort of triggers that topic.
24  Did you assist in the search for

## Page 232

HIGHLY CONFIDENTIAL - M. KELLY

1  additional assets to give to Barclays?
2    A.  No. Well, let me clarify. My
3  recollection is that I was asked to determine
4  what the excess funds in the 15c3 requirement
5  were.
6    Q.  And you were asked that by Lowitt, Ian
7  Lowitt?
8    A.  I recall it was Ian, yeah.
9    Q.  And did you get a sense in your
10  conversations with Ian about, you said -- I
11  believe you said this morning that the
12  determination of how much was available in 15c3
13  and the other asset categories we talked about
14  was to replace certain assets that Lehman could
15  not deliver to Barclays; is that right?
16    MR. BERNSTEIN: Objection. Vague and
17  ambiguous. Mischaracterizes his testimony.
18    A.  Can you repeat the question, please?
19    Q.  Let me try this again. You talked
20  this morning about over the course of the week
21  the amount of assets that Lehman had agreed to
22  deliver shrinking, you recall that?
23    A.  Well, I would characterize it as the
24  amount of assets that both sides had agreed was

## Page 233

HIGHLY CONFIDENTIAL - M. KELLY

1  shrinking.
2    Q.  And was the search for additional
3  assets related to that reduction in the size of
4  assets that the parties had agreed would be
5  delivered?
6    A.  I don't know.
7    Q.  Was it making up a difference of some
8  kind, search for additional assets?
9    A.  I don't know.
10    Q.  Was there any limit on the additional
11  assets that were being searched for? How many
12  needed to be found in order to solve whatever
13  problem was being solved?
14    A.  I don't know.
15    Q.  Did Mr. Lowitt give you an idea of why
16  he wanted you to determine the amount of
17  available funds in the 15c3 category that could
18  be transferred to Barclays?
19    MR. BERNSTEIN: Objection. Asked and
20  answered.
21    A.  Will you repeat the question, please?
22    (Record read.)
23    A.  My recollection is that the work
24  around the 15c3 requirement was related to

Page 234

HIGHLY CONFIDENTIAL - M. KELLY

1    identifying potential sources of value to be --
2    to be provided -- or, to be sold, sorry --
3    potential additional assets, I should say, to be
4    provided to Barclays.
5        Q.   And again, did you have an
6    understanding as to why potential additional
7    assets to be transferred to Barclays were being
8    looked for?
9            MR. BERNSTEIN:  Objection.  Asked and
10       answered.
11       A.   My recollection is that certain of the
12   assets that had been agreed to be sold may not
13   have been available to be sold based on title or
14   possession issues.
15       Q.   Okay.  And do you have a recollection
16   of how much in 15c3 funds was determined could
17   be sent over to Barclays?
18       A.   No, my role was limited to -- limited
19   to calculating what the surplus might be.
20       Q.   I'm not sure I see where the
21   distinction is.  Is it, as opposed to what could
22   be sent over, you were just supposed to figure
23   out how much was available; is that what you're
24   saying?

Page 235

HIGHLY CONFIDENTIAL - M. KELLY

1        A.   My role was to determine what the
2    reserve requirement was relative to what was
3    segregated in the account.
4        Q.   To see if there was a surplus, yes?
5        A.   Correct.
6        Q.   Now, I'm going to ask you about the
7    text in the middle of the page in a minute, but
8    there's a calculation down toward -- a little
9    further down that has three lines in it, "Cash,"
10   "Inventory," and something "15c3."  Just for
11   purposes of being on the same page, do you see
12   where we are on the page?
13       A.   Yes.
14       Q.   And that first line says Cash, 7 -- 7
15   billion; is that right?
16       A.   7,000, short for 7 billion, yes.
17       Q.   And the second says, Inventory,
18   44,846,000,000?
19       A.   Yes.
20       Q.   And you're going to have to read that
21   third one to me.  What does that say below that?
22       A.   The amount is a billion.  A thousand.
23   That's short for a billion.
24       Q.   And what are the words?

Page 236

HIGHLY CONFIDENTIAL - M. KELLY

1        A.   Something 15c3.
2        Q.   Okay.  Does that represent a billion
3    in 15c3 surplus?
4            MR. HUME:  Objection.  Lack of
5        foundation.
6        A.   I'm not sure what that represents.
7        Q.   And those numbers add to
8    52,846,000,000, do you see that?
9        A.   Yes.  According to the schedule, yes.
10       Q.   Okay.  And the math is right, right?
11       A.   Yes.
12       Q.   And what were you adding up there,
13   that 52,846,000,000?
14       A.   The sum of the three captions above
15   it.
16       Q.   Okay.  And it was contemplated, apart
17   from assets that -- we talked a bit about this.
18   There were some assets that got tied up and
19   didn't go over until later, right?
20       A.   Uh-huh.
21       Q.   Yes?
22       A.   Correct.
23       Q.   Okay.  Without regard to when they
24   went over, does this calculation of 7 billion

Page 237

HIGHLY CONFIDENTIAL - M. KELLY

1    plus 44846 plus a billion represent the value
2    that was supposed to go to Barclays at the time
3    of the transaction?
4            MR. HUME:  Objection.  Vague and
5        ambiguous.
6        A.   I'm not aware.
7        Q.   Well, do you know where the source of
8    the inventory number there of 44,846,000,000
9    comes from?
10       A.   No, I don't recall the source.
11       Q.   Now, just above that, sir, does that
12   say "went," W-E-N-T?
13       A.   In a circle?
14       Q.   Yes.
15       A.   I don't know.
16       Q.   Okay.
17       A.   I think below it it refers to Wells.
I'm not sure if it's the same word.
19       Q.   Well, there were some 15c3 funds that
20   were found in an account at Wells, correct?
21       A.   I don't recall right offhand.
22       Q.   And below that it says "Chase," do you
23   see that?
24       A.   Yes.

Page 238

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   So for some reason or another that's
3  referring to a couple of banks, but what I want
4  is to know, if you can tell me, what, if that
5  says "sent" or "went" at the top, what that
6  means?
7        MR. BERNSTEIN: Objection.
8    A.   I don't know.
9    Q.   Now, over on the right-hand side, you
10  see where it says "42 b pledged," "2 b"?
11   A.   Yes.
12   Q.   What does that mean?
13   A.   Well, I would expect that "b" refers
14  to Barclays.
15   Q.   Okay. Do you know what "42 billion
16  pledged to Barclays" would mean? Can you put
17  that in some kind of context looking at these
18  notes?
19   A.   I would expect that that means pledged
20  as part of a repo, but I'm not certain.
21   Q.   And below that, "0.8 pledged B." And
22  I just can't read what's below that. What does
23  that say?
24   A.   I think that says "Friday night."
25   Q.   Okay. Now, I guess over the week

Page 239

HIGHLY CONFIDENTIAL - M. KELLY
1
2  we've been talking about, from Tuesday when the
3  agreement is made until Monday when the
4  transaction is closed, from the 16th to the
5  22nd; you with me with that timeframe, okay?
6    A.   We've been talking about that, yes.
7    Q.   There's only one Friday in that
8  sequence, right?
9    A.   I'm not sure about that.
10   Q.   Well, Tuesday, Wednesday, Thursday,
11  Friday, Saturday, Sunday. Only one Friday,
12  right?
13   A.   If that's the timeframe we're looking
14  at. I'm not sure that this refers to that time.
15   Q.   If that's the timeframe we're talking
16  about, does that suggest to you these notes were
17  done over the weekend of the 21st -- of the 20th
18  and the 21st?
19        MR. BERNSTEIN: Objection. By "these
20    notes" you mean a particular page or all of
21    the pages?
22   Q.   The ones that refer to something
23  pledged on Friday night.
24        MR. HUME: Objection.
25        MR. BERNSTEIN: I just want to

Page 240

HIGHLY CONFIDENTIAL - M. KELLY
1
2  clarify. Are you asking him this page or
3  all of the pages in Exhibit 198?
4    Q.   Let's do this page.
5        MR. BERNSTEIN: Thank you.
6    A.   Yeah, regarding this page, I would
7  infer that the use of the past tense in the word
8  "pledged" infers that Friday night was prior to
9  this page having been written.
10   Q.   Okay. Now, with that sort of review
11  of that portion of your notes, can you go back
12  to the 52,846,000,000 and tell me, now that we
13  have contextualized it to that weekend of the
14  20th and the 21st, that refreshes your
15  recollection as to why we see a total of
16  52,846,000,000 calculated in this way?
17        MR. HUME: Objection. Asked and
18    answered.
19   A.   No.
20   Q.   Well, again, sir, the effort to find
21  the 15 -- the surplus 15c3 didn't occur until
22  the 19th of September, right? It was later in
23  the week?
24   A.   The 19th was what date?
25   Q.   That's the Friday.

Page 241

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.   I can't recall when the effort
3  started. I can't say it went through that
4  weekend.
5    Q.   Does anything on this page give you
6  any ability to suggest or speculate as to why
7  52,846,000,000 is shown on there?
8        MR. BERNSTEIN: Objection to the form.
9    Compound.
10        And you shouldn't speculate unless
11    you're directed to speculate by the
12    questioner.
13        MR. GAFFEY: And I have.
14        MR. BERNSTEIN: You said "suggest or
15    speculate."
16   Q.   I'll take either one. Tell me whether
17  you're suggesting or speculating.
18   A.   Could you repeat the question, please?
19   Q.   Withdrawn.
20        With the discussion we've had about
21  this page of notes, sir, do you have any ability
22  to suggest to me any reason that it says
23  52,846,000,000 there on that page of your notes?
24   A.   I'm sorry, I don't understand the
25  question.

Page 242

HIGHLY CONFIDENTIAL - M. KELLY
1
2     Q.   Was the value of the assets
3  transferred to Barclays after the weekend of the
4  20th and the 21st somewhere in the range of 52
5  or 53 billion dollars?
6         MR. BERNSTEIN: Objection.  No
7  foundation.
8     A.   My recollection was that the value was
9  approximately 50 billion.
10    Q.   You had a repo for a principal amount
11 of approximately $45 billion between Lehman and
12 Barclays during that week, correct?  We talked
13 about this before.
14        MR. HUME: Objection.  Lack of
15 foundation.
16    A.   I don't recall the specific amounts.
17    Q.   You have no recollection of the amount
18 of the repo?
19    A.   Correct.
20        (Exhibit 199, an e-mail and attached
21    balance sheet, marked for identification, as
22    of this date.)
23    Q.   Take a look through what we have
24 marked as Exhibit 199, which is an e-mail and
25 attached balance sheet.  Tell me whether you

Page 243

HIGHLY CONFIDENTIAL - M. KELLY
1
2  recognize the document.
3         (Document review.)
4     A.   I don't recall the document.
5     Q.   Take a look at the attachment, please.
6  You might want to have handy, sir, the financial
7  schedule within Exhibit 196, okay?
8         And just so we have both an asset and
9  a liability column, I'll ask you to turn to the
10 last page of the document, the schedule showing
11 both assets and liabilities in columns A through
12 M, see that?
13    A.   Yes.
14    Q.   Now, in the assets side, let's start
15 there, there are two columns, one that says "Per
16 Contract Estimate" and one that says "9/16
17 Estimate," do you see that?
18    A.   Yes.
19    Q.   And the difference between the totals
20 there is $5.1 billion, do you see that, between
21 the 62.7 and the 57.6?
22    A.   Yes.  Approximately, yes.
23    Q.   And do you know the source of the --
24 do you know what the 9/16 estimate is an
25 estimate of?

Page 244

HIGHLY CONFIDENTIAL - M. KELLY
1
2         MR. BERNSTEIN: Objection.  No
3  foundation.
4     A.   It appears to be a revision to the
5  amounts listed under the "Contract Estimate"
6  column.
7     Q.   Okay.  And just so we're again on the
8  same page, the contract estimate numbers on the
9  asset side match the asset values shown on the
10 schedule within Exhibit 196, the one dated
11 September 16, right?
12        The 40 and the 1.1, 2.7?
13    A.   I understand.  I'm just looking at the
14 numbers.
15        Yes, so the "Contract Estimate" column
16 appears to match.
17    Q.   Okay.  And again, just having looked
18 at the document a little more, do you have any
19 memory of seeing this before or any knowledge as
20 to why or how it was prepared?
21    A.   No, I don't recall seeing this.
22    Q.   Can you offer any explanation, sir, as
23 to why on the 18th September Mr. Reilly would be
24 sending that balance sheet to you, as the cover
25 e-mail reflects?

Page 245

HIGHLY CONFIDENTIAL - M. KELLY
1
2     A.   Well, Gerry was part of the group of
3  people I referenced earlier as being involved in
4  updating the estimates of the balance sheet.
5     Q.   And does anything we discussed about
6  this particular document now refresh your
7  recollection as to the circumstances under which
8  it was sent to you, why it was sent to you, any
9  conversations you may have had with Mr. Reilly
10 about it?
11    A.   No.
12    Q.   Okay.
13        (Exhibit 200, a document bearing Bates
14    Nos. BCI-EX-00115141, marked for
15    identification, as of this date.)
16    Q.   Mr. Kelly, I have put before you what
17 we have marked as Exhibit 200, a one-page
18 document bearing Bates No. BCI-EX-00115141, do
19 you recognize that document?
20    A.   I do recognize this as another version
21 of the estimates of the assets and liabilities.
22    Q.   Do you recognize it as a version that
23 was created before or after the financial
24 schedule that's within Exhibit 196?
25    A.   I'm not sure if this is before or

| Page 246 | Page 247 |
|---|---|

**Page 246**

HIGHLY CONFIDENTIAL - M. KELLY

1    after the other exhibit.

2    Q.  Take a look, if you would -- I take it

3    the handwriting on this page is yours; is that

4    right?

5    A.  No, I don't believe -- this is not my

6    handwriting.

7    Q.  Do you know whose handwriting that is

8    where it says "mark down" under "Adjusted Total

9    Assets"?

10    A.  I believe this is Ian Lowitt's

11    handwriting.

12    Q.  Just so we're clear about what you

13    mean by this, what about -- let me ask about the

14    rest of the handwriting on the page which

15    consists of numbers.  Do you recognize whose

16    handwriting that is?

17    A.  I don't believe any of the handwriting

18    is mine.  I think -- I think the handwriting is

19    Ian Lowitt's.

20    Q.  Can you offer any explanation as to

21    why Mr. Lowitt would be writing "mark down"

22    under "Adjusted Total Assets" on this schedule?

23    A.  No.

24    Q.  When the schedule that's within

**Page 247**

HIGHLY CONFIDENTIAL - M. KELLY

1    Exhibit 196 -- that is what I'm going to call

2    the final schedule, sir, okay? -- when that was

3    prepared, was it Mr. Lowitt who communicated to

4    you what amounts should be attributed to

5    particular asset classes as shown on that

6    schedule?

7    MR. BERNSTEIN:  Objection.  Asked and

8    answered.

9    A.  Can you repeat the question, please?

10    (Record read.)

11    A.  No.

12    Q.  It was not Mr. Lowitt or you don't

13    remember?

14    A.  I should say -- I should correct that.

15    I don't believe so.

16    Q.  Did Mr. Lowitt ever communicate to you

17    any kind of mark down he thought should be

18    attributed to the assets that were being

19    transferred to Barclays?

20    A.  I don't believe so.

21    (Exhibit 201, an e-mail with attached

22    financial schedule, marked for

23    identification, as of this date.)

24    Q.  Mr. Kelly, you have before you a

| Page 248 | Page 249 |
|---|---|

**Page 248**

HIGHLY CONFIDENTIAL - M. KELLY

1    document we've marked as Exhibit 201.  It's a

2    cover e-mail from Brian Yeung, Y-E-U-N-G, to

3    you, containing an attached financial schedule.

4    Have you seen that document before?

5    A.  Which document are you referring to?

6    Q.  Well, either one.  I guess it's an

7    e-mail and the attachment that came with it,

8    so...

9    A.  I don't recall the e-mail cover.

10    Q.  Uh-huh.

11    MR. BERNSTEIN:  I just note this is

12    not Bates-stamped.  Is it your understanding

13    that this is all -- that pages 2 and 3 are

14    in fact the attachment to page 1?

15    MR. GAFFEY:  That's my best

16    information, yes.

17    A.  I do recall versions of this.  I'll

18    call it a spreadsheet.

19    Q.  Okay.

20    A.  In this format.

21    I don't recall specifically seeing

22    this version.

23    Q.  Okay.  You may have seen it, you may

24    not, but you saw them at or around the time in

**Page 249**

HIGHLY CONFIDENTIAL - M. KELLY

1    this format, is that fair?  You just don't know

2    if you saw this one in particular?

3    A.  I don't have specific recollection on

4    this.

5    Q.  Okay.  There's a column on the

6    spreadsheet for transaction adjustments, do you

7    see that?

8    A.  Yes.

9    Q.  Okay.  What is that column meant to

10    designate?  While you're looking at that, let me

11    withdraw that and ask you my next question

12    anyway.

13    If you would turn to the last page of

14    the document in the "Liability" section under

15    "Payables" where it says "Compensation Payable,"

16    you with me?

17    A.  Yes.

18    Q.  If you would just read across from

19    left to right -- not out loud, but to

20    yourself -- read across from left to right.

21    What I want to know, sir, is what is

22    represented by that 1 billion entry in the

23    "Transactions" column -- "Adjustments" column,

24    along that line?

Page 250

1       HIGHLY CONFIDENTIAL - M. KELLY
2       MR. BERNSTEIN: Objection. No
3    foundation.
4       A.   I don't know.
5       Q.   Does it reflect a write-up of some
6    sort of the amount on Lehman's books for
7    compensation payable as of 9/17/08?
8       A.   I'm sorry, could you repeat the
9    question?
10      Q.   Well, let me rephrase it.
11          Compensation payable, it's got two
12   dates columns, 8/31/08 and 9/17/08. You with me
13   there?
14      A.   Yes.
15      Q.   And in the 9/17/08 column it shows an
16   amount of 520, correct?
17      A.   Yes.
18      Q.   And moving further to the right, it
19   shows an amount to the thousand in the
20   "Transaction Adjustments" column, correct?
21      A.   Yes.
22      Q.   And in "Balance Sheet Transferred,"
23   the next column, it's in the amount of 1,520,
24   correct?
25      A.   Yes.

Page 251

1       HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Well, that's -- that's the math, and I
3    have that, but what is -- what transaction
4    adjustment is being made for a balance sheet?
5    What does balance -- withdrawn.
6          What does "Balance Sheet Transferred"
7    mean on this spreadsheet, do you know?
8       A.   I believe it was intended to represent
9    the estimate at this point in time of the assets
10   and liabilities transferred to Barclays.
11      Q.   When we spoke earlier this morning
12   about your e-mail, which is Exhibit 136, which
13   we spent so much time on this morning, and you
14   referred to an extra 1 billion of comp beyond
15   our accrual, do you remember that?
16      A.   Yes.
17      Q.   Is this the extra 1 billion comp above
18   the accrual that you were talking about in that
19   e-mail?
20      MR. BERNSTEIN: Objection.
21      MR. HUME: Objection.
22   Mischaracterizes testimony.
23      MR. BERNSTEIN: And no foundation.
24      A.   I don't know.
25      MR. BERNSTEIN: It's 5:45 and our

Page 252

1       HIGHLY CONFIDENTIAL - M. KELLY
2    position is the deposition is over.
3       MR. GAFFEY: It's not mine, I'm
4    afraid. I think we're going to need him
5    back. If you want to stop for the day,
6    that's fine, but we're going to reserve our
7    rights to resume questioning. I have a lot
8    more to go through with him. I think we had
9    a lot of time spent today on read-backs and
10   conferences and the like, and I don't think
11   I've got a full and fair seven hours.
12      MR. BERNSTEIN: I prefer not to have
13   long colloquies on the record.
14      MR. GAFFEY: That's fine. So you know
15   where I am and I know where you are.
16      MR. BERNSTEIN: Although I would like
17   to say something.
18          We went over by 15 minutes as in
19   recognition of the fact that there were some
20   extra conferences with respect to privilege
21   issues. And I think he's satisfied his
22   obligation to give a deposition, and our
23   position is that the deposition is over.
24          Without waiving anything, do you and
25   the others around the table have an estimate

Page 253

1       HIGHLY CONFIDENTIAL - M. KELLY
2    of how much additional questioning you have?
3       MR. GAFFEY: I've got a couple more
4    hours.
5       MR. BERNSTEIN: Does anyone else
6    intend to question this witness?
7       MR. OXFORD: Yes.
8       MR. BERNSTEIN: Assuming there is an
9    additional deposition, which, as you know,
10   our position is there should not be --
11      MR. OXFORD: I intend to question the
12   witness for the Trustee. I expect to be at
13   least an hour.
14      MS. TAGGART: About the same thing for
15   the Committee.
16      MR. BERNSTEIN: Anyone else?
17          Well, our position is it's over, but I
18   don't want to provoke long colloquies. It's
19   something that we can discuss off the
20   record, phone calls. We'll see if there's a
21   way to make an accommodation. I'm not
22   saying there will be.
23      MR. CARDEN: Should we get the elapsed
24   time so far so we're all dealing with the
25   same information base?

Page 254

HIGHLY CONFIDENTIAL - M. KELLY

1
2    MR. BERNSTEIN:  Right now --
3    MR. CARDEN:  The court reporter could
4    tell us how much time we were under
5    questioning.
6    MR. BERNSTEIN:  Right now it's 5:47.
7    MR. CARDEN:  That doesn't answer the
8    question.
9    (Discussion off the record.)
10   (Time Noted:  5:49 P.M.)
11   oOo
12
13
14
15
16
17
18
     _____
19
     MARTIN KELLY
20   Subscribed and sworn to
     before me this    day
21   of        2009.
22
     _____
23
24
25

Page 255

HIGHLY CONFIDENTIAL - M. KELLY

1
2    CERTIFICATE
3    STATE OF NEW YORK )
                : ss
4    COUNTY OF NEW YORK)
5    I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9    That MARTIN KELLY, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14   I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18   I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23   In witness whereof, I have hereunto
24   set my hand this 18th day of August, 2009.
25   --------------------------------

Page 256

HIGHLY CONFIDENTIAL - M. KELLY

1
2    INDEX
3    WITNESS:        EXAMINATION BY        PAGE
4    M. KELLY        Mr. Gaffey        5
5    EXHIBITS:                PAGE
6    Exhibit 193, a document bearing Bates Nos.    21
7    BCI-EX-00077323 through 77325
8    Exhibit 194, a document bearing Bates Nos.    23
9    BCI-EX-00077326 through 77327
10   Exhibit 195, a document bearing Bates Nos.    84
11   10252949
12   Exhibit 196, a document bearing Bates Nos.    91
13   464234 and 466133
14   Exhibit 197, a document bearing Bates Nos.    161
15   10292661
16   Exhibit 198, a document bearing Bates Nos.    207
17   BCI-EX-00115167 through 5173
18   Exhibit 199, an e-mail and attached        242
19   balance sheet
20   Exhibit 200, a document bearing Bates Nos.    245
21   BCI-EX-00115141
22   Exhibit 201, an e-mail with attached        247
23   financial schedule
24
25

Page 257

1    HIGHLY CONFIDENTIAL - M. KELLY
2    NAME OF CASE:  In re Lehman Brothers
3    DATE OF DEPOSITION:  August 18, 2009
4    NAME OF WITNESS:  Martin Kelly
5    Reason Codes:
        1. To clarify the record.
6       2. To conform to the facts.
        3 To correct transcription errors.
7    Page _____ Line _____ Reason _____
8    From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25       MARTIN KELLY