# A. 15

Page 1

1

2                 UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9                 Debtors.

10     ------------------------x

11

12           * * *HIGHLY CONFIDENTIAL* * *

13           DEPOSITION OF STEPHEN KING

14                New York, New York

15                September 10, 2009

16

17     Reported by:

18     MARY F. BOWMAN, RPR, CRR

19     JOB NO. 24299

20

21

22

23

24

25

## Page 2

```
 1
 2
 3
 4
 5                    September 10, 2009
 6                       9:35 a.m.
 7
 8
 9          Deposition of STEPHEN KING held at
10   the offices of Jones Day, LLP, 222 East 41st
11   Street, New York, New York, before Mary F.
12   Bowman, a Registered Professional Reporter,
13   Certified Realtime Reporter, and Notary Public
14   of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                    APPEARANCES:
 3   JONES DAY, LLP
 4   Attorneys for Lehman Brothers, Inc.
 5       222 East 41st Street
 6       New York, New York   10017-6702
 7   BY:  WILLIAM HINE, ESQ.
 8       GEORGE E. SPENCER, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12       575 Lexington Avenue
13       New York, New York   10022
14   BY:  JACK STERN, ESQ.
15
16   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17   Attorneys for the Creditors Committee
18       51 Madison Avenue
19       New York, New York   10010
20   BY:  ROBERT K. DAKIS, ESQ.
21
22
23
24
25
```

## Page 4

```
 1
 2                    APPEARANCES:
 3
 4   JENNER & BLOCK, LLC
 5   Attorneys for the Examiner
 6       330 N. Wabash Avenue
 7       Chicago, Illinois   60611-7603
 8   BY:  DAVID C. LAYDEN, ESQ.
 9
10   HUGHES, HUBBARD & REED, LLP
11   Attorneys for the SIPA Trustee
12       One Battery Park Plaza
13       New York, New York   10004-1482
14   BY:  NEIL J. OXFORD, ESQ.
15       FARA TABATABAI, ESQ.
16
17   Also Present:
18       INGRID M. CHRISTIAN, Alvarez & Marsal
19
20
21
22
23
24
25
```

## Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 6

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 7

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 8

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 9

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 14

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 15

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 16

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 17

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

20      Q.   So you participated in meetings with
21  Lehman folks during that weekend?
22      A.   I don't know whether we did by that
23  weekend.  That was really -- I thought that was --
24  I thought in the lead up to that week, there was a
25  data room that was set up by Lehman.  I never went

Page 18

KING - HIGHLY-CONFIDENTIAL
1  KING - HIGHLY-CONFIDENTIAL
2  to it actually, but one of the people that works
3  for me did.
4       I would have been at Lehman over the
5  weekend, but most of what we did was phone calls
6  to people and -- I mean in reality, there is a --
7  it is a -- there were many, many -- this was a
8  phenomenally complex situation just because of the
9  number of line items.  So in many respects, the
10 approach that we took to the analysis was high
11 level down rather than bottom up, meaning to have
12 accurately assessed the value of an individual
13 security by reference to talking to a trader when
14 there were then, say, 10,000 line items was less
15 useful than being able to initially categorize
16 things as residential mortgage-backed securities,
17 credit card securities, et cetera, et cetera,
18 subordinate, senior, and then have broad
19 valuations based on where we know similar markets
20 trade, and then each day we just refined.
21      Q.   OK, I think I understood what you
22 said.  When you said bottom up, you mean if you
23 had the luxury of time, you -- one might go CUSIP
24 by CUSIP or security by security and try to assess
25 the value of an individual security?

Page 19

1  KING - HIGHLY-CONFIDENTIAL
2       A.   Right, right.
3       Q.   But you didn't have the luxury of
4  time.  Is that what I hear you saying?
5       A.   Luxury of time and even time -- then
6  markets are actually moving, so I would have to
7  be -- if you had infinite resources for a very
8  short period of time, then you might try to go
9  bottom up.
10      As -- once we had a definitive set --
11 it was really -- so the first exercise was -- and
12 this was repeated as we went through the 15th,
13 through the various iterations of the asset
14 population, was one, do we have a complete
15 description of the population, can we categorize
16 the population, can we estimate valuations for the
17 categories within the population, can we refine
18 and improve those estimates, increasingly becoming
19 more granular.  Have we engaged the appropriate
20 desks, trading desks within Barclays to -- or
21 existing Lehman desks, to provide us as much input
22 to where markets are or what securities -- what a
23 particular security is.
24      And then the last part was how do we
25 risk -- what is the risk associated with these

Page 20

1  KING - HIGHLY-CONFIDENTIAL
2  categories of securities and how might we either
3  plan to dispose of the assets or in the short term
4  risk manage the assets.

REDACTED

Page 21

1  KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 22

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 23

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 24

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 25

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 26

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 27

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

6    Did you -- when you received the
7    information from Lehman, it had some kind of book
8    value ascribed to it by Lehman, correct?
9    A.  Yes.
10    Q.  Did you understand that by the time
11    Barclays and Lehman signed an agreement, that
12    there was going to be some kind of discount off of
13    that book value for the pool of assets that
14    Barclays was going to be acquiring?
15    A.  The signing of the agreement on the
16    Tuesday that you have told me about?
17    Q.  Yes, yes.
18    A.  -- or later --
19    Q.  Yes.
20    A.  I don't know much -- I don't really
21    know what agreement was reached on the 16th.  All
22    I know is that there was some assets that we were
23    looking at.  I would assume that it wouldn't have
24    been at all a surprise to anybody that a bid, even
25    a reasonable bid or reasonable assessment of a bid

Page 28

1    KING - HIGHLY-CONFIDENTIAL
2    for small size would be at a discount to book
3    value if that's the valuation that you are
4    referring to.  Book value being where it is held
5    in books and records.
6    Q.  Well, I guess I understand your
7    answer, but do you have any recollection of
8    discussions during that period of time -- and
9    again I'm talking the 15th and 16th -- about
10    either discounting or reducing the values that
11    Lehman had ascribed to these pools of assets in
12    order to come to an agreement as to the pool of
13    assets or the marks for the pool of assets that
14    Barclays was going to acquire?
15    MR. STERN:  This is you personally.
16    A.  This is me personally.  I have never
17    had any conversations with anybody at Lehman about
18    discounting Lehman's marks.  It is definitely the
19    case that in the crudest -- if somebody said to
20    me, Stephen, here is a security, you don't know
21    what it is, but, you know, it is -- it has a
22    price -- the last time it traded it had a price of
23    50, let's say, mentally, I would say, well, I know
24    it is not -- I certainly wouldn't be bidding 50.
25    I would be bidding half of that or 20 percent of

Page 29

1    KING - HIGHLY-CONFIDENTIAL
2    that or 80 percent of that or some number.
3    So it is definitely the case that when
4    we were trying to guess what might be a reasonable
5    value, in a very, very distressed market --
6    Q.  Sure.
7    A.  A very, very distressed market for a
8    very, very substantial number of assets that
9    Barclays would want to be selling, and Barclays
10    didn't -- bear in mind, Barclays didn't want these
11    assets.  The assets were -- you wouldn't want to
12    hold on to them.  They consume capital.  They need
13    to be funded.  Funding was expensive, capital was
14    expensive.
15    The assets were part of, you know, a
16    deal, and therefore, they would -- and, you know,
17    the -- I avoided the word "hedging" when you used
18    hedging because hedging doesn't really -- hedging
19    still means there is a left-over risk.  You never
20    really -- especially with assets like this.
21    Hedging is just, well, I have got one thing that
22    I'm short against something I am long.  It is not
23    very well hedged, there is still a risk, and
24    that's why banks and hedge funds have had quite a
25    lot of difficulty in the last few months.

Page 30

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2         So we knew that the objective would be
3    that we need to dispose of this risk.  That was
4    the objective.  So if I was looking at a portfolio
5    of assets, and you held the assets at 100, let's
6    say, I'd say I don't know -- and I felt
7    comfortable that I understand what the assets are,
8    my bet is I couldn't sell those for more than
9    80 cents of where you have currently ascribed a
10   value to them.
11        So yes, when we -- as a desk, the "we"
12   meaning my group, one of the first things that we
13   did was say, let's just assume that the stuff we
14   don't know is at 50 percent of book value.  The
15   stuff that is exchange traded equities is at
16   95 percent of where it is, because that was a --
17   the crudest form of guess.
18        Q.   Is that the type of analysis you were
19   doing on the 15th and 16th when you described -- I
20   think you previously talked about a top-down
21   approach as opposed to bottom up?
22        A.   Yes.  Because you do that -- really if
23   you think about it, you repeatedly do that same
24   process at an ever-more granular level.  Even if
25   you got down to an individual security, a trader

Page 31

1    KING - HIGHLY-CONFIDENTIAL
2    would say I've projected -- the thing about some
3    of these securities and assets is, unlike -- not
4    all of them but some of them, and certainly the
5    ones that we would have been looking at at this
6    time, they are not -- even though many of them are
7    called fixed income or debt instruments, the
8    amount of cash that they would be expected to
9    ultimately pay is actually uncertain, either
10   because there is a lot of risk associated with the
11   borrower or there is a prepayment risk or there is
12   something that makes the cash flow uncertain.
13        So the way a trader would look at it
14   is to say, I'll make a -- I'll form a view of how
15   much cash that I would want -- that I expect to
16   receive on this security, and then I would want to
17   discount the amount of cash back to some price
18   that I felt that I was earning an appropriate
19   yield on.  And then when a trader was then
20   subsequently bidding, they then may provide --
21   say, actually I'll bid 80 percent of that.
22        So whether it is at the portfolio
23   level, when we are looking at a whole balance
24   sheet, or an individual CUSIP, in many respects
25   the process is the same.  It is about how

Page 32

1    KING - HIGHLY-CONFIDENTIAL
2    confident you can be that you have assessed
3    everything correctly, because there is so much
4    uncertainty.

REDACTED

Page 33

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

PAGES 34 – 53 REDACTED

Page 54

1           KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 55

1           KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 56

1           KING - HIGHLY-CONFIDENTIAL

REDACTED

16      Q.   So if there was, you don't recall
17  seeing them?
18      A.   No.  If they -- you know, and as you
19  said, sort of towards the -- sometime between the
20  16th and 18th, our focus changed totally to the
21  securities that were just in the Fed facility.

Page 57

1           KING - HIGHLY-CONFIDENTIAL

REDACTED

PAGES 58 – 65 REDACTED

Page 66

1      KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 67

1      KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 68

1      KING - HIGHLY-CONFIDENTIAL

REDACTED

9      Q.  OK.  Well, tell me then why this all
10     became relevant.  I assume you are talking about
11     in the Wednesday-Thursday time frame?
12         A.   Yeah, at the point that we started to
13     be asked to focus on the securities that were
14     collateralizing the Fed repo facility.
15         Q.   And what were you told in that regard?
16         A.   That here is a population of
17     securities that is collateralizing a loan that was
18     provided to LBI by the Fed, and we were being --
19     we, Barclays was being asked to step into the
20     position of the Fed.  I don't know -- I wasn't
21     part of the discussions as to why that would be
22     the case or whether it -- or how it had come about
23     or whether we would do it.
24         My group was then asked once again to
25     provide an assessment of the probable value or --

Page 69

1       KING - HIGHLY-CONFIDENTIAL
2      not just even the value actually.  What was in the
3      Fed facility.
4          Q.   And who told you -- who told you all
5      this?  Who gave you these instructions?
6          A.   The instructions to start to do that
7      work?
8          Q.   Yeah.
9          A.   I think, I think it was Mike at the
10     time asked us to look at it.
11         Q.   Mike who?
12         A.   Keegan.
13         Q.   And did you -- you understand that
14     there was a repo transaction entered into on
15     September 18 involving Barclays and Lehman,
16     correct?
17         A.   Yes.
18         Q.   That's the Thursday?
19         A.   Yes.
20         Q.   And so was this assessment you were
21     asked to do prior to that repo transaction or
22     was -- were you assessing the securities that had
23     been posted into that repo transaction?
24         A.   Both.
25         Q.   So am I correct -- I assume the

1    KING - HIGHLY-CONFIDENTIAL
2    securities that were -- supported the Fed repo
3    earlier in the week were somehow supposed to make
4    their way into the September 18 repo involving
5    Barclays and Lehman, correct?
6        A.    Yes.
7        Q.    So you were asked to assess both the
8    Fed pool of securities and then what ultimately
9    made it into the repo?
10        A.    That's correct, yes.
11        Q.    And did you come to any conclusions
12    after that assessment?
13        A.    Yes, the same -- we did the same
14    process that we had done on each of the previous
15    iterations.  We were able to reuse some of the
16    information because there was an overlap between
17    the list of securities that were in the Fed
18    facility, ostensibly, the Fed facility and also on
19    the balance sheet of LBI.
20            We had -- I thought it was on the
21    Wednesday, we were -- I thought it was on the
22    Wednesday, not the Thursday, we were first asked
23    to look at it, which is why I say about the
24    Wednesday we started to put our pens down on what
25    we were doing previously, and I remember that we

1    KING - HIGHLY-CONFIDENTIAL
2    had literally something like about an hour or hour
3    and a half when we were first asked to look at it
4    to -- and the population was 49 or so billion
5    dollars of assets, and the question was, Stephen,
6    what do you think these are worth?

REDACTED

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

25        Q.    Well, I think you said previously you

1    KING - HIGHLY-CONFIDENTIAL
2    were asked -- you mentioned a close to 50 billion
3    dollar number.
4        A.    Yeah.
5        Q.    I still don't know that you answered.
6    Is that the Fed pool or is that the collateral
7    that was ultimately posted to the September 18
8    repo?
9        A.    There I am describing what we were
10    doing prior to the settlement, which was to
11    provide -- the question that had been asked to us
12    is, there is a Fed facility, I seem to remember it
13    was 45 billion dollars, and it is backed by
14    securities which have a value -- which I think
15    subsequently or around that time we found was not
16    of course -- it is neither a Barclays assessment
17    of value or Lehman assessment of value, it is a JP
18    as custodian for the securities assessment of
19    value.  Not a trader's value, so not a mark, just
20    a -- you know, a price, a matrix price or wherever
21    they got their prices from, assessment of how much
22    collateral was supposedly supporting the Fed
23    facility, and the Fed facility was sized by
24    reference to haircuts to that assumed value.
25            So we were then asked to say, well, do

Page 74

1    KING - HIGHLY-CONFIDENTIAL
2    we think that if you had to liquidate this
3    portfolio, that you could recover the amount of
4    the loan that was being made.

REDACTED

Page 75

1    KING - HIGHLY-CONFIDENTIAL
2    half. So that may just have been because we
3    didn't have a night.
4        Q.   I appreciate that, for all of us who
5    have missed nights as well.
6        So is this -- when you said you had
7    about an hour and a half or two --
8        A.   We had an hour and a half. There was
9    a phone call to say we are being asked to take the
10   Fed out of this. We didn't know the reason why or
11   reason for the transaction or whether it was even
12   necessarily related to it.
13       MR. STERN: "We" being you?
14       A.   "We" being Barclays at that point.
15   That Barclays was being asked to take the Fed out
16   of its facility, out of this loan, and the
17   question to us as my group was, what do you think
18   about this value of securities?
19       Q.   And what did --
20       A.   And I found that an extraordinary
21   situation, because we had just had the bankruptcy
22   of Lehman and we were being asked whether or not
23   we thought a portfolio of securities, which we
24   barely knew, because we had only really
25   encountered them a handful of days before, it was

Page 76

1    KING - HIGHLY-CONFIDENTIAL
2    actually worth 45 billion dollars, and therefore,
3    should we permit Barclays to lend 45 billion
4    dollars against a portfolio of securities, and in
5    any normal circumstances I would never make that
6    statement or assertion.
7        Q.   When you say 45, that's the amount of
8    the Fed facility?
9        A.   That's the amount I remember being the
10   Fed facility.
11       Q.   Secured by -- 45 was the value of the
12   pool in the Fed, to your recollection, or was that
13   the amount that the Fed --
14       A.   That was the loan amount.
15       Q.   And the value or purported value in
16   the pool was about 5 billion more than that?
17       A.   Well, you are using -- you are saying
18   "value" as if that was value.
19       Q.   OK.
20       A.   The numbers that were the JP Morgan
21   marks I think at some date, and I don't remember
22   which date it was, they may have even been from
23   the Monday or Tuesday or Wednesday, I don't
24   remember how current they were. Markets were that
25   volatile, but that they -- those numbers added up

Page 77

1    KING - HIGHLY-CONFIDENTIAL
2    to -- I remember it being anything from 48 and a
3    half to 49, to 49.7. There was some -- if you add
4    up those numbers, it would appear that if it were
5    possible, if it were possible to sell into the
6    open market at those JP Morgan marks, then you
7    would get 49 point or 48 point whatever it is for
8    the portfolio.
9        Of course that's not a -- that's not a
10   value.
11       Q.   OK. But -- I understand that. I
12   didn't mean to misuse that word.
13       So what did you conclude as to the --
14   what did you respond to the people who had asked
15   you to make this assessment?
16       A.   We thought it was possible that in a
17   controlled way, we might be able to recover enough
18   to cover the loan.
19       Q.   Meaning the 45 number?
20       A.   Meaning the 45.

REDACTED

1       KING - HIGHLY-CONFIDENTIAL

REDACTED

22    Q. Can you specify "this transaction"?

23    A. The Fed transaction.

24       The peculiarity of this, and we didn't

25  really understand this at the beginning, but it

1       KING - HIGHLY-CONFIDENTIAL

2  became clear, is, of course, the normal

3  circumstances, a repo transaction shouldn't mean

4  that the lender on the loan is long the underlying

5  risk of the securities collateralizing the loan.

6  They have a secured lending to a borrower that's

7  collateralized.

8       Here, of course, we knew that we were

9  lending to a borrower that was expected to be

10  bankrupt within a short period of time, and whose

11  parent was bankrupt.  Therefore, although it was a

12  loan to a counterparty, at some point we were

13  going to be long the underlying assets.

14       And if we were long the underlying

15  assets, we therefore needed to risk manage them.

16  Because just because we had assessed that as of

17  the Thursday they were worth some amount,

18  hopefully more than 45 billion dollars, by the

19  Monday, they might have been worth 35 billion

20  dollars.

21    Q. Right.

22    A. So we better do something about that.

23  So the focus started to move from how do we

24  manage, how do we even see and book -- how do we

25  book securities that are not just going to be

1       KING - HIGHLY-CONFIDENTIAL

2  collateral for a repo but are effectively going to

3  need to be shadow booked into risk systems so that

4  we can generate appropriate risk metrics so that

5  we can risk manage them.  So we -- our process

6  started to change to that.

7    Q. And this started even before you

8  booked the September 18 --

9    A. Yes, yes.

10    Q. -- repo?

11    A. Yes.  Because we had to say how are we

12  going to manage this transaction?  How are we

13  going to manage this risk once Barclays has

14  lent -- once Barclays has lent -- in Barclays'

15  book, it is going to have -- the repo desk seems

16  to have lent 45 billion dollars to a counterparty

17  that is going to default, and that is

18  collateralized with a number of securities.

19       And if it followed its normal process,

20  it would be marking those securities, asking

21  desks, asking price services to -- it wouldn't

22  actually be assuming that it was going to get long

23  the collateral and have to liquidate it.

24       But here we knew that was going to be

25  the case, and it is mostly the case in other

1       KING - HIGHLY-CONFIDENTIAL

2  distressed -- it is frequently the case, and we

3  have obviously seen this because of what happened

4  with Bear and Bear's hedge funds that had

5  defaulted on repo-secured lending, that the moment

6  the repo -- the borrower defaults under the repo,

7  you seek to liquidate the collateral, and you

8  invariably don't recover enough to cover the loan.

9  You hope you are going to, but markets are

10  distressed at that moment.

11       Well, this was the mother of all

12  distress.  We are in the middle of a bank, a major

13  bank defaulting that many people had thought

14  wouldn't have been left to default, but had

15  defaulted, and we were about to undertake a

16  45 billion dollar lending in which we would be

17  long this risk with very limited ways of risk

18  managing it.

19    Q. So what did you do to risk manage it?

20    A. Well, so Thursday we had to assess how

21  are we going to record in our books securities,

22  when we haven't actually booked the securities, we

23  booked a repo facility.  So we had to construct

24  shadow books that were going to represent the risk

25  of the securities that were in the repo facility,

Page 82

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    and then we sought to insure that -- our plan was
3    on the Thursday, each of the desks had a list of
4    the securities that they were expecting to
5    receive, and we had informed them that of course
6    repo is -- this was overnight repo.  We weren't
7    but -- a week earlier, by the way, we were not
8    experts in repo.  So some of what I am able to
9    talk about now about that repo facility, I
10   actually only learned afterwards.
11          But this was overnight repo, which
12   meant that strictly speaking the borrower could
13   switch the collateral within the repo facility
14   each night.  So we had advised the respective
15   desks, thinking about, you know, in a similar way
16   we categorized the assets that were in the repo
17   facility in a similar way to the way they are
18   categorized on 388-B, and we passed those out to
19   the relevant desks and said tomorrow, you are
20   going to be -- we need you to help us manage this
21   exposure.
22          And we sent lists to each of the
23   desks.  Of course -- but we told them they may
24   marginally change overnight, and until we are
25   certainly long the risk, we can't hedge.  We

Page 83

1    KING - HIGHLY-CONFIDENTIAL
2    couldn't hedge prior because of course if for some
3    reason the transaction hadn't settled, we would be
4    short the market, so there was no way to hedge
5    until we knew that we actually were long the risk.
6        Q.   OK then.  There was a lot there, so
7    let me ask a couple of questions.
8            When you say we were certain we were
9    long the risk, that would be when there was a
10   default?
11       A.   No.  Once the securities had settled
12   into Barclays.
13       Q.   Oh.
14       A.   Which would have been the Thursday
15   night, Friday morning.
16           MR. STERN:  You might just explain
17   what you mean when you talk about long the
18   risk and so on.
19       A.   On Thursday, there was -- we knew that
20   there was a Fed facility.  Barclays had not lent
21   any money to Lehman.  The Fed had lent money to
22   Lehman and collateralized that lending with
23   securities.
24       Q.   Right.
25       A.   That night, Barclays would effectively

Page 84

1    KING - HIGHLY-CONFIDENTIAL
2    replace the Fed, thereby knowing for certain that
3    it had a secured loan out to Lehman, LBI, where
4    LBI was expected to default.
5        So it is not until for certain that
6    Barclays has funded that loan that it could say
7    that it definitely is long the risk of the
8    underlying securities.
9        Q.   OK.  So if --
10       A.   So for example -- maybe it is easiest
11   by example.  If we took a single security on the
12   Thursday, in normal trading, in a normal trading
13   environment, I might be negotiating with a
14   counterparty to buy something and I might be
15   agreeing the price and we might be trading, but --
16   and I might know that the moment that I want to --
17   moment that I know I am going to be long the
18   security, I will need to hedge, and I have worked
19   out how I am going to hedge, but until the trader
20   tells me done, not just at some point while we are
21   discussing the price, if I decide to hedge before
22   he says done and then he says, you know what,
23   change my mind, now I have put a hedge on against
24   nothing and I have got to take the hedge off.
25          So until we know that this repo

Page 85

1    KING - HIGHLY-CONFIDENTIAL
2    transaction -- this replacement repo transaction
3    has settled, it would be -- it was a trading
4    decision whether or not we should hedge before it
5    settles or after it settles.  And we elected to
6    start hedging after it settled.
7        Q.   So when you say settles, that's on
8    Thursday, the 18th?
9        A.   Thursday night into Friday morning.
10       Q.   So that -- OK, I think I understand
11   that.
12          But aren't you -- I guess I didn't
13   understand the shadow book concept.  I thought you
14   weren't long the security until LBI defaults on
15   the Friday.
16       A.   Formally -- exactly right.  Until the
17   Friday when there is the default of LBI, then the
18   systems would record a secured lending facility.
19   As I say, some of this, you know, back filling the
20   knowledge because we learned how it really would
21   happen after the fact.
22       Q.   Sure.
23       A.   But that there would be a loan and the
24   repo desk would say, I have got a loan out to LBI
25   and it is collateralized by the following

Page 86

1           KING - HIGHLY-CONFIDENTIAL
2   securities, but it isn't equipped to hedge or
3   manage those underlying securities because it is
4   not expecting to ever need to.  It thinks it has
5   got an overcollateralized loan.
6       Q.   Right.
7       A.   Where it hopes -- where a repo desk
8   risk management ought to be, I've lent you money,
9   I have got some additional margin over and above
10  the amount of money that you have lent, that I
11  have lent you, and if you default, I am going to
12  sell it all as quickly as possible.  I am not
13  going to reflect on it and think about whether I
14  would like to -- those are trading decisions for
15  someone else.  I am going to sell it.
16          And hence, when you try to sell
17  something in that way, you would invariably,
18  regardless of whether the last trade observed in
19  the market was 95, if you phone up somebody and
20  say I need a bid, you might get a 85, and that's
21  why they need the margin.  But that would be their
22  normal repo risk management decision.
23          Here we were going into this lending
24  with the benefit of knowledge that within 24 hours
25  to 48 hours, it would be the case that this

Page 87

1           KING - HIGHLY-CONFIDENTIAL
2   borrower would default, so that there was no value
3   to the counterparty, and furthermore, we were
4   therefore going to be long a humongous number of
5   securities that we would have no ability to sell.
6       Q.   So for that reason you start risk
7   managing those securities the minute the repo
8   settles?
9       A.   First we say -- many of these
10  securities have -- so the -- maybe again it is
11  worth just touching on this for a second.
12          When I talk about risk, what I mean is
13  that what is the expected change in value of a
14  security with respect to a change in something
15  else.  So many of the securities have interest
16  rate sensitivity.
17      Q.   Right.
18      A.   How much would the value of these
19  bonds change if the interest rates went up.
20      Q.   OK.
21      A.   We would also come up with some crude
22  estimates for, say, the equities portfolio, which
23  would be how much of the S&P 500 does this equity
24  portfolio look like.  For the RMBS securities we
25  might say how much of a particular mortgage-backed

Page 88

1           KING - HIGHLY-CONFIDENTIAL
2   index does this portfolio look like.
3          Because we can't know -- we know there
4   is no way we can sell.  If we go out and start
5   selling at 8 a.m. on the Friday morning, five days
6   after the bankruptcy of Lehman, we would
7   recover -- I don't know what we would recover.
8          And we already knew that where we had
9   seen some of the bids in the market during that
10  week where other people have been selling -- bear
11  in mind, the market was flooded with collateral
12  from the bankrupt Lehman Brothers Holding and
13  LBIE, so that people were closing out other repo
14  facilities.  So the market was full of Barclays --
15  of Lehman's securities that were already being
16  sold.  So -- and we were about to get long another
17  45 billion dollars of them.
18          So there would be no way for us to
19  manage that.  The only way we could do it was
20  bring the risk on to our systems, assess how
21  volatile it was going to be and what parts of that
22  volatility we would have to hedge with instruments
23  in more liquid markets.  For example, S&P.  For
24  example, interest rate derivatives.
25          And that's what we started to do on

Page 89

1           KING - HIGHLY-CONFIDENTIAL
2   the Thursday in anticipation, what systems are we
3   going to need to help manage that and what are we
4   going to do on the Friday.  Of course, that was
5   complicated, further complicated by the fact on
6   the Friday morning we woke up to discover we don't
7   own the same portfolio we thought we were going to
8   own a day earlier.
9       Q.   OK.  Let me put that issue aside for a
10  minute here.  I think I followed you.  It is an
11  area that I am not familiar with, so I apologize.
12          So on Thursday, you are risk managing
13  or hedging the volatility that you foresee in that
14  pool of securities as a result of all this market
15  activity that you have seen?  The plan was to
16  hedge the portion you needed to hedge and then
17  sell the securities later?
18      A.   Yeah.  So I think the answer to your
19  question is actually no, we were not hedging on
20  the Thursday.  We were starting to work out
21  that -- the process up to the decision of will
22  Barclays lend against this pool of assets was one
23  that would incorporate both an assessment of
24  Barclays' assessment, not JP's assessment or
25  Lehman's assessment or anybody else, but Barclays'

1        KING - HIGHLY-CONFIDENTIAL
2    traders' assessment of what was the realizable
3    value of the securities and the amount of -- it
4    would need to have some amount of cushion over and
5    above the amount that it would lend, because the
6    moment that it started to sell, Barclays itself
7    would drive the market down.
8        Q.   Right, right.
9        A.   So we needed to do two things on
10    Wednesday and Thursday.  One, an assessment of an
11    estimate of what we thought was a reasonable
12    liquidation value for the portfolio, and then,
13    two, what was a reasonable guess at the risks that
14    we were taking by being long that portfolio.
15    That's what we were doing Thursday.
16        On Friday then --
17        MR. STERN:  "That portfolio" is the
18        Fed portfolio?
19        A.   For the portfolio we thought we were
20    going to take delivery of, or best guess of the
21    portfolio we thought we were going to take
22    delivery of on the Friday.
23        But it wasn't until -- and then we
24    made a decision not to hedge on the Thursday.  And
25    then on the Friday, once we knew the transaction

1        KING - HIGHLY-CONFIDENTIAL
2    had been consummated, so we knew that we were
3    actually long --
4        Q.   That's Thursday night, Friday morning?
5        A.   So some point Thursday night, somebody
6    would have phoned me and said, Stephen, we are
7    long.  So then we knew we had eliminated one risk,
8    which was the execution risk.
9        Q.   Right, right.
10        A.   Because we couldn't -- the reason for
11    not hedging was we could never manage -- never
12    hedge the execution risk.
13        Q.   Right.
14        A.   But on Friday we now know we are long.
15    Let's say that was at 2 o'clock in the morning or
16    something.  No markets are open, so there is no
17    way to start selling or to manage -- actually we
18    couldn't start selling because actually it is just
19    a repo facility, it is not that we are long the
20    assets, so you couldn't sell on the Friday.
21        So therefore, we would have to think
22    up things we could use to hedge the risk.  And
23    that's -- we started that process on Thursday.  By
24    Friday we started to realize there are securities
25    that we thought we were going to take delivery of

1        KING - HIGHLY-CONFIDENTIAL
2    that we haven't, and there were securities that we
3    have never seen before.

REDACTED

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 94

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 95

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 96

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 97

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 98

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 99

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

14        Q.   Are you coming to some interim
15   conclusions during that weekend about the marks?
16        A.   Yes.
17        Q.   And what are you finding out that
18   weekend?
19        A.   I don't really -- the one thing that I
20   remember is saying that I felt that the cumulative
21   amount of securities and cash that we had received
22   in an orderly disposal, in not just a fire sale,
23   we couldn't just sell -- we couldn't say let's
24   sell these over the weekend and then we are done
25   by Monday.

Page 100

1          KING - HIGHLY-CONFIDENTIAL
2        The -- there was -- the loan was
3   adequately collateralized.  And that I remember.
4        Q.   And you told that to your supervisors
5   or whoever was asking?
6        A.   Yes, yeah, yeah.  And then on the
7   Friday we started to hedge.

REDACTED

Page 101

1          KING - HIGHLY-CONFIDENTIAL

REDACTED

PAGES 102 – 165 REDACTED

Page 166

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 167

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

21    Q.  Can we skip ahead to the repo
22    transaction, which is the September 18 repo.
23    A.  Yeah.
24    Q.  Did Barclays provide a list of assets
25    that it wanted excluded from the repo or would not

Page 168

1    KING - HIGHLY-CONFIDENTIAL
2    accept as collateral in the repo?
3    A.  No.  We didn't have any option on
4    the -- going into the -- we weren't -- "we" being
5    PMTG, weren't aware of any flexibility as to what
6    we were going to receive.  That was part of the
7    problem, was we are going to take delivery of --
8    remember you asked me the questions earlier about
9    what were you looking at, Steve, and I was
10    provided an inventory of securities on the
11    Wednesday, Thursday, that represented what I would
12    take delivery of.
13        And then it did happen to change by
14    Friday, but that was not what we were expecting to
15    receive, that list of securities.
16    Q.  I am talking about before the Friday.
17    I'm talking about in the Wednesday, Tuesday,
18    whenever you are talking about the repo, were
19    there certain assets that Barclays would not
20    accept as collateral for that repo?
21    A.  No.  I -- on the Wednesday -- so the
22    Wednesday or Thursday we are analyzing the repo,
23    we just assumed we were taking delivery of
24    whatever was described to us as being in the repo
25    on the Thursday.

Page 169

1    KING - HIGHLY-CONFIDENTIAL
2    Q.  Described to you by who?
3    A.  In the schedule of securities
4    provided -- you asked me the question earlier as
5    to -- about a list of securities that was in the
6    repo, and I answered that I didn't know where it
7    came from, whether it was from operations or the
8    Fed or whoever, but somebody provided us a list of
9    securities on the Thursday, which is the list we
10    thought we would take delivery of.  It wasn't the
11    list that we ultimately took delivery of, but it
12    was the list that we passed out to the various
13    traders.
14        We didn't think that we had any option
15    to pick and choose.
16    MR. STERN:  Is that the list that you
17    referred to as having an hour and a half to
18    look at?
19    THE WITNESS:  The hour and a half to
20    look at, yes.
21    Q.  This might clarify the question.  I am
22    going to hand you a document that was previously
23    marked as 143-B.  It is an e-mail stream of which
24    you are not a party to until you get to page 2.
25    MR. STERN:  Take a look at the whole

Page 170

1        KING - HIGHLY-CONFIDENTIAL
2    thing.
3        Q.   You can look at the whole thing.  I am
4    just directing your attention to an entry on
5    page 2, which is an e-mail from you to David
6    Petrie, and it attaches something called excluded
7    mortgage assets.
8        A.   Right.
9        Q.   So take your time to look at the
10   document, but my questions are going to be
11   primarily about that attachment.
12       A.   OK.
13       Q.   Have you ever seen this document
14   before?
15       A.   Yes.
16       Q.   Can you tell me what the attachment
17   which is titled "Excluded Mortgage Assets 9/17/08"
18   is?
19       A.   Yeah.  It is from the 6.5 billion
20   dollars of assets on the -- let me look here.
21       Q.   Is that the exhibit we first used in
22   this --
23       A.   Yeah, I think so.
24       Q.   I think it is --
25       A.   388-B.

Page 171

1        KING - HIGHLY-CONFIDENTIAL
2        Q.   The 6.6 billion in mortgage?
3        A.   Yeah.  So once upon a time in the
4    first part of the week, we had suggested that we
5    wouldn't -- remember I said that we wouldn't take
6    all of the mortgage and mortgage-backed total.  So
7    we divided it into two pools, the included and the
8    excluded.
9        So that e-mail from the 17th, unless I
10   have made a mistake, it is an e-mail about the
11   assets that we wouldn't be taking out of the
12   mortgage and mortgage-backed securities.
13       Q.   So these are mortgages you are not
14   going to take?
15       A.   These would be -- yes, that's the --
16   well, it was -- in the early part of the week it
17   was the list of securities which we were
18   suggesting that we wouldn't take, "we" being my
19   group, suggesting that we would rather not take
20   out of the total mortgage and mortgage-backed
21   total.
22       Q.   It is really nothing to do with the
23   repo.  It has to do with the agreement to only
24   take a portion of the mortgage-related securities?
25       A.   That's correct.

Page 172

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 173

1        KING - HIGHLY-CONFIDENTIAL

REDACTED

PAGES 174 – 285 REDACTED

Page 286

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 287

1    KING - HIGHLY-CONFIDENTIAL

REDACTED

Page 288

KING - HIGHLY-CONFIDENTIAL

REDACTED

(Time noted:  5:52 p.m.)

_____
STEPHEN KING

Subscribed and sworn to
before me this     day
of September, 2009.

_____

Page 289

1    KING - HIGHLY-CONFIDENTIAL
2              INDEX:
3    WITNESS        EXAM BY:          PAGE:
4    S. King        Mr. Hine        6
5                   Mr. Oxford     204
6                   Mr. Dakis      283
7                   Mr. Layden     285
8
9              EXHIBITS
10   Exhibit No.              Marked
11   Exhibit 388-B Document Bates stamped     34
12       BCI-EX-S 74256 through 257
13   Exhibit 389-B Document Bates stamped    105
14       BCI-EX-S 75200 through 201
15   Exhibit 390-B Document Bates stamped    141
16       BCI-EX-S 52667 through 68 with
17       attachment
18   Exhibit 391-B Document Bates stamped    181
19       BCI-EX-S 136198
20   Exhibit 392-B E-mail dated Wednesday,   225
21       September 17, 2008 at 19:14:24
22   Exhibit 393-B E-mail dated Friday, 19   235
23       September 2008 at 00:57:45
24   Exhibit 394-B E-mail dated 9/19/2008 at 239
25       9:41 p.m. with attachment

Page 290

1       KING - HIGHLY-CONFIDENTIAL
2              EXHIBITS
3   Exhibit No.                    Marked
4   Exhibit 395-B Document Bates stamped        255
5         BCI-EX-S 57416 through 417
6   Exhibit 396-B Document Bates stamped        260
7         BCI-EX-S S8711 through 114
8   Exhibit 397-B Document Bates stamped BCI     278
9         EX-81185
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 291

1       KING - HIGHLY-CONFIDENTIAL
2
3
4              CERTIFICATE
5   STATE OF NEW YORK )
6              )ss:
7   COUNTY OF NEW YORK)
8       I, MARY F. BOWMAN, a Registered
9   Professional Reporter, Certified Realtime
10  Reporter, and Notary Public within and for
11  the State of New York, do hereby certify:
12      That STEPHEN KING, the witness whose
13  deposition is hereinbefore set forth, was
14  duly sworn by me and that such deposition is
15  a true record of the testimony given by such
16  witness.
17      I further certify that I am not
18  related to any of the parties to this action
19  by blood or marriage and that I am in no way
20  interested in the outcome of this matter.
21      In witness whereof, I have hereunto
22  set my hand this 10th day of September,
23  2009.
24
25     _____

Page 292

1       KING - HIGHLY-CONFIDENTIAL
2          * * *ERRATA SHEET* * *
3   NAME OF CASE:  In Re: Lehman
4   DATE OF DEPOSITION:  September 10, 2009
5   NAME OF WITNESS:  STEPHEN KING
6   Reason codes:
7      1. To clarify the record.
       2. To conform to the facts.
8      3. To correct transcription errors.
9
10  Page ____ Line ____ Reason____
    From _____ to_____
11
12  Page ____ Line ____ Reason____
    From _____ to_____
13
14  Page ____ Line ____ Reason____
    From _____ to_____
15
16  Page ____ Line ____ Reason____
    From _____ to_____
17
18  Page ____ Line ____ Reason____
    From _____ to_____
19
20  Page ____ Line ____ Reason____
    From _____ to_____
21
22  Page ____ Line ____ Reason____
    From _____ to_____
23
24     _____
           STEPHEN KING
25