# A. 16 (A)

1          HIGHLY CONFIDENTIAL - A. KIRK

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

     ----------------------x

11

12          * * * HIGHLY CONFIDENTIAL * * *

13          DEPOSITION OF ALEX KIRK

14              New York, New York

15              August 31, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24545

Page 2

1      HIGHLY CONFIDENTIAL - A. KIRK
2           August 31, 2009
3             9:30 a.m.
4
5           HIGHLY CONFIDENTIAL deposition
6      of ALEX KIRK, held at Jones Day, LLP,
7      222 East 41st Street, LLP, New York,
8      New York, before Kathy S. Klepfer, a
9      Registered Professional Reporter,
10     Registered Merit Reporter, Certified
11     Realtime Reporter, Certified Livenote
12     Reporter, and Notary Public of the State
13     of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1      HIGHLY CONFIDENTIAL - A. KIRK
2
3           A P P E A R A N C E S :
4
5      JONES DAY, LLP
6      Attorneys for Lehman Brothers, Inc.
7           222 East 41st Street
8           New York, New York  10017-6702
9      BY:  ROBERT W. GAFFEY, ESQ.
10          BRIDGET CRAWFORD, ESQ.
11          GEORGE E. SPENCER, ESQ.
12
13     BOIES, SCHILLER & FLEXNER, LLP
14     Attorneys for Barclays Capital
15          5301 Wisconsin Avenue, NW - Suite 800
16          Washington, DC 20015
17     BY:  HAMISH HUME, ESQ.
18
19     CAHILL, GORDON & REINDEL, LLP
20     Attorneys for the Witness
21          80 Pine Street
22          New York, New York  10005
23     BY:  DAVID N. KELLEY, ESQ.
24          JOHN O. ENRIGHT, ESQ.
25

Page 4

1           HIGHLY CONFIDENTIAL - A. KIRK
2           A P P E A R A N C E S : (Cont'd.)
3
4      QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5      Attorneys for the Creditors Committee
6           51 Madison Avenue
7           22nd Floor
8           New York, New York  10010
9      BY:  JAMES C. TECCE, ESQ.
10
11     JENNER & BLOCK, LLC
12     Attorneys for the Examiner
13          330 N. Wabash Avenue
14          Chicago, Illinois  60611-7603
15     BY:  DAVID C. LAYDEN, ESQ.
16
17     HUGHES, HUBBARD & REED, LLP
18     Attorneys for the SIPA Trustee
19          One Battery Park Plaza
20          New York, New York  10004-1482
21     BY:  SETH D. ROTHMAN, ESQ.
22          SAMUEL C. McCOUBREY, ESQ.
23
24     Also Present:
25          PHILIP E. KRUSE, Alvarez & Marsal

Page 5

1           HIGHLY CONFIDENTIAL - A. KIRK
2      ALEX KIRK, called as a
3           witness, having been duly sworn by a Notary
4           Public, was examined and testified as
5           follows:
6      EXAMINATION BY
7      MR. GAFFEY:
8           Q.  Mr. Kirk, good morning.  My name is
9      Bob Gaffey.  We met briefly before.  I'm with
10     Jones Day.  We are special counsel to the estate
11     of Lehman Brothers Holdings, Inc., and as I
12     guess you may know, we are spending some time
13     looking into the facts surrounding the
14     transaction in September of 2008 --
15          A.  Uh-huh.
16          Q.  -- through which Barclays purchased
17     some assets from Lehman.
18          Just a few ground rules.  If at any
19     time you need a break, just say so.  If there's
20     a question pending, I would prefer to get an
21     answer to it and then we can take break, but
22     just speak right up if you want to take five or
23     ten minutes.
24          I'm kind of a fast talker, so if I'm
25     going too fast, tell me and I'll try and slow

Page 6

HIGHLY CONFIDENTIAL - A. KIRK

1  myself down.  And I'm going to ask you please to
2  wait until there's a full question asked before
3  you answer so that we can, as best we can, get a
4  clear record.
5  A.  Uh-huh.
6  Q.  Okay?
7      Did you have discussions with anyone
8  other than your counsel, Mr. Kelley, to prepare
9  for your deposition today?
10  A.  Yes.
11  Q.  With whom?
12  A.  I don't remember.
13  Q.  Mr. Kelley or anybody from his firm?
14  Anybody outside of his firm?
15  A.  Outside his firm we met with the
16  Barclays lawyers.
17  Q.  Okay.
18  A.  I don't remember their names.
19  Q.  And by whom are you employed, sir?
20  A.  Currently I'm not employed.
21  Q.  Was there a time when you were
22  employed at Lehman Brothers?
23  A.  Yes.
24  Q.  Can you give me, sir, just a brief

Page 7

HIGHLY CONFIDENTIAL - A. KIRK

1  description of the positions you held?
2      How long were you at Lehman?
3  A.  I was at Lehman two separate stints.
4  I was at Lehman from December of 1994 until
5  January of 2008.
6  Q.  Uh-huh.
7  A.  And I returned to Lehman in July of
8  2008.  When I went to Lehman Brothers from
9  basically July of -- or, December of 1994 till
10  December 2001, I ran the distressed debt
11  business for Lehman Brothers.  From 2002 until
12  2006, I ran the high-yield and leveraged loan
13  business for Lehman Brothers.  From 2006 until
14  October of 2007, I ran the global credit
15  businesses.  From October 2007 until January of
16  '08, I was co-chief operating officer of fixed
17  income, and from -- and then I left the firm.
18  When I returned, I was global head of principal
19  businesses for that brief period of time.
20  Q.  And why did you leave the firm in
21  January of '08?
22  A.  The global head of fixed income, Roger
23  Nagioff, had resigned; my partner, Andy Morton,
24  was promoted to head of fixed income; and I

Page 8

HIGHLY CONFIDENTIAL - A. KIRK

1  reached a mutual agreement to leave the firm
2  with senior -- with the president of Lehman
3  Brothers.
4  Q.  And where did you work in between
5  January of '08 and July of '08 when you returned
6  to Lehman?
7  A.  Didn't work.
8  Q.  And what occasioned your return to
9  Lehman in July of '08?
10  A.  They had promoted Bart McDade to be
11  president of the firm, and he requested that I
12  return to the firm within a few days of his
13  elevation.
14  Q.  And I take it you worked at Lehman --
15  well, for how long after July of '08 did you
16  work at Lehman Brothers?
17  A.  Until the end.  Until most of the
18  employees were transferred to Barclays, U.S.
19  employees.
20  Q.  And at the end, did you transfer over
21  to Barclays yourself?
22  A.  Yes.
23  Q.  And when did you start work at
24  Barclays?

Page 9

HIGHLY CONFIDENTIAL - A. KIRK

1  A.  I don't remember the transfer date, to
2  be honest with you.  I worked there till the
3  first week of November.
4  Q.  First week of November '08?
5  A.  Yes.
6  Q.  What positions did you hold at
7  Barclays?
8  A.  I didn't have a position at Barclays.
9  Q.  Was there -- I know it was sort of
10  tumultuous times.  Was there any break in
11  between leaving Lehman and going to Barclays, or
12  did you just sort of start working at Barclays
13  at the end of the Lehman --
14  A.  Whenever the actual HR records
15  transferred.

REDACTED

Page 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REDACTED

Page 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23     **Why did you leave Barclays?**
24     A.   I had -- because I wanted to leave the
25   sell side of the business, broadly, and move to

REDACTED

Page 12

1        HIGHLY CONFIDENTIAL - A. KIRK
2    the buy side of the business.
3        **Q.   Could you explain to me what you mean**
4    **by that?**
5        A.   Meaning I wanted to go work as a
6    principal in a hedge fund or a money management
7    firm.
8        **Q. . Did you do that?**
9        A.   I'm in the process of setting up a
10   firm right now.
11       **Q.   Before you went to work at Barclays,**
12   **before the end of Lehman, had you had any**
13   **discussions with anyone at Barclays about the**
14   **prospects of working there after the Lehman sale**
15   **was concluded?**
16       A.   I was approached by Bob Diamond to see
17   if I was interested in a job, broadly, as
18   opposed to a specific job. I told him I wasn't.
19       **Q.   Pardon me?**
20       A.   I was not.
21       **Q.   And when were you approached by Bob**
22   **Diamond?**
23       A.   At some point within the first week or
24   two that they were -- I would say probably that
25   week that they were negotiating to buy the firm.

Page 13

1        HIGHLY CONFIDENTIAL - A. KIRK
2    If not that week, the week after.
3        **Q.   Okay. We're going to spend a lot of**
4    **time today talking about the negotiations on**
5    **that point, so let me take this point to frame**
6    **out some dates.**
7        **I put before you a blank calendar**
8    **which may help you with days of the week that**
9    **we'll talk about, but when you talk about the**
10   **week in which there were negotiations, could you**
11   **tell me what week or weeks you're talking about?**
12       A.   The week of September -- Monday,
13   September 15th through Friday, you know, through
14   Sunday, September 21st.
15       **Q.   And at what point during that week did**
16   **Mr. Diamond talk to you about coming to work for**
17   **Barclays?**
18       A.   I don't remember if it was that week
19   or the following week.
20       **Q.   Again, just to give us a time point,**
21   **the transaction we're talking about closed on**
22   **September 22. Do you recall if it was before or**
23   **after the closing?**
24       A.   I don't recall.
25       **Q.   Was it just you and Mr. Diamond in the**

Page 14

**HIGHLY CONFIDENTIAL - A. KIRK**
1
2    conversation?
3      A.   Yes.
4      Q.   And apart from this conversation with
5    Mr. Diamond, had you had discussions with anyone
6    about going to work for Barclays?
7      A.   No.
8      Q.   And when you had the discussion with
9    Mr. Diamond, did he talk to you about a
10   compensation package?
11     A.   No.
12     Q.   When did you first talk to anyone at
13   Barclays about a compensation package?
14     A.   First conversation I had with anybody
15   at Barclays was the meeting I sat down with Rich
16   Ricci where he told me what the
17   severance/compensation packet bonus would be,
18   which was in late October.
19     Q.   Had you had any conversations with any
20   of your fellow Lehman employees about the topic
21   of compensation at Barclays?
22     A.   Bart McDade.
23                         REDACTED
24
25

Page 15

REDACTED

8      Q.   And what did Mr. McDade say to you?
9      A.   He said he agreed and he would talk to
10   Barclays about that.  He was on point for those
11   sorts of issues with Barclays.
12     Q.   Do you know if he did talk to anyone
13   at Barclays about you in that regard?
14     A.   I assume he did.
15     Q.   And why do you assume that?
16     A.   Because they approached me with a
17   deal --
18     Q.   Was the conversation --
19     A.   -- a couple weeks later.
20     Q.   I beg your pardon.
21          Was the conversation with Mr. McDade
22   during the week of the negotiations between the
23   15th and the 22nd?
24     A.   No, it was sometime in late October.
25     Q.   Did you have conversations with anyone

Page 16

**HIGHLY CONFIDENTIAL - A. KIRK**
1
2    at Lehman during that week, the 15th through the
3    22nd?
4      A.   No.
5      Q.   Let me just put a full question so
6    that we have a clear record, okay?
7      A.   Yeah.
8      Q.   Did you have conversations with anyone
9    during the week of the 15th to the 22nd about
10   compensation that would be paid to you at
11   Barclays after the 22nd?
12     A.   No.
13
14
15
16
17
18                   REDACTED
19
20
21
22
23
24
25

Page 17

Page 18

1
2
3
4
5
6
7
8
9
10
11
12 **REDACTED**
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1
2
3
4
5
6
7
8
9
10
11
12 **REDACTED**
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 20

1
2
3
4
5 **REDACTED**
6
7
8
9
10
11
12  BY MR. GAFFEY:
13      Q.   Now, when you met, Mr. Kirk, with
14  Mr. Hume or people from his firm, did you talk
15  about events during a time period other than the
16  time you were employed by Barclays?
17      MR. KELLEY: Objection.  Privileged.
18      MR. GAFFEY:  I think I can inquire to
19  find out -- a yes or no will tell me whether
20  or not I can press on the privilege point.
21      Q.   If you just answer yes or no.
22      MR. KELLEY:  No, I'll make the same
23  objection.
24      Q.   When did you meet with the lawyers for
25  Barclays?

Page 21

1      HIGHLY CONFIDENTIAL - A. KIRK
2      A.   Last Thursday.
3      Q.   Who was present?
4      A.   Mr. Hume and -- who was the other?
5      MR. KELLEY:  If you know.
6      A.   I don't remember that guy's name.
7      Q.   And I take it Mr. Kelley or people
8  from his firm were there as well?
9      A.   Yes.
10      Q.   Anyone else other than lawyers from
11  Mr. Kelley's firm or Mr. Hume's firm?
12      A.   No.
13      Q.   Did you review any documents?  Just
14  answer that yes or no, please.
15      A.   Yes.
16      Q.   Did any of those documents have the
17  effect of refreshing your recollection about the
18  events concerning the sale of assets from Lehman
19  to Barclays?
20      A.   Some.
21      Q.   Which ones?
22      A.   I don't remember specifically.
23      Q.   Are there any that you remember
24  specifically that refreshed your recollection
25  about matters?

Page 22

**HIGHLY CONFIDENTIAL - A. KIRK**

1    A.  Not in particular.

2    **Q.  In general?**

3    A.  Not in -- generally, yes.

4    **Q.  Did those documents cover a time**

5  **period prior to -- on or prior to September 22?**

6    MR. KELLEY:  I object to that.

7    MR. GAFFEY:  I'm not sure of the

8  nature of the objection, David.

9    **Q.  Can you answer it?**

10    MR. KELLEY:  Privileged.

11    MR. HUME:  We would assert the same

12  objection.

13    MR. GAFFEY:  Do you contend you have a

14  privilege with this witness?

15    MR. HUME:  I think the objection -- I

16  assume what you're questioning is to try to

17  attack this privilege.

18    MR. GAFFEY:  I'm not attacking the

19  privilege.  I'm just trying to find out if

20  you have a basis to assert it.

21    Do you contend you have a privilege?

22    MR. HUME:  Yes, I think that your

23  motion suggested that there were fiduciary

24  breach claims that you were considering as

Page 23

HIGHLY CONFIDENTIAL - A. KIRK

1  to senior Lehman officers and as part of

2  your investigation of potential claims

3  against Barclays, but the same theory would

4  give rise to claims against the officers and

5  against Barclays.  So, yes, I think we do

6  have a common interest privilege in that we

7  both deny those claims.

8    MR. GAFFEY:  I'll leave that, but I

9  don't want to have a colloquy on the record.

10  I disagree.

11  BY MR. GAFFEY:

12    **Q.  Let's talk about that week, the week**

13  **in September that's brought us here.  Can you**

14  **tell me, sir, as a general matter, did you play**

15  **any role in the negotiations of the agreement**

16  **between Lehman and Barclays that led to the sale**

17  **of assets to Barclays.**

18    **(The witness confers with Mr. Kelley.)**

19    A.  Is the week you're referring to the

20  15th through the 21st?

21    **Q.  Yes.  Well, let me reframe it because**

22  **you asked that question.  At any point during**

23  **September of 2008, were you involved in any**

24  **discussions or negotiations with Barclays?**

Page 24

**HIGHLY CONFIDENTIAL - A. KIRK**

1    A.  Yes.

2    **Q.  When?**

3    A.  I was involved in discussions that

4  went from Friday, the 12th of September, until

5  Sunday, the 14th, of the transaction that

6  ultimately failed, and I was asked to

7  participate in the discussions, facilitate the

8  discussions starting Friday morning, the 19th.

9    **Q.  So if I understand your answer**

10  **correctly, you're not involved in any**

11  **discussions or negotiations with Barclays in the**

12  **period from the 15th through the 18th?**

13    A.  That is correct.

14    **Q.  Okay.  Describe for me, if you would,**

15  **generally the nature of what you did in**

16  **connection with the negotiations from the 12th**

17  **to the 14th, that is, from the Friday to the**

18  **Sunday?**

19    A.  Generally, I helped organize the due

20  diligence of the assets of Lehman Brothers that

21  I was responsible for specifically and helped

22  coordinate with some of the other departments

23  meetings that would take place with Barclays.

24    In addition, I was down at the Federal

Page 25

HIGHLY CONFIDENTIAL - A. KIRK

1  Reserve both Saturday and Sunday, so I

2  participated in probably two different

3  discussions with Barclays on Saturday and

4  Sunday.

5    **Q.  And what was the -- actually, if you**

6  **don't mind, just so we have some term we can use**

7  **and I don't have to keep saying it this way,**

8  **could you give me, you referred to the assets**

9  **you were responsible for specifically.  What**

10  **were those assets called?**

11    A.  The global principal business.

12    **Q.  What was the nature of the transaction**

13  **that was being discussed from the Friday and the**

14  **Saturday and the Sunday, the 12th through the**

15  **14th?**

16    A.  The nature of that transaction was

17  Barclays was going to buy all of Lehman

18  Brothers.

19    **Q.  Do you know what the structure of that**

20  **transaction was?  Was it an asset purchase?**

21  **Stock purchase?  Did you have any sense of that?**

22    A.  It was a -- I'm not an M&A expert, but

23  I believe they were going to assume the debt and

24  other contractual obligations of Lehman

Page 26

HIGHLY CONFIDENTIAL - A. KIRK

1 Brothers. They were going to not assume the
2 preferred stock of Lehman Brothers and they were
3 going to pay a nominal, less than a dollar, per
4 share price for part of the equity and they were
5 going to spin off the real estate and private
6 equity positions into a new company which would
7 be capitalized with debt by a consortium of
8 lenders and have as its equity capital the
9 preferred stock of Lehman Brothers and the
10 equity.
11     Q.   And you said that that transaction
12 failed. Why did that transaction fail, do you
13 know?
14     A.   I was told by Bart McDade that the FSA
15 had turned down the application to close that
16 transaction.
17     Q.   When were you told this by Mr. McDade?
18     A.   Sunday around noon.
19     Q.   Now, did you have any role in those
20 negotiations, again I'm on the 12th through the
21 14th, other than as you described, the sense I'm
22 getting is primarily involved with due diligence
23 for the global principal business.
24     A.   Yes, we had -- I spent most of my time

Page 27

HIGHLY CONFIDENTIAL - A. KIRK

1 trying to coordinate due diligence with our
2 principals and the rest of the street, meaning
3 Goldman Sachs, Citigroup, First Boston, et
4 cetera, around the value of those assets which
5 they were going to make a loan to the spun-off
6 company.
7     Q.   And were Barclays personnel involved
8 in that process?
9     A.   Not in the due diligence process, no.
10     Q.   Were you in touch with Barclays
11 personnel about this due diligence process?
12     A.   There were some joint meetings that
13 were arranged between Goldman Sachs and
14 Citigroup as point for the street and Barclays
15 and Lehman Brothers together. Barclays
16 personnel were obviously in those meetings.
17     Q.   To your knowledge, at any point in
18 that period from Friday to Sunday were people
19 from Barclays given an opportunity to review
20 Lehman's books for due diligence purposes?
21     A.   Yes, I believe they continued to do
22 due diligence over the weekend.
23     Q.   And did you have any involvement in
24 that project, that process, giving access to

Page 28

HIGHLY CONFIDENTIAL - A. KIRK

1 Lehman's books to personnel from Barclays?
2     A.   I don't recall specifically, but
3 probably. We were down at the Federal Reserve
4 in rooms across the hallway.
5     Q.   During the period from Friday, the
6 12th, through Sunday, the 14th, were you dealing
7 with any particular people at Barclays who you
8 could name?
9     A.   Archibald Cox. Bob Diamond. Rich
10 Ricci. Michael Klein, as their agent.
11     Q.   Anyone else?
12     A.   Those are the ones I recall.
13     Q.   And was there a principal -- were
14 there a group of people you would describe as
15 the principal negotiators for Lehman? Again,
16 I'm in the 12th through the 14th.
17     A.   Mark Shafir, who was head of M&A; Bart
18 McDade, who was president; and via telephone,
19 Dick Fuld.
20     Q.   Anyone else you would characterize,
21 that you would describe as Lehman's principal
22 negotiators?
23     A.   I was the advisor. I believe,
24 although I don't know for sure, I don't have any

Page 29

HIGHLY CONFIDENTIAL - A. KIRK

1 direct knowledge, but I have secondhand
2 knowledge that Skip McGee was involved.
3     Q.   Anyone else?
4     A.   That's all I know.
5     Q.   What's the basis of your secondhand
6 knowledge that McGee was involved?
7     A.   Mark Shafir would call Skip from the
8 Federal Reserve.
9     Q.   After that transaction failed, did
10 there come a time when you learned that
11 negotiations had begun again between Barclays
12 and Lehman?
13     A.   Late Sunday night sometime between 11
14 and 2 in the morning.
15     Q.   Would you describe that to me? How
16 did you learn it? Where were you when you
17 learned it?
18     A.   I believe I was in Bart McDade's
19 office, and he mentioned that Barclays had --
20 they had had contact with Barclays and Barclays
21 was interested -- "they" meaning Dick himself,
22 Skip and Barclays was interested in pursuing an
23 acquisition of the U.S. businesses of Lehman
24 Brothers.

Page 30

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   Did he tell you anything more than
3    that?  Who called who or anything that was said
4    in the conversation?
5    A.   No, nothing more than that.
6    Q.   Who else was present when you learned
7    this from Mr. McDade on Sunday night?
8    A.   I don't recall specifically, but
9    probably Mike Gelband.
10   Q.   I should tell you, and I should have
11   said this upfront, I don't want you, please, to
12   speculate during the day.
13   A.   Okay.
14   Q.   Once or twice you've answered by
15   saying "probably," and it's common usage, but if
16   you can give me your memory of things, as you
17   have been, tell me when you'd have to speculate,
18   okay --
19   A.   Okay.
20   Q.   -- so the record will be clear.
21        So do you know if Mr. Gelband was in
22   that conversation?
23   A.   I don't recall.
24   Q.   Now, do you know if that conversation
25   took place before or after Lehman filed for

Page 31

1    HIGHLY CONFIDENTIAL - A. KIRK
2    bankruptcy protection?
3    A.   I don't remember exactly when the firm
4    filed, but that's a matter of record, so ...
5    Q.   Well, do you know, do you remember
6    when you learned, first learned the firm was
7    going to file?  Withdrawn.
8        Did you know before the firm filed
9    that it was going to do so?
10   A.   Yes.
11   Q.   When did you learn, first learn that
12   the firm was going to file?
13   A.   After the board meeting on Sunday
14   night, approximately 8 o'clock.
15   Q.   Did you attend that board meeting?
16   A.   No.
17   Q.   From whom did you learn the substance
18   of the board meeting?
19   A.   I don't recall.
20   Q.   And the conversation with Mr. McDade
21   about renewed negotiations with Barclays, did it
22   take place after the board meeting?
23   A.   Yes.
24   Q.   Did Mr. McDade ask you to do anything
25   in connection with these renewed negotiations?

Page 32

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.   No.
3    Q.   Did anyone ask you to do anything in
4    connection with these new renewed negotiations?
5    A.   No.
6    Q.   Did there come a time when you learned
7    the negotiations --
8    A.   I'm sorry.
9    Q.   Beg your pardon.  Go ahead.
10   A.   No, not that evening.
11   Q.   Not that evening, okay.
12        Did come a time where you were asked
13   to perform some tasks or do something in
14   connection with the negotiations?
15   A.   Yes.
16   Q.   And when did that happen?
17   A.   Late Thursday night, the 18th of
18   September.
19   Q.   I'm coming there.
20        Did there come a time when you learned
21   there was an agreement reached between Lehman
22   and Barclays concerning the sale of Lehman
23   assets to Barclays?
24   A.   Yes.
25   Q.   When did you learn that?

Page 33

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.   Sometime Tuesday.
3    Q.   From whom did you learn that?
4    A.   I don't recall.
5    Q.   Did you learn whether that agreement
6    was reduced to a writing?
7    A.   No.
8    Q.   Have you ever seen any -- the written
9    agreement, have you ever seen a written
10   agreement between Lehman and Barclays concerning
11   the asset sale?
12   A.   No.
13   Q.   So you learn on maybe the Tuesday that
14   there's a deal between Lehman and Barclays, and
15   then -- and on late Thursday night you're asked
16   to participate in some way.
17        How are you spending your time between
18   the Tuesday and Thursday?
19   A.   I'm spending, between really Sunday
20   night and Thursday, I was spending all my time
21   attempting to help coordinate the risk reduction
22   and risk management of the firm so it could
23   survive for a few days to get to closure.
24   Q.   Now, did those -- now I'm in the
25   period from, that you just described, from the

Page 34

**HIGHLY CONFIDENTIAL - A. KIRK**
1
2  Sunday up until Thursday.
3      A.   Uh-huh.
4      Q.   Are you working with any people from
5  Barclays in connection with those activities?
6      A.   I don't recall specifically working
7  with Barclays employees.  Just Lehman employees.
8      Q.   Were you in communications with
9  Barclays employees?
10     A.   Not directly.  I would have
11 communicated to our finance staff and they would
12 have communicated to Barclays.
13     Q.   And who on the finance staff?
14     A.   Ian Lowitt, Paolo Tonucci.
15     Q.   Did you also deal with Martin Kelly?
16     A.   Maybe once, twice.
17     Q.   When you learned about a deal between
18 Lehman and Barclays having been concluded, what
19 was your understanding of the nature of the
20 deal?
21     A.   That I was -- that it was going to be
22 an asset purchase deal and that they were going
23 to purchase some amount of assets and assume the
24 employees of Lehman, some of the limited
25 obligations of Lehman Brothers.

Page 35

HIGHLY CONFIDENTIAL - A. KIRK
1
2      Q.   Did you have an understanding of the
3  asset components that were going to be
4  purchased?
5      A.   No.
6      Q.   Did you ever learn what asset
7  components were going to be purchased?
8      A.   Are you specifically asking about the
9  deal that was struck on that Tuesday?
10     Q.   Yes.
11     A.   No.
12         No, let me be more specific.
13     Q.   Sure.
14     A.   I got an e-mail that said they were
15 going to purchase the building and a pool of
16 other broadly defined assets.
17     Q.   Who did you get that e-mail from?
18     A.   Ajay Nagpal.
19     Q.   Could you spell that so we have it in
20 the record, please?
21     A.   A-J-A-Y  N-A-G-P-A-L.
22     Q.   What understanding did you have of the
23 constituent parts of the pool of the defined
24 assets apart from the building?
25     A.   None.

Page 36

HIGHLY CONFIDENTIAL - A. KIRK
1
2      Q.   Did you have an understanding who the
3  principal negotiators for Lehman of that
4  transaction were?
5      A.   I understood it to be Mark Shafir,
6  Skip McGee.
7      Q.   Did Mr. McDade have any role in those
8  negotiations, to your understanding?
9      A.   I believe he did.
10     Q.   But you wouldn't describe him as one
11 of the principal negotiators?
12     A.   He might have been.
13     Q.   Do you have a reason to think he might
14 have been?  Is it that --
15     A.   He was the president of the firm.
16     Q.   But other than his title, do you have
17 a basis for thinking he might have been one of
18 the principal negotiators?
19     A.   No.
20     Q.   Did you talk to Shafir about the
21 negotiations?
22     A.   No.
23     Q.   Did you talk to McGee about the
24 negotiations?
25     A.   No.

Page 37

HIGHLY CONFIDENTIAL - A. KIRK
1
2      Q.   Did you have an understanding of the
3  nature of the liabilities that Barclays was
4  going to assume under the agreement?
5      A.   Not at the time.
6      Q.   Did there come a time when you did
7  gain an understanding of the liabilities
8  Barclays was going to assume under the
9  agreement?
10     A.   A very cursory understanding on
11 Friday.
12     Q.   That's on Friday, the 19th?
13     A.   Correct.
14     Q.   From whom did you get that
15 understanding?
16     A.   Paolo Tonucci.
17     Q.   What did Mr. Tonucci tell you in that
18 regard?
19     A.   That there were two categories.  One
20 was assumption of certain trade liabilities and
21 the other was the assumption of compensation
22 liabilities, and that they together totaled
23 somewhere over $4 billion.
24     Q.   Did you talk to anyone other than
25 Mr. Tonucci about these assumed liabilities that

Page 38

**HIGHLY CONFIDENTIAL - A. KIRK**

1  totaled somewhere over $4 billion?
2      A.   During Friday, the amount of those
3  liabilities were referenced several times by
4  Paolo, who was attempting to accurately estimate
5  them, and by Barclays in their description of
6  the deal later in the afternoon.
7      Q.   Let's go back to the earlier part of
8  the week.  I swear I'm getting to Thursday and
9  Friday.
10     A.   That's all right.
11     Q.   Now I'm still sort of in the early
12  part of the week.
13          Were you asked to be involved in any
14  assessment of the value of the pool of
15  securities that was to be sold?
16     A.   No.
17     Q.   Did you ever come to understand that
18  the agreement between Lehman and Barclays
19  included a loss, an overall loss against the
20  amount at which those assets were carried on
21  Lehman's books?
22     A.   No.
23     Q.   Did you ever at any time have an
24  understanding that that agreement involved a

Page 39

**HIGHLY CONFIDENTIAL - A. KIRK**

1  discount of any kind given to Barclays against
2  the amount shown on Lehman's books of those
3  assets?
4      A.   No.
5      Q.   Apart from your counsel and counsel
6  from Mr. Hume's firm, have you spoken to anybody
7  about that topic?
8      A.   No.
9      Q.   When you learned about the sale of a
10  pool of assets, and again, apart from the real
11  estate on Tuesday, did you have an understanding
12  it was to be sold at book value?
13     A.   I didn't have an understanding one way
14  or the other.
15     Q.   So on the Monday, the Tuesday, the
16  Wednesday and during the day on Thursday, if I
17  understand what we've talked about so far
18  correctly, you're essentially involved in
19  managing risk?
20     A.   Yes.
21     Q.   And the purpose, apart from the
22  inherent reason for doing it --
23     A.   Keep the firm funded.
24     Q.   Did you have an understanding, while

Page 40

**HIGHLY CONFIDENTIAL - A. KIRK**

1  you were doing that, of how long you needed to
2  do that?  What the timetable was for things?
3      A.   We knew we were -- I believe they were
4  trying to schedule a meeting with the bankruptcy
5  court on Friday evening, Friday afternoon.
6          It was really a day-to-day operation.
7      Q.   And during that day-to-day operation,
8  did any of your activities involve entering into
9  or addressing repurchase agreements, repos?
10     A.   Some of them.
11     Q.   Could you describe that for me?  What
12  was the nature of your activities in connection
13  with repos?
14     A.   The firm had a number, a large number
15  of clients whose assets had been trapped under
16  repurchase agreements in the European
17  subsidiaries, so we spent some time trying to
18  figure out how we were going to help solve those
19  issues.  That was a big piece of it.
20          And then we were also trying to shrink
21  the matched book because it used liquidity at
22  the firm as a way to raise liquidity, so where
23  you would finance client positions with other
24  client's money.

Page 41

HIGHLY CONFIDENTIAL - A. KIRK

1      Q.   Financing of client positions with
2  other client's money; is that what you're
3  talking about when you talk about the matched
4  book?
5      A.   Yes.
6      Q.   And by shrinking the matched book,
7  you're reducing that level of activity of --
8      A.   Yes.
9      Q.   -- using --
10     A.   And you're -- it would -- I was told
11  it would free up liquidity.
12     Q.   And did you have any involvement, sir,
13  in connection with the Repurchase Agreement that
14  Lehman had with the Fed?
15     A.   Only -- my only involvement there was
16  I was at the Fed when they told us Sunday
17  evening that they would lend us money to pay
18  back the tri-party repo lenders the following
19  morning.
20     Q.   And did Lehman enter into a Repurchase
21  Agreement with the Fed for that purpose, do you
22  know?
23     A.   Yes, they did.
24     Q.   Were any of your activities devoted to

Page 42

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    the making of that Repurchase Agreement with the
 3    Fed?
 4        A.  No.
 5        Q.  Did there come a time when the Fed
 6    made it known it wanted to come out of that
 7    Repurchase Agreement, to your knowledge?
 8        A.  Yes.
 9        Q.  Describe to me how you came to learn
10    that.
11        A.  I don't recall specifically who told
12    me.
13        Q.  As a general matter, tell me what you
14    remember about learning that the Fed wanted to
15    get out of the Repurchase Agreement with Lehman?
16        A.  At some point on Wednesday, the Fed
17    said that they wanted to get paid back, I
18    believe it was Wednesday, and Lehman had to
19    figure out how to arrange alternative financing,
20    and there was only one party that would provide
21    that financing and that was Barclays.
22        Q.  And what did you do in connection with
23    those activities, if anything?
24        A.  I was not a repo expert.  I didn't --
25    I was not -- I'm not a repo expert.  I did not
```

Page 43

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    participate in those.
 3        Q.  How did you learn about those
 4    activities?  From whom?
 5        A.  I don't recall specifically.
 6        Q.  Do you have any general recollection?
 7        A.  Probably the finance staff.
 8        Q.  And that would be Tonucci?
 9        A.  Ian Lowitt or Tonucci, one or the
10    other.
11        MR. GAFFEY:  Can we take a five-minute
12    break?
13        THE WITNESS:  Sure.
14        (Recess; Time Noted:  10:21 A.M.)
15        (Time Noted:  10:29 A.M.)
16    BY MR. GAFFEY:
17        Q.  In a question I asked you a little
18    while ago, Mr. Kirk, you clarified by saying,
19    "You mean the agreement made on Tuesday?"  Did
20    there come a point where you learned that the
21    deal had changed?
22        A.  Friday.
23        Q.  Okay.  Here we are.  Tell me about
24    Friday.
25        Actually, let me just back up.  I
```

Page 44

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    think you also told me there was a conversation
 3    late on Thursday night that began your Friday
 4    activities?
 5        A.  Yes.
 6        Q.  Okay.  Let's talk about that one
 7    first.  Who's the conversation with, where are
 8    you, and what's the content of the conversation?
 9        A.  I'm at home.  I get a call from Bart
10    McDade.  He informs me that Mark Shafir has left
11    Lehman Brothers and that he needs some help
12    wrapping up the Barclays deal the following day.
13        Q.  Had Shafir left on the Thursday?
14        A.  I believe so.
15        Q.  You described Shafir as one of the
16    principal negotiators.  As of the Thursday, to
17    your knowledge, has he now gone?
18        A.  Yes.
19        Q.  Did McDade have anything to say about
20    that topic?
21        A.  He said he went -- he quit and he went
22    to work at Citigroup.
23        Q.  Other than telling you that Shafir had
24    quit and gone to work at Citigroup, did
25    Mr. McDade have anything to say about
```

Page 45

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    Mr. Shafir's departure --
 3        A.  No.
 4        Q.  -- on this Thursday?
 5        A.  No.
 6        Q.  Did Mr. McDade say anything about the
 7    departure, Shafir's departure having any impact
 8    on the deal?
 9        A.  He said that, given his departure, he
10    would need extra help and he asked for my help.
11        Q.  What did he ask you to do?
12        A.  That evening he did not specify what
13    he wanted me to do.
14        Q.  Tell me what Mr. McDade said and what
15    you said in that conversation on Thursday night,
16    as best you remember.
17        A.  He said that Mark Shafir has quit,
18    gone to Citigroup, I need some help wrapping
19    this up tomorrow, can you help me, I said yes.
20        Q.  That's the entire conversation as you
21    remember it?
22        A.  Yes.
23        Q.  Did you ask him what he needed you to
24    do?
25        A.  I think I asked him, Do you want me to
```

Page 46

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    come in the office tonight?  He said no, he was
3    already home.  I said, What time do you want me
4    to come in the morning?  And he said, you'll get
5    an e-mail about an early morning meeting.
6        Q.   Did you speak to anyone else that
7    Thursday night about the deal after you spoke to
8    Mr. McDade?
9        A.   Not that I recall.
10       Q.   So let's just get through the rest of
11   Thursday night, okay?  After you have the
12   conversation with Mr. McDade, he says he needs
13   your help, there will be an early morning
14   meeting.
15       Did you do anything else with respect
16   to the transaction on the Thursday night?
17       A.   I don't recall specifically or
18   generally.
19       Q.   On the Thursday, sir -- I'll show you
20   a document about this in a second -- do you
21   recall reaching out to others in the firm,
22   including Kaushik Amin and Gerald Donini and
23   Eric Felder, to ask them to put together
24   information to -- that would be necessary to
25   portray a fire sale liquidation of the

Page 47

1    HIGHLY CONFIDENTIAL - A. KIRK
2    securities?
3        A.   I may have done so by e-mail.
4        Q.   Okay.  I'll show you the e-mail, but
5    first, if you don't mind, what's your
6    independent recollection of that, if you have
7    any?
8        A.   My independent recollection is that I
9    got an e-mail for a scheduled meeting the
10   following day and I got a request, I didn't
11   recall when it was specifically, to help
12   organize a valuation exercise on behalf of Barry
13   Ridings.  I didn't recall whether that was
14   Thursday night or Friday morning.
15       Q.   And who is Barry Ridings?
16       A.   A Lazard restructuring banker hired by
17   the firm to testify in bankruptcy court.
18       Q.   And who made this request of you?
19       A.   I don't recall specifically who asked
20   me to do that.
21       Q.   I'm showing you, Mr. Kirk, what has
22   been marked at a prior deposition as Exhibit 3
23   an e-mail from you to an address
24   4955214@archwireless.net.  Is that your wireless
25   account?

Page 48

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.   I believe we've determined that was a
3    wireless account that was used in the late '90s
4    when there were wireless pagers, if you recall
5    those devices.
6        Q.   Uh-huh.
7        A.   But had been inoperative but still
8    alive in the system.
9        Q.   Okay.  You're about to solve one of
10   the great mysteries of this case.
11       A.   Yeah, we had --
12       Q.   Did you have that account?  Are you
13   sending it to your home e-mail?
14       A.   I don't -- no, this is auto-forwarded
15   by the computers.
16       Q.   Okay.
17       A.   So like they auto-forward to your
18   BlackBerry, these are things that auto-forward
19   from the --
20       Q.   You would love it right now if I said
21   I have nothing further, but that wasn't the key
22   question, so let me go to the exhibit that I
23   showed you.
24       A.   We had to ask ourselves the same
25   question when we saw this.

Page 49

1    HIGHLY CONFIDENTIAL - A. KIRK
2        Q.   Okay.  Take a minute to look through
3    what was marked as Exhibit 3, sir.  I have a
4    couple questions for you about it.
5        (Document review.)
6        A.   Okay.
7        Q.   In this, who is Daniel Flores, the man
8    from whom the underlying e-mail is sent?
9        A.   I believe Daniel worked for Mark
10   Shapiro.  It's indicated he worked in the
11   restructuring group that was run by a fellow
12   named Mark Shapiro at Lehman.
13       Q.   And in the e-mail, you see that
14   Mr. Flores recounts, "Alex Kirk suggested we
15   contact each of you to help us understand on a
16   theoretical basis what would happen in a fire
17   sale liquidation of the securities that are
18   being transferred to Barclays as part of the
19   proposed transaction."
20       Did you have a conversation or
21   communication with Mr. Flores about that topic?
22       A.   This indicates I must have.
23       Q.   Apart from seeing it written on this
24   e-mail, do you have any recollection?
25       A.   I don't recall.

Page 50

HIGHLY CONFIDENTIAL - A. KIRK

1    **Q.   Does this e-mail refresh your**
2    **recollection in any way of a communication with**
3    **Mr. Flores about that topic?**
4    A.   Again, I assume that I must have
5    talked to him.
6    **Q.   But again, sir, apart from seeing it**
7    **on the page in front of you, do you have a basis**
8    **for that assumption?**
9    A.   No.
10   **Q.   You said that that was -- well, let me**
11   **continue down into Mr. Flores' e-mail where he**
12   **talks about, "We will be leaving on your desks a**
13   **list of the top 100 positions in each of your**
14   **area's expertise." Did that exercise take**
15   **place, to your knowledge?**
16   A.   Yes, I believe it did.
17   **Q.   And what was the result of the**
18   **exercise?  Was there a fire sale liquidation**
19   **scenario put together?**
20   A.   So these positions were delivered to
21   each of the recipients of this e-mail, Kaushik
22   Amin, Charlie Spero, Eric Felder, Gerry Donini,
23   were the various business heads in charge of
24   parts of fixed income or equities, and they

Page 51

HIGHLY CONFIDENTIAL - A. KIRK

1    would have been -- had those delivered early in
2    the morning, and then we were attempting to have
3    an 11 o'clock meeting to go over the findings of
4    their -- their assumptions and analysis about
5    the value of those positions.
6    **Q.   And did that meeting take place?**
7    A.   Yes, it did.
8    **Q.   Were you at it?**
9    A.   Yes.
10   **Q.   Who was at the meeting?**
11   A.   Mike Gelband, Kaushik Amin, Charlie
12   Spero and Gerry Donini, and Daniel Flores was
13   there as well as Gerry Reilly.
14   **Q.   Was James Seery there?**
15   A.   He might have been.  I recall he was
16   there.
17   **Q.   You do recall he was there?**
18   A.   I recall he was there.
19   **Q.   Was a determination made about**
20   **liquidation value?**
21   A.   No.  The data had been delivered in --
22   the position data had been delivered in a way
23   that, given the short period of time, a couple
24   hours, the business heads were not able to

Page 52

HIGHLY CONFIDENTIAL - A. KIRK

1    determine in any comprehensive way the values.
2    So we adjourned the meeting with the -- with a
3    plan that Barry Ridings would talk to each of
4    these individuals separately closer to the end
5    of the day when they might have a better sense.
6    **Q.   Do you know if Mr. Ridings did that?**
7    A.   I don't know that.
8    **Q.   Did he speak to you at all?**
9    A.   Not about this topic.  I saw him later
10   in the day in a meeting.
11   **Q.   Let me just back up a little bit.  Did**
12   **Ridings know you were organizing this project?**
13   A.   Yes.
14   **Q.   Would he have known you're the contact**
15   **guy on it?**
16   A.   Yes.  I probably called him and told
17   him call these people directly.
18   **Q.   Did you have any conversations that**
19   **you recall with Mr. Ridings about the need for a**
20   **liquidation scenario to be analyzed?**
21   A.   I assume he clarified the reasoning as
22   a test for the court.
23   **Q.   When you say you assume that, what's**
24   **the basis of that assumption?**

Page 53

HIGHLY CONFIDENTIAL - A. KIRK

1    A.   I vaguely recall having a conversation
2    with him.
3    **Q.   Let's go to the early morning of**
4    **Friday, the 19th.  You spoke a moment ago about**
5    **getting a call from Mr. McDade.  Shafir's quit.**
6    **He asked for your help, can you come to meet**
7    **with him in the morning.  Did you do that?**
8    A.   Yes.
9    **Q.   And where was the meeting?**
10   A.   It was a -- I believe it was in my
11   office.
12   **Q.   In your office, sir?**
13   A.   Yes.
14   **Q.   Who was in attendance?**
15   A.   Ian Lowitt, Chris O'Meara, Gerry
16   Reilly, Paolo Tonucci.  I think that was it.
17   **Q.   Was Mr. McDade there?**
18   A.   I don't believe, no, I don't believe
19   he was there.
20   **Q.   Now, in your conversation with**
21   **Mr. McDade the night before, he had told you**
22   **Shafir quit, he told you he needed your help,**
23   **you offered to come in, he said come in in the**
24   **morning, if I remember your testimony right, and**

Page 54

HIGHLY CONFIDENTIAL - A. KIRK

1  that's not what governs, that's basically the
2  topics you covered with McDade on Thursday
3  night.
4       So here you are in a meeting with
5  Lowitt, O'Meara, Reilly and Tonucci. Do you
6  learn more at the meeting about the nature of
7  the help that you're going to have to give?
8     A.  They broadly outlined the first
9  transaction. That was a quick summary. Then we
10 discussed an issue that had come up earlier that
11 morning around JPMorgan as our clearing bank
12 shutting down Lehman's DTC account and what
13 effect that would have on the transaction as
14 planned.
15    Q.  Now, you referred to -- you said they
16 broadly outlined the first transaction. By the
17 Friday morning, is it your understanding there's
18 a second transaction, a subsequent transaction?
19    A.  By the time we had this meeting --
20    Q.  Uh-huh.
21    A.  -- it was my view, my opinion, that
22 there would have to be a reworking of the
23 transaction because a vast majority of those
24 securities that had been planned for transfer

Page 55

HIGHLY CONFIDENTIAL - A. KIRK

1  were held at JPMorgan. There was a -- and
2  JPMorgan had a dispute of some sort about the
3  transfer of the repo with Barclays, which was
4  described to me by Mike Keegan, and in addition
5  to that, they shut down Lehman's -- they closed
6  down Lehman's DTC account, which led me to
7  believe that JPMorgan would not cooperate and
8  transfer the aforementioned securities to
9  Barclays on that Friday.
10    Q.  When had you spoken to Mike Keegan?
11    A.  I got up and I went to the office
12 about 5 A.M. and I ran into him about 5:30 in
13 the morning.
14    Q.  Had you met Mr. Keegan before?
15    A.  I had met him the week before during
16 the due diligence process.
17    Q.  So you say "they," that's some
18 combination of Lowitt, O'Meara, Reilly and
19 Tonucci, broadly outlined the first transaction
20 to give you a quick summary?
21    A.  Yes.
22    Q.  How did they summarize -- tell me what
23 you remember about their broad outline of the
24 first transaction, the quick summary that they

Page 56

HIGHLY CONFIDENTIAL - A. KIRK

1  gave you.
2     A.  They summarized it as a purchase of
3  the building, purchase of assets, and an
4  assumption of this 4 billion, 4 and a quarter
5  billion dollars in liabilities.
6       That discussion ended very quickly
7  because of my belief that that transaction,
8  given what had just transpired -- what I had
9  learned from Keegan and the action that JPMorgan
10 had taken, that I believe that they would act as
11 a hostile party towards the closing of this
12 transaction and that whatever had taken place
13 before was irrelevant.
14    Q.  Did Mr. Tonucci tell you anything
15 other than there was an assumption of
16 liabilities in an approximate amount of 4 and a
17 quarter billion for compensation of payables?
18    A.  No.
19    Q.  Did you have any knowledge as to how
20 that number came to be determined?
21    A.  No. I was not concerned with that
22 part of the transaction.
23    Q.  I'm sort of away from the Friday
24 meeting for a moment.

Page 57

HIGHLY CONFIDENTIAL - A. KIRK

1     A.  No.
2     Q.  At any point did you come to an
3  understanding as to how those, those components
4  of assumed liabilities came to be calculated?
5     A.  No. No.
6     Q.  When the transaction, the first
7  transaction was outlined to you by Tonucci,
8  O'Meara, Reilly and Lowitt, or some combination,
9  did you have an understanding as to where the
10 assets would come from to fund those assumed
11 liabilities?
12    A.  I believe there was a schedule,
13 one-page schedule, which I think you have, that
14 broadly gave an asset and liability balance
15 sheet.
16    Q.  Have you ever seen that schedule?
17    A.  Yes.
18    Q.  When did you first see that schedule?
19    A.  I believe it was that morning. It was
20 that morning.
21    Q.  Apart from the schedule, did you look
22 at any other documents that morning?
23    A.  No.
24    Q.  I'm putting before you what previously

Page 58

1   **HIGHLY CONFIDENTIAL - A. KIRK**
2   **has been marked as Deposition Exhibit 19.**
3       A.   Yes, that's the schedule.
4       **Q.   And the schedule that you saw that**
5   **morning was the one with the annotation in the**
6   **upper right-hand corner "9/16/08, Final SB"?**
7       A.   Uh-huh.
8       **Q.   Do you remember that?**
9       A.   Yes.
10      **Q.   Okay.  Who gave you the schedule?**
11      A.   One of the gentleman.
12      **Q.   Do you recall which one?**
13      A.   No.
14      **Q.   Did anybody tell you anything about**
15  **the schedule?**
16      A.   They briefly described it as an asset
17  sale that was approximately this size of this
18  characteristics of the category of assets that
19  they were going to buy, category of liabilities
20  that they were going to assume, including
21  financing liabilities and the aforementioned
22  cure payment and comp.
23      **Q.   When you refer to the financing**
24  **liabilities, are you just sort of broadly**
25  **describing the liabilities opposite the**

Page 59

1   **HIGHLY CONFIDENTIAL - A. KIRK**
2   **particular assets in ST borrowings, government**
3   **and agencies?**
4       A.   Yes.
5       **Q.   The ones that add up to 33.9?**
6       A.   Well, in addition, there's the 34.5
7   below that.
8       **Q.   For collateralized short-term funding,**
9   **right?**
10      A.   Yes.
11      **Q.   Now, did you have an understanding**
12  **when you were shown this schedule of where the**
13  **values for assets -- from where the values for**
14  **assets were derived?**
15      A.   I don't recall.  We quickly moved on
16  from this.
17      **Q.   Did whoever described the schedule to**
18  **you, did they give you any description of the**
19  **role that any of that schedule played in the**
20  **first transaction?**
21      A.   They described it as the template for
22  the first transaction.
23      **Q.   And do you know who put together the**
24  **schedule that was the template for the first**
25  **transaction?  Did they tell you that?**

Page 60

1   **HIGHLY CONFIDENTIAL - A. KIRK**
2       A.   No.
3       **Q.   Did you ask?**
4       A.   No.
5       **Q.   Now, present at the meeting was**
6   **Lowitt, O'Meara, Reilly and Tonucci.  Was**
7   **anybody participating by telephone?**
8       A.   I don't recall.
9       **Q.   Was there any participation in that**
10  **Friday morning meeting by anybody from Barclays?**
11      A.   No.
12      **Q.   So they broadly outlined the first**
13  **transaction.  They tell you the problem with**
14  **JPM, one of them or some combination of them.**
15      **What happens next in that meeting?**
16      A.   We break up.  I tell them that I'm
17  going to go try to shepherd the valuation
18  process that I have been asked to follow up on
19  for this 11 o'clock meeting and that I'm going
20  to try to arrange a meeting with the senior
21  executives at Barclays to explain to them what
22  my view was, that this transaction as outlined
23  couldn't be closed on that Friday night, which
24  they agreed with.
25      Oh, I tell them I'm first going to go

Page 61

1   HIGHLY CONFIDENTIAL - A. KIRK
2   inform senior Lehman executives, Bart and Dick,
3   of this problem.
4       (Mr. Kelley confers with the witness.)
5       A.   I'm sorry, just to clarify, my
6   assumption about this being problem -- this
7   transaction being problematic was agreed to.
8   The basis for that worry was verified by or
9   agreed to by Ian Lowitt and Paolo Tonucci in
10  that meeting.
11      **Q.   As I understand it, your primary**
12  **activities for the week until this Friday**
13  **morning meeting had been in risk management --**
14      A.   Uh-huh.
15      **Q.   -- had been in shrinking the matched**
16  **book, keeping the firm alive so that the Friday**
17  **hearing had some possibility of succeeding, is**
18  **that a fair summary?**
19      A.   Yes.
20      **Q.   And you're called into this meeting on**
21  **Friday morning and told that the transaction**
22  **that's been on the table all week can't go**
23  **forward because of this problem.  This may seem**
24  **an odd question, sir, but why are you now the**
25  **guy that has to call Barclays and call senior**

Page 62

HIGHLY CONFIDENTIAL - A. KIRK
1 **HIGHLY CONFIDENTIAL - A. KIRK**
2 management?  Did you have an understanding of
3 why you're the lucky winner of that
4 responsibility?
5     A.   Because I volunteered.  Yeah, I --
6     Q.   Did you have --
7     A.   Believe me, I almost had a heart
8 attack just thinking about that.
9         (Mr. Kelley confers with the witness.)
10    A.   That's true.  In addition to Mark
11 Shafir had left the firm, so ...
12    Q.   That's sort of implicit in my
13 question.  Why are you the guy who has to step
14 up to the plate when Shafir leaves?  Why not
15 McGee?  Why not Tonucci?  Why not Lowitt?
16    A.   Because Bart trusted me.
17    Q.   So did you go and inform more senior
18 Lehman executives of the issues of the problem?
19    A.   Yes.
20    Q.   Okay.  Tell me about that.  Who did
21 you contact and what did you tell them, what did
22 they say to you?
23    A.   I contacted Bart, I don't recall who
24 else was in the meeting exactly, but I walked
25 in, and there were others, I don't remember who

Page 63

1 HIGHLY CONFIDENTIAL - A. KIRK
2 exactly, Fuld, most likely, that the assets and
3 liabilities that had been assumed to be
4 transferred in the first transaction were all
5 held in custody or had to be cleared through
6 JPMorgan, and because JPMorgan had taken this
7 hostile action, there was a dispute, which I
8 didn't understand the exact nature of, with the
9 transfer of collateral between Barclays and --
10 between the Fed through JPMorgan to Barclays.
11        I knew at a very high level there was
12 a dispute between the two firms as to what
13 collateral was accept -- what collateral was
14 transferred and what collateral was left at
15 JPMorgan, and I knew that JPMorgan had shut down
16 Lehman's DTC account and failed all the
17 settlements on that Friday, and a combination of
18 those two pieces of information led me to
19 believe that JPMorgan wouldn't transfer these
20 assets on this schedule and liabilities, both
21 sides, in any normal course.
22    Q.   And when you reported this to McDade,
23 you said -- withdrawn.  You said Fuld was there,
24 most likely.
25        Do you have a recollection of him

Page 64

1 **HIGHLY CONFIDENTIAL - A. KIRK**
2 being there, or are you assuming again, because
3 of his role, his title, that he might have been?
4     A.   Yes, I'm assuming because of his title
5 he might have been.
6     Q.   But you do recall talking to McDade
7 about it?
8     A.   Yes.
9     Q.   Do you recall anyone else other than
10 McDade to whom you spoke?
11    A.   No.
12    Q.   And what did Mr. McDade say?
13    A.   He said we should have a sit-down with
14 the Barclays senior team and we should explain
15 our point of view on this ASAP.
16    Q.   And what happened next?
17    A.   We had a meeting with Bart, myself,
18 and then it was Michael Klein, Rich Ricci, and
19 Mike Keegan from Barclays.
20    Q.   Where was the meeting?
21    A.   It was in an office on 31 that
22 Barclays was using as temporary space.
23    Q.   And who's there from the Lehman side
24 of the table?
25    A.   Bart and I were there.

Page 65

1 HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   Anyone else?
3    A.   Ian was there as well, I'm pretty
4 sure.
5    Q.   Was Tonucci there?
6    A.   I don't remember.
7    Q.   Do you recall whether or not with
8 regard to which ones there were, do you recall a
9 bigger meeting than that, or is this the
10 assembly of people that you remember?
11    A.   It was an assembly of no more than ten
12 people total.
13        MR. GAFFEY:  Can we go off the record
14 for a minute?
15        (Discussion off the record.)
16        (Recess; Time Noted:  10:59 A.M.)
17        (Time Noted:  11:09 A.M.)
18 BY MR. GAFFEY:
19    Q.   We were, before the break, we were at
20 this Friday morning meeting, and so I want to go
21 through in as much detail as I can what happened
22 at that meeting and who said what.
23        I have a general sense that the JPM
24 problem has arisen.  Did you have a sense, was
25 there any discussion about the JPM problem being

Page 66

1      **HIGHLY CONFIDENTIAL - A. KIRK**
2    related in any way to the Repurchase Agreement
3    with Barclays?
4      A.   Yes.
5      Q.   Describe that for me.  What was your
6    understanding?
7      A.   So, to be clear, I'm not an expert,
8    was not an expert on repo, so I was learning
9    things for the first time that day that I didn't
10    understand how they actually worked prior to
11    that.  So I got what was a cursory as opposed to
12    a detailed explanation of the issue, but as I
13    understood it from the way that Mike Keegan
14    explained it to me was that the Fed had been
15    providing a repo for Lehman Brothers earlier in
16    the week of approximately $50 billion, that the
17    Fed had made it known that they wanted to be
18    repaid on that repo, and that Barclays had
19    agreed to assume that repo obligation from the
20    Fed.  Without that financing the firm would have
21    collapsed the next morning.
22      So the way it was explained to me was,
23    during the transfer of those -- that loan and
24    the collateral associated with that loan, there
25    were many pieces of collateral that Barclays

Page 67

1      HIGHLY CONFIDENTIAL - A. KIRK
2    could not value, so they did not accept them in
3    transfer from the Fed.  And mechanically, it was
4    explained to me the way that worked was, in a
5    tri-party repo, the Fed transferred all of the
6    positions to JPMorgan and then JPMorgan began
7    transferring those positions upon the receipt of
8    money from Barclays transferred money, and then
9    they would transfer the positions that secured
10    that repo.
11      And at some point during that process,
12    Barclays became very uncertain as to some
13    percentage of that collateral, I don't recall
14    the exact amount, but it was a large number,
15    maybe as much as, you know, 20 percent of the
16    collateral, and when Barclays didn't accept
17    those positions, they, by definition, just got
18    left at JPMorgan.
19      They -- so JPMorgan was left with
20    collateral that they were not comfortable with
21    but Barclays would not accept, so -- and
22    JPMorgan, I guess they attempted to negotiate
23    but couldn't get that negotiation done.
24      Q.   Who was the "they" who attempted to
25    negotiate?

Page 68

1      **HIGHLY CONFIDENTIAL - A. KIRK**
2      A.   That JPMorgan and Barclays attempted
3    to negotiate, but they couldn't complete a
4    negotiation for a transfer of that collateral.
5      Q.   And when you say Keegan's explanation,
6    I take it you're talking about the conversation
7    you had with Keegan before the meeting?
8      A.   Yes.
9      Q.   Okay.
10      A.   The 5:30 in the morning.
11      Q.   And did Keegan give you any level of
12    detail about why Barclays was uncertain about
13    some percentage of that collateral?
14      A.   It was collateral that they didn't --
15    was either they didn't have the expertise to
16    value or was not transparent, meaning that there
17    were financing vehicles that Lehman set up that
18    went into the repo that you couldn't look
19    through to what was in those financing vehicles.
20      Q.   And did Mr. Keegan give you any
21    information about what that collateral was, what
22    type of securities?
23      A.   He didn't know.
24      Q.   Well --
25      A.   In some cases he didn't know.  In

Page 69

1      HIGHLY CONFIDENTIAL - A. KIRK
2    other cases it was, yes, it was illiquid and
3    either high-yield or defaulted or consumer
4    mortgage securities that were the ones he could
5    identify that were very hard to value.
6      Q.   I'm hearing this in two categories,
7    and I want to be sure you and I are on the same
8    page.  There's a component of this collateral
9    that's hard to value and there's a component
10    that is not transparent, which may also make it
11    hard to value --
12      A.   Yes.
13      Q.   -- but some of it's transparent and
14    hard to value?
15      A.   Yes.
16      Q.   Okay.  Did he identify any particular
17    categories of hard-to-value securities?  I get
18    it, high-yield or mortgage-backed, but did he --
19      A.   Distressed.
20      Q.   Did he use the term "racers" at all?
21      A.   That was the non-transparent category.
22      Q.   Okay.  Tell me what Mr. Keegan said to
23    you about racers.
24      A.   "What are they?"
25      Q.   Anything else?

Page 70

HIGHLY CONFIDENTIAL - A. KIRK

1    A.  "And what's in them?" I said, "I
2  don't know." I then went and -- Paolo Tonucci,
3  I directed him to Paolo, who would be able to
4  tell him what was in those various financing
5  vehicles.
6    Q.  Do you know what Paolo Tonucci then
7  spoke to Mr. Keegan about?
8    A.  I don't know.
9    Q.  Did Mr. Keegan say anything else about
10  racers other than he didn't know what they were?
11    A.  He asked how would I find out.
12    Q.  Did Mr. Keegan say anything to you
13  that, in sum or substance, compared the assets
14  that Barclays had agreed to buy in the first
15  transaction, to use your term, and the assets
16  that were in the repo that were the subject of
17  this transfer problem?
18    A.  He summarized it as it was a very
19  different and riskier category of assets.
20    Q.  Was anyone else present when
21  Mr. Keegan and you had this early morning
22  conversation?
23    A.  No.
24    Q.  Did you understand from Mr. Keegan, in

Page 71

HIGHLY CONFIDENTIAL - A. KIRK

1  sum or substance, whether he had spoken to
2  others at Lehman about this problem by the time
3  he had spoke to you?
4    A.  I understood I was the first person he
5  had explained it to, at Lehman that he had
6  explained it to.
7    Q.  When you spoke to him and about this
8  topic, did you let him know that there was a
9  Friday meeting planned with -- that you had been
10  asked to come to an early morning meeting by
11  Mr. McDade?
12    A.  Yes.
13    Q.  And did you tell him you'd get back to
14  him after that meeting to see if there was a
15  solution to this problem?
16    A.  Yes.
17    Q.  So, in the course of that meeting, now
18  we've got the JPM issue, it's been identified,
19  you've had the first transaction outlined to you
20  broadly, the JPM problem --
21    A.  Right.
22    Q.  -- has been also described.  What
23  happens next?
24    A.  I'm sorry, so where -- what time of

Page 72

HIGHLY CONFIDENTIAL - A. KIRK

1  day are we now?
2    Q.  I'm sorry.  I've got you back at the
3  Friday meeting with -- we're back at the Friday
4  meeting with Bart, yourself, Klein --
5    A.  Okay.
6    Q.  -- Ricci and Keegan.
7    A.  Yeah.
8    Q.  Okay.
9    A.  So at that meeting I walk through -- I
10  summarized the issues, as I understand them, for
11  this private discussion with Barclays.  I inform Barclays
12  that those executives -- that JPMorgan had shut
13  down Lehman's DTC account, and I made the
14  supposition that that would make it impossible
15  to complete the transaction as contemplated.
16    Q.  And what, if anything, did Mr. McDade
17  have to say about those topics?
18    A.  He said he agreed with me.
19    Q.  Did you speak first in outlining the
20  issues?
21    A.  Yes.
22    Q.  And how did Klein, Ricci and Keegan or
23  any combination of those three men react to that
24  news?

Page 73

HIGHLY CONFIDENTIAL - A. KIRK

1    A.  There was some question as to, well,
2  what do we do now?  I suggested that the only
3  reasonable course of action would be to proceed
4  with the transaction substituting the repo
5  assets, the assets that Barclays had lent
6  against, for all the other securities that had
7  been contemplated in the transaction and leave
8  the rest of the transaction as was.
9    Q.  So if I understand this -- I want to
10  make sure I understand this correctly.  Your
11  suggestion was to take the assets that were the
12  subject of the first transaction roughly
13  outlined in that schedule?
14    A.  Yeah.
15    Q.  And instead of transferring that body
16  of assets, transfer the body of assets that are
17  in the repo, correct?
18    A.  Yes.
19    Q.  Maybe I'm not understanding.  Is the
20  problem here, doesn't it involve the assets that
21  are in the repo?  Hasn't Mr. Keegan told you
22  that Barclays is uncertain about some components
23  of the repo collateral?
24    A.  So, again, the issue was that it was

Page 74

HIGHLY CONFIDENTIAL - A. KIRK

1  my view that JPMorgan would not transfer one
2  dollar of one asset unless they got whatever
3  they wanted in a negotiation from Barclays or
4  anybody else, and even then they wouldn't -- it
5  didn't appear that they would do anything but be
6  hostile, having shut down our DTC account, which
7  is a, I mean, that's a colossal nightmare.  You
8  know, you've got tens of billions of dollars of
9  securities supposed to settle a regular way that
10 you've been transacting with your clients, and
11 every single one of them fails -- both sides,
12 buys and sells.
13    Q.  How is JPM in a position to shut down
14 Lehman's?
15    A.  They're our clearing bank.
16       So it was, again, my supposition,
17 which was confirmed by, you know, the senior
18 finance staff and Bart and then finally the
19 Barclays guys, that, you know, JPMorgan should
20 be viewed as not going to cooperate.  And
21 Barclays was attempting to reach JPMorgan and
22 never got a return call, was my understanding.
23 I was told that by probably Gerard LaRocca or
24 Keegan, one of them, and hence, you know, the

Page 75

HIGHLY CONFIDENTIAL - A. KIRK

1  only assets that could participate in any way in
2  this transfer were ones that Barclays had held
3  in custody at their clearing bank, Bank of New
4  York, and potentially any assets at Lehman that
5  were unencumbered and were held away from
6  JPMorgan.
7    Q.  So, again, forgive me if I'm thick
8  here, but is the problem with JPMorgan --
9  withdrawn.
10       When you talk about the assets that
11 Barclays had at Bank of New York, those were
12 assets within the repo?
13    A.  Yes.
14    Q.  Within the Barclays repo, yes?
15    A.  Yes.
16    Q.  Do you know the amount, the value of
17 the assets that were at Bank of New York within
18 the Barclays repo?
19    A.  I didn't know that.  I didn't know the
20 amount or the value of those assets.
21    Q.  Okay.  And again, so we're clear, you
22 didn't know at the time or you don't remember
23 now, or both?
24    A.  I didn't know at the time.

Page 76

HIGHLY CONFIDENTIAL - A. KIRK

1    Q.  Okay.  And the problem with JPM
2  refusing to transfer assets over, is that away
3  from the repo?
4    A.  Yes.
5    Q.  Okay.  So your suggestion is to focus
6  on the repo as the body of assets that can be
7  transferred to Barclays?
8    A.  Right.
9    Q.  Plus unencumbered, other unencumbered
10 assets?
11    A.  That were not held or cleared through
12 JPMorgan.
13    Q.  That are away from JPMorgan?
14    A.  Correct.
15    Q.  Now, did you have an idea then of what
16 the value of that total package could be?
17    A.  No.
18    Q.  So you've made --
19    A.  Because I wasn't clear on what
20 actually got transferred and what didn't get
21 transferred.  I knew broadly the size of the Fed
22 repo.  I didn't know what the disputed amount
23 was or the assets.
24    Q.  I just need to follow up a bit on the

Page 77

HIGHLY CONFIDENTIAL - A. KIRK

1  disputed amount.
2    A.  Yeah.
3    Q.  I'm trying to be as clear as I can --
4    A.  Yeah.
5    Q.  -- as to what's the JPM problem and
6  how much of that is --
7    A.  Right.
8    Q.  -- whether that's -- we've established
9  the JPM problem is away from the repo, right?
10   A.  The JPM problem vis-a-vis Lehman
11 Brothers was away from the repo, that is
12 correct.
13   Q.  But vis-a-vis Barclays, it was not
14 away from the repo?
15   A.  My understanding was there was a
16 dispute about Barclays not accepting all the
17 collateral out of the Fed, only some of it, and
18 that collateral they didn't accept got left
19 behind or, by definition, stays at the clearing
20 bank, which was JPMorgan.  JPMorgan clears for
21 the Fed.
22   Q.  And I think you had an -- a rough idea
23 of what percentage of that.  It was some
24 percentage.  It could have been as much as 20

Page 78

HIGHLY CONFIDENTIAL - A. KIRK

1  percent that Barclays would not accept, yes?
2     A.   Yes.
3     Q.   Did you have a sense of a dollar
4  amount of what was net of the amount that
5  Barclays would not accept?
6     A.   It was somewhere in the 40s.
7     Q.   And when you're talking about the
8  amount of the repo, are you talking about the
9  amount that was financed or the total collateral
10  as pledged?  Withdrawn.
11       You told me you're not an expert in
12  repos --
13     A.   Yeah.
14     Q.   -- and neither am I, but I understand
15  there's a haircut.
16     A.   Yeah, I think I was talking about the
17  amount financed, but I'm not -- I'm sketchy on
18  that.
19     Q.   So you make this proposal.  McDade
20  says he thinks you're right.  What's the
21  reaction from Klein, Ricci and Keegan?
22     A.   Ricci says -- there was some
23  discussion, I don't recall the specifics of it,
24  but Ricci then I recall specifically says, I

Page 79

HIGHLY CONFIDENTIAL - A. KIRK

1  believe he's right.  We have to change course.
2     Q.   I know it's a long time ago, but just
3  given that phrase, is that -- are you quoting
4  him?  Are you summarizing him?
5     A.   I'm summarizing him.  I was under a
6  tremendous amount of pressure and stress, so my
7  memory is a little fuzzy from that.
8     Q.   Sure.
9     A.   At one point in this meeting, Mike
10  Klein looked at me and said, "Do you need a
11  doctor?"
12     Q.   Really?
13     A.   Yeah.
14     Q.   Well, you're kind of a last-minute
15  volunteer in this thing, you know?
16     A.   Yeah.  Story of my life.
17     Q.   What did Klein say?
18     A.   He said, okay, let's get to it.
19     Q.   And did Keegan say anything?
20     A.   He said, well, we haven't analyzed
21  this collateral so we don't know what it's
22  worth.  How are we going to figure out what it's
23  worth?  And we said we had started a process
24  with these large positions.

Page 80

HIGHLY CONFIDENTIAL - A. KIRK

1       The problem turned out to be not only
2  was the data delivered in a not usable fashion
3  to the heads of the desk, but it was a different
4  set of securities.  So we had to -- it was
5  determined that the finance staff of Lehman
6  Brothers needed to work with the finance staff
7  at Barclays and get a list of everything that
8  was in their repo line, and then take that off
9  the systems and try to put it together in a way
10  that could be delivered to the various trading
11  desks to try to put some value on it.
12     Q.   When you referred before to, you know,
13  we had started that process, was that a -- were
14  you referring --
15     A.   From the night of the --
16     Q.   Yes.
17     A.   -- Daniel Flores' e-mail.
18     Q.   That's the one that refers to trying
19  to come up with fire-sale-type prices?
20     A.   Yes.
21     Q.   What in your mind was the connection
22  between the, what I'll call the fire sale
23  analysis and the problem you were dealing with
24  on Friday?  I'm not sure I'm clear on that.

Page 81

HIGHLY CONFIDENTIAL - A. KIRK

1     A.   Only that we had -- that I could tell
2  the Barclays guys that we were already trying to
3  value some collateral and relative to the marks.
4  The -- Lehman suffered, you know, two issues
5  that week around valuations.  One was the
6  markets were unbelievably volatile and
7  incredibly illiquid, and that we were a less
8  than desirable counterparty for us -- so that
9  we had been, when we had been liquidating
10  collateral, we had been losing a lot of money,
11  and in addition to that, a smaller problem was,
12  you know, since the firm had filed for
13  bankruptcy, not every person was showing up to
14  work.
15     Q.   Now, the fire sale liquidation
16  analysis, the top 100 positions there, did
17  you -- are you saying that some of those might
18  have been in the repo?
19     A.   Yeah, but we didn't know which ones.
20     Q.   You didn't know?
21     A.   We had no idea.
22     Q.   That's not, so we're clear, the 100
23  positions we're talking about there is not with
24  direct reference to what was in the repo?

Page 82

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   No, not at all.  We didn't know we had
3  this problem Thursday night.
4    Q.   What's the tone of the Friday meeting?
5  I know it's tense and Klein says do you need a
6  doctor, but are people angry?  Are they calm?
7  Are they -- what's the temperature in this
8  meeting?
9    A.   Anxious.  It's very, very anxious.
10  How are we going to be able to try to get
11  anything over the goal line by 4 o'clock this
12  afternoon, and if we don't, you we don't believe
13  we can survive the weekend.
14    Q.   And why 4 o'clock that afternoon?  Was
15  that the bankruptcy hearing?
16    A.   Yeah, that was the bankruptcy hearing,
17  the scheduled bankruptcy hearing.
18    Q.   Is there any discussion in this
19  meeting about what, if anything, needs to be
20  said to the bankruptcy court about this event,
21  these events?
22    A.   That it would have to be explained.
23  This transaction was very different than what
24  had been previewed two days before, and it would
25  have to be explained why it came up.

Page 83

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Who said it would have to be
3  explained?
4    A.   Barry -- in that meeting -- I
5  apologize, some of these meetings are blurs.
6    Q.   Sure.
7    A.   But at some point during the day,
8  Barry Ridings, I was in a meeting with him, I
9  believe it was maybe at the tail-end of this
10  meeting, he came in and, you know, he listened
11  to this explanation again and then he said,
12  okay, we're going to have to be able to explain
13  this.
14    Q.   And did the Barclays folks in the
15  meeting -- and by that, I'm including Klein
16  here, Klein, Ricci, Keegan -- did they have
17  anything to say about whether and when this
18  would have to be explained to the court?
19    A.   No, they were taking Barry's lead.
20    Q.   Now --
21    A.   We all knew that there was a court
22  hearing scheduled at 4 o'clock.
23    Q.   Why do you describe this as a very
24  different agreement?
25    A.   The list of assets is different.

Page 84

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Was there any discussion about the
3  consideration Barclays was to give in the
4  agreement also changing?
5    A.   Besides the amount, no.
6    Q.   Well --
7    A.   Meaning besides the fact that it
8  wasn't 72 million, you know, the attempt was to
9  get it so that the assets and liabilities would
10  balance.
11    Q.   And the 72 million, you're looking at
12  Exhibit 19, yeah?
13    A.   Yes.
14    Q.   That financial schedule.
15        Was there any discussion of the
16  compensation and cure components of the assumed
17  liabilities changing?
18    A.   Not at that meeting.
19    Q.   Did you at some point hear a
20  discussion about the compensation and cure
21  components changing?
22    A.   At some point late in the day, there
23  was a -- not on the compensation, there was no
24  discussion of compensation.  Ian -- not Ian,
25  Paolo was attempting to figure out a better

Page 85

HIGHLY CONFIDENTIAL - A. KIRK

1
2  estimate.  I think they had always continually
3  worked on it, but they were trying to figure a
4  better estimate.
5        Ian -- I remember Paolo coming into a
6  meeting I was in, I don't remember who it was
7  with, but he came in and said I'm working
8  through the cure payments to try to see if
9  there's some wiggle room there, so to speak, in
10  terms of what is that estimate.  I never got
11  a -- I was -- that was not part of the
12  transaction I was concerning myself with.  I was
13  supposed to try to shepherd along as best as
14  possible in this incredible short timeframe some
15  valuation work that we could get to on the
16  assets.
17    Q.   Wiggle room up or wiggle room down, or
18  both?
19    A.   I don't -- he didn't mention it one
20  way or another.  Some variance I guess is a
21  better way to put it.  I don't remember whether
22  it was higher or lower.
23    Q.   In the Friday meeting with McDade and
24  you and Klein and Ricci and Keegan, was there
25  any discussion about Lehman defaulting on the

HIGHLY CONFIDENTIAL - A. KIRK

1  repo?
2  A. No.
3  Q. Were you ever involved in any
4  discussion concerning the topic of Lehman
5  defaulting on the repo?
6  A. Not a discussion. I received an
7  e-mail that referenced it, but --
8  Q. From whom did you receive the e-mail?
9  A. I don't have it in front of me.
10  You've got it, Gerry Reilly. That was
11  a couple days earlier when I wasn't involved, so
12  I didn't pay attention to it.
13  Q. Do you recall that as an e-mail where
14  Reilly proposed defaulting on the repo was the
15  best way to deliver the bulk discount to
16  Barclays?
17  A. I would have to look at it again.
18  Q. We'll get to that a little later.
19  A. Fine.
20  Q. Is there any discussion in the Friday
21  meeting of that, of using the repo as a means of
22  delivering a haircut to Barclays?
23  A. No.
24  Q. Was there any discussion in the Friday

HIGHLY CONFIDENTIAL - A. KIRK

1  meeting of terminating the repo?
2  A. I recall a discussion, I don't
3  remember who was in the meeting, but with
4  Barclays that if we couldn't get to closure that
5  day --
6  Q. That Friday?
7  A. That Friday.
8  Q. Okay.
9  A. -- it was likely they would terminate
10  the repo.
11  Q. Do you know if at any point Barclays
12  did terminate the repo?
13  A. I don't know the answer to that.
14  Q. When the Barclays folks said if they
15  couldn't get to closure on Friday, they would
16  have to terminate the repo, was there any
17  reaction from the Lehman folks to that
18  statement?
19  A. We understood they had to do what was
20  within their rights and what they felt was
21  appropriate.
22  Q. Who said that?
23  A. McDade.
24  Q. I'm going to show you, Mr. Kirk,

HIGHLY CONFIDENTIAL - A. KIRK

1  what's previously been marked as Exhibit 21.
2  Take a moment to look through the document.
3  (Document review.)
4  A. Okay.
5  Q. Is that the document, the e-mail you
6  referred to a moment ago?
7  A. Yes.
8  Q. At the very bottom of the document,
9  paragraph 3, and this is within the e-mail from
10  Reilly to Lowitt, Gelband, Tonucci and Kelly, is
11  the following, "Not clear on the amount of block
12  discount or how we make it happen. Defaulting
13  on repo could be the best, as discount could be
14  taken from haircut." Do you see that?
15  A. Uh-huh.
16  Q. You may have said something a moment
17  ago about this, but let me ask you, did you have
18  an understanding when you saw this e-mail of
19  what it was Mr. Reilly was talking about, using
20  the repo?
21  A. No, this was before I was involved,
22  and I was CC'd on this e-mail because of my work
23  in the auction rate book and the prime brokerage
24  financing at the time.

HIGHLY CONFIDENTIAL - A. KIRK

1  Q. Okay. So the first paragraph of
2  Mr. Reilly's e-mail refers to the auction rate
3  book?
4  A. Yeah.
5  Q. And the question appears to be whether
6  it's staying or going in the transaction, yes?
7  A. Right.
8  Q. And was it your understanding that it
9  was that first question that was the reason it
10  was forwarded to you, because you're in the ARS
11  world?
12  A. I had been in the ARS world in my
13  previous job, and I assumed it was forwarded to
14  me so they could figure out who should answer
15  these questions, who would be most expert to
16  answer them.
17  Q. All right. So when you got the whole
18  e-mail, including the other two questions --
19  A. Yep.
20  Q. -- am I fairly understanding your
21  testimony that you didn't really focus on 3
22  because it wasn't in your area of
23  responsibility, you didn't understand it to be
24  addressed to you?

Page 90

**HIGHLY CONFIDENTIAL - A. KIRK**

1    A.   As a matter of fact, my answer
2 indicates what I did was I redirected them to
3 people I thought could be helpful.
4    Q.   Okay.
5    A.   That's what I thought my
6 responsibility would be.
7    Q.   Okay.
8    A.   Try to put point them in a direction.
9    Q.   Beg your pardon.
10    And with respect to the third
11 question, you say, "The third question is
12 definitely for Cogs," C-O-G-S. Is that a
13 reference to Mr. Coghlan?
14    A.   John Coghlan, yes.
15    Q.   John Coghlan, okay. And why was it a
16 question for John Coghlan?
17    A.   Because he was head of repo financing
18 at the firm.
19    Q.   Do you know if Mr. Coghlan ever did
20 address the third question?
21    A.   No idea.
22    Q.   Now, when you were in the Friday
23 meeting and the topic of the repo was being
24 discussed -- withdrawn.

Page 91

**HIGHLY CONFIDENTIAL - A. KIRK**

1 This is sent, this e-mail comes to you
2 on Thursday?
3    A.   Yes.
4    Q.   At roughly 6:40 in the morning. Note
5 that that's Greenwich mean time shown there.
6    A.   Yeah.
7    Q.   The next morning you're in a meeting
8 where the repo is being discussed. Did that
9 trigger any recollection in your mind about, you
10 know, an e-mail discussion the prior day about
11 using the repo as a means of making the block
12 discount happen?
13    A.   No, I, you know, I get 500 e-mails a
14 day, and during this period of time we were
15 getting probably twice that. So ...
16    Q.   And when you saw a reference --
17    A.   I was answering all of them, so, you
18 know, or as many of them as I could.
19    Q.   And also to the mysterious number that
20 we finally identified.
21    A.   Yes, and then there's the mysterious
22 number.
23    Q.   Now, the --
24    A.   I don't think the company's in

Page 92

HIGHLY CONFIDENTIAL - A. KIRK

1 business anymore.
2    Q.   Was there a reference to the -- any
3 discussion in the Friday meeting of a discount?
4    A.   No, not that I recall.
5    Q.   Okay. So I'll summarize it just to
6 frame my next question so you're not married to
7 how I do this. But as I understand it, the
8 meetings happened, you identified the JPM
9 problem, the recommendation is made to transfer
10 what's in the repo, and there's some issues
11 about how to value what's in there; is that a
12 fair summary?
13    A.   Yes.
14    Q.   Okay. And the general sense of the
15 meeting from both sides of the table is, okay,
16 let's go to it and try and figure this out, we
17 have until about 4 o'clock to see if we can
18 solve this, yes?
19    A.   Yes.
20    Q.   And Barclays says if we can't reach a
21 resolution of that by about 4 o'clock, we may
22 have to terminate the repo, correct?
23    A.   Correct.
24    Q.   And McDade has said if that comes to

Page 93

**HIGHLY CONFIDENTIAL - A. KIRK**

1 be, you know, you have to do what you have to
2 do?
3    A.   Those are your rights.
4    Q.   And you don't know if the repo was in
5 fact ever terminated by Barclays?
6    A.   I don't know that.
7    Q.   Okay. So now what happens? Does the
8 meeting end or is there further discussion?
9    A.   I recall the meeting ending at that
10 time.
11    Q.   And what did you do next?
12    A.   I went back to my office. I called
13 the various senior executives I was going to
14 meet with and told them that we should be
15 getting a new schedule at some point of assets
16 that we would have to -- they should ignore that
17 schedule of assets and we would be getting a new
18 schedule of assets at some point to try to put
19 some values on.
20    Q.   When you say "ignore that schedule of
21 assets," again, for clarity of record, are you
22 talking about Exhibit 19, the original financial
23 schedule?
24    A.   I'm sorry, no, I'm talking about the

Page 94

HIGHLY CONFIDENTIAL - A. KIRK

1  list of hundred assets that was delivered to the
2  desk early that morning.
3  **Q.   Got it.  As part of the fire sale**
4  **liquidation?**
5     A.   Correct.
6  **Q.   And you told them they would be**
7  **getting a new list of assets.  Who is it you're**
8  **having these communications with?**
9     A.   I certainly called Mike Gelband and I
10 would have called some subset, although I don't
11 recall who I spoke to specifically or who Mike
12 spoke to, but I would have called either
13 Kaushik, Charlie, Eric and Gerry.
14 **Q.   Eric is Eric Felder?**
15    A.   Yes.
16 **Q.   And Gerry is Gerald Donini?**
17    A.   Yes.
18 **Q.   And who is Charlie?  Is that Charlie**
19 **Spero?**
20    A.   Spero, uh-huh.
21 **Q.   And did do you this on a conference**
22 **call?  Call them separately?  In a meeting?**
23    A.   Probably called them separately.
24 **Q.   And what happened after that?**

Page 95

HIGHLY CONFIDENTIAL - A. KIRK

1     A.   We waited for a deliverable schedule
2  from finance.
3  **Q.   Did you get one?**
4     A.   Got one at sometime within the hour.
5  **Q.   And from whom within finance did you**
6  **receive that?**
7     A.   I don't remember who it was.
8  **Q.   Who within finance was in charge of**
9  **that piece?**
10    A.   It would have been some combination --
11 well, no, most likely it would have been Paolo,
12 working with accounting.
13 **Q.   And Paolo or somebody at his direction**
14 **delivers a schedule.  To whom is it delivered?**
15    A.   I don't recall, but I'm sure it was
16 instructed to be delivered directly to the
17 people on this list that I mentioned before and
18 myself and Mike.
19 **Q.   And what happened with the list?**
20    A.   We asked the senior managers to try to
21 value the list given the market conditions that
22 day, and generally the response was the markets
23 are too volatile, there's too many line items,
24 it's not possible to get this done in any

Page 96

HIGHLY CONFIDENTIAL - A. KIRK

1  pinpoint fashion in this timeframe, but we'll
2  try.
3  **Q.   And at some point was there -- did**
4  **they solve that problem?  Did they produce**
5  **valuations?**
6     A.   The only valuations we got was that --
7  I don't know what they communicated to Barry
8  Ridings or the people working on that specific
9  testimony.
10 **Q.   Uh-huh.**
11    A.   But I got the word back generally that
12 many of these positions were so illiquid that,
13 you know, that if we were to try to sell them,
14 given our circumstances, you know, the bids
15 might be down 20 percent.
16 **Q.   Was there any discussion about looking**
17 **at the valuations that Bank of New York had**
18 **given to what was in the repo?**
19    A.   We didn't have access to Bank of New
20 York's valuations, I don't believe.
21 **Q.   Did you talk to anyone who was**
22 **familiar with how repurchase -- more familiar**
23 **than you with how repurchase agreements worked**
24 **to see if the collateral agent applied**

Page 97

HIGHLY CONFIDENTIAL - A. KIRK

1  **valuations to what was held as collateral?**
2     A.   I don't recall having that specific
3  conversation.
4  **Q.   Do you know if anyone did have that**
5  **discussion, that conversation with Barclays?**
6     A.   They might have.
7  **Q.   Without regard to the particular**
8  **detail or even the number --**
9     A.   Yeah.
10 **Q.   -- you had a sense of whether by, you**
11 **know, at some point on that Friday a value was**
12 **put on the collateral within the repo?**
13    A.   We at Lehman determined that the
14 out -- the volatility of those outcomes we
15 couldn't put a number that was specific on it.
16 It was, given how illiquid many of the assets
17 were, some of the assets you could value, but
18 the markets were tremendously volatile all week.
19    We had had, you know, been getting
20 closed out of -- just the prior day we got
21 closed out of a repo, a futures position on the
22 CME that had excess margin of, you know, $1.6
23 billion.
24    As far as we could tell, the markets

Page 98

HIGHLY CONFIDENTIAL - A. KIRK

1  hadn't moved that much.  Many of them were in
2  Treasury and government bond futures, but the
3  CME called us to inform us they had closed us
4  out of the position and we had lost all the
5  money in excess margin.  So it was becoming very
6  hard to value even what were deemed to be liquid
7  securities.
8      Q.   Just so we're clear here, the closing
9  out of the position by the Chicago Merc doesn't
10 bear on the collateral that's within the repo;
11 that's a separate event, correct?
12     A.   That is a separate event, but it
13 was -- it was demonstrative of the volatility
14 and the issues we were wrestling with.
15     Q.   And the question that I would like to
16 put is, did Lehman come to some number, did it
17 come to a value, a valuation of the collateral
18 that was within the Barclays Repurchase
19 Agreement?
20     A.   We couldn't come up with a specific
21 value.  We didn't have time.  We knew we
22 didn't -- we tried, but we couldn't, and we knew
23 the risk was that Barclays would close out of
24 the repo and take all that collateral, so they

Page 99

HIGHLY CONFIDENTIAL - A. KIRK

1  owned it, that we would end up with no excess
2  from that collateral, and that from the very
3  high-level work that the senior risk managers
4  did, which we were relying upon, that we could
5  be well out of the money, it was likely that we
6  could be well -- we would be well out of the
7  money in that below the haircut, which I
8  believe, understood to be somewhere between 5
9  and 10 percent.
10     Q.   When you referred to a moment ago to
11 one of the risks was that we would not end up
12 with -- we would not end up with no excess, what did
13 you mean by that?
14     A.   Meaning that if Barclays closed us out
15 of the repo, our experience had been, not just
16 in that period of time but other cases, but
17 certainly in that week, that their liquidation
18 of that collateral would eat through more than
19 the haircut they had and that they would not get
20 back a hundred cents on the dollar.  So we,
21 Lehman, would not receive any proceeds back from
22 the liquidation of that collateral.
23     Q.   What was your understanding of what
24 would happen if there was excess collateral?

Page 100

HIGHLY CONFIDENTIAL - A. KIRK

1  Who would keep that?
2      A.   If there was excess collateral, Lehman
3  would keep that value.
4      Q.   Was that discussed at the Friday
5  meeting, that if there was excess collateral, it
6  would say with Lehman?
7      A.   There was not a discussion of closing
8  out the repo and the mechanics of it.
9      Q.   So did there come a point on Friday
10 where Lehman communicated to Barclays either --
11 where it communicated a value of the repo or it
12 said it couldn't?  What happens next vis-a-vis
13 talking to Barclays.
14     A.   In terms of talking to Barclays, the
15 next meeting was at some point, call it 3
16 o'clock in the afternoon, and they were
17 indicating that the -- their view of the value
18 of the repo securities was far below the stated
19 value and below their loan value and that Lehman
20 should attempt to find other unencumbered
21 assets, should continue to attempt to find other
22 unencumbered assets or the transaction may not
23 take place.
24     Q.   Now, is this response from Barclays

Page 101

HIGHLY CONFIDENTIAL - A. KIRK

1  after the Friday meeting has ended?  I want to
2  get a sense of the timeline within Friday of
3  when Barclays does this.
4      A.   This is like 3 o'clock in the
5  afternoon.
6      Q.   Does Barclays tell you, does Barclays
7  tell Lehman how much difference has to be made
8  up?
9      A.   No.
10     Q.   Is your answer that you don't remember
11 or that you remember that they didn't?
12     A.   I remember they didn't.
13     Q.   So what happens now?
14     A.   We said we'll continue to look.  And
15 Ian and I had a conversation with McDade
16 offline, just he and I.  I said, I don't have
17 any basis or enough information to argue with
18 them about their point of view, about the value
19 of collateral, and that the high-level work
20 we've been doing leads me to believe that they
21 have a reason to be nervous about this.
22     Q.   And what was --
23         (Mr. Kelley confers with the witness.)
24     A.   Barclays.

Page 102

HIGHLY CONFIDENTIAL - A. KIRK

I'm sorry. Who is "they," he asked me. Barclays has a reason to be nervous.

Q.   And did McDade give any instructions or suggestions about what to do next?

A.   He said, well, make sure Ian is working on any possible unencumbered assets.

Q.   So did McDade give a target of any kind of how much in unencumbered assets needed to be found?

A.   At that point, all we could do was figure out what was there, and specifically I don't recall, but I do -- I do recall that the shortfall was described as, you know, billions of dollars.

Q.   And by "the shortfall," you're referring to what?

A.   The value that Barclays thought those repo assets were worth versus their stated value.

Q.   That's the shortfall between what Barclays thought they were actually worth and the amount of the repo?

A.   Yeah.

Q.   So your recollection is that the

Page 103

HIGHLY CONFIDENTIAL - A. KIRK

shortfall was in the billions of dollars?

A.   Yes.

Q.   But do you have a recollection of whether it was between 2 billion and a gazillion billion?  Is there some range you were thinking of at the time?

A.   Somewhere between 2 and 5.

Q.   And I'm trying to get a sense here, that's why I keep pushing at the number --

A.   Yeah.

Q.   -- I'm trying to get a sense here of what the project is.  Is it go find every unencumbered asset we have on the one end of the possibilities, or we have to make up this specific shortfall, go find that amount at the other?

A.   I didn't have the conversation.  Bart had the conversation with Ian, so I didn't have that conversation specifically with him.

Q.   So you don't know one way or the other whether Mr. McDade gave a target of some kind to Mr. Lowitt?

A.   No, I don't know that.

Q.   Your understanding from your view of

Page 104

HIGHLY CONFIDENTIAL - A. KIRK

things was there was a shortfall?

A.   Yes.

Q.   It wasn't Barclays was saying it wouldn't be made up out of the repo bucket?

A.   Yeah.

Q.   Therefore, other assets, unencumbered assets, capable of delivery had to be found?

A.   Right.

Q.   It was in the billions, but for your -- for the purposes of what you were doing, you didn't really need to know the number, you just needed to know the problem had --

A.   Right, I was not the one who was going to solve those specific issues, so that was someone else's job.

Q.   Was anyone other than Lowitt involved in the particulars of solving the problem?

A.   I don't know the answer to that.

Q.   Did you ever learn whether Lowitt enlisted others in the task of finding unencumbered assets?

A.   No, I didn't, I didn't find out.

Q.   Did there come a time when you learned whether additional value, additional

Page 105

HIGHLY CONFIDENTIAL - A. KIRK

unencumbered assets were located that could be transferred to Barclays?

A.   Sometime late in the afternoon between 3 and 4, Ian came into a meeting where I was about to start a phone call with Bart, the Weil Gotshal lawyers on the phone, and I was sitting in the room with Mark Shapiro and I think it was Jim Seery and the Barclays, again, Diamond, Ricci, Klein and Keegan, and Ian came in and he said there's a -- there's a schedule of assets that we have that are unencumbered.  I believe the number was $1.9 billion of marked value.

In addition, he said there might be value in our 15c3 margin, which at the time I remember thinking specifically because I was like, "Gee, what's that?  I've never heard of that." So he said there might be value there, I don't know yet, and there might be others.

So we said to Ian, well, get us a schedule of what's in the 1.9 billion in the -- I think he referred to it as being in the box unencumbered of these unencumbered assets, i.e., they were being financed by Lehman's unsecured debt, I believe at the time, or equity, and he

Page 106

HIGHLY CONFIDENTIAL - A. KIRK

1    came back with that list, showed it to myself
2    and to Keegan and some others.
3        Keegan looked at it and said, you
4    know, this is the -- these assets are even
5    harder to value than what we already have. I
6    don't even know what these are. I specifically
7    remember there being residential mortgage
8    residual interests and things like IOs and some
9    very illiquid aged positions in high-yield and
10   distressed debt. I don't specifically recall
11   what else it was, but I do recall the list was
12   a -- there was a reason why there was nobody
13   financing those assets and it was because they
14   were the most illiquid and hardest to value
15   securities that Lehman Brothers owned on its
16   balance sheet.
17       Q.   So when Keegan said these are even
18   harder to value than --
19       A.   Yeah.
20       Q.   -- than the other stuff, was he
21   comparing this new schedule with the
22   hard-to-value stuff in the repo?
23       A.   Yes.
24       Q.   And apart from saying it was hard to

Page 107

HIGHLY CONFIDENTIAL - A. KIRK

1    value, did Keegan have anything to say about
2    that?
3        A.   He said I don't know how I'm going to
4    put a value on this of any positive number.
5        Q.   Describe for me as best you can the
6    conversation about that topic and who said what.
7        A.   Ian came in. He delivered this -- he
8    said -- we started the conversation with Ian
9    delivering the list of assets, and he handed it
10   to Keegan -- he handed out probably five copies.
11   Most people were just staring at it saying
12   nothing.
13       Mike looked at it and said, you know,
14   I -- what's this asset? What's that asset? I
15   think Ian may have answered specifically if he
16   knew what the nature of those assets were,
17   because in like residential mortgages you have
18   names for deals that unless you knew that that
19   was a residential mortgage deal, you wouldn't
20   know what it was, you know, Sasco or things of
21   that nature.
22       And Ian had some familiarity with
23   the -- with what the assets were because he had
24   been responsible for financing those sorts of

Page 108

HIGHLY CONFIDENTIAL - A. KIRK

1    assets or, in this case, having the equity
2    finance the assets. And so there was some back
3    and forth around that, and Keegan made the
4    conclusion that he was not going to warrant any
5    positive value on those assets from his seat,
6    and he made that -- he sort of said that to Rich
7    Ricci and Bob Diamond: "I can't value these. I
8    would be very nervous about putting a positive
9    value on them."
10       Q.   So, just to kind of cut to the end of
11   the sequence here, does Barclays agree to take
12   these additional buckets of value, you know, the
13   15c3 and the assets, the unencumbered assets in
14   the box?
15       A.   Yes.
16       Q.   And when they make that agreement, are
17   you present? Was that at this meeting?
18       A.   Yes.
19       Q.   And tell me what was said in that
20   regard.
21       A.   That, all right, we don't know what
22   they're worth. They might be worth something,
23   so we want them. And Bart was on the phone, he
24   agreed -- he agreed to that, and I think that

Page 109

HIGHLY CONFIDENTIAL - A. KIRK

1    was the sum and the substance as to what was
2    said about those assets.
3        Q.   Was any number put on now the total
4    value of the deal, combining the assets that
5    were in the repo plus the 15c3 and the
6    unencumbered assets in the box?
7        A.   I don't recall a specific number being
8    put on the -- on the deal.
9        Q.   Whether you recall today what the
10   number was, I'm going to press on this a little
11   bit, do you recall if a number was put out
12   there?
13       A.   I'm sorry, I don't recall what --
14   whether -- I don't recall whether there was a
15   number specifically put out there.
16       Q.   Okay. And did you have a sense after
17   this conversation, Mr. Lowitt reports on the
18   15c3 assets and the unencumbered assets and
19   Keegan says, I can't value those and then the
20   agreement's made, well, we'll take them because
21   there may be some value, whether after that
22   point there were additional searches for value?
23   Do you know one way or the other?
24       A.   I don't recall one way or another. I