# A. 16 (B)

Page 110

1    HIGHLY CONFIDENTIAL - A. KIRK
2    don't recall what the whole -- I recall 15c3. I
3    recall this 1.9 billion because I was sitting
4    there with the list and I said, "Gee, what is
5    15c3?" So I recall those two. I don't recall
6    if there were other categories discussed during
7    that meeting.
8    **Q.    You said a moment ago that Lowitt,**
9    **when he reported on the 15c3 piece, he put that**
10   **at about 1.9 billion?**
11   A.    That was the marked value.
12   **Q.    Of marked value. And that there was**
13   **some value, but -- of what was in the box, but**
14   **he didn't know what it was?**
15   A.    It was some value in 15c3, but he
16   didn't know how much there would be.
17   **Q.    So when that meeting ended, did you**
18   **have, whether you remember the number or not**
19   **today, did you have a sense of what the total**
20   **additional value was between the 15c3 and the**
21   **contents of the box?**
22   A.    No.
23   **Q.    Was there any plan made to calculate**
24   **that number?**
25   A.    I think Ian was putting together a

Page 111

1    HIGHLY CONFIDENTIAL - A. KIRK
2    schedule that he would communicate to Bart
3    with -- there was, first of all, in that
4    discussion there was a wrap-up of this is what
5    the deal looks like. It's got the 45 billion,
6    it's got the, on the asset side, it's got this
7    1.9, it's got 15c3, it may have had, you know,
8    other components to it.
9        Bart agreed, Ian and Bart agreed that
10   these were the components on the assets side.
11   It had the assumed liabilities. They agreed
12   that those were the assumed liabilities that
13   were going to agree, I don't remember the exact
14   numbers, and they said, okay, do we have an
15   agreement? Barclays said yes. Ian was going to
16   go codify that, I believe, and talk to Bart.
17       Bart was in a car with Weil lawyers on
18   his way to bankruptcy court. That's why he
19   wasn't in the room.
20   **Q.    When you say Ian was going to go away**
21   **and codify that, you mean put the schedules**
22   **together?**
23   A.    I think so, yes, that's what I mean.
24   **Q.    Did Mr. Klein say anything about this**
25   **process adding additional value for Barclays?**

Page 112

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.    No, not adding additional value. He
3    didn't comment on that.
4    **Q.    Did Klein make any recommendation in**
5    **your hearing as to whether Barclays should or**
6    **should not accept this deal?**
7    A.    Klein recommended that they accept the
8    deal if -- when they got the additional, all the
9    additional collateral.
10   **Q.    I don't mean this to be sarcastic. I**
11   **just can't come up with another way of phrasing**
12   **it.**
13       **We're looking around for all this**
14   **additional value and your memory is not clear on**
15   **whether there was a target or not?**
16   A.    Yeah.
17   **Q.    Framed that way, what was the project**
18   **here? Was it to go find everything else and**
19   **turn it over, or was it to find some, some**
20   **identifiable bucket of value until Barclays**
21   **said, yeah, that's enough? Do you see the**
22   **distinction I'm making?**
23   A.    Yes, it's -- the project was the
24   second, not the first.
25   **Q.    Okay. So the idea was there would be**

Page 113

1    HIGHLY CONFIDENTIAL - A. KIRK
2    some value left in Lehman; it was just a
3    question of finding enough additional value to
4    make Barclays still close?
5    A.    Yeah. And that project was Ian's
6    project, not mine. I wasn't -- I was an
7    observer to this part of the process.
8    **Q.    What was Ian's manner in this meeting?**
9    **I mean, it's a tough week for everybody, but**
10   **what's his demeanor?**
11   A.    He hadn't slept in a week, so he was a
12   little harried.
13   **Q.    Did Ian identify other potential**
14   **sources of additional value that he had looked**
15   **at apart from the box and 15c3?**
16   A.    He --
17       MR. HUME: Objection. Asked and
18   answered.
19   **Q.    You can answer.**
20   A.    No, he, as I said, he may have, but I
21   didn't -- I don't remember.
22   **Q.    You don't remember, then, any**
23   **particular other sources that he might have**
24   **discussed?**
25   A.    No, I don't.

Page 114

1    HIGHLY CONFIDENTIAL - A. KIRK
2        (Discussion off the record.)
3    BY MR. GAFFEY:
4        Q.   While we're pulling a couple of
5    documents out, Mr. Kirk, let me see if I can get
6    the rest of, you know, the blocks of your day.
7            This meeting ends. Lowitt is given
8    the task of codifying -- your word -- you know,
9    getting a list together?
10       A.   Yes.
11       Q.   What do you do next?
12       A.   I just go back to my office. Sit
13   there silently, stunned.
14       Q.   Maybe try to get some sleep?
15       A.   Yeah.
16       Q.   Do you have any role or involvement in
17   this asset collection process we've been talking
18   about after this point?
19       A.   No.
20       Q.   Did you go to the hearing?
21       A.   No.
22       Q.   Did anyone render reports to you from
23   the hearing --
24       A.   Yes.
25       Q.   -- as to what was going on?

Page 115

1    HIGHLY CONFIDENTIAL - A. KIRK
2        Okay. Who did that?
3        A.   I got a couple e-mails from Jim Seery
4    and I had a conversation with Jean-Francois
5    Astier.
6        Q.   And what were the, in sum and
7    substance, what were you hearing in the reports
8    from -- we don't have to go through this chapter
9    and verse, but what were the nature of the
10   reports you were getting back from the --
11       A.   There was, first of all, they were --
12   JF and Jim were trying to understand what the
13   new deal was, so I had a conversation with JF
14   trying to explain to him what I knew, and
15   because they were, I believe, going to
16   participate in a meeting with the creditors
17   explaining this, what the deal was.
18           And then I got -- so there was some
19   back and forth to just try to reach me on that
20   front, and then there was -- they sent me a
21   couple updates of, you know, Bart's proffers
22   being read and there's cross-examination, and
23   then ultimately the deal was done with some
24   quotes from Judge Peck later that night.
25       Q.   Did anyone --

Page 116

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.   And then somebody called me when it
3    was done.
4        Q.   Somebody called to say the judge has
5    approved the deal?
6        A.   Yeah.
7        Q.   Did you get reports from anyone that
8    told you whether or not anyone had told the
9    judge that this was a new transaction, different
10   transaction?
11       A.   I didn't get presented -- one early
12   conversation I had with JF, I didn't talk to
13   anybody directly by phone, and I just got a few
14   cursory e-mails.
15       Q.   And --
16       A.   But at one point there was, you know,
17   my understanding was there was -- and early,
18   there was discussions before they went, you
19   know, to court to wrap it up with various
20   constituents. And certainly there were
21   constituents there, Bart, Michael Klein and
22   others, that had the details.
23       Q.   Now, did you stay in your office until
24   you heard about the --
25       A.   No. No. I went home and I went to

Page 117

1    HIGHLY CONFIDENTIAL - A. KIRK
2    bed sometime late that evening.
3        Q.   Sometime after you heard that the deal
4    had been approved?
5        A.   No. No. I went to bed before that.
6    Somebody woke me up out of bed.
7        Q.   Did you continue to do any work or did
8    you perform any tasks in connection with the
9    transaction --
10       A.   No.
11       Q.   -- over the weekend?
12       A.   Saturday I had no involvement. On
13   Sunday, Bart asked me to come in and try to
14   participate in the closing of the transaction at
15   Weil Gotshal.
16       Q.   Did you do that?
17       A.   Yes.
18       Q.   Just so I can plan a little bit for
19   what I want to ask you after lunch break, give
20   me an outline of what you did on the Sunday.
21       A.   So we went over to Weil. We, Bart and
22   I, were put in a room. You know, we were there
23   as a resource as people were trying to put
24   schedules together, et cetera.
25           An issue came up early in the morning

Page 118

HIGHLY CONFIDENTIAL - A. KIRK
1   around the settlement of trades on Monday and
2   how they were going to be handled, Lehman
3   trades, customer trades with Lehman. We tried
4   to help work that issue out, and then we
5   effectively became observers of this dispute
6   between JPMorgan and Barclays, as there were
7   many meetings held into the evening that
8   JPMorgan came to Weil about 6 o'clock Sunday
9   night and at the urging of the Federal Reserve
10  and they walked through, described in very large
11  group meetings the issues they had.
12      We sort of hung around and eventually
13  were told that Barclays and JPMorgan had
14  resolved their dispute and that the deal could
15  go to closure.
16      Q.   When you say "we," are you talking
17  about yourself and Mr. McDade?
18      A.   And there were others at Lehman as
19  well.
20      Q.   Who else?
21      A.   Jim Seery was there. I called him
22  late in the afternoon. Ian Lowitt was there.
23  Paolo was there. A guy name Alastair Blackwell
24  was there. Steve Berkenfeld was there. That's

Page 119

HIGHLY CONFIDENTIAL - A. KIRK
1   everybody I recall.
2       Q.   Did you learn how the dispute between
3   JPM and Barclays had been resolved, what the
4   terms of that resolution were?
5       A.   They didn't tell us.
6       Q.   So did anybody ask, anybody say how
7   did this issue get resolved?
8       A.   Yeah, and they said it's between us
9   and -- Barclays representatives told us -- well,
10  I don't remember if it was the lawyer or who
11  specifically, but a representative from Barclays
12  said that's between Barclays and JPMorgan.
13      Q.   So the closing did not take place on
14  the Sunday, correct?
15      A.   It eventually I think closed Monday
16  morning, but it was one continuous -- I left at
17  2 A.M., and then they worked towards closing at
18  some point in the morning prior to the markets
19  opening.
20      Q.   Did you go back for the closing?
21      A.   No.
22      Q.   Do you know if any additional
23  documentation was done to reflect the new
24  agreement that had been reached on Friday?

Page 120

HIGHLY CONFIDENTIAL - A. KIRK
1       A.   Oh, I'm sure there was lots of
2   documentation, but I'm not a lawyer so I wasn't
3   reviewing it.
4       Q.   Do you know, apart from whether you
5   read it or reviewed it, my question is do you
6   know if a new -- a new contract or an amendment
7   or anything else was written up that would
8   reflect the fact that the deal had changed on
9   Friday?
10      A.   I assume so. I don't -- I never saw
11  actual evidence of it, but ...
12      Q.   I've asked you a couple of times when
13  you said you've assumed. What's the basis of
14  the assumption? The fact that it --
15      A.   That you couldn't proceed with a
16  commercial transaction without it.
17      Q.   Do you have any factual basis to think
18  that it was? Did you talk to anybody about it?
19  Did you see any documents?
20      A.   I didn't see any documents. Certainly
21  we were advised by Weil that the documents were
22  in good order.
23      (Exhibit 316, an e-mail chain with
24  attached balance sheet, marked for

Page 121

HIGHLY CONFIDENTIAL - A. KIRK
1   identification, as of this date.)
2       Q.   I have put before you, Mr. Kirk, a
3   three-page document. I'll ask you to take a
4   look through it sufficiently to tell me whether
5   you've seen it before.
6       A.   Yes, I've seen it.
7       Q.   Did you see it at or around the time
8   that it's -- of September 19 at 6:16 A.M.?
9   That's the date at the top.
10      A.   Yes.
11      Q.   And was this sent to you -- was it
12  your understanding this was sent to you to
13  prepare for that Friday meeting we've been
14  talking about?
15      A.   It was one, one of the documents that
16  I assumed we would review.
17      Q.   Okay. And do you recall --
18          MR. HUME: Are you marking it as an
19  exhibit?
20          MR. GAFFEY: Yes, I did, Hamish. It's
21  316.
22          MR. HUME: I'm sorry.
23      Q.   Do you recall reviewing it at the
24  Friday meeting?

Page 122

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.    No, I actually don't recall reviewing
3    this.
4        Q.    Let me just direct your attention,
5    sir, to the third page -- well, to the second
6    page. You'll see that that's a balance sheet
7    that's attached to the e-mail and then referred
8    to in the second e-mail.
9        A.    Yes.
10       Q.    Do you know who prepared this balance
11   sheet?
12       A.    I don't know specifically who prepared
13   it, but it would have been prepared by
14   accounting.
15       Q.    Okay. And --
16       A.    Well, the e-mail seems to indicate
17   Martin -- somebody who worked for Martin Kelly
18   had prepared it.
19       Q.    And within the balance sheet, sir, the
20   fifth column that's entitled Transaction
21   Adjustments, do you see that?
22       A.    Yes.
23       Q.    Do you know what that column
24   represents, what the entries in that column are
25   meant to represent?

Page 123

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.    Only from reading it.
3        Q.    I don't want you just to guess from
4    the face of the document.
5        A.    No.
6        Q.    Do you recall any discussion of
7    transaction adjustments?
8        A.    No.
9        Q.    And in particular, if you could take a
10   look at the last page of the document, I would
11   ask you to take a look at the Transaction
12   Adjustments column where it says 2 billion and
13   1.645 billion, are you with me?
14       A.    Uh-huh.
15       Q.    And you'll see that those relate to,
16   if you read across to the left, items Bonus
17   Payable and Cure Payments?
18       A.    Uh-huh.
19       Q.    And if you read across with me on the
20   Cure Payments line, you'll see, as of 8/31/08,
21   the number 701 is there, you with me?
22       A.    Uh-huh.
23       Q.    And then as of 9/17/08, 605?
24       A.    Uh-huh.
25       Q.    And then there's a transaction

Page 124

1    HIGHLY CONFIDENTIAL - A. KIRK
2    adjustment of 1,645,000,000?
3        A.    Uh-huh.
4        Q.    Resulting in a balance sheet transfer
5    total of 2.25 billion, do you see that?
6        A.    Uh-huh. Uh-huh.
7        Q.    2.25 is the amount that you recall
8    Mr. Tonucci telling you was the assumed
9    liability for cure that was Barclays'
10   consideration in the deal?
11       A.    Yes.
12       Q.    Do you have any knowledge or have you
13   been involved in any discussion where a
14   transaction adjustment of 1.645 billion was made
15   against Lehman's books? Do you know if that
16   number was written up?
17       A.    If it was written up, meaning?
18       Q.    Do you know if the amount for cure
19   payments shown on Lehman's books was written up
20   by 1.645 billion?
21       A.    Oh, I have no idea.
22       Q.    Did you ever have a discussion with
23   Mr. Tonucci or Mr. Kelly or Mr. Lowitt about
24   that topic?
25       A.    No.

Page 125

1    HIGHLY CONFIDENTIAL - A. KIRK
2        Q.    And I'll ask you the same question,
3    sir, with respect to the line for bonus payable.
4    Do you see a transaction adjustment of 2
5    billion, and the 2 billion is contained in the
6    Balance Sheet Transferred column?
7        A.    Yes.
8        Q.    Any conversations with Lowitt, Kelly
9    or Tonucci about that topic?
10       A.    No, no conversations.
11       Q.    Any conversations with anyone else
12   about that topic?
13       A.    No.
14       Q.    Was that topic addressed at the Friday
15   meeting we've been talking about, to your
16   recollection?
17       A.    Only to the extent that there was a
18   liability that was 2 billion and 2 and a quarter
19   billion that's reflected in this balance sheet
20   that had been agreed to prior.
21       Q.    Do you know if those liabilities of 2
22   billion and 2 and a quarter billion were based
23   on Lehman's accruals on its books, or were they
24   agreed numbers?
25       A.    I don't know.

Page 126

HIGHLY CONFIDENTIAL - A. KIRK

1
2    Q.   Mr. Kirk, I'm showing you what was
3    previously marked as Exhibit 8 at a prior
4    deposition. Take a look through it, sir,
5    sufficiently to tell me whether you've seen it
6    before.
7    A.   Yes.
8    Q.   Okay. And what is the document, sir?
9    A.   This is a list of assets that Lehman
10   Brothers owned.
11   Q.   Was this document -- and again, just
12   for clarity, there's a time on the cover e-mail
13   of Mr. Reilly's e-mail to you of 10:51 A.M.,
14   GMT, which would put it at 6:51 New York time,
15   okay?
16   Do you recall receiving this in the
17   early morning of Friday?
18   A.   Yes.
19   Q.   Is this one of the schedules that
20   was -- was this schedule sent to you for use at
21   the Friday meeting?
22   A.   Yes.
23   Q.   Okay. And what was its purpose? What
24   is this supposed to tell you that's of use to
25   you at the Friday meeting?

Page 127

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   I don't recall specifically what this
3    was used to describe to me, except that it was
4    a -- this I assume is a, just a comprehensive
5    list of the assets that were going -- were
6    planned to be transferred to Barclays.
7    Q.   Now, if you would take look, Mr. Kirk,
8    at the third page of the document. It's a --
9    MR. KELLEY: Sorry, Bob, you said the
10   third page?
11   MR. GAFFEY: Yes, the third page.
12   A.   The Woodburn?
13   Q.   No, just before that.
14   A.   That's my second page.
15   Q.   My fault. The second page of the
16   document. What do you understand that to be,
17   sir?
18   A.   I don't recall what this was
19   particularly. I can read it for the face of it,
20   but ...
21   Q.   Well, if you could read it with the
22   Friday meeting in mind and tell me if it
23   refreshes your recollection as to what role this
24   summary would have played in your activities at
25   that meeting, that would be helpful.

Page 128

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   I don't recall this being discussed
3    because we quickly got to, as I described
4    before, that whatever schedules had been
5    produced earlier in that week were no longer
6    operative.
7    Q.   Do you know if the schedule that's
8    attached to Exhibit 8 bears any relation to the
9    schedule that was summarized in Exhibit 19, that
10   is, that --
11   A.   I don't remember. I can't tell.
12   Q.   Okay. Just back on that page,
13   Mr. Kirk, do you know what the column Excluded
14   is for? Do you know what it means?
15   A.   No, I don't know what that means.
16   Q.   I take it, then, you wouldn't be able
17   to tell me what "Available for Transfer" means
18   either?
19   A.   No, I don't remember what that is.
20   Q.   Do you recall anyone discussing this?
21   Whether you recall the contents of the
22   discussion, do you recall anybody discussing
23   this at the meeting?
24   A.   I don't recall discussing this
25   particular sheet.

Page 129

HIGHLY CONFIDENTIAL - A. KIRK

1
2    MR. GAFFEY: Why don't we take a lunch
3    break now.
4    (Luncheon Recess; Time Noted: 12:29
5    P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 130

1    HIGHLY CONFIDENTIAL - A. KIRK
2         AFTERNOON SESSION
3         (Time Noted:  1:16 P.M.)
4    ALEX KIRK, resumed and
5         testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8    Q.   We talked a little bit this morning,
9    Mr. Kirk, about Mr. Shafir leaving on Thursday?
10   A.   Yes.
11   Q.   Did he just leave?  I mean, was it
12   sudden?
13   A.   I just got a call after the fact.  I
14   don't know what the back and forth was.
15   Q.   Did Mr. McDade or did anyone say to
16   you anything to the effect of this would be a
17   problem for Lehman in the deal since Shafir had
18   played a major role in the negotiations, in sum
19   or substance?  Did you pick up that sense from
20   anybody?
21        MR. HUME:  Objection to the form of
22        the question.
23   A.   I don't remember if he described it as
24   a problem, but certainly, you know, there was
25   lots to do that needed to be done.

## Page 131

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   Uh-huh.
3    A.   It was not viewed as a happy
4    circumstance.
5    Q.   Sure.  Were there parts, to your
6    knowledge, were there parts of the deal, of the
7    negotiations in which Shafir would be the only
8    source of knowledge?
9    A.   I don't know the answer to that.  I
10   wasn't around the negotiations at all earlier in
11   the week, so I don't know who did what.
12   Q.   Okay.  From your time around there
13   during the week, I mean, I understand your
14   involvement in the deal becomes more intense, as
15   it were, on the Friday, but do you pick up any
16   idea during the week of how involved McDade is
17   in the negotiations?
18   A.   I think he was very involved.
19   Q.   Is he negotiating particular issues or
20   the deal as a whole?
21   A.   Again, I don't have any specifics.
22   They were, all these -- my understanding all
23   these negotiations were taking place on the 32nd
24   floor, which I never went up to the 32nd floor
25   during that period of time except maybe to find

## Page 132

1    HIGHLY CONFIDENTIAL - A. KIRK
2    somebody, so ...
3    Q.   In the initial conversations with Bart
4    McDade on the Thursday night and with Lehman
5    folks on the Friday morning, does anyone comment
6    on the departure of Shafir and its impact on the
7    deal?
8        MR. HUME:  Objection.  Asked and
9        answered.
10       MR. KELLEY:  Objection as to form.
11   A.   Can I answer that question?
12   Q.   Yes, I think you can.
13   A.   No, with the exception of it's
14   unfortunate that he's left at this moment in
15   time.
16       (Exhibit 317, a document bearing Bates
17       Nos. 10310050, marked for identification, as
18       of this date.)
19   Q.   Mr. Kirk, I'll ask you just take a
20   look through that document sufficiently to tell
21   me whether you can remember seeing it before?
22   A.   Yes.
23   Q.   Did you see it at or around the time
24   that it's dated, September 19?
25   A.   Yes.

## Page 133

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   Reading up the e-mail chain from
3    bottom to top, you appear to get added in in the
4    message from Paul Houston to O'Meara, Tonucci,
5    Kirk, Walsh, dated 18th September at 23:12, do
6    you see that?
7    A.   Uh-huh.
8        MR. KELLEY:  I think you meant
9    Houston.
10   Q.   I beg your pardon.  I do mean Houston,
11   yes.
12   A.   Yes.
13   Q.   Do you have an understanding of why
14   you are added into this e-mail conversation at
15   this point?  What's the issue?
16   A.   The issue appears to be, or I recall
17   it to be the racers trust was a piece of
18   collateral that Barclays had received in the
19   repo.  Inside the racers trust -- by the way,
20   there are many racers trusts, so I think racers
21   trust was something that indicated a whole
22   series of financing trusts.  It wasn't one
23   particular financing trust.
24       But in one of them there might have
25   been a -- some commercial real estate

Page 134

HIGHLY CONFIDENTIAL - A. KIRK

1    collateral, Archstone, in particular, and Mike
2    Mazzei, who is -- ran commercial real estate at
3    Barclays, is pinging the number to the guy in
4    commercial real estate, Paul Houston at Lehman,
5    to try to understand the nature of that of --
6    well, he's trying to understand something about
7    Archstone relative to that.
8        Q.   What is Archstone?
9        A.   Archstone is a very large commercial
10   real estate financing that both Lehman and
11   Barclays participated in in the fall of '07.
12       Q.   Now, in the e-mail in which you're
13   **joined in the communication, Houston writes to**
14   **O'Meara, Tonucci, Kirk and Walsh, "What should I**
15   **tell him?  That the assets are not going to**
16   **Barclays?"  Do you see that?**
17       A.   Uh-huh.
18       Q.   **What do you understand Mr. Houston to**
19   **mean when he writes to you that the assets --**
20   **"What should I tell them?  That the assets**
21   **aren't going to Barclays?"**
22       A.   Barclays had specifically told
23   representatives of Lehman Brothers that they
24   didn't want commercial real estate exposure.
25

Page 135

HIGHLY CONFIDENTIAL - A. KIRK

1        Q.   **So, fairly understood, the issue here**
2    **is that Barclays does not want the racers, yes?**
3        A.   Doesn't want commercial real estate.
4    Racers might have a whole variety of collateral
5    inside them.
6        Q.   **Do you know if the racers remained in**
7    **the assets that were ultimately transferred to**
8    **Barclays?**
9        A.   No idea.
10       Q.   **Do you know if there was any**
11   **discussion with Barclays about whether or not**
12   **the racers should remain in the value that**
13   **ultimately was transferred to Barclays?**
14       A.   If they were in the repo, I believe
15   they were transferred to Barclays because
16   Barclays had possession of them.  If they were
17   not in the repo, I believe they were not in.
18       Q.   **Do you know if --**
19       A.   And again, this was a series of
20   financings, so there was more than one Racers
21   Trust.
22       Q.   **Do you know if at any point the racers**
23   **were taken out of the repo and other collateral**
24   **was substituted for that?**
25

Page 136

HIGHLY CONFIDENTIAL - A. KIRK

1        A.   I don't know the answer to that.
2        Q.   **Did you ever hear a discussion about**
3    **whether the racers could be taken out of the**
4    **repo and other collateral substituted for them?**
5        A.   No.
6            This, by the way, seems to indicate
7    that the racers with the Archstone pieces
8    were -- had custody at Chase, JPMorgan Chase.
9        Q.   **I'm about to move on to Tonucci where**
10   **he says, "They are with Chase now."  What does**
11   **that mean in context?  How does it address the**
12   **problem that's being discussed in the e-mail?**
13       A.   There was an assumption by Paul
14   Houston that Mike Mazzei was just fishing for
15   information about Archstone which may be
16   proprietary to Lehman Brothers which he would
17   like for purposes other than the deal.  So he
18   was looking for a reason not to answer any
19   questions about Archstone and because it
20   wouldn't have been proper if their assets
21   weren't being transferred, and Paolo is
22   confirming that the assets would not be
23   transferred because they're at Chase.
24       Q.   Okay.  So, with that answer in mind,

Page 137

HIGHLY CONFIDENTIAL - A. KIRK

1    **does this e-mail chain in your mind address any**
2    **issue concerning whether the racers would stay**
3    **in or not stay in the repo?**
4        A.   No.
5            (Exhibit 318, a document bearing Bates
6    Nos. 10325943 with attachment, marked for
7    identification, as of this date.)
8        Q.   **Mr. Kirk, I have put before you two**
9    **documents, one which we have marked as Exhibit**
10   **318, a one-page document bearing numbers**
11   **10325943.  Withdrawn.**
12           MR. KELLEY:  On our copy the comment
13   at the far left is, on some pages, partially
14   blocked out.
15           MR. GAFFEY:  I don't have a copy of it
16   yet.  I see that.
17           MR. KELLEY:  That's not a good 318.
18           MR. GAFFEY:  Let me more clearly
19   describe it for the record.  Exhibit 318 is
20   actually a multi-page document bearing
21   number 10325943, annexed to which is a
22   schedule which I agree, David, is miscopied
23   so that some of the numbers down the
24   left-hand side don't appear and there may

Page 138

HIGHLY CONFIDENTIAL - A. KIRK

1    actually be some numbers cut off at the
2    bottom, but I'm not going to ask any
3    questions about the specific numbers.
4
5    BY MR. GAFFEY:
6        Q.   Have you seen Exhibit 318 before,
7    Mr. Kirk?
8        A.   Yes.
9        Q.   And what is the document?
10       A.   This is a schedule of residential
11   mortgage positions available for sale.
12       Q.   Is this one of the schedules that we
13   spoke about before the break that were prepared
14   for the -- in connection with the Friday, the
15   Friday project to see what assets could be
16   transferred to Barclays?
17       MR. HUME:  Objection.  Vague and
18   ambiguous.
19       A.   I don't know if this was in particular
20   for that, but it appears to be so.
21       Q.   Okay.  Do you have a recollection of
22   seeing this document on that Friday, on the
23   19th, in connection with the work you were doing
24   that day?
25       A.   I took a cursory review of it, as I

Page 139

HIGHLY CONFIDENTIAL - A. KIRK

1    recall.
2        Q.   Would you take a look at what's
3    previously been marked as Exhibit 9, which is
4    also before you.  Same question:  Have you seen
5    the document before?
6        A.   Yes.
7        Q.   And what is the document?
8        A.   This is a schedule of CDs and
9    short-term money market instruments that were
10   available for sale.
11       Q.   And again, the same question:  Did you
12   have this document, did you use this document in
13   connection with the work you were doing on
14   Friday, the 19th?
15       A.   Yes.
16       Q.   And for what purpose did you use it?
17       A.   The same -- to be particular, I don't
18   know if this is the document that was produced
19   that was part of the 45 billion or it was a
20   schedule that related to the 70 billion or it
21   was something in between.  I just don't know.
22       Q.   Okay.
23       A.   But all the documents that were
24   produced were an attempt to get to the
25

Page 140

HIGHLY CONFIDENTIAL - A. KIRK

1    equivalent of what actually could be sold to
2    Barclays, which should have been one of them, and
3    to be able to deliver to the experts to value
4    them.
5        Q.   Okay.  I may be retreading a little
6    bit a topic we addressed before the lunch break,
7    and forgive me for that, but I want to make sure
8    I have a clear understanding of your memory of
9    this.
10       In this work on Friday to find
11   additional assets, the 15c3 and the unencumbered
12   assets, I asked you that question about the
13   broad spectrum, you know, just go find
14   everything or go find a defined amount.
15       Was the formula that was used there,
16   in essence, keep finding assets until Barclays
17   says that's enough?
18       MR. HUME:  Objection.  Vague and
19   ambiguous.
20       A.   Again, I didn't -- I wasn't party to
21   the discussion between Bart and Ian as to what
22   the specifics of that was.
23       (Exhibit 319, an e-mail chain, marked
24   for identification, as of this date.)
25

Page 141

HIGHLY CONFIDENTIAL - A. KIRK

1        Q.   You have before you, Mr. Kirk, a
2    two-page document that we have marked as Exhibit
3    319.  Take a look through it.  Let me know
4    whether you've seen the document before, please.
5        (Document review.)
6        A.   Yes.
7        Q.   And what's the document?  Well, it
8    appears to be a set of e-mails sent to and fro
9    on the 19th of September.  Do you recall seeing
10   this e-mail chain at or around the time that
11   these e-mails are dated?
12       A.   Yes.
13       Q.   And tell me what you remember about
14   the circumstances under which this is of
15   interest to you -- withdrawn.
16       Why is this chain of e-mails of
17   interest to you in the work you're doing on the
18   19th?
19       A.   Well, this is 5:30 in the afternoon.
20   Everybody's left for court.  Jim Seery asks me
21   if I'm coming down to the courthouse.  That's
22   the first e-mail.  I'm not planning on it.  Do I
23   have to, i.e., do they need to be down there?
24   He replies no.  We will be drinking later.

Page 142

HIGHLY CONFIDENTIAL - A. KIRK
1
2    I reply, "I'm here. I'm close to the
3    building. How long will you guys be down
4    there?" "Give you an idea after we start."
5    "Sounds like hours." "What is the value of
6    collateral Barclays posted to the DTC today?" I
7    answered, "I believe it's 45 and a half."
8    Billion would be the number, would be the big
9    number. "I don't know the marked value,"
10    meaning I don't know what the change in the
11    value might have been between the marks on
12    Thursday night that they accepted and what --
13    what had been attempted to agree to on Friday.
14    Q.    Okay. The 45.5, let me see if I can
15    put a little context to this. When you get this
16    last e-mail from Mr. Seery in this sequence, the
17    one with the time of 5:51 on the Friday?
18    A.    Uh-huh.
19    Q.    Is it your understanding Mr. Seery is
20    down in court still?
21    A.    Yes.
22    Q.    And Seery is writing to you to ask
23    what the value of the collateral was that
24    Barclays posted to the DTC. What do you
25    understand Seery to mean when he's describing it

Page 143

HIGHLY CONFIDENTIAL - A. KIRK
1
2    as the collateral that Barclays posted to the
3    DTC?
4    A.    The collateral that they would have
5    held in the DTC account at Bank of New York,
6    bank, you know, that they had taken over from
7    the Fed, the repo.
8    Q.    Is that the collateral in the repo?
9    A.    Yes.
10    Q.    And you put the value in your response
11    at 45.5 billion, correct?
12    A.    Yes.
13    Q.    And you're distinguishing in your
14    response the difference between the marked value
15    and what kind of value? The actual value? The
16    fair value?
17    A.    Whatever the stated value of the
18    transfer was, which Barclays had indicated all
19    day that they weren't sure what the actual value
20    of the collateral was, so that 45 was the stated
21    value versus, as I said, I didn't know what the
22    marked value or the market value was.
23    Q.    Okay. Now --
24    A.    And it's probably meant to read
25    "market." I probably just mistyped it.

Page 144

HIGHLY CONFIDENTIAL - A. KIRK
1
2    Q.    Now, the --
3    I'm sorry, "marked," M-A-R-K-E-D, was
4    supposed to read "market," is that what you --
5    A.    Probably.
6    Q.    So the value of 45.5 that you referred
7    to here may go to a question I asked you before
8    the break, which was whether or not you became
9    aware of the value that was put on the repo
10    collateral by Bank of New York?
11    A.    I don't know if this is a number that
12    was quoted to me by Barclays and it was a number
13    they had at -- by Bank of New York or not. I
14    just don't recall.
15    Q.    Do you have any recollection of what
16    your source was for the $45 and a half billion
17    number in your e-mail?
18    MR. HUME: Objection. Asked and
19    answered.
20    A.    I don't remember.
21    Q.    Did you ever learn why it was that
22    Seery was asking you this question from the
23    courthouse?
24    MR. KELLEY: Objection. Speculation.
25    MR. HUME: Calls for speculation.

Page 145

HIGHLY CONFIDENTIAL - A. KIRK
1
2    Objection.
3    Q.    You can answer.
4    A.    I assume there was a good reason he
5    needed it. I don't know what it was.
6    Q.    Yeah, my question is a little
7    different. Did there come a time when you ever
8    knew, either at the time or later, why Seery
9    wanted to know this information from you?
10    A.    No, because it was impossible to
11    communicate directly with him that evening.
12    There was -- I didn't have a phone. I didn't
13    have a conversation with him to have it
14    explained to me.
15    Q.    He's in the courthouse so he can't use
16    his phone.
17    It doesn't matter. You can't speak to
18    him by telephone?
19    A.    It's chaos.
20    Q.    Now, did you ever learn, sir, what
21    value was described to the court of the deal as
22    it stood on Friday?
23    A.    No.
24    (Exhibit 320, a document bearing Bates
25    Nos. 10293820, marked for identification, as

Page 146

1      HIGHLY CONFIDENTIAL - A. KIRK
2    of this date.)
3      Q.   Mr. Kirk, you have before you what I
4    have marked as Exhibit 320, a two-page chain of
5    e-mails. Have you seen this document before?
6      A.   I don't remember seeing this document,
7    no.
8      Q.   Do you recall learning that -- have
9    you had a chance to look through the document?
10   Sorry.
11     A.   I don't recall this.
12     Q.   Okay. Do you recall any
13   conversation -- take a look at the chain of
14   e-mails. You see it ends, it discusses Barclays
15   closing out the repo with Lehman and taking all
16   of the assets collateral, asking, further up,
17   Jean-Francois Astier asks, "Is that part of the
18   plan?" You respond, "Call my cell."
19        Do you see that?
20     A.   Right, uh-huh.
21     Q.   Do you recall a conversation with him
22   about that topic?
23     A.   I don't recall speaking to JF about
24   this specific topic.
25     Q.   And JF is Mr. Astier?

Page 147

1      HIGHLY CONFIDENTIAL - A. KIRK
2      A.   Jean-Francois Astier.
3      Q.   And do you recall the topic coming up,
4    whether you remember speaking to JF about it or
5    not, the topic being Barclays taking all the
6    collateral in the repo?
7      A.   Without being refreshed by this
8    e-mail, I didn't recall it.
9      Q.   Does this e-mail refresh your
10   recollection as to whether or not the topic came
11   up?
12     A.   Somewhat.
13     Q.   What do you remember about it?
14     A.   I think I remember knowing nothing
15   about this being part of the plan or discussed
16   prior to us going down to the courthouse.
17     Q.   And when you say you remember nothing
18   about it being part of the plan, do you mean you
19   didn't know one way or the other, or you thought
20   it wasn't part of the plan? Or you thought it
21   wasn't part of the plan?
22     A.   It was never discussed one way or
23   another.
24     Q.   So your understanding was at the time
25   that Barclays was taking, correct me if I'm

Page 148

1      HIGHLY CONFIDENTIAL - A. KIRK
2    wrong, your understanding was at the time that
3    Barclays is taking both the collateral
4    reflecting the financing amount of the repo and
5    the haircut; is that correct?
6      A.   I don't remember understanding what it
7    was exactly that they had done.
8      Q.   Now, after writing back to JF, "Call
9    my cell," he writes back to you, "I don't
10   understand it either. Seery says it is okay.
11   He is walking out to call you." Do you see
12   that?
13     A.   Yes.
14     Q.   Now, I take it at 11:18 P.M. --
15   actually, 7:18 P.M., with the adjustment for
16   Greenwich mean time, on the 19th of February,
17   Mr. Seery is still down in the courthouse,
18   correct?
19     A.   Yeah, they're all down there. JF is
20   down there as well.
21     Q.   And Seery can't use his phone to call
22   you from the courthouse, we've talked about
23   that, and he says, "Seery is walking out to call
24   you." Do you recall getting a phone call from
25   Mr. Seery that evening?

Page 149

1      HIGHLY CONFIDENTIAL - A. KIRK
2      A.   Yes, but I wouldn't recall what
3    specifically the discussion was.
4      Q.   Do you recall anything about the
5    discussion?
6      A.   No.
7      Q.   But you do recall receiving a
8    telephone call from Mr. Seery?
9      A.   Yes, vaguely. This is refreshing my
10   memory. He must have called me if he says he's
11   going to.
12     Q.   Does it refresh your memory, as you
13   look further at the document, that you got a
14   call and somehow the topic was the repo?
15     A.   If it was, it wouldn't have been more
16   beyond Jim just saying it's not a big deal,
17   don't worry about it.
18     Q.   Jim saying it's -- that the issue,
19   that the issue's not a big deal, or the fact
20   that Barclays' taking the collateral is not a
21   big deal?
22     A.   I think the issue, whatever that --
23   which is Barclays taking collateral, so it's one
24   and the same.
25     Q.   And after around that time, around

Page 150

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2    **7:18 P.M. on that Friday, did you have a**
3    **discussion with anyone else about Barclays**
4    **taking the collateral that was in the repo at**
5    **any point?**
6    A.    No.
7    **Q.    Did you talk to anybody about that**
8    **over the weekend?**
9    A.    No.
10    **Q.    Was there any conversation about that**
11    **when you and Mr. McDade were at Weil in**
12    **connection with preparing for the closing?**
13    A.    Not that I recall.
14    **Q.    Do you know if the issue of Barclays**
15    **taking the collateral in the repo was addressed**
16    **at the closing in any way?**
17    A.    I assume not, because if the
18    transaction was that they were -- well, I don't
19    remember is the better answer.  I don't remember
20    that being discussed.
21    **Q.    And as you sit here today, you have no**
22    **recollection of you yourself engaging in a**
23    **conversation with anyone about Barclays taking**
24    **the collateral that was in the repo?**
25    A.    Except for a vague recollection that

Page 151

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Jim would have called me about it.
3    **Q.    And just so I'm clear on that, because**
4    **you're gesturing at the document saying "Jim**
5    **would have," do you have a recollection --**
6    A.    Yeah.
7    **Q.    -- or are you just inferring that from**
8    **the document?**
9    A.    It's vague.  I don't recall the
10    specific conversation.
11    **Q.    Okay.**
12    A.    But if it had been an issue, I'm sure
13    I would remember it.
14    **Q.    Okay.**
15    A.    Since it wasn't.
16    **Q.    And from the discussions on Friday, it**
17    **was your understanding that if Barclays got --**
18    **if this value collection effort gave Barclays**
19    **enough value to support the financing in the**
20    **repo, that Lehman would get the excess back,**
21    **right?**
22    MR. HUME:  Objection.
23    Mischaracterizes the testimony.
24    A.    I don't --
25    MR. KELLEY:  Do you want the question

Page 152

1    HIGHLY CONFIDENTIAL - A. KIRK
2    read back?
3    THE WITNESS:  Yeah, why don't you read
4    the question back, please.  I'm not quite
5    sure exactly...
6    (Record read.)
7    MR. HUME:  Same objection.
8    A.    No, that discussion never took place.
9    There was too much uncertainty about the values.
10    **Q.    Was there, in connection with this**
11    **value of additional profit we talked about on**
12    **Friday, was there any discussion about what it**
13    **would take to get Barclays up to the value of**
14    **the financing in the repo?**
15    A.    Not that I was present at.  I don't
16    know if there were any away from me.
17    **Q.    This sort of goes to a few other**
18    **questions I have asked you about, whether there**
19    **was a goal or a cap on how much had to be**
20    **collected on Friday.**
21    **Without regard to what the number may**
22    **or may not have been, was the goal to find**
23    **enough assets to replace the loss in value**
24    **within the repo?**
25    MR. HUME:  Objection.  Vague and

Page 153

1    HIGHLY CONFIDENTIAL - A. KIRK
2    ambiguous and lack of foundation.
3    A.    In the end, I was the witness to an
4    agreement that was agreed to between Bart and
5    Ian and the Barclays team, but I wasn't part of
6    any discussions as to the basis for that
7    agreement.
8    **Q.    And the agreement that you were a**
9    **witness to is the one you described to me before**
10    **where they said, do we have a deal?**
11    A.    Yes.
12    **Q.    And the agreement was we have a deal.**
13    (Exhibit 321, a document bearing Bates
14    Nos. AK-LB-BANKR00002 through 27, marked for
15    identification, as of this date.)
16    **Q.    Mr. Kirk, I have put before you a**
17    document bearing Bates number AK-LB-BANKR000002
18    through 27.  Do you recognize the document?
19    A.    Yes.
20    **Q.    What is it?**
21    A.    It's a notebook.
22    **Q.    Is it your notebook?**
23    A.    Yes, my notebook.
24    **Q.    Is it in your handwriting?**
25    A.    Yes.

Page 154

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   During the course of your work in
3    connection with the Barclays matter, did you
4    carry the same notebook from place to place?
5    What was your habit with respect to taking
6    notes?
7        MR. KELLEY: Objection. Do you
8    understand the "Barclays matter."
9        THE WITNESS: What?
10   Q.   Withdrawn. Did you take these notes
11   during the week of the 15th to the 22nd that
12   we've been talking about today?
13   A.   From the 11th or -- 10th or 11th to
14   the -- yeah.
15   Q.   Okay. Some of these notes may go back
16   to the period before the weekend?
17   A.   Yes.
18   Q.   Is that what you're telling me?
19   A.   Yes.
20       MR. HUME: May I ask a question? Were
21   these notes produced to Barclays by anyone.
22       MR. GAFFEY: I have no idea. They
23   were produced by the witness pursuant to the
24   subpoena.
25   Q.   Are you able to tell me from looking

Page 155

1    HIGHLY CONFIDENTIAL - A. KIRK
2    at your notes, Mr. Kirk, when you took these
3    notes?
4    A.   Some of them, yes.
5    Q.   Let's just take a minute. I don't
6    want you to go through every page, but tell me
7    how you're dating it because there's no dates on
8    any of the pages.
9    A.   This looks like it would have been
10   Friday, the 12th, first page.
11   Q.   Okay. And you're making that
12   inference from the kind of notes you have here
13   that's what was being discussed then?
14   A.   That's correct.
15   Q.   Could you go, if you don't mind, maybe
16   we can save you some time, if you would go
17   through the notes and tell me at what point they
18   pick up, if at all, on the events that begin on
19   the Sunday night, the 15th. I meant Sunday, the
20   14th, I'm told.
21       (Document review.)
22   A.   Page 14.
23   Q.   Okay. And just so I can put it in
24   some kind of context, what is it about page 14
25   that tells you this picks up on the night of

Page 156

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Sunday, the 14th?
3    A.   Because this is dealing with issues
4    that we might have -- hold on one second. Hold
5    on. I apologize. I'm wrong. Sorry. Hold on.
6        14 I'm not sure about. That may
7    actually still have to do with the morning of
8    attempting to get the Barclays deal done and how
9    we would deal with that with Spinco. This
10   reference to Shafron is what makes me think that
11   it is because Steve was the point on Treasury
12   with us. He works for Treasury.
13   Q.   So once I see Steve Shafir's name at
14   page --
15   A.   Shafron.
16   Q.   Shafron, I see.
17   A.   Right. That indicates I'm still
18   trapped at the Fed. Okay? There's notes here
19   with the reference to tri-party repo labeled
20   number 1 on page 16 is during our discussions
21   with the Fed, and the following pages prior to
22   filing but when they were encouraging us to
23   file.
24   Q.   Now, if you would turn to page --
25   A.   So that's during that period of time.

Page 157

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Hold on. That goes through the 18. Yeah, I
3    think that's through 18. Those are all notes
4    from the meeting with the Fed and the Treasury
5    representatives between 4 and 7 o'clock Sunday.
6    Q.   Okay. Now, are the notes sequential
7    after that? Can I -- I'm trying to get a course
8    of dealing here. Can I kind of work on the
9    assumption that we're at Sunday or after as I go
10   through the rest of these notes?
11       I note that it's a spiral notebook,
12   and that's one of the reasons I'm asking that
13   question. Are you writing as you go?
14   A.   I don't know that these are all in the
15   same order, but let me just look. Sometimes you
16   end up inadvertently skipping a page.
17       Yeah, these are -- these next through
18   23 are --
19   Q.   Okay.
20   A.   -- sequential.
21   Q.   Can we go to 23, please?
22   A.   Yes.
23   Q.   There's a list of what appear to be
24   names on there, Chambers, Orlan, Assi, Seery, do
25   you see that?

Page 158

**HIGHLY CONFIDENTIAL - A. KIRK**
1
2      A.   Yes.
3      **Q.   Anything to add?  Any knowledge as to**
4  **why you're listing those eight names there?**
5      A.   I don't recall specifically.  Some of
6  these people I'm responsible for, some of them
7  I'm not, so I don't recall exactly what this
8  list was -- why it's there.  This would have
9  been during the week, early in the week of the
10  15th.
11     **Q.   And if you would turn to starting at**
12  **page 24, it's the following four pages are --**
13  **following three pages are a typewritten balance**
14  **sheet of some kind.**
15     **Are we in the same place?**
16     A.   Yes.
17     **Q.   And it's entitled Funding 2008 Q3**
18  **Balance Sheet?**
19     A.   This was a schedule which was faxed to
20  Bart Saturday morning at the Fed that he and I
21  used to prepare for a meeting with John Mack,
22  Vickram Pandit, John Thayne and their associates
23  to discuss the possible iterations of Lehman
24  Brothers going forward.  This was those -- that
25  was the first -- well, that's the first pages of

Page 159

HIGHLY CONFIDENTIAL - A. KIRK
1
2  funding.
3      This second page is a -- is an
4  analysis that B of A did marking down our assets
5  earlier in the week, which we also discussed at
6  that meeting.  B of A's valuation of Lehman
7  Brothers' assets.
8      **Q.   You can put that aside.  I'm done with**
9  **that document.**
10     A.   Okay.
11     (Exhibit 322, a document bearing Bates
12  Nos. AK-LB-BANKR000028, marked for
13  identification, as of this date.)
14     **Q.   Before you, Mr. Kirk, is Exhibit 322,**
15  **a one-page set of notes bearing Bates number**
16  **AK-LB-BANKR000028.  Is that your handwriting?**
17     A.   Yes.
18     **Q.   Do you have any recollection of making**
19  **these notes?**
20     A.   Yeah, this was somebody trying to
21  explain to me in broad terms what 15c3-3 was.
22     **Q.   Okay.  I take it you're looking at the**
23  **reference to customer accounts segregated in**
24  **margin in the box in the upper left-hand corner.**
25     A.   I'm looking at the whole page, yes.

Page 160

HIGHLY CONFIDENTIAL - A. KIRK
1
2      **Q.   Do you know, these numbers on the**
3  **right-hand side, 1B and 1.7B, what do they**
4  **represent?**
5      A.   I don't recall what they represent.
6      (Exhibit 323, a document bearing Bates
7  Nos. AK-LB-BANKR000030, marked for
8  identification, as of this date.)
9      **Q.   You have before you, Mr. Kirk, what we**
10  **have marked as Exhibit 323, bearing Bates number**
11  **AK-LB-BANKR000030.  Are these notes in your**
12  **handwriting?**
13     A.   Yes.
14     **Q.   Can you, as you look at them, do you**
15  **remember the circumstances under which you took**
16  **the notes?**
17     A.   I think these were notes on Sunday
18  during the closing.
19     **Q.   And why is it you think they're notes**
20  **on Sunday during the closing?**
21     A.   Because I see a reference to Alastair,
22  which would be Alastair Blackwell, who I didn't
23  deal with prior to Sunday, and Tom Hamilton, who
24  was head of mortgage trading at Barclays, who
25  was trying to deal with this issue of the

Page 161

HIGHLY CONFIDENTIAL - A. KIRK
1
2  settlements.
3      The dispute that arose on Sunday was
4  who was going to guarantee the settlements of
5  the trades that were supposed to settlement on
6  Lehman Brothers' account starting Monday
7  morning.
8      **Q.   And that dispute, broadly speaking,**
9  **involved DTC needing some comfort as to who was**
10  **going to guarantee those settlements?**
11     A.   Yes.
12     **Q.   Now, on the notes themselves there is,**
13  **amidst the names and above the name Tom Hamilton**
14  **and Harry Harnson -- I'm just giving you that**
15  **for placement on the document.**
16     A.   Uh-huh.
17     **Q.   -- is what appears to be an Assets and**
18  **Liabilities column; is that right?**
19     A.   Yes.
20     **Q.   Okay.  Can you explain to me what that**
21  **represents?**
22     A.   To the extent that I understand it, it
23  represents some assets of 45 and a half billion,
24  goodwill would be the next line of 250 million,
25  and then it had a loan from BarCap that says 45

Page 162

HIGHLY CONFIDENTIAL - A. KIRK

1  and a half, and then payables or trade payables,
2  or whatever they are, cure payments and comp of
3  2 and a quarter and 2 billion on it.
4      Q.   Is that your understanding of the
5  balance sheet of the deal that was agreed on
6  Friday?
7          MR. HUME: Objection. Lacks
8  foundation.
9      A.   I don't remember if this was -- this
10 was probably more a broad generalization than a
11 specific.
12     Q.   I recognize it's some handwritten
13 notes and it's got scratches all over it, sir.
14 I'm not giving it any greater dignity than that,
15 but my question is, really goes to the 45.5 on
16 the asset side and the 45.5 on the liability
17 side.
18     A.   I don't remember for this specific
19 document and why I was scratching this out that
20 way.
21     Q.   You do see on the liability side the
22 amount for payables at 2.25 billion, correct?
23     A.   Yes.
24     Q.   And the amount for comp at 2 billion,

Page 163

HIGHLY CONFIDENTIAL - A. KIRK

1  correct?
2      A.   Yes.
3      Q.   And those were the assumed liabilities
4  that had stayed in the deal from the first time
5  you saw it, right?
6      A.   This would have been -- yes, but I
7  don't know, I don't recall anybody warranting to
8  me what all these numbers were or if I was just
9  scratching them down from a press release or...
10     Q.   Actually, I should ask you that. Do
11 you recall the source? Is this something you're
12 reading? Something somebody is saying?
13     A.   I don't recall whether this was
14 something somebody was saying or if I was
15 reading a press release or a, you know, a
16 newspaper account or something.
17     Q.   Do you have any understanding with the
18 repo in mind of whether the agreement made on
19 Friday was that Barclays would get 45.5 out of
20 the repo --
21         MR. HUME: Objection.
22         MR. GAFFEY: You got to wait until I'm
23 done, Hamish.
24         MR. HUME: I thought you were.

Page 164

HIGHLY CONFIDENTIAL - A. KIRK

1      Q.   Do you have any understanding with the
2  repo in mind of whether the agreement made on
3  Friday was that Barclays would get 45.5 out of
4  the repo in return for 45.5 in funding?
5          MR. HUME: Objection. Lack of
6  foundation.
7      A.   I'm not sure, actually.  They had
8  funded the firm for that amount on Thursday, so
9  I --
10     Q.   I see the problem. Let me rephrase
11 the question. You understood that Barclays had
12 funded the firm for 45.5 the prior Thursday,
13 correct?
14     A.   Thursday or Friday, right.
15     Q.   Okay. And on the Friday, you
16 understood that the deal had changed so that the
17 collateral in the repo was what would be
18 transferred to Barclays, correct?
19     A.   Correct.
20     Q.   Did these notes reflect your
21 understanding that what would be transferred to
22 Barclays was the amount in the repo sufficient
23 to cover the amount they had funded?
24         MR. HUME: Objection.

Page 165

HIGHLY CONFIDENTIAL - A. KIRK

1      Q.   They were supposed to balance?
2          MR. HUME: Objection. Vague and
3  ambiguous as to what the values they had
4  funded.
5      Q.   Do you have the question in mind? Do
6  you want it read?
7      A.   No. No, I understand the question.
8  I'm just saying there were lots of moving parts,
9  so I don't know that those were exactly supposed
10 to balance in that.
11     Q.   Was it your understanding they were
12 roughly supposed to balance?
13         MR. HUME: Objection. Vague and
14 ambiguous.
15     A.   Again, I don't -- I didn't have an
16 understanding of that. I didn't know how much
17 would be made up from the shortfall of other
18 assets versus the repo. Once they went to
19 court, I wasn't dealing with valuation issues,
20 so ...
21     Q.   Apart from the source of assets to be
22 given to Barclays, was it your understanding
23 that what was to be given to Barclays was to be
24 equal to the amount that Barclays had funded?

Page 166

**HIGHLY CONFIDENTIAL - A. KIRK**

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2        MR. HUME: Objection.
3        MR. KELLEY: Objection. Speculation.
4    Misstates prior answers.
5        MR. HUME: Vague and ambiguous as to
6    valuation.
7    A.    I didn't have that understanding.
8    **Q.    Did you have --**
9    A.    Nowhere did anybody say they should be
10   equal.
11   **Q.    Okay. Did you have an understanding**
12   **that Barclays was going to get more than it had**
13   **funded?**
14   A.    In terms of assets?
15   **Q.    Yes.**
16   A.    Yeah, they were going to get assets
17   that were unencumbered.
18   **Q.    And when you added the unencumbered to**
19   **the amount in the repo, was it your**
20   **understanding that Barclays was going to take**
21   **more out than it had funded into the repo?**
22   A.    Well, they were also assuming other
23   liabilities away from the repo.
24   **Q.    I understand that.**
25       **Did you understand they were going to**

Page 167

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2    take out more than they had funded into the
3    repo?
4        MR. KELLEY: Objection. That's based
5    on speculation. Calls for speculation, I
6    should say.
7        THE WITNESS: So I --
8    **Q.    You can answer that question.**
9        MR. KELLEY: It just asks him to
10   identify the source of his knowledge.
11       MR. GAFFEY: No, I'm going to ask him
12   to answer the question I asked.
13       Will you read it back?
14       (Record read.)
15   A.    I don't understand the nature of, when
16   you say "take out more," what does that mean?
17   **Q.    Barclays funds the repo to the tune of**
18   **$45.5 billion, you understand that, right?**
19   A.    Right.
20   **Q.    In the asset transfer agreement that's**
21   **at issue for the bankruptcy court, Barclays is**
22   **going to take a certain amount of assets out of**
23   **Lehman, correct?**
24   A.    Yes.
25   **Q.    Was it your understanding that that**

Page 168

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2    **latter bucket of assets was to equal to or to**
3    **exceed the amount that Barclays had paid into**
4    **the repo for funding?**
5        MR. HUME: Again, objection. Vague
6    and ambiguous as to the valuations posed in
7    your question.
8    A.    My understanding was the totality of
9    the assets should attempt to get somewhere close
10   to covering all the liabilities.
11   **Q.    The liabilities, you mean the**
12   **liabilities in the repo plus the assumed**
13   **liabilities?**
14   A.    Yes.
15   **Q.    Is that what you mean?**
16       MR. HUME: Objection to the phrase
17   "assumed liabilities."
18   A.    Yes.
19   **Q.    And the assumed liabilities you're**
20   **referring to are the assumed liabilities for**
21   **payable and comp in the amount of 4.25 billion,**
22   **correct?**
23   A.    Correct, and then ultimately the
24   assumed liabilities in guaranteeing the trading
25   obligations which they were agreed to do come

Page 169

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Sunday.
3    **Q.    Okay. And do you know what the**
4    **resolution was of the issue of guaranteeing --**
5    **the dollar resolution was of the guarantee of**
6    **the trading liabilities?**
7    A.    I don't recall specifically, but they
8    agreed to I think fund into DTC some amount of
9    cash to make good on the liabilities. I don't
10   remember what the number was.
11   **Q.    Do you recall that the number was**
12   **about $250 million?**
13   A.    Sounds reasonable.
14   **Q.    Okay. So Barclays is to take out of**
15   **the deal an amount roughly in balance to the**
16   **amount in the repo, the assumed liability for**
17   **comp, the assumed liability for payables, and**
18   **the guarantee to the DTC; is that your**
19   **understanding?**
20       MR. HUME: Object to the form of the
21   question.
22   A.    And the goodwill.
23   **Q.    And the goodwill. And the goodwill is**
24   **about 250 million, correct?**
25   A.    Right, so that -- well, they were

Page 170

1      HIGHLY CONFIDENTIAL - A. KIRK
2   buying the business of Lehman Brothers and they
3   were buying a whole bunch of assets which had,
4   in my opinion, quite uncertain value so that
5   they could lose many billions of dollars or make
6   many billions of dollars on those assets given
7   the volatility of the markets, and in addition
8   to that, they would obviously get the ongoing
9   operations of Lehman Brothers.
10     Q.   Was it your understanding that --
11     A.   So that it was --
12     Q.   Sorry.
13     A.   What I would say is that, in my
14  opinion, there was, at least from my seat, no
15  way to know what the actual value of those
16  assets would end up being for Barclays, you
17  know, over -- because I had no idea what
18  strategies they were going to pursue about those
19  assets, whether they were going to hedge them,
20  you know, all the variety of things that they
21  might end up choosing to do to execute a large,
22  huge block of -- the size of a transfer of this
23  size of assets is, you know, enormous and at the
24  time maybe even unprecedented.
25     Q.   Was it your understanding that the

Page 171

1      HIGHLY CONFIDENTIAL - A. KIRK
2   transaction was supposed to give Barclays a gain
3   on day one?
4      A.   No.
5      Q.   I hear what you're saying about longer
6   term they may operate the business and make
7   money out of it.  The question about day one, I
8   want to be sure we're --
9      A.   Yeah.
10     Q.   -- hearing each other here.  Was it
11  your understanding that there was any immediate
12  gain embedded for Barclays in the deal that was
13  made on Friday?
14         MR. HUME:  Objection.  Lacks
15     foundation.
16     A.   No, there was no understanding on my
17  part that there was a gain.
18         (Recess; Time Noted:  2:10 P.M.)
19         (Time Noted:  3:15 P.M.)
20         (Exhibit 324, a document bearing Bates
21     Nos. AK-LB-BANKR0000987 through 119, marked
22     for identification, as of this date.)
23  BY MR. GAFFEY:
24     Q.   Mr. Kirk, you have before you what we
25  have marked as Exhibit 324, a document bearing

Page 172

1      HIGHLY CONFIDENTIAL - A. KIRK
2   Bates number AK-LB-BANKR000097 through 119.  Do
3   you recognize the document?
4      A.   Yes.
5      Q.   What is the document?
6      A.   This is a document that describes the
7   deal that was cut early in the week between
8   Lehman and Barclays.
9      Q.   Is that your handwriting on the
10  document?
11     A.   No.
12     Q.   Do you know whose handwriting it is on
13  the document?
14     A.   No.
15     Q.   I would note that the document was
16  produced to us by you.  Do you know how you came
17  into possession of this document with somebody
18  else's handwriting on it?  Any memory?
19     A.   No, I don't know what this is.
20     Q.   Do you have any knowledge of what the
21  annotations mean on the asset side where
22  somebody has written "ACT" and "HC"?
23     A.   No.
24     Q.   Would you understand the phrase "HC"
25  to mean haircut?

Page 173

1      HIGHLY CONFIDENTIAL - A. KIRK
2      A.   That could be.
3      Q.   Would you understand the phrase "ACT"
4   to mean actual?
5      A.   That's not usually a vernacular, but
6   maybe.
7      Q.   I asked you --
8      A.   It could be "account."
9      Q.   Could be.  I don't know what your --
10     A.   Yeah.  Yeah.
11     Q.   I asked you earlier this morning if
12  you had any knowledge of a discount or a haircut
13  being given to Barclays on the book value of the
14  assets being traded for in the early part of the
15  week.  Does this refresh your recollection as to
16  whether there was an agreement on the deal as it
17  originally was made on Monday and Tuesday to
18  give Barclays a discount from book value?
19     A.   No.
20     Q.   Could you put before you Exhibit 19?
21  It's within the pile.
22     A.   What does it look like?
23     Q.   It's the other copy of that financial
24  statement, the one-pager.
25     A.   Yeah.

## Page 174

HIGHLY CONFIDENTIAL - A. KIRK

1. Q. I'm just going to take a fly around this just because I wonder if you know.
2. This document, if you compare it to Exhibit 19, that is, Exhibit 324 is identical to Exhibit 19, except for two things: One is the handwritten note in the upper right-hand corner in 19 and the other is the time stamp in the lower right-hand corner.
3. You see one is generated 11:18 and one is generated at 11:19?
4. A. Okay.
5. Q. Do you have any knowledge of how this schedule was being generated or who was generating it?
6. A. No, I don't even know why I had this document. Whatever documents I had I gave to David, he gave to you.
7. Q. Okay. I have nothing further at this time.
8. Oh, sorry, I lied. I have one more.
9. (Exhibit 325, a document bearing Bates Nos. AK-LB-BANKR000188, marked for identification, as of this date.)
10. A. Okay.

## Page 175

HIGHLY CONFIDENTIAL - A. KIRK

1. Q. Before you, Mr. Kirk, is a one-page document from amongst the documents that you produced, and its number is AK-LB-BANKR0000188.
2. A. Uh-huh.
3. Q. Do you recognize the document?
4. A. Yes.
5. Q. And the first e-mail in the series, the earlier one, is from you saying, "Today is my last day at BarCap/Lehman. I want to thank everyone for all their help over the years," and you give your contact information, do you see that?
6. A. Uh-huh.
7. Q. And the next e-mail up is a response from Mr. McGee to you, do you see that?
8. A. Uh-huh.
9. Q. Where he says, "You are a talent and a good guy. You were amazing through the final months. I am sorry we didn't pull it off. Best of luck." Do you see that?
10. A. Uh-huh.
11. Q. Do you know what Mr. McGee was referring to when he said, "I'm sorry we didn't pull it off"?

## Page 176

HIGHLY CONFIDENTIAL - A. KIRK

1. A. Meaning that Lehman didn't survive and thrive as an independent entity.
2. MR. GAFFEY: Okay. Now I have nothing further. Thanks.
3. I have to pass you down to my friends.
4. EXAMINATION BY
5. MR. ROTHMAN:
6. Q. Good afternoon. My name is Seth Rothman. We met earlier. I represent the trustee who's been appointed under the SIPA statute to liquidate LBI.
7. A. Okay.
8. Q. If you would dig out of the pile of exhibits in front of you number 322. These are your handwritten notes, correct?
9. A. Yes.
10. Q. In the upper left-hand corner at the top of the page, there's a box that's divided in two. It says "Customer Account Seg" in the top?
11. A. Uh-huh.
12. Q. Correct? And then underneath it says "Margin." Can you tell me what that represents?
13. A. Okay. My recollection was somebody was trying to explain to me how the 15c3 margin

## Page 177

HIGHLY CONFIDENTIAL - A. KIRK

worked, and it was, my recollection from reviewing this document, it was different than between high-net worth individuals and Neuberger Berman, so that's why there's four boxes instead of two.

I don't remember the distinct difference, but the customer accounts, the individual customer accounts in the high-net-worth business were held in individual accounts. In each of them there was some margin that Lehman had to support those accounts. It was regulatory -- required by regulation.

Q. Are you familiar with the concept of a margin deposit to cover short positions?
A. I'm familiar with that concept.
Q. Is that what you were referring to here when you write margin?
A. I don't know if it was that or if there were other margin requirements that were required by the regulators. I don't know if it was specifically that or if it was overall margin or if the margin is not required on others.
Q. Over on the right it looks like you

Page 178

**HIGHLY CONFIDENTIAL - A. KIRK**

1   wrote 500, is that million?
2   A.   It looks like that, yeah.
3   Q.   Do you know if that relates to the
4   margin box on the left?
5   A.   It appears to, but none of these
6   numbers add up in those columns over there, so
7   I'm not sure what it refers to exactly.
8   Q.   Do you recall any discussions
9   concerning the margin deposit that LBI had with
10  the OCC?
11  A.   With the?
12  Q.   OCC.
13  A.   Who's that?  What's that?  The office
14  of --
15  Q.   The Options Clearing --
16  A.   Oh, no.
17  Q.   -- Corp.
18  A.   Those typically would have been equity
19  options positions.  I assume would have been
20  mostly equity, so it was not my bailiwick.  I
21  was not involved in that.
22  Q.   In your work on the transaction, did
23  you hear any discussions about whether margin
24  deposits would be transferred to Barclays?

Page 179

**HIGHLY CONFIDENTIAL - A. KIRK**

1   A.   I don't recall.
2   Q.   You can put that aside.
3   A.   Okay.
4   Q.   And you mentioned that there was a
5   dispute involving the DTC.  Do you recall that?
6   A.   Yes.
7   Q.   That arose on Sunday while you were up
8   at Weil?
9   A.   Yes.
10  Q.   When did you become aware of that
11  dispute?  At what point during the day?
12  A.   It would have been somewhere, sometime
13  between 10 and 2, 10 A.M. and 2 P.M.
14  Q.   And how did you become aware of that?
15  A.   I don't recall who told us it was an
16  issue, but someone informed Bart and I in the
17  room that there was an issue with the
18  settlements and those obligations going forward.
19  Q.   So you yourself weren't involved or
20  participating directly in any of those
21  discussions?
22  A.   We were informed there was an issue.
23  We were informed that it -- a big piece of the
24  issue had to do with TBAs, mortgage trades, and

Page 180

**HIGHLY CONFIDENTIAL - A. KIRK**

1   government securities in terms of what was
2   settling.
3   So I was involved only to the extent
4   that I tracked down through Kaushik Amin and
5   Jeff Michaels, who ran agency and government
6   bond trading, to get him in touch with the
7   mortgage people at Barclays to explain to them
8   how what the market risk in those positions and
9   settlement risk in those positions would be.
10  So I set up a call.  I reached Jeff
11  Michaels on the phone, I tracked him down, and
12  then I got him to speak to the Barclays
13  representatives by phone.  I didn't participate
14  in those conversations.
15  Q.   Who is Jeff Michaels?
16  A.   Head of government agency trading at
17  Lehman Brothers in the U.S. -- globally, I
18  think.
19  Q.   You also mentioned in response to
20  Mr. Gaffey's questions a guarantee relating to
21  this issue.
22  A.   We were informed that the issue had
23  been settled later in the day along with there
24  was a, what referred to as a global settlement

Page 181

**HIGHLY CONFIDENTIAL - A. KIRK**

1   between JPMorgan and Barclays.  We were not
2   given details, but I do recall one detail we
3   were given was that they had agreed to guarantee
4   the trades.  They had gotten enough information
5   and the DTC was comfortable to settle trades the
6   next day.  We couldn't open for business with
7   this cash deposit.
8   Q.   When you say they had agreed to
9   guarantee the trade?
10  A.   Barclays.
11  Q.   And did you understand the guarantee
12  to be $250 million or --
13  A.   I don't know if -- I remember the
14  amount, that amount being discussed as being put
15  as a deposit.  I don't remember if there were
16  additional parts of the guarantee that were
17  described beyond that.  There might have been.
18  Q.   Did you hear that there was a concern,
19  any concern on the part of the DTC that it might
20  be exposed if the trades didn't settle?
21  A.   I remember that being discussed at
22  some point in the day as the reason as to why
23  all the DTC trades had failed on Friday, and DTC
24  was concerned that if they reopened, they would

Page 182

HIGHLY CONFIDENTIAL - A. KIRK
1    HIGHLY CONFIDENTIAL - A. KIRK
2    be assuming all kinds of risks from failed
3    trades on Friday and in addition to the trades
4    going forward on Monday, and that they wanted
5    some -- they needed a margin safety to be able
6    to do that. So they were concerned that they
7    were exposed.
8        Q.    And did you hear anything about the
9    extent of that exposure?
10       A.    No.
11       Q.    Do you know if the deposit or the
12   guarantee was meant to cover the entire
13   potential exposure?
14       A.    I don't know the answer to that.
15   Those discussions happened directly, that is, my
16   understanding those discussions happened
17   directly between DTC and Barclays.
18       Q.    Do you know if there was a written
19   agreement?
20       A.    I don't know that.
21       Q.    You never saw a written agreement
22   resolving this dispute with the DTC?
23       A.    No. No.
24       Q.    Did you hear anything about what would
25   happen to the guarantee if it turned out not to

Page 183

1    HIGHLY CONFIDENTIAL - A. KIRK
2    be used?
3        A.    No.
4        Q.    Changing the subject. You mentioned
5    back on September 14 that Mr. McDade told you
6    that the first transaction that was being
7    discussed with Barclays wasn't going to go
8    forward. Do you remember that?
9        A.    Yes.
10       Q.    And I think you said he told you that
11   the FSA had turned down the application to close
12   that transaction?
13       A.    Yes.
14       Q.    Did he tell you why?
15       A.    Yes, that Barclays needed a waiver to
16   guarantee the trading obligations -- I'm sorry,
17   Barclays -- for Lehman to -- for them to close
18   the transaction, they would have to get a
19   shareholder vote, which would take some period
20   of time, I forget if it was 30 or 45 days, but
21   some reasonable period of time, and that it was
22   the view of all the participants, including
23   Treasury and the Fed and everybody, that Lehman
24   would not make it for 30 days without some
25   else guaranteeing the trading obligations for

Page 184

1    HIGHLY CONFIDENTIAL - A. KIRK
2    that period of time.
3        The only person who would do that was
4    Barclays. Barclays apparently needed a waiver
5    of shareholder approval to make that guarantee,
6    which the FSA deemed they would not give.
7        Q.    Okay. Let me now switch topics again
8    and take you back to the Friday meeting that you
9    testified that I think you said started around 3
10   o'clock on Friday afternoon?
11       A.    Uh-huh.
12       Q.    This is the meeting that you had with,
13   among others, Mr. Klein, Mr. Diamond and
14   Mr. Keegan from Barclays?
15       A.    Uh-huh.
16       Q.    You have to give me an out-loud
17   answer --
18       A.    Yes.
19       Q.    -- for the court reporter. Thanks.
20       Was Mr. McDade physically present in
21   that meeting or is he on the phone?
22       A.    He's on the phone.
23       Q.    And were there any discussions about
24   that during that meeting about having to go back
25   and explain the deal to the Barclays board?

Page 185

1    HIGHLY CONFIDENTIAL - A. KIRK
2        A.    No, not in that meeting.
3        Q.    Did you hear that at another meeting?
4        A.    No, I didn't hear it in any meeting.
5        Q.    When you say no, you don't think it
6    happened or you don't remember?
7        A.    No, I didn't hear it. Didn't
8    happen -- that was not discussed in front of me.
9        This was what day again? This was the
10   19th?
11       Q.    On Friday, the 19th.
12       A.    Friday, yes, no.
13       Q.    You had a meeting --
14       A.    Yeah.
15       Q.    -- late in the afternoon where -- this
16   is late in the afternoon where I think you said
17   this is when Barclays came back and said they
18   thought the value of the securities didn't match
19   the value of the loan and so they were looking
20   for additional unencumbered assets?
21       A.    Uh-huh.
22       Q.    Is that right?
23       A.    Yes.
24       Q.    And Mr. Gaffey asked you a couple of
25   times about whether they gave a target or a

Page 186

HIGHLY CONFIDENTIAL - A. KIRK
1
2  number for how much more they would need?
3     A.   Yes.
4     Q.   Right?
5        As best you can recall, they didn't
6  give you such a number, correct; is that right?
7     A.   That's correct.
8     Q.   And nobody -- Mr. Klein didn't say
9  anything about having to have a certain number
10  to go back to the Barclays board?
11     A.   No.
12     Q.   I'm going to mark as my only exhibit
13  as 326 an e-mail from you to Mr. McDade.
14        (Exhibit 326, an e-mail chain, marked
15     for identification, as of this date.)
16     A.   Right.
17     Q.   Do you recall sending this e-mail to
18  Mr. McDade?
19     A.   I do recall that.
20     Q.   So the bottom e-mail on the page is
21  from you to Mr. McDade. It's sent on that
22  Friday at 3:39.
23     A.   Uh-huh.
24     Q.   Do you see that?
25     A.   Yes.

Page 187

HIGHLY CONFIDENTIAL - A. KIRK
1
2     Q.   You write to Mr. McDade, "Rich Ricci
3  just told me he won't blow up this trade by
4  being a pig."
5        Do you recall the context for that?
6     A.   Well, the Barclays team had left.
7  Bart was on the road and he was having
8  discussions with Ian about whatever additional
9  assets there were. You know, I implored to
10  these guys that they shouldn't blow this deal
11  up, 10,000 jobs were at stake, you know, there
12  was a tremendous amount of pressure on all of
13  us, and Rich said to me something to this
14  effect: I won't blow the deal up by being too
15  piggish.
16        I wanted to make sure Bart knew that
17  because they were wrapping up with he and Ian
18  whatever issues there were, so that's why I sent
19  the e-mail.
20     Q.   Was there a concern on the Lehman said
21  that the Barclays people were being too piggish?
22     A.   I was concerned that we were going to
23  go into bankruptcy court, which there's always
24  uncertainty, and try to describe a deal that
25  didn't look like the deal that they had heard

Page 188

HIGHLY CONFIDENTIAL - A. KIRK
1
2  about two days before.
3        So my primary concern at that point
4  was that there be as much flexibility, so to
5  speak, at least give the -- enough operating
6  room that we wouldn't go into court, have the
7  transaction denied, and have to put the padlocks
8  on the building Saturday morning.
9        So -- and I've been around many, many
10  bankruptcy cases over two decades. Wildly
11  uncertain things happen in these courts in
12  circumstances.
13     Q.   Sorry. Is that what you meant by
14  "blow up the trade"?
15     A.   Yes.
16     Q.   That the bankruptcy court wouldn't
17  approve the deal?
18     A.   That's correct.
19     Q.   And you were, just so I understand
20  your testimony, you were concerned that that
21  might happen if Barclays was too piggish?
22     A.   Yeah, I think there were a myriad of
23  risks that could have done, you know, I mean,
24  the -- the stress of that not happening that
25  evening and you only had one shot at it, you

Page 189

HIGHLY CONFIDENTIAL - A. KIRK
1
2  know, it was -- certainly everybody was very
3  concerned that this was sort of a do-or-die
4  situation, literally.
5     Q.   Was the comment about being a pig
6  related to the effort to find unencumbered
7  assets?
8     A.   Yes.
9     Q.   And you didn't -- so you don't have,
10  since that's in Mr. Lowitt's bailiwick, you
11  don't have a specific number or value that
12  would --
13     A.   No, this comment had been made to me.
14  I just wanted to pass it along.
15     Q.   And then Mr. McDade asks you back,
16  "Are the shorts all gone?" What was that a
17  reference to? Did you have an understanding as
18  to what he meant?
19     A.   I don't recall specifically why he
20  asked that, but that was a problem we were
21  dealing with all week at Lehman, that we were
22  naturally getting longer every day because our
23  hedges were either derivatives that had been
24  wiped out by the terms of their contracts or
25  short positions that were being bought in on the

Page 190

HIGHLY CONFIDENTIAL - A. KIRK
1
2    other side.
3         So, you know, asset prices were
4    imploding and we were naturally getting longer
5    every day.  So his question was how long is the
6    firm, so to speak, at this moment in time.  I
7    believe -- I don't -- so that's what I -- I
8    guess I tracked that down.
9    **Q.   And that's what your answer to**
10   **Mr. McDade says?**
11       A.   Yeah.  Yeah.
12           MR. ROTHMAN:  That's all the questions
13   I have.  Thank you.
14           THE WITNESS:  You're welcome.
15   EXAMINATION BY
16   MR. TECCE:
17   **Q.   Mr. Kirk, my name is James Tecce.  I'm**
18   **an attorney at Quinn Emanuel.  We are special**
19   **counsel to the Creditors Committee.  I just**
20   **wanted to ask you a couple of follow-up**
21   **questions.**
22       **Going back to Friday, September 19th,**
23   **I believe it is, I think that you had said that**
24   **it was your belief on that day that JPMorgan**
25   **Chase would be "hostile," I believe was the word**

Page 191

HIGHLY CONFIDENTIAL - A. KIRK
1
2    **that you used, with respect to the transaction.**
3    **What was the basis for that belief?**
4        A.   The fact that they had shut our DTC
5    account down was one issue.  The other issue was
6    that Barclays had described to me they were
7    having a dispute with JPMorgan about the
8    transfer of collateral.  In addition to that,
9    JPMorgan had been, my -- my understanding, it
10   had been described to me by Ian that JPMorgan
11   over time prior to the bankruptcy had been
12   squeezing a lot of additional collateral out of
13   Lehman Brothers along the way.
14   **Q.   Do you have an understanding as to**
15   **when JPMorgan froze the DTC account?**
16       A.   You know, it was either Thursday or
17   Friday.  I don't remember.  I think it was --
18   I'm pretty sure it was Friday, but it may have
19   been Thursday.
20   **Q.   And when were you told about the**
21   **dispute between Chase and Barclays that you**
22   **described?**
23       A.   Friday morning.
24   **Q.   Going forward --**
25       A.   And that's when I learned about the

Page 192

HIGHLY CONFIDENTIAL - A. KIRK
1
2    DTC account.  So I don't remember whether they
3    had closed -- I learned about it all on Friday.
4    I just don't remember if it was for that day or
5    it was for the previous day.
6    **Q.   Do you know what the basis -- do you**
7    **have an understanding of the basis of**
8    **Mr. Lowitt's statements that Chase had been**
9    **taking collateral?**
10       A.   Well, he was dealing with them
11   directly, so they were -- my understanding was
12   that they were threatening to not clear our
13   transactions without additional collateral prior
14   to the bankruptcy.
15   **Q.   Did he provide any examples of that to**
16   **you?**
17       A.   The one example that he provided was
18   that they requested Thursday night, the 11th --
19   is that right?  Yeah, the 11th, that Lehman
20   deliver another $5 billion to them prior to the
21   opening on Friday.
22   **Q.   Going forward to the 21st, I believe**
23   **Sunday, the day of the closing, September 21,**
24   **you had just spoken briefly about the dispute**
25   **regarding the guarantee of trades with the DTC.**

Page 193

HIGHLY CONFIDENTIAL - A. KIRK
1
2    **Were you aware of any other disputes**
3    **besides that issue between Chase and Barclays at**
4    **that time?**
5        A.   They were still arguing about the
6    transfer of collateral, your clients were there
7    for some of those arguments, in a, what I would
8    refer to as a giant conference room with 50
9    people in it and a lot of yelling.
10   **Q.   Right.  And do you remember the**
11   **substance of those disputes regarding the**
12   **collateral?**
13       A.   JPMorgan felt as if Barclays should
14   pay them and take additional collateral to
15   complete the repo transfer from the Fed, and in
16   addition to that, they actually asked for
17   Barclays to buy additional collateral even
18   beyond that that they had gotten from Lehman
19   Brothers earlier.
20   **Q.   And do you have an understanding as to**
21   **what the resolution of that dispute was?**
22       A.   No, they wouldn't tell us.
23   **Q.   Do you have an understanding of anyone**
24   **at Lehman who does know the resolution of that**
25   **dispute?**

Page 194

HIGHLY CONFIDENTIAL - A. KIRK

1      A.  I don't know if anybody at Lehman does
2  know that.
3      **Q.  Do you know if Mr. McDade knows the**
4  **answer?**
5      A.  I don't know that.  I was in the room
6  when they told us they wouldn't tell us.  I
7  don't know if there were conversations after
8  that.
9      **Q.  Do you have an understanding if**
10 **Mr. Klein knows the resolution of the dispute?**
11     A.  I don't know that he knows it.  He
12 probably does.
13     **Q.  Do you have an understanding as to**
14 **whether or not the resolution of that dispute**
15 **resulted in any additional assets being**
16 **transferred or liabilities being assumed by**
17 **Barclays in connection with the transaction?**
18     A.  I don't know the answer to that.  This
19 was a delivered to us as a fait accompli and,
20 you know, at 2 I went home.  There may have been
21 somebody dealing with transfers of assets and
22 have some insight into that.  Ian might have
23 insight into it, you know, what happened past
24 that in terms of the closing, but he may not

Page 195

HIGHLY CONFIDENTIAL - A. KIRK

1  have because, you know, there may not be -- I
2  don't think they would necessarily have had to
3  have involved Lehman in any transfer of assets
4  between JPMorgan and Barclays.  They may have.
5  They may not.  I don't know.
6      (Exhibit 327, an e-mail chain dated
7      September 21, 2008, marked for
8      identification, as of this date.)
9      **Q.  I'm handing the witness an Exhibit**
10 **327, an e-mail dated 9/21/2008.**
11     A.  Uh-huh.
12     **Q.  Have you ever seen this document**
13 **before?**
14     A.  Yes.
15     **Q.  What is it?**
16     A.  This is a series of e-mails between
17 myself and Jeff Michaels, who I described
18 earlier was global head of government and agency
19 trading, and who I was -- reached to deal with
20 directly with the -- his counterparties at
21 Barclays to describe what the settlement issues
22 going forward were in his business so they could
23 get some sense of what the risk of those
24 settlement issues were.

Page 196

HIGHLY CONFIDENTIAL - A. KIRK

1      **Q.  And this, again, correct me if I'm**
2  **wrong, this is the issue of the settling of the**
3  **trades involving the DTC?**
4      A.  Yes.
5      **Q.  And just going up to the e-mail Sunday**
6  **September 21, 18:13:18, do you see that?  I**
7  **believe it's the second e-mail down from the top**
8  **of the page.**
9      A.  Uh-huh.
10     **Q.  And Mr. Michaels asks you, I believe,**
11 **"Okay, here is where we are."  He says, "We had**
12 **a problem with Chase on Friday re about 8B of**
13 **collateral.  They are the ones holding up this**
14 **transaction.  Chase holds the cards and Alastair**
15 **and Beth are involved."**
16     **What's your understanding of what**
17 **Mr. Michaels is saying in that e-mail?**
18     A.  He's certainly saying that JPMorgan
19 Chase is acting as a hostile party.  They're
20 holding up the transaction.  There's a dispute
21 on Friday.  I don't know what exact dispute he's
22 referring to because there were lots of disputes
23 with JPMorgan at this point in time.  They had
24 shut our DTC account down.  They had taken the

Page 197

HIGHLY CONFIDENTIAL - A. KIRK

1  DTC deposit from us.  They were having a dispute
2  with Barclays at the same time.  And you know,
3  Alastair, Alastair Blackwell, as head of
4  operations, and Beth I think it's Rudofker who
5  he's referring to, I assume who is a lawyer,
6  are, you know, involved in trying to settle this
7  position.
8      Why I asked him how many treasuries
9  was he short in his position I don't recall.
10     **Q.  What are treasuries?**
11     A.  Government bonds.
12     **Q.  And let's actually just go back to**
13 **his -- to Mr. Michaels e-mail.  He says about 8**
14 **billion of collateral.  Do you know whether --**
15 **do you have an understanding as to whether or**
16 **not that was Fed repo collateral or other**
17 **collateral?**
18     A.  I don't recall what collateral that
19 was.  There were a couple disputes with
20 JPMorgan, so ...
21     **Q.  And the treasuries, what portion of**
22 **the assets transferred were the treasuries, what**
23 **basket of the assets transferred would the**
24 **treasuries have fallen into?  Would they have**

Page 198

```
1        HIGHLY CONFIDENTIAL - A. KIRK
2   been part of the Fed repo or would they have
3   been part of the, quote/unquote, unencumbered?
4       A.   The issues that I'm discussing with
5   him here are settlements.  So these are going
6   forward -- they're not actually positions.
7   They're going-forward settlements between Lehman
8   and other counterparties that Lehman's standing
9   in the middle buying and selling all kind of
10  securities.  So that the positions were
11  reflected.
12       This would have reflected what risk
13  there would be in settlements not settling in a
14  normal way.  So that -- but to answer your
15  question, I don't -- I don't remember what the
16  percentage of treasuries were in this.  I wasn't
17  dealing with him on any -- on that issue.
18       MR. TECCE:  Those are the only
19  questions I have.  Thank you for your time.
20       MR. HUME:  I have just a few
21  questions.
22  EXAMINATION BY
23  BY MR. HUME:
24       Q.   Mr. Kirk, my name is Hamish Hume.  We
25  met before.  I represent Barclays.
```

Page 199

```
1        HIGHLY CONFIDENTIAL - A. KIRK
2       Mr. Kirk, during the week of September
3   15 to September 22, 2008 that you've been
4   questioned about, did you believe there was any
5   other viable purchaser of Lehman Brothers other
6   than Barclays?
7       A.   No.
8       Q.   Did you believe there was any other
9   alternative for Lehman Brothers other than the
10  Barclays acquisition?
11       A.   Liquidation.
12       Q.   Did you believe the Barclays
13  acquisition was the best outcome for the Lehman
14  estate for all stakeholders?
15       A.   Yes.
16       Q.   During the questioning earlier in the
17  deposition, you were asked -- you testified
18  about discussions with Mike Keegan about
19  valuation of assets, do you recall that,
20  generally?
21       A.   Yes.
22       Q.   And I think at one point you were
23  explaining that Mr. Keegan complained about
24  certain asset values and that you at some point
25  huddled with Ian Lowitt and Bart McDade to
```

Page 200

```
1        HIGHLY CONFIDENTIAL - A. KIRK
2   discuss whether there was any good basis for
3   disagreeing with Mr. Keegan's concerns.  Do you
4   recall describing that?
5       A.   Yes.
6       Q.   I believe you testified that the three
7   of you concluded there wasn't really a strong
8   basis for disagreeing with Mr. Keegan.  Do you
9   recall that?
10       A.   Yes.
11       Q.   During those discussions, were you
12  attempting to negotiate the best deal you could
13  for Lehman Brothers?
14       A.   Yes.
15       Q.   Do you believe you participated in
16  arm's length negotiations or that you witnessed
17  arm's length negotiations?
18       A.   I'll be clear about that.  I wasn't
19  actually negotiating and I wasn't -- I had no
20  authority to negotiate.  I believe we were
21  participating in arm's length negotiations,
22  Lehman was, with Barclays.
23       Q.   You testified earlier in the
24  deposition that you did not have an
25  understanding regarding whether there would be a
```

Page 201

```
1        HIGHLY CONFIDENTIAL - A. KIRK
2   gain at Barclays on day one; do you recall that
3   line of questioning?
4       A.   Yes.
5       Q.   Did you have any knowledge about how
6   Barclays would account for this transaction on
7   its balance sheet?
8       A.   No.
9       Q.   Did you give any thought or analysis
10  to how Barclays would account for the
11  transaction on its balance sheet during the
12  negotiations?
13       A.   No.
14       Q.   Did you have any knowledge of whether
15  Barclays would be required to record an
16  intangible asset in excess of a billion dollars
17  on its balance sheet?
18       A.   No.
19       Q.   Did I understand your testimony
20  earlier that you believed many of the assets
21  being transferred to Barclays were of uncertain
22  value?
23       A.   Yes.
24       Q.   And were many of those assets going to
25  take some time to value?
```

Page 202

HIGHLY CONFIDENTIAL - A. KIRK

2    A.   Yes.
3    Q.   Did you understand the liabilities for
4  cure payments and compensation to be estimated
5  liabilities?
6    A.   Yes.
7    Q.   Did you understand that Barclays was
8  stepping into the shoes of Lehman with respect
9  to its exchange-traded derivative accounts?
10   A.   I was not aware of any agreements
11 around the derivatives.
12   Q.   You weren't involved one way or the
13 other with derivatives?
14   A.   I wasn't involved one way or the
15 other.
16   Q.   Did you generally understand that both
17 the assets and the liabilities Barclays was
18 taking over were uncertain and difficult to
19 value as of the time of the transaction?
20   A.   Yes.
21   Q.   Therefore, as of the time of the
22 transaction, was it in your mind possible that
23 after Barclays had taken the time to value the
24 assets and the liabilities in accordance with
25 its own methodology and accounted for the

Page 203

HIGHLY CONFIDENTIAL - A. KIRK

2  transaction under its own accounting
3  methodologies, that it would be possible that it
4  record either a gain or a loss on the
5  transaction --
6    MR. GAFFEY:  Objection.
7    Q.   -- as of day one?
8    MR. GAFFEY:  Object to the form.
9    Q.   Do you understand the question?
10   MR. GAFFEY:  You can ignore me.
11   THE WITNESS:  Okay.
12   MR. GAFFEY:  He can't, but you can.
13   THE WITNESS:  Okay.  I never know with
14 these objections if I'm supposed to ignore
15 them or not.
16   I think it was completely a matter
17 of -- I had no idea what their accounting
18 issues were on any of those fronts, so I was
19 not aware of that, and whether they would
20 end up recording a gain or loss over time
21 would depend upon market conditions, hedging
22 strategies, you know, disposition
23 strategies, et cetera, that I had no insight
24 into how they were going to execute them.
25   Q.   I understand that.  I think you said

Page 204

HIGHLY CONFIDENTIAL - A. KIRK

2  that earlier.  I'm saying, wholly apart from
3  what would happen over time, after Barclays took
4  the time to actually value the assets and
5  liabilities as they were valued on day one,
6  given the uncertainties in both the assets and
7  values that Barclays took on and the limitations
8  on what you knew about derivatives and other
9  assets, was it in your mind at least possible
10 that Barclays would record either a gain or a
11 loss on day one, as of day one of the
12 transaction?
13   MR. GAFFEY:  Objection to form.
14   MR. ROTHMAN:  Objection to form.
15   A.   Yes, it was possible.
16   Q.   Mr. Kirk, you testified a little bit
17 about the transfer of collateral when Barclays
18 replaced the Federal Reserve's lending position
19 on the repo transaction, do you recall that,
20 generally?
21   A.   Yes.
22   Q.   Were you aware of that when Barclays
23 advanced its $45 billion in cash to replace the
24 Federal Reserve, Barclays did not receive the
25 same collateral that had been pledged by Lehman

Page 205

HIGHLY CONFIDENTIAL - A. KIRK

2  to the Federal Reserve in its repo?
3    A.   I was not aware of that.
4    Q.   Were you aware of the operational
5  difficulties that arose when the Fed collateral
6  was released into the Lehman clearing account so
7  that some of that collateral disappeared or was
8  tucked into other transactions and, therefore,
9  could not be transferred to Barclays?
10   A.   I was not aware of any specifics of
11 those issues.  I was aware there was a -- some
12 dispute.
13   Q.   I'd like to refer you very quickly to
14 Exhibit 321.
15   A.   Okay.
16   Q.   The third-to-last page with the Bates
17 number, number in the bottom corner, number 25.
18   A.   Okay.
19   Q.   Which I believe you testified
20 reflected write-downs that were being discussed
21 or considered by Bank of America in the
22 potential Bank of America transaction; is that
23 correct?
24   A.   That is correct.
25   Q.   Was this done during that weekend

Page 206

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    before the bankruptcy when you were at the Fed?
 3        A.   This was done I believe the Friday,
 4    December -- September 12th.
 5        Q.   And I don't know if you testified or
 6    not, but whose handwriting is this on this page?
 7        A.   I don't know whose handwriting this
 8    is. It's not mine.
 9        Q.   Was the general idea that Bank of
10    America wanted haircuts or discounts from the
11    marked to market book values that Lehman had for
12    these assets?
13        A.   Yes.
14        Q.   And was that information shared with
15    the Federal Reserve during discussions?
16        A.   Yes.
17        Q.   And did the Federal Reserve express
18    any surprise or disagreement with that concept?
19        A.   I wasn't there when they shared it,
20    this information.
21        Q.   How do you know it was shared with the
22    Federal Reserve?
23        A.   Because we got this delivered to us at
24    the Federal Reserve. We shared it with -- I
25    think Bart gave a copy to Shafron and we shared
```

Page 207

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    it with John Mack, Vickram Pandit and John
 3    Thayne and their teams.
 4        Q.   You testified earlier about the
 5    unencumbered collateral in the clearance boxes
 6    that Ian Lowitt identified as assets to be
 7    transferred, do you recall that?
 8        A.   Yes.
 9        Q.   And you testified that there was an
10    agreement that those assets would be transferred
11    made on the Friday, September 19?
12        A.   Yes.
13        Q.   Is that right?
14        A.   Correct.
15        Q.   You also testified that you were aware
16    of an issue over the weekend relating to the
17    DTC's desire for some support for settlement
18    obligations on the Monday, correct?
19        A.   Correct.
20        Q.   And your general understanding was
21    Barclays agreed to deposit $250 million to
22    address those settlement obligations?
23        A.   Yes.
24        Q.   Did anyone at any time ever tell you
25    or lead you to believe -- let me withdraw that
```

Page 208

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    and say it differently.
 3        Did you at any time form an
 4    understanding at any time that weekend or that
 5    Monday, the 22nd, did you ever form an
 6    understanding that the unencumbered collateral
 7    in the clearance boxes that Ian Lowitt had
 8    identified to be transferred in the transaction
 9    were not going to be transferred in the
10    transaction because of the way in which Barclays
11    was dealing with the DTC settlement issue?
12        MR. ROTHMAN: Objection to the form.
13        MR. GAFFEY: Join.
14        MR. TECCE: Join.
15        A.   No.
16        Q.   That was never your understanding?
17        A.   No.
18        MR. HUME: No further questions.
19    EXAMINATION BY
20    MR. GAFFEY:
21        Q.   Just one or two. Your view that there
22    was no other viable purchaser, would that view
23    have changed if there were a $5 billion
24    immediate gain embedded in the transaction?
25    Would you have had the view there might be
```

Page 209

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    viable purchasers then?
 3        MR. HUME: Object to the form. Calls
 4    for speculation.
 5        A.   I think the -- there were -- we were
 6    open to a transaction with anybody, so if
 7    somebody was willing to take that kind of risk,
 8    I assume they would have showed up.
 9        Q.   Do you think they would have shown up
10    if they were not told there was a $5 billion
11    haircut embedded in the transaction?
12        MR. KELLEY: Objection. Calls for
13    speculation.
14        A.   There was no certainty what that
15    number was.
16        Q.   If, in addition to whatever else was
17    said about the deal publicly, it was also said
18    that there was a $5 billion haircut embedded in
19    the transaction, do you think there would have
20    been other viable purchasers, do you know?
21        MR. KELLEY: Objection. Calls for
22    speculation.
23        A.   I don't know.
24        Q.   Are you able to say one way or the
25    other?
```

Page 210

HIGHLY CONFIDENTIAL - A. KIRK

1  A.  Not really.
2  Q.  Okay.  Do you know the basis of the
3  estimated liabilities?  You told Mr. Hume that
4  you knew that the liabilities for comp and cure
5  were estimated in some way.  Do you know the
6  basis for the estimation?
7  A.  I assume that the basis was -- I don't
8  know the estimation.  I knew it came from our
9  Finance Department.
10  Q.  And your understanding at the time on
11  the Friday when you were looking at this was
12  that those were estimates based upon Lehman's
13  books, correct?
14  A.  Upon the work that Lehman had done.
15  Certain, you know, liabilities only
16  come up in the nature a transaction like this,
17  right?  So you cancel contracts you have
18  liabilities.  So they would be contingent and
19  necessarily not necessarily on your books prior
20  to doing an acquisition like that.
21  So the -- it's -- it's not -- it's not
22  completely -- it wouldn't be completely just
23  what was actually recorded on the books.  There
24  would also be other liabilities that could be

Page 211

HIGHLY CONFIDENTIAL - A. KIRK

1  triggered by the transaction itself.
2  Q.  And back to this issue of a viable
3  purchaser, if it had been announced in addition
4  to the other components of the deal that --
5  withdrawn.
6  You understood the assumed liabilities
7  component of the deal to be a cost that Barclays
8  would have in the transaction, correct?
9  A.  Correct.
10  Q.  If it had been publicly announced that
11  the $2 billion cost for compensation had been
12  deliberately inflated by a billion dollars, that
13  in your view would lower the actual cost for
14  Barclays, correct?
15  MR. KELLEY:  Same objection.
16  A.  If --
17  Q.  If it --
18  A.  If the answer is if it was inflated,
19  it would lower the cost, the answer is yes,
20  that's factual, I think.
21  Q.  If it had been announced in addition
22  to other components of the deal that the assumed
23  liability for compensation was deliberately
24  inflated by a billion dollars, do you have a

Page 212

HIGHLY CONFIDENTIAL - A. KIRK

1  view as to whether that might have attracted
2  other viable purchasers?
3  A.  The market was so uncertain and there
4  was so much financial stress in the list of
5  potential purchasers that I'm not sure there was
6  anybody who could have executed it no matter
7  what they thought the gain was because the
8  market would have viewed it as too risky, so to
9  speak, and too strategically risky in many ways
10  and too risky from a financial standpoint to
11  approve them for any board to approve it.
12  Q.  In your view --
13  A.  No matter what the gain was.
14  Q.  Sure.  And in your view, was there at
15  any point where additional value in the deal
16  might have attracted other viable purchasers?
17  MR. HUME:  Objection.  Asked and
18  answered.
19  A.  None with the time to actually execute
20  it.
21  Q.  And what was your role in determining
22  whether or not there were other actual viable
23  purchasers?
24  A.  I didn't have a role in that.

Page 213

HIGHLY CONFIDENTIAL - A. KIRK

1  Q.  Did you have any role at all in that?
2  A.  No, that was the role of the FIG, the
3  FIG bankers, Financial Institutions Group.
4  MR. GAFFEY:  Thanks.  Nothing further.
5  THE WITNESS:  Okay.
6  MR. ROTHMAN:  One question.
7  EXAMINATION BY
8  MR. ROTHMAN:
9  Q.  Fair to say that you don't know how
10  the dispute -- the terms of the resolution of
11  the dispute with the DTC on that Sunday night?
12  MR. HUME:  Objection.  Vague and
13  ambiguous.
14  MR. KELLEY:  Asked and answered, too.
15  A.  I don't know.  Did you say is it fair
16  to say I don't know the terms?
17  Q.  You don't know, yes.
18  A.  I only know it was described that
19  there was 250 million put into the DTC account.
20  I don't know the full terms.  As I said, there
21  may have been other terms that I was not aware
22  of.
23  Q.  You don't know, beyond that 250
24  million that we discussed, you don't know one

Page 214

HIGHLY CONFIDENTIAL - A. KIRK
1    way or the other what was supposed to happen to
2    the unencumbered assets that had been in that
3    DTC box, correct?
4
5        A.    No, I don't know that.
6        MR. ROTHMAN:  Thank you.
7        MR. HUME:  Let me have follow up on
8    that.
9    EXAMINATION BY
10   MR. HUME:
11       Q.    When you say you don't know the
12   unencumbered assets in the DTC box, to the
13   extent that they were identified by Mr. Lowitt
14   as transferable assets, was it your
15   understanding they were going to be transferred
16   as part of the deal?
17       (Continued on the next page to include
18   the jurat.)
19
20
21
22
23
24
25

Page 215

HIGHLY CONFIDENTIAL - A. KIRK
1
2        MR. ROTHMAN:  Objection to the form.
3    A.    Yes.
4        MR. HUME:  No further questions.
5        THE WITNESS:  I may have misunderstood
6    the earlier question.
7        MR. GAFFEY:  I'm going to have mercy.
8    I have no follow-up questions.
9        (Time Noted:  3:06 P.M.)
10           oOo
11
12
13
14
15
16
17
18
                _____
                ALEX KIRK
19
20   Subscribed and sworn to
     before me this      day
     of        2009.
21
22
                _____
23
24
25

Page 216

HIGHLY CONFIDENTIAL - A. KIRK
1                CERTIFICATE
2    STATE OF NEW YORK )
3                : ss
4    COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9        That ALEX KIRK, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14       I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18       I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23       In witness whereof, I have hereunto
24   set my hand this 31st day of August, 2009.
25       ------------------------------------
         KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Page 217

HIGHLY CONFIDENTIAL - A. KIRK
1
2                    INDEX
3    WITNESS:        EXAMINATION BY        PAGE
4    A. KIRK        Mr. Gaffey        5, 208
5                   Mr. Rothman      176, 213
6                   Mr. Tecce        190
7                   Mr. Hume         213, 214
8    EXHIBITS:                       PAGE
9    Exhibit 316, an e-mail chain with .......... 121
10   attached balance sheet
11   Exhibit 317, a document bearing Bates ...... 132
12   Nos. 10310050
13   Exhibit 318, a document bearing Bates ...... 137
14   Nos. 10325943 with attachment
15   Exhibit 319, an e-mail chain ............... 140
16   Exhibit 320, a document bearing Bates ...... 145
17   Nos. 10293820
18   Exhibit 321, a document bearing Bates ...... 153
19   Nos. AK-LB-BANKR00002 through 27
20   Exhibit 323, a document bearing Bates ...... 160
21   Nos. AK-LB-BANKR000030
22   Exhibit 324, a document bearing Bates ...... 171
23   Nos. AK-LB-BANKR0000987 through 119
24   Exhibit 325, a document bearing Bates ...... 174
25   Nos. AK-LB-BANKR000188

1      HIGHLY CONFIDENTIAL - A. KIRK
2            INDEX (Cont'd.)
3   EXHIBITS:                    PAGE
4   Exhibit 326, an e-mail chain .............. 186
5   Exhibit 327, an e-mail chain dated ........ 195
6   September 21, 2008
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        HIGHLY CONFIDENTIAL - A. KIRK
2   NAME OF CASE: In re Lehman Brothers
3   DATE OF DEPOSITION: August 31, 2009
4   NAME OF WITNESS: Alex Kirk
5   Reason Codes:
6      1. To clarify the record.
       2. To conform to the facts.
7      3. To correct transcription errors.
8   Page _____ Line _____ Reason _____
    From _____ to _____
9
    Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
    Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
    From _____ to _____
18
    Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
    From _____ to _____
21
    Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24

25            _____
              ALEX KIRK