# A. 17

Page 1

1     HIGHLY CONFIDENTIAL - M. KLEIN
2         UNITED STATES BANKRUPTCY COURT
3         SOUTHERN DISTRICT OF NEW YORK
4     ------------------------x
5     In Re:
6                                 Chapter 11
7     LEHMAN BROTHERS             Case No. 08-13555(JMP)
8     HOLDINGS, INC., et al.,     (Jointly Administered)
9
              Debtors.
10
      ------------------------x
11
12         * * *HIGHLY CONFIDENTIAL* * *
13         DEPOSITION OF MICHAEL KLEIN
14              New York, New York
15              September 12, 2009
16
17
18
19
20
21
22
23    Reported by:
24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25    JOB NO. 24546

Page 2

1  HIGHLY CONFIDENTIAL - M. KLEIN
2       September 12, 2009
3         10:40 a.m.
4
5      HIGHLY CONFIDENTIAL deposition
6  of MICHAEL KLEIN, held at Jones Day
7  LLP, 222 East 41st Street, New
8  York, New York, before Kathy S.
9  Klepfer, a Registered Professional
10 Reporter, Registered Merit Reporter,
11 Certified Realtime Reporter, Certified
12 Livenote Reporter, and Notary Public
13 of the State of New York.

Page 3

1  HIGHLY CONFIDENTIAL - M. KLEIN
2
3       A P P E A R A N C E S:
4
5  JONES DAY, LLP
6  Attorneys for Lehman Brothers, Inc.
7     222 East 41st Street
8     New York, New York  10017-6702
9  BY: ROBERT W. GAFFEY, ESQ.
10    BRIDGET CRAWFORD, ESQ.
11
12 BOIES, SCHILLER & FLEXNER, LLP
13 Attorneys for Barclays
14    575 Lexington Avenue - 7th Floor
15    New York, New York  10022
16 BY: JACK G. STERN, ESQ.
17
18 KIRKLAND & ELLIS, LLP
19 Attorneys for the Witness
20    Citigroup Center
21    153 East 53rd Street
22    New York, New York  10022-4611
23 BY: DAVID BERNICK, ESQ.
24    JOHN P. DEL MONACO, ESQ.

Page 4

1   HIGHLY CONFIDENTIAL - M. KLEIN
2      A P P E A R A N C E S: (Cont'd.)
3
4  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5  Attorneys for the Creditors Committee
6     51 Madison Avenue
7     22nd Floor
8     New York, New York  10010
9  BY: JAMES C. TECCE, ESQ.
10
11 JENNER & BLOCK, LLP
12 Attorneys for the Examiner
13    330 N. Wabash Avenue
14    Chicago, Illinois  60611-7603
15 BY: JACOB P. ZIPFEL, ESQ.
16
17 HUGHES, HUBBARD & REED, LLP
18 Attorneys for the SIPA Trustee
19    One Battery Park Plaza
20    New York, New York  10004-1482
21 BY: NEIL J. OXFORD, ESQ.
22    AMINA HASSAN, ESQ.
23
24 Also Present:
25    PHILIP E. KRUSE, Alvarez & Marsal

Page 5

HIGHLY CONFIDENTIAL - M. KLEIN

REDACTED

PAGES 6-45 REDACTED

Page 46

1
2
3
4
5
6
7
8
9
10
11
12  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

1
2
3
4
5
6
7
8
9
10
11
12  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 48

1
2
3
4
5
6
7
8
9
10  REDACTED
11
12
13
14
15
16
17
18
19
20
21
22    Q.  You referred to purchase price
23  negotiations. Were you involved in those?
24    A.  I was involved in the discussions on
25  the elements of the building and the elements of

Page 49

1        HIGHLY CONFIDENTIAL - M. KLEIN
2  the cash paid for the rights to operate the
3  business.
4    Q.  Can you explain to me what you mean
5  when you say "cash paid for the rights to
6  operate the business"?
7    A.  As best as I can.
8    Q.  Sure.
9    A.  The view was that the business didn't
10  have any value as an ongoing business; that if
11  you were going to step in and take on 10,000
12  employees and whatever liabilities to operate
13  that business, when you had no idea of what
14  revenues would be because there's no -- (A) you
15  just have no knowledge, (B) you have no
16  knowledge of what clients or customers think or
17  feel of you at that point in time, you don't
18  know who's going to stay and who's not going to
19  stay, whether that's clients, customers
20  counterparties, you don't know what had taken
21  place in the week prior to that, it was a
22  very -- there was a lot of reasons to believe
23  that this was not an ongoing business.
24       So the view at the outset was there's
25  no value for the ongoing business, so the

Page 50

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  discussion as to what then cash was paid for,
3  quote, the rights to do this business, which
4  really was the transaction, is how do you end up
5  stepping into those, if you will, operations of
6  the brokerage business, as it turned out, the
7  North American brokerage business. That's what
8  I'm referring to, which became the $250 million
9  number.
10
11
12
13
14
15
16
17         REDACTED
18
19
20
21
22
23
24
25

Page 51

REDACTED

Page 52

REDACTED

Page 53

REDACTED

Page 54

1
2
3
4
5
6
7
8
9
10
11
12      REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 55

1
2
3
4
5
6
7
8
9
10
11
12      REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 56

1
2
3
4
5
6
7
8
9
10
11
12      REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 57

1
2
3
4
5
6
7
8
9
10
11
12      REDACTED
13
14
15
16
17
18
19
20      Q.   You understand that an Asset Purchase
21  Agreement was executed between Lehman Brothers
22  Holdings, Inc., Lehman Brothers, Inc., LB 745,
23  LLC and Barclays Capital, correct?
24      A.   Yes.
25      Q.   At the time that agreement was

15

Page 58

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   finalized -- and you understood that there was
3   one that was actually signed by the parties,
4   correct?
5       A.   I understood that there was an
6   agreement between the parties, yes.
7       Q.   Without regard to the particular
8   exhibit in front of you, did you see that
9   agreement at or around the time it was signed?
10      A.   I did not review this agreement at or
11  around the time it was -- or, I don't recall
12  reviewing this agreement at or around the time
13  it was signed.
14
15
16
17
18
19  REDACTED
20
21
22
23
24
25

Page 59

REDACTED

Page 60

REDACTED

Page 61

REDACTED

PAGES 62-65 REDACTED

Page 66

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 69

1
2
3
4
5    REDACTED
6
7
8
9
10
11    Q.  It does. Thank you.
12        On Monday, the 15th, and Tuesday, the
13    16th -- I'm at the day of the filing and the day
14    the deal is announced -- were you involved in
15    any way in separate price negotiations about the
16    long position of securities that would be
17    included in the transaction?
18        A.   I really don't recall that I
19    participated in -- I really don't recall that.
20
21
22                  REDACTED
23
24
25

PAGES 70-93 REDACTED

Page 94

REDACTED

3  Q. That's the meeting I'm asking about.
4  Is this the meeting on Friday morning?
5  A. Again, I don't recall which specific.
6  I know that on Friday we had to clean up the
7  issues and or not, I mean, it was that much of a
8  make-or-break event, and the issue as it had
9  been described to me by my client was we have a
10 problem in that this is, given the significant
11 removal of positions and obviously the impact as
12 a result on the, quote, business deal, we need
13 to be very clear that (A) this is a different --
14 putting 45 billion of cash capital now to buy
15 assets and, secondly, we don't have the same
16 value. So I was instructed to go in and express
17 that we needed more assets. So that's the
18 meeting I'm referring to.

REDACTED

Page 95

REDACTED

2  Q. So did you make that request? Did you
3  come in and say -- did you, in sum or substance,
4  did you make it known to Lehman that you needed
5  more value?
6  A. Well, I made it known to the parties
7  that were involved that there needed to be more
8  assets, because if there weren't more assets,
9  the transaction couldn't take place.
10     Now, to say "I," it was made known and
11 I was part of discussions that were around what
12 could solve that gap. I don't know that I was
13 the person that specifically stated it or not.
14 Q. How big a gap had to be made up?
15 A. The quantification of what I was told
16 was that we had an understanding that the value
17 of the assets, if you will, the loan, the $45
18 billion loan, was -- the collateral base could
19 not be assured that that would solve that; that,
20 secondly, we then needed to go and get more
21 assets. No one gave me an instruction that said
22 you need to get X or Y, but we need to go get
23 more.
24     I wasn't, because I wasn't involved in
25 the, if you will, the -- I may not use the right

Page 96

1   HIGHLY CONFIDENTIAL - M. KLEIN
2  term, but the back end of Barclays in terms of
3  how they were looking at the construct for
4  themselves, I don't know what the accounting
5  was, but I was told you need to go in and get
6  more assets, this won't work.
7      And I think there was a great degree
8  of trepidation. It was already complicated
9  enough because the integration issues. It was
10 already complicated enough because of the market
11 issues. It was now public. It was complicated
12 enough because of the Europe, Asia, everything
13 separating away. It was now already a very
14 complicated event to have what was then this
15 meaningful change and, thus, have a hit to them
16 and that additional incremental risk, and in
17 addition, owning the risk on disposing of what
18 were this 45 billion of securities, there was
19 quite a lot of fear, and at that point there was
20 a sense that this transaction just might not
21 occur.
22     Now, of course, that happened many
23 times over the couple of weeks, the sense that
24 this might not occur, but it was very acute, and
25 I was told you need to -- we need to make it

Page 97

1   HIGHLY CONFIDENTIAL - M. KLEIN
2  very clear if there's not other assets, we can't
3  get this done.
4  Q. You have to make it very clear that if
5  there are not more assets, this won't get done,
6  how do you do that without being able to tell
7  Lehman this is how much more we need? Does that
8  present an obstacle here?
9  A. I don't want to hypothesize.
10 Q. Let me try this another way. Your
11 instructions are to make it clear to Lehman that
12 if there are not more assets to be added, that
13 it's possible the deal won't get done; is that
14 correct?
15 A. My recollection of both those
16 discussions and at least the instructions that I
17 got were this transaction was going to fail
18 because of what was the diminution in the
19 original plan. Now, that's -- those are the
20 communications that I was part of.

REDACTED

PAGES 98-121 REDACTED

Page 122

REDACTED

24  Q. Have you ever heard the term
25  "clarification letter" used in connection with

Page 123

HIGHLY CONFIDENTIAL - M. KLEIN
this transaction?
   A. Yes, I have.
   Q. With that question and answer, does
that refresh your recollection as to whether
you've seen this document before?
   A. I didn't review the clarification
letters when they were drafted, but I'm aware
that they existed.
   Q. I might be able to save you a little
time with my next question. I have a couple of
drafts of the clarification letter on which your
name appears on the e-mail distribution. Did
you read those when you got them?
   A. I didn't. I didn't view that given
the time that I could read the various different
notes that were part of that. I didn't read the
clarification letters at all that I can recall.

REDACTED

Page 124

REDACTED

Page 125

REDACTED

PAGES 126-217 REDACTED

Page 218

REDACTED

oOo

MICHAEL KLEIN

Subscribed and sworn to
before me this     day
of      2009.

_____

Page 219

HIGHLY CONFIDENTIAL - M. KLEIN
CERTIFICATE
STATE OF NEW YORK )
                  : ss
COUNTY OF NEW YORK)

I, Kathy S. Klepfer, a Registered Merit Reporter and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL KLEIN, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

I further certify that neither the deponent nor a party requested a review of the transcript pursuant to Federal Rule of Civil Procedure 30(e) before the deposition was completed.

In witness whereof, I have hereunto set my hand this 12th day of Sept., 2009.

-------------------------------

Page 220

HIGHLY CONFIDENTIAL - M. KLEIN
INDEX

| WITNESS: | EXAMINATION BY | PAGE |
|---|---|---|
| M. KLEIN | Mr. Gaffey | 5 |
|  | Mr. Tecce | 156 |
|  | Mr. Oxford | 180 |

| EXHIBITS: | PAGE |
|---|---|
| Exhibit 424, Subpoena for Rule 2004 Examination | 13 |
| Exhibit 425, a document bearing Bates Nos. BCI-EX-00077378 through 379 | 124 |
| Exhibit 426, a document bearing Bates Nos. BCI-EX-00080661 | 149 |

Page 221

HIGHLY CONFIDENTIAL - M. KLEIN
NAME OF CASE: In re Lehman Brothers Holdings, Inc.
DATE OF DEPOSITION: September 12, 2009
NAME OF WITNESS: Michael Klein
Reason Codes:
  1. To clarify the record.
  2. To conform to the facts.
  3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____