# A. 19 (A)

Page 1

1

2                    UNITED STATES BANKRUPTCY COURT

3                     SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5       In Re:

6                                    Chapter 11

7       LEHMAN BROTHERS          Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al,    (Jointly Administered)

9                    Debtors.

10      ------------------------x

11

12              * * *HIGHLY CONFIDENTIAL* * *

13                  DEPOSITION OF IAN LOWITT

14                    New York, New York

15                      August 20, 2009

16

17      Reported by:

18      MARY F. BOWMAN, RPR, CRR

19      JOB NO. 24043

20

21

22

23

24

25

## Page 2

```
 1
 2
 3
 4                  August 20, 2009
 5                  9:31 a.m.
 6
 7
 8
 9          Deposition of IAN LOWITT, held at
10   the offices of Jones Day, LLP, 222 East 41st
11   Street, New York, New York, before Mary F.
12   Bowman, a Registered Professional Reporter,
13   Certified Realtime Reporter, and Notary Public
14   of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                  APPEARANCES:
 3   JONES DAY, LLP
 4   Attorneys for Lehman Brothers, Inc.
 5       222 East 41st Street
 6       New York, New York   10017-6702
 7   BY:  ROBERT GAFFEY, ESQ.
 8        BRIDGET CRAWFORD, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12       5301 Wisconsin Avenue, NW - Suite 800
13       Washington, DC 20015
14   BY:  HAMISH HUME, ESQ.
15
16   WILLKIE FARR & GALLAGHER, LLP
17   Attorneys for the Witness
18       1875 K Street NW
19       Washington DC   20006-1238
20   BY:  RICHARD D. BERNSTEIN, ESQ.
21        KELLY M. HNATT, ESQ.
22
23
24
25
```

## Page 4

```
 1
 2          APPEARANCES:
 3   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
 4   Attorneys for the Creditors Committee
 5       865 Figueroa Street, 10th Floor
 6       Los Angeles, CA  90017
 7   BY:  ERICA P. TAGGART, ESQ.
 8
 9   JENNER & BLOCK, LLC
10   Attorneys for the Examiner
11       330 N. Wabash Avenue
12       Chicago, Illinois  60611-7603
13   BY:  ROBERT L. BYMAN, ESQ.
14
15   HUGHES, HUBBARD & REED, LLP
16   Attorneys for the SIPA Trustee
17       One Battery Park Plaza
18       New York, New York  10004-1482
19   BY:  NEIL J. OXFORD, ESQ.
20        JOHN F. WOOD, ESQ.
21
22   Also Present:
23       THOMAS E. HOMMEL, ESQ.
24          Lehman Brothers Holdings
25       PHILIP E. KRUSE, Alvarez & Marsal
```

## Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 6

LOWITT - HIGHLY CONFIDENTIAL
1
2 IAN LOWITT,
3    called as a witness by the parties,
4    having been duly sworn, testified as
5    follows:
6 EXAMINATION BY
7 MR. GAFFEY:
8    Q.   Good morning, Mr. Lowitt.  My name is
9 Bob Gaffey.  We met briefly before.  I am with
10 Jones Day.  We're special counsel to the estate of
11 Lehman Brothers Holdings, Inc., and as you
12 probably know, we are looking into issues arising
13 from the transaction in September of 2008 wherein
14 Barclays purchased certain assets of Lehman.
15    I should say to start, I have had a
16 request from my friends at the bottom of the table
17 who have been with us the last couple of days to
18 keep my voice up so they can hear, and I am going
19 to ask you to do the same thing.
20    Have you had your deposition taken
21 before?
22    A.   I have not.
23    Q.   Just a couple of ground rules.  One,
24 try and keep your voice up for everybody.  Two,
25 please give me audible answers.  The court

Page 7

1    LOWITT - HIGHLY CONFIDENTIAL
2 reporter can't take down a nod or a shake of the
3 head. So for the sake of a clear record, please
4 try to do that.
5    If you need a break at any time, say
6 so. If there is a question pending and there's
7 not an issue about whether there's a privilege
8 applying to the question, what I would ask is for
9 an answer to that, and then if you need to, you
10 can step out into the hall and we will take a
11 short break.
12    A.   Okay.  Thank you.
13    Q.   Can you give me a description,
14 Mr. Lowitt, of your education after secondary
15 school?
16    A.   I attended the University of
17 Witwatersrand in South Africa, in Johannesburg.
18    MR. BYMAN: I cannot hear you at all.
19 Can you speak up.
20    A.   I attended the University of
21 Witwatersrand in Johannesburg, South Africa, did
22 an undergraduate degree in electrical engineering,
23 and then I did a Master's degree in electrical
24 engineering.
25    And then I went to Oxford in England

Page 8

1    LOWITT - HIGHLY CONFIDENTIAL
2 and did a PPE, philosophy, politics and economics,
3 and then I did a graduate degree in economics at
4 Oxford.
5    Q.   What college at Oxford?
6    A.   I was at Merton College.
7    Q.   After you took your second degree at
8 Oxford, is that the end of your education?
9    A.   That is the end of my education.
10    Q.   Do you keep any professional licenses?
11    A.   I do not.
12    Q.   Have you ever?  Series 7, series 23,
13 anything like that?
14    A.   No.
15    Q.   Now, you currently are employed as the
16 chief operating officer of Barclays Wealth
17 Americas; is that correct?
18    A.   That is correct.
19    Q.   How long have you held that position?
20    A.   Since April of this year.
21    Q.   And when did you first start work for
22 Barclays?
23    A.   I joined Barclays I guess the Monday
24 that the deal closed.
25    Q.   That would be September 22nd?

Page 9

1    LOWITT - HIGHLY CONFIDENTIAL
2    A.   I believe that's correct.
3    MR. GAFFEY: Off the record for a
4 second.
5    (Off-the-record discussion)
6    Q.   What was your position when you first
7 joined Barclays on September 22nd?
8    A.   I didn't have a position on the day
9 that I joined Barclays on September 22nd, but
10 within a few days, I was appointed as the director
11 of integration for the Lehman businesses.
12    Q.   And what were your duties as director
13 of integration?
14    A.   To work with Barclays on integrating
15 the Lehman businesses into the Barclays
16 infrastructure.
17    Q.   Is that the position you held until
18 April when you took your current position as head
19 of Barclays Wealth?
20    A.   That's correct.
21    Q.   And prior to taking up employment with
22 Barclays, you were employed by Lehman, correct?
23    A.   That is correct.
24    Q.   Do you know which entity within the
25 Lehman family you were employed by?

Page 10

LOWITT - HIGHLY CONFIDENTIAL

1  A.  I don't know with certainty.  I
2  believe it was LBI, but I don't know with
3  certainty.
4    Q.  As I understand it, you began work at
5  Lehman in about 1994 as head of corporate
6  development?
7    A.  That is correct.
8    Q.  Was that head of corporate development
9  at Lehman Brothers Holdings, Inc.?  Do you recall
10  that?
11    A.  I know that my position was head of
12  corporate development.  I can't be clear on
13  whether it was the holding company that employed
14  me or LBI.  It is not a distinction that I would
15  have noted at that time.
16    Q.  And you served as treasurer and global
17  head of tax from 2000 to 2005, correct?
18    A.  That is correct.
19    Q.  And from July of 2005 until October of
20  2006, you acted as chief administrative officer of
21  LBHI Europe; is that correct?
22    A.  I was the chief administrative officer
23  for the European business.  I don't know whether
24  that was holdings or LBIE, but that was my

Page 11

LOWITT - HIGHLY CONFIDENTIAL

1  position.
2    Q.  And after you -- did you take on a
3  position after you acted as chief administrative
4  officer?
5    A.  Yes, I did.
6    Q.  What position was that?
7    A.  I was the co-global CAO for Lehman.
8    Q.  How long were you the co-global CAO
9  for Lehman?
10    A.  From when I returned from London,
11  which I recall as being January 2007, through my
12  employment with Barclays.
13    Q.  And then in or around June of 2008 --
14  did you leave Lehman at any time?
15    A.  I did not.
16    Q.  In or around June of 2008, you became
17  chief financial officer, correct?
18    A.  That is correct.
19    Q.  And what were your duties as chief
20  financial officer?
21    A.  I needed to run the finance
22  department, the product control, the financial
23  control, tax and treasury.
24    Q.  And within those responsibilities were

Page 12

LOWITT - HIGHLY CONFIDENTIAL

1  you responsible to insure that the books and
2  records of the corporation were kept accurately?
3    A.  Maintaining the accuracy of the books
4  and records was the responsibility of the -- a lot
5  of people in the finance department, and it
6  included myself.
7    Q.  Well, it included yourself but
8  ultimately reported up to yourself, correct?
9    A.  Correct.
10    Q.  You were the man in charge of that
11  operation?
12    A.  I was in charge of that.
13    Q.  Now, there came a time in September of
14  2008, Mr. Lowitt, did there not, when Lehman
15  engaged in discussions with Barclays about a
16  potential acquisition of Lehman by Barclays?  Is
17  that correct?
18    A.  That is correct.
19    Q.  And to your knowledge, when did those
20  discussions first take place?
21    A.  I believe there were discussions that
22  began on the Friday before the bankruptcy filing
23  on the Sunday.  I wasn't party to those
24  discussions, but I believe that there was contact

Page 13

LOWITT - HIGHLY CONFIDENTIAL

1  between people at Lehman and people at Barclays
2  from that point.
3    Q.  And although you were not involved in
4  the discussions in those -- that period before the
5  bankruptcy, did you play any role or have any
6  involvement in activities related to those
7  discussions?
8    A.  There was some due diligence work that
9  was done on the Friday.  I didn't participate in
10  those meetings but I was aware that it had taken
11  place.
12    Q.  Was any of the due diligence work
13  being done under your supervision or were you
14  responsible for any part of it?
15    A.  There were -- the people who were
16  meeting with the folks at Barclays were people who
17  reported to me.
18    Q.  Who were those people who were meeting
19  with Barclays?  Again I am still in the period
20  before the bankruptcy filing.
21    A.  My recollection is Martin Kelly met
22  with some of his counterparties at Barclays.
23    Q.  As CFO of Lehman, to whom did you
24  report?

## Page 14

LOWITT - HIGHLY CONFIDENTIAL

1
2    A.   I reported to Bart McDade, who was the
3    president of Lehman Brothers.
4    **Q.   Did you have one or more persons who**
5    **were direct reports to you?**
6    A.   I did.
7    **Q.   Who were your direct reports?**
8    A.   Well, I had direct reports within the
9    finance organization, which included Jerry Reilly,
10   who was the product controller; Martin Kelly, who
11   was the financial controller; Paolo Tonucci, who
12   was the treasurer of the firm; John DeRosa, who
13   was the head of tax, in addition to others.
14       And then I had reports which I
15   maintained through my CAO role which included the
16   other head of IT, which was Bridget O'Connor, and
17   the head of operations, which was Alastair
18   Blackwell.  It also included Bob Lieberberg, who
19   ran expense management for us, and others.
20       MR. BYMAN:  I hate to be a pest, but
21   your voice does drop.  It is difficult to
22   hear you.  I don't want to ask the reporter
23   to repeat things which will make double your
24   agony, so --
25       THE WITNESS:  I will try.  I

## Page 15

LOWITT - HIGHLY CONFIDENTIAL

1
2    apologize.
3    BY MR. GAFFEY:
4    **Q.   I won't think you're yelling at me if**
5    **you keep your voice up.**
6    **Now, the discussions between Lehman**
7    **and Barclays that were taking place prior to the**
8    **filing of the bankruptcy, as I understand it, sir,**
9    **did not result in an agreement between the two**
10   **entities.  Is that your understanding as well?**
11   A.   That is my understanding.
12   **Q.   And to your knowledge, did discussions**
13   **at some point resume between Barclays and Lehman?**
14   A.   Yes, they did.
15   **Q.   And when did that occur?**
16   A.   I believe that Bart McDade was in
17   contact with folks at Barclays on the Monday
18   morning after the filing for bankruptcy.
19   **Q.   That would be September 15?**
20   A.   I -- if that was --
21   **Q.   OK.**
22   A.   If that was the Monday, September 15.
23   **Q.   And tell me what you know about the**
24   **contact Mr. McDade had with folks at Barclays**
25   **beginning on Monday the 15th.**

## Page 16

LOWITT - HIGHLY CONFIDENTIAL

1
2    A.   I understood from Bart that Barclays
3    were interested in potentially transacting an
4    acquisition of some of the assets of LBI and
5    buying the businesses that were in LBI or some
6    subset of those businesses, and that the details
7    would be worked out over the course of the next
8    day.
9    **Q.   And how did you gain that**
10   **understanding?  Did you speak to Bart McDade?**
11   A.   I did speak with Bart.
12   **Q.   Did he tell you anything else that you**
13   **can remember now about that initial contact with**
14   **Barclays and Lehman?**
15   A.   He also shared with me that there were
16   eight individuals that Barclays deemed as critical
17   to the transaction, and that I was one of those
18   eight individuals.
19   **Q.   Who were the other seven?**
20   A.   The other seven, to the best of my
21   recollection, was Mike Gelband, Eric Felder, Ajay
22   Nagpal, Tom Humphrey, Hyung Lee, myself.
23   **Q.   Is Skip McGee the last one?**
24   A.   Skip McGee.  And I -- Bart indicated
25   to me that he was not going to be part of that

## Page 17

LOWITT - HIGHLY CONFIDENTIAL

1
2    group of eight.
3    **Q.   What did Mr. McDade tell you about not**
4    **being part of the group of eight, best you recall?**
5    A.   Nothing beyond that.
6    **Q.   Did you understand him to be saying he**
7    **wasn't going to work at Barclays after the**
8    **transaction or he wasn't one of the eight that**
9    **Barclays considered to be critical to the deal?**
10   A.   He just indicated that he wasn't part
11   of the eight.
12   **Q.   Now, did there come a time when you**
13   **began to negotiate or -- withdrawn.**
14   **Did there come a time when you began**
15   **to discuss with Barclays the terms and conditions**
16   **upon which you would be employed at Barclays after**
17   **the transaction?**
18   A.   I met with Rich Richie at some point
19   on early Tuesday morning.
20   **Q.   And tell me about your meeting with**
21   **Mr. Richie.  What did you say?  What did he say?**
22   A.   To the best of my recollection, he
23   indicated that they wanted me to be part of the
24   transaction, that having me be part of their
25   organization was important.  And he shared with me

Page 18

1    LOWITT - HIGHLY CONFIDENTIAL
2    the terms that they would be extending to me.
3
4
5
6
7    REDACTED
8
9
10
11
12
13
14    MR. BERNSTEIN:  Again, we as
15    Mr. Lowitt's counsel will want to be part of
16    the process, and I understand from last time
17    we had a right to be part of the process in
18    terms of maintaining the highly confidential
19    designation for this deposition and
20    particularly for any discussion about his
21    compensation.
22    MR. GAFFEY:  Richard, if you mean by
23    maintaining the highly confidential
24    designation it is bound by the
25    confidentiality order and our agreement that

Page 19

1    LOWITT - HIGHLY CONFIDENTIAL
2    everything in the depositions is highly
3    confidential until designations come and
4    some period after that, then I agree.
5    I am not waiving any rights we have
6    under the confidentiality order to go back
7    and say we don't think it is highly
8    confidential and to take it to the Court if
9    we need to.
10    MR. BERNSTEIN:  I didn't think you
11    were.
12    MR. GAFFEY:  I just wanted to make it
13    clear.
14
15
16
17
18    REDACTED
19
20
21
22
23
24
25

Page 20

1
2
3
4
5
6
7
8    REDACTED
9
10
11
12
13
14
15
16
17
18
19
20
21
22    Q.   And Anthony Collerton was I think head
23    of HR at Lehman or in HR at Lehman?
24    A.   He was in HR in Lehman.
25    Q.   It was delivered to you by hard copy,

Page 21

1    LOWITT - HIGHLY CONFIDENTIAL
2    not by e-mail, not by electronic means?
3    A.   Correct.  To the best of my
4    recollection.  It may have been sent to me in
5    addition in soft copy, but I did have a hard copy.
6    Q.   Do you know when any of the other
7    seven people that you named signed their contracts
8    with Barclays?
9    A.   I don't know when anybody else signed.
10    My understanding was that a condition of the
11    transaction proceeding was that the seven sign
12    their contract.
13    Q.   It was your understanding that the
14    seven had to sign their contracts before the
15    transaction closed?
16    A.   That it was a condition of closing,
17    was at least my understanding.
18    Q.   And from whom did you obtain that
19    understanding?
20    A.   I don't have a specific recollection
21    of where I heard that.
22    Q.   Do you have any general recollection
23    about that?
24    A.   No, I -- I don't know specific -- I
25    have no recollection of how I got that.

Page 22

LOWITT - HIGHLY CONFIDENTIAL

1
2  Q.  Were you -- in the week between the
3  filing of the bankruptcy on the 15th and the
4  closing of the transaction on the 22nd, did you
5  have any involvement in either negotiating or
6  implementing the terms of the agreement?
7      A.  I didn't have a role in negotiating
8  the transaction.  And I guess I'm not sure what
9  you mean by implementing the transaction.  I
10  certainly played a role in providing information
11  to those folks who were doing the negotiation.
12      Q.  Were you kept apprised by Mr. McDade
13  of the state of negotiations through the week?
14  And by the week, I mean between the 15th and the
15  22nd.
16      A.  Not in any formal way.  There may have
17  been elements that he shared with me, but I
18  don't -- I was -- it wasn't part of -- he wasn't
19  keeping me regularly updated on that.
20      Q.  Was one of your responsibilities
21  during that week to identify assets that would be
22  transferred from Lehman to Barclays?
23      A.  That is an exercise that I was
24  involved with towards the end of that week.
25      Q.  When towards the end of the week?

Page 23

LOWITT - HIGHLY CONFIDENTIAL

1
2  Tell me on what day that began.
3      A.  I can't be more precise.  I believe it
4  was on the Friday, the 19th, after the repo
5  transaction had taken place.
6      Q.  And prior to Friday, the 19th, did you
7  have any involvement in the activities surrounding
8  the transaction?
9          MR. BERNSTEIN:  Objection, vague and
10  ambiguous.
11          But you can answer.
12      A.  Yeah, I'm -- I'm not sure what you are
13  getting at.
14      Q.  Let me try and rephrase it.
15          As a general matter, and I'll
16  obviously follow up on this, I am trying to get an
17  idea, Mr. Lowitt, of what you were doing during
18  that week.  Could you sort of take me through the
19  week and give me a general idea of what your
20  activities were?
21      A.  The focus for me during that week was
22  a combination of dealing with funding issues,
23  which were quite extreme; dealing with personnel
24  issues with a number of people in the
25  organization, very disconcerted with what had

Page 24

LOWITT - HIGHLY CONFIDENTIAL

1
2  happened to Lehman and worried about their
3  futures; and then supporting, you know, specific
4  requests, you know, from Bart and others.
5      Q.  Who were the others in addition to
6  Bart that you just referred to?
7      A.  Well, the other people who were
8  involved with the negotiation were Mark Shapiro,
9  Mark Schaefer.  Skip McGee I think was involved in
10  some of the questions and issues, and I think
11  Steve Berkenfeld was providing, you know, legal
12  advice.  There may have been others.
13      Q.  What were the nature of the funding
14  issues that you said were a focus of your
15  activities during that week?
16      A.  Well, clearly there was very
17  substantial market disruption following the Lehman
18  bankruptcy filing.  Clearly, there was, you know,
19  a great deal of fear in the marketplace with
20  secured funders, and there was concern about, you
21  know, LBI, and so we had people not rolling their
22  secured funding and we needed to find other ways
23  to fund the firm.
24          Initially, we were utilizing the Fed,
25  but on Wednesday became involved, together with

Page 25

LOWITT - HIGHLY CONFIDENTIAL

1
2  folks at Barclays, in arranging for the Fed to be
3  taken out of their repo position with LBI and to
4  have that repo replaced with one with Barclays.
5      Q.  And was what you were doing in
6  connection with -- actually, let me just follow up
7  on a phrasing.  When you say rolling the funding,
8  in layman's terms, does that mean not continuing
9  the next day?
10      A.  Correct.  People were canceling their
11  repo trades and returning the collateral for cash.
12      Q.  When you were dealing with Barclays
13  with respect to the repurchase transaction, and
14  again that is something we will talk about in more
15  detail today, were you --
16      A.  When you say repurchase transaction --
17      Q.  That's the transaction that I think
18  you were just referring to where Barclays supplied
19  funding for the firm.
20      A.  Right.  Where Barclays took the Fed
21  out of their repo position.
22      Q.  OK.  And give me a little more detail,
23  if you would, on your activities in connection
24  with the repo transaction.  What did you do in
25  connection with the repo transaction?

Page 26

**LOWITT - HIGHLY CONFIDENTIAL**

1    A.    Well, I was asked to join people from
2 Barclays in a meeting with the Fed to talk through
3 the logistics and details of how that transaction
4 would take place. And then on the -- that was on
5 the Wednesday.
6        And then on the Thursday was, you
7 know, involved in -- together with other folks at
8 Lehman, in insuring that the -- you know, the
9 collateral movements and cash movements were
10 taking place as, you know, expected by the
11 transaction.
12    **Q.    Is it fair to characterize what you**
13 **were engaged in during those couple of days as**
14 **negotiations with Barclays over the terms of the**
15 **repo?**
16    A.    There was no negotiation with regard
17 to the terms of the repo. The repo was -- the
18 repo with the Fed was governed by the haircuts
19 that the Fed applied to various term -- parts of
20 collateral, and then when the collateral went over
21 to Barclays, it was again being driven by the
22 Schedule A that Barclays had in place.
23        So there was no negotiation or pricing
24 elements involved in that at all. It was just the

Page 27

LOWITT - HIGHLY CONFIDENTIAL

1 mechanics of moving collateral out of the Fed and
2 getting cash back for that, playing cash to the
3 Fed, and then the reverse on the Barclays side,
4 getting the collateral to Barclays and receiving
5 cash in from Barclays.
6        MR. BERNSTEIN: The record says
7 "playing cash to the Fed." Did you say
8 "playing" or "paying"?
9        THE WITNESS: "Paying."
10        MR. BERNSTEIN: Thank you. Go ahead.
11 BY MR. GAFFEY:
12    **Q.    Were there any discussions with**
13 **Barclays about what implied interest rate would be**
14 **applied in the reverse repo?**
15    A.    Not that I was aware of.
16    **Q.    When you referred to the Schedule A a**
17 **moment ago, is that -- could you describe for me**
18 **what you meant by Schedule A?**
19    A.    In financing transactions, any
20 counterparty that's extending cash against
21 collateral would specify what are the haircuts
22 that apply to any piece of collateral that they
23 would be willing to lend against to protect them
24 in the event that that collateral needed to be

Page 28

LOWITT - HIGHLY CONFIDENTIAL

1 sold out and they would realize their cash as a
2 result of that sale.
3        So there is standard haircuts that
4 operate across the marketplace, and in certain
5 cases individual institutions would adjust their
6 haircuts relative to the standards that prevailed
7 in the marketplace, and that tends to get
8 characterized on a schedule that is just called
9 the Schedule A. So I am using shorthand for that.
10    **Q.    When you refer to a haircut, just to**
11 **try to put this in layman's terms, the haircut is**
12 **the difference between the value of the security**
13 **used as collateral and the amount at which the**
14 **purchaser will pay for it on the first leg of the**
15 **repo, yes?**
16    A.    It is the difference between the
17 amount of cash that somebody is willing to extend
18 to a given collateral value. So if there is, you
19 know, $100 worth of government bonds, they would
20 be willing to, just to make the point, extend $99
21 of cash, because in the event that they -- the
22 repo had to get canceled, they would take the
23 government bonds and they would have to sell those
24 government bonds to recover the 99 of cash that

Page 29

LOWITT - HIGHLY CONFIDENTIAL

1 they extended, and there is always uncertainty in
2 what you can sell collateral for in the
3 marketplace, even if it is very liquid collateral,
4 and the haircuts would tend to be larger for less
5 liquid security.
6    **Q.    What was the mechanism by which the**
7 **collateral underlying the fed repo was valued?**
8    A.    Well, within tripary, the tripary
9 agent, so in the case of the fed repo, JP Morgan
10 Chase maintains as part of their triparty service
11 a pricing mechanism for the collateral that's
12 being funded on behalf of, in our case, Lehman
13 with the various funding counterparties, so that
14 pricing is part of the triparty service, so that
15 that pricing would have been provided by JP Morgan
16 Chase in the example of the Fed repo.
17    **Q.    Do you know if there was any**
18 **comparison made between the pricing that JP Morgan**
19 **Chase applied in the triparty and the values**
20 **ascribed to the particular securities as**
21 **collateral on Lehman's books?**
22    A.    Well, these would be, you know, liquid
23 securities, so the pricing, one would expect the
24 pricing to be the same or very similar. I

Page 30

1          LOWITT - HIGHLY CONFIDENTIAL
2    wouldn't imagine that there would be sources of
3    difference.
4       Q.    Thanks.
5             Was there a comparison made, do you
6    know?
7       A.    I'm not aware of a specific
8    comparison.
9       Q.    Was there anything else that you did
10   in connection with arranging the repurchase -- for
11   Barclays to take over the Fed repo?
12      A.    Nothing that I recall specifically
13   that we haven't talked about already.
14      Q.    Did you consider it part of your
15   duties in the course of doing that work to protect
16   the interest of Lehman?
17            MR. BERNSTEIN:  Objection, vague and
18   ambiguous.
19      A.    I saw myself as having to support
20   Lehman Brothers and do the -- and I was an
21   employee of Lehman Brothers at that point, so yes.
22
23                    REDACTED
24
25

Page 31

REDACTED

Page 32

REDACTED

Page 33

REDACTED

20      Q.    And if the transaction with Barclays
21   had not closed, what were Lehman's prospects?
22      A.    Oh, I think that Lehman -- I don't
23   know -- it is pure speculation on my part, but it
24   would have been difficult to see how Lehman would
25   have, you know, continued to operate.  I mean post

Page 34

LOWITT - HIGHLY CONFIDENTIAL

the bankruptcy, the objective was to wind down LBI
in an orderly fashion. Whether one could in fact
have wound it down in an orderly fashion given how
much turmoil there was in the market the week
after the bankruptcy filing in the absence of the
transaction I think has to be seen as quite
unlikely.

    Q.  And you would have lost your job?

    A.  I would not have been employed by
Lehman. I mean possibly, as others, would have,
you know, joined the estate in assisting with the
wind-down of the remaining positions as other
folks did. But --

    Q.  Was it your view you could make that
amount of money working for the estate?

    A.  I really wasn't focused on how much
money I was potentially going to make if I stayed
at Barclays (sic) through the course of that week.
I was working to see if we could -- we could get a
transaction with Barclays which we all believed
were in the interests of our employees and all the
participants, including the creditors.

    Q.  Did you discuss with anyone whether
the fact that you had a signed offer letter with

Page 35

LOWITT - HIGHLY CONFIDENTIAL

Barclays on September 18 presented a conflict in
your duties?

    A.  There were people within Lehman who
obviously knew that I was one of the eight, and
given that I wasn't involved in the negotiation, I
didn't feel a specific conflict.

    Q.  Thank you.

    Let's go back to the negotiations, all
right. I want to, just to frame this for a time
period point, I want to go back to the Monday,
which is when I think you told me you first spoke
to Mr. McDade about the fact there were renewed
negotiations with Barclays. That was the Monday,
correct?

    A.  That is correct.

    Q.  What is your understanding of what
happened next between the Monday and the Tuesday?

    A.  Well, in the Monday evening, you know,
a number of Barclays folks came to meet with their
counterparts at Lehman to understand, you know,
what was the inventory and the assets in the firm.
And then there were, you know, groups of folks who
were also involved that evening in crafting a
deal.

Page 36

LOWITT - HIGHLY CONFIDENTIAL

    Q.  And can you tell me who were the
Barclays folks who came to meet with your
counterparts at Lehman to understand what was the
inventory and assets in the firm?

    A.  I don't know the names of all of them.
But the -- you know, the head of interest rates
would have met with the head of interest rates at
Lehman, and the head of credit would have, you
know, met with Eric Felder, for example.

    Q.  Can you give me a roster of who was
involved in the Lehman side on this activity?

    A.  I think the people -- not a complete
list, but it would have included Mike Gelband, who
was the head of capital markets. It would have
included Alex Kirk, and it would have included
Eric Felder.

    There may well have been others, but
those three I'm sure were involved.

    Q.  Did any of them meet with you, any of
the Barclays people meet with you at that point?
I'm on the Monday into the Tuesday.

    A.  I mean I met with Rich Richie. I --
there were some meetings -- I wouldn't say a
meeting, but sort of contact where we were --

Page 37

LOWITT - HIGHLY CONFIDENTIAL

where I was introducing some of the Barclays
people to some of the Lehman people.

    I mean I recall one situation where
there was one asset that the Barclays folks
weren't sure what it was, and the person who was
in a position to explain it was Jim Seery, so I
put the Barclays person, whose name I can't
recall, in contact with Jim to understand the
particular asset.

    Q.  And did any of the people who worked
directly for you, who were your direct reports or
people who reported to them, were they involved in
these meetings with the Barclays folks to
understand the inventory and assets of the firm?

    A.  I don't know. You know, Jerry Reilly,
who was the head of product control, may well have
been involved in some of those meetings, given
that he was knowledgeable about some of the
assets, but I'm not aware specifically of any of
my reports meeting specifically with people
specifically at Barclays, but they may well have.

    Q.  When you met with Mr. Richie, you
talked about the fact that you were one of the
eight and that he wanted you at Barclays. Did you

Page 38

LOWITT - HIGHLY CONFIDENTIAL

1  talk about anything else?
2      A.  I don't recall talking about other
3  things.
4      Q.  Did there come a time when you learned
5  that an agreement of terms had been reached
6  between Lehman and Barclays?
7      A.  Well, there were, you know, a number
8  of us waiting in the morning of Tuesday to hear
9  that terms had been reached between the two firms,
10  and at some point on the Tuesday morning, I was
11  aware that a deal between the two firms had, in
12  fact, been reached.
13      Q.  How did you become aware of the fact
14  that a deal between the two firms had been
15  reached?
16      A.  I can't recall precisely.  I imagine
17  somebody who was in the room negotiating would
18  have come out and shared with, you know, the
19  senior Lehman folks who were waiting on the 32nd
20  floor that that had taken place, but I can't be
21  more specific in my recollection.
22      Q.  Who were the senior Lehman folks who
23  were waiting on the 32nd floor to learn whether an
24  agreement had been reached?

Page 39

LOWITT - HIGHLY CONFIDENTIAL

1      A.  Well, it included -- my recollection
2  is Skip McGee was there, Paul Parker.  It would
3  have involved, included some of the finance folks
4  that had been working that evening.  So Jerry
5  Reilly, Martin Kelly.
6      Q.  A tumultuous week for everybody.  Are
7  you there on the premises all night?
8      A.  Yeah, I was.
9      Q.  What were you doing, other than
10  waiting?
11      A.  I was involved in collecting the input
12  that was being generated by different parties,
13  vis-a-vis the assets that were, you know, going to
14  be part of the transaction.
15      Q.  Tell me what you did in terms of
16  collecting input that was generated by different
17  parties vis-a-vis the assets that were going to be
18  part of the transaction.
19      A.  There were a number of people that
20  were, you know, involved in that.  There was
21  obviously input from the various business teams
22  with regard to which assets the Barclays folks
23  were interested in purchasing and which ones they
24  weren't.  There was, you know, an effort to match

Page 40

LOWITT - HIGHLY CONFIDENTIAL

1  up assets and liabilities, and again a number of
2  folks in Lehman were involved in that effort.
3      Q.  And what were you doing?  What were
4  your activities?  You described that there were
5  teams looking at assets and teams looking at
6  liabilities.  I want to get a sense of what you
7  were doing over the night from Monday to Tuesday,
8  from the 15th to the 16th.
9      A.  Well, part of what I was doing was
10  meeting with some of the -- as I indicated, you
11  know, introducing some of the Barclays folks to
12  Lehman folks, and some part of what I was doing
13  was, let's say maintaining a sense of where those
14  discussions were coming out.  And that's mostly
15  what we were doing.
16      Q.  And were those discussions that you
17  refer to, when you say, talk about the discussions
18  and how they were coming out, are those the
19  discussions -- did they include what the value of
20  the assets are that Barclays will purchase from
21  Lehman?
22      A.  Yeah.  It included both -- you know,
23  there were certain assets that as the Barclays
24  folks understood them, they decided they would not

Page 41

LOWITT - HIGHLY CONFIDENTIAL

1  want to purchase them, and then there were also,
2  as one would expect, if you were buying big blocks
3  of assets, that you would -- that the price that
4  you would offer to purchase those big blocks of
5  assets would be less than what those assets were
6  trading in the marketplace at that point in time.
7      Q.  Did Lehman's books at that time fairly
8  reflect the value of the assets according to how
9  they were trading at the time?
10      A.  Yes, I believe they did.
11      Q.  So it was your understanding on the
12  15th and the 16th of September of 2008, that
13  Lehman's books carried accurate marks for
14  securities that were recorded therein; is that
15  correct?
16      A.  Yeah.  The assets that were on
17  Lehman's books were, particularly LBI, were
18  securities, and securities are priced based on,
19  you know, market sources, and our books and
20  records were accurate.
21      Q.  And as CFO, you were comfortable with
22  the fact that Lehman's books and records were
23  accurate; is that right?
24      A.  There is obviously an enormous process

Page 42

LOWITT - HIGHLY CONFIDENTIAL
2  that finance goes through and business goes
3  through to validate those prices, and I had
4  confidence in that process to establish the
5  pricing.
6      Q.  Do you know if -- when you learned on
7  the Tuesday morning that there was a deal, what is
8  your memory of the terms that you learned?
9      A.  I didn't know all of the -- I wasn't
10 party to all of the terms.  You know, I was aware
11 that the -- that Barclays was going to purchase a
12 substantial block of assets for less than the
13 amount that we had on our books to reflect a sort
14 of bid offer that reflected both the size of the
15 purchase, as well as the inherent volatility in
16 the market, which was significant that week.
17     Q.  So was Barclays agreeing to buy the
18 assets at a fixed discount?
19         MR. HUME:  Objection, vague and
20 ambiguous.
21     A.  Barclays were going to purchase the
22 assets at a price they were willing to pay to
23 purchase a substantial block of assets at a time
24 that was tumultuous in the marketplace.  That
25 amount was less than the amount that those assets

Page 43

LOWITT - HIGHLY CONFIDENTIAL
2  were on our books for.
3      Q.  Was it a discount from the amount
4  shown on Lehman's books?
5          MR. HUME:  Same objection.
6      A.  You keep asking whether it was a
7  discount.  It was an amount that was less than the
8  amount that we had it on our books for, which
9  reflected a bid offer that was consistent with the
10 size of the purchase, as well as the volatility in
11 the marketplace.
12     Q.  Is there a reason you are not
13 agreeable to the term "discount" to describe that?
14     A.  I think my explanation of it is more
15 accurate.  The shorthand for it could be discount.
16 I think that it is important to reflect that the
17 marks that we had on our books were accurate,
18 which I believe was the case, as well as the fact
19 that if you are going to sell a very substantial
20 block of assets, you sell it for an amount, or
21 somebody is going to pay you less than the amount
22 that you actually have it on your books for.
23     Q.  If someone is going to pay you less
24 than the amount that you have it on your books
25 for, you would expect that to be recorded in the

Page 44

LOWITT - HIGHLY CONFIDENTIAL
2  agreement for that transaction; is that correct?
3          MR. HUME:  Objection, lacks
4  foundation.
5      A.  The -- my understanding of the
6  transaction was that it included that feature, and
7  how it was reflected in any agreement is not
8  something that I know about.
9      Q.  Tell me what you know about the
10 process by which this difference between the
11 amount shown on Lehman's books and the amount
12 Barclays would pay was determined.
13     A.  I think it was a combination of what I
14 term sort of bottom up, as the Barclays folks met
15 with the Lehman folks and looked at the assets
16 specifically, as well as, you know, a top-down
17 view that, you know, emerged from the negotiation
18 between Lehman and Barclays.
19     Q.  This may be an inartful question, but
20 what ultimately governed the decision as to the
21 amount of the difference between the amount shown
22 on Lehman's books and the price paid?  The
23 bottom-up process or the top-down view?
24         MR. HUME:  Objection, lacks
25 foundation.

Page 45

LOWITT - HIGHLY CONFIDENTIAL
2      A.  I mean it is hard for me to say.  I
3  wasn't part of the discussion.  But I would say
4  that the bottoms-up view would have informed what
5  was going on inside the negotiating room, but that
6  in the end, it must have been what was agreed to
7  between the parties in their negotiating sessions.
8      Q.  Do you know if what was agreed to
9  between the parties in their negotiating session
10 with regard to this difference between the amount
11 shown on the books and the price paid was an
12 agreement in terms of a percentage of what was
13 shown in the amount of the books or a raw number?
14     A.  My recollection is that it was a
15 number, not a percentage.
16     Q.  What was the number?
17     A.  My recollection is it was $5 billion.
18     Q.  And do you know how that $5 billion
19 number was calculated?  How it was generated?
20         MR. BERNSTEIN:  Objection, asked and
21 answered.
22         But you can answer it again.
23     A.  I don't know how it was derived, but I
24 understand that if you were buying a big block of
25 assets in one go in a very volatile market, you

Page 46

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2  would expect to have a fairly substantial bid
3  offer spread associated with that purchase.
4    Q.  Again, it is something I will ask you
5  in more detail as we go through the day, but to
6  your understanding, sir, the deal changed in form
7  over the week?
8    A.  Well, the deal that was consummated
9  and approved by the judge was a completely
10 different deal than the deal that was worked
11 through on the Monday night/Tuesday morning.
12   Q.  I want to get up to the point -- when
13 the deal is approved by the judge, it is at the
14 hearing that takes place on Friday, the 19th?  Can
15 we agree on that?  I am trying to put the date on
16 that.
17   A.  We can agree on that.
18   Q.  That is all I want you to agree on, is
19 the date.
20     In addition to the Tuesday morning
21 when you learn there is a deal and the hearing on
22 the 19th, the repo arises, right?  Barclays steps
23 into the shoes of the Fed on the repo?
24   A.  The Fed insists on Barclays taking
25 them out of the repo.

Page 47

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.  For whatever reason, Barclays takes
3  them out of the repo?
4    A.  Correct.
5    Q.  The repo ultimately plays a role in
6  the transaction, correct?
7    MR. HUME:  Objection, vague and
8  ambiguous.
9    Q.  The deal ultimately becomes giving to
10 Barclays the collateral that's in the repo, yes?
11   MR. BERNSTEIN:  Objection, vague and
12 ambiguous.
13   A.  The deal was that Barclays would keep
14 the collateral that was in the repo, and those
15 were the assets that Barclays was going to take as
16 part of the transaction.
17   Q.  And the $5 billion number we talked
18 about before, did that number stay in the deal
19 through its various iterations?
20   A.  Well, the repo transaction was just a
21 different thing.  As we discussed earlier, you
22 know, the standard repo construct is one where a
23 lender extends less cash than the amount of
24 collateral they receive to protect them in the
25 event that they have to cancel that repo and sell

Page 48

1    LOWITT - HIGHLY CONFIDENTIAL
2  off the collateral in order to get the cash back
3  that they have extended.
4      And so in a -- the repo that we did
5  with Barclays was done in a way that was
6  completely sort of market standard, and it did
7  include the financing haircut that was typical,
8  and so it is accurate that the transaction as it
9  took place did include that Barclays received
10 collateral for cash through the repo transaction.
11   Q.  And that --
12   A.  And there was a difference between the
13 amount of repo and the cash proceeds, but they
14 were different and not really related to the
15 original transaction.
16   Q.  And the difference between the amount
17 of the repo and the cash proceeds was
18 approximately $5 billion, correct?
19   MR. HUME:  Objection, lacks
20 foundation.
21   A.  It, it -- I mean it was in that
22 region.
23   Q.  Now, let's go back to the Tuesday
24 morning when you learn about the deal.  I may be
25 treading on a few things you already told me.

Page 49

1    LOWITT - HIGHLY CONFIDENTIAL
2      You learn about it from -- I just
3  forget if I asked you this.  From whom did you
4  learn about the terms of the deal?
5    A.  As I said earlier, I didn't recall
6  specifically.  It was part of a group of us
7  waiting to hear and we heard simultaneously.
8    Q.  And where were you when you heard
9  about the terms of the deal simultaneously?
10   A.  We were on the 32nd floor of 745.
11   Q.  And this was very early in the morning
12 of Tuesday?
13   A.  I don't think it was very early in the
14 morning.  Again, I don't have a precise
15 recollection, but I think that this continued
16 through the morning.
17   Q.  Did there come a time when you
18 attended a meeting of the boards of Lehman
19 Brothers Holdings, Inc. and Lehman Brothers, Inc.
20 on the morning of Tuesday, September 16?
21   A.  I don't recall attending a board
22 meeting on the Tuesday.
23   Q.  No recollection of that at all?
24   A.  I don't.  I was very tired, so I --
25 it's possible, but I have no recollection of it.

Page 50

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    **Q.  Do you have any recollection of the**
3    **deal being described to the board by anybody?**
4    A.   I don't have a recollection of being
5    at a meeting of the board, so, no.
6    **Q.  Do you ever learn one way or another,**
7    **whether you attended or not, whether the deal had**
8    **been described to the board?**
9    A.   I mean I would have assumed it would
10   have been presented to the board and approved.
11   But I wasn't aware of anything specific to it, or
12   I don't recall being aware of anything specific to
13   it, but I would have expected that it would have
14   been presented to the board.
15   **Q.  Did there come a time when the**
16   **agreement between Lehman and Barclays was reduced**
17   **to a written contract?**
18   A.   Well, I know there was a contract that
19   was worked on on the Tuesday, and I know that
20   there was, you know, various clarifications that
21   were made to that, but I wasn't involved in the
22   drafting or commenting, you know, of that.
23   **Q.  At any point during the week?**
24   A.   At any point during the week.
25   **Q.  Did you ever see the contract that was**

Page 51

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    first agreed?
3    A.   I don't recall I did.
4    **Q.  I am sorry?**
5    A.   I don't recall that I did.
6    **Q.  I just need to press that a little**
7    **bit.  You don't recall seeing it or you don't**
8    **recall whether or not you saw it?**
9    A.   I don't recall seeing the contract.
10   **Q.  This might be quite an event for you.**
11   I am about to show it to you.
12   A.   Can I take a quick break?  Is that OK?
13   **Q.  Sure.**
14   A.   Thank you.  Very quick.
15   (Recess)
16   BY MR. GAFFEY:
17   **Q.  Mr. Lowitt, I have put before you what**
18   **we have marked as Exhibit 1 at a prior deposition,**
19   **a document entitled Asset Purchase Agreement among**
20   **Lehman Brothers Holdings, Inc., Lehman Brothers,**
21   **Inc., LB745 LLC, and Barclays Capital, Inc., dated**
22   **as of September 16, 2008.**
23   **Would you look through the document,**
24   **sir, sufficiently to tell me whether you have ever**
25   **seen it before.**

Page 52

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    A.   I have seen it as part of my meetings
3    with my counsel.
4    **Q.  Apart from meetings you may have had**
5    **to prepare for your deposition, have you ever seen**
6    **the document before?**
7    A.   I didn't read it ahead of this, no.
8    **Q.  I am asking a different question.**
9    **Putting aside what documents you may have reviewed**
10   **with counsel --**
11   A.   Right.
12   **Q.  -- to prepare for your deposition,**
13   **independently of that activity, have you ever seen**
14   **the document marked as Exhibit 1 before?**
15   A.   I don't recall having seen the
16   document before that.
17   **Q.  You learned that there was a written**
18   **agreement between Lehman and Barclays, yes?**
19   A.   Yes.
20   **Q.  Did you ever ask to see it at the**
21   **time?**
22   A.   I was -- I don't recall asking to see
23   it at the time.
24   **Q.  Did any of your activities in the**
25   **ensuing week require you to understand the terms**

Page 53

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    of the agreement?
3    A.   I don't believe they did.
4    **Q.  When you learned the terms of the**
5    **agreement, sir, without regard to the exhibit I**
6    **gave you, when you learned the terms of the**
7    **agreement, did you also learn that Barclays would,**
8    **as part of the deal, assume certain liabilities?**
9    A.   I mean my understanding of the
10   transaction was that Barclays was going to assume
11   additional liabilities in addition to the sort of
12   asset liability -- the work around the individual
13   assets and the liabilities associated with those.
14   **Q.  Did you come to understand that in the**
15   **deal there would be an extra $1 billion of**
16   **compensation beyond Lehman's accrual?**
17   A.   I mean I was aware that the
18   compensation liability that Barclays was taking on
19   was $2 billion.
20   **Q.  Did you understand that to be**
21   **$1 billion beyond Lehman's accrual?**
22   A.   Well, I understood it to be the total
23   compensation, which as we would have thought about
24   it at Lehman would have included both a cash
25   component and a stock component.

Page 54

LOWITT - HIGHLY CONFIDENTIAL
1
2    Q.    Was it $1 billion above the accrual
3    that Lehman had for those components?
4        A.    We would not have accrued for the
5    stock component of compensation that was granted
6    in -- at the end of that year.  We would have been
7    accruing for that over the five years, three or
8    five years that that stock was vesting.
9        So the accrual would have been for the
10   bonus, and then in addition to that, away from the
11   bonus accrual, we had expensed the cost of the
12   prior equity awards that were continuing to vest
13   through 2008.  So compensation that was included
14   in the 2 billion would have been more than just
15   the bonus piece, it would also have, in my mind,
16   included a component that would have been stock.
17       Q.    Now, putting before you, Mr. Lowitt,
18   what has previously been marked as Exhibit 24 and
19   what has previously been marked as Exhibit 25.
20   And with respect to those two documents, sir, I'll
21   ask you the same question.  Take a look through
22   them sufficiently to tell me whether you have seen
23   them before.
24       A.    I don't believe I've seen either of
25   these documents before.

Page 55

LOWITT - HIGHLY CONFIDENTIAL
1
2        Q.    Now, Exhibit 24 is a First Amendment
3    to the asset purchase agreement, and Exhibit 25 is
4    a letter dated as of September 20, which has come
5    to be called the clarification letter.  Have you
6    heard that term before?
7        A.    I have.
8        Q.    And when did you hear the term
9    "clarification letter" in connection with the
10   transaction between Lehman and Barclays?
11       A.    I would have heard of the
12   clarification letter actually subsequent to the
13   transaction closing, is my recollection.
14       Q.    How long after the transaction closed
15   did you first hear about the clarification letter?
16       A.    My recollection around that is hazy,
17   but it would have been a few weeks, probably
18   within a few weeks of the transaction closing that
19   there was a clarification letter.
20       Q.    Do you remember anything about the
21   circumstances under which you learned a few weeks
22   after the closing about a clarification letter?
23       A.    No.
24       Q.    Did you -- until I have shown it to
25   you today, did you ever know there was a First

Page 56

LOWITT - HIGHLY CONFIDENTIAL
1
2    Amendment to the asset purchase agreement?
3        A.    No.
4        Q.    You knew generally at the time -- and
5    by the time, I mean the week between the 15th and
6    22nd, that there were changes in the deal that
7    were memorialized in some way, correct?
8        A.    Yes.
9        Q.    Did you ever ask to see the writings
10   that memorialized those changes in the deal?
11       A.    I don't recall ever asking to see
12   those.
13       Q.    To conduct the activities you were
14   conducting in connection with the deal, did you
15   think you needed to understand or see the written
16   terms of the deal?
17       MR. BERNSTEIN: Objection.  Compound.
18       A.    I -- I don't believe I -- I didn't ask
19   to see it, so I felt -- I believe I would have
20   felt competent to fulfill my duties without having
21   read it.
22       Q.    Did you attend any of the hearings
23   before the bankruptcy court concerning the
24   transaction?
25       A.    I did not.

Page 57

LOWITT - HIGHLY CONFIDENTIAL
1
2        Q.    Did you have reports from anyone who
3    did attend the hearings before the bankruptcy
4    court about the transaction, about what was going
5    on at the hearings?
6        A.    I recall having conversations with
7    Steve Berkenfeld on the weekend after the 7th --
8    the Friday evening, about it, but don't have
9    recollection of specific details of that
10   conversation.
11       Q.    Do you have a general recollection of
12   what Mr. Berkenfeld was recounting to you in those
13   conversations about the hearing?
14       MR. BERNSTEIN: Is Lehman --
15   Mr. Berkenfeld, as I understand it, was a
16   Lehman lawyer.  Is everyone comfortable
17   waiving the privilege?
18       MR. GAFFEY: Mr. Berkenfeld was not
19   acting as a lawyer at that time, so it is
20   not a waiver of privilege.
21       MR. BERNSTEIN: No one is going to
22   assert that this witness is violating the
23   privilege by answering this question.  There
24   are lots of constituents around the table.
25       MR. GAFFEY: I'm not.  I'm not going

Page 58

LOWITT - HIGHLY CONFIDENTIAL

1  to --
2
3        MR. BERNSTEIN: If anyone is going to
4  assert that, they need to assert that now.
5        MR. GAFFEY: I am not going to assert
6  that.
7        MR. HUME: Barclays may assert that
8  Berkenfeld was acting as a lawyer and this
9  is waiving the privilege. At least we
10  reserve the right to reserve that.
11        MR. GAFFEY: I would disagree with
12  that.
13    Q.   Could you answer the question, please.
14    A.   Could you --
15    Q.   Do you recall generally what
16  Berkenfeld told you about the hearing when he
17  spoke to you after the -- over the weekend after
18  the hearing had taken place?
19    A.   I think he was recounting the broad
20  narrative of how it had proceeded without giving
21  very specific details of what had actually
22  transpired. But again my recollection of it is
23  low on sort of detail. I just recall having that
24  conversation with him.
25    Q.   Before our break in one of your

Page 59

LOWITT - HIGHLY CONFIDENTIAL

1
2  answers you mentioned the deal that was
3  approved by the court at the hearing was a
4  different deal than the one that had been reached
5  on the Tuesday. Do you recall that?
6    A.   I do.
7    Q.   How did you learn that the deal that
8  was approved by the court was a different deal
9  than the one that had been reached on Tuesday?
10    A.   Well, there were -- as specific
11  examples, you know, the work that we had done on
12  the Friday to identify additional sources of value
13  for the transaction were clearly elements that
14  were included in the final transaction which were
15  not part of the transaction that was discussed on
16  the Monday and Tuesday.
17    Q.   What were the different sources of
18  value that were identified on the Friday?
19    A.   There was a 15c3 lock-up excess and
20  unencumbered collateral in LBI.
21    Q.   Anything else?
22    A.   I wasn't party to all the elements of
23  what went into the transaction, but I was aware of
24  the work that we did on, you know, those elements.
25  So there may have been others, but certainly I was

Page 60

LOWITT - HIGHLY CONFIDENTIAL

1  aware of those.
2
3    Q.   And what, as best you recall, is the
4  value of those additional elements, dollar value?
5    A.   The dollar value of the unencumbered
6  collateral was in and around $2 billion, and, you
7  know, the 15c3 excess, my understanding of the
8  deal that was reached vis-a-vis the 15c3 excess
9  was around 750 to 800 million dollars.
10    Q.   And why, why was -- why were different
11  sources of values being identified on the Friday
12  to be transferred to Barclays?
13    A.   I mean I was asked to identify
14  potential sources of value by Bart and by Rich. I
15  wasn't part of the discussions of why that was
16  necessary.
17    Q.   By Rich, do you mean Mr. Richie?
18    A.   Rich Richie. I am sorry. Mr. Richie.
19    Q.   What did Mr. Richie say to you about
20  identifying different sources of value?
21    A.   Just that we needed to identify those,
22  we, Lehman, needed to go and identify where there
23  were different sources of value and what those
24  would be.
25    Q.   And do you remember anything else

Page 61

LOWITT - HIGHLY CONFIDENTIAL

1
2  about what Mr. Richie said about identifying
3  additional sources of value?
4    A.   I don't recall additional details of
5  that conversation, no.
6    Q.   Describe the setting in which
7  Mr. Richie told you that Lehman needed to identify
8  additional sources of value. Meeting, phone call?
9    A.   It was a meeting. I had an office on
10  the 31st floor, Rich had an office that he was
11  operating out of on the 31st floor, so we would
12  have -- I can't recall precisely where we met, but
13  we met probably somewhere on the 31st floor.
14    Q.   Was anyone else present when you had
15  this conversation with Mr. Richie?
16    A.   I don't believe anybody else was
17  present.
18    Q.   Did you have the conversation with
19  Mr. Richie before or after you had a conversation
20  with Bart McDade about identifying additional
21  sources of value?
22    A.   I can't be certain, but I believe it
23  was after I spoke with Bart.
24    Q.   So was Bart McDade the first person
25  who discussed with you identifying additional

Page 62

LOWITT - HIGHLY CONFIDENTIAL
1  sources of value?
2
3     A.   I believe that to be the case.
4     Q.   Was anyone else present when you had
5  this conversation with Bart McDade?
6     A.   I don't recall anybody else being
7  present.
8     Q.   As best you remember, what did
9  Mr. McDade say to you about finding additional
10 sources of value?
11    A.   I don't have a specific recollection
12 of the conversation, but I would -- I would expect
13 that he would have asked me where, if anywhere,
14 were there additional sources of value we could
15 include in a new transaction.
16    Q.   Did Mr. McDade give you a target
17 number for additional sources of value?  How much
18 he needed to find?
19    A.   My recollection is between 3 and 4
20 billion dollars.
21    Q.   Did you ask him why you needed to find
22 3 to 4 billion dollars in additional value on that
23 Friday?
24    A.   I don't recall the details of that
25 conversation, so I can't be clear on whether I did

Page 63

LOWITT - HIGHLY CONFIDENTIAL
1  ask him about that or not.
2
3     Q.   Without regard to the specific
4  conversation, Mr. Lowitt, after you had these
5  conversations, you spent a considerable amount of
6  time that day looking for 3 to 4 billion dollars
7  in additional value, correct?
8     A.   That is correct.
9     Q.   Who worked with you in that endeavor
10 to find 3 to 4 billion dollars in additional
11 value?
12    A.   The main person I worked with on that
13 was Paolo Tonucci, and we would have also included
14 Jerry Reilly and probably Alastair Blackwell.
15    Q.   Did you have an understanding as to
16 whether finding an additional 3 to 4 billion
17 dollars in additional value was important to the
18 transaction?
19    A.   I mean at some level, it needed to be
20 important to the transaction or we wouldn't have
21 been asked to find it.
22    Q.   I agree with the inference, but it is
23 a different question.
24        My question is, is -- did you have an
25 understanding at the time as to whether it was

Page 64

LOWITT - HIGHLY CONFIDENTIAL
1  important to the transaction?
2
3        MR. HUME:  Objection, vague and
4  ambiguous.
5     A.   I don't recall how I was thinking
6  about it.  I know that I worked hard on it, you
7  know, on the Friday and into the weekend.  So I
8  would have thought it was important.
9     Q.   Did you express to anyone you were
10 working with in this endeavor to find 3 to 4
11 billion dollars in additional value that it was
12 critical to the deal?
13    A.   I don't recall expressing that to
14 people, but it was obviously, you know, an
15 important exercise, an important element of, you
16 know, the new transaction post the repo.
17    Q.   What was your understanding of why it
18 was an important element of the new transaction
19 post the repo?
20    A.   I don't have specific recollection.  I
21 do know that there was -- it was a pretty
22 tumultuous marketplace, and obviously the
23 discussions between, you know, Barclays and
24 Lehman, Barclays communicated to Lehman that it
25 was important that this additional source of value

Page 65

LOWITT - HIGHLY CONFIDENTIAL
1  was located.
2
3     Q.   Do you know that as a matter of fact
4  or as a matter of inference that Barclays
5  communicated that to Lehman?
6     A.   I know that as a matter of inference.
7  I wasn't party to those discussions.  Thank you
8  for clarifying.
9     Q.   Did anyone tell you that Barclays had
10 communicated that it was important?
11    A.   I don't recall anybody saying that
12 specifically, but as I say, the fact that I was
13 working on it, it was clear to me it was
14 important.
15    Q.   It can fairly be said that the work
16 that you did on Friday into the weekend to find
17 the additional value was a fairly intense
18 activity, correct?  There was a lot of effort
19 being put into this, correct?
20        MR. BERNSTEIN:  Objection, asked and
21 answered.
22    A.   Yeah, we worked hard on Thursday into
23 the weekend.
24    Q.   Were you curious why you needed to
25 find 3 to 4 billion dollars of additional value

Page 66

LOWITT - HIGHLY CONFIDENTIAL

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **for the transaction post the repo?**
3        A.    I mean the transaction had changed.
4    The circumstances in the marketplace were
5    tumultuous. It wasn't a great surprise to me that
6    Barclays was, given the risk they were taking on,
7    looking for additional value.
8        Q.    **Now, while you and these other**
9    **folks -- and Mr. Tonucchi and Mr. Reilly and**
10   **perhaps Mr. Blackwell and perhaps other folks,**
11   **were searching for 3 to 4 billion dollars in**
12   **additional value on that Friday, there was a**
13   **hearing in the afternoon going on down at the**
14   **bankruptcy court, correct?**
15       A.    That's correct.
16       Q.    **And you had no reports from the**
17   **hearing about what was going on? That's what you**
18   **told me, correct?**
19       A.    Yeah, I don't believe I was -- I
20   certainly wasn't getting updates of how things
21   were going in the meeting.
22       Q.    **Did you ever ask anyone if the judge**
23   **had addressed and approved the 15c3 issue?**
24       A.    I do know as a result of an e-mail
25   that I saw as part of my preparation for this

Page 67

1    LOWITT - HIGHLY CONFIDENTIAL
2    deposition that I had asked that of Bart.
3        Q.    **Did you get an answer from Bart?**
4        A.    I don't recall the specific
5    conversation that I had with Bart, but I'm sure I
6    did.
7        Q.    **Why were you asking Bart whether the**
8    **court had approved the 15c3 lock-up point?**
9        A.    We needed to sort of operationalize
10   the movement of collateral, if that was part of
11   the approved transaction, and so my interest was
12   in determining what we needed to do to get
13   ourselves ready to close on the transaction.
14       Q.    **My question is a bit more specific.**
15       A.    It is less than -- 15c3 lock-up would
16   have been something that would have resolved over
17   a period of time as the customer claims were being
18   addressed. It was really around the unencumbered
19   collateral that we would have needed to
20   operationalize ourselves.
21       Q.    **The 15c3 lock-up piece, let me be sure**
22   **I understand what you just said. As I understand**
23   **it, the reason it takes place over a period of**
24   **time is as trades settle and customer activity**
25   **takes place, you are able to realize how much is**

Page 68

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **surplus in 15c3, correct?**
3        A.    I don't know if it's so much trade
4    settling, but 15c3 lock-up is sort of a regulatory
5    requirement which establishes a set of rules
6    which, based on customer assets and how they are
7    custodied, determines an amount of excess that you
8    need to hold against that.
9            And it is only in sort of the unwind
10   of all of those customer positions that you can
11   determine whether there is excess as calculated
12   per the formula or whether the actual excess is a
13   different number.
14       Q.    **When you asked Bart whether the court**
15   **had approved this 15c3 component, did you think**
16   **the court needed to approve it before you could**
17   **operationalize transferring that to Barclays?**
18       A.    If -- if those elements were not part
19   of a deal, then obviously there was no requirement
20   to operationalize those.
21       Q.    **Was it your understanding that the**
22   **court needed to approve it for it to be part of**
23   **the deal?**
24       MR. HUME: Objection, lacks
25   foundation. Calls for a legal conclusion.

Page 69

1    LOWITT - HIGHLY CONFIDENTIAL
2        A.    All I wanted to know was whether we
3    needed to get ourselves set up on the Monday to
4    begin moving assets.
5        Q.    **So I guess my question is, why didn't**
6    **you ask Mr. McDade, should I send it, should I**
7    **operationalize it, as opposed to did the court**
8    **approve it?**
9        A.    I did understand that the court needed
10   to approve the transaction, and if the court had,
11   you know, not approved the transaction, then -- or
12   not approved elements of the transaction, then
13   there would have been no requirement to
14   operationalize it.
15       Q.    **And you were asking Mr. McDade in that**
16   **e-mail about whether the court had approved the**
17   **15c3 component specifically, correct?**
18       MR. HUME: Objection, lacks
19   foundation.
20       MR. BERNSTEIN: Why don't we show him
21   the e-mail.
22       MR. GAFFEY: I want to get his
23   independent recollection first before it is
24   refreshed.
25       MR. BERNSTEIN: If you want to ask him

Page 70

LOWITT - HIGHLY CONFIDENTIAL

1        LOWITT - HIGHLY CONFIDENTIAL
2  specifically what he did in the e-mail, show
3  him the e-mail.
4      **Q.   I think you can answer my question.**
5      A.   Which is your question?
6      MR. BERNSTEIN:  You have the right if
7  you're being asked about what a specific
8  document says to see the document.
9      THE WITNESS:  OK.
10     MR. GAFFEY:  I'm not sure that's so.
11 But let's not have that fight.
12     **Q.   Let me ask you this.  Did you review**
13 **documents to prepare for your testimony today?**
14     A.   I did.
15     MR. BERNSTEIN:  You can answer yes or
16 no.
17     A.   Yes.
18     **Q.   And can you tell me whether any of the**
19 **documents that you reviewed had the effect of**
20 **refreshing your recollection about the events I am**
21 **asking you about?**
22     MR. BERNSTEIN:  You can answer that
23 yes or no.
24     A.   I am struggling with it because I'm
25 not quite sure what -- of my ability to sort of

Page 71

1        LOWITT - HIGHLY CONFIDENTIAL
2  separate out if something refreshed it or not.  In
3  some cases it probably did.
4      **Q.   Can you tell me which documents had**
5  **that effect of refreshing your recollection of**
6  **events?**
7      A.   I can't.
8      **Q.   Do you know when the agreement was**
9  **made -- do you know, sir, if the agreement with**
10 **Barclays was changed or amended to include the**
11 **unencumbered collateral -- unencumbered collateral**
12 **and the 15c3 lock-up?**
13     MR. HUME:  Objection, vague and
14 ambiguous and calls for a legal conclusion.
15     MR. BERNSTEIN:  I would add no
16 foundation.
17     A.   I wasn't party to the negotiation of
18 the deal, the writing of the contracts or what was
19 presented to the court, so I'm not in a position
20 to respond to that.
21     **Q.   Did you know at the time -- well,**
22 **withdrawn.**
23     **Do you know now whether the court was**
24 **told about the 15c3 lock-up and the unencumbered**
25 **collateral?**

Page 72

1      **LOWITT - HIGHLY CONFIDENTIAL**
2      MR. BERNSTEIN:  You are asking him
3  whether he knows from sources other than
4  discussions with counsel what the court was
5  told?
6      **Q.   Other than discussions with the**
7  **counsel representing you here today.**
8      A.   I do not.
9      **Q.   Do you know if the $5 billion**
10 **difference between the amount at which assets were**
11 **carried on Lehman's books and the amount Barclays**
12 **agreed to pay, back on Tuesday, was disclosed to**
13 **the court?**
14     MR. BERNSTEIN:  Again you are asking
15 for his knowledge other than his discussions
16 with counsel?
17     MR. GAFFEY:  Counsel representing him
18 here today.
19     MR. BERNSTEIN:  Counsel representing
20 him, period.
21     MR. GAFFEY:  No, counsel representing
22 him here today.
23     MR. BERNSTEIN:  My instruction is
24 counsel representing him, period.  We all
25 have associates, et cetera.

Page 73

1        LOWITT - HIGHLY CONFIDENTIAL
2      MR. GAFFEY:  OK, Willkie Farr or Boies
3  Schiller, I will take all of them.
4      MR. BERNSTEIN:  Whoever his counsel
5  is.
6      MR. HUME:  Or representing Barclays.
7      MR. GAFFEY:  Fine.
8      A.   Can you repeat the question.
9      **Q.   Apart from talking to your own lawyers**
10 **or lawyers from Barclays, do you know if the**
11 **$5 billion difference between the amount at which**
12 **assets were carried on Lehman's books and the**
13 **amount Barclays agreed to pay, back on Tuesday,**
14 **was disclosed to the court?**
15     A.   I don't know what was disclosed to the
16 court, but I also would say that the transaction
17 that was presented to the court was not the
18 transaction that was the one that was agreed to on
19 the Tuesday.  It mutated, it was different as a
20 result of sort of the repo and other factors.
21     **Q.   Did the deal mutate over the weekend**
22 **of the 21st -- of the 20th and 21st?**
23     A.   Again, I'm not really in a position to
24 say what happened because I'm not -- I don't know
25 what was really agreed to on the Friday and what

Page 74

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2  was presented to the court.
3    Q.  Do you know -- whether you know the
4  specific means in which it did, do you know
5  whether the deal mutated over the weekend of the
6  20th and 21st?
7    MR. BERNSTEIN:  Objection, asked and
8  answered.
9    MR. HUME:  Same objection, lacks
10  foundation.
11    A.  Again, I just repeat the previous
12  answer, which was I didn't know what exactly went
13  into the deal on the Friday that was presented to
14  the court, so I'm not in a position to say whether
15  things changed.  I wasn't party to the discussions
16  even over the weekend around what would have or
17  might have changed.
18    Q.  Did you ever get an understanding of
19  the components of the deal as it actually closed
20  on the 22nd?
21    A.  The 22nd is the --
22    Q.  Is the Monday.
23    A.  Is the Monday?
24    MR. HUME:  Excluding conversations
25  with counsel.

Page 75

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    A.  Well, I knew that there was a fairly
3  detailed schedule which identified unencumbered
4  collateral that was, you know, reviewed by the
5  creditors' committee and was -- again I assumed,
6  not that I knew, included what -- the deal that
7  was agreed to with Barclays.
8    Q.  When you refer there to unencumbered
9  collateral, are you talking about the unencumbered
10  collateral you were looking for on Friday?
11    A.  Correct.
12    Q.  My question is a little broader.  Did
13  you ever have an understanding of the overall
14  terms of the deal that closed on Monday?  What did
15  Barclays get, what did Barclays pay?
16    MR. HUME:  Again objection to the
17  extent it calls for anything you learned
18  from Barclays' lawyers or your own lawyers,
19  I am instructing you on behalf of the
20  company not to answer.  Preserve the
21  attorney/client privilege.
22    MR. GAFFEY:  I -- hold that thought.
23  Let's see if we can save everybody some
24  speechifying.  That will be a standing
25  instruction to the witness.

Page 76

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2  I never want you to disclose to me,
3  unless I specifically ask you for it,
4  anything that was disclosed to you by your
5  counsel from Willkie Farr or counsel
6  representing Barclays.
7    Would that solve the problem so we
8  don't have to solve it every time?
9    MR. BERNSTEIN:  It doesn't solve his
10  problem.  It has to be counsel, period.
11    MR. HUME:  First of all, what about
12  in-house Barclays counsel?  We are entitled
13  to object and to instruct the witness.
14    MR. GAFFEY:  It will take longer.
15  That's fine.  I have all day.
16    Q.  Do you have the question in mind?
17    A.  Can you repeat it for me, please.
18    (Record read)
19    MR. BERNSTEIN:  Again, you can answer
20  the question except with reference to
21  information you have obtained from either
22  Barclays' counsel or your counsel.
23    THE WITNESS:  No, I understand.
24    A.  I had a sense of many but probably not
25  all of the elements of the transaction.

Page 77

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.  Describe for me what your sense was,
3  what your understanding was.
4    A.  So my sense was that it included the
5  unencumbered collateral, it included the 15c3
6  lock-up excess or a component of 15c3 lock-up
7  excess, that it involved the cancellation of the
8  repo, it involved making offers to -- of
9  employment to legacy Lehman employees of LBI.  It
10  included the exchange -- the exchange derivative
11  business and all the business -- the majority of
12  the businesses of LBI.
13    But again, the details of what was in
14  and what was out, there were details there that I
15  would not have been aware of.
16    Q.  Do you know if in connection with the
17  inclusion of the exchange derivative business any
18  cash was transferred to Barclays?
19    A.  Not aware.
20    Q.  So the unencumbered collateral, if I
21  have your testimony correctly, was approximately
22  2 billion?
23    A.  That's my recollection.
24    Q.  And the 15c3 was approximately
25  1 billion, correct?

Page 78

**LOWITT - HIGHLY CONFIDENTIAL**

1
2      A.   I think my recollection was between
3   750 and 800 million dollars.
4      **Q.   And the collateral on the repo was**
5   **approximately 50 billion, correct?**
6          MR. HUME: Objection, lacks
7   foundation, vague and ambiguous.
8      A.   I believe it was in and around
9   $50 billion of collateral.
10     **Q.   So at least by my amateur math, my**
11  **understanding, as I am adding it up, sir, tell me**
12  **if I'm correct, your understanding is that**
13  **Barclays got about $52.8 billion in value?**
14         MR. BERNSTEIN: Objection,
15  mischaracterizes his testimony.
16     A.   There was individual components of the
17  deal. I don't think you could adequately -- you
18  can correctly stand them up as you have just done
19  that. And you are just mixing different concepts
20  together.
21     **Q.   Why don't you tell me what you think**
22  **Barclays -- let me ask you this. In your**
23  **understanding, was the deal structured in a way**
24  **that Barclays would have an immediate gain on**
25  **acquisition?**

Page 79

**LOWITT - HIGHLY CONFIDENTIAL**

1
2      A.   I didn't know how Barclays was going
3   to account for the transaction, but it wouldn't
4   have surprised me that Barclays was going to get
5   some equity out of the transaction, given the
6   risks that they were taking on.
7      **Q.   Describe what you mean by that, given**
8   **the risks that they were taking on? Why would it**
9   **not surprise you given the risks that they were**
10  **taking on?**
11     A.   I think they were taking on at least
12  two risks. One was that as they looked to sell
13  off the collateral on the repo trade, that they
14  couldn't sell it out for -- you know, within the
15  amount of the financing haircut.
16         And then the second risk is obviously,
17  you know, any integration has a fair amount of
18  risk, and they were going to employ, you know, a
19  large number of Lehman people, and it was possible
20  that they wouldn't have been successful in
21  integrating all of those people and that the costs
22  of those folks would have been more than they were
23  generating in revenue.
24     **Q.   And at the time that the deal closed,**
25  **again around the Monday, September 22nd, did you**

Page 80

**LOWITT - HIGHLY CONFIDENTIAL**

1
2   **have an understanding or a view as to whether**
3   **Barclays would enjoy immediate gain on the**
4   **acquisition?**
5      A.   I had no sense of it.
6      **Q.   Mr. Lowitt, showing you what was**
7   **marked at a prior deposition as Exhibit 19. Have**
8   **you seen that document before?**
9      A.   I have.
10     **Q.   What do you recognize the document to**
11  **be?**
12     A.   Monday night, Tuesday morning, we were
13  tracking elements of the transaction and in
14  particular the sort of net assets, the specific
15  liabilities that we from a Lehman perspective
16  understood that Barclays would be assuming in the
17  transaction as it was conceived on the Monday and
18  Tuesday period.
19     **Q.   Did you play any role in the drafting**
20  **of the document we have marked as Exhibit 19?**
21     A.   I mean I can't recall precisely my
22  role in this particular version, but I was
23  certainly involved in the iterative work product
24  that led up to this particular piece of paper.
25     **Q.   By iterative work product, are you**

Page 81

**LOWITT - HIGHLY CONFIDENTIAL**

1
2   **talking about prior drafts of this -- withdrawn.**
3       **What do you mean by iterative work**
4   **product?**
5      A.   I believe there were earlier drafts of
6   this as our understanding of what was going to
7   constitute the transaction as we were getting a
8   better sense of it through the morning of Tuesday.
9      **Q.   Now, on the asset side of this --**
10  **withdrawn.**
11      **On the asset side of this financial**
12  **schedule, sir, there are descriptions of various**
13  **asset classes. Do you see that? Government**
14  **agency, commercial paper, et cetera?**
15     A.   I do see that.
16     **Q.   Are the amounts attributed to each of**
17  **those asset classes -- withdrawn.**
18      **Were the amounts attributed to each of**
19  **those asset classes the values shown on Lehman's**
20  **books for each of those asset classes?**
21     A.   My understanding of what was reflected
22  in these asset values would be the amount that
23  Barclays would be paying for assets in those asset
24  categories.
25     **Q.   So that roughly $5 billion number that**

Page 82

**LOWITT - HIGHLY CONFIDENTIAL**

1  we talked about before is recognized in this
2  document, Exhibit 19, correct?
3      MR. BERNSTEIN: Objection, vague and
4      ambiguous.
5      A.  It is not recognized in this, in the
6  sense that these -- these asset numbers are post
7  that -- reflect what Barclays were willing to pay
8  for $72 billion worth, $72.65 billion worth of
9  assets, which was less for reasons that we talked
10 about earlier than the amount they were on
11 Lehman's books for, and the amount less is
12 probably the 5 billion that you referenced.
13     Q.  Now, you told me a moment ago, sir,
14 there were various drafts of iterative work
15 product that led to this final. Do you recall how
16 many different drafts of it were before this
17 document was a result?
18     A.  I don't recall how many, but there
19 were many, and that's -- just for clarification,
20 you know, I'm not aware of why this is marked
21 final, but there were a number of, you know, sort
22 of iterations that led to whatever the final
23 version of this thing was.
24     Q.  And when were these iterations being

Page 83

**LOWITT - HIGHLY CONFIDENTIAL**

1  generated?  Is this during Tuesday, the 16th?
2      A.  It would have started -- I can't say
3  when it would have started, but it certainly would
4  have continued through the morning of Tuesday.
5      Q.  May have started as early as --
6      A.  Monday evening.
7      Q.  Monday evening.  OK.
8          And who, if you know, was actually
9  generating the document?
10     A.  Again, my recollection is that it was
11 one of the Weil lawyers who had the spreadsheets
12 on his computer, but I don't know the name of that
13 person.
14     Q.  Do you -- can you describe that
15 person?
16     A.  A reasonably young man, but I'm afraid
17 I can't be more specific than that.
18     Q.  That would qualify every man in the
19 room, sir.  Can you give a more detailed
20 description?
21         MR. BERNSTEIN:  I just want to correct
22     that.  It wouldn't describe everyone in the
23     courtroom.
24     Q.  With the possible exception of Neil

Page 84

**LOWITT - HIGHLY CONFIDENTIAL**

1  Oxford, it would be everyone in the room.
2          Do you have a more detailed
3  description that you can give me, sir, than
4  fungible young associate at Weil Gotshal?
5      A.  I'm afraid I can't.
6      Q.  Did he have it on a laptop?  Did he
7  have it on a computer, a PC?
8      A.  I believe it was on a laptop that he
9  had rather than a standing PC, just because he was
10 in one of the dining rooms on the 32nd floor, so
11 there aren't standing computers there.  But that's
12 based on my assumption rather than a specific
13 recollection of whether it was a laptop or a
14 computer.
15     Q.  How do you know he worked for Weil
16 Gotshal?
17     A.  I can't be specific about how I knew.
18 He wasn't somebody who was, you know, at Lehman,
19 and he wasn't somebody at Barclays, but -- and my
20 recollection is he was at Weil, but I
21 unfortunately can't be more clear about how I knew
22 he was at Weil.
23     Q.  Is it anything other than process of
24 elimination that makes you think that he worked

Page 85

**LOWITT - HIGHLY CONFIDENTIAL**

1  for Weil?
2      A.  I have a recollection that he worked
3  for Weil. I can't be more specific as to why I
4  have that recollection.
5      Q.  Is it possible he was a Lehman intern?
6      A.  It's possible.
7      Q.  Were there Lehman interns in and
8  around the premises when this work was being done?
9          MR. BERNSTEIN:  Were you finished with
10     your answer, your prior answer?
11     Q.  I am sorry.  If I interrupted, I
12 apologize.  Is there any --
13     A.  Again, it is not because of
14 recollection, but I would have been very surprised
15 if we would have seen a Lehman intern for
16 this. Again, given that I can't be more precise
17 about who it was, things are possible, but it
18 would surprise me if that was the case.
19     Q.  Were there any junior-level Lehman
20 personnel in and around the premises when this
21 work was being done?
22     A.  Again, I couldn't say with complete
23 certainty, but I would be surprised if there were.
24     Q.  Did you know everybody who was in and

Page 86

LOWITT - HIGHLY CONFIDENTIAL

1
2 around the premises when this work was being done?
3     A.   I obviously didn't know everybody who
4 was involved.
5     Q.   And had you met this young man at any
6 time prior to seeing him when this work was being
7 done?
8     A.   I don't recall meeting him prior to
9 that.
10     Q.   I am going to put before you what has
11 been marked at a previous deposition as
12 Exhibit 200. Mr. Lowitt, I will ask you what I
13 asked you with respect to other documents. Would
14 you take a look through that document sufficiently
15 to tell me whether you have seen it before.
16     A.   I certainly saw it as part of my -- I
17 have seen it before.
18     Q.   Let me ask you this. Have you seen it
19 before, apart from your preparation for the
20 deposition?
21     A.   I don't recall seeing it before that.
22 It is just an interim work product, and when I
23 recall seeing it is as part of my preparation for
24 this deposition.
25     Q.   Is that your handwriting on the

Page 87

LOWITT - HIGHLY CONFIDENTIAL

1
2 document?
3     A.   Part of this looks like my
4 handwriting.
5     Q.   Does that include the part that says
6 "mark down," down below the asset line?
7     A.   I can't be certain of that, but it may
8 well be.
9     Q.   Why do you say it may well be?
10 Because it looks like your handwriting to you?
11     A.   It looks like it could be my
12 handwriting.
13     Q.   And there are other annotations on the
14 document by hand. Do you recognize any of them as
15 your handwriting, the various numbers written on
16 the page?
17     A.   The numbers on the right side of the
18 adjust column look like my handwriting. The ones
19 to the left actually don't.
20     Q.   When you say the adjust column, you
21 are talking about the adjustment column both for
22 assets and liabilities? There are two adjustment
23 columns.
24     A.   To the right of both of those columns.
25     Q.   Under the word "asset," where it says

Page 88

LOWITT - HIGHLY CONFIDENTIAL

1
2 40.31 and 8.4, that may not be your handwriting;
3 is that right?
4     A.   That is correct.
5     Q.   Do you have any idea whose handwriting
6 that is?
7     A.   I do not.
8     Q.   Do you recall making handwritten
9 notations on the financial schedule as part of
10 this iterative work?
11     A.   I do.
12     Q.   Why are you doing that?
13     A.   We are really trying to keep track of
14 what are the assets that Barclays is willing to
15 purchase and at what price they would be willing
16 to purchase it at that reflects a difference
17 between our book value and what they would be
18 willing to purchase at to reflect the size of the
19 purchase and the market conditions.
20     Q.   Take a look, if you would, sir, at the
21 handwritten entries along the line for government
22 and agencies on the asset side. Do you see that?
23     A.   Yes.
24     Q.   Is that a 42 or a 41 in your
25 handwriting next to the adjustment column?

Page 89

LOWITT - HIGHLY CONFIDENTIAL

1
2     A.   It looks like 41 to me.
3     Q.   Do you recall a point where Barclays
4 offered 41 for government and agencies? I'm
5 wondering why that number is higher than the
6 number shown on the schedule.
7     A.   I can't say. We may have found that
8 the amount of governments and agencies was
9 actually more than was on the schedule rather than
10 a markup of any position.
11     Q.   I asked you earlier before about --
12 that sort of vague question I put about the
13 difference between the bottoms-up review and the
14 top-down look. This sort of -- the question I am
15 about to ask you relates to that.
16         Are the calculations being done on
17 this schedule and whatever other calculations were
18 done like that that day, are they meant to achieve
19 the raw total number or are they meant to develop
20 the components, add them up and see what the raw
21 number will be?
22     A.   I think it is supposed to cover both,
23 which is supposed to say bottoms up, what does it
24 look like, and then top down, what would we need
25 to do to achieve the overall goal.

Page 90

LOWITT - HIGHLY CONFIDENTIAL

1      LOWITT - HIGHLY CONFIDENTIAL
2    Q.   And the overall goal is the price that
3  Barclays will pay and the difference between that
4  and the value shown on Lehman's books, yes?
5    A.   The difference between what Barclays
6  are willing to pay versus the amount that's on
7  Lehman's books which reflects, you know, the
8  market price of those securities.
9    Q.   When that agreement ultimately was
10  made, whatever that difference was between the
11  amount shown on the books and the amount Barclays
12  would pay, was it expressed as a percentage of the
13  amount shown on the books?
14    A.   My recollection is that it was a
15  dollar amount, not a percentage.
16    MR. GAFFEY: I need to take about ten
17  minutes. Can we do that now? Is that
18  convenient?
19    MR. BERNSTEIN: Sure.
20    (Recess)
21  BY MR. GAFFEY:
22    Q.   Exhibit 200, sir, is before you. We
23  were talking before the break about some of your
24  annotations down the right-hand side of each of
25  the adjustment columns.

Page 91

1      LOWITT - HIGHLY CONFIDENTIAL
2    I direct your attention now to the
3  words "mark down" at the bottom. Do you have any
4  information, sir, as to why you wrote the words
5  "mark down" on this document? Why you would have
6  written the words "mark down" on this document?
7    A.   I really don't have any recollection
8  of why that would be the case. We were in this
9  exercise both identifying which assets Barclays
10  would be purchasing and the price they were
11  comfortable paying, and that represented a -- you
12  know, obviously a lower price than they were on
13  the books for.
14    So it is possible that it has to do
15  with that, but I don't recall writing this down
16  specifically. So that would just be an
17  interpretation of what I am seeing on the page.
18    Q.   Without regard to that particular
19  document, sir, in this process where the
20  determination is being made as to the amount that
21  this schedule finally will reflect when it is
22  done, do you know if there is any back and forth
23  between Lehman and Barclays as to the price?
24    A.   I mean I know there is back and forth
25  between Lehman and Barclays vis-a-vis what assets

Page 92

1      LOWITT - HIGHLY CONFIDENTIAL
2  are going to be included. So I recall, for
3  example, that a set of the mortgage assets were
4  ones that Barclays said they weren't in a position
5  to determine value so they would -- they would not
6  include those.
7    And I know that there was ---if you
8  are asking me do I know precisely the nature of
9  that back and forth, I don't.
10    Q.   I'll follow up on the -- the inclusion
11  of assets point that you just told me about. My
12  question goes more toward the number, the number
13  that's finally agreed.
14    Is there a negotiation of that number,
15  Barclays wants it to be a zillion dollars and
16  Lehman wants it to be one, and they negotiate it?
17  Do you know anything about the process that led to
18  it being that number as opposed to any other
19  number?
20    A.   Again, I wasn't in the room where the
21  negotiations were taking place, but what -- you
22  know, what I was seeing was, you know, information
23  that was coming in from the various businesses
24  that indicated how much less Barclays would pay
25  for certain assets than it was on the books of

Page 93

1      LOWITT - HIGHLY CONFIDENTIAL
2  Lehman for, and that the combination of those
3  things I think were being tracked and became part
4  of the back and forth of the negotiation.
5    But I again wasn't party to those
6  discussions, so I don't know how that was
7  proceeding. But my sense was it was an iterative
8  process between the parties.
9    Q.   Do you have any -- not with respect to
10  the particular document we have marked as
11  Exhibit 200, but if you can use that to refresh
12  your recollection, fine.
13    Do you have any recollection of where
14  you sit in the process? You're writing down
15  numbers on a financial statement. What are you
16  keeping track of here?
17    A.   I don't have a specific recollection,
18  but I would imagine that what I was keeping track
19  of was a combination of which assets Barclays
20  would have or would not be purchasing because they
21  were in a position to say what price they would be
22  willing to purchase it for, so that was part of
23  the screening exercise that we talked about
24  earlier that Barclays was engaging with its
25  counterparts at Lehman about.

Page 94

1       LOWITT - HIGHLY CONFIDENTIAL
2       And then the difference between what
3   the assets were on Lehman's books for and as a
4   result of the bulk purchase and the volatility of
5   the marketplace, what Barclays would be willing to
6   pay for it.
7       Q.   Was it your understanding of the
8   transaction -- did you have an understanding that
9   after the transaction, Barclays planned to sell
10  these assets off in bulk?
11      MR. HUME: Objection, lacks
12      foundation.
13      A.   I had no idea what Barclays were
14  planning to do.
15      Q.   You knew you were going to go work at
16  Barclays. You knew they were taking what
17  businesses they were taking. Did you have an
18  understanding that what Barclays was planning to
19  do was operate the business as Lehman had?
20      MR. BERNSTEIN: Objection, compound,
21      mischaracterizes his testimony.
22      You may answer.
23      A.   Well, it seems like there were a
24  couple of things you were saying. I didn't know I
25  was going to work at Barclays because I didn't

Page 95

1       LOWITT - HIGHLY CONFIDENTIAL
2   know that the deal was going to be completed. I
3   would -- I had had no discussions with Barclays
4   vis-a-vis how they were going to operate these
5   various businesses. So I am not in a position to
6   say whether they were anticipating selling off
7   these assets or not.
8       You know, what I would have known was
9   that if Barclays were going to maintain these on
10  their balance sheet, then they needed sort of
11  equity to support those assets and they needed
12  room within their leverage ratios, and I wouldn't
13  have known if they had an ability to absorb that
14  or not.
15      Q.   Can you go back to Exhibit 19. That's
16  the one without the handwritten notes.
17      Now, Exhibit 19 shows on the liability
18  side entries for cure payment and comp on the
19  lower right-hand side. Do you see that?
20      A.   I do.
21      Q.   And cure payment is put at
22  2.25 billion, and comp is put at 2 billion. Do
23  you see that?
24      A.   Yes. There isn't the dot on my copy,
25  but yes, 2.25 and 2 billion.

Page 96

1       LOWITT - HIGHLY CONFIDENTIAL
2       Q.   Do you know the basis upon which those
3   numbers were calculated?
4       MR. BERNSTEIN: Objection, compound.
5       A.   When you say the basis under which
6   they were calculated, I mean those were numbers
7   that -- the $2 billion of comp I think was a
8   negotiated number between the parties.
9       The cure payment number was one that I
10  recall Martin Kelly was working on and that, you
11  know, it represented the best estimate that we had
12  of the -- those payables that would be assumed by
13  Barclays.
14      Q.   And was it, to your understanding, a
15  component of the transaction that the difference
16  between the amount Barclays would pay for the
17  assets and the amount for which -- and the
18  amount -- the value of those assets shown on
19  Lehman's books needed to exceed the amount of
20  liabilities assumed for cure and comp?
21      MR. HUME: Objection, lacks
22      foundation.
23      A.   I wasn't party to the discussions that
24  were occurring between sort of Lehman and Barclays
25  with regard to that. Again, you know, we spent a

Page 97

1       LOWITT - HIGHLY CONFIDENTIAL
2   lot of time on this, the difference between the
3   amount that things were on Lehman's books for and
4   the amount that Barclays were going to pay for,
5   for those assets. How they viewed their ability
6   to capture that difference, I just have no basis
7   to assess.
8       Q.   My question goes to something slightly
9   different, not Barclays' state of mind. It is
10  more toward did you hear any conversation, see any
11  documents, learn any facts at the time this
12  schedule was being prepared about that issue,
13  about whether the 5 billion was to cover the cost
14  of the assumed liabilities?
15      A.   I don't recall knowing anything
16  specific to that, and again, that would have been
17  something that would have been discussed between
18  Lehman and Barclays.
19      Q.   Did you ever have a discussion with
20  Mr. Kelly concerning whether the 5 billion was
21  needed to cover Barclays' expenses?
22      A.   I don't recall a conversation with
23  Martin about that.
24      (Exhibit 217, document Bates stamped
25  BCI-EX00115595 through 654 marked for

Page 98

1          LOWITT - HIGHLY CONFIDENTIAL
2     identification, as of this date.)
3          Q.   Mr. Lowitt, I have put before you what
4     we have marked as Exhibit 217, a document,
5     multipage document bearing Bates number
6     BCI-EX00115595 through 115654.
7          I will ask you if you have any
8     recollection of seeing this document before.
9          A.   I don't recall this document.
10         Q.   I will represent to you, sir, that
11    this exhibit is put together in the manner in
12    which it was produced to us by Barclays.  In other
13    words, the metadata put all of these pages
14    together.
15         Can you see any reason why the
16    schedule that is the first page of the document
17    would have been combined with the triparty
18    collateral analysis that's attached to it?
19         MR. BERNSTEIN:  Objection, no
20    foundation.
21         MR. HUME:  When you say, when you say
22    the metadata -- you said the metadata put
23    the pages together.  I don't know what you
24    mean.
25         MR. GAFFEY:  It appears from Barclays'

Page 99

1          LOWITT - HIGHLY CONFIDENTIAL
2     production that this is produced as a
3     singular document.
4          MR. HUME:  Was it attached to an
5     e-mail?  This whole production came from an
6     e-mail?
7          MR. GAFFEY:  No.
8          MR. HUME:  It was not attached to an
9     e-mail?
10         MR. GAFFEY:  Not the way it was
11    produced.  It could well be a clerical
12    issue, but I need to ask him about it.
13         MR. BERNSTEIN:  Can I ask a question?
14    Who put the Bates numbers on this?
15         MR. GAFFEY:  Barclays.
16         A.   But I think I know what at least
17    elements of this are.  These are materials that as
18    I was preparing for the deposition, as I looked
19    through --
20         MR. HUME:  Can anyone give me a copy?
21    I don't have a copy.
22         Q.   Go ahead.
23         A.   I was asked the question whether I had
24    any materials that were associated with the period
25    post the bankruptcy, and the first and second

Page 100

1          LOWITT - HIGHLY CONFIDENTIAL
2     schedules I believe were materials that I made
3     available through my lawyers to Barclays.  The
4     subsequent materials, I'm not aware of what those
5     would be.
6          Q.   Let me see if I can get a slightly
7     clearer record on it.  The first page is what you
8     are referring to as the first schedule?
9          A.   Yes.
10         Q.   The second page entitled "Triparty
11    Collateral Analysis" is the second.
12         A.   Yes.
13         Q.   But after that, you haven't seen the
14    document before?
15         A.   I don't have a specific recollection
16    of that, but it is possible that this -- I mean I
17    would just be speculating what the long document
18    is.
19         Q.   I don't want you to do that.
20         You have seen the first page marked
21    115595, yes?
22         A.   Yes.
23         Q.   You have seen that before?
24         A.   This page.
25         Q.   Right.

Page 101

1          LOWITT - HIGHLY CONFIDENTIAL
2          A.   Yes.
3          Q.   And you have seen the second page
4     bearing the number in the lower right-hand corner
5     115596?
6          A.   Correct.
7          Q.   And you don't know if you have seen
8     the pages 115597 through the end of the document?
9          A.   Correct.
10         Q.   What's the second page, marked 115596?
11         A.   I believe that this is the collateral
12    that was with the Fed that was part -- that was --
13    as there was the necessity to unwind the Fed repo,
14    this was the collateral that was returned to
15    Lehman from the Fed.
16         Q.   Can you tell me what it means when it
17    describes collateral value after margin reduction?
18         A.   This is a schedule from the Fed.  It
19    says, "Customer Lehman Brothers," top left.
20         Q.   Well, in the column where it says
21    "effective margin," do you understand that to be
22    describing the haircut in some fashion?
23         MR. BERNSTEIN:  No foundation.
24    Objection, no foundation.
25         A.   It is not my schedule, so I don't

Page 102

1      LOWITT - HIGHLY CONFIDENTIAL
2    know.
3      Q.   OK.  All right, that's fine.  Let's
4    put the document aside.
5        I want to go back to the conversation
6    you told me about a while ago that you had with
7    Mr. Richie on the morning of Friday, September 19,
8    about looking for additional sources of value.
9      A.   Right.
10     Q.   Did Mr. Richie say to you in sum or
11   substance that it was critical to the deal closing
12   to find those additional sources of value?
13     A.   I don't recall Rich saying it was
14   critical to the deal closing.  But clearly it was
15   important as an input into the discussions that
16   were taking place between Barclays and Lehman.
17     Q.   The conversation that you had with
18   Mr. McDade, the first conversation that you had
19   about -- as between the one with Mr. Richie, that
20   you had about finding additional sources of
21   collateral, was that in the early morning of
22   Friday?
23     A.   My recollection is somewhat hazy, but
24   I believe it was early on Friday morning.
25     Q.   Was there a meeting with Mr. McDade

Page 103

1      LOWITT - HIGHLY CONFIDENTIAL
2    early on Friday morning that you attended along
3    with others?
4      A.   I have no recollection of that
5    meeting, but I believe it is possible that it took
6    place.  I think Thursday night was also an
7    all-nighter.
8      Q.   It sounds like most of the week was
9    all-nighters.
10       Was there a sense of urgency in
11   finding the additional sources of value?
12       MR. BERNSTEIN:  Objection, asked and
13   answered.
14     A.   It was obviously important for us to
15   do that.
16     Q.   When you spoke to Mr. Richie after you
17   spoke to Mr. McDade, did Mr. Richie relay to you
18   any conversations he had had with McDade about
19   this issue?
20     A.   No.  I don't believe he did.
21     Q.   Did you refer to your earlier
22   conversation with Mr. McDade about the issue when
23   you spoke to Mr. Richie?
24     A.   I don't have a recollection of the
25   details of, you know, my conversation with

Page 104

1      LOWITT - HIGHLY CONFIDENTIAL
2    Mr. Richie other than that it was -- other than we
3    needed to look to identify sources of additional
4    value.
5      Q.   Did you speak or otherwise communicate
6    with Mr. McDade about the issue after you spoke to
7    Richie?
8      A.   I can't recall any additional
9    conversations with Bart, but the progress that we
10   were making in identifying sources of value is
11   something that I would have been communicating to
12   Bart through the course of the day.
13     Q.   Now, there came a point during the
14   course of the day where Bart went down to the
15   bankruptcy court, correct?
16     A.   On the Friday, yes.
17     Q.   And approximately when during the day
18   was that, morning or afternoon?
19     A.   I don't know exactly when Bart went
20   down, but I would assume it was in the afternoon.
21     Q.   And the hearing went on until the wee
22   hours of the morning on the 20th.  It went past
23   midnight, correct?
24     A.   Don't know with certainty, but if you
25   say that was what happened, I'm sure that's right.

Page 105

1      LOWITT - HIGHLY CONFIDENTIAL
2      Q.   Do you know if Mr. McDade was down
3    there for the entire hearing?
4      A.   Again, I wasn't there so I don't know
5    if Bart was there for the whole time.
6      Q.   Do you know if as part of this project
7    to identify additional sources of collateral, do
8    you know if during the work related to that
9    project anyone sent assets over to Barclays on the
10   Friday?
11       MR. BERNSTEIN:  Objection, vague and
12   ambiguous.
13     A.   I don't have a recollection.
14     Q.   Did it ever come to your attention
15   that that happened, that additional sources of
16   value that were found during the Friday project
17   were sent over to Barclays on the Friday?
18       MR. BERNSTEIN:  Same objection.
19     A.   I don't have a recollection.
20     Q.   Was part of your -- was one of the
21   goals of that work on the Friday to send assets to
22   Barclays on the Friday, Friday, the 19th?
23       MR. BERNSTEIN:  Same objections.
24     A.   I don't have a recollection of that.
25     Q.   Putting before you what was marked at

Page 106

LOWITT - HIGHLY CONFIDENTIAL

1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **a prior deposition as Exhibit 20. Can you take a**
3  **look through the document and tell me whether you**
4  **have seen it before?**
5       MR. BERNSTEIN: Just so the record is
6    clear, when you are showing him documents
7    like this, you mean the part after "unknown"
8    and the 2009 date?
9       MR. GAFFEY: Yes.
10      **Q.   Do you understand what he is referring**
11  **to? Up at the top it says "unknown" and then a**
12  **date. Ignore that. That's imprinted on the**
13  **document by our vendor. Below that is a copy of**
14  **the document I want to ask you about.**
15      A.   Again, only in the preparation for the
16  deposition.
17      **Q.   You note that the document is an**
18  **e-mail addressed to you and Paolo Tonucci from**
19  **Martin Kelly. That's the only e-mail on the**
20  **chain.**
21      A.   I can see that, yes.
22      **Q.   Do you have a recollection of seeing**
23  **this e-mail from Mr. Kelly at or about the time it**
24  **is dated, September 16, 5:10 a.m.?**
25      A.   I don't have a recollection of it

Page 107

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2  specifically.
3       **Q.   Do you have any recollection of**
4  **communicating in any way with Mr. Kelly in the**
5  **early morning hours of September 16 about the deal**
6  **terms?**
7       A.   I don't have a recollection of
8  speaking with Mr. Kelly about anything
9  specifically, but speculatively, I would imagine
10  that I would have spoken with him about what was
11  our understanding of what was emerging.
12      **Q.   And looking at the document in**
13  **preparation for your testimony today, did that**
14  **have any -- did that refresh your recollection in**
15  **any way about communications with Mr. Kelly on the**
16  **early -- in the early morning of September 16?**
17      A.   It did not.
18      **Q.   Does looking at that now refresh your**
19  **recollection?**
20      A.   No, it doesn't refresh the
21  recollection.
22      **Q.   Take a look, if you would, at the next**
23  **e-mail up in the chain, which appears to be from**
24  **you to Martin Kelly, copying Mr. Tonucci. Do you**
25  **see that?**

Page 108

1    **LOWITT - HIGHLY CONFIDENTIAL**
2      A.   Yes.
3       **Q.   And in it, it says, "You are a hero.**
4  **Well done." Do you see that?**
5      A.   Yes.
6       **Q.   Do you have any recollection as to why**
7  **you would respond to Mr. Kelly and describe him as**
8  **a hero?**
9      A.   I think the reason I would imagine
10  that I was doing that, he had worked all night
11  after an extremely tumultuous week around this
12  deal, and that he had -- and it was part of just
13  showing appreciation for that.
14      **Q.   Do you have -- he was one of your**
15  **direct reports, is that right, Martin Kelly?**
16      A.   That is correct.
17      **Q.   Do you have an understanding of -- can**
18  **you describe to me what it was that Martin Kelly**
19  **was doing overnight from Monday to Tuesday? What**
20  **were his tasks?**
21       MR. BERNSTEIN: Objection, no
22    foundation and compound.
23      A.   I know some of the things that Martin
24  was doing. Martin was helping to sort of estimate
25  some of the numbers that were going into the

Page 109

1    LOWITT - HIGHLY CONFIDENTIAL
2  transaction, like the cure payment, and as the
3  financial controller, he was a key participant in
4  determining what some of the items in the
5  transaction were, and is as clear from the e-mail,
6  he had a good sense of what many of the key
7  elements of the transaction included.
8       **Q.   Is that the extent of your**
9  **recollection about that?**
10      A.   That's my recollection of that morning
11  and my interactions with Martin and his role.
12      **Q.   You referred before to some**
13  **mortgage -- some mortgage securities that Barclays**
14  **did not want.**
15      A.   Correct.
16      **Q.   Can you describe them in any more**
17  **detail?**
18      A.   Only that they were sort of
19  residential mortgages. But no, I can't be more
20  specific. But as you see in the e-mail, you know,
21  it talks about $3.6 billion of Resi assets left
22  behind. I believe that's the -- those are the
23  same assets I was referring to before.
24      **Q.   Did you have an understanding in the**
25  **early part of the week, the Monday, Tuesday, that**

1      LOWITT - HIGHLY CONFIDENTIAL
2  the agreement that was reached had 50 percent of
3  the Resis going to Barclays and 50 percent going
4  to Lehman, remaining with Lehman?
5     A.   I don't recall what the percentages
6  were, but there were clearly assets that were
7  staying and assets that were going.
8     Q.   I put before you, Mr. Lowitt, what has
9  been marked at a prior deposition as Exhibit 10.
10  I would ask you to take a look through the
11  document and tell me whether you have a
12  recollection of seeing it before.
13     A.   No, I don't recall seeing this before.
14     Q.   Some of the e-mails reflect on this --
15  well, the e-mail at the top appears to be an
16  e-mail from you to Jerry Reilly and Eric Felder.
17  Do you see that?
18     A.   Yes, I do.
19     Q.   And in that piece of the e-mail chain,
20  it says "that's my understanding, but check with
21  whoever drafted the purchase agreement, Ian," and
22  that's responding to a question about whether
23  certain Resis and auction securities are going to
24  be included, right?
25     A.   That seems to be the sense of the

1     LOWITT - HIGHLY CONFIDENTIAL
2  chain of e-mails.
3     Q.   I want you to get the sense of it
4  because my question goes to your apparent
5  direction to Reilly and Felder to check with
6  whoever drafted the purchase agreement.  Do you
7  know who drafted the purchase agreement?
8     A.   It would be -- I don't know.  I would
9  assume it was lawyers from Weil working together
10  with maybe some lawyers from Lehman.
11     Q.   You are assuming it because that's
12  what -- do you have any factual basis for the
13  assumption or it is an assumption?
14     A.   It's an assumption.
15     Q.   And do you have any knowledge, sir, of
16  what facts were given to whoever drafted the
17  purchase agreement about the business terms that
18  had been agreed?
19     Let me make that question simpler.  Do
20  you know what the drafters were told about the
21  terms of the deal?
22     A.   I do not.
23     Q.   And this e-mail appears to indicate
24  that at least on September 17 at 12:34 p.m., which
25  is the time of the e-mail from you to Reilly and

1      LOWITT - HIGHLY CONFIDENTIAL
2  Felder, you had not seen the purchase agreement;
3  is that correct?
4     MR. BERNSTEIN:  You are asking him if
5    that's what the e-mail indicates or --
6     MR. GAFFEY:  Actually let me ask if it
7    refreshes his recollection as to the first
8    time he saw the asset purchase agreement.
9     A.   I don't believe I had seen the
10  purchase agreement.
11     Q.   Further down in that e-mail chain,
12  there is an e-mail from Eric Felder to a number of
13  people and a cc to a number of people including
14  you.  And Mr. Felder wrote, "I think the Barclays
15  folks picked the assets.  I recall them saying
16  they didn't want the auction securities, but I
17  wasn't in all the meetings."
18     Do you see that?
19     A.   I do.
20     Q.   Was it your understanding that the
21  Barclays folks picked the assets?
22     A.   The Barclays folks determined which
23  assets they were willing to purchase and which
24  assets they didn't want to purchase.  So in that
25  sense, the Barclays folks picked the assets.

1     LOWITT - HIGHLY CONFIDENTIAL
2     Q.   Was it your understanding that
3  Barclays picked the assets it was willing to
4  purchase based on the quality of those assets they
5  were --
6     MR. HUME:  Objection, lacks
7    foundation.
8     A.   I couldn't say why they chose to
9  purchase certain assets and not others.
10     Q.   Let me go back to what may have been
11  expressed to you at the time by others.  That's
12  really what I am asking.  Did anybody express to
13  you that Barclays was picking assets based on the
14  quality of the assets?
15     A.   I have no recollection that that was
16  the basis.  It would have been what they -- how
17  they decided which assets they wanted to purchase
18  would have been driven by their own positions and
19  not wanting to get overconcentrated, as well as,
20  you know, their view of how easy it was to assess
21  what was an appropriate mark on those.
22     Q.   Take a look, if you would, sir, at the
23  second page of the exhibit.  The earliest e-mail
24  in this e-mail chain is from -- I'll probably
25  murder this -- Gilles Aublin to Jerry Reilly, cc

Page 114

1        **LOWITT - HIGHLY CONFIDENTIAL**
2    **Clement Bernard, dated September 17, 11:53 a.m.**
3        **And it is asking in the last line**
4    **whether there are "guidelines to exclude some**
5    **assets that are deemed to be more toxic (for**
6    **example, we have 2.8 billion of ARS, in high grade**
7    **and muni combined)."**
8        **Do you see that?**
9        A.    I do.
10        **Q.    Does that refresh your recollection as**
11    **to whether there were standards or guidelines**
12    **governing assets Barclays had said it would**
13    **purchase as opposed to those it said it would not?**
14        A.    I wasn't aware of any guidelines.  I
15    know there were meetings that took place between
16    managers at Barclays and managers at Lehman so
17    that Barclays could make an assessment about
18    whether they were willing to purchase certain
19    assets, with an understanding that there were some
20    assets in the portfolio that for reasons that made
21    sense to them they chose not to want to purchase.
22        **Q.    Mr. Lowitt, we talked earlier today in**
23    **somewhat broad terms about the repo, and I would**
24    **like to return to that topic and that segment of**
25    **the week, as it were.**

Page 115

1        **LOWITT - HIGHLY CONFIDENTIAL**
2        A.    Sure.
3        **Q.    Give me as best you can a description**
4    **of how it came to be that the repo with Barclays**
5    **was necessary and agreed.  What caused the repo to**
6    **come into being?**
7        A.    I think the context for it was the
8    extreme markets disruption that was being
9    experienced that week, where, as you recall, AIG
10    was -- received assistance on the Tuesday.  There
11    was big increases in credit default swaps of many
12    other firms.
13        The Fed, for reasons of its own,
14    decided that it didn't want to have ongoing
15    exposure to LBI, and although I wasn't party to
16    any of the discussions, you know, communicated to
17    Barclays that they wanted Barclays to take them
18    out of their repo with Lehman Brothers.
19        I was asked to attend the meeting with
20    the Fed, together with people at Barclays, to talk
21    through how that was going to get effected, but it
22    was clear that the Fed was very keen on being
23    taken out of that risk so that they would
24    either -- for reasons that made sense to them.  I
25    can speculate on what those were.

Page 116

1        LOWITT - HIGHLY CONFIDENTIAL
2        As a consequence, on the Thursday,
3    there was a huge effort under way to move the
4    collateral back from -- move -- to move the
5    collateral from JP Morgan, who was the triparty
6    agent for Lehman, to BONY, that was the triparty
7    agent for Barclays, with Chase obviously concerned
8    through this whole process about their own
9    exposures to Lehman Brothers.
10        The effect of this was that through
11    the Thursday, this repo was now effected with
12    Barclays rather than with the Fed, so Barclays
13    needed to come up with, in round numbers, the
14    $45 billion of cash to buy the Fed out of their
15    repo position so the Fed no longer had a claim on
16    that collateral and received the cash for that
17    collateral.
18        That then became a new and very
19    different element, because there was no way that
20    LBI could get out of that repo position.  It
21    couldn't generate $45 billion to give to Barclays
22    to get back its collateral.  The repo was now an
23    imposed element on whatever deal was going to get
24    consummated between LBI and Barclays.
25        **Q.    Now, when the repo was put into**

Page 117

1        **LOWITT - HIGHLY CONFIDENTIAL**
2    **place -- was it put into place on the Thursday,**
3    **the 18th?**
4        A.    That's my recollection, that we met
5    with the Fed on the Wednesday and Thursday, and
6    the Thursday evening was when the repo was unwound
7    with the Fed and a new repo was put in place with
8    Barclays.
9        **Q.    Is it your understanding, sir, as the**
10    **deal ultimately came to be implemented, one**
11    **element of it was that Lehman -- that the repo was**
12    **extinguished, it was terminated?**
13        MR. HUME:  Objection, vague and
14    ambiguous, calls for a legal conclusion.
15        **Q.    Can you answer my question.**
16        A.    Can you repeat the question.
17        (Record read)
18        A.    I mean what was clear to me was that
19    Barclays kept the collateral and LBI kept the
20    cash.  If that's the equivalent of extinguishing
21    the repo, yes, it extinguished the repo.
22        What really was happening, Barclays
23    accepted the collateral that was in the repo trade
24    and they kept that collateral and LBI kept the
25    cash.

Page 118

LOWITT - HIGHLY CONFIDENTIAL

1
2     **Q.   The collateral included the haircut**
3     **over and above the cash amount?**
4         A.   It included the collateral -- the
5     amount of cash was less than the collateral
6     reflecting the standard financing haircuts on
7     those collateral terms, but yes.
8     **Q.   Yes, it kept the difference?**
9         A.   It got the collateral that was part of
10    the repo. They retained that. And they didn't
11    get the cash back from LBI. That cash obviously
12    had gone to the Fed to take the Fed out of its
13    repo position.
14    **Q.   Do you know when during the week it**
15    **was determined that that's how the repo would be**
16    **resolved, that Barclays would keep the collateral**
17    **and Lehman would keep the cash?**
18        A.   It was definitely part of -- I wasn't
19    party to the negotiating sessions, but it was
20    definitely part of the discussions that were
21    occurring on the Friday.
22    **Q.   The discussions between whom and whom**
23    **on the Friday?**
24        A.   Well, we were looking to see how the
25    deal -- within finance, there was an effort to

Page 119

LOWITT - HIGHLY CONFIDENTIAL

1
2     determine what would be delivered to Barclays
3     under the deal, whatever the deal was, and the
4     repo as a new fact in the situation allowed or it
5     enabled or became a basis for the new transaction.
6     **Q.   I think we might be at cross purposes**
7     **here. My question to you, sir, when you referred**
8     **to some discussions that were occurring on the**
9     **Friday, I asked you between whom and whom. What**
10    **people were involved in these discussions?**
11        A.   I don't have specific recollections of
12    the discussions. I do know that the people in
13    finance, so that would have included Jerry Reilly,
14    myself, would have been discussing what collateral
15    was going to be delivered to Barclays and how that
16    was going to be effected.
17            Actually, could I take a break,
18    please?
19    **Q.   Sure.**
20        **(Luncheon recess)**
21        **(Continued on next page)**
22
23
24
25

Page 120

LOWITT - HIGHLY CONFIDENTIAL

1
2     AFTERNOON SESSION
3     1:10 p.m.
4     BY MR. GAFFEY:
5     **Q.   Mr. Lowitt, I have put before you what**
6     **we have previously marked as Deposition Exhibit 5.**
7     **Take a look at the document and tell me whether**
8     **you recognize it.**
9         A.   I don't recognize the e-mail, but I am
10    obviously aware of the people who are referenced
11    in it.
12    **Q.   There is a reference in the e-mail,**
13    **which is from you to Chris O'Meara, to -- you say**
14    **as follows: "We worked all night to find what**
15    **inventory we have available to sell. Meet me in**
16    **Martin's office. Jerry has the details. Ian."**
17        **Do you see that?**
18        A.   I do.
19    **Q.   Do you recall working all night from**
20    **Thursday to Friday to find inventory to sell?**
21        A.   I do.
22    **Q.   Is that part of this project we were**
23    **talking about before the lunch break of looking**
24    **for additional value for Barclays?**
25        A.   No. This was in the construct of the

Page 121

LOWITT - HIGHLY CONFIDENTIAL

1
2     earlier transaction which was around our ability
3     to insure that the collateral that we were selling
4     to Barclays was collateral that was unencumbered
5     and available.
6     **Q.   When you're referring to the**
7     **collateral that was going to Barclays, is that the**
8     **collateral in the repo?**
9         A.   It was the collateral that was
10    conceptually referenced on the earlier schedules,
11    the assets that would have been described in that
12    schedule. So we were -- it wasn't thinking about
13    the repo specifically. It was, you know, what
14    assets did we have where we knew we had possession
15    of those so that we could make sure that they went
16    to Barclays, some portion of which was the repo,
17    but it could have been in other inventory as well.
18    **Q.   And is that because during the week,**
19    **starting on Tuesday and now we are at Friday, the**
20    **body of available collateral had shrunk because of**
21    **issues of possession or title?**
22        A.   Yes. And the fact that, you know,
23    some of it was being financed and that the various
24    counterparties wouldn't have returned it, and
25    there was that series of issues, operationalizing

Page 122

LOWITT - HIGHLY CONFIDENTIAL
1    the delivery of collateral.
2        Q.    And do you have a sense of how much
3    that body of collateral had shrunk from Tuesday to
4    Friday?
5        A.    I don't have a recollection of how
6    much.
7        Q.    Do you remember if on Friday, whether
8    you remember the number today or not, do you
9    remember if on Friday you had a determination of
10   what the value was of what was available to give
11   to Barclays?
12       A.    I know we worked Thursday to develop a
13   point of view of what collateral we did have that
14   we could deliver as part of the transaction.  I
15   can't be more specific about the amount, and I
16   would simply be speculating as to how much it was
17   less than the amount that was available on Monday.
18       Q.    But again without regard to the
19   particular number, and it is a while ago, you do
20   remember that there was a number of some kind, if
21   you can't remember it today?  It was quantified in
22   some way?
23       A.    There were a series of schedules that
24   identified specific pieces of collateral that
25

Page 123

LOWITT - HIGHLY CONFIDENTIAL
1    based on the information that we had, which was
2    hazy because of data issues with Chase and others,
3    that we were confident was collateral we could
4    have delivered into the deal.
5        Q.    And there is a reference in the lower
6    e-mail, that is the earlier e-mail from Chris
7    O'Meara to you at 6:24 in the morning on
8    September 19, "Ian, Bart asked some LEH folks to
9    meet with Alex Kirk about the Barclays deal at
10   7 a.m. today.  We will get him up to speed on
11   where we stand, especially on the matter of
12   inventory being sold.  We will then coordinate
13   with the LEH business heads to ensure they are in
14   agreement, FYIC."
15       Focusing your attention on that
16   language, sir, was there a meeting with Alex Kirk
17   in the early morning of September 19?
18       A.    I don't recall.
19       Q.    Do you know if there was a meeting --
20   well, this suggests that you had a conversation or
21   a communication of some kind with Bart McDade
22   prior to 6:24 on September 19.  Does it refresh
23   your recollection as to --
24       A.    No, I actually don't see that in -- it
25

Page 124

LOWITT - HIGHLY CONFIDENTIAL
1    says Bart asked some Lehman folks to meet with
2    Alex.
3        Q.    I beg your pardon, that's absolutely
4    right, that's absolutely right.
5        Do you know why Bart wanted LEH folks
6    to meet with Alex Kirk about the Barclays deal
7    that morning?
8        A.    I don't know.  Again, the sense of the
9    e-mail is that it is associated with the inventory
10   that was being sold as part of the transaction,
11   and the work that we had done the previous evening
12   was around determining what it was that we had
13   that was available to sell.
14       So it is -- they seem linked to me.
15       Q.    Is that determination with respect to
16   inventory separate from the other issue we were
17   talking about before, the 15c3 and unencumbered
18   collateral?
19       A.    It is separate in the sense that --
20   they are different issues to my mind.  So there
21   was one which was what was the inventory that we
22   had that was available to us that we could include
23   in a transaction.  So that was one thing.
24       And then separately there is a

Page 125

LOWITT - HIGHLY CONFIDENTIAL
1    question of sort of unencumbered collateral, which
2    would have overlapped with this but was different
3    from it, and I think the exercise that we
4    undertook on the Thursday evening was to determine
5    what was the inventory that was unencumbered that
6    we would be able to sell to Barclays.
7        Q.    I think -- I always get these two
8    numbers backwards.  We talked before about a
9    $1.9 billion number, an approximately $2 billion
10   number as between the 15c3 and the unencumbered
11   collateral?
12       A.    No, I think we said unencumbered
13   collateral was around $2 billion and the 15c3 was
14   between 700 and 800 million.
15       Q.    Those are the two I mixed up.  Was
16   the -- did the unencumbered collateral overlap the
17   inventory that is being discussed in Exhibit 5?
18       MR. HUME:  Objection, lacks
19   foundation.
20       A.    Really they were just different
21   things.  To the extent that we discovered
22   inventory that was unencumbered and could be
23   delivered into the deal and wasn't part of the
24   repo, then it would be available as unencumbered

Page 126

LOWITT - HIGHLY CONFIDENTIAL
1  collateral to deliver into the transaction.
2  
3      **Q.   And was property of that character**
4  **added to the body of assets that were going to be**
5  **traded to Barclays?  Not in the repo but available**
6  **for transfer?**
7      A.   Again, this exercise was associated
8  with trying to satisfy the structure that was
9  existing prior to the repo, even though it was
10  done on the Thursday evening.  I think what
11  emerged through Friday was that the repo itself
12  was going to be the basis of the transaction.
13      **Q.   That brings me back to the search for**
14  **additional value, if the repo itself was going to**
15  **be the basis for the transaction.  The 15c3 and**
16  **the unencumbered collateral were not within the**
17  **repo, correct?**
18      MR. BERNSTEIN:  Objection, form,
19  compound.
20      Go ahead.
21      A.   The transaction clearly included more
22  than just the repo.  It included other elements as
23  well.  It included the repo, it included 15c3 and
24  unencumbered collateral.  It included the
25  exchanged traded derivatives.  It included a

Page 127

LOWITT - HIGHLY CONFIDENTIAL
1  variety of other things.
2  
3      So the repo was an element of the
4  transaction, obviously a big part of the
5  transaction, but it wasn't the sole part of the
6  transaction.
7      **Q.   Was there a time, Mr. Lowitt, during**
8  **the week when Barclays' personnel were involved in**
9  **marking Lehman positions?**
10      A.   Marking Lehman positions for the
11  purpose of --
12      **Q.   You would have to tell me.**
13      A.   I mean I think there were Barclays
14  personnel involved in looking at our assets and
15  determining what they would be willing to purchase
16  it for, but they were not marking our positions
17  for the purposes of our books and records.
18      **Q.   I show you what was marked at a prior**
19  **deposition as Exhibit 23.  I ask you to take a**
20  **look at that.**
21      **Do you recall seeing this e-mail chain**
22  **before?**
23      A.   Not before preparing for the
24  deposition.
25      **Q.   Take a look, please, at the earliest**

Page 128

LOWITT - HIGHLY CONFIDENTIAL
1  **of the e-mails, from Ian Lowitt to Gerard Reilly,**
2  **September 17, 9:29 p.m.  In it you write, the**
3  **subject is, "Are we set up to do the marking of**
4  **the positions?  Ian."**
5      A.   Yup.
6      **Q.   And then above that is an e-mail from**
7  **you to Gerard Reilly forwarding that e-mail and**
8  **adding, "What I meant was for BarCap to mark the**
9  **positions further?  Ian."  Do you see that?**
10      A.   I do.
11      **Q.   What did you mean when you wrote that**
12  **to Mr. Reilly, asking if we were set up to do the**
13  **marking of positions and with the explanatory note**
14  **about BarCap?**
15      A.   Either -- what I understand as I read
16  it now is that we were determining what was the
17  price that BarCap were willing to pay for the
18  assets of the -- that reflected the discount for
19  the -- to use your word discount -- the delta
20  between what they were on our books for and what
21  they would buy it for, given the size of the
22  purchase, as well as for the volatility of the
23  underlying positions.
24      **Q.   So can you tell me why negotiations**

Page 129

LOWITT - HIGHLY CONFIDENTIAL
1  **were continuing on September 17 about that topic?**
2      A.   I don't know whether they were
3  negotiations.  We were trying to determine what
4  was the way in which we would effect the
5  transaction, which was to deliver a series of
6  assets to Barclays at prices that they were
7  comfortable purchasing them at.
8      **Q.   Had the prices not been determined in**
9  **the exercise on Tuesday with the development of**
10  **the financial schedule we looked at before?**
11      A.   They weren't developed at the level
12  of -- I don't know the extent to which they were
13  developed, but we weren't aware of information
14  that was at an asset-by-asset level which would
15  have been necessary to effect the transaction.
16      **Q.   And was that process being conducted**
17  **on an asset-by-asset level on the 17th?  Is that**
18  **what you are referring to here?**
19      A.   On the 17th we were believing what we
20  needed to do was to mark the positions to a level
21  that was consistent with what Barclays were
22  willing to purchase them at.
23      **Q.   Did that happen?**
24      A.   I don't believe that it did.

Page 130

LOWITT - HIGHLY CONFIDENTIAL
1
2    Q.   Why not?
3    A.   I think the transaction changed when
4  the repo was effected, and because the repo was
5  effected, the transaction itself changed.
6    Q.   Was the process of marking the
7  positions to a level that was consistent with what
8  Barclays were willing to purchase them at referred
9  to as the conversion?
10   A.   I don't believe so. The conversion --
11  can you be more precise about the conversion.
12   Q.   I will show you a document in a little
13  while about that.
14   A.   I would imagine the conversion is
15  about converting the assets from the Fed to
16  Barclays, would be my surmise about what that
17  means.
18        This was not an exercise that we
19  actually undertook.
20   Q.   And --
21        MR. BERNSTEIN:  Can we be clear for
22  the record, when you said this was not an
23  exercise, I don't want to suggest an answer
24  to you, but you might want to explain
25  "this," because I'm not sure if you are

Page 131

LOWITT - HIGHLY CONFIDENTIAL
1
2  talking about the conversion or piece of
3  paper that you are holding in your hand.
4    Q.   My question exactly.
5    A.   I am referring to what is described in
6  this e-mail as having Barclays' traders come to
7  Lehman and engage in a marking process.
8        MR. BERNSTEIN:  Just for the record,
9  this e-mail is Exhibit 23, correct?
10        THE WITNESS:  That is correct.
11   Q.   Further up in that e-mail chain, there
12  is an e-mail from Mr. Reilly to you, also
13  September 17, at 9:35 p.m., responding to yours,
14  saying "Ian, I told business guys they must get
15  counterparts at BarCap comfortable tomorrow night
16  by our front-end systems. We will not have time
17  to do Friday. We are going to send last night's
18  assets and marks over so they can see mix and
19  marks."
20        What did you understand Mr. Reilly to
21  be conveying to you with that e-mail?
22   A.   That we needed to have the Barclays'
23  traders comfortable with the assets that they were
24  purchasing and marks that they were going to buy
25  them at that reflected a price that they were

Page 132

LOWITT - HIGHLY CONFIDENTIAL
1
2  willing to pay for those assets.
3    Q.   Now, further up, the next one up,
4  September 17, 9:41 p.m., Mr. Reilly writes to you,
5  "I went through all docs and did not see reference
6  to the price haircut. If we want conservative
7  marks to reflect block nature, we need to know how
8  much and then can allocate to most logical
9  assets."
10        Could you explain that to me?
11   A.   I think what Jerry is describing here
12  is the need to reflect in the assets that we
13  are -- we would be sending to Barclays a mark that
14  reflected what they were willing to pay for the
15  assets and that there needed to be a process of
16  reflecting that not at the level of the gross
17  asset category but at the level of individual
18  assets.
19   Q.   Now, do I understand that to mean that
20  the price haircut would be determined and then the
21  assets would be identified to which it would be
22  applied?
23        MR. BERNSTEIN:  Objection to the form.
24   A.   Yeah, I didn't see it in that way.  I
25  think it was trying to insure what we were doing

Page 133

LOWITT - HIGHLY CONFIDENTIAL
1
2  at an asset-by-asset level was consistent with
3  what was in the agreement.
4    Q.   And is that -- when you say in the
5  agreement, is that what you understood Mr. Reilly
6  to be referring to when he referred to the docs?
7    A.   Yeah, the documents describing what
8  the contract was.
9    Q.   You respond to Mr. Reilly by saying,
10  "Since not in contract, hard to see what to" -- it
11  says D-P but I will read that as "do. Ian." Do
12  you see that?
13   A.   I do.
14   Q.   Had you, by September 18, referred
15  the -- now reviewed the contract?
16   A.   I had not.
17   Q.   Well, how would you know, Mr. Lowitt,
18  what was and what was not in the contract?
19   A.   I didn't know what was in and what
20  wasn't in the contract. I had a sense of what the
21  terms were, but I hadn't reviewed it in the
22  contract.
23   Q.   I note that you don't say in your
24  e-mail to Mr. Reilly I don't know what the
25  contract says. You say it's not in the contract.

Page 134

LOWITT - HIGHLY CONFIDENTIAL
2  Do you see that?
3      A.  I do.
4      Q.  Does that suggest to you that you had
5  read the contract and seen no reference to the
6  price haircut?
7          MR. BERNSTEIN: Objection. Asked and
8  answered.
9      A.  I don't read it as such.  I said if --
10 it doesn't -- when I say "since not in contract,"
11 it doesn't mean that I knew that independently.
12 It is referencing what Jerry has said about that
13 the documents didn't include it.
14     Q.  So when you were saying to Mr. Reilly
15 that it was hard to see what to do, what were you
16 communicating?
17     A.  It was hard to see how we were going
18 to identify those assets that Barclays were going
19 to purchase and what the pricing on each of those
20 individual assets were going to be.
21     Q.  And it was hard to see because, at
22 least if Mr. Reilly's right that there is no
23 reference to the price haircut, it doesn't give
24 any guidance?
25         MR. BERNSTEIN: Objection to form.

Page 135

LOWITT - HIGHLY CONFIDENTIAL
2      Q.  Is that right?
3      A.  It is hard because, as Jerry says,
4  "went through the docs and do not see reference to
5  price haircut."
6      Q.  So absent a reference in the
7  documents, you don't know how to apply the price
8  haircut?  Is that what you are saying?
9      A.  It is hard to determine how we are
10 going to identify the series of assets that are
11 part of the transaction and at what price those
12 are going to be marked at and that Barclays is
13 going to purchase them at.
14     Q.  Now, did there come a time,
15 Mr. Lowitt, where you understood that --
16 withdrawn.
17         Did there come a time when it was
18 suggested to you that the best means of delivering
19 the discount to Barclays was by defaulting on the
20 repo?
21     A.  Again, I don't -- I don't agree with
22 the characterization of the best way to deliver
23 the discount.  I think what was clear on the
24 Friday, in part because of the difficulties that
25 we have talked about, but also because the repo

Page 136

LOWITT - HIGHLY CONFIDENTIAL
2  was now in place, that the repo represented -- was
3  part of any new transaction was going to be
4  and that what you had in the repo addressed many
5  of the operational questions that we were not sure
6  how to address, which was which of the assets
7  Barclays was going to acquire, because clearly the
8  ones in the repo became the basis of what they
9  were going to acquire, as well as what was the
10 financing haircut associated with that.
11     Q.  Mr. Lowitt, I am putting before you
12 what has previously been marked as Deposition
13 Exhibit 127. Have you seen that document before?
14     A.  Again, I don't recall seeing this
15 before the preparation for the deposition.
16     Q.  Take a scan through it sufficient to
17 familiarize yourself with it and let me know when
18 you have done that.
19     A.  OK.
20     Q.  I would -- directing your attention to
21 the earliest message on the page, the one at the
22 bottom, from Gerard Reilly to you, Michael
23 Gelband, copy Paolo Tonucci and Martin Kelly,
24 September 18th, 2008 at 6:04 a.m.
25         And in that e-mail entitled "Open

Page 137

LOWITT - HIGHLY CONFIDENTIAL
2  Issues on Deal," Mr. Reilly writes -- I'm down at
3  paragraph 3 -- "Not clear on the amount of block
4  discount or how we make it happen.  Defaulting on
5  repo could be the best, as discount could be taken
6  from haircut.  If not that, then we need to give
7  business an allocation of block discount so they
8  can mark down the books tonight.  Does that create
9  a problem, as it could tip the broker early?
10 Would we rather have that be in the sale price
11 tomorrow?"
12         Do you see that portion?
13     A.  I do.
14     Q.  What did you understand Mr. Reilly to
15 be suggesting in this e-mail when he said,
16 defaulting on repo could be the best as the
17 discount could be taken from the haircut?
18     A.  Again, I don't have a recollection of
19 this on the Thursday, but in reading the e-mail
20 here, you know, what Jerry is suggesting is that
21 the repo transaction is a way in which we could
22 deliver collateral to Barclays and that as a basic
23 concept, the financing haircut is a similar
24 concept to the item that we were talking about
25 earlier, which is Barclays' buying collateral for

Page 138

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2  less than the marks to reflect the size of their
3  purchase and the volatility of the underlying
4  assets.
5    Q.    So to put that at least in my layman's
6  terms, that would be using the haircut on the repo
7  as a replacement for the markdown of the value
8  shown on the books?
9    MR. BERNSTEIN:  Objection,
10  mischaracterizes his testimony.
11    A.    What I would say is not how I would
12  think of it as a replacement.  They were -- they
13  are comparable concepts, but the repo transaction
14  was, again, a way in which we could deliver
15  specific assets to Barclays at a specific price,
16  which is what the original deal intended, but it
17  was a different thing.
18    Q.    Well, if the repo is used to deliver
19  assets to Barclays at a specific price and
20  Barclays gave $45 billion and received 50 billion
21  in collateral, does that mean Barclays bought
22  50 billion in collateral for $45 billion?
23    A.    If the -- if they received all their
24  collateral and that was the cash that came to the
25  firm, then, yes, they received $49 billion of

Page 139

1    LOWITT - HIGHLY CONFIDENTIAL
2  collateral -- $50 billion of collateral for the
3  cash.
4    Q.    Further up in the e-mail, you write to
5  Mr. Reilly, Gelband, with copies to Kelly, Felder
6  and Lee, "Jerry, please set up a meeting first
7  thing this morning to work through these issues
8  with Mike, Eric and Hyung."
9    A.    That's Hyung Lee.
10    Q.    "Probably want Martin as well, and how
11  to approach.  Must be a huge priority for today.
12  Ian."
13    Why was this a huge priority for that
14  day?
15    A.    Well, we needed to determine how we
16  would be able to deliver collateral that was
17  specified and what Barclays would be paying for
18  that collateral.
19    Q.    And the Martin that you are referring
20  to is Martin Kelly?
21    A.    I believe it would be Martin Kelly
22  from the context.
23    Q.    Do you still work with Martin Kelly on
24  a day-to-day basis?
25    A.    I do not.  We speak occasionally,

Page 140

1    LOWITT - HIGHLY CONFIDENTIAL
2  but --
3    Q.    Apart from meeting with your lawyers,
4  did you talk to anyone about the fact that your
5  deposition was being taken today?
6    A.    There are some people in the wealth
7  division that are aware that I am being deposed.
8    Q.    Did you talk to them for any reason
9  other than to explain your absence?  Did you talk
10  to them about the substance of what you would be
11  testifying about?
12    A.    No, no.
13    Q.    Have you spoken to anyone else who has
14  had their deposition taken in this matter?
15    MR. BERNSTEIN:  I presume you mean
16  about the deposition?
17    MR. GAFFEY:  Yeah, sure.
18    MR. BERNSTEIN:  As opposed to at some
19  point in his life about something else.
20    MR. GAFFEY:  Yes.  But "no" would
21  cover both.
22    A.    But I meant about the deposition.
23    Q.    OK.  Now, up at the top of this,
24  Mr. Felder writes to Reilly, Lowitt, Gelband, copy
25  Kelly and Lee, "The Barclays guys chose the

Page 141

1    LOWITT - HIGHLY CONFIDENTIAL
2  assets.  We did not have anything to do with it."
3    In the context of the e-mails below,
4  do you have an understanding of what Mr. Felder is
5  communicating here?
6    A.    He is saying that Barclays' folks, my
7  understanding would be that what the -- that the
8  Barclays folks were the ones who decided which
9  assets they wanted to purchase and which ones they
10  didn't, so the selection of which assets would be
11  included was not something driven by the Lehman
12  folks but by the Barclays folks.
13    Q.    I am trying to put it in context of
14  the e-mail.  Let me suggest it might be a response
15  to paragraph 1 in the bottom e-mail, about whether
16  or not auction rates are included.  I don't want
17  you to speculate, but I am wondering if you have
18  any knowledge of what it is Mr. Felder meant when
19  he wrote this.
20    A.    I don't know what Mr. Felder meant
21  when he wrote this.
22    Q.    Mr. Lowitt, you have before you what
23  has previously been marked as Deposition
24  Exhibit 14.  And with the exclusion we talked
25  about before, the top two lines that say "unknown

Page 142

1          LOWITT - HIGHLY CONFIDENTIAL
2    and sent," have you seen the text of this e-mail
3    before?
4          A.   Yeah, I don't have a recollection of
5    it besides in the preparation for the deposition.
6          Q.   In the bottom e-mail, from you to
7    Gelband, Kirk and Beldner, copies to Tonucci,
8    Reilly and Kelly, you say, "Today was very bad
9    with very large number of surprises, increased
10   requirement of 7 or so billion. Cannot get
11   through tomorrow if not tighter. Not sure what to
12   suggest other than someone makes ensuring great
13   discipline the number one priority. Let's huddle
14   in the morning to see the best way forward. Also
15   need to shrink matchbook, which as of yesterday
16   was much larger than expected. Jerry and Martin
17   have details. Ian."
18         What were you referring to when you
19   said increased requirement of 7 or so billion?
20         A.   You see here the subject says funding
21   tomorrow?
22         Q.   Yes.
23         A.   This was referring to the funding
24   position of the firm on the Wednesday evening
25   where per the e-mail, there was a number of

Page 143

1          LOWITT - HIGHLY CONFIDENTIAL
2    surprises vis-a-vis the funding, which I think
3    would have referred to the fact that people we
4    thought were going to roll secured funding didn't,
5    or some of the term repo that we expected to stay
6    on as term had -- wasn't available to us, which
7    increased the funding requirement that we had to 7
8    or so billion dollars. So this was referring to
9    the funding position of the firm.
10         When it says, "cannot get through
11   tomorrow if not tighter," it is saying that our
12   ability to fund the firm on Thursday requires us
13   to be extremely disciplined around financing and
14   funding in one or two, ensuring that the senior
15   people in fixed income were aware of just how
16   important this was and how our funding position
17   was deteriorating.
18         Q.   And what are you referring to when you
19   talk about the need to shrink the matchbook?
20         A.   Well, the matchbook, there is a book
21   which has -- you know, assets and liabilities
22   should be matched. It was consuming some amount
23   of cash. So shrinking the matchbook was one of
24   the ways we wanted to improve the liquidity
25   position of the firm.

Page 144

1          LOWITT - HIGHLY CONFIDENTIAL
2          Q.   When you say shrink the matchbook,
3    what does that mean? I guess you need to explain
4    the matchbook term.
5          A.   It means you could be longer Treasury
6    and shorter Treasury, and shrink it means -- you
7    know, one is a repo, one is a reverse repo, so
8    when you repo the collateral out, so shrinking the
9    matchbook's essentially relating to reducing the
10   number of repos of collateral where you hold the
11   collateral and reducing the number of reverse
12   repos where you reverse the collateral in.
13   Normally -- that's what it would be.
14         Q.   Could you -- in front of you there
15   ought to be Exhibit 127 that we just looked at a
16   moment ago. It is the e-mail, not clear about the
17   amount of block discount.
18         A.   Yes, I see that.
19         Q.   A few more questions about that. Down
20   in paragraph 3, when Mr. Reilly writes, "Does that
21   create a problem, as it could tip the broker
22   early," what did you understand him to mean?
23         A.   Again, I don't have a recollection of
24   what that means. Again, as I sort of speculate
25   from the context, it is you need broker -- the

Page 145

1          LOWITT - HIGHLY CONFIDENTIAL
2    broker-dealer needs to remain in compliance from a
3    regulatory perspective and regulatory capital
4    perspective, so he may have been talking about the
5    implications of dealer marking the books down
6    would create a problem from a regulatory capital
7    perspective, but again this is pure speculation.
8          Q.   Is an alternative speculation that
9    defaulting on the repo could drive the
10   broker-dealer into a bankruptcy earlier than
11   planned?
12         A.   Defaulting on the repo? I don't see
13   why -- I don't read it in that way at all.
14         Q.   And when Mr. Reilly writes, "Would we
15   rather have that be in the sale price tomorrow,"
16   do you have an understanding of what he is
17   communicating to you there?
18         A.   I don't have a recollection of it, but
19   I think it is a question of do you mark the books
20   down before the bankruptcy filing or essentially
21   as part of the bankruptcy filing.
22         Q.   This is written on the 18th and the
23   sale hearing is going to be conducted before the
24   bankruptcy court on the 19th, LBI, correct?
25         A.   That is correct.