# A. 19 (B)

Page 146

LOWITT - HIGHLY CONFIDENTIAL

Q.   Do you understand this to mean a reference to the sale price that will be referenced at the bankruptcy hearing the next day?

MR. BERNSTEIN:  Objection, no foundation.

A.   I can't say what that would be referring to, but -- I can't say what it would be referring to.

(Exhibit 218, document Bates stamped 42628 marked for identification, as of this date.)

Q.   Mr. Lowitt, you have before you what we have marked as Deposition Exhibit 218.  Do you recognize the document?

A.   I don't recall it specifically.

Q.   Have you seen it before?

A.   I don't recall seeing it before.  But I see that it was sent from me to Paolo.

Q.   In the e-mail sent from you to Paolo, the subject is "As matter of urgency need to get going on showing THAT the DTCC money is there."  What did you mean by the DTCC money?

A.   I can't recall what I would have meant by that.

Page 147

LOWITT - HIGHLY CONFIDENTIAL

Q.   The text of the e-mail refers to the -- well, IT says, "Need proof that lock-up is 2 billion.  Also other unencumbered collateral in DTCC we can pledge.  Ian."

Does that e-mail relate to the project we were talking about before of identifying additional value?

A.   From the context, it suggests that it does.

Q.   And having looked at that now, do you have -- can you tell me why finding additional value would require looking for unencumbered collateral in DTCC?

A.   I can't say why it would be in DTCC rather than unencumbered collateral in aggregate.  Our exercise was around unencumbered collateral whether it was in DTCC or any other depository or location.

Q.   Why were you describing this as a matter of urgency on Friday, September 19, at 1:36 p.m. eastern time?  Note that the time there is GMT.

A.   Well, again, to the discussion we had earlier, finding sources of value was an important

Page 148

LOWITT - HIGHLY CONFIDENTIAL

exercise for us on the Friday.  You can see here that the estimate of the 15c3 lock-up at that point was 2 billion.  It turned out as a result of the work that was done that the amount of the lock-up was less than that.  But it was obviously an early estimate of it as high as $2 billion.

Q.   Were you describing this as a matter of urgency based in any part on your conversation that morning with Mr. Ricci?

A.   The whole exercise of identifying additional collateral, which as we talked about was a result of a conversation with Bart as well as with Rich Ricci, was a very important exercise for us on the Friday, which is why I think I would have talked about it in this way.

Q.   Did you think you were at some degree of professional risk if that project was unsuccessful?

A.   No, I don't recall feeling that.

(Exhibit 219, document Bates stamped 138017 marked for identification, as of this date.)

Q.   You have before you, Mr. Lowitt, what we have marked as Deposition Exhibit 219.  Do you

Page 149

LOWITT - HIGHLY CONFIDENTIAL

recognize the document?

A.   I don't recall the e-mail specifically.

Q.   It appears to be an e-mail from you to Mr. McDade.

A.   Yes, it does.

Q.   And the subject says "CLS money all snarfed up by city.  The 15c3 lock-up looks OK at 1.3 billion.  Good faith not.  So we are short 1.7 billion.  The TBA and FX settlement don't work.  We did find 5 billion of exchange listed options which we are investigating.  Ian."

Can you explain to me what it is you are reporting to Mr. McDade here?

A.   Yeah.  There are a series of issues obviously.  Not issues, items.  CLS refers to money that we had pledged to Citi to insure that they would continue to operate as our CLS bank, so that's the bank that performs the FX settlements on behalf of -- that was performing FX settlements on behalf of Lehman Brothers.  So we posted cash to them probably on the Thursday, and this suggests that they had not released it, and they had taken it all themselves.

Page 150

LOWITT - HIGHLY CONFIDENTIAL

1
2      The 15c3 lock-up, so this is now
3   saying what we think the value of the 15c3 lock-up
4   was. So what's the excess in 15c3? Looks like at
5   that point the estimate was 1.3 billion.
6      Good faith was another item of --
7   there was an item called the good faith lock-up,
8   which again as part of the investigation to
9   determine sources of value, it was determined that
10  there was no value that could be included in the
11  transaction from the line that was called good
12  faith lock-up. So that is suggesting that if, you
13  know, your target is 4 billion, that we need
14  $1.7 billion of additional value beyond what's in
15  the 15c3 lock-up.
16     And TBA and FX settlements don't work,
17  I think what that was meaning was there was no
18  additional sources of value in the items of TBA or
19  FX settlement.
20     And then it says we did find 5 billion
21  of exchange listed options which we are
22  investigating.
23     So it was a status update for Bart on
24  a series of things that were going on vis-a-vis
25  our efforts to determine the extra value.

Page 151

LOWITT - HIGHLY CONFIDENTIAL

1
2     Q.   So you're basically looking in every
3   corner for this extra value, right?
4     A.   We were looking in a number of places
5   to determine -- to find extra value.
6     Q.   And the target was $4 billion?
7     A.   Yeah. My recollection is between 3
8   and 4, and the math here suggests that what we
9   were targeting was $4 billion.
10    Q.   Let me push that a little further.
11  Rather than suggesting it, does it refresh your
12  recollection that the target was $4 billion?
13    A.   My recollection is it was between 3
14  and 4.
15    Q.   Did there come a point where the
16  target was reached? Whether it was 3 or 4 billion
17  dollars or something in between, did there come a
18  point where the target was reached?
19    A.   I think we identified -- we determined
20  that the exchange listed options were already
21  included as part of the business transaction, so
22  there was no additional value there, and the
23  additional place where we found the value was in
24  the unencumbered collateral in the various depots.
25    Q.   As of the writing of Exhibit 219,

Page 152

LOWITT - HIGHLY CONFIDENTIAL

1
2   where you say, "So we are 1.7 billion short,"
3   that's one time point. My question goes to what
4   follows. Did there come a time when the target
5   was met?
6     A.   I mean there was a time when we had
7   identified unencumbered collateral and 15c3
8   lock-up that we had some degree of confidence
9   represented 3 to 4 billion dollars of value.
10  Didn't know with certainty, but we believed that
11  it did represent value of the amount we were
12  searching for.
13    Q.   Did there come a point where Barclays
14  indicated that enough extra value had been found
15  that it was willing to close?
16    A.   I'm not aware of that, but the
17  transaction went forward, so that seems to
18  indicate.
19    Q.   When did you stop looking for
20  additional assets?
21    A.   I don't recall specifically when we
22  stopped looking for additional assets.
23    Q.   Do you generally recall that the
24  search continued into the weekend?
25    A.   I do recall that we were continuing to

Page 153

LOWITT - HIGHLY CONFIDENTIAL

1
2   work through the weekend, and I do recall that we
3   shared a schedule of unencumbered collateral with
4   the creditors' committee on the Sunday.
5     Q.   And who is the "we" who shared the
6   schedule of unencumbered collateral with the
7   creditors' committee on Sunday? Is that a
8   meeting? And if so, who is at it?
9     A.   I think -- my recollection is a
10  schedule was delivered, so there were big thick
11  piles of paper which included all the collateral
12  that was included on that schedule, and that
13  schedule was delivered to a group of people
14  representing the creditors' committee in another
15  room at Weil.
16    Q.   Why was it delivered to the creditors'
17  committee?
18    A.   I can't say specifically. I assume
19  because they wanted to review it.
20    Q.   Did you deliver it to the creditors'
21  committee?
22    A.   I don't recall being the person
23  delivering it.
24    Q.   Did you cause it to be delivered to --
25  did somebody under your supervision deliver it?

Page 154

LOWITT - HIGHLY CONFIDENTIAL

1    A.   My recollection is that either -- I
2    would expect that either Paolo or Robert Azerad
3    would have delivered it, but I can't be precise.
4    **Q.   Other than thinking they had a reason**
5    **they wanted to see it, do you have any**
6    **recollection of the reason this schedule was given**
7    **to the creditors' committee?**
8         MR. BERNSTEIN:  Objection, asked and
9    answered.
10        A.   I don't have anything additional to
11   say.
12   **Q.   Before you, Mr. Lowitt, is what we**
13   **have marked as Deposition Exhibit 220, a two-page**
14   **document.  Have you seen the document before?**
15        MS. HNATT:  Did you say two-page
16   document?
17        MR. GAFFEY:  I did.
18        MR. BERNSTEIN:  Mine is one.
19        MR. GAFFEY:  You know what?  Let's
20   just -- I'll sort that out during a break
21   and we will come back to the document.
22        MR. BERNSTEIN:  OK.
23        (Exhibit 220 withdrawn)
24        (Exhibit 221, document Bates stamped

Page 155

LOWITT - HIGHLY CONFIDENTIAL

1    137537 marked for identification, as of this
2    date.)
3    **Q.   Before you, Mr. Lowitt, is what we**
4    **have marked as Deposition Exhibit 221, an e-mail**
5    **from Bart McDade to you at the top.  Have you seen**
6    **the document before?**
7         A.   I don't recall the document
8    specifically, but I have seen it as part of my
9    preparation.
10   **Q.   The earliest e-mail in the chain is**
11   **from you to McDade, September 19 at 7:12 p.m.**
12   **Subject, "Please send word when you are done.**
13   **Ian."**
14        **What were you referring to there?**
15        A.   Again, I don't have a specific
16   recollection, but given from the timing of it and
17   the context, it suggests that I would -- I am
18   asking Bart to say when he is completed with the
19   bankruptcy hearing with the judge.
20   **Q.   And Mr. McDade responds, "The conclave**
21   **is over.  We are part of BarCap," exclamation**
22   **point, "subject to documenting."**
23        **Do you see that?**
24        A.   I do.

Page 156

LOWITT - HIGHLY CONFIDENTIAL

1    **Q.   Do you have any knowledge of any**
2    **documenting going on after this point?**
3         A.   I mean, I was aware that there was
4    documentation of the transaction that was
5    occurring over the weekend following the agreement
6    with the bankruptcy court, but I don't have any
7    knowledge specifically of what documentation
8    needed to be completed.
9    **Q.   And did you -- I may have asked you**
10   **this before, but just so it is in this section,**
11   **were you involved in that documenting over the**
12   **weekend?**
13        A.   I was not.
14   **Q.   Did you ever see it?**
15        A.   I did not.  I don't remember seeing
16   it.
17   **Q.   Further up is a response from you to**
18   **McDade, Berkenfeld, with a copy to Tonucci, at**
19   **5:52 a.m. on Saturday, September 20, and it reads,**
20   **"Did the court accept the 15c3 lock-up and**
21   **unencumbered box make it through to BarCap?  If**
22   **so, need to make sure documentation is very tight**
23   **so we can deliver on it.  Should have Weil lawyers**
24   **work closely with Paolo on it.  Obviously critical**

Page 157

LOWITT - HIGHLY CONFIDENTIAL

1    we get this right.  Congrats again.  Ian."
2         **When you refer to the documentation**
3    **needing to be "very tight," are you referring to**
4    **documentation about 15c3 lock-up and unencumbered**
5    **box?**
6         A.   The sense of it suggests that.
7    **Q.   Did you ever see any documentation**
8    **concerning the 15c3 lock-up and unencumbered box?**
9         A.   I didn't read through the contract,
10   no.
11   **Q.   Do you know if Paolo worked with**
12   **lawyers on putting that documentation together?**
13        A.   I don't know with certainty.
14   **Q.   Do you have any general recollection**
15   **of that?**
16        A.   My recollection is Paolo talking with
17   some of the folks at Barclays about this, but I
18   don't have a specific recollection about him
19   talking to lawyers.
20   **Q.   Do you have any recollection about him**
21   **being involved in any documentation concerning the**
22   **15c3 lock-up and the unencumbered box?**
23        A.   I mean he was the person who knew a
24   great deal about both of those two items, so I

Page 158

1      LOWITT - HIGHLY CONFIDENTIAL
2   would have expected him to be involved, but I
3   don't have a specific knowledge of whether he was
4   or he wasn't.
5      Q.   Now, apart from the search for
6   additional value that we have been talking about,
7   give me a general idea of what your activities are
8   on the Friday and through the weekend before the
9   deal was closed.
10      MR. BERNSTEIN:  Can I just clarify,
11   when you say on the Friday, he has already
12   talked a lot about on the Friday.
13      MR. GAFFEY:  That's a good point.
14      Q.   Let's go to the evening of the
15   Friday -- actually after you wrote this e-mail to
16   Mr. McDade, at 1 in the morning on Saturday.  What
17   did you do during the weekend?
18      A.   Again, I have a hazy recollection.
19   But I -- again, I was very tired, but I do have
20   remembrances of spending time waiting at the Weil
21   offices to answer specific questions about
22   settlement and other issues which were a subject
23   of discussion in the -- on the Sunday.
24      Q.   What are you referring to when you
25   refer to settlement?

Page 159

1      LOWITT - HIGHLY CONFIDENTIAL
2      A.   Well, there was a series of questions
3   about whether Barclays would step into Lehman's
4   shoes vis-a-vis settlement obligations that
5   existed in the coming week, and there were
6   representatives from a number of different
7   organizations, including DTCC and Chase, that were
8   discussing these items with folks from Barclays,
9   and on occasion people would ask questions about
10   elements of that.
11      Q.   And what was the area of knowledge or
12   expertise that you lent to that discussion?
13      A.   You know, it was familiarity with
14   elements of Lehman's operational processes or at
15   least knowing who within Lehman would be better
16   equipped to address those questions.
17      Q.   Now, in the e-mail that we have marked
18   as -- series of e-mails that we have marked as
19   Exhibit 221, the one at the top, Mr. McDade to
20   you, says, "Can you call me at home," and that's
21   at 10:51 p.m. -- 10:51 a.m. on Saturday,
22   September 20, when we convert to GMT time.
23      Did you speak to Mr. McDade at home on
24   Saturday morning.
25      A.   I don't have a specific recollection

Page 160

1      LOWITT - HIGHLY CONFIDENTIAL
2   of speaking with Bart, but in all likelihood I
3   would have called him.  I wasn't going to not call
4   the president of the firm.
5      Q.   Do you have a general recollection of
6   speaking with him in person or over the phone over
7   the weekend?
8      A.   Well, I believe I would have spoken to
9   him over the phone on Saturday morning, and then I
10   think we were both at the Weil offices on --
11   certainly on the Sunday.
12      Q.   As you sit here today, looking at
13   Exhibit 221, do you have any knowledge as to
14   whether there was any particular topic Mr. McDade
15   wanted to talk to you about when he wrote this
16   e-mail?
17      A.   Well, I think that again it is -- I
18   don't have a specific recollection, but from the
19   sense of the e-mail, it was to answer the
20   questions that I asked of him.
21      Q.   Did you get an answer to the question
22   you asked of him as to whether the court accepted
23   the 15c3 lock-up and unencumbered box make it
24   through to BarCap?
25      A.   I don't have a recollection of that,

Page 161

1      LOWITT - HIGHLY CONFIDENTIAL
2   but we did begin working, once the transaction
3   closed, on both of these items, so I feel
4   confident, but I don't have a specific
5   recollection that Bart would have communicated to
6   me that these were both part of the transaction.
7      Q.   Just sort of focus where you are and I
8   will give you the two-page version of that
9   version.
10      MR. GAFFEY:  Can we just substitute --
11   do you mind if we unmark that and mark that
12   as 220?
13      MR. BERNSTEIN:  Fine.
14      Would now be a good time for a break?
15      THE WITNESS:  Yes.
16      (Exhibit 220, document Bates stamped
17   10298186 marked for identification as of
18   this date.)
19      (Recess)
20   BY MR. GAFFEY:
21      Q.   Mr. Lowitt, could you go back to in
22   the pile in front of you Exhibit 23, please.
23      A.   Yes.
24      Q.   We talked a bit about this a moment
25   ago where I asked you about the language in these

Page 162

LOWITT - HIGHLY CONFIDENTIAL

1 e-mails that referred to marking of the positions,
2 and what you meant was for BarCap to mark the
3 positions further, and I think you said this was
4 the asset-by-asset assessment that was being done;
5 is that right?
6     A.   Yes, I think that's what we talked
7 about before.
8     Q.   Now, the financial schedule we looked
9 at earlier, one-page financial schedule, reflected
10 the difference between the price Barclays agreed
11 to pay and the amount shown on Lehman's books as
12 of September 16, correct?
13         MR. HUME: Objection, lacks
14     foundation. Which schedule?
15     Q.   Exhibit 19 that's in front of you
16 there.
17     A.   I think that --
18     Q.   Do you have 19 there?
19     A.   I have 19.
20     Q.   That's the schedule I am referring to.
21 That schedule reflects the values for the assets
22 that reflect the difference between the amounts
23 shown on Lehman's books and the amount Barclays
24 was willing to pay, correct?

Page 163

LOWITT - HIGHLY CONFIDENTIAL

1         MR. BERNSTEIN: Objection, asked and
2     answered.
3     A.   What this reflects is for the
4 different -- at the broad level of the asset
5 categories, an amount that Barclays was going to
6 pay to Lehman for assets in those asset categories
7 which reflected the combination of those assets
8 they wanted to purchase as well as the price that
9 they were willing to pay, as we discussed, for the
10 large purchases as well as the volatility of the
11 assets.
12     Q.   Taking a look at Exhibit 23, which
13 refers to Barclays and the positions, is there
14 further marking down going on here when it is done
15 on an asset-by-asset basis?
16     A.   It is not additional. I wouldn't read
17 it that way. It is an asset-by-asset buildup that
18 gets us to the purchase. But what you see on
19 Exhibit 19 is the amount after the -- that
20 Barclays is willing to pay. It doesn't reflect
21 what was the amount that was the amount that was
22 on -- that those particular assets were on
23 Lehman's books at.
24         So the combination of things that you

Page 164

LOWITT - HIGHLY CONFIDENTIAL

1 have to do in the exercise that I think Jerry is
2 referring to on Exhibit 23 is come up with a set
3 of assets which on a -- which reflects the amount
4 that Barclays is going to pay within that asset
5 category that is consistent with Exhibit 19.
6         MR. BERNSTEIN: Can I just -- can I --
7     this is the problem with having a live
8     transcript. The second sentence on the live
9     transcript begins, "I want read it that
10     way," and what I heard was, "I wouldn't read
11     it that way."
12     Q.   So I asked you a little earlier
13 whether in the exercise that led to the completion
14 of Exhibit 19, the top-down view was to arrive at
15 the broad price then. And to put another
16 question, so the exercise that led to Exhibit 19
17 was the top-down process to determine broadly the
18 difference between the amount on Lehman's books
19 and the amount that Barclays would pay?
20     A.   I don't think that's completely right.
21 I think that's the -- what led to Exhibit 19 was a
22 view on the Lehman side of the combination of what
23 was emerging from the sort of bottoms up with what
24 was happening top down. It wasn't just the

Page 165

LOWITT - HIGHLY CONFIDENTIAL

1 top-down view. It was a combination, and it was
2 iterative through the course of the evening.
3     Q.   And now looking again at Exhibit 23,
4 which is written on the 17th of September, this is
5 the security-by-security review you talked about,
6 yes?
7     A.   It is the effort to say, just pick a
8 number. There are $2.7 billion of mortgages on
9 Exhibit 19. What are the specific positions that
10 are going to get transferred over to Barclays that
11 they will be paying 2.7 billion for, that
12 represents the price they are willing to pay which
13 is less than the amount that would have been the
14 book value.
15     Q.   So the question that's being answered
16 on the 17th is which particular securities within
17 the category of mortgages will be priced in a way
18 to add up to the total for mortgages in
19 Exhibit 19?
20     A.   You mean the September 18, but yes.
21     Q.   Yes. But yes is the answer?
22     A.   I believe, if I am understanding you
23 correctly, that it is the asset-by-asset view
24 that's going to -- because in the end, what was

Page 166

LOWITT - HIGHLY CONFIDENTIAL
1
2  necessary to complete the transaction was a
3  specific set of assets were going to be delivered
4  at a specific set of prices. In aggregate by
5  category, we are going to be consistent with 19,
6  if it didn't shift in some way, rather than just
7  something that you saw on 19, on Exhibit 19.
8      Q. Well, what do you mean if it didn't
9  shift in some way?
10     A. Again, the values that -- the values
11 of assets may have changed, some assets that --
12 that valuations of those may have changed. I
13 didn't mean anything more than that.
14     Q. As a result of the asset-by-asset
15 review that was going on, that you are writing
16 about on the 17th, did the delta between the
17 amount shown on Lehman's books and the price
18 Barclays was willing to pay grow larger?
19     A. I think as we said, we didn't actually
20 do the exercise that we talked about on Exhibit
21 23. It was -- this was a series of correspondence
22 about what we would need to have done, but we
23 didn't sit down with Barclays, we didn't sit down
24 and actually re-mark any of the positions. It
25 was -- it was a reference to what we would have

Page 167

1      LOWITT - HIGHLY CONFIDENTIAL
2  needed to have done if the transaction had
3  proceeded in the earlier form rather than the repo
4  form.
5      Q. Were the individual positions being
6  marked for the purpose of putting them into the
7  repo?
8      A. No.
9      Q. Would you need to do --
10     A. I don't believe so.
11     Q. Would you need to -- to put them into
12 repo, would you need a schedule of individual
13 positions?
14     A. The repo, the advantage of the repo
15 was that there was collateral that was at the Fed,
16 that collateral was delivered to Chase, Chase was
17 supposed to deliver that collateral to Barclays at
18 BoNY, Bank of New York, and as a result, there was
19 no requirement to go into separate schedules and
20 identify specific assets or to mark them in any
21 particular way.
22     Q. Because they are marked by BoNY when
23 they're received, BoNY in the triparty; is that
24 correct?
25     A. And by Chase when they return from the

Page 168

1      LOWITT - HIGHLY CONFIDENTIAL
2  Fed.
3      Q. OK. I am going to show you a new and
4  improved Exhibit 220. I have marked the correct
5  document this time. And just so we don't have a
6  gap in numbering, I have re-marked Exhibit 66B
7  also as Exhibit 220.
8      MR. BERNSTEIN: So this is both 66B
9      and 220.
10     MR. GAFFEY: Yeah. We will call it
11     220 for the purpose of this deposition. I
12     just didn't want a numbering gap.
13     MR. BERNSTEIN: Sure.
14 BY MR. GAFFEY:
15     Q. Let me know when you have had a chance
16 to look at what we have marked as Exhibit 220,
17 Mr. Lowitt, and tell me whether you recall seeing
18 it before.
19     A. I don't have a specific recollection
20 of this chain of e-mails.
21     Q. Do you know who David Aronow is?
22 A-R-O-N-O-W.
23     A. David was one of the people in
24 operations who worked for Alastair Blackwell.
25     Q. Would David Aronow have been involved

Page 169

1      LOWITT - HIGHLY CONFIDENTIAL
2  in this security-by-security marking we were
3  talking about before with respect to Exhibit 23?
4      A. There was no security-by-security
5  marking for Exhibit 23. There was no effort
6  that -- in other words, there was a project that
7  was being identified as a piece of work. It
8  wasn't a piece of work that actually took place.
9      Q. OK. In his e-mail to Mr. Tonucci,
10 copy to you, Mr. Aronow says, "Paolo, apologies if
11 you already know this. Barclays' operations team
12 has recalculated the value of the collateral that
13 they received from us last night and they are more
14 than fully collateralized, including the haircut
15 applied. Senior management at Barclays I am told
16 are very satisfied with the results of the effort.
17 They are not interested in moving forward with any
18 more collateral movements from us to them today
19 through the process we built and applied
20 yesterday. They have said that we can now stand
21 down with the process we had in place to move
22 collateral."
23     Do you know what Mr. Aronow was
24 referring to when he communicated that the
25 Barclays operation team had recalculated the value

Page 170

1      **LOWITT - HIGHLY CONFIDENTIAL**
2  **of the collateral they received from Lehman?**
3      A.   I mean I can't know precisely what
4  Dave meant by this, but I would assume what
5  Barclays' operations was doing was looking at the
6  collateral that was in their BoNY accounts and
7  assessing the value of that collateral, probably
8  utilizing the BoNY triparty system to assess what
9  they had received and what the value of that was.
10     **Q.   When Mr. Aronow writes that Barclays**
11 **was now "more than fully collateralized, including**
12 **the haircuts applied," what do you understand that**
13 **to mean?**
14     A.   Again, I don't know what Dave was
15 referring to.
16     **Q.   All right.  Well, if you had received**
17 **this in realtime on the 19th of September, give me**
18 **your best estimate of what you would have**
19 **understood it to mean or whether you would have**
20 **had to write back to David to say what do you mean**
21 **by this.**
22     MR. HUME:  Objection, calls for
23  speculation.
24     A.   I don't know what David was referring
25 to specifically with that.  I could speculate if

Page 171

1      LOWITT - HIGHLY CONFIDENTIAL
2  you would like.
3      Q.   No, thank you.
4          Did it ever come to your attention
5  **that Barclays was more than fully collateralized?**
6      A.   Again, I wasn't aware of Barclays
7  being fully collateralized or not.  I know that
8  there were a lot of difficulties associated with
9  the collateral movement from Chase to BoNY and
10 that that didn't proceed smoothly.
11     **Q.   Do you know what Mr. Aronow was**
12 **referring to when he refers to "the process we had**
13 **in place to move collateral"?**
14     A.   Again, from the context, I would
15 suggest that it is, or I would understand it to be
16 the collateral that was going to move from Chase
17 to BoNY because, you know, the Fed repo was taken
18 down, and rather than transact through JP Morgan,
19 the new repo was going to get booked through BoNY.
20 That process of moving the collateral was not a
21 standard one, and so a process needed to be
22 developed and then applied.
23     **Q.   And at some point apparently Lehman**
24 **was told it could stand down with the process,**
25 **yes?**

Page 172

1      **LOWITT - HIGHLY CONFIDENTIAL**
2      A.   That's what David is saying.
3      **Q.   Do you have any independent knowledge**
4  **of a process -- of Lehman standing down on that**
5  **process?**
6      A.   I mean at some point, we weren't
7  moving additional collateral, but I'm not aware
8  specifically of, you know, a time or a place where
9  people were told no additional work needed to get
10 done.
11     **Q.   Do you have -- without regard to the**
12 **documents, sir, do you have any knowledge of a**
13 **point during this week where Barclays said we have**
14 **enough collateral?**
15     A.   I am not aware of that, no.  I don't
16 recall being aware of that.
17     **Q.   Now, did you this, the project we have**
18 **been talking about of looking for additional**
19 **assets, did that project ultimately succeed?  Did**
20 **you find enough additional assets?**
21     A.   I think we identified unencumbered
22 collateral and we understood the excess collateral
23 in the 15c3 lock-up were in the range that we were
24 looking for.
25     MR. GAFFEY:  Can we mark that, please.

Page 173

1      LOWITT - HIGHLY CONFIDENTIAL
2          (Exhibit 222, e-mail dated 9/20/2008
3  at 1:42:32 marked for identification, as of
4  this date.)
5      **Q.   We have marked as Exhibit 222,**
6  **Mr. Lowitt, a one-page chain of e-mails.  Take a**
7  **look through it and tell me whether you have seen**
8  **it before.**
9      A.   I don't recall the e-mail trail
10 specifically.
11     **Q.   On the lower e-mail from you to Paolo**
12 **Tonucci, copy to Steven Berkenfeld, the subject is**
13 **"Thanks for all your help getting us over the goal**
14 **line.  We did it," with exclamation points.**
15         **Is "we did it" a reference to we found**
16 **enough additional value to transfer to Barclays?**
17     A.   I think it's -- that the transaction
18 was approved by the court would have been what I
19 think we would have referred to as getting over
20 the goal line.  And we participated in that.
21     **Q.   And what was Mr. Tonucci's**
22 **participation in getting you over the goal line --**
23 **withdrawn.  I will get to that in a minute.**
24         **That being so, there is no reference**
25 **in here to the bankruptcy court or hearing or**

Page 174

LOWITT - HIGHLY CONFIDENTIAL

1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **decision. It is speaking in terms of 15c3 lock-up**
3  **money and the unencumbered box. By that, were you**
4  **referring to the result in the hearing of the**
5  **bankruptcy court where the sale was approved?**
6      MR. BERNSTEIN: Objection,
7      mischaracterizes the document.
8      MR. HUME: I object to vague and
9      ambiguous, the question.
10     A.   Again, my -- you know, we had just
11  gone through an extremely trying period in
12  aggregate. You know, dealing with the bankruptcy
13  initially and then all the work to get a deal done
14  with Barclays. And this is on the Saturday saying
15  we got the approval or the transaction was
16  approved, but we have to do more work. We have to
17  ensure that the 15c3 lock-up money and the -- you
18  know, we could free that up and transfer it, and
19  we can also transfer the collateral in the
20  unencumbered box to Barclays.
21     Saying that everything that we have
22  had to deal with has proven to be complicated and
23  difficult, we wanted to make sure that we had a
24  team on it to ensure that we are organized to
25  effect that.

Page 175

1  LOWITT - HIGHLY CONFIDENTIAL
2      Q.   And how was it that Mr. Tonucci's
3  activities helped get over the goal line?
4      A.   Well, it was a combination of things.
5  One was the work that he had done in identifying
6  the excess collateral, as well as the 15c3 excess.
7  It was also all the work that was done in
8  effecting the movement of collateral from Chase to
9  BoNY, as well as helping to keep the firm sort of
10  funded over that period.
11     Q.   And Mr. Tonucci responds in response
12  to your direction to coordinate with Berkenfeld
13  and the additional work that needs to be done,
14  "Agreed. We will use Robert for this. Have
15  confidence he knows how to get done."
16     Is that a reference to Robert Azerad?
17     A.   I believe it is.
18     Q.   Now, I asked you before if in the
19  course of the project to find additional assets
20  you felt that you were at some degree of
21  professional risk if that goal was not achieved.
22  Do you recall that?
23     A.   I do recall you asking that.
24     Q.   And you told me no?
25     MR. BERNSTEIN: Mischaracterizes his

Page 176

1      LOWITT - HIGHLY CONFIDENTIAL
2  testimony.
3      Q.   Well, did you feel some degree of
4  professional risk if the goal was not achieved
5  with respect to finding additional assets?
6      MR. BERNSTEIN: Objection, asked and
7      answered.
8      You can answer it again.
9      A.   I think I said I didn't recall
10  specifically.
11     Q.   Well, you write to Mr. Tonucci on the
12  20th of September at 9:33 a.m., "You need to be
13  close to it. If we don't succeed, you and I are
14  toast despite all our heroics."
15     Does that refresh your recollection?
16     A.   I think that -- what I think was
17  described here is we both worked fantastically
18  hard to get the transaction to a point where we
19  could fund the firm through the Friday where we
20  could meet the requirements of the -- we could
21  support the transaction as it was negotiated, and
22  that we didn't want to sort of fail at the last
23  minute vis-a-vis our ability to move the
24  collateral and to resolve the 15c3 lock-up.
25     Q.   Is that what you meant when you said

Page 177

1      **LOWITT - HIGHLY CONFIDENTIAL**
2  to Mr. Tonucci, "if we don't succeed, you and I
3  are toast despite all our heroics"?
4      A.   That's what I think I could have meant
5  by that.
6
7
8
9
10
11                 REDACTED
12
13
14
15
16
17
18
19
20
21     Q.   And when you refer to the benefits of
22  this to the whole franchise and the employees and
23  functioning entity, is that what you meant when
24  you wrote to Mr. Tonucci referring to "you and I
25  being toast"?

Page 178

LOWITT - HIGHLY CONFIDENTIAL
1 **LOWITT - HIGHLY CONFIDENTIAL**
2       MR. BERNSTEIN: Objection, asked and
3 answered, and argumentative.
4       You can answer it one more time and
5    then we will move on.
6       A.   I think it means -- I don't see it as
7 referring only to Paolo and myself. I think of it
8 as if we are not successful with this despite all
9 the hard work that everybody has put into this,
10 that it will be -- that it would have been in
11 vain.
12       Q.   Had you and Mr. Tonucci ever had
13 **discussions, the two of you, about the effect on**
14 **your own personal careers if the transaction**
15 **didn't close?**
16       A.   I don't recall us having that
17 conversation, and we were so busy with so many
18 things, I don't believe we would have had that
19 conversation.
20       Q.   **Well, do you know if Mr. Tonucci had**
21 **an offer in hand from Barclays during the week**
22 **before the closing?**
23       A.   He didn't have an offer in the week
24 before the closing. The deal would have included,
25 you know, all the employees of LBI having an offer

Page 179

LOWITT - HIGHLY CONFIDENTIAL
1 LOWITT - HIGHLY CONFIDENTIAL
2 as part of the transaction.
3       Q.   **Had you had any conversations with**
4 **Mr. Tonucci in the week prior to the transaction**
5 **about whether he, Paolo Tonucci, was likely to**
6 **find employment with Barclays after the**
7 **transaction?**
8       A.   I don't recall having that
9 conversation with Paolo.
10       Q.   **Did he ever raise that topic with you,**
11 **is there going to be a job for me at Barclays?**
12       A.   I don't recall him ever raising it
13 with me.
14       Q.   **Did there ever come a point when you**
15 **spoke to Mr. Tonucci who reported directly to you**
16 **about whether there would be a job for him at**
17 **Barclays?**
18       A.   I did speak with Barclays the week
19 after the transaction closed together with a
20 number of other folks who were on a list of --
21 people that Barclays wanted to retain. But that
22 was only the week after the transaction closed.
23       Q.   **When did Barclays make it known to you**
24 **that it wanted to retain Mr. Tonucci?**
25       A.   Well, there wasn't a communication

Page 180

LOWITT - HIGHLY CONFIDENTIAL
1 LOWITT - HIGHLY CONFIDENTIAL
2 around Mr. Tonucci specifically. There were --
3 there was a list that had been generated for a
4 number of people in the corporate area that
5 Barclays was interested in retaining.
6       Q.   **Did this list include Mr. Tonucci?**
7       A.   It did.
8       Q.   **Did it include Mr. Kelly?**
9       A.   It did.
10       Q.   **Did it include Mr. Reilly?**
11       A.   It did.
12       Q.   **Did it include -- I didn't get the**
13 **name -- the person who was in charge of tax who**
14 **was a direct report to you?**
15       A.   Yes, it did.
16       Q.   **Did it include Alastair Blackwell?**
17       A.   It did.
18       Q.   **Did it exclude any of your direct**
19 **reports?**
20       A.   I can't say with certainty. It was a
21 list that was -- that had actually been generated
22 by Lehman prior to the bankruptcy as the list of
23 people that would receive -- that potentially
24 would have received various stock awards that
25 Lehman was contemplating.

Page 181

LOWITT - HIGHLY CONFIDENTIAL
1 LOWITT - HIGHLY CONFIDENTIAL
2       So it was a lift of a list that had
3 been developed previously.
4       Q.   **On the Friday, the 19th, when the**
5 **project was going on to search for additional**
6 **assets, during that day, was it matter of any**
7 **concern to you that you might not have a position**
8 **at Barclays if that project was not successful?**
9       MR. BERNSTEIN: Objection, asked and
10 answered.
11       A.   I did not -- that was not my focus on
12 that day, and it was not a concern of mine, I
13 don't believe.
14       Q.   **Was it a focus of yours or matter of**
15 **concern to you that if the project of finding**
16 **additional value was not successful, your several**
17 **direct reports would not have jobs or the**
18 **possibility of jobs at Barclays?**
19       A.   Again, I was -- we were all working
20 very hard to ensure a transaction took place
21 without regard to individual circumstances.
22       (Exhibit 223, document Bates stamped
23 10293506 marked for identification, as of
24 this date.)
25       Q.   **Mr. Lowitt, I put before you what we**

Page 182

```
1           LOWITT - HIGHLY CONFIDENTIAL
2    have marked as Deposition Exhibit 223. Have you
3    seen this document before?
4        A.   I have not. Or I don't recall seeing
5    it before.
6        Q.   The document is a chain of e-mails,
7    the earliest of which is 20th September, 2008, at
8    1:04 p.m. from you to Alastair Blackwell with a
9    copy to Paolo Tonucci. Subject, "Confirming our
10   unencumbered box is now the top priority."
11           And in it you say to Mr. Blackwell,
12   "Please coordinate with Paolo to do everything
13   possible to ensure we have the 1.95 billion of
14   collateral identified and ready to move and
15   address claims from Chase that they have a claim.
16   Ian."
17           What are you referring to when you
18   refer to claims from Chase there?
19       A.   I am -- again, I don't have a
20   recollection of this specifically, but Chase were
21   seizing collateral, and so what we needed to do
22   was make sure that the collateral that we had
23   identified that was unencumbered was -- in fact,
24   we were in -- we had the ability to deliver to
25   Barclays.
```

Page 183

```
1           LOWITT - HIGHLY CONFIDENTIAL
2        So I think that this is again about
3    operationalizing what had been agreed to, which
4    was our ability to deliver the collateral to
5    Barclays to satisfy the terms of the transaction.
6        Q.   OK. So on the Saturday, as far as
7    this e-mail reflects anyway, on the Saturday, you
8    are looking at whether the -- having found the
9    additional value, whether it can actually be --
10   you are assuring yourself it can be transferred to
11   Barclays, correct?
12       A.   That's the essence of the e-mail, yes.
13       Q.   Over the course of the weekend, apart
14   from that type of activity, what was found on
15   Friday can be transferred to Barclays, were there
16   efforts to find still more value?
17       A.   Again, I can't recall whether there
18   were things specifically to add additional value.
19   I think that if there were additional efforts, it
20   was to sort of understand, in the event some of
21   this collateral couldn't be delivered, whether
22   there was other collateral that could have been
23   delivered to satisfy the requirement under
24   whatever the deal was that was agreed.
25           Can I have a quick break, please.
```

Page 184

```
1           LOWITT - HIGHLY CONFIDENTIAL
2        Q.   Sure.
3        A.   Thank you very much.
4            (Recess)
5            (Exhibit 224, four-page e-mail dated
6    9/20/2008 at 6:12 p.m. marked for
7    identification as of this date.)
8    BY MR. GAFFEY:
9        Q.   Mr. Lowitt, I am putting before you a
10   document we have marked as 224. Take a look at
11   that, please, and let me know whether you have
12   seen it before.
13       A.   I don't have a specific recollection
14   of seeing this trail of e-mails.
15       Q.   OK. I should -- I am going to ask you
16   a couple of questions about it anyway, but I just
17   want to note that as far as I can see on my read,
18   you are not within the e-mail chain until the very
19   top one that seems to be sent to you as a whole.
20   I only see your name at the top.
21           But you will see that the e-mail chain
22   is a series of communications that start with
23   Martin Kelly writing to Robert Azerad, Alastair
24   Blackwell and Brett Beldner with some ccs about an
25   opening balance sheet that has been requested by
```

Page 185

```
1           LOWITT - HIGHLY CONFIDENTIAL
2    Barclays. Do you see that?
3        A.   I do see that on the last page.
4        Q.   Do you have any independent
5    recollection of work being done to prepare an
6    opening balance sheet for Barclays?
7        A.   I don't have an independent
8    recollection of that, no, not that I recall.
9        Q.   And in the e-mail that follows, and
10   I'm moving up the page here, 20 September 2008 at
11   10:27 a.m. from Azerad to Kelly, Blackwell and
12   Felder. Do you see that?
13       A.   I do see that.
14       Q.   Azerad refers to a "classification of
15   the assets by asset class that should be done by
16   end of day today, assuming that what was
17   transferred was," and then he has got two items.
18   One is, "Repo with Barclays as of Thursday night
19   (49 billion-42 billion of securities and 7 billion
20   of cash)." Do you see that?
21       A.   I do see that.
22       Q.   And then two, "Non-actionable box as
23   shown to Barclays on Friday afternoon (1.9 billion
24   of collateral). Actual box is slightly bigger
25   because it also contains Lehman debt."
```

1          **LOWITT - HIGHLY CONFIDENTIAL**
2          Do you see that?
3      A.    I do.
4      Q.    And do you recognize this to be two of
5  the components of the value that was ultimately
6  transferred to Barclays in the transaction?
7      A.    I see this as two of the elements of
8  the transaction, the repo transaction and the
9  non-actionable box, which I think is shorthand for
10  or just a different term for the unencumbered
11  collateral.
12      Q.    The description of the values there is
13  correct, is it not?  49 billion for the repo and
14  1.9 billion for the unencumbered collateral?
15          MR. HUME:  Objection, lacks
16      foundation, vague and ambiguous.
17      A.    Yeah.  As I said before, unencumbered
18  collateral was about a billion nine, and the total
19  repo was, you know, my recollection, about --
20  between 49 and 50 billion dollars of collateral
21  was what was papered, and the cash movement was
22  about $45 billion, again from my recollection.
23          What I will say, I don't think the
24  7 billion in cash was actually included in the 49.
25      Q.    Well, there was a point where -- there

1          **LOWITT - HIGHLY CONFIDENTIAL**
2  was 7 billion in cash that was supposed to be
3  included, correct?
4      A.    Again, I believe that that was how the
5  49 was -- or 49, 50 was going to get established,
6  but it didn't move -- I don't believe it all
7  moved.
8      Q.    Do you know why the 7 billion did not
9  move?
10      A.    I don't know why.  I know Chase didn't
11  move it.
12      Q.    And ultimately Chase's failure to move
13  it was resolved in a settlement that came in
14  December, correct?
15      A.    I don't know when it happened.  I know
16  there was an ongoing settlement discussion that
17  Mr. Ricci was involved in.
18      Q.    Were you involved in any of the
19  discussions that led to that settlement in
20  December?
21      A.    I was not.
22      Q.    Do you have any knowledge as to on
23  what terms Chase's failure to move the 7 billion
24  were resolved?
25      A.    I don't know and I wasn't part of the

1          LOWITT - HIGHLY CONFIDENTIAL
2  negotiating team.
3      Q.    The plan was 42 billion plus 7 billion
4  in cash, correct?
5      A.    Again, I can't confirm that for you.
6  That's what it says down on the e-mail.
7      Q.    Apart from the fact that it says that
8  on the e-mail, sir, do you have any knowledge as
9  to whether the amount of the repo, the collateral
10  in the repo was roughly $49 billion?
11      A.    Yeah, my recollection is between 49
12  and 50 billion dollars.
13      Q.    Further up the e-mail, there is an
14  e-mail from Paolo Tonucci to Azerad, Kelly,
15  Blackwell and Beldner.
16      A.    This is the 10:31?
17      Q.    That's right.
18          And in it Mr. Tonucci writes, "We also
19  need to add the 15c3 cash as a receivable."  Do
20  you see that?
21      A.    I do see that.
22      Q.    And if you read further up the e-mail,
23  you will see that's calculated -- well, that a
24  series of cash sources are calculated, and I am
25  going to ask you to read through it and then take

1          LOWITT - HIGHLY CONFIDENTIAL
2  a look at the e-mail from Dan Flemming to Paolo
3  Tonucci, 20 September at 5:01.  Read that through.
4      A.    I have read the E mail.
5      Q.    Do you see the reference in the 20
6  September 5 -- 17:01 e-mail to a summary of
7  securities in lock-up at JPM for 15c3 EBOC, all
8  caps, and PAIB, all caps?
9      A.    I do.
10      Q.    I want to see what your reading is of
11  this, but as I understand the calculations being
12  done here, there is a total of 1.763 billion --
13      A.    Yeah, my --
14      Q.    -- identified here; is that right?
15  Are you seeing it that way?
16      A.    Yeah.  My recollection was that the
17  15c3 excess was about $1.75 billion, so this would
18  be consistent with that recollection.
19      Q.    And at the end of the day, in the
20  event only the security portion of the 15c3 was --
21  well, what was the ultimate amount of 15c3 that
22  went over?
23      A.    Again, I know that in the final
24  contract, the amount was about $560 million.
25          (Exhibit 225, two-page document Bates

Page 190

LOWITT - HIGHLY CONFIDENTIAL

1  stamped 77882 marked for identification, as
2  of this date.)
3  Q.   I put before you Exhibit 225,
4  Mr. Lowitt. Tell me, please, if you recall seeing
5  this document before.
6  A.   I don't recall seeing this document
7  before.
8  Q.   The chain of e-mails here begins on
9  the second page with an e-mail -- well, on the
10  first page it runs over. An e-mail from Paolo
11  Tonucci sent September 18, 4:07 p.m., to you, copy
12  to Alastair Blackwell, subject, "First 5 billion
13  gone."
14      What is that a reference to?  Do you
15  know?
16  A.   Again, I would assume this is moving
17  the collateral from Chase to BoNY.
18  Q.   And that's collateral in respect of
19  the September 18 Lehman-Barclays-BoNY triparty
20  repo?
21  A.   Right. The unwind of the Fed and the
22  movement of collateral from JP Morgan to BoNY, so
23  the repo could be booked through BoNY's triparty
24  rather than Chase's triparty.

Page 191

LOWITT - HIGHLY CONFIDENTIAL

1  Q.   The next e-mail up, from you to
2  Blackwell, September 18, 16:35, you write, "Are we
3  still papering the 18 billion repo from Barclays
4  or is that all part of the same transfer?  Afraid
5  that is getting lost in the numbers. Ian."
6      Do you see that?
7  A.   I do.
8  Q.   Mr. Blackwell responds in the next
9  e-mail up, "We are not unwinding. It was
10  15.8 billion last night. We will increase it at
11  the end of the process."
12  A.   I see that.
13  Q.   This was just kind of a cry for help
14  for me. What is the $18 billion Barclays repo you
15  are referring to here?
16  A.   So you will recall one of those
17  earlier e-mails that we talked about that the
18  funding position of the firm was deteriorating
19  quite rapidly. So on the Wednesday we talked
20  about the position having deteriorated by
21  $7 billion. Barclays was assisting us in our
22  funding, so Barclays was doing repos with Lehman
23  and helping to make up the lost funding capacity
24  that we were experiencing as people were pulling

Page 192

LOWITT - HIGHLY CONFIDENTIAL

1  away from funding the street and funding Lehman.
2      So in addition to taking on the Fed
3  repo, Barclays were additionally funding Lehman.
4  Q.   In a repo transaction separate and
5  apart from stepping into the Fed repo?
6  A.   Separate and apart.
7  Q.   OK. And that --
8  A.   And that was built up over, I think --
9  again, I can't say with certainty, but I think it
10  was probably being built up on the Tuesday and the
11  Wednesday.
12  Q.   Now, on the Thursday in your e-mail
13  from -- in your e-mail to Blackwell and Tonucci,
14  you seem to be asking whether we are still
15  papering the $18 billion repo with Barclays or is
16  that all part of the same transfer. Is the
17  question you are asking whether they are to be
18  combined, that is the Fed repo and the 18 billion?
19  A.   It is saying -- I don't recall it
20  specifically, but the question would have been,
21  was Barclays going to continue to fund the
22  $18 billion of collateral or cash -- I can't be
23  sure if it was collateral or cash -- in addition
24  to what they were doing with the Fed, or was -- or

Page 193

LOWITT - HIGHLY CONFIDENTIAL

1  were they in effect going to cancel this
2  $18 billion repo that they had outstanding.
3  Q.   And that perhaps explains for me
4  anyway the e-mail you're sending further up,
5  Lowitt to Blackwell, September 18, 16:44. What --
6  "Do you mean increase it at the end of the
7  process? Do you mean that the total repo with
8  BarCap becomes 15.8 plus 48 or so?  What is the
9  exact number to take out the Fed so it goes up to
10  63.8?"
11      That's not what happened, right?
12  A.   That's not what happened. One way
13  this could have happened was that Barclays
14  maintained their $18 billion repo, which they were
15  doing through Chase, and in addition to that, they
16  were going to take on the $50 billion or so off
17  the Fed.
18  Q.   Now, did Barclays roll a $15.8 billion
19  repo --
20      MR. BERNSTEIN: In your last answer
21  did you say 15 billion or so off the Fed or
22  50?
23      THE WITNESS: 50. 5-0.
24  Q.   Did Barclays roll the $15.8 billion

Page 194

1        **LOWITT - HIGHLY CONFIDENTIAL**
2  **repo, the one that is referred to here?**
3        A.    They did not.
4        **Q.    Had it been your expectation that they**
5  **would?**
6        A.    I mean expectation is -- I'm not sure
7  if that's the right word.  I certainly wasn't
8  aware that they were not going to, but that was
9  why I was asking the question.
10       **Q.    Were you surprised at the time to**
11 **learn that they weren't rolling the $15.8 billion**
12 **repo?**
13       A.    Again, I don't have a complete
14 recollection, but I do believe that I -- it was
15 not expected that they were not going to roll the
16 15.8 that they had been funding up to that point.
17       **Q.    So did that create -- we have enough**
18 **to deal with there.  Does that create another**
19 **problem that has to be addressed to replace that**
20 **funding?**
21       A.    That's the heart of the issue with
22 Chase, because Chase then had to fund that as a
23 box position.  So Chase effectively stood in to
24 fund that position on the Thursday evening.
25       **Q.    Did Chase do that, stand in on that**

Page 195

1        **LOWITT - HIGHLY CONFIDENTIAL**
2  **funding?**
3        A.    They did.
4        **Q.    Would you explain to me how they do**
5  **that?  I'm a little, as you put it in your**
6  **e-mails, lost in the numbers.  How does Chase**
7  **stand in to replace the Barclays repo funding?**
8        A.    The collateral is sitting in the Chase
9  accounts, so they have the collateral, and they
10 extend a box loan against that collateral.
11       So the way the triparty would work
12 normally is, if there is any collateral left in
13 the box, because of inefficiencies in funding
14 through the course of the day that weren't
15 anticipated, in certain cases if there is extra
16 collateral in the box, Chase would extend a loan
17 against that collateral.
18       So the collateral here that had been
19 funded by Barclays in the 15.8 remained in the box
20 as collateral, and Chase needed to fund it that
21 night with a very substantial box loan.
22       **Q.    And they made the loan?**
23       A.    They did make the loan.
24       **Q.    And does that roll the next day?**
25       A.    Well, it remains in place and the

Page 196

1        LOWITT - HIGHLY CONFIDENTIAL
2  meeting with the bankruptcy judge occurs on the
3  Friday afternoon.
4        **Q.    Mr. Lowitt, I put before you what was**
5  **previously marked as Deposition Exhibit 77B.  Have**
6  **you seen those e-mails before, that chain of**
7  **e-mails?**
8        A.    Yeah, I don't have a specific
9  recollection of this e-mail chain.
10       **Q.    The e-mail -- again, I am now starting**
11 **at the top of the page rather than working**
12 **chronologically.  The e-mail from you to Monty**
13 **Forrest, Alastair Blackwell, Neal Ullman, Jim**
14 **Hrasca, copies Tonucci, Azerad and Flemming,**
15 **entitled "1.9 billion, 9:15 p.m. update."**
16       **And you say, and it's as follows,**
17 **"Need a CUSIP level detail of the collateral and**
18 **where it is for a 7 a.m. meeting with Bart.**
19 **Monty, you or Alastair need to be at that 7 a.m.**
20 **meeting to prepare for a final Weil meeting to**
21 **finalize the agreement.  Thanks.  Good luck**
22 **getting additional collateral.  But good accurate**
23 **presentation of the collateral is also critical,**
24 **as we will append to the agreement.  Thanks again**
25 **for all the hard work.  Ian."**

Page 197

1        **LOWITT - HIGHLY CONFIDENTIAL**
2        **Now, do you recall -- if you don't --**
3  **even if you don't recall a particular e-mail, do**
4  **you recall putting this project on the plate of**
5  **people that night for a 7 a.m. meeting with Bart**
6  **McDade?**
7        A.    I don't have a recollection of that.
8        **Q.    Do you recall meeting with Bart McDade**
9  **on the Monday morning at 7 a.m.?**
10       A.    Is it on the --
11       MR. BERNSTEIN:  Yeah.
12       **Q.    Let me back up.  The e-mail you send**
13 **is --**
14       A.    This is Saturday night for Sunday
15 morning.
16       **Q.    You're right.  I have screwed up my**
17 **GMTs here.**
18       So the e-mail is late Saturday night
19 at about 10:23 p.m. Saturday night, and refers to
20 a 7 a.m. meeting for Sunday, yeah?
21       A.    I believe that to be the case based on
22 the timing.
23       **Q.    OK.  All right.  And the reference in**
24 **here to a final Weil meeting to finalize the**
25 **agreement, what agreement are you referring to in**

Page 198

LOWITT - HIGHLY CONFIDENTIAL

1     LOWITT - HIGHLY CONFIDENTIAL
2 there?
3     A.   Again, I know that the -- that there
4 were meetings on Saturday and Sunday at Weil which
5 were finalizing the agreement with Barclays, and
6 that there were some set of issues or items that,
7 you know, still needed to get resolved, and that's
8 why, you know, we were meeting at the Weil offices
9 on Sunday.
10     Q.   Did you go to any of those meetings?
11     A.   I mean I was at Weil.  A lot of time
12 was spent sitting around.  There was some meetings
13 that I was a part of, but the majority of meetings
14 were happening with other people involved in
15 those.
16     Q.   And you were not at any of the
17 meetings where the agreements were finalized; is
18 that right?
19     A.   That's -- I don't remember being at
20 any meetings where things were finalized.
21     Q.   And in this e-mail, you express to the
22 men to whom you are sending it, "Good luck getting
23 additional collateral."  What is that a reference
24 to?  Are you still looking for collateral as late
25 as Saturday night?

Page 199

1     LOWITT - HIGHLY CONFIDENTIAL
2     A.   I think we were trying to understand
3 what was the collateral that was unencumbered.
4 The information that was available was
5 extremely -- it was extremely difficult to get
6 clarity on what collateral we had that was really
7 unencumbered, given that we didn't have access to
8 many of our accounts at Chase and we didn't know
9 what collateral Chase had actually taken.
10     So I think that was what this was
11 probably referring to.  But I don't have a precise
12 recollection of it.  Based on what I know was
13 going on at the time.
14     Q.   Did that get straightened out, what
15 collateral they had actually taken?
16     A.   I think it was -- it wasn't
17 straightened out completely that weekend.  I think
18 it remained work that was ongoing, and we didn't
19 have access to many of the -- much of the
20 information systems that we needed to resolve that
21 completely.
22     (Exhibit 226, e-mail dated September
23 21, 2008 at 2:15 p.m. marked for
24 identification, as of this date.)
25     Q.   I put before you, Mr. Lowitt, what we

Page 200

1     LOWITT - HIGHLY CONFIDENTIAL
2 have marked as Deposition Exhibit 226.  Have you
3 seen that before?
4     A.   I have no recollection of seeing this
5 before.
6     Q.   Do you know Gerard Larocca?
7     A.   Gerard is the CAO for BarCap in the
8 Americas.
9     Q.   And this e-mail is dated September 21,
10 2:15 p.m.
11     A.   So that's the Saturday?
12     Q.   Yes.  No, that's the Sunday.
13     A.   That's the Sunday.
14     Q.   That's the Sunday.
15     Entitled "Please give me a call to
16 review the schedules on collateral."  And the text
17 of the e-mail says, "To emphasize the key point,
18 there is no overlap between the unencumbered
19 collateral and the purchased assets of
20 49.9 billion.  Ian."
21     Do you see that?
22     A.   I do.
23     Q.   Do you have a recollection of there
24 being some issue that you needed to resolve or
25 clarify with Mr. Larocca as to whether the

Page 201

1     LOWITT - HIGHLY CONFIDENTIAL
2 unencumbered collateral overlapped with the repo
3 amount?
4     A.   I don't have a specific recollection,
5 but I'm sure that BarCap would have wanted to make
6 sure that the schedule that was the unencumbered
7 collateral schedule didn't include any assets that
8 were already in the repo transaction and that they
9 were -- given the sort of uncertainty around
10 information, that we were sure that the collateral
11 that was in the unencumbered collateral schedule
12 was not included in the repo transaction that we
13 talked about before.
14     Q.   And apparently you determined that the
15 unencumbered collateral was not included in the
16 repo; is that correct?
17     A.   That was what a lot of the work that
18 Alastair and the others who are referenced in that
19 earlier e-mail were working to insure.  Not only
20 that it wasn't in the repo, but also that it was
21 genuinely unencumbered and that if there was --
22 you know, additional work over that period may
23 have identified some collateral that we had
24 previously thought was unencumbered that may have
25 been encumbered as they got better or new

Page 202

LOWITT - HIGHLY CONFIDENTIAL

1    information.
2
3    **Q.   When you write to Mr. Larocca on**
4    **Sunday, the 21st, the conclusion that has been**
5    **reached is it wasn't in the repo and it was**
6    **unencumbered, correct?**
7        A.    That was what the exercise was
8    designed to ensure, and every effort was made to
9    ensure that was the case. Whether it was correct
10   in every case, can't say, but that was the best
11   effort that a lot of people were putting in to
12   determine that was the case, because that was our
13   understanding of what the transaction called for.
14       **Q.   I'm not trying to be argumentative**
15   **here. I think we may be at cross purposes. I**
16   **think what I am asking you is, this project people**
17   **were working so hard on, did it conclude that the**
18   **unencumbered -- that the unencumbered collateral**
19   **was not included in the repo and it was available**
20   **for transfer?**
21       MR. BERNSTEIN:  Objection, asked and
22       answered.
23       A.    The exercise was to identify
24   collateral that was unencumbered and not part of
25   the repo transaction. The people working on it

Page 203

LOWITT - HIGHLY CONFIDENTIAL

1
2    were confident that was the case.
3        What I can't say with certainty is
4    that that was correct in every single
5    circumstance, but that was the purpose of the
6    exercise that people were undergoing.
7        **Q.   OK, thank you.**
8        (Exhibit 227, two-page document Bates
9        numbed 70327 marked for identification, as
10       of this date.)
11       **Q.   I put before you, Mr. Lowitt, what we**
12   **have marked as Deposition Exhibit 227. Have you**
13   **seen this set of e-mails before?**
14       A.    Again, I don't recall the specific
15   flow of e-mails.
16       **Q.   Looking at the earliest e-mail in the**
17   **chain, from Tonucci to you September 22,**
18   **5:24 a.m., re: 15c3 -- you know, I think it's part**
19   **of --**
20       A.    Mine says 4:02 a.m.
21       **Q.   I was in the wrong place. Let me**
22   **start again.**
23       The earliest is 4:02 a.m. entitled
24   **"15c3." Tonucci writes to O'Meara, Lowitt, Kelly,**
25   **Azerad and Blackwell, "Final agreement was limited**

Page 204

LOWITT - HIGHLY CONFIDENTIAL

1
2    to the 769 million of Treasuries so should be more
3    comfortable to accomplish."
4        **Does that reflect an adjustment in the**
5    **15c3 that no cash would move over?**
6        A.    I don't know if it would be that no
7    cash would move over. What I understood this to
8    mean was the amount of excess under the 15c3 that
9    was in the contract was 769 rather than that
10   billion seven that had been talked about earlier.
11       **Q.   What contract are you referring to?**
12       A.    The final agreement that was signed by
13   BarCap.
14       **Q.   And you have never seen that contract?**
15       A.    Which I didn't read.
16       **Q.   Well, were you -- did you ever have it**
17   **in your hand? Were you ever in possession of it?**
18       A.    I did not have it in my hand that I
19   recall.
20       **Q.   And in your e-mail to Mr. Tonucci, at**
21   **5:22 on the morning of September 22, you ask, "Is**
22   **it all signed? Ian." Do you see that?**
23       A.    Yes, I do.
24       **Q.   What is the "it" that you are**
25   **referring to?**

Page 205

LOWITT - HIGHLY CONFIDENTIAL

1
2        A.    I think I would have been referring to
3    the agreement between Barclays and Lehman being
4    finally signed and completed.
5        **Q.   Again, just so we -- this series of**
6    **questions is complete, that's the agreement you**
7    **hadn't seen?**
8        A.    It was the agreement that was being
9    worked on by a large number of people between
10   Barclays and Lehman. I wasn't involved with that.
11   I wasn't present at the time that those agreements
12   were being worked on.
13       **Q.   Now, further up in the e-mail chain,**
14   **you're told by Mr. Tonucci that there is an issue**
15   **with RACERS which JPM had on their list of assets**
16   **to transfer. That is the only open item. Do you**
17   **see that?**
18       A.    I do.
19       **Q.   Do you have any recollection of what**
20   **the issue was concerning RACERS?**
21       A.    I don't have a specific recollection,
22   but I can infer from this that JP Morgan wanted
23   the RACERS to be included in the repo trade with
24   Barclays and that Barclays was resisting that, and
25   that was something that I was aware was an issue.

Page 206

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.   Can you give me a bit more detail
3    about the issues?  Why was it Barclays
4    resisting that?  Did you have an understanding of
5    that?
6    A.   Well, it was one of those assets that
7    Barclays didn't want to take, and when they
8    thought about the Fed repo that they stepped into,
9    the Fed repo didn't include the RACERS, and so
10   they didn't feel that they should have to take the
11   RACERS position as part of the repo.
12   Q.   Did they wind up taking the RACERS
13   position, as far as you know?
14   A.   I don't know.  That was, I'm sure,
15   part of the discussion between JP Morgan and
16   BarCap that you referenced that was completed in
17   December.
18   Q.   Further up in the e-mail Mr. Tonucci
19   says, "We are not involved, have tried to stay out
20   of it completely."  Do you see that?
21   A.   I do.
22   Q.   What is your understanding of why
23   Tonucci or Lehman would try to stay out of it
24   completely?
25   A.   Look, I -- I don't know what Paolo

Page 207

1    LOWITT - HIGHLY CONFIDENTIAL
2    means by this specifically, but this would -- I
3    think we would have seen this as an issue between
4    JP Morgan and BarCap to resolve, not something
5    that Lehman could contribute to.
6    Could I take a quick break, please.
7    Q.   Sure.  If it helps, I am almost done.
8    If you want to take a break --
9    A.   Just a short one.  I just need a few
10   minutes.
11   (Recess)
12   BY MR. GAFFEY:
13   Q.   There was some part of your testimony
14   that you wanted to clarify, sir?
15   A.   Yes.
16   MR. BERNSTEIN:  Let me refer you to
17   the end of 176.  You were asked, "What was
18   the ultimate amount of 15c3 that went over?"
19   And your answer:  "Again, I know that in the
20   final contract, the amount was about
21   $560 million."
22   Do you want to make a clarification?
23   A.   The correct number would be
24   $760 million, around $760 million.
25   Q.   Thanks.

Page 208

1    LOWITT - HIGHLY CONFIDENTIAL
2    Mr. Lowitt, when the -- you will --
3    can you pull out -- I think you have it there --
4    Exhibit 19.
5    A.   Yes.
6    Q.   Everybody spends time with Exhibit 19.
7    Exhibit 19.  When the -- when that schedule was
8    put together and the asset classes -- when that
9    schedule was put together and it was going to
10   reflect the price that Barclays would pay versus
11   the amount shown on Lehman's books for those asset
12   classes, were the RACERS included within the asset
13   classes that are listed?
14   A.   I actually don't know.  I don't know.
15   Q.   We talked a bit just before the last
16   break about an issue that arose over the weekend
17   where Barclays didn't want the RACERS and they
18   were -- I think they were taken out of the
19   collateral supporting the repo.  Is that right?
20   A.   Again, I don't know what ended up
21   being concluded between JP Morgan and Barclays,
22   but I know that it was a point of contention
23   between the two parties.
24   Q.   And whatever discussions they had to
25   solve that point of contention, do you know if the

Page 209

1    LOWITT - HIGHLY CONFIDENTIAL
2    end result was the RACERS were not transferred
3    over to Barclays?
4    A.   Again, I don't know the details of
5    what the settlement was between JP Morgan and
6    BarCap, so I don't know whether the RACERS went
7    over to Barclays or remained with JP Morgan.
8    Q.   Do you know if the basis of Barclays'
9    concern about the RACERS was the quality of that
10   collateral?
11   A.   I don't know the basis of their
12   concern.  It may well have been their ability to
13   feel comfortable with what they were willing to
14   pay for it, but I don't know why, what the basis
15   of their concern was.
16   Q.   We have talked from time to time today
17   about the delta between the amount Barclays was
18   willing to pay against the amount -- against the
19   value that Lehman ascribed to the collateral.  Was
20   there any discussion over the weekend about
21   adjusting that delta if the RACERS were taken out?
22   A.   Again, I'm not aware of any
23   discussions around that.  I think that the repo
24   that Barclays believed that they were entering
25   into was the one that they were standing in the

Page 210

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2  shoes of the Fed.  The RACERS were not part of the
3  repo with the Fed, so they were not expecting the
4  RACERS to be part of the transaction.
5    Q.   The constituent parts of the
6  collateral that was in the repo at the Fed, the
7  body of collateral that was with the Fed, was that
8  body of collateral amongst the securities that
9  were valued that led to the -- valued and priced,
10 that led to the drafting of Exhibit 19?
11    MR. HUME:  Objection, vague and
12   ambiguous.
13   A.   I think the --
14    Q.   You know, I think my friend Hamish
15 might be right.  Let me rephrase that.
16    Did the component parts of Lehman's
17 inventory change from the time the exercise that
18 led to Exhibit 19 took place to the time
19 collateral was put into the repo when Barclays
20 stepped in for the Fed?
21   A.   I think there was some small amount of
22 trading activity, but given the state of LBI, it
23 would have been, you know, securities that were
24 maturing or settling but there was very little
25 trading activity.  So it wouldn't be identical,

Page 211

1    LOWITT - HIGHLY CONFIDENTIAL
2  but it would be largely similar but not
3  necessarily identical.
4    Q.   Now, with respect to this, on
5  Exhibit 19, the annotations for assumed
6  liabilities for comp and cure, did you ever have a
7  discussion with Mr. Kelly about the amount that
8  was accrued for cure in that schedule?
9    A.   You said the amount that was accrued
10 for cure?
11    Q.   You see the amount next to "cure"
12 there is 2 and a quarter billion?
13   A.   I do.
14    Q.   Did there come a time after that
15 schedule was prepared where you had a discussion
16 with Martin Kelly about whether that number was
17 too high?
18   A.   Yeah, I have no recollection of
19 discussions with Martin about a cure payment.
20    Q.   Do you have any recollections of any
21 discussions with Mr. McDade where he was informed
22 that that number was too high?
23   A.   I have -- I don't recall a
24 conversation with Bart about that.
25    Q.   Do you generally recall any point

Page 212

1    LOWITT - HIGHLY CONFIDENTIAL
2  where Mr. McDade allowed as how if that number was
3  too high, Lehman had just left a billion dollars
4  on the table?
5    A.   I don't recall any conversations
6  around the cure payment after the Monday night,
7  Tuesday morning.
8    Q.   Do you recall any conversations at
9  all, without, you know, with regard to Mr. McDade,
10 Mr. Kelly, any conversations at all about whether
11 that accrual for 2 and a quarter billion for cure
12 was a good estimate, whether it was close to what
13 the real liability would be?
14   A.   Again, my focus through the course of
15 that week was around funding, around other
16 aspects, and I don't recall any discussions around
17 the cure payment.
18    Q.   Were you involved in any discussions
19 surrounding the comp accrual shown on that
20 schedule?
21   A.   I don't recall being a part of any
22 discussions around the comp.
23    Q.   Did you ever develop an understanding
24 as to whether the accrual for comp on that
25 schedule bore any relation to the actual accruals

Page 213

1    LOWITT - HIGHLY CONFIDENTIAL
2  for comp at Lehman?
3    MR. BERNSTEIN:  Objection,
4   mischaracterizes the document.
5    Q.   I am sorry, I am getting tired too.
6  Let me rephrase the question.
7    Did you ever develop an understanding
8  as to whether a $2 billion accrual for comp was a
9  good estimate?
10   A.   My understanding of the 2 billion was
11 that it was a negotiated number between Barclays
12 and Lehman, that it included the cash bonus, as
13 well as sort of stock and other forms of
14 compensation.
15    So the fact that it was a $2 billion
16 number which was larger than the sort of accrual
17 for cash bonus didn't surprise me.
18    Q.   Is the effect of that enlargement of
19 the number over the accrual for -- accrual for a
20 cash bonus, to increase the consideration Barclays
21 is shown to pay by assuming liabilities?
22   A.   I don't see it in that way.  I see it
23 as an agreement that $2 billion of compensation in
24 the form of cash bonus and stock would be
25 available for Lehman employees.

Page 214

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2        Q.  Was it agreed to that amount,
3    $2 billion, simply so assets and liabilities would
4    balance on Exhibit 19?
5        A.  The comp number at 2 billion was
6    consistent through earlier iterations of this that
7    we have been through, so it wasn't a number that
8    made these balance.  It was one of the inputs that
9    had been consistent based on the discussions
10   through the evening and morning.
11       Q.  Were the -- were the numbers for comp
12   and accrual on that balance -- on that, on Exhibit
13   19, just plug numbers?
14       A.  No.  The comp number was the number
15   that was the number that was agreed between the
16   parties, and 2 and a quarter was the estimate that
17   Martin generated on that evening for what the cure
18   payment items were going to be.
19       Q.  It was Martin who generated that
20   number?
21       A.  That's my recollection.
22       Q.  Tell me what you remember about Martin
23   generating that number.  Martin is Martin Kelly?
24       A.  Martin Kelly.
25           My own specific recollection was

Page 215

1    LOWITT - HIGHLY CONFIDENTIAL
2    talking with Martin on that -- either the Monday
3    night or Tuesday morning about the need to
4    estimate that and the difficulties associated with
5    it, given that we didn't have sort of daily
6    balance sheets associated with LBI, and there was
7    a need to estimate it, and Martin went through
8    some process to estimate it, which I don't recall
9    him taking me through.  He would just have
10   provided the estimate.
11       Q.  I am showing you, sir, what has
12   previously been marked as Exhibit 45.  Have you
13   seen this document before?
14       A.  I have not.
15       Q.  Do you recall writing to
16   Mr. Berkenfeld, Mr. McDade, Mr. Kirk, Mr. Tonucci
17   and Mr. Seery in the early morning hours of
18   Monday, September 22, and commenting on the fact
19   that the closing had started?
20       A.  I don't recall it specifically.
21       Q.  Do you recall sending e-mails back and
22   forth inquiring as to where things stood on the
23   closing?
24       A.  I mean we have been through
25   Exhibit 227, where I was asking Paolo how the

Page 216

1    LOWITT - HIGHLY CONFIDENTIAL
2    negotiations were proceeding.  I obviously was
3    interested in how it was going.
4        Q.  And in the e-mail below yours saying
5    hooray, from Berkenfeld to McDade, Berkenfeld
6    writes, "JP Morgan blinked.  They agreed to cancel
7    the 7.4 billion collateral purchase."
8            Do you understand what that is a
9    reference to?
10       A.  I don't know.
11       Q.  Do you know if at the time you did
12   have an understanding, even if you don't remember
13   it today?
14       A.  I don't have any recollection other
15   than I am sure that my hooray with three
16   exclamation points was about we are starting the
17   closing.  That was a huge relief, that after all
18   this, the transaction was going to close.
19       Q.  I am going to ask you not to say
20   hooray, but I don't have any further questions.
21   Let's just change some seats so the court reporter
22   can hear.
23           - - - -
24
25

Page 217

1    LOWITT - HIGHLY CONFIDENTIAL
2    EXAMINATION BY
3    MS. TAGGART:
4        Q.  Mr. Lowitt, I am Erica Taggart and I
5    represent the committee.
6        A.  The committee?
7        Q.  The official committee of unsecured
8    creditors.  We are special counsel for the
9    committee and we're the law firm of Quinn Emanuel.
10       A.  So the creditors' committee?
11       Q.  Yes.
12           Before the closing did you have any
13   other outstanding offers of employment if you did
14   not move to Barclays?
15       A.  I didn't have outstanding offers, but
16   I had been in conversations with various other
17   institutions.
18       Q.  Do you remember now what those
19   institutions were?
20       A.  I had some conversations with Citadel.
21       Q.  And any others?
22       A.  That was -- that's one that I had
23   probably the most conversations with.
24       Q.  Did you get to the point of discussing
25   any terms of employment with Citadel prior to the

Page 218

LOWITT - HIGHLY CONFIDENTIAL

closing?

    A.   I did not.

    Q.   Do you know one way or the other whether Citadel was prepared to offer you any terms that were commensurate with what Barclays was offering you?

    MR. BERNSTEIN:  Objection, vague and ambiguous.

    A.   The role that I was in discussions with Citadel was a very senior role at a major hedge fund, but we did not discuss terms specifically.  It didn't get to that point.

    Q.   Now, I want to switch gears for a minute and talk about the repo transaction, and I understand that the general idea was that Barclays was going to step into the shoes of the Fed and take the collateral that had been pledged to the Fed as part of a repurchase agreement.

    Do you generally recall that subject?

    A.   I do.

    Q.   Was all of the collateral that was pledged to the Fed as part of the repurchase agreement ultimately given to Barclays?

    A.   Again, I don't know whether some of

Page 219

LOWITT - HIGHLY CONFIDENTIAL

that collateral was held by Chase or whether all of that collateral was moved to Barclays.  That was subject to that settlement that we referred to earlier as occurring in the December time frame between JP Morgan and Barclays.

    Q.   Is it your understanding that some of the collateral that was pledged to the Fed did not make it over to Barclays?

    A.   Again, I don't know with certainty whether all the collateral that was in the Fed repo made it over to Barclays.  I believe the majority did.  I can't say whether all did because I don't have the details of the settlement between JP Morgan and Barclays.

    Q.   Do you know if there was collateral that went to Barclays as part of the triparty repo with Bank of New York, Barclays and Lehman that was not part of what was pledged to the Fed?

    A.   Again, I don't know all the collateral that made it into BoNY because of the operational difficulties with Chase and Chase's activity moving collateral from Chase to BoNY.

    Q.   Do you know who would know that?

    A.   Well, the people who would have the

Page 220

LOWITT - HIGHLY CONFIDENTIAL

best view of that would probably be Paolo Tonucci and Mr. Blackwell.

    Q.   Do you know whether it was someone at JPMC or someone at Lehman who made the decision about what of the securities that were pledged to the Fed were going to be transferred to Barclays?

    A.   I don't know with certainty.  I would imagine that it was -- there were communications going on between Lehman operations and people at Chase to effect the movement of collateral from Chase to BoNY.

    Q.   Were you involved at all in discussions of whether residential mortgage-backed securities would be part of the transaction between Lehman and Barclays?

    A.   I wasn't part of the negotiations or the determination of which assets would be included.  I am assuming you are referring to now the sort of earlier transaction that was discussed on the Monday and Tuesday.

    Q.   Well, do you know one way or another whether -- have you heard the term "Resi's" in connection with this transaction?

    A.   There may well have been Resi's that

Page 221

LOWITT - HIGHLY CONFIDENTIAL

were part of the transaction, I can't say for certainty whether they were or they weren't.

    Q.   So just to be clear, do you know one way or the other whether any residential mortgage-backed securities were transferred to Barclays as part of the transaction with Lehman?

    A.   I don't know with certainty.

    Q.   You also discussed earlier that there was a presentation to the creditors committee the weekend prior to the closing that showed a schedule of unencumbered collateral.  Do you recall that?

    A.   I don't think it was a presentation, but I do recall that a schedule of unencumbered collateral that was going to be included as a component of the deal was shared with the creditors committee.

    Q.   How do you know that?

    A.   I was at the Weil offices and the creditors were in a -- the creditors committee were in one of the rooms at the Weil offices.

    Q.   Were you present during that presentation to the committee?

    A.   Again, it wasn't a presentation.  I

Page 222

LOWITT - HIGHLY CONFIDENTIAL
1 think it was a delivery of a schedule.
2 **Q.   Were you present when there was a**
3 **delivery of a schedule?**
4     A.   I don't have a precise recollection of
5 that.
6     **Q.   Do you know who did the delivery?**
7     A.   I don't know precisely.  I would --
8 again, I'm speculating, but I think it would have
9 been either Paolo Tonucci or Robert Azerad.
10    **Q.   Do you know if any other documents**
11 **were transmitted to the committee along with that**
12 **schedule identifying unencumbered collateral?**
13    A.   I don't know whether they received
14 additional information.  They may well have, I
15 don't know.
16    **Q.   Do you know one way or the other**
17 **whether there was any discussion of the value of**
18 **that unencumbered collateral in the delivery of**
19 **that schedule to the committee?**
20    A.   Again, I think that the schedule was
21 delivered to the committee.  I'm not aware of
22 specific discussions in relation to the valuation.
23    **Q.   You also testified this morning about**
24 **your understanding of the deal as it closed and**

Page 223

LOWITT - HIGHLY CONFIDENTIAL
1 **you described your sense of many of the elements**
2 **of the transaction.  Do you recall that part of**
3 **your testimony?**
4     A.   I do recall that.
5     **Q.   And I think you listed some different**
6 **pieces of the transaction of value that was**
7 **ultimately received by Barclays generally?**
8     A.   My recollection is that I talked about
9 different elements of the transaction.
10    **Q.   Do you have a sense of what Barclays**
11 **gave in the deal to Lehman?**
12    A.   I am sorry, can you be more specific
13 about what you mean by what Barclays gave to
14 Lehman.
15    **Q.   Sure.  So if I understand your**
16 **testimony from earlier, you listed some different**
17 **things that Lehman ended up transferring to**
18 **Barclays in the transaction, including**
19 **unencumbered collateral and the 15c3 and some**
20 **securities that were related to the repo.  Do you**
21 **recall that?**
22    A.   I do.
23    **Q.   What did Lehman receive from the**
24 **transaction?**

Page 224

LOWITT - HIGHLY CONFIDENTIAL
1     A.   Again, what Lehman received was
2 negotiated by other parties and I don't know the
3 details of all of those items.  I know they got
4 consideration for the building.  I know they
5 received some amount of cash and I know there was
6 a TSA agreement that was signed which required
7 Barclays to provide a number of services to
8 support the various estates.  And there may be
9 others, I'm not familiar with all of them, all
10 other items.
11    **Q.   And in connection with the repurchase**
12 **agreement, they received 45 billion dollars in**
13 **cash?**
14    A.   Essentially, they received, you know,
15 45 billion dollars of cash which then had to be
16 paid to the Fed to replace the repo that was done
17 by the Fed.
18    **Q.   For the securities that Barclays**
19 **received as part of this repurchase agreement, did**
20 **it assume any liabilities related to those**
21 **securities?**
22       MR. BERNSTEIN:  Objection, calls for a
23 legal conclusion.
24    A.   I'm afraid I don't understand what you

Page 225

LOWITT - HIGHLY CONFIDENTIAL
1 mean by accepted liabilities.
2    **Q.   Well, maybe we could take a look at**
3 **Exhibit 19 and that's the schedule -- this is the**
4 **version that was marked final.**
5    A.   Everyone's favorite schedule.
6    **Q.   It is everyone's favorite schedule.**
7       **So putting aside the questions I just**
8 **asked, focusing on this schedule, did you have**
9 **an understanding of what was listed under the**
10 **liability section?**
11    A.   Yeah, but the repo that we have just
12 been talking about was what was transacted on the
13 Thursday and it replaced this transaction.
14    **Q.   I understand and it is my fault that I**
15 **switched two gears, but I just for a minute want**
16 **to now focus on this schedule and the way it**
17 **reflected the deal that was in place as of**
18 **September 16 at 11:18 a.m.  Did you have an**
19 **understanding of what these numbers listed under**
20 **liabilities were meant to reflect?**
21    A.   I think these were liabilities that
22 Barclays would take on, whether those were the
23 short positions that LBI held or they would have
24 to step in for -- they would have to assume the

Page 226

LOWITT - HIGHLY CONFIDENTIAL
1 LOWITT - HIGHLY CONFIDENTIAL
2 liability of some of the short term funding.
3    Q.   Was there a relationship between the
4 categories of assets that were listed, such as
5 government and agriculture, with assets and the
6 liabilities that were listed under that same
7 category in the other column?
8    A.   Those are agencies, so it is
9 government and agencies.
10    Q.   Excuse me?
11    A.   That's OK.  Those would have been
12 short positions in governments and agencies is 21
13 billion, and the 40 would have been the long
14 positions in governments and agencies.
15    Q.   Do you know how the numbers were
16 arrived at that were listed in the liabilities on
17 this schedule?
18    A.   Again, they were the collection of a
19 number of people in finance identifying what were
20 the short positions that were associated with
21 those assets that were going to be acquired by
22 Barclays.
23    Q.   Were the numbers listed in the
24 liabilities on Exhibit 19 subject to negotiation
25 between Barclays and Lehman?

Page 227

1 LOWITT - HIGHLY CONFIDENTIAL
2    A.   Again, I wasn't party to those
3 discussions so I can't answer that question for
4 you.  I am sorry.
5    Q.   Do you know one way or another whether
6 they reflected Lehman's view of what the
7 liabilities would be or an opinion based on what
8 Barclays thought the liabilities would be?
9    A.   I can't say with certainty.  I think
10 these were probably the liabilities as Lehman
11 assessed them with input from folks at BarCap to
12 the extent that they were uncomfortable accepting
13 some of the short positions.
14    Q.   Do you know if in the ultimate
15 agreement, setting this aside, Barclays assumed
16 any liabilities related to short positions?
17    A.   Again, I don't know.  As discussed,
18 you know, I wasn't party to the negotiations.
19    Q.   I think you also testified earlier
20 that you were involved in a -- there was some
21 effort made to match assets and liabilities I
22 think in conjunction with setting up the initial
23 deal on Tuesday the 16th.
24       MR. HUME:  Objection, mischaracterizes
25 prior testimony.

Page 228

1 LOWITT - HIGHLY CONFIDENTIAL
2    A.   No, I don't think I said that.
3    Q.   Was there any -- was there any effort
4 made to match assets and liabilities?
5       MR. BERNSTEIN:  Objection, vague and
6 ambiguous, but you may answer.
7    A.   I mean the, you know, adjusted total
8 assets and the total of liabilities do match, so
9 one would assume from that that there was some
10 effort to match assets and liabilities in this
11 schedule.  Whether this schedule represents the
12 agreement that was agreed to by Barclays again is
13 subject to the negotiators and what the
14 negotiators agreed to.
15    Q.   First let me find out if I can
16 understand what I think you testified to before.
17 I think it was in just -- according to my notes,
18 when you were talking about what you were doing
19 that night, you collected input from parties about
20 the asset part of the transaction, you got input
21 from the business about which assets Barclays
22 would be interested in, and I believe you made
23 some sort of testimony about there was an effort
24 to match assets and liabilities.  I understand
25 that is paraphrasing and not exactly what you

Page 229

1 LOWITT - HIGHLY CONFIDENTIAL
2 said, but do you recall any involvement that you
3 personally did in an effort to match assets and
4 liabilities?
5       MR. BERNSTEIN:  I am going to object
6 to the form of the question.
7       You can answer the last sentence which
8 was the question part.
9    A.   Again, I think that the adjusted total
10 assets equals the total liabilities on this, so
11 some effort was undertaken to match assets and
12 liabilities per the schedule.
13    Q.   Were you personally involved in some
14 activity relating to matching assets and
15 liabilities?
16    A.   Again, I have no precise recollection,
17 but I may well have been involved in that.
18    Q.   But like you testified, you did notice
19 that the final exhibit does have a matching in
20 that the adjusted total assets is the same number
21 as the total liabilities?  You see that?
22    A.   I do see that.
23    Q.   And do you know if that was
24 coincidence or that was something that was
25 purposeful?

Page 230

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  MR. HUME: Objection, vague and
3  ambiguous.
4  A.  Yeah, I can't say -- I can't say
5  anything to you other than the totals do equal one
6  another.
7  **Q.  If I look, Exhibit 200, which is I**
8  **believe the earlier -- an earlier version of the**
9  **schedule that has some annotations by yourself,**
10  **and here you see there are some -- the numbers**
11  **that are listed under adjusted total assets is not**
12  **the same as total liabilities.  You see that?**
13  A.  I do see that.
14  **Q.  Do you know when -- did there come a**
15  **time that you noticed that the schedule had those**
16  **matching of assets and liabilities?**
17  A.  Again, I don't have a specific --
18  this -- I don't have a specific recollection of
19  that.  I do know that through the course of the
20  evening and the morning, these were updated with
21  additional information, and as you point out, the
22  Exhibit 19 does have assets and liabilities equal
23  to one another.
24  **Q.  Switching topics again, I also want to**
25  **take you to the conversation that you had with**

Page 231

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  **Mr. McDade and Mr. Ricci on Friday the 19th about**
3  **the process of finding additional value.  Do you**
4  **remember that event?**
5  A.  I do.
6  **Q.  Was there any time given where you**
7  **needed to find that amount of collateral by a**
8  **certain time?**
9  A.  I don't recall a specific deadline for
10  that.
11  **Q.  Did you have a sense for when that**
12  **would be needed by?**
13  A.  I think my sense was the sooner, the
14  better.
15  **Q.  You also testified a number of times**
16  **about -- that the numbers -- let's start with, for**
17  **example, listed on the assets in Exhibit 19**
18  **reflected a price that Barclays was willing to pay**
19  **given the size of their purchase and the**
20  **volatility of the market.  Do you recall that?**
21  A.  I do.
22  **Q.  What is your basis of your testimony**
23  **that that price was determined based on the**
24  **factors of the size of their purchase and the**
25  **volatility of the market?**

Page 232

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  A.  I mean, it is not based on specific
3  knowledge of what they were thinking about.  It is
4  based on my sense of what would happen in a -- in
5  any circumstance where a securities firm was
6  selling a very large block of assets.
7  They would expect that whoever was
8  purchasing that large block of assets,
9  particularly at a time of great market
10  uncertainty -- which certainly the week after
11  the Lehman bankruptcy was a time of great
12  market uncertainty -- that they would pay less
13  for those assets because they were making such
14  a large purchase and how much less they would
15  pay would also be determined by the amount of
16  volatility in the marketplace and how given
17  that volatility, the asset prices could reduce
18  before they were able to sell out their
19  positions.
20  **Q.  Did you communicate with anyone at**
21  **Barclays about whether the reason for their**
22  **selection of price had to do with either the size**
23  **of their purchase or the volatility of the market?**
24  A.  I don't recall specific conversation
25  with people at Barclays about their approach to

Page 233

**LOWITT - HIGHLY CONFIDENTIAL**

1
2  the valuation of the assets.
3  **Q.  What about anyone at Lehman?  Did**
4  **anybody at Lehman say that the price that Barclays**
5  **was going to pay was based on the size of their**
6  **purchase and the volatility of the market?**
7  A.  Again, I don't have a precise
8  recollection of that.  But again, I don't feel
9  that that would have been an unusual view for
10  anyone to have had.  If I had spoken with Bart or
11  Alex Kirk about that, I'm sure, I believe they
12  would have agreed that that made sense.  But I
13  don't recall a specific conversation.
14  **Q.  Putting aside conversations with your**
15  **lawyers and this discussion today, have you ever**
16  **spoken to anybody about whether or not the price**
17  **that Barclays paid was reflective of the size of**
18  **their purchase and the volatility of the market?**
19  MR. BERNSTEIN:  Hold on.  When you
20  said putting aside conversations with your
21  lawyers, you are including Barclays counsel?
22  MS. TAGGART:  Yes.
23  MR. BERNSTEIN:  OK, go ahead.
24  A.  The transaction that actually took
25  place was not this transaction.  It was the repo

Page 234

1        LOWITT - HIGHLY CONFIDENTIAL
2    transaction and the repo transaction, the
3    difference between the collateral delivered and
4    the cash received was driven by the standard
5    financing haircuts and so the actual transaction
6    that took place was different and there was no
7    requirement hence operationalize this version
8    of adjusted assets being sold to Barclays.
9        Q.   I understand there is something that
10   happens after about the repo transaction, but I do
11   just want to focus on your testimony today, a
12   number of times, that the pricing that was, at
13   least in the original transaction on the 16th,
14   was based on the size of the purchase and the
15   volatility of the market. Putting aside your
16   conversations with counsel, have you ever
17   discussed that with anybody?
18       A.   I don't have a recollection of
19   discussing that specifically with anybody, but
20   again, I would just reiterate that the notion of
21   one firm buying a large block of assets from
22   another would involve a substantial bid offer
23   spread is one that would be broadly understood by
24   market participants.
25       Q.   What exactly were you told about the

Page 235

1        LOWITT - HIGHLY CONFIDENTIAL
2    reason that these prices were less than what was
3    marked on Lehman's books referring to the prices
4    reflected on Exhibit 19?
5        A.   Again, I don't have a recollection of
6    a specific instruction with regard to that. I was
7    aware that Barclays were willing to purchase a
8    substantial quantity of assets from the Lehman
9    estate and that what they were willing to pay for
10   those assets was less than what those were marked
11   at based on the prevailing market prices.
12       Q.   Is there anything else that you
13   actually learned from somebody, either from
14   Barclays or Lehman, prior to September 22, about
15   the basis for the pricing that Barclays used in
16   the assets that it was willing to pay for these
17   assets?
18       A.   Again, I don't have anything specific
19   with regard to why Barclays were willing to pay
20   those prices for these specific assets. That was
21   their judgment of what they were willing to pay to
22   acquire this large quantity of assets.
23       Q.   You did testify just a bit ago that
24   you believed that some sort of discount based on
25   the size of the purchase or volatility of the

Page 236

1        LOWITT - HIGHLY CONFIDENTIAL
2    market is something that happens when securities
3    firms are selling a large block of assets. Do you
4    recall that?
5        A.   I do.
6        Q.   Have you been in any transactions
7    where securities firms are selling large blocks of
8    asset?
9        A.   Well, in the, you know, in the prior
10   quarter, Lehman had sold substantial quantities of
11   assets in our efforts to manage down our legacy
12   positions. But I wasn't party to those specific
13   negotiations, but I was aware that when
14   counterparties were looking to purchase blocks of
15   assets, they were looking for a big bid/offer
16   spread associated with that.
17       MR. BERNSTEIN: Again, this may just
18   be the transcript, but what's written down
19   "big bid/offer spread."
20       THE WITNESS: A big bid/offer spread.
21       MR. BERNSTEIN: Good, my apologies.
22       Q.   Are you referring to specific
23   transactions?
24       A.   The transaction that I have in mind is
25   a sale of European residential securities to

Page 237

1        LOWITT - HIGHLY CONFIDENTIAL
2    BlackRock.
3        Q.   Were you involved in those
4    negotiations?
5        A.   I was not.
6        Q.   How do you know that BlackRock wanted
7    a bid off the spread in association with the
8    transaction?
9        A.   That would have been reported to me by
10   Tom Humphrey who was engaged in discussions with
11   BlackRock.
12       Q.   Do you know what BlackRock was
13   intending to do with the assets that it purchased?
14       A.   No, I don't.
15       Q.   And do you know what the amount of
16   spread it negotiated for, BlackRock negotiated in
17   this other transaction?
18       A.   I don't recall precisely what the
19   spread was. It actually wasn't a consummated
20   transaction. It was one that was in negotiations
21   over the quarter end and didn't end up being
22   completed.
23       Q.   Is there any other transaction that is
24   informing your testimony that you believe that
25   generally when securities firms are selling large

Page 238

**LOWITT - HIGHLY CONFIDENTIAL**

1   **LOWITT - HIGHLY CONFIDENTIAL**
2   **blocks of assets, they require some sort of**
3   **discount?**
4        A.   Again, I can't point to specific
5   transactions, but it was my understanding that --
6   it is my understanding that that's how the market
7   operates.  And it does seem logical to me.
8        **Q.   Do you have any other factual basis**
9   **besides your belief that that is logical?**
10       A.   I can't point to a specific
11  transaction which effects that.  I could --
12       **Q.   Anything else?**
13       A.   No.
14       **Q.   But your general belief based on logic**
15  **that securities firms selling a large block of**
16  **assets include this sort of discount -- how is**
17  **your sense of how much that discount is compared**
18  **to the haircut that financers (sic) often require**
19  **when they are giving cash for collateral?**
20       MR. BERNSTEIN:  Objection, vague and
21  ambiguous.
22       A.   I think those are just different
23  things.  One is negotiated by two parties, one of
24  whom wants to sell assets in size quickly where
25  the buyer has negotiating power and can extract a

Page 239

1   LOWITT - HIGHLY CONFIDENTIAL
2   large bid/offer spread to transact.  You know,
3   financing haircuts are set based on sort of a
4   market standard which establishes what the market
5   believes they have to take possession of the
6   collateral and sell off the collateral to generate
7   cash, they will have to sell the collateral out at
8   in order to realize the cash value that they have
9   extended.
10       Can I take a short break?
11       **Q.   Sure.**
12       (Recess)
13       **Q.   So I also want to ask you some**
14  **questions about the search for unencumbered**
15  **assets.  As I understand that, there was a long**
16  **process of trying to find what unencumbered assets**
17  **Lehman had that could be transferred to Barclays,**
18  **do you recall that?**
19       A.   I do.
20       **Q.   Of all the unencumbered assets that**
21  **Lehman located, did it give all of those to**
22  **Barclays?**
23       A.   I don't know the details of the
24  transaction that was agreed between the parties.
25       **Q.   Are you aware of any unencumbered**

Page 240

1   **LOWITT - HIGHLY CONFIDENTIAL**
2   **assets that were held back from Barclays?**
3        A.   Again, I think there was a schedule
4   that was created that represented our best
5   estimate of what the unencumbered collateral was
6   and that was the schedule that was provided to the
7   Lehman management and they then negotiated a deal
8   with Barclays.
9        **Q.   But as far as you know, there was no**
10  **unencumbered assets that you found in your search**
11  **that were held back from the transfer to Barclays,**
12  **is that correct?**
13       MR. BERNSTEIN:  Objection, no
14  foundation.  But go ahead.
15       A.   Again, we came up with what we thought
16  was the unencumbered collateral.  We realize that
17  had we had imperfect information and it may have
18  been that there was additional collateral.  It may
19  have been that some of the collateral on the
20  schedule was, in fact, encumbered and we were
21  unaware of that.  So it was a best efforts to come
22  up with a schedule that reflected collateral that
23  was not a part of the repo, as well as was
24  unencumbered and available to be transferred to
25  Barclays if that was what was agreed between the

Page 241

1   LOWITT - HIGHLY CONFIDENTIAL
2   parties.
3        **Q.   I just want to focus on what you know.**
4   **You were part of a search where you searched for**
5   **any collateral that was unencumbered that could be**
6   **transferred to Barclays.  You were part of that**
7   **search effort, right?**
8        A.   That's correct.
9        **Q.   And all of the unencumbered assets**
10  **that you were able to locate that could be**
11  **transferred, you communicated that to people at**
12  **Lehman as assets that could be transferred to**
13  **Barclays, right?**
14       A.   Yeah, that schedule was made available
15  to people, that schedule was made available.
16       **Q.   And do you personally know of any of**
17  **those assets that you found that were held back**
18  **from the transfer?**
19       A.   Again, we had a schedule of assets
20  that we believed was, were unencumbered and those
21  assets were identified and included on a schedule
22  and it summed around a billion, nine of value.
23       **Q.   You personally don't know of any**
24  **assets that were determined to be unencumbered**
25  **that were held back from the agreement with**

Page 242

LOWITT - HIGHLY CONFIDENTIAL

1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **Barclays, correct?**
3      A.  I'm not aware at this point of any
4  collateral that was not included in that schedule
5  that we have talked about.
6      **Q.  And that schedule refers to the**
7  **schedule of unencumbered assets that -- well,**
8  **maybe I should ask, what schedule are you**
9  **referring to when you say that all of the**
10 **unencumbered assets were included on the schedule?**
11     A.  That we were aware of at that time
12 were included in the schedule of unencumbered
13 assets, I don't know if it is schedule B that I
14 think we have been referring to.
15     **Q.  So is it your understanding that all**
16 **of the assets that you determined were**
17 **unencumbered and could be transferred were**
18 **included on a schedule that became schedule B to a**
19 **contract with Barclays?**
20     A.  Again, I don't know that it became
21 part of the contract, but yes, all the assets that
22 we identified -- but again, I'll come back to make
23 sure there was no confusion, there may well have
24 been unencumbered collateral that we had not
25 identified and determined that it specifically was

Page 243

1  LOWITT - HIGHLY CONFIDENTIAL
2  unencumbered and we knew that there may well have
3  been additional collateral that we were not able
4  to determine at that point was unencumbered but
5  there may have been.  But what we had identified
6  to the point that you have been pressing on was
7  included in that schedule.
8      **Q.  When you were searching for**
9  **unencumbered collateral, did you search everywhere**
10 **you thought that unencumbered collateral might be?**
11     A.  Well, I think the search was broad,
12 but I mean in particular, there was -- there is
13 collateral in physical form that we were unsure
14 whether it was unencumbered or whether it had been
15 seized by one of the entities, so that in
16 particular was collateral that we just did not
17 know if it was unencumbered or not.
18     **Q.  But in your search that you did prior**
19 **to the closing, you searched for everywhere that**
20 **there might be collateral that would be**
21 **unencumbered that could be transferred to**
22 **Barclays, right?**
23     A.  Again, I keep saying the same thing
24 which is we looked to determine what collateral we
25 could determine was unencumbered.  There may have

Page 244

1  LOWITT - HIGHLY CONFIDENTIAL
2  been collateral that actually was unencumbered but
3  we were unable to determine it, and as a result,
4  we would not have included it in that schedule.
5      The "we" I am talking about here is
6  very loose.  I wasn't actually involved in
7  searching for pieces of collateral.  I am
8  merely referring to the broad effort that was
9  going on involving operations and finance.
10     **Q.  The broad effort that involved**
11 **operations and finance looked everywhere that it**
12 **thought there might be unencumbered collateral and**
13 **every collateral that it could determine really**
14 **was unencumbered, you put on schedule B, right?**
15     MR. BERNSTEIN:  Two objections; no
16 foundation, asked and answered.  This really
17 ought to be the last time.
18     A.  Again, I -- I have just got to
19 reiterate what I think I have said in the previous
20 answers which is we looked broadly for all sources
21 of unencumbered collateral.  When we -- when
22 people in operations and finance were able to
23 determine to the best of their judgment that it
24 was unencumbered, then it made it on to the
25 schedule.  There was an understanding that there

Page 245

1  LOWITT - HIGHLY CONFIDENTIAL
2  was some collateral which, upon additional work,
3  might have been determined to be unencumbered and
4  people knew and recognized that.
5      **Q.  While you have been at Barclays, have**
6  **you been involved at all in valuing the gain that**
7  **Barclays had upon acquisition, the gain of what it**
8  **received from Lehman?**
9      A.  I've not been involved in that.
10     **Q.  You also testified earlier today that**
11 **you were not yourself involved in documenting any**
12 **of the changes to the contract that followed the**
13 **court hearing, correct?**
14     A.  I am sorry, can you be more specific
15 what you mean by changing the contract?
16     **Q.  Sure.  I think it was your**
17 **understanding that following the agreement that**
18 **was presented to the court, there was some sort of**
19 **documenting of that agreement?**
20     A.  Yeah, there was a -- and we went
21 through it as one of the e-mails, there was a
22 documentation process that needed to take place to
23 reflect the agreement that was discussed.
24     **Q.  Do you know who was involved in that**
25 **process?**

Page 246

LOWITT - HIGHLY CONFIDENTIAL
2    A.    Who was involved in the process of
3  documenting?
4    Q.    Yes.
5    A.    I think the main law firm was Weil.
6  Again, I don't know the specific people that were
7  involved.  I could speculate on who I think was
8  involved.
9    Q.    First, do you know anyone at Lehman
10  who was involved in documenting the deal following
11  the court hearing?
12    A.    Yeah, I believe Steve Berkenfeld was
13  involved, but I don't know with certainty because
14  I didn't see him actually documenting things
15  myself, but it would -- I would have expected
16  Steve to have been involved in that effort.
17    Q.    Anybody else?
18    A.    I can't -- there are no specific names
19  that I could give you.  Again, I could speculate
20  who I think was involved.
21    Q.    Why don't you go ahead and speculate,
22  but I understand you don't know for sure.  But who
23  are the people you personally might ask if you
24  were trying to find out who documented the deal as
25  it changed or documenting anything following the

Page 247

LOWITT - HIGHLY CONFIDENTIAL
2  court hearing.
3    A.    Well, again, I think the people who
4  negotiated the deal would have been involved.  I
5  think Steve, Steve Berkenfeld would have been
6  involved.  I think the senior lawyers from Weil
7  would have been involved.  I would guess that Alex
8  Kirk may have been involved.  But again, I'm
9  basing that not on any specific knowledge, I'm
10  basing that on my understanding of sort of the
11  roles that different people played at Lehman.
12    Q.    On Sunday -- where were you Sunday, at
13  Weil's office, on the Sunday, September 21st, the
14  day before the closing?
15    A.    Yeah, I spent a lot of the day at
16  Weil.
17    Q.    Who else from Lehman was there at the
18  office with you?
19    A.    Paolo Tonucci was there, Robert Azerad
20  was there, Bart McDade was there.  I think Alex
21  Kirk was there, that's my recollection, and Steve
22  Berkenfeld was there.  I'm sure there were others.
23  Those are the -- the listing includes those.
24    MS. TAGGART:  OK, that is all the
25  questions I have.

Page 248

LOWITT - HIGHLY CONFIDENTIAL
2  EXAMINATION BY
3  MR. OXFORD:
4    Q.    Good afternoon, Mr. Lowitt.  My name
5  is Neil Oxford.  I am with the law firm of Hughes,
6  Hubbard & Reed.  We represent the SIPA trustee.
7    Could you have in front of you Exhibit
8  219.  If you could direct your attention to the
9  part of the subject line in the last sentence
10  where it says, "We did find 5 billion of
11  exchange listed options which we are
12  investigating."
13    I believe you testified that you, when
14  you investigated, you found what that was already
15  included as part of the business transaction.
16    A.    Yes.
17    Q.    Is that correct?
18    A.    That is correct.
19    Q.    Can you explain that a little further,
20  which part of the business transaction was this 5
21  billion dollars a part of?
22    A.    Well, again, I don't have a
23  recollection of the 5 billion specifically, so
24  again, I have no recollection of where that came
25  from.  I do know that the exchange-listed sort of

Page 249

LOWITT - HIGHLY CONFIDENTIAL
2  options business was one that we came to
3  understand was included in the deal, that that
4  business was being taken over by Barclays in its
5  entirety and that was part of what had been agreed
6  to on the, I guess, on the Tuesday.
7    Q.    Did that business deal, to your
8  understanding, sir, change at any point?
9    A.    Again, I wasn't part of the final -- I
10  wasn't aware of how the whole thing was coming
11  together in the final version.  But given that it
12  was included -- the business itself was included
13  as part of the earlier transaction, the assumption
14  that we were working with was it would be included
15  in the remaining transaction and so we didn't
16  continue to do any additional work on looking for
17  value in the exchange-listed options.
18    Q.    Just so I am clear, the
19  exchange-listed options you are e-mailing
20  Mr. McDade about in Exhibit 219 don't form any
21  part of the repo that we have been discussing
22  today, correct?
23    A.    That's correct.  That would have --
24  the repo would have been the repo and then we were
25  looking for value in items away from that.  There

Page 250

LOWITT - HIGHLY CONFIDENTIAL

1   was a long list that was generated, including
2   15c3, the good faith lock-up, the TBA settlement,
3   FX settlement, and there was obviously an item
4   that somebody had identified as a potential source
5   of value which was exchange-listed options and
6   that was dropped from our investigation because
7   our understanding was that it was already included
8   in the transaction as a stand-alone business.
9       Q.   And from whom did you gain that
10  understanding, sir?
11      A.   I don't have a precise recollection of
12  who I would have got that from. I think that -- I
13  mean to the best of my recollection, that was
14  something that Paolo Tonucci had looked into and
15  communicated, but I do know -- I do recall that we
16  didn't continue to investigate exchange-listed
17  options. Our focus was on the 15c3 and
18  unencumbered collateral.
19      Q.   Was it your understanding, sir, that
20  Barclays was to step into the shoes of Lehman
21  insofar as Lehman owned exchange-listed options?
22      A.   Again, I didn't have a sense of what
23  was agreed to between the parties with regard to
24  this. What I do recall was that this was a

Page 251

LOWITT - HIGHLY CONFIDENTIAL

1   business that was included in the transaction and
2   didn't represent a place where we should
3   investigate to determine additional sources of
4   value. How precisely Barclays was going to engage
5   with regard to this business, I wasn't aware of.
6       Q.   Can you give me your definition of
7   what you meant by exchange-listed options in
8   Exhibit 219, please?
9       A.   Again, I --
10      Q.   What kind of assets were covered in
11  exchange-listed options as you used it in this
12  document?
13      A.   Again, I don't recall precisely --
14  there was sort of a list that identified potential
15  sources of value and exchange-listed options had
16  made it to the list and then was removed from the
17  list because it was already included in the deal.
18  So that's what I would say around that.
19      If you are asking me the more general
20  question away from this about what are
21  exchange-listed options, they are, you know,
22  derivative contracts that are listed on an
23  exchange and sort of collateralized with that
24  exchange.

Page 252

LOWITT - HIGHLY CONFIDENTIAL

1       Q.   In the context of the use of that
2   phrase "exchange-listed options" in this document,
3   sir, would that include short options as well as
4   long options?
5       A.   Again, in -- for the purposes of this,
6   we were engaged in an exercise to identify
7   additional sources of value and that, the
8   investigation suggested that we would not look for
9   value in exchange-listed options. So that was --
10  we didn't do any work on exchange-listed options.
11  So what actually made it into the transaction was
12  what was agreed to between the parties and really
13  we were just, we didn't pursue as a source of
14  value which could be included in the transaction
15  potentially.
16      Q.   Again, I think I have got this, but
17  just so I am clear, to the best of your knowledge,
18  the exchange-listed options were never removed
19  from the deal between Barclays and Lehman?
20      A.   I'm not aware but -- I'm not aware
21  that -- I'm not aware either way.
22      Q.   OK. Do you have any knowledge as to
23  whether the 5 billion dollars that's estimated
24  here for exchange-listed options includes margin

Page 253

LOWITT - HIGHLY CONFIDENTIAL

1   and deposits at various exchanges?
2       A.   Again, I -- I have no recollection of
3   where the 5 billion came from or what it reflects.
4   It was something that we looked at to determine if
5   it was a potential source of value, as were
6   others, and determined that it wasn't a place we
7   needed to look because it was already included in
8   the deal, was my recollection of why we didn't.
9   We found, for example, in the TBA and FX
10  settlements that there was no value in those
11  items. So that was the investigation that we were
12  doing on the Friday.
13      Q.   Do you recall having any conversations
14  at any time, sir, in the week from 15th of
15  September until the closing on the 22nd with
16  anybody other than Mr. Tonucci about the inclusion
17  or otherwise of exchange-listed options in the
18  transaction between Lehman and Barclays?
19      A.   Again, I have no recollection of any
20  conversations besides the one with Paolo.
21      Q.   Are you able to testify any further
22  about the details of your conversation with
23  Mr. Tonucci?
24      A.   Again, the only thing that I recall

Page 254

LOWITT - HIGHLY CONFIDENTIAL

1      LOWITT - HIGHLY CONFIDENTIAL
2   was that this was not an item that we needed to
3   continue to investigate because it was already
4   included in the deal.
5       Q.   OK.  I am handing what you has
6   previously been marked in these depositions as
7   Exhibit 95B.  If you could take a moment to review
8   that document, I am going to focus primarily on
9   the e-mail, and let me know when you have had a
10  chance to do that.
11      A.   I've read through the e-mail trail.
12      Q.   Do you recognize this document, sir?
13      A.   I don't have a recollection of this.
14      Q.   You see that it is an e-mail that was
15  sent to you by Francis Pearn on Sunday the 21st of
16  September.  Do you see that?
17      A.   I do see that, yes.
18      Q.   And the time here is reflected, and
19  GMT, so it was sent to you at 4:03 p.m. eastern?
20  Do you have any understanding of why Mr. Pearn
21  would send this document to you?
22      A.   I mean, I don't know specifically why
23  he would have.  I was the CFO of the firm and
24  Frank was in the finance department, so that might
25  be a reason why he would have included me in it.

Page 255

1      LOWITT - HIGHLY CONFIDENTIAL
2       Q.   Are you familiar with the type of
3   report that is attached to this e-mail, sir?
4       A.   I mean, I can't recall ever looking
5   through this report or one like it.
6       Q.   Reading the e-mail that Mr. Pearn
7   sends to you and others, it says "Craig Jones
8   provided the OCC statements as of September 22 for
9   the LBI 074 account.  The first statement shows
10  collateral value of 522 million (cash and
11  government securities) in LBI.  The second file
12  details approximately 2 billion of collateral,
13  (letters of credit, cash and security).  Craig and
14  Dan confirmed these balances with the OCC and can
15  answer questions you may have."
16      Do you see that?
17      A.   I do.
18      Q.   Would you agree with me that this
19  e-mail Mr. Pearn -- withdrawn.
20      Would you agree with me that the
21  e-mail that Mr. Pearn sends to you reflects that
22  there is substantial collateral value held by LBI
23  at the OCC?
24      A.   Well, it suggests there is a lot of
25  collateral at the OCC.  My recollection was at

Page 256

1      LOWITT - HIGHLY CONFIDENTIAL
2   some point during the week that because Lehman was
3   no longer posting margin, that the OCC sold out
4   the Lehman position and would have -- would have
5   been satisfied with whatever the obligations it
6   had were and I don't know how that -- how much
7   collateral was left after that.
8       Q.   If you look at the first attachment,
9   sir.  Do you see in the middle of the page at the
10  top it says "activity date"?
11      A.   I do.
12      Q.   And that date is 9/22/08, correct?
13      A.   Yes.
14      Q.   And below, there is a system date and
15  that date is 9/20/08?
16      A.   Yes.
17      Q.   Does that refresh your recollection as
18  to the collateral that LBI owned that was posted
19  at OCC as of the date of this e-mail?
20      A.   Again, I -- I don't recall spending
21  any time around the collateral at OCC on the
22  Sunday or on any of the other days.  To say we
23  were engaged in, you know, efforts to fund the
24  firm, to effect the repo, and to identify sources
25  of value and really, I didn't focus any attention

Page 257

1      LOWITT - HIGHLY CONFIDENTIAL
2   on this over that time period.
3       MR. OXFORD:  OK, that is all I have on
4   that document.
5       (Exhibit 228, e-mail dated 9/21/2008
6   at 8:09:34 p.m. marked for identification,
7   as of this date.)
8       A.   Do you mind if we take a short break?
9       Q.   Sure.
10      (Recess)
11      Q.   Mr. Lowitt, I would like to hand you
12  what I have marked as Exhibit 228.
13      A.   Yes.
14      Q.   Which is an e-mail from Jerry Reilly
15  to you, Mr. Kelly and Mr. O'Meara entitled, "VIX,
16  V-I-X Statements," and on Sunday, the 21st, 4:08
17  eastern in the afternoon.  Why don't you take a
18  moment to read through that document.  Again, I am
19  going to ask you mostly about the e-mail rather
20  than the attachments.  Let me know when you have
21  had a chance to do that?
22      A.   I have.
23      Q.   Do you recognize this document, sir?
24      A.   I don't.
25      Q.   In the chain below where it is

Page 258

LOWITT - HIGHLY CONFIDENTIAL

1   forwarded to you, Mr. Michael Neilson writes to
2   Mr. Francis Pearn and others:  Here are the
3   clearing house runs.  Do you know what the
4   clearing house runs are?
5       A.   No, I don't.
6       Q.   Do you know what the reference to VIX
7   is in the subject line?
8       A.   I mean, I don't know.  The VIX is an
9   instrument that is associated with the volatility
10   of the equity markets.
11       Q.   Mr. Reilly writes to you, "This has
12   been confirmed as a good balance.  We are going to
13   send to BarCap who is looking for our positions
14   and balances, 507 M" -- which I take it to be 507
15   million?  Do you see that?
16       A.   I see that.  I don't know if that is
17   millions or thousands.  But I can see it is 507 M.
18   I'm sure you could show me that it is millions.
19       Q.   I'm sure I could, but I'm not so sure
20   it matters if you don't remember the document.  Do
21   you remember having -- withdrawn.
22            Do you have any understanding of why
23   Mr. Reilly sent you this e-mail?
24       A.   I don't know why he did.  I imagine he

Page 259

LOWITT - HIGHLY CONFIDENTIAL

1   was keeping -- he felt he should include me in a
2   mail because I was the CFO and he was reporting to
3   me and it would be something that he felt I would
4   want to see.
5       Q.   From your review of this e-mail, do
6   you have an understanding of what he was keeping
7   you in the loop on?
8       A.   I mean, that Barclays was looking for
9   information and that this was part of the
10   information and what they were looking for.
11       Q.   Does this refresh your recollection
12   about the inclusion or otherwise in the business
13   deal between Lehman and Barclays of
14   exchange-traded derivatives?
15       A.   Again, exchange-traded derivatives, I
16   was -- I spent no time on it.  It wasn't -- it
17   just wasn't a focus either for me during that
18   period.
19       Q.   You don't recall any conversations
20   with Mr. Kelly about that subject?
21       A.   I don't recall any conversations with
22   Martin about exchange-traded derivatives or about
23   this.
24       Q.   What about Mr. Reilly, same question,

Page 260

LOWITT - HIGHLY CONFIDENTIAL

1   did you have any conversations with him about the
2   inclusion or otherwise in the assets going to
3   Barclays of exchange-traded derivatives or any
4   assets to secure those derivatives?
5       A.   I have no recollection of discussions
6   with either Jerry or Martin or Chris or any of the
7   folks on this e-mail about that.
8       MR. OXFORD:  That is all I have on
9   this document.
10       (Exhibit 229, e-mail dated 9/21/2008
11   at 6:20:35 p.m. marked for identification,
12   as of this date.)
13       MR. BERNSTEIN:  By the way, I
14   actually -- I should do this -- I'm assuming
15   with this and the prior document, which are
16   not Bates stamped, that Counsel has a -- it
17   is Counsel's understanding that these are,
18   in fact, attached documents in the real
19   world?
20       MR. OXFORD:  Yes, that is my
21   information.
22       Q.   Mr. Lowitt, take your time and
23   whenever you're ready, let me know when you have
24   had a chance to review Exhibit 229.

Page 261

LOWITT - HIGHLY CONFIDENTIAL

1       A.   Yeah, I have looked at it.
2       Q.   It looks to me to be an e-mail from
3   Robert Azerad to Gary Romain at Barclays, James
4   Walker at Barclays, T.J. Gavenda, also at
5   Barclays, and you and others at Lehman are copied,
6   is that correct?
7       A.   That's what it suggests on the first
8   page.
9       Q.   It was sent on the Sunday, 21st of
10   September at 2:20 eastern.  The subject is
11   "updated opening balance sheet."  Do you see that?
12       A.   I do.
13       Q.   Do you recognize this document?
14       A.   I don't recognize it.
15       Q.   Did you have any responsibility,
16   direct or otherwise, for the creation of an
17   opening balance sheet for Barclays?
18       A.   I am sorry, could you just repeat, did
19   you have any responsibility --
20       Q.   Did you have any responsibility,
21   direct or otherwise, for the creation of an
22   opening balance sheet for Barclays?
23       MR. BERNSTEIN:  Objection, vague and
24   ambiguous.

Page 262

1    LOWITT - HIGHLY CONFIDENTIAL
2        You may answer.
3    Q.   Let me ask it this way:  Did you have
4    any responsibility for creating an open balance
5    sheet for Barclays?
6    A.   I don't believe I had responsibility
7    for creating an opening balance sheet for
8    Barclays.  I think we were -- we needed to provide
9    information to Barclays so that they could go
10   through their process and there was pieces of
11   information that they would have looked to from us
12   to provide, but that, you know, establishing an
13   opening balance sheet was going to be their
14   responsibility.
15   Q.   OK, did Mr. Azerad work for you?
16   A.   Robert reported in to Paolo and Paolo
17   reported to me, so Robert was in my chain.
18   Q.   Do you have any understanding that
19   Mr. Azerad created the opening balance sheet that
20   is attached to this e-mail?
21   A.   Again, I'm not in a position to say
22   who created this.  I just have no knowledge of who
23   would have done this.
24   Q.   Safe to say then you did not have any
25   involvement in creating this opening balance

Page 263

1    LOWITT - HIGHLY CONFIDENTIAL
2    sheet?
3    A.   I can't recall having any involvement
4    in creating this.
5    Q.   You see that it was sent at 2:20 p.m.
6    on Sunday the 21st?
7    A.   I do see that.
8    Q.   If you take a moment to review the
9    balance sheet and then tell me if, to the best of
10   your recollection, it accurately reflects the
11   business deal between Barclays and Lehman as you
12   understood it at the time the e-mail was sent?
13   A.   Again, I -- I didn't know all the
14   items of what went into the business deals, so
15   what I would have been aware of was that there was
16   a repo transaction, that there was the assumption
17   of liabilities for sort of bonuses or cure
18   payment, although again, I didn't know that with
19   any certainty because I didn't know that that made
20   it into the final transaction.  And I know that we
21   had been looking for, you know, additional sources
22   of value but I can't say more than that or how
23   that would have been reflected in a balance sheet
24   or what Barclays would have wanted to show in
25   their opening balance sheet.

Page 264

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.   One of those additional sources of
3    value that you have testified about at length is
4    the 15c3 lock-up release, correct?
5    A.   Yes.
6    Q.   And that's shown is there as 1 billion
7    dollars.
8    A.   That's what it is shown here.
9    Q.   You have already testified about a
10   search for other unencumbered assets that you
11   believe were valued at approximately 2 billion
12   dollars, correct?
13   A.   At 1.9 to 2 billion.
14   Q.   1.9 to 2 billion.  Do you see anywhere
15   on this spreadsheet where those unencumbered
16   assets balance at 1.9 to 2 billion dollars are
17   reflected?
18   A.   I don't see it on this schedule.  But
19   again, I don't think that the schedule would
20   necessarily have represented the transaction that
21   was agreed to.  Also -- another example, the 15c3
22   lock-up release we talked about earlier was agreed
23   to at around 760 million dollars.
24   Q.   The 5 billion dollars of
25   exchange-listed options that you included in the

Page 265

1    LOWITT - HIGHLY CONFIDENTIAL
2    subject line of Exhibit 219, do you see those
3    exchange-listed options listed anywhere in the
4    opening balance sheet marked as Exhibit 229?
5    A.   I don't see it listed.
6    Q.   Do you have any understanding of why
7    it would not be listed?
8    A.   Again, I don't know who pulled this
9    schedule together and I don't know the amount of
10   knowledge they would have had about all the
11   elements of the deal.  And even if they had known
12   about that item, I don't know if they would have
13   had any knowledge of what that was actually worth,
14   again, it wasn't something that I was aware of any
15   work that went on to determine if there was or how
16   much value there was in that and so just wouldn't
17   have known how -- I don't know how anybody would
18   have reflected it on the balance sheet.
19   Q.   Well, they could have used the 5
20   billion dollar figure that you told Mr. McDade
21   that you had found in Exhibit 219, right?
22   A.   We didn't say we had found it.  We
23   said in that exhibit that there was
24   exchange-listed options.  I don't know where the 5
25   billion came from, and I don't know if 5 billion

Page 266

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2   was right. But you're right, somebody could have
3   put that there. But again, I don't know who put
4   this together and I don't know what they were
5   aware of and I, again, don't know what the real
6   valuation of exchange-listed options business was.
7   And I wasn't aware of any work that was done to
8   determine that.
9       Q.   Could you just briefly have Exhibit 19
10  in front of you, please?
11      A.   Sure, 19.  Do see anywhere on Exhibit
12  19 a description or a figure that includes the
13  exchange-listed options that you referenced in
14  your e-mail marked as Exhibit 219?
15          MR. HUME: Objection, vague and
16      ambiguous.
17      A.   Again, I don't know how
18  exchange-listed options turn up on balance sheets.
19  So I wouldn't know this.  There is derivative
20  lines here, it's possible that it is in those
21  lines, but again, I'm just speculating.  I don't
22  know where it would have turned up here.
23      Q.   OK.  You testified earlier about a
24  conversion, sir.  Do you remember that testimony?
25      A.   The conversion.

Page 267

1    LOWITT - HIGHLY CONFIDENTIAL
2       Q.   You used the word "conversion"?
3       A.   Actually somebody else used the word
4   "conversion," but I did say that I understood it
5   to be the movement of collateral from JP Morgan
6   Chase to BoNY to reflect the replacement of the
7   Fed repo with the Barclays repo.
8       Q.   And the way in which you used that
9   phrase "conversion" has nothing to do with the OCC
10  or exchange-traded derivatives, correct?
11      A.   That is correct.
12      Q.   You mentioned, sir, that the subject
13  of discussion on Sunday the 21st of September was
14  a series of questions about what would happen if
15  Barclays steps into the shoes of Lehman in the
16  coming weeks.  Do you remember that testimony?
17      A.   I do, yes.
18      Q.   Focusing on the DTCC for the present,
19  did you tell me what your recollection is of any
20  discussions about Barclays stepping into the shoes
21  of Lehman at DTCC?
22      A.   I was aware that on the Sunday, there
23  were ongoing discussions between the Barclays
24  representatives and representatives from DTCC
25  around how that would be covered, but I was not

Page 268

1    LOWITT - HIGHLY CONFIDENTIAL
2   party to the resolution of those -- of that.
3       Q.   With whom did you discuss that issue,
4   sir?
5       A.   I don't recall discussing it with
6   anybody.  There was a large forum that included
7   participants from a number of different --
8   representing Barclays and JP Morgan and DTCC and
9   creditors and others and my recollection is that
10  at a certain point, the people from Barclays and
11  people from DTCC left that group and went through
12  and talked through that issue themselves.
13      Q.   Did you have any understanding, sir,
14  that Barclays was conducting due diligence into
15  Lehman's positions at DTC during the day on Sunday
16  the 21st?
17      A.   I'm not sure I understand what the
18  word "due diligence" means, but I do know that
19  Barclays were trying to understand what the Lehman
20  obligations were vis-a-vis DTCC and what, if any,
21  were the risks that they would take on if they
22  stepped into LBI's shoes and that those were
23  discussions that they had in my recollection with
24  people in operations like Alastair Blackwell.
25      Q.   Did you ever come to have an

Page 269

1    LOWITT - HIGHLY CONFIDENTIAL
2   understanding of what Barclays concluded about the
3   risks they would take on if they stepped into
4   Lehman's shoes at DTCC?
5       A.   I was not part of that discussion and
6   I did not know where Barclays came out or what
7   their assessment of those risks were.
8       Q.   You didn't talk to Mr. Blackwell about
9   that?
10      A.   I don't recall having a conversation
11  with Mr. Blackwell about that. I do -- but I
12  don't believe that Mr. Blackwell would have been
13  aware of what Barclays' assessment of those risks
14  would have been. He would have explained the
15  risks as he understood them and it was up to
16  Barclays to make an assessment of those risks
17  themselves.
18      Q.   Do you know who at Barclays was
19  involved in assessing the risks of stepping into
20  Lehman's positions in DTC?
21      A.   Again, I wasn't party to those
22  discussions, but of the people at Barclays that
23  were involved, my recollection is that it included
24  Rich Ricci, Gerard Larocca, probably Jonathan
25  Hughes. There may be others at Barclays that were

Page 270

1    LOWITT - HIGHLY CONFIDENTIAL
2  involved in those discussions.
3      Q.   Did you ever hear, sir, that Barclays
4  had decided not to take Lehman's positions at DTC
5  because there were concerns about the liabilities
6  associated with those positions?
7      MR. HUME:  Objection, lacks
8      foundation.
9      A.   Yeah, I have no recollection of how
10 that got resolved.
11     Q.   Just a couple of questions on C3, sir.
12 Did you understand that the transfer of any assets
13 from Lehman's 15c3 reserve was conditional upon an
14 approval of the SEC?
15     MR. HUME:  Objection, calls for legal
16     speculation -- legal conclusion.
17     A.   Again, I -- what I was aware of was
18 that the resolution of the 15c3 excess was
19 uncertain because it was a formula and nobody
20 would know precisely how much excess there was
21 when the customer positions were fully unwound.
22 So there was uncertainty about what that was going
23 to -- what that number was going to eventually
24 become.
25     Q.   Was it your understanding, sir, that

Page 271

1      LOWITT - HIGHLY CONFIDENTIAL
2  the resolution of the 15c3 excess was that any
3  transfer of 15c3 excess would be conditional upon
4  the existence of an excess?
5      MR. HUME:  Objection, lacks
6      foundation, calls for a legal conclusion.
7      A.   I don't know what actually made it
8  into the contract with regard to 15c3.  What I was
9  involved with, as I have spoken about today, is
10 the efforts to identify what our best estimate of
11 what that excess was and to make that available to
12 those who are involved in negotiating to determine
13 how they were going to treat that and I don't know
14 how it was treated specifically in the final
15 resolution between Barclays and Lehman.
16     Q.   Did you understand, sir, that there
17 were certain difficulties negotiated with
18 calculating the 15c3 requirement over the weekend
19 of the 21st and 22nd of September?
20     A.   I was aware that the data that the
21 people needed to -- the data were -- there were a
22 lot of data issues associated with running the 15C
23 lock-up that weekend.
24     Q.   Did you or anybody who reported to you
25 come to the conclusion as to the existence or

Page 272

1      LOWITT - HIGHLY CONFIDENTIAL
2  otherwise of an excess in the 15c3 reserve over
3  the weekend of the 21st and the 20th of September?
4      A.   Well, again, I -- we didn't -- my
5  recollection was that the estimates of the 15c3
6  excess that had been generated earlier in the week
7  were believed to be accurate reflections and that
8  those were computed without all the dirty data
9  that was associated with all the collateral
10 movements and other issues in LBI, and so the
11 excess that had been estimated earlier was a good
12 reflection of what the excess was likely to be.
13 Because there wasn't a lot of customer activity
14 that had taken place subsequent to when those
15 earlier calculations were made.
16     Q.   What do you mean by "dirty data"?
17     A.   Well, there was a fair amount of chaos
18 in the marketplace towards the end of that week.
19 There was a lot of fails.  There was items that
20 weren't being posted accurately and those were all
21 elements that made the computation of 15c3
22 difficult that weekend.
23     Q.   Did you ever come to have an
24 understanding, Mr. Lowitt, that there was a change
25 in the deal between Lehman and Barclays and that

Page 273

1      LOWITT - HIGHLY CONFIDENTIAL
2  change was that no cash was to be transferred from
3  Lehman to Barclays?
4      A.   Again, I was not part of the
5  negotiating teams and I wasn't aware of what was
6  agreed to between the two parties.  So I would
7  have no view on whether that was agreed to or not
8  agreed to.
9      Q.   Nobody ever told you that?
10     A.   No, I don't recall.
11     Q.   Even subsequent to the transaction,
12 did anyone ever discuss the inclusion or otherwise
13 of cash in the deal between Lehman and Barclays?
14     MR. HUME:  Obviously excluding any
15     conversations with counsel for Barclays or
16     your own counsel.
17     Q.   I offer the same caveat as Mr. Gaffey,
18 I am not looking for --
19     A.   I have no recollection of anybody
20 indicating that the transfer of cash was not --
21 was excluded from the deal in any way.  It was
22 just no discussion one way or the other with me
23 that I recall.
24     MR. OXFORD:  Can I mark this as my
25     last one.

Page 274

LOWITT - HIGHLY CONFIDENTIAL
1
2       (Exhibit 230, e-mail dated 9/22/2008
3   at 11:53:18 a.m. marked for identification,
4   as of this date.)
5       Q.   This, I promise, Mr. Lowitt is my last
6   exhibit which I have marked as Exhibit 230. It is
7   an e-mail from you to Mr. Tonucci at 11:53 a.m.
8   Greenwich Mean Time so 7:53 Eastern on the 22nd.
9   And below, Mr. Tonucci writes to you and
10  Mr. McDade on the subject of closing call saying,
11  "Cash should go in the next five minutes.
12  Congratulations! Paolo." And you reply, "What a
13  relief!! Ian." Do you see that?
14      A.   I do.
15      Q.   Do you have any understanding of what
16  Mr. Tonucci meant by his reference to cash going
17  in the next five minutes?
18      A.   I don't have a specific recollection.
19  Again, if I was speculating, it would be the cash
20  from Barclays to Lehman to effect the transaction
21  would move and that that was establishing that the
22  transaction was actually closing. And my response
23  is it is actually done. Because I think we knew
24  that it needed to happen before 8 o'clock when the
25  markets opened.

Page 275

LOWITT - HIGHLY CONFIDENTIAL
1
2       Q.   You made it by 7 minutes.
3       A.   It was a stressful time.
4       Q.   I'm sure it was.
5           MR. OXFORD: I have no further
6   questions for you at this time. Thank you,
7   sir.
8           THE WITNESS: Thank you very much.
9           MR. GAFFEY: Just one or two to follow
10  up, I promise.
11  EXAMINATION BY
12  BY MR. GAFFEY:
13      Q.   Mr. Lowitt, in response to --
14  Ms. Taggart asked you a series of questions about
15  the logic behind the discount behind the idea of a
16  discount applying to a large transaction by a
17  firm. You said, and I think I have the words
18  here, I am if I am a little off forgive me, if
19  anyone had spoke to Bart or Kirk, they would agree
20  it made sense, but I don't recall a specific
21  conversation. And that was in the context of
22  talking about these bulk prices.
23          Do you know who on the Lehman side of
24  the table decided that the point was negotiable
25  at all? Who decided that it was negotiable

Page 276

LOWITT - HIGHLY CONFIDENTIAL
1
2   whether Lehman would take less than the marks
3   shown on its books for its securities?
4       A.   I don't. It is a question for you to
5   ask those people who were involved in the
6   negotiations.
7       Q.   The reason I ask you, you made a
8   reference to Bart or Kirk. I assume Bart is Bart
9   McDade and Kirk is Alex Kirk?
10      A.   Yes.
11      Q.   Is there a reason Alex Kirk is a
12  person who might have some information on that?
13      A.   Well, Alex was running our principal
14  business and was involved in the -- was close to
15  Bart and was engaged in the negotiation as best I
16  understood it. So that was the reason I included
17  those two names and they would both be very
18  knowledgeable about capital markets and how one
19  disposes of big blocks of assets.
20      Q.   And my question as to who made the
21  decision as to whether it was appropriate to
22  negotiate at all was a very broad one. It doesn't
23  go to the process that you spoke about before of
24  determining what it was. Who made the
25  determination, all right, we will talk to Barclays

Page 277

LOWITT - HIGHLY CONFIDENTIAL
1
2   about selling assets for less than we carry them
3   on our books and you don't know who it was who
4   made that decision?
5       A.   I'm not aware of who would have made
6   that decision.
7       Q.   OK, and Mr. Oxford asked you a
8   question about the conversion which is a topic
9   that I had raised with you earlier and
10  unfortunately for you, it reminded me of a
11  document that I promise you I won't be very long
12  with it.
13          (Exhibit 231, document Bates stamped
14  10254271 (two pages) marked for
15  identification, as of this date.)
16      Q.   Take a look at the document,
17  Mr. Lowitt, sufficiently to determine if you
18  remember seeing it before.
19      A.   Yeah, I have read it.
20      Q.   Have you seen the document before
21  today?
22      A.   I don't recall seeing it before.
23      Q.   I would direct your attention to
24  the -- again, the top two lines which we are
25  disregarding, "administrator" and "sent," below

Page 278

LOWITT - HIGHLY CONFIDENTIAL

2  that, the latest e-mail in the chain is from you
3  to Alastair Blackwell, Robert Azerad entitled,
4  "The Conversion," where you say, "Need people to
5  work all night on it. Need to know we can get
6  BarCap their money by Sunday night. We had a list
7  we showed them. Can we not give them that
8  collateral. Robert produced it. Ian." Would you
9  take a look there?
10     A.  Yeah.
11     Q.  And then if you go to the very bottom,
12  the very last e-mail, and that is from a Nancy
13  Reyda to the ITD war room on the previous evening,
14  Friday, September 19, at about 8:08 p.m.
15     A.  I do see that.
16     Q.  And she writes to the war room, "As
17  you all probably know by now, the asset move was
18  orchestrated in such a way that the conversion
19  move was not needed this weekend. We will regroup
20  on Monday to discuss these next steps." Do you
21  see that?
22     A.  I do.
23     Q.  Having seen the two ends of this
24  e-mail conversation where Nancy Reyda is telling
25  the war room that the asset transfer was

Page 279

LOWITT - HIGHLY CONFIDENTIAL

2  orchestrated in such a way that we can go home,
3  and you say no, everybody needs to work all night,
4  does that refresh your recollection as to what the
5  conversion was?
6     A.  I think the conversion here is
7  different than the conversion that I have been
8  talking about. So the conversion that I was
9  referring to, without the benefit of this was just
10  the movement of assets from the JP Morgan to BoNY
11  to effect the repo.
12        Again, I don't have a recollection of
13  this, but what I think Nancy is sharing with
14  people is that there is no requirement to move
15  the assets in the way that was envisaged in the
16  original transaction, which was moving large
17  amount of specific assets and at specific
18  prices to Barclays in one way or another. And
19  then the -- my mail at the top, again, I am
20  doing this by just reading through this -- is
21  saying that the reserve formula requires recs.
22  R-E-C-S to be run and processed,
23  reconciliations, and that what I am saying in
24  this is that we actually need to, we need to
25  work on those reconciliations so we can update

Page 280

LOWITT - HIGHLY CONFIDENTIAL

2  the reserve formula. The reserve formula would
3  be referring to the 15c3 lock-up and then my
4  mail is really referring to that income
5  collateral. So it seems to be a combination of
6  a number of different things in this chain.
7     Q.  And in the middle of that sequence is
8  an e-mail from Alastair Blackwell to you and
9  Gerard Larocca, September 27, 10 p.m., asking,
10  "FYI, what do you want us to do here, use Thursday
11  night or can it wait until tomorrow?"
12        Do you understand what is meant by use
13  Thursday night?
14     A.  Again, I'm basing that on what goes
15  below that. But usually 15c3 lock-up calculation
16  that was calculated on the Thursday night.
17     Q.  OK.
18     A.  Rather than having to rerun it and
19  then to the questions that we had a little while
20  ago about the need to rerun the 15c3 over the
21  weekend, that was -- that was work that needed to
22  get done in order to run that 15c3.
23        MR. GAFFEY: Thanks, I have nothing
24  else.
25        MR. HUME: I have I am sorry, to do

Page 281

LOWITT - HIGHLY CONFIDENTIAL

2  this. I have two things to quickly clean
3  up.
4  EXAMINATION BY
5  MR. HUME:
6     Q.  Mr. Lowitt, if you look at Exhibit 229
7  that Mr. Oxford showed you. Do you have Exhibit
8  229 in front of you?
9     A.  I do.
10     Q.  If you look at the spreadsheet
11  attached or schedule attached, Mr. Oxford asks you
12  first whether you saw the unencumbered collateral
13  that has been talked about today of approximately
14  1.9 billion or 2 billion on this schedule. Do you
15  remember him asking you that?
16     A.  I do.
17     Q.  I think you may have said that you did
18  not see it on there. And I just wanted to ask
19  you, you see that there is a cash number of 7
20  billion represented. Do you see that?
21     A.  I do.
22     Q.  And then you see there is an inventory
23  of a variety of classes of securities. Do you see
24  that?
25     A.  I do.

Page 282

1      LOWITT - HIGHLY CONFIDENTIAL
2      Q.   And that inventory totaled 44.8
3  billion. Do you see that?
4      A.   I do.
5      Q.   Which if you add the inventory and the
6  cash, you get to 51.8 billion.  Do you see that?
7      A.   I do.
8      Q.   And do you recall saying earlier that
9  your general recollection was that the repo
10 collateral had a value at least from Chase of
11 about 49.7, I think, or 49.9 billion, something
12 like that.  Do you recall that?
13     A.   I do.
14     Q.   Is it possible -- first let me ask
15 you, do you know -- did you prepare this schedule?
16     A.   I did not prepare this schedule.
17     Q.   Do you know that the unencumbered
18 assets, the approximately 1.9 billion or 2 billion
19 is not included within the inventory?
20     A.   I don't know that and as you show what
21 the sum of the numbers are, at close to 52 billion
22 dollars, it is quite plausible that the 1.9
23 billion dollars of unencumbered collateral is
24 included in inventory for the purpose of this, but
25 again, I didn't prepare it and I don't know with

Page 283

1      LOWITT - HIGHLY CONFIDENTIAL
2  certainty if it is.
3      Q.   Mr. Oxford also asked you if you
4  saw -- and here I just don't know whether the
5  question was clear.  He asked you if you saw the 5
6  billion of exchange-listed options which he took
7  as a phrase from another exhibit, Exhibit 219.  Do
8  you remember him asking you that?
9      A.   I do remember him asking me that.
10     Q.   And you said you did not see that on
11 this schedule, Exhibit 229.  Do you recall giving
12 that answer?
13     A.   I do recall giving that answer.
14     Q.   Now, do you see a listing of 5 billion
15 on the schedule?  Let me ask the question this
16 way: Was your answer that you did not see the 5
17 billion for exchange-listed options or that you do
18 not believe it is possible that exchange-traded
19 derivatives of any kind are listed on this
20 schedule?
21     MS. TAGGART:  Object to form.
22     A.   I mean, I see under inventory a number
23 that says "derivatives and other contracts."
24     Again, I didn't create this schedule
25 and I probably didn't spend enough time

Page 284

1      LOWITT - HIGHLY CONFIDENTIAL
2  reviewing it.  I was saying I didn't see a line
3  that referred explicitly to exchange-traded
4  options and I didn't see a 5 billion dollar
5  number.
6      Again, I don't know how the schedule
7  was created and it is possible that it includes
8  an estimate for what the exchange-traded
9  options are.  I can't say one way or the other.
10     MR. HUME:  I have no further
11 questions.
12     I do want it state for the record that
13 Exhibit 217, I have been informed -- and we
14 can address this off line -- I just want to
15 state it on line, from our production
16 people, it is not an integrated document.
17 All these sheets marked together as Exhibit
18 217 are not a single document but multiple
19 documents.  We will have to address it off
20 the record.
21     MR. GAFFEY:  Sounds like a vendor
22 issue.
23              - - - -
24
25

Page 285

1      LOWITT - HIGHLY CONFIDENTIAL
2  EXAMINATION BY
3  MR. OXFORD:
4      Q.   I have one question based on Mr.
5  Hume's question.  You just said with respect to
6  Exhibit 229 that it was possible that the
7  spreadsheet attached to the e-mail included a line
8  item for derivatives, is that correct?
9      A.   Again, I see under "inventory
10 derivatives and other contracts."
11     Q.   What's the value of that entry, sir?
12     A.   It looks like 80.
13     Q.   And when you say 80, do you mean 80
14 million dollars, sir?
15     A.   It doesn't say what the unit is, but
16 given the other numbers, it seems that it would be
17 80 million.
18     Q.   Well, you managed to answer my
19 question about a thousand for C3 lock-up release
20 meant 1 billion dollars, right?
21     A.   Right.
22     Q.   And you managed to answer Mr. Hume's
23 question that figure of 7000 for cash is 7
24 billion?
25     A.   Yes.

Page 286

LOWITT - HIGHLY CONFIDENTIAL

1
2    Q.   So it is fair to assume that the
3  figure of 80 against the line items of derivatives
4  and other contracts is 80 million dollars,
5  correct?
6        MR. BERNSTEIN:  Asked and answered.
7    A.   Yes, I did say it was 80 million
8  dollars.
9    Q.   Do you see anywhere on Exhibit 229 an
10  entry that reflects, separate and apart from the
11  "derivatives and other contracts" line any entry
12  for margin or deposits at the UCC or any other
13  exchange?
14        MR. HUME:  Objection, the document
15  speaks for itself.
16    A.   Again, I didn't develop the schedule.
17  I don't know precisely what makes it into the
18  different lines.  The words "margin" or -- and
19  "OCC," I don't see on the schedule.
20    Q.   And do you see any other entry under
21  the subheading of inventory in which margin or
22  deposits at OCC or elsewhere would naturally fit?
23    A.   I didn't generate the schedule so I
24  don't know where somebody might have done that,
25  but the inventory categories of governments and

Page 287

LOWITT - HIGHLY CONFIDENTIAL

1
2  equities and mortgages and corporate debt,
3  commercial paper and derivatives and other, you
4  would imagine it would be in the derivatives line
5        (Continued on next page for jurat)

Page 288

LOWITT - HIGHLY CONFIDENTIAL

1
2  if it was anywhere.
3        MR. OXFORD:  OK.  Thank you, no
4  further questions.
5        MR. BERNSTEIN:  Both Mr. Lowitt and
6  Mr. Kelly reserve the right to read the
7  deposition and provide errata.  Depositions,
8  and provide errata.
9        (Time noted:  5:51 p.m.)
10
11
12        IAN LOWITT
13
14  Subscribed and sworn to
15  before me this     day
16  of August, 2009.
17
18
19
20
21
22
23
24
25

Page 289

LOWITT - HIGHLY CONFIDENTIAL

1
2                INDEX:
3  WITNESS        EXAM BY·          PAGE:
4  I. Lowitt    Mr. Gaffey        6, 276
5              Ms. Taggart      216
6              Mr. Oxford      248, 285
7              Mr. Hume        281
8
9                EXHIBITS
10  Exhibit No              Marked
11  Exhibit 216 document Bates stamped        30
          BCI-EX77335 through 37
12  Exhibit 217 document Bates stamped        97
          BCI-EX00115595 through 654
13  Exhibit 218 document Bates stamped 42628    146
    Exhibit 219 document Bates stamped 138017    148
14  Exhibit 221 document Bates stamped 137537    154
    Exhibit 220 document Bates stamped        161
15    10298186
    Exhibit 222 e-mail dated 9/20/2008 at      173
16    1:42:32
    Exhibit 223 document Bates stamped        181
17    10293506
    Exhibit 224 four-page e-mail dated        184
18    9/20/2008 at 6:12 p.m.
    Exhibit 225 two-page document Bates        189
19    stamped 77882
    Exhibit 226 e-mail dated September 21,      199
20    2008 at 2:15 p.m.
    Exhibit 227 two-page document Bates numbed    203
21    70327
    Exhibit 228 e-mail dated 9/21/2008 at      257
22    8:09:34 p.m.
    Exhibit 229 e-mail dated 9/21/2008 at      260
23    6:20.35 p.m.
    Exhibit 230 e-mail dated 9/22/2008 at      274
24    11:53:18 a.m.
    Exhibit 231 document Bates stamped        277
25    10254271 (two pages)

LOWITT - HIGHLY CONFIDENTIAL

CERTIFICATE
STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK)

I, MARY F. BOWMAN, a Registered
Professional Reporter, Certified Realtime
Reporter, and Notary Public within and for
the State of New York, do hereby certify:

That IAN LOWITT, the witness whose
deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is
a true record of the testimony given by such
witness.

I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.

In witness whereof, I have hereunto
set my hand this 20th day of August, 2009.

_____
MARY F. BOWMAN, RPR, CRR

LOWITT - HIGHLY CONFIDENTIAL
* * *ERRATA SHEET* * *
NAME OF CASE:  In Re:  Lehman Brothers, Inc.
DATE OF DEPOSITION: 8/20/09
NAME OF WITNESS:  Ian Lowitt
Reason codes:
    1. To clarify the record.
    2. To conform to the facts.
    3. To correct transcription errors.

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

Page ____ Line ____ Reason____
From _____ to_____

_____
IAN LOWITT