# A. 20 (A)

Page 1

1          HIGHLY CONFIDENTIAL - B. McDADE

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF BART McDADE

14            New York, New York

15            September 2, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24045

Page 2

1    HIGHLY CONFIDENTIAL - B. McDADE
2        September 2, 2009
3          9:57 a.m.
4
5        HIGHLY CONFIDENTIAL deposition
6    of BART McDADE, held at Jones Day, LLP,
7    222 East 41st Street, New York,
8    New York, before Kathy S. Klepfer, a
9    Registered Professional Reporter,
10    Registered Merit Reporter, Certified
11    Realtime Reporter, Certified Livenote
12    Reporter, and Notary Public of the State
13    of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    HIGHLY CONFIDENTIAL - B. McDADE
2
3    A P P E A R A N C E S:
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7        222 East 41st Street
8        New York, New York  10017-6702
9    BY:  ROBERT W. GAFFEY, ESQ.
10        BART GREEN, ESQ.
11
12    BOIES, SCHILLER & FLEXNER, LLP
13    Attorneys for Barclays Capital
14        5301 Wisconsin Avenue, NW
15        Washington, DC  20015
16    BY:  HAMISH HUME, ESQ.
17
18    WILLIAMS & CONNOLLY, LLP
19    Attorneys for the Witness
20        725 12th Street, NW
21        Washington, DC  20005
22    BY:  JOHN J. BUCKLEY, ESQ.
23        JAMES WEINGARTEN, ESQ.
24
25

Page 4

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A P P E A R A N C E S:  (Cont'd.)
3
4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5    Attorneys for the Creditors Committee
6    865 S. Figueroa Street, 10th Floor
7    Los Angeles, California  90017
8    BY:  ERICA P. TAGGART, ESQ.
9
10    JENNER & BLOCK, LLC
11    Attorneys for the Examiner
12        330 N. Wabash Avenue
13        Chicago, Illinois  60611-7603
14    BY:  ROBERT L. BYMAN, ESQ.
15
16    HUGHES, HUBBARD & REED, LLP
17    Attorneys for the SIPA Trustee
18        One Battery Park Plaza
19        New York, New York  10004-1482
20    BY:  WILLIAM R. MAGUIRE, ESQ.
21        AMINA HASSAN, ESQ.
22
23    Also Present:
24        THOMAS E. HOMMEL
25        RAJESH ANKALKOTI

Page 5

1    HIGHLY CONFIDENTIAL - B. McDADE
2    BART McDADE, called as a
3        witness, having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8        Q.   Good morning, Mr. McDade.  We met
9    briefly before.  As you know, I'm Bob Gaffey.
10        A.   Good morning.
11        Q.   I'm from Jones Day and we are special
12    counsel to the estate of Lehman Brothers
13    Holdings, Inc. and, as I hope you know, we are
14    charged with looking into some matters relating
15    to the transaction in September of 2008 where
16    assets were transferred from Lehman to Barclays,
17    and that will be the subject of my questions
18    this morning.
19        Just a couple of ground rules, which
20    you either know or have been told, but let me
21    review them.  If you need a break at any time,
22    just say so, and if there's a question pending,
23    I would ask that the question be answered and
24    then take whatever break you want.  Just speak
25    up when that's convenience whenever you think

Page 6

1        HIGHLY CONFIDENTIAL - B. McDADE
2    you need a break.
3        I have a habit of becoming a fast
4    talker. I try and slow it down when I'm going
5    this long, but if I'm speaking too quickly, tell
6    me, and if you don't understand me in any way,
7    tell me and I'll try and rephrase the question
8    so you do. And I'll ask, if you can, try and
9    wait for me to ask a complete question before
10   you answer it for the sake of the court
11   reporter. That will make it easier for Kathy
12   here and make for a cleaner record.
13       A.   Okay, I understand.
14       Q.   Have you had your deposition taken
15   before?
16       A.   No, I have not.
17       Q.   How are you currently employed?
18       A.   I am unemployed.
19       Q.   And prior to being unemployed, what
20   was your last job?
21       A.   My last job was a small stint at
22   Barclays Capital.
23       Q.   When did you work at Barclays Capital?
24       A.   The end of the week of September 22nd
25   through till December 31st of 2008.

Page 7

1        HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   Prior to that you were employed by
3    Lehman Brothers, correct?
4        A.   Correct.
5        Q.   How long were you at Lehman Brothers?
6        A.   I was a summer intern from 1979;
7    full-time employee from 1983.
8        Q.   I'm not going to ask you to go through
9    the whole 1993 --
10       A.   Thank you.
11       Q.   -- but if you can give me an idea of
12   what you were -- maybe just give me a summary of
13   positions you held in the last three years
14   before September of 2008.
15       A.   Sure. The job I held from early 2000
16   until 2005 was the global head of fixed income.
17   From 2005 till June of 2008, I was global head
18   of equities. From 2008 until I left to go to
19   Barclays, I was the president of Lehman
20   Brothers.
21       Q.   Okay. Did you leave the firm at any
22   time during that period or were you continuously
23   employed?
24       A.   No, I did not.
25       Q.   And why did you leave Barclays?

Page 8

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.   I left Barclays -- I went to Barclays
3    to help the transaction's integration. I left
4    Barclays -- that was the sole purpose of going
5    to Barclays. Therefore, when I thought my
6    responsibilities with that integration were
7    done, I left Barclays.
8        Q.   From the outset, had that been the
9    plan, that you would go there for the
10   integration, stay a short period of time, and
11   then leave?
12       A.   Yes.
13       Q.   If you could, I'll ask you to focus
14   for time period purposes in September of 2008.
15   Did there come a time when Lehman and Barclays
16   began to engage in discussions about a
17   transaction in which Barclays would purchase all
18   or some of Lehman?
19       A.   That's correct.
20       Q.   When did that happen?
21       A.   That was Thursday, September 11.
22       Q.   And were you involved in those initial
23   discussions?
24       A.   I was in due diligence process with
25   the Bank of America discussions between Lehman.

Page 9

1        HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   Okay.
3        A.   So I only engaged with Bob Diamond and
4    his team late in the evening of the 12th of
5    September, 2008.
6        Q.   While you were doing the Bank of
7    America side of things, was there someone who
8    was in charge of dealing with Barclays during
9    that period prior to the weekend?
10       A.   There was a team that had started to
11   engage with Barclays and Bob's team, yes.
12       Q.   Who was that? Who was the Lehman team
13   there?
14       A.   That would have been Michael Gelband,
15   Alex Kirk. I wasn't there so I don't know all
16   of the individuals that were there at the time.
17       Q.   What I'm looking for is who you would
18   say were the primary individuals.
19       A.   Those two individuals would have been
20   the primary.
21       Q.   So they're dealing, before the
22   weekend, the 11th, 12th --
23       A.   Correct.
24       Q.   -- Gelband and Kirk are dealing with
25   the Barclays side of things?

## Page 10

HIGHLY CONFIDENTIAL - B. McDADE

A.   Correct.

Q.   And you're dealing with the Bank of America side of things?

A.   Correct.

Q.   Who is working with you, at the top level, who is working with you on the Bank of America side of things?

A.   Well, we had -- we had fully engaged a set of probably 50 individuals at Lehman and a like amount from BankAmerica that were locked in a room in Midtown in different rooms in different teams.  So the most senior partner working with me at BankAmerica would have been Skip McGee, who ran investment banking.

But it would be unfair to say we were the sole protagonists, if you will, because there were large groups of teams from all the different functional areas of the firm.

Q.   Where I am now, and we'll drill down a bit more sort of at a 30,000-foot view, of who you would characterize as sort of running the Bank of America side of things for Lehman, and that would be you and Skip McGee?

A.   Yes.

## Page 11

HIGHLY CONFIDENTIAL - B. McDADE

Q.   Now, you came to become involved or start dealing with Bob Diamond and his team on the 12th of September?

A.   That's correct.

Q.   Describe for me, please, how that came about and what you did initially.

A.   The team of individuals that I previously mentioned, Mike and Alex, were encouraged with the dialogue and the other teams were encouraged with the dialogue, so they encouraged me to lead the due diligence process, which was, if you will, well in hand, in terms of it had started on Thursday with BankAmerica, so I went down to the office, actually somewhere around here, I don't remember the exact location, and met Bob Diamond.

So my first interaction was an hour meeting or so with Bob Diamond, and then I left Bob and went into a room with the Lehman deal team, if you will, that was there and we built the strategy for how to proceed with dialogue with Barclays in earnest.

Q.   And who were the members of the Lehman deal team that you met with to build a strategy?

## Page 12

HIGHLY CONFIDENTIAL - B. McDADE

A.   The two previous mentioned.  There were -- it was a large group of folks.  So it would have been Mark Shafir -- to be honest, I don't have recollection of the individuals in the room.

Q.   But that team included Gelband, Kirk and Shafir?

A.   Absolutely.

Q.   When you met with Bob Diamond, was anybody else in the meeting?  Was it just the two of you?

A.   No, the two of us.

Q.   What was the nature of your discussion with Mr. Diamond?  Just summarize it for me.

A.   The nature of the discussion was his -- we had never met, and it was his walking through what his intentions and needs were if he was going to do a deal over the weekend and his trying to get a basic understanding from a senior executive of what the core of the businesses were and how I and he felt an integration would or would not work of the collective set of businesses.

Q.   And what did you say to Mr. Diamond

## Page 13

HIGHLY CONFIDENTIAL - B. McDADE

about those topics?

A.   Well, I believe, you know, it was -- it was very clear that Barclays had -- at this point he was contemplating the purchase of the whole firm, so it was very clear that there would be challenges and certain overlaps between their international capabilities and their lack of, if you will, U.S. capabilities.  So we spent time talking about that, and mostly I walked him through the philosophy and the basic approach in terms of how the businesses had been built, the client focus, the research focus, to make sure that we were aligned just at a general philosophical level with where and how money should and could be made over a period of time.

Q.   Was there any discussion at that first meeting about price?

A.   No, absolutely not.  Absolutely not.

Q.   Now, as I understand it, that, that -- those discussions before the weekend, in sum and substance, were for an acquisition of the entire firm?

A.   That is correct.  That is correct.

Q.   And those discussions contemplated or

Page 14

1      HIGHLY CONFIDENTIAL - B. McDADE
2   addressed an acquisition of the firm globally?
3      A.   That's correct.
4      Q.   And as I also understand it, that deal
5   died; that deal didn't happen?
6      A.   That's correct.
7      Q.   Tell me what you know about the
8   circumstances of that, those negotiations coming
9   to an end?  When did they do it and why?
10     A.   The deal -- Barclays had, like all
11  financial institutions, a set of limitations in
12  terms of what they could and couldn't do, and it
13  was very clear by their rhetoric that they were
14  challenged by certain -- acquisition of certain
15  of our balance sheet items, those being private
16  equity and commercial real estate, because their
17  accounting regime apparently, as they
18  communicated to me and to us, charged them a
19  significant amount of capital, if you will,
20  against assets like that.
21     So the deal needed to be formed as we
22  went through the weekend with a construct that
23  those assets would not be included, and that's
24  why we were engaged significantly at the Fed
25  with all of the industry consortium participants

Page 15

1      HIGHLY CONFIDENTIAL - B. McDADE
2   to try to establish an ability to create a
3   separate facility for those assets to be spun
4   out of Lehman, if you will, and a deal that
5   would take place.
6      Q.   Those assets being the private equity
7   and the commercial real estate?
8      A.   Correct.  Correct.
9      At the end, that looked to have been
10  accomplished, but then clearly there were
11  regulatory issues which have been -- which I
12  wasn't privy to in terms of being part of the
13  discussions with all the different regulators,
14  including the UK regulators, the Barclays
15  regulators specifically, and the U.S.
16  regulators, but clearly there must have been
17  some sort of discomfort.  And it's been
18  communicated to me that the FSA in particular
19  had some discomfort with the structure of the
20  deal as contemplated.
21     Q.   And it was the FSA's, among other
22  things, perhaps, but it was the FSA's discomfort
23  with the structure of the transaction that
24  prevented it from going forward?
25     A.   That is what has been communicated to

Page 16

1      HIGHLY CONFIDENTIAL - B. McDADE
2   me.
3      Q.   And who communicated that to you?
4      A.   Bob Diamond.
5      Q.   And when was that?  Was that the
6   Sunday?
7      A.   Sunday morning, correct.
8      Q.   So did there come a time when
9   negotiations with Barclays began again about a
10  subsequent transaction?
11     A.   Absolutely.
12     Q.   And when was that?
13     A.   The genesis of the second set of
14  conversations started to take place early in the
15  evening of September 14th, Sunday, September
16  14th.  I made a call to Bob Diamond to express
17  interest in continuing a dialogue, despite the
18  bankruptcy.  There was a meeting that took place
19  which specifically kicked off the discussions
20  the next morning by telephone with Bob Diamond,
21  Jerry del Missier, his president, Michael Klein,
22  his advisor, myself, Skip McGee, Mark Shafir to
23  talk about that transaction and the
24  possibilities of that 7 A.M. on Monday morning,
25  the 15th.

Page 17

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   And if you could summarize for me the
3   sum and substance of the conversations that that
4   group had in that phone call on the morning of
5   the 15th.
6      A.   The basic thrust that Barclays and Bob
7   were concerned about was whether or not he would
8   be buying a business, given all the media
9   reports and all that he had seen on T.V. of our
10  employees having left in droves from the
11  building, taking their belongings, et cetera,
12  and so he and they were obviously concerned that
13  they would be entering into a set of
14  negotiations and buying perhaps a set of
15  businesses that were no longer what they used to
16  be.
17     We felt confident that we could, if we
18  did a deal in an efficient time period, bring
19  together a large part of the businesses and keep
20  a large part of the businesses together.  And
21  then the second part of the conversation really
22  had to do with, okay, let's go do this, where do
23  we do it, where do we hold the discussions, what
24  do we need to do, practical matters related to
25  starting the dialogue again in earnest.

Page 18

HIGHLY CONFIDENTIAL - B. McDADE

1
2    Q.    The "this" that you're referring to,
3    the "let's go do this," was there any discussion
4    in that first meeting on the Monday morning
5    about the structure of the deal?
6    A.    No.
7    Q.    When did a discussion begin about the
8    structure of the deal?
9    A.    Over the course of by noon of Monday,
10   the 32nd floor at 745 had been taken over as the
11   deal room, it used to be the dining rooms of
12   Lehman, and that's where all the discussions
13   started to take place, the different individuals
14   from both organizations organizing in subgroups
15   to go through it.
16          The main deal negotiating team of
17   individuals, including Lehmanites, BarCap
18   employees and our external advisors started
19   to -- started to shape the form of the deal I
20   would say over the course of the afternoon of
21   the 15th.
22   Q.    Who were the Lehmanites who were again
23   heading up the discussions?  I know there were a
24   lot of people involved, but who would you
25   describe as the primary negotiators?

Page 19

HIGHLY CONFIDENTIAL - B. McDADE

1
2    A.    Bart McDade, Skip McGee, Mark Shafir,
3    clearly Dick Fuld was an informed party but not
4    in the room in terms of those discussions, would
5    be how I would describe the main, the main
6    Lehman principals.
7    Q.    And who were the principals for
8    BarCap?
9    A.    Rich Ricci, Jerry del Missier, and
10   their advisor, Michael Klein.  And sorry,
11   Archibald Cox, the CEO of the Americas.
12   Q.    Was Diamond involved?
13   A.    In and out.
14   Q.    In and out physically or in and out by
15   phone?
16   A.    Both.  Both.  So very much involved,
17   but not able to be there in every step of the
18   conversations.
19   Q.    Just to back up a little bit, in that
20   first conference call, that first phone call,
21   the 7 A.M. first meeting on the 15th when the
22   BarCap folks expressed concerns about whether or
23   not there was really a business that would be
24   left for them to buy, did you or someone else on
25   the Lehman team address those concerns?

Page 20

HIGHLY CONFIDENTIAL - B. McDADE

1
2    A.    I did, yes.
3    Q.    What did you say to Mr. Diamond or say
4    to the BarCap team?
5    A.    I felt very strongly that the value of
6    the franchise was worth the effort, number one;
7    and, number two, we as a collection of managers
8    felt very strongly that if, again, we did it as
9    I said before, in a time-efficient fashion, we
10   could keep the bulk of the team intact that had
11   created that valuable franchise.
12   Q.    In that 7 A.M. call, I'm going to move
13   ahead in a minute to the afternoon, but in that
14   7 A.M. call was there any discussion of
15   particular individuals who would be critical
16   to --
17   A.    No.
18   Q.    -- the deal?
19   A.    Absolutely not.
20   Q.    Did that discussion come about at some
21   point?
22   A.    Those discussions came about over the
23   course of the day in the afternoon and well into
24   the --
25   Q.    For an orderly record, I'm going to

Page 21

HIGHLY CONFIDENTIAL - B. McDADE

1
2    get to that in sequence, but was there anything
3    else that was discussed in the 7 A.M. meeting
4    that you recall?
5    A.    No, it was a very short meeting to the
6    point of let's get to work.
7    Q.    I assume after the 7 A.M. meeting
8    there was a lot of phone calls made telling
9    people to gather on the 32nd floor and get to
10   work?
11   A.    Correct.
12   Q.    Describe for me how -- how were the
13   negotiations set up?  Were there people
14   responsible for particular issues?  Were there
15   rooms devoted to particular topics?
16   A.    So that the actual configuration of
17   the 32nd floor lent itself very well to a deal
18   environment.  We used what was commonly referred
19   to as Dick Fuld's dining room upstairs as the
20   main place because it had the largest table for
21   the main significant protagonists to be sitting
22   with each other to set up the process, to be
23   doing some of the negotiations, et cetera.  So
24   there was that in the corner of the building was
25   the main room, if you will, the central hub.

Page 22

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2           There were probably, I forget how many
3   letters in the alphabet, but there probably 15
4   or so different dining rooms, each of which was
5   occupied by different teams.  So there would
6   have been human resource team, there would have
7   been finance team, there would have been
8   different risk teams taking on as the assets
9   started to get valued, different of the
10  components of the risk teams would be in
11  different rooms.  We had legal teams, et cetera,
12  across all the different -- all the different
13  rooms, including using the lobby and everything
14  else.
15      Q.   We've had a bunch of descriptions of
16  that in a sense fairly vibrant couple hours.
17      A.   It was a beehive.
18      Q.   Who's in the Fuld dining room?  Who is
19  in the main room?
20      A.   So those are the Lehmanites mentioned
21  before, including other of our senior partners
22  involved, all the advisors, so the Weil team,
23  Simpson lawyers, the lawyers for Barclays and
24  clearly all the significant Barclays senior team
25  as well.

Page 23

1       HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   So in that room is McDade, McGee,
3   Shafir, and you said some other senior
4   executives.  Who were they on the Lehman side?
5       A.   Again, when you say "in the room,"
6   just to clarify, that room would have had many
7   participants, different participants over the
8   course of day.  So there wasn't one meeting at 1
9   o'clock that I'm describing.  I'm describing a
10  dynamic process over, you know, over a basically
11  a 30-hour period.
12      Q.   Okay.
13      A.   So I wouldn't be able to describe for
14  you who else was in the room because there would
15  be a long list, most of which I can't recall in
16  terms of who was in the room at what point in
17  time.  But they would have been in general
18  categories.  Folks in and around the process at
19  Lehman would have been the financial
20  institutions banking team as an example of who
21  outside of those protagonists would have been
22  there as part of the process that we had been
23  dealing with over the course of the whole year
24  in terms of trying to find solutions for the
25  overall Lehman platform.

Page 24

1       HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   You referred to, I think you said risk
3   teams.  I'm having trouble with my own
4   handwriting, but risk teams who gathered as the
5   assets were being valued.  Who from the Lehman
6   side of things were the main protagonists?
7       A.   Mike Gelband ran capital markets.  In
8   that responsibility, he would have been in
9   charge all of the risk of the firm, with the
10  exception of the businesses that Alex Kirk ran
11  the principal businesses.  So those two ran all
12  the risk of the firm at that point in time.
13          So Michael Gelband would have been
14  chaperoning his different asset experts.  So it
15  would have been Charlie Spero for residential
16  mortgages, it would have been Eric Felder for
17  the credit businesses, and it would have been
18  Kaushik Amin for our interest rate and foreign
19  exchange businesses.
20      Q.   And who, again, at the top level was
21  dealing with the HR issues?
22      A.   The head of HR at Lehman was Tracy
23  Binkley.  Her deputy was Anthony Collerton.
24      Q.   And who was dealing with HR for
25  Barclays, do you know?

Page 25

1       HIGHLY CONFIDENTIAL - B. McDADE
2       A.   Michael Evans and a gentleman named
3   Mark Kerman, I believe his name is.
4       Q.   Kerman, with a K?
5       A.   Kerman, with a K, I believe.
6       Q.   Now, how involved were you in the side
7   of things where assets were being valued?
8       A.   I was involved from the point of view
9   of being informed.  I was involved from helping
10  facilitate and set the process up, and at some
11  point, I could not tell you exactly what moment
12  in time, I believe over the course of the week
13  several times I would have been involved in
14  getting an update from the team in terms of
15  where the different valuation processes were
16  heading, but I certainly wouldn't describe
17  myself as being in the room going asset-by-asset
18  through --
19      Q.   Were people in the room going
20  asset-by-asset?
21      A.   Absolutely.
22      Q.   Who?
23      A.   Those individuals I mentioned.  The
24  junior traders who -- or, the senior traders who
25  had been working with them, and the counterparts

Page 26

1    HIGHLY CONFIDENTIAL - B. McDADE
2    from Barclays, most of which I didn't know and
3    don't know their names.
4        Q.   And what was your understanding of
5    what they were doing in these meetings with the
6    traders?
7        A.   So that the -- I would describe it as
8    a bottoms-up process, albeit in a very quick
9    time period, of establishing a fair market value
10   for the individual assets and done in a way such
11   that most of the focus would have been on the
12   largest concentrated positions in terms of
13   notional size, if that -- does that make sense
14   to you?
15       Q.   A little bit.
16       A.   If there's a hundred line items in the
17   credit business, and 90 of them -- sorry, 10 of
18   them represent 90 percent of the market value --
19       Q.   Uh-huh.
20       A.   -- the focus of those meetings would
21   have been on the --
22       Q.   On the big pieces?
23       A.   -- on the ten pieces that represent 90
24   percent of the value.
25       Q.   And what was the result of this

Page 27

1    HIGHLY CONFIDENTIAL - B. McDADE
2    process you've described in terms of valuation
3    of the assets?
4        A.   Well, eventually that's how we agreed
5    on the prices of the assets.
6        Q.   Was there back and forth on the price?
7        A.   Absolutely.
8        Q.   Who was doing the negotiating of that?
9        A.   Again, Michael Gelband would have been
10   the lead.
11       Q.   Who was the lead for Barclays?
12       A.   I can't answer the question directly.
13   Stephen King was certainly an individual that
14   had a large role on their side, but I can't
15   answer the question specifically.  You'd have to
16   ask Barclays.
17       Q.   I'd have to ask Gelband?  Oh, I'd have
18   to ask Barclays?
19       A.   Barclays would be my guess.  Michael
20   might know as well.
21       Q.   And did there come a time when you, as
22   you got these information updates, when you were
23   informed that a price had been agreed?
24       A.   The context of what we were dealing
25   with?

Page 28

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   Yeah.
3        A.   There were no markets.  They were
4    tumultuous, volatile.  The market had changed
5    from Friday to Saturday to Sunday to Monday,
6    Monday at 9, Monday at 11, et cetera.  So prices
7    agreed at a moment in time, but prices were
8    changing in the world dramatically.
9        So we knew that we didn't have a deal
10   until we had a deal at the end, whenever the
11   bankruptcy process was.  So was there a
12   penultimate moment at a piece in time relative
13   to the first transaction?  Yes, there was an
14   agreement, but we knew it was a dynamic process
15   over the course of the -- it would be a dynamic
16   process over the course of the week.
17       Q.   So in recognizing that it would be a
18   dynamic process over the course of the week, was
19   it -- how was it agreed that the price in the
20   deal for these assets that were being valued
21   would adjust, would change?
22       A.   It would adjust as the market adjusted
23   and as the participants continued to dialogue.
24       Q.   So, from your view, was anything built
25   into the price at the outset to anticipate

Page 29

1    HIGHLY CONFIDENTIAL - B. McDADE
2    volatile markets over the week, or am I
3    understanding that the idea was we would reach a
4    price, but we know this price is probably going
5    to change as we go?
6        A.   It's very clear that the price would
7    change given how much volatility was in the
8    market.
9        Q.   So when an original pricing is
10   reached -- moving forward a little bit, on the
11   15th and into the 16th, an agreement is reached?
12       A.   That's correct.
13       Q.   And we'll talk a bit about that
14   sequence, but in that sequence when an agreement
15   is reached, a price of some kind is agreed for
16   these assets?
17       A.   That's correct.
18       Q.   And there's real estate assets, hard
19   real estate assets, right, as well as
20   securities?
21       A.   The --
22       Q.   The buildings?
23       A.   The buildings themselves, yes.  I'm
24   sorry, the commercial real estate business
25   assets were separate.

Page 30

HIGHLY CONFIDENTIAL - B. McDADE

1
2     Q.   The reason I raised the building is --
3  put them out of the mind.  I don't want to talk
4  about them.  I want to talk about the securities
5  side of things.
6     A.   I understand.
7     Q.   In this process for over from Monday
8  to Tuesday toward a deal is reached, was a price
9  reached for the securities component?
10    A.   A price wouldn't have been reached for
11 the securities component until Tuesday.
12    Q.   I'm going overnight from Monday to
13 Tuesday.
14    A.   Okay.
15    Q.   So we're early Tuesday morning, and a
16 price is reached for the securities component?
17    A.   Correct.
18    Q.   What was that price based on?
19    A.   That price was based on all of that
20 collaborative work between the Barclays' points
21 of view and the Lehman's points of view.
22    Q.   Did that price contemplate any delta
23 between the book value at which Lehman carried
24 the assets and the price that Barclays would
25 pay?

Page 31

HIGHLY CONFIDENTIAL - B. McDADE

1
2     A.   You'll have to clarify what you mean
3  by "contemplate."  The price was different
4  because Lehman hadn't marked the books since
5  Friday, and the markets were unbelievably
6  different in terms of the nature of the dynamic
7  of what happened in the markets.
8         So, yes, there ultimately was a
9  difference in where Lehman's marks were, but the
10 marks were as of Friday night.
11    Q.   Do you know what the quantum of the
12 different was?
13    A.   No, I don't know specifically.
14    Q.   Did anybody ever talk to you about
15 what the quantum of the difference was between
16 the last time Lehman marked its books and the
17 price that was agreed?
18    A.   In general terms, absolutely.
19    Q.   Okay.  Who told you that and what did
20 they tell you?
21    A.   Well, that the deal team would have
22 been, you know, any of the individuals might
23 have communicated that, so the individuals
24 mentioned before, and the approximate value
25 would have been about $5 billion.

Page 32

HIGHLY CONFIDENTIAL - B. McDADE

1
2     Q.   When you say "the approximate value,"
3  you're talking about the difference between book
4  and the price; you're not talking about the
5  overall value --
6     A.   The difference in the marks from
7  Friday to the contemplated asset purchase price,
8  yes.
9     Q.   And do you recall who it is who
10 communicated to you that the difference was
11 about $5 billion?
12    A.   It would have been a number of people.
13 No, I don't recall specifically.
14    Q.   Who would be the candidates?
15    A.   Ian Lowitt, Michael Gelband, Eric
16 Felder.
17    Q.   About what time on Tuesday was,
18 subject to documentation, perhaps, but about
19 what time on Tuesday was a deal reached?
20    A.   Early afternoon.
21    Q.   On Tuesday?
22    A.   Yes, on Tuesday.
23    Q.   Do you recall a board meeting on
24 Tuesday morning, the meeting of the boards?
25    A.   No, I was not involved in any of the

Page 33

HIGHLY CONFIDENTIAL - B. McDADE

1  board meetings.
2
3     Q.   I guess I should -- would you describe
4  yourself as the lead negotiator for Lehman?
5     A.   I was the senior officer amongst all
6  of the team, but I would describe myself as one
7  of three lead negotiators with Mark and Skip.
8     Q.   Did Skip McGee devote his attentions
9  to any particular aspect of the negotiations?
10    A.   Well, he was an M&A banker by
11 background, as obviously was Mark, the global
12 head of M&A, so they spent their time working
13 through the specifics of what M&A transactions,
14 and this one charting new territory in terms of
15 its speed, in terms of processing.
16    Q.   Was Mr. McGee particularly focused on
17 employee issues?
18    A.   Well, I think that the key to the
19 transaction, as I stated before, was retaining
20 the bulk of a service organization or its
21 people.  So, from that point of view, yes.
22    Q.   I guess my question goes to Mr. McGee
23 in particular as opposed to you and Mr. Shafir
24 or the other senior executives involved.
25         Was McGee's particular focus retention

Page 34

HIGHLY CONFIDENTIAL - B. McDADE

1    of employees?
2
3    A.    No.
4    Q.    Was he dealing with all aspects of the
5    deal?
6    A.    Absolutely.
7    Q.    And what about Shafir, did he have any
8    particular focus, or was he dealing with all
9    aspects of the deal as well?
10    A.    He was dealing with all aspects of the
11    deal.
12    Q.    I haven't been in this setting myself,
13    so this may be an ignorant question, but is
14    there one point guy for Lehman as between say
15    you, Shafir and McGee?
16    A.    Is there one point guy?  No.
17    Q.    Was McGee as involved in these
18    negotiations as you and Shafir were?
19    A.    Absolutely.
20    Q.    And I guess Shafir -- all three of you
21    were equally involved?
22    A.    Absolutely.
23    Q.    Did it ever come to your attention
24    that a deal was presented to the boards of
25    Lehman Brothers Holdings and Lehman Brothers,

Page 35

HIGHLY CONFIDENTIAL - B. McDADE

1    Inc. on the morning of September 16?
2
3    A.    Well, it was very clear that we -- we
4    didn't have permission as the employees.  It
5    would have to be done through the CEO and the
6    chairman Dick and the board.  So we were wrapped
7    up in, again, the processing, but it would have
8    been very clear to us that some board process
9    had to take place, yes.
10    Q.    What do you know about the board
11    process, you know, what meetings took place, who
12    made presentations to the boards?
13    A.    I do not know any of that.
14    Q.    Have you ever learned that there was a
15    board meeting -- there were board meetings of
16    Holdings and Inc. concerning the transaction
17    with Barclays?
18    A.    Have I ever specifically learned and
19    did I ask and confirm?  No.
20    Q.    Do you have any knowledge as to what
21    was described to the boards of Lehman Brothers
22    Holdings, Inc. and Lehman Brothers, Inc. with
23    regard to the Barclays transaction?
24    A.    All of the information that we were
25    using in the processing would have been the

Page 36

HIGHLY CONFIDENTIAL - B. McDADE

1    documents used in the description to a board
2    meeting.
3    Q.    Apart from any documents that may have
4    been given to the board, my question is a little
5    more basic.  Do you know what the board was told
6    about the deal?
7    A.    I was specifically not there, so I
8    can't -- no, I do not.
9    Q.    Did anyone ever recount to you what
10    the boards were told about the meeting?
11    A.    No.
12    Q.    Do you know when the boards were told
13    there was a deal?
14    A.    No.
15    Q.    Have you ever talked to any member of
16    the boards about the components of the deal?
17    A.    No, I have not.
18    Q.    So I think you said before the deal
19    was reached in the early afternoon of Tuesday?
20    A.    Correct.
21    Q.    Okay.  I know it's a long time ago,
22    but approximately what time would you say a deal
23    was reached?
24    A.    My guess it would have been about 1

Page 37

HIGHLY CONFIDENTIAL - B. McDADE

1    P.M. New York time.
2
3    Q.    Okay.
4    A.    And then we were in waiting for
5    regulatory approval from the UK regulators.
6    Q.    Now, this point at about 1 P.M. New
7    York time, is this a -- is this when, you know,
8    hands are shaking and there's a deal and it has
9    to be documented, or is there a document by that
10    time?
11    A.    There is a piece of legal paper.
12    There's no document.  Needs to be documented.
13    Q.    By that 1 P.M. or so point when a deal
14    is done, have you seen any documentation, any
15    contract?
16    A.    No, I have not.
17    Q.    Working from that point at 1 P.M. and
18    backwards, I want to get an idea of what the
19    remaining issues were.
20    A deal gets made when all issues are
21    resolved.  What were the last big issues that
22    had to be dealt with before folks were saying we
23    have a deal?
24    A.    You said working backwards from 1
25    P.M.?  You mean earlier?

Page 38

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    Let me just sort of explain the
3    context of my question, if that's okay. I'm
4    hearing about a process that where this
5    negotiation is overnight from Monday to Tuesday.
6    I'm assuming there's a whole bunch of issues
7    that are dealt with. I'm assuming, and I may be
8    wrong, that there's, as you get closer to a deal
9    being made, there are a couple of issues that
10   need to be resolved before everybody knows
11   there's a deal. That's the context of my
12   question.
13          What's your memory of what, what if
14   any, big issues there were that were resolved
15   last in the process?
16   A.    I don't have a recollection of a
17   priority of first to last in terms of what, you
18   know, what was resolved.
19   Q.    When was price decided for the
20   securities assets?
21   A.    I've walked through that process.
22   Price was decided as late as possible because
23   the dynamics of the markets moving. So price
24   would have been decided up unto that point at 1
25   o'clock.

Page 39

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    I'm going to show you, Mr. McDade,
3    what has been marked at a prior deposition as
4    Exhibit 21. Take a moment, please, take a look
5    at the document. That's the wrong one. Hold
6    on.
7          Handing you what was marked as 20 at a
8    prior deposition. When you've had a chance to
9    look it through, my first question to you, sir,
10   will be have you seen this document before?
11   A.    Yes, I have.
12   Q.    When did you first see it?
13   A.    I saw this document in a review with
14   my attorney.
15   Q.    Prior to that point, had you ever seen
16   the document before?
17   A.    No.
18   Q.    Do you know Martin Kelly?
19   A.    Yes, I do.
20   Q.    Who is Martin Kelly?
21   A.    Controller for Lehman.
22   Q.    Was he involved in the negotiations in
23   any way?
24   A.    He was definitely involved in helping
25   the deal.

Page 40

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    Describe for me what his role was?
3    A.    Financial controller. He's in charge
4    of the books and records, if you will, and the
5    assets. So his -- his job would have been
6    twofold: One, organizing his team of
7    individuals who would have had a lot of the
8    necessary information to put assets together to
9    be formed in an asset purchase; and,
10   secondarily, he was running points specifically
11   for Ian around making sure that the information
12   was as accurate as possible.
13   Q.    And we've spoken about Mr. Lowitt. He
14   was the chief financial officer?
15   A.    Chief financial officer, that's
16   correct.
17   Q.    And who's Paolo Tonucci?
18   A.    Paolo Tonucci was our treasurer.
19   Q.    And did both --
20   A.    He ran the funding for the firm.
21   Q.    Tonucci and Kelly both are direct
22   reports to Lowitt; is that right?
23   A.    That's correct.
24   Q.    Was Lowitt your direct report?
25   A.    Lowitt was a direct report of Dick

Page 41

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Fuld, but Lowitt and I lived together as if he
3    was direct report of mine. We sat next to each
4    other and we didn't care about the org.
5    structure. So, in effect, yes.
6    Q.    Have you had a chance to look through
7    the body of the --
8    A.    Yes, I have.
9    Q.    -- of the e-mail?
10          The one I'm talking about is the one
11   at the bottom from Kelly to Lowitt, copy
12   Tonucci, at 5:10 A.M. on the 16th. And in it
13   Mr. Kelly writes, "Well, it took all night and
14   lots of back and forth, but the deal is done and
15   ready for the board."
16   A.    Uh-huh.
17   Q.    "Final price did not change
18   meaningfully. Approximately a 5 billion all in
19   economic loss versus our marks."
20   A.    Uh-huh.
21   Q.    "And 3.6 billion of resi assets left
22   behind." Do you see that?
23   A.    Yes.
24   Q.    Is that an accurate description of
25   deal?

Page 42

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.   That is.
3        Q.   Is it accurate that that deal was made
4    by 5:10 A.M. on the morning of the 16th?
5        A.   At that point in time, again, process
6    with the risk guys went all the way up unto,
7    because markets changed again overnight
8    dramatically, so we had another repricing in
9    terms of the process after this.  But at that
10   point in time, that would have been accurate,
11   yes.
12       Q.   So it was accurate that by 5:10 A.M.
13   on the 16th there was a 5 billion all in
14   economic loss versus the marks?
15       A.   That's correct.
16       Q.   And it was ready for the board by that
17   time?
18       A.   Yes.
19       Q.   Withdrawn.  I don't -- I heard what
20   you said about not knowing about the board, and
21   that's an unfair question.
22            Do you know one way or the other
23   whether -- when Mr. Kelly says it's ready for
24   the board, does this refresh your recollection
25   about if you knew anything else about when the

Page 43

1        HIGHLY CONFIDENTIAL - B. McDADE
2    board was going to review this deal?
3        A.   Does not.  Does not.
4        Q.   Mr. Kelly writes "final price did not
5    change meaningfully" when he describes the 5
6    billion all in economic loss.  Can you shed any
7    light on what he means there, about the price
8    not changing meaningfully?
9        A.   What I would describe is a process
10   with the risk operators is what he's describing
11   taking place.  In the initial math and the math
12   as it went through the first day, there was one
13   set of market movements.  So one would expect
14   overnight process, with no inputs from any of
15   the markets, for that price not to have changed.
16   With the next day's trading activity, you then
17   would have new inputs in terms of markets
18   potentially changing either way, up or down.
19       Q.   When Mr. Kelly writes that "the final
20   price did not change meaningfully," was there a
21   price, approximate or otherwise, reached early
22   in the process, an overall price?
23       A.   There would have been no overall price
24   reached because the nature of the buyer knew
25   that the assets were dynamic and we had a

Page 44

1        HIGHLY CONFIDENTIAL - B. McDADE
2    responsibility as the seller of the assets'
3    prices being dynamic as well.
4        Q.   Further into the e-mail we're
5    talking about Mr. Kelly writes, "Also, an extra
6    1 billion of comp beyond our accrual and
7    assumption of all trade payables in LBI and
8    LBHI," do you see that portion?
9        A.   Yes, I do.
10       Q.   Do you have an understanding of what
11   Mr. Kelly is referring to there?
12       A.   Yes, I do.
13       Q.   Could you describe it to me, please?
14       A.   The deal in terms of Barclays
15   purchasing the assets also assumed roughly the
16   employing of 9,000 Lehman employees, so there
17   had been an accrual in Lehman's system for the
18   accounting of our compensation for our Lehman
19   employees.
20            We handed over to Barclays all of the
21   accrual information and all of the 2007
22   compensation information for all of our
23   employees.  They took that information and built
24   an assumption in terms of what it would be
25   necessary to protect the investment that they

Page 45

1        HIGHLY CONFIDENTIAL - B. McDADE
2    made in terms of overall compensation for the
3    year 2008 for all of those 9,000 employees that
4    they would be acquiring.  That's my recollection
5    on the comp.
6        Q.   So --
7            Sorry.  Were you done with your
8    answer?  I may have interrupted you.
9        A.   I think you asked me to answer both,
10   but I'll be happy to stop and answer the trade
11   payables in a second.
12       Q.   Tell me about the trade payables piece
13   and then I'll follow up on both.
14       A.   It clearly was understood on the
15   Barclays side that the vendor contracts that
16   Lehman was responsible for in the course of
17   running its businesses would be necessary items
18   to be dealt with by an acquirer, in this case,
19   Barclays.  So I believe it was contemplated in
20   the first Asset Purchase Agreement that they
21   would have 60 days, and Martin was giving an
22   estimate in terms of what -- he was giving a
23   process in terms of an estimate of what those
24   trade payables would be and giving an update to
25   Barclays.

Page 46

HIGHLY CONFIDENTIAL - B. McDADE

1      Q.   And on the compensation piece, I just
2   want to go back to something you said in your
3   answer about the accrual information was turned
4   over to Barclays and they built a model to
5   anticipate what their costs would be?
6      A.   Correct.
7      Q.   Did you ever see --
8      A.   No.
9      Q.   -- any --
10      Let me just finish the question so we
11   have a clear record.
12      Did you ever see that model, see any
13   documentation of the calculations that they did?
14      A.   No, I did not.
15      Q.   Were you involved in any of the
16   discussions that led to whatever their ultimate
17   conclusion was?
18      A.   Brief discussions.
19      Q.   With whom?
20      A.   With Jerry del Missier, with Rich
21   Ricci, and with Michael Evans and Mark Kerman.
22      Q.   And in the --
23      A.   And I don't mean to describe that as
24   one large meeting with all of them.

Page 47

HIGHLY CONFIDENTIAL - B. McDADE

1      Q.   Okay.
2      A.   A series of meetings.
3      Q.   Overall and in sum and substance --
4      A.   Right.
5      Q.   -- over these series of meetings, what
6   did you come to understand Barclays was going to
7   do with the compensation accrual?  Increase it?
8   Decrease it?  Take it as it was?
9      A.   With the accrual that had been on the
10   books of Lehman?
11      Q.   Correct.
12      A.   Increase it.
13      Q.   And why were they going to increase
14   it?
15      A.   To protect the investment in terms of
16   the people they were acquiring and to reflect a
17   full year of compensation.  Because the accrual
18   would have been only for that portion of the
19   year which we had gone through.
20      Q.   If the accrual was at that point
21   through August 31?
22      A.   Uh-huh.
23      Q.   Do you have any knowledge one way or
24   the other about whether the difference for the

Page 48

HIGHLY CONFIDENTIAL - B. McDADE

1   rest of the year would have been a billion more?
2      A.   All of the pay processes are dynamic
3   so I would have no knowledge in terms of looking
4   into the future what may or may not have
5   happened.
6      Q.   What I'm aiming at here, and this is
7   the state of your knowledge, is whether one
8   billion over the accrual is meant just to
9   annualize it or if it's more than that.
10      A.   It's definitely more than just
11   annualizing.
12      Q.   And who at Barclays was responsible
13   for, if you know, who at Barclays was
14   responsible for doing that modeling?
15      A.   I don't know.
16      Q.   Was there a similar process with
17   respect to calculating the liabilities for trade
18   payables?
19      A.   No.
20      Q.   Describe that process to me.
21      A.   We struggled over the course of the
22   week with getting an accurate depiction of what
23   those trade payables would be to Barclays, but
24   that would have been a specific set of

Page 49

HIGHLY CONFIDENTIAL - B. McDADE

1   obligations that Lehman had that Barclays would
2   have received and accepted at face value given
3   they didn't -- they didn't, you know, other than
4   their general knowledge of what payables may be
5   in a general sense, they would have taken that
6   at face value.
7      Q.   And was any exercise undertaken within
8   Lehman to increase the amount shown, the accrued
9   amounts for trade payables as part of the
10   transaction?
11      A.   Our only process was to provide
12   accurate information in terms of what those
13   payables would be.
14      Q.   Who were the people responsible for
15   assessing?
16      A.   Martin Kelly.
17      Q.   Do you know if Mr. Kelly added any
18   transaction adjustments to the accruals for
19   trade payables?
20      MR. HUME:  Objection.  Vague and
21   ambiguous.
22      Q.   You can answer.
23      A.   I'm not sure I understand your
24   question.  Say it again, please.

Page 50

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   To your knowledge, did Mr. Kelly make
3  any transaction adjustments with respect to the
4  accrual for payables?
5    A.   Again, a transaction adjustment?
6    Q.   Did you write them up for the purpose
7  of the deal?
8    A.   Oh, I'm sorry.  Absolutely not, to my
9  knowledge.
10    Q.   Do you know if Mr. Kelly calculated
11  any transaction adjustments for the compensation
12  accrual?  Did he write them up for the purpose
13  of the deal?
14    A.   I do not know.
15       To the best of my knowledge, Martin
16  Kelly would have only seen generic information
17  on comp.  He wouldn't have been -- it would have
18  been an HR process.
19    Q.   Mr. Kelly writes here, "Bart reviewed
20  all of it before final agreement."  Do you see
21  that?
22    A.   Yes, I do.
23    Q.   Okay.  You've said to me the deal
24  isn't final, the deal's not done until the
25  afternoon of the 16th.  Mr. Kelly is writing at

Page 51

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2  5:10 A.M. on the 16th, "Bart reviewed all of it
3  before final agreement."
4       Had you reviewed all of it before
5  final agreement at that time?  Is Mr. Kelly
6  right or is he wrong here?
7    A.   This is a choice that Mr. Kelly's use
8  of words.  I reviewed all the information I had
9  at that point in time.
10    Q.   Okay.  At that point in time, did
11  you --
12    A.   As I did often during the course of
13  the week.
14    Q.   I'm sure, and I hear what you're
15  telling me about a dynamic process.
16    A.   And there's no final deal until
17  bankruptcy court.
18    Q.   There can be a final agreement before
19  the bankruptcy court, though, right?
20    A.   Yes.
21    Q.   Okay.  And your view is a final
22  agreement was not reached until the afternoon of
23  the 16th?
24    A.   That's correct.
25    Q.   Mr. Kelly appears to be writing that a

Page 52

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2  final agreement had been reached by 5:10 A.M.,
3  you had reviewed it and it was ready for the
4  board.  Is that in accord with your
5  recollection?
6    A.   My recollection was the process would
7  stay in place and dynamic in terms of the pieces
8  of it all the way up until as late as possible
9  because of the nature of the assets and the
10  movements.
11    Q.   By 5:10 A.M. on the morning of
12  September 16, was there a final deal ready for
13  the board?
14    A.   I don't recall.
15    Q.   By 5:10 A.M. on September 16, had the
16  final process been reached which included a 5
17  billion all in economic loss versus the marks?
18    A.   I would repeat the same answer I used
19  before, which is the markets again changed
20  overnight so there's no way that a final price
21  had been reached at 5:10 A.M. because both the
22  seller and the buyer would have wanted to review
23  the changes in the marketplace again --
24    Q.   Okay.
25    A.   -- before final agreement.

Page 53

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Mr. McDade, I'm putting before you
3  what we previously marked as Deposition Exhibit
4  19.  Take a moment, please, sufficient to tell
5  me whether you've seen that document before.
6    A.   I have seen this document before.
7    Q.   When did you first see the document?
8    A.   I first saw this document on
9  9/16/2008.
10    Q.   And could you describe for me the
11  circumstances under which you saw the document,
12  meaning meeting, with other people?
13    A.   Correct.
14    Q.   Who you are meeting with when you
15  first see this document?
16    A.   I would have -- this document would
17  have been with our collection of internal Lehman
18  advisors and our external advisors.
19    Q.   And do you know who prepared this
20  document?
21    A.   I do not know the individual who
22  prepared this document, no.
23    Q.   Do you know who delivered the document
24  into that meeting?
25    A.   I do not know who delivered the

Page 54

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2  document into the meeting, no.
3    Q.  And does this document bear any
4  relation to the transaction that was agreed with
5  Barclays?
6    A.  Bear any relation to the transaction
7  that was ultimately done or the transaction --
8    Q.  Yes.  Actually, that's a good point.
9  Let me clarify the question.
10    Does that bear any relation to the
11  transaction that was agreed as of the 16th of
12  September?
13    A.  Yes.
14    Q.  Okay.  What relation does it bear?
15    A.  Significant relation.
16    Q.  Could you describe that to me?
17    A.  The deal contemplated an assumption of
18  liabilities and the acquiring of assets, and
19  this represents the summation of those two
20  components of the transaction.
21    Q.  And among those components are the
22  assumption of liabilities for cure and
23  compensation that we've been talking about,
24  correct?
25    A.  That's correct.

Page 55

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.  And the cure assumption of liabilities
3  was put at 2.25 billion, correct?
4    A.  That's correct.
5    Q.  And the compensation liability was put
6  at 2 billion, correct?
7    A.  Correct.
8    Q.  And this schedule reflects those two
9  assumed liabilities that were part of the price,
10  correct?
11    A.  Yes, it does.
12    Q.  And on the asset side, does the asset
13  side reflect the book value of the securities
14  being sold as of the 16th?
15    A.  No, this represents the bottoms-up
16  work done between the two deal teams.  This
17  reflects the market price or the price agreed to
18  by the individuals, the sellers and the buyer.
19    Q.  It may be, but I'm not sure that's
20  responsive.  We may be missing each other, so I
21  just want to take a look at the -- I guess my
22  question is:  On Lehman's books were the marks
23  for these securities higher than the amount
24  shown on the schedule as of the 16th of
25  September?

Page 56

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.  On Lehman's books were the marks for
3  the assets?
4    Q.  Correct.
5    A.  They would have been higher, yes.
6    Q.  By about that $5 billion element?
7    A.  That's correct.
8    Q.  So would it be fair to say that, as of
9  the 16th of September, the book value of this
10  position was not approximately $70 billion,
11  72.65?
12    A.  The Lehman books hadn't been marked
13  since Friday evening, the 12th, if that's what
14  you're describing as the book value of the
15  securities.  What we marked to market is the
16  market value of those securities.  The markets
17  changed dramatically between the 12th, the last
18  process for marking, and when this was done in
19  the middle of the evening that early morning of
20  the 16th.
21    So, yes, the long assets purchased
22  would reflect change in the dynamic of the
23  market, particularly given the nature of what a
24  lot of those assets were.
25    Q.  Did Lehman's books on the 16th of

Page 57

1    HIGHLY CONFIDENTIAL - B. McDADE
2  September reflect that dynamic change in the
3  market?
4    A.  We attempted to keep up with the mark
5  to market process, but to the best of my
6  recollection, Lehman's books reflected were --
7  or, last reflected the market on the 12th.
8    Q.  Would you have known on the 16th what
9  book value was attributed to these assets as of
10  the 16th of September?
11    A.  It wouldn't have changed from the 12th
12  was the point I was making.  So, yes.
13    Q.  I want to ask you in a little more
14  detail how this $5 billion number came about,
15  this bottoms-up process that you've described to
16  me.  Is that the sum total of an asset-by-asset
17  valuation or is it -- was it arrived at in any
18  different way?
19    A.  It's a sum total of each of the
20  individual risk heads, business heads working
21  with their individual traders and their
22  counterpart from Barclays in a bottoms-up way as
23  I described earlier.
24    Q.  Do you know if the 5 billion was
25  calculated based on particular securities or by

Page 58

HIGHLY CONFIDENTIAL - B. McDADE

asset class or otherwise?

A.   I tried to describe the process
previously.  It was there's no way in that short
a period of time to identify every single line
item, but the significant line items in terms of
market value as a percentage of the total were
valued individually, yes.

Q.   Before you saw the financial schedule
that's marked as Deposition Exhibit 19, before
that point on the 16th -- withdrawn.  If you
would, just take note that it's dated 11:18 A.M.
on the 16th.  With that as a focus, did you see
prior drafts of this?

A.   Prior drafts of this exact document?
I don't recall.

Q.   Did you ever see a version of this
document that had different totals on it in the
course of the negotiating process we've been
talking about today?

A.   I'm sure I did, but I don't recall.

Q.   If you take a look at the upper
right-hand corner of the document, you'll see a
handwritten notation.  Do you recognize the
writing or do you know who put that notation

Page 59

HIGHLY CONFIDENTIAL - B. McDADE

there?

A.   Steve Berkenfeld.

Q.   Do you know why and when and the
circumstances under which he put that notation
on the document?

A.   I don't know why and when.  I wasn't
there when he inked it, but he ran our CAD, our
compliance and legal areas, and I'm sure he was
trying to mark a moment in time for the
collection of partners because it had been so
dynamic.

Q.   When you say you're sure, I just want
to --

A.   Sorry.

Q.   -- get your basis.  Are you making an
inference?

A.   I'm making an inference.  I apologize.

Q.   Just to switch topics for a minute,
and I want to come back to the agreement itself,
but during this period from the Sunday evening
through the Monday and into the Tuesday morning,
from the evening of the 14th through the --
actually, let me reframe that.

     From the evening, the Sunday evening

Page 60

HIGHLY CONFIDENTIAL - B. McDADE

through the point in the early afternoon on
Tuesday when an agreement was reached, to your
knowledge were there any discussions between
Barclays and senior Lehman personnel about
personnel, those personnel going to work for
Barclays?

A.   Yes.

Q.   With whom were those -- which Lehman,
which senior Lehman personnel were the subject
of those discussions or involved in them?

A.   There was an established group of
eight individuals.  That would have been the
group.

Q.   And who were they?

A.   McGee, Nagpal, Humphrey, Felder,
Donini, Gelband, Lee, and I apologize, I forget
the last.

Q.   So do I.  So I can't suggest an answer
to you, but if it comes to you, speak up.

     Were you one of them?

A.   No, I was not.

Q.   Did you have any discussions with
Barclays about going to work there?

A.   No, I did not.

Page 61

HIGHLY CONFIDENTIAL - B. McDADE

Q.   There came a point where you did go to
work at Barclays for the transitional purposes
we talked about, correct?

A.   Uh-huh.

Q.   When did you first have any
discussions with Barclays about doing that,
about going over for transitional purposes?

A.   So the early morning of the 16th, Bob
Diamond tried to engage me in conversation about
employment at Barclays.  I stopped him
immediately, given the responsibility I had at
Lehman, and immediately left that meeting, which
was in my office, and went and got Tom Roberts
from Weil, walked him through what had just
happened.  We went and got Bob and his chief
legal counsel, made it very clear that in no
way, shape or form could any conversation with
Bart McDade ever take place about employment or
anything to do with employment.

Q.   Did you ever have during this time --
actually, let me broaden it out a little bit to
the week.  In between the 16th and the closing
on the 22nd, in that timeframe, was there ever a
time where you said to anybody from Barclays, in

HIGHLY CONFIDENTIAL - B. McDADE

1    sum or substance, "I have a handshake deal and
2    that's good enough for me for now," anything
3    like that?
4        A.   No.
5        Q.   Did you ever say that during that
6    week, in sum or substance, to any of the Lehman
7    personnel involved, "A handshake deal is good
8    enough for me right now," or words to that
9    effect?
10       A.   A handshake deal with respect to my --
11       Q.   With respect to you going to work at
12   Barclays, yes.
13       A.   No.   No.
14       Q.   When the time came, when you did have
15   discussions -- well, when did you have
16   discussions about going over to Barclays?
17       A.   It became very clear to me as the
18   process post-bankruptcy, which -- post the whole
19   process of getting through, so after the 21st of
20   September, starting on the 22nd as the deal
21   dynamics finished, it became very clear to me
22   that I could be helpful and would be necessary
23   to protect the balance of the investment that
24   all the Lehmanites had made in making this

HIGHLY CONFIDENTIAL - B. McDADE

1    change.
2        So I made the decision to sign on in a
3    transition way to sign on to join Barclays with
4    no deal other than continuance of my sal rate to
5    walk through and specifically, as I described
6    before, for the sole purpose of integrating the
7    Lehman employees into the BarCap franchise.
8        Q.   Presumably you had a conversation with
9    someone at Barclays about that.   Was it Diamond?
10       A.   I had a conversation with Diamond
11   about that, yes.
12       Q.   And as best you recall, when did that
13   conversation take place?
14       A.   Sometime early in the week of the
15   22nd.
16       Q.   Okay.   After the closing?
17       A.   Correct.
18       Q.   Do you know if employment contracts
19   were offered to any of the other senior Lehman
20   executives involved in the negotiations in the
21   team period between --
22       A.   Yes.
23       Q.   -- Sunday night, the 14th, and before
24   the closing on the 22nd?

HIGHLY CONFIDENTIAL - B. McDADE

1        A.   Yes, I do know they were.
2        Q.   Who?
3        A.   The group of eight.
4        Q.   The group of eight?
5        A.   Yes.
6        Q.   Outside of this group of eight, do you
7    know if job offers were made to senior Lehman
8    executives who were involved at the upper levels
9    of the negotiations?
10       A.   Well, additional group of 200
11   employees were contemplated as part of the
12   transaction, some of which I don't have -- those
13   lists were created by the business heads.   Some
14   of those individuals I'm sure were involved in
15   some aspect of the dynamic on the 32nd floor.
16       Q.   And that's a larger process of what
17   group as a whole is going to move over with the
18   businesses, right?
19       A.   Right.
20       Q.   I'm at a slightly more individual
21   level.   Let me give you an example.   Do you know
22   if Ian Lowitt was offered a job during the week?
23       A.   Ian Lowitt I believe was the last of
24   the group of eight.

HIGHLY CONFIDENTIAL - B. McDADE

1        Q.   Okay.   I knew we would fill that in.
2        Do you know if Steve Berkenfeld was
3    offered a job?
4        A.   I don't know.
5        Q.   Do you know if Martin Kelly was
6    offered a job?
7        A.   I do not know.
8        Q.   Do you know if Paolo Tonucci was
9    offered a job?
10       A.   I do not know.
11       Q.   Did you know at the time?   I just want
12   to distinguish between whether you recall or
13   whether you knew contemporaneously.
14       A.   I guess I don't understand your
15   question.   I don't know now.   I didn't know
16   then.
17       Q.   Okay.   I'm going to show you what's
18   previously been marked as Deposition Exhibit 1,
19   Mr. McDade.   Tell me whether you recognize the
20   document.
21       A.   Yes, I do.
22       Q.   What is the document?
23       A.   It's the Asset Purchase Agreement.
24       Q.   And you'll --

1    HIGHLY CONFIDENTIAL - B. McDADE
2       A.   The original Asset Purchase Agreement.
3       Q.   Just for the record, because I don't
4    want to mislead you, I will tell you that the
5    Asset Purchase Agreement as it was originally
6    signed and filed with the court is actually not
7    this document. We can get it out if you want to
8    see it, but you may recall there was a document
9    with handwritten interlineations on it.
10      A.   Okay. Understood.
11      Q.   I will represent to you, and we have
12   compared it, this is what ultimately was sort of
13   retyped and signed and filed?
14      A.   Okay.
15      Q.   But I don't want your testimony to be
16   misconstrued later.
17      A.   Thank you.
18      Q.   But do you recognize the signature?
19           You see that it's signed on the last
20   page of the document for Lehman Brothers by
21   Mr. Berkenfeld?
22      A.   Yes.
23      Q.   Why didn't you sign it?
24      A.   I can't answer that question. I don't
25   know.

1    HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   Okay. Now, if you would turn to
3    page -- you've read this document before?
4    You're roughly familiar with it?
5       A.   Yes, I am.
6       Q.   And did you review it before
7    Mr. Berkenfeld signed it?
8       A.   Yes, I was familiar with this
9    document. Yes, I reviewed it before
10   Mr. Berkenfeld signed it.
11      Q.   And when you reviewed it, did you
12   review it in its final form before
13   Mr. Berkenfeld signed it?
14      A.   There were so many iterations of the
15   document and I can't -- I can't acknowledge that
16   it was in its exact final form, but certainly
17   was in its close to final form, I would certify.
18      Q.   Let me not be shy here. What I'm
19   pushing for is, was there a point where you
20   looked at it to determine whether this was a
21   document suitable for you to sign, whether it
22   was the final, you know, whether it accurately
23   reflected the final agreement?
24      A.   Yes. Yes.
25      Q.   And do you know if you did that review

1    HIGHLY CONFIDENTIAL - B. McDADE
2    before Berkenfeld signed it?
3       A.   Yes.
4       Q.   If you could take a look at page --
5    for context, please, just take a look at page 1
6    of the document, Article I, and you'll see that
7    we're in the Definitions section. Okay?
8       A.   Uh-huh.
9       Q.   And further into that Definitions
10   section at page 6, I'm directing your attention
11   to the definition of Purchased Assets.
12      A.   Uh-huh.
13      Q.   And this, does it not, describes the
14   assets that were to be purchased by Barclays in
15   the transaction as contemplated on Tuesday, the
16   16th, correct?
17      A.   That's correct.
18      Q.   And item D in the definition of
19   Purchased Assets, would you take a look at that?
20   You see that?
21      A.   Uh-huh.
22      Q.   And it describes government
23   securities, commercial paper, corporate debt,
24   corporate equity, exchange-traded derivatives
25   and collateralized short-term agreements with a

1    HIGHLY CONFIDENTIAL - B. McDADE
2    book value as of the date hereof of
3    approximately 70 billion?
4       A.   Uh-huh.
5       Q.   Collectively the long positions?
6       A.   Uh-huh.
7       Q.   Is that an accurate description?
8       A.   Yes.
9       Q.   Did the long position have a book
10   value of approximately $70 billion as of
11   September 16?
12      A.   Well, it's a book value in terms of
13   this process, yes.
14      Q.   Indicating 19, Exhibit 19?
15      A.   Correct.
16      Q.   So it's your view that Exhibit 19,
17   that schedule, reflected the book value of the
18   assets of Lehman that were to be transferred in
19   the deal?
20           MR. HUME: Objection. Asked and
21   answered.
22      Q.   You can answer it.
23      A.   I can answer?
24           Again, I'd repeat, maybe I don't
25   understand the specifics of your question, the

Page 70

1  HIGHLY CONFIDENTIAL - B. McDADE
2  market -- the securities were last marked on
3  Friday, the 12th, to the best of my knowledge.
4  The process, in terms of the bottoms-up between
5  the two firms to recognize a value of assets to
6  be purchased, was done over the course of the
7  15th and 16th, prices had changed dramatically
8  in the marketplace.
9      So your specific question, using the
10 term "book value," I would agree that the book
11 value, if you're describing what our traders and
12 the Barclays traders came up with, I would agree
13 that that's one and the same, this is the book
14 value.
15     Q.  That Exhibit 19 is the book value?
16     A.  Correct.
17     Q.  What did the books of Lehman reflect
18 as of the 16th?  Did they reflect that number or
19 did they reflect a number $5 billion higher, do
20 you know?
21     A.  I believe they reflected 5 billion
22 higher because we hadn't marked since the 12th.
23     Q.  If you would turn, please, to pages 34
24 and 35 of the document.  Look at 34 so you'll
25 know what section we're in, and then I'm going

Page 71

1  HIGHLY CONFIDENTIAL - B. McDADE
2  to direct your attention to Section 9.1(C) on
3  page 35.  Take a moment to put yourself in that
4  piece of the document, okay.
5      (Document review.)
6      A.  Okay.
7      Q.  My first question with respect to
8  9.1(C) is, is the schedule that's marked as
9  Deposition Exhibit 19, that financial schedule,
10 the schedule that's referred to in Section
11 9.1(C)?
12     A.  Can you point me to the reference to
13 schedule?
14     Q.  Within 9.1(C), you'll see -- let me
15 read you the section I'm thinking about here.
16 "On or after" -- reading along with me in
17 9.1(C), "On or after the closing, purchaser
18 shall, or shall cause its subsidiaries to, pay
19 each transferred employee an annual bonus in
20 respect of the 2008 fiscal year that, in the
21 aggregate, are equal in amount to 100 percent of
22 the bonus pool amounts, accrued in respect of
23 the amounts payable for incentive compensation,
24 but not base salary, and reflected on the
25 financial schedule delivered to purchaser on

Page 72

1  HIGHLY CONFIDENTIAL - B. McDADE
2  September 16, 2008" --
3      A.  Right.
4      Q.  -- "and initialed by an officer."
5      Do you see where I am?
6      A.  Yes.
7      Q.  Is that schedule that's referred to in
8  9.1C, the schedule that's marked as Deposition
9  Exhibit 19?
10     A.  Yes.  Yes, it is.
11     Q.  So is it your understanding that the
12 amount to be paid in bonuses pursuant to 9.1(C)
13 was to equal the amount shown as the
14 compensation accrual on Deposition Exhibit 19?
15     MR. HUME:  Objection.  Calls for a
16 legal conclusion.
17     Q.  You can ignore him.  I do.  Sorry.
18     You can answer the question, sir.
19     A.  The accrual was based on a Barclays
20 model, which I don't know how to contemplate and
21 answer the question relative to their ultimate
22 intent.
23     Q.  Let me ask it this way:  Is the 2
24 billion number, do you know one way or the other
25 whether the $2 billion number in the liability

Page 73

1  HIGHLY CONFIDENTIAL - B. McDADE
2  side of Exhibit 19 comes from the Barclays
3  model?
4      A.  Comes from all the data given from
5  Lehman.
6      Q.  Uh-huh.
7      A.  It's very specific data, you know,
8  both top-down and bottoms-up in terms of
9  individuals, and then built in and ultimately
10 processed in terms of what that responsibility
11 would be, you know, by Barclays.  So if --
12     Did I not answer your question?
13     Q.  I'm not sure it did.
14     Who came up with the $2 billion that's
15 shown on Exhibit 19 for comp?
16     A.  Data provided by Lehman, 2 billion in
17 terms of the responsible number by the acquirer,
18 Barclays.
19     Q.  And who came up with the $2.25 billion
20 number for cure that's shown as a liability on
21 Exhibit 19?
22     A.  I believe I've answered that before.
23 That number was specifically given by Martin
24 Kelly from Lehman.
25     MR. GAFFEY:  Can we take a five-minute

Page 74

1    HIGHLY CONFIDENTIAL - B. McDADE
2    break? Is that okay?
3        (Recess; Time Noted: 11:11 A.M.)
4        (Time Noted: 11:21 A.M.)
5    BY MR. GAFFEY:
6        Q.  Mr. McDade, just a couple of questions
7    about some topics we were talking about before
8    the break. Do you know if Mark Shafir was made
9    any job offer from Barclays during that week
10   between --
11       A.  I do not know.
12       Q.  And was there a reason that you were
13   the one who was, you know, you described this
14   conversation with Diamond and then with Roberts
15   and Hughes and -- Roberts or Barclays counsel
16   where it was fairly emphatic there would not be
17   any negotiations with you.
18       What was the reason for that?
19       A.  The reason for that, in my mind, I had
20   two responsibilities: Responsibility in terms
21   of the role that I had assumed in June and being
22   completely unfettered in terms of being able to
23   assume and have those -- continue with those
24   responsibilities; and, second, I was already on
25   record to the entire Lehman population in the

Page 75

1    HIGHLY CONFIDENTIAL - B. McDADE
2    summer of 2008 that I was not going to get paid
3    for 2008.
4        Q.  Now, these discussions we were talking
5    about that were taking place, again, from over
6    the Monday night into the Tuesday concerning
7    asset values, were any of McGee, Nagpal,
8    Humphrey, Felder, Donini, Lee or Lowitt involved
9    in that process? That's the eight we talked
10   about before. Were any of them involved in
11   that?
12       A.  Yes.
13       Q.  Which ones?
14       A.  If you read the list, I'll tell you
15   yea or nay.
16       Q.  McGee?
17       A.  No.
18       Q.  Nagpal?
19       A.  No.
20       Q.  Humphrey?
21       A.  No.
22       Q.  Felder?
23       A.  Yes.
24       Q.  Donini?
25       A.  Yes.

Page 76

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.  Gelband?
3        A.  Yes.
4        Q.  Lee?
5        A.  No.
6        Q.  Lowitt?
7        A.  No.
8        Q.  Was Lowitt, did Lowitt have any
9    functional role in connection with the results
10   of those meetings? Was he -- the traders are
11   wherever they are. Finance is wherever they are
12   in this. What's Lowitt's role in that?
13       A.  Lowitt's role is making sure that his
14   team is providing the accurate information,
15   which was a struggle all week, to the risk
16   teams.
17       Q.  And Lowitt as CFO is responsible for
18   the keeping of the books and records of the
19   broker-dealer, correct?
20       A.  That would be correct.
21       Q.  And to your knowledge, were there
22   regulatory requirements that a broker-dealer
23   marks its books every day?
24       A.  Absolutely.
25       Q.  Had Lehman marked its books on the

Page 77

1    HIGHLY CONFIDENTIAL - B. McDADE
2    15th?
3        A.  I'm sorry?
4        Q.  Had Lehman marked its books on the
5    15th?
6        A.  Not to the best of my knowledge.
7        Q.  You say "to the best of your
8    knowledge." If you wanted to know who actually
9    knew that, would you ask Lowitt?
10       A.  I would ask Martin Kelly and Lowitt.
11       Q.  So as between you, Martin Kelly and
12   Ian Lowitt, who, to your view, would have the
13   best knowledge of whether the books of Lehman on
14   September -- as of September 16th fairly and
15   accurately represented the market value of the
16   securities?
17       A.  Martin Kelly would always have the
18   best view.
19       Q.  And as between you and Lowitt, who
20   would have the best view?
21       A.  Lowitt would have the best view.
22       Q.  Did you have any degree of concern,
23   sir, that Felder, Donini and Gelband were
24   involved in the negotiation of price at the same
25   time they had job offers from Barclays?

Page 78

HIGHLY CONFIDENTIAL - B. McDADE

1
2    A.    No, I did not.
3    Q.    Did you see any potential conflict in
4    that situation?
5    A.    Yes.
6    Q.    Did you do anything to resolve the
7    potential conflict in that situation?
8    Withdrawn.
9         You say you didn't see a problem with
10   it, but you see a potential conflict.  How did
11   you resolve that in your own view?
12   A.    I resolved it in my own view with
13   making sure that, one, I was part of the
14   process; number two, I solved it in my own mind
15   because those individuals collectively, I'm just
16   adding it up, worked with me for about 60 years;
17   and number three, I knew where their hearts
18   were, which is leaving Lehman green blood.
19
20
21   REDACTED
22
23
24
25

Page 79

HIGHLY CONFIDENTIAL - B. McDADE

1
2    A.    Those meetings took place starting in
3    the evening and early morning hours of the 15th
4    and the 16th.
5    Q.    Okay.  And during that time --
6    A.    The group of eight.
7    Q.    The group of eight.  That's who I'm
8    talking about.
9         During that time from the 15th to the
10   16th, they are, at least Felder, Donini, and
11   Gelband, are at about the same time negotiating
12   price at the same time they're talking about
13   compensation for themselves?
14   A.    The discussions started.  I don't know
15   the specific times that those individuals had
16   meetings with Jerry or Rich Ricci, Jerry del
17   Missier or Rich Ricci.
18   Q.    So you don't know if, for example,
19   while they were negotiating about a particular
20   asset class, they were pulled out of the room to
21   talk about what their compensation would be when
22   they went to Barclays?
23   A.    I do not know that.
24   Q.    Do you know who was having the
25   conversation with them about what their

Page 80

HIGHLY CONFIDENTIAL - B. McDADE

1
2    compensation would be at Barclays?
3    A.    Jerry del Missier and/or Rich Ricci.
4    Q.    Did you have any knowledge as to
5    whether Ricci and del Missier or others at
6    Barclays had kind of divided up who they were
7    going to talk to midst the group of eight.
8    A.    I believe there was a lot of dividing
9    and conquering.  I believe they did that, but I
10   don't know the specifics.
11   Q.    Do you know if Diamond spoke to any of
12   these eight about their compensation when they
13   went to Barclays?
14   A.    I don't know specifically.
15   Q.    Did you have knowledge at the time as
16   to the compensation packages that were being
17   offered to this group of eight?
18   A.    Yes.
19
20
21   REDACTED
22
23
24
25

Page 81

REDACTED

1
2
3    Q.    The $5 billion differential, the
4    overall loss versus Lehman's marks that we
5    talked about before, would it be fair to
6    describe that as a discount from the book value
7    as then shown?
8    A.    I would describe it as a change in the
9    valuation of the assets.
10   Q.    If you could turn back to page 6.
11   When you read the agreement and you saw the
12   definition of Purchased Assets to be describing
13   a book value as of the date hereof --
14        Let me just, so everything is in the
15   question, take a look at the cover of the
16   document.  You see that it's dated as of
17   September 16?  So that's the date we're talking
18   about.
19        In the definition of Purchased Assets
20   in subsection D on page 6, when you reviewed
21   this document to see if it accurately reflected
22   the deal, did you think it should say "market
23   value" instead of "book value"?
24   A.    I didn't reflect -- this is a 50-page
25   document.  I didn't reflect on every word of

1       HIGHLY CONFIDENTIAL - B. McDADE
2   every paragraph.
3       Q.   Apart from the buildings -- actually,
4   even including the buildings, the $70 billion
5   long position that's being sold here is by far
6   the largest component of the transaction; is
7   that right?
8       A.   That's correct.
9       Q.   So when you looked at that definition
10  of the largest component of the transaction, did
11  you give any thought to whether it should have
12  been described as market value instead of book
13  value?
14      A.   I did not give any thought to that.
15      Q.   I mean, I know it's a long document,
16  but you would agree that that definition of
17  what's being purchased by Barclays is a fairly
18  important piece of it, wouldn't you?
19      A.   I would agree that the $70 billion
20  assets are very important.
21      Q.   When you looked at that provision to
22  determine if it was accurate, did you discuss
23  with Mr. Lowitt, the CFO, whether or not the
24  book value as of the date of this agreement was
25  approximately $70 billion?

1       HIGHLY CONFIDENTIAL - B. McDADE
2       A.   I do not recall.
3       Q.   Did you have any discussion with
4   Mr. Lowitt at all about the description of
5   purchased assets in the agreement?
6       A.   In the agreement?  No, I did not.
7       Q.   Did you have any discussion with
8   Mr. Kelly about the definition, this definition
9   of Purchased Assets --
10      A.   No, I did not.
11      Q.   -- in the agreement?
12      A.   No, I did not.
13      Q.   Did you have any discussion with
14  Mr. Kelly about whether describing the $70
15  billion long position as the book value was an
16  accurate description?
17      A.   No, I did not.
18      Q.   Did you have a discussion with anyone
19  else as to whether describing the long position
20  as a book value as of the date hereof
21  approximately $70 billion was accurate?
22      A.   No, I did not.
23      Q.   Let's talk a little bit about
24  Mr. Shafir's role in these negotiations.
25          Did he have any particular area of

1       HIGHLY CONFIDENTIAL - B. McDADE
2   responsibility in the negotiations?
3       A.   Mr. Shafir was the global head of M&A
4   at Lehman and he would have been responsible for
5   what I would describe as the deal mechanics in
6   terms of the role that he played.  So he, along
7   with, as described earlier, Mr. McGee and I,
8   shared collective responsibilities.
9           We divided and conquered along the way
10  in terms of what those obligations were and we
11  always came back together with our advisors and
12  tried to reconcile processes that were taking
13  place.
14      Q.   Do you know --
15      A.   He did not have a specific special
16  role with respect to one aspect of the
17  transaction.
18      Q.   Do you know if Mr. Shafir reviewed
19  this document to determine -- the agreement to
20  determine if it was accurate before Berkenfeld
21  signed it?
22      A.   I do not know specifically.
23      Q.   Do you have a general knowledge of
24  that?
25      A.   General knowledge would be yes,

1       HIGHLY CONFIDENTIAL - B. McDADE
2   absolutely.
3       Q.   And I'll ask you a question I asked
4   you before:  Is that an inference or do you have
5   a general knowledge that he reviewed it?
6       A.   I have a general knowledge.
7       Q.   Did you talk to Shafir about whether
8   the definition of Purchased Assets was accurate?
9       A.   I did not specifically talk to him
10  about that.
11      Q.   Do you know if McGee reviewed the
12  entire agreement?
13      A.   I do not know.
14      Q.   Did you have any discussions with
15  McGee about whether the definition of Purchased
16  Assets was accurate?
17      A.   No, I did not.
18      Q.   As a general matter, without regard to
19  the agreement itself, was it your understanding
20  that the long position was being conveyed at
21  market value as opposed to book value?
22      A.   Yes.
23      Q.   Did there come a time when you learned
24  that the Asset Purchase Agreement had been filed
25  with the bankruptcy court to seek its approval

Page 86

1        HIGHLY CONFIDENTIAL - B. McDADE
2   of the transaction?
3            That's a -- that's a bad question.
4   Let me rephrase that.
5            You understood, sir, that the
6   bankruptcy court would need to approve the
7   transaction, correct?
8       A.   Yes, I did.
9       Q.   Do you know if there were any filings
10  made to seek that bankruptcy court approval?
11      A.   In a general sense, I would know
12  filings would need to be made. In a specific
13  sense, no, I don't know the specific filings.
14      Q.   So, beyond knowing it needed to be
15  done, did you review any of the filings that
16  were made with the bankruptcy court?
17      A.   No, I did not.
18      Q.   Is the agreement before you marked as
19  Deposition Exhibit 1 the agreement that
20  ultimately was closed on the 22nd?
21      A.   The deal changed. The market changed.
22  The deal changed over the course of the week.
23  There was a First Amendment and there was
24  ultimately a clarifying amendment -- letter made
25  to the original asset purchase. I would

Page 87

1   describe the deal's details to have changed. I
2   would describe the concept and the approach to
3   be extremely similar in terms of what was
4   ultimately consummated.
5       Q.   The Clarification Letter that you
6   referred to, did you view that as an amendment
7   to this transaction? "This," I'm pointing
8   Exhibit 1.
9       A.   The First Amendment and the -- I would
10  view as amendments to this original document,
11  yes.
12      Q.   Both the First Amendment and the
13  Clarification Letter?
14      A.   Yes.
15      Q.   Were amendments to this document.
16      A.   Yes.
17      Q.   Now, I'm showing you, Mr. McDade, what
18  previously has been marked as Exhibit 43. Take
19  a moment to look through the document.
20          (Document review.)
21      Q.   Have you had a chance to do that?
22      A.   Yes.
23      Q.   Now, again, I don't want to mislead
24  you. Your name is not on here. I want to

Page 88

1        HIGHLY CONFIDENTIAL - B. McDADE
2   direct your attention to the substance at the
3   bottom where it says, "The HR director at
4   Barclays called to try to get a schedule that
5   was supposed to be initialed by the parties and
6   is a financial schedule related to bonuses
7   'accrued FY liability.' It sounds like his team
8   is concerned about getting that document before
9   closing. Do you know what he's referring to and
10  where to get his hands on it?" And the response
11  from Mr. Berkenfeld to Ms. Binkley is, "I don't.
12  Check with Bart and Skip."
13          Did anyone ever check with you to look
14  for a copy of Deposition Exhibit 19, the
15  financial schedule?
16      A.   To look for a copy of Exhibit 19?
17      Q.   Yes.
18      A.   No.
19      Q.   Did it ever come to your attention
20  during the week that Barclays had lost track of
21  that financial schedule?
22      A.   No.
23      Q.   Okay. Now, you mentioned a moment ago
24  that the deal details changed. Can you give me
25  sort of a -- I want to go through the week and

Page 89

1        HIGHLY CONFIDENTIAL - B. McDADE
2   we'll spend some time on that, but if you could,
3   sir, give me a summary of how the details
4   changed through the week.
5       A.   First of all, the balance sheet
6   changed at Lehman. The market changed in terms
7   of value of balance sheet items that were still
8   left at Lehman. Those would be the two most
9   significant changes.
10      Q.   During the week, to your knowledge,
11  did Lehman mark its books -- did the
12  broker-dealer mark its books from day-to-day?
13      A.   As awareness of the potential for the
14  Barclays deal came to the employee base, it
15  became more normal course of business than
16  Monday or Tuesday or the weekend had been. I
17  don't know specifically the answer, but it would
18  be my -- it would be my guess that, yes, we
19  would be back to marking the books and records.
20      Q.   Do you know one way or the other?
21      A.   I do not know.
22      Q.   Do you know if after the price was
23  agreed, including the $5 billion overall loss
24  against the marks, whether in the following days
25  a process began where people were instructed to

Page 90

HIGHLY CONFIDENTIAL - B. McDADE
1  mark the books to reflect the $5 billion
2  agreement?
3      A.    I do not know.  I know a process
4  continued until the end of the week to continue
5  to value the assets, because that would have
6  been our responsibility and that would have been
7  Barclays, the purchaser's, desire.
8      Q.    When you say "continued to value the
9  assets," do you know if the books -- when the
10 process began again of marking the books, do you
11 know if they were marked by market values the
12 way they always had been or were they marked to
13 reflect this $5 billion agreement that had been
14 made with Barclays?
15     A.    I don't know the answer.
16     Q.    Who would I ask if I wanted to know
17 the answer to that?
18     A.    Ian Lowitt and Martin Kelly.
19     Q.    To your knowledge, would it be
20 appropriate, if you wanted to reflect the market
21 value, to mark the books to reflect the $5
22 billion agreement as opposed to the way they had
23 always been marked to market?
24         MR. BUCKLEY:  Object to your referring

Page 91

HIGHLY CONFIDENTIAL - B. McDADE
1  to the $5 billion agreement.  That's not
2  what the witness has testified.  He's not
3  testified that it's a $5 billion agreement.
4  So I object to the question.
5      Q.    I think you can answer it, sir.
6      A.    The mark to market process on a daily
7  basis was and has always been the same.  I would
8  assume that the individual traders at the line
9  level who do the individual marking of the
10 aggregate positions that you see here would have
11 taken their same approach to the marking over
12 the course of the week.
13     Q.    So, with respect to the $5 billion
14 overall loss against the marks that we talked
15 about before, do you know if, when the books
16 were marked on the 17th, they were marked to
17 reflect market value as they always had been or
18 if they were marked to reflect the $5 billion
19 overall economic loss that we talked about
20 before?
21     A.    I do not --
22         MR. HUME:  Objection to form.  Lack of
23 foundation.
24         MR. BUCKLEY:  Objection to form.  You

Page 92

HIGHLY CONFIDENTIAL - B. McDADE
1  can answer.
2      A.    I do not know.
3      Q.    And if you wanted to know, you would
4  ask Mr. Lowitt, correct?
5      A.    Correct.
6      Q.    I take it from your answer to that
7  question that you would not know whether a
8  process of marking the books to reflect the $5
9  billion component we talked about stopped also
10 on the 17th, whether it wasn't completed?
11     A.    I don't know the specific answer to
12 the question about the marking process over the
13 course of the week at the broker-dealer.  I do
14 know the specific processes and was involved in
15 the valuation of these assets relative to the
16 transaction.
17     Q.    Okay.  In the valuation of the assets
18 relative to the transaction was it a process by
19 which Lehman and Barclays agreed on what they
20 viewed as the market value or did it also
21 involve a haircut that Barclays had wanted as a
22 negotiated price?
23     A.    It was the former:  A market value
24 process which then reflected all the features of what

Page 93

HIGHLY CONFIDENTIAL - B. McDADE
1  was happening in the marketplace at the time.
2      Q.    That was your understanding of what
3  was going on in these asset value discussions?
4      A.    Yes, it was.
5      Q.    Did you have any understanding that
6  what was going on in these asset value
7  discussions also included a haircut to reflect
8  market, future market volatility?
9      A.    No.
10     Q.    If there had been negotiations of a
11 haircut -- an agreement to apply a haircut to
12 reflect future market volatility, would that
13 have been consistent with your understanding of
14 the transaction?
15         MR. HUME:  Objection.  Vague and
16 ambiguous, the use of the word "haircut."
17     A.    No.
18     Q.    If there had been an agreement to sell
19 the assets to Barclays for $5 billion less than
20 the amount shown on Lehman's books, would that
21 have been consistent with your understanding of
22 the transaction?
23     A.    You'll have to repeat the question,
24 because I believe you're asking me to speculate

| Page 94 | Page 95 |
|---|---|

**Page 94**

HIGHLY CONFIDENTIAL - B. McDADE

1  HIGHLY CONFIDENTIAL - B. McDADE
2  on something that --
3      Could you repeat the question?
4      MR. GAFFEY:  Can you read it back,
5  please?
6      (Record read.)
7      MR. BUCKLEY:  Objection to form and
8  foundation.
9  A.   Yes.
10  Q.   Did there come a point during the week
11  where you had a discussion with Mr. Kelly where
12  he told you that the evaluation of accrued
13  liabilities for trade payables was overstated?
14  A.   We were, over the course of the week,
15  trying to determine with a great degree of
16  specificity and struggling with what those cure
17  payments, what that figure was, yes.
18  Q.   Did there come a time when Mr. Kelly
19  informed you that in his view the accrual for
20  trade payables was overstated?
21  A.   The numbers moved from a higher level
22  to a lower level over the course of the week,
23  yes.
24  Q.   I think we're missing each other.  I'm
25  asking about whether you recall any specific

**Page 95**

HIGHLY CONFIDENTIAL - B. McDADE

1  HIGHLY CONFIDENTIAL - B. McDADE
2  conversation with Mr. Kelly.
3  A.   I don't recall specific conversation
4  with Mr. Kelly.
5  Q.   Do you recall any conversation with
6  Mr. Kelly where you responded to him, "We just
7  left a billion dollars on the table"?
8  A.   I don't recall a specific conversation
9  with Mr. Kelly where I said we left a billion
10  dollars on the table.
11  Q.   Do you recall any conversation with
12  Mr. Kelly where the topic was the accrued
13  liability for trade payables where you said, in
14  sum or substance, "We left a billion dollars on
15  the table"?
16  A.   I don't recall a specific conversation
17  with respect to Mr. Kelly.
18  Q.   Do you recall any, generally, any
19  conversations with Mr. Kelly along those lines?
20  A.   Generally, Mr. Kelly would have been
21  in a series of meetings with Ian Lowitt and
22  potentially with me during the course of the
23  week trying to inform us as to the specific
24  number with respect to assets and with respect
25  to cure payments.  So, yes, in a general sense.

**Page 96**

HIGHLY CONFIDENTIAL - B. McDADE

1  HIGHLY CONFIDENTIAL - B. McDADE
2  Q.   Do you have any recollection of a
3  conversation with Mr. Kelly where he talked
4  about the cure payment shown on Exhibit 19, the
5  financial schedule, and told you he thought that
6  number was overstated?
7  A.   So I don't recall a specific
8  conversation, no.
9  Q.   Did it ever come to your attention
10  during the week that it was the view within the
11  folks in finance that the accrued liability for
12  cure on the financial schedule was overstated?
13  A.   Yes, the number kept moving.  It kept
14  moving down.  That would have been a benefit to
15  the Lehman estate.
16  Q.   The accrued liability for cure was
17  part of the compensation that the court was told
18  Barclays would be paying for Lehman's assets,
19  correct?
20  A.   That's correct.
21  Q.   And if the number was going down, I
22  take it then -- or if it started at 2 and a
23  quarter, it winds up at something less than 2
24  and a quarter, right?
25  A.   Correct.

**Page 97**

HIGHLY CONFIDENTIAL - B. McDADE

1  HIGHLY CONFIDENTIAL - B. McDADE
2  Q.   Do you know how much less than 2 and a
3  quarter it wound up?
4  A.   The number was between 750 and 800
5  million.
6  Q.   And what's your basis for that number?
7  You state it with some degree of certitude.  How
8  do you know it came to 750 to 800 million?
9  A.   The clarifying -- I believe the
10  clarifying letter.
11  Q.   You believe the clarifying letter
12  addressed a change in the accrued --
13  A.   Addressed a change in the cures, yes.
14  Q.   Do you know who calculated the reduced
15  liability for trade payables to 700 or 800
16  million?
17  A.   I don't know the individuals.  It
18  would have rolled up under Martin Kelly's team.
19  Q.   There would be individuals within
20  Martin Kelly's team?
21  A.   Most definitely.
22  Q.   So, in realtime, if you wanted to know
23  the, you know, if you wanted to know the answer
24  to the question, Kelly's the guy you would have
25  asked?

| Page 98 | Page 99 |
|---|---|

**Page 98**

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Yes.
3    Q.   As a result of the number going down
4    from the 2 and a quarter billion shown on the
5    financial schedule to the 7 or 8 hundred million
6    that you told me about, you would agree with me
7    that the component of consideration Barclays was
8    paying in the form of assumed trade payables was
9    also going down, correct?
10   A.   Absolutely.
11   Q.   And do you know if there was any
12   change in the compensation accrual over that
13   period?
14   A.   I don't believe there was any change
15   in compensation.
16   Q.   It always stayed at 2 billion?
17   A.   Yes.
18   Q.   That was an agreed number?
19   A.   That was the number used. I've
20   answered that before. That was the number used
21   by Barclays in the process.
22   Q.   Did you know at the time whether the
23   number $2 billion as the liability that Barclays
24   would assume for compensation accurately stated
25   what Barclays would wind up paying?

**Page 99**

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   I would, again, not part of the
3    Barclays process, part of gathering the
4    information and helping to give some context, I
5    would assume that number reflected an accurate
6    assessment, yes.
7    Q.   I want to push that a bit further,
8    sir, than you would assume. I want to get the
9    basis of what you knew at the time.
10       Did you know one way or the other
11   whether the $2 billion number for compensation
12   accurately stated what Barclays would actually
13   wind up paying?
14   A.   I -- no one could possibly know that
15   number, no, I would not have known that to
16   accurately state what would have actually been
17   paid because they were taking on 9,000
18   employees, 9,000 different iterations of a
19   modeling process.
20   Q.   Do you know if that was a good faith
21   estimate of the amount that Barclays would wind
22   up paying?
23   A.   Absolutely.
24   Q.   And how do you know it was a good
25   faith estimate?

**Page 100**

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Because the data was rigorously
3    provided by Lehman and rigorously reviewed and
4    modeled by Barclays.
5    Q.   Do you know what Lehman's accrual --
6    do you know the difference between what Lehman
7    had on its books accrued and the $2 billion
8    number?
9    A.   I believe it was a billion dollars.
10   Q.   And the difference of a billion
11   dollars was attributable, if I understand you
12   correctly, to Barclays' modeling?
13   A.   It was a combination of full year.
14   The combination of, to the best of my knowledge,
15   Barclays pays in a different percentage of cash
16   and stock, therefore, a higher cash component
17   of -- therefore, a higher expense accrual in the
18   Barclays system than Lehman's, who paid us a
19   higher percentage of equity. The combination of
20   those plus an estimate of what it would keep in
21   a competitive environment to keep the bulk of
22   the team in place.
23   Q.   But you didn't see Barclays' model,
24   correct?
25   A.   No, I did not.

**Page 101**

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   You didn't know the method that
3    Barclays used to model this number, correct?
4    A.   No, I did not.
5    Q.   You knew only the number that Barclays
6    told you was the result of the modeling,
7    correct?
8    A.   Correct.
9    Q.   What was your basis to know that it
10   was a good faith estimate of what Barclays
11   actually would pay, other than the fact that
12   Barclays told you that?
13   A.   My, my method, my litmus test was the
14   knowledge of what was happening in the
15   marketplace and the knowledge of what
16   historically had been necessary to keep the
17   folks at Lehman who they were hiring in place.
18   So I would have used internal metrics and market
19   metrics that I would have always used in a
20   competitive pay process.
21   Q.   In a competitive pay process, could
22   you have discerned why there was a
23   billion-dollar difference between the accrual on
24   Lehman's books and the amount Barclays said
25   should be the assumed liability amount? Would

Page 102

1    HIGHLY CONFIDENTIAL - B. McDADE
2  you be in a position to know that?
3      A.   I would have been in a reasonable
4  position to understand the pay dynamics, yes.
5      Q.   Take another look, if you would, sir,
6  at page 35 of the Asset Purchase Agreement,
7  Section 9.1(C).  And we talked a while before
8  ago, sir, about the financial schedule, Exhibit
9  19, being the schedule that's referred to in
10 paragraph 9.1C of the agreement.
11         When the agreement speaks in terms of
12 "bonus pool amounts accrued," do you see where I
13 am.  Just so we're in the same place on the
14 document, just about the fourth line down,
15 referring to "bonus pool amounts accrued," we in
16 the same place?
17     A.   Uh-huh.
18     Q.   Where the agreement refers to a
19 hundred percent of the bonus pool amounts
20 accrued in respect of amounts payable, and then
21 reading on a little bit, "reflected on the
22 financial schedule delivered to purchaser"?
23     A.   Uh-huh.
24     Q.   Would you fairly read that to
25 understand that it was an amount calculated by

Page 103

1    HIGHLY CONFIDENTIAL - B. McDADE
2  Barclays as opposed to an amount accrued by
3  Lehman?
4      A.   So if I understand your question,
5  ultimately Barclays is the amount -- is the
6  payer.  It accurately reflects --
7      Q.   Well --
8          MR. BUCKLEY:  Let him finish the
9  answer.
10         MR. GAFFEY:  I beg your pardon.
11         MR. BUCKLEY:  Finish your answer.
12     A.   It accurately reflects the
13 combination -- the full cost of employing
14 including all aspects of the 9,000 employees who
15 would and wouldn't stay as a part of the
16 transaction.
17     Q.   Well, looking at the language itself
18 in the agreement, sir, where it talks about
19 "bonus pool amounts accrued"?
20     A.   Uh-huh.
21     Q.   Accrued where?
22     A.   Accrued in the -- we're speaking to
23 the Lehman accrual.
24     Q.   Okay.  And the Lehman accrual that
25 we're speaking to, according to the agreement,

Page 104

1    HIGHLY CONFIDENTIAL - B. McDADE
2  is reflected on the financial schedule delivered
3  to purchaser, correct?  That's what it says?
4      A.   I think you're choosing the words
5  extremely specifically.  I read it to -- I read
6  this to specifically be the ultimate
7  responsibility for compensation for bonus pool
8  compensation that Barclays would be responsible
9  for.
10     Q.   I think I agree with you on that as an
11 overall matter, sir, but I'm looking at the
12 description of the financial schedule, and at
13 least as I'm reading this, what it refers to is
14 "bonus pool amounts accrued in respect of
15 amounts payable for incentive compensation, but
16 not base salary, and reflected on the financial
17 schedule delivered to purchaser on September
18 16."
19         Is Lehman's accrual for amounts
20 payable for incentive compensation but not base
21 salary, is Lehman's accrual reflected on that
22 financial schedule marked as Deposition Exhibit
23 19?
24     A.   No, this reflects the estimate of what
25 it would take for a full year to compensate the

Page 105

1    HIGHLY CONFIDENTIAL - B. McDADE
2  9,000 employees.
3      Q.   So that $2 billion number reflected on
4  the financial schedule does not reflect Lehman's
5  accrual?
6      A.   It includes Lehman's accrual.
7      Q.   Plus the billion added by Barclays?
8      A.   Correct.
9      Q.   Now, the $4.25 billion in accrued
10 liabilities for comp and cure shown on the
11 financial schedule, do you know if -- withdrawn.
12 The 4.25 billion in accrued liabilities
13 reflected on the financial schedule, were they
14 meant in any way to cover the difference between
15 Lehman's book values and the market value, the
16 $5 billion difference we've been talking about?
17     A.   No, the cure payments are literally a
18 series of, a collection of hundreds of contracts
19 that already exist.
20     Q.   Was it your --
21     A.   And the compensation is again what
22 we've described, so no.
23     Q.   Was it your understanding that the
24 accrued liabilities for compensation and cure
25 were consideration Barclays was giving over and

| Page 106 | Page 107 |
|---|---|

**Page 106**

1      HIGHLY CONFIDENTIAL - B. McDADE
2  above the assumption of short positions against
3  the long position?
4      A.   These were responsibilities and
5  expenses that clearly would have to be paid and
6  honored to run the businesses going forward.
7      Q.   Let me put the question another way.
8  Did you understand the transaction at issue here
9  to be basically a wash from the perspective of
10 LBI, the broker-dealer, an equivalent exchange
11 of assets?
12      MR. HUME:  Objection.  Vague and
13 ambiguous.
14      A.   I understood the transaction to be an
15 assumption of the assets and liabilities.  It's
16 clear Barclays was negotiating, as any purchaser
17 would, in their opinion, in its most efficient
18 fashion, and we were responsible as Lehman to
19 negotiate against their efficient process.
20      Q.   If I understand your last answer, sir,
21 correctly, you're essentially describing to me
22 that a purchaser wants to pay the least amount
23 possible and the seller wants to get the most?
24      A.   Correct.
25      Q.   My question goes to the end result,

**Page 107**

1      HIGHLY CONFIDENTIAL - B. McDADE
2  not the goals of the negotiators.
3          Did you understand the end results of
4  this transaction to be, from the perspective of
5  LBI, essentially a wash, an equivalent -- with
6  Barclays assuming liabilities, including
7  employee liabilities and contract cure
8  amounts --
9      A.   Yes.
10      Q.   -- basically equivalent to the assets?
11      A.   Yes.
12      Q.   And did that equivalent exchange
13 include or exclude the $4.25 billion in assumed
14 liabilities shown on that financial schedule?
15      A.   It ultimately included what those
16 figures ultimately ended up being, but did
17 not -- it did not --
18          Are you talking about the final
19 transaction consummated or are you talking
20 about --
21          In concept, yes.
22      Q.   Okay.  When you say "in concept, yes,"
23 you're talking about the deal as it was --
24      A.   Cure payments -- as the final details
25 of cure payments and compensation.

| Page 108 | Page 109 |
|---|---|

**Page 108**

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   Let's do this with time periods, okay?
3  So --
4      A.   Fine.
5      Q.   -- on the 16th, as reflected in the
6  Asset Purchase Agreement dated as of September
7  16th and signed on that day, was it contemplated
8  that this would be an equivalent exchange of
9  assets, a wash?
10      A.   It ended up being an equivalent
11 exchange of assets and liabilities, yes.  Yes.
12      Q.   On the 16th?
13      A.   On the 16th, yes.
14      Q.   And for it to be an equivalent
15 exchange of assets -- withdrawn.
16          And within that equivalent exchange of
17 assets --
18      MR. BUCKLEY:  Assets and liabilities.
19      MR. GAFFEY:  That's sort of where I'm
20 going.
21      Q.   Within that equivalent exchange would
22 be included the $4.25 billion in assumed
23 liabilities, correct?
24      A.   Yes.
25      Q.   And in order for it to be an

**Page 109**

1      HIGHLY CONFIDENTIAL - B. McDADE
2  equivalent exchange of assets, the $4.25 billion
3  in assumed liabilities would have to be
4  accurately stated?
5      A.   Correct.
6      Q.   And if the actual assumed liabilities
7  were less than $4.25 billion, it would not be an
8  equivalent exchange of assets, correct?
9      A.   That's correct.
10      Q.   It would be a deal to Barclays'
11 benefit if the assumed liabilities were lower
12 than $4.25 billion, correct?
13      A.   That's correct.
14      Q.   And I think you told me over the week
15 the amount of accrued liabilities for cure
16 dropped from 2 billion to between 7 and 8
17 hundred million dollars?
18      A.   Correct.
19      Q.   Was there any change in the assets
20 that would be delivered to keep it in equivalent
21 exchange?
22      A.   The assets changed over the course of
23 the week dramatically.
24      Q.   Okay.  Was it --
25      A.   So there was a different nature of the

Page 110

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    balance sheet. So the process started all over
3    again at the end of the week.
4        Q.    By, say, Friday --
5        A.    Given the dynamic nature.
6        Q.    I'm sorry to interrupt you.
7            Given the -- let's say by Friday, the
8    19th, was it accurate or inaccurate --
9    withdrawn. By Friday the 19th, would it have
10   been accurate or inaccurate to say that the
11   assumed liabilities of 2 billion for comp and
12   2.25 -- 2 billion for comp was the same as it
13   had been earlier in the week?
14       A.    Yes. Accurate.
15       Q.    And would it have been accurate or
16   inaccurate to say that on Friday, the 19th, that
17   the assumed liabilities for trade payables was
18   the same as it had been earlier in the week?
19       A.    It would be inaccurate to say it's the
20   same.
21       Q.    And that's because the amount of trade
22   payables dropped from the 2.25 shown on the
23   financial schedule to 7 or 8 hundred million?
24       A.    Correct.
25       Q.    Do you know if at any point the amount

Page 111

1    HIGHLY CONFIDENTIAL - B. McDADE
2    for trade payables was calculated downwards from
3    2.25 to 1.15?
4        A.    It was talked about in the bankruptcy
5    court at 1.5, yes. The number kept moving over
6    the course of the week.
7        Q.    Well, it was talked about in the
8    bankruptcy court at 1.5 on Wednesday, the 17th?
9        A.    Right.
10       Q.    The day after this deal was signed,
11   right?
12       A.    Right.
13       Q.    Do you know what accounted for the
14   drop of 750 million from Tuesday evening when
15   the agreement was signed? Withdrawn.
16           Do you know what accounted for the
17   drop from Tuesday at 11:18 A.M. when that
18   schedule was created to the filing of the papers
19   that described the liability at 1.5 billion?
20       A.    I specifically did not go through that
21   process, so I don't know the answer
22   specifically.
23       Q.    I'm just looking for the math. Do you
24   know, was there an event or a recalculation or
25   what? How could it -- why did it drop from 2

Page 112

1    HIGHLY CONFIDENTIAL - B. McDADE
2    and a quarter to 1.5 as opposed to the mechanics
3    of filing with the court?
4        A.    I don't know the specific answer.
5    Again, Martin Kelly is the correct individual to
6    talk to for the specifics of the process.
7        Q.    And would he be the correct individual
8    for me to talk to know why it dropped from 1.5
9    on the 17th to between 7 and 8 hundred million
10   near the end of the week?
11       A.    Yes, he would.
12       Q.    It wasn't 1.5 billion by Friday, the
13   19th, correct?
14       A.    That's correct.
15       Q.    Just before I sort of move on to a
16   couple other topics, I want to see if I can set
17   some groundwork with you about how the week
18   went.
19           Can you give me a general idea of how
20   your -- what were your activities after the deal
21   was -- after the contract was actually signed?
22       A.    Most of my activities involved working
23   with the Weil team in and around the bankruptcy
24   process.
25       Q.    And give me a general description of

Page 113

1    HIGHLY CONFIDENTIAL - B. McDADE
2    what you were doing in working with the Weil
3    team?
4        A.    Well, I ultimately was involved in
5    creditor meetings, as you described it, the
6    pre-bankruptcy hearing on Wednesday, then
7    ultimately the preparation of and the process of
8    being a hundred percent part of and a witness in
9    the actual bankruptcy hearing on Friday.
10       Q.    You testified at the sale hearing?
11       A.    Yes, I did.
12       Q.    Now, also during that Tuesday,
13   Wednesday, Thursday and Friday, were you dealing
14   with the finance guys, Reilly, Kelly, Lowitt and
15   Tonucci?
16       A.    Yes, I was.
17       Q.    Did it come to your attention at some
18   point during that week that the Fed -- announced
19   Fed that it wanted to be relieved of its
20   obligations under a repurchase transaction
21   through which it was financing the broker-dealer
22   and that Barclays needed to take that over?
23       A.    Yes, it did.
24       Q.    Did you have any involvement in the
25   process that followed that announcement by the

Page 114

HIGHLY CONFIDENTIAL - B. McDADE

1   Fed?
2      A.   No, I did not.
3      Q.   Who was responsible, to your
4   knowledge, on the Lehman side for dealing with
5   that issue?
6      A.   Paolo Tonucci and Ian Lowitt.
7      Q.   Was Mr. Kelly involved at all?
8      A.   I do not know.
9      Q.   Anyone else other than Tonucci and
10  Lowitt?
11     A.   I do not know.
12     Q.   Do you know if Gerry Reilly was
13  involved in that at all?
14     A.   I do not know.
15     Q.   Describe for me what you do understand
16  about the process of transitioning from a Fed
17  repo to a repo with Barclays.
18     A.   Ultimately the cash that had been lent
19  to Lehman for assets was repaid to the Fed and
20  Barclays became, if you will, the lender, the
21  provider of the cash against the assets.
22     Q.   Do you have an understanding of what
23  the numbers were, what was lent, what was put up
24  as collateral?

Page 115

HIGHLY CONFIDENTIAL - B. McDADE

1      A.   I don't know the specifics.
2      Q.   Did you know at the time?
3      A.   No, I did not.
4      Q.   Did there come a point during the week
5   where the transaction we've been talking about
6   became centered on the Repurchase Agreement?
7      A.   Yes.
8      Q.   How so?
9      A.   The clearing bank, JPMorgan, where
10  ultimately custodied assets took place,
11  apparently -- again, apparently, because we're
12  removed from the process specifically from the
13  Lehman seat -- did not provide the swift,
14  efficient, clean transfer of all of that repo
15  and ultimately could not get resolution with
16  Barclays for whatever that commercial dispute
17  was and started to cause other, if you will,
18  down-the-chain challenges for Lehman, in
19  particular, threatening to and removing our
20  ability to process transactions that had already
21  taken place with DTC, which is, as you know or
22  may know, the ultimate clearer of most of the
23  securities in the world.
24     Q.   How did that bring the repo to the

Page 116

HIGHLY CONFIDENTIAL - B. McDADE

1   center of the transaction?
2      A.   The ultimate -- the original balance
3   sheet as described were repo counterparties that
4   were customers of the firm. The Fed replaced
5   the customers of the firm on Monday. Barclays
6   replaced the customers -- Barclays replaced the
7   Fed, I believe it took place on Thursday. So it
8   created a very different dynamic in that just
9   the financing of the assets had a different
10  financing partner, in that case, Barclays.
11        The twist that I would describe is the
12  real dynamic around repo had to do with the
13  dispute that occurred between JP and Barclays
14  around the unwind of the Fed repo, and that's
15  where I think it really affected the change in
16  the transaction to the point where over the
17  weekend, this was the weekend now of --
18     Q.   Following the hearing.
19     A.   -- following the hearing, we lived --
20  we, as the Lehman team, lived in sort of a
21  silent cave off to the side at the Weil offices
22  waiting for the regulators and JPMorgan and
23  Barclays to resolve their dispute, and it was
24  not clear that a deal -- that it would be

Page 117

HIGHLY CONFIDENTIAL - B. McDADE

1   resolved.
2      Q.   Ultimately was a resolution reached
3   for that?
4      A.   It was, but we were not made privy.
5   We, as Lehmanites, were not made privy to the
6   specifics of the resolution.
7      Q.   Okay. I can understand from what
8   you've described how this may have presented an
9   operational hurdle to concluding the deal, but
10  I'm still not sure I'm clear on how the repo
11  becomes the center of the deal.
12     A.   Those are your words, not mine.
13     Q.   Okay. Let me ask you that. Did it
14  become the center of the deal?
15     A.   No.
16     Q.   By Friday, was it so that the
17  Repurchase Agreement was -- withdrawn.
18        Was it so, in your view, sir, that by
19  Friday there was a completely new deal?
20     A.   The repo made Barclays the ultimate
21  owner of the assets already in the form of the
22  repo contract if Lehman didn't exist and the
23  financier of those assets. So the deal shifted
24  in that Barclays now was valuing what assets

HIGHLY CONFIDENTIAL - B. McDADE

1 were left by the way, because these assets that
2 you're looking at on September 16th are now at a
3 combination of Barclays and JPMorgan, they're
4 not at Lehman anymore, right? So as Barclays
5 assessed its value of the repo, the collateral
6 within it, that collateral represented some of
7 the assets that they would have originally, as
8 we contemplated, had originally not wanted to
9 purchase, as an example, the residential
10 mortgage assets, and there might be other
11 examples.
12     So it made for a fundamental view in
13 their mind of a shortfall in terms of the value
14 of the assets as first contemplated and as
15 contemplated on Friday when the, quote, new
16 balance sheet assessment process, the continuing
17 assessment of the assets was taking place.
18    Q.   Was the idea that there was a
19 shortfall based on Barclays' valuation of the
20 collateral in the repo?
21    A.   It was a combination of Barclays'
22 process around the repo and JPMorgan having
23 taken some of the assets.
24    Q.   I may be a bit confused here myself.

HIGHLY CONFIDENTIAL - B. McDADE

1 I understand the piece where JPMorgan is hanging
2 onto some collateral.
3    A.   Right.
4    Q.   That's what you're describing to me,
5 yes?
6    A.   Right.
7    Q.   I'm addressing a different --
8    A.   The Barclays issue.
9    Q.   Yeah, my question goes to who is
10 valuing the collateral that's in the repo,
11 whether Barclays actually got it or not, you
12 know, whose value is it, who is doing the
13 valuation modeling?
14    A.   Same team of individuals, so at
15 Barclays and at Lehman. So I can't speak
16 specifically to who was doing that process on
17 the Barclays side.
18    Q.   Your answer sort of -- I asked you a
19 bad question and you answered it anyway. My
20 question is, was it people on both sides
21 involved in the valuation?
22    A.   Absolutely.
23    Q.   And you don't know who the teams were
24 who were involved in that valuation process?

HIGHLY CONFIDENTIAL - B. McDADE

1    A.   On the Lehman side I can answer the
2 question. It's the same group of individuals,
3 in addition to Alex Kirk being part of the
4 process.
5    Q.   When does Kirk first get involved?
6    A.   Kirk gets involved when I ask him to
7 get involved on Thursday evening. He
8 technically gets involved on Friday morning. I
9 asked him on Thursday evening.
10    Q.   You called Kirk on Thursday evening
11 and asked him to get involved, correct?
12    A.   Yes.
13    Q.   Had he had any involvement prior to
14 that other than managing credit risk?
15    A.   No, he had not. He had very specific
16 involvement over the weekend up to Sunday
17 evening.
18    Q.   That's in the deal that didn't get
19 done?
20    A.   Exactly.
21    Q.   My question goes to, in the deal that
22 did get done, he doesn't get involved until
23 Friday, right?
24    A.   Does not get involved until Friday

HIGHLY CONFIDENTIAL - B. McDADE

1 morning.
2    Q.   And he gets involved because you call
3 him on Thursday night and ask him to get
4 involved, correct?
5    A.   That's correct.
6    Q.   You asked him to get involved because
7 Mark Shafir had left; is that correct?
8    A.   I asked him to get involved for a
9 couple different reasons. I educated him that
10 Mark Shafir had left, but I asked him to get
11 involved because he was an adult, he was a
12 senior risk operator, it was clear that we still
13 did not have a transaction, and an extra set of
14 hands was extremely valuable.
15    Q.   Okay. Had Mark Shafir actually left?
16    A.   He had left.
17    Q.   On the 18th he announced he was
18 leaving, and he left that day?
19    A.   I don't recall the exact moment in
20 time, so I can't confirm the 18th, but he was
21 there through the processing of the deal and it
22 was either the 17th or the 18th that he made his
23 decision to leave and go to Citi.
24    Q.   Let's try and use a milestone. Is he

Page 122

HIGHLY CONFIDENTIAL - B. McDADE
1
2  gone before the bankruptcy hearing at which you
3  testified took place?
4      A.   Yes.
5      Q.   So that would go move it back at least
6  to the 18th?
7      A.   That's correct.
8      Q.   Because Friday is the 19th?
9      A.   That's correct.
10     Q.   And was there any gap in between the
11 time he said he'd be leaving and the time that
12 he actually left?
13     A.   I --
14     Q.   Did you get notice or did he go that
15 day?
16     A.   I don't recall.  He would not have
17 communicated that departure to me.  He would
18 have communicated to Skip McGee, his boss.
19     Q.   Okay.  How did you learn Shafir was
20 leaving?
21     A.   Through Skip McGee.
22     Q.   And what did you learn?  Did you
23 learn --
24     A.   I learned he left.
25     Q.   Did you learn Mark is going to leave

Page 123

HIGHLY CONFIDENTIAL - B. McDADE
1
2  or did you learn Mark's gone?
3      A.   He left.
4      Q.   And Mark was one of the three
5  principal members of the negotiating team along
6  with you and Skip McGee, correct?
7      A.   That's correct.
8      Q.   Did the departure of one of the
9  principal negotiators on such short notice
10 create a problem?
11     A.   It created a continuity problem.  It
12 did not create a substance problem, in my
13 opinion, in terms of the deal.
14     Q.   Did it create a continuity problem in
15 having the same personnel on board who
16 understood the terms of the deal and how they
17 came to be?
18     A.   I would describe it as a human dynamic
19 continuity problem because he had been
20 interacting with Michael Klein, facing off with
21 the advisors of Barclays.  It was more of a
22 human social than it is the dynamic of the
23 actual information, because he was not working
24 in a vacuum.  His M&A team had been very much
25 around it from Paul Parker, his head of M&A in

Page 124

HIGHLY CONFIDENTIAL - B. McDADE
1
2  the U.S., to a lot of financial institutions'
3  bankers.
4      Q.   When you say he had been facing off
5  with Mark Klein?
6      A.   Michael Klein.
7      Q.   Michael Klein, beg your pardon.
8          In what sense was he facing off with
9  Michael Klein?  What were they facing off about?
10     A.   They were the two M&A advisors
11 representing the clients.  So there were many
12 moments, as there is in any deal, of lots of
13 back and forth and pushing and cajoling, et
14 cetera.
15     Q.   Did you have any conversations with
16 Shafir in between the time you learned from
17 McGee that he was leaving and the closing of the
18 deal?
19     A.   I believe he might have come by or
20 phoned and said, "I left, thanks," but I don't
21 have a specific -- I don't have a very good
22 frame of reference for the recall of that.
23     Q.   Why did he --
24     A.   That's it.
25     Q.   Do you know why he left?

Page 125

HIGHLY CONFIDENTIAL - B. McDADE
1
2      A.   I do not know.  I do not know why he
3  left.
4      Q.   Did you ever know?  I mean as opposed
5  to you might not remember now, do you remember
6  if anybody gave you a reason that Mark Shafir
7  left during the middle of the week while the
8  deal was being processed?
9      A.   My understanding is that he had been
10 contemplating leaving for a long period of time
11 and wanted to see through the end of the --
12 whatever happened with Lehman.
13     Q.   To your knowledge, did his decision to
14 depart have anything to do with anything going
15 on in connection with the transaction?
16     A.   No, it did not.
17     Q.   You know that that's not so or you
18 don't know one way or the other?
19     A.   You asked to my knowledge.  I do not
20 know, to my knowledge, that this had anything to
21 do with his departure.
22     Q.   Let's go back to the repurchase
23 agreement.  I want to see if I can get a better
24 understanding of what role it ultimately comes
25 to play in the deal.

Page 126

HIGHLY CONFIDENTIAL - B. McDADE

1    I think when we left that topic there
2
3    are difficulties, for whatever reason, hostile
4    or not, of getting collateral out of JPMorgan.
5        They had the collateral because they
6    were the collateral agent on the tri-party repo
7    with the Fed, correct?
8        A.  They're a clearing bank, exactly.
9        Q.  And JPM had some view that it had a
10   claim to some of the collateral for some reason,
11   correct?
12       A.  Yes, correct.
13       Q.  Okay.  I won't take your time with
14   what it was.  I think it's enough they thought
15   they should be able to keep it, yes?
16       A.  Correct.
17       Q.  And as a result, collateral that was
18   within the repo did not in fact move over to
19   Bank of New York, which was the collateral agent
20   on the tri-party repo between Barclays and
21   Lehman, correct?
22       A.  That's correct.
23       Q.  For the collateral that did move over
24   to Bank of New York, do you know whether Bank of
25   New York put a value on the collateral that

Page 127

HIGHLY CONFIDENTIAL - B. McDADE

1
2    arrived?
3        A.  Typically, I'm not a repo expert, but
4    typically a repo, the clearing banks have a
5    pricing service in terms of the process, yes.
6        Q.  And normally when the clearing banks
7    give you a pricing service in terms of the
8    process, that pricing governs the value of the
9    collateral in the repo, correct?
10       A.  Normally, it doesn't apply to 2008.
11   Prior to 2008, that would have applied, but
12   anyone doing their work in repo would not have
13   accepted a third party's top-down approach to
14   valuing assets.
15       Q.  Okay.  And when you say that, sir, are
16   you talking about some sort of regulatory change
17   in 2008 or just -- or the economic circumstances
18   that obtained in 2008?
19       A.  I'm talking about the economic
20   circumstances.  Nothing to do with the
21   regulatory environment.  Pure business
22   observation.
23       Q.  Do you know if that change in practice
24   had been applied at any point in 2008 other than
25   with respect to the Barclays Repurchase

Page 128

HIGHLY CONFIDENTIAL - B. McDADE

1
2    Agreement we've been talking about?
3        A.  I know how we operated at Lehman in
4    terms of our repo business.
5        Q.  Do you know what the view was of
6    people whose day-to-day job involved repurchase
7    agreements was with respect to whether or not
8    you could have a negotiation with the collateral
9    agent regarding the valuation?
10       A.  I don't know that specifically.
11       Q.  And you're not a repo expert?
12       A.  That's correct.
13       Q.  Do you know if there was any -- and
14   you referred to the groups that were for
15   Barclays and Lehman talking about asset
16   valuations, sort of continuing that --
17       A.  Uh-huh.
18       Q.  -- at the time of the Repurchase
19   Agreement?
20       A.  Uh-huh.
21       Q.  Using my awkward phrasing.
22       To your knowledge, what exactly were
23   they doing when they were continuing this
24   process with respect to the collateral that was
25   in the repo?

Page 129

HIGHLY CONFIDENTIAL - B. McDADE

1
2        A.  The Barclays -- the Lehman and
3    Barclays participants in this process?
4        Q.  Yeah.  So I can frame it, I'm at the
5    point where the repo's happened, Barclays is
6    supposed to have transitioned in for the Fed,
7    JPM hasn't sent over everything, there's some
8    valuation process going on with respect to what
9    has been sent into Bank of New York.
10       A.  Exactly.
11       Q.  Describe for me --
12       A.  The same process.  I would describe it
13   as the same process that took place earlier.
14   It's just in a different form in terms of the,
15   you know, the -- it's in a repo form as opposed
16   to Lehman's balance sheet, but it's the
17   identical process, with the inclusion of the
18   experts from the repo side at Barclays and the
19   professionals at the Lehman repo side, so John
20   Coghlan, for example, at Lehman who would have
21   ran the Lehman financing business.
22       Q.  Coghlan is the guy you would think of
23   as the Lehman expert on repos?
24       A.  Coghlan, yes, he ran the business.
25       Q.  So if I want an answer to the question

Page 130

HIGHLY CONFIDENTIAL - B. McDADE

1      about whether or not you could operate
2      independently of the valuation that the
3      collateral agent applied, Coghlan is the guy I
4      ask?
5          A.   Yes, from the Lehman point of view.
6          Q.   From the Lehman point of view, yes.
7      At the time, from your point of view too, right?
8          A.   Yes.
9          Q.   Do you know if Coghlan's involved in
10     discussions with his counterparts at Barclays
11     about the value of the securities within the
12     repo?
13         A.   I don't know specifically.
14         Q.   Do you know who was involved in
15     discussions with counterparts at Barclays about
16     the valuation of the securities in the repo?
17         A.   I don't know specifically the answer,
18     but again, the same group -- I have a general
19     sense it would have been the same group of
20     individuals that had been involved all week in
21     risk.
22         Q.   Do you have any sense as to whether
23     the Barclays side of the table had actual input
24     into valuing the collateral that was within the

Page 131

HIGHLY CONFIDENTIAL - B. McDADE

1      repo?
2          A.   I believe in a general sense they had
3      a strong view on the value of the collateral.
4          Q.   Okay.  We can all have views about a
5      lot of things.  The question is whether or not
6      their view had any impact.
7              Do you know if the Barclays view was
8      given any weight or any effect in terms of
9      valuing what was in the repo?
10         A.   I think ultimately the markets, the
11     markets had effect on the valuation process.
12         Q.   All right.  Again, generally, I guess
13     we can understand that, with the markets
14     dropping, the value of a lot of collateral or a
15     lot of securities generally would be dropping;
16     some goes up, but most goes down in a down
17     market, yes?
18         A.   Yes.
19         Q.   So that macro view aside, I'm talking
20     about the process you've described to me where
21     Barclays and Lehman people were talking about
22     valuing the assets in the repo.
23             Is it your view that what they decided
24     between themselves constituted market value?

Page 132

HIGHLY CONFIDENTIAL - B. McDADE

1          A.   Yes.
2          Q.   Because the two of them were -- the
3      two sides were negotiating a price?
4          A.   The continued process over the course
5      of the week, yes.
6          Q.   And in that continued process of
7      negotiating a price, do you know if any account
8      was taken of extraneous market data with respect
9      to valuing the collateral in the repo?  Is this
10     something other than what Barclays was willing
11     to pay for it?
12         A.   Yes, I'm sure the third-party
13     providers in both cases, JP, as our clearer, and
14     Bank of New York's data was used.
15         Q.   Do you know if it was actually taken
16     into account or merely recognized to exist?
17         A.   I think it would have -- I don't know
18     the answer.
19             MR. GAFFEY:  Let's go off the record
20         for a second.
21             (Luncheon Recess; Time Noted: 12:25
22         P.M.)

Page 133

HIGHLY CONFIDENTIAL - B. McDADE

1              AFTERNOON SESSION
2          (Time Noted: 1:15 P.M.)
3      BART McDADE, resumed and
4      testified further as follows:
5      EXAMINATION BY (Cont'd.)
6      MR. GAFFEY:
7          Q.   We were talking before the break,
8      Mr. McDade, about the Repurchase Agreement, and
9      I think you had told me, and correct me if I'm
10     wrong, that you don't know -- you don't remember
11     now, anyway, that the amount that Barclays
12     financed?
13         A.   That's correct.
14         Q.   Would it refresh your recollection if
15     I was to tell you it was $45 billion, does that
16     ring true with you?
17         A.   Approximately.
18         Q.   And do you know if in the Repurchase
19     Agreement with Barclays Lehman pledged more than
20     $45 billion in collateral to support the
21     financing?
22         A.   We would have -- my understanding,
23     again, not being there in terms of effecting the
24     trade with the deal, the team that was doing it,

Page 134

1      HIGHLY CONFIDENTIAL - B. McDADE
2  but we would have pledged collateral in the same
3  terms that would have been pledged from the Fed,
4  the transfer over to Barclays.
5      Q.  And you understood, if not -- with
6  respect to the specific number, as a general
7  matter, there was a haircut in the repo that has
8  collateral over and above the amount of
9  financing?
10      A.  That's commonplace for repo
11  transactions, yes.
12      Q.  Do you know the rough amount of the --
13      A.  No, I do not.
14      Q.  -- of the haircut?
15          I'm going to ask you two questions
16  here and I want to make them both full and
17  clear.  So do you know the amount of the haircut
18  that obtained with respect to the Repurchase
19  Agreement with the Fed?
20      A.  No, I do not.
21      Q.  Do you know the amount of the haircut
22  that obtained with respect to the Repurchase
23  Agreement with Barclays?
24      A.  No, I do not.
25      Q.  Would it refresh your recollection if

Page 135

1      HIGHLY CONFIDENTIAL - B. McDADE
2  I were to tell you it was in the amount of
3  approximately $5 billion?
4      A.  No.
5      Q.  Do you recall having any discussions
6  in connection with your work regarding the
7  transaction during that week of the amount of
8  the Fed haircut?
9      A.  No.
10      Q.  Do you recall having any discussions
11  in connection with your work regarding the
12  transaction during that week of the amount of
13  the haircut in the Barclays Repurchase
14  Agreement?
15      A.  No.
16      Q.  As a general matter, as I understand
17  it, as I understand what you were telling me
18  before the lunch break, the quantum of
19  securities that could be delivered to Barclays
20  had decreased in between Tuesday when the Asset
21  Purchase Agreement was signed and Thursday,
22  correct?
23      A.  Correct.
24      Q.  And what's your understanding of why
25  that quantum of securities that could be

Page 136

1      HIGHLY CONFIDENTIAL - B. McDADE
2  delivered decreased?
3      A.  The market changed, so any
4  transactions that may have occurred at Lehman,
5  transactions that were imposed on Lehman, for
6  example, the CME taking us out of a piece of the
7  balance sheet, the cash, for example, wiping us
8  out of all of our futures positions at the CME,
9  and the actual difference of the market value
10  because the markets continued to move, and
11  finally, the difference had to do with different
12  pieces of collateral that Barclays was
13  ultimately valuing as a result of the, however
14  we want to describe it, the dispute with
15  JPMorgan.
16      Q.  Okay.  So I understand it, those three
17  categories, it's there is some of the body of
18  collateral that's unavailable to be delivered
19  anymore for a variety of reasons?
20      A.  That's correct.
21      Q.  Closed out of trades or taken by the
22  Chicago Merc, right?
23      A.  Exactly.
24      Q.  That's one category.  The other
25  category is, as a matter of general market

Page 137

1      HIGHLY CONFIDENTIAL - B. McDADE
2  forces, the pricing, the value of the available
3  body of collateral has dropped in that time?
4      A.  Right.
5      Q.  Correct?
6          And the third is the body of
7  collateral that was stuck in the problem with
8  JPM?
9      A.  Exactly.  Yes.
10      Q.  And do you know as a general matter
11  what the difference was caused by those three
12  factors between the amount of the long position
13  that was agreed on Tuesday in the Asset Purchase
14  Agreement and what was available to be delivered
15  on Thursday?
16      A.  No, I don't.
17      Q.  Do you have a rough idea?
18      A.  No, I do not.
19      Q.  Do you know if the amount of
20  securities available to be delivered after
21  taking those three factors into account was less
22  or more than the amount that was in the repo,
23  including the haircut?
24      A.  Could you repeat that one more time?
25  Sorry.

Page 138

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   Let me try and rephrase it.  The
3  quantum of securities available that can
4  delivered to Barclays drops because of those
5  three factors you told me about, correct?
6      A.   Yes.
7      Q.   Do you know if that quantum was more
8  or less than the amount of the financing
9  Barclays supplied in connection with the repo,
10  the 45 billion?
11      A.   I understand.
12         I don't know the answer.
13      Q.   Do you know if the quantum of those
14  securities dropped below the amount in the
15  Barclays repo consisting of the amount financed
16  plus the haircut, the higher number?
17      A.   Yes.
18      Q.   And I take it from your testimony
19  before the break that one of the things that was
20  under discussion was finding assets sufficient
21  to deliver a particular amount to Barclays,
22  correct?
23      A.   That's correct.
24      Q.   What was the amount?
25      A.   Again, the process that we went

Page 139

1      HIGHLY CONFIDENTIAL - B. McDADE
2  through over the course of the week was to find
3  the market valuation of the assets that were
4  available.
5         In this case, the quantum of assets,
6  using your term, had changed.  We were going
7  through a process again of finding the value of
8  those assets that were available to be purchased
9  by the purchaser, in this case, Barclays.  They
10  still were in the position where the value of
11  the liabilities was reasonably similar.  The
12  form had changed in terms of it being their repo
13  now, but there were still the responsibilities
14  around cure payments and the compensation.
15         So we were looking for, at that point
16  of view, as a result of the current process of
17  valuing assets, for more assets within Lehman
18  that weren't part of the process of the repo,
19  all of the repo.
20      Q.   So you were looking for assets outside
21  the scope of the repo?
22      A.   Correct.
23      Q.   To add to the body of assets that
24  could be transferred to Barclays?
25      A.   Correct.

Page 140

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   So maybe I'm asking the same question,
3  but what was the total amount of -- total value
4  of assets you were looking for?  You knew you
5  wanted to add to what was in the repo, right?
6  Yes?
7      A.   That's -- that's correct.
8      Q.   How much more did you want to add to
9  what was in the repo?
10      A.   We were still going through the
11  process of valuing.  We knew we had a gap.  I
12  wasn't part of the specific meeting, so I can't
13  answer the question specifically, but there was
14  still a gap.
15      Q.   Okay.  A gap between what and what?
16      A.   The rough assets and liabilities
17  matching.
18      Q.   So, in the search for additional
19  assets to deliver to Barclays, one of the tasks
20  was to find enough assets to match the
21  liabilities that Barclays was undertaking,
22  correct?
23      A.   Our task was to understand all the
24  assets -- within Lehman, our task was to
25  understand all the assets and make sure we had

Page 141

1      HIGHLY CONFIDENTIAL - B. McDADE
2  proper valuation in terms of understanding the
3  value of those assets and to get the best price
4  for Lehman for those assets.
5      Q.   Okay.
6      A.   It was clear, yes, I have stated I
7  think previously, it was clear Barclays was
8  trying to find a means to provide against the
9  liabilities of cure payments and compensation.
10      Q.   Okay.  So I just want to run down the
11  liability side sort of full by category from the
12  bottom up.  It's the comp liability, correct?
13      A.   Correct.
14      Q.   The cure liability, correct?
15      A.   Correct.
16      Q.   And the liabilities that are incident
17  to the securities themselves, correct?
18      A.   Correct.
19      Q.   The short side of long position, yes?
20      A.   Yes.
21      Q.   Okay.  And included in the mathematics
22  of the total amount of liabilities that Barclays
23  would be undertaking were whatever the amounts
24  were of comp and cure, correct?
25      A.   That's correct.

Page 142

HIGHLY CONFIDENTIAL - B. McDADE
2  Q.   Okay.  So as the amount of -- as over
3  the week the amount of liability for cure
4  dropped, you would agree with me then that the
5  price -- that the amount of value that had to be
6  given to Barclays should have dropped in
7  accordance with that, correct?
8     A.   Correct.
9     Q.   So when the value of the cure
10  liability dropped from its original number of
11  2.25 and then to 1.5 and then down to the range
12  of 7 or 8 hundred million, the value of
13  securities attributable to that as it were
14  should have dropped, correct?
15     A.   I want to make a correction to the
16  statement I made earlier.  I was confusing the
17  15c3 7 to 8 hundred figure with cure.  So the
18  last figure that I do recall is the billion and
19  a half in cure.
20     Q.   As the number dropped from 2.25 to --
21     A.   To 1.5.
22     Q.   -- to 1.5?
23     A.   To answer your question, though, yes.
24     Q.   So, to follow up on your clarification
25  a little bit, your memory is not now that it

Page 143

HIGHLY CONFIDENTIAL - B. McDADE
2  dropped from 1.5 further during the week?
3     A.   That's correct.
4     Q.   It stayed at 1.5 from --
5     A.   To the best of my recollection, yes.
6     Q.   Let me put the "from" and "to" in
7  there so we have a good record.
8        It stayed at 1.5 from September 17 to
9  the closing on September 22?
10     A.   To the best of my recollection, yes.
11     Q.   Was any work being done between
12  September 17 and September 22 to fine-tune that
13  number?  Was Mr. Kelly continuing to look at it?
14     A.   Yes, he was.
15     Q.   And when Mr. Kelly and his crew
16  continued to look at it, did they ever change
17  that number from $1.5 billion?
18     A.   I don't know.
19     Q.   I'll go back to a question I asked you
20  before the break.  Having now sort of refreshed
21  your recollection about whether or not there was
22  this other drop, do you have a better
23  recollection now of whether or not Mr. Kelly
24  came to you during the week and told you the
25  trade payable number was overstated by about a

Page 144

HIGHLY CONFIDENTIAL - B. McDADE
2  billion dollars?
3     A.   I don't have a -- I don't have a
4  better recollection.  I tried to describe my
5  recollection of the week with Mr. Kelly being in
6  and around Ian Lowitt's office and in and around
7  my office several times, some of which we were
8  obviously talking because I was imploring an
9  accurate assessment of what the cure payment
10  number was.
11     Q.   Who were you imploring to give an
12  accurate assessment of what the cure payment
13  was?
14     A.   Ian Lowitt and Martin Kelly.
15     Q.   And you were imploring Lowitt and
16  Martin Kelly to get an accurate assessment of
17  the cure payment number because it related to
18  the amount of value that Lehman had to give to
19  Barclays, correct?
20     A.   Exactly.  And the number was changing.
21     Q.   So as the number dropped -- looking at
22  Exhibit 19, the financial statement upon which
23  the original transaction was based, that number
24  drops from 2.25 for cure.  The assets to be
25  delivered should drop dollar for dollar, right?

Page 145

HIGHLY CONFIDENTIAL - B. McDADE
2     A.   That's correct.
3     Q.   Was there a point --
4     A.   Assuming that they were all the same
5  assets and the markets hadn't changed.
6     Q.   We were going to have to take into
7  account this --
8     A.   That would be correct.
9     Q.   -- dynamic, as you call it, that takes
10  place during the week, but as a basic matter in
11  the deal as it was contemplated, as the accrued
12  liabilities dropped, the value to Barclays
13  should also drop, yes?
14     A.   That's correct.
15     Q.   And I guess it's also so that, to the
16  extent the value of any assets went up, the
17  price should change as well, correct?
18     A.   Absolutely.
19     Q.   Barclays should take on more
20  liabilities, yes?  Or pay more cash?
21     A.   Or pay more cash.
22     Q.   And if there's an imbalance at the end
23  of the day between the accrued liability for, to
24  pick one, cure?
25     A.   Uh-huh.

| Page 146 | Page 147 |
|---|---|
| HIGHLY CONFIDENTIAL - B. McDADE | HIGHLY CONFIDENTIAL - B. McDADE |

Page 146

1     HIGHLY CONFIDENTIAL - B. McDADE
2     Q.   And the total value that Barclays
3  is -- actually, withdrawn.
4       I want to ask you to put one other
5  piece in here before I ask you this question.
6  Part of the transaction contemplated a cash
7  payment from Barclays to Lehman of $250 million,
8  correct?
9     A.   Yes, that's correct.
10    Q.   And as far as -- apart from the real
11 estate?
12    A.   That's correct.
13    Q.   That's the only cash that's moving
14 from Barclays to Lehman, right?
15    A.   That's correct.
16    Q.   Everything else in the form of
17 consideration is in the form of assumed
18 liabilities, correct?
19    A.   That's correct.
20    Q.   So if an imbalance occurs at the end
21 of the week where the -- when the deal is closed
22 where the amounts of the accrued -- of the
23 assumed liabilities drops, then either you have
24 to give them fewer assets or they have to pay a
25 bigger cash price to make the deal balanced,

Page 147

1     HIGHLY CONFIDENTIAL - B. McDADE
2  correct?
3     A.   To make the deal balanced, that's
4  correct.
5     Q.   And it was always the view that the
6  deal should balance, correct?
7     A.   It was always Barclays' view that the
8  deal should balance.  It was always our view to
9  get the market value for the assets and the
10 businesses we were selling at the best price.
11    Q.   I beg your pardon.  Did you finish
12 your answer?
13    A.   I did.
14    Q.   You wanted either a balance or better,
15 in Lehman's favor, correct?
16    A.   We wanted the best price for Lehman,
17 right.
18    Q.   At any point did you think you were
19 selling the assets of Lehman for less than their
20 value?
21    A.   No.  The context of the marketplace,
22 the illiquidity in the marketplace, the
23 volatility, the tumultuous, cannot begin to
24 describe how illiquid all the markets were over
25 the course of the preceding weeks and especially

Page 148

1     HIGHLY CONFIDENTIAL - B. McDADE
2  that week.
3     Q.   And that type of illiquidity would be
4  reflected when a regulator broker-dealer would
5  mark its books in the market, wouldn't it?
6     A.   It would be reflected in marking to
7  market on a regular basis, yes, absolutely.
8     Q.   And it would be the responsibility of
9  the CFO to make sure that that illiquidity was
10 taken into account when marking to market was
11 done on the books of company, correct?
12    A.   That's correct.
13    Q.   Whether or not that illiquidity was
14 taken into account in marking the books to
15 market would be a question you would ask of the
16 CFO, Ian Lowitt, correct?
17    A.   I would ask that, yes.
18    Q.   To go back to the point that you
19 clarified, sir, with regard to your memory of
20 the drop in the amount of assumed liability for
21 cure, we still have a drop here from 2.25 to
22 1.5, correct?
23    A.   Correct.
24    Q.   Is it still your testimony that was
25 reflected in the Clarification Letter?

Page 149

1     HIGHLY CONFIDENTIAL - B. McDADE
2     A.   I believe I read that in the -- I
3  remember that from the actual bankruptcy,
4  Mr. Miller talking to the bankruptcy.
5     Q.   And that was when Mr. Miller told the
6  bankruptcy court that the assumption of
7  liabilities --
8     A.   Was 1.5.
9     Q.   That would be when Mr. Miller on the
10 19th told the bankruptcy court that the
11 assumption of liabilities for cure and comp
12 would be the same as he had described at the
13 prehearing on the 17th, correct?
14    A.   Exactly, which is the 1.5 figure.
15    Q.   And the 20.0 including Barclays'
16 modeling?
17    A.   Correct.
18    Q.   To your knowledge, sir, can you tell
19 me anyplace in what was filed or told to the
20 court that the fact that the $2 billion was
21 based on Barclays' modeling was disclosed?
22    A.   I don't recall the specifics of
23 whether Barclays modeling was described, no.
24    Q.   My question -- I guess my question
25 should be a little more general.  Do you recall