# A. 20 (B)

Page 150

HIGHLY CONFIDENTIAL - B. McDADE

1    any point where the fact that the 2 billion was
2    a number calculated by Barclays as opposed to
3    Lehman was disclosed?
4        A.    My answer would be I would have
5    thought the court would have assumed the
6    purchaser would have made the calculation --
7        Q.    Of --
8        A.    -- of the 2 billion.
9        Q.    Would you have assumed the court would
10   have thought that the purchaser made the
11   calculation of the trade payable liability as
12   well?
13       A.    I would have thought the purchaser
14   would have thought there was a list of the
15   vendor contracts.
16       Q.    Okay.
17       A.    I would have gotten a list, would have
18   gotten a list, and the court would have assumed
19   that a list had existed from Lehman.
20       Q.    So you would have assumed the court
21   would have thought that the purchaser calculated
22   the assumed liability for comp but that the
23   assumed liability for cure came from a list that
24   Lehman supplied?

Page 151

HIGHLY CONFIDENTIAL - B. McDADE

1        A.    In my mind it's very clear.  The cure
2    payments are a list of contractual obligations.
3    The pay process is a payment of a -- to a group
4    of 9,000 folks in the future in very uncertain
5    times and in, you know, in a very dramatic,
6    large M&A transaction.  So I'm very confident
7    the court understood the distinction between the
8    two.
9        Q.    When you're talking about the
10   liability for the cure payment being subject to
11   these very uncertain times, let's pursue that a
12   little bit.  Presumably there is an objective
13   list of contracts that could be reviewed to get
14   the number, correct, of what the cap, what the
15   ceiling is of potential trade payables, correct?
16       A.    That's correct.
17       Q.    And is it your view that in these
18   tumultuous times you're describing that that
19   number could go up as a result of market forces?
20       A.    No.
21       Q.    It would go down from the cap,
22   correct?
23       A.    Absolutely.
24       Q.    Okay.  So if the amount accrued on

Page 152

HIGHLY CONFIDENTIAL - B. McDADE

1    Lehman's books was X, then this market forces --
2    these market force you're talking about would
3    make the number less than X, correct?
4        A.    You're talking about the cure
5    payments, just to clarify?
6        Q.    Correct.  Yes.
7        A.    It's actually papered I believe right
8    from the beginning of the transaction that
9    Barclays had 60 days to walk through all of the
10   vendor contracts, to the best of my
11   recollection, and say which ones they intended
12   they needed to run the businesses and they would
13   honor those.
14           It was very clear in terms of I think
15   the -- from all the operators that this would be
16   the basic course of business in this or any
17   other transaction.
18       Q.    Okay.  I'm not sure that goes to the
19   question I asked.  Let me try and rephrase the
20   question a little bit.  If you took the list of
21   potential -- of contracts subject to that
22   process where Barclays has the option of taking
23   or leaving it?
24       A.    Right.

Page 153

HIGHLY CONFIDENTIAL - B. McDADE

1        Q.    And you add them up, you're going to
2    get a total number, right?
3        A.    Yes.
4        Q.    And the fact that Barclays can take or
5    leave some of them will do nothing but reduce
6    that number; it'll never increase it, right?
7        A.    That's correct.
8        Q.    And the fact that these market forces
9    you're talking about may have an impact on the
10   payables also will reduce the number; it won't
11   increase it, correct?
12       A.    No, I would not describe the market
13   forces have anything to do with it.  These are
14   contracts and these are inventories providing
15   all sorts of different services, hundreds of
16   different services.  I would not describe the
17   market having an impact on that.
18       Q.    The thing that would have the impact
19   on the contract would be the amount Barclays
20   would ultimately undertake?
21       A.    Would need to run its businesses.
22       Q.    With that in mind, sir, can you think
23   of a reason why the accrual for liabilities on
24   the trade payables would be an increased

Page 154

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  adjustment for the transaction?
3    A.   Would increase from the moment the
4  transaction was done?
5    Q.   Would increase from the amount accrued
6  on Lehman's books to a higher number for the
7  purpose of the transaction?
8    A.   No, I would just be speculating. No,
9  I can't think of a reason.
10    Q.   Because, in your view, the number can
11  do nothing but go down from the amount, correct?
12    A.   Correct.
13    Q.   So you can think of no reason, can
14  you, why the number would be written up?
15    A.   No.
16    Q.   Let me suggest a reason: Could it be
17  written up so that the comp -- the cure assumed
18  liability is a plug number to make sure that
19  balance sheet balances?
20    A.   I don't have a comment on that.
21  That's --
22    Q.   I'm afraid I'm going to have to ask
23  you for one. Do you know -- was that the reason
24  the number was what it was, to be a plug number
25  on the balance sheet?

Page 155

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   That's a different question.
3  No.
4    Q.   Did anybody ever discuss that fact
5  with you?
6    MR. BUCKLEY: That fact?
7    Q.   Withdrawn. Did anybody ever discuss
8  with you the possibility of writing up that
9  number to make that balance sheet balance?
10    A.   Absolutely not.
11    Q.   I'll go back to what I asked you about
12  Mr. Kelly. Do you know if Mr. Kelly wrote that
13  number up?
14    A.   No, I do not.
15    Q.   Do you know if Mr. Lowitt was involved
16  in any writing up of that number?
17    A.   No, I do not.
18    Q.   Did you ever see any work product
19  generated by Mr. Kelly or Mr. Lowitt indicating
20  a write-up of that number by as much as a
21  billion dollars?
22    A.   No, I did not.
23    Q.   If you had seen work product from
24  Mr. Lowitt or Mr. Kelly writing that number up
25  by a billion dollars, that would have been

Page 156

1    HIGHLY CONFIDENTIAL - B. McDADE
2  inconsistent with your view of what this number
3  represented, would it not?
4    MR. BUCKLEY: Objection. Would you
5  repeat the question?
6    No foundation.
7    (Record read.)
8    A.   Yes, that's correct.
9    Q.   And by "this number," I'm pointing at
10  the number on Exhibit 19.
11    A.   2.25.
12    Q.   We're in the same place on the
13  document?
14    A.   Yes.
15    Q.   And if the comp accrual was not in
16  fact a good faith estimate of the amount that
17  Barclays would in fact pay for compensation,
18  that would not be consistent with your view of
19  what the financial schedule upon which the deal
20  was based represented; isn't that correct?
21    A.   That's correct.
22    Q.   And you don't know, because it was
23  Barclays model that resulted in that number,
24  whether there was any writing up of that number
25  beyond a good faith estimate of what Barclays

Page 157

1    HIGHLY CONFIDENTIAL - B. McDADE
2  actually would pay; isn't that correct?
3    A.   I don't know.
4    Q.   In the deal as you understood it both
5  on the Tuesday, September 16th, and as it closed
6  on the 22nd, in between those two times, in your
7  view, was there any embedded gain for Barclays
8  contemplated in that deal on day one?
9    A.   No, there was not.
10    Q.   Did you come to learn that Barclays
11  declared earnings that showed a gain on day one
12  in the range of $4 billion?
13    A.   I have come to learn that they
14  reported their interim results that they
15  reported a gain.
16    Q.   Mr. McDade, I have put before you what
17  we previously had marked as Exhibit 22.
18  Barclays Results Announcement Figures 2008,
19  which was published in February of 2009, and I
20  would direct your attention to page 95 of that
21  fairly lengthy document.
22    And in particular, sir, there's a
23  description in note 11 starting on page 95 of
24  the group's material acquisitions and it
25  describes Lehman Brothers North American

Page 158

1     HIGHLY CONFIDENTIAL - B. McDADE
2   businesses. Take the time you need, sir, to
3   read through it to familiarize yourself with it,
4   but my question, sir, is going to go to the
5   second to last paragraph, which reads, "The
6   excess of the fair value of net assets acquired
7   over consideration paid resulted in
8   $2,262,000,000 of gains on acquisition," and the
9   number there is in sterling.
10      A.   Uh-huh.
11      Q.   Was that type of gain contemplated by
12  the deal you made with Barclays?
13      A.   No, absolutely not. The type of risk
14  that they took on for this transaction
15  associated with the liabilities could have led
16  to a gain or a less given the nature of the
17  markets. Absolutely not contemplated. I have
18  no knowledge of how their accounting works. I
19  have no knowledge of how they hedged and what
20  they did with the risk.
21      Q.   The question actually revolves a bit
22  around the phrase "on acquisition" here. I'm
23  not talking about their sort of ultimate success
24  with the assets.
25           Was it contemplated there would be a

Page 159

1     HIGHLY CONFIDENTIAL - B. McDADE
2   gain upon acquisition?
3       A.   No, it was not.
4       Q.   Was it contemplated that the price
5   paid by Barclays would be less than the fair
6   value of the net assets acquired?
7       A.   Absolutely not.
8       Q.   And that's because at all points from
9   Tuesday, September 16, through the closing on
10  Monday, September 22, the deal was supposed to
11  be in balance, taking into account the changing
12  amount of securities that could be transferred;
13  is that right?
14      A.   Those are your words.
15      Q.   That's a question. Correct?
16      A.   I'm sorry. No, from Monday all the
17  way through till the closing we, as Lehman, the
18  responsible parties at Lehman, worked to put a
19  transaction together, always valuing the assets
20  with all the current and relevant market
21  information that we had available to us with the
22  relevant experts.
23      Q.   You were in court on Friday, the 19th,
24  for the sale hearing; is that correct?
25      A.   That's correct.

Page 160

1     HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   Were you there for the entire hearing?
3       A.   Yes, I was.
4       Q.   So you were there from 4 or so when it
5   started till 20 minutes after midnight when it
6   ended?
7       A.   That's correct.
8       Q.   And you heard the deal described to
9   the court by the -- whoever got up and spoke,
10  you know, Mr. Miller, whatever lawyers got up
11  and spoke, you had a sense how the deal was
12  being described to Judge Peck, correct?
13      A.   Yes.
14      Q.   At any point in the description to
15  Judge Peck did you have an understanding that
16  the deal was described as anything other than a
17  wash, an equivalent exchange of assets?
18      A.   The deal was described as a
19  transaction where the assets and liabilities
20  matched.
21      Q.   Now, you mentioned before a
22  Clarification Letter that was put together after
23  the hearing, correct?
24      A.   That's correct.
25      Q.   And did you have any role in

Page 161

1     HIGHLY CONFIDENTIAL - B. McDADE
2   connection with putting that Clarification
3   Letter together?
4       A.   Role with the actual creation of the
5   document, no.
6       Q.   That's a good --
7       A.   Role with certain aspects of it,
8   clarification of businesses that were
9   contemplated as part of being purchased or not,
10  yes.
11      Q.   The role you have just described, did
12  that include any role in redefining the assets
13  that were to be transferred pursuant to the
14  transaction?
15      A.   Redefining the assets?
16      Q.   Let me make that question a bit
17  clearer.
18      A.   Please.
19      Q.   In the role that you played, did you
20  play any role in any change in the definition of
21  Purchased Assets as stated in the Asset Purchase
22  Agreement that we talked about before?
23      A.   Well, for example, the original Asset
24  Purchase Agreement I'm fairly certain
25  contemplated purchase of Eagle Energy. I would

Page 162

HIGHLY CONFIDENTIAL - B. McDADE

1   HIGHLY CONFIDENTIAL - B. McDADE
2   have been knowledgeable and part of the decision
3   of that clarifying letter that excluded the
4   Eagle commodity business and I think Lehman
5   commodity services excluded as part of it. That
6   would be an example of where I would have been
7   involved.
8       Q.   Let me give you another example. Do
9   you have any recollection of the definition of
10  Purchased Assets changing from the description
11  of a long position worth -- with a book value of
12  approximately $70 billion changing to the assets
13  transferred in the repo plus the 15c3 assets you
14  mentioned plus certain other unencumbered funds?
15      A.   Yes, I do.
16      Q.   When was that change made?
17      A.   The actual change made, the deal that
18  was put together or the actual change for the
19  clarifying letter?
20      Q.   Let's take both.
21      A.   The deal was put together over the
22  course of the day on Friday, so that would be
23  Friday, the 19th, and the letter, I'm not sure
24  all the drafting, but over the course of the
25  20th through the 22nd, I assume. The original

Page 163

1   HIGHLY CONFIDENTIAL - B. McDADE
2   draft I guess started on the 20th.
3       Q.   Now, describe for me, if you would,
4   how those changes came -- in the deal came to be
5   made during the course of the day on Friday.
6   I'll ask you for a general description and who
7   was involved and then obviously I'm going to
8   follow up on that.
9       A.   Sure. So with the changes in what
10  Barclays' view of the assets that, after all the
11  quantum changes, could be acquired, you know,
12  there was a need for one clarification of just
13  making sure they understood what assets could be
14  acquired. After that, plus the valuation
15  process of the teams that we've talked about and
16  described, it became clear that they would
17  insist on more value in terms of the
18  transaction.
19      Ian Lowitt, Alex Kirk, probably
20  others -- I was not involved directly in much of
21  the process -- started working on a couple of
22  ideas that they had come up with in terms of
23  places where there might be other assets that
24  could be available to be contemplated as part of
25  the purchase. So that's when we contemplated

Page 164

1   HIGHLY CONFIDENTIAL - B. McDADE
2   this concept of the 15c3 and that's when we
3   started looking at the, what's called the
4   clearance boxes for any unencumbered assets that
5   could be made available.
6       The process was a process that I
7   believe included combination of Lehmanites and
8   Barclays in terms of the general notion, and
9   then specifically Ian and Martin and his team
10  working -- and Paolo Tonucci working to find
11  other assets that may be of value in terms of a
12  purchaser.
13      Q.   Now, you said you were not part of
14  the --
15      A.   I was part of it for a brief period of
16  time in the morning.
17      Q.   Okay.
18      A.   Directing traffic to start, and then I
19  left to go prepare for bankruptcy over at Weil
20  Gotshal. So I was part of it for a brief period
21  of time, not actual part of most of those
22  meetings that took place.
23      Q.   Describe for me what you did when you
24  were directing traffic to start.
25      A.   We understood that Barclays was

Page 165

1   HIGHLY CONFIDENTIAL - B. McDADE
2   uncomfortable with the new aspect of what they
3   now had in terms of market value that we and
4   they had agreed upon. We had, in order to
5   transact the deal, we had to find more in the
6   way of ideas that would provide value.
7       So we, as the Lehmanites, sat and
8   tried to come up with a couple of different
9   concepts that we had, both of which I've just
10  mentioned to you, that might be of value, and I
11  directed the team to go ascertain whether any of
12  those were actual paths that we could take that
13  could have a positive outcome.
14      Q.   And the team was Kirk, Lowitt --
15      A.   Kirk was really directing traffic.
16  Lowitt was directing traffic in terms of, you
17  know, facilitating the finance team's logistics
18  on it, yes.
19      Q.   Kirk, Lowitt and Tonucci were the
20  three main guys on that?
21      A.   Yes.
22      Q.   Now, to whom did Barclays communicate
23  its lack of comfort about the market value?
24      A.   The team, Michael Klein, Archie Cox,
25  Rich Ricci, I believe Michael Keegan, who was

Page 166

HIGHLY CONFIDENTIAL - B. McDADE
1    playing a significant risk role in the process
2    over the course of the week, described the
3    process around the asset valuation discomfort
4    to, I believe -- there were two sets of groups:
5    One, the Alex Kirks of the world and, two, the
6    different risk teams that we've talked about in
7    previous questions.
8        Q.    Did Klein, Cox, Ricci and Keegan
9    describe this discomfort to you?
10       A.    They -- to me, in a collective sense
11   to me, and Ian and Alex Kirk, yes, that's
12   correct.
13       Q.    I'm not sure what you mean by "in a
14   collective sense." Were you present when they
15   communicated this?
16       A.    Early in the morning, yes. Early
17   Friday morning.
18       Q.    And there's a meeting on early Friday
19   morning?
20       A.    We're sitting somewhere in one of
21   offices on the 31st floor.
22       Q.    In this meeting on the 31st floor for
23   Barclays is Klein, Cox, Ricci and Keegan?
24       A.    To the best of my recollection.

Page 167

HIGHLY CONFIDENTIAL - B. McDADE
1        Q.    And the Lehmanites in this meeting are
2    you, Kirk, Lowitt and Tonucci; is that right?
3        A.    To the best of my recollection, it's
4    Lowitt. I don't recall whether Tonucci was
5    there.
6        Q.    Do you recall if Kirk was there?
7        A.    Yes, he was.
8        Q.    Kirk was there because you had asked
9    him to come, right?
10       A.    That's correct.
11       Q.    The night before?
12       A.    That's correct.
13       Q.    As best you can recall, what precisely
14   did the Barclays people say and who said it
15   about the lack of comfort with market value?
16       A.    Well, I think the -- I don't have a
17   recollection of who said what. It was -- you
18   know, I was there for a short period of time. I
19   don't have a specific recollection. They tended
20   to rely a lot on their advisor, Michael Klein,
21   but none of them were shy in terms of the
22   process.
23           So I don't know who spoke. The
24   content I believe of what was spoken to is we

Page 168

HIGHLY CONFIDENTIAL - B. McDADE
1    believed that our process -- Mike Keegan spoke
2    and talked about some of the assets that now had
3    become part of the deal, part of the repo/part
4    of the deal, were different assets and he was
5    having a hard time finding the ability to value
6    those assets.
7            We spoke about trying to help get the
8    transparency and the information underlying some
9    of that collateral to them, which we set about a
10   process to do. That would have been Tonucci's
11   job. And then we just talked overall about the
12   other aspect of their view that the markets were
13   continuing to decline and their current view on
14   values as of that Friday morning, which would
15   have been the same process, just a fresh market
16   view from -- that we had been undertaking all
17   week.
18       Q.    Now, the assets that Keegan spoke
19   about, did they include among his concerns that
20   there was now in the repo categories of assets
21   that had been excluded in the earlier part of
22   the week?
23       A.    That's correct.
24       Q.    Did Barclays say they no longer wanted

Page 169

HIGHLY CONFIDENTIAL - B. McDADE
1    those previously excluded assets?
2        A.    Keegan's whole line of thinking was I
3    just need to be able to value the assets. There
4    was never any, to my recollection, there was
5    never anything "we don't want any asset," "we
6    moved past the residentials," you know, none of
7    the earlier dynamic that we had in terms of the
8    constituent base of the assets.
9            So he needed information, he was
10   lacking information to be able to value those
11   both from a time point of view and also from a
12   specific information point of view. So he was
13   saying he couldn't have a thorough enough
14   process in his mind with what he was lacking and
15   how could we help him.
16       Q.    Apart from looking for additional
17   assets, was part of the solution that was
18   arrived here that Barclays could substitute
19   collateral? It could take out assets it didn't
20   want and replace it with assets that it did
21   within the repo?
22       A.    No. No. No.
23       Q.    Other than that search for additional
24   value which you directed Lowitt and Kirk to

Page 170

HIGHLY CONFIDENTIAL - B. McDADE

1  supervise, were there any other solutions
2  reached to the problem that Barclays had stated,
3  that they were concerned about the overall value
4  of the assets they were getting?
5      A.   Not in the meetings that I was at, no.
6      Q.   How long were you in this meeting?
7      A.   I don't remember, but it could not
8  have been more than half an hour.
9      Q.   And after your attendance at the
10 meeting, did you at any point return to the
11 issue, you know, check in by phone, send a
12 BlackBerry?
13     A.   Very likely, yes, because it was an
14 important aspect of getting a deal done or not.
15     Q.   When you say "very likely," do you
16 have a recollection of doing that or are you
17 inferring from your general management style?
18     A.   I have a recollection -- no, I have a
19 recollection of a combination of both, but I
20 have a specific recollection of driving down to
21 the bankruptcy court still haven't completely
22 resolved the transaction.
23     Q.   Did there come a point where you
24 learned it had been resolved?

Page 171

HIGHLY CONFIDENTIAL - B. McDADE

1      A.   There came a point where we got more
2  comfort with the process that we had been
3  working on, 15c3, as a value, and there came a
4  point in time where we got more comfort that
5  there were unencumbered assets and that a
6  process was taking place.
7          So, quote, that it had been completely
8  worked out, no, but yes, confidence that there
9  were unencumbered assets that were going to go
10 through the same process we had gone through to
11 value and also that working -- both Barclays and
12 Lehmanites were working with the S.E.C. and I
13 believe other regulators -- I wasn't part of the
14 process -- around the second counts, the 15c3.
15     Q.   The Barclays and the Lehmanites were
16 not working with the S.E.C. and the other
17 regulators with regard to valuation, were they?
18     A.   No.
19     Q.   That was just with regard to whether
20 the 15c3 --
21     A.   Exactly.
22     Q.   -- could be released to be
23 transferred?
24     A.   Exactly.

Page 172

HIGHLY CONFIDENTIAL - B. McDADE

1      Q.   When you directed Lowitt and Kirk to
2  undertake this project of finding additional
3  value, did you give them a target they had to
4  reach?
5      A.   I think we understood that the -- that
6  there was a differential between Barclays'
7  desired outcome, but I don't remember giving
8  them a specific target.  And again, I wasn't
9  there long enough for that specific target to
10 be -- for that part of the process.
11     Q.   Well, sir, a differential between
12 Barclays' desired outcome and what?
13     A.   The -- I don't recall specifically
14 giving a target.  It was very clear that
15 Barclays had a view in terms of the market value
16 of the assets, of the new assets in the --
17 valued in the repo, and we had a view on what
18 cure was, we had a view on what comp was and
19 assumed liabilities.  It was very clear that
20 Barclays still wanted more value in terms of
21 assets.
22     Q.   So the cure and the comp assumed
23 liabilities were taken into account in measuring
24 this differential between --

Page 173

HIGHLY CONFIDENTIAL - B. McDADE

1      A.   Yes.
2      Q.   -- Barclays' view and the amount
3  needed?
4      A.   Yes.
5      Q.   I'm still trying to get some clarity
6  on -- this is what I think I hear so far: Kirk
7  and Lowitt are supposed to go look for
8  additional value with whatever resources they
9  can marshal to do that?
10     A.   Correct.
11     Q.   Barclays is expressing discomfort
12 about the amount of value that it's getting?
13     A.   Correct.
14     Q.   You don't know -- you don't remember
15 giving them, that is, Kirk and Lowitt, a target,
16 go find X amount of additional value.
17         Who was going to decide when enough
18 additional value had been found?
19     A.   It's the same, it's the identical
20 process that we've been going through.  So if
21 it's Barclays, the purchaser's, intent to try to
22 end up with a transaction where assets and
23 assumed liabilities, including cure and comp,
24 roughly matched, it's our goal as representing

Page 174

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    the estate to make sure that the assets are
3    valued fairly in that process.
4         So we continued the process up unto
5    late into the evening of valuing the assets in
6    the repo and continuing that process and also
7    finding other assets.  There was not a specific
8    target because that number in terms of the
9    valuation could still have been moving around.
10   That's why I say I don't remember giving a
11   specific target.
12        Who at the end would have made that
13   ultimate valuation?  The risk operators who were
14   still responsible for understanding the value of
15   the assets being transferred and ultimately the
16   deal team in terms of, you know, the individuals
17   involved.
18        Q.   This may be my stupidest question of
19   the day, but you've got a team of people looking
20   for assets.  They need to have a deal in
21   balance.  How were they going to know when to
22   stop?  How were they going to know when to stop
23   looking?
24        A.   I think the basic premise that I'm
25   trying to communicate is there was a lot of

Page 175

1    HIGHLY CONFIDENTIAL - B. McDADE
2    challenges in ascertaining perfect information
3    in terms of what were unencumbered assets.  So
4    the first real challenge that the team had to go
5    through that I instructed them on was not,
6    here's a target, it was what are the
7    unencumbered assets.  Not that all the
8    unencumbered assets are therefore going to go.
9    What are the unencumbered assets so we can
10   define what it is that, if a transaction needed
11   more assets, could be possibly applied.  And the
12   same confusion applied to 15c3.
13        So, in fairness, it didn't matter what
14   the target was.  If we didn't have unencumbered
15   assets or we didn't have comfort that Barclays
16   or the regulators would be comfortable with
17   15c3, we wouldn't be able to do that.
18        Q.   So assets available for transfer as
19   part of this project --
20        A.   Right.
21        Q.   -- constituted 15c3 and unencumbered
22   assets?
23        A.   Right.
24        Q.   Yes?
25        A.   Yes.

Page 176

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   Were there any other categories of
3    assets that were included?
4        A.   I don't recall.
5        Q.   Were there any, any assets, 15c3,
6    unencumbered or otherwise, that could have been
7    transferred to Barclays that were not
8    transferred to Barclays?
9        A.   Any assets?
10       Q.   Anything, yes.
11       A.   I gave you an example before of Eagle
12   Energy as an example.
13       Q.   And why did Eagle Energy come out of
14   the deal?
15       A.   I don't know the specifics.  I think
16   it -- I don't know the specifics.
17       Q.   It's because Barclays didn't want it,
18   isn't that right?
19       A.   It's a -- I don't know the specifics
20   so I can't answer the question.
21       Q.   You have no --
22       A.   I don't know the specifics.
23       Q.   So the team's looking for additional
24   assets to make up this difference.  Apart from
25   Eagle Energy, are there any assets that that

Page 177

1    HIGHLY CONFIDENTIAL - B. McDADE
2    team identifies that don't wind up going over to
3    Barclays?  Is there any excess that the estate
4    needs to keep -- that the estate gets to keep?
5        A.   To the best of my knowledge, the other
6    overriding -- we were trying to manage the
7    actual risk of Lehman.  To the best of my
8    knowledge, "no" is the answer to your question.
9         That's the reason we were trying to
10   get fair value for all of our assets.  Because
11   we were unable to operate in the marketplace at
12   the same time.  We were being shut at DTC.  All
13   our counterparts wouldn't do business with us.
14   We had employees in and out, et cetera.  So it
15   was an impossible struggle to manage any assets.
16        We were motivated from a Lehman point
17   of view to mitigate risk to include assets in
18   the process.  So, to the best of my knowledge,
19   the answer is "no" to your question.
20       Q.   Was it communicated to you at some
21   point that the asset value -- that the search
22   for additional value had been successful?
23       A.   The search for other assets had been
24   successful, yes.
25       Q.   Was it communicated to you that the

Page 178

1    HIGHLY CONFIDENTIAL - B. McDADE
2  amount of additional value that was found had
3  been determined to be sufficient?
4     A.   Yes.
5     Q.   And was it communicated to you who
6  made the determination that the amount of
7  additional value that was found was sufficient?
8     A.   Again, I go back to --
9        Who made those determinations in terms
10 of the process?
11    Q.   Yes.
12    A.   So that would have been Alex Kirk,
13 given I was in bankruptcy court, you know, with
14 my proxy, and his deal teams, along obviously
15 with the folks at BarCap on the other side, on
16 the risk side.
17    Q.   And where were you when you learned
18 that the project had been -- the project to find
19 additional value had been found?
20    A.   Bankruptcy court.
21    Q.   You were in the courthouse?  How was
22 it communicated to you that the project was
23 successful?
24    A.   How was it communicated to me?
25    Q.   By what means?

Page 179

1    HIGHLY CONFIDENTIAL - B. McDADE
2     A.   By means of word of mouth and once in
3  a while a BlackBerry.
4     Q.   You got a BlackBerry from them?  Do
5  you remember getting an e-mail from them telling
6  you this?
7     A.   No, I don't remember getting an
8  e-mail.  Collective, collective bits of
9  information.  BlackBerries were checked at
10 the -- best of my knowledge, most BlackBerries
11 were checked.
12    Q.   You can't use your phone in the
13 courthouse, though, right?
14    A.   To the best of my understanding, no.
15    Q.   Your means of communication were
16 either you get an e-mail on your BlackBerry or
17 somebody tells you something, right?
18    A.   That's correct.
19    Q.   And you don't recall getting an e-mail
20 reporting to you that the project was
21 successful, correct?
22    A.   I don't recall getting an e-mail.
23    Q.   And you do recall, at least in part,
24 learning by word of mouth that the project had
25 been successful?

Page 180

1    HIGHLY CONFIDENTIAL - B. McDADE
2     A.   Correct.
3     Q.   I guess my question is, whose mouth
4  and what words?  Who told you this?
5     A.   I don't recall.  Keep in mind that
6  I'm, many parts of the evening, on the witness
7  stand.
8     Q.   Sure.  Can you recall any -- you're
9  paying close attention through the whole
10 hearing?  It's a big deal, right?
11    A.   Yes.
12    Q.   Do you recall any part of the hearing
13 where anybody tells the judge about the search
14 for additional value?
15    A.   I don't recall that process.  I recall
16 a process where we started the bankruptcy -- we
17 started the meeting by going to a recess to
18 educate the masses on what the concept of the
19 deal was and that certain specifics including,
20 for example, leaving the commercial real estate
21 had yet to be, quote, finalized, but over the
22 course of the evening it would be.  That's all I
23 recall.
24    Q.   Were the masses told that the bulk of
25 the assets to be conveyed to Barclays were those

Page 181

1    HIGHLY CONFIDENTIAL - B. McDADE
2  within the Repurchase Agreement?  Had they told
3  the details of repo and its role in the deal?
4     A.   I don't recall that.
5     Q.   Were they told about the search for
6  15c3 and unencumbered assets to make up the
7  difference between the perceived value of the
8  repo and what Barclays needed to close?
9     A.   No, they were not told that
10 specifically.
11    Q.   Were they told the valuations that
12 Barclays had applied itself to the amount of
13 collateral in the repo?
14    A.   No.
15    Q.   Were they told that the Clarification
16 Letter would have addressed these changes in the
17 purchased assets?
18    A.   There was -- there was clear rhetoric
19 around letter clarifying over the weekend the
20 deal terms.
21    Q.   Were they shown any draft of that
22 letter?
23    A.   I don't know.
24    Q.   Was the judge shown any draft of that
25 letter?

## Page 182

HIGHLY CONFIDENTIAL - B. McDADE

1    A.    I don't know.
2    Q.    Did you talk to Mr. Ricci, talk or
3 otherwise communicate with Mr. Ricci about this
4 Friday project to find additional value to
5 transfer to Barclays?
6    A.    Did I talk to Mr. Ricci specifically?
7 No, I did not.  Other than he would have been
8 present, I believe, in the morning meeting.
9    Q.    Do you recall Mr. Ricci saying to you
10 in substance that he wouldn't let this trade
11 blow up by being piggish?
12    A.    No, Mr. Ricci never said that to me.
13    Q.    You're certain he never said that to
14 you?
15    A.    He never said that to me.  I'm
16 certain.
17    Q.    How much additional value was found in
18 15c3 and unencumbered assets?
19    A.    I believe the 15c3 was the figure that
20 I was confusing before, was between 750 and 800
21 million of value, and I believe the unencumbered
22 assets was a billion-9.
23    Q.    So with 2.7 billion in additional
24 value, did the deal now balance, in your view?

## Page 183

HIGHLY CONFIDENTIAL - B. McDADE

1    A.    Yes.
2    Q.    Did you know whether it balanced with
3 an addition 2.7 billion in additional value?
4    A.    I knew that the deal team had gone
5 through the same process through the course of
6 all the way into the afternoon and evening.  I
7 specifically was unable at that moment in time,
8 given where I was sitting and obligated to do.
9    Q.    Uh-huh.
10    A.    But, yes, I felt comfortable given who
11 was in the process and what was process was.
12    Q.    And the balance, this concept of a
13 balance in the transaction at this point still
14 depended on the 1.5 billion in assumed
15 liabilities for trade payables and 2 billion in
16 assumed liabilities for compensation, correct?
17    A.    Yes, that's correct.
18    Q.    And it also depended on an accurate
19 valuation of the collateral actually being
20 transferred, correct?
21    A.    Yes, that's correct.
22    Q.    When those three elements are added
23 up -- I'm sorry, when those elements are
24 compared, your view of the deal was they should

## Page 184

HIGHLY CONFIDENTIAL - B. McDADE

1 balance and there would be no immediate gain to
2 Barclays, correct?
3    A.    That's correct.
4    Q.    Did Barclays share with you or with
5 anyone on the Lehman team the value that they
6 did determine applied to the collateral in the
7 Repurchase Agreement?
8    A.    No.
9    Q.    Did they ever tell you what the amount
10 of the --
11    A.    To me?
12    Q.    You or, to your knowledge, anyone
13 under your supervision.
14    A.    Of course they would have gone through
15 the process of valuing the collateral, just as
16 they had done, again, all week in terms of the
17 assets.
18    Q.    Yes.
19    A.    So the answer: The deal team, yes.
20 To me, no.
21    Q.    Did you learn from the deal team that
22 Barclays said we're short by X amount?
23    A.    Yes, absolutely.  Over the course of
24 time.

## Page 185

HIGHLY CONFIDENTIAL - B. McDADE

1    Q.    And over the course of time did the
2 deal team let you know what X amount was, what
3 the shortfall was?
4    A.    Ultimately, the shortfall --
5 ultimately, the satisfaction of the process of
6 the deal teams working together got to a point
7 where Barclays would do a transaction.
8         So, again, you're pushing towards this
9 notion of something that we were pushing toward
10 correct valuation of the assets that we had on
11 our books.  They were pushing for a deal on the
12 best terms.  There was no target given other
13 than continued valuation of these assets and
14 trying to get and extract market valuation for
15 them.  In the process, it ultimately consummated
16 with Barclays being comfortable with the
17 transaction which ultimately contemplated in
18 roughly the assets and liabilities matching.
19    Q.    And given what you heard in the
20 bankruptcy hearing on the 19th of September,
21 where you heard the deal described to the judge
22 as essentially a balance --
23    A.    Right.
24    Q.    -- it would have been important in

---

Page 186

1      HIGHLY CONFIDENTIAL - B. McDADE
2    your view, sir, to tell the judge if it was not
3    in fact in balance because that's a different
4    deal, is it not?
5       A.   Most definitely, yes, sir.
6       Q.   Mr. McDade, I'm handing you what has
7    previously been marked as Exhibits 24 and 25.
8    Ask you if you recognize those documents?
9       A.   Yes, I do.
10      Q.   What are they?
11      A.   The First Amendment to the purchase
12   agreement and second is the clarifying -- I
13   believe the clarifying letter.
14      Q.   Now, did you have any involvement with
15   the negotiation of the business terms of the
16   First Amendment?
17      A.   Yes.
18      Q.   Can you briefly describe to me what
19   your involvement was?
20      A.   As I said, the involvement that I had
21   had to do with the excluded assets and purchased
22   assets change with respect to the residential
23   mortgages.
24      Q.   And then the Clarification Letter,
25   sir, dated as of September 20, Exhibit 25, were

---

Page 187

1      HIGHLY CONFIDENTIAL - B. McDADE
2    you involved in the negotiation of the business
3    terms of this letter?
4       A.   I was involved in some of the
5    negotiation terms of some of this, yes.
6       Q.   Which parts?
7       A.   For example, clarification around the
8    IMD business.
9       Q.   That's paragraph 2?
10      A.   Paragraph 2 on page 3.  I certainly
11   was understanding and knowledgeable about the
12   cash, the DTC issue, which is paragraph D up
13   above; the clarification of the Lehman name and
14   licensing for two years; the subleases for
15   offices I would have been involved in, page 5,
16   since they inherited certain business
17   obligations.
18         That's it, to the best of my
19   recollection.
20      Q.   Did you have any involvement in the
21   negotiation of the terms reflected in paragraph
22   1, Purchased Assets?
23      A.   Specifically, no.  Generally, I was
24   aware of.
25      Q.   Who on the team of businesspeople was

---

Page 188

1      HIGHLY CONFIDENTIAL - B. McDADE
2    involved in negotiating the terms of paragraph
3    1, Purchased Assets?
4       A.   So that would have been -- that would
5    have been our -- that would have been a
6    combination of Kelly, Lowitt, Kirk, McGee,
7    Berkenfeld.
8       Q.   Any others?
9       A.   Our advisors, our advisors from Weil.
10   That's it.
11      Q.   Would you turn to paragraph 13.
12   Actually --
13      A.   Page 13 or paragraph?
14      Q.   Actually, I'm in the wrong place.
15   Hold on one second.
16         Would you turn to page 4, paragraph 9,
17   please.  You with me?
18      A.   Uh-huh.
19      Q.   That section concerns the deletion of
20   a purchase price adjustment?
21      A.   Right, the original deal had
22   contemplated a hold-back, if you will, if
23   Barclays earned profits and profits going back
24   to the Lehman estate.
25      Q.   Do you recall, we can show you, but

---

Page 189

1      HIGHLY CONFIDENTIAL - B. McDADE
2    maybe to save a little time, do you recall
3    generally that the terms of that purchase price
4    adjustment were that Lehman would share in the
5    upside of any profit on the long position up to
6    a cap of 750 million?
7       A.   I recall a cap and I recall a
8    construct of -- you know, I don't know all the
9    specifics, but yes.
10      Q.   Why did that come out in the
11   Clarification Letter?
12      A.   Because the original balance sheet
13   changed so dramatically from Tuesday to Friday,
14   and a combination of the changes, the Barclays
15   assumption of the repo and negotiation, to be
16   blunt.
17      Q.   When you say "negotiation, to be
18   blunt," the fact is Barclays just said that's
19   got to come out for us to do the deal; is that
20   right?
21      A.   Well, Barclays was ascribing a value
22   to it like we were, and as part of the process,
23   no, I'm not -- I'm not suggesting Barclays
24   said -- those are your words, no.
25         Over the course of the week, value

Page 190

HIGHLY CONFIDENTIAL - B. McDADE

1  ascribed in different ways, value taken away in
2  different ways. We thought that that -- that
3  that feature didn't represent as much value
4  given the change in the mix.
5      Q.    And was that, was the value of that
6  feature, the potential upside to Lehman,
7  attributed to any particular securities that
8  were being transferred? I'm trying to find out
9  how that got involved in the valuation, if at
10 all.
11     A.    You mean in the original
12 contemplation?
13     Q.    No, I'm on the -- we're on the weekend
14 and the potential 750 million upside to Lehman's
15 being taken out of the deal. And if I
16 understand your answer, it's because of the
17 drops in value and the changes in value and the
18 buckets of securities.
19         Was the decision to eliminate a
20 potential upside of 750 million to Lehman
21 attributed to a drop in value of any particular
22 security?
23     A.    No. It was our view that the upside
24 had changed dramatically, meaning there was much

Page 191

HIGHLY CONFIDENTIAL - B. McDADE

1  less upside because there was a lot less in the
2  way of values. We would have assigned less
3  value to that as part of the process in terms of
4  what that value could be.
5      Q.    But it did not derive from any
6  analysis of a particular asset or class of
7  assets?
8      A.    It derived from analysis of all the
9  assets. Continued on the bottoms-up process.
10     Q.    And would you take a look at paragraph
11 13, please, on page 5. Take a moment to read
12 that to yourself.
13         (Document review.)
14     Q.    Have you had a chance to look that
15 through?
16     A.    I have.
17     Q.    You see, sir, that that, as a general
18 matter -- and it's my description, not the
19 actual words -- is a paragraph that terminates
20 the Repurchase Agreement we've been talking
21 about, correct?
22     A.    Yes.
23     Q.    And it also -- and now I'm reading in
24 the last sentence, "Additionally, the Notice of

Page 192

HIGHLY CONFIDENTIAL - B. McDADE

1  Termination relating to the Barclays Repurchase
2  Agreement dated September 19, 2008, is hereby
3  deemed rescinded and void ab initio in all
4  respects," do you see that?
5      A.    Uh-huh.
6      Q.    Do you have any understanding of why
7  that provision was put in the Clarification
8  Letter?
9      A.    No, I do not.
10     Q.    Any understanding at all?
11     A.    No, I do not.
12     Q.    Did you discuss that provision with
13 anyone at the time of the closing on the 22nd?
14     A.    No, I did not.
15     Q.    Did you go to the closing?
16     A.    Did I go to the closing? No, I did
17 not.
18     Q.    Is there a reason you didn't go to the
19 closing other than the fact you were probably
20 very tired by then?
21     A.    I don't recall the specific reason why
22 I didn't go to the closing.
23     Q.    And I note that Mr. Berkenfeld signed
24 this document as well. Is there a reason he

Page 193

HIGHLY CONFIDENTIAL - B. McDADE

1  signed it instead of you?
2      A.    You asked me that question before. It
3  was the common practice within Lehman for the
4  lawyers to sign the documents, so that wouldn't
5  have been part of anything. The role was new to
6  me, you know, over a period of time, but that
7  wouldn't have been normal course of business.
8      Q.    And when it was the common practice
9  within Lehman for the lawyers to sign the
10 documents, was it also the common practice for
11 the businesspeople to communicate to those
12 lawyers all the terms that they had agreed to so
13 that the documents signed reflected the terms?
14     A.    Most definitely. Most definitely.
15 Including our outside legal advisors.
16     Q.    Also including Mr. Berkenfeld?
17     A.    Absolutely.
18     Q.    Now, I asked you before, and I may
19 have misspoke, do you recall anyone
20 communicating to you that Rich Ricci said he
21 wouldn't blow up the trade by being a pig?
22     A.    You asked me before if Rich Ricci
23 spoke to me directly.
24     Q.    Correct.

Page 194

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    He did not speak to me directly.
3    Q.    Was that sentiment communicated to
4    you?
5    A.    That sentiment was communicated to me.
6    Q.    This has previously been marked as
7    Exhibit 36, sir -- 326, and it contains an
8    e-mail from Alex Kirsch to you on Friday,
9    September 19, at 3:39.
10    A.    Uh-huh.
11    Q.    And it says, "Rich Ricci just told me
12    he won't blow up this trade by being a pig."
13    A.    Uh-huh.
14    Q.    And at 3:39 that afternoon, I'm
15    guessing you're in court, or on your way; is
16    that right?
17    A.    Driving.
18    Q.    And what did you understand Mr. Kirk
19    to be communicating to you when you sent -- when
20    he sent this e-mail to you?
21    A.    That if the finishing up of the
22    process of the assets that we were looking for,
23    unencumbered and the 15c3, didn't add up, that
24    Barclays would still do the transaction.  That's
25    what I understood.

Page 195

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    Did you ever get a sense of what
3    Barclays' tolerance was on that point?
4    A.    No.  No.  I had no means to
5    communicate directly with Mr. Kirk at the time.
6    Q.    Well, you responded to him by e-mail,
7    "Are all the shorts gone?"  So that's one means,
8    right?
9    A.    Yeah, but literally I was walking in
10    the door.
11    Q.    And when you were walking in the door,
12    did you --
13    A.    No, I had not.
14    Q.    You didn't write back to Mr. Kirk and
15    ask, "Well, what's their tolerance?  How short
16    can we fall and Barclays will still do the
17    trade?"  Right?
18    A.    No, I did not.
19    Q.    Did you ever ask him that question?
20    A.    No, I did not.
21
22
23    REDACTED
24
25

Page 196

1
2
3
4
5
6
7    REDACTED
8
9
10
11
12
13
14
15
16
17
18
19    (Exhibit 335, a document bearing Bates
20    Nos. BCI-EX-(S)-50261, marked for
21    identification, as of this date.)
22    Q.    Mr. McDade, I have put before you a
23    document we've marked as Exhibit 335.
24    A.    Yes.
25    Q.    Have you seen this document before?

Page 197

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    This document?
3    Q.    Correct.
4    A.    I believe this is me clicking on the
5    Barclays system to be accepted as a Barclays
6    employee.
7    Q.    Okay.
8    A.    Accepting an offer of employment, I
9    guess.
10
11
12
13    REDACTED
14
15
16
17
18
19    Q.    Okay.  Can you think of any reason
20    that Barclays would deem this document to be
21    highly confidential, sir?  Do you think this is
22    a big secret?
23    A.    This document?
24    Q.    Yes.
25    A.    No, it was reported in the press

| Page 198 | Page 199 |
|---|---|
| HIGHLY CONFIDENTIAL - B. McDADE | HIGHLY CONFIDENTIAL - B. McDADE |

### Page 198

1  HIGHLY CONFIDENTIAL - B. McDADE
2  and -- no.
3  Q. Thanks.
4  A. Every employee had to click the box to
5  accept employment.
6  Q. This search for additional value that
7  we were talking about before, I know there was a
8  meeting on Friday morning, you mentioned that to
9  me. Had the search been done at all before
10  that?
11  A. I believe the clarification of the
12  assets what we had, what was encumbered,
13  unencumbered, et cetera, had been happening all
14  week.
15  To the best of my recollection, the
16  search for me to continue to find assets both
17  for the motivation of we were having a hard time
18  managing any assets because we couldn't manage
19  hedges or anything, from Lehman's motivation,
20  yes, and also from the point of view of we
21  didn't know what the ultimate terms would be and
22  we wanted to make sure that we were availing
23  ourselves of all possible outcomes, yes.
24  Q. But the particular work that we were
25  talking about where you directed Kirk and Lowitt

### Page 199

1  HIGHLY CONFIDENTIAL - B. McDADE
2  to go look for sources, you know, what wound up
3  being the 15c3 and the unencumbered assets, did
4  that begin on the Friday morning?
5  A. To the best of my knowledge,
6  unencumbered assets did not begin on the Friday
7  morning. It began earlier in terms of finding
8  assets that would be part of a transaction. So
9  that work would have been done earlier. I --
10  Q. And when did -- I beg your pardon. Go
11  ahead.
12  A. I don't know the specifics, to answer
13  your question, when they might have been.
14  Q. When did it end? Did it end on the
15  Friday or did it continue over the weekend?
16  A. Oh, it continued over the weekend.
17  Q. On both days of the weekend?
18  A. We were -- the work continuing over
19  the weekend, most of Sunday would have been
20  related to all of the protagonists were working
21  on the DTC issue. We were all locked in at
22  Weil. We at Lehman were sequestered in the
23  corner working on the specific DTC issues and
24  understanding what the ramifications would be.
25  So, no, it wouldn't have -- it

### Page 200

1  HIGHLY CONFIDENTIAL - B. McDADE
2  wouldn't have been over all of the weekend. It
3  would have been Saturday, primary. Friday
4  evening, Saturday morning, Saturday.
5  Q. What was the value of the deal? When
6  the deal was done, what was the value of what
7  Barclays received and what was the value of what
8  Barclays gave?
9  A. I have never seen a final balance
10  sheet, so I can't give you a specific answer.
11  Q. Do you have a general idea of the deal
12  that you negotiated, what it was worth and who
13  gave what?
14  A. The general idea is 1.29 billion for
15  Lehman's 745 headquarters, the two data centers,
16  250 million in goodwill, cure payments,
17  compensation that we have spoken to, and the
18  value of unwinding the repo.
19  That actual number, roughly speaking,
20  was, roughly speaking, the combination of the
21  15c3, the figure you talked before, the 45, and
22  the unencumbered assets. That's roughly the
23  deal, but I've never seen the final. I've never
24  seen, never been given the final number.
25  Q. Again, using those rough numbers, and

### Page 201

1  HIGHLY CONFIDENTIAL - B. McDADE
2  I appreciate that's how you're describing them,
3  45 billion for the repo, right?
4  A. Uh-huh.
5  Q. Plus approximately 800 million for the
6  15c3?
7  A. Uh-huh.
8  Q. Right?
9  And 1.9 --
10  A. Uh-huh.
11  Q. -- in unencumbered assets?
12  A. Uh-huh.
13  Q. Again, net of the real estate, because
14  we have sort of stayed out of that topic the
15  whole day.
16  A. Uh-huh.
17  Q. That's 47.7, right? That's your
18  estimate of the amount of value that Barclays
19  received, correct?
20  MR. HUME: Objection.
21  MR. BUCKLEY: Objection.
22  MR. HUME: Lacks foundation.
23  MR. BUCKLEY: Did you include the 250
24  for goodwill?
25  MR. GAFFEY: I beg your pardon. I

Page 202

1     HIGHLY CONFIDENTIAL - B. McDADE
2     didn't.
3     Q.   47.950?
4          MR. HUME: Objection. Lacks
5     foundation.
6          MR. BUCKLEY: Objection. Same.
7          MR. GAFFEY: Is my math wrong?
8     A.   It's goodwill is the other way around.
9     They're paying us.
10    Q.   That's what I thought. They wanted me
11    to add it in. Let's take it back out.
12         MR. BUCKLEY: A trick question.
13         MR. GAFFEY: It's a trick objection.
14         MR. BUCKLEY: I have to throw one at
15    you today. Keep you awake.
16         MR. GAFFEY: I'm just kidding.
17    Q.   Barclays gets 45 billion in the repo,
18    yes?
19    A.   Uh-huh.
20    Q.   800 million in 15c3?
21    A.   Uh-huh.
22    Q.   And 1.9 billion in unencumbered
23    assets?
24    A.   Uh-huh.
25    Q.   Which by my math comes to $47.7

Page 203

1     HIGHLY CONFIDENTIAL - B. McDADE
2     billion, we agree on that?
3     A.   Uh-huh.
4     Q.   And Barclays gave 250 million and what
5     else add up the Barclays consideration?
6     A.   The building.
7          Away from the building?
8     Q.   Away from the building.
9     A.   They expunged the loan on the repo,
10    right? So that's 45.
11    Q.   45.
12    A.   Right. And then assumed the cure
13    payments.
14    Q.   At let's call that 1.5?
15    A.   Yes.
16    Q.   As described to the court?
17    A.   Yes.
18    Q.   Okay.
19    A.   And assumed the comp.
20    Q.   And assumed the comp.
21         Which by my calculation comes to 48.7;
22    is that right?
23    A.   Uh-huh. I don't know. I'm not
24    looking at your math. I'm not doing it in my
25    head.

Page 204

1     HIGHLY CONFIDENTIAL - B. McDADE
2     Q.   I think I've added it up right.
3     48.750.
4          So, first, sir, is there an
5     explanation for the billion-dollar difference
6     between the two?
7          MR. BUCKLEY: Objection. Foundation.
8     Q.   Barclays gives, on these numbers,
9     48.7; gets 47.7?
10         MR. BUCKLEY: Objection. Same.
11    A.   You're excluding the buildings, right?
12    Q.   Yes.
13    A.   I can't read your math and look at it
14    upsidedown, so I have to go through this process
15    myself.
16    Q.   Okay. Can you do that?
17    A.   I would rather not interpret your ...
18         (The witness calculates.)
19    A.   Of what we're adding up, I get 47.7
20    and 48.75.
21    Q.   And the 47.7 is the value that
22    Barclays receives?
23         MR. HUME: Objection. Lack of
24    foundation.
25    A.   Again, 1.9 billion of identified

Page 205

1     HIGHLY CONFIDENTIAL - B. McDADE
2     assets that Lehman finds. Then there's a
3     valuation process to identify what those assets
4     are worth. I'm not part of that process. It's
5     up to the final balance sheet.
6          MR. GAFFEY: I think just for the
7     clarity of the record I would like to mark
8     that as an exhibit.
9          MR. HUME: I would like to state for
10    the record that the document being marked is
11    the witness's handwritten down numbers that
12    Mr. Gaffey gave him.
13         MR. GAFFEY: Okay. We'll read the
14    record and see what they really were, but
15    you can characterize them however you want.
16         (Exhibit 336, handwritten calculation,
17    marked for identification, as of this date.)
18    Q.   You've taken account in there of
19    the -- "in there" being what we have now marked
20    as Exhibit 336 -- the assumed liabilities for
21    comp and cure at a total of 3.5, right?
22    A.   That's correct.
23    Q.   Now, to your knowledge, sir, was there
24    at any point -- you remember we spoke before
25    about the Repurchase Agreement having a haircut,

Page 206

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    the collateral in excess of the amount financed?
3    A.    Yes.
4    Q.    Where did that go?  Who gets the
5    haircut on your math?
6    A.    The repo was essentially expunged,
7    right?
8    Q.    Including the haircut?
9    A.    Including the haircut.
10    Q.    So --
11    A.    It's all in the value of the process.
12    Q.    So your 45 is --
13    A.    The assets themselves, not the repo
14    loan.
15    Q.    Okay.  Just so I'm -- let me put a
16    full question because I want to be sure I'm
17    clear on your testimony here.
18        The 45 that you calculate is the total
19    of the -- of all the assets in the repo?
20    A.    The repo contract is a set of assets
21    and a loan against those assets, haircut
22    typically being somewhat less than those assets,
23    right?  So the haircut, the haircut being the
24    total loan is somewhat less than the total
25    assets.

Page 207

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    Okay.  And the haircut, just so we're
3    clear on our terms, the haircut is the
4    difference between the total loan and the total
5    assets?
6    A.    That's correct.
7    Q.    It could also be the excess collateral
8    over the amount of the loan, yes?
9    A.    That's correct.
10    Q.    Okay.
11    A.    That's correct.
12        So, yes, it's written in the document
13    we just reviewed, the -- yeah, the repo
14    paragraph.
15    Q.    The Clarification Letter?
16    A.    The Clarification Letter.  So they
17    kept the collateral in terms of the process
18    because of the valuation process that both the
19    teams had been going through.
20    Q.    And when you calculated the 45 here on
21    Exhibit 336 --
22    A.    And I calculated --
23        MR. HUME:  Those were your numbers.
24    A.    I put your numbers in.  I didn't
25    calculate anything.  I used your numbers and

Page 208

1    HIGHLY CONFIDENTIAL - B. McDADE
2    added it up to make sure your math correctly --
3    Q.    Let's do this again, sir, because I
4    need your testimony.  Could you please calculate
5    for me what were the numbers on the deal that
6    you negotiated?
7        MR. HUME:  Objection.
8    Q.    Forget anything I told you.  Could you
9    write down the numbers on the deal that you
10    negotiated, sir?
11        MR. BUCKLEY:  Mr. Gaffey, you've
12    behaved yourself all day.  Please calm down.
13        Mr. McDade has explained he's never
14    seen the final balance sheet on the
15    transaction.  If you have it, why don't you
16    show it to him.
17    Q.    I'll clarify the record.
18        MR. BUCKLEY:  You better back off a
19    little.
20    Q.    Apart from whether you've seen a fully
21    calculated balance sheet, sir, do you have a
22    concept of the deal, the negotiation you led on
23    behalf of Lehman as to what the value was of
24    what was given to Barclays?
25    A.    Do I have a concept?

Page 209

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    Yeah, do you have a rough idea of what
3    went to Barclays and what it consisted of?
4    A.    Yes, I do.
5    Q.    Could you tell me what the components
6    were that went to Barclays and what they were
7    worth?
8        MR. BUCKLEY:  Objection.  Asked and
9    answered.
10        THE WITNESS:  I'm sorry?
11        MR. BUCKLEY:  You may answer.
12    Q.    You can answer.
13        MR. BUCKLEY:  It's just repetitive of
14    what he said.
15    A.    The assets that were unencumbered, the
16    15c3, what the ultimate valuation was of the
17    Barclays repo, the unwinding of the Barclays
18    repo in terms of the cash, right, in terms of
19    the 45, the cure payments, and the compensation.
20    Q.    What was the ultimate value of the
21    Barclays repo?
22    A.    I did not see the final.  I did not
23    see the final balance sheet.
24    Q.    What's your best estimate as you sit
25    here today, having negotiated the deal, of what

Page 210

HIGHLY CONFIDENTIAL - B. McDADE

1    the ultimate value of the Barclays repo was?
2        MR. HUME: Objection. Calls for
3    speculation.
4        MR. BUCKLEY: Objection. Foundation.
5        THE WITNESS: You want me to answer?
6        MR. BUCKLEY: Go ahead.
7    Q.    You can answer.
8    A.    My best guess is 45.
9    Q.    And your best guess of 45, does that
10   include all of the collateral in the repo, yes?
11   A.    Yes.
12   Q.    When you say it includes all of the
13   collateral in the repo, that includes the
14   haircut, correct?
15       MR. BUCKLEY: Objection.
16       MR. HUME: Objection. Vague and
17   ambiguous.
18       MR. BUCKLEY: Misstates the testimony.
19   Q.    With all of that, sir, you may still
20   answer.
21   A.    Yes.
22   Q.    And that, and again, I understand it's
23   your best estimate, but is that best estimate
24   based on the value that Lehman gave to the

Page 211

HIGHLY CONFIDENTIAL - B. McDADE

1    collateral in the repo, Barclays gave to the
2    value to the collateral in the repo, or
3    something else?
4    A.    I have described the process and I
5    would answer the same way. Barclays obviously
6    had a view as the purchaser. Lehman has a view
7    as the responsible owner of the assets. It's a
8    mutual agreement of the two.
9    Q.    Okay. I guess that's -- did they come
10   to a common view?
11   A.    Yes.
12   Q.    And what was the level of your
13   involvement in -- your personal involvement in
14   that valuation?
15   A.    I've tried to describe over the course
16   of the different questions. My personal
17   involvement was making sure that the teams were
18   in place and the process was constantly in place
19   through the course of the week. I did not have
20   direct personal involvement in terms of the
21   actual negotiations.
22   Q.    Who on the Lehman team had the
23   responsibility to make that call, to make the
24   agreement with Barclays as to what the

Page 212

HIGHLY CONFIDENTIAL - B. McDADE

1    collateral in the repo was worth?
2    A.    Michael Gelband, Alex Kirk, all the
3    different risk operators within the different
4    business units.
5    Q.    Again, it may be my unfamiliarity with
6    this part of the world, but at some point some
7    one person makes the decision, right, after a
8    process? Somebody makes the call?
9    A.    Absolutely.
10   Q.    Who was it?
11   A.    Absolutely.
12   Q.    Who made the call as to what the value
13   was of the collateral in the repo?
14   A.    What the value was in the collateral
15   of the repo, that would have been the head of
16   risk, which would have been Michael Gelband, but
17   in concert with others, coming to me and
18   communicating he's gone through a thorough
19   process and has reached an agreement.
20       (Discussion off the record.)
21       (Recess; Time Noted: 2:40 P.M.)
22       (Time Noted: 2:53 P.M.)
23   BY MR. GAFFEY:
24   Q.    Now, did it ever come to your

Page 213

HIGHLY CONFIDENTIAL - B. McDADE

1    attention, sir, that in anticipation of the
2    closing, personnel within Lehman prepared an
3    opening balance sheet to reflect the
4    transaction?
5    A.    I have a vague recollection.
6    Q.    Let me show you -- do you recall it
7    being prepared by Mr. Robert Azerad, working
8    with Kelly and Tonucci?
9    A.    I know who he is. I don't recall in
10   specific who would have prepared it.
11   Q.    Let me show you what's previously been
12   marked as Exhibit 229. Take a look through the
13   document, if you would, sir. Let me know when
14   you've had a chance to look that through.
15   A.    Okay.
16   Q.    Have you seen that opening balance
17   sheet before?
18   A.    I have not.
19   Q.    You'll note, sir, that the balance
20   sheet is annexed to an e-mail from Robert
21   Azerad. You said you know who he is?
22   A.    Yes.
23   Q.    Who is he?
24   A.    He's an old employee of Lehman in the

1    HIGHLY CONFIDENTIAL - B. McDADE
2    finance area.
3    Q.    Did he work under Kelly and Lowitt or
4    with Kelly and Lowitt?
5    A.    Yes.  Yes, he did.
6    Q.    Under?
7    A.    Under.
8    Q.    And you recognize the names in the
9    "to" line here, Gary Romain, James Walker, TJ
10    Gavenda?
11    A.    No, sir.
12    Q.    Now, you'll see on the -- the e-mail
13    itself reads "Copy of Opening Balance Sheet," do
14    you see that?
15    A.    Uh-huh.
16    Q.    And that balance sheet, sir, covers
17    first cash and cash equivalent and then a
18    variety of inventory and the 15c3 stuff that
19    we've been talking about, do you see that?
20    A.    Uh-huh.
21    Q.    And it also covers the accrued bonuses
22    at 2 billion and the cure payments at the
23    original number of 250, do you see that?
24    A.    Uh-huh.
25    Q.    And it reflects a valuation of the

1    HIGHLY CONFIDENTIAL - B. McDADE
2    inventory, and by this point, by the point of
3    this -- by the date this is sent, which is
4    Sunday, September 21, the inventory we're
5    talking about in the transaction is the
6    inventory in the repo, correct?
7    A.    Yes.
8    Q.    Okay.  And this values the inventory
9    of the repo at 44,880,000,000; is that right?
10    A.    That's what this document says.
11    Q.    And it puts the 15c3 amount at a
12    billion, do you see that?
13    A.    Yes, I do.
14    Q.    And when you add in the cash and cash
15    equivalents, it comes out to 52.8 billion, do
16    you see that?
17    A.    Yes, I do.
18    Q.    And below the "Asset" line is the cash
19    received from Barclays, and it recounts the 45
20    billion for the repo.  We talked about that
21    number, right?
22    A.    Yes.
23    Q.    And the $250 million cash payment?
24    A.    Yes.
25    Q.    Totals at 45-billion-250 and then

1    HIGHLY CONFIDENTIAL - B. McDADE
2    takes accounts of the accrued bonuses and the
3    cure payments, right?
4    A.    Yes.
5    Q.    And then there's a provision of equity
6    of $3.38 billion.  Now, as I read this, sir,
7    that would be equity to Barclays after the
8    transaction, correct?
9    A.    I have not seen this document.  I
10    don't know what this is in terms of the equity
11    line.
12    Q.    Well, if the equity line is meant to
13    indicate the equity to Barclays in the amount of
14    3.380, given what we've talked about about the
15    deal being in balance --
16    A.    I didn't create the document.  I've
17    never seen the document before.
18    Q.    I understand.
19    A.    I prefer not to interpret it.
20        MR. BUCKLEY:  Let the witness answer.
21    A.    I prefer not to interpret it.  I don't
22    know what it means.
23    Q.    If there were an equity component in
24    the deal on the opening day, sir, of $3.38
25    billion, that deal would not be in balance; is

1    HIGHLY CONFIDENTIAL - B. McDADE
2    that right?
3        MR. BUCKLEY:  Objection to form and
4    foundation.
5    A.    That's correct.
6    Q.    And the deal that you made was one to
7    be in balance; is that right?
8        MR. BUCKLEY:  Objection.
9        MR. HUME:  Objection.  Vague and
10    ambiguous.
11    A.    That's correct.
12    Q.    So if the opening day balance sheet
13    for the deal reflected that Barclays had $3.38
14    billion in equity, that's not the deal you made,
15    is it?
16        MR. HUME:  Objection to form and calls
17    for a legal conclusion.
18        MR. BUCKLEY:  Objection.  Foundation.
19    A.    That's correct.
20    Q.    And it wouldn't be consistent with the
21    deal that you made, would it?
22    A.    It would not be consistent, that's
23    correct.
24    Q.    Now, was there ever a time, sir,
25    where -- at around the time of the hearing

Page 218

HIGHLY CONFIDENTIAL - B. McDADE

1        HIGHLY CONFIDENTIAL - B. McDADE
2    where, to your knowledge --
3        A.   Which hearing?
4        Q.   Good point.  The hearing at which you
5    testified on the 19th, the Friday sale hearing.
6    For time periods that's where this question goes
7    to.
8            Before that hearing, sir, do you have
9    any knowledge of a project where Alex Kirk
10   suggested that fire sale liquidation prices be
11   calculated for the -- for a list of the top 100
12   positions in each of the different categories?
13       A.   I don't know -- I don't have knowledge
14   of a fire sale process, no.
15       Q.   Let me show you what's previously been
16   marked as Exhibit 3.  Ask you to take a look
17   through that e-mail, and just for purposes of
18   your review, sir, take note that you're at least
19   shown as one of the CCs on this.
20       A.   Uh-huh.
21       Q.   Let me know what you've had a chance
22   to look through the document, sir.
23       A.   I'm good.
24       Q.   Now, the document addressed to Kaushik
25   Amin, Charlie Spero, Eric Felder and Gerald

Page 219

1        HIGHLY CONFIDENTIAL - B. McDADE
2    Donini recounts that Alex Kirk -- "Alex Kirk
3    suggested we contact each of you to help us
4    understand on a theoretical basis what would
5    happen in a fire sale liquidation of the
6    securities that are being transferred to
7    Barclays as part of the proposed transaction.
8    The question is what these securities could be
9    sold for in such a scenario.  We will be leaving
10   on your desks a list of the top 100 positions in
11   each of your areas of expertise.  The pages you
12   need to look at will be flagged.  We need to get
13   your views on this by no later than 11 A.M.
14   tomorrow.  The court hearing is at 4 P.M. and
15   Bart and Lazard need to have their testimony
16   ready several hours prior to that.  We will
17   follow up with each of you in the morning."  And
18   then, "Please do not hesitate to contact me," et
19   cetera.
20          Having looked through this, was there
21   any discussion that your testimony might address
22   fire sale prices for securities?
23       A.   No.
24       Q.   Any recollection of this at all?
25       A.   My -- my testimony?  I'm sorry.

Page 220

1        HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   My question derives from the document,
3    where there's this instruction appears to be
4    given and the note is made that the court
5    hearing is at 4 P.M. and Bart and Lazard need to
6    have their testimony ready.
7        A.   Right.
8        Q.   Do you have any knowledge, sir, of a
9    connection between the need for fire sale
10   prices?
11       A.   I was obviously CC'd, but I don't know
12   the context of how Daniel spoke to Alex.  I
13   don't have any of the specific recollection of
14   this e-mail.
15       Q.   Okay.  We've been doing this long
16   enough today I can just do it this way:  Is
17   there anything you can add about the topic of
18   this e-mail?
19       A.   There's nothing I would add.
20       Q.   Showing you, sir, what previously has
21   been marked as Exhibit 221, an e-mail from you
22   to Ian Lowitt with a prior e-mail below that.
23   Take look through that, please.
24       A.   Okay.
25       Q.   Do you recall this e-mail?

Page 221

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.   Yes.
3        Q.   And in the earliest of them at 1:02
4    A.M. on the 20th of September, you recount to
5    Mr. Lowitt, "The conflate is over.  We are part
6    of BarCap subject to documenting"?
7        A.   Uh-huh.
8        Q.   I take it this was sent shortly after
9    the hearing finally had ended in the early
10   morning hours of September 20?
11       A.   That's correct.
12       Q.   And Mr. Lowitt responds by asking in
13   his e-mail to you, Berkenfeld and Tonucci, "Did
14   the court accept the 15c3 lockup and
15   unencumbered box make it through to BarCap?  If
16   so, we need to make sure documentation is very
17   tight so we can deliver on it.  Should have Weil
18   lawyers work closely with Paolo on it.
19   Obviously critical we get this right.  Congrats
20   again.  Ian."
21          Did you have an understanding of what
22   Mr. Lowitt was asking you about when he asked if
23   the court accepted the 15c3 lockup and
24   unencumbered box in BarCap?
25       A.   I did not have an understanding of

Page 222

HIGHLY CONFIDENTIAL - B. McDADE

1  what he was specifically asking in that.
2
3      Q.   It's some reference to the project on
4  Friday to find added value, yes?
5      A.   Yes.
6      Q.   And those were the categories in which
7  the added value was found?
8      A.   Correct.
9      Q.   Had you had any discussions with
10 Mr. Lowitt about bringing to the court's
11 attention these particular --
12     A.   No.
13     Q.   -- additional assets?
14     A.   Absolutely not.
15     Q.   Do you know if they were brought to
16 the court's attention?
17     A.   In a specific way they were not
18 brought to the court's attention.
19     Q.   And your final e-mail from you to
20 Lowitt, "Can you call me at home?" Did you have
21 a conversation with Mr. Lowitt that -- I guess
22 in that early morning?
23     A.   So I don't know the times of these. I
24 don't recall a specific conversation with Ian.
25 I spent all day Sunday with him back at Weil.

Page 223

HIGHLY CONFIDENTIAL - B. McDADE

1
2      Q.   You know, I think that my question may
3  have been misleading, and I apologize. I had
4  not noticed this.
5          Take a look at the time and date of
6  the top e-mail and note that it's GMT, so
7  subtract four hours. So we're on -- now we're
8  on Saturday night when you say, "Can you call me
9  at home?"
10     A.   And we lived together all day Sunday.
11     Q.   So that could have been any one of any
12 number of calls between you?
13     A.   Right.
14     Q.   Is there any particular topic you were
15 asking him to call you at home about?
16     A.   I don't recall.
17     Q.   I'd like to just return briefly to
18 Mr. Shafir's departure from the scene on
19 Thursday. Was that a surprise to you, sir?
20     A.   Yes, it was.
21     Q.   Why were you surprised at that?
22     A.   Well, number one, it was new
23 information; number two, competitive instincts,
24 you never like to lose good employees; and,
25 number three, obviously we were in the middle of

Page 224

HIGHLY CONFIDENTIAL - B. McDADE

1  a deal.
2      Q.   You were in the middle of a deal and
3  he was playing a fairly critical role in --
4      A.   I have described the role that he was
5  playing.
6      Q.   Would it be fair to describe it as a
7  fairly critical role?
8      A.   He was playing an important role.
9      Q.   Who conveyed to Barclays the news that
10 Mr. Shafir had left?
11     A.   I don't know that answer.
12     Q.   I take it by your answer that means it
13 wasn't you?
14     A.   I don't recall doing that.
15     Q.   Had there been particular people at
16 Barclays for whom Shafir was the contact point?
17     A.   I described earlier I think Shafir and
18 Mike Klein, the advisor to BarCap, were -- were
19 their prospective contact points, but we were
20 all living together, so ...
21     Q.   Okay.
22     A.   It's not like it was a remote set of
23 discussions going on. Everyone was together,
24 so...

Page 225

HIGHLY CONFIDENTIAL - B. McDADE

1
2      Q.   I guess I'm working on the assumption
3  that somebody on the BarCap side of things would
4  have noticed Mr. Shafir was missing. Did
5  anybody ask where did Shafir go?
6      A.   Again, I wasn't there in the process.
7  I was informed, I believe, by Skip McGee, as
8  I've said before. I am sure Mr. Shafir had the
9  professional courtesy, but I don't have specific
10 knowledge of, to speak to the proper
11 counterparts at Barclays. I'm sure as soon as
12 we at Lehman knew the BarCap team you knew.
13     Q.   With Shafir's departure on the
14 Thursday, was there any, you know, was there any
15 learning curve, was there anybody who had to
16 pick up what Shafir had been doing, learn what
17 Shafir knew?
18     A.   No, because while the deal specifics
19 changed in terms of the detail, the general
20 nature of the deal had been accomplished earlier
21 on in the week and there were many, many
22 advisors, internal and external, that had been
23 and had become part of the process over the
24 course of the week.
25     Q.   Okay. There is a continuum, I guess,

Page 226

1    HIGHLY CONFIDENTIAL - B. McDADE
2    between graveyards that are full of
3    indispensable people and people are
4    indispensable. But Shafir plays an important
5    role in this deal.
6         On Thursday night, you got --
7         MR. BUCKLEY:  Is that a question or a
8    statement you're making?
9         MR. GAFFEY:  That's a statement I'm
10   making.
11   Q.   On Thursday night, you call Kirk and
12   ask him to come in and help get involved on
13   Friday. Prior to Thursday night, Kirk had been
14   managing credit risk, not involved in the deal.
15        Was Kirk meant to replace Shafir in
16   the primary deal team?
17   A.   No.
18   Q.   Does anybody download to Kirk what it
19   was Shafir was doing or Shafir knew or was
20   responsible for in the deal?
21   A.   Kirk was working on specifics related
22   to accomplishing the finality of determining the
23   value of the assets.
24   Q.   Prior to his departure, had anyone --
25   A.   Prior to whose departure?  Shafir?

Page 227

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Shafir's departure.
3         Had anyone had a conversation with
4    Shafir about this, about Barclays allowing as to
5    how they weren't getting the value that they
6    thought they were getting, the reason for the
7    Friday project?
8    A.   I don't know the answer. He was no
9    longer an employee, but I don't know the answer.
10   Q.   Did you ever talk to Shafir after he
11   departed on Thursday, September 18?
12   A.   One time he called me.
13   Q.   When did he call you?
14   A.   I don't recall. Soon thereafter.
15   Q.   Soon thereafter.
16        And do you recall what the
17   conversation was between you and Shafir when he
18   called you?
19   A.   He thanked me for our professional
20   relationship.
21   Q.   Were you angry when Shafir left on
22   such short notice in the middle of the deal?
23   A.   It was frustrating, yes. I had
24   different forms of -- of challenges over the
25   course of the couple months, so it was par for

Page 228

1    HIGHLY CONFIDENTIAL - B. McDADE
2    the course.
3    Q.   Did the departure of Shafir add to
4    the -- to confusion about the deal?
5    A.   No, it did not, not in my opinion, no.
6    Q.   Did the departure of Shafir present
7    additional challenges to completing the deal?
8    A.   I -- I remain with the same set of
9    statements that we were adequately womaned and
10   manned in terms of the right type of personnel
11   to be able to, internal to Lehman and external,
12   to be able to process responsibly and
13   accurately.
14   Q.   After Shafir left, who dealt with
15   Klein?
16   A.   A combination -- a combination of a
17   number of us dealt with Klein. Myself, Kirk,
18   Paul Parker, investment banking, M&A, other
19   financial institutions' bankers. A number of
20   people.
21   Q.   What issues were left to be discussed
22   with Klein after Shafir's departure?
23   A.   Well, after Shafir's departure, the
24   challenge of the change in the mix that we had
25   spoken to in terms of the balance sheet, the

Page 229

1    HIGHLY CONFIDENTIAL - B. McDADE
2    need in processing of the different assets that
3    we have talked about this morning, those would
4    have been the basic challenges of getting a deal
5    done.
6    Q.   Prior to his departure, had Shafir
7    played any role in this process of valuing the
8    different assets we talked about this morning?
9    A.   Of valuing the assets?
10   Q.   Yes.
11   A.   No.
12   Q.   Prior to his departure, had Shafir
13   played any role in determining the nature of
14   the -- the composition of the assets that were
15   going to go to Barclays?
16   A.   The composition of the assets?
17   Q.   Yes, what Barclays was going to get.
18   A.   He would have been involved in
19   developing a framework and construct in terms of
20   how the deal was coming together, but he didn't
21   grow up in risk management. He wouldn't have
22   known what the assets were worth that could
23   constitute good assets to be purchased. That
24   would not have been his role.
25   Q.   Did you ever have any conversations

Page 230

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2    with Mr. Shafir where he indicated that in his
3    view the deal had changed from a -- it was a
4    completely different deal from the one made on
5    Tuesday?
6    A.    I never had those conversations, no.
7    Q.    When you spoke to Shafir shortly after
8    the deal, was that the first time you spoke to
9    him after his -- is that the only time you spoke
10    to him after his departure?
11    A.    Best of my recollection, yes.
12    Q.    Did you ask him why he left in the
13    middle of the deal?
14    A.    I don't recall the actual
15    conversation, so I can't answer that question.
16    Q.    Do you know if anyone on your team at
17    Lehman ever asked Shafir why he left in the
18    middle of the deal?
19    A.    I do not -- I do not know.
20    Q.    Did you ask anyone else on the team if
21    they knew why Shafir left in the middle of the
22    deal?
23    A.    Absolutely.
24    Q.    Who did you ask?
25    A.    Skip McGee.

Page 231

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    What did Skip McGee say to you?
3    A.    He said he stayed to get the deal
4    done.  He wanted to do this, apparently, for a
5    long time.
6    Q.    Was the deal done on Thursday,
7    September 18?
8    A.    The deal obviously wasn't completely
9    contemplated -- consummated, no.
10    Q.    So when McGee told you that Shafir had
11    said he wanted to get the deal done, did you
12    comment on the fact that Shafir left before that
13    happened?
14    A.    I don't recall the specifics of the
15    conversation other than me asking and McGee
16    giving that answer.
17    Q.    Do you remember McGee saying anything
18    else about why Shafir left before the deal got
19    done?
20    A.    No, I do not.
21    Q.    Other than McGee, did you talk to
22    anyone about the fact that Shafir left before
23    the deal got done?
24    A.    Not that I recall.
25    Q.    Do you recall hearing anybody talk,

Page 232

1    HIGHLY CONFIDENTIAL - B. McDADE
2    other than your conversation with McGee, about
3    why Shafir left before the deal got done?
4    A.    That we were too focused on the deal.
5    So, no, I do not recall that.
6    MR. GAFFEY:  I don't have anything
7    further.  Thanks.  Thanks for your time.  My
8    friends may have some questions for you,
9    though.
10    THE WITNESS:  Understood.
11    EXAMINATION BY
12    MS. TAGGART:
13    Q.    I have a few.  Can you hear me okay
14    from here?
15    A.    Yes, I can.
16    MR. BUCKLEY:  Who are you?  Who do you
17    represent?
18    Q.    My name is Erica Taggart and I
19    represent the Creditors Committee.
20    First thing, I want to ask you some
21    questions about residential mortgage-backed
22    securities, and to put a little context, if you
23    look at Exhibit 1, which is the Asset Purchase
24    Agreement, page 3, and there's a subsection K, I
25    believe this is the section discussing excluded

Page 233

1    HIGHLY CONFIDENTIAL - B. McDADE
2    assets, there's a discussion of 50 percent of
3    each position, residential real estate mortgage
4    securities, and also on page 6 of this document
5    under Purchased Assets, subsection E, there's 50
6    percent of each position, the residential real
7    estate mortgage securities.
8    Were you involved in negotiations at
9    all related to any amount of residential
10    mortgage-backed securities going to Barclays as
11    part of the deal?
12    A.    Yes, from a top-down point of view, I
13    was involved.  Originally, Barclays wanted none
14    of the mortgage securities consistent with the
15    weekend before view on certain challenges that
16    they had with their own concentrations and
17    capital, et cetera.  So there was a strong
18    negotiation on our part to continue to push to
19    include those illiquid assets in the deal.
20    But the role I would have had would
21    have been continuing to push the process which
22    ultimately did change in the inclusion of those
23    assets.
24    Q.    Did you speak personally to someone at
25    Barclays about the issue?

Page 234

HIGHLY CONFIDENTIAL - B. McDADE

1     A.   I spoke personally to Rich Ricci and
2  to Jerry del Missier and the senior deal team.
3  I did not speak to the senior individuals
4  involved in the mortgage risk and
5  decision-making at the risk level of Barclays.
6     Q.   And what did those individuals at
7  Barclays that you spoke of say why they did not
8  want to include the residential mortgage
9  securities?
10    A.   Right, they didn't want to include
11 residential mortgages, one, because of the
12 illiquid nature of them; two, because of the
13 capital-intensive nature of apparently their
14 need to account for those type of assets; and my
15 estimation as well just that the concentration
16 of that type of asset being looked at unkindly
17 by the marketplace, to say the least.
18    Q.   And how did it come about that some of
19 those, at least some, residential
20 mortgage-backed securities were included let's
21 start in the original agreement, the APA?
22    A.   That was part of the negotiation
23 process of at least Barclays meeting us halfway
24 in terms of our position that mortgages should

Page 235

HIGHLY CONFIDENTIAL - B. McDADE

1  be included.
2     Q.   And what was your position about why
3  they should be included?
4     A.   There was -- I had two reasons:
5  Number one, it was, again, very challenging for
6  us to manage any of the assets, especially the
7  most illiquid assets, residential mortgages
8  being more illiquid than some of the other
9  assets on the balance sheet, one; and two, it
10 would, you know, be important in terms of the
11 overall -- so the fundamental thrust was the
12 reduction of the risk to the Lehman estate and
13 from point of view of the mechanics of being
14 able to manage if businesses -- we had a
15 responsibility, if businesses were being assumed
16 by Barclays, those resident experts that we had
17 at Lehman would potentially be going over to
18 Barclays wouldn't be able to manage the risks.
19 So a responsibility around they would be taking
20 the individuals, they had to understand the
21 burden that that would put Lehman under.
22    Q.   If you look at Exhibit 19, which I
23 think is the schedule that was referred to in
24 the APA.

Page 236

HIGHLY CONFIDENTIAL - B. McDADE

1     A.   Right.
2     Q.   In this schedule, does it include the
3  mortgage-backed securities that were subject of
4  those negotiations?
5     A.   Mortgages.
6     Q.   And this 2.7, what does that reflect?
7     A.   That reflects the bottoms-up process
8  between the two deal teams in terms of the 50
9  percent, the original 50 percent value of the
10 residential mortgages.
11    Q.   So this 2.7 is, first of all, it's 50
12 percent of the total mortgage-backed securities
13 that Lehman had at the time?
14    A.   To the best of my recollection, yes.
15    Q.   And if you look back at the APA page
16 6, under Purchased Assets, if you look at
17 subsection D, it's describing government
18 securities, commercial paper, corporate debt --
19    A.   Uh-huh.
20    Q.   -- corporate equity and some other
21 things of the approximately $70 billion in
22 value. Do you know if that includes value that
23 was part of residential mortgage-backed
24 securities?

Page 237

HIGHLY CONFIDENTIAL - B. McDADE

1     A.   I believe residential mortgages were
2  included in E because of the specific nature of
3  the split.
4     Q.   Okay. So the 70 billion that's the
5  estimate in Purchased Assets, subsection D, does
6  not include the value of the assets that were in
7  these resis; is that right?
8     A.   Which trues up the math to the 72.7,
9  which is the total, exactly.
10    Q.   Could you explain that?
11    A.   So the 70 billion in line D plus the
12 2.7 in mortgages gets to the actual figure you
13 see in Exhibit 19 of 72.65.
14    Q.   Now, subsequent to that, was there a
15 change in the decision about how much of the
16 residential mortgage securities would go to
17 Barclays?
18    A.   Yes.
19    Q.   And how did that change?
20    A.   It was part of the repo that
21 ultimately was -- part of the decision was based
22 on negotiation and part of it was the repo
23 transaction. Barclays actually ended up with
24 more of those assets already assumed in the repo

HIGHLY CONFIDENTIAL - B. McDADE

1  transaction.
2
3      Q.   First, let's look at on the First
4  Amendment to the Asset Purchase Agreement, and
5  that's Exhibit 24, and in particular, now you
6  see under number 3, Purchased Assets, says,
7  "Cause E of the definition of Purchased Assets
8  in the original agreement is hereby amended to
9  delete 50 percent and to insert 100 percent in
10  lieu thereof."
11     A.   Uh-huh.
12     Q.   First of all, were you involved in the
13  negotiation of that change?
14     A.   I was involved again only at a high
15  level, but yes.
16     Q.   Did you speak with anyone at Barclays
17  about that change?
18     A.   It's likely that we ratified that
19  change at our level.
20     Q.   And what was the reason for the change
21  between the time of the APA and the first
22  amendment to change that to be 100 percent of
23  the residential real estate mortgage securities?
24     A.   I think, as I -- I think I previously
25  stated, a combination of our need to find

HIGHLY CONFIDENTIAL - B. McDADE

1  responsible risk managers at Lehman, the change
2  in the -- the change in the overall dynamic of
3  the marketplace, the change in the assets, it
4  became clear that it would be a whole lot more
5  efficient ultimately for all parties for all the
6  assets to be included.
7      Q.   At the time of when you decided to
8  give 100 percent of the residential real estate
9  mortgage securities, did you have an estimate at
10  that time of what the value of that hundred
11  percent of those securities were worth?
12     A.   I'm sure we did.  I did not have that
13  specific value.  We didn't give.  We sold.  We
14  agreed to sell the residential mortgage assets.
15     Q.   Do you know if it was more or less
16  than two times the 2.7 billion that's reflected
17  in Exhibit 19?
18     A.   I don't have the specifics.
19     Q.   Do you know if the value had changed
20  of those mortgage securities in the time between
21  the APA and that First Amendment?
22     A.   I am sure the value changed given what
23  was happening in the market, but I don't have
24  the specifics.

HIGHLY CONFIDENTIAL - B. McDADE

1      Q.   Now, you say that you didn't give, you
2  agreed to sell.  Was there any specific
3  counterbalance in what -- in the deal to reflect
4  that now Barclays was going to receive all of
5  the mortgages?
6      A.   Any given counterbalance?
7      Q.   What did you sell them for?
8      A.   We sold them for the proceeds.  We
9  sold them for whatever the valuation process of
10  the two deal teams had put together.
11     Q.   I guess regarding this particular
12  change for the -- from 50 percent to 100
13  percent, was there any counterbalancing change
14  that was made to the deal in assumption of
15  liabilities or more that Barclays had to pay?
16     A.   I understand your question in a
17  vacuum, but the deal was changing and the assets
18  were changing, so I can't answer the question
19  specifically because so many moving pieces in
20  terms of the balance sheet was taking place.
21     Q.   But it was your understanding that
22  there was some change that would have been
23  reflected to Barclays in order to keep those in
24  balance so that Barclays would give more or

HIGHLY CONFIDENTIAL - B. McDADE

1  receive less to keep it in balance after this
2  change?
3      A.   It's my understanding that Lehman got
4  value for those assets in a properly -- in a
5  proper process, as described.
6      Q.   Do you know who would know what value
7  was attributed to these residential securities
8  in order to make sure that it continued to be
9  balanced?
10     A.   On the Lehman side, that would have
11  been Charlie Spero, who would have spearheaded
12  our efforts.
13     Q.   Did you speak with Charlie Spero about
14  the value of those mortgage securities?
15     A.   I did not speak directly to Charlie.
16  I'm sure Michael Gelband did.
17     Q.   Now, at the time of the First
18  Amendment to the Asset Purchase Agreement, was
19  it already decided that Barclays would enter
20  into the repo with the Fed?
21     A.   The First Amendment I believe is dated
22  the 19th, and I believe the Fed transaction with
23  Barclays took effect late in the evening on the
24  18th.  So, yes.

Page 242

1       HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   Let's start with were any real estate
3   mortgage securities included in the collateral
4   that had been pledged to the Fed?
5       MR. HUME:  Objection.  Lack of
6   foundation.
7       A.   I don't know the specifics of the
8   exact collateral pledged to the Fed.
9       Q.   Do you know if any residential real
10  estate mortgage securities ultimately were
11  transferred to Barclays at the end of the deal?
12      A.   It's my understanding, yes.
13      Q.   What's that understanding based on?
14      A.   My understanding is based -- my
15  understanding is based on our inability to
16  transact much in the way of those assets over
17  that period of week in terms of what market
18  activity.  So those balance -- those balances
19  and those assets would have been there and those
20  balances were part of the transaction.
21      Q.   Did you ever have a specific
22  conversation or communication with anyone that
23  confirmed, yes, the real estate mortgage
24  securities have now gone to Barclays?
25      A.   Did I ever have a specific

Page 243

1       HIGHLY CONFIDENTIAL - B. McDADE
2   conversation?  No.
3       Q.   And you may have already answered
4   this, but do you have any understanding today
5   about what value Barclays got as a result of
6   these residential real estate mortgage
7   securities?
8       A.   I don't have a specific figure.
9       Q.   I also want to talk about the process
10  about this coming up with a $5 billion price,
11  which I know was described quite a bit this
12  morning and don't need to restate all that now,
13  but one thing that you had mentioned is that
14  there was a back and forth about the price.
15  Barclays probably wanted to pay less and get
16  more and Lehman wanted to get more and not pay
17  as much.
18      Was there ever a time -- well, first
19  of all, did you actually speak with someone at
20  Barclays where the number 5 billion was ever
21  mentioned?
22      A.   No.
23      MR. BUCKLEY:  Objection to the
24  question.
25      A.   No, the number 5 billion is not my

Page 244

1       HIGHLY CONFIDENTIAL - B. McDADE
2   number.  It's not a number that we used in the
3   process.  We went through a process of valuing
4   assets from Monday midday all the way through to
5   the final consummated transaction, and that $5
6   billion figure was simply the different at the
7   end of the day in terms of day for the initial
8   balance sheet from where the marks were on
9   Friday.  There was no concept of a discount, and
10  there was -- there was the same process we went
11  through over the course of the week.
12      Q.   Who did you speak with about this
13  difference between the price that they would pay
14  and the marks that it's your understanding where
15  the marks that were on Friday?
16      A.   Who did I --
17      MR. BUCKLEY:  Would you specify which
18  Friday we're talking about, if you would?
19      Q.   Okay.  Who if anyone did you ever
20  speak about about this $5 billion difference
21  between a price and marks?
22      MR. BUCKLEY:  Price on Friday, the
23  12th?
24      Q.   The price that is --
25      MR. BUCKLEY:  Or the marks?

Page 245

1       HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   -- discussed on the APA -- that are
3   reflected in the APA.
4       A.   The main individual that I would have
5   spoken to at Lehman with respect to the whole of
6   the risk process and the valuation process from
7   the beginning to the end would have been Michael
8   Gelband, who had collective responsibility for
9   all of the businesses with the exception of the
10  principal businesses, which was Alex Kirk, which
11  were not part of broker-dealer assets.  The bulk
12  of his risk responsibilities were not part of
13  the broker-dealer assets.  So it would have been
14  Michael Gelband, to answer your question.
15      Did I speak to any of the other risk
16  operators that have been mentioned today, Gerry
17  Donini in equities, and Eric Felder in credit
18  and Charlie Spero, possibly on occasion in terms
19  of making sure I understood their process, if
20  they needed help, et cetera, yes, but my main
21  point of contact would have been Michael
22  Gelband.
23      Q.   And do you actually remember a
24  conversation with Michael Gelband where the
25  number 5 billion came up?

Page 246

HIGHLY CONFIDENTIAL - B. McDADE
1
2     A.    No, I don't remember a conversation
3   with Mike Gelband where the number 5 billion --
4     Q.    Do you remember a conversation with
5   Mike Gelband in particular about the difference
6   between the numbers that were reflected on
7   Exhibit 19 and numbers that were reflected on
8   Lehman's books?
9     A.    Our specific focus was getting the
10  best possible execution.  I remember -- I have
11  no recollection of any conversation with respect
12  to the books on Friday and the market prices
13  reflected in the 5 billion figure that you
14  suggest.
15        I recall many conversations with
16  respect to the valuation process, what are we
17  doing, how are we doing it, and how are we
18  making sure that we're getting the best possible
19  execution in terms of those -- valuing those and
20  transacting those assets.
21    Q.    Do you remember speaking with anyone
22  about the topic of whether the marks were marks
23  that were done on Friday and not after that?
24        MR. BUCKLEY:  Could we please have
25  clarification what Friday we're talking

Page 247

HIGHLY CONFIDENTIAL - B. McDADE
1
2   about here?
3        MS. TAGGART:  Sure, that's Friday the
4   12th.
5     Q.    I guess I should ask you.  We talked
6   today about the difference between the prices
7   that are reflected on Exhibit 19 and the marks
8   on Lehman's books.  What is your understanding
9   of when the time that the marks had been done
10  that you're using for that comparison?
11    A.    Again, I think I've answered the
12  question today.  I think I've answered the
13  question today.  I don't have the specific
14  knowledge of when the marks were done.  We were
15  going through a process of valuing the assets
16  for the transaction over the course of the week,
17  those assets changed in terms of composition
18  over the course of the week, and that was done
19  in iterative times.
20    Q.    I guess, and I know I'm looking at my
21  notes from this morning, but I have something
22  about that there was a price that was different
23  because there were marks changed from the marks
24  on the books since Friday?
25    A.    Right.

Page 248

HIGHLY CONFIDENTIAL - B. McDADE
1
2     Q.    Did you speak with anyone about that
3   the marks that were used to calculate the
4   difference were marks that were done on Friday,
5   and not after that?
6     A.    I understood the last time that we
7   were able to mark our books was September 12th
8   in the evening.
9     Q.    Where does that understanding -- I'm
10  sorry.  Continue.
11    A.    I understood that given that the
12  carnage, human carnage that had taken place in
13  terms of what happened at Lehman and our
14  inability on Monday to really operate and
15  function in any real capacity until life came
16  back to the organization because of the
17  potential of a BarCap deal.
18        So all I understood was we had marked
19  on Friday, it would have been impossible to mark
20  on Monday, and this balance sheet, Exhibit 19,
21  reflected the bottoms-up process between the two
22  collective teams.
23    Q.    Did you actually speak to somebody
24  where the topic that someone said Lehman was
25  unable to mark on Monday, that topic was

Page 249

HIGHLY CONFIDENTIAL - B. McDADE
1
2   discussed?
3     A.    I don't recall the specific
4   conversation about that.
5     Q.    Did you speak to any trader about
6   whether they had marked the books on Monday?
7     A.    I would speak to individual business
8   heads, not individual traders in the normal
9   course of business, and it became clear that
10  that would be -- have been impossible to do.
11    Q.    What did they say and who said in
12  particular something that made you think it was
13  impossible to do?
14    A.    "There's nobody on the interest rate
15  trading desk today."
16    Q.    Who said that?
17    A.    I don't know.  I'm using an example of
18  what would be communicated early on on Monday as
19  everyone had left the building.  So, therefore,
20  I put two and two together.  We did not
21  specifically talk about the mark process, to
22  answer your question specifically.
23    Q.    Okay.  And did you ever actually see
24  the document or computer system that showed
25  there hadn't been marks on Monday?

Page 250

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   I would never see those documents, no.
3      Q.   Is it your understanding that Barclays
4    had wanted to ascribe even lower value to these
5    assets than is reflected on Exhibit 19?
6      A.   Very much so.
7      Q.   How much lower did they want to go?
8      A.   I wasn't part of the individual
9    conversations where the valuing was taking
10   place, so I can't give you a frame of reference.
11     Q.   Then where does your understanding
12   that very much so Barclays actually was trying
13   to get an even lower attribution of the value of
14   the assets than they were getting?
15     A.   It comes, one, from the, again, the
16   liaison that I had, Michael Gelband, in terms of
17   just general me getting a general update in
18   terms of how that process is going; and, two, it
19   just comes from my set of market experiences
20   knowing all of the markets had shut down.
21     So for an individual organization to
22   take on the risk of a balance sheet of this
23   size, intuitively, they would -- they would be
24   pushing for an efficient, translation, low
25   execution.

Page 251

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   Did Mike Gelband tell you that someone
3    at Barclays had said that they needed a change
4    because of what you just described, because of
5    the market shutdown?
6      A.   No.
7      Q.   Okay.   That was your understanding of
8    what logically might be taking place?
9      A.   Correct.
10     Q.   And you also mentioned that you
11   thought that, at some point I think you said --
12   let me just strike that.
13        Do you believe that Exhibit 19, the
14   values attributed to the assets, were the fair
15   market value of those assets at the time?
16     A.   At that time, yes, I do.
17     Q.   And so is it your belief that the
18   value of these assets had gone down $5 billion
19   from the Friday, September 12th, and September
20   16th?
21     A.   If the 5 billion represents where the
22   marks were, and I believe that we marked fairly
23   on Friday, yes, I believe we -- I believe we
24   marked fairly on -- the process came up with a
25   fair market valuation on Tuesday, and I believe

Page 252

1      HIGHLY CONFIDENTIAL - B. McDADE
2    at the close of business on Friday we had marked
3    our books appropriately into the market.
4      Q.   When you say "we had marked our books
5    appropriately," what are you referring to?
6      A.   You asked me about the $5 billion
7    figure, I think, in your question.
8      Q.   Right.   Yes.
9      A.   I'm just saying that our
10   responsibility was to mark our books to market
11   each evening.
12     Q.   Right.
13     A.   On Friday, September 12, we had done
14   that.   You then pointed out that the price on
15   Exhibit 19 happens to be $5 billion difference.
16   I'm suggesting that we went through a thorough
17   process in terms of getting to the place on
18   September 16th where this reflected the fair
19   market value.   So, therefore, I viewed it to be
20   fair on Friday and fair on Tuesday, and so that
21   would reflect the 5 billion change in terms of
22   the process.
23     Q.   Is there any difference in your
24   understanding of fair market value and the price
25   that these would be marked on that day?

Page 253

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   There's a -- again, the ability to
3    value and transact in this type of size did not
4    exist in the marketplace.
5      Q.   So what do you mean when you say "fair
6    market value"?
7      A.   Ability to transact -- the ability to
8    transact securities of a normal lot size in the
9    marketplace is typically what's described as
10   fair market value.
11     Q.   And sorry, maybe I misunderstood your
12   answer, but is that then different between what
13   would be marked if they had marked the books on
14   what -- how they could sell those assets on that
15   day in the market; is that different than what
16   you're describing as fair market value?
17     A.   No financial institution marks its
18   books at the close of the evening, mutual funds,
19   to where they can liquidate that entire
20   portfolio that evening.
21     Q.   Is that what you're describing as fair
22   market value, is the amount to liquidate those
23   assets that evening?
24     A.   No, our transaction reflected the
25   ability to eliminate all of the assets over the

1    HIGHLY CONFIDENTIAL - B. McDADE
2 course of this transaction.
3    Q.   Looking in particular at the assets
4 listed on Exhibit 19, did the assets listed
5 there -- first of all, do you believe they all
6 went down in value from Friday, September 12th,
7 until the APA was signed on the 16th?
8    A.   There was -- there was a lot of
9 correlation in terms of the asset prices
10 changing and all heading down.  Do I believe
11 they all went down?  I would not make that
12 statement.
13    Q.   Do you know if the top one, which I
14 think is government and agencies, had gone down
15 in value?
16    A.   It definitely went down in value.
17    Q.   Do you have any idea of the amount of
18 the $5 billion difference that was attributable
19 to the change in value to the government and
20 agencies?
21    A.   I don't have the specific balance
22 sheet details in front of me.  From my
23 recollection, these were not T bills and
24 two-year notes in terms of governments and
25 agencies that's the bulk of the 40 billion

1    HIGHLY CONFIDENTIAL - B. McDADE
2 that's described here.  So there was a lot of
3 agency securities as a percentage of the total
4 which were definitely being affected by the
5 goings on with Fannie and Freddie all over the
6 market.
7    So I don't have the specifics to be
8 able to answer your question, but I think it's
9 fair to say that the majority of the portfolio
10 was being negatively affected, but not -- I
11 would not answer all.
12    Q.   Do you know how that $5 billion
13 difference was attributed among these different
14 asset classes?
15    A.   Specifically, no.  It was -- the
16 process, yes.  Specifically, I do not know the
17 answer.
18    Q.   I asked you if Barclays wanted to mark
19 these down even lower.  Let me ask the other
20 side.  Did Lehman say that these assets should
21 be marked even higher?
22    A.   I'm not sure what you mean by
23 "marked."  As it pertains to the deal?
24    Q.   As it pertains to the deal, did Lehman
25 believe that the value attributed to these

1    HIGHLY CONFIDENTIAL - B. McDADE
2 assets should be higher than is reflected on
3 Exhibit 19?
4    A.   Clearly we continued to push for what
5 we thought was appropriate valuation for all
6 these assets.
7    Q.   And what were the reasons that you
8 were conveying to Barclays that the asset values
9 reflected on Exhibit 19 were too low?
10    A.   I can only give you the general
11 answer, which is, in most cases, their deal team
12 would have had a small amount of time.  We might
13 have had more transparency and more -- we would
14 have had more transparency and more information
15 with respect to details.  Many of these
16 securities were illiquid and pretty specific in
17 terms of the characteristics of the securities.
18 So I think it would have been the knowledge of
19 the assets would have been part of what
20 obviously we would have been making arguments
21 about.
22    We would also have argued that in many
23 cases we had significant transparency in terms
24 of transacting of because we had been in the
25 business of selling assets over the course of

1    HIGHLY CONFIDENTIAL - B. McDADE
2 2008.  In some cases these assets were very
3 familiar to Barclays and their businesses.  In
4 some cases, some of these assets were businesses
5 that they were less-market-share significant in,
6 which is one of the reasons why they wanted to
7 buy the U.S. businesses.
8    Q.   Well, of the $5 billion difference
9 that you have described, how much was Lehman
10 saying was the appropriate difference for these
11 assets that are reflected on Exhibit 19?
12    A.   We went through a process, a
13 collective process, you know, between the two
14 organizations and between all the risk
15 operators.  So we obviously came to a conclusion
16 at the end of that process in terms of what we
17 viewed to be fair in terms of transacting.
18    I don't have the context.  I wasn't
19 sitting in the room for any of the beginning of
20 the dialogue to be able to give you any
21 specifics, where it started, where it ended,
22 none of that, unfortunately, I can't give you.
23    Q.   Well, did you ever discuss with anyone
24 at Lehman that the assets should be valued at
25 the last time they had been marked by Lehman?

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.   I would never make that statement
3    because the markets had dramatically moved from
4    Friday until when we were doing the transaction.
5        Q.   So is it your testimony that nobody at
6    Lehman said that the value attributed to the
7    assets that would be part of the APA should be
8    valued at the amounts that they appeared on
9    Lehman's books?
10       A.   All of the operators involved in the
11   transaction were working on -- we hadn't marked
12   since Friday.  We weren't focused on the mark
13   process.  We were focused on the transacting
14   process and the valuation process and an
15   education process to the buyer to make sure we
16   could effect the best possible sale.  The --
17       Q.   I just want to -- sorry.
18       A.   The individual risk operators were not
19   focused on the Friday mark because the Friday
20   mark didn't reflect any relevance to what had
21   happened in the market or to an actual
22   transaction.
23       Q.   Let me just make sure the record is
24   clear.  You don't have any memory of anyone at
25   Lehman taking the position during negotiations

1    HIGHLY CONFIDENTIAL - B. McDADE
2    that the asset value should be, that when we're
3    coming up with a transaction that's in the APA,
4    should be the way they were valued on Lehman's
5    books?
6        A.   No, I -- we take very seriously the
7    marking responsibility as -- we took very
8    seriously as an organization all the way down to
9    the individual operators.  So clearly there was
10   an understanding somewhere within finance and
11   intuitively at the trader level, but not
12   specifically in aggregate, because these were
13   individual traders and senior traders working
14   this process up.
15       So certainly, to answer your question,
16   there would have been responsible understanding
17   of where we were marked to where this
18   transaction was, but all relative to what had
19   happened vis-a-vis the markets between Friday
20   night and Tuesday.
21
22
23                   REDACTED
24
25

1
2
3
4
5
6                REDACTED
7
8
9
10
11
12
13
14
15       Q.   Of the people who negotiated this deal
16   was there anyone who did not spend any time in
17   the employment of Barclays?
18       A.   I don't have a specific list of who
19   all was involved with us over the course of the
20   week or who ultimately has gone to Barclays, so
21   I can't answer the specific question.
22       Q.   Sitting here today, do you -- can you
23   remember anyone who was part of what you
24   consider the negotiating deal team who never
25   spent any time at Barclays?

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.   No.
3        Q.   You mentioned earlier today that you
4    had a conversation with Bob Diamond in the
5    morning of the 16th where you talked about
6    employment and you said that you stopped him and
7    you left that meeting and you went to talk to
8    your lawyer.
9        What exactly did Bob Diamond say
10   before you stopped him?
11       A.   He started a process of asking if I
12   would -- if I wanted to be part of Barclays, and
13   I stopped him.
14       Q.   Anything else?
15       A.   No.
16       Q.   Who did make the presentation to the
17   board about this transaction?
18       A.   I don't know.
19       Q.   Does the board involve anyone who was
20   also involved in the negotiations?
21       A.   I don't know the process that went at
22   the board.  Do you mean the constituent of who
23   the board is?
24       Q.   Yes, is there any overlap between the
25   constituents of who the board is and any

Page 262

1    HIGHLY CONFIDENTIAL - B. McDADE
2  negotiators that were part of the deal?
3    A.   An informed person in the process was
4  Dick Fuld, but he was not a negotiator sitting
5  on the 32nd floor in the deal room.
6    Q.   Anybody else?
7    A.   No one else.  He was the only employee
8  of Lehman on the board.
9    Q.   After LBHI declared bankruptcies, so
10  from September 15 on, was this deal shopped to
11  anybody other than Barclays?
12    MR. BUCKLEY:  Objection to the form of
13    the question.
14    A.   The Lehman Brothers platform had been
15  aggressively shopped from the moment I became
16  president in early June up unto this
17  transaction.  So the week of, to answer
18  specifically your question, the week of 15th
19  through 19th, everyone knew the opportunity.  No
20  one came forward.
21    Q.   Do you know of any specific efforts
22  following the morning of September 15 to shop or
23  advertise any sale of any part of Lehman to
24  anyone other than Barclays?
25    A.   I do not.

Page 263

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Did you ever meet with anyone from the
3  Creditors Committee to discuss this deal?
4    A.   I never met with the Creditors
5  Committee.  Representatives of Lehman, including
6  Jim Seery -- I know for a fact Jim Seery did,
7  but I did not.
8    Q.   Do you know anything about what was
9  communicated to the Creditors Committee about
10  this transaction?
11    A.   No, I'm sorry, I do not.
12    Q.   You also testified earlier today about
13  how JPMorgan had custody of assets that it did
14  not provide and it did not transfer all of the
15  assets that were under the Fed repo.
16    What do you know about why they didn't
17  do that?
18    A.   The commercial dispute was between
19  Barclays and JPMorgan.  I know nothing other
20  than it became a dispute which caused more
21  issues in terms of DTC, et cetera.
22    Q.   Did you ever speak to anyone at
23  JPMorgan about it?
24    A.   I was involved on Sunday at the
25  offices of Weil, in extremely large, dozens and

Page 264

1    HIGHLY CONFIDENTIAL - B. McDADE
2  dozens of folks, of which JPMorgan
3  representatives were there and I was there, to
4  try to begin -- and regulators, Fed, S.E.C.,
5  SIPC, et cetera, et cetera -- to begin the
6  process of trying to create a solution.  But did
7  I speak individually?  No.
8    Q.   At that time, what did JPMorgan say
9  about their position on whether they should be
10  transferring additional assets to Barclays?
11    A.   In the public setting, if you will,
12  where we or I was exposed to, they just had a
13  simple party line that they viewed they had the
14  right to collateral given their collective set
15  of exposures to Lehman as the clearing bank, in
16  particular.
17    Q.   Did you have a position whether
18  that -- whether JPMC had the right to the
19  collateral or not?
20    A.   Lehman had been struggling with JPM
21  over a period of weeks prior to, you know,
22  this -- the bankruptcy and this particular
23  transaction.  So I have seen some of what
24  JPMorgan had been doing specifically to Lehman
25  in terms of trying to secure, you know, its

Page 265

1    HIGHLY CONFIDENTIAL - B. McDADE
2  credit position.
3    Q.   Did you have an opinion about whether
4  JPMC was justified in its actions?
5    A.   That would be a question most
6  specifically better asked to the financing
7  individuals, but the extreme process by which
8  they were claiming and gathering our collateral
9  is I think at this point reasonably
10  well-documented.  It was aggressive would be my
11  opinion.
12    Q.   Do you know anything about assets that
13  are referred to as racers, R-A-C-E-R-S?
14    A.   The trust certificate, yes.
15    Q.   Do you know if any of the racers
16  assets were transferred to Barclays?
17    A.   I don't know specifically, but I
18  believe the answer is yes.
19    Q.   Who did you discuss the issue of the
20  racers in context of this transaction with?
21    A.   I didn't discuss racers with any
22  individual.  I know that racers is a common
23  financing trust vehicle that we had used over a
24  period of time for certain of our asset classes
25  to use to gain much more efficiency in terms of

Page 266

HIGHLY CONFIDENTIAL - B. McDADE

1  the repo market.
2  
3      Q.   I'd like to turn your attention to
4  that handwritten page that we talked about right
5  before the break that was some notations about
6  the parts of the deal that you recall, and I
7  think you told Mr. Gaffey that what you thought
8  that Barclays received as part of the repo you
9  attributed to 45, and then you also said that
10 the cash given related to the repo was also 45
11 billion.
12      First of all, did I understand that
13 testimony right?
14      A.   Uh-huh.
15      Q.   So is it your understanding that
16 Barclays received exactly the amount of
17 collateral that it gave in cash, those were
18 exactly equal?
19      A.   What I would describe is if Barclays
20 had unwound the repo with Lehman, so there was
21 actually no repo transaction, the transaction
22 that ultimately happened would have been the
23 same transaction.  So we would have received
24 back the haircut, we would have gone through a
25 process of valuing the assets, and those -- that

Page 267

HIGHLY CONFIDENTIAL - B. McDADE

1  process would have come with the same outcome in
2  terms of the price.
3      So, to me, the repo is actually
4  secondary to actually what transpired because
5  ultimately we just kept valuing the assets,
6  whether it was the haircut in the original
7  construct, there was no additional haircut taken
8  in terms of the process, and the haircut,
9  whether it was Lehman and Lehman's cash back,
10 would have been valued at par.  It was
11 ultimately a process around the assets
12 themselves in terms of how we valued them.
13      Q.   I guess you said normally you would --
14 it was your understanding that Lehman would have
15 received back a haircut.
16      Did Lehman receive back the haircut in
17 collateral?
18      A.   No, we did not receive back a haircut
19 in collateral.
20      Q.   Barclays took the entire amount of or
21 value of collateral that had been pledged to the
22 Fed, right?
23      A.   Because the ultimate package of cash a
24 hundred cents on the dollar, whatever that

Page 268

HIGHLY CONFIDENTIAL - B. McDADE

1  haircut was, and I've testified I don't know the
2  specific number, but whatever that haircut was
3  and then the value of the assets is the same
4  number.
5      Q.   I'm sorry, tell me what the two
6  numbers are that you think are the same number.
7      A.   If Lehman had taken back the repo
8  transaction.  So we had our securities and we
9  had our cash and Barclays had effected the same
10 transaction with us, they would have valued our
11 cash at par, presumably, and they would have
12 valued the securities the same -- the total of
13 the two would have added up to the same price.
14      So to me it's moot what the haircut
15 was.  We would have added back in terms of the
16 total value proposition.
17      Q.   In terms of what actually happened, do
18 you know what the value was of the securities
19 that were transferred as part of the repo?
20      A.   The deal team went through that
21 process.  I was not part of that specifically.
22      Q.   Do you know whether the amount of
23 assets and collateral that Barclays received as
24 part of the repo was more or less than $45

Page 269

HIGHLY CONFIDENTIAL - B. McDADE

1  billion?
2      A.   I never saw the specific document in
3  terms of the final process, but I am confident
4  that our team went through a process, both the
5  risk and the components of the operational
6  aspect of the repo, I'm confident that that was
7  the outcome.
8      Q.   Do you know -- I guess I have to ask
9  it again.  I'm sorry if I misunderstood.  Do you
10 know one way or another whether the assets, the
11 value of the assets that Barclays received when
12 they took over the repo was more or less than
13 $45 billion?
14      A.   The value of the assets was the value
15 of the assets that we had determined together in
16 terms of the process.  It would not have been
17 more than 45 billion.
18      Q.   Why do you say it would not have been
19 more than 45 billion?
20      A.   Barclays had a different view of the
21 value of the assets.
22      Q.   Do you know whether Lehman had a view
23 that the value of the assets that were given to
24 Barclays was more --

Page 270

HIGHLY CONFIDENTIAL - B. McDADE
2    A.    The ultimate conclusion was the
3  collection of the two views.
4    Q.    What was Lehman's view of the value of
5  the assets that were transferred to Barclays as
6  part of the Barclays taking over the Fed repo?
7    A.    I wasn't part of the specific process
8  in terms of that valuation, so I can't give you
9  that answer.
10    Q.    So you don't know whether Lehman
11  believed that the value of the assets that went
12  to Barclays as part of the Fed repo was more
13  than $45 billion?
14    A.    No, I believe that the deal teams went
15  through the process and concluded that it was
16  $45 billion.
17    Q.    But I thought that that process was
18  because Lehman had a view and Barclays had a
19  view and it's your understanding that the view
20  together would have been $45 billion, right?
21    A.    Right.
22    Q.    I want to know if you know what
23  Lehman's view of what the asset value was.
24    A.    I do not know.
25    MS. TAGGART:  That's all my questions.

Page 271

HIGHLY CONFIDENTIAL - B. McDADE
2    Thank you.
3  EXAMINATION BY
4  MR. MAGUIRE:
5    Q.    Sir, my name is Bill Maguire from
6  Hughes, Hubbard & Reed.  Sir, Hughes Hubbard is
7  counsel to the trustee for the Estate of Lehman
8  Brothers, Inc.
9    I'll start by showing you a document
10  that's previously been marked as Exhibit 219.
11    Do you recognize the e-mail, sir?
12    A.    Yes, I do.
13    Q.    You'll see in this e-mail Mr. Lowitt
14  indicates that -- he refers to the 15c3 lockup
15  as 1.3 billion.  You see that?
16    A.    Yes.
17    Q.    And he goes on to say, "So we are
18  short 1.7 billion."  And taking those two
19  numbers, it sounds as though the 15c3 seems to
20  leave him short, or he seems to be suggesting to
21  you that that leaves you short by 1.7 billion,
22  which seems to suggest that he's shooting for an
23  overall target of around 3 billion.
24    Do you understand how Mr. Lowitt got
25  that understanding?

Page 272

HIGHLY CONFIDENTIAL - B. McDADE
2    A.    Again, I have attempted to answer that
3  question.  I don't remember a specific target.
4  Mr. Lowitt would have been with Mr. Kirk at that
5  time.  I believe the time of this would have
6  been when I was in the courtroom.
7    So, specifically, they're work with
8  the live data in terms of the full valuation
9  process, which is how we probably got to that
10  figure.
11    Q.    Do you recall hearing from Barclays
12  any specific number or target that they wanted?
13    A.    A number or target?
14    Q.    Yes.
15    A.    Specifically me, no.
16    Q.    At the time of this, you had gone to
17  court?  You were actually in the hearing?
18    A.    I'm not good on GMT time.  Is this
19  2:30 in the afternoon?
20    Q.    Let me leave the exhibit aside.  I
21  just wanted to really direct your attention to
22  the hearing.
23    A.    Yes.
24    Q.    You mentioned there's a session at the
25  court, there's a period where the masses are

Page 273

HIGHLY CONFIDENTIAL - B. McDADE
2  told about changes to the deal?
3    A.    Uh-huh.
4    Q.    In the course of that discussion, do
5  you recall anything that was told to the masses
6  about the 15c3 assets?
7    A.    No, I was -- it was a large gathering
8  around Mr. Miller in a live setting without
9  microphones, so I wasn't part of the actual
10  conversation.  So the senior lawyers were
11  gathered in the middle of the courtroom.
12    Q.    And when you say you weren't part of
13  the conversation, were you able to hear the
14  conversation?
15    A.    No, that's what I mean.  I was not
16  able to hear the conversation.  There was no
17  microphone.  He was not in a position with a
18  microphone in any public setting.  It was a
19  public setting where, unless you were crowded
20  around the ring, you couldn't hear.
21    Q.    I see.  So there was a meeting where
22  information was given to the masses, but you
23  needed to be specifically within the tight
24  immediate ring in order to actually hear what
25  was being said?

Page 274

1        HIGHLY CONFIDENTIAL - B. McDADE
2      A.   Correct.
3      Q.   And you did not hear what was said?
4      A.   Yes, sir.
5      Q.   When you say "yes, sir"?
6      A.   Yes, sir, I did not hear.
7      Q.   You had looked a number of times today
8    at the September 16 balance sheet, Exhibit 19,
9    and that includes on each side, the assets and
10   the liabilities, a reference to derivatives.
11   See that, 4 and a half billion on the asset side
12   and 4 and a half billion on the liability side?
13     A.   Uh-huh.
14     Q.   Am I correct that on the asset side
15   that represents long positions?
16     A.   Yes.
17     Q.   And on the liability side that
18   represents short positions?
19     A.   Yes.
20     Q.   And those are positions in derivatives
21   that are -- that LBI had?
22     A.   Yes, exchange-traded.
23     Q.   The exchange-traded, do those include
24   derivatives that were traded on the Options
25   Clearing Corporation, or OCC?

Page 275

1        HIGHLY CONFIDENTIAL - B. McDADE
2      A.   Yes.
3      Q.   Did you understand that, in addition
4    to the long positions and the short positions
5    that Lehman had at OCC, it also had additional
6    cash and assets that were deposited as margin
7    and also clearing funds deposited at the OCC?
8      A.   Yes, I did, but keep in mind the
9    context that we had had assets like that, for
10   example, at the CME, and they lost those assets
11   over the course of the week.  So we had no
12   confidence that those were potentially our
13   assets given what had been transpiring.
14     Q.   Did anyone tell you that you -- that
15   Lehman had an excess of those assets at OCC?
16     A.   Not specifically, no.
17     Q.   Do you recall whether at any time
18   anyone told you that Lehman had an excess of
19   $1.3 billion of cash deposited at the OCC?
20     A.   No one told me that specifically, no.
21     Q.   Did anyone tell you that Lehman had an
22   excess of $900 million in additional assets
23   beyond the cash deposited at the OCC?
24     A.   No one told me that.
25     Q.   Did you ever have any discussion with

Page 276

1        HIGHLY CONFIDENTIAL - B. McDADE
2    Barclays about Barclays acquiring the $2.2
3    billion of excess cash and assets margin at OCC?
4        MR. HUME:  Objection.  Lacks
5    foundation.
6      A.   I specifically did not.
7      Q.   Are you aware whether Barclays ever
8    asked anyone at Lehman to include any of those
9    assets in the sale?
10     A.   I'm not specifically aware of any
11   specific dialogue with respect to those options,
12   the collateral, BarCap and Lehman.
13     Q.   And to your knowledge, was there ever
14   any intent on the part of Lehman to transfer any
15   of those excess cash, that 1.3 billion or any
16   additional assets, that was clearing in margin
17   at OCC to Barclays as part of the sale?
18     A.   My recollection is the original
19   contemplation of those positions would have
20   been, to your point, the actual positions
21   themselves.  Collateral would have been a
22   secondary consideration.  We were concerned
23   about our collateral positions.
24        However, I think over the course of
25   the week, that became -- that became, to my

Page 277

1        HIGHLY CONFIDENTIAL - B. McDADE
2    recollection, over the course of time, that
3    became something that ended up, I believe, in
4    the clarifying document.
5      Q.   Did anyone tell you that the, under
6    the clarifying document, there had been some
7    agreement where Barclays to transfer to Barclays
8    an additional $2.2 billion of cash and
9    securities representing margin, excess margin
10   and other assets at OCC?
11     A.   No.
12        MR. HUME:  Objection.  Vague and
13   ambiguous.  Lacks foundation.
14     Q.   To your knowledge, was there ever any
15   intent on the part of Lehman that the clarifying
16   letter would provide Barclays an additional $2.2
17   billion in margin at OCC?
18     A.   No.
19     Q.   What about margin, additional margin
20   that Lehman had at any other clearing
21   corporations, and I want to specifically include
22   any foreign clearing corporations, counterparts
23   to the OCC, were you aware, was there ever any
24   negotiations or intent on the part of Lehman to
25   transfer any such margin, cash or additional

70

Page 278

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    assets, at foreign clearing corporations to
3    Barclays?
4        A.   I'm not aware of those.
5        Q.   Were you involved, sir, with any
6    discussions with the Depository Trust
7    Corporation, DTC?
8        A.   Specifically, no.
9        Q.   Were you aware of any concerns at DTC
10   concerning Lehman's business?
11       A.   Yes, absolutely.
12       Q.   What were the nature of the concerns
13   that you heard about that were experienced by
14   DTC?
15       A.   We obviously had a number of
16   settlements normal course of business, and DTC
17   had become concerned because JPMorgan apparently
18   was backing -- was backing away in terms of its
19   role with us, and DTC essentially told us they
20   were going to shut down our ability to not only
21   transact going forward, but to shut down
22   hundreds of thousands of settlements that were
23   in process.
24       Q.   And how did that threaten the deal
25   with Barclays?

Page 279

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.   Well, it was the position of -- it was
3    the position of Barclays that they didn't want
4    to assume all of those liabilities, and it was
5    the position of the other protagonists,
6    regulators and others -- again, this is my
7    opinion -- that Barclays should be more
8    forthcoming in terms of assuming some of those
9    responsibilities.  And it was also -- there was
10   also the confusion of the dispute between
11   JPMorgan and Barclays that clearly created --
12   created headache.
13       So how it was going to stop the deal,
14   it would have become an enormous challenge for
15   Barclays to buy a set of businesses where all of
16   the normal course transacting over the course of
17   the last couple weeks of the core constituent
18   clients, it would have been a massive brand and
19   reputational challenge, I believe, for a new
20   buyer, practically speaking, I think.
21       Q.   The uncleared trades were in the many
22   billions of dollars; is that correct?
23       A.   I don't have the exact figure, but I
24   know they were in the hundreds of thousands of
25   individual transactions.

Page 280

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   And DTC's concern was as to its
3    exposure --
4        A.   Exactly.
5        Q.   -- in clearing those trades?
6        A.   Exactly.
7        Q.   And it wanted Barclays to assume
8    responsibility for that exposure?
9        A.   Exactly.  It wanted a letter of credit
10   and it wanted posted collateral, et cetera.
11       Q.   And Barclays did offer some limited
12   guarantee?
13       A.   My understanding is Barclays offered
14   250 million.
15       Q.   And DTC wanted an unlimited guarantee?
16       A.   That's correct.
17       Q.   Were you involved in any discussions
18   concerning the pledging of certain residential
19   mortgage assets to DTC in connection with its
20   concerns?
21       A.   Only at a very -- I have vague
22   recollection of the process, but I was not
23   involved specifically, no.
24       Q.   What do you recall about it?
25       A.   We were trying to find at that point

Page 281

1    HIGHLY CONFIDENTIAL - B. McDADE
2    in time an ability for Lehman to solve some of
3    these issues back to the -- at some point during
4    the week we had an understanding we still might
5    have some -- any asset that we had we were using
6    to try to figure out how to solve individual
7    problems, that being one of them.  That's the
8    extent of my recollection.
9        Q.   Did you learn that DTC had specific
10   concerns about Lehman transferring assets,
11   unencumbered assets at DTC to Barclays as part
12   of the sale, and specifically the concern that
13   that would deprive DTC of collateral that it was
14   looking to as a line of defense against its
15   exposure to Lehman?
16       A.   I was not part of those discussions.
17   I did not learn that, no.
18       Q.   Did you learn that there was an
19   agreement including not only Lehman, but also
20   DTC and Barclays that was worked out over the
21   weekend?
22       A.   It's in the -- I believe it's in the
23   clarifying letter.  In terms of the posting of
24   250 million of posted collateral?
25       Q.   Yes.  Did you understand there was a

Page 282

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  separate agreement with DTC?
3    A.   Again, we were -- we -- only after the
4  fact because we were not allowed in the room in
5  terms of the process.
6    Q.   So you did not have an understanding
7  of what the terms of that were, other than
8  obviously there was a $250 million guarantee?
9    A.   Right.  Correct.
10    Q.   We have the clarifying letter marked
11  as an exhibit.  I believe it's Exhibit 25.  If
12  you turn, sir, to page 4, there's a paragraph 8
13  there which concerns transfer of customer
14  accounts.  If you take a moment to look at that.
15  I'm going to ask you about the part that begins
16  little "ii".
17    A.   Uh-huh.
18    Q.   This refers to the 15c3 assets, and
19  you understand the 15c3 was a lockup or
20  protective customer account?
21    A.   Uh-huh.
22    Q.   Did you understand that there were
23  regulatory issues about whether assets could be
24  removed from that account?
25    A.   Most definitely.

Page 283

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Did you understand that the promise by
3  Lehman to pay assets, 15c3 assets, required
4  regulatory approval?
5    A.   Yes.
6    Q.   And did Barclays understand that the
7  transfer was conditioned on obtaining that
8  regulatory approval?
9    MR. HUME:  Objection.  Lacks
10  foundation.
11    A.   I was not part of the individual
12  discussions with the regulator, the BarCap and
13  Lehman team together, but I do know that BarCap
14  was very interested in learning whether this
15  could be an asset that could be part of the
16  transaction in order to facilitate a deal being
17  done, and I do know that they spent a lot of
18  time -- their experts spent a lot of time with
19  the team from Lehman and the team from the
20  S.E.C. and I assume other regulators working
21  through the process.
22    I don't know the conclusion in terms
23  of their comfort level with that or the --
24  presumably they got some sense of comfort taking
25  it on as an asset in the transaction, but that's

Page 284

1    HIGHLY CONFIDENTIAL - B. McDADE
2  all I know.
3    Q.   And your understanding is that Lehman
4  was open and transparent with Barclays in giving
5  them whatever information was available so they
6  could assess, I guess, whatever level of comfort
7  they could as to what the excess in the account
8  was?
9    MR. HUME:  Objection.  Lacks
10  foundation.
11    A.   Yes, Lehman -- this was a brand-new
12  concept for all of us in terms of the notion.  I
13  didn't know what 15c3 was, you know, walking
14  into the week of September 15th, as did -- as
15  probably did some of our other front-end risk
16  operators, but clearly our financing and
17  regulatory folks did.
18    It's my understanding that our
19  communication with Barclays over the course of
20  the week would have led Barclays to a level of
21  uncertainty in whether or not -- how much and
22  whether or not this could be doable, yes,
23  because there were lots of -- there was a lot of
24  dynamics in terms of the fact that Lehman was
25  providing to Barclays because of the unchartered

Page 285

1    HIGHLY CONFIDENTIAL - B. McDADE
2  nature of what we were contemplating.
3    Q.   Was there ever any discussion between
4  Lehman and Barclays in which Lehman undertook to
5  provide the 700 plus million dollars to Barclays
6  unconditionally, regardless of whether there was
7  regulatory approval or regardless of the extent
8  to which it was permitted by law to remove 760
9  million or anything from a lockup account?
10    A.   No, not to my recollection.
11    Q.   That term never became unconditional
12  as far as you're aware?
13    A.   As far as I'm aware, no.
14    MR. MAGUIRE:  Thank you, sir.  That's
15  all I have.
16    THE WITNESS:  Thank you very much.
17    MR. HUME:  I may have a few questions.
18  I would like a short break to review my
19  notes.
20    (Recess; Time Noted:  4:17 P.M.)
21    (Time Noted:  4:29 P.M.)
22  EXAMINATION BY
23  MR. HUME:
24    Q.   Mr. McDade, thanks.  I'm Hamish Hume.
25  We met earlier today.  I'm represent Barclays

Page 286

1    HIGHLY CONFIDENTIAL - B. McDADE
2 from Boies, Schiller & Flexner.
3         Just a couple of questions.  Earlier
4 in the day you were asked about the estimated
5 liability of $2 billion for compensation, do you
6 remember that?
7    A.   Yes, I do.
8    Q.   And you were asked about its
9 relationship to the Lehman accrual, do you
10 remember that?
11    A.   Yes, I do.
12    Q.   Am I correct that Lehman would
13 accrue -- let me withdraw that.  Am I correct
14 that Lehman would pay bonuses to its employees
15 through a mix of cash and equity?
16    A.   Yes, you're correct.
17    Q.   Am I correct that Lehman paid a
18 significant portion of its bonuses in equity?
19    A.   Yes, a very significant proportion.
20    Q.   Above average for Wall Street?
21    A.   Above average for Wall Street, and it
22 had changed in 2007 to a higher percentage of
23 equity.
24    Q.   Am I correct that the accrual on
25 Lehman's books for bonuses reflected only the

Page 287

1    HIGHLY CONFIDENTIAL - B. McDADE
2 cash component of the bonus?
3         MS. TAGGART:  Objection to form.
4         MR. GAFFEY:  Join.
5    A.   That's correct.
6    Q.   And so the accrual at Lehman was a
7 cash accrual -- was for the cash portion of the
8 bonus?
9         MS. TAGGART:  Objection to form.
10 Foundation.
11    A.   The 2008 accrual was the -- for
12 employees pay in 2008 was a cash accrual, and
13 then there was accrual for anything that might
14 have vested for previous awards over a period of
15 time.
16    Q.   If you wanted to compensate -- if
17 Barclays wanted to compensate all of the
18 transferred employees in a manner commensurate
19 with what their 2008 compensation would
20 otherwise have been, would it be appropriate for
21 them to increase, to add some portion to the
22 cash accrual to reflect the equity that they
23 would have received?
24         MR. GAFFEY:  Objection.
25    A.   Yes, it would.

Page 288

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   You were also asked questions about
3 the cure estimate.  Do you remember that?
4    A.   Yes, I do.
5    Q.   You referenced, I think, in your
6 testimony an understanding that Barclays had 60
7 days under the agreement to determine which
8 contracts to assume or not?
9    A.   Yes.
10    Q.   Do you recall that?
11    A.   Yes, I do.
12    Q.   And we can look at the provision, but
13 it sounded like you remembered it.  Was it clear
14 in your head, in your understanding that it was
15 Barclays' decision, in its sole discretion, as
16 to which contracts to assume and which not to
17 assume?
18    A.   It's intuitive and it was very clear
19 from the outset, yes.
20    Q.   And that process would happen only
21 after the closing, correct?
22    A.   It couldn't happen before the closing,
23 right.
24    Q.   And therefore, it was not possible
25 before the closing to have a definitive number

Page 289

1    HIGHLY CONFIDENTIAL - B. McDADE
2 for the cure payments Barclays would have to
3 pay?
4         MR. GAFFEY:  Objection to form.
5         MS. TAGGART:  Objection.
6    Q.   Is that correct?
7    A.   That is correct.
8    Q.   Was it, therefore, in your mind always
9 just an estimate of what the cure payments might
10 be?
11    A.   From my seat, I could not make a
12 determination what Barclays' management would do
13 with the contracts.  The only determination I
14 could make was a list of the obligations that
15 were there.  Barclays' management team would
16 make those decisions.
17    Q.   You gave testimony earlier I think
18 during Ms. Taggart's questioning about how no
19 financial institution would mark to market the
20 assets on its books securities at the price at
21 which it could liquidate the entire portfolio.
22 Do you recall that?
23    A.   Yes.
24    Q.   I think you gave the example of a
25 mutual fund, for example, which marks to market,

Page 290

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    would not mark to market at the value that it
3    would sell the entire portfolio at once in a
4    bulk sale?
5        A.   Correct.
6        Q.   Would you elaborate upon what you
7    meant by that?
8        A.   I think it's -- the whole notion of
9    marking assets that need to be marked in
10   broker-dealer context around the world has been
11   challenged by what's happened in the credit
12   crisis, but it was our responsibility to mark on
13   every given night to the best of our abilities
14   and all the market inputs and all the individual
15   operators' ability to transact a significant
16   amount of those assets, but not in aggregate all
17   of those assets.  None of the individual
18   collective balance sheets with the liquidity
19   characteristics of the market particularly in
20   2008 would allow for transactions of that
21   significant a size.
22       Q.   Let me make sure I understand that.
23   If Lehman Brothers were to look at its books,
24   even assuming that everything had been perfectly
25   marked to market as of a minute before they

Page 291

1    HIGHLY CONFIDENTIAL - B. McDADE
2    looked at the books, and Lehman then had to
3    decide that it was going to sell its entire
4    portfolio or some significant portion of the
5    portfolio, tens of billions of dollars, what
6    would the relationship be in your mind between
7    the price Lehman would be able to get for the
8    sale of the entire portfolio versus those marks?
9        MS. TAGGART:  Objection.
10       A.   Obviously depends on the time of the
11   day, the characteristics of the assets, but it
12   would be lower.
13       I would give an even simpler example.
14   If I tried to transact in IBM stock and I can
15   see on any self-directed ticker that the price
16   is 101 to 101 and one cent, if I tried to
17   transact a hundred shares, I'll get an
18   execution.  If I try to transact 10,000 shares
19   of IBM, I won't get a 101 execution.
20       Q.   You will get a lower execution?
21       A.   I'll get a lower execution.  So even
22   in the, quote, most liquid forms of assets.
23       Sorry.
24       Q.   And is that dynamic you just
25   explained, that relationship in the market value

Page 292

1    HIGHLY CONFIDENTIAL - B. McDADE
2    of a sale of a bulk portfolio and the marks,
3    does that -- is that relevant to understanding
4    the negotiations of the price that were
5    occurring between Lehman and Barclays?
6        A.   I think it's very relevant because
7    Barclays was taking a large amount of risk given
8    the size of the transaction relative to the
9    liquidity characteristics of all of the marks.
10   Barclays could easily have lost a significant
11   amount of money purchasing these assets.
12       Q.   And is that because when you buy the
13   long positions in a volatile market in a large
14   bulk, you can't liquidate them immediately --
15       A.   That's correct.
16       Q.   -- at a set price?  Instead, while you
17   hold them, the price may drop?
18       A.   That's correct.
19       Q.   You testified also that there was an
20   ongoing effort through the week to value the
21   assets, the changing potential list of assets
22   that would be in the deal, correct?
23       A.   Yes, that's correct.
24       Q.   And am I correct that there were --
25   that the process of debating the values of the

Page 293

1    HIGHLY CONFIDENTIAL - B. McDADE
2    bulk value of the assets, as you just described,
3    there was back and forth between Barclays and
4    Lehman?
5        A.   Yes, there was.
6        Q.   And was there room for reasonable
7    disagreement about the value of those assets?
8        A.   I was not in the room, but, yes, it's
9    my understanding, yes.
10       Q.   And is it relevant to that discussion
11   of the value of the assets that it was happening
12   in the context of a very difficult financial
13   market?
14       A.   I think the backdrop of the markets is
15   very relevant.
16       Q.   Do you believe there was some level of
17   uncertainty, therefore, in what the absolute
18   final asset values were, some level of
19   uncertainty?
20       A.   I'm not sure I understand the
21   specifics of your question.
22       Q.   Well, let me just ask it this way.
23   You've testified through the day that there was
24   a concept that the assets and liabilities should
25   roughly balance, correct?

Page 294

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    Correct.
3        Q.    But would you also agree that some
4   portions of the liabilities were estimated
5   liabilities, such as cure?
6        A.    That's correct.
7        Q.    And that the asset -- the components
8   of assets that were being transferred changed
9   during the week; is that correct?
10        A.    Yes, they did.
11        Q.    And the valuations of those assets
12   changed during the week; is that correct?
13        A.    Yes, they did.
14        Q.    And there were debates over those
15   valuations, yes?
16        A.    Yes, there was.
17        Q.    And so there was a clear deal over
18   what assets were being transferred, correct?
19        A.    Yes.
20        Q.    And there was a clear effort to value
21   those assets?
22        A.    Yes, there was.
23        Q.    But there was also some uncertainty
24   over precisely what the value of those assets
25   would turn out to be?

Page 295

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    Absolutely, yes.  I understand, yes.
3        Q.    With respect to the exchanged-traded
4   derivatives, was it your understanding that
5   Barclays was taking over Lehman's settlement
6   obligations with respect to all of the
7   exchange-traded derivatives?  Did you understand
8   that?
9        A.    I wasn't involved in the specifics of
10   the actual equity derivative trade, so it would
11   be my understanding that the settlements, option
12   positions and settlements are very important
13   aspects of the risk characteristics.  So, yes,
14   the settlements, yes.
15        Q.    Is it your testimony that you don't
16   recall one way or the other the specifics of the
17   deal with respect to the exchange-traded
18   derivatives?
19        A.    That's correct.
20        Q.    So you don't have a specific
21   recollection, as I understand it, with respect
22   to whether the collateral was or was not
23   included?
24        A.    That's correct.
25        MR. HUME:  I don't have any more

Page 296

1        HIGHLY CONFIDENTIAL - B. McDADE
2   questions.
3   EXAMINATION BY
4   MR. GAFFEY:
5        Q.    Just one or two.  This concept
6   Mr. Hume has asked you about where accounts are
7   taken of financial institutions not maintaining
8   the book value to contemplate a transaction of
9   this size, is there a difference -- is there,
10   when this extra consideration is brought into
11   play of moving in that bulk, that's not the same
12   thing as book value, right?
13        MR. BUCKLEY:  Objection.
14        MR. HUME:  Objection.  Vague and
15   ambiguous.
16        A.    The concept of a broker-dealer is
17   market value every single night.  So it's a
18   debate about the market value, the criteria used
19   in that process of creating the valuations for
20   market value, and there's a difference between
21   the price of buying seven, you know, seven loads
22   of oil tankers and one, and same thing in
23   securities.
24        Q.    So when the market value is determined
25   every night, that is a market value determined

Page 297

1        HIGHLY CONFIDENTIAL - B. McDADE
2   by moving smaller blocks of the asset, not the
3   whole thing?
4        A.    That's correct.
5        Q.    So the book value would not reflect
6   that block discount?
7        A.    Book value of any financial
8   institution would not reflect moving the entire
9   book that next morning, that's correct.
10        Q.    So if the assets are described as the
11   book value, that's a different concept than the
12   valuation contemplating of a bulk transfer,
13   correct?
14        MR. HUME:  Objection.  Vague and
15   ambiguous.
16        A.    Again, I'm not -- I'm not familiar
17   with the term "book value."  We used only
18   "market value" at Lehman.
19        Q.    Well, the Asset Purchase Agreement
20   used the term "book value," right?
21        A.    I remember we used the -- the papering
22   of the transaction used the term "book value."
23   I had not focused on that.  I'm not sure who
24   wrote this specifics, so I couldn't comment on
25   the use of the term in that paragraph.

Page 298

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   You could comment on whether it's an
3  accurate description of the assets, though,
4  couldn't you?
5    A.   It's an accurate description of the
6  Friday night -- I have gone through it -- the
7  Friday night, September 12, to the market value
8  process that we went through on September 16.
9    Q.   And whether you're looking at it on
10  the 12th or on whatever day the book value was
11  determined, it does not include this additional
12  haircut for a bulk transfer?
13    A.   For any financial institution, that's
14  correct.
15    Q.   Now, you have spoken a bit today about
16  Barclays purchasing the business, although we've
17  been talking about an asset transfer.  The idea
18  was Barclays would take in the franchise, the
19  people, the inventory, and have a running
20  business; is that right?
21    A.   Absolutely.
22    Q.   Okay.  And so, and in that concept,
23  Barclays would on day one, after the
24  transaction, be as close an approximation as it
25  could be of what Lehman had been in terms of

Page 299

1    HIGHLY CONFIDENTIAL - B. McDADE
2  people and inventory and businesses, correct?
3    A.   Correct.  Even more so with the
4  integration of their -- their infrastructure
5  that they had already built up.
6    Q.   Into the Lehman infrastructure they
7  took in?
8    A.   Yes.
9    Q.   And when those infrastructures were
10  combined and Barclays had now a substantial
11  broker-dealer presence in the United States,
12  that's not a transaction that contemplates
13  moving the bulk of inventory out the next day,
14  is it?  It's a -- that's the inventory for the
15  business to be run?
16    A.   I can't comment about how Barclays,
17  you know, was thinking about or working through
18  the assets.  They were buying the assets as part
19  of the combination to buy the businesses.
20    Q.   Okay.  Well, a lot of attention was
21  spent on the eight critical employees, yes?
22    A.   Absolutely.
23    Q.   And the top 200, yes?
24    A.   Yes.
25    Q.   And a percentage of the rest of the

Page 300

1    HIGHLY CONFIDENTIAL - B. McDADE
2  employee population, yes?
3    A.   Yes.
4    Q.   And taking over the buildings, yes?
5    A.   Yes.
6    Q.   And taking over the systems and the
7  hard assets necessary to run the business, yes?
8    A.   Yes, that's correct.
9    Q.   And the inventory of securities that
10  were necessary to operate the business, yes?
11    A.   No, the point that I was trying to
12  make just a minute ago is the goal of
13  Mr. Diamond and BarCap was to buy the
14  businesses.  They understood the responsibility
15  around the assets.  If they had their druthers,
16  I'm sure they would have not wanted to go
17  through the asset part of the process because
18  buying the business would have been far simpler
19  in terms of process given the market conditions
20  at that moment in time.
21    Q.   So they would have bought the business
22  without any inventory would have been their
23  preference, am I understanding that correctly?
24    A.   If you could buy a world-class client
25  franchise with no risk attached to the

Page 301

1    HIGHLY CONFIDENTIAL - B. McDADE
2  transaction, you would prefer to do that
3  transaction.
4    Q.   Did anything anybody from Barclays
5  said to you at all during the week indicate that
6  it was their intention to take the inventory and
7  move it out in a bulk trade shortly after the
8  transaction closed?
9    A.   I have no information in terms of,
10  during that week or anytime after, in terms of
11  what Barclays' intent was with the assets.
12    Q.   My question is a little broader than
13  that.  Did anything anybody said to you during
14  that week indicate to you that that might have
15  been Barclays plan?
16       (Continued on the next page to include
17    the jurat.)

Page 302

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Nobody said to that to me.
3         MR. GAFFEY:  Thanks.  I have nothing
4    further.  Thank you for your time again.
5         THE WITNESS:  Thank you.
6         (Time Noted:  4:45 P.M.)
7              oOo
8
9
10
11
12
13
14
15
16
17
18
          _____
          BART McDADE
19
20   Subscribed and sworn to
     before me this     day
21   of        2009.
22
     _____
23
24
25
```

Page 303

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2              CERTIFICATE
3    STATE OF NEW YORK )
             : ss
4    COUNTY OF NEW YORK)
5         I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9         That BART McDADE, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18        I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23        In witness whereof, I have hereunto
24   set my hand this 2nd day of September, 2009.
25   -----------------------------------
```

Page 304

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2              INDEX
3    WITNESS:        EXAMINATION BY      PAGE
4    B. McDADE    Mr. Gaffey       5, 296
5             Ms. Taggart       232
6             Mr. Maguire       271
7             Mr. Hume          285
8
9    EXHIBITS:                  PAGE
10   Exhibit 335, a document bearing Bates     196
11   Nos. BCI-EX-(S)-50261
12   Exhibit 336, handwritten calculation      205
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 305

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2    NAME OF CASE:  In re Lehman Brothers
3    DATE OF DEPOSITION:  September 2, 2009
4    NAME OF WITNESS:  Bart McDade
5    Reason Codes
6       1. To clarify the record.
        2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Lme _____ Reason _____
     From _____ to _____
9
10   Page _____ Lme _____ Reason _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Lme _____ Reason _____
13   From _____ to _____
14   Page _____ Lme _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Lme _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25         BART McDADE _____
```