# A. 21

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x
     In Re:                         Chapter 11
5    LEHMAN BROTHERS                Case No. 08-13555 (JMP)
     HOLDINGS, INC., et al.,        (Jointly Administered)
6    ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF HUGH McGEE

10            New York, New York

11          Monday, August 10, 2009

12

13

14

15

16

17

18

19

20    Reported by:
      FRANCIS X. FREDERICK, CSR, RPR, RMR
21    JOB NO. 24038

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5            August 10, 2009
 6            10:00 a.m.
 7
 8            HIGHLY CONFIDENTIAL deposition of
 9   HUGH McGEE, held at the offices of Jones
10   Day, 222 East 41st Street, New York, New
11   York, pursuant to Notice, before Francis
12   X. Frederick, a Certified Shorthand
13   Reporter, Registered Merit Reporter and
14   Notary Public of the States of New York
15   and New Jersey.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4      JONES DAY, LLP
 5      Attorneys for Lehman Brothers, Inc.
 6         222 East 41st Street
 7         New York, New York  10017-6702
 8      BY:  ROBERT W. GAFFEY, ESQ.
 9         BRIDGET CRAWFORD, ESQ.
10
11      SIMPSON THACHER & BARTLETT
12      Attorneys for the Witness
13         425 Lexington Avenue
14         New York, New York  10017
15      BY:  MICHAEL CHEPIGA, ESQ.
16         CHRISTOPHER J. LUCHT, ESQ.
17
18      BOISE SCHILLER & FLEXNER, LLP
19      Attorneys for Barclays Capital
20         575 Lexington Avenue - 7th Floor
21         New York, New York  10022
22      BY:  JACK G. STERN, ESQ.
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S:  (Cont'd.)
 3      QUINN, EMANUEL, URQUHART, OLIVER &
 4   HEDGES, LLP
 5      Attorneys for the Creditors Committee
 6         865 S. Figueroa Street, 10th Floor
 7         Los Angeles, California  90017
 8      BY:  ERICA P. TAGGART, ESQ.
 9
10      HUGHES, HUBBARD & REED, LLP
11      Attorneys for the SIPA Trustee
12         One Battery Park Plaza
13         New York, New York  10004-1482
14      BY:  SETH D. ROTHMAN, ESQ.
15         SAMUEL C. McCOUBREY, ESQ.
16         - and -
17      HUGHES, HUBBARD & REED, LLP
18         1175 I Street, N.W.
19         Washington, D.C.  20006-2401
20      BY:  JOHN F. WOOD, ESQ.
21
22
23
24
25
```

Page 5

```
 1
 2   A P P E A R A N C E S:  (Cont'd.)
 3      JENNER & BLOCK, LLC
 4      Attorneys for the Examiner
 5         330 N. Wabash Avenue
 6         Chicago, Illinois  60611-7603
 7      BY:  ROBERT L. BYMAN, ESQ.
 8
 9
10   ALSO PRESENT:
11      RAJESH ANKALKOTI, Alvarez & Marsal
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 6

PROCEEDINGS - HIGHLY CONFIDENTIAL
1
2    (Witness sworn.)
3        MR. STERN: I'll just state on the
4    record our standing agreement concerning
5    confidentiality. The transcript will be
6    marked as highly confidential and within
7    a week of receiving the transcript we
8    will make appropriate designations under
9    the confidentiality stipulation.
10        MR. GAFFEY: And that's agreed.
11            * * *
12    H U G H   M c G E E,  called as a witness,
13        having been duly sworn by a Notary
14        Public, was examined and testified as
15        follows:
16    EXAMINATION BY
17    MR. GAFFEY:
18        Q.  Good morning, Mr. McGee. My name
19    is Bob Gaffey. I'm with Jones Day. And we're
20    special counsel to the estate of Lehman
21    Brothers Holdings, Inc. We met briefly before
22    the deposition.
23        Can you give me an idea, Mr.
24    McGee, of your background at -- well, first
25    let me cover your educational background.

---

Page 7

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2        **You're a graduate of Princeton; is**
3    **that correct?**
4        A.  That's correct.
5        **Q.  What year did you graduate?**
6        A.  1981.
7        **Q.  And you also graduated law school**
8    **from the University of Texas?**
9        A.  That's correct.
10        **Q.  When did you graduate from there?**
11        A.  1984.
12        **Q.  And do you keep an active license**
13    **to practice law in any jurisdiction?**
14        A.  No.
15        **Q.  Could you give briefly a**
16    **description of your employment after your**
17    **graduation from law school.**
18        A.  Sure. I went to work in Houston,
19    Texas for the law firm Andrews & Kurth as an
20    associate in the corporate and securities
21    department working primarily on corporate
22    finance transactions, some M&A transactions,
23    with a client base that was largely
24    energy-based. Had exposure to a number of
25    investment banks through the course of that

---

Page 8

1        H. McGEE - HIGHLY CONFIDENTIAL
2    activity. Was asked by First Boston to
3    consider a career change. After the second
4    time that they asked, which was due to that
5    they had a young person leave, I moved to New
6    York City in late 1986, kind of beginning of
7    '87, and switched careers and became an
8    investment banker for First Boston in their
9    energy M&A department. Stayed there until
10    June of 1989 at which time I left to join
11    Wasserstein Perella which was a split-off from
12    First Boston. Stayed with Wasserstein Perella
13    through early 1993 when at such time the two
14    named partners of that firm were starting to
15    have some disagreements. And I joined Lehman
16    Brothers at that time as a senior vice
17    president heading up their Houston office
18    focused primarily on energy.
19        Over time built up the Houston
20    office, became a managing director, ran the
21    energy group, ran the energy and power group
22    globally, both of those. Then in December of
23    '02 the then head of investment banking had
24    been promoted up within Lehman Brothers and
25    they asked me to assume the job of global head

---

Page 9

1        H. McGEE - HIGHLY CONFIDENTIAL
2    of investment banking which I was in that role
3    through the end of Lehman Brothers.
4        **Q.  And who did you replace as head of**
5    **investment banking?**
6        A.  A guy by the name of Brad Jack.
7        **Q.  Okay. I'd ask you, Mr. McGee,**
8    **just answer this question yes or no, please.**
9    **Did you review any documents to prepare for**
10    **your deposition testimony today?**
11        A.  I was shown some documents.
12        **Q.  Okay. Did any of the documents**
13    **you were shown have the effect of refreshing**
14    **your recollection about the events of the week**
15    **of September 15th, 2008?**
16        A.  To a limited extent, yes.
17        **Q.  Could you tell me what those**
18    **documents were?**
19        A.  I was shown some e-mail and I
20    think that's all. I was shown some e-mail
21    documents.
22        **Q.  Do you have a better recollection**
23    **of what the content of the e-mails was rather**
24    **than just e-mails? What were they about, what**
25    **were their dates, what can you remember about**

Page 10

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2  **those?**
3       A.   They were generally dated during
4  the period of time that you're referring to.
5       **Q.   Okay.**
6       A.   But I can't -- I mean, we looked
7  at different e-mails.  I can't recall.
8       **Q.   Okay.**
9       A.   I'd be happy to address any
10 particular ones.
11      **Q.   Okay.  We'll be showing you some**
12 **e-mails as we go through the day.**
13      A.   Okay.
14      **Q.   Have you -- other than lawyers,**
15 **have you spoken to anyone to prepare for your**
16 **deposition today?**
17      A.   No.
18      **Q.   Have you spoken to anyone whose**
19 **deposition has been taken in connection with**
20 **this proceeding?  Mr. Berkenfeld, Shapiro, Mr.**
21 **Felder?**
22      A.   Well, I speak with them in the
23 normal course of business but not about this
24 topic.
25      **Q.   Okay.  Now, as you know, Mr.**

Page 11

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2  **McGee, we're here to talk about the**
3  **transaction through which assets of Lehman**
4  **Brothers were sold to Barclays.  Give me, if**
5  **you would, a description of your role in the**
6  **negotiations of that transaction or other**
7  **activities connected to that transaction.**
8       A.   Sure.  In connection with the
9  transaction that ultimately resulted in
10 Barclays buying the North American business of
11 Lehman Brothers I was involved as head of
12 investment banking in an ongoing effort to
13 explore a number of different transactions
14 throughout the course of the summer leading
15 into the final weekend.  And I was one of the
16 more senior Lehman people involved in the
17 activities that weekend.  I would not
18 characterize myself as the primary negotiator.
19 I would say that I was focused on trying to
20 facilitate the transaction with the particular
21 focus on trying to make sure that we delivered
22 the human capital side of the equation to that
23 franchise that we preserved it, were able to
24 then deliver it as part of the transportation.
25      **Q.   Who would you describe as the**

Page 12

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2  **primary negotiator or negotiators of the**
3  **transaction that was effected with Barclays?**
4       A.   Well, Bart McDade was the
5  president of Lehman Brothers at the time.  He
6  was the senior Lehman executive involved.
7       **Q.   And is he what you would describe**
8  **as the primary negotiator?**
9       A.   Well, we had our head of M&A, Mark
10 Shafir, involved.  We had a full team.  We
11 were trying to get a lot done in 48 hours.
12      **Q.   Sure.**
13      A.   But anything that was a major
14 decision was taken to Bart.
15      **Q.   And apart from Mr. McDade and Mr.**
16 **Shafir who were the other senior Lehman**
17 **executives you would describe as involved in**
18 **the negotiations?**
19      A.   Alex Kirk was actively involved
20 around some of the balance sheet things I
21 think.
22      **Q.   And anyone else?**
23      A.   Mark Shapiro from our
24 restructuring team.  But he was more on the
25 basis of expertise as opposed to status as a

Page 13

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2  senior Lehman executive.
3       **Q.   Um-hum.  And anyone else?**
4       A.   I'm not sure how far down the
5  chain you want to go.
6       **Q.   Stay up at the top of the chain if**
7  **we could for a moment because I know there's a**
8  **lot of people who do something in connection**
9  **with it.  I'm looking at the senior activities**
10 **either at the table or near the table.  Who's**
11 **involved in getting the transaction done?**
12      A.   Well, certainly Mike Gelband was
13 there as well.
14      **Q.   Was Paolo Tonucci involved?**
15      A.   Yes.
16      **Q.   What was his role?**
17      A.   Well, Paolo and Ian Lowitt were
18 both involved around some of the balance sheet
19 type items.
20      **Q.   And when you say the balance sheet**
21 **type items, does that include putting a value**
22 **on the assets that were transferred?**
23 **Assessing the value?**
24      A.   I'm not sure.
25      **Q.   Did you have any role or**

Page 14

1       H. McGEE - HIGHLY CONFIDENTIAL
2   involvement in that process during the week?
3       A.   No.
4       Q.   I should say just for clarity when
5   we're talking about "the week" we're talking
6   about the week of September 15th, right?
7       A.   Correct.
8       Q.   You made a reference before to the
9   weekend and I just want to put some dates on
10  that. You're talking about the week of
11  September 13th and 14th.
12      A.   Correct.
13      Q.   Holdings files its bankruptcy on
14  the 15th and what we're talking about is the
15  week that follows that.
16      A.   Correct.
17      Q.   Before that week, you mentioned
18  before that during the summer you were
19  exploring different options with respect to
20  Lehman. Could you give me a general
21  description of the type of options that were
22  being explored and the negotiations that took
23  place. Before the negotiations that led to
24  the transportation that occurred.
25      A.   Well, going all the way back to

TSG Reporting - Worldwide  (877) 702-9580

Page 15

1       H. McGEE - HIGHLY CONFIDENTIAL
2   the weekend in March when Bear Stearns went
3   down, Lehman Brothers and all financial
4   institutions were facing an increasingly
5   difficult and deteriorating market. We looked
6   at a bunch of different financing
7   alternatives. We looked at transaction
8   alternatives. Some that we could control
9   ourselves. Some that would involve
10  transactions with third parties. Those that
11  we could do ourselves were transactions such
12  as the spin-off of our commercial real estate
13  business, the sale of a partial interest in
14  the investment management division. The
15  transactions involving third parties ranged
16  from, you know, potential combinations to
17  strategic investments. And they involved
18  parties from -- you know, all different parts
19  of the globe.
20      Q.   And in the week preceding the week
21  we've been talking about, were there
22  discussions with Barclays?
23      A.   The discussions with Barclays
24  really took place starting on Friday and then
25  through the course of the weekend.

TSG Reporting - Worldwide  (877) 702-9580

Page 16

1       H. McGEE - HIGHLY CONFIDENTIAL
2       Q.   Before Friday, the 13th -- is that
3   correct? The 13th?
4       MS. CRAWFORD: The 14th -- I mean
5   the 12th.
6       MR. GAFFEY: I have not come armed
7   with my calendar.
8       Q.   Okay. Before Friday the 12th.
9       A.   Okay.
10      Q.   Isn't it so that there were
11  discussions with Barclays and Bank of America
12  about a global purchase of Lehman?
13      A.   Well, I need -- yes and no. So,
14  yes in that there were discussions with Bank
15  of America and Barclays leading into that
16  final weekend. Bank of America had a team
17  that showed up if I -- I may be a day off but
18  I think it was Thursday and I don't think the
19  Barclays team actually showed up until Friday,
20  kind of mid day Friday. And then they went
21  through that night and then through Saturday.
22  BofA efforts were slightly ahead because their
23  team showed up first. But it's an accurate
24  statement to say that discussions at some
25  point were going on contemporaneously with

TSG Reporting - Worldwide  (877) 702-9580

Page 17

1       H. McGEE - HIGHLY CONFIDENTIAL
2   both Bank of America and Barclays.
3       Q.   Did there come a point over the
4   weekend where the discussions with Bank of
5   America came to an end?
6       A.   There was a point on Saturday
7   where it became clear that the additional
8   request for follow-up due diligence evaporated
9   from Bank of America and our speculation was
10  that they were off doing something else. We
11  were never formally told Bank of America is
12  discontinuing discussions.
13      Q.   So essentially the phone stops
14  ringing with Bank of America. What happens
15  with Barclays? Do the discussions with
16  Barclays that took place on the Friday and the
17  Saturday, do they at some point cease prior to
18  the bankruptcy filing?
19      A.   The discussions with Barclays
20  continued straight through to Sunday morning
21  where it appeared at one point in time that
22  there was a handshake deal for the entire
23  company in a structured transaction.
24      Q.   Now, in the interest of your time
25  and everybody's time today we can agree that

TSG Reporting - Worldwide  (877) 702-9580

Page 18

1    H. McGEE - HIGHLY CONFIDENTIAL
2    the structured transaction for the entire
3    company did not take place. What took place
4    was a sale of the assets, right?
5        A.   That is correct.
6        Q.   Okay. If you know, why didn't the
7    structured transaction for the entire company
8    take place?
9        A.   I could give you my understanding.
10       Q.   Sure.
11       A.   I can tell you I was sitting in a
12   conference room at the Simpson Thacher
13   Conference Center with Jerry Del Missier, the
14   president of BarCap, and we were talking about
15   various plans as we consummated the
16   transaction, things that we could do moving
17   forward, et cetera. My cell phone rang and it
18   was from a team that was down at the New York
19   Fed. And they reported to me that in fact the
20   transaction had fallen apart on some
21   regulatory approvals. So everything I would
22   tell you at that point on is second hand.
23       Q.   Let's stay with your first-hand
24   knowledge for the moment. Did you have an
25   understanding of what the regulatory approval

TSG Reporting - Worldwide  (877) 702-9580

Page 19

1    H. McGEE - HIGHLY CONFIDENTIAL
2    issue was?
3        A.   I have an understanding what was
4    told to me.
5        Q.   Okay. Do that.
6        A.   That the FSA had some objections
7    to effectively stepping into the shoes of
8    Lehman on the trading side and an unlimited
9    guarantee without shareholder approval.
10       Q.   Okay. After the FSA issue arose,
11   was there a point, however brief, where the
12   discussions with Barclays came to a halt?
13       A.   Yes.
14       Q.   And did those discussions resume
15   at any point before the filing of Lehman
16   Brothers Holdings for bankruptcy protection?
17       A.   No.
18       Q.   By the way, I should ask you in
19   the description of your employment that you
20   gave me before, were you an officer of
21   Holdings or Lehman Brothers, Inc. or both?
22       A.   That's a good question.
23       Q.   Everybody answers that that way.
24       A.   I assume of Holdings but maybe
25   both. We never thought about the corporate

TSG Reporting - Worldwide  (877) 702-9580

Page 20

1    H. McGEE - HIGHLY CONFIDENTIAL
2    structure.
3        Q.   Sure.
4        A.   Until that Sunday, the honest
5    answer is I don't know. My business card said
6    Lehman Brothers.
7        Q.   So Holdings files for bankruptcy
8    in the early -- very early morning hours of
9    Monday, the 15th. And I'd like to focus your
10   attention on that time period.
11       At what point after that does it
12   come to your attention that there are renewed
13   discussions with Barclays about the
14   transaction?
15       A.   I'd received a phone call from
16   Bart McDade that evening that said we're going
17   to try to see if there's an opportunity to
18   pursue a transaction with Barclays and we're
19   going to meet first thing in the morning.
20       MR. STERN: You just may want to
21   clarify what "that evening" is.
22       Q.   That was my next question. When
23   you say that evening, are we on the evening of
24   Sunday?
25       A.   Sunday.

TSG Reporting - Worldwide  (877) 702-9580

Page 21

1    H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   Going into Monday.
3        A.   Going into Monday. Sunday
4    evening.
5        Q.   And, best you recall, tell me what
6    Mr. McDade told you about the nature of the
7    transaction that was being contemplated at
8    that time.
9        A.   That we were going to get teams
10   together to see if there was -- still a way to
11   do a transaction.
12       Q.   Okay. What happened next?
13       A.   I communicated with some of my
14   team, including Mr. Shafir, Shapiro, some
15   others, and we had agreed to meet first thing
16   in the morning at Lehman Brothers. I can't
17   remember if that was 7 a.m., 7:30, 6:30. But
18   it was relatively early.
19       Q.   And on the Monday morning -- is
20   there a point on the Monday morning where you
21   catch up with Mr. McDade?
22       A.   Yeah. I think I probably saw him
23   first thing.
24       Q.   And when you saw Mr. McDade first
25   thing what did you say to him, what did he say

TSG Reporting - Worldwide  (877) 702-9580

Page 22

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **to you about the possibility of renewed**
3    **negotiations with Barclays?**
4        A.   I can't recall specifically what
5    was said.
6        **Q.   All right.  And did there come a**
7    **time when an agreement was reached with**
8    **Barclays about a transaction?**
9        A.   Sure.  At some point over the next
10   two days, you know, agreement was reached and
11   an agreement was signed.  I don't recall
12   exactly what time it was.
13       **Q.   And in the course of those**
14   **negotiations of that agreement, did you have**
15   **any involvement in negotiating with people**
16   **from Barclays?**
17       A.   Yes.
18       **Q.   Describe your role in those**
19   **negotiations.**
20       A.   As I mentioned before I was
21   focused on preserving the franchise.  That
22   involved keeping the people and making sure
23   they were treated fairly.  So the place where
24   I was most directly involved was the
25   provisions of the agreement dealing with comp

TSG Reporting - Worldwide  (877) 702-9580

Page 23

1        H. McGEE - HIGHLY CONFIDENTIAL
2    and severance.
3        **Q.   Did you have any role at all in**
4    **the negotiation of the terms of the agreement**
5    **regarding the purchase of assets?**
6        A.   No.
7        **Q.   Were you present while any of**
8    **those negotiations took place regarding the**
9    **purchase of assets?**
10       A.   The answer is yes.  But I was
11   walking in and out of the room.
12       **Q.   Okay.**
13       A.   So I wasn't directly involved in
14   the -- you know, taking the ball all the way
15   down the field so to speak.  I was in and out
16   of the room.  I was trying to make sure the
17   overall -- that we were -- that we had an eye
18   on the different pieces of the transaction and
19   that they were all moving along so that we
20   didn't forget something since we had to get
21   the entire thing done in 48 hours.
22       **Q.   When you say you were in and out**
23   **of the room, what room are you referring to?**
24       A.   One of the conference rooms that
25   was the larger ones up on the 32nd floor of

TSG Reporting - Worldwide  (877) 702-9580

Page 24

1        H. McGEE - HIGHLY CONFIDENTIAL
2    Lehman Brothers where everyone was basically
3    situated.
4        **Q.   And was there -- as I understand**
5    **it there's a lot of activity going on on the**
6    **32nd floor that day and that night.  Was there**
7    **one room where -- you would characterize as**
8    **the main table where the negotiations were**
9    **going on?**
10       A.   There's a -- one of the larger
11   dining rooms had a large conference table in
12   it and that was a room where there was a lot
13   of meetings to discuss stuff with two sides
14   because there was more seating and there was
15   also kind of an anti-room next to that.
16       **Q.   Is that the room where McDade is**
17   **negotiating?**
18       A.   He was moving around as well is my
19   recollection.  But I wasn't keeping track of
20   his specific whereabouts all the time.
21       **Q.   Do you know -- is there anyone you**
22   **would describe as the primary or main**
23   **negotiators for Barclays?**
24       A.   Again, my participation in the
25   direct negotiations was somewhat limited but

TSG Reporting - Worldwide  (877) 702-9580

Page 25

1        H. McGEE - HIGHLY CONFIDENTIAL
2    in the times I was in the room Archie Cox was
3    in there a lot.
4        **Q.   Anyone else from Barclays?**
5        A.   Certainly Rich Richie was on the
6    scene.
7        **Q.   And anyone else?**
8        A.   Not that I saw in the room.
9        **Q.   Do you know a man named Michael**
10   **Klein?**
11       A.   Yes.
12       **Q.   Was Michael Klein involved in the**
13   **negotiations?**
14       A.   Yes.  But he was an advisor.
15       **Q.   To whom?**
16       A.   Barclays.
17       **Q.   Do you know where Mr. Klein works**
18   **today?**
19       A.   No.
20
21
22              REDACTED
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 26

REDACTED

20    Q.    Well, prior to -- let me just put
21    some dates in place so we're clear where we
22    are in the week. The asset purchase agreement
23    was signed on September 16th and the
24    transaction closed on Monday, the 22nd, so
25    with those two dates in mind a lot of my

Page 27

1    H. McGEE - HIGHLY CONFIDENTIAL
2    questions will relate to that time period.
3         Prior to the closing of the
4    transaction on the 22nd of September, were you
5    engaged in any negotiations with Barclays
6    concerning your compensation as a Barclays
7    employee after the transaction?
8         A.  Yes. I had a discussion with Bob
9    Diamond.
10        Q.   Just one discussion?
11        A.   Two discussions.
12        Q.   Okay. Could you describe each of
13   them to me, when they took place and who said
14   what.
15        A.   Both discussions took place that
16   Monday evening. Bob Diamond approached me and
17   told me what he was thinking about for '08
18   compensation. He also indicated that it was
19   important that I joined Barclays and run
20   investment banking for Barclays. And my
21   understanding is that there were a group of
22   people that were important to agree to join
23   and that I was one of those people.
24        Q.   Who else was in the group of
25   people for whom it was important to join?

Page 28

1    H. McGEE - HIGHLY CONFIDENTIAL
2         A.   I assume Bart McDade and others.
3    You know, Jerry Donini. People that ran
4    important businesses that were an important
5    part of delivering the actual franchise as
6    part of the transaction.
7         Q.   In addition to McDade and Donini,
8    do you remember specifically who any of those
9    people were?
10        MR. STERN: Objection to the form.
11   I don't think he said that he
12   remembered. He said he assumed.
13        MR. GAFFEY: Okay. That's fair.
14        Q.   But, do you have an idea, then,
15   sir, of who the other people were in addition
16   to McDade and Donini?
17        MR. STERN: Same objection.
18        A.   Well, I assume -- I did not see --
19   there was discussion of seven. I can
20   speculate who the seven were but no one told
21   me specifically who they were and I'm sure you
22   have that information.
23        Q.   When you were devoting some of
24   your energies to moving capital over to
25   Barclays and keep the franchise intact and all

Page 29

1    H. McGEE - HIGHLY CONFIDENTIAL
2    of that, was there a group of about eight
3    senior executives that were deemed critical to
4    the transaction?
5         A.   I believe that's right.
6         Q.   Were you involved in any way in
7    the determination as to who those eight
8    critical executives were?
9         A.   No.
10        Q.   And was there a group of
11   approximately 200 Lehman personnel who were
12   deemed important and some percentage of them
13   had to go over to Barclays for the deal to
14   close?
15        A.   My understanding is that there was
16   such a designation.
17        Q.   Okay. And were you involved in
18   putting together that group of 200 or so?
19        A.   Yes. Insofar as it involved
20   investment bankers.
21        Q.   Now, you said you spoke to Mr.
22   Diamond on that Monday. Again, for date
23   purposes are we on Monday, the 15th?
24        A.   Correct.
25        Q.   Okay. And when you spoke -- and

Page 30

1  **H. McGEE - HIGHLY CONFIDENTIAL**
2  **that was one of two conversations you had with**
3  **Mr. Diamond.**
4  A.  (Witness nods.)
5  **Q.  When was the second one?**
6  A.  Later that same evening.  Night.
7
8
9
10
11
12
13
14
15              REDACTED
16
17
18
19
20
21
22
23
24
25

Page 31

1
2
3
4
5
6
7
8
9
10
11
12              REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 32

1
2
3
4
5
6
7
8
9
10
11
12              REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 33

1
2
3
4
5
6
7              REDACTED
8
9
10
11
12
13
14
15
16
17              **Q.   And was that -- to your knowledge,**
18  **was the fact that Mr. Diamond had made an**
19  **employment offer to you during the**
20  **negotiations disclosed to the boards of Lehman**
21  **Brothers Holdings and Lehman Brothers, Inc.?**
22          MR. STERN:  Objection to the form.
23  **Q.   Do you know one way or the other?**
24  A.   I have no idea.
25  **Q.   And do you know if the discussions**

Page 34

1      H. McGEE - HIGHLY CONFIDENTIAL
2   about employing other senior executives at
3   Lehman apart from yourself that you were
4   talking to Mr. Diamond about, were disclosed
5   to the board of either Lehman Brothers
6   Holdings or Lehman Brothers, Inc.?
7      A.   I have no idea.
8      Q.   Do you know if Mr. McDade was in
9   similar discussions with Barclays during the
10  week leading up to the closing on 22nd of
11  September?
12     A.   I have no idea.
13     Q.   You referred in one of your
14  answers a minute ago to the division.  When
15  you say that, are you referring to the
16  investment banking division?
17     A.   Yes.  The investment banking
18  division.
19     Q.   Now, there were portions -- and
20  I'll show it to you in a while.  We'll come
21  back to some more detail on this so I'm
22  looking for your general recollection at this
23  point.  But there were portions of the asset
24  purchase agreement that dealt with the issue
25  of compensation to transferred employees; that

TSG Reporting - Worldwide  (877) 702-9580

Page 35

1      H. McGEE - HIGHLY CONFIDENTIAL
2   is, employees that went from Lehman to
3   Barclays.
4      Do you have a general
5   understanding that that's so?
6      A.   Yes.
7      Q.   Okay.  Did you have any
8   involvement in the negotiation of the terms of
9   those provisions of the asset purchase
10  agreement?
11     A.   Yes, I did.
12     Q.   Okay.  And just as a general
13  matter, and again I'll show you the final at
14  some later point today, but did you look at
15  drafts of that provision?
16     A.   Yes.
17     Q.   Those provisions?
18     A.   Yes.
19     Q.   And did you engage in negotiations
20  about the terms of those provisions with
21  personnel from Barclays?
22     A.   Yes.
23     Q.   And with whom at Barclays did you
24  engage in those discussions?
25     A.   There were a number of people in

TSG Reporting - Worldwide  (877) 702-9580

Page 36

1      H. McGEE - HIGHLY CONFIDENTIAL
2   the room but I recall that Archie Cox was one
3   of the more senior people from Barclays in the
4   room.
5      Q.   And, again, for lack of a better
6   term, would it be fair to describe Archie Cox
7   as the principal negotiator from Barclays on
8   that issue?
9      MR. STERN:  Objection to form.
10     A.   Don't know.
11     Q.   Well, were you talking to anybody
12  from Barclays other than Archie Cox about
13  these matters?
14     A.   There were a bunch of people in
15  the room.  I didn't know all the people from
16  Barclays so I don't know who else -- who was
17  lawyers, inside lawyers, outside lawyers, who
18  was -- but Archie Cox is a name of a person
19  that I remember was in the room.
20     Q.   And apart from yourself, were
21  there others on the Lehman side of the table
22  engaged in discussions with Barclays about the
23  terms of compensation for transferred
24  employees?
25     A.   Mark Shafir who was head of M&A

TSG Reporting - Worldwide  (877) 702-9580

Page 37

1      H. McGEE - HIGHLY CONFIDENTIAL
2   was kind of very focused on all aspects of the
3   deal.
4      Q.   Anyone else?
5      A.   No.
6      Q.   What lawyers were involved in
7   drafting the provisions of the APA concerning
8   compensation?  For transferred employees.
9      A.   I don't know.
10     (Deposition Exhibit 98, document
11     bearing production number 10282956,
12     marked for identification as of this
13     date.)
14  BY MR. GAFFEY:
15     Q.   Mr. McGee, I've put before you
16  what we've marked as Deposition Exhibit 98, a
17  one-page document bearing number 10282956.
18     Have you seen that document
19  before?
20     A.   I don't recall.
21     Q.   Do you know what it is?  You'll
22  see that it appears to be an e-mail from Peter
23  Calistri to you.
24     A.   I see that it's an e-mail from
25  Peter Calistri to me.

TSG Reporting - Worldwide  (877) 702-9580

Page 38

H. McGEE - HIGHLY CONFIDENTIAL

1
2    Q.    Okay. Who's Peter Calistri?
3    A.    Peter Calistri is the CFO of the
4    investment banking division at Lehman
5    Brothers.
6    Q.    And the e-mail is entitled Exec
7    Comm Comp and Retention and lists the names of
8    six people. Parker, Weiss, Stephenson,
9    Wieseneck, Gatto, Hash.
10        Do you see that?
11    A.    Yes.
12    Q.    Do you know who those people are?
13    A.    Yes. I know who these people are.
14    Q.    Who are they?
15    A.    Those are the names of the
16    investment banking executive committee that
17    are from Lehman Brothers.
18    Q.    Now, when you referred a few
19    moments ago to a group of about eight -- when
20    we were talking a few moments ago about a
21    group of eight senior Lehman executives who
22    were critical to the transaction, are these
23    six people among those eight?
24    A.    No. Not to my knowledge.
25    Q.    And forgive me. I may have

Page 39

H. McGEE - HIGHLY CONFIDENTIAL

1
2    forgotten if I asked you this and you answered
3    it.
4        Do you know who the eight were who
5    were the critical eight?
6    A.    I answered previously that I
7    assumed it was McDade, Jerry Donini, Eric
8    Felder. Some people that ran some major
9    businesses that presumably BarCap would want
10    the business leaders who led the people to
11    come across, but I don't -- no one ever shared
12    that list with me.
13    Q.    Now, these people, Parker, Weiss,
14    Stephenson, Wieseneck, Gatto and Hash, did
15    they all work for you?
16    A.    They all worked for me in
17    investment banking.
18    Q.    And did you spend time during the
19    week leading up to the closing on the 22nd
20    addressing compensation for this group of six
21    people?
22    A.    Yes. We talked about
23    compensation, what it might take to retain
24    some of these people. But this is -- this is
25    just an e-mail somewhere along the way. I

Page 40

H. McGEE - HIGHLY CONFIDENTIAL

1
2    don't think any of these numbers were pinned
3    down at this point.
4    Q.    Did there come a point where
5    numbers were pinned down for people in the
6    investment banking division?
7    A.    Yes. There did come a point when
8    numbers were pinned down for people.
9    Q.    When did that happen?
10    A.    It varied person by person and
11    group by group. It was an iterative process
12    that took quite a while.
13    Q.    Okay. Was it pinned down before
14    the transaction closed?
15    A.    Was what pinned down?
16    Q.    Compensation for the senior
17    executives within the investment banking
18    division.
19    A.    Specific numbers next to specific
20    names?
21    Q.    Yes.
22    A.    No.
23    Q.    When were there specific numbers
24    next to specific names?
25    A.    It would have been weeks and

Page 41

H. McGEE - HIGHLY CONFIDENTIAL

1
2    almost a month later.
3    Q.    By later after the closing.
4    A.    Later after the closing, correct.
5    Q.    Okay. On Exhibit 98 with respect
6    to Mr. Parker and Mr. Gatto, you'll notice
7    that there's a column for 2009.
8        Do you see that?
9    A.    Yes, I do.
10    Q.    As a general matter, without
11    reference to that particular document, as a
12    general matter were some of the investment
13    banking division personnel -- withdrawn.
14        With respect to some of the
15    investment banking division personnel were
16    there discussions about retention payments
17    that would be paid or guaranteed in connection
18    with 2009? As opposed to 2008?
19    A.    The 2009 column next to Parker in
20    this particular e-mail refers to a guarantee
21    of compensation for the year 2009. In other
22    words, a two-year agreement of compensation
23    for '08 and '09.
24        The retention amount was a
25    separate retention program that was being put

1    H. McGEE - HIGHLY CONFIDENTIAL
2  in by BarCap that was consistent with trying
3  to hold the franchise together and somewhat
4  make up for the wipe-out on the net worth of
5  all the senior Lehman people to -- the
6  retention program was structured such that it
7  vested over a couple of years.
8    Q.   And have you heard that retention
9  program referred to as a special cash award?
10   A.   No, I have not heard it referred
11 to as that.
12   Q.   Is that a term you've heard before
13 in connection with compensation?
14   A.   No.
15   Q.   Withdrawn.
16   I --
17   (Deposition Exhibit 99, document
18   bearing production number 10265851,
19   marked for identification as of this
20   date.)
21 BY MR. GAFFEY:
22   Q.   Mr. McGee, I've put before you
23 what we've marked as Deposition Exhibit 99 an
24 e-mail from Tim Sullivan sent Saturday,
25 September 20th, 8:27 p.m. Greenwich meantime

1    H. McGEE - HIGHLY CONFIDENTIAL
2  which would put it at about 4:27 p.m. eastern
3  time to you, a copy to Jennifer Becker.
4  Subject, Exec Comm Deals.
5    Have you seen this before?
6    A.   Yeah.  This is an e-mail to me
7  from Tim Sullivan.
8    Q.   Okay.  Who's Tim Sullivan?
9    A.   Tim Sullivan works for me in my
10 office.
11   Q.   Did he have a particular role or
12 function?  What I want to know is he an HR guy
13 or did he have some kind of line
14 responsibility?
15   A.   He is -- you might think of him as
16 almost a chief of staff for me.
17   Q.   And in that e-mail marked as
18 Deposition Exhibit 99 there are references
19 again to Weiss, Parker, Ros, who I believe
20 would be a reference to Stephenson; is that
21 right?
22   A.   That is correct.
23   Q.   Larry, that would be a reference
24 to Wieseneck; is that correct?
25   A.   That is correct.

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Q.   Gatto and Hash.  Mr. Sullivan
3  writes to you here, "Barclays has drafted the
4  letters to IBD exec members but we want to
5  confirm the terms hasn't changed.  Below is
6  what we currently have on our sheets.  Any
7  changes we should post Barc on."
8    Were there -- now we're at
9  Saturday the 20th.  We're two days before the
10 closing.  Were you at that stage of the week
11 involved in the negotiations of what the
12 particular numbers would be for these six
13 people?
14   A.   Continuing to have discussions --
15 at that point on Saturday I had -- I had left
16 New York on Wednesday to fly to London to try
17 and see if there was an opportunity to put a
18 transaction together for the European business
19 of Lehman Brothers.  So this was all -- I'm
20 not sure when I received this e-mail, whether
21 I was on a plane, if I was in London at the
22 time or if I was flying back.  But there
23 was -- there were no letters that were signed
24 and I think the final numbers around all these
25 people changed even from these numbers.

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Q.   Okay.  When you went to London,
3  was that at the request of Mr. Diamond?
4    A.   No.
5    Q.   Did there come a point where Bob
6  asked you to go to London?
7    A.   No.
8    Q.   During that week?
9    A.   No.
10   Q.   Were there discussions about the
11 European business with Barclays or with other
12 entities?
13   A.   I flew to London because I
14 personally felt horrible about the way the
15 transaction had played out for the people in
16 London.  And I was getting bombarded with
17 phone calls and e-mails, what are we to do,
18 are were in the transaction, is there a plan
19 for step 2.
20   So I flew over as much as anything
21 out of a feeling of personal obligation to all
22 those colleagues that I had hired and had
23 worked for me.  Spent time trying to figure
24 out whether there was the potential for a
25 transaction.  Jerry Del Missier also came to

Page 46

1    H. McGEE - HIGHLY CONFIDENTIAL
2  London. But given the absolute devastation in
3  the financial markets there was not scope or
4  appetite to put together a significant
5  transaction.
6    Q.  Jerry Del Missier was from
7  Barclays?
8    A.  That is correct.
9    Q.  Did he go with you on the trip?
10    A.  No. He arrived after I was
11  already there.
12    Q.  And were you in discussions -- was
13  he involved in these discussions about looking
14  for some sort of remedy to the European
15  issues?
16    MR. STERN: Objection to the form.
17    Q.  I think you can answer it.
18    A.  I'm not sure what you mean by
19  "remedy to the European issues." That's --
20  it's -- depending on who you ask that question
21  to there's a long list of things that need to
22  be remedied.
23    Q.  Yeah, I guess that's right. Let
24  me try to ask it a different way.
25    You go to London to meet with

Page 47

1    H. McGEE - HIGHLY CONFIDENTIAL
2  people who you have hired because you have
3  some concern about what's going to befall them
4  because of the transaction. You're looking
5  for some sort of transaction on the European
6  side of things. Is Mr. Del Missier involved
7  with you in that effort?
8    A.  He was in Europe. We spent some
9  time. He was focused on I think a lot of
10  things in addition to that given the world was
11  blowing up.
12    Q.  Did you meet with Mr. Diamond when
13  you were in London?
14    A.  No.
15    (Deposition Exhibit 100, document
16  with the first page bearing production
17  number 10287489, marked for
18  identification as of this date.)
19  BY MR. GAFFEY:
20    Q.  Mr. McGee, I've put before you
21  what we've marked as Deposition Exhibit 100, a
22  multi-page document bearing 10287489 with a
23  series of attachments. Take a minute, please,
24  to look through it sufficiently to tell me
25  whether you recall seeing it before.

Page 48

1    H. McGEE - HIGHLY CONFIDENTIAL
2    MR. CHEPIGA: Bob, I don't know if
3  you care but the document -- these
4  numbers are not sequential after that
5  first number.
6    MR. GAFFEY: They're not, Mike,
7  because the number system that was used
8  to -- they have not been turned over in
9  discovery so they're not subsequent
10  Bates numbers.
11    MR. CHEPIGA: But you know that
12  they go together.
13    MR. GAFFEY: That's how they came
14  out of the box, yeah. I don't mean the
15  box. My best knowledge is, yeah, this
16  is a singular document.
17    Can you repeat the question?
18    Q.  Have you seen the document before?
19    MR. CHEPIGA: In fact, I see there
20  are two pages with the same numbers on
21  two consecutive pages.
22    MR. GAFFEY: You will because the
23  document is numbered, not the pages
24  same.
25

Page 49

1    H. McGEE - HIGHLY CONFIDENTIAL
2  BY MR. GAFFEY:
3    Q.  Have you seen the document before?
4    A.  This appears to be an e-mail
5  addressed to me which has some drafts of
6  potential contracts.
7    Q.  Okay. Now, the e-mail is dated
8  September 21, 2008, 10:04 p.m. Greenwich
9  meantime which is about 6:04 p.m. eastern
10  time.
11    By that time, by Sunday night,
12  were there final offer letters put together
13  for this group of people including Mr. Gatto,
14  Mr. Weiss, Mr. Wieseneck, and Mr. Hash?
15    A.  No. I don't believe any of these
16  letters were final.
17    Q.  And there's a c.c. on this e-mail
18  to a Melissa Kastens. Do you know who Ms.
19  Kastens is?
20    A.  I do not know Melissa Kastens.
21    Q.  Mr. McGee, were you one of the
22  eight critical employees?
23    MR. STERN: Objection to the form.
24    A.  I assume that I was. But no one
25  ever -- I never saw the list. I saw a

Page 50

1        H. McGEE - HIGHLY CONFIDENTIAL
2   reference to eight.
3        Q.   Um-hum.
4        A.   But I -- Bob had mentioned to me
5   we're not going to do this deal if you're not
6   going to run investment banking. I assumed
7   that I was. But -- and that was the context
8   in which I took his statement that I was one
9   of that number.
10       Q.   Who would you ask if you wanted to
11  know if you were one of the eight critical
12  people?
13       A.   Who would I have asked?
14       Q.   Who would you ask now? I'd like
15  to put them over there and ask them. So who
16  would you ask now?
17       A.   I would ask the people who put
18  that list together which are the senior BarCap
19  people.
20       Q.   Amongst the former Lehman people
21  who would you ask?
22       A.   Bart McDade.
23           (Deposition Exhibit 101, document
24           with the first page bearing production
25           number 10322002, marked for

TSG Reporting - Worldwide  (877) 702-9580

Page 51

1        H. McGEE - HIGHLY CONFIDENTIAL
2        identification as of this date.)
3            MR. STERN:  Could we just go off
4   the record for a second.
5            (Discussion held off the record.)
6   BY MR. GAFFEY:
7        Q.   Okay.  We're back on the record.
8            Mr. McGee, have you seen the
9   document that we've marked as Exhibit 101?
10  Have you seen that before?
11       A.   No.  This is the first I've seen
12  of this.  It's not addressed to me.
13           MR. STERN:  I guess we should just
14           note on the record that which we stated
15           off the record which was a concern about
16           the non-sequential numbering of
17           the attachments to the exhibit and an open
18           question as to whether the attachments
19           are, in fact, attachments to the
20           original e-mail but subject to that
21           objection.
22  BY MR. GAFFEY:
23       Q.   Mr. McDade, would you turn to the
24  sixth page.
25           MR. STERN:  McGee.

TSG Reporting - Worldwide  (877) 702-9580

Page 52

1        H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   I beg your pardon.  There's too
3   many Mcs in here.  I meant that as a reference
4   to me, folks.  I'm sorry.
5            Mr. McGee, would you please turn
6   to the sixth page from the back of this
7   document.
8        A.   I see it.
9        Q.   And do you know, Mr. McGee,
10  whether an offer of employment was made to Mr.
11  McDade during the week preceding the closing
12  on September 22nd?
13       A.   I would have no way of knowing
14  that one way or the other.
15       Q.   And if you would now turn to the
16  second page of the exhibit.  And I would
17  direct your attention to the three-page
18  unsigned letter that begins there.  Appears to
19  be addressed to Hugh E. McGee, III.  September
20  18th.  Ask you if you've seen those three
21  pages before.
22       A.   This looks like a draft of the
23  agreement that Barclays -- that I signed with
24  Barclays.
25       Q.   Did you see a draft written

TSG Reporting - Worldwide  (877) 702-9580

Page 53

1        H. McGEE - HIGHLY CONFIDENTIAL
2   employment agreement sometime on or around the
3   date this document bears, September 18th?
4        A.   I'm not sure when I was actually
5   handed a draft of an agreement.
6        Q.   Do you recall if you saw a draft
7   of a written agreement at any point prior to
8   the 22nd?
9        A.   No.  I would not have because
10  draft agreements were not -- they didn't send
11  me an e-mail.  It would have been handed to
12  me.  And so it would have been after the
13  closing when I would have first seen the draft
14  of my agreement.
15       Q.   I just want to follow up on that a
16  little bit because I think we're talking about
17  two issues and I want to separate them a
18  little bit.
19           When you did see draft agreements
20  they weren't sent to you by e-mail, they were
21  handed to you in hard copy; is that right?
22       A.   Of my contract.  This Exhibit 101
23  that you have handed to me, they never would
24  have sent me contract terms for Bart McDade,
25  Eric Felder, Jerry Donini, who were either

TSG Reporting - Worldwide  (877) 702-9580

Page 54

1        H. McGEE - HIGHLY CONFIDENTIAL
2  people at my level or above me. I never would
3  have seen this information.
4      Q.    With respect to your contract
5  offer, your contract documents --
6      A.    They would have -- the practice
7  was to hand you a written agreement. I was in
8  Europe. I went to Texas for the weekend.
9  Came back. So this -- my actual contract
10 caught up with me some sometime after the
11 fact.
12     Q.    After the 22nd.
13     A.    Yes.
14     Q.    Okay.
15         (Deposition Exhibit 102, document
16     bearing production number
17     BCI-EX-(S)-00003505, marked for
18     identification as of this date.)
19         (Deposition Exhibit 103, document
20     bearing production numbers
21     BCI-EX-00077338 through BCI-EX-00077340,
22     marked for identification as of this
23     date.)
24         MR. STERN: After you get through
25  these maybe we'll take a short break.
TSG Reporting - Worldwide  (877) 702-9580

Page 55

1       H. McGEE - HIGHLY CONFIDENTIAL
2         MR. GAFFEY: Yeah. It would be
3  good to take a break.
4  BY MR. GAFFEY:
5      Q.    Mr. McGee, I put two documents
6  before you, one marked Exhibit 102, a one-page
7  e-mail bearing Bates number
8  BCI-EX-(S)-00003505, and the other a
9  three-page document bearing Bates number
10 BCI-EX 000077338 through -340 proving Mr.
11 Stern has a better Bates numbering system than
12 I do.
13         Have you seen either of those
14 documents before?
15     A.    The -- yes. The item 103 is the
16 contract that I ultimately signed.
17     Q.    And that is your signature on the
18 last page?
19     A.    That is my signature on page 3.
20     Q.    And it appears to have been dated
21 on October 7th, 2008. Did you put that date
22 in there when you signed it?
23     A.    Yes, I did.
24     Q.    Okay. That's your handwriting?
25     A.    Yes, it is.
TSG Reporting - Worldwide  (877) 702-9580

Page 56

1        H. McGEE - HIGHLY CONFIDENTIAL
2      Q.    And does this document accurately
3  state your compensation agreement with
4  Barclays for employment that commenced on
5  September 22nd, 2008? I'm making note of the
6  start date in the document.
7      A.    Yes, it does.
8      Q.    Now, if you would take a look at
9  Exhibit 102, Mr. McGee, that's an e-mail from
10 you to an address called Accept Barclays
11 Offer.
12         Do you recall sending this
13 document?
14     A.    I don't recall specifically but my
15 assumption is that there was a central
16 clearinghouse that you had to send an e-mail
17 into to basically say you're in or not. I
18 didn't have my contract yet. But I thought it
19 was important for me to be shown as in the --
20 you know, in the list of -- I didn't want to
21 continue showing up on the list of people who
22 were not "in." I think that is my
23 recollection.
24     Q.    As I understand it, for the
25 transferred employees there was a sort of
TSG Reporting - Worldwide  (877) 702-9580

Page 57

1        H. McGEE - HIGHLY CONFIDENTIAL
2  default. If you didn't say yes at a certain
3  point you would be deemed to say no. So you
4  had to say yes to a website of some kind.
5      A.    There was some sort of an e-mail
6  that went into some sort of a central thing
7  and I still didn't have my contract because
8  obviously that wasn't signed until a couple of
9  weeks later. But I had a handshake deal with
10 Bob Diamond. I had no reason to not believe
11 that at some point the -- you know, a contract
12 in line with the handshake deal would come
13 forth.
14     Q.    When did you reach the handshake
15 deal?
16     A.    That night.
17     Q.    Was the handshake deal on the
18 numbers that are shown --
19     A.    The night that -- you know, that I
20 described earlier, the two conversations. It
21 was the Monday night, whatever night that was.
22     Q.    That's Monday, the 15th?
23     A.    That would be Monday, the 15th.
24
25         REDACTED
TSG Reporting - Worldwide  (877) 702-9580

Page 58

REDACTED

6   **Q. Okay.**
7      MR. GAFFEY: This is a good time
8  for a break.
9      MR. STERN: Yeah. Let's take a
10 short break. Good.
11    (Recess taken.)
12 BY MR. GAFFEY:

REDACTED

Page 59

REDACTED

Page 60

REDACTED

Page 61

REDACTED

7   **Q. Okay. Now, when you were involved**
8 **in the negotiations of the asset purchase**
9 **agreement, we spoke a while before the break**
10 **about aspects of that agreement that covered**
11 **compensation to transferred employees.**
12    **Do you recall that?**
13   **A. Yes.**
14   **Q. And that was a part of the**
15 **agreement that you were involved in, correct?**
16   **A. Correct.**
17   **Q. Okay. And do you recall that**
18 **there was a pool set aside, an amount of money**
19 **set aside for Barclays to pay transferred**
20 **employees in respect of their '08 Lehman --**
21      MR. STERN: Objection to the form.
22   **Q. -- compensation?**
23      MR. STERN: Can I hear the
24 question again?
25      MR. GAFFEY: I can rephrase it.

Page 62

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Never mind. Withdrawn.
3    Q.    As best you recall, sir, what
4    aspects of the asset purchase agreement
5    addressed compensation to be paid by Barclays
6    to Lehman employees? Describe them as best
7    you remember.
8    A.    There was a provision in the
9    contract that dealt with compensation and how
10   continuing employees were to be treated and
11   how employees who were not continuing
12   employees were to be treated.
13   Q.    Do you have any more independent
14   recollection on that?
15   A.    No.
16   Q.    We'll come to the documents, okay.
17   I'd like to switch topics here and
18   in particular switch time periods and go back
19   to the period in the week prior to the
20   bankruptcy filing, okay? If you could...
21   And I think you mentioned to me
22   this morning that you had some involvement
23   going back as far as March but certainly in
24   the week before that looking for transactions
25   with Bank of America, with Barclays, other

TSG Reporting - Worldwide  (877) 702-9580

Page 63

1    H. McGEE - HIGHLY CONFIDENTIAL
2    potential transaction parties.
3    Were any investment bankers
4    retained to assist in that during that time
5    period?
6    A.    Retained by Lehman Brothers?
7    Q.    Yes, sir.
8    A.    There was another investment bank
9    that was retained by Lehman Brothers to give
10   an independent point of view to the board.
11   That investment bank was Lazard.
12   MR. GAFFEY: Let's mark this as
13   104.
14   (Deposition Exhibit 104, e-mail
15   dated 9/14/2008 6:15 a.m. with
16   attachments, marked for identification
17   as of this date.)
18   BY MR. GAFFEY:
19   Q.    Take a look, Mr. McGee, through
20   the document we've marked as Exhibit 104. Let
21   me know when you've had a chance to do that
22   sufficient to tell me whether you've seen it
23   before.
24   (Document review.)
25   A.    Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 64

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Q.    Have you seen the document before,
3    sir?
4    A.    If I've seen it I don't remember
5    it.
6    Q.    The document appears to be an
7    e-mail from Brad Whitman to you and others if
8    you take a look at the first page. Who's Brad
9    Whitman?
10   A.    Brad Whitman worked for Lehman
11   Brothers. He was an M&A banker focused on
12   FIG. Financial institutions.
13   Q.    Did he report to you, directly or
14   indirectly?
15   A.    Indirectly.
16   Q.    Okay. If you would take a look,
17   please, at the fifth slide in the slide dec
18   that's attached to that e-mail entitled Sales
19   Strategic Investment Process, can I just -- if
20   you don't mind if I come around. I want to
21   make sure we're on the same page here.
22   A.    This one (indicating)?
23   Q.    Yeah. That's the one.
24   Did the term Green come to your
25   attention as a pseudonym for Lehman in

TSG Reporting - Worldwide  (877) 702-9580

Page 65

1    H. McGEE - HIGHLY CONFIDENTIAL
2    materials that were prepared in connection
3    with potential transactions?
4    A.    I assume that Green was Lazard's
5    code name for Lehman.
6    Q.    Okay. There's a description on
7    this slide of -- well, it says, "Lazard
8    understands Green has contacted approximately
9    30 strategic private equity sovereign wealth
10   institutions over the last three months about
11   a potential investment in or acquisition of
12   Green. Most of the discussions were premised
13   on a separation of Green's commercial real
14   estate assets. Lazard was not asked to
15   solicit interest for Green."
16   And then there are four columns
17   below that denoting particular entities and
18   characterizing them. Active, current
19   discussions, recent inbound inquiries, et
20   cetera.
21   Do you have any independent
22   knowledge, sir, of a program to conduct
23   strategic -- to contact institutions such as
24   those listed on this slide to see if they were
25   interested in a transaction with Lehman?

TSG Reporting - Worldwide  (877) 702-9580

Page 66

1       **H. McGEE - HIGHLY CONFIDENTIAL**
2       A.   Sure.
3       **Q.   And you'll note that in the**
4    **left-hand column Barclays and Bank of America**
5    **are listed and described as the active current**
6    **discussions, correct?**
7       A.   Correct.
8       **Q.   Okay.  To the right of that**
9    **there's a series of other entities, CITIC,**
10   **Nomura, Korea, Inc., et cetera, et cetera.**
11          **To your knowledge, sir, were any**
12   **of these entities contacted about interest in**
13   **a potential transaction after the asset**
14   **purchase agreement with Barclays was signed on**
15   **the 16th?**
16      A.   To my knowledge, I don't know.  I
17   would think that given the fact that through
18   the course of the summer we had been in
19   contact with almost -- because if you go to
20   the next page -- almost every financial
21   institution on the planet, that if one had
22   interest when one saw the transaction
23   announcement one could have -- we had already
24   contacted a very, very significant number of
25   people who for different reasons had not had
        TSG Reporting - Worldwide  (877) 702-9580

Page 67

1       H. McGEE - HIGHLY CONFIDENTIAL
2    interest.  And -- but I don't know
3    specifically if additional outbound calls were
4    made.  I did not make any.  As I said, I got
5    on a plane to London trying to see if there
6    was a transaction to be done to put the rest
7    of Lehman Brothers back together.
8       **Q.   I'm presuming that while you were**
9    **in London you were in contact with your office**
10   **by phone and by e-mail, right?**
11      A.   Correct.
12      **Q.   Were you in a position to know --**
13   withdrawn.
14          **Did you ever ask during the week**
15   **after the asset purchase agreement was signed**
16   **on September 16th whether the deal was being**
17   **shopped or offered to other parties?**
18      A.   I did not specifically ask.  I
19   cannot believe that if anybody had any
20   interest why they would not have shown up.
21   And there was no one else there.  We had
22   canvassed the world.
23      **Q.   When the asset purchase agreement**
24   **was signed, when it was agreed to, did you**
25   **have an understanding of the economics of the**
        TSG Reporting - Worldwide  (877) 702-9580

Page 68

1       **H. McGEE - HIGHLY CONFIDENTIAL**
2    **transaction that was agreed with Barclays?**
3       A.   You'll have to be more specific.
4    What do you mean by economics?
5       **Q.   Who paid what for what?  What was**
6    **the price given to Barclays?**
7       A.   In general, yes.  And I'll
8    describe that for you.  Specifically, no.
9          In general my understanding was
10   that Barclays was going to buy the building, a
11   couple of data centers, the people, which is
12   really the assets that had value, and, as I
13   stated previously, were evaporating under our
14   feet.
15          And some amount of balance sheet
16   assets which was determined by a separate
17   working group that I'm not familiar with
18   exactly was included in balance sheet items.
19      **Q.   Who was the separate working group**
20   **that determined the balance sheet items?**
21      A.   The balance sheet items were
22   focused on by Alex Kirk, by Bart McDade, by
23   Mike Gelband.  Certainly Ian and Paolo would
24   have been involved as well.
25      **Q.   By Ian you mean Ian Lowitt?**
        TSG Reporting - Worldwide  (877) 702-9580

Page 69

1       **H. McGEE - HIGHLY CONFIDENTIAL**
2       A.   Even Lowitt.
3       **Q.   And Paolo is Paolo Tonucci?**
4       A.   Paolo Tonucci, yes.
5       **Q.   Did you, during the course of --**
6    **excuse me -- during the course of the week**
7    **leading to the closing on the 22nd, did you**
8    **see any work product or analysis generated by**
9    **that working group or people under their**
10   **supervision?**
11      A.   Not to my recollection.
12      **Q.   Did you have a general**
13   **understanding or do you have one today about**
14   **that -- that's two questions.  Withdrawn.**
15          **Did you have a general**
16   **understanding at the time of the value, the**
17   **amount of balance sheet assets, that were**
18   **going to be transferred to Barclays?**
19      A.   No.
20      **Q.   I may have confused that by**
21   **interrupting myself.**
22          **Let me be clear on time period.**
23   **My question goes to at the time, sir.  At the**
24   **time did you have an understanding what**
25   **quantum of balance sheet assets was going to**
        TSG Reporting - Worldwide  (877) 702-9580

Page 70

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **be transferred over to Barclays?**
3        A.    No, I did not. My understanding
4    was that the structure of the transaction was
5    an asset purchase and there was still work
6    being done to agree on exactly what the assets
7    were to be purchased.
8        **Q.    Do you know, sir, if there was any**
9    **discount off the book value of the assets**
10   **transferred, any agreed discount off the book**
11   **value?**
12       A.    I was not involved in that process
13   so I have no idea.
14       **Q.    Did you review the asset purchase**
15   **agreement when it was finalized and signed?**
16       A.    No, I did not.
17       **Q.    Have you reviewed it since?**
18       A.    No, I have not.
19       **Q.    Did anyone ask you to review it at**
20   **the time that it was signed?**
21       A.    No.
22            With the exception of the
23   provision relating to compensation and
24   employees.
25       **Q.    Okay.**
TSG Reporting - Worldwide   (877) 702-9580

Page 71

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2        (Pause on the record.)
3        **Q.    Now, Mr. McGee, I've put before**
4    **you what we previously have marked as**
5    **Deposition Exhibit 1.**
6            **Do you recognize the document?**
7        A.    Actually, I don't recognize it.
8    But I take it for what it's labeled to be.
9        **Q.    Okay.  And that would be the asset**
10   **purchase agreement between Lehman Brothers**
11   **Holdings, Lehman Brothers, Inc., LB 745, LLC**
12   **and Barclays Capital, dated as of September**
13   **16th, 2008?**
14       A.    That is what it says on the cover.
15   Yes, sir.
16       **Q.    Prior to today, have you ever seen**
17   **this document that we've marked as Exhibit 1?**
18       A.    No.  Have not.
19       **Q.    Would you take a look, please,**
20   **at --**
21       A.    Have not seen in it in its
22   entirety.  I have seen a provision
23   (indicating).
24       **Q.    Okay.  You're pointing to a**
25   **provision.  Which one are you pointing to?**
TSG Reporting - Worldwide   (877) 702-9580

Page 72

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **Page 34?**
3        A.    Page 34.
4        **Q.    Okay.**
5        A.    That my counsel has helpfully
6    paged me to.
7        **Q.    And page 34 is the beginning of**
8    **Article 9 entitled Employees and Employee**
9    **Benefits, correct?**
10       A.    Correct.
11       **Q.    And if you would take a look, sir,**
12   **please, through -- you'll note it has three**
13   **subsections, (a), (b), and (c), right?**
14       A.    Yes.
15       **Q.    Were you involved in the drafting**
16   **or the finalizing of the language in**
17   **Exhibit -- in Section 9.1 of the asset**
18   **purchase agreement?**
19       A.    Yes, I was.
20       **Q.    Describe for me as best -- with it**
21   **in front of you, describe for me as best you**
22   **remember exactly what your role was in**
23   **drafting or finalizing that language.**
24       A.    Again, as I mentioned earlier, I
25   had very real-time and serious concerns about
TSG Reporting - Worldwide   (877) 702-9580

Page 73

1        H. McGEE - HIGHLY CONFIDENTIAL
2    the franchise of Lehman Brothers and
3    preserving some value in that franchise.
4    Headhunters were conducting very aggressive
5    campaigns to hire senior employees, groups of
6    employees, entire industry groups.  We had
7    very significant numbers of employees,
8    certainly in investment banking that already
9    had contracts in hand from competitors.  And I
10   was worried about the value of Lehman Brothers
11   was about to walk out the front door if this
12   wasn't handled the right way.
13            So I was involved in the
14   discussion of these provisions.  Two places
15   where I was the most involved had to do with
16   what would happen with employees who didn't
17   end up having a job, would they be treated
18   fairly and appropriately severed because there
19   was bound to be redundancies and I wanted to
20   make sure that the severance program was
21   consistent with the kind of severance program
22   that Lehman had historically utilized.
23            The second was to make sure that,
24   in fact, there was a bonus pool and bonuses
25   paid for employees because, as I mentioned
TSG Reporting - Worldwide   (877) 702-9580

Page 74

1     H. McGEE - HIGHLY CONFIDENTIAL
2  previously, if you're a senior employee you
3  work for a salary which is ultimately a
4  fraction of your compensation and it's about
5  the year-end bonus or year-end compensation.
6     And if we didn't have -- if we did
7  not have an adequate answer to this question I
8  worried about our ability to retain the
9  franchise represented by the employees.
10    Q.   Are you finished with your answer,
11  sir?
12    A.   Yes.
13    Q.   Okay.  Why were you worried about
14  Barclays' ability to retain employees after
15  the transaction?  Why was that a matter of
16  concern to you?
17    A.   Because if we couldn't represent
18  to the employees that there was a program to
19  take care of them they were going to leave.
20  They had offers away.
21    Q.   Okay.  And --
22    A.   And without employees the client
23  relationships, the -- there's no value to the
24  business.  At least that was my view.
25    Q.   Do you know if any part of the
   TSG Reporting - Worldwide  (877) 702-9580

Page 75

1     H. McGEE - HIGHLY CONFIDENTIAL
2  consideration paid in the asset purchase
3  agreement was consideration paid for the
4  franchise value of Lehman?
5     A.   My understanding was that there
6  was a "goodwill" number that was included in
7  the transaction.
8     Q.   Can you remember what the
9  "goodwill" number was?
10    A.   250 million was what I had heard.
11    Q.   And did you have a view at the
12  time as to whether the Lehman franchise was
13  worth $250 million?
14    MR. STERN:  Objection to the form.
15    A.   I would say that that's a very
16  difficult question to answer.  What I would
17  say was that that number was very rapidly
18  speeding to zero.  And the more employees --
19  the more key employees that left to go to
20  other firms, it was quite certainly going to
21  zero.
22    Q.   Now, when the agreement was being
23  negotiated prior -- the agreement being the
24  asset purchase agreement before it's signed --
25  what's contemplated, as I understand it, is a
   TSG Reporting - Worldwide  (877) 702-9580

Page 76

1     H. McGEE - HIGHLY CONFIDENTIAL
2  sale of assets; the building, the two data
3  centers, the balance sheet assets.
4     Can you describe for me what
5  interest Lehman Brothers Holdings or Lehman
6  Brothers, Inc. would have in the continued
7  viability of the franchise after Barclays
8  bought those assets?
9     THE WITNESS:  Could you repeat the
10  question.
11    (Record read.)
12    A.   Well, I can't speculate as to what
13  their interests are or should have been but I
14  would -- I would assume that one would be
15  interested in the franchise staying intact
16  through the transaction so that the purchaser
17  actually carried through with the transaction
18  and actually purchased.
19    If there was no franchise, if
20  there was no people and most of the key
21  employees had left to go do other things and
22  the only employees that were remaining were
23  those that generally couldn't find
24  opportunities elsewhere, I would think that
25  what was there for any potential purchaser was
   TSG Reporting - Worldwide  (877) 702-9580

Page 77

1     H. McGEE - HIGHLY CONFIDENTIAL
2  much less valuable and, therefore, what was
3  then realized in any transaction was much
4  lower.
5     Q.   So when you spoke about the
6  severance program before you said there were
7  two main topics that were of concern to you;
8  one was how severed, terminated employees
9  would be treated because there would be
10  redundancies; and the other was the
11  establishment of a bonus pool.
12    Let's talk about the first piece,
13  the severance piece.  Is the agreement
14  regarding severance as reached the one
15  that's reflected in paragraph 9.1(b) of the
16  asset purchase agreement?
17    A.   I believe that to be true.  I
18  looked at drafts of just this article.
19    Q.   Um-hum.
20    A.   And worked on some of the
21  language.  I didn't reread the entire document
22  as signed.  But my understanding is that it
23  was -- that this is consistent.
24    Q.   You just said something that went
25  back to the question I asked a few moments ago
   TSG Reporting - Worldwide  (877) 702-9580

Page 78

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   which is actually what mechanically you were
3   doing.  Were you marking up drafts as they
4   came -- from time to time as they came through
5   of this document?
6        A.   I looked at a draft of this
7   language along the way and got involved in
8   some discussions to change some of provision
9   (b) and some of provision (c).
10       Q.   Do you recall what provisions of
11  subparagraph (b) and subparagraph (c) were the
12  subject of changes?
13       A.   Specifically to say that the
14  severance was going to be no less favorable
15  than they would have been entitled to had they
16  been basically under Lehman's program to put
17  it in common language.
18       Q.   No pool was put together to fund
19  the severance obligations under 9.1(b); is
20  that correct?
21       MR. STERN:  Objection to the form.
22       A.   I have no idea.  I don't know the
23  answer to that.
24       Q.   When you were speaking before
25  about making sure there was a bonus pool tell
```
TSG Reporting - Worldwide  (877) 702-9580

Page 79

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   me what steps, if any, you took to make sure
3   there was a bonus pool.
4        A.   There was a calculation made, and
5   I'm not sure by who, to come up with some
6   amount which was a number to represent the
7   accrued compensation liability for the North
8   American business.  That was a complicated
9   calculation because normally Lehman
10  operated as a global business.  Investment
11  banking was global.  Equities was global.  I
12  never -- people never thought about the comp
13  pool as, you know, sub pieces of it.  You also
14  had, you know, comp always -- the "comp line"
15  always has other stuff in there besides pure
16  bonus.  There's -- severance probably flows
17  through there.  There's other benefits.  So
18  it's somewhat unclear.
19       But what was important was that
20  there was a defined number that was calculated
21  by somebody, I'm not sure who, that was based
22  on the historical Lehman accruals which I
23  guess were then pro rated through for the
24  balance of the year and to come up with a
25  number.
```
TSG Reporting - Worldwide  (877) 702-9580

Page 80

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   Did you review any of the work
3   that was done with respect to calculating that
4   pool?
5        A.   No.  No.
6        Q.   And, again, I'm sorry if I'm
7   repeating myself or asking you to answer again
8   but do you know who was involved in -- you
9   know, who signed off on a final number for
10  that pool?
11       A.   I don't know.  I'm not sure who
12  calculated it.
13       Q.   Would you take a look at paragraph
14  9.1(c).  It's at page 35 of Exhibit 1.
15       A.   Um-hum.
16       Q.   Let me know when you've had a
17  chance to read through the language of that
18  section.  You don't need to memorize it but I
19  want you to familiarize yourself with it
20  because I'm going to go to different pieces of
21  it.
22       (Document review.)
23       A.   Okay.
24       Q.   Now, there's a reference in
25  9.1(c), sir, to a financial schedule delivered
```
TSG Reporting - Worldwide  (877) 702-9580

Page 81

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   to purchaser on September 16th, 2008 and
3   initialed by an officer of each of Holdings
4   and purchaser defined as "The Accrued '08 FY
5   Liability."
6        Do you see that?
7        A.   Yes.
8        Q.   Have you ever seen that schedule?
9        A.   No.
10       Q.   Well, do you know how much was --
11  do you know how much -- what the amount of the
12  accrued '08 FY liability was that was referred
13  in to paragraph 9.1(c)?
14       A.   I heard of number of 2 billion.
15       Q.   And who did you hear that number
16  from?
17       A.   I don't recall.
18       Q.   And did you hear it at or around
19  the time the asset purchase agreement was
20  being finalized and signed or at some
21  subsequent time?
22       A.   I'm not sure.  I think I heard it
23  at or -- I may have heard it at or about the
24  time but I'm not positive.
25       Q.   Well, when you were --
```
TSG Reporting - Worldwide  (877) 702-9580

H. McGEE - HIGHLY CONFIDENTIAL
2  A.  And I'm not sure exactly what was
3  in the two.
4  Q.  When you were working on these two
5  pieces, you know, severance and bonus,
6  wouldn't you have -- I mean, once you got the
7  agreement in place to actually pay the
8  bonuses, wouldn't you have been concerned to
9  see that the bonus pool was enough?
10  A.  My understanding was based on how
11  the number was calculated that it took the
12  accrual year-to-date, grossed it up, reflected
13  the subset of the employees that were part of
14  this transaction, that it would be the right
15  number, but I didn't know how exactly what
16  was -- exactly was was included in all this
17  stuff.
18  Q.  And you don't remember who it was
19  that described that formula to you that gave
20  you comfort that it was based on the accrued
21  bonus -- the accrued liability for bonuses on
22  Lehman's books?
23      MR. STERN:  Objection to the form.
24  A.  No.  I don't recall.
25  Q.  I'm giving you a copy of a

H. McGEE - HIGHLY CONFIDENTIAL
2  document, Mr. McGee, that was marked as
3  Exhibit 19 at a prior deposition.  Have you
4  ever seen that document before?
5  A.  No.  Not to my recollection.
6  Q.  Would you be able to tell me one
7  way or the other whether this is the financial
8  schedule referred to in paragraph 9.1(c) of
9  the asset purchase agreement?
10  A.  I can't comment one way or the
11  other.
12  Q.  Do you know if in the process of
13  calculating the accrued liability for bonuses
14  on Lehman's books that number was overstated
15  in connection with the asset purchase
16  agreement?
17  A.  I have no way of knowing.
18  Q.  If you wanted an answer to that
19  question who would you ask amongst the former
20  Lehman employees?
21  A.  And the question being again?
22  Q.  Whether the accrual for bonus
23  liability that's referred to in paragraph
24  9.1(c) was inflated.
25  A.  And as reflected on Exhibit 19

H. McGEE - HIGHLY CONFIDENTIAL
2  from the prior deposition?
3  Q.  Actually, no.  Without reference
4  to that because you've told me you'd never
5  seen that before and you can't tell me if it
6  has anything to do with 9.1(c).  So I'm really
7  talking about what's referred to in paragraph
8  9.1(c).
9      Just for clarity, since -- I beg
10  your pardon.  Since you've asked for that
11  clarification, let me ask you both questions
12  again.
13  A.  Okay.
14  Q.  Solely with respect to the
15  language of 9.1(c), do you know if the '08
16  liability referred to in that section was
17  inflated for the purposes of September 16th,
18  2008 asset purchase agreement?
19  A.  When you say inflated, do you mean
20  to -- grossed up to reflect a full year or do
21  you --
22  Q.  No, I'm --
23  A.  Because I -- or do you mean
24  inflated as not reflective of the number that
25  was in the -- supposedly in the books and

H. McGEE - HIGHLY CONFIDENTIAL
2  records of Lehman Brothers?
3  Q.  The latter.
4  A.  I have no knowledge that --
5  Q.  And my second question was who
6  would ask you within the group of former
7  Lehman employees if you wanted an answer to
8  that question?
9  A.  People that were responsible for
10  accruals on the balance sheet starting with
11  Ian Lowitt and Paolo Tonucci.
12  Q.  Do you know Martin Kelly?
13  A.  Yes.
14  Q.  Who is Martin Kelly?
15  A.  He works in the finance and
16  accounting area for Lehman.
17  Q.  To whom did he report at Lehman?
18  A.  I'm not exactly sure.  Maybe Ian.
19  But I'm not positive.
20      (Pause on the record.)
21  Q.  Do you recall, sir, if you knew --
22  after the asset purchase agreement was signed
23  but before the deal was closed on the 22nd, if
24  you knew what the amount of the pool was that
25  we've been talking about established under

Page 86

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **Article 8 of the APA?**
3    A.    Define the pool for me.
4    **Q.    You made reference before to a**
5    **bonus pool.**
6    A.    Correct.
7    **Q.    Did you know at the time, even if**
8    **you don't remember now, what the amount was?**
9    A.    There's an accrual that's
10   referenced.  Unclear to me exactly what is
11   included in the accrual.
12   **Q.    Um-hum.**
13   A.    A portion of the accrual I assume
14   is a year-end bonus pool.  A portion of it is
15   an accrual for remaining salaries.  A portion
16   of it is accrual for other comp and benefits.
17   Probably a portion of it is an accrual for
18   estimated severance.  So unclear when you say
19   the pool, exactly which part of these accruals
20   that you're referring to.
21       MR. GAFFEY:  Mark that, please.
22       (Deposition Exhibit 105, document
23       bearing production number 10321888,
24       marked for identification as of this
25       date.)
TSG Reporting - Worldwide  (877) 702-9580

Page 87

1    H. McGEE - HIGHLY CONFIDENTIAL
2    BY MR. GAFFEY:
3    **Q.    We've marked as Deposition**
4    **Exhibit 105, Mr. McGee, a one-page document.**
5    **It appears to be an e-mail from you dated**
6    **September 18th, 2008 8:01 a.m. GMT to Anthony**
7    **Collerton.  Subject, Confidential.**
8        **Take a look at this document.**
9    **Tell me if you recall seeing it before.**
10   A.    It's an e-mail that I sent.  That
11   is correct.
12       MR. STERN:  Take a look at the
13       e-mails starting at the bottom.
14       (Document review.)
15   **Q.    Have you had a chance to look**
16   **through the document?**
17   A.    Um-hum.
18   **Q.    And the top e-mail is from you to**
19   **Anthony Collerton.  Who is Anthony Collerton?**
20   A.    He worked in HR for Lehman
21   Brothers.
22   **Q.    And in your e-mail to Mr.**
23   **Collerton you ask this question:  "Of the 2**
24   **billion number, what is share for IBD?"**
25       **Do you know what $2 billion number**
TSG Reporting - Worldwide  (877) 702-9580

Page 88

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **you were referring to when you wrote that**
3    **e-mail to Mr. Collerton on September 18th?**
4    A.    I believe that to be the 2 billion
5    number that I had heard to be the accrual
6    number.
7    **Q.    Okay.  And you go on in the e-mail**
8    **to Mr. Collerton to ask, "Is that remaining**
9    **salary plus year-end bonus?"**
10       **Do you see that?**
11   A.    Yes.
12   **Q.    Did you get an answer to that**
13   **question?**
14   A.    No.
15   **Q.    Do you know the answer as you sit**
16   **here today?**
17   A.    No.
18   **Q.    And then you ask Mr. Collerton,**
19   **"Does it include the retention or is that**
20   **separate?"**
21       **Do you see that?**
22   A.    Yep.
23   **Q.    Did you get an answer to that**
24   **question?**
25   A.    Nope.
TSG Reporting - Worldwide  (877) 702-9580

Page 89

1    H. McGEE - HIGHLY CONFIDENTIAL
2    **Q.    Do you have an answer to that as**
3    **you sit here today?**
4    A.    No.
5    **Q.    Did you ever known the answer to**
6    **either -- any of those three questions?**
7    A.    No.
8    **Q.    So looking again at what was**
9    **marked as Exhibit 19, that's the financial**
10   **schedule that shows a $2 billion number for**
11   **comp, you have -- you can't tell us whether**
12   **that $2 billion is for bonuses only, for**
13   **bonuses and salary, or for bonuses and**
14   **severance, can you?**
15   A.    Cannot.
16   **Q.    Do you have any idea at all?**
17   A.    No.
18       (Deposition Exhibit 106, e-mail
19       dated 9/17/2008 2:21 p.m., marked for
20       identification as of this date.)
21   BY MR. GAFFEY:
22   **Q.    Mr. McGee, I've marked as**
23   **Exhibit 106 a one-page e-mail from Ajay Nagpal**
24   **to Bart McDade, Michael Gelband, Gerald**
25   **Donini, Thomas Humphrey, yourself, Eric Felder**
TSG Reporting - Worldwide  (877) 702-9580

Page 90

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **and Hyung Lee.**
3    **Have you seen this e-mail before?**
4        A.   I see that I'm listed as one of
5    the addressees. I don't recall it. I'm
6    reading it now.
7        (Document review.)
8    A.   Okay. I've read it.
9        **Q.   Having read through it does it**
10   **refresh your recollection as to whether you've**
11   **seen it prior to today?**
12       A.   It appears I received this. I
13   can't recall receiving this specific e-mail
14   but I get hundreds every day and there's lots
15   of days between now and then.
16   **Q.   Okay. You can put that e-mail**
17   **aside then.**
18       **(Pause on the record.)**
19   **Q.   Could you take from the pile in**
20   **front of you, please, Mr. McGee, Exhibit 103.**
21   **It's your signed --**
22       A.   Contract.
23   **Q.   -- contract. And you also need in**
24   **front of you the asset purchase agreement.**
25       A.   Okay.

TSG Reporting - Worldwide (877) 702-9580

Page 91

1    H. McGEE - HIGHLY CONFIDENTIAL
2    **Q.   Now, having been involved in the**
3    **drafting of Article 9 of the asset purchase**
4    **agreement you would meet the definition, sir,**
5    **of a transferred employee as it's used in that**
6    **provision, correct?**
7    A.   Correct.

REDACTED

TSG Reporting - Worldwide (877) 702-9580

Page 92

REDACTED

4    **Q.   Now, when the asset purchase**
5    **agreement was concluded on the 16th -- when it**
6    **was signed, the one in front of you was signed**
7    **on the 16th of September 2008 -- and taking**
8    **into account, sir, you're telling me that you**
9    **had a general idea of its terms but**
10   **specifically dealt only with this -- do you**
11   **have a general sense of whether the pricing of**
12   **it was such that it was to the net benefit of**
13   **Lehman, the net benefit of Barclays or a wash?**
14       A.   As I've answered previously, I was
15   not involved in the discussions around
16   specific assets so I -- you know, I can't
17   comment.
18   **Q.   Did you have a sense of that at**
19   **the time? Whether it was a net benefit to**
20   **Lehman, a net benefit to Barclays, or a wash?**
21       A.   No.
22   **Q.   There were hearings in the**
23   **bankruptcy court during the week of the 15th.**
24   **There was one on the 17th, the Wednesday, and**
25   **then there was one -- actually, there was one**

TSG Reporting - Worldwide (877) 702-9580

Page 93

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **on the 16th, there was one on the 17th, and**
3    **then there was one on Friday, the 19th.**
4        **Did you attend any of those?**
5    A.   No.
6    **Q.   And remind me, when did you leave**
7    **for London? Wednesday?**
8        A.   Wednesday afternoon for Thursday
9    morning.
10   **Q.   Okay.**
11       **Did you see any of the filings**
12   **made with the bankruptcy court that described**
13   **the transaction at any point?**
14       A.   No.
15   **Q.   During the week of September 15th**
16   **there came a point -- did you ever learn that**
17   **during the week of September 5th there came a**
18   **point where Barclays stepped into the shoes of**
19   **the Federal Reserve with respect to a certain**
20   **repurchase agreement concerning Lehman?**
21       MR. STERN: I'm sorry. The
22   date --
23   **Q.   Withdraw the question.**
24       **During the week before the**
25   **transaction closed did the existence of a**

TSG Reporting - Worldwide (877) 702-9580

Page 94

H. McGEE - HIGHLY CONFIDENTIAL

1    repurchase agreement in connection with the
2    transaction come to your attention?
3
4        A.   No.
5        Q.   In any way whatsoever?
6            MR. STERN: Objection to the form.
7            MR. CHEPIGA: I don't know what it
8    means.
9        A.   No. I mean, subsequently, I've
10   heard reference to it but at the time, no.
11   And I was out of the country.
12       Q.   Apart from counsel, what
13   references have you heard to it subsequently?
14       A.   Nothing more than that there was a
15   repurchase agreement that Barclays got
16   involved in.
17       Q.   Anything more than that?
18       A.   No.
19       Q.   Anybody ever talk to you about the
20   use of the repurchase agreement as a means of
21   transferring the assets over to Barclays?
22       A.   No.
23       Q.   Do you know if the deal that was
24   made on the 16th of September, the one that
25   was signed on Tuesday, the 16th of September,

Page 95

H. McGEE - HIGHLY CONFIDENTIAL

1    was, in fact, the deal that was closed on
2    Monday, the 22nd of September that the terms
3    of the deal stayed the same?
4
5        A.   I don't know.
6        Q.   Do you know if the terms of the
7    deal changed between the 16th and the 22nd?
8        A.   I don't know.
9        Q.   Did you attend the closing?
10       A.   No.
11       Q.   Did you ever see any amendments to
12   the asset purchase agreement that's before you
13   marked as Exhibit 1?
14       A.   No.
15       Q.   Did it ever come to your attention
16   that there were any amendments to the asset
17   purchase agreement?
18       A.   Maybe after the fact.
19       Q.   By after the fact you mean after
20   the closing?
21       A.   Yes.
22       Q.   In what manner did that come to
23   your attention?
24       A.   It might have been around this
25   process. I don't recall. But I don't feel

Page 96

H. McGEE - HIGHLY CONFIDENTIAL

1    like I can say I never heard that there were
2    any changes.
3        Q.   Yeah, and I appreciate that. What
4    I want to do is focus on from the 22nd of
5    September and prior.
6        A.   Okay. I had not. No. I had not.
7        Q.   Have you ever heard about the
8    execution of a clarification letter concerning
9    the asset purchase agreement?
10       A.   No.
11       Q.   So I take it you were not involved
12   in the negotiation of any such clarification
13   letter.
14       A.   That is correct.
15       Q.   And had you heard about the
16   existence or the drafting or the negotiation
17   of such a clarification letter in the week
18   prior to the closing on the 22nd?
19       A.   I had not.
20       Q.   Did it ever come to your
21   attention, Mr. McGee, that Barclays announced
22   a certain gain upon the acquisition of the
23   Lehman assets?
24       A.   That Barclays announced --

Page 97

H. McGEE - HIGHLY CONFIDENTIAL

1
2        Q.   A gain on acquisition.
3        A.   When would such announcement have
4    been made?
5        Q.   I'll show you a document.
6            (Pause on the record.)
7        Q.   Mr. McGee, I've put in front of
8    you what was previously marked as Deposition
9    Exhibit 22 entitled Barclays PLC Results
10   Announcement Figures 2008.
11           Let me ask you first, have you
12   seen this before?
13       A.   I have -- I have seen it but I
14   haven't read all the footnotes.
15       Q.   Okay. Well, let me show you --
16   I'm not going to ask you to read them all but
17   I am going to ask to you take a look at page
18   95.
19       A.   Okay.
20       Q.   There's a section -- there's a
21   note there entitled Acquisitions and in the
22   second-to-last paragraph do you see the phrase
23   "The excess of the fair value..."
24       A.   Yeah.
25       Q.   It says "The excess of the fair

1    H. McGEE - HIGHLY CONFIDENTIAL
2    value of net assets acquired over
3    consideration paid resulted in 2,262,000,000
4    pounds of gains on acquisition."
5        Do you see that?
6    A.   Yes, I do.
7    Q.   Did that announcement of a gain on
8    acquisition of the Lehman assets come to your
9    attention at or around the time Barclays made
10   this announcement?
11   A.   I saw it in the -- I saw it picked
12   up by the press and other places, yes.
13   Q.   And when you saw it picked up by
14   the press and in other places, did you have a
15   view as to whether it was consistent or
16   inconsistent with the terms of the transaction
17   in which you were involved in September of
18   2008?
19   A.   My sense is it was consistent with
20   the environment in which the transaction was
21   consummated; that it was the absolute worst
22   financial crisis anyone had ever seen, the
23   fact that somebody bought assets, any assets
24   at the very bottom, they were probably going
25   to ultimately earn a return on having stepped

1    H. McGEE - HIGHLY CONFIDENTIAL
2    up.
3    Q.   And when you say ultimately earn a
4    return, do you mean that over the longer term
5    make better use of those assets to return
6    profit?
7    A.   Perhaps ultimately is a bad term.
8    It's not surprising to me that there was a
9    gain if that's what you're asking me.
10   Q.   Would it be surprising to you that
11   there was a gain on acquisition?  At the point
12   of acquisition.
13   A.   I'm not so sure that's what this
14   says.
15   Q.   Well, where it says there "on
16   acquisition" that's what I'm talking about.
17   Would it surprise you that there was a gain
18   "on acquisition"?
19   A.   I'm not sure I understand you.
20       MR. STERN:  If you don't
21   understand the question --
22   Q.   Do you understand the question?
23   A.   No, I don't.
24   Q.   Okay.  Barclays purchases the
25   assets - as you put it, the franchise - gets

1    H. McGEE - HIGHLY CONFIDENTIAL
2    the people, gets the assets, on September
3    22nd, 2008.
4    A.   Correct.
5    Q.   As we sit here today Barclays has
6    had some opportunity to operate businesses
7    using those people and those assets and those
8    other facilities that were transferred to it,
9    correct?
10   A.   Right.
11   Q.   Barclays will have had over that
12   period of time as we sit here today some
13   degree of success or lack of success using
14   those assets and people and facilities, right?
15   A.   Correct.
16   Q.   My question has nothing to do with
17   any of that.  My question has to do with
18   whether or not Barclays made a gain at the
19   moment it acquired the assets.
20   A.   Are these financial -- I thought
21   these financial estimates were as of December
22   31st.
23   Q.   I'm just asking you, sir, whether
24   it was your understanding that Barclays would
25   make a gain at the moment it acquired the

1    H. McGEE - HIGHLY CONFIDENTIAL
2    assets.
3    A.   As I said before, I was not
4    involved in the detail around the asset side
5    of the acquisition.
6    Q.   You were involved in the bigger
7    picture of negotiation of the transaction,
8    correct?
9        MR. STERN:  Objection to the form.
10   A.   I think that's a bit too broad.  I
11   was involved -- I was involved in trying to
12   facilitate the transaction to try and make
13   sure that we had 48 hours to try to put
14   something together that we didn't forget
15   something.  So I'd go around and say, you
16   know, are we buttoned up here, are we going to
17   need this approval, do we have to get these
18   guys.  So I was wandering in and out of the
19   rooms.  Anything material went to Bart McDade
20   for his sign-off.  And anything related to the
21   balance I just wasn't involved in.
22   Q.   We've had more than one witness,
23   sir, prior to today describe you as one of the
24   principal negotiators of the transaction.  Is
25   that accurate?

Page 102

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2        MR. STERN:  Objection to the form.
3    Objection to the form.
4        A.    Of the senior Lehman executives
5    who were there for the entire time frame, you
6    know, two days without sleep, I was one of
7    them.  But Bart McDade was my boss and he was
8    there the whole time, too.
9        So -- and in terms of a principal
10    negotiator I've never -- well, this is the
11    wrong document -- but that particular asset
12    purchase -- the only place I really dug in on
13    the language was around the stuff related to
14    the employees because, as I said before, the
15    employee base was -- some of them had one foot
16    out the door already.
17    **Q.  Okay.**
18        MR. GAFFEY:  It would be a good
19        time to take a break now because I'm
20        going to move into a body of documents
21        that will take about an hour.  So why
22        don't we take a lunch break now.
23        MR. STERN:  Let's go off the
24        record.
25        (Discussion held off the record.)
    TSG Reporting - Worldwide  (877) 702-9580

Page 103

1    H. McGEE - HIGHLY CONFIDENTIAL
2        (Luncheon recess taken at 12:22
3    p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
    TSG Reporting - Worldwide  (877) 702-9580

Page 104

1    H. McGEE - HIGHLY CONFIDENTIAL
2    A F T E R N O O N   S E S S I O N
3        (Time noted:      1:07 p.m.)
4    H U G H   M c G E E,   resumed and testified
5        as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8    **Q.    Let's go back on the record.  I**
9    **know you were in London during the week, Mr.**
10    **McGee, but did it come to your attention**
11    **during the week between the 15th and the 22nd**
12    **at any point that a problem had arisen and**
13    **that Lehman would not be able to deliver to**
14    **Barclay the assets promised in the asset**
15    **purchase agreement?**
16    A.    No.  It did not.
17    **Q.    Did it ever come to your attention**
18    **that at the sale hearing that took place**
19    **before Judge Peck on Friday, the 19th of**
20    **September, the court was told that the value**
21    **of the assets to be transferred had fallen?**
22    A.    I was not aware of that.
23    **Q.    Did you have any knowledge of any**
24    **efforts being undertaken by folks at Lehman to**
25    **find additional assets to send to Barclays?**
    TSG Reporting - Worldwide  (877) 702-9580

Page 105

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    A.    No.
3    **Q.    Has that -- have any facts**
4    **concerning those questions come to your**
5    **attention since the closing?  I mean, since**
6    **you've been at Barclays?**
7    A.    Any facts concerning -- well, I've
8    heard generally about some of that but, you
9    know, I'm not -- was not in the middle of it.
10    **Q.    In your time at -- have you been**
11    **working at Barclays more or less continuously**
12    **since September 22nd?  That was the start date**
13    **on your employment agreement.**
14    A.    Yes.
15    **Q.    And in your time at Barclays since**
16    **September 22nd -- let me back up.  I need to**
17    **ask you this.**
18        **Did you start before or after the**
19    **closing?  Working for Barclays.**
20    A.    Well, I view working -- prior to
21    the closing I was working to preserve the
22    franchise which I viewed as working very much
23    for Lehman Brothers to try and preserve value
24    that could actually be closable against.
25        After the closing -- I mean, I
    TSG Reporting - Worldwide  (877) 702-9580

1      H. McGEE - HIGHLY CONFIDENTIAL
2   didn't just go away and come back. I mean, I
3   kept working but it was all the -- it was on
4   the same thing, trying to keep -- trying to
5   keep the people -- you know, it was herding
6   cats. I mean, it was --
7      Q.   That's what your activities in
8   the -- at least in the immediate
9   post-transaction days are still devoted to
10  keeping the team together.
11     A.   Correct.
12     Q.   Keeping the personnel to come over
13  and work at Barclays, yes?
14     A.   Right. Right.
15     Q.   In your time at Barclays since
16  September 22nd, 2008, have you had discussions
17  with Barclays personnel, that is people who
18  never worked at Lehman, where they've
19  expressed a view to you about whether the deal
20  was a good one or a bad one for Barclays?
21     A.   Oh, I think everybody who was a
22  historical Barclays employee looks at the
23  franchise that they had and now the franchise
24  that they have today, the capabilities, the
25  skill set, the reach, the product set, and

TSG Reporting - Worldwide  (877) 702-9580

1      H. McGEE - HIGHLY CONFIDENTIAL
2   feels that the company is -- and I think the
3   company's own public pronouncements describes
4   the combination as transformational.
5      Q.   I'm more interested in what's
6   being said internally as opposed to the public
7   pronouncements. Are you -- have you had
8   conversations with senior executives at
9   Barclays where they have said to you in
10  substance that they paid less for the assets
11  than they were worth?
12     A.   No.
13     Q.   Have you had conversations with
14  senior Barclays executives where they have
15  told you that they got a good bargain on the
16  assets that were transferred?
17     A.   No.
18        (Deposition Exhibit 107, document
19     bearing production number 10270027,
20     marked for identification as of this
21     date.)
22  BY MR. GAFFEY:
23     Q.   Mr. McGee, I've put in front of
24  you what we've marked as Deposition
25  Exhibit 107, a one-page e-mail dated September

TSG Reporting - Worldwide  (877) 702-9580

1      H. McGEE - HIGHLY CONFIDENTIAL
2   18th, 2008 from Tim Sullivan to you entitled
3   "Balance sheet that you and Archie signed."
4      A.   Um-hum.
5      Q.   Was there a balance sheet that you
6   and Archie signed?
7      A.   No. There was not.
8      Q.   Looking at this document, do you
9   recall receiving this document at or around
10  the time it's dated?
11     A.   It's easy to read it and see it
12  was addressed to me from Tim Sullivan. He
13  worked directly for me. This was sent to me
14  no doubt while I was in London. And
15  apparently people were looking around for a
16  document but I never signed any sort of
17  balance sheet.
18     Q.   Do you have any recollection --
19  and, again, I know you're in London at the
20  time but you talked to me before the lunch
21  break a fair bit about your main focus being
22  the compensation side of things, the human
23  capital as you put it, moving over to
24  Barclays.
25        Do you have any recollection of

TSG Reporting - Worldwide  (877) 702-9580

1      H. McGEE - HIGHLY CONFIDENTIAL
2   being asked about the location of the $2
3   billion comp liability -- a document that
4   concerned $2 billion in comp liability?
5      A.   No. Just this e-mail.
6      Q.   Do you recall receiving it?
7      A.   I don't recall it but I clearly --
8   I can see that it's addressed to me but I --
9   you know, until you put this in front of me
10  now I can see that I did receive the e-mail.
11     Q.   Apart from the e-mail itself do
12  you have any independent recollection of
13  anybody asking you the whereabouts of a
14  schedule?
15     A.   No.
16     Q.   Do you have any recollection of
17  any conversation with Tim Sullivan along those
18  lines?
19     A.   I can't recall whether I responded
20  to this e-mail or whether I talked to him on
21  the phone but he -- I don't think he ever
22  found the schedule because I never saw one.
23     Q.   I want to separate out what you
24  might be inferring from what you know.
25     A.   Okay. That's fair.

TSG Reporting - Worldwide  (877) 702-9580

Page 110

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Q.   Apart from the e-mail, itself,
3  let's just go through this, you never signed a
4  financial schedule.  That much you have an
5  independent recollection of, right?
6    A.   That is true.
7    Q.   As a marginally separate topic do
8  you have any recollection of talking to Tim
9  Sullivan about him thinking you had signed a
10  financial schedule?
11    A.   No.
12    Q.   Do you have a recollection of
13  talking to anyone about them thinking you had
14  signed a financial schedule?
15    A.   No.
16    Q.   Was there ever a setting during
17  the week between the 15th of September and the
18  closing on the 22nd of September where you
19  signed anything in connection with the asset
20  purchase agreement?
21    A.   Not to my knowledge.
22    Q.   Did it ever come to your attention
23  at the time, during that week, did it come to
24  your attention that the schedule -- a schedule
25  that was related to the agreement had gone
TSG Reporting - Worldwide  (877) 702-9580

Page 111

1    H. McGEE - HIGHLY CONFIDENTIAL
2  missing and people were looking for it?
3    A.   No.
4    (Deposition Exhibit 108, document
5    bearing production numbers 10269417,
6    marked for identification as of this
7    date.)
8  BY MR. GAFFEY:
9    Q.   We've put in front of you, Mr.
10  McGee, what we've marked as Deposition
11  Exhibit 108.  It's a three-page e-mail chain
12  beginning with its earliest one that would be
13  on the last page, September 18th, 2008, from
14  Tim Sullivan and Ros Stephenson and others
15  including you.
16    Let me give you a sec -- why don't
17  you take a look through each portion of that
18  e-mail chain as you go up through the most
19  recent and let me know when you've had a
20  chance to do that.
21    MR. STERN:  Before he does that is
22    there any particular part you're going
23    to focus on?
24    MR. GAFFEY:  Well, we'll see as we
25    go.
TSG Reporting - Worldwide  (877) 702-9580

Page 112

1    H. McGEE - HIGHLY CONFIDENTIAL
2    MR. STERN:  Okay.
3    MR. GAFFEY:  The chances are each
4    piece of it, so spend enough time
5    reading each segment, please.
6    Was that your question Jack?  Was
7    there one part of it?
8    MR. STERN:  Yes.
9    (Document review.)
10    Q.   For clarity I should point out to
11  you that starting on the first page of the
12  document you disappear out of the e-mail chain
13  beginning with the From Parker to Sullivan
14  September 18th, 8:54 p.m. near the bottom of
15  the page.  So I'm not going to ask you about
16  what's above that, okay?
17    A.   Okay.
18    Q.   And if you turn to the last -- the
19  earliest e-mail in the chain, sir, from Larry
20  Wieseneck to Tim Sullivan, Ros Stephenson, and
21  others, c.c.'d to you entitled "Updates for
22  Skip.  Skip, PLEASE READ."
23    A.   Yes.
24    Q.   Do you recall seeing that e-mail
25  from Mr. Wieseneck on the 18th -- around the
TSG Reporting - Worldwide  (877) 702-9580

Page 113

1    H. McGEE - HIGHLY CONFIDENTIAL
2  18th of September?
3    A.   Well, now, you've asked me to read
4  it.  There were a lot of e-mails during this
5  period with similar discussions.  So this
6  specific one I don't recall it specifically
7  but...
8    Q.   I picked this specific one for a
9  couple reasons.  One, it's got that, "Skip
10  PLEASE READ."
11    You're in London at this point,
12  right?
13    A.   I'm in London.
14    Q.   And the men involved in this
15  e-mail chain are the group we talked about
16  earlier.  You know, it's Wieseneck.  And then
17  moving up it's Jeffrey Weiss and then moving
18  up it's Paul Parker.
19    A.   Um-hum.
20    Q.   So I guess my question is given
21  that it's an e-mail amongst these gentlemen
22  who I understand are fairly senior members of
23  IBD --
24    A.   Correct.
25    Q.   -- and it concerns an issue that
TSG Reporting - Worldwide  (877) 702-9580

Page 114

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **was of big concern to you, you know, who had**
3    **bids away and keeping the group together --**
4    A.    Correct.
5    **Q.    -- does that help you remember**
6    **whether or not you saw or focused on this**
7    **particular e-mail chain?**
8    A.    I'm sure I saw it.
9    **Q.    Okay.  Apart from seeing it today**
10    **and being sure you saw it because it's an**
11    **e-mail, do you have any other independent**
12    **recollection of it?**
13    A.    No.  Because, as I said, I get a
14    tremendous number of e-mails every day and
15    during that period of time I was getting
16    buried with e-mails just like this because
17    this guy's got a bid away, that guy's got a
18    bid away, this team's got a bid, what are we
19    going to do.
20    **Q.    Where Mr. Wieseneck writes -- and**
21    **I'm again at the earliest e-mail at the bottom**
22    **of the penultimate page, "Basically, the fear**
23    **is spreading that BARC bought us for nothing**
24    **and now don't even want to put up the right**
25    **dollar to pay people.  This is the wrong way**
TSG Reporting - Worldwide  (877) 702-9580

Page 115

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **for them to start if they want to make money**
3    **on this asset."**
4    **Do you recall a sentiment being**
5    **expressed amongst the people that worked for**
6    **Barclays that bought Lehman for nothing?**
7    A.    Well, this is an e-mail to -- I'm
8    c.c.'d.  It's to a group from Larry Wieseneck
9    and you have to understand the dynamic here.
10    They're trying to hold their teams together.
11    These guys hadn't yet signed their agreement,
12    and, oh, by the way, they all -- you showed me
13    an e-mail earlier that had, you know, names
14    and those people on my executive committee.
15    Well, they ultimately all held out for
16    two-year deals.  And also had retention.  And
17    so it was -- I was a little bit man in the
18    middle because these guys were negotiating
19    their packages a little bit with me.  They
20    were negotiating them on behalf of their team.
21    They want more and more and I'm trying to hold
22    the line because it just cascades all the way
23    through.
24    And the ultimate -- I mean, the
25    commentary -- you know, the editorial
TSG Reporting - Worldwide  (877) 702-9580

Page 116

1    H. McGEE - HIGHLY CONFIDENTIAL
2    commentary about the transaction, I mean, the
3    transaction was the transaction.  There was no
4    one else there ready to do a transaction.  I
5    mean, these people were frustrated that their
6    own teams were disintegrating.  I think you
7    can see it through the e-mail chain.
8    **Q.    Sure.  But I guess my question is**
9    **do you recall a sentiment being expressed by**
10    **the members of your executive committee that**
11    **in sum and substance was that Barclays had**
12    **bought Lehman for nothing?**
13    A.    Well, whatever the consideration
14    was that traded hands, it was a lot less than
15    what Lehman had been worth, you know, some
16    period before.  The stock had gone from $85 to
17    zero.  And so, I mean, I can't comment what
18    was in Larry Wieseneck's mind when he wrote
19    this.
20    **Q.    Can you comment whether you heard**
21    **that kind of sentiment from people who worked**
22    **for and you if so whether you responded to it?**
23    A.    Well, I think there was a
24    frustration that that is a very understandable
25    human reaction which is when the teams are
TSG Reporting - Worldwide  (877) 702-9580

Page 117

1    H. McGEE - HIGHLY CONFIDENTIAL
2    dissipating and it's a team that's been
3    together for years and years and people have
4    bids here and bids there and we're trying to
5    hold the line on one year and trying to take
6    the overall comp pool down, there was
7    frustration.  And they juxtaposed that
8    against, you know, whatever the transaction
9    consideration was.  And none of these people
10    were expertized in that in terms of what was
11    the deal.  It was a lot less than what Lehman
12    Brothers had been worth three months before,
13    six months before, one year before, you know,
14    whatever.
15    **Q.    At this point were you expertized**
16    **in what consideration was given in the deal?**
17    A.    No.
18    **Q.    Just to frame it for time**
19    **reference, Mr. McGee, the questions I'm asking**
20    **you now go basically to the weekend.  The**
21    **20th, the 21st.**
22    A.    Okay.
23    **Q.    And into the 22nd.  I want those**
24    **last couple of days before the deal closes.**
25    **At that point are you close to**
TSG Reporting - Worldwide  (877) 702-9580

1  **H. McGEE - HIGHLY CONFIDENTIAL**
2  **finality with Barclays as to what the**
3  **compensation will be for the members -- for**
4  **yourself and for the members of your executive**
5  **committee and --**
6  A.  No.
7  Q.  -- and the other people you're
8  **concerned about?  Are you getting close to**
9  **resolution of that?**
10  A.  No.
11  Q.  Is there a point where in the days
12  **before the deal closes -- and put it at the**
13  **Friday, the Saturday, the Sunday, where you**
14  **begin to get authority from Barclays as to**
15  **what kind of offers can be made to people?**
16  A.  No.  This was still iterating.
17  Q.  Was there a point where you got
18  **approval -- prior to the closing of the deal**
19  **was there a point where you got approval to**
20  **tell people in investment banking that**
21  **Barclays would honor all guarantees in your**
22  **group for a million dollars or more?**
23  A.  I think you're going to have to
24  give me some more facts around that question.
25  When you say honor guarantees, are you talking

1  H. McGEE - HIGHLY CONFIDENTIAL
2  about guarantees that were pre-existing Lehman
3  guarantees?
4  Q.  You know, I don't know the answer
5  to that.  I'll give you a document in a couple
6  minutes.  We'll go back to that topic.  I
7  mean, I'm pulling that from a document.  But I
8  want to be a little more general right now,
9  but we'll --
10  A.  Well, there were no new guarantees
11  yet because no contracts had been signed.
12  Q.  Okay.  That's where I want to go
13  next.  And we'll go back and drill down on
14  that.  I don't want to just leave that
15  hanging.
16  A.  Okay.
17  Q.  But are there documents out there?
18  You've got -- let me frame this.  You've got
19  these two groups, in essence.  You've got the
20  eight critical employees that we've talked
21  about.  I know you don't know who's on that
22  list, that was not shared with you.  But
23  there's that eight.  And then there's the
24  200 -- there's a group of 200, right?
25  A.  Correct.

1  H. McGEE - HIGHLY CONFIDENTIAL
2  Q.  And you're aware at the time that
3  **there's this group of 200 who Barclays wants**
4  **to come over or ought to want to come over so**
5  **they can operate the franchise, right?**
6  Apart from you was anyone else
7  **talking to Barclays about how to compensate**
8  **that group of 200 and the of eight?**
9  A.  I assume that there parallel
10  discussions going on between Jerry Donini and
11  people and Felder and some of his people and
12  that those are being reflected up through
13  chain.
14  Q.  And Donini and Felder are division
15  **heads as you are, right?  Different divisions.**
16  A.  Correct.
17  Q.  With respect to the people for
18  **whom you're responsible, that is the folks in**
19  **the investment banking division, are you**
20  **close -- at some point do you get an**
21  **understanding that you've got X-amount of**
22  **dollars from Barclays to use to make**
23  **compensation offers to the people in the**
24  **investment banking division?**
25  And again I'm in the period prior

1  **H. McGEE - HIGHLY CONFIDENTIAL**
2  to the closing.
3  A.  Prior to the closing, no.
4  Q.  No, okay.
5  I wasn't going to use this
6  **document but I promised you I wouldn't leave**
7  **you hanging so I just want to put some context**
8  **to that question I asked you about a moment**
9  **ago.**
10  A.  Okay.  Sure.
11  (Deposition Exhibit 109, document
12  bearing production numbers 01321878,
13  marked for identification as of this
14  date.)
15  BY MR. GAFFEY:
16  Q.  Mr. McGee, I've put in front of
17  **you an e-mail that I was referring to before**
18  **and we've marked it as 109.  I should point**
19  **out it's neither addressed to nor from you.**
20  **It appears to be an e-mail from Michael Evans**
21  **at Barclays Capital to Tracy Binkley at Lehman**
22  **with a copy to Anthony Collerton at Lehman**
23  **entitled "How to handle employees with**
24  **guarantees."**
25  First let me ask you, do you know

Page 122

1      H. McGEE - HIGHLY CONFIDENTIAL
2  who Tracy Binkley is?
3      A.   Tracy Binkley was the head of HR
4  at Lehman Brothers.
5      Q.   And Michael Evans, what's his role
6  at Barclays?
7      A.   He's the head of HR.
8      Q.   I should ask you have you seen
9  this e-mail exchange before?
10     A.   No.
11     Q.   You see in it, though, that
12 there's a reference to -- and I'm at the
13 bottom here.  "By the way, my HR person
14 covering investment banking tells me that Skip
15 McGee, head of IBD, was told that Barclays
16 would honor all guarantees of his group for $1
17 million or more.  I presume he has begun
18 communicating that but don't know.  Got this
19 info second hand."
20     And then further up just to sort
21 of relate these two things it says "As for
22 Skip saying he has that approval, I'm not
23 aware of it."
24     Any of this ringing any bells
25 about an area of confusion or any
      TSG Reporting - Worldwide  (877) 702-9580

Page 123

1      H. McGEE - HIGHLY CONFIDENTIAL
2  conversations you may have had at around this
3  time?
4      A.   No.  It's not -- I've never seen
5  this before.  There was a concern by some
6  people that had guarantees going into the year
7  2008 with Lehman Brothers as to what was going
8  to be the status of those guarantees.
9      Q.   Once they went over to Barclays.
10     A.   Once they went over to Barclays.
11     Q.   And is that an area that you were
12 addressing that you were having conversations
13 about during the week?
14     A.   It would have been down the list
15 of priorities.  Because that was not a
16 significant population of people nor was it
17 the most significant people.
18     Q.   I'll take that back.  I just
19 marked that to show you I keep my promises.
20     A.   Okay.  Thanks.
21     (Deposition Exhibit 110, document
22     bearing production numbers 10279514,
23     marked for identification as of this
24     date.)
25
      TSG Reporting - Worldwide  (877) 702-9580

Page 124

1      H. McGEE - HIGHLY CONFIDENTIAL
2  BY MR. GAFFEY:
3      Q.   What we've put in front of you,
4  Mr. McGee, is marked Exhibit 110.  And on its
5  top it appears to be an e-mail from you to
6  Roger Jenkins at Barclays Capital entitled
7  "Current Numbers."  And it's got an e-mail
8  chain within it.  And take a look at the
9  e-mail, please, from earliest to latest and
10 let me know when you've had a chance to do
11 that.
12     (Document review.)
13     A.   Okay.
14     Q.   I guess starting at the earliest
15 one, Mr. McGee -- well, do you have any
16 independent recollection of this e-mail chain?
17     A.   Generally, yes.
18     Q.   Okay.  Tell me what your best
19 recollection is about the issue that's
20 addressed in it and how it came up and how you
21 dealt with it.
22     A.   Well, this again relates to trying
23 to pin down the various groups or senior
24 individuals within investment banking and
25 trying to do so with some combination of a
      TSG Reporting - Worldwide  (877) 702-9580

Page 125

1      H. McGEE - HIGHLY CONFIDENTIAL
2  await, perhaps retention, and hopefully not
3  '09 but in some instances '09 guarantees.
4      And Roger Jenkins was a member of
5  the BarCap Executive Committee who was
6  nominally watching over the process with
7  respect to investment banking.  And my
8  assumption is that there were similar
9  processes going on with other divisions.  And
10 this had to do with that process.
11     Q.   Was there a point -- there are
12 references on the e-mail to -- well, let me
13 direct your attention to the second most
14 recent e-mail.  It's on the first page from
15 Jenkins to you.
16     A.   Yes.
17     Q.   Saturday, September 20th, 15:40,
18 Re. Current Numbers.  It begins, "Skip, we got
19 to talk."
20     A.   Yes.
21     Q.   Okay.  Mr. Jenkins writes "Skip,
22 we got to talk.  We are over the pool and
23 don't have the money.  All comp stuff needs to
24 come through me for my sign-off.  We are
25 working to a clearly defined pool."
      TSG Reporting - Worldwide  (877) 702-9580

Page 126

H. McGEE - HIGHLY CONFIDENTIAL
1
2    Do you know what clearly defined
3    pool Mr. Jenkins was referring to when he
4    wrote to you on September 20th?
5    A.   No, I did not.
6    Q.   Did you know that on September
7    20th there was a clearly defined pool
8    available for compensation of investment
9    banking division personnel?
10   A.   My understanding was that there
11   was some pool.  I didn't know exactly what was
12   in it, how much was in investment banking, how
13   much was in equities.
14   Q.   Okay.
15   A.   And you can see that in the e-mail
16   that I was somewhat frustrated as to -- I
17   didn't really know what the pool was and I was
18   trying to manage this on the one hand with the
19   e-mail chain we just went through a minute ago
20   with all my direct reports who were saying,
21   you know, you got to -- you know, we got bids
22   away, people have two years, et cetera, et
23   cetera.  So it was -- there was a bit of
24   frustration in this e-mail chain.
25   Q.   And you ask 00 in your response to

TSG Reporting - Worldwide  (877) 702-9580

Page 127

H. McGEE - HIGHLY CONFIDENTIAL
1
2    that e-mail you ask Jenkins, "What is the
3    pool?"
4    Do you see that?
5    A.   Yes, I see that.
6    Q.   Did you get a response as to what
7    the pool was?
8    A.   No.
9    Q.   Now, in the next --
10   A.   Not that I recall.  I don't
11   recall.
12   Q.   Are you on your way back from
13   London at this point?
14   A.   I am -- yes.
15   Q.   Let me --
16   A.   I believe so.
17       (Deposition Exhibit 111, document
18   bearing production numbers 01279510,
19   marked for identification as of this
20   date.)
21   BY MR. GAFFEY:
22   Q.   Mr. McGee, I've put before you an
23   e-mail marked Deposition Exhibit 111.  It's
24   from you to Roger Jenkins, Saturday, September
25   20th, 2008, at 7:38 p.m. GMT.

TSG Reporting - Worldwide  (877) 702-9580

Page 128

H. McGEE - HIGHLY CONFIDENTIAL
1
2    A.   Um-hum.
3    Q.   And I show this to you -- well,
4    let me ask you the usual question.
5    Do you recall seeing that before?
6    A.   These are e-mails from my e-mail,
7    yes.
8    Q.   You're writing to Mr. Jenkins at
9    7:38 p.m.  "Yes.  Sorry.  Plane door shut.
10   Will call again in 45 minutes."
11       Are you getting on an airplane on
12   Saturday night?
13   A.   That would have been an
14   airplane -- yes, I was getting on an airplane.
15   Q.   Okay.  And is that your flight
16   from London back to New York?
17   A.   No.  I think that's a flight -- I
18   think I landed in New York and then was flying
19   on to Texas for the week.
20   Q.   Okay.  So you're back in the US on
21   Saturday, 7:38 p.m. GMT?
22   A.   I believe so, yes.
23   Q.   Now, if you could go back to
24   Exhibit 110.
25   A.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 129

H. McGEE - HIGHLY CONFIDENTIAL
1
2    Q.   And that e-mail's about a half
3    hour after that.
4    A.   Okay.
5    Q.   And, as you say, there is a degree
6    of frustration in this e-mail.  You don't know
7    what the pool is.  You're writing back to
8    Jenkins and you say this:  "Bob asked me to go
9    to London so I did.  I'm sorry this is so
10   disjointed.  Further complicated by the fact
11   that our plan keeps changing.  I have no idea
12   what authority I have or don't have and what
13   the boundaries are."
14       Do you see that?
15   A.   Um-hum.
16   Q.   Who's the Bob you're referring to
17   there?
18   A.   That would be Bob Diamond.
19   Q.   Had Bob Diamond asked you to go to
20   London?
21   A.   Well, I think you asked me that
22   earlier and maybe I said that he didn't.
23   Maybe he suggested that I go to London when I
24   was talking about the European piece of
25   Lehman.  There was no reason to go to London

TSG Reporting - Worldwide  (877) 702-9580

1          H. McGEE - HIGHLY CONFIDENTIAL
2    for this transaction because it didn't -- but
3    I went to -- I was concerned about trying to
4    do the European piece of Lehman and then the
5    Asian piece of Lehman.  And Bob had suggested
6    that I head over there.
7       **Q.   So that's why I raised this**
8    **because, you know, I did ask you this**
9    **morning --**
10      A.   Yeah, I didn't recall that
11   accurately.
12      **Q.   And is one reason that you went to**
13   **London to meet with Bob to talk about the**
14   **compensation for yourself and the people in**
15   **the investment banking division?**
16      A.   No.  I never saw --
17         MR. STERN:  Objection to the form.
18      A.   Well, I never saw Bob when I was
19   in London.  I don't even know if he was in
20   London at the time.
21      **Q.   Do you have -- as you see this**
22   **e-mail now, do you have a recollection of what**
23   **it was Bob wanted you in London for?**
24      A.   I was very focused as we announced
25   the transaction on what were the follow-on

1          H. McGEE - HIGHLY CONFIDENTIAL
2    plans to try to put the rest of Lehman
3    Brothers back together that the European piece
4    and the Asian piece had gone into separate
5    receivership.  So in that context I wanted to
6    go to London and Bob said, Yes, you should go
7    and see, you know, what it is we can do there.
8    Jerry Del Missier did show up while I was in
9    London.  We did not travel together nor
10   coordinate our schedules.
11      **Q.   So when you wrote -- and, again, I**
12   **just want to get as pinpoint as I can on your**
13   **memory of this.  You write in the e-mail "Bob**
14   **asked me to London" but I think you just told**
15   **me you suggested to Bob that you go.**
16         **Which was it?  Did Bob ask you to**
17   **come to London or did you suggest you go there**
18   **and he agreed?**
19      A.   I'm not so sure I understand that
20   there's a significant difference.
21      **Q.   One's the invitor and the other is**
22   **invitee.  I'm trying to figure out who's who.**
23      A.   Well, I wanted to go because I
24   wanted to put the transaction together for the
25   European piece and I had a number of our

1          H. McGEE - HIGHLY CONFIDENTIAL
2    European colleagues who were very, very
3    curious as to what did this mean for them.  In
4    the context of responding in an e-mail chain
5    to Roger Jenkins I probably said Bob asked me
6    to go to London.  Whether he invited me to go
7    or said, Yes, you can go and try to do that,
8    it's probably a little bit of interpretation.
9       **Q.   There's some frustration in this**
10   **communication with Jenkins and it's possible**
11   **you're taking a pop at Jenkins saying here,**
12   **Look, I'm in London because Bob Diamond asked**
13   **me to be here?**
14      A.   Yeah, a little bit of that.  And
15   no sleep for the previous week and a half.
16   Hadn't seen my family in a month.  You know, I
17   was a little bit frustrated.
18      **Q.   So do you have a recollection of**
19   **whether Bob asked you to go to London as you**
20   **sit here now?**
21      A.   No, no.
22      **Q.   While we're getting the document,**
23   **did you say when you got back from London you**
24   **went home to Texas?**
25      A.   Yes.

1          H. McGEE - HIGHLY CONFIDENTIAL
2       **Q.   When did you next come back to New**
3    **York?**
4       A.   Sunday night.
5       **Q.   And why did you come back on**
6    **Sunday night?  Did you have a particular**
7    **meeting you had to be at or place you needed**
8    **to be?**
9       A.   Because I always come back to New
10   York on Sunday night.
11      **Q.   I mean, as opposed to generally**
12   **being back in the area.  Was there any reason**
13   **to come back Sunday night?**
14      A.   No.
15      **Q.   Was it part of the plan to go to**
16   **the closing the next morning?**
17      A.   No.
18      **Q.   When you got back on Sunday did**
19   **you touch base with other Lehman executives to**
20   **see where things stood on the deal?**
21      A.   Not to my recollection.
22      **Q.   Through that week -- I mean, the**
23   **sequence I'm getting here -- and, again, this**
24   **is me making a statement, not asking a**
25   **question.  I just want to put this in context.**

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **Is that -- your primary focus**
3    **through the week is what you've called holding**
4    **the franchise together, dealing with the HR**
5    **side of things, the human capital side of**
6    **things.**
7        **You know the APA is signed -- the**
8    **asset purchase agreement is signed on the**
9    **16th. I asked you if you had any knowledge of**
10   **an amendment or a clarification letter and you**
11   **don't, right?**
12       MR. STERN: Is this a question or
13   statement?
14       MR. GAFFEY: That's a question.
15       MR. STERN: So what is the --
16   A.   I had no knowledge of the
17   amendment or clarification letter. My
18   involvement with the asset purchase
19   transaction effectively ended on Tuesday, you
20   know, when the thing was signed. I was not
21   involved in any of the follow-up hearings or
22   whatever else happened after that.
23   **Q.   Okay. That's a cleaner way to get**
24   **to where I was bumping along to, yes.**
25       A.   And so what I was focused on was

1    H. McGEE - HIGHLY CONFIDENTIAL
2    that we had employees again that were -- and I
3    know I keep repeating myself -- but that -- in
4    my business in particular people had lost
5    their entire net worth. They had all of a
6    sudden become vulnerable to being hired by
7    other firms. Other firms viewed this -- we're
8    still in the first part of the week so we
9    didn't yet have financial Armageddon when
10   things were still good and they were putting
11   very attractive proposals in front of our
12   people, I was afraid we were going to show up
13   at closing and we weren't going to have any
14   employees and there was going to be no closing
15   and there would be nothing left for the
16   creditors.
17   **Q.   During that week -- you know, from**
18   **the time the asset purchase agreement is**
19   **signed --**
20       A.   Yes.
21   **Q.   -- through when the closing**
22   **actually occurs, what if anything are you**
23   **doing to stay in touch with McDade or whoever**
24   **else is involved with the negotiation of the**
25   **deal and making sure that a closing occurs?**

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    A.   I was not in regular contact. I
3    just assumed that somebody would call me if
4    they needed me for something.
5    **Q.   So when you got back to the US on**
6    **Saturday and went home to Texas, did you check**
7    **in by phone when you got there with anybody to**
8    **say How's it looking, did we close, is the**
9    **deal going to close? Did you check in with**
10   **anybody along those lines?**
11       A.   I'm sure I did but I can't recall
12   specifically.
13   **Q.   And did you have a sense when you**
14   **got back of when the closing was going to**
15   **occur?**
16       **Well, withdrawn.**
17       **When you left for London did you**
18   **have an idea of when the deal was supposed to**
19   **close?**
20       A.   I had a sense that the time line
21   was that weekend but I don't know specifically
22   when.
23   **Q.   So when you got back on that**
24   **weekend did you ask anybody did the deal**
25   **close?**

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    A.   I'm sure I did because I remember
3    getting e-mails kind of play-by-play as to
4    what was going on in a hearing. And I can't
5    remember when that was.
6    **Q.   And did you find out when you got**
7    **back whether or not the deal had closed right**
8    **after the hearing? I don't mean to be --**
9        A.   I don't recall.
10   **Q.   Let me withdraw the question.**
11       A.   I don't recall.
12   **Q.   The closing doesn't happen till**
13   **the Monday. We know that, right?**
14       A.   Okay.
15   **Q.   Okay. When you get back on the**
16   **weekend are you surprised to find out it**
17   **hasn't closed yet?**
18       A.   No.
19   **Q.   Did you ask anybody when the**
20   **closing was going to be?**
21       A.   I'm sure I did but I can't recall.
22   **Q.   Any recollection of who you spoke**
23   **to?**
24       A.   No.
25   **Q.   And when you say you're sure you**

Page 138

1    H. McGEE - HIGHLY CONFIDENTIAL
2    did is that because you had a sense that it
3    was an important deal in your life at the time
4    and you must have asked or you have a vague
5    recollection of asking someone?
6    A.    The former. It was important --
7    I'm sure I would have asked but I can't recall
8    who I would have asked.
9        (Deposition Exhibit 112, document
10       with the first page bearing production
11       number 10269342, marked for
12       identification as of this date.)
13   BY MR. GAFFEY:
14   Q.    Mr. McGee, I've put before you an
15   e-mail and attachments which we've annotated
16   Deposition Exhibit 112. It appears to be an
17   e-mail from Ros Stephenson sent Sunday,
18   September 21st, at 9:15 p.m. to you,
19   Wieseneck, Weiss, Parker, and Gatto, subject
20   BarCap 200 Template.
21       MR. STERN:  I'll just note again
22       that we have the same issue with
23       non-sequential numbers.
24   Q.    Have you seen that document
25   before?

Page 139

1    H. McGEE - HIGHLY CONFIDENTIAL
2    A.    I don't specifically recall.
3    Q.    Do you recall a template, a form
4    of employment agreement, Barclays Capital
5    employment agreement being circulated on this
6    Sunday night?
7    A.    I don't specifically recall on
8    that Sunday night. But there certainly were
9    drafts of form employment agreements that were
10   being circulated and there was discussion as
11   to some of the specific terms.
12   Q.    Do you know if there was a
13   distribution of offer letters made to a
14   population of people within -- withdrawn.
15       Do you know if there was a
16   distribution of an offer letter in this format
17   made to employees of the investment banking
18   division?
19   A.    When?
20   Q.    That would be my next question.
21   Do you know if one was sent out?
22   A.    Well, there were -- they
23   definitely were offer letters that were given
24   to selected senior employees of the investment
25   banking division. Whether they were of this

Page 140

1    H. McGEE - HIGHLY CONFIDENTIAL
2    draft, the prior draft if there was one or a
3    later draft, I have no idea. This thing was
4    modified a number of times along the way and I
5    don't know -- I mean, people ultimately -- people
6    ultimately signed a final agreement that had a
7    lot of these provisions, but were -- you know,
8    there were some changes along the way.
9    Q.    There's a reference in the e-mail
10   from Mr. Stephenson to you. It's the last
11   sentence of the first paragraph it says, "We
12   should keep a master list."
13       Do you know if a master list was
14   kept?
15   A.    No. I don't know.
16       (Pause on the record.)
17       MR. GAFFEY: I have good news and
18       bad news which is that I'm done with
19       questions but all these people might
20       have a couple so -- but thank you for
21       your time.
22       THE WITNESS: Okay. Thank you.
23       MR. ROTHMAN: Can we take a quick
24       break?
25       MR. STERN: If you'd like to, yes.

Page 141

1    H. McGEE - HIGHLY CONFIDENTIAL
2       (Recess taken.)
3    EXAMINATION BY
4    MR. ROTHMAN:
5    Q.    Mr. McGee, my name is Seth
6    Rothman. I'm a lawyer at Hughes Hubbard &
7    Reed. We represent the trustee who was
8    appointed under the SIPA Act to liquidate the
9    affairs of LBI.
10   A.    Okay.
11   Q.    You described your role in the
12   transaction or what you were doing to Mr.
13   Gaffey a moment ago as herding cats; is that
14   correct?
15       MR. STERN: Objection to the form.
16   A.    I think I used the term herding
17   cats as descriptive of my effort to round up
18   the various investment bankers who were off
19   negotiating all their separate deals with
20   different companies. In terms of my role in
21   the transaction I was trying to serve as a
22   facilitator to try and keep an eye on the
23   overall picture to make sure that there were
24   not things that we were forgetting as we sped,
25   you know, around the clock to try and get this

Page 142

1   H. McGEE - HIGHLY CONFIDENTIAL
2  thing done.
3   Q.   Did Lehman have an office in
4  Houston?
5   A.   Lehman did and still does have an
6  office -- or Barclay does have an office in
7  Houston.
8   Q.   And some of the investment bankers
9  you were in touch with were people in that
10  Houston office?
11   A.   That's correct.
12   Q.   Do you know who Gregory Pipkin is?
13   A.   Yes, I do.
14   Q.   Who was he or what was his role?
15   A.   He's a managing director in the
16  nature resources group. The nature resources
17  group is one of the stronger groups at Lehman
18  Brothers and there's bankers in Houston and
19  bankers in New York for purposes of this
20  transaction.
21   Q.   And did you speak to Mr. Pipkin
22  about retaining people in the Houston office?
23   A.   Yes.
24   Q.   Did Mr. Pipkin ever tell you that
25  Bob Diamond stole Lehman?
TSG Reporting - Worldwide  (877) 702-9580

Page 143

1   H. McGEE - HIGHLY CONFIDENTIAL
2   A.   I can't recall whether he did or
3  he didn't. I know that he was focused on
4  making sure that the bankers in Houston and
5  the energy bankers were appropriately taken
6  care of.
7   Q.   Do you know how Mr. Pipkin felt
8  about that deal?
9   MR. STERN: Objection to the form.
10   A.   I know how he felt about his
11  ultimate compensation but I don't know how he
12  felt about the deal.
13   Q.   Do you know if he felt that
14  Barclays was getting a good deal?
15   MR. STERN: Objection to the form.
16   A.   I'm not -- I'm not sure what I
17  would say about what Mr. Pipkin thought back
18  then. Other than I know that he was very
19  concerned about making sure that there was
20  some sort of a deal for the energy team as a
21  group and that that entire team had a two-year
22  bid away from another firm.
23   MR. ROTHMAN: Let's mark as the
24  next exhibit an e-mail chain. The top
25  e-mail is an e-mail from Mr. Pipkin to
TSG Reporting - Worldwide  (877) 702-9580

Page 144

1   H. McGEE - HIGHLY CONFIDENTIAL
2  Lee Jacobe and to you and it's dated
3  September 18, 2008.
4   (Deposition Exhibit 113, e-mail
5  dated Thursday, 9/18/2008, 9:55:41 a.m.,
6  marked for identification as of this
7  date.)
8   (Document review.)
9   A.   Okay. I've read it.
10   Q.   Have you ever seen this e-mail
11  before?
12   A.   It's addressed to me from Pipkin
13  so, yeah, I assume I received it.
14   Q.   And do you recall the issue that
15  Mr. Pipkin and Mr. Jacobe in earlier e-mails
16  in the chain are discussing?
17   A.   Well, there's a couple of
18  different issues here. The New York energy
19  team, which was Grant and Carlos, are the
20  senior guys there, had separately been out
21  marketing the entire energy group as a
22  franchise to -- I may have the groups wrong --
23  to JPMorgan and Citi and had bids, and the
24  Houston team which viewed itself as perhaps
25  the stronger component of the energy
TSG Reporting - Worldwide  (877) 702-9580

Page 145

1   H. McGEE - HIGHLY CONFIDENTIAL
2  franchise, had separately been marketing
3  itself in a different direction.
4   So the other thing is that all of
5  these people had been at Lehman more than five
6  years so they had just seen at least two and a
7  half years of earnings go puff and, in fact,
8  probably a much greater percentage of their
9  net worth. And so there's a lot -- there's
10  obviously emotion in all this. And so those
11  are some of the issues that I think are
12  weaving their way through this e-mail chain
13  that you've asked me to read.
14   Q.   Okay. In the top e-mail Mr.
15  Pipkin writes to you and Mr. Jacob, "Bob
16  Diamond is a former Morgan Stanley guy. He
17  has paid for talent many times before. While
18  he's still at Lehman he has to pay up for the
19  best originating franchise - the Houston
20  upstream and midstream verticals."
21   When you received this e-mail from
22  Mr. Pipkin did you know what that meant?
23   MR. CHEPIGA: Objection to the
24  form.
25   A.   I think Mr. Pipkin wanted more
TSG Reporting - Worldwide  (877) 702-9580

1        H. McGEE - HIGHLY CONFIDENTIAL
2    money.
3        **Q.   Do you know what he meant when he**
4    **said Bob Diamond stole Lehman?**
5        A.   No.  I have no idea why he chose
6    that particular phrase.
7        **Q.   Was that a sentiment you were**
8    **hearing from other investment bankers?**
9        A.   No.  But I think the concept that
10   the investment bankers had multiple, you know,
11   alternatives in different directions and were
12   ready, willing, and able to walk down the
13   street was a consistent theme in many of the
14   e-mails that Bob had asked me to read.
15       MR. ROTHMAN:  Let's mark as
16   Exhibit 112 an e-mail --
17       MR. STERN:  This would be 114.
18       MR. ROTHMAN:  114.  Thank you.
19       -- from you to Mr. Diamond and Mr.
20   Del Missier at Barclays dated 9/20/2008.
21       (Deposition Exhibit 114, e-mail
22       dated Saturday, 9/20/2008, 6:19:26 a.m.,
23       marked for identification as of this
24       date.)
25       (Document review.)

1        H. McGEE - HIGHLY CONFIDENTIAL
2        A.   Okay.  I've read it.
3        **Q.   This is an e-mail you've sent to**
4    **Mr. Diamond and Mr. Del Missier, correct?**
5        A.   Yes.
6        **Q.   Do you recall sending this e-mail?**
7        A.   It looks like an e-mail I sent,
8    yes.
9        **Q.   You're sending this Saturday?**
10       A.   Looks like I sent it from London
11   as I was getting ready to get on the plane
12   back to the States.
13       **Q.   Okay.  Can we walk -- let's walk**
14   **through the e-mail.  Maybe you can explain to**
15   **me what you were telling them.**
16       A.   Sure.
17       **Q.   So the top line you say "Step 1 is**
18   **done (USA)."**
19       **What did that refer to?**
20       A.   Well, again, my -- I say again.  I
21   referenced earlier in some responses to the
22   questions from Mr. Gaffey that I had wanted to
23   go Europe to try and see if we could put the
24   deal together for Lehman Brothers Europe.
25       The original transaction between

1        H. McGEE - HIGHLY CONFIDENTIAL
2    Barclays and Lehman Brothers contemplated all
3    of Lehman Brothers.  That was the deal that
4    did not get approved by the regulators.
5    Lehman Brothers went into bankruptcy and then
6    there was a new construct that people began
7    discussing that Monday morning and then worked
8    through for 48 hours and that got signed up on
9    Tuesday.  Wednesday evening I got on a plane
10   to Europe.  I thought that if BarCap had an
11   interest in all of Lehman Brothers on Sunday
12   what was different on the following Thursday
13   and that we should try and see if we can put
14   the deal together.  I flew over there with
15   that mission in mind and worked with John
16   Winter who was the head of BarCap investment
17   banking for Europe on what I thought was a
18   workable construct to get to a meaningful
19   amount of critical mass in Europe.
20       My thinking then was to run the
21   same play again in Asia.  The reason I say a
22   need for speed on all fronts is because in
23   every region it was an absolute free-for-all
24   in terms of people wanting to go after the
25   ex-Lehman employees.  A need for a global

1        H. McGEE - HIGHLY CONFIDENTIAL
2    franchise is -- I mean, I can explain it to
3    you but if you're in the M&A business and the
4    equities business you have to be global.  When
5    you're dealing with companies like Pfizer,
6    like AT&T, like Chevron, the discussion
7    doesn't stop at the border.  You have to be
8    global.
9        So the fact that we no longer had
10   the global capability in M&A and equities was
11   of real issue to all the bankers that they
12   were asking me to try and, you know, hold on
13   to in the States and a very important issue to
14   them.
15       So that's why I said I need the
16   global franchise.
17       **Q.   So is step 1 the sale of the**
18   **Lehman assets in the United States or in North**
19   **America?**
20       A.   Yes.
21       **Q.   And as far as you're concerned**
22   **that's now completed because you've signed the**
23   **APA on Tuesday?**
24       MR. STERN:  Objection to the form.
25       A.   Well, yeah.  The -- again, let's

Page 150

1        H. McGEE - HIGHLY CONFIDENTIAL
2  review what I was doing and what my role was.
3  Step 1 was the deal was signed. I assumed it
4  was going to close. I was not involved at
5  all --
6      Q.    What did you --
7            MR. STERN: Please let him finish
8  his answer.
9      Q.    Sorry.
10     A.    I assumed that the transaction for
11 the North American business of Lehman Brothers
12 would close. I was very focused on how do we
13 then do a similar transaction for the European
14 business, and then a third transaction for the
15 Asian business. I was very focused on Lehman
16 Brothers had created this franchise over many
17 years which I had spent the last six years
18 building up. I didn't want to see it just go
19 puff in smoke and disappear.
20     Q.    Okay. So what did you mean when
21 you said step 1 was done?
22     A.    What I meant was that there was a
23 deal that was signed and I assumed was going
24 to close. I did not mean in the legal
25 perspective that the deal was closed.

TSG Reporting - Worldwide  (877) 702-9580

Page 151

1      H. McGEE - HIGHLY CONFIDENTIAL
2      Q.    And if you go back to the e-mail
3  you go on to say, "This deal will go down in
4  history as one of the savviest."
5            What did you mean by that?
6      A.    By that I meant that the
7  combination of the BarCap existing platform
8  with product strength and fixed income,
9  commodities, FX, a balance sheet that was
10 bigger and more highly ranked than Lehman
11 Brothers, combined with the Lehman Brothers
12 capability in M&A, equities, and also fixed
13 income was going to create a real powerhouse
14 in the investment banking business, and that
15 BarCap had the intestinal fortitude to
16 actually step in and do a transaction when
17 everyone else in the world said no.
18     Q.    And you were congratulating Mr.
19 Diamond and Mr. Del Missier on doing that
20 transaction, correct?
21     A.    Although, as you've already
22 pointed out, the deal had not yet closed, yes.
23 So prematurely I assumed it was going to get
24 to a closing at some point.
25     Q.    Then you say you were excited to

TSG Reporting - Worldwide  (877) 702-9580

Page 152

1      H. McGEE - HIGHLY CONFIDENTIAL
2  get back on offense. What did you mean by
3  that?
4      A.    To think about going back and
5  actually focusing on business again and client
6  business and generating revenue. It was more
7  of a personal comment. That from March of '08
8  through that weekend I had done nothing but
9  lurch from crisis to crisis to crisis with
10 Lehman Brothers. And you don't need to hear
11 my tale of woe but it was not a fun period nor
12 was it a financially rewarding period.
13            (Continued on next page to include
14    jurat.)
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 153

1      H. McGEE - HIGHLY CONFIDENTIAL
2
3            So it was going to be -- I was
4  looking forward to getting back to actually
5  doing investment banking business, working on
6  deals, calling on clients, things like that.
7  So that's what that meant. More of a personal
8  commentary.
9            MR. STERN: Anything else?
10           MR. ROTHMAN: I think that's it.
11           MR. STERN: Okay. Thank you very
12 much. We're off the record.
13           (Time Noted:    2:18 p.m.)
14
15
16
17
18
19
20      _____
20      HUGH E. McGEE, III
21
22 Subscribed and sworn to before me
23 this ___ day of _____, 2009.
24
25 _____

TSG Reporting - Worldwide  (877) 702-9580

Page 154

```
1
2         C E R T I F I C A T E
3   STATE OF NEW YORK    )
4                : ss.
5   COUNTY OF NEW YORK  )
6           I, FRANCIS X. FREDERICK, a Notary
7   Public within and for the State of New
8   York, do hereby certify:
9           That HUGH E. McGEE, III, the
10  witness whose deposition is hereinbefore
11  set forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14          I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19          IN WITNESS WHEREOF, I have
20  hereunto set my hand this 10th day of
21  August, 2009.
22
23          _____
24              FRANCIS X. FREDERICK
25
```

Page 155

```
1
2   ---------------- I N D E X ----------------
3   WITNESS       EXAMINATION BY   PAGE
4   HUGH E. McGEE, III   MR. GAFFEY      6
5           MR. ROTHMAN      141
6
7   ---------- INFORMATION REQUESTS ------------
8   DIRECTIONS:  NONE
9   RULINGS:  NONE
10  TO BE FURNISHED:  NONE
11  REQUESTS:  NONE
12  MOTIONS:  NONE
13
14  ----------------- EXHIBITS -----------------
15  EXHIBIT                    FOR ID.
16  Exhibit 98
17  document bearing production
18  number 10282956......................... 37
19  Exhibit 99
20  document bearing production
21  number 10265851......................... 42
22  Exhibit 100
23  document with the first
24  page bearing production
25  number 10287489......................... 47
```

Page 156

```
1
2   ----------------- EXHIBITS -----------------
3   EXHIBIT                    FOR ID.
4   Exhibit 101
5   document with the first
6   page bearing production
7   number 10322002......................... 50
8   Exhibit 102
9   document bearing production
10  number BCI-EX-(S)-00003505.............. 54
11  Exhibit 103
12  document bearing production
13  numbers BCI-EX-00077338
14  through BCI-EX-00077340................. 54
15  Exhibit 104
16  e-mail dated 9/14/2008
17  6:15 a.m. with attachments.............. 63
18  Exhibit 105
19  document bearing production
20  number 10321888......................... 86
21  Exhibit 106
22  e-mail dated 9/17/2008 2:21 p.m......... 89
23  Exhibit 107
24  document bearing production
25  number 10270027......................... 107
```

Page 157

```
1
2   ----------------- EXHIBITS -----------------
3   EXHIBIT                    FOR ID.
4   Exhibit 108
5   document bearing production
6   numbers 10269417....................... 111
7   Exhibit 109
8   document bearing production
9   numbers 01321878....................... 121
10  Exhibit 110
11  document bearing production
12  numbers 10279514....................... 123
13  Exhibit 111
14  document bearing production
15  numbers 01279510....................... 127
16  Exhibit 112
17  document with the first
18  page bearing production
19  number 10269342......................... 138
20  Exhibit 113
21  e-mail dated Thursday,
22  9/18/2008, 9:55:41 a.m................. 144
23
24
25
```

Page 158

```
1
2    ------------------ EXHIBITS ------------------
3    EXHIBIT                        FOR ID.
4    Exhibit 114
5    e-mail dated Saturday,
6    9/20/2008, 6:19:26 a.m................. 146
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide   (877) 702-9580

Page 159

```
1
2    NAME OF CASE   IN RE   LEHMAN BROTHERS
3    DATE OF DEPOSITION   AUGUST 10TH, 2009
4    NAME OF WITNESS.  HUGH E. McGEE, III
5    Reason codes
         1   To clarify the record.
6        2   To conform to the facts
         3   To correct transcription errors.
7    Page _____ Line _____ Reason _____
     From _____ to _____
8
     Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23
     _____
24
         HUGH E. McGEE, III
25
```

TSG Reporting - Worldwide   (877) 702-9580