# A. 23

Page 1

1          HIGHLY CONFIDENTIAL - R. RICCI

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF RICH RICCI

14            New York, New York

15           September 8, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24547

Page 2

1  HIGHLY CONFIDENTIAL - R. RICCI
2  September 8, 2009
3  9:56 a.m.
4
5  HIGHLY CONFIDENTIAL deposition
6  of RICH RICCI, held at Jones Day,
7  LLP, 222 East 41st Street, New York,
8  New York, before Kathy S. Klepfer,
9  a Registered Professional Reporter,
10  Registered Merit Reporter, Certified
11  Realtime Reporter, Certified Livenote
12  Reporter, and Notary Public of the
13  State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  HIGHLY CONFIDENTIAL - R. RICCI
2  A P P E A R A N C E S :
3  JONES DAY, LLP
4  Attorneys for Lehman Brothers, Inc.
5  222 East 41st Street
6  New York, New York  10017-6702
7  BY:  DAVID L. CARDEN, ESQ.
8  JENNIFER DEL MEDICO, ESQ.
9  BART GREEN, ESQ.
10
11  BOIES, SCHILLER & FLEXNER, LLP
12  Attorneys for Barclays and the Witness
13  5301 Wisconsin Avenue, NW
14  Washington, DC  20015
15  BY: HAMISH HUME, ESQ.
16  JONATHAN D. SCHILLER, ESQ.
17  LOUIS SMITH, ESQ.
18
19  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
20  Attorneys for the Creditors Committee
21  51 Madison Avenue
22  22nd Floor
23  New York, New York  10010
24  BY:  ERIC M. KAY, ESQ.
25

Page 4

1  HIGHLY CONFIDENTIAL - R. RICCI
2  A P P E A R A N C E S :  (Cont'd.)
3  JENNER & BLOCK, LLC
4  Attorneys for the Examiner
5  330 N. Wabash Avenue
6  Chicago, Illinois  60611-7603
7  BY:  DAVID C. LAYDEN, ESQ.
8
9  HUGHES, HUBBARD & REED, LLP
10  Attorneys for the SIPA Trustee
11  One Battery Park Plaza
12  New York, New York  10004-1482
13  BY:  WILLIAM R. MAGUIRE, ESQ.
14  KENNETH E. LEE, ESQ.
15  FARA TABATABAI, ESQ.
16
17
18
19  Also Present:
20  RAJESH ANKALKOTI, Alvarez & Marsal
21
22
23
24
25

Page 5

1  HIGHLY CONFIDENTIAL - R. RICCI
2
3
4
5
6
7
8
9
10
11
12  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

PAGES 6-9 REDACTED

Page 10

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
```

REDACTED

```
17    Q.   What was your role in connection with
18   those conversations or that possible transaction
19   with Lehman Brothers?
20    A.   My role at the time was as one of the
21   lead business heads in potentially determining
22   whether an acquisition made sense.  I was also
23   teed up as the, I guess as the senior person to
24   lead discussions from our side.
25    Q.   And did you have a team of people who
```

Page 11

```
1         HIGHLY CONFIDENTIAL - R. RICCI
2    were involved in the discussions on behalf of
3    Barclays?
4     A.   We did.
5     Q.   Who were they?
6     A.   It would have been Bob Diamond, Jerry
7    del Missier.  The team was built up over time.
8    So Mike Keegan, Stephen King, Michael Evans,
9    Archie Cox, Michael Klein, who we retained as an
10   advisor on the transaction.  Certainly we had
11   conversations with our board and John Varley.
12   I'm sure there were others.
13
14
15
16
17
```

REDACTED

```
18
19
20
21
22
23
24
25
```

Page 12

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REDACTED

Page 13

```
1
2
3
4
5
6
7
8
```

REDACTED

```
9
10    Q.   And we know at some juncture the
11   conversations related to the acquisition of all
12   of Lehman Brothers ended on Sunday.  Can you
13   tell me why, sir?
14    A.   We had reached an agreement we felt
15   with Lehman Brothers that was always subject to
16   certain regulatory conditions.  On Sunday, the
17   14th, there was a question as to the ability of
18   Lehman to open on Monday morning and that there
19   would be required for Lehman to open a guarantee
20   of all Lehman's liabilities.
21         Under UK listing rules, a guarantee of
22   that size cannot happen without shareholder
23   approval.  We asked the UK listing authority to
24   waive that ruling.  They did not.  We then asked
25   the United States Government to provide that
```

Page 14

1    HIGHLY CONFIDENTIAL - R. RICCI
2    guarantee, and they said they could not do that.
3
4
5
6
7
8
9
10    REDACTED
11
12
13
14
15
16
17
18
19
20    Q.   Who was the person at Barclays, if
21    there was one, and if there was more than one,
22    please tell me that, who was responsible for
23    actually sitting down across the table from
24    somebody at Lehman Brothers, if this is the way
25    it happened, and having the discussion

Page 15

1    HIGHLY CONFIDENTIAL - R. RICCI
2    concerning the acquisition of the entire firm?
3    A.   There were several dialogues.
4    Q.   Okay.  Tell me what they were, if you
5    will.
6    A.   So Bob Diamond would have had a
7    conversation with Dick Fuld initially; I had a
8    brief conversation, series of conversations with
9    Mark Shafir; and Michael Klein and Archie Cox
10    would have a series of conversations with Mark
11    Shafir and others.
12
13
14
15
16
17
18    REDACTED
19
20
21
22
23
24
25

Page 16

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 17

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

PAGES 18-21 REDACTED

Page 22

1
2
3
4
5   REDACTED
6
7
8
9
10
11
12
13   Q.   Did Mr. Diamond give you an assignment
14   with regard to evaluating the transaction that
15   had been suggested by Mr. McDade?
16   A.   Yes.
17   Q.   What was your assignment?
18   A.   My assignment was to see if we could,
19   you know, get our team back together and work
20   out a deal with the estate of the bankruptcy
21   court with creditors on getting a portion of
22   Lehman done.
23   Q.   And once again, were you heading up
24   the team?
25   A.   Yes.

Page 23

1   HIGHLY CONFIDENTIAL - R. RICCI
2   Q.   Was the team essentially the same team
3   that you had before when you were evaluating the
4   purchase of the entire firm?
5   A.   Yes.
6
7
8
9
10
11
12
13
14   REDACTED
15
16
17
18
19
20
21
22
23
24
25

Page 24

1
2
3
4
5
6
7
8
9
10
11
12   REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 25

1
2
3
4
5
6
7
8
9
10
11
12   REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

PAGES 26-33 REDACTED

Page 34

REDACTED

Page 35

REDACTED

Q.  We were talking about you having gone over to Lehman Brothers on the Monday, and we got into the conversation concerning the instructions given as to the assets that Barclays was going to be acquiring.

Did you have any conversations with anyone at Lehman while you were over at the Lehman offices that day?

A.  Regarding?

Q.  Anything.

A.  I recall I think speaking to some of the human resource people on the Monday about potential people issues.

Q.  What do you mean by "people issues"?

A.  It was, with all the uncertainty around Lehman and in the market, it was -- Lehman people were being very, very heavily recruited by other Wall Street firms, and I was concerned that Lehman may lose a lot of its core people.

Page 36

HIGHLY CONFIDENTIAL - R. RICCI

Q.  At some time on the Monday, was there a conversation with anyone in which you were involved -- let me rephrase that.  At any time did you have a conversation on Monday, September 15, about the need to establish a bonus pool for Lehman people to keep them from leaving the employment of Lehman and then Barclays?

A.  I don't recall if that was specifically on Monday, the 15th.

Q.  At some point did you have such a conversation?

A.  Yes.

Q.  With whom did you have that conversation or conversations?

A.  I had conversation with Skip McGee and with human resource people.  I don't recall their names.

Q.  Lehman human resource people?

A.  Lehman human resource people.

Q.  Did you have those conversations at Lehman?

A.  Yes.

Q.  Did you ask them how much Lehman had accrued for bonuses for its people that were

Page 37

HIGHLY CONFIDENTIAL - R. RICCI

among those that would be, if the transaction went through, moving to Barclays?

A.  Lehman presented me and others with a number of roughly $2 billion that they felt they needed to compensate the Lehman staff.

Q.  Did you agree to that number?

A.  Not initially.  It was presented to me.

Q.  Did there come a time when you did agree to that number?

A.  Yes.

Q.  When was that?

A.  Sometime during that week.

Q.  Do you recall when?

A.  No.

Q.  When you say that you agreed to the number, does that mean that Barclays committed to pay the $2 billion in bonuses to the individuals at Lehman who would be coming into Barclays' employment?

MR. HUME:  Objection.  Mischaracterizes the testimony.

A.  What we had agreed was that we would assume a liability related to compensation.

Page 38

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2    "Compensation" was defined in my conversations
3    as bonuses or severance or other non- sort of
4    salary-related matters, that we would assume
5    that liability, but we didn't agree that we
6    would pay the whole thing out.
7         We recognized we might have to, but we
8    did not agree that we would absolutely pay the
9    whole thing out.  In the end, we did, but at the
10   time, we didn't absolutely agree.  We were
11   hoping we might not have to pay it all out, but
12   we assumed the liability and expected we may
13   have to pay it out.
14
15
16
17
18
19                    REDACTED
20
21
22
23
24
25
```

Page 39

```
1
2
3
4
5
6
7
8                    REDACTED
9
10
11
12
13
14
15
16
17
18
19        Q.   You say there was scenarios under
20   which you might not have to pay that amount.
21   What did you mean by that?
22        A.   It was a, you know, I didn't know -- a
23   scenario might have where, if we had kept fewer
24   people than we thought, there were also
25   scenarios we may have had to pay more if we
```

Page 40

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2    ended up keeping more Lehman people than we
3    thought.  So that's an example.
4
5
6
7
8
9
10
11
12                    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 41

```
1
2
3
4
5
6
7
8
9
10
11
12                    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 42

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 43

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 44

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 45

```
 1
 2
 3                  REDACTED
 4
 5
 6
 7
 8
 9     Q.    As of the time that this was executed,
10   sir.
11          MR. HUME:  Objection.  Lacks
12   foundation as to what that date is.
13     A.    I can't speak for every single asset,
14   but in order to try to answer your question, if
15   there -- given what I know about the timing of
16   when we first started looking at their assets
17   versus when this agreement was signed, I would
18   think there would have been a discount, yes, of
19   Lehman assets -- the Lehman marks on their
20   assets, yes.
21
22                  REDACTED
23
24
25
```

PAGES 46-49 REDACTED

Page 50

```
1
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 51

```
1
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 52

```
1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Q.   I'm going to show you what has been
```

Page 53

```
1         HIGHLY CONFIDENTIAL - R. RICCI
2    previously marked as Exhibit 285B.
3         A.   Thank you.
4         Q.   Which has two e-mails on it, the top
5    one from you to Mr. Clackson and the bottom from
6    Mr. Clackson to you and Mr. Evans.  Take a
7    moment and review it.
8         (Document review.)
9         A.   Okay.
10        Q.   Okay.  The first e-mail -- let's just
11   start with the bottom because it's an e-mail
12   chain.  Mr. Clackson writes to you and Mr. Evans
13   on Wednesday, September 17th, at 7:07 P.M.
14   regarding a $650 million problem.  Do you recall
15   having gotten this e-mail, sir?
16        A.   Yes.
17
18
19
20             REDACTED
21
22
23
24
25
```

PAGES 54-117 REDACTED

Page 118

```
1
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 119

```
1
2
3
4
5
6
7
8
9
10
11
12          REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 120

```
1
2
3
4
5
6
7
8
9
10
11          REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 121

```
1
2
3          REDACTED
4
5
6
7
```

8      Q.   We're going to come to this in the
9   afternoon after you've been fed, but at towards
10   the end of the week there was an effort to
11   identify additional Lehman assets for purposes
12   of the transaction, correct?
13      A.   That is correct, to replace assets
14   that weren't delivered earlier in the week and
15   agreed to earlier in the week.
16      Q.   Right.  Were you involved in
17   evaluating -- strike that.  Were you involved in
18   that process at any level?
19      A.   I was involved in -- at a high level
20   in terms of the potential assets.
21      Q.   Did you give anyone working for you
22   or, for that matter, anybody at Lehman Brothers
23   a number which they should try to identify --
24   strike that -- a number of assets, a valuation
25   of assets that they should identify for purposes

Page 122

1       HIGHLY CONFIDENTIAL - R. RICCI
2   of adding in the transaction?
3       A.   I don't recall being given the
4   specific number.
5       Q.   The confusion can simply be mine, but
6   at some point you stopped look for assets,
7   right?
8       A.   Yes.
9       Q.   Okay.  Why did you stop when you
10  stopped?
11      A.   We had -- it is quite confusing, so I
12  certainly understand your question.
13          You know, we had an agreement earlier
14  in the week.  It was tumultuous during that
15  whole week about trying to find assets that were
16  in the purchase agreement that said were ours,
17  that we had agreed to, they had been seized by
18  the parties, Lehman couldn't find them, and we
19  were trying to replace those with assets of
20  similar value as best we could.
21      Q.   I was simply just trying to identify
22  whether there was a number in terms of the
23  valuation of those additional assets that you
24  were trying to identify.
25      A.   No, I don't think we had a specific

Page 123

1       HIGHLY CONFIDENTIAL - R. RICCI
2   number other than trying to replace replacement
3   value what we couldn't get our hands on.  I
4   don't recall what that number was off the top of
5   my head.
6
7
8
9
10
11
12
13                   REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1
2
3
4
5
6
7
8
9
10
11
12                   REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

1                   REDACTED
2
3
4       Q.   How did you intend for Barclays to
5   have the cushion you described it needed to be
6   accomplished in the purchase of those assets?
7       A.   There were several ways to achieve it,
8   we had hoped.  One was to ensure that in any
9   price we were paying for assets, particularly
10  illiquid prices, illiquid assets, of which there
11  were a lot, that we had an appropriate liquidity
12  premium in our price.
13          Secondly, as I've already testified,
14  on the comp and the cure payments, we had hoped
15  that we could pay less than what we had assumed
16  but recognize that we might have to assume
17  those.  And also, we had intangible assets, that
18  is, you know, accounting function that might
19  help create some cushion.  Those were the big
20  components.
21
22                   REDACTED
23
24
25

Page 126

REDACTED

Page 127

REDACTED

Page 128

REDACTED

8       Q.    Let's just go back to Exhibit 378 for
9    just a moment, which is in front of you.  And
10   you were on the board call.  Do you have any
11   recollection while being on the call of anyone
12   saying that Barclays was acquiring $75 billion
13   worth of assets?
14       A.    I don't recall.
15       Q.    And I take it it follows, then, that
16   you don't recall whether or not you corrected
17   them that the Asset Purchase Agreement provided
18   for an acquisition of $70 billion, correct?
19       A.    I don't recall.
20       Q.    Who would have prepared, if you know,
21   the deck itself?
22       A.    The deck most likely would have been
23   prepared by Group Planning.
24       Q.    And you told me before who was head of
25   Group Planning, but I can't recall the name

Page 129

1         HIGHLY CONFIDENTIAL - R. RICCI
2    right now.
3       A.    Reports to Mr. Lucas.
4       Q.    Was Mr. Lucas with you in New York
5    during the negotiations?
6       A.    No.
7       Q.    Did you communicate to Mr. Lucas
8    during the week of September 15th concerning
9    the transaction, apart from what might be an
10   e-mail?
11      A.    I can't recall, but I must have.
12      Q.    Can you tell me who in your view would
13   have been the one who would have calculated the
14   negative goodwill number of 3 billion that is in
15   Exhibit 378?
16        MR. HUME:  Objection.  Lacks
17   foundation.
18      A.    Would have been Patrick Clackson or
19   someone on his team.

REDACTED

PAGES 130-153 REDACTED

Page 154

REDACTED

Page 155

REDACTED

Page 156

REDACTED

On Friday morning, you took a view
that you didn't have sufficient cushion,
correct?
    A.   Uh-huh.  Yes.
    Q.   And I think it follows that you
necessarily had to take a view as to how much
cushion would have been sufficient, am I
correct?
    A.   Is that a question?
    Q.   Yes.  Am I correct?
    A.   Again, there was incredible
uncertainty.  I was now looking at a transaction
which had been signed on Tuesday, which didn't
look like a lot of those assets were going to
arrive.  We had problems getting collateral for
the $45 billion we had outlaid to the Fed.
Markets were getting worse.  I felt I needed as

Page 157

HIGHLY CONFIDENTIAL - R. RICCI
much as I could get to protect the firm.
    Q.   Okay.
    A.   And I wasn't sure what Lehman had
left.
    Q.   Okay.
    A.   Didn't know there was anything left.
    Q.   All right.  What did you do to try to
determine how much Lehman left that could be
transferred to Barclays?
    A.   I believe I instructed Mr. Klein to
see if Lehman had any other assets.
    Q.   Did you tell anybody on Friday morning
that if Barclays were unable to come up with
additional assets, that it would not go through
with the transaction?
    A.   I don't -- I recall certainly having
those thoughts.  I can't recall if I said that
to anyone specifically.
    Q.   And by "additional assets," I meant
additional Lehman assets, you understood?
    A.   Additional Lehman assets, yes.

REDACTED

Page 158

**REDACTED**

1
2
3
4    Q.    At any point did anybody at Lehman
5    suggest that Barclays was being piggish?
6    A.    I remember having a conversation with
7    Alex Kirk after we had tried to seek more
8    assets, and I expressed some discomfort to Alex
9    that I still didn't think we had enough assets,
10    and he said there's nothing left.  And I said
11    something like to him, well, fine, we're not
12    going to be -- we're not going to be pigs and go
13    after every last nickel.  We'll try to get
14    comfortable with what you have given us, and if
15    that's the case, we're done.
16    Q.    So is it fair to say that Barclays
17    stopped looking for additional Lehman assets
18    when Mr. Kirk said there was nothing else left
19    to transfer to Barclays?
20    A.    I recall saying to Alex that -- he was
21    very worried that we were going to walk because
22    we had asked for more assets, they had given us
23    what we could, he was worried we were going to
24    walk, and I said, okay, if this is it, if this
25    is all we can find before we go to court, you

Page 159

1    HIGHLY CONFIDENTIAL - R. RICCI
2    know, we'll take it, we'll take the chance, but
3    we won't kill the deal over looking for more
4    assets.
5    Q.    So, based on that conversation with
6    Mr. Kirk, Barclays stopped looking for
7    additional Lehman assets, correct?
8    A.    I believe that's correct.
9
10
11
12
13
14
15
16    **REDACTED**
17
18
19
20
21
22
23
24
25

Page 160

1
2
3
4
5
6
7
8
9
10
11
12    **REDACTED**
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 161

1
2
3
4
5
6
7
8
9
10
11
12    **REDACTED**
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 162 | Page 163 |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |

**Page 164**

**REDACTED**

16   Q.  Okay.  Some point on Friday you had a
17 conversation with Mr. McDade in which it was
18 agreed that the $1.9 billion would be additional
19 assets provided to Barclays to provide as a
20 cushion, correct?
21   A.  That we would take $1.9 billion in
22 additional assets.
23   Q.  When was that conversation?
24   A.  I believe that was Friday afternoon
25 prior to the hearing.

**Page 165**

1   HIGHLY CONFIDENTIAL - R. RICCI
2   Q.  In addition to that 1.9, do you recall
3 the amount of any additional assets that were
4 transferred to Barclays that day apart from the
5 repo?
6     MR. HUME:  Objection.  Vague and
7  ambiguous.
8   A.  That were transferred to Barclays that
9 day?
10   Q.  On Friday morning early throughout the
11 day, Barclays was looking for additional assets,
12 correct?
13   A.  Correct.
14   Q.  And 1.9 was transferred to Barclays,
15 correct?
16   A.  Wasn't transferred.  It was agreed
17 that we would take it.  Still waiting for it.
18   Q.  All right.  Okay.  Was there any
19 additional assets that day other than the 1.9 --
20   A.  Yes.
21   Q.  -- that was agreed would be
22 transferred to Lehman -- to Barclays?
23   A.  The 15c3 deposit money.
24   Q.  And how much was that?
25   A.  Roughly $750 million.

PAGES 166-169 REDACTED

Page 170

REDACTED

Page 171

REDACTED

Page 172

REDACTED

16    Q.    Mr. Ricci, I show you what has been
17  marked as Exhibit 383, which is an e-mail from
18  Mr. King to you.  Just take a moment to read
19  this one.
20         Finished?
21    A.    Uh-huh.
22    Q.    Mr. King has said the best estimate --
23  "current best estimate is the portfolio inc," I
24  suppose that means includes, but "7 billion cash
25  is 48.5 to 49 billion."  Do you remember getting

Page 173

1         HIGHLY CONFIDENTIAL - R. RICCI
2  this e-mail?
3    A.    Yes.
4    Q.    Okay.  Had you asked Mr. King to value
5  the assets that had been transferred to Barclays
6  in exchange for the $45 billion that it had laid
7  out on the repo?
8    A.    He would have been on the team, yes.
9    Q.    And this number of 48.5 and 49 billion
10  doesn't include the 1.9 of the 15c3 or the
11  $750,000 -- I'm sorry, the 1.9 or the $750,000
12  from the 15c3, does it?
13         MR. HUME:  Objection.  Lacks
14  foundation.
15    A.    No, it wouldn't.
16    Q.    Okay.
17    A.    If I recall correctly, the $49 billion
18  was roughly I believe what the Fed had pledged
19  as collateral against the 45 billion.  So --
20    Q.    Okay.  I stated this awkwardly, but I
21  just want to be clear.  The moneys transferred
22  pursuant to the 15c3 accounts of 750 and the 1.9
23  is not included in these numbers in Exhibit 383,
24  is it?
25    A.    To the best of my knowledge.

PAGES 174-289 REDACTED

Page 290

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 291

1
2
3
4
5
6
7
8
9
10
11
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 292

1
2    REDACTED
3
4
5    (Time Noted: 5:34 P.M.)
6         oOo
7
8
9
10
11
12
13
14
15
16
17
18
         _____
         RICH RICCI
19
20    Subscribed and sworn to
      before me this    day
21    of        2009.
22
      _____
23
24
25

Page 293

1    HIGHLY CONFIDENTIAL - R. RICCI
2         CERTIFICATE
3    STATE OF NEW YORK )
          : ss
4    COUNTY OF NEW YORK)
5         I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9         That RICH RICCI, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18        I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23        In witness whereof, I have hereunto
24   set my hand this 8th day of September, 2009.
25        --------------------------------

Page 294

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2              INDEX
3    WITNESS:      EXAMINATION BY      PAGE
4    R. RICCI          Mr. Carden        5, 278
5                 Mr. Maguire      189, 289
6                 Mr. Hume          282
7
8    EXHIBITS:              PAGE
9    Exhibit 378, a document bearing Bates      84
10   Nos. BCI-EX-(S)-00023787 through 788 with
11   attachment
12   Exhibit 379, a document bearing Bates      106
13   Nos. BCI-EX-(S)-00053514 through 53515
14   Exhibit 380, a document bearing Bates      110
15   Nos. BCI-EX-00081880 through 81884
16   Exhibit 381, a document bearing Bates      162
17   Nos. BCI-EX-00078268 through 78270
18   Exhibit 382, a document bearing Bates      169
19   Nos. BCI-X-00080984 through 80985
20   Exhibit 383, a document bearing Bates      172
21   Nos. BCI-EX-00080668
22   Exhibit 384, a document bearing Bates      174
23   Nos. BCI-EX-00079340 through 79342
24   Exhibit 385, a document bearing Bates      181
25   Nos. BCI-EX-00079472 through 79473
```

Page 295

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2            INDEX (Cont'd.)
3    EXHIBITS:                PAGE
4    Exhibit 386, a document bearing Bates      185
5    Nos. BCI-EX-(S)-00024686 through 24687
6    Exhibit 387, Debtors' Third Rule 30(b)(6)   207
7    Deposition Notice to Barclays on Issues
8    Pertaining to Exchange-Traded Derivatives
9    and Exchange Deposits
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 296

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2    NAME OF CASE.  In re Lehman Brothers
3    DATE OF DEPOSITION:  September 8, 2009
4    NAME OF WITNESS.  Rich Ricci
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```

TSG Reporting - Worldwide      877-702-9580