# A. 25 (A)

Highly Confidential

Page 1

1                    M. Shapiro

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13       DEPOSITION OF MARK J. SHAPIRO

14            New York, New York

15             August 7, 2009

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 24036

Highly Confidential

Page 2

```
1              M. Shapiro
2         August 7, 2009
3            9:30 a.m.
4
5         HIGHLY CONFIDENTIAL deposition
6    of MARK J. SHAPIRO, held at Jones
7    Day, LLP, 222 East 41st Street, LLP,
8    New York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public
13   of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 3

```
1              M. Shapiro
2
3         A P P E A R A N C E S:
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7       222 East 41st Street
8       New York, New York  10017-6702
9    BY:  DAVID L. CARDEN, ESQ.
10      KELLY A. CARRERO, ESQ.
11      JENNIFER DEL MEDICO, ESQ.
12
13   BOIES, SCHILLER & FLEXNER, LLP
14   Attorneys for Barclays and the Witness
15      575 Lexington Avenue - 7th Floor
16      New York, New York  10022
17   BY:  JACK G. STERN, ESQ.
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 4

```
1              M. Shapiro
2    A P P E A R A N C E S: (Cont'd.)
3
4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5    Attorneys for the Creditors Committee
6       865 Figueroa Street, 10th Floor
7       Los Angeles, California 90017
8    BY:  ERICA P. TAGGART, ESQ.
9
10   JENNER & BLOCK, LLC
11   Attorneys for the Examiner
12      330 N. Wabash Avenue
13      Chicago, Illinois  60611-7603
14   BY:  DAVID C. LAYDEN, ESQ.
15
16   HUGHES, HUBBARD & REED, LLP
17   Attorneys for the SIPA Trustee
18      1775 I Street, N.W.
19      Washngton, DC  20006-2401
20   BY:  JOHN F. WOOD, ESQ.
21      SAMUEL C. McCOUBREY, ESQ.
22
23   Also Present:
24      THOMAS E. HOMMEL, Lehman Brothers
25      PHILIP E. KRUSE, Alvarez & Marsal
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 5

```
1              M. Shapiro
2    MARK J. SHAPIRO, called as a
3       witness, having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6    EXAMINATION BY
7    MR. CARDEN:
8       Q.  Good morning, Mr. Shapiro.
9       A.  Good morning.
10      Q.  My name is David Carden.  I represent
11   the Lehman estate as their special counsel and
12   my colleagues with me here are Jen Del Medico
13   and Kelly Carrero.  And I think we'll go around
14   the table and identify ourselves for your
15   benefit, although I think you'll probably know
16   several of these people.
17         MR. WOOD:  I'm John Wood from Hughes,
18   Hubbard & Reed, and we represent the Trustee
19   under the Security Investors Protection Act.
20         MR. McCOUBREY:  I'm Sam McCoubrey,
21   also from Hughes, Hubbard & Reed, and we
22   represent the Trustee.
23         MS. TAGGART:  Erica Taggart with Quinn
24   Emanuel for the Committee.
25         MR. HOMMEL:  Tom Hommel with Lehman
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 6

```
 1          M. Shapiro
 2   Brothers.
 3          MR. KRUSE:  Philip Kruse with Alvarez
 4   & Marsal.
 5          MR. LAYDEN:  David Layden, Jennifer &
 6   Block, on behalf of the Examiner.
 7          MR. STERN:  Jack Stern, Boies,
 8   Schiller & Flexner, for Barclays Capital and
 9   the witness.
10          MR. CARDEN:  I hate housekeeping
11   matters since I don't typically do well with
12   them, but last time you and I spoke, Jack,
13   we decided that we would do exhibits in
14   chunks like this and I'm told this is not
15   the way we decided to go, in our -- my
16   absence, anyway.
17          So what I want to do today is try to
18   use the exhibits that have previously been
19   marked, to the extent possible, obviously,
20   and if not, I'm going to put an A on the end
21   of any exhibits that I use so that we know
22   that the deposition that is occurring right
23   here is different than the one that is
24   occurring next door of one of your
25   colleagues.
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 7

```
 1          M. Shapiro
 2   So, is that fair enough?
 3          MR. STERN:  Yes.  And I also think we
 4   had a general agreement with Mr. Gaffey
 5   yesterday concerning our treatment of
 6   confidentiality designations and that that
 7   would be done as it was done for Mr.
 8   Felder's deposition.
 9          MR. CARDEN:  Okay.
10   BY MR. CARDEN:
11      Q.   Would you please state your name, Mr.
12   Shapiro?
13      A.   Mark J. Shapiro.
14      Q.   By whom are you presently employed?
15      A.   Barclays Capital.
16      Q.   And what's your position there?
17      A.   I am the head of Restructuring and
18   Finance within the Investment Banking Division.
19      Q.   Okay.  And just generally what does
20   that entail?
21      A.   It entails running a group of 16
22   bankers that are dedicated to working on matters
23   that involve stress and distressed companies,
24   either working for companies, working for
25   creditors, and sometimes financing companies
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 8

```
 1          M. Shapiro
 2   that are either in or out of bankruptcy.
 3      Q.   Stating the obvious, you're a lawyer,
 4   are you not?
 5      A.   I was a lawyer.
 6      Q.   Well, once a lawyer, always lawyer,
 7   don't you think?
 8      A.   I don't think I have to comment on
 9   that.
10      Q.   What you're saying is you're not
11   practicing law now?
12      A.   I'm not practicing and I don't have a
13   license to practice.
14      Q.   But you do have a law degree, correct?
15      A.   I graduated from law school, yes.
16      Q.   And in the past you were a practicing
17   lawyer, were you not?
18      A.   Correct.  I was a partner at Shearman
19   & Sterling.
20      Q.   At some point you were employed by
21   Lehman Brothers, correct?
22      A.   Starting in September of 2002.
23      Q.   What was your position when you first
24   joined Lehman Brothers?
25      A.   Co-head of Restructuring within
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 9

```
 1          M. Shapiro
 2   Investment Banking in Lehman Brothers.
 3      Q.   And what generally were your
 4   responsibilities in that position?  Are they the
 5   same as they presently are with Barclays?
 6      A.   Essentially the same.  We were more, a
 7   little bit more focused on the advisory practice
 8   and less focused on financing, now we're a
 9   little more balanced, as we went through Lehman,
10   if you're talking about 2002 versus later, I
11   think that was your question --
12      Q.   Yes.
13      A.   -- as of the date we started.
14      Q.   Okay.  And did your position remain
15   the same throughout your entire tenure at Lehman
16   Brothers?
17      A.   It changed in I guess it was spring or
18   summer -- spring of 2008, something like that.
19   I can't remember exactly when.  It was decided
20   within the firm that it made sense to spend more
21   time on financing than we had before, and in
22   order to effectuate that, we basically created a
23   joint venture between Investment Banking and
24   Fixed Income where my group was basically a
25   joint venture and to do both.  And as a result
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 10

M. Shapiro

1  of that, I was asked to head the whole thing and
2  so my position went from co-head to head of the
3  group.
4  **Q.   When did that happen?**
5  A.   I can't remember exactly.  I think it
6  was the spring of -- spring of '08, but I don't
7  remember exactly.
8  **Q.   And to whom did you report in that
9  position?**
10  A.   So I reported to two different people
11  within the firm, Mark Shafir, who was the head
12  of M&A from the banking side and Paul Parker,
13  who was his co-head.  I mean, if you're talking
14  about at the end versus along the way --
15  **Q.   Yes.**
16  A.   Because obviously things changed.
17  **Q.   As fascinating as that would be for
18  both of us to go through, my focus is really
19  going to be obviously at the end.**
20  A.   And then on the fixed income side, it
21  was -- it was Jim Seery, who ran loan sales and
22  trading for fixed income.
23  **Q.   I'm sorry, I just missed the import of
24  that.  Did you report to him on that side or --**

Highly Confidential

Page 11

M. Shapiro

1  A.   Yeah, well, when we say report, this
2  was a new thing, so it was a joint venture
3  between the two divisions.  I was running the
4  joint venture.  Jim was on the fixed income
5  side, so he was responsible from fixed income
6  for that and, effectively, you know, I wouldn't
7  say I was reporting to him in the sense of, you
8  know, he never obviously gave me reviews or
9  comp, because what happened was that that all
10  really came to fruition, as I said,
11  spring/summer.
12  Obviously it was a tough general
13  summer overall.  There wasn't a lot of
14  financings going on in, you know, within Lehman
15  in terms of the distressed area that I was in
16  until call it towards the end of the summer when
17  we worked on Tronox.  So it was all kind of
18  information.
19  So when you say reporting, there
20  wasn't a whole lot to report to.
21  **Q.   Now, in your position as head of
22  Restructuring at Lehman, did you become
23  acquainted with how the business sides really
24  function, by that I mean how they ran a matched**

Highly Confidential

Page 12

M. Shapiro

1  **book, how they did their business?**
2  A.   No, I would say that, you know, on the
3  investment -- you know, the firm is set up
4  within three divisions:  Investment Banking,
5  Fixed Income and Equities.  So if you're on the
6  banking side, you really are not part --
7  participating in any way on the trading side
8  where they're dealing with things around how
9  they -- how they buy, sell or finance assets.
10  So not really.
11  **Q.   And you did not become acquainted even
12  in the most general sense as to how they did
13  their business as a consequence of the position
14  you had at Lehman?**
15  MR. STERN:  Objection to the form.
16  A.   Yeah, I'm not sure I understand your
17  question.
18  **Q.   Do you understand what a matched book
19  is?**
20  A.   If you're talking about where a party
21  purchases an asset and then finances that asset
22  with liability that they, you know, borrowed
23  money, if that's what you would call a matched
24  book, or a series of those assets together being

Highly Confidential

Page 13

M. Shapiro

1  a matched book, I guess that would maybe
2  constitute a matched book, but it's not a term I
3  use frequently.
4  **Q.   Okay.  But in using that term in the
5  way you defined it, you are generally acquainted
6  with how a matched book works, correct?**
7  A.   Just to the extent I just described
8  it.
9  **Q.   Okay.  All right.  And as a
10  consequence of your position at Lehman, did you
11  become acquainted with the fact that, on the
12  trading side, Lehman ran a matched book?**
13  A.   Not really.
14  **Q.   Not news to you today, though, right?**
15  A.   Today I wouldn't say it's news to me,
16  but I would say during my, you know, seven years
17  at Lehman, I really didn't give thought to how
18  Lehman financed itself.
19  **Q.   Okay.  Now I brought a prop today,
20  which is a calendar from September of 2008,
21  which I brought to the last deposition and I was
22  responsible for.  This is something to which you
23  can refer if you wish.  I don't think we're
24  going to mark it.  Time is what it is and**

Highly Confidential

Page 14

1          M. Shapiro
2 everybody knows exactly what days of the week
3 we're going to be referring to.
4          But what I would like to do is direct
5 your attention to the week of September 8 last
6 fall.
7     A.   Uh-huh.
8     Q.   And at some point during that week
9 Lehman Brothers entered into negotiations with B
10 of A with regard to the sale of the firm,
11 correct?
12    A.   I don't know.
13    Q.   Okay.  Were you involved with any
14 negotiations concerning a sale of all or part of
15 the firm during the week of September 8?
16    A.   No.
17    Q.   Were you involved with negotiations
18 concerning a sale of all or part of the firm on
19 the weekend of -- well, I don't know what you
20 call a weekend, but September 13 and 14?
21    A.   No.
22    Q.   Did there --
23    A.   Other than, other than by the -- other
24 than by the end of Sunday night when I made a
25 suggestion on something, but not -- I was not

Highly Confidential

Page 15

1          M. Shapiro
2 personally involved in any of the discussions,
3 negotiations, or anything else relating to a
4 sale.
5     Q.   Where were you the weekend of
6 September 13?
7     A.   I was in the offices principally at
8 Lehman Brothers.
9     Q.   Okay.  What were you doing in the
10 offices that weekend?
11    A.   Preparing for a bankruptcy.
12    Q.   And were you working with outside
13 lawyers with regard to the possible filing?
14    A.   Yes.  The firm had hired -- I believe
15 it was Steven Berkenfeld that hired Weil
16 Gotshal.
17    Q.   All right.  Were you at any point in
18 time, from during the week of September 8 and
19 the weekend of September 13, in conversations
20 with anyone at Lehman Brothers concerning the
21 terms of any deal that might be done with Bank
22 of America?
23    A.   Not the terms, no.  I was aware
24 starting on the Thursday the 11th that
25 discussions were going on between -- and I think

Highly Confidential

Page 16

1          M. Shapiro
2 this is probably reported in the press maybe at
3 the same time even, but I was aware that there
4 were discussions going on between Bank of
5 America and Lehman Brothers and I think Barclays
6 and Lehman Brothers that most of it was
7 happening in and around the Fed, the Fed had a
8 big involvement in it, and that's pretty much
9 what I knew as of the, you know, 11th, 12th.
10         And then there was obviously a lot of
11 discussion within Lehman Brothers as to what was
12 going on at the Fed that I heard, you know,
13 heard snippets of.  But I was not personally
14 directly in discussions with anybody about it.
15    Q.   And were you in discussions with
16 anyone at Barclays during the week of September
17 8th or the weekend of September 13th concerning
18 a possible transaction with Lehman Brothers?
19    A.   No, the only -- the only discussion
20 that I was even a part of was the night of
21 Sunday the 7th -- night of Sunday the 14th when
22 I went into Bart McDade's office about 6 o'clock
23 that evening and told him that we could sell
24 ourselves to Barclays in bankruptcy and I wanted
25 to make sure he understood that, and then he

Highly Confidential

Page 17

1          M. Shapiro
2 called Bob Diamond on the phone, who was I
3 believe having dinner, as has been reported, but
4 I only heard Bart's side of the conversation.
5     Q.   Uh-huh.
6     A.   And he told Bob Diamond that I was in
7 the room with him, that I -- I told Bart that
8 the firm could sell itself to Barclays if
9 Barclays was interested in purchasing Lehman in
10 a Chapter 11 asset sale and was Barclays
11 interested in doing that.
12         And that was probably about a
13 five-minute conversation, to which I only heard
14 Bart's side of the conversation, and he got off
15 the phone and he said he's going to call us
16 back.  He said he needs to call somebody and
17 he's going to call us back in a few minutes.
18    Q.   Let's just go a little slower through
19 this conversation so I understand what it was
20 you were proposing to Mr. McDade --
21    A.   Sure.
22    Q.   -- that was in any respect different
23 than what had been transpiring over the weekend
24 when the transaction with Barclays had not
25 consummated, correct?

Page 18

M. Shapiro

1
2    A.    Correct.
3    Q.    So I'm not a bankruptcy lawyer, so
4    you'll have to sort of tutor me just a little
5    bit, but exactly what you were recommending
6    to Mr. McDade was possible after the
7    conversations with Barclays had failed on the
8    weekend?
9        A.    I recommended to him that we see
10    whether Barclays would be willing to purchase
11    Lehman Brothers, in whole or in part, through
12    what's known as a Section 363 sale, which would
13    have involved, you know, a sale of all or any
14    part of the assets and assumption of liabilities
15    of Lehman Brothers in order to effectuate a
16    going concern sale.
17    Q.    And when you say at Lehman Brothers,
18    you mean Lehman Brothers, Inc., or do you mean
19    Lehman Brothers Holding?
20    A.    I think at that point we were just
21    talking about a generic Lehman Brothers.  The
22    specificity of which assets was yet to be
23    determined.
24    Q.    I take it that your suggestion to Mr.
25    McDade was that Barclays could purchase all or

Page 19

1        M. Shapiro
2    some of the assets of whatever of the Lehman
3    Brothers entities we're referring to, correct?
4        A.    I wasn't that specific with Bart.  I
5    basically said we can sell the firm -- we can
6    sell ourselves, I think was maybe my words, the
7    firm to Barclays in a 363, you know.  You know,
8    I didn't know if Bart understood what that was
9    because he wasn't a bankruptcy expert,
10    obviously.
11        He did understand what I was talking
12    about.  I gave him the 30-second snippet, if you
13    want to call it that, of pretty much what I just
14    told you.
15    Q.    I was going to ask you if I could have
16    the same 30 seconds, but if I've had it, fine.
17    A.    Then he immediately call Bob Diamond
18    to share that with him.
19    Q.    Was anybody else in the room when you
20    had your conversation with Bart?
21    A.    Somebody else was in the room, yes,
22    but I just don't remember who it was.
23    Q.    Was it Mr. Shafir?
24    A.    It might have been Mr. Shafir.  I just
25    can't remember.

Page 20

1        M. Shapiro
2    Q.    Was this idea Mr. Shafir's idea or
3    your idea?
4    A.    It was my idea.
5    Q.    And Mr. McDade reported to you that
6    Mr. Diamond was going to have to get back to
7    you?
8    A.    He didn't report to me.  He was on the
9    phone.
10    Q.    I see.
11    A.    He said -- dropped the phone.  He said
12    he needs to call somebody.  He's going to call
13    us back in a few minutes.
14    Q.    Did he call back?
15    A.    Yes.
16    Q.    What happened in that conversation?
17    A.    Bart spoke to him very briefly.
18    Q.    Was it personally or was it on a
19    speakerphone?
20    A.    No, it was personally.  So I didn't
21    hear the other side of the conversation, and
22    when Bart got off, which was a very short
23    conversation, he said he wants to -- he wants to
24    move forward and he wants to have his team meet
25    our team 7 A.M. tomorrow morning.

Page 21

1        M. Shapiro
2    Q.    Now --
3    A.    Here in our office.
4    Q.    Now, who was Lehman's team at that
5    point?
6    A.    Well, when were you talking about?
7    Q.    When Mr. McDade got off the phone and
8    said he wants to meet our team at 7 A.M., who
9    was on that team?
10    A.    Well, it was whoever Bart was going to
11    have in that meeting.
12    Q.    Were you on that team?
13    A.    Yes.
14    Q.    Who else was on it?
15    A.    Well, when you say "who else was on
16    the team," I don't think that's the right
17    question.  I think --
18    Q.    All right.
19    A.    Are you asking me the question who was
20    in the first meeting?
21    Q.    I was going to ask you that question,
22    but I didn't know whether Mr. McDade had gotten
23    off the phone and said I want you to assemble a
24    team.  Let's back up a little bit.
25    A.    No, he did not.

Highly Confidential

Page 22

M. Shapiro
1
2    Q.   All right.  After your conversation
3  with Mr. McDade when he had just spoken to Mr
4  Diamond the second time, what did you do?  Did
5  you stay at the firm or did you go home?
6    A.   I stayed at the firm.
7    Q.   What did you do at that point?
8    A.   I started thinking about and mapping
9  out what -- how we might be able to sell the
10 assets, you know, the assets of the firm in a
11 way that would be able to effectuate a
12 transaction.
13   Q.   How did you do that?
14   A.   Well, I had been, starting on --
15 starting on Thursday night when I first was
16 asked to be involved in thinking about a
17 possible bankruptcy filing, I had pulled
18 together for myself, since I wasn't allowed to
19 have anybody working for me, so it was pretty
20 much a one-man operation from Thursday --
21 Thursday, Friday for me in terms of thinking
22 about this, a corporate chart, tried to figure
23 out where the assets and liabilities were, tried
24 to understand where the real estate was housed
25 since nobody wanted to seem to touch the real

Highly Confidential

Page 23

M. Shapiro
1
2  estate, that was the kind of, you know, the set
3  of assets that people did not want to seem to
4  want to acquire, generally, and tried to think
5  about how a deal could be structured that would
6  allow for a sale of the entire firm, let's call
7  it, without a sale of the real estate.  I would
8  say that was my principal focus on thinking
9  about how a sale might occur.
10   Q.   You're talking about back on the prior
11 Thursday?
12   A.   Back on Thursday.
13   Q.   How did you know on Thursday that the
14 acquirers were not interested in acquiring the
15 real estate?  Somebody told you that?
16   A.   When I learned about what was
17 happening generally on Thursday afternoon, you
18 know, I had been told by one of the M&A guys
19 that the firm had set up something that they
20 called Spinco; that the assets they were in the
21 process of trying to keep, move the, house the
22 commercial real estate assets in Spinco; that
23 generally speaking, you know, the buyers were
24 not interested in the real estate, that they
25 were worried about it, given everything that was

Highly Confidential

Page 24

M. Shapiro
1
2  going on in the real estate world; and that the
3  idea in any kind of sale, whoever it was to, was
4  to effectively sell the Lehman Brothers as a
5  going concern firm to somebody.
6        This is outside of bankruptcy now
7  we're talking about.
8    Q.   Yes.
9    A.   And to spin off those assets to the
10 shareholders as a real estate going concern, you
11 know, proposition that would, you know, at some
12 point presumably be worth something, maybe more
13 than it was perceived to be worth at the time of
14 the spinoff.
15   Q.   Now, what was Project Green?  Is that
16 a name you know?
17   A.   No.
18   Q.   After you spoke to Mr. McDade that
19 evening around 6 o'clock on Sunday and you
20 stayed at the firm, did you have any part in
21 preparing a balance sheet for Lehman Brothers?
22   A.   No.
23   Q.   Did you do anything to prepare for the
24 meeting at 7 A.M. the next morning?
25   A.   Yes.

Highly Confidential

Page 25

M. Shapiro
1
2    Q.   What did you do?
3    A.   At first I called in people on my team
4  to come in and help me.  Realizing that whatever
5  we were potentially going to be undertaking was
6  going to be very challenging, I needed more
7  people who could help deal with different issues
8  that were clearly going to need to be addressed.
9    Q.   Let's stop there.  Tell me who was on
10 your team that evening.
11   A.   Well, people were coming in, I'd say,
12 over the course of the evening.  So Dan Flores
13 came in first.  He was a vice president and one
14 of my most trusted associates, associates in the
15 general sense.
16   Q.   I understand.
17   A.   And then others came in over the
18 course of the evening, including Gil Sanborn,
19 who is a managing director and was formally
20 co-head with me, and he's the chairman of
21 Advisory Restructuring.  George Mack, who was a
22 senior vice president and someone who, again,
23 very senior, you know, a lot of bankruptcy
24 experience.
25        And they, in turn, called in some

Highly Confidential

Page 26

M. Shapiro
2 other people, so that there were a few analysts
3 and I can't remember all the people, but there
4 were, you know, of the -- of the 12 or 13 people
5 in the group, probably eight or nine of them
6 were called in to come in and help.
7    Q.   Okay.  And did you have a task, if you
8 will, something you were trying to prepare as a
9 group for purposes of the 7 A.M. meeting the
10 next morning?
11    A.   Not as a group.  I thought it made
12 sense to figure out, you know, could we come up
13 with a reasonably straightforward deal
14 structure, and so we did put together a
15 PowerPoint presentation that we utilized during
16 the meeting at 7 A.M. the next day.
17    Q.   All right.  You stayed there all
18 night?
19    A.   No.  We -- I think I left -- we worked
20 from, you know, that point through probably
21 until about 1 or 2.  Then I went home and then I
22 came in very early.  Obviously I was there by 7
23 A.M. the next morning.  So I went home, got a
24 couple hours of sleep, and then came back.
25    Q.   Who prepared the PowerPoint

Highly Confidential

Page 27

M. Shapiro
2 presentation?
3    A.   Well, Dan Flores did a draft of it for
4 me and then I reviewed it and made changes to
5 it.
6    Q.   You took it home with you to do the --
7 did you do the edits before you left?
8    A.   I think I did the edits before I left.
9    Q.   And --
10    A.   I think.  I, truthfully, I don't
11 remember exactly.
12    Q.   What you --
13    A.   It was very high level.  It wasn't
14 granular because we didn't have any granular
15 facts, so it was just here's a basic framework
16 for how to think about this based on what we
17 understood from the M&A team Barclays had been
18 talking about generally.
19    Q.   Did it include financial information
20 for the Lehman Brothers entities you were
21 talking about?
22    A.   No, not that I recall.
23    Q.   Tell me what it looked like so I can
24 try to locate it.
25    A.   I haven't seen it since then, so I --

Highly Confidential

Page 28

M. Shapiro
2 what I remember is it was one or two pages, it
3 was very short, and it had a series of different
4 categories of like I think different things that
5 could be sold, but that was, you know, and
6 which -- maybe which company housed it, with a
7 general description of how a 363 might work,
8 something like that.
9      I, honestly, I'd have to look at it
10 again.  I haven't looked at it so I don't
11 remember exactly.  But it was intended in my
12 mind to at least lay out a basic framework for
13 how this kind of a transaction gets done.  Not
14 dissimilar in any way to any other 363 sale that
15 I had worked on before.
16    Q.   Did it identify the various divisions
17 of Lehman Brothers and what assets it's had?
18    A.   I don't remember.
19    Q.   Was it presented at 7 o'clock the next
20 morning to --
21    A.   Not 7 o'clock, no.
22    Q.   When was it presented?
23    A.   It was presented towards the end of
24 that meeting.
25    Q.   Let's talk about the meeting at 7 A.M.

Highly Confidential

Page 29

M. Shapiro
2      First off, when you came in to Lehman
3 Brothers on -- that would be then Monday
4 morning, the 8th, correct?
5    A.   Correct.
6    Q.   Pardon me.  I misspoke.
7    A.   No, Monday morning, the 15th.
8    Q.   The 15th.  What time did you get in
9 the office?
10    A.   Right before the meeting.
11    Q.   Did you have any meetings with anyone
12 at Lehman Brothers prior to going into the
13 meeting?
14    A.   Not that I recall.
15    Q.   Who was in the meeting at 7 o'clock?
16    A.   To the best of my recollection, from
17 the Lehman side it was Mark Shafir, Skip
18 McGee, Bart McDade.  There were I believe a
19 number of Weil Gotshal attorneys there.  Harvey
20 Miller, Lori Fife, I think Tom Roberts.  I can't
21 remember who else.  Maybe others, I just don't
22 remember.  But it wasn't a huge meeting.  It was
23 a reasonably small meeting.
24      And then from Barclays it was Archie
25 Cox, Michael Klein, who was their advisor,

1          M. Shapiro
2  Cleary, a number of Cleary Gottlieb lawyers,
3  which included Victor Lewkow.  I don't remember
4  who else from Cleary.  There might have been
5  others.  I don't have a complete recollection,
6  but that's most of the people, probably.
7      **Q.   Okay.  Bob Diamond wasn't there?**
8      A.   No.
9      **Q.   Was Steve Berkenfeld there?**
10     A.   I don't remember.
11     **Q.   How long did the meeting last?**
12     A.   I would guess it lasted about two
13 hours, maybe something like that, in that
14 neighborhood.
15     **Q.   Would you tell me what you recall**
16 **about what was said in the meeting and, as best**
17 **you can at this point, by whom?**
18     A.   It was a long time ago so it's hard to
19 remember specifics, truthfully.
20          I remember Barclays saying that they
21 were, you know, they were interested in
22 purchasing the U.S. assets of Lehman, the U.S.
23 business of Lehman.  They were not interested in
24 buying the commercial real estate, let's call it
25 the Spinco assets.  That was not something that

1          M. Shapiro
2  they wanted.
3          They said, I think, that they didn't
4  think that they were going to be interested in
5  businesses outside the United States, but they
6  hadn't finalized that yet, but that was kind of
7  their starting -- kind of starting point, let's
8  call it.  They would still consider that, but
9  they hadn't made a final decision on it, but
10 that's where they were heading, was just to
11 obtain -- just to purchase the U.S. businesses.
12          There was some discussion about
13 timing.  They asked Harvey Miller, you know, how
14 long would this take, how would he see it going.
15 His response was, you know, that we would have
16 to do it quickly, obviously.  He thought that,
17 you know, if we could move very quickly, it
18 could get done, you know, reasonably fast.  I
19 think he estimated that it would probably be, in
20 his estimation, about 15 days, and to which I --
21 to which I responded saying, I don't think the
22 firm will be able to survive that long and that
23 I thought we needed to do it more rapidly and
24 that I thought we needed to try to accomplish a
25 sale, you know, within a shorter timeframe than

1          M. Shapiro
2  that.
3      **Q.   Why was the firm under that kind of**
4  **pressure?  Why couldn't it survive 15 days?**
5      A.   Based on my personal observations,
6  people were packing up and leaving.  The e-mails
7  were flying around saying goodbye.  The general
8  mood was one of people believing that Lehman
9  Brothers was going to be liquidated and that
10 everybody was moving on to wherever they could
11 try to move on to and that there wasn't going to
12 be a going concern left because you wouldn't
13 have all the people around to actually function
14 in their positions.
15     **Q.   Was a timeframe set at that meeting**
16 **for purposes of getting a transaction done?**
17     A.   No.
18     **Q.   Was there any discussion about any**
19 **specific assets of Lehman, apart from the**
20 **commercial real estate that you described, that**
21 **of the U.S. assets that Barclays was interested**
22 **in purchasing?**
23     A.   You know, unfortunately, I don't have
24 a great recollection of exactly the specifics in
25 that meeting.  I think -- I think there was

1          M. Shapiro
2  probably some discussion about the real estate,
3  you know, the building.  I just don't remember
4  exactly.
5      **Q.   Did the people from Barclays bring**
6  **anything to the meeting, any documents?**
7      A.   Not that I remember.
8      **Q.   They had done a due diligence of**
9  **Lehman assets at some point in time for the**
10 **transaction that was being negotiated over the**
11 **weekend, right?**
12          MR. STERN:  Objection to the form.
13     A.   Can you clarify the question or read
14 back the question?
15     **Q.   You were aware, were you not, that**
16 **Barclays was not starting from ground zero when**
17 **it was meeting with you?  They had already done**
18 **an analysis or review of certainly the assets --**
19 **I thought you told me a little while ago that**
20 **you were aware that there was some kind of**
21 **negotiation between Lehman Brothers and Barclays**
22 **at the end of the prior week and over the**
23 **weekend, right?**
24          MR. STERN:  Objection to the form.
25          You can answer.

Highly Confidential

Page 34

M. Shapiro

1
2     A.    I was aware starting on, as I said,
3  Thursday afternoon that there were discussions
4  going on generally between Lehman Brothers, the
5  Fed, and a number of institutions which were
6  rumored to be Barclays and B of A.  I have no
7  idea what Barclays' level of diligence was other
8  than what I heard afterwards, which was that
9  they hadn't started doing due diligence until
10  Wednesday of this week, meaning Wednesday the
11  10th.
12     Q.    Okay.
13     A.    So that's what I heard after the fact.
14  I have no personal knowledge of when they
15  actually started or what they actually did.
16     Q.    Okay.  When you were in the meeting
17  with the Barclays people and the Lehman people
18  on the morning of the 15th, is it your
19  recollection there was no discussion of any
20  specific Lehman assets that were -- that
21  Barclays was interested in purchasing?
22     A.    I don't remember.
23     Q.    And was this PowerPoint presented in
24  the meeting?
25     A.    Yeah, later during the meeting,

Highly Confidential

Page 35

M. Shapiro

1
2  because Lori Fife took the lead in describing
3  let's call it generically what a transaction
4  could look like structurally, and then this --
5  this document was kind of similar to what Lori
6  then had outlined, and I think we provided it to
7  everybody towards the end of the meeting.  We
8  didn't actually then go through that document.
9     Q.    As best you recall, is it the only
10  document that was discussed or shared in the
11  meeting?
12     A.    I don't remember.
13     Q.    What happened immediately after the
14  meeting so far as you were concerned?
15     A.    I'm trying to remember immediately
16  after the meeting.  I think we -- I think what
17  was agreed was that there was -- people were
18  going to split up into different functions to
19  start to work through to how to get to a
20  transaction, which is I'd say, you know, a
21  normal -- a normal thing you do is figure out,
22  okay, who's going to be doing what part of the
23  deal, who's going to be focused on which
24  particular elements of the deal.
25         And I think there was agreement that,

Highly Confidential

Page 36

M. Shapiro

1
2  you know, amongst different people that there
3  would be different people -- different people
4  would be gathered to start working towards
5  different pieces of the deal.
6     Q.    Okay.  Again, I've already confessed
7  I'm not a bankruptcy lawyer, so perhaps you can
8  tell me what those various divisions of labor
9  were.
10     A.    Well, there was clearly, you know,
11  there was clearly going to be, if you look at
12  what -- what was Barclays going to buy, we
13  weren't really exactly sure what they were going
14  to buy.  So we start with let's call it the
15  bigger pieces, which was starting with the real
16  estate.
17         All right, so we had a building in New
18  York that we all worked in, 745 Seventh Avenue.
19  I learned during the course of I guess the
20  weekend maybe that there were two buildings, two
21  or three buildings -- I believe two buildings in
22  New Jersey that were operation centers that
23  would also be necessary as part of the, you
24  know, back office, computer functions, all of
25  those things that support a financial firm that

Highly Confidential

Page 37

M. Shapiro

1
2  would need to be sold in order to sell the
3  business as a going concern.  So those buildings
4  would be sold.
5         Then there was the question of, well,
6  what assets, i.e., what are the assets of
7  Lehman.  The assets of Lehman obviously included
8  a range of things ranging from securities that
9  they owned to private equity positions to real
10  estate positions to, you know, other -- other
11  kinds of financial assets.  The question was
12  what would Barclays buy.  That was obviously was
13  going to be them telling us what they were
14  interested in buying.
15         There were obviously the contracts in
16  terms of the operations of the firm in a
17  bankruptcy in order to transfer contracts.  You
18  need to in 363 sale have them assumed and
19  assigned, so we needed to figure out a way that
20  they could understand in some way what those
21  contracts might be.
22         Obviously there was the liabilities
23  side of the firm, which is what assets -- what
24  liabilities would they assume as part of the
25  transaction, ranging from ordinary-course

Highly Confidential

Page 38

1          M. Shapiro
2 payables to accrued compensation to other
3 elements that obviously --
4          Again, these were not specifically
5 discussed that I recall in this meeting. I'm
6 just giving you a general view from my
7 perspective of how I was thinking about the
8 different elements involved. Obviously there
9 was also the question of the non-U.S. parts of
10 the firm and what they were going to do around
11 those.
12          We obviously had operations, large
13 operations in Europe and a large operation in
14 Asia, not quite as large, but still meaningful,
15 and how they were going to deal with that. So
16 the question was really what was it that they
17 were going to buy and how, once they decided
18 what they were going to be willing to buy, how
19 were we going to structure that.
20    **Q.   Let's step out of the time sequence**
21 **for a moment and then let me ask you this**
22 **question: Did there come a time when you**
23 **finally learned exactly what it was that**
24 **Barclays was intending to buy?**
25    A.   I would say, generally, in terms of

Highly Confidential

Page 39

1          M. Shapiro
2 categories, yes, but over the course of a, you
3 know, let's call it 24-hour period, so it was,
4 you know, it wasn't -- it wasn't a -- it wasn't
5 like they had a list and said here's exactly
6 what we're buying, here are the exact assets.
7          We knew at some point that they wanted
8 to own the building, 745 Seventh Avenue; that
9 they wanted the data centers; that they were
10 looking at the book of securities, they were
11 diligencing that kind of in a real-time basis.
12          They had two, at least two senior
13 executives that I recall that were not in the
14 original meeting that I recall at least. Maybe
15 one of them might have been Rich Ricci. I can't
16 remember if he was in that first 7 A.M. meeting,
17 but Rich Ricci and Mike Keegan, who I met, were
18 both senior executives or are currently senior
19 executives of Barclays, but senior executives
20 who were diligencing a lot of the securities
21 that were under consideration by them for
22 purchase.
23          I'd have to go back through the -- you
24 know, ultimately I think they concluded that
25 they did not want Europe, they did not want

Highly Confidential

Page 40

1          M. Shapiro
2 Asia, and obviously that actually made -- made
3 life from a deal perspective a little simpler
4 because those two entities that -- general
5 entities, meaning Lehman Brothers International
6 in London and whatever the name of the Asian
7 entity was, were at that point both either in
8 insolvency proceedings or on the verge of
9 insolvency proceedings which were completely
10 outside the Chapter 11.
11          And since a court in the bankruptcy
12 court in the U.S. only has jurisdiction to deal
13 with assets under its jurisdiction in the United
14 States, it would have been very difficult to put
15 together a multifaceted deal that was across
16 borders in the time that we all believed we had
17 to accomplish a transaction.
18          So I would say their desires matched
19 up well in my mind at the time with what was
20 achievable.
21    **Q.   Going back to the meeting in the**
22 **morning, did it start at 7 o'clock?**
23    A.   Yes.
24    **Q.   And end at about 9, you said?**
25    A.   I don't remember exactly. It was a

Highly Confidential

Page 41

1          M. Shapiro
2 few hours. It was a few hours of meetings.
3    **Q.   I would like to talk a little bit**
4 **about the landscape of that day, meaning how**
5 **people actually divided up and where they were**
6 **and what rooms they were in and where you were**
7 **and the like.**
8          **Now, we can do this, you know, one**
9 **step at a time, but maybe you should give me an**
10 **overview, if you can, so we can begin to talk**
11 **about this with more specificity.**
12          **So after the meeting breaks up, do**
13 **people essentially get assignments to deal with**
14 **the various aspects of a possible transaction**
15 **and occupy certain rooms? Tell me what it is**
16 **that happened.**
17    A.   Again, it's hard to remember exactly
18 what happened minute or minute or hour by hour.
19    **Q.   That's why I asked the question the**
20 **question the way I did. I appreciate that that**
21 **might be difficult. I'm just right now trying**
22 **to get an understanding of what -- I'm calling**
23 **it the landscape of the day.**
24    A.   Sure.
25    **Q.   How work got done that day.**

Highly Confidential

Page 42

1    **M. Shapiro**
2    A.   Right.
3    **Q.   If you could give me some background.**
4    A.   I would say people were generally, you
5    know, people who were working on the deal, which
6    there were many, were gathered -- I would say
7    the leaders were gathered from time to time on
8    the 31st floor.  Different conference rooms were
9    allocated to different people or different
10   teams.
11        So Barclays had a room.  I don't know,
12   you know, I'm not sure who was in their room,
13   but they had a room or two.  Cleary had a room
14   or two.  We had a couple of rooms, meaning
15   Lehman had a few rooms.  There was a room where
16   the DIP -- room or rooms that the DIP
17   negotiations were going on, which was a
18   separate, separate set of discussions,
19   obviously, separate but related.
20        One of the problems we had
21   logistically was that, you know, 31 is set up as
22   a dining room and not as a conference center
23   with laptops and computers and printers, and we
24   started the deal there, ended the deal there.
25        It was probably, you know, it was not

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 43

1    M. Shapiro
2    the easiest place to get a deal done.
3    Ultimately, we had to bring in printers and
4    computers.  And I think during the course of the
5    evening through the night someone at Cleary
6    suggested we move to Cleary, which I said, no,
7    we're not moving 100 people to Cleary in the
8    middle of the night.  That didn't seem like a
9    good idea to me.
10        MR. STERN:  Minor thing:  Is it 31 or
11   32?
12        THE WITNESS:  Sorry.  32.
13   **Q.   We were going to get to that, but**
14   **thank you.**
15   A.   32.  32nd floor.
16        So I don't know if that answers your
17   question about kind of logistically where people
18   were, but there were -- obviously every room was
19   being taken up by somebody who was a participant
20   in the discussions dealing with some function in
21   the discussion.
22   **Q.   Now --**
23   A.   And it was actually very, given the
24   time we had, it was very well organized.  We had
25   labels on each door.  Everybody knew whose room

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 44

1         M. Shapiro
2    was -- which room was which so people were not
3    interrupting people if they wanted privacy.
4         And we -- the lawyers started working
5    immediately on a general contract that was, I
6    don't know who -- I think -- I don't remember
7    who did the drafting, I think it might have been
8    Weil Gotshal, a guy named Mike -- I forget his
9    last name.  Mike, I forget his last name, but
10   was a partner, M&A partner, working for Tom
11   Roberts or working with Tom Roberts.  He was one
12   of the principal drafts people of the contract.
13   **Q.   Of the Asset Purchase Agreement?**
14   A.   Of the Asset Purchase Agreement,
15   correct.
16        MR. STERN:  Lubowitz.
17        THE WITNESS:  That's it.  Lubowitz,
18   that's correct.  Mike Lubowitz.
19   **Q.   Let's talk about the rooms for just a**
20   **moment so I'm clear what the breakup is.  I**
21   **understand there were several Lehman rooms, but**
22   **were the rooms broken down for people who were**
23   **dealing with issues related to contracts the**
24   **firm had, compensation, you know, securities**
25   **positions, and was it that broken down?**

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 45

1         **M. Shapiro**
2    A.   No, it was not.  It was broken down by
3    let's call it who was doing what work.  So you
4    had a room probably about the size of this room
5    where lawyers were gathered around the table
6    similar to this who were starting to think about
7    a contract, right?
8         And they were -- obviously everybody
9    was waiting because there was no contract,
10   right?  It had to be drafted.  It had to be, you
11   know -- and then not only did it have to be
12   drafted, but you had to start putting the meat
13   on the bones, which is what is it that Barclays
14   was interested in buying and what would that all
15   look like.
16        So there was a room that was
17   effectively filled with lawyers that I would
18   come in and out of around later in the day and
19   the evening around kind of what was going on.
20   Because obviously we were negotiating and
21   drafting, you know, real-time.  So we were going
22   through page by page and going through
23   provisions and negotiating specifics around each
24   provision.  And it obviously took more than one
25   round to do that.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 46

1              M. Shapiro
2      Q.   Where was the actual negotiation of
3   the transaction taking place?
4      A.   On the 32nd floor.
5      Q.   And was it taking place in any one
6   place?
7      A.   On that -- let me say it was taking
8   place on the 32nd floor on the night of -- on
9   the day and the night of the 15th and 16th.
10  After that, obviously there were other
11  negotiations that took place which were not
12  necessarily in those rooms.
13     Q.   Okay.  Who was negotiating the
14  transaction, as opposed now to getting backup
15  for the negotiators, if you take my point?
16     A.   I would say our lead negotiator, the
17  lead overall negotiator was Bart McDade, who was
18  the president of the firm.  I would say he was,
19  you know, he was informed on every key
20  provision.  He obviously was not, you know,
21  privy to every legal negotiation, but, you know,
22  you wouldn't expect him to be because that's not
23  the role of a CEO.  That's what we had lawyers
24  and other people for.  But in terms of any key
25  provisions, he was always consulted and his
             TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 47

1              M. Shapiro
2   input was obtained.
3      Q.   Anyone else for Lehman who was a
4   principal negotiator?
5      A.   Then in terms of let's call it -- but
6   I'm differentiating -- I'm differentiating
7   different levels of negotiation, which always
8   occur in every transaction.  So you have let's
9   call it the in-the-trench negotiators who are
10  negotiating most of the individual provisions
11  and then you have the leaders of each side who,
12  when things are not agreed to or when there's a
13  dispute, people go back to them and try to see
14  whether or not.  So I would --
15     Q.   And that was Mr. McDade?
16     A.   That was Mr. McDade, yes.
17     Q.   And who on the Barclays side was his
18  counterpart?
19     A.   It appeared to me to be Archie Cox,
20  but I'm not privy to all the discussions that
21  happened at Barclays.  But Archie was, of
22  anybody at Barclays, he was the face of Barclays
23  that we saw the most of.  He appeared to be the
24  person who was, at least on its face, making the
25  decisions.  He might have been consulting with
             TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 48

1              M. Shapiro
2   others, including Bob Diamond, for all I know,
3   or Rich Ricci or other people.
4           But to us, when Michael Klein would --
5   Michael Klein was their investment banker, so he
6   was also, let's call it -- now I'll get to the
7   second part of your question, which was who was
8   in the trenches dealing with some specific
9   issues as we negotiated this deal through --
10     Q.   Right.
11     A.   -- as you always have, and that team
12  was really a combination of Mark Shafir, who was
13  the head of M&A, myself, Skip McGee from time to
14  time, depending on what provisions we were
15  dealing with, he was around and we would consult
16  with him, and then the lawyers from Weil
17  Gotshal, which included Lori Fife, who's a
18  bankruptcy lawyer, Tom Roberts, Mike Lub --
19          What's his name?
20          MR. STERN:  Lubowitz.
21     A.   -- mike Lubowitz, and then on the
22  other side it was really Archie Cox, this guy
23  Michael Klein, and then the Cleary lawyers led
24  by really Victor Lewkow.
25          And then there were many other people
             TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 49

1              M. Shapiro
2   who were involved in ascertaining what the
3   assets were that were being -- that were
4   proposing to be purchased and proposing to be
5   sold, and there were many people who were trying
6   just to obtain sufficient information that would
7   form the basis for a contract that could
8   ultimately be presented to the court because
9   obviously we needed to make sure that we
10  understood what we had the right to sell to
11  Barclays.
12          Given the fact that we were talking
13  about a very large firm of, you know, with a lot
14  of securities and there was a lot of stuff going
15  on, meaning people were taking legal action
16  against Lehman all over the world, we had to be
17  sure ultimately that whatever we were telling
18  them we were selling to them we actually had the
19  legal right to sell to them.
20     Q.   Was Steve Berkenfeld involved in the
21  negotiations on that Monday and Tuesday?
22     A.   Yes.
23     Q.   Would he have been one of the people
24  negotiating what you call in the trenches?
25     A.   He was more involved in some of the
             TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 50

1          M. Shapiro
2  legal negotiations. He was definitely at the
3  table from time to time with the lawyers. He
4  was not, to the best of my recollection, in the
5  meetings that took place between myself, Mark
6  Shafir, Archie and Michael Klein.
7      Q.   I want to get the names of the people
8  that you recall who were dealing with specific
9  issues before we come back to how the actual
10  negotiations took place.
11      You said that there were people
12  looking at securities, people dealing with the
13  real estate and the like. Can you give me any
14  names of people who were dealing with those
15  component parts of a possible transaction?
16      A.   Sure. Okay. So let's start with the
17  real estate.
18      Q.   Okay.
19      A.   So they said to us that they would buy
20  the buildings for appraised value. I believe
21  that was Archie who told us that. And so that
22  seemed like a pretty reasonable way to approach
23  it given the fact that, you know, no one wanted
24  to just pick a number.
25      So we said we would go off and get an

Highly Confidential

Page 51

1          M. Shapiro
2  appraisal, they would go off and get an
3  appraisal, and hopefully they would match or
4  come close to matching. So I called the head of
5  Investment Banking, Real Estate, Steve Hash, and
6  told him that I needed him to hire a firm to
7  provide us with desktop appraisals for 745
8  Seventh Avenue and for the two data centers.
9      He asked me a few questions like
10  should they assume that the building was going
11  to be occupied as a going concern or was it
12  going to be an empty, you know, an appraisal
13  based on an empty building. I said, no, we
14  should assume that it's a full working building,
15  that it would be effectively, you know, I don't
16  know what you want to call it, but leased up as
17  if, you know, a valuation based on a fully
18  occupied 745 and a fully occupied set of data
19  centers.
20      And he said he would go off and hire
21  one of the major appraisal firms. I don't
22  recall whether it was Cushman or -- it was one
23  of the traditional firms that you would go to to
24  get a real estate appraisal of major commercial
25  real estate. And I told him that we had very

Highly Confidential

Page 52

1          M. Shapiro
2  little time to get it done, that we needed it
3  within a day or two, and he said he would go
4  work on that.
5      Q.   Okay.
6      A.   So I would say that was -- and then
7  he, I believe he in turn assigned people within
8  his group to help him facilitate that. And I
9  don't know what Barclays did, but I believe that
10  they -- they had their own appraisal, I believe.
11  So that was the real estate.
12      On the securities side, I would say I
13  was not privy to some of, a good chunk of what
14  was happening other than the fact that there
15  were a number of people who I think Bart tasked
16  to make sure, you know, we were figuring out
17  what is it that we had and how, you know, and
18  give appropriate information to Barclays in
19  terms of those securities. And I know that
20  there were a lot of different people who were
21  being asked to pull all this information
22  together.
23      So, for example, Alex Kirk, who ran
24  High Yield was involved in that. Jim Seery, who
25  ran Loan Sales and Trading was involved in that.

Highly Confidential

Page 53

1          M. Shapiro
2  Martin Kelly, who I don't know his function, but
3  I know he was involved in helping find some of
4  that information.
5      Q.   Ian Lowitt?
6      A.   Probably Ian Lowitt, yeah, but
7  probably more -- he was probably dealing more
8  with Bart and, you know, than -- I mean, I dealt
9  with Ian from time to time, but not a lot.
10      Q.   What about Mark Gelband?
11      A.   Mark Gelband? You mean Mike Gelband?
12      Q.   Mike Gelband.
13      A.   Mike was I think the head of Fixed
14  Income at the time or a senior guy in Fixed
15  Income. I forget his title at that point
16  because he had come and left and come back. He
17  was definitely involved in it at some point.
18      Q.   And when we say "it," talking about
19  the securities?
20      A.   Securities, yeah.
21      And don't forget these are all people
22  who were in the Fixed Income Division, you know,
23  senior leaders of the Fixed Income Division who
24  had obviously the most access to what fixed
25  income securities we had.

Highly Confidential

Page 54

M. Shapiro

1
2    Q.   Okay.
3    A.   I don't know -- I don't know on the
4    equity side who was involved.  I suspect Jerry
5    Donini, who ran the Equities Division, had some
6    role, but I don't know for sure.
7    Q.   Before we leave fixed income, was Eric
8    Felder involved?
9    A.   Eric Felder was involved at some
10   level, but my impression was that he was not
11   around a good chunk of the weekend.  From what I
12   was hearing, he was out, you know, shopping
13   himself.
14   Q.   You say not involved in the weekend?
15   We're on Monday and Tuesday now.  I just want to
16   be clear on what time period we're talking.
17   A.   Okay.  Sorry.  I was thinking the
18   weekend.
19   Q.   You're talking about the weekend
20   previous or the weekend --
21   A.   Well, what I was -- when I was
22   talking, I'm meaning like starting on Sunday
23   night, Monday.  Probably by Monday during the
24   day, Felder was around, yeah, and I don't know
25   exactly what his role was.

Highly Confidential

Page 55

M. Shapiro

1
2    Q.   But the word was he was shopping
3    himself and he wasn't around?
4    A.   At the time the word was, you know, he
5    wasn't completely around.
6    Q.   But do you know whether or not he had
7    any involvement?
8    A.   I don't personally know.  I think he
9    had some involvement, but I don't know what the
10   level of involvement was, how detailed, what he
11   exactly did.  I know that we were trying to
12   get -- we were trying to get him to look at
13   something that involved some fixed income piece,
14   but I just don't remember what it was.
15   Q.   Were there people involved in pulling
16   together compensation information for Barclays?
17   A.   I don't personally know.  I don't
18   know.
19   Q.   And you referred previously to this
20   collection of contracts that Barclays might be
21   assuming.  Was there someone looking at that
22   universe?
23   A.   Yeah.
24   Q.   Who was that?
25   A.   I wouldn't say there was someone.  I

Highly Confidential

Page 56

M. Shapiro

1
2    don't know who it was, but I can tell you how we
3    started to think about it.
4    So, obviously, given my background,
5    you know, and knowing how these deals get done,
6    you quickly say, okay, what's someone who's on
7    the buy side going to want, right?  They're
8    going to clearly need some of these contracts
9    that are running this firm.
10   Now, Lehman is a gigantic firm.  I had
11   no idea how many contracts we would ultimately
12   have to assume, have assumed and assigned to
13   them.  So when we sat down, and clearly we
14   started talking about, you know, what were the
15   material contracts, there wasn't anybody who
16   really -- who had ever been tasked with the
17   notion of like what Lehman -- you know, a firm
18   as big as a place like Lehman, there isn't a
19   single person who is expecting to have to answer
20   the question of what are all the contracts of
21   Lehman Brothers, right?  And so there wasn't a
22   push the button, here's all the contracts.
23   So we asked -- I tasked one of the
24   people who worked for me, George Mack, and said
25   we need to start to get someone who can pull

Highly Confidential

Page 57

M. Shapiro

1
2    together either a list or, you know, something
3    that ultimately Barclays could start to look at
4    to understand what these contracts might be, and
5    as we started talking about it with Archie
6    Cox -- I believe it was Archie -- and Michael
7    Klein, one of them asked something like, you
8    know, well -- I said you understand the
9    way -- and they didn't really have much of an
10   appreciation for bankruptcy, truthfully.
11   Michael Klein, while he had been an investment
12   banker, he had, as far as I was concerned, zero
13   knowledge of bankruptcy and so I was explaining
14   to him how you effectuate a sale that involves
15   an assumption of contracts by a debtor.
16   So what I explained to him was that
17   you need to -- they would have the right to pick
18   which contracts they ultimately wanted.  We
19   would give them some reasonable timeframe to do
20   this, which, you know, I proposed 60 days.  I
21   thought that would be sufficient time for them
22   to figure it out since we didn't know exactly
23   what we were talking about.
24   And that's a pretty -- I would call
25   that a pretty common, maybe even a short,

Highly Confidential

Page 58

1          M. Shapiro
2 relatively speaking, period of time to do that
3 in, and told them that they would have to pay
4 the cure costs for any contracts that they would
5 want to have assumed and assigned to them as
6 part of this deal, that that was something that
7 we wanted them to take on, that that was not
8 something that the estate was prepared to do.
9 And I explained to them that, in my experience,
10 that's the normal way that these deals get done.
11     **Q.   And your concern at that point as a**
12 **bankruptcy person was that those claims would**
13 **be -- pardon me, those contracts could end up**
14 **being claims against the estate, so you wanted**
15 **them taken on by Barclays?**
16     A.   Yeah, we wanted -- I would say there
17 were two issues.  One was we wanted to design a
18 contract that made sense in the context of what
19 we were doing, and so this was a very standard
20 provision for when you're selling a company is
21 the buyer having the right to purchase contracts
22 that they ultimately choose to purchase.
23          And I would say it's always
24 negotiated, actually, whether the buyer or the
25 seller will end up paying the cure costs of the

Highly Confidential

Page 59

1          M. Shapiro
2 assumed contracts.  That's usually a very
3 heavily negotiated item in the context of a 363
4 sale.  My going-in negotiating position was,
5 Barclays, you need to take them all, you need to
6 pick up all the cure costs.
7     **Q.   Now --**
8     A.   And then the question came back to me,
9 well, what are we talking about?  How much are
10 we talking about?
11     **Q.   And you had said previously that there**
12 **had been, when you sat down to look at this,**
13 **there was -- you used that phrase "when you sat**
14 **down." I take it there was some gathering of**
15 **people, yourself, maybe Mr. Mack?**
16     A.   Actually, it was a big room and it was
17 basically Archie and Michael Klein and Mark
18 Shafir and myself.
19     **Q.   All right.  And you met**
20 **specifically -- at least part of the meeting was**
21 **for purposes of trying to identify or understand**
22 **what the contracts that would have to be assumed**
23 **by Barclays?**
24     A.   Well, we were talking about a bunch of
25 different issues and this was one of them, and

Highly Confidential

Page 60

1          M. Shapiro
2 this took a while to explain, obviously, because
3 it has a level of complexity to it that they
4 were not really aware of.
5     **Q.   At the time you're sitting down at**
6 **this meeting, had you already asked Mr. Mack to**
7 **try to identify the universe of contracts that**
8 **Lehman had?**
9     A.   No, I think as a result of this
10 meeting I then called him and said I need you to
11 figure out and start finding out like where are
12 the contracts, who are they with, can we get a
13 list of them.  You know, I was expecting to see,
14 you know, a computer stack of just like a
15 printout or something this high (indicating),
16 whatever we could get.
17     **Q.   "This high" meaning two feet or so?**
18     A.   Yeah, two feet, sorry, that could
19 allow Barclays to diligence and to start to
20 understand what this might be, recognizing that
21 we were going to give them 60 days so they
22 didn't need to know everything before we closed.
23 But the question that came back to us was, which
24 was a fair question, was, okay, well, how much
25 do you think this would -- if we assumed, you

Highly Confidential

Page 61

1          M. Shapiro
2 know, a lot of these contracts, what do you
3 think it's going to cost us to do this?
4     **Q.   Was the question if we assumed a lot**
5 **of them or the question whether we assumed all**
6 **of them?  I mean, what was the actual question**
7 **itself?**
8     A.   I think it was a more general
9 question, which was, when we said, you know,
10 here -- there's a lot of contracts, I can't tell
11 you what they are, they could be in the
12 thousands, I really can't be sure, but we will
13 try to get that information obviously in the
14 course of the day.  Because this was probably, I
15 don't know, early afternoon or something like
16 that on that -- on the 15th.
17          The question came back, I believe from
18 Archie, you know, well, what would the cure
19 costs be?  I think he was just trying to get a
20 sense of what we were talking about, you know,
21 on the assumption that many of the contracts
22 could be contracts he would need to assume in
23 order to continue to operate the business,
24 right?  He really didn't have -- none of us
25 really knew exactly what they would have to

Highly Confidential

Page 62

1          M. Shapiro
2  assume. We assumed that a good chunk of them
3  would have to be assumed in order to continue to
4  run the firm.
5      **Q.   It's fairly, fairly stated, isn't it,**
6  **that you knew some of them would have to be**
7  **assumed and you knew some of them would not have**
8  **to be assumed, correct?**
9      A.   We didn't know some of them wouldn't
10  have to be assumed. We assumed that many of
11  them would have to be assumed. We didn't know
12  what wouldn't have to be assumed because we had
13  no idea what Barclays wouldn't need, nor did we
14  actually know what all of the contracts were.
15  We just knew that there were likely to be a lot
16  of them.
17      **Q.   And so you tasked Mr. Mack after this**
18  **meeting to get the collection of contracts?**
19      A.   Start a process to get somebody in the
20  firm or some group of people in the firm to pull
21  together the contracts. That was kind of task
22  one. And then to the cure point, let's call it,
23  to the question of, well, what is it that --
24  what would be the magnitude of what we might
25  have to pay, we didn't know, and so we started

Highly Confidential

Page 63

1          M. Shapiro
2  thinking about, well, how -- how could we figure
3  that out in the timeframe that we had,
4  recognizing that we all believed that we had,
5  you know, a short time, a couple of days, two
6  days, three days, at best, to pull this
7  information together in some satisfactory way to
8  Barclays.
9      **Q.   And how did you go about trying to**
10  **identify what I'll call the quantum? How big is**
11  **this number?**
12      A.   So I think I first asked George Mack,
13  again, as part of this, to figure out like what
14  were the outstandings that were unpaid under
15  these contracts. And I think he went to
16  somebody and the answer came back we can't
17  possibly figure that out in this time
18  specifically to each contract. It was just, you
19  know, there was no ability, functionally, to do
20  that in the time we had. That's just not -- I
21  was not humanly possible.
22          So but Barclays obviously wanted that
23  information from us, so we started thinking
24  about, well, how could we approximate that
25  amount. And so a group of us, we were talking

Highly Confidential

Page 64

1          M. Shapiro
2  about it on the Lehman side, and we said, well,
3  one way that we could estimate this was by
4  having somebody look at the payables run, the
5  normal payables run in the ordinary course,
6  exclude comp, right, whatever is normally paid
7  for compensation on a weekly or monthly basis,
8  take a snapshot of a normal payable cycle, all
9  right, so at any given time you have a certainly
10  amount of payables outstanding, not knowing when
11  under every contract a payment was going to be
12  made, and not knowing they were all monthly,
13  necessarily, but we assumed that a lot of them
14  would be paid normally, you know, on a monthly
15  cycle, and provide us with an overall number
16  that would be a proxy for what the payments
17  under, you know, if you were assuming many of
18  those contracts, what those payments estimated
19  could be.
20          So that this was an intent. And we
21  told Barclays we couldn't provide them with the
22  specifics that they were looking for, but we
23  would try to get them an estimate of, for them
24  and ourselves, obviously, an estimate of what we
25  thought the amount would be that could be paid

Highly Confidential

Page 65

1          M. Shapiro
2  if they were going to have to assume all of
3  these contracts.
4      **Q.   Who did that work?**
5      A.   I don't know. George -- George went
6  off and started talking to people in the finance
7  area. And there were many people that were
8  working around, obviously around the clock on
9  these things trying to pull this information
10  together for us. I don't know who actually did
11  the work.
12      **Q.   Is George the person that you tasked**
13  **to get the number?**
14      A.   George is the person who I tasked to,
15  you know, to get people to provide us with those
16  numbers.
17      **Q.   Right. That's what I meant. Is it**
18  **George that reported back to you as to what the**
19  **proxy for the --**
20      A.   I don't remember --
21      **Q.   Let me just finish.**
22          **George reported back to you in terms**
23  **of what he thought the proxy for the cure number**
24  **was?**
25      A.   I don't remember.

Highly Confidential

Page 66

1      M. Shapiro
2      Q.   Was your approach in generating what
3   the cure number could be to make certain that
4   you came up with a, you know, a large enough
5   number to cover any and all contingencies, in
6   other words, you shot high?
7      A.   No, we were just trying to come up
8   with an estimate. I mean, we knew that we were
9   working with imperfect information. We knew
10  Barclays wanted at least an estimate of -- and
11  everyone understood, I would say, through that
12  day and evening that it was an estimate and that
13  the reality was that they, you know, it could
14  have been low, it could have been high, we
15  didn't exactly know. We were trying to give
16  them a fair estimate, to the best of our
17  abilities over the course of that 48-hour
18  period, as to what we thought they would
19  potentially have to pay, and recognizing that it
20  was possible that that could be high, it was
21  possible that that could be low.
22     Q.   I understand on Monday and Tuesday as
23  you were trying to come up with this estimate
24  you did it in this way you have described, but
25  did work continue on identification of contracts

Highly Confidential

Page 67

1      M. Shapiro
2   and what the actual obligation of Lehman was
3   throughout the week of September 15th?
4      A.   I don't remember.
5      Q.   Were you involved in any way with what
6   I'll call an effort to actually identify what
7   the cure number was as opposed to using a proxy?
8      A.   I don't remember.
9      Q.   Do you have any recollection as to
10  whether anyone continued that effort?
11     A.   I don't remember.
12     Q.   If anyone continued the effort, would
13  it have been Mr. Mack?
14     A.   No. Mr. Mack had the fortuity, maybe,
15  of getting married that weekend and so he had to
16  leave on the 17th to start his plans for his
17  wedding preparations on Saturday or Sunday. So
18  he left on Wednesday, and that was the end of
19  his involvement until he came back from his
20  honeymoon.
21     Q.   When Mr. Mack left, did you give the
22  responsibility for what we've been calling the
23  cure number to someone else?
24     A.   I don't remember. I don't think so.
25  I think he -- he had done what we had done.

Highly Confidential

Page 68

1      M. Shapiro
2   What we had done I don't think -- I think -- I
3   don't think he thought that there was anything
4   else that he was being asked to do when he left.
5   If he did, he obviously handed it off to whoever
6   was working with him.
7      Q.   To the best of your recollection, was
8   any work done to identify the actual obligations
9   of Lehman for the contracts that it had after
10  the Monday and Tuesday --
11     A.   I don't know.
12     Q.   -- the 15th and 16th of September?
13     A.   I don't know.
14     Q.   And do you know anyone who would know
15  the answer to that question?
16     A.   Only those who were potentially doing
17  the work.
18     Q.   Did you ever see a stack of, you
19  know -- you put your hands two feet apart. Did
20  you ever see the run of contracts Lehman had?
21     A.   I recall that there were some Excel
22  spreadsheets or someone had put together
23  something along the way, I'm not sure where it
24  was, like when it was during the course of that
25  week, whether it was before we signed the

Highly Confidential

Page 69

1      M. Shapiro
2   contract, after we signed the original contract,
3   but there was definitely stuff, when I say
4   "stuff," I mean papers prepared that had some
5   specifics around contracts. I don't remember
6   reading them in detail.
7      Q.   Do you know whether the information on
8   those sheets was sufficient to derive what the
9   actual obligations of Lehman Brothers were on
10  those contracts?
11     A.   Since I don't remember what they said,
12  I don't know the answer to your question.
13     Q.   I had asked you a little while ago
14  about whether someone was dealing with the
15  compensation questions. I think you said you
16  didn't have any recollections of that?
17     A.   No. No. No. I said I didn't, at the
18  point we started this, it wasn't clear to me
19  who -- ultimately, Bart obviously was going to
20  be dealing with the compensation issue. I would
21  say of the -- along the way the people who
22  ultimately dealt with the compensation issue was
23  Bart and Skip McGee and Mark Shafir.
24        And I had a little bit of input into
25  the drafting of the provision because I was

Highly Confidential

Page 70

M. Shapiro

1    sitting with the lawyers for Weil and Cleary as
2    they were drafting that provision, making sure
3    that it reflected what I was told that the
4    business deal was, but I would say, to the best
5    of my recollection, it was Bart, Skip and Mark
6    Shafir who were on the Lehman side dealing with
7    this.
8        MR. STERN: I don't want to interrupt
9        your flow, but if there's a convenient
10       point --
11       MR. CARDEN: Let's finish the comp
12       piece.
13       MR. STERN: In the next ten minutes or
14       so.
15   Q.    Do you know who was dealing with it on
16   the Barclays side?
17   A.    Again, as I said earlier, the
18   principal face that we were dealing with in
19   terms of seeing was Archie Cox and Michael
20   Klein. I don't know who was actually dealing
21   with that or who they were talking to or -- so I
22   don't know the answer.
23   Q.    And you say that you were involved in
24   the actual drafting of the provision concerning

Highly Confidential

Page 71

M. Shapiro

1    compensation?
2    A.    I didn't personally draft it. I was
3    sitting there, we were in a hallway, actually,
4    and I believe it was -- it was there were two
5    lawyers, one -- two employment compensation
6    lawyers, I would call them, one from Weil
7    Gotshal and one from Cleary Gottlieb sitting
8    next to each other. They were drafting, having
9    things typed, and then reviewing them basically
10   side-by-side together, and I at one point sat
11   down next to them and started reading the
12   provisions with them to make sure that I
13   understood it, that I could report back to make
14   sure that it was accurately reflecting what I
15   was being told the basic business deal was.
16   Q.    Was it your responsibility to
17   communicate to those lawyers what should be in
18   the compensation provision in the APA?
19   A.    I wouldn't say it was my
20   responsibility. I would just say that nobody
21   said to me your responsibility is to make sure
22   that the compensation provision is -- I just
23   took it upon myself to make sure, because I
24   obviously have legal training and I can read

Highly Confidential

Page 72

M. Shapiro

1    contracts and make sure that I think they are
2    clear, that I read it and communicated to the
3    lawyers my input based on what I was being told
4    by Bart, Skip and Mark.
5    Q.    Okay. Just so I'm clear, I don't want
6    to get hung up on the word "responsibility"
7    here. At some point you were told by Bart, Skip
8    and Mark what the agreement was concerning
9    compensation, and you communicated that to the
10   lawyers at Cleary and Weil that did the
11   drafting?
12   A.    Yeah, I'm not -- I don't know -- I
13   don't think I necessarily communicated. I
14   wasn't the intermediary, if you want to call it
15   that.
16   Q.    Uh-huh.
17   A.    So I wouldn't say I was the
18   intermediary that was communicating the message
19   back to the lawyers. I would say that one of
20   the principals clearly discussed with Weil
21   Gotshal, maybe Tom Roberts. I don't know the
22   answer to your question who at Weil. I believe
23   that someone on the Weil side was told by a
24   senior person at Barclays what the deal was, I

Highly Confidential

Page 73

M. Shapiro

1    think I was also told what the deal was, and
2    then the lawyers were off drafting and then I
3    was basically there to read it from my
4    perspective and make sure that I was comfortable
5    that the deal as explained to me was being
6    properly reflected. Since neither Bart nor Mark
7    and -- well, Skip I think went to law school and
8    practiced, but he doesn't function as a lawyer,
9    I'm probably a closer functionary in that
10   respect than they were.
11   Q.    What was your recollection of what the
12   deal was on compensation?
13   A.    My recollection was that, you know,
14   the all-in compensation pool that Barclays was
15   willing to agree to which would, you know, pick
16   up all moneys for 2008 that would be paid to
17   people that were moving over to Barclays, they
18   were --
19       Let me back up. My understanding of
20   the deal was that they were going to make offers
21   of employment to everybody in the U.S. business,
22   number one; that they were going to give people
23   at least 90 days and pay severance to the extent
24   that they didn't keep people around for whatever

Highly Confidential

Page 74

M. Shapiro

1  reason; that they were going to pay bonuses, you
2  know, they were going to have a bonus pool of
3  some amount of money that was going to, as part
4  of this, the overall -- as part of the overall
5  compensation, there was a bonus pool; that they
6  were going to be paying out of bonus pool an
7  amount that was -- that had some relationship to
8  what Barclays had accrued -- not Barclays,
9  sorry, that Lehman had accrued for 2008,
10 excluding what had been paid out under salary to
11 date to that point in time, right?
12         Because as you know, in investment
13 banks, the salary portion is, from a -- for most
14 of the people who are senior executives and
15 investment bankers, the bonus portion is the
16 most significant portion of compensation. The
17 salary is just a very small portion of what
18 people have typically earned.
19        And so Barclays was agreeable to, you
20 know, subject to whatever total number that was
21 going to be, to paying some of that.
22 Q.   By when did they have to pay that?
23 A.   By March 15th of 2009, which was I
24 guess the date that they would typically pay

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 75

M. Shapiro

1  bonuses. Because at Lehman we typically
2  received our bonuses in January or February.
3  Q.   Anything else that you recall about
4  the deal on compensation?
5  A.   Well, the number ultimately was an
6  all-in $2 billion number, which was supposed to
7  pick up kind of everything I just described to
8  you. There was also an adjustment mechanism
9  which said something like if 10 percent of the
10 people didn't come to Barclays, and there was
11 different people, like there was a -- there were
12 sort of let's call it the more important people
13 from their perception, there was a few hundred
14 people that they truly cared about who really
15 drove the businesses. If 10 percent, I believe,
16 of those people didn't come and those people's
17 comp for 2008 represented in excess of 10
18 percent, I think they had the right to take that
19 out of the pool. So I think there was some
20 adjustment mechanism built into it.
21 Q.   Just so I'm clear, then, so the bonus
22 pool that was going to be created was going to
23 be paid out by March 15, '09, correct?
24 A.   Yes.

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 76

M. Shapiro

1  Q.   Was it all cash?
2  A.   You know, that was never clear to me
3  and it was a concern to me, actually, that I
4  don't think, you know, was expressed
5  specifically in the contract.
6  Q.   Did you have an understanding of
7  whether it was supposed to be all cash?
8  A.   I didn't have an understanding, no.
9  Q.   When you talked to Bart or Mark or
10 Skip about it, did they speak to you about
11 whether or not it was going to be a cash bonus?
12 A.   No.

REDACTED

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 77

REDACTED

18 Q.   You were also --
19 A.   Which I was pleasantly surprised at.
20        MR. CARDEN:  Let's just mark this and
21 then we'll take a break after we just have a
22 few questions concerning it. I don't
23 believe this has been marked so this is the
24 next exhibit, which is 55A.
25        (Exhibit 55A, a document bearing Bates

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 78

1       M. Shapiro
2    Nos. BCI-EX-00077347 through 77349, marked
3    for identification, as of this date.)
4    **Q.   Mr. Shapiro, I show you what he wants**
5    **been marked as Exhibit 55A, and this is the**
6    **contract to which you were just referring,**
7    **correct?**
8    A.   That's correct.
9
10
11
12
13
14
15
16                  REDACTED
17
18
19
20
21
22
23
24
25
         TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 79

1
2
3
4
5
6
7
8
9
10
11
12                  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
         TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 80

1
2
3
4
5
6
7
8
9
10
11                  REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
25
         TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 81

1
2
3
4
5
6
7
8
9
10
11                  REDACTED
12
13
14
15
16
17
18
19
20
21
22    **Q.   I'm going to do that right now and**
23    **then we can take a break.  Let me show you what**
24    **has been previously marked as Exhibit 1, which**
25    **is the Asset Purchase Agreement.**
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 82

1          M. Shapiro
2          If I can direct your attention to page
3    35, which has the compensation clause about
4    which you have given prior testimony.
5      A.   Okay.
6      Q.   If you see paragraph 9(c), the top of
7    page 35, it does make reference to the annual
8    bonuses being awarded on or before March 15,
9    2009, consistent with your recollection, do you
10   see that?
11     A.   Yes, I do.
12
13
14
15
16
17              REDACTED
18
19
20
21
22
23
24
25
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 83

1
2              REDACTED
3
4
5
6
7       MR. CARDEN:  Let's take a break.
8       (Recess; Time Noted:  10:50 A.M.)
9       (Time Noted:  11:04 A.M.)
10   BY MR. CARDEN:
11     Q.   I'd like to understand a little better
12   than I presently do just how you were, I'm going
13   to call it -- say functioning on Monday
14   afternoon and Tuesday and describe some of the
15   things you were doing, you know, but tell me, if
16   you will, you know, how were you actually
17   functioning in this negotiation process, you
18   personally?
19     A.   So I would say that my function was to
20   work with -- initially, my function was to work
21   with Mark Shafir, Bart on helping to construct a
22   transaction -- since I was the firm's
23   restructuring expert, obviously that expertise
24   was required -- to provide input into how to do
25   so, you know, effectively; to help Mark
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 84

1          M. Shapiro
2    negotiate points, particularly points that
3    involved anything around bankruptcy matters that
4    were obviously let's call them technical in
5    nature, not something that he had any real depth
6    key expertise around; and to I would say help
7    kind of quarterback the entire effort over the
8    course of the days.
9          Again, I wouldn't say that anyone said
10   to me, you know, Mark, please do the following.
11   It was just kind of an expectation that that was
12   my role given the function that I had and given
13   the team that had been put together by Bart.
14     Q.   You've described how you met with the
15   Weil and Cleary people in that hallway and
16   reviewed the compensation provision of the
17   contract?
18     A.   That was just one piece of a much
19   bigger puzzle, obviously.
20     Q.   Were there other pieces of that
21   puzzle, other aspects of the APA that you
22   reviewed to see if they were consistent with
23   what you were told was the business deal that
24   had been reached?
25     A.   Well, I would say over the course of
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 85

1          M. Shapiro
2    the drafting of the document, you know, I didn't
3    leave the firm, so I stayed through the night.
4    I was -- I read every draft of the contract that
5    came out.  I provided my comments on the
6    drafting.  I sat with both sides.
7          There was a lot of what I call, you
8    know, typical lawyering that was going on,
9    pretty heated discussions, negotiations on both
10   sides around lots of different points, and I was
11   trying to find a way to get to commercial
12   resolution on them so that we could, you know,
13   make sure that we were progressing the deal as
14   best we could without getting stuck on what can
15   sometimes be very parochial points.
16          You know, a compensation lawyer might
17   have a particular technical thing that he
18   required, and I tried to make sure that we were
19   sort of seeing the forest from the trees, making
20   sure that we weren't getting stuck on what I
21   would call very, very minute points relative to
22   the size of the transaction we were dealing
23   with.
24          I wouldn't say I was involved in every
25   single discussion by any means, and I -- and I
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 86

1           M. Shapiro
2 was involved in direct discussions with Mark, as
3 I described earlier, with Archie and with
4 Michael Klein during the course of the night,
5 you know, middle of the night let's call it of
6 whether you want to call the night of the 15th
7 or the morning of the 16th, on some discrete
8 issues.
9    **Q.   Come back to those in a moment. I**
10 **just want to understand one aspect about how you**
11 **were functioning.**
12    **Did you take it upon yourself in the**
13 **reading of the various drafts to ensure that**
14 **what you understood to be the business**
15 **agreements that had been reached were being**
16 **memorialized in the document?**
17    A.   To the best of my ability. I mean,
18 you know, obviously there were a number of us
19 reading the contract, myself, Steve Berkenfeld,
20 Mark Shafir, although I think Mark probably read
21 it less so than me or than Steve.
22    The lawyers -- obviously, there was a
23 lot of responsibility placed on Weil. So you
24 had, as I said, Mike -- what's his name?
25    MR. STERN: Lubowitz.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 87

1           M. Shapiro
2    A.   -- Mike Lubowitz, Lori Fife, Shai
3 Waisman so, you know, some of them were
4 obviously reading the contract carefully. Tom
5 Roberts.
6    So there was a group of people who
7 were all reading the contract to try to make
8 sure that it reflected the business deal or, to
9 the extent that there was a dispute in any way,
10 we were bringing it to the right people to see
11 if it could either get resolved or modified or
12 not.
13    **Q.   Of that group of people you just**
14 **described, yourself, Steve Berkenfeld, Lori**
15 **Fife, I think you said Tom Roberts, were all of**
16 **you kept apprized of the business terms and the**
17 **negotiations that were being conducted by Bart**
18 **and Archie Cox?**
19    A.   Well, I would say I don't know how to
20 answer that question exactly when you say the
21 "business negotiations." I'm not -- I don't
22 know exactly what Bart and Archie were
23 negotiating, so I'm not sure --
24    **Q.   Let me ask it a different way. It's**
25 **an awkward question. I'm just trying to**

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 88

1           M. Shapiro
2 **understand what you just said.**
3    **When you were reading the contract,**
4 **you weren't reading it just to see if it**
5 **legally, you know, conformed with some idea of**
6 **what the agreement ought to be. You were**
7 **reading it to see if it conformed with what you**
8 **understood to be the terms of the business deal,**
9 **correct?**
10    A.   No, I was reading it. I was reading
11 every word of that contract. Truthfully, I
12 viewed this as a pretty, you know, significant
13 responsibility that I had to, you know, to the
14 Lehman estate and to the deal to make sure that
15 it was being done correctly.
16    Obviously, you know, I had a lot of
17 deal experience, I had drafted those kinds of
18 contracts, I have negotiated those contracts,
19 and so I was probably one of the few people
20 around that had the ability to make sure that
21 not only was the business deal being reflected,
22 but also that I felt comfortable with the legal
23 terms that were in it.
24    Again, I wasn't playing lawyer there,
25 we had Weil Gotshal to do that, and we had --

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 89

1           M. Shapiro
2 and we had, you know, Steve Berkenfeld to do
3 some of that, but I was reading it sort of
4 comprehensively.
5    **Q.   I'm just trying to understand how you**
6 **came to know the business terms to make certain**
7 **that the APA was consistent with what deal had**
8 **been reached?**
9    A.   Sure. So I think what I did was, as I
10 went through the contract, I obviously, you
11 know, looked at it, and on the key -- on the key
12 provisions, I went back to people during the
13 night and made sure that what was in the
14 contract was what had been agreed to.
15    **Q.   And was Steve Berkenfeld doing the**
16 **same thing?**
17    A.   Not really from what I remember. I
18 don't have a perfect recollection of what Steve
19 was doing. Steve was -- Steve was kind of
20 hanging around. He actually went home during
21 the night and got some sleep, so I stayed
22 through the night. He left and then he came
23 back. And I said, I'm glad you're back because
24 it's good to have a fresh set of eyes looking at
25 this stuff again, and maybe he came back at 6 or

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 90

```
1              M. Shapiro
2   7 in the morning.
3          So I would say that he -- he didn't
4   play -- he wasn't in the negotiations with
5   Shafir and I, with Michael Klein and with
6   Archie, so I can't tell you exactly what Steve
7   did except that I know that he was reading the
8   contract, he was -- he was around the table from
9   time to time with the lawyers, and then he
10  ultimately -- you know, again, he was one of the
11  more senior people at Lehman Brothers involved
12  in the deal over that course of those days and
13  he ultimately signed the contract.
14     Q.   Did you have conversations with him
15  concerning deal terms in the contract that you
16  recall?
17     A.   I probably did. I just -- I don't
18  have any specific like exactly what we were
19  talking about. I think, you know, we definitely
20  of course chatted through the day and night.
21     Q.   When you said that you were glad to
22  have another or a new set of eyes or fresh set
23  of eyes, did you mean to make certain that the
24  contract was consistent with the business terms
25  that had been agreed upon?
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 91

```
1              M. Shapiro
2     A.   No, I just meant generally speaking,
3   he's a lawyer, I wanted to be sure that we
4   weren't missing anything, you know, and that,
5   you know, when you're reading a contract at 5 in
6   the morning, 6 in the morning, if you've been up
7   all night, you start to get a little tired.
8          So I just wanted to be sure that there
9   were other people besides -- obviously Weil
10  Gotshal, we were trusting them a lot, but from a
11  business perspective, we needed to be sure that
12  whatever we were entering into properly
13  reflected the general deal and didn't put Lehman
14  in a legal position that it had -- wouldn't
15  create any problems for it.
16     Q.   Just so I'm clear, was anyone other
17  than yourself that you know about reading the
18  contracts and their drafts for purposes of
19  determining whether or not it accurately
20  reflected the business deal that had been
21  reached?
22     A.   Well, Bart. People were bringing the
23  contract to Bart. I don't know what exactly he
24  read, but I know that people went over all of
25  the key terms with Bart. So clearly Bart was in
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 92

```
1              M. Shapiro
2   the loop and it's possible that others were.
3          I just, you know, again, there were --
4   as drafts would come out, they would have a
5   stack of them and they were being handed out to
6   people, and so I don't -- I'm not privy to all
7   the people who read the contract. I do know
8   that Bart was, you know, provided, you know,
9   with a contract and somebody went through that
10  with him.
11     Q.   When you had a question as to whether
12  or not the contract comported with what the
13  business agreement had been, did you go back
14  only to Bart? Did you go back to other people?
15     A.   I didn't really have that many
16  conversion, truthfully. It wasn't like I had a
17  thousand questions. It's actually a reasonably
18  straightforward contract and so it was really
19  around sort of, you know, some of the key issues
20  that we had to go through the contract for me to
21  tell you as we thought about these key issues
22  what they were.
23          But there were only I would call it a
24  handful of key issues that were in the contract
25  that were contractual issues as opposed to -- as
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 93

```
1              M. Shapiro
2   opposed to diligence and other things that were
3   still going on during that timeframe.
4     Q.   We'll take a moment and just pass
5   through it here and see if we can identify some
6   of those, but do you recall any of the key
7   issues before we start that process?
8     A.   I think it'll be easier if we just
9   flip through the contract.
10     Q.   Okay. Why don't you go through and
11  maybe give me a summary at the beginning of what
12  you consider to be the key issues about which
13  you had some questions.
14     A.   Okay.
15     Q.   And then we'll go through them.
16     A.   Well, are we talking about key issues
17  that I had questions about or just key issues
18  that had to be focused?
19     Q.   I'm sorry, I thought you said there
20  were only a handful of things that you had to go
21  back and ask about these key issues, so I was
22  trying to pick up on what you said.
23     A.   Okay.
24     Q.   You tell me.
25     A.   I guess -- is there --
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

1           M. Shapiro
2    Q.   What I don't need you to do is tell me
3 what the key aspects of the agreement are.
4    A.   I guess what I'll -- what I really
5 meant is I will focus on what I thought were the
6 key issues that I needed to make sure I was
7 focused on.
8    Q.   Fine.
9    A.   And if I have a recollection that I
10 had a question about it, I will share that with
11 you as we go through this.
12    Q.   Excellent.
13    A.   I don't have anything at this minute
14 until I look at it and see exactly what we're
15 talking about.
16    Q.   And you're looking at Exhibit 1.
17    A.   Correct.
18        So we're talking about Article II has
19 the -- really is where it starts after the
20 definitions.  Purchase of -- shall purchase, it
21 says in 2.1, on the terms and subject to the
22 conditions, purchaser shall purchase, acquire
23 from the seller and 745.
24        There was some discussion early on
25 about which entity, legal entity held 745

Highly Confidential

1           M. Shapiro
2 Seventh Avenue, was there a mortgage right on
3 it, was there not a mortgage on it.  There had
4 been some structured -- it had been structured
5 when it had been put into whatever it had been
6 put into about maybe a splitting of the building
7 and the ground lease.  I can't recall exactly.
8    Q.   Okay.
9    A.   But I know that there were some things
10 around it, and I did focus on that and told the
11 real estate person to let's make sure we get
12 this right, let's make sure that we understand
13 exactly what we have to convey and that we get
14 this whole provision right, that we know who the
15 right seller is.
16        I believe, to the best of my
17 recollection, that 745 was an entity that held
18 some portion of the building in some way, some
19 rights that related to the building.
20    Q.   Now, only because you passed by it,
21 I'm going to draw you back to page 6.
22    A.   Okay.
23    Q.   I'm assuming that, since you passed by
24 it, you didn't --
25    A.   Well, I didn't look through the

Highly Confidential

1           M. Shapiro
2 definitions.  I figured it's easier to look at
3 the definitions in the context of a provision.
4    Q.   Let me just draw your attention,
5 before we pass beyond the definitions, to the
6 definition of "purchased assets."  Did you focus
7 on that?
8    A.   Yes, it definitely was a provision
9 that I spent time making sure that I tried to
10 understand it at the time, yes.
11    Q.   And were you trying to determine what
12 exactly Barclays was buying and what was being
13 left behind?
14    A.   Most importantly, I wanted to be sure,
15 (A) what was it that we were conveying to them.
16 Is it clearly delineated, right?  We always want
17 to be sure that you know in a contract,
18 particularly when things are moving quickly,
19 that you're getting it right.  And so I just
20 wanted to be sure that whatever we were putting
21 in the contract we, you know, we all understood
22 what it was.
23    Q.   Okay.  I draw your attention to
24 subparagraph (d) underneath "Purchased Assets"
25 on page 6.  Do you see the reference to

Highly Confidential

1           M. Shapiro
2 approximately $70 billion in securities?
3    A.   Yes.
4    Q.   Did you focus on what those securities
5 were when you read this contract?
6    A.   Did I focus on what those securities
7 were?
8    Q.   Let me rephrase that question.  I
9 phrased that poorly.
10        When you read the contract, were you
11 aware of what positions in government
12 securities, commercial paper, corporate debt,
13 corporate equity, Exchange-traded derivatives
14 and collateralized short-term agreements were as
15 referenced in subparagraph (d) under "purchased
16 assets"?
17    A.   Okay.  So let me try to -- let me try
18 to answer that in the context of the way things
19 were happening over the course of those days.
20        So obviously, as I explained earlier,
21 people were trying to understand what was the
22 book of securities that we actually had title to
23 that we could sell to Barclays.  In particular,
24 I was pointing out to people that we needed to
25 make sure that we were getting -- people around

Highly Confidential

Page 98

1          M. Shapiro
2    the firm in the securities area were pulling
3    together information, batches of information
4    about each of the different pools of securities
5    that the firm owned.
6          As you can imagine, given the fluidity
7    of the situation, people were blowing Lehman out
8    of positions.  So it was a very fluid situation
9    in terms of like knowing on a, you know, you
10   could do a photo, you know, photo check on time
11   1, but by time 3, meaning an hour later, it
12   could have been a different situation.
13         So what I was telling everybody was
14   let's get as much real-time information as we
15   can around these securities, but everyone was
16   pointing out that it was changing rapidly and
17   the balance sheet was actually shrinking rapidly
18   as things were being taken from Lehman, in other
19   words, the repo positions they had, they were
20   being blown out of securities.
21         If you recall, the only company that
22   we actually put into bankruptcy was the holding
23   company and most of the securities were held at
24   the broker-dealer, and so that was not still
25   under the bankruptcy yet until maybe Wednesday,

Highly Confidential

Page 99

1          M. Shapiro
2    I can't remember when they actually filed it,
3    but it wasn't filed immediately.
4          And so there were still things
5    happening at the broker-dealer that led to those
6    securities in the different pools potentially
7    changing, through no fault of Lehman, just
8    because the market was -- things were happening
9    in the market on the other side of the other
10   side of Lehman Brothers.
11         So people were -- I would say this was
12   where you asked me earlier, you know, who was
13   doing a lot of the securities analysis.  You
14   know, this is where Bart and Alex and -- Alex
15   Kirk, Jim Seery, Martin Kelly, probably Ian
16   Lowitt, people were very focused on let's figure
17   out what do we have.
18         You know, Bart was clearly trying to
19   get as much information real-time as he could
20   get so that we could try to understand what did
21   we have the right to convey to Barclays.  The
22   last thing that I wanted to see was us telling
23   Barclays we can convey this security to you,
24   finding out we didn't ultimately have it, and
25   having a breach of contract which could let them

Highly Confidential

Page 100

1          M. Shapiro
2    walk away from the deal.
3          So I wanted to be sure that if we --
4    that we could identify, to the best of our
5    abilities under the circumstances, what is it
6    that we thought we could convey to them legal
7    title to.  So, in that effort, in that effort,
8    and I guess George Mack was a little bit I think
9    around that effort at some point, one of my
10   analysts, John Grenier was brought in with a
11   laptop who was told, let's start to kind of put
12   together a sheet that might reflect what
13   securities were being told by other people in
14   the firm we owned that we think we can convey,
15   and then what's the funding against those
16   securities that Barclays would have to assume as
17   part of this.
18   Q.    Because that was the offset for the --
19   Barclays was going to take the position, but it
20   also had to take the financing of those
21   positions?
22   A.    I wouldn't say they had to.  I would
23   say the discussion was we have securities, we
24   have financing for those securities, and that's
25   the -- that was, in a sense, the basis for the

Highly Confidential

Page 101

1          M. Shapiro
2    discussion.  That was obviously a negotiation
3    that took place really I believe between Bart
4    and people at Barclays, ultimately.
5    Q.    The discussion as to what assets would
6    be taken and what financings --
7    A.    What liabilities would be assumed in
8    connection with those securities, correct.
9    Q.    When did this Grenier -- I'm sorry, I
10   forgot his first name.
11   A.    John.
12   Q.    When did John --
13   A.    He was only at the firm for three
14   weeks at that point, so he was thrust into an
15   interesting position.
16   Q.    When do you recall him coming into the
17   process to try to assemble this list of
18   positions?
19   A.    Probably Sunday night, I mean like
20   Sunday night late, and then probably starting
21   very, very early in the morning on Monday
22   morning.
23   Q.    Okay.  So obviously developing this
24   list of security --
25   A.    It wasn't a list like a long list.

Highly Confidential

Page 102

1         M. Shapiro
2  This was categories of different things that
3  were being identified by other people to him.
4  He was basically a scribe with a computer,
5  right?  And basically was asked, okay, put this
6  on a piece of paper, show up with a laptop, get
7  up to Bart's office, and let's start to make
8  sure we understand what securities might be able
9  to be conveyed.
10        And it turned out to be clearly a
11 moving process, because as the two days went on,
12 you know, the information that we started with,
13 which was that we believed that Lehman had a
14 hundred billion dollars, roughly, of securities
15 that could be conveyed to Barclays ultimately
16 translated down to I believe in the low $70
17 million range by 24 to 48 hours later, and then
18 even less as we get further into the week.
19    Q.   At the time that you reviewed the
20 **drafts of the APA, did the number 70 billion**
21 **change in the draft?**
22    A.   I don't remember.  I suspect it did,
23 but I don't remember.
24    **Q.   And at the time -- obviously this is**
25 **the signed version, Exhibit 1, do you see that?**
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 103

1         **M. Shapiro**
2    A.   Yes.
3    **Q.   At that time was there any schedule of**
4  **any kind backing up the $70 billion number?**
5    A.   I wouldn't say it was backing it up.
6  I would say in connection with this there was
7  this piece of paper that we were just kind of
8  using as a way to, for all of our purposes, make
9  sure that we knew kind of what we were talking
10 about in terms of people figuring out, okay,
11 what is it that we were buying and they are
12 assuming.
13        So this piece of paper was created
14 that ultimately got initialed by Berkenfeld, I
15 know, I remember seeing it, that had a list of
16 different securities on the asset side,
17 different securities on the liability side.
18 That did change.  You know, over the course of
19 those two days, there was probably, I don't
20 know, there could have been as many as ten or
21 more iterations of that particular piece of
22 paper, and I was not -- I was not in the middle
23 of drafting that piece of paper, so I can't
24 speak to how it got changed or why it got
25 changed other than the fact that, as the
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 104

1         M. Shapiro
2  information came in through the securities
3  people, those numbers got changed.
4    **Q.   Who was drafting that document?**
5    A.   Well, as I said, John Grenier was the
6  scribe.  "Scribe" meaning he was --
7    **Q.   I was talking about the document that**
8  **Steve Berkenfeld initialed.**
9    A.   That's what I'm talking about.  That
10 document turned into the document Steve
11 initialed.
12   **Q.   I didn't understand that.  So Steve --**
13 **pardon me.  John was working on this document**
14 **that ultimately became --**
15   A.   Yeah.
16   **Q.   -- the balance sheet that was**
17 **initialed by Steve?**
18   A.   Correct.
19   **Q.   Okay.  Let's go back to the 70 billion**
20 **for just a moment.  Were the value of those**
21 **securities based on Lehman's marks?**
22   A.   Well, this says it has a book value.
23 So I believe it was based on Lehman's -- as
24 Lehman had marked them as of the time that this
25 contract got signed, which meant -- the contract
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 105

1         M. Shapiro
2  got signed at 10:30 P.M. around on Tuesday -- on
3  the night of the 16th, so I'm presuming that on
4  or about the close of business on the 16th there
5  was a view, and it does say approximately 70
6  billion, so presumably there was a list that was
7  taken that they had obviously different pools of
8  securities in, they had the marks that Lehman
9  had on those securities as of that date,
10 approximately, and that's presumably where this
11 $70 billion came from.
12   **Q.   Do you know if Barclays was given a**
13 **discount in the purchase of those assets?**
14   A.   I don't know what you mean by a
15 "discount."
16   **Q.   Well, the $70 billion is based, as you**
17 **said, on Lehman's marks.  Do you know whether or**
18 **not, in selling the securities to Barclays,**
19 **whether different marks were used?**
20   A.   No, these -- again, as I recall, this
21 70 billion was a rough approximation of the
22 aggregate book value, you know, based on
23 Lehman's marks, of the asset side of the deal,
24 right?  And so I would say, no, there was no
25 discount because obviously it was a book value.
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 106

```
1              M. Shapiro
2       Then you had the other side of the
3  deal, as you mentioned before, which was the
4  liabilities side.  My recollection was that the
5  liabilities side was lower, that the funding of
6  these securities, which actually is not a
7  surprise because people take haircuts, right?
8  People don't lend you necessarily a hundred
9  cents on the dollar against an asset.
10      So there was a lower amount of a
11 liability that was assumed opposite these 70.  I
12 do remember, again, that changed along the way,
13 right, in the terms of like -- but it was
14 always, it was always, to the best of my
15 recollection, somewhere between one and a half
16 and two billion dollars of differential between
17 the amount of liabilities that were being
18 assumed in connection with these securities by
19 Barclays versus the amount of assets that were
20 book-valued by Lehman Brothers under the
21 schedule, which kind of made sense to me because
22 if they were, you know, if they were taking a
23 matched book (A) you're going to always have
24 small -- some amount of haircut, right, against
25 what people were willing to lend you against
```

Highly Confidential

Page 107

```
1              M. Shapiro
2  those securities; and, two, I assume that, this
3  is just my personal assumption, that, you know,
4  given the volatility of the time we were in
5  where the stock market had just absolutely, you
6  know, so volatile over that course of those
7  couple of days, and I can't remember exactly
8  what happened in those two days, but it was, you
9  know, the Friday before I think was bad and a
10 couple of days around it was bad, and I'm
11 obviously -- the world was in crisis.  No one,
12 no one knew where the next day's marks might
13 have to be given the fact that people were
14 genuinely worried that if Lehman toppled over
15 completely and all these securities might be put
16 into the marketplace, what those marks might be.
17      So I just had a presumption that a
18 negotiation was taking place, you know, really
19 between Bart and the people on the securities
20 side and Barclays over what they're prepared to
21 assume, assuming that there was -- that they
22 were, on their side, building some cushion in
23 for volatility that they could, you know, by the
24 Monday morning they wake up and all of a sudden
25 they find these securities are worth 20 percent
```

Highly Confidential

Page 108

```
1              M. Shapiro
2  less.  So that was just my presumption.  I don't
3  know if that's actually what happened.
4      Q.  Are the financing to which you are
5  referring that were being assumed by Barclays
6  referenced on page 12 in paragraph 2.3I?
7          MR. STERN:  Objection to the form.
8  Can I just -- can you read the question
9  again?
10         (Record read.)
11         MR. STERN:  You can answer.
12     A.  Yeah, that's my general understanding,
13 is that this "I" provision was the offset to the
14 provision that we just went through, and so you
15 had 70, approximately 70 in that provision,
16 approximately 69 in this provision.  That
17 reflects what I just told you before.
18     Q.  All right, now I interrupted you.  You
19 were just starting through the provisions of the
20 APA that you had focused on.
21     A.  Yeah.
22     Q.  And I drew you back to the definition
23 of "purchased assets," so I'm going to turn you
24 loose again.
25     A.  This could take a while, if I'm going
```

Highly Confidential

Page 109

```
1              M. Shapiro
2  to read through this.
3      Q.  I'm here all day.
4          MR. STERN:  Take your time.
5          MR. CARDEN:  Jack is looking quite
6  relaxed and comfy over there.
7          MR. STERN:  Take your time.
8      A.  I am taking my time.  I'm just telling
9  you I have to read this contract.
10      So, as we go through 2.3, I'll just
11 tell you what I spent some time I remember on.
12     Q.  Okay.
13     A.  To the best of my recollection.
14      So 2.3(b) has liabilities of Seller
15 under the purchased contracts arising after the
16 date of such entity.  So that was obviously a
17 provision that was attached to the provision
18 dealing with what contracts we might assume and
19 assign, and they were agreeing that they would
20 pick up any liabilities from and after the date
21 of this contract under those purchased
22 contracts.
23      There was some discussion, because we
24 were giving them 60 days to decide whether or
25 not they would take any of these contracts,
```

Highly Confidential

Page 110

1          M. Shapiro
2  right, there was some discussion about whether
3  kind of who would be responsible during this
4  60-day period for the contracts because you were
5  going to clearly accrue administrative expenses
6  during the case if you hadn't yet made a
7  decision.
8          So just, you know, let's take a simple
9  example of a, you know, a computer contract,
10  computer -- if they had decided that they didn't
11  need the computers that were there and they
12  terminated whatever lease or whatever else there
13  was around those computers, during the 60 days
14  that we were giving them to make a decision to
15  assume or assign, the counterparty to that
16  contract -- and there was thousands of these
17  things -- had a right to administrate a priority
18  claim under the bankruptcy code, right?
19          I wanted to be sure that they were
20  picking up those liabilities so that, even if
21  they decided not to take the contract, they were
22  still responsible for whatever arose after the
23  contract so that the estate wouldn't be
24  responsible for that. There was some discussion
25  about that, and after, you know, to-ing and
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 111

1          M. Shapiro
2  fro-ing with them, they ultimately agreed to do
3  that. I do remember that one.
4          Maybe we can -- the next provision
5  that I'm looking at is 2.3(c), which is "all
6  Liabilities assumed under Article IX," Roman IX,
7  and maybe we should skip that until we get to
8  that because that obviously has some of the
9  compensation provisions that we need to talk
10  about.
11    Q.  Okay.
12    A.  I definitely was, as I mentioned
13  earlier, involved in trying to make sure that
14  that properly reflected the deal.
15          On 2.3(f), the provision that says,
16  "All other Liabilities to the extent related to
17  the Business, the Purchased Assets or the
18  Transferred Employees," there was some general
19  discussion I remember certainly the lawyers of
20  trying to iron out this. And frankly, you have
21  to -- I think you have to look at this provision
22  and read this with the Excluded Liabilities
23  provision, because while this says certain
24  things and the Excluded Liabilities provision
25  says notwithstanding what's said here, certain
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 112

1          M. Shapiro
2  things are excluded. So they have to kind of be
3  read hand-in-hand, so I do remember talking
4  about like what were the things related to the
5  business that would or wouldn't be included.
6          Obviously you have the provision you
7  pointed out before, (i). There was a lot of
8  discussion about how to properly reflect that.
9  Specifically, Mike Lubowitz wanted to be sure
10  that he accurately reflected what this meant as
11  people thought at the time. I would say that it
12  was intended to mean the liabilities associated
13  with the assets from a funding standpoint.
14    Q.  The assets that were being acquired?
15    A.  The assets that were being acquired,
16  correct.
17          And there were shorts positions. One
18  of the things this says is includes short
19  positions. You could, in theory, have had a
20  short position that was unrelated to the asset
21  side, right?
22    Q.  Right.
23    A.  So I don't know the specifics of that.
24          2.4(c) makes it clear that the
25  purchaser was required to pay the cure amounts
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 113

1          M. Shapiro
2  that were required under 2.5. I remember trying
3  to make sure that we had that right.
4          There was some discussion under 2.4(d)
5  about, you know, how would medical claims work,
6  people who were coming across from Lehman to
7  Barclays, you know, what, you know -- and I
8  think they basically took the position like they
9  are not assuming anything at all, whatsoever, as
10  it related to Lehman employees kind of personal,
11  medical, anything that arose pre-petition, that
12  they -- it would start fresh when you moved over
13  to Barclays.
14    Q.  Okay.
15    A.  I was just trying to, you know,
16  understand it really so that I could explain to
17  people kind of what was happening when this deal
18  closed from a personal standpoint in terms of
19  what people would have rights to and not have
20  rights to.
21    Q.  Okay.
22    A.  That would be 2.3. 2.5, you know, I
23  probably, you know, oversaw this provision, if
24  you want to call it that, right, in terms of
25  how, you know -- I negotiated the 60 days,
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 114

M. Shapiro
1
2  worked with the lawyers to make sure we had this
3  right. I think it's pretty -- actually, I think
4  it's very straightforward.
5          They had the right to, you know,
6  designate contracts, and if they designated the
7  contracts, we had the obligation to have it
8  assumed and assigned to them and they had the
9  obligation to pay the cure costs.
10   **Q.   Okay.  Now that you're on page 1, I'm**
11  **going to just interrupt your review and ask you**
12  **a general question so I can budget our time for**
13  **the rest of our day.**
14   A.   Okay.
15   **Q.   I realize that you were involved quite**
16  **closely with the APA.  Were you also involved**
17  **with any documentation of the transaction as it**
18  **changed through the week, the clarification**
19  **letters, for example?**
20   A.   I was definitely not involved with the
21  clarification letter from a documentation
22  standpoint.  As I recall, on that Friday, there
23  was still, you know, a lot of -- there was still
24  a lot of concern as to whether Barclays was
25  going to actually finish the deal, actually
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 115

M. Shapiro
1
2  close the deal, you know, and I remember there
3  was a lot of discussions happening in Bart's
4  office about what securities they would actually
5  buy, what could we convey to them, you know, in
6  terms of what did we know that we had the right
7  to convey to them.  The size of the balance
8  sheet had been shrinking during the course of
9  the week given the volatility of the market and
10  people blowing Lehman out of positions and
11  valuations coming down.
12          There was this confluence of all
13  different things happening that were changing
14  the nature of the securities that was described
15  in that 70/69 million dollars set of provisions,
16  and so I would say I was in Bart's office during
17  the morning of Friday going through the contract
18  with him and with the lawyers, Tom Roberts, and
19  like walking him through all the provisions and
20  probably --
21   **Q.   The provisions in the clarification**
22  **letter or the APA?**
23   A.   No, the provisions in the APA.
24   **Q.   Okay.**
25   A.   I don't know when the clarification
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 116

M. Shapiro
1
2  letter actually started to be drafted, but at
3  some point on Friday during the day, you know, I
4  don't know if it was maybe sometime in the
5  morning, I think it was determined that Barclays
6  was not going to take -- or, that the securities
7  that were described previously in this APA were
8  not necessarily the same securities that could
9  be conveyed to Barclays given the change in
10  everything that had happened between the night
11  that this contract had been presented to the
12  court and Friday when we were actually showing
13  up in court.
14          So it needed to reflect the actual
15  deal, and as I understood it, there were
16  discussions between Bart and Barclays and other
17  people who worked with Bart -- I was not privy
18  to those discussions directly -- that Barclays
19  would end up taking the repo book that Barclays
20  had been told by the Fed to take over on
21  Wednesday during, you know, during the time
22  right before the Asset Purchase Agreement
23  stalking horse hearing.
24          Barclays again had, to the best of my
25  knowledge, had been told by the Federal Reserve
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 117

M. Shapiro
1
2  Bank and the treasury that they had to take over
3  that repo book which the government had taken
4  over Sunday night.
5   **Q.   Sunday night, the 14th?**
6   A.   Sunday night, the 14th.
7          So, you know, I don't know exactly what
8  transpired that led to that decision ultimately,
9  except surmising that things had changed a lot
10  factually in terms of what securities Lehman
11  Brothers had the right to deliver.
12          And so there was definitely a business
13  understanding, as I understood it when I left
14  the firm to go to the hearing, which was
15  probably -- I probably left around between 3 and
16  4 o'clock to take the subway downtown.
17   **Q.   On Friday?**
18   A.   On Friday to the hearing.
19          Bart was still -- Bart was -- Bart
20  had -- Bart left about the same time and was
21  heading to Weil Gotshal to be prepped for the
22  hearing, and there was an agreement, as I
23  understood it, that they were going to take the
24  assets and liabilities that really were relating
25  to the repo book which had the same, you know,
TSG Reporting - Worldwide   877-702-9580