# A. 25 (B)

Highly Confidential

Page 118

M. Shapiro
1  proportionality to it.
2  **Q.  Same proportion as what?**
3  A.  You had the 70 and the 69, and I think
4  I remember hearing it was something like, you
5  know, 45 and -- 45 in liabilities and maybe 47
6  in assets, something like that.  So when I say
7  proportionality, I meant there was a difference
8  between the liability side and the asset side by
9  between one and two billion dollars.
10  And so I don't remember, until the
11  hearing, I don't remember hearing about the
12  clarification letter.  Like I didn't see it.  I
13  didn't hear about it.  Obviously it was being
14  drafted by the lawyers.  And then Lori Fife in
15  the hearing got up -- I think it was Lori, it
16  was maybe Harvey and Lori, but I think Lori did
17  the specifics of going through what the
18  clarification letter was going to say, what the
19  deal was, as revised, so that everybody
20  understood, could understand, you know, that
21  there had been some changes in the deal and the
22  deal terms from the APA that had been presented
23  as the stalking horse APA, which is not uncommon
24  in these kinds of deals and certainly not

Highly Confidential

Page 119

M. Shapiro
1  uncommon in a deal that had this level of
2  complexity in terms of the -- the securities
3  that were being sold.
4  Does that answer your question?
5  **Q.  Yes, it does, and we were just getting
6  to paragraph 3.3.  I wanted to focus your
7  attention on it, which is an adjustment to the
8  cash amount, a kind of true-up, if you will.  Do
9  you recall focusing on this provision?**
10  A.  Yes, I do.
11  **Q.  Tell me what you remember about that.**
12  A.  I remember that there was some
13  discussion, there was some discussion -- I was
14  involved in some part of this discussion, I just
15  can't remember exactly when or exactly who it
16  was with, but I do remember having some
17  discussion where we talked about the fact that
18  one way to deal with the fact that this $70
19  million was still approximate and people were
20  trying to get their hands on everything was to
21  create a provision that would say, basically,
22  you know, that there would be some sort of a
23  true-up down the road.
24  And when I say true-up, I mean there

Highly Confidential

Page 120

M. Shapiro
1  would be a purchase price adjustment as really
2  outlined here.  And again, I didn't negotiate
3  the terms of this in terms of dollars or how
4  much or exactly how it worked, but I do remember
5  being part of a discussion where we talked about
6  that Lehman Brothers would have the benefit of
7  this provision which would give Lehman Brothers
8  the right up to $750 million in the event that
9  the value of the securities increased before
10  Barclays were to have sold them.
11  Let me refresh my recollection of
12  exactly what this says now.
13  (Document review.)
14  A.  So the concept -- there was really two
15  concepts in this provision.  One was that
16  Barclays would have the sole right to just
17  decide when they wanted to sell any of these
18  securities that they were buying.  So we didn't
19  really control that.  So, unlike a provision
20  where they had to hold it to a point in time,
21  this wasn't that.  They could have turned around
22  and sold this the next day or up to the 12th
23  month anniversary, right?  Or they could have
24  held it.

Highly Confidential

Page 121

M. Shapiro
1  And the concept was whenever they --
2  whenever they did so, they would take, you know,
3  a recognized profit or loss, as determined by
4  the LBI mark as of the date of this contract,
5  and then, in the event that the profits exceeded
6  the losses, the aggregate profits exceeded the
7  losses, then up to the first $500 million, the
8  purchaser had to pay the seller the net amount,
9  and if it was more than the $500 (sic), there
10  was a 50 percent concept with a total cap of
11  750.
12  **Q.  Were you aware that this provision was
13  eliminated in the clarification agreement to
14  which you were just referring?**
15  A.  Yes, I was told that as part of the
16  revised deal that Barclays -- there was
17  obviously, in that last call at the last part of
18  the deal, the last negotiation that Bart had
19  with them, I was told that as part of the give
20  and take of the negotiation, they were taking
21  certain things on that they didn't expect to
22  take on and that they wanted this provision
23  removed, and so I recall it was removed.
24  **Q.  Do you recall what they were taking on**

1          **M. Shapiro**
2   **that they hadn't previously agreed to take on?**
3       A.   I don't specifically remember.  I
4   would have to -- I would have to go back and
5   obviously look at other things, but I don't,
6   sitting here right now, I don't remember
7   exactly.
8       **Q.   Do you know the categories of things**
9   **they were taking on?  Were they securities**
10  **positions?**
11      A.   Well, I remember that they were
12  supposed to get some cash originally in the
13  deal, and I think we dropped the notion that we
14  would be transferring the cash to them.  But I
15  don't remember the specifics.  I would have to
16  spend more time.
17      **Q.   What would you look at to determine**
18  **what they were taking on that was additional?**
19      A.   Well, you would have to go back to --
20  you would have to look at all along the way the
21  negotiations.  This was -- and again, you
22  wouldn't find this all in writing because this
23  was a negotiation going on amongst business
24  people.
25      **Q.   Let me just jump ahead, if you will,**

1          **M. Shapiro**
2   **in the interest of time and there's a lot of**
3   **things in here, and I know that you focused on**
4   **many of them, but maybe we ought to just go**
5   **ahead to Article IX to which you referred a few**
6   **times in your answers concerning this agreement**
7   **and focus on subparagraph (c), which is on page**
8   **35.  And after you tell me what you recall about**
9   **that, in addition to everything you have already**
10  **told me, we'll move on.**
11      A.   Okay.  So what I remember is that this
12  provision was being drafted, as I said earlier,
13  by, you know, a Cleary employee benefits lawyer
14  and a Weil employee benefits lawyer, neither of
15  whom I knew before that day.  And I remember --
16          MR. STERN:  I'll just note that the
17      witness is referring to page 34.
18          THE WITNESS:  Yes, page 34 --
19          MR. CARDEN:  Did I misspeak?
20          MR. STERN:  No, you didn't misspeak,
21      but I think you were directing him to page
22      35.
23      A.   Article IX, Section 9.1, and we were
24  talking now about sometime probably during the
25  afternoon late -- maybe early late morning,

1          M. Shapiro
2   early afternoon of the 16th of September.
3       **Q.   Okay.**
4       A.   These lawyers were drafting this and I
5   remember looking at it.  I remember I was
6   standing with -- I was standing with Paul
7   Parker, who was co-head of M&A, who happened to
8   be in the hallway at that point in time.  These
9   lawyers were sitting kind of in an alcove of the
10  hallway on chairs, and so there were people kind
11  of that were milling about who were not directly
12  reading this or negotiating it, and I remember
13  saying to him, "Let's make sure we get this
14  right.  Can you get Skip?"  Because I want to
15  make sure that we have this right because Skip's
16  one of people who was in that negotiation, to
17  the best of my knowledge.
18          And so Skip came over and I just said,
19  "I want to make sure we get this right.  This is
20  a pretty important provision for everybody.
21  Let's make sure that we have it clear."
22      **Q.   Okay.**
23      A.   And I remember reading it.  I remember
24  going through particularly paragraph --
25  paragraph (c) with the lawyers, especially this

1          M. Shapiro
2   whole reduction provision that dealt with the 10
3   percent.  I think -- I think Barclays' initial
4   position was basically reduce this total comp by
5   anybody who's not staying or who's not offered a
6   contract, or I can't remember exactly, but
7   basically their point was they wanted a
8   reduction.
9           We pushed back and said no reduction.
10  This ultimately came to some kind of a, as you
11  can see here, some kind of a compromise, if you
12  want to call it that, which required both 10
13  percent voluntarily terminated.  And no one
14  knew, obviously, how many people were actually
15  going to go over to Barclays.  It was such an
16  uncertain time, and they didn't certainly make
17  any -- give anybody, other than I think the top
18  eight executives, any assurances of anything
19  through that period.
20          And so we wanted to be sure that we
21  had a provision that, you know, seemed fair.  So
22  that's how this got drafted.
23      **Q.   Do you remember there having been a**
24  **specific number that represented the bonus**
25  **accrual for LBI at this time?**

Highly Confidential

Page 126

M. Shapiro

1
2    A.   No.  The only number I recall was
3    there was a 2 billion total comp number that had
4    been both referred to and that also is
5    referenced, somewhere in here referenced, in I
6    think it's Schedule -- here it is -- reflected
7    on the financial schedule delivered.
8         So there was a 2 billion total comp
9    number which included, as I said, to the best of
10   my recollection, the bonus pool and the
11   severance obligations that they were taking on
12   as part of this, and that number was on that --
13   if you recall the schedule I mentioned that John
14   Grenier was working on -- that number was in
15   that schedule.
16   **Q.   And the schedule that John Grenier was**
17   **working on perhaps starting as early as Sunday**
18   **night, but sometime in that Sunday night, Monday**
19   **morning time period, you said that schedule**
20   **changed over time, correct?**
21   A.   It definitely changed.
22   **Q.   Did the comp number change on that**
23   **schedule?**
24   A.   I don't think the comp number changed
25   much.  I think there was an approximate number

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 127

M. Shapiro

1
2    of 2 billion, from what I remember, about that,
3    and I don't think it changed.  But again, I
4    can't be sure, because I didn't, as I mentioned
5    earlier, I was not privy to that schedule being
6    changed.  I was not sitting around with people
7    as they made changes to that, so I might have
8    seen it like at -- I probably did see it at a
9    point, and I might have seen it at another
10   point, and I probably saw it at the end.
11   What -- the sausage-making, what actually
12   happened, I doubt I saw everything.
13   **Q.   I'm going to show you what has been**
14   **marked as Exhibit 19.  That's the schedule to**
15   **which you are referring, is it not?**
16   A.   Yes.
17   **Q.   Okay.  And this is the schedule that's**
18   **referred to in subparagraph 9(c) of Article IX,**
19   **right?**
20   A.   It looks like it to me.  It has
21   Berkenfeld's initials on it and I do remember
22   that he initialed the final one.
23   **Q.   Were you there when he initialed it?**
24   A.   I believe I was, yeah.
25   **Q.   Where did that happen?**

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 128

M. Shapiro

1
2    A.   On the 32nd floor.
3    **Q.   Did it happen in a conference room**
4    **with -- tell me where it happened on the 32nd**
5    **floor.**
6    A.   I think it happened in the conference
7    room, but I'm not positive.  I mean, I -- we
8    were all -- it was late.  It was probably around
9    between 10 and 10:30 at night, and I just
10   remember thinking to myself -- on the, sorry, on
11   the night of the 16th, you know, somewhere
12   between 8:30 and 10:30 at night, and I just
13   remember thinking to myself, I hope they don't
14   ask me to sign this thing because, you know, you
15   know, and Steve obviously was an authorized
16   signatory and he was the one who was asked to
17   sign it.
18   **Q.   Do you know why it was him as opposed**
19   **to someone else?**
20   A.   I do not know.
21   **Q.   Was there any discussion about this**
22   **document when it was initialed by Steve?**
23   A.   Not that I'm aware of.  Not that I
24   recall.
25   **Q.   Were there Barclays people in the**

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 129

M. Shapiro

1
2    **room?**
3    A.   When he signed it?
4    **Q.   Yes.**
5    A.   There were lawyers, I believe, but I
6    don't know for sure who was there.
7    **Q.   To what use was this document to be**
8    **put, if any, in addition to being referenced in**
9    **paragraph 9(c)?**
10   A.   Right, well, as I said earlier, I
11   think this piece of paper ultimately was being
12   used through the course of the discussions
13   between Sunday night, really Monday morning,
14   let's call it, and Tuesday night, as trying to
15   capture what assets and liabilities were being
16   conveyed, right?
17        And so I think that you would, if you
18   had all the different versions of this, you
19   would find that probably all these numbers were
20   changing.  As they were giving -- as they were
21   giving people new information, both sides of
22   this was changing in terms of the, let's call it
23   the upper part of this, the securities that are
24   described and the liabilities that are described
25   outside of the cure payment and the comp

TSG Reporting - Worldwide    877-702-9580

Page 130

M. Shapiro

1  numbers.
2       I don't think that those changed, to
3  the best of my recollection, from maybe the
4  first one I saw to this one, but certainly these
5  numbers changed, and I think -- I think we
6  started with higher numbers in terms of
7  aggregate numbers that were just bigger.  And
8  then as the course of the week, those two days
9  went on, it got a bit smaller.  That's the best
10  I remember.
11      **Q.   You testified previously about the**
12  **definition of "purchased assets" and, in**
13  **particular, the 70, approximately $70 billion in**
14  **assets being purchased by Barclays, correct?**
15      A.   Yes.
16      **Q.   That $70 billion number does not**
17  **appear to be on Exhibit 19, do you agree with**
18  **that?**
19      A.   No, I would say that that was
20  intended -- again, I wasn't the draftsperson of
21  the contract, so I can't speak to it, but I
22  think because they used the word
23  "approximately" -- you have to remember that you
24  had lawyers working on the document, right?

Page 131

M. Shapiro

1  Reasonably quickly, and lots of them.
2       But, you know, you had Mike, who was
3  the principal draftsperson, with a few other
4  people, you had someone on the Cleary side and
5  maybe some other lawyers involved, and then you
6  had people who were working on this, which was
7  separated from the lawyers.
8      **Q.   "This" meaning Exhibit 19?**
9      A.   Yeah.  And when I say "this," I don't
10  really mean so much the exhibit itself as I mean
11  the information that was going into this
12  exhibit.
13      So what I would say is that the
14  approximately $70 billion number was intended to
15  reflect the fact that ultimately people were
16  talking about, at the time of Tuesday, again
17  this all changed later, that there was this
18  amount of assets that we believed we could
19  convey to them.
20      **Q.   Which is 72.?**
21      A.   65.
22      **Q.   65?**
23      A.   And that there was this amount of
24  liabilities that they were prepared to assume as

Page 132

M. Shapiro

1  of this date.
2      **Q.   Which is 68.4?**
3      A.   Which is 68.4 in financing obligations
4  that they were taking on associated with those
5  securities up to -- under this schedule it says
6  2.25 cure payments and up to $2 billion of comp.
7      **Q.   Do you have any explanation for me as**
8  **to why this schedule, which is referred to in**
9  **the APA in paragraph 9(c), has different numbers**
10  **than the quantum of purchased assets and assumed**
11  **liabilities in the same document?**
12      A.   Well, I would say it's not very
13  different if you look at, you know,
14  approximately 70 billion versus 72.65 billion
15  and approximately -- and 68.4 billion versus
16  approximately 69 billion, in my mind, in the
17  context of this transaction are not materially
18  didn't.
19      **Q.   Okay.  You don't recall any discussion**
20  **about that differential at all?**
21      A.   Do not recall any discussion at all.
22      **Q.   Did you have any conversation with**
23  **anyone about the, you know, the residential**
24  **mortgage assets as being included or not**

Page 133

M. Shapiro

1  **included in the deal?**
2      A.   There was discussion -- yeah, there
3  was definitely like sometimes there was -- at
4  one point they were in.  At one point they were
5  not in.  At one point it was 50 percent in.  I
6  really -- that really was not something that I
7  was involved in.
8       I was aware of it as it was happening,
9  but I didn't participate in it.  I would say
10  that Shafir and Bart were probably two of the
11  people closest to that, this discussion.
12      **Q.   Did you ever have a conversation with**
13  **anyone as to whether or not Exhibit 19 should be**
14  **attached to the APA when it was presented?**
15      A.   No, no discussion about whether it
16  should be attached, no.
17      **Q.   Is it your view that paragraph 9(c) in**
18  **referring to the schedule -- strike that.  Do**
19  **you have any explanation for why it wasn't**
20  **attached to the APA?**
21      A.   I think it wasn't intended to actually
22  be part of the contract.  I think if you have a
23  contract that's going to be -- to have a
24  schedule that says, like this schedule, make

M. Shapiro
1
2   this part of the contract, right, I think that
3   because of the -- because of the timing of
4   everything and the information flow and how this
5   was all coming together, the people who were
6   putting this together, as I said before, were,
7   you know, were not sitting in the drafting room
8   while the lawyers were drafting.
9       So the lawyers took, you know, what I
10  would say is a reasonable approach, which was to
11  say approximately 70, and this schedule, which
12  was the -- which was the business people's
13  attempt to reflect what they were trying to
14  agree, to reflects 72.56 and 68.5, which in my
15  mind at the time certainly reflected the
16  approximate numbers that were in the contract.
17      Q.   Do you know whether or not the reason
18  there is any differential at all has anything to
19  do with the residential mortgage positions?
20      A.   I don't know.
21      Q.   Let's go back and pick something up
22  about which you have testified previously.
23          MR. CARDEN:  Let's mark this as
24  Exhibit 56A.
25          (Exhibit 56A, Agreement, marked for

M. Shapiro
1
2   identification, as of this date.)
3       Q.   I want to point out that your name is
4   not on this document, so if you're looking in
5   vein for it, you won't --
6       A.   I was looking for it.
7       Q.   It's not here, at least not that I've
8   seen.
9       A.   I don't even think I was --
10      Q.   My question simply is, have you seen
11  any portion of this document?  Including the top
12  page, but my focus really is on the following
13  pages.
14      A.   The answer is no, I have not ever seen
15  this document.
16      Q.   And this is not the PowerPoint to
17  which you were referring that was used in the
18  meeting on Monday morning?
19      A.   Let me just look at it.
20          (Document review.)
21      A.   No, this is not the document, nor have
22  I ever seen this document.
23      Q.   Okay.  Did you have anything at all to
24  do with the Repurchase Agreement that first the
25  Fed had had -- start with that.

M. Shapiro
1
2       Did you have anything to the Fed repo
3   agreement?
4       A.   What do you mean by "anything to do
5   with"?
6       Q.   Did you have any discussions with
7   anybody concerning -- strike that.  Did you have
8   any discussions with anybody about the
9   assumption of the Fed repo agreement by
10  Barclays?
11      A.   Yes.
12      Q.   With whom?
13      A.   Well, it really starts with the
14  assumption of the JPMorgan repo agreement by the
15  Fed.  So, as I understand it, I was told -- I
16  was told on Sunday afternoon when it became
17  clear in the late afternoon that Lehman was
18  going to have to file for Chapter 11, once
19  the -- once the government determined that it
20  wasn't going to intercede in any way, that as
21  part of an attempt to insulate the markets from
22  further dislocation beyond what they thought
23  might happen, that the Fed was going to take
24  over the JPMorgan repo book as of Sunday night,
25  and I was told that by I think Tom Russo.

M. Shapiro
1
2       Then I learned from Jim Seery, I think
3   it was on Wednesday, maybe right before the
4   hearing, actually, right before the bankruptcy
5   court hearing that was the stalking horse
6   hearing, I remember him telling me that the Fed
7   had basically told Barclays that if it wanted
8   support for the transaction from the U.S.
9   government, it would have to take over the repo
10  book from the government itself.
11      And so I was not directly involved in
12  anything, I'm just telling you what I remember
13  hearing, so it could be untrue.  But assuming
14  that it's true, that Barclays was told or asked
15  to take over the book from the government and
16  that it did so either late Wednesday night or
17  early Thursday morning from the government.
18      Q.   Were you ever told by anyone that
19  Barclays had canceled the repo agreement with
20  Lehman?
21      A.   At what point in time?
22      Q.   At any point in time.
23      A.   Not that I remember, no.
24      Q.   Do you recall having had any
25  conversations with Martin Kelly in connection

Highly Confidential

Page 138

M. Shapiro

1
2    with your -- I'm going to call it, you know,
3    quarterbacking role?
4        A.   Yeah, I definitely dealt with him.  I
5    don't think I had ever met Martin before this
6    weekend.  I hadn't met a lot of these people
7    before this weekend.  I definitely had some -- I
8    definitely sat down with him once, I think, and
9    went through -- one of the things we were trying
10   to do was to, when Barry Ridings and Lazard was
11   hired on Sunday night, one of the functions that
12   they undertook was to try to understand what
13   securities were being sold and try to understand
14   the value of those securities and also try to
15   understand what those securities might be valued
16   at -- and this was obviously going to be
17   speculative -- if Lehman was not purchased and
18   these securities were going to have to be
19   liquidated in any way.
20         And so one of the things that I think
21   we talked to Martin about was organizing that
22   effort, finding who were the right people and
23   all, that these were obviously different pockets
24   of kinds of securities.  I didn't know most of
25   the people in Fixed Income.  He was around some

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 139

M. Shapiro

1
2    of this stuff, so I remember he was helping
3    organize some of that.  He was clearly someone
4    who was around some of these discussions on the
5    securities.
6         I wouldn't say I had extensive, like,
7    you know, like extensive discussions with him
8    around this stuff, so I do remember coming into
9    contact with him, you know, regularly over the
10   course of a 24-hour period, let's say, but he
11   was really spending a lot of time, as I could
12   see it, at least, with where Bart was asking him
13   to get certain information for Bart, maybe Ian
14   as well, and so he was around the financial side
15   of these securities in terms of information
16   flow.
17       Q.   Could you tell what the difference in
18   role, if any, was between Ian and Martin in
19   connection with that effort?
20       A.   I couldn't tell you, no.
21       Q.   Were you ever present when Martin was
22   speaking to Bart about the securities that were
23   being considered for sale?
24       A.   I probably was, but I don't really
25   have any specific recollection of exactly what

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 140

M. Shapiro

1
2    he would have said.
3        Q.   And do you remember any conversations
4    with Martin concerning how those securities were
5    being valued?
6        A.   No.  Not specifically, no.
7        Q.   Are you aware --
8        A.   No, I don't remember specifically that
9    I had such conversations.
10       Q.   Did you ever have any conversations
11   with Martin about valuing those securities on
12   any basis other than Lehman's marks?
13       A.   No.  No.
14       Q.   Did you ever have any conversations
15   with anyone concerning whether or not the value
16   of those securities had been discounted off of
17   Lehman's marks in the sale to Barclays?
18       A.   No, no discussion that I ever heard
19   about a discount.
20       Q.   Are you, as you sit here today, are
21   you aware of whether a discount was given to
22   Barclays in the sale of those securities?
23       A.   I'm not aware that there was a
24   discount.  The only, again, the only awareness
25   of the difference between the marks that were on

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 141

M. Shapiro

1
2    the securities that were (A) first described in
3    the contract and then ultimately were in the
4    repo book, which was reflected in the -- I think
5    the testimony that Bart gave at the hearing as
6    well as Lori Fife's description to the court,
7    was that there was a differential between the
8    marked value of the securities that were to be
9    transferred and the liabilities associated with
10   those securities that were assumed by Barclays,
11   where there was let's call it somewhere between
12   a one and a half and two billion dollar
13   differential which everybody was aware of.
14        How that was ultimately determined
15   might have been, you know, that was obviously
16   something that was -- was not something that I
17   was privy to.
18       Q.   Was your understanding that was the
19   term of the -- the deal terms of the
20   transaction?
21       A.   Yeah, as described both in the court
22   and in the contract, correct.
23          MR. CARDEN:  Let's go off the record
24   for a second.
25          (Recess; Time Noted:  12:08 P.M.)

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 142

1          M. Shapiro
2      (Time Noted: 12:22 P.M.)
3  BY MR. CARDEN:
4      Q.   You testified previously that on,
5  maybe it was Thursday evening or at some point
6  later in the week, that you thought that there
7  was some concern about Barclays going through
8  with the deal, okay?  I don't know what language
9  you used.  Tell me what the -- was there
10 anything that Barclays said to anyone at Lehman
11 that caused that concern, or was it just a
12 general anxiety about wanting to get something
13 done?
14     A.   No, it was really a comment that was
15 made to me by Jim Seery, who said something like
16 there's a big, I think his words were "shit
17 show" going on between JPMorgan and Barclays
18 around the repo and that, you know, JPMorgan was
19 screwing around doing something that Jim
20 characterized, as I said, as something that was
21 not positive, and that, you know, that was
22 putting the deal potentially at risk.  That was,
23 I would say, the nature of what concerned me.
24 So that was it.
25     Q.   I take it that that was related in
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 143

1          M. Shapiro
2  some way to what assets were going to be
3  available to sell to Barclays?
4      A.   No.
5      MR. STERN:  Objection to the form.
6      A.   No, as I understand it, at the time it
7  was really related to this repo that had been
8  taken over and that, you know, not digressing
9  too much, JPMorgan, you know, in my mind, was a
10 bad actor in the entire situation.  And so
11 ranging from the fact that they pulled a lot of
12 liquidity out of the firm before we filed to
13 entering into an agreement to be able to set
14 things off shortly before the filing took place
15 to then, you know, as Jim explained it to me at
16 the time, kind of changing the mix of what was
17 in the repo that Barclays was basically being
18 asked to take over by the Fed.
19     So, as far as I knew at that point in
20 time, in the week, you know, as of Tuesday when
21 we signed the contract and once we went to
22 court, the contract says what it says in terms
23 of the mix of securities and the repo
24 securities, if you want to call them those, had
25 not been -- that was not dealt with until
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 144

1          M. Shapiro
2  Friday, as I understood it.
3      So this was happening really more like
4  Wednesday-ish when this whole repo thing came
5  up, and my understanding was that that could
6  put, you know, a chink in the deal because
7  Barclays was concerned about what was going on.
8  That's -- and that was the nature of the concern
9  that I had, just that particular issue.
10     Q.   Did Jim Seery have something to do
11 with the repo?  Was it part of his
12 responsibility?
13     A.   He knew about stuff.  I don't know
14 what he actually had to do with it.  He was in
15 the loop on certain things, but I don't know
16 what he actually had to do with it.
17     Q.   Did you ever have any conversations
18 with anyone at Lehman as to what collateral was
19 in the repo?
20     A.   In the JPMorgan repo?
21     Q.   No, I'm sorry, in the repo taken over
22 by Barclays?
23     A.   No. Not specifically, no.
24     Q.   Generally?
25     A.   When I say "specifically," I mean, I
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 145

1          M. Shapiro
2  knew there was a repo.  I didn't know what
3  securities were in it.  So if that's the nature
4  of your question, the answer is no.
5      Q.   Did you ever develop an understanding
6  as to how Barclays taking over the repo changed
7  in any way the terms of the transaction
8  memorialized in the APA?
9      A.   Well, I would say my understanding
10 was, at the time, that we had this description
11 in the APA of this call it 70 billion and 69
12 billion of assets/liabilities which related to
13 some pool of securities that were categorized in
14 that schedule that we went through before,
15 Schedule -- that was referenced in --
16     Q.   Exhibit 19 --
17     A.   Exhibit 19.
18     Q.   -- the balance sheet?
19     A.   Exactly.
20     Q.   Initialed by Steve?
21     A.   Right, initialed by Steve.
22     And then, over the course of the week
23 it became more difficult for everybody both on
24 the Lehman side and on the Barclays side to
25 ensure that those securities were actually
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 146

M. Shapiro

1  M. Shapiro
2  saleable because of the amount of securities
3  that had been blown out, had been sold, had been
4  bought, the change in the values.  Everything
5  was happening, you know, in a way that did not
6  lend itself to a very clear understanding,
7  probably on both sides at that point as to
8  exactly what was going to be conveyed.
9      So I think there was some comfort
10  taken that there was a known amount of
11  securities and loan as a result of the repo,
12  right?  So you had a repo, you had a defined
13  group of securities that existed in the repo
14  that was, up until JPMorgan maybe played around
15  with it, I don't know exactly what happened, by
16  Friday presumably -- and again, I was not privy
17  to this so I'm just surmising based on my
18  recollection -- that the principle was that this
19  was a group of securities, the universe of which
20  was identifiable, the liabilities associated
21  with them obviously was identifiable because
22  that was the repo loan, and therefore, you could
23  do a deal on that basis where there was clarity
24  around exactly what was being taken over.
25      That was my understanding of why the

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 147

1  M. Shapiro
2  deal ultimately got modified on Friday, and then
3  that was obviously explained in court and
4  evidenced by, ultimately, that clarification
5  letter that got entered into.
6      Q.   Did you ever speak to Bart McDade
7  about that change?
8      A.   I don't remember.
9      Q.   Going back just a moment to the
10  hearing on Wednesday, were you in court that
11  day?
12      A.   Yes, I was sitting in the audience.
13      Q.   Did you help prepare Bart for that
14  hearing?
15      A.   I did -- I wouldn't call it I helped
16  prepare him.  He actually was with the Weil
17  folks who actually prepared him.  I think I said
18  I think I was in his office a couple of hours
19  before we went down.  I said, "You ever been in
20  bankruptcy court before?"  And he said no, and I
21  said, "Well, let me just give you -- I'll just
22  tell you kind of what it's like."
23      I gave him a few minutes of advice
24  just generally about like what it is and then,
25  you know, how his testimony was probably going

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 148

1  M. Shapiro
2  to get proffered, but he still could end up
3  getting called as a witness, and he -- I don't
4  think he was particularly looking forward to it,
5  but he, you know, he was going to do it.
6      Q.   Okay.  And did you help prepare him on
7  Friday before the hearing on Friday?
8      A.   Not really.  I was in his office
9  before we all went down, a couple of hours
10  before we all went down, but really the Weil
11  folks were going to prepare him.
12      Q.   Let me show you again what has been
13  marked as Exhibit 19 and draw your attention to
14  the cure amount about which you testified
15  previously --
16      A.   Yes.
17      Q.   -- reflected on this schedule as
18  being, as I read it, 2.25 billion.  Do you see
19  that?
20      A.   Yeah, I do see that.
21      Q.   Do you recall what that number ever
22  changing in the course of the week?
23      A.   I don't remember -- I don't really
24  remember how that 2.25 got in there.  I
25  personally have a better recollection of a $1.5

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 149

1  M. Shapiro
2  billion number that we were using for -- and
3  obviously it was an estimate, right?
4      So these were all, at the end of the
5  day, as I explained to you earlier, we were
6  trying to do our best at the time to provide
7  Barclays, principally, with a perspective on
8  what it might cost them to take over all of the
9  contracts that could be subject to the
10  assumption of the assignment.  And so, as I said
11  earlier, we were trying to come up with an
12  estimate of what that number was.
13      My recollection was we -- I used, in
14  my own head, a billion-five, and the reason I
15  remember that is when we were negotiating
16  the breakup fee, we were -- I was thinking
17  about -- and I had negotiated the breakup fee in
18  the transaction relating to the stalking horse
19  bid -- I remember thinking, okay, we can do 3,
20  typically 3 percent of the deal.  Barclays asked
21  for a lot more going in.  They asked -- I think
22  Victor Lewkow told me something like $250
23  million or something like that.  It was big
24  number.  And I told him we weren't going to do
25  that, that in my mind that, you know, there

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 150

M. Shapiro

1 was -- that that could be perceived as, you
2 know, chilling the bidding. I didn't want any
3 perception of anybody feeling that they couldn't
4 make a bid.
5 Obviously, you know, I said that 3
6 percent was a normal -- he was not a bankruptcy
7 lawyer, by the way. So I was -- I wouldn't say
8 I was educating him because he obviously was a
9 smart guy, but I was explaining to him in my
10 experience what an acceptable number would be
11 from the court's perspective, and at the time my
12 recollection is we were looking at $250 million
13 for goodwill, it was around a million to a
14 million-450 for the buildings, which ultimately,
15 you know, that was our estimate, we didn't have
16 our desktop appraisals yet --
17 MR. STERN: Billion.
18 A. Billion, yeah, sorry.
19 1.45 billion. That was a
20 billion-seven. We added this estimate for cure
21 costs of a billion and a half, that got us to
22 3.2 billion, and we told them that the $100
23 million breakup fee would be approximately 3
24 percent and that's what we would be willing to

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 151

M. Shapiro

1 do, plus some expense reimbursement, I think
2 maybe 25 million.
3 Q. And that's in your negotiation with
4 Barclays?
5 A. That's in my negotiation Cleary on
6 behalf of Barclays, correct.
7 Q. Right?
8 A. And so in using the number -- I
9 remember that the billion-five was a number we
10 used from a cure standpoint, and that was how we
11 got as part of the arrival of what, you know,
12 what a $100 million number would be, you know,
13 viewed as. And so at the time that seemed, you
14 know, as a fair number given the kind of
15 transaction we were with entering into and not,
16 not unusual in size in a large transaction.
17 You know, I worked on the Time Warner
18 transaction. We advised Time Warner around
19 Adelphia and we had something like 2 percent of
20 an 18 to 20 billion dollar transaction. So this
21 was not nearly as large on the scale of things.
22 So $100 million felt like we could
23 pass muster with the court, with the committee,
24 felt like a fair number, and I remember

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 152

M. Shapiro

1 negotiating that very -- in a very difficult
2 conversation with Victor where he was, you know,
3 telling me it couldn't be that low and had to be
4 higher, and I basically told him we weren't
5 going to do that.
6 Q. When was this conversation?
7 A. In the middle of the night on the
8 15th/16th.
9 Q. Did he explain why he thought it was
10 important for that number to be so much higher?
11 A. Yeah. Buyers always want higher
12 numbers because it keeps -- it gives them a
13 natural advantage over any other bidder, of
14 course.
15 Q. Was there anyone else they thought
16 might come in and bid?
17 A. I don't know what was in their minds,
18 but --
19 Q. What was in your mind? Did you think
20 someone else could come in?
21 A. I didn't think that was likely. I
22 thought that, you know, and I think this is part
23 of my discussion with him, I said that, you
24 know, that the firm had been shopped all summer

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 153

M. Shapiro

1 and we didn't have a buyer. Obviously, Bank of
2 America, who was the other bidder, had just
3 announced their deal with Merrill Lynch so they
4 were out of the picture.
5 The world felt like it was in a state
6 of virtual collapse. AIG was going down at the
7 same time as we were, or potentially going down,
8 I should say, since they got rescued, but we
9 didn't. And I told him that I didn't, you know,
10 as far as I was concerned, I didn't see, you
11 know, I said, kind of look around you. Do you
12 see any other people doing a deal with someone
13 else? I mean, you're here, we're here. I think
14 that we need to, most importantly, put, you
15 know, a number on the table for the court that's
16 a fair number that would still provide you
17 compensation if you did get topped, but not some
18 number that would not be acceptable to people.
19 Q. Now, in that conversation on late
20 Monday night or early Tuesday morning, you say
21 you used a number for cure of 1.5?
22 A. Yes. My recollection for the purposes
23 of calculating this $100 million.
24 Q. I understand. Do you have any

TSG Reporting - Worldwide    877-702-9580

1        M. Shapiro
2   recollection where you got that number and why
3   it's different than number that's in Exhibit 19?
4       A.   The only recollection I have is that,
5   as I said, I had asked people to go back and get
6   me a proxy for what that month, you know, call
7   it snapshot of a monthly payables number would
8   be off of let's call them trade payables, which
9   would really cover contracts that you're paying
10  under, excluding employee liabilities and things
11  like that.
12       Somebody probably in my team who was
13  tasked with that -- it could have been George
14  Mack, it could have been somebody else, Dan
15  Flores -- I'm sure came back to me and said, I'm
16  being told that rough cut around a billion-five,
17  but it was a true estimate, we never told
18  Barclays it was anything other than an estimate,
19  and we told them it could be higher, it could be
20  lower.  And it was, at the end of the day, it
21  was always going to be based on what contracts
22  they ultimately assumed.  So, you know, which we
23  didn't have any clear view on other than the
24  fact that we thought they were going to need a
25  good chunk of the contracts to operate the firm.

1        M. Shapiro
2       Q.   Just so I'm clear, I understand what
3   the number was and where you got it and the
4   like, but do you have any explanation for why
5   it's different -- the 1.5 you used is different
6   than the 2.25 in Exhibit 19?
7       A.   No, I don't know why they're
8   different, no.
9       Q.   Now, when you did your -- when you had
10  your conversation with the Cleary gentleman, Mr.
11  Lewkow, did you include in the calculation --
12  strike that.
13       When you had your conversation with
14  Victor Lewkow about the breakup fee, you did not
15  include the comp number for purposes of
16  calculating the breakup fee, did you?
17       A.   No, I didn't.
18       Q.   And why is that?
19       A.   I guess it was a judgment call on my
20  part, but an argument certainly could have been
21  made, if I had included it as part of it, that
22  those were funds that were going solely to
23  employees as opposed to, when you think of a
24  cure payment, that's clearly going -- that's,
25  you know, there's a clear benefit to the estate

1        M. Shapiro
2   of picking up cure payments for two reasons:
3   One is that sometimes the estate can be asked to
4   pick them up as part of the assumption
5   assignment, which I didn't want to have happen,
6   and two is that, to the extent that they were --
7   Barclays was going to take contracts, that was
8   eliminating claims from the estate which
9   otherwise would have arisen under those
10  contracts being rejected.
11       So there's a good reason why.  And
12  certainly I remember Mr. Despains, Luc Despains,
13  at the hearing argued about whether or not that
14  was appropriate to include as part of the, let's
15  call it -- but it's not uncommon, and I think
16  people in the profession would agree that it's
17  not uncommon for designated assumed liabilities
18  to be included as part of the purchase price.
19       It was my judgment that the comp pool,
20  because it was solely for employees, because an
21  argument certainly would have been made probably
22  that, you know, employees -- that Lehman's
23  obligation to pay employees, you know, was that
24  a legal obligation that, you know, a lot of it
25  was bonus or severance that who knows whether it

1        M. Shapiro
2   ultimately would have been permitted to be paid
3   if it had actually been argued.
4       So rather than getting into that
5   argument, I'm a reasonably practical person, in
6   my judgment and experience of 20 years of doing
7   this, it was less complicated to leave it out.
8   And all it would have done was add to the
9   number, which I wasn't trying to do.  I was
10  trying to keep it to a number that I felt was a
11  reasonable number that people could find
12  acceptable.
13       Q.   And I take it Mr. Lewkow didn't add it
14  in to get to a bigger number either?  He didn't
15  try to add it in?
16       A.   No.  No.  He just wanted a bigger
17  number per se, truthfully.  He didn't really
18  care how I was calculating it.  He just wanted a
19  bigger number.
20       And we had a pretty vociferous
21  argument in the middle of the night, and I just
22  remember pushing back very hard on him and
23  basically telling him that he should be focused
24  on getting the deal done as opposed to worrying
25  about a topping bid.

Highly Confidential

Page 158

M. Shapiro

1
2    (Exhibit 57A, a document bearing Bates
3    Nos. 10296233 through 10299664, marked for
4    identification, as of this date.)
5    Q.    Show me what has been marked as
6    Exhibit 57A, Mr. Shapiro. I will tell you that
7    the top e-mail sliver doesn't have your name,
8    but if you look right below, there's one below
9    it that does.
10   A.    Okay.
11   Q.    And it's my earnest and heartfelt
12   belief that the document that is page 2 is what
13   was attached to this e-mail.
14   A.    Okay.
15   Q.    But I could be wrong.
16   A.    Okay.
17   Q.    So let me ask you this way: Have you
18   ever seen Exhibit 57A before?
19       MR. STERN:  I'll just note that the
20   Bates numbers are not sequential. I'll just
21   note that for the record.
22   Q.    Have you ever seen page 2 of Exhibit
23   57A?
24   A.    Only in preparation for this
25   deposition.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 159

M. Shapiro

1
2    Q.    You have no recollection of having
3    seen it before?
4    A.    None.
5    Q.    Do you know for a fact that you
6    didn't?
7    A.    I don't know for a fact that I didn't,
8    but I don't have any recollection of it, and I
9    don't know who Julie Barboza is.
10   Q.    Okay.
11   A.    I suspect, just, you know, by way of
12   background, that I was copied on a lot of things
13   I think during those two days because people
14   thought I was one of the key people around it,
15   and I was not able to read my e-mails, as you
16   can imagine, every minute of the day going
17   through a 48-hour negotiation.
18       So is it possible that I saw it?  It's
19   possible.  I don't remember it and I don't know
20   who she is.
21   Q.    Okay.  I take it, since you don't
22   recall having seen it, that you can't explain
23   the way this document's set up in terms of its
24   numbers.  It goes from 1, 4, 7 and 5?
25   A.    No idea.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 160

M. Shapiro

1
2    Q.    There's nothing in your experience
3    that helps illuminate why that would be the
4    case?
5    A.    I have no idea, no.  Nothing in my
6    experience, other than that she doesn't know how
7    to number.
8    Q.    Well, if you haven't seen this, no
9    sense pushing it around.  Okay.  Thank you for
10   that.
11       I show you what has been marked
12   Exhibit 22, Mr. Shapiro.  Have you ever seen
13   this document before?
14   A.    No.
15   Q.    I draw your attention to page 95 under
16   the --
17   A.    I just want to see what this document
18   actually is.
19   Q.    Take your time.
20   A.    I presume that this is the annual
21   report as published by Barclays.
22   Q.    I have no more information than you do
23   in looking at the document --
24   A.    Okay.
25   Q.    -- on its face.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 161

M. Shapiro

1
2    A.    Okay.  I have never read it.  I
3    presume Results Announcement is their equivalent
4    of an annual report.
5    Q.    I can only offering you the following
6    modest benefit.  I didn't write it and so it is
7    what it -- it is what it is based on the review
8    of the document.
9    A.    Okay.
10   Q.    But right now I'm only directing your
11   attention to page 95 of Exhibit 22?
12   A.    Okay.
13   Q.    You've already told me you have not it
14   before, right?
15   A.    No, I have not seen this.
16   Q.    I want to draw your attention to the
17   penultimate paragraph on that page, which is a
18   one-line paragraph.  "The excess of the fair
19   value of net assets acquired over consideration
20   paid resulted in 2,262,000 of gains on
21   acquisition."  See that?
22   A.    I do see the sentence, correct.
23       MR. STERN:  I think you should read
24   the whole section.
25       MR. CARDEN:  I apologize.  Actually, I

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 162

```
 1            M. Shapiro
 2   think Jack is absolutely correct about that.
 3      Q.   Why don't you just take a moment and
 4   read this section under "Acquisitions."
 5      A.   Okay.
 6      Q.   Okay.  I may have misspoken before,
 7   but let me just rephrase the question.
 8           Directing your attention to the
 9   penultimate paragraph that says, "The excess of
10   the fair value of net assets acquired over
11   consideration paid resulted in a 2,262 million
12   pound -- million pounds of gains on
13   acquisition."  Do you see that?
14      A.   Yes, I do see that.
15      Q.   Okay.  Let's say it simpler because
16   it's better to say billion.  It's easier to say
17   billion.
18      A.   I understand what you're saying.
19      Q.   It's 2,262 million of pounds, which is
20   awkward.  So you see the paragraph that states
21   that Barclays realized a gain on the
22   Lehman/Barclays transaction of $1.262 billion,
23   do you see that, sir?
24      A.   I do see that, yes.
25      Q.   Pounds.  My mistake.  I'm sorry.
```

Highly Confidential

Page 163

```
 1            M. Shapiro
 2           Do you see the paragraph that states
 3   that Barclays realized a 2.262 billion pound
 4   gain on the Lehman/Barclays transaction?
 5      A.   I do see the sentence that says that.
 6      Q.   Based upon your involvement in the
 7   negotiation between Lehman Brothers and
 8   Barclays, is that consistent with what you
 9   understand to be the transaction?
10      A.   I have no idea how this relates to the
11   transaction.
12           MR. CARDEN:  Okay.  I'm going to
13   take -- I'm going to stand down to my
14   colleagues now.
15           (Discussion off the record.)
16           (Luncheon recess; Time Noted:  12:48
17   P.M.)
18
19
20
21
22
23
24
25
```

Highly Confidential

Page 164

```
 1            M. Shapiro
 2           AFTERNOON SESSION
 3           (Time Noted:  1:27 P.M.)
 4   MARK J. SHAPIRO, resumed and
 5      testified further as follows:
 6   EXAMINATION BY (Cont'd.)
 7   MR. CARDEN:
 8      Q.   I just have what I think will be a
 9   short series of questions, and then I'm going to
10   pass you off to some of my friends down here at
11   the end of the table.
12           You went to the hearing on Friday?
13      A.   Correct.
14      Q.   Which lasted late into the evening?
15      A.   Until about 1 A.M.
16      Q.   You stayed the entire time?
17      A.   Correct.
18      Q.   Did you report to Lehman on Saturday?
19      A.   No, I did not.
20      Q.   Sunday?
21      A.   When you say "report"?
22      Q.   Well, did you go to the building on
23   Saturday?
24      A.   No, I went to California, actually.
25      Q.   Okay.  Did you go on business?
```

Highly Confidential

Page 165

```
 1            M. Shapiro
 2      A.   No, I was -- my first cousin's
 3   daughter was getting bat mitzvahed in San
 4   Francisco and I had promised her I would be
 5   there and so I -- the hearing ended at 1 A.M.  I
 6   got home in to Connecticut about 2:30, showered,
 7   shaved, took about a 15-minute nap, and then got
 8   in my car and drove to JFK and got on the 6 A.M.
 9   flight to San Francisco.
10      Q.   Somebody should have put you in a car
11   instead of having you drive your own.
12           When did you come back from
13   California?
14      A.   I wasn't sure who I was employed by at
15   that point.
16      Q.   When did come back from California?
17      A.   Late Sunday night.
18      Q.   Arriving Monday morning, or
19   arriving --
20      A.   No, we arrived I believe on Sunday
21   night.
22      Q.   Did you go into the office on Sunday?
23      A.   Yes.
24      Q.   Did you have any responsibilities of
25   any kind related to what I'll call closing the
```

Highly Confidential

Page 166

1          **M. Shapiro**
2   **transaction that day?**
3       A.   No.
4       **Q.   What did you do that day at work?**
5       A.   I spoke to Jim Seery a little bit
6   about, you know -- the transaction had been
7   announced as closed I think at opening of the
8   morning.  There were a lot of people
9   congratulating me, truthfully, about getting it
10  done and wanting to hear what happened.  And so
11  there was a fair amount of like relief,
12  generally relief, I guess, and we had a whole --
13  I mean, one of the things that, in the meantime,
14  I have a business to run and so we had a lot of
15  clients who we were trying to make sure we
16  preserved the relationship with as we brought
17  them from Lehman to Barclays.  And as you
18  probably know, part of the deal was that
19  engagements would be transferred over.
20          And that was a process.  You had to
21  get the client's approval, et cetera.  So we
22  were in -- I was getting my team to focus on
23  let's make sure that we bring everybody along.
24  We actually kept every single mandate we had at
25  Lehman over to Barclays, with the exception of

Highly Confidential

Page 167

1          M. Shapiro
2   one that we had basically had to give up during
3   the weekend, but other than that -- during the
4   weekend when they needed to have somebody around
5   it.
6          But so I'd say I spent that better
7   part of that day and obviously just dealing with
8   the aftermath, but not in terms of like the
9   documentation or the deal.
10      **Q.   Did you have any responsibilities**
11  **concerning the collateral, the valuation of the**
12  **collateral, the transfer of the collateral,**
13  **anything at all concerning what I'll call the,**
14  **you know, finalizing the transaction?**
15      A.   No.
16      **Q.   So your labors were done as of Friday?**
17      A.   Yeah.  My view was, as of Monday, I
18  was figuring out -- my wife had complained to me
19  all week that I was the only person at Lehman
20  Brothers not looking for a new job, and so
21  since -- I told her I had a responsibility to,
22  if we could get this deal done with somebody, to
23  help complete it.  I felt I had done that and I
24  was at that point going to figure out what I was
25  going to do next.  So I would say I was spending

Highly Confidential

Page 168

1          M. Shapiro
2   some of my time talking to -- talking to people,
3   including an offer made from your own firm.
4       **Q.   All right.  And you signed -- I'm**
5   **sorry, when did you receive the offer letter**
6   **that's been marked as 55A?  It's dated September**
7   **25, 2008.**
8       A.   I think around that date.  That's my
9   recollection.  I had been -- you know, as soon
10  as we came over, of course, everybody was saying
11  like what's happening.  And I have, you know, I
12  had 12, 13 people working for me.  I felt
13  responsibility for them, you know, in terms of
14  what was going to happen next.  So I was trying
15  to figure out what to do.
16          I had gotten a lot of, while the week
17  was going on, e-mails and voice mails from
18  people offering me or saying, you know, when
19  this all finishes up, let's talk, you know, what
20  are you going to do next.  Corinne Ball, as I
21  indicated, your partner left me a long message
22  saying you won't have to skip a day, you could
23  be a partner here tomorrow, just call me back,
24  please.  And there were other people like that
25  who had very kind messages.

Highly Confidential

Page 169

1          M. Shapiro
2          And so I basically was trying to
3   figure out what to do.  I didn't really know
4   anything about Barclays at all.  Literally, I
5   didn't know a single person at Barclays, had
6   never dealt with Barclays, didn't really know
7   what this would mean for me in terms of, you
8   know, my area that, you know, that I do business
9   in and whether in fact it would be an effective
10  platform to do business in it.
11          And so it was a combination of me
12  figuring out is it a place that I wanted to go
13  to, how were they going to fairly compensate me,
14  would I be able to have my group, my title, what
15  was the -- what was the deal going to be in
16  terms of advisory and financing, would we have
17  access to balance sheet.  I mean, all of those
18  questions in my mind, and then weighing that
19  against other opportunities that people were
20  coming in to me with.
21      **Q.   During this time period, the September**
22  **2008, did you have a personal e-mail address?**
23      A.   I have an AOL account, yes.
24      **Q.   Is there any reason to believe that**
25  **anything related to this transaction, any**

Highly Confidential

Page 170

1        **M. Shapiro**
2    **communications of any kind, resulted in**
3    **communications in your AOL account?**
4        A.   I don't think so, no.  I would be
5    really surprised if I -- I was at the firm
6    pretty much the whole time, and if I wasn't at
7    the firm, I was in bed sleeping for two or three
8    hours a night.  So I would say highly unlikely.
9        **Q.   Okay.  Did you carry a BlackBerry**
10   **during those --**
11       A.   Yes.
12       **Q.   -- weeks?**
13       A.   Yes.
14       **Q.   And is your BlackBerry set up so as to**
15   **receive AOL and the Lehman e-mail?**
16       A.   No, it couldn't.  You can only,
17   because of the firewalls up at investment banks,
18   you can only access -- you can't even access
19   Yahoo or AOL or anything through your BlackBerry
20   or your computer.  You just can't do it.
21       **Q.   Well, we may come to this, but we'll**
22   **want you to take a look at your AOL account and**
23   **see what you've got, but we'll pass that right**
24   **now and I'll deal with your counsel on that.**
25       **You are, by the way, represented by**

Highly Confidential

Page 171

1        **M. Shapiro**
2    **Mr. Stern, correct?**
3        MR. STERN:  Yes.
4        A.   Barclays has employed Mr. Stern as
5    counsel, and he's defending my deposition,
6    correct.
7        **Q.   All right.  That's usually the first**
8    **question somebody asks, but sometimes we like to**
9    **turn things around.**
10       MR. CARDEN:  I'm finished for now.  As
11   the world works, I'll probably come up with
12   some more questions by the time it comes
13   back around to me.
14       THE WITNESS:  Okay.
15   EXAMINATION BY
16   MR. WOOD:
17       **Q.   I'll probably be fairly brief.  Again,**
18   **I'm John Wood from Hughes, Hubbard & Reed.  We**
19   **represent the SIPA Trustee.**
20       **You said earlier that you had a**
21   **conversation in Bart McDade's office on**
22   **September 19; is that correct?**
23       A.   Yes.
24       **Q.   This is a Friday?**
25       A.   Correct.  Yes.

Highly Confidential

Page 172

1        M. Shapiro
2        **Q.   Was anybody else there?**
3        A.   Yeah, there were numerous people
4    there.
5        **Q.   Were they all from Lehman?**
6        A.   And Weil Gotshal.
7        **Q.   Was anybody from Barclays there?**
8        A.   Not that I recall.
9        **Q.   Or representatives from Barclays?**
10   **Might have been people from Cleary.**
11       A.   No, because these were -- I wasn't
12   there all day, obviously.  I was there for a
13   given time, maybe it was an hour, something like
14   that, and these were discussions around -- these
15   were Lehman-only, Lehman discussions
16   about different aspects of the deal that we were
17   chatting about.  So, no, it wasn't in
18   negotiation with Barclays.
19       **Q.   Did you have any conversations with**
20   **Barclays or their representatives that day?**
21       A.   That day?  I just don't remember.
22       **Q.   Going --**
23       A.   I mean, it's possible I did because, I
24   mean, people were all talking about lots of
25   different things, you know, throughout so you

Highly Confidential

Page 173

1        M. Shapiro
2    might run into someone who --
3        **Q.   I'm not talking about in the hallway**
4    **or passing conversations at the bankruptcy**
5    **court.**
6        A.   I don't remember having any direct
7    discussion on a specific topic as I sit here
8    today with anyone at Barclays on Friday.
9        **Q.   So nothing that you would consider**
10   **negotiations with Barclays?**
11       A.   No, the -- from my vantage point in my
12   role of the negotiations, all of the
13   negotiations took place over that night and day,
14   you know, day, night, day.
15       **Q.   Which night?**
16       A.   Day of the 15th, night of the 15th,
17   day of the 16th into the evening on the 16th.
18   After that, then the next day we really did a
19   Creditor Committee presentation and I lead that
20   presentation of what the deal would look like
21   and we gave information to the Creditors
22   Committee and their counsel.
23       **Q.   Which day was that?**
24       A.   17th before the stalking horse
25   hearing.  So the committee was appointed that

Highly Confidential

Page 174

1          M. Shapiro
2   morning.
3          I think it was either late morning or
4   early afternoon, I just don't remember the time,
5   we met with Houlihan, Milbank, some committee
6   members who were there. It was a huge -- big
7   rooms. I was basically tasked with explaining
8   the deal to them, walking them through it,
9   bringing in people who could help explain any
10  specifics that they had questions about as a
11  follow-up matter. So we did that for a couple
12  of hours.
13         Then we left and they were left
14  obviously to think about everything and do some
15  diligence and then we all ended up in court by 5
16  o'clock.
17     Q.   The deal changed substantially on or
18  around September 19, didn't it?
19     A.   I won't characterize it, but I would
20  say the deal -- the securities that were being
21  conveyed in the deal changed I believe on that
22  date.
23     Q.   And you've already talked about that
24  so I'm going to ask you a different question.
25         Were you involved in any conversations

Highly Confidential

Page 175

1          M. Shapiro
2   on the 19th involving the possibility of adding
3   additional assets to the definition of
4   "purchased assets"?
5     A.   Adding additional assets? Meaning
6   conveying more assets to Barclays?
7     Q.   Conveying more assets from Lehman to
8   Barclays?
9     A.   Not that I recall, no.
10    Q.   Do you recall any conversations about
11  the possibility of including Lehman's margin
12  account at the OCC?
13    A.   No.
14    Q.   Any conversations about including
15  funds from Lehman's margin accounts at any other
16  exchanges?
17    A.   I don't remember having any
18  conversations or even hearing of conversations
19  about margin accounts and exchanges.
20    Q.   Do you remember any conversations
21  about so-called clearance box assets at DTC?
22    A.   No. The only thing that I heard, and
23  I don't know if this was clearance box at DTC,
24  was, you know, was really relating to the
25  JPMorgan repo. I don't know if that has a

Highly Confidential

Page 176

1          M. Shapiro
2   relationship to DTC or not, but not, you know,
3   it wasn't -- the term "clearance box" wasn't the
4   term that was used. It was really a box and but
5   it was around the JPMorgan repo, not -- nothing
6   to do with DTC that I heard about.
7     Q.   I want to show you what's already been
8   marked as Exhibit 25, and this is the signed
9   version of what we referred to as the
10  clarification letter.
11    A.   Okay.
12    Q.   I'm going to show it to you just so
13  you know what I'm talking about here in terms of
14  the term "clearance box assets."
15    A.   Okay.
16    Q.   The term "clearance boxes" is just
17  there in quotation marks at the bottom of page
18  1, about three lines up.
19    A.   Okay. I see what you're talking
20  about.
21    Q.   Do you have any recollection of any
22  conversations about those assets?
23    A.   Not specifically, no. Only as it
24  might relate to something that I heard about
25  JPMorgan doing something and leaving behind in a

Highly Confidential

Page 177

1          M. Shapiro
2   box -- and I didn't really understand it when
3   someone mentioned it to me because I wasn't sure
4   how this all worked -- but leaving behind I
5   think they called them hammers or nails and
6   hammers or something like that. I think they
7   were implying derogatorily about the kinds of
8   securities that JPMorgan was leaving behind and
9   had -- and something about JPMorgan had like
10  left behind for Barclays some crappy securities,
11  essentially.
12    Q.   Do you remember who said that?
13    A.   Jim Seery.
14    Q.   Did he use the term "cats and dogs"?
15    A.   No, he didn't use "cats and dogs." He
16  used more like --
17    Q.   Hammers and nails, you think?
18    A.   It was some term that had metal
19  involved. It was hammers or it was something.
20  A term I had never actually heard before, but
21  obviously a term that may be used in the trade
22  of people who deal in securities.
23    Q.   Do you recall any conversations about
24  whether or not to include these so-called
25  clearance box assets in the deal?

Highly Confidential

Page 178

1           **M. Shapiro**
2       A.    No idea.
3       **Q.    Were you involved in any conversations**
4   **regarding the inclusion of assets from Lehman's**
5   **15c3-3 account in the deal?**
6       A.    I don't know what a 15c3-3 account is
7   and I don't believe I had anything to do with
8   any conversations around whatever that account
9   is.
10      **Q.    If you'll take a look at that same**
11  **exhibit number 25 on page 4, paragraph 8. And**
12  **this is just to see whether this refreshes your**
13  **recollection at all.**
14          **Paragraph 8, little Roman ii, "To the**
15  **extent permitted by applicable law, and as soon**
16  **as practicable, after closing, $769 million of**
17  **securities is held by or on behalf of LBI on the**
18  **date hereof pursuant to Rule 15c3-3 of the**
19  **Securities and Exchange Act" -- I'm sorry, "the**
20  **Securities Exchange Act of 1934." The sentence**
21  **continues, but that's just to see if that**
22  **refreshes your recollection at all.**
23      A.    Not at all, no. The only thing I knew
24  about custody under this paragraph of transfer
25  of customer accounts was, as explained to the
            TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 179

1           M. Shapiro
2   court, which was that the customer accounts were
3   all being transferred because of the SIPA -- by
4   the SIPAC -- by SIPA to Barclays out of the
5   estate.
6           And in fact, I do have one
7   recollection in connection with transferred
8   accounts where the government had told us not to
9   file a bankruptcy for LBI until they felt that
10  all the accounts had actually been successfully
11  moved out of LBI, or whatever the -- whatever
12  entity it was, I think it was LBI -- into
13  Barclays because they didn't want the bankruptcy
14  to interfere with the transfer of those
15  accounts. The only thing I recall about that
16  was that specific fact. It just stuck in my
17  mind at the time.
18      **Q.    And when you say "explained to the**
19  **court," who did that explanation?**
20      A.    During -- I think it was either Harvey
21  or -- Harvey Miller or Lori Fife who explained
22  that the accounts were, you know, consistent
23  with the desires of the SIPA Trustee and the
24  S.E.C., being transferred from out of the
25  broker-dealer to let's call it a safe haven. I
            TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 180

1           M. Shapiro
2   think it was Barclays.
3       **Q.    Was that explanation --**
4       A.    And I actually had a personal interest
5   in it because I had an account at Lehman which
6   had a lot of securities and other things in it,
7   and I wanted -- I obviously wanted to know like
8   where was my -- where are all these securities.
9   I had probably a million dollars in securities
10  held at Lehman and I didn't know where they
11  were. Obviously had some concern about what
12  would happen, and so I was personally interested
13  in like where were these happening.
14          And then very shortly after the deal
15  closed, I remember getting something that said,
16  you know, Barclays, you know, I get a notice in
17  the mail or something and something -- an e-mail
18  or something saying that Barclays now had taken
19  over the account and I should contact so and so.
20  And my broker at Lehman in the interim between
21  the filing and the deal closing had left and
22  gone to UBS, so I didn't even have anyone to
23  call to know what happened.
24      **Q.    That explanation in court by Harvey**
25  **Miller or Lori Fife, do you recall, was that in**
            TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 181

1           **M. Shapiro**
2   **front of Judge Peck while he was --**
3       A.    I think everything was in front of
4   Judge Peck.
5       **Q.    While he was in the courtroom?**
6       A.    Yes. Presumably, yes.
7       **Q.    The reason I'm asking about that, do**
8   **you recall a recess during which attorneys stood**
9   **up and explained the substance of the deal to**
10  **the attendees outside the presence of the judge?**
11      A.    This is on Friday?
12      **Q.    Yes, Friday the 19th.**
13      A.    I remember Lori -- I remember Harvey
14  and, you know, the judge saying something like,
15  you know, I've been told by the attorneys that
16  some changes have been made. Either Mr. Miller
17  is going to explain them or volunteer one of his
18  partners to explain it. I believe Lori Fife got
19  up and then explained the deal.
20          I seem to recall that there might have
21  been a recess at some point after that, I just
22  don't have a specific recollection, and I was
23  not party to it. I was there just sitting in
24  like on the window ledge next to the -- next to
25  where people were -- the witnesses were lined
            TSG Reporting - Worldwide    877-702-9580

1          M. Shapiro
2    up, just observing, basically.
3        Q.    As far as you can recall, though, you
4    stayed during any such recess?
5        A.    I stayed. I didn't leave. Well,
6    actually I did leave the court at one point.
7    I'm trying to remember if this was Friday. No,
8    this was probably on -- I'm trying to remember.
9          At one point someone asked for the
10   real estate appraisals, and I knew who had them,
11   and I can't remember if this was on Wednesday or
12   Friday. So I did leave the court. The only
13   time I left the court was to go find the person
14   who had the real estate appraisals, and I can't
15   remember if that was on that Wednesday or that
16   Friday. But that was the only time I left the
17   court.
18       Q.    I would like to show you what's
19   already been marked as Exhibit 11. And it
20   doesn't appear that you're on this e-mail.
21       A.    Okay.
22       Q.    This is a string of looks like three
23   e-mails. If you look at the one in the middle,
24   the last paragraph there that begins "Weil
25   lawyers"?

1          **M. Shapiro**
2        A.    I'm sorry, where are you looking?
3          MR. STERN: Why don't you read the
4    whole thing just from top to bottom.
5          (Document review.)
6        A.    Okay. I know most of the people who
7    are named in this e-mail, but I've never seen
8    this e-mail before.
9        Q.    I understand that. The paragraph
10   there that says, "Weil lawyers a bit out of
11   whack, but granted timing here not unexpected.
12   They didn't explain the balance sheet changes
13   well, but then a Barclays lawyer came in and
14   gave a much better explanation"?
15       A.    I have no --
16       Q.    Do you recall --
17       A.    I have no idea. First of all, this is
18   a person who had nothing to do with the deal,
19   for absolute sure. I can tell you that. Dan
20   Kamensky was a lawyer who worked for the
21   distressed traders on the fixed income side.
22       Q.    Do you know whether he was in court,
23   though?
24       A.    No idea. He might have been in court
25   because -- he might have been in court only

1          M. Shapiro
2    because he's a lawyer who's a former bankruptcy
3    type who was interested and who worked for the,
4    effectively, the trading guys and the sales guys
5    on the distressed side. So I don't know what
6    kind of information he was trying to ultimately
7    glean from a business perspective, but --
8        Q.    But --
9        A.    So I -- but I don't know what he was
10   trying to get at here, nor he have an official
11   role in anything.
12       Q.    All I'm really interested in is
13   whether you know what this presentation was by a
14   Barclays lawyer.
15       A.    I do not know.
16       Q.    Doesn't sound familiar at all?
17       A.    Well, I believe when they say
18   "Barclays lawyers," the only the lawyers who
19   spoke for Barclays, as far as I recall, were
20   Cleary lawyers. I believe Lindsee Grandfield --
21   I think that's her name -- the bankruptcy
22   lawyer, she definitely at one point got up and
23   spoke or presented something.
24       Q.    And again --
25       A.    Look, there's a transcript for the

1          M. Shapiro
2    hearing, obviously, so I don't -- I don't
3    remember everything that happened. If you
4    showed me the transcript and I read it, I might
5    have a better recollection.
6        Q.    Actually, what I'm really interested
7    in is if there's anything that's not reflected
8    on the transcript. That's why I was asking
9    about that recess.
10         Do you recall whether during any
11   recess a lawyer representing Barclays got up and
12   explained the deal?
13       A.    I do not know.
14       Q.    Did you take any notes during the
15   hearing?
16       A.    I think I did take some notes, yes.
17       Q.    Did you keep those notes?
18       A.    I don't know. I'm not a very
19   organized person, so I would have to -- it's
20   possible they're in some pile. I mean,
21   basically I moved -- I had an office. It's been
22   moved like three times. I didn't really keep --
23   because I actually sit on a desk as opposed to
24   like in an office. So I keep some stuff in the
25   office. It could be still there. It could be

Highly Confidential

Page 186

1          M. Shapiro
2    gone. I would have to spend a lot of time
3    looking.
4          It was, at best, it was a notepad, on
5    a notepad like this, and I think the only notes
6    I took were kind of -- I remember thinking this
7    is a pretty interesting historical moment. This
8    is in the courtroom, by the way, the only notes
9    I took were in the courtroom. And I think I
10   wrote down a few things that Judge Peck said
11   because I just thought that they were going to
12   be quotes that were going to be out there at
13   some point.
14         MR. STERN: We'll see if we can find
15   that.
16   **Q.   Did you have your BlackBerry with you**
17   **in the courtroom?**
18   A.   Yes.
19   **Q.   Did you send --**
20   A.   You couldn't -- I don't -- I can't
21   remember if we could use it or not. Yeah, I
22   think we could use the BlackBerry.
23   **Q.   Mr. Berkenfeld told us that**
24   **technically you were supposed to check it, but a**
25   **lot of people brought them in.**
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 187

1          **M. Shapiro**
2    A.   I think I did use it on occasion,
3    yeah.
4    **Q.   Do you recall sending e-mails?**
5    A.   Yeah, I think I sent a few e-mails.
6    People were e-mailing me saying like, how's it
7    going? What's going on? You know, when are you
8    out of there? And I was kind of just giving
9    people a very short like, yes, you know, it's
10   going to be a few more hours.
11         Everybody obviously who was interested
12   in like has the deal been approved. I would say
13   that was the predominant question I was getting
14   from a few people. I was getting inundated by a
15   couple of people like has the deal been approved
16   yet, and I said, no, we're still here.
17   Obviously the hearing went on from 6 till like 1
18   in the morning and ultimately got approved,
19   so -- but, yeah, I definitely responded on
20   occasion in very short thrift to people who
21   e-mailed me.
22   **Q.   Under the deal as it was described at**
23   **the court on September 19, was Lehman supposed**
24   **to give Barclays any cash?**
25   A.   Under the original agreement, as I
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 188

1          M. Shapiro
2    recall, there was a cash transfer. Under the
3    revised agreement, I don't believe -- again, I'd
4    have to review the agreement again in more
5    detail, but my recollection, my best
6    recollection is that that was changed and there
7    was no cash passing hands from Lehman to
8    Barclays.
9    **Q.   And do you recall how you learned**
10   **about that change?**
11   A.   I think I heard about that change -- I
12   heard about that change during the day on
13   Friday.
14   **Q.   Before court?**
15   A.   Yeah, before -- I think it was in the
16   afternoon I heard about it, and then it was
17   actually the whole deal -- I didn't really have
18   full understanding of the deal because I wasn't,
19   you know, in Bart's office when they were
20   finishing it, as I explained earlier. So I
21   heard what everybody else heard at the time, but
22   I do have a recollection that the -- that there
23   was an elimination of the cash transfer.
24   **Q.   And just to be clear, you think you**
25   **learned about that at that meeting in Bart**
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 189

1          **M. Shapiro**
2    **McDade's office on the 19th?**
3    A.   Again, I'm being a little bit careful
4    because I don't have a precise recollection.
5    I'm trying to give you the best --
6    **Q.   That's okay.**
7    A.   -- kind of sense that I remember. I
8    don't -- if I learned about it, it would have
9    most likely been in Bart's office at some point
10   during that day because that's most likely where
11   it would have come from, is someone -- either
12   Bart or someone working for Bart or Shafir, you
13   know, might have been Shafir. I can't tell you
14   because I don't have a specific recollection.
15   But it would have most likely have been, you
16   know, in one of the meetings that I attended in
17   Bart's office.
18   **Q.   Do you recall who said it?**
19   A.   No. I don't even remember it actually
20   being said. I just have a recollection that I
21   knew before the hearing that the cash piece had
22   been eliminated. I just don't remember where I
23   got it from.
24         MR. STERN: Is this a meeting at which
25   counsel was present?
     TSG Reporting - Worldwide    877-702-9580

Page 190

1    M. Shapiro
2    THE WITNESS: Weil Gotshal was pretty
3  much in Bart's office most of that afternoon
4  because Mike was doing the contract. And so
5  whatever changes were happening, he was
6  sitting there with his computer making
7  changes. Mike --
8    What's his name?
9    MR. STERN: Lubowitz.
10    THE WITNESS: Lubowitz.
11    So counsel would have probably been
12  around.
13    MR. WOOD: Just to make the record
14  clear, I'm not intending to ask about any
15  comments that the lawyers made there.
16    MR. STERN: I think you already asked
17  a question about discussions with counsel,
18  but go ahead.
19    MR. WOOD: By asking about the
20  conversation in Mr. McDade's office.
21    MR. STERN: You're asking about
22  conversations between the client and their
23  counsel. It's your choice as to whether you
24  want to do that.
25    MR. WOOD: Well, when I asked about
TSG Reporting - Worldwide    877-702-9580

Page 191

1    M. Shapiro
2  the meeting earlier, I don't recall the
3  witness -- when I asked about the meeting in
4  Mr. McDade's office, I don't recall the
5  witness saying originally that anyone from
6  Weil was there.
7    THE WITNESS: I think I had said
8  actually earlier in the testimony actually I
9  think I had said that.
10    MR. CARDEN: Anyway, he can't put in
11  anything from that meeting, so I think we
12  can move on.
13    MR. WOOD: He doesn't recall it so we
14  can move on.
15    Q.  Do you remember any presentation to
16  the court -- I'm sorry, do you recall any
17  representations to the court regarding whether
18  or not cash would be included in the deal?
19    A.  I don't remember. When you say
20  "representations to the court," you mean in the
21  form of an oral presentation by someone or what
22  do you mean?
23    Q.  At all.
24    A.  Well, the contract spoke for itself
25  and the motion describing the contract
TSG Reporting - Worldwide    877-702-9580

Page 192

1    M. Shapiro
2  presumably speaks for itself, so whatever they
3  will say was said and whatever was said in the
4  hearing on the record was said, I don't --
5    Q.  Do you recall anything being said --
6    A.  I don't personally.
7    Q.  -- orally?
8    A.  I don't remember anything.
9    Q.  Okay. The clarification letter you
10  have there, Exhibit 25, have you read that
11  before today?
12    A.  Yes, I read it in preparation for the
13  deposition.
14    Q.  Did you read it before then?
15    A.  It's possible that I read it when I
16  got back from California and I asked for a set
17  of documents. I may have -- I may have looked
18  at it, but I don't think I like read it, read it
19  because the deal had been done and I wasn't part
20  of that negotiation and it said clarification
21  letter and I wasn't that interested in it.
22    Q.  Do you recall whether you read it at
23  all over the weekend while you were in
24  California?
25    A.  No, I definitely did not. I had
TSG Reporting - Worldwide    877-702-9580

Page 193

1    M. Shapiro
2  virtually no communication -- I mean, maybe I
3  had minor, but I had almost no communication
4  with anybody from Lehman Brothers over the
5  weekend.
6    MR. WOOD: Okay. I don't have
7    anything else, thanks.
8  EXAMINATION BY
9  MS. TAGGART:
10    Q.  Do you know where Michael Klein is
11  now?
12    A.  Only -- well, the answer is no.
13    Q.  What's the last that you heard where
14  Michael Klein was or might be?
15    A.  I read an article in the paper, when
16  was it, I don't know when it was, months ago
17  that he and Sandy Weil might have been forming
18  some sort of a venture to buy distressed assets
19  or invest in distressed banks or something like
20  that.
21    Q.  Also you talked at the very beginning
22  that when you were setting out to kind of make
23  the deal and put it in some sort of contract
24  form, you had a big -- a structural idea of what
25  that would be.
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 194

1          M. Shapiro
2      **What was your first concept**
3  **structurally about what assets were going to be**
4  **transferred?  Not, obviously, not at a specific**
5  **level but kind of when you're first putting**
6  **together the deal, what was the criterion you**
7  **were looking in what assets might be there?**
8      A.   At the end of the day, it was really
9  what the purchaser was willing to buy as opposed
10  to what I was willing to sell because we didn't
11  have a lot of choices, obviously.  So the
12  structure of the deal had to be tailored to what
13  our buyer or buyers, depending on what we had in
14  hand, and when we started thinking about it, I
15  didn't know it was going to be Barclays.  When I
16  started working on it, I thought it could either
17  be B of A or Barclays, had actually written a
18  short memo to -- an e-mail to Mark Shafir and
19  Tom Russo and Brad Whitman, who's on the M&A
20  team, which was a paragraph or two basically
21  saying that if we couldn't get a deal done with
22  somebody out of court that maybe we could
23  actually effectuate a 363 sale in court with a
24  buyer, either Barclays or BarCap, and I thought
25  we could actually get something done reasonably

Highly Confidential

Page 195

1          M. Shapiro
2  quickly if we had the support of the regulators.
3      And so I would say that sort of
4  general construct was, okay, it's going to be an
5  asset deal of some kind.  Then obviously we need
6  to figure out what assets is your buyer going to
7  buy.  In my simple world, it was buy the
8  buildings, New York, New Jersey, buy whatever
9  securities you're prepared to buy, right?  And
10  that was obviously a decision that Barclays had
11  to make as to what it wanted to buy and Lehman
12  had to make as to what it wanted to sell, which
13  wasn't, obviously, within my pursue; deal with
14  whatever liabilities could be assumed, you know,
15  in terms of the firm's ongoing businesses and
16  how we could create -- get Barclays to pick up
17  the maximum amount of liabilities, because
18  obviously that would limit what the estate was
19  responsible for; deal with the contracts, as we
20  discussed earlier, in terms of assuming the
21  assigned contracts; deal with the -- deal with
22  the employees and how they were going to be
23  treated, because at the end of the day, you
24  know, I don't think Barclays believed that it
25  was buying an empty building.  I think they

Highly Confidential

Page 196

1          M. Shapiro
2  believed they were buying a going concern with
3  people who could function to create a going
4  concern.  This is a business where your human
5  capital walks in and out the door every day, and
6  that's the most important capital you have, is
7  the people.  So we had to figure out how to
8  ensure that we were able to convince people to
9  stick around and not leave while we were getting
10  this done.
11      Those are probably the general
12  categories when I started thinking about this.
13  There were a lot of other assets that Lehman
14  owned, private equity assets, commercial real
15  estate, obviously you had the Europe, you had
16  Asia, and, you know, my view was that, you know,
17  to actually get a transaction accomplished
18  within a reasonable period of time, we needed to
19  keep it as simple as we could because obviously
20  the simpler it's kept the more easily people can
21  understand it.
22      **Q.  Was there a time that you got an**
23  **indication of what Barclays was interested in**
24  **buying as far as the assets?**
25      A.   Yeah, I think, as I indicated earlier,

Highly Confidential

Page 197

1          M. Shapiro
2  at some point Archie Cox and their team said,
3  you know, we want to buy the building, obviously
4  we need the buildings in New Jersey, we're
5  evaluating the securities.  Obviously so they
6  were not committing to what they would or
7  wouldn't buy.  They were doing diligence on
8  that.  There was a whole team of people from
9  Barclays that were on -- I think they were on
10  the 31st floor, from what I remember seeing
11  them, in some offices doing diligence around
12  different securities, but I really wasn't party
13  to that.
14      There was the discussion I mentioned
15  earlier which was more of a generic discussion
16  about having the right to purchase contracts
17  that they could assume and assign, but there was
18  no specificity as to, well, I want this specific
19  contract, I want that specific contract.
20      At some point during the week they
21  clearly had a team of people that were starting
22  to go through that, but that had been an ongoing
23  effort from them since they had 60 days to
24  figure it out.
25      **Q.  How best --**

Highly Confidential

Page 198

1    **M. Shapiro**
2    **I'm sorry.**
3    A.    I'm just thinking.  As you're asking,
4    I'm just thinking about your question.
5        In terms of assets --
6    **Q.    Let's talk about the securities in**
7    **particular.**
8    A.    Sure.
9    **Q.    When did that evaluation of securities**
10   **end so that Barclays had made a decision about**
11   **what securities it wanted to buy?**
12   A.    Well, I would say it was -- it seemed
13   to me that it was an ongoing process that really
14   took place throughout the week because it was
15   not just what Barclays could buy, but what
16   Lehman could convey, right?
17       As I indicated earlier, I was
18   personally very focused on making sure that
19   everyone understood.  You know, there weren't
20   very many people who had ever worked on a
21   bankruptcy deal, and I just wanted people to
22   understand that we could only convey what we had
23   right, title and interest to convey,
24   notwithstanding bankruptcy.
25       And so it was very important that
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 199

1        M. Shapiro
2    everyone make sure that they try to get the
3    facts as right as they could under the
4    circumstances and be able to convey, you know,
5    what we had right, title and interest in, not
6    subject to a lien, et cetera.
7        So, in light of the size of the Lehman
8    Brothers balance sheet, it was taking time to
9    evaluate that from both side's perspective, time
10   in terms of understanding what they were, time
11   in terms of presumably understanding what each
12   side believed the marks to be, et cetera.
13       So that was an ongoing process that
14   did not end when we left court on Wednesday
15   where they were named the stalking horse and
16   they clearly, if we had tried to convey to them
17   securities that we didn't have title to, for
18   example, they could have said, no, we don't have
19   to close.
20       So I believe, you know, the changes
21   that were ultimately made to the contract
22   reflect the fact that the facts had continued to
23   change from Monday to Friday based on what we
24   believed to be a snapshot on call it the middle
25   of the night on Monday.  The contract was
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 200

1        M. Shapiro
2    drafted, as it said, on Tuesday, and then as
3    Wednesday when we were in court, and then over
4    the -- but facts had continued to change,
5    obviously, facts were continuing to change post
6    the hearing, and therefore people ultimately got
7    to a different set of securities that ultimately
8    were conveyed by Friday.
9    **Q.    What, if anything, was decided about**
10   **what securities would be conveyed as of the**
11   **signing of the APA?**
12   A.    I'm not sure I understand your
13   question.
14       MR. STERN:  Objection as to form.
15   **Q.    Well, let's look at it.**
16   A.    Okay.
17   **Q.    It's Exhibit 1, and you can go to page**
18   **6.**
19   A.    I'm sorry, I'm looking at this
20   exhibit.  Is this what you're talking about?
21       MR. STERN:  Let me get Exhibit 1.
22   **Q.    So if you turn to page 6, in**
23   **particular on Purchased Assets, and let's start**
24   **on section D, which starts with government**
25   **securities, commercial paper, corporate debt.**
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 201

1        **M. Shapiro**
2    A.    Yeah.  Okay.  I'm looking at that
3    section.
4    **Q.    Sure.  Go ahead.  Sorry.**
5    **What was your understanding of what**
6    **was being agreed to with Section D?**
7    A.    What it says:  That the purchased
8    assets included government securities,
9    commercial paper, corporate debt, corporate
10   equity, exchange-traded derivatives, short-term
11   agreements that had a book value of
12   approximately 70 billion, and that that group
13   obviously was I'll call it generically described
14   in this provision, let's call it the backing of
15   that, the information from which that was
16   derived obviously was for people who were in the
17   securities area and who at the time were using
18   that sheet that we talked about earlier, that --
19   I forget what the exhibit is.
20   **Q.    19.**
21   A.    Exhibit 91, we were using that as a
22   shorthand way to categorize and put down on a
23   piece of paper what both sides believed were
24   going to be transferred from, you know,
25   theoretically, at that point in time, owned by
    TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 202

1         M. Shapiro
2 Lehman Brothers.
3    Q.   Was it your understanding that there
4 was some sort of bucket of assets that there was
5 an agreement as of the time of the signing of
6 the APA would be transferred?
7         MR. STERN: Objection.
8    Q.   That is being described in subsection
9 D?
10        MR. STERN: Objection to the form.
11   A.   I'm not sure I understand your
12 question.
13   Q.   Is subsection D meant to describe an
14 actual set of securities that is in any way had
15 already been determined as of the signing of the
16 APA?
17   A.   I'm still not -- subsection D
18 describes what both sides believed to be the
19 types, kinds and magnitude of the securities
20 that Barclays, as the buyer, Lehman, as the
21 seller, believed could be conveyed to Barclays
22 under this contract as of -- as of the time we
23 signed it, which was, you know, as I said, about
24 10:30 on that Tuesday night, the 16th.
25   Q.   I guess what I'm trying to get at, I

Highly Confidential

Page 203

1         M. Shapiro
2 understand that things were pretty fluid, and
3 when you were talking about contracts, there's a
4 whole process that's in this contract where
5 you're going to review contracts and evaluate
6 and choose.
7    A.   Right.
8    Q.   But when it comes to the securities,
9 first of all, you're not describing a process of
10 choosing securities in a contract, right?
11   A.   That's correct.
12        MR. STERN: Wait. Wait. Wait. I
13 just want a standing objection to the form.
14   Q.   And was it your understanding there
15 was an agreement that there would be conveyed
16 some bucket of assets that had a value at that
17 date of $70 billion?
18        MR. STERN: Objection to the form.
19 Can you read the question?
20        (Record read.)
21   A.   I can't speak to an agreement as to
22 value. I can only say that I believed the
23 parties intended by this provision D that
24 this -- these categories of securities, meaning
25 government securities, commercial paper, et

Highly Confidential

Page 204

1         M. Shapiro
2 cetera, as described in Exhibit D, which I
3 believe Lehman had a book value with respect to
4 such securities of $70 billion as of that night,
5 that that's what the parties agreed were the --
6 were the securities to be transferred on the
7 asset side.
8    Q.   Well, were there actually securities
9 that had been agreed as of the signing of the
10 APA to be transferred?
11        MR. STERN: Objection to the form.
12   A.   When you say "were there securities,"
13 I'm not sure what you mean by that.
14   Q.   I'm trying to find out what's -- I
15 think you mentioned, I was trying to check my
16 notes, that when you were drafting, you were
17 trying to make sure that it really delineated
18 what was agreed to?
19   A.   Yes.
20        MR. STERN: That's the question?
21   A.   Your question was were we trying to
22 accurately reflect what was agreed?
23   Q.   Yes. Sure.
24   A.   I would hope we were trying, yeah.
25   Q.   So I understand that this describes

Highly Confidential

Page 205

1         M. Shapiro
2 some things, and I want to find out in what way
3 you think you're describing. First of all, were
4 there at the time of the signing of the APA
5 actual securities, a bucket of securities that
6 are being described by subsection D?
7         MR. STERN: Objection to the form, but
8 you can answer.
9    A.   I can only state what I know as a
10 matter of fact personally, which was that it was
11 represented by people who were going through the
12 reames of data that provided the description of
13 securities and however they were categorizing it
14 that the information we were given was that
15 these securities as described in this form were
16 available to be conveyed as of that time by
17 Lehman to Barclays.
18        As I think I indicated in earlier
19 testimony, the facts on the ground changed
20 significantly because not only were some of the
21 securities that Lehman -- that people at Lehman
22 may have believed were owned by Lehman as of
23 that moment in time, they learned later during
24 the week that maybe they weren't necessarily
25 owned, they might have been sold, trades were

Highly Confidential

Page 206

1  M. Shapiro
2  closing, people were getting blown out.
3  So, you know, this is a trading
4  business, right? I think if you stepped into
5  any trading business, you would learn very
6  quickly that it's very hard to absolutely know
7  with absolute certainty as of a given minute
8  exactly what you have and that's why I think
9  this says "approximately 70 billion." It gives
10  categories of securities.
11  In the 24 hours we had, I think this
12  was the best we could do as a description within
13  a contract. That didn't mean that people
14  didn't, from a business perspective, have the
15  backup for what they believed to be able to be
16  conveyed as of that date. They did, but then,
17  as I indicated, as they learned more about what
18  was happening to Lehman over the course of the
19  next few days, those changed.
20  **Q. Is it your understanding that what's**
21  **being described here is an intent to convey any**
22  **of these categories, government securities,**
23  **commercial paper, et cetera, that can be**
24  **conveyed?**
25  MR. STERN: Objection to the form.

Highly Confidential

Page 207

1  M. Shapiro
2  A. If we couldn't convey them, we
3  couldn't make the representations that we make
4  in the contract so we wouldn't have been able to
5  actually close the deal. So obviously you
6  can't -- often you enter into a contract where,
7  on the day you enter into the contract, you say
8  something, but then you have to bring the rep
9  down at closing.
10  And this is not a rep that could have
11  been brought down at closing in terms of being
12  able to convey to them right, title and interest
13  to these specific securities as they had
14  identified them as of that date because there
15  were things that changed about those securities.
16  **Q. I understand you think whether it's**
17  **implicit or just known in the industry that you**
18  **cannot convey ones that you don't have title to,**
19  **that's going to be a limitation --**
20  MR. STERN: Wait. I'm waiting to hear
21  the question.
22  **Q. That would be a limitation that you**
23  **think is built into this deal, right?**
24  MR. STERN: Objection to the form.
25  Can I hear the question?

Highly Confidential

Page 208

1  M. Shapiro
2  (Record read.)
3  MR. STERN: That's the question.
4  **Q. Maybe I can put it another way.**
5  A. Okay.
6  **Q. In what way, as a contractual matter,**
7  **would Lehman breach this provision?**
8  A. Okay. So if you were to look at
9  Section 5.4 of the contract, it says "Title to
10  Purchased Assets," and it says, "Other than the
11  real property...intellectual property...Seller
12  owns each of the purchased assets, the Seller --
13  and Purchaser will be vested with good and
14  exclusive titles to such Purchased Assets, free
15  and clear of all Liens, other than Permitted
16  Exceptions, to the fullest extent permitted
17  under Section 363."
18  So I would call that a reasonably
19  standard provision in a sale contract, and
20  basically it means that you have to convey good
21  title to your buyer or your buyer either doesn't
22  have to close or can sue you for breach of
23  contract if you close and deliver him an asset
24  that you didn't have the right to convey.
25  **Q. How would Lehman breach this provision**

Highly Confidential

Page 209

1  **M. Shapiro**
2  **of the contract?**
3  MR. STERN: Objection to the form.
4  You can try to answer.
5  A. Well, my fear was they could have
6  breached it, or possibly could have breached it
7  if they agreed to let's call it a set of
8  securities that existed in their books and
9  records as reflected by traders and other people
10  who were in control of those records as of the
11  date that we signed this that in fact things
12  were happening that were well beyond the
13  knowledge of those of the lawyers drafting this
14  contract in the context of the trading business,
15  which actually did occur, and therefore, we were
16  making -- then if you can't know that an asset
17  that you are trying to convey you actually have
18  title to because either (A) you already sold it
19  to somebody else or (B) someone took it from you
20  because you had repoed it and you didn't -- and
21  the repo was taken, you know, the repo was
22  terminated and the security was taken and,
23  therefore, while on your books and records you
24  might have shown that as an asset you owned
25  subject to the repo, by the time Friday came

1             M. Shapiro
2  along, you no longer owned it because the repo
3  had been blown out.
4         So things like that concerned me about
5  making sure that we were able to make the rep at
6  closing.
7     Q.   On the page 6, though, the description
8  of purchased assets, I think that you have
9  mentioned that there's no schedule attached of
10  the assets that are going to be conveyed, right?
11    A.   Yeah, the only schedule that was in
12  any way referenced that had let's say a
13  relationship to this was the schedule we
14  previously talked about.
15    Q.   And that even wasn't attached --
16    A.   That was not a party to the contract.
17  That was just a referred to schedule.
18    Q.   And I believe this -- you said this
19  value of approximately 70 billion, did you
20  believe there was actually an agreement that
21  securities valued at 70 billion would be
22  conveyed?  Is that the way you read this?
23    A.   What it says is what I believe was
24  agreed to.
25    Q.   So Lehman is agreeing to give assets

1         M. Shapiro
2  that have this description, government
3  securities, commercial paper, that are valued as
4  of -- at approximately $70 billion as of the
5  signing of the APA?
6         MR. STERN:  Objection to the form.
7     A.   Lehman agreed to sell to Barclays the
8  securities that were described in Section D in
9  accordance with the terms of this agreement as
10  part of this agreement.
11    Q.   Do you see there's not much
12  description about what those assets are, right?
13         MR. STERN:  Objection to the form.
14    A.   If you're asking could there -- could
15  there have been more detail behind each of these
16  if this deal was done in the course of a let's
17  say a month and you had lots of time, I guess
18  probably the answer would be yes, but since this
19  deal was done in a week, and because you were
20  dealing with a moving -- a moving target in the
21  sense as I described earlier, some of the
22  securities that were trying to be conveyed were
23  being changed on the ground, this was the best
24  that the lawyers could do to reflect the
25  business agreement, which I believe it does

1             M. Shapiro
2  accurately reflect as of that Tuesday night what
3  people had agreed to, that obviously that was
4  required to be changed because of the fact both
5  sides recognized that this description no longer
6  accurately reflected what could be conveyed as
7  of Friday.
8     Q.   We also talked or you spoke earlier
9  about how the liabilities were at 69 billion,
10  approximately, and the conveyed assets was 70
11  billion, right?
12    A.   Yeah, those two -- there was obviously
13  a linkage because the liabilities were, you
14  know, were financings of these securities, for
15  the most part, as I understood it.
16    Q.   Was it your understanding that, in
17  making this deal, that there were going to be
18  some parity between the assets and the
19  liabilities?
20         MR. STERN:  Objection to the form.
21    A.   I don't really know what you mean by
22  "parity."  I think as I described it earlier,
23  just in terms of the facts as I knew them, there
24  was a number which was approximately 70 billion
25  in this contract which was reflecting that

1         M. Shapiro
2  schedule that said around 72 billion.  There
3  was -- on the asset side.  On the liability
4  side, this says I think approximately 69
5  million.  The schedule reflected around 68.4,
6  69.4.  I don't remember what it said, again,
7  approximately.
8         The difference between the two would
9  generally reflect I think the fact that you've
10  never financed 100 percent of the positions that
11  you were buying, right?  Everything was
12  haircutted a bit.
13         So I -- you're asking me the question,
14  was there a different between the asset side and
15  the liability side, yeah, but I would have
16  expected that.
17    Q.   Let's look at Exhibit 19.  Do you
18  still have that in front of you?
19         MR. STERN:  No, but we'll get it out.
20    Q.   I'm also going to show you what's
21  previously been marked as Exhibit 18.
22         First, for the record, do you
23  recognize Exhibit 18?
24    A.   They look very similar to me, so when
25  you say do I recognize it, I don't have a

Highly Confidential

Page 214

1        M. Shapiro
2   specific recollection of it, other than
3   generally I am familiar with this schedule as it
4   kind of looks like the last schedule I looked
5   at.
6      Q.   You see they look similar.  They have
7   columns.  There's assets --
8      A.   Yeah.
9      Q.   -- and liabilities?
10     A.   Yeah.
11     Q.   And similar categories, right?
12     A.   Yes.
13     Q.   And some changes in the numbers?
14     A.   Yeah, one looks like it was done at
15  11:18, one looks like it was done 10:09.
16     Q.   And I believe you said there was a
17  number of iterations of this type of
18  spreadsheet, right?
19     A.   I believe there were multiple
20  iterations of it.
21     Q.   You notice that on both Exhibit 18 and
22  Exhibit 19 the assets and liabilities are the
23  same, right?
24     A.   Let's see.  No, they're not the same.
25  Well, when you say they're the same, meaning the

Highly Confidential

Page 215

1        M. Shapiro
2   same categories?  What do you mean by "the
3   same"?
4      Q.   In both Exhibit 18 and Exhibit 19, the
5   totals of the assets match the totals of the
6   liabilities in that exhibit?
7      A.   No, I don't agree with what you just
8   said, unless I don't understand what you just
9   said, which is probably --
10     Q.   Well, let's look at Exhibit 18.
11     A.   Let's just take the first column of
12  assets.  So I see government and AG, agencies,
13  40 billion.  Commercial paper, 1.1.  That's the
14  same.  Mortgages, 2.9 versus 2.7.
15     Q.   I just mean the totals.  So let me try
16  to ask that again.  Let's just start with
17  Exhibit --
18     A.   Total dollars?  What are we talking
19  about when you say "total"?  Can you be more
20  precise?
21     Q.   Let's start with Exhibit 18.  On the
22  bottom, the number for adjusted total assets is
23  73.15, which I believe is billions of dollars,
24  right?
25     A.   Yes.

Highly Confidential

Page 216

1        M. Shapiro
2      Q.   And that's also the total that's
3   listed under liabilities, 73.15?
4      A.   Those two numbers match, correct.
5      Q.   And in Exhibit 19 the totals also
6   match, where the total assets is 72.65 and then
7   the total liabilities is 72.65 also, right?
8      A.   Those numbers are the same, I agree.
9      Q.   Do you remember in previous iterations
10  of this document whether the assets and
11  liabilities also matched each other?
12     A.   I think, again, as I said, there were
13  multiple of these documents.  I think that there
14  were times when they didn't match, but I can't
15  be absolutely sure of that, but I think that
16  there were.
17     Q.   And do you know if going into signing
18  the APA the understanding was, although these
19  numbers might change, there would be a matching
20  between the assets that were conveyed and the
21  liabilities that were assumed?
22     MR. STERN:  Objection to the form.
23     Let me hear the question again.
24     (Record read.)
25     A.   I don't know the answer to your

Highly Confidential

Page 217

1        M. Shapiro
2   question.
3      Q.   You also mentioned, I think you said
4   that you would expect the liabilities to be a
5   little bit less than the assets for what you
6   described as a haircut; is that right?
7      MR. STERN:  Objection to the form.
8      A.   What I described is that when people
9   typically finance an asset, when financial
10  institutions finances an asset, it doesn't
11  usually lend 100 cents on the dollar because if
12  the asset value goes down, then they're
13  out-of-pocket.  So usually they have some
14  cushion for what's known as a haircut so that
15  before when they lend, they only lend a portion
16  of the asset value.  So it didn't surprise me
17  that we had that differential since we were
18  talking about a book.
19     Q.   And do you mean that on a
20  particular -- each individual security?
21     A.   Sure.
22     Q.   So a security would have an asset but
23  the liability of it would be a little bit less
24  for each individual security?
25     A.   Depending --

Highly Confidential

Page 218

1        M. Shapiro
2    MR. STERN: Objection to the form.
3    Can I hear the question again?
4    (Record read.)
5    MR. STERN: Objection to the form.
6    Are you talking about generally speaking?
7    Are you talking about specifically to this
8    set of assets?
9    Q.   I'm first trying to find out about
10   your general understanding that you think
11   usually in some transaction that the assets will
12   be a little bit more than the liability to
13   reflect a risk or financing?
14   MR. STERN: Objection to the form.
15   Look, I've been very patient, but I think
16   these questions are very misleading.  I
17   don't even where you get the "little bit
18   less" from.
19   A.   Can I hear the question again?  I'm
20   not sure what the question is.
21   (Record read.)
22   A.   I think you should restate your
23   question because I don't really understand it.
24   Q.   I'm just trying to first understand
25   your understanding about the way that assets and

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 219

1        M. Shapiro
2    liabilities interact.
3    A.   Okay.
4    Q.   So maybe you could state it again.
5    For this transaction for the APA, what
6    was your understanding of what you expected the
7    relationship between assets and liabilities
8    would be?
9    A.   Okay.  I had no -- I had no
10   understanding specifically to these assets of
11   what they should be, which is really what you're
12   getting at.  I think what I was explaining to
13   you is that, generally speaking, in the
14   commercial finance area, you find that
15   institutions are not willing to lend necessarily
16   the full market value, 100 cents on the dollar,
17   against the security that they are financing
18   because they are worried, potentially, that they
19   would have to take a haircut, take a hit if the
20   value of that security goes down.
21   So people typically lend at some
22   margin, some margin less than, generally
23   speaking, and I'm not referring to this specific
24   transaction and the securities involved here, so
25   then my second statement, which was it didn't

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 220

1        M. Shapiro
2    surprise me that there was a difference between
3    the stated marked value of the assets in the APA
4    and the stated liabilities being assumed
5    associated with them and that there was a
6    difference between the two, that didn't surprise
7    me for the reason I just stated.
8    Q.   But you don't --
9    A.   I have no personal knowledge as to
10   what amount of financing was specifically
11   associated with each security that fell within
12   the baskets of each of these categories that
13   were to be conveyed.  Hopefully that answers
14   your question.
15   Q.   You don't know one way or another
16   whether that general commercial practice
17   explains the difference between the liabilities
18   and the assets in this case?
19   A.   I do not, no.
20   Q.   Also, if you look at the definition --
21   Let's go back to 6 of "Purchased
22   Assets."
23   MR. STERN: We're on Exhibit 1?
24   Q.   Exhibit 1, page 6, subsection D under
25   "Purchased Assets."  You'll see -- well, that 70

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 221

1        M. Shapiro
2    billion, that approximate, do you know if that
3    includes what's listed on Exhibit 19 as
4    mortgages?
5    A.   Can I see Exhibit 19?
6    MR. STERN: We're on page 6 at what
7    point?  What's the question?  Do you mind
8    telling me what you're focusing on?
9    MS. TAGGART: It's the same provision
10   that I've been talking about.
11   MR. STERN: Can you just tell me what
12   it is as a courtesy?  I'm looking at the
13   page.  I was getting an exhibit so now I'm
14   looking at the page.  Can you tell me what I
15   should be looking at?
16   MS. TAGGART: It's page 6, the
17   definition of "Purchased Assets," subsection
18   D.
19   MR. STERN: Thank you.
20   A.   Could you repeat the question?
21   (Record read.)
22   MR. STERN: Objection to the form.
23   A.   As I testified earlier today, the
24   approximately $70 billion that's referenced in
25   section D on page 6 relates to the 72.65 number

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 222

1        M. Shapiro
2  that's under the "adjusted total assets" line
3  since -- since the 72.65 is the total of the
4  62.7 and the 10, which obviously doesn't exactly
5  add up, which is approximately 72.65. The
6  bottom -- the first column totals 62.7. The
7  second column shows 10. If you add those two
8  up, you get to 72.7. This says 72.65. My only
9  point is that the mortgages -- you were
10 referring to mortgages of 2.7 in that line.
11 It's subsumed within the 72.65.
12     **Q.   Well, in subsection E of page 6, which**
13 **is "Purchased Assets," it talks about 50 percent**
14 **of each position in the residential real estate**
15 **mortgage securities. Do you see that?**
16     A.   Yes.
17     **Q.   Do you know if there's any**
18 **relationship between that and what's described**
19 **in Exhibit 19 as mortgages under "Assets"?**
20     A.   My recollection is that the resis,
21 what was called the resis, were being treated
22 separately. And "resis" I think is shorthand
23 when people are talking about them for the
24 residential real estate mortgages, that those
25 were not being treated as part of this asset

Highly Confidential

Page 223

1        M. Shapiro
2  group; they were being dealt with separately.
3      **Q.   So your understanding is that the**
4  **mortgages described on Exhibit 19 are different**
5  **than the mortgages that are described on page 6,**
6  **the definition of "purchased assets," subsection**
7  **E?**
8      A.   To the best of my recollection, I
9  don't think that the resis were necessarily
10 included in the assets that are described here,
11 but the only thing I would say is that I was not
12 the person who was in any way putting the
13 information together around what securities
14 actually went into each of these buckets, so I
15 can't be sure. But that's what I -- that's the
16 best recollection I have.
17     **Q.   Were you involved at all in the**
18 **discussions or negotiations about what resis**
19 **were going to be conveyed?**
20     A.   No, there was some discussions about
21 would Barclays take resis, would Barclays not
22 take resis. I have a recollection of the
23 discussion. I don't remember -- I was not
24 personally involved in those discussions, no.
25     I believe Bart, Mark Shafir, maybe

Highly Confidential

Page 224

1        M. Shapiro
2  others, but it wasn't me.
3      **Q.   You described earlier that you thought**
4  **that JPMC was I think you used the term "a bad**
5  **actor"?**
6      A.   From my perspective.
7      **Q.   Can you describe why you used that**
8  **term?**
9      A.   Well, I thought that they -- they,
10 before the bankruptcy, they were the ones who
11 took the liquidity out of Lehman Brothers by
12 virtue of the demand that they made on Lehman
13 Brothers in the week that led up to the
14 bankruptcy.
15     So Lehman Brothers started the week
16 with $40 billion of liquid capital in the bank
17 accounts, and by the end of the week, we had
18 virtually none of it and, you know, to the point
19 where we had to send them a nasty letter on -- I
20 think it was on Friday or Saturday asking them
21 to allow us to wire $20 million to Weil Gotshal
22 for retainer.
23     And one of the things that I learned
24 in the course of getting involved that Thursday
25 when I sat down with a number of the lawyers who

Highly Confidential

Page 225

1        M. Shapiro
2  had worked for Treasury and I was trying to
3  understand, you know, what kind of cash we had,
4  is I learned that they had required the firm to
5  enter into a letter agreement that required --
6  allowed them to set off any cash that they were
7  holding against any exposures that they had
8  across any agreement that they had with Lehman
9  Brothers, which they didn't have the right to
10 before that agreement was entered into, they
11 only had it as it related to their clearing
12 obligations.
13     I believe that they used their
14 monopoly position as a clearing bank to extract
15 that agreement from Lehman Brothers, and that
16 allowed them to basically take the position that
17 any assets that Lehman had at JPMorgan and the
18 cash that was being held by JPMorgan anywhere
19 could be set off against any obligation that
20 Lehman Brothers had to JPMorgan anywhere, and
21 that that was the, in my view, the final blow to
22 Lehman Brothers.
23     So I'm not saying that they
24 necessarily did anything wrong legally. I'm
25 just saying that I believe that they were a key

Highly Confidential

Page 226

1    M. Shapiro
2 reason why Lehman's liquidity ran dry.
3    **Q.   What's that based on?  What's your**
4 **understanding based on the facts that you've**
5 **got?**
6    A.   What I just described.  What I was
7 told by other people in the firm and the
8 agreement that I actually saw.
9    **Q.   Who did you talk to about it?**
10    A.   I talked to -- there were, on the
11 agreement itself, I talked to a number of
12 lawyers who were lawyers for the Treasury Group
13 who, when I was basically doing some of my own
14 due diligence to figure out what were we dealing
15 with here on Friday, they told me about --
16    **Q.   Let's not talk about what you talked**
17 **with lawyers for now.**
18    MR. STERN:  No, wait.  I think he is
19 entitled -- you asked a question.  He's
20 entitled to give an answer.  There was no
21 instruction from either of Lehman's
22 counsel --
23    MR. CARDEN:  We just got to the
24 lawyers.
25    MS. TAGGART:  I just asked who he

Highly Confidential

Page 227

1    M. Shapiro
2 spoke with.  If you want to -- I just don't
3 want to hear later that you -- right now I
4 am not asking for what he spoke with any
5 lawyers about.  If you want him to go ahead
6 and answer, that's fine, but I want it to be
7 clear --
8    MR. STERN:  No, it's not my choice.
9 I'm not asking the questions.
10    MS. TAGGART:  My question was not what
11 was said.  My question was who did you speak
12 with.
13    MR. STERN:  I'm going to wait for the
14 next question.
15    MS. TAGGART:  Well, that's fine.
16    **Q.   Is there anyone else that you spoke**
17 **with on this topic about the JPMC issue?**
18    A.   Outside of lawyers?
19    **Q.   Outside of lawyers.**
20    A.   I believe I told a few other people
21 about it and how I was absolutely shocked that
22 we would let that happen, and that I think I --
23 I think I characterized it as sort of
24 ridiculously stupid on our part.
25    **Q.   Just to make the record clear, did you**

Highly Confidential

Page 228

1    **M. Shapiro**
2 **make -- were you involved in any changes to the**
3 **contract with Barclays after the court hearing**
4 **on September 19?**
5    A.   No, I was not.
6    **Q.   Also earlier today you spoke about**
7 **the -- how there was originally a provision that**
8 **was, I believe, provision 3.3, the adjustment to**
9 **the cash amount, and it was your understanding**
10 **it was eventually eliminated in the revised**
11 **deal?**
12    A.   That's my recollection.
13    **Q.   Do you know when there was the**
14 **decision to revise that part?**
15    A.   Well, I don't know -- I don't know
16 when this is meant to actually revise just that
17 specific part.  As I indicated, I think that
18 there was an overall agreement on making changes
19 to this that happened on that either Thursday or
20 that more likely to be actually -- was actually
21 agreed to on that Friday.
22    **Q.   You also mentioned earlier today that**
23 **you had spoken with Mark Kelly and --**
24    A.   Martin Kelly.
25    **Q.   Martin Kelly, excuse me.**

Highly Confidential

Page 229

1    **M. Shapiro**
2 **-- to try to get an understanding of,**
3 **if the securities were sold, if it was possible**
4 **to value them based on if Lehman was not**
5 **purchased and was liquidated?**
6    A.   I don't believe --
7    MR. STERN:  Objection to the form.
8 Can I hear that question again?
9    (Record read.)
10    A.   I'll --
11    MR. STERN:  Is there a question?
12 Wait.  I'm not quite sure.
13    **Q.   Was that your testimony earlier today?**
14    A.   I'm not sure what the question is that
15 you asked me.  I think I know what it is and I
16 would restate the question if you would like me
17 to.
18    **Q.   No, I -- we can -- why don't you**
19 **say --**
20    A.   I don't understand your question.
21    MR. STERN:  Let her ask questions and
22 you give answers.
23    THE WITNESS:  Fine.
24    **Q.   Can you describe what the conversation**
25 **was that you had with Martin Kelly on the**

Highly Confidential

Page 230

1        **M. Shapiro**
2 **subject of valuation if Lehman was not**
3 **purchased?**
4    A.    Yeah, I don't think it was necessarily
5 just Martin Kelly. I just can't remember. I
6 think he was involved in those discussions.
7        What we were trying to do was find the
8 right people at Lehman Brothers who could -- and
9 it wasn't one person, it was groups of people --
10 who were responsible for trading and, you know,
11 and managing the portfolios of these different
12 categories of securities so that Barry Ridings
13 could meet with these people and get their
14 perspective on how they believed those
15 securities -- what those securities might end up
16 being worth if Lehman was forced to sell those
17 securities in the near term.
18        And so Martin was one of I think a
19 number of people that helped us organize
20 different people in the firm to meet with Barry
21 Ridings on I believe Thursday and Friday to --
22 so he could evaluate what would happen if this
23 transaction did not complete and what the
24 potential loss in value to the estate might be
25 if a forced sale of these securities were to

Highly Confidential

Page 231

1        M. Shapiro
2 take place.
3    **Q.    Who is Barry Ridings?**
4    A.    Barry Ridings. He's the senior
5 partner and investment banker at Lazard.
6    **Q.    I'm laughing. It's a West Coast**
7 **thing. I can't say the difference between Barry**
8 **and berry.**
9        **And the Thursday and Friday, is that**
10 **the 18th and 19th?**
11    A.    I believe -- it would have been -- it
12 would have been the 18th or the 19th, I believe,
13 yes. It could have been earlier, too. I just
14 don't have a specific recollection, but I think
15 it was during those, you know, during the course
16 of this week. I don't remember exactly what
17 days he actually did that. He would have a
18 better recollection of what days he did it, but
19 it was during the course of that week.
20    **Q.    Do you know any other people who were**
21 **involved in that evaluation?**
22    A.    I believe he spoke to -- I believe on
23 some of this he spoke to Felder, probably
24 Gelband, Alex Kirk, you know, different people
25 who, within the Fixed Income, mostly Fixed

Highly Confidential

Page 232

1        M. Shapiro
2 Income, not always, and I think there was some
3 derivatives people. I don't remember all the
4 people, no. These are not people that for the
5 most part I knew. I knew a few of them.
6    **Q.    Did you ever communicate about the**
7 **results of that evaluation with Mr. Ridings or**
8 **anyone else?**
9    A.    Not specifically, other than listening
10 to his testimony in court where I think he
11 testified as to his view of what they might --
12 what might happen if the transaction didn't
13 close and Lehman was liquidated and those
14 securities were liquidated. I think he
15 testified on that.
16        (Continued on the next page to include
17    the jurat.)
18
19
20
21
22
23
24
25

Highly Confidential

Page 233

1        M. Shapiro
2    **Q.    Did you see any documents associated**
3 **with that evaluation?**
4    A.    No.
5        MS. TAGGART: That's all my questions.
6 Thank you.
7        MR. STERN: Anybody else?
8        MR. CARDEN: You're a free man.
9        MR. STERN: I think were done.
10        THE WITNESS: Okay, thanks.
11        (Time Noted: 2:42 P.M.)
12            oOo
13
14
15
16
17
                    _____
                    MARK J. SHAPIRO
18
19    Subscribed and sworn to
    before me this     day
20    of     2009.
21
                    _____
22
23
24
25

Highly Confidential

Page 234

```
1              M. Shapiro
2        CERTIFICATE
3  STATE OF NEW YORK )
4              : ss
4  COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9        That MARK J. SHAPIRO, the witness
10 whose deposition is herein before set forth,
11 was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by such witness.
14       I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18       I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23       In witness whereof, I have hereunto
24 set my hand this 7th day of August, 2009.
25       ----------------------------
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 235

```
1              M. Shapiro
2              INDEX
3  WITNESS:       EXAMINATION BY      PAGE
4  M. SHAPIRO      Mr. Carden       5
5              Mr. Wood        171
6              Ms. Taggart      193
7
8  EXHIBITS:                  PAGE
9  Exhibit 55A, a document bearing Bates    78
10 Nos. BCI-EX-00077347 through 77349
11 Exhibit 56A, Agreement           135
12 Exhibit 57A, a document bearing Bates   158
13 Nos. 10296233 through 10299664
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 236

```
1              M. Shapiro
2  NAME OF CASE. In re Lehman Brothers Holding
3  DATE OF DEPOSITION  August 7, 2009
4  NAME OF WITNESS  Mark J. Shapiro
5  Reason Codes
6     1. To clarify the record
      2. To conform to the facts.
7     3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
   From _____ to _____
9
   Page _____ Line _____ Reason _____
10 From _____ to _____
11 Page _____ Line _____ Reason _____
   From _____ to _____
12
   Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
   From _____ to _____
15
   Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
   From _____ to _____
18
   Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
   From _____ to _____
21
   Page _____ Line _____ Reason _____
22 From _____ to _____
23 Page _____ Line _____ Reason _____
   From _____ to _____
24
25 _____
```

TSG Reporting - Worldwide    877-702-9580