# A. 26

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    1

2                   UNITED STATES BANKRUPTCY COURT

3                   SOUTHERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - - - - -

5     In Re:

                           Chapter 11

6

7     LEHMAN BROTHERS    Case No. 08-13555(JMP)

      HOLDINGS, INC. et al., (Jointly Administered)

8

9                           Debtors.

10    - - - - - - - - - - - - - - - - - - - - - -

11                    HIGHLY CONFIDENTIAL

12              DEPOSITION OF PAOLO TONUCCI

13                  Friday 14 August 2009

14                     At:  7:00 am

15                      Taken at:

16                       Jones Day

                     21 Tudor Street

17                        London

                     United Kingdom

18

19    Reported by: AILSA WILLIAMS

      Certified LiveNote Reporter

20

21

22

23

24

25

## Page 2

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                2

A P P E A R A N C E S

JONES DAY, LLP
    Attorneys for Lehman Brothers, Inc.
    222 East 41st Street
    New York, NY 10017-6702
    BY: JAYANT W. TAMBE, ESQ
        BRIDGET CRAWFORD, ESQ

BOIES, SCHILLER & FLEXNER, LLP
    Attorneys for Barclays Capital and the
    Witness
    5301 Wisconsin Avenue, NW
    Washington, DC 20015
    BY: HAMISH HUME, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
    Attorneys for the Creditors Committee
    865 S. Figueroa Street, 10th Floor
    Los Angeles, California 90017
    BY: MATTHEW BUNTING, ESQ.
        ERICA TAGGART, ESQ. (By Phone)

SIMPSON THACHER & BARTLETT LLP
    Attorneys for the Witness
    425 Lexington Avenue
    New York, NY 10017-3954
    BY: CHRISTOPHER J. LUCHT

HUGHES, HUBBARD & REED, LLP
    Attorneys for the SIPA Trustee
    One Battery Park Plaza
    New York, NY 10004-1482
    BY: WILLIAM R. MAGUIRE, ESQ.
Also Present:
    PHILIP E. KRUSE, Alvarez & Marsal

## Page 3

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                3

I N D E X

PAOLO TONUCCI   ...    ...  ...  ..   .  5
DIRECT EXAMINATION BY MR. TAMBE       .   .5
CROSS-EXAMINATION BY MR MAGUIRE      .    . 177
INDEX OF EXHIBITS

Exhibit 136A E-mail, Lowitt to Kelly             .         28
Exhibit 137A E-mail, Tonucci to "Accept   .   ..   64
    Barclays Offer"

Exhibit 138A BCI-EX-00077360-62        .   .  .      68

Exhibit 139A E-mail, Hraska to various         .   .   72

Exhibit 140A E-mail, Azerad to various  ..   ..86

Exhibit 141A Bates 10331632-10320368  .  .  .  .   93

Exhibit 142A BCI-EX-00055047-59912           .    101

Exhibit 143A E-mail, Tonucci to various       ..     110

Exhibit 144A BCI 000580 ..        .          119

Exhibit 145A E-mail, Tonucci to various       .   . 123

Exhibit 146A E-mail, Azerad to various  .  .  .   128

Exhibit 147A E-mail, Azerad to various  ...   .. 130

Exhibit 148A E-mail, Reilly to various       ...  ... 137

Exhibit 149A BCI-EX-00077823-24     .  .  .    . 143

Exhibit 150A E-mail, Tonucci to various   .      150

Exhibit 151A E-mail, Azerad to various     ...  ...  . 151

Exhibit 152A E-mail, Beldner to Kelly     .  . 154
Exhibit 153A E-mail, Kelly to Beldner .  .  .    . 155

## Page 4

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                4

Exhibit 154A E-mail, Beldner to Kelly         .  158

Exhibit 155A E-mail, Veksler to various          159

Exhibit 156A BCI-CG00055192-55669           ... 165

Exhibit 157A E-mail, Tonucci to Aronow      . 169

Exhibit 158A E-mail, Berland to various   ..  ...  171

Exhibit 159A E-mail, Yu to various           173

Exhibit 160A E-mail, Tonucci to O'Meara         175

Exhibit 161A E-mail, Fleming to Tonucci        177

Exhibit 162A E-mail, Tonucci to Lyons   ...      179

Exhibit 163A E-mail, Tonucci to Fleming      .   . 182

Exhibit 164A E-mail, Tonucci to Azerad          192

Exhibit 165A E-mail, Hraska to Tonucci        194

Exhibit 166A E-mail, Tonucci to Blackwell        194

Exhibit 167A E-mail, Azerad to Tonucci      .  ... 199

Exhibit 168A E-mail, Forrest to various  ...   .  201

Exhibit 169A E-mail, Azerad to Tonucci          205

Exhibit 170A E-mail, Blackwell to various        207

Exhibit 171A E-mail, Tonucci to Murgio    ..   ... 208

Exhibit 172A E-mail, Tonucci to Lowitt  ...  ...  214

Exhibit 173A E-mail, Kelly to various           216

## Page 5

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                5

PAOLO TONUCCI

    Having been sworn,

    Testified as follows

    DIRECT EXAMINATION BY MR. TAMBE:

    MR. TAMBE . Morning, Mr Tonucci. We
met this morning. My name is Jay Tambe with Jones
Day, representing the Lehman Brothers Holdings
Estate. I will have counsel introduce themselves
to you and then we will get started

    MS CRAWFORD: Bridget Crawford from
Jones Day.

    MR. MAGUIRE: Bill Maguire, Hughes,
Hubbard & Reed for the Trustee.

    MR. BUNTING: Matthew Bunting, Quinn,
Emanuel, Urquhart, Oliver & Hedges for the
Creditors Committee and on the phone Erica
Taggart, also Quinn, Emanuel, Urquhart, Oliver &
Hedges.

    MR. KRUSE  Phil Kruse with Alvarez &
Marsal on behalf of the LBHI Estate.

    MR. LUCHT: Christopher Lucht, Simpson
Thacher & Bartlett, on behalf of the witness in
his individual capacity.

    MR. HUME: Hamish Hume from Boies,

## Page 6

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    6

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    6
2     Schiller & Flexner representing Barclays.
3         MR. TAMBE: Erica, can you hear us?
4         MS TAGGART: Yes, thank you.
5         MR TAMBE: Morning, Mr. Tonucci. By
6     whom are you currently employed?
7         A. Barclays.
8         Q. In what capacity?
9         A. I work in the treasury area
10        Q. What is your position?
11        A. Head of group balance sheet
12        Q. And is that head of group balance sheet
13    for global operations?
14        A. That is right, for global operations.
15        Q. How long have you held that position?
16        A. Since February of this year
17        Q. How long have you been employed by
18    Barclays?
19        A. Since September, 26 September 2008.
20        Q. What was your position at Barclays when
21    you first joined Barclays in September 2008?
22        A US treasurer for Barclays Capital.
23        Q. If you could describe for us briefly
24    what your duties have been since you joined
25    Barclays, both as US treasurer and now as global

## Page 7

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    7

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    7
2     treasurer?
3         A. I am not the global treasurer.
4         Q. Okay.
5         A. Head of global balance sheet. The US
6     treasurer role was focused on liquidity and
7     capital management for the US Barclays Capital
8     operations and the role with group treasury, the
9     global balance sheet role is responsible for
10    funding and hedging for the group's balance sheet
11    globally.
12        Q. Before joining Barclays
13    in September 2008 you were employed by Lehman
14    Brothers, correct?
15        A. That is correct
16        Q. And what Lehman Brothers entities were
17    you employed by?
18        A. LBHI and LBI.
19        Q. Collectively for the Lehman entities
20    when did you first begin working for the Lehman
21    entities?
22        A. December 1996.
23        Q. If you can give us a brief overview of
24    your career at Lehman, the positions you held, the
25    time periods that you held them for?

## Page 8

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    8

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    8
2         A. Yes  I joined Lehman as head of or
3     manager for the fixed income derivatives product
4     control team from 96 to 98.
5         From 98 to 2000 I was manager of fixed income
6     liquid markets product control.
7         From 2000 to 2002 I was head of asset and
8     liability management for Europe within the treasury area.
9         From 2002 until 2005 I was head of assets and
10    liability management for the group globally in New York.
11    From 2005, or in 2005 I was international treasurer and then
12    also through 2005 to 2000 onwards I was global treasurer.
13        Q. And in your capacity as global treasurer
14    for the Lehman entities, could you briefly
15    describe what your duties were?
16        A. Responsible for funding liquidity and
17    capital management for the group.
18        Q. And to whom did you directly report in
19    that capacity?
20        A. To the CFO.
21        Q. In the time period, say, in 2008, who
22    were your direct reports at Lehman?
23        A. Most recently in 2008, Robert Azerad,
24    Dan Fleming, Janet Birney.
25        Q. The last name?

## Page 9

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    9

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    9
2         A. B-I-R-N-E-Y, Julie Boyle, B-O-Y-L-E
3     Jackie F-R-O-M-M-E-R and Kevin Thatcher.
4         Q. Mr. Azerad, what was his position and
5     role at Lehman?
6         A He was responsible for liquidity
7     management.
8         Q. And Mr. Fleming?
9         A. For cash management
10        Q. And when you use the phrase "liquidity
11    management", what do you mean by that?
12        A  I mean for the tracking, reporting, and
13    execution of liquidity oversight.
14        Q. Does liquidity management include
15    arranging for repurchase agreements and other
16    forms of financing for the Lehman entities?
17        A. Generally not.
18        Q. Who within Lehman would have been
19    responsible for repurchase agreements and
20    liquidity, financing of that nature?
21        A. Secured financing was managed within the
22    prime brokerage team and overseen by John Coghlan.
23        Q. And John was not one of your direct
24    reports, is that correct?
25        A. He was not, no.

## Page 10

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          10

2  Q.  Was he in the line of reporting in your
3  department?
4  A.  No, he was not, he was within the prime
5  brokerage business
6  Q.  I guess I am trying to understand this
7  better.  Repurchase agreements and financing
8  secured by repurchase agreements is part of
9  liquidity of the firm, correct?
10  A.  It is.
11  Q.  And your responsibility included
12  liquidity management, correct?
13  A.  It did.
14  Q.  Could you describe for me how your role
15  and Mr. Coghlan's role were related to each other?
16  A.  Certainly.  Any activity that was
17  performed by the secured funding team would affect
18  our liquidity and would be a component of the
19  resulting liquidity  We would therefore work
20  closely with that team to understand their
21  activities but, you know, to collectively I guess
22  ensure that we were executing the right series of
23  transactions, but the actual activity was executed
24  entirely by John's team, and there was no
25  reporting line from John to me

## Page 11

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          11

2  Q.  As overseeing liquidity management at
3  Lehman, you were responsible for figuring out how
4  much cash Lehman needed on a daily basis just to
5  run operations, correct?
6  A  How much cash we needed, how much cash
7  we had.
8  Q.  Once you figured out how much cash you
9  needed, how much cash you had, you would have to
10  tell the secured funding team how much cash they
11  needed to raise overnight, correct?
12  A  The execution of transactions was within
13  that team  We would within Dan Fleming's area
14  advise them of the broad requirements, because we
15  were tracking the cash in the cash accounts, and
16  had the most accurate within the group forecasts
17  of what the cash position was, so there was that
18  interaction.
19  Q.  If I am --
20  A.  But to be clear we were not directing
21  them to execute explicit transactions  We were
22  advising them of what the overall cash position
23  was and what we saw as the collateral position.
24  Q.  So you told them what the needs were,
25  they figured out how to get the cash, right?

## Page 12

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          12

2  A.  Yes.
3  Q.  Was that the case during the week
4  of September 15 as well.  Were those the roles
5  played by yourself and Mr. Coghlan during the week
6  of September 15, 2008?
7  A.  In the week leading up to?
8  Q.  No, the week of September 15, starting
9  Monday 15 September?
10  A.  The position was quite different at that
11  point  We were certainly trying to -- we were
12  certainly trying to execute the same function,
13  meaning that we were trying to calculate and
14  advise what the cash position was and what the
15  financing requirements were.  However, the access
16  to information and our ability to predict the
17  position was impaired by both difficulties with
18  the change in the group that had happened, because
19  obviously all of the intercompanies, the
20  intercompany activity was severely impaired or
21  completely ceased, and the difficulties with
22  getting information from clearers and from the
23  exchanges, but we were trying to perform that same
24  function of forecasting and advising what the cash
25  position was and the collateral position.

## Page 13

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          13

2  Q.  And you, Mr. Tonucci, you were much more
3  hands-on involved in the mechanics of repurchase
4  agreements that week, correct?
5  A.  I would not say so, actually.  I don't
6  recall -- I don't recall anything other than
7  really the oversight of the sort of final
8  positions, the final trades that were booked  So
9  I wouldn't say that there was a -- I wouldn't say
10  that there was a significant change in my level of
11  involvement.
12  Q.  We have a window into sort of your
13  involvement that week through e-mails and
14  testimony from other people.  Would you say your
15  involvement with repos that week was similar to
16  your investment with repos in prior weeks and
17  months?
18  A.  I would say probably a little bit more
19  If you look at the volume of repos that week and
20  the volume of repo counterparties, there were very
21  few.  There were repos with the Fed and with
22  Barclays and probably a couple of other
23  counterparties  So there were very few repos
24  being executed.  So consequently I think, you
25  know, the level of oversight of those particular

Page 14

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                14

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                14
2 repos was greater than would typically have been
3 the case for a much larger set of repos.
4     Q.  And your personal involvement in those
5 particular repos was much greater than your
6 involvement had been on prior repos.  Is that
7 correct?
8        MR. HUME.  Object to the form of the
9 question and to the lack of foundation.  I think
10 if you have e-mails you should show him to
11 characterize what you are asking.
12        MR. TAMBE:  Do you have my question in
13 mind?
14     A.  I am not sure, this point about much
15 more involved, it is difficult for me to respond
16 to.  I would say that there was slightly more
17 involvement than there would have been in a normal
18 day's repo activity but I would not say that I was
19 much more involved, no.
20     Q.  Let's see what you were involved in
21 during that week broadly.  I am going to start in
22 this period beginning September 12, Friday
23 through September 22, the Monday.  Start at the
24 beginning, September 12, and just generally tell
25 me what your involvement was in the events of that

Page 15

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                15

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                15
2 weekend, in terms of possibly doing transactions
3 with buyers, the filing of the bankruptcy, your
4 role in the sale of assets to Barclays and finally
5 the closing of the transaction on September 22,
6 and we will take it in pieces but I want to get an
7 overview of your recollection of your involvement
8 during that ten day period.  Okay?
9     A.  Okay.
10     Q.  Let's start with the weekend before the
11 filing of the bankruptcy.  What were you involved
12 in starting on Friday, September 12?
13     A.  Friday was a trading day and so the
14 range of activity included overseeing our
15 financing position that day and our financing --
16 our liquidity forecasting, which I would
17 characterize as regular daily activity, regular
18 daily oversight.
19       There was due diligence, specifically
20 with Bank of America for much of that day, and
21 there was towards the end of the day discussion
22 with Barclays directly and with the due diligence
23 teams at one other potential buyer.
24     Q.  What other potential buyer?
25     A.  Nomura, but I didn't speak to them

Page 16

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                16

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                16
2 directly.  And I gather from your answer then you
3     Q.  And I gather from your answer then you
4 were speaking directly with the due diligence
5 teams from Bank of America?
6     A.  Yes.
7     Q.  And you had direct discussions with
8 Barclays towards the end of the day on the 12th?
9     A.  Yes, in the capacity of due diligence,
10 not negotiations.
11     Q.  And when you mean in capacity of due
12 diligence you were providing information?
13     A.  That is right.
14     Q.  In terms of liquidity management on the
15 12th, were there any particular constraints on
16 Lehman or challenges for Lehman in terms of
17 managing its liquidity for operations on the 12th?
18     A.  Yes.
19     Q.  Can you describe what those constraints
20 were?
21     A.  There was a large cash request from
22 JP Morgan, which was for $5 billion in cash, and
23 that was a significant challenge.  There were
24 changes being made to secured funding haircuts and
25 collateral agreements and there were margin

Page 17

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                17

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI                17
2 requests from a variety of clients.  So overall
3 I would characterize it as extremely busy and
4 complicated
5     Q.  You used a phrase, "There were changes
6 in secured funding haircuts", is that right?  I
7 want to understand what you mean by "haircuts"?
8     A.  The difference between the market value
9 and the cash received is known as the haircut in
10 a secured funding arrangement, the market value of
11 the securities I should say.
12     Q.  So is it fair to say that the haircut
13 allows you to determine how much cash you can
14 borrow against a given market value of securities?
15     A.  That is correct.
16     Q.  And what were the changes in haircuts on
17 the 12th, generally?
18     A.  Generally, they were that the haircuts
19 were widening, but I don't have any specifics.  I
20 don't recall any specifics.
21     Q.  We go into the weekend of 13 and 14
22 September.  Describe for me what you were --
23 describe for me what your duties were that weekend
24 and what you were doing that weekend?
25     A.  Due diligence continued  Discussion

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                18

1    with the internal team on potential outcomes and
2    the management of potential purchases. Some
3    discussion with external lawyers acting for the
4    Board in terms of fairness opinions.
5        Q.  Generally, when you are talking about
6    interactions you had with external counsel for
7    Lehman Brothers during that time period, you can
8    identify that you had those contacts but I would
9    urge you not to disclose the substance of your
10   conversations with external counsel for Lehman.
11   Understood?
12       A.  Yes.
13       Q.  I mean when my question is requesting an
14   answer of that type, just alert me if you think
15   you are going to have to tell me about
16   conversations with external counsel. Fair?
17       A.  Yes.
18       Q.  In terms of who the potential purchasers
19   being discussed were over the weekend
20   of September 13 and 14, you had BFA, correct?
21       A.  Correct.
22       Q.  Barclays was still a potential
23   purchaser?
24       A.  Barclays was the most likely purchaser.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                19

1        Q.  Nomura, was that still a potential
2    purchaser?
3        A.  Not that I was aware of
4        Q.  Other than those three were any other
5    potential purchasers discussed that weekend?
6        A.  Not that I am aware of.
7        Q.  When you say you had discussions with
8    the internal team, who was the internal team that
9    you were having discussions with?
10       A.  Largely with Ian Lowitt but with other
11   members of Lehman's senior management.
12       Q.  Do you recall any of the other members
13   of senior management that you had discussions with
14   that weekend?
15       A.  Bart McDade, Tom Russo, Stephen
16   Berkenfeld, Alex Kirk
17       Q.  Any others?
18       A.  I can't recall.
19       Q.  When did you first learn that Lehman
20   Brothers Holdings Inc was contemplating
21   a bankruptcy filing?
22       A.  I believe first contemplated on
23   Saturday.
24       Q.  Were you asked to perform any tasks

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                20

1    specifically in connection with contemplated
2    filing of the bankruptcy?
3        A.  Only one comes to mind, which was to
4    make a payment to Weil Gotshal.
5        Q.  We go ahead with the bankruptcy filing
6    on September 15. Describe for me the kinds of
7    things you were doing on September 15. What was
8    your day like?
9        A.  So the filing happened in the early
10   hours of the morning and there was great confusion
11   about the consequences of that, so much of the day
12   was spent fielding telephone calls from various
13   parts of the organization within Lehman, some from
14   external counterparties seeking clarification as
15   to the position, which entities may have filed and
16   the position of the remaining entities, and trying
17   to oversee the position and funding for LBI, the
18   US broker dealer.
19       Q.  Describe for me what actions you took
20   and conversations you had in connection with the
21   funding for LBI, the US broker dealer on the 15th?
22       A.  We had been instructed that the Fed
23   would be providing secured financing and that
24   other secured financing arrangements would be

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                21

1    maturing, so the discussion to the extent that
2    there was any was really just about executing that
3    transaction
4        Q.  When you say "that transaction", the Fed
5    transaction?
6        A.  With the Fed, yes
7        Q.  Were you involved in executing the
8    transaction with the Fed?
9        A.  Not executing it, no
10       Q.  Were you involved with negotiating the
11   transaction with the Fed?
12       A.  No.
13       Q.  What was your involvement with the Fed
14   transaction?
15       A.  Only overseeing the collateral, the
16   collateral allocation and the cash received
17   afterwards.
18       Q.  When you say "overseeing collateral
19   allocation", what was your role in overseeing?
20   What specifically did you do to oversee collateral
21   allocation on the Fed repo?
22       A.  I reviewed the collateral that had been
23   allocated and the cash that had been received
24   against that collateral My role was largely

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      22
2    analytical and much of the liquidity oversight is
3    an analytical function   It is explaining the
4    changes in the liquidity position and explaining
5    the financing arrangements in the context of the
6    overall financial picture and balance sheet of the
7    entity. So I don't know -- my group did not book
8    the transactions or the allocations, but clearly
9    it was important to understand the substance of
10   the transaction and detail of the transaction that
11   was executed to get a clear picture of the
12   financial position of the entity.
13       Q.  Who booked the transaction?
14       A.  The secured funding area.
15       Q.  Mr. Coghlan's group?
16       A.  Yes.
17       Q.  Did you have conversations with
18   Mr. Coghlan about the Fed funding on the 15th?
19       A.  I don't recall.
20       Q.  You said you reviewed the collateral.
21   What were you reviewing the collateral allocated
22   for. Let me restate that. You stated earlier you
23   reviewed the collateral allocated. For what
24   purpose were you reviewing the collateral
25   allocated?

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      23
2       A.  I have already explained that, to
3    understand the financial position of the entity.
4    It is obviously pertinent to the financial
5    position of the entity to understand the
6    collateral that has been transferred and the value
7    received for that.
8       Q.  So your review includes what specific
9    pieces of collateral that have been allocated, is
10   that right?
11      A.  That is right.
12      Q.  And you also did a review of what values
13   had been ascribed to that collateral?
14      A.  That is right
15      Q.  Let's talk about the values ascribed to
16   the collateral allocated. Who determines the
17   values of the collateral, the market value of the
18   collateral that is being allocated for financing?
19      A.  The tri-party provider in the case of
20   a tri-party repo transaction.
21      Q.  And was the Fed funding a tri-party
22   funding?
23      A.  It was.
24      Q.  Who was the third party?
25      A   JP Morgan and Chase.

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      24
2       Q.  So would it be correct to say that
3    JP Morgan and Chase would determine the values for
4    the collateral allocated by Lehman for the Fed
5    funding on September 15, is that correct?
6       A.  Yes.
7       Q.  And the applicable haircuts would then
8    be applied to the JP Morgan valuation, is that
9    correct?
10      A.  That is correct.
11      Q.  Now, Lehman would have its own values
12   for the collateral that was allocated to this
13   funding, correct?
14      A.  That is correct
15      Q.  Was part of your review to see how the
16   JP Morgan values differed from the Lehman values
17   for the same collateral?
18      A.  It was.
19      Q.  Do you recall generally if the JP Morgan
20   values were higher, lower or the same?
21      A.  I don't recall.
22      Q.  Do you recall there being any
23   significant discrepancy at any time with the
24   JP Morgan prices for the collateral during that
25   week, September 15?

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      25
2       MR HUME:  Object to the form of the
3    question.  Any time during the week?
4       MR. TAMBE:  Yes.
5       A.  I don't recall.
6       Q.  Generally, as a matter of mechanics,
7    when the tri-party provider had done a valuation
8    of collateral and that valuation was significantly
9    lower than the Lehman valuation, that would affect
10   how much money you could borrow, correct?
11      A   That is correct
12      Q.  So you would probably disagree with the
13   valuation done by the third tri-party provider,
14   correct?
15       MR. HUME:  Object to the form of the
16   question.
17      A.  No.
18      Q.  You had no ability to disagree?
19      A.  We had no ability to disagree, nor do we
20   have an ability to negotiate the haircuts provided
21   by the Fed or other lenders.
22      Q.  I am not talking about the haircut, I am
23   talking about the market value of the collateral
24   before you apply the haircuts?
25      A.  We had no ability to object.

Page 26

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    26

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    26
2    I certainly did not
3    Q.  Do you recall what the term was of the
4    Fed funding that was put in place on 15 September?
5    A.  I believe it was overnight
6    Q.  Moving to the 16th, was that facility
7    rolled over on the 16th?
8    A.  The majority of the facility was rolled
9    over.  Barclays provided some financing as well so
10   the amount of the facility with the Fed reduced.
11   Q.  Before we get to the 16th, on the 15th,
12   other than dealing with the Fed funding, were you
13   also involved in any discussions about a possible
14   acquisition of the North American assets by
15   Barclays?
16   A.  I was not, no.
17   Q.  Were you aware that Barclays had
18   returned to Lehman to engage Lehman in discussions
19   about that?
20   A.  I was aware, yes.
21   Q.  How did you become aware of that?
22   A.  I can't remember who advised me but
23   someone, one of the senior members of the firm had
24   advised me that that was the case.
25   Q.  On the 15th through the morning of the

Page 27

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    27

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    27
2    16th were you involved in any negotiations with
3    Barclays about the purchase by Barclays of
4    Lehman's North American assets?
5    A.  I was not.
6    Q.  But you were aware those negotiations
7    were taking place, correct?
8    A.  I was.
9    Q.  Did you provide any due diligence
10   information in that time period?
11   A.  I don't believe so.
12   Q.  What was your understanding of what
13   transaction was being contemplated on the 15th
14   over into the 16th between Lehman and Barclays?
15   A.  I understood that it was the purchase of
16   the business and assets, some selection of assets
17   of the North American Lehman Brothers business.
18   Q.  And either on the 15th or 16th did you
19   have any understanding of what the economics of
20   that deal were?
21   MR. HUME.  Objection, lacks foundation.
22   A.  Not really.  I mean, I was aware of the
23   balance sheet that was being agreed at a very
24   summary level and, as I am sure you know, Martin
25   Kelly sent me a note advising me of some of the

Page 28

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    28

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    28
2    details, so I had a very general sense of the
3    substance of the transaction, but to say that
4    I understood the economics would be, you know,
5    would not be accurate.
6    Q.  The Martin Kelly e-mail that you are
7    referring to, is that the one that talks about the
8    5 billion-dollar loss?
9    A.  That is right
10   Q.  Let's take a look at that e-mail.  It is
11   136A.
12   (Exhibit 136A marked for identification)
13   MR. HUME:  Is that a new number?
14   MR. TAMBE  Yes.
15   MR. HUME·  Has this document not been
16   made an exhibit yet?
17   MR. TAMBE:  I just do not know if it has
18   been.  Wherever possible we are trying to avoid
19   re-marking exhibits  My guess is this one has
20   been.  We could not figure out what the number
21   was.
22   Mr. Tonucci, I have placed before you
23   a document marked Exhibit 136A  Is that the
24   e-mail that you were referring to?
25   A  That is correct.

Page 29

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    29

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    29
2    Q.  That is an e-mail from Martin Kelly, you
3    are cc'd on that e-mail at the bottom.  Do you see
4    that?
5    A.  Yes
6    Q.  There is a reference in there to a
7    "$5 billion all in economic loss versus our
8    marks".  Do you see that?
9    A  I do
10   Q.  What was your understanding of that
11   phrase?  What did that mean?
12   A.  I read that to mean that there would be
13   a discount to the marks at that time on the
14   assets.
15   Q.  And this notion of a discount on the
16   marks on the assets, was that a feature of the
17   transaction that ultimately persisted with the
18   transaction as it unfolded?
19   MR. HUME  Objection, calls for
20   speculation and lacks foundation
21   A.  Can you repeat?
22   Q.  Let me rephrase.  You understood the
23   5 billion dollars all in economic loss versus our
24   marks to be a reference to a discount off the
25   marks, correct?

Page 30

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    30

1    A. Yes.
2    Q. The deal that was ultimately done and
3    closed on September 22, that too included
4    a discount off of Lehman's marks, correct?
5    A. That is correct
6    Q. Okay, and the amount of that discount
7    off of Lehman's marks was about $5 billion, is
8    that right?
9    MR HUME· Objection, lacks foundation.
10    A. It is uncertain, because obviously there
11    were a lot of valuation movements and so
12    I couldn't say with certainty, but certainly what
13    I can say is versus the valuations that I recall
14    seeing from our analysis it was about that number.
15    Q. About $5 billion?
16    A. About $5 billion
17    Q. Was it your understanding that about
18    a $5 billion discount was a negotiated amount of
19    discount?
20    MR. HUME: Objection, lacks foundation.
21    A   Only insofar as what I can read in this
22    e-mail.
23    Q. Here is what I am getting at. This
24    e-mail, 136A, is sent to you on

Page 31

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    31

1    early September 16, correct? The deal that is
2    contemplated on the 16th changes in many ways by
3    the 22nd, correct?
4    A. Yes.
5    Q. The amount of the discount in this
6    e-mail, the $5 billion you are telling me was
7    about the discount when all was said and done at
8    the end of the day, is that correct?
9    A. That is correct
10    Q. Is it your understanding that the
11    $5 billion amount was the agreed upon discount for
12    the transaction?
13    MR. HUME. Objection, the witness has
14    said he did not participate in the negotiations
15    and so the question lacks foundation.
16    A. Only as I said from what I read here. I
17    didn't have any further discussions about the
18    discount that I can recall.
19    Q. Do you have an understanding of how the
20    discount was effected, how was the discount made
21    available to Barclays?
22    MR. HUME: Objection, vague and
23    ambiguous.
24    A. Do you want to reword that?

Page 32

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    32

1    Q. Do you have trouble with the question?
2    A. Not sure what you mean
3    Q. How did Barclays get the
4    5 billion-dollar discount?
5    A. Right. I think what was contemplated in
6    the negotiation, and what was executed in terms of
7    the settlement probably differed slightly, you
8    know, and involved over the week the settlement of
9    the transaction, meaning the actual transfer of
10    securities and cash was through the repo
11    agreements, and essentially the termination of
12    those repo agreements.
13    Q. Was the discount given to Barclays by
14    defaulting on the repo?
15    MR. HUME: Objection. You are asking
16    the witness very general questions about
17    a complicated transaction without walking him
18    through any of the details of that transaction. I
19    think the line of questioning lacks foundation.
20    MR TAMBE: You have an objection to
21    form, right, Hamish? So noted. Answer the
22    question, please.
23    MR. HUME: I think the line of
24    questioning is calling for speculation and lacks

Page 33

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    33

1    foundation.
2    MR. TAMBE: Do you remember my question?
3    Probably not. Do you want it read back?
4    A. Yes, please.
5    (Read back)
6    A   Yes, I would say that was the way in
7    which the transaction was settled, so that is
8    fair
9    Q. Would it also be fair to say, therefore,
10    that the discount was embedded in the haircut on
11    the repo transaction?
12    MR. HUME: Objection, what discount?
13    MR. TAMBE· The 5 billion-dollar
14    discount.
15    MR. HUME: What 5 billion-dollar
16    discount? You have not established or laid any
17    record of foundation
18    MR. TAMBE: Hamish, make objection to
19    form, move on. Don't make speaking objections.
20    MR. HUME· The objection is this is
21    a deliberately ambiguous and misleading line of
22    questioning
23    MR. TAMBE: Do you have my question in
24    mind?

## Page 34

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          34

1
2    A.  Could you repeat it please or read it
3    back
4              (Read back)
5    A.  In a repo transaction there is haircut,
6    a difference between the market value and the cash
7    value received  You could view that as
8    a discount  I think in this case it is fair to
9    say that that was the settlement mechanics and
10   therefore the way that the difference between
11   market value and cash paid was accomplished.
12   There was in that sense a discount.
13   Q.  So I understand your last answer, there
14   was a 5 billion-dollar differential, roughly,
15   between the cash paid by Barclays and the market
16   value of the collateral they received, correct?
17   A.  That was when I looked at our analysis,
18   that about the size of the number.
19   Q.  Let's go back to the week of the 16th.
20   You get the e-mail from Martin Kelly telling you
21   about at least an agreement in principle, correct?
22   A.  That is correct.
23   Q.  Let's move forward from there.  You have
24   got on the 16th a Fed funding facility in place,
25   correct.  Right?

## Page 35

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          35

1
2    A.  That is correct.
3    Q.  And you have got a repo from Barclays as
4    well, correct?
5    A.  Yes
6    Q.  And there was a pre-existing master
7    repurchase agreement with Barclays, correct?
8    A.  I believe so.
9    Q.  That was amended on Monday September 15?
10   A.  I believe so.
11   Q.  Were you involved in the amendment to
12   that?
13   A  I was not.
14   Q.  Who was?
15   A.  I don't know.
16   Q.  Do you have an under standing of what
17   the terms were of the Barclays -- the amended
18   Barclays repurchase agreement?
19   A.  I don't really recall, no
20   Q.  Am I right to believe that there are
21   haircut schedules associated with repo agreements?
22   A.  Correct.
23   Q.  There was such a haircut schedule in
24   connection with the Fed repo, correct?
25   A.  There was.

## Page 36

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          36

1
2    Q.  And there was a haircut schedule on the
3    Barclays repo, correct?
4    A.  I believe so, yes.
5    Q.  Do you recall there being any
6    significant difference between the haircuts on the
7    Fed repo and the haircuts on the Barclays repo?
8         MR. HUME:  Objection.
9    A.  There were certainly differences, I
10   can't recall how significant.
11   Q.  Do you remember if there were particular
12   asset classes in which there were differences?
13   A.  I don't, no.
14   Q.  The Fed repo was an overnight repo,
15   right?
16   A.  Correct.
17   Q.  So it rolled over from the 15th to the
18   16th?
19   A.  Correct.
20   Q.  And rolled over again from the 16th to
21   the 17th?
22   A.  Not the same size, no.
23   Q.  Tell me briefly what the changes were,
24   if any, in the size of the Fed repo from Monday to
25   Tuesday to later in the week?

## Page 37

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          37

1
2    A.  I can't recall the exact details.  I
3    recall that the Barclays repo on the -- again, I
4    am not certain about this but the Barclays repo on
5    the 16th, I believe, was for $5 billion  On the
6    17th I believe it was for $8 billion and then on
7    the Thursday there was obviously a much bigger
8    transaction and so that changed the Fed repo,
9    which became zero.
10   Q.  Let's talk about that bigger transaction
11   on Thursday, okay.  Describe for me how the Fed
12   repo went to zero and what happened with the
13   Barclays repo on Thursday?
14   A.  It is difficult for me to talk about the
15   mechanics because I am not that close to the
16   operational mechanics of the repo being unwound,
17   but my understanding was that the repo unwound on
18   the Thursday morning, which would be typical in
19   a tri-party repo, that an overnight repo would
20   unwind, you would return the collateral and the
21   cash and the transactions would then settle with
22   that collateral that was released, and at the end
23   of the day a new financing transaction would be
24   settled.
25           In this instance there was complexity because

## Page 38

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          38

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          38
2    JP Morgan was the tri-party agent for Lehman and had been
3    the tri-party agent in the transaction with the Fed. BONY
4    was the tri-party agent for Barclays and so there was a need
5    to transfer collateral from JP Morgan to Bank of New York
6    tri-party system, and I am not sure about the mechanics
7    involved in that transfer but it was clearly a more
8    complicated transaction than if the financing had just been
9    through the JP Morgan tri-party system.
10   Q. Is it your understanding that on
11   Thursday, in this bigger transaction on Thursday,
12   Barclays effectively replaced the Fed and the Fed
13   funding transaction?
14   A. I was not involved in the discussions
15   with Barclays or with the Fed on the removal or
16   replacement of the Fed in that transaction, so I
17   can't really talk to the specifics, but my
18   understanding was that the Fed transaction was
19   going to mature on the Thursday and they were not
20   really providing any financing subsequently.
21   Q. Wednesday night into Thursday, do you
22   recall the size of the Fed funding being
23   approximately $45 billion?
24   A. Yes, that sounds about right.
25   Q. And the Fed was holding approximately

## Page 39

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          39

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          39
2    $50 billion in collateral against that financing?
3    A. That sounds right.
4    Q. And the big transaction that you
5    described on Thursday effectively had Barclays
6    coming in and putting in $45 billion to pay off
7    the Fed repo, correct?
8    A. I understood that they were going to be
9    putting in 45, that it was going to be
10   a 45 billion-dollar transaction, yes.
11   Q. And all the collateral that was being
12   held by the Fed was then going to be transferred
13   to Barclays, correct?
14   MR. HUME: Objection, asked and
15   answered. He has already explained.
16   A. To be honest, I was not close enough to
17   the actual transaction that was being booked to
18   know exactly where all the collateral was going to
19   end up, nor was I close enough to any agreements
20   with Barclays or with the Fed as to where all of
21   the collateral was going to end up.
22   Q. So effectively on Thursday the Fed
23   funding goes down to zero, correct?
24   A. That is correct.
25   Q. And they exit the financing picture at

## Page 40

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          40

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          40
2    that point?
3    A. That is correct.
4    Q. And what you have left is the Barclays
5    repo, correct?
6    A. That is correct.
7    Q. Describe for me what happens with the
8    Barclays repo over the next few business dates?
9    We are now into Thursday on to Friday the 19th.
10   MR. HUME: Again, objection to the form
11   of the question and the lack of foundation.
12   A. That transaction happened on Thursday.
13   That was essentially the last of that transaction
14   in the way that I think about it. It was executed
15   on Thursday night and settled Thursday night into
16   Friday morning and that was the end of that
17   transaction. After that it was just a matter of
18   that transaction terminating and the collateral
19   being rebooked as a purchase by Barclays and as
20   a sale by Lehman.
21   Q. Do you recall if the Barclays repo was
22   terminated on Friday?
23   A. I don't.
24   Q. The legal documentation for the
25   Lehman/Barclays transaction, are you generally

## Page 41

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          41

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          41
2    familiar with that documentation?
3    A. With parts of it.
4    Q. What do you understand the operative
5    legal documentation to be for that transaction?
6    MR. HUME: I am going to object again.
7    You are asking -- he said he is not a negotiator.
8    You have shown him their documents and you keep
9    asking him to speculate about the entire
10   transaction. I will counsel the witness not to
11   speculate.
12   A. I am not a lawyer but I believe that the
13   asset purchase agreement is the document that you
14   are referring to.
15   Q. Is that a document that you -- when is
16   the first time you saw the asset purchase
17   agreement?
18   A. Not until a long time after the
19   transaction closed
20   Q. Is it fair to say during the week of the
21   15th to the 22nd you did not see the asset
22   purchase agreement?
23   A. I didn't, no.
24   Q. Did you see something called
25   a clarification letter?

## Page 42

HIGHLY CONFIDENTIAL - PAOLO TONUCCI  42

1
2  A  Not until long after the close.
3  Q.  You know what I mean by "clarification
4  letter"?
5  A  I know what you mean when you say the
6  clarification letter in relation to this
7  transaction, yes.
8  Q.  I am sorry, I cut you off.  What is your
9  understanding of the clarification letter?
10  MR. HUME:  Objection.  Same objection
11  You are asking someone who was not a negotiator,
12  who is not a lawyer to speculate as to the meaning
13  of these documents that you are not even showing
14  him.
15  A.  Only that it was a clarification to the
16  purchase agreement
17  Q.  Do you know when it was negotiated?
18  A.  I believe on the -- prior to closing on
19  the -- I don't remember  Actually, I don't know
20  when it was negotiated
21  Q.  Did anyone ever tell you why
22  a clarification letter was needed?
23  A.  No.
24  Q.  Did you review any drafts of
25  a clarification letter?

## Page 43

HIGHLY CONFIDENTIAL - PAOLO TONUCCI  43

1
2  MR. HUME:  Objection, asked and
3  answered.
4  A.  No.
5  Q.  During the week of September 15, so from
6  the 15th through the 19th, were you aware of any
7  mark downs on the Lehman assets on Lehman's own
8  books?
9  MR. HUME:  Objection, vague and
10  ambiguous.
11  A.  There was a great deal of volatility in
12  prices over that week so I can't really sort of
13  answer whether there were any specific mark downs.
14  I was not part of the process of re-marking those
15  books or re-marking the assets, but there was
16  a great deal of price volatility and so I would
17  certainly expect that there would be asset price
18  movements and I would expect most of them to be
19  down.
20  Q.  Were you aware of a general mark down
21  process in connection with Lehman's assets during
22  that week?
23  A.  No
24  Q.  Going back to Thursday and the closing
25  out of the Fed facility, and then the Barclays

## Page 44

HIGHLY CONFIDENTIAL - PAOLO TONUCCI  44

1
2  repo, you said the Bank of New York was
3  a tri-party provider for the Barclays repo, is
4  that right?
5  A.  That is right.
6  Q.  So they would have played a similar role
7  to the role played by JP Morgan on the Fed
8  facility, correct?
9  A.  That is correct.
10  Q.  And therefore Bank of New York would
11  have had prepared valuations of the collateral
12  that was being posted on the Barclays repo,
13  correct?
14  A.  Correct
15  Q.  And they did that, correct?
16  A.  I believe so, yes.
17  Q.  Are you familiar generally with the Bank
18  of New York valuations of the collateral posted by
19  Lehman?
20  A.  Generally, yes.
21  Q.  Are you aware of any discrepancies
22  between the Bank of New York valuations for the
23  collateral and Lehman valuations of that same
24  collateral?
25  MR. HUME:  Objection to form, what

## Page 45

HIGHLY CONFIDENTIAL - PAOLO TONUCCI  45

1
2  collateral.
3  Q.  The Barclays collateral.
4  A.  There was certainly a very comprehensive
5  reconciliation required because of the number of
6  securities that were moving, and some of those
7  securities were quite complicated in terms of not
8  just the valuation but the actual amounts.  These
9  are mortgage securities, mortgage pass throughs,
10  so there was a very big reconciliation required
11  and there were differences identified in the
12  details of the securities  There were differences
13  in the valuations and for certain there were
14  differences in the valuations.
15  Q.  And this reconciliation process that you
16  just described, when did that take place?
17  A.  I think the reconciliation that I
18  remember sort of in detail was after the closing
19  I think we tried to do a reconciliation on the
20  Friday  When I say "we", it was within the
21  operations team, and certainly after the 22nd or
22  on the 22nd, and after there were more detailed
23  reconciliations produced.
24  Q.  When you got to Barclays were you
25  involved in dealing with Barclays' accountants in

Page 46

HIGHLY CONFIDENTIAL - PAOLO TONUCCI            46

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI       46
2    accounting for the economics of the acquisition of
3    Lehman by Barclays?
4        A.  We were asked to contribute to the
5    initial balance sheet, the preparation of an
6    initial balance sheet, but I would say that my
7    involvement with the accountants was as an
8    information provider and was sporadic. I was not
9    involved in -- after the initial balance sheet,
10   components of the initial balance sheet were
11   provided, our balance sheet commitment, I don't
12   think I did very much in terms of the accounting
13   for the transaction.
14       Q.  In addition to helping with the
15   preparation of the initial balance sheet, did you
16   play any role in reviewing the valuation of the
17   acquisition in connection with the year-end
18   results for Barclays?
19       A.  I saw the balance sheet, the acquisition
20   balance sheet a number of times, and as I say I
21   was peripherally involved. The accounting for
22   this was quite complicated because of the
23   different entities that were involved, and so yes
24   I saw some details but the overall economics
25   I would say was not really clear to me  I was not

Page 47

HIGHLY CONFIDENTIAL - PAOLO TONUCCI            47

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI       47
2    sort of involved at that level
3        Q.  You are generally aware that Barclays
4    has reported a gain on the acquisition, correct?
5        A.  Yes.  I mean, I am aware of what was
6    publicly disclosed  I have not seen the details
7    of the calculation of that.
8        Q.  What is your general understanding of
9    the magnitude of the gain reported by Barclays for
10   the year-end 2008 from the Lehman acquisition?
11       A   That a gain on acquisition was reported
12   of over 2 billion pounds.
13       Q.  Over 2 billion pounds?
14       A.  Yes.
15       Q.  Is it your understanding that there may
16   well be additional gains from the acquisition that
17   have not yet been reported by Barclays?
18       MR. HUME:  Objection.
19       A.  I am not aware of that.
20       Q.  You don't know one way or the other?
21       A.  I don't.
22       Q.  Did you ever talk to anyone as to why
23   Barclays was getting a 5 billion-dollar discount
24   on this transaction?
25       A.  I don't think I did, no.

Page 48

HIGHLY CONFIDENTIAL - PAOLO TONUCCI            48

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI       48
2        Q.  You told us that you reviewed the asset
3    purchase agreement and the clarification letter at
4    some time after the closing of the transaction?
5        A.  No, I didn't say I reviewed them.
6    I said I was shown parts of the asset purchase
7    agreement and the clarification letter.
8        Q.  Even better. Do you recall whether the
9    asset purchase agreement or the clarification
10   letter reflect a 5 billion-dollar discount?
11       MR. HUME:  Objection to the form of the
12   question.  What do you mean "reflect"?
13       Q.  Do you have my question in mind?
14       A.  Could you repeat it, please?
15       (Read back)
16       MR. HUME   Again I am going to object to
17   the question since you have not shown him the
18   agreements, he is not a lawyer and he was not
19   a negotiator.
20       Q.  You were shown parts of the agreements,
21   right, that is what you said?
22       A.  I just don't know.
23       Q.  Let me ask you the question. You were
24   shown parts of these agreements, the asset
25   purchase agreement and the clarification letter,

Page 49

HIGHLY CONFIDENTIAL - PAOLO TONUCCI            49

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI       49
2    right?
3        A.  Yes.
4        Q.  The parts that you were shown, did they
5    show a 5 billion-dollar discount?
6        MR. HUME:  Do you recall is the
7    question.
8        A.  I don't recall, no.
9        Q.  What parts of the agreement do you
10   recall being shown?
11       A.  I don't know. I don't know. I didn't
12   see the whole agreement so -- I don't think I saw
13   the whole agreement.  I saw components of it
14   related to the various schedules of assets that
15   were being transferred and to some of the other
16   assets that were included in the agreement.
17       Q.  Was there a particular task or event in
18   connection with which you were shown these pieces
19   or parts of the transaction documents?
20       A   Yes, in the preparation I would say of
21   revisions to Schedule B to the agreement and in
22   the analysis of the 15c3 receivables.
23       Q.  And what role did you play in connection
24   with the revisions to Schedule B?
25       A   Providing some analytical support to the

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    50

1  determination of available collateral.

2      Q.  **Does that mean you determined what**

3  **collateral was available to be included in**

4  **Schedule B?**

5      A.  No.

6      Q.  **What do you mean by "analytical**

7  **support"?**

8      A.  It means that I helped coordinate the

9  process of reviewing collateral that may be

10 available that was being extracted from various

11 systems that you would typically use, whether it

12 was the operations systems or some of the

13 databases which aggregate that information and

14 provide a different cut of analysis.  So my work,

15 my involvement, was in reviewing that to ensure

16 that it was being appropriately queried and

17 analyzed and understood, validated.

18     Q.  **Who else was involved in this process?**

19     A.  The operations team were really the

20 experts in the operating systems and therefore in

21 understanding the availability of collateral.

22     Q.  **Who was the operations team?**

23     A.  Alastair --

24     Q.  **Who was the operations team doing this?**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    51

1      A.  Alastair Blackwell manages that team.

2  I would say that Jim Hraska was the person most

3  involved

4      Q.  **And this event that you are describe,**

5  **the revisions to Schedule B, this is post-closing,**

6  **correct?**

7      A.  That is correct.

8      Q.  **And in the weeks immediately after the**

9  **closing of the transaction?**

10     A.  Pre-closing there was an analysis

11 performed to determine the unencumbered

12 collateral, as I am sure you are aware, which was

13 the basis for the original Schedule B.  The

14 subsequent analysis I would say was to correct for

15 errors that may have been made in the initial

16 aggregation of information in the initial

17 analysis, and to reflect some of the breaks in the

18 different systems that were used, stock record

19 breaks for example.  That exercise continued

20 sporadically through the remaining three months of

21 2008.

22     Q.  **Again, just talking about the revisions**

23 **to Schedule B, I want to talk about the**

24 **post-closing revisions to Schedule B.  The errors**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    52

1  **you are talking about, is it errors about**

2  **identifying particular pieces of collateral?  Is**

3  **that the nature?**

4      A.  That is correct.

5      Q.  **When you said "stock record breaks",**

6  **what do you mean by "stock record breaks"?**

7      A.  These are breaks between the internal

8  accounting records and the external depository

9  statements.

10     Q.  **In terms of ownership of particular**

11 **securities, is that what you mean?**

12     A.  In terms of possession

13     Q.  **Did these revisions to Schedule B that**

14 **took place post-close affect the value of the**

15 **collateral that was listed on Schedule B, the**

16 **total value?**

17     MR HUME:  Objection  The revisions to

18 Schedule B are being referred to -- I believe the

19 record is unclear whether you mean revisions to

20 the schedule filed a week after the closing or any

21 subsequent work after that.  For the line of

22 questioning to be clear that needs to be made

23 clear in the questions.

24     MR TAMBE:  I am talking about the

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    53

1  revisions to Schedule B that you talked about,

2  Mr. Tonucci

3      MR HUME:  There have been a number of

4  answers that he has provided so I still think the

5  question is unclear

6      MR. TAMBE:  So the revisions to Schedule

7  B that you were talking about, did those revisions

8  affect the total value of the Schedule B?

9      A.  I am referring to the revisions that

10 happened in the period after the initial filing of

11 Schedule B and I am not sure when and if the --

12 you know, when and if revisions were actually

13 lodged with the court.  I am not a lawyer and I am

14 not sure what the legal process was but certainly

15 the internal calculations of unencumbered

16 collateral is what I am referring to as the

17 revisions to Schedule B that happened essentially

18 after the initial filing of Schedule B in

19 late September, and those revisions changed the

20 collateral detail significantly  So the values

21 clearly changed along with the composition of the

22 assets.

23     Q.  **Did they change up, increasing value, or**

24 **did they change down?**

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          54
2      A  I believe they changed in both
3  directions.
4      Q.  As an aggregate?
5      A.  I don't know.
6      Q.  Do you have an understanding as to the
7  origination of Schedule B?
8      A.  I do.
9      Q.  What is your understanding about the
10  origination of Schedule B?
11     A.  The origination of Schedule B was to
12  list the unencumbered collateral that was to be
13  included within the sale and purchase agreement.
14     Q.  So this was unencumbered collateral
15  other than the collateral that had already been
16  posted to Barclays under the Barclays repo,
17  correct?
18     A.  That is correct.
19     Q.  And is it your recollection that the
20  origination of Schedule B goes back to Friday,
21  19 September?
22         MR. HUME  Objection, lacks foundation.
23     A.  That is correct.
24     Q.  And do you recall there being an effort
25  on September 19 to find additional collateral for

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          55
2  Barclays?
3      A.  I do.
4      Q.  What can you tell us about the efforts
5  to find additional collateral for Barclays?
6      A.  That we were asked on the morning of the
7  19th to find if there was additional collateral to
8  include in the transaction
9      Q.  Asked by whom?
10     A.  I believe I was asked by Ian Lowitt.
11     Q.  Did Ian Lowitt tell you why he was
12  asking you to find additional collateral?
13     A.  He said that it was necessary for the
14  transaction to close and he reiterated that
15  through the day.
16     Q.  In addition to Schedule B, were there
17  other collections of assets that were put together
18  to provide additional collateral to Barclays?
19     A.  There were receivables in the form of
20  the 15c3 reserve, which were reviewed, and through
21  the course of the Friday there were other
22  receivables that were also reviewed to determine
23  if they could be included as assets or collateral
24  in the sales agreement.
25     Q.  What other receivables?

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          56
2      A.  We reviewed derivative receivables and
3  margin balances, FX receivables, that is foreign
4  exchange.  I should add actually we also reviewed
5  some bank receivables, because there had been cash
6  posted with some of the clearing banks, so that
7  was also reviewed.
8      Q.  Safe to say you looked in every corner
9  for assets and receivables that you could deliver
10  to Barclays?
11         MR. HUME· Objection, vague and
12  ambiguous.
13     A  We reviewed the balance sheet to see
14  where there might be additional assets.
15     Q.  You looked everywhere, right?
16     A.  We looked across the whole balance
17  sheet.
18     Q.  And this was a directive from Mr. Lowitt
19  to find these assets, correct?
20     A  That is correct.
21     Q.  And you found a bunch of unencumbered
22  assets and put them in Schedule B?
23     A.  That is correct.
24     Q.  And then you found these 15c3
25  receivables, is that right?

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          57
2      A.  I would say we identified the 15c3
3  receivables as an asset that could be transferred
4      Q.  Who is the "we" who identified those
5  receivables?
6      A.  It was again overseen by Ian but it was
7  myself, Martin Kelly, Robert Azerad.
8      Q.  What was approximately the value of the
9  15c3 receivables that you identified?
10     A.  There was uncertainty, a great deal of
11  uncertainty about the excess, but there was
12  certainty about the actual deposits that had been
13  made for 15c3, which included a cash deposit with
14  Wells Fargo for a billion dollars and securities
15  which in the calculation had been valued at, I
16  believe, $769 million
17     Q.  And so that is about what, $1.7 billion
18  total?
19     A.  That is correct.  There may have been
20  other balances.  I think that there were other
21  securities balances also that were on deposit but
22  I recall specifically those two.
23     Q.  On the Friday the 19th, is it your
24  recollection that the 15c3 receivables were
25  identified as assets or receivables that in fact

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    58
2    could be transferred to Barclays?
3        MR. HUME: Objection to the lack of
4    foundation.
5        A. That is correct, that is my
6    understanding.
7        Q. From your earlier answer it seems that
8    there were receivables that you identified that
9    maybe you concluded could not be transferred to
10    Barclays, is that fair?
11        A. That is correct.
12        Q. The 15c3's could be transferred to
13    Barclays, right?
14        MR. HUME: Objection to the vagueness of
15    the question. What do you mean by "could"?
16        A. I mean, I would try and clarify this --
17        Q. Sure.
18        A. The thinking was that there was
19    a surplus, in that calculation that although it
20    was uncertain as to worth the amount of the surplus
21    and the requirement, these represented assets
22    which were transferable and, you know,
23    identifiable and transferable I would say that
24    the distinction with some of the other receivables
25    was that it was much more difficult, given our

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    59
2    information, our sort of accounting position at
3    that time, our transactional detail at that time,
4    it was much more difficult to identify specific
5    receivables that could have been transferred. So
6    it was more a matter of these were much more
7    easily identifiable, but yes, we did believe that
8    they were transferable, or would become
9    transferable. It was always understood that there
10    was a regulatory approval that would be required
11    but that they would become transferable.
12        Q. Did you have any discussions with
13    Mr. Lowitt as to whether transferring their
14    receivables was part of the deal with Barclays?
15        MR. HUME: Objection, what receivables?
16        Q. The 15c3 receivables?
17        A. I do recall talking to him about that,
18    yes.
19        Q. What did he tell you?
20        A. We were looking for potential other
21    assets and so we were going to include this in the
22    agreement.
23        Q. Do you know one way or the other whether
24    the 15c3 receivables were part of the asset
25    purchase agreement?

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    60
2        A. I can't recall if they were part of the
3    asset purchase agreement or some clarification
4    letter.
5        Q. The parts of the asset purchase
6    agreement or the clarification letter that were
7    shown to you, do you recall whether they had any
8    reference to the 15c3 assets?
9        A. I don't recall. I don't recall which.
10    I do recall that there was in one or other of
11    those documents a reference to that, to those
12    assets.
13        Q. The other receivables you mentioned, the
14    derivatives receivables, could you describe what
15    you mean by derivative receivables?
16        A. Yes. Particularly for LBI there were
17    substantial margins posted at the exchanges, which
18    were accounted for, essentially accounted for as
19    receivables, and those are what I refer to as
20    derivative receivables.
21        Q. Would an example of derivative
22    receivables be these types of receivables that
23    were posted with the OCC?
24        MR. HUME: Objection to the form of the
25    question. These type? Which type of receivables?

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    61
2        Q. Derivative receivables?
3        A. I would say that would be consistent
4    with my understanding.
5        Q. And the OCC is the Options Clearing
6    Corp?
7        A. That is correct.
8        Q. Do you recall in the bits and pieces of
9    the asset purchase agreement, the APA and the
10    clarification letter that was shown to you whether
11    those documents provided for derivatives
12    receivables to be transferred to Barclays?
13        MR. HUME: Objection. You are asking
14    this witness to give an opinion on a legal
15    document that you have not shown him. He is not
16    a lawyer and he said he was not a negotiator of
17    the deal
18        MR. TAMBE: You have an objection to
19    foundation and form.
20        MR. HUME: I am not just objecting to
21    foundation It is an inappropriate, misleading
22    question
23        MR. TAMBE: Don't make speaking
24    objections. Object to form, move on, we will get
25    through this faster.

Page 62

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          62

1       MR. HUME: It is not just an objection
2   to form.
3       MR. TAMBE: Are you instructing him not
4   to answer?
5       MR. HUME: I am objecting to
6   a misleading line of questioning.
7       MR. TAMBE: Thank you.
8       Mr. Tonucci, do you have my question in
9   mind?
10          (Read back)
11      A. I don't recall.
12      Q. Another type of receivable you described
13  before were FX receivables?
14      A. Um hum
15      Q. Did you identify any foreign exchange
16  receivables that could be transferred to Barclays?
17      A There was a receivable balance for
18  forward settling foreign exchange on the LBI
19  balance sheet.
20      Q. And the determination was that those
21  receivables could be transferred to Barclays, is
22  that right?
23      MR. HUME: Objection to the form,
24  objection to the vagueness of the word --

Page 63

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          63

1       A  There was insufficient detail to be able
2   to confirm that, that that still existed at that
3   point in time.
4       Q. At some subsequent point in time was
5   a determination made as to those FX receivables?
6       A I don't know.
7       Q. Another category of receivables you
8   identified were bank receivables?
9       A. Yes.
10      Q. Again, the same series of questions on
11  the bank receivables; was a determination made on
12  the 19th that those were transferable to Barclays?
13      A. On the 19th there was a determination
14  made that it was too complicated and too uncertain
15  to be able to say whether those were transferable
16      Q. And on some subsequent date after the
17  19th was a determination made as to whether those
18  could be transferred?
19      A. I don't know.
20      Q. You were in New York during this week,
21  correct?
22      A. That is correct.
23      Q. Do you recall accepting your offer of
24  employment at Barclays?

Page 64

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          64

1       A. I do.
2       Q. When did you do that?
3       A. I believe it was 26 September.
4       Q. You sent an e-mail on the morning of the
5   22nd accepting your offer, right?
6       MR. HUME: Objection, lacks foundation.
7       A. I can't remember.
8       Q. Do you recall about an hour after the
9   ink dried on the clarification letter you sent an
10  e-mail?
11      MR. HUME: Objection to form.
12      A I don't remember.
13      Q. Let me show it to you.
14          (Exhibit 137A marked for identification)
15      I have handed you a one page document
16  marked Exhibit 137A. Do you have that before you?
17      A. I do.
18      Q. Do you recognize this as an e-mail that
19  you sent to an e-mail box called "Accept Barclays
20  offer at Lehman.com"?
21      A. Yes.
22      Q. And the subject simply says: "I accept".
23  Correct?
24      A. Yes.

Page 65

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          65

1       Q. You were accepting an offer of
2   employment for Barclays, right?
3       A. Yes.
4       Q. What offer were you accepting on
5   Monday September 22 at 1:04 pm GMT?
6       A. I can't recall the details at that point
7   but I believe that the offers went out over the
8   weekend, but I don't recall the exact details of
9   it at that point. I recall the hard copy in more
10  detail. I am not too sure when that was sent out
11      Q. If I understand your answer, at some
12  point over the weekend of the 20th/21st you
13  received a soft copy of the offer?
14      A. Yes.
15      Q. And at some point during the week of the
16  22nd you actually signed a hard copy?
17      A. That is correct.
18      Q. But you knew before the 20th that you
19  would be offered employment by Barclays, correct?
20      MR. HUME: Objection.
21      A. I knew on the evening of the 19th that
22  I would receive an offer from Barclays
23      Q. Had you had any discussions with anyone
24  prior to September 19 about receiving an offer

Page 66

```
1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI        66
2   from Barclays?
3       A.  No.
4       Q.  What was the communication you received
5   on the evening of September 19 about an offer from
6   Barclays?
7       A.  After the Lehman and the Barclays and
8   the other teams had gone to the bankruptcy court,
9   after the day's work had been completed and I was
10  going to head home, and I had been up all night so
11  I was exhausted, and so I am not too sure, I am
12  not too sure of the exact time, before departing
13  for the day Ian Lowitt advised me that I would
14  receive an offer, and he gave me the general terms
15  that I would likely be offered.
16      Q.  When you say "the general terms", the
17  general economic terms of the offer?
18      A.  The general economic terms, but I was
19  not sure of the position at that point.
20      Q.  Prior to that September 19, had you had
21  discussions with Ian about what your future held
22  for you?
23      A.  No.
24      Q.  No discussions?
25      A.  No.
```

Page 67

```
1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI        67
2       Q.  Did you try to get any assurance from
3   him or anyone else about whether there was a place
4   for you at Barclays?
5       A.  No
6       Q.  You knew he would be heading to
7   Barclays, right?
8       A.  I didn't, no.
9       Q.  Did you know whether any of the folks
10  that you were working with at Lehman that week
11  were going to be headed to Barclays?
12      A.  I expected that there would be some that
13  were heading to Barclays but I was not sure of
14  exactly whom.
15      Q.  Barclays was buying the North American
16  operations, correct?
17      A.  Correct
18      Q.  And they needed people to run those
19  operations?
20      A.  Correct
21      Q.  So your expectation was that some
22  significant number of Lehman folks would in fact
23  get offers from Barclays?
24      A.  That is correct.
25      Q.  And you certainly hoped to be included
```

Page 68

```
1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI        68
2   in that group?
3       A.  Yes, I think it is fair to say I hoped
4   to be included.
5
6
7
8
9
10
11
12                  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 69

```
1                                                    69
2
3
4
5
6
7
8
9
10
11
12                  REDACTED
13
14
15
16
17
18
19
20
21
22
23          MR. HUME:  Sorry, I am unsure.  We are
24  going to designate obviously any portion of the
25  transcript that relates to compensation highly
```

## Page 70

HIGHLY CONFIDENTIAL - PAOLO TONUCCI 70

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI   70
2   confidential. Is it understood we can do that
3   after the deposition?
4       MR. TAMBE:  Yes, and I think the
5   agreement that was reached at the Felder
6   deposition we assume carries for all depositions.
7       MR. HUME.  For all designations we can
8   do it later rather than during.
9       MR. TAMBE:  You can do it later.  Let's
10  just follow the Felder rule.  I think it was that
11  we were going to treat the entire transcript as
12  highly confidential.
13      MR. MAGUIRE:  Treating the entire
14  transcript as highly confidential for a week and
15  make the designations within the week.
16
17
18
19              REDACTED
20
21
22
23
24
25

## Page 71

71

REDACTED

## Page 72

72

REDACTED

11      . . .
12      (Exhibit 139A marked for identification).
13      Q.  I have placed before you a 2-page
14  document marked Exhibit 139A.  Let me know when
15  you have had a chance to review it.
16      A.  I have reviewed it, yes
17      Q.  A couple of questions about some of the
18  names that appear on this e-mail chain.  Some you
19  have mentioned this morning but a couple of others
20  I want to ask you about.  David Aronow, what
21  position did Mr. Aronow have?
22      A.  He is within the operations team.
23      Q.  At Lehman?
24      A.  At Lehman.
25      Q.  And he made the move to Barclays as

## Page 73

HIGHLY CONFIDENTIAL - PAOLO TONUCCI 73

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI   73
2   well?
3       A.  Yes.
4       Q.  John Palchynsky, what position did he
5   have at Lehman?
6       A.  He was in the operations team.
7       Q.  Did he make the move to Barclays?
8       A.  Yes.
9       Q.  John Feraca.  Was he in the operations
10  team at Lehman as well?
11      A.  He was in the prime services team
12      Q.  Did he make the move to Barclays?
13      A.  Yes.
14      Q.  Monty Forrest, what was his position at
15  Lehman?
16      A.  He was in the prime services team.
17      Q.  Did he make the move to Barclays?
18      A.  He did.
19      Q.  Neil Ullman, what was his position at
20  Lehman?
21      A.  He was in the operations team.
22      Q.  Did he make the move to Barclays?
23      A.  He did.
24      Q.  Dan Fleming, you have mentioned before.
25  Did he make the move to Barclays?

Page 74

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      74
2      A. He did.
3      Q. Just a question about the e-mail address
4  for Mr. Fleming. It has in parentheses "TSY"
5  after it. Do you see that?
6      A. Yes.
7      Q. Any understanding what that means?
8      A. Treasury.
9      Q. And that was a designation used within
10  Lehman?
11      A. I don't know. I think that the TSY
12  designation is used where there may be more than
13  one person, just to identify which one it is.
14      Q. Craig Jones, what was his position
15  within Lehman?
16      A. He was in treasury.
17      Q. Did he make it over to Barclays?
18      A. He did.
19      Q. Look at the top half of Exhibit 139A.
20  There is a message there from Mr. Palchynsky to
21  several people, including you. Do you see that?
22      A. I do.
23      Q. He says in there: "Anyway, see you all
24  at BarCap". Do you see that?
25      A. I do.

Page 75

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      75
2      Q. There is an e-mail dated September 19,
3  2008. Do you see that?
4      A. I do.
5      Q. Around 6:28 pm, right?
6      A. Yes.
7      Q. So was this the first that you had heard
8  about your employment at Barclays?
9      A. I believe that I had heard perhaps an
10  hour before that.
11      Q. Was this the first that you had heard
12  that all these other people were also going to be
13  going to Barclays?
14      A. This is a relatively junior person in an
15  operations area, who could have been speculating.
16  It was not clear to me that all of these people
17  were going to be moving over
18      Q. This chain of e-mails has a subject line
19  that says: "Urgent, tri unwind". Do you see that?
20      A. I do
21      Q. And what was the "Urgent tri unwind"
22  about, if you recall?
23      A. It was to do with the cash balance that
24  was placed with JP Morgan on the night by Barclays
25  on the night of the 18th, and was part of the

Page 76

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      76
2  tri-party arrangement, and it was being unwound.
3      Q. And the collection of people on these
4  e-mails were involved in assisting with that
5  unwind?
6      A. They were involved in the repo
7  operations.
8      Q. So they would have dealt with that
9  unwind and other aspects of the repo?
10      A. Yes.
11      MR. TAMBE · Thank you. We will take
12  a short break now.
13      (Break from 8:55 to 9:14 am.).
14      Q. I am showing you a document previously
15  marked as Exhibit 19. Have you seen this document
16  before today, sir?
17      A. I have.
18      Q. What do you understand it to be?
19      MR HUME· Objection to the form.
20      A. It was the balance sheet that was I
21  believe, you know, part of the negotiation for the
22  sale to Barclays, so the estimated balance sheet.
23      Q. And the estimated balance sheet for what
24  entity?
25      A. For the part of LBI that was being sold.

Page 77

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      77
2      Q. Do you recall if this is a document that
3  you saw during that week, the week
4  of September 15, 2008?
5      A. Yes, I believe I saw it on the 16th.
6      Q. Do you know in connection with what
7  event or action did you see this document?
8      A. In relation to the Barclays contemplated
9  purchase.
10      Q. Who showed it to you?
11      A. I think it was Ian Lowitt.
12      Q. Did you play any role in the preparation
13  of this document, Exhibit 19?
14      A. I did not.
15      Q. We had earlier talked about the
16  $5 billion discount. Do you know if the
17  $5 billion discount was reflected in this
18  document, Exhibit 19?
19      MR. HUME: Objection, lacks foundation
20      A. I do not know.
21      Q. If you look under the "liabilities"
22  column, last two entries above the total are
23  titled "Cure PMT" and "Comp". Do you see that?
24      A. I do.
25      Q. And there is a total of about four and

Page 78

1     **HIGHLY CONFIDENTIAL - PAOLO TONUCCI**     78
2   a quarter billion dollars, do you see that?
3       A   I do.
4       Q.   Did you have any understanding during
5   the week of the 15th as to what those items were?
6       A.   No, not really
7       Q.   Do you have any understanding today
8   about what those items were?
9       A.   I can read that the compensation number
10  is compensation and I am not sure about the cure
11  payment.
12      Q.   At any time from September 15th to the
13  present have you had discussions with anyone,
14  other than counsel, about the cure payment and
15  comp liabilities assumed by Barclays?
16      A.   No, I have not.
17      Q.   Going up to the assets side of this
18  balance sheet, there is a sub-total of
19  $62.7 billion for assets.  Do you see that?
20      A.   I do.
21      Q.   Was that your understanding of the
22  assets available to LBI on or about September 15
23  or September 16 of 2008?
24      MR. HUME.  Objection, lacks foundation.
25  Are you asking his understanding at that time or

Page 79

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI     79
2   the assets at that time?
3       Q.   His understanding of assets at that
4   time?
5       A   I would have expected the assets to be
6   of that order.
7       Q.   And that is something you would have
8   tracked in connection with your liquidity
9   management function, correct?
10      A.   Not in this form   This is sort of an
11  accounting representation, and so it was not so
12  relevant to funding, which is slightly different,
13  a different way of viewing the balance sheet
14      Q.   But you would want to know what the
15  aggregate amount of Government and agency paper
16  that Lehman had?
17      A.   Yes.
18      Q.   Because that is what you would be
19  pledging as collateral against --
20      A.   That is right.
21      Q.   You would care about what commercial
22  paper you had?
23      A.   That is right.
24      Q.   For the same reasons?
25      A.   That is right

Page 80

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI     80
2       Q.   The derivatives item on this Exhibit 19,
3   do you have an understanding as to what that was
4   comprised of?
5       A.   I mean, the derivative balance is on
6   both sides, the assets and the liabilities, and I
7   am not sure exactly what went into either of
8   those.
9       Q.   You had talked earlier about being
10  involved in preparing an opening balance sheet for
11  Barclays.  Do you recall that?
12      A.   I do.
13      Q.   Did you use Exhibit 19 or a document
14  like Exhibit 19 as a starting point for that work
15  that you did?
16      MR. HUME:  Objection to the form.
17      A.   No, I did not.
18      Q.   What process did you follow in preparing
19  the opening balance sheet?
20      A.   In reconstructing the balance sheet we
21  used the transactions which we understood to have
22  settled or be in the process of settling.
23      Q.   And by "the transactions" you mean the
24  transactions pursuant to the asset purchase
25  agreement, the clarification letter?

Page 81

1     **HIGHLY CONFIDENTIAL - PAOLO TONUCCI**     81
2       A.   That is right.
3       Q.   I have had placed before you a document
4   or I have placed before you a document marked
5   Exhibit 60B.  Take a moment to look at those
6   2 pages, let me know when you are done.
7       A   Yes.
8       Q.   Are you familiar with that document?
9       A   No.  It is the first time I have seen
10  it.
11      Q.   Take a moment to read the cover e-mail
12  and the spreadsheet that is attached and I am
13  going to ask you a couple of questions about the
14  information that is contained in that document,
15  and let me know when you are done.
16      A.   Okay.
17      Q.   Turning to the attachment to the cover
18  e-mail, do you have a general understanding of the
19  nature of the information that is contained on
20  that spreadsheet that is the second page of
21  Exhibit 60B?
22      A.   Yes, a general understanding.
23      MR. HUME:  May I just ask, the e-mail
24  says it is September 18, 2008  The attachment is
25  dated March 27, 2009.

Page 82

```
 1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        82
 2        MR. TAMBE: I think the attachment is
 3   a native format document so when you print it out
 4   it prints out the date on which it was printed
 5   out. That is just my guess.
 6        MR. HUME: This is not Bates numbered.
 7        MR. TAMBE: No, it is not.
 8        MR. HUME: So I am objecting to the form
 9   of the exhibit.
10        MR. TAMBE: Okay.
11        MR. HUME: And I am reserving all rights
12   to object to the authenticity of the exhibit.
13        MR. TAMBE : Do you have my question in
14   mind? Probably not.
15        A   I don't
16        Q.  We will have it read back.
17        (Previous Question and Answer Read back)
18        Looking down this attachment to Exhibit 60B and
19   the left-hand column under the heading "Program", there is
20   a series of entries with the title "TSLF". Do you see that?
21        A.  I do.
22        Q.  Do you recognize that as a Fed funding
23   program?
24        A.  I do.
25        Q.  And that the term security is lending
```

Page 83

```
 1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        83
 2   facility?
 3        A   That is correct
 4        Q.  There is a total associated with that,
 5   do you see that?
 6        A.  I do.
 7        Q.  The next item is "PDCF", and that is the
 8   prime dealer credit facility, is that right?
 9        A.  Primary dealers credit facility.
10        Q.  Primary dealers, and the next item is
11   OMO, and that is open market operations?
12        A   That is correct
13        Q.  And all three of these items, TSLF, PDCF
14   and OMO are Fed funding facilities that were
15   available back in September 2008?
16        A.  That is correct
17        Q.  Looking at the amounts, the grand total
18   amounts at the bottom, is it your recollection
19   that that was roughly the amount of the Fed
20   facility borrowing as of September 18, 2008?
21        MR. HUME: Objection to the form.
22        A   Yes, that sounds about right
23        Q.  I would like your understanding of the
24   different values that appear in the grand total
25   line or row.
```

Page 84

```
 1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        84
 2        MR. HUME: What grand total line, which
 3   line?
 4        MR TAMBE   There is only one grand
 5   total line.
 6        MR HUME. At the bottom?
 7        Q.  Yes. Par amount, $43 billion and
 8   change. Do you see that?
 9        A   Yes.
10        Q.  Do you have an understanding as to what
11   that is a reference to?
12        A.  I do.
13        Q.  Okay, what?
14        A.  Par amount of the securities.
15        Q.  So that would be the par amount of
16   securities pledged?
17        A.  That is correct.
18        Q.  The next column over is titled "Current
19   market". Do you see that?
20        A.  I do.
21        Q.  And that carries a value at the bottom,
22   the grand total row of $49.7 billion. Do you see
23   that?
24        A.  I do.
25        Q.  What is your understanding of what that
```

Page 85

```
 1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        85
 2   column and that grand total represents?
 3        MR. HUME: Objection, lacks foundation.
 4        A.  I could only read what it says, which is
 5   "current market", and I would assume that is the
 6   current market valuation as attributed by whoever
 7   is preparing this document
 8        Q.  And then the next two columns are
 9   "Paydown amount" and "Anticipated prefunding
10   dollar amount". Do you have an understanding of
11   what these terms mean?
12        MR. HUME: Objection. I believe you are
13   asking the witness to speculate about a document
14   he has not seen before.
15        Q.  Managing liquid, you know what paydown
16   amounts are?
17        A.  It is actually not a term that I would
18   typically use.
19        Q.  Any understanding what that term means?
20        A.  I assume that that is the cash component
21   of the transaction.
22        Q.  And the anticipated prefunding dollar
23   amount, is that a term you are familiar with?
24        A.  No.
25        Q.  Not a term you use?
```

Page 86

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    86 |
| 2 | A. No |
| 3 | Q. Any idea what that means? |
| 4 | MR. HUME: Objection, calls for |
| 5 | speculation. |
| 6 | A. No, not really |
| 7 | MR. HUME: He is asking you to |
| 8 | speculate. |
| 9 | Q. Just in broad dollar terms, was it your |
| 10 | understanding that the amount of the Fed facility |
| 11 | on or about September 18, 2008, was a funding of |
| 12 | about $44 billion or $45 billion against a market |
| 13 | value of collateral of about $50 billion? |
| 14 | A  Yes, that sounds right. |
| 15 | (Exhibit 140A marked for identification) |
| 16 | Q. I have had placed before you a document |
| 17 | marked Exhibit 140A, a 3-page document.  Take |
| 18 | a moment to look at it, let me know when you are |
| 19 | done.  You done? |
| 20 | A. I have read through it. |
| 21 | Q. Do you recognize that document? |
| 22 | A. Actually, I can't recall going through |
| 23 | this, no. |
| 24 | Q. Do you see the cover e-mail is an e-mail |
| 25 | from Mr. Robert Azerad? |

Page 87

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    87 |
| 2 | A. Yes. |
| 3 | Q. Martin Kelly? |
| 4 | A. Yes. |
| 5 | Q. You are shown as a cc on that? |
| 6 | A. Yes. |
| 7 | Q. Do you understand the information that |
| 8 | is contained on page 2 of Exhibit 140A? |
| 9 | A. Not entirely sure I do. |
| 10 | Q. Do you recall there being a discussion |
| 11 | or an analysis during that week of September 15 |
| 12 | about assets available to be transferred by LBI to |
| 13 | Barclays? |
| 14 | A. I do, yes. |
| 15 | Q. What do you recall about that analysis |
| 16 | or discussion? |
| 17 | A. That obviously we were trying to be as |
| 18 | specific as possible about not just the assets |
| 19 | that were on the balance sheet but actually what |
| 20 | was going to be available for transfer.  The |
| 21 | difference between the balance sheet from a sort |
| 22 | of accounting or GAPP perspective from a funding |
| 23 | perspective, was really one of granularity, in |
| 24 | terms of what has settled and exactly where the |
| 25 | securities that are in the repo agreements or |

Page 88

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    88 |
| 2 | reverse repo agreements.  So the effort was to try |
| 3 | and establish what was exactly available for |
| 4 | transfer. |
| 5 | Q. Is it your understanding that the assets |
| 6 | that were listed on the LBI balance sheet, not all |
| 7 | of those ultimately were transferable to Barclays? |
| 8 | A. Yes. |
| 9 | Q. We had seen earlier in Exhibit 19, which |
| 10 | I think is still before you, if you can just turn |
| 11 | to that -- |
| 12 | A. Yes. |
| 13 | Q. This is a balance sheet I think you told |
| 14 | us of LBI as of September 16, 2008, correct? |
| 15 | A. Yes 15th, I think, I assume. |
| 16 | Q. And that has a total adjusted assets or |
| 17 | adjusted total assets of 72.6 billion.  Do you see |
| 18 | that? |
| 19 | MR HUME: Objection. Did you ask |
| 20 | whether this Exhibit 19 was a balance sheet for |
| 21 | LBI. |
| 22 | MR. TAMBE: Yes? |
| 23 | MR. HUME: Was that the question? |
| 24 | MR. TAMBE: That was not the question, |
| 25 | no  The question was whether it as had a total |

Page 89

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    89 |
| 2 | adjusted assets of 72 6 billion. |
| 3 | MR. HUME.  Before you asked if it was |
| 4 | a balance sheet of LBI. |
| 5 | MR  TAMBE:  The record is what it is. |
| 6 | You have an objection to make, make it, let's move |
| 7 | on. |
| 8 | MR. HUME:  I think the record is |
| 9 | misleading now  You asked a question that the |
| 10 | witness did not understand. |
| 11 | MR. TAMBE.  Unless you are challenging |
| 12 | the witness I am not sure what that objection is |
| 13 | all about. |
| 14 | Let's go back to the Exhibit 19, LBI |
| 15 | balance sheet adjusted total assets 72.65 billion |
| 16 | Correct. |
| 17 | A. I can see that, yes |
| 18 | Q. And is it your recollection that over |
| 19 | some -- over the course of that week, the week |
| 20 | of September 15, the assets of LBI available for |
| 21 | transfer were less than 72.65 billion? |
| 22 | A. Yes. |
| 23 | Q. It went down to a number of about |
| 24 | 50 billion, correct? |
| 25 | A  I am not sure it ever went as low as |

Page 90

2  that, but anyway it certainly went down.

3      Q.  How low did it go in your recollection?

4      A.  Somewhere between 50 and 60 billion

5      Q.  And part of the reason for that change

6  from 72 to the 50 to 60 billion range is assets

7  that could not be transferred to Barclays,

8  correct?

9          MR. HUME:  Objection, lacks foundation.

10     A.  Yes, that is right.  I mean, insofar as

11 they were transactions that were being settled

12 elsewhere, and so the securities would not be

13 available for transfer to Barclays

14     Q.  Going back to Exhibit 140A, the 3-pager,

15 on the third page of that exhibit, there is an

16 analysis set forth.  Do you see that?

17     A.  I do

18     Q.  Do you have an understanding of what

19 that analysis is?

20     A.  General, yes.

21     Q.  Generally, could you tell us what that

22 analysis is?

23     A.  It is a summarization of the inventory

24 which has been reversed in from other entities or

25 repo'd out.  The LBI proprietary matched book is

Page 91

2  a representation of the inventory which is both

3  reversed in and repo'd out.

4      Q.  If you can just explain what a matched

5  book is?  It is a phrase I have seen in some of

6  the e-mails.  I want to get a better understanding

7  of what that is.

8      A.  The matched book is a financing business

9  where securities are financed on behalf of

10 customers and the matching that is on the other

11 side, they are financed to the street or with

12 other customers, so it is an activity where the

13 financing should be matched.

14     Q.  And presumably Lehman are in some spread

15 in the course of this matched activity?

16     A.  It should, yes

17     Q.  During the course of this week

18 of September 15 was the matched book reduced down

19 effectively to zero?

20     A.  As close as possible to zero.

21     Q.  Were you involved during this time

22 period, September 18, September 19, in identifying

23 or helping to identify those assets of LBI that

24 would be available for transfer to Barclays?

25     A.  Yes, particularly in the sort of

Page 92

2  18th/19th period.

3      Q.  And Mr. Azerad was involved in that

4  process as well?

5      A.  Yes.

6      Q.  Was Mr. Martin Kelly involved in that as

7  well?

8      A.  Yes.

9      Q.  What was Mr. Kelly's position?

10     A.  Martin was the financial controller so

11 he was the accounting -- he was essentially the

12 accountant for the group, chief accountant for the

13 group.

14     Q.  Your co-equal or your subordinate?

15     A.  We were both direct reports to the CFO.

16     Q.  Gerry Reilly, Gerard Reilly, what was

17 his position?

18     A.  He was the product controller, the head

19 of products control, which is really the business

20 CFO, business units' CFO.

21     Q.  Which business units?

22     A.  He actually oversaw all of the business

23 units.

24     Q.  Give me a description of what you would

25 consider a business unit?

Page 93

2      A.  Just any of the fixed income for

3  example, any of the trading businesses.

4      Q.  So fixed income was a business unit that

5  he would oversee?

6      A.  Right.  I would think of Gerry as being

7  the management accountant and Martin being the

8  entity accountant, if that makes any sense

9      Q.  Not entirely, but that is fine.  We will

10 move on.  Francis Pearn, P-E-A-R-N?

11     A.  Yes.

12     Q.  Who was Francis?

13     A.  He worked for Gerry.

14     Q.  Were Gerry and Francis involved in this

15 process we talked about, identifying the assets of

16 LBI that were in fact transferable to Barclays?

17     A.  They were, yes.

18         (Exhibit 141A marked for identification)

19     Q.  I have handed you an exhibit marked

20 Exhibit 141A, which is a cover e-mail with

21 a spreadsheet attached to it.  If you could

22 generally look at the cover e-mail and the

23 spreadsheet attached, I will ask you some general

24 questions and then maybe some more specific ones about

25 the spreadsheet.  Just let me know when you are

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    94

1  done.
2  Q. Okay.
3  Q. Starting with the cover e-mail, reading
4  the chain from the bottom up, do you recognize
5  that as an e-mail sent to you from Mr. Hraska?
6  A. I do.
7  Q. Just some terminology I want to get your
8  understanding on. Mr. Hraska asks you, says:
9  "We do not have MV of DTC yet but are working
10  on it".
11  Is that a reference to market value of
12  DTC?
13  A. Correct.
14  Q. And DTC is?
15  A. DTC is the Depository Clearing
16  Corporation.
17  Q. The next line, there is a reference to
18  "GFS". What is that a reference to?
19  A. It is a system that was used to collate
20  assets and financing information called the Global
21  Financing System
22  Q. That is a system at Lehman?
23  A. That is correct.
24  Q. And market value data about securities

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    95

1  is entered into that system?
2  A. No.
3  Q. Okay. Describe it?
4  A. Market data is received from other
5  systems. GFS is just an aggregation tool, so
6  would source data from settlement systems or from
7  other pricing sources and apply that to the
8  inventory positions or collateral positions.
9  Q. So if Lehman has a collection of
10  mortgage backed securities, those are valued by
11  the traders at Lehman on some regular basis, is
12  that right?
13  A. That is correct.
14  Q. And those values get pulled into GFS
15  automatically, is that correct?
16  A. That is correct.
17  Q. So the Lehman traders would go in and
18  ascribe values to those securities, right?
19  A. That is correct.
20  Q. And GFS, do you have to run a GFS
21  program or does GFS automatically update itself
22  when new values are entered for particular
23  collateral?
24  A. It runs on an overnight basis so it

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    96

1  should pick up all of the most current
2  information.
3  Q. So if you wanted to track the value
4  ascribed by Lehman to a particular CUSIP over the
5  course of that week, September 15 through 22nd, if
6  I queried the GFS system, it could give me a daily
7  valuation of that CUSIP?
8  A. I have no idea
9  Q. Who would know the answer to that?
10  A. That is a technological question on data
11  storage and retrieval, so I would speak to someone
12  in the technology department
13  Q. In terms of figuring out how much money
14  Lehman could borrow on any day, would you query
15  the GFS system for values?
16  A. Yes.
17  Q. Who would do that on your behalf? Would
18  you do that yourself?
19  A. No.
20  Q. Who would do that?
21  A. Someone within my team, someone junior
22  to Robert generally.
23  Q. I just want to understand a little about
24  this spreadsheet that is attached to this cover

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    97

1  e-mail, Exhibit 141A. Are you generally familiar
2  with the format of this spreadsheet?
3  MR. HUME Object to the form
4  A. Generally.
5  Q. It is a kind of spreadsheet that was
6  prepared at Lehman from time to time, is that
7  right?
8  A. That is correct.
9  Q. I want to get an understanding of some
10  of the column headings, what your understanding is
11  of what they mean. Let's use the column title, so
12  column A, on the first page of the spreadsheet has
13  a code "PR underscore space ID". Do you see that?
14  A. Yes.
15  Q. What is your understanding of what that
16  means?
17  A. It is an identifier.
18  Q. A Lehman identifier?
19  A. I believe so.
20  Q. The next column is "CUSIP", and that is
21  the security identifier, is that right?
22  A. That is correct.
23  Q. The next, column C, is "LB underscore
24  space rating". Do you see that?

Page 98

```
1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI      98
2      A.  I do.
3      Q.  And what is that a reference to?
4      A.  I think that is an amalgum rating,
5   default rating from -- for I guess a Lehman
6   assigned default rating.
7      Q.  Columns D, E and F are external rating
8   agency ratings, is that right?
9      A.  That is correct
10     Q.  And the next column, G, is titled "Long
11  underscore space description".  Do you see that?
12     A.  I do.
13     Q.  And that is just a description of the
14  security?
15     A.  Correct.
16     Q.  Turn over to the next page, 10320368,
17  column H, that is just a quantity, "QTY"?
18     A.  Correct.
19     Q.  And quantity in this setting means what?
20     A.  It means -- I am not sure if they are
21  equity securities but for fixed income securities
22  it means the notional or principal amounts and
23  for -- and the principal, notional or nominal are
24  all somewhat interchangeable terms for fixed
25  income securities, and for equity securities it is
```

Page 99

```
1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI       99
2   generally not the number of shares.
3      Q.  Okay, and for fixed income securities
4   the quantity column would be the principal then
5   outstanding?
6      A.  Yes.
7      Q.  The next column?
8         MR. HUME·  Did you finish your answer?
9      A.  I was going to say it is not necessarily
10  the principal outstanding on the security  It is
11  the principal balance held by or owned by the
12  entity.
13     Q.  Understood, thank you.  Column I?
14     A.  Yes.
15     Q.  "Price". Do you have an as to what that
16  column is?
17     A.  That is the price attributed to the
18  security.
19     Q.  If you look down that column, on this
20  particular page 10320368, you will see a lot of
21  entries that are less than one, so it is
22  zero-point something.  What is the pricing
23  convention that you think is being used here?
24         MR. HUME:  Objection, lacks foundation.
25     A.  I don't know
```

Page 100

```
1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI      100
2      Q.  Generally what pricing convention would
3   you use in pricing securities in the Lehman
4   system?
5         MR. HUME  Objection, the witness has
6   not testified that he prices any securities.
7      A  I don't know what the pricing convention
8   is.
9      Q.  Next column J: "Price underscore space
10  source".
11     A.  Yes
12     Q.  And there is a series of abbreviations
13  below in that column.  The first one says "TMS"?
14     A.  Yes
15     Q.  Do you have an understanding of what TMS
16  is?
17     A.  It is a settlement system
18     Q.  There is a series of entries titled
19  "MTS", what is that?
20     A.  It is a settlement system.
21     Q.  These are both Lehman settlement
22  systems?
23     A.  I don't know if they are Lehman
24  proprietary systems or whether they are street
25  wide settlement systems but they are settlement
```

Page 101

```
1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI      101
2   systems used at Lehman.
3      Q.  And then column K is titled "MV", and
4   that is market value, correct?
5      A  That is correct.
6      Q.  The e-mail on page 1 of Exhibit 141A,
7   these are all e-mails dated September 19, 2008.
8   Do you see that?
9      A.  I do.
10     Q.  Do you recall preparing a spreadsheet
11  with market valuations for Barclays on the morning
12  of September 19, 2008?
13         MR. HUME:  Objection to form.
14     A.  I don't remember preparing that for
15  Barclays, no.
16     Q.  Do you remember preparing that period on
17  the morning of --
18     A.  I do remember preparing a summary of the
19  repo transaction and the values that we saw.
20         (Exhibit 142A marked for identification)
21     Q.  Sir, I have placed before you a document
22  marked Exhibit 142A.  It has two initial pages
23  which are e-mails and then a spreadsheet attached
24  to it.  Take a moment to look at the document and
25  let me know when you are done, and I will have
```

Page 102

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          102

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          102
2    questions for you similar to the questions I asked
3    you about 141A.
4    MR. HUME: I am just going to register
5    an objection on the record to the extent that the
6    first e-mail in the chain may be privileged and we
7    reserve our rights to claw back anything that is
8    privileged.
9    Q. Are you done?
10   A. Yes.
11   Q. You will see this e-mail chain starts on
12   the second page of Exhibit 142A with an e-mail
13   from you to Gerry Reilly?
14   A. Yes.
15   Q. And the file you are sending him with
16   the e-mail is titled "Inventory Adjustments.xls"
17   do you see that?
18   A. Yes.
19   Q. This is a series of e-mails on pages one
20   and two, again dated Friday September 19, 2008.
21   Do you see that?
22   A. Yes
23   Q. Do you recall preparing an inventory
24   adjustment file on September 19?
25   A. Yes.

Page 103

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          103

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          103
2    Q. What is your recollection about that
3    process of preparing this inventory adjustment?
4    A. We were trying to identify the
5    securities in the repo transaction.
6    Q. The repo that had occurred on the night
7    of the 18th, correct?
8    A. That is correct.
9    Q. And the file that you were forwarding,
10   "inventory adjustments.xls", would you have
11   prepared that file?
12   A. I think that Robert Azerad prepared it
13   but I cannot be sure.
14   Q. You were involved in the preparation of
15   the file?
16   A. Yes, in the reviewing.
17   Q. For what purpose were you reviewing the
18   inventory adjustment file?
19   A. I was reviewing it to make sure that it
20   made sense and looked accurate.
21   Q. Just going through the column headings
22   so I understand what these column headings are,
23   starting with the third page of the exhibit, last
24   four digits 5049 on the Bates number, do you see
25   that?

Page 104

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          104

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          104
2    A. Yes.
3    Q. So starting with column A, "Account",
4    and there is a series of codes that appear in that
5    column. What is your understanding of what
6    information is contained in that column?
7    A. I think they are trading accounts.
8    Q. These are trading accounts at Lehman?
9    A. Yes.
10   Q. Next column B, "Account name", the name
11   of the trading account, I take it?
12   A. Yes.
13   Q. The next column is "Adjusted flag". Do
14   you see that?
15   A. I do.
16   Q. What is that a reference to?
17   A. I don't know
18   Q. Next column over, "Adjustment, [ADJ]
19   comment." Do you see that?
20   A. Yes
21   Q. Do you have an understanding what that
22   means?
23   A. No.
24   Q. Next column over, E, "Cost centre", do
25   you have any understanding what that means?

Page 105

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          105

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          105
2    A. Yes, it is the cost centre attached to
3    the trading book.
4    Q. The next column over, F, is "Lead
5    account"?
6    A. Yes.
7    Q. What is that a reference to?
8    A. I think that is just where there is
9    trading book roll-ups, it means that you have
10   different layers of trading accounts and then they
11   can aggregate into a larger more aggregated
12   account.
13   Q. Next column over, G, is "Trader name".
14   then you go over to "DBS entity", column H. What
15   is that?
16   A. DBS was the general ledger system, so
17   the entity was the annotation for or should have
18   been the annotation for the DBS entity.
19   Q. What does DBS stand for?
20   A. I don't know.
21   Q. All right. The next page, page 5050
22   last digits, there is a series of columns for
23   division, region and then it says "BPM level zero,
24   one and two". Do you see those columns?
25   A. Yes.

## Page 106

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    106
2    Q. What does BPM stand for?
3    A    Business performance measurement.
4    Q. Next column, "Real world Cusip". That
5    is the security identifier?
6    A. Correct
7    Q. Turn to page 5051. First column is
8    "ISIN", again an identifier for the security,
9    correct?
10    A    Correct
11    Q. "Q" is "Product". There is a series of
12    codes that appear there. Do you have an
13    understanding of what that column is?
14    A. No
15    Q. Then you have columns for product name,
16    coupon, maturity date, coupon rate, source system.
17    Let's go over to page 52.
18    A. Yes
19    Q. There is a column entitled "W", "Trade
20    date position". What is your understanding of
21    what information is contained in that column?
22    A. The trade date position is a position
23    for accounting purposes, which should represent
24    what your ownership interest is    It may not
25    correspond to the actual settled position but, for

## Page 107

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    107
2    example, if you buy some shares, if you were to
3    buy some shares today then you would record the
4    fact that you have an economic interest, an
5    economic exposure in those shares, but you may not
6    pay for them or settle those for a few days, but
7    your economic interest and exposure is the trade
8    date position.
9    Q. Then you have columns X and Y for clean
10    market price and dirty market price. Do you see
11    that?
12    A. I do.
13    Q. Could you briefly describe what clean
14    market price and dirty market price is?
15    A. Clean market price is the trader price
16    exclusive of the accrued coupon. The dirty market
17    price is the traded price inclusive of the accrued
18    coupon.
19    Q. Column Z is "Gross long inventory TD at
20    MV"?
21    A. Yes.
22    Q. What is TD at MV?
23    A. Trade date at market value.
24    Q. And that calculation is done using clean
25    market price, the dirty market price or neither?

## Page 108

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    108
2    A    I am not sure.
3    Q. The next column over, "Long Inlraco
4    Netdown TD at MV". Do you have an understanding
5    as to that column, column Z?
6    A. Column Z is the gross long inventory TD
7    at MV
8    Q. I am sorry, column AA, sorry: "Long
9    Inlraco Netdown TD at MV."
10    A. I actually think that should say --
11    Q. "Intraco"?
12    A. "Intraco Netdown", which means that
13    there may be trading books that are both long and
14    short, and this is the first of the netdowns to
15    reflect offsetting positions.
16    Q. Then you have a net long column, AB, and
17    that is just a net long position, is that right?
18    A. That is right.
19    Q. And then you have a series of columns,
20    AC, AD. Over on to the next page, 5053.
21    A. Yes
22    Q. AE, which deals with short positions,
23    correct?
24    A. That is right
25    Q. Then you have a column AF, "B/S summary

## Page 109

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    109
2    total"?
3    A. Yes
4    Q. What is that? Is that the buy/sell?
5    A. No, balance sheet summary.
6    Q. And then AG is balance sheet usage?
7    A. Yes.
8    Q. The prices that appear in X and Y, the
9    clean market price and the dirty market price,
10    with respect to fixed income securities, would
11    those be observed trading prices or would those
12    also include indicative or pricing assumptions by
13    traders at Lehman?
14    MR. HUME: Objection, lacks foundation.
15    Witness has testified he was not involved in
16    pricing.
17    A. They may be observable. They would
18    probably be a combination of exchange traded,
19    which are observable on assets at closing prices
20    and trader determined prices and trader input
21    prices
22    Q. Were you aware of any process
23    on September 19, 2008, where traders at Lehman
24    were marking down positions on that date?
25    A. I was not, no

## Page 110

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          110

1
2      (Exhibit 143A marked for identification)
3      Q. I have placed before you a one paged
4  document marked Exhibit 143A.
5      A. Yes.
6      Q. Do you see that is an e-mail sent by you
7  to various people at Barclays?
8      A  I do.
9      Q. Sent on Friday, September 19, on or
10  about -- looks like noon Eastern time?
11      A. Yes
12      Q. And you are sending over a file
13  captioned "BarCap collateral.xls". Do you see
14  that?
15      A  Yes
16      Q. And you state in the body of your e-mail
17  that "This is using our prices". Do you see that?
18      A  Yes, I do.
19      Q. That means using the Lehman prices,
20  right?
21      A. That is right.
22      Q. And you state that: "It shows less than
23  BONY file so we may be being conservative." Do you
24  see that?
25      A. I do.

## Page 111

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          111

1
2      Q. And your reference to BONY file is
3  a reference to the BONY prices, correct?
4      A. Right.
5      Q. The Bank of New York prices, correct?
6      A. Yes.
7      Q. And Bank of New York was the tri-party
8  provider on the BarCap tri-party agreement,
9  correct?
10      A. Yes.
11      Q. Do you recall Barclays requesting you to
12  provide the Lehman marks as separate from the BONY
13  prices?
14      A. I don't, no.
15      Q. Do you recall any discussions on
16  Friday September 19 about the BONY prices versus
17  the Lehman prices, a discussion with Barclays?
18      A. No, not with Barclays. I do recall --
19  there was obviously a tremendous amount of
20  complexity in this transaction and the repo
21  transaction in particular was very complicated,
22  and all that we were trying to do was to establish
23  the accuracy of the positions that have
24  transferred over and some reference in terms of
25  valuations. We had asked for details from

## Page 112

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          112

1
2  Barclays from their BONY file because they would
3  have received an electronic version of the
4  tri-party reporting from their tri-party provider,
5  so we were just going through the process of
6  trying to identify any discrepancies or problems;
7  discrepancies in the quantity, problems in terms
8  of differences in the assets or in valuations.
9      I would say that this was relatively -- this was
10  a relatively early cut. As I recall, we only received the
11  file shortly before this, you know, that morning, and so it
12  was certainly not a complete and finalized piece of work. I
13  don't recall anyone from Barclays requesting that we provide
14  Lehman values or JP Morgan values  This was just to give
15  them some reference to help everyone understand the
16  transaction.
17      Q. We earlier talked about the effort on
18  Friday September 19 to identify additional assets
19  and receivables. Do you recall that?
20      A. I do
21      Q. Do you recall that effort being the
22  result of concerns about the valuation of the repo
23  collateral?
24      A. I don't recall it being explicitly that,
25  although I do -- when I spoke about it with Ian it

## Page 113

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          113

1
2  was clear that one of the considerations was the
3  valuations, was going to be the valuations, and
4  the mix of collateral, and it was not clear to
5  them and to some of the senior managers exactly
6  what collateral had been transferred over because,
7  as I say, it was a very complicated process, and
8  so to have their trading teams review and revalue
9  all of that was clearly a necessary part of it.
10      Q. And then do you recall the effort being
11  the result of concerns about preserving the
12  economic value of the transaction for Barclays?
13      A. Yes, I mean, it was all linked together
14  It is perhaps worth saying, and you can see here
15  that there are thousands and thousands of
16  securities and they are complicated securities.
17  Some of these are not liquid, insofar as there are
18  observable market prices, and the complexity with
19  reviewing this is tremendous, particularly with
20  mortgage securities and structured securities. I
21  can certainly think of at least one large position
22  that was transferred over, for which there would
23  be a tremendous range of valuation, you know,
24  potentially ascribed, and I am sure that that
25  could be applied to many securities

Page 114

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          114

1
2    So given that the -- you have to understand that
3    this is a transaction where the actual assets being
4    transferred over is really only being finalized on that
5    morning, and is still being reviewed, and so we were trying
6    to provide support and assistance insofar as, you know,
7    determining the securities and a potential value for those.
8    But this is not something which had already been reviewed
9    and values confirmed by Barclays, and the BONY system could
10   also have had problems with valuing some of these
11   securities.
12       Q.  The one large position you were talking
13   about, that is Pine?
14       A.  Yes.
15       Q.  What was Pine?
16       A.  Pine was a CLO, which is
17   a collateralized loan obligation
18       Q.  I have handed you a document that was
19   previously marked as Exhibit 47.  It is about
20   3 pages of cover e-mails, 4 pages of cover
21   e-mails, and a large spreadsheet.  If you can
22   review the e-mails and take a look at the
23   spreadsheet, let me know when you are done, and I
24   will ask you some questions about them.
25       MR HUME·  The binding of this exhibit

Page 115

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          115

1
2    was obviously done for ease of presentation,
3    right?  It was not presented like this originally.
4        A.  Yes.
5        Q.  Reviewing this chain of e-mails,
6    starting with the earliest e-mail, which is an
7    e-mail from you to various people, the subject
8    line is: "Delivering other assets to Barclays".
9    Do you see that?
10       A.  Yes.
11       Q.  And is that a reference to this process
12   we talked about, the assets over and above the
13   repo assets?
14       A   That is correct.
15       Q.  Take a look at the first page of this
16   exhibit, the e-mail, page 1, Exhibit 47.  At the
17   top of the page there is an e-mail from David
18   Murgio at Weil to two additional people, V Lewkow
19   and R Davis.  Do you see that?
20       A.  I do.
21       Q.  Was it your understanding that
22   spreadsheet information about the collateral was
23   provided by lawyers for the estate to the lawyers
24   for Barclays?
25       A.  Yes.

Page 116

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          116

1
2        Q.  There is a reference to BarCap
3    collateral.xls.  Do you see that file?
4        A.  I do.
5        Q.  That was the same file that you had sent
6    over earlier, right, Exhibit 143A?
7        A   Yes.
8        Q.  If you turn to the fifth page, Bates
9    number 5138 are the last four digits, do you see
10   that calculation up there?
11       A   I do, yes.
12       Q.  And it is a total of 49.9 billion.  Do
13   you see that?
14       A.  I do.
15       Q.  And that is in the market value column?
16       A.  I see that.
17       Q.  And there is four components to that
18   total.  Do you see that?
19       A   I do
20       Q.  The first is Fed collateral?
21       A   Yes
22       Q.  Do you have an understanding of what
23   that item is?
24       A.  Yes.
25       Q.  What is it?

Page 117

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          117

1
2        A.  It is Fed wirable collateral that was
3    transferred over, Fed wire being the market
4    settlement system for this type of collateral.
5        Q.  The next line item is DTC074.  Do you
6    see that?
7        A.  I do.
8        Q.  Is that an account or a box at DTC?
9        A   That is I think an account at DTC.
10       Q.  A Lehman account?
11       A.  Yes.
12       Q.  The next item is DTC636.  Do you see
13   that?
14       A   I do.
15       Q.  What is your understanding of what that
16   is?
17       A.  That is a different type of DTC account
18       Q.  And in the last line item is "TP
19   cashed".  What does that stand for?
20       A.  That is the tri-party cash.
21       Q.  Was it your understanding on
22   Friday September 19 that there was 7 billion
23   dollars in cash to be delivered to Barclays?
24       A.  I understood that $7 billion of cash had
25   been given by -- had been deposited by Barclays

Page 118

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    118
2    with JP Morgan and that it was being held by
3    JP Morgan.
4        Q.  Was it your understanding of -- I guess
5    these e-mails are all dated September 20, so was
6    it your understanding on September 20, 2008, that
7    the total value of the collateral on the cash in
8    the transaction was 49.9 billion?
9        MR. HUME:  Objection, vague and
10    ambiguous as to the value.
11       A   This was my view of the repo transaction
12    on the Thursday night, and it was limited to that,
13    just to the repo transaction.
14       Q.  So the 15c3 cash, for example, would be
15    in addition to this?
16       A.  That is correct, yes, as well as the
17    other unencumbered collateral, as well as other
18    components to the agreement.
19       Q.  The other unencumbered collateral, that
20    would be the Schedule B collateral?
21       A.  That is what became Schedule B
22    collateral, that is right
23       Q.  So that would be added to these items
24    here?
25       A   That is right.

Page 119

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    119
2        Q.  If you go down to page 5139, do you see
3    that?
4        A.  I do.
5        Q.  There is a column titled "Market value"?
6        A.  Yes.
7        Q.  Do you know what the source of that
8    market value information was in this spreadsheet?
9        A.  I believe that this was the Lehman price
10    market value.
11       (Exhibit 144A marked for identification)
12       Q.  I have handed you a one page document
13    entitled Exhibit 144A.  Take a moment to look at
14    that and let me know when you are done.
15       A   Yes.
16       Q.  Have you seen this document before
17    today?
18       A.  I have not, no.
19       Q.  Do you remember the information that is
20    contained in this document?
21       A.  I do
22       Q.  If you can just go through the
23    components, the components I want to talk to you
24    about are the component that add up to the total
25    securities cash received item.  Do you see that?

Page 120

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    120
2        A.  Okay, yes.
3        Q.  If you start with the Fed wire
4    securities, that is similar to the Fed collateral
5    entry we were discussing earlier, correct?
6        A.  Correct.
7        Q.  And the next item is "DTC cash".  Do you
8    see that?
9        A.  I do.
10       Q.  Do you have an understanding as to what
11    that is?
12       A.  DTC securities
13       Q.  The next item down "DTC cash .3".
14    I assume these are billions?
15       A   Yes.
16       Q.  Do you have an understanding of what
17    that line item is?
18       A.  I assume it is more DTC securities.
19       Q.  The reference to "Repo cash, 7 billion".
20    Do you see that?
21       A.  Yes.
22       Q.  We have discussed that before?
23       A.  That is correct.
24       Q.  And then it says "Today DTC collateral".
25    Do you see that?

Page 121

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    121
2        A.  I do.
3        Q.  And that is 390 million.  This is an
4    e-mail dated as of September 19, 2008.  Do you
5    have an understanding as to what that means?
6        A.  I don't know the specifics.
7        Q.  And that rolled up into 52.19 billion
8    total.  Do you see that?
9        A.  Yes.
10       Q.  Again, this does not include, as far as
11    you know, the 15c3 cash, correct?
12       A.  That is correct.
13       Q.  Do you know whether this includes
14    Schedule B?
15       A   I would presume that the "Today DTC
16    collateral" includes some of what became the
17    Schedule B collateral.
18       Q.  When you look below the total securities
19    cash received there is a repo cash amount.  Do you
20    see that?
21       A.  Yes.
22       Q.  And that is 45 billion?
23       A.  Yes.
24       Q.  So the differential between the value of
25    the securities and cash received and the repo cash

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        122
2   amount is listed as excess collateral there,
3   right?
4        A   That is right.
5        Q.   That is $7 billion?
6        A.   Yes.
7        Q.   So that is the excess of market value
8   over cash paid for the repo?
9        A.   That is, you know, what it looks like.
10        Q.   And this, as far as you can tell, the
11   folks who have sent this e-mail around are all
12   Barclays folks, right?
13        A   Yes
14        Q.   Not former Lehman people, is that right?
15        A   No
16        Q.   And are they also still at Barclays?
17        A.   I have no idea.
18        Q.   Do you know any of these names, Gerry
19   LaRocca?
20        A.   I do.
21        Q.   Does Gerry work with you?
22        A   No
23        Q.   Not in your department or group?
24        A.   No.
25        Q.   Stephen King?

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        123
2        A.   I know Stephen, yes.
3        Q.   Is he in your group?
4        A.   No.
5        Q.   Back in the last quarter of 2008, did
6   you work with Gerry or Stephen?
7        A.   Yes, intermittently. I mean we were not
8   in the same group but we worked together on a few
9   things, you know
10        (Exhibit 145A marked for identification)
11        Q.   I have had placed before you a 3-page
12   document marked Exhibit 145A.
13        A.   Yes.
14        Q.   If you take a moment to look at that
15   e-mail chain and let me know when you are done.
16        A.   Yes.
17        Q.   You will see the subject line of the
18   series of e-mails is "Opening balance sheet".  Do
19   you see that?
20        A   I do.
21        Q.   This is part of the effort that you had
22   testified about before, which was preparing the
23   initial opening balance sheet?
24        A.   That is correct.
25        Q.   It starts off with an e-mail from Martin

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        124
2   Kelly to Robert Azerad, Blackwell and Beldner,
3   right.  Who was Brett Beldner?
4        A.   He is an accountant who worked for
5   Martin Kelly.
6        Q.   He was at Lehman, right?
7        A.   He was.
8        Q.   Is he now at Barclays?
9        A.   I don't know.
10        Q.   You are copied on that e-mail at the
11   bottom of page 2, right?
12        A.   Yes.
13        Q.   If you go over to page 1 of this
14   Exhibit 145A, it is the e-mail at the bottom of
15   the page which is an e-mail from you to a group of
16   people.  Do you see that?
17        A.   Yes.
18        Q.   And you have got sort of two items in
19   your e-mail, correct?
20        MR. HUME:  Which e-mail?
21        Q.   The bottom of page 1.  Are you with me,
22   Mr. Tonucci?
23        A.   What are the two items?
24        Q.   The first item is "I think they have
25   ..." and you correct yourself, "42.9 billion of

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        125
2   assets and paid net 38 billion of cash." Do you
3   see that?
4        A   Yes.
5        Q.   That is one item in your e-mail,
6   correct?
7        A.   Correct.
8        Q.   And that is your recap of the repo
9   situation?
10        A.   That is correct.
11        Q.   You have a second item: "Their opening
12   balance sheet should also include 1.9 billion of
13   box assets".  Correct?
14        A.   Correct.
15        Q.   What is that a reference to?
16        A.   The unencumbered collateral.
17        Q.   Schedule B?
18        A.   Which became Schedule B.
19        Q.   I guess there is a third item then, "and
20   one billion of cash receivable from the release of
21   lock ups."  Correct?
22        A.   That is correct.
23        Q.   And that is the 15c3?
24        A.   That is correct.
25        Q.   And at least on the morning

Page 126

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    126

1    of September 20 those were the sort of three
2    components you were thinking of as comprising the
3    balance sheet. Correct?
4        MR. HUME: Objection, lacks foundation.
5    A. Those were the components that I was
6    aware of, so I was not the accountant and I was
7    not on the negotiation team and I was not aware of
8    any other entries that may be being made for
9    example on the liability side or for other assets
10   over and above these.
11       Q. Just on a net basis, the three
12   components that you identified at the bottom of
13   page 1, there is a net of 4 billion on the repo
14   piece, correct?
15   A. If you are calculating the 42.9 minus
16   the 38.
17       Q. Yes.
18   A. That is the calculation you are doing?
19       Q. That is the calculation. It is actually
20   4.9.
21   A. That is correct.
22       Q. You add to that the 1.9 of boxed assets?
23   A. Yes.
24       Q. With no offsetting liability against

Page 127

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    127

1    that 1.9?
2        MR. HUME: Objection, lacks foundation.
3    A. That is not clear to me. I can only
4    tell you the asset side that I was aware of.
5        Q. So the asset side you have net assets on
6    the repo of 4.9, 1.9 on the box assets and then
7    a billion on the cash receivable?
8        MR. HUME  Objection, vagueness, vague
9    and ambiguous.
10       MR. TAMBE: Right?
11   A. You can read it.
12       Q. And that is a total of what, about
13   7.9 billion?
14       MR. HUME: Objection, lacks foundation.
15   You are just asking him to do the maths?
16   A. You are just asking me to add up?
17       Q. 7.8 billion --
18   A. Yes.
19       Q. Were you aware of any liabilities that
20   offset that 7.8 billion dollars of net assets
21   delivered to Barclays?
22   A. I knew there were some liabilities.
23       Q. What magnitude?
24   A. I was not sure but I knew that there

Page 128

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    128

1    were liabilities for compensation and for other
2    payments, services and so on that, you know, were
3    not part of the numbers that I was putting
4    together.
5        (Exhibit 146A marked for identification)
6        Q. I have handed you a 3-page document
7    marked Exhibit 146A, an e-mail chain. Let me know
8    when you are done reviewing it.
9    A. Yes.
10       Q. Do you recognize this as a series of
11   e-mails between folks at Lehman about a transfer
12   of collateral to BarCap?
13   A. Yes
14       Q. And this is a series of e-mails
15   dated September 22, 2008. Correct?
16   A. Yes
17       Q. And it is early in the morning, right,
18   6:00 or 7:00 am?
19   A. Yes.
20       Q. And is that before the clarification
21   letter is signed?
22       MR. HUME: Objection, lacks foundation.
23   The witness has testified he didn't review it that
24   week.

Page 129

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    129

1    A. I can't say
2        Q. Do you recall there being some urgency
3    on the morning of September 22 to getting answers
4    to this question, "queuing up delivery to BarCap"?
5        MR. HUME  Objection, vague.
6    A. I don't really know but, you know,
7    I would say that everyone was focused on doing
8    their job.
9        Q. And what was your job that morning?
10   A. Well, we were trying to close the
11   transaction in an orderly way.
12       Q. There is an e-mail at the bottom of page
13   1 over to page 2 from Monty Forrest to you and
14   Robert Azerad. Do you see that e-mail?
15   A. Yes
16       Q. And his first numbered point, which is
17   at the bottom of page 1 over on to page 2 states:
18       "What was the final agreed upon list (our
19   version or the version after Robert took out and
20   re-marked Lehman paper.)"
21       Do you see that?
22   A. Yes.
23       Q. Do you understand the reference to
24   re-marked Lehman paper?

Page 130

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    130

1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI        130
2       A.  Well, just I think it is more relevant
3    that he just removed the Lehman paper.  There was
4    some -- in the original unencumbered list there
5    was some securities which were Lehman issued.
6       Q.  It is not your understanding that there
7    was a mark down of Lehman paper by Robert in that
8    list?
9       A.  That is not what it refers to
10          (Exhibit 147A marked for identification)
11      Q.  I have handed you a 2-page document
12   marked Exhibit 147A, an e-mail chain.  Please
13   review it and let me know when you are done.
14      A.  Yes.
15      Q.  And you recognize this as a series of
16   e-mails, again dated September 22, 2008?
17      A.  Yes.
18      Q.  And these are additional e-mails about
19   the financing facility?
20      A.  Additional e-mails about the securities
21   that were transferred over and confirmation of
22   those securities.
23      Q.  On page 2 of this exhibit, the body of
24   the e-mail from Jasen Yang to Robert Azerad and
25   James Hraska.  Do you see that?

Page 131

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    131

1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI        131
2       A.  Yes.
3       Q.  And you are seen as a copy on that
4    e-mail?
5       A.  Yes.
6       Q.  It appears from that e-mail that he is
7    sending over to you the BONY valuation of the
8    collateral, is that right?
9       A   Sending over the BONY file, which
10   includes the valuation, but it obviously also
11   includes the details around nominal and
12   securities.
13      Q.  There is a reference to BONY market
14   value of approximately 45MM.  Do you see that?
15      A.  Yes.
16      Q.  He was referring to a 45 billion-dollar
17   value, correct?
18      A.  I assume so.
19      Q.  You will see on page 1 of the e-mail
20   a reference to "fast reconciliation".  Do you see
21   that?
22      A.  I do.
23      Q.  Was that sort of the beginning of the
24   reconciliation process you talked about before?
25      A.  We had tried to do an initial

Page 132

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    132

1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI        132
2    reconciliation on the Friday.  This was
3    a subsequent reconciliation and at a more detailed
4    level  Jasen had identified what he saw as some
5    discrepancies, and we were trying to resolve
6    whether those discrepancies existed, principally
7    in the securities that were transferred over and
8    the nominal value of those securities.
9          (Break from 10.37 to 10:55 am.)
10         MR. TAMBE:  Mr. Tonucci, I have placed
11   before you a document marked Exhibit 126.  Can you
12   take a moment to look at the e-mail chain and let
13   me know when you are done.
14      A   Yes
15      Q.  Starting with the e-mail at the bottom
16   of the page, it is from Gerry Reilly to Ian Lowitt
17   and Michael Gelband.  You are copied on it.  Do
18   you see that?
19      A.  I do.
20      Q.  There are three numbered items in that
21   e-mail.  Do you see that?
22      A.  Yes.
23      Q.  The third item reads: "Not clear on the
24   amount of blocked discount or how we make it
25   happen." Do you see that?

Page 133

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    133

1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI        133
2       A.  Yes.
3       Q.  And you understand that to be
4    a reference to the 5 billion-dollar discount that
5    we talked about earlier?
6          MR HUME:  Objection, lacks foundation.
7       A.  I understand it to be a reference to the
8    discount on purchase, so I would have linked it to
9    that $5 billion.
10      Q.  Then the next sentence reads:
11         "Defaulting on repo could be the best as
12   discounts could be taken from the haircut."
13         Do you see that?
14      A.  Yes.
15      Q.  Do you remember discussing with anyone
16   at Lehman defaulting on the repo as a way of
17   providing the discount to Barclays?
18      A.  Yes.
19      Q.  With whom did you discuss that?
20      A.  I think it was with Ian and with Gerry,
21   perhaps Martin Kelly as well.
22      Q.  And then in Gerry's e-mail at the bottom
23   of this e-mail chain on exhibit 126 he says:
24         "If not that then we need to give business an
25   allocation of block discount so they can mark down the

Page 134

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        134

1  books tonight."
2      Do you see that?
3  A  Yes.
4  Q.  Do you recall if that ever happened,
5  whether there was an allocation of a block
6  discount?
7  A.  I don't know
8  Q.  Does the phrase "block discount" have
9  any meaning to you?
10  A.  Not really.
11  Q.  Other than what we have talked about
12  here?
13  A.  Other than in this context.
14  Q.  The next e-mail up, from Ian Lowitt to
15  Gerry Reilly and Michael Gelband talks about
16  "shrinking down matched book".  Do you see that?
17  A.  I do.
18  Q.  Do you understand that to be a reference
19  to what we talked about before, about the matched
20  book being shrunk down to zero?
21  A.  Yes.
22  Q.  The first bullet point in Gerry Reilly's
23  e-mail at the bottom of the page talks about the
24  option rate book.  Do you see that?

Page 135

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        135

1  A  Yes.
2  Q.  Was it your understanding during this
3  week of 15 September that there were assets that
4  Barclays was picking and choosing as to which
5  assets it was prepared to purchase?
6  A.  That is right.
7      MR. HUME:  Objection.
8  A.  That was my understanding
9  Q.  And from whom did you get that
10  understanding?
11  A.  I can't recall but I understood that
12  they were not going to be buying all the assets.
13  Q.  Was it your understanding that there was
14  a change or an evolution in the transaction where
15  it went from being all assets to only some assets?
16  A.  No, I understood that it was never all
17  assets.
18  Q.  Did you have an understanding as to who
19  was making the decisions as to which assets it
20  would be?
21  A.  It was -- I think it was the negotiation
22  team, Barclays and Lehman negotiation team.
23  Q.  Was it your understanding that it was
24  Barclays making the decisions?

Page 136

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        136

1  A.  Well, they were the buyers so they would
2  by extension have the final decision on what
3  assets are bought
4  Q.  I have placed before you a document
5  marked Exhibit 127.  It is another branch in the
6  e-mail chain that we were looking at before in
7  126.  Let me know when you are done with the
8  document.
9  A.  Yes.
10  Q.  So it starts with the same Gerry Reilly
11  e-mail at the bottom but there is a different
12  e-mail at the top.  At the top of the document
13  there is an e-mail from Eric Felder to various
14  e-mail at Lehman.  Do you see that?
15  A.  Yes.
16  Q.  And Eric says:
17      "The Barclays guys chose the assets.  We did not
18  have anything to do with it."
19      Do you see that?
20  A.  Yes.
21  Q.  And that was consistent with your
22  understanding of how the assets were picked --
23      MR. HUME:  Objection to the lack of
24  foundation  Mr. Tonucci is not on that e-mail

Page 137

HIGHLY CONFIDENTIAL - PAOLO TONUCCI        137

1  A.  I mean, I have only seen this e-mail in
2  the deposition process and I have not spoken to
3  Eric and I was not part of the negotiation team.
4  I am not sure what Eric was seeing.  Eric was also
5  not -- you know, he was running the credit book so
6  I don't know if he would have seen all parts of
7  this process.
8  Q.  Basically, one way or the other, you
9  don't know whether what Eric says here is right?
10  A.  That is right.
11      (Exhibit 148A marked for identification)
12  Q.  I have handed you a 2-page document
13  marked Exhibit 148A.  Let me know when you are
14  done with it.
15  A  Okay.
16  Q.  In the top e-mail on this chain of
17  e-mails from Gerry Reilly to Martin Kelly and
18  Daniel Flores, I want you to focus on that e-mail.
19  Do you have it there?
20  A.  I do.
21  Q.  You are not shown as a copy on any of
22  these e-mails.  Can I ask you about a phrase that
23  is used in this e-mail.  The third sentence of
24  that e-mail, Gerry Reilly's e-mail states that:

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                138

1    "Purchase will be at a fixed discount on the
2    assets that remain to reflect the bulk size of the
3    purchase".
4        Do you see that?
5    A.  I do.
6    Q.  Did anyone ever describe for you the
7    reason for the discount being the bulk size of the
8    purchase?
9    A   I don't recall that, no.
10   Q.  Does that phrase have any meaning to
11   you?
12   A.  I have not seen it before.
13   Q.  Then the next sentence in Gerry Reilly's
14   e-mail starts off by saying: "We can track our
15   PL..."  Is that profit and loss?
16   A.  Yes.
17   Q.  "... by assets category, which gives
18   some indication of how much we have moved the
19   marks".  Do you see that?
20   A.  Yes.
21   Q.  Do you understand the reference to
22   "moving the marks"?
23   A.  Yes.  Can I give you just a bit of
24   context, because I think that you are sort of

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                139

1    misunderstanding some of this  Post Lehman, even
2    pre the Lehman filing on the weekend of
3    12/13/14th, there was a tremendous amount of price
4    volatility and tremendous amount of uncertainty in
5    sort of the traded price of a lot of securities,
6    even those which were exchange traded, and
7    therefore there was more visibility on -- we were
8    experiencing a huge amount of volatility.  The
9    process of re-marking, that was something that
10   would typically be conducted on a daily basis and
11   was conducted by thousands of traders, so it was
12   not as though there was one person with a giant
13   brain sat at the centre of this re-marking process
14   who had understanding or an ability to re-mark all
15   of these assets. It really was a very distributed
16   process which involved many, many people, because
17   they were responsible for their trading books and
18   for the risks on those trading books, and had the
19   best understanding of the securities
20       So on any given day there was going to
21   be a lot of price volatility and the movement in
22   the marks was often just a function of market
23   price volatility.  It may also be a function of
24   actual trading activity, but I would say that in

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                140

1    this week the amount of trading activity for these
2    particular securities and for these traders was
3    limited, so really it is a matter of sort of
4    interpretation of where the market is.
5        You have to add to that the fact that
6    the holding company had filed and so the coverage
7    of the desks was also impaired.  I don't think
8    that there would be every trader turning up and
9    re-marking his book. So there was great
10   difficulty in just creating the P&L and in being
11   able to track the movements. So that sort of
12   added to the complexity here
13       So my interpretation here is that the
14   amount that we have moved the marks is really just
15   a reference to the traders re-marking their books
16   because of this, because of what is being observed
17   in the market, and it probably was the most
18   volatile week in the market in the last nearly
19   100 years  So very, very difficult, very
20   difficult process, and we were not getting good
21   P&L's on a daily basis as a result.  It was much
22   more complicated than was typically the case, and
23   on a typical day the process was complicated, so
24   this was really extraordinarily difficult to

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                141

1    track, to track assets, the asset position and to
2    track valuations.
3    Q.  In the week of September 15 you did not
4    do any of the marking of the prices, right?
5    A.  Absolutely not.
6    Q.  That is not something you do?
7    A.  No.
8    Q.  You don't know specifically what traders
9    marked down what prices for what reason, correct?
10   A   No.
11   Q.  You don't know if the marking down was
12   pursuant to price movements in the market or
13   because they were allocated a block discount?
14   A.  I don't know with certainty, but you did
15   ask me for my interpretation of this and my
16   interpretation is that it is going to be
17   predominantly because of the volatility in
18   valuations in the market
19   Q.  Okay, and you don't know whether that is
20   because they were allocated a block discount to
21   mark down their books?
22   A.  I am saying that it is not because of
23   the allocation of a block discount.  My
24   interpretation of this is that it was because of

Page 142

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI    142
2   the market price movements.
3       Q.  I have handed you a document marked as
4   Exhibit 71B.  It is an e-mail exchange between
5   yourself and Alastair Blackwell.  Do you see that?
6       A.  Yes
7       Q.  It is on Friday, September 19, 2008.  Do
8   you see that?
9       A   Yes
10      Q.  At the top of the e-mail Alastair asks
11  you: "Putting the repo into default is my
12  conversion?" Do you see that?
13      A   Um hum.
14      Q.  Do you have a recollection of having
15  a discussion with Alastair about putting the repo
16  into default on Friday, September 19?
17      A.  I don't, no.
18      Q.  Any understanding of the phrase "my
19  conversion", what he meant by that?
20      A   My interpretation would be that his area
21  would have to rebook the repo, convert the repo
22  into a sale transaction.
23      Q.  And your understanding was that
24  a default on the repo really converted what was a
25  two-leg transaction; the repurchase leg would go

Page 143

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI    143
2   away and there would effectively be a sale of the
3   asset?
4       MR. HUME:  Objection.
5       A.  That is correct  It would become
6   a sale.
7       (Exhibit 149A marked for identification)
8       Q.  I have handed you a 2-page document
9   marked Exhibit 149A.  Let me know when you are
10  done reviewing that document.
11      A   Yes.
12      Q.  Have you ever seen this document before
13  today?
14      A.  No.
15      Q.  You know who Bob Diamond is, right?
16      A.  Yes.
17      Q.  Who is he?
18      A.  He is the President of Barclays.
19      Q.  Do you know who Michael Klein is?
20      A.  Yes.
21      Q.  Who is Michael Klein?
22      A.  He is someone who was involved in the
23  transaction.
24      Q.  Is he someone that you dealt with during
25  that week of September 15?

Page 144

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI    144
2       A.  Yes, I spoke to him.  I dealt with him
3   you know, just through that week.  I don't think I
4   have seen him since then.
5       Q.  Describe your interactions with
6   Mr. Klein during that week.  What were you
7   speaking with him about?
8       A.  Predominantly it was clarification of
9   the assets, so Michael was asking for various
10  points, just details of the sort of asset
11  schedules and some of the other transfers.  That
12  is all I can really recall.
13      Q.  Was he part of the conversations on
14  Friday, September 19, about locating additional
15  assets and value for Barclays?
16      A.  I didn't speak to him on that, sorry, I
17  don't know.
18      Q.  In his e-mail to Bob Diamond on
19  Saturday, September 20, 2008, Mike says: "Great
20  day.  We clawed back 3 billion more of value of
21  the transaction".  Do you see that?
22      A.  I do see that.
23      Q.  Any understanding as to what he is
24  referring to in the 3 billion more of value?
25      MR. HUME:  Objection, calls for

Page 145

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI    145
2   speculation.
3       A.  I don't know what would go into that
4   specifically.
5       Q.  Was it your understanding on Friday or
6   Saturday of that week that Lehman had provided an
7   additional $3 billion of value to Barclays?
8       MR. HUME·  Objection, lacks foundation.
9   Witness has testified he was not negotiating the
10  economics of the deal.
11      A.  I can't really answer that, I don't
12  know.
13      Q.  But we have talked about a couple of
14  items of additional value on Friday, September 19,
15  right?
16      A.  We have, but we have also talked about
17  the price volatility and the lack of certainty
18  around the actual assets that were being
19  transferred, and just the difficulty in
20  establishing values.  So I mean I wouldn't sort
21  of, you know, I wouldn't sort of describe this as
22  just additive to the original transaction.  It was
23  clearly changing.
24      Q.  And among the items that were added was
25  1.9 billion in Schedule B, is that right?

## Page 146

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          146

1
2     MR. HUME: Objection, mischaracterizes
3   his testimony.
4     **Q. Right?**
5     MR. HUME. Objection.
6     A. Can I clarify your question, please?
7     **Q. You can answer my question.**
8     A. I am asking you what are you referring
9   to when you are saying "in addition there was". I
10  am not sure what you mean  In addition to what?
11    **Q. I have talked about the components at**
12  **least that you have in your e-mail, where you**
13  **recap the opening balance sheet, right, you have**
14  **the repo component and then you have 1.9 billion**
15  **for what we have talked about, became Schedule B,**
16  **and then you had another billion dollars of the**
17  **15c3 receivables?**
18    A. That is correct.
19    **Q. And the 1.9 and the 1 is about**
20  **$2.9 billion, right?**
21    A. That is correct.
22    **Q. And that was additional value over and**
23  **above the repo, correct?**
24    MR. HUME· Objection.
25    A. Additional assets over and above the

## Page 147

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          147

1
2   repo assets that were transferred on the Thursday
3   night.
4     **Q. We have touched on this briefly, about**
5   **the $7 billion in cash that had been transferred**
6   **from Barclays to JP Morgan, is that right?**
7     A. That is correct.
8     **Q. On Friday, the 19th?**
9     A. That was transferred on the Thursday,
10  the 18th.
11    **Q. On Thursday the 18th, just using that as**
12  **a springboard, can you describe for me generally**
13  **the interactions between Lehman and JP Morgan**
14  **during that week, so that week of the 15th on**
15  **through the 22nd?**
16    A. Yes. JP Morgan was continuing to
17  provide clearance for LBI, and so there were
18  discussions through the week about that activity
19  related to that clearance activity.  You know,
20  I spoke to them a number of times about all
21  related to clearance activity, tri-party and
22  securities clearance.
23    **Q. I think you described that one of the**
24  **liquidity issues that arose on the 12th, the**
25  **Friday the 12th, was a demand for additional**

## Page 148

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          148

1
2   **collateral by JP Morgan?**
3     A. That is correct.
4     **Q. And that presented Lehman with some**
5   **difficulties?**
6     A. It was a very large cash request, so an
7   unusual size and difficult, a difficult request to
8   fulfill, particularly in the way that they -- the
9   timing that they wanted it.
10    **Q. In terms of dealing with JP Morgan**
11  **during the week of the 15th through the 22nd, did**
12  **you experience any other difficulties or**
13  **impediments in dealing with them?**
14    A. They were certainly not being very
15  cooperative
16    **Q. Can you describe to me what you mean by**
17  **that?**
18    A  Really they were just not being very
19  cooperative.
20    **Q. Anything specific you recall?**
21    A. No, general. I don't think there is
22  anything specific that I would point to, just
23  generally not very cooperative, not providing
24  a lot of information, you know, not on a timely
25  basis, not releasing transactions on a timely

## Page 149

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          149

1
2   basis, you know, those types of things.
3     **Q. Do you recall any difficulty in dealing**
4   **with JP Morgan over the $7 billion in cash either**
5   **on 19 September or thereafter?**
6     A. I absolutely never spoke to them about
7   that
8     **Q. Did other people describe to you their**
9   **interactions with JP Morgan about that item?**
10    A. Not really.
11    **Q. Are you aware of any settlement**
12  **agreement between JP Morgan and Barclays over the**
13  **subject matter of this proceeding?**
14    A. I am. It was a matter of I think court
15  record and it was publicly disclosed.  I am not
16  aware of any details over and above those that
17  were publicly disclosed.
18    **Q. What are you aware about -- scratch**
19  **that. What is your knowledge about the settlement**
20  **between JP Morgan and Barclays?**
21    A. That there was a component of cash and
22  there were a selection of securities that were
23  transferred.  I have not seen the securities that
24  were transferred over but I was aware that that
25  was the sort of composition, and I think

Page 150

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          150

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          150
2   subsequently I may have seen some asset level cut
3   of that, because of the entities in which it was
4   going to get booked in in Barclays, but it is very
5   sort of general information
6       Q.   In the time period after you joined
7   Barclays, were you involved at all in doing any
8   analytics or assisting with that settlement?
9       A.  No.
10      Q.   Were you asked to do any valuations of
11  what had been transferred to Barclays in
12  connection with that settlement?
13      A.  No
14      Q.   Have you seen any documentation about
15  the settlement?
16      A.  No.
17      Q.   Do you know who would have done the
18  analytics in connection with that settlement?
19      A.   I would imagine that it would have been
20  the accounting team, the finance team, so it could
21  be Martin Kelly, someone in Martin Kelly's team.
22      MR. HUME:  Don't speculate.
23      A.  But I don't know.  I mean that is
24  speculative.
25      (Exhibit 150A marked for identification)

Page 151

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          151

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          151
2       Q.   I have handed you a document marked
3   Exhibit 150A.  Take a moment to read that and let
4   me know when you are done.
5       A.   I have read it.
6       Q.   I think the bottom e-mail is one we have
7   seen on another exhibit.  It is the e-mail from
8   Martin Kelly to certain people?
9       A.  Yes.
10      Q.   Requesting the opening balance sheet.
11  Your response in the fourth paragraph, an e-mail
12  which begins: "I think the reversions within the
13  asset transferred." Do you see that?
14      A.  Yes.
15      Q.   Further down in that paragraph you refer
16  to treating something as a "broken repo".  What
17  did you mean by a "broken repo"?
18      A.   A defaulted repo
19      Q.   And there is a reference to cleaning up
20  with the clients at the other side, and that is
21  what, reconciling -- what did you mean by that?
22      A.   Clean up with a broken repo or defaulted
23  repo is the rebooking of that transaction as
24  a purchase or as a sale.
25      (Exhibit 151A marked for identification)

Page 152

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          152

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          152
2       Q.   I have handed you a 3-page document
3   marked Exhibit 151A.  Let me know when you are
4   done reading it.
5       A.  Yes.
6       Q.   Once again this is an e-mail chain that
7   begins with the request for the opening balance
8   sheet at the bottom of page 1 over to page 2.  Do
9   you see that?
10      A.  I do.
11      Q.   At the top of page 1 is an e-mail from
12  Robert Azerad to you and others.  Do you see that?
13      A.  I do.
14      Q.   And it refers to the details of the
15  15c3, both customer and PAIB.  Do you see that?
16      A.  I do see that, yes.
17      Q.   What is your understanding of what PAIB
18  stands for?
19      A.   I thought it was to do with other
20  brokers.
21      MR. HUME:  Again, don't speculate if you
22  are not sure.
23      A.   It is not really my area of knowledge.
24      Q.   Would that be Mr. Azerad's area of
25  knowledge?

Page 153

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          153

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI          153
2       A.   Not really.  It would be more people,
3   someone from the regulatory accounting or
4   compliance group.
5       Q.   Do you have an understanding of the
6   spreadsheet that is attached as page 3 of this
7   exhibit?
8       A.  I do.
9       Q.   What is your understanding of what that
10  spreadsheet is --
11      A.   It is a calculation of the 15c3 and the
12  requirement on different days
13      Q.   And was this spreadsheet or this
14  analysis prepared to identify the cash that was
15  available to be transferred?
16      A.   Yes, that is right, it was part of that
17  work
18      Q.   The next e-mail down from -- the second
19  e-mail down from the top of the page is an e-mail
20  from you to Robert Azerad and others, identifying
21  the 15c3 cash as a component to be added to the
22  balance sheet.  Right?
23      MR. HUME:  Objection to the phrase
24  "added to the balance sheet".
25      A   The mail was to include within the

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          154

1    opening balance sheet the receivable related to

2    15c3.

3        Q.  In that same e-mail you have questions

4    for Dan.  I assume that is Dan Fleming?

5        A   Correct.

6        Q.  And you have questions about the

7    transferring over of collateral that was locked up

8    for 15c3 needs.  Do you see that?

9        A.  Yes, I do

10       Q.  Do you know if that collateral was

11   transferred over to Barclays?

12       A.  I don't believe it was

13       Q.  Do you know what happened to that

14   collateral?

15       A.  I don't

16       (Exhibit 152A marked for identification)

17       Q.  I have handed you a 3-page document

18   marked 152A.  It is another e-mail chain.  Would

19   you take a look at it, let me know when you are

20   done.

21       A.  Yes, it is the same chain that we saw

22   earlier.

23       Q.  But a different branch of that chain?

24       A.  It has a couple of extra points at the

---

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          155

1    top, which I was not included on.

2        (Exhibit 153A marked for identification)

3        Q.  I have handed you a 2-page document

4    marked Exhibit 153A.  Let me know when you are

5    done looking at it.

6        A.  Yes.

7        Q.  The first page is two e-mails, one from

8    Robert Azerad to you and others.  Do you see that?

9        A.  I do.

10       Q.  Attaching an opening balance sheet?

11       A.  I do.

12       Q.  And the top e-mail, I guess, is that

13   document being forwarded to Brett Beldner?

14       A.  Yes.

15       Q.  And the document attached is the asset

16   side of the balance sheet, correct?

17       A.  Correct.

18       Q.  And you were involved in preparing this,

19   right?

20           MR. HUME:  Objection, lacks foundation.

21       A.  Robert prepared it.  I reviewed it, so

22   that is the level of involvement.

23       Q.  I guess in some of the earlier e-mails

24   you had some comments about things to be included

---

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          156

1    as receivables, et cetera?

2        A.  Correct.

3        Q.  On this exhibit, Exhibit 153A, were any

4    derivatives included as part of the total assets?

5            MR. HUME.  Objection, lacks foundation

6        A.  This includes the assets that I was

7    aware of and was limited to the assets that

8    I would have some visibility around, and as you

9    can see it does not include anything on the

10   liability side and it does not have anything on

11   derivatives.  I didn't have visibility on either

12   of those.

13       Q.  Is it your understanding at some point

14   the assets side picked up a derivatives component

15   as well?

16       A.  Yes, that is my understanding.

17       Q.  If you didn't have visibility on that,

18   where would that have come from?  Who would have

19   provided that information for the balance sheet?

20       A.  I think the product control team or

21   other parts of the finance team  It is perhaps

22   worth just saying, there were some other

23   components to the transaction which were not

24   related just to these series of repos and these

---

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          157

1    assets being transferred.  For example, there was

2    a whole slew of activity around what moved into

3    Barclays wealth, so the non-institutional

4    business.

5        Q.  The PIN business?

6        A.  The PIN business, yes, which again I

7    didn't have any visibility really into.  So I am

8    not sure about the sort of accounting there  On

9    the derivatives side it was again -- it was not

10   something that I really had any visibility around.

11       Q.  Do you know the economics of the PIN

12   component of the transaction?

13       A.  I don't, no

14       Q.  Have you seen any analysis or valuations

15   of that?

16       A.  I have not, no.  My involvement in that

17   has been limited to -- it has been really very

18   limited.  I am aware of some of the issues with

19   transferring assets over and I was involved in

20   some of the reconciliations around positions that

21   were expected to be transferred over in the

22   various conversions but did not get transferred,

23   but I have not seen any economics or anything over

24   and above that.

---

Page 158

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          158

1
2    Q.  Do you recall there being a customer
3    cash component with the PIN transfer?
4    A   I don't, no
5        (Exhibit 154A marked for identification)
6    Q.  Have you had a chance to review 154A?
7    A   Not yet.  Right.
8    Q.  Have you seen Exhibit 154A before today?
9    A.  No.
10   Q.  Would you turn to the second page of the
11   exhibit.  You will see it is the calculations we
12   saw before, only now there has been a section
13   added for liabilities.  Do you see that?
14   A   Yes.
15   Q.  And this spreadsheet as well does not
16   have an asset entry for derivatives, right?
17   A   I cannot see one.
18   Q.  There is a line item under "liabilities"
19   for equity, do you see that?
20   A.  I do.
21   Q.  What is your understanding, if any, of
22   what that line item is?
23   A.  It is the balancing item.
24   Q.  That is just to balance out the assets
25   and liabilities?

Page 159

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          159

1
2    A.  That is correct
3        (Exhibit 155A marked for identification)
4    Q.  I have handed you a 2-page document
5    marked Exhibit 155A, a cover e-mail and
6    a spreadsheet.  Let me know when you are done
7    reviewing it.
8    A.  Yes.
9    Q.  This cover e-mail is from Irina Veksler.
10   Do you see that?
11   A.  Yes.
12   Q.  Do you know who Irina Veksler is?
13   A   Yes, she works for Robert.
14   Q.  If you look at the spreadsheet, similar
15   to the one we saw before, maybe just a few changes
16   in the numbers.  Do you see that?
17   A.  I do.
18   Q.  This is on Sunday, September 21, 2008,
19   if you look at the cover e-mail.  What is your
20   general recollection of changes to the asset
21   valuation that weekend?  What were the reasons or
22   some of the reasons for changes in the asset
23   valuation that weekend?
24       MR. HUME:  Objection to the form and the
25   vagueness of the phrase "asset valuation".

Page 160

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          160

1
2    A.  I don't know if there were any asset
3    valuation changes, and I certainly was not
4    involved in any asset valuation changes.  This
5    exercise, and my recollection of Irina's version
6    of this was purely to clean up the asset
7    classifications.
8    Q.  Do you have 153A before you?
9    A.  Yes
10   Q.  It is this document.
11   A   Yes
12   Q.  If you turn to the calculation that is
13   attached to that exhibit, you will see there is
14   some changes in classification but there is also
15   a change in the bottom line number.  Do you see
16   that?
17   A.  Yes.
18   Q.  Do you have any understanding as to why
19   the bottom line number had changed?  I think both
20   of these e-mails are over that same weekend.
21   A.  It is a trivial amount   It is
22   34 million, it is rounding.  I don't know what
23   Irina did.  It could have been changing the
24   decimal points or something.
25   Q.  The one other change that I see in the

Page 161

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          161

1
2    two spreadsheets, on Exhibit 155A there is now
3    a line item for derivatives and other contracts.
4    Do you see that?
5    A.  I do.
6    Q.  Do you recall any discussion or
7    understanding as to where that line item or why
8    that line item was added?
9    A.  No.  I think that Irina was going
10   through the GFS classifications, the asset
11   classifications to just clean up the
12   representation of those balances.  These are the
13   balances that we were aware of, so those within
14   the repo contracts and the other assets schedule,
15   which was what became Schedule B, and I don't
16   think it was anything more than that.  So this is
17   just trying to clean up classification of those
18   assets.  She would not have been aware of anything
19   over and above that.
20   Q.  I have handed you what has been
21   previously marked as Exhibit 86B, a collection of
22   documents.  Let me know when you have had a chance
23   to review them.  It is 3 pages.
24   A.  Yes.
25   Q.  Have you seen this document before

Page 162

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    162

1    today?
2    A. No.
3    Q. Are you familiar with this document?
4    A. No
5    Q. I will ask you a couple of notations and
6    see if they have any meaning to you. There is
7    a column, column D, which is titled "PCG value".
8    Do you see that?
9    A. I do.
10    Q. Do you understand what that means?
11    A. Product control group value.
12    Q. There is a column F titled "PCG
13    liquidity value". Do you see that?
14    A. I do.
15    Q. Do you have any understanding as to what
16    that means?
17    MR. HUME: Don't speculate.
18    A. I don't want to speculate.
19    Q. Sir, I am handing you a document that
20    was previously marked as Exhibit 87B. Are you
21    familiar with that document?
22    A. No.
23    Q. I am handing you a document marked
24    Exhibit 88B. That is a multipage document. If

Page 163

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    163

1    you can take a look at that and let me know if you
2    are familiar with any of that document.
3    A. I have not seen this before.
4    Q. If you turn to page 3 of this document,
5    Exhibit 88B, there is a spreadsheet with the title
6    "Long Island Acquisition Balance Sheet Draft". Do
7    you see that?
8    A. I do.
9    Q. Do you have an understanding as to what
10    the Long Island acquisition was?
11    A. Yes.
12    Q. It is the Lehman/Barclays transaction?
13    A. Yes.
14    Q. Is this spreadsheet one that you are
15    familiar with?
16    A. I don't believe I have seen this.
17    Q. The documents that were marked as
18    Exhibits 86B, 87B and 88B have been described to
19    us as spreadsheets containing information provided
20    to Barclays' auditors in connection with the
21    acquisition. Were you involved in providing any
22    information to Barclays' auditors in connection
23    with the acquisition?
24    A. I was not, no.

Page 164

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    164

1    Q. Did Barclays' auditors ever have
2    conversations with you about what they were doing
3    to account for the acquisition?
4    A. They didn't speak to me, no.
5    Q. Or anyone in your group that you are
6    aware of?
7    A. I believe that they spoke to one or two
8    of the more junior people in the group about the
9    components in Schedule B, what you would know as
10    Schedule B, but I think that that was it
11    Q. Do you have any understanding as to the
12    questions that they had about Schedule B?
13    A. I think mainly it was around the way
14    that it was constructed and balances confirmed,
15    certainly not to do with valuation
16    Q. Of the assets that were transferred from
17    Lehman to Barclays, the various pieces of
18    collateral, do you have any understanding as to
19    whether any of that collateral has been sold by
20    Barclays?
21    MR. HUME: Objection, lacks foundation.
22    A. Again, I would be speculating but --
23    MR. HUME: Don't speculate
24    A So I should not

Page 165

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    165

1    Q. Who would know about sales of
2    collateral, what is sold by Lehman to Barclays and
3    that may have been onsold now by Barclays?
4    A. I don't know who the best person would
5    be. I would assume that someone in Patrick
6    Claxton's team would be able to.
7    Q. Claxton's team?
8    A. Patrick Claxton's team.
9    Q. What is his position, Claxton?
10    A. He is BarCap CFO.
11    MR. TAMBE: Okay. Let's take a break
12    and then pick up again.
13    (Break for Lunch from 11:53 to 12:33 )
14    (Exhibit 156A marked for identification)
15    MR. HUME: Before we get started, in
16    terms of timing and what we discussed,
17    unfortunately the goal was to finish so he could
18    preserve his Friday afternoon for work. He has
19    things to do, which is why we started at 7.00. He
20    is I think realistically to take until 2.00 pm.
21    MR. BUNTING: 2:00 or 3:00?
22    MR. HUME: 2:00. That was I think the
23    time he had in his 7-hour cut-off. Obviously we
24    are not saying you are only entitled to that, and

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                166

1
2   based on what you said before the break it is not
3   clear that an hour and a half will be -- it sounds
4   like an hour and a half will not be enough. We
5   will see. If it is not enough we can arrange to
6   keep it open perhaps. He is here when you are
7   coming back for Claxton on September 4. We can do
8   it the day before or something.
9        MR. TAMBE: Okay, let's get as much
10  progress as we can
11       I have placed before you a document
12  marked Exhibit 156A It is a cover e-mail and
13  then what appears to be a set of spreadsheets
14  attached to it Are you familiar with those
15  documents?
16       A. I am.
17       **Q. The cover e-mail, at the top of the**
18  **e-mail it is from you to Duane McLaughlin and**
19  **others. Do you see that?**
20       A. I do.
21       **Q. And what you are doing is providing the**
22  **latest iterations of Schedule A and Schedule B**
23  **part one, as of September 26, 2008. Correct?**
24       A That is correct.
25       **Q. And this is following a reconciliation**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                167

1
2   process that had commenced as early
3   as September 19 and continued post-closing?
4        A. That is correct.
5        **Q. Just a question about the market values**
6   **that are used in these attachments.**
7        A. Yes.
8        **Q. Generally, what is the source of the**
9   **market value information in this document?**
10       A. I believe that that was the --
11       MR. HUME: I am sorry, I need to
12  register an objection. This e-mail looks
13  privileged.
14       MR TAMBE: How could it be privileged?
15       MR. HUME: It is from September 26 after
16  the transaction and it is between Barclays.
17       MR TAMBE: And Weil
18       MR. HUME: Where is Weil?
19       MR. TAMBE: David Murgio, Weil cc'd,
20  look at the bottom e-mail
21       MR. HUME: Okay. In both e-mails, okay,
22  all right, sorry about that
23       A. I believe that the valuations were the
24  Lehman source valuations.
25       **Q. As of what date?**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                168

1
2        A. Probably as of the 18th. I am not sure
3   that they were updated subsequently, close of the
4   18th.
5        **Q. Just as a matter of convention, that was**
6   **picked as the valuation date to be used for these**
7   **schedules, was that a conscious decision?**
8        A. No, I mean for convenience, because, you
9   know, systems were not being updated afterwards or
10  we were not getting full feeds from all of the
11  external providers, and it was almost by necessity
12  the reference date that we were using and the
13  reference data, but it was not a conscious
14  decision that it should be as of that date.
15       **Q. Are you aware of a valuation done of**
16  **these securities that are in the spreadsheet**
17  **attached to Exhibit 156A, a valuation that was**
18  **done as of 19 September?**
19       A. I am actually not aware of any explicit
20  valuation done. There have been many I think
21  valuations as of the closing date for recording
22  the transaction, you know, the value of the
23  transaction, so I am not sure which you are
24  referring to. I have not really been part of
25  those.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                169

1
2        **Q. Who has at Barclays?**
3        A That would be part of the finance
4   function.
5        **Q. Claxton's group?**
6        A. Claxton.
7        **Q. Claxton's group, right.**
8        **(Exhibit 157A marked for identification)**
9        **I have placed before you a 2-page document marked**
10  **Exhibit 157A. Take a moment to look at it, let me know when**
11  **you are done.**
12       A. Yes.
13       **Q. There is a chain of e-mails between**
14  **David Aronow and yourself?**
15       A. Yes.
16       **Q. The e-mail in the middle of page 1 is**
17  **from David Aronow to you with a CC to Ian Lowitt.**
18  **There is a reference there to the Barclays repo.**
19  **Do you see that?**
20       A. I do.
21       **Q. Towards the middle of that first big**
22  **paragraph in that e-mail it states that:**
23       **"They are not interested in moving forward with**
24  **any more collateral movements from us to them today through**
25  **the process we built and applied yesterday."**

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    170
2        Do you see that?
3        A. I do.
4        Q. Do you have an understanding as to what
5    that is a reference to?
6        A. Yes, I think that that is the specific
7    process where collateral was moving from JP Morgan
8    to BONY and had been applied the previous day, so
9    I think that there was an unusual process of
10   pre-agreeing collateral and cash movements and
11   there was not going to be any more of that.
12       Q. And this was not a limitation on
13   movements of other collateral outside of the repo
14   process?
15       A. That was not my interpretation that
16   there was not going to be that -- excuse me, I did
17   not interpret this as meaning that there were not
18   going to be any other movements outside of the
19   repo process.
20       Q. In terms of the repo process, you
21   understood this as an indication from Barclays
22   that they considered themselves to be fully
23   collateralized applying the haircuts to the repo
24   piece?
25       MR. HUME: Objection, lacks foundation.

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    171
2    As of what time?
3        MR. TAMBE: As of the date of this
4    e-mail.
5        A. That was what David was saying. I
6    didn't really have an insight into what Barclays
7    were thinking the situation was and I am not too
8    sure that David really knew. I think he may be
9    speculating.
10       Q. What was David's role?
11       A. He worked in the operations area.
12       Q. And he would have been communicating
13   with Barclays about the repo mechanics?
14       A. Around the repo mechanics, yes.
15       (Exhibit 158A marked for identification)
16       Q. I have handed you a 3-page exhibit
17   marked Exhibit 158A. Just let me know when you
18   have had a chance to review it.
19       A. Yes.
20       Q. We talked this morning about some
21   efforts to identify FX receivables that might be
22   transferred to Barclays. Does this e-mail relate
23   to that effort?
24       A. It relates to that and to the more
25   general possibility of Barclays assuming the

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    172
2    settlement counterparty role around FX
3    transactions.
4        Q. And if they were to do that, drawing
5    your attention to the bottom of page 1, was the
6    understanding that they would stand to get the
7    $1.3 billion of excess cash in the account?
8        A. The $1 3 billion of excess cash in the
9    account is I believe the balance with Citibank,
10   and that was a possibility that Citibank would
11   then release that, because they really had been
12   very explicit with the fact that they were holding
13   it against FX activity.
14       Q. Just to be clear, if Barclays were able
15   to step into those transactions they would get the
16   benefit of that cash?
17       MR. HUME: Objection, calls for
18   speculation.
19       A. I think potentially
20       Q. These e-mails are dated 18 and
21   19 September. Do you know if in fact as the
22   transaction unfolded whether Barclays did in fact
23   step into this position?
24       A. I believe they did not step into that
25   position.

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    173
2        Q. Who within Barclays would know whether
3    in fact they stepped into that position? You said
4    you believe they did not so I want to know if
5    there is someone who has better information.
6        A. I am pretty certain that they didn't
7    step into these transactions.
8        Q. Is there a reason why they didn't step
9    into these transactions?
10       MR. HUME: Objection, calls for
11   speculation, lacks foundation.
12       A. There were a tremendous volume of
13   transactions, and the analysis required to
14   understand that and the exposures was too great to
15   accomplish in the limited time.
16       Q. And so what happened with these
17   transactions then?
18       A. They remained with Lehman as the
19   counterparty.
20       (Exhibit 159A marked for identification)
21       Q. I have placed before you a document
22   marked Exhibit 159A, a one page e-mail chain.
23   Have you reviewed it?
24       A. Yes.
25       Q. At the top of the page there is an

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    174
2    e-mail from Anna Yu at Lehman to several people,
3    including you. Do you see that?
4    A. Yes.
5    Q. There are two items in her e-mail. One
6    is concerning the 15c3-1 segregated cash. Do you
7    see that?
8    A. I do.
9    Q. And we have talked about that before.
10    The second item relates to "Futures seg cash and
11    margin receivables breakout."
12    A. Yes.
13    Q. What is that a reference to?
14    MR. HUME: Objection, lacks foundation.
15    A. I don't know the details. I can only
16    read that it was related to future seg cash and
17    margin receivables.
18    Q. Do you understand that as related to the
19    OCC transactions?
20    MR. HUME: Objection, calls for
21    speculation.
22    A. The risk system recorded futures,
23    exchange traded options and FX transactions, and
24    so I would expect that the OCC transactions would
25    be recorded on that system and would be a part of

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    175
2    these balances.
3    (Exhibit 160A marked for identification)
4    Q. I have handed you a one page document
5    marked Exhibit 160A. Let me know when you have
6    had a chance to review it.
7    A. I can see this.
8    Q. There is an exchange of e-mails between
9    yourself and Chris O'Meara at Lehman?
10    A. Yes.
11    Q. The second e-mail from the top is an
12    e-mail from Chris O'Meara to you. There is
13    a discussion about the 15c3-3 lock up. Towards
14    the end of his e-mail he asks: "Is DTCC issue
15    fatal?" Do you see that?
16    A. I do
17    Q. What was the DTCC issue that he was
18    referring to, do you know?
19    A. I believe this was just DTC supporting
20    the settlements post-close.
21    Q. And was there a concern that they would
22    not be supporting the settlements post-close?
23    A. There was certainly not any clarity on
24    how this was going to work.
25    Q. You respond to Chris O'Meara's e-mail

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    176
2    with the line at the top that says "Possibly
3    fatal", and then you say: "Can you call me re
4    15c3". Do you see that?
5    A. Um hum
6    Q. Your reference to "possibly fatal", is
7    that a reference to the DTCC issue or to the 15c3
8    issue?
9    A. DTCC issue.
10    Q. Is there a connection between the DTCC
11    issue and the 15c3 issue?
12    A. No.
13    Q. Two separate issues?
14    A. Yes.
15    MR. TAMBE: I think in the interests of
16    time I am going to pass the questioning to other
17    counsel. I think I am largely done. If we do
18    have any clean-up questions we would like to take
19    you up on your offer to finish examining
20    Mr. Tonucci when we return for the Claxton
21    deposition I assume that offer still stands.
22    MR. HUME: If necessary and reasonable
23    within the time limit, yes.
24    MR. TAMBE: Thank you, Mr. Tonucci.
25    A. Thank you.

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    177
2    CROSS-EXAMINATION BY MR. MAGUIRE:
3    (Exhibit 161A marked for identification)
4    MR. MAGUIRE: Mr. Tonucci, I have handed
5    you a document we have marked as Exhibit 161A, an
6    e-mail exchange between you and Mr. Fleming You
7    will see that Mr Fleming advised you on Sunday,
8    September 21, about the statement from the OCC
9    What was that a reference to?
10    A It is just a margin statement received
11    from the OCC
12    Q. And reflects a large excess position
13    in-house and customer?
14    A. Yes.
15    Q. What does that mean?
16    A. That we had excess margin deposited with
17    the exchange.
18    Q. He goes on to say: "I do not know how
19    accessible this is." What did you understand that
20    to mean?
21    A. At that time it was not clear what the
22    clearing banks that serviced our cash payment
23    requirements were going to support, so it was not
24    clear whether JP Morgan Chase, for example, would
25    actually execute a payment or release a payment.

## Page 178

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          178

1    So the mechanisms for accessing cash and
2    transferring cash were at that point unclear
3         Q.  Was there clarity as to the actual state
4    of the margin at OCC?  In other words, was that in
5    real time?  Did you know exactly what the excess
6    was?
7         A.  I didn't.
8              MR HUME:  Objection, lacks foundation
9         A.  I don't know.
10        Q.  How did you come to be involved in this
11   e-mail exchange?
12        A   Dan worked for me managing the cash
13   management area and I think he was just trying to
14   keep me up-to-date on anything that he thought
15   would be relevant or of interest.
16        Q.  Had you asked him specifically for any
17   OCC excess?
18        A.  I don't believe I had.
19        Q.  Was this part of the effort to find
20   collateral to move to Barclays?
21        A.  No, it was not.
22        Q.  You respond to him, you say: "But that
23   may include the value of LCs drawn."  What does
24   that mean?

## Page 179

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          179

1         A.  It was typically the case that there
2    would be some LCs also deposited with the
3    exchanges.  LCs are letters of credit provided by
4    third party banks, and I was not sure if that
5    excess amount reflected the OCC drawing down on
6    some of those LCs.
7         Q.  What is the significance of that if
8    there has been a drawdown in LCs?
9              MR. HUME:  Objection, calls for
10   speculation.
11        A.  It was certainly not my area of
12   expertise but, you know, I think a question to ask
13   was whether they calculated the excess inclusive
14   of any cash that they may have received from third
15   party banks.
16        Q.  Did you find out about that?
17        A.  I don't recall.
18        Q.  What is the difference between the house
19   and the customer excess?
20        A.  I am not sure.
21             (Exhibit 162A marked for identification)
22        Q.  I will show you a document we will mark
23   as Exhibit 162A.  You will see this is an exchange
24   that starts September 22, with a question about

## Page 180

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          180

1    the final list of purchased assets.
2         A.  Yes.
3         Q.  What did you understand is meant by the
4    final list of purchased assets?
5         A.  The assets which were transferred under
6    the repo agreement and the other collateral -- I
7    can't recall the details of this schedule -- the
8    other collateral, including the unencumbered
9    assets.  I am not sure about the sort of precision
10   composition of this list, and there is not a lot
11   of color given in the initial e-mail, so I don't
12   know if I responded with what was included on
13   Schedule B.
14        Q.  You referred to 15c3 lock up of cash of
15   769 million.  Do you see that?
16        A   Yes
17        Q.  And you had told us previously I believe
18   that there was about a billion dollar of cash at
19   Wells Fargo?
20        A.  Yes.
21        Q.  The 769, was that cash or securities?
22        A.  Securities.
23        Q.  What kind of securities were they?
24        A.  I believe that they were treasuries.

## Page 181

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          181

1         Q.  Are you familiar with the term "cash
2    equivalent"?
3         A.  I am
4         Q.  What does that mean to you?
5              MR. HUME:  Objection, calls for
6    speculation.
7         A.  Equivalent to cash.
8         Q.  And the treasuries that were the subject
9    of this lock up, were they equivalent to cash?
10        A   I don't think so.
11        Q.  Why not?
12        A.  Because I think what goes into cash and
13   cash equivalent is really overnight money market
14   investments, and I don't believe these treasuries
15   were overnight treasuries.
16        Q.  You use the term "cash" here, cash of
17   769 million.  Can you tell us why you used that
18   term, as opposed to securities?
19        A.  Because it was late and I was exhausted
20   and so, you know, it is clearly wrong, because I
21   was absolutely certain that they were securities.
22        Q.  You use the term "lock up".  What does
23   that refer to?
24        A   I use the term "15c3 lock up".  It is

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    182
2    the entirety of that that is important  It is the
3    amount of cash and securities that was segregated
4    against the 15c3 reserve requirement.
5        Q.  I will show you a document we will mark
6    as Exhibit 163A.
7        (Exhibit 163A marked for identification)
8        This is an e-mail string.  You are welcome to look
9    at as much of it as you want.  I am just going to ask you
10   about the top of the page, where Mr. Fleming asks you: "Are
11   these the OCC positions that would have been terminated and
12   have generated the cash?" Do you see that?
13       A.  Is that not from me to him
14       Q.  I am sorry, you are correct, it is from
15   you to Mr. Fleming.
16       A   Yes.
17       Q.  Can you explain to us what you were
18   referring to there?
19       A.  I was looking for clarification on what
20   this statement was and what exactly these
21   positions related to and how they affected the
22   cash position or the margin position.  So up to
23   this point I had never seen this report before or
24   this type of report so I was just looking for
25   clarification as to how to interpret it.

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    183
2        Q.  And you understood the report contained
3    positions at OCC?
4        A.  That is correct
5        Q.  What did you mean when you asked the
6    question whether these are the positions that
7    would have been terminated?
8        A.  I was not sure whether all of the OCC
9    positions had been terminated or whether some
10   positions had remained open, so there was at that
11   time a lack of certainty about which positions had
12   been closed out by the exchanges, and I was not
13   sure if that was applicable to OCC as well.  I was
14   aware that the CBOT had closed out some positions.
15   I was just asking the question whether that was
16   the case here.
17       Q.  Did you have any information about any
18   close out of positions at OCC?
19       A.  I did not, no.
20       Q.  Did you get any information as a result
21   of this question?
22       A.  I don't believe I saw anything more, no
23       Q.  I will show you a document that has
24   previously been marked as Exhibit 53.  Have you
25   seen this e-mail before, sir?

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    184
2        A.  No.
3        Q.  Can you tell me who Mr. Willoughby is?
4        A.  He was a lawyer at Lehman Brothers.
5        Q.  Was he working in connection with the
6    transfer of OCC positions?
7        A   I don't know
8        Q.  Did you speak with him on or
9    about September 30, 2008, concerning the transfer
10   of OCC positions to Barclays?
11       A.  Yes, briefly.
12       MR. HUME:  Can I state for the record, I
13   thought we had made a request to claw this
14   e-mail back.  It is privileged.  Are you aware of
15   that?
16       MR. MAGUIRE:  I am not aware, but
17   I mean if you can reserve your rights that is
18   fine, but I still intend to ask the witness about
19   his conversation with Mr. Willoughby.
20       MR. HUME:  We reserve the right to -- I
21   believe we have clawed it back as privileged and
22   if we have I don't think it is appropriate asking
23   questions about it.
24       MR. MAGUIRE .  You can state, you can
25   reserve your rights on that but I believe there

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    185
2    was testimony I think Mr. Berkenfeld's
3    deposition that Mr. Willoughby was acting in
4    a business capacity in connection with this  That
5    is my understanding.  Now, I am free to be
6    corrected but I don't think this is the time or
7    place to do that
8        MR  HUME:  It is the time and the place
9    if we have clawed the e-mail back.  Do you take
10   the position even if we have clawed it back
11   that --
12       MR. MAGUIRE :  I believe you are
13   entitled to reserve your rights as to the e-mail
14   I am not aware that you have clawed it back.
15       MR. HUME:  We can determine that in one
16   minute off the record and I would like to do that,
17   because if we have clawed it back I don't think
18   you are allowed to ask questions about it, unless
19   and until you have successfully challenged the
20   privilege asserted.
21       MR. MAGUIRE :  Okay.  If you are taking
22   the position that you want to direct the witness
23   not to answer the questions, that is fine, but I
24   don't think the questions I am asking would be
25   objectionable whether or not there was any claw

Page 186

```
 1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI      186
 2   back
 3       MR. HUME:  Let's put the document aside
 4   and just ask the questions.
 5       MR. MAGUIRE.  Let me ask you directly
 6   then.
 7       MR. HUME:  Put the document aside,
 8   ignore the document and answer the questions.
 9       MR. MAGUIRE   In September 2008 you had
10   some discussions with people at Barclays
11   concerning some open issues under the transfers of
12   assets from Lehman to Barclays.  Isn't that
13   correct?
14       A.  There were a variety of conversations,
15   yes.
16       Q.  And in connection with OCC positions you
17   identified two, what you described as the main
18   open issues concerning the transfer.  Isn't that
19   correct?
20       A.  I can't really recall the specifics.
21       Q.  Do you recall that one specific that you
22   identified as an open issue was in connection with
23   the transfer of OCC positions, the extent to
24   whether that was only with the amount, the minimum
25   amount necessary to support the collateral and
```

Page 187

```
 1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI      187
 2   exchange the OCC.  Do you recall that, sir?
 3       A.  I recall asking the question.  I should
 4   clarify that I had not seen the APA and so I would
 5   not really have an understanding of what had been
 6   agreed   I was just asking the question.
 7       Q.  And you were asking the question whether
 8   Barclays was entitled to anything from the
 9   Lehman's position at OCC beyond the collateral
10   that was necessary to support specific positions?
11       MR. HUME.  To the extent you were asking
12   that question of a lawyer, it is privileged.  You
13   should not reveal either the question asked or the
14   answer given.
15       A   I honestly do not recall the specifics
16   of that conversation   My reason for interest
17   would have been to help direct the group that
18   worked for me in cash management to provide the
19   relevant analytical support or information.  I
20   don't really have a view on what the entitlement
21   was or an understanding, and I am not a lawyer.
22       Q.  I am not asking you for a legal view,
23   sir.  Can you explain to us the difference between
24   the amount necessary to support a position at OCC
25   and an amount that is not limited by that?  Can
```

Page 188

```
 1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI      188
 2   you just explain that distinction for us?
 3       MR. HUME:  Objection.  He testified he
 4   is not expert in the OCC issues
 5       A.  I was asking very open questions because
 6   I don't really know the specific mechanics around
 7   this, so this was just a better understanding so
 8   that I could then help my team provide the sort of
 9   necessary supporting information  So I am asking
10   these questions in a general way.
11       Q.  And you don't have an understanding as
12   to whether Barclays was entitled to anything in
13   terms of OCC margin beyond what was necessary to
14   support specific positions?
15       MR HUME: Objection to the form of the
16   question.
17       A.  I don't have a view or an understanding
18   of what the entitlement was, full stop.  I had not
19   seen the APA  I don't have -- I am not a lawyer
20   and I have not reviewed it in relation to this, in
21   relation to these series of positions.
22       Q.  Did you ever discuss this question with
23   Ian Lowitt?
24       A.  I don't believe so.
25       Q.  Did you ever discuss this with any other
```

Page 189

```
 1       HIGHLY CONFIDENTIAL - PAOLO TONUCCI      189
 2   business person?
 3       A.  I can't recall having done so.
 4       Q.  Did you discuss this with anyone else,
 5   whether a lawyer or not, who was acting in
 6   a business capacity?
 7       MR HUME.  If it was a lawyer, you
 8   should not answer.
 9       A   I don't recall.
10       Q.  When you talked to Mr. Willoughby, was
11   he practising as a lawyer?  Was he a lawyer, in
12   other words, who actually was providing legal
13   advice?
14       A.  Yes.
15       Q.  Or was he somebody who had a business
16   function at Barclays?
17       A.  I thought of him as a lawyer.
18       Q.  Did you obtain any legal advice from
19   Mr. Willoughby?
20       MR HUME:  Objection.  You are not
21   entitled to get that information
22       Q.  Only "yes" or "no".
23       MR HUME:  I am instructing the witness
24   not to answer that.
25       A   I am not going to answer
```

Page 190

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      190
2          MR. HUME: He is not qualified to
3   articulate what is legal advice and it is
4   privileged.
5          Q.  Fine.  Let me ask you, did you obtain
6   any advice from Mr. Willoughby?
7          MR. HUME: Objection.  Don't answer.
8          Q.  I am not asking for the substance of any
9   advice I just want to know did Mr. Willoughby
10  respond and provide you with any advice following
11  that discussion that you had?
12         MR. HUME: Object to the
13  characterization of whether there was
14  a communication  You can ask whether there was
15  a communication from Mr. Willoughby.
16         A.  I don't recall.
17         Q.  You don't recall receiving any
18  communication from Mr. Willoughby in response to
19  the discussion that you had in late September?
20         A.  That is right.
21         Q.  And you don't recall following up with
22  Mr. Willoughby concerning that communication?
23         A.  That is right.
24         Q.  So as far as you recall, you have never
25  touched this subject since that one discussion you

Page 191

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      191
2   had with Mr. Willoughby in late September, 2008?
3          A.  Certainly not that -- I don't recall
4   speaking to Scott Willoughby and I would say that
5   my involvement in this transaction subsequent to
6   that was minimal.
7          Q.  And you don't recall discussing this,
8   this I mean in the OCC positions and Barclays'
9   entitlement since September 2008 with anyone?
10         A  No, I don't believe I have discussed
11  with anyone
12         Q.  You testified earlier about unencumbered
13  assets, and specifically I want to ask you about
14  Schedule B that you mentioned.  Where were the
15  assets that are listed on Schedule B physically
16  located?
17         A.  There were very many versions of
18  Schedule B so you are going to have to be more
19  specific.
20         Q.  I am just now looking only for your
21  understanding as to where they were physically
22  custodied.  If it is more than one place or
23  changed over time, let me know?
24         A  That is what I am saying, it was more
25  than one place and it changed over time.

Page 192

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      192
2          Q.  What were the different places where
3   those assets were --
4          A.  DTCC, JP Morgan, Euroclear.  I can't
5   remember the name of the Canadian depository, so
6   those are the ones that I remember
7          Q.  At any time was Schedule B limited to
8   the unencumbered assets at DTC?
9          A.  Not that I am aware of.
10         Q.  I will show you a document we will mark
11  as 164A.
12         (Exhibit 164A marked for identification).
13         If we start at the bottom, you will see there is
14  an e-mail that then gets sent to you on 18 September, and
15  then you forward to Mr. Azerad.  Do you see that?
16         A  I do.
17         Q.  And the chain starts with what is called
18  a box summary.  Can you tell me what the box
19  summary is?
20         A.  Yes, it is the securities in possession,
21  in the clearance box.
22         Q.  When you say "clearance box", is that
23  the clearance box at DTC?
24         A  No, it could mean any number of
25  custodial or depository arrangements.

Page 193

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI      193
2          Q.  Then you will see Mr. Azerad's e-mail
3   says: "FYI, 3.2 billion at risk."  Can you explain
4   what "3.2 billion at risk" means?
5          A.  I don't think I can.
6          Q.  Did you have an understanding at the
7   time that you received this e-mail?
8          A.  I am assuming the 3 2 billion is the
9   "stays at LBI" position.  I am not too sure what
10  the "at risk" means.
11         MR. HUME: Don't speculate.
12         Q.  In your e-mail you say: "That seems very
13  high.  What are the assets they need to sell?"
14  Does that help you to understand what you were
15  hearing here and what you were following up with?
16         A  Not really.  I mean, there was a lot
17  going on, and I am sure you have seen that there
18  were a lot of e-mails that I was getting, so
19  responses like that could be quite open, just
20  because I don't really know what was going on and
21  I was trying to get information from others.
22         Q.  What was the Sparrow report?
23         A  Charlie Sparrow was the mortgage trader,
24  he was the head of the mortgage desk, so I think
25  it was his report of positions.

Page 194

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    194 |
| 2 | Q.  I will show you a document we will mark |
| 3 | as Exhibit 165A. |
| 4 | (Exhibit 165A marked for identification). |
| 5 | I would like to start with Mr. Blackwell's e-mail |
| 6 | to you, sir, in which he says: |
| 7 | "We need to fund DTC 1.2 billion to allow |
| 8 | settlement." |
| 9 | A.  Which one are you looking at? |
| 10 | Q.  Did I give you the wrong document?  No, |
| 11 | sorry, I gave you the wrong document.  Let's mark |
| 12 | this as Exhibit 166A. |
| 13 | (Exhibit 166A marked for identification) |
| 14 | Q.  Mr. Blackwell asks: "We need to fund DTC |
| 15 | 1.2 billion to allow settlement and we need to |
| 16 | call with Chase.' Can you tell me, what was your |
| 17 | understanding as to why there is a need to fund |
| 18 | 1.2 billion to DTC? |
| 19 | A.  To facilitate the DTC settlement |
| 20 | process, there was often a prefunding requirement. |
| 21 | You would get the cash back at the end of the day |
| 22 | but intra day they would require funding in order |
| 23 | to essentially grease the wheels and initiate the |
| 24 | settlement chain. |
| 25 | Q.  This is to clear trades? |

Page 195

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    195 |
| 2 | A.  That is right, to clear trades. |
| 3 | Q.  You responded: "Don't know how we can do |
| 4 | this".  Do you know how this ultimately was |
| 5 | resolved? |
| 6 | A.  I don't. |
| 7 | Q.  If you turn back to the previous |
| 8 | document I gave you, Exhibit 165A, here Mr. Azerad |
| 9 | notes that: "We managed to pledge over about |
| 10 | 800 million in MV."  Do you understand that to be |
| 11 | market value? |
| 12 | MR. HUME  Excuse me, you say Mr. Azerad |
| 13 | notes? |
| 14 | A.  It is Jim Hraska. |
| 15 | MR. MAGUIRE : Quite right, strike that. |
| 16 | MR. HUME: Is there a reason it begins |
| 17 | with a cc at the top? |
| 18 | MR. MAGUIRE : I am not aware of any. |
| 19 | MR. HUME.  Object to the form of the |
| 20 | document but go ahead.  We have never seen it |
| 21 | before |
| 22 | MR. MAGUIRE : You did receive this, did |
| 23 | you not, sir, this e-mail? |
| 24 | A.  I guess so. |
| 25 | MR. HUME:  Don't guess.  Do you remember |

Page 196

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    196 |
| 2 | receiving it is the question. |
| 3 | A.  I don't remember receiving it |
| 4 | Q.  My only question is this a reference |
| 5 | here to a pledge of 800 million to Barclays? |
| 6 | A.  Um hum. |
| 7 | Q.  Can you tell me what was Lehman doing on |
| 8 | Friday, September 19, pledging 800 million to |
| 9 | Barclays? |
| 10 | MR. HUME:  Objection, calls for |
| 11 | speculation and lacks foundation  Don't |
| 12 | speculate.  Only speak to what you know. |
| 13 | A.  I don't know. |
| 14 | Q.  Do you have any knowledge of any |
| 15 | collateral being pledged to Barclays |
| 16 | on September 19? |
| 17 | A.  I do have knowledge of that. |
| 18 | Q.  What knowledge do you have? |
| 19 | A.  The details of some securities that were |
| 20 | pledged I think became Schedule B1, and I am not |
| 21 | sure when I sort of became really conscious of |
| 22 | these. I don't remember seeing this mail. |
| 23 | Certainly at that point I had not seen any |
| 24 | details, so it was after that. |
| 25 | Q.  So you had knowledge that some |

Page 197

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    197 |
| 2 | collateral was being pledged to Barclays? |
| 3 | A.  I have knowledge that some collateral |
| 4 | was pledged to Barclays.  I am not aware of having |
| 5 | knowledge at the time it was being pledged. |
| 6 | Q.  When did you learn that it had been |
| 7 | pledged to Barclays? |
| 8 | MR. HUME.  Object to the vagueness of |
| 9 | the word "pledged" in this line of questioning. |
| 10 | A.  I think late on the 19th, perhaps on the |
| 11 | 20th. |
| 12 | Q.  Did you understand -- I will use the |
| 13 | word "transfer" maybe.  Did you understand the |
| 14 | business reason why this collateral had been |
| 15 | transferred to Barclays? |
| 16 | A.  Not specifically, but I would assume as |
| 17 | part of the sales agreement. |
| 18 | Q.  And when did the transfer physically |
| 19 | occur? |
| 20 | MR. HUME  Objection, calls for |
| 21 | speculation. |
| 22 | A.  I think I can only say that the |
| 23 | transfers that happened that Jim is referring to |
| 24 | appear to have happened on the 19th  I am aware |
| 25 | that there were actually subsequent transfers. |

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                198

Q.  In the following week?

A.  Yes, in the following week.

Q.  How did you come to learn about these transfers?

A.  I believe that Jim Hraska made me aware of them.

Q.  What did he tell you about them?

A.  This is the transfers on the 19th I am referring to.  I don't remember getting any specifics from him.

Q.  How did you come to learn that they were part of the sale agreement?

A.  I didn't come to learn of that.  I was saying that that was my assumption, that would be my assumption.

Q.  Did you ever get any information from anyone as to whether or not they were part of the sale agreement?

MR. HUME:  Objection to form

A.  I don't think so.  I don't know  What do you have in mind?

Q.  I am just trying to understand.  I am trying to learn what you know about those transfers, whether you learned about it on the

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                199

19th or whether you learned about it the following week or even subsequently to that?

MR. HUME:  Objection, asked and answered.

A.  My recollection was that I learned that either late on the 19th or the 20th, but when you ask about the sales agreement I am not sure what you have in mind.

Q.  I don't have anything in mind.  I am just trying to understand what was the business reason for the transfer to Barclays.  If your understanding is that it was part of the sale agreement, I just want to confirm that.

A.  That is my understanding

Q.  Do you have any different understanding?

A.  I don't have any different understanding.

Q.  I will show you a document we will mark as Exhibit 167A.

(Exhibit 167A marked for identification)

If we start at the beginning of the string, the second page, sir, chronologically the beginning, Mr. Azerad is informing you that he found 700 million in the DTC box, and at the end of his e-mail the key question is whether

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                200

they can count the 800 million delivered to Barclays on Friday.  Do you see that, sir?

A  I do

Q.  Can you tell us what the issue was that Mr. Azerad and you were communicating about here?

A.  It is just a representation of the unencumbered collateral that was being included as transferable.

Q.  When you say "the representation", what do you mean?

A.  In order to represent it accurately in the opening balance sheet or in the various agreements, we just wanted to be clear on how this was going to be -- how this should be recorded So I think Robert is asking the question: are we treating the 800 million they got transferred on the Friday as part of the unencumbered collateral schedule?

Q.  And what was the answer to that question?

A.  I don't see an answer to that.  I think we are asking -- Ian was asking that we get a legal confirmation, and I don't recall seeing one.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                201

Q.  Where did the 800 million collateral come from?

A.  I think it was from the DTC, one of the DTC accounts.

Q.  I will show you a document we will mark as Exhibit 168A.

(Exhibit 168A marked for identification)

If we start at the first e-mail you received, Saturday, September 20 e-mail, on the second page, you were copied on that e-mail from Mr. Forrest, right?

A.  Yes.

Q.  You see the subject is "Re: 1.9 billion."

A.  Yes.

Q.  What is the significance of the 1.9?

A.  The 1.9 billion was the initial estimate of the unencumbered collateral.

Q.  And at the time of that, of that initial estimate, do you remember where that collateral was custodied or whether it was in more than one place?

A.  It was in a number of places.

Q.  The first item here is 800 million at BONY.  Do you know whether that is reference to

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    202

1    the 800 million that had been transferred on the
2    Friday?
3        A.  I don't.  I would assume so.
4        MR HUME: Don't assume. Don't
5    speculate.
6        Q.  The next is: "We have 746 million in
7    074." Do you recognize that as a DTC box?
8        A  I do
9        Q.  You will see number 4 says: "We have
10   identified another 300 million of mortgages in
11   636." Do you know what 636 is a reference to?
12       A. Another DTC box or account.
13       Q. And Mr. Forrest says: "That is a total
14   of 2.181 billion."  Do you see that, sir?
15       A.  Yes.
16       Q.  Was there a specific target that people
17   were shooting for, a specific total people were
18   trying to get to?
19       A.  Not really.
20       Q.  So people were kind of keeping score of
21   what they found but there was not any number that
22   you had in mind as a target that you needed to get
23   to?
24       MR. HUME:  Objection to the form.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    203

1        A.  Not really.  I mean I think, as Ian
2    says, it is more important just to be accurate.
3        Q.  You had mentioned that you had heard I
4    believe on the Friday that there was a need for
5    additional collateral in order for the transaction
6    to close; that was something that Mr. Lowitt told
7    you?
8        A.  Um hum
9        Q.  And he reiterated that a number of times
10   during the day?
11       A.  Yes.
12       Q.  Did he tell you how much additional
13   collateral would be needed to make the transaction
14   close?
15       A.  I thought -- no, I don't remember the
16   total  It was more than 2 billion.
17       Q.  Was there a number that he gave you and
18   you don't remember what that is now?
19       A.  I don't remember what it was.  I don't
20   remember if he gave me a number and I don't
21   remember what it was
22       Q.  Over the course of the next couple of
23   days, the Saturday and the Sunday, did you hear of
24   a target, a number that was needed in order to

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    204

1    close the transaction?
2        A.  I think we had gone to the bankruptcy
3    court on Friday with the unencumbered collateral
4    at 1.9 billion, so that was our initial estimate,
5    and then a further billion or so in the 15c3
6    reserve account, so that would give nearly
7    $3 billion. I think that that is what everyone
8    was expecting the value of the unencumbered
9    collateral plus the 15c3 to be.
10       Q.  When you say "we went to the bankruptcy
11   court", you are describing what everybody's
12   expectation was at the time everybody went down to
13   the bankruptcy court hearing?
14       MR. HUME:  Objection to the form,
15   calling for speculation about what other people's
16   expectations were
17       Q.  That certainly was your understanding?
18       A.  It was my understanding
19       Q.  Did you attend the hearing before the
20   bankruptcy court?
21       A.  I did not.
22       Q.  Did you hear from anybody who did
23   attend?
24       A.  Yes.

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    205

1        Q.  Who did you hear from?
2        A.  From Chris O'Meara.
3        Q.  Who was Chris O'Meara?
4        A.  He was at Lehman Brothers.  He had been
5    head of risk.
6        Q.  What did Chris O'Meara tell you about
7    the hearing?
8        A.  That it was long and seemed to have gone
9    well, and that the court had approved the sale.
10       Q.  Did he tell you anything else?
11       A.  No.
12       Q.  Did he tell you anything about any
13   proceedings that had happened in the course of the
14   hearing?
15       A.  No, he kept it to a minimum.
16       Q.  Did you hear from anyone else other than
17   Chris O'Meara about the hearing?
18       A.  I did not
19       Q.  I will show you a document we will mark
20   as Exhibit 169A.
21           (Exhibit 169A marked for identification).
22           The subject of these e-mails is "PL on 9/18".  Do
23   you have an understanding what "PL" refers to?
24       A.  I am not sure here.  I am not

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    206

1  understanding these mails.

2    Q.  Do you have any understanding just as to

3  what the letters capital P and capital L stand

4  for?

5    MR. HUME:  Objection, calls for

6  speculation.  He has already testified he does not

7  know

8    A.  I don't know.

9    Q.  You will see that there is a reference

10  here to your expecting 3.1 billion, and that is

11  contrasted with finding only 1.9 billion.  Can you

12  explain to us what your expectation was?

13    MR. HUME·  Objection, lacks foundation.

14    A.  I don't know.  I don't know where that

15  number has come from.  I don't have a recollection

16  of expecting that or communicating that to Irina.

17    Q.  Your e-mail says: "My previous answer

18  was as of Friday night".

19    A.  It is not my e-mail.

20    Q.  You are right, it is Mr. Azerad's e-mail

21  to you, and his previous answer was as of Friday

22  night and Irina's answer is as of Thursday night.

23  Does that assist you in any way?

24    A.  No.

25

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    207

1    Q.  I will show you a document we will mark

2  as Exhibit 170A.

3    (Exhibit 170A marked for identification)

4    First, sir, can you tell me what prompted you to

5  send the first e-mail here, just before 4:00 am on

6  Monday, September 22?

7    A  I can't remember.

8    Q.  You say:

9    "You should plan on moving all the unencumbered

10  collateral in the DTC box first thing".

11    Did you have an understanding then as to what the

12  value of the unencumbered collateral in the DTC box was?

13    A.  Only the estimates.

14    Q.  And what was the estimate you had at

15  this time?

16    A.  I don't remember.

17    Q.  Did you follow up on this instruction?

18    A.  I don't remember.  This is 4.00 in the

19  morning as the transaction was being sort of

20  finalized, and I had been up all night, in front

21  of the Creditors Committee for much of it, so you

22  know it may well be that -- I mean there are going

23  to be things that I just don't remember about  I

24  was quite tired.

25

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    208

1    Q.  I am sure you were.  My only question is

2  whether there was something specifically that made

3  you at 4 o'clock in the morning send this

4  particular e-mail?

5    A.  I don't recall it

6    Q.  I will show you a document we will mark

7  as Exhibit 171A.

8    (Exhibit 171A marked for identification)

9    Q.  The transfers to the BONY records, this

10  refers to the assets transferred on Friday?

11    A.  Yes

12    Q.  Is it your understanding that was the

13  800 million that was transferred on Friday that

14  was the subject of some of the earlier e-mails

15  that we looked at?

16    A.  I believe so.

17    Q.  You had referred to I think Schedule B1

18  or .1 I think in your earlier testimony.  Is that

19  what is referred to here as the first part of the

20  Schedule B?

21    A.  Yes.

22    Q.  Did I understand you earlier to say that

23  another group was responsible ultimately for

24  determining the exact assets that should be in

25

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    209

1  Schedule B and should not be in Schedule B?

2    A.  Yes.

3    Q.  Was that Mr. Claxton's group?

4    A.  No, Mr. Claxton is at BarCap.  It was

5  Mr. Blackwell, who is the head of the operations

6  area and was therefore in the best place to

7  determine what assets were held.

8    Q.  I will show you a document previously

9  marked as Exhibit 85B.  With respect to the list

10  of exhibits that are attached here, 1 to 8, were

11  you involved, sir, in the preparation of any of

12  those?

13    A.  I don't think directly but some of this

14  may have come from my team.

15    Q.  Did you attend the APA scheduled meeting

16  on September 30?

17    A.  I don't recall.

18    Q.  Were there any APA scheduled meetings

19  that you remember attending?

20    A.  I remember attending one meeting on

21  this.  It may well have been this one.

22    Q.  What happened at that meeting?

23    A.  It was I think, as I recall, almost

24  entirely dedicated to trying to explain the

25

Page 210

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   210

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI   210
2   sequence of transactions
3      Q.  Which transactions?
4      A.  The various repo transactions and
5   collateral transfers
6      Q.  Who was at that meeting?
7      A   I don't recall.
8      Q.  Do you recall anyone who was present at
9   the meeting?
10     A.  Not by name.
11     Q.  If you turn to the first exhibit, the
12  APA lead sheet.
13     A.  Yes.
14     Q.  Can you tell us what the elements of the
15  top part, which describe the securities
16  transferred under Barclays repo agreement, the
17  total transferred under the repo agreement, what
18  does that refer to?
19     A.  The assets transferred on the Thursday
20  night repo.
21     Q.  And the reference to "Fed settled" and
22  "DTC settled", what does that mean?
23     A   I think we have covered this but it is
24  Fed wirable securities and DTC settled securities.
25     Q.  And then the next is the unencumbered

Page 211

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   211

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI   211
2   box as of Sunday 9/21/08, APA clearance boxes, APA
3   Schedule B?
4      A.  Yes.
5      Q.  Underneath that it has "Positions not
6   with no memo seg, positions with memo seg", and
7   a sub-total of those positions?
8      A.  Yes.
9      Q.  What was your understanding as to what
10  they referred to?
11     A.  They refer to securities identified at
12  the DTC, within the DTC box.
13     Q.  And underneath that is 636, that is
14  another DTC box?
15     A.  That is a different DTC box.
16     Q.  And that gives a total for the positions
17  as of Sunday, September 21; is that correct?
18     A.  That is correct.
19     Q.  And then the next section is the Friday
20  9/26 transfers.  What does that refer to?
21     A.  The Friday -- I think that is wrong
22  actually.  I am not sure.
23     Q.  When you say you think it is wrong, why
24  do you say that?
25     A.  I don't think there was -- I don't know

Page 212

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   212

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI   212
2   why it says 9/26.  Maybe it means Friday 19th.
3      Q.  So there were certainly transfers on
4   a Friday and it was either the 19th or the 26th or
5   maybe both, you don't know?
6      A.  Yes  I don't think there were any
7   transferred on the 26th though.
8      Q.  What about the Monday transfers?  What
9   does that refer to?
10     A.  There were some further transfers on I
11  believe -- I think it was on the Monday.
12     Q.  Saying Monday, are we now talking about
13  the 22nd?
14     A   Yes, I think so.
15     Q.  Then there is another line for "Monday
16  transfers par amount".  What does that mean.
17     A.  I don't know.
18     Q.  Then for the total unencumbered box it
19  is about 2.6 billion.  Do you see that?
20     A   Yes, I see that.
21     Q.  Is that a reference to the clearance box
22  at DTC?
23     MR. HUME:  Objection, lacks foundation
24     A.  No, I don't think so.
25     Q.  What do you understand the unencumbered

Page 213

HIGHLY CONFIDENTIAL - PAOLO TONUCCI   213

1   HIGHLY CONFIDENTIAL - PAOLO TONUCCI   213
2   box to refer to?
3      A.  It could be the unencumbered, you know,
4   it is just a sub-total, not even one that looks as
5   though it was right to me.  It looks to me as
6   though there has been double counting in this.
7   You can see this yourself but the 269 appears
8   twice and shows up in the sub-total or in the
9   total.  That cannot be right.
10     Q.  Do you know whether this was corrected?
11     A.  I don't know.  I didn't prepare it.  I
12  don't recall seeing a revised version.
13     Q.  What do you understand the total
14  unencumbered box to refer to?
15     A   It was an estimate of the unencumbered
16  collateral but I am not sure if it was specific to
17  just DTC.
18     Q.  Who would be the person who would know
19  best what specifically was at DTC and what
20  transfers were made from the DTC box at any
21  particular date?
22     A.  Jim Hraska.
23     Q.  I will show you a document previously
24  marked as Exhibit 48. If we start with the first
25  e-mail chronologically, you are copied on an

Page 214

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    214

1
2  e-mail from Mr. Lowitt to Mr. McDade and
3  Mr. Berkenfeld.  Do you see the question there:
4  "Did the court accept the 15c3 lock up and
5  unencumbered box make it through to BarCap."  Do
6  you see that question?
7      A.  I see that, yes.
8      Q.  Did you hear any response or understand
9  what the answer to that question was?
10     A.  I didn't receive a response.
11     Q.  Did you discuss that issue with anybody?
12     A.  This is not to be facetious but this is
13  what we have been talking about so I think I have
14  discussed it with lots of people over the past
15  year.
16     Q.  I am not talking now generally about the
17  15c3 lock up or the unencumbered box.  I am asking
18  specifically about whether the court accepted --
19     A.  I didn't answer about that
20     Q.  We will mark this as Exhibit 172A.
21     (Exhibit 172A marked for identification)
22     The first e-mail is a Saturday e-mail from
23  Mr. Lowitt to you.
24     A.  Yes.
25     Q.  He says:

Page 215

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    215

1
2      "We need to launch an effort as soon as possible
3  to ensure we get the 15c3 lock up money and also secure the
4  unencumbered box".
5      He asks you to coordinate with Berkenfeld on that.
6  What did you do?
7      A.  I spoke to Robert Azerad about it.  I
8  don't recall speaking to -- when I spoke to
9  Stephen but I am sure I did.  He is a lawyer so
10  I presume I am not allowed to discuss what
11  I talked to him about.
12     MR. HUME:  You are if you want you to.
13     A.  Is that right?
14     MR. HUME:  Yes.
15     A.  I am sure I talked to him about what he
16  could help with so for me this was sort of largely
17  a legal question.
18     Q.  You respond: "Agreed.  Will use Robert
19  for this".  Then someone comes back to you and
20  says:
21      "You need to be close to it.  If we don't succeed
22  you and I are toast, despite all our heroics."
23      Did you discuss this e-mail with Mr. Lowitt?
24     A.  I didn't.
25     Q.  Did you have an understanding what he

Page 216

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    216

1
2  meant?
3      A.  I did.
4      Q.  What did he mean?
5      A.  He meant that in spite of all the work
6  that we had put in this was important to closing
7  the transaction.
8      Q.  Did you have any further follow-up with
9  Mr. Lowitt concerning the 15c3 or the unencumbered
10  box?
11     A.  I am sure I did.
12     Q.  Do you recall any?
13     A.  I don't recall specifics, no.
14     Q.  We will mark this as Exhibit 173A.
15     (Exhibit 173A marked for identification)
16     You testified earlier, sir, that you
17  understood that any transfer would be subject, and
18  this is specifically with respect to 15c3, that
19  any transfer would require regulatory approval?
20     A.  Yes.
21     MR. HUME:  Objection, mischaracterizes
22  the testimony  He cannot testify as to what was
23  required.
24     Q.  What was your understanding as to what
25  kind of regulatory approval was required?

Page 217

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    217

1
2      MR. HUME:  Same objection.
3      A.  It is consistent really with what Martin
4  is saying here.  Martin would be more of the
5  expert on this than I would, and I would defer to
6  him in terms of what was required.
7      Q.  The 15c3, you have explained how there
8  was a billion in cash, there was also 769 in
9  securities, and ultimately the agreement was to
10  transfer only the 769 in securities.  Is that your
11  understanding?
12     A.  That is my understanding
13     Q.  Do you have any -- did you hear how that
14  final agreement came about?
15     MR. HUME:  Objection, lacks foundation
16  and calls for speculation.  The witness has said
17  he was not a negotiator of the terms of the deal.
18     A.  No, I mean I was not really privy to the
19  final decision.
20     Q.  Did anyone ever tell you how that final
21  decision came about?
22     MR. HUME:  Same objection.  If the
23  someone was a lawyer then make sure that they are
24  waiving the privilege.
25     A.  I think if anything it would have been

Page 218

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          218

1    one of the Weil lawyers that would have told me.

2    Q. Did you have any discussions with

3    Mr. Lowitt about how the final decision was made?

4    A    I don't recall, no.

5        MR HUME.  Are you intending to finish

6    today?  You only have three minutes until

7    2 o'clock.

8        MR. MAGUIRE : I am not going to finish

9    in three minutes.  I think we are going to go

10   a bit beyond that.  It might actually be feasible

11   but definitely not within the next three minutes

12   or probably the next 30 minutes.

13       MR. HUME:  Do the Creditors Committee

14   still expect to have questions?

15       MR. BUNTING:  45 minutes estimate.  I

16   think realistically, if you need to go today,

17   rather than try and compress into the time you

18   don't have an hour and a quarter, on the basis of

19   the commitment that you have made that you be

20   available at a time approximate to the Claxton

21   deposition in London

22       MR. HUME:  That would seem to be

23   a convenient time for those of us coming over from

24   the US

Page 219

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          219

1        MR. BUNTING·  As long as we don't get

2    into an argument about getting time then that is

3    fine by us

4        THE WITNESS:  My only concern is that we

5    don't have another very extended, unnecessarily

6    extended session, but I am happy to within reason

7    of course

8        MR. HUME:  With the understanding that

9    it will not be a full day, it will be something to

10   accommodate the time, roughly half an hour,

11   roughly 45 minutes, maybe a little bit more time

12   but not a full day, a couple of hours, I think we

13   can make the commitment, and I believe the witness

14   will be around in London that week, perhaps on the

15   3rd.

16       THE WITNESS:  Yes.

17       MR. HUME:  You can check your calendar

18   to confirm 100 percent.  We can tentatively plan

19   for perhaps the afternoon or the morning of the

20   3rd

21       MR BUNTING:  That is good for us.

22       MR. MAGUIRE :  We may have to make

23   arrangements, not sure I can make it back,

24   arrangements either by phone or somebody

Page 220

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          220

1    substituting, but we will work that out.

2        MR. BUNTING:  We will probably have the

3    same arrangement as today with Erica on the phone

4    and myself in person.

5        MR HUME·  So we will agree to leave the

6    deposition open on that basis.

7        MR MAGUIRE:  That is fine.

8        MR. TAMBE·  Thank you.

9        (Deposition concluded for the day at 2:00 pm)

Page 221

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          221

CERTIFICATE OF DEPONENT

I, Paolo Tonucci, hereby certify that I have read
the foregoing pages, numbered 1 through 223, of my
deposition of testimony taken in these proceedings
on Friday, 14 August 2009, and, with the exception
of the changes listed on the next page and/or
corrections, if any, find them to be a true and
accurate transcription thereof.

Signed:  ......  .................

Name:    Paolo Tonucci

Date:  ..  ..  ..  ..

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    222
2    CERTIFICATE OF COURT REPORTER
3
4    I, AILSA WILLIAMS, an Accredited LiveNote Reporter
     for TSG Reporting, hereby certify that the
5    testimony of the witness Paolo Tonucci in the
     foregoing transcript, numbered pages 1 through
6    223, taken on Friday, 14 August 2009 was recorded
     by me in machine shorthand and was thereafter
7    transcribed by me; and that the foregoing
     transcript is a true and accurate verbatim record
8    of the said testimony.
9
10   I further certify that I am not a relative,
     employee, counsel or financially involved with any
11   of the parties to the within cause, nor am I an
     employee or relative of any counsel for the
12   parties, nor am I in any way interested in the
     outcome of the within cause.
13
14
15
16
17   Signed: ................ ......
18   AILSA WILLIAMS
19   Dated: August 14,2009
20
21
22
23
24
25

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    223
2
3    E R R A T A
4    Deposition of Paolo Tonucci
5    Page/Line No.    Description    Reason for
6    change
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   Signed.  .............. ......
24   Name:   Paolo Tonucci
25   Date:    ............ ..