# A. 27

```
                                                           Page 1
 1          HIGHLY CONFIDENTIAL - JOHN VARLEY                  1
 2              UNITED STATES BANKRUPTCY COURT
 3               SOUTHERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - - -
 5    In Re:
                         Chapter 11
 6
 7    LEHMAN BROTHERS    Case No. 08-13555(JMP)
      HOLDINGS, INC. et al., (Jointly Administered)
 8
 9                       Debtors.
10    - - - - - - - - - - - - - - - - - - - - -
11                     HIGHLY CONFIDENTIAL
12                  DEPOSITION OF JOHN VARLEY
13                 Thursday, September 3, 2009
14                      At:  12:00 pm
15                        Taken at:
16                         Barclays
                      1 Churchill Place
17                          London
                       United Kingdom
18
19    Reported by: AILSA WILLIAMS
      Certified LiveNote Reporter
20
21
22
23
24
25
```

## Page 2

1  HIGHLY CONFIDENTIAL - JOHN VARLEY
2       APPEARANCES
3  JONES DAY, LLP
   Attorneys for Lehman Brothers, Inc.
4  222 East 41st Street
   New York, NY 10017-6702
5  BY: JAYANT W. TAMBE, ESQ
   BRIDGET CRAWFORD, ESQ
6
   BOIES, SCHILLER & FLEXNER, LLP
7  Attorneys for Barclays Capital and the
   Witness
8  5301 Wisconsin Avenue N.W
   Washington D.C 20015
9  BY: JONATHAN M. SHAW
10 QUINN, EMANUEL, URQUHART, OLIVER & HEDGES,
   LLP
11 Attorneys for the Creditors Committee
   16 Old Bailey
12 London, United Kingdom, EC4M 7EG
   BY: MATTHEW BUNTING, ESQ.
13
   HUGHES, HUBBARD & REED, LLP
14 Attorneys for the SIPA Trustee
   1775 I Street, N.W
15 Washington D.C. 20006-2401
   BY: JOHN F. WOOD
16 Also Present:
17   PHILIP E. KRUSE  Alvarez & Marsal
18   GREG BARDEN. Jones Day
19   DEBORAH COOPER. Barclays

## Page 3

HIGHLY CONFIDENTIAL - JOHN VARLEY

INDEX

JOHN VARLEY ............................................4
DIRECT EXAMINATION BY MR. TAMBE: ...............4
CROSS-EXAMINATION BY MR. WOOD: ...............90
CROSS-EXAMINATION BY MR. BUNTING: ...........92
REDIRECT EXAMINATION BY MR. ........... 112
    TAMBE:

FURTHER CROSS-EXAMINATION BY MR. ....... 114
    WOOD:
FURTHER CROSS-EXAMINATION BY MR ....... 117
    BUNTING:

INDEX OF EXHIBITS
Exhibit 337A Powerpoint Presentation ............... 19
Exhibit 338A E-mail, Rosen to Varley ............... 37
Exhibit 339A Message from J. Varley ............... 39
Exhibit 340A E-mail, Merson to Varley ............ 40
Exhibit 342A E-mail, Clackson to Walker ......... 48
Exhibit 343A Barclays Announcement ............. 60
Exhibit 344A E-mail, HR to Varley .................. 71
Exhibit 341A E-mail, from Lucas to Varley ...... 73
Exhibit 345A E-mail, Chase to Barclays .......... 78
Exhibit 346A E-mail, Varley to Diamond ........ 95
Exhibit 347A E-mail, Le Blanc to Varley ......... 96
Exhibit 348A E-mail, M. Smith to various ....... 97

## Page 4

1  HIGHLY CONFIDENTIAL - JOHN VARLEY
2       JOHN VARLEY
3       Having been duly sworn,
4       Testified as follows:
5       DIRECT EXAMINATION BY MR. TAMBE:
6       MR. TAMBE. Good afternoon, Mr. Varley.
7  My name is Jay Tambe with the law firm of Jones
8  Day, special counsel to Lehman Brothers Holdings
9  Inc  With me is my colleague, Bridget Crawford
10      I will let the other attorneys and folks
11 down the table introduce themselves to you on the
12 record and then we will get started.
13      MR. WOOD: John Wood, from the law firm
14 Hughes, Hubbard & Reed, and we represent the
15 SIPA Trustee.
16      MR. BUNTING: Matthew Bunting from
17 Quinn, Emanuel, Urquhart, Oliver & Hedges
18 representing Creditors Committee.
19      MR. KRUSE: Phil Kruse with Alvarez &
20 Marsal on behalf of the LBHI estate.
21      MR. SHAW: Jonathan Shaw, Boies,
22 Schiller & Flexner, on behalf of Barclays and
23 Mr. Varley.
24      MS COOPER: Deborah Cooper, Head of
25 Group Litigation, Barclays

## Page 5

1  HIGHLY CONFIDENTIAL - JOHN VARLEY
2       MR. TAMBE: We understand we have some
3  time constraints here. I think we have a total of
4  3 hours of your time and while reserving all of
5  our rights we want to make the best use of that
6  time.
7       What I would like to pose to you this
8  afternoon are a series of questions about the
9  Barclays/Lehman transaction and get your best
10 recollection and show you some documents and
11 discuss some documents with you. Is that fair?
12      A. It is.

REDACTED

Page 6

REDACTED

18  Q. Going back to last year and the
19  Lehman/Barclays transaction, in broad strokes if
20  you can describe for me what was the role that you
21  played, what was your individual involvement in
22  considering that deal, negotiating that deal,
23  taking that deal through the board, whatever other
24  steps you may have taken?
25      A. Perhaps it would help if I answer the

Page 7

1       HIGHLY CONFIDENTIAL - JOHN VARLEY
2  question within the context of the operating
3  protocols here. I said to you a moment ago that
4  as Chief Executive Officer I am answerable to the
5  board for the implementation of strategy. We
6  employ 140-odd thousand people in Barclays. We do
7  business in 50 countries or so, and the breadth of
8  that business requires delegation of operational
9  activity.
10          So Bob Diamond, as head of the
11  investment banking and investment management
12  business, has operational responsibility for the
13  running of those businesses within a strategic
14  framework that I impose on that business and the
15  other businesses. That operating protocol would
16  apply to this particular transaction.
17          So that I had responsibility for taking
18  the strategy of the acquisition of the Lehman
19  North American businesses to the board, discussing
20  that with the board, receiving their authority to
21  implement, and I then delegated, subject to the
22  strategic framework that we had set for the
23  transaction, I then delegated responsibility for
24  the negotiation and the execution of the
25  transaction to Bob Diamond

Page 8

REDACTED

Page 9

REDACTED

PAGES 10-33 REDACTED

Page 34

REDACTED

Page 35

REDACTED

Page 36

REDACTED

Q. Once you are into Lehman two and you have announced to the world that the outlines of Lehman two, you have now got a number, you have got this 4 billion-dollar delta, is that 4 billion-dollar delta then the target as the deal changes from Lehman two to Lehman three? I would expect it to be --

A. I am just thinking carefully about how I thought about it at the time. How I thought about it at the time was that we had to protect a margin to ensure that as the valuations in the balance sheet were realized, and you should know that they have not yet fully been realized, in other words our expectation was that the risk period would be very protracted, we needed to ensure that we had an appropriate margin. I don't know whether "target" is quite the right way of describing it, but I was certainly very fixated on

Page 37

HIGHLY CONFIDENTIAL - JOHN VARLEY
the need to have a substantial discount.

REDACTED

PAGES 38-41 REDACTED

Page 42

REDACTED

14  Q. Do you have an understanding as to what
15  that is a reference to, "negative goodwill"?
16  A. Yes, it is a technical term which is
17  applied within the international financial
18  reporting standards by which our accounting is
19  governed. Let me try to explain it  If you
20  acquire for a purchase consideration of 10 assets
21  or a business that has a net asset value of five,
22  then you would create goodwill of five, and
23  goodwill is subject to an impairment test, it is
24  carried in the balance sheet and subject to an
25  impairment test.

Page 43

HIGHLY CONFIDENTIAL - JOHN VARLEY

If on the other hand you acquire assets
of 10 for a valuation of five, then there would be
negative goodwill of five because of the discount
at which you are buying the assets. So negative
goodwill is a term of science describing in
a scientific way what most people would refer to
as a discount.

REDACTED

Page 44

REDACTED

Page 45

REDACTED

Page 46

46

REDACTED

Page 47

47

REDACTED

Page 48

48

REDACTED

5  Q. Sir, I have placed before you a document
6  marked Exhibit 342A. It is a cover e-mail with
7  a Powerpoint attachment. If you could take
8  a moment to review that, let me know when you are
9  done, and I will ask you some questions.
10  A. Thank you
11  Q. Although you are not shown as
12  a recipient of the cover e-mail, do you recognize
13  the attachment as materials used at the board
14  meeting on 16 September?
15  MR. SHAW: Is there any indication this
16  is the final version?
17  MR. TAMBE: No, this is all we got from
18  you.
19  A. I don't recollect.
20  MR. TAMBE : If there is a final
21  version, if you could produce it, that would be
22  great.
23  MR. SHAW: I don't know that it is not.
24  MR. TAMBE · But there was
25  a presentation made to the board?

Page 49

49

1  HIGHLY CONFIDENTIAL - JOHN VARLEY
2  A As I recall, there was a presentation
3  made to the -- I think we had a telephone meeting
4  with the board on the Tuesday.
5  Q. Would you have participated in that by
6  phone or were there some people who gathered in
7  person?
8  A. I expect I would have participated
9  physically, in this room.

REDACTED

Page 50

```
 1                                                  50
 2
 3
 4
 5
 6                  REDACTED
 7
 8
 9
10
11
12
13
14
15    Q.  On page 2 of the attachment there is
16  a summary, an executive summary of the
17  transaction. If you look at the first set of
18  arrows, the first one begins: "We intended to seek
19  permission ..." I want to focus on those four
20  arrows there. The second arrow refers to an
21  acquisition of 75 billion of assets and
22  liabilities. Do you see that?
23    A.  I do.
24    Q.  This arrow does not separate out the
25  $75 billion of assets versus the $71 billion of
```

Page 51

```
 1         HIGHLY CONFIDENTIAL - JOHN VARLEY        51
 2  liabilities. Is there any reason why not?
 3      MR. SHAW.  Objection, foundation.
 4    A.  I don't know.
 5    Q.  Because your understanding was you were
 6  not acquiring 75 billion of assets and
 7  liabilities, correct?
 8    A.  I draw your attention to the third
 9  arrow, where there is a statement: "The
10  recognition of negative goodwill amounts to
11  $3 billion pretax".
12    Q.  That would be my next question. The
13  numbers we had looked at on the earlier Exhibit,
14  75 billion versus 71 billion, my question is where
15  does that 3 billion-dollar negative goodwill
16  amount come from?
17    A.  You are assuming a level of precision in
18  a market that is moving with volatility that is
19  unprecedented by anything that has been seen in
20  the last hundred years, and I wish it were
21  possible to be absolutely precise in answering
22  questions of that sort. Even at the time, even
23  with the benefit of contemporary recall I would
24  not have been able to answer such a question.
25    Q.  Did the board impose any restrictions on
```

Page 52

```
 1         HIGHLY CONFIDENTIAL - JOHN VARLEY        52
 2  their grant of authority or did they give the
 3  execution team carte blanche to do this
 4  transaction, even if in this extremely volatile
 5  period the metrics changed completely?
 6    A.  The way that we organize such matters,
 7  because as your question assumes you cannot have
 8  the board making realtime decisions about
 9  a transaction of this complexity, is that
10  authority would be delegated to the Executive
11  Committee to execute a transaction that is broadly
12  consistent with what has been approved by the
13  board.
14    Q.  So, for example, if you had said to the
15  board you expected $3 billion of pretax
16  goodwill --
17      MR. SHAW: Negative goodwill you mean?
18    A   Yes.
19    Q.  That is something you would strive to
20  achieve even if the particular specifics of the
21  deal were changing and evolving because of market
22  conditions?
23    A.  It is, but I would form and the
24  Executive Committee would form a judgment about
25  whether there was a change in the deal parameters
```

Page 53

```
 1         HIGHLY CONFIDENTIAL - JOHN VARLEY        53
 2  that caused us to go back to the board.
 3    Q.  And as the deal evolved from Lehman two
 4  to Lehman three, you did not go back to the board
 5  for any additional authority, is that correct?
 6    A.  That is my recollection, that we did
 7  not.
 8
 9
10
11
12
13
14                  REDACTED
15
16
17
18
19
20
21
22
23
24
25
```

PAGES 54-61 REDACTED

Page 62

REDACTED

Page 63

REDACTED

9  Q. The numbers that appear there, the
10 $72 billion and the $68 billion, those are numbers
11 that reflect Barclays' view of what the
12 appropriate values were for those assets?
13  A. Yes.
14  Q. So these are not the Lehman values that
15 you are talking about, these are the Barclays
16 values?
17  A. I mentioned earlier that we were seeking
18 to ensure that we were appropriately contemporary
19 in our valuations and that we had created an
20 appropriate delta between asset and liability
21 values, and what you have put to me would be
22 consistent with that.

REDACTED

Page 64

REDACTED

Page 65

REDACTED

PAGES 66-69 REDACTED

Page 70

REDACTED

15  Q. Given everything that was going on in
16  the market and volatility in the market, why did
17  you absolutely expect to preserve that buffer?
18  How could you?
19  A. The expectation is to preserve it in the
20  transaction.

REDACTED

Page 71

REDACTED

Page 72

REDACTED

Page 73

REDACTED

PAGES 74-117 REDACTED

Page 118

```
 1                                                              118
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12               REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 119

```
 1                                                              119
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12               REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 120

```
 1      HIGHLY CONFIDENTIAL - JOHN VARLEY              120
 2
 3            CERTIFICATE OF DEPONENT
 4
 5    I, John Varley, hereby certify that I have read
      the foregoing pages, numbered 1 through 122, of my
 6    deposition of testimony taken in these proceedings
      on 3 September, 2009, and, with the exception of
 7    the changes listed on the next page and/or
      corrections, if any, find them to be a true and
 8    accurate transcription thereof.
 9
10
11
12
13    Signed: .........................
14    Name:   John Varley
15    Date:   .........................
16
17
18
19
20
21
22
23
24
25
```

Page 121

```
 1      HIGHLY CONFIDENTIAL - JOHN VARLEY              121
 2           CERTIFICATE OF COURT REPORTER
 3
 4    I, AILSA WILLIAMS, an Accredited LiveNote Reporter
      with European Deposition Services, London,
 5    England, hereby certify that the testimony of the
      witness John Varley in the foregoing transcript,
 6    numbered pages 1 through 122, taken on 3
      September, 2009 was recorded by me in machine
 7    shorthand and was thereafter transcribed by me;
      and that the foregoing transcript is a true and
 8    accurate verbatim record of the said testimony
 9
10    I further certify that I am not a relative,
      employee, counsel or financially involved with any
11    of the parties to the within cause, nor am I an
      employee or relative of any counsel for the
12    parties, nor am I in any way interested in the
      outcome of the within cause.
13
14
15
16
17    Signed: ...  ...................
18    AILSA WILLIAMS
19    Dated  9/3/2009
20
21
22
23
24
25
```

Page 122

1    HIGHLY CONFIDENTIAL - JOHN VARLEY                122
2
3                    E R R A T A
4              Deposition of John Varley
5    Page/Line No.    Description        Reason for
6    change
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Signed:    ..... . . ... ...
24    Name    John Varley
25    Date:    ....................