# A. 29

Confidential

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
In Re:                            Chapter 11
LEHMAN BROTHERS                   Case No. 08-13555 (JMP)
HOLDINGS, INC., et al.,           (Jointly Administered)
-------------------------------)


    \* \* \* HIGHLY CONFIDENTIAL \* \* \*
      DEPOSITION OF JASEN YANG
        New York, New York
      Friday, September 4, 2009

Reported by:
FRANCIS X. FREDERICK, CSR, RPR, RMR
JOB NO. 24621

Confidential

Page 2

September 4, 2009
9:36 a.m.

HIGHLY CONFIDENTIAL deposition of JASEN YANG, held at the offices of Jones Day, 222 East 41st Street, New York, New York, pursuant to Notice, before Francis X. Frederick, a Certified Shorthand Reporter, Registered Merit Reporter and Notary Public of the States of New York and New Jersey.

Page 3

APPEARANCES:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
    222 East 41st Street
    New York, New York  10017-6702
BY:  WILLIAM J. HINE, ESQ.
    GEORGE E. SPENCER, ESQ.

BOIES SCHILLER & FLEXNER, LLP
Attorneys for Barclays Capital
    575 Lexington Avenue - 7th Floor
    New York, New York  10022
BY:  JACK G. STERN, ESQ.

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
    One Battery Park Plaza
    New York, New York  10004-1482
BY:  SAMUEL C. McCOUBREY, ESQ.

ALSO PRESENT:
    INGRID M. CHRISTIAN, Alvarez & Marsal

Page 4

1   J. YANG - HIGHLY CONFIDENTIAL
2   JASEN YANG, called as a witness,
3       having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6   EXAMINATION BY
7   MR. HINE:
8       Q.  Good morning, Mr. Yang.
9       A.  Good morning.
10      Q.  My name is -- we met off the
11  record but my name is Bill Hine and I'm with
12  the firm of Jones Day and we are special
13  counsel to the Creditors Committee -- I'm
14  sorry, to the estate of Lehman Brothers
15  Holdings, Inc. in connection with this
16  bankruptcy proceeding so we're taking some
17  discovery with respect to that.  And this
18  deposition here is what's called a 30(b)(6)
19  deposition and you've been designated by
20  Barclays as a deponent for a couple select
21  topics which we'll go over in a little bit.
22      A.  Um-hum.
23      Q.  Have you ever been deposed before?
24      A.  No, I have not.
25      Q.  Okay.  So I'm sure your counsel

Page 5

1   J. YANG - HIGHLY CONFIDENTIAL
2   has advised you of the ground rules but
3   basically I'm going to ask you some questions.
4   You're going to give me some answers to the
5   best you can.  My one request is that sometime
6   during the deposition I will undoubtedly ask a
7   misleading question or use a word improperly
8   or one of your technical terms that you folks
9   use.  Please correct me, ask me to clarify it.
10  I want to ask you clear questions so you can
11  give me clear answers.  So if we can agree on
12  that we can probably get started.
13          MR. STERN:  Yes.  I'll just note
14      for the record that the two topics are
15      first topic 4 which is a person with
16      knowledge of the calculations shown on
17      the e-mail of BCI 000580; and topic 5,
18      the marking process to take place the
19      afternoon of Friday, September 19th,
20      2008, referenced in BCI 000878 and
21      BCI-EX-00012161.
22  BY MR. HINE:
23      Q.  And I will be asking you questions
24  about those topics but also some general
25  questions around those topics.

Confidential

Page 6

1    J. YANG - HIGHLY CONFIDENTIAL
2         MR. HINE:  So we do reserve our
3    rights to conduct the deposition of Mr.
4    Yang in his personal capacity if the
5    need ever arises.
6         But in that vein why don't we
7    enter as the first exhibit the
8    deposition notice.
9         MR. SPENCER:  Previously marked.
10   BY MR. HINE:
11   Q.   Okay.  Mr. Yang, I'm handing you a
12   copy of a document previously marked as
13   Exhibit 81B from which your counsel was
14   reading, I believe.  I just wanted to point
15   out to you topics 4 and 5 on page 3.
16   A.   Um-hum.
17   Q.   Do you see them?
18   A.   Yes, I do.
19   Q.   You understand that you've been
20   designated by Barclays as the witness to speak
21   on those topics?
22   A.   Yes.
23   Q.   Okay.  Did you prepare for your
24   deposition at all today?
25   A.   Maybe.

Page 7

1    J. YANG - HIGHLY CONFIDENTIAL
2    Q.   What does that mean?
3         MR. STERN:  Yes.  He met --
4    A.   Yes.  The short answer is yes.  I
5    didn't know if the question was today or...
6    Q.   Okay.  Fair enough.
7         Did you conduct any investigations
8    or factual reviews in preparation for your
9    deposition on those two topics?
10   A.   Yeah.  I took a look at some of
11   the e-mails that came across my desk around
12   that time.
13   Q.   Okay.  Anything else?
14   A.   No.  Just review of personal -- of
15   my e-mails.
16   Q.   Okay.  Did you meet with counsel
17   in preparation for today's deposition?
18   A.   Yes, I did.
19   Q.   Okay.  Did you review any
20   documents with counsel?
21   A.   Yes, I did.
22   Q.   Did any of those documents refresh
23   your recollection about either of these two
24   topics?
25   A.   Yes.

Page 8

1    J. YANG - HIGHLY CONFIDENTIAL
2
3
4
5
6
7
8
9
10
11
12              REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1
2
3
4
5
6
7
8
9
10
11
12              REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    800-702-9580

PAGES 10-25 REDACTED

Confidential

Page 26

REDACTED

Page 27

REDACTED

Page 28

REDACTED

6  Q. Well, let me be clear. I mean,
7  it's not the number of CUSIPS or the number of
8  securities, right?
9  A. No, I don't think so. It would
10 be -- it would be some representation of
11 somebody's marks but certainly not Barclays'
12 because we had just received -- we were in the
13 process of figuring out what these actual
14 portfolios were.
15 Q. So you understand these to be
16 dollar figures in billions of dollars, right?
17 A. Yes. Dollars in billions.
18 Q. And do you know whose -- well,
19 before we get to that do you see where it
20 says, "Collateral received from Lehman on Fed
21 facility"?
22 A. Um-hum.
23 Q. What did you understand that to
24 mean?
25 A. Well, I suppose -- and I have to

Page 29

1  J. YANG - HIGHLY CONFIDENTIAL
2  say I don't agree necessarily with what Marty
3  wrote there.
4  Q. Sure.
5  A. I think he intended it to mean
6  that these are assets that would then secure
7  the 45 billion of lending that Barclays was
8  doing. But I don't agree with him necessarily
9  because some of these items I'm not sure were
10 actually part of the repo transaction.
11 Q. Well, let me just --
12 A. But I don't necessarily have...
13 Q. When you talked about the 45
14 billion in lending you were talking about the
15 September 18th repo transaction?
16 A. Yes. That's what I think the line
17 that says repo cash amount represents.
18 Q. Okay. That's --
19 A. Towards the bottom.
20 Q. So that's $45 billion, right?
21 A. Yes.
22 Q. And that's the amount that
23 Barclays effectively paid Lehman through the
24 September 18th repo transaction, right?
25 A. Right.

Confidential

Page 30

1      J. YANG - HIGHLY CONFIDENTIAL
2         Q.   And the Total Securities/Cash
3    Received, do you see that line, which is 52.19
4    billion?
5         A.   Um-hum.
6         Q.   What does that represent?
7         A.   That's the sum of the numbers
8    attributed to the five -- the five blocks of
9    assets that Barclays received or expected to
10   receive.
11        Q.   Okay.  So that's the value of the
12   collateral that was posted in support of
13   Barclays paying $45 billion, right?
14           MR. STERN:  Objection to the form.
15      Could you repeat the question, Francis?
16           (Record read.)
17           MR. STERN:  You can answer.
18        A.   I wouldn't say that.  We, at that
19   point, hadn't had a chance to look at the
20   securities; so therefore had -- you know,
21   couldn't really put a value on it, per se.
22           So these numbers -- I think that
23   number is a proxy but subject to -- a proxy
24   for value, but subject to quite a bit of
25   needed due diligence.

Page 31

REDACTED

Page 32

REDACTED

Page 33

REDACTED

PAGES 34-41 REDACTED

Confidential

### Page 42

REDACTED

### Page 43

REDACTED

### Page 44

REDACTED

21  Q. Okay. Now, at the bottom it says
22  Total securities/cash received, 52.19 billion.
23  Do you see that?
24  A. Um-hum, yep.
25  Q. So am I understanding you correct

### Page 45

J. YANG - HIGHLY CONFIDENTIAL
to say that you don't know if that was, in
fact, received even though this entry says
received?
 A. Well, in fact, I know that some of
it wasn't because that 7 billion repo cash
wasn't in the long -- you know, eventually. I
don't know what people knew at the time.
 Q. Okay. But over that weekend or on
Friday the 19th, the 7 billion had not been
received?
 MR. STERN: Objection to the form.
 A. I don't know.
 Q. Don't know? Okay.
 And do you have any understanding
of whether the rest of it was received?
 MR. STERN: Objection to the form.
 A. Yeah. I think we already
discussed why it's hard for me to say if I
agree or not because --
 Q. So you don't know.
 A. I don't know.
 Q. Okay. When -- you see the line
Excess Collateral, 7.9?
 A. Yes.

Confidential

Page 46

J. YANG - HIGHLY CONFIDENTIAL

Q. And I assume that's the difference between 52.19 and 45 billion, correct?
A. Yep.
Q. Is that what you under -- do you understand under -- is that what you understood to be the haircut associated with the September 18th repo?
    MR. STERN: Objection to the form.
A. I don't think haircut is a very precise term.
Q. Okay.
A. But -- I don't think it's a very precise term. But I do agree that it's sort of the excess of this sort of number, 52.19, which is a proxy for some measure of what was received over the loan amount.
Q. I appreciate haircut's kind of a colloquial term. We've heard it in all these depositions. So is it fair to say -- and I am trying to take into account your statements previously about valuation, that the 7.19 is the excess of the total securities in cash received as collateral -- I'm sorry. Let me rephrase it.

Page 47

J. YANG - HIGHLY CONFIDENTIAL

Is the 7.19 the excess of the collateral that was posted in support of the September 18th transaction over and above the amount that Barclays paid? Taking into account that those numbers are BoNY values, not necessarily Barclays' values?
    MR. STERN: Objection to the form. Let me hear the question again. You're just totally ignoring his responses and using your terminology despite his testimony.
    MR. HINE: No, I'm not, Jack.
    MR. STERN: Yes, you are.
    MR. HINE: No, I'm not.
    MR. STERN: It's very misleading and the record will reflect that --
    MR. HINE: And you can stop coaching the witness.
    MR. STERN: I'm not coaching the witness.
    MR. HINE: If you have an objection to form, put it on the record.
    MR. STERN: I am not coaching the witness. I've been silent throughout

Page 48

J. YANG - HIGHLY CONFIDENTIAL

this. But, you know, it just goes too far.
    MR. HINE: Let's read the question.
    MR. STERN: It just goes too far.
    MR. HINE: Read the question.
    MR. STERN: You know what you're doing. You know very well what you're doing and it's highly misleading.
    MR. HINE: And you're coaching the witness, Jack, so put an objection to form on the record and that's it.
    MR. STERN: This witness does not need to be coached, okay?
    MR. HINE: I'm not trying to mislead him. I'm trying to ask a question. So you stated your objection. Fine. Let's move on.
    MR. STERN: You really should relax. You really should relax. I want the question reread. And you really should stop asking misleading questions.
    MR. HINE: Please read the question back.

Page 49

J. YANG - HIGHLY CONFIDENTIAL

(Record read.)
A. I wouldn't characterize them as excess. The reason is because I've already stated my -- the fact that I don't think 52.19 is a value and obviously we've also discussed the fact that the 7 billion repo cash wasn't eventually received.
    So then the problem is the 45 of course is just a dollar number. It's an amount of cash that Barclays provided whereas 52.9 isn't an equivalent. It's a proxy.
    So I don't think colloquially -- you know, it says excess collateral here. But it's not really excess in the sense that you have more. It's just the mathematical difference obviously. And that's meant to -- you know, that's meant to do all kinds of things including adjust for uncertainty about what the actual value of the securities is.
Q. So you take issue with Mr. Malloy's use of excess collateral in this document; is that right?
    MR. STERN: Objection to the form. Take issue. You can answer.

Confidential

Page 50

1          J. YANG - HIGHLY CONFIDENTIAL
2       A.   I think if -- everyone knows what
3   he means but I think it's not very precise
4   terminology, no.
5       Q.   Okay. And what do you understand
6   the Margin Percentage entry to entail?
7       A.   I guess he's just expressing as a
8   percentage that 7.19 number of -- I can't
9   tell -- one of the other -- one of the two
10  numbers above it. Probably the 7.19 divided
11  by 52.19.
12      Q.   Okay. So that's how it's
13  calculated but what it does mean?
14      A.   He's just expressing as a
15  percentage the same concept he's expressing
16  with the 7.19.
17      Q.   Do you have an understanding of
18  what the term "margin" means in connection
19  with a repo transaction?
20      A.   Margin is a very commonly used --
21  margin has a lot of different meanings,
22  actually, in finance. So I don't know why he
23  chose that in particular. Very often when I
24  hear margin I actually think of an interest
25  rate but that's obviously not how it's being

Page 51

1          J. YANG - HIGHLY CONFIDENTIAL
2   used.
3       Q.   Well, but how do you think it's
4   being used in this document?
5       A.   I think I would just refer to, you
6   know, the conversation we had about the 7.19
7   number. I don't think it's in -- it's not in
8   excess in the sense again, you know, more than
9   the 4.45. But it's just a measure of -- it's
10  just -- it's just a measure of to what extent
11  the proxy for the asset side of the balance
12  sheet exceeds the 45 million.
13      Q.   You don't really know what Mr.
14  Malloy meant by the use of the term margin; is
15  that what you're saying?
16      MR. STERN: Objection to the form.
17      A.   I guess I know what I just said.
18  Why he chose margin instead of just
19  percentage, I don't know.
20      Q.   Well, is it also possible that he
21  was referring to amount of return Barclays was
22  going to get on its investment of $45 billion?
23      MR. STERN: Objection to the form.
24      A.   I don't think so.
25      Q.   Why not?

Page 52

1          J. YANG - HIGHLY CONFIDENTIAL
2       A.   It would just not have occurred to
3   me to read it that way.
4       Q.   Okay. Do you know what Mr. Malloy
5   meant when he wrote it?
6       A.   I think what he meant was that
7   is -- that is -- I guess I don't.

REDACTED

Page 53

REDACTED

PAGES 54-117 REDACTED

Confidential

| Page 118 | Page 119 |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12 REDACTED<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12 REDACTED<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |

| Page 120 | Page 121 |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12 REDACTED<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7 REDACTED<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19        _____<br>20        JASEN YANG<br>21<br>22 Subscribed and sworn to before me<br>23 this ___ day of _____, 2009.<br>24<br>25 |

Confidential

Page 122

```
 1
 2        C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF NEW YORK  )
 6         I, FRANCIS X. FREDERICK, a Notary
 7   Public within and for the State of New
 8   York, do hereby certify:
 9         That JASEN YANG, the witness whose
10   deposition is hereinbefore set forth,
11   was duly sworn by me and that such
12   deposition is a true record of the
13   testimony given by the witness.
14         I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19         IN WITNESS WHEREOF, I have
20   hereunto set my hand this 4th day of
21   September, 2009.
22
23
24              _____
                FRANCIS X. FREDERICK
25
```

Page 123

```
 1
 2   ----------------I N D E X-----------------
 3   WITNESS        EXAMINATION BY    PAGE
 4   JASEN YANG         MR. HINE        4
 5                      MR. McCOUBREY  118
 6
 7   ---------- INFORMATION REQUESTS -------------
 8   DIRECTIONS: 33
 9   RULINGS: NONE
10   TO BE FURNISHED: NONE
11   REQUESTS: NONE
12   MOTIONS: NONE
```

Page 124

```
 1
 2   ------------------ EXHIBITS ------------------
 3   EXHIBIT                          FOR ID.
 4   Exhibit 349B
 5   document bearing production
 6   numbers BCI-EX-00070958
 7   through BCI-EX-00070961................ 52
 8   Exhibit 350B
 9   document bearing production
10   numbers BCI-EX-00012161
11   through BCI-EX-00012162................ 65
12   Exhibit 351B
13   document bearing production
14   numbers BCI 000878 through
15   BCI 000879 with attachment............. 72
16   Exhibit 352B
17   document bearing production
18   numbers BCI-EX-00013019
19   through BCI-EX-00013186................ 85
20   Exhibit 353B
21   document bearing production
22   numbers BCI-EX-(S)-00055573
23   through BCI-EX-(S)-00055574............ 101
```

Page 125

```
NAME OF CASE: LEHMAN BROTHERS
DATE OF DEPOSITION  SEPTEMBER 4, 2009
NAME OF WITNESS  LEHMAN BROTHERS
Reason codes:
    1  To clarify the record
    2. To conform to the facts
    3  To correct transcription errors
Page_____ Line_____ Reason_____
From_____            to_____

Page_____ Line_____ Reason_____
From_____            to_____
Page_____ Line_____ Reason_____
From_____            to_____

Page_____ Line_____ Reason_____
From_____            to_____
Page_____ Line_____ Reason_____
From_____            to_____

Page_____ Line_____ Reason_____
From_____            to_____
Page_____ Line_____ Reason_____
From_____            to_____

Page_____ Line_____ Reason_____
From_____            to_____
Page_____ Line_____ Reason_____
From_____            to_____

Page_____ Line_____ Reason_____
From_____            to_____
Page_____ Line_____ Reason_____
From_____            to_____


            _____
            JASEN YANG
```