# A. 34

**Unknown**

Sent: Sunday, May 17, 2009 12:46 AM

| | |
|---|---|
| **From:** | Aprigliano, Sindy <Sindy.Liu@LEHMAN.COM> |
| **Sent:** | Monday, September 15, 2008 3:05 PM (GMT) |
| **To:** | Tonucci, Paolo <paolo.tonucci@lehman.com>; Azerad, Robert <RAzerad@lehman.com> |
| **Cc:** | Veksler, Irina <irina.veksler@lehman.com> |
| **Subject:** | PDCF Haircuts |
| **Attach:** | ole0.bmp |

Paolo,

The estimated impact is approx.. $4bn - this is a conservative estimate as I assumed the haircuts for the liquid book were on the high end without knowing the term of the debt:

[x] Picture (Metafile)

Thanks,
Sindy

7/27/2009



EXHIBIT
Coghlin
118
KK 8/13/09

depobook.com

10297296

**Chase Triparty Haircut Summary**
**Trades Maturing Sep 15, 2008**
as of Sep 12, 2008

| Collateral Allocated Summary | Prin ($Bn's) | Current Haircut | Fed Haircut | Variance | Impact |
|---|---|---|---|---|---|
| ASSET BACKS - INVESTMENT GRADE | 1.1 | 15% | 20% | 5% | 0.1 |
| ASSET BACKS - NON-INVESTMENT GRADE | 0.9 | 33% | 20% | -13% | (0.1) |
| C1 - INVESTMENT GRADE CONVERTIBLES | 0.0 | 15% | 20% | 5% | 0.0 |
| C2 - NON-INVESTMENT GRADE CONVERTIBLES | 0.2 | 5% | 20% | 15% | 0.0 |
| CORPORATES - INVESTMENT GRADE | 5.8 | 7% | 20% | 13% | 0.7 |
| `RPORATES - NON-INVESTMENT GRADE | 1.6 | 15% | 20% | 5% | 0.1 |
| JITIES | 3.1 | 6% | 20% | 14% | 0.4 |
| "ERNMENT AGENCY | 12.7 | 2% | 6% | 4% | 0.6 |
| JL | 20.7 | 2% | 6% | 4% | 0.8 |
| MONEY MARKETS | 3.9 | 9% | 20% | 11% | 0.4 |
| MUNI | 1.9 | 8% | 20% | 12% | 0.2 |
| OTHER | 0.0 | 7% | 20% | 13% | 0.0 |
| PRIVATE LABELS - HIGH YIELD | 0.6 | 19% | 20% | 1% | 0.0 |
| PRIVATE LABELS - INVESTMENT GRADE | 1.8 | 13% | 20% | 7% | 0.1 |
| TREASURIES | 21.2 | 1% | 4% | 3% | 0.5 |
| Grand Total | 75.5 | 4% | 9% | 5% | 3.9 |

10300641

# A. 35



**From:** Clackson, Patrick: Finance (LDN)
**Sent:** Tue, 16 Sep 2008 09:52:39 GMT
**To:** Walker, James: Finance (NYK)
**Subject:** Fw: Board Deck

**From:** Haworth, Richard: Barclays Capital (LDN)
**To:** Clackson, Patrick: Finance (LDN); Walker, James: Finance (NYK)
**Cc:** Ricci, Rich: Barclays Capital
**Sent:** Tue Sep 16 10:50:53 2008
**Subject:** Board Deck

I know the numbers have been moving until frustratingly late - need you to confirm you are happy that they are right per the attached (all based off latest from your team). Key pieces to confirm:

1) Gross assets, WRAs, purchase price and negative goodwill per page 2
2) Specific staff numbers page 2
3) Balance sheet category breakdown of the $75bn, p5
4) Profit forecast page 6 (looks a little uninspiring and drives a negative EP/EPS in year 1 due to this and the raising of the capital)

5) Synergies not shown (we have used the $0.6bn post tax, split -$0.6bn revenue and $1.35bn cost savings (62% of Long Island 2007 cost base), plus $600m integration costs)

Thx

<<2008 09 16 - Board deck v4.ppt>>

HIGHLY CONFIDENTIAL

## Placeholder
# Document produced in native format

HIGHLY CONFIDENTIAL

BCI-EX-(S)-00023788

# Project Long Island

## Board discussion materials

### 16 September 2008

# Executive Summary

- We are asking for approval to purchase the US broker dealer operations of Long Island
- This transaction strongly supports our strategy and would materially enhance the Barclays Capital US position, and further diversify our earnings stream by product and geography.
- In this transaction, we would hire the staff of the broker dealer and assume a portion of its assets and liabilities
  - ➢ We intend today to seek permission from the US bankruptcy court to acquire the business
  - ➢ We would acquire $75bn of assets and liabilities. The business would include RWA of $13.5bn
  - ➢ We would offer $250m to acquire the business and we are buying $1.5bn worth of company-related property (HQ and data centres). The recognition of negative goodwill amounts to $3.0bn pre tax ($2bn post tax)
  - ➢ We would issue 612m shares to fund the capital required to operate the broker dealer. This would be from either Sumitomo, ICD or the QIA. As a backup, we are arranging volume underwriting from CS,DB and JPM.
- This transaction structure mitigates some of the risks that we previously identified
  - ➢ It significantly reduces the amount of assets we acquire
  - ➢ We extract "clean" assets and contracts out of Long Island
  - ➢ Our consolidated equity ratio rises by an estimated 60bps as a result of the amount of equity funding we intend to raise connected to the deal
- There are three primary risks outstanding
  - ➢ If we do not get a fixed price from the major investors (Sumitomo, ICD, QIA) before announcement, we take the risk that the share issuance raises less than the $3.4bn current market value of these shares.
  - ➢ We have performed accelerated due diligence and there will be a number of loose ends upon separation from Long Island (e.g. continuation of Group Services)
  - ➢ We will be subject to a US legal process which is unpredictable
- **We are seeking Board approval for the transaction and to issue 612m Barclays shares**

## What are we buying?

- Acquiring the businesses previously undertaken in Long Island's US Broker Dealer entity

- The deal would include

  ➢ Both the Capital Markets and Investment Banking businesses including OTC derivative trading desks

  ➢ All regulatory licenses and approvals

  ➢ $1.5bn purchase of the HQ ($1bn) and data centres ($500m) at a 6% discount to current market value

  ➢ 5,810 front office staff and c. 3,000 back office support staff

- The deal would exclude

  ➢ Investment Management and Neuberger Berman

  ➢ Outstanding OTC derivative contracts

- The transaction will be effected through an asset transfer into Barclays Capital Inc

# The transaction is now focused on adding the most valuable parts of LI to fill Baltimore's gaps



## Key Benefits

**(1)** Significantly strengthen Barclays Capital's position in the US/Americas

- In line with Barclays Capital's strategy
- Area of highest impact of LI addition to Barclays franchise

**(2)** Adding significant new product capabilities

- With the merger of BofA and ML, the I-banking market is now dominated by Domestic Universal Banks that combine ability to lend with good M&A capabilities
- It is key for Barclays Capital to add this capability to remain competitive in the US Top Tier
- Both M&A and ECM capabilities in the US can then be extended to the rest of the World

**(3)** Become a Top 5 player in the Americas in existing Capital Markets businesses

Source:  Thomson, Coalition, S&P analysis

# Total Assets in New Transaction are $75bn

| $bn | Long Island Starting Position | Excluded Original Transaction | Excluded New Transaction | New Transaction included | Description |
|---|---|---|---|---|---|
| Mortgage | 55.0 | 24.0 | 24.5 | 6.5 | Secondary Mortgage Securities and ABS products |
| Real Estate | 18.6 | 8.6 | 10.0 | 0.0 | |
| Corporate Debt | 41.7 | 8.7 | 27.6 | 5.4 | Secondary US Corporate Debt |
| Corporate Equities | 43.2 | 10.5 | 23.4 | 9.3 | Cash Equities and Exchange traded business |
| Government & Agencies | 42.3 | 0.0 | 12.1 | 30.2 | US Government & Agencies business |
| CP and other MM instruments | 4.6 | 0.0 | 3.4 | 1.2 | |
| Derivatives and Other contracts | 46.3 | 0.0 | 43.5 | 2.8 | Include Future & Options business |
| **Sub-total** | **251.8** | **51.8** | **144.6** | **55.4** | |
| Other | 346.0 | 0.0 | 326.1 | 19.9 | |
| **Total** | **597.8** | **51.8** | **470.7** | **75.3** | |

# Income statement of the business we are acquiring

| | | | | P&L | | | |
|---|---|---|---|---|---|---|---|
| | **2006 (A)** | **2007 (A)** | **H1 2008 (A)** | **2008 (F)** | **2009 (F)** | **2010 (F)** | **2011 (F)** |
| Net interest income | 435,305 | 387,089 | 1,490,587 | 2,235,880 | 400,000 | 420,000 | 441,000 |
| Total Commissions | 1,234,235 | 1,455,142 | 1,070,779 | 1,228,873 | 1,290,317 | 1,354,832 | 1,422,574 |
| Total Firm trading | 2,019,024 | (2,901,603) | (5,586,898) | (5,503,553) | 1,000,000 | 1,050,000 | 1,102,500 |
| Other Income | 3,254,977 | 3,451,633 | 3,870,490 | 4,916,720 | 3,978,135 | 4,192,042 | 4,414,144 |
| **NET REVENUE** | **6,508,236** | **2,015,917** | **(645,630)** | **642,040** | **6,268,452** | **6,596,875** | **6,939,218** |
| Compensation | (3,213,924) | (995,891) | (735,313) | (3,583,000) | (3,762,150) | (3,950,258) | (4,147,770) |
| Other expenses | 1,066,296 | 1,190,806 | 883,690 | (1,325,536) | (1,391,812) | (1,461,403) | (1,534,473) |
| **TOTAL EXPENSES** | **(4,280,220)** | **(2,186,697)** | **(1,619,003)** | **(4,908,536)** | **(5,153,962)** | **(5,411,661)** | **(5,682,244)** |
| Income before taxes | 2,228,014 | (170,780) | (2,264,633) | (4,266,496) | 1,114,490 | 1,185,214 | 1,256,975 |
| Taxes | 912,844 | (243,458) | (996,538) | (1,877,258) | 490,375 | 521,494 | 553,069 |
| **Profit after Tax** | **1,315,170** | **114,257** | **(1,268,095)** | **(2,389,238)** | **624,114** | **663,720** | **703,906** |
| **NET INCOME AFTER TAXES** | **1,948,137** | **1,810,031** | **(2,227,317)** | **(2,389,238)** | **624,114** | **663,720** | **703,906** |
| | | | | | | | |
| **Compensation breakdown** | | | | | | | |
| Salaries | (718,806) | (805,820) | (607,874) | (1,307,000) | (1,372,350) | (1,440,968) | (1,513,016) |
| Benefits | (234,101) | (173,813) | (138,172) | (523,000) | (549,150) | (576,608) | (605,438) |
| Production Comp. | (175,890) | (205,554) | (146,688) | (261,000) | (274,050) | (287,753) | (302,140) |
| Bonus | (1,921,444) | 378,250 | 333,758 | (1,100,000) | (1,155,000) | (1,212,750) | (1,273,388) |
| Other (ie: Long Term Comp ) | (183,242) | (188,959) | (176,339) | (392,000) | (411,600) | (432,180) | (453,789) |
| **TOTAL COMPENSATION** | **(3,233,482)** | **(995,896)** | **(735,315)** | **(3,583,000)** | **(3,762,150)** | **(3,950,258)** | **(4,147,770)** |
| *COMP / REVENUE RATIO* | *49.38%* | *49.40%* | *-113.89%* | | | | |
| *EFFECTIVE TAX RATE* | *40.97%* | *142.56%* | *44.00%* | | | | |

Estimated current monthly expenses of $400m

## The transaction improves our Group Equity ratio by 60bps and the Solus ratio by 41bps, assuming we raise $3.12bn of equity (10% discount to current)

| ($m) | Group | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Baltimore 2008f | Broker/ Dealer 2008e | Equity raising @ 10% discount | Negative G'will | Transaction costs | Combined |
| RWAs | 680,311 | 15,000 [1] | | | | 695,311 |
| Equity Tier 1 | 40,652 | | 3,124 [2] | 2,000 | (126) | 45,650 |
| "FSA" Tier 1 | 36,465 | | 3,124 | 2,000 | (126) | 41,463 |
| Tier 1 | 57,977 | | 3,124 | 2,000 | (126) | 62,975 |
| Gross Assets | 2,261,540 | 62,700 | | | (126) | 2,324,115 |
| Shareholder's (Common) Equity | 53,133 | | 3,124 | 2,000 | (126) | 58,131 |
| Minorities / prefs | 20,632 | | | | - | 20,632 |
| Total Equity | 73,765 | | 3,124 | 2,000 | (126) | 78,763 |

| Ratios | | | | | | | Previous: |
| --- | --- | --- | --- | --- | --- | --- | --- |
| "FSA" Ratio | 5.36% | | | | | 5.96% | 5.29% |
| Equity Ratio | 5.98% | | | | | 6.57% | 5.84% |
| Tier 1 Ratio | 8.52% | | | | | 9.06% | 8.61% |

**Previous:** 3,500    3,500

| ($m) | Solus | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | BB Plc 2008f | Broker/ Dealer 2008e | Equity raising | Negative G'will | Capital deduction | Combined |
| RWAs | 553,860 | | | | | 553,860 |
| Equity Tier 1 | 23,927 | | 3,124 | 1,620 [3] | (2,474) | 26,197 |
| Ratios | | | | | | |
| Equity Ratio | 4.32% | | | | | 4.73% |

**The equity ratio is significantly improved versus the prior deal due to – a lower RWA requirement; the absence of $6bn of negative NAV adjustments (own credit and deferred tax); and lower consideration to the vendor**

1)  ~~£9,508 of £2,500 of converted Lehman requires funding~~
2)  Equity raising based on available shares to issue under section 80 of 612,454,218 issued at price of £2.84 representing a ten percent headroom discount to the closing price of £3.16 on Monday 15th September
3)  Post tax negative goodwill at Solus level based on 75% of negative goodwill recognised by BB Plc level taxed at 28%

# Value creation is driven by cost synergies and reflecting a low price

## Value Creation



## Financial Effects

| £m | 2008 | 2009 | 2010 | 2011 | 09-11 CAGR |
|---|---|---|---|---|---|
| Baltimore - Reported Attributable PAT | 3,547 | 4,575 | 5,542 | 6,096 | 15% |
| Long Island - Reported Attributable PAT | -1,146 | 364 | 393 | 421 | 8% |
| Synergies inc. transaction costs (post-tax) | | -16 | 383 | 391 | na |
| **Total** | **2,401** | **4,924** | **6,318** | **6,908** | **18%** |
| **Cash EPS (£)** | | | | | |
| Pre | 0.50 | 0.58 | 0.70 | 0.77 | 15% |
| Post (post-restructuring costs) | | 0.58 | 0.74 | 0.81 | 18% |
| Accretion/(dilution) | | -0.1% | 5.7% | 5.1% | na |
| **EP impact (£m) - post-integration charges** | | 337 | 759 | 770 | na |
| ROCE (%) - post-integration charges | | 133.4% | 252.2% | 149.7% | na |

# We will look to issue 612m shares to capitalise the purchased assets

## Capital Raising = £1.8bn

- We are seeking to raise £1.8bn ($3.4bn)

- We can issue up to 612m shares without shareholder approval [1]

## Reference Investors = £800m +

- We have approached the QIA, ICD and Sumitomo to subscribe to the equity raising

  - We are seeking commitments from these investors. The issue price cannot exceed a 5% discount to the Barclays share price at the time of the announcement

- It may be that , particularly for Sumitomo, the investors cannot commit in time for an announcement, in which case we will agree a bank underwriting (see below)

## Bank underwriters = up to £1bn

- We are seeking commitment from Credit Suisse, JPMCaz and Deutsche to execute a placing of up to 612m Barclays shares within 15 days [2]

- The banks will execute the issuance within ABI discount guidelines (<5% of price at time of pricing) and within UKLA guidelines (<10% of closing price on the day prior to issuance)

- The price is not guaranteed and so proceeds may fall below $3.4bn

1)  Un-issued authorised share capital limits the raising to 612m shares or £1,840m at close price of 316p on 15th September
2)  Banks will have flexibility to execute on any day within 15 day period in order to allow them to 'feel' for market conditions and have the greatest opportunity to fill the issuance

# Remaining issues

Remaining issues/Risks and mitigants

- The proceeds of the equity raising cannot be guaranteed at announcement unless reference investors subscribe at a fixed price

- If Barclays share price falls, less capital is raised, however, the negative goodwill arising from the transaction will still improve Barclays equity ratio (by a minimum of 16bps if zero capital is raised)

- Transaction is subject to US legal process and the decision of the judge.  There is no certainty that our proposed deal timetable will be followed by the judge

- Business separation issues – ring fencing/ identifying the key assets/ contracts.  This is the limitation of accelerated due diligence

- Requisite US and UK regulatory clearances

# APPENDIX

# Transaction completion is anticipated for Friday, but will be subject to a judge's discretion and HSR process

| | W/C 15th September | | | | | |
|---|---|---|---|---|---|---|
| | T<br>16 | W<br>17 | TH<br>18 | F<br>19 | SA<br>20 | SU<br>21 |
| Barclays Board meeting | | | | | | |
| Underwriting commitment by banks | | | | | | |
| Signing of subscription agreement with strategic investors | | | | | | |
| Announcement by Barclays | | | | | | |
| Submission of Barclays proposal to court | | | | | | |
| Motion entered by Court | | | | | | |
| Court approval of Barclays proposal [1] | | | | | | |
| HSR submission and approval [2] | | | | | | |
| Sumitomo Board Meeting | | | | | | |
| Set up cash box | | | | | | |
| Sumitomo section 89 placing | | | | | | |
| Strategic investors subscription [3] | | | | | | |
| Completion [4] | | | | | | |
|     Transfer of assets and liabilities to Barclays | | | | | | |
|     Novation of contracts (employees, IT) | | | | | | |
|     Day 1 trading under Barclays name | | | | | | |

Notes:
(1) Assumes that, given circumstances, court judge would allow for an expedited approval process; auction process subject to judge's discretion; could add up to 30 days to the process
(2) Could take up to 30 days depending on willingness of DOJ
(3) Assumes no standby underwriting by banks is required
(4) Subject to court and HSR approval

# Americas market rankings clearly demonstrate LI's potential to enhance Baltimore's market position in the Americas…



Americas Market Position

| | Commodities | EM | FI Rates | Securitized Products* | FI Credit* | Prime Services | FX |
|---|---|---|---|---|---|---|---|
| **Top 3** | MS | Citi | Goldman | CS | Goldman | Goldman | JPM |
| | Goldman | CS | JPM | Long Island | Long Island | MS | Citi |
| | **Baltimore** | UBS | BofA | JPM | JPM | JPM (Bear) | BofA |
| **5** | Merrill | JPM | Long Island | Deutsche | MS | Long Island | Deutsche |
| | JPM | Deutsche | MS | BofA | BofA | CS | MS |
| | | #7 - Baltimore | #6 - Baltimore | #6 - Baltimore | #7 - Baltimore | #9 - Baltimore | #7- Baltimore |

| | CMBS | IG Bonds | IG Loans | HY Bonds | Lev Loans | Equities |
|---|---|---|---|---|---|---|
| **Top 3** | Goldman | Citi | JPM | JPM | JPM | Goldman |
| | JPM | JPM | Citi | CS | BofA | MS |
| | BofA | Goldman | RBS | Citi | Citi | BofA |
| **5** | MS | Long Island | Wachovia | BofA | CS | Citi |
| | CS | MS | BNP | ML | DB | Long Island |
| | #17 – Baltimore | #10 - Baltimore | #9 - Baltimore | #15 - Baltimore | #17 - Baltimore | #13 - Baltimore |

\* - Excluding writedowns/losses in 2007; 'normalized' years

Source: Business heads and COOs, Coalition, Strategy & Planning Americas analysis, Reuters, Thomson, Dealogic

## …with excellent capability across the investment banking product set

### Market Positions (2007)



**Primary**

**Primary Equity**
- Long Island: #6 in US ECM revenues
- Long Island is #1 in US in global IPOs

**Primary Debt**
- Baltimore #7 in global All Debt – addition of L.I. moves us to #1 with 10.8%
- Baltimore #3 in Intl. Bonds – addition of L.I. moves us to clear #1 with 10.9% share
- Baltimore #10 in USD Intl. Bonds – addition of L.I. moves us to #1 with 12.1% share

**M&A Advisory**
- Long Island: Top 5 US player
- Accelerates Baltimore's recent investments in EM advisory services

**Secondary**

**Equities**
- Long Island: Top 5 player in the US, minor player outside US
- Baltimore:  Top 10 equity derivatives player globally

**Fixed Income**
- Long Island:  Top 5 player in the US
- Baltimore:  Top 5 global player – addition of L.I. would create a Top 3 player in the US

**FX**
- Long Island: Top 11 player in North America
- Baltimore:  Top 5 player globally and in North America - addition of L.I. would push us into Top 3

**Commods**
- Long Island: Second tier player
- Baltimore:  Top 3 player – L.I. would add little

**EM**
- Neither Long Island nor Baltimore are top tier players in EM
- Combination of both would create at least a Top 10 player

Source: Business heads and COOs, Coalition, Strategy & Planning Americas analysis, Reuters, Thomson, Dealogic

# A. 36

**From:** Clackson, Patrick: Finance (LDN)
**Sent:** Tue, 16 Sep 2008 09:52:39 GMT
**To:** Walker, James: Finance (NYK)
**Subject:** Fw: Board Deck

**From:** Haworth, Richard: Barclays Capital (LDN)
**To:** Clackson, Patrick: Finance (LDN); Walker, James: Finance (NYK)
**Cc:** Ricci, Rich: Barclays Capital
**Sent:** Tue Sep 16 10:50:53 2008
**Subject:** Board Deck

I know the numbers have been moving until frustratingly late - need you to confirm you are happy that they are right per the attached (all based off latest from your team). Key pieces to confirm:

1) Gross assets, WRAs, purchase price and negative goodwill per page 2
2) Specific staff numbers page 2
3) Balance sheet category breakdown of the $75bn, p5
4) Profit forecast page 6 (looks a little uninspiring and drives a negative EP/EPS in year 1 due to this and the raising of the capital)

5) Synergies not shown (we have used the $0.6bn post tax, split -$0.6bn revenue and $1.35bn cost savings (62% of Long Island 2007 cost base), plus $600m integration costs)

Thx

<<2008 09 16 - Board deck v4.ppt>>



Δ π EXHIBIT 378
Deponent Ricci
Date 9/8/09 Rptr KK
WWW.DEPOBOOK.COM

**HIGHLY CONFIDENTIAL**                                                                 BCI-EX-(S)-00023787

**<u>Placeholder</u>**
**Document produced in native format**

**HIGHLY CONFIDENTIAL**

BCI-EX-(S)-00023788

# Project Long Island

## Board discussion materials

16 September 2008

# Executive Summary

- We are asking for approval to purchase the US broker dealer operations of Long Island

- This transaction strongly supports our strategy and would materially enhance the Barclays Capital US position, and further diversify our earnings stream by product and geography.

- In this transaction, we would hire the staff of the broker dealer and assume a portion of its assets and liabilities
  - ⅄ We intend today to seek permission from the US bankruptcy court to acquire the business
  - ⅄ We would acquire $75bn of assets and liabilities. The business would include RWA of $13.5bn
  - ⅄ We would offer $250m to acquire the business and we are buying $1.5bn worth of company-related property (HQ and data centres). The recognition of negative goodwill amounts to $3.0bn pre tax ($2bn post tax)
  - ⅄ We would issue 612m shares to fund the capital required to operate the broker dealer. This would be from either Sumitomo, ICD or the QIA. As a backup, we are arranging volume underwriting from CS, DB and JPM.

- This transaction structure mitigates some of the risks that we previously identified
  - ⅄ It significantly reduces the amount of assets we acquire
  - ⅄ We extract "clean" assets and contracts out of Long Island
  - ⅄ Our consolidated equity ratio rises by an estimated 60bps as a result of the amount of equity funding we intend to raise connected to the deal

- There are three primary risks outstanding
  - ⅄ If we do not get a fixed price from the major investors (Sumitomo, ICD, QIA) before announcement, we take the risk that the share issuance raises less than the $3.4bn current market value of these shares.
  - ⅄ We have performed accelerated due diligence and there will be a number of loose ends upon separation from Long Island (e.g. continuation of Group Services)
  - ⅄ We will be subject to a US legal process which is unpredictable

- **We are seeking Board approval for the transaction and to issue 612m Barclays shares**

## What are we buying?

- Acquiring the businesses previously undertaken in Long Island's US Broker Dealer entity

- The deal would include

  ➢ Both the Capital Markets and Investment Banking businesses including OTC derivative trading desks

  ➢ All regulatory licenses and approvals

  ➢ $1.5bn purchase of the HQ ($1bn) and data centres ($500m) at a 6% discount to current market value

  ➢ 5,810 front office staff and c. 3,000 back office support staff

- The deal would exclude

  ➢ Investment Management and Neuberger Berman

  ➢ Outstanding OTC derivative contracts

- The transaction will be effected through an asset transfer into Barclays Capital Inc

# The transaction is now focused on adding the most valuable parts of LI to fill Baltimore's gaps



**Key Benefits**

(1)
- Significantly strengthen Barclays Capital's position in the US/Americas
- In line with Barclays Capital's strategy
- Area of highest impact of LI addition to Barclays franchise
- Adding significant new product capabilities

(2)
- With the merger of BofA and ML, the I-banking market is now dominated by Domestic Universal Banks that combine ability to lend with good M&A capabilities
- It is key for Barclays Capital to add this capability to remain competitive in the US Top Tier
- Both M&A and ECM capabilities in the US can then be extended to the rest of the World

(3)
- Become a Top 5 player in the Americas in existing Capital Markets businesses

Source: Thomson, Coalition, S&P analysis

✓✓✓ Top 3 player    ✓✓ Top 5 player    ✓ Top 10 player    --- Outside Top 10    ✗ No Capabilities

# Total Assets in New Transaction are $75bn

| $bn | Long Island Starting Position | Excluded Original Transaction | Excluded New Transaction | New Transaction Included | Description |
|---|---|---|---|---|---|
| Mortgage | 55.0 | 24.0 | 24.5 | 8.5 | Secondary Mortgage Securities and ABS products |
| Real Estate | 18.6 | 8.6 | 10.0 | 0.0 | |
| Corporate Debt | 41.7 | 8.7 | 27.6 | 5.4 | Secondary US Corporate Debt |
| Corporate Equities | 43.2 | 10.5 | 23.4 | 9.3 | Cash Equities and Exchange traded business |
| Government & Agencies | 42.3 | 0.0 | 12.1 | 30.2 | US Government & Agencies business |
| CP and other MM instruments | 4.6 | 0.0 | 3.4 | 1.2 | |
| Derivatives and Other contracts | 46.3 | 0.0 | 43.5 | 2.8 | Include Future & Options business |
| **Sub-total** | **251.8** | **51.8** | **144.6** | **55.4** | |
| Other | 346.0 | 0.0 | 326.1 | 19.9 | |
| **Total** | **597.8** | **51.8** | **470.7** | **75.3** | |

# Income statement of the business we are acquiring

## P&L

| | 2006 (A) | 2007 (A) | H1 2008 (A) | 2008 (F) | 2009 (F) | 2010 (F) | 2011 (F) |
|---|---|---|---|---|---|---|---|
| Net interest income | 435,305 | 387,089 | 1,490,587 | 2,235,880 | 400,000 | 420,000 | 441,000 |
| Total Commissions | 1,234,235 | 1,455,142 | 1,070,779 | 1,228,873 | 1,290,317 | 1,354,832 | 1,422,574 |
| Total Firm trading | 2,019,024 | 2,901,603 | (5,586,898) | (5,503,553) | 1,000,000 | 1,050,000 | 1,102,500 |
| Other Income | 3,254,977 | 3,451,633 | 3,870,490 | 4,916,720 | 3,978,135 | 4,192,042 | 4,414,144 |
| NET REVENUE | 6,508,236 | 2,015,917 | (645,630) | 642,040 | 6,268,452 | 6,596,875 | 6,939,218 |
| Compensation | (3,213,924) | (995,891) | (735,313) | (3,583,000) | (3,762,150) | (3,950,258) | (4,147,770) |
| Other expenses | 1,066,296 | 1,190,806 | 883,690 | (1,325,536) | (1,391,812) | (1,461,403) | (1,534,473) |
| TOTAL EXPENSES | (4,280,220) | (2,186,697) | (1,619,003) | (4,908,536) | (5,153,962) | (5,411,661) | (5,682,244) |
| Income before taxes | 2,228,014 | (170,780) | (2,264,633) | (4,266,496) | 1,114,490 | 1,185,214 | 1,256,975 |
| Taxes | 912,844 | (243,458) | (996,538) | (1,877,258) | 490,375 | 521,494 | 553,069 |
| Profit after Tax | 1,315,170 | 114,257 | (1,268,095) | (2,389,238) | 624,114 | 663,720 | 703,906 |
| NET INCOME AFTER TAXES | 1,948,137 | 1,810,031 | (2,227,317) | (2,389,238) | 624,114 | 663,720 | 703,906 |
| | | | | | | | |
| Compensation breakdown | | | | | | | |
| Salaries | (718,606) | (805,820) | (607,874) | (1,307,000) | (1,372,350) | (1,440,968) | (1,513,016) |
| Benefits | (234,101) | (173,813) | (138,172) | (523,000) | (549,150) | (576,608) | (605,438) |
| Production Comp. | (175,890) | (205,554) | (146,688) | (261,000) | (274,050) | (287,753) | (302,140) |
| Bonus | (1,921,444) | 378,250 | 333,758 | (1,100,000) | (1,155,000) | (1,212,750) | (1,273,388) |
| Other (ie Long Term Comp.) | (183,242) | (188,959) | (176,339) | (392,000) | (411,600) | (432,180) | (453,789) |
| TOTAL COMPENSATION | (3,233,482) | (995,896) | (735,315) | (3,583,000) | (3,762,150) | (3,950,258) | (4,147,770) |
| COMP / REVENUE RATIO | 49.38% | 49.40% | -113.89% | | | | |
| EFFECTIVE TAX RATE | 40.97% | 142.56% | 44.00% | | | | |

Estimated current monthly expenses of $400m

Page 6

## The transaction improves our Group Equity ratio by 60bps and the Solus ratio by 41bps, assuming we raise $3.12bn of equity (10% discount to current)

### Group

| ($m) | Baltimore 2008f | Broker/Dealer 2008e | Equity raising @10% discount | Negative G'will | Transaction costs | Combined | |
|---|---|---|---|---|---|---|---|
| RWAs | 680,311 | 15,000 [1] | | | | 695,311 | |
| Equity Tier 1 | 40,652 | | 3,124 [2] | 2,000 | (126) | 45,650 | |
| "FSA" Tier 1 | 36,465 | | 3,124 | 2,000 | (126) | 41,463 | |
| Tier 1 | 57,977 | | 3,124 | 2,000 | (126) | 62,975 | |
| Gross Assets | 2,261,540 | 62,700 | | | | 2,324,115 | |
| Shareholder's (Common) Equity | 53,133 | | 3,124 | 2,000 | (126) | 58,131 | |
| Minorities / prefs | 20,632 | | | | - | 20,632 | |
| Total Equity | 73,765 | | 3,124 | 2,000 | (126) | 78,763 | |
| | | | | | | | Previous: |
| Ratios | | | | | | | |
| "FSA" Ratio | 5.36% | | | | | 5.96% | 5.29% |
| Equity Ratio | 5.98% | | | | | 6.57% | 5.84% |
| Tier 1 Ratio | 8.52% | | | | | 9.06% | 8.61% |
| Previous: | | | 3,500 | 3,500 | | | |

### Solus

| ($m) | BB Plc 2008f | Broker/Dealer 2008e | Equity raising | Negative G'will | Capital deduction | Combined |
|---|---|---|---|---|---|---|
| RWAs | 553,860 | | | | | 553,860 |
| Equity Tier 1 | 23,927 | | 3,124 | 1,620 [3] | (2,474) | 26,197 |
| Ratios | | | | | | |
| Equity Ratio | 4.32% | | | | | 4.73% |

**The equity ratio is significantly improved versus the prior deal due to – a lower RWA requirement; the absence of £6bn of negative NAV adjustments (own credit and deferred tax); and lower consideration to the vendor**

1)  Equity raising based on available shares to issue under section 80 of 612,454,218 issued at price of £2.84 representing a ten percent headroom discount to the closing price of £3.16 on Monday 15th September
2)
3)  Post tax negative goodwill at Solus level based on 75% of negative goodwill recognised by BB Plc level taxed at 28%

# Value creation is driven by cost synergies and reflecting a low price

## Value Creation



## Financial Effects

| £m | 2008 | 2009 | 2010 | 2011 | 09-11 CAGR |
|---|---|---|---|---|---|
| Baltmore - Reported Attributable PAT | 3,547 | 4,575 | 5,542 | 6,096 | 15% |
| Long Island - Reported Attributable PAT | 1,168 | 364 | 393 | 421 | 8% |
| Synergies inc transaction costs (post-tax) | | -15 | 383 | 391 | na |
| **Total** | **2,401** | **4,924** | **6,318** | **6,908** | **18%** |
| Cash EPS (£) | | | | | |
| Pre | 0.50 | 0.58 | 0.70 | 0.77 | 15% |
| Post (post-restructuring costs) | | 0.58 | 0.74 | 0.81 | 18% |
| Accretion/(dilution) | | -0.1% | 5.7% | 5.1% | na |
| EP impact (£m) - post-integration charges | | 337 | 759 | 770 | na |
| ROCE (%) - post-integration charges | | 133.4% | 252.2% | 149.7% | na |

# We will look to issue 612m shares to capitalise the purchased assets

### Capital Raising = £1.8bn

- We are seeking to raise £1.8bn ($3.4bn)

- We can issue up to 612m shares without shareholder approval [1]

### Reference investors = £800m +

- We have approached the QIA, ICD and Sumitomo to subscribe to the equity raising

  - We are seeking commitments from these investors. The issue price cannot exceed a 5% discount to the Barclays share price at the time of the announcement

- It may be that, particularly for Sumitomo, the investors cannot commit in time for an announcement, in which case we will agree a bank underwriting (see below)

### Bank underwriters = up to £1bn

- We are seeking commitment from Credit Suisse, JPMCaz and Deutsche to execute a placing of up to 612m Barclays shares within 15 days [2]

- The banks will execute the issuance within ABI discount guidelines (<5% of price at time of pricing) and within UKLA guidelines (<10% of closing price on the day prior to issuance)

- The price is not guaranteed and so proceeds may fall below $3.4bn

1) Un-issued authorised share capital limits the raising to 612m shares or £1.840m at close price of 316p on 15th September
2) Banks will have flexibility to execute on any day within 15 day period in order to allow them to 'feel' for market conditions and have the greatest opportunity to fill the issuance

# Remaining issues

Remaining issues/Risks and mitigants

- The proceeds of the equity raising cannot be guaranteed at announcement unless reference investors subscribe at a fixed price

- If Barclays share price falls, less capital is raised, however, the negative goodwill arising from the transaction will still improve Barclays equity ratio (by a minimum of 16bps if zero capital is raised)

- Transaction is subject to US legal process and the decision of the judge. There is no certainty that our proposed deal timetable will be followed by the judge

- Business separation issues – ring fencing/ identifying the key assets/ contracts. This is the limitation of accelerated due diligence

- Requisite US and UK regulatory clearances

# APPENDIX



## Transaction completion is anticipated for Friday, but will be subject to a judge's discretion and HSR process

| | W/C 15th September | | | | | |
|---|---|---|---|---|---|---|
| | T 16 | W 17 | TH 18 | F 19 | SA 20 | SU 21 |
| Barclays Board meeting | | | | | | |
| Underwriting commitment by banks | | | | | | |
| Signing of subscription agreement with strategic investors | | | | | | |
| Announcement by Barclays | | | | | | |
| Submission of Barclays proposal to court | | | | | | |
| Motion entered by Court | | | | | | |
| Court approval of Barclays proposal [1] | | | | | | |
| HSR submission and approval [2] | | | | | | |
| Sumitomo Board Meeting | | | | | | |
| Set up cash box | | | | | | |
| Sumitomo section 89 placing | | | | | | |
| Strategic investor's subscription [3] | | | | | | |
| Completion [4] | | | | | | |
| Transfer of assets and liabilities to Barclays | | | | | | |
| Novation of contracts (employees, IT) | | | | | | |
| Day 1 trading under Barclays name | | | | | | |

Notes:
[1] Assumes that, given circumstances, court judge would allow for an expedited approval process; auction process subject to judge's discretion; could add up to 30 days to the process
[2] Could take up to 30 days depending on willingness of DOJ
[3] Assumes no standby underwriting by banks is required
[4] Subject to court and HSR approval

# Americas market rankings clearly demonstrate LI's potential to enhance Baltimore's market position in the Americas…

## Americas Market Position

|        | Commodities | EM | FI Rates | Securitized Products* | FI Credit* | Prime Services | FX |
|--------|-------------|-----|----------|-----------------------|------------|----------------|-----|
| Top 3  | MS | Citi | Goldman | CS | Goldman | Goldman | JPM |
|        | Goldman | CS | JPM | Long Island | Long Island | MS | Citi |
|        | Baltimore | UBS | BofA | JPM | JPM | JPM (Bear) | BofA |
| 5      | Merrill | JPM | Long Island | Deutsche | MS | Long Island | Deutsche |
|        | JPM | Deutsche | MS | BofA | BofA | CS | MS |
|        | #7 - Baltimore | #7 - Baltimore | #6 - Baltimore | #6 - Baltimore | #7 - Baltimore | #9 - Baltimore | #7 - Baltimore |

|        | CMBS | IG Bonds | IG Loans | HY Bonds | Lev Loans | Equities |
|--------|------|----------|----------|----------|-----------|----------|
| Top 3  | Goldman | Citi | JPM | JPM | JPM | Goldman |
|        | JPM | JPM | Citi | CS | BofA | MS |
|        | BofA | Goldman | RBS | Citi | Citi | BofA |
| 5      | MS | Long Island | Wachovia | BofA | CS | Citi |
|        | CS | MS | BNP | ML | DB | Long Island |
|        | #17 - Baltimore | #10 - Baltimore | #9 - Baltimore | #15 - Baltimore | #17 - Baltimore | #13 - Baltimore |

\* - Excluding writedowns/losses in 2007; 'normalized' years

Source: Business heads and COOs, Coalition, Strategy & Planning Americas analysis, Reuters, Thomson, Dealogic

# ...with excellent capability across the investment banking product set

**Market Positions (2007)**



| | | |
|---|---|---|
| **Primary** | Primary Equity | • Long Island: #6 in US ECM revenues<br>• Long Island is #1 in US in global IPOs |
| | Primary Debt | • Baltimore #7 in global All Debt – addition of L.I. moves us to #1 with 10.8%<br>• Baltimore #3 in Intl. Bonds – addition of L.I. moves us to clear #1 with 10.9% share<br>• Baltimore #10 in USD Intl. Bonds – addition of L.I. moves us to #1 with 12.1% share |
| | M&A Advisory | • Long Island: Top 5 US player<br>• Accelerates Baltimore's recent investments in EM advisory services |
| **Secondary** | Equities | • Long Island: Top 5 player in the US, minor player outside US<br>• Baltimore: Top 10 equity derivatives player globally |
| | Fixed Income | • Long Island: Top 5 player in the US<br>• Baltimore: Top 5 global player – addition of L.I. would create a Top 3 player in the US |
| | FX | • Long Island: Top 11 player in North America<br>• Baltimore: Top 5 player globally and in North America - addition of L.I. would push us into Top 3 |
| | Commods | • Long Island: Second tier player<br>• Baltimore: Top 3 player – L.I. would add little |
| | EM | • Neither Long Island nor Baltimore are top tier players in EM<br>• Combination of both would create at least a Top 10 player |

Source: Business heads and COOs, Coalition, Strategy & Planning Americas analysis, Reuters, Thomson, Dealogic

# A. 37

**Unknown**

**Sent:** Sunday, March 22, 2009 2:45 AM

| | |
|---|---|
| **From:** | Tonucci, Paolo [paolo.tonucci@lehman.com] |
| **Sent:** | Tuesday, September 16, 2008 9:57 AM (GMT) |
| **To:** | Lowitt, Ian T [ilowitt@lehman.com]; Kelly, Martin [martin.kelly@lehman.com] |
| **Subject:** | Re: |

Fantastic.  Great work.
Paolo

---------------------------------

----- Original Message -----
From: Lowitt, Ian T
To: Kelly, Martin
Cc: Tonucci, Paolo
Sent: Tue Sep 16 05:33:59 2008
Subject: Re:

You are a hero. Well done. Ian
------Original Message------
From: Martin Kelly
To: Ian Lowitt
Cc: Tonucci, Paolo
Sent: Sep 16, 2008 5:10 AM
Subject:

Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final price did not change meaningfully - approx a $5b all in economic loss versus our marks and $3.6b of resi assets left behind. Assume we can fund this after everything else winds down but paolo you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI. Took 745 for $1b and several data centers for $400mm. Bart reviewed all of it before final agreement. I'm going to try to get some sleep and will be in mid morning.

---------------------------------

7/15/2009



132841

# A. 38

| From: | Tonucci, Paolo [paolo.tonucci@lehman.com]. | | Sent:9/16/2008 5:57 AM. |
|---|---|---|---|
| To: | Lowitt, Ian T [ilowitt@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]. | | |
| Cc: | . | | |
| Bcc: | . | | |
| Subject: | Re:. | | |

Fantastic. Great work.
Paolo

—————————————————

—— Original Message ——
From: Lowitt, Ian T
To: Kelly, Martin
Cc: Tonucci, Paolo
Sent: Tue Sep 16 05:33:59 2008
Subject: Re:

You are a hero. Well done. Ian
——Original Message——
From: Martin Kelly
To: Ian Lowitt
Cc: Tonucci, Paolo
Sent: Sep 16, 2008 5:10 AM
Subject:

Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final
price did not change meaningfully - approx a $5b all in economic loss versus our marks and
$3.6b of resi assets left behind. Assume we can fund this after everything else winds down but
paolo you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of
all trade payables in LBI and LBHI. Took 745 for $1b and several data centers for $400mm. Bart
reviewed all of it before final agreement. I'm going to try to get some sleep and will be in mid
morning.

—————————————————



EXHIBIT
136A
8.14.09  AW

# A. 39

# LEHMAN BROTHERS HOLDINGS INC.

## Minutes of the Board of Directors
## September 16, 2008

A meeting of the Board of Directors of Lehman Brothers Holdings Inc. (the "Corporation" or collectively with its subsidiaries, the "Firm") was held jointly with a meeting of the Board of Directors of Lehman Brothers Inc. ("LBI") telephonically at 6 a.m. on September 16, 2008, pursuant to written notice.

## PRESENT – LBHI BOARD MEMBERS

Mr. Michael L. Ainslie
Mr. John F. Akers
Mr. Roger S. Berlind
Mr. Thomas H. Cruikshank (*also a LBI Board Member*)
Ms. Marsha Johnson Evans
Mr. Richard S. Fuld, Jr. (*also a LBI Board Member*)
Sir Christopher Gent
Mr. Jerry A. Grundhofer
Mr. Roland A. Hernandez
Mr. Henry Kaufman
Mr. John D. Macomber

## PRESENT – OTHER LBI BOARD MEMBERS

Mr. Howard L. Clark, Jr.
Mr. Frederick Frank

## ALSO PRESENT BY INVITATION

Mr. Ian T. Lowitt
Mr. Herbert H. McDade III
Mr. Hugh E. McGee III
Mr. Thomas A. Russo
Mr. Mark Shafir
Mr. Jeffrey A. Welikson
Mr. Andrew J. Levander (Dechert)
Ms. Lori Fife (Weil Gotshal & Manges)
Mr. Michael Lubowitz (Weil Gotshal & Manges)
Mr. Thomas Roberts (Weil Gotshal & Manges)
Mr. Alvin Brown (Simpson Thacher & Bartlett)
Mr. John Finley (Simpson Thacher & Bartlett)
Mr. Andrew Keller (Simpson Thacher & Bartlett)
Mr. Barry W. Ridings (Lazard)

Mr. Russo introduced the meeting, stating that the Board of Directors of each of the Corporation and LBI is present because the matters to be considered involve both companies. Mr. Russo reported that the agenda items for the meeting are an asset sale transaction for consideration by both companies, the retention of Alvarez & Marsal for consideration by the Corporation, and a debtor-in-possession financing facility for the Corporation. Mr. Russo reported that there are still a few details to be resolved on the sale transaction, but the Firm is hoping to be in a position to announce the transaction before the U.S. markets open. He introduced Mr. Roberts of Weil, Gotshal & Manges to present the transaction.

## APPROVAL OF THE SALE OF CERTAIN ASSETS AND OF DEBTOR-IN-POSSESSION FINANCING

Mr. Roberts stated that Mr. Barry Ridings of Lazard is present at the meeting, and that the Board of Directors of the Corporation will be asked to consider the retention of Lazard by the Corporation. Mr. Roberts presented the proposed transaction with Barclays, as consisting of (1) the sale to Barclays of 745 Seventh Avenue and related data centers for approximately $1.45 billion, to close within the next week, (2) debtor-in-possession ("DIP") financing from Barclays of $500 million for the Corporation, half in the form of a term facility and half in the form of a revolving facility, which would probably start that day, and (3) the transfer of most assets of the U.S. broker dealer, along with approximately 10,000 employees, to Barclays. Mr. Roberts stated that this transaction would benefit the creditors of the Corporation and also save the franchise and many jobs.

The Directors asked which entity will receive the proceeds from the sale of 745 Seventh Avenue and are advised it is the Corporation indirectly through its subsidiary which owns that real estate. The Directors asked about the timeline and are advised that the Bankruptcy Court hearing to approve the transaction is expected to be held on Friday or Monday. The Directors asked about employees to be retained at the Corporation and are advised it will be certain commercial real estate managers and managers of other assets retained by the Corporation, as well as the employees of Aurora and certain support groups at the Corporation.

The Directors asked about the sale of the Investment Management Division ("IMD"), and are advised that it is not included in this transaction. The Directors asked how the sale price for 745 Seventh Avenue was determined, and are advised it was an internal evaluation but that the Corporation retained Cushman & Wakefield and is expecting its oral appraisal that morning. The Directors asked about the DIP financing, and are advised that it will be secured by shares of Neuberger Berman and will become due upon the sale of Neuberger Berman. The Directors are also advised that the transaction involves the sale of two data centers at appraised value, and that the two data centers have an aggregate book value of $450 million and are owned by the Corporation.

2

Mr. Shafir continued the description of the transaction, describing the assets and liabilities to be transferred to Barclays and stating that there would be an additional purchase price component of $250 million for goodwill.

Mr. Roberts resumed by describing that it is a condition to the transaction that eight specific Firm employees enter into employment agreements with Barclays. He stated that Mr. McGee was one of those employees, so interested Firm employees were involved in the transaction negotiations on behalf of the Firm. Mr. Roberts reported that Mr. McDade was subsequently advised by Barclays that his agreement to continued employment was a condition precedent to the transaction. Mr. Roberts reported that both Weil, Gotshal & Manges and Simpson Thacher & Bartlett then told Barclays there were to be no more discussions concerning Mr. McDade's employment until all terms of the Firm transaction were completed. Mr. Roberts reported that the discussions regarding Mr. McDade's employment were suspended to protect Mr. McDade's independence.

Mr. Lubowitz of Weil, Gotshal & Manges reported on the most significant contract terms for the proposed sale of assets. He described that the contract provides that closing must occur within eight days of signing, and that Weil, Gotshal & Manges expected to go into Bankruptcy Court later that day to get the Bankruptcy Court approval process underway. Mr. Lubowitz reported that the contract is quite tight in terms of Barclays' obligation to close. He stated that there is no MAE ("material adverse effect") clause, and there is no bringdown of the representations and warranties. He described that one significant condition of the proposed sale is that a minimum percentage of the Firm's top 200 employees must indicate that they will stay at Barclays post-closing. Mr. Lubowitz reported that Barclays has requested that such percentage be 75%, but that the percentage is still open. Mr. McDade stated that the Firm expects to be able to satisfy a 75% test but is trying to reduce the percentage to create more certainty. Mr. Lubowitz described that the assets being sold include the Lehman Brothers name, but that the name will be licensed back to the rest of the Firm, including the Asset Management Group. Mr. Lubowitz described that the contract allows the Corporation to consider other bids, but provides for a 3% break-up fee. The Directors asked about the break-up fee and about the status of the Firm's operations in the United Kingdom and Asia.

Mr. Brown of Simpson Thacher & Bartlett reported on the employee benefits aspects of the proposed sale of assets. He reported that the Firm proposed post-closing covenants to protect employee benefits, but that the only commitment Barclays would make is to keep current severance levels in place for the balance of the calendar year. Mr. Brown reported that Barclays would not assume any liability for the Firm's pension or benefit plans. He described the status of the Firm's pension plans, deferred compensation plans, and 401(k) plan. Mr. Brown reported that the Firm is attempting to eliminate a contract provision which provides that Barclays' confidentiality obligation terminates if the agreement terminates. Mr. Brown described the draft employment letters for eight specific Firm employees which are a condition to the deal. He described that the draft employment letters provide for at-will employment for a period of time, with salary and guaranteed cash bonus and a retention award.

3

The Directors asked about the Firm subsidiaries and employees which will remain with the Corporation. Ms. Fife described that approximately two thousand employees will be moved from the Corporation to LBI that morning in advance of the transaction with Barclays.

The Directors are briefed on the timeline for the day and on the fact that the Barclays transaction is subject to Bankruptcy Court approval, and that another party can make a topping bid. The Directors are advised that the plan is to sign the Barclays transaction that morning, then make a public announcement of the transaction, and then request Bankruptcy Court approval that day of the break-up fee and interim authority for the DIP financing. The Directors are advised that those matters should get heard and approved by the Bankruptcy Court that afternoon. The Directors are also advised that the Corporation will ask the Bankruptcy Court that day to set a hearing for approval of the sale, that there will be an organizational meeting with the U.S. Trustee that evening and that a creditors' committee should be appointed then. The Directors are advised that the creditors' committee will be briefed on the transaction the next day. The Directors are advised that it will be necessary to put LBI in a Securities Investor Protection Corporation ("SIPC") proceeding for a very short period of time to facilitate the sale of LBI assets to Barclays.

Mr. Ridings of Lazard advised the Directors that the applicable standards for this sale (under Section 363 of the Bankruptcy Code) are to obtain the highest and best price and a price greater than liquidation value. He advised the Directors that he believes these tests can be met, but that it will be a close decision for the Bankruptcy Court judge. He advised that the chances of a topping bid are very remote since the business is deteriorating. He advised that he will testify at the Bankruptcy Court hearing in support of approval of the proposed transaction with Barclays.

Mr. Russo asked for any questions or comments. The Directors summarized the consideration as follows: approximately $1 billion to the Corporation for 745 Seventh Avenue, $250 million to LBI for the Lehman Brothers name, and approximately $450 million to the Corporation for the data centers. For LBI, the transaction was described as a wash – with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets.

Mr. Lowitt advised that he believes that LBI would not be able to fund itself that day without this deal, based on how funding went yesterday. Mr. Lowitt stated that if the Firm does not do this deal that day, LBI would have to declare bankruptcy.

The Directors asked questions about the sale and license-back of the Lehman Brothers name, Barclays' ability to solicit Firm employees if the deal does not go forward, and the fact that Barclays will have already signed up approximately 200 of the Firm's employees. The Directors asked if Mr. Levander has any objections. Mr. Levander asked bankruptcy counsel about the acceptability of the break-up fee. Mr. Russo asked to release Messrs. McDade and McGee from the meeting to finalize the transaction. Messrs. McDade and McGee then left the meeting. The Directors asked if

4

the transaction is subject to approval by Barclays' board of directors or shareholders, and are advised that Barclays only requires board approval and that its board is meeting now. The Directors asked about the other members of the Firm's management executive committee who are included among the eight employees whose agreement to continue employment is a condition to the deal, and they are advised that Messrs. Felder, Donini, Lowitt, Gelband, and Lee are included.

Mr. Russo asked for a motion to approve this transaction in principle with authority delegated to appropriate officers to negotiate final terms and report back to the Executive Committee of the Board of Directors of the Corporation for final approval of the transaction.

Mr. Roberts summarized the Board approvals being requested as follows: the approval of the transaction with Barclays, the execution of documents and the taking of actions in connection with the outline presented that day, and the retention of Lazard on terms to be negotiated by management. After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of DIP Facility

**WHEREAS**, it is proposed that Lehman Brothers Holdings Inc. ("LBHI") enter into (i) a Debtor-in-Possession Credit Agreement for up to $500 million, to be dated on or about the date hereof (the "DIP Facility"), by and between, LBHI and Barclays Bank PLC (the "Agent"), (ii) a Pledge Agreement, to be dated on or about the date hereof (the "Pledge Agreement"), relating to LBHI's equity interest in the business of Neuberger & Berman by and between LBHI and the Agent, and (iii) all other documents, instruments and certificates required or appropriate in connection with execution, delivery or performance of such agreements (the items referred to in the foregoing clauses (i) - (iii) being individually a "Loan Document" and collectively, the "Loan Documents"), substantially on the material terms described to the Board of Directors by its legal counsel, Weil, Gotshal & Manges LLP ("Weil"), including a final maturity of the earlier of six months and the closing of the sale of the investment management division; now, therefore, be it

**RESOLVED** that (i) the execution, delivery and performance of the Loan Documents, substantially on the material terms described to the Board of Directors by Weil, on the date hereof, to provide debtor-in-possession financing in such aggregate principal amounts as so described, are authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of each of the Loan Documents is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter into each of the Loan Documents and consummate the transactions contemplated thereby; and further

**RESOLVED** that each of the Chief Executive Officer, the Chief Financial Officer, the Chief Restructuring Officer, the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary, any Assistant Secretary and any other person designated and so authorized to act (each, an "Authorized Officer") of LBHI is, individually authorized, empowered and directed, in the name and on behalf of LBHI to perform such acts and deeds and to negotiate, prepare, execute and deliver the Loan Documents substantially in accordance with the material terms described to the Board of Directors by its legal counsel, Weil, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and delivery thereof; and further

**RESOLVED** that each Authorized Officer of LBHI is individually authorized, empowered and directed to take such additional action from time to time and execute, certify, deliver, file and record with the appropriate judicial, public and governmental authorities or any other persons or entities from time to time such additional documents, instruments and agreements, including, without limitation, Uniform Commercial Code financing statements, intellectual property recordations, and any amendment, extension, waiver or consent in connection with the Loan Documents, as any such Authorized Officer may deem appropriate or desirable to implement the provisions and carry out the purposes of the foregoing resolutions and the Loan Documents authorized and approved thereby, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such action to be the conclusive evidence of the authority therefor granted.

## Authorization of Asset Purchase Agreement

**WHEREAS**, it is proposed that Lehman Brothers Inc. ("LBI") sell substantially all of the assets comprising its U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant, and that LBHI sell its assets primarily related to the conduct of such businesses and cause its appropriate subsidiaries to sell the headquarters building of LBHI and LBI at 745 Seventh Avenue and other real estate assets related to such businesses, pursuant to an Asset Purchase Agreement, to be dated on or about the date hereof (the "Asset Purchase Agreement") by and among Barclays Capital Inc. ("BarCap"), LBHI, LBI and LB 745 LLC; now, therefore, be it

6

**RESOLVED** that (i) the execution, delivery and performance of the Asset Purchase Agreement, substantially on the material terms described to the Board of Directors by its legal counsel, Weil and Simpson, Thacher & Bartlett LLP ("Simpson" and together with Weil, "Counsel"), on the date hereof, to sell the assets described above is authorized and approved in every respect, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Asset Purchase Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Asset Purchase Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Asset Purchase Agreement substantially in accordance with the material terms described to the Board of Directors by Counsel, on the date hereof, with such changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

## Authorization of Retention of Lazard by LBHI

**WHEREAS,** it is proposed that LBHI, in conjunction with entering into the Asset Purchase Agreement and the Loan Documents as described herein, enter into a financial advisory agreement to be dated on or about September 16, 2008 (the "Financial Advisory Agreement") between LBHI and Lazard Ltd. ("Lazard") whereby, among other things, Lazard will serve as LBHI's financial advisor in connection with, and provide certain valuation services with respect to, the restructuring of LBHI's business; now, therefore, be it

**RESOLVED** that (i) Lazard be engaged by the Corporation to serve as its financial advisor pursuant to the Financial Advisory Agreement to be negotiated by Authorized Officers of the Corporation, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Financial Advisory Agreement is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Financial Advisory Agreement and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Financial Advisory Agreement with such terms, conditions, changes, additions and modifications thereto as such

Authorized Officer shall consider necessary or appropriate, the authority therefore to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

### General Authority and Ratification of Past Actions for LBHI

**RESOLVED** that other appropriate officers of LBHI designated by the Authorized Officers of LBHI, respectively, are authorized to execute, or join in the execution of, agreements, documents and instruments on behalf of LBHI, respectively, to attest or deliver certificates on behalf of LBHI and to take such additional action on behalf of LBHI as the Authorized Officers of LBHI may deem appropriate or desirable, relating to any document that the Authorized Officers of LBHI have been authorized to execute on behalf of LBHI pursuant to the foregoing resolutions and to perform and carry out the purposes of the Loan Documents, the Asset Purchase Agreement, the Engagement Letter (as hereinafter defined) and the Financial Advisory Agreement, the execution, certification, delivery, filing and recording of such agreements, documents and instruments and the taking of such additional action to be the conclusive evidence of the authority therefor granted; and further

**RESOLVED** that the authority given hereunder is retroactive and any and all acts relating to the subject matter of the foregoing resolutions performed prior to the passage of the foregoing resolutions by any of the officers of LBHI are ratified, confirmed and approved in all respects.

Mr. Shafir updated the Directors on the potential sale of IMD, stating that Bain Capital and Hellman & Friedman may together purchase a 100% interest in IMD. He reported that negotiations have commenced, that final due diligence is underway, and that Private Equity will probably be excluded from the transaction. He reported that the IMD business is deteriorating, given the current situation. Messrs. Shafir and Ridings then left the meeting.

### APPROVAL OF THE RETENTION OF ALVAREZ & MARSAL

Mr. Russo stated that the next agenda item was for the Board of Directors of the Corporation to consider the engagement of Alvarez & Marsal as Restructuring Advisor, including the election of Mr. Bryan Marsal as Chief Restructuring Officer of the Corporation. Ms. Fife of Weil, Gotshal & Manges presented to the Board of the Corporation and described that it is very common in Chapter 11 cases to hire chief restructuring officers to prepare restructuring plans and budgets, and to deal with the bankruptcy case generally, leaving the Corporation's employees the time to operate the business. Ms. Fife reported that Weil, Gotshal & Manges has previously worked with Alvarez & Marsal and with Mr. Marsal, and that Mr. Marsal was interviewed yesterday by Mr. Russo. The Directors of the Corporation asked questions regarding the

8

compensation which would be paid, and were advised that it would be based on hourly fees comparable to a law firm. The Directors of the Corporation asked about the amount of time the Corporation will be in Chapter 11 proceedings and the possibility of there being residual value for the Corporation's stockholders. Mr. Levander asked Ms. Fife to speak about Alvarez & Marsal, including their reputation, their competitors, and potential conflicts with the Firm. Ms. Fife reported that Alvarez & Marsal is one of the two leading firms in this area, very highly regarded and very experienced. She stated that Weil, Gotshal & Manges recommends them very highly. Ms. Fife stated that the retention of Alvarez & Marsal would require approval by the Bankruptcy Court, and that the Bankruptcy Court will require that Alvarez & Marsal be free of conflicts. Mr. Levander stated that he holds a high opinion of Alvarez & Marsal as well. After discussion, upon motion duly made and seconded, it was unanimously resolved

### Authorization of Engagement Letter

**WHEREAS**, it is proposed that LBHI enter into an engagement letter to be dated on or about the date hereof (the "Engagement Letter") between LBHI and Alvarez & Marsal North America, LLC ("A&M") whereby, among other things, A&M will serve as LBHI's Restructuring Advisor, subject to such approval by the U.S. Bankruptcy Court for the Southern District of New York of the retention of A&M as may be required by law; now, therefore, be it

**RESOLVED** that (i) A&M be engaged by the Corporation to serve as its restructuring advisor pursuant to the Engagement Letter to be negotiated by Authorized Officers of the Corporation, (ii) each transaction effected or to be effected pursuant to the terms and provisions of the Engagement Letter is authorized and approved in every respect as being in the best interest of LBHI, and (iii) LBHI shall enter the Engagement Letter and consummate the transactions contemplated thereby; and further

**RESOLVED** that each Authorized Officer of LBHI is, individually, authorized, empowered and directed, in the name and on behalf of LBHI, to perform such acts and deeds and to negotiate, prepare, execute and deliver the Engagement Letter with such terms, conditions, changes, additions and modifications thereto as such Authorized Officer shall deem necessary or appropriate, the authority therefor to be conclusively evidenced by such Authorized Officer's execution and deliver thereof.

### Authorization of Retention of Bryan Marsal

**WHEREAS**, it is proposed that LBHI, in accordance with Article V, Section 21 of its By-Laws, retain and appoint Bryan P. Marsal of A&M as its Chief Restructuring Officer; now, therefore, be it

9

**RESOLVED** that Bryan P. Marsal be, and hereby is, appointed, effective immediately, to serve as the Chief Restructuring Officer of LBHI, having in such capacity the rank of Executive Vice President and authority and supervision over the restructuring of the business, operations, finances and activities of LBHI and its subsidiaries, including, without limitation, the sale of assets of LBHI and its subsidiaries, to serve as such until his successor is elected or appointed and qualified or, if earlier, until his death, resignation or removal from office.

Mr. Russo then reviewed the timeline for that morning.

There being no further business to come before the meeting, the meeting was, upon motion duly made and seconded, adjourned.

Respectfully submitted,

*Jeffrey A. Welikson*

Jeffrey A. Welikson
Secretary of the Meeting

10

# A. 40

**From:**   Syal, Vivek: Finance (LDN)
**Sent:**   Tue, 16 Sep 2008 14:14:25 GMT
**To:**   Romain, Gary: Finance (LDN)
**CC:**   Drexler, Michael: Planning (LDN); Haworth, Richard: Barclays Capital (LDN); Clackson, Patrick: Finance (LDN); Walker, James: Finance (NYK)
**Subject:** FW: Long Island Balance Sheet

---

Gary - I believe you are the man in the know......further to Bill's note below, do we have a final agreed set of assets, liabilities, consideration and goodwill numbers yet? Also pls confirm final treatment of real estate properties, per Bill's final paragraph.

I understand you will be feeding any changes though to Bill, when you have done so please let me/Richard Haworth know so we can incorporate into relevant downstream deliverables.

I am not at my desk and my mobile is probably the best way to get in touch with me (+44 7966 262 939).

Regards,

Viv

---

**From:**   Castell, Bill:
**Sent:**   16 September 2008 14:46
**To:**   Stone, Jonathan: Barclays Treasury (LDN); Haworth, Richard: Barclays Capital (LDN); Fowden, Rupert: Barclays Treasury (LDN); Syal, Vivek: Finance (LDN); Jones, Stephen: IBD (LDN); Kohler, Reto: Planning (NYK)

**Cc:**   Clackson, Patrick: Finance (LDN); Walker, James: Finance (NYK); Romain, Gary: Finance (LDN); Baker, Joanna: ; Meredith-Jones, Daniel: ; Ball, Warwick: ; McKay, Darren: ; Trevelyan, James: ; Thorburn, Harry: ; Sieh, Tim: ; Dennis, John:

**Subject:**   Long Island Balance Sheet

Following the numerous emails on people trying to reconcile the £75.3bn in the board deck and in particular wanting to understand the £19.9bn in the board deck I thought it best to outline what I understand to be the latest position. Having spoken to Gary I understand that as a result of current negotiations on the legal documentation there is a possibility that the numbers below may change but I understand these were the basis for the $3bn negative goodwill.

All figures in $bn

**FV INVENTORY**

|  | Gross | Net | |
|---|---|---|---|
| Mortgage | 3.25 | (0.50) | 2.75 |
| Corporate Debt | 20.00 | (1.50) | 18.50 |
| Government | 35.00 | (0.10) | 34.90 |
| Agencies | 4.00 | (0.10) | 3.90 |
| SUBTOTAL | 62.25 | (2.20) | 60.05 |



EXHIBIT

392A

9/10/09

```
Minus        (1.50)  (0.00)  (1.50)*
TOTAL         60.75  (0.00)  58.55
```

*Unallocated deduction – not assigned to a specific asset class

```
Cash                    1.30
Match Book                    10.00
7 Avenue Office                1.00
Other                   1.20
(Fixed Assets, F&F etc)
```

**TOTAL ASSETS        72.05**

```
Short Positions        (56.00)
Match Book             (10.00)
Bonus Accrual           (1.30)
External funding              (0.20)
```

**TOTAL LIABILITIES        (67.5)**

**NET ASSETS        4.55**

**CONSIDERATION        1.55**

**NEGATIVE GOODWILL        3.00 (Pre-tax)**

Please note that when the board deck refers to $3.00bn negative equity it refers to a consideration of $250m. However this consideration as I understand it did not cover the real estate properties which when included increases the consideration to $1.55bn for a NAV of $4.55bn.

Kind regards,

Bill

_____

**Bill Castell**
Assistant Director
Barclays Corporate Development
29th Floor, One Churchill Place, London, E14 5HP
Tel:  +44 (0) 20 7116 9902
Fax:  +44 (0) 20 7116 7706
Mob: +44 (0) 781 000 0598
e-mail: bill.castell@barclays.com

# A. 41



SEP-18-2008  10:5?   WEIL GOTSHAL AND MANGES                        P.01/01

9/16/2008
11:18 AM

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Gov & Ag | $40.0 | ST Borrowings | 90.0 |
| Commercial Paper | 1.1 | Gov & Ag | 21.0 |
| Mortgages | 2.7 | Commercial Paper | 0.0 |
| Total Corp Debt | 4.9 | Mortgages | 0.0 |
| Corp Equity | 8.8 | Corp Debt | 2.1 |
| Derivatives | 4.5 | Corp Equities | 6.3 |
| Cash | 0.7 | Derivatives | 4.5 |
| Total | $62.7 | Total | $33.9 |
| Collateralized ST Agr | 10.0 | Collateralized ST Fund | 34.5 |
| Receivables | 0.0 | Payables | 0.0 |
| Other Assets | 0.0 | Deposits | 0.0 |
| Inv In Con Subs | 0.0 | Due To Subs | 0.0 |
| Due From Subs | 0.0 | Sub Notes | 0.0 |
| Total | 10.0 | Total | 34.5 |
| | | Total | 68.4 |
| | | Cure pmt | 2.25 |
| | | Comp | .20 |
| Adj. Total Assets | $72.65 | Total | $72.65 |

Δ π EXHIBIT ///03
Deponent __Cox__
Date 9/16/08 Rptr. KK
WWW.DEPOBOOK.COM

TOTAL  P.01

SEP-18-2008  10:53       WEIL GOTSHAL AND MANGES                    P.01/01

9/16/2008
11:18 AM

*9/16/08 – Pzwac*

*SB*

## ASSETS

| | |
|---|---|
| Gov & Ag | $40.0 |
| Commercial Paper | 1.1 |
| Mortgages | 2.7 |
| Total Corp Debt | 4.9 |
| Corp Equity | 8.8 |
| Derivatives | 4.5 |
| Cash | 0.7 |
| **Total** | **$62.7** |
| Collateralized ST Agr | 10.0 |
| Receivables | 0.0 |
| Other Assets | 0.0 |
| Inv In Con Subs | 0.0 |
| Due From Subs | 0.0 |
| **Total** | **10.0** |
| **Adj. Total Assets** | **$72.65** |

## LIABILITIES

| | |
|---|---|
| ST Borrowings | $50.0 |
| Gov & Ag | 21.0 |
| Commercial Paper | 0.0 |
| Mortgages | 0.0 |
| Corp Debt | 2.1 |
| Corp Equities | 6.3 |
| Derivatives | 4.5 |
| **Total** | **$33.9** |
| Collateralized ST Fund | 34.5 |
| Payables | 0.0 |
| Deposits | 0.0 |
| Due To Subs | 0.0 |
| Sub Notes | 0.0 |
| **Total** | **34.5** |
| **Total** | **68.4** |
| Cure pmt | 2.25 |
| Comp | .20 |
| **Total** | **$72.65** |

TOTAL  P.01

Highly Confidential

BCI-EX-00115899

*FINAL*

9/16/2008
11:18 AM

## ASSETS

| | |
|---|---:|
| Gov & Ag | $40.0 |
| Commercial Paper | 1.1 |
| Mortgages | 2.7 |
| Total Corp Debt | 4.9 |
| Corp Equity | 8.8 |
| Derivatives | 4.5 |
| Cash | 0.7 |
| **Total** | **$62.7** |
| Collateralized ST Agr | 10.0 |
| Receivables | 0.0 |
| Other Assets | 0.0 |
| Inv In Con Subs | 0.0 |
| Due From Subs | 0.0 |
| **Total** | **10.0** |
| **Adj. Total Assets** | **$72.65** |

-.500
72.15

## LIABILITIES

| | |
|---|---:|
| ST Borrowings | $0.0 |
| Gov & Ag | 21.0 |
| Commercial Paper | 0.0 |
| Mortgages | 0.0 |
| Corp Debt | 2.1 |
| Corp Equities | 6.3 |
| Derivatives | 4.5 |
| **Total** | **$33.9** |
| Collateralized ST Fund | 34.5 |
| Payables | 0.0 |
| Deposits | 0.0 |
| Due To Subs | 0.0 |
| Sub Notes | 0.0 |
| **Total** | **34.5** |
| **Total** | **68.4** |
| Cure pmt | 2.25 |
| Comp | 2.0 |
| **Total** | **$72.65** |

4/12-1338  Fleet

Highly Confidential

BCI-EX-00115900