# A. 81

**To:**     McDade, Bart[bmcdade@lehman.com]
**From:**           Kirk, Alex
**Sent:**           Fri 9/19/2008 8:09:17 PM
**Subject:**       Re: Box
**Categories:**   urn:content-classes:message

Not being bought by barclays but we don't know if they remain at lbi I assume they have all been bought in

----- Original Message -----
From: McDade, Bart
To: Kirk, Alex
Sent: Fri Sep 19 16:06:41 2008
Subject: Re: Box

Are the shorts all gone?
-----------

----- Original Message -----
From: Kirk, Alex
To: McDade, Bart
Sent: Fri Sep 19 15:39:35 2008
Subject: Box

Rich richie just told me he won't blow up this trade by being a pig.



Δ π EXHIBIT 326
Deponent KIRK
Date 8/31/09 Rptr. HK
WWW.DEPOBOOK.COM

# A. 82

**From:**         michaelklein@michaelsklein.com
**Sent:**         Saturday, September 20, 2008 2:39 AM
**To:**           Diamond, Bob: Barclays Capital
**Subject:**      Re: Lehman Brothers

Bob

Great day.

We clawed back 3B more of value in the transaction and cut the building prices by 160 mm
tonight.

But all of that pales in comparison to Barclay's share price today.

All the best
Sent via BlackBerry by AT&T

-----Original Message-----
From: <bob.diamond@barclayscapital.com>

Date: Sat, 20 Sep 2008 06:12:15
To: <michaelklein@michaelsklein.com>; <rich.ricci@barclayscapital.com>;
<Jerry.delmissier@barclayscapital.com>; <archie.cox@barclayscapital.com>
Subject: Re: Lehman Brothers


Yes!!!!!!

----- Original Message -----
From: michaelklein@michaelsklein.com <michaelklein@michaelsklein.com>
To: Diamond, Bob: Barclays Capital; Ricci, Rich: Barclays Capital; del Missier, Jerry:
Barclays Capital (NYK); Cox, Archie: Barclays Capital (NYK)
Sent: Sat Sep 20 05:39:03 2008
Subject: Lehman Brothers

The court has approved Barclay's acquisition of Lehman Brothers

Congratulations. A great leap forward for Barcap.

The new leader in global corporate and investment banking.

Created in record time and at an unbelievable cost.

An extraordinary team effort.

It has been an honor to work with you to get to this point.

More work still ahead around the globe.

But now the fun really begins.


Sent via BlackBerry by AT&T

1

EXHIBIT
149 A
8.14.09 AW

Highly Confidential

BCI-EX-00077823

10335693

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing.  Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP.  This email may relate to or be sent from other members of the Barclays Group.

Highly Confidential

BCI-EX-00077824

10335693

# A. 83

| | |
|---|---|
| **From:** | robert.messineo@weil.com |
| **Sent:** | Saturday, September 20, 2008 2:39 PM |
| **To:** | vlewkow@cgsh.com; dleinwand@cgsh.com |
| **Cc:** | akeller@stblaw.com; david.murgio@weil.com |
| **Subject:** | LEHMAN-- Barclays |
| **Attach:** | Current Version - Clarification Letter_#1916861.DOC;Current Version - Clarification Letter_#1916861.DOC.001 |

Here is the current version of the "clarification letter," along with a
copy marked to show the changes from last night's version.


Marked copy:


Robert L. Messineo
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone = 212-310-8835
Telecopy = 212-833-3862  - Current Version - Clarification Letter_#1916861.DOC - Current Version -
Clarification Letter_#1916861.DOC



*WGM Final – September 20, 2008  am*

# BARCLAYS CAPITAL INC.

September 21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter.  Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

(i)    the items set forth in clauses (b), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets";

(ii)    plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barlcays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates (it being understood that Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

1

NY2:\1916861\10\1532506\DOC\73683.1037

IFIDENTIAL

BCI-CG00024253

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA;

(iv)    the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

(v)    all prime brokerage accounts and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties include Intellectual Property Rights, Software and Technology, wherever in the world held by LBHI or any of its Subsidiaries, that are primarily used or necessary for the operation of the Business.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business.

(c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries. The following shall also be Excluded Assets: All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement. Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries. For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets). The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Section 1.1(h) of the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and the Business includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by employees to Seller or its Affiliates.

2

CONFIDENTIAL

BCI-CG00024254

The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the PIM Business in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). Excluded Liabilities shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser after the Closing in connection with the Business. Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities" assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

6.    Hedges on Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

3

NFIDENTIAL

7.      Subordinated Notes of LBI.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

8.      Breakup Fee.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.      DTC Arrangements.  Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.      Deletion of Purchase Price Adjustment and Holdback Provisions.  Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.  Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect *ab initio*.

10.      Payables, Deposits and Receivables.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

11.      Intercompany Obligations.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12.      Schedule 12.3.  Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13.      Barclays Repurchase Agreement.  At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

14.      Risk of Loss of Artwork.  During such period the Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

4

CONFIDENTIAL

)

15.    Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16.    Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)    With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that any such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and

5

BCI-CG00024257

Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred

6

CONFIDENTIAL

BCI-CG0002425%

Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

22.    PIM Business Leases. Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser. Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease. With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets. All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time. No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to

7

IFIDENTIAL

permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller not Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

CONFIDENTIAL

BCI-CG0002426

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:


NY2:\1916861\13\15325131.DOC\73683.1037

IFIDENTIAL

*WGM ~~Draft~~ Final – September ~~19,~~20, 2008 ~~7:30 pm~~ am*

)

# BARCLAYS CAPITAL INC.

September ~~—~~21, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

Ladies and Gentlemen:

Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (as previously amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser").  Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Agreement.  This letter agreement clarifies the intention of the parties with respect to certain provisions of the Agreement ~~and,~~ supplements in certain respects the agreements of the parties stated therein and ~~shall amend~~amends the Agreement ~~to the extent necessary so as~~in certain respect and to be consistent with this provisions of this letter, and is binding on the parties hereto upon its execution and delivery.

1.    Purchased Assets; Excluded Assets.

(a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets)~~, including~~ and (ii) none of the assets of Subsidiaries of LBHI (other than LBI as a Subsidiary of LBHI) except as otherwise specifically provided in the Agreement or the Letter.  Other than with respect to an Excluded Asset, the Purchased Assets shall include, without limitation:

(i)    the items set forth in clauses (a~~b~~), (c) and (g) through (o) and (q) through (s) of the definition of "Purchased Assets~~," plus, with respect to securities owned by LBI, shall also include municipal securities, residential mortgage securities and other securities of which a summary description, by category, is reflected in Exhibit A hereto;~~ ".

(ii)    plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barlcays Repurchase Agreement (as defined above0, as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates or (B) such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule

1

NY2:\1916861\10\1532506!.DOC\73683.1037

FIDENTIAL

BCI-CG00024262

previously delivered by Seller to Purchaser or its Affiliates (it being understood that ~~the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion.  The categories of securities included among the "Purchased Assets" include only securities in such categories owned by LBI and not any other Affiliate of LBI and, with respect to collateralized short-term agreements, only those collateralized short-term agreements relating to short positions of LBI.  Also included in the Purchased Assets are (a)~~ Purchaser in its discretion may select to receive all such securities); it being also understood that no securities owned by LBHI or any Subsidiary are Purchased Assets;

      (iii)   the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA~~-~~;

      (~~b~~iv)   the government securities trading and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller); and

      (~~c~~v)   all prime brokerage accounts~~,~~ and repurchase agreement and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business), subject, however, to the provisions of Section 2.5 of the Agreement to the extent any executory contract may be considered included therein.

Subject to Paragraph 22 of this Letter, Purchased Intellectual Properties ~~includes~~include Intellectual Property Rights, Software and Technology, wherever in the world held by ~~Holdings~~LBHI or any of its Subsidiaries, that are primarily used or necessary for the ~~conduct by Purchaser~~operation of the Business.

      (b)   For the avoidance of doubt, the "Business" includes LBI's commodities business.

      (~~b~~c)   The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a) and (c) through (j) and (l) through (q) of the definition of "Excluded Assets" and, except as otherwise provided below, any cash, cash equivalents, bank deposits or similar cash items of ~~LBHI~~Seller and its Subsidiaries.  The following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement ~~(as hereinafter defined)~~.  Also included in the Excluded Assets are ~~(a)~~ the mortgage servicing rights for Ginnie Mae guaranteed securities ~~and (b) all assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration, except as notified by the administrator to LBI from time to time~~.  Included in clause (h) of the definition of "Excluded Assets" are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC,  are Excluded Assets (rather than Purchased Assets).  The reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller.  Section 1.1(h) of

2

CONFIDENTIAL

BCI-CG00024263

the definition of Excluded Liabilities is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

2.    IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business, and ~~Purchased Assets and~~ the Business ~~include~~includes the private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") and the Purchased Assets include the assets of the Seller used primarily in or necessary for the operation of the PIM Business, but not the forgivable notes issued by employees to Seller or its Affiliates. The employees of PIM of the Closing Date shall become Transferred Employees. For the avoidance of doubt, Purchaser's obligations pursuant to Section 9.1(c) of the Agreement did not contemplate the additional Transferred Employees that result from the inclusion of the ~~private investment management business of Seller (the "PIM Business")~~ in the pool of Transferred Employees. Accordingly, Purchaser shall increase the amount available to be awarded as bonuses to Transferred Employees to take into account the addition of the Transferred Employees of the PIM Business. The Transferred Employees of the PIM Business will be treated in a manner consistent with the principles set forth in Section 9.1(c). ~~The Purchased Assets include forgivable notes issued by the Transferred Employees of the PIM Business to Seller ("PIM Employee Notes"). [Purchaser agrees to pay any proceeds it receives in respect of such PIM Employee Notes to Seller if and when received. After the date hereof, Purchaser and Seller agree to negotiate in good faith to determine whether an alternative means of addressing the PIM Employee Notes is preferable and agree, to the extent necessary, to jointly seek Bankruptcy Court approval of any such alternative means.]~~ Excluded Liabilities shall include any pre-closing legal tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.    Assumed Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser~~,~~ after the Closing~~,~~ in connection with the Business. ~~Nothing in this Paragraph 3 is intended to modify Section 8.12 of the Agreement~~ ~~[and~~Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities~~."]~~" assumed by Purchaser.

4.    Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue, the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission and, accordingly, the Cash Amount shall be $1,540,000,000. In light of the other provisions provided herein, the Cash Amount shall not be subject to adjustment under Section 3.3.

5.    License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller

3

NFIDENTIAL

BCI-CG00024264

and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any other businessesbusiness of Seller and its Subsidiaries, in each case solely for use by such Subsidiaries or purchaser in connection with the winding up of any such businessesbusiness.

5-6.    Hedges on Long Positions. The Purchased Assets and Assumed Liabilities include hedges placed on the Long Positions that are entered into after the date of the Agreement and before Closing, but will not include any other types of hedges or derivatives (it being understood that exchange-traded derivatives as specified in clause (d) of the definition of "Purchased Assets" are included in Long Positions, but TBA mortgage-backed securities and any over-the-counter derivatives, such as spot and forward currency contracts, are excluded). The reference to "government securities" in the definition of Long Positions includes securities of any government agency.

6-7.    Subordinated Notes of LBI. The outstanding subordinated notes of LBI and the proceeds thereof are not Assumed Liabilities or Purchased Assets, and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

7-8.    Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

8.    Certain Cash Proceeds.    Any cash amount received from closing out Long Positions, less the cash amount expended to close out Short Positions, before the Closing, shall be delivered to Purchaser.

8.    DTC Arrangements. Upon the Closing, Purchaser shall assume all of the rights and obligations under LBI's arrangements with the Depository Trust Clearing Corporation, including all settlement obligations and related rights thereunder.

9.    Deletion of Purchase Price Adjustment and Holdback Provisions. Section 3.3 of the Agreement is hereby deleted in its entirety and shall be of no effect ab initio. Section 4 of the First Amendment to the Asset Purchase Agreement, dated September 19, 2008, is hereby deleted in its entirety and shall be of no effect ab initio.

10.    Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

10-11. Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations,

4

CONFIDENTIAL

respectively, of Seller or its Subsidiaries or between or among any Seller orand any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

11.12. Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

12.13. Barclays Repurchase Agreement. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, [and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates,] from their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "Barclays Repurchase Agreement").

13.14. Risk of Loss of Artwork. During such period thatthe Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

14.15. Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

15.16. Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a)     As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by SellerLBHI or LBI in connection with theits bankruptcy proceedingsproceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

(b)     With respect to each Sublease Property, Seller and Purchaser shall, within a commercially reasonable period of time following the Closing Date, negotiate in good

5

faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, pursuant to which a portion of the demised premises under such underlying lease (such portion of the premises to be agreed upon by the parties) shall be subleased to (A) with respect to the SF Property, the Purchaser, and (B) with respect to the LA Property, Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of Seller) or any person who purchases the IMD Business (provided that the entityany such purchaser entering into the sublease agreement as a subtenant shall be reasonably acceptable to the Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and the tenant under such sublease being referred to as the "Subtenant"), in each case, upon such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided that (1) the Subtenant shall pay rent and other charges under such sublease agreement equal to its proportionate share of the rent and other charges payable by the Sublandlord to the landlord under the underlying lease (which proportionate share shall be based upon the relative square footage of the subleased space in proportion to the square footage of the overall demised space under the underlying lease), (2) the term of the sublease agreement shall be a period commencing on the Closing Date and ending on the day immediately preceding the expiration date of the underlying lease (as the same may be extended pursuant to the terms of the underlying lease), (3) any alterations or modifications which the Sublandlord and Subtenant mutually agree need to be made to the demised premises in order to segregate the subleased space from the remainder of the demised premises under the underlying lease shall be performed by the Sublandlord and the cost thereof (including the cost of any plans and specifications, drawings, permits, licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and Subtenant in proportion to the square footage of their respective spaces. Prior to the execution and delivery of the sublease agreement for a particular Sublease Property, subject to reasonable premises security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, and for a commercially reasonable period after the Closing Date, (i) with respect to the SF Property, to the extent that Transferred Employees occupied any portion of the SF Property prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use the SF Property to the same extent and for the same purposes as the SF Property was occupied by such Transferred Employees prior to the Closing; provided, that the foregoing shall be subject to Purchaser's ability to substitute a substantially similar number of new employees of Purchaser for any such Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each Sublease Property other than the SF Property, to the extent that Excluded Employees occupied any portion of such Sublease Property prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such Sublease Property to the same extent and for the same purposes as such Sublease Property was occupied by such Excluded Employees prior to the Closing; provided, that the foregoing shall be subject to Seller's ability to substitute a substantially similar number of new employees of Seller for any such Excluded Employees as provided in Paragraph 18 below. In each case described in clauses (i) and (ii) above, no rent or other payments shall be made to the party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing

6

)

Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

     (c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

     16. 17.    Deferred Transfers. Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

     17. 18.    745 Seventh Avenue. The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of its Affiliate will be fully repaid and extinguished.

     18. 19.    Prorations. Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

     19. 20.    Schedules. Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

     20. 21.    Definition of Excluded Contract. As used in the Agreement, the term "Excluded Contract" shall not include swap agreements include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

7

21 22.  PIM Business Leases.  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "PIM Leases"). At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

23.    No Overseas Assets.  All assets and rights of the Lehman companies (other than Seller or 745) that have or do come under governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time.  No assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that, to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

This letter agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state.  This letter agreement may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

8

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

IFIDENTIAL

BCI-CG00024270

Document comparison done by DeltaView on Saturday, September 20, 2008 2:31:22 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1916861/11 |
| Document 2 | pcdocs://ny2/1916861/13 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 85 |
| Deletions | 66 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 157 |

CONFIDENTIAL

# A. 84

| From: | Azerad, Robert [RAzerad@lehman.com]. | Sent:9/20/2008 10:34 AM. |
|---|---|---|
| To: | Tonucci, Paolo [paolo.tonucci@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; Blackwell, Alastair [ablackwe@lehman.com]; Beldner, Brett [brett.beldner@lehman.com]. | |
| Cc: | Stewart, Marie [marie.stewart@lehman.com]; Reilly, Gerard [greilly@lehman.com]; Veksler, Irina [irina.veksler@lehman.com]; Fleming, Dan (TSY) [dfleming@lehman.com]. | |
| Bcc: | . | |

Subject: RE: Opening balance sheet.

Details of the 15c3 (both customer and PAIB). Don't have the details on
how it was locked up (cash vs. securities) but this should not make a
difference from an accounting standpoint hopefully.

Robert

-----Original Message-----
From: Tonucci, Paolo
Sent: Saturday, September 20, 2008 10:31 AM
To: Azerad, Robert; Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; Fleming, Dan (TSY)
Subject: RE: Opening balance sheet

We also need to add the 15c3 cash as a receivable.

Dan,

The collateral that was locked up for 15c3 needs to be transferred over
the Barclays. How is that done? Has that already been moved with the
customer collateral?

-----Original Message-----
From: Azerad, Robert
Sent: 20 September 2008 10:27
To: Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Tonucci, Paolo; Veksler, Irina
Subject: RE: Opening balance sheet

Classification of the assets by asset class should be done by EOD today
assuming that what was transferred was:

1) Repo with Barclays as of Thursday night ($49 billion - $42 billion of
securities and $7 billion of cash)
2) Non-actionable box as shown to Barclays on Friday afternoon ($1.9
billion of collateral). Actual box is slightly bigger because it also
contains Lehman debt

Robert

PS: Prices will be per the repo file sent by Ops on Friday morning and
per the box report as of Friday morning.

-----Original Message-----
From: Kelly, Martin
Sent: Saturday, September 20, 2008 9:36 AM
To: Azerad, Robert; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Tonucci, Paolo
Subject: Opening balance sheet

EXHIBIT
151A
8.14.09 AW

Barclays (James Walker) called this am. They want an "opening balance sheet" today. 3 pieces to this. (1) Robert - do you have the final list of assets under the repo which they took possession of - need by gaap asset class versus the financing. Could you please assemble in a file which can be sent direct back to barclays (2) did we end up transferring the shorts and related reverse repo? If so, Robert/Alistair who has that list, were tickets booked for this etc.same as above need a list to be emailed back (3) Brett - could you please update the summary BS once we have this information later in the day.

I think we need to deliver back to narclays the simple BS together with inventory list and possibly shorts/reverses depending on what was done with this. Robert - could you please compile and coordinate with brett around BS.

Please give me ETA so I can update James at Barclays.

Thx - M

----------------------------------

*FINAL*

*Lehman Brothers Inc.*
*Customer/PAIB Reserve Analysis*

| Customer: | 09/17/08 | 09/16/08 | Variance | 3 Month Avg |
|---|---|---|---|---|
| **MTS** | | | | |
| Free Credits | 77,216 | 85,126 | (7,911) | 31,115 |
| SCS Cash | 46,462 | 62,778 | (16,316) | 393,585 |
| Option Margin | 15,824 | 12,105 | 3,719 | 63,353 |
| P & I | 22,858 | 22,253 | 605 | 22,809 |
| Aged Fails and Partly Secured Debits | 7,518 | 9,847 | (2,330) | 9,538 |
| Customer Receivable Versus Box * | - | - | | (65) |
| Stock Record/P&C items | 86,809 | 49,550 | 37,259 | 33,719 |
| Overdrafts | - | 69,484 | (69,484) | 45,935 |
| Unapplied Cash / Suspense | 31,677 | 123,215 | (91,538) | 55,468 |
| 3% ADI | 216,477 | 295,389 | (78,911) | 35,950 |
| Sub-total | 504,841 | 729,747 | (224,906) | 691,407 |
| **ADP** | | | | |
| Free Credits / Margin | 481,456 | 174,237 | 307,219 | 2,858,182 |
| Net Customer Financing * | (831,906) | 405,508 | (1,237,414) | (972,434) |
| OMNI Conversion Payable | - | - | | - |
| O/Drafts | 62,604 | 294,945 | (232,341) | 50,330 |
| Dividends | 5,322 | 3,648 | 1,675 | 15,695 |
| S/B L.O.C. vs. Customer Short | - | - | | - |
| S/B NQ vs. Customer Short | 5,287 | 6,981 | (1,694) | 14,152 |
| Non-Broker Dealer Affil. | 290,539 | 211,676 | 78,863 | 149,720 |
| OCC Proprietary Qualified Collateral | (349,858) | (487,071) | 137,213 | (831,762) |
| Firm Bank Loan - Firm Not Long | - | - | | - |
| Suspense | 39,897 | 39,897 | - | 14,203 |
| Unapplied Cash | 10,121 | 18,307 | (8,185) | 9,642 |
| Abandoned Property / Soft Dollars ($42 mil) | 85,212 | 85,212 | - | 81,066 |
| Other | 82,685 | 50,271 | 32,414 | 22,382 |
| 3% ADI | 322,692 | 321,529 | 1,163 | 132,964 |
| Sub-total | 204,052 | 1,125,139 | (921,087) | 1,544,142 |
| **ITS** | | | | |
| Free Credits (primarily SCS cash) | 160,575 | 344,517 | (183,943) | 1,234,634 |
| Unsecured Shorts | 77,639 | 77,639 | - | 60,336 |
| Securities Related IC Payable (Mostly ITS) | 189,086 | 189,086 | - | 133,470 |
| Other | - | - | | - |
| 3% ADI | 178,711 | 142,950 | 35,762 | 24,315 |
| Sub-total | 606,011 | 754,192 | (148,181) | 1,452,756 |
| **Commodities** | | | | |
| O/Drafts | 176,487 | 97,367 | 79,120 | 54,728 |
| Non-Reg Commodity Credits | 52,000 | 52,000 | - | 106,668 |
| Sub-total | 228,487 | 149,367 | 79,120 | 161,396 |
| Requirement | 1,543,392 | 2,758,446 | (1,215,054) | 3,849,701 |
| Cushion (plus 2% deduction) | 225,608 | 10,554 | 215,054 | 332,154 |
| Amount Segregated | 1,769,000 | 2,769,000 | (1,000,000) | 4,181,855 |
| **PAIB:** | | | | |
| Net PAIB Debits/Credits | 325,286 | 350,949 | (25,663) | 1,245,733 |
| Bank Loan | 3,560 | 9,509 | (5,949) | 719 |
| Stock Loan | 312,247 | 338,880 | (26,633) | 171,674 |
| F/R Vs PAIB Long | 31,031 | 23,095 | 7,936 | 1,147 |
| Firm Short vs. PAIB Long | 394,506 | 350,157 | 44,349 | 130,203 |
| Stock Borrow * | (560,229) | (606,515) | 46,286 | (1,116,764) |
| Fail to Deliver | (40,281) | (21,581) | (18,700) | (2,633) |
| Requirement | 466,120 | 444,494 | 21,626 | 430,079 |
| Cushion (plus 2% deduction) | 25,880 | 15,506 | 10,374 | 111,079 |
| Amount Segregated | 492,000 | 460,000 | 32,000 | 541,158 |
| Total Segregated | 2,261,000 | 3,228,999 | (967,999) | 4,723,013 |

\* Denotes account net debit balances.

# A. 85

## Unknown

**Sent:** Sunday, March 22, 2009 3:45 AM

| | |
|---|---|
| **From:** | Tonucci, Paolo [paolo.tonucci@lehman.com] |
| **Sent:** | Saturday, September 20, 2008 3:14 PM (GMT) |
| **To:** | Reilly, Gerard [greilly@lehman.com]; Azerad, Robert [RAzerad@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; Blackwell, Alastair [ablackwe@lehman.com]; Beldner, Brett [brett.beldner@lehman.com] |
| **Cc:** | Stewart, Marie [marie.stewart@lehman.com]; Veksler, Irina [irina.veksler@lehman.com] |
| **Subject:** | RE: Opening balance sheet |

I think Robert should do summary level and send to Martin.

I think the lock up receivable should be treated as a $1 bn receivable.

The other box will need to be included in the relevant asset classes.
And the challenge for next week will be delivering both of these through
DTC or loan transfers.

This will need assistance from the lawyers.

Paolo

-----Original Message-----
From: Reilly, Gerard
Sent: 20 September 2008 11:07
To: Tonucci, Paolo; Azerad, Robert; Kelly, Martin; Blackwell, Alastair;
Beldner, Brett
Cc: Stewart, Marie; Veksler, Irina
Subject: Re: Opening balance sheet

Who can send the file to james walker?
-----------

----- Original Message -----
From: Tonucci, Paolo
To: Tonucci, Paolo; Reilly, Gerard; Azerad, Robert; Kelly, Martin;
Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Veksler, Irina
Sent: Sat Sep 20 11:02:47 2008
Subject: RE: Opening balance sheet

Apologies should have read $42.9 bn of collateral.

-----Original Message-----
From: Tonucci, Paolo
Sent: 20 September 2008 10:33
To: Reilly, Gerard; Azerad, Robert; Kelly, Martin; Blackwell, Alastair;
Beldner, Brett
Cc: Stewart, Marie; Veksler, Irina
Subject: RE: Opening balance sheet

I think the have 442.9 bn of assets and paid net $38 bn of cash.

Their opening balance sheet should also include $1.9 bn of box assets
and $1 bn of cash receivable from the release of lock ups.



EXHIBIT

145A

8.14.09  AJ

-----Original Message-----
From: Reilly, Gerard
Sent: 20 September 2008 10:30
To: Azerad, Robert; Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Tonucci, Paolo; Veksler, Irina
Subject: Re: Opening balance sheet

So they basically have 42b of assets and paid 38b of cash.  Is that how
they should think about it?
-----------

----- Original Message -----
From: Reilly, Gerard
To: Azerad, Robert; Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Tonucci, Paolo; Veksler, Irina
Sent: Sat Sep 20 10:28:05 2008
Subject: Re: Opening balance sheet

We can go with totals for now
-----------

----- Original Message -----
From: Azerad, Robert
To: Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Tonucci, Paolo; Veksler, Irina
Sent: Sat Sep 20 10:26:34 2008
Subject: RE: Opening balance sheet

Classification of the assets by asset class should be done by EOD today
assuming that what was transferred was:

1) Repo with Barclays as of Thursday night ($49 billion - $42 billion of
securities and $7 billion of cash)
2) Non-actionable box as shown to Barclays on Friday afternoon ($1.9
billion of collateral). Actual box is slightly bigger because it also
contains Lehman debt

Robert

PS: Prices will be per the repo file sent by Ops on Friday morning and
per the box report as of Friday morning.

-----Original Message-----
From: Kelly, Martin
Sent: Saturday, September 20, 2008 9:36 AM
To: Azerad, Robert; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Tonucci, Paolo
Subject: Opening balance sheet

Barclays (James Walker) called this am. They want an "opening balance
sheet" today. 3 pieces to this. (1) Robert - do you have the final list
of assets under the repo which they took possession of - need by gaap
asset class versus the financing. Could you please assemble in a file
which can be sent direct back to barclays (2) did we end up transferring
the shorts and related reverse repo? If so, Robert/Alistair who has that
list, were tickets booked for this etc.same as above need a list to be
emailed back (3) Brett - could you please update the summary BS once we
have this information later in the day.

I think we need to deliver back to narclays the simple BS together with
inventory list and possibly shorts/reverses depending on what was done
with this. Robert - could you please compile and coordinate with brett
around BS.

7/15/2009

Please give me ETA so I can update James at Barclays.

Thx - M

--------------------------------