# A. 150

# Excerpt of 9/19/08 Hearing Transcript

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 19, 2008

            4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Debtor's Motion for an Order Pursuant to Section 105

3   of the Bankruptcy Code Confirming Status of Citibank Clearing

4   Advances

5

6   HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

7   Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

8   Approve the Sale of the Purchased Assets and the Assumption and

9   Assignment of Contracts Relating to the Purchased Assets

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

47

1    going to ask that question.  So --

2           THE COURT:  I hate to be that predictable.

3           MR. MILLER:  There is a document -- maybe it'd be

4    better, Your Honor, if we do it orally.

5           THE COURT:  Fine.

6           MR. MILLER:  My partner, Ms. Fife, will do that.  And

7    with some assistance from Ms. --

8           THE COURT:  Let me just check on something because --

9    and this is purely technical.  During the first phase of the

10   hearing, I was told that those people who are listening in

11   spillover courtrooms had a very hard time hearing me.  I'm

12   having some difficulty as compared with our last hearing with

13   the amplification coming out of the podium.  And I just want to

14   make sure that we're not suffering system overload.  Okay.

15   That's on.  And let me also make the announcement, whenever

16   anyone speaks for the record, this is always true here, but

17   given the number of people, please identify yourself before

18   speaking.

19          MS. FIFE:  Thank you, Your Honor.  Lori Fife from

20   Weil Gotshal & Manges on behalf of the debtors.  Let me try to

21   summarize the changes that were made to the transaction.  In

22   terms of the economic changes, they result largely because of

23   the markets, unfortunately.  And from the time that the

24   transaction was actually entered into till now, the markets

25   dropped and the value of the securities dropped as well.

48

1    So, originally, we were selling assets that had a

2    value of seventy -- approximately seventy billion dollars.  And

3    today, Your Honor, we're only selling assets that have a value

4    of 47.4 billion dollars.

5    Barclays is assuming liabilities, however, of 45.5

6    billion dollars in connection with those assets.  So that has

7    not changed from the original transaction.  There was an upside

8    sharing in the original transaction.  There was going to be a

9    true-up twelve months later on and that has been eliminated

10   from this transaction.

11   Barclays is still agreeing to pay the cure amounts on

12   any leases that it assumes or that we assume and assign to it.

13   Barclays is also agreeing to the same employee compensation

14   arrangements.  And it is also agreeing to pay the 250 million

15   dollars of goodwill to LBI.

16   With respect to the real estate assets, Your Honor,

17   that was -- we had said at the last hearing, I believe, it was

18   approximately a billion dollars.  Since that time, an appraisal

19   has come in and it is below that amount.  The contact had a

20   provision which allowed the purchaser really to purchase the

21   building at the appraised amount.  So we have some negotiations

22   to go, but I believe that the purchase price will come down by

23   approximately a hundred million dollars.

24   There were two other real estate properties also

25   which we received appraisals for which, similarly, were lower

49

1    than we had anticipated, unfortunately.  So I think,

2    cumulatively, we're expecting that the purchase price will come

3    down by a hundred to maybe 200 million dollars for the real

4    estate.

5            Some other changes that were made to the contracts

6    affect what are called purchase assets and what are excluded

7    assets.  There was some confusion as to which subsidiaries, if

8    any, were being sold.  And we've clarified in a clarification

9    letter which we're hoping to finalize and actually present to

10   Your Honor whenever it comes down here.  But in that letter,

11   we're going to clarify that the only subsidiaries that are

12   being purchased by Barclays are Lehman Brothers Canada Inc.,

13   Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA.

14   The latter two subsidiaries that I just referred to relate to a

15   business that is called PIM, or Private Investment Management

16   Business, which is a business that was not part of the original

17   deal but is now being purchased by Barclays.

18           THE COURT:  For no additional consideration?

19           MS. FIFE:  That's correct, Your Honor.

20           THE COURT:  And what's that business worth?

21           MS. FIFE:  It's essentially just people, Your Honor.

22   It's the high net worth individual brokerage business.  And

23   it's really just the people who are in those offices.

24           THE COURT:  And their rolodexes.

25           MS. FIFE:  And their rolodexes, exactly.  The

50

1   customer accounts were being transferred anyway.

2           There was a change that was made to the license of

3   the Lehman Brothers' name.  It was perpetual.  It is now two

4   years but we don't really believe that that's a problem.  The

5   IMD business, which is essentially Neuberger Berman and some

6   other related entities, will have a perpetual license to use

7   the name.

8           There was a provision in the old agreement pursuant

9   to which the parties were sharing the residential real estate

10  mortgages.  There is no longer that provision.  Barclays was

11  required to post collateral, actually this morning, in order to

12  get DTC to open up trading.  And that collateral was posted --

13  the residential real estate mortgages was posted to DTC.

14  Pursuant to this transaction, Barclays is taking over and

15  guaranteeing all of those transactions.  And they are assuming

16  the risk related to those transactions so that collateral will

17  remain with Barclays.

18          THE COURT:  What's the aggregate value of the posted

19  collateral?

20          MS. FIFE:  One second, Your Honor.

21      (Pause)

22          MS. FIFE:  Your Honor, I'm not -- excuse me?  There

23  are 300,000 trades but we're not sure the value of the

24  collateral.  Perhaps during the rest of the hearing we can find

25  that amount out for Your Honor.

51

1     THE COURT: Okay. I'm not entirely sure I'm

2    understanding the overall impact of the change in the sharing

3    of the residential mortgage collateral and whether or not that

4    constitutes a benefit to the estate or a detriment to the

5    estate. Which do you think it is?

6     MS. FIFE: It's hard to tell. It depends on which

7    way those trades come out. But we believe it's a benefit to

8    the estate because it allowed trading to continue this morning

9    because DTC and NASDAQ were unwilling to allow Lehman to

10   continue trading without this posting of collateral which was

11   very important to the company, obviously. So we were able to

12   work out this arrangement whereby Barclays would stand behind

13   the trades. It is the debtors' belief that it's a necessary

14   part of the transaction.

15     THE COURT: Okay. And I realize I'm asking a lot of

16   questions about things that may have been fully explained when

17   I was in chambers, but Barclays' undertaking to stand behind,

18   as you put it, this posted collateral, how is that documented?

19   And what happens in the event that the transaction that we're

20   now talking about is not approved or is delayed?

21     MS. FIFE: It was documented in the First Amendment

22   to the asset purchase agreement, which we actually do have and

23   if the transaction is not consummated -- I'm actually not sure

24   of the answer, Your Honor. I'm sorry. I believe Barclays is

25   liable. Oh, okay. So, I'm advised by my partner that if the

52

1   transaction's not consummated then the transactions -- all the

2   trades come back to Lehman, and Lehman is then responsible for

3   them.  Excuse me for one second, Your Honor.

4      (Pause)

5      MS. FIFE:  I'm being told that if the liabilities are

6   less than the collateral then the excess collateral comes back

7   to Lehman.

8      THE COURT:  And if the liabilities are greater?

9      MS. FIFE:  We have no further obligation.

10      THE COURT:  Okay.

11      MS. FIFE:  We also modified the agreement -- would

12   you like the representative from DTC to explain that in more

13   detail, Your Honor?

14      THE COURT:  Mr. Hirshon, I'd be happy to hear from

15   you.

16      MR. HIRSHON:  Good afternoon, Your Honor.  Nice to be

17   before you.  Sheldon Hirshon, Proskauer Rose, representing the

18   composite -- the trust clearing corporations.  Your Honor, the

19   essence of the transaction is to move all of the accounts

20   seamlessly from Lehman to Barclays.  What DTC does is the

21   plumbing of that and handles all of the details in the settling

22   of the trades.

23      THE COURT:  Is that how they describe themselves?

24      MR. HIRSHON:  That's how I describe them because

25   until Sunday, I didn't understand any of this.  But it is what

53

1   spigots get turned on and off and how the pipeline is filled

2   and then emptied.  So each day -- there are several different

3   clearinghouses.  And each day the trades are matches and then

4   either a net number goes to Lehman or from Lehman to DTC or any

5   of its clearing companies.  There was a depository that holds

6   all of the securities.  The residential mortgages that you've

7   heard about that were going to be split fifty/fifty are in the

8   DTC registry.  We hold them now.  They are there.  Originally,

9   the idea for the original transaction was to split those

10  fifty/fifty between Barclays and the estate.  But in order to

11  facilitate the settlement of these accounts, the additional

12  fifty percent was needed so that DTC would not be at risk for

13  the settlement.  So the --

14          THE COURT:  So this modification principally is for

15  the benefit of your client?

16          MR. HIRSHON:  Correct.  And for the transaction,

17  because without it trading would have stopped.  There would be

18  no business to sell because there would have been no -- no

19  trades cleared today.  So it was to facilitate the transaction

20  as a friend to the transaction that this was done so that the

21  business continues to operate today.  Now, the arrangement is

22  that the whole six billion dollars of residential mortgages

23  will be there and subject to settlement.  But the anticipation

24  is that once all these claims settle, the trades that are from

25  Wednesday through Monday settle, there will not be a need for

54

1    all of that collateral.  So what the amendment to the APA says

2    is that the fifty percent will be returned, as long as it's

3    there.  If something really terrible happens in the world and

4    the settlements don't work and we have to use that collateral,

5    then there will be nothing to return.  But the anticipation is

6    that if the world remains somewhat stable that the fifty

7    percent that was now transferred to Barclays will be

8    transferred back to Lehman.  That is the expectation.

9        THE COURT:  All right.  I appreciate that

10   explanation.

11       One comment before you continue, Ms. Fife.  I'm just

12   once again hearing the Geiger counter.  And we are connected to

13   two extra courtrooms and I know that there are people

14   participating at various occasions by telephone through

15   CourtCall.  And I'm hearing increased static on the line.  So,

16   I'm just going to request everybody who is participating in

17   this hearing, whether by telephone or in person, who has an

18   electronic device to shut it off.  And if you're on the phone,

19   since you're just listening, please mute your phone.

20       MS. FIFE:  Thank you, Your Honor.  I'll continue

21   going through some of the changes, if that's okay.  There was a

22   provision in a deal originally which required the debtors to

23   transfer 700 million dollars in cash to Barclays.  And that is

24   no longer the case.  There's no cash that's being transferred

25   to Barclays.

55

1          In addition, there was a provision in the contract

2     where Barclays was going to purchase a company called Eagle

3     Energy Management and they are no longer going to purchase that

4     entity.

5          We clarified, because a number of creditors had some

6     concerns during the -- yesterday we had a meeting with the

7     creditors and they were asked some questions regarding

8     intercompany claims.  We made it very clear in this

9     clarification that we are not transferring any intercompany

10    payables or receivables.  Those remain with the particular

11    entities.

12         There was a reference in the agreement to a mortgage

13    that was on the 745 Seventh Avenue property.  And as it turned

14    out, Your Honor, there is no mortgage on that property.  So we

15    deleted that reference.  There was a 500 million dollar

16    promissory note made by 745 in favor of an affiliate which will

17    be repaid and extinguished.

18         Those are the major changes to the transaction.

19    There were some other clarifications that we made but I don't

20    consider them material, Your Honor.

21         THE COURT:  I still consider 500 million dollars

22    material, though.

23         MS. FIFE:  Yes.

24         THE COURT:  So, the money that's due an affiliate,

25    what affiliate is that?  And as a result of the payment, how

56

1   does that impact the overall realization to the estate?

2           MS. FIFE:  Umm --

3           THE COURT:  Maybe it doesn't.

4           MS. FIFE:  Yeah.  I don't think it does, Your Honor.

5   We still anticipate that the full purchase price will be paid

6   to 745 and then transferred up to the holding company and the

7   note will be extinguished -- I'm sorry?  Yeah.  It already has

8   been extinguished.

9           THE COURT:  Okay.

10          MS. FIFE:  Do you have any further questions, Your

11  Honor?

12          THE COURT:  I may have some as we proceed.  It's hard

13  for me to tell, based upon this helpful oral presentation, how

14  the deal has moved in terms of material changes and whether or

15  not those changes affect, in any way, the objectors and whether

16  or not these are changes that make the objectors happy or sad.

17          MS. FIFE:  Right.

18          THE COURT:  It's unclear to me at the moment because

19  I haven't had a chance to reflect on it and I don't know what

20  documents have been prepared that will clarify this.  But I'm

21  confident that as the evening progresses, I'll learn more.

22          MS. FIFE:  Yes.  We're hopeful that we'll have the

23  documents so that everyone can look at them.  And just one

24  other thing I wanted to point out to Your Honor, we are keeping

25  approximately twenty million dollars -- twenty billion dollars

57

1   of assets in LBI that are not being transferred. So those

2   assets will have value and inure to the benefit to the SIPC

3   estate. Okay?

4          THE COURT: Thank you for that.

5          MS. FIFE: I'm now going to turn it over to Mr.

6   Miller.

7          MR. MILLER: Your Honor, I don't think it's necessary

8   to repeat that we did make another change in connection with

9   the time to object to cure amounts which was in --

10         THE COURT: I remember you said that before. One

11  thing I do want to take care of as a piece of unfinished

12  business from before the break. And that's the creditors'

13  committee's position with regard to the Citibank comfort order.

14         MR. DESPINS: Your Honor, there was a reason why

15  there was some -- we couldn't address it is 'cause our

16  conflicts counsel was going to look at those issues. Susheel

17  Kirpalani is here and he will address that, Your Honor.

18         MR. KIRPALANI: Good evening, Your Honor. Susheel

19  Kirpalani of Quinn Emanuel for the creditors' committee. Your

20  Honor, it's been represented to us that this is the same type

21  of relief that was requested with respect to the Chase motion.

22         THE COURT: It was represented to me as well.

23         MR. KIRPALANI: Yes, Your Honor. It appears that the

24  language is the same. The Chase motion -- or the Chase order

25  dealt with securities and cash. And so the language is a

92

1          My suggestion is for good order that we, at some

2     point, have a break.  You and others will have an opportunity

3     to meet and confer and gain some additional information.  And

4     that we proceed by way of proffer unless there's someone else

5     who has something to say on that subject.

6          MR. SABIN:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. MILLER:  Harvey Miller, Your Honor, for the

9     debtors, again.

10         If Your Honor please, I would offer proffer, the

11    testimony of Herbert H. McDade.  If Mr. McDade, Your Honor,

12    were called to the stand to testify, he would testify to the

13    following effect:

14         Mr. McDade received a Bachelor of Arts degree from

15    Duke University and a Masters of Business Administration from

16    the University of Michigan.

17         After joining Lehman Holdings in 1983, Mr. McDade was

18    named head of Corporate Bond Department in 1991.  In 1998 he

19    was named global head of Debt Capital Markets.  In 2002 Mr.

20    McDade was named to Lehman Holdings Operating Committee.  He

21    has served as global head of the Fixed Income Division for the

22    period June 2002 through 2005.  In June of 2005 Mr. McDade

23    assumed the responsibilities of the global head of Equities

24    Division.  Mr. McDade has over twenty-five years of experience

25    in managing a company's financial operations.

93

1          Mr. McDade would testify that Lehman Holdings'

2     predecessor was founded in 1850.  Since that time Lehman

3     Holdings grew into the fourth largest investment bank in the

4     world.  He would testify that through Lehman Holdings'

5     subsidiaries, it is a global market maker in all major equity

6     and fixed income products.  Lehman Holdings' subsidiaries are

7     members of all principal securities and commodities exchanges

8     in the United States, including FINRA and the NYSE.  And

9     memberships on several principal international securities and

10    commodities exchanges, including London, Tokyo, Hong Kong,

11    Frankfurt, Paris, Milan, Singapore and Australia.

12          Lehman is a global leader -- was a global leader in

13    equity and fixed income sales, trading and research, investment

14    banking, private investment management, asset management and

15    private equity.

16          Mr. McDade would testify that the tightening of the

17    U.S. and international markets caused Lehman Brothers to

18    experience a severe liquidity crisis.

19          Now Lehman Holdings' broker-dealer subsidiary, Lehman

20    Brothers Inc., relies to a large extent upon funding from

21    Lehman Holdings, which is the public company and the issuer of

22    debt -- unsecured debt that provides funds for the entire

23    organization.  And that such funding is no longer available to

24    provide to Lehman and LBI.

25          And as each hour has passed and uncertainty is

94

1   prolonged, investor's faith in the market has weakened the

2   value of Lehman's business and it has rapidly deteriorated.

3           The state of affairs at Lehman Brothers Holding Inc.

4   and LBI is critical and their fate just jeopardizes their

5   affiliates' ability to conduct business.

6           Absent approval of the Barclays' transaction, the

7   broker-dealer business would discontinue as a going concern and

8   adversely impact the credit markets on a global scale in ways

9   that are immeasurable.

10          He would testify that Lehman Brothers and its

11  advisors have literally spent every hour attempting to preserve

12  Lehman Holdings' estate and LBI's broker-dealer business.

13          Other than the liquidity crisis, Lehman has been

14  facing pressure and constraints from regulators and agencies.

15  The Federal Reserve, the SEC, the CFTC and other governmental

16  entities have been putting constant pressure on Lehman to

17  engage a prospective buyer and consummate a sale of the broker-

18  dealer business, no later than today, so that there is a

19  seamless transition to preserve the business.

20          Other than the pressures from regulators, Mr. McDade

21  would testify that the broker-dealer's customers are in a state

22  of panic.  Vendors are threatening to stop providing services.

23  Lehman is experiencing severe internal pressures.  He would

24  testify that it would be an understatement to state that the

25  morale of the employees is low.  Employees have and will

95

1   continue to defect.  And the images on television of employees

2   streaming out of the Seventh Avenue headquarters with boxes and

3   suitcases with their possessions is self-evident proof of what

4   is happening.

5          He would testify that the broker-dealer business

6   services over 600,000 customer accounts, and that it could take

7   several months to transfer all of the accounts in the ordinary

8   course of business.  In its current state the broker-dealer

9   does not have sufficient capital to service its customer

10  accounts while transferring them to another broker-dealer in

11  the ordinary course of business.  The market value of customer

12  accounts is in the hundreds of billions.

13         Mr. McDade would testify that the broker-dealer is

14  dependent upon financing from Lehman Holdings Inc., the holding

15  company during the period prior to the Chapter 11 case.

16  Without access to financing, the broker-dealer is incapable of

17  servicing its customer accounts.  As a result, the broker-

18  dealer would have no choice but to close its customer accounts

19  and that would result in billions of dollars of losses and

20  damages.

21         If the broker-dealer is not able to settle trades, a

22  SIPC trustee will commence a proceeding and there has been a

23  proceeding commenced consistent with the transaction that is

24  being proposed.

25         Mr. McDade would testify that during the past ten

96

1    days, he and Lehman's senior management, have been in constant

2    communications with Lehman's regulators.  The regulators are,

3    for now, very supportive of the current transaction.  In an

4    effort to facilitate the transaction, the SIPC trustee agreed

5    not to freeze customer accounts when the broker-dealer was

6    placed into a SIPC proceeding.

7         The regulators and agencies support the Barclays'

8    transaction.  But they have made clear to Lehman that their

9    patience is limited and they are placing tremendous pressure on

10   all parties to close a transaction no later than today.  The

11   state of Lehman's affairs have been widely publicized the world

12   over.

13        It has been widely reported in the media that Lehman,

14   its senior management and advisors have participated in

15   numerous meetings conducted by the Federal Reserve Bank.  At

16   these meetings, the Federal Reserve Bank and Lehman met with

17   numerous financial institutions to attempt to find the solution

18   to the problem of Lehman's financial condition.

19        Also, as widely reported in the media, the financial

20   institutions that participated in those meetings included some

21   of the largest banks in the country.

22        Notwithstanding the help from regulators and other

23   governmental agencies, Lehman was not successful in reaching an

24   agreement with any of these parties as to a support for

25   continued operations.

97

1      Mr. McDade would testify that he first became

2  involved with this particular transaction Monday morning --

3  last Monday morning, I guess that was September 15, at 7 a.m.

4  in the morning.  Since that time, he has been in constant

5  contact with senior management and Lehman's outside advisors

6  regarding the status and progression of the negotiations.  The

7  negotiations leading up to the Barclays' transaction have been

8  at arm's length, objective, aggressively pursued by Barclays

9  and difficult, to say the least, Your Honor.

10      He would testify that since the collapse of Bear

11  Stearns and a subsequent takeover by JPMorgan, the Federal

12  Reserve Bank has made financing available to broker-dealers in

13  what is colloquially referred to as the window.

14      After the broker-dealer settles its trade at the

15  close of business, the clearing bank returns the collateral,

16  which Lehman then transfers to the Federal Reserve in exchange

17  for financing until the opening of business the next day.  That

18  process, as the liquidity of Lehman's deteriorated, no longer

19  became possible.

20      He would testify that in the climate of today's

21  market, a potential buyer of the broker-dealer business could

22  not operate without having access to the PDCF, the Primary

23  Dealer Credit Facility.  That facility is not available to all

24  broker-dealers.  Rather, it is available only to a limited

25  number of financial institutions who could meet the rules and

98

1  regulations of the Federal Reserve in respect thereof.  And

2  that, Your Honor, is probably less than a dozen institutions.

3           He would testify that during the period of stress and

4  strain, the week before this week, Lehman attempted to interest

5  the Bank of America in an acquisition of Lehman's, and that,

6  unfortunately, did not come to fruition.  At the same time, it

7  was negotiating an acquisition by Barclays of the Lehman

8  business.  And that negotiation led to what I might call an

9  agreement that was subject to the -- he would testify it was

10  subject to the regulators throughout the world, and,

11  unfortunately, it became clear that that agreement could not be

12  consummated.

13           And immediately after that announcement was made, he

14  would testify that he and other officers of Lehman were called

15  to the Federal Reserve Bank in New York to meet with the

16  Federal Reserve Bank representatives, the SEC, and the United

17  States Treasury to deal with the problem confronting Lehmans.

18  And those meetings, he would testify, took place, Your Honor,

19  Sunday morning and ran into the late evening of that day.  In

20  which it was made perfectly clear that it was necessary for the

21  protection of the public and the financial markets in an effort

22  to placate the public markets, or at least stabilize the

23  situation, that it is in the best interest of all parties that

24  Lehman Brothers Holdings Inc. commence a Chapter 11 proceeding.

25  And that it maintain, for LBI, access to the so-called window.

99

1   And it was in that context, he would testify, that LBI was

2   enabled to go forward, at least for the past week.

3        He would also testify, Your Honor, Barclays, unlike

4   some of the larger and healthier financial institutions that

5   might qualify for access to the PDCF, does not have a North

6   American broker-dealer operation of this scale.  Therefore, the

7   sale is a national extension of Barclays' business.  Barclays

8   would have access to the PDCF and also will assume Lehman's

9   broad spectrum broker-dealer license.

10       Not only is this sale a good match economically but

11  it saves the jobs of thousands of employees and avoids losses

12  that could total in the hundreds of billions of dollars.

13       He would further testify, Your Honor, that he is

14  familiar with the asset purchase agreement, that he

15  participated in all of the negotiations involved in the asset

16  purchase agreement.  And that those negotiations from time to

17  time broke out into different teams, but he was the team leader

18  for Lehman.

19       He would testify that the asset purchase agreement

20  provides for the sale of the North American broker-dealer

21  business of LBI, which includes banking and capital markets

22  business in addition to numerous other divisions.

23       The Seventh Avenue headquarters is being transferred

24  to Barclays, in addition to the various offices located

25  throughout the United States, that are integral to the broker-

100

1  dealer business.  The value of the real estate being

2  transferred to  Barclays pursuant to the transaction is subject

3  to negotiation with respect of the appraised values.  That the

4  building on Seventh Avenue is subject to an appraisal which has

5  been provided to Barclays.  And that appraisal is in the area

6  of 900 million dollars to 100 million dollars.  And that the

7  appraisal was done by CB Richard Ellis.  And it was prepared

8  for the other debtor in this case, LB 745 LLC and Barclays

9  Capital Inc.  And it is a voluminous appraisal of the

10  properties which we will offer into evidence at the appropriate

11  time, Your Honor.

12        And that he would also testify that an appraisal of

13  the two data centers was also directed and that CB Richard

14  Ellis was also engaged to undertake that appraisal.  And that

15  appraisal has established the value for the purpose of the

16  negotiations, Your Honor.  And as pointed out earlier in the

17  proceeding, those values have come in at slightly less -- I

18  shouldn't say slightly, less than was originally projected.

19        So that was a very negotiated term, and the reason

20  for the transfer of these properties, Your Honor, is that they

21  are integral to the smooth transition of the businesses.

22        Barclays will also assume exposure for the employees

23  that accept offers of employment, which is estimated to have a

24  value of approximately -- an exposure of approximately two

25  billion dollars.

101

1        Barclays is also assuming the cure amounts relating

2    to contracts and leases that will be assumed pursuant to the

3    asset purchase agreement.  And that has a potential exposure,

4    Your Honor, of 1.5 billion dollars that he would testify to.

5        Barclays is also paying the real estate transfer

6    taxes, which are estimated to be approximately thirty million

7    dollars.

8        Mr. McDade would testify that the financial community

9    has known that Lehman has been under stress for some time.

10   Certainly, going back to the time that Bear Sterns was bailed

11   out.  Potential purchasers have known that Lehman has been

12   searching for a buyer since well before the Chapter 11 case

13   commenced.  And that those ethics, those strategic alternatives

14   that were being pursued involved parts of Lehman as well as the

15   whole of Lehman.  And that the notoriety attached to that did

16   not produce any interested parties other than the ones I

17   mentioned -- he mentioned.

18       During the meeting at the Federal Reserve Bank last

19   week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20   were all present, showing interest in the broker-dealer assets.

21   It was clear to each party that if Lehman was unable to reach a

22   deal it would most likely have to commence cases under Chapter

23   11 of the Bankruptcy Code.  That would not only have an adverse

24   impact upon their businesses but also upon the international

25   markets.

102

1          He would testify that since the commencement of the

2     Chapter 11 case, Lehman's senior management and its advisors

3     have not undertaken an intensive marketing of the business and

4     the assets to be sold.  But instead focused on reaching an

5     agreement with the most eligible interested buyer for these

6     assets.

7          That notwithstanding the lack of a specific program

8     for marketing, the sale of Lehman's broker-dealer business has

9     been known worldwide.  And, yet, he would say nobody has

10    expressed an interest to step into the shoes of -- excuse me,

11    step into the shoes of Barclays, Your Honor.

12         Lehman has not received any other interest since the

13    commencement of the Chapter 11 cases.  If Lehman was approached

14    by another potential buyer that he would consider the offer,

15    provided that the company had sufficient liquidity to operate

16    the business without jeopardizing customer accounts.  That has

17    not happened, Your Honor.  So it is almost academic.

18         Mr. McDade would testify, Your Honor, that if the

19    sale with Barclays is consummated, customer accounts would

20    continue on a seamless, uninterrupted basis and trading would

21    continue on a normal basis, thereby maintaining the billions of

22    dollars in value.

23         At the same time, the jobs of thousands of employees

24    would be saved and will be entitled to substantial benefits

25    from Barclays in the form of compensation, bonuses and

1    severance payments that are based upon the employee's prior

2    performance while with Lehman.

3            He would testify to the consummation of the

4    transactions makes available a greater pool of assets to the

5    debtors' estates, because the exposure under Lehman Holdings

6    guarantee to the broker-dealer will be substantially less.  If

7    the transaction does not close today or over this weekend, Your

8    Honor, Mr. McDade would testify that the effect on the broker-

9    dealers business and on Lehman Holdings would be devastating.

10   First, the failure to consummate the transaction would cause

11   default under the DIP facility and require Lehman Holdings to

12   repay the outstanding amounts under that facility.

13           He would testify that the liabilities in the hundreds

14   of billions of dollars would be triggered against Lehman

15   Holdings which would in turn deplete the property available to

16   distribution to creditors.  It would adversely affect the

17   debtors other nondebtor subsidiaries to the extent they have

18   any value.

19           He would testify, Your Honor, that if the transaction

20   is not consummated, it will result in the largest failure of a

21   broker-dealer in the history of the United States and will

22   cripple the credit markets for some time to come.

23           He would further testify, Your Honor, that the shock

24   of this transaction not being consummated in the public markets

25   could be immeasurable and could ignite a panic in the financial

104

1    condition that we now face in the United States.

2            He would testify that it is essential to an orderly

3    financial market that this transaction be consummated as early

4    as possible in the interest of all stakeholders of these two

5    cases.  And in the interest of the public in general and the

6    economy in general, and to avoid a dislocation in the market,

7    Your Honor.

8            Thank you, Your Honor.

9            THE COURT:  And that concludes the proffer?

10           MR. MILLER:  Yes, Your Honor.

11           THE COURT:  Is there anyone who wishes to cross-

12   examine Mr. McDade with respect to the proffer or may I simply

13   accept the proffer in the form it has been offered by Mr.

14   Miller without further examination?

15           MR. QURESHI:  Your Honor, Abid Qureshi, Akin, Gump,

16   Strauss, Hauer & Feld on behalf of an ad hoc group of

17   noteholders of LBHI.  We would like to cross-examine the

18   witness.

19           THE COURT:  All right.  Mr. McDade should come to the

20   stand then.

21       (Witness is sworn)

22   CROSS-EXAMINATION

23   BY MR. QURESHI:

24   Q.   Good evening, Mr. McDade.  You testified through the

25   proffer that you were involved in the negotiations concerning