QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Susheel Kirpalani
James C. Tecce
Robert K. Dakis

*Special Counsel to the Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
```

| | |
|---|---|
| **In re:** | : **Chapter 11** |
| | : **Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : **Jointly Administered** |
| | : |
| **Debtors.** | : |

```
-------------------------------------------------------------------x
```

| | |
|---|---|
| **In re:** | : **SIPA Proceeding** |
| | : **Case No. 08-01420 (JMP)** |
| **LEHMAN BROTHERS INC.,** | : |
| | : |
| **Debtor.** | : |

```
-------------------------------------------------------------------x
```

## NOTICE OF NOTICE OF FILING OF UNSEALED
## COMMITTEE RULE 60 MOTION AND RELATED APPENDIXES

PLEASE TAKE NOTICE that on September 15, 2009, the Official Committee of

Unsecured Creditors of Lehman Brothers Holdings Inc., et al., (the "Committee") filed the

Motion Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et

al., Pursuant To 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief

From Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules Of Bankruptcy

Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale Of Purchased Assets Free

and Clear Of Liens and Other Interests and (B) Assumption and Assignment Of Executory

Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and

Joinder In Debtors' and SIPA Trustee's Motions For An Order Under Rule 60(B) To Modify Sale Order (the "Rule 60 Motion") and related appendixes (the "Appendixes").

PLEASE TAKE FURTHER NOTICE that, pursuant to the Confidentiality Stipulation and Protective Order Between the Examiner, Debtors, Trustee, the Committee and Barclays Capital Inc. (the "Protective Order"), portions of the Rule 60 Motion and Appendixes were filed under seal and, therefore, were electronically filed in redacted form only.

PLEASE TAKE FURTHER NOTICE that, pursuant to a Stipulation Between the Debtors, Trustee, Committee and Barclays Capital Inc. Concerning the Discovery Parties' Unsealing Motions, so-ordered by the Court on October 14, 2009 (the "Unsealing Stipulation"), certain information and exhibits contained in the redacted Rule 60 Motion and Appendixes were unsealed, and the Debtor was expressly authorized to file such documents (to the extent unsealed) in an unredacted form.

PLEASE TAKE FURTHER NOTICE that the Committee hereby files the Rule 60 Motion and the Appendixes containing the information and exhibits that have been unsealed pursuant to the Unsealing Stipulation.

Dated: October 15, 2009
New York, New York

**QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP**

/s/ James C. Tecce
Susheel Kirpalani
James C. Tecce
Robert K. Dakis

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone No.: (212) 849-7000
*Special Counsel to the Official Committee Of
Unsecured Creditors Of Lehman Brothers
Holdings Inc., et al.*

QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Susheel Kirpalani
James C. Tecce
Erica P. Taggart

**Hearing Date:**
OCTOBER 15, 2009
**Objections Due:**
OCTOBER 9, 2009

*Special Counsel to the Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

In re:          : Chapter 11
         : Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., et al.,    : Jointly Administered
         :
         Debtors.    :

---------------------------------------------------------------------x

In re:          : SIPA Proceeding
         : Case No. 08-01420 (JMP)
LEHMAN BROTHERS INC.,       :
         :
         Debtor.    :

---------------------------------------------------------------------x

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN
BROTHERS HOLDINGS INC., ET AL., PURSUANT TO 11 U.S.C. § 105(a), FED. R.
CIV. P. 60(b), AND FED. R. BANKR. P. 9024, FOR RELIEF FROM ORDER UNDER
11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY
PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING
(A) SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER
INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, DATED SEPTEMBER 20, 2008 (AND
RELATED SIPA SALE ORDER) AND JOINDER IN DEBTORS' AND SIPA TRUSTEE'S
MOTIONS FOR AN ORDER UNDER RULE 60(b) TO MODIFY SALE ORDER**

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................2

II.  FACTS RELATING TO TRANSACTION DOCUMENTS AND SALE
     HEARING ..........................................................................................6

     A.   TRANSACTION DOCUMENTS PREPARED AND FILED BEFORE SALE
          HEARING ....................................................................................6

          1.   APA ....................................................................................7

          2.   FIRST AMENDMENT ...........................................................8

     B.   COURT APPROVES SALE TRANSACTION FOLLOWING SEPTEMBER 19
          HEARING ....................................................................................8

     C.   CLARIFICATION LETTER .............................................................12

     D.   REPRESENTATIONS TO COMMITTEE AT SALE CLOSING; COMMITTEE'S
          INVESTIGATION IN PURSUIT OF FINAL TRANSACTION RECONCILIATION .........12

III. FACTS REVEALED IN RULE 2004 DISCOVERY ...................................16

     A.   SEVERAL LEHMAN PRINCIPALS NEGOTIATING SALE TRANSACTION
          TRANSFERRED TO BARCLAYS IMMEDIATELY AFTER CLOSING .........................16

     B.   AT THE OUTSET OF NEGOTIATIONS, BARCLAYS AND LEHMAN SELLERS
          NEGOTIATED AN EMBEDDED $5 BILLION DISCOUNT TO BARCLAYS
          THAT WAS NEITHER DISCLOSED TO THE COURT NOR SPECIFICALLY
          STATED IN TRANSACTION DOCUMENTS ...............................................19

     C.   FUNDAMENTAL STRUCTURE OF TRANSACTION CHANGED TO
          INCORPORATE BARCLAYS-LBI REPURCHASE AGREEMENT; PARTIES
          APPLIED NEGOTIATED DISCOUNT THROUGH REPURCHASE AGREEMENT
          COLLATERAL ..............................................................................23

          1.   FED REPURCHASE AGREEMENT .............................................23

          2.   BARCLAYS STEPS INTO FED SHOES, ASSUMES FINANCING
               OBLIGATION ......................................................................24

          3.   PARTIES RESTRUCTURE TRANSACTION TO ACCOMPLISH SALE
               OF LBI ASSETS THROUGH BARCLAYS-LBI REPURCHASE
               AGREEMENT ......................................................................27

4.  CLARIFICATION LETTER DID NOT EVOLVE INTO FINAL FORM UNTIL AFTER SALE HEARING CONCLUDED AND COURT ENTERED SALE ORDER ......................................................28

D.  BARCLAYS DEMANDS THAT LEHMAN SELLERS TRANSFER ADDITIONAL VALUE IN ADDITION TO THE BARCLAYS-LBI REPURCHASE AGREEMENT COLLATERAL ............................................31

E.  CURE AND COMPENSATION LIABILITIES WERE OVERSTATED TO MAKE IT APPEAR THAT BARCLAYS WAS TAKING ON MORE LIABILITIES THAN IT WAS ............................................................34

IV.  JURISDICTION AND VENUE ............................................36

V.  ARGUMENT ............................................................37

A.  COMMITTEE IS ENTITLED TO RELIEF FROM SALE ORDER FOR MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT PURSUANT TO RULE 60(B)(1)............................................................38

B.  NEWLY DISCOVERED EVIDENCED UNEARTHED THROUGH RULE 2004 DISCOVERY WARRANTS RELIEF FROM SALE ORDER UNDER RULE 60(B)(2) ............................................................42

C.  RELIEF FROM SALE ORDER UNDER 60(B)(3) IS APPROPRIATE ....................43

D.  RULE 60(B)(6) PROVIDES A BASIS FOR RELIEF ......................................44

E.  BY GRANTING THE RELIEF REQUESTED HEREIN, ESTATES ARE PROVIDED AN OPPORTUNITY TO RECOVER EXCESS VALUE TRANSFERRED TO BARCLAYS IN THE SALE TRANSACTION ..............................45

1.  IF SALE ORDER DID NOT APPROVE CLARIFICATION LETTER, OR IF RELIEF FROM SALE ORDER IS AUTHORIZED TO REMOVE CLARIFICATION LETTER FROM SALE ORDER, THEN TRANSFERS CONSUMMATED PURSUANT THERETO ARE RECOVERABLE UNDER SECTION 549 OF BANKRUPTCY CODE ......................................46

2.  UNDER SECTION 559, THE EXCESS COLLATERAL IN FORM OF "HAIRCUT" IS ESTATE PROPERTY ......................................47

F.  COURT SHOULD ORDER IMMEDIATE ACCOUNTING ............................................47

VI.  JOINDER IN DEBTORS' RULE 60(B) MOTION ......................................49

VII.  JOINDER IN SIPA TRUSTEE'S RULE 60(B) MOTION ......................................49

VIII.  CONCLUSION ............................................................50

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

Frontier Farm Credit v. Schwartz (In re Schwartz),
  2008 Bankr. LEXIS 1795 (Bankr. D. Kan. June 10, 2008) ................................................... 45

FutureSource LLC v. Reuters Ltd.,
  312 F.3d 281 (7th Cir. 2002) ................................................... 37

Grace v. Bank Leumi Trust Co. of NY,
  443 F.3d 180 (2nd Cir. 2006) ................................................... 37

In re 310 Assocs.,
  346 F.3d 31 (2d Cir. 2003) ................................................... 38

In re Benhil Shirt Shops, Inc.,
  87 B.R. 275 (S.D.N.Y. 1988) ................................................... 37

In re Centennial Textiles, Inc.,
  220 B.R. 165 (Bankr. S.D.N.Y. 1998) ................................................... 46

In re CHC Industries, Inc.,
  389 B.R. 767 (Bankr. M.D. Fla. ,2007) ................................................... 37

In re Contractor Technology, Ltd.,
  343 B.R. 573 (Bankr. S.D. Tex. 2006) ................................................... 46

In re Dunning Bros. Co.,
  2009 Bankr. LEXIS 2427 (Bankr. E.D. Cal. Sept. 4, 2009) ................................................... 44

In re Govola,
  306 B.R. 733 (D. Conn. 2004) ................................................... 38

IF Realty L.P. v. Rochester Assocs.,
  92 F. 3d 752 (8th Cir. 1996) ................................................... 37

In re Lawrence,
  293 F.3d 615 (2nd Cir. 2002) ................................................... 43

In re Ray,
  2008 WL 544876 (Bankr. W.D. Wash. February 26, 2008) ................................................... 37

In re Rickel & Associates, Inc.,
  272 B.R. 74 (S.D.N.Y. 2002) (holding Rule 60(b)(3) ................................................... 43

In re Rome Family Corp.,
  407 B.R. 65 (Bankr. D. Vt. 2009) ................................................... 37

In re Superior Crewboats, Inc.,
  374 F.3d 330 (5th Cir. 2004) ..................................................................................45

Londsdorf v. Seefeldt,
  47 F.3d 893 (7th Cir. 1995) ("[Rule] 60(b)(3) ........................................................43

Matter of Emergency Beacon Corp.,
  666 F.2d 754 (2nd Cir. 1981).............................................................................37, 38

Matter of Met-L-Wood Corp.,
  861 F.2d 1012 (7th Cir. 1988) ..............................................................................37

Mora v. Vasquez (In re Mora),
  199 F.3d 1024 (9th Cir. 1999) ...............................................................................46

Rosenshein v. Kleban,
  918 F. Supp. 98 (S.D.N.Y. 1996)...........................................................................44

Sheng v. Starkey Lab., Inc.,
  53 F. 3d 192 (8th Cir. 1995) .................................................................................38

## Statutes

11 U.S.C. §§ 105(a) ...............................................................................................37

11 U.S.C. § 559 (emphasis added)............................................................................47

28 U.S.C. § 1334....................................................................................................37

28 U.S.C. § 1409....................................................................................................37

28 U.S.C. § 157(b) .................................................................................................37

Fed. R. Bankr. P. 9024 ...........................................................................................37

Fed. R. Civ. P. 60(b) ...................................................... 37, 39, 42, 44, 45, 46, 49, 50

## Miscellaneous

Collier on Bankruptcy ¶ 549.02 (15th ed. rev. 2006) ...............................................46

Wright & Miller, Federal Practice and Procedure: Civil § 2857 .................................37

The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.

(the "Committee"), hereby moves the Court for the entry of an order, pursuant to section 105(a)

of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy

Code"), Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules") and Rule 9024

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

- granting the Committee relief from the Sale Order[1] to the extent it purports to approve material modifications to the Sale Transaction that were not disclosed to the Court;

- revising the Sale Order:

  - to remove approval of the Clarification Letter (as defined below) from the Sale Order to the extent it materially modified the Sale Transaction approved by the Court; and

  - to amend the Purchased Assets definition so that it contains assets with a fair value, as of the closing date, that is no greater than the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of the actual liabilities assumed by Barclays without the application of any secret or other $5 billion discount described below;

- requiring a full accounting and reconciliation of all Purchased Assets and assumed liabilities within 10 days (including any disposition of the same); and

- directing the return to the estates of the value of all Purchased Assets in excess of the above (with interest).

The Committee also joins in the Debtors' Rule 60(b) Motion[2] and the SIPA Trustee's Rule 60(b)

Motion.[3]

---

[1]  Collectively, the (1) Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004 And 6006 Authorizing And Approving (A) Sale Of Purchased Assets Free And Clear Of Liens And Other Interests And (B) Assumption and Assignment of Executory Contracts And Unexpired Leases, dated September 20, 2008 and (2) Order Approving And Incorporating By Reference For Purposes Of This Proceeding, An Order Authorizing The Sale Of Purchased Assets And Other Relief In Lehman Brothers Holdings, Inc. Chapter 11 Proceeding (Docket No. 3 in the above-referenced SIPA Proceeding (08-1420 (JPM)) shall be referred to as the "Sale Order." The Sale Order approved the sale of assets from the North American broker dealer business (the "Sale Transaction") of Lehman Brothers Inc. ("LBI") to Barclays Capital, Inc. ("Barclays"). Lehman Brothers Holdings Inc., LBI and LB 745 LLC were the "Lehman Sellers."

# I.   PRELIMINARY STATEMENT

1.   ***Sunshine Is Best Disinfectant.***  Consistent with well-established precepts demanding that transparency permeate every aspect of bankruptcy-court sales, the Court authorized the Committee (and the estates) to thoroughly investigate the events surrounding the Sale Transaction.  That discovery unfortunately confirmed the Committee's long-standing suspicion that a lack of transparency resulted in the estates losing billions of dollars of assets for no additional consideration.  The Sale Transaction that ultimately closed was far different from that described to the Court and the Committee.  Not only were extensive structural changes implemented after the Court entered the Sale Order, but Barclays extracted billions of dollars worth of additional assets from these estates.  Moreover, those additional assets supplemented a secret $5 billion discount that was a component of the transaction from its inception -- but which was neither reflected in the agreements presented to the Court nor disclosed in the descriptions made to the Court.[4]  While courts are reluctant to revisit asset sale orders, the unusual circumstances of this case require the strictest integrity of, and adherence to process.  Even more important to the policy of bankruptcy sales than finality is honesty, candor, and disclosure to the Court.

---

[2]   Debtors' Motion For An Order, Pursuant To Fed. R. Civ. P. 60 And Fed. R. Bankr. P. 9024, Modifying September 20, 2008 Sale Order And Granting Other Relief, dated September 15, 2009 (the "Debtors' Motion").

[3]   The Trustee's Motion For Relief Pursuant To The Sale Orders Or, Alternatively, For Certain Limited Relief Under Rule 60(b), dated September 15, 2009 (the "Trustee's Motion").

[4]   It should come as no surprise that one definitive accounting of what was gained upon acquisition is Barclay's own public financial statements, which provide that "[o]n 22nd September 2008 Barclays completed the acquisition of Lehman Brothers North American businesses .... ***The excess of the fair value of net assets acquired over consideration paid resulted in £2,262m [nearly $4 billion] of gains on acquisition.***" Ex. 53, Barclays PLC Results Announcement Figures 2008, at p. 95 (emphasis added).

2.   ***Documents Did Not Reflect Secret Agreement.***   The Sale Transaction described in the APA[5] provided for Barclays to purchase assets with a "book value" of $70 billion and assume liabilities of $69 billion. During the Sale Hearing four days later, the parties told the Court that, as a result of market deterioration, the value of the assets had fallen to $47.4 billion, with Barclays assuming liabilities associated with those assets of $45.5 billion. Unbeknownst to the Court or the Committee, the value of the assets being purchased by Barclays was misstated.

3.   ***Barclays' Open-Ended Demands For Assets After Sale Hearing.***   While the parties explained the transaction to the Court, over the weekend following the Sale Hearing, Barclays continued to renegotiate material aspects of the transaction with the estates as a condition to closing by demanding that the Lehman Sellers provide additional assets. In the weekend following the Sale Hearing, Barclays and the Lehman Sellers attempted to shoehorn the material, post-hearing modifications into an inaccurately titled "Clarification Letter." But the letter does not simply "clarify" the transaction -- it purports to modify the transaction to transfer billions of dollars in additional assets to Barclays.[6]

4.   ***Investigation Unearths Material Discrepancies.***   The Committee never approved the Sale Transaction either as presented to the Court or as actually consummated. As the Committee noted during the Sale Hearing, it lacked sufficient information to make an informed decision whether to extend its support. After the transaction closed, the Committee asked for a final reconciliation, including information sufficient to identify the specific assets transferred and liabilities assumed and their respective values. The Committee's investigative efforts continued

---

[5]   Asset Purchase Agreement dated September 16, 2008 among Barclays and the Lehman Sellers (the "APA"), and the hearing to consider approval of the same conducted on September 19, 2008 (the "Sale Hearing").

[6]   See Sale Order ¶ 3 ("The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.").

into early spring, yet Barclays failed to produce even a basic explanation of the consummated transaction. After more than 20 depositions and review of thousands of documents, the following material discrepancies between the represented and consummated Sale Transaction have emerged:

- ***Implied $5 Billion Discount.*** Unbeknownst to the Court or the Committee, early in the negotiations, Barclays and the Lehman Sellers agreed to give Barclays a $5 billion discount from the transferred assets' book value. Indeed, evidence suggests the $70 billion figure contained in the APA was not the value on the Lehman Sellers' books at all. Instead, it was a "negotiated" number with an embedded $5 billion discount. This discount was not disclosed in any of the transaction documents given to the Court.

- ***Significant Structural Changes To Sale Transaction.*** The APA contemplated Barclays would acquire the North American broker dealer operations by purchasing certain of its assets and the liabilities relating to those assets. However, on September 17, 2008, the Federal Reserve Bank of New York (the "Fed") insisted that Barclays assume the Fed's obligations to provide financing to LBI. The Fed had financed LBI through a repurchase agreement (the "Fed Repurchase Agreement"). Barclays agreed to step into the Fed's position and entered into its own repurchase agreement with LBI (the "Barclays-LBI Repurchase Agreement"), which replaced the Fed Repurchase Agreement. As is common in financings of this type, the Fed Repurchase Agreement contained an approximately $4.4 to $5 billion cushion or haircut in valuing the assets in relation to the liabilities. Barclays agreed to provide $45.0 billion in funding, which LBI would secure with assets worth at least $50 billion. After executing and filing the APA, the parties ultimately decided to transform the Barclays-LBI Repurchase Agreement into an asset sale, with Barclays keeping all of the collateral pledged under the Fed Repurchase Agreement (the "Fed Portfolio") – which contained not less than $5 billion additional collateral beyond the $45.0 billion that Barclays was required to advance, i.e., the haircut.

- ***Mad Dash For Unencumbered Assets.*** Not satisfied with the $5 billion cushion, beginning on Friday September 19, 2008, Barclays demanded that the Lehman Sellers transfer billions of dollars more additional assets. The search for these assets continued after the Sale Hearing, and included (a) no less than $1.9 billion of unencumbered securities in the "non-actionable" box, (b) 15c3 Securities valued at between $750 million and $800 million and (c) an undisclosed amount of collateral supporting the OCC Accounts and other exchange-traded accounts (valued at approximately 2.3 billion).[7]

---

[7]   Shortly after the Sale Hearing, and on the eve of the Sale Transaction closing, the Committee was advised that the pre-mark value of the Fed Portfolio had declined from $49.9 billion to between $44 (footnote continued)

4

- ***Overstated Liabilities***. The evidence also reveals that Lehman and Barclays intentionally overstated the Cure and Compensation Liabilities to foster the impression that Barclays was assuming greater liabilities. The APA Scheduled these amounts at $2.25 billion and $2.0 billion respectively. In reality, the estimates of the liabilities were only approximately $1.3-$1.7 billion.

- ***Conflicts Of Interest In Negotiations.*** The Lehman Sellers' teams negotiating on behalf of the estates were steeped in personal conflicts of interest. Several of the negotiators for the Lehman Sellers either negotiated their employment agreements in the midst of the Sale Transaction negotiations or at least knew that they would be transferred to Barclays.

5.    Neither the change in the APA to account for the repurchase agreement component of the transaction nor the additional assets Barclays demanded and received appeared in any transaction documents until ***after*** the Sale Hearing. While the Sale Order purported to approve those transaction documents (including the Clarification Letter albeit on a prospective basis), their full contents were never presented to or approved by the Court. As a result, the Court never had the ability to inspect the final transaction documents or the opportunity to ensure the Sale Transaction as consummated comported with the transaction described to the Court. Notwithstanding the inclusion of the term "Clarification Letter" in the Sale Order, the actual Clarification Letter that the parties executed was not, and could not have been approved by the Court. To that end, it should be stricken from the Sale Order.[8]

---

billion and $45 billion. To compensate for that decline, LBI would transfer $1.9 billion of additional securities that had not previously been pledged (but Barclays would still be assuming liabilities in an amount greater than the assets it was receiving). The Committee was told these liabilities totaled $45.5 billion ***plus*** an additional $4.25 billion in cure and compensation liabilities.

[8]    The Committee submits the Sale Order's statement that the Clarification Letter has been approved should be stricken as, among other things, inaccurate. To the extent the Court determines that the Committee's request for a determination constitutes a request for declaratory relief, i.e., a request for a declaration that the Sale Order did not approve the Clarification Letter, the Committee stands prepared to file the complaint for declaratory judgment attached hereto as Exhibit 1. The Committee submits the question of whether the Court (and the Sale Order) ever approved the Clarification Letter presents a gating issue that should be decided in the first instance. It may, among other things, obviate the need to consider whether Rule 60(b) relief from the Sale Order is required. (It also may entail a request for a return of those assets as unauthorized post-petition transfers).

6.     At the time the Court entered the Sale Order, global financial markets were experiencing unprecedented upheaval.  The Court acknowledged this in entering the Sale Order. The urgency of the moment, however, was not intended to bestow significant economic advantages on Barclays.  Rather, it was intended to restore confidence in the markets.  In order to achieve that goal, the Committee submits the Sale Order must approve the transaction as it was represented to the Court.  Absent that relief, the estates and creditors will suffer harm as a consequence of the very same lack of transparency that contributed initially to the financial crisis.  Moreover, the Committee does not seek drastic relief.  In fact, each estate fiduciary, i.e., the Debtors, the Committee and the SIPA Trustee, similarly is raising issues of grave concern with respect to the Sale Transaction, questioning the propriety of the results Barclays obtained the means through which it obtained those results.  Accordingly, the Committee should be granted relief from the Sale Order pursuant to Federal Rule 60(b) to the extent that order purports to approve material modifications to the Sale Transaction that were neither disclosed to, nor secured the imprimatur of, the Court and the Committee.

## II.     FACTS RELATING TO TRANSACTION DOCUMENTS AND SALE HEARING

### A.     TRANSACTION DOCUMENTS PREPARED AND FILED BEFORE SALE HEARING

7.     Shortly after LBHI filed for chapter 11 protection, Barclays, LBHI and LBI announced Barclays would purchase LBI's North American broker-dealer business.  Barclays and the Lehman Sellers purported to document the Sale Transaction through three agreements: the original APA dated September 16, 2008, a First Amendment to the Asset Purchase Agreement dated September 19, 2008 (the "First Amendment"), and a Clarification Letter dated "[a]s of September 20, 2008" (and executed on September 22, 2008 (the "Clarification Letter")).

## 1.    APA

8.    When executed on September 16, 2008, the APA purported to serve as the

operative document for the Sale Transaction, describing generally the cash and securities that

would be transferred to Barclays as part of the Sale Transaction.  In addition to certain real estate

transferred as part of the Sale Transaction, the APA generally provided for Barclays to pay $250

million cash plus up to $750 million in potential payments under a "true up" provision, receive

assets with a book value of $70 billion, receive 50% of the residential real estate mortgage

securities, and assume $69 billion in liabilities.

9.    Specifically, the original APA defined Purchased Assets to include:

(a) the Retained Cash; (b) all deposits . . . ; (c) the Transferred Real Property
Leases . . . ; (d) government securities, commercial paper, corporate debt,
corporate equity, exchange traded derivatives and collateralized short-term
agreements with a book value as of the date hereof *of approximately $70 billion* .
. . (e) 50% of each position in the residential real estate mortgage securities.[9]

10.    The APA did not contain a schedule setting forth the specific securities to be

transferred.  Indeed, the parties did not provide any elaboration regarding the securities included

in subsection (d).  The APA further provided for assumption of liabilities "with a book value as

of the date hereof of approximately $69 billion."[10]

11.    The APA also required Barclays to assume certain liabilities for contractual cure

payments and employee compensation (the "Cure and Compensation Liabilities").  In particular,

the APA allows Barclays to acquire contracts related to the acquired assets, after which Barclays

is "obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract."[11]

Barclays also agreed to retain certain employees and to "pay each Transferred Employee an

annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate,

---

[9]    Ex. 20, APA § 1.1 (definition of "Purchased Assets") (emphasis added).

[10]    Ex. 20, APA § 2.3(i).

[11]    Ex. 20, APA § 2.5

are equal to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation . . . ."[12]

## 2. FIRST AMENDMENT

12.    The First Amendment changed the APA's definition of "Purchased Assets" to provide that all of LBI's residential real estate securities would be transferred to Barclays as security for clearing services provided by the Depository Trust Clearance Corporation ("DTCC").[13]  But this "Residential Adjustment" was only meant to secure certain "Guaranteed Obligations" with the DTCC; the parties claimed they would return those securities to the estates to the extent they were not needed to cover the Guaranteed Obligations.[14]

## B. COURT APPROVES SALE TRANSACTION FOLLOWING SEPTEMBER 19 HEARING

13.    During the bid procedures hearing on September 17, 2008, the Lehman Sellers summarized the components of the transaction as follows:

> [L]ooking at it from the net of this transaction, there will be approximately 1,700,000,000 dollars yielded out of this transaction .... [I]f you start with the billion seven hundred million dollars, which is the cash component, as Your Honor obviously read in the papers, there will be an exposure for 2.5 billion dollars in connection with the retention of these 10 to 12,000 employees. In addition … in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts, are estimated to be a billion five hundred million dollars. So we have four billion dollars right there .... In addition … the purchaser is paying 250 million dollars for the goodwill of LBI. So there you have 4,250,000,000 dollars in that respect .... And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed.[15]

---

[12]    Ex. 20, APA § 9.1(c).

[13]    Ex. 21, First Amendment to APA § 3.

[14]    Ex. 21, First Amendment to the APA at § 4.

[15]    Ex. 22, Tr. Hearing 9/17/08 at 22:8-11; 23:21-24:12.

14.     During the Sale Hearing (September 19), the Lehman Sellers stated the Sale

Transaction was still being negotiated in the context of deteriorating market conditions and

outlined some changes made to the terms, including the following with respect to the cash and

securities to be transferred:

> Let me try to summarize the changes that were made to the transaction.  In terms
> of the economic changes, they result largely because of the markets,
> unfortunately.  And from the time that the transaction was actually entered into til
> now, the markets dropped and the value of the securities dropped as well.  *So,*
> *originally, we were selling assets that had a value of seventy -- approximately*
> *seventy billion dollars.  And today ... we're only selling assets that have a value*
> *of 47.4 billion dollars.  Barclays is assuming liabilities, however, of 45.5 billion*
> *dollars in connection with those assets.  So that has not changed from the*
> *original transaction.*  There was an upside sharing in the original transaction.
> There was going to be a true-up twelve months later on and that has been
> eliminated from this transaction.  Barclays is still agreeing to pay the cure
> amounts on any leases that it assumes or that we assume and assign to it.
> Barclays is also agreeing to the same employee compensation arrangements.  And
> it is also agreeing to pay the 250 million dollars of goodwill to LBI.[16]

15.     Counsel also briefly described how Barclays had assumed the Fed's financing of

LBI (i.e., the substitution of the Barclays-LBI Repurchase Agreement for the Fed Repurchase

Agreement and the provision of interim financing):

> Yesterday, as Your Honor has heard, Barclays basically stepped into the shoes of
> the Federal Reserve in connection with the Primary Dealer Credit Facility as to
> the 45.5 billion dollars Lehman borrowed last Monday and received the collateral
> that Lehman had posted in connection therewith.[17]

16.     However, counsel never said that the Barclays-LBI Repurchase Agreement would

become the vehicle through which more than $50 billion of securities would be transferred from

LBI to Barclays.  The parties also made a number of statements designed to describe how the

Lehman Sellers were receiving fair consideration for their assets.  For example, during cross-

---

[16]   Ex. 23, Tr. Hearing 9/19/08 at 46:20-47:15 (emphasis added).

[17]   Ex. 23, Tr. Hearing 9/19/08 at 63:16-22.

examination, McDade stated the Lehman Sellers had done a valuation of their assets to

determine that fair value was being realized:

> Q: Well, in the absence of a closing balance sheet having been prepared, can you
> please describe for the Court how it is that the debtor determined that fair value
> was being realized for the sale of those assets? ....
> A: The individual assets on the balance sheet, the trading inventory was bottoms
> up, meaning individual line item detail processed through all of our individual
> risk business units in coordination with the normal finance professionals who are
> incorporated into the valuation process.[18]

17.    With respect to the residential mortgage securities, the Court was advised that

approximately $6 billion of the securities would be pledged to the DTCC as collateral for the

singular purpose of clearing trades, after which 50% of them would be returned to LBI:

> [DTCC COUNSEL:] So it was to facilitate the transaction as a friend to the transaction
> that this was done so that the business continues to operate today. ***Now, the arrangement
> is that the whole six billion dollars of residential mortgages will be there and subject to
> settlement. But the anticipation is that once all these claims settle,*** the trades that are
> from Wednesday through Monday settle, ***there will not be a need for all of that
> collateral. So what the amendment to the APA says is that the fifty percent will be
> returned.***[19]

18.    The Committee neither objected to, nor affirmatively supported the Sale

Transaction.  Given the speed with which it was consummated, and the Committee's formation

and appointment only days before the Sale Hearing, the Committee advised the Court it simply

lacked sufficient time to conduct the appropriate due diligence needed in order to arrive at an

informed position.  The Committee clearly stated on the record: "We're not affirmatively

supporting the transaction, Your Honor, because there has been insufficient time for us to really

do all the due diligence that we would feel should be done to take that next step of saying yes,

this is the best deal and we're supportive actively."[20]

---

[18]   Ex. 23, Tr. Hearing 9/19/08 at 109:5-15.

[19]   Ex. 23, Tr. Hearing 9/19/08 at 52:19-53:2 (emphasis added).

[20]   Ex. 23, Tr. Hearing 9/19/08 at 67:16-21 (emphasis added).

19.     Even though the Clarification Letter was not presented to the Court and was

executed following the Sale Order (on Monday, September 22, 2008), it is listed among the

approved transaction documents.[21] It also directed the Lehman Sellers "to (1) execute the

Purchase Agreement, along with any additional instruments or documents that may be

reasonably necessary or appropriate to implement the Purchase Agreement, *provided that such*

*additional documents do not materially change its terms*; (2) consummate the Sale in

accordance with the terms and conditions of the Purchase Agreement and the other agreements

contemplated thereby; and (3) take all other and further actions as may be reasonably necessary

to implement the transactions contemplated by the Purchase Agreement."[22] During the Sale

Hearing, the Lehman Sellers' indicated that the draft Clarification Letter was on its way to the

Court and that the parties were "hoping to finalize and actually present the [Clarification Letter]

to Your Honor whenever it comes down here,"[23] but never presented it during the hearing or any

time thereafter.

20.     The Court entered the Sale Order in the early morning hours of September 20,

2008. Notably, it included a provision making even non-material modifications to the

transaction documents subject to a written agreement "between the Committee, the Debtors and

the Purchaser [Barclays]."[24]

---

[21]  Ex. 24, Sale Order, Introduction (referring to "that letter agreement clarifying and
supplementing the Asset Purchase Agreement dated September 20, 2008" in definition of "Purchase
Agreement").

[22]  Ex. 24, Sale Order § 3 (emphasis added).

[23]  Ex. 23, Tr., Hearing 9/19/08 at 44:8-10.

[24]  Ex. 24, Sale Order § 25 ("The Purchase Agreement and any related agreements, documents or
other instruments may be modified, amended or supplemented by the parties thereto, *in a writing signed
by such parties*, and in accordance with the terms thereof, without further order of the Court, provided
that any such modification, amendment or supplement does not have a material adverse effect on the
Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.")
(emphasis added).

### C.    CLARIFICATION LETTER

21.     Following the Sale Hearing and entry of the Sale Order, the parties purported to materially modify the terms of the Sale Transaction through the inaccurately self-titled Clarification Letter, which is dated "[a]s of September 20, 2008," but which was not executed until September 22, 2008.[25] The Clarification Letter supersedes its predecessor agreements with respect to the cash and securities transferred by replacing all sections in the APA and First Amendment that govern the transfer of securities with the following provision:

> [W]ith respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified in Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and Accepted by Purchaser . . . and (C) exchange traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short term agreements.[26]

### D.    REPRESENTATIONS TO COMMITTEE AT SALE CLOSING; COMMITTEE'S INVESTIGATION IN PURSUIT OF FINAL TRANSACTION RECONCILIATION

22.     In connection with the closing -- after entry of the Sale Order, but before consummation of the Sale Transaction -- the Committee was told the parties had agreed to certain changes to the Sale Transaction, including:

---

[25]     Ex. 25, Clarification Letter (bearing the date September 20, 2008); see also Ex. 26, BCI-EX-(S)-00007262, email sent 9/22/08 at 11:09 a..m. covering final Clarification Letter.

[26]     Ex. 25, Clarification Letter § 1(a)(ii).

- the pre-mark value of the Fed Portfolio Securities was $49.9 billion[27] (though neither the date nor the method of that mark was clear) -- but that value had (purportedly based on an updated mark-to-market) declined to between $44 billion and $45 billion;

- to compensate for that decline, LBI had to transfer $1.9 billion of additional securities that had not previously been pledged as collateral for the Fed Repurchase Agreement or that had otherwise not previously been contemplated to be transferred to Barclays (but that transfer would still leave Barclays with assets valued less than the liabilities it was assuming);

- the liabilities owing to the Fed being assumed by Barclays totaled $45.5 billion; and

- Barclays was assuming an additional $4.25 billion in liabilities.[28]

23.    Shortly after the closing, the Committee began investigating the particulars of the transaction in an attempt to prepare a final reconciliation. In the course of that investigation, the Committee discovered discrepancies between the terms of the Sale Transaction as the Lehman Sellers and Barclays had represented them to the Committee and the Court and the recitation of those terms appearing in later-filed documents.

24.    Specifically, in the weeks following the transaction, various parties asked the Court to rectify purported "mistakes" and resolve disputes. In particular, Barclays, JPMorgan Chase Bank, N.A. ("JPMC"), the DTCC, the Fed, and the trustee appointed in LBI's Securities Investor Protection Act proceeding (the "SIPA Trustee"), filed the following:

---

[27]    At the Sale Hearing, the Lehman Sellers indicated the value of the Fed Portfolio Securities was $47.4 billion.  See Ex. 23, Tr. Hearing, 9/19/08 at 47:1-47:7.

[28]    See Ex. 27, Declaration Of Saul Burian In Support Of Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "Burian Decl.") (Docket No. 493 in Case No. 08-1420 (JPM)) at 3 (¶ 10).

- the December 2008 Settlement Motion,[29] which purported to resolve disputes concerning the failure to transfer to Barclays not less than $7 billion from the Fed Portfolio and JPMC's subsequent failure to transfer $7 billion in cash to Barclays in replacement of such securities (which JPMC instead retained and applied to reduce LBI's obligations to it); and

- the January 2009 Settlement Motion,[30] which purported to resolve disputes concerning the failure by the DTCC to transfer to Barclays securities in LBI customer accounts (instead proceeding to wind down LBI's DTCC accounts and apply the securities to LBI obligations owing to the DTCC). As a result of the DTCC's actions, the SIPA Trustee agreed to provide Barclays with a "Make-Whole Payment" (as defined therein) that could total approximately $221 million.

25.     The Committee opposed the December Settlement Motion.  In its Limited Objection,[31] the Committee argued, among other things, that the settlement's approval should be adjourned because it sought the Court's imprimatur of the settling parties' depiction of the facts and circumstances surrounding the Sale Transaction.  Those findings did not comport with facts the Committee was gathering in connection with its attempts to reach a final reconciliation with respect to the assets transferred and liabilities assumed:

---

[29]     Motion Under 11 U.S.C. §§ 105 And 365 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement, filed on December 5, 2008 (the "December 2008 Settlement Motion") (Docket No. 387 in Case No. 08-1420 (JMP)).

[30]     Motion Under Fed. R. Bankr. P. 9019(a) For Approval of Settlement and Compromise, filed on January 22, 2009 (the "January 2009 Settlement Motion") (Docket No. 586 in Case No. 08-1420 (JPM)).

[31]     Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement, dated December 19, 2008 (Docket No. 453 in Case No. 08-1420 (JMP)) (the "Limited Objection").

| ISSUE | DECEMBER SETTLEMENT MOTION DEPICTION | FACTS RECOUNTED TO COMMITTEE |
|---|---|---|
| **VALUE OF SECURITIES TRANSFERRED** | Fed Portfolio totaling $49.7 was transferred to Barclays as collateral for funding LBI | The pre-mark valuation was $49.9 billion; the September 21 valuation had declined to between $44 and $45 billion; LBI would transfer an additional $1.9 billion of securities that previously had not been pledged[32] |
| **VALUE OF ASSUMED LIABILITIES** | Barclays assumed New York Fed liabilities totaling $45.0 billion | Barclays assumed Fed Repurchase Agreement liabilities totaling $45.5 billion and an additional $4.25 of additional assumed liabilities[33] |

26.     The origins of the December 2008 Settlement Motion were unbeknownst to the Committee until only recently.  Indeed, in a letter dated October 11, 2008 designed to initiate settlement discussions with Barclays, JPMC, among other things, stated its position that Barclays failed to reveal certain salient terms of the Sale Transaction to the Court:

On Friday night, for the first time as far as we know, the Bankruptcy Court was apprised of a different 'deal' between Barclays Capital and Lehman Brothers -- and that Barclays Capital was no longer purchasing $70 billion in assets and assuming $69 billion in related debt.  ***But the Court was not apprised of the purchase that Barclays Capital now says it agreed to make.  Instead, of the Court being told that Barclays Capital was purchasing approximately $49.7 billion in securities for $45 billion in cash, the Court was told that Barclays Capital was purchasing $47.4 billion in securities for $45.5 billion in cash. In addition, the Court was told that the reason for the change was a deterioration in market prices, an explanation that we now know to be incorrect ....*** [I]nasmuch as you ended up taking securities that had not been part of the 'Fed collateral' -- again, some were part of the 'Barclays Capital tri-party collateral' and still others were not financed by JPMorgan at all -- we believe that a full accounting should be done.  ***It is altogether possible that the LBI estate and its creditors gave you more or less value than you were entitled to receive.  Moreover, the Bankruptcy Court was told that Barclays Capital was to receive $47.4 billion (not $49.7 billion) in securities and to pay $45.5 billion (not $45 or $45.2 billion) in cash***.  We are both duty-bound to ensure that LBI received the value it was supposed to receive in exchange for your $45 billion.  We have offered several times to do this accounting with you (and, as appropriate, the Fed), and it is entirely

---

[32]     Compare Ex. 28, Affidavit of Shari Leventhal filed in Support of December Settlement Motion (the "Leventhal Aff.") ¶¶ 12-13 with, Ex. 27, Burian Decl. at ¶ 10.  See Docket No. 493 in Case No. 08-1420 (JMP).

[33]     Compare Ex. 28, Leventhal Aff. ¶¶ 7, 9, 11-12, with, Ex. 28, Burian Decl. ¶ 10.

possible that the SIPA Trustee and the Bankruptcy Court would want such an accounting, but your personnel have declined, citing the amount of time and effort it would take. We should do this accounting and should do it now. . . .[34]

27.     Promptly following the hearing on the Limited Objection, the Committee began requesting documents and information from Barclays on an informal basis. The documents Barclays ultimately produced, however, were largely indecipherable. Moreover, Barclays did not provide a final reconciliation or a balance sheet identifying the specific assets transferred, the specific liabilities assumed and their respective values.

28.     In May 2009, the Debtors also requested discovery from Barclays in furtherance of their own investigation into the Sale Transaction pursuant to Bankruptcy Rule 2004 (the "Rule 2004 Motion") (Docket No. 3596). The Committee joined in the Rule 2004 Motion and, in an effort to avoid duplication, coordinated its investigative efforts with those of the Debtors. Extensive discovery followed, including the production of tens of thousands of pages of documents and more than 20 depositions.

### III.     FACTS REVEALED IN RULE 2004 DISCOVERY

#### A.     SEVERAL LEHMAN PRINCIPALS NEGOTIATING SALE TRANSACTION TRANSFERRED TO BARCLAYS IMMEDIATELY AFTER CLOSING

29.     Deposition testimony revealed the identity of a certain core group of individuals responsible for negotiating the Sale Transaction. On the Lehman Sellers' side, the negotiators included Bart McDade (President), Skip McGee (Managing Director - Head of Investment Banking), Mark Shafir (Co-Head of M&A), Alex Kirk (Advisor), Mark Shapiro (Head of Restructuring) and Dick Fuld (CEO).[35] Steven Berkenfeld (Managing Director, Legal) executed

---

[34]     Ex. 29, Draft Letter from Jamie Dimon to John Varley, Oct. 11, 2008, at BCI-CG00059724, BCI-CG00059725 (emphasis added).

[35]     Ex. 2, Deposition of Steven Berkenfeld, taken August 6, 2009 ("Berkenfeld Tr.") at 65:14-23; Ex. 2, Berkenfeld Tr. at 164:7-12 ("The negotiators included Mr. McDade. Was he not authorized to sign on behalf of LBHI? A. He was. Q. Was he not present? A. He wasn't present at the time the document was ready to be signed."); see also Ex. 3, Deposition of Bart McDade, taken on September 2, 2009 ("McDade Tr.") at 18:22-19:6 ("Q. Who were the Lehmanites who were again heading up the (footnote continued)

the APA, the First Amendment and the Clarification Letter on the Lehman Sellers' behalf.[36]

Also involved from the Lehman Sellers were Paolo Tonucci (Treasurer), Ian Lowitt (CFO), Mike

Gelband (Head of Capital Markets), Eric Felder (Co-Head of Fixed Income) and Martin Kelly

(Global Financial Controller).[37]  At the operations level, the Lehman Sellers' employees involved

included James Hraska, Robert Azerad, and Alastair Blackwell.  As explained below, many of

these individuals became Barclays' employees following the Sale Transaction.

       30.     On the Barclays' side, the chief negotiators appear to have been Rich Ricci (Chief

Operating Officer), Archie Cox (Chief Executive Officer - Americas), Michael Klein (Advisor),

Gerard LaRocca (Chief Accounting Officer - Americas), Bob Diamond (Chief Executive

Officer), and Jerry del Missier (President).[38]  Also involved were Patrick Clackson and Michael

Keegan.  David Petrie and John Rodefeld were involved at the operations level on the Barclays'

side.

---

discussions?  I know there were a lot of people involved, but who would you describe as the primary
negotiators?   A.  Bart McDade, Skip McGee, Mark Shafir, clearly Dick Fuld was an informed party but
not in the room in terms of those discussions, would be how I would describe the main, the main Lehman
principals.").

    [36]  Ex. 2, Berkenfeld Tr. at 162:21-163:10.

    [37]  Ex. 4, Deposition of Hugh "Skip" McGee, taken on August 10, 2009 ("McGee Tr.") at 13:6-
19; see also Ex. 5 Deposition of Mark Shapiro, taken on August 7, 2009 ("Shapiro Tr.") at 49:20-50:6
("Q.  Was Steve Berkenfeld involved in the negotiations on that Monday and Tuesday?  A.  Yes.  Q.
Would he have been one of the people negotiating what you call in the trenches?  A.  He was more
involved in some of the legal negotiations.  He was definitely at the table from time to time with the
lawyers.  He was not, to the best of my recollection, in the meetings that took place between myself, Mark
Shafir, Archie and Michael Klein.").

    [38]  Ex. 2, Berkenfeld Tr. at 65:24-66:12; see also Ex. 6, Deposition of Alex Kirk, taken on
August 31, 2009 ("Kirk Tr.") at 28:6-11 ("Q.  During the period from Friday, the 12th, through Sunday,
the 14th, were you dealing with any particular people at Barclays who you could name?  A.  Archibald
Cox.  Bob Diamond.  Rich Ricci.  Michael Klein, as their agent."); Ex. 3, McDade Tr. at 19:7-13 ("Q.
And who were the principals for BarCap?  A.  Rich Ricci, Jerry del Missier, and their advisor, Michael
Klein.  And sorry, Archibald Cox, the CEO of the Americas.  Q.  Was Diamond involved?  A.  In and
out.").

31.     Many of the individuals negotiating the Sale Transaction on the Lehman Sellers' behalf became Barclays' employees following the closing.  Indeed, McDade told Lowitt that Barclays deemed eight individuals, including Lowitt himself, as critical to the transaction.[39]  The other seven were Skip McGee, Ajay Nagpal, Tom Humphrey, Eric Felder, Gerald Donini, Mike Gelband and Hyung Lee.[40]  The transfer of these eight individuals to Barclays apparently became a condition of the Sale Transaction closing[41] -- a fact disclosed during the Sale Hearing.[42]  McDade also worked for Barclays after the sale transaction.[43]

32.     However, the significant bonuses paid to these employees after the Sale Transaction closed was not disclosed to the Court.  As Alex Kirk explained, "[s]everal of my colleagues . . . who had signed employment agreements were resigning from [Barclays] and receiving large payouts upon their leaving the firm."[44]  Kirk, who McDade had re-hired to assist during the negotiations, also went to work with Barclays after the transaction.  Because he had no written employment agreement with Barclays, he prevailed upon McDade to press Barclays for a bonus package because "[McDade] was on point for those sorts of issues with Barclays."[45]

███████████████████████████████████████████████████████

---

[39]   Ex. 7, Deposition of Ian Lowitt, taken on August 20, 2009 ("Lowitt Tr.") at 16:12-17:2.

[40]   Ex. 3, McDade Tr. at 60:9-18.

[41]   Ex. 7, Lowitt Tr. at 21:13-17.

[42]   Ex. 23, Tr. Hearing 9/19/08 at 127:13-16 (McDade) ("Q. And I think there was a question, but I just want to be clear.  There is a closing condition regarding eight employees signing up agreements, is that correct?   A. That is correct."); Ex. 23, Tr. Hearing 9/19/08 at 149:11-16 (Ridings) ("Q. Okay. Are you aware, sir, of the provision in the asset purchase agreement that requires contracts to be negotiated with eight key employees?   A. Yes.   Q. Is it your understanding that that is a closing condition?   A. Yes.").

[43]   Ex. 3, McDade Tr. at 197:10-18 ("Q.   We talked a little bit this morning about the offer that was made to you of a salary and nothing more, and as I understand it, and again, I'm trying to sort of -- A.  No offer was made.  I just continued the Lehman salary that I had.   Q.  Okay.  This was to put you on Barclays' payroll and nothing more?   A.  Correct.  Correct.").

[44]   Ex. 6, Kirk Tr. at 14:25-15:4.

[45]   Ex. 6, Kirk Tr. at 15:10-11.



Shapiro, Azerad, Blackwell, Hraska, and Kelly each joined Barclays as well.[51]

**B.      AT THE OUTSET OF NEGOTIATIONS, BARCLAYS AND LEHMAN SELLERS NEGOTIATED AN EMBEDDED $5 BILLION DISCOUNT TO BARCLAYS THAT WAS NEITHER DISCLOSED TO THE COURT NOR SPECIFICALLY STATED IN TRANSACTION DOCUMENTS**

33.      Early in the negotiations, Barclays and the Lehman Sellers agreed Barclays would receive a $5 billion discount from the transferred assets' book value. That discount was never disclosed in the transaction documents (including the APA, the First Amendment, and the Clarification Letter) or to the Court.



[50]   Ex. 7, Lowitt Tr. at 17:14-20:4; 30:25-31:12; 8:21-9:2.

[51]   Ex. 5, Shapiro Tr. at 7:14-18; Ex. 10, Deposition of Robert Azerad, taken on August 17, 2009 ("Azerad Tr.") at 6:5-14; Ex. 11, Deposition of Alastair Blackwell, taken on August 7, 2009 ("Blackwell Tr.") at 8:15-22; Ex. 12, Deposition of James Hraska, taken on August 14, 2009 ("Hraska Tr.") at 15:2-14; Ex. 13, Deposition of Martin Kelly, taken on August 18, 2009 ("Kelly Tr.") at 8:2-9:14.

34.     Notably, none of the transaction documents filed with the Court refer to any

discount.  The APA stated Barclays will acquire approximately $70 billion in LBI assets plus

50% of the residential mortgage securities and assume approximately $69 billion in liabilities

based on their "book value" -- plus the Cure and Compensation Liabilities.[52]

35.     Email correspondence among transaction negotiators confirms the APA does not

disclose any implied discount or negotiated revaluation of assets.  On September 17, 2008,

LBHI's Product Controller Gerard Reilly sent an email to Lowitt stating that he "went through

all docs and did not see reference to the price haircut."[53]  Lowitt responded, "[s]ince not in

contract, hard to see what to [do]."[54]  Berkenfeld was similarly uninformed, despite signing the

APA for the Lehman Sellers.  He explained his view of the agreement he signed as follows:

> Q: And nobody looking at that agreement, at least from the point of view of the
> man who signed it, would read that to say that there was a discount being given to
> Barclays for what it was buying? . . . .
> A: I didn't believe at the time when I signed this agreement that the intent of the
> agreement was to deliver assets with a material embedded gain to them, to
> Barclays.[55]

36.     As revealed in discovery, however, the APA's $70 billion number was not the

"book value" at all -- it was a negotiated figure.  Specifically, the APA indicates that Barclays

will acquire assets with a book value of $70 billion plus 50% of the residential mortgage

securities.  However, according to Rich Ricci -- by all accounts a chief negotiator for Barclays --

he worked "to ensure that we, whatever assets we did take, were taken at the *appropriate*

*price*."[56]  He further explained that the "appropriate price" included a discount to Barclays off of

---

[52]   Ex. 20, APA, at § 1.1, definition of "Purchased Assets" and § 2.3, "Assumption of
Liabilities."

[53]   Ex. 30, 9/17/08 email from Reilly to Lowitt.

[54]   Ex. 30, 9/18/08 email from Lowitt to Reilly.

[55]   Ex. 2, Berkenfeld Tr. at 122:17-123:2.

[56]   Ex. 14, Deposition of Rich Ricci, taken on September 8, 2009 ("Ricci Tr.") at 28:10-29:4.

Lehman's marks for the assets.[57] Similarly, Tonucci testified that the final Sale Transaction

included a discount to Barclays off the Lehman Sellers' marks by about $5 billion.[58] Indeed, the

presentation to Barclays' Board of Directors referenced assets worth $75 billion, not the APA's

$70 billion.[59]

37.     On September 16, 2008, the day the APA was finalized, Kelly emailed Lowitt,

describing the deal that had been reached:

> ***Well, it took all night and lots of back and forth but the deal is done and ready
> for the Board.  Final price did not change meaningfully - approx a $5b all in
> economic loss versus our marks and $3.6b of resi assets left behind.***[60]

38.     Kelly also recorded in his notes that there was a "loss of $5.25 and loss on sale of

$5.75."[61]  During his deposition, Kelley confirmed these numbers indicated that the loss to the

Lehman Sellers was either $5.25 or 5.75 billion.[62]  Kelly testified that "the 5 billion represents

the difference between the negotiated price and the values of those assets on Lehman's books."[63]

---

[57]  Ex. 14, Ricci Tr. at 44:23-45:20 ("Q.  My question is a different one, Mr. Ricci.  You either
know it or you don't know it.  The question is do you know that the prices at which Barclays was agreeing
to purchase the assets reflected in the Asset Purchase Agreement which are given at approximately $70
billion reflect a discount off of whatever Lehman marks existed as of that time?  A.  As of what time,
sir?  Q.  As of the time that this was executed, sir. . . .  A.  I can't speak for every single asset, but in
order to try to answer your question, if there -- given what I know about the timing of when we first
started looking at their assets versus when this agreement was signed, I would think there would have
been a discount, yes, of Lehman assets -- the Lehman marks on their assets, yes.").

[58]  Ex. 9, Tonucci Tr. at 29:22-30:17 ("Q.  Let me rephrase.  You understood the 5 billion dollars
all in economic loss versus our marks to be a reference [in Ex. 136A] to a discount off the marks, correct?
A.  Yes.   Q.  The deal that was ultimately done and closed on September 22, that too included a discount
off of Lehman's marks, correct?   A.  That is correct.  Q.  Okay, and the amount of that discount off of
Lehman's marks was about $5 billion, is that right?  ...  A.  It is uncertain, because obviously there was a
lot of valuation movements and so I couldn't say with certainty, but certainly what I can say is versus the
valuations that I recall seeing from our analysis it was about that number.  Q.  About $5 billion?   A.
About $5 billion.").

[59]  Ex. 31, 9/16/08 email from Haworth to Clackson, copy to Ricci covering presentation to the
Barclays board.

[60]  Ex. 32, 9/16/08 email from Kelly to Lowitt, copy Tonucci (emphasis added).

[61]  Ex. 33, Martin Kelly's handwritten notes, at BCI-EX-00115169.

[62]  Ex. 13, Kelly Tr. at 229:2-13 (Q.  Is it fair to say that the -- now I'm back in the "Loss/Gain"
column, the 5.25 loss to Lehman.  Did that calculate -- is it fair to say that's primarily a function of the
(footnote continued)

39.     Lowitt similarly testified that there was a negotiated $5 billion difference between the amount shown on the Lehman Sellers' books and the amount Barclays agreed to pay for the assets.[64] The APA refers to a "financial schedule delivered to [Barclays] on September 16, 2008 and initialed by an officer of each of [LBHI] and [Barclays]."[65] That schedule set forth a balance sheet showing assets and liabilities matching at $72.65 billion.[66] Prior iterations of the schedule list assets totaling $73.15 billion.[67] While the $5 billion discount supposedly was incorporated into the balance sheet, the balance sheet does not disclose that any discount had been applied.[68]

---

difference between the book value of the inventory and the value negotiated -- and the negotiated value in the contract for the securities?    A.  It may.  It may.  It likely accounts for the difference based on these estimates at this point in time.").

[63]  Ex. 13, Kelly Tr. at 46:11-16 ("Q.  When you wrote, 'Approx. a 5 billion all in economic loss versus our marks,' what did you mean by that?    A.  I recall that the 5 billion represents the difference between the negotiated price and the values of those assets on Lehman's books.").  See also Ex. 13, Kelly Tr. at 66:7-16 ("Q  Did you have an understanding, sir, that the agreement, the pricing of the agreement was that Baclays would pay Lehman $5 billion less than Lehman had thought the assets were worth?  A.  My understanding was that the negotiated sales price across all of those asset portfolios resulted in a $5 billion, approximately $5 billion less to Lehman relative to its marks at that time").

[64]  Ex. 7, Lowitt Tr. at 45:8-17 ("Q.  Do you know if what was agreed to between the parties in their negotiating session with regard to this difference between the amount shown on the books and the price paid was an agreement in terms of a percentage of what was shown in the amount of the books or a raw number?    A.  My recollection is that it was a number, not a percentage.    Q.  What was the number?    A.  My recollection is it was $5 billion.").

[65]  Ex. 20, APA, at § 9.1(c) ("On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus . . . in respect of the 2008 Fiscal Year that, in the aggregate are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on *that financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and purchaser*.") (emphasis added); see also Ex. 2, Berkenfeld Tr. at 86:6-25.

[66]  Ex. 34, Final Balance Sheet dated September 16, 2008.  Berkenfeld testified that the balance sheet guided the deal as documented by the APA.  Berkenfeld, who signed the APA and initialed the balance sheet, testified that the balance sheet "was meant as some guidance for [the deal as documented by the APA] as what we meant as 70 billion of assets . . . because we didn't specify any of that in the text. It was just $70 billion of all this stuff.  And [Exhibit 34] gives you a little bit better sense of what that stuff is."  Ex. 2, Berkenfeld Tr. at 118:3-25.

[67]  Ex. 35, Balance Sheet dated September 16, 2008 (showing assets and liabilities balanced at $73.15 billion).

[68]  Ex. 34, APA Schedule; see also Ex. 7, Lowitt Tr. at 81:25-82:13 ("Q.  So that roughly $5 billion number that we talked about before is recognized in this document, [Exhibit 34], correct?    . . . A. (footnote continued)

Indeed, Kelly testified the $62 billion figure in the schedule (i.e., the asset subtotal) was understood by $5 billion.[69]

### C.   FUNDAMENTAL STRUCTURE OF TRANSACTION CHANGED TO INCORPORATE BARCLAYS-LBI REPURCHASE AGREEMENT; PARTIES APPLIED NEGOTIATED DISCOUNT THROUGH REPURCHASE AGREEMENT COLLATERAL

40.     Whereas the Sale Transaction initially was described as a purchase of certain categories of assets and the assumption of related liabilities, the Lehman Sellers and Barclays abandoned the early attempts at a standard asset purchase agreement and instead, mid-week (i.e., between September 16 and September 18) decided to convey to Barclays all the collateral pledged in connection with the Barclays-LBI Repurchase Agreement, including the haircut, and additional unencumbered assets.

### 1.   FED REPURCHASE AGREEMENT

41.     During the early part of the week of September 15, the Fed financed LBI through the tri-party Fed Repurchase Agreement through which the Fed provided $45 billion in cash to LBI. LBI collateralized its obligation to the Fed by pledging the Fed Portfolio. Although there are differing accounts regarding the amount of the haircut, it appears that the Fed received at approximately $5 billion in additional collateral in the Fed Portfolio for a total of approximately $50 billion.[70]

---

It is not recognized in this, in the sense that these -- these asset numbers are post that -- reflect what Barclays were willing to pay for $72 billion worth, $72.65 billion worth of assets, which was less for reasons that we talked about earlier than the amount they were on Lehman's books for, and the amount less is probably the 5 billion that you referenced.").

[69] Ex. 13, Kelly Tr. 108:7-16 ([Referring to Exhibit 34] Q: As far as you know, sir, for these asset classes, exclusive of the cash, were they shown on Lehman's books at an amount higher than the $62 billion at or about the time this schedule was prepared? A. My understanding is yes, they were, in the aggregate. Q. Were they $5 billion higher, is that your understanding? A. Approximately $5 billion higher.").

[70] Ex. 7, Lowitt Tr. at 48:16-22 ("Q. And the difference between the amount of the repo and the cash proceeds was approximately $5 billion, correct? . . .  A. It, it -- I mean it was in that region."). But see Ex. 28, Leventhal Decl. ¶ 9 (stating difference between collateral and cash pledged was closer to $4.4 billion).

## 2.   BARCLAYS STEPS INTO FED SHOES, ASSUMES FINANCING OBLIGATION

42.   Shortly after the Fed insisted that Barclays assume the Fed's financing of LBI,[71]

Barclays entered into the Barclays-LBI Repurchase Agreement.[72]   As Petrie put it, the haircut in

the Fed Repurchase Agreement was "implied" into the Barclays-LBI Repurchase Agreement.[73]

Barclays therefore paid $45.0 billion in cash, and LBI attempted to transfer approximately $50.0

billion in securities (i.e., the Fed Portfolio) for the purpose of providing collateral to Barclays.[74]

---

[71]   Ex. 15, Deposition of Gerard LaRocca, taken on August 19, 2009 ("LaRocca Tr."), at 29:18-30:21 ("Q.   Okay.   A.   And said we needed to get on the phone with the Fed, okay?   And Jonathan used words like if the Fed is going to support this, you know, if we want the Fed to work with us and to support this transaction that we want to try to do, that we're going to have to step into that -- we're going to have to take the Fed out of my -- of their financing obligation with Lehman Brothers.   I participated in a phone call with the Fed on that Tuesday, and -- and you're going to ask me who it was with, and I don't recall, and after my phone call, the urgency was evident to me and I dropped what I was doing and headed down to the Fed and I met with -- now, I'm not sure if I -- I don't know if I went down on the Tuesday night.   I think so, I'm almost, I'm almost positive it was Tuesday night early evening and met with Lucinda Brickler and other colleagues of hers from the Fed.   And Lucinda had explained to me that the Fed was financing Lehman Brothers, had provided roughly $45 billion in financing for Lehman Brothers, and that they were using -- that Lehman was using three facilities to finance collateral and the Fed had lent them $45 billion.").

[72]   Ex. 9, Tonucci Tr. at 36:23-40:3 ("Q.   Tell me briefly what the changes were, if any, in the size of the Fed repo from Monday to Tuesday in the week?   A.   I can't recall the exact details.   I recall that the Barclays repo on the -- again, I am not certain about this but the Barclays repo on the 16th, I believe, was for $5 billion.   On the 17th I believe it was for $8 billion and then on the Thursday there was obviously a much bigger transaction and so that changed the Fed repo, which became zero.   . . . Q. And the big transaction that you described on Thursday effectively had Barclays coming in and putting in $45 billion to pay off the Fed repo, correct?   A.   I understood that they were going to be putting in 45, that it was going to be a 45 billion-dollar transaction, yes.   . . . Q.   So effectively on Thursday the Fed funding goes down to zero, correct?   A.   That is correct.   . . . Q.   And what you have left is the Barclays repo, correct?   A.   That is correct.").

[73]   Ex. 16, Deposition of David Petrie, taken on August 26, 2009 ("Petrie Tr.") at 93:2 18 ("Q. And the next line below that?   A.   The next line below that reads, 'Haircut charged will be implied.'   Q. What does that mean?   A.   Given that the Fed had extended funding for Lehman assets, the Fed employed its own haircut schedule for those assets.   Given that Barclays had been asked by the Fed and we were undertaking taking the Fed out of their lending of money to Lehman Brothers for those specific assets, when we would receive those assets versus the cash that we were lending to Lehman, the collateral that we would receive, which would be at this point identical to what the Fed had been funding on that Thursday, the haircuts would be implied because they had already been applied to the Lehman loans.").

[74]   Ex. 12, Hraska Tr. at 58:14-59:18 ("There was the total loan amount, which was this $45 billion, and the total collateral value that we were trying to transfer over to Barclays or what we were directed to transfer over to Barclays was approximately $50 billion.").

43.     JPMC served as the Fed's custodian on the Fed Repurchase Agreement, and Bank of New York ("BONY") served as a custodian for the Barclays-LBI Repurchase Agreement. On Wednesday, September 18, 2008, the process of moving the Fed Portfolio from JPMC to BONY (so Barclays could provide interim financing) began. By Kirk's account, however, Barclays decided not to extend financing based on as much as 20% of the Fed Portfolio because it included securities "that Barclays could not value."[75]  By some accounts, Barclays "received 42.7-ish billion dollars worth of collateral and $7 billion in cash to complete the Fed Repo trade."[76]  Contemporaneous Barclays emails, however, suggest both the value of the collateral pledged in the Barclays-LBI Repurchase Agreement and the value of the haircut with respect to Barclays' financing were much higher than $50 billion and $5 billion – instead, $52.19 billion and $7.190 billion, respectively.[77]

---

[75]  Ex. 6, Kirk Tr. at 66:5-67:23 ("Q.  Describe that for me.  What was your understanding?   A. . . . [A]s I understood it from the way that Mike Keegan explained it to me was that the Fed had been providing a repo for Lehman Brothers earlier in the week of approximately $50 billion, that the Fed had made it known that they wanted to be repaid on that repo, and that Barclays had agreed to assume that repo obligation from the Fed.  Without that financing the firm would have collapsed the next morning. So the way it was explained to me was, during the transfer of those -- that loan and the collateral associated with that loan, there were many pieces of collateral that Barclays could not value, so they did not accept them in transfer from the Fed.  And mechanically, it was explained to me the way that worked was, in a tri-party repo, the Fed transferred all of the positions to JPMorgan and then JPMorgan began transferring those positions upon the receipt of money from Barclays transferred money, and then they would transfer the positions that secured that repo.  And at some point during that process, Barclays became very uncertain as to some percentage of that collateral, I don't recall the exact amount, but it was a large number, maybe as much as, you know, 20 percent of the collateral, and when Barclays didn't accept those positions, they, by definition, just got left at JPMorgan.  They -- so JPMorgan was left with collateral that they were not comfortable with but Barclays would not accept, so -- and JPMorgan, I guess they attempted to negotiate but couldn't get that negotiation done.").

[76]  Ex. 16, Petrie Tr. at 113:3-12 ("Q.  Is that consistent with your recollection of what happened that evening into the Friday?   A.  My recollection is in dollar terms.  We received 42.7-ish billion dollars worth of collateral and got $7 billion in cash to complete the Fed repo trade.  This breakdown from John Haley is something I wouldn't be able to comment on.  I don't know if it's correct or not.").

[77]  Ex. 36, 9/19/08 email from Malloy to LaRocca; Ex. 37, "Haircut Summary" (showing haircut of $7.17 billion).  See also Ex. 38, 9/21/08 email from Ricci to Klein (*"**Pretty convinced resis not in 52 after talking to a few people**.  Will confirm, but more confident.  **Where the resis went more troubling. Worried about stepping blind into dtcc** ..."*) (emphasis added).

(footnote continued)

44. During the transfer, JPMC -- concerned about the LBI collateral that would remain at JPMC following a transfer of the Fed Portfolio to Barclays (i.e., collateral that LBI would use to secure its obligations to JPMC under the clearing agreements) -- apparently took aggressive action. Kirk testified JPMC had "closed down Lehman's DTC[C] account, which led me to believe that JPMorgan would not cooperate and transfer the aforementioned securities to Barclays on the Friday."[78] LaRocca testified he had to call the Fed to enlist their help in encouraging JPMC to proceed with the transaction because JPMC "didn't play nice in the sandbox."[79] Shapiro testified hearing that, with respect to the transfer from the Fed to Barclays, JPMC was a bad actor and potentially putting the deal at risk.[80]

---

Notably, the testimony concerning the ultimate disposition of the residential mortgage securities is unclear. While at least McDade claims they were transferred to Barclays (see Ex. 3, McDade Tr. at 242:9-20) most witnesses asked cannot account for their whereabouts. See Ex. 17, Deposition of Michael Klein, taken on September 12, 2009 ("Klein Tr.") at 177:23-178:3; Ex. 18, Deposition of Archibald Cox, taken on September 11, 2009 ("Cox Tr.") at 99:22-100:8.

[78] Ex. 6, Kirk Tr. at 54:16-55:10 ("Q. Now, you referred to -- you said they broadly outlined the first transaction. By the Friday morning, is it your understanding there's a second transaction, a subsequent transaction? A. By the time we had this meeting -- Q. Uh-huh. A. -- it was my view, my opinion, that there would have to be a reworking of the transaction because a vast majority of those securities that had been planned for transfer were held at JPMorgan. There was a -- and JPMorgan had a dispute of some sort about the transfer of the repo with Barclays, which was described to me by Mike Keegan, and in addition to that, they shut down Lehman's -- they closed down Lehman's DTC account, which led me to believe that JPMorgan would not cooperate and transfer the aforementioned securities to Barclays on that Friday.").

[79] Ex. 15, LaRocca Tr. at 36:18-38:7 ("Q. The cash is how much? 45 billion? A. Originally, the -- we moved 5 billion initially, and the securities did not move across quickly, and as a matter of fact, we actually didn't get $5 billion worth of securities for the first $5 billion worth of cash that moved across. At that point in time, I alerted the Fed, and I would have called, I'm not sure if it was Lucinda Brickler or Stephanie Heller, that we had agreed a transaction, we were having a great deal of difficulty because JPMorgan was not cooperating, and they had gone onto the --they had gotten -- I was told that they were going to reach out to JPMorgan. I can't tell you what they said. They came back to me, the Fed, and said that JPMorgan wanted to hold the excess collateral in margin for the transactions to satisfy, you know, their potential exposure to Lehman Brothers, and I said that's a non-starter, that's not the transaction that we had agreed on the Wednesday. We had agreed a transaction with the Fed to take the Fed out of the transaction, not for Barclays to satisfy or, you know, JPMorgan's exposures to Lehman Brothers. That was a lively discussion with me and the Fed, and at that point in time, I had escalated to Rich Ricci that JPMorgan was -- I don't know the words I would have used. I don't know that -- Q. Something colorful? A. Something colorful, right? They didn't play nice in the sandbox, okay? And, (footnote continued)

### 3. PARTIES RESTRUCTURE TRANSACTION TO ACCOMPLISH SALE OF LBI ASSETS THROUGH BARCLAYS-LBI REPURCHASE AGREEMENT

45.    In the wake of seemingly debilitating issues that arose when transferring collateral from the Fed Repurchase Agreement to the Barclays-LBI Repurchase Agreement in connection with Barclays' stepping into the Feds' shoes, the focus of the transaction shifted. Instead of the planned asset purchase transaction, the parties decided to use the Barclays-LBI Repurchase Agreement as the vehicle to transfer assets to Barclays at a discount.[81] In principle, the transaction would entail the Lehman Sellers and Barclays agreeing that Barclays simply would keep the pledged collateral under the Barclays-LBI Repurchase Agreement -- *including the haircut*[82] -- effectively transforming the repurchase agreement financing provided by Barclays to LBI into an asset sale.[83]

---

you know, and several -- now hours have passed, right? And, you know, we haven't done -- we haven't moved much cash and much securities.").

[80]    Ex. 5, Shapiro Tr. at 142:4-24 ("Q.   You testified previously that on, maybe it was Thursday evening or at some point later in the week, that you thought that there was some concern about Barclays going through with the deal, okay? I don't know what language you used. Tell me what the -- was there anything that Barclays said to anyone at Lehman that caused that concern, or was it just a general anxiety about wanting to get something done?   A.  No, it was really a  comment that was made to me by Jim Seery, who said something like there's a big, I think his words were "shit show" going on between JPMorgan and Barclays around the repo and that, you know, JPMorgan was screwing around doing something that Jim characterized, as I said, as something that was not positive, and that, you know, that was putting the deal potentially at risk. That was, I would say, the nature of what concerned me. So that was it.").

[81]    See, e.g., Ex. 6, Kirk Tr. at 72:23-73:9 ("Q. And how did Klein, Ricci and Keegan or any combination of those three men react to that news?   A. There was some question as to, well, what do we do now? I suggested that the only reasonable course of action would be to proceed with the transaction substituting the repo assets, the assets that Barclays had lent against, for all the other securities that had been contemplated in the transaction and leave the rest of the transaction as was.").

[82]    Ex. 7, Lowitt Tr. at 118:14-21 ("Q. Do you know when during the week it was determined that that's how the repo would be resolved, that Barclays would keep the collateral and Lehman would keep the cash? A. It was definitely part of -- I wasn't party to the negotiating sessions, but it was definitely part of the discussions that were occurring on the Friday.").

[83]    Ex. 9, Tonucci Tr. at 142:23-143:6 ("Q. And your understanding was that a default on the repo really converted what was a two-leg transaction; the repurchase leg would go away and there would effectively be a sale of the asset? [Objection] A.  That is correct.  It would become a sale."). Tonucci explained the transaction as Barclays replacing the Fed in the Fed Repurchase Agreement and then rebooking the trade as an asset sale. Ex. 9, Tonucci Tr. at 39:22-40:20 ("Q.  So effectively on Thursday (footnote continued)

46.     The Barclays-LBI Repurchase Agreement thus provided a convenient vehicle through which the parties could bury the secret $5 billion discount to Barclays agreed upon earlier in the week when the parties were proceeding under the APA. On September 18, 2008, the day before the Sale Hearing, Reilly reported: "***Not clear on the amount of block discount or how we make it happen. Defaulting on repo could be the best as discount could be taken from haircut. If that then we need to give business an allocation of block discount so they can mark down the books tonight.***"[84] Tonucci testified that he also had conversations with others at the Lehman Sellers about the possibility of using a default under the Barclays-LBI Repurchase Agreement as a vehicle through which Barclays would receive the embedded discount.[85]

### 4.     CLARIFICATION LETTER DID NOT EVOLVE INTO FINAL FORM UNTIL AFTER SALE HEARING CONCLUDED AND COURT ENTERED SALE ORDER

47.     The preconceived default of the Barclays-LBI Repurchase Agreement, which became the centerpiece of the transaction, appears only once in the Sale Transaction documents -- in a paragraph of the Clarification Letter. In particular, Section 13 of the Clarification Letter reads as follows:

---

the Fed funding goes down to zero, correct?   A.   That is correct.   Q.   And they exit the financing picture at that point?   A.   That is correct.   Q.   And what you have left is the Barclays repo, correct?   A. That is correct.   Q.   Describe for me what happens with the Barclays repo over the next few business dates?   We are now into Thursday on to Friday the 19th.   . . . A.   That transaction happened on Thursday.   That was essentially the last of that transaction in the way that I think about it.   It was executed on Thursday night and settled Thursday night into Friday morning and that was the end of that transaction.   After that it was just a matter of that transaction terminating and the collateral being rebooked as a purchase by Barclays and as a sale by Lehman.").

[84]   Ex. 39, 9/18/08 email from Reilly to Lowitt and Gelband, copy Tonucci and Kelly (emphasis added).

[85]   Ex. 9, Tonucci Tr. at 132:23-133:21 ("Q.   Do you remember discussing with anyone at Lehman defaulting on the repo as a way of providing the discount to Barclays?   A.   Yes.   Q.   With whom did you discuss that?   A.   I think it was with Ian and with Gerry, perhaps Martin Kelly as well."); Deposition Ex. 126, Email chain between Tonucci, Lowitt, Reilly, Gelband with copies to Kelly).   See also Ex. 9, Tonucci Tr. at 32:4-33:9 ("Q.   How did Barclays get the $5 billion discount .... Was the discount given to Barclays by defaulting on the repo?   A.   Yes, I would say that was the way in which the transaction was settled, so that is fair ...").

Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") *shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate*. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.[86]

48.     Even then, however, the document makes no disclosure of an embedded $5 billion discount being funneled to Barclays through the Barclays-LBI Repurchase Agreement and Barclays' retention of the haircut.  The final Clarification Letter also redefined the definition of "purchased assets" to account for the use of the Barclays-LBI Repurchase Agreement as a vehicle for the asset transfer:

1. Purchased Assets; Excluded Assets.  . . . (ii) with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement [the APA], instead of the items referred to in such clauses, *(A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A previously delivered by Seller and accepted by Purchaser, (B) such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered to Seller and accepted by Purchaser* (provided, however, that Purchaser in its discretion may elect within 60 days after Closing to return any such securities to LBI); provided that no securities owned by LBI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets . . . .[87]

49.     Although this drastic change in concept existed in drafts of the Clarification Letter created before the September 19 hearing, it was not disclosed to the Court.  The "Purchased Assets" definition developed as follows during the Friday, September 19, 2008, Saturday, September 20, 2008 and Sunday, September 21, 2008 timeframe:

---

[86]   Ex. 25, Clarification Letter § 13.

[87]   Ex. 25, Clarification Letter § 1.

| DATE, TIME AND SIGNIFICANCE | LANGUAGE IN DRAFT CLARIFICATION LETTER |
|---|---|
| • Friday, September 19, 2008 at 5:15 p.m. (during Sale Hearing)[88]<br><br>• First mention of the Barclays-LBI Repurchase Agreement in the Clarification Letter<br><br>• Fed Portfolio excluded from "Excluded Assets" | 14. <u>Barclays Repurchase Agreement</u>. At the Closing, Purchaser and its Affiliates will release Seller and its Subsidiaries from any obligation under the September 18 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates"<br>1. <u>Purchased Assets; Excluded Assets</u> … (b) In lieu of the assets referred to in clause (k) of the definition of "Excluded Assets," the following shall be Excluded Assets; All of the investments held by Sellers or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, similar asset backed securities and corporate loans, ***other than those subject to the Barclays Repurchase Agreement …*** (emphasis added) |
| • Saturday, September 20, 2008 at 2:39 p.m.[89]<br><br>• First combination of unwinding the Barclays-LBI Repurchase Agreement and express inclusion of collateral as "purchased assets" | 1. <u>Purchased Assets; Excluded Assets</u>. (a) The Purchased Assets means … plus the securities owned by LBI and either (A) pledged to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined above0) [sic], as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates ….<br>13. <u>Barclays Repurchase Agreement</u>. At the Closing, Purchaser and its Affiliates will provide a written release of Seller and its Subsidiaries, and Seller and its Subsidiaries will provide a written release of Purchaser and its Affiliates, from all their respective obligations under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates (the "<u>Barclays Repurchase Agreement</u>"). |
| • Sunday, September 21, 2008, at 5:03 p.m.[90]<br><br>• First version of the operative clause to "rescind" the termination of the Barclays-LBI Repurchase Agreement sent by email | 13. <u>Barclays Repurchase Agreement</u>. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008, repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "<u>Barclays Repurchase Agreement</u>") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Buyer shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects. |

---

[88] <u>Ex. 40</u>, email sent 9/19/08 at 9:15 p.m. covering draft Clarification Letter.

[89] <u>Ex. 41</u>, email sent 9/20/08 at 2:39 p.m. covering draft Clarification Letter.

[90] <u>Ex. 42</u>, email sent 9/21/08 at 5:03 p.m.

**D.     BARCLAYS DEMANDS THAT LEHMAN SELLERS TRANSFER ADDITIONAL VALUE IN ADDITION TO THE BARCLAYS-LBI REPURCHASE AGREEMENT COLLATERAL**

50.     In addition to keeping the haircut reflected in the Barclays-LBI Repurchase Agreement (which totaled *at least $5 billion*) following the Sale Hearing, Barclays demanded that the Lehman Sellers transfer additional value in connection with the Sale Transaction.  The Lehman Sellers were told several times throughout the day of the Sale Hearing that the additional collateral was essential to closing the Sale Transaction.[91]  For example, according to Lowitt, on September 19, McDade asked him to find "between 3 and 4 billion dollars" of additional value to Barclays to add to the transaction.[92]  Kirk testified the Lehman Sellers began searching to "find some, some identifiable bucket of value until Barclays said, yeah, that's enough."[93]  Klein gloated to Diamond in an email sent early September 20, 2008 (the day after the Sale Hearing) that "*we clawed back 3B more of value in the transaction* and cut the building prices by $160 mm."[94]

51.     *Non-Actionable Box.*  The primary source of additional value the Lehman Sellers identified was the "non-actionable box,"  which is "a box of assets which is financed on an

---

[91]  Ex. 9, Tonucci Tr. at 54:24-55:15 ("Q.  And do you recall there being an effort on September 19 to find additional collateral for Barclays?  A.  I do.  Q.  What can you tell us about the efforts to find additional collateral for Barclays?  A.  That we were asked on the morning of the 19th to find if there was additional value to include in the transaction.  Q.  Asked by whom?  A.  I believe I was asked by Ian Lowitt.  Q.  Did Ian Lowitt tell you why he was asking you to find additional collateral?  A.  He said that it was necessary for the transaction to close and he reiterated that through the day.").

[92]  Ex. 7, Lowitt Tr. at 62:8-20 ("Q.  As best you remember, what did Mr. McDade say to you about finding additional sources of value?  A.  I don't have a specific recollection of the conversation, but I would -- I would expect that he would have asked me where, if anywhere, were there additional sources of value we could include in a new transaction.  Q.  Did Mr. McDade give you a target number for additional sources of value?  How much he needed to find?  A.  My recollection is between 3 and 4 billion dollars.").

[93]  Ex. 6, Kirk Tr. at 112:19-20 (emphasis added).

[94]  Ex. 43, 9/20/08 email from Klein to Diamond (emphasis added).

unsecured basis."[95]  The non-actionable box appears to have provided *no less than* $1.9 billion

of additional collateral for Barclays,[96] though the figure may be as high as $2.3 billion.[97]  The

$1.9 billion in the non-actionable box became Schedule B to the Clarification Letter.[98]

    52.    ***Custodial Account Securities.***  Another additional source of value appears to be

an excess in the reserves LBI was required to maintain pursuant to Rule 15c3 of the Securities

Exchange Act (the "15c3 Securities").[99]  By unwinding customer positions, Lowitt was able to

---

[95]  Ex. 10, Azerad Tr. at 110:25-111:10 ("Q. Yes.  A. . . .  The non-actionable box is a box of assets which is financed on an unsecured basis.  The reason it's called non-actionable is because it's -- as part of our analysis of the box, we try to separate assets which we thought were left in the box, left unencumbered, but could be financed from assets left in the box, but couldn't be financed on a "business as usual" basis.  That could be the same 1.9 billion.").

[96]  Ex. 7, Lowitt Tr. at 185:22-186:11 ("Q. And then two, 'Non-actionable box as shown to Barclays on Friday afternoon (1.9 billion of collateral).  Actual box is slightly bigger because it also contains Lehman debt.'  Do you see that? A. I do.  Q. And do you recognize this to be two of the components of the value that was ultimately transferred to Barclays in the transaction? A.  I see this as two of the elements of the transaction, the repo transaction and the non-actionable box, which I think is shorthand for or just a different term for the unencumbered collateral.").

[97]  Ex. 44, 9/21/08 email from Forrest to Blackwell; see also Ex. 45, 9/21/08 email from Forrest to Lowitt (identifying $2.3 billion in potentially transferable assets).

[98]  Ex. 9, Tonucci Tr. at 125:11-18 ("Q. You have a second item: "Their opening balance sheet should also include 1.9 billion of box assets".  Correct? A.  Correct.  Q.  What is that a reference to? A. The unencumbered collateral.  Q.  Schedule B? A.  Which became Schedule B.").

[99]  Ex. 13, Kelly Tr. at 129:6-18 ("Q. What do you mean when you say there was an effort to identify other assets?  What other assets are you talking about? A. My recollection is that there was an effort to identify whether there was a surplus in funds segregated under the 15c3 requirement.  Q. Apart from the effort to find a surplus in funds, the segregated funds under 15c3, were there other types of assets that were being searched for to transfer to Barclays? A. My recollection is there was a general effort to identify unencumbered and pledgeable assets.").

identify a surplus in the reserves.[100] One witness quantified the excess at approximately $1 billion,[101] although another quantified it as between $750-800 million.[102]

53. ***Options Clearing Corporation Securities.*** Another source of potential additional value the Lehman Sellers uncovered included margin accounts with the Options Clearing Corporation (the "OCC Accounts"). Internal documents from the Lehman Sellers suggest the OCC Accounts may have contained as much as $5 billion,[103] while others peg the figure at closer to $2.3 billion.[104] Even McDade claims to be unaware of the transfer of these assets.[105]

---

[100] Ex. 7, Lowitt Tr. at 67:21-68:13 ("Q. The 15c3 lock-up piece, let me be sure I understand what you just said. As I understand it, the reason it takes place over a period of time is as trades settle and customer activity takes place, you are able to realize how much is surplus in 15c3, correct? A. I don't know if it's so much trade settling, but 15c3 lock-up is sort of a regulatory requirement which establishes a set of rules which, based on customer assets and how they are custodied, determines an amount of excess that you need to hold against that. And it is only in sort of the unwind of all of those customer positions that you can determine whether there is excess as calculated per the formula or whether the actual excess is a different number.").

[101] Ex. 9, Tonucci Tr. at 146:11-147:3 ("Q. I have talked about the components at least that you have in your e-mail, where you recap the opening balance sheet, right, you have the repo component and then you have 1.9 billion for what we have talked about, became Schedule B, and then you had another billion dollars of the15c3 receivables? A. That is correct. Q. And the 1.9 and the 1 is about $2.9 billion, right? A. That is correct. Q. And that was additional value over and above the repo, correct? . . . A. Additional assets over and above the repo assets that were transferred on the Thursday night.").

[102] Ex. 7, Lowitt Tr. at 60:3-9 ("Q. And what, as best you recall, is the value of those additional elements, dollar value? A. The dollar value of the unencumbered collateral was in and around $2 billion, and, you know, the 15c3 excess, my understanding of the deal that was reached vis-a-vis the 15c3 excess was around 750 to 800 million dollars.").

[103] Ex. 46, 9/19/08 email from Lowitt to McDade ("We did find $5 bn of exchange listed options which we are investigating.").

[104] Ex .47, Valuation Spreadsheet (ascribing $2.3 billion value to OCC Accounts).

[105] See Ex. 9, McDade Tr. at 275:14-278:4 ("Q. Did anyone tell you that you -- that Lehman had an excess of those assets at OCC? A. Not specifically, no. Q. Do you recall whether at any time anyone told you that Lehman had an excess of $1.3 billion of cash deposited at the OCC? A. No one told me that specifically, no. Q. Did anyone tell you that Lehman had an excess of $900 million in additional assets beyond the cash deposited at the OCC? A. No one told me that. . . . Q. Did anyone tell you that the, under the clarifying document, there had been some agreement where Barclays to transfer to Barclays an additional $2.2 billion of cash and securities representing margin, excess margin and other assets at OCC? A. No. . . . Q. To your knowledge, was there ever any intent on the part of Lehman that the clarifying letter would provide Barclays an additional $2.2 billion in margin at OCC? A. No. Q. What about margin, additional margin that Lehman had at any other clearing corporations, and I want to specifically include any foreign clearing corporations, counterparts to the OCC, were you (footnote continued)

54.    *Lagging Revisions To Clarification Letter.*  Changes to the draft Clarification

Letter documenting the transfer of these additional assets were not made until *after the*

*September 19 hearing*:

| DATE, TIME AND SIGNIFICANCE | LANGUAGE IN DRAFT CLARIFICATION LETTER |
|---|---|
| • Saturday, September 20, 2008, at 2:39 p.m.[106]  <br><br>• First mention of the non-actionable box | 1. Purchased Assets; Excluded Assets. (a) The Purchased Assets [includes] ... (B) *such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates* (it being understood that Purchaser in its discretion may select to receive all such securities) . . . . |
| • Saturday, September 20, 2008, at 11:13 p.m.[107]  <br><br>• First mention of Schedule B  <br><br>• First mention of exchange-traded derivatives (presumably the OCC Accounts) | 1. Purchased Assets; Excluded Assets. (a) The Purchased Assets [includes] ... (B) *such securities as Purchaser may, within 60 days after the Closing select to receive and are held in the clearance "box" on the Closing Date as specified in the schedule previously delivered by Seller to Purchaser or its Affiliates* (it being understood that Purchaser in its discretion may select to receive all such securities); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and *[(C) exchange-traded futures and collateralized short-term agreements]* . . . |
| • Monday, September 22, 2008, at 11:09 a.m. (executed version)[108]  <br><br>• First inclusion of collateral securing exchange traded derivatives | 1. Purchased Assets; Excluded Assets. (a) The Purchased Assets [includes] ... *(C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements* . . . . |

## E.    CURE AND COMPENSATION LIABILITIES WERE OVERSTATED TO MAKE IT APPEAR THAT BARCLAYS WAS TAKING ON MORE LIABILITIES THAN IT WAS

55.    The schedule incorporated into the APA indicated that Barclays would take on

Cure and Compensation Liabilities estimated at $2.25 billion and $2 billion, respectively.[109]

---

aware, was there ever any negotiations or intent on the part of Lehman to transfer any such margin, cash or additional assets, at foreign clearing corporations to Barclays?    A.  I'm not aware of those.").

[106]    Ex. 41, email sent 9/20/08 at 2:39 p.m. covering draft Clarification Letter.

[107]    Ex. 48, email sent 9/20/08 at 11:13 p.m. covering draft Clarification Letter.

[108]    Ex. 26, email sent 9/22/08 at 11:09 a.m. covering executed Clarification Letter.

[109]    Ex. 34, APA Schedule.

During the Sale Hearing, the Debtor disclosed to the Court that the contract cure amount actually was $1.5 billion.[110]

56. It appears that the quantum of both of these liabilities may have been inflated during negotiations, however, to provide further value to Barclays. Specifically, Barclays apparently estimated the actual exposure for the Cure and Compensation Liabilities at only $1.3 billion -- not the $4.25 billion figure indicated in the APA schedule.[111] This overstatement was no mistake. Ricci explained that "on the comp and the cure payments, we had hoped that we could pay less than what we had assumed."[112] Put another way, Barclays hoped to "underspend to create some cushion."[113]

57. ***Contract Cure.*** At Lehman, Shapiro and his team helped estimate the contract cure payments.[114] Shapiro testified that he used a $1.5 billion estimate during negotiations, and could not explain why it was reported on some documentation as $2.25 billion.[115] At some point in the week of September 15, 2008, others also recognized the $2.25 billion figure was overstated, believing the number only should have been approximately $1 billion.[116] According

---

[110] Ex. 23, Tr. Hearing, 9/19/08 at 100:1-4 ("Barclays is also assuming the cure amounts relating to contracts and leases that will be assumed pursuant to the asset purchase agreement. And that has a potential exposure, Your Honor, of 1.5 billion dollars that he would testify to.") (reading McDade proffer).

[111] Ex. 49, 9/19/08 email from Trevelyan to Clackson ("We understand broadly that the negative goodwill arises because the 2.25 cure payment and 2.0 comp provision won't be valued at that amount but instead C1.3."); Ex. 19, Deposition of Patrick Clackson, taken on September 4, 2009 ("Clackson Tr.") at 98:21-101:19 (discussing Ex. 49 and explaining that "C1.3" meant "circa 1.3").

[112] Ex. 14, Ricci Tr. at 125:4-20.

[113] Ex. 14, Ricci Tr. at 145:20-146:9.

[114] Ex. 5, Shapiro Tr. at 63:9-65:16.

[115] Ex. 5, Shapiro Tr. at 148:12-151:3; 153:20-154:24.

[116] Ex. 13, Kelly Tr. at 134:5-24 ("Q. Why was it reduced from 2 and a quarter to $1 billion? A. It was reduced after a review of the schedule that Ian, Ian Lowitt, and I undertook at some point during that week whereby we observed that the estimated liability appeared to be high relative to the expense run rate of the firm. Q. And was it you and Mr. Lowitt who made that determination that it was high relative to the expense run rate? A. My recollection is that it was Ian and I that made that observation. Q. And at what point in the week did you and Mr. Lowitt make that observation? Early in (footnote continued)

to Kelly, when they told McDade, McDade said "[w]e just left a billion dollars on the table."[117]

In fact, Barclays ultimately may have paid only $238 million for contract cure payments.[118]

58.    ***Compensation Liabilities.*** With respect to the compensation liabilities, the

schedule incorporated into the APA estimated Barclays' liability at $2 billion.[119] Again, Kelly

testified the $2 billion number was a negotiated number that exceeded the accrual for cash

compensation on the Lehman Sellers' books by $1 billion.[120] Lowitt testified that the $1 billion

margin over the Lehman Sellers' books was not surprising because the books reflected only the

cash compensation -- and the agreed-upon figure represented both cash and other forms of

compensation.[121] Barclays appears to have actually paid only $1.5 billion for 2008 bonuses.[122]

## IV.    **JURISDICTION AND VENUE**

59.    This Court has jurisdiction over this motion under 28 U.S.C. § 1334. This is a

core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28

U.S.C. § 1409. The statutory predicates for the relief requested herein are section 105(a) of the

Bankruptcy Code, Federal Rule 60(b) and Bankruptcy Rule 9024.

---

the week? Late in the week?   A. I can't recall.   Q. Was it before Friday of the week?   A. I believe it
was before Friday, but I'm not certain.").

[117]  Ex. 13, Kelly Tr. at 136:2-10.

[118]  See Ex. 50, July 16, 2009 Letter from Barclays counsel covering a spreadsheet of "aggregate
cure payments" labeled BCI-EX00077272-286.

[119]  Ex. 34, APA Schedule; Ex. 20, APA § 9.1(c).

[120]  Ex. 13, Kelly Tr. at 116:19-117:14 ("Q.   Well, the comp number of 2 billion was an agreed
number, correct?   A.  Yes, that was my understanding.   Q. And it was your understanding that the 2
billion comp number that was agreed was a billion dollars over the accrual that Lehman carried on its
books for comp, correct?   A.  It was approximately a billion dollars over the cash component of the
accrual.").

[121]  Ex. 7, Lowitt Tr. at 213:7-25 ("Did you ever develop an understanding s to whether a $2
billion accrual for comp was a good estimate?   A.  My understanding of the 2 billion was that it was a
negotiated number between Barclays and Lehman, that it included the cash bonus, as well as sort of stock
and other forms of compensation.  So the fact that it was a $2 billion number which was larger than the
sort of accrual for cash bonus didn't surprise me.").

[122]  Ex. 54, Spreadsheet of 2008 Bonuses (excluding non-bonus items).

## V.   ARGUMENT

60.    Section 105(a) of the Bankruptcy Code authorizes the Court to issue any order,

process or judgment that is necessary or appropriate to carry out the provisions of the

Bankruptcy Code.  See 11 U.S.C. §§ 105(a).

61.    Federal Rule 60(b) enables the Court to relieve "a party or a party's legal

representative from a final judgment, order or proceeding . . . [for] (1) mistake, inadvertence,

surprise or excusable neglect; (2) newly discovered evidence . . . (3) fraud, misrepresentation, or

misconduct by an opposing party . . . [and] (6) any other reason that justifies relief." Fed. R. Civ.

P. 60(b).  See also Fed. R. Bankr. P. 9024 ("Rule 60 F.R.Civ.P. applies in cases under the

Code").  Sale orders entered under section 363(b) of the Bankruptcy Code are subject to

challenge under Rule 60(b).[123]

62.    Rule 60(b) motions are addressed to the Court's discretion, and equitable

principles may influence the decision whether to award relief.  See Grace v. Bank Leumi Trust

Co. of NY, 443 F.3d 180, 187 (2nd Cir. 2006) ("Federal Rule of Civil Procedure 60(b) decisions

by district courts are accorded deference.  We reverse only where there has been an abuse of

discretion."); Matter of Emergency Beacon Corp., 666 F.2d 754, 760 (2nd Cir. 1981) ( "A

motion under Rule 60(b) is addressed to the sound discretion of the trial court."); In re Benhil

Shirt Shops, Inc., 87 B.R. 275, 277 (S.D.N.Y. 1988) (citing Wright & Miller, Federal Practice

and Procedure: Civil § 2857) ("Decisions under Fed. R. Civ. P. 60(b) are solidly within the

---

[123]    Cf. FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 286 (7th Cir. 2002) ("[T]he order
approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits
that Fed. R. Civ. P. 60(b) imposes."); In re Rome Family Corp., 407 B.R. 65, 80 (Bankr. D. Vt. 2009)
(citing Matter of Met-L-Wood Corp., 861 F. 2d 1012, 1016-18 (7th Cir. 1988)). See also In re Ray, 2008
WL 544876, 5 (Bankr. W.D. Wash. February 26, 2008) ("A review of numerous circuit and bankruptcy
court decisions indicates that other than the appeal of the sale order, the only method to collaterally attack
a sale is by a motion to vacate the sale order under Fed. R. Civ. P. 60(b) ..."); In re CHC Industries, Inc.,
389 B.R. 767, 775 (Bankr. M.D. Fla. 2007) ("To challenge a Sale Order, a party may pursue the remedies
provided by § 363 of the Bankruptcy Code or Rule 60(b) ...").

equitable discretion of the court. A court must weigh the countervailing principles of deciding a claim on its merits and achieving a final result."); In re Govola, 306 B.R. 733, 737 (D. Conn. 2004) ("Rule 60(b) motions are, in general, addressed to the discretion of the court with equitable principles taken into account.").

### A. COMMITTEE IS ENTITLED TO RELIEF FROM SALE ORDER FOR MISTAKE, INADVERTENCE OR EXCUSABLE NEGLECT PURSUANT TO RULE 60(B)(1)

63.     "Generally [Rule 60(b)(1) remedies] the mistake of a party or his representatives." Matter of Emergency Beacon Corp., 666 F.2d 754, 758 (2nd Cir. 1981) (upholding lower bankruptcy court decision vacating portion of prior order). Still, mistakes of fact or law by third parties also support reconsideration under Rule 60(b)(1). See In re 310 Assocs., 346 F.3d 31, 34-35 (2d Cir. 2003) (holding that mistake of fact by a court is proper grounds for Rule 60(b)(1) relief). Moreover, a misunderstanding among the parties provides a basis for Rule 60(b)(1) relief. IF Realty L.P. v. Rochester Assocs., 92 F. 3d 752, 757 (8th Cir. 1996) ("The mistake in this case did not involve attorney error but a misunderstanding among the parties resulting in lack of mutual assent to the settlement agreement. This is precisely the type of mistake that Rule 60(b) is intended to redress.") (citing Sheng v. Starkey Lab., Inc., 53 F. 3d 192,194, n.6 (8th Cir. 1995) (remanding for hearing to determine whether there was mutual assent to settlement, because if not, then contract never existed)).

64.     The Court was presented with, and approved a transaction with the understanding that the Debtors sold assets valued at $47.4 billion to a purchaser that assumed liabilities totaling $45.5 billion (plus Cure and Compensation Liabilities). The only documents before the Court at the time it entered the Sale Order were the APA and the First Amendment. At no time was the Court apprised of the secret $5 billion discount.[124] Moreover, the final transaction and the Clarification Letter differ materially from the transactions identified in these documents:

---

[124]     See, e.g., Ex. 32; Ex. 30; Ex. 33; Ex. 31; Ex. 13, Kelly Tr. at 46:11-16, 229:2-13; Ex. 7, Lowitt Tr. at 45:8-17; Ex. 14, Ricci Tr. at 28:10-29:4; Ex. 9, Tonucci Tr. at 29:22-30:17.

| ASSET PURCHASE AGREEMENT AND FIRST AMENDMENT | SALE HEARING | CLOSING (MODIFICATIONS REFLECTED IN CLARIFICATION LETTER) |
|---|---|---|
| • **Assets**: $70 billion long position (listed as $70 billion, though this is a negotiated figure; true figure could be $75 billion)<br><br>• **Liabilities Assumed**: $69 billion<br><br>• **Residential Mortgage Securities**. 50% of residential real estate mortgage securities | • **Assets**: $70 billion long position declined to $47.4 billion (figure could include implied $5 billion discount)<br><br>• **Liabilities Assumed**. $45.5 billion (plus Cure and Compensation Liabilities)<br><br>• **Residential Mortgage Securities**. 100% of residential real estate mortgage securities ($6 billion worth) will be pledge to secure DTCC clearing, but then returned to LBI | • **Assets**: (a) implied $5 billion discount now channeled through repurchase agreement haircut (not scheduled assets in APA), which could have totaled between $5 billion and $7.190 billion; (b) allegedly "unencumbered securities" ranging from $1.9 billion to $2.3 billion; (c) 15c3 Securities totaling approximately $750 million to $800 million and (d) Options Clearing Corporation securities ranging between $2.3 billion and $5 billion<br><br>• **Liabilities Assumed**. $45.0 billion relating to Fed Repurchase Agreement, plus Cure and Compensation Liabilities of $1.3-$1.7 billion<br><br>• **Residential Mortgage Securities**. Disposition unknown. |

65.     The Court never approved the Clarification Letter. Even though the Clarification Letter materially altered significant terms of the Sale Transaction, the parties never presented it to the Court for its review and consideration. When the parties eluded to the Clarification Letter at the Sale Hearing, the Court was advised that it only was designed to "clarify" (not change) the transaction.[125] Instead, it was the mechanism for very material changes: the transaction

---

[125] Ex. 23, Tr., Hearing 9/19/08 at 48:5-17 ("Some other changes that were made to the contract affect what are called purchase assets and what are excluded assets. There was some confusion as to which subsidiaries, if any, were being sold. And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here. But in that letter, we're going to clarify that the only subsidiaries that are being purchased by Barclays are Lehman Brothers Canada Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA. The latter two subsidiaries that I just referred to relate to a business that is called PIM, or Private Investment Management Business, which is a business that was not part of the original deal but is now being purchased by Barclays").

restructuring from the APA to the Barclays-LBI Repurchase Agreement, the "haircut" transferred to Barclays, and the additional unencumbered assets being transferred to Barclays in the non-actionable box, the 15c3 Securities and the OCC Accounts.

66.    Moreover, the Clarification Letter purported to rescind the noticed termination of the Barclays-LBI Repurchase Agreement, and thus attempt to avoid the effect of relevant portions of the Bankruptcy Code. Barclays issued a Notice of Termination with respect to the Barclays-LBI Repurchase Agreement on September 19, 2008.[126] That termination would have, under section 559 of the Bankruptcy Code, resulted in the haircut of not less than $5 billion (and possibly much more) becoming property of the estates. In order to transfer the implied haircut to Barclays, it became necessary to "rescind" the termination notice.

67.    Indeed, the parties' ability to provide a detailed description of the changes brought about in the Clarification Letter suffered for good reason. The Lehman Sellers and Barclays' principals continued to negotiate the material terms and contours of the Clarification Letter after entry of the Sale Order. The process of drafting of the Clarification Letter was in its nascent stages at the time of the Sale Hearing, while the parties were still searching for additional assets to transfer to Barclays. The provisions restructuring the transaction through the Barclays-LBI Repurchase Agreement did not reach their final form -- including the "rescission" of the termination notice -- until Sunday, September 21, 2008 at 5:03 in the afternoon.

68.    The definition of "Purchased Assets" also changed considerably after the Sale Hearing. In fact, the draft sent on September 20, 2008 at 2:39 p.m. was the first to mention the non-actionable box that would become Schedule B to the Clarification Letter. The first draft to mention transfer of "exchange-traded derivatives" and the property collateralizing these derivatives did not appear until 11:13 p.m. that night.

---

[126]    Ex. 52, 9/19/08 Notice of Termination.

69.     Accordingly, even though the Sale Order provides for the approval of the
"Purchase Agreement," and that definition includes the Clarification Letter, the actual text of the
Sale Order cannot be read to authorize or approve the Clarification Letter.  Although no specific
provision of the Sale Order endorses the contents of the Clarification Letter or the additional
transfers it effectuates, in an abundance of caution, the Committee requests that the Court
conform the Sale Order to the terms of the transaction presented to the Court and strike any
reference to approval of the Clarification Letter.

70.     To the extent the Court decides that the question of whether the Sale Order (and
the Court) approved the Clarification Letter presents a request for declaratory relief that only can
be resolved through the initiation of a declaratory judgment action, the Committee stands
prepared to file the attached complaint for declaratory judgment seeking that relief.[127]  Indeed,
the Committee submits the question of whether the Court (and the Sale Order) approved the
Clarification Letter is a threshold issue that should be resolved first.  Should the Court conclude
that the Clarification Letter was not approved, then that determination may obviate the question
of whether Rule 60(b) relief from the Sale Order is required.  It also leads to the conclusion that
the transfers consummated under the Clarification Letter were not authorized and hence subject
to avoidance under section 549 of the Bankruptcy Code.

---

[127]  Ex. 1, Draft Complaint.

## B. NEWLY DISCOVERED EVIDENCED UNEARTHED THROUGH RULE 2004 DISCOVERY WARRANTS RELIEF FROM SALE ORDER UNDER RULE 60(B)(2)

71.     Since the Court entered the Sale Order, myriad facts have been discovered that

simply were not presented for the Court's consideration.  These include, without limitation:

- the implied $5 billion discount that was neither disclosed in the APA nor disclosed to the Court;

- the restructuring of the transaction that resulted in Barclays acquiring the broker-dealer business through the Barclays-LBI Repurchase Agreement (and not the APA), including the "haircut" associated with the Fed Portfolio securities;

- the Lehman Seller's acquiescence to Barclays' last-minute demands for additional assets, and their efforts to find additional assets until Barclays was satisfied that there was nothing left;[128]

- the transfer of unencumbered securities in the non-actionable box which may have totaled $2.3 billion (not $1.9 billion); the OCC Accounts, which may have totaled between $2.3 billion and $5.0 billion and the 15c3 Securities (which may have totaled $800 million);

- even though the haircut under the Fed Repurchase Agreement totaled between $4.4. billion and $5 billion, the haircut under the Barclays –LBI Repurchase Agreement was $5 billion (and possibly as high as $7.190 billion) -- a haircut that was retained by Barclays as part of the transaction;[129] and

---

[128]  Ex. 14, Ricci Tr. at 158:4-159:4 ("Q.  At any point did anybody at Lehman  suggest that Barclays was being piggish? A. … [Lehman said] there's nothing left. And I said something like to him, well, fine, we're not going to be -- we're not going to be pigs and go after every last nickel. We'll try to get comfortable with what you have given us, and if that's the case, we're done. Q. So is it fair to say that Barclays stopped looking for additional Lehman assets when Mr. Kirk said there was nothing else left to transfer to Barclays?  A. I recall saying to Alex that -- he was very worried that we were going to walk because we had asked for more assets, they had given us what we could, he was worried we were going to walk, and I said, okay, if this is it, if this is all we can find before we go to court, you know, we'll take it, we'll take the chance, but we won't kill the deal over looking for more assets."); Ex. 6, Kirk Tr. at 122:17-24.

[129]  See, e.g., Ex. 28, Levanthal Decl. ¶ 9 (stating Fed required LBI to post as collateral securities valued at approximately $50.62 billion in exchange for Fed advances of $46.22 billion); Ex. 9, Tonucci Tr. at 17:5-11 ("Q.  You used a phrase, "There were changes in secured funding haircuts", is that right?  I want to understand what you mean by "haircuts"?   A.  The difference between the market value and the cash received is known as the haircut in a secured funding arrangement, the market value of the securities I should say."); see also Ex. 51, 9/15/08 email from Aprigliano to Tonucci and Azeraz (showing Fed haircuts on 9/15/08); Ex. 36, 9/19/08 email from Malloy to LaRocca; Ex. 37, "Haircut Summary."

- overstatement of the Cure and Compensation Liabilities, which were grossly overestimated at a purported $4.25 billion -- but instead totaled only $1.3-$1.7 billion.

72.     Each of these newly-discovered facts demonstrate the Sale Transaction that was consummated differed significantly from the transaction described to the Court.

**C.     RELIEF FROM SALE ORDER UNDER 60(B)(3) IS APPROPRIATE**

73.     Rule 60(b)(3) serves to modify or vacate an order approving an asset sale where an adverse party's "fraud or misrepresentation ... prevented the movant from fully litigating the issue." In re Rickel & Associates, Inc., 272 B.R. 74, 86-87 (S.D.N.Y. 2002) (holding Rule 60(b)(3) motion to vacate a sale order "raises factual issues and will be tried together with the issues raised in [a corresponding adversary] complaint"); see also In re Lawrence, 293 F.3d 615, 624-26 (2nd Cir. 2002) (noting bankruptcy court's statement that "[i]f there were misrepresentations at the time of the sale, this Court approved such sale not fully knowing all the salient facts" and ordering the district court to grant Rule 60(b)(3) relief).  Moreover, Rule 60(b)(3) allows the Court to grant relief from the Sale Order based on misrepresentations made at the Sale Hearing whether intentional or not.  See Londsdorf v. Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995) ("[Rule] 60(b)(3) applies to both intentional and unintentional misrepresentations").

74.     The facts unearthed reveal that the terms of the transaction as consummated differ from those represented to the Committee:

| ISSUE | TRANSACTION AS CONSUMMATED | FACTS RECOUNTED TO COMMITTEE |
|---|---|---|
| **VALUE OF SECURITIES TRANSFERRED** | With respect to the Fed Portfolio, no less than $50 billion (possibly $52 billion) of securities transferred, *plus* not less than $1.9 billion (possibly $2.3 billion) in the non-actionable box | The pre-mark valuation was $49.9 billion; the September 21 valuation had declined to between $44 and $45 billion; LBI would transfer an additional $1.9 billion of securities that previously had not been pledged[130] |
| **VALUE OF ASSUMED LIABILITIES** | Barclays assumed New York Fed liabilities totaling $45.0 billion; Cure and Compensation Liabilities totaled between $1.3 billion and $1.7 billion | Barclays assumed Fed Repurchase Agreement liabilities totaling $45.5 billion and $4.25 of additional assumed liabilities[131] |

75.     The transaction that closed similarly differed from the one presented to the Court. The Court initially was presented with information leading to the inevitable conclusion that the transaction was not meant to provide an immediate economic gain to either party but instead result in the transfer of $70 billion of assets and the assumption of $69 billion in liabilities. Those figures again purportedly dropped to $47.4 billion and $45.5 billion (plus Cure and Compensation Liabilities). At no time was the embedded gain disclosed, nor was the quantum of the additional assets transferred to Barclays disclosed. Accordingly, the Committee submits the misrepresentations made to the Court at the Sale Hearing justify relief from the Sale Order pursuant to Federal Rule 60(b)(3).

### D.     RULE 60(B)(6) PROVIDES A BASIS FOR RELIEF

76.     Granting the Committee Rule 60(b) relief in the instant case comports squarely with the importance placed on disclosure and transparency in bankruptcy sales. See Rosenshein v. Kleban, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) (noting "integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets"); See In re Dunning Bros. Co., 2009 Bankr. LEXIS 2427, at *31 (Bankr. E.D. Cal. Sept. 4, 2009) ("There is an important bankruptcy policy to be enforced that is grounded on the premise that the integrity of the

---

[130]     Compare Ex. 28, Leventhal Aff. ¶¶ 12-13 with Ex. 29, Burian Decl. at ¶ 10.

[131]     Compare Ex. 28, Leventhal Aff. ¶¶ 7, 9, 11-12, with Ex. 29, Burian Decl. ¶ 10.

bankruptcy system depends in large part on full, candid, and complete scheduling of assets by debtors"); <u>Frontier Farm Credit v. Schwartz (In re Schwartz)</u>, 2008 Bankr. LEXIS 1795, at *16 (Bankr. D. Kan. June 10, 2008) ("Debtor candor is essential to the orderly operation of the system. This Court categorically condemns the conduct of a debtor who (1) fails to schedule a remainder interest of substantial value; [and] (2) sells part of that interest during a chapter 11 case without seeking this Court's approval as is required by § 363 . . . .") (internal footnote omitted); <u>In re Superior Crewboats, Inc.</u>, 374 F.3d 330, 335 (5th Cir. 2004) ("The Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims; the duty is continuous.").

77.     Considering the magnitude of the changes to the Sale Transaction, and the impact on the estates occasioned by the transfer of billions of dollars of additional estate assets to Barclays for no consideration, Rule 60(b)(6) relief from the Sale Order is warranted. This is especially true when significant features of the transaction, including the secret implied $5 billion discount, were never disclosed. In light of the facts revealed and statements made to the Court and the Committee concerning the Sale Transaction, and the extent to which the consummated transaction differed from the approved transaction, the Committee submits it has identified ample "other reasons justifying [Rule 60(b)] relief."

### E.     BY GRANTING THE RELIEF REQUESTED HEREIN, ESTATES ARE PROVIDED AN OPPORTUNITY TO RECOVER EXCESS VALUE TRANSFERRED TO BARCLAYS IN THE SALE TRANSACTION

78.     By relieving the Committee of the Sale Order's approval of the Clarification Letter (to the extent the Sale Order can be said to have approved the Clarification Letter), the Court will empower the estates (and the Committee, should it obtain derivative standing) to recover billions in unauthorized transfers and other amounts specifically determined to be property of the estate under the Bankruptcy Code.

1. **IF SALE ORDER DID NOT APPROVE CLARIFICATION LETTER, OR IF RELIEF FROM SALE ORDER IS AUTHORIZED TO REMOVE CLARIFICATION LETTER FROM SALE ORDER, THEN TRANSFERS CONSUMMATED PURSUANT THERETO ARE RECOVERABLE UNDER SECTION 549 OF BANKRUPTCY CODE**

79. Section 549 of the Bankruptcy Code permits a trustee to "restore the estate to the financial condition it would have enjoyed if the [unauthorized] transfer had not occurred . . . ." In re Centennial Textiles, Inc., 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998). The principal purpose of section 549 is to assure creditors "that the estate's fiduciary complies with applicable distribution law and Court orders." In re Contractor Technology, Ltd., 343 B.R. 573, 584 (Bankr. S.D. Tex. 2006) (holding "Creditors of the estate should have confidence that the estate's fiduciaries-from the moment of the order for relief-control the distribution of the estate's assets"). See also Collier on Bankruptcy ¶ 549.02 (15th ed. rev. 2006) ("The purpose of section 549 is to allow the trustee to avoid those postpetition transfers which deplete the estate while providing limited protection to transferees who deal with the debtor. Fraud by the debtor and, except with respect to purchasers of real property, good faith on the part of the transferee are irrelevant to the application of this section.").

80. Any additional value provided to Barclays pursuant to the Clarification Letter beyond what was disclosed to the Court, including the "haircut" of between $5.0 and $7.190 billion in securities from Barclays-LBI Repurchase Agreement that Barclays retained, the Non-Actionable box, the 15c3 Securities, the property securing the OCC Accounts and any other additional value added to the Sale Transaction pursuant to the Clarification Letter following the Sale Hearing is recoverable as an unauthorized transfer. See Mora v. Vasquez (In re Mora), 199 F.3d 1024, 1026 (9th Cir. 1999) ("If a trustee seeks to recover a postpetition transfer under section 549 . . . the trustee must show that a transfer occurred after the filing of the bankruptcy petition and that the transfer was not authorized by either the bankruptcy court or the Code.").

### 2. UNDER SECTION 559, THE EXCESS COLLATERAL IN FORM OF "HAIRCUT" IS ESTATE PROPERTY

81.    Section 559 of the Bankruptcy Code provides, in part, that:

> In the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, *any excess of the market prices received on liquidation of such assets ... over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate* . . . .

11 U.S.C. § 559 (emphasis added).

82.    On September 19, 2008, Barclays provided official notice to LBI that Barclays was terminating the Barclays-LBI Repurchase Agreement.[132] At that moment, the excess collateral representing the haircut became property of the estate through operation of section 559. Apparently realizing this after the fact, the Clarification Letter attempts to re-write history. At the end of the clause providing for the repurchase collateral to become "purchased assets," the Clarification Letter includes the following language: "Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void ab initio in all respects."[133] The purpose of the language is clear -- to avoid the requirements of section 559. The fate of the haircut under the Barclays-LBI Repurchase Agreement fits the contours of section 559 precisely, and the Court should not countenance a secret attempt to sweep extra assets to Barclays that undoubtedly belonged to the estates.

### F. COURT SHOULD ORDER IMMEDIATE ACCOUNTING

83.    Any relief the Court may provide -- whether pursuant to Rule 60(b) or after an adversary proceeding -- will require an understanding of the specific identity and value of the assets transferred to Barclays. To date, final transaction reconciliations and detailed balance

---

[132]  Ex. 52, 9/19/08 Notice of Termination.

[133]  Ex. 25, Clarification Letter.

sheets have eluded the Committee, despite nearly a year of pursuing them. The Committee

therefore moves the Court to order an immediate accounting and reconciliation of the assets it

received (including an accounting of any assets it sold).

84.     Barclays' witnesses have said there was a reconciliation process following the

transaction, but Barclays has yet to produce the result of that exercise. Barclays publicly

reported earnings that included gains "on acquisition."[134]   The gain reflected on Barclays'

financial statements surely resulted from an accounting and reconciliation of what it received as

a result of the Sale Transaction. Moreover, McDade testified to this Court that there had been a

valuation and accounting for the assets transferred up to the point of the Sale Hearing:

> Q. Does Lehman have any valuations -- internal valuations of any of the assets
> that are being transferred to Barclays?
> A. Absolutely. There are many complex securities involved. Many different
> models that we use to evaluate those securities.
> Q. And so, sir, is it your testimony then that a valuation was conducted within
> Lehman of all of the assets that are being transferred to Barclays? When was that
> conducted?
> A. Portfolio moved during the week, but that was conducted all last evening. All
> through and up to the arrangement -- the agreement today.
>              *       *       *
> Q. Did you do an audit of the -- I'm sorry. Has an audit been accomplished of the
> securities that are to be transferred to Barclays under the proposed transactions?
> A. If you mean an audit by external valuation process?
> Q. By identification of the securities?
> A. Absolutely, line by line.[135]

85.     Accordingly the Committee seeks an order requiring a reconciliation and

accounting within 10 days detailing (1) the identity and value of the assets transferred through

the termination of the Barclays-LBI Repurchase Agreement, (2) the identity and value of all

other assets transferred pursuant to the terms of the Clarification Letter or otherwise as a result of

---

[134]   Ex. 53, Barclays 2008 Figures.

[135]   Ex. 23, Tr. Hearing 9/19/08 at 109:19-110:3; 126:21-127:1.

the Sale Transaction, (3) valuations of each asset transferred as of the date of the transfer, and (4) any disposition of such assets.

## VI.     JOINDER IN DEBTORS' RULE 60(B) MOTION

The Committee joins in the Debtors' Rule 60(b) Motion (to the extent not inconsistent herewith), specifically the relief requested and arguments set forth therein. The Committee reserves the right to be heard at any hearing in connection with the Debtors' Motion, to present evidence, to cross examine witnesses and proffer arguments.

## VII.     JOINDER IN SIPA TRUSTEE'S RULE 60(B) MOTION

The Committee joins in the SIPA Trustee's Rule 60(b) Motion (to the extent not inconsistent herewith). The Committee reserves the right to be heard at any hearing in connection with the SIPA Trustee's Motion, to present evidence, to cross examine witnesses and proffer arguments.

# VIII.  <u>CONCLUSION</u>

For the foregoing reasons, the Committee respectfully requests that the Court enter an

order (A) granting the Committee relief from the Sale Order to the extent it purports to approve

material modifications to the Sale Transaction that were not disclosed to the Court; (B) revising

the Sale Order (1) to remove approval of the Clarification Letter from the Sale Order to the

extent it materially modified the Sale Transaction approved by the Court; and (2) to amend the

Purchased Assets definition so that it contains assets with a fair value, as of the closing date, that

is no greater than the lesser of (a) $47.4 billion and (b) the fair value, as of the closing date, of

the actual liabilities assumed by Barclays without the application of any secret or other $5 billion

discount; (C) requiring a full a accounting and reconciliation of all Purchased Assets and

assumed liabilities within 10 days of the entry of such Order (including any disposition of the

same); (D) directing the return to the estates of the value of all Purchased Assets in excess of the

above (with interest); and (E) awarding the Committee such further, different relief as the Court

deems appropriate.

Dated:  September 15, 2009
       New York, New York

**QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP**

/s/ James C. Tecce
Susheel Kirpalani
James C. Tecce
Erica P. Taggart

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone No.:  (212) 849-7000

*Special Counsel to the Official Committee Of
Unsecured Creditors Of Lehman Brothers
Holdings Inc., et al.*
