```
                                                            Page 1

 1           HIGHLY CONFIDENTIAL - J. HRASKA
 2           UNITED STATES BANKRUPTCY COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4    ------------------------x
 5    In Re:
 6                              Chapter 11
 7    LEHMAN BROTHERS           Case No. 08-13555(JMP)
 8    HOLDINGS, INC., et al.,   (Jointly Administered)
 9
              Debtors.
10
      ------------------------x
11
12          * * *HIGHLY CONFIDENTIAL* * *
13          DEPOSITION OF JAMES HRASKA
14               New York, New York
15                August 14, 2009
16
17
18
19
20
21
22
23    Reported by:
24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25    JOB NO. 24039
```

08-13555-mg    Doc 5532-12    Filed 10/16/09    Entered 10/16/09 03:03:04    Exhibit 12
Pg 2 of 5

Page 2

1          HIGHLY CONFIDENTIAL - J. HRASKA

2                  August 14, 2009

3                    9:25 a.m.

4

5          HIGHLY CONFIDENTIAL deposition

6    of JAMES HRASKA, held at Jones Day

7    LLP, 222 East 41st Street, LLP, New

8    York, New York, before Kathy S.

9    Klepfer, a Registered Professional

10   Reporter, Registered Merit Reporter,

11   Certified Realtime Reporter, Certified

12   Livenote Reporter, and Notary Public

13   of the State of New York.

Page 15

1       HIGHLY CONFIDENTIAL - J. HRASKA

2       Q.    Okay.  Before I forget, what is your

3   current position at Barclays?

4       A.    I am in a very similar role.

5   Corporate title-wise I'm a director, which is

6   equivalent to SVP.  I manage, again, Secured

7   Financing Operations for both equities globally

8   and fixed income in North America.

9       Q.    Is it fair to say your role is -- your

10  duties and responsibilities are relatively the

11  same as you had when you were at Lehman?

12      A.    Responsibilities are reasonably the

13  same, not quite as extensive as they were at

14  Lehman from a global perspective.

15  [REDACTED]

16  [REDACTED]

17  [REDACTED]

18  [REDACTED]

19  [REDACTED]

20  [REDACTED]

21  [REDACTED]

22  [REDACTED]

23  [REDACTED]

24  [REDACTED]

25  [REDACTED]

Page 58

1  HIGHLY CONFIDENTIAL - J. HRASKA

2  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]

14      Q.      And so what was the haircut associated
15 with the September 18 repo?
16      A.      There wasn't a -- there wasn't a
17 specific stated haircut.  There was a total loan
18 amount, which was this $45 billion, and the
19 total collateral value that we were trying to
20 transfer over to Barclays or what we were
21 directed to transfer over to Barclays was
22 approximately $50 billion.
23      Q.      And that $50 billion was comprised of
24 the approximately $42 billion in securities that
25 you mentioned earlier plus the cash?

Page 59

1           HIGHLY CONFIDENTIAL - J. HRASKA

2     A.    It turned out that that was the case.

3 It was initially intended to be all collateral,

4 but the market value of what we were to transfer

5 initially was $50 billion.

6     Q.    Okay. And Barclays was, after the --

7 after they received the proceeds of the loan and

8 the collateral, was Barclays satisfied that it

9 had received the entire amount of collateral

10 that it was expecting with respect to that repo?

11     MR. SHAW:   Objection. Foundation.

12     A.    Yeah, I don't know whether they were

13 satisfied or not. I mean, we completed the

14 securities transfers until the point that we

15 couldn't make any transfers because the system

16 had been shut down, and we were requested at

17 that point to deliver an additional 7 billion in

18 cash, which we did.

19 [redacted]

20 [redacted]

21 [redacted]

22 [redacted]

23 [redacted]

24 [redacted]

25 [redacted]