Page 1

1        HIGHLY CONFIDENTIAL - R. RICCI
2           UNITED STATES BANKRUPTCY COURT
3           SOUTHERN DISTRICT OF NEW YORK
4     ----------------------x
5     In Re:
6                               Chapter 11
7     LEHMAN BROTHERS           Case No. 08-13555(JMP)
8     HOLDINGS, INC., et al.,   (Jointly Administered)
9
           Debtors.
10
      ----------------------x
11
12         * * *HIGHLY CONFIDENTIAL* * *
13          DEPOSITION OF RICH RICCI
14              New York, New York
15              September 8, 2009
16
17
18
19
20
21
22
23    Reported by:
24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25    JOB NO. 24547

Page 2

1  　　　　　HIGHLY CONFIDENTIAL - R. RICCI
2  　　　　　　　　September 8, 2009
3  　　　　　　　　　9:56 a.m.
4
5  　　　　　HIGHLY CONFIDENTIAL deposition
6  　of RICH RICCI, held at Jones Day,
7  　LLP, 222 East 41st Street, New York,
8  　New York, before Kathy S. Klepfer,
9  　a Registered Professional Reporter,
10 　Registered Merit Reporter, Certified
11 　Realtime Reporter, Certified Livenote
12 　Reporter, and Notary Public of the
13 　State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

```
                                                      Page 28
 1              HIGHLY CONFIDENTIAL - R. RICCI
 2  [redacted]
 3  [redacted]
 4  [redacted]
 5  [redacted]
 6  [redacted]
 7  [redacted]
 8  [redacted]
 9  [redacted]
```

10      Q.      All right.  Did you give them any
11 instructions at that time as to what assets they
12 ought to be considering and at what prices they
13 should consider?
14      A.      At that time during the week, again,
15 we were very concerned with all the uncertainty
16 in the market and the potential risk we were
17 taking to ensure that we, whatever assets we did
18 take, were taken at the appropriate price.  That
19 would have been my steer.
20      Q.      And by "appropriate price," you mean a
21 price at which their acquisition would not have
22 had an adverse impact upon the capital at
23 Barclays, correct?
24      A.      No.
25      Q.      What do you mean?

Page 29

1       HIGHLY CONFIDENTIAL - R. RICCI

2       A.    The appropriate price would have been

3   the best estimate of market value given all the

4   uncertainty in the market.



Page 44

1        HIGHLY CONFIDENTIAL - R. RICCI

2  [REDACTED]
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6  [REDACTED]
7  [REDACTED]
8  [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 [REDACTED]
12 [REDACTED]
13 [REDACTED]
14 [REDACTED]
15 [REDACTED]
16 [REDACTED]
17 [REDACTED]
18 [REDACTED]
19 [REDACTED]
20 [REDACTED]
21 [REDACTED]
22 [REDACTED]

23       Q.    My question is a different one, Mr.
24 Ricci.  You either know it or you don't know it.
25             The question is do you know that the

```
                                                      Page 45
 1           HIGHLY CONFIDENTIAL - R. RICCI
 2    prices at which Barclays was agreeing to
 3    purchase the assets reflected in the Asset
 4    Purchase Agreement which are given at
 5    approximately $70 billion reflect a discount off
 6    of whatever Lehman marks existed as of that
 7    time?
 8         A.    As of what time, sir?
 9         Q.    As of the time that this was executed,
10    sir.
11         MR. HUME:  Objection.  Lacks
12    foundation as to what that date is.
13         A.    I can't speak for every single asset,
14    but in order to try to answer your question, if
15    there -- given what I know about the timing of
16    when we first started looking at their assets
17    versus when this agreement was signed, I would
18    think there would have been a discount, yes, of
19    Lehman assets -- the Lehman marks on their
20    assets, yes.
21    [redacted]
22    [redacted]
23    [redacted]
24    [redacted]
25    [redacted]
```

1          HIGHLY CONFIDENTIAL - R. RICCI
2  ████████████████████████████████████████
3  ████████████████████████████
4      Q.    How did you intend for Barclays to
5  have the cushion you described it needed to be
6  accomplished in the purchase of those assets?
7      A.    There were several ways to achieve it,
8  we had hoped.  One was to ensure that in any
9  price we were paying for assets, particularly
10 illiquid prices, illiquid assets, of which there
11 were a lot, that we had an appropriate liquidity
12 premium in our price.
13           Secondly, as I've already testified,
14 on the comp and the cure payments, we had hoped
15 that we could pay less than what we had assumed
16 but recognize that we might have to assume
17 those.  And also, we had intangible assets, that
18 is, you know, accounting function that might
19 help create some cushion.  Those were the big
20 components.
21 ████████████████████████████████████████
22 ████████████████████████████
23 ████████
24 ████████████████████████████████████████
25 ████████████████████████████████████████

Page 145

1        HIGHLY CONFIDENTIAL - R. RICCI
2    [redacted]
3    [redacted] id
4    [redacted]
5    [redacted]
6    [redacted]
7    [redacted]
8    [redacted]
9    [redacted]
10   [redacted]
11   [redacted]
12   [redacted]
13   [redacted]
14   [redacted]
15   [redacted]
16   [redacted]
17   [redacted]
18   [redacted]
19   [redacted]
20        Q.    Did you have a general number?
21        A.    I didn't have a general number in
22   mind.  Again, my instructions have been
23   consistent to make sure that any assets we were
24   taking were at the appropriate values, and I was
25   also hopeful that the estimates that had been

1     HIGHLY CONFIDENTIAL - R. RICCI
2     made for comp and cure payments through
3     leveraging, you know, Barclays' platforms, we
4     might be able to underspend to create some
5     cushion. But it was an environment where
6     valuations were very, very, very difficult and
7     uncertain, I think as evidenced by the fact that
8     we didn't determine the final valuation of these
9     transactions until February of '09.
10    [redacted]
11    [redacted]
12    [redacted]
13    [redacted]
14    [redacted]
15    [redacted]
16    [redacted]
17    [redacted]
18    [redacted]
19    [redacted]
20    [redacted]
21    [redacted]
22    [redacted]
23    [redacted]
24    [redacted]
25    [redacted]

1        HIGHLY CONFIDENTIAL - R. RICCI

2        ████████████████████████████

3        ████████████████████████

4        Q.    At any point did anybody at Lehman
5   suggest that Barclays was being piggish?
6        A.    I remember having a conversation with
7   Alex Kirk after we had tried to seek more
8   assets, and I expressed some discomfort to Alex
9   that I still didn't think we had enough assets,
10  and he said there's nothing left. And I said
11  something like to him, well, fine, we're not
12  going to be -- we're not going to be pigs and go
13  after every last nickel. We'll try to get
14  comfortable with what you have given us, and if
15  that's the case, we're done.
16       Q.    So is it fair to say that Barclays
17  stopped looking for additional Lehman assets
18  when Mr. Kirk said there was nothing else left
19  to transfer to Barclays?
20       A.    I recall saying to Alex that -- he was
21  very worried that we were going to walk because
22  we had asked for more assets, they had given us
23  what we could, he was worried we were going to
24  walk, and I said, okay, if this is it, if this
25  is all we can find before we go to court, you

1           HIGHLY CONFIDENTIAL - R. RICCI

2   know, we'll take it, we'll take the chance, but

3   we won't kill the deal over looking for more

4   assets.

5   [redacted]

6   [redacted]

7   [redacted]

8   [redacted]

9   [redacted]

10  [redacted]

11  [redacted]

12  [redacted]

13  [redacted]

14  [redacted]

15  [redacted]

16  [redacted]

17  [redacted]

18  [redacted]

19  [redacted]

20  [redacted]

21  [redacted]

22  [redacted]

23  [redacted]

24  [redacted]

25  [redacted]