Page 1

1       HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2              UNITED STATES BANKRUPTCY COURT
3              SOUTHERN DISTRICT OF NEW YORK
4   - - - - - - - - - - - - - - - - - - - -
5   In Re:
                                        Chapter 11
6
7   LEHMAN BROTHERS    Case No. 08-13555(JMP)
    HOLDINGS, INC. et al., (Jointly Administered)
8
9                       Debtors.
10  - - - - - - - - - - - - - - - - - - - - -
11                  HIGHLY CONFIDENTIAL
12          DEPOSITION OF PATRICK CLACKSON
13             Friday, September 4, 2009
14                  At:  9:00 am
15                    Taken at:
16                     Barclays
                   1 Churchill Place
17                      London
                    United Kingdom
18
19  Reported by: AILSA WILLIAMS
    Certified LiveNote Reporter
20
21
22
23
24
25

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2              A P P E A R A N C E S
3      JONES DAY, LLP
       Attorneys for Lehman Brothers, Inc.
4      222 East 41st Street
       New York, NY 10017-6702
5      BY:   JAYANT W. TAMBE, ESQ
       BRIDGET CRAWFORD, ESQ
6
       BOIES, SCHILLER & FLEXNER, LLP
7      Attorneys for Barclays Capital and the
       Witness
8      5301 Wisconsin Avenue N.W
       Washington D.C 20015
9      BY: HAMISH HUME
10     QUINN, EMANUEL, URQUHART, OLIVER & HEDGES,
       LLP
11     Attorneys for the Creditors Committee
       16 Old Bailey
12     London, United Kingdom EC4M 7EG
       BY: MATTHEW BUNTING, ESQ.
13
       HUGHES, HUBBARD & REED, LLP
14     Attorneys for the SIPA Trustee
       1775 I Street, N.W
15     Washington D.C. 20006-2401
       BY: JOHN F. WOOD
16  Also Present:
17     PHILIP E. KRUSE: Alvarez & Marsal
18
19
20
21
22
23
24
25

Page 98

1   HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2   [redacted]
3   [redacted]
4   [redacted]
5   [redacted]
6   [redacted]
7   [redacted]
8   [redacted]
9   [redacted]
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21       Q.    I have handed you a one page document
22  marked Exhibit 362A.  Take a moment to review it.
23  Please let me know when you are done.
24       A.    I have reviewed it.
25       Q.    The bottom e-mail is an e-mail from

Page 99

1        HIGHLY CONFIDENTIAL - PATRICK CLACKSON

2   James Trevelyan.

3        A.   Yes, he is a member of the Barclays

4   corporate development group.

5        Q.   To you, and he is again discussing

6   negative goodwill, and in particular the comp and

7   cure provisions.  Do you see that?

8        A.   Yes.

9        Q.   He states in his second paragraph of his

10  e-mail:

11           "We understand broadly that the negative goodwill

12  arises because the 2.25 cure payment and 2.0 comp provision

13  won't be valued at that amount but instead circa 1.3 or

14  C1.3."

15           Do you see that?

16       A.   Yes.

17       Q.   Do you understand that as circa 1.3?

18       A.   Yes.

19       Q.   Approximately 1.35.  "The difference

20  (2.95) giving rise to net assets for which we pay

21  250 million."  Is that how you understand that?

22       A.   Yes, I think that is right.

23       Q.   "Leading to a negative goodwill of

24  $2.7 billion."  Is that right?

25       A.   Yes.

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON

2        Q.    Was his description of the source of the

3    negative goodwill accurate in your view?

4        A.    In many ways you can calculate things in

5    different ways, but in terms of the estimates we

6    had at that time, and looking at the balance sheet

7    which we thought under the agreement we were

8    taking on, the assets and the liabilities we were

9    taking on, that was the estimate.  I suppose there

10   was a lot of confusion, as I said, a lot of

11   different versions, things changing by the minute

12   over time, and going on for quite a long period of

13   time.  So I suppose what I tried to share was what

14   was my provisional understanding at the time,

15   which was in terms of -- which I think I have set

16   out here, in terms of the compensation we were

17   taking, and we had to take a lot of liabilities to

18   people, it looks like my understanding at the time

19   was -- I mean all these things developed and

20   changed but I was saying here I thought in terms

21   of what we accounted for was the cash portion

22   rather than the deferred portion of the bonuses.

23   So that would be the compensation in the opening

24   balance sheet, which as I said I think I mentioned

25   earlier I was erroneous in my estimate on that,

```
 1         HIGHLY CONFIDENTIAL - PATRICK CLACKSON
 2   and on the cure payments we had potential
 3   liabilities, and I hoped at the time that we would
 4   be able to find ways of negotiating with our
 5   suppliers, so we were taking on suppliers and we
 6   would find ways of negotiating with our suppliers.
 7   So that because of the existing relationship of
 8   Barclays and the combined relationship of the
 9   combined Barclays and Lehman group, that the cure
10   payments could be kept to a low level.  So that
11   was my hope at that point.
12         Q.    And to date what has Barclays paid out
13   in the cure payments related to this transaction?
14         A.    I can't precisely remember.  I think
15   again it is -- I am sure we disclose it in our
16   financials.
17         Q.    Does a number around $300 million ring
18   a bell?
19         A.    Not really, but it could be.
20   ████████████████████████████████████████████████
21   ████████████████████████████████████████████████
22   ████████████████████████████████████████████████
23   ████████████████████████████████████████████████
24   ████████████████████████████████████████████████
25   ████████████████████████████████████████████████
```

