1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 19, 2008

          4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re Debtor's Motion for an Order Pursuant to Section 105

3  of the Bankruptcy Code Confirming Status of Citibank Clearing

4  Advances

5

6  HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

7  Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

8  Approve the Sale of the Purchased Assets and the Assumption and

9  Assignment of Contracts Relating to the Purchased Assets

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

45

1    if people have objections based upon that, they should be

2    somewhat relieved.

3              THE COURT:  All right.  And I'm sure if there are

4    questions during the break, they'll approach you or your

5    partners.

6              MR. MILLER:  Thank you, Your Honor.

7              THE COURT:  I think if a half hour is what you think

8    you need --

9              MR. MILLER:  Yes.

10             THE COURT:  -- why don't we say 5:15 with the

11   understanding that time has proven to be very flexible here in

12   the past this week.  And it may turn out that we'll need a

13   little bit more time.  But let's make that the holding time and

14   if there's a need for more, somebody should just knock on my

15   chambers door and let me know what's required.

16             MR. MILLER:  Thank you, Your Honor.

17             THE COURT:  Okay.  We're adjourned until 5:15

18   provisionally.

19         (Recess from 4:43 p.m. until 5:41 p.m.)

20             THE COURT:  Please be seated.  I find myself in the

21   unusual position of being perhaps the only person in the

22   courtroom who doesn't know what everybody else knows because I

23   didn't hear what you told everybody.  Do you want to tell me

24   anything?

25             MR. MILLER:  Somehow, Your Honor, we knew you were

46

1    going to ask that question.  So --

2              THE COURT:  I hate to be that predictable.

3              MR. MILLER:  There is a document -- maybe it'd be

4    better, Your Honor, if we do it orally.

5              THE COURT:  Fine.

6              MR. MILLER:  My partner, Ms. Fife, will do that.  And

7    with some assistance from Ms. --

8              THE COURT:  Let me just check on something because --

9    and this is purely technical.  During the first phase of the

10   hearing, I was told that those people who are listening in

11   spillover courtrooms had a very hard time hearing me.  I'm

12   having some difficulty as compared with our last hearing with

13   the amplification coming out of the podium.  And I just want to

14   make sure that we're not suffering system overload.  Okay.

15   That's on.  And let me also make the announcement, whenever

16   anyone speaks for the record, this is always true here, but

17   given the number of people, please identify yourself before

18   speaking.

19             MS. FIFE:  Thank you, Your Honor.  Lori Fife from

20   Weil Gotshal & Manges on behalf of the debtors.  Let me try to

21   summarize the changes that were made to the transaction.  In

22   terms of the economic changes, they result largely because of

23   the markets, unfortunately.  And from the time that the

24   transaction was actually entered into till now, the markets

25   dropped and the value of the securities dropped as well.

47

1          So, originally, we were selling assets that had a

2   value of seventy -- approximately seventy billion dollars.  And

3   today, Your Honor, we're only selling assets that have a value

4   of 47.4 billion dollars.

5          Barclays is assuming liabilities, however, of 45.5

6   billion dollars in connection with those assets.  So that has

7   not changed from the original transaction.  There was an upside

8   sharing in the original transaction.  There was going to be a

9   true-up twelve months later on and that has been eliminated

10   from this transaction.

11          Barclays is still agreeing to pay the cure amounts on

12   any leases that it assumes or that we assume and assign to it.

13   Barclays is also agreeing to the same employee compensation

14   arrangements.  And it is also agreeing to pay the 250 million

15   dollars of goodwill to LBI.

16          With respect to the real estate assets, Your Honor,

17   that was -- we had said at the last hearing, I believe, it was

18   approximately a billion dollars.  Since that time, an appraisal

19   has come in and it is below that amount.  The contact had a

20   provision which allowed the purchaser really to purchase the

21   building at the appraised amount.  So we have some negotiations

22   to go, but I believe that the purchase price will come down by

23   approximately a hundred million dollars.

24          There were two other real estate properties also

25   which we received appraisals for which, similarly, were lower

48

1   than we had anticipated, unfortunately.  So I think,

2   cumulatively, we're expecting that the purchase price will come

3   down by a hundred to maybe 200 million dollars for the real

4   estate.

5           Some other changes that were made to the contracts

6   affect what are called purchase assets and what are excluded

7   assets.  There was some confusion as to which subsidiaries, if

8   any, were being sold.  And we've clarified in a clarification

9   letter which we're hoping to finalize and actually present to

10  Your Honor whenever it comes down here.  But in that letter,

11  we're going to clarify that the only subsidiaries that are

12  being purchased by Barclays are Lehman Brothers Canada Inc.,

13  Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA.

14  The latter two subsidiaries that I just referred to relate to a

15  business that is called PIM, or Private Investment Management

16  Business, which is a business that was not part of the original

17  deal but is now being purchased by Barclays.

18           THE COURT:  For no additional consideration?

19           MS. FIFE:  That's correct, Your Honor.

20           THE COURT:  And what's that business worth?

21           MS. FIFE:  It's essentially just people, Your Honor.

22  It's the high net worth individual brokerage business.  And

23  it's really just the people who are in those offices.

24           THE COURT:  And their rolodexes.

25           MS. FIFE:  And their rolodexes, exactly.  The

49

1    customer accounts were being transferred anyway.

2         There was a change that was made to the license of

3    the Lehman Brothers' name.  It was perpetual.  It is now two

4    years but we don't really believe that that's a problem.  The

5    IMD business, which is essentially Neuberger Berman and some

6    other related entities, will have a perpetual license to use

7    the name.

8         There was a provision in the old agreement pursuant

9    to which the parties were sharing the residential real estate

10   mortgages.  There is no longer that provision.  Barclays was

11   required to post collateral, actually this morning, in order to

12   get DTC to open up trading.  And that collateral was posted --

13   the residential real estate mortgages was posted to DTC.

14   Pursuant to this transaction, Barclays is taking over and

15   guaranteeing all of those transactions.  And they are assuming

16   the risk related to those transactions so that collateral will

17   remain with Barclays.

18         THE COURT:  What's the aggregate value of the posted

19   collateral?

20         MS. FIFE:  One second, Your Honor.

21      (Pause)

22         MS. FIFE:  Your Honor, I'm not -- excuse me?  There

23   are 300,000 trades but we're not sure the value of the

24   collateral.  Perhaps during the rest of the hearing we can find

25   that amount out for Your Honor.

51

1    transaction's not consummated then the transactions -- all the

2    trades come back to Lehman, and Lehman is then responsible for

3    them.   Excuse me for one second, Your Honor.

4        (Pause)

5            MS. FIFE:   I'm being told that if the liabilities are

6    less than the collateral then the excess collateral comes back

7    to Lehman.

8            THE COURT:   And if the liabilities are greater?

9            MS. FIFE:   We have no further obligation.

10           THE COURT:   Okay.

11           MS. FIFE:   We also modified the agreement -- would

12   you like the representative from DTC to explain that in more

13   detail, Your Honor?

14           THE COURT:   Mr. Hirshon, I'd be happy to hear from

15   you.

16           MR. HIRSHON:   Good afternoon, Your Honor.   Nice to be

17   before you.   Sheldon Hirshon, Proskauer Rose, representing the

18   composite -- the trust clearing corporations.   Your Honor, the

19   essence of the transaction is to move all of the accounts

20   seamlessly from Lehman to Barclays.   What DTC does is the

21   plumbing of that and handles all of the details in the settling

22   of the trades.

23           THE COURT:   Is that how they describe themselves?

24           MR. HIRSHON:   That's how I describe them because

25   until Sunday, I didn't understand any of this.   But it is what

52

1    spigots get turned on and off and how the pipeline is filled

2    and then emptied.  So each day -- there are several different

3    clearinghouses.  And each day the trades are matches and then

4    either a net number goes to Lehman or from Lehman to DTC or any

5    of its clearing companies.  There was a depository that holds

6    all of the securities.  The residential mortgages that you've

7    heard about that were going to be split fifty/fifty are in the

8    DTC registry.  We hold them now.  They are there.  Originally,

9    the idea for the original transaction was to split those

10   fifty/fifty between Barclays and the estate.  But in order to

11   facilitate the settlement of these accounts, the additional

12   fifty percent was needed so that DTC would not be at risk for

13   the settlement.  So the --

14            THE COURT:  So this modification principally is for

15   the benefit of your client?

16            MR. HIRSHON:  Correct.  And for the transaction,

17   because without it trading would have stopped.  There would be

18   no business to sell because there would have been no -- no

19   trades cleared today.  So it was to facilitate the transaction

20   as a friend to the transaction that this was done so that the

21   business continues to operate today.  Now, the arrangement is

22   that the whole six billion dollars of residential mortgages

23   will be there and subject to settlement.  But the anticipation

24   is that once all these claims settle, the trades that are from

25   Wednesday through Monday settle, there will not be a need for

53

1   all of that collateral.  So what the amendment to the APA says

2   is that the fifty percent will be returned, as long as it's

3   there.  If something really terrible happens in the world and

4   the settlements don't work and we have to use that collateral,

5   then there will be nothing to return.  But the anticipation is

6   that if the world remains somewhat stable that the fifty

7   percent that was now transferred to Barclays will be

8   transferred back to Lehman.  That is the expectation.

9          THE COURT:  All right.  I appreciate that

10  explanation.

11         One comment before you continue, Ms. Fife.  I'm just

12  once again hearing the Geiger counter.  And we are connected to

13  two extra courtrooms and I know that there are people

14  participating at various occasions by telephone through

15  CourtCall.  And I'm hearing increased static on the line.  So,

16  I'm just going to request everybody who is participating in

17  this hearing, whether by telephone or in person, who has an

18  electronic device to shut it off.  And if you're on the phone,

19  since you're just listening, please mute your phone.

20         MS. FIFE:  Thank you, Your Honor.  I'll continue

21  going through some of the changes, if that's okay.  There was a

22  provision in a deal originally which required the debtors to

23  transfer 700 million dollars in cash to Barclays.  And that is

24  no longer the case.  There's no cash that's being transferred

25  to Barclays.

54

1    In addition, there was a provision in the contract

2 where Barclays was going to purchase a company called Eagle

3 Energy Management and they are no longer going to purchase that

4 entity.

5    We clarified, because a number of creditors had some

6 concerns during the -- yesterday we had a meeting with the

7 creditors and they were asked some questions regarding

8 intercompany claims.  We made it very clear in this

9 clarification that we are not transferring any intercompany

10 payables or receivables.  Those remain with the particular

11 entities.

12    There was a reference in the agreement to a mortgage

13 that was on the 745 Seventh Avenue property.  And as it turned

14 out, Your Honor, there is no mortgage on that property.  So we

15 deleted that reference.  There was a 500 million dollar

16 promissory note made by 745 in favor of an affiliate which will

17 be repaid and extinguished.

18    Those are the major changes to the transaction.

19 There were some other clarifications that we made but I don't

20 consider them material, Your Honor.

21    THE COURT:  I still consider 500 million dollars

22 material, though.

23    MS. FIFE:  Yes.

24    THE COURT:  So, the money that's due an affiliate,

25 what affiliate is that?  And as a result of the payment, how

62

1   the telephone who's whispering into the courtroom.  As I said

2   at the outset, everybody who is listening on the phone, mute

3   your phone.  Everybody who has an electronic device, find it

4   and shut it off or throw it away.

5            MR. MILLER:  Your Honor, as I was saying, this

6   afternoon the Securities Investor Protection Corporation

7   initiated a proceeding under the Securities Investor Protection

8   Act in the United States District Court for the Southern

9   District of New York.  Mr. James Giddens, an attorney and

10  experienced SIPC trustee, has been appointed as trustee in the

11  SIPC proceeding.  LBI consented to the commencement of the SIPC

12  proceeding.  And during the past few days, Mr. Giddens was

13  provided with information concerning the state of affairs at

14  LBI and the need for expedition and support of the sale

15  transaction.  Mr. Giddens is a recognized SIPC trustee and a

16  man of great talent, Your Honor.  He recognized the

17  extraordinary nature of what is occurring and, unusual for a

18  SIPC proceeding, SIPC and the trustee have agreed that trading

19  in customer accounts --

20           THE COURT:  Sorry.  Technical difficulties.

21           MR. MILLER:  In that SIPC proceeding, Your Honor, the

22  trustee and SIPC have agreed that trading in customer accounts

23  may continue in the ordinary course of business rather than be

24  suspended as is usual in a SIPC proceeding.  SIPC and the

25  trustee have expended extraordinary efforts in an extraordinary

63

1    case to protect the public customers and ensure stability and

2    preservation of customer interests.  Their actions are to be

3    commended, Your Honor.  And I believe, Your Honor, that the

4    SIPC proceeding has been referred, I hope, to Your Honor.

5           THE COURT:  I've seen Judge Lynch's order.  I have a

6    certified copy of it and the order includes a decretal

7    paragraph removing those proceedings to this court.  I'm

8    satisfied that the seal is in fact genuine and I'm prepared to

9    proceed with full authority.

10          MR. MILLER:  And, Your Honor, Mr. Giddens is here

11   with Mr. Kevin (sic) Caputo from SIPC and the president of

12   SIPC, Your Honor, Mr. Stephen Harbeck who's sitting in the jury

13   box.

14          THE COURT:  Gentlemen, welcome.

15          MR. GIDDENS:  Thank you, Your Honor.

16          MR. MILLER:  Barclays, Your Honor, has extended the

17   sale to enable this extraordinary transaction and hopefully to

18   be consummated.  Yesterday, as Your Honor has heard, Barclays

19   basically stepped into the shoes of the Federal Reserve in

20   connection with the Primary Dealer Credit Facility as to the

21   45.5 billion dollars Lehman borrowed last Monday and received

22   the collateral that Lehman had posted in connection therewith.

23          Because of the circumstances this week, Your Honor,

24   the operations of LBI have resulted in approximately 300,000

25   sales, which is very significant.  In addition, Your Honor,

64

1    because of the administration proceeding in the United Kingdom

2    for LBIE and the freezing of all of the assets of LBI that were

3    in the possession of LBIE, which I believe, Your Honor, stands

4    for Lehman Brothers England, relating to repo financings, the

5    result is that we were unable -- or LBI is unable to deliver to

6    Barclays the assets that were originally intended under the

7    APA.  That's one of the reasons, Your Honor, for the amendments

8    that we heard about earlier today.

9            There are many moving parts in what we are trying to

10   do, many of which are beyond the control of Lehman or Barclays

11   as market forces operate to affect the value of the transaction

12   and the assets.  Enormous problems did arise in connection with

13   clearing transactions that have caused a number of

14   modifications to the transaction.  The necessity of assuring

15   DTC and other clearing institutions who will not expose

16   themselves to additional liability of some kind has been

17   enormously time consuming.

18           It's because of that, Your Honor, that we have heard

19   about these changes.  But if Your Honor will look at the basic

20   agreement, the amount of cash consideration will be relatively

21   the same except for the issues with respect to the value of the

22   real estate.  The 250 million dollars being paid for the

23   goodwill of LBI will go to LBI.  The real estate, 745 Seventh

24   Avenue, and the two data centers in New Jersey, that's with a

25   variation, Your Honor, and there's some negotiation to be done

66

1    don't know if he or she is in court.  But I am, frankly,

2    concerned that we're all hearing -- and maybe others heard it

3    earlier but I'm hearing it only now -- that there is this

4    negative variance in the assumed value of the real estate.  And

5    I find that troublesome.

6            MR. MILLER:  Yes, sir.  We will try to deal with

7    that, Your Honor.  Now, Your Honor, in connection with going

8    forward in the transaction, I don't know what order Your Honor

9    wants to go in, whether you want to hear oral statements of

10   objections or should we move right to the evidentiary hearing?

11           THE COURT:  Well, one of the things I'd like to do,

12   and it's really to verify something, I don't recall seeing an

13   objection from the official creditors' committee.  And I don't

14   know, as a result of that, whether the committee supports the

15   transaction, has issues with respect to the transaction or has

16   given you notice of whatever objections they might have.  So it

17   seems to me that because of the expedited nature of today's

18   proceeding, we agreed Wednesday that written objections were

19   not necessary and, particularly, not necessary in the case of

20   the committee which had just been formed.  I'd like to know

21   what the status is as it relates to that important

22   constituency.

23           MR. MILLER:  Mr. Despins informed me, Your Honor,

24   before the hearing -- I'm losing my voice -- that the committee

25   will not object to the transaction but does not support it.  So

67

1    they're not affirmatively -- I think not affirmatively going to

2    stand up and say --

3            MR. DESPINS:  Why don't I address that, Your Honor?

4            MR. MILLER:  Sure.

5            THE COURT:  I think that would be helpful.

6            MR. MILLER:  Don't change your position.

7            MR. DESPINS:  Good afternoon, Your Honor.  Luc

8    Despins with Milbank Tweed, proposed counsel for the committee.

9    I'm here with my partners, Paul Aronson and Dennis Dunne.  The

10   headline is we are not objecting, Your Honor, but although

11   we'll have some minor comments to the form of order, which we

12   don't need to detain the court order at this point.  And the

13   reason we're not objecting is really based on the lack of a

14   viable alternative.  And, Your Honor, we're still a little bit

15   puzzled by the statement by Mr. Miller that we're not

16   affirmatively supporting.  And that's correct.  We're not

17   affirmatively supporting the transaction, Your Honor, because

18   there has been insufficient time for us to really do all the

19   due diligence that we would feel should be done to take that

20   next step of saying yes, this is the best deal and we're

21   supportive actively.  We've met with the debtor.  They've been

22   very cooperative.  I don't want to imply that they have not

23   been but we have not had time to test the assumptions and do

24   all the due diligence we would normally do.  So that is, Your

25   Honor, the distinction.

68

1        The second message, Your Honor, which is not directed

2    at Your Honor but really at the debtor and, generally, at also

3    regulators, is that the committee, although we're not objecting

4    to this transaction, we understand we're dealing with

5    extraordinary circumstances, as Your Honor has described.  The

6    committee fully expects that after this, we're going to go back

7    to what I would call -- ·

8        THE COURT:  A more conventional model?

9        MR. DESPINS:  Yes.  Business as usual for Chapter 11,

10   if you will, Your Honor.  The committee feels very strongly and

11   wanted me to say that they recognize the extraordinary nature

12   of what's going on here but they feel their duties are to pre-

13   petition creditors, not to the market participants, not to the

14   economy at large or other participants in those markets.  And I

15   think that that's very important and it's very important to the

16   committee that I convey that message, again, not to Your Honor,

17   but really to the debtor and other parties in this case.  So

18   that is where we stand, Your Honor.

19       THE COURT:  I appreciate that.  And it lifts the fog

20   over at least that aspect of the case.  And I'm grateful for

21   the comment.  Has there been any --

22       MR. MILLER:  Your Honor, we --

23       THE COURT:  Has there been any resolution by

24   agreement of any of the other objections?  Or are they all live

25   at this point --

99

1   dealer business.  The value of the real estate being

2   transferred to  Barclays pursuant to the transaction is subject

3   to negotiation with respect of the appraised values.  That the

4   building on Seventh Avenue is subject to an appraisal which has

5   been provided to Barclays.  And that appraisal is in the area

6   of 900 million dollars to 100 million dollars.  And that the

7   appraisal was done by CB Richard Ellis.  And it was prepared

8   for the other debtor in this case, LB 745 LLC and Barclays

9   Capital Inc.  And it is a voluminous appraisal of the

10  properties which we will offer into evidence at the appropriate

11  time, Your Honor.

12          And that he would also testify that an appraisal of

13  the two data centers was also directed and that CB Richard

14  Ellis was also engaged to undertake that appraisal.  And that

15  appraisal has established the value for the purpose of the

16  negotiations, Your Honor.  And as pointed out earlier in the

17  proceeding, those values have come in at slightly less -- I

18  shouldn't say slightly, less than was originally projected.

19          So that was a very negotiated term, and the reason

20  for the transfer of these properties, Your Honor, is that they

21  are integral to the smooth transition of the businesses.

22          Barclays will also assume exposure for the employees

23  that accept offers of employment, which is estimated to have a

24  value of approximately -- an exposure of approximately two

25  billion dollars.

100

1        Barclays is also assuming the cure amounts relating

2    to contracts and leases that will be assumed pursuant to the

3    asset purchase agreement.  And that has a potential exposure,

4    Your Honor, of 1.5 billion dollars that he would testify to.

5        Barclays is also paying the real estate transfer

6    taxes, which are estimated to be approximately thirty million

7    dollars.

8        Mr. McDade would testify that the financial community

9    has known that Lehman has been under stress for some time.

10   Certainly, going back to the time that Bear Sterns was bailed

11   out.  Potential purchasers have known that Lehman has been

12   searching for a buyer since well before the Chapter 11 case

13   commenced.  And that those ethics, those strategic alternatives

14   that were being pursued involved parts of Lehman as well as the

15   whole of Lehman.  And that the notoriety attached to that did

16   not produce any interested parties other than the ones I

17   mentioned -- he mentioned.

18       During the meeting at the Federal Reserve Bank last

19   week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20   were all present, showing interest in the broker-dealer assets.

21   It was clear to each party that if Lehman was unable to reach a

22   deal it would most likely have to commence cases under Chapter

23   11 of the Bankruptcy Code.  That would not only have an adverse

24   impact upon their businesses but also upon the international

25   markets.

101

1          He would testify that since the commencement of the

2     Chapter 11 case, Lehman's senior management and its advisors

3     have not undertaken an intensive marketing of the business and

4     the assets to be sold.  But instead focused on reaching an

5     agreement with the most eligible interested buyer for these

6     assets.

7          That notwithstanding the lack of a specific program

8     for marketing, the sale of Lehman's broker-dealer business has

9     been known worldwide.  And, yet, he would say nobody has

10    expressed an interest to step into the shoes of -- excuse me,

11    step into the shoes of Barclays, Your Honor.

12         Lehman has not received any other interest since the

13    commencement of the Chapter 11 cases.  If Lehman was approached

14    by another potential buyer that he would consider the offer,

15    provided that the company had sufficient liquidity to operate

16    the business without jeopardizing customer accounts.  That has

17    not happened, Your Honor.  So it is almost academic.

18         Mr. McDade would testify, Your Honor, that if the

19    sale with Barclays is consummated, customer accounts would

20    continue on a seamless, uninterrupted basis and trading would

21    continue on a normal basis, thereby maintaining the billions of

22    dollars in value.

23         At the same time, the jobs of thousands of employees

24    would be saved and will be entitled to substantial benefits

25    from Barclays in the form of compensation, bonuses and

108

1   A.   The specific question has yet to be determined, given the

2   dynamic nature and speed of which we're operating.  Each of the

3   individual businesses will enter into a series of very quick

4   next steps to determine how we actually transact in each of

5   those business units going forward.

6   Q.   And who will determine which of those contracts go to the

7   purchaser and which of those contracts stay behind?  Will that

8   be something in Barclays' discretion, or is that Lehman's

9   decision?

10   A.   That will be a mutual process.

11   Q.   And is it your understanding, sir, that all of the

12   contracts that are to be negotiated, in terms of whether they

13   stay or whether they go, are contracts that reside at LBI?  Or

14   are any of those contracts that reside at other Lehman

15   entities?

16   A.   LBI.

17   Q.   And, sir, can you also please confirm if it is your

18   understanding that the purchased assets do not include

19   Neuberger Berman or any of its assets?

20   A.   Yes, I affirm that.

21   Q.   Okay.  Sir, are you aware of whether -- do you know what a

22   closing balance sheet is?

23   A.   Yes, I do.

24   Q.   Okay.  And do you know whether a closing balance sheet was

25   prepared in connection with this transaction?

VERITEXT REPORTING COMPANY

109

1   A.   I am not aware of that.

2   Q.   Okay.  Assuming that one was not, do you have any

3   understanding of why one was not?

4   A.   The speed of which we're operating.

5   Q.   Well, in the absence of a closing balance sheet having

6   been prepared, can you please describe for the Court how it is

7   that the debtor determined that fair value was being realized

8   for the sale of these assets?

9   A.   For the assets?

10   Q.   Yes.

11   A.   The individual assets on the balance sheet, the trading

12   inventory was bottoms up, meaning individual line item detail

13   processed through all of our individual risk business units in

14   coordination with the normal finance professionals who are

15   incorporated into the valuation process.

16   Q.   Did the debtors have any form of valuations of any of the

17   assets that are being transferred?

18   A.   Sorry?

19   Q.   Does Lehman have any valuations -- internal valuations of

20   any of the assets that are being transferred to Barclays?

21   A.   Absolutely.  There are many complex securities involved.

22   Many different models that we use to evaluate those securities.

23   Q.   And so, sir, is it your testimony then that a valuation

24   was conducted within Lehman of all of the assets that are being

25   transferred to Barclays?  When was that conducted?

110

1    A.    Portfolio moved during the week, but that was conducted

2    all last evening.  All through and up to the arrangement -- the

3    agreement today.

4    Q.    And, sir, was it the case that at the time of the meeting

5    that took place with creditors this past Wednesday, LBI had

6    approximately --

7              MR. MILLER:  Excuse me, Your Honor, Thursday.

8              MR. QURESHI:  I apologize, it was Thursday.

9              THE COURT:  I'll take that as an objection to the

10   question, and it's sustained.

11   Q.    Am I correct, sir, in understanding that at that time

12   creditors were told that LBI had approximately 1.3 billion

13   dollars in cash?

14   A.    That's correct.

15   Q.    Okay.  And at that time, the deal was that 700 million of

16   those funds would go to Barclays, and the remaining 600 million

17   would stay at LBI?

18   A.    That's correct.

19   Q.    And what is the cash balance at LBI today?

20   A.    It's virtually nil.

21   Q.    Where did it go?

22   A.    To the CME.  Liquidation of the CME trades.  And to all

23   the other clearing banks involved in processing of the

24   transactions this week.

25   Q.    Sir, since the time that the agreement was first entered

111

1    into with Barclays early in the week, are you aware of any

2    affirmative efforts of having been undertaken on behalf of

3    Lehman to shop these assets to any other potential purchasers?

4    A.   The assets, specifically, the inventory assets?

5    Q.   The assets being acquired by Barclays or any subset of

6    those?

7    A.   No.  Nor -- no.

8            MR. QURESHI:  Your Honor, may I have one moment,

9    please?

10           THE COURT:  Sure.

11   Q.   Sir, are you familiar, generally, with the terms of the

12   DIP financing agreement?

13   A.   Generally.

14   Q.   Okay.  Is it your understanding that if the transaction

15   with Barclays does not close, that that would constitute a

16   default under the DIP?

17   A.   Thirty days to repay.  It's thirty days to repay.

18   Q.   So it would trigger a thirty-day repayment of it?

19   A.   Yes.

20   Q.   Okay.

21           MR. QURESHI:  Thank you, Your Honor, that's all I

22   have.

23           THE COURT:  Is there anyone else who wishes to

24   examine the witness?

25           MR. ROSNER:  Your Honor, if you can see me, I'm right

126

1  A.   I was at an afternoon session.  My understanding is there

2  was more than one session.

3  Q.   And these questions were asked as to the intercompany

4  payable, correct?

5  A.   Uh-huh.

6  Q.   And do you recall whether --

7         THE COURT:  You have to answer with more than a nod

8  of the head.  Thanks.

9         THE WITNESS:  Sorry.

10  Q.   And do you recall whether this information that I'm asking

11  now was given yesterday at the information center?

12  A.   It was not given yesterday.

13  Q.   Which debtor entity owes that money to LBIE?

14  A.   LBI is a payable to LBIE.

15  Q.   And what about Holdings?

16  A.   LBIE is a payable to LB Holdings.

17  Q.   And how much is that?

18  A.   Eight billion.

19  Q.   And do you know what that's derived from?

20  A.   No.

21  Q.   Did you do an audit of the -- I'm sorry.  Has an audit

22  been accomplished of the securities that are to be transferred

23  to Barclays under the proposed transactions?

24  A.   If you mean an audit by external valuation process?

25  Q.   By identification of the securities?

127

1   A.   Absolutely, line by line.

2   Q.   I think during your proffer it was stated that you are

3   familiar with the contract.  I assume that means you don't know

4   every line but you are generally familiar with the contract

5   that's before the Court today, is that a fair statement?

6   A.   Yes.

7   Q.   Are you aware of the closing conditions under the

8   contract?

9   A.   I believe so.

10  Q.   Are they all satisfied as of today, subject to the entry

11  of an order by this Court?

12  A.   With respect to all those that I have knowledge of, yes.

13  Q.   And I think there was a question, but I just want to be

14  clear.  There is a closing condition regarding eight employees

15  signing up agreements, is that correct?

16  A.   That is correct.

17  Q.   And I might have missed this before, and have all of those

18  eight employees been signed up?

19  A.   We expect no issues with respect to the employment

20  services needs to close.

21  Q.   Okay.  So as of sitting here right now, that condition has

22  not been met?

23  A.   We expect no issues.

24  Q.   For the record, it's a yes or no and I just want to make

25  it clear on the record?

VERITEXT REPORTING COMPANY
212-267-6868                                    516-608-2400

128

1     A.     I do not have the specific information with respect to

2     either the exact number of those participants or with respect

3     to Barclays' view as to whether that would be waived if,

4     indeed, that became an issue.

5              MR. ROSNER:  Okay.  I have nothing further, Your

6     Honor.  Thank you.

7              THE COURT:  Okay, thank you.  Is there anyone else

8     that wishes to examine Mr. McDade?  Come forward.  Please state

9     your name and identity of the client that you're here to

10    represent.

11             MR. BYRNE:  Yes, Your Honor, good afternoon.  Larry

12    Byrne from Linklaters.  Linklaters, Your Honor, represents the

13    administrators who have been appointed to supervise the

14    insolvency of four Lehman Brothers entities in the U.K. and in

15    Europe.

16             THE COURT:  These are the Pricewaterhouse people?

17             MR. BYRNE:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MR. BYRNE:  So we act for Pricewaterhouse who are now

20    the insolvency administrators in the U.K. for these four Lehman

21    Brothers entities who are affiliates of subsidiaries of the

22    debtors.

23             THE COURT:  Okay.  You may proceed with your

24    questions.

25    CROSS-EXAMINATION

148

1   connection with the transactions that did not happen.  And then

2   we were re-retained on, I guess, Monday afternoon, after the

3   filing.

4   Q.   Okay.  And, sir, is it correct that you are, again,

5   generally familiar with the terms and the provisions contained

6   in the asset purchase agreement?

7   A.   Yes.

8   Q.   And in your proffer the preservation of nine to ten

9   thousand jobs was discussed, correct?

10  A.   Yes.

11  Q.   And is it your understanding that Barclays' obligation,

12  under the terms of the asset purchase agreement, is to only

13  keep those employees for ninety days?

14  A.   I think, under the terms of the agreement, all nine to ten

15  thousand people will be offered a job for ninety days, and at

16  the end of that period Barclays will decide if they want to

17  offer them full-time employment or not and, if not, they will

18  be given severance according to Lehman's normal severance

19  policy.

20  Q.   Okay.  With the severance to be paid by whom?

21  A.   Barclays.

22  Q.   Okay.  So the obligation to employ runs only for ninety

23  days?

24  A.   I don't know that there's a commitment only for ninety

25  days.  It's unimaginable to me that they can run the business

149

1   without people.

2   Q.   Sir, are you generally familiar with the closing

3   conditions contained in the APA?

4   A.   Generally.

5   Q.   Okay.  And, according to your understanding, as you sit

6   here today, have all of the closing conditions been satisfied?

7   A.   I don't know.

8   Q.   Okay.  Are you aware of any specific closing conditions

9   that have not been satisfied?

10   A.   I don't know.

11   Q.   Okay.  Are you aware, sir, of the provision in the asset

12   purchase agreement that requires contracts to be negotiated

13   with eight key employees?

14   A.   Yes.

15   Q.   Is it your understanding that that is a closing condition?

16   A.   Yes.

17   Q.   Is it your understanding that that closing condition has

18   been satisfied?

19   A.   I don't know.

20   Q.   Okay.  Is it your understanding that that closing

21   condition has been waived by Barclays?

22   A.   Not that I know of.

23   Q.   Okay.  Sir, is it also your understanding that one of the

24   closing conditions is that, I believe, a prior version of the

25   APA used the term "substantial majority" of so-called "critical

150

1    employees" agreed to go with Barclays upon the closing of the

2    transaction?

3    A.    My understanding:  that it's that they don't leave.  I

4    don't know that there's an agreement that they go.

5    Q.    That they are acquired by Barclays, in other words?

6    A.    In other words, they haven't left before the closing.

7    Q.    Right.  And is it your understanding --

8            MR. QURESHI:  Or, strike that.

9    Q.    Do you know if that closing condition has been complied

10   with?

11   A.    We're closing tonight or we're not closing?

12   Q.    Do you have an understanding of whether the substantial

13   majority of the employees on that list have agreed to stay upon

14   the closing?

15   A.    That's not the -- they don't leave.  It's not that they

16   agreed to stay.  And at close of business I saw people working,

17   albeit not everybody was at their desk.

18   Q.    Sir, in your proffer -- through your proffer you testified

19   that Lazard has contacted a number of entities in connection

20   with attempting to find buyers for these assets.  Is that

21   correct?

22   A.    Can you clarify when?

23   Q.    Well, that is going to be my question.  Since the

24   transaction with Barclays was signed up, has any effort been

25   made by Lazard to try to find an alternative buyer for the same

259

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
| --- | --- | --- |
| Debtor's motion for an order confirming status of Citibank clearing advances approved | 57 | 1 |
| Sale transaction approved | 245 | 25 |

260

1

2                              C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6        **Lisa Bar-Leib**  Digitally signed by Lisa Bar-Leib
                             DN: cn=Lisa Bar-Leib, c=US
                             Reason: I am the author of this
7                            document
                             Date: 2008.09.23 11:37:51 -04'00'

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:   September 22, 2008

16

17

18

19

20

21

22

23

24

25