WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., *et al.*,** | : | **08-13555 (JMP)** |
| **Debtors.** | : | **(Jointly Administered)** |

**NOTICE OF AMENDED PROPOSED PLAN IN THE SUNCAL CHAPTER 11 CASES**

**PLEASE TAKE NOTICE** that, pursuant to the Order Pursuant to Federal Rules of Bankruptcy Procedure 6004 and 9019 and Section 363 of the Bankruptcy Code Authorizing Lehman Commercial Paper Inc. to Consummate Transactions Contemplated in the Chapter 11 Plan Proposed by the Lehman Lenders in the SunCal Chapter 11 Cases, dated October 9, 2009 [Docket No. 5420] (the "Order"),[1] Lehman Commercial Paper Inc. hereby files (i) an amended version of the Proposed Plan (the "Amended Proposed Plan"), a copy of which is attached hereto as Exhibit A, and (ii) a disclosure statement for the Amended Proposed Plan, a copy of which is attached hereto as Exhibit B.

Dated: October 16, 2009
New York, New York

/s/Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Order.

# **Exhibit A**

See Attached.

Richard M. Pachulski (CA Bar No. 90073)
Dean A. Ziehl (CA Bar No. 84529)
Robert B. Orgel (CA Bar No. 101875)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

Edward Soto (admitted *pro hac vice*)
Shai Y. Waisman (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC and OVC Holdings LLC

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

In re:
Palmdale Hills Property, LLC, and its Related Debtors,
Jointly Administered Debtors
and Debtors-In-Possession

Affects:
☐ All Debtors
☑ Palmdale Hills Property, LLC
☑ SunCal Beaumont Heights, LLC
☑ SCC/Palmdale, LLC
☑ SunCal Johannson Ranch, LLC
☑ SunCal Summit Valley, LLC
☑ SunCal Emerald Meadows, LLC
☑ SunCal Bickford Ranch, LLC
☑ Acton Estates, LLC
☑ Seven Brothers, LLC
☑ SJD Partners, Ltd.
☐ SJD Development Corp.
☑ Kirby Estates, LLC
☑ SunCal Communities I, LLC
☑ SCC Communities LLC
☐ SunCal Communities III, LLC
☑ North Orange Del Rio Land, LLC
☑ Tesoro SF, LLC
☑ LB/L-SunCal Oak Valley, LLC
☑ SunCal Heartland, LLC
☑ LB/L-SunCal Northlake, LLC
☑ SunCal Marblehead, LLC
☑ SunCal Century City, LLC
☑ SunCal PSV, LLC
☑ Delta Coves Venture, LLC
☑ SunCal Torrance Properties, LLC
☑ SunCal Oak Knoll, LLC

Case No.: 8:08-bk-17206-ES
Chapter 11

Jointly Administered Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES; 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES; 8:08-bk-17573-ES; 8:08-bk-17574-ES; 8:08-bk-17575-ES 8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES; 8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES; 8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-bk-17588-ES

***FIRST AMENDED* JOINT CHAPTER 11 PLAN PROPOSED BY LEHMAN LENDERS**

**<u>Hearing</u>:**
Date: October 15, 2009
Time: 2:00 p.m.
Place: Courtroom 5A
411 West Fourth Street
Santa Ana, CA 92701

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Table of Contents**

**Page**

I. INTRODUCTION ..... 1
1.1 Prefatory Statement. ..... 1
1.2 Plan Debtors. ..... 2
1.3 Plan Overview. ..... 2
II. DEFINITIONS AND RULES OF INTERPRETATION ..... 5
2.1 Definitions. ..... 5
2.1.1 10000 Santa Monica Project. ..... 5
2.1.2 Acquisitions. ..... 5
2.1.3 Acton Estates. ..... 5
2.1.4 Acton Project. ..... 5
2.1.5 Administrative Claim(s) ..... 5
2.1.6 Administrative Claim Bar Date. ..... 5
2.1.7 Administrative Tax Claim(s). ..... 5
2.1.8 Administrative Tax Claim Bar Date. ..... 6
2.1.9 Affiliate. ..... 6
2.1.10 Allowed. ..... 6
2.1.11 Allowed Amount. ..... 8
2.1.12 Arch. ..... 8
2.1.13 Assets. ..... 8
2.1.14 Available Cash. ..... 8
2.1.15 Avoidance Actions. ..... 8
2.1.16 Ballot. ..... 8
2.1.17 Bankruptcy Code. ..... 8
2.1.18 Bankruptcy Court. ..... 9
2.1.19 Bankruptcy Rules. ..... 9
2.1.20 Beaumont Heights Project. ..... 9
2.1.21 BFP Waiver. ..... 9
2.1.22 Bickford Ranch Project. ..... 9
2.1.23 Bickford Second Lien Loan Agreement. ..... 9
2.1.24 Bond Claim(s). ..... 10
2.1.25 Bond Claimant. ..... 10
2.1.26 Bond Issuer(s). ..... 10
2.1.27 Bond Obligation(s). ..... 10
2.1.28 Bond Obligor(s). ..... 10
2.1.29 Bond Safeguard. ..... 10
2.1.30 Business Day. ..... 10
2.1.31 Cases. ..... 10
2.1.32 Cash. ..... 10
2.1.33 Cash Collateral. ..... 11
2.1.34 Claim. ..... 11
2.1.35 Claims Bar Date. ..... 11
2.1.36 Claims Objection Deadline. ..... 11
2.1.37 Class. ..... 12
2.1.38 Committees. ..... 12
2.1.39 Conclusion of [ES Action, Cross-Collateralization Action(s) or Project Related Action(s)]. ..... 12
2.1.40 Confirmation Date. ..... 12
2.1.41 Confirmation Order. ..... 12
2.1.42 Contingent Bid. ..... 12
2.1.43 Contingent Lehman ALI Claims Against SJD Partners. ..... 12
2.1.44 Contingent Lehman ALI Unsecured Claims Against SJD Partners. ..... 12
2.1.45 Contingent Lehman ALI Secured Claim Against SJD Partners. ..... 13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2.1.46 Credit Bid Conditions. 13
2.1.47 Creditor. 13
2.1.48 Cross-Collateralization Action. 13
2.1.49 Cross-Collateralization Claim. 13
2.1.50 Cross-Collateralization Final Judgment. 13
2.1.51 Cross-Collateralization Judgment. 14
2.1.52 Danske Bank. 14
2.1.53 Danske Secured Claim. 14
2.1.54 Debtor(s). 14
2.1.55 Debtor(s)-in-Possession. 14
2.1.56 Debtors' Third Amended Disclosure Statement. 14
2.1.57 Del Amo Project. 14
2.1.58 Del Rio. 14
2.1.59 Del Rio CFD Bond Proceeds. 14
2.1.60 Del Rio Development Agreement. 14
2.1.61 Del Rio PSA. 15
2.1.62 Del Rio Rights. 15
2.1.63 Del Rio / SJD Partners Release. 15
2.1.64 Delta Coves. 15
2.1.65 Delta Coves Loan Agreement. 16
2.1.66 Delta Coves Project. 16
2.1.67 Detailed Sale Procedures. 16
2.1.68 Disputed Claim(s). 16
2.1.69 Distribution(s). 17
2.1.70 Distribution Agent. 17
2.1.71 Distribution Date. 17
2.1.72 Effective Date. 17
2.1.73 Elieff. 17
2.1.74 Emerald Meadows Project. 17
2.1.75 Encumbrance. 17
2.1.76 Equitable Subordination Claims. 18
2.1.77 ES Action. 18
2.1.78 ES Claim. 18
2.1.79 ES Claimant. 18
2.1.80 ES Claimant Release and Assignment. 18
2.1.81 ES Claimant Released Claims. 19
2.1.82 ES Date. 19
2.1.83 ES Final Judgment. 19
2.1.84 ES Judgment. 19
2.1.85 ES Litigation Expenses. 19
2.1.86 ES Litigation Loan. 20
2.1.87 ES Litigation Proceeds. 20
2.1.88 ES Plan Debtors. 20
2.1.89 ES Pro Rata Settlement Payment. 20
2.1.90 ES Settlement. 20
2.1.91 ES Settlement Amount. 20
2.1.92 ES Settlement Offer. 21
2.1.93 Estate or Estates. 21
2.1.94 Estate Acceptance of the ES Settlement. 21
2.1.95 Estate ES Settlement Release. 21
2.1.96 Fee Applications. 22
2.1.97 Fenway Capital. 22
2.1.98 Filed. 22
2.1.99 Final Order. 22
2.1.100 General Administrative Claim Bar Date. 22
2.1.101 General Unsecured Claim. 22

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2.1.102 Guaranteed Minimum Distribution. 22
2.1.103 Heartland Project. 22
2.1.104 Holder. 23
2.1.105 Initial Bid. 23
2.1.106 Insider. 23
2.1.107 Interest. 23
2.1.108 Interim Loan Agreement. 23
2.1.109 Johannson Ranch Project. 23
2.1.110 Joshua Ridge Project. 24
2.1.111 Kirby Estates. 24
2.1.112 LCPI. 24
2.1.113 Lehman Administrative Loans. 24
2.1.114 Lehman ALI. 24
2.1.115 Lehman ALI's Bickford Second Lien. 24
2.1.116 Lehman Appeal. 24
2.1.117 Lehman Appeal Affected Debtor. 25
2.1.118 Lehman Commercial. 25
2.1.119 Lehman Commercial's SCC Palmdale Lien. 25
2.1.120 Lehman Commercial's SunCal I Lien. 25
2.1.121 Lehman Creditor. 25
2.1.122 Lehman Creditor Party. 25
2.1.123 Lehman Disclosure Statement. 25
2.1.124 Lehman Lender. 25
2.1.125 Lehman Loan. 25
2.1.126 Lehman Nominee(s). 26
2.1.127 Lehman Plan. 26
2.1.128 Lehman Plan Sale Procedures. 26
2.1.129 Lehman Post-Confirmation Expenses. 26
2.1.130 Lehman Post-Confirmation Funding. 26
2.1.131 Lehman Proponents. 26
2.1.132 Lehman Related Party. 26
2.1.133 Lehman Releasees. 27
2.1.134 Lehman Secured Claim. 27
2.1.135 Lehman Successor. 27
2.1.136 Liquidating Trustee. 27
2.1.137 Litigation Claim(s). 27
2.1.138 Litigation Recoveries. 27
2.1.139 Marblehead Project. 28
2.1.140 Maximum DOT Security Amount. 28
2.1.141 Maximum PRA Recovery Amount. 28
2.1.142 Mechanic's Lien Claim. 28
2.1.143 Minimum Distribution Release and Assignment. 29
2.1.144 Minimum Distribution Released Claims. 29
2.1.145 Negative Covenant. 29
2.1.146 Net Cash Litigation Recoveries. 30
2.1.147 Net Cash Proceeds. 30
2.1.148 Net Proceeds. 30
2.1.149 Non-Settled ES Claims. 30
2.1.150 Non-Settling ES Claimant(s): 30
2.1.151 Non-Settling ES Claimant Percentage. 30
2.1.152 Northlake Holdings. 30
2.1.153 Northlake Project. 31
2.1.154 Oak Knoll Project. 31
2.1.155 Oak Valley Project. 31
2.1.156 Other Secured Claim. 31
2.1.157 OVC Holdings. 31

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2.1.158 Pacific Point First Loan Agreement. 31
2.1.159 Pacific Point Foreclosure. 31
2.1.160 Pacific Point Project. 31
2.1.161 Palmdale Hills. 31
2.1.162 Palmdale Hills CFD Bonds. 32
2.1.163 Palm Springs Village Project. 32
2.1.164 Permitted Liens. 32
2.1.165 Person. 32
2.1.166 Petition Dates. 32
2.1.167 Plan. 33
2.1.168 Plan Debtors. 33
2.1.169 Plan Release. 33
2.1.170 Plan Reserve. 34
2.1.171 Post-Confirmation Account(s). 34
2.1.172 Post-Confirmation Expenses. 35
2.1.173 PRA Recovery Deed(s) of Trust. 35
2.1.174 PRA Recovery Security Pool. 35
2.1.175 PRA Security Project. 35
2.1.176 Priority Claim. 35
2.1.177 Priority Tax Claim. 35
2.1.178 Professional. 35
2.1.179 Professional Fees. 36
2.1.180 Projects. 36
2.1.181 Project Related Action. 36
2.1.182 Project Related Action Recovery. 36
2.1.183 Pro Rata. (a) 36
2.1.184 Proof of Claim. 36
2.1.185 Proof of Interest. 36
2.1.186 Reconveyance Agreement. 36
2.1.187 Remaining Other Assets. 37
2.1.188 Remaining Real Estate Projects. 37
2.1.189 Residual Cash. 37
2.1.190 Ritter Cash. 37
2.1.191 Ritter Ranch Loan Agreement. 37
2.1.192 Ritter Ranch Project. 38
2.1.193 Sales Procedures Motion. 38
2.1.194 SCC Communities. 38
2.1.195 SCC LLC. 38
2.1.196 SCC Palmdale. 38
2.1.197 SCC Palmdale Loan Agreement. 38
2.1.198 Schedules. 38
2.1.199 Secured Claim. 39
2.1.200 Secured Real Property Tax Claims. 39
2.1.201 Settling ES Claimant(s): 39
2.1.202 Settling ES Claimant(s) by Vote: 39
2.1.203 Seven Brothers. 39
2.1.204 SJD Development. 39
2.1.205 SJD Partners. 39
2.1.206 Successful Bidder. 39
2.1.207 Summit Valley Project. 39
2.1.208 SunCal. 39
2.1.209 SunCal I. 40
2.1.210 SunCal III. 40
2.1.211 SunCal Beaumont. 40
2.1.212 SunCal Bickford. 40
2.1.213 SunCal Century City. 40

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2.1.214 SunCal Century City Loan Agreement. ... 40
2.1.215 SunCal Communities I Loan Agreement. ... 40
2.1.216 SunCal Emerald. ... 41
2.1.217 SunCal Heartland. ... 41
2.1.218 SunCal Johansson. ... 41
2.1.219 SunCal Marblehead. ... 41
2.1.220 SunCal Marblehead / SunCal Heartland Loan Agreement. ... 41
2.1.221 SunCal Northlake. ... 41
2.1.222 SunCal Northlake Loan Agreement. ... 42
2.1.223 SunCal Oak Knoll. ... 42
2.1.224 SunCal Oak Knoll/SunCal Torrance Loan Agreement. ... 42
2.1.225 SunCal Oak Valley. ... 42
2.1.226 SunCal Oak Valley Loan Agreement. ... 42
2.1.227 SunCal PSV. ... 43
2.1.228 SunCal PSV Loan Agreement. ... 43
2.1.229 SunCal Summit Valley. ... 43
2.1.230 SunCal Torrance. ... 43
2.1.231 Tax. ... 43
2.1.232 Tesoro. ... 43
2.1.233 Tesoro Project. ... 43
2.1.234 Trustee. ... 44
2.1.235 Trustee Debtor(s). ... 44
2.1.236 Trustee Debtors' Committee. ... 44
2.1.237 Unclaimed Property. ... 44
2.1.238 Voluntary Debtor(s). ... 44
2.1.239 Voluntary Debtors' Committee. ... 44
2.2 Rules of Construction. ... 44
III. TREATMENT OF UNCLASSIFIED CLAIMS ... 45
3.1 Treatment of Allowed Administrative Claims. ... 46
(a) Treatment and Repayment of the Lehman Administrative Loan(s). ... 46
(b) Administrative Claim Bar Date. ... 47
3.2 Treatment of Priority Tax Claims. ... 48
3.3 Treatment of Unavoided Liens Securing Claims That Are Not Allowed. ... 48
IV. CLASSIFICATION OF CLAIMS AND INTERESTS ... 49
V. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ... 68
5.1 Treatment of Allowed Secured Real Property Tax Claims (Classes 1.1 through 1.20). ... 69
5.2 Treatment of Lehman Secured Claims (Classes 2.1 through 2.17). ... 70
5.2.1 Voting. ... 70
5.2.2 Liens. ... 70
5.2.3 Claims. ... 70
5.2.4 Disposition of Collateral ... 71
5.2.5 Releases, Reconveyances, Assignments and Payments. ... 72
5.3 Treatment of Allowed Danske Secured Claim (Class 3). ... 74
5.3.1 Voting. ... 74
5.3.2 Liens. ... 74
5.3.3 Claims. ... 74
5.3.4 Disposition of Collateral and Means Therefor ... 74
5.4 Treatment of Allowed Other Secured Claims (Classes 4.1 Through 4.15). ... 75
5.5 Treatment of Allowed Secured Mechanic's Lien Claims Against the Plan Debtors (Classes 5.1 through 5.57). ... 77
5.6 Treatment of Allowed Priority Claims (Classes 6.1 Through 6.4). ... 78
5.7 Treatment of Allowed General Unsecured Claims (Classes 7.1 Through 7.24). ... 78
5.8 Treatment of Allowed ES Claims (Classes 8.1 through 8.19). ... 79
5.9 Treatment of Allowed Interests (Classes 9.1 through 9.24) ... 81
VI. ACCEPTANCE OR REJECTION OF THE PLAN ... 81
6.1 Introduction. ... 81

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6.2 Who May Object to Confirmation of the Lehman Plan. .... 82
6.3 Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims and for Holders of ES Claims or General Unsecured Claims. .... 82
6.4 What Is an Allowed Claim/Interest. .... 82
6.5 What Is an Impaired Class. .... 83
6.6 Who Is Not Entitled to Vote. .... 83
6.7 Who Can Vote in More than One Class. .... 83
6.8 Votes Necessary for a Class to Accept the Lehman Plan. .... 84
6.9 Treatment of Nonaccepting Classes. .... 84
6.10 Request for Confirmation Despite Nonacceptance by Impaired Class(es). .... 84
VII. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN .... 84
7.1 Introduction. .... 84
7.2 The Liquidating Trustee. .... 85
7.3 The Guaranteed Minimum Distribution Will be Held in the Plan Reserve to Assure a Minimum Amount for Creditors without Security or Priority. .... 85
7.4 Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee. .... 89
7.5 The Committee(s). .... 89
7.6 Lehman Post-Confirmation Funding. .... 89
7.6.1 Amount and Uses of Lehman Post-Confirmation Funding. .... 89
7.6.2 Cash Collateral of a Lehman Creditor. .... 91
7.6.3 Terms and Documentation of Lehman Post-Confirmation Funding. .... 92
7.7 Plan Reserve and Post-Confirmation Accounts. .... 94
7.8 Disposition of Assets .... 95
7.8.1 Litigation Claims, Net Cash Litigation Recoveries and Remaining Other Assets. .... 95
7.9 Disposition of the Remaining Real Estate Projects. .... 96
7.9.1 Lehman Plan Sale Procedures. .... 96
7.9.2 Net Proceeds from Sales of Remaining Real Estate Projects to Third Party Purchasers. .... 105
7.9.3 PRA Recovery Security Pool. .... 105
(a) Generally. .... 105
(b) PRA Recovery Deeds of Trust. .... 106
(c) Reconveyance Agreements. .... 108
(d) Release of PRA Recovery Deeds of Trust. .... 109
(e) Reduction of Maximum PRA Recovery Amount. .... 111
7.9.4 Sale or Refinance of PRA Security Projects. .... 112
7.10 Equitable Subordination Claims .... 113
7.10.1 Generally. .... 113
7.10.2 ES Settlement Offer. .... 113
(a) Payments to ES Settling Claimants .... 114
(b) Releases and Assignments. .... 114
7.10.3 Continued Prosecution of Equitable Subordination Claims. .... 116
(a) ES Litigation Loan. .... 117
(b) Concessions by Lehman Lenders to Facilitate Collection of ES Judgments. .... 118
7.11 Post-Confirmation Expenses, Intercompany Loans and Payables and Priorities in Payment. .... 119
7.11.1 Post Confirmation Expenses and Intercompany Loans. .... 119
7.11.2 Payables and Priorities in Payment. .... 120
(a) Funds Constituting Collateral. .... 120
(b) Funds Constituting ES Litigation Proceeds. .... 120
(c) Various Other Funds, Including Funds Constituting a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment. .... 121
(d) Funds that Constitute Both ES Litigation Proceeds and a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment. .... 122
(e) Funds that May Later be Determined to be Both ES Litigation Proceeds and Project Related Action Recovery With Respect to a Cross-Collateralization Judgment. .... 123

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7.11.3 Allocations and Distributions Under this Section. 124
7.12 Plan Release. 124
7.13 Entry of Final Decrees. 126
7.14 Dissolution of Committees and Discharge of Trustee and Liquidating Trustee. 126
VIII. DISTRIBUTIONS 126
8.1 Distribution Agent. 126
8.2 Distributions. 127
(a) Dates of Distributions. 127
(b) Limitation on Liability. 127
8.3 Old Instruments and Securities. 127
(a) Surrender and Cancellation of Instruments and Securities. 127
(b) Cancellation of Liens. 127
8.4 De Minimis Distributions and Fractional Shares. 128
8.5 Delivery of Distributions. 128
8.6 Unclaimed Property. 128
8.7 Disposition of Unclaimed Property. 129
IX. OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS 129
9.1 Standing for Objections to Claims. 129
9.2 Treatment of Disputed Claims. 130
(a) No Distribution Pending Allowance. 130
(b) Distribution After Allowance. 130
(c) Reserves for Disputed Claims. 130
X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES 131
10.1 Executory Contracts Potentially Being Assumed. 131
10.2 Executory Contracts Being Rejected. 131
10.3 Retention of Property Rights by Lehman Nominees or Liquidating Trustee. 131
10.4 Bar Date for Rejection Damages. 131
XI. EFFECT OF CONFIRMATION OF THE PLAN 132
XII. LIMITATION OF LIABILITY 133
12.1 No Liability for Solicitation or Participation. 133
12.2 Limitation of Liability. 133
XIII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN 134
13.1 Conditions Precedent to Plan Confirmation. 134
13.2 Conditions Precedent to Plan Effectiveness. 134
XIV. RETENTION OF JURISDICTION 135
XV. MODIFICATION OR WITHDRAWAL OF PLAN 135
15.1 Modification of Plan. 135
15.2 Nonconsensual Confirmation. 135
XVI. MISCELLANEOUS 135
16.1 Changes in Rates Subject to Regulatory Commission Approval. 135
16.2 Payment of Statutory Fees. 135
16.3 Payment Dates. 136
16.4 Headings. 136
16.5 Other Documents and Actions. 136
16.6 Notices. 136
16.7 Governing Law. 137
16.8 Binding Effect. 137
16.9 Successors and Assigns. 137
16.10 Severability of Plan Provisions. 137
16.11 No Waiver. 138
16.12 Inconsistencies. 138
16.13 Exemption from Certain Transfer Taxes and Recording Fees. 138
16.14 Post-Confirmation Status Report. 139
16.15 Post-Confirmation Conversion/Dismissal. 139
16.16 Final Decree. 139

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# I.

# INTRODUCTION

**1.1 Prefatory Statement.** This *First Amended Joint Chapter 11 Plan Proposed by Lehman Lenders* (the "Plan" or "Lehman Plan")[1] is Filed by Creditors Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC, and OVC Holdings LLC, each in its capacity as agent for the Lehman Successors, and/or as agent and lender in its own right, with respect to the applicable Lehman Loans (referred to in the Lehman Plan as both the Lehman Proponents, with reference to their role as proponents of this Plan, and as the Lehman Lenders, with reference to their other capacities).

The Plan essentially is a blueprint of how the Plan Debtors (*i.e.*, all Debtors in the Cases other than SJD Development and SunCal III) will be structured or liquidated after or as a result of bankruptcy – whether they will survive, the forms of entities they will be, who will own them, and what distributions will be made or required. Among other things, the Lehman Plan designates classes of Claims and classes of Interests, identifies unimpaired and impaired Classes, sets forth a proposal for the satisfaction of all Claims against, and Interests in, the Plan Debtors, and provides adequate means for the implementation of the Lehman Plan. With the Lehman Plan, Holders of Claims and Interests entitled to vote on the Lehman Plan will receive a Ballot for voting on the Lehman Plan and, for Certain Creditors (ES Claimants holding Allowed ES Claims, each as defined below), for voting on whether the Liquidating Trustee should accept or reject, on behalf of and for the benefit of the ES Claimants, the proposed settlement of the Equitable Subordination Claims (the "ES Settlement Offer") asserted in the pending, relevant action (the ES Action, as defined below) against one or more Lehman Related Parties.

A separate document, entitled *Disclosure Statement With Respect to First Amended Joint Chapter 11 Plan Proposed By Lehman Lenders* (the "Lehman Disclosure Statement"), is being sent as an accompaniment to the Lehman Plan, which may be included in the same envelope as this document or under separate cover. The Lehman Disclosure Statement is intended to provide Creditors with information sufficient to enable Creditors to vote on the Lehman Plan and has been

[1] All capitalized terms have the meanings set forth in Article II of the Lehman Plan.

approved by the Bankruptcy Court as containing sufficient information for that purpose. The Lehman Disclosure Statement includes a summary of the Plan Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Lehman Plan, a discussion of certain alternatives to the Lehman Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Lehman Plan. Creditors should thoroughly review both the Lehman Plan and Lehman Disclosure Statement before deciding whether Creditors will accept or reject the Lehman Plan (and, if a Creditor is an ES Claimant, whether the Creditor votes for acceptance or rejection of the ES Settlement Offer by the Liquidating Trustee). No solicitation materials, other than the Lehman Disclosure Statement and related materials transmitted therewith and approved for solicitation purposes by the Bankruptcy Court, have been authorized for use in soliciting acceptances or rejections of the Lehman Plan.

**1.2** **Plan Debtors.** The Lehman Plan applies to 24 of the 26 Debtors, being all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**1.3** **Plan Overview.** The Lehman Creditors (*i.e.*, the Lehman Lenders and Lehman Successors) are owed, collectively, approximately $2 billion secured by deeds of trust on certain of the Remaining Real Estate Projects, certain Cash Collateral and other Assets of the Plan Debtors' Estates. The Debtors have challenged the Lehman Creditors' Secured Claims, contending that (a) certain of the Lehman Creditors' Liens on the Assets of particular Plan Debtors who are obligors under certain Lehman Loans are subject to being set aside because, among other things, other affiliated Debtors, rather than the obligor Plan Debtors, received the benefit of such Lehman Loans (the Cross-Collateralization Claims), and (b) the Claims of the Lehman Creditors should be subordinated to the Claims of certain other Creditors allegedly harmed by the conduct of the Lehman Lenders (the Equitable Subordination Claims). Significantly, the Debtors also have alleged that as a result of these disputes, the applicable Lehman Creditors should not have the right to credit bid in connection with a sale of the Projects owned by the Trustee Debtors. The Lehman Lenders do not concur with these conclusions of the Debtors or with many of the factual

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

contentions asserted as supporting or providing a basis for the Cross-Collateralization Claims and/or Equitable Subordination Claims.

Nonetheless, to enable the Plan Debtors to emerge from bankruptcy, which the Lehman Lenders believe is in the interest of all Creditors, with a Plan that is fair to all constituencies and best preserves current values and prevents further deterioration in the values of the Assets of the Plan Debtors, the Lehman Proponents have proposed the Lehman Plan. Through the Lehman Plan:

(a) The Lehman Lenders will fund $10 million on the Plan's Effective Date from new transfers of Cash to provide a reserve for a Guaranteed Minimum Distribution payable to Creditors without priority or security (which $10 million amount can be reduced or eliminated if, *inter alia*, the Credit Bid Conditions are not met or ES Final Judgments are rendered in a sufficient amount, all as reflected in the definition below of "Guaranteed Minimum Distribution");

(b) The Lehman Proponents are making an offer to settle the Equitable Subordination Claims in the ES Action through the ES Settlement Offer ($15 million if all eligible Creditors settle and less if fewer settlements occur) and will make available funding for the ES Settlement Offer either through new Cash transfers or through the use of Cash Collateral;

(c) Auctions of the Remaining Real Estate Projects would occur within sixty (60) days after the Plan's Effective Date (in accordance with the Lehman Plan Sale Procedures specified in the Plan), at which third parties may bid and, significantly, at which the Lehman Creditors and other Holders of Allowed Secured Claims may credit bid; provided that any Project acquired by a Lehman Nominee as a result of a credit bid under this Plan shall be subject to a deed of trust (the PRA Recovery Deed of Trust) to be granted to the Liquidating Trustee by the applicable Lehman Nominee as part of a PRA Recovery Security Pool, which serves as collateral for any ES Final Judgment (a final judgment granting some form or manner of equitable subordination in the ES Action, as more fully defined below) and any Cross-Collateralization Final Judgments;

(d) Means and a framework are provided for liquidation of the Remaining Other Assets and the distribution of any Residual Cash for Holders of Allowed Claims; and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(e) As part of the *quid pro quo* for the Lehman Plan and for the ability under the Lehman Plan of the Lehman Creditors to obtain control of their collateral through credit bids, the Lehman Creditors are agreeing to afford valuable benefits to the Creditors who are eligible to vote to have the Estates settle their ES Claims (ES Claimants), but who do not settle, which benefits may facilitate the Liquidating Trustee obtaining for such Creditors an ES Final Judgment or may facilitate the Liquidating Trustee's collection of any such judgment. These protections are summarized as follows:

(i) The Lehman Lenders will make available the ES Litigation Loan to enable continued prosecution of the Equitable Subordination Claims in the ES Action;

(ii) The Lehman Creditors are waiving or endeavoring to waive certain defenses, including a defense by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, and granting certain specific concessions, described below, that could facilitate the entry and collection of an ES Final Judgment for the Estates of Debtors SJD Partners or Del Rio;

(iii) The Lehman Creditors are providing security for satisfaction of both ES Final Judgments and Cross-Collateralization Final Judgments; and

(iv) To address the possibility of shortfalls in the amount of proceeds available from some applicable Estates to satisfy the amount of any ES Final Judgments that may be obtained for ES Claimants of those Estates, the Lehman Creditors are agreeing to offer as additional collateral for all ES Final Judgments a pool of certain Cash and deeds of trust (PRA Recovery Deeds of Trust) on all Projects on which Lehman Creditors successfully credit bid under the Lehman Plan, such that, where the proceeds of a sale or disposition of a Project *exceeds* any ES Final Judgment of the particular Estate which had owned such Project, such excess proceeds would be available to satisfy other ES Final Judgments at Estates where there was a shortfall.

The overview of the Lehman Plan in this Section 1.3 of the Lehman Plan is not intended to substitute for the Lehman Disclosure Statement or for the more specific terms set forth in the Lehman Plan other than in this Section 1.3 of the Lehman Plan. If there are any discrepancies between the overview provided in this Section 1.3 of the Lehman Plan and the other provisions of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Lehman Plan, the other provisions shall control. Additionally, the Cases of the Plan Debtors have been jointly administered, but not substantively consolidated. Accordingly, the Lehman Plan provides separate treatment for Holders of Claims and Interests against each Plan Debtor.

## II.

## DEFINITIONS AND RULES OF INTERPRETATION

**2.1 Definitions.** The following defined terms are used in the Lehman Plan. Any capitalized term that is not defined in the Lehman Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

**2.1.1 10000 Santa Monica Project.** The Project owned by SunCal Century City, located in Century City, California.

**2.1.2 Acquisitions.** SCC Acquisitions, Inc., a California corporation, and the Debtors' indirect parent, but not a Debtor in any of the Cases.

**2.1.3 Acton Estates.** Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor in these Cases, and the owner of the Acton Project.

**2.1.4 Acton Project.** The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.5 Administrative Claim(s).** Any Claim against a Plan Debtor incurred after the applicable Petition Date for such Plan Debtor but before the Confirmation Date for any cost or expense of administration of the Cases of the Plan Debtors entitled to priority under Section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fees or charges assessed against the Estates of the Plan Debtors under Section 1930 of Title 28 of the United States Code.

**2.1.6 Administrative Claim Bar Date.** The General Administrative Claim Bar Date and the Administrative Tax Claim Bar Date.

**2.1.7 Administrative Tax Claim(s).** A request for payment of an Administrative Claim by a governmental unit for Taxes (or for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date.

**2.1.8** **<u>Administrative Tax Claim Bar Date.</u>** The earlier of (a) any bar date otherwise established by the Bankruptcy Court or (b) on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit.

**2.1.9** **<u>Affiliate.</u>** As to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise; provided that as to any Lehman Related Party, the term “Affiliate” does not include any Debtor.

**2.1.10** **<u>Allowed.</u>** This term is used both separately and in conjunction with other defined terms in the Lehman Plan (*e.g.*, Allowed Tax Claims) and means:

a. with respect to any Administrative Claim: (1) if the Claim is based upon a Fee Application, an unsecured Claim in the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (2) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Plan Debtors and is not otherwise subject to an Administrative Claim Bar Date, in the amount of such Claim and with a status as secured or unsecured as each are asserted by such creditor and not disputed by the Liquidating Trustee or the Lehman Lenders, failing which, the amount and secured or unsecured status thereof as fixed by a Final Order of the Bankruptcy Court; or (3) if the Holder of such Claim was required to File and has Filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (i) in the amount and with the status as secured or unsecured and in the statutory priority as stated in such proof of Administrative Claim if no objection to such proof of Administrative Claim is interposed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court or the Lehman Plan, or (ii) in the amount and with the status as secured or unsecured and in the statutory priority as fixed by Final

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Order of the Bankruptcy Court if an objection to such proof was interposed within any applicable period of time so fixed; and (4) in the amount of zero, if the Holder of such Claim was required to File and has not Filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, in which event no distribution shall be made on account of such Claim; and

b. with respect to any Claim which is not an Administrative Claim: (1) if no objection to such Claim was interposed by the Claims Objection Deadline, (i) if the Holder of such Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, in the amount of such Claim and with the status as secured or unsecured and with the statutory priority as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (ii) if the Holder of such Claim has Filed a Proof of Claim therefor with the Bankruptcy Court on or before the Claims Bar Date, in the amount and with the status as secured or unsecured and in the statutory priority as stated in such Proofs of Claim; or (2) if an objection to such Claim was interposed by the Claims Objection Deadline, in the amount and with the status as secured or unsecured and in the statutory priority thereof as fixed by Final Order of the Bankruptcy Court; and (3) if the Holder of such Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the Claim is not listed in the Plan Debtors' Schedules or is listed as either disputed, contingent or unliquidated, and the Claim is not deemed Allowed under the terms of this Plan, in the amount of zero and no distribution shall be made on account of such Claim; and

c. with respect to a Claim's status as an ES Claim, (1) with ES Claim status if ES Claim status is alleged on the Holder's Ballot in the manner provided therefor and if no objection thereto is interposed by the Claims Objection Deadline, (2) with ES Claim status if alleged by the Liquidating Trustee and either (i) the Lehman Creditors and any surviving Committee consent or (ii) no objection thereto is Filed by the later of the Claims Objection Deadline or seventy-five (75) days after notice thereof to any surviving Committees and the Lehman Creditors or (3) as fixed by Final Order of the Bankruptcy Court; and

d. with respect to any Interest, (1) if no objection to such Interest was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, (i) if the Holder of such Interest did not File

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

proof thereof with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (ii) if the Holder of such Interest has Filed a Proof of Interest therefor with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as stated in such Proof of Interest, or (2) if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and nature thereof as fixed by Final Order of the Bankruptcy Court; but

e. with respect to any Administrative Claim, Claim or Interest, the term "Allowed" does not signify whether or not such Administrative Claim, Claim or Interest has been subordinated to another Administrative Claim, Claim or Interest or is entitled to the benefits of such subordination.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.11** **Allowed Amount.** The amount in which a Claim or Interest is Allowed.

**2.1.12** **Arch.** Arch Insurance Company, a Bond Issuer.

**2.1.13** **Assets.** All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

**2.1.14** **Available Cash.** Cash held by each Plan Debtor as of the Effective Date other than Cash Collateral.

**2.1.15** **Avoidance Actions.** All Claims and defenses to Claims accruing to the Plan Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

**2.1.16** **Ballot.** The ballot to vote to accept or reject the Lehman Plan and to vote for acceptance or rejection of the ES Settlement Offer.

**2.1.17** **Bankruptcy Code.** The Bankruptcy Reform Act of 1978, as amended, as set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as applicable to the Cases.

**2.1.18** **Bankruptcy Court.** The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of Title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

**2.1.19** **Bankruptcy Rules.** Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

**2.1.20** **Beaumont Heights Project.** The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.21** **BFP Waiver.** The waiver of the defense to the ES Action by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, which waiver shall be applicable only if the Credit Bid Conditions are satisfied and Fenway Capital affirmatively consents in writing to such waiver. (The Lehman Lenders are exercising good faith efforts to obtain the affirmative consent in writing of Fenway Capital to the BFP Waiver.)

**2.1.22** **Bickford Ranch Project.** The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.23** **Bickford Second Lien Loan Agreement.** That certain promissory note, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000, made by SunCal Bickford, as borrower, and payable to the order of Lehman ALI, as lender. The loan made pursuant to and/or evidenced by the Bickford Second Lien Loan Agreement is secured by a second priority deed of trust on the Bickford Ranch Project. The outstanding balance of the loan under the Bickford Second Lien Loan Agreement was not less than $54,494,059.38 as of the applicable Petition Date.

**2.1.24** **Bond Claim(s).** Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds issued by a Bond Issuer.

**2.1.25** **Bond Claimant.** Holder(s) of a Bond Claim.

**2.1.26** **Bond Issuer(s).** Bond Safeguard and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors and with respect to and for the benefit of the Projects owned by such Debtors.

**2.1.27** **Bond Obligation(s).** The alleged obligation(s) of the Bond Obligor(s) to indemnify the Bond Issuers for any payments made by the Bond Issuers to Holders of Bond Claims.

**2.1.28** **Bond Obligor(s).** Obligors who are liable to a Bond Issuer for any payments made by such Bond Issuer to a Bond Claimant or for performance obligations under any performance bonds issued by such Bond Issuer for the benefit of any of the Debtors or their respective Projects. Arch asserts that the Bond Obligors under payment and performance bonds issued by Arch for the benefit of any Debtor or with respect to any Project are all of the Debtors, Acquisitions and Elieff. Bond Safeguard asserts that the Bond Obligors under payment and performance bonds issued by Bond Safeguard for the benefit of any Debtor or with respect to any Project are the respective Debtors for whose benefit such bonds were issued, Acquisitions and Elieff.

**2.1.29** **Bond Safeguard.** Bond Safeguard Insurance Company, a Bond Issuer.

**2.1.30** **Business Day.** Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a); provided that with reference to the date on which something is to be Filed, it shall not include a day on which the applicable court is inaccessible for the purpose of Filing such paper.

**2.1.31** **Cases.** The chapter 11 cases of the Debtors pending before the Bankruptcy Court.

**2.1.32** **Cash.** Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.33** **Cash Collateral.** This term is used in reference to certain Assets of a Plan Debtor's Estate with the same meaning as set forth in Bankruptcy Code Section 363(a).

**2.1.34** **Claim.** A claim — as Bankruptcy Code section 101(5) defines the term "claim"— against any Plan Debtor or any Plan Debtor's property, including, without limitation (a) any right to payment from any of the Plan Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Plan Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

**2.1.35** **Claims Bar Date.** For Claims, other than Administrative Claims, the last date for Filing proofs of Claim as was established by order or orders of the Bankruptcy Court entered prior to October 11, 2009, which date was March 31, 2009 for certain Claims; provided that: (a) for Claims arising from the rejection of executory contracts or unexpired leases, the date(s) as set forth in Plan Section 10.4; (b) for Claims resulting from the successful prosecution or settlement of Avoidance Actions, the later of any otherwise applicable date under this paragraph and forty-five (45) days following entry of the Final Order determining such Avoidance Action; and (c) for Claims of governmental units, the later of any otherwise applicable date under this paragraph and 180 days after the date of the applicable order for relief under Bankruptcy Code §§ 301 or 303, as applicable.

**2.1.36** **Claims Objection Deadline.** For a Claim other than an Administrative Claim and except as otherwise set forth in the Lehman Plan, the first Business Day following the one hundred and twentieth (120th) day after the later of (a) the Effective Date or (b) the applicable bar date for the Claim; provided that: (a) for the ES Claims of Settling ES Claimants, instead, the first Business Day that is at least sixty (60) days after the Effective Date; (b) upon application to the Bankruptcy Court, the Liquidating Trustee or Lehman Lenders may obtain an extension of any such deadline for up to sixty (60) days for cause shown; and (c) any deadline may be extended by agreement of the potential target of the objection and the Liquidating Trustee or a Lehman Lender.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.37** **Class.** Each group of Claims or Interests classified in Article IV of the Lehman Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

**2.1.38** **Committees.** Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee.

**2.1.39** **Conclusion of [ES Action, Cross-Collateralization Action(s) or Project Related Action(s)].** As to the applicable action, either (a) the action has been finally resolved or determined through entry of an ES Final Judgment(s), Cross-Collateralization Final Judgment(s), Final Orders settling or dismissing the actions or any combination thereof or (b) as to Cross-Collateralization Actions only, the time for Filing thereof passes without any such action being Filed.

**2.1.40** **Confirmation Date.** The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

**2.1.41** **Confirmation Order.** The order entered by the Bankruptcy Court confirming the Lehman Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**2.1.42** **Contingent Bid.** This term shall have the meaning ascribed to it in Section 7.9.1 of the Plan.

**2.1.43** **Contingent Lehman ALI Claims Against SJD Partners.** The Claims of Lehman ALI or its assignees or successors (a) arising under the Pacific Point First Loan Agreement in the amount of $120,110,237 that is secured by the Pacific Point Project and any proceeds thereof or from its sale or disposition, which is a Claim against SJD Partners and which also is a Secured Claim against SJD Partners contingent upon the set aside of the Pacific Point Foreclosure and (b) arising based upon Lehman ALI's prior second priority Lien under which it foreclosed through the Pacific Point Foreclosure upon its Claim of approximately $28 million, which is a Claim against SJD Partners contingent upon the set aside of the Pacific Point Foreclosure.

**2.1.44** **Contingent Lehman ALI Unsecured Claims Against SJD Partners.** The Contingent Lehman ALI Claims Against SJD Partners that are General Unsecured Claims.

**2.1.45 Contingent Lehman ALI Secured Claim Against SJD Partners.** The Contingent Lehman ALI Claim Against SJD Partners that is a Secured Claim.

**2.1.46 Credit Bid Conditions.** The conditions applicable with respect to the Guaranteed Minimum Distribution and BFP Waiver that both (a) no hearing on the merits is held, and no order is issued by the Bankruptcy Court with respect to the merits of, the Sales Procedures Motion or any similar motion that seeks, in effect, to deny or limit the ability of any Lehman Creditor to credit bid on any or all Projects, unless neither the Trustee nor any Committee Files, supports or prosecutes such motion; and (b) all rights of the Lehman Creditors to credit bid are afforded to them as set forth in the Plan.

**2.1.47 Creditor.** Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the applicable Debtor's Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**2.1.48 Cross-Collateralization Action.** An Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date.

**2.1.49 Cross-Collateralization Claim.** A Claim against any Lehman Creditor under state or federal fraudulent transfer laws, provided: (a) it is set forth in a complaint Filed no later than sixty (60) days following the Effective Date and (b) such Claim seeks to set aside a Lehman Secured Claim as against a particular Plan Debtor's Estate based on the principal amount of such Lehman Secured Claim against such Plan Debtor's Estate exceeding the funds alleged by the Debtors to have been advanced for the subject collateral or to have directly or indirectly benefitted the applicable Plan Debtor in connection with the applicable Lehman Loan.

**2.1.50 Cross-Collateralization Final Judgment.** A Cross-Collateralization Judgment represented by a Final Order.

**2.1.51** **Cross-Collateralization Judgment.** Any judgment in favor of the Liquidating Trustee pursuant to or as a result of a Cross-Collateralization Action against a Lehman Related Party.

**2.1.52** **Danske Bank.** Danske Bank A/S London Branch.

**2.1.53** **Danske Secured Claim.** The Secured Claim of Danske Bank, a Lehman Successor, arising from the SunCal Century City Loan Agreement.

**2.1.54** **Debtor(s).** Individually or collectively, the Voluntary Debtors and the Trustee Debtors.

**2.1.55** **Debtor(s)-in-Possession.** The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Cases.

**2.1.56** **Debtors' Third Amended Disclosure Statement.** The Debtors' Third Amended Joint Disclosure Statement Describing Debtors' Third Amended Joint Chapter 11 Plan, dated September __, 2009.

**2.1.57** **Del Amo Project.** The Project owned by SunCal Torrance, located in the City of Torrance, California, as more particularly described in XX to the Lehman Plan.

**2.1.58** **Del Rio.** North Orange Del Rio Land, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner and holder of the Del Rio Rights and the Del Rio CFD Bond Proceeds.

**2.1.59** **Del Rio CFD Bond Proceeds.** All proceeds of those certain bonds to be designated as "City of Orange, Community Facilities District No. 06-01 (Del Rio Public Improvements) 2007 Special Tax Bonds" or similarly designated bonds to be issued by the City of Orange, California in connection with that certain community facilities district established by the City and known as the City of Orange Community Facilities District No. 06-01 (Del Rio Public Improvements).

**2.1.60** **Del Rio Development Agreement.** Development Agreement, recorded on July 27, 2004 in the Official Records of Orange County, California as Instrument No. 2004-000677141, as amended by (i) that certain First Operating Memorandum, dated August 17, 2006, (ii) that certain Second Operating Memorandum, dated December 5, 2006, (iii) that certain

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Operating Memorandum No. 3, dated May 22, 2007, and (iv) that certain Operating Memorandum No. 4, dated July 21, 2008.

**2.1.61**    **Del Rio PSA.**  That certain Purchase Agreement and Escrow Instruction (Del Rio) dated as of June 14, 2005 by and among Del Rio, as the seller, and Lennar Homes of California and Centex Homes, as the buyers, as assigned by the buyers to Lennar Centex Del Rio Partners, LLC per that certain Assignment of Purchase Agreement and Escrow Instructions dated as of November 14, 2005, as amended by that certain First Amendment to Purchase Agreement and Escrow Instructions (Del Rio) and that certain Second Amendment to Purchase Agreement and Escrow Instructions (Del Rio) dated as of January 30, 2007.

**2.1.62**    **Del Rio Rights.**  Collectively, (i) all right, title and interest of Del Rio, as developer or in any other capacity, in, to, under or pursuant to the Del Rio Development Agreement including, without limitation, all any and all Del Rio CFD Bond Proceeds, and (ii) all right, title and interest of Del Rio, as seller, under the Del Rio PSA including, without limitation, all profit participation, proceeds, revenues and income to which Del Rio is or may be entitled thereunder.

**2.1.63**    **Del Rio / SJD Partners Release.**  A release (which, as to SJD Partners, must be executed and delivered prior to any setting aside of the Pacific Point Foreclosure and prior to any recovery by a Plan Debtor's Estate with respect to the setting aside of the Pacific Point Foreclosure), in a form reasonably acceptable to the Lehman Lenders, to be executed within forty-five (45) days following the Effective Date by the Liquidating Trustee for the Estate of Del Rio or the Estate of SJD Partners to obtain certain benefits described in Section 7.10.3(b)(ii) of the Lehman Plan that is in a form or substantially the form of the Plan Release set forth in Section 7.12 of the Lehman Plan, but (a) without any exception, as matters not to be released, for Cross-Collateralization Claims or Avoidance Actions and (b) with additional releasees consisting of all and any owners of the applicable Project(s) or other Assets that were at any time owned by Del Rio or SJD Partners, as applicable.

**2.1.64**    **Delta Coves.**  Delta Coves Venture, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Delta Coves Project.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.65** **Delta Coves Loan Agreement.** That certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lenders thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $236,000,000. The loan made pursuant to and/or evidenced by the Delta Coves Loan Agreement is secured by a first priority deed of trust on the Delta Coves Project. The outstanding balance of the loan under the Delta Coves Loan Agreement was not less than $206,023,142.48 as of the applicable Petition Date.

**2.1.66** **Delta Coves Project.** The Project owned by Delta Coves, located in Bethel Island in Contra Costa County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.67** **Detailed Sale Procedures.** The detailed procedures with respect to which the Liquidating Trustee shall sell or convey each of the Remaining Real Estate Projects for which there is a Successful Bidder, either to a third party purchaser, a Lehman Nominee or another Holder of an Allowed Secured Claim, pursuant to and consistent with the Lehman Plan Sale Procedures, in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at, or after the hearing on, confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner and Liquidating Trustee or approval of the Bankruptcy Court.

**2.1.68** **Disputed Claim(s).** All or any part of a Claim that is not Allowed, including, without limitation, all or part of a Claim as to which any one of the following applies: (i) no Proofs of Claim has been Filed with respect to such Claim and it is not deemed Allowed under the Lehman Plan, and either (a) the Claim is not listed in the Schedules or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the liability for, amount, priority or status of the Claim as secured, status as unsecured or status as an ES Claim (a) is the subject of a pending proceeding, whether arbitration, mediation, litigation, adversary proceeding or otherwise; (b) is subject to offset based upon a Filed judgment, Filed order, Filed stipulation or express provision in an executed agreement that was Filed or executed, as

appropriate, after the alleged right to offset arose; (c) is the subject of a timely objection; or (d) is the subject of a request for estimation made in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court or the Lehman Plan, in each case that is Filed on or before the Claims Objection Deadline, provided that any such proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Lehman Plan.

**2.1.69** **Distribution(s).** Payment(s) to Holder(s) of an Allowed Claim(s) or Allowed Interest(s) that are provided for under the Lehman Plan.

**2.1.70** **Distribution Agent.** The Liquidating Trustee.

**2.1.71** **Distribution Date.** With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Lehman Plan.

**2.1.72** **Effective Date.** A date selected by the Lehman Lenders, but in no event later than the sixtieth (60th) day after the Confirmation Date.

**2.1.73** **Elieff.** Bruce Elieff, the manager of Acquisitions, the indirect parent of all of the Debtors.

**2.1.74** **Emerald Meadows Project.** The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.75** **Encumbrance.** Any Lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, unassumed affirmative obligations under development agreements or subdivision improvement agreements, license, preference, priority, security agreement, easement, covenant, encroachment, option or other interest in the subject Project, including any right of recovery, tax (including foreign, federal, state and local tax), Order of any governmental authority or other claim there against or therein, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claims based on any theory that the acquirer is a successor, transferee or continuation of the sellers or their business, and (iv) any leasehold

interest, license or other right, in favor of a person other than the transferor in connection with a sale or conveyance, to use any portion of the subject Project), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**2.1.76** **Equitable Subordination Claims.** Claims for equitable subordination pursuant to Bankruptcy Code § 510(c) held by an Estate for an ES Claimant against a Lehman Creditor.

**2.1.77** **ES Action.** That certain adversary proceeding Filed in the Cases on behalf of all Trustee Debtors and 13 of the Voluntary Debtors and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005.

**2.1.78** **ES Claim.** A Claim, including a Bond Claim and Bond Obligation, against an ES Plan Debtor for "new value" (as defined in 11 U.S.C. section 547(a)(2) and as that section is interpreted with reference to controlling law for the Bankruptcy Court ) voluntarily provided or voluntarily extended to one or more of the ES Plan Debtors after the ES Date and prior to the applicable Petition Date(s); provided that such Claim is not a (i) Secured Claim, (ii) Administrative Claim, (iii) Priority Tax Claim, (iv) Priority Claim, (v) Claim of an Insider or (vi) Claim of either a Lehman Lender or Lehman Successor in such capacity. *E.g.*, ES Claims do not include Claims provided or extended pursuant to a legal or contractual commitment or obligation existing prior to the ES Date. ES Claims are entitled to vote on the ES Settlement as set forth in the Lehman Plan.

**2.1.79** **ES Claimant.** The Holder of an Allowed ES Claim.

**2.1.80** **ES Claimant Release and Assignment.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote ("releasor") shall execute a release and assignment reflecting the following and shall be deemed to release and assign as follows: (a) the releasor shall release the ES Claimant Released Claims from and against all Lehman Releasees and all and any owners of the applicable

Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, and (b) to the extent such ES Claimant Released Claims cannot be released by the releasor, the releasor assigns to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the releasor, including rights to Net Cash Litigation Recoveries, with respect to the ES Claimant Released Claims, all as more fully set forth in Section 7.10.2(b)(ii) of the Lehman Plan.

**2.1.81** **ES Claimant Released Claims.** Any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable or related to the ES Claims of the releasing Person or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of such releasing Person.

**2.1.82** **ES Date.** August 1, 2007, the earliest date on which the Lehman Lenders are alleged to have engaged in inequitable conduct as described in that certain adversary proceeding Filed in the Cases and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005.

**2.1.83** **ES Final Judgment.** An ES Judgment represented by a Final Order.

**2.1.84** **ES Judgment.** A judgment in the ES Action in favor of the Liquidating Trustee on behalf of and for the benefit of any particular group of ES Claimants in connection with any of the Equitable Subordination Claims against a Lehman Related Party.

**2.1.85** **ES Litigation Expenses.** The reasonable and direct out-of-pocket expenses (but not any legal fees): (a) of and incurred by any replacement legal counsel to Miller Barondess, LLP, that is retained by the Liquidating Trustee on a contingency fee basis to prosecute the Equitable Subordination Claims of any ES Plan Debtor's Estate in the ES Action; (b) which are

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

in excess of any Available Cash in the Post-Confirmation Accounts; and (c) which were incurred in connection with prosecuting the Equitable Subordination Claims in the ES Action; provided that (i) such expenses shall, under no circumstances, include any legal fees (including paralegal fees) or other fees of professionals employed by, or of, the replacement legal counsel or any other law firm (other than the reasonable fees and costs of any retained attorney expert witness) nor (ii) shall such expenses include any fees or expenses incurred or otherwise payable to Miller Barondess, LLP.

**2.1.86** **ES Litigation Loan.** A loan to be made available by a Lehman Lender pursuant to the terms and conditions of and as further described in Section 7.10 of the Lehman Plan.

**2.1.87** **ES Litigation Proceeds.** The proceeds of any ES Final Judgment or settlement (other than the ES Settlement) with respect to Non-Settled ES Claims.

**2.1.88** **ES Plan Debtors.** All of the Plan Debtors other than: Kirby Estates; Seven Brothers; SunCal Beaumont; SunCal Century City; and SunCal Johannson

**2.1.89** **ES Pro Rata Settlement Payment.** A payment to any particular Holder of an Allowed ES Claim equal to the ES Settlement Amount multiplied by a fraction, the numerator of which shall be the amount of such Holders' Allowed ES Claim and the denominator of which shall be the amount of all Allowed ES Claims and all Allowed Mechanic's Lien Claims.

**2.1.90** **ES Settlement.** The settlement or settlements of Equitable Subordination Claims relating to any particular Estate of a Plan Debtor upon acceptance of an ES Settlement Offer.

**2.1.91** **ES Settlement Amount.** The maximum aggregate amount of $15,000,000 to be made available to the Liquidating Trustee collectively by the Lehman Lenders as provided in Section 7.6 of the Lehman Plan to fund any ES Pro Rata Settlement Payments to be made to the ES Claimants who vote for acceptance of the ES Settlement Offer on their Ballots and return with the Ballots ES Claimant Release and Assignments (included with the Ballots) duly executed by such ES Claimants or who are deemed to have accepted or who are otherwise bound by, the ES Settlement pursuant to the terms of the Lehman Plan.

**2.1.92** **ES Settlement Offer.** The offer of the applicable Lehman Lender to settle the Equitable Subordination Claims relating to any particular Estate of an ES Plan Debtor by payment of the ES Pro Rata Settlement Payments either (a) to all Holders of Allowed ES Claims against such Estate who return a duly executed ES Claimant Release and Assignment, if there is Estate Acceptance of the ES Settlement by such Estate, or (b) only to the Holders of Allowed ES Claims against such Estate who vote for acceptance of the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments, if there is not Estate Acceptance of the ES Settlement by such Estate.

**2.1.93** **Estate or Estates.** The bankruptcy estates of the Debtors created pursuant to Section 541 of the Bankruptcy Code.

**2.1.94** **Estate Acceptance of the ES Settlement.** The circumstance by which the Estate of a Plan Debtor accepts the ES Settlement Offer, which occurs if at least one-half in number and two-thirds in amount of the voting ES Claimants in such Estate vote for acceptance of the ES Settlement Offer on their Ballots and (unless waived by the Lehman Lenders as to one or more Ballots) return with their Ballots a duly executed ES Claimant Release and Assignment.

**2.1.95** **Estate ES Settlement Release.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors in these Cases, shall be deemed to release all claims, including without limitation any Litigation Claims to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, all as more fully set forth in Section 7.10.2(b)(i) of the Lehman Plan.

**2.1.96** **Fee Applications.** Applications of Professionals under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

**2.1.97** **Fenway Capital.** Fenway Capital Funding LLC, which owns or holds a legal or equitable interest in all or a portion of the Lehman Loans made pursuant to and/or evidenced by the following loan agreements, but for which a Lehman Lender nonetheless continues as agent: (a) SunCal Communities I Loan Agreement; (b) Ritter Ranch Loan Agreement; (c) SunCal PSV Loan Agreement; (d) Delta Coves Loan Agreement; (e) SunCal Marblehead / SunCal Heartland Loan Agreement; (f) SunCal Oak Valley Loan Agreement; and (g) SunCal Northlake Loan Agreement.

**2.1.98** **Filed.** Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court. "File" and "Filing" shall have correlative meanings.

**2.1.99** **Final Order.** A final and non-appealable judgment, order, ruling or other decree issued and entered by a court of competent jurisdiction.

**2.1.100** **General Administrative Claim Bar Date.** The last date fixed by the Lehman Plan for the filing of Proofs of Claim or requests for payment of Administrative Claims other than for Taxes. Under the Lehman Plan, the General Administrative Claim Bar Date shall be the first Business Day after the sixtieth (60th) day after the Confirmation Date.

**2.1.101** **General Unsecured Claim.** A Claim, including a Bond Claim and Bond Obligation, against a Plan Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) a Priority Claim or (e) an ES Claim.

**2.1.102** **Guaranteed Minimum Distribution.** An amount equal to $10 million less (a) one-third of the aggregate amount of all ES Pro Rata Settlement Payments and less (b) 100% of the amount of any ES Final Judgment; provided that the Guaranteed Minimum Distribution shall be zero if the Credit Bid Conditions are not satisfied and never shall be less than zero.

**2.1.103** **Heartland Project.** The Project owned by SunCal Heartland, located in Riverside County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.104** **Holder.** The beneficial owner of any Claim or Interest.

**2.1.105** **Initial Bid.** This term shall have the meaning ascribed to it in Section 7.9.1 of the Plan.

**2.1.106** **Insider.** (1) A Person other than a Lehman Related Party that is an "insider" as defined in Bankruptcy Code Section 101, (2) an Affiliate of a Person or (3) without limiting the foregoing, as to all Debtors, *inter alia*, each other Debtor, SunCal Management, LLC, Acquisitions, Elieff, Voss, Cook & Thel LLP, Greenfield Communications, SunCal Master Venture Member, LLC and SunCal Del Rio, LLC.

**2.1.107** **Interest.** Any equity security or interest in any Plan Debtor within the meaning of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Plan Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, or any other equity security or interest.

**2.1.108** **Interim Loan Agreement.** That certain Loan Agreement, dated as of October 31,2007, by and between SCC LLC, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $20,000,000. The outstanding balance of the loan under the Interim Loan Agreement was not less than $23,795,012.59 as of the applicable Petition Date. The loan made pursuant to and/or evidenced by the Interim Loan Agreement is supported by a Subsidiary Guaranty made by SCC Communities, Tesoro and Del Rio and the obligations of the guarantors thereunder are secured by (a) a first priority deed of trust on the Joshua Ridge Project; (b) a first priority deed of trust on the Tesoro Project; and (c) an assignment of the Del Rio CFD Bond Proceeds.

**2.1.109** **Johannson Ranch Project.** The Project owned by SunCal Johannson, located in the City of Modesto, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.110 Joshua Ridge Project.** The Project owned by SCC Communities, located in the City of Victorville, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.111 Kirby Estates.** Kirby Estates, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of that portion of the Summit Valley Project not owned by SunCal Summit Valley or Seven Brothers.

**2.1.112 LCPI.** Lehman Commercial Paper Inc., a New York corporation.

**2.1.113 Lehman Administrative Loans.** (a) The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, under which first priority priming Liens were granted to Lehman ALI on all borrower Debtors' assets (with the exception of SunCal Century City in which the Liens are junior priority), and as to which financing, super-priority administrative status was afforded and the automatic stay was modified to the extent necessary to implement the financing (the aggregate amount of such loans to all of the borrower Debtors was not less than $1,790,572, as of October 11, 2009); (b) any post-petition financing provided by any Lehman Related Party after September 23, 2009 to any of the Debtors or their Estates pursuant to an order of the Bankruptcy Court; and (c) all interest, fees and other charges thereupon.

**2.1.114 Lehman ALI.** Lehman ALI, Inc., a Delaware corporation

**2.1.115 Lehman ALI's Bickford Second Lien.** The Liens of Lehman ALI or its assignee or successor against SunCal Bickford Ranch, including a second priority deed of trust on the Bickford Ranch Project and certain personal property, arising from the Claims under the Bickford Second Lien Loan Agreement in the Allowed Amount of $56,494,059.38.

**2.1.116 Lehman Appeal.** Any appeal by a Lehman Related Party relating to the Equitable Subordination Claims in the ES Action or any Cross-Collateralization Claims in a Cross-Collateralization Action.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

**2.1.117 Lehman Appeal Affected Debtor.** Any Estate of a Plan Debtor that cannot close due to a pending Lehman Appeal concerning such Estate's Assets or liabilities, including subordination of certain of its liabilities to other of its liabilities.

**2.1.118 Lehman Commercial.** Lehman Commercial Paper Inc., a New York corporation.

**2.1.119 Lehman Commercial's SCC Palmdale Lien.** The Liens of Lehman Commercial or its assignee or successor against SCC Palmdale, including a pledge of SCC Palmdale's interests in Palmdale Hills, arising from the Claims under the SCC Palmdale Loan Agreement in the Allowed Amount of $119,664,305.25.

**2.1.120 Lehman Commercial's SunCal I Lien.** The Liens of Lehman Commercial or its assignee or successor against SunCal I, including pledges of SunCal I's equity membership interests in Acton Estates, SunCal Summit Valley, SunCal Beaumont, SunCal Johannson, SunCal Bickford, and SunCal Emerald, arising from the Claims under the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06.

**2.1.121 Lehman Creditor.** Lehman Lender or Lehman Successor.

**2.1.122 Lehman Creditor Party.** Lehman Lender, Lehman Successor, the direct or indirect parent of either, or an Affiliate of either that is wholly owned by the Lehman Lender, Lehman Successor or by a direct or indirect parent of such Lehman Lender or Lehman Successor.

**2.1.123 Lehman Disclosure Statement.** The Amended Disclosure Statement With Respect to *First Amended* Joint Chapter 11 Plan Proposed By Lehman Lenders.

**2.1.124 Lehman Lender.** Lehman ALI, Lehman Commercial, Northlake Holdings or OVC Holdings, including each in its capacity as agent, or agent and lender, with respect to the applicable Lehman Loans (and, collectively, the "Lehman Lenders"). Any funding obligation or similar commitment of the "Lehman Lenders" under the Lehman Plan is a singular, aggregate obligation as to the amount or obligation specified, and thus will be satisfied by a single satisfaction thereof.

**2.1.125 Lehman Loan.** Each loan made pursuant to and/or evidenced by the following agreements: (a) SunCal Communities I Loan Agreement; (b) Bickford Second Lien Loan

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan Agreement; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal PSV Loan Agreement; (h) Delta Coves Loan Agreement; (i) SunCal Marblehead / SunCal Heartland Loan Agreement; (j) SunCal Oak Valley Loan Agreement; and (k) SunCal Northlake Loan Agreement.

**2.1.126 Lehman Nominee(s).** The entity or each entity designated by the Lehman Lenders, or any of them, to take title to a Remaining Real Estate Project as to which a Lehman Creditor is the Successful Bidder.

**2.1.127 Lehman Plan.** This *First Amended Joint Chapter 11 Plan Proposed By Lehman Lenders*, together with the Exhibits hereto, as the same may be amended, modified or restated from time to time.

**2.1.128 Lehman Plan Sale Procedures.** The marketing, bidding and sale procedures for a sale of some or all of the Projects after confirmation of the Lehman Plan, all as more fully set forth in Section 7.9 of the Lehman Plan.

**2.1.129 Lehman Post-Confirmation Expenses.** Post-Confirmation Expenses incurred with respect to a Litigation Claim against a Lehman Related Party, other than ES Litigation Expenses to the extent susceptible of satisfaction from the proceeds of the ES Litigation Loan.

**2.1.130 Lehman Post-Confirmation Funding.** All funding made available to the Liquidating Trustee in connection with, or after, the Effective Date from either (or both) loans made by or on behalf of a Lehman Related Party (of up to a maximum of $5 million) in the form of new Cash transfers or by a Lehman Lender permitting the use of Cash Collateral of a Lehman Creditor, plus, as to any loans, all costs, fees and expenses incurred in connection with making or collecting such loan(s), plus ten percent (10%) annual, compounded interest on the outstanding balance of such loan(s).

**2.1.131 Lehman Proponents.** The Lehman Lenders, in their capacity as proponents of the Lehman Plan.

**2.1.132 Lehman Related Party.** A Lehman Lender, Lehman Successor or Lehman Nominee, or an Affiliate of any of them.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.133    Lehman Releasees.**  The Lehman Lenders, LV Pacific Point LLC, Lehman Re Ltd., all other defendants in the ES Action, their respective Affiliates and each of their respective officers, directors, employees, agents, successors and assigns, including, without limitation, the Lehman Successors.

**2.1.134    Lehman Secured Claim.**  A Secured Claim held by a Lehman Creditor.

**2.1.135    Lehman Successor.**  Any entity, other than a Lehman Lender, that either asserts to be or is determined by the Bankruptcy Court to be the owner of a Lehman Loan or any portion thereof, such as Fenway Capital.

**2.1.136    Liquidating Trustee.**  An individual nominated by a Committee(s), identified no later than ten (10) Business Days prior to the commencement of the hearing on confirmation of the Lehman Plan and approved by the Bankruptcy Court as qualified to serve in such capacity under the Lehman Plan; provided that if no other such person is so nominated, identified and approved, the Trustee shall serve as the Liquidating Trustee.

**2.1.137    Litigation Claim(s).**  Any and all interests of the Liquidating Trustee, Plan Debtors or their Estates in any and all claims, Liens, rights, causes of action, and objections or defenses to Claims, Liens, rights, or causes of action to the extent not waived, released or compromised under the Lehman Plan that have been or may be commenced by the Debtor(s), the Liquidating Trustee, the Trustee, or the Committee(s), as the case may be, including, but not limited to (i) Avoidance Actions, including any Cross-Collateralization Action or other Avoidance Action against a Lehman Related Party; (ii) Claims, rights or causes of action for turnover of property to the Plan Debtors' Estates and/or Liquidating Trustee; (iii) Claims, rights or causes of action for the recovery of property by, or payment of money to, the Plan Debtors' Estates or the Liquidating Trustee, including Equitable Subordination Claims in the ES Action and Cross-Collateralization Claims in a Cross-Collateralization Action; (iv) the right of the Liquidating Trustee to compensation in the form of damages, recoupment, or setoff; and (v) objections to Claims.

**2.1.138    Litigation Recoveries.**  Any Cash or other property received by the Trustee, the Plan Debtors, the Liquidating Trustee, or the Committees, as the case may be, from all

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

**2.1.139** **Marblehead Project.** The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.140** **Maximum DOT Security Amount.** The aggregate amount secured by the PRA Recovery Deeds of Trust at any time which shall be equal to the Maximum PRA Recovery Amount less the aggregate amount in the Plan Reserve (including any interest accrued on funds therein).

**2.1.141** **Maximum PRA Recovery Amount.** An amount that serves as the maximum aggregate amount secured by the PRA Recovery Security Pool. This amount is to equal the sum of: (a) to secure a potential Cross-Collateralization Final Judgment, $1.74 million; and (b) to secure a potential ES Final Judgment, (i) $200 million less (ii) the amount from clause (a) hereof (if applicable), with the difference of (i) less (ii) to be multiplied by (iii) the Non-Settling ES Claimant Percentage. Notwithstanding the foregoing:

(1) The amount in clause (a) of this definition shall be zero if (x) none of the Acton Project, Joshua Ridge Project or Tesoro Project are conveyed to a Lehman Nominee under the Plan pursuant to a Contingent Bid or (y) after the last date for Filing a Cross-Collateralization Action, no such action is pending seeking to set aside a Lehman Secured Claim against Acton Estates, SCC Communities or Tesoro and either no Cross-Collateralization Judgment has issued so setting aside such a Secured Claim or such judgment has been satisfied, annulled, vacated or reversed; and

(2) On motion of a Lehman Related Party, the amounts set forth in clauses (a) and/or (b)(i) hereof may be reduced upon a Final Order of the Bankruptcy Court, as described in Section 7.9.3(e) of the Lehman Plan.

**2.1.142** **Mechanic's Lien Claim.** Mechanic's lien claims against a Plan Debtor's Project arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise and allegedly satisfy the requirements of Bankruptcy Code Section 546(b).

**2.1.143** **Minimum Distribution Release and Assignment.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the Guaranteed Minimum Distribution from new Cash transfers to the Liquidating Trustee on the Effective Date, each Non-Settling ES Claimant holding an Allowed ES Claim and each Holder of an Allowed General Unsecured Claim desiring to share in the Guaranteed Minimum Distribution (the "releasor") shall execute a release and assignment (a) releasing the Minimum Distribution Released Claims from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim or Allowed General Unsecured Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, and (b) to the extent such Minimum Distribution Released Claims cannot be released by the releasor, assigning to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project or Assets), all rights, benefits and interests of the releasor, including rights to Net Cash Litigation Recoveries, with respect to such Minimum Distribution Released Claims, all as more fully set forth in Section 7.3 of the Lehman Plan.

**2.1.144** **Minimum Distribution Released Claims.** Any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent related to the Claims of the releasing Person or these Cases, Debtors or their Projects or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the Claims of such releasing Person.

**2.1.145** **Negative Covenant.** The provision in each PRA Recovery Deed of Trust that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above.

**2.1.146 Net Cash Litigation Recoveries.** Any Litigation Recoveries consisting of Cash and any Cash proceeds of Litigation Recoveries less associated Post-Confirmation Expenses incurred in connection therewith.

**2.1.147 Net Cash Proceeds.** Net Proceeds consisting of Cash.

**2.1.148 Net Proceeds.** Gross proceeds of sale, liquidation or refinancing, less costs, expenses, fees, commissions, taxes (including federal, state and local income tax calculated at an assumed rate of forty-five percent (45%)) and other charges incurred directly in the sale, liquidation or refinancing of the underlying asset, including payment of senior Liens or encumbrances.

**2.1.149 Non-Settled ES Claims.** The ES Claims of Non-Settling ES Claimants.

**2.1.150 Non-Settling ES Claimant(s):** With respect to each Estate of an ES Plan Debtor, ES Claimants that do not vote to accept the ES Settlement Offer, unless there is Estate Acceptance of the ES Settlement for such Estate, in which case there shall be no Non-Settling ES Claimants of such Estate.

**2.1.151 Non-Settling ES Claimant Percentage.** The percentage of Allowed ES Claims that are held by Non-Settling ES Claimants.

**2.1.152 Northlake Holdings.** Northlake Holdings LLC, a Delaware limited liability company.

**2.1.153** **Northlake Project.** The Project owned by SunCal Northlake, located in the City of Castaic California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.154** **Oak Knoll Project.** The Project owned by SunCal Oak Knoll, located in the City of Oakland, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.155** **Oak Valley Project.** The Project owned by SunCal Oak Valley, located in Riverside County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.156** **Other Secured Claim.** A Secured Claim that is not a Secured Real Property Tax Claim, Lehman Secured Claim or Danske Secured Claim.

**2.1.157** **OVC Holdings.** OVC Holdings LLC, a Delaware limited liability company.

**2.1.158** **Pacific Point First Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement dated as of February 16, 2006 (as amended and/or supplemented) and the various related loan documents as well as any other documents evidencing perfection of the security interests therefor, including any amendments and/or supplements thereto, by and among SJD Partners, as borrower, and Lehman ALI, as administrative agent and lender, pursuant to which the lenders thereunder made loans to the borrower for which the outstanding balance was not less than $120,110,237 as of the applicable Petition Date and which loans are secured by, among other things, a first priority deed of trust on the Pacific Point Project.

**2.1.159** **Pacific Point Foreclosure.** The non-judicial foreclosure of the Pacific Point Project formerly owned by SJD Partners with respect to a second Lien loan of approximately $28 million, through which such Project was sold on August 28, 2008 to LV Pacific Point LLC.

**2.1.160** **Pacific Point Project.** The Project formerly owned by SJD Partners, which was non-judicially foreclosed upon pursuant to a sale on August 28, 2008 by LV Pacific Point LLC, a Delaware limited liability company.

**2.1.161** **Palmdale Hills.** Palmdale Hills Property, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Ritter Ranch Project, the Ritter Cash and the Palmdale Hills CFD Bonds.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.162** **Palmdale Hills CFD Bonds.** Certain community facilities district bonds issued by the City of Palmdale that are owned by Palmdale Hills.

**2.1.163** **Palm Springs Village Project.** The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.164** **Permitted Liens.** (a) Statutory liens for Secured Real Property Tax Claims; (b) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (excluding any rights of appeal from the Final Order with respect to the sale or conveyance of the Project) that (i) appear on the lender title insurance policies concerning such Project issued to the relevant Lehman Lender or (ii) do not in any material respect detract from the value of the relevant Project and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property, excluding Liens that will be removed and stricken as against the relevant Project pursuant to the Final Order with respect to the sale or conveyance of the Project, (c) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the relevant Project that are not violated by the current use of the Project, (d) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, (e) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey of the subject Project would disclose and (f) other Liens to which the transferor of the property, in connection with such transfer, agrees to take subject.

**2.1.165** **Person.** An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

**2.1.166** **Petition Dates.** The following are dates that each of the Voluntary Debtors Filed their voluntary chapter 11 petitions or Creditors Filed involuntary chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves | November 14, 2008 |
| SunCal Heartland | November 12, 2008 |
| SunCal Marblehead | November 12, 2008 |
| SunCal Northlake | November 12, 2008 |
| SunCal Oak Valley | November 12, 2008 |
| SunCal Century City | November 14, 2008 |
| SunCal PSV | November 14, 2008 |
| SunCal Torrance | November 14, 2008 |
| SunCal Oak Knoll | November 19, 2008 |

**2.1.167** **Plan.**The Lehman Plan.

**2.1.168** **Plan Debtors.** The 24 Debtors for which the Lehman Plan is being proposed, consisting of all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**2.1.169** **Plan Release.** In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Funding, the ES Settlement Offer and the delayed satisfaction of the Secured Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor shall be deemed to release all claims, including any Litigation Claims except certain Avoidance Actions and certain claims therein and except that, with respect to all Equitable Subordination Claims in the ES Action and certain Cross-Collateralization Claims asserted in a Cross-Collateralization Action, each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by an ES Final Judgment or Cross-Collateralization Final Judgment, which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

may be satisfied by a Cash payment to the applicable Estate(s) in the amount of any Project Related Action Recovery, all as more fully set forth in Section 7.12 of the Lehman Plan.

**2.1.170** **Plan Reserve.** A reserve fund established by the Liquidating Trustee to hold the Ritter Cash, all Cash Collateral of a Lehman Creditor held by a Plan Debtor, and any other Cash required or permitted to be deposited therein on the Effective Date pursuant to the terms of the Lehman Plan and which funds shall be subject to withdrawal pursuant to the terms of the Lehman Plan, including (i) all Net Cash Proceeds of sales or refinancing of certain Remaining Real Estate Projects as set forth in the Lehman Plan and (ii) any other Cash which the Lehman Related Parties may desire to deposit therein from time to time, all upon the terms and conditions set forth in Article VII of the Lehman Plan. Such funds shall be held in account(s) to be established at an FDIC insured bank to be selected by the Liquidating Trustee with the consent of the Lehman Lenders, which consent shall not be unreasonably withheld. There shall be separate accounts or accounting for the Ritter Cash, Net Cash Proceeds derived from each Remaining Real Estate Project and other Cash Collateral of a Lehman Creditor as to a Plan Debtor, with the Ritter Cash being attributed to the Ritter Ranch Project, Net Cash Proceeds being attributed to the Remaining Real Estate Project, the sale or refinancing of which resulted in such Net Cash Proceeds and other Cash Collateral of a Lehman Creditor being attributed to the applicable Plan Debtor. The applicable Lehman Creditor shall report the Cash Collateral held in the Plan Reserve as being owned by it for all applicable federal, state and local income tax purposes. To enable the applicable Lehman Creditor to pay its applicable federal, state and local income tax with respect to amounts in the Plan Reserve, the Liquidating Trustee shall distribute, or cause to be distributed, to the applicable Lehman Creditor an amount equal to forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve (including with respect to the amount held as the reserve for the Guaranteed Minimum Distribution) no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

**2.1.171** **Post-Confirmation Account(s).** An account with a bank, financial institution or similar depository in which the Liquidating Trustee holds Cash or other liquid assets or securities for any Plan Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.172   Post-Confirmation Expenses.**  The fees and expenses incurred by the Liquidating Trustee or the Committees following the Effective Date (including the fees and costs of Professionals and the Lehman Post-Confirmation Funding) for the purpose of (i) prosecuting and/or liquidating the Litigation Claims; (ii) selling or otherwise liquidating the Liquidating Trustee's Assets; (iii) effectuating Distributions under the Lehman Plan; and (iv) otherwise consummating the Lehman Plan and closing the Debtor(s)' Cases.

**2.1.173   PRA Recovery Deed(s) of Trust.**  A deed or deeds of trust as to any particular PRA Security Project to be granted by the Lehman Nominee in favor of the Liquidating Trustee upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale Procedures, subject to any Permitted Liens, which deeds of trust (a) secure the obligations set forth in the Reconveyance Agreements, and (b) are to be released or subordinated as set forth in Section 7.9.3 of the Lehman Plan.  The PRA Security Deeds of Trust secure, in the aggregate, an amount not in excess of the Maximum DOT Security Amount.

**2.1.174   PRA Recovery Security Pool.**  At any time, collectively, the PRA Recovery Deeds of Trust then in effect and the Plan Reserve.

**2.1.175   PRA Security Project.**  Each Project conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures.

**2.1.176   Priority Claim.**  Any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

**2.1.177   Priority Tax Claim.**  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code or would be so entitled were it not secured.

**2.1.178   Professional.**  A Person (a) employed by the Plan Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

**2.1.179    Professional Fees.**  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

**2.1.180    Projects.**  The Plan Debtors' real estate development projects as more particularly described on an Exhibit or supplement to the Lehman Plan to be Filed on or before the Effective  Date, together with all rights, remedies, privileges and easements appurtenant thereto and all other real and personal, tangible and intangible, property related thereto.

**2.1.181    Project Related Action.**  The ES Action or Cross-Collateralization Action.

**2.1.182    Project Related Action Recovery.**  An ES Judgment or Cross-Collateralization Judgment.

**2.1.183    Pro Rata.**  (a) With respect to any distribution in respect of any Allowed Claim, proportionately, so that the ratio of (i)(1) the amount of property distributed on account of such Allowed Claim to (2) the amount of such Allowed Claim, is the same as the ratio of (ii)(1) the amount of property distributed on account of all Allowed Claims of the Class or Classes of the applicable Estate sharing in such distribution to (2) the amount of all Allowed Claims in such Class or Classes of the applicable Estate; and (b) in calculating allocations of responsibility for obligations among Debtors, Pro Rata shall be determined in reference to the Liquidating Trustee's reasonable estimate of the gross value of each applicable Estate's Assets as of the Confirmation Date.

**2.1.184    Proof of Claim.**  A proof of claim as referenced in Bankruptcy Code Section 501(a).

**2.1.185    Proof of Interest.**  A proof of interest as referenced in Bankruptcy Code Section 501(a).

**2.1.186    Reconveyance Agreement.**  A written agreement to be executed by, and evidencing, among other things, the non-recourse obligations of, a Lehman Nominee to which a PRA Recovery Security Project is conveyed pursuant to the Lehman Plan Sale Procedures, as more fully set forth in Section 7.9.3(c) of the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.187** **Remaining Other Assets.** All of the then remaining Assets of the Plan Debtors' Estates excluding the Projects, as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**2.1.188** **Remaining Real Estate Projects.** All of the then remaining Projects as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**2.1.189** **Residual Cash.** As to any particular Plan Debtor's Estate, Net Cash Proceeds derived from the liquidation by the Liquidating Trustee of any Remaining Real Estate Projects owned by such Estate and any Remaining Other Assets of such Estate, including any applicable Net Cash Litigation Recoveries in which such Estate has an interest, to the extent not subject to a Secured Claim (or to a Claim to which such Secured Claim is subordinated) and remaining after payment or reserve for the Lehman Post-Confirmation Funding and, as provided in the Lehman Plan, certain Post-Confirmation Expenses, post-Confirmation Date intercompany payables and due and payable Allowed Administrative Claims, Allowed Priority Claims and Allowed Priority Tax Claims, all as more fully set forth in Section 7.11 of the Lehman Plan. Residual Cash does not include the Guaranteed Minimum Distribution.

**2.1.190** **Ritter Cash.** As of the Effective Date, the Cash owned by Palmdale Hills or in which Palmdale Hills has any residual interest and held in escrow, reserve or other accounts for the benefit of Lehman Commercial and securing the loans made pursuant to the Ritter Ranch Loan Agreement.

**2.1.191** **Ritter Ranch Loan Agreement.** That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, and Lehman Commercial, as administrative agent and lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $264,000,000. The loans made pursuant to and/or evidenced by the Ritter Ranch Loan Agreement are secured by, among other things, a first priority deed of trust on the Ritter Ranch Project. The outstanding balance of the loans under the Ritter Ranch Loan Agreement was not less than $287,252,096.31 as of the applicable Petition Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.192 Ritter Ranch Project.** The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.193 Sales Procedures Motion.** The motion of the Trustee Debtors and certain Voluntary Debtors, filed February 18, 2009, as modified, seeking approval of overbid procedures for a sale of certain Projects and denial of any right of the Lehman Creditors to overbid in connection with such sale.

**2.1.194 SCC Communities.** SCC Communities, LLC, a limited liability company, a Voluntary Debtor in these Cases, and the owner of the Joshua Ridge Project.

**2.1.195 SCC LLC.** SCC Acquisitions LLC, a Delaware limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent of each of the Debtors, but not itself a Debtor in any of the Cases.

**2.1.196 SCC Palmdale.** SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the Holder of the Allowed Interest in Palmdale Hills.

**2.1.197 SCC Palmdale Loan Agreement.** That certain Mezzanine Credit Agreement, between SCC Palmdale, as borrower, and Lehman Commercial, as lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $95,000,000. The loan made pursuant to and/or evidenced by the SCC Palmdale Loan Agreement is secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. The outstanding balance of the loan under the SCC Palmdale Loan was not less than $119,664,305.25 as of the applicable Petition Date.

**2.1.198 Schedules.** The schedules of assets and liabilities and list of equity security holders Filed by the Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.199** **Secured Claim.** Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, to the extent that it is secured by a valid and unavoidable Lien on the Plan Debtor(s)' Assets.

**2.1.200** **Secured Real Property Tax Claims.** Secured Claims, other than Priority Tax Claims, held by various government entities for real property tax assessments secured by Liens on the underlying real properties owned by the Plan Debtors but that are non-recourse to the Plan Debtors.

**2.1.201** **Settling ES Claimant(s):** (1) a Settling ES Claimant by Vote or (2) an ES Claimant in an Estate which accepts the ES Settlement Offer.

**2.1.202** **Settling ES Claimant(s) by Vote:** Each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment duly executed by such ES Claimant, included with the Ballot.

**2.1.203** **Seven Brothers.** Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of that portion of the Summit Valley Project not owned by Kirby Estates or SunCal Summit Valley.

**2.1.204** **SJD Development.** SJD Development Corp., a California corporation, a Voluntary Debtor in these Cases, and the Holder of an Allowed Interest in SJD Partners.

**2.1.205** **SJD Partners.** SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor in these Cases, and the prior owner of the Pacific Point Project.

**2.1.206** **Successful Bidder.** With respect to the each Remaining Real Estate Project, the successful bidder at the auction for the sale of such Remaining Real Estate Project conducted by the Liquidating Trustee pursuant to the Lehman Plan Sale Procedures.

**2.1.207** **Summit Valley Project.** The Project owned in part by SunCal Summit Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**2.1.208** **SunCal.** The SunCal Companies, a trade name for Acquisitions and its Affiliates.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.209** **SunCal I.** SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the equity membership interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

**2.1.210** **SunCal III.** SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases.

**2.1.211** **SunCal Beaumont.** SunCal Beaumont Heights, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Beaumont Heights Project.

**2.1.212** **SunCal Bickford.** SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Bickford Ranch Project.

**2.1.213** **SunCal Century City.** SunCal Century City, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the 10000 Santa Monica Project.

**2.1.214** **SunCal Century City Loan Agreement.** That certain Loan Agreement, dated as of August 11, 2006, by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000. The SunCal Century City Loan Agreement is secured by a first-priority deed of trust on the 10000 Santa Monica Project. The SunCal Century City Loan Agreement has a balance due of $120,000,000.00 as of April 1,2009.

**2.1.215** **SunCal Communities I Loan Agreement.** That certain Credit Agreement, dated as of November 17, 2005, by and among (i) SunCal I and SunCal III, as borrowers, Lehman Brothers, Inc., as sole advisor, sole lead arranger and sole bookrunner, and Lehman Commercial, as syndication and administrative agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $395,313,713.37. The loan made pursuant to and/or evidenced by the SunCal Communities I Loan Agreement is secured directly or indirectly by (a) first priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) pledges of SunCal

I's Allowed Interest in Acton Estates, SunCal Summit Valley, SunCal Beaumont; SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) pledges of SunCal Summit Valley's Allowed Interest in Seven Brothers and Kirby Estates.  The outstanding balance of the loan under the SunCal Communities I Loan Agreement was $343,221,391.06 as of the applicable Petition Date.

     **2.1.216**   **SunCal Emerald.** SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Emerald Meadows Project.

     **2.1.217**   **SunCal Heartland.** SunCal Heartland, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Heartland Project

     **2.1.218**   **SunCal Johansson.** SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Johansson Ranch Project.

     **2.1.219**   **SunCal Marblehead.** SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Marblehead Project.

     **2.1.220**   **SunCal Marblehead / SunCal Heartland Loan Agreement.** That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrowers in the maximum aggregate principal amount of approximately $316,061,300.  The loans made pursuant to and/or evidenced by the SunCal Marblehead / SunCal Heartland Loan Agreement are secured by first priority deeds of trust on the Marblehead and the Heartland Projects.  The outstanding aggregate balance of the loans under the SunCal Marblehead / SunCal Heartland Loan Agreement was not less than $354,325,126.15 as of the applicable Petition Date.

     **2.1.221**   **SunCal Northlake.** LB/L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Northlake Project.

**2.1.222    SunCal Northlake Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 9, 2005, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans in the maximum aggregate principal amount of approximately $100,000,000. The loans made pursuant to and/or evidenced by the SunCal Northlake Loan Agreement are secured by a first priority deed of trust on the Northlake Project. The outstanding aggregate balance of the loans under the SunCal Northlake Loan Agreement was not less than $123,654,776.88 as of the applicable Petition Date.

**2.1.223    SunCal Oak Knoll.** SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Oak Knoll Project.

**2.1.224    SunCal Oak Knoll/SunCal Torrance Loan Agreement.** That certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $167,700,000. The loans made pursuant to and/or evidenced by the SunCal Oak Knoll/SunCal Torrance Loan Agreement are secured by first priority deeds of trust on the Oak Knoll and the Del Amo Projects. The outstanding aggregate balance of the loans under the SunCal Oak Knoll/SunCal Torrance Loan Agreement was not less than $157,870,186.15 as of the applicable Petition Date.

**2.1.225    SunCal Oak Valley.** LB/L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Oak Valley Project.

**2.1.226    SunCal Oak Valley Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal mount of approximately $120,000,000. The loans made pursuant to and/or evidenced by the SunCal Oak Valley Loan Agreement are secured by a first priority deed of trust on the Oak Valley Project. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

outstanding aggregate balance of the loans under the SunCal Oak Valley Loan Agreement was not less than $143,630,091.63 as of the applicable Petition Date.

**2.1.227** **SunCal PSV.** SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Palm Springs Village Project.

**2.1.228** **SunCal PSV Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $90,000,000. The loans made pursuant to and/or evidenced by the SunCal PSV Loan Agreement are secured by a first priority deed of trust on the Palm Springs Village Project. The outstanding aggregate balance of the loans under the SunCal PSV Loan Agreement was not less than $88,257,340.20 as of the applicable Petition Date.

**2.1.229** **SunCal Summit Valley.** SunCal Summit Valley, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, the owner of that portion of the Summit Valley Project not owned by Kirby Estates or Seven Brothers, and the Holder of Allowed Interests in Kirby Estates and Seven Brothers.

**2.1.230** **SunCal Torrance.** SunCal Torrance, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Del Amo Project.

**2.1.231** **Tax.** Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. “Tax” shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

**2.1.232** **Tesoro.** Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Tesoro Project.

**2.1.233** **Tesoro Project.** The Project owned by Tesoro located in the City of Santa Clarita, California, as more particularly described in **Exhibit “B”** to the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.1.234** **Trustee.** Steven M. Speier, the duly appointed trustee of the Trustee Debtors or any successor trustee for the Trustee Debtors.

**2.1.235** **Trustee Debtor(s).** The following chapter 11 debtors, individually or collectively, that are represented by the Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

**2.1.236** **Trustee Debtors' Committee.** The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases of the Trustee Debtors pursuant to Section 1102 of the Bankruptcy Code.

**2.1.237** **Unclaimed Property.** Cash held for Distribution if either (1) such the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.*, as undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date such Distribution first could have been made under the Plan and for one hundred twenty (120) days thereafter.

**2.1.238** **Voluntary Debtor(s).** The following chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit Valley, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

**2.1.239** **Voluntary Debtors' Committee.** The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases of the Voluntary Debtors pursuant to Section 1102 of the Bankruptcy Code.

**2.2** **Rules of Construction**. For purposes of the Lehman Plan and the Lehman Disclosure Statement, unless otherwise provided in the Lehman Plan or in the Lehman Disclosure Statement, (a) whenever from the context it is appropriate, each term, whether stated in the singular

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Lehman Plan or the Lehman Disclosure Statement to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Lehman Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated in the Lehman Plan all references in the Lehman Plan or the Lehman Disclosure Statement to Sections and Articles are references to Sections and Articles of or to the Lehman Plan; (f) unless otherwise indicated, the words “therein," "thereunder" and "thereto" refer to the Lehman Plan in its entirety rather than to a particular portion of the Lehman Plan; (g) unless otherwise provided in the Lehman Plan or the Lehman Disclosure Statement, any reference in the Lehman Plan or the Lehman Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Lehman Plan or the Lehman Disclosure Statement to a document or schedule to the Lehman Plan, Plan Documentary Supplement, or Lehman Disclosure Statement Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Lehman Plan or the Lehman Disclosure Statement or any other provision in this Section.

## III.

## TREATMENT OF UNCLASSIFIED CLAIMS

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority. However, certain types of Claims are not classified in any Classes under the Lehman Plan and the Lehman Proponents have not placed such Claims in a Class. These Claims are "unclassified." As to Allowed Administrative Claims and Allowed Priority Tax Claims, these Claims are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bankruptcy Code. Other unclassified Claims support Liens that have not been avoided, but are not classified to the extent the Claims were not timely Filed. The treatment of these unclassified Claims is as provided below.

**3.1 Treatment of Allowed Administrative Claims.** Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claim Bar Date set forth in the Lehman Plan, the Liquidating Trustee shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred prior to the Effective Date in the ordinary course of post-petition business by the Plan Debtors (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**(a) Treatment and Repayment of the Lehman Administrative Loan(s).**

The Lehman Administrative Loans (certain post-petition and pre-Confirmation financing provided by Lehman Related Parties pursuant to order(s) of the Bankruptcy Court, as more fully defined above) are Allowed in the amount loaned or advanced by Lehman ALI after the commencement of the Cases net of any repayment thereof and shall be paid in Cash in full on the Effective Date, together with any interest, charges and expenses due thereupon, or shall be payable at such later time and on such terms more favorable to the Liquidating Trustee to which the applicable Lehman Related Party may agree; provided that repayment of any loans made through use of Cash Collateral shall be repaid by replenishing such Cash Collateral and depositing the amount thereof in the Plan Reserve for treatment in accordance with this Plan. Pending any such payment or during a period of voluntary deferral by the applicable Lehman Related Party, the Lehman Administrative Loans and any interest, charges and expenses due thereupon shall continue to have a first priority Lien against the respective Assets securing such loans, including any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

proceeds thereof deposited in the Plan Reserve or Post-Confirmation Accounts (with the exception of the Lien for the amounts due under the Lehman Administrative Loan secured by the 10000 Santa Monica Project, which shall be subordinate to the Secured Claims and Liens arising from the SunCal Century City Loan Agreement).

**(b) Administrative Claim Bar Date.**

Any Administrative Claim which is subject to an Administrative Claim Bar Date and not Filed by the applicable Administrative Claim Bar Date shall be disallowed, and no distribution shall be made on account of any such Administrative Claim.

**(i) General Administrative Claim Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Plan Debtors' postpetition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which the bar date described in the following Section shall apply) shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee no later than the General Administrative Claim Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Liquidating Trustee. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claim Bar Date and that is not Filed and served on or before the General Administrative Claim Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that is required to File a request for payment of such Administrative Claims and does not File such a request by the deadline established in the Lehman Plan, shall be forever barred from asserting such Administrative Claims against the Plan Debtors, the Liquidating Trustee, the Plan Debtors’ Estates, or any of their properties.

**(ii) Administrative Tax Claim Bar Date.**

All requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date ("Administrative Tax Claims") and for which no bar date has otherwise previously been established, must be Filed and served on the Liquidating Trustee on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such Taxes for such tax year or period with the applicable governmental unit. Any Holder of an Administrative Tax Claim that is required to File a request for payment of such Taxes and does not File and properly serve such a request by the applicable bar date shall be forever barred from asserting any such Administrative Tax Claims against the Plan Debtors, Liquidating Trustee, Plan Debtors' Estates, or their properties.

**3.2 Treatment of Priority Tax Claims.**

Priority Tax Claims are certain unsecured income, employment and other Taxes described by Bankruptcy Code Section 507(a)(8) and Claims, as provided in Bankruptcy Code Section 1129(a)(7)(D) which would otherwise meet such description, but for the secured status of that Claim. The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred Cash payments over a period not exceeding five (5) years from the applicable Petition Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

At the election of the Liquidating Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal Cash payments on the last Business Day of each three-month period following the Effective Date, during a period not exceeding five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Liquidating Trustee, provided such treatment is on more favorable terms to the applicable Plan Debtor's Estate than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash on the Effective Date.

**3.3 Treatment of Unavoided Liens Securing Claims That Are Not Allowed.**

Unless the Holder thereof objects, if there is a Lien that cannot be avoided as set forth in

Bankruptcy Code § 502(d) even though the Claim it secures is not Allowed or is disallowed, then the Lien shall continue in force, be transferred or be released and extinguished on and after the Effective Date in the same manner and to the same extent as if the Claim were Allowed as a Secured Claim and any such Claim it secures shall be treated on and after the Effective Date as if it were an Allowed Claim (provided that the Bankruptcy Court may issue such orders as are appropriate to give effect to Bankruptcy Code § 502(e), *e.g.*, to assure a single recovery for Claims of a Creditor and another Creditor liable with the applicable Debtors for such Claim and for which such Debtor is liable for reimbursement or contribution). The Lehman Lenders consent to such treatment.

**IV.**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Lehman Plan sets forth the treatment each Class will receive. The table below lists the Classes of Claims established under the Lehman Plan and states whether each particular Class is impaired or left unimpaired by the Lehman Plan. A Class is "unimpaired" if the Lehman Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such. Further, in the event that any alleged Secured Claim is not, or only is partially, Allowed as a Secured Claim, the deficiency amount will constitute a Class 7 or Class 8 Claim against the applicable Plan Debtor, as appropriate, and will receive the same treatment as provided to other Claims in Class 7 or Class 8 of such Plan Debtor, as appropriate.

THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET COMPLETE, AND THEIR LISTING IN THE LEHMAN PLAN OR IN THE TABLES BELOW SHOULD NOT BE CONSTRUED AS PROVIDING THAT SUCH CLAIMS ARE ALLOWED UNDER THE

PLAN IN ANY RESPECT (WHETHER AS TO AMOUNT OR AS TO STATUS, E.G., AS A SECURED CLAIM, SECURED REAL PROPERTY TAX CLAIM OR MECHANIC'S LIEN CLAM), EXCEPT AS EXPRESSLY SET FORTH FOR THE PARTICULAR CLAIM.

| **CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS** | **Class 1 is Unimpaired** | **Class 1 Claim Holders are Not Entitled to Vote** |
|---|---|---|

| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
|---|---|---|
| Class 1.1 | Secured Real Property Tax Claim of Los Angeles County against the Ritter Ranch Project | Palmdale Hills; Palmdale Hills 12 |
| Class 1.2 | Secured Real Property Tax Claim of Los Angeles County against the Acton Project in the amount of $200 | Acton Estates; Acton Estates 1 |
| Class 1.3 | Secured Real Property Tax Claim of Riverside County against the Emerald Meadows Project in the amount of $284 | Emerald Meadows; Emerald Meadows 9 |
| Class 1.4 | Secured Real Property Tax Claim of Placer County against the Bickford Ranch Project | SunCal Bickford; SunCal Bickford Scheduled Amount |
| Class 1.5 | Secured Real Property Tax Claim of Contra Costa County against the Delta Coves Project in the amount of $609,221. | Delta Coves; Delta Coves 16 |
| Class 1.6 | Secured Real Property Tax Claim of Riverside County against the Heartland Project in the amount of $559,022. | SunCal Heartland; SunCal Heartland 5 |
| Class 1.7 | Secured Real Property Tax Claim of Orange County against the Marblehead Project in the amount of $379,156. | SunCal Marblehead; SunCal Marblehead 49 and 57 |
| Class 1.8 | Secured Real Property Tax Claim of Los Angeles County against the Northlake Project in the amount of $1,189,919. | SunCal Northlake; SunCal Northlake Scheduled Amount |
| Class 1.9 | Secured Real Property Tax Claim of Riverside County against the Oak Valley Project in the amount of $280,280. | SunCal Oak Valley; SunCal Oak Valley 9 |
| Class 1.10 | Secured Real Property Tax Claim of Los Angeles County against the 10000 Santa Monica Project in the amount of $1,407,212. | SunCal Century City; SunCal Century City 4 |
| Class 1.11 | Secured Real Property Tax Claim of San Bernardino County against the Palm Springs Village Project in the amount of $589,367. | SunCal PSV; SunCal PSV 22 |
| Class 1.12 | Secured Real Property Tax Claim (disputed) of Alameda County against the Oak Knoll Project in the amount of $2,356,035. | SunCal Oak Knoll; SunCal Oak Knoll 22, 23 and 24 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS** | | **Class 1 is Unimpaired** | **Class 1 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class 1.13 | Secured Real Property Tax Claim of Los Angeles County against the Tesoro Project in the amount of $70,239. | Tesoro; Tesoro 2 | |
| Class 1.14 | Secured Real Property Tax Claim of San Bernardino County against the Joshua Ridge Project in the amount of $5,900. | SCC Communities; SCC Communities Scheduled Amount | |
| Class 1.15 | Secured Real Property Tax Claim of Placer County against the Summit Valley Project in the amount of $ 504,245. | SunCal Summit Valley; Palmdale Hills 97 | |
| Class 1.16 | Secured Real Property Tax Claim of San Bernardino County against the Summit Valley Project in the amount of $69,530. | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount | |
| Class 1.17 | Secured Real Property Tax Claim of Riverside County against the Beaumont Project in the amount of $365,954. | SunCal Beaumont; SunCal Beaumont 9 | |
| Class 1.18 | Secured Real Property Tax Claim of Stanislaus County against the Johannson Ranch Project in the amount of $75,106. | SunCal Johannson; SunCal Johannson Scheduled Amount | |
| Class 1.19 | Secured Real Property Tax Claim of San Bernardino County against Seven Brothers' property in the amount of $60,828. | Seven Brothers; Seven Brothers Scheduled Amount | |
| Class 1.20 | Secured Real Property Tax Claim of San Bernardino County against the property Kirby Estates' property in the amount of $1,744. | Kirby Estates; Kirby Estates Scheduled Amount | |

| **CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS**[2] | | **Class 2 is Impaired** | **Class 2 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| | **SunCal Communities I Loan Agreement** | | |

[2] The Secured Claims of the Lehman Creditors indicated below are calculated using the applicable Project values of the Lehman Lenders as set forth in Exhibit 2 to the Debtors' Third Amended Disclosure Statement, provided that references to "Cash Collateral" in this table are references to the Cash Collateral as of the Effective Date for the applicable Lehman Creditor from the applicable Debtor (to be estimated for voting purposes in the amount set forth in Exhibit 1 to the Debtors' Third Amended Disclosure Statement) and provided, further, that the Lehman Proponents shall be entitled to reasonably apportion any Cash Collateral in which multiple Plan Debtors' Estates may have interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS**[2] | | **Class 2 is Impaired** | **Class 2 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| Class 2.1 | Allowed Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $6.8 million plus Cash Collateral | Acton Estates; Acton Estates: 6 | |
| Class 2.2 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $12 million plus Cash Collateral | SunCal Emerald; SunCal Emerald: 7 | |
| Class 2.3 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $29.5 million plus Cash Collateral | SunCal Bickford; SunCal Bickford: 16 | |
| Class 2.4 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $2.2 million plus Cash Collateral | SunCal Summit Valley; SunCal Summit Valley: 12 | |
| | **Ritter Ranch Loan Agreement** | | |
| Class 2.5 | Allowed Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31 and as an Allowed Secured Claim in the amount of $42.9 million plus Cash Collateral | Palmdale Hills; Palmdale Hills: 65 | |
| | **Interim Loan Agreement** | | |
| Class 2.6 | Allowed Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.2 million plus Cash Collateral | SCC Communities; SCC Communities: 9 | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS[2] | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.7 | Allowed Claim of Lehman ALI or its assignee or successor against Del Rio arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $4.5 million plus Cash Collateral | Del Rio; Del Rio: 14 |
| Class 2.8 | Allowed Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.85 million plus Cash Collateral | Tesoro; Tesoro: 7 |
| | **SunCal Oak Knoll/SunCal Torrance Loan Agreement** | |
| Class 2.9 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64 and as an Allowed Secured Claim in the amount of $48 million plus Cash Collateral | SunCal Oak Knoll; SunCal Oak Knoll: 12 |
| Class 2.10 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15 and as an Allowed Secured Claim in the amount of $25 million plus Cash Collateral | SunCal Torrance; SunCal Torrance: 4 |
| | **Delta Coves Loan Agreement** | |
| Class 2.11 | Allowed Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48 and as an Allowed Secured Claim in the amount of $25.2 million plus Cash Collateral | Delta Coves; Delta Coves 21 |
| | **SunCal Marblehead / SunCal Heartland Loan Agreement** | |
| Class 2.12 | Allowed Claim of Lehman ALI against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $7.9 million plus Cash Collateral | SunCal Heartland; SunCal Heartland: 9 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS**[2] | **Class 2 is Impaired** | **Class 2 Claim Holders are Entitled to Vote** |
|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.13 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $187.5 million plus Cash Collateral | SunCal Marblehead; SunCal Marblehead: 21 |
| | **SunCal Oak Valley Loan Agreement** | |
| Class 2.14 | Allowed Claim of OVC Holdings or its assignee or successor against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63 and as an Allowed Secured Claim in the amount of $20.9 million plus Cash Collateral | SunCal Oak Valley; SunCal Oak Valley 16 |
| | **SunCal Northlake Loan Agreement** | |
| Class 2.15 | Allowed Claim of Northlake Holdings or its assignee or successor against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88 and as an Allowed Secured Claim in the amount of $23 million plus Cash Collateral | SunCal Northlake; SunCal Northlake 6 |
| | **SunCal PSV Loan Agreement** | |
| Class 2.16 | Allowed Claim of Lehman ALI or its assignee or successor arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20 and as an Allowed Secured Claim in the amount of $13.8 million plus Cash Collateral | SunCal PSV; SunCal PSV 12 |
| | **Pacific Point First Loan Agreement** | |
| Class 2.17 | Contingent Lehman ALI Claim Against SJD Partners Allowed as a Secured Claim for Voting Purposes in the Amount of $25 million | SJD Partners; SJD Partners 23 |

| **CLASS 3: CLASSIFICATION OF ALLOWED DANSKE SECURED CLAIM** | **Class 3 is Impaired** | **The Class 3 Claim Holder is Entitled to Vote** |
|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 3: CLASSIFICATION OF ALLOWED DANSKE SECURED CLAIM** | | **Class 3 is Impaired** | **The Class 3 Claim Holder is Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| Class 3.1 | Secured Claim of Danske Bank against SunCal Century City arising from the SunCal Century City Loan Agreement, in the Allowed Amount of $120,000,000. | SunCal Century; City SunCal Century City 17 | |

| **CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS** | | **Class 4 is Unimpaired** | **Class 4 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) | |
| Class 4.1 | Secured Claim of, or formerly of, Yen Chu Chang Dou, et al. pursuant to first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $3,173,499.50. | SunCal Beaumont; SunCal Beaumont 3 | |
| Class 4.2 | Secured Claim of, or formerly of, Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $136,229. | SunCal Beaumont; Palmdale Hills 101 | |
| Class 4.3 | Secured Claim of, or formerly of, William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $130,000. | SunCal Beaumont; SunCal Beaumont Scheduled Amount | |
| Class 4.4 | Secured Claim of, or formerly of, Scott McDaniel pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $535,000. | SunCal Beaumont; Palmdale Hills 20 | |
| Class 4.5 | Secured Claim of, or formerly of, Wayne & Francis Lee pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $650,000. | SunCal Beaumont; SunCal Beaumont Scheduled Amount | |
| Class 4.6 | Secured Claim of, or formerly of, Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $154,742. | SunCal Beaumont; SunCal Beaumont 6 | |
| Class 4.7 | Secured Claim of, or formerly of, Patricia I Volkerts pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $871,703. | SunCal Beaumont; Palmdale Hills 11 | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS** | | **Class 4 is Unimpaired** | **Class 4 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.8 | Secured Claim of, or formerly of, Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $668,250. | | SunCal Summit Valley; SunCal Summit Valley 5 |
| Class 4.9 | Secured Claim of, or formerly of, K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project in the amount of $200,000. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.10 | Secured Claim of, or formerly of, Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $1,246,500. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.11 | Secured Claim of, or formerly of, Jerry Wong Scheduled Amount & Rosalie Wong, Inc. pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $390,000. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.12 | Secured Claim of, or formerly of, Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $1,388,156. | | Seven Brothers; SunCal Summit 17 |
| Class 4.13 | Secured Claim of, or formerly of, Philip C. Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $296,910. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 4.14 | Secured Claim of, or formerly of, Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $880,000. | | Seven Brothers; Seven Brothers Scheduled Amount |

| **CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS** | | **Class 4 is Unimpaired** | **Class 4 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.15 | Secured Claim of, or formerly of, Desert Wind, LLC pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $862,000. | | Seven Brothers; Seven Brothers Scheduled Amount |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) | |
| Class 5.1 | Mechanic's Lien Claim of Asphalt Professionals or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills; Palmdale Hills 1 and 46 | |
| Class 5.2 | Mechanic's Lien Claim of Sierra Cascade Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills; Palmdale Hills 33 | |
| Class 5.3 | Mechanic's Lien Claim of Staats Construction. Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills; Palmdale Hills 51 | |
| Class 5.4 | Mechanic's Lien Claim of Southland Farmers, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills; Palmdale Hills 55, 67 and 68 | |
| Class 5.5 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $1,530,146. | Palmdale Hills; Palmdale Hills 62, 63 and 64 | |
| Class 5.6 | Mechanic's Lien Claim of Chameleon Design Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | Palmdale Hills; Palmdale Hills 93, 99 | |
| Class 5.7 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $14,893. | Palmdale Hills; Palmdale Hills 15 | |
| Class 5.8 | Mechanic's Lien Claim of Hall & Foreman, Inc. or its assignee or successor against the Emerald Meadows Project in the amount of $287,727. | SunCal Emerald; SunCal Emerald 13 | |
| Class 5.9 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Emerald Meadows Project in the amount of $991,315. | SunCal Emerald; SunCal Emerald 15 and 16 | |
| Class 5.10 | Mechanic's Lien Claim of Park West Landscape or its assignee or successor against the Ritter Ranch Project in the amount of $27,624.70. | Palmdale Hills; Palmdale Hills 109 | |
| Class 5.11 | Mechanic's Lien Claim of MHM Engineers or its assignee or successor against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford; SunCal Bickford 5 | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.12 | Mechanic's Lien Claim of Land Architecture or its assignee or successor against the Bickford Ranch Project in the amount of $100,245. | | SunCal Bickford; SunCal Bickford 6 |
| Class 5.13 | Mechanic's Lien Claim of Kiewit Pacific Co. or its assignee or successor against the Bickford Ranch Project in the amount of $1,868,357. | | SunCal Bickford; SunCal Bickford 10 |
| Class 5.14 | Mechanic's Lien Claim of ARB, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $1,052,272. | | SunCal Bickford; SunCal Bickford 15 |
| Class 5.15 | Mechanic's Lien Claim of Independent Construction or its assignee or successor against the Bickford Ranch Project in the amount of $117,209. | | SunCal Bickford; SunCal Bickford 28 |
| Class 5.16 | Mechanic's Lien Claim of Marques Pipeline, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $330,118. | | SunCal Bickford; SunCal Bickford 29 and 30 |
| Class 5.17 | Mechanic's Lien Claim of Pacific Soils Engineering or its assignee or successor against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | | SunCal Summit Valley; SunCal Summit Valley 9 |
| Class 5.18 | Mechanic's Lien Class of, or formerly of, Hertz Equipment Rental Corporation or its assignee or successor against the Delta Coves Project in the amount of $25,444. | | Delta Coves; Delta Coves 2 |
| Class 5.19 | Mechanic's Lien Claim of MBH Architects or its assignee or successor against the Delta Coves Project in the amount of $97,091. | | Delta Coves; Delta Coves 8 |
| Class 5.20 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Heartland Project in the amount of $47,675. | | SunCal Heartland; SunCal Heartland 2 |
| Class 5.21 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Heartland Project in the amount of $563,159. | | SunCal Heartland; SunCal Heartland 8 |
| Class 5.22 | Mechanic's Lien Claim of Dennis M. McCoy & Sons or its assignee or successor against the Heartland Project in the amount of $941,960. | | SunCal Heartland; SunCal Heartland 16 |
| Class 5.23 | Mechanic's Lien Claim of SunCal Marblehead by Trimax Systems, Inc. or its assignee or successor against the Marblehead Project in the amount of $75,286. | | SunCal Marblehead; SunCal Marblehead 3 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | <u>Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.24 | Mechanic's Lien Claim of Butsko Utility Design, Inc. or its assignee or successor against the Marblehead Project in the amount of $6,250. | | SunCal Marblehead; SunCal Marblehead 4 |
| Class 5.25 | Mechanic's Lien Claim of Dennis RMF Contracting, Inc. or its assignee or successor against the Marblehead Project in the amount of $264,749. | | SunCal Marblehead; SunCal Marblehead 28 |
| Class 5.26 | Mechanic's Lien Claim of The Jasper Companies or its assignee or successor against the Marblehead Project in the amount of $165,260. | | SunCal Marblehead; SunCal Marblehead 29 |
| Class 5.27 | Mechanic's Lien Claim of Kirk Negrete, Inc. dba United Steel Placers or its assignee or successor against the Marblehead Project in the amount of $270,056. | | SunCal Marblehead; SunCal Marblehead 38 |
| Class 5.28 | Mechanic's Lien Claim of RBF Consulting or its assignee or successor against the Marblehead Project in the amount of $7,096. | | SunCal Marblehead; SunCal Marblehead 39 |
| Class 5.29 | Mechanic's Lien Claim of RJ Noble Co. or its assignee or successor against the Marblehead Project in the amount of $175,030. | | SunCal Marblehead; SunCal Marblehead 42, 50 and 58 |
| Class 5.30 | Mechanic's Lien Claim of Orange County Stripping Services or its assignee or successor against the Marblehead Project in the amount of $4,400. | | SunCal Marblehead; SunCal Marblehead 46 and 54 |
| Class 5.31 | Mechanic's Lien Claim of Savala Equipment Co. Inc. or its assignee or successor against the Marblehead Project in the amount of $34,440. | | SunCal Marblehead; SunCal Marblehead 48 and 56 |
| Class 5.32 | Mechanic's Lien Claim of Rockey Murata Landscaping or its assignee or successor against the Marblehead Project in the amount of $285,643. | | SunCal Marblehead; SunCal Marblehead 60 |
| Class 5.33 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Oak Valley Project in the amount of $52,806. | | SunCal Oak Valley; SunCal Oak Valley 3 |
| Class 5.34 | Mechanic's Lien Claim of Pinnik Inc. or its assignee or successor against the Oak Valley Project in the amount of $966,987. | | SunCal Oak Valley; SunCal Oak Valley 12 and 14 |
| Class 5.35 | Mechanic's Lien Claim of Hillcrest Contracting Inc. or its assignee or successor against the Oak Valley Project in the amount of $136,567. | | SunCal Oak Valley; SunCal Oak Valley 23 |
| Class 5.36 | Mechanic's Lien Claim of MacKenzie Landscape or its assignee or successor against the Oak Valley Project in the amount of $121,297. | | SunCal Oak Valley; SunCal Oak Valley 25 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) | |
| Class 5.37 | Mechanic's Lien Claim of All American Asphalt or its assignee or successor against the Oak Valley Project in the amount of $60,355. | SunCal Oak Valley; SunCal Oak Valley 26 | |
| Class 5.38 | Mechanic's Lien Claim of Los Angeles Times or its assignee or successor against the Oak Valley Project in the amount of $43,610. | SunCal Oak Valley; SunCal Oak Valley 31 and 32 | |
| Class 5.39 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Oak Valley Project in the amount of $280,685. | SunCal Oak Valley; SunCal Oak Valley 35 and 36 | |
| Class 5.40 | Mechanic's Lien Claim of Ateliers Jean Nouvel or its assignee or successor against the 10000 Santa Monica Project in the amount of $1,110,000. | SunCal Century City; SunCal Century City 15 | |
| Class 5.41 | Mechanic's Lien Claim of Englekirk & Sabol Construction Structure Engineering or its assignee or successor against the 10000 Santa Monica Project in the amount of $324,520. | SunCal Century City SunCal Century City 12 | |
| Class 5.42 | Mechanic's Lien Claim of Brudvik Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV; SunCal PSV 4 | |
| Class 5.43 | Mechanic's Lien Claim of Larry Jacinto Construction Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV; SunCal PSV 5 and 24 | |
| Class 5.44 | Mechanic's Lien Claim of William + Paddon Architects + Planners Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV; SunCal PSV 9 and 10 | |
| Class 5.45 | Mechanic's Lien Claim of Southern California Edison or its assignee or successor against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV; SunCal PSV 26 | |
| Class 5.46 | Mechanic's Lien Claim of Pacific Masonry Walls, Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV; SunCal PSV 33 and 39 | |
| Class 5.47 | Mechanic's Lien Claim of J.R. Simplot Company or its assignee or successor against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV; SunCal PSV 34 and 40 | |
| Class 5.48 | Mechanic's Lien Claim of Desert Pipeline Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV; SunCal PSV 36, 42 and 47 | |
| Class 5.49 | Mechanic's Lien Claim of MSA Consulting or its assignee or successor against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV; SunCal PSV 43 | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.50 | Mechanic's Lien Claim of Jackson DeMarco or its assignee or successor against the Palm Springs Village Project in the amount of $52,234. | | SunCal PSV; SunCal PSV 45 |
| Class 5.51 | Mechanic's Lien Claim of Oliphant Gold, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $456,476. | | SunCal Oak Knoll; SunCal Oak Knoll 46 |
| Class 5.52 | Mechanic's Lien Claim of RGA Environmental, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $75,617. | | SunCal Oak Knoll; SunCal Oak Knoll 1 |
| Class 5.53 | Mechanic's Lien Claim of BKF Engineers or its assignee or successor against the Oak Knoll Project in the amount of $308,817. | | SunCal Oak Knoll; SunCal Oak Knoll 2 and 19 |
| Class 5.54 | Mechanic's Lien Claim of CST Environmental Inc. or its assignee or successor against the Oak Knoll Project in the amount of $4,316,169. | | SunCal Oak Knoll; SunCal Oak Knoll 4 and 9 |
| Class 5.55 | Mechanic's Lien Claim of The Professional Tree Care Co. or its assignee or successor against the Oak Knoll Project in the amount of 93,925.01. | | SunCal Oak Knoll; SunCal Oak Knoll 3 |
| Class 5.56 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Beaumont Heights Project in the amount of $46,188. | | SunCal Beaumont; SunCal Beaumont 11 and 12 |
| Class 5.57 | Mechanic's Lien Claim of Park West Landscape or its assignee or successor against the "Del Rio Ranch Project" in the amount of $148,266.10. | | Del Rio; Del Rio 26 |

| **CLASS 6: CLASSIFICATION OF ALLOWED PRIORITY CLAIMS** | | **Class 6 is Unimpaired** | **Class 6 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 6.1 | Priority Claims against SunCal Marblehead (alleged amount - $10,950). | | SunCal Marblehead; SunCal Marblehead Scheduled Amount and SunCal Marblehead 45 |
| Class 6.2 | Priority Claims against SunCal Oak Knoll (alleged amount - $235). | | SunCal Oak Knoll; SunCal Oak Knoll 26 |
| Class 6.3 | Priority Claims against Palmdale Hills (alleged amount - $10,950). | | Palmdale Hills; Palmdale Hills 70 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | |
|---|---|---|
| Class 6.4 | Priority Claims against SJD Partners (alleged amount - $4,188). | SJD Partners; SJD Partners Scheduled Amount and SJD Partners 12 |

| **CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS**[3] | **Class 7 is Impaired** | **Class 7 Claim Holders are Entitled to Vote** |
|---|---|---|
| Class | Claims | Plan Debtor |
| Class 7.1 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $244,352,096.31 less Cash Collateral) | Palmdale Hills |
| Class 7.2 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising form the Interim Loan Agreement in the Allowed Amount of $19,295,012.59 less Cash Collateral) | Del Rio |
| Class 7.3 | General Unsecured Claims | SunCal Beaumont |
| Class 7.4 | General Unsecured Claims(including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $331,221,391.06 less Cash Collateral) | SunCal Emerald |
| Class 7.5 | General Unsecured Claims | SunCal Johannson |
| Class 7.6 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $341,021,391.06 less Cash Collateral) | SunCal Summit Valley |
| Class 7.7 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $336,421,391.06 less | Acton Estates |

[3] The General Unsecured Claims of the Lehman Creditors indicated below are calculated by deducting the applicable Lehman Creditor's Allowed Secured Claims under this Plan for the subject loan as against the subject Debtor from the total Allowed Claim thereof, provided that references to "Cash Collateral" in this table are references to the Cash Collateral as of the Effective Date for the applicable Lehman Creditor from the applicable Debtor (to be estimated for voting purposes in the amount set forth in Exhibit 1 to the Debtors' Third Amended Disclosure Statement and not to be deducted for more than one loan) and provided, further, that the Lehman Proponents shall be entitled to reasonably apportion any Cash Collateral in which multiple Plan Debtors' Estates may have interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS[3] | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|
| Class | Claims | Plan Debtor |
| | Cash Collateral) | |
| Class 7.8 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the Delta Coves Loan Agreement in the Allowed Amount of $180,823,142.48 less Cash Collateral) | Delta Coves |
| Class 7.9 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $346,425,126.15 less Cash Collateral) | SunCal Heartland |
| Class 7.10 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $166,825,126.15 less Cash Collateral) | SunCal Marblehead |
| Class 7.11 | General Unsecured Claims (including the Contingent Lehman ALI Claims Against SJD Partners Allowed as a General Unsecured Claim for Voting Purposes in the Amount of $95,110,237 and the Amount of approximately $28 million) | SJD Partners |
| Class 7.12 | General Unsecured Claims | SunCal Century City |
| Class 7.13 | General Unsecured Claims (including the Allowed General Unsecured Claim of Northlake Holdings or its assignee or successor arising from the Northlake Loan Agreement in the Allowed Amount of $100,654,776.88 less Cash Collateral) | SunCal Northlake |
| Class 7.14 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $110,141,364.64 less Cash Collateral) | SunCal Oak Knoll |
| Class 7.15 | General Unsecured Claims (including the Allowed General Unsecured Claim of OVC Holdings or its assignee or successor arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $120,730,091.63 less Cash Collateral) | SunCal Oak Valley |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS**[3] | | **Class 7 is Impaired** | **Class 7 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor |
| | | | |
| Class 7.16 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal PSV Loan Agreement in the Allowed Amount of $74,457,340.20 less Cash Collateral) | | SunCal PSV |
| Class 7.17 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $132,870,186.15 less Cash Collateral) | | SunCal Torrance |
| Class 7.18 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the Interim Loan Agreement in the Allowed Amount of $22,595,012.59 less Cash Collateral) | | SCC Communities |
| Class 7.19 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the Interim Loan Agreement in the Allowed Amount of $21,945,012.59 less Cash Collateral) | | Tesoro |
| Class 7.20 | General Unsecured Claims (including the Allowed General Unsecured Claims of: (a) Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $313,721,391.06 less Cash Collateral and (b) Lehman ALI or its assignee or successor arising from the Bickford Second Lien Loan Agreement in the Allowed Amount of $56,494,059.38) | | SunCal Bickford |
| Class 7.21 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06) | | SunCal I |
| Class 7.22 | General Unsecured Claims | | Seven Brothers |
| Class 7.23 | General Unsecured Claims | | Kirby Estates |
| Class 7.24 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising | | SCC Palmdale |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS[3] | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|
| Class | Claims | Plan Debtor |
| | from the SCC Palmdale Loan Agreement in the Allowed Amount of $119,664,305.25) | |

| CLASS 8: CLASSIFICATION OF ALLOWED ES CLAIMS | Class 8 is Impaired | Class 8 Claim Holders are Entitled to Vote |
|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claims |
| Class 8.1 | ES Claims | Palmdale Hills |
| Class 8.2 | ES Claims | Del Rio - Various Filed and Scheduled |
| Class 8.3 | ES Claims | SunCal Emerald - Various Filed and Scheduled |
| Class 8.4 | ES Claims | SunCal Summit Valley - Various Filed and Scheduled |
| Class 8.5 | ES Claims | Acton Estates - Various Filed and Scheduled |
| Class 8.6 | ES Claims | Delta Coves - Various Filed and Scheduled |
| Class 8.7 | ES Claims | SunCal Heartland - Various Filed and Scheduled |
| Class 8.8 | ES Claims | SunCal Marblehead - Various Filed and Scheduled |
| Class 8.9 | ES Claims | SJD Partners - Various Filed and Scheduled |
| Class 8.10 | ES Claims | SunCal Northlake - Various Filed and Scheduled |
| Class 8.11 | ES Claims | SunCal Oak Knoll - Various Filed and Scheduled |
| Class 8.12 | ES Claims | SunCal Oak Valley - Various Filed and Scheduled |
| Class 8.13 | ES Claims | SunCal PSV - Various Filed and Scheduled |
| Class 8.14 | ES Claims | SunCal Torrance - Various Filed and Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 8: CLASSIFICATION OF ALLOWED ES CLAIMS** | | **Class 8 is Impaired** | **Class 8 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claims |
| Class 8.15 | ES Claims | | SCC Communities - Various Filed and Scheduled |
| Class 8.16 | ES Claims | | Tesoro - Various Filed and Scheduled |
| Class 8.17 | ES Claims | | SunCal Bickford - Various Filed and Scheduled |
| Class 8.18 | ES Claims | | SunCal I |
| Class 8.19 | ES Claims | | SCC Palmdale |

| **CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS** | **Class 9 is Impaired** | **Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote** |
|---|---|---|
| Class | Interests (and alleged Holders) | Plan Debtor and Basis for Interests |
| Class 9.1 | Interests in Palmdale Hills (of SCC Palmdale). | Palmdale Hills Scheduled |
| Class 9.2 | Interests in Del Rio (of SCC LLC). | Del Rio Scheduled |
| Class 9.3 | Interests in SunCal Beaumont (of SunCal I). | SunCal Beaumont Scheduled |
| Class 9.4 | Interests in SunCal Emerald (of SunCal I). | SunCal Emerald Scheduled |
| Class 9.5 | Interests in SunCal Johannson (of SunCal I). | SunCal Johannson Scheduled |
| Class 9.6 | Interests in SunCal Summit Valley (of SunCal I). | SunCal Summit Valley Scheduled |
| Class 9.7 | Interests in Acton Estates (of SunCal I). | Acton Estates Scheduled |
| Class 9.8 | Interests in Delta Coves (of Delta Coves Member LLC). | Delta Coves Scheduled |
| Class 9.9 | Interests in SunCal Heartland (of SunCal Marblehead Heartland Master LLC). | SunCal Heartland Scheduled |
| Class 9.10 | Interests in SunCal Marblehead (of SunCal Marblehead Heartland Master LLC). | SunCal Marblehead Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS** | **Class 9 is Impaired** | **Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote** |
|---|---|---|
| Class | Interests (and alleged Holders) | Plan Debtor and Basis for Interests |
| Class 9.11 | Interests in SJD Partners (of, *inter alia*, SJD Development). | SJD Partners Scheduled |
| Class 9.12 | Interests in SunCal Century City (of SunCal Century City Member LLC). | SunCal Century City Scheduled |
| Class 9.13 | Interests in SunCal Northlake (of SCLV Northlake, LLC and SCC/Northlake, LLC). | SunCal Northlake Scheduled |
| Class 9.14 | Interests in SunCal Oak Knoll (of Lehman SunCal Real Estate Holdings LLC). | SunCal Oak Knoll Scheduled |
| Class 9.15 | Interests in SunCal Oak Valley (of SCLV Oak Valley LLC and SCC/Oak Valley, LLC). | SunCal Oak Valley Scheduled |
| Class 9.16 | Interests in SunCal PSV (of Lehman SunCal PSV Holdings LLC). | SunCal PSV Scheduled |
| Class 9.17 | Interests in SunCal Torrance (of Lehman SunCal Real Estate Holdings LLC). | SunCal Torrance Scheduled |
| Class 9.18 | Interests in SCC Communities (of SCC LLC). | SCC Communities Scheduled |
| Class 9.19 | Interests in Tesoro (of SCC LLC). | Tesoro Scheduled |
| Class 9.20 | Interests in SunCal Bickford (of SunCal I). | SunCal Bickford Scheduled |
| Class 9.21 | Interests in SunCal I (of SCC LLC). | SunCal I Scheduled |
| Class 9.22 | Interests in Seven Brothers (of SunCal Summit Valley). | Seven Brothers Scheduled |
| Class 9.23 | Interests in Kirby Estates (of SunCal Summit Valley). | Kirby Estates Scheduled |
| Class 9.24 | Interests in SCC Palmdale (of SCC LLC). | SCC Palmdale Scheduled |

## V.

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Any references in the Lehman Plan to Class 1, Class 2, Class 4, Class 5, Class 6, Class 7, Class 8 and Class 9 are summary references made for convenience only to the group of subclasses

of each such Class (Classes 1.1 through 1.20, Classes 2.1 through 2.17, Classes 4.1 through 4.15, Classes 5.1 through 5.57, Classes 6.1 through 6.4, Classes 7.1 through 7.24, Classes 8.1 through 8.19 and Classes 9.1 through 9.24). Regardless of the treatment provided in the Lehman Plan for any Holder of a Claim, the Holder may agree to accept less favorable treatment. Provisions for treatment below for Holders of Allowed Claims are not an indication that any particular Claim is Allowed unless expressly provided.

**5.1 Treatment of Allowed Secured Real Property Tax Claims (Classes 1.1 through 1.20).**

The treatment of any Allowed Secured Real Property Tax Claims in Classes 1.1 through 1.20 under the Lehman Plan is as follows:

(a) Classes 1.1 through 1.20 are unimpaired under the Plan, and each Holder of an Allowed Secured Real Property Tax Claim is not entitled to vote on the Plan;

(b) As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim shall retain its underlying Liens on the applicable real property collateral;

(c) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Real Property Tax Claim agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Real Property Tax Claim, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Real Property Tax Claim:

**A. Cash Payment.** On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Real Property Tax Claim, Cash equal to the amount of such Allowed Secured Real Property Tax Claim, or such lesser amount as to which the Holder of such Allowed Secured Real Property Tax Claim, the Liquidating Trustee and the Lehman Lenders agree; or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B. Unimpairment.** (i) As of the Effective Date, the Holder of such Allowed Secured Real Property Tax Claim shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Real Property Tax Claim and shall be free to pursue its rights and remedies against the underlying real property collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder notice of the selection of this alternative treatment for such Holder.

**5.2 Treatment of Lehman Secured Claims (Classes 2.1 through 2.17).**

The treatment of Lehman Secured Claims (Classes 2.1 through 2.17) under the Lehman Plan shall be as follows:

**5.2.1 Voting.**

Classes 2.1 through 2.17 are impaired under the Plan, and each Holder of a Lehman Secured Claim is entitled to vote on the Plan.

**5.2.2 Liens.**

As of the Effective Date, each Holder of a Lehman Secured Claim shall retain its underlying Liens on the applicable collateral. Thereafter, additional Liens may be granted or Liens may be released all as set forth in Section 5.2 and Article VII of the Plan.

**5.2.3 Claims.**

Subject to applicable provisions of the Lehman Plan, including Article VII of the Plan (which provisions are designed to protect (a) ES Claimants as provided therein in the event of an ES Final Judgment subordinating all or any part of certain Lehman Secured Claims to Allowed ES Claims and (b) the Estates of Acton Estates, Tesoro and SCC Communities in the event of a Cross-Collateralization Final Judgment), each Claim of a Lehman Creditor other than the Contingent Lehman ALI Secured Claim Against SJD Partners shall be Allowed for voting and all other purposes in the amount and with the status as a Secured Claim or General Unsecured Claim as set forth in the classification tables in Article IV above; provided that:

(i) as to any Lehman Secured Claim secured by collateral of the applicable Lehman Creditor (other than Cash Collateral), which has been sold to a Successful Bidder in accordance with the Lehman Plan Sale Procedures: (1) the amount of the Lehman Secured Claim

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

shall be adjusted to equal the sum of (x) any such Cash Collateral and (y) the amount bid by the Successful Bidder for the non-Cash collateral; and (2) the applicable Allowed Class 7 Claim of the applicable Lehman Creditor shall be adjusted accordingly;

(ii) as to all other Lehman Secured Claims (including the Contingent Lehman ALI Secured Claim Against SJD Partners), upon disposition of all of the collateral therefor or upon a valuation motion made by the Liquidating Trustee or the applicable Holder of any Lehman Secured Claims after abandonment or surrender of the collateral therefor, the amount of the applicable Lehman Secured Claim and any related deficiency shall be accordingly adjusted;

(iii) the Contingent Lehman ALI Secured Claim Against SJD Partners initially shall be treated as a Disputed Claim for distribution purposes, but: (1) initially also shall be Allowed for voting purposes as a Secured Claim in the amount of $25 million and as General Unsecured Claims in the amounts of $95,110,237 and $28 million, and (2) contingent upon the Pacific Point Foreclosure being set aside, shall be Allowed as a Secured Claim in the amount of $25 million and as General Unsecured Claims in the amounts of $95,110,237 and $28 million for distribution and all other purposes, subject to adjustment in accordance with clause (ii) of this proviso; and

(iv) the following Liens, *inter alia*, are deemed valid and preserved, in accordance with that *Stipulation Valuing Certain Collateral and Preserving Certain Liens* Filed in the Cases, for the benefit of the Lehman Creditors and any other holder of an interest in any of the Liens for the sole purpose of allowing the Lehman Creditors and any other holder of any interest in any of the Liens to enforce their rights to obtain any available distribution from the applicable Plan Debtor's Estate prior to any distribution to holders of Interests in such applicable Plan Debtor, and, thus, permitting, *inter alia*, the Contingent Bids set forth in Section 7.9.1 below of the Plan: (1) Lehman Commercial's SunCal I Lien; (2) Lehman Commercial's SCC Palmdale Lien; and (3) Lehman ALI's Bickford Second Lien.

**5.2.4 <u>Disposition of Collateral</u>**

On the Effective Date, all Cash Collateral for a Lehman Secured Claim not used on the Effective Date as permitted or required by the Lehman Plan shall be deposited into the Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Reserve (a reserve fund to be established by the Liquidating Trustee to hold the Ritter Cash, all Cash Collateral of a Lehman Creditor held by a Plan Debtor, and any other Cash required or permitted to be deposited therein on the Effective Date pursuant to the terms of the Lehman Plan, all as more fully defined above). Certain of the Remaining Real Restate Projects shall be sold or conveyed pursuant to the Lehman Plan Sale Procedures (discussed below in Plan Section 7.9.1). If a Project or other Asset of a Plan Debtor which is the collateral for a Lehman Secured Claim is transferred to one or more Lehman Nominees pursuant to the Lehman Plan Sale Procedures, any such Project so conveyed shall become a PRA Security Project subject to a PRA Recovery Deed of Trust as and to the extent described in Article VII of the Plan, which PRA Recovery Deed of Trust will be part of the PRA Recovery Security Pool and thus security for any ES Final Judgment, in accordance with this Plan. If a Project or other Asset of a Plan Debtor which is collateral for a Lehman Secured Claim is sold to a third party purchaser, the Net Cash Proceeds therefrom shall be remitted to the Liquidating Trustee who shall hold such Net Cash Proceeds in the Plan Reserve and any non-Cash Net Proceeds therefrom shall also be remitted to the Liquidating Trustee and the applicable Lehman Lender shall be afforded a substitute Lien on such non-Cash Net Proceeds. Any remaining collateral for a Lehman Secured Claim, which is not otherwise sold or conveyed pursuant to the Lehman Plan Sale Procedures may be retained, sold or abandoned by the Liquidating Trustee as provided under the Lehman Plan with the Net Cash Proceeds therefrom to be applied first to pay such Lehman Secured Claim and then to pay other Claims in accordance with the Lehman Plan, provided that (a) if no disposition of such collateral occurs within one (1) year after the Effective Date, the applicable Lehman Lender may enforce its Liens; and (b) if the Pacific Point Project is recovered by the Estate of SJD Partners and proposed to be sold, the applicable Lehman Creditor shall be entitled to credit bid up to the full amount of its unpaid Claim against SJD Partners.

**5.2.5 <u>Releases, Reconveyances, Assignments and Payments.</u>**

(i) Upon Conclusion of the Project Related Actions (*i.e.*, the ES Action and any Cross-Collateralization Actions) in favor of the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee shall (1) release and reconvey to the applicable

Lehman Nominees all PRA Recovery Deeds of Trust and terminate all Reconveyance Agreements, (2) pay the applicable Lehman Nominee the amount held in the Plan Reserve in respect of, and any other, Net Cash Proceeds of the sale of the PRA Security Project previously owned by such Lehman Nominee, (3) assign non-Cash Net Proceeds (including all substitute Liens and related, underlying obligations) (x) from the sale of any PRA Security Project, to the applicable Lehman Nominee and (y) from the sale of any collateral for a Lehman Secured Claim, to the applicable Holder of such Lehman Secured Claim, (4) distribute to the applicable Holder of a Lehman Secured Claim any remaining non-Cash collateral for such Claim, and (5) pay to the applicable Holder of a Lehman Secured Claim, the amounts held in the Plan Reserve with respect to such Lehman Secured Claim (including any Cash Collateral of such Holder that was deposited in the Plan Reserve) and any other Net Cash Proceeds of the disposition of collateral for such Lehman Secured Claim, up to the amount of the Lehman Secured Claim, with interest and fees in accordance with its contractual terms.  Thereupon, the Lehman Secured Claim shall be deemed satisfied by such payments and such conveyances of collateral free and clear as set forth in Section 7.9.1.

(ii)    Upon Conclusion of the Project Related Actions against the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee, in satisfaction of the Project Related Action Recoveries, shall distribute to the applicable Estates available Cash from the Plan Reserve and shall liquidate and distribute to the applicable Estates the Net Proceeds from the PRA Recovery Security Pool and non-Cash Net Proceeds from the sale of collateral for the Lehman Secured Claims (which are the exclusive sources of satisfaction of a Project Related Action Recovery absent a voluntary payment by a Lehman Related Party in accordance with Article VII of the Plan), and upon satisfaction of the Project Related Action Recoveries, to the extent of any remainder of such Cash or property, the Liquidating Trustee shall afford Lehman Secured Claims the treatment described in the preceding subparagraph to this Section 5.2.5 of the Lehman Plan.

(iii)    As more fully set forth in Article VII of the Plan, at any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, the Liquidating Trustee shall release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust, terminate all Reconveyance Agreements and release to the applicable Holders of Lehman

Secured Claims and all Lehman Nominees all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount.

**5.3 Treatment of Allowed Danske Secured Claim (Class 3).**

The treatment of the Danske Secured Claim (Class 3) under the Lehman Plan shall be as follows:

**5.3.1 Voting.**

Class 3 is impaired under the Plan, and the Holder of the Allowed Danske Secured Claim is entitled to vote on the Plan.

**5.3.2 Liens.**

As of the Effective Date, the Holder of the Allowed Danske Secured Claim shall retain its underlying Liens on the applicable collateral.

**5.3.3 Claims.**

The Allowed Danske Secured Claim shall be Allowed for voting and all other purposes as a Secured Claim in the amounts set forth in Article IV above; provided that (i) any deficiency shall be an Allowed Class 7 Claim in the appropriate subclass thereof; and (ii) upon disposition of all of the collateral for such Allowed Danske Secured Claim or upon valuation motion made by the Liquidating Trustee or the Holder of such Allowed Danske Secured Claim after abandonment or surrender of such collateral, the amount of the Allowed Danske Secured Claim and any related deficiency shall be accordingly adjusted.

**5.3.4 Disposition of Collateral and Means Therefor**

The Allowed Danske Secured Claim shall receive either the following treatment or such less favorable treatment to which its Holder consents:

On the Effective Date, all Cash Collateral for the Allowed Danske Secured Claim shall be turned over to the Holder of the Allowed Danske Secured Claim in respect of such Claim, unless the Holder agrees to permit the Liquidating Trustee to retain or use any portion thereof.

The Liquidating Trustee shall market for sale and sell the non-Cash collateral for the Allowed Danske Secured Claim, if any, including the 10000 Santa Monica Project, if not previously sold or conveyed from the Estate of SunCal Century City, or abandon all or any of such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

collateral upon motion to the Bankruptcy Court. The collateral, together with all associated personal property, shall be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of the Allowed Danske Secured Claim consents. The Holder of the Allowed Danske Secured Claim shall receive at least thirty (30) days' prior notice of any proposed sale. The Holder of the Allowed Danske Secured Claim may elect to credit bid in response to such notice up to the full amount of the Allowed Danske Secured Claim (without the amount bid being limited to the value of the interest of the Holder of the Allowed Danske Secured Claim in such collateral).

If the collateral for the Allowed Danske Secured Claim is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, there shall be turned over or paid to the Holder of the Allowed Danske Secured Claim up to the full amount of the Allowed Danske Secured Claim from any non-Cash Net Proceeds therefrom and from the Net Cash Proceeds remaining after payment, (a) first, of SunCal Century City's Pro Rata share of the Lehman Post-Confirmation Funding, (b) second, payment of SunCal Century City's direct Post-Confirmation Expenses and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors, and (c) third, any post-Confirmation Date intercompany payables. Any remaining Net Cash Proceeds thereafter shall be used to pay other obligations of the applicable Debtor in the priorities set forth in Section 7.11.2(c) of the Plan. If no disposition of such collateral occurs within one (1) year after the Effective Date, the Holder of the Allowed Danske Secured Claim may enforce its Liens. The Holder of the Allowed Danske Secured Claim may advance funds to the Liquidating Trustee for the protection of its collateral or administration of the Estate of SunCal Century City on such terms as the Holder of the Allowed Danske Secured Claim and Liquidating Trustee agree.

**5.4 Treatment of Allowed Other Secured Claims (Classes 4.1 Through 4.15).**

The treatment of any Allowed Other Secured Claims in Classes 4.1 through 4.15 under the Lehman Plan shall be as follows:

(a) Classes 4.1 through 4.15 are unimpaired under the Plan, and each Holder of an Allowed Secured Claim in Classes 4.1 through 4.15 is not entitled to vote on the Plan;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(b) As of the Effective Date, each Holder of an Allowed Other Secured Claim in Classes 4.1 through 4.15 shall retain its underlying Liens on the applicable collateral;

(c) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and anticipated Liquidating Trustee, as limited below, shall select and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Other Secured Claim in Classes 4.1 through 4.15 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Other Secured Claim in Classes 4.1 through 4.15, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Claim in Classes 4.1 through 4.15:

**A. Abandonment or Surrender.** On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 the property securing such Allowed Other Secured Claim in Classes 4.1 through 4.15 as of the Effective Date;

**B. Cash Payment.** On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, Cash equal to the amount of such Allowed Other Secured Claim in Classes 4.1 through 4.15, or such lesser amount as to which the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, the Liquidating Trustee and the Lehman Lenders agree; or

**C. Unimpairment.** (i) As of the Effective Date, the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Other Secured Claim in Classes 4.1 through 4.15 for which this treatment is selected, notice of the selection of this alternative treatment for such Holder.

**5.5 Treatment of Allowed Secured Mechanic's Lien Claims Against the Plan Debtors (Classes 5.1 through 5.57).**

The treatment of any Allowed Secured Mechanic's Lien Claims in Classes 5.1 through 5.57 under the Lehman Plan shall be as follows:

(a) Classes 5.1 through 5.57 are unimpaired under the Plan, and each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 is not entitled to vote on the Plan;

(b) As of the Effective Date, each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 shall retain its underlying Liens on the applicable collateral;

(c) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57:

**A. Abandonment or Surrender.** On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 the property securing such Allowed Secured Claim as of the Effective Date;

**B. Cash Payment.** On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, Cash equal to the amount of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, or such lesser amount as to which the Holder of such Allowed Secured

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Mechanic's Lien Claim in Classes 5.1 through 5.57, the Liquidating Trustee and the Lehman Lenders agree; or

**C. Unimpairment.** (i) As of the Effective Date, the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 for which this treatment was selected, notice of the selection of this alternative treatment for such Holder.

**5.6 Treatment of Allowed Priority Claims (Classes 6.1 Through 6.4).**

The treatment of any Allowed Priority Claims in Classes 6.1 through 6.4 under the Lehman Plan shall be as follows:

(a) Classes 6.1 through 6.4 are unimpaired under the Plan, and each Holder of an Allowed Priority Claim is not entitled to vote on the Plan.

(b) Each Holder of an Allowed Priority Claim shall be paid (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder of the Allowed Priority Claim and the Liquidating Trustee.

**5.7 Treatment of Allowed General Unsecured Claims (Classes 7.1 Through 7.24).**

The treatment of any Allowed General Unsecured Claims in Classes 7.1 through 7.24 under the Lehman Plan shall be as follows:

(a) Classes 7.1 through 7.24 are impaired under the Plan, and each Holder of an Allowed General Unsecured Claim is entitled to vote on the Plan;

(b) As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash (defined above) in each Estate Pro Rata

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable;

(c) Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied, the Guaranteed Minimum Distribution will be calculated (*i.e.*, $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third of the aggregate ES Pro Rata Settlement Payments) and, thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those Holders of Allowed General Unsecured Claims (other than those in Class 7.12 – Allowed General Unsecured Claims against SunCal Century City) and Allowed Non-Settled ES Claims who provide the Lehman Lenders a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the Guaranteed Minimum Distribution, all as more fully set forth in Plan Section 7.3. If payment of the distribution in accordance with this paragraph with respect to a Claim otherwise would result or contribute to such Claim being paid in excess of the full amount of the Claim, any such excess shall be redistributed Pro Rata to other Holders of Claims entitled to distributions in accordance with this paragraph.

The treatment provided in the Lehman Plan for Claims in Classes 7.1 through 7.24 does not take into account and shall not affect any subordination or other intercreditor remedies afforded by any ES Final Judgment, contract, other judgment or other binding determination.

**5.8 <u>Treatment of Allowed ES Claims (Classes 8.1 through 8.19).</u>**

The treatment of any Allowed ES Claims in Classes 8.1 through 8.19 under the Lehman Plan shall be as follows:

(a) Classes 8.1 through 8.19 are <u>impaired</u> under the Plan, and each Holder of an Allowed ES Claim is <u>entitled to vote</u> on the Plan;

(b) As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable (subject to the terms of any ES Claimant Release

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and Assignment and any Minimum Distribution Release and Assignment with respect to Claims against a Lehman Releasee);

(c)    Each Holder of an Allowed ES Claim also shall receive either:

(i)    if the Holder of an Allowed ES Claim votes to accept the ES Settlement Offer (or if there is Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted) and the Holder returns with its Ballot or to the Lehman Lenders a duly executed ES Claimant Release and Assignment, an ES Pro Rata Settlement Payment to be paid as soon as reasonably practicable after the later of: (1) the Effective Date; and (2) final allowance of such Allowed ES Claim; or

(ii)    if the Holder of an Allowed ES Claim does not vote to accept the ES Settlement Offer (and there is not Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted):

(1) the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with the ES Action, upon Conclusion of the Equitable Subordination Claims in the ES Action against the applicable Lehman Related Parties, if any, such that (A) the Liquidating Trustee, in satisfaction of an ES Final Judgment and to the extent consistent therewith (I) shall distribute to the applicable Estate available Cash from the Plan Reserve, other than amounts reserved for the Guaranteed Minimum Distribution and (II) shall liquidate and distribute to the applicable Estate Net Cash Proceeds from the PRA Recovery Security Pool and from the liquidation of any non-Cash Net Proceeds from the sale of collateral of the Holders of Lehman Secured Claims or the sale of any PRA Security Project (which distributions described in this subparagraph, collectively, are the exclusive sources of satisfaction of an ES Judgment absent a voluntary payment by a Lehman Related Party in accordance with Article VII of the Plan); and (B) the Liquidating Trustee shall pay such Cash in accordance with the priorities set forth in this Plan (*see* Plan Sections 7.11.2(a) and 7.11.2(d)); and

(2)    Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied, the Guaranteed Minimum Distribution will be calculated (*i.e.*, $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third

of the aggregate ES Pro Rata Settlement Payments) and, thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those holders of Allowed General Unsecured Claims (other than those in Class 7.12 – Allowed General Unsecured Claims against SunCal Century City) and Allowed Non-Settled ES Claims who provide the Lehman Lenders a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the Guaranteed Minimum Distribution, all as more fully set forth in Plan Section 7.3. If payment of the distribution in accordance with this paragraph with respect to a Claim otherwise would result or contribute to such Claim being paid in excess of the full amount of the Claim, any such excess shall be redistributed Pro Rata to other Holders of Claims entitled to distributions in accordance with this paragraph.

**5.9 Treatment of Allowed Interests (Classes 9.1 through 9.24)**

The treatment of any Allowed Interests in Classes 9.1 through 9.24 under the Lehman Plan shall be as follows:

(a) Classes 9.1 through 9.24 are impaired under the Plan, and each Holder of an Allowed Interest is deemed to reject the Plan and is not entitled to vote; and

(b) On the Effective Date, all such Allowed Interests shall be cancelled.

## VI.

## ACCEPTANCE OR REJECTION OF THE PLAN

**6.1 Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Lehman Proponents cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Lehman Plan. Some of the requirements include that the Lehman Plan must (a) be proposed in good faith, (b) be accepted in accordance with the provisions of the Bankruptcy Code, (c) pay creditors at least as much as creditors would receive in a Chapter 7 liquidation and (d) be feasible. The requirements described in the Lehman Plan are not the only requirements for confirmation.

**6.2 Who May Object to Confirmation of the Lehman Plan.**

Any party in interest may object to the confirmation of the Lehman Plan but, as explained below, not everyone is entitled to vote to accept or reject the Lehman Plan.

**6.3 Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims and for Holders of ES Claims or General Unsecured Claims.**

A Holder of a Claim or Interest has a right to vote for or against the Lehman Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.

Because Classes 5.1 through 5.57 are unimpaired, any Holders of Allowed Mechanic's Lien Claims are deemed to accept the Plan. The Lehman Proponents, however, dispute the "secured" status of all, many or most of the Claims classified in Classes 5.1 to 5.57 because they believe that there are senior Liens of Lehman Creditors and no value in the junior Liens of the Holders of Mechanic's Lien Claims. Thus, each listed Holder of a Mechanic's Lien Claim will be provided a Ballot on which such Holder may elect to vote its Claims as a General Unsecured Claim or an ES Claim, as applicable, in which event the Holder will have to waive contentions that its interest in the collateral securing its Claim has any value and thus will have to waive contentions that it holds a Secured Claim against the applicable Project.

To vote any Claim as an ES Claim (Class 8), a Creditor must mark its Ballot to indicate that it holds an ES Claim. A Creditor voting a Claim as an ES Claim (Class 8) may vote for (or against) the Plan whether or not it votes to accept the ES Settlement Offer.

**6.4 What Is an Allowed Claim/Interest.**

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Interest to vote.

**6.5 What Is an Impaired Class.**

A Class is impaired if the Lehman Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. Under the Lehman Plan, Classes 1, 4, 5 and 6 are unimpaired and Classes 2, 3, 7, 8 and 9 are impaired.

**6.6 Who Is Not Entitled to Vote.**

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims that, pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3) or (a)(8), are entitled to priority, and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(2), (3) or (8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Lehman Proponents believe that (a) Classes 1, 4, 5 and 6 are unimpaired and thus are not entitled to vote because they are conclusively deemed to have accepted the Plan; (b) Class 9 Interests are being cancelled under the Plan and nothing is to be paid to their Holders and accordingly these Holders are deemed to have voted to reject the Plan and also are not entitled to vote; and (c) Classes 2, 3, 7 and 8 are impaired and are entitled to vote.

EVEN IF A CLAIM IS OF THE TYPE DESCRIBED ABOVE, A CREDITOR MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**6.7 Who Can Vote in More than One Class.**

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the Unsecured Claim. Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of General Unsecured Claims and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ES Claims), and may vote the Claims held in each Class.

**6.8 <u>Votes Necessary for a Class to Accept the Lehman Plan</u>.**

A Class of Claims is deemed to have accepted the Lehman Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Lehman Plan. A Class of interests is deemed to have accepted the Lehman Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Lehman Plan.

**6.9 <u>Treatment of Nonaccepting Classes</u>.**

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Lehman Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code and at least one impaired Class of Claims accepts the Lehman Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown." The Bankruptcy Code allows the Lehman Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Lehman Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Lehman Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**6.10 <u>Request for Confirmation Despite Nonacceptance by Impaired Class(es)</u>.**

The Lehman Proponents will ask the Bankruptcy Court to confirm the Lehman Plan by cramdown on any impaired Class if such Class does not vote to accept the Lehman Plan.

**VII.**

**<u>MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN</u>**

**7.1 <u>Introduction</u>.**

This section is intended to address how the Lehman Proponents intend to fund and to have implemented the obligations to Creditors under the Lehman Plan. It thus provides information regarding funding sources and mechanisms for the Plan obligations, management of the Plan Debtors' Estates after the Effective Date and other material issues bearing upon the performance of the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**7.2 <u>The Liquidating Trustee</u>.**

The Estate of each Plan Debtor shall be managed after the Effective Date by the Liquidating Trustee, who, except as otherwise provided in the Lehman Plan, shall oversee and effectuate the liquidation of the Remaining Other Assets, oversee and effectuate the sale and transfer or other disposition or liquidation of the Remaining Real Estate Projects and implement the Plan. The Liquidating Trustee shall be appointed by the Court upon nomination, if any, by a Committee and, in his or her capacity as such, shall be an agent of each Estate and not a separate taxable entity therefrom. Compensation of the Liquidating Trustee shall be reasonable hourly compensation payable from the Plan Debtors' Estates after prior notice to, *inter alia*, the Lehman Lenders, Committee members, and U.S. Trustee and after order of the Bankruptcy Court. The Bankruptcy Court may, by order, replace the Liquidating Trustee in its reasonable discretion. After the Effective Date, the Liquidating Trustee, *inter alia*, will cooperate in granting, perfecting or reflecting perfection of any Liens acknowledged or created or provided for under the Plan, will complete the claims process, will resolve or abandon any objections to Claims, will liquidate and/or distribute assets and will resolve or dismiss any Litigation Claims which are not waived in the Plan, all in accordance with the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**7.3 <u>The Guaranteed Minimum Distribution Will be Held in the Plan Reserve to Assure a Minimum Amount for Creditors without Security or Priority.</u>**

On the Effective Date, the Lehman Lenders will pay the Liquidating Trustee $10 million from new Cash transfers (rather than from existing Cash Collateral) to be held in the Plan Reserve for the Guaranteed Minimum Distribution. Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied, the Guaranteed Minimum Distribution will be calculated (*i.e.*, $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third of the aggregate ES Pro Rata Settlement Payments). Thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those holders of Allowed General Unsecured Claims and Allowed Non-Settled ES Claims who provide the Lehman Proponents a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the

Guaranteed Minimum Distribution.

As and to the extent reflected in the definition of "Guaranteed Minimum Distribution," the payment of ES Pro Rata Settlement Payments and entry of an ES Final Judgment each result in a reduction in the Guaranteed Minimum Distribution. Simultaneously with the payment of any ES Pro Rata Settlement Payments, the Liquidating Trustee shall return to the Lehman Lenders or their designee from the Plan Reserve one-third (1/3rd) of the amount of such ES Pro Rata Settlement Payments (not to exceed the remaining amount on reserve for the Guaranteed Minimum Distribution). Additionally, upon entry of each and any ES Final Judgment (each or any of which, under the Plan, are secured by the PRA Recovery Security Pool), one hundred percent (100%) of the amount of such ES Final Judgment (not to exceed the remaining amount on reserve for the Guaranteed Minimum Distribution), at the election of the Lehman Lenders, either shall: (1) be applied by the Liquidating Trustee to such ES Final Judgment or (2) be returned from the Plan Reserve by the Liquidating Trustee to the Lehman Lenders or their designee.

As to the process for obtaining delivery of ES Claimant Releases and Assignments, the Liquidating Trustee shall be entitled to utilize the following procedure, which the Liquidating Trustee may modify with the consent of the Lehman Lenders, which they may grant or withhold in their sole and absolute discretion:

(1) within sixty (60) days after (x) Conclusion of the ES Action, if there are no ES Final Judgments or (y) collection and/or enforcement with respect to all ES Final Judgments is completed, if there are any ES Final Judgments, the Liquidating Trustee shall afford notice to Creditors potentially entitled to a Pro Rata distribution of the Guaranteed Minimum Distribution that they have sixty (60) days to return to the Liquidating Trustee a duly executed Minimum Distribution Release and Assignment;

(2) within ten (10) days after expiration of the time for Creditors to return to the Liquidating Trustee a duly executed Minimum Distribution Release and Assignment, the Liquidating Trustee shall deliver to the appropriate Lehman Creditor, or as they direct, the original of each such Minimum Distribution Release and Assignment;

(3) within ten (10) days after the time for delivery to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Creditors of each original, returned Minimum Distribution Release and Assignment, the Lehman Creditors shall advise the Liquidating Trustee of any issues with respect to the form or propriety of the execution or delivery of any such Minimum Distribution Release and Assignment;

(4) within ten (10) days after expiration of the time for objection to the execution or delivery of any returned Minimum Distribution Release and Assignment, the Liquidating Trustee shall:

(I) allocate the Guaranteed Minimum Distribution Pro Rata among each Holder of an Allowed Non-Settled ES Claim and Allowed General Unsecured Claim; and

(II) pay to each Holder of an Allowed Non-Settled ES Claim and Allowed General Unsecured Claim who timely returned a duly executed Minimum Distribution Release and Assignment their aliquot share of the Guaranteed Minimum Distribution; and

(III) simultaneously with payment to each Holder of an Allowed Non-Settled ES Claim and Allowed General Unsecured Claim who returned a duly executed Minimum Distribution Release and Assignment of its aliquot share of the Guaranteed Minimum Distribution, pay to the applicable Lehman Creditors, or as they direct, the aliquot shares of the Guaranteed Minimum Distribution which otherwise would have been payable to the Holders of Allowed Non-Settled ES Claims and Allowed General Unsecured Claims who failed to timely return a Minimum Distribution Release and Assignment.

In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the Guaranteed Minimum Distribution from new Cash transfers to the Liquidating Trustee on the Effective Date, each Non-Settling ES Claimant holding an Allowed ES Claim and each Holder of an Allowed General Unsecured Claim desiring to share in the Guaranteed Minimum Distribution shall (a) unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or

unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any

Litigation Claims, whether for damages, subordination or other remedies, and including any and

any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to

the extent related to the Claims of the releasing Person or these Cases, Debtors or their Projects or

to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the

Claims of such releasing Person (collectively, the "Minimum Distribution Released Claims"), from

and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at

any time owned by the Plan Debtor of the Estate against which the applicable Allowed ES Claim or

Allowed General Unsecured Claim is asserted), including the Lehman Nominees, which owners are

or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and

their respective officers, directors, employees, agents, predecessors, successors, assigns,

representatives, attorneys and other professionals, or their properties, and (b) to the extent such

Minimum Distribution Released Claims are owned by the Estate of a Plan Debtor and cannot be

released by the releasing Person, assign to the applicable Lehman Lender (or if multiple applicable

Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's

Project), all rights, benefits and interests of the releasing Person with respect to such Minimum

Distribution Released Claims, including the Litigation Recoveries that otherwise would be due

therefrom to, or attributable to the Claims of, the releasing Person.

The releases given above include an express, informed, knowing and voluntary waiver and

relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California

Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the

world:

A general release does not extend to claims which the creditor does not know or suspect to

exist in his favor at the time of executing the release, which if known by him must have materially

affected his settlement with the debtor.

While the Confirmation Order, without more, shall effectuate the release, waiver and

relinquishment described or referenced in this section for the Lehman Releasees and all successor

owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be

entitled to the issuance of a separate written release, waiver and relinquishment by the releasing Person in a form determined by the Lehman Lenders and reasonably consistent herewith.

**7.4 Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee.**

Except as otherwise provided in the Lehman Plan or any agreement, instrument or other document relating to the Lehman Plan, on and after the Effective Date, all property of each Plan Debtor's Estate shall vest in each respective Estate, free and clear of all Liens. Except as may be provided in the Lehman Plan, on and after the Effective Date, the Liquidating Trustee may operate the business of each Estate and may use, acquire or dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. On motion to the Bankruptcy Court and consent of the Lehman Lenders, the Liquidating Trustee may elect hereafter to abandon to the Plan Debtors Assets of inconsequential value.

**7.5 The Committee(s).**

On the Effective Date, the Voluntary Debtors' Committee and the Trustee Debtors' Committee shall continue to serve the applicable Estates of the Plan Debtors and shall be entitled to retain, employ and compensate Professionals in order to assist with the obligations and rights of the Committees under the terms of the Lehman Plan (with compensation to be paid by the Liquidating Trustee from the Post-Confirmation Account(s)), provided that the duties of the Committee(s) after the Effective Date shall be limited to monitoring the Plan's implementation. The Liquidating Trustee shall reimburse members of the Committee without further Court Order required for their reasonable out-of-pocket expenses incurred after the Effective Date for mileage, parking, or other incidentals incurred in performing their duties as members of the Committee.

**7.6 Lehman Post-Confirmation Funding.**

**7.6.1 Amount and Uses of Lehman Post-Confirmation Funding.**

On and after the Effective Date, the Lehman Lenders, or certain of them as described in the Lehman Plan, will make funding available to the Liquidating Trustee, in addition to the $10 million for the reserve for the Guaranteed Minimum Distribution, from either (or both) loans made by or on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

behalf of a Lehman Related Party (of up to a maximum of $5 million) in the form of new Cash transfers or by permitting the use of Cash Collateral of a Lehman Creditor, including, without limitation, all or a portion of the Ritter Cash (estimated to be at least $18.87 million), for the following purposes and in the following amounts, provided that the proceeds of Lehman Post-Confirmation Funding may not be utilized to pay any Lehman Post-Confirmation Expenses:

(a) Allowed Professional Fees of the insolvency counsels for the Trustee and the Committees, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and with any such use of Cash of one Plan Debtor's Estate for another booked as a Post-Confirmation Date intercompany payable by the borrowing Plan Debtor's Estate);

(b) Satisfaction of Allowed Priority Claims , provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section);

(c) Funding for or relating to the ES Litigation Expenses solely from proceeds from the ES Litigation Loan;

(d) All amounts required to address critical and urgent health and safety issues on the Projects (other than 10000 Santa Monica Project) until the expiration of the earlier of (i) the date that such Project is no longer an Asset belonging to an Estate of a Plan Debtor, or (ii) thirty (30) days following the auction of such Project to occur pursuant to the Lehman Plan Sale Procedures, up to the aggregate amount of $400,000 or such other amount as approved by the Bankruptcy Court on notice (including to the Lehman Lenders) and opportunity to object, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section);

(e) Satisfaction of the Lehman Administrative Loans (provided that (i) Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section), and (ii) the Lehman Lenders may elect prior to receipt of payment thereupon to defer receipt thereof and be paid otherwise as provided in the Lehman Plan for such Lehman Administrative Loans);

(f) Obligations with respect to the Remaining Real Estate Projects while owned by the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Estates that are Administrative Claims or arise after the Confirmation Date, to the extent requested by the Lehman Lenders holding or representing the Holder of an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section), which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders;

(g) Obligations with respect to the PRA Security Projects that are part of the PRA Recovery Security Pool and therefore serve as collateral for a Project Related Action Recovery to the extent requested by the Lehman Lenders or Lehman Nominee holding an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders; provided, however, that repayment of Lehman Post-Confirmation Funding made for a purpose set forth in this subparagraph shall be limited in recourse to an offset against any ES Judgment; and

(h) To the extent that the Liquidating Trustee is unable to otherwise fund them, all additional obligations of the Liquidating Trustee (in such capacity) that arise on or after the Effective Date to the extent that both their incurrence is necessary for implementation of the Lehman Plan and they become due and payable in Cash during the term of the Lehman Post-Confirmation Funding other than and excluding those obligations covered in any portion by insurance or for which obtaining insurance would have been reasonable, appropriate and customary, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section).

**7.6.2 Cash Collateral of a Lehman Creditor.**

Cash Collateral of Lehman Creditors shall be available as funding (i) to the Liquidating Trustee and Plan Debtors' Estates as and to the extent set forth in the preceding numbered Section

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of the Plan and (ii) for payment of the ES Pro Rata Settlement Payments. At any time, the Liquidating Trustee, as directed by a Lehman Lender, shall use Cash Collateral of the Lehman Creditors to repay Lehman Post-Confirmation Funding that was made other than from the use of Cash Collateral.

Also, upon disposition of collateral of a Lehman Creditor or of a PRA Security Project that results in proceeds being deposited to the Plan Reserve, or upon turnover of Cash Collateral to the Plan Reserve, a Lien in favor of the applicable Lehman Creditor shall attach to (or remain upon) such proceeds and/or Cash Collateral held in the Plan Reserve, subject to a Conclusion of the Project Related Actions.

Further, at the election of a Lehman Lender and to facilitate its extension of credit under the Plan, as to any payment that could be made with funds comprising Cash Collateral of a Lehman Creditor, the Lehman Lender may direct the Liquidating Trustee to instead use Lehman Post-Confirmation Funding in the form of a loan from new Cash from a Lehman Lender and to pay a like amount of Cash Collateral securing a Lehman Loan towards a reduction of such Lehman Loan, as the Lehman Lender directs, provided, however, that (a) such use of Cash Collateral shall not itself be Lehman Post-Confirmation Funding and, if such use occurs before maturity of the Lehman Post-Confirmation Funding, the $5 million maximum Cash commitment of the Lehman Lenders with respect to the Lehman Post-Confirmation Funding shall increase by the amount of Cash Collateral so used to pay a Lehman Loan; and (b) repayment of any amount of a loan constituting Lehman Post-Confirmation Funding used to substitute for Cash Collateral paid with respect to a Lehman Loan under this paragraph shall be treated as a repayment or replenishment of Cash Collateral in accordance with the following Plan Section 7.6.3.

**7.6.3 Terms and Documentation of Lehman Post-Confirmation Funding.**

The Liquidating Trustee shall reasonably execute all documents reasonably requested by a Lehman Lender to evidence a loan or use of Cash Collateral constituting Lehman Post-Confirmation Funding and to evidence any Liens securing the loans or replacement Liens for the use of Cash Collateral on terms and in a form reasonably requested by such Lehman Lender, with customary and reasonable provisions for interest, fees and expenses thereupon. Loans constituting

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Post-Confirmation Funding are Allowed in the amount provided to the Liquidating Trustee or for the benefit of an Estate by or on behalf of any Lehman Lender with respect thereto plus interest, fees, expenses and other charges as provided in the Lehman Plan and in the documentation thereof.

The Liquidating Trustee shall repay the Lehman Post-Confirmation Funding from the sources and in the priority otherwise set forth in this Plan. (*See* Plan Section 7.11.2). Such repayments first shall be applied to repay any loans constituting Lehman Post-Confirmation Funding and all amounts owed with respect thereto. Thereafter, such repayments shall be used to replenish the Cash Collateral constituting Lehman Post-Confirmation Funding. These obligations of the Liquidating Trustee to repay the Lehman Post-Confirmation Funding shall be secured by a self-effectuating, first priority Lien and/or replacement Lien on the Post-Confirmation Accounts, Plan Reserve and all proceeds of the Plan Debtors' Assets.

In all events, no later than sixty (60) days following the settlement and/or final determination of the Project Related Actions, the obligation of the Lehman Lenders to provide the Lehman Post-Confirmation Funding shall terminate, the Lehman Post-Confirmation Funding shall mature and the Liquidating Trustee shall pay the loans and all amounts owing with respect thereto and replenish the used Cash Collateral constituting Lehman Post-Confirmation Funding in full.

Because the Lehman Creditors' Claims all are undersecured, permitting use of Cash Collateral for Lehman Post-Confirmation Funding, in effect, is a voluntary subordination of the Lehman Lenders' Claims to the extent of such use of Cash Collateral, at least absent any obligation to replenish the used Cash Collateral. Thus, to the extent that any applicable Lehman Creditor's Claim that was secured by a Lien upon Cash Collateral used hereunder as Lehman Post-Confirmation Funding is hereafter subordinated by an ES Final Judgment, such ES Final Judgment shall be offset, dollar for dollar, by the amount of any such used Cash Collateral constituting Lehman Post-Confirmation Funding and the obligation of the Estates to replenish such Cash Collateral instead shall become an obligation to pay such amounts to the Plan Reserve as ES Litigation Proceeds for the Creditors and Estates benefitted by such ES Final Judgment in accordance therewith and such funds, when available, shall be distributed as ES Litigation Proceeds

in accordance with the priorities established by this Plan (*see* Plan Section 7.11.2).

**7.7 <u>Plan Reserve and Post-Confirmation Accounts</u>.**

In order to, among other things, provide for a source of recovery in respect of Non-Settled ES Claims should an ES Judgment be obtained for the benefit of the Holders of such Non-Settled ES Claims, and in respect of the applicable Estates and their Creditors should a Cross-Collateralization Judgment be obtained for the benefit of such Creditors, the Lehman Lenders are making available Cash on which the Lehman Creditors claim a Lien. Specifically, (a) on the Effective Date, all Cash of the Estates of the Plan Debtors not otherwise distributed in accordance with the Plan shall be held by the Liquidating Trustee either in the Plan Reserve or a Post-Confirmation Account pending payment of any Post-Confirmation Expenses or distribution in accordance with the Plan, (b) on and after the Effective Date, all Cash Collateral of the Lehman Creditors shall be deposited by the Liquidating Trustee into the Plan Reserve, pending distribution or payment in accordance with the Plan, (c) on the Effective Date, the Lehman Proponents shall cause $10 million to be paid to the Liquidating Trustee from new Cash transfers (rather than from existing Cash Collateral) to be held in the Plan Reserve as a reserve for the Guaranteed Minimum Distribution, (d) all new Cash transfers from or on behalf of a Lehman Lender that are proceeds of or comprising a loan constituting Lehman Post-Confirmation Funding shall be deposited in or held in the Plan Reserve until utilized in accordance with the Lehman Plan, and (e) on and after the Effective Date, the Lehman Lenders shall have a Lien and/or retain their Lien on all Cash in the Plan Reserve, which Cash also shall serve, among other things, as a reserve for satisfaction of a Project Related Action Recovery and shall be a component of the PRA Recovery Security Pool. The applicable Lehman Creditor shall report the Cash Collateral, while held in the Plan Reserve, as being owned by it for all applicable federal, state and local income tax purposes. To enable the applicable Lehman Creditor to pay its applicable federal, state and local income tax with respect to amounts in the Plan Reserve, the Liquidating Trustee shall distribute to the applicable Lehman Creditor, or cause to be distributed, forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

**7.8 Disposition of Assets**

The Assets of the Estates of the Plan Debtors consist primarily of certain Remaining Real Estate Projects and certain Cash that is Cash Collateral for Lehman Secured Claims. There also may be certain Remaining Other Assets, including Litigation Claims. (Litigation Claims possibly could result in affirmative recoveries for the Estates or possibly could reduce the size of the Creditor Claims to share in available Cash for distribution.)

**7.8.1 Litigation Claims, Net Cash Litigation Recoveries and Remaining Other Assets.**

The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee, and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors in accordance with the Plan. Pursuant to Section 1123(b)(3) of the Bankruptcy Code and subject to the compromises, waivers and releases provided in the Lehman Plan, the Liquidating Trustee shall retain all Litigation Claims whether or not pending on the Effective Date. Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Lehman Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Liquidating Trustee may pursue such Litigation Claims. The Liquidating Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 without a Lehman Lender's consent and absent providing ten (10) days' prior written notice and opportunity to object to the Committees; and the Lehman Lenders may pursue any Litigation Claim for the applicable Estate or Estates that, upon request, the Trustee does not agree to pursue. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party. All Net Cash Litigation Recoveries realized or obtained in respect of Litigation Claims of the Estates shall be promptly deposited into the Post-Confirmation Account(s) or Plan Reserve, as appropriate. Except as otherwise provided in the Lehman Plan and the Confirmation Order, the Net Cash Litigation Recoveries shall be free and clear of all Liens and shall only be expended in accordance with the provisions of the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**7.9    Disposition of the Remaining Real Estate Projects.**

The disposition of the Remaining Real Estate Projects or related Assets shall be as follows:

**7.9.1    Lehman Plan Sale Procedures.**

a.    Upon the Effective Date, the Liquidating Trustee shall market for sale the Remaining Real Estate Projects and related Assets pursuant to the Lehman Plan.

b.    Within sixty (60) days after the Effective Date, the Liquidating Trustee shall hold auctions on such dates and at such times and places as is reasonably established by the Liquidating Trustee, provided that all auctions shall occur no later than sixty (60) days after the Effective Date.  At the auctions, the Remaining Real Estate Projects and related Assets for which there is a Successful Bidder shall be sold or conveyed to a third party purchaser, a Lehman Nominee, or another Holder of an Allowed Secured Claim who submits a qualifying bid and becomes the Successful Bidder in accordance herewith and pursuant to the further detailed procedures for such bidding and auctions, which detailed procedures shall be in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Lenders or other owners and the Liquidating Trustee or approval of the Bankruptcy Court (the "Detailed Sale Procedures").

c.    Pursuant to Bankruptcy Code Section 1123(a) and the Lehman Plan, at the auction of each Remaining Real Estate Project, such Remaining Real Estate Project and all associated personal property, including the applicable Plan Debtor's Estate's right, title and interest in, to and under any development agreements, plans, engineering reports and community facilities district bonds, shall be sold by virtue of the Confirmation Order to the highest bidder or its nominee free and clear of any Encumbrances (other than the Permitted Liens) with such Encumbrances (other than the Permitted Liens) not paid in connection with the transaction to attach to the consideration to be received by the Liquidating Trustee in the same priority and subject to the same defenses and avoidability, if any, as before the closing of the transaction.  The Liquidating Trustee shall obtain a hearing date from the Bankruptcy Court at which the Bankruptcy Court shall issue an

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Order approving such sales or conveyances to the extent consistent herewith and order that such sale or conveyance shall be free and clear of all Encumbrances (other than Permitted Liens) in accordance herewith. Consistent with each particular bid, debts and obligations secured by existing Encumbrances on said Remaining Real Estate Projects or related property at the time of sale or conveyance either shall be paid in full upon such sale or conveyance, attach to the Net Cash Proceeds with the same validity, priority and extent to which they attach to the underlying collateral (such as would occur with respect to the Lehman Secured Claims upon a sale to a third party purchaser) or be unimpaired in which case the Remaining Real Estate Projects or other assets sold or conveyed shall remain encumbered by the Encumbrances thereon securing the unimpaired debts and obligations and such Encumbrances would be Permitted Liens.

d. Subject to the terms of the Lehman Plan, the respective Lehman Creditors commit to credit bid the following "Initial Bids" at the auctions as to the indicated Assets and may elect hereafter to make the following "Contingent Bids" at the auctions with respect to the indicated Assets as set forth in the following table:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**LEHMAN CREDITORS' INITIAL BIDS AND CONTINGENT BIDS**

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 1 | Class 2.2 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $12 million plus Cash Collateral | SunCal Emerald; SunCal Emerald: 7 | Emerald Mea-dows Project | Initial Bid: $12 Million |

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 2 | Class 2.3 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $29.5 million plus Cash Collateral | SunCal Bickford; SunCal Bickford: 16 | Bickford Ranch Project | Initial Bid: $29.5 Million |
| 3 | Class 2.5 | Allowed Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31 and as an Allowed Secured Claim in the amount of $42.9 million plus Cash Collateral | Palmdale Hills; Palmdale Hills 65 | Ritter Ranch Project | Initial Bid: $42.9 Million |
| 4 | Class 2.9 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64 and as an Allowed Secured Claim in the amount of $48 million plus Cash Collateral | SunCal Oak Knoll; SunCal Oak Knoll: 12 | Oak Knoll Project | Initial Bid: $48 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 5 | Class 2.10 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15 and as an Allowed Secured Claim in the amount of $25 million plus Cash Collateral | SunCal Torrance; SunCal Torrance: 4 | Del Amo Project | Initial Bid: $25 Million |
| 6 | Class 2.11 | Allowed Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48 and as an Allowed Secured Claim in the amount of $25.2 million plus Cash Collateral | Delta Coves; Delta Coves 21 | Delta Coves Project | Initial Bid: $25.2 Million |
| 7 | Class 2.13 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $187.5 million plus Cash Collateral | SunCal Heartland; SunCal Heartland: 9 | Marble-head Project | Initial Bid: $187.5 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Initial Bid #; Cont. Bid Letter | Class / Plan § | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | Asset | Bid |
|---|---|---|---|---|---|
| 8 | Class 2.12 | Allowed Claim of Lehman ALI against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $7.9 million plus Cash Collateral | SunCal Marblehead; SunCal Marblehead: 21 | Heart-land Project | Initial Bid: $7.9 Million |
| 9 | Class 2.14 | Allowed Claim of OVC Holdings or its assignee or successor against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63 and as an Allowed Secured Claim in the amount of $20.9 million plus Cash Collateral | SunCal Oak Valley; SunCal Oak Valley 16 | Oak Valley Project | Initial Bid: $20.9 Million |
| 10 | Class 2.15 | Allowed Claim of Northlake Holdings or its assignee or successor against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88 and as an Allowed Secured Claim in the amount of $23 million plus Cash Collateral | SunCal Northlake; SunCal Northlake 6 | North-lake Project | Initial Bid: $23 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 11 | Class 2.16 | Allowed Claim of Lehman ALI or its assignee or successor arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20 and as an Allowed Secured Claim in the amount of $13.8 million plus Cash Collateral | SunCal PSV; SunCal PSV 12 | Palm Springs Village Project | Initial Bid: $13.8 Million |
| A | Plan § 5.2.3 / Class 7.21 | Lehman Commercial's SunCal I Lien & Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 | SunCal I; SunCal I: 1 | SunCal Beau-mont's Beau-mont Heights Project | Con-tingent Bid: $1.2 Million |
| | | | | SunCal Johann-son's Johann-son Ranch Project | Con-tingent Bid: $2.1 Million |
| | | | | SunCal Summit Valley's Summit Valley Project | Con-tingent Bid: $750,00 0 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Initial Bid #; Cont. Bid Letter | Class / Plan § | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | Asset | Bid |
|---|---|---|---|---|---|
| B | Class 2.1 | Allowed Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $6.8 million plus Cash Collateral | Acton Estates; Acton Estates: 6 | Acton Project | Con-tingent Bid: $3.4 Million |
| C | Class 2.4 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $2.2 million plus Cash Collateral | SunCal Summit Valley; SunCal Summit Valley: 12 | Owner-ship Interests of Kirby Estates and Seven Brothers in Summit Valley Project | Con-tingent Bid: $1.075 Million |
| D | Class 2.6 | Allowed Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.2 million plus Cash Collateral | SCC Communities; SCC Communities: 9 | Joshua Ridge Project | Con-tingent Bid: $1 Million |
| E | Class 2.8 | Allowed Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.85 million plus Cash Collateral | Tesoro; Tesoro: 7 | Tesoro Project | Con-tingent Bid: $1.5 Million |

e. Qualifying bids by third party purchasers must be bids for payment in Cash. Other Holders of Allowed Secured Claims may credit bid such amount of their Allowed Secured Claims as agreed with the Liquidating Trustee or fixed by the Bankruptcy Court, in each case on a Project by Project basis. The bids of such other Holders of Allowed Secured Claims and third party purchasers must comply with and be made consistent with the Detailed Sale Procedures. If a qualifying bid or bids are received for any Project within forty-five (45) days after the Effective Date, such bids shall be Filed with the Bankruptcy Court by the Liquidating Trustee.

f. The Initial Bids and, if made by any Lehman Creditor (and subject to the following), the Contingent Bids, and any increased bids thereof by Lehman Creditors up to the outstanding amount of the applicable Lehman Loans as set forth in Article IV of the Lehman Plan, each shall be deemed fully qualifying and eligible bids for all purposes of such auctions and the Detailed Sale Procedures. If no higher and better bid is made by another Holder of an Allowed Secured Claim or third party purchaser in accordance with the Detailed Sale Procedures, the applicable Lehman Creditor shall be the Successful Bidder and the Liquidating Trustee shall convey the subject Project and related Assets to a Lehman Nominee in accordance herewith. The Lehman Nominee shall report the subject Project and related Assets as being owned by it for all applicable federal, state and local income tax purposes. If there is no Successful Bidder with respect to an Asset, the Liquidating Trustee need not sell or convey it pursuant to the Lehman Plan Sale Procedures.

g. The Initial Bids are in the amount of the Lehman Creditors' previously appraised values for the subject Projects. The Contingent Bids are in the amounts of the Debtors' value estimates as set forth in the Debtors' Third Amended Disclosure Statement. The Contingent Bids relate to Assets as to which either (1) the Debtors have alleged that the Lien of the applicable Lehman Lender is subject to a Cross-Collateralization Claim or (2) a Lehman Lender holds a Lien on the equity interest in the owner of the Project for a limited purpose, but not directly upon the Project itself and holds a General Unsecured Claim against the Holder of the equity interests in the Project.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

h. The Lehman Creditors Initial Bids and Contingent Bids represent bids on Assets associated with all of the Projects currently owned by the Debtors other than the 10000 Santa Monica Project, owned by SunCal Century City; provided that the Initial Bids and Contingent Bids do not include parcels within the Summit Valley Project and Beaumont Heights Project as to which there are Secured Claims in Class 4 of the Plan senior to the Secured Claims of the Lehman Creditors. Although a Lehman Creditor may at any time elect to bid Cash for an Asset on the same terms as other third parties, for bids made through the Initial Bids and, if the applicable Lehman Creditors elect to make them, bids made through the Contingent Bids, Creditors are protected, as and to the extent provided in the Lehman Plan:

(1) Any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures pursuant to an Initial Bid or Contingent Bid or increased bid therefrom, as set forth above (each a "<u>PRA Security Project</u>") shall be encumbered by a PRA Recovery Deed of Trust and such Lehman Nominee shall execute a Reconveyance Agreement.

(2) Contingent Bids B, D and E, identified in the table above, relate to three Remaining Real Estate Projects as to which the Debtors have alleged that the Lien of the Lehman Lender is subject to a Cross-Collateralization Claim. If a Lehman Creditor is a Successful Bidder pursuant to Contingent Bid B, D or E, a reconveyance obligation for a Cross-Collateralization Final Judgment will apply as to such Project as set forth in the Lehman Plan and such obligation will be secured by a PRA Recovery Deed of Trust (which shall be released as provided in the Lehman Plan).

(3) Contingent Bids A and C, identified in the table above, relate to three Remaining Real Estate Projects as to which a Lehman Lender holds a Lien on the equity interests in the owners of such Remaining Real Estate Projects for a limited purpose, but not directly upon the Remaining Real Estate Projects and holds a General Unsecured Claim against the Holder of the equity interests in the Project. Contingent Bids A and C are in the amount of the Debtors' estimate of value for the applicable Remaining Real Estate Project set forth in the Debtors' Third Amended Disclosure Statement. They will include a Cash portion equal to the full

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

amount of the bid, or, if less, 110% of the aggregate amount of all non-Lehman Creditor Claims against the particular Plan Debtor owning the subject Remaining Real Estate Project as estimated in Exhibit 7 to the Debtors' Third Amended Disclosure Statement. The Cash portions of Contingent Bids A and C, identified in the table above, for these three Remaining Real Estate Projects, divided among the five Plan Debtor owners thereof, are as follows: Beaumont Heights Project (owned by SunCal Beaumont): $689,200 Cash (non-Lehman Creditor Claims of $626,545 x 110%); Johannson Ranch Project (owned by SunCal Johannson): $165,427 Cash (non-Lehman Creditor Claims of $150,388 x 110%); Summit Valley Project (the portion owned by SunCal Summit Valley): $750,000 Cash (entire bid); Summit Valley Project (the portion owned by Kirby Estates): $2,000 Cash (non-Lehman Creditor Claims of $1,744 x 110%); and Summit Valley Project (the portion owned by Seven Brothers): $66,911 Cash (non-Lehman Creditor Claims of $60,828 x 110%).

**7.9.2 <u>Net Proceeds from Sales of Remaining Real Estate Projects to Third Party Purchasers.</u>**

If a Remaining Real Estate Project subject to a Lehman Lender's Lien is sold to a third party purchaser (rather than sold or conveyed to a Lehman Nominee), as to the Net Cash Proceeds therefrom, the Liquidating Trustee shall hold such Net Cash Proceeds in the Plan Reserve and, as to non-Cash Net Proceeds to the Liquidating Trustee therefrom, the applicable Lehman Lenders shall be afforded substitute Liens on such non-Cash Net Proceeds.

**7.9.3 <u>PRA Recovery Security Pool.</u>**

**(a) <u>Generally.</u>**

The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims. If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in the ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), and if a variety of other litigation hurdles were overcome, the values of the Remaining Real Estate Projects against which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding and may bid possibly would be available to satisfy the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Project Related Action Recovery. Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (1) certain Cash is to be held by the Liquidating Trustee in the Plan Reserve and the remainder therefrom shall be available to satisfy such ES Final Judgment or Cross-Collateralization Final Judgment to the extent otherwise provided under the Lehman Plan and (2) any Remaining Real Estate Project that is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures shall be subject to a PRA Recovery Deed of Trust (collectively, the "PRA Recovery Security Pool").

At any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, by voluntary payment of a Lehman Related Party or otherwise, the Liquidating Trustee shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount. At any time that the ES Action and all timely Filed Cross-Collateralization Actions either (I) have been dismissed with prejudice and/or settled or (II) the Project Related Action Recovery with respect thereto as against the applicable Lehman Related Parties has been fully satisfied, the Liquidating Trustee, upon the request of the applicable Lehman Related Parties, shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve other than the amount reserved with respect to the Guaranteed Minimum Distribution.

**(b) PRA Recovery Deeds of Trust.**

Upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale Procedures, the Lehman Lenders will cause the applicable Lehman Nominees taking title to the applicable PRA Security Project to record a PRA Recovery Deed of Trust with the priority achievable from the appropriate recording thereof just prior to the moment of conveyance. The Liquidating Trustee shall be the named beneficiary under any PRA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Recovery Deed of Trust and, in his or her sole discretion, may delay, defer or waive receipt of the benefits or the recording thereof as to one or more Remaining Real Estate Projects. Each PRA Recovery Deed of Trust is being given solely for the purpose of creating a Lien on the applicable PRA Security Project to be part of the PRA Recovery Security Pool and nothing contained therein shall in any way restrict or interfere with the rights of the owner of such PRA Security Project, including, without limitation, such owner's right to own, manage, operate, improve, sell, convey, refinance, encumber and otherwise deal with such PRA Security Project.

Each PRA Recovery Deed of Trust shall secure the non-recourse obligation of each Lehman Nominee who is the owner of each relevant PRA Security Project to reconvey the applicable PRA Security Project to the Liquidating Trustee in the event of an ES Final Judgment or Cross-Collateralization Final Judgment, subject to the terms of the Reconveyance Agreements and subject to the option of the Lehman Nominee to pay in Cash the amount of the Project Related Action Recovery in lieu of effectuating such reconveyance. In aggregate, the PRA Security Deeds of Trust secure an amount not in excess of the Maximum DOT Security Amount.

Each PRA Recovery Deed of Trust shall also provide that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above (the "Negative Covenant"). If such Lehman Nominee fails to comply with the foregoing Negative Covenant for thirty (30) days following written notice and an opportunity to cure, then the Liquidating Trustee shall have the right to seek

damages against Lehman ALI and Lehman Commercial, jointly and severally, and any claims arising from the pursuit of such remedies shall be treated as administrative expense claims in Lehman Commercial's bankruptcy case and, if Lehman ALI is then subject to its own bankruptcy proceeding, Lehman ALI shall use its best efforts to afford the same administrative priority to such claims in any such bankruptcy case. Any payments made or assets seized in satisfaction of any judgment based on such damage claims shall be deposited into the Plan Reserve. In addition, if a Lehman Nominee fails to pay or cause to be paid any property taxes or assessments due and payable with respect to the PRA Security Project owned by such Lehman Nominee on or prior to the date which is six (6) months prior to the earliest date on which a foreclosure of such PRA Security Project could be effectuated for non-payment of property taxes or assessments, then the Liquidating Trustee shall have the right to make a protective advance for the payment of such taxes or assessments and to foreclose upon the applicable PRA Recovery Deed of Trust encumbering such PRA Security Project in order to repay any such outstanding protective advance; provided that any proceeds of any such foreclosure sale and any interest acquired by the Liquidating Trustee in connection with any such foreclosure sale shall be deposited into the Plan Reserve pending the completion of the Project Related Actions.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(c) Reconveyance Agreements.**

The non-recourse performance obligations for turnover and reconveyance of each PRA Security Project secured by the applicable PRA Recovery Deed of Trust shall be in a writing (each, a "Reconveyance Agreement"), which writing is to be executed by the applicable Lehman Nominee that takes ownership of the subject PRA Security Project and shall be in a form acceptable to the Lehman Lenders or Lehman Nominee and Liquidating Trustee or as reasonably proposed by the Lehman Lenders or Lehman Nominee and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner of the applicable PRA Security Project and Liquidating Trustee or approval of the Bankruptcy Court. At a Lehman Nominee's election, such non-recourse obligations, instead, may be satisfied by a Cash payment to the applicable Estate(s) in the amount of any applicable Project Related Action Recovery.

The obligations to reconvey a particular PRA Security Project following the occurrence of, and in satisfaction of, a Cross-Collateralization Final Judgment or an ES Final Judgment are distinct. The reconveyance obligation with respect to an ES Final Judgment shall be included in each Reconveyance Agreement. The reconveyance obligation with respect to a Cross-Collateralization Final Judgment shall be included only in the Reconveyance Agreement related to the PRA Security Project as to which a Cross-Collateralization Claim is alleged in a Cross-Collateralization Action. The benefits of the reconveyance obligations with respect to ES Final Judgments, if any, are themselves to be cross-collateralized, to the extent provided in the Lehman Plan, by virtue of the concessions being made by the Lehman Creditors to benefit Non-Settling ES Claimants as described in Section 7.10.3(b) of the Plan. A reconveyance obligation with respect to a Cross-Collateralization Final Judgment, if any, shall only apply with respect to the particular PRA Security Project as to which the Lien of the applicable Lehman Creditor is avoided by the Cross-Collateralization Final Judgment and the benefits thereof, if any, only shall inure to the Holders of Allowed Claims against the Plan Debtor that owned such PRA Security Project as provided in Section 7.11.2 of the Plan. Nonetheless, for PRA Security Projects as to which the Reconveyance Agreement contains obligations to reconvey for both an ES Final Judgment and a Cross-Collateralization Final Judgment, the distribution priorities as to the Net Cash Proceeds from the disposition of the reconveyed PRA Security Project, set forth in Section 7.11.2 of the Plan, give priority to the Cross-Collateralization Judgment, which in theory would be setting aside the Lien as to which the related ES Judgment seeks to transfer the now extinguished benefits.

**(d) <u>Release of PRA Recovery Deeds of Trust.</u>**

The PRA Recovery Deeds of Trust generally shall remain in effect pending the final settlement or determination of the Project Related Actions. Thus, all PRA Recovery Deeds of Trust shall be released and reconveyed and all Reconveyance Agreements shall be terminated upon:

(1) the dismissal, with prejudice, and/or settlement of all Project Related Actions against the applicable Lehman Related Parties, or

(2) full satisfaction of each Project Related Action Recovery as against the applicable Lehman Related Parties.

Additionally, in order to permit the Lehman Nominees holding title to the PRA Security Projects to fully utilize such properties:

A.  all of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated at such time as the balance of funds in the Plan Reserve is equal to the Maximum PRA Recovery Amount; and

B.  the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be released and the corresponding Reconveyance Agreement terminated upon the sale of such Project to a third party and the deposit of any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale; and

C.   the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash Proceeds derived from such refinancing are deposited into the Plan Reserve.

Further, the reconveyance obligation, to be included in any Reconveyance Agreement with respect to a Cross-Collateralization Final Judgment if a timely Cross-Collateralization Action is pending as to certain Projects if conveyed under the Lehman Plan Sale Procedures to a Lehman Nominee, shall terminate once no Cross-Collateralization Action is pending and either no Cross-Collateralization Judgment has issued or such judgment been satisfied, annulled, vacated or reversed.

Whenever Lien releases or subordinations or terminations of reconveyance obligations or Reconveyance Agreements occur or are required, the Liquidating Trustee shall act reasonably in arranging to provide, and in executing such documents as the applicable Lehman Nominee reasonably requests to effectuate the reconveyance in full of the PRA Recovery Deeds of Trust or terimination of reconveyance obligations or Reconveyance Agrements.

**(e) Reduction of Maximum PRA Recovery Amount.**

The Maximum PRA Recovery Amount, which serves as the maximum aggregate amount secured by the PRA Recovery Security Pool, is an amount intended to be not less than the maximum potential cash value of the Project Related Action Recovery. For the calculation of the Maximum PRA Recovery Amount, the definition thereof in the Lehman Plan includes, unless rebutted with lower figures, presumptions that the maximum cash value of the potential Project Related Action Recovery for Cross-Collateralization Final Judgments is $1.74 million and for ES Judgments is $200 million. If, however, a Lehman Lender Files a motion with the Bankruptcy Court and provides relevant evidence, as follows, the Maximum PRA Recovery Amount shall be reduced accordingly:

(1) to replace the amount used in subparagraph (a) of the definition of Maximum PRA Recovery Amount (Section 2.1.141 of the Plan), the Bankruptcy Court must find that a lower number results upon determining (I) the lesser of (A) the maximum cash value, if any, of the Lehman Secured Claims alleged to be subject to being set aside pursuant to a Cross-Collateralization Judgment, which Secured Claims are against any of the Acton Project, Joshua Ridge Project or Tesoro Project as is conveyed to a Lehman Nominee upon a credit bid and (B) the maximum Claims (other than Claims of Lehman Creditors) against Acton Estates, SCC Communities or Tesoro (as to which Plan Debtors, there are pending Cross-Collateralization Claims in a pending Cross-Collateralization Action against a Lehman Related Party and the Project owned by such Estate has been conveyed to a Lehman Nominee pursuant to a credit bid), and (II) subtracting from such amount the value of all direct or indirect benefits to the subject Plan Debtor resulting from the subject Lehman Loan; and/or

(2) to replace the amount used in subparagraph (b)(i) of the definition of Maximum PRA Recovery Amount (Section 2.1.141 of the Plan), the Bankruptcy Court finds that a lower number results upon determining (I) the lesser of (A) the maximum cash value of the Lehman Secured Claims in the Plan Debtors' Assets that are alleged to be subject to subordination pursuant to an ES Judgment and (B) the maximum Claims (other than Claims of

Lehman Creditors) against the Plan Debtors (as to which there are pending allegations in the ES Action that a Lehman Secured Claim is subject to subordination).

**7.9.4 <u>Sale or Refinance of PRA Security Projects.</u>**

a. The Lehman Nominee(s) will have full right to sell and/or refinance the PRA Security Projects in all respects after the conveyance thereof to the Lehman Nominee(s) pursuant to the Lehman Plan Sale Procedures without any interference by the Liquidating Trustee, SunCal, the Trustee, the Debtors or any of their respective Affiliates or any ES Claimants or other Creditors of the applicable Plan Debtors.

b. If any particular PRA Security Project is thereafter sold by a Lehman Nominee other than to a Lehman Related Party, (a) the Liquidating Trustee shall release the PRA Recovery Deed(s) of Trust as to such PRA Security Project, (b) the Net Cash Proceeds derived from such sale shall be deposited into the Plan Reserve, and (c) the Lehman Nominee shall grant the Liquidating Trustee a substitute Lien in any non-Cash Net Proceeds received by such Lehman Nominee to become part of the PRA Recovery Security Pool and to be subject to the same terms as other PRA Recovery Deeds of Trust.

c. If any particular PRA Security Project is refinanced by the Lehman Nominee, (a) the Liquidating Trustee shall agree to subordinate the PRA Recovery Deed(s) of Trust as to such PRA Security Project so as to permit the imposition on the PRA Security Project of a new senior refinancing Lien, and (b) the Net Cash Proceeds derived from such refinancing shall be deposited into the Plan Reserve.

d. If any particular PRA Security Project is sold by a Lehman Nominee to another Lehman Related Party, then either (x) such sale may be made subject to the PRA Recovery Deed(s) of Trust (which shall be mandatory if the transferee is a Lehman Creditor Party), or (y) all of the following shall apply: (1) there shall be deposited into the Plan Reserve all Net Cash Proceeds received by the Lehman Nominee in connection with such transfer, (2) the Liquidating Trustee shall be granted a substitute Lien on any non-Cash Net Proceeds received by a Lehman Nominee in connection with such transfer and (3) a Lien either (I) against the equity interest in the joint venture or similar entity of the Lehman Nominee or (II) against the most direct

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

interest held by a Lehman Nominee, shall be granted to the Liquidating Trustee and the Lien so granted shall become part of the PRA Recovery Security Pool and be subject to the same terms as the PRA Recovery Deeds of Trust.

e. As to any Remaining Real Estate Projects not sold or conveyed pursuant to the Lehman Plan Sale Procedures: (i) they shall be otherwise liquidated by the Liquidating Trustee or may be abandoned or surrendered with the consent of the Lehman Lenders and after approval of the Bankruptcy Court; (ii) such Remaining Real Estate Projects may be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of an Allowed Secured Claim with respect thereto consents; (iii) the Holder of any such Allowed Secured Claim (including any applicable Holder of any Lehman Secured Claim) shall receive at least thirty (30) days' prior notice of any proposed sale and may elect to credit bid in response to such notice up to the full amount of its Claim for which the item being sold is collateral (without the amount bid being limited to the value of the Holder's interest in such collateral); (iv) if the Remaining Real Estate Project is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, the Net Cash Proceeds (and any non-Cash Net Proceeds) therefrom shall be paid or turned over to the Holders of Allowed Secured Claims against such Remaining Real Estate Project up to the full amount of each such Holder's Allowed Claim (or used in payment of other Claims as otherwise set forth in the Lehman Plan in respect of the treatment of such Allowed Secured Claims) and any remaining Net Cash Proceeds shall be used to pay other obligations of the applicable Plan Debtor's Estate in the priorities set forth in Section 7.11.2(c) of the Plan.

**7.10 <u>Equitable Subordination Claims</u>**

**7.10.1 <u>Generally.</u>**

As set forth in Section 5.8, ES Claimants are afforded the option to vote either for acceptance of the ES Settlement Offer and the specified benefits it provides or to have the Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit.

**7.10.2 <u>ES Settlement Offer.</u>**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(a) <u>Payments to ES Settling Claimants.</u>**

The Settling ES Claimants are to receive the ES Pro Rata Settlement Payments as and to the extent set forth in Section 5.8.

**(b) <u>Releases and Assignments.</u>**

In exchange for the ES Pro Rata Settlement Payments: (A) the Liquidating Trustee will issue an Estate ES Settlement Release as to each Estate in which any Settling ES Claimant holds its Allowed ES Claim; (B) each Settling ES Claimant will issue an ES Claimant Release and Assignment; and (C) if there is Estate Acceptance of the ES Settlement as to all applicable Estates of the ES Plan Debtors, the Liquidating Trustee also will dismiss (with prejudice), as to the Estates of all ES Plan Debtors, the ES Action, with each party to bear its own costs and fees.

**(i) Estate ES Settlement Release.**

In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors in these Cases, shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

attorneys and other professionals, or their properties.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

**(ii) ES Claimant Release and Assignment.**

In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote, on behalf of itself and its Affiliates, shall be deemed to (a) unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable or related to the ES Claims of such Settling ES Claimant or to the extent that the Net Cash Litigation Recoveries

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

therefrom would be payable in respect of the ES Claims of such Settling ES Claimant (collectively, the "ES Claimant Released Claims"), from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the Estate against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties, and (b) to the extent such ES Claimant Released Claims are owned by the Estate of a Plan Debtor and cannot be released by the ES Claimant, assign to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the Settling ES Claimant with respect to such ES Claimant Released Claims, including the Litigation Recoveries that otherwise would be due therefrom to, or attributable to the ES Claims of, the Settling ES Claimants.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and all successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Settling ES Claimant by Vote in the form set forth on, or attached to, the Ballot.

**7.10.3 <u>Continued Prosecution of Equitable Subordination Claims.</u>**

Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal (with prejudice), release and settlement of all Equitable Subordination Claims as to all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in the ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of and attributable to the ES Claims of any Non-Settling ES Claimants, subject to the Plan Release and as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender elects to pay Cash in lieu thereof.

**(a) <u>ES Litigation Loan.</u>**

i. Unless the Equitable Subordination Claims in the ES Action are fully settled as to all ES Plan Debtors' Estates (*i.e.*, there is Estate Acceptance of the ES Settlement for all ES Plan Debtors' Estates), a Lehman Lender will make available to the Liquidating Trustee the ES Litigation Loan in the aggregate principal amount of up to $1 million for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination Claims. The ES Litigation Loan will accrue interest at a 10% annual rate (compounded annually). The proceeds of the ES Litigation Loan may be used solely for the payment of ES Litigation Expenses if and only if there is no Available Cash in the Post-Confirmation Accounts to fund the ES Litigation Expenses and SunCal and its principals decline to continue paying the cost of prosecuting the Equitable Subordination Claims in the ES Action.

ii. The ES Litigation Loan shall be made available by a Lehman Lender to the Liquidating Trustee as the ES Litigation Expenses are incurred and shall be funded no more frequently than on a monthly basis. The Liquidating Trustee shall provide the Lehman Lender with reasonable substantiation and backup (including invoices and statements from the parties to be paid) for any ES Litigation Expenses to be paid with the proceeds of the ES Litigation Loan in connection with any request to the Lehman Lender for an advance of proceeds of the ES Litigation Loan; provided, however, that the Liquidating Trustee shall not be required to provide any substantiation or backup to the Lehman Lender that discloses, directly or indirectly, information or communications that are subject to attorney-client privilege or attorney work product or contains

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any other privileged or confidential information or strategies of the Liquidating Trustee with respect to the ES Action.

iii. ES Litigation Proceeds shall be made available to pay Allowed Non-Settled ES Claims only after repayment of the ES Litigation Loan, together with interest thereon at an annual, compounded rate of interest equal to 10%; provided, that such repayment may be made without any prejudice to the right of the prevailing party to seek reasonable fees and costs from the non-prevailing party in the ES Action. Such repayment shall be from sources other than Cash Collateral to which the applicable Lehman Creditor otherwise is entitled.

iv. At the election of a Lehman Lender, (1) the ES Litigation Loan may be funded from Cash Collateral of a Lehman Creditor, (2) the ES Litigation Loan may be funded from a transfer of new Cash from a Lehman Lender or (3) a Lehman Lender may direct that the Liquidating Trustee use, for the ES Litigation Loan, funds in the form of new Cash from one or another Lehman Creditor and pay a like amount of Cash Collateral securing a Lehman Loan towards reduction of such Lehman Loan, as the Lehman Lender directs.

**(b) <u>Concessions by Lehman Lenders to Facilitate Collection of ES Judgments.</u>**

Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in the ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

**(i) Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtors' Projects Are to be Collateral for Equitable Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.** For some particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against those Estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Recovery Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Final Judgment as to other ES Plan Debtors' Estates.

**(ii) To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.** As to the Estates of Del Rio and SJD Partners only, Lehman ALI and Fenway Capital will waive an objection or defense, that, even were the applicable Lehman Secured Claim ignored, there was insufficient value in those Estates to pay their Allowed ES Claims and, as to SJD Partners, that they are inappropriate defendants as to a non-recourse judgment secured by the PRA Recovery Security Pool, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied, and (II) the applicable Estate executes the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**(iii) There is to be a BFP Waiver by Fenway Capital.** The defense to the ES Action by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, such that the actions or conduct of the Lehman Lenders could not be attributed to Fenway Capital due to such status, is to be waived if the Credit Bid Conditions are satisfied and if Fenway Capital affirmatively consents in writing. (The Lehman Lenders are exercising good faith efforts to obtain the affirmative consent in writing of Fenway Capital to the BFP Waiver.)

**7.11 Post-Confirmation Expenses, Intercompany Loans and Payables and Priorities in Payment.**

**7.11.1 Post Confirmation Expenses and Intercompany Loans.**

All Post-Confirmation Expenses may be paid by the Liquidating Trustee from the Post-Confirmation Account(s) upon ten (10) days' prior written notice and opportunity to object

provided to the Lehman Lenders, the Committee(s), the Holders of Lehman Disputed Secured Claim(s), or with their consent, but without further notice to other Creditors or Holders of Interests, or approval of the Bankruptcy Court. Any disputes concerning the payment of Administrative and Post-Confirmation Expenses shall be submitted to the Bankruptcy Court for resolution. To the extent readily determinable, Post-Confirmation Expenses attributable to a particular Plan Debtor shall be paid from that Plan Debtor's Assets consistent with the provisions of the Lehman Plan. To the extent of available Assets from each Plan Debtor, other Post-Confirmation Expenses shall be payable by each Plan Debtor Pro Rata consistent with the Lehman Plan, provided that after a Plan Debtor's available Cash or Assets are exhausted, the other Plan Debtors shall absorb such Plan Debtor's share of unpaid Post-Confirmation Expenses as provided in the Lehman Plan, which shall be Pro Rata to the extent reasonably possible. To the extent one Plan Debtor advances funds on behalf of another, the Liquidating Trustee shall book a receivable for the advancing Debtor and a payable for the borrowing Debtor.

**7.11.2 Payables and Priorities in Payment.**

Recoveries from the following sources as to which there are no unsubordinated Secured Claims shall be applied in the following manner:

**(a) Funds Constituting Collateral.**

All funds that are collateral for the Lehman Post-Confirmation Funding shall be used for repayment thereof to the applicable Lehman Lender or replenishment of Cash Collateral for the applicable Lehman Lender when available for distribution or upon maturity of the Lehman Post-Confirmation Funding; and all funds that are collateral for a Lehman Secured Claim shall be used for repayment thereof when provided in the Lehman Plan as to treatment of the Lehman Secured Claims; provided that the tax distributions to the applicable Lehman Creditor from the Plan Reserve shall be payable no less than annually from the income earned thereupon;

**(b) Funds Constituting ES Litigation Proceeds.**

ES Litigation Proceeds of a particular Estate (unless they are or may also be a Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment) shall be applied in the following order of priority until exhausted:

(1) First, to payment of the ES Litigation Loan;

(2) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the particular Estate's Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(3) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(4) Fourth, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(5) Fifth, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment until paid the full amount of their Allowed ES Claims;

(6) Sixth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment, if any, payable Pro Rata among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of repayments owing with respect to Lehman Post-Confirmation Funding and next to pay such Allowed ES Claims until paid in full; and

(7) Seventh, to the applicable Lehman Creditors;

**(c) <u>Various Other Funds, Including Funds Constituting a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.</u>**

(i) A Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment (unless it also may become ES Litigation Proceeds based upon the ES Action), (ii) any Net Cash Proceeds from the sale or disposition of Remaining Other Assets or otherwise, including Net Cash Litigation Recoveries and other funds in the Post-Confirmation Accounts, and (iii) any repayment of a post-Confirmation Date intercompany payable, shall be applied in the following order of priority until exhausted:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(1) First, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(2) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(3) Third, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(4) Fourth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(5) Fifth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of repayments owing with respect to Lehman Post-Confirmation Funding (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(6) Sixth, to pay, in the discretion of the Liquidating Trustee, an accelerated payment for Tax Claims; and

(7) Seventh, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan;

**(d) Funds that Constitute Both ES Litigation Proceeds and a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

ES Litigation Proceeds of a particular Estate that also are a Project Related Action Recovery of such Estate with respect to a Cross-Collateralization Judgment, shall be applied in the following order of priority until exhausted:

(1) First, to payment of the ES Litigation Loan;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(2) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the particular Estate's Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(3) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(4) Fourth, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(5) Fifth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(6) Sixth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of repayments owing with respect to Lehman Post-Confirmation Funding (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(7) Seventh, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment until paid the full amount of their Allowed ES Claims;

(8) Eighth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment, if any, payable Pro Rata among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of repayments owing with respect to Lehman Post-Confirmation Funding and next to pay such Allowed ES Claims until paid in full; and

(9) Ninth, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan; and

**(e) <u>Funds that May Later be Determined to be Both ES Litigation Proceeds and Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.</u>**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Funds that presently are known to be either, but not yet both, ES Litigation Proceeds of a particular Estate or a Project Related Action Recovery with respect to a Cross-Collateralization Judgment, which potentially could also become the other upon Conclusion of the relevant, pending Project Related Action, shall be applied in the following order of priority until exhausted:

(1) First, reserved for payment of the ES Litigation Loan;

(2) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the particular Estate's Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(3) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(4) Fourth, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(5) Fifth, to be reserved and applied upon Conclusion of the relevant, pending Project Related Action in accordance with the above-described priorities of distribution.

**7.11.3 Allocations and Distributions Under this Section.**

For purposes of this Section 7.10.3(b)(ii) of the Plan, in calculating the amount of Allowed ES Claims not paid from an Estate's own Assets for a distribution of ES Litigation Proceeds pursuant to the Lehman Plan, the Liquidating Trustee may ignore future expected or possible recoveries, but upon such later recoveries occurring for such Estates, the Liquidating Trustee shall recalculate the prior distribution and adjust the amount of the later distribution to ensure that the aggregate distributions are correct among entitled Holders of Allowed ES Claims.

**7.12 Plan Release.**

In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Funding, the ES Settlement Offer and the delayed satisfaction of the Secured Claims

of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor, on behalf of itself and its Affiliates exclusive of other Debtors in these Cases shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish:

(a) any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, from and against all Lehman Releasees, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their property; except

(b) the following are not released, to the extent indicated:

(i) Avoidance Actions timely Filed and Filed no later than sixty (60) days following the Effective Date other than to the extent of Cross-Collateralization Claims; and

(ii) with respect to (1) all Equitable Subordination Claims in the ES Action and (2) those Cross-Collateralization Claims identified in the Debtors' Third Amended Disclosure Statement and asserted in a Cross-Collateralization Action (*i.e.*, an Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date), each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by a Project Related Action Recovery (in the form of an ES Final Judgment or a Cross-Collateralization Final Judgment), which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment to the applicable Estate(s) in the amount of any Project Related Action Recovery.

The releases given above include an express, informed, knowing and voluntary waiver and

relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees in accordance herewith, the Lehman Releasees also shall be entitled to issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

**7.13 Entry of Final Decrees.**

The Liquidating Trustee shall cause the entry of a final decree in the Case of each Estate of a Plan Debtor at the earliest reasonable opportunity therefor. Such final decrees may be sought and entered individually for each Case.

**7.14 Dissolution of Committees and Discharge of Trustee and Liquidating Trustee.**

The Trustee, in his capacity as such, shall be discharged upon the Effective Date and his bond may be exonerated. The Liquidating Trustee and Committee shall be discharged upon consummation of the Lehman Plan and the entry of a final decree in each Case or as otherwise ordered by the Court.

## VIII.

## DISTRIBUTIONS

**8.1 Distribution Agent.**

The Liquidating Trustee shall serve as the Distribution Agent for distributions due under the Lehman Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such subagent as a Post-Confirmation Expense from the Post-Confirmation Accounts. The Distribution Agent shall not be required to provide any

bond in connection with the making of any Distributions pursuant to the Lehman Plan.

**8.2 Distributions.**

**(a) Dates of Distributions.**

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

**(b) Limitation on Liability.**

Neither the Lehman Related Parties, the Lehman Nominees, the Liquidating Trustee, their Affiliates, nor any of their employees, members, officers, directors, agents, attorneys or other professionals shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan, or (ii) any change in the value of Distributions made pursuant to the Lehman Plan resulting from any delays in making such Distributions in accordance with the Lehman Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**8.3 Old Instruments and Securities.**

**(a) Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any distribution pursuant to the Lehman Plan in respect of a Claim, each Person holding any note or other instrument or security evidencing such Claim must surrender such instrument or security to the Distribution Agent, if requested.

**(b) Cancellation of Liens.**

Except as otherwise provided in the Lehman Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Liquidating Trustee (including, without limitation, any Cash Collateral) held by such Person and to take such actions as may be requested by the Liquidating Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

requested by the Liquidating Trustee.

**8.4 De Minimis Distributions and Fractional Shares.**

No Cash payment of less than ten dollars ($10) shall be made by the Liquidating Trustee to any Holder of Claims unless a request therefor is made in writing to the Liquidating Trustee. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Lehman Plan.

**8.5 Delivery of Distributions.**

Except as provided in the Lehman Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows: (1) with respect to each Holder of an Allowed Claim that has Filed a Proofs of Claim, at the address for such Holder as maintained by the official claims agent for the Plan Debtors; (2) with respect to each Holder of an Allowed Claim that has not Filed a Proofs of Claim, at the address reflected on the Schedules Filed by the Plan Debtors, provided, however, that if the Plan Debtors or the Liquidating Trustee has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

**8.6 Unclaimed Property.**

If either (1) the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.,* as undeliverable) and the check or other similar instrument or distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date such Distribution first could have been made under the Lehman Plan and for one hundred twenty (120) days thereafter, then such applicable Distribution shall be Unclaimed Property under the Lehman Plan and the Liquidating

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee shall be relieved of making such Distribution or any further Distribution to such Holder of such Allowed Claim unless and until the Liquidating Trustee is notified in writing of the then current address of such Holder of an Allowed Claim. Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Liquidating Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated, interest bearing account to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable. Nothing contained in the Lehman Plan shall require the Liquidating Trustee or any other Person to attempt to locate the Holder of an Allowed Claim as to which there is Unclaimed Property.

**8.7 Disposition of Unclaimed Property.**

If the Person entitled thereto notifies the Liquidating Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practical. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Liquidating Trustee within ninety (90) days after the Holders' initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Lehman Plan or otherwise from the Liquidating Trustee. In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Post-Confirmation Account of the Plan Debtor's Estate against which the applicable Allowed Claim was asserted.

## IX.

## OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

**9.1 Standing for Objections to Claims.**

The Liquidating Trustee and Lehman Lenders shall have the sole and exclusive right to File and resolve for the Estates objections to Claims and their status as ES Claims (provided, however, that the Lehman Lenders shall not be allowed to resolve for the Estates objections to Claims of any Lehman Related Party). Any objection to a Claim, including an objection to a Bond Obligation in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

favor of a Bond Issuer under Bankruptcy Code section 502(e), or any objection to a Claim's status as an ES Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline, expect as provided in the Lehman Plan.

**9.2 Treatment of Disputed Claims.**

**(a) No Distribution Pending Allowance.**

If any portion of a Claim is a Disputed Claim, no payment or distribution provided for under the Lehman Plan shall be made on account of such Claim unless expressly provided hereunder or unless and until such Claim becomes an Allowed Claim. Except as expressly provided in the Lehman Plan, Holders of Disputed Claims, pending their allowance, shall forbear from enforcement of the rights entitled to them under the Lehman Plan for their Claims were they Allowed Claims; provided that if the Claim is a Secured Claim, the Creditor may seek adequate protection for its Claim from the Bankruptcy Court. A Claim that has not been Allowed by a Final Order of the Bankruptcy Court and as to which the objection deadline has not passed, including as to its status as an ES Claim, may be treated by the Liquidating Trustee as a Disputed Claim and, absent the agreement of the Lehman Lenders, the Liquidating Trustee shall so treat any such Secured Claim not expressly Allowed under the Lehman Plan and any ES Claim to which a payment otherwise would be due under subparagraph (c) of Sections 5.8 of the Lehman Plan.

**(b) Distribution After Allowance.**

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

**(c) Reserves for Disputed Claims.**

In the event that Disputed Claims are pending, the Liquidating Trustee shall establish reasonable reserves, including the Plan Reserve for such Disputed Claims. The Distribution Agent may move the Bankruptcy Court for approval of its determination to reserve certain amounts.

**X.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**10.1 Executory Contracts Potentially Being Assumed.**

The Lehman Proponents may File and/or amend or modify on or prior to the Confirmation Date an **Exhibit "A"** to the Lehman Plan containing a list of contracts and leases. The Liquidating Trustee shall assume, assume and assign or reject the executory contracts and unexpired leases on **Exhibit "A"** to the Lehman Plan no later than (a) forty-five (45) days following the last auction under the Lehman Plan Sale Procedures if the subject contract or lease is not related to a particular Project or Projects and (b) forty-five (45) days following the last sale or conveyance by the Liquidating Trustee (voluntary or involuntary) of the related Project(s) if the subject contract or lease relates to a particular Project or Projects. The Lehman Lenders may add any executory contract or unexpired leases to these exhibits or delete any contract or lease therefrom up to and including the Confirmation Date.

**10.2 Executory Contracts Being Rejected.**

All executory contracts and unexpired leases of the Plan Debtors' Estates not listed on **Exhibit "A"** to the Lehman Plan, as is or as amended prior to the Confirmation Date, and not previously rejected, are rejected under the Lehman Plan as of the Confirmation Date. All executory contracts and unexpired leases of the Plan Debtors' Estates that are listed on **Exhibit "A"** to the Lehman Plan that are not assumed or assumed and assigned within the deadlines set forth in the Plan are automatically rejected after such deadline has expired.

**10.3 Retention of Property Rights by Lehman Nominees or Liquidating Trustee.**

To the extent that a matter that provides the Plan Debtors or their Estates with property rights does not constitute an executory contract or unexpired lease, or the Plan Debtors have obtained property rights under the executed portion of an executory contract or unexpired lease, rejection shall not constitute an abandonment by the Plan Debtors, the Lehman Nominees or the Liquidating Trustee of any such property rights.

**10.4 Bar Date for Rejection Damages.**

Any Claim arising out of the rejection of an executory contract or unexpired lease shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

forever barred and shall not be enforceable against the Plan Debtors, their Estates, the Liquidating Trustee, their Affiliates, their successors, or their properties, and shall not be entitled to any distribution under the Lehman Plan, unless a Proof of Claim for such Claim is timely Filed and served. For rejections occurring prior to Confirmation, such Claims must have been Filed by the later of March 31, 2009 or thirty (30) days following the date of entry of the order of the Bankruptcy Court approving rejection. For Claims related to executory contracts or unexpired leases not listed on **Exhibit "A"** to the Lehman Plan that are rejected under the Plan, such Claim must have been Filed and served on the Plan Debtors (if before the Effective Date) or the Liquidating Trustee and Lehman Creditors (if after the Effective Date) within thirty (30) days after the Confirmation Date. For Claims related to executed contracts or unexpired leases listed on **Exhibit "A"** to the Lehman Plan that are rejected under or in accordance with the Plan, such Claim must have been Filed and served on the Liquidating Trustee and Lehman Creditors within thirty (30) days after receipt by the non-debtor party to the contract or lease of a notice of the rejection of the contract or lease.

## XI.

## EFFECT OF CONFIRMATION OF THE PLAN

Except as otherwise expressly provided in the Lehman Plan, the documents executed pursuant to the Lehman Plan, or the Confirmation Order, on and after the Effective Date, all Persons and Entities who have held, currently hold, or may hold a debt, Claim, or Interest against the Plan Debtors (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) shall be permanently enjoined from: (a) taking any of the following actions on account of any such debt, Claim, or Interest: (1) commencing or continuing in any manner any action or other proceeding against the Plan Debtors and the Liquidating Trustee, their successors, or their property; (2) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (3) creating, perfecting, or enforcing any Lien or encumbrance against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (4) asserting

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any set off, right of subrogation, or recoupment of any kind against any obligation due the Plan Debtors or the Liquidating Trustee, their successors, or their property; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Lehman Plan; (b) challenging the distributions to be effected by, or the classification of Claims or Interests set forth in, the Plan, except as expressly provided in and permitted by the Plan and (c) taking any of the following actions on account of any claims or rights of action that are revested in, or transferred to, the Liquidating Trustee as of the Effective Date or under the Lehman Plan (to the extent one or more Plan Debtors' Estates first held such claim or rights of action or held the right to assert such claim or right of action after the Petition Date), including, without limitation: (1) asserting such claims or rights of action against nondebtor third parties; and (2) commencing or continuing in any manner any action or other proceeding of any kind with respect to such claims or rights of action. Any person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

## XII.

## LIMITATION OF LIABILITY

**12.1 No Liability for Solicitation or Participation.**

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Lehman Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Lehman Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Lehman Plan or the offer, issuance, sale, or purchase of securities.

**12.2 Limitation of Liability.**

Effective as of the Effective Date, none of the Liquidating Trustee, the Lehman Related Parties or their respective Affiliates, nor any of their respective members, officers, directors, employees and other agents, advisors, attorneys and accountants shall have or incur any liability to any Holder of any Claim or Interest or any other Person for any act or omission in connection with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or arising out of the negotiation, preparation and pursuit of confirmation of the Lehman Plan, the Lehman Disclosure Statement, the consummation of the Lehman Plan, the administration of the Lehman Plan, the Cases or the property to be distributed under the Lehman Plan except: (a) the Liquidating Trustee shall be liable contractually for the performance of obligations assumed or imposed under or by the Lehman Plan; (b) for liability based on willful misconduct as finally determined by a Final Order of the Bankruptcy Court; and (c) for gross negligence in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan. Each of the Liquidating Trustee, Lehman Related Parties and their respective Affiliates, and each of their respective officers, directors, employees and other agents, advisors, attorneys and accountants) shall be entitled to rely, in every respect, upon the advice of counsel with respect to their duties and responsibilities under or with respect to the Lehman Plan.

## XIII.

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### 13.1 Conditions Precedent to Plan Confirmation.

The condition precedent to Confirmation is the Bankruptcy Court's entry of the Confirmation Order.

### 13.2 Conditions Precedent to Plan Effectiveness.

The following shall be conditions precedent to the effectiveness of the Lehman Plan and the occurrence of the Effective Date.

(a) The Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the Lehman Lenders.

(b) All agreements and instruments contemplated by, or to be entered into pursuant to, the Lehman Plan, including, without limitation, each of the Plan Documents necessary for consummation of the Lehman Plan, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived other than the occurrence of the Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## XIV.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

## XV.

## MODIFICATION OR WITHDRAWAL OF PLAN

**15.1 Modification of Plan.**

At any time prior to confirmation of the Lehman Plan, the Lehman Lenders may supplement, amend or modify the Lehman Plan. After confirmation of the Lehman Plan, the Lehman Lenders or Liquidating Trustee with the consent of the Lehman Lenders may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Lehman Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Lehman Plan or to reconcile inconsistencies in the Lehman Plan.

**15.2 Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Lehman Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, Lehman Lenders (i) may request that the Bankruptcy Court confirm the Lehman Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with the Lehman Plan, and may modify the Lehman Plan in accordance with Section 1127(a) of the Bankruptcy Code.

## XVI.

## MISCELLANEOUS

**16.1 Changes in Rates Subject to Regulatory Commission Approval.**

The Plan Debtors are not subject to governmental regulatory commission approval of their rates.

**16.2 Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of Title 28 of the United States Code with respect to the Plan Debtors shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(l2) of the Bankruptcy Code. The Liquidating Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date with respect to the Plan Debtors until each applicable Plan Debtor's Case is closed, to the extent required by Section 1930(a)(6) of Title 28 of the United States Code.

**16.3 Payment Dates.**

Whenever any payment or distribution to be made under the Lehman Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**16.4 Headings.**

The headings used in the Lehman Disclosure Statement and in the Lehman Plan are inserted for convenience only and neither constitutes a portion of the Lehman Disclosure Statement or the Lehman Plan nor in any manner affect the construction of the provisions of the Lehman Disclosure Statement or the Lehman Plan.

**16.5 Other Documents and Actions.**

The Liquidating Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Lehman Plan.

**16.6 Notices.**

All notices and requests in connection with the Lehman Disclosure Statement and the Lehman Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

Edward Soto, Esq.
Nellie P. Camerick, Esq.
Weil, Gotshal & Manges LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131

and

Shai Y. Waisman, Esq.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**With copies to:**
Dean A. Ziehl, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Fl.
Los Angeles, CA 90067

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

**16.7    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Lehman Plan and any agreements, documents, and instruments executed in connection with the Lehman Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**16.8    Binding Effect.**

This Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Lehman Creditors, the Plan Debtors, the Liquidating Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

**16.9    Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Lehman Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**16.10    Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Lehman Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Lehman Plan, the Bankruptcy Court shall, with the consent of the Lehman Proponents, have the power to interpret, modify or delete such term or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Lehman Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**16.11 <u>No Waiver</u>.**

The failure of the Plan Debtors, Liquidating Trustee, Committee or Lehman Lenders or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Plan Debtors', the Liquidating Trustee's or the Lehman Lenders' right to object to or examine such Claim, in whole or in part.

**16.12 <u>Inconsistencies</u>.**

In the event the terms or provisions of the Lehman Disclosure Statement are inconsistent with the terms and provisions of the Lehman Plan or documents executed in connection with the Lehman Plan, the terms of the Lehman Plan shall control.

**16.13 <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Plan Debtor or its Estate to the Liquidating Trustee or to any other Person or entity pursuant to the Lehman Plan, or any agreement regarding the transfer of title to or ownership of any of the Plan Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest), including, without limitation, transfers or sales pursuant to the Lehman Plan Sale Procedures or Reconveyance Agreements will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**16.14   Post-Confirmation Status Report.**

By the earlier of 180 days following the entry of the Confirmation Order a status report shall be Filed with the Court explaining what progress has been made toward consummation of the confirmed Plan, which report shall be Filed by the Liquidating Trustee, if the Effective Date occurs with 120 days following the entry of the Confirmation Order and, otherwise, by the Lehman Lenders. The status report shall be served on the United States Trustee, the list of twenty largest unsecured creditors Filed by the Debtors or Trustee for the jointly administered Cases of the Debtors, the Lehman Creditors, the Liquidating Trustee and those parties who have requested special notice. Unless otherwise ordered, further status reports shall be Filed every 180 days and served on the same entities.

**16.15   Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss any Case of a Plan Debtor under § 1112(b), after the Lehman Plan is confirmed, if there is a default in performing the Lehman Plan, subject to the right of any party in interest to object to such motion. If the Court orders any of the Cases converted to Chapter 7 after the Lehman Plan is confirmed, then all property that had been property of the chapter 11 Estate, and that has not been disbursed pursuant to the Lehman Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

**16.16   Final Decree.**

Once a Plan Debtor's Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trustee, or other party as the Court shall designate in the Confirmation Order, shall File a motion with the Court to obtain a final decree to close the Case of such Plan Debtor.

Dated: October 13, 2009

PACHULSKI STANG ZIEHL & JONES LLP

By */s/ Robert B. Orgel*

Dean A. Ziehl (CA Bar No. 84529)
E-mail: dziehl@pszjlaw.com
Robert B. Orgel (CA Bar No. 101875)
E-mail: rorgel@pszjlaw.com
Attorneys for Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC and OVC Holdings LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

**Exhibit "A"**

**List of Contracts and Leases**

**[TO BE FILED]**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT B

**Exhibit "B"**

| | NAME OF PROJECT AND ITS OWNER | DESCRIPTION |
|---|---|---|
| 1. | Ritter Ranch Project; Palmdale Hills (Voluntary Debtor) | Palmdale Hills owns the Ritter Ranch Project. The Ritter Ranch Project consists of a 10,625 acre site situated in the City of Palmdale, in Los Angeles County, California. Grading of the first phase is complete with master infrastructure nearly 90% complete. The specific plan and the development agreement were approved in 1992 and allow for the development of up to 7,200 residential units. A vesting tentative parcel map consisting of 42 parcels has been processed and was recorded in 1995. Additionally, six vesting tentative tract maps totaling 553 lots were approved by the city in December 1995. All regulatory permits have been received.<br><br>Palmdale Hills also owns personal property in the form of cash in the amount of approximately $21 million and the Palmdale Hills CFD Bonds. |
| 2. | Acton Project; Acton Estates (Voluntary Debtor) | Action Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land. The Acton Project is expected to consist of 136 units. |
| 3. | Beaumont Heights Project; SunCal Beaumont (Voluntary Debtor) | SunCal Beaumont owns the Beaumont Heights Project, that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California. The property is currently designated as low density residential use -rural residential use. The City of Beaumont is in the process of amending the general plan, preparing an environmental impact report and annexing the assemblage. The specific plan and tentative tract map are in the drafting stage. The Beaumont Heights Project was expected to consist of 1,203 units. A portion of the Beaumont Heights Project has been lost through foreclosure sales completed prior to the Petition Date. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| NAME OF PROJECT AND ITS OWNER | DESCRIPTION |
| --- | --- |
| 4. Bickford Ranch Project; SunCal Bickford (Voluntary Debtor) | SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement. The offsite water and sewer improvements are mostly complete. Improvement plans for major roads and in-tract improvements were in process of being completed and a memorandum of understanding between the City and County for the regional sewer pipeline was in process. The Bickford Ranch Project is expected to consist of 2,105 units.<br><br>SunCal Bickford owns personal property in the approximate amount of $2,305,523 in the form of cash. |
| 5. Emerald Meadows Project; SunCal Emerald (Voluntary Debtor) | SunCal Emerald owns the Emerald Meadows Project, consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California. The specific plan, general plan and the environmental impact report were approved in October 2005. The tentative tract map & final map were in process. The Emerald Meadows Project is expected to consist of 1,002 units. |
| 6. Johannson Ranch Project; SunCal Johannson (Voluntary Debtor) | SunCal Johannson owns the Johannson Ranch Project, consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California. Tentative maps were in the process of being prepared. Engineering plans and preparation of the draft specific plan were commenced prior to the filing of the Debtors' Cases. The SunCal Johansson Project is expected to consist of 921 units. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | NAME OF PROJECT AND ITS OWNER | DESCRIPTION |
|---|---|---|
| 7. | Summit Valley Project; SunCal Summit Valley, Kirby Estates, Seven Brothers (Voluntary Debtors) | SunCal Summit Valley, Kirby Estates and Seven Brothers each own portions of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report were completed. The Summit Valley Project was previously expected to consist of 6,023 units. A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date. Seven Brothers owned 900 acres of the Summit Valley Project, a portion of which has been lost through foreclosure proceedings completed prior to the Petition Date. Kirby Estates owns 27 acres of the Summit Valley Project. (SunCal Summit Valley is the Holder of the Allowed Interests in Seven Brothers and Kirby Estates.) |
| 8. | Joshua Ridge Project; SCC Communities (Voluntary Debtor) | SCC Communities owns the Joshua Ridge Project, consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The Joshua Ridge Project was slated to be sold to the city and the city was scheduled to use the land to build a park or a school. |
| 9. | Tesoro Project; Tesoro (Voluntary Debtor) | Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. |

| | NAME OF PROJECT AND ITS OWNER | DESCRIPTION |
|---|---|---|
| 10. | Delta Coves Project; Delta Coves (Trustee Debtor) | Delta Coves owns the Delta Coves Project consisting of a 310-acre site which is located on Bethel Island within Contra Costa County. The Delta Coves Project is expected to consist of 494 waterfront residential lots, some of which will be condominiums/townhomes and some of which will contain private boat docks. The Delta Coves Project is expected to include an interior lagoon that will provide direct boating access to San Joaquin River Delta. |
| 11. | Heartland Project; SunCal Heartland (Trustee Debtor) | SunCal Heartland owns the Heartland Project consisting of a 417 acre site located in Riverside County, California. The Heartland Project is expected to consist of 983 units. |
| 12. | Marblehead Project; SunCal Marblehead (Trustee Debtor) | SunCal Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California. The development is expected to offer canyon and ocean views from a number of lots throughout the Marblehead Project. (SunCal Marblehead also owns personal property in the approximate amount of $1,176,584 in the form of cash.) |
| 13. | Northlake Project; SunCal Northlake (Trustee Debtor) | SunCal Northlake owns the Northlake Project, consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is expected to consist of 3,417 units. (SunCal Northlake also owns personal property in the amount of $967,728 in the form of cash.) |
| 14. | Oak Valley Project; SunCal Oak Valley (Trustee Debtor) | SunCal Oak Valley owns the Oak Valley Project consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project consists primarily of residential property and is expected to also include two commercial sites, one school site and several parks. The Oak Valley Project is expected to consist of 3,417 units. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | NAME OF PROJECT AND ITS OWNER | DESCRIPTION |
|---|---|---|
| 15. | 10000 Santa Monica Project; SunCal Century City (Trustee Debtor) | SunCal Century City owns the 10000 Santa Monica Project, consisting of a 2-acre site which is located at the eastern edge of Century City, in Los Angeles County, California. The 10000 Santa Monica Project is expected to consist of 163 condominium units. |
| 16. | Palm Springs Village Project; SunCal PSV (Trustee Debtor) | SunCal PSV owns the Palm Springs Village Project, consisting of a 309-acre site which is located in the City of Palm Springs, California. The current proposed development consists of 752 single family units, 398 multi-family units, an 18-hole executive golf course, a driving range, a golf clubhouse and recreational facilities. |
| 17. | Del Amo Project; SunCal Torrance (Trustee Debtor) | SunCal Torrance owns the Del Amo Project, consisting of a 14-acre site which is located in the City of Torrance in Los Angeles County, California. The site is currently a section of the Del Amo Fashion Center complex, a 3 million square feet retail mall. The Del Amo Project is expected to consist of 365 units. |
| 18. | Oak Knoll Project; SunCal Oak Knoll (Trustee Debtor) | SunCal Oak Knoll owns the Oak Knoll Project, consisting of a 172.5-acre site which is located in the City of Oakland, California. The Oak Knoll Project is expected to be a diverse master planned community that includes 960 residential units, including single family homes, town homes and apartments. The Oak Knoll Project is also expected to consist of six restaurant spaces, along with a grocery anchor.[4] |

[4] The SunCal Oak Knoll Project is subject to various notices of public health and safety violations and conditions, including those set forth in Exhibit "1" to the Disclosure Statement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Pg 159 of 409

| In re: PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS, Debtor(s). | CHAPTER 11 CASE NUMBER 08-17206-ES |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067**

A true and correct copy of the foregoing document described *as* ***FIRST AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY LEHMAN LENDERS*** will be served or was served **(a)** on the **judge in chambers** in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 13, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _______________________ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 13, 2009** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

JUDGE'S COPY [Hand Delivery]
The Honorable Erithe A. Smith
United States Bankruptcy Court - Central District of California
Ronald Reagan Federal Building and
United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 13, 2009 | Myra Kulick | */s/ Myra Kulick* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009* **F 9013-3.1**

Pg 160 of 409

| In re: PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS, Debtor(s). | CHAPTER 11 CASE NUMBER 08-17206-ES |
| --- | --- |

**I. SERVED BY NEF**

**8:08-bk-17206-ES Notice will be electronically mailed to:**

1. Selia M Acevedo for Interested Party Courtesy NEF
sacevedo@millerbarondess.com
2. Joseph M Adams for Defendant The City of San Juan Capistrano
jadams@sycr.com
3. Raymond H Aver for Debtor Palmdale Hills Property, LLC
ray@averlaw.com
4. James C Bastian for Creditor ARB, Inc.
jbastian@shbllp.com
5. John A Boyd for Interested Party Oliphant Golf Inc
fednotice@tclaw.net
6. Brendt C Butler for Creditor EMR Residential Properties LLC
BButler@rutan.com
7. Carollynn Callari for Creditor Danske Bank A/S London Branch
ccallari@venable.com
8. Dan E Chambers for Creditor EMR Residential Properties LLC
dchambers@jmbm.com
9. Shirley Cho for Creditor Lehman ALI, Inc.
scho@pszjlaw.com
10. Vonn Christenson for Interested Party Courtesy NEF
vrc@paynefears.com
11. Vincent M Coscino for Petitioning Creditor CST Environmental Inc
emurdoch@allenmatkins.com
12. Paul J Couchot for Debtor ACTON ESTATES, LLC
pcouchot@winthropcouchot.com, pj@winthropcouchot.com
13. Jonathan S Dabbieri for Interested Party Courtesy NEF
dabbieri@shlaw.com
14. Ana Damonte for Creditor Top Grade Construction, Inc.
ana.damonte@pillsburylaw.com
15. Melissa Davis for Creditor City of Orange
mdavis@shbllp.com
16. Daniel Denny for Interested Party Courtesy NEF
ddenny@gibsondunn.com
17. Caroline Djang for Creditor Lehman ALI, Inc.
crd@jmbm.com
18. Donald T Dunning for Creditor Hertz Equipment Rental Corporation
ddunning@dunningLaw.com
19. Joseph A Eisenberg for Creditor Lehman ALI, Inc.
jae@jmbm.com
20. Lei Lei Wang Ekvall for Creditor Committee Joint Committee of Creditors Holding Unsecured Claims
lekvall@wgllp.com
21. Richard W Esterkin for Debtor Palmdale Hills Property, LLC
resterkin@morganlewis.com
22. Lisa Hill Fenning for Defendant Fenway Capital, LLC
Lisa.Fenning@aporter.com, Jean.Kellett@aporter.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009 F 9013-3.1

Pg 161 of 409

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,
Debtor(s).

CHAPTER 11

CASE NUMBER 08-17206-ES

23. Marc C Forsythe for Attorney Robert Goe
kmurphy@goeforlaw.com
24. Alan J Friedman for Attorney Irell & Manella LLP
afriedman@irell.com
25. Christian J Gascou for Creditor Arch Insurance Company
cgascou@gascouhopkins.com
26. Robert P Goe for Attorney Robert Goe
kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
27. Eric D Goldberg for Interested Party Courtesy NEF
egoldberg@stutman.com
28. Kelly C Griffith for Creditor Bond Safeguard Insurance Co
bkemail@harrisbeach.com
29. Asa S Hami for Debtor Palmdale Hills Property, LLC
ahami@morganlewis.com
30. Michael J Hauser for U.S. Trustee United States Trustee (SA)
michael.hauser@usdoj.gov
31. D Edward Hays for Creditor Philip Dowse
ehays@marshackhays.com
32. Michael C Heinrichs for Interested Party Courtesy NEF
mheinrichs@omm.com
33. Harry D. Hochman for Creditor Lehman ALI, Inc.
hhochman@pszjlaw.com, hhochman@pszjlaw.com
34. Michelle Hribar for Plaintiff EMR Residential Properties LLC
mhribar@rutan.com
35. Lawrence A Jacobson for Creditor BKF Engineers
laj@cohenandjacobson.com
36. Stephen M Judson for Petitioning Creditor The Professional Tree Care Co
sjudson@fablaw.com
37. David I Katzen for Interested Party Bethel Island Municipal Improvement District
katzen@ksfirm.com
38. Christopher W Keegan for Creditor SC Master Holdings II LLC
ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com
39. Irene L Kiet for Creditor BNB Engineering, Inc.
ikiet@hkclaw.com
40. Mark J Krone for Creditor Bond Safeguard Insurance Co
mk@amclaw.com
41. Leib M Lerner for Creditor Steiny and Company, Inc.
leib.lerner@alston.com
42. Peter W Lianides for Debtor Palmdale Hills Property, LLC
plianides@winthropcouchot.com, pj@winthropcouchot.com
43. Charles Liu for Debtor Palmdale Hills Property, LLC
cliu@winthropcouchot.com
44. Kerri A Lyman for Attorney Irell & Manella LLP
klyman@irell.com
45. Mariam S Marshall for Creditor RGA Environmental, Inc.
mmarshall@marshallramoslaw.com
46. Robert C Martinez for Creditor TC Construction Company, Inc
rmartinez@mclex.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009
F 9013-3.1

Pg 162 of 409

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,
Debtor(s).
CHAPTER 11
CASE NUMBER 08-17206-ES

47. Hutchison B Meltzer for Creditor Committee Joint Committee of Creditors Holding Unsecured Claims
hmeltzer@wgllp.com
48. Joel S. Miliband for Creditor RBF CONSULTING
jmiliband@rusmiliband.com
49. James M Miller for Debtor Palmdale Hills Property, LLC
jmiller@millerbarondess.com
50. Louis R Miller for Plaintiff Palmdale Hills Property, LLC
smiller@millerbarondess.com
51. Mike D Neue for Trustee Steven Speier
mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
52. Robert Nida for Creditor Kirk Negrete, Inc
Rnida@castlelawoffice.com
53. Sean A Okeefe for Debtor Palmdale Hills Property, LLC
sokeefe@okeefelc.com
54. Robert B Orgel for Creditor Lehman ALI, Inc.
rorgel@pszjlaw.com, rorgel@pszjlaw.com
55. Penelope Parmes for Creditor EMR Residential Properties LLC
pparmes@rutan.com
56. Ronald B Pierce for Creditor Griffith Company
ronald.pierce@sdma.com
57. Raymond A Policar for Creditor Williams+Paddon Architects+Planners, Inc.
hausermouzes@sbcglobal.net
58. Cassandra J Richey for Creditor Patricia I Volkerts, as Trustee, et al
cmartin@pprlaw.net
59. Debra Riley for Interested Party City of Palmdale
driley@allenmatkins.com
60. Martha E Romero for Creditor San Bernardino County Tax Collector
Romero@mromerolawfirm.com
61. William D Schuster for Creditor HD Supply Construction Supply LTD
bills@allieschuster.org
62. Wendy W Smith for Creditor Castaic Union School District
wendy@bindermalter.com
63. Steven M Speier for Trustee Steven Speier
Sspeier@Squarmilner.com, ca85@ecfcbis.com
64. Michael St James for Creditor MBH Architects, Inc.
ecf@stjames-law.com
65. Todd L Turoci for Creditor Philip Dowse
tturoci@aol.com
66. United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov
67. Jason Wallach for Interested Party Courtesy NEF
jwallach@gladstonemichel.com
68. Joshua D Wayser for Other Professional D. E. Shaw & Co., L.P.
joshua.wayser@kattenlaw.com
69. Christopher T Williams for Creditor Danske Bank A/S London Branch
ctwilliams@venable.com, jcontreras@venable.com
70. Marc J Winthrop for Debtor Palmdale Hills Property, LLC
pj@winthropcouchot.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009
F 9013-3.1

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS, Debtor(s). | CHAPTER 11
CASE NUMBER 08-17206-ES

71. David M Wiseblood for Creditor Bethel Island Municipal Improvement District
dwiseblood@seyfarth.com
72. Arnold H Wuhrman for Creditor Wayne Lee
Wuhrman@serenitylls.com
73. Dean A Ziehl for Creditor LV Pacific Point, LLC
dziehl@pszjlaw.com, dziehl@pszjlaw.com

**III. SERVED BY E-MAIL**

(1) counsel for the Voluntary Debtors:
Paul Couchot - pcouchot@winthropcouchot.com
Marc J Winthrop - pj@winthropcouchot.com
Charles Liu - cliu@winthropcouchot.com

(2) counsel for the Trustee Debtors:
William Lobel - wlobel@thelobelfirm.com

(3) counsel for the Voluntary Debtors' Committee:
Alan Friedman - afriedman@irell.com
Kerri A Lyman - klyman@irell.com

(4) counsel for the Trustee Debtors' Committee:
Lei Lei Wang Ekvall - lekvall@wgllp.com
Hutchison B Meltzer - hmeltzer@wgllp.com

(5) Office of the United States Trustee:
Michael Hauser - michael.hauser@usdoj.gov

Louis Miller - smiller@millerbarondess.com
Martin Pritikin – mpritikin@millerbarondess.com
Steven N. Speier (Chapter 11 Trustee, c/o Squar Nilner) - sspeier@squarmilner.com; ca85@ecfcbis.com
Edward Soto - Edward.soto@weil.com
Carrolynn H. G. Callari - ccallari@venable.com
John Sieger - john.sieger@kattenlaw.com
Atty for P. Volkerts - c.martin@pprlaw.net
Atty for Bond Safeguard & Lexon - mea@amclaw.com
Palmdale Hills Property, LLC and its related entities - bcook@suncal.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009* **F 9013-3.1**

## File a Plan:

8:08-bk-17206-ES Palmdale Hills Property, LLC

| Type: bk | Chapter: 11 v | Office: 8 (Santa Ana) |
|---|---|---|
| Assets: y | Judge: ES | Case Flag: JNTADMN, LEAD, Incomplete, DEFER, APPEAL |

**U.S. Bankruptcy Court**

**Central District Of California**

Notice of Electronic Filing

The following transaction was received from Robert B Orgel entered on 10/13/2009 at 10:56 PM PDT and filed on 10/13/2009

| | |
|---|---|
| **Case Name:** | Palmdale Hills Property, LLC |
| **Case Number:** | 8:08-bk-17206-ES |
| **Document Number:** | 710 |

**Docket Text:**
Amended Chapter 11 Plan *First Amended Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC (RE: related document(s)[567] Chapter 11 Plan of Reorganization *Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC.). (Orgel, Robert)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\205532v28 Lehman Plan.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1106918562 [Date=10/13/2009] [FileNumber=28930167-0] [6c35353112fa0a03f476adae67842620059cce439cb8218dcfe93784614c67192335d4d278f4387732efcd09f22c10128f6399d1439f168684c0ba50fa0e031d]]

**8:08-bk-17206-ES Notice will be electronically mailed to:**

Selia M Acevedo on behalf of Interested Party Courtesy NEF
sacevedo@millerbarondess.com

Joseph M Adams on behalf of Defendant The City of San Juan Capistrano
jadams@sycr.com

Raymond H Aver on behalf of Debtor Palmdale Hills Property, LLC
ray@averlaw.com

James C Bastian on behalf of Creditor ARB, Inc.

jbastian@shbllp.com

John A Boyd on behalf of Interested Party Oliphant Golf Inc
fednotice@tclaw.net

Brendt C Butler on behalf of Creditor EMR Residential Properties LLC
BButler@rutan.com

Carollynn Callari on behalf of Creditor Danske Bank A/S London Branch
ccallari@venable.com

Dan E Chambers on behalf of Creditor EMR Residential Properties LLC
dchambers@jmbm.com

Shirley Cho on behalf of Creditor Lehman ALI, Inc.
scho@pszjlaw.com

Vonn Christenson on behalf of Interested Party Courtesy NEF
vrc@paynefears.com

Vincent M Coscino on behalf of Petitioning Creditor CST Environmental Inc
emurdoch@allenmatkins.com

Paul J Couchot on behalf of Debtor ACTON ESTATES, LLC
pcouchot@winthropcouchot.com, pj@winthropcouchot.com

Jonathan S Dabbieri on behalf of Interested Party Courtesy NEF
dabbieri@shlaw.com

Ana Damonte on behalf of Creditor Top Grade Construction, Inc.
ana.damonte@pillsburylaw.com

Melissa Davis on behalf of Creditor City of Orange
mdavis@shbllp.com

Daniel Denny on behalf of Interested Party Courtesy NEF
ddenny@gibsondunn.com

Caroline Djang on behalf of Creditor Lehman ALI, Inc.
crd@jmbm.com

Donald T Dunning on behalf of Creditor Hertz Equipment Rental Corporation
ddunning@dunningLaw.com

Joseph A Eisenberg on behalf of Creditor Lehman ALI, Inc.
jae@jmbm.com

Lei Lei Wang Ekvall on behalf of Creditor Committee Joint Committee of Creditors Holding Unsecured
Claims
lekvall@wgllp.com

Richard W Esterkin on behalf of Debtor Palmdale Hills Property, LLC
resterkin@morganlewis.com

Lisa Hill Fenning on behalf of Defendant Fenway Capital, LLC
Lisa.Fenning@aporter.com, Jean.Kellett@aporter.com

Marc C Forsythe on behalf of Attorney Robert Goe
kmurphy@goeforlaw.com

Alan J Friedman on behalf of Attorney Irell & Manella LLP
afriedman@irell.com

Christian J Gascou on behalf of Creditor Arch Insurance Company
cgascou@gascouhopkins.com

Robert P Goe on behalf of Attorney Robert Goe
kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com

Eric D Goldberg on behalf of Interested Party Courtesy NEF
egoldberg@stutman.com

Kelly C Griffith on behalf of Creditor Bond Safeguard Insurance Co
bkemail@harrisbeach.com

Asa S Hami on behalf of Debtor Palmdale Hills Property, LLC
ahami@morganlewis.com

Michael J Hauser on behalf of U.S. Trustee United States Trustee (SA)
michael.hauser@usdoj.gov

D Edward Hays on behalf of Creditor Philip Dowse
ehays@marshackhays.com

Michael C Heinrichs on behalf of Interested Party Courtesy NEF
mheinrichs@omm.com

Harry D. Hochman on behalf of Creditor Lehman ALI, Inc.
hhochman@pszjlaw.com, hhochman@pszjlaw.com

Michelle Hribar on behalf of Plaintiff EMR Residential Properties LLC
mhribar@rutan.com

Lawrence A Jacobson on behalf of Creditor BKF Engineers
laj@cohenandjacobson.com

Stephen M Judson on behalf of Petitioning Creditor The Professional Tree Care Co
sjudson@fablaw.com

David I Katzen on behalf of Interested Party Bethel Island Municipal Improvement District
katzen@ksfirm.com

Christopher W Keegan on behalf of Creditor SC Master Holdings II LLC
ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com

Irene L Kiet on behalf of Creditor BNB Engineering, Inc.
ikiet@hkclaw.com

Mark J Krone on behalf of Creditor Bond Safeguard Insurance Co
mk@amclaw.com

Leib M Lerner on behalf of Creditor Steiny and Company, Inc.
leib.lerner@alston.com

Peter W Lianides on behalf of Debtor Palmdale Hills Property, LLC
plianides@winthropcouchot.com, pj@winthropcouchot.com

Charles Liu on behalf of Debtor Palmdale Hills Property, LLC
cliu@winthropcouchot.com

Kerri A Lyman on behalf of Attorney Irell & Manella LLP
klyman@irell.com

Mariam S Marshall on behalf of Creditor RGA Environmental, Inc.
mmarshall@marshallramoslaw.com

Robert C Martinez on behalf of Creditor TC Construction Company, Inc
rmartinez@mclex.com

Hutchison B Meltzer on behalf of Creditor Committee Joint Committee of Creditors Holding Unsecured
Claims
hmeltzer@wgllp.com

Joel S. Miliband on behalf of Creditor RBF CONSULTING
jmiliband@rusmiliband.com

James M Miller on behalf of Debtor Palmdale Hills Property, LLC
jmiller@millerbarondess.com

Louis R Miller on behalf of Plaintiff Palmdale Hills Property, LLC
smiller@millerbarondess.com

Mike D Neue on behalf of Trustee Steven Speier
mneue@thelobelfirm.com, csolorzano@thelobelfirm.com

Robert Nida on behalf of Creditor Kirk Negrete, Inc
Rnida@castlelawoffice.com

Sean A Okeefe on behalf of Debtor Palmdale Hills Property, LLC
sokeefe@okeefelc.com

Robert B Orgel on behalf of Creditor Lehman ALI, Inc.
rorgel@pszjlaw.com, rorgel@pszjlaw.com

Penelope Parmes on behalf of Creditor EMR Residential Properties LLC
pparmes@rutan.com

Ronald B Pierce on behalf of Creditor Griffith Company
ronald.pierce@sdma.com

Raymond A Policar on behalf of Creditor Williams+Paddon Architects+Planners, Inc.
hausermouzes@sbcglobal.net

Cassandra J Richey on behalf of Creditor Patricia I Volkerts, as Trustee, et al
cmartin@pprlaw.net

Debra Riley on behalf of Interested Party City of Palmdale
driley@allenmatkins.com

Martha E Romero on behalf of Creditor San Bernardino County Tax Collector
Romero@mromerolawfirm.com

William D Schuster on behalf of Creditor HD Supply Construction Supply LTD
bills@allieschuster.org

Wendy W Smith on behalf of Creditor Castaic Union School District
wendy@bindermalter.com

Steven M Speier on behalf of Trustee Steven Speier
Sspeier@Squarmilner.com, ca85@ecfcbis.com

Michael St James on behalf of Creditor MBH Architects, Inc.
ecf@stjames-law.com

Todd L Turoci on behalf of Creditor Philip Dowse
tturoci@aol.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

Jason Wallach on behalf of Interested Party Courtesy NEF
jwallach@gladstonemichel.com

Joshua D Wayser on behalf of Other Professional D. E. Shaw & Co., L.P.
joshua.wayser@kattenlaw.com

Christopher T Williams on behalf of Creditor Danske Bank A/S London Branch
ctwilliams@venable.com, jcontreras@venable.com

Marc J Winthrop on behalf of Debtor Palmdale Hills Property, LLC
pj@winthropcouchot.com

David M Wiseblood on behalf of Creditor Bethel Island Municipal Improvement District
dwiseblood@seyfarth.com

Arnold H Wuhrman on behalf of Creditor Wayne Lee
Wuhrman@serenitylls.com

Dean A Ziehl on behalf of Creditor LV Pacific Point, LLC
dziehl@pszjlaw.com, dziehl@pszjlaw.com

**8:08-bk-17206-ES Notice will not be electronically mailed to:**

Tab L K Artis on behalf of Creditor Desert Pipeline, Inc.
301 N Lake Ave 7th Fl
Pasadena, CA 91101

Shaaron A Bangs on behalf of Defendant Rockey Murata Landscaping, Inc.
Crawford & Bangs
1290 E Center Ct Dr
Covina, CA 91724

William G Bissell on behalf of Creditor Boudreau Pipeline Corporation
110 Newport Ctr Dr Ste 200
Newport Beach, CA 92660

William Bissell on behalf of Defendant Boudreau Pipeline Corporation
110 Newport Center Dr Ste 200
Newport Beach, CA 92660

John W Busby on behalf of Creditor Marques Pipeline, Inc.
251 Lafayette Circle Ste 350
Lafayette, CA 94549

Wayne W Call on behalf of Creditor Bova Contracting Corporation
Call, Jensen & Ferrell
610 Newport Ctr Dr Ste 700
Newport Beach, CA 92660

Brent S Clemmer on behalf of Creditor MSA Consulting, Inc.
Slovak Baron & Empey LLP
1800 E Tahquitz Cyn Wy
Palm Springs, CA 92262

Adrianna M Corrado on behalf of Defendant Orange County Striping Service, Inc.
Lanak & Hanna
400 N Tustin Ave Ste 120
Santa Ana, CA 92705-3815

Donald B Devirian on behalf of Defendant ALL AMERICAN ASPHALT
Devirian & Shinmoto
11400 W Olympic Blvd Ste 200
Los Angeles, CA 90064

Fenway Capital, LLC

c/o John E. Schreiber
Dewey & LeBouef LLP
333 S. Grand Avenue, 26th Fl.
Los Angeles, CA 90071

Steven M Garber on behalf of Creditor Park West Landscape, Inc
1901 Ave Of The Stars #1100
Los Angeles, CA 90067

Stanley Haren on behalf of Defendant Sierra Cascade Construction, Inc.
Gill & Baldwin
130 N Baldwin Blvd #405
Glendale, CA 91203

William R Hart on behalf of Defendant BNB Engineering, Inc.
Hart King & Coldren
200 Sandpointe Fourth Fl
Santa Ana, CA 92707

Jonathan M Hoff on behalf of Interested Party Joint Provisional Liquidators of Lehman RE Ltd
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281

Andrew C Kienle on behalf of Defendant BNB Engineering, Inc.
200 Sandpointe, 4th Fl
Santa Ana, CA 92707

Vivian Le on behalf of Creditor WEC Corporation
Gary R King & Associates
30950 Rancho Viejo Rd Ste 155
San Juan Capistrano, CA 92675

Michael D. May on behalf of Defendant RJ Noble Co.
250 W First St, Ste 256
Claremont, CA 91711

Mark E McKane on behalf of Creditor SC Master Holdings II LLC
Kirkland & Ellis LLP
555 California St
San Francisco, CA 94104

Louis R Miller on behalf of Plaintiff Acton Estates LLC
1999 Ave of the Star Ste 1000
Los Angeles, CA 90067

Gerald W Mouzis on behalf of Creditor Hillcrest Contracting, Inc.
The Mouzis Law Firm APC
13681 Newport Ave Ste 8-605
Tustin, CA 92680

Richard Pachulski on behalf of Creditor Lehman ALI, Inc.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Bl Ste 1100
Los Angeles, CA 90067-4003

Martin Pritikin on behalf of Debtor Palmdale Hills Property, LLC
Miller Barondess, LLP
1999 Avenue of the Stars, Ste 1000
Los Angeles, CA 90067

Raymond D Scott on behalf of Defendant Kip Incorporated
1835 W Orangewood Ave Ste 255
Orange, CA 92868

Kimberly A Soyer on behalf of Defendant Marques Pipeline, Inc.
251 Lafayette Cir, Ste 350
Lafayette, CA 94549

Steven M Speier
4100 Newport Place 3rd Floor
Newport Beach, CA 92660

Joseph L Strohman on behalf of Creditor SME Construction, Inc
Ferguson Case Orr Paterson LLP
1050 S Kimball Rd
Ventura, CA 93004

Theresa Crawford Tate on behalf of Defendant Chino Grading, Inc.
Crawford & Bangs LLP
1290 E Center Crt Dr
Covina, CA 91724

Robert S Throckmorton on behalf of Creditor Paula Cunningham
Throckmorton, Beckstrom & Tomassian, LLP
2 Corporate Park, Ste 210
Irvine, CA 92606-5115

Weiland Golden Smiley Wang Ekvall & Strok, LLP
650 Town Center Dr Ste 950
Costa Mesa, CA 92626

Douglas F Welebir on behalf of Creditor Nancy and John Probst
Welebir Tierney & Weck
2068 Orange Tree Ln Ste 215
Redlands, CA 92374

**Exhibit B**

See Attached.

Richard N. Pachulski (CA Bar No. 90073)
Dean A. Ziehl (CA Bar No. 84529)
Robert B. Orgel (CA Bar No. 101875)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760

Edward Soto (admitted *pro hac vice*)
Shai Waisman (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC and OVC Holdings LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

In re:
Palmdale Hills Property, LLC, and its Related Debtors,
Jointly Administered Debtors
and Debtors-In-Possession

Affects:
☐ All Debtors
☑ Palmdale Hills Property, LLC
☑ SunCal Beaumont Heights, LLC
☑ SCC/Palmdale, LLC
☑ SunCal Johannson Ranch, LLC
☑ SunCal Summit Valley, LLC
☑ SunCal Emerald Meadows, LLC
☑ SunCal Bickford Ranch, LLC
☑ Acton Estates, LLC
☑ Seven Brothers, LLC
☑ SJD Partners, Ltd.
☐ SJD Development Corp.
☑ Kirby Estates, LLC
☑ SunCal Communities I, LLC
☑ SCC Communities LLC
☐ SunCal Communities III, LLC
☑ North Orange Del Rio Land, LLC
☑ Tesoro SF, LLC
☑ LB/L-SunCal Oak Valley, LLC
☑ SunCal Heartland, LLC
☑ LB/L-SunCal Northlake, LLC
☑ SunCal Marblehead, LLC
☑ SunCal Century City, LLC
☑ SunCal PSV, LLC
☑ Delta Coves Venture, LLC
☑ SunCal Torrance Properties, LLC
☑ SunCal Oak Knoll, LLC

Case No.: 8:08-bk-17206-ES
Chapter 11

Jointly Administered Case Nos. 8:08-bk-17209-ES; 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES; 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES; 8:08-bk-17573-ES; 8:08-bk-17574-ES; 8:08-bk-17575-ES; 8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES; 8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES; 8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-bk-17588-ES

**AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY LEHMAN LENDERS**

**<u>Hearing</u>:**
Date: October 15, 2009
Time: 2:00 p.m.
Place: Courtroom 5A
411 West Fourth Street
Santa Ana, CA 92701

**[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE LEHMAN PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT]**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. INTRODUCTION | | 1 |
| 1.1 | Summary of this Disclosure Statement. | 1 |
| 1.2 | Purpose of this Document. | 7 |
| 1.3 | Court Approval of this Document | 8 |
| 1.4 | Competing Plans. | 8 |
| 1.5 | Summary of the Lehman Plan | 9 |
| 1.6 | Recommendations. | 20 |
| II. PLAN CONFIRMATION DEADLINES | | 21 |
| 2.1 | Time and Place of the Confirmation Hearing. | 21 |
| 2.2 | Deadline for Voting for or Against the Lehman Plan. | 21 |
| 2.3 | Deadline for Objecting to the Confirmation of the Lehman Plan. | 21 |
| 2.4 | Identity of Person to Contact for More Information Regarding the Lehman Plan. | 22 |
| 2.5 | Disclaimer. | 22 |
| III. BACKGROUND OF THE DEBTORS | | 23 |
| 3.1 | The SunCal Companies and the Debtors. | 23 |
| 3.2 | The Debtors' Primary Assets. | 24 |
| 3.3 | Debt and Capital Structure. | 28 |
| 3.4 | Asset Values | 32 |
| 3.5 | A Summary of the Lehman Creditors' Loans. | 34 |
| 3.6 | Filing of Proofs of Claim with Respect to the Lehman Loans. | 37 |
| 3.7 | Summary of the Debtors' Cash | 38 |
| IV. DEBTORS' ALLEGED CLAIMS AGAINST THE LEHMAN LENDERS | | 39 |
| 4.1 | Introduction. | 39 |
| 4.2 | The Debtors' Disputes Relating to the Allowed Secured Claims of Fenway Capital Pursuant to Bankruptcy Code Section 506. | 40 |
| 4.3 | The Elieff Plan Proponents Assertions regarding Fraudulent Transfer Actions Against the Lehman Lenders Arising under Various Cross-Collateralized Lehman Loans. | 41 |
| 4.4 | Alleged Preference Claims Against the Lehman Lenders. | 43 |
| 4.5 | The Equitable Subordination Claims Relating to the Lehman Lenders' Claims. | 44 |
| 4.6 | Alleged Fraud, Breach of Fiduciary Duty and Other Potential Litigation Claims Against the Lehman Lenders. | 46 |
| V. THE ELIEFF PLAN IS UNCONFIRMABLE | | 46 |
| 5.1 | Consideration of the Elieff Plan is Premature | 46 |
| 5.2 | The Acquisitions Offer is Vague, Incomprehensible and Illusory | 47 |
| 5.3 | The Separate Classification of Class 9 is Improper | 47 |
| 5.4 | The Plan is Predicated Upon Substantive Consolidation of the Debtors. | 48 |
| 5.5 | The Distribution Scheme of the Plan is Untenable | 49 |
| 5.6 | The Elieff Plan's Treatment of the Lehman Creditors' Claims is Unconfirmable. | 49 |
| 5.7 | The Elieff Plan Violates the Absolute Priority Rule | 52 |
| 5.8 | The Appointment of Acquisitions as the Elieff Plan Trustee Violates Bankruptcy Code Section 1129(5)(a)(II) | 53 |
| 5.9 | The Terms of the Acquisitions Administrative Loan are Indefinite | 54 |
| 5.10 | The Elieff Plan Violates the Best Interest of Creditors Test | 55 |
| 5.11 | The Elieff Plan's Treatment of Class 1 and Class 2 Secured Real Property Tax Claims Violates the Express Provisions of Bankruptcy Code Section 1129 (a)(9)(c) | 55 |
| VI. SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES | | 56 |
| 6.1 | Voluntary Debtors. | 56 |
| 6.2 | Trustee Debtors. | 56 |
| 6.3 | The Debtors' Motion for Relief from Stay in the Lehman Commercial Chapter 11 Proceedings. | 57 |
| 6.4 | Certain of the Voluntary Debtors' Motion for Surcharge and Use of Cash Collateral | 57 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6.5 Lehman Commercial's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects. .... 58
6.6 The Debtors' Filing of the ES Action Against the Lehman Lenders. .... 58
6.7 Certain Debtors' Filing of the Sales Procedures Motion. .... 59
6.8 The Lehman Administrative Loans. .... 61
6.9 The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims. .... 63
6.10 The Debtors' Motion Pursuant to Bankruptcy Code Section 506(d). .... 63
6.11 The Debtors' Motions to Strike the Claims and Pleadings Arising from the Repurchase Lehman Loans .... 64
6.12 The Debtors' Denied Preliminary Injunction Motion Against the Holders of Bond Claims. .... 64
6.13 The Non-Lehman Related Primary Secured Lenders' Motions for Relief from Stay. .... 65
6.14 The Rubidoux 60 Litigation. .... 65
6.15 Church Litigation. .... 67
6.16 Mechanic's Lien Claims. .... 67
6.17 The Debtors' Potential Preferential Transfers. .... 68
6.18 The Debtors Substantive Consolidation Motion .... 70
6.19 Debtors' and Lehman Lenders' Motions to Approve Administrative Loans for Payment of Professionals .... 70
VII. LEHMAN CREDITORS' PLAN .... 71
7.1 Treatment of Unclassified Claims. .... 71
7.2 Treatment of Allowed Administrative Claims. .... 71
7.3 Treatment of Priority Unsecured Tax Claims. .... 73
7.4 Treatment of Unavoided Liens Securing Claims That Are Not Allowed. .... 74
7.5 Classification Of Claims And Interests. .... 74
7.6 Treatment Of Classified Claims And Interests .... 93
VIII. ACCEPTANCE OR REJECTION OF THE LEHMAN PLAN .... 106
8.1 Introduction. .... 106
8.2 Who May Object to Confirmation of the Lehman Plan. .... 106
8.3 Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims and for Holders of ES Claims or General Unsecured Claims. .... 106
8.4 What Is an Allowed Claim/Interest. .... 107
8.5 What Is an Impaired Class. .... 107
8.6 Who Is Not Entitled to Vote. .... 107
8.7 Who Can Vote in More than One Class. .... 108
8.8 Votes Necessary for a Class to Accept the Lehman Plan. .... 108
8.9 Treatment of Nonaccepting Classes. .... 108
8.10 Request for Confirmation Despite Nonacceptance by Impaired Class(es). .... 109
IX. MEANS OF EXECUTION AND IMPLEMENTATION OF THE LEHMAN PLAN .... 109
9.1 Introduction. .... 109
9.2 The Liquidating Trustee. .... 109
9.3 The Guaranteed Minimum Distribution Will be Held in the Plan Reserve to Assure a Minimum Amount for Creditors without Security or Priority. .... 110
9.4 Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee. .... 113
9.5 The Committee(s). .... 114
9.6 Lehman Post-Confirmation Loans. .... 114
9.7 Plan Reserve and Post-Confirmation Accounts. .... 118
9.8 Disposition of Assets .... 119
9.9 Equitable Subordination Claims .... 137
9.10 Post-Petition Expenses, Intercompany Loans and Payables and Priorities in Payment. .... 143
9.11 Plan Release. .... 148
9.12 Entry of Final Decrees. .... 150
9.13 Dissolution of Committees and Discharge of Trustee and Liquidating Trustee. .... 150
9.14 The Effective Date Cash Funding and Plan Feasibility .... 150

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

X. DISTRIBUTIONS ........ 150
10.1 Distribution Agent. ........ 150
10.2 Distributions........ 151
10.3 Old Instruments and Securities. ........ 151
10.4 De Minimis Distributions and Fractional Shares. ........ 152
10.5 Delivery of Distributions. ........ 152
10.6 Unclaimed Property. ........ 152
10.7 Disposition of Unclaimed Property. ........ 153
XI. OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ........ 153
11.1 Standing for Objections to Claims. ........ 153
11.2 Treatment of Disputed Claims. ........ 154
XII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 155
12.1 Executory Contracts Potentially Being Assumed. ........ 155
12.2 Executory Contracts Being Rejected. ........ 155
12.3 Retention of Property Rights by Lehman Nominees or Liquidating Trustee. ........ 155
12.4 Bar Date for Rejection Damages. ........ 156
XIII. BEST INTEREST OF CREDITORS TEST ........ 156
XIV. PLAN FEASIBILITY ........ 159
XV. EFFECT OF CONFIRMATION OF THE LEHMAN PLAN ........ 159
XVI. LIMITATION OF LIABILITY ........ 160
**16.1** No Liability for Solicitation or Participation. ........ 160
16.2 Limitation of Liability........ 160
XVII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE LEHMAN PLAN 161
17.1 Conditions Precedent to Plan Confirmation. ........ 161
17.2 Conditions Precedent to Plan Effectiveness. ........ 161
XVIII. RETENTION OF JURISDICTION ........ 162
XIX. MODIFICATION OF PLAN........ 162
19.1 Modification of Plan. ........ 162
19.2 Nonconsensual Confirmation........ 162
XX. MISCELLANEOUS ........ 162
20.1 Payment of Statutory Fees. ........ 162
20.2 Payment Dates. ........ 163
20.3 Headings. ........ 163
20.4 Other Documents and Actions. ........ 163
20.5 Notices. ........ 163
20.6 Governing Law. ........ 164
20.7 Binding Effect. ........ 164
20.8 Successors and Assigns........ 164
20.9 Severability of Plan Provisions. ........ 164
20.10 No Waiver. ........ 165
20.11 Inconsistencies. ........ 165
20.12 Exemption from Certain Transfer Taxes and Recording Fees........ 165
20.13 Post-Confirmation Status Report. ........ 165
20.14 Post-Confirmation Conversion/Dismissal. ........ 166
20.15 Final Decree. ........ 166
XXI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE LEHMAN PLAN ........ 166
21.1 Consequences to Holders of Lehman Secured Claims and Danske Bank Secured Claims 168
21.2 Consequences to Holders of General Unsecured Claims. ........ 169
21.3 Distributions in Discharge of Accrued but Unpaid Interest........ 170
21.4 Character of Gain or Loss ........ 171
21.5 Information Reporting and Withholding ........ 171
XXII. CONCLUSION ........ 172

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

APPENDIX "A" ..... 174
DEFINITIONS AND RULES OF INTERPRETATION ..... 174

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE LEHMAN PLAN.

Creditors Lehman Commercial Paper Inc., Lehman ALI, Inc., Northlake Holdings LLC, and OVC Holdings LLC, each in its capacity as agent for the Lehman Successors, and/or as agent and lender in its own right, with respect to the applicable Lehman Loans (referred to herein as both the Lehman Proponents, with reference to their role as proponents of this Plan, and as the Lehman Lenders, with reference to their other capacities) have proposed a plan (the "Lehman Plan") under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") for twenty-four (24) of the Debtors (referred to herein as the "Plan Debtors"), and submit this disclosure statement in support of the Lehman Plan (the "Disclosure Statement" or "Lehman Disclosure Statement").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# I.

# INTRODUCTION

## 1.1 Summary of this Disclosure Statement.[1]

The Lehman Plan is being proposed by the Lehman Lenders. They and the Lehman Successors (collectively, the "Lehman Creditors") are owed approximately $2 billion of debt that is secured by Liens on Assets of the Debtors. The Lehman Plan is designed to enable a reasonable resolution of the financial distress of the Plan Debtors. It is offered as a counterpoint to another plan, the Elieff Plan (defined below), and to the course of action for the Debtors proposed by the Elieff Plan's sponsor, an indirect parent of each Debtor, SCC Acquisitions, Inc. ("Acquisitions"), for which Bruce Elieff ("Elieff") is its sole owner and manager.

The Debtors are hopelessly insolvent. The Debtors collectively own 18 Remaining Real Estate Projects and certain related Cash with an estimated collective value of $350 million to $600 million (the Debtors' valuations represent the lower sums). The Debtors collectively owe debts of approximately $2.4 billion to various creditors holding Claims not secured by collateral and

[1] While good faith effort has been made to make the Plan and Disclosure Statement consistent in all respects, if there are any discrepancies between the Plan and the Disclosure Statement, the Plan controls, and if there are any discrepancies between the summaries provided in sections 1.1 and 1.5 of the Disclosure Statement and the other provisions of this Disclosure Statement, the other provisions shall control.

to the Lehman Creditors. Importantly, however, of this debt, Elieff and his wife personally guaranteed payment of approximately $230 million in Bond Obligations potentially owed to Bond Safeguard and Arch.

Elieff and Acquisitions appear to claim that the centerpiece of the Elieff Plan and their proposed course for the Debtors is the pursuit of various Litigation Claims, consisting primarily of certain Equitable Subordination Claims against Lehman Related Parties, and an offer, that appears illusory and/or unfunded, to purchase Claims entitled to the benefits of a judgment for equitable subordination at ten cents on the dollar. The Equitable Subordination Claims essentially are premised on a contention that certain Lehman Related Parties acted so egregiously that their approximately $2 billion in Claims and Liens against the Debtors and their respective Assets should be subordinated to the Claims of all Creditors harmed by such alleged misconduct.

The Lehman Creditors dispute these Litigation Claims against the Lehman Related Parties and believe them to be just a smokescreen. The Elieff Plan and the proposed course of action of Acquisitions and Elieff are designed primarily to provide Elieff the personal benefit of reducing or eliminating his personal liability with respect to the Bond Obligations. The Elieff Plan is centered upon a sale (that Acquisitions and Elieff have arranged and proposed) of certain Remaining Real Estate Projects to D.E. Shaw or another bidder at an under-market price, but on terms that require all of the likely liability for the Elieff guaranteed Bond Obligations to be assumed and satisfied by the buyer, whether or not any other Holder of an unsecured, non-priority Claim gets paid anything at all. (According to the Debtors' Third Amended Disclosure Statement - Exhibit 6, notes - Bond Obligations of $157 million are paid or resolved by the proposed sale to D.E. Shaw. Instead, the Projects should be sold free and clear of those Claims to achieve a higher Cash price and return to the Estate.)

Pursuit of the Equitable Subordination Claims represents a 'lottery ticket' litigation strategy. Besides having to prove inequitable conduct by the Lehman Related Parties, the benefits of any such litigation would be somewhat limited unless the Estates of the various Debtors could be merged (*e.g.*, substantively consolidated) so that values payable to the Lehman Creditors in their capacity as Creditors of one particular Debtor could be used instead to pay Creditors of another

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtor. To succeed, the Elieff Plan requires that the Debtors' Estates be substantively consolidated, requiring the Debtors to meet high evidentiary hurdles. None of the factors required for substantive consolidation (either the hopeless intermingling of the assets and liabilities of the Debtors or the treatment of the Debtors by the Creditors as a consolidated, single enterprise) are satisfied in this instance. The Lehman Creditors believe that there is no basis for such substantive consolidation and that the Lehman Related Parties not only will prevail in defending the Equitable Subordination Claims, but would also defeat any effort to substantively consolidate these Estates.

More importantly, even if the Debtors are able to overcome the legal obstacles they face in confirming the Elieff Plan, the litigation attendant to the two cornerstones of the Elieff Plan could take years to resolve – thus depriving the Debtors' Creditors from access to any payment on account of their Allowed Claims until resolution of such litigation, all the while forcing the Creditors to bear the risk of the inevitable protracted litigation.

For Elieff's and Acquisition's course of action to work in eliminating Elieff's personal liability for the Bond Obligations, they must ensure that the Lehman Creditors cannot credit bid so that D.E. Shaw (or another entity willing to pay less Cash but assume the Bond Obligations or replace the applicable payment and performance bonds) can purchase certain of the Remaining Real Estate Projects, because the Lehman Creditors or their nominees who would take title to those Projects would not commit up front to, and ultimately might not at all, assume the Bond Obligations or otherwise agree to replace the applicable payment and performance bonds (thereby eliminating the Bond Obligations associated with such bonds), which appears to be Elieff's and Acquisitions goal. However, the Lehman Creditors do want the ability to credit bid and to thus control at least certain of the Remaining Real Estate Projects. Accordingly, they have proposed the Lehman Plan.

Whereas Elieff and Acquisitions are out-of-the-money parties focused on providing Elieff substantial personal benefits through a flawed sale process and offering other Creditors only a speculative 'lottery ticket' litigation strategy, which could take years to resolve, the Lehman Creditors, on the other hand, are in-the-money Creditors holding substantial Claims secured by valuable Liens on the Assets of the Debtors. To protect their valuable position in these Cases, the Lehman Proponents have offered Creditors through the Lehman Plan what the Lehman Creditors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

believe is a better alternative than the Elieff Plan:

First, the Lehman Lenders have agreed that on the Plan's Effective Date they will deposit $10 million through new Cash transfers to the independent trustee to be appointed by the Court to oversee the liquidation of the Debtors' Estates following Plan Confirmation (Liquidating Trustee) to serve as a reserve for a guaranteed minimum recovery (the Guaranteed Minimum Distribution) from the Lehman Lenders for Creditors who have no security interest in any of the Assets of the Debtors and whose Claims have no priority over General Unsecured Claims[2]. This Guaranteed Minimum Distribution is to be reduced by the amount of any actual ES Final Judgments obtained by the Liquidating Trustee for any group of Creditors, reduced further by a certain portion of settlement payments made in connection with the ES Settlement Offer described below, and is subject to certain conditions relating to assuring the Lehman Creditors the right to credit bid – the Credit Bid Conditions. The Guaranteed Minimum Distribution could not be paid until after the ES Action is finally determined or settled.

Second, the Lehman Lenders also are offering certain Creditors (*i.e.*, ES Claimants) that it believes may hold Allowed Claims (Allowed ES Claims) that arguably would benefit from any judgment (ES Final Judgment) with respect to the pending action seeking equitable subordination (ES Action), the choice of accepting their pro rata share of a $15 million aggregate settlement offer (the ES Settlement Offer) projected to yield at least 6.6% on their Claims, payable as soon after the Effective Date as their Allowed Claims are determined by the Liquidating Trustee to be Allowed. The Lehman Plan also requires an expedited process for determining whether the ES Claims of ES Claimants are Allowed.

Third, the Lehman Plan provides a more appropriate auction process for the Remaining Real Estate Projects that leaves bidders free to agree to assume or not to assume the Bond Obligations. Significantly, this process does afford the Lehman Creditors the right to credit bid at the auction sales, and they are committing to bid their aggregate appraised values of $435.7 million for certain Projects, but this process also requires that the Lehman Creditors or their

[2] The Lehman Creditors believe that the Trustee and Danske Bank are in the process of documenting a settlement with respect to SunCal Century City. Thus, the SunCal Century Creditors without priority or security are not included among those to share in the Guaranteed Minimum Distribution from the Lehman Creditors.

nominees to whom the Projects are conveyed (the Lehman Nominees) grant deeds of trust (PRA Recovery Deeds of Trust) on every Project as to which a Lehman Creditor is the successful bidder, as discussed below (the PRA Security Projects). This right to credit bid and the requirement for providing PRA Recovery Deeds of Trust on the PRA Security Projects are included in the Plan pursuant to Bankruptcy Code Section 1123(a) and are intended as a supplement and alternative to whatever rights and remedies parties otherwise would have for a sale under Bankruptcy Code Section 363.

Fourth, under the Lehman Plan, the Lehman Lenders also make substantial funds available for Confirmation and implementation of the Plan. Besides their contribution of $10 million as the reserve for the Guaranteed Minimum Distribution, the Lehman Lenders also are agreeing to fund up to an additional $5 million of new Cash and, significantly, use of Cash Collateral of the Lehman Creditors, which is believed to be at least $18.87 million. Although the Cash Collateral is owned by Debtors, the Lehman Lenders claim it is part of their collateral, that they will be entitled to turnover of such sums upon defeating the ES Action and that, absent their consent, the Cash Collateral could be used by the Debtors and Trustee for only limited purposes and, even then, only if the Debtors or Trustee overcame significant legal hurdles. Thus, the Lehman Lenders believe that their agreement to permit use of the Cash Collateral under the Lehman Plan has substantial value.

Finally, under the Lehman Plan, ES Claimants that elect not to vote to accept the ES Settlement Offer and instead to continue to wait for resolution of the ‘lottery ticket’ litigation are provided certain valuable concessions intended as part of the *quid pro quo* for the Lehman Creditors obtaining the right to credit bid:

(1) The Lehman Creditors are agreeing to use good faith efforts to obtain a waiver of the defense to the ES Action from Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, subject to conditions relating to assuring the Lehman Creditors the right to credit bid – the Credit Bid Conditions.

(2) The Lehman Creditors are providing collateral for satisfaction of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

all ES Final Judgments or Cross-Collateralization Final Judgments (collectively referred to as the Project Related Action Recoveries) through the PRA Recovery Security Pool (comprised of the Plan Reserve and the PRA Recovery Deeds of Trust). If third parties purchase the Project on which the Lehman Creditors are bidding, the proceeds are to be held as Cash in the Plan Reserve. If the Lehman Creditors' credit bids are successful, deeds of trust (PRA Recovery Deeds of Trust) will be granted to the Liquidating Trustee for each such Project (PRA Security Project).

(3) The Lehman Creditors have agreed that excess values (*i.e.*, values in excess of the Allowed ES Claims against the applicable Debtor who owned a particular Project prior to the transfer of the same to a Lehman Nominee) otherwise available to pay the Lehman Creditors from certain Projects are to remain as collateral in the PRA Recovery Security Pool to address the possibility of shortfalls in the amount of proceeds available from some applicable Estates to satisfy the amount of any ES Final Judgments that may be obtained for ES Claimants of those Estates. The PRA Recovery Security Pool will secure all ES Final Judgments and the Lehman Creditors are agreeing, to their detriment, that they cannot simply pay a particular ES Final Judgment to obtain a release of the PRA Recovery Deed of Trust on the Project and retain for themselves, as a Creditor of that Estate, the residual value from the Project. Rather, as a concession to encourage approval of the Lehman Plan, the Lehman Creditors are agreeing, as more fully set forth below, that their payment of such particular ES Final Judgment would not result in a release of any PRA Recovery Deed of Trust unless all Project Related Action Recoveries were satisfied.

(4) The Lehman Creditors are making available the ES Litigation Loan to enable continued prosecution of the Equitable Subordination Claims in the ES Action, subject to specified conditions. As indicated above, the Lehman Creditors believe that the ES Action is not meritorious and is being prosecuted in large part as part of a course of action designed to benefit Elieff and Acquistions and is subject to a contingency fee arrangement. The ES Litigation Loan requires continued prosecution of the ES Action on a contingency fee basis and thus is available to fund a portion of the substantial expenses associated with continued prosecution of the ES Action. Such funding, however, only is available for replacement counsel to be selected by the Liquidating Trustee.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(5) As to the Estates of Del Rio and SJD Partners only, Lehman ALI and Fenway Capital will waive an objection or defense, that, even if the applicable Lehman Secured Claim was ignored, there was insufficient value in those Estates to pay their Allowed ES Claims and, as to SJD Partners, that they are inappropriate defendants as to a non-recourse judgment secured by the PRA Recovery Security Pool. To obtain this waiver and thus facilitate the entry of an ES Judgment against a Lehman Lender or Fenway, the Estates of Del Rio and SJD Partners must execute the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date essentially releasing all Claims against the Lehman Related Parties other than the ES Claims of Del Rio and SJD Partners.

### 1.2 <u>Purpose of this Document.</u>

The Lehman Disclosure Statement is submitted in accordance with 11 U.S.C. § 1125 and contains information regarding the Lehman Plan, a copy of which accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Lehman Plan. The Lehman Disclosure Statement describes the Lehman Plan and contains information concerning, among other matters: (1) the history, business, results of operations, assets and liabilities of the Debtors, (2) the business plan (*e.g.*, to liquidate) that is to be implemented following confirmation of the Lehman Plan, (3) risk factors to be considered in voting on the Lehman Plan, and (4) certain tax considerations of the Lehman Plan.

The Lehman Disclosure Statement also contains a discussion of the proposed Elieff Plan, for which solicitation might be permitted by the Bankruptcy Court simultaneously with the Lehman Plan. If so, the discussion herein of the Elieff Plan would supplement, but not replace, a discussion thereof in the Elieff Disclosure Statement.

The Lehman Creditors strongly urge you to review carefully the contents of this Lehman Disclosure Statement and the Lehman Plan (including the exhibits to each) before making a decision to accept or reject the Lehman Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Holder of a Claim or Interest.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Lehman Plan will

affect you and your best course of action.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

- **WHO CAN VOTE OR OBJECT TO THE LEHMAN PLAN;**
- **HOW YOUR CLAIM OR INTEREST IS TREATED;**
- **HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE ON ACCOUNT OF YOUR CLAIM OR INTEREST IN LIQUIDATION;**
- **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDINGS;**
- **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE LEHMAN PLAN;**
- **WHAT IS THE EFFECT OF CONFIRMATION; AND**
- **WHETHER THE LEHMAN PLAN IS FEASIBLE.**

### 1.3 Court Approval of this Document.

The Bankruptcy Court approved the Lehman Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor, typical of Holders of Claims or Interests receiving the Lehman Disclosure Statement, to make an informed judgment about the Lehman Plan. This approval enabled the Lehman Creditors to send you this Disclosure Statement and solicit your acceptance of the Lehman Plan. The Bankruptcy Court has not, however, ruled on the Lehman Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

### 1.4 Competing Plans.

At the same time that the Lehman Creditors are seeking to have the Bankruptcy Court confirm the Lehman Plan, it appears that Acquisitions and Elieff are seeking to have the Bankruptcy Court instead confirm the Elieff Plan. As noted above, the Lehman Creditors contend that the Elieff Plan is unconfirmable (*see* Article V, below). Assuming, however, that both the Elieff Plan and the Lehman Plan are confirmable, you may vote to accept or reject: the Lehman Plan; the Elieff Plan; both plans; or neither of them, irrespective of how you vote (if at all) on the other plan. The Bankruptcy Court may confirm only one plan for each Debtor (although it could conceivably

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

confirm one plan as to some of the Debtors and another plan as to some of the other Debtors). The Bankruptcy Court will have discretion in determining which plan of reorganization to confirm but ". . . shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

**1.5 Summary of the Lehman Plan.**

The summary of the Lehman Plan that follows in this Section 1.5 is not intended to substitute for the more specific terms set forth in the Lehman Plan. If there are any discrepancies between the summary provided in this Section 1.5 and the Lehman Plan, the provisions of the Lehman Plan shall control. Additionally, the Cases of the Plan Debtors have been jointly administered, but not substantively consolidated. Accordingly, the Lehman Plan provides separate treatment for Holders of Claims and Interests against each Plan Debtor. The following is a general outline of the Lehman Plan.

**(a) Plan Debtors.** The Lehman Plan applies to 24 of the 26 Debtors, being all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**(b) Generally.** The Lehman Creditors (*i.e.*, the Lehman Lenders and Lehman Successors) are owed, collectively, approximately $2 billion secured by deeds of trust on certain of the Remaining Real Estate Projects, certain Cash Collateral and other Assets of the Plan Debtors' Estates. The Debtors have challenged the Lehman Creditors' Secured Claims, contending that (a) certain of the Lehman Creditors' Liens on the Assets of particular Plan Debtors who are obligors under certain Lehman Loans are subject to being set aside because, among other things, other affiliated Debtors, rather than the obligor Plan Debtors, received the benefit of such Lehman Loans (the Cross-Collateralization Claims), and (b) the Claims of the Lehman Creditors should be subordinated to the Claims of certain other Creditors allegedly harmed by the conduct of the Lehman Lenders (the Equitable Subordination Claims). Significantly, the Debtors also have alleged that as a result of these disputes, the applicable Lehman Creditors should not have the right to credit bid in connection with a sale of the Projects owned by the Trustee Debtors. The Lehman Lenders do not concur with these conclusions of the Debtors or with many of the factual contentions asserted as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

supporting or providing a basis for the Cross-Collateralization Claims and/or Equitable Subordination Claims.

Nonetheless, to enable the Plan Debtors to emerge from bankruptcy, which the Lehman Lenders believe is in the interest of all Creditors, with a Plan that is fair to all constituencies and best preserves current values and prevents further deterioration in the values of the Assets of the Plan Debtors, the Lehman Proponents have proposed the Lehman Plan. Through the Lehman Plan:

(a) The Lehman Lenders will fund $10 million on the Plan's Effective Date from new transfers of Cash to provide a reserve for a Guaranteed Minimum Distribution payable to Creditors without priority or security (which $10 million amount can be reduced or eliminated if, *inter alia*, the Credit Bid Conditions are not met or ES Final Judgments are rendered in a sufficient amount, all as reflected in the definition below of "Guaranteed Minimum Distribution");

(b) The Lehman Proponents are making an offer to settle the Equitable Subordination Claims in the ES Action through the ES Settlement Offer ($15 million if all eligible Creditors settle and less if fewer settlements occur) and will make available funding for the ES Settlement Offer either through new Cash transfers or through the use of Cash Collateral;

(c) Auctions of the Remaining Real Estate Projects would occur within sixty (60) days after the Plan's Effective Date (in accordance with the Lehman Plan Sale Procedures specified in the Plan), at which third parties may bid and, significantly, at which the Lehman Creditors and other Holders of Allowed Secured Claims may credit bid; provided that any Project acquired by a Lehman Nominee as a result of a credit bid under this Plan shall be subject to a deed of trust (the PRA Recovery Deed of Trust) to be granted to the Liquidating Trustee by the applicable Lehman Nominee as part of a PRA Recovery Security Pool, which serves as collateral for any ES Final Judgment (a final judgment granting some form or manner of equitable subordination in the ES Action, as more fully defined below) and any Cross-Collateralization Final Judgments;

(d) Means and a framework are provided for liquidation of the Remaining Other Assets and the distribution of any Residual Cash for Holders of Allowed Claims; and

(e) As part of the *quid pro quo* for the Lehman Plan and for the ability under

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Lehman Plan of the Lehman Creditors to obtain control of their collateral through credit bids, the Lehman Creditors are agreeing to afford valuable benefits to the Creditors who are eligible to vote to have the Estates settle their ES Claims (ES Claimants), but who do not settle, which benefits may facilitate the Liquidating Trustee obtaining for such Creditors an ES Final Judgment or may facilitate the Liquidating Trustee's collection of any such judgment. These protections are summarized as follows:

(i) The Lehman Lenders will make available the ES Litigation Loan to enable continued prosecution of the Equitable Subordination Claims in the ES Action;

(ii) The Lehman Creditors are waiving or endeavoring to waive certain defenses, including a defense by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, and granting certain specific concessions, described below, that could facilitate the entry and collection of an ES Final Judgment for the Estates of Debtors SJD Partners or Del Rio;

(iii) The Lehman Creditors are providing security for satisfaction of both ES Final Judgments and Cross-Collateralization Final Judgments; and

(iv) To address the possibility of shortfalls in the amount of proceeds available from some applicable Estates to satisfy the amount of any ES Final Judgments that may be obtained for ES Claimants of those Estates, the Lehman Creditors are agreeing to offer as additional collateral for all ES Final Judgments a pool of certain Cash and deeds of trust (PRA Recovery Deeds of Trust) on all Projects on which Lehman Creditors successfully credit bid under the Lehman Plan or which are sold to a third party, such that, where the proceeds of a sale or disposition of a Project *exceeds* any ES Final Judgment of the particular Estate which had owned such Project, such excess proceeds would be available to satisfy other ES Final Judgments at Estates where there was a shortfall.

**(c)** **Liquidating Trustee.** A Liquidating Trustee, to be nominated by one or the other of the two Official Committees of Creditors Holding Unsecured Claims (the Committees), shall be appointed to oversee the realization of values from the Remaining Real Estate Projects and the Remaining Other Assets for the benefit of the Creditors of the Plan Debtors. The

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

values of the Remaining Real Estate Projects and Remaining Other Assets (net of Post-Confirmation Expenses) shall be distributed to the respective Creditors of the applicable Plan Debtors in accordance with the strict priority rules of the Bankruptcy Code, applied on a Plan Debtor-by-Plan Debtor basis, except as otherwise provided in the Lehman Plan and described below. No Assets from the Estates of the Plan Debtors created under law upon the commencement of the Plan Debtors' Cases will be left with the Plan Debtors on the Effective Date; instead, such Assets will remain vested in the Plan Debtors' Estates to be administered by the Liquidating Trustee, although the Liquidating Trustee could elect thereafter to abandon to the Lehman Debtors Assets of inconsequential value to the extent permitted in the Lehman Plan.

**(d) The Guaranteed Minimum Distribution Will be Held in the Plan Reserve to Assure a Minimum Amount for Creditors without Security or Priority.** On the Effective Date, the Lehman Lenders will pay the Liquidating Trustee $10 million from new Cash transfers (rather than from existing Cash Collateral) to be held in the Plan Reserve for the Guaranteed Minimum Distribution. Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied, the Guaranteed Minimum Distribution will be calculated (*i.e.*, $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third of the aggregate ES Pro Rata Settlement Payments). Thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those holders of Allowed General Unsecured Claims (other than the general unsecured claims against SunCal Century City) and Allowed Non-Settled ES Claims who provide the Lehman Lenders a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the Guaranteed Minimum Distribution, all as more fully set forth in Plan Section 7.3.

As and to the extent reflected in the definition of "Guaranteed Minimum Distribution," the payment of ES Pro Rata Settlement Payments and entry of an ES Final Judgment each result in a reduction in the Guaranteed Minimum Distribution. Simultaneously with the payment of any ES Pro Rata Settlement Payments, the Liquidating Trustee shall return to the Lehman Lenders or their designee from the Plan Reserve one-third (1/3rd) of the amount of such ES

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Pro Rata Settlement Payments (not to exceed the remaining amount on reserve for the Guaranteed Minimum Distribution). Additionally, upon entry of each and any ES Final Judgment (each or any of which, under the Plan, are secured by the PRA Recovery Security Pool), one hundred percent (100%) of the amount of such ES Final Judgment (not to exceed the remaining amount on reserve for the Guaranteed Minimum Distribution), at the election of the Lehman Lenders, either shall: (1) be applied by the Liquidating Trustee to such ES Final Judgment or (2) be returned from the Plan Reserve by the Liquidating Trustee to the Lehman Lenders or their designee.

In exchange for the funding the $10 million reserve by the Lehman Lenders for the Guaranteed Minimum Distribution, each eligible Creditor also must grant a release of all claims against the Lehman Releasees or any future owners of the applicable Project(s) as to, or to the extent attributable to, or to the extent any recovery is payable with respect to, any or all of the Claims of such Creditor (the "Minimum Distribution Release and Assignment" as more fully set forth and defined in the Lehman Plan).

**(e) Disposition of the Remaining Real Estate Projects.** Within sixty (60) days after the Effective Date, the Liquidating Trustee shall sell or convey after auction each of the Remaining Real Estate Projects for which the Successful Bidder is either a third party purchaser, a Lehman Nominee or another Holder of an Allowed Secured Claim, all pursuant to the Lehman Plan Sale Procedures set forth in the Lehman Plan. Under the Lehman Plan, the Lehman Creditors are afforded the ability to credit bid up to the amount of their Claims as specified in Article IV of the Lehman Plan on a Project-by-Project basis; provided, however, that each of the Remaining Real Estate Projects conveyed to a Lehman Nominee shall become subject to a PRA Recovery Deed of Trust for the protection of the applicable Estate and its Creditors as and to the extent set forth in the Lehman Plan. The Lehman Creditors are committing in connection with the Lehman Plan to make credit bids (the Initial Bids) as set forth in Section 7.9.1 of the Lehman Plan on eleven (11) of the Projects against which the Lehman Creditors have direct Liens, which Projects have values appraised for the Lehman Creditors at approximately $437.5 million, which is the aggregate amount of the Lehman Creditors' Initial Bids. The Lehman Creditors also may make certain additional bids (referred to in the Lehman Plan as "Contingent Bids") with respect to seven (7) of the other

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Remaining Real Estate Projects as to which the Lehman Lenders either have: (a) a Lien in the equity ownership of the Remaining Real Estate Project rather than the Remaining Real Estate Project itself; or (b) a direct Lien in the Project, which Lien is subject to a Cross-Collaterization Claim. The Contingent Bids exclude parcels on which the Lehman Creditors hold no Liens that are subject to other Secured Claims in Class 4, but the Plan enables the Lehman Creditors to elect to bid on any other Remaining Real Estate Project or Asset. The Contingent Bids are at values equal to the Debtors' estimated value of the subject Remaining Real Estate Projects.

**(f)** **PRA Recovery Security Pool.** The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims. If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in an ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), absent a Plan, the values of the Remaining Real Estate Projects on which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding arguably would be available to satisfy the Project Related Action Recovery. Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (a) the Lehman Plan provides that certain Cash is to be held by the Liquidating Trustee in the Plan Reserve, including the Net Cash Proceeds of any sale of a Remaining Real Estate Project to a third party, and (b) any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures shall be subject to a deed of trust in favor of the Liquidating Trustee (as defined below, the "PRA Recovery Deeds of Trust") to secure the obligation of such Lehman Nominee to reconvey the Project acquired by such Lehman Nominee in the event of a Project Related Action Recovery, which obligation is to be set forth in a Reconveyance Agreement and, which reconveyance obligation may, at the Lehman Nominee's election, instead be satisfied by a Cash payment in the amount of any Project Related Action Recovery. The Plan Reserve and PRA Recovery Deeds of Trust are referred to in the Lehman Plan collectively as the "PRA Recovery Security Pool"). The Plan Reserve is comprised of Cash and thus enforcement of a Project Related Action Recovery against this collateral by the Liquidating Trustee should be uncomplicated. If, however, the Lehman Creditors are the

successful bidders as to the Projects on which they bid, any greater risks of delay or diminution in the value of the collateral are mitigated by the fact that the Lehman Creditors' appraised values of the Projects upon which they have committed to bid totals approximately $437.5 million (whereas the maximum Project Related Action Recoveries are projected by the Lehman Creditors to be over $200 million less).

**(g) Release of PRA Recovery Deeds of Trust.** Although the PRA Recovery Deeds of Trust generally shall remain in effect pending the Conclusion of the Project Related Actions, as provided in the Lehman Plan, in order to permit the Lehman Nominees holding title to the Remaining Real Estate Projects (*i.e.*, the PRA Security Projects) to fully utilize such properties, the Lehman Plan also includes provisions by which (i) all of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated upon there having been deposited Cash into the Plan Reserve equal to the Maximum PRA Recovery Amount and (ii) the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be: (1) released and the corresponding Reconveyance Agreement terminated upon the sale of such PRA Security Project to a third party and the deposit of any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale or (2) subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash Proceeds derived from such refinancing are deposited into the Plan Reserve. However, the Lehman Creditors are offering a pool of collateral for the Project Related Action Recoveries. Thus, the Lehman Creditors are agreeing, to their detriment, that they cannot simply pay a particular ES Final Judgment to obtain a release of the PRA Recovery Deed of Trust on the Project and retain for themselves, as a Creditor of that Estate, the residual value from the Project.

**(h) The Remaining Other Assets.** The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors, as set forth in the Lehman Plan.

**(i) Equitable Subordination Claims.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Generally.** Under the Lehman Plan, ES Claimants are afforded the option to either accept the benefits of the ES Settlement, as provided in the Lehman Plan, or have the Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit. To incentivize ES Claimants to accept the Lehman Plan even if they do not accept the ES Settlement Offer, the Lehman Lenders are making available as set forth below funding for such continued prosecution of the Equitable Subordination Claims.

**(i) ES Settlement Offer.**

**(1)** Funding for ES Settlement Offer**.** The Lehman Lenders are making available funds for the ES Settlement Pro Rata Payments to Settling ES Claimants.

**(2)** **S**ettlement by an Individual ES Claimant**.** For each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment (included with the Ballot) duly executed by such ES Claimant, such ES Claimant will receive an ES Pro Rata Settlement Payment (*e.g.*, its relative share of the aggregate amount of the ES Settlement Amount).

**(3)** Full Settlement by an Estate**.** If at least one-half in number and two-thirds in amount of the voting ES Claimants in any of the Estates of the Plan Debtors vote for acceptance of the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments (with respect to such Estate, the "Estate Acceptance of the ES Settlement"), all ES Claimants of such Estate will be entitled to receive an ES Pro Rata Settlement Payment upon return with their Ballots or to the Lehman Lenders of a duly executed ES Claimant Release and Assignment. If there is Estate Acceptance of the ES Settlement for an Estate of a particular Plan Debtor, the Equitable Subordination Claims of such Estate will be fully settled, dismissed (with prejudice) and released, including as to ES Claimants who do not vote to accept the ES Settlement Offer, who vote to reject the ES Settlement Offer or who vote to accept the ES Settlement Offer but who fail to execute and deliver the ES Claimant Release and Assignment.

**(4)** Releases and Assignments**.** In exchange for the consideration payable to each Settling ES Claimant: (A) the Liquidating Trustee will issue for or on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

behalf of each relevant Estate a release of all claims against the Lehman Releasees or any future owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assignees of the applicable Debtor, as to, or to the extent attributable to, or to the extent any recovery would be payable with respect to, any or all of the ES Claims of the Settling ES Claimants (the "Estate ES Settlement Release" as more fully set forth and defined in the Lehman Plan); and (B) in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote also, itself, will be granting a release of all claims against the Lehman Releasees or any future owners of the applicable Project(s) as to, or to the extent attributable to, or to the extent any recovery is payable with respect to, any or all of the ES Claims of such Settling ES Claimant (the "ES Claimant Release and Assignment" as more fully set forth and defined in the Lehman Plan).

**(5)** Estimate of Recovery on Account of Allowed ES Claims to Those Accepting, or Deemed to have Accepted the ES Settlement Offer**.** The ultimate recovery on account of an Allowed ES Claim to those accepting, or deemed to have accepted, the ES Settlement Offer will vary depending on the total amount of Allowed ES Claims. The Lehman Lenders estimate that the maximum total amount of Allowed ES Claims will not exceed approximately $227.4 million (the "ES Claims Estimate") and will likely be significantly less for the reasons stated below. The ES Claims Estimate was determined by totaling the estimated Claims of ES Plan Debtors' Estates that were Filed or were scheduled other than as contingent, disputed or unliquidated to the extent they were General Unsecured Claims, asserted Mechanic's Lien Claims (most of which are believed to be subordinate to the Lehman Secured Claims) and those Bond Obligations that appear to arise from bonds issued on or after the ES Date of August 1, 2007 (which is the approximate commencement date of the alleged conduct that forms the basis of the complaint in the ES Action). Accordingly, to the extent each potential ES Claimant holds an Allowed ES Claim and accepts the ES Settlement Offer, it is estimated that such ES Claimant will receive recovery on account of its Allowed ES Claim of not less than approximately 6.6%. It should be noted that in calculating the ES Claims Estimate, no reductions were made for various factors that would likely result in a significant reduction of the ES Claims Estimate, namely: (a) no analysis was done and

therefore no reduction was made to eliminate Claims (other than Claims Filed by the Bond Issuers) which likely do not qualify as ES Claims (*i.e.*, claims which arose prior to August 1, 2007) or which may otherwise be ultimately disallowed in accordance with the Claims allowance process in the Debtors' Cases, (b) although Claims Filed by Bond Issuers in respect of bonds issued prior to August 1, 2007 were disregarded for purposes of the ES Claims Estimate, no reduction was made to the ES Claims Estimate to account for the fact that many of the Claims Filed by contractors and other parties are secured by payment bonds issued by the Bond Issuers who have accounted for such Claims in their own Proofs of Claims, thereby resulting in "overlapping" Claims, (c) Claims of Bond Issuers arising from performance bonds are contingent and will likely be significantly less than the face amount of such performance bonds (which face amounts provided the basis for the Proofs of Claim Filed by the Bond Issuers) depending upon whether performance is demanded by the beneficiaries of such bonds and/or the actual cost of such performance. It is difficult to assess the impact that the factors described above will have upon the ES Claims Estimate but the Lehman Proponents believe that these factors will result in a significant reduction in the ES Claims Estimate and thereby increase the estimated recovery for the ES Claims that actually are Allowed.

**(ii) Continued Prosecution of Equitable Subordination Claims.** Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal (with prejudice), release and settlement of all Equitable Subordination Claims of all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in an ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of and attributable to the ES Claims of any Non-Settling ES Claimants, as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender elects to pay Cash in lieu thereof.

**(iii) ES Litigation Loan.** Unless all of the ES Plan Debtors' Estates accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), a Lehman Lender will make available a loan in the aggregate principal amount of up to $1 million to the Liquidating Trustee for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination Claims, which loan may be used solely for the payment of ES Litigation Expenses (as more fully defined below, the "ES Litigation Loan").

**(iv) Concessions by Lehman Lenders to Facilitate Collection of an ES Judgments.** Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in an ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

**(1) Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtors' Projects Are to be Collateral for Equitable Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.** For some particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against those Estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Recovery Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Final Judgment as to other ES Plan Debtors' Estates.

**(2) To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.** As to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Estates of Del Rio and SJD Partners only, Lehman ALI and Fenway Capital will waive an objection or defense, that, even if the applicable Lehman Secured Claim was ignored, there was insufficient value in those Estates to pay their Allowed ES Claims and, as to SJD Partners, that they are inappropriate defendants as to a non-recourse judgment secured by the PRA Recovery Security Pool, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied, and (II) the Estates of Del Rio and SJD Partners execute the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**(3) There is to be a BFP Waiver by Fenway Capital.** The defense to the ES Action by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, such that the actions or conduct of the Lehman Lenders could not be attributed to Fenway Capital due to such status, is to be waived if the Credit Bid Conditions are satisfied and if Fenway Capital affirmatively consents in writing. (The Lehman Lenders are exercising good faith efforts to obtain the affirmative consent in writing of Fenway Capital to the BFP Waiver.)

**(j) Plan Funding by Lehman Lenders.** In addition to the $10 million to be deposited on the Effective Date as a reserve for the Guaranteed Minimum Distribution, the Lehman Lenders will make substantial other funding available to enable the confirmation and implementation of the Lehman Plan, including payment of Administrative Claims, Project related expenses, certain Post-Confirmation Expenses and certain settlement amounts. Such funding will be provided either (i) through new transfers of Cash by a Lehman Lender, or (ii) by the Lehman Lenders forgoing the full extent of adequate protection to which Lehman Creditors otherwise would claim entitlement with respect to their substantial Cash Collateral being held in escrow or held by the Estates and instead permitting use of such Cash Collateral, as and to the extent set forth more fully in the Lehman Plan.

### 1.6 Recommendations.

Your vote on the Lehman Plan is important. The Lehman Creditors urge you to vote accept the Lehman Plan by completing and returning the enclosed ballot(s) no later than the Voting Deadline (defined below) and urge the ES Claimants to vote to accept the ES Settlement Offer and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

execute and deliver the requested releases.

The Voting Deadline is set forth in a notice or order, which is sent as an accompaniment to the Lehman Disclosure Statement.

## II.

## PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed the Lehman Plan described in this Lehman Disclosure Statement. Accordingly, the terms of the Lehman Plan are not binding on anyone. However, if the Bankruptcy Court confirms the Lehman Plan, then the Lehman Plan will be binding on the affected Debtors and on all Creditors and Holders in those Cases.

### 2.1 Time and Place of the Confirmation Hearing.

The hearing where the Bankruptcy Court will determine whether or not to confirm the Lehman Plan will take place at 411 West Fourth Street, Santa Ana, California 92701-4593 at _ .m., in Courtroom 5A.

### 2.2 Deadline for Voting for or Against the Lehman Plan.

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot and, if applicable, the ES Claimant Release and Assignment to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Attention: ___________________

Your ballot must be **received by** _______, 2009 (the "Voting Deadline"), or it will not be counted.

### 2.3 Deadline for Objecting to the Confirmation of the Lehman Plan.

Objections to the confirmation of the Lehman Plan must be Filed with the Bankruptcy Court, and served upon the following parties so that they are received by __________________, 2009:

| | |
|---|---|
| **Counsel for Lehman Creditors** | Richard M. Pachulski<br>Dean A. Ziehl<br>Robert B. Orgel<br>Jeremy V. Richards<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 11th Floor<br>Los Angeles, California 90067-4100 |

| | |
|---|---|
| | Edward Soto<br>Shai Waisman<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153-0119 |

**2.4 Identity of Person to Contact for More Information Regarding the Lehman Plan.**

Any interested party desiring further information about the Lehman Plan should contact the Lehman Creditors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 11th Floor, Los Angeles, California 90067, (310) 277-6910, attention: Richard M. Pachulski, Robert M. Orgel, or Jeremy V. Richards.

**2.5 Disclaimer.**

The information contained in this Lehman Disclosure Statement in Section 3.1, 3.2, the Table of Claims and notes relating thereto in Section 3.3, SunCal's stated opininons of value in Section 3.4, Section 6.16 and Section 6.17, is either provided by the Debtors or the Trustee or is contained in the Elieff Disclosure Statement. Additionally, this Disclosure Statement from time to time notes within the text when the Lehman Proponents are specifically relying upon information provided or disclosed by either the Debtors or Elieff. The Lehman Proponents represent that they are unaware of any material inaccuracies in the information set forth herein.

The Bankruptcy Court has not yet determined whether or not the Lehman Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Lehman Plan.

The discussion in this Lehman Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses,

distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or projections mayor may not turn out to be accurate.

**III.**

**BACKGROUND OF THE DEBTORS**

**3.1 The SunCal Companies and the Debtors.**[3]

SunCal's business focused upon the "development" of residential land. A typical SunCal development began with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team developed a master plan for the acreage that incorporated streets, homes, parks, schools and commercial areas, and then it worked with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to achieve such plan. This process, which required the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, took a period of years. Once a master plan had been approved, SunCal provided for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sold the lots or parcels within the project to merchant builders.

The land development process is inherently capital intensive due to size and costs of the assets being acquired, the front-loaded capital requirements, and the length of time between the initial acquisition and the ultimate realization of profits. A typical SunCal project was financed through an equity contribution coupled with a land or acquisition loan. Thereafter one or more development and entitlement credit facilities would either be incorporated into the acquisition loan, or an entirely new facility would be obtained to fund the development. In some cases a layer of mezzanine debt (secured by an equity ownership interest in the entity that owns the project) was employed to provide additional funding.

SunCal historically financed its projects with land acquisition and development loans using a number of different lenders, but over the past five years, the company formed a relationship with the Lehman Lenders and the Lehman Lenders became SunCal's largest funding source.

[3] The information set forth in this Article III is largely obtained from the Elieff Disclosure Statement. This information is designed to provide to the reader with a general background understanding of the Debtors and their operations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtors are twenty-six (26) entities formed to develop the Projects throughout California. Some of the Debtors directly own the Projects and others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects. SunCal Management, LLC, a non-debtor entity owned and controlled by Elieff.

Attached hereto as Exhibit "1" is a list and general description of various notices of potential health and safety issues asserted by various government agencies with respect to the Projects, which information has been supplied by the Debtors.

**3.2 <u>The Debtors' Primary Assets.</u>**

The following is a general description of the Debtors and their primary Assets (other than the Litigation Claims) as of their respective Petition Dates, based solely upon the Debtors' disclosures in the Elieff Disclosure Statement:

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| Palmdale Hills (Voluntary Debtor) | Palmdale Hills owns the Ritter Ranch Project. The Ritter Ranch Project consists of a 10,625 acre site situated in the City of Palmdale, in Los Angeles County, California. Grading of the first phase is complete with master infrastructure nearly 90% complete. The specific plan and the development agreement were approved in 1992 and allow for the development of up to 7,200 residential units. A vesting tentative parcel map consisting of 42 parcels has been processed and was recorded in 1995. Additionally, six vesting tentative tract maps totaling 553 lots were approved by the city in December 1995. All regulatory permits have been received.<br><br>Palmdale Hills also owns personal property in the form of cash in the amount of approximately $21 million and the Palmdale Hills CFD Bonds. |
| SCC Palmdale (Voluntary Debtor) | SCC Palmdale does not own any real property. SCC Palmdale is the Holder of the Allowed Interest in Palmdale Hills. |
| Acton Estates (Voluntary Debtor) | Action Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land. The Acton Project is expected to consist of 136 units. |
| SunCal Beaumont (Voluntary Debtor) | SunCal Beaumont owns the Beaumont Heights Project, that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California. The property is currently designated as low density residential use -rural residential use. The City of Beaumont is in the process of |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| NAME OF DEBTOR | ASSET DESCRIPTION |
| --- | --- |
| | amending the general plan, preparing an environmental impact report and annexing the assemblage. The specific plan and tentative tract map are in the drafting stage. The Beaumont Heights Project was expected to consist of 1,203 units. A portion of the Beaumont Heights Project has been lost through foreclosure sales completed prior to the Petition Date. |
| SunCal Bickford (Voluntary Debtor) | SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement. The offsite water and sewer improvements are mostly complete. Improvement plans for major roads and in-tract improvements were in process of being completed and a memorandum of understanding between the City and County for the regional sewer pipeline was in process. The Bickford Ranch Project is expected to consist of 2,105 units.<br><br>SunCal Bickford owns personal property in the approximate amount of $2,305,523 in the form of cash. |
| SunCal Emerald (Voluntary Debtor) | SunCal Emerald owns the Emerald Meadows Project, consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California. The specific plan, general plan and the environmental impact report were approved in October 2005. The tentative tract map & final map were in process. The Emerald Meadows Project is expected to consist of 1,002 units. |
| SunCal Johannson (Voluntary Debtor) | SunCal Johannson owns the Johannson Ranch Project, consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California. Tentative maps were in the process of being prepared. Engineering plans and preparation of the draft specific plan were commenced prior to the filing of the Debtors' Cases. The SunCal Johansson Project is expected to consist of 921 units. |
| SJD Partners (Voluntary Debtor) | SJD Partners currently owns no real property. SJD Partners formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project." The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, pursuant to which a Lehman Affiliate, LV Pacific Point LLC ("LV PacPoint"), a Delaware limited liability company, purchased the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. SJD Partners alleges a potential preference claim and other causes of action against the LV PacPoint (*See* Article IV, below.) SJD Partners owns personal property in the approximate amount of $110,485, consisting of cash and accounts receivable. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:205341.13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
| --- | --- |
| SJD Development (Voluntary Debtor) | SJD Development does not own any real property. SJD Development is the Holder of an Allowed Interest in SJD Partners. |
| SunCal Summit Valley (Voluntary Debtor) | SunCal Summit Valley owns the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report were completed. The Summit Valley Project was previously expected to consist of 6,023 units. A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date.<br><br>SunCal Summit Valley is the Holder of the Allowed Interests in Seven Brothers and Kirby Estates. |
| Seven Brothers (Voluntary Debtor) | Seven Brothers owned 900 acres of the Summit Valley Project, a portion of which has been lost through foreclosure proceedings completed prior to the Petition Date. |
| Kirby Estates (Voluntary Debtor) | Kirby Estates owns 27 acres of the Summit Valley Project. |
| SCC Communities (Voluntary Debtor) | SCC Communities owns the Joshua Ridge Project, consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The Joshua Ridge Project was slated to be sold to the city and the city was scheduled to use the land to build a park or a school. |
| Tesoro (Voluntary Debtor) | Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. |
| Del Rio (Voluntary Debtor) | Del Rio does not own any real property. Del Rio owns the Del Rio CFD Bond Proceeds after use and application as provided in an Acquisition Agreement to be entered into between Del Rio and the City of Orange. The Acquisition Agreement will set forth certain terms for the acquisition of various facilities by the City of Orange from Del Rio, the issuance of the Del Rio CFD Bonds and the use and application of a portion of the proceeds of the Del Rio CFD Bonds for the construction of certain improvements and other applications, and with the remaining proceeds to go to Del Rio. It is anticipated that the Acquisition Agreement will provide for a |

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| | maximum bond authorization in the amount of up to $25 million. The Acquisition Agreement has not been finally negotiated and the maximum authorization amount may change. |
| SunCal I (Voluntary Debtor) | SunCal I does not own any real property. SunCal I is the Holder of Allowed Interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald. |
| SunCal III (Voluntary Debtor) | SunCal III owns no real or personal property. |
| Delta Coves (Trustee Debtor) | Delta Coves owns the Delta Coves Project consisting of a 310-acre site which is located on Bethel Island within Contra Costa County. The Delta Coves Project is expected to consist of 494 waterfront residential lots, some of which will be condominiums/townhomes and some of which will contain private boat docks. The Delta Coves Project is expected to include an interior lagoon that will provide direct boating access to San Joaquin River Delta. |
| SunCal Heartland (Trustee Debtor) | SunCal Heartland owns the Heartland Project consisting of a 417 acre site located in Riverside County, California. The Heartland Project is expected to consist of 983 units. |
| SunCal Marblehead (Trustee Debtor) | SunCal Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California. The development is expected to offer canyon and ocean views from a number of lots throughout the Marblehead Project.<br><br>SunCal Marblehead also owns personal property in the approximate amount of $1,176,584 in the form of cash. |
| SunCal Northlake (Trustee Debtor) | SunCal Northlake owns the Northlake Project, consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is expected to consist of 3,417 units.<br><br>SunCal Northlake also owns personal property in the amount of $967,728 in the form of cash. |
| SunCal Oak Valley (Trustee Debtor) | SunCal Oak Valley owns the Oak Valley Project consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project consists primarily of residential property and is expected to also include two commercial sites, one school site and |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| | several parks. The Oak Valley Project is expected to consist of 3,417 units. |
| SunCal Century City (Trustee Debtor) | SunCal Century City owns the 10000 Santa Monica Project, consisting of a 2-acre site which is located at the eastern edge of Century City, in Los Angeles County, California. The 10000 Santa Monica Project is expected to consist of 163 condominium units. |
| SunCal PSV (Trustee Debtor) | SunCal PSV owns the Palm Springs Village Project, consisting of a 309-acre site which is located in the City of Palm Springs, California. The current proposed development consists of 752 single family units, 398 multi-family units, an 18-hole executive golf course, a driving range, a golf clubhouse and recreational facilities. |
| SunCal Torrance (Trustee Debtor) | SunCal Torrance owns the Del Amo Project, consisting of a 14-acre site which is located in the City of Torrance in Los Angeles County, California. The site is currently a section of the Del Amo Fashion Center complex, a 3 million square feet retail mall. The Del Amo Project is expected to consist of 365 units. |
| SunCal Oak Knoll (Trustee Debtor) | SunCal Oak Knoll owns the Oak Knoll Project, consisting of a 172.5-acre site which is located in the City of Oakland, California. The Oak Knoll Project is expected to be a diverse master planned community that includes 960 residential units, including single family homes, town homes and apartments. The Oak Knoll Project is also expected to consist of six restaurant spaces, along with a grocery anchor.[4] |

**3.3 Debt and Capital Structure.**

In the case of the seventeen Voluntary Debtors, SunCal Affiliates are the owners of one hundred percent (100%) of the equity and SunCal Affiliates have full corporate governance authority over the Voluntary Debtors. Eleven (11) of the Voluntary Debtors own nine (9) Projects:

(a) Four (4) Projects (Ritter Ranch Project; Acton Estates Project; Emerald Meadows Project; and Bickford Ranch Project) are owned, respectively, by Palmdale Hills, Acton Estates, SunCal Emerald, and SunCal Bickford. Lehman Commercial asserts a first priority lien by virtue of first-priority deeds of trust on each of these four Projects.

[4] The SunCal Oak Knoll Project is subject to various notices of public health and safety violations and conditions, including those set forth in Exhibit "1" to this Disclosure Statement. The Debtors estimate that the cost of remediating the violations recited in such notices is approximately $6 million. The City of Oakland issued an order to abate on June 12, 2009 but no action has yet been taken to abate the violations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(b) Two (2) Projects (the Joshua Ridge and Tesoro Projects) are owned, respectively, by SCC Communities and Tesoro. Lehman ALI is the primary secured creditor on each of these two additional Projects.

(c) Two (2) Projects (the Johannson Ranch Project and Beaumont Heights Project) are owned, respectively, by SunCal Johannson and SunCal Beaumont. Lehman Commercial holds a first priority pledge of the membership interests in SunCal Johannson and SunCal Beaumont.

(d) One (1) Project (SunCal Summit Valley) is owned by three Debtors: SunCal Summit Valley, Kirby Estates and Seven Brothers, which each own a portion of the Project. Lehman Commercial holds a first priority pledge of the membership interests in SunCal Summit Valley, which in turn owns Kirby Estates and Seven Brothers.

Additionally, besides holding a first priority Lien directly on the Ritter Ranch Project, Lehman Commercial holds a first priority pledge of the membership interests in Palmdale Hills, which is the owner of the Ritter Ranch Project. Further, Lehman ALI was also the primary secured creditor of SJD Partners' Pacific Point Project prior to a non-judicial foreclosure sale of the Pacific Point Project in August of 2008.

Various unrelated third parties are the primary secured creditors with respect to certain portions of two (2) of the Voluntary Debtors' Projects (SunCal Beaumont and SunCal Summit Valley -including portions thereof owned by Seven Brothers).

Although the equity interests in the entities owning the Johannson Ranch Project, the Summit Valley Project, and the Beaumont Heights Project have been pledged to the Lehman Lenders, there are no primary secured creditors on the following Projects or portions thereof: (i) the Johannson Ranch Project, (ii) portions of the Summit Valley Project, including portions owned by Kirby Estates and Seven Brothers, and (iii) portions of the Beaumont Heights Project.

As to the nine (9) Trustee Debtors, there are currently nine (9) Projects (the Delta Coves, the Heartland, the Marblehead, the Northlake, the Oak Valley, the Oak Knoll, the 10000 Santa Monica, the Palm Springs Village, and Del Amo Projects).

As of the Petition Dates, Affiliates of SunCal and Lehman Brothers Holdings Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

both Interest Holders and (with the exception of the 10000 Santa Monica Project) the Lehman Lenders held a first priority lien and security interest in and to each of the foregoing Projects. Danske Bank alleges a first priority lien and security interest in and to the 10000 Santa Monica Project.

In addition to the foregoing, there are miscellaneous Real Property Tax Claims, Other Secured Claims, Mechanic's Lien Claims, Priority Claims, Administrative Claims and General Unsecured Claims asserted against each of the Projects and each of the Debtors, summarized in the chart below (which chart is compiled from information disclosed in the Elieff Disclosure Statement).

| DEBTOR | REAL PROPERTY TAX CLAIMS | ALLEGED SECURED CLAIMS | ALLEGED MECHANIC LIEN CLAIMS | PRIORITY AND ADMINIS-TRATIVE CLAIMS | GENERAL UNSECURED CLAIMS |
|---|---|---|---|---|---|
| Palmdale Hills | $1,037,377 | $287,252,096 | $1,006,435 | $499,970 | $33,027,677 |
| SSC Palmdale | $0 | $119,664,305 | $0 | $0 | $0 |
| SunCal Heartland | $559,022 | $354,325,126 | $1,552,794 | $231,873 | $30,774,591 |
| SunCal Marblehead | $379,156 | (same as SunCal Heartland) | $1,406,209 | $740,382 | $109,697,964 |
| SunCal Beaumont | $365,954 | $4,825,659 | $46,188 | $33,672 | $183,731 |
| SunCal Oak Knoll | $2,356,036 | $158,141,365 | $4,794,529 | $874,609 | $1,041,373 |
| SunCal Torrance | $567,669 | (same as SunCal Oak Knoll) | $0 | $160,914 | $203,838 |
| SCC Communities | $5,900 | $23,795,013 | $0 | $27,072 | $32,813 |
| Del Rio | $0 | (same as SSC Communities) | $0 | $261,542 | $8,242,033 |
| Tesoro | $70,239 | (same as SSC Communities) | $0 | $118,891 | $170,969 |
| SunCal Bickford | $2,887,678 | $343,221,391 (Bickford 1st) | $3,477,120 | $345,221 | $10,146,825 |
| | | $56,494,059 (Bickford 2nd) | | $0 | |
| SunCal Emerald | $284,974 | (same as Bickford 1st) | $1,279,043 | $188,695 | $7,878,901 |
| Acton Estates | $200,454 | (same as Bickford 1st) | $0 | $59,242 | $1,428,250 |
| SunCal I | $0 | (same as Bickford 1st) | $0 | $0 | $0 |
| Summit Valley | $573,775 | (same as Bickford 1st) | $16,827 | $48,018 | $1,076,053 |
| | | $2,504,750 | | | |
| SunCal III | $0 | (same as Bickford 1st) | $0 | $0 | $459 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| DEBTOR | REAL PROPERTY TAX CLAIMS | ALLEGED SECURED CLAIMS | ALLEGED MECHANIC LIEN CLAIMS | PRIORITY AND ADMINIS-TRATIVE CLAIMS | GENERAL UNSECURED CLAIMS |
|---|---|---|---|---|---|
| Seven Brothers | $60,828 | $3,427,066 | $0 | $0 | $0 |
| Kirby Estates | $1,744 | $0 | $0 | $0 | $0 |
| SunCal Johannson | $75,107 | $0 | $0 | $34,101 | $41,181 |
| Delta Coves | $609,222 | $206,023,142 | $122,535 | $448,061 | $35,192,631 |
| SJD Development | $0 | $120,110,237 | $0 | | $368,362 |
| SJD Partners | $0 | (same as SJD Development) | $0 | $244,090 | $51,265,349 |
| SunCal Century City | $1,407,213 | $120,000,000 | $1,434,520 | $1,040,005 | $3,289,632 |
| SunCal Northlake | $1,189,919 | $123,654,777 | $0 | $421,783 | $911,296 |
| SunCal Oak Valley | $280,280 | $141,630,092 | $1,662,309 | $138,443 | $29,605,482 |
| SunCal PSV | $589,367 | $88,257,340 | $2,316,430 | $315,213 | $21,892,343 |
| **Total** | $13,501,914 | $2,153,326,418 | $19,114,939 | $6,231,797 | $346,471,753 |

- Certain Proofs of Claims Filed against Palmdale Hills appear to be misfiled and relate to other Debtors.

- Certain Disputed Claims, such as duplicative Claims, have been deducted from the figures above.

- The Debtors have not yet completed their investigation on what Claims are Allowed Claims and their listing herein or in the Lehman Plan should not be construed as providing for Allowance under the Lehman Plan unless expressly so provided. Administrative Claims are ongoing.

- $275,918 of Mechanic's Lien claims asserted against Del Rio and $1,996,537 of Mechanic's Lien claims asserted against SJD Partners have been classified as General Unsecured Claims since neither Del Rio nor SJD Partners own any underlying real property.

- The Debtors have assumed Bond Claims (and corresponding Bond Obligations) according to the Bond Claims (and corresponding Bond Obligations) arising from the particular Debtors' Projects. The Bond Issuers have asserted various Bond Obligations against the Debtors in the approximate amount of $230 million (representing approximately $155 million by Arch and $75 million by Bond Safeguard, some of which Claims are not the subject of timely Filed proofs of claim). The Bond Issuers assert that the Bond Obligations are joint and several obligations of and thus Claims against all of the Debtors, which the Debtors dispute as lacking consideration and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

fraudulent conveyances to the extent that such Bond Obligations do not arise from or exceed the amount of Bond Obligations attributed to the Project of each Debtor. The Lehman Lenders adopt this view and further believe that Arch can only assert liability against the Debtor for whose benefit it issued a bond as the Debtors have no joint and several liability with respect thereto.

- The Debtors believe that the $368,362 Claims Filed against SJD Development should have been Filed against SJD Partners

The Lehman Lenders do not believe that the liquidated Bond Claims (and corresponding Bond Obligations) will be nearly as much as the face amount of Bond Claims (and corresponding Bond Obligations) allocated by the Debtors to each Project. For instance, certain of the Bond Obligations include bonded obligations for projects that do not relate to any of the Projects or Debtors. Further, as of March 2009, the liquidated claims of Arch (the Debtors' primary bonding company) were only $132,000 based upon proofs of claim Filed by Arch in the Bankruptcy Cases. Further, the majority of the Bond Claims (and corresponding Bond Obligations) relate to obligations under performance bonds. At this time, it is unknown what portion of the Bond Claims (and corresponding Bond Obligations) will ultimately become liquidated. Under the Lehman Plan, none of the Bond Claims (and corresponding Bond Obligations) will be assumed by any Lehman Nominee purchasing one or more of the Projects pursuant to the sales procedures set forth herein.

**3.4 Asset Values.**

The below chart sets forth the appraised value of most of the Debtors' Projects based upon appraisals prepared for the Lehman Lenders during the pendency of the Bankruptcy Cases, and SunCal's stated valuation opinions for all of the Projects and the Del Rio CFD Bond Proceeds.

| NAME OF DEBTOR | APPRAISED VALUE OF DEBTORS' PROJECTS BASED UPON APPRAISALS PREPARED FOR LEHMAN LENDERS DURING THE PENDENCY OF THE DEBTORS' CHAPTER 11 PROCEEDING | SUNCAL'S STATED VALUATION OPINIONS[5] |
|---|---|---|
| SunCal Bickford | $29,500,000 | $21,000,000 |
| SunCal Emerald | $12,000,000 | $6,000,000 |

[5] The Debtors represent that the valuations set forth below were prepared by its internal underwriting team using criteria consistent with the team's acquisition of real properties. The Lehman Proponents have not verified, nor do they vouch for the valuation techniques adopted by the Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| NAME OF DEBTOR | APPRAISED VALUE OF DEBTORS' PROJECTS BASED UPON APPRAISALS PREPARED FOR LEHMAN LENDERS DURING THE PENDENCY OF THE DEBTORS' CHAPTER 11 PROCEEDING | SUNCAL'S STATED VALUATION OPINIONS[5] |
|---|---|---|
| Palmdale Hills | $42,900,000 | $27,000,000 |
| Tesoro | $1,850,000 | $1,500,000 |
| SCC Communities | $1,200,000 | $1,000,000 |
| SunCal Marblehead | $187,500,000 | $74,000,000 |
| SunCal Heartland | $7,900,000 | $5,000,000 |
| OVC Holdings | $20,900,000 | $12,000,000 |
| Northlake Holdings | $23,000,000 | $4,000,000 |
| SunCal Oak Knoll | $48,000,000 | $32,000,000 |
| SunCal PSV | $13,800,000 | $10,000,000 |
| SunCal Torrance | $25,000,000 | $16,000,000 |
| Delta Coves | $25,200,000 | $22,000,000 |
| SunCal Century City | $50,900,000 | $39,000,000 |
| SunCal Beaumont | $1,200,000 (SunCal Opinion) | $1,200,000 |
| Acton Estates | $6,800,000 | $3,400,000 |
| SunCal Johannson | $4,000,000 | $2,100,000 |
| SunCal Summit Valley | $2,200,000 | $750,000 |
| Kirby Estates | $2,800,000 | 1,000,000 |
| Seven Brothers | $200,000 | $75,000 |
| Del Rio | $4,500,000 (SunCal Opinion) | $4,500,000 |
| SJD Partners | $25,000,000 (SunCal Opinion) | $25,000,000 |
| **TOTAL** | $536,350,000 | $308,525,000 |

- The Lehman Lenders' appraised value of the Summit Valley Project includes the portions of the Summit Valley Project owned by Seven Brothers and Kirby Estates. The appraisal values the property that is owned outright by SunCal Summit, Seven Brothers and Kirby Estates, and not subject to other third-party seller financing lien holders.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

- The Lehman Creditors do not have an appraisal of the Project belonging to SunCal Beaumont. However, the Lehman Lenders have a Lien on SunCal I's Allowed Interest in SunCal Beaumont. SunCal has stated that it believes that the value of the Beaumont Heights Project is $1,200,000, net of portions of the Project that are expected to be lost through foreclosure sales conducted by third-party seller financing lien holders.

- The Lehman Creditors do not have an estimate for the Del Rio CFD Bond Proceeds. SunCal has stated that it believes that the Del Rio CFD Bond Proceeds subject to the Lehman Lenders' liens have a value of $4.5 million.

- The Lehman Creditors do not have an appraisal for the Pacific Point Project (SJD Partners' former Project which is subject to a potential Avoidance Action discussed below). Lehman ALI non-judicially foreclosed on the Pacific Point Project on August 28, 2008, and an Affiliate of Lehman ALI (LV Pacific Point LLC) acquired title to the Pacific Point Project at the foreclosure sale. SunCal has stated that it believes the Pacific Point Project has a fair market value of $25 million.

**3.5 A Summary of the Lehman Creditors' Loans.**

Of the 18 Remaining Real Estate Projects of the Debtors, 14 are subject to first priority Liens in favor of the Lehman Creditors by virtue of first-priority deeds of trust:

(a) Ritter Ranch Project;

(b) Acton Estates Project;

(c) Emerald Meadows Project;

(d) Bickford Ranch Project;

(e) Joshua Ridge Project;

(f) Tesoro Project;

(g) Delta Coves Project;

(h) Heartland Project;

(i) Marblehead Project;

(j) Northlake Project;

(k) Oak Valley Project;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(l) Oak Knoll Project;

(m) Palm Springs Village; and

(n) Del Amo Project.

As to another three of the Remaining Real Estate Projects or portions thereof, the Lehman Lenders hold first priority Liens against the two parent Debtors' Interests in the five (5) Debtors that own the Projects:

| | Parent Debtor Holding Pledged Interests | Collateral | Owner Debtor | Project |
|---|---|---|---|---|
| (iv) | SunCal Summit Valley | LLC Interests in Kirby Estates | Kirby Estates | Summit Valley Project (portion) |
| (v) | SunCal Summit Valley | LLC Interests in Seven Brothers | Seven Brothers | Summit Valley Project (portion) |

As to the final project, 10000 Santa Monica Project, Danske Bank holds the first priority Lien.

The Lehman Lenders also hold other Liens in other of the Debtors' property, *e.g.*, a Lien in the Del Rio CFD Bond Proceeds, Liens against SunCal I's Interests in SunCal Bickford, Acton Estates and SunCal Emerald, a second priority Lien against the Bickford Ranch Project, a Lien against SCC Palmdale's Interest in Palmdale Hills and a Lien in all, or substantially all, of the Debtors' cash balances (Cash Collateral) and receivables and other rights relating to the Projects in which they assert Liens.

The various Lehman Loans, the entities against which they are asserted and the Allowed Amount of each Lehman Loan as of the Petition Date for the purposes of the Lehman Plan are all set forth in the classification tables that are set forth herein below and in the Plan.

Some of the Lehman Loans are held in all respects by a single Lehman Creditor. For other Lehman Loans, all or the term loan component of the Lehman Loan was the subject of a repurchase (or repo) agreement with a Lehman Successor (either Fenway Capital or Lehman Re). Additionally, the Court has ruled (in a ruling discussed in section 3.6 below) that, as to certain of the Lehman Loans, Fenway Capital is a transferee of the loans or the term loan component thereof under

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

a repurchase agreement. The Lehman Creditors have reserved all rights in connection with such ruling, including, without limitation, the right to appeal the ruling, assert that the transactions under any repurchase agreement constitutes a transfer for security and not an outright sale, and all of the Lehman Creditors' other rights in connection with the relevant Claims. **Exhibit "2"** to the Disclosure Statement sets forth a table showing, *inter alia*, each of the Lehman Loans and the dollar amount thereof attributable to each Lehman Creditor as owner of the subject loan or the term or revolver component thereof or as counterparty to a repurchase agreement. Based thereupon, eleven of the thirteen relevant Lehman Loans have amounts thereof attributable to the Lehman Lenders, as to which loans or portions of loans the total amount owing by the Debtors is over $592.1 million. Based thereupon, seven of the thirteen relevant Lehman Loans have amounts thereof attributable to Fenway Capital, as to which loans or portions of loans the total amount owing is over $1.4 billion. Based thereupon, one of the thirteen relevant Lehman Loans (the Pacific Point First Loan Agreement) has an amount thereof attributable to Lehman Re, as to which term component of such loan the total amount owing by the applicable Debtor is over $101 million. (Although the obligation under the Pacific Point First Loan agreement presently is a General Unsecured Claim against SJD Partners, the Claim is a contingent Secured Claim, contingent upon the Pacific Point Foreclosure being set aside.) The Lehman Lenders have received written authorization from representatives of Fenway Capital with respect to proposing the Lehman Plan. Presently, Lehman Re and its receivers have not provided the Lehman Proponents such authorization.

All of the Lehman Loans are recourse loans as to the respective borrowers' assets. To the extent that Projects subject to the Claims and Liens of the Lehman Creditors are being sold pursuant to the Plan, such sale is taking place pursuant to Bankruptcy Code § 1123(a) and the Lehman Creditors have committed to credit bid in accordance with the procedures and safeguards set forth in the Plan, not pursuant to applicable state judicial or non-judicial foreclosure laws. Accordingly, the Lehman Creditors contend that to the extent the sale of the underlying Project is insufficient to pay their Claims in full, the Lehman Creditors are entitled to assert deficiency claims against all of the Debtors that are liable for the subject loan. The Lehman Creditors are informed and believe that the Debtors and Elieff dispute this contention.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtors and Elieff contend that the Lehman Creditors are "insiders" of the Debtors (presumably as that term is defined in Bankruptcy Code § 101(31)). The Lehman Creditors deny the foregoing allegations for, *inter alia*, the reasons set forth in their pending motion to dismiss the Third Amended Complaint in the Lehman Adversary Proceeding. In any event, however, except to the extent that such "insider" status, if proven, may have some bearing on the ability of either the Debtors or the Trustee to equitably subordinate the Claims of the Lehman Creditors (discussed more fully in Section 4.5, below), the Lehman Proponents do not believe that the issue of whether the Lehman Creditors are or are not "insiders" of the Debtors has any bearing on the confirmability of the Plan.

**3.6 Filing of Proofs of Claim with Respect to the Lehman Loans.**

On or before the bar date for filing proofs of claim, the Lehman Lenders Filed proofs of claim on account of all of the Lehman Loans. All or portions of seven of the outstanding Lehman Loans (the "Repurchase Lehman Loans") are subject to outstanding repurchase agreements with Fenway Capital. Based upon this fact, the Debtors moved to strike all of the proofs of claim Filed by the Lehman Lenders on the basis that they allegedly do not own the Repurchase Lehman Loans. The Lehman Lenders opposed the motion, asserting that they own the Repurchase Lehman Loans because the repurchase agreements with Fenway Capital were transfers for security only, and that they had the power and authority to File the related proofs of claim.

The Bankruptcy Court held a hearing on the foregoing motion to strike on June 30, 2009. At that hearing, the Bankruptcy Court determined, over the objection of the Lehman Lenders, that the Repurchase Lehman Loans had actually been "sold" to Fenway Capital (rather than having been pledged to Fenway Capital as collateral for a loan, as asserted by the Lehman Lenders). The Court entered an order on the foregoing issue on October 2, 2009 and the Lehman Creditors intend to appeal such Order. The Bankruptcy Court ruled that the proofs of claim relating to those loans would be stricken unless the Lehman Lenders could prove that they were authorized to File proofs of claim as agent for Fenway Capital. A hearing on this outstanding issue was heard on September 22, 2009 and the Court has taken the matter under submission.

The Lehman Lenders contend that the Bankruptcy Court's ruling with respect to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Repurchase Lehman Loans is erroneous and, if the Bankruptcy Court finally determines that the Lehman Lenders were not authorized to File proofs of claim on account of the Repurchase Lehman Loans, will likely appeal the Bankruptcy Court's ruling. However, even if the Bankruptcy Court rules that the Lehman Lenders were not authorized to File proofs of claim on behalf of the Repurchase Lehman Loans and an appellate court upholds the Bankruptcy Court's ruling, the Lehman Lenders contend that the only effect of such rulings would be that the Lehman Lenders (or Fenway Capital) would be unable to assert unsecured deficiency claims against the Plan Debtors' Estates. The Lehman Lenders believe, however, that such a ruling would not in any way invalidate the Liens in and to the Debtors' assets created pursuant to the Lehman Loans and that all of the rights and remedies relating to such Liens, including the right to foreclose on the underlying collateral and credit bid at a foreclosure sale pursuant to the terms of the Lehman Plan, would not in any way be invalidated or impaired by such rulings.

### 3.7 Summary of the Debtors' Cash

The following chart (based upon information provided by the Debtors) sets forth the Debtors' cash on hand as of September 25, 2009 for the Trustee Debtors and as of October 9, 2009 for the Voluntary Debtors. The Lehman Creditors contend that some or all of the following amounts are subject to its Liens and therefore constitute their "cash collateral."

| ***Debtors*** | ***Amount*** |
|---|---|
| Palmdale Hills – ELR Escrow | $ 2,190,234 |
| Palmdale Hills | 16,681,498 |
| Palmdale Hills | 4,446,250 |
| Palmdale Hills | 2,712,312 |
| Palmdale Hills | 1,424,058 |
| SunCal Emerald | 42,403 |
| SunCal Bickford | 2,305,491 |
| SunCal Bickford | 38,808 |
| Acton Estates | 107 |

| ***Debtors*** | ***Amount*** |
|---|---|
| Tesoro | 71 |
| Del Rio | 72 |
| Kirby Estates | 10 |
| SCC Communities | 5,509 |
| SCC Palmdale | 27 |
| SJD Development | 211 |
| SJD Partners | 10,977 |
| Seven Brothers | 173 |
| SunCal Beaumont Heights | 11 |
| SunCal Communities I | 25 |
| SunCal Communities III | 29 |
| SunCal Johnannson Ranch | 47,661 |
| SunCal Summit Valley | 38,409 |
| SunCal Oak Knoll | 12,187 |
| SunCal Northlake | 291,696 |
| SunCal Oak Valley | 336,194 |
| SunCal Heartland | 56,202 |
| SunCal Marblehead | 416,177 |
| SunCal PSV | 2,789 |
| SunCal Torrance | 38,462 |
| Delta Coves | 443,213 |
| **Total** | $31,541,266 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## IV.

## DEBTORS' ALLEGED CLAIMS AGAINST THE LEHMAN LENDERS

### 4.1 Introduction.

As more fully set forth in the Elieff Disclosure Statement, the Elieff Plan Proponents contend that the Debtors or certain of the Debtors' Creditors have substantial claims against the

Lehman Lenders with respect to the Lehman Loans that would result either in the subordination of the Lehman Loans to payment in full of all, or a substantial portion of the Debtors' Creditors, the avoidance or setting aside of various Claims and Liens that the Lehman Creditors assert against certain Debtors and/or recovery of substantial monies by one or more of the Debtors from the Lehman Lenders. Those claims fall into five general categories: (i) the Section 506(d) Claims; (ii) the Equitable Subordination Claims; (iii) the Fraudulent Transfer Claims; (iv) the Preference Claims; and (v) the Breach of Fiduciary Duty Claims. The nature of these claims and the Lehman Creditors' analysis of their merits and likely value is discussed in Articles 4.2 through 4.6, below.

**4.2 The Debtors' Disputes Relating to the Allowed Secured Claims of Fenway Capital Pursuant to Bankruptcy Code Section 506.**

Bankruptcy Code section 506(a) provides that an asserted secured claim is only an Allowed Secured Claim to the extent of the value of such Creditors' interest in the Estate's interest in such property. Bankruptcy Code section 506(d) provides that to the extent a lien secures a claim against a debtor that is not an allowed secured claim, such lien is void subject to certain exceptions. Finally, Bankruptcy Code section 551 provides that such liens that are void under section 506(d) are preserved for the benefit of the applicable debtor's estate.

The Elieff Plan Proponents contend that based upon the Lehman Lenders' appraised values (as set forth in Article 3.4, above), there is no value to the collateral supporting the Lehman ALI's second deed of trust on the Bickford Ranch Project, the pledge of SCC Palmdale's Allowed Interested in Palmdale Hills to Lehman Commercial, or the pledge of SunCal I's Allowed Interests in Acton Estates, SunCal Summit Valley, SunCal Bickford, and SunCal Emerald to Lehman Commercial. (The foregoing assertions are clearly erroneous as to Lehman Commercial's first priority lien in SunCal I's Allowed Interest in SunCal Summit. Based upon the Lehman Lenders' appraisal, the SunCal Summit Valley Project is worth approximately $2.2 million and, based upon the Elieff Disclosure Statement, SunCal Summit Valley has obligations that are less than this appraised value, resulting in equity value in the membership interest and the pledge of that interest to the Lehman Commercial.) However, disallowance of the foregoing alleged Secured Claims and avoidance of the foregoing alleged Liens for the benefit of the respective Debtors' Estates does not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

generate or create any value or unencumbered assets for distribution to general unsecured creditors of any of the Debtors. The Bickford Ranch Project, the Acton Estates Project, the Emerald Meadows Project, the Summit Valley Project and the Ritter Ranch Project are all subject to senior liens in favor of Lehman Commercial and all of the value in those projects must be distributed or paid to the applicable Lehman Creditors on account of the foregoing, valid senior liens. Thus, even if the assertions of the Elieff Plan Proponents were correct, they would likely be of no economic consequence to the Debtors' Creditors. The Debtors and the Lehman Entities have since entered into a stipulation to resolve the valuation of such Liens.

**4.3 <u>The Elieff Plan Proponents Assertions regarding Fraudulent Transfer Actions Against the Lehman Lenders Arising under Various Cross-Collateralized Lehman Loans.</u>**

The Elieff Plan Proponents contend that certain Claims and Liens of the Lehman Lenders can be set aside and avoided pursuant to Bankruptcy Code sections 544, 548, 502(d) and 551 on the theory that at least part of the Claims and Liens identified therein relate to monies received by a Debtor other than the Debtor with a secured obligation to repay those monies. The Elieff Plan Proponents contend the Lehman Lenders may only assert a Claim and Lien against a particular Debtor to the extent that particular Debtor actually received monies on account of the subject Claim (rather than to the extent the Debtor guaranteed and secured repayment of monies received by an Affiliate).

There are numerous problems with this theory of recovery, not the least of which is that a guarantee or co-obligor obligation (and the lien securing such obligation) based upon monies advanced to an Affiliate can only be set aside if the Debtor incurring such obligation or granting such lien was insolvent, or was rendered insolvent (as insolvency is defined in section 544 and applicable state law or section 548) by virtue of incurring the secured obligation at the time the obligation and lien were incurred. The Elieff Disclosure Statement does not allege that the subject cross-collateralization identified therein was incurred by any Debtor at a time when the Debtor was, or was thereby rendered, insolvent. The Lehman Creditors believe that in all, or substantially all instances of cross-collateralization identified by the Elieff Plan Proponents, the Debtor incurring the

secured obligation was not insolvent, nor was it rendered insolvent (as such term is defined by applicable law) at the time the Lien and obligation were incurred.

Furthermore, the Elieff Plan Proponents concede that the Liens and Claims of Lehman Lenders cannot be set aside to the extent that funds were actually received by the obligor/pledgor. Taking the amount of funds that the Elieff Plan Proponents concede each of the relevant Debtors received and comparing that number with the Debtors' estimate of the value of the related collateral pledged in favor of the Lehman Lenders, it is clear that in only one instance (the Acton Project) is the amount of funds allegedly received ($380,000) less than the value of the pledged collateral (in this case, $3.4 million). Thus, even if the Fraudulent Transfer Claims are valid, they would at best generate a recovery of approximately $3.02 million and then only for the benefit of Creditors of the Acton Estate. However, as Bankruptcy Code section 550 limits recovery "for the benefit of the estate" and the Lehman Creditors contend that fraudulent transfer claims cannot be prosecuted for the benefit of equity holders, the potential recovery on account of the foregoing Fraudulent Transfer Claims would be capped at no more than approximately $1.4 million, the unsecured claims asserted against the Acton estate according to the Elieff Disclosure Statement.

Even if the fraudulent conveyance alleged with respect to the cross-collateralization of the SSC Palmdale Loan had merit, the value to the estate of SSC Palmdale is zero, as noted by the Elieff Plan Proponents. The collateral, SSC Palmdale's Allowed Interest in Palmdale Hills, therefore is worthless.

Likewise, even if the claims asserted in Article 4.5(c) and (d) of the Elieff Disclosure Statement were valid and the requisite insolvency could be proven, the Elieff Plan Proponents have conceded that the Claims and Liens of the Lehman Lenders are valid at least to the extent of proceeds received by the obligor/pledgor. As the proceeds received by SunCal Oak Knoll and SunCal Torrance ($103.5 million and $45 million, respectively) exceed SunCal's estimate of the value of the underlying pledged collateral ($48 million and $25 million, respectively), the Fraudulent Transfer Claims identified in Articles 4.5(c) and (d) of the Elieff Disclosure Statement are without merit.

Finally, with respect to the claims identified in the Elieff Disclosure Statement

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

relating to the Interim Loan Agreement, assuming insolvency as of the date such obligations were incurred can be proved, the maximum potential liability of the Lehman Lenders would be approximately $1.5 million as to the Tesoro Estate and $4.5 million as to the Del Rio Estate. However, based on the Elieff Proponents' own numbers, the unsecured claims at those estates total approximately $290,000 and $270,000, respectively, therefore capping the maximum potential recovery on account of such alleged Fraudulent Transfer Claims at approximately $560,000.

While the Lehman Lenders believe that the Fraudulent Transfer Claims outlined in the Elieff Disclosure Statement are without merit, making assumptions most favorable to the Debtors, the maximum aggregate exposure of Lehman Lenders to such Fraudulent Transfer Claims is no more than approximately $2 million, and the probable value of litigation on such claims significantly less.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**4.4 <u>Alleged Preference Claims Against the Lehman Lenders.</u>**

The Elieff Plan Proponents assert that Delta Coves, SunCal Century City and SunCal Marblehead Heartland Master LLC made prepetition transfers in the one year preceding the Petition Date to Lehman Lenders in the sums of approximately $6.5 million, $10.6 million, and $3.4 million, respectively. The Elieff Disclosure Statement asserts, without any further support, that these payments are recoverable as preferences. However, there is absolutely no factual support in the Elieff Disclosure Statement to support these contentions. In particular, it would be necessary for the Debtors to establish balance sheet insolvency (as required by Bankruptcy Code section 547) in order to be able to maintain a preference recovery. Furthermore, and perhaps more importantly, the Lehman Lenders assert (or in the case of SunCal Century City, at all relevant times asserted) validly perfected first priority security interests and deeds of trust in and to all of the material assets of the Debtors that the Elieff Plan Proponents contend may have made alleged preferential transfers. Under such circumstances, a transfer of some or all of the collateral of a validly perfected secured creditor (even an undersecured creditor) cannot constitute a recoverable preferential transfer as it does not have the effect of depleting assets otherwise available to pay unsecured creditors. Furthermore, as noted above, the Lehman Lenders contend that pursuant to Bankruptcy Code section 550, preferences can only be recovered for the benefit of unsecured creditors of the transferor. The

Lehman Lenders believe that for these, and other reasons that will be asserted at the appropriate time, the preference claims that have been alleged against them are wholly, or largely, without merit and are unlikely to result in Creditors receiving a meaningful recovery.

Finally, the status of any preference claim against Lehman Commercial (which is itself a debtor in a chapter 11 proceeding before the United States Bankruptcy Court for the Southern District of New York) is subject to the treatment in that chapter 11 case. Specifically, there is a distinct possibility that such a claim may be treated as a general unsecured claim in Lehman Commercial's bankruptcy, which claim is subject to an uncertain recovery.

The Elieff Plan Proponents contend that the foreclosure by Lehman ALI on its second priority deed of trust against the Pacific Point Project in August 2008 constituted a preferential transfer because there was no equity value supporting the second priority deed of trust. "Specifically, the fair market value of the Pacific Point Project was and remains approximately $25 million and the alleged obligations securing the first deed of trust was approximately $100 million." However, based upon the Elieff Plan Proponents' own assertions, it is clear that the bankruptcy estate of SJD Partners (and in turn, the unsecured creditors of that Estate) were not deprived of any value by virtue of the alleged foreclosure. Indeed, based upon the Elieff Disclosure Statement, Lehman ALI, as the beneficiary under the first deed of trust, is undersecured by more than $75 million. Under these circumstances, no valid preference claims can be asserted against the Lehman Lenders based on the foregoing transactions.

**4.5 <u>The Equitable Subordination Claims Relating to the Lehman Lenders' Claims.</u>**

The Elieff Disclosure Statement sets forth the basis upon which the Elieff Plan Proponents believe that the Lehman Creditors' Claims could be "equitably subordinated" to the claims of all other unsecured creditors such that distributions that would otherwise be made by the Debtors to the Lehman Creditors on account of their senior secured claims could be redistributed to junior, unsecured creditors.

As the Elieff Plan Proponents acknowledge, equitable subordination requires findings that: the claimant whose claim is sought to be equitably subordinated engaged in some type of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

inequitable conduct; the conduct injured creditors, or conferred an unfair advantage on the claimant; and subordination would not be inconsistent with the Bankruptcy Code. Additionally, applicable case law provides that claims can be subordinated only to the extent necessary to offset the injury to a debtor or its creditors and that the concept of equitable subordination is remedial, not penal, and is a measure that should be used only sparingly. Furthermore, the applicable provision of the Bankruptcy Code (section 510(c)) is clear that a claim may only be subordinated to "all or part of [another] allowed claim" but that a claim cannot be subordinated to an interest.

In January 2009, certain of the Debtors commenced an action in the Bankruptcy Cases (the ES Action), seeking to subordinate all of the Lehman Creditors' Claims and the Danske Bank Claim to payment in full of all unsecured claims against those Debtors and named the Lehman Lenders, Fenway Capital and Danske Bank, among others, as defendants (collectively, the "ES Defendants").

The primary basis of the Equitable Subordination Action as originally Filed was that, beginning in or about August of 2007, the Lehman Lenders took over effective control of all of the material aspects of the Debtors' projects operations without regard as to whether a Lehman entity was the lender or whether a Lehman entity was an equity member and caused the Debtors to incur substantial unsecured vendor claims with the promise of payment that went unfulfilled. The Debtors twice amended their complaint, and thereafter the Lehman Lenders moved to dismiss the second amended complaint for failure to state a claim upon which relief could be granted. At a hearing held on June 11, 2009, the Bankruptcy Court granted the foregoing motion to dismiss, with leave to further amend the complaint. The Bankruptcy Court found that the Debtors had failed to (1) state a claim regarding insider status; (2) tie specific defendants to inequitable conduct or sufficiently state the basis of imputing such conduct; (3) adequately allege "gross and egregious conduct"; (4) identify particular inequitable conduct of defendants against particular Debtor plaintiffs; (5) sufficiently identify the alleged injured creditors; and (6) allege fraudulent conduct with particularity.

In July 2009, the Debtors filed a third amended complaint that added new causes of action alleging preference and fraudulent transfer liability, certain post-petition "bad acts" of the Lehman Lenders, but otherwise asserted similar allegations as the prior Filed complaints. The ES

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Defendants (including the Lehman Lenders) timely filed a motion to dismiss the third amended complaint, which is set for hearing on February 9, 2010.

Notwithstanding the foregoing, the Lehman Lenders are making an offer (the ES Settlement Offer) through the Lehman Plan to Holders of Allowed ES Claims, upon the terms and conditions more fully discussed below. The Debtors estimate that the Lehman Adversary Proceeding will cost between $3 and $4 million to prosecute. Under the Ellieff Plan, it is not clear to what degree Acquisitions or its Affiliates have agreed to fund the anticipated costs and expenses.

**4.6 Alleged Fraud, Breach of Fiduciary Duty and Other Potential Litigation Claims Against the Lehman Lenders.**

Article 4.7 of the Elieff Disclosure Statement purports to set forth further claims against the Lehman Lenders, based upon the Interim Loan Agreement, the Restructuring Agreement of May 2008, and the Pacific Point Foreclosure. However, the narrative contained in the Elieff Disclosure Statement does not state any claim for relief or theory of recovery against the Lehman Lenders based upon the alleged facts and, in reality, asserts nothing different from the material allegations set forth in the Equitable Subordination Claims (more fully discussed in Article 4.5 above).

## V.

## THE ELIEFF PLAN IS UNCONFIRMABLE

**5.1 Consideration of the Elieff Plan is Premature.**[6]

The Elieff Plan does not provide for any recovery to general unsecured creditors of most Debtors unless the Debtors or their successors obtain a successful result in the ES Action (and in particular the cornerstone of that proceeding, the Equitable Subordination Claims). Furthermore, even under the Debtors' flawed legal theories, substantive consolidation is required to achieve the ratable distribution among Creditors of different Debtors that the Elieff Plan proposes. (In fact, regardless of whether there is substantive consolidation, success on the Equitable Subordination Claims does not assure a recovery to all Creditors of a particular Debtor or even to any particular group of creditors, but only potentially to specific Creditors harmed by specific inequitable conduct.)

[6] Terms appearing within quotation marks in this Article V shall have the same meaning as set forth in the Elieff Plan rather than as such terms may be defined either herein or in the Lehman Plan.

If the promise of the Elieff Plan is achieving a recovery based on success on the Equitable Subordination Claims and spreading the bounty through substantive consolidation, then it is inherently misleading to Creditors, not to mention a tremendous waste of resources, to consider confirmation of the Elieff Plan at this time. The Debtors have been unable to state claims for relief so far in the ES Action, and the Lehman Proponents believe that the Third Amended Complaint suffers from the same infirmities that resulted in dismissal of the Second Amended Complaint. In sum, the Lehman Proponents believe that the promise of any recovery under the Elieff Plan is highly speculative and remote until the Debtors have at least been able to state claims against the Defendants in the ES Action (including the Lehman Lenders) that have withstood a motion to dismiss.

**5.2 <u>The Acquisitions Offer is Vague, Incomprehensible and Illusory</u>**

The Elieff Plan purports to offer a 10% recovery by means of a purchase offer (the "Acquisitions Offer"), which under the Elieff Plan is available to the "Holders of General Unsecured Claims that are intended to be beneficiaries of an Equitable Subordination Judgment against Lehman's Disputed Claims and Disputed Liens." Such Creditors are classified in Class 9 under the Elieff Plan.

The Acquisitions Offer is vague, ambiguous, unintelligible and wholly illusory. In particular, unless and until an Equitable Subordination Judgment (an undefined term) is entered, it cannot be determined from the Elieff Plan who are the members of Class 9 (and its subclasses) and who are the intended beneficiaries of the Acquisitions Offer. The purported promise of Acquisitions is that it will purchase such claims within sixty (60) days of the receipt of the Creditors' written election to accept the Acquisitions Offer (which might even precede the Effective Date and thus exacerbate the gerrymandering problem identified below) or sixty days after the Claim becomes an Allowed Claim and given the foregoing, the promise is illusory.[7]

**5.3 <u>The Separate Classification of Class 9 is Improper</u>**

Given that, aside from the Acquisitions Offer, the Elieff Plan does not offer Creditors any meaningful recovery and is therefore unlikely to garner the support of third party holders of such

[7] The use of the word "purchase" is also ambiguous; a "purchase of" and the "payment for" a claim may not be one and the same event.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

claims, it would appear that Class 9 (the members of which are the beneficiaries the purported Acquisitions Offer) constitutes a "gerrymandered" class designed to create at least one impaired accepting class of Creditors for each of the Debtors. It is well established that such a purpose is an improper basis for classification.

Underscoring the lack of any legitimate justification for the separate classification of Class 9 is that the distributions from the Estates for each of Classes 9 and 10 are exactly the same. Both classes receive the same treatment, namely, after payment in full of "Post Confirmation Expenses," "Allowed Administrative Claims," and "Allowed Priority Claims," the Holders thereof receive "their pro rata share from the applicable Distribution Account(s)." *See* Elieff Plan, §§ 5.9(b); 5.10(b). The only difference between Classes 9 and 10 is that the Acquisitions Offer extends only to Class 9. As such, the Acquisitions Offer is effectively an independent offer by one of the Elieff Plan Proponents to purchase certain Claims with its own Cash, independent of the Elieff Plan. Accordingly, the apparent disparate treatment between the Holders of Class 9 claims and Class 10 claims is illusory and cannot form the basis or separate classification of those claims.

Further, Class 9 cannot constitute a separate class of Creditors for the simple reason that its beneficiaries cannot be identified, at least as of the time of solicitation and confirmation of the Elieff Plan.

**5.4 <u>The Plan is Predicated Upon Substantive Consolidation of the Debtors.</u>**

The Elieff Plan provides that its confirmation is not conditioned upon substantive consolidation, but the mechanics of the Elieff Plan appear to be unworkable without it. For instance, it appears from the Elieff Plan that all "Post-Confirmation Expenses," "Allowed Administrative Claims," and "Allowed Priority Claims" are being paid from one Distribution Account. Even though the Elieff Plan makes reference to "the applicable Distribution Account(s)," certain Estates clearly will not have any Available Cash (*i.e.*, unencumbered cash) from which to fund their fair share or any part of these mandatory plan payments. Furthermore, the Elieff Plan is being funded by the "Acquisitions Administrative Loan," which is defined as a single claim and appears to be assertable against all of the Debtors. Section 7.3 of the Elieff Plan provides for use of Available Cash to pay certain administrative, priority and post-confirmation Claims and expenses prior to use

of the Acquisitions Administrative Loan, without specifying how the loan is to be accounted for as between Debtors prior to or absent any substantive consolidation. Accordingly, all of the Debtors' assets are being used to support the loan by which administrative and priority claims will be funded (*i.e.*, a *de facto* substantive consolidation). In addition, the Elieff Plan also attempts to substantively consolidate with respect to the Lehman Creditors' Claims: although many of the Lehman Loans have multiple borrowers and are asserted against multiple Debtors, the Elieff Plan gives the applicable Lehman Creditor only one claim against those multiple Debtors.

**5.5 <u>The Distribution Scheme of the Plan is Untenable</u>**

Any recovery under the Elieff Plan (other than via the Acquisitions Offer) is dependent upon success in the ES Action and the Equitable Subordination Claims stated therein. The Elieff Plan provides that all proceeds of "Litigation Recoveries" are to be deposited into the "applicable Distribution Account(s)." Elieff Plan, § 7.8. Funds in each "Distribution Account" are used to fund "Post-Confirmation Expenses" (or presumably repay the Acquisitions Administrative Loan), "Allowed Administrative Claims," "Allowed Priority Claims," and are then distributed on a pro-rata basis to the Holders of General Unsecured Claims (either on a Debtor-by-Debtor basis or, if there is substantive consolidation, to the Creditors of all consolidated Debtors).

Such a distribution will almost certainly not be permitted by any judgment on the Equitable Subordination Claims. As set forth herein, equitable subordination is a remedy for specific creditors harmed by a defendant's inequitable conduct. The Elieff Plan purports to take away these recoveries and redistribute them in a manner that will significantly reduce, if not eliminate, the recovery to which a beneficiary of any successful Equitable Subordination Claim may be entitled.

**5.6 <u>The Elieff Plan's Treatment of the Lehman Creditors' Claims is Unconfirmable.</u>**

The Elieff Plan's proposed treatment of the Lehman Creditors' Claims is unconfirmable over the objection of the Lehman Creditors. Specifically, under the Elieff Plan: (a) the Lehman Creditors cannot pursue any rights or remedies with respect to collateral until the expiration of the "Sales Period" (an indefinite period of time, which could extend multiple years,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ending on the 180th day following entry of a Final Order resolving the "Lehman's Disputed Claims" and/or the "Lehman Disputed Liens"); (b) the Elieff Plan Trustee is under no obligation to adequately protect or properly maintain the Collateral in the meantime, or, indeed, to do anything whatsoever with respect to the preservation of the Collateral; (c) the Elieff Plan Trustee is given the power to sell the Collateral free and clear of Lehman's Claims and Liens without any right to credit bid; and (d) only in the event the Elieff Plan Trustee fails to dispose of the Collateral within the Sales Period are the Lehman Lenders permitted at that indeterminate point in time, to pursue their respective rights and remedies against the Collateral under applicable law.[8]

The foregoing treatment is unconfirmable over the Lehman Creditors' objections for numerous reasons, including the following:

(A) The Lehman Creditors' claims are classified on a loan-by-loan, rather than a debtor-by-debtor basis. Unless the Elieff Plan is a partially substantively consolidating plan, the Lehman Creditors are entitled to assert, and vote upon Claims on a debtor-by-debtor basis.

(B) The mandatory and indefinite forbearance, without any adequate protection, cannot constitute "fair and equitable" treatment pursuant to Bankruptcy Code § 1129(b). The Lehman Creditors request, and are entitled to adequate protection. There should be a Elieff Plan obligation to assure both Project maintenance and payment of post-Confirmation taxes and a Elieff Plan remedy for any failure. Additionally, proposing no payments to a secured creditor while imposing an extended period of forbearance equates to extreme negative amortization of the Lehman Creditors' secured claims while giving the Debtors an indefinite, no-risk cost-free option. That treatment could not remotely pass muster under the standards for negative amortization set forth in applicable law.

[8] While the Plan does not expressly so state, from a comparison with secured creditors in Classes 1 and 2 who are offered similarly unconfirmable treatment, it appears Acquisitions intends, under these circumstances, that the Lehman Creditors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(C) The Elieff Plan summarily and without any basis or justification eliminates the rights of the Lehman Entities to credit bid for the Collateral pursuant to section 363(k) of the Bankruptcy Code. Just as the Lehman Creditors cannot be deprived of that basic right through the Sales Procedures Motion, they cannot be deprived of that right through a Plan. Accordingly, the Elieff Plan is defective on its face and cannot be confirmed.

(D) Section 5.3(f) of the Elieff Plan improperly strips the Lehman Creditors of recourse claims against the Elieff Plan Trust. None of the distribution schedules reflect distributions on the Lehman Creditors' unsecured claims. The Lehman Loans are recourse as to all of the Debtors.

(E) The Elieff Plan does not require the Elieff Plan Trustee to set aside reserves to ensure that the Holders of Disputed Claims receive the same distributions as the Holders of Allowed Claims in the event their Disputed Claims are ultimately allowed. This is especially problematic given that pending a resolution of the ES Action, the Lehman Creditors will have substantial Disputed Claims against all or substantially all of the Debtors for which substantial reserves must be retained. Failure to provide adequate reserves for Disputed Claims is disparate treatment that could not be confirmed as "fair and equitable" to Holders of such Claims.

Furthermore, the Elieff Plan fails completely to account for the fact that the Lehman Creditors would have residual Secured Claims even if the Debtors were completely successful on their equitable subordination claims. The Debtors contend that equitable subordination is warranted for all but $68.7 million of the unsecured Claims in these Cases. This equates to a maximum subordination of approximately $280 million. The Debtors value the Collateral at $308 million (the

would have no recourse against the Plan Trust or the Plan Trustee, again in violation of applicable provisions of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Entities contend the value is approximately $536 million). Even at the Debtors' valuation, the Lehman Entities' would retain Secured Claims of at least $28 million; at the Lehman Entities' valuation, the minimum amount of residual, secured claims for the Lehman Entities would be approximately $256 million. To the extent the Elieff Plan diverts proceeds of the Collateral to the payment of Post Confirmation Expenses, Allowed Administrative Claims and Allowed Priority Claims rather than to the Lehman Entities on account of their secured claims, its treatment of the Lehman Entities' claims is unconfirmable.

**5.7 <u>The Elieff Plan Violates the Absolute Priority Rule</u>**

Although their interests are nominally cancelled, Acquisitions, and through it the principals of the Debtors, receive important and economically valuable control rights under the Elieff Plan on account of their interests in the Debtors. Specifically, Acquisitions is to act as the Elieff Plan Trustee with the right to control the litigation against the ES Defendants and the sole right to object to claims of all Creditors other than its Affiliates. Those rights have substantial value to Acquisitions and its direct and indirect owners, who have personal liability in respect of the Bond Obligations that they seek to eliminate or reduce through the ES Action and, potentially, a vested economic interest in Claims against the Debtors.

Equity security holders are not allowed to receive any distribution under a plan on account of their equity interests unless classes of claims senior to their equity interests are afforded the treatment set forth in section 1129(b)(2) of the Bankruptcy Code.

The "new value" exception allows junior interest holders (*e.g.*, equity holders in a corporate debtor) to receive a distribution of property under a plan if they offer "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. 2 F.3d at 909. Only those contributions that will actually be paid on the effective date of the plan may be considered as "money or money's worth" under the new value exception. In determining whether the new value contribution is "reasonably equivalent to the value being received," courts have required that the new value be substantial in comparison to such things as (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

unsecured claims by virtue of the contribution.

Literally none of these requirements are satisfied by the Elieff Plan. No new value is provided at all: whatever funds Acquisitions may be called upon to advance are treated under the Elieff Plan as a loan. The amount of the "new value" – zero – is not substantial, by any measure. It is not "money or money's worth" because, among other things, it is not being provided on the Effective Date. Rather, it is a loan that is contingent on the exhaustion of other resources. It is not "necessary for a successful reorganization": this is a liquidation, not a reorganization. Finally, Acquisitions' contingent loan is not "reasonably equivalent to the value received." Acquisitions gives nothing. Rather, it is called upon to *possibly* extend loans that are secured by first priority liens. Furthermore, it apparently receives in exchange repayment of previously extended Cash and a blanket release of Estate Claims (and, gratuitously, a release of its direct and indirect owners). No value is stated for those Claims; if the Debtors have conducted any analysis, they have not shared it with Creditors.

Furthermore, the Elieff Plan may provide that Allowed General Unsecured Claims may receive "interest at the legal rate from and as of the applicable Debtor's Petition date." Disclosure Statement ¶ 2.1.99.[9] However, unless a debtor is solvent or a creditor is oversecured (neither of which is the case here), unsecured creditors do not receive interest. The Debtors are not solvent; thus if the Lehman Creditors' Claims are subordinated, Creditors in Classes 9 and 10 (who are unsecured) cannot receive payment of interest if the Lehman Creditors' Claims are not paid in full. To the extent the Elieff Plan so provides, it violates the absolute priority rule.

**5.8 The Appointment of Acquisitions as the Elieff Plan Trustee Violates Bankruptcy Code Section 1129(5)(a)(II)**

In order for the Elieff Plan to be confirmed, the appointment of Acquisitions as the Elieff Plan Trustee must be "consistent with the interest of creditors and equity security holders and with public policy." 11 U.S.C. §1129(a)(5)(A)(II). Under the Elieff Plan, the Elieff Plan Trustee will prosecute the ES Action and be the sole party responsible for objecting to Claims, with limited exceptions. However, Acquisitions has irreconcilable conflicts in carrying out both of these

[9] "Maximum Distributions" is so defined. The Elieff Plan is unclear, however, whether unsecured creditors are to receive Maximum Distributions in the event the Lehman Creditors' Claims are equitably subordinated.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

responsibilities.

As to the prosecution of the ES Action, assuming that certain Creditors elect to accept the Acquisitions Offer, Acquisitions will be both the Trustee of, and the beneficiary of the Elieff Plan Trust with respect to the ES Action. This creates inherent conflicts of interest. Acquisitions and/or its Affiliates have personal liability in respect of a subset of the general unsecured claims, *i.e.*, the Bond Obligations. Acquisitions can be expected to utilize its control of the prosecution of the ES Action to seek the satisfaction of those Claims which are most likely to result in personal liability to its owner, Bruce Elieff, regardless of whether there are other strategies that would benefit a broader number of Creditors. As well, the Elieff Plan would vest Acquisitions with an indeterminate priority status for repayment of the "Acquisitions Administrative Loan," a status that may put its interests into conflict with those of General Unsecured Creditors, and which would give it substantial leverage in any such dispute. This conflict further infects the Acquisitions Offer: to the extent that Acquisitions agrees to purchase Class 9 Claims pursuant to the Acquisitions Offer (the payment for which need not be made until sixty days after such purchased claim becomes an Allowed Claim), Acquisitions will have an improper incentive to object to the purchased Claims in order to delay, defer or reduce the purchase price expense incurred by Acquisitions. Further, to the extent that Acquisitions and its Affiliates have liability for some or all of the Bond Obligations, Acquisitions, as Elieff Plan Trustee, will have an improper incentive not to object to any of those Claims, thereby reducing the recovery of the Holders of other Allowed Claims and reducing its own exposure to the Bond Insurers in respect of the Bond Obligations.

**5.9 <u>The Terms of the Acquisitions Administrative Loan are Indefinite</u>**

The "Acquisitions Administrative Loan" is a loan of indefinite amount, interest rate or payment terms, to be advanced by Acquisitions as needed for payment of Administrative Claims, Priority Claims and ongoing Professional Fees, to the extent there is insufficient Available Cash in the Estates. No matter the amount, apparently making the loan results in a release of all Estate causes of action against Acquisitions and its Affiliates, defined so as to include Mr. Elieff. It is also conditioned upon "Allowance of the Acquisitions Administrative Loan in an amount equal to all Chapter 11 and post-confirmation funding caused by Acquisitions to the extent that the same has not

already been approved by the Court." No interest rate or payment terms are stated, nor is it clear what 'allowance of the loan' means or what amount of already extended funding such allowance is intended to cover. Nor are there any provisions for default or termination. What if Acquisitions determines to cease funding? The rights and obligations of Acquisitions, as the lender are insufficiently stated in the Elieff Plan.

**5.10 <u>The Elieff Plan Violates the Best Interest of Creditors Test</u>**

The "best interests of creditors" test under section 11 U.S.C. §1129(a(7)(A)(ii) requires that creditors receive as much pursuant to a chapter 11 plan as they would from a chapter 7 liquidation. The Elieff Disclosure Statement purports to summarize recoveries under the Elieff Plan, but it simply assumes total success on the Equitable Subordination Claims against the ES Defendants. However, whatever Claims exist against the ES Defendants would continue to exist after a conversion of all of these cases to chapter 7. Furthermore, there are claims that are waived under the Elieff Plan against Acquisitions and Affiliates that are not identified or assigned any value in the Elieff Disclosure Statement. Furthermore, there is a partial redistribution built into the structure of the Elieff Plan that would likely leave at least some Creditors worse off under the Elieff Plan than in liquidation. The Elieff Plan allocates recoveries on a judgment in the ES Action first to pay post-confirmation, administrative and priority claims and then, on a *pro rata* basis, to compensate Creditors who are not the beneficiaries of a judgment on the Equitable Subordination Claims. Thus it appears likely, if not probable, that a true best interest of creditors test analysis would demonstrate that if the ES Action is even partially successful, certain Creditors may well receive higher recoveries in a chapter 7 liquidation than under the Elieff Plan.

**5.11 <u>The Elieff Plan's Treatment of Class 1 and Class 2 Secured Real Property Tax Claims Violates the Express Provisions of Bankruptcy Code Section 1129 (a)(9)(c)</u>**

The Elieff Plan provides that Secured Real Property Tax Claims against the Collateral shall be paid according to priority if the Collateral is sold during the "Sales Period," but otherwise cannot exercise their rights and remedies until after the Sales Period, without recourse to the Elieff Plan Trust. Holders of Allowed Secured Real Property Tax Claims secured by other property may

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

exercise their rights on the Effective Date, but again without recourse to the Elieff Plan's Trust.

To the extent that the Claims encompassed by Classes 1 and 2 under the Elieff Plan are Priority Tax Claims within the scope of Bankruptcy Code § 507(a)(8), absent consent, the Elieff Plan must provide for the treatment mandated in Bankruptcy Code § 1129(a)(9)(c), *i.e.*, regular installment payments in cash, of a total value as of the Effective Date equal to the allowed amount of such claim over a period not to exceed five years from the date of entry of the applicable order for relief, and in a manner not less favorable than the most favored non-priority unsecured claim under the Elieff Plan. The proposed treatment of claims in Classes 1 and 2 violates all of the foregoing requirements and therefore renders the Elieff Plan unconfirmable on its face. This is no small issue, given the Elieff Plan estimate that the aggregate amount of Class 1 claims is almost $13 million.

## VI.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 6.1 Voluntary Debtors.

Since the Petition Dates, beginning in November 6, 2008, the seventeen (17) Voluntary Debtors have continued to operate as a "debtors-in-possession" subject to the supervision of the Bankruptcy Court. The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are jointly administered with each other pursuant to orders entered on November 10, 2008 and November 26, 2008. The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' Chapter 11 Cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, Morgan Lewis & Bockius LLP as their special litigation counsel for the Southern District of New York and Miller Barondess, LLP as their special litigation counsel.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

### 6.2 Trustee Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The Trustee Debtors are represented by their duly-appointed Chapter 11 trustee, Steven M. Speier, pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

The Trustee has Filed an application to employ the Lobel Firm as the Trustee's general insolvency counsel and Miller Baroness LLP as special litigation counsel.

The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang, Ekvall & Strok, LLP as its counsel.

**6.3 The Debtors' Motion for Relief from Stay in the Lehman Commercial Chapter 11 Proceedings.**

On November 10, 2008, the Debtors Filed a motion for an order modifying the automatic stay in the Lehman Commercial Bankruptcy Proceeding to allow the Debtors to administer their own Cases to the extent that such Cases, and the relief requested by such Debtors therein, may affect the rights of Lehman Commercial. The Debtors also requested the court to allow the Debtors to proceed to obtain post-petition debtor-in-possession financing on a priming lien basis that would subordinate Lehman Commercial's Claims and Liens arising from the Ritter Ranch Loan Agreement and the SunCal Communities I Loan Agreement to those of a proposed debtor-in-possession lender. Lehman Commercial opposed the motion on November 18, 2008 and the objection was joined by the Lehman Commercial Official Creditors' Committee. The motion was denied, without prejudice, by the New York Bankruptcy Court pursuant to an order entered on November 21, 2008.

**6.4 Certain of the Voluntary Debtors' Motion for Surcharge and Use of Cash Collateral.**

On January 16, 2009, seven of the Debtors Filed a motion seeking an order authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of Lehman Commercial arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Debtors' Projects that are subject to deeds of trust and other security held by Lehman Commercial.

Lehman Commercial objected to the motion and subsequently Filed a motion in the New York Bankruptcy Court requesting the New York Bankruptcy Court to enforce its automatic stay as to the motion. The motion was taken off calendar prior to any ruling by the New York Bankruptcy Court.

**6.5 Lehman Commercial's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects.**

On January 23, 2009, Lehman Commercial and Lehman ALI Filed in the Bankruptcy Court various motions for relief from the automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the "Lehman Lenders' Stay Motions") pursuant to which Lehman Commercial and Lehman ALI sought to foreclose on, *inter alia,* their deeds of trust encumbering certain of the Debtors' Projects.

On February 4, 2009, the Debtors Filed an opposition to Lehman Commercial and Lehman ALI's requests for relief from stay. On February 13, 2009, Lehman Commercial and Lehman ALI Filed a reply to the Debtors' opposition primarily asserting that the ES Action would violate Lehman Commercial's automatic stay.

On March 10, 2009, the Bankruptcy Court entered an order denying the Lehman Lenders' Stay Motion without prejudice. Lehman Commercial has appealed the Bankruptcy Court's order.

**6.6 The Debtors' Filing of the ES Action Against the Lehman Lenders.**

On January 6, 2009, the Voluntary Debtors Filed the ES Action against, *inter alia,* Lehman ALI in the jointly administered cases of the Voluntary Debtors requesting, amongst other relief, that Lehman ALI's liens be equitably subordinated to the claims of unsecured creditors in all of the Debtors' Cases. On February 3, 2009, the Debtors Filed a first amended complaint adding the Trustee Debtors as plaintiffs to various causes of action. On March 11, 2009, the Debtors Filed a motion for leave to File a second amended complaint to add Lehman Commercial as a defendant in the ES Action. On March 24, 2009, the Bankruptcy Court granted this request and deemed the second amended complaint to be Filed. On March 26, 2009, the Lehman Lenders filed an appeal of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Bankruptcy Court's order.

On April 27, 2009, the Lehman Lenders Filed a motion to dismiss the second amended complaint (the "Motion to Dismiss Second Amended Complaint"), alleging, among other things, that the Debtors' requested relief was not available as a matter of law and that the Debtors were seeking to circumvent legal restrictions by substantive consolidation. On May 11, 2009, the Debtors Filed an opposition to the Motion to Dismiss Second Amended Complaint, stating that the second amended complaint is not "premised on" substantive consolidation and states a valid cause of action for equitable subordination of the Claims or Interests of the applicable Lehman Lenders. On May 15, 2009, the Lehman Lenders Filed a reply, alleging that the Debtors failed to state their cause of action with sufficient specificity or detail to establish a claim.

As more fully discussed in Section 4.5 above, at a hearing held on June 11, 2009, the Bankruptcy Court dismissed the second amended complaint with leave to amend. In July, 2009, the Debtors Filed a third amended complaint, adding new causes of action as set forth in Section 4.5 above. The deadline for all defendants to File a responsive pleading to the third amended complaint is September 30, 2009. The Lehman Lenders intend to move to dismiss the complaint for, among other things, failure to state a claim on which relief can be granted.

**6.7 Certain Debtors' Filing of the Sales Procedures Motion.**

On February 18, 2009, the Trustee Debtors and certain Voluntary Debtors Filed a motion (the "Sale Procedures Motion") seeking approval of overbid procedures for a purchase by D.E. Shaw of a significant portion of the Debtors' assets for $200 million and its purported assumption of certain related bond liabilities personally guaranteed by Elieff. Although the Sale Procedures Motion indicated that D.E. Shaw would assume the bond liabilities as part of its purchase of the properties, there was no such commitment in D.E. Shaw's commitment letter. The commitment letter provided that $175 million of the purchase price would be paid in cash and the remaining $25 million would be in the form of an assumption of the Debtors' contractual and other obligations. As part of the Sale Procedures Motion, the Debtors seeking relief conditioned the sale on the disallowance of the Lehman Lenders' credit bid rights and the transfer of their Liens to the Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

On March 10, 2009, the Bankruptcy Court commenced a hearing on the Sale Procedures Motion. At that hearing, the Bankruptcy Court held that the automatic stay in the Lehman Commercial Bankruptcy Proceeding did not apply to the Sales Procedures Motion and continued the Sales Procedures Motion to March 20, 2009.

At the March 20, 2009 hearing, the parties agreed to continue the Sale Procedures Motion to allow settlement discussions to take place. The Sale Procedures Motion has been continued from time to time. In August 2009, the Sales Procedures Motion was modified to exclude the 10000 Santa Monica Project owned by SunCal Century City and to reduce the purchase price to $150 million pursuant to a tentative settlement agreement between Danske Bank and the Trustee. Based upon disclosures made by the Trustee, pursuant to that settlement agreement, the Trustee will convey the 10000 Santa Monica Project to Danske Bank in exchange for $5.3 million. The Trustee has further disclosed that the settlement agreement provides that SunCal Century City will retain any right it has, or may have, to pursue any Avoidance Actions against the Lehman Lenders with respect to the 10000 Santa Monica Project and SunCal Century City.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(a) <u>Lehman Commercial's Stay Assertion and the Sales Procedure Motion.</u>**

On March 9, 2009, the Trustee, SCC Communities, Del Rio, and Tesoro Filed emergency motions for an order that the automatic stay in the Lehman Commercial Bankruptcy Proceeding does not apply to the Sales Procedures Motion.

On March 10, 2009, Lehman Commercial, Lehman ALI, Northlake Holdings and OVC Holdings Filed responses to the emergency motions, asserting that Lehman Commercial's automatic stay prevented the Bankruptcy Court from hearing the Sales Procedures Motion.

On March 10, 2009, the Bankruptcy Court held that the automatic stay in the Lehman Commercial Bankruptcy Case does not apply to the Sales Procedures Motion.

**(b) <u>Danske Bank's Intervention into the Sales Procedures Motion.</u>**

On March 25, 2009, Danske Bank Filed a supplemental response to the Sales Procedures Motion. Danske Bank's supplemental response asserts various allegations, including the allegations that Danske Bank has a first-priority deed of trust on the 10000 Santa Monica Project by

the virtue of the SunCal Century City Loan Agreement and related loan documents and that the Secured Claim and Lien arising from the SunCal Century City Loan Agreement and related loan documents are not subject to a bona fide dispute because there has been no allegation of wrongdoing by Danske Bank and that Danske Bank is a holder in due course that effectively cuts off any defenses to the loan based on the Lehman Lenders' alleged inequitable conduct.

On April 1, 2009, the Debtors Filed a reply to Danske Bank's supplemental response asserting that Danske is not a holder in due course and that Danske Bank took the assignment of the disputed loan subject to all defenses thereto, including the defense of equitable subordination described below.

**(c) Lehman's Disclosure of the Repurchase Agreement Involving Certain Loans with the Debtors.**

After the emergence of Danske Bank in connection with the Sales Procedure Motion, the Debtors demanded that the Lehman Lenders disclose any other loans of the Debtors that were subject to repurchase agreements. In response, on or about April 15, 2009, the Lehman Lenders provided a letter to the Debtors disclosing the Repurchase Lehman Loans.

**(d) The Modifications to the Sales Procedure Motion.**

The Sales Procedures Motion was thereafter modified to include a purchase of the Assets of only the Trustee Debtors and the D.E. Shaw proposed aggregate purchase price was reduced from $200 million to $195 million.

**6.8 The Lehman Administrative Loans.**

**(a) The Stipulation.**

At a hearing on March 20, 2009, the Bankruptcy Court approved a stipulation (the "Financing Stipulation") among Lehman ALI, Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, pursuant to which each of the foregoing Debtors was authorized to borrow from Lehman ALI and Lehman ALI agreed to make individual loans in an aggregate amount equal to $1,790,572 for the purposes of paying the costs and expenses provided in their 30-day budgets and for paying up to $250,000 of certain professional

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

expenses limited to settlement efforts (the "Lehman Administrative Loans"). The loan proceeds were used to pay for the most urgent and critical public health and safety issues on certain of the Projects. The Financing Stipulation provided Lehman ALI superpriority administrative status in each of the Debtor borrowers' Estates on account of the Lehman Administrative Loans. The Lehman Administrative Loans also have priming lien status on all of the borrowing Debtors' Assets with the exception of SunCal Century City in which the Lehman Administrative Loans have junior priority. The following is a breakdown of each Debtors' loans comprising the Lehman Administrative Loans:

| DEBTOR NAME | 1-MONTH TOTAL |
|---|---|
| SunCal Century City | $ 3,166 |
| Acton Estates | $37,059 |
| SunCal Beaumont | $0 |
| SunCal Bickford | $83,454 |
| SunCal Torrance | $0 |
| Del Rio | $0 |
| Delta Coves | $302,307 |
| SunCal Emerald | $70,259 |
| SunCal Heartland | $163,231 |
| Johannson Ranch | $0 |
| SCC Communities | $0 |
| Marblehead | $455,009 |
| SunCal Northlake | $46,909 |
| SunCal Oak Knoll | $250,876 |
| Oak Valley | $249,534 |
| SunCal PSV | $48,809 |
| Palmdale Hills | $79,959 |
| SunCal Summit Valley | $0 |
| Tesoro | $0 |
| **Total** | $1,790,572 |

**(b) The Rubidoux Objection.**

On April 10, 2009, Rubidoux (defined below) and EMR (defined below) Filed an objection to the Lehman Administrative Loans. The basis for the objection was that SunCal Emerald holds title to portions of the Emerald Meadows Project in constructive trust for Rubidoux and EMR and the Financing Stipulation allowed SunCal Emerald to further encumber the SunCal Emerald Meadows Project with superpriority liens, thereby threatening Rubidoux's and EMR's rights to have those portions of the SunCal Emerald Meadows Project returned to them unencumbered, as provided contractually among EMR, Rubidoux and SunCal Emerald. Accordingly, Rubidoux and EMR

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

requested that superpriority liens not attach to a certain portion of the SunCal Emerald Meadows Project. The Lehman Lenders and certain Debtors agreed to modify the Lehman Administrative Loans in this regard.

**(c) Voluntary Debtors' Further Surcharging Motion.**

On September 1, 2009, 14 of the Debtors filed a motion seeking authority to surcharge collateral pursuant to Bankruptcy Code § 506(c) or use the alleged "cash collateral" of the Lehman Lenders for the purpose of addressing public health, safety and other issues relating to some of the Debtors' Projects. In the motion, the Debtors proposed a 120-day budget with expenses totaling $6,483,316. At a hearing held on September 22, 2009, the Lehman Lenders advised the Court of an agreement subject to documentation, which agreement would provide the funding for a 120-day budget with expenses totaling approximately $5 million, funded from Palmdale Hills.

**6.9 The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.**

Various contractors of the Debtors that were hired to perform work on some of the Projects have Filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims against the Bond Issuers. These creditors have requested the Bankruptcy Court relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including rights to payment under certain surety bonds that are alleged to have been issued in favor of such creditors. The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties. The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the surety bonds against the Bond Issuers.

**6.10 The Debtors' Motion Pursuant to Bankruptcy Code Section 506(d).**

On May 29, 2009 and June 9, 2009, the Debtors Filed motions seeking orders (i) valuing certain collateral at zero dollars, which allegedly secure certain disputed proofs of claim Filed by the Lehman Lenders, pursuant to 11 U.S.C. § 506(a) and Federal Rule of Bankruptcy Procedure 3012 as set forth in the below chart, (ii) voiding the corresponding liens, pursuant to 11

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

U.S.C. § 506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

| *Disputed Proof of Secured Claim No.* | *Debtor* | *Claim Holder* | *Alleged Amount* | *Alleged Collateral* |
|---|---|---|---|---|
| 1 | SunCal I | Lehman Commercial | $343,221,391 | SunCal I's allowed interest in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford. |
| 1 | SCC Palmdale | Lehman Commercial | $119,664,305 | SCC Palmdale's allowed interest in Palmdale Hills. |
| 2 | SunCal III | Lehman Commercial | $343,221,391 | SunCal III's ownership interest non-existent investment property |
| 17-2 | SunCal Bickford | Lehman ALI | $56,494,059 | Second priority deed of trust on the Bickford Ranch Project. |

**6.11 <u>The Debtors' Motions to Strike the Claims and Pleadings Arising from the Repurchase Lehman Loans</u>**

On June 9, 2009, the Debtors Filed a motion seeking an order striking certain pleadings Filed by the Lehman Lenders to the extent that they are premised on the Lehman Lenders' ownership of the Repurchase Lehman Loans and striking any future pleadings Filed by the Lehman Lenders that are premised on their ownership of the Repurchase Lehman Loans. As noted in Section 3.6 above, the Bankruptcy Court has ruled that the Lehman Lenders have "sold" the Repurchase Lehman Loans to Fenway Capital (a conclusion that is vigorously contested by the Lehman Lenders) and set a hearing for September 22, 2009 to determine whether, notwithstanding what the Bankruptcy Court determined was a "sale" of the Repurchase Lehman Loans, the Lehman Lenders were authorized to File proofs of claim on account of the Repurchase Lehman Loans as agents for Fenway Capital.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**6.12 The Debtors' Denied Preliminary Injunction Motion Against the Holders of Bond Claims.**

On February 20, 2009, the Debtors Filed a complaint and a motion for preliminary injunction, pursuant to which the Debtors sought a preliminary injunction against the Holders of Bond Claims from pursuing such Claims.

On February 23, 2009, the Bankruptcy Court denied the Debtors' request for a temporary restraining order and granted the Debtors' request to require the defendants thereon to show cause why the motion for preliminary injunction should not be granted.

On March 2, 2009, several Bond Claimants objected to the motion for the preliminary injunction. The objections generally alleged that the Debtors failed to show that the balancing of the equities favored granting the preliminary injunction versus the harm to the Bond Claimants.

At a hearing held on March 4, 2009, the Court denied the motion for preliminary injunction and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

**6.13 The Non-Lehman Related Primary Secured Lenders' Motions for Relief from Stay.**

Various secured creditors, including Philip C. Dowse, successor Trustee of the Philip C. Dowse revocable trust, and Patricia I. Volkerts, as trustee, have Filed motions for relief from stay with respect to portions of the properties owned by Seven Brothers and SunCal Beaumont. Such secured creditors are not defendants in the ES Action, and the applicable Debtors have not opposed the requested relief. There are other similarly situated secured parties in the real properties owned by Seven Brothers, SunCal Beaumont, and SunCal Summit, which may result in foreclosure of such real property.

**6.14 The Rubidoux 60 Litigation.**

**(a) Procedural Background.**

On December 17, 2008, Rubidoux and EMR Filed a complaint in the Bankruptcy Court to remove a prior action (the "Rubidoux Action") filed with the Superior Court of the State of California, County of Riverside (the "Superior Court") to the Bankruptcy Court. The Rubidoux

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Action filed with the Superior Court is against SunCal Emerald for breach of contract, breach of implied covenant of good faith and fair dealings, and declaratory relief.

On March 10, 2009, SunCal Emerald Filed a motion to remand the Rubidoux Action to the Superior Court on the grounds that (i) the Rubidoux Action raises exclusively issues of state law and invokes no substantive right created by the Bankruptcy Code; (ii) the Rubidoux Action is a non-core proceeding and the parties have duly made a demand for a jury trial with the Superior Court; (iii) SunCal Emerald did not consent to the Bankruptcy Court's conducting a jury trial of, or entry of a final order with respect to, the Rubidoux Action; and (iv) SunCal Emerald would suffer prejudice if the Bankruptcy Court did not remand the Rubidoux Action.

On April 16, 2009, Rubidoux and EMR Filed a first amended complaint with the Bankruptcy Court and sought to add three additional claims against SunCal Emerald as described below.

On April 23, 2009, SunCal Emerald Filed an opposition to the filing of the first amended complaint based on the grounds that Rubidoux and EMR's proposed amendment sought to (i) address a controversy that did not exist and (ii) prevent a potential outcome that was not possible under the law. On April 23, 2009, Rubidoux and EMR Filed an opposition to SunCal's Emerald's motion to remand the Rubidoux Action to the Superior Court.

On May 7, 2009, the Bankruptcy Court granted SunCal Emerald's motion to remand the Rubidoux Action to the Superior Court. The Rubidoux Action is currently pending before the Superior Court.

**(b) <u>Rubidoux's Allegations.</u>**

Rubidoux and EMR make the allegations that (i) certain real property over which SunCal Emerald holds legal title is actually being held in constructive trust for Rubidoux and EMR, (ii) said property therefore should not be considered part of SunCal Emerald's bankruptcy estate, and (iii) that certain funds currently held in an escrow account that SunCal Emerald refuses to allow to be released to Rubidoux and EMR should also not be considered part of SunCal Emerald's bankruptcy estate because such funds belong to Rubidoux and EMR.

According to Rubidoux and EMR, these allegations are based on various prepetition

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

agreements among EMR, Rubidoux and SunCal Emerald, pursuant to which SunCal Emerald allegedly holds title to portions of the Emerald Meadows Project in constructive trust for EMR and Rubidoux. Rubidoux and EMR allege that portions of the Emerald Meadows Project were temporarily transferred to SunCal Emerald, without any consideration, and that SunCal Emerald is required to transfer such property back to EMR and Rubidoux when certain parcel maps are recorded.

Rubidoux and EMR also allege that approximately $500,000 that is currently held in a certain escrow account by SunCal Emerald should be paid to Rubidoux and EMR.

If Rubidoux and EMR are successful in the Rubidoux Action, the SunCal Emerald Estate will be comprised of less property that could be available to other Holders of Claims against the SunCal Emerald Estate.

**6.15 Church Litigation.**

On March 30, 2009, Life Church of God in Christ (the "Church") Filed an adversary complaint (the "Church Litigation") against SunCal Emerald for breach of contract, breach of implied covenant of good faith and fair dealings and declaratory relief.

The Church alleges that SunCal Emerald has not used its best efforts as required by certain agreements to record various maps to entitle the property owned by SunCal Emerald and such failure has caused its inability to transfer certain portions of the property owned by SunCal Emerald to the Church. The Church further alleges that SunCal Emerald is obligated to make certain improvements to described property but has failed to do so. The Church also alleges that SunCal Emerald has failed to keep the property free and clear of liens and encumbrances as required by certain agreements.

On April 1, 2009, SunCal Emerald Filed its response to the adversary complaint generally denying various elements of the causes of action asserted against it and asserting various affirmative defenses.

**6.16 Mechanic's Lien Claims.**

Mechanic's Lien claims constitute Claims arising pursuant to California Civil Code §3110 et seq. that were either perfected prepetition or otherwise satisfy the requirements of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bankruptcy Code 546(b). There are approximately $27 million of asserted Mechanic's Lien claims against various of the Debtors' Projects.

The $27 million of Mechanic's Lien claims exclude $275,918 of Mechanic's Lien claims asserted against Del Rio and $1,996,537 of Mechanic's Lien claims asserted against SJD Partners, neither of which own real property.

**6.17 <u>The Debtors' Potential Preferential Transfers.</u>**

The Debtors' Schedules and Statement of Financial Affairs, which are on file with the Bankruptcy Court and available for viewing, provide a list of all payments made to creditors, other than Insiders, for the 90 days preceding the respective Petition Dates, and all payments made to insiders during the one year preceding the respective Petition Dates.

Below is a summary showing the total payments by each Debtor to non-insiders within the 90 days preceding the Petition Date for each Debtor, as disclosed by the Debtors in the Schedules and Statement of Financial Affairs.

| NAME OF DEBTOR | AMOUNT TRANSFERRED |
|---|---:|
| Acton Estates | $1,300.00 |
| SunCal Beaumont | $25,244.97 |
| SunCal Bickford | $133,669.98 |
| SunCal I | $0.00 |
| SunCal III | $0.00 |
| SunCal Emerald | $128,287.10 |
| SunCal Johansson | $26,187.00 |
| Kirby Estates | $0.00 |
| Del Rio | $86,622.93 |
| SCC Palmdale | $0.00 |
| Palmdale Hills | $6,002,491.87 |
| SCC Communities | $500.00 |
| Seven Brothers | $0.00 |
| SJD Development | $25.00 |
| SJD Partners | $748,926.28 |
| SunCal Summit Valley | $39,649.77 |
| Tesoro | $659.00 |
| SunCal Century City | $190,087.05 |
| Delta Coves | $597,961.92 |
| SunCal Heartland | $48,896.50 |
| SunCal Marblehead | $1,798,895.67 |
| SunCal Northlake | $833,921.81 |
| SunCal Oak Knoll | $2,324,630.92 |
| SunCal Oak Valley | $316,534.90 |
| SunCal PSV | $446,722.69 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| SunCal Torrance | $18,618.50 |
|---|---|
| Total | $13,769,833.86 |

Under the Lehman Plan, the Liquidating Trustee is authorized to investigate and pursue potential Avoidance Actions.

Below is a summary showing the total payments by each Debtor to SunCal within one year preceding the Petition Date for each Debtor, as disclosed by the Debtors in the Schedules and Statements of Financial Affairs.

| NAME OF DEBTOR | AMOUNT TRANSFERRED | RECIPIENT |
|---|---|---|
| Acton Estates | $7,885.12 | SunCal Management |
| SunCal Beaumont | $15,602.83 | SunCal Management |
| SunCal Bickford | $492,802.57 | SunCal Management & Acquisitions |
| SunCal I | $20,449.52 | SunCal Bickford |
| SunCal III | $0.00 | N/A |
| SunCal Emerald | $884,890.80 | SunCal Management & Acquisitions |
| SunCal Johansson | $8,046.53 | SunCal Management & Acquisitions |
| Kirby Estates | $500.00 | SunCal Management |
| Del Rio | $50,721.00 | SunCal Management & Acquisitions |
| SCC Palmdale | $238,352.34 | N/A |
| Palmdale Hills | $1,149,348.04 | SunCal Management & Acquisitions |
| SCC Communities | $0.00 | |
| Seven Brothers | $0.00 | N/A |
| SJD Development | $0.00 | N/A |
| SJD Partners | $498,351.39 | SunCal Management |
| SunCal Summit Valley | $16,717.60 | Acquisitions & SC Master Marketing LLC |
| Tesoro | $5,000.00 | Acquisitions |
| SunCal Century City | $747,727.13 | SunCal Management & Acquisitions |
| Delta Coves | $2,305,572.58 | SunCal Management & Acquisitions |
| SunCal Heartland | $282,628.75 | SunCal Management; SunCal Marblehead Heartland Master LLC |
| SunCal Marblehead | $945,435.28 | SunCal Management; Acquisitions; and SunCal Marblehead Heartland Master LLC |
| SunCal Northlake | $819,207.14 | SunCal Management; Acquisitions; SCC College Park LLC |
| SunCal Oak Knoll | $2,914,645.70 | SunCal Management and Acquisitions |
| SunCal Oak Valley | $87,293.65 | SunCal Management and Acquisitions |
| SunCal PSV | $4,345.05 | SunCal Management; Lehman SunCal Real Estate Fund |
| SunCal Torrance | $310,181.43 | SunCal Management; Acquisitions; SunCal PSV; and Lehman SunCal Real Estate Holdings |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Total $11,805,704.45

The Debtors contend that these payments were made in the ordinary course of the Debtors' business, predominately in the form of management fees. However, as described below, the Lehman Plan preserves the right of the Liquidating Trustee to pursue any valid claims based on these transfers. The Elieff Plan, however, would release all of the foregoing claims against Elieff and any of his related parties.

**6.18 The Debtors Substantive Consolidation Motion**

On September 24, 2009, the Debtors filed a motion for substantive consolidation of some, but not all, of the Debtors' assets and liabilities, as well as non-debtor LV Pacific Point LLC. The substantive consolidation motion does not include the Estates of Seven Brothers, Kirby Estates, SunCal Beaumont or SunCal Johansson, ostensibly for the reason that "such Debtors do not have a Lehman Lender or Lehman Successor as their primary Secured Creditor, do not have any Assets or value, or do not have unsecured creditors". As more fully set forth herein, the Lehman Proponents do not believe that the foregoing substantive consolidation motion has any merit and intend to vigorously oppose the motion. The Debtors content that if the motion is granted, the Trustee will be discharged but both Committees will remain in place.

**6.19 Debtors' and Lehman Lenders' Motions to Approve Administrative Loans for Payment of Professionals**

On September 4, 2009, the Debtors filed a motion seeking approval of the Acquisitions Administrative Loan upon various terms more fully disclosed therein. The Debtors filed an application for an order shortening time to have a hearing held on such motion on September 22, 2009. The Court denied the application for an order shortening time and the Trustee has declined to proceed with the motion.

On September 25, 2009, the Trustee and the Lehman Lenders filed a joint motion seeking an order authorizing the Trustee to use the Lehman Lenders' alleged cash collateral held by the Trustee Debtors and Voluntary Debtors to pay for certain professionals hired at the expense of the Estates in these Cases. The Voluntary Debtors and certain other parties in interest filed oppositions to this motion and the Voluntary Debtors have also filed an *ex parte* motion to continue

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the hearing on the joint motion (currently scheduled to occur on October 15, 2009) to November 5, 2009 (the date on which the alternative financing motion of the Voluntary Debtors (described below) is scheduled to be heard. In response to the opposition to the joint motion, the Trustee and the Lehman Lenders filed a reply in which they agreed to modify the proposed stipulation attached to the joint motion. The Trustee and the Lehman Lenders have objected to the *ex parte* motion for continuance.

The Voluntary Debtors have filed a motion seeking authority to use the Lehman Lenders' cash collateral and to authorize loans from Acquisitions to pay professional fees and expenses, up to a cap of $2.7 million. This motion is currently set for hearing on November 5, 2009.

**VII.**

**LEHMAN CREDITORS' PLAN**

**7.1 Treatment of Unclassified Claims.**

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests into various Classes according to their right to priority. However, certain types of Claims are not classified in any Classes under the Lehman Plan and the Lehman Proponents have not placed such Claims in a Class. These Claims are "unclassified." As to Allowed Administrative Claims and Allowed Priority Tax Claims, these Claims are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Other unclassified Claims support Liens that have not been avoided, but are not classified to the extent the Claims were not timely Filed. The treatment of these unclassified Claims is as provided below.

**7.2 Treatment of Allowed Administrative Claims.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claim Bar Date set forth in the Lehman Plan, the Liquidating Trustee shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

Claim representing obligations incurred prior to the Effective Date in the ordinary course of post-petition business by the Plan Debtors (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**(a) Treatment and Repayment of the Lehman Administrative Loan(s).**

The Lehman Administrative Loans (certain post-petition and pre-Confirmation financing provided by Lehman Related Parties pursuant to order(s) of the Bankruptcy Court, as more fully defined above) are Allowed in the amount loaned or advanced by Lehman ALI after the commencement of the Cases net of any repayment thereof and shall be paid in Cash in full on the Effective Date, together with any interest, charges and expenses due thereupon, or shall be payable at such later time and on such terms more favorable to the Liquidating Trustee to which the applicable Lehman Related Party may agree; provided that repayment of any loans made through use of Cash Collateral shall be repaid by replenishing such Cash Collateral and depositing the amount thereof in the Plan Reserve for treatment in accordance with this Plan. Pending any such payment or during a period of voluntary deferral by the applicable Lehman Related Party, the Lehman Administrative Loans and any interest, charges and expenses due thereupon shall continue to have a first priority Lien against the respective Assets securing such loans, including any proceeds thereof deposited in the Plan Reserve or Post-Confirmation Accounts (with the exception of the Lien for the amounts due under the Lehman Administrative Loan secured by the 10000 Santa Monica Project, which shall be subordinate to the Secured Claims and Liens arising from the SunCal Century City Loan Agreement).

**(b) Administrative Claim Bar Date.**

Any Administrative Claim which is subject to an Administrative Claim Bar Date and not Filed by the applicable Administrative Claim Bar Date shall be disallowed, and no distribution shall be made on account of any such Administrative Claim.

**(i) General Administrative Claim Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Plan Debtors' postpetition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which the bar date described in the following Section shall apply) shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee no later than the General Administrative Claim Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Liquidating Trustee. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claim Bar Date and that is not Filed and served on or before the General Administrative Claim Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that is required to File a request for payment of such Administrative Claims and does not File such a request by the deadline established in the Lehman Plan, shall be forever barred from asserting such Administrative Claims against the Plan Debtors, the Liquidating Trustee, the Plan Debtors' Estates, or any of their properties.

**(ii) Administrative Tax Claim Bar Date.**

All requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date ("Administrative Tax Claims") and for which no bar date has otherwise previously been established, must be Filed and served on the Liquidating Trustee on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such Taxes for such tax year or period with the applicable governmental unit. Any Holder of an Administrative Tax Claim that is required to File a request for payment of such Taxes and does not File and properly serve such a request by the applicable bar date shall be forever barred from asserting any such Administrative Tax Claims against the Plan Debtors, Liquidating Trustee, Plan Debtors' Estates, or their properties.

**7.3 Treatment of Priority Unsecured Tax Claims.**

Priority Tax Claims are certain unsecured income, employment and other Taxes

described by Bankruptcy Code Section 507(a)(8) and Claims, as provided in Bankruptcy Code Section 1129(a)(7)(D) which would otherwise meet such description, but for the secured status of that Claim. The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred Cash payments over a period not exceeding five (5) years from the applicable Petition Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

At the election of the Liquidating Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal Cash payments on the last Business Day of each three-month period following the Effective Date, during a period not exceeding five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Liquidating Trustee, provided such treatment is on more favorable terms to the applicable Plan Debtor's Estate than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash on the Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**7.4 Treatment of Unavoided Liens Securing Claims That Are Not Allowed.**

Unless the Holder thereof objects, if there is a Lien that cannot be avoided as set forth in Bankruptcy Code § 502(d) even though the Claim it secures is not Allowed or is disallowed, then the Lien shall continue in force, be transferred or be released and extinguished on and after the Effective Date in the same manner and to the same extent as if the Claim were Allowed as a Secured Claim and any such Claim it secures shall be treated on and after the Effective Date as if it were an Allowed Claim (provided that the Bankruptcy Court may issue such orders as are appropriate to give effect to Bankruptcy Code § 502(e), *e.g.*, to assure a single recovery for Claims of a Creditor and another Creditor liable with the applicable Debtors for such Claim and for which such Debtor is liable for reimbursement or contribution). The Lehman Lenders consent to such treatment.

**7.5 Classification Of Claims And Interests.**

As required by the Bankruptcy Code, the Lehman Plan places Claims and Interests

into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Lehman Plan sets forth the treatment each Class will receive. The table below lists the Classes of Claims established under the Lehman Plan and states whether each particular Class is impaired or left unimpaired by the Lehman Plan. A Class is "unimpaired" if the Lehman Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such. Further, in the event that any alleged Secured Claim is not, or only is partially, Allowed as a Secured Claim, the deficiency amount will constitute a Class 7 or Class 8 Claim against the applicable Plan Debtor, as appropriate, and will receive the same treatment as provided to other Claims in Class 7 or Class 8 of such Plan Debtor, as appropriate.

THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET COMPLETE, AND THEIR LISTING IN THE LEHMAN PLAN OR IN THE TABLES BELOW SHOULD NOT BE CONSTRUED AS PROVIDING THAT SUCH CLAIMS ARE ALLOWED UNDER THE PLAN IN ANY RESPECT (WHETHER AS TO AMOUNT OR AS TO STATUS, E.G., AS A SECURED CLAIM, SECURED REAL PROPERTY TAX CLAIM OR MECHANIC'S LIEN CLAM), EXCEPT AS EXPRESSLY SET FORTH FOR THE PARTICULAR CLAIM.

| **CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS** | | **Class 1 is Unimpaired** | **Class 1 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 1.1 | Secured Real Property Tax Claim of Los Angeles County against the Ritter Ranch Project | | Palmdale Hills; Palmdale Hills 12 |
| Class 1.2 | Secured Real Property Tax Claim of Los Angeles County against the Acton Project in the amount of $200 | | Acton Estates; Acton Estates 1 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS** | | **Class 1 is Unimpaired** / **Class 1 Claim Holders are Not Entitled to Vote** |
|---|---|---|
| Class 1.3 | Secured Real Property Tax Claim of Riverside County against the Emerald Meadows Project in the amount of $284 | Emerald Meadows; Emerald Meadows 9 |
| Class 1.4 | Secured Real Property Tax Claim of Placer County against the Bickford Ranch Project | SunCal Bickford; SunCal Bickford Scheduled Amount |
| Class 1.5 | Secured Real Property Tax Claim of Contra Costa County against the Delta Coves Project in the amount of $609,221. | Delta Coves; Delta Coves 16 |
| Class 1.6 | Secured Real Property Tax Claim of Riverside County against the Heartland Project in the amount of $559,022. | SunCal Heartland; SunCal Heartland 5 |
| Class 1.7 | Secured Real Property Tax Claim of Orange County against the Marblehead Project in the amount of $379,156. | SunCal Marblehead; SunCal Marblehead 49 and 57 |
| Class 1.8 | Secured Real Property Tax Claim of Los Angeles County against the Northlake Project in the amount of $1,189,919. | SunCal Northlake; SunCal Northlake Scheduled Amount |
| Class 1.9 | Secured Real Property Tax Claim of Riverside County against the Oak Valley Project in the amount of $280,280. | SunCal Oak Valley; SunCal Oak Valley 9 |
| Class 1.10 | Secured Real Property Tax Claim of Los Angeles County against the 10000 Santa Monica Project in the amount of $1,407,212. | SunCal Century City; SunCal Century City 4 |
| Class 1.11 | Secured Real Property Tax Claim of San Bernardino County against the Palm Springs Village Project in the amount of $589,367. | SunCal PSV; SunCal PSV 22 |
| Class 1.12 | Secured Real Property Tax Claim (disputed) of Alameda County against the Oak Knoll Project in the amount of $2,356,035. | SunCal Oak Knoll; SunCal Oak Knoll 22, 23 and 24 |
| Class 1.13 | Secured Real Property Tax Claim of Los Angeles County against the Tesoro Project in the amount of $70,239. | Tesoro; Tesoro 2 |
| Class 1.14 | Secured Real Property Tax Claim of San Bernardino County against the Joshua Ridge Project in the amount of $5,900. | SCC Communities; SCC Communities Scheduled Amount |
| Class 1.15 | Secured Real Property Tax Claim of Placer County against the Summit Valley Project in the amount of $ 504,245. | SunCal Summit Valley; Palmdale Hills 97 |
| Class 1.16 | Secured Real Property Tax Claim of San Bernardino County against the Summit Valley Project in the amount of $69,530. | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 1.17 | Secured Real Property Tax Claim of Riverside County against the Beaumont Project in the amount of $365,954. | SunCal Beaumont; SunCal Beaumont 9 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 1: CLASSIFICATION OF ALLOWED SECURED REAL PROPERTY TAX CLAIMS** | | **Class 1 is Unimpaired** | **Class 1 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class 1.18 | Secured Real Property Tax Claim of Stanislaus County against the Johannson Ranch Project in the amount of $75,106. | SunCal Johannson; SunCal Johannson Scheduled Amount | |
| Class 1.19 | Secured Real Property Tax Claim of San Bernardino County against Seven Brothers' property in the amount of $60,828. | Seven Brothers; Seven Brothers Scheduled Amount | |
| Class 1.20 | Secured Real Property Tax Claim of San Bernardino County against the property Kirby Estates' property in the amount of $1,744. | Kirby Estates; Kirby Estates Scheduled Amount | |

| **CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS**[10] | | **Class 2 is Impaired** | **Class 2 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| | **SunCal Communities I Loan Agreement** | | |
| Class 2.1 | Allowed Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $6.8 million plus Cash Collateral | Acton Estates; Acton Estates: 6 | |
| Class 2.2 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $12 million plus Cash Collateral | SunCal Emerald; SunCal Emerald: 7 | |
| Class 2.3 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $29.5 million plus Cash Collateral | SunCal Bickford; SunCal Bickford: 16 | |

[10] The Secured Claims of the Lehman Creditors indicated below are calculated using the applicable Project values of the Lehman Lenders as set forth in Exhibit 2 to the Debtors' Third Amended Disclosure Statement, provided that references to "Cash Collateral" in this table are references to the Cash Collateral as of the Effective Date for the applicable Lehman Creditor from the applicable Debtor (to be estimated for voting purposes in the amount set forth in Exhibit 1 to the Debtors' Third Amended Disclosure Statement) and provided, further, that the Lehman Proponents shall be entitled to reasonably apportion any Cash Collateral in which multiple Plan Debtors' Estates may have interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS**[10] | | **Class 2 is Impaired** | **Class 2 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| Class 2.4 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $2.2 million plus Cash Collateral | SunCal Summit Valley; SunCal Summit Valley: 12 | |
| | **Ritter Ranch Loan Agreement** | | |
| Class 2.5 | Allowed Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31 and as an Allowed Secured Claim in the amount of $42.9 million plus Cash Collateral | Palmdale Hills; Palmdale Hills: 65 | |
| | **Interim Loan Agreement** | | |
| Class 2.6 | Allowed Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.2 million plus Cash Collateral | SCC Communities; SCC Communities: 9 | |
| Class 2.7 | Allowed Claim of Lehman ALI or its assignee or successor against Del Rio arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $4.5 million plus Cash Collateral | Del Rio; Del Rio: 14 | |
| Class 2.8 | Allowed Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.85 million plus Cash Collateral | Tesoro; Tesoro: 7 | |
| | **SunCal Oak Knoll/SunCal Torrance Loan Agreement** | | |
| Class 2.9 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64 and as an Allowed Secured Claim in the amount of $48 million plus Cash Collateral | SunCal Oak Knoll; SunCal Oak Knoll: 12 | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS**[10] | | **Class 2 is Impaired** | **Class 2 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| Class 2.10 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15 and as an Allowed Secured Claim in the amount of $25 million plus Cash Collateral | SunCal Torrance; SunCal Torrance: 4 | |
| | **Delta Coves Loan Agreement** | | |
| Class 2.11 | Allowed Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48 and as an Allowed Secured Claim in the amount of $25.2 million plus Cash Collateral | Delta Coves; Delta Coves 21 | |
| | **SunCal Marblehead / SunCal Heartland Loan Agreement** | | |
| Class 2.12 | Allowed Claim of Lehman ALI against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $7.9 million plus Cash Collateral | SunCal Heartland; SunCal Heartland: 9 | |
| Class 2.13 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $187.5 million plus Cash Collateral | SunCal Marblehead; SunCal Marblehead: 21 | |
| | **SunCal Oak Valley Loan Agreement** | | |
| Class 2.14 | Allowed Claim of OVC Holdings or its assignee or successor against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63 and as an Allowed Secured Claim in the amount of $20.9 million plus Cash Collateral | SunCal Oak Valley; SunCal Oak Valley 16 | |
| | **SunCal Northlake Loan Agreement** | | |

DOCS_LA:205341.13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS[10] | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|

| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
|---|---|---|
| Class 2.15 | Allowed Claim of Northlake Holdings or its assignee or successor against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88 and as an Allowed Secured Claim in the amount of $23 million plus Cash Collateral | SunCal Northlake; SunCal Northlake 6 |
| | **SunCal PSV Loan Agreement** | |
| Class 2.16 | Allowed Claim of Lehman ALI or its assignee or successor arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20 and as an Allowed Secured Claim in the amount of $13.8 million plus Cash Collateral | SunCal PSV; SunCal PSV 12 |
| | **Pacific Point First Loan Agreement** | |
| Class 2.17 | Contingent Lehman ALI Claims Against SJD Partners Allowed as a Secured Claim for Voting Purposes in the Amount of $25 million | SJD Partners; SJD Partners 23 |

| CLASS 3: CLASSIFICATION OF ALLOWED DANSKE SECURED CLAIM | Class 3 is Impaired | The Class 3 Claim Holder is Entitled to Vote |
|---|---|---|

| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
|---|---|---|
| Class 3.1 | Secured Claim of Danske Bank against SunCal Century City arising from the SunCal Century City Loan Agreement, in the Allowed Amount of $120,000,000. | SunCal Century; City SunCal Century City 17 |

| CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|

| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
|---|---|---|

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.1 | Secured Claim of, or formerly of, Yen Chu Chang Dou, et al. pursuant to first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $3,173,499.50. | | SunCal Beaumont; SunCal Beaumont 3 |
| Class 4.2 | Secured Claim of, or formerly of, Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $136,229. | | SunCal Beaumont; Palmdale Hills 101 |
| Class 4.3 | Secured Claim of, or formerly of, William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $130,000. | | SunCal Beaumont; SunCal Beaumont Scheduled Amount |
| Class 4.4 | Secured Claim of, or formerly of, Scott McDaniel pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $535,000. | | SunCal Beaumont; Palmdale Hills 20 |
| Class 4.5 | Secured Claim of, or formerly of, Wayne & Francis Lee pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $650,000. | | SunCal Beaumont; SunCal Beaumont Scheduled Amount |
| Class 4.6 | Secured Claim of, or formerly of, Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $154,742. | | SunCal Beaumont; SunCal Beaumont 6 |
| Class 4.7 | Secured Claim of, or formerly of, Patricia I Volkerts pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $871,703. | | SunCal Beaumont; Palmdale Hills 11 |
| Class 4.8 | Secured Claim of, or formerly of, Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $668,250. | | SunCal Summit Valley; SunCal Summit Valley 5 |
| Class 4.9 | Secured Claim of, or formerly of, K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project in the amount of $200,000. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.10 | Secured Claim of, or formerly of, Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $1,246,500. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 4: CLASSIFICATION OF ALLOWED OTHER SECURED CLAIMS** | | **Class 4 is Unimpaired** | **Class 4 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof of Claim Filed and Number) |
| Class 4.11 | Secured Claim of, or formerly of, Jerry Wong Scheduled Amount & Rosalie Wong, Inc. pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $390,000. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.12 | Secured Claim of, or formerly of, Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $1,388,156. | | Seven Brothers; SunCal Summit 17 |
| Class 4.13 | Secured Claim of, or formerly of, Philip C. Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $296,910. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 4.14 | Secured Claim of, or formerly of, Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $880,000. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 4.15 | Secured Claim of, or formerly of, Desert Wind, LLC pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $862,000. | | Seven Brothers; Seven Brothers Scheduled Amount |

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:205341.13

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.1 | Mechanic's Lien Claim of Asphalt Professionals or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | | Palmdale Hills; Palmdale Hills 1 and 46 |
| Class 5.2 | Mechanic's Lien Claim of Sierra Cascade Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | | Palmdale Hills; Palmdale Hills 33 |
| Class 5.3 | Mechanic's Lien Claim of Staats Construction. Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | | Palmdale Hills; Palmdale Hills 51 |
| Class 5.4 | Mechanic's Lien Claim of Southland Farmers, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | | Palmdale Hills; Palmdale Hills 55, 67 and 68 |
| Class 5.5 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $1,530,146. | | Palmdale Hills; Palmdale Hills 62, 63 and 64 |
| Class 5.6 | Mechanic's Lien Claim of Chameleon Design Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | | Palmdale Hills; Palmdale Hills 93, 99 |
| Class 5.7 | Mechanic's Lien Claim of Park West Landscape or its assignee or successor against the Ritter Ranch Project in the amount of $27,624.70. | | Palmdale Hills; Palmdale Hills 109 |
| Class 5.8 | Mechanic's Lien Claim of Hall & Foreman, Inc. or its assignee or successor against the Emerald Meadows Project in the amount of $287,727. | | SunCal Emerald; SunCal Emerald 13 |
| Class 5.9 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Emerald Meadows Project in the amount of $991,315. | | SunCal Emerald; SunCal Emerald 15 and 16 |
| Class 5.10 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $14,893. | | Palmdale Hills; Palmdale Hills 15 |
| Class 5.11 | Mechanic's Lien Claim of MHM Engineers or its assignee or successor against the Bickford Ranch Project in the amount of $8,916. | | SunCal Bickford; SunCal Bickford 5 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.12 | Mechanic's Lien Claim of Land Architecture or its assignee or successor against the Bickford Ranch Project in the amount of $100,245. | | SunCal Bickford; SunCal Bickford 6 |
| Class 5.13 | Mechanic's Lien Claim of Kiewit Pacific Co. or its assignee or successor against the Bickford Ranch Project in the amount of $1,868,357. | | SunCal Bickford; SunCal Bickford 10 |
| Class 5.14 | Mechanic's Lien Claim of ARB, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $1,052,272. | | SunCal Bickford; SunCal Bickford 15 |
| Class 5.15 | Mechanic's Lien Claim of Independent Construction or its assignee or successor against the Bickford Ranch Project in the amount of $117,209. | | SunCal Bickford; SunCal Bickford 28 |
| Class 5.16 | Mechanic's Lien Claim of Marques Pipeline, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $330,118. | | SunCal Bickford; SunCal Bickford 29 and 30 |
| Class 5.17 | Mechanic's Lien Claim of Pacific Soils Engineering or its assignee or successor against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | | SunCal Summit Valley; SunCal Summit Valley 9 |
| Class 5.18 | Mechanic's Lien Class of, or formerly of, Hertz Equipment Rental Corporation or its assignee or successor against the Delta Coves Project in the amount of $25,444. | | Delta Coves; Delta Coves 2 |
| Class 5.19 | Mechanic's Lien Claim of MBH Architects or its assignee or successor against the Delta Coves Project in the amount of $97,091. | | Delta Coves; Delta Coves 8 |
| Class 5.20 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Heartland Project in the amount of $47,675. | | SunCal Heartland; SunCal Heartland 2 |
| Class 5.21 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Heartland Project in the amount of $563,159. | | SunCal Heartland; SunCal Heartland 8 |
| Class 5.22 | Mechanic's Lien Claim of Dennis M. McCoy & Sons or its assignee or successor against the Heartland Project in the amount of $941,960. | | SunCal Heartland; SunCal Heartland 16 |
| Class 5.23 | Mechanic's Lien Claim of SunCal Marblehead by Trimax Systems, Inc. or its assignee or successor against the Marblehead Project in the amount of $75,286. | | SunCal Marblehead; SunCal Marblehead 3 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | <u>Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.24 | Mechanic's Lien Claim of Butsko Utility Design, Inc. or its assignee or successor against the Marblehead Project in the amount of $6,250. | | SunCal Marblehead; SunCal Marblehead 4 |
| Class 5.25 | Mechanic's Lien Claim of Dennis RMF Contracting, Inc. or its assignee or successor against the Marblehead Project in the amount of $264,749. | | SunCal Marblehead; SunCal Marblehead 28 |
| Class 5.26 | Mechanic's Lien Claim of The Jasper Companies or its assignee or successor against the Marblehead Project in the amount of $165,260. | | SunCal Marblehead; SunCal Marblehead 29 |
| Class 5.27 | Mechanic's Lien Claim of Kirk Negrete, Inc. dba United Steel Placers or its assignee or successor against the Marblehead Project in the amount of $270,056. | | SunCal Marblehead; SunCal Marblehead 38 |
| Class 5.28 | Mechanic's Lien Claim of RBF Consulting or its assignee or successor against the Marblehead Project in the amount of $7,096. | | SunCal Marblehead; SunCal Marblehead 39 |
| Class 5.29 | Mechanic's Lien Claim of RJ Noble Co. or its assignee or successor against the Marblehead Project in the amount of $175,030. | | SunCal Marblehead; SunCal Marblehead 42, 50 and 58 |
| Class 5.30 | Mechanic's Lien Claim of Orange County Stripping Services or its assignee or successor against the Marblehead Project in the amount of $4,400. | | SunCal Marblehead; SunCal Marblehead 46 and 54 |
| Class 5.31 | Mechanic's Lien Claim of Savala Equipment Co. Inc. or its assignee or successor against the Marblehead Project in the amount of $34,440. | | SunCal Marblehead; SunCal Marblehead 48 and 56 |
| Class 5.32 | Mechanic's Lien Claim of Rockey Murata Landscaping or its assignee or successor against the Marblehead Project in the amount of $285,643. | | SunCal Marblehead; SunCal Marblehead 60 |
| Class 5.33 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Oak Valley Project in the amount of $52,806. | | SunCal Oak Valley; SunCal Oak Valley 3 |
| Class 5.34 | Mechanic's Lien Claim of Pinnik Inc. or its assignee or successor against the Oak Valley Project in the amount of $966,987. | | SunCal Oak Valley; SunCal Oak Valley 12 and 14 |
| Class 5.35 | Mechanic's Lien Claim of Hillcrest Contracting Inc. or its assignee or successor against the Oak Valley Project in the amount of $136,567. | | SunCal Oak Valley; SunCal Oak Valley 23 |
| Class 5.36 | Mechanic's Lien Claim of MacKenzie Landscape or its assignee or successor against the Oak Valley Project in the amount of $121,297. | | SunCal Oak Valley; SunCal Oak Valley 25 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) | |
| Class 5.37 | Mechanic's Lien Claim of All American Asphalt or its assignee or successor against the Oak Valley Project in the amount of $60,355. | SunCal Oak Valley; SunCal Oak Valley 26 | |
| Class 5.38 | Mechanic's Lien Claim of Los Angeles Times or its assignee or successor against the Oak Valley Project in the amount of $43,610. | SunCal Oak Valley; SunCal Oak Valley 31 and 32 | |
| Class 5.39 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Oak Valley Project in the amount of $280,685. | SunCal Oak Valley; SunCal Oak Valley 35 and 36 | |
| Class 5.40 | Mechanic's Lien Claim of Ateliers Jean Nouvel or its assignee or successor against the 10000 Santa Monica Project in the amount of $1,110,000. | SunCal Century City; SunCal Century City 15 | |
| Class 5.41 | Mechanic's Lien Claim of Englekirk & Sabol Construction Structure Engineering or its assignee or successor against the 10000 Santa Monica Project in the amount of $324,520. | SunCal Century City SunCal Century City 12 | |
| Class 5.42 | Mechanic's Lien Claim of Brudvik Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV; SunCal PSV 4 | |
| Class 5.43 | Mechanic's Lien Claim of Larry Jacinto Construction Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV; SunCal PSV 5 and 24 | |
| Class 5.44 | Mechanic's Lien Claim of William + Paddon Architects + Planners Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV; SunCal PSV 9 and 10 | |
| Class 5.45 | Mechanic's Lien Claim of Southern California Edison or its assignee or successor against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV; SunCal PSV 26 | |
| Class 5.46 | Mechanic's Lien Claim of Pacific Masonry Walls, Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV; SunCal PSV 33 and 39 | |
| Class 5.47 | Mechanic's Lien Claim of J.R. Simplot Company or its assignee or successor against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV; SunCal PSV 34 and 40 | |
| Class 5.48 | Mechanic's Lien Claim of Desert Pipeline Inc. or its assignee or successor against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV; SunCal PSV 36, 42 and 47 | |
| Class 5.49 | Mechanic's Lien Claim of MSA Consulting or its assignee or successor against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV; SunCal PSV 43 | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 5: CLASSIFICATION OF ALLOWED MECHANIC'S LIEN CLAIMS** | | **Class 5 is Unimpaired** | **Class 5 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | <u>Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 5.50 | Mechanic's Lien Claim of Jackson DeMarco or its assignee or successor against the Palm Springs Village Project in the amount of $52,234. | | SunCal PSV; SunCal PSV 45 |
| Class 5.51 | Mechanic's Lien Claim of Oliphant Gold, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $456,476. | | SunCal Oak Knoll; SunCal Oak Knoll 46 |
| Class 5.52 | Mechanic's Lien Claim of RGA Environmental, Inc. or its assignee or successor against the Oak Knoll Project in the amount of $75,617. | | SunCal Oak Knoll; SunCal Oak Knoll 1 |
| Class 5.53 | Mechanic's Lien Claim of BKF Engineers or its assignee or successor against the Oak Knoll Project in the amount of $308,817. | | SunCal Oak Knoll; SunCal Oak Knoll 2 and 19 |
| Class 5.54 | Mechanic's Lien Claim of CST Environmental Inc. or its assignee or successor against the Oak Knoll Project in the amount of $4,316,169. | | SunCal Oak Knoll; SunCal Oak Knoll 4 and 9 |
| Class 5.55 | Mechanic's Lien Claim of The Professional Tree Care Co. or its assignee or successor against the Oak Knoll Project in the amount of $93,925.01. | | SunCal Oak Knoll; SunCal Oak Knoll 3 |
| Class 5.56 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Beaumont Heights Project in the amount of $46,188. | | SunCal Beaumont; SunCal Beaumont 11 and 12 |
| Class 5.57 | Mechanic's Lien Claim of Park West Landscape or its assignee or successor against the "Del Rio Ranch Project" in the amount of $148,266.10. | | Del Rio; Del Rio 26 |

| **CLASS 6: CLASSIFICATION OF ALLOWED PRIORITY CLAIMS** | | **Class 6 is Unimpaired** | **Class 6 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | <u>Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 6.1 | Priority Claims against SunCal Marblehead (alleged amount - $10,950). | | SunCal Marblehead; SunCal Marblehead Scheduled Amount and SunCal Marblehead 45 |
| Class 6.2 | Priority Claims against SunCal Oak Knoll (alleged amount - $235). | | SunCal Oak Knoll; SunCal Oak Knoll 26 |
| Class 6.3 | Priority Claims against Palmdale Hills (alleged amount - $10,950). | | Palmdale Hills; Palmdale Hills 70 |
| Class 6.4 | Priority Claims against SJD Partners (alleged amount - $4,188). | | SJD Partners; SJD Partners Scheduled Amount and SJD |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | |
|---|---|---|
| | | Partners 12 |

| **CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS[11]** | **Class 7 is Impaired** | **Class 7 Claim Holders are Entitled to Vote** |
|---|---|---|

| Class | Claims | Plan Debtor |
|---|---|---|
| Class 7.1 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $244,352,096.31 less Cash Collateral) | Palmdale Hills |
| Class 7.2 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising form the Interim Loan Agreement in the Allowed Amount of $19,295,012.59 less Cash Collateral) | Del Rio |
| Class 7.3 | General Unsecured Claims | SunCal Beaumont |
| Class 7.4 | General Unsecured Claims(including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $331,221,391.06 less Cash Collateral) | SunCal Emerald |
| Class 7.5 | General Unsecured Claims | SunCal Johannson |
| Class 7.6 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $341,021,391.06 less Cash Collateral) | SunCal Summit Valley |
| Class 7.7 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $336,421,391.06 less Cash Collateral) | Acton Estates |

[11] The General Unsecured Claims of the Lehman Creditors indicated below are calculated by deducting the applicable Lehman Creditor's Allowed Secured Claims under this Plan for the subject loan as against the subject Debtor from the total Allowed Claim thereof, provided that references to "Cash Collateral" in this table are references to the Cash Collateral as of the Effective Date for the applicable Lehman Creditor from the applicable Debtor (to be estimated for voting purposes in the amount set forth in Exhibit 1 to the Debtors' Third Amended Disclosure Statement and not to be deducted for more than one loan) and provided, further, that the Lehman Proponents shall be entitled to reasonably apportion any Cash Collateral in which multiple Plan Debtors' Estates may have interests.

| CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS[11] | | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | Plan Debtor | |
| Class 7.8 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the Delta Coves Loan Agreement in the Allowed Amount of $180,823,142.48 less Cash Collateral) | Delta Coves | |
| Class 7.9 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $346,425,126.15 less Cash Collateral) | SunCal Heartland | |
| Class 7.10 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $166,825,126.15 less Cash Collateral) | SunCal Marblehead | |
| Class 7.11 | General Unsecured Claims (including the Contingent Lehman ALI Claims Against SJD Partners Allowed as a General Unsecured Claim for Voting Purposes in the Amount of $95,110,237 and the Amount of approximately $28 million) | SJD Partners | |
| Class 7.12 | General Unsecured Claims | SunCal Century City | |
| Class 7.13 | General Unsecured Claims (including the Allowed General Unsecured Claim of Northlake Holdings or its assignee or successor arising from the Northlake Loan Agreement in the Allowed Amount of $100,654,776.88 less Cash Collateral) | SunCal Northlake | |
| Class 7.14 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $110,141,364.64 less Cash Collateral) | SunCal Oak Knoll | |
| Class 7.15 | General Unsecured Claims (including the Allowed General Unsecured Claim of OVC Holdings or its assignee or successor arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $120,730,091.63 less Cash Collateral) | SunCal Oak Valley | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS**[11] | | **Class 7 is Impaired** | **Class 7 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | Plan Debtor | |
| Class 7.16 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal PSV Loan Agreement in the Allowed Amount of $74,457,340.20 less Cash Collateral) | SunCal PSV | |
| Class 7.17 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $132,870,186.15 less Cash Collateral) | SunCal Torrance | |
| Class 7.18 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the Interim Loan Agreement in the Allowed Amount of $22,595,012.59 less Cash Collateral) | SCC Communities | |
| Class 7.19 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman ALI or its assignee or successor arising from the Interim Loan Agreement in the Allowed Amount of $21,945,012.59 less Cash Collateral) | Tesoro | |
| Class 7.20 | General Unsecured Claims (including the Allowed General Unsecured Claims of: (a) Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $313,721,391.06 less Cash Collateral and (b) Lehman ALI or its assignee or successor arising from the Bickford Second Lien Loan Agreement in the Allowed Amount of $56,494,059.38) | SunCal Bickford | |
| Class 7.21 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06) | SunCal I | |
| Class 7.22 | General Unsecured Claims | Seven Brothers | |
| Class 7.23 | General Unsecured Claims | Kirby Estates | |
| Class 7.24 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SCC Palmdale Loan Agreement in the Allowed Amount of $119,664,305.25) | SCC Palmdale | |

| **CLASS 7: CLASSIFICATION OF ALLOWED GENERAL UNSECURED CLAIMS**[11] | | **Class 7 is Impaired** | **Class 7 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor |
| | | | |

| **CLASS 8: CLASSIFICATION OF ALLOWED ES CLAIMS** | | **Class 8 is Impaired** | **Class 8 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claims |
| Class 8.1 | ES Claims | | Palmdale Hills |
| Class 8.2 | ES Claims | | Del Rio - Various Filed and Scheduled |
| Class 8.3 | ES Claims | | SunCal Emerald - Various Filed and Scheduled |
| Class 8.4 | ES Claims | | SunCal Summit Valley - Various Filed and Scheduled |
| Class 8.5 | ES Claims | | Acton Estates - Various Filed and Scheduled |
| Class 8.6 | ES Claims | | Delta Coves - Various Filed and Scheduled |
| Class 8.7 | ES Claims | | SunCal Heartland - Various Filed and Scheduled |
| Class 8.8 | ES Claims | | SunCal Marblehead - Various Filed and Scheduled |
| Class 8.9 | ES Claims | | SJD Partners - Various Filed and Scheduled |
| Class 8.10 | ES Claims | | SunCal Northlake - Various Filed and Scheduled |
| Class 8.11 | ES Claims | | SunCal Oak Knoll - Various Filed and Scheduled |
| Class 8.12 | ES Claims | | SunCal Oak Valley - Various Filed and Scheduled |
| Class 8.13 | ES Claims | | SunCal PSV - Various Filed and Scheduled |
| Class 8.14 | ES Claims | | SunCal Torrance - Various Filed and Scheduled |
| Class 8.15 | ES Claims | | SCC Communities - Various Filed and Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 8: CLASSIFICATION OF ALLOWED ES CLAIMS** | | **Class 8 is Impaired** | **Class 8 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | Plan Debtor and Basis for Claims |
| Class 8.16 | ES Claims | | Tesoro - Various Filed and Scheduled |
| Class 8.17 | ES Claims | | SunCal Bickford - Various Filed and Scheduled |
| Class 8.18 | ES Claims | | SunCal I |
| Class 8.19 | ES Claims | | SCC Palmdale |

| **CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS** | | **Class 9 is Impaired** | **Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote** |
|---|---|---|---|
| Class | Interests (and alleged Holders) | | Plan Debtor and Basis for Interests |
| Class 9.1 | Interests in Palmdale Hills (of SCC Palmdale). | | Palmdale Hills Scheduled |
| Class 9.2 | Interests in Del Rio (of SCC LLC). | | Del Rio Scheduled |
| Class 9.3 | Interests in SunCal Beaumont (of SunCal I). | | SunCal Beaumont Scheduled |
| Class 9.4 | Interests in SunCal Emerald (of SunCal I). | | SunCal Emerald Scheduled |
| Class 9.5 | Interests in SunCal Johannson (of SunCal I). | | SunCal Johannson Scheduled |
| Class 9.6 | Interests in SunCal Summit Valley (of SunCal I). | | SunCal Summit Valley Scheduled |
| Class 9.7 | Interests in Acton Estates (of SunCal I). | | Acton Estates Scheduled |
| Class 9.8 | Interests in Delta Coves (of Delta Coves Member LLC). | | Delta Coves Scheduled |
| Class 9.9 | Interests in SunCal Heartland (of SunCal Marblehead Heartland Master LLC). | | SunCal Heartland Scheduled |
| Class 9.10 | Interests in SunCal Marblehead (of SunCal Marblehead Heartland Master LLC). | | SunCal Marblehead Scheduled |
| Class 9.11 | Interests in SJD Partners (of, *inter alia*, SJD Development). | | SJD Partners Scheduled |
| Class 9.12 | Interests in SunCal Century City (of SunCal Century City Member LLC). | | SunCal Century City Scheduled |

| CLASS 9: CLASSIFICATION OF ALLOWED INTERESTS | Class 9 is Impaired | Class 9 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|

| Class | Interests (and alleged Holders) | Plan Debtor and Basis for Interests |
|---|---|---|
| Class 9.13 | Interests in SunCal Northlake (of SCLV Northlake, LLC and SCC/Northlake, LLC). | SunCal Northlake Scheduled |
| Class 9.14 | Interests in SunCal Oak Knoll (of Lehman SunCal Real Estate Holdings LLC). | SunCal Oak Knoll Scheduled |
| Class 9.15 | Interests in SunCal Oak Valley (of SCLV Oak Valley LLC and SCC/Oak Valley, LLC). | SunCal Oak Valley Scheduled |
| Class 9.16 | Interests in SunCal PSV (of Lehman SunCal PSV Holdings LLC). | SunCal PSV Scheduled |
| Class 9.17 | Interests in SunCal Torrance (of Lehman SunCal Real Estate Holdings LLC). | SunCal Torrance Scheduled |
| Class 9.18 | Interests in SCC Communities (of SCC LLC). | SCC Communities Scheduled |
| Class 9.19 | Interests in Tesoro (of SCC LLC). | Tesoro Scheduled |
| Class 9.20 | Interests in SunCal Bickford (of SunCal I). | SunCal Bickford Scheduled |
| Class 9.21 | Interests in SunCal I (of SCC LLC). | SunCal I Scheduled |
| Class 9.22 | Interests in Seven Brothers (of SunCal Summit Valley). | Seven Brothers Scheduled |
| Class 9.23 | Interests in Kirby Estates (of SunCal Summit Valley). | Kirby Estates Scheduled |
| Class 9.24 | Interests in SCC Palmdale (of SCC LLC). | SCC Palmdale Scheduled |

### 7.6 <u>Treatment Of Classified Claims And Interests</u>

Any references in the Lehman Plan to Class 1, Class 2, Class 4, Class 5, Class 6, Class 7, Class 8 and Class 9 are summary references made for convenience only to the group of subclasses of each such Class (Classes 1.1 through 1.20, Classes 2.1 through 2.17, Classes 4.1 through 4.15, Classes 5.1 through 5.57, Classes 6.1 through 6.4, Classes 7.1 through 7.24, Classes 8.1 through 8.19 and Classes 9.1 through 9.24). Regardless of the treatment provided in the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan for any Holder of a Claim, the Holder may agree to accept less favorable treatment. Provisions for treatment below for Holders of Allowed Claims are not an indication that any particular Claim is Allowed unless expressly provided.

**7.6.1 Treatment of Allowed Secured Real Property Tax Claims (Classes 1.1 through 1.20).**

The treatment of any Allowed Secured Real Property Tax Claims in Classes 1.1 through 1.20 under the Lehman Plan is as follows:

(i) Classes 1.1 through 1.20 are unimpaired under the Plan, and each Holder of an Allowed Secured Real Property Tax Claim is not entitled to vote on the Plan;

(ii) As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim shall retain its underlying Liens on the applicable real property collateral;

(iii) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Real Property Tax Claim agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Real Property Tax Claim, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Real Property Tax Claim:

**(a) Cash Payment.**

On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Real Property Tax Claim, Cash equal to the amount of such Allowed Secured Real Property Tax Claim, or such lesser amount as to which the Holder of such Allowed Secured Real Property Tax Claim, the Liquidating Trustee and the Lehman Lenders agree; or

**(b) Unimpairment.**

(i) As of the Effective Date, the Holder of such Allowed Secured Real Property Tax Claim shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Secured Real Property Tax Claim and shall be free to pursue its rights and remedies against the underlying real property collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder notice of the selection of this alternative treatment for such Holder.

**7.6.2 <u>Treatment of Secured Claims with Respect to Lehman Loans (Classes 2.1 through 2.17).</u>**

The treatment of Lehman Secured Claims (Classes 2.1 through 2.17) under the Lehman Plan shall be as follows:

**(a) <u>Voting.</u>**

Classes 2.1 through 2.17 are <u>impaired</u> under the Plan, and each Holder of a Lehman Secured Claim is <u>entitled to vote</u> on the Plan.

**(b) <u>Liens.</u>**

As of the Effective Date, each Holder of a Lehman Secured Claim shall <u>retain its underlying Liens</u> on the applicable collateral. Thereafter, additional Liens may be granted or Liens may be released all as set forth in Section 7.6.2 and Article IX of the Plan.

**(c) <u>Claims.</u>**

Subject to applicable provisions of the Lehman Plan, including Article IX of the Plan (which provisions are designed to protect (a) ES Claimants as provided therein in the event of an ES Final Judgment subordinating all or any part of certain Lehman Secured Claims to Allowed ES Claims and (b) the Estates of Acton Estates, Tesoro and SCC Communities in the event of a Cross-Collateralization Final Judgment), each Claim of a Lehman Creditor other than the Contingent Lehman ALI Secured Claim Against SJD Partners shall be Allowed for voting and all other purposes in the amount and with the status as a Secured Claim or General Unsecured Claim as set forth in the classification tables in Section 7.5 above; <u>provided that</u>:

(i) as to any Lehman Secured Claim secured by collateral of the applicable Lehman Creditor (other than Cash Collateral), which has been sold to a Successful Bidder in accordance with the Lehman Plan Sale Procedures: (1) the amount of the Lehman Secured Claim

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

shall be adjusted to equal the sum of (x) any such Cash Collateral and (y) the amount bid by the Successful Bidder for the non-Cash collateral; and (2) the applicable Allowed Class 7 Claim of the applicable Lehman Creditor shall be adjusted accordingly;

(ii) as to all other Lehman Secured Claims (including the Contingent Lehman ALI Secured Claim Against SJD Partners), upon disposition of all of the collateral therefor or upon a valuation motion made by the Liquidating Trustee or the applicable Holder of any Lehman Secured Claims after abandonment or surrender of the collateral therefor, the amount of the applicable Lehman Secured Claim and any related deficiency shall be accordingly adjusted;

(iii) the Contingent Lehman ALI Secured Claim Against SJD Partners initially shall be treated as a Disputed Claim for distribution purposes, but: (1) initially also shall be Allowed for voting purposes as a Secured Claim in the amount of $25 million and as General Unsecured Claims in the amounts of $95,110,237 and $28 million, and (2) contingent upon the Pacific Point Foreclosure being set aside, shall be Allowed as a Secured Claim in the amount of $25 million and as General Unsecured Claims in the amounts of $95,110,237 and $28 million for distribution and all other purposes, subject to adjustment in accordance with clause (ii) of this proviso; and

(iv) the following Liens, *inter alia*, are deemed valid and preserved, in accordance with that *Stipulation Valuing Certain Collateral and Preserving Certain Liens* Filed in the Cases, for the benefit of the Lehman Creditors and any other holder of an interest in any of the Liens for the sole purpose of allowing the Lehman Creditors and any other holder of any interest in any of the Liens to enforce their rights to obtain any available distribution from the applicable Plan Debtor's Estate prior to any distribution to holders of Interests in such applicable Plan Debtor, and, thus, permitting, *inter alia*, the Contingent Bids set forth in Section 9.8(a) below of the Plan: (1) Lehman Commercial's SunCal I Lien; (2) Lehman Commercial's SCC Palmdale Lien; and (3) Lehman ALI's Bickford Second Lien.

**(d) <u>Disposition of Collateral</u>**

On the Effective Date, all Cash Collateral for a Lehman Secured Claim not used on the Effective Date as permitted or required by the Lehman Plan shall be deposited into the Plan Reserve (a reserve fund to be established by the Liquidating Trustee to hold the Ritter Cash, all Cash

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Collateral of a Lehman Creditor held by a Plan Debtor, and any other Cash required or permitted to be deposited therein on the Effective Date pursuant to the terms of the Lehman Plan, all as more fully defined above). Certain of the Remaining Real Restate Projects shall be sold or conveyed pursuant to the Lehman Plan Sale Procedures (discussed below in Plan Section 9.8(a)). If a Project or other Asset of a Plan Debtor which is the collateral for a Lehman Secured Claim is transferred to one or more Lehman Nominees pursuant to the Lehman Plan Sale Procedures, any such Project so conveyed shall become a PRA Security Project subject to a PRA Recovery Deed of Trust as and to the extent described in Article IX of the Plan, which PRA Recovery Deed of Trust will be part of the PRA Recovery Security Pool and thus security for any ES Final Judgment, in accordance with this Plan. If a Project or other Asset of a Plan Debtor which is collateral for a Lehman Secured Claim is sold to a third party purchaser, the Net Cash Proceeds therefrom shall be remitted to the Liquidating Trustee who shall hold such Net Cash Proceeds in the Plan Reserve and any non-Cash Net Proceeds therefrom shall also be remitted to the Liquidating Trustee and the applicable Lehman Lender shall be afforded a substitute Lien on such non-Cash Net Proceeds. Any remaining collateral for a Lehman Secured Claim, which is not otherwise sold or conveyed pursuant to the Lehman Plan Sale Procedures may be retained, sold or abandoned by the Liquidating Trustee as provided under the Lehman Plan with the Net Cash Proceeds therefrom to be applied first to pay such Lehman Secured Claim and then to pay other Claims in accordance with the Lehman Plan, provided that (a) if no disposition of such collateral occurs within one (1) year after the Effective Date, the applicable Lehman Lender may enforce its Liens; and (b) if the Pacific Point Project is recovered by the Estate of SJD Partners and proposed to be sold, the applicable Lehman Creditor shall be entitled to credit bid up to the full amount of its unpaid Claim against SJD Partners.

**(e) Releases, Reconveyances, Assignments and Payments.**

(i) Upon Conclusion of the Project Related Actions (*i.e.*, the ES Action and any Cross-Collateralization Actions) in favor of the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee shall (1) release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and terminate all Reconveyance Agreements, (2) pay the applicable Lehman Nominee the amount held in the Plan Reserve in respect of, and any other,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Net Cash Proceeds of the sale of the PRA Security Project previously owned by such Lehman Nominee, (3) assign non-Cash Net Proceeds (including all substitute Liens and related, underlying obligations) (x) from the sale of any PRA Security Project, to the applicable Lehman Nominee and (y) from the sale of any collateral for a Lehman Secured Claim, to the applicable Holder of such Lehman Secured Claim, (4) distribute to the applicable Holder of a Lehman Secured Claim any remaining non-Cash collateral for such Claim, and (5) pay to the applicable Holder of a Lehman Secured Claim, the amounts held in the Plan Reserve with respect to such Lehman Secured Claim (including any Cash Collateral of such Holder that was deposited in the Plan Reserve) and any other Net Cash Proceeds of the disposition of collateral for such Lehman Secured Claim, up to the amount of the Lehman Secured Claim, with interest and fees in accordance with its contractual terms. Thereupon, the Lehman Secured Claim shall be deemed satisfied by such payments and such conveyances of collateral free and clear as set forth in Section 9.8(a).

(ii) Upon Conclusion of the Project Related Actions against the applicable Lehman Related Parties, consistent therewith, the Liquidating Trustee, in satisfaction of the Project Related Action Recoveries, shall distribute to the applicable Estates available Cash from the Plan Reserve and shall liquidate and distribute to the applicable Estates the Net Proceeds from the PRA Recovery Security Pool and non-Cash Net Proceeds from the sale of collateral for the Lehman Secured Claims (which are the exclusive sources of satisfaction of a Project Related Action Recovery absent a voluntary payment by a Lehman Related Party in accordance with Article IX of the Plan), and upon satisfaction of the Project Related Action Recoveries, to the extent of any remainder of such Cash or property, the Liquidating Trustee shall afford Lehman Secured Claims the treatment described in the preceding subparagraph to this Section (e) of the Lehman Plan.

(iii) As more fully set forth in Article IX of the Plan, at any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, the Liquidating Trustee shall release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust, terminate all Reconveyance Agreements and release to the applicable Holders of Lehman Secured Claims and all Lehman Nominees all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**7.6.3 Treatment of Allowed Danske Bank Secured Claim (Class 3).**

The treatment of the Danske Secured Claim (Class 3) under the Lehman Plan shall be as follows:

**(f) Voting.**

Class 3 is impaired under the Plan, and the Holder of the Allowed Danske Secured Claim is entitled to vote on the Plan.

**(g) Liens.**

As of the Effective Date, the Holder of the Allowed Danske Secured Claim shall retain its underlying Liens on the applicable collateral.

**(h) Claims.**

The Allowed Danske Secured Claim shall be Allowed for voting and all other purposes as a Secured Claim in the amounts set forth in Article 7.5 above; provided that (i) any deficiency shall be an Allowed Class 7 Claim in the appropriate subclass thereof; and (ii) upon disposition of all of the collateral for such Allowed Danske Secured Claim or upon valuation motion made by the Liquidating Trustee or the Holder of such Allowed Danske Secured Claim after abandonment or surrender of such collateral, the amount of the Allowed Danske Secured Claim and any related deficiency shall be accordingly adjusted.

**(i) Disposition of Collateral and Means Therefor**

The Allowed Danske Secured Claim shall receive either the following treatment or such less favorable treatment to which its Holder consents:

On the Effective Date, all Cash Collateral for the Allowed Danske Secured Claim shall be turned over to the Holder of the Allowed Danske Secured Claim in respect of such Claim, unless the Holder agrees to permit the Liquidating Trustee to retain or use any portion thereof.

The Liquidating Trustee shall market for sale and sell the non-Cash collateral for the Allowed Danske Secured Claim, if any, including the 10000 Santa Monica Project, if not previously sold or conveyed from the Estate of SunCal Century City, or abandon all or any of such collateral upon motion to the Bankruptcy Court. The collateral, together with all associated personal property, shall be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other

terms to which the Holder of the Allowed Danske Secured Claim consents. The Holder of the Allowed Danske Secured Claim shall receive at least thirty (30) days' prior notice of any proposed sale. The Holder of the Allowed Danske Secured Claim may elect to credit bid in response to such notice up to the full amount of the Allowed Danske Secured Claim (without the amount bid being limited to the value of the interest of the Holder of the Allowed Danske Secured Claim in such collateral).

If the collateral for the Allowed Danske Secured Claim is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, there shall be turned over or paid to the Holder of the Allowed Danske Secured Claim up to the full amount of the Allowed Danske Secured Claim from any non-Cash Net Proceeds therefrom and from the Net Cash Proceeds remaining after payment, (a) first, of SunCal Century City's Pro Rata share of the Lehman Post-Confirmation Funding, (b) second, payment of SunCal Century City's direct Post-Confirmation Expenses and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors, and (c) third, any post-Confirmation Date intercompany payables. Any remaining Net Cash Proceeds thereafter shall be used to pay other obligations of the applicable Debtor in the priorities set forth in Section 9.10(c) of the Plan. If no disposition of such collateral occurs within one (1) year after the Effective Date, the Holder of the Allowed Danske Secured Claim may enforce its Liens. The Holder of the Allowed Danske Secured Claim may advance funds to the Liquidating Trustee for the protection of its collateral or administration of the Estate of SunCal Century City on such terms as the Holder of the Allowed Danske Secured Claim and Liquidating Trustee agree.

**7.6.4 <u>Treatment of Other Secured Claims (Classes 4.1 Through 4.15).</u>**

The treatment of any Allowed Other Secured Claims in Classes 4.1 through 4.15 under the Lehman Plan shall be as follows:

(i) Classes 4.1 through 4.15 are <u>unimpaired</u> under the Plan, and each Holder of an Allowed Secured Claim in Classes 4.1 through 4.15 is <u>not entitled to vote</u> on the Plan;

(ii) As of the Effective Date, each Holder of an Allowed Other Secured Claim in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Classes 4.1 through 4.15 shall retain its underlying Liens on the applicable collateral;

(iii) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and anticipated Liquidating Trustee, as limited below, shall select and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Other Secured Claim in Classes 4.1 through 4.15 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Other Secured Claim in Classes 4.1 through 4.15, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Claim in Classes 4.1 through 4.15:

**(j) Abandonment or Surrender.** On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 the property securing such Allowed Other Secured Claim in Classes 4.1 through 4.15 as of the Effective Date;

**(k) Cash Payment.** On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, Cash equal to the amount of such Allowed Other Secured Claim in Classes 4.1 through 4.15, or such lesser amount as to which the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15, the Liquidating Trustee and the Lehman Lenders agree; or

**(l) Unimpairment.** (i) As of the Effective Date, the Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Other Secured Claim in Classes 4.1 through 4.15 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Other Secured Claim in Classes 4.1 through 4.15 for which this treatment is selected, notice of the selection of this alternative treatment for such Holder.

**7.6.5 Treatment of Allowed Secured Mechanic's Lien Claims Against the Plan Debtors (Classes 5.1 Through 5.57).**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The treatment of any Allowed Secured Mechanic's Lien Claims in Classes 5.1 through 5.57 under the Lehman Plan shall be as follows:

(i) Classes 5.1 through 5.57 are unimpaired under the Plan, and each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 is not entitled to vote on the Plan;

(ii) As of the Effective Date, each Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 shall retain its underlying Liens on the applicable collateral;

(iii) On or before the Effective Date, the Lehman Lenders, in consultation with the Committees and the anticipated Liquidating Trustee, as limited below, shall select, and the Liquidating Trustee shall implement, as necessary, unless the Holder of an Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 agrees to less favorable treatment, one of the following alternative treatments for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for each such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57:

**(m) Abandonment or Surrender.** On the Effective Date, the Liquidating Trustee will abandon or surrender to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 the property securing such Allowed Secured Claim as of the Effective Date;

**(n) Cash Payment.** On the Effective Date, the Liquidating Trustee (with the consent of the Lehman Lenders to the extent that payment would require utilization of Cash Collateral of any of the Lehman Creditors, which consent may be granted or denied in their sole discretion) will pay, to the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, Cash equal to the amount of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, or such lesser amount as to which the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57, the Liquidating Trustee and the Lehman Lenders agree; or

**(o) Unimpairment.** (i) As of the Effective Date, the Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 shall have left unaltered its

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

legal, equitable and contractual rights as a Holder of such Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 and shall be free to pursue its rights and remedies against the underlying collateral under applicable nonbankruptcy law; and (ii) the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Holder of each Allowed Secured Mechanic's Lien Claim in Classes 5.1 through 5.57 for which this treatment was selected, notice of the selection of this alternative treatment for such Holder.

**7.6.6 Treatment of Priority Claims (Classes 6.1 Through 6.4).**

The treatment of any Allowed Priority Claims in Classes 6.1 through 6.4 under the Lehman Plan shall be as follows:

(a) Classes 6.1 through 6.4 are unimpaired under the Plan, and each Holder of an Allowed Priority Claim is not entitled to vote on the Plan.

(b) Each Holder of an Allowed Priority Claim shall be paid (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder of the Allowed Priority Claim and the Liquidating Trustee.

**7.6.7 Treatment of Allowed General Unsecured Claims (Classes 7.1 Through 7.24).**

The treatment of any Allowed General Unsecured Claims in Classes 7.1 through 7.24 under the Lehman Plan shall be as follows:

(a) Classes 7.1 through 7.24 are impaired under the Plan, and each Holder of an Allowed General Unsecured Claim is entitled to vote on the Plan;

(b) As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash (defined above) in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable;

(c) Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Guaranteed Minimum Distribution will be calculated (*i.e.*, $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third of the aggregate ES Pro Rata Settlement Payments) and, thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those Holders of Allowed General Unsecured Claims (other than those in Class 7.12 – Allowed General Unsecured Claims against SunCal Century City) and Allowed Non-Settled ES Claims who provide the Lehman Lenders a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the Guaranteed Minimum Distribution, all as more fully set forth in Plan Section 7.3. If payment of the distribution in accordance with this paragraph with respect to a Claim otherwise would result or contribute to such Claim being paid in excess of the full amount of the Claim, any such excess shall be redistributed Pro Rata to other Holders of Claims entitled to distributions in accordance with this paragraph.

The treatment provided in the Lehman Plan for Claims in Classes 7.1 through 7.24 does not take into account and shall not affect any subordination or other intercreditor remedies afforded by any ES Final Judgment, contract, other judgment or other binding determination.

**7.6.8 <u>Treatment of Allowed ES Claims (Classes 8.1 through 8.19).</u>**

The treatment of any Allowed ES Claims in Classes 8.1 through 8.19 under the Lehman Plan shall be as follows:

(a) Classes 8.1 through 8.19 are impaired under the Plan, and each Holder of an Allowed ES Claim is entitled to vote on the Plan;

(b) As soon as reasonably practicable in the sole discretion of the Liquidating Trustee, the Liquidating Trustee shall distribute the Residual Cash in each Estate Pro Rata to the Holders of Allowed General Unsecured Claims in Classes 7.1 through 7.24, as applicable, and Allowed ES Claims in Classes 8.1 through 8.19, as applicable (subject to the terms of any ES Claimant Release and Assignment and any Minimum Distribution Release and Assignment with respect to Claims against a Lehman Releasee);

(c) Each Holder of an Allowed ES Claim also shall receive either:

(i) if the Holder of an Allowed ES Claim votes to accept the ES

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Settlement Offer (or if there is Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted) and the Holder returns with its Ballot or to the Lehman Lenders a duly executed ES Claimant Release and Assignment, an ES Pro Rata Settlement Payment to be paid as soon as reasonably practicable after the later of: (1) the Effective Date; and (2) final allowance of such Allowed ES Claim; or

(ii)    if the Holder of an Allowed ES Claim does not vote to accept the ES Settlement Offer (and there is not Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted):

(1) the benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with the ES Action, upon Conclusion of the Equitable Subordination Claims in the ES Action against the applicable Lehman Related Parties, if any, such that (A) the Liquidating Trustee, in satisfaction of an ES Final Judgment and to the extent consistent therewith (I) shall distribute to the applicable Estate available Cash from the Plan Reserve, other than amounts reserved for the Guaranteed Minimum Distribution and (II) shall liquidate and distribute to the applicable Estate Net Cash Proceeds from the PRA Recovery Security Pool and from the liquidation of any non-Cash Net Proceeds from the sale of collateral of the Holders of Lehman Secured Claims or the sale of any PRA Security Project (which distributions described in this subparagraph, collectively, are the exclusive sources of satisfaction of an ES Judgment absent a voluntary payment by a Lehman Related Party in accordance with Article VII of the Plan); and (B) the Liquidating Trustee shall pay such Cash in accordance with the priorities set forth in this Plan (see Plan Sections 7.11.2(a) and 7.11.2(d)); and

(2)    Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied, the Guaranteed Minimum Distribution will be calculated (i.e., $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third of the aggregate ES Pro Rata Settlement Payments) and, thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those holders of Allowed General Unsecured Claims (other than those in Class 7.12 – Allowed General Unsecured Claims against SunCal Century City) and Allowed Non-Settled ES Claims who provide the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lenders a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the Guaranteed Minimum Distribution, all as more fully set forth in Plan Section 7.3. If payment of the distribution in accordance with this paragraph with respect to a Claim otherwise would result or contribute to such Claim being paid in excess of the full amount of the Claim, any such excess shall be redistributed Pro Rata to other Holders of Claims entitled to distributions in accordance with this paragraph.

**7.6.9 Treatment of Holders of Allowed Interests (Classes 9.1 through 9.24)**

The treatment of Allowed Interests in Classes 9.1 through 9.24 under the Lehman Plan shall be as follows:

(a) Classes 9.1 through 9.24 are impaired under the Plan, and each Holder of an Allowed Interest is deemed to reject the Plan and is not entitled to vote; and

(b) On the Effective Date, all such Allowed Interests shall be cancelled.

## VIII.

## ACCEPTANCE OR REJECTION OF THE LEHMAN PLAN

### 8.1 Introduction.

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Lehman Proponents cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Lehman Plan. Some of the requirements include that the Lehman Plan must (a) be proposed in good faith, (b) be accepted in accordance with the provisions of the Bankruptcy Code, (c) pay creditors at least as much as creditors would receive in a Chapter 7 liquidation and (d) be feasible. The requirements described in the Lehman Plan are not the only requirements for confirmation.

**8.2 Who May Object to Confirmation of the Lehman Plan.**

Any party in interest may object to the confirmation of the Lehman Plan, but as explained below not everyone is entitled to vote to accept or reject the Lehman Plan.

**8.3 Who May Vote to Accept/Reject the Lehman Plan and Special Provisions for Listed Holders of Mechanic's Lien Claims and for Holders of ES Claims or General Unsecured Claims.**

A Holder of a Claim or Interest has a right to vote for or against the Lehman Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.

Because Classes 5.1 through 5.57 are unimpaired, any Holders of Allowed Mechanic's Lien Claims are deemed to accept the Plan. The Lehman Proponents, however, dispute the "secured" status of all, many or most of the Claims classified in Classes 5.1 to 5.57 because they believe that there are senior Liens of Lehman Creditors and no value in the junior Liens of the Holders of Mechanic's Lien Claims. Thus, each listed Holder of a Mechanic's Lien Claim will be provided a Ballot on which such Holder may elect to vote its Claims as a General Unsecured Claim or an ES Claim, as applicable, in which event the Holder will have to waive contentions that its interest in the collateral securing its Claim has any value and thus will have to waive contentions that it holds a Secured Claim against the applicable Project.

To vote any Claim as an ES Claim (Class 8), a Creditor must mark its Ballot to indicate that it holds an ES Claim. A Creditor voting a Claim as an ES Claim (Class 8) may vote for (or against) the Plan whether or not it votes to accept the ES Settlement Offer.

**8.4 What Is an Allowed Claim/Interest.**

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

**8.5 What Is an Impaired Class.**

A Class is impaired if the Lehman Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

kinds of defaults. Under the Lehman Plan, Classes 1, 4, 5 and 6 are unimpaired and Classes 2, 3, 7, 8 and 9 are impaired.

**8.6 <u>Who Is Not Entitled to Vote.</u>**

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims that, pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3) or (a)(8), are entitled to priority, and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(2), (3) or (8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Lehman Proponents believe that (a) Classes 1, 4, 5 and 6 are unimpaired and thus are not entitled to vote because they are conclusively deemed to have accepted the Plan; (b) Class 9 Interests are being cancelled under the Plan and nothing is to be paid to their Holders and accordingly these Holders are deemed to have voted to reject the Plan and also are not entitled to vote; and (c) Classes 2, 3, 7 and 8 are impaired and are entitled to vote.

EVEN IF A CLAIM IS OF THE TYPE DESCRIBED ABOVE, A CREDITOR MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**8.7 <u>Who Can Vote in More than One Class.</u>**

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the Unsecured Claim. Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of General Unsecured Claims and ES Claims), and may vote the Claims held in each Class.

**8.8 <u>Votes Necessary for a Class to Accept the Lehman Plan.</u>**

A Class of Claims is deemed to have accepted the Lehman Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*,

vote to accept the Lehman Plan. A Class of interests is deemed to have accepted the Lehman Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Lehman Plan.

**8.9 <u>Treatment of Nonaccepting Classes.</u>**

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Lehman Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code and at least one impaired Class of Claims accepts the Lehman Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown." The Bankruptcy Code allows the Lehman Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Lehman Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Lehman Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**8.10 <u>Request for Confirmation Despite Nonacceptance by Impaired Class(es).</u>**

The Lehman Proponents will ask the Bankruptcy Court to confirm the Lehman Plan by cramdown on any impaired Class if such Class does not vote to accept the Lehman Plan.

## IX.

## <u>MEANS OF EXECUTION AND IMPLEMENTATION OF THE LEHMAN PLAN</u>

**9.1 <u>Introduction.</u>**

This section is intended to address how the Lehman Lenders intend to fund and to have implemented the obligations to Creditors under the Lehman Plan. It thus provides information regarding funding sources and mechanisms for the Plan obligations, management of the Plan Debtors' Estates after the Effective Date and other material issues bearing upon the performance of the Lehman Plan.

**9.2 <u>The Liquidating Trustee.</u>**

The Estate of each Plan Debtor shall be managed after the Effective Date by the Liquidating Trustee, who, except as otherwise provided in the Lehman Plan, shall oversee and effectuate the liquidation of the Remaining Other Assets, oversee and effectuate the sale and transfer

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or other disposition or liquidation of the Remaining Real Estate Projects and implement the Plan. The Liquidating Trustee shall be appointed by the Court upon nomination, if any, by a Committee and, in his or her capacity as such, shall be an agent of each Estate and not a separate taxable entity therefrom. Compensation of the Liquidating Trustee shall be reasonable hourly compensation payable from the Plan Debtors' Estates after prior notice to, *inter alia*, the Lehman Lenders, Committee members, and U.S. Trustee and after order of the Bankruptcy Court. The Bankruptcy Court may, by order, replace the Liquidating Trustee in its reasonable discretion. After the Effective Date, the Liquidating Trustee, *inter alia*, will cooperate in granting, perfecting or reflecting perfection of any Liens acknowledged or created or provided for under the Plan, will complete the claims process, will resolve or abandon any objections to Claims, will liquidate and/or distribute assets and will resolve or dismiss any Litigation Claims which are not waived in the Plan, all in accordance with the Plan.

**9.3 The Guaranteed Minimum Distribution Will be Held in the Plan Reserve to Assure a Minimum Amount for Creditors without Security or Priority.**

On the Effective Date, the Lehman Lenders will pay the Liquidating Trustee $10 million from new Cash transfers (rather than from existing Cash Collateral) to be held in the Plan Reserve for the Guaranteed Minimum Distribution. Upon Conclusion of the ES Action, if the Credit Bid Conditions are satisfied, the Guaranteed Minimum Distribution will be calculated (*i.e.*, $10 million less the amount of any ES Final Judgments and less the amount –which cannot exceed $5 million – that is one-third of the aggregate ES Pro Rata Settlement Payments). Thereafter, the Liquidating Trustee shall distribute the Guaranteed Minimum Distribution Pro Rata to those holders of Allowed General Unsecured Claims and Allowed Non-Settled ES Claims who provide the Lehman Lenders a duly executed Minimum Distribution Release and Assignment. The Lehman Lenders (and each Lehman Successor, unless it timely objects to Plan Confirmation) will not share in the Guaranteed Minimum Distribution.

As and to the extent reflected in the definition of "Guaranteed Minimum Distribution," the payment of ES Pro Rata Settlement Payments and entry of an ES Final Judgment each result in a reduction in the Guaranteed Minimum Distribution. Simultaneously with the

payment of any ES Pro Rata Settlement Payments, the Liquidating Trustee shall return to the Lehman Lenders or their designee from the Plan Reserve one-third (1/3rd) of the amount of such ES Pro Rata Settlement Payments (not to exceed the remaining amount on reserve for the Guaranteed Minimum Distribution). Additionally, upon entry of each and any ES Final Judgment (each or any of which, under the Plan, are secured by the PRA Recovery Security Pool), one hundred percent (100%) of the amount of such ES Final Judgment (not to exceed the remaining amount on reserve for the Guaranteed Minimum Distribution), at the election of the Lehman Lenders, either shall: (1) be applied by the Liquidating Trustee to such ES Final Judgment or (2) be returned from the Plan Reserve by the Liquidating Trustee to the Lehman Lenders or their designee.

As to the process for obtaining delivery of ES Claimant Releases and Assignments, the Liquidating Trustee shall be entitled to utilize the following procedure, which the Liquidating Trustee may modify with the consent of the Lehman Lenders, which they may grant or withhold in their sole and absolute discretion:

(1) within sixty (60) days after (x) Conclusion of the ES Action, if there are no ES Final Judgments or (y) collection and/or enforcement with respect to all ES Final Judgments is completed, if there are any ES Final Judgments, the Liquidating Trustee shall afford notice to Creditors potentially entitled to a Pro Rata distribution of the Guaranteed Minimum Distribution that they have sixty (60) days to return to the Liquidating Trustee a duly executed Minimum Distribution Release and Assignment;

(2) within ten (10) days after expiration of the time for Creditors to return to the Liquidating Trustee a duly executed Minimum Distribution Release and Assignment, the Liquidating Trustee shall deliver to the appropriate Lehman Creditor, or as they direct, the original of each such Minimum Distribution Release and Assignment;

(3) within ten (10) days after the time for delivery to the Lehman Creditors of each original, returned Minimum Distribution Release and Assignment, the Lehman Creditors shall advise the Liquidating Trustee of any issues with respect to the form or propriety of the execution or delivery of any such Minimum Distribution Release and Assignment;

(4) within ten (10) days after expiration of the time for objection to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

execution or delivery of any returned Minimum Distribution Release and Assignment, the Liquidating Trustee shall:

(I) allocate the Guaranteed Minimum Distribution Pro Rata among each Holder of an Allowed Non-Settled ES Claim and Allowed General Unsecured Claim; and

(II) pay to each Holder of an Allowed Non-Settled ES Claim and Allowed General Unsecured Claim who timely returned a duly executed Minimum Distribution Release and Assignment their aliquot share of the Guaranteed Minimum Distribution; and

(III) simultaneously with payment to each Holder of an Allowed Non-Settled ES Claim and Allowed General Unsecured Claim who returned a duly executed Minimum Distribution Release and Assignment of its aliquot share of the Guaranteed Minimum Distribution, pay to the applicable Lehman Creditors, or as they direct, the aliquot shares of the Guaranteed Minimum Distribution which otherwise would have been payable to the Holders of Allowed Non-Settled ES Claims and Allowed General Unsecured Claims who failed to timely return a Minimum Distribution Release and Assignment.

In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the Guaranteed Minimum Distribution from new Cash transfers to the Liquidating Trustee on the Effective Date, each Non-Settling ES Claimant holding an Allowed ES Claim and each Holder of an Allowed General Unsecured Claim desiring to share in the Guaranteed Minimum Distribution shall (a) unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent related to the Claims of the releasing Person or these Cases, Debtors or their Projects or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the Claims of such releasing Person (collectively, the "Minimum Distribution Released Claims"), from and against all Lehman Releasees

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the Estate against which the applicable Allowed ES Claim or Allowed General Unsecured Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties, and (b) to the extent such Minimum Distribution Released Claims are owned by the Estate of a Plan Debtor and cannot be released by the releasing Person, assign to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the releasing Person with respect to such Minimum Distribution Released Claims, including the Litigation Recoveries that otherwise would be due therefrom to, or attributable to the Claims of, the releasing Person.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and all successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the releasing Person in a form determined by the Lehman Lenders and reasonably consistent herewith.

**9.4 <u>Vesting of Assets in Plan Debtors' Estates Managed by Liquidating Trustee.</u>**

Except as otherwise provided in the Lehman Plan or any agreement, instrument or other document relating hereto, on and after the Effective Date, all property of each Plan Debtor's Estate shall vest in each respective Estate, free and clear of all Liens. Except as may be provided in

the Lehman Plan, on and after the Effective Date, the Liquidating Trustee may operate the business of each Estate and may use, acquire or dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. On motion to the Bankruptcy Court and consent of the Lehman Lenders, the Liquidating Trustee may elect hereafter to abandon to the Plan Debtors Assets of inconsequential value.

**9.5 <u>The Committee(s)</u>.**

On the Effective Date, the Voluntary Debtors' Committee and the Trustee Debtors' Committee shall continue to serve the applicable Estates of the Plan Debtors and shall be entitled to retain, employ and compensate Professionals in order to assist with the obligations and rights of the Committees under the terms of the Lehman Plan (with compensation to be paid by the Liquidating Trustee from the Post-Confirmation Account(s)), provided that the duties of the Committee(s) after the Effective Date shall be limited to monitoring the Plan's implementation. The Liquidating Trustee shall reimburse members of the Committee without further Court Order required for their reasonable out-of-pocket expenses incurred after the Effective Date for mileage, parking, or other incidentals incurred in performing their duties as members of the Committee.

**9.6 <u>Lehman Post-Confirmation Loans.</u>**

**9.6.1 <u>Amount and Uses of Lehman Post-Confirmation Loans.</u>**

On and after the Effective Date, the Lehman Lenders, or certain of them as described in the Lehman Plan, will make funding available to the Liquidating Trustee, in addition to the $10 million for the reserve for the Guaranteed Minimum Distribution, from either (or both) loans made by or on behalf of a Lehman Related Party (of up to a maximum of $5 million) in the form of new Cash transfers or by permitting the use of Cash Collateral of a Lehman Creditor, including, without limitation, all or a portion of the Ritter Cash (estimated to be at least $18.87 million), for the following purposes and in the following amounts, provided that the proceeds of Lehman Post-Confirmation Funding may not be utilized to pay any Lehman Post-Confirmation Expenses:

(a) Allowed Professional Fees of the insolvency counsels for the Trustee and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Committees, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and with any such use of Cash of one Plan Debtor's Estate for another booked as a Post-Confirmation Date intercompany payable by the borrowing Plan Debtor's Estate);

(b) Satisfaction of Allowed Priority Claims , provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section);

(c) Funding for or relating to the ES Litigation Expenses solely from proceeds from the ES Litigation Loan;

(d) All amounts required to address critical and urgent health and safety issues on the Projects (other than 10000 Santa Monica Project) until the expiration of the earlier of (i) the date that such Project is no longer an Asset belonging to an Estate of a Plan Debtor, or (ii) thirty (30) days following the auction of such Project to occur pursuant to the Lehman Plan Sale Procedures, up to the aggregate amount of $400,000 or such other amount as approved by the Bankruptcy Court on notice (including to the Lehman Lenders) and opportunity to object, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section);

(e) Satisfaction of the Lehman Administrative Loans (provided that (i) Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section), and (ii) the Lehman Lenders may elect prior to receipt of payment thereupon to defer receipt thereof and be paid otherwise as provided in the Lehman Plan for such Lehman Administrative Loans);

(f) Obligations with respect to the Remaining Real Estate Projects while owned by the Estates that are Administrative Claims or arise after the Confirmation Date, to the extent requested by the Lehman Lenders holding or representing the Holder of an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, provided that Available

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section), which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders;

(g) Obligations with respect to the PRA Security Projects that are part of the PRA Recovery Security Pool and therefore serve as collateral for a Project Related Action Recovery to the extent requested by the Lehman Lenders or Lehman Nominee holding an interest in the subject Project and in their sole and absolute discretion, including any property taxes, assessments, liabilities, obligations, claims or payables that would be superior to the interest of any Lehman Creditor holding a Secured Claim in any Remaining Real Estate Project, which obligations are to be paid by the Liquidating Trustee if so directed by the Lehman Lenders; provided, however, that repayment of Lehman Post-Confirmation Funding made for a purpose set forth in this subparagraph shall be limited in recourse to an offset against any ES Judgment; and

(h) To the extent that the Liquidating Trustee is unable to otherwise fund them, all additional obligations of the Liquidating Trustee (in such capacity) that arise on or after the Effective Date to the extent that both their incurrence is necessary for implementation of the Lehman Plan and they become due and payable in Cash during the term of the Lehman Post-Confirmation Funding other than and excluding those obligations covered in any portion by insurance or for which obtaining insurance would have been reasonable, appropriate and customary, provided that Available Cash from the Post-Confirmation Account(s) has been exhausted (and applied as set forth in clause (a) of this Section).

**9.6.2 Cash Collateral of a Lehman Creditor.**

Cash Collateral of Lehman Creditors shall be available as funding (i) to the Liquidating Trustee and Plan Debtors' Estates as and to the extent set forth in the preceding numbered Section of the Plan and (ii) for payment of the ES Pro Rata Settlement Payments. At any time, the Liquidating Trustee, as directed by a Lehman Lender, shall use Cash Collateral of the Lehman Creditors to repay Lehman Post-Confirmation Funding that was made other than from the use of Cash Collateral.

Also, upon disposition of collateral of a Lehman Creditor or of a PRA Security

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Project that results in proceeds being deposited to the Plan Reserve, or upon turnover of Cash Collateral to the Plan Reserve, a Lien in favor of the applicable Lehman Creditor shall attach to (or remain upon) such proceeds and/or Cash Collateral held in the Plan Reserve, subject to a Conclusion of the Project Related Actions.

Further, at the election of a Lehman Lender and to facilitate its extension of credit under the Plan, as to any payment that could be made with funds comprising Cash Collateral of a Lehman Creditor, the Lehman Lender may direct the Liquidating Trustee to instead use Lehman Post-Confirmation Funding in the form of a loan from new Cash from a Lehman Lender and to pay a like amount of Cash Collateral securing a Lehman Loan towards a reduction of such Lehman Loan, as the Lehman Lender directs, provided, however, that (a) such use of Cash Collateral shall not itself be Lehman Post-Confirmation Funding and, if such use occurs before maturity of the Lehman Post-Confirmation Funding, the $5 million maximum Cash commitment of the Lehman Lenders with respect to the Lehman Post-Confirmation Funding shall increase by the amount of Cash Collateral so used to pay a Lehman Loan; and (b) repayment of any amount of a loan constituting Lehman Post-Confirmation Funding used to substitute for Cash Collateral paid with respect to a Lehman Loan under this paragraph shall be treated as a repayment or replenishment of Cash Collateral.

**9.6.3 Terms and Documentation of Lehman Post-Confirmation Loans.**

The Liquidating Trustee shall reasonably execute all documents reasonably requested by a Lehman Lender to evidence a loan or use of Cash Collateral constituting Lehman Post-Confirmation Funding and to evidence any Liens securing the loans or replacement Liens for the use of Cash Collateral on terms and in a form reasonably requested by such Lehman Lender, with customary and reasonable provisions for interest, fees and expenses thereupon. Loans constituting Lehman Post-Confirmation Funding are Allowed in the amount provided to the Liquidating Trustee or for the benefit of an Estate by or on behalf of any Lehman Lender with respect thereto plus interest, fees, expenses and other charges as provided in the Lehman Plan and in the documentation thereof.

The Liquidating Trustee shall repay the Lehman Post-Confirmation Funding from the sources and in the priority otherwise set forth in this Plan. (*See* Plan Section 0). Such repayments

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

first shall be applied to repay any loans constituting Lehman Post-Confirmation Funding and all amounts owed with respect thereto. Thereafter, such repayments shall be used to replenish the Cash Collateral constituting Lehman Post-Confirmation Funding. These obligations of the Liquidating Trustee to repay the Lehman Post-Confirmation Funding shall be secured by a self-effectuating, first priority Lien and/or replacement Lien on the Post-Confirmation Accounts, Plan Reserve and all proceeds of the Plan Debtors' Assets.

In all events, no later than sixty (60) days following the settlement and/or final determination of the Project Related Actions, the obligation of the Lehman Lenders to provide the Lehman Post-Confirmation Funding shall terminate, the Lehman Post-Confirmation Funding shall mature and the Liquidating Trustee shall pay the loans and all amounts owing with respect thereto and replenish the used Cash Collateral constituting Lehman Post-Confirmation Funding in full.

Because the Lehman Creditors' Claims all are undersecured, permitting use of Cash Collateral for Lehman Post-Confirmation Funding, in effect, is a voluntary subordination of the Lehman Lenders' Claims to the extent of such use of Cash Collateral, at least absent any obligation to replenish the used Cash Collateral. Thus, to the extent that any applicable Lehman Creditor's Claim that was secured by a Lien upon Cash Collateral used hereunder as Lehman Post-Confirmation Funding is hereafter subordinated by an ES Final Judgment, such ES Final Judgment shall be offset, dollar for dollar, by the amount of any such used Cash Collateral constituting Lehman Post-Confirmation Funding and the obligation of the Estates to replenish such Cash Collateral instead shall become an obligation to pay such amounts to the Plan Reserve as ES Litigation Proceeds for the Creditors and Estates benefitted by such ES Final Judgment in accordance therewith and such funds, when available, shall be distributed as ES Litigation Proceeds in accordance with the priorities established by the Lehman Plan.

**9.7 Plan Reserve and Post-Confirmation Accounts.**

In order to, among other things, provide for a source of recovery in respect of Non-Settled ES Claims should an ES Judgment be obtained for the benefit of the Holders of such Non-Settled ES Claims, and in respect of the applicable Estates and their Creditors should a Cross-Collateralization Judgment be obtained for the benefit of such Creditors, the Lehman Lenders are

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

making available Cash on which the Lehman Creditors claim a Lien. Specifically, (a) on the Effective Date, all Cash of the Estates of the Plan Debtors not otherwise distributed in accordance with the Plan shall be held by the Liquidating Trustee either in the Plan Reserve or a Post-Confirmation Account pending payment of any Post-Confirmation Expenses or distribution in accordance with the Plan, (b) on and after the Effective Date, all Cash Collateral of the Lehman Creditors shall be deposited by the Liquidating Trustee into the Plan Reserve, pending distribution or payment in accordance with the Plan, (c) on the Effective Date, the Lehman Lenders shall cause $10 million to be paid to the Liquidating Trustee from new Cash transfers (rather than from existing Cash Collateral) to be held in the Plan Reserve as a reserve for the Guaranteed Minimum Distribution, (d) all new Cash transfers from or on behalf of a Lehman Lender that are proceeds of or comprising a loan constituting Lehman Post-Confirmation Funding shall be deposited in or held in the Plan Reserve until utilized in accordance with the Lehman Plan, and (e) on and after the Effective Date, the Lehman Lenders shall have a Lien and/or retain their Lien on all Cash in the Plan Reserve, which Cash also shall serve, among other things, as a reserve for satisfaction of a Project Related Action Recovery and shall be a component of the PRA Recovery Security Pool. The applicable Lehman Creditor shall report the Cash Collateral, while held in the Plan Reserve, as being owned by it for all applicable federal, state and local income tax purposes. To enable the applicable Lehman Creditor to pay its applicable federal, state and local income tax with respect to amounts in the Plan Reserve, the Liquidating Trustee shall distribute to the applicable Lehman Creditor, or cause to be distributed, forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

**9.8 <u>Disposition of Assets</u>**

The Assets of the Estates of the Plan Debtors consist primarily of certain Remaining Real Estate Projects and certain Cash that is Cash Collateral for Lehman Secured Claims. There also may be certain Remaining Other Assets, including Litigation Claims. (Litigation Claims possibly could result in affirmative recoveries for the Estates or possibly could reduce the size of the Creditor Claims to share in available Cash for distribution.)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**9.8.1. Litigation Claims, Net Cash Litigation Recoveries and Remaining Other Assets.**

The Remaining Other Assets (other than Cash) shall be liquidated by the Liquidating Trustee, and the Net Cash Proceeds therefrom shall be available for payment of Claims and Creditors in accordance with the Plan. Pursuant to Section 1123(b)(3) of the Bankruptcy Code and subject to the compromises, waivers and releases provided in the Lehman Plan, the Liquidating Trustee shall retain all Litigation Claims whether or not pending on the Effective Date. Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Lehman Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Liquidating Trustee may pursue such Litigation Claims. The Liquidating Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 without a Lehman Lender's consent and absent providing ten (10) days' prior written notice and opportunity to object to the Committees; and the Lehman Lenders may pursue any Litigation Claim for the applicable Estate or Estates that, upon request, the Trustee does not agree to pursue. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party. All Net Cash Litigation Recoveries realized or obtained in respect of Litigation Claims of the Estates shall be promptly deposited into the Post-Confirmation Account(s) or Plan Reserve, as appropriate. Except as otherwise provided in the Lehman Plan and the Confirmation Order, the Net Cash Litigation Recoveries shall be free and clear of all Liens and shall only be expended in accordance with the provisions of the Lehman Plan.

**9.8.2 Disposition of the Remaining Real Estate Projects.**

The disposition of the Remaining Real Estate Projects or related Assets shall be as follows:

**(a) Lehman Plan Sale Procedures.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(i) Upon the Effective Date, the Liquidating Trustee shall market for sale the Remaining Real Estate Projects and related Assets pursuant hereto.

(ii) Within sixty (60) days after the Effective Date, the Liquidating Trustee shall hold auctions on such dates and at such times and places as is reasonably established by the Liquidating Trustee, provided that all auctions shall occur no later than sixty (60) days after the Effective Date. At the auctions, the Remaining Real Estate Projects and related Assets for which there is a Successful Bidder shall be sold or conveyed to a third party purchaser, a Lehman Nominee, or another Holder of an Allowed Secured Claim who submits a qualifying bid and becomes the Successful Bidder in accordance herewith and pursuant to the further detailed procedures for such bidding and auctions, which detailed procedures shall be in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Lenders or other owners and the Liquidating Trustee or approval of the Bankruptcy Court (the "Detailed Sale Procedures").

(iii) Pursuant to Bankruptcy Code Section 1123(a) and the Lehman Plan, at the auction of each Remaining Real Estate Project, such Remaining Real Estate Project and all associated personal property, including the applicable Plan Debtor's Estate's right, title and interest in, to and under any development agreements, plans, engineering reports and community facilities district bonds, shall be sold by virtue of the Confirmation Order to the highest bidder or its nominee free and clear of any Encumbrances (other than the Permitted Liens) with such Encumbrances (other than the Permitted Liens) not paid in connection with the transaction to attach to the consideration to be received by the Liquidating Trustee in the same priority and subject to the same defenses and avoidability, if any, as before the closing of the transaction. The Liquidating Trustee shall obtain a hearing date from the Bankruptcy Court at which the Bankruptcy Court shall issue an Order approving such sales or conveyances to the extent consistent herewith and order that such sale or conveyance shall be free and clear of all Encumbrances (other than Permitted Liens) in accordance herewith. Consistent with each particular bid, debts and obligations secured by existing Encumbrances on said Remaining Real Estate Projects or related property at the time of sale or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

conveyance either shall be paid in full upon such sale or conveyance, attach to the Net Cash Proceeds with the same validity, priority and extent to which they attach to the underlying collateral (such as would occur with respect to the Lehman Secured Claims upon a sale to a third party purchaser) or be unimpaired in which case the Remaining Real Estate Projects or other assets sold or conveyed shall remain encumbered by the Encumbrances thereon securing the unimpaired debts and obligations and such Encumbrances would be Permitted Liens.

Subject to the terms of the Lehman Plan, the respective Lehman Creditors commit to credit bid the following "Initial Bids" at the auctions as to the indicated Assets and may elect hereafter to make the following "Contingent Bids" at the auctions with respect to the indicated Assets as set forth in the following table:

**LEHMAN CREDITORS' INITIAL BIDS AND CONTINGENT BIDS**

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 1 | Class 2.2 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Emerald arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $12 million plus Cash Collateral | SunCal Emerald; SunCal Emerald: 7 | Emerald Mea-dows Project | Initial Bid: $12 Million |

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 2 | Class 2.3 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $29.5 million plus Cash Collateral | SunCal Bickford; SunCal Bickford: 16 | Bickford Ranch Project | Initial Bid: $29.5 Million |
| 3 | Class 2.5 | Allowed Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31 and as an Allowed Secured Claim in the amount of $42.9 million plus Cash Collateral | Palmdale Hills; Palmdale Hills 65 | Ritter Ranch Project | Initial Bid: $42.9 Million |
| 4 | Class 2.9 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Oak Knoll arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the Allowed Amount of $158,141,364.64 and as an Allowed Secured Claim in the amount of $48 million plus Cash Collateral | SunCal Oak Knoll; SunCal Oak Knoll: 12 | Oak Knoll Project | Initial Bid: $48 Million |

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| 5 | Class 2.10 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Agreement in the Allowed Amount of $157,870,186.15 and as an Allowed Secured Claim in the amount of $25 million plus Cash Collateral | SunCal Torrance; SunCal Torrance: 4 | Del Amo Project | Initial Bid: $25 Million |
| 6 | Class 2.11 | Allowed Claim of Lehman ALI or its assignee or successor against Delta Coves arising from the Delta Coves Loan Agreement in the Allowed Amount of $206,023,142.48 and as an Allowed Secured Claim in the amount of $25.2 million plus Cash Collateral | Delta Coves; Delta Coves 21 | Delta Coves Project | Initial Bid: $25.2 Million |
| 7 | Class 2.13 | Allowed Claim of Lehman ALI or its assignee or successor against SunCal Heartland arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $187.5 million plus Cash Collateral | SunCal Heartland; SunCal Heartland: 9 | Marble-head Project | Initial Bid: $187.5 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Initial Bid #; Cont. Bid Letter | Class / Plan § | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | Asset | Bid |
|---|---|---|---|---|---|
| 8 | Class 2.12 | Allowed Claim of Lehman ALI against SunCal Marblehead arising from the SunCal Marblehead / SunCal Heartland Loan Agreement in the Allowed Amount of $354,325,126.15 and as an Allowed Secured Claim in the amount of $7.9 million plus Cash Collateral | SunCal Marblehead; SunCal Marblehead: 21 | Heart-land Project | Initial Bid: $7.9 Million |
| 9 | Class 2.14 | Allowed Claim of OVC Holdings or its assignee or successor against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the Allowed Amount of $141,630,091.63 and as an Allowed Secured Claim in the amount of $20.9 million plus Cash Collateral | SunCal Oak Valley; SunCal Oak Valley 16 | Oak Valley Project | Initial Bid: $20.9 Million |
| 10 | Class 2.15 | Allowed Claim of Northlake Holdings or its assignee or successor against SunCal Northlake arising from the Northlake Loan Agreement in the Allowed Amount of $123,654,776.88 and as an Allowed Secured Claim in the amount of $23 million plus Cash Collateral | SunCal Northlake; SunCal Northlake 6 | North-lake Project | Initial Bid: $23 Million |
| 11 | Class 2.16 | Allowed Claim of Lehman ALI or its assignee or successor arising from the SunCal PSV Loan Agreement in the Allowed Amount of $88,257,340.20 and as an Allowed Secured Claim in the amount of $13.8 million plus Cash Collateral | SunCal PSV; SunCal PSV 12 | Palm Springs Village Project | Initial Bid: $13.8 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **Initial Bid #; Cont. Bid Letter** | **Class / Plan §** | **Claims** | **Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number).** | **Asset** | **Bid** |
|---|---|---|---|---|---|
| A | Plan § 7.6(c) / Class 7.21 | Lehman Commercial's SunCal I Lien & Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 | SunCal I; SunCal I: 1 | SunCal Beau-mont's Beau-mont Heights Project | Con-tingent Bid: $1.2 Million |
| | | | | SunCal Johann-son's Johann-son Ranch Project | Con-tingent Bid: $2.1 Million |
| | | | | SunCal Summit Valley's Summit Valley Project | Con-tingent Bid: $750,000 |
| B | Class 2.1 | Allowed Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $6.8 million plus Cash Collateral | Acton Estates; Acton Estates: 6 | Acton Project | Con-tingent Bid: $3.4 Million |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Initial Bid #; Cont. Bid Letter | Class / Plan § | Claims | Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | Asset | Bid |
|---|---|---|---|---|---|
| C | Class 2.4 | Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim in the amount of $2.2 million plus Cash Collateral | SunCal Summit Valley; SunCal Summit Valley: 12 | Owner-ship Interests of Kirby Estates and Seven Brothers in Summit Valley Project | Con-tingent Bid: $1.075 Million |
| D | Class 2.6 | Allowed Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.2 million plus Cash Collateral | SCC Communities; SCC Communities: 9 | Joshua Ridge Project | Con-tingent Bid: $1 Million |
| E | Class 2.8 | Allowed Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim in the amount of $1.85 million plus Cash Collateral | Tesoro; Tesoro: 7 | Tesoro Project | Con-tingent Bid: $1.5 Million |

(iv) Qualifying bids by third party purchasers must be bids for payment in Cash. Other Holders of Allowed Secured Claims may credit bid such amount of their Allowed Secured Claims as agreed with the Liquidating Trustee or fixed by the Bankruptcy Court, in each case on a Project by Project basis. The bids of such other Holders of Allowed Secured Claims and third party purchasers must comply with and be made consistent with the Detailed Sale Procedures.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

If a qualifying bid or bids are received for any Project within forty-five (45) days after the Effective Date, such bids shall be Filed with the Bankruptcy Court by the Liquidating Trustee.

(v) The Initial Bids and, if made by any Lehman Creditor (and subject to the following), the Contingent Bids, and any increased bids thereof by Lehman Creditors up to the outstanding amount of the applicable Lehman Loans as set forth in Article 7.5 of the Lehman Plan, each shall be deemed fully qualifying and eligible bids for all purposes of such auctions and the Detailed Sale Procedures. If no higher and better bid is made by another Holder of an Allowed Secured Claim or third party purchaser in accordance with the Detailed Sale Procedures, the applicable Lehman Creditor shall be the Successful Bidder and the Liquidating Trustee shall convey the subject Project and related Assets to a Lehman Nominee in accordance herewith. The Lehman Nominee shall report the subject Project and related Assets as being owned by it for all applicable federal, state and local income tax purposes. If there is no Successful Bidder with respect to an Asset, the Liquidating Trustee need not sell or convey it pursuant to the Lehman Plan Sale Procedures.

(vi) The Initial Bids are in the amount of the Lehman Creditors' previously appraised values for the subject Projects. The Contingent Bids are in the amounts of the Debtors' value estimates as set forth in the Debtors' Third Amended Disclosure Statement. The Contingent Bids relate to Assets as to which either (1) the Debtors have alleged that the Lien of the applicable Lehman Lender is subject to a Cross-Collateralization Claim or (2) a Lehman Lender holds a Lien on the equity interest in the owner of the Project for a limited purpose, but not directly upon the Project itself and holds a General Unsecured Claim against the Holder of the equity interests in the Project.

(vii) The Lehman Creditors Initial Bids and Contingent Bids represent bids on Assets associated with all of the Projects currently owned by the Debtors other than the 10000 Santa Monica Project, owned by SunCal Century City; provided that the Initial Bids and Contingent Bids do not include parcels within the Summit Valley Project and Beaumont Heights Project as to which there are Secured Claims in Class 4 of the Plan senior to the Secured Claims of the Lehman Creditors. Although a Lehman Creditor may at any time elect to bid Cash for an Asset on the same

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

terms as other third parties, for bids made through the Initial Bids and, if the applicable Lehman Creditors elect to make them, bids made through the Contingent Bids, Creditors are protected, as and to the extent provided in the Lehman Plan:

A. Any Remaining Real Estate Project which is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures pursuant to an Initial Bid or Contingent Bid or increased bid therefrom, as set forth above (each a "PRA Security Project") shall be encumbered by a PRA Recovery Deed of Trust and such Lehman Nominee shall execute a Reconveyance Agreement.

B. Contingent Bids B, D and E, identified in the table above, relate to three Remaining Real Estate Projects as to which the Debtors have alleged that the Lien of the Lehman Lender is subject to a Cross-Collateralization Claim. If a Lehman Creditor is a Successful Bidder pursuant to Contingent Bid B, D or E, a reconveyance obligation for a Cross-Collateralization Final Judgment will apply as to such Project as set forth in the Lehman Plan and such obligation will be secured by a PRA Recovery Deed of Trust (which shall be released as provided in the Lehman Plan).

C. Contingent Bids A and C, identified in the table above, relate to three Remaining Real Estate Projects as to which a Lehman Lender holds a Lien on the equity interests in the owners of such Remaining Real Estate Projects for a limited purpose, but not directly upon the Remaining Real Estate Projects and holds a General Unsecured Claim against the Holder of the equity interests in the Project. Contingent Bids A and C are in the amount of the Debtors' estimate of value for the applicable Remaining Real Estate Project set forth in the Debtors' Third Amended Disclosure Statement. They will include a Cash portion equal to the full amount of the bid, or, if less, 110% of the aggregate amount of all non-Lehman Creditor Claims against the particular Plan Debtor owning the subject Remaining Real Estate Project as estimated in Exhibit 7 to the Debtors' Third Amended Disclosure Statement. The Cash portions of Contingent Bids A and C, identified in the table above, for these three Remaining Real Estate Projects, divided among the five Plan Debtor owners thereof, are as follows: Beaumont Heights Project (owned by SunCal Beaumont): $689,200 Cash (non-Lehman Creditor Claims of $626,545 x 110%); Johannson Ranch

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Project (owned by SunCal Johannson): $165,427 Cash (non-Lehman Creditor Claims of $150,388 x 110%); Summit Valley Project (the portion owned by SunCal Summit Valley): $750,000 Cash (entire bid); Summit Valley Project (the portion owned by Kirby Estates): $2,000 Cash (non-Lehman Creditor Claims of $1,744 x 110%); and Summit Valley Project (the portion owned by Seven Brothers): $66,911 Cash (non-Lehman Creditor Claims of $60,828 x 110%).

**(b) Net Proceeds from Sales of Remaining Real Estate Projects to Third Party Purchasers.**

If a Remaining Real Estate Project subject to a Lehman Lender's Lien is sold to a third party purchaser (rather than sold or conveyed to a Lehman Nominee), as to the Net Cash Proceeds therefrom, the Liquidating Trustee shall hold such Net Cash Proceeds in the Plan Reserve and, as to non-Cash Net Proceeds to the Liquidating Trustee therefrom, the applicable Lehman Lenders shall be afforded substitute Liens on such non-Cash Net Proceeds.

**(c) PRA Recovery Security Pool.**

**(i) Generally.**

The Lehman Lenders dispute or may dispute all or substantially all of the Equitable Subordination Claims and the Cross-Collateralization Claims. If, however, some recovery were afforded to the Liquidating Trustee for the Estates in respect of the Equitable Subordination Claims in the ES Action or the Cross-Collateralization Claims in a Cross-Collateralization Action (*i.e.*, a Project Related Action Recovery), and if a variety of other litigation hurdles were overcome, the values of the Remaining Real Estate Projects against which Lehman Creditors hold Secured Claims and on which Lehman Creditors are bidding and may bid possibly would be available to satisfy the Project Related Action Recovery. Thus, to secure the satisfaction of a Project Related Action Recovery and thereby protect the Estates of the Plan Debtors and their Creditors (1) certain Cash is to be held by the Liquidating Trustee in the Plan Reserve and the remainder therefrom shall be available to satisfy such ES Final Judgment or Cross-Collateralization Final Judgment to the extent otherwise provided under the Lehman Plan and (2) any Remaining Real Estate Project that is conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures shall be subject to a PRA Recovery Deed of Trust (collectively, the "PRA Recovery Security Pool").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

At any time that the Plan Reserve contains an amount equal to the Maximum PRA Recovery Amount, by voluntary payment of a Lehman Related Party or otherwise, the Liquidating Trustee shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve in excess of the Maximum PRA Recovery Amount. At any time that the ES Action and all timely Filed Cross-Collateralization Actions either (I) have been dismissed with prejudice and/or settled or (II) the Project Related Action Recovery with respect thereto as against the applicable Lehman Related Parties has been fully satisfied, the Liquidating Trustee, upon the request of the applicable Lehman Related Parties, shall terminate all Reconveyance Agreements, release and reconvey to the applicable Lehman Nominees all PRA Recovery Deeds of Trust and release to the applicable Holders of the Lehman Secured Claims and all Lehman Nominees (who shall determine the allocation of the funds amongst them) all funds in the Plan Reserve other than the amount reserved with respect to the Guaranteed Minimum Distribution.

**(ii) PRA Recovery Deeds of Trust.**

Upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale Procedures, the Lehman Lenders will cause the applicable Lehman Nominees taking title to the applicable PRA Security Project to record a PRA Recovery Deed of Trust with the priority achievable from the appropriate recording thereof just prior to the moment of conveyance. The Liquidating Trustee shall be the named beneficiary under any PRA Recovery Deed of Trust and, in his or her sole discretion, may delay, defer or waive receipt of the benefits or the recording thereof as to one or more Remaining Real Estate Projects. Each PRA Recovery Deed of Trust is being given solely for the purpose of creating a Lien on the applicable PRA Security Project to be part of the PRA Recovery Security Pool and nothing contained therein shall in any way restrict or interfere with the rights of the owner of such PRA Security Project, including, without limitation, such owner’s right to own, manage, operate, improve, sell, convey, refinance, encumber and otherwise deal with such PRA Security Project.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Each PRA Recovery Deed of Trust shall secure the non-recourse obligation of each Lehman Nominee who is the owner of each relevant PRA Security Project to reconvey the applicable PRA Security Project to the Liquidating Trustee in the event of an ES Final Judgment or Cross-Collateralization Final Judgment, subject to the terms of the Reconveyance Agreements and subject to the option of the Lehman Nominee to pay in Cash the amount of the Project Related Action Recovery in lieu of effectuating such reconveyance. In aggregate, the PRA Security Deeds of Trust secure an amount not in excess of the Maximum DOT Security Amount.

Each PRA Recovery Deed of Trust shall also provide that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above (the "Negative Covenant"). If such Lehman Nominee fails to comply with the foregoing Negative Covenant for thirty (30) days following written notice and an opportunity to cure, then the Liquidating Trustee shall have the right to seek damages against Lehman ALI and Lehman Commercial, jointly and severally, and any claims arising from the pursuit of such remedies shall be treated as administrative expense claims in Lehman Commercial's bankruptcy case and, if Lehman ALI is then subject to its own bankruptcy proceeding, Lehman ALI shall use its best efforts to afford the same administrative priority to such claims in any such bankruptcy case. Any payments made or assets seized in satisfaction of any judgment based on such damage claims shall be deposited into the Plan Reserve. In addition, if a Lehman Nominee fails to pay or cause to be paid any property taxes or assessments due and payable with respect to the PRA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Security Project owned by such Lehman Nominee on or prior to the date which is six (6) months prior to the earliest date on which a foreclosure of such PRA Security Project could be effectuated for non-payment of property taxes or assessments, then the Liquidating Trustee shall have the right to make a protective advance for the payment of such taxes or assessments and to foreclose upon the applicable PRA Recovery Deed of Trust encumbering such PRA Security Project in order to repay any such outstanding protective advance; provided that any proceeds of any such foreclosure sale and any interest acquired by the Liquidating Trustee in connection with any such foreclosure sale shall be deposited into the Plan Reserve pending the completion of the Project Related Actions.

**(iii) Reconveyance Agreements.**

The non-recourse performance obligations for turnover and reconveyance of each PRA Security Project secured by the applicable PRA Recovery Deed of Trust shall be in a writing (each, a "Reconveyance Agreement"), which writing is to be executed by the applicable Lehman Nominee that takes ownership of the subject PRA Security Project and shall be in a form acceptable to the Lehman Lenders or Lehman Nominee and Liquidating Trustee or as reasonably proposed by the Lehman Lenders or Lehman Nominee and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner of the applicable PRA Security Project and Liquidating Trustee or approval of the Bankruptcy Court. At a Lehman Nominee's election, such non-recourse obligations, instead, may be satisfied by a Cash payment to the applicable Estate(s) in the amount of any applicable Project Related Action Recovery.

The obligations to reconvey a particular PRA Security Project following the occurrence of, and in satisfaction of, a Cross-Collateralization Final Judgment or an ES Final Judgment are distinct. The reconveyance obligation with respect to an ES Final Judgment shall be included in each Reconveyance Agreement. The reconveyance obligation with respect to a Cross-Collateralization Final Judgment shall be included only in the Reconveyance Agreement related to the PRA Security Project as to which a Cross-Collateralization Claim is alleged in a Cross-Collateralization Action. The benefits of the reconveyance obligations with respect to ES Final Judgments, if any, are themselves to be cross-collateralized, to the extent provided in the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan, by virtue of the concessions being made by the Lehman Creditors to benefit Non-Settling ES Claimants as described in Section 9.9(f) of the Plan. A reconveyance obligation with respect to a Cross-Collateralization Final Judgment, if any, shall only apply with respect to the particular PRA Security Project as to which the Lien of the applicable Lehman Creditor is avoided by the Cross-Collateralization Final Judgment and the benefits thereof, if any, only shall inure to the Holders of Allowed Claims against the Plan Debtor that owned such PRA Security Project as provided in Section 0 of the Plan. Nonetheless, for PRA Security Projects as to which the Reconveyance Agreement contains obligations to reconvey for both an ES Final Judgment and a Cross-Collateralization Final Judgment, the distribution priorities as to the Net Cash Proceeds from the disposition of the reconveyed PRA Security Project give priority to the Cross-Collateralization Judgment, which in theory would be setting aside the Lien as to which the related ES Judgment seeks to transfer the now extinguished benefits.

**(iv) Release of PRA Recovery Deeds of Trust.**

The PRA Recovery Deeds of Trust generally shall remain in effect pending the final settlement or determination of the Project Related Actions. Thus, all PRA Recovery Deeds of Trust shall be released and reconveyed and all Reconveyance Agreements shall be terminated upon:

(A) the dismissal, with prejudice, and/or settlement of all Project Related Actions against the applicable Lehman Related Parties, or

(B) full satisfaction of each Project Related Action Recovery as against the applicable Lehman Related Parties.

Additionally, in order to permit the Lehman Nominees holding title to the PRA Security Projects to fully utilize such properties:

i. all of the PRA Recovery Deeds of Trust shall be released and all Reconveyance Agreements terminated at such time as the balance of funds in the Plan Reserve is equal to the Maximum PRA Recovery Amount; and

ii. the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be released and the corresponding Reconveyance Agreement terminated upon the sale of such Project to a third party and the deposit of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any Net Cash Proceeds resulting from such sale into the Plan Reserve and/or the provision of a substitute Lien on any non-Cash Net Proceeds resulting from such sale; and

iii. the PRA Recovery Deed of Trust encumbering a particular PRA Security Project shall be subordinated to the Lien of a new mortgage loan upon a refinancing of the particular PRA Security Project obtained by the applicable Lehman Nominee in its sole and absolute discretion, provided that all Net Cash Proceeds derived from such refinancing are deposited into the Plan Reserve.

Further, the reconveyance obligation, to be included in any Reconveyance Agreement with respect to a Cross-Collateralization Final Judgment if a timely Cross-Collateralization Action is pending as to certain Projects if conveyed under the Lehman Plan Sale Procedures to a Lehman Nominee, shall terminate once no Cross-Collateralization Action is pending and either no Cross-Collateralization Judgment has issued or such judgment been satisfied, annulled, vacated or reversed.

Whenever Lien releases or subordinations or terminations of reconveyance obligations or Reconveyance Agreements occur or are required, the Liquidating Trustee shall act reasonably in arranging to provide, and in executing such documents as the applicable Lehman Nominee reasonably requests to effectuate the reconveyance in full of the PRA Recovery Deeds of Trust or termination of reconveyance obligations or Reconveyance Agreements.

**(v) Reduction of Maximum PRA Recovery Amount.**

The Maximum PRA Recovery Amount, which serves as the maximum aggregate amount secured by the PRA Recovery Security Pool, is an amount intended to be not less than the maximum potential cash value of the Project Related Action Recovery. For the calculation of the Maximum PRA Recovery Amount, the definition thereof in the Lehman Plan includes, unless rebutted with lower figures, presumptions that the maximum cash value of the potential Project Related Action Recovery for Cross-Collateralization Final Judgments is $1.74 million and for ES Judgments is $200 million. If, however, a Lehman Lender Files a motion with the Bankruptcy Court

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and provides relevant evidence, as follows, the Maximum PRA Recovery Amount shall be reduced accordingly:

A. to replace the amount used in subparagraph (a) of the definition of Maximum PRA Recovery Amount, the Bankruptcy Court must find that a lower number results upon determining (I) the lesser of (A) the maximum cash value, if any, of the Lehman Secured Claims alleged to be subject to being set aside pursuant to a Cross-Collateralization Judgment, which Secured Claims are against any of the Acton Project, Joshua Ridge Project or Tesoro Project as is conveyed to a Lehman Nominee upon a credit bid and (B) the maximum Claims (other than Claims of Lehman Creditors) against Acton Estates, SCC Communities or Tesoro (as to which Plan Debtors, there are pending Cross-Collateralization Claims in a pending Cross-Collateralization Action against a Lehman Related Party and the Project owned by such Estate has been conveyed to a Lehman Nominee pursuant to a credit bid), and (II) subtracting from such amount the value of all direct or indirect benefits to the subject Plan Debtor resulting from the subject Lehman Loan; and/or

to replace the amount used in subparagraph (b)(i) of the definition of Maximum PRA Recovery Amount, the Bankruptcy Court finds that a lower number results upon determining (I) the lesser of (A) the maximum cash value of the Lehman Secured Claims in the Plan Debtors' Assets that are alleged to be subject to subordination pursuant to an ES Judgment and (B) the maximum Claims (other than Claims of Lehman Creditors) against the Plan Debtors (as to which there are pending allegations in the ES Action that a Lehman Secured Claim is subject to subordination).

**(d) <u>Sale or Refinance of PRA Security Projects.</u>**

(i) refinance the PRA Security Projects in all respects The Lehman Nominee(s) will have full right to sell and/or after the conveyance thereof to the Lehman Nominee(s) pursuant to the Lehman Plan Sale Procedures without any interference by the Liquidating Trustee, SunCal, the Trustee, the Debtors or any of their respective Affiliates or any ES Claimants or other Creditors of the applicable Plan Debtors.

(ii) If any particular PRA Security Project is thereafter sold by a Lehman Nominee other than to a Lehman Related Party, (a) the Liquidating Trustee shall release the PRA Recovery Deed(s) of Trust as to such PRA Security Project, (b) the Net Cash Proceeds derived

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

from such sale shall be deposited into the Plan Reserve, and (c) the Lehman Nominee shall grant the Liquidating Trustee a substitute Lien in any non-Cash Net Proceeds received by such Lehman Nominee to become part of the PRA Recovery Security Pool and to be subject to the same terms as other PRA Recovery Deeds of Trust.

(iii) If any particular PRA Security Project is refinanced by the Lehman Nominee, (a) the Liquidating Trustee shall agree to subordinate the PRA Recovery Deed(s) of Trust as to such PRA Security Project so as to permit the imposition on the PRA Security Project of a new senior refinancing Lien, and (b) the Net Cash Proceeds derived from such refinancing shall be deposited into the Plan Reserve.

(iv) If any particular PRA Security Project is sold by a Lehman Nominee to another Lehman Related Party, then either (x) such sale may be made subject to the PRA Recovery Deed(s) of Trust (which shall be mandatory if the transferee is a Lehman Creditor Party), or (y) all of the following shall apply: (1) there shall be deposited into the Plan Reserve all Net Cash Proceeds received by the Lehman Nominee in connection with such transfer, (2) the Liquidating Trustee shall be granted a substitute Lien on any non-Cash Net Proceeds received by a Lehman Nominee in connection with such transfer and (3) a Lien either (I) against the equity interest in the joint venture or similar entity of the Lehman Nominee or (II) against the most direct interest held by a Lehman Nominee, shall be granted to the Liquidating Trustee and the Lien so granted shall become part of the PRA Recovery Security Pool and be subject to the same terms as the PRA Recovery Deeds of Trust.

(v) As to any Remaining Real Estate Projects not sold or conveyed pursuant to the Lehman Plan Sale Procedures: (i) they shall be otherwise liquidated by the Liquidating Trustee or may be abandoned or surrendered with the consent of the Lehman Lenders and after approval of the Bankruptcy Court; (ii) such Remaining Real Estate Projects may be sold free and clear of Encumbrances other than Permitted Liens for Cash, or on such other terms to which the Holder of an Allowed Secured Claim with respect thereto consents; (iii) the Holder of any such Allowed Secured Claim (including any applicable Holder of any Lehman Secured Claim) shall receive at least thirty (30) days' prior notice of any proposed sale and may elect to credit bid in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

response to such notice up to the full amount of its Claim for which the item being sold is collateral (without the amount bid being limited to the value of the Holder's interest in such collateral); (iv) if the Remaining Real Estate Project is sold to a third party purchaser, promptly upon receipt thereof by the Liquidating Trustee, the Net Cash Proceeds (and any non-Cash Net Proceeds) therefrom shall be paid or turned over to the Holders of Allowed Secured Claims against such Remaining Real Estate Project up to the full amount of each such Holder's Allowed Claim (or used in payment of other Claims as otherwise set forth in the Lehman Plan in respect of the treatment of such Allowed Secured Claims) and any remaining Net Cash Proceeds shall be used to pay other obligations of the applicable Plan Debtor's Estate in the priorities set forth in Section 9.10(c) of the Plan.

**9.9 Equitable Subordination Claims**

**9.9.1 Generally.**

ES Claimants are afforded the option to vote either for acceptance of the ES Settlement Offer and the specified benefits it provides or to have the Liquidating Trustee continue prosecution of the Equitable Subordination Claims for their potential benefit.

**9.9.2 ES Settlement Offer.**

**(a) Payments to ES Settling Claimants.**

The Settling ES Claimants are to receive the ES Pro Rata Settlement Payments as and to the extent set forth herein.

**(b) Releases and Assignments.**

In exchange for the ES Pro Rata Settlement Payments: (A) the Liquidating Trustee will issue an Estate ES Settlement Release as to each Estate in which any Settling ES Claimant holds its Allowed ES Claim; (B) each Settling ES Claimant will issue an ES Claimant Release and Assignment; and (C) if there is Estate Acceptance of the ES Settlement as to all applicable Estates of the ES Plan Debtors, the Liquidating Trustee also will dismiss (with prejudice), as to the Estates of all ES Plan Debtors, the ES Action, with each party to bear its own costs and fees.

**(c) Estate ES Settlement Release.** In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors in these Cases, shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties.

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the

Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

**(d) ES Claimant Release and Assignment.**

In exchange for the commitment of the Lehman Lenders under the Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote, on behalf of itself and its Affiliates, shall be deemed to (a) unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable or related to the ES Claims of such Settling ES Claimant or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of such Settling ES Claimant (collectively, the "ES Claimant Released Claims"), from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of the Estate against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their properties, and (b) to the extent such ES Claimant Released Claims are owned by the Estate of a Plan Debtor and cannot be released by the ES Claimant, assign to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the Settling ES Claimant with respect to such ES Claimant Released Claims, including the Litigation Recoveries that otherwise would be due therefrom to, or attributable to the ES Claims of, the Settling ES Claimants.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees and all successor owners of the specified Projects, in accordance herewith, the Lehman Releasees also shall be entitled to the issuance of a separate written release, waiver and relinquishment by the Settling ES Claimant by Vote in the form set forth on, or attached to, the Ballot.

**9.9.3 <u>Continued Prosecution of Equitable Subordination Claims.</u>**

Unless all of the Estates of the ES Plan Debtors accept the ES Settlement Offer (through the acceptance of the ES Settlement Offer by at least one-half in number and two-thirds in amount of the voting ES Claimants of each such ES Plan Debtor's Estate), resulting in a dismissal (with prejudice), release and settlement of all Equitable Subordination Claims as to all ES Plan Debtors' Estates, the Liquidating Trustee may continue prosecution of the Equitable Subordination Claims in the ES Action seeking any alleged damages, subordination or other remedies that may be available for the benefit of and attributable to the ES Claims of any Non-Settling ES Claimants, subject to the Plan Release and as determined by the court with jurisdiction over such actions; provided, that the PRA Recovery Security Pool will be the sole source for recovery on an ES Judgment, unless a Lehman Lender elects to pay Cash in lieu thereof.

**(e) <u>ES Litigation Loan.</u>**

(i) Unless the Equitable Subordination Claims in the ES Action are fully settled as to all ES Plan Debtors' Estates (*i.e.*, there is Estate Acceptance of the ES Settlement for all ES Plan Debtors' Estates), a Lehman Lender will make available to the Liquidating Trustee the ES Litigation Loan in the aggregate principal amount of up to $1 million for the Estates of those ES Plan Debtors for which the Liquidating Trustee continues to prosecute Equitable Subordination

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

Claims. The ES Litigation Loan will accrue interest at a 10% annual rate (compounded annually). The proceeds of the ES Litigation Loan may be used solely for the payment of ES Litigation Expenses if and only if there is no Available Cash in the Post-Confirmation Accounts to fund the ES Litigation Expenses and SunCal and its principals decline to continue paying the cost of prosecuting the Equitable Subordination Claims in the ES Action.

(ii) The ES Litigation Loan shall be made available by a Lehman Lender to the Liquidating Trustee as the ES Litigation Expenses are incurred and shall be funded no more frequently than on a monthly basis. The Liquidating Trustee shall provide the Lehman Lender with reasonable substantiation and backup (including invoices and statements from the parties to be paid) for any ES Litigation Expenses to be paid with the proceeds of the ES Litigation Loan in connection with any request to the Lehman Lender for an advance of proceeds of the ES Litigation Loan; provided, however, that the Liquidating Trustee shall not be required to provide any substantiation or backup to the Lehman Lender that discloses, directly or indirectly, information or communications that are subject to attorney-client privilege or attorney work product or contains any other privileged or confidential information or strategies of the Liquidating Trustee with respect to the ES Action.

(iii) ES Litigation Proceeds shall be made available to pay Allowed Non-Settled ES Claims only after repayment of the ES Litigation Loan, together with interest thereon at an annual, compounded rate of interest equal to 10%; provided, that such repayment may be made without any prejudice to the right of the prevailing party to seek reasonable fees and costs from the non-prevailing party in the ES Action. Such repayment shall be from sources other than Cash Collateral to which the applicable Lehman Creditor otherwise is entitled.

(iv) At the election of a Lehman Lender, (1) the ES Litigation Loan may be funded from Cash Collateral of a Lehman Creditor, (2) the ES Litigation Loan may be funded from a transfer of new Cash from a Lehman Lender or (3) a Lehman Lender may direct that the Liquidating Trustee use, for the ES Litigation Loan, funds in the form of new Cash from one or another Lehman Creditor and pay a like amount of Cash Collateral securing a Lehman Loan towards reduction of such Lehman Loan, as the Lehman Lender directs.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(f) Concessions by Lehman Lenders' to Facilitate Collection of ES Judgments.**

Although the Lehman Lenders believe they will defeat any Equitable Subordination Claims in the ES Action, to further incentivize support of all ES Claimants for the Lehman Plan, including Non-Settling ES Claimants, the Lehman Lenders, solely in connection with and for confirmation and the effectiveness of the Lehman Plan, agree to the following in connection with entry of an ES Judgment subordinating the Lehman Secured Claims to the ES Claims, if any such judgment is entered:

**(1) Excess Values Otherwise Available to Pay the Lehman Creditors from Certain ES Plan Debtors' Projects Are to be Collateral for Equitable Subordination Claims that Benefit ES Claimants of Other ES Plan Debtors.** For some particular ES Plan Debtors' Estates, the Net Cash Proceeds from the sale of their PRA Security Projects or other Assets likely would be insufficient to pay the Allowed ES Claims against those Estates and, for other particular ES Plan Debtors' Estates, such Net Cash Proceeds likely would exceed the Allowed ES Claims against their Estates. Instead of any such excess Net Cash Proceeds being available next to the Lehman Creditors, as Holders of Secured Claims or subordinated Secured Claims against those Estates, the Lehman Creditors, to their own detriment, have agreed, by virtue of permitting the PRA Recovery Security Pool to secure all ES Judgments, to voluntarily subordinate their remaining Secured Claims in any such excess values in the PRA Security Projects to any unpaid portion of an ES Final Judgment as to other ES Plan Debtors' Estates.

**(2) To Obtain the ES Judgment in the First Instance for Del Rio and SJD Partners, No Showing Will be Required that the Subject Estates Had Enough Value In Them to Pay their ES Claims Without Regard to Any Lehman Secured Claim.** As to the Estates of Del Rio and SJD Partners only, Lehman ALI and Fenway Capital will waive an objection or defense, that, even if the applicable Lehman Secured Claim was ignored, there was insufficient value in those Estates to pay their Allowed ES Claims and, as to SJD Partners, that they are inappropriate defendants as to a non-recourse judgment secured by the PRA Recovery Security Pool, provided that (I) all other grounds necessary to obtain an ES Judgment have been satisfied, and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(II) the applicable Estate executes the Del Rio / SJD Partners Release within forty-five (45) days following the Effective Date.

**(3) There is to be a BFP Waiver by Fenway Capital.** The defense to the ES Action by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, such that the actions or conduct of the Lehman Lenders could not be attributed to Fenway Capital due to such status, is to be waived if the Credit Bid Conditions are satisfied and if Fenway Capital affirmatively consents in writing. (The Lehman Lenders are exercising good faith efforts to obtain the affirmative consent in writing of Fenway Capital to the BFP Waiver.)

**9.10 Post-Petition Expenses, Intercompany Loans and Payables and Priorities in Payment.**

**9.10.1 Post Confirmation Expenses and Intercompany Loans.**

All Post-Confirmation Expenses may be paid by the Liquidating Trustee from the Post-Confirmation Account(s) upon ten (10) days' prior written notice and opportunity to object provided to the Lehman Lenders, the Committee(s), the Holders of Lehman Disputed Secured Claim(s), or with their consent, but without further notice to other Creditors or Holders of Interests, or approval of the Bankruptcy Court. Any disputes concerning the payment of Administrative and Post-Confirmation Expenses shall be submitted to the Bankruptcy Court for resolution. To the extent readily determinable, Post-Confirmation Expenses attributable to a particular Plan Debtor shall be paid from that Plan Debtor's Assets consistent with the provisions of the Lehman Plan. To the extent of available Assets from each Plan Debtor, other Post-Confirmation Expenses shall be payable by each Plan Debtor Pro Rata consistent with the Lehman Plan, provided that after a Plan Debtor's available Cash or Assets are exhausted, the other Plan Debtors shall absorb such Plan Debtor's share of unpaid Post-Confirmation Expenses as provided in the Lehman Plan, which shall be Pro Rata to the extent reasonably possible. To the extent one Plan Debtor advances funds on behalf of another, the Liquidating Trustee shall book a receivable for the advancing Debtor and a payable for the borrowing Debtor.

**9.10.2 Payables and Priorities in Payment.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Recoveries from the following sources as to which there are no unsubordinated Secured Claims shall be applied in the following manner:

**(a) Funds Constituting Collateral.**

All funds that are collateral for the Lehman Post-Confirmation Funding shall be used for repayment thereof to the applicable Lehman Lender or replenishment of Cash Collateral for the applicable Lehman Lender when available for distribution or upon maturity of the Lehman Post-Confirmation Funding; and all funds that are collateral for a Lehman Secured Claim shall be used for repayment thereof when provided in the Lehman Plan as to treatment of the Lehman Secured Claims; provided that the tax distributions to the applicable Lehman Lender from the Plan Reserve shall be payable no less than annually from the income earned thereupon;

**(b) Funds Constituting ES Litigation Proceeds.**

ES Litigation Proceeds of a particular Estate (unless they are or may also be a Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment) shall be applied in the following order of priority until exhausted:

(i) First, to payment of the ES Litigation Loan;

(ii) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the particular Estate's Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(iii) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iv) Fourth, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(v) Fifth, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment until paid the full amount of their Allowed ES Claims;

(vi) Sixth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment, if any, payable Pro Rata among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of repayments owing with respect to Lehman Post-Confirmation Funding and next to pay such Allowed ES Claims until paid in full; and

(vii) Seventh, to the applicable Lehman Creditors;

**(c) <u>Various Other Funds, Including Funds Constituting a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.</u>**

(1) A Project Related Action Recovery of a particular Estate with respect to a Cross-Collateralization Judgment (unless it also may become ES Litigation Proceeds based upon the ES Action), (2) any Net Cash Proceeds from the sale or disposition of Remaining Other Assets or otherwise, including Net Cash Litigation Recoveries and other funds in the Post-Confirmation Accounts, and (3) any repayment of a post-Confirmation Date intercompany payable, shall be applied in the following order of priority until exhausted:

(i) First, to payment of, or, in the discretion of the Liquidating Trustee, reserve for its Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(ii) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iii) Third, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(iv) Fourth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(v) Fifth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of repayments owing

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with respect to Lehman Post-Confirmation Funding (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

(vi) Sixth, to pay, in the discretion of the Liquidating Trustee, an accelerated payment for Tax Claims; and

(vii) Seventh, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan;

**(d) Funds that Constitute Both ES Litigation Proceeds and a Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

ES Litigation Proceeds of a particular Estate that also are a Project Related Action Recovery of such Estate with respect to a Cross-Collateralization Judgment, shall be applied in the following order of priority until exhausted:

(i) First, to payment of the ES Litigation Loan;

(ii) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the particular Estate's Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(iii) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iv) Fourth, to repayment of any post-Confirmation Date intercompany payables of such Estate;

(v) Fifth, to any of such Estate's due and payable Allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Claims;

(vi) Sixth, to pay or, in the discretion of the Liquidating Trustee, reserve for unpaid Post-Confirmation Expenses of other Debtors and their share of repayments owing with respect to Lehman Post-Confirmation Funding (to be booked upon use as a receivable to the advancing Estate and as a payable by the borrowing Estate);

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(vii) Seventh, to such Estate's Holders of Allowed Non-Settled ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment until paid the full amount of their Allowed ES Claims;

(viii) Eighth, to the Estates of other Holders of Allowed ES Claims entitled to the ES Litigation Proceeds pursuant to the terms of the ES Final Judgment, if any, payable Pro Rata among such Estates based upon their entitled and Allowed ES Claims not paid from their Estate's own Assets, first to pay such Estate's share of repayments owing with respect to Lehman Post-Confirmation Funding and next to pay such Allowed ES Claims until paid in full; and

(ix) Ninth, as Residual Cash to the Holders of Allowed Claims in Class 7 and Class 8 under the Plan; and

**(e) Funds that May Later be Determined to be Both ES Litigation Proceeds and Project Related Action Recovery With Respect to a Cross-Collateralization Judgment.**

Funds that presently are known to be either, but not yet both, ES Litigation Proceeds of a particular Estate or a Project Related Action Recovery with respect to a Cross-Collateralization Judgment, which potentially could also become the other upon Conclusion of the relevant, pending Project Related Action, shall be applied in the following order of priority until exhausted:

(i) First, reserved for payment of the ES Litigation Loan;

(ii) Second, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the particular Estate's Pro Rata share of repayments owing with respect to Lehman Post-Confirmation Funding;

(iii) Third, to payment of, or, in the discretion of the Liquidating Trustee, reserve for the direct Post-Confirmation Expenses of such Estate and its Pro Rata share of unpaid Post-Confirmation Expenses commonly allocable among it and other Plan Debtors (not including any repayment of post-Confirmation Date intercompany payables);

(iv) Fourth, to repayment of any post-Confirmation Date intercompany payables of such Estate;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(v) Fifth, to be reserved and applied upon Conclusion of the relevant, pending Project Related Action in accordance with the above-described priorities of distribution.

**9.10.3 Allocations and Distributions Under this Section.**

For purposes of this Section 9.9(f)(2) of the Plan, in calculating the amount of Allowed ES Claims not paid from an Estate's own Assets for a distribution of ES Litigation Proceeds pursuant hereto, the Liquidating Trustee may ignore future expected or possible recoveries, but upon such later recoveries occurring for such Estates, the Liquidating Trustee shall recalculate the prior distribution and adjust the amount of the later distribution to ensure that the aggregate distributions are correct among entitled Holders of Allowed ES Claims.

**9.11 Plan Release.**

In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Funding, the ES Settlement Offer and the delayed satisfaction of the Secured Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor, on behalf of itself and its Affiliates exclusive of other Debtors in these Cases shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish:

(a) any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, from and against all Lehman Releasees, or any of them, and their subsidiaries and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, attorneys and other professionals, or their property; except

(b) the following are not released, to the extent indicated:

(i) Avoidance Actions timely Filed and Filed no later than sixty (60) days following the Effective Date other than to the extent of Cross-Collateralization

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claims; and

(ii) with respect to (1) all Equitable Subordination Claims in the ES Action and (2) those Cross-Collateralization Claims identified in the Debtors' Third Amended Disclosure Statement and asserted in a Cross-Collateralization Action (*i.e.*, an Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date), each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by a Project Related Action Recovery (in the form of an ES Final Judgment or a Cross-Collateralization Final Judgment), which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment to the applicable Estate(s) in the amount of any Project Related Action Recovery.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

The releases given above include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law of rights under Section 1542 of the California Civil Code, which reads as follows, and under any similar or comparable laws anywhere in the world:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

While the Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Lehman Releasees in accordance herewith, the Lehman Releasees also shall be entitled to issuance of a separate written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the Lehman Lenders and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at or after the hearing on confirmation of the Lehman Plan.

**9.12 <u>Entry of Final Decrees.</u>**

The Liquidating Trustee shall cause the entry of a final decree in the Case of each

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Estate of a Plan Debtor at the earliest reasonable opportunity therefor. Such final decrees may be sought and entered individually for each Case.

**9.13 Dissolution of Committees and Discharge of Trustee and Liquidating Trustee.**

The Trustee, in his capacity as such, shall be discharged upon the Effective Date and his bond may be exonerated. The Liquidating Trustee and Committee shall be discharged upon consummation of the Lehman Plan and the entry of a final decree in each Case or as otherwise ordered by the Court.

**9.14 The Effective Date Cash Funding and Plan Feasibility**

The Debtors have estimated that there are approximately $6.2 million of Allowed Administrative Claims and Allowed Priority Claims that will need to be funded on the effective date of any plan of reorganization herein. Further, the Debtors have estimated post-effective date costs and expenses of between $5 and 6 million and post-effective date litigation expenses of between $3 and 4 million. Thus, based upon the Debtors' current estimates, the cash expenses to be incurred in confirming and implementing a plan of reorganization herein will total approximately $16 million.

The Lehman Proponents believe that the foregoing understates, and may significantly understate, the cost of confirming and implementing a plan of reorganization herein. However, the Lehman Proponents have available to them all of the cash balances of the Debtors in order to confirm and implement the Lehman Plan, together with the Lehman Post-Confirmation funding of up to $5 million. Such liquidity should more than amply support both confirmation and implementation of the Lehman Plan.

**X.**

**DISTRIBUTIONS**

**10.1 Distribution Agent.**

The Liquidating Trustee shall serve as the Distribution Agent for distributions due under the Lehman Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such subagent as a Post-Confirmation Expense from the Post-Confirmation Accounts. The Distribution Agent shall not be required to

provide any bond in connection with the making of any Distributions pursuant to the Lehman Plan.

**10.2 Distributions.**

(i) Dates of Distributions.

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

(ii) Limitation on Liability.

Neither the Lehman Related Parties, the Lehman Nominees, the Liquidating Trustee, their Affiliates, nor any of their employees, members, officers, directors, agents, attorneys or other professionals shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan, or (ii) any change in the value of Distributions made pursuant to the Lehman Plan resulting from any delays in making such Distributions in accordance with the Lehman Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**10.3 Old Instruments and Securities.**

(i) Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Lehman Plan in respect of a Claim, each Person holding any note or other instrument or security evidencing such Claim must surrender such instrument or security to the Distribution Agent, if requested.

(ii) Cancellation of Liens.

Except as otherwise provided in the Lehman Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Liquidating Trustee (including, without limitation, any Cash Collateral) held by such Person and to take such actions as may be requested by the Liquidating Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Liquidating Trustee.

**10.4 <u>De Minimis Distributions and Fractional Shares.</u>**

No Cash payment of less than ten dollars ($10) shall be made by the Liquidating Trustee to any Holder of Claims unless a request therefor is made in writing to the Liquidating Trustee. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Lehman Plan.

**10.5 <u>Delivery of Distributions.</u>**

Except as provided in the Lehman Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows: (1) with respect to each Holder of an Allowed Claim that has Filed a Proofs of Claim, at the address for such Holder as maintained by the official claims agent for the Plan Debtors; (2) with respect to each Holder of an Allowed Claim that has not Filed a Proofs of Claim, at the address reflected on the Schedules Filed by the Plan Debtors, <u>provided</u>, <u>however</u>, that if the Plan Debtors or the Liquidating Trustee has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

**10.6 <u>Unclaimed Property.</u>**

If either (1) the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.*, as undeliverable) and the check or other similar instrument or distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date such Distribution first could have been made under the Lehman Plan and for one hundred twenty (120) days thereafter, then such applicable Distribution shall be Unclaimed Property under the Lehman Plan and the Liquidating Trustee shall be relieved of making such Distribution or any further Distribution to such Holder of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such Allowed Claim unless and until the Liquidating Trustee is notified in writing of the then current address of such Holder of an Allowed Claim. Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Liquidating Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated, interest bearing account to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable. Nothing contained in the Lehman Plan shall require the Liquidating Trustee or any other Person to attempt to locate the Holder of an Allowed Claim as to which there is Unclaimed Property.

**10.7 Disposition of Unclaimed Property.**

If the Person entitled thereto notifies the Liquidating Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practical. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Liquidating Trustee within ninety (90) days after the Holders' initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Lehman Plan or otherwise from the Liquidating Trustee. In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Post-Confirmation Account of the Plan Debtor's Estate against which the applicable Allowed Claim was asserted.

**XI.**

**OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

**11.1 Standing for Objections to Claims.**

The Liquidating Trustee and Lehman Lenders shall have the sole and exclusive right to File and resolve for the Estates objections to Claims and their status as ES Claims (provided, however, that the Lehman Lenders shall not be allowed to resolve for the Estates objections to Claims of any Lehman Related Party). Any objection to a Claim, including an objection to a Bond Obligation in favor of a Bond Issuer under Bankruptcy Code section 502(e), or any objection to a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claim's status as an ES Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline, expect as provided in the Lehman Plan.

**11.2 <u>Treatment of Disputed Claims.</u>**

(i) No Distribution Pending Allowance.

If any portion of a Claim is a Disputed Claim, no payment or distribution provided for under the Lehman Plan shall be made on account of such Claim unless expressly provided hereunder or unless and until such Claim becomes an Allowed Claim. Except as expressly provided in the Lehman Plan, Holders of Disputed Claims, pending their allowance, shall forbear from enforcement of the rights entitled to them under the Lehman Plan for their Claims were they Allowed Claims; provided that if the Claim is a Secured Claim, the Creditor may seek adequate protection for its Claim from the Bankruptcy Court. A Claim that has not been Allowed by a Final Order of the Bankruptcy Court and as to which the objection deadline has not passed, including as to its status as an ES Claim, may be treated by the Liquidating Trustee as a Disputed Claim and, absent the agreement of the Lehman Lenders, the Liquidating Trustee shall so treat any such Secured Claim not expressly Allowed under the Lehman Plan and any ES Claim to which a payment otherwise would be due under subparagraph (c) of Section 6.8 of the Lehman Plan.

(ii) Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

(iii) Reserves for Disputed Claims.

In the event that Disputed Claims are pending, the Liquidating Trustee shall establish reasonable reserves, including the Plan Reserve for such Disputed Claims. The Distribution Agent may move the Bankruptcy Court for approval of its determination to reserve certain amounts.

**XII.**

**<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**12.1 Executory Contracts Potentially Being Assumed.**

The Lehman Proponents may File and/or amend or modify on or prior to the Confirmation Date an **Exhibit "A"** to the Lehman Plan containing a list of contracts and leases. The Liquidating Trustee shall assume, assume and assign or reject the executory contracts and unexpired leases on **Exhibit "A"** to the Lehman Plan no later than (a) forty-five (45) days following the last auction under the Lehman Plan Sale Procedures if the subject contract or lease is not related to a particular Project or Projects and (b) forty-five (45) days following the last sale or conveyance by the Liquidating Trustee (voluntary or involuntary) of the related Project(s) if the subject contract or lease relates to a particular Project or Projects. The Lehman Lenders may add any executory contract or unexpired leases to these exhibits or delete any contract or lease therefrom up to and including the Confirmation Date.

**12.2 Executory Contracts Being Rejected.**

All executory contracts and unexpired leases of the Plan Debtors' Estates not listed on **Exhibit "A"** to the Lehman Plan, as is or as amended prior to the Confirmation Date, and not previously rejected, are rejected under the Lehman Plan as of the Confirmation Date. All executory contracts and unexpired leases of the Plan Debtors' Estates that are listed on **Exhibit "A"** to the Lehman Plan that are not assumed or assumed and assigned within the deadlines set forth in the Plan are automatically rejected after such deadline has expired.

**12.3 Retention of Property Rights by Lehman Nominees or Liquidating Trustee.**

To the extent that a matter that provides the Plan Debtors or their Estates with property rights does not constitute an executory contract or unexpired lease, or the Plan Debtors have obtained property rights under the executed portion of an executory contract or unexpired lease, rejection shall not constitute an abandonment by the Plan Debtors, the Lehman Nominees or the Liquidating Trustee of any such property rights.

**12.4 Bar Date for Rejection Damages.**

Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Plan Debtors, their Estates, the Liquidating Trustee, their Affiliates, their successors, or their properties, and shall not be entitled to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any distribution under the Lehman Plan, unless a Proof of Claim for such Claim is timely Filed and served.  For rejections occurring prior to Confirmation, such Claims must have been Filed by the later of March 31, 2009 or thirty (30) days following the date of entry of the order of the Bankruptcy Court approving rejection.  For Claims related to executory contracts or unexpired leases not listed on **Exhibit "A"** to the Lehman Plan that are rejected under the Plan, such Claim must have been Filed and served on the Plan Debtors (if before the Effective Date) or the Liquidating Trustee and Lehman Creditors (if after the Effective Date) within thirty (30) days after the Confirmation Date.  For Claims related to executed contracts or unexpired leases listed on **Exhibit "A"** to the Lehman Plan that are rejected under or in accordance with the Plan, such Claim must have been Filed and served on the Liquidating Trustee and Lehman Creditors within thirty (30) days after receipt by the non-debtor party to the contract or lease of a notice of the rejection of the contract or lease.

## XIII.

## BEST INTEREST OF CREDITORS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the Bankruptcy Court determines that Distributions under the Lehman Plan to all Holders of Claims and Interests who have not accepted the Lehman Plan and whose Claims are classified in Classes that are impaired under the Lehman Plan, are not less than those which they would receive in a liquidation under Chapter 7 of the Bankruptcy Code (referenced herein as the "Best Interests Test").

The Best Interests Test must be satisfied even if the Lehman Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Lehman Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that (i) all Holders of Claims in an impaired Class of Claims have accepted the Lehman Plan, or (ii) the Lehman Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Lehman Plan with a recovery of property of a value, as of the effective date of the Lehman Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Lehman Plan contemplates the orderly sale and liquidation by the Liquidating

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee (nominated by the Committees) of all of the Remaining Real Estate Projects pursuant to the Lehman Plan Sale or Foreclosure Procedures. As more fully set forth in Section 9.7.2(a)(iv), the Lehman Lenders are making Initial Bids for most of the Remaining Real Estate Projects which bids are in all cases equal to the appraised values obtained by the Lehman Lenders and set forth at Section 3.4 herein. In certain other cases (where either the Lehman Lenders Liens are subject to a Cross-Collaterization Claim or the Lehman Lenders have a Lien on the equity interest of the entity that owns a particular Remaining Real Estate Project, rather than the Project itself), the Lehman Lenders are making Contingent Bids based upon the Debtors' value estimates as set forth in Section 3.4 herein. The Lehman Plan Sale or Foreclosure Procedures are designed to enable the Liquidating Trustee to obtain the highest and best value for the Remaining Real Estates Asset, within a reasonably practicable period of time. Given that the Initial Bids are in all cases higher than the Debtors' estimate of value for the Remaining Real Estate Projects and given the possibility that other third-party bidders may present bids that are higher and better than the Initial Bids (or, if applicable, the Contingent Bids), there is no reason to believe that the Lehman Plan Sale or Foreclosure Procedures will generate less of a recovery to the Estates and their Creditors than a hypothetical Chapter 7 liquidation as of the Effective Date of the Lehman Plan.

Further, as more fully set forth at page 130 of the Elieff Disclosure Statement, the Debtors believe that with the exception of Creditors of Seven Brothers, Kirby Estates, SunCal Beaumont and SunCal Johannson (whose Allowed Unsecured Claims have been estimated by the Debtors to equal $60,288; $1,744; $626,545; and $150,388, respectively), if the Equitable Subordination Claims are unsuccessful, none of the Creditors of any of the Debtors will receive any recovery in a Chapter 7 liquidation.

Based upon both the Debtors' opinion of value and, where available, the Lehman Lenders' appraised values, a liquidation of the respective Assets of Seven Brothers, Kirby Estates, SunCal Beaumont and SunCal Johannson should provide more than enough net proceeds to satisfy in full the estimated general unsecured claims against the Debtors under the Lehman Plan. Further, the Holders of Allowed ES Claims are estimated to receive a distribution of at least approximately 6.6% under the Lehman Plan, more than they would receive in a Chapter 7 liquidation. Furthermore,

to the extent that ES Claimants neither accept, nor are deemed to have accepted, the ES Settlement Offer, the Lehman Plan provides funding for continued prosecution of the Equitable Subordination Claims in the ES Action, creating the likelihood of a higher recovery for ES Claimants, to the extent the Equitable Subordination Claims have any validity, than would be afforded in a Chapter 7 liquidation. Finally, as noted above, if the Lehman Plan is confirmed, the Lehman Lenders have made significant concessions which, all other things being equal, will enhance possible recoveries on any litigation brought by the Liquidating Trustee against the Lehman Lenders that is not released pursuant to confirmation of the Lehman Plan.

The Debtors contend that general unsecured creditors will receive a greater recovery under a chapter 7 liquidation than under the Plan because in the event the Lehman Creditors non-judicially foreclose on their collateral in connection with a chapter 7 liquidation, they would not be entitled to assert any deficiency claims that would share with claims of other unsecured creditors with respect to any distributions from the Debtors' Estates. However, the Lehman Proponents contend this assertion is erroneous for the simple reason that, absent confirmation of the Lehman Plan, there would likely be few, if any, Assets available to distribute to unsecured creditors. The Debtors contend that the Estates have more than $30 - $40 million of Avoidance Actions (presumably preference actions) which would create a substantial recovery in a chapter 7 liquidation. To the extent this assertion is correct, such claims asserted, or assertable, against any entities other than the Lehman Lenders will still be available for general unsecured creditors to pursue under the Lehman Plan. To the extent the Debtors' contention relates to alleged preference claims against the Lehman Lenders, for the reasons more fully set forth herein, the Lehman Proponents believe that those Claims are without merit and would not result in any recovery for the Estates. Finally, as more fully noted above, general unsecured creditors of Seven Brothers, Kirby Estates, SunCal Beaumont and SunCal Johansson will receive payment in full, whether under the Lehman Plan, the Elieff Plan, or a chapter 7 liquidation.

## XIV.

## PLAN FEASIBILITY

In order to confirm the Lehman Plan, the Bankruptcy Court must find that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

confirmation of the Lehman Plan is not likely to be followed by the liquidation or the need for further financial reorganization. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement. The Lehman Creditors are consenting to the use of their Cash Collateral held with the Debtors, and the Lehman Lenders are making an additional loan commitment of $5 million in order to fund, confirm and implement the Lehman Plan. The Debtors have estimated that there are at least $6.5 million of Administrative Claims and Priority Claims which will need to be satisfied on, or in connection with, confirmation of any plan of reorganization of the Debtors. The Lehman Lenders believe that the combination of Cash Collateral and the Lehman Post-Confirmation Loan will provide more than adequate funds for the Lehman Plan to become effective and to be implemented.

## XV.

## EFFECT OF CONFIRMATION OF THE LEHMAN PLAN

Except as otherwise expressly provided in the Lehman Plan, the documents executed pursuant to the Lehman Plan, or the Confirmation Order, on and after the Effective Date, all Persons and Entities who have held, currently hold, or may hold a debt, Claim, or Interest against the Plan Debtors (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) shall be permanently enjoined from: (a) taking any of the following actions on account of any such debt, Claim, or Interest: (1) commencing or continuing in any manner any action or other proceeding against the Plan Debtors and the Liquidating Trustee, their successors, or their property; (2) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (3) creating, perfecting, or enforcing any Lien or encumbrance against the Plan Debtors or the Liquidating Trustee, their successors, or their property; (4) asserting any set off, right of subrogation, or recoupment of any kind against any obligation due the Plan Debtors or the Liquidating Trustee, their successors, or their property; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Lehman Plan; and (b) taking any of the following actions on account of any Claims or rights

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of action that are revested in, or transferred to, the Liquidating Trustee as of the Effective Date or under the Lehman Plan (to the extent one or more Plan Debtors' Estates first held such claim or rights of action or held the right to assert such claim or right of action after the Petition Date), including, without limitation: (1) asserting such Claims or rights of action against nondebtor third parties; and (2) commencing or continuing in any manner any action or other proceeding of any kind with respect to such claims or rights of action. Any person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

**XVI.**

**LIMITATION OF LIABILITY**

**16.1 No Liability for Solicitation or Participation.**

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Lehman Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Lehman Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Lehman Plan or the offer, issuance, sale, or purchase of securities.

**16.2 Limitation of Liability.**

Effective as of the Effective Date, none of the Liquidating Trustee, the Lehman Related Parties or their respective Affiliates, nor any of their respective members, officers, directors, employees and other agents, advisors, attorneys and accountants shall have or incur any liability to any Holder of any Claim or Interest or any other Person for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Lehman Plan, the Lehman Disclosure Statement, the consummation of the Lehman Plan, the administration of the Lehman Plan, the Cases or the property to be distributed under the Lehman Plan except: (a) the Liquidating Trustee shall be liable contractually for the performance of obligations assumed or imposed under or by the Lehman Plan; (b) for liability based on willful misconduct as finally determined by a Final Order of the Bankruptcy Court; and (c) for gross negligence in connection

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with implementing the Distribution provisions of the Lehman Plan and the making or withholding of Distributions pursuant to the Lehman Plan. Each of the Liquidating Trustee, Lehman Related Parties and their respective Affiliates, and each of their respective officers, directors, employees and other agents, advisors, attorneys and accountants) shall be entitled to rely, in every respect, upon the advice of counsel with respect to their duties and responsibilities under or with respect to the Lehman Plan.

**XVII.**

**CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE LEHMAN PLAN**

**17.1 Conditions Precedent to Plan Confirmation.**

The condition precedent to Confirmation is the Bankruptcy Court's entry of the Confirmation Order.

**17.2 Conditions Precedent to Plan Effectiveness.**

The following shall be conditions precedent to the effectiveness of the Lehman Plan and the occurrence of the Effective Date.

(a) The Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the Lehman Lenders.

(b) All agreements and instruments contemplated by, or to be entered into pursuant to, the Lehman Plan, including, without limitation, each of the documents necessary for consummation of the Lehman Plan, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived other than the occurrence of the Effective Date.

**XVIII.**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Lehman Plan and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

**XIX.**

**MODIFICATION OF PLAN**

**19.1 Modification of Plan.**

At any time prior to confirmation of the Lehman Plan, the Lehman Lenders may supplement, amend or modify the Lehman Plan. After confirmation of the Lehman Plan, the Lehman Lenders or Liquidating Trustee with the consent of the Lehman Lenders may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Lehman Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Lehman Plan or to reconcile inconsistencies in the Lehman Plan.

**19.2 Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Lehman Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, Lehman Proponents (i) may request that the Bankruptcy Court confirm the Lehman Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with the Lehman Plan, and may modify the Lehman Plan in accordance with Section 1127(a) of the Bankruptcy Code.

**XX.**

**MISCELLANEOUS**

**20.1 Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of Title 28 of the United States Code with respect to the Plan Debtors shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(l2) of the Bankruptcy Code. The Liquidating Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date with respect to the Plan Debtors until each applicable Plan Debtor's Case is closed, to the extent required by Section 1930(a)(6) of Title 28 of the United States Code.

**20.2 Payment Dates.**

Whenever any payment or distribution to be made under the Lehman Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**20.3 Headings.**

The headings used in the Lehman Disclosure Statement and in the Lehman Plan are inserted for convenience only and neither constitutes a portion of the Lehman Disclosure Statement or the Lehman Plan nor in any manner affect the construction of the provisions of the Lehman Disclosure Statement or the Lehman Plan.

**20.4 Other Documents and Actions.**

The Liquidating Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Lehman Plan.

**20.5 Notices.**

All notices and requests in connection with the Lehman Disclosure Statement and the Lehman Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

Edward Soto, Esq.
Nellie P. Camerik, Esq.
Weil, Gotshal & Manges LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131

and

Shai Y. Waisman, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**With copies to:**

Richard M. Pachulski, Esq.
Dean A. Ziehl, Esq.
Robert B. Orgel, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Fl.
Los Angeles, CA 90067

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

**20.6 Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Lehman Plan and any agreements, documents, and instruments executed in connection with the Lehman Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**20.7 Binding Effect.**

The Lehman Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Lehman Creditors, the Plan Debtors, the Liquidating Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

**20.8 Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Lehman Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**20.9 Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Lehman Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Lehman Plan, the Bankruptcy Court shall, with the consent of the Lehman Proponents, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Lehman Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**20.10 No Waiver.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The failure of the Plan Debtors, Liquidating Trustee, Committee or Lehman Lenders or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Plan Debtors', the Liquidating Trustee's or the Lehman Lenders' right to object to or examine such Claim, in whole or in part.

**20.11 Inconsistencies.**

In the event the terms or provisions of the Lehman Disclosure Statement are inconsistent with the terms and provisions of the Lehman Plan or documents executed in connection with the Lehman Plan, the terms of the Lehman Plan shall control.

**20.12 Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Plan Debtor or its Estate to the Liquidating Trustee or to any other Person or entity pursuant to the Lehman Plan, or any agreement regarding the transfer of title to or ownership of any of the Plan Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest), including, without limitation, transfers or sales pursuant to the Lehman Plan Sale or Foreclosure Procedures or Reconveyance Agreements will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**20.13 Post-Confirmation Status Report.**

By the earlier of 180 days following the entry of the Confirmation Order a status report shall be Filed with the Court explaining what progress has been made toward consummation of the confirmed Plan, which report shall be Filed by the Liquidating Trustee, if the Effective Date occurs with 120 days following the entry of the Confirmation Order and, otherwise, by the Lehman Lenders. The status report shall be served on the United States Trustee, the list of twenty largest unsecured creditors Filed by the Debtors or Trustee for the jointly administered Cases of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtors, the Lehman Creditors, the Liquidating Trustee and those parties who have requested special notice. Unless otherwise ordered, further status reports shall be Filed every 180 days and served on the same entities.

**20.14 Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss any Case of a Plan Debtor under § 1112(b), after the Lehman Plan is confirmed, if there is a default in performing the Lehman Plan, subject to the right of any party in interest to object to such motion. If the Court orders any of the Cases converted to Chapter 7 after the Lehman Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Lehman Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

**20.15 Final Decree.**

Once a Plan Debtor's Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trustee, or other party as the Court shall designate in the Confirmation Order, shall File a motion with the Court to obtain a final decree to close the Case of such Plan Debtor.

## XXI.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE LEHMAN PLAN

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Lehman Plan to certain Holders of Claims. The following summary does not address the United States federal income tax consequences to (i) Holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Lehman Plan or (ii) Holders of Interests as they are deemed to reject the Plan.

The following summary is based on the Internal Revenue Code of 1986 and all rules and treasury regulations promulgated thereunder ("Tax Code"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal income tax consequences described below.

The United States federal income tax consequences of the Lehman Plan are complex and are subject to significant uncertainties. The Lehman Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Lehman Plan. Thus, no assurance can be given as to whether the IRS will successfully assert alternative positions from those set forth herein or the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Lehman Plan, nor does it address the United States federal alternative minimum or federal income tax consequences of the Lehman Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle or other integrated transaction, and investors in pass-through entities, including partnerships). If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

***Accordingly, the following summary of certain United States federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.***

***<u>IRS Circular 230 Notice</u>: To ensure compliance with IRS Circular 230, Holders of Claims are hereby notified that: (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Lehman Proponents of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.***

**21.1 Consequences to Holders of Lehman Secured Claims and Danske Bank Secured Claims**

Pursuant to the Lehman Plan, the Holders of Lehman Secured Claims and Danske Bank Secured Claims will either receive Cash or property (including Remaining Real Estate Projects conveyed to the Holders of such Claims or one or more Lehman Nominees in consideration of a successful credit bid) in satisfaction of their Claims.

In general, each Holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of cash and the fair market value of other property received by the Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest but including any basis such holder has as a result of a transfer by a Lehman Related Party of new Cash to fund a Lehman Post-Confirmation Loan).

Distributions to such holders may be made subsequent to the Effective Date. Under the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such holder may be deferred until such time as such Holder has received its final distribution. All Holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

A Holder's initial tax basis in any Remaining Real Estate Projects conveyed should equal the fair market value thereof. Gain or loss recognized by a holder on the sale, exchange or other disposition of the Remaining Real Estate Projects will equal the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the Remaining Real Estate Projects immediately before the sale, exchange or other disposition. Any such gain or loss will be long-term if the holder's holding period for the Remaining Real Estate Project is more than one year at that time. A holder's holding period for any conveyed Remaining Real Estate Projects generally should begin the day following the day that it is conveyed to the holder. Depending upon the facts at the time, such gain or loss may be capital or may be "Section 1231 Gain" or "Section 1231 Loss."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The discussion in this paragraph is premised upon the holder being considered the owner of a Remaining Real Estate Project for federal income tax purposes. There is some uncertainty to this position to the extent the Remaining Real Estate Projects are subject to the PRA Recovery Deeds of Trust. Holders of Remaining Real Estate Projects should consult their own tax advisors as to the tax consequences of the receipt, holding and disposition of Remaining Real Estate Projects.

In addition, as described in Section VII of the Plan, an amount of Cash, up to the Maximum PRA Recovery Amount, will be deposited from time to time into the Plan Reserve. Although there may be alternative characterizations of such funds for federal income tax purposes, the applicable Holders of Lehman Secured Claims will treat all such amounts as having been received by them for all applicable federal income tax purposes. Thus, the applicable Holders of Lehman Secured Claims should include all such amounts as having been received by them in their calculation of gain or loss described above. In addition, the applicable Holders of Lehman Secured Claims should include in their gross income all income earned by the Plan Reserve. Upon a distribution of any amounts from the Plan Reserve to the Holders of Allowed ES Claims, the applicable Holder of a Lehman Secured Claim should recognize a loss equal to the amount so distributed. The Holder of a Lehman Secured Claim should consult its own tax advisor regarding the character of such loss.

**21.2 Consequences to Holders of General Unsecured Claims.**

Pursuant to the Lehman Plan, as soon as reasonably practicable, the Liquidating Trustee will distribute Residual Cash, if any, Pro Rata to the Holders of Allowed General Unsecured Claims and Allowed ES Claims in satisfaction and discharge of their Claims. In addition, each Holder of an Allowed ES Claim shall receive (a) if the Holder votes to accept, the ES Settlement Offer (or if there is Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted and the Holder returns with its Ballot or to the Lehman Lenders a duly executed ES Claimant Release and Assignment, an ES Pro Rata Settlement Payment to be paid as soon as reasonably practicable after the later of (i) the Effective Date and (ii) final allowance of such Claim and (b) if the Holder does not vote to accept the ES Settlement Offer (and there is not Estate Acceptance of the ES Settlement for the Estate against which the Allowed ES Claim is asserted), the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

benefits, if any, of the Equitable Subordination Claims as determined by the Bankruptcy Court in connection with an ES Action, as and when available.

In general, each Holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below) whether received pursuant to the Lehman Plan, and (y) the Holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest).

Distributions to such Holders will be made subsequent to the Effective Date. Under the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its final distribution whether received by the Holder pursuant to the Lehman Plan. All Holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

**21.3 <u>Distributions in Discharge of Accrued but Unpaid Interest.</u>**

Pursuant to the Lehman Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount ("<u>OID</u>"). However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Lehman Plan by a Holder of an Allowed Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim of a non-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

**21.4 Character of Gain or Loss**

Where gain or loss is recognized by a Holder of such a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder (including method of accounting), whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim arose in connection with the provision of services by the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

**21.5 Information Reporting and Withholding**

All distributions to holders of Allowed Claims under the Lehman Plan are subject to any applicable tax withholding. Under United States federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded by the IRS to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of

transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the United States federal, state and local and foreign tax consequences applicable under the Plan.*

**XXII.**

**CONCLUSION**

For all of the reasons stated in Article V of this Lehman Disclosure Statement, the Elieff Plan is unlikely to be confirmed and is dependent for its success and feasibility on the successful prosecution of the ES Action, which (as more fully set forth in Section 4.5 of this Lehman Disclosure Statement) the Lehman Lenders believe is wholly without merit. Indeed, as the Elieff Plan Proponents concede in the Elieff Disclosure Statement (at page 132): "The feasibility of a distribution to creditors other than each Debtor's senior creditors is dependent on the Debtors' ability to prevail in the [ES Action]."

The Lehman Plan, on the other hand, provides for: an orderly disposition of the Remaining Real Estate Assets; a settlement proposal to the Holders of Allowed ES Claims that is likely to result in a distribution of at least 6.6% on account of such Allowed ES Claims; adequate funding for the Lehman Plan to become effective and to be implemented; and a litigation fund and recovery mechanism for the continued prosecution of the Equitable Subordination Claims in the ES Action after the Effective Date on behalf of ES Claimants who have either not accepted, nor are deemed to have accepted, the ES Settlement Offer. Further, the Lehman Proponents believe that the risk that the Lehman Plan will not be confirmed is substantially less than the confirmation risk associated with the Elieff Plan.

The Lehman Proponents contend that the Lehman Plan provides a faster and higher recovery to Creditors (especially the holders of Allowed ES Claims) than the alternatives offered

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

either by the Elieff Plan or a Chapter 7 liquidation of the Debtors' Estates. Accordingly, the Lehman Proponents urge Creditors entitled to vote with respect to the Lehman Plan to vote for its acceptance and, further, urge the holders of ES Claims to accept ES Settlement Offer when returning their Ballots on the Lehman Plan.

Dated: October 13, 2009

PACHULSKI STANG ZIEHL & JONES LLP

By *[/s/Robert B. Orgel]*
Richard M. Pachulski (CA Bar No. 84529)
Dean A. Ziehl (CA Bar No. 84529)
Robert B. Orgel (CA Bar No. 101875)
Attorneys for Lehman ALI, Inc. and
Lehman Commercial Paper, Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# APPENDIX "A"

## DEFINITIONS AND RULES OF INTERPRETATION

### 1. Definitions.

The following defined terms are used in the Lehman Plan. Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Other capitalized terms not defined in this Appendix "A" are defined in the body of the Lehman Disclosure Statement.

**10000 Santa Monica Project.** The Project owned by SunCal Century City, located in Century City, California.

**Acquisitions.** SCC Acquisitions, Inc., a California corporation, and the Debtors' indirect parent, but not a Debtor in any of the Cases.

**Acton Estates.** Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor in these Cases, and the owner of the Acton Project.

**Acton Project.** The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Administrative Claim(s).** Any Claim against a Plan Debtor incurred after the applicable Petition Date for such Plan Debtor but before the Confirmation Date for any cost or expense of administration of the Cases of the Plan Debtors entitled to priority under Section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fees or charges assessed against the Estates of the Plan Debtors under Section 1930 of Title 28 of the United States Code.

**Administrative Claim Bar Date.** The General Administrative Claim Bar Date and the Administrative Tax Claim Bar Date.

**Administrative Tax Claim(s).** A request for payment of an Administrative Claim by a governmental unit for Taxes (or for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through and including the Effective Date.

**Administrative Tax Claim Bar Date.** The earlier of (a) any bar date otherwise established by the Bankruptcy Court or (b) on or before the later of (i) sixty (60) days following the Effective

Date; and (ii) 180 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit.

**Affiliate.** As to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise; provided that as to any Lehman Related Party, the term "Affiliate" does not include any Debtor.

**Allowed.** This term is used both separately and in conjunction with other defined terms in the Lehman Plan (*e.g.*, Allowed Tax Claims) and means:

(i) with respect to any Administrative Claim: (1) if the Claim is based upon a Fee Application, an unsecured Claim in the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (2) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Plan Debtors and is not otherwise subject to an Administrative Claim Bar Date, in the amount of such Claim and with a status as secured or unsecured as each are asserted by such creditor and not disputed by the Liquidating Trustee or the Lehman Lenders, failing which, the amount and secured or unsecured status thereof as fixed by a Final Order of the Bankruptcy Court; or (3) if the Holder of such Claim was required to File and has Filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (i) in the amount and with the status as secured or unsecured and in the statutory priority as stated in such proof of Administrative Claim if no objection to such proof of Administrative Claim is interposed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court or the Lehman Plan, or (ii) in the amount and with the status as secured or unsecured and in the statutory priority as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within any applicable period of time so fixed; and (4) in the amount of zero, if the Holder of such Claim was required to File and has not Filed proof thereof with

the Bankruptcy Court prior to an Administrative Claim Bar Date, in which event no distribution shall be made on account of such Claim; and

(ii) with respect to any Claim which is not an Administrative Claim: (1) if no objection to such Claim was interposed by the Claims Objection Deadline, (i) if the Holder of such Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, in the amount of such Claim and with the status as secured or unsecured and with the statutory priority as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (ii) if the Holder of such Claim has Filed a Proof of Claim therefor with the Bankruptcy Court on or before the Claims Bar Date, in the amount and with the status as secured or unsecured and in the statutory priority as stated in such Proofs of Claim; or (2) if an objection to such Claim was interposed by the Claims Objection Deadline, in the amount and with the status as secured or unsecured and in the statutory priority thereof as fixed by Final Order of the Bankruptcy Court; and (3) if the Holder of such Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the Claim is not listed in the Plan Debtors' Schedules or is listed as either disputed, contingent or unliquidated, and the Claim is not deemed Allowed under the terms of this Plan, in the amount of zero and no distribution shall be made on account of such Claim; and

(iii) with respect to a Claim's status as an ES Claim, (1) with ES Claim status if ES Claim status is alleged on the Holder's Ballot in the manner provided therefor and if no objection thereto is interposed by the Claims Objection Deadline, (2) with ES Claim status if alleged by the Liquidating Trustee and either (i) the Lehman Creditors and any surviving Committee consent or (ii) no objection thereto is Filed by the later of the Claims Objection Deadline or seventy-five (75) days after notice thereof to any surviving Committees and the Lehman Creditors or (3) as fixed by Final Order of the Bankruptcy Court; and

(iv) with respect to any Interest, (1) if no objection to such Interest was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, (i) if the Holder of such Interest did not File proof thereof with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of such Interest and with the nature thereof as listed in the Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (ii) if the Holder of such Interest has Filed a Proof of Interest therefor with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as stated in such Proof of Interest, or (2) if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Lehman Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and nature thereof as fixed by Final Order of the Bankruptcy Court; but

(v) with respect to any Administrative Claim, Claim or Interest, the term "Allowed" does not signify whether or not such Administrative Claim, Claim or Interest has been subordinated to another Administrative Claim, Claim or Interest or is entitled to the benefits of such subordination.

**Allowed Amount.** The amount in which a Claim or Interest is Allowed.

**Arch.** Arch Insurance Company, a Bond Issuer.

**Assets.** All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

**Available Cash.** Cash held by each Plan Debtor as of the Effective Date other than Cash Collateral.

**Avoidance Actions.** All Claims and defenses to Claims accruing to the Plan Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

**Ballot.** The ballot to vote to accept or reject the Lehman Plan and to vote for acceptance or rejection of the ES Settlement Offer.

**Bankruptcy Code.** The Bankruptcy Reform Act of 1978, as amended, as set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as applicable to the Cases.

**Bankruptcy Court.** The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference

made pursuant to Section 157 of Title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

**Bankruptcy Rules.** Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

**Beaumont Heights Project.** The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**BFP Waiver.** The waiver of the defense to the ES Action by Fenway Capital (which the Bankruptcy Court determined is a Lehman Successor) that Fenway Capital is a *bona fide* purchaser for value of certain applicable Lehman Loans, which waiver shall be applicable only if the Credit Bid Conditions are satisfied and Fenway Capital affirmatively consents in writing to such waiver. (The Lehman Lenders are exercising good faith efforts to obtain the affirmative consent in writing of Fenway Capital to the BFP Waiver.)

**Bickford Ranch Project.** The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Bickford Second Lien Loan Agreement.** That certain promissory note, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000, made by SunCal Bickford, as borrower, and payable to the order of Lehman ALI, as lender. The loan made pursuant to and/or evidenced by the Bickford Second Lien Loan Agreement is secured by a second priority deed of trust on the Bickford Ranch Project. The outstanding balance of the loan under the Bickford Second Lien Loan Agreement was not less than $54,494,059.38 as of the applicable Petition Date.

**Bond Claim(s).** Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds issued by a Bond Issuer.

**Bond Claimant.** Holder(s) of a Bond Claim.

**Bond Issuer(s).** Bond Safeguard and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors and with respect to and for the benefit of the Projects owned by such Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Bond Obligation(s).** The alleged obligation(s) of the Bond Obligor(s) to indemnify the Bond Issuers for any payments made by the Bond Issuers to Holders of Bond Claims.

**Bond Obligor(s).** Obligors who are liable to a Bond Issuer for any payments made by such Bond Issuer to a Bond Claimant or for performance obligations under any performance bonds issued by such Bond Issuer for the benefit of any of the Debtors or their respective Projects. Arch asserts that the Bond Obligors under payment and performance bonds issued by Arch for the benefit of any Debtor or with respect to any Project are all of the Debtors, Acquisitions and Elieff. Bond Safeguard asserts that the Bond Obligors under payment and performance bonds issued by Bond Safeguard for the benefit of any Debtor or with respect to any Project are the respective Debtors for whose benefit such bonds were issued, Acquisitions and Elieff.

**Bond Safeguard.** Bond Safeguard Insurance Company, a Bond Issuer.

**Business Day.** Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a); provided that with reference to the date on which something is to be Filed, it shall not include a day on which the applicable court is inaccessible for the purpose of Filing such paper.

**Cases.** The chapter 11 cases of the Debtors pending before the Bankruptcy Court.

**Cash.** Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

**Cash Collateral.** This term is used in reference to certain Assets of a Plan Debtor's Estate with the same meaning as set forth in Bankruptcy Code Section 363(a).

**Claim.** A claim — as Bankruptcy Code section 101(5) defines the term "claim"— against any Plan Debtor or any Plan Debtor's property, including, without limitation (a) any right to payment from any of the Plan Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Plan Debtors, whether or not such right to an equitable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

**Claims Bar Date.** For Claims, other than Administrative Claims, the last date for Filing proofs of Claim as was established by order or orders of the Bankruptcy Court entered prior to October 11, 2009, which date was March 31, 2009 for certain Claims; provided that: (a) for Claims arising from the rejection of executory contracts or unexpired leases, the date(s) as set forth in Plan Section **Error! Reference source not found.**; (b) for Claims resulting from the successful prosecution or settlement of Avoidance Actions, the later of any otherwise applicable date under this paragraph and forty-five (45) days following entry of the Final Order determining such Avoidance Action; and (c) for Claims of governmental units, the later of any otherwise applicable date under this paragraph and 180 days after the date of the applicable order for relief under Bankruptcy Code §§ 301 or 303, as applicable.

**Claims Objection Deadline.** For a Claim other than an Administrative Claim and except as otherwise set forth in the Lehman Plan, the first Business Day following the one hundred and twentieth (120th) day after the later of (a) the Effective Date or (b) the applicable bar date for the Claim; provided that: (a) for the ES Claims of Settling ES Claimants, instead, the first Business Day that is at least sixty (60) days after the Effective Date; (b) upon application to the Bankruptcy Court, the Liquidating Trustee or Lehman Lenders may obtain an extension of any such deadline for up to sixty (60) days for cause shown; and (c) any deadline may be extended by agreement of the potential target of the objection and the Liquidating Trustee or a Lehman Lender.

**Class.** Each group of Claims or Interests classified in Article IV of the Lehman Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

**Committees.** Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee.

**Conclusion of [ES Action, Cross-Collateralization Action(s) or Project Related Action(s)].** As to the applicable action, either (a) the action has been finally resolved or determined through entry of an ES Final Judgment(s), Cross-Collateralization Final Judgment(s), Final Orders

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

settling or dismissing the actions or any combination thereof or (b) as to Cross-Collateralization Actions only, the time for Filing thereof passes without any such action being Filed.

**Confirmation Date.** The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

**Confirmation Order.** The order entered by the Bankruptcy Court confirming the Lehman Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**Contingent Bid.** This term shall have the meaning ascribed to it in Section 9.8(a) of the Plan.

**Contingent Lehman ALI Claims Against SJD Partners.** The Claims of Lehman ALI or its assignees or successors (a) arising under the Pacific Point First Loan Agreement in the amount of $120,110,237 that is secured by the Pacific Point Project and any proceeds thereof or from its sale or disposition, which is a Claim against SJD Partners and which also is a Secured Claim against SJD Partners contingent upon the set aside of the Pacific Point Foreclosure and (b) arising based upon Lehman ALI's prior second priority Lien under which it foreclosed through the Pacific Point Foreclosure upon its Claim of approximately $28 million, which is a Claim against SJD Partners contingent upon the set aside of the Pacific Point Foreclosure.

**Contingent Lehman ALI Unsecured Claims Against SJD Partners.** The Contingent Lehman ALI Claims Against SJD Partners that are General Unsecured Claims.

**Contingent Lehman ALI Secured Claim Against SJD Partners.** The Contingent Lehman ALI Claim Against SJD Partners that is a Secured Claim.

**Credit Bid Conditions.** The conditions applicable with respect to the Guaranteed Minimum Distribution and BFP Waiver that both (a) no hearing on the merits is held, and no order is issued by the Bankruptcy Court with respect to the merits of, the Sales Procedures Motion or any similar motion that seeks, in effect, to deny or limit the ability of any Lehman Creditor to credit bid on any or all Projects, unless neither the Trustee nor any Committee Files, supports or prosecutes such motion; and (b) all rights of the Lehman Creditors to credit bid are afforded to them as set forth in the Plan.

**Creditor.** Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the applicable Debtor's Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**Cross-Collateralization Action.** An Avoidance Action against a Lehman Related Party that relates to a Cross-Collateralization Claim that is timely Filed and Filed no later than sixty (60) days following the Effective Date.

**Cross-Collateralization Claim.** A Claim against any Lehman Creditor under state or federal fraudulent transfer laws, provided: (a) it is set forth in a complaint Filed no later than sixty (60) days following the Effective Date and (b) such Claim seeks to set aside a Lehman Secured Claim as against a particular Plan Debtor's Estate based on the principal amount of such Lehman Secured Claim against such Plan Debtor's Estate exceeding the funds alleged by the Debtors to have been advanced for the subject collateral or to have directly or indirectly benefitted the applicable Plan Debtor in connection with the applicable Lehman Loan.

**Cross-Collateralization Final Judgment.** A Cross-Collateralization Judgment represented by a Final Order.

**Cross-Collateralization Judgment.** Any judgment in favor of the Liquidating Trustee pursuant to or as a result of a Cross-Collateralization Action against a Lehman Related Party.

**Danske Bank.** Danske Bank A/S London Branch.

**Danske Secured Claim.** The Secured Claim of Danske Bank, a Lehman Successor, arising from the SunCal Century City Loan Agreement.

**Debtor(s).** Individually or collectively, the Voluntary Debtors and the Trustee Debtors.

**Debtor(s)-in-Possession.** The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Cases.

**Debtors' Third Amended Disclosure Statement.** The Debtors' Third Amended Joint Disclosure Statement Describing Debtors' Third Amended Joint Chapter 11 Plan, dated September __, 2009.

**Del Amo Project.** The Project owned by SunCal Torrance, located in the City of Torrance, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Del Rio.** North Orange Del Rio Land, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner and holder of the Del Rio Rights and the Del Rio CFD Bond Proceeds.

**Del Rio CFD Bond Proceeds.** All proceeds of those certain bonds to be designated as "City of Orange, Community Facilities District No. 06-01 (Del Rio Public Improvements) 2007 Special Tax Bonds" or similarly designated bonds to be issued by the City of Orange, California in connection with that certain community facilities district established by the City and known as the City of Orange Community Facilities District No. 06-01 (Del Rio Public Improvements).

**Del Rio Development Agreement.** Development Agreement, recorded on July 27, 2004 in the Official Records of Orange County, California as Instrument No. 2004-000677141, as amended by (i) that certain First Operating Memorandum, dated August 17, 2006, (ii) that certain Second Operating Memorandum, dated December 5, 2006, (iii) that certain Operating Memorandum No. 3, dated May 22, 2007, and (iv) that certain Operating Memorandum No. 4, dated July 21, 2008.

**Del Rio PSA.** That certain Purchase Agreement and Escrow Instruction (Del Rio) dated as of June 14, 2005 by and among Del Rio, as the seller, and Lennar Homes of California and Centex Homes, as the buyers, as assigned by the buyers to Lennar Centex Del Rio Partners, LLC per that certain Assignment of Purchase Agreement and Escrow Instructions dated as of November 14, 2005, as amended by that certain First Amendment to Purchase Agreement and Escrow Instructions (Del Rio) and that certain Second Amendment to Purchase Agreement and Escrow Instructions (Del Rio) dated as of January 30, 2007.

**Del Rio Rights.** Collectively, (i) all right, title and interest of Del Rio, as developer or in any other capacity, in, to, under or pursuant to the Del Rio Development Agreement including, without limitation, all any and all Del Rio CFD Bond Proceeds, and (ii) all right, title and interest of Del Rio, as seller, under the Del Rio PSA including, without limitation, all profit participation, proceeds, revenues and income to which Del Rio is or may be entitled thereunder.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Del Rio / SJD Partners Release.** A release (which, as to SJD Partners, must be executed and delivered prior to any setting aside of the Pacific Point Foreclosure and prior to any recovery by a Plan Debtor's Estate with respect to the setting aside of the Pacific Point Foreclosure), in a form reasonably acceptable to the Lehman Lenders, to be executed within forty-five (45) days following the Effective Date by the Liquidating Trustee for the Estate of Del Rio or the Estate of SJD Partners to obtain certain benefits described in Section 1.5(i)(iv)(2) of the Lehman Plan that is in a form or substantially the form of the Plan Release set forth in Section 9.11 of the Lehman Plan, but (a) without any exception, as matters not to be released, for Cross-Collateralization Claims or Avoidance Actions and (b) with additional releasees consisting of all and any owners of the applicable Project(s) or other Assets that were at any time owned by Del Rio or SJD Partners, as applicable.

**Delta Coves.** Delta Coves Venture, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Delta Coves Project.

**Delta Coves Loan Agreement.** That certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lenders thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $236,000,000. The loan made pursuant to and/or evidenced by the Delta Coves Loan Agreement is secured by a first priority deed of trust on the Delta Coves Project. The outstanding balance of the loan under the Delta Coves Loan Agreement was not less than $206,023,142.48 as of the applicable Petition Date.

**Delta Coves Project.** The Project owned by Delta Coves, located in Bethel Island in Contra Costa County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Detailed Sale Procedures.** The detailed procedures with respect to which the Liquidating Trustee shall sell or convey each of the Remaining Real Estate Projects for which there is a Successful Bidder, either to a third party purchaser, a Lehman Nominee or another Holder of an Allowed Secured Claim, pursuant to and consistent with the Lehman Plan Sale Procedures, in a form acceptable to the Lehman Creditors and Liquidating Trustee or as reasonably proposed by the Lehman Lenders and approved by the Bankruptcy Court at, or after the hearing on, confirmation of

the Lehman Plan, as may be modified after the Confirmation Date by agreement of the applicable Lehman Nominee or other owner and Liquidating Trustee or approval of the Bankruptcy Court.

**Disputed Claim(s).** All or any part of a Claim that is not Allowed, including, without limitation, all or part of a Claim as to which any one of the following applies: (i) no Proofs of Claim has been Filed with respect to such Claim and it is not deemed Allowed under the Lehman Plan, and either (a) the Claim is not listed in the Schedules or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the liability for, amount, priority or status of the Claim as secured, status as unsecured or status as an ES Claim (a) is the subject of a pending proceeding, whether arbitration, mediation, litigation, adversary proceeding or otherwise; (b) is subject to offset based upon a Filed judgment, Filed order, Filed stipulation or express provision in an executed agreement that was Filed or executed, as appropriate, after the alleged right to offset arose; (c) is the subject of a timely objection; or (d) is the subject of a request for estimation made in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court or the Lehman Plan, in each case that is Filed on or before the Claims Objection Deadline, provided that any such proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Lehman Plan.

**Distribution(s).** Payment(s) to Holder(s) of an Allowed Claim(s) or Allowed Interest(s) that are provided for under the Lehman Plan.

**Distribution Agent.** The Liquidating Trustee.

**Distribution Date.** With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Lehman Plan.

**Effective Date.** A date selected by the Lehman Lenders, but in no event later than the sixtieth (60th) day after the Confirmation Date.

**Elieff.** Bruce Elieff, the manager of Acquisitions, the indirect parent of all of the Debtors.

**Emerald Meadows Project.** The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Encumbrance.** Any Lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, unassumed affirmative obligations under development agreements or subdivision improvement agreements, license, preference, priority, security agreement, easement, covenant, encroachment, option or other interest in the subject Project, including any right of recovery, tax (including foreign, federal, state and local tax), Order of any governmental authority or other claim there against or therein, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claims based on any theory that the acquirer is a successor, transferee or continuation of the sellers or their business, and (iv) any leasehold interest, license or other right, in favor of a person other than the transferor in connection with a sale or conveyance, to use any portion of the subject Project), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**Equitable Subordination Claims.** Claims for equitable subordination pursuant to Bankruptcy Code § 510(c) held by an Estate for an ES Claimant against a Lehman Creditor.

**ES Action.** That certain adversary proceeding Filed in the Cases on behalf of all Trustee Debtors and 13 of the Voluntary Debtors and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005.

**ES Claim.** A Claim, including a Bond Claim and Bond Obligation, against an ES Plan Debtor for "new value" (as defined in 11 U.S.C. section 547(a)(2) and as that section is interpreted with reference to controlling law for the Bankruptcy Court ) voluntarily provided or voluntarily extended to one or more of the ES Plan Debtors after the ES Date and prior to the applicable Petition Date(s); provided that such Claim is not a (i) Secured Claim, (ii) Administrative Claim, (iii) Priority Tax Claim, (iv) Priority Claim, (v) Claim of an Insider or (vi) Claim of either a Lehman Lender or Lehman Successor in such capacity. *E.g.*, ES Claims do not include Claims provided or extended pursuant to a legal or contractual commitment or obligation existing prior to the ES Date. ES Claims are entitled to vote on the ES Settlement as set forth in the Lehman Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**ES Claimant.** The Holder of an Allowed ES Claim.

**ES Claimant Release and Assignment.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors as of the Effective Date, in returning its Ballot accepting the ES Settlement Offer, each Settling ES Claimant by Vote ("releasor") shall execute a release and assignment reflecting the following and shall be deemed to release and assign as follows: (a) the releasor shall release the ES Claimant Released Claims from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, and (b) to the extent such ES Claimant Released Claims cannot be released by the releasor, the releasor assigns to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project), all rights, benefits and interests of the releasor, including rights to Net Cash Litigation Recoveries, with respect to the ES Claimant Released Claims, all as more fully set forth in Section 9.9(d) of the Lehman Plan.

**ES Claimant Released Claims.** Any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent attributable or related to the ES Claims of the releasing Person or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of such releasing Person.

**ES Date.** August 1, 2007, the earliest date on which the Lehman Lenders are alleged to have engaged in inequitable conduct as described in that certain adversary proceeding Filed in the Cases and pending before the Bankruptcy Court as Adversary Case No. 8:09-ap-01005.

**ES Final Judgment.** An ES Judgment represented by a Final Order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**ES Judgment.** A judgment in the ES Action in favor of the Liquidating Trustee on behalf of and for the benefit of any particular group of ES Claimants in connection with any of the Equitable Subordination Claims against a Lehman Related Party.

**ES Litigation Expenses.** The reasonable and direct out-of-pocket expenses (but not any legal fees): (a) of and incurred by any replacement legal counsel to Miller Barondess, LLP, that is retained by the Liquidating Trustee on a contingency fee basis to prosecute the Equitable Subordination Claims of any ES Plan Debtor's Estate in the ES Action; (b) which are in excess of any Available Cash in the Post-Confirmation Accounts; and (c) which were incurred in connection with prosecuting the Equitable Subordination Claims in the ES Action; provided that (i) such expenses shall, under no circumstances, include any legal fees (including paralegal fees) or other fees of professionals employed by, or of, the replacement legal counsel or any other law firm (other than the reasonable fees and costs of any retained attorney expert witness) nor (ii) shall such expenses include any fees or expenses incurred or otherwise payable to Miller Barondess, LLP.

**ES Litigation Loan.** A loan to be made available by a Lehman Lender pursuant to the terms and conditions of and as further described in Section 9.9 of the Lehman Plan.

**ES Litigation Proceeds.** The proceeds of any ES Final Judgment or settlement (other than the ES Settlement) with respect to Non-Settled ES Claims.

**ES Plan Debtors.** All of the Plan Debtors other than: Kirby Estates; Seven Brothers; SunCal Beaumont; SunCal Century City; and SunCal Johannson

**ES Pro Rata Settlement Payment.** A payment to any particular Holder of an Allowed ES Claim equal to the ES Settlement Amount multiplied by a fraction, the numerator of which shall be the amount of such Holders' Allowed ES Claim and the denominator of which shall be the amount of all Allowed ES Claims and all Allowed Mechanic's Lien Claims.

**ES Settlement.** The settlement or settlements of Equitable Subordination Claims relating to any particular Estate of a Plan Debtor upon acceptance of an ES Settlement Offer.

**ES Settlement Amount.** The maximum aggregate amount of $15,000,000 to be made available to the Liquidating Trustee collectively by the Lehman Lenders as provided in Section 9.6 of the Lehman Plan to fund any ES Pro Rata Settlement Payments to be made to the ES Claimants

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

who vote for acceptance of the ES Settlement Offer on their Ballots and return with the Ballots ES Claimant Release and Assignments (included with the Ballots) duly executed by such ES Claimants or who are deemed to have accepted or who are otherwise bound by, the ES Settlement pursuant to the terms of the Lehman Plan.

**ES Settlement Offer.** The offer of the applicable Lehman Lender to settle the Equitable Subordination Claims relating to any particular Estate of an ES Plan Debtor by payment of the ES Pro Rata Settlement Payments either (a) to all Holders of Allowed ES Claims against such Estate who return a duly executed ES Claimant Release and Assignment, if there is Estate Acceptance of the ES Settlement by such Estate, or (b) only to the Holders of Allowed ES Claims against such Estate who vote for acceptance of the ES Settlement Offer on their Ballots and return with their Ballots duly executed ES Claimant Release and Assignments, if there is not Estate Acceptance of the ES Settlement by such Estate.

**Estate or Estates.** The bankruptcy estates of the Debtors created pursuant to Section 541 of the Bankruptcy Code.

**Estate Acceptance of the ES Settlement.** The circumstance by which the Estate of a Plan Debtor accepts the ES Settlement Offer, which occurs if at least one-half in number and two-thirds in amount of the voting ES Claimants in such Estate vote for acceptance of the ES Settlement Offer on their Ballots and (unless waived by the Lehman Lenders as to one or more Ballots) return with their Ballots a duly executed ES Claimant Release and Assignment.

**Estate ES Settlement Release.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the ES Pro Rata Settlement Payments from, among other sources, Cash Collateral of the Lehman Creditors, as of the Effective Date, the Estate of each Plan Debtor as to which there is a Settling ES Claimant, on behalf of itself and its Affiliates exclusive of other Debtors in these Cases, shall be deemed to release all claims, including without limitation any Litigation Claims to the extent attributable to the ES Claims of the Settling ES Claimants or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the ES Claims of the Settling ES Claimants, from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the releasing Estate), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, all as more fully set forth in Section 9.9(c) of the Lehman Plan.

**Fee Applications.** Applications of Professionals under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

**Fenway Capital.** Fenway Capital Funding LLC, which owns or holds a legal or equitable interest in all or a portion of the Lehman Loans made pursuant to and/or evidenced by the following loan agreements, but for which a Lehman Lender nonetheless continues as agent: (a) SunCal Communities I Loan Agreement; (b) Ritter Ranch Loan Agreement; (c) SunCal PSV Loan Agreement; (d) Delta Coves Loan Agreement; (e) SunCal Marblehead / SunCal Heartland Loan Agreement; (f) SunCal Oak Valley Loan Agreement; and (g) SunCal Northlake Loan Agreement.

**Filed.** Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court. "File" and “Filing” shall have correlative meanings.

**Final Order.** A final and non-appealable judgment, order, ruling or other decree issued and entered by a court of competent jurisdiction.

**General Administrative Claim Bar Date.** The last date fixed by the Lehman Plan for the filing of Proofs of Claim or requests for payment of Administrative Claims other than for Taxes. Under the Lehman Plan, the General Administrative Claim Bar Date shall be the first Business Day after the sixtieth (60th) day after the Confirmation Date.

**General Unsecured Claim.** A Claim, including a Bond Claim and Bond Obligation, against a Plan Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) a Priority Claim or (e) an ES Claim.

**Guaranteed Minimum Distribution.** An amount equal to $10 million less (a) one-third of the aggregate amount of all ES Pro Rata Settlement Payments and less (b) 100% of the amount of any ES Final Judgment; provided that the Guaranteed Minimum Distribution shall be zero if the Credit Bid Conditions are not satisfied and never shall be less than zero.

**Heartland Project.** The Project owned by SunCal Heartland, located in Riverside County, California, as more particularly described in **Exhibit “B”** to the Lehman Plan.

**Holder.** The beneficial owner of any Claim or Interest.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Initial Bid.** This term shall have the meaning ascribed to it in Section 9.8(a) of the Plan.

**Insider.** (1) A Person other than a Lehman Related Party that is an "insider" as defined in Bankruptcy Code Section 101, (2) an Affiliate of a Person or (3) without limiting the foregoing, as to all Debtors, *inter alia*, each other Debtor, SunCal Management, LLC, Acquisitions, Elieff, Voss, Cook & Thel LLP, Greenfield Communications, SunCal Master Venture Member, LLC and SunCal Del Rio, LLC.

**Interest.** Any equity security or interest in any Plan Debtor within the meaning of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Plan Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, or any other equity security or interest.

**Interim Loan Agreement.** That certain Loan Agreement, dated as of October 31,2007, by and between SCC LLC, as borrower, and Lehman ALI, as agent and lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $20,000,000. The outstanding balance of the loan under the Interim Loan Agreement was not less than $23,795,012.59 as of the applicable Petition Date. The loan made pursuant to and/or evidenced by the Interim Loan Agreement is supported by a Subsidiary Guaranty made by SCC Communities, Tesoro and Del Rio and the obligations of the guarantors thereunder are secured by (a) a first priority deed of trust on the Joshua Ridge Project; (b) a first priority deed of trust on the Tesoro Project; and (c) an assignment of the Del Rio CFD Bond Proceeds.

**Johannson Ranch Project.** The Project owned by SunCal Johannson, located in the City of Modesto, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Joshua Ridge Project.** The Project owned by SCC Communities, located in the City of Victorville, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Kirby Estates.** Kirby Estates, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of that portion of the Summit Valley Project not owned by SunCal Summit Valley or Seven Brothers.

**LCPI.** Lehman Commercial Paper Inc., a New York corporation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Lehman Administrative Loans.** (a) The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, under which first priority priming Liens were granted to Lehman ALI on all borrower Debtors' assets (with the exception of SunCal Century City in which the Liens are junior priority), and as to which financing, super-priority administrative status was afforded and the automatic stay was modified to the extent necessary to implement the financing (the aggregate amount of such loans to all of the borrower Debtors was not less than $1,790,572, as of October 11, 2009); (b) any post-petition financing provided by any Lehman Related Party after September 23, 2009 to any of the Debtors or their Estates pursuant to an order of the Bankruptcy Court; and (c) all interest, fees and other charges thereupon.

**Lehman ALI.** Lehman ALI, Inc., a Delaware corporation

**Lehman ALI's Bickford Second Lien.** The Liens of Lehman ALI or its assignee or successor against SunCal Bickford Ranch, including a second priority deed of trust on the Bickford Ranch Project and certain personal property, arising from the Claims under the Bickford Second Lien Loan Agreement in the Allowed Amount of $56,494,059.38.

**Lehman Appeal.** Any appeal by a Lehman Related Party relating to the Equitable Subordination Claims in the ES Action or any Cross-Collateralization Claims in a Cross-Collateralization Action.

**Lehman Appeal Affected Debtor.** Any Estate of a Plan Debtor that cannot close due to a pending Lehman Appeal concerning such Estate's Assets or liabilities, including subordination of certain of its liabilities to other of its liabilities.

**Lehman Commercial.** Lehman Commercial Paper Inc., a New York corporation.

**Lehman Commercial's SCC Palmdale Lien.** The Liens of Lehman Commercial or its assignee or successor against SCC Palmdale, including a pledge of SCC Palmdale's interests in Palmdale Hills, arising from the Claims under the SCC Palmdale Loan Agreement in the Allowed Amount of $119,664,305.25.

**Lehman Commercial's SunCal I Lien.** The Liens of Lehman Commercial or its assignee or successor against SunCal I, including pledges of SunCal I's equity membership interests in Acton Estates, SunCal Summit Valley, SunCal Beaumont, SunCal Johannson, SunCal Bickford, and SunCal Emerald, arising from the Claims under the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06.

**Lehman Creditor.** Lehman Lender or Lehman Successor.

**Lehman Creditor Party.** Lehman Lender, Lehman Successor, the direct or indirect parent of either, or an Affiliate of either that is wholly owned by the Lehman Lender, Lehman Successor or by a direct or indirect parent of such Lehman Lender or Lehman Successor.

**Lehman Disclosure Statement.** The Amended Disclosure Statement With Respect to *First Amended* Joint Chapter 11 Plan Proposed By Lehman Lenders.

**Lehman Lender.** Lehman ALI, Lehman Commercial, Northlake Holdings or OVC Holdings, including each in its capacity as agent, or agent and lender, with respect to the applicable Lehman Loans (and, collectively, the "Lehman Lenders"). Any funding obligation or similar commitment of the "Lehman Lenders" under the Lehman Plan is a singular, aggregate obligation as to the amount or obligation specified, and thus will be satisfied by a single satisfaction thereof.

**Lehman Loan.** Each loan made pursuant to and/or evidenced by the following agreements: (a) SunCal Communities I Loan Agreement; (b) Bickford Second Lien Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan Agreement; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal PSV Loan Agreement; (h) Delta Coves Loan Agreement; (i) SunCal Marblehead / SunCal Heartland Loan Agreement; (j) SunCal Oak Valley Loan Agreement; and (k) SunCal Northlake Loan Agreement.

**Lehman Nominee(s).** The entity or each entity designated by the Lehman Lenders, or any of them, to take title to a Remaining Real Estate Project as to which a Lehman Creditor is the Successful Bidder.

**Lehman Plan.** This *First Amended Joint Chapter 11 Plan Proposed By Lehman Lenders*, together with the Exhibits hereto, as the same may be amended, modified or restated from time to time.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Lehman Plan Sale Procedures.** The marketing, bidding and sale procedures for a sale of some or all of the Projects after confirmation of the Lehman Plan, all as more fully set forth in Section 0 of the Lehman Plan.

**Lehman Post-Confirmation Expenses.** Post-Confirmation Expenses incurred with respect to a Litigation Claim against a Lehman Related Party, other than ES Litigation Expenses to the extent susceptible of satisfaction from the proceeds of the ES Litigation Loan.

**Lehman Post-Confirmation Funding.** All funding made available to the Liquidating Trustee in connection with, or after, the Effective Date from either (or both) loans made by or on behalf of a Lehman Related Party (of up to a maximum of $5 million) in the form of new Cash transfers or by a Lehman Lender permitting the use of Cash Collateral of a Lehman Creditor, plus, as to any loans, all costs, fees and expenses incurred in connection with making or collecting such loan(s), plus ten percent (10%) annual, compounded interest on the outstanding balance of such loan(s).

**Lehman Proponents.** The Lehman Lenders, in their capacity as proponents of the Lehman Plan.

**Lehman Related Party.** A Lehman Lender, Lehman Successor or Lehman Nominee, or an Affiliate of any of them.

**Lehman Releasees.** The Lehman Lenders, LV Pacific Point LLC, Lehman Re Ltd., all other defendants in the ES Action, their respective Affiliates and each of their respective officers, directors, employees, agents, successors and assigns, including, without limitation, the Lehman Successors.

**Lehman Secured Claim.** A Secured Claim held by a Lehman Creditor.

**Lehman Successor.** Any entity, other than a Lehman Lender, that either asserts to be or is determined by the Bankruptcy Court to be the owner of a Lehman Loan or any portion thereof, such as Fenway Capital.

**Liquidating Trustee.** An individual nominated by a Committee(s), identified no later than ten (10) Business Days prior to the commencement of the hearing on confirmation of the Lehman Plan and approved by the Bankruptcy Court as qualified to serve in such capacity under the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan; provided that if no other such person is so nominated, identified and approved, the Trustee shall serve as the Liquidating Trustee.

**Litigation Claim(s).** Any and all interests of the Liquidating Trustee, Plan Debtors or their Estates in any and all claims, Liens, rights, causes of action, and objections or defenses to Claims, Liens, rights, or causes of action to the extent not waived, released or compromised under the Lehman Plan that have been or may be commenced by the Debtor(s), the Liquidating Trustee, the Trustee, or the Committee(s), as the case may be, including, but not limited to (i) Avoidance Actions, including any Cross-Collateralization Action or other Avoidance Action against a Lehman Related Party; (ii) Claims, rights or causes of action for turnover of property to the Plan Debtors' Estates and/or Liquidating Trustee; (iii) Claims, rights or causes of action for the recovery of property by, or payment of money to, the Plan Debtors' Estates or the Liquidating Trustee, including Equitable Subordination Claims in the ES Action and Cross-Collateralization Claims in a Cross-Collateralization Action; (iv) the right of the Liquidating Trustee to compensation in the form of damages, recoupment, or setoff; and (v) objections to Claims.

**Litigation Recoveries.** Any Cash or other property received by the Trustee, the Plan Debtors, the Liquidating Trustee, or the Committees, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

**Marblehead Project.** The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Maximum DOT Security Amount.** The aggregate amount secured by the PRA Recovery Deeds of Trust at any time which shall be equal to the Maximum PRA Recovery Amount less the aggregate amount in the Plan Reserve (including any interest accrued on funds therein).

**Maximum PRA Recovery Amount.** An amount that serves as the maximum aggregate amount secured by the PRA Recovery Security Pool. This amount is to equal the sum of: (a) to secure a potential Cross-Collateralization Final Judgment, $1.74 million; and (b) to secure a potential ES Final Judgment, (i) $200 million less (ii) the amount from clause (a) hereof (if

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable), with the difference between (i) and (ii) to be multiplied by (iii) the Non-Settling ES Claimant Percentage. Notwithstanding the foregoing:

(1) The amount in clause (a) of this definition shall be zero if (x) none of the Acton Project, Joshua Ridge Project or Tesoro Project are conveyed to a Lehman Nominee under the Plan pursuant to a Contingent Bid or (y) after the last date for Filing a Cross-Collateralization Action, no such action is pending seeking to set aside a Lehman Secured Claim against Acton Estates, SCC Communities or Tesoro and either no Cross-Collateralization Judgment has issued so setting aside such a Secured Claim or such judgment has been satisfied, annulled, vacated or reversed;

(2) On motion of a Lehman Related Party, the amounts set forth in clauses (a) and/or (b)(i) hereof may be reduced upon a Final Order of the Bankruptcy Court, as described in Section 9.8(c)(v) of the Lehman Plan.

**Mechanic's Lien Claim.** Mechanic's lien claims against a Plan Debtor's Project arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise and allegedly satisfy the requirements of Bankruptcy Code Section 546(b).

**Minimum Distribution Release and Assignment.** In exchange for the commitment of the Lehman Lenders under the Lehman Plan to make available funding for the Guaranteed Minimum Distribution from new Cash transfers to the Liquidating Trustee on the Effective Date, each Non-Settling ES Claimant holding an Allowed ES Claim and each Holder of an Allowed General Unsecured Claim desiring to share in the Guaranteed Minimum Distribution (the "releasor") shall execute a release and assignment (a) releasing the Minimum Distribution Released Claims from and against all Lehman Releasees and all and any owners of the applicable Project(s) (that were at any time owned by the Plan Debtor against which the applicable Allowed ES Claim or Allowed General Unsecured Claim is asserted), including the Lehman Nominees, which owners are or were successors or assigns of the applicable Debtor, and (b) to the extent such Minimum Distribution Released Claims cannot be released by the releasor, assigning to the applicable Lehman Lender (or if multiple applicable Lehman Lenders, the Lehman Lender holding the most senior Lien against the applicable Estate's Project or Assets), all rights, benefits and interests of the releasor, including

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

rights to Net Cash Litigation Recoveries, with respect to such Minimum Distribution Released Claims, all as more fully set forth in Section 1.5(d) of the Lehman Plan.

**Minimum Distribution Released Claims.** Any and all causes of action, actions, rights of action, suits, judgments, liens, indebtedness, damages, losses, claims, liabilities, obligations, attorneys' fees, costs, expenses and demands of every kind and character, whether known or unknown, suspected or unsuspected, disclosed or undisclosed, including without limitation any Litigation Claims, whether for damages, subordination or other remedies, and including any and any objections or defenses to Lehman Related Party's Claims, Liens, rights, or causes of action, to the extent related to the Claims of the releasing Person or these Cases, Debtors or their Projects or to the extent that the Net Cash Litigation Recoveries therefrom would be payable in respect of the Claims of such releasing Person.

**Negative Covenant.** The provision in each PRA Recovery Deed of Trust that the applicable Lehman Nominee will not cause, through an affirmative action on its part (as opposed to any inaction or failure to act), any hazardous substances to be deposited onto the applicable PRA Security Project encumbered by such PRA Recovery Deed of Trust at any time following the acquisition of title to such PRA Security Project by such Lehman Nominee and prior to the sale of such PRA Security Project; provided, however, that the Lehman Nominee shall have no obligation to (1) clean up, remove or remediate any existing hazardous substances (including, without limitation, any asbestos, mold or petroleum products) which may be present on or within such PRA Security Project or which may be emanating therefrom as of the date of the conveyance of such property to such Lehman Nominee or (2) take any action or incur any expense to prevent hazardous substances from existing or being present on or within such PRA Security Project or from otherwise emanating therefrom except as specifically provided above.

**Net Cash Litigation Recoveries.** Any Litigation Recoveries consisting of Cash and any Cash proceeds of Litigation Recoveries less associated Post-Confirmation Expenses incurred in connection therewith.

**Net Cash Proceeds.** Net Proceeds consisting of Cash.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Net Proceeds.** Gross proceeds of sale, liquidation or refinancing, less costs, expenses, fees, commissions, taxes (including federal, state and local income tax calculated at an assumed rate of forty-five percent (45%)) and other charges incurred directly in the sale, liquidation or refinancing of the underlying asset, including payment of senior Liens or encumbrances.

**Non-Settled ES Claims.** The ES Claims of Non-Settling ES Claimants.

**Non-Settling ES Claimant(s):** With respect to each Estate of an ES Plan Debtor, ES Claimants that do not vote to accept the ES Settlement Offer, unless there is Estate Acceptance of the ES Settlement for such Estate, in which case there shall be no Non-Settling ES Claimants of such Estate.

**Non-Settling ES Claimant Percentage.** The percentage of Allowed ES Claims that are held by Non-Settling ES Claimants.

**Northlake Holdings.** Northlake Holdings LLC, a Delaware limited liability company.

**Northlake Project.** The Project owned by SunCal Northlake, located in the City of Castaic California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Oak Knoll Project.** The Project owned by SunCal Oak Knoll, located in the City of Oakland, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Oak Valley Project.** The Project owned by SunCal Oak Valley, located in Riverside County, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Other Secured Claim.** A Secured Claim that is not a Secured Real Property Tax Claim, Lehman Secured Claim or Danske Secured Claim.

**OVC Holdings.** OVC Holdings LLC, a Delaware limited liability company.

**Pacific Point First Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement dated as of February 16, 2006 (as amended and/or supplemented) and the various related loan documents as well as any other documents evidencing perfection of the security interests therefor, including any amendments and/or supplements thereto, by and among SJD Partners, as borrower, and Lehman ALI, as administrative agent and lender, pursuant to which the lenders thereunder made loans to the borrower for which the outstanding balance was not less than

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

$120,110,237 as of the applicable Petition Date and which loans are secured by, among other things, a first priority deed of trust on the Pacific Point Project.

**Pacific Point Foreclosure.** The non-judicial foreclosure of the Pacific Point Project formerly owned by SJD Partners with respect to a second Lien loan of approximately $28 million, through which such Project was sold on August 28, 2008 to LV Pacific Point LLC.

**Pacific Point Project.** The Project formerly owned by SJD Partners, which was non-judicially foreclosed upon pursuant to a sale on August 28, 2008 by LV Pacific Point LLC, a Delaware limited liability company.

**Palmdale Hills.** Palmdale Hills Property, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Ritter Ranch Project, the Ritter Cash and the Palmdale Hills CFD Bonds.

**Palmdale Hills CFD Bonds.** Certain community facilities district bonds issued by the City of Palmdale that are owned by Palmdale Hills.

**Palm Springs Village Project.** The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Permitted Liens.** (a) Statutory liens for Secured Real Property Tax Claims; (b) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (excluding any rights of appeal from the Final Order with respect to the sale or conveyance of the Project) that (i) appear on the lender title insurance policies concerning such Project issued to the relevant Lehman Lender or (ii) do not in any material respect detract from the value of the relevant Project and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property, excluding Liens that will be removed and stricken as against the relevant Project pursuant to the Final Order with respect to the sale or conveyance of the Project, (c) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the relevant Project that are not violated by the current use of the Project, (d) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, (e) discrepancies, conflicts in boundary lines, shortages in area or encroachments

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

which an inspection or survey of the subject Project would disclose and (f) other Liens to which the transferor of the property, in connection with such transfer, agrees to take subject.

**Person.** An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

**Petition Dates.** The following are dates that each of the Voluntary Debtors Filed their voluntary chapter 11 petitions or Creditors Filed involuntary chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves | November 14, 2008 |
| SunCal Heartland | November 12, 2008 |
| SunCal Marblehead | November 12, 2008 |
| SunCal Northlake | November 12, 2008 |
| SunCal Oak Valley | November 12, 2008 |
| SunCal Century City | November 14, 2008 |
| SunCal PSV | November 14, 2008 |
| SunCal Torrance | November 14, 2008 |
| SunCal Oak Knoll | November 19, 2008 |

**Plan.**The Lehman Plan.

**Plan Debtors.** The 24 Debtors for which the Lehman Plan is being proposed, consisting of all of the Debtors other than SJD Development and SunCal III (the Estates of which are believed to hold no Assets of any significant current or potential value).

**Plan Release.** In exchange for the extension of credit represented by the additional Lehman Post-Confirmation Funding, the ES Settlement Offer and the delayed satisfaction of the Secured

Claims of the Lehman Related Parties, as of the Effective Date, the Estate of each Plan Debtor shall be deemed to release all claims, including any Litigation Claims except certain Avoidance Actions and certain claims therein and except that, with respect to all Equitable Subordination Claims in the ES Action and certain Cross-Collateralization Claims asserted in a Cross-Collateralization Action, each owner of each PRA Security Project shall have a non-recourse obligation to reconvey each PRA Security Project to the Liquidating Trustee if required by an ES Final Judgment or Cross-Collateralization Final Judgment, which obligation shall be secured by the PRA Recovery Security Pool and, at a Lehman Nominee's election, instead may be satisfied by a Cash payment to the applicable Estate(s) in the amount of any Project Related Action Recovery, all as more fully set forth in Section 9.11 of the Lehman Plan.

**Plan Reserve.** A reserve fund established by the Liquidating Trustee to hold the Ritter Cash, all Cash Collateral of a Lehman Creditor held by a Plan Debtor, and any other Cash required or permitted to be deposited therein on the Effective Date pursuant to the terms of the Lehman Plan and which funds shall be subject to withdrawal pursuant to the terms of the Lehman Plan, including (i) all Net Cash Proceeds of sales or refinancing of certain Remaining Real Estate Projects as set forth in the Lehman Plan and (ii) any other Cash which the Lehman Related Parties may desire to deposit therein from time to time, all upon the terms and conditions set forth in Article IX of the Lehman Plan. Such funds shall be held in account(s) to be established at an FDIC insured bank to be selected by the Liquidating Trustee with the consent of the Lehman Lenders, which consent shall not be unreasonably withheld. There shall be separate accounts or accounting for the Ritter Cash, Net Cash Proceeds derived from each Remaining Real Estate Project and other Cash Collateral of a Lehman Creditor as to a Plan Debtor, with the Ritter Cash being attributed to the Ritter Ranch Project, Net Cash Proceeds being attributed to the Remaining Real Estate Project, the sale or refinancing of which resulted in such Net Cash Proceeds and other Cash Collateral of a Lehman Creditor being attributed to the applicable Plan Debtor. The applicable Lehman Creditor shall report the Cash Collateral held in the Plan Reserve as being owned by it for all applicable federal, state and local income tax purposes. To enable the applicable Lehman Creditor to pay its applicable federal, state and local income tax with respect to amounts in the Plan Reserve, the Liquidating Trustee shall

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

distribute, or cause to be distributed, to the applicable Lehman Creditor an amount equal to forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve (including with respect to the amount held as the reserve for the Guaranteed Minimum Distribution) no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

**Post-Confirmation Account(s).** An account with a bank, financial institution or similar depository in which the Liquidating Trustee holds Cash or other liquid assets or securities for any Plan Debtor.

**Post-Confirmation Expenses.** The fees and expenses incurred by the Liquidating Trustee or the Committees following the Effective Date (including the fees and costs of Professionals and the Lehman Post-Confirmation Funding) for the purpose of (i) prosecuting and/or liquidating the Litigation Claims; (ii) selling or otherwise liquidating the Liquidating Trustee's Assets; (iii) effectuating Distributions under the Lehman Plan; and (iv) otherwise consummating the Lehman Plan and closing the Debtor(s)' Cases.

**PRA Recovery Deed(s) of Trust.** A deed or deeds of trust as to any particular PRA Security Project to be granted by the Lehman Nominee in favor of the Liquidating Trustee upon conveyance of a Remaining Real Estate Project to one or more Lehman Nominees in connection with the Lehman Plan Sale Procedures, subject to any Permitted Liens, which deeds of trust (a) secure the obligations set forth in the Reconveyance Agreements, and (b) are to be released or subordinated as set forth in Section 9.8(c) of the Lehman Plan. The PRA Security Deeds of Trust secure, in the aggregate, an amount not in excess of the Maximum DOT Security Amount.

**PRA Recovery Security Pool.** At any time, collectively, the PRA Recovery Deeds of Trust then in effect and the Plan Reserve.

**PRA Security Project.** Each Project conveyed to a Lehman Nominee pursuant to the Lehman Plan Sale Procedures.

**Priority Claim.** Any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

**Priority Tax Claim.** Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code or would be so entitled were it not secured.

**Professional.** A Person (a) employed by the Plan Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

**Professional Fees.** All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

**Projects.** The Plan Debtors' real estate development projects as more particularly described on an Exhibit or supplement to the Lehman Plan to be Filed on or before the Effective Date, together with all rights, remedies, privileges and easements appurtenant thereto and all other real and personal, tangible and intangible, property related thereto.

**Project Related Action.** The ES Action or Cross-Collateralization Action.

**Project Related Action Recovery.** An ES Judgment or Cross-Collateralization Judgment.

**Pro Rata.** (a) With respect to any distribution in respect of any Allowed Claim, proportionately, so that the ratio of (i)(1) the amount of property distributed on account of such Allowed Claim to (2) the amount of such Allowed Claim, is the same as the ratio of (ii)(1) the amount of property distributed on account of all Allowed Claims of the Class or Classes of the applicable Estate sharing in such distribution to (2) the amount of all Allowed Claims in such Class or Classes of the applicable Estate; and (b) in calculating allocations of responsibility for obligations among Debtors, Pro Rata shall be determined in reference to the Liquidating Trustee's reasonable estimate of the gross value of each applicable Estate's Assets as of the Confirmation Date.

**Proof of Claim.** A proof of claim as referenced in Bankruptcy Code Section 501(a).

**Proof of Interest.** A proof of interest as referenced in Bankruptcy Code Section 501(a).

**Reconveyance Agreement.** A written agreement to be executed by, and evidencing, among other things, the non-recourse obligations of, a Lehman Nominee to which a PRA Recovery Security

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Project is conveyed pursuant to the Lehman Plan Sale Procedures, as more fully set forth in Section 9.8(c)(iii) of the Lehman Plan.

**Remaining Other Assets.** All of the then remaining Assets of the Plan Debtors' Estates excluding the Projects, as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**Remaining Real Estate Projects.** All of the then remaining Projects as of the point in time referenced in any particular utilization of this term in the Lehman Plan.

**Residual Cash.** As to any particular Plan Debtor's Estate, Net Cash Proceeds derived from the liquidation by the Liquidating Trustee of any Remaining Real Estate Projects owned by such Estate and any Remaining Other Assets of such Estate, including any applicable Net Cash Litigation Recoveries in which such Estate has an interest, to the extent not subject to a Secured Claim (or to a Claim to which such Secured Claim is subordinated) and remaining after payment or reserve for the Lehman Post-Confirmation Funding and, as provided in the Lehman Plan, certain Post-Confirmation Expenses, post-Confirmation Date intercompany payables and due and payable Allowed Administrative Claims, Allowed Priority Claims and Allowed Priority Tax Claims, all as more fully set forth in Section **Error! Reference source not found.** of the Lehman Plan. Residual Cash does not include the Guaranteed Minimum Distribution.

**Ritter Cash.** As of the Effective Date, the Cash owned by Palmdale Hills or in which Palmdale Hills has any residual interest and held in escrow, reserve or other accounts for the benefit of Lehman Commercial and securing the loans made pursuant to the Ritter Ranch Loan Agreement.

**Ritter Ranch Loan Agreement.** That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, and Lehman Commercial, as administrative agent and lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $264,000,000. The loans made pursuant to and/or evidenced by the Ritter Ranch Loan Agreement are secured by, among other things, a first priority deed of trust on the Ritter Ranch Project. The outstanding balance of the loans under the Ritter Ranch Loan Agreement was not less than $287,252,096.31 as of the applicable Petition Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Ritter Ranch Project.** The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Sales Procedures Motion.** The motion of the Trustee Debtors and certain Voluntary Debtors, Filed February 18, 2009, as modified, seeking approval of overbid procedures for a sale of certain Projects and denial of any right of the Lehman Creditors to overbid in connection with such sale.

**SCC Communities.** SCC Communities, LLC, a limited liability company, a Voluntary Debtor in these Cases, and the owner of the Joshua Ridge Project.

**SCC LLC.** SCC Acquisitions LLC, a Delaware limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent of each of the Debtors, but not itself a Debtor in any of the Cases.

**SCC Palmdale.** SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the Holder of the Allowed Interest in Palmdale Hills.

**SCC Palmdale Loan Agreement.** That certain Mezzanine Credit Agreement, between SCC Palmdale, as borrower, and Lehman Commercial, as lender, pursuant to which the lender thereunder made a loan to the borrower in the maximum aggregate principal amount of approximately $95,000,000. The loan made pursuant to and/or evidenced by the SCC Palmdale Loan Agreement is secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. The outstanding balance of the loan under the SCC Palmdale Loan was not less than $119,664,305.25 as of the applicable Petition Date.

**Schedules.** The schedules of assets and liabilities and list of equity security holders Filed by the Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

**Secured Claim.** Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, to the extent that it is secured by a valid and unavoidable Lien on the Plan Debtor(s)' Assets.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Secured Real Property Tax Claims.** Secured Claims, other than Priority Tax Claims, held by various government entities for real property tax assessments secured by Liens on the underlying real properties owned by the Plan Debtors but that are non-recourse to the Plan Debtors.

**Settling ES Claimant(s):** (1) a Settling ES Claimant by Vote or (2) an ES Claimant in an Estate which accepts the ES Settlement Offer.

**Settling ES Claimant(s) by Vote:** Each ES Claimant who votes for acceptance of the ES Settlement Offer on its Ballot and returns with the Ballot an ES Claimant Release and Assignment duly executed by such ES Claimant, included with the Ballot.

**Seven Brothers.** Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of that portion of the Summit Valley Project not owned by Kirby Estates or SunCal Summit Valley.

**SJD Development.** SJD Development Corp., a California corporation, a Voluntary Debtor in these Cases, and the Holder of an Allowed Interest in SJD Partners.

**SJD Partners.** SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor in these Cases, and the prior owner of the Pacific Point Project.

**Successful Bidder.** With respect to the each Remaining Real Estate Project, the successful bidder at the auction for the sale of such Remaining Real Estate Project conducted by the Liquidating Trustee pursuant to the Lehman Plan Sale Procedures.

**Summit Valley Project.** The Project owned in part by SunCal Summit Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**SunCal.** The SunCal Companies, a trade name for Acquisitions and its Affiliates.

**SunCal I.** SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the equity membership interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

**SunCal III.** SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**SunCal Beaumont.** SunCal Beaumont Heights, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Beaumont Heights Project.

**SunCal Bickford.** SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Bickford Ranch Project.

**SunCal Century City.** SunCal Century City, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the 10000 Santa Monica Project.

**SunCal Century City Loan Agreement.** That certain Loan Agreement, dated as of August 11, 2006, by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000. The SunCal Century City Loan Agreement is secured by a first-priority deed of trust on the 10000 Santa Monica Project. The SunCal Century City Loan Agreement has a balance due of $120,000,000.00 as of April 1,2009.

**SunCal Communities I Loan Agreement.** That certain Credit Agreement, dated as of November 17, 2005, by and among (i) SunCal I and SunCal III, as borrowers, Lehman Brothers, Inc., as sole advisor, sole lead arranger and sole bookrunner, and Lehman Commercial, as syndication and administrative agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $395,313,713.37. The loan made pursuant to and/or evidenced by the SunCal Communities I Loan Agreement is secured directly or indirectly by (a) first priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) pledges of SunCal I's Allowed Interest in Acton Estates, SunCal Summit Valley, SunCal Beaumont; SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) pledges of SunCal Summit Valley's Allowed Interest in Seven Brothers and Kirby Estates. The outstanding balance of the loan under the SunCal Communities I Loan Agreement was $343,221,391.06 as of the applicable Petition Date.

**SunCal Emerald.** SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Emerald Meadows Project.

**SunCal Heartland.** SunCal Heartland, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Heartland Project

**SunCal Johansson.** SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Johansson Ranch Project.

**SunCal Marblehead.** SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Marblehead Project.

**SunCal Marblehead / SunCal Heartland Loan Agreement.** That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrowers in the maximum aggregate principal amount of approximately $316,061,300. The loans made pursuant to and/or evidenced by the SunCal Marblehead / SunCal Heartland Loan Agreement are secured by first priority deeds of trust on the Marblehead and the Heartland Projects. The outstanding aggregate balance of the loans under the SunCal Marblehead / SunCal Heartland Loan Agreement was not less than $354,325,126.15 as of the applicable Petition Date.

**SunCal Northlake.** LB/L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Northlake Project.

**SunCal Northlake Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 9, 2005, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans in the maximum aggregate principal amount of approximately $100,000,000. The loans made pursuant to and/or evidenced by the SunCal Northlake Loan Agreement are secured by a first priority deed of trust on the Northlake Project. The outstanding aggregate balance of the loans under the SunCal Northlake Loan Agreement was not less than $123,654,776.88 as of the applicable Petition Date.

**SunCal Oak Knoll.** SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Oak Knoll Project.

**SunCal Oak Knoll/SunCal Torrance Loan Agreement.** That certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made a loan to the borrowers in the maximum aggregate principal amount of approximately $167,700,000. The loans made pursuant to and/or evidenced by the SunCal Oak Knoll/SunCal Torrance Loan Agreement are secured by first priority deeds of trust on the Oak Knoll and the Del Amo Projects. The outstanding aggregate balance of the loans under the SunCal Oak Knoll/SunCal Torrance Loan Agreement was not less than $157,870,186.15 as of the applicable Petition Date.

**SunCal Oak Valley.** LB/L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Oak Valley Project.

**SunCal Oak Valley Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal mount of approximately $120,000,000. The loans made pursuant to and/or evidenced by the SunCal Oak Valley Loan Agreement are secured by a first priority deed of trust on the Oak Valley Project. The outstanding aggregate balance of the loans under the SunCal Oak Valley Loan Agreement was not less than $143,630,091.63 as of the applicable Petition Date.

**SunCal PSV.** SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Palm Springs Village Project.

**SunCal PSV Loan Agreement.** That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which the lenders thereunder made loans to the borrower in the maximum aggregate principal amount of approximately $90,000,000. The loans made pursuant to and/or evidenced by the SunCal PSV Loan Agreement are secured by a first priority deed of trust on the Palm Springs Village Project. The outstanding aggregate balance of the loans under the SunCal PSV Loan Agreement was not less than $88,257,340.20 as of the applicable Petition Date.

**SunCal Summit Valley.** SunCal Summit Valley, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, the owner of that portion of the Summit Valley Project

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

not owned by Kirby Estates or Seven Brothers, and the Holder of Allowed Interests in Kirby Estates and Seven Brothers.

**SunCal Torrance.** SunCal Torrance, LLC, a Delaware limited liability company, a Trustee Debtor in these Cases, and the owner of the Del Amo Project.

**Tax.** Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

**Tesoro.** Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor in these Cases, and the owner of the Tesoro Project.

**Tesoro Project.** The Project owned by Tesoro located in the City of Santa Clarita, California, as more particularly described in **Exhibit "B"** to the Lehman Plan.

**Trustee.** Steven M. Speier, the duly appointed trustee of the Trustee Debtors or any successor trustee for the Trustee Debtors.

**Trustee Debtor(s).** The following chapter 11 debtors, individually or collectively, that are represented by the Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

**Trustee Debtors' Committee.** The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases of the Trustee Debtors pursuant to Section 1102 of the Bankruptcy Code.

**Unclaimed Property.** Cash held for Distribution if either (1) such the Distribution of Cash to the Holder of any Allowed Claim is returned to the Liquidating Trustee (*e.g.*, as undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or other similar instrument used for the Distribution to the Holder of any Allowed Claim remains uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not have an address for a Holder of any Allowed Claim on the date

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such Distribution first could have been made under the Plan and for one hundred twenty (120) days thereafter.

**Voluntary Debtor(s).** The following chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit Valley, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

**Voluntary Debtors' Committee.** The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases of the Voluntary Debtors pursuant to Section 1102 of the Bankruptcy Code.

2. **Rules of Construction.** For purposes of the Lehman Plan and the Lehman Disclosure Statement, unless otherwise provided herein or in the Lehman Disclosure Statement, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Lehman Plan or the Lehman Disclosure Statement to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Lehman Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Lehman Plan or the Lehman Disclosure Statement to Sections and Articles are references to Sections and Articles of or to the Lehman Plan; (f) unless otherwise indicated, the words “therein," "thereunder" and "thereto" refer to the Lehman Plan in its entirety rather than to a particular portion of the Lehman Plan; (g) unless otherwise provided in the Lehman Plan or the Lehman Disclosure Statement, any reference in the Lehman Plan or the Lehman Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Lehman Plan or the Lehman Disclosure Statement to a document or schedule to the Lehman Plan, Plan Documentary

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Supplement, or Lehman Disclosure Statement Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Lehman Plan or the Lehman Disclosure Statement or any other provision in this Section.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# **EXHIBIT 1**

**EXHIBIT 1**

**SUMMARY OF HEALTH AND SAFETY NOTICES**

| Ex. No | Citation | Date | Issuing Agency | Applicable Projects |
|---|---|---|---|---|
| 1 | Notice of Violation of the California Coastal Act | June 4, 2009 | California Coastal Commission | Marblehead Project |
| 2 | Order to Abate – Habitability Hazards | June 12, 2009 | City of Oakland | Oak Knoll Project |
| 3 | Notice of Violation | April 1, 2009 | City of Palm Springs Department of Building & Safety | Palm Springs Village Project |
| 4 | Request for Supplemental Deposit | February 19,2009 | Los Angeles County Department of Regional Planning | Tesoro Project |
| 5 | Notice of Violation, Construction Storm Water General Permit No. CAS000002, Delta Coves Venture LLC SunCal Company, WDID No. 5S07C344548, Contra Costa County | October 17, 2008 | California Regional Water Quality Control Board | Delta Coves Project |
| 6 | Administrative Citation for Violations of the City of San Clemente Municipal Code (SCMC); Storm Water Runoff Control (Chapter 13, 40) and Excavations & Grading | October 15, 2008 | City of San Clemente, Engineering Division | Marblehead Project |
| 7 | Notice to Comply | October 14, 2008 | Contra Costa County – Building Inspection Department | Delta Coves Project |
| 8 | Notice of Violation No. A49456 | October 9, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 9 | Notice of Violation No. A 49457 | October 10, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 10 | Contra Costa County Stormwater Pollution Prevention Plan Notice of | October 7, 2008 | Contra Costa County | Delta Coves Project |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | | | |
|---|---|---|---|---|
| | Correction | | | |
| 11 | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |
| | | | | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT 2

EXHIBIT "2"

| | Class | Loan | Plan Debtor; Claim # | Lehman ALI | LCPI | Northlake Holdings | OVC Holdings | Lehman Re* | Fenway Capital* |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2.1-2.4 | **SunCal Communities I Loan Agreement**<br>Claim Filed by Lehman Commercial: $343,221,391.06 | Acton Estates; Acton Estates: 6<br>SunCal Emerald; SunCal Emerald: 7<br>SunCal Bickford; SunCal Bickford: 16<br>SunCal Summit Valley; SunCal Summit Valley: 12 | | | | | | $343,221,391.06 |
| 2 | 2.5 | **Ritter Ranch Loan Agreement**<br>Claim Filed byLehman Commercial: $287,252,096.31 | Palmdale Hills; Palmdale Hills: 65 | | $43,637,046.39 | | | | $243,615,049.90 |
| 3 | 2.6 - 2.8 | **Interim Loan Agreement**<br>Claim Filed by Lehman ALI: $23,795,012.59 | SCC Communities; SCC Communities: 9<br>Del Rio; Del Rio: 14; Tesoro; Tesoro: 7 | $23,795,012.59 | | | | | |
| 4 | 2.9-210 | **SunCal Oak Knoll/SunCal Torrance Loan Agreement**<br>Claim Filed by Lehman ALI: $158,141,364.64 | SunCal Oak Knoll; SunCal Oak Knoll: 12<br>SunCal Torrance; SunCal Torrance: 4 | $158,141,364.64 | | | | | |
| 5 | 2.11 | **Delta Coves Loan Agreement**<br>Claim Filed by Lehman ALI: $206,023,142.48 | Delta Coves; Delta Coves 21 | | | | | | $206,023,142.48 |
| 6 | 2.12 -2.13 | **SunCal Marblehead / SunCal Heartland Loan Agreement**<br>Claim Filed by Lehman ALI: $354,325,126.15 | SunCal Heartland; SunCal Heartland: 9 | $11,200,606.79 | | | | | $343,124,519.35 |
| 7 | 2.13<br>2.14 | **SunCal Oak Valley Loan Agreement**<br>Claim Filed by OVC Holdings: $141,630,091.63 | SunCal Marblehead; SunCal Marblehead: 21<br>SunCal Oak Valley; SunCal Oak Valley 16 | | | | $32,769,837.35 | | $108,671,526.00 |
| 8 | 2.15 | **SunCal Northlake Loan Agreement**<br>Claim Filed by Northlake Holdings: $123,654,776.88 | SunCal Northlake; SunCal Northlake 6 | | | $39,653,078.69 | | | $84,001,698.19 |
| 9 | 2.16 | **SunCal PSV Loan Agreement**<br>Claim Filed by Lehman ALI: $88,257,340.20 | SunCal PSV; SunCal PSV 12 | $88,257,340.20 | | | | | $76,719,265.09 |
| 10 | 7.20 | **SunCal Bickford 2nd Lien Loan Agreement**<br>Claim Filed by Lehman Ali: $56,494,059.38 | SunCal Bickford; SunCal Bickford 17 | $56,494,059.38 | | | | | |
| 11 | 7.24 | **SCC Palmdale Loan Agreement**<br>Claim Filed by Lehman Commercial: $119,664,305.25 | SCC Palmdale; SCC Palmdale 1 | | $119,664,305.25 | | | | |
| 12 | 2.17 | **Pacific Point First Loan Agreement****<br>Claim Filed by Lehman ALI: $120,110,236.78 | SJD Partners; SJD Partners 23 | $18,510,054.68 | | | | $101,600,182.00 | |
| | **Totals by Lehman Creditor without Contingent Claims:** | | | $356,398,438.28 | $163,301,351.64 | $39,653,078.69 | $32,769,837.35 | **$101,600,182.00** | **$1,405,376,592.07** |
| | **Totals for all Lehman Lenders without Contingent Claims:** | | **$592,122,705.96** | | | | | | |
| | **Total for all Lehman Creditors without Contingent Claims:** | | **$2,099,099,480.03** | | | | | | |
| | | **Contingent Claim:** | | | | | | | |
| 13 | 7.11 | **2nd Lien Loan**<br>Claim Filed by Lehman ALI: approximately $28 million (Contingent) | SJD Partners; SJD Partners 24 | $28,000,000.00 | | | | | |
| | **Totals by Lehman Creditor:** | | | $384,398,438.28 | $163,301,351.64 | $39,653,078.69 | $32,769,837.35 | **$101,600,182.00** | **$1,405,376,592.07** |
| | **Totals for Lehman Lenders:** | | **$620,122,705.96** | | | | | | |
| | **Totals for all Lehman Creditors** | | **$2,127,099,480.03** | | | | | | |

* All or the term component of each loan for which an amount in the table above is attributed to Lehman Successors Fenway Capital or Lehman Re was the subject of a repurchase agreement between such Lehman Successor and a Lehman Lender. The Bankruptcy Court has ruled that the transactions with respect to certain of such Lehman Loans resulted in sales of loans or the term components thereof to Fenway Capital. The Lehman Creditors have reserved all rights in connection with such ruling, including, without limitation, the right to appeal the ruling, assert that the transactions under any repurchase agreement constitutes a transfer for security and not an outright sale, and all of the Lehman Creditors' other rights in connection with the relevant Claim.

** Although the obligation under this loan agreement presently is a General Unsecured Claim against SJD Partners, the Claim is a contingent Secured Claim, contingent upon the Pacific Point Foreclosure being set aside.

| In re: PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS, Debtor(s). | CHAPTER 11 CASE NUMBER 08-17206-ES |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067**

A true and correct copy of the foregoing document described as ***AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY LEHMAN LENDERS*** will be served or was served **(a)** on the **judge in chambers** in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 13, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ________________________ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 13, 2009** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

JUDGE'S COPY [via Personal Delivery]
The Honorable Erithe A. Smith
United States Bankruptcy Court - Central District of California
Ronald Reagan Federal Building and
United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 13, 2009 | Myra Kulick | /s/ *Myra Kulick* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

Pg 398 of 409

| In re: PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS, Debtor(s). | CHAPTER 11 CASE NUMBER 08-17206-ES |
|---|---|

**I. SERVED BY NEF**

**8:08-bk-17206-ES Notice will be electronically mailed to:**

1. Selia M Acevedo for Interested Party Courtesy NEF
sacevedo@millerbarondess.com
2. Joseph M Adams for Defendant The City of San Juan Capistrano
jadams@sycr.com
3. Raymond H Aver for Debtor Palmdale Hills Property, LLC
ray@averlaw.com
4. James C Bastian for Creditor ARB, Inc.
jbastian@shbllp.com
5. John A Boyd for Interested Party Oliphant Golf Inc
fednotice@tclaw.net
6. Brendt C Butler for Creditor EMR Residential Properties LLC
BButler@rutan.com
7. Carollynn Callari for Creditor Danske Bank A/S London Branch
ccallari@venable.com
8. Dan E Chambers for Creditor EMR Residential Properties LLC
dchambers@jmbm.com
9. Shirley Cho for Creditor Lehman ALI, Inc.
scho@pszjlaw.com
10. Vonn Christenson for Interested Party Courtesy NEF
vrc@paynefears.com
11. Vincent M Coscino for Petitioning Creditor CST Environmental Inc
emurdoch@allenmatkins.com
12. Paul J Couchot for Debtor ACTON ESTATES, LLC
pcouchot@winthropcouchot.com, pj@winthropcouchot.com
13. Jonathan S Dabbieri for Interested Party Courtesy NEF
dabbieri@shlaw.com
14. Ana Damonte for Creditor Top Grade Construction, Inc.
ana.damonte@pillsburylaw.com
15. Melissa Davis for Creditor City of Orange
mdavis@shbllp.com
16. Daniel Denny for Interested Party Courtesy NEF
ddenny@gibsondunn.com
17. Caroline Djang for Creditor Lehman ALI, Inc.
crd@jmbm.com
18. Donald T Dunning for Creditor Hertz Equipment Rental Corporation
ddunning@dunningLaw.com
19. Joseph A Eisenberg for Creditor Lehman ALI, Inc.
jae@jmbm.com
20. Lei Lei Wang Ekvall for Creditor Committee Joint Committee of Creditors Holding Unsecured Claims
lekvall@wgllp.com
21. Richard W Esterkin for Debtor Palmdale Hills Property, LLC
resterkin@morganlewis.com
22. Lisa Hill Fenning for Defendant Fenway Capital, LLC
Lisa.Fenning@aporter.com, Jean.Kellett@aporter.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009 F 9013-3.1

Pg 399 of 409

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,
Debtor(s).
CHAPTER 11
CASE NUMBER 08-17206-ES

23. Marc C Forsythe for Attorney Robert Goe
kmurphy@goeforlaw.com
24. Alan J Friedman for Attorney Irell & Manella LLP
afriedman@irell.com
25. Christian J Gascou for Creditor Arch Insurance Company
cgascou@gascouhopkins.com
26. Robert P Goe for Attorney Robert Goe
kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
27. Eric D Goldberg for Interested Party Courtesy NEF
egoldberg@stutman.com
28. Kelly C Griffith for Creditor Bond Safeguard Insurance Co
bkemail@harrisbeach.com
29. Asa S Hami for Debtor Palmdale Hills Property, LLC
ahami@morganlewis.com
30. Michael J Hauser for U.S. Trustee United States Trustee (SA)
michael.hauser@usdoj.gov
31. D Edward Hays for Creditor Philip Dowse
ehays@marshackhays.com
32. Michael C Heinrichs for Interested Party Courtesy NEF
mheinrichs@omm.com
33. Harry D. Hochman for Creditor Lehman ALI, Inc.
hhochman@pszjlaw.com, hhochman@pszjlaw.com
34. Michelle Hribar for Plaintiff EMR Residential Properties LLC
mhribar@rutan.com
35. Lawrence A Jacobson for Creditor BKF Engineers
laj@cohenandjacobson.com
36. Stephen M Judson for Petitioning Creditor The Professional Tree Care Co
sjudson@fablaw.com
37. David I Katzen for Interested Party Bethel Island Municipal Improvement District
katzen@ksfirm.com
38. Christopher W Keegan for Creditor SC Master Holdings II LLC
ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com
39. Irene L Kiet for Creditor BNB Engineering, Inc.
ikiet@hkclaw.com
40. Mark J Krone for Creditor Bond Safeguard Insurance Co
mk@amclaw.com
41. Leib M Lerner for Creditor Steiny and Company, Inc.
leib.lerner@alston.com
42. Peter W Lianides for Debtor Palmdale Hills Property, LLC
plianides@winthropcouchot.com, pj@winthropcouchot.com
43. Charles Liu for Debtor Palmdale Hills Property, LLC
cliu@winthropcouchot.com
44. Kerri A Lyman for Attorney Irell & Manella LLP
klyman@irell.com
45. Mariam S Marshall for Creditor RGA Environmental, Inc.
mmarshall@marshallramoslaw.com
46. Robert C Martinez for Creditor TC Construction Company, Inc
rmartinez@mclex.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009
F 9013-3.1

Pg 400 of 409

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,
Debtor(s).

CHAPTER 11

CASE NUMBER 08-17206-ES

47. Hutchison B Meltzer for Creditor Committee Joint Committee of Creditors Holding Unsecured Claims
hmeltzer@wgllp.com
48. Joel S. Miliband for Creditor RBF CONSULTING
jmiliband@rusmiliband.com
49. James M Miller for Debtor Palmdale Hills Property, LLC
jmiller@millerbarondess.com
50. Louis R Miller for Plaintiff Palmdale Hills Property, LLC
smiller@millerbarondess.com
51. Mike D Neue for Trustee Steven Speier
mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
52. Robert Nida for Creditor Kirk Negrete, Inc
Rnida@castlelawoffice.com
53. Sean A Okeefe for Debtor Palmdale Hills Property, LLC
sokeefe@okeefelc.com
54. Robert B Orgel for Creditor Lehman ALI, Inc.
rorgel@pszjlaw.com, rorgel@pszjlaw.com
55. Penelope Parmes for Creditor EMR Residential Properties LLC
pparmes@rutan.com
56. Ronald B Pierce for Creditor Griffith Company
ronald.pierce@sdma.com
57. Raymond A Policar for Creditor Williams+Paddon Architects+Planners, Inc.
hausermouzes@sbcglobal.net
58. Cassandra J Richey for Creditor Patricia I Volkerts, as Trustee, et al
cmartin@pprlaw.net
59. Debra Riley for Interested Party City of Palmdale
driley@allenmatkins.com
60. Martha E Romero for Creditor San Bernardino County Tax Collector
Romero@mromerolawfirm.com
61. William D Schuster for Creditor HD Supply Construction Supply LTD
bills@allieschuster.org
62. Wendy W Smith for Creditor Castaic Union School District
wendy@bindermalter.com
63. Steven M Speier for Trustee Steven Speier
Sspeier@Squarmilner.com, ca85@ecfcbis.com
64. Michael St James for Creditor MBH Architects, Inc.
ecf@stjames-law.com
65. Todd L Turoci for Creditor Philip Dowse
tturoci@aol.com
66. United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov
67. Jason Wallach for Interested Party Courtesy NEF
jwallach@gladstonemichel.com
68. Joshua D Wayser for Other Professional D. E. Shaw & Co., L.P.
joshua.wayser@kattenlaw.com
69. Christopher T Williams for Creditor Danske Bank A/S London Branch
ctwilliams@venable.com, jcontreras@venable.com
70. Marc J Winthrop for Debtor Palmdale Hills Property, LLC
pj@winthropcouchot.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009 **F 9013-3.1**

Pg 401 of 409

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,
Debtor(s).
CHAPTER 11
CASE NUMBER 08-17206-ES

71. David M Wiseblood for Creditor Bethel Island Municipal Improvement District
dwiseblood@seyfarth.com
72. Arnold H Wuhrman for Creditor Wayne Lee
Wuhrman@serenitylls.com
73. Dean A Ziehl for Creditor LV Pacific Point, LLC
dziehl@pszjlaw.com, dziehl@pszjlaw.com

**III. SERVED BY E-MAIL**

(1) counsel for the Voluntary Debtors:
Paul Couchot - pcouchot@winthropcouchot.com
Marc J Winthrop - pj@winthropcouchot.com
Charles Liu - cliu@winthropcouchot.com

(2) counsel for the Trustee Debtors:
William Lobel - wlobel@thelobelfirm.com

(3) counsel for the Voluntary Debtors' Committee:
Alan Friedman - afriedman@irell.com
Kerri A Lyman - klyman@irell.com

(4) counsel for the Trustee Debtors' Committee:
Lei Lei Wang Ekvall - lekvall@wgllp.com
Hutchison B Meltzer - hmeltzer@wgllp.com

(5) Office of the United States Trustee:
Michael Hauser - michael.hauser@usdoj.gov

Louis Miller - smiller@millerbarondess.com
Martin Pritikin – mpritikin@millerbarondess.com
Steven N. Speier (Chapter 11 Trustee, c/o Squar Nilner) - sspeier@squarmilner.com; ca85@ecfcbis.com
Edward Soto - Edward.soto@weil.com
Carrolynn H. G. Callari - ccallari@venable.com
John Sieger - john.sieger@kattenlaw.com
Atty for P. Volkerts - c.martin@pprlaw.net
Atty for Bond Safeguard & Lexon - mea@amclaw.com
Palmdale Hills Property, LLC and its related entities - bcook@suncal.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009* **F 9013-3.1**

## File a Plan:

8:08-bk-17206-ES Palmdale Hills Property, LLC

| Type: bk | Chapter: 11 v | Office: 8 (Santa Ana) |
|---|---|---|
| Assets: y | Judge: ES | Case Flag: JNTADMN, LEAD, Incomplete, DEFER, APPEAL |

**U.S. Bankruptcy Court**

**Central District Of California**

Notice of Electronic Filing

The following transaction was received from Robert B Orgel entered on 10/13/2009 at 11:05 PM PDT and filed on 10/13/2009

**Case Name:** Palmdale Hills Property, LLC
**Case Number:** 8:08-bk-17206-ES
**Document Number:** 711

**Docket Text:**
Amended Disclosure Statement *Amended Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC (RE: related document(s)[568] Disclosure Statement *with Respect to Joint Chapter 11 Plan Proposed by Lehman Lenders). (Orgel, Robert)*

*The following document(s) are associated with this transaction:*

***Document description:****Main Document*
***Original filename:****C:\fakepath\205341v13 Disclosure Statement -- Lehman Creditors.pdf*
***Electronic document Stamp:***
*[STAMP bkecfStamp_ID=1106918562 [Date=10/13/2009] [FileNumber=28930224-0] [0ee8a061ff8600ba50459044de41eb5c6b4d70bb52f1411e7ab4eeab13b21cdf23c57579bdf44cfe7030ae63f047973bc244d23a27d785cc88211a66ebeea943]]*

***8:08-bk-17206-ES Notice will be electronically mailed to:***

*Selia M Acevedo on behalf of Interested Party Courtesy NEF*
*sacevedo@millerbarondess.com*

*Joseph M Adams on behalf of Defendant The City of San Juan Capistrano*
*jadams@sycr.com*

*Raymond H Aver on behalf of Debtor Palmdale Hills Property, LLC*
*ray@averlaw.com*

*James C Bastian on behalf of Creditor ARB, Inc.*

*jbastian@shbllp.com*

*John A Boyd on behalf of Interested Party Oliphant Golf Inc*
*fednotice@tclaw.net*

*Brendt C Butler on behalf of Creditor EMR Residential Properties LLC*
*BButler@rutan.com*

*Carollynn Callari on behalf of Creditor Danske Bank A/S London Branch*
*ccallari@venable.com*

*Dan E Chambers on behalf of Creditor EMR Residential Properties LLC*
*dchambers@jmbm.com*

*Shirley Cho on behalf of Creditor Lehman ALI, Inc.*
*scho@pszjlaw.com*

*Vonn Christenson on behalf of Interested Party Courtesy NEF*
*vrc@paynefears.com*

*Vincent M Coscino on behalf of Petitioning Creditor CST Environmental Inc*
*emurdoch@allenmatkins.com*

*Paul J Couchot on behalf of Debtor ACTON ESTATES, LLC*
*pcouchot@winthropcouchot.com, pj@winthropcouchot.com*

*Jonathan S Dabbieri on behalf of Interested Party Courtesy NEF*
*dabbieri@shlaw.com*

*Ana Damonte on behalf of Creditor Top Grade Construction, Inc.*
*ana.damonte@pillsburylaw.com*

*Melissa Davis on behalf of Creditor City of Orange*
*mdavis@shbllp.com*

*Daniel Denny on behalf of Interested Party Courtesy NEF*
*ddenny@gibsondunn.com*

*Caroline Djang on behalf of Creditor Lehman ALI, Inc.*
*crd@jmbm.com*

*Donald T Dunning on behalf of Creditor Hertz Equipment Rental Corporation*
*ddunning@dunningLaw.com*

*Joseph A Eisenberg on behalf of Creditor Lehman ALI, Inc.*
*jae@jmbm.com*

*Lei Lei Wang Ekvall on behalf of Creditor Committee Joint Committee of Creditors Holding Unsecured Claims*
*lekvall@wgllp.com*

*Richard W Esterkin on behalf of Debtor Palmdale Hills Property, LLC*
*resterkin@morganlewis.com*

*Lisa Hill Fenning on behalf of Defendant Fenway Capital, LLC*
*Lisa.Fenning@aporter.com, Jean.Kellett@aporter.com*

*Marc C Forsythe on behalf of Attorney Robert Goe*
*kmurphy@goeforlaw.com*

*Alan J Friedman on behalf of Attorney Irell & Manella LLP*
*afriedman@irell.com*

*Christian J Gascou on behalf of Creditor Arch Insurance Company*
*cgascou@gascouhopkins.com*

*Robert P Goe on behalf of Attorney Robert Goe*
*kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com*

*Eric D Goldberg on behalf of Interested Party Courtesy NEF*
*egoldberg@stutman.com*

*Kelly C Griffith on behalf of Creditor Bond Safeguard Insurance Co*
*bkemail@harrisbeach.com*

*Asa S Hami on behalf of Debtor Palmdale Hills Property, LLC*
*ahami@morganlewis.com*

*Michael J Hauser on behalf of U.S. Trustee United States Trustee (SA)*
*michael.hauser@usdoj.gov*

*D Edward Hays on behalf of Creditor Philip Dowse*
*ehays@marshackhays.com*

*Michael C Heinrichs on behalf of Interested Party Courtesy NEF*
*mheinrichs@omm.com*

*Harry D. Hochman on behalf of Creditor Lehman ALI, Inc.*
*hhochman@pszjlaw.com, hhochman@pszjlaw.com*

*Michelle Hribar on behalf of Plaintiff EMR Residential Properties LLC*
*mhribar@rutan.com*

*Lawrence A Jacobson on behalf of Creditor BKF Engineers*
*laj@cohenandjacobson.com*

*Stephen M Judson on behalf of Petitioning Creditor The Professional Tree Care Co*
*sjudson@fablaw.com*

*David I Katzen on behalf of Interested Party Bethel Island Municipal Improvement District*
*katzen@ksfirm.com*

*Christopher W Keegan on behalf of Creditor SC Master Holdings II LLC*
*ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com*

*Irene L Kiet on behalf of Creditor BNB Engineering, Inc.*
*ikiet@hkclaw.com*

*Mark J Krone on behalf of Creditor Bond Safeguard Insurance Co*
*mk@amclaw.com*

*Leib M Lerner on behalf of Creditor Steiny and Company, Inc.*
*leib.lerner@alston.com*

*Peter W Lianides on behalf of Debtor Palmdale Hills Property, LLC*
*plianides@winthropcouchot.com, pj@winthropcouchot.com*

*Charles Liu on behalf of Debtor Palmdale Hills Property, LLC*
*cliu@winthropcouchot.com*

*Kerri A Lyman on behalf of Attorney Irell & Manella LLP*
*klyman@irell.com*

*Mariam S Marshall on behalf of Creditor RGA Environmental, Inc.*
*mmarshall@marshallramoslaw.com*

*Robert C Martinez on behalf of Creditor TC Construction Company, Inc*
*rmartinez@mclex.com*

*Hutchison B Meltzer on behalf of Creditor Committee Joint Committee of Creditors Holding Unsecured Claims*
*hmeltzer@wgllp.com*

*Joel S. Miliband on behalf of Creditor RBF CONSULTING*
*jmiliband@rusmiliband.com*

*James M Miller on behalf of Debtor Palmdale Hills Property, LLC*
*jmiller@millerbarondess.com*

*Louis R Miller on behalf of Plaintiff Palmdale Hills Property, LLC*
*smiller@millerbarondess.com*

*Mike D Neue on behalf of Trustee Steven Speier*
*mneue@thelobelfirm.com, csolorzano@thelobelfirm.com*

*Robert Nida on behalf of Creditor Kirk Negrete, Inc*
*Rnida@castlelawoffice.com*

*Sean A Okeefe on behalf of Debtor Palmdale Hills Property, LLC*
*sokeefe@okeefelc.com*

*Robert B Orgel on behalf of Creditor Lehman ALI, Inc.*
*rorgel@pszjlaw.com, rorgel@pszjlaw.com*

*Penelope Parmes on behalf of Creditor EMR Residential Properties LLC*
*pparmes@rutan.com*

*Ronald B Pierce on behalf of Creditor Griffith Company*
*ronald.pierce@sdma.com*

*Raymond A Policar on behalf of Creditor Williams+Paddon Architects+Planners, Inc.*
*hausermouzes@sbcglobal.net*

*Cassandra J Richey on behalf of Creditor Patricia I Volkerts, as Trustee, et al*
*cmartin@pprlaw.net*

*Debra Riley on behalf of Interested Party City of Palmdale*
*driley@allenmatkins.com*

*Martha E Romero on behalf of Creditor San Bernardino County Tax Collector*
*Romero@mromerolawfirm.com*

*William D Schuster on behalf of Creditor HD Supply Construction Supply LTD*
*bills@allieschuster.org*

*Wendy W Smith on behalf of Creditor Castaic Union School District*
*wendy@bindermalter.com*

*Steven M Speier on behalf of Trustee Steven Speier*
*Sspeier@Squarmilner.com, ca85@ecfcbis.com*

*Michael St James on behalf of Creditor MBH Architects, Inc.*
*ecf@stjames-law.com*

*Todd L Turoci on behalf of Creditor Philip Dowse*
*tturoci@aol.com*

*United States Trustee (SA)*
*ustpregion16.sa.ecf@usdoj.gov*

*Jason Wallach on behalf of Interested Party Courtesy NEF*
*jwallach@gladstonemichel.com*

*Joshua D Wayser on behalf of Other Professional D. E. Shaw & Co., L.P.*
*joshua.wayser@kattenlaw.com*

*Christopher T Williams on behalf of Creditor Danske Bank A/S London Branch*
*ctwilliams@venable.com, jcontreras@venable.com*

*Marc J Winthrop on behalf of Debtor Palmdale Hills Property, LLC*
*pj@winthropcouchot.com*

*David M Wiseblood on behalf of Creditor Bethel Island Municipal Improvement District*
*dwiseblood@seyfarth.com*

*Arnold H Wuhrman on behalf of Creditor Wayne Lee*
*Wuhrman@serenitylls.com*

*Dean A Ziehl on behalf of Creditor LV Pacific Point, LLC*
*dziehl@pszjlaw.com, dziehl@pszjlaw.com*

***8:08-bk-17206-ES Notice will not be electronically mailed to:***

*Tab L K Artis on behalf of Creditor Desert Pipeline, Inc.*
*301 N Lake Ave 7th Fl*
*Pasadena, CA 91101*

*Shaaron A Bangs on behalf of Defendant Rockey Murata Landscaping, Inc.*
*Crawford & Bangs*
*1290 E Center Ct Dr*
*Covina, CA 91724*

*William G Bissell on behalf of Creditor Boudreau Pipeline Corporation*
*110 Newport Ctr Dr Ste 200*
*Newport Beach, CA 92660*

*William Bissell on behalf of Defendant Boudreau Pipeline Corporation*
*110 Newport Center Dr Ste 200*
*Newport Beach, CA 92660*

*John W Busby on behalf of Creditor Marques Pipeline, Inc.*
*251 Lafayette Circle Ste 350*
*Lafayette, CA 94549*

*Wayne W Call on behalf of Creditor Bova Contracting Corporation*
*Call, Jensen & Ferrell*
*610 Newport Ctr Dr Ste 700*
*Newport Beach, CA 92660*

*Brent S Clemmer on behalf of Creditor MSA Consulting, Inc.*
*Slovak Baron & Empey LLP*
*1800 E Tahquitz Cyn Wy*
*Palm Springs, CA 92262*

*Adrianna M Corrado on behalf of Defendant Orange County Striping Service, Inc.*
*Lanak & Hanna*
*400 N Tustin Ave Ste 120*
*Santa Ana, CA 92705-3815*

*Donald B Devirian on behalf of Defendant ALL AMERICAN ASPHALT*
*Devirian & Shinmoto*
*11400 W Olympic Blvd Ste 200*
*Los Angeles, CA 90064*

*Fenway Capital, LLC*

*c/o John E. Schreiber*
*Dewey & LeBouef LLP*
*333 S. Grand Avenue, 26th Fl.*
*Los Angeles, CA 90071*

*Steven M Garber on behalf of Creditor Park West Landscape, Inc*
*1901 Ave Of The Stars #1100*
*Los Angeles, CA 90067*

*Stanley Haren on behalf of Defendant Sierra Cascade Construction, Inc.*
*Gill & Baldwin*
*130 N Baldwin Blvd #405*
*Glendale, CA 91203*

*William R Hart on behalf of Defendant BNB Engineering, Inc.*
*Hart King & Coldren*
*200 Sandpointe Fourth Fl*
*Santa Ana, CA 92707*

*Jonathan M Hoff on behalf of Interested Party Joint Provisional Liquidators of Lehman RE Ltd*
*Cadwalader, Wickersham & Taft LLP*
*One World Financial Center*
*New York, NY 10281*

*Andrew C Kienle on behalf of Defendant BNB Engineering, Inc.*
*200 Sandpointe, 4th Fl*
*Santa Ana, CA 92707*

*Vivian Le on behalf of Creditor WEC Corporation*
*Gary R King & Associates*
*30950 Rancho Viejo Rd Ste 155*
*San Juan Capistrano, CA 92675*

*Michael D. May on behalf of Defendant RJ Noble Co.*
*250 W First St, Ste 256*
*Claremont, CA 91711*

*Mark E McKane on behalf of Creditor SC Master Holdings II LLC*
*Kirkland & Ellis LLP*
*555 California St*
*San Francisco, CA 94104*

*Louis R Miller on behalf of Plaintiff Acton Estates LLC*
*1999 Ave of the Star Ste 1000*
*Los Angeles, CA 90067*

*Gerald W Mouzis on behalf of Creditor Hillcrest Contracting, Inc.*
*The Mouzis Law Firm APC*
*13681 Newport Ave Ste 8-605*
*Tustin, CA 92680*

*Richard Pachulski on behalf of Creditor Lehman ALI, Inc.*
*Pachulski Stang Ziehl & Jones LLP*
*10100 Santa Monica Bl Ste 1100*
*Los Angeles, CA 90067-4003*

*Martin Pritikin on behalf of Debtor Palmdale Hills Property, LLC*
*Miller Barondess, LLP*
*1999 Avenue of the Stars, Ste 1000*
*Los Angeles, CA 90067*

*Raymond D Scott on behalf of Defendant Kip Incorporated*
*1835 W Orangewood Ave Ste 255*
*Orange, CA 92868*

*Kimberly A Soyer on behalf of Defendant Marques Pipeline, Inc.*
*251 Lafayette Cir, Ste 350*
*Lafayette, CA 94549*

*Steven M Speier*
*4100 Newport Place 3rd Floor*
*Newport Beach, CA 92660*

*Joseph L Strohman on behalf of Creditor SME Construction, Inc*
*Ferguson Case Orr Paterson LLP*
*1050 S Kimball Rd*
*Ventura, CA 93004*

*Theresa Crawford Tate on behalf of Defendant Chino Grading, Inc.*
*Crawford & Bangs LLP*
*1290 E Center Crt Dr*
*Covina, CA 91724*

*Robert S Throckmorton on behalf of Creditor Paula Cunningham*
*Throckmorton, Beckstrom & Tomassian, LLP*
*2 Corporate Park, Ste 210*
*Irvine, CA 92606-5115*

*Weiland Golden Smiley Wang Ekvall & Strok, LLP*
*650 Town Center Dr Ste 950*
*Costa Mesa, CA 92626*

*Douglas F Welebir on behalf of Creditor Nancy and John Probst*
*Welebir Tierney & Weck*
*2068 Orange Tree Ln Ste 215*
*Redlands, CA 92374*