UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS, INC., *et al.*,

Debtor.

Chapter 11 Case No. 08-13555
(JMP) (Jointly Administered)

VEYANCE TECHNOLOGIES, INC.,

Plaintiff,

-v-

LEHMAN BROTHERS SPECIAL
FINANCING, INC.

Defendant.

Adv. Proc. No. 09-_____

JURY TRIAL DEMANDED

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff, Veyance Technologies, Inc. ("Veyance"), by its undersigned attorneys,

Latham & Watkins LLP, for its Complaint for Declaratory Judgment and Injunctive Relief,

pursuant to 28 U.S.C. §§ 157[1] and 1334, 11 U.S.C. § 105, and Federal Rule of Bankruptcy

Procedure 7001, alleges upon knowledge with respect to itself and its own acts, and upon

information and belief as to all other matters, as follows:

---

[1] Pursuant to its Motion to Withdraw the Reference filed contemporaneously herewith,
Veyance maintains that this Complaint must be heard in the District Court for the
Southern District of New York, pursuant to 28 U.S.C. § 157 and *N. Pipeline Constr. Co.
v. Marathon Pipe Line Co. et al.*, 458 U.S. 50 (1984), and thus does not consent to
jurisdiction in this Court.

## INTRODUCTION

1.      Veyance brings this action seeking a declaratory judgment that no contract

exists between Veyance and Lehman Brothers Special Financing, Inc. ("LBSF") regarding a

potential interest rate swap transaction that was unsuccessfully negotiated over the course of the

spring and summer of 2008.  The language of the unsigned draft contract (the "Draft

Confirmation") at issue required that it be executed and delivered in order to constitute a legally

valid and binding obligation.  Although LBSF executed the Draft Confirmation, Veyance never

did, and is therefore not bound by its terms.

2.      Veyance also seeks preliminary and permanent injunctive relief to prevent

LBSF from declaring an event of default under the terms of the Draft Confirmation or any

related transaction.  The first payment under the Draft Confirmation would be due on December

11, 2009.  Veyance believes that it is under no obligation to make this payment because there is

no enforceable contract, and accordingly anticipates moving for a preliminary injunction as soon

as its motion to withdraw the reference is decided.

## PARTIES

3.      Plaintiff Veyance is a company organized under the laws of Delaware

with its principal place of business at 703 S. Cleveland Massillon Road, Fairlawn, Ohio.

4.      Upon information and belief, LBSF is a corporation organized under the

laws of the state of Delaware, and has its principal place of business at 1271 Avenue of the

Americas, 35th Floor, New York, New York, 10020.  LBSF filed a petition under chapter 11 of

the Bankruptcy Code on October 3, 2008, and is currently operating its business as a debtor in

possession.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and Federal Rule of Bankruptcy Procedure 7001(7) and (9).  Venue is proper

before this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

6.      Veyance manufactures and sells Goodyear Engineered Products, including

industrial and hydraulic hose and fittings, automotive products, conveyor belt, power

transmission products, air springs and rubber track.

7.      In early 2008, Veyance and LBSF began discussing economic terms of an

interest-rate swap transaction.  Veyance, as a manufacturer of automotive and other products, is

not a regular participant in the interest-rate swap market.  This was the first time that Veyance

had dealt with LBSF regarding a swap transaction.

8.      The parties participated in a telephone call on May 16, 2008, during which

they agreed on certain economic terms for the proposed swap.  There were, however, many other

material terms that remained subject to negotiations after the May 16 call.

9.      Upon information and belief, LBSF drafted the Draft Confirmation.

10.     On May 22, 2008, William Cardinale, who upon information and belief is

a member of LBSF's legal department, emailed the Draft Confirmation for the proposed swap to

Benjamin Schlater, Veyance's Treasurer, requesting that he "review and have [it] signed at [his]

earliest convenience." (A copy of the Draft Confirmation is attached hereto as Exhibit A.)

11.     Knowing that Veyance had not yet executed the Draft Confirmation, and

that it was not effective until signed, Jenny Suh, who upon information and belief is a member of

LBSF's legal department, emailed Mr. Schlater on July 7, 2008, asking him to review, sign and return the Draft Confirmation to LBSF.

12.     On July 16, 2008, Kiery Tuttle, who upon information and belief is an employee of LBSF, sent an email to Veyance's consultant Mr. Dennis Rosenfeld advising that "[t]o move ahead with Veyance, we need to execute the confirm from the trade done in May. . . . Could you please work with the client to get this executed?"

13.     In late July 2008, Veyance involved outside counsel, Latham & Watkins LLP, to review and comment on the terms of the Draft Confirmation, and to assist in negotiating certain terms with LBSF. Outside counsel subsequently identified material issues in the Draft Confirmation that were detrimental to Veyance's interest.

14.     On September 3, 2008, Carlos Arango, who upon information and belief is an employee of LBSF, sent an email to Mr. Rosenfeld advising that LBSF had obtained credit approval to enter into additional swap transactions with Veyance, but that the approval was conditioned upon Veyance's execution of the Draft Confirmation.

15.     Throughout July, August, and early September 2008, Veyance, its counsel, and LBSF engaged in negotiations regarding multiple material terms in the Draft Confirmation.

16.     The open terms being negotiated were material and important to Veyance. They included provisions that could have given LBSF veto power over certain provisions in or amendments to Veyance's first lien credit documents, which are a major portion of its capital structure. Another disputed provision would have required Veyance to obtain LBSF's prior written consent before releasing collateral, limiting the liabilities of certain guarantors, or amending certain provisions of the loan documents. Finally, one of the open provisions would have prohibited any of Veyance's affiliates, including its equity holders and affiliates thereof,

from acquiring more than a fifty percent interest in any of Veyance's senior secured loans under its first lien credit agreement. Given Veyance's capital structure and the requirements of certain of its affiliates, Veyance would not have agreed to a transaction with these terms, and did not do so. Veyance would have rather dealt with another party, and paid a higher rate for the swap if necessary, to avoid these terms.

17. The parties never arrived at a final agreement regarding the outstanding terms in the Draft Confirmation, and accordingly Veyance never executed the Draft Confirmation.

18. By its language, the Draft Confirmation requires "due execution and delivery" to "constitute a legally valid and binding obligation." (Ex. A at 1, 7.)

19. Upon information and belief, agreements to enter into interest rate swap transactions of this size are typically reduced to writing.

20. In a letter dated November 24, 2008, Veyance informed LBSF that, because the parties had not agreed upon terms despite good faith efforts, Veyance no longer had an interest in entering into or continuing negotiations regarding the proposed swap.

21. In a letter dated April 6, 2009, LBSF advised that it believed that the parties had "agreed upon the material economic terms with respect to the [proposed] Transaction . . . ." LBSF repeated its position in a second letter to Veyance, dated April 28, 2009.

22. In a letter dated August 27, 2009, Veyance reiterated to LBSF that the proposed swap was never consummated because "many of the legal and other non-economic provisions" of the Draft Confirmation "were not agreed to," and "no final agreement was ever

5

reached." Latham & Watkins then sent a letter to LBSF dated September 10, 2009, confirming Veyance's position.

23. The effective date for the Draft Confirmation was September 11, 2009. The terms of the Draft Confirmation, if it had been effective, would have called for LBSF to set an initial 3 month LIBOR interest rate and to give notice to Veyance on September 11, 2009, specifying the 3 month LIBOR interest rate, the payment date, the amount of the payment due, and reasonable details as to how the amount was determined. LBSF did not do so.

24. The Draft Confirmation, if it had been effective, would have dictated that the first payment under the proposed swap be made on December 11, 2009.

25. On October 7, 2009, LBSF filed a motion for an entry of order pursuant to Bankruptcy Rule 2004 authorizing discovery, seeking to obtain information from Veyance regarding the Draft Confirmation.

26. LBSF has refused to agree not to declare an event of default until the Court can resolve whether a contract exists. If LBSF declares an event of default under the Draft Confirmation, and if the Draft Confirmation is in fact a binding contract, Veyance would be irreparably harmed because it will be required to pay the entire net present value of the swap, which could be many millions of dollars, and which would be detrimental to the Company's cashflow and liquidity position. In addition, the Draft Confirmation contains provisions which Veyance never agreed to and that Veyance was actively negotiating with LBSF, which would also interfere with its regular business functions.

## COUNT I

### *(Declaratory Judgment)*

27.    Veyance repeats and re-alleges the allegations from the foregoing paragraphs of the Complaint as if fully set forth herein.

28.    There is a ripe dispute among the parties that presents a case or controversy requiring judicial action.

29.    There was never a meeting of the minds between Veyance and LBSF regarding the terms of the Draft Confirmation, as demonstrated by the allegations in this Complaint.  The terms of the Draft Confirmation required that both parties execute it before it became a valid and binding agreement.  Veyance never executed the Draft Confirmation.

30.    Accordingly, Veyance is entitled to a declaratory judgment that no binding contract exists between Veyance and LBSF, and that it is not obligated to make any payments to LBSF.

## DEMAND FOR JURY TRIAL

31.    Pursuant to Federal Rule of Civil Procedure 38, Veyance hereby demands a jury trial on its claim for declaratory judgment.

## PRAYER FOR RELIEF

WHEREFORE, Veyance demands the following judgment against LBSF:

a) declaring that no valid agreement arose out of the failed 2008 negotiations between Veyance and LBSF; and

b) ordering preliminary and permanent injunctive relief to prevent LBSF from declaring an event of default regarding the Draft Confirmation or any related transaction.

Dated: October 16, 2009
New York, New York

Respectfully Submitted,

LATHAM & WATKINS LLP

s/ Christopher Harris
Christopher Harris
885 Third Avenue
New York, NY 10022
(212) 906-1200

*Attorneys for Plaintiff Veyance Technologies, Inc.*

# EXHIBIT A

# LEHMAN BROTHERS

## Transaction

Date:       22 May, 2008

To:         VEYANCE TECHNOLOGIES, INC.
            Attention:    Documentation Unit

From:       Lehman Brothers Special Financing Inc.
            Confirmations Group
            Facsimile:    (+1) 646-885-9551 (United States of America)
            Telephone:    William Cardinale (646-333-9506)

Ref. Numbers:   Risk ID: 1936711L / Effort ID: N2096338 / Global Deal ID: 3837957

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and VEYANCE TECHNOLOGIES, INC. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 16 May, 2008 |
| Effective Date: | 11 September, 2009 |
| Termination Date: | 11 September, 2011, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 100,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 11th calendar day of each March, June, September, and December, from and including 11 December, 2009 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 3 months. |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 11th calendar day of each March, June, September, and December, from and including 11 December, 2009 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.025% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:** London; New York

**Additional Provisions:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these Additional Provisions):

1. The **"Cross Default"** provisions of <u>Section 5(a)(vi)</u> of the ISDA Form will apply.

   **"Threshold Amount"** means the lesser of (i) USD 100 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and USD 25 million, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

2. The **"Credit Event Upon Merger"** provisions of <u>Section 5(b)(iv)</u> of the ISDA Form will apply to Party A and Party B, provided, that the term "materially weaker" means, with respect to Party A, that Holdings or the resulting, surviving or transferee entity of Holdings fails to maintain a long-term senior, unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- from Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc. ("S&P").

3. **Additional Termination Events.** Each of the following shall constitute an Additional Termination Event:

   (i) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Confirmation or the Credit Support Documents as unsecured indebtedness, <u>or</u> (5) the obligations and liabilities of Party B and its Credit Support Providers under this Confirmation and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans (and, for the avoidance of doubt, if there are multiple tranches of Loans, the most senior tranche) under the Loan Documents. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

   (ii) **Financial Covenants.** At any time Party B fails to comply with any of the Financial Condition Covenants (A) set forth in Section 7.1 of the Credit Agreement as of the date of this Transaction or (B) of any and all other financial covenants added to the Credit Agreement at any time in the future. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

   (iii) **Change of Control.** A Change of Control (as defined in the Credit Agreement as of July 31, 2007) has occurred. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

   (iv) **Failure to deliver an ISDA Master Agreement.** Party B fails to execute and deliver to Party A the Agreement within 60 calendar days following the Trade

Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

4. **Additional Events of Default.** Each of the Events of Default (as such term is defined in the Credit Agreement) (together with the relevant provisions of any other Sections or Sections to which they refer, including definitions) of the Credit Agreement is hereby incorporated herein by this reference and made part of this Confirmation to the same extent as if the Credit Agreement were set forth in full herein, provided that any reference in such Events of Default to the "Lenders" shall be deemed to be a reference to Party A. The occurrence at any time of any such Event of Default under the Credit Agreement, will constitute an Event of Default with respect to Party B for the purposes of Section 5(a) of the Agreement. If for any reason Party A, or an affiliate of Party A, ceases to remain a party to such Credit Agreement or if such Credit Agreement should for any reason terminate or if Party A or an affiliate of Party A shall object to any amendment to the Credit Agreement, such Events of Default will be incorporated herein as they existed immediately prior to such event. If all of the obligations of Party B under such Credit Agreement have been satisfied or discharged in full and have not been replaced or succeeded by any similar obligations, then such Events of Default shall cease to apply to Party B hereunder.

5. **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times until the termination of this Transaction that:

(1)    **Hedge Agreement.** (i) This Transaction has been, and will be, entered into and will remain in the ordinary course of business and not for the speculative purposes, (ii) Party A is one of the Secured Parties, (iii) this Transaction is a Hedge Agreement and Specified Hedge Agreement and (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Transaction and the relevant Credit Support Documents constitute the Obligations of the Loan Parties and rank pari passu with and equal in right and priority of payment with the Loans (and, for the avoidance of doubt, if there are multiple tranches of Loans, the most senior tranche) under the Loan Documents.

(2)    **Contractual Obligations.** This Transaction is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Transaction does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof.

6. **Amendments to Loan Documents.** Party B agrees and covenants to Party A that Party B will not request or agree to any amendment, modification, addition, waiver or consent to or under any of the Loan Documents without Party A's prior written consent (such consent not to be unreasonably withheld) if such amendment, modification, addition, waiver or consent could have a materially adverse effect on Party A's rights under this Transaction or Party B's ability to comply with the terms of this Transaction or to perform under this Transaction.

7. **Additional Definitions.** Section 14 of the ISDA Form is hereby amended by adding the following definitions in their appropriate alphabetical order:

"Collateral" shall have the meaning assigned to such term in the Loan Documents.

"Contractual Obligation" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Loan Documents).

"Credit Agreement" means the First Lien Credit Agreement, dated as of July 31, 2007 (as amended, supplemented, waived or otherwise modified from time to time), by and among EDP Holdings, Inc., Veyance Technologies, Inc., as borrower, the Lenders from time to time party thereto, Lehman Commercial Paper Inc., as administrative agent and collateral agent, J.P.Morgan Securities Inc., as syndication agent, Goldman Sachs Credit Partners L.P., a Documentation Agent and Lehman Brothers Inc., J.P. Morgan Securities Inc., and Goldman Sachs Credit Partners L.P., as joint lead arrangers and joint bookrunners.

"Credit Support Documents" means, with respect to Party B, the First Lien Loan Documents as defined in the Credit Agreement.

"Credit Support Provider" means, with respect to Party B, the Guarantors as defined in the Credit Agreement.

"Hedge Agreement" shall have the meaning assigned to such term in the Loan Documents.

"Lien" shall have the meaning assigned to such term in the Credit Agreement.

"Loans" shall have the meaning assigned to such term in the Credit Agreement.

"Loan Documents" shall have the meaning assigned to the term "First Lien Loan Documents" in the Credit Agreement.

"Loan Parties" shall have the meaning assigned to such term in the Credit Agreement.

"Moody's" means Moody's Investor Services, Inc.

"Obligations" shall have the meaning assigned to such term in the Loan Documents.

"Person" shall have the meaning assigned to such term in the Credit Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Secured Parties" shall have the meaning assigned to such term in the Loan Documents.

"Specified Hedge Agreement" shall have the meaning assigned to such term in the Loan Documents

"Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"USD" means United States Dollars.

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |
| Transfer: | Notwithstanding Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Representations: | Section 3 of the ISDA Form is hereby amended by adding the following additional subsection: |
| | Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Waiver of Trial By Jury: | Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

| | |
|---|---|
| Payments on Early Termination: | For the purpose of <u>Section 6(e)</u> of the ISDA Form, Loss and the Second Method will apply; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Netting of Payments: | <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of the ISDA Form will not apply to any Transaction between the parties hereto; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                        Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**    **VEYANCE TECHNOLOGIES, INC.**

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title:  Authorized Signatory

By: _____
Name:
Title: