1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 08-01751

Adv. Case No. 08-01743

Adv. Case No. 09-01054

Adv. Case No. 09-01455

Adv. Case No. 09-01258

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                   Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                   Debtor.

- - - - - - - - - - - - - - - - - - - -x

ALIANT BANK,

               Plaintiff,

       -against-

LEHMAN BROTHERS SPECIAL FINANCING, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - -x

2

1    - - - - - - - - - - - - - - - - - - - -x

2    STATE STREET BANK AND TRUST COMPANY,

3                         Plaintiff,

4             -against-

5    LEHMAN COMMERCIAL PAPER INC.,

6                         Defendant.

7    - - - - - - - - - - - - - - - - - - - -x

8    HANK'S LIVING TRUST,

9                         Plaintiff,

10            -against-

11   LEHMAN BROTHERS OTC DERIVATIVES AND LBHI,

12                        Defendants.

13   - - - - - - - - - - - - - - - - - - - -x

14   BOARD OF EDUCATION, CITY OF CHICAGO,

15                        Plaintiff,

16            -against-

17   LEHMAN BROTHERS SPECIAL FINANCING,

18                        Defendant.

19   - - - - - - - - - - - - - - - - - - - -x

20   NEUBERGER BERMAN,

21                        Plaintiff,

22            -against-

23   PNC BANK, NA, et al.,

24                        Defendants.

25   - - - - - - - - - - - - - - - - - - - -x

3

1          U.S. Bankruptcy Court

2          One Bowling Green

3          New York, New York

4

5          October 14, 2009

6          10:04 AM

7

8    B E F O R E:

9    HON. JAMES M. PECK

10   U.S. BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2      RE: CASE NOS. 08-13555(JMP) and 08-01420(JMP)(SIPA):

3      HEARING re Motion of New York Institute of Finance, Inc. for

4      Relief from the Automatic Stay [Docket No. 5134]

5

6      HEARING re Motion of Garfield County, CO Treasurer for Relief

7      from the Automatic Stay [Docket No. 5208]

8

9      HEARING re Motion of Tobacco Settlement Financing Corporation

10     for Relief from the Automatic Stay [Docket No. 5277]

11

12     HEARING re Debtors' Motion for Entry of an Order Pursuant to

13     Bankruptcy Rule 2004 Authorizing Discovery from Dollar General

14     Corporation [Docket No. 5304]

15

16     HEARING re Debtors' Motion for an Order Enforcing the Automatic

17     Stay and Holding Shinsei Bank in Contempt for Violating the

18     Automatic Stay [Docket No. 4764]

19

20     HEARING re Motion of Lehman Commercial Paper Inc. for

21     Authorization to Purchase FairPoint Participation [Docket No.

22     5199]

23

24

25

5

1

2    HEARING re Presentment of Fourth Supplemental Order Pursuant to

3    Sections 105 and 365 of the Bankruptcy Code to Establish

4    Procedures for the Settlement or Assumption and Assignment of

5    Prepetition Derivative Contracts [Docket No. 5327]

6

7    HEARING re Debtors' Motion for Entry of an Order Pursuant to

8    Bankruptcy Rule 2004 Authorizing Discovery from First Data

9    Corporation [Docket No. 5303]

10

11    HEARING re Motion of Debtor to Compel Performance by AIG CDS,

12    Inc. of Its Obligations Under an Executory Contract and to

13    Enforce the Automatic Stay [Docket No. 4728)

14

15    RE: ADV. CASE NO. 08-01751:

16    PRE-TRIAL CONFERENCE

17

18    RE: ADV. CASE NO. 08-01743:

19    PRE-TRIAL CONFERENCE

20

21    RE: ADV. CASE NO. 09-01054:

22    PRE-TRIAL CONFERENCE

23

24    RE: ADV. CASE NO. 09-01455:

25    PRE-TRIAL CONFERENCE

6

1

2      RE: ADV. CASE NO. 09-01258:

3      PRE-TRIAL CONFERENCE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Transcribed by:  Clara Rubin

25

7

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES, LLP

4         Attorneys for Lehman Brothers Holdings, Inc. and

5          Affiliated Debtors

6         767 Fifth Avenue

7         New York, NY 10153

8

9    BY:   JACQUELINE MARCUS, ESQ.

10        RICHARD W. SLACK, ESQ.

11        RICHARD L. LEVINE, ESQ.

12        ROBERT J. LEMONS, ESQ.

13        DENISE ALVAREZ, ESQ.

14        HOWARD B. COMET, ESQ.

15        HEATHER RENEE SOLOW, ESQ.

16        BRENNAN E. HACKETT, ESQ.

17        RICHARD P. KRASNOW, ESQ. (TELEPHONICALLY)

18

19   WEIL, GOTSHAL & MANGES, LLP

20        Attorneys for Lehman Brothers Holdings, Inc. and

21         Affiliated Debtors

22        1395 Brickell Avenue, Suite 1200

23        Miami, FL 33131

24

25   BY:   ARDITH BRONSON, ESQ.

8

1

2    BINGHAM MCCUTCHEN LLP

3         Attorneys for State Street Bank and Trust Company

4         One Federal Street

5         Boston, MA 02110

6

7    BY:   ANDREW C. PHELAN, ESQ.

8

9

10   BUCHANAN INGERSOLL & ROONEY PC

11        Attorneys for PNC Bank

12        One Oxford Centre

13        301 Grant Street, 20th Floor

14        Pittsburgh, PA 15219

15

16   BY:   STANLEY YORSZ, ESQ.

17

18

19   CLEARY GOTTLIEB STEEN & HAMILTON LLP

20        Attorneys for Barclays Bank/Barclays Capital, Inc.

21        One Liberty Plaza

22        New York, NY 10006

23

24   BY:   LISA M. SCHWEITZER, ESQ.

25        JOEL S. MOSS, ESQ.

9

1

2    DLA PIPER

3          Attorneys for Hank's Living Trust

4          1251 Avenue of the Americas

5          New York, NY 10020

6

7    BY:   STEPHEN P. DAVIDSON, ESQ.

8

9

10   HUGHES HUBBARD & REED LLP

11         Attorneys for the James W. Giddens, SIPA Trustee

12         One Battery Park Plaza

13         New York, NY 10004

14

15   BY:   JEFFREY S. MARGOLIN, ESQ.

16         JEFFREY M. GREILSHEIMER, ESQ.

17

18

19   JONES DAY

20         Special Counsel to Lehman Brothers Special Financing Inc.

21         222 East 41st Street

22         New York, NY 10017

23

24   BY:   AVIVA WARTER SISITSKY, ESQ.

25         JAYANT W. TAMBE, ESQ.

10

1

2     KATTEN MUCHIN ROSENMAN LLP

3           Attorneys for the Board of Education of the City of

4            Chicago

5           575 Madison Avenue

6           New York, NY 10022

7

8     BY:   JEFF J. FRIEDMAN, ESQ.

9

10

11    MILBANK, TWEED, HADLEY & MCCLOY, LLP

12          Attorneys for the Official Committee of

13           Unsecured Creditors

14          One Chase Manhattan Plaza

15          New York, NY 10005

16

17    BY:   EVAN R. FLECK, ESQ.

18          DENNIS C. O'DONNELL, ESQ.

19          DENNIS F. DUNNE, ESQ.

20

21

22

23

24

25

11

1

2    MILBANK, TWEED, HADLEY & MCCLOY, LLP

3         Attorneys for the Official Committee of

4          Unsecured Creditors

5         International Square Building

6         1850 K Street, NW

7         Washington, DC 20006

8

9    BY:   ADRIAN C. AZER, ESQ.

10

11   SHEPPARD MULLIN RICHTER & HAMPTON LLP

12        Attorneys for Norton Gold Fields

13        30 Rockefeller Plaza, 24th Floor

14        New York, NY 10112

15

16   BY:   MICHAEL K. DUNN, ESQ.

17

18   VINSON & ELKINS LLP

19        Attorneys for Shinsei Bank, Limited

20        666 Fifth Avenue, 26th Floor

21        New York, NY 10103

22

23   BY:   J. RONALD TROST, ESQ.

24        DOV KLEINER, ESQ.

25

12

1

2    WILLKIE FARR & GALLAGHER LLP

3         Attorneys for AIG CDS

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:   BRIAN E. O'CONNOR, ESQ.

8         DAN C. KOZUSKO, ESQ.

9

10

11   U.S. DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street, 21st Floor

14        New York, NY 10004

15

16   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

17

18

19   CHAPMAN & CUTLER

20        Attorneys for Creditor, US Bank

21        111 West Monroe Street

22        Chicago, IL 60603

23

24   BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

25        FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)

13

1

2   STUTMAN TREISTER & GLATT

3        Interested Party

4        1901 Avenue of the Stars

5        12th Floor

6        Los Angeles, CA 90067

7

8   BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

9

10   STUTMAN TREISTER & GLATT

11        Attorneys for Interested Party, Elliott Company

12        1901 Avenue of the Stars

13        12th Floor

14        Los Angeles, CA 90067

15

16   BY:   GEORGE WEBSTER II, ESQ. (TELEPHONICALLY)

17

18   STUTMAN TREISTER & GLATT

19        Attorneys for Creditor, Perry Capital

20        1901 Avenue of the Stars

21        12th Floor

22        Los Angeles, CA 90067

23

24   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

25

14

1

2    WHYTE HIRSCHBOECK DUDEK S.C.

3          Attorneys for Creditor, Metavante Corporation

4          555 East Wells Street, Suite 1900

5          Milwaukee, WI 53202

6

7    BY:   BRUCE G. ARNOLD, ESQ. (TELEPHONICALLY)

8

9    GARFIELD COUNTY ATTORNEY'S OFFICE

10          Attorneys for Creditor, Garfield County Treasurer

11          108 8th Street

12          Glenwood Springs, CO 81601

13

14    BY:   DEBBIE QUINN, ESQ. (TELEPHONICALLY)

15

16    BANC OF AMERICA SECURITIES LLC

17          Creditor

18          Charlotte, NC

19

20    BY:   NATALIE FOY (TELEPHONICALLY)

21

22    CITIGROUP

23          Interested Party

24

25    BY:   MARC J. HEIMOWITZ (TELEPHONICALLY)

15

1

2    CREDIT SUISSE FIRST BOSTON

3         Interested Party

4

5    BY:   ANDREW REBAK (TELEPHONICALLY)

6

7

8    THOMSON & REUTERS

9         Interested Party

10

11   BY:   THOMAS HALS (TELEPHONICALLY)

12

13

14   TRICADIA CAPITAL

15        Interested Party

16

17   BY:   STEPHEN GRISANTI (TELEPHONICALLY)

18

19

20   MATT HIGBEE, IN PRO PER/PRO SE (TELEPHONICALLY)

21

22

23   SCOTT HARTMAN (TELEPHONICALLY)

24        For Creditor, Varde Partners

25

16

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          Yes, it's fine, you may stand.  I'm just going to make

4    another one of my announcements about the past lives of my new

5    law clerks.

6          I have two new law clerks who are working in chambers,

7    who started in September.  One used to work at Weil Gotshal,

8    and one used to work at Quinn Emanuel.  I can confirm that

9    neither of them worked on any matters that involve Lehman

10   Brothers, except Harrison Denman tells me that at the very

11   beginning of the case he reviewed some papers but has done

12   nothing substantive since.  I don't view that his preliminary

13   work is material to anything that's before me at this point,

14   and as a result I am allowing both of them to work on Lehman

15   matters.  And because in the case of David Meskov he didn't

16   work on any of the Weil cases that are before me, he is free to

17   work on all of those cases as well.  If anyone has a problem,

18   as I've said at other hearings, please let me know.

19         Please proceed.

20         MS. MARCUS:  Good morning, Your Honor.  Jacqueline

21   Marcus for Lehman Brothers Holdings, Inc. and its affiliated

22   debtors.  Your Honor, the first matter on the agenda this

23   morning is an uncontested matter; it's the motion of New York

24   Institute of Finance for relief from the automatic stay.  No

25   objections were received by the objection deadline.  The amount

17

1    at stake is minimal, and I don't want to waste any more time

2    discussing it.  The debtors have entered into a stipulation and

3    agreed order, which will be submitted to the Court.

4              THE COURT:  Fine.  It's approved.

5              MS. MARCUS:  The second matter, Your Honor, is the

6    motion of Garfield County Treasurer for relief from the

7    automatic stay.  This involves -- this matter is proceeding.

8    No objections have been filed.  And the debtors and the

9    Treasurer have entered into a stipulation and agreement subject

10   to the approval of the Court.  This involves the payment of

11   approximately 325,000 dollars of taxes to the relevant

12   authority.  We believe that the property is worth substantially

13   more than the amount of the taxes, and we believe that payment

14   will stop the accrual of interest under the applicable state

15   taxing regulations, and therefore we submit that payment is

16   appropriate and we'd like authority to go forward and make the

17   payment.

18             THE COURT:  You have that authority.

19             MS. MARCUS:  Thank you, Your Honor.  The next motion

20   is the motion of Tobacco Settlement Financing Corporation for

21   relief from the automatic stay.  This is a motion in which the

22   Tobacco Settlement Financing Corporation moved to compel the

23   debtors to assume or reject two reserve fund agreements.  The

24   debtors have determined to reject both agreements.  No

25   objections to the requested relief have been filed, and we'd

18

1   ask that the Court approve the debtors' rejection of those

2   agreements.

3          THE COURT:  That is approved.

4          MS. MARCUS:  Thank you, Your Honor.  The next matter

5   will be handled by my partner Mr. Slack.

6          MR. SLACK:  Good morning, Your Honor.  Richard Slack

7   from Weil Gotshal.  Item number 4 is a Rule 2004 motion.  We've

8   been in contact with Dollar General.  We have an agreement and

9   there has been consent to the order.  We have an order to hand

10  up which is consistent with the orders Your Honor has signed in

11  a number of the other 2004 matters that we've brought with

12  counterparties.  So with that, Your Honor, we would ask that

13  you approve the entry of a 2004 order in that matter.

14         THE COURT:  That's approved as a consensual order.

15         MR. SLACK:  Your Honor, I want to take out of order

16  number 8, which was on the contested matters.  And there has

17  been an opposition filed; that was our 2004 motion against

18  First Data Corporation.  We've also been in contact with

19  counsel for First Data over the last twenty-four hours, and

20  that matter has also been resolved.

21         THE COURT:  Good.

22         MR. SLACK:  And First Data has now consented to the

23  entry of the order that we submitted to the Court.  I don't

24  believe that anyone from First Data is going to appear, though

25  I guess I would ask, if somebody's here, to confirm that.

19

1    But --

2            THE COURT:  Well, why don't I ask?

3            MR. SLACK:  What?

4            THE COURT:  Is there anyone here from First Data or on

5    behalf of First Data?

6            I guess they decided it wasn't worth the trip because

7    they reached an agreement with you.

8            MR. SLACK:  I think that's right, Your Honor.  That

9    was my understanding.  I just wanted to make sure.  So item

10   number 8 is now essentially an uncontested matter, and similar

11   to the 2004 motion with Dollar General there's a consented-to

12   order that we would ask Your Honor to approve.

13           THE COURT:  That's approved.

14           MS. MARCUS:  Turning to the contested matters, Your

15   Honor, number 5 is the debtor's motion for an order enforcing

16   the automatic stay and holding Shinsei Bank in contempt for

17   violating the automatic stay.  Richard Krasnow, my partner, is,

18   I believe, on the phone from Europe.

19           Richard, are you there?

20           MR. KRASNOW:  Good morning, Your Honor.  This is

21   Richard Krasnow, Weil, Gotshal & Manges, for the debtors with

22   respect to the Shinsei matter.

23           THE COURT:  And Richard Levine is here as well.

24           MR. LEVINE:  Good morning, Your Honor.

25           THE COURT:  Mr. Krasnow, just out of curiosity, where

20

1    are you?

2        MR. KRASNOW:  I am, Your Honor, in Amsterdam attending

3    the second global protocol meeting.

4        THE COURT:  I'd like to hear more about that another

5    time.

6        All right, I take it you're going to be representing

7    the interests of the debtors as movants in this matter?

8        MR. KRASNOW:  Yes, Your Honor, along with my partner

9    Richard Levine, who is in the courtroom.

10        THE COURT:  How are you going to coordinate?  Is Mr.

11   Levine going to stand up and do the talking, or is he going to

12   stand up and do the talking only if you lateral the ball to

13   him?

14        MR. LEVINE:  The latter, Your Honor.

15        MR. KRASNOW:  We'll --

16        MR. LEVINE:  I think it's really just in case we lose

17   the phone connection with Mr. Krasnow.  I'm here, but Mr.

18   Krasnow otherwise will be handling it.

19        THE COURT:  Okay.

20        Mr. Krasnow, why don't you proceed?  I mean, I've

21   looked at all --

22        MR. KRASNOW:  Well, Your Honor --

23        THE COURT:  -- I've look at all the papers that have

24   been filed, including the controversy surrounding the surreply,

25   and I'm actually in a position to make some fundamental

21

1    statements about how I see this, but I'd be happy to hear

2    whatever you want to present at this point.

3          MR. KRASNOW:  Your Honor, this has been scheduled as a

4    status conference, so we will defer to the Court.

5          THE COURT:  Succinctly put, I believe that Lehman

6    loses this motion.  Having reviewed the papers that have been

7    submitted since the last argument, and giving some thought to

8    the manner in which the proceeding in the Tokyo District Court

9    has proceeded to date and, based upon the affidavits, will

10   proceed in the future, I don't see this as a stay violation.  I

11   can provide a much more detailed ruling if you like and put

12   that on the record, but that is the bottom line.  And if you

13   want to say anything or if you'd like to have me provide my

14   reasoning, I can do that; it will take probably, since it's

15   written out, about fifteen minutes.

16         MR. KRASNOW:  Your Honor, it may be helpful to -- for

17   Your Honor to do that just so we have an understanding and

18   third parties have an understanding as to what may or may not

19   be permissible in connection with foreign proceedings or

20   proceedings outside of the bankruptcy court in New York.

21         THE COURT:  That's fine.

22         Mr. Trost is standing.

23         MR. TROST:  Good morning, Your Honor.  Ronald Trost.

24   I was waiting to identify myself.  We have no reason to ask you

25   to do any more than you've done.

22

1          THE COURT:  All right, well, once again the parties

2    are in conflict and I get to decide what I'm going to do, which

3    is, I will provide a little bit more color on what I've said.

4          First of all, I'm going to deal with the question of

5    Shinsei's filing of a surreply.  I'm satisfied that the

6    surreply was responding to newly raised allegations and, as a

7    result, was appropriate; also, I read it.  So, having read it,

8    it didn't strike me as an inappropriate pleading.  It also

9    helpfully summarized aspects of Mr. Suzuki's affidavit

10   concerning practice and procedure in the Tokyo District Court.

11         As an initial matter, it's appropriate to review the

12   relevant law governing this dispute.  Section 541 of the

13   Bankruptcy Code enumerates the type of property interests that

14   are included in the bankruptcy estate.  As provided in that

15   section, all legal or equitable interests of the debtor in

16   properties as of the commencement of the case constitutes

17   property for purposes of Section 541(a)(1).

18         Upon the filing of a bankruptcy petition, an automatic

19   stay protects property of the estate under Section 541 against

20   attack from creditors.  Most relevant for this case are the

21   protections offered by Section 362(a)(1), which stays the

22   commencement or continuation of a judicial proceeding against

23   the debtor, and Section 362(a)(3), which stays acts to obtain

24   possession of property of the estate or to exercise control

25   over property of the estate.

23

1    In determining whether a creditor's conduct violates

2    the automatic stay, United States bankruptcy courts have

3    differentiated between permissible creditor conduct that is

4    defensive in nature and impermissible creditor conduct that is

5    offensive in nature and therefore sufficiently similar to the

6    prohibited commencement of litigation against the debtor.

7    There is significant case authority that deals with

8    this subject.  One of the cases that has been referenced by

9    both Lehman and Shinsei in this dispute is the decision of my

10   colleague Judge Gonzalez in the Enron matter, which made the

11   offensive/defensive distinction in the context of litigation

12   seeking equitable subordination.  The offensive/defensive

13   dichotomy used in Enron to identify conduct functionally

14   equivalent to the commencement of litigation is inappropriate,

15   in my view, in the context of the present dispute, given the

16   central role in this case of another jurisdiction's legal

17   procedures and substantive law.

18   The offensive/defensive distinction may be a helpful

19   tool to evaluate questionable creditor conduct while balancing

20   the competing policy concerns implicated by Section 362 for

21   United States bankruptcy law purposes, but I do not believe

22   that, given what I have been told in the affidavit submitted is

23   the practice in the Tokyo District Court, that this

24   offensive/defensive distinction should be respected for these

25   purposes.

24

1        One of the things that I noted was the eight-day

2   period which was applicable to the objection procedure in

3   Tokyo, a very, very abbreviated period which, according to one

4   of the affidavits that I read, frequently is not meaningful

5   because so much information is held by third parties.  The

6   distinction between being able to permissibly object to a claim

7   within that eight-day period but impermissibly file a competing

8   plan is not, in my view, a meaningful distinction, at least for

9   purposes of the Tokyo bankruptcy case.

10       I believe that a more appropriate inquiry in light of

11  the central role of Japanese law in this dispute is whether

12  under Japanese law the submission of the Shinsei plan

13  constituted conduct explicitly prohibited by the Bankruptcy

14  Code, specifically, whether the submission of the Shinsei plan

15  constituted the commencement of litigation against LBHI, which

16  would violate the stay under Section 362(a)(1), or the seizure

17  or exercise of control over LBHI property, which would violate

18  the stay under Section 362(a)(3).

19       Whether Shinsei's submission of the Shinsei plan

20  constituted the commencement of litigation forbidden under

21  362(a)(1) requires a brief examination of relevant Japanese

22  law, a subject as to which I have zero expertise.  To that end,

23  a careful review of the Japanese declarations reveals that

24  Shinsei's submission of the Shinsei plan is, under Japanese

25  law, not the commencement of litigation against LBHI forbidden

25

1    under Section 362(a)(1).

2         As explained in the Suzuki declaration, the

3    appropriate legislation in Japan delineates a procedure for

4    discrete litigation akin to adversary proceedings, as the term

5    is used in the United States.  The law there does not deem a

6    creditor's submission of rehabilitation plan to be such an

7    action.  Instead, the submission of competing rehabilitation

8    plans appears to be merely the first step in a somewhat drawn-

9    out and protracted procedure whereby the supervisor and, in

10   turn, the Tokyo District Court evaluate the fairness and

11   reasonableness of competing distribution schemes.  The

12   supervisor then opines as to whether there are grounds to

13   dismiss a proposed plan.  Based upon the supervisor's

14   discretion and judgment, the district court then decides

15   whether to refer a draft plan to creditors for a vote.

16        Shinsei's submission of the Shinsei plan also does not

17   appear to be a hidden attempt to disguise the commencement of

18   litigation against LBHI through the submission of an

19   alternative rehabilitation plan.  According to the Suzuki

20   declaration, it is not unusual for a creditor to contest the

21   classification of a determined claim by submitting a competing

22   rehabilitation plan.  This factor also influences the Court's

23   earlier stated reasoning that the distinction between offensive

24   and defensive action does not appear to be rational in the

25   context of the Japanese proceeding.  This holding honors the

26

1   principles of comity underlying this dispute.  It is axiomatic

2   that United States courts have long recognized the need to

3   respect the sovereignty of proceedings in sister jurisdictions.

4   There are a variety of cases that I can cite to, but there's no

5   need.

6          In this ruling, the Court also affirms principles

7   underlying the cross-border protocol approved by this Court on

8   June 17, 2009.  And it's purely coincidental that Mr. Krasnow

9   is hearing me say this while in Amsterdam attending some

10  meetings that relate to that protocol.  As stated at Section

11  11.2, "Each tribunal shall have sole jurisdiction and power

12  over the conduct of the proceeding in that forum."

13         Nor is Shinsei's submission of the Shinsei plan a

14  seizure or exercise of control over estate property under

15  Section 362(a)(3).  Shinsei's submission of the Shinsei plan is

16  markedly different from the flagrant confiscation of debtor

17  property by creditors which characterizes the various cases

18  relied upon by LBHI.  I'm not going to mention those cases;

19  they're in the papers.

20         The debtors' characterization of Shinsei's submission

21  of the Shinsei plan as the functional equivalent of a seizure

22  or exercise of control over estate property similarly is

23  unpersuasive.  It is true that the Shinsei plan, if ultimately

24  deemed legal by the supervisor and the Tokyo District Court and

25  ratified by creditor vote, would have the effect of causing

27

1   LBHI to recover less on its claim against Sunrise.  It is also

2   true that Shinsei as well as other unsecured creditors would

3   consequently enjoy an enhanced recovery on claims against

4   Sunrise.  But the Shinsei plan's potentially negative impact on

5   LBHI's recovery does not render the equivalent of a seizure of

6   or exercise of control over estate property.  LBHI's right to

7   collect on its claim against Sunrise depends on that claim's

8   amount and priority and being valid under relevant Japanese

9   law.  Case law is replete with examples of permissible creditor

10  actions with actual or potential negative consequences for

11  debtor property.

12          Finally, I want to dispose of certain peripheral

13  arguments made by a variety of other parties.  First, today's

14  ruling is limited to holding that Shinsei's submission of the

15  Shinsei plan does not violate the automatic stay that arose as

16  a result of LBHI's Chapter 11 filing and consequently does not

17  reach the issue of whether the automatic stay extends in this

18  context to protect nondebtor affiliates such as LB Asia.  It

19  appears that it would not because LB Asia is not a debtor, but

20  I make no findings one way or the other as to whether what was

21  done in Tokyo was proper as to LB Asia.

22          Given my reliance on the pleadings and declarations

23  submitted by Shinsei, I similarly do not reach the issue of

24  whether the nonparty objectors have standing to be heard in

25  this dispute.

28

1          As a result of these rulings, there's no basis for

2    finding Shinsei in contempt.  And I will entertain an order

3    denying the motion.

4          MR. KRASNOW:  Thank you, Your Honor.  With the Court's

5    permission, may I be excused for the balance of the hearing?

6    This is Richard Krasnow.

7          THE COURT:  Yes.  You're excused.

8          And Shinsei's counsel is excused as well.

9          MR. KLEINER:  Thank you.

10          MR. TROST:  Thank you.

11          MS. MARCUS:  Your Honor, Jacqueline Marcus again for

12    LBHI.  The next item on the agenda is number 6, the motion of

13    Lehman Commercial Paper Inc. for authorization to purchase the

14    FairPoint participation.  Your Honor, this is a motion by LCPI

15    for authorization to purchase from the VFT (ph.) 2008 Trust a

16    participation in Term Loan A issued by FairPoint

17    Communications.

18          This motion arises out of a settlement with

19    Metropolitan Life Insurance Company which was approved by the

20    Court on May 13th.  Under the terms of the MetLife settlement,

21    if LCPI and MetLife cannot agree as to whether a particular

22    loan should be sold by the trust, and if the outlook of Moody's

23    and Standard & Poor's with respect to that debt is negative,

24    then MetLife can compel a sale of the loan at the prevailing

25    market rate.

29

1          MetLife has requested that LCPI sell the VFT 2008's

2     interest in the FairPoint loan.  Because LCPI believes that the

3     market is undervaluing the FairPoint loan, LCPI would like to

4     purchase the FairPoint participation from VFT 2008.

5          Your Honor, there have been a couple of pleadings

6     filed in response to the motion.  The ad hoc group of Lehman

7     Brothers creditors has filed a statement in support of the

8     motion.  And we have received one objection; it was filed by

9     William Kuntz III as part of his objection to the SunCal

10    motion.  I don't know if Mr. Kuntz is present in court today or

11    by phone.

12         THE COURT:  Let me find out.

13         Is Mr. Kuntz present on the phone or in court?

14         Apparently not.

15         MS. MARCUS:  I'll just address his objection very

16    briefly, Your Honor.  It appears Mr. Kuntz questions the

17    debtors' business judgment underlying the motion.

18         THE COURT:  If I could just interject.  There was a

19    separate hearing that took place in connection with the SunCal

20    matter; I think it was last week.

21         MS. MARCUS:  It was.

22         THE COURT:  And Mr. Kuntz submitted a letter just

23    before the start of that hearing, which was delivered to

24    chambers, indicating that he was going to rely on his papers

25    and not appear in person to press his objection in the SunCal

30

1   matter, which is an entirely different issue.  For those who

2   weren't present, that was a separate motion brought by Lehman

3   Brothers to file a competing plan in the Central District of

4   California relating to the bankruptcy of SunCal.  Mr. Kuntz

5   filed a single objection in writing, which related both to the

6   matter which is now being heard and the SunCal matter.

7        I placed on the record during the course of the SunCal

8   hearing a disposition of his objection, and I am prepared to

9   incorporate that disposition into the record today, after

10  you've completed your remarks, so I don't have to repeat it.

11       MS. MARCUS:  Okay, thank you, Your Honor.  Mr. Kuntz

12  questions the debtors' business judgment underlying the motion.

13  And I failed to mention that the creditors' committee, which is

14  here today, supports the motion.  So we have both the

15  creditors' committee and the ad hoc group supporting the

16  debtors' business judgment here.  I think that speaks volumes

17  for the appropriateness of the debtors' business judgment.

18       Notwithstanding that, we have present in court today

19  Mr. Frank Turner who is in charge of LCPI's commercial and

20  industrial loan portfolio.  And in support of the motion, I am

21  prepared to proffer Mr. Turner's testimony; I think I'll wait

22  on that decision until I hear what the Court's disposition of

23  the SunCal hearing was.

24       THE COURT:  I'm surprised you don't talk to everybody

25  at your office.

31

1        MS. MARCUS:  We try, Your Honor.

2        THE COURT:  It was simply a denial of Mr. Kuntz's

3    objection for a variety of reasons that related to SunCal but,

4    I believe, are also applicable to the matter before the Court.

5    The Kuntz objection did not speak to the specifics of SunCal,

6    nor does it speak to the specifics of the pending motion.

7    Rather, it repeats and reiterates positions previously

8    expressed by Mr. Kuntz in connection with his concerns about

9    the disposition of funds associated with the Grand Union

10   bankruptcy from a number of years ago.

11       I found in my comments, which will speak for

12   themselves, that Mr. Kuntz's objections did not in fact go to

13   the merits of the SunCal competing plan, nor did it go to the

14   merits of what's presently before me.  And so I denied the

15   motions as, in effect, being inapposite -- excuse me, the

16   objection as being inapposite to the motion.  That's what I

17   did.

18       MS. MARCUS:  Okay.  Thank you, Your Honor.

19       THE COURT:  But what I actually did will speak for

20   itself on the record --

21       MS. MARCUS:  Okay.

22       THE COURT:  -- because I don't remember word for word.

23       MS. MARCUS:  I know Mr. Fleck wants to speak on behalf

24   of the committee, and maybe I'll withhold my decision as to

25   whether we proffer the testimony until he's through, if that's

32

1    okay.

2          THE COURT:  Okay.

3          MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

4    Milbank, Tweed, Hadley & McCloy, on behalf of the official

5    committee of unsecured creditors.  As Ms. Marcus stated, the

6    committee does support the relief requested in the motion, but

7    we do view it as an important matter and something the

8    committee would like to address the Court briefly on just for a

9    few points.

10          Your Honor, it's important, from the committee's

11    perspective and in considering this motion, what the debtors

12    are not seeking here.  The debtors are not seeking approval to

13    make an open-market purchase of FairPoint notes.  We think we

14    that's a very different motion; it's asking for a different

15    level of business judgment and authority, and that's not what

16    was requested here.  Instead, it's a preservation of an

17    interest that the debtors have in the securitization trust.

18    Nevertheless, the committee spent considerable time considering

19    the relief, the business judgment and the merits of the

20    proposed transaction; had separate meetings, in fact, with Mr.

21    Turner to talk about the particular credit here and whether it

22    was appropriate -- an appropriate expenditure of estate

23    resources.

24          We do have a protocol, as the Court is aware, for

25    considering these transactions.  We think, given the nature of

33

1    the transaction, it was appropriate to come before the Court,

2    and we respectfully disagree with the debtors' view that this

3    is an ordinary-course transaction.  Notwithstanding that, it's

4    not an open-market purchase.  It is a significant expenditure

5    of estate resources.  Even though it's to preserve an asset, it

6    should be vetted before the Court.  And we're pleased to see

7    that other creditors have also -- we spent time with them, they

8    read the motion and there also was a statement, as Ms. Marcus

9    stated, on behalf of one group of creditors in the case.

10            Your Honor, for the reasons that were set forth in the

11   debtors' motion, and based upon the committee's considered

12   judgment of the relief requested, we do support the relief and

13   the proposed transaction.

14            THE COURT:  Okay, thank you.

15            MR. FLECK:  Thank you.

16            MS. MARCUS:  Your Honor, upon further reflection,

17   unless you want to hear the proffer, I think we'll defer with

18   the proffer and save the Court and everyone else some time.

19            THE COURT:  I don't feel a need to hear the proffer

20   based upon my review of the papers and the supporting statement

21   just given by the creditors' committee, but it's entirely up to

22   you.

23            MS. MARCUS:  Okay.  Thank you, Your Honor.  Based on

24   that, the debtors request that you approve the relief requested

25   in the FairPoint motion.

34

1        THE COURT:  I approve the relief and I overrule the

2   objections, to the extent applicable, filed by Mr. Kuntz.

3        MS. MARCUS:  Thank you, Your Honor.  The next matter

4   will be handled by my partner Mr. Lemons.

5        MR. LEMONS:  Good morning, Your Honor.  Robert Lemons

6   from Weil, Gotshal & Manges, on behalf of the debtors.  Your

7   Honor, I'm here to present a fourth supplemental order,

8   pursuant to Sections 105 and 365 of the Bankruptcy Code, to

9   establish procedures for the settlement or assumption and

10   assignment of pre-petition derivative contracts.

11        This order, Your Honor, would supplement the order

12   that you entered on December 16th, 2008, the established

13   procedures, both for the assumption and assignment of

14   derivative contracts and for the termination -- or the entry by

15   the debtors of termination and settlement agreements with

16   respect to derivative contracts.

17        As Your Honor may recall, originally there were

18   several contracts that were carved out of that December 16th

19   order so that neither the assumption and assignment procedures,

20   nor the termination and settlement procedures, were applicable.

21   The contracts that were carved out were contracts subject to

22   objections of certain parties that had been lodged to our

23   original motion.

24        The debtors have discovered since then that there have

25   been a number of instances where one of the objecting parties

35

1    wished to enter into a termination and settlement agreement or

2    consented to the entry into one by another party.  Because

3    these agreements have been carved out of the order however,

4    we've had to go back and get supplemental orders each time.

5          After having been through this drill a couple of times

6    and dealing with the administrative time and also the

7    uncertainty that creates, particularly in minds of

8    counterparties when we're trying to negotiate these, it seemed

9    like a good decision to us to save the estate's and the Court's

10   time and resources and to reduce this uncertainty by filing the

11   current proposed order.

12         The current order would make the termination and

13   settlement procedures, but not the assumption and assignment

14   procedures, applicable to any currently carved-out contract if

15   the party who objected to that contract's inclusion in the

16   termination and settlement procedures either signs the

17   termination and settlement agreement or consents in writing to

18   it.

19         Your Honor, we think, as I said before, that this will

20   save resources, and importantly, considering the two pleadings

21   filed in respect of this order, really will harm none of the

22   objecting counterparties because, critically, these parties

23   control in their discretion whether the termination and

24   settlement procedures will apply.  If the parties don't want

25   them to apply, they simply don't enter into a termination and

36

1    settlement agreement or they don't consent in writing to the

2    entry into one by another party.

3        Two reservations of rights were filed, Your Honor, by

4    EPCO Holdings and Norton Gold Fields.  Each asserts that it

5    hasn't entered into a termination and settlement agreement,

6    which we don't dispute.  Each also goes further and suggests

7    that this order should not apply to its contracts.  We frankly

8    don't understand that.  I'll let them speak for themselves if

9    they're here, but as I said before, we don't believe that this

10   prejudices them in any way.

11       THE COURT:  Let me find out if they're here.

12       Is anybody here from EPCO or from Norton Gold Fields

13   Limited?

14       MR. DUNN:  Good morning, Your Honor.  Michael Dunn,

15   Sheppard, Mullin, Richter & Hampton, on behalf of Norton Gold

16   Fields.  Your Honor, we do not object to the proposed order.

17   We just wanted to reserve our rights given the high number of

18   January (ph.) remaining objectors and for the avoidance of any

19   doubt.  We have not entered any termination agreements, nor

20   have we consented to any.  And so we simply request that we be

21   excepted from the relief in the proposed order.

22       THE COURT:  As far as I can tell, even if you hadn't

23   filed those papers, you would be excepted from the relief

24   because the relief only applies if you agree to it.

25   Understood?

37

1        MR. DUNN:  Yes.

2        THE COURT:  Okay.

3        MR. DUNN:  Thank you, Your Honor.

4        THE COURT:  That's -- is there anybody here from EPCO?

5        I guess they're standing on their papers.  And the

6    same thing goes for them:  Their papers really didn't add very

7    much to the process, but they are clearly reserving their

8    rights.

9        MR. LEMONS:  So with that, Your Honor, we'd request

10   that you -- respectfully request that you enter the order.

11       THE COURT:  Order will be entered.

12       MR. LEMONS:  Thank you.  The next item, number 9, will

13   actually be handled by co-counsel to the debtors, Jones Day.

14       THE COURT:  Okay.

15       MR. TAMBE:  Good morning, Your Honor.  Jay Tambe from

16   Jones Day, special counsel to Lehman Brothers Special Financing

17   Inc.  This is LBSF's motion to compel performance from a

18   counterparty, AIG CDS, Inc., on a series of credit derivative

19   swap transactions.

20       We filed a motion on August 7th of this year.  There

21   was an objection filed by AIG CDS on October 5.  We filed our

22   reply on October 13.  No other papers have been filed.  I'm

23   authorized by the unsecured creditors' committee to represent

24   that they join in the debtors' relief requested; they support

25   the motion.

38

1          The issues raised are familiar to the Court in large

2     part.  The issues of compelling performance from AIG are, in

3     fact, identical to the issues that were raised and litigated in

4     the context of the Metavante motion.  I don't think there are

5     any new issues that have been raised with respect to whether or

6     not AIG CDS can rely on Section 283 of the master agreement.

7     They have raised arguments; we've addressed those in our reply

8     brief.  I don't believe they substantially change the issues

9     that were before Your Honor when Your Honor decided Metavante.

10          THE COURT:  Well, let me make clear what the -- if I

11    can make this clear, because it's very confusing, the status of

12    the Metavante matter.  That was a bench ruling.  I received

13    today a letter from Weil Gotshal's -- I think it was Mr. Slack,

14    who's here.

15          Mr. Slack, that was your letter, right?

16          MR. SLACK:  It was my letter, Your Honor.

17          THE COURT:  Okay.

18          I received a letter from Mr. Slack, a lengthy one.  I

19    didn't have a chance to read all of it because I was getting

20    ready for today's hearing.  But there is a matter relating to

21    details of the Metavante ruling, now listed for November 19th.

22    I believe Metavante's counsel is also on the phone right now

23    because, based upon the CourtCall list, I saw Mr. Arnold's

24    name.  I'm not asking him to identify himself yet, however.

25          And I have been asked to conduct a chambers conference

39

1   on an expedited basis.  This is not going to be converted into

2   a discussion about the suitability of that conference.  I'm

3   simply mentioning that aspects of the Metavante ruling are very

4   much in flux at the moment.  And so it does not at this moment

5   constitute settled law.

6          Now you can proceed and talk about Metavante --

7          MR. TAMBE:  Okay.

8          THE COURT:  -- to the extent you want to.

9          MR. TAMBE:  Sure, Your Honor.  Thank you.  In response

10  to the motion that was filed on August 7th, we received a

11  letter from AIG CDS in which they stated two reasons why they

12  had failed to perform since September of last year, and the

13  first reason they provided was the bankruptcy filings, first of

14  LBHI and then of LBSF in September and October of last year,

15  and claimed that, pursuant to section 283 of the master

16  agreement, that was a potential event of default which gave

17  them the right to suspend their performance under the master

18  agreement.  That's an issue that was addressed in the Metavante

19  papers.

20         I'm not going to belabor that point but, frankly, they

21  no longer have the benefit of the safe harbor.  The safe harbor

22  simply does not excuse the failure to perform by AIG CDS Inc.

23  They have certain specifically carved-out rights pursuant to

24  the bankruptcy safe harbor to liquidate, terminate and take

25  other actions sufficiently close in time to the filing of the

40

1   bankruptcy petitions; they failed to do so.  In fact, that is a

2   theme that runs through AIG CDS's objection is the notion that

3   somehow it's the debtors who are playing a market timing game

4   here.

5        And if I could sort of reset that discussion a little

6   bit, what AIG CDS had here at the inception of the bankruptcy

7   cases was a right that few other counterparties to executory

8   contracts have:  They had the right to, really, pull the

9   trigger and terminate the swaps.  I suspect the reason they

10  didn't do that is because these contracts were very valuable

11  from the estate's perspective, and a termination of these swap

12  contracts at the inception of the bankruptcy would likely have

13  resulted in a substantial payment being due from AIG CDS to

14  Lehman.  Hence, they are the ones who elected not to exercise a

15  right that was expressly granted to them by Congress, a unique

16  right in some respect, and see what happened in markets.  And

17  to some extent, the markets have helped them.  The value, the

18  intrinsic value of these contracts, on a mark-to-market basis,

19  has shifted more in favor of AIG.  It's still significantly in

20  favor of Lehman but less so than it was at the inception of the

21  cases.

22       But something else has happened during the last

23  thirteen months:  Credit events have occurred.  So, by way of

24  example, General Motors filed for bankruptcy.  Now, General

25  Motors was one of the credits on which AIG had sold protection

41

1    to Lehman.  The bankruptcy of General Motors gave rise to a

2    right by LBSF to demand a credit protection payment from AIG,

3    and that is what we did this summer, on a total of eight names

4    on which credit protection had been sold, both by Lehman to AIG

5    and by AIG to Lehman, were the subject of credit events.  We

6    sent credit event notices; we said amounts were due and paying

7    on a net basis.

8         So, giving AIG the benefit of every missed premium

9    payment over the last thirteen months, they are still a net

10   obligee to Lehman.  And on that net basis, they are

11   indistinguishable from Metavante.  That was what was happening

12   in Metavante on a periodic basis is there were two streams of

13   payments that were being swapped, and when you swap those two

14   streams of payment, on each payment date the net payment was

15   due from Metavante to Lehman.

16        Similarly here, once we delivered the credit event

17   notices on a net basis, AIG had become a net obligor to Lehman.

18   And under the contract they have an obligation to perform and

19   make that payment to us, and under bankruptcy law we have the

20   right with respect to these executory contracts to seek

21   performance from AIG on that basis.

22        In their objection, I don't believe they seriously

23   dispute our right to seek that performance.  They devote much

24   of their objection to the notion that they are entitled to seek

25   and secure adequate assurances from Lehman with respect to

42

1    future performance.

2         Two points on that.  One, as a matter of contract law,

3    there's nothing in the credit default swap agreements that

4    entitles AIG to seek adequate assurances outside of the

5    bankruptcy law concept.  There has been a ruling, I think

6    earlier this year, or perhaps it was last year, Merrill Lynch

7    v. XL -- it's cited in our papers -- where Judge Rakoff found

8    that as a matter of New York law, which governs these

9    contracts, the UCC's concept of demanding and securing adequate

10   assurances has not been extended, it's not likely to be

11   extended by the New York Court of Appeals to credit default

12   swap transactions, they're not the sale of goods.

13        Once you get into the bankruptcy context, what right

14   do they have to seek adequate assurances from the estate at a

15   stage when the contract has neither been assumed nor rejected?

16   We're in this gap period.  We have assured them that in the

17   future, if we ever seek performance if there are additional

18   credits events in the future, we'll do so and on that basis.

19   So this is not a situation where we are refusing to pay premium

20   payments and yet demanding full performance from AIG with no

21   compensation to them for the fair services.

22        So just as we have done this summer, we will in the

23   future, on a net basis, demand performance from AIG.  That's

24   all they're entitled to under the bankruptcy law; that's all

25   they should get.  If they impose restrictions on us, if they

43

1    seek from the Court conditions to be imposed under the guise of

2    adequate assurances, we would submit that is an undue

3    impairment on the assets of the estate.

4         Notwithstanding all of that, we have proposed to AIG a

5    way of resolving this, and that was set out in our reply

6    papers, there's several elements to it, a way of resolving this

7    issue, permitting performance to accrue and be paid to the

8    estate as time goes on and giving them some comfort that in the

9    future they would not be left totally exposed to the fact that

10   there are due and unpaid premiums that are accruing.  That

11   proposal was rejected and, hence, we are before Your Honor.

12   What we would ask is that your order be entered, that there be

13   no order entered requiring adequate assurances to be provided

14   by the estate.  And I'm happy to address any questions the

15   Court might have.

16        THE COURT:  I have a very fundamental question, which

17   probably reflects my general lack of familiarity with the way

18   netting works in situations where parties are both purchasers

19   and sellers of credit protection with respect to multiple

20   reference entities.  But I believe that this is not by any

21   stretch of the imagination similar to the simplicity, the

22   relative simplicity, of the Metavante swap agreement, which was

23   a relatively benign interest rate swap.  This is a much more

24   complex set of undertakings between sophisticated financial

25   enterprises that at one time were vibrant to pay each other in

44

1   reference to a whole portfolio of reference entities.  And if I

2   understand this correctly, as to some, LBSF is a purchaser of

3   protection; as to some, LBSF is a seller of protection.  And

4   the same is true on the other side of the coin for AIG.  Do I

5   have it right?

6           MR. TAMBE:  That's exactly right.

7           THE COURT:  I don't see that as directly comparable to

8   Metavante.

9           MR. TAMBE:  If I could address that?

10          THE COURT:  Please.

11          MR. TAMBE:  Yes, these are more complex transactions,

12  but they are based on the same architecture in terms of the

13  swap agreement and the kinds of obligations that are imposed on

14  the two parties. The timing is different in this case than it

15  was in Metavante because you could have a period of time when

16  nothing -- when there are no credit events, when all that

17  happens is that fixed payments accrue, in effect, premium

18  payments.  And there are different options that follow from the

19  contract if there is a failure to make a fixed payment.

20          Outside of the bankruptcy context, if Lehman had

21  failed to make a payment, one of the options, and it would be

22  an option that AIG would have, is to say there's been a failure

23  to pay as a potential event of default, we're going to declare

24  an event of default, there's rules for that -- section 5 of the

25  master agreement -- and we're going to terminate the entire

45

1    agreement, not just that transaction, the entire agreement and

2    we'll divvy up the economics.

3            Alternatively, they could see that failure to pay and

4    say that gives us a basis under 283 -- again, outside of the

5    bankruptcy context -- to suspend our own performance, and we'll

6    do that.  But what happens when the performance that is due

7    from AIG now exceeds the net value of the performance that was

8    due from Lehman?  At that point in time the 283 condition

9    precedent really ceases to exist because what 283 requires is

10   not only that there be an event of default or a potential of

11   default; that it be continuing at the time performance is due.

12   So that's one way in which netting factors into these kinds of

13   credit default swap agreements where you have lots of different

14   reference obligations, lots of different time periods when

15   fixed payments are made.

16           The contract itself does provide for netting within

17   transactions in the master agreement.  So in this case, there

18   are 125 transactions, and what that means is there's 97

19   transactions where we have purchased protection from AIG, and I

20   believe there are 28 where we have sold protection to AIG.

21   Those are individual transactions.  But the master agreement

22   permits us, expressly permits us, to net across those

23   transactions.  The parties could have elected otherwise.  The

24   parties could have said there will be no netting within the

25   master agreement.  That's one of the options we have; that's

46

1    not an option the parties exercised.

2         So, as a matter of contract law, although this is more

3    complicated than Metavante, in effect we have agreed net

4    obligations.  That's how we get to the stage where they become

5    a net obligee.  And once they are a net obligee, they are no

6    different than Metavante.  All the same rules follow from the

7    point in time when they become a net obligee, and that happened

8    this summer.

9         THE COURT:  What is it that happened this summer?

10        MR. TAMBE:  What happened this summer is the total

11   dollar amount of credit protection that they owed us was far in

12   excess of any payments we owed them going back to the

13   bankruptcy filing date.  So if you look -- if you set out all

14   the payments, the fixed payments, the floating payments, you

15   put them on a grid, the net payment is a payment due from AIG

16   to Lehman in the gross amount of nine million dollars.  And

17   once that happens, they are a net obligee and we are -- the

18   potential event of default that might have existed prior to

19   that point in time, by the terms the contract, are no longer

20   a basis not to perform, because they are no longer continuing,

21   because the parties have agreed net.  That's baked into the

22   agreement.

23        THE COURT:  I hear you, and I need to think about that

24   some more.  But I also want to hear from AIG.  Let me -- are

25   you done with your argument?

47

1          MR. TAMBE:  I am, Your Honor.

2          THE COURT:  Okay.

3          MR. TAMBE:  I'm happy to answer any other questions

4     you have.

5          THE COURT:  Okay.

6          Let me hear from AIG.

7          MR. O'CONNOR:  Good morning, Your Honor.  Brian

8     O'Connor from Willkie Farr and Gallagher LLP, on behalf of AIG

9     CDS.  I think where I'd like to start is where you started:  to

10    make the point that this really is not the same case as the

11    Metavante case, which I was not personally involved in.  As

12    Your Honor has pointed out, the Metavante case was a situation

13    in which there was a fairly plain-vanilla interest rate swap

14    with payments going either way depending upon whether the

15    interest rates were higher or lower.  That's not the situation

16    here.  As you've heard, this is a situation where, for the most

17    part, AIG CDS has provided credit protection to Lehman for

18    which it receives a fixed payment on a quarterly basis.

19          Now, also different from Metavante, prior to the

20    bankruptcy filing, Lehman had defaulted on approximately a

21    900,000 dollar payment pre-petition and then has continued not

22    to make any of the regularly scheduled quarterly payments,

23    which I think are about 600,000 dollars or more, through the

24    course of the bankruptcy.

25          And why I say that this is really a different case:

48

1    It seems to me that this is more analogous to an insurance

2    situation.  We don't disagree with the basic principle that

3    this is an executory contract.  We don't disagree that the

4    debtor has time to decide whether to assume or reject; it has

5    not done that yet.  We don't disagree that as the nondebtor

6    party that we have to stand ready, willing and able to perform,

7    yet we can't compel the debtor to perform.

8           But what I think is different about this is -- let me

9    analogize for a moment to as if I was a debtor and I went out

10   and I bought fire insurance for my plant.  And at the time of

11   my bankruptcy filing I had still owed premiums for that fire

12   insurance.  And after the bankruptcy filing, I continued to

13   watch, and I watched to see whether my plant burns down.  And

14   if at the end of the time when I want to -- at the end -- or,

15   excuse me, the expiration of the policy, I then get the chance

16   to decide, just before that, should I assume or reject that

17   contract.  Well, if I see that my plant burned down, I go ahead

18   and I assume the contract, I cure the default by making the

19   payments on the missing premiums.  On the other hand, if I look

20   and I see that my plant hasn't burned down, I reject the

21   contract and I relegate the insurance company to a pre-petition

22   claim.

23          And I think that's what's happening here.  They did

24   not pay a 900,000 dollar premium that was due pre-petition;

25   they haven't made any payments since.  And you've heard Mr.

49

1    Tambe tell you that in the interim what's happened is there

2    have been three or four, four I think, credit default incidents

3    which now have triggered a payment of protection from AIG.  And

4    when they filed the motion, what they said was that all they

5    were willing to do was to say that they would allow us to make

6    a net payment.  So we could subtract the 900,000 dollars and

7    hold the post-petition payments they should have paid to us

8    from the amount that we owed them.  And of course we said to

9    them, well, that doesn't really protect us, down the road we're

10   going to continue with this contract and you'll wait and you'll

11   watch and see again if there are no credit default incidents

12   such that we owe them money.  They'll simply reject the

13   contract at some point and relegate us to a pre-petition claim.

14   On the other hand, as time goes by, if there are more credit

15   defaults such that our obligation becomes higher than their

16   obligation, they'll assume the contract.  And we said, well,

17   you can't do that, you've -- if you want to have the benefit of

18   the insurance post-petition, you've got to pay for it on a

19   current basis as you're required to do.

20          And, for example, if we change the example now and we

21   said -- let's say that I'm the debtor and I have a requirements

22   contract with a supplier, and I go into bankruptcy and I

23   haven't decided yet to assume or reject the contract; I haven't

24   asked the Court to do that, but I say to the supplier I'd like

25   a truckload of widgets, the supplier supplies me with the

50

1    widgets.  I don't say to the supplier, as they've said to us

2    now only in their reply, don't worry about it, now we're going

3    to say that we'll give you an administrative expense claim

4    whether we assume or reject for the missing premiums, and we'll

5    pay you on the effective date of the plan, whenever that might

6    be.  The supplier wouldn't agree to that.  It would be -- the

7    supplier would be entitled to be paid on a current basis.

8          So our issue which I think this comes down to at this

9    point, Your Honor, is, given the fact that in their reply

10   Lehman has now said they are prepared to grant this

11   administrative expense claim, whether they assume or reject,

12   either way, for the premiums that they haven't paid us, the

13   only missing element here is that we're not going to get paid

14   that until the effective date of the plan when we're entitled

15   to current payments now if they want the current protection of

16   our insurance.  And I think that's the only issue that's left

17   before Your Honor:  whether we are entitled to current payment

18   or they're entitled to defer payment to us while they wait and

19   see whether the credit events happen in a way that will require

20   them or make it, you know, desirable for them to actually

21   assume the contract.

22         THE COURT:  Well, let me make sure I understand what

23   you've just said.

24         MR. O'CONNOR:  Yep.

25         THE COURT:  Are you saying that this is not only not

51

1    like Metavante because of the underlying nature of the

2    contractual arrangements but it's also unlike Metavante because

3    the only issue that you believe remains by virtue of the

4    debtors' reply is paying you?

5           MR. O'CONNOR:  That's -- I think that's correct, Your

6    Honor.  And what they want to do now is they have offered in

7    their reply to say that this should be treated as an

8    administrative expense, these unpaid premiums, because what's

9    going to happen now is if you were to order us to make the

10   payment to them, then the next quarter they'll owe us another

11   600,000, and it'll keep on going.

12          THE COURT:  So do I understand your position to be

13   that you are prepared to make the payments that are net due to

14   LBSF provided that you receive a cure of payments that are due

15   AIG?

16          MR. O'CONNOR:  What we had -- yeah, I think that's

17   right.  Let me just see if I can say it as -- what we had said

18   to them is we --

19          THE COURT:  I was just saying it like a bankruptcy

20   lawyer might say it.

21          MR. O'CONNOR:  I'm sorry?

22          THE COURT:  I was just saying it --

23          MR. O'CONNOR:  Yeah.

24          THE COURT:  -- the way a bankruptcy lawyer might say

25   it.

52

1        MR. O'CONNOR:  Well, the only reason that I would

2   differ with the expression "cure" is that I think of cure from

3   the point of view of at some point later on when they decide to

4   assume or reject that they would cure any defaults.  Our point

5   is that if they want to continue to have the benefit of the

6   insurance on an ongoing basis for which they are supposed to be

7   paying us on a quarterly basis, they should be paying us on a

8   quarterly basis; or if they're going to say for some reason

9   that we should be paid an administrative expense claim at the

10  end on the effective date, unless we're given interest on that,

11  we've lost the time value of the money.

12       THE COURT:  Well, what I'm hearing you say is that I

13  don't have to decide this.  What I'm hearing you say is that I

14  should give the parties an opportunity to work out some kind of

15  acceptable compromise based upon the reply papers that were

16  submitted yesterday by Jones Day that, in effect, offered a

17  solution.  Is that correct?

18       MR. O'CONNOR:  Well, Your Honor, we did try to do

19  that.  I did talk to Mr. Tambe.  I called him last night; we

20  spoke this morning.  And I think -- and he can speak for

21  himself, but I think his position is they're not prepared to

22  agree to pay us interest, if we want to litigate that later on

23  when we file our administrative expense claim we can do that,

24  and that was unacceptable to us.

25       THE COURT:  Well, I'm going to make the following

53

1    suggestion, which is that you continue those discussions.  This

2    is a complicated matter in which we're not going to negotiate

3    the outcome in open court.  But what I'm hearing you say, if

4    I'm understanding you correctly, is that AIG is prepared to pay

5    what it owes on a net basis to LBSF provided that it receives

6    either payment, or I'm going to use the term "adequate

7    assurance of payment", in a manner that's acceptable to your

8    client.  And I think you should all talk about that rather than

9    have me adjudicate something that I don't think needs to be

10   adjudicated yet and may not be ripe for it.

11          But I'd like to hear what counsel -- special counsel

12   for LBSF has to say about that suggestion.  Is it worth giving

13   you some time to talk through a possible resolution by

14   agreement?

15          MR. TAMBE:  Your Honor, we're certainly always willing

16   to entertain a reasonable discussion with AIG.  The reply brief

17   wasn't the first time they heard of our proposal.  We spoke

18   with that counsel on Thursday.

19          THE COURT:  It's only the first time I heard of it.

20          MR. TAMBE:  That's right, Your Honor.  And we were

21   trying to address the concerns raised in their objection; we

22   thought we'd addressed the concerns raised in their objection.

23   They are now asking us to commit to something that we were not

24   prepared to commit to at this stage, in part because it's

25   unknown what the future holds in terms of credit event payments

54

1  and premiums that are due and when interest might accrue and at

2  what rates, et cetera.  But we're prepared to have that

3  discussion, Your Honor.

4          THE COURT:  I think you should have that discussion

5  and I think we should adjourn this to the next omnibus hearing

6  date with the hope that you're able to reach a resolution.  And

7  if you haven't reached a resolution, we'll deem this to be a

8  status conference as to what happens next with regard to the

9  motion.

10         I think the experience in the Metavante matter

11 demonstrates that adjudicated outcomes don't necessarily get

12 you to where you want to be as quickly as you want to get

13 there.  And you may use your time more fruitfully between now

14 and November trying to work out a compromise, particularly

15 because I am sensing from the statements of counsel a

16 willingness to work out a business solution.  I think you

17 should have some time to try to get there.  So that's what I'm

18 doing.  I'm not deciding this today.

19         MR. TAMBE:  All right.  Thank you, Your Honor.

20         THE COURT:  But I'm encouraging you to try to work

21 something out.

22         MR. TAMBE:  And we will do so.

23         THE COURT:  Great.

24         MR. TAMBE:  Thank you.

25         MR. O'CONNOR:  Thank you, Your Honor.

55

1      MS. MARCUS:  Jacqueline Marcus again, Your Honor.

2  That brings us to the conclusion of today's calendar.

3      THE COURT:  Okay, we have an afternoon calendar at

4  2 o'clock, so we're adjourned till then.

5      MS. MARCUS:  Thank you.

6      (Recess from 11:07 a.m. until 2 p.m.)

7      THE COURT:  Be seated, please.  Let's proceed with the

8  pre-trials.

9      MR. LEMONS:  Good afternoon, Your Honor.  Robert

10  Lemons on behalf of -- from Weil, Gotshal & Manges, on behalf

11  of Lehman Brothers Holdings Inc. and its affiliated Chapter 11

12  debtors.

13      My colleague, Denise Alvarez, will be addressing the

14  first matter on the agenda, the Aliant Bank v. LBSF adversary.

15      THE COURT:  Okay.

16      MS. ALVAREZ:  Good afternoon, Your Honor.  Denise

17  Alvarez with Weil, Gotshal & Manges, representing the debtors.

18  The debtors want to inform you that Aliant Bank has voluntarily

19  withdrawn its claims in this matter.  We submitted a

20  stipulation of dismissal with prejudice to Your Honor

21  yesterday.  I have a copy of the stipulation if you would like

22  it.

23      THE COURT:  I don't need it if it's already been

24  submitted to chambers.  Thank you.

25      MS. ALVAREZ:  Okay.  I have nothing further.

56

1          THE COURT:  I think they're not all going to be that

2     fast.

3          MR. LEMONS:  We should be so lucky.  My colleague

4     Howard Comet will handle the next matter, which is the pre-

5     trial conference in State Street v. LCPI.

6          THE COURT:  This is as follow-up from the one we had

7     last month.

8          MR. COMET:  Yes, Your Honor.  Howard Comet, Weil,

9     Gotshal & Manges, for the debtors.  Mr. Phelan represents the

10    plaintiff in the adversary proceeding.

11         MR. PHELAN:  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon.  Did you make any progress

13    in a month?  I'm guessing the answer is not really.

14         MR. PHELAN:  The answer -- the answer, Your Honor, is

15    no.  Andrew Phelan on behalf of State Street Bank in this

16    matter.

17         When we were last before the Court, the Court asked

18    that the parties consider whether they want to undertake a

19    mediation in the matter, and if they aren't able to agree to

20    undertake a mediation, that we come to the Court and work on

21    putting together a schedule -- a trial schedule.

22         We were not -- we were unable to reach agreement on

23    going forward with the mediation, largely because, Your Honor,

24    what State Street still needs in order to make the mediation

25    productive is to have discovery that we have not yet received.

57

1   As part of the effort to start the mediation, we asked for

2   certain key information, the same information that we asked for

3   three months ago in our discovery, and have not received it,

4   and received a call at the end of the week or earlier this week

5   that maybe we really don't need that kind of information for

6   the mediation.

7        THE COURT:  Refresh my recollection on something.  As

8   I recall, there was one loan, a thirty-seventh loan in the pool

9   that had a value of something like twenty-five million dollars,

10  although that's just a plug number, and that most of this

11  dispute centers on that loan.  Is that right?

12       MR. PHELAN:  That is correct.  Although there's

13  another dispute brewing with regard to one of the other thirty-

14  six.  But generally, that's correct, Your Honor.

15       THE COURT:  Okay.  My best recollection is that what I

16  was really urging you gentlemen to do was to see if there was a

17  way to come up with a resolution that would avoid a year

18  discovery and unnecessary effort, given that the amount

19  involved isn't trivial but isn't high, relative to the billion

20  dollars in the portfolio.  And are you telling me that there is

21  no way that you can start to move this process forward

22  consensually without taking extensive discovery?

23       MR. PHELAN:  I don't know that extensive discovery

24  would be needed, Your Honor, but let me just lay out a few of

25  the key pieces that we need in order to make that mediation

58

1   productive.  And we served these, Your Honor, with our first

2   set of interrogatory requests and our first set of document

3   requests.

4           The judge recalls apparently a lot of these facts, but

5   let me give you a few thumbnail sketches.  On the eve of the

6   bankruptcy, in fact, after Lehman Brothers, the guarantor under

7   this repo, had filed bankruptcy, the 340 Madison loan was taken

8   out of State Street's pool.  Before that time, in say September

9   1st of 2008, there was a billion dollar repo with a five

10  percent margin requirement.  There were concerns that State

11  Street had expressed to Lehman about the margin and the quality

12  of the assets in that loan as a result of which, on September

13  10th -- dates are important -- the margin was increased from

14  five percent to ten percent.

15          As a result of that, Lehman had to add to that pool

16  two loans, and it did add two loans to that.  During that time

17  period, State Street also had discussions on recorded lines

18  with Lehman representatives in which State Street expressed

19  concern about the quality of the assets in the pool and in

20  which representatives of Lehman said you're right; your pool

21  contains assets that are one cent, nine cents, fifteen cents on

22  the dollar.  Meaning the value -- we took that to mean that the

23  value was much lower than required.

24          We asked, at that point, for a twenty-five percent

25  margin.  And the Lehman folks on the phone, and this is in our

59

1    complaint, committed to getting more assets for the loan.  This

2    was on September 16th.  On that same day -- remember the margin

3    had just been increased to ten percent and two new loans had

4    been added to the pool -- on that same day, two days later --

5    three days later -- Lehman took out the 340 Madison asset.  No

6    notice, no indication of any kind of a margin excess in the

7    pool -- took out that asset.

8         The discovery that we sent was very targeted in this

9    regard.  It asked for the information or explanation of the

10   reason why the 340 Madison loan was taken out of that pool.  It

11   also asked for the valuation methodology that Lehman was using

12   in order to determine whether or not we had 1.1 billion dollars

13   of assets in our pool.

14        With a cover letter on the discovery, I said I

15   realized that Rule 703 -- it's not Rule 7033, but it's a rule

16   of the Bankruptcy Code that says interrogatories asking for

17   explanations, descriptions, normally are not proper with the

18   first round -- but I said, to save time, I am serving this to

19   hone the discovery down to what we need.  The response I got

20   three months ago was, we're not going to answer that discovery.

21   We're not going to answer that interrogatory because it's

22   premature under the bankruptcy rules.

23        Since that time, I have pressed for the same

24   information, explain why -- explain who took the 340 Madison

25   loan out of that pool. The answer is, we can't determine who

60

1   did it or who was involved in that at all.  So I can't even

2   take a deposition of one or two people involved in that

3   decision.  There is the source, or one of the sources of my

4   frustration.

5         We have also asked specifically for an explanation of

6   the methodology used to value the loans in that pool and got a

7   response that they have been unable to determine, as of

8   September 10th, how the loans were valued in that pool.  What

9   we do have are documents that we received for the year and a

10  half that the repo was in effect, called detailed reports; one

11  page documents we got every day that said here's your market

12  value.  The market value was listed as the par value of the

13  outstanding loan with no markdown whatsoever.

14        When we got concerned and asked for more information

15  about those loans, we received another set of records that had

16  a different valuation, still quite high valuations, for those

17  loans.  Our discovery was aimed at getting at where those

18  valuations came from, who made them, and how they were made, so

19  that we can determine whether our loan was converted or stolen

20  from our account, an account where we were the owner of the 340

21  Madison loan.

22        So it's a long way of answering your question, Your

23  Honor, but that is the discovery that we need in order even to

24  determine whether mediation could be useful.  But if we don't

25  get it, mediation cannot be productive, because we're told and

61

1   I'm told by Lehman counsel that he doesn't understand our

2   claims; that it doesn't appear that we have a claim that's not

3   a contract claim anyway.  I said well, I need the facts.  We

4   have alleged enough in the complaint, but we need this

5   discovery in order to move forward.

6           THE COURT:  Okay.  I'll hear from Lehman's counsel.

7           MR. COMET:  Your Honor, we have proposed that we have

8   a mediation, that we focus the discovery in a limited way

9   towards the mediation.  And we've received no response to that

10  except, I guess, today, we finally heard Mr. Phelan say they

11  won't agree to that.  I'd not heard that before today.

12          THE COURT:  I think what I heard him say was he's

13  requested some discovery -- and I'm not going to go into the

14  characterization of whether it's reasonable or unreasonable,

15  focused or broad -- but he's requested some discovery which he

16  thinks is a precursor to a productive mediation.  I'm not

17  commenting yet as to whether or not I think that's a reasonable

18  or unreasonable position.  But have you and he discussed some

19  kind of cooperative approach to discovery during the interval?

20          MR. COMET:  We've discussed it numerous times, Your

21  Honor.  We've sent e-mails, we've sent letters, we've had

22  conference calls.  I sent him an e-mail this morning telling

23  him who -- identifying specific individuals who were involved

24  in valuing the loans.  I entirely disagree with Mr. Phelan's

25  statements about what's occurred in discovery.

62

1          As Your Honor knows, Lehman has some difficulties in

2     the discovery process because almost all the people involved

3     are gone and there's been a complete disruption.  But we --

4     starting before we began this 340 Madison litigation, just to

5     put it in context, Your Honor, we had a long period where we

6     weren't really litigating at all.  We were trying to work out

7     the other thirty-six loans and transfer them.  Then starting a

8     few months ago, we agreed to go forward with the 340 Madison

9     loans.  The 340 Madison loan alone is the only subject of the

10    litigation for the time being.  And we've been trying to deal

11    with discovery on that since then.

12         But even before we did that, I had extensive

13    discussions with Mr. Phelan where I explained the valuation

14    process here and the process of determining which loans would

15    be in this pool and which would not.  And the -- as I think I

16    discussed last time, the agreements here give Lehman -- these

17    are the words of the agreement:  "an unlimited right to

18    withdraw or substitute loans in the pool."  They did that

19    regularly throughout the course of the year or so that this

20    repurchase agreement existed.

21         Throughout most of that time, all State Street ever

22    got was a statement from the custodian of the loans that listed

23    the principal balance value of the loans.  State Street never

24    questioned that.  They were fine with that, because they

25    assumed, in the end, this was really just a lending

63

1    arrangement.  They were providing financing to State Street,

2    and they'd be repaid, and they didn't really need the

3    collateral.

4            Now, when they became concerned, Lehman explained to

5    them that Lehman marked the loans -- sometimes at their

6    principal balance, if they thought it was all going to be

7    repaid, sometimes a lower amount.  They used the marked amount

8    to determine whether they satisfied the billion-dollar

9    requirement or any excess in the pool.

10           On the day the 340 Madison loan was removed, even

11   after that loan was removed, Lehman had on the marked value --

12   not the principal balance -- over 110 percent of the billion

13   dollar requirement, 1,100,000,000 dollars in the pool.  So this

14   was a typical transaction that occurred in the course of this

15   arrangement.

16           But we -- the decision about whether to take a loan in

17   or out of the pool was made in the treasury group.  Everyone

18   involved in that is no longer at Lehman.  So we have difficulty

19   identifying who the specific person was who made that specific

20   decision that day, but I've explained all this to Mr. Phelan.

21   We discussed last week, engaging in a focused e-mail search, to

22   try to see if we could identify an e-mail that would tell us

23   who the person was who perhaps made that decision.  And we're

24   working on that right now, as I told him this morning.

25           We've also told him how -- we're going to provide

64

1    him -- we provided them more documents already, substantially

2    more than they've given us.  We're continuing to produce

3    documents, many of them on valuation.  And I've told him, we're

4    going to give you everything we have on valuation, tell you who

5    did the valuations, and if we can identify the person who took

6    this particular loan out of the pool, we'll do that.

7        And I've suggested we focus on that for the next month

8    or two.  Then we have a mediation, see if we can resolve this.

9    If not, then we'll go forward.  But the other thing I've said

10   is, Mr. Phelan's discovery requests are massive.  He's asked

11   every document on every loan in the entire pool, as if we were

12   litigating every loan not just this 340 Madison loan; and every

13   e-mail concerning every loan in the pool; every e-mail

14   concerning State Street.

15       We've look at this.  And it would cost millions of

16   dollars to do that discovery.  I had thought this was going to

17   be a discrete, limited litigation about one loan, but it's not

18   that.  So now, having seen what apparently State Street wants

19   to do, I've said to Mr. Phelan, I don't really understand your

20   claim.  I mean, you might have a claim that Lehman breached the

21   contract because they don't have enough value in the pool,

22   whatever, but they have a deficiency claim about that separate

23   from this adversary proceeding.  But since the agreement quite

24   clearly provided that Lehman had an unlimited right to

25   substitute or withdraw loans, what basis do you have for

65

1    claiming that you own -- continue to own the 340 Madison loan

2    after Lehman removed it.  And I've received no meaningful

3    response.

4           I've asked him, can he cite me any authority that

5    gives -- that anything he's asking about could give rise to

6    some claim that would support ownership?  I've received no

7    response.  Literally, no response at all.  Nothing.  Not a

8    single attempt to identify any facts or any legal authority

9    that would support any claim of ownership here.

10          So what I think we should do, Your Honor, what I would

11   propose, is that we continue to try to get the particular

12   discovery Mr. Phelan's talking about, which Lehman is actively

13   engaged in trying to provide him.  And I would hope by --

14   certainly by sometime next month, it may be sooner, we would

15   have provided everything that exists on that to him; that we

16   have a mediation, perhaps in December or January latest; that

17   if the mediation is unsuccessful -- I mean, what I would hope

18   would occur in the mediation from my advocate's point of view

19   is, Mr. Phelan will have the facts; the mediator will say to

20   him, you have no claim, and we'll reach a settlement on that

21   basis.  But that, as I said, is from my advocate's point of

22   view.

23          But if the mediation is unsuccessful, I think what we

24   need, Your Honor, whether it's now or after mediation, is some

25   kind of adjudication, determination of what the basis for State

66

1   Street's claim is here, because I don't understand it.  We can

2   make a motion for judgment on the pleadings.  I didn't do that

3   initially, because I thought we'd have a focused, limited case;

4   we'd have some limited discovery; and then we'd move for

5   summary judgment, and that would be the most efficient way to

6   deal with it.

7          But seeing now the massive discovery requests, I think

8   that probably is not the way to go, and that either now or

9   after the mediation, we would file a motion for judgment on the

10  pleadings or perhaps -- or in the alternative, summary

11  judgment, and we'd figure out whether State Street actually has

12  any cognizable legal claim here.  Because I can't figure it

13  out.  And I've asked Mr. Phelan to explain it to me, and he

14  won't give me an answer.

15         THE COURT:  Well, this is one of those situations

16  where what seemed like a good idea last month to me, no longer

17  seems like a good idea at all.  The original philosophy that

18  led to this adjournment of the pre-trial was that you were both

19  talking about what to me seemed like a disproportionate effort,

20  relative to what I viewed as the real dispute based upon what

21  the parties had told me.  It still seems like a

22  disproportionate effort.  And I'm a little bit disappointed,

23  not that there's anything I can do about it, that the month

24  seems to have produced more fog than clarity in terms of where

25  the parties are and a direction for moving it briskly forward.

67

1        I'm inclined to suggest that we have a mediation; that

2   it take place in January or February, the sooner the better;

3   that the parties meet and confer productively this time, to

4   develop a discovery plan that is focused and not burdensome

5   that deals with the issues that are genuinely in dispute, and

6   that facilitates a productive mediation.  If the parties are

7   unable to agree on a mediator within two weeks from today,

8   we'll have a telephone conference.  You'll advise me that

9   you've been unable to agree on a mediator, and I'll appoint

10  one.

11       And in terms of the orderliness of the process, I

12  would like a stipulation which I can so order, also in two

13  weeks, which sets forth some orderly process for discovery and

14  for mediation preparation.  I leave to the mediator any

15  determination to be made as to mediation statements and other

16  submissions that may be useful to getting the process to a

17  productive conclusion.  And I would hope that this would be a

18  productive process.

19       Now, mediation works best when it is consensual.  And

20  I would be interested in knowing from State Street now its

21  willingness to be a good-faith participant in this process;

22  also, comments concerning whether or not the schedule I've

23  outlined is both reasonable and potentially productive.

24       MR. PHELAN:  Answering the second question first, Your

25  Honor, yes, that schedule can be reasonable productive.  I

68

1    think it can be.  State Street -- based on how you have

2    outlined it, State Street is amenable to that mediation.  But

3    the stipulation that is going to come from the parties is going

4    to identify the discovery that we need and that needs to be

5    produced in order to make the mediation successful.

6         I think that -- I'm not going to address all of Mr.

7    Comet's points about the burdensomeness of the discovery,

8    massive discovery.  It was targeted to certain things.  We will

9    put that into the stipulation that is submitted to the Court.

10   And then, I think, with the Court's imprimatur on that

11   scheduling order, we then will receive some of the records and

12   the discovery that we need.  And I think that that can lead to

13   a productive mediation.  So to answer both your questions, yes.

14        THE COURT:  Fine.  Okay.  Why don't you do that?  And

15   assume that I'll either have a stipulation in two weeks that

16   includes an identified mediator or process for identifying a

17   mediator.  And if there is no stipulation by then, we'll have a

18   telephone conference.

19        MR. PHELAN:  Very well.  And we'll submit that to the

20   Court for the Court's approval of the stipulation.

21        THE COURT:  Thank you.

22        MR. PHELAN:  Thank you.

23        THE COURT:  Let's move on to the next one.

24        MR. LEMONS:  My colleague Heather Solow will be

25   handling that for the debtors.

69

1    MS. SOLOW:  Thank you, Your Honor.  Heather Solow on

2    behalf of Lehman Brothers OTC Derivatives and Lehman Brothers

3    Holdings, Incorporated, on Hank's Living Trust.

4        MR. DAVIDSON:  Stephen Davidson from DLA Piper, Your

5    Honor, on behalf of Hank's Living Trust.

6        THE COURT:  Okay.

7        MR. GREILSHEIMER:  Jeff Greilsheimer, Your Honor,

8    Hughes Hubbard, for the SIPA trustee.

9        THE COURT:  Okay.  So tell me about this case.  I

10   realize this is about Google stock, and they say they don't

11   have it.

12       MR. GREILSHEIMER:  Well, there's a process either

13   through litigation or otherwise through which we're going to be

14   able to get it back.  But at this point, the parties have a

15   consent order regarding a discovery schedule that we'll get

16   through discovery within the six-month period that Your Honor

17   refers, and we'll get started on this and see if there's a way

18   to resolve this matter.

19       MS. SOLOW:  Your Honor, if I may be heard?  The

20   debtors have absolutely no objection to the discovery schedule

21   itself, but with respect to the debtors in this case, there's

22   absolutely no relief which we can provide, which we have

23   explained to the plaintiffs several times and over a period of

24   time where we've had extension over extension.  We stopped the

25   extensions just at a time where things had begun to reach a

70

1   process.

2        In short, LBI is the possessor of the collateral, and

3   the collateral is involved in the SIPA proceeding at this time.

4   The plaintiffs acknowledge in their amended complaint that LBI

5   is in possession of the collateral.  So there's absolutely

6   nothing that we can give them other than what we've given them

7   on behalf of LBOTC or on behalf of LBHI.  They haven't

8   requested any further discovery.  And to the best of our

9   understanding, there's nothing we can do.

10        THE COURT:  Well, I suppose there are some things you

11  can do.  You can do very little and just watch the dispute

12  resolve, if it does, without your active involvement.  Or you

13  can, through some dispositive motion process, seek to remove

14  yourself from the case for cause shown.  So you're not without

15  some options.

16        Let me hear from LBI, though.  Because I looked at

17  some of the pleadings here.  Where's the Google stock?

18        MR. GREILSHEIMER:  I don't know the answer to your

19  question, Your Honor.

20        THE COURT:  It's kind of a basic question.

21        MR. GREILSHEIMER:  I recognize that and I apologize to

22  the Court.

23        THE COURT:  No, there's no need to apologize.  I

24  just -- if you don't know where it is, is there anybody you

25  know who does know?

71

1        MR. GREILSHEIMER:  I believe there probably is

2   somebody at the firm or at Deloitte who can answer that

3   question.  I don't have the information myself, Your Honor.

4        THE COURT:  Okay --

5        MR. GREILSHEIMER:  I apologize for that.

6        THE COURT:  -- I'm sort of left with the same

7   impression as to this case.  I have no problem with a six-month

8   discovery schedule in a situation where it's not an instrument

9   for delay.  But a year ago we were dealing in the bankruptcy

10  case with a host of motions brought by third parties,

11  counterparties to repo agreements, various clients of the

12  Lehman family of companies, looking for their collateral or

13  looking for their stock.  And this seems to be in the same

14  category of a scavenger hunt, this one being about some very

15  valuable Google stock.  What I'm not understanding is why

16  there's a need for six months of discovery to figure out

17  something that's pretty basic.

18       MR. GREILSHEIMER:  I'm not sure that I have an answer

19  for that, Your Honor.  It's not usually a part of this case

20  that I handle.  I'm here on something else, but willing to step

21  in on this, and I don't have the information.

22       THE COURT:  Okay.  Let me ask plaintiff's counsel to

23  provide me with some -- I mean, this is just a very basic

24  question.  Why is this -- why are you having a hard time

25  getting to some very basic answers?

72

1        MR. DAVIDSON:  Up until this point, we just hadn't

2  been able to get the answers.  We extended the time for both

3  parties to answer up until late September.

4        MS. SOLOW:  September 23rd.

5        MR. DAVIDSON:  So the answers were just filed at the

6  end of September, and we're scheduled for this conference.  And

7  we put this schedule in place.  We'll be happy to go back and

8  have these conversations with both of the other parties and see

9  if we can figure all this out.  But in the meantime, we thought

10  that it was prudent to prepare a discovery schedule, that it

11  would make sense.  And at the same time, there are certain

12  parallel proceedings that are going on that may or may not be

13  able to resolve this issue outside of this adversary

14  proceeding.

15        THE COURT:  I don't have a problem with the schedule.

16  I guess what I'm expressing is some impatience with litigation

17  as a slow means to get to a very simple answer.  And this is

18  not a case, as I read it, that's complicated.  It's simply

19  about finding a very basic pool of assets that are

20  identifiable, presumably with CUSIP numbers.

21        MR. DAVIDSON:  Yes.

22        THE COURT:  Correct?

23        MR. DAVIDSON:  They should be.

24        THE COURT:  So I don't understand why it should take

25  six months to either find it or to determine that nobody knows

73

1    where it is.

2          MR. DAVIDSON:  Well, the only way that it should take

3    six months to determine anything is if it's determined that

4    nobody knows where they are, in which case we need to figure

5    out what happened and why it is that nobody knows where they

6    are.

7          THE COURT:  Okay.  All I'm saying is, I'll approve

8    your stipulation with the admonition that -- and this, I

9    suppose goes mostly to the trustee, who seems to be in a

10   position to be the finder of, if not the stock, people who

11   might know where the stock is.  The admonition is this.  The

12   six months shouldn't be a license to take six months.  It's an

13   outside period which assumes that everything has gone wrong.

14         This is a situation that should be diligently pursued

15   to minimize unnecessary effort.  The sooner we know the answer

16   to some very basic questions, like the one I asked five minutes

17   ago, the better.  Where's the stock?

18         MR. DAVIDSON:  Thank you, Your Honor.

19         THE COURT:  Okay.

20         MR. DAVIDSON:  Do you want -- do you want me to --

21         THE COURT:  I'll -- you can hand that up.  Do you have

22   a disk?  If you don't have a disk, the piece of paper will not

23   help me.

24         MR. DAVIDSON:  Okay.  We'll get a disk to you.

25         THE COURT:  Okay.  That can be submitted.

74

1      MR. DAVIDSON:  Great.  Thank you, Your Honor.

2      MR. LEMONS:  I'll be handling the next one, Your

3  Honor, which is Board of Education of the City of Chicago v.

4  LBSI.

5      THE COURT:  Okay.

6      MR. FRIEDMAN:  Good afternoon, Your Honor.  Jeff

7  Friedman of Katten Muchin Rosenman, for the Board of Education

8  of the City of Chicago.

9      THE COURT:  Good afternoon.

10     MR. FRIEDMAN:  As Your Honors knows, the Board of

11  Education filed an adversary proceeding for declaratory

12  judgment with regard to a slightly more complicated swap than

13  was the case in the Metavante decision that Your Honor rendered

14  and that's been attached to their motion to dismiss, as well as

15  a motion that the debtors filed last night to compel

16  performance by the Board of Education, under ultimately threat

17  of contempt of Court.  They reserved their right to seek

18  contempt.

19     We have agreed to have the answer date with respect to

20  the motion to dismiss and with respect to the motion to compel

21  both due on November 3rd.  There is a hearing scheduled before

22  Your Honor on both the motion to dismiss and the motion to

23  compel on November 19th.

24     I didn't think I was going to have anything more to

25  say, but that's before I knew last night that a motion to

75

1   compel was going to be served upon us.  We have other clients

2   who have been getting almost form letters, basically

3   threatening them with contempt of Court in light of Metavante,

4   if they don't immediately perform.  And one of the frustrating

5   things that the Board of Education has been dealing with is

6   that they don't understand and I don't understand the Court's

7   decision in Metavante to require post-petition performance by

8   the nondebtor party, where Lehman has actually not rendered

9   post-petition performance, very much like AIG this morning.

10          We don't quibble, and I think it's correct, that

11   there's just been a pre-petition default, and the debtor is

12   prepared to perform post-petition, that the nondebtor party is

13   free not to perform.  I think that's a correct statement of a

14   law.  But I've never understood the law, nor do I understand

15   Metavante as holding that where the nondebtor party is not

16   receiving performance, in essence, somebody paying for the

17   widgets that are supposed to be delivered on a post-petition

18   basis, that he must continue to incur the costs and expense of

19   producing the widgets and delivering the widgets, in the hopes

20   that they're going to get paid.

21          I was somewhat heartened this morning when I heard

22   that there were discussions with AIG to at least recognize that

23   perhaps there was an administrative obligations to make the

24   payments; because unlike the Metavante swap, where frankly it

25   was impossible to tell, putting aside the ipso facto defaults,

76

1    that Lehman was not performing, because there was simply a

2    quarterly settlement date, and whoever happened to owe the

3    money on that date owed the money on that date, and that turned

4    out to be Metavante.

5          Here, undisputedly, Lehman was supposed to make

6    monthly payments on a floating rate.  We were supposed to make

7    semiannual payments on a fixed rate.  And they weren't supposed

8    to net.  Undisputedly, since October 1st of 2008, Lehman has

9    not made one of its floating rate payments.  So, from a basic

10   hedge standpoint, which is why the Board acquired the swap in

11   the first place, because it's using this hedge with respect to

12   bonds that it issued, and it's got a very limited budget;

13   unlike a company entering into a swap, it isn't free to just go

14   raise money, it's got to jump through a whole bunch of hoops.

15         So when its budget is messed up, when it's not getting

16   a floating rate payment that it had bargained for, it's got

17   real problems to deal with in terms of making sure its bonds

18   get paid.  And so, there are real issues when the hedge

19   disappears, and that's what's effectively happened here.

20         So we were actually willing -- and unlike Metavante,

21   we've not replaced the swap.  It's true that we haven't

22   terminated it, but really, almost from the outset of the

23   case -- I'm talking now about the Chapter 11 case -- Lehman

24   came to the Board and said we'd like to try to work with you

25   and try to get a replacement counterparty.  Because this swap,

77

1    I think, runs to like 2030.  It's got a long time to run.  And

2    the Board said, that's fine.  And where it broke down --

3    because I think they had lined up somebody who was prepared to

4    take the swap -- where it broke down is Lehman said you need to

5    pay us for the payment that you had to make in March, even

6    though they had not made the October, November, December,

7    January, February or March payment.  The March payment normally

8    would have been offset against our payment.  So the Board had a

9    real problem with that conceptually.  And that's where

10   negotiations broke off.  And they've since withdrawn that

11   effort to assign the swap to a third party.

12         So we commenced this.  This was before the Metavante

13   decision came out.  But we still have lurking this issue, much

14   like AIG had, where the Board is willing to perform on a post-

15   petition basis.  It only asks that Lehman honor the contract

16   and that they not try to rewrite the contract on the basis of

17   Metavante, which I don't understand the Metavante decision to

18   require.  So that's the fundamental dispute here.

19         We may try to work it out, because, as I heard, to the

20   extent Lehman at least recognizes they have some administrative

21   expense obligation with respect to those payments, that may

22   begin to provide a path.  But I don't know.  I only heard that

23   this morning for the first time.

24         THE COURT:  That makes two of us.  Mr. Friedman made a

25   little bit of an argument that went beyond what is conventional

78

1     for pre-trial scheduling.  And so to the extent that Lehman's

2     counsel wishes to respond on the merits, I'm going to let that

3     happen.  But I recognize that it could be that Mr. Slack is the

4     person who is the right person to do that, because I think his

5     name was on the papers filed in connection with the motion to

6     compel performance to be heard on the 19th.

7          MR. FRIEDMAN:  Mr. Lemons' name is on it as well.

8          MR. LEMONS:  Your Honor, I'll keep my remarks very

9     brief and just touch on the specific points made by the Chicago

10    Board's counsel, rather than digging in and arguing everything,

11    which I think is --

12         THE COURT:  I don't want that to happen.

13         MR. LEMONS:  -- I'm sure you don't.  And it's set

14    forth in our papers.

15         A couple things.  I was actually somewhat surprised to

16    hear counsel's statements.  First of all, their focus now on

17    payments that were missed by Lehman post-petition is

18    interesting, because that was not identified in their complaint

19    as the reason that they haven't performed.  As I read the

20    complaint, it focused solely on ipso facto defaults relating to

21    LBHI's filing and its financial condition.

22         Secondly, Your Honor, as we'll argue more fully in our

23    papers, we do believe that the law with respect to garden-

24    variety executory contracts is that a counterparty must

25    continue to perform on a post-petition basis, while a debtor

79

1    determines whether to assume or reject, even if the debtor is

2    not performing at that time.  They have remedies they could

3    seek to protect themselves, but that is, I believe, the law,

4    Your Honor.

5         Secondly, I'd like to just point out that they make

6    much of the fact that they were allegedly left without a

7    hedging instrument.  Well, they certainly could have terminated

8    the contract after the bankruptcy filing like any other party,

9    and re-hedged, but they elected not to, because they would have

10   had to pay the estate money, and so they're trying to have

11   their cake and eat it too on that front.

12        Finally, Your Honor, this statement about them just

13   being interested in Lehman paying the unpaid amounts I think is

14   interesting, particularly in light of the assignment that was

15   being negotiated between the two parties and a third-party

16   assignee several months ago, which was correctly identified as

17   the point where discussions broke down.

18        Lehman, all it wanted at the time that it would assign

19   that contract, was for the Chicago Board to pay the net amounts

20   that it owed, which would have given it full credit for any

21   missed payments, it would have cured any payment defaults that

22   Lehman had under the contract, and would have given the Chicago

23   Board a new counterparty.

24        I don't know whether there is any assignee currently

25   available now.  These are not easy to find.  That was several

80

1   months ago.  It was, I think, a major loss for the estate that

2   they took that position.  And I was surprised to hear the

3   comments a few minutes ago.

4          THE COURT:  Well, this is just a pre-trial that

5   doesn't seem to be functioning as a pre-trial.  It seems to be

6   functioning as a mini hearing in connection with the motions to

7   be heard on the 19th of November.  I'm not going to comment as

8   to the arguments that have been made on the merits.  But as to

9   scheduling only, I gather that there is agreement that both the

10  motion to dismiss and the motion filed yesterday by Lehman to

11  compel payments will be heard at the same time as related

12  matters on the 19th, unless the parties reach some other

13  agreement.  And I gather there's also agreement that November

14  3rd is an identified date for responses.  Presumably responses

15  by the Board to the motion filed by Lehman and responses by

16  Lehman to the motion filed by the Board.

17          MR. LEMONS:  Actually, Your Honor, there --

18          THE COURT:  They're both the same?

19          MR. LEMONS:  -- both motions were filed by Lehman, so

20  they would both be responses by the Board.

21          THE COURT:  Both filed by Lehman?  Sorry.  I have it

22  backwards.

23          The only comment I have is that I seem to be hearing

24  in the comments of counsel some potential for conversations

25  that could perhaps restart discussions that broke down relating

81

1    to a business solution here.  And I'll see you on the 19th.

2    But to the extent you can, before the 3rd of November, and

3    spending all the time and effort associated with pleadings,

4    find out if there's a business solution, I encourage you to do

5    that.

6         MR. LEMONS:  Your Honor, we'll certainly pursue that.

7    And we took heed of your remarks this morning about that as

8    well.

9         THE COURT:  Okay.  I think that the AIG argument this

10   morning probably foreshadows some of the issues here.  And I'm

11   not saying they're linked, because they're not.  But some of

12   the same issues are certainly embedded in this and in that.

13        MR. LEMONS:  We'll certainly encourage the debtors to

14   engage with the Chicago Board, Your Honor.

15        THE COURT:  Great.  Thank you.

16        MR. FRIEDMAN:  Just one last comment, Your Honor.  We

17   have no problem with anything Your Honor just said.  But given

18   that there are a number of these, not only the AIG motion and

19   our motion, but we sort of see coming down the road, perhaps

20   for at least one other client of ours, forgetting other

21   clients, other motions to compel by Lehman, I'm just wondering

22   whether there shouldn't be some effort to coordinate these,

23   really, for everyone's time issues and because if Your Honor is

24   just going to be sort of considering seriatum, motion after

25   motion to compel payment and performance on derivative claims,

82

1    it may make sense.

2         Because I know these form letters are going out.

3    We've got two clients who've gotten them, and that's just us.

4    Whether it makes sense to coordinate this and have an

5    opportunity for people to -- whether it's submit amicus briefs

6    or have these issues joined so that they're decided at once by

7    the Court.

8         THE COURT:  Mr. Friedman, it may make sense for it to

9    be coordinated, but I don't know what the problem looks like

10   yet in terms of size and dimension.  So if it turns out that

11   there are quite a few of these that need to be coordinated, it

12   would be prudent for them to be coordinated.  If it turns out

13   that people are getting demand letters and then writing checks,

14   that's not a lot of work for me.

15        MR. FRIEDMAN:  Okay.  Thank you, Your Honor.

16        MR. LEMONS:  Your Honor, the next item is Neuberger

17   Berman v. PNC Bank.  My colleague Ardith Bronson will be

18   handling that.  She is admitted in Florida, but not yet in this

19   Court.  We filed a pro hac vice motion yesterday, and I'd just

20   like to move for her admission orally.

21        THE COURT:  She's certainly welcome to speak today.

22        MR. LEMONS:  Thank you, Your Honor.

23        MS. BRONSON:  Thank you, Your Honor.  Ardith Bronson

24   on behalf of the debtors.  Last time Mr. Slack was before the

25   Court, he had indicated that the parties were working together

83

1    to try to resolve this matter through settlement.

2    Unfortunately, during the course of the last thirty days,

3    between the last hearing and this hearing, we were unable to do

4    so, despite our efforts.

5         We're still -- the parties still desire to work on

6    settling, but we'd like to set some of the outstanding motions

7    or actually all of the outstanding motions for the Court's

8    hearing on November 19th, if you have time to hear those

9    matters.  And we'd like to propose -- and I believe the other

10   parties are also here -- have agreed that Lehman Brothers can

11   file its answer to the interpleader complaint on November 13th,

12   if the Court will permit us.  And an opposition or response to

13   the motions filed by PNC could be filed by Lehman on November

14   13th -- excuse me -- 10th.  I apologize.  The answer on the

15   opposition, to be filed on November 10th.  November 17th would

16   be PNC's reply.  And on November 19th, all outstanding motions

17   would be heard by the Court.

18        THE COURT:  I don't have a problem with the schedule

19   you've outlined, except I think November 19th is beginning to

20   sound like a pretty heavy day for me.  And it may be that some

21   things will have to be moved.  But for the time being, that's

22   fine.

23        I'd be interested in knowing whether or not this

24   failsafe schedule is viewed as just that, a failsafe schedule,

25   or whether or not there is some reasonable prospect that the

84

1    parties are going to be able to get their act together and

2    reach an agreement on something which, as of a month ago,

3    seemed within sight?

4        MS. BRONSON:  Standing here today, Your Honor, I can

5    say that we are earnestly attempting to resolve this so that

6    this is just a failsafe schedule.  But I can't give you any

7    assurances that we will, in fact, be able to resolve this

8    before the first deadline that we're going to be setting.

9        THE COURT:  Okay.  Is there anybody involved in the

10   case who wishes to say anything.

11       MR. YORSZ:  Your Honor, Stan Yorsz for PNC Bank.  I do

12   agree with the schedule.  I only make one comment, and perhaps

13   this is more cathartic than anything else.  When I was before

14   the Court last month, I expressed my client's concern that LBCC

15   had not even gotten to us their position why they disagreed

16   with us.  Your Honor urged them to do so within the month.  We

17   have heard nothing from them with regard to their position.

18       And I suppose we will hear something at the time they

19   answer.  But I would certainly suggest to the Court that once

20   again they be urged to at least tell us what their position is

21   so that we can intelligently respond to it, if there is

22   something to talk about.  Because we certainly do think this

23   should be resolved.  And the other parties, I believe, believe

24   it should be resolved too.  But either the creditors' committee

25   or LBCC does not want to take a position, and that's what is

85

1    holding us up.

2         THE COURT:  Well, I don't want to get into anything

3    that involves either settlement discussions or the merits at

4    this point.  But what's the problem with getting the statement

5    of position publicly, or at least to PNC, declared?

6         MS. BRONSON:  That's why we were proposing that our

7    answer be filed on a particular day, so that we can, in fact,

8    give everyone publicly our position.  And it's going to take

9    that -- I believe it's going to take that amount of time for us

10   to come to some resolution as to what our position is.

11        THE COURT:  Okay.  It seems a little metaphysical to

12   me at this point as to why that's so hard to do.  But I'm not

13   going to second-guess this anymore.  You have a schedule.  It's

14   an acceptable schedule to the parties.  Presumably you'll show

15   your cards early enough in the process that parties will be

16   able to react in a thoughtful manner and perhaps reach a

17   resolution before the hearing.  I hope that's what happens.

18        MS. BRONSON:  Thank you, Your Honor.

19        THE COURT:  Anything more on this?  Okay.  I think --

20        MR. LEMONS:  That's it for --

21        THE COURT:  -- that's the end of the agenda, isn't it?

22   We're adjourned, then.

23        (Proceedings concluded at 2:46 PM)

24

25

86

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion of New York Institute of Finance,<br>Inc. for relief from the automatic stay<br>approved | 17 | 4 |
| Motion of Garfield County, CO Treasurer<br>for relief from the automatic stay<br>approved | 17 | 18 |
| Motion of Tobacco Settlement Financing<br>Corporation for relief from the automatic<br>stay approved | 18 | 3 |
| Debtors' motion for entry of an order<br>pursuant to Bankruptcy Rule 2004<br>authorizing discovery from Dollar<br>General Corporation approved | 18 | 14 |
| Debtors' motion for entry of an order<br>Pursuant to Bankruptcy Rule 2004<br>authorizing discovery from First Data<br>Corporation approved | 19 | 13 |

87

R U L I N G S (cont'd.)

| DESCRIPTION | PAGE | LINE |
| --- | --- | --- |
| Debtors' Motion for an order enforcing the automatic stay and holding Shinsei Bank in contempt for violating the automatic stay denied | 28 | 3 |
| Motion of Lehman Commercial Paper Inc. for authorization to purchase FairPoint participation approved | 34 | 1 |
| Fourth supplemental order pursuant to Sections 105 and 365 of the Bankruptcy Code to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts approved | 37 | 11 |
| Scheduling stipulation for Hank's Living Trust adversary proceeding approved | 73 | 7 |

88

1

2                        C E R T I F I C A T I O N

3

4      I, Clara Rubin, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Clara Rubin

9      AAERT Certified Electronic Transcriber (CET**D-491)

10

11     Veritext LLC

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date: October 16, 2009

17

18

19

20

21

22

23

24

25