1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            October 15, 2009

            2:02 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re Motion of debtor to modify the September 20, 2008

3  sale order and granting other relief.

4

5  HEARING re Motion of the trustee for relief pursuant to the

6  sale orders or, alternatively, for certain limited relief under

7  Rule 60(b).

8

9  HEARING re Motion of official committee of unsecured creditors

10  of Lehman Brothers Holdings Inc., authorizing and approving (a)

11  sale of purchased assets free and clear of liens and other

12  interests and (b) assumption and assignment of executory

13  contracts and unexpired leases dated September 20, 2008 (and

14  related SIPA sale order) and joinder in debtor's and SIPA

15  trustee's motions for an order under Rule 60(b) to modify sale

16  order.

17

18

19

20

21

22

23

24

25  Transcribed by:  Penina Wolicki

3

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Attorneys for Debtors

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9

10

11   HUGHES HUBBARD & REED LLP

12        Attorneys for SIPA Trustee

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   WILLIAM R. MAGUIRE, ESQ.

17

18

19   SECURITIES INVESTOR PROTECTION CORPORATION

20        805 15th Street N.W.

21        Suite 800

22        Washington, DC 20005

23

24   BY:   KENNETH J. CAPUTO, ESQ.

25

4

1

2    QUINN EMANUEL URQUHART SILVER & HEDGES, LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         51 Madison Avenue

5         22nd Floor

6         New York, NY 10010

7

8    BY:   JAMES C. TECCE, ESQ.

9

10    QUINN EMANUEL URQUHART SILVER & HEDGES, LLP

11         Attorneys for Official Committee of Unsecured Creditors

12         865 S. Figueroa St.

13         10th Floor

14       Los Angeles, CA 90017

15

16    BY:   ERICA TAGGART, ESQ. (TELEPHONICALLY)

17

18    BOIES, SCHILLER & FLEXNER LLP

19         Attorneys for Barclays

20         575 Lexington Avenue

21         7th Floor

22         New York, NY 10022

23

24    BY:   HAMISH HUME, ESQ.

25

5

1

2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

3        Attorneys for Barclays

4        One Liberty Plaza

5        New York, NY 10006

6

7   BY:   BOAZ S. MORAG, ESQ.

8         LISA SCHWEITZER, ESQ.

9         JOEL MOSS, ESQ.

10

11

12   GOODWIN PROCTER LLP

13        Attorneys for Evergreen Solar

14        The New York Times Building

15        620 Eighth Avenue

16        New York, NY 10018

17

18   BY:   EMANUEL C. GRILLO, ESQ.

19

20

21   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

22        One New York Plaza

23        New York, NY 10004

24

25   BY:   MARIANNE MORTIMER, ESQ.

6

```
 1

 2     MILBANK, TWEED, HADLEY & MCCLOY LLP

 3          International Square Building

 4          1850 K Street, NW

 5          Washington, DC 20006

 6

 7     BY:   DAVID S. COHEN, ESQ.

 8

 9

10     U.S. DEPARTMENT OF JUSTICE

11          Office of the U.S. Trustee

12          33 Whitehall Street

13          Suite 2100

14          New York, NY 10004

15

16     BY:   LINDA A. RIFFKIN, ESQ.

17

18     STUTMAN, TREISTER & GLATT

19          1901 Avenue of the Stars

20          12th Floor

21          Los Angeles, CA 90067

22

23     BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

24

25
```

7

```
1

2    FELDERSTEIN FITZGERALD WILLOUGHBY &PASCUZZI LLP

3         Attorneys for Calpers

4         400 Capitol Mall

5         Suite 1450

6         Sacramento, CA 95814

7

8    BY:  HOLLY A. ESTIOKO, ESQ. (TELEPHONICALLY)

9

10   CHAPMAN & CUTLER LLP

11        Attorneys for US Bank

12        111 West Monroe Street

13        Chicago, IL 60603

14

15   BY:  JAMES HEISER, ESQ. (TELEPHONICALLY)

16        FRANKLIN TOP, ESQ. (TELEPHONICALLY)

17

18   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

19        Attorneys for the Sunguard Entities

20        1900 Main Street

21        5th Floor

22        Irvine, CA 92614

23

24   BY:   JAMES A TIMKO, ESQ. (TELEPHONICALLY)

25
```

8

1

2    ALSO PRESENT:

3         STEPHEN GRISANTI, Tricadia Capital (TELEPHONICALLY)

4         SCOTT HARTMAN, Varde Partners (TELEPHONICALLY)

5         MARC HEIMOWITZ, CitiGroup (TELEPHONICALLY)

6         MEGHAN S. MICHELS, The Baupost Group (TELEPHONICALLY)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1                    P R O C E E D I N G S

2         THE COURT:  Be seated, please.  I have a

3    correspondence that came in overnight from Quinn Emanuel, the

4    joint submission from Boise Schiller -- and from Boise

5    Schiller.  Somebody's on the line with an open mike.  Please

6    mute it.  I'm assuming nobody who's on the telephone is going

7    to be speaking.  Why don't I take appearances from those who

8    are going to be participating in at least the discussion of the

9    areas of disagreement.

10        MR. GAFFEY:  Robert Gaffey from Jones Day, Your Honor,

11   special counsel to the debtor, Lehman Brothers Holdings Inc.

12        MR. MAGUIRE:  Bill Maguire, Your Honor, of Hughes

13   Hubbard & Reed, for the SIPA trustee.

14        MR. TECCE:  James Tecce, Your Honor, Quinn Emanuel,

15   for the creditors' committee.

16        MR. HUME:  Good afternoon, Your Honor.  Hamish Hume

17   from Boise Schiller & Flexner, for Barclays.

18        THE COURT:  Okay.  I take it everybody else is just an

19   interest -- not just, but an interested observer.

20        First of all, I'm pleased that the parties have been

21   able to narrow their differences regarding procedure so

22   dramatically, and I think that the letters reflect that you've

23   been doing some good work over the last couple of weeks.  It

24   probably makes sense for me just to understand the positions of

25   the parties relative to the areas of principal disagreement.

10

 1    And we should also deal with all areas of disagreement, not

 2    just the principal ones.  The one that I'd like to start with

 3    is whether we need an evidentiary hearing at the get-go.

 4         MR. GAFFEY:  Your Honor, if it please the Court, I'll

 5    proceed on that.  I should quickly tell you, we're down to two

 6    issues.  Those two date issues in the letters have been

 7    resolved by the parties --

 8         THE COURT:  Oh, good.

 9         MR. GAFFEY:  -- in the last few minutes, so.

10         THE COURT:  And the question of the evidentiary

11    hearing remains an issue?

12         MR. GAFFEY:  The evidentiary hearing, Your Honor,

13    where the parties are apart and where the movants are, are as

14    follows.  In the two proposals that are before Your Honor about

15    how to proceed, it is the movants' view that the most efficient

16    way to proceed, both in terms of the Court's resources, the

17    parties resources, and assessing what facts, if any, need to be

18    subject to an evidentiary hearing; our proposal is that after

19    full submission of the papers -- and we have an agreed schedule

20    for that -- and argument of the motions -- and we have an

21    agreed date for that if it suits the Court's calendar -- the

22    Court would then have a fully briefed motion, including, under

23    the procedure that we've agreed upon, the submission by both

24    sides of our view as to facts that cannot reasonably be

25    disputed and Barclay's ability to put in a counter-statement to

11

1    that effect.

2         That the Court should consider the motion, hear

3    argument on the motion and decide the motion, to the extent

4    that it can on the written record, which is voluminous; but in

5    large part based on testimony, and much of that testimony, in

6    our view, based on testimony of Barclay's employees.  The Court

7    would then be in a position to determine if a hearing is needed

8    at all.  And it is our view that there are issues in this case

9    that can be decided without a hearing.  What it is the Court

10   would need evidence on; what issues are genuinely, legitimately

11   in dispute; what are not?

12        The alternative, offered by Barclays, is, as I

13   understand it, to see the Court on the 29th -- we're in

14   agreement on that -- after all the briefing is done; to have

15   either a status conference or an argument; but to immediately

16   say now that there'll be a hearing four or five days later.

17   Now the problem from our perspective with that proposal is

18   that's a plan for an unfocused hearing.  We would have to try

19   everything.  And our view is, on the record that's submitted by

20   the movants, each of our motions are well-supported in the

21   sense that there's a lot of evidence.  I'm not arguing the

22   weight of that evidence.

23        Barclays will have opportunity to take discovery under

24   our proposed plan; put in equally supported papers.  We will

25   put into the Court these competing factual statements where we

12

1    think we'll be able to demonstrate a large number, if not all

2    of the dispositive facts, cannot genuinely be disputed.  And

3    the Court would then be able, if it needed a hearing at all, to

4    have one in the five days that both parties -- both sides

5    agree -- have asked the Court to set aside.  It would be a

6    focused hearing and we'd know what proof we wanted.  We'd know

7    what proof Your Honor wanted to hear.

8         It strikes us as the most efficient way to proceed.

9    And that's why, in our paragraph 13, that's what we have

10   offered.  I'm prepared to go to the other issue, too, Your

11   Honor, unless you just want to hear from --

12        THE COURT:  Why don't we do it one at a time.

13        MR. GAFFEY:  Okay.  Then that's where we stand on the

14   evidentiary hearing, Judge.

15        THE COURT:  Okay.  Mr. Hume?

16        MR. HUME:  Thank you, Your Honor.  It may help to

17   just, if I could, emphasize for the Court, Barclays' desire for

18   a prompt resolution of this, consistent with creating a full

19   record.  I think the principal disagreement as -- we disagree

20   about the realism of deciding these motions on an oral

21   argument.

22        They have submitted 170 pages of briefing, thousands

23   of pages of exhibits.  And we believe they have grossly

24   distorted the facts of what happened in September 2008 in this

25   transaction in numerous ways.  We do not want the Court to

13

1   decide those motions based on snippets of depositions and what

2   we believe are mischaracterizations of documents and

3   depositions.  We would like the Court to hear directly from the

4   people involved and to hear from the negotiators how the deal

5   changed; to hear from the people involved about the incredible

6   uncertainty in the financial markets.

7          Their motions play, with respect, fast and loose with

8   the numbers and the values of the assets involved.  This is a

9   week in the financial markets that Your Honor will remember

10  well and that the witnesses would tell Your Honor and explain

11  in graphic detail was probably one of the worst weeks in the

12  financial markets since the Great Depression.  And the assets

13  Barclays was being asked to acquire, asked in part by the

14  Federal Reserve through the repo transaction, included assets

15  that Your Honor will remember reading about, mortgage-backed

16  securities, collateralized debt obligations, collateralized

17  loan obligations, other assets that were illiquid, not traded

18  at all or very thinly traded, even corporate bonds and muni

19  bonds were not heavily traded that week and were illiquid.

20         In that context, the parties made a good-faith effort

21  to value the assets, to determine what was there and available

22  to be transferred and what it was worth.  And we think it is

23  totally inappropriate to try to decide the extraordinary claims

24  for relief that the motions and the movants have submitted

25  without hearing from the witnesses directly.

14

1       Now, to be sure, it's ironic, because we believe the

2   legal standard for what these motions seek to accomplish is

3   exceptionally high.  It's well-established, in an ordinary Rule

4   60 context, that courts are reluctant to disturb the finality

5   of orders and only do so in extraordinary circumstances.  That

6   is especially true in the context of an attack upon a sale out

7   of bankruptcy under Section 363, because of the interest in

8   encouraging bidders to make such sales.

9       So for those policy reasons and legal reasons, there

10  is a high hurdle.  And they're trying to clear that high hurdle

11  with an incredibly fact-intensive submission that we heavily

12  dispute.  We dispute the way they use numbers; we dispute their

13  valuations; we dispute the deposition testimony they present to

14  you.  And we think we could probably win, as a matter of law,

15  but we want a result as promptly as possible, because Barclays

16  is owed assets under the purchase agreement that have an

17  approximate value somewhere in the region of three billion

18  dollars, still not delivered, that is owed under the purchase

19  contract that their clients signed and agreed to.

20      Your Honor, we think they are trying to avoid their

21  obligations under that contract and are asking this Court to

22  nullify that contract and impose a different contract that

23  Barclays never would have agreed to.  It is extraordinary

24  relief that they are seeking.  They agreed -- Lehman agreed to

25  the contract.  The Lehman lawyers, Weil Gotshal, helped

15

1    negotiate the contract.  They filed the contract in court

2    publicly after the closing.  They defended the contract on

3    appeal.  The appeal wasn't even decided until March.  They know

4    what the contract says.  They were represented by the best --

5    among the best bankruptcy lawyers in the country, Weil Gotshal;

6    had some of the top financial advisors in the county in Lazard.

7         We believe Lazard and Weil will confirm that everyone

8    understood the nature of the deal, that it involved a

9    collection of assets.  There was no certainty to the valuation.

10   There was no valuation cap on the assets that were transferred.

11   There was an effort to come up with a deal that made sense to

12   buy this broker dealer in that tumultuous week.

13        And again, we think we could win as a matter of law,

14   but we don't want to waste time trying to do that and then

15   understanding that the Court, as you have indicated earlier,

16   would like to understand the full picture of what happened.  So

17   we want you to understand that.  We think it should tell you

18   something that the movants, the plaintiffs in this context,

19   don't want you to have an evidentiary hearing.

20        We think we ought to have our limited discovery; have

21   our fair opportunity to gather the facts; come before Your

22   Honor, set aside three or four days, maybe five days; come up

23   with the six to eight key people who were involved in

24   negotiating the deal, who were involved in assessing the assets

25   and the values of the assets, which is such a point of

16

1   contention here; explain to you what happened; explain to you

2   that the deal was understood, how to came to be, how it changed

3   during the week; and what the valuations ultimately turned out

4   to be and how long it took Barclays -- months -- to actually

5   value these assets that they received in the deal.  We just

6   think it's the more efficient way to resolve this is to present

7   the evidence to you directly.

8           THE COURT:  Let me ask you a question which is

9   prompted both by your remarks and by my review of the proposed

10  orders that have been submitted.  There's a provision calling

11  for Barclays and the movants to identify areas of agreement, if

12  you will, as to the record, in which there'll be a statement of

13  uncontested facts.  Let's just say, for the sake of argument,

14  because that's something to happen in the future, presumably

15  after discovery has taken place, and something we don't know

16  anything about yet.  Let's just say that there is a stipulation

17  of uncontested facts that is sufficient to support your view

18  that as a matter of law you should win.  Why on earth would you

19  be arguing now for an evidentiary hearing?

20          MR. HUME:  Because, Your Honor, we believe, at the end

21  of the day, that's unlikely to happen.  They -- we have sat

22  through three months of discovery with them and depositions of

23  the roughly thirty senior-most executives from Barclays and

24  former Lehman executives.  We've read their submissions.  They

25  are distorting the facts.  To get the relief they want, they

17

1    have to twist the facts.  They're going to put their spin on

2    the facts no matter what.

3              So, yes, our brief -- our opposition, I suspect, will

4    argue, for the following three or four legal reasons, the Court

5    can deny the motions on very limited undisputed facts.

6    Estoppel on the fact of what they argued on appeal.  There are

7    legal arguments -- they are charged with the knowledge of the

8    very employees they are getting the information from.  So there

9    will be legal arguments that would allow the Court to deny the

10   motions.

11             I think the practical answer to the Court's question

12   is, we don't want to delay the resolution by having a long and

13   elaborate oral argument with a long delay to read hundreds of

14   pages of briefing and volumes of appendices of exhibits, a

15   burden on the Court, rather than to come in practically and

16   explain everything in the way, as we understand it, contested

17   matters are frequently resolved, just to present directly the

18   evidence to the Court.  We think it's more efficient, more

19   likely to lead to a prompt resolution.

20             THE COURT:  Okay.  I understand your position.  Any

21   further response?

22             MR. GAFFEY:  Just very briefly, Your Honor.  I think

23   Your Honor hit the right point with respect to the submission

24   of undisputed facts.  We are not -- we are not ruling out the

25   possibility that Your Honor will find that an evidentiary

1    hearing might be necessary.  What we are doing is proposing a

2    method to say what it really should be about.

3           Much of this case is about disclosure to the Court.

4    And that's not a bad example of what I'm talking about with

5    respect to factual issues that we really don't see can be

6    genuinely disputed.  The best evidence of what the Court was

7    told is the record of what took place before the Court.  And to

8    the extent the Court had the deal described to it in a certain

9    way on Friday the 19th of September and the deal differed from

10   that, and we're able to show that, that probably doesn't need

11   an evidentiary hearing.

12          The issue of whether the Court signed the

13   clarification letter -- and I take note that Mr. Hume was very

14   careful to say it was filed after the deal, but not that the

15   clarification letter was approved.  We think that that is an

16   issue that the Court could, on a full record, a full written

17   record, make a determination about.  And it is a gating issue.

18   It is a critical predicate issue to a lot of what follows in

19   the 60(b) motion.

20          Now, it may well be that after looking at that issue,

21   Your Honor might need proof on a subsequent issue.  For

22   example, if Your Honor were to find that the clarification

23   letter, which was never submitted for the Court's approval and

24   was merely filed on the 22nd of September after the transaction

25   closed, on its face, materially differed from the sale order,

19

1    and we think there's a way that Your Honor could easily get

2    there, then the only thing Your Honor would need proof on --

3    and Your Honor could find that, for example, by taking note of

4    the fact that the definition of purchased assets was changed in

5    a transaction that was an asset purchase agreement -- then it

6    may well be that as Mr. Hume suggests, Your Honor might need

7    some proof about the value of the assets that were wrongfully

8    transferred.  But we wouldn't have to go through testimony

9    about the clarification letter and how it was negotiated.

10           We have put in the record and Barclays will have and

11   is free to put in their own version of the record, the various

12   drafts of the clarification letter.  Much can be determined

13   simply by that chain of written events.  There's no need for a

14   hearing on that.

15           Now, again, I'm not saying no hearing ever will be

16   necessary.  One may be necessary.  But it seems to us, it makes

17   sense to proceed as Your Honor is suggesting with regard to the

18   attempt to reach a set of facts about which either the parties

19   do agree or Barclays cannot reasonably disagree, and if a

20   hearing is needed, have it about the rest.

21           As for the suggestion that a hearing will speed

22   everything up, as Mr. Hume says, we filed -- if it totals 170

23   pages, it totals 170 pages.  Whether we have a hearing or not,

24   Your Honor is going to read the papers.

25           THE COURT:  Yes, I am.

20

1          MR. GAFFEY:  Of course you are.  So that's not a time

2     saver.  I would suggest, though, that a day of argument to go

3     over that record, to argue that motion, which might save weeks

4     of hearing time, is a time saver.  It saves resources of the

5     Court and it saves resources of the parties.

6          So for that reason, Your Honor, I think our suggestion

7     of an argument on the motion, a decision on the motion at

8     whatever pace Your Honor decides, and if a hearing is

9     necessary, a hearing after that.  If Your Honor were to say to

10    us even at the oral argument, look, I'm seeing these three or

11    four issues about which I know I'm going to need a hearing, we

12    can start getting witnesses ready right then.  We can start

13    marking those exhibits right then.

14         The alternative, though, is to try and figure out what

15    really are the issues that need to be disputed, get everything

16    marked, get every witness ready, get ready for a hearing that

17    has no shape yet.  There are no pleadings in this case.  We

18    haven't even seen Barclays' opposition yet.  What Mr. Hume had

19    told you today is frankly the most detail I've heard yet.  And

20    that's fine.  His time hasn't come to oppose the motion.  But

21    by the same token, the time is not here today to say sure, we

22    can try this, we can have a hearing on this.  The better course

23    is to determine what facts are actually in dispute and if

24    evidence is needed on it -- because they will be factual

25    issues -- then determine the scope of the hearing after an

21

1    argument and a decision on the 60(b) motion.

2          THE COURT:  Okay.  Do you have something else, Mr.

3    Hume?

4          MR. HUME:  Very briefly, if I may, Your Honor.  If I

5    may make a practical suggestion.  What we really would like to

6    resist, given the Court's busy docket, is that we brief

7    everything, have an argument, and we find ourselves next

8    spring, knowing we're going to need an evidentiary hearing, and

9    looking out on the Court's calendar for when one can be

10   scheduled that will have to be months later.  We would like

11   time set aside now so that we can resolve this promptly.  That

12   is really a principal concern of Barclays that this not delay.

13         I also would say to the practical point of an

14   unfocused hearing.  We have, even under out proposal, several

15   months between now and April for the parties to work together

16   just as we have, to narrow the issues through this -- whatever

17   procedure they want to propose that will be presented to Your

18   Honor, just as they always are in a contested matter.

19         MR. GAFFEY:  Very quickly --

20         THE COURT:  Apparently it's not the last word.

21         MR. GAFFEY:  It's a very short last word.  In our

22   paragraph 13, Your Honor, the one that deals with this issue,

23   we've let a blank for the Court to fill in to tentatively set a

24   hearing date now.  If Your Honor wanted to estimate how long it

25   would take to review the papers, hear argument, issue a

22

1   decision and set us down for a date now, so everybody has some

2   certainty about what we're aiming at, that makes complete

3   sense.

4            THE COURT:  All right.  This is an unusual argument.

5   I would analogize it to the procedure that sometimes takes

6   place in adversary proceedings where one party says that there

7   should be briefing on a summary judgment and the other party

8   says there are genuine issues of material fact, and that would

9   be wasteful.

10           We're fairly early in the process of developing the

11  record that will be the basis for the stipulation of

12  uncontested facts or the list of uncontested facts that might

13  become the basis for argument on the 60(b) motions.  And I

14  think it's difficult and hazardous to establish in October,

15  procedures that should apply six months from now.

16           My inclination is to give you what amounts to a

17  hybrid.  I think that it makes sense for the parties to

18  endeavor to narrow the issues, to identify the areas of

19  agreement, if any, and those areas that are relevant to the

20  issue that may require an evidentiary hearing.  That's

21  ordinary-course trial preparation.  In terms of Mr. Hume's

22  suggestion, which he couches in terms of the desire to avoid

23  delay, I think it does make sense to reserve time now for an

24  evidentiary hearing.  Whether that's five days or ten days, I

25  don't know.  But taking Mr. Hume at his word that it's four or

23

1    five days, let's assume it's five, and let's reserve that time.

2    If the time isn't needed, I'll take a vacation.  If the time is

3    needed, it will be available.

4          Importantly, I think that both sides appear to

5    acknowledge that it is at least possible if not probable and

6    foreseeable that there will be a need for some evidence to be

7    developed.  Taking Mr. Hume's argument, which to some extent

8    goes to the merits, I gather that Barclays would prefer, to the

9    greatest extent possible, not to have me rely upon a cold

10   record, but rather to have me evaluate the credibility of

11   eyewitnesses to history who would be here in court and who

12   would be describing how they experienced the events of

13   September of 2008.  Speaking for myself, to the extent that I

14   have a personal preference, I would be interested in hearing

15   what live witnesses have to say, to the extent I can't decide

16   something on the basis of stipulated facts or a record.

17         So here's how I think it makes sense to resolve this.

18   And I'll hear what you have to say after I've said my piece.  I

19   think that your proposed orders should reflect, as Mr. Hume has

20   proposed, a provision for an evidentiary hearing, and we'll

21   figure out a five-day period that works for the parties and for

22   the Court.  My courtroom deputy will assist in that.  Just

23   because it's reserved, however, doesn't mean that it will

24   happen.  Because I will at least leave open the possibility

25   that following the completion of discovery and the development

24

1    of papers that I'm sure will be well-crafted and thoughtful,

2    following argument, I may well be able to decide this on the

3    basis of the arguments presented and the stipulated record.  So

4    without prejudging the outcome, we will at least have set aside

5    and reserved sufficient time to deal with those areas that are

6    not susceptible to summary disposition.  I think that works.

7            If you think it doesn't work, let me know why you

8    think it needs to be adjusted.  But I think that makes sense to

9    me.

10           MR. GAFFEY:  It's fine with us, Your Honor.  All I

11   would ask is that the time period between the date of the oral

12   argument and the hearing be set at something like thirty days,

13   not at four or five, because we'll have a sense after the

14   argument of particularly what witnesses might be needed, what

15   evidence needs to be put in, what experts might have to

16   actually testify.  There's -- as a -- if we set it for -- if

17   we're going to argue on the 29th, which both parties have

18   proposed, and Your Honor were to set it down to -- would have

19   reserved the five days for early April, if we went ahead with

20   that, we still don't have the idea of how to frame it.  With

21   thirty days, we could do that, and we could get all the interim

22   work done of exchanging exhibits and identifying witnesses and

23   the like.

24           THE COURT:  That to me does not seem unreasonable.

25   And let me also make another observation based upon some recent

25

1    experience.  Depending upon the issues to be tried, five days

2    may turn out to be optimistically brief, because the timing

3    associated with the trial will depend to a great extent upon

4    cross examination and argument associated with the evidence at

5    the conclusion of the evidence.  If the parties, in good faith,

6    believe that this can be concluded in five days, that's great,

7    but the last time various skilled lawyers told me that the

8    trial would take five days, it took nineteen.

9         So if you think you really can get it done in five,

10   that's fine.  If you think you legitimately should reserve more

11   time, do it now.

12        Okay.  That's that issue.  As far as the thirty days,

13   I agree that there should be a lag between the -- whether it's

14   thirty days or twenty days, is a matter of indifference to

15   me -- but there should be a lag of some sufficient time for the

16   parties to prepare for what will be an identified evidentiary

17   hearing, the contours of which cannot really be determined

18   until we get to the point of seeing what's in the basket of

19   issues to be decided.

20        MR. GAFFEY:  I know I said it was the last word, Your

21   Honor, but I think I can get us to a final order that we just

22   have to fill in the date.  If we remove from our paragraph 13

23   the sentence, "The parties shall be prepared to conduct an

24   evidentiary hearing on the assertions made in Rule 60 motions,

25   beginning thirty days after a decision is issued on the Rule 60

26

1   motions," and just fill in the next sentence with, the Court

2   shall schedule five days in, what I suggest is early May, to

3   thirty-one, thirty-two days.

4           THE COURT:  Look, I don't want it to be within thirty

5   days after the Court has issued a decision.

6           MR. GAFFEY:  No, no.  That's what I'm proposing to

7   strike from our paragraph.  And then that would accommodate

8   what Your Honor has said is preferable.

9           THE COURT:  Okay, fine.

10          MR. GAFFEY:  Okay.  I think Mr. Tecce wants to be

11  heard on the other issue before Your Honor.  He's spent a

12  little more time on it than I have.

13          MR. TECCE:  If Your Honor is prepared to move to the

14  second issue.

15          THE COURT:  The second issue is discovery.

16          MR. GAFFEY:  It's the scheduling of motions regarding

17  discovery.

18          THE COURT:  Motions to compel.

19          MR. GAFFEY:  Yes.

20          MR. TECCE:  Good afternoon, Your Honor.  For the

21  record, James Tecce of Quinn Emanuel on behalf of the

22  creditors' committee.

23          The issue, Your Honor, with respect to motions to

24  compel, Barclays' proposal would contemplate and expedited

25  procedure for motions to compel the production of documents and

27

1    discovery.  And as a general proposition, we don't have an

2    objection to that.  The issue is, with respect to a specific

3    area of discovery that Barclays is seeking and our position

4    that expedited discovery, as defined by Barclays, will not

5    work.

6            Specifically, Your Honor, Barclays has served wide

7    ranging document requests on attorneys and advisors in these

8    cases.  They have served document requests on Milbank Tweed,

9    counsel to the creditors' committee; on Weil Gotshal; on

10   Simpson Thatcher and Bartlett; and on Houlihan Lokey.  These

11   are advisors, not the parties themselves.  And it is Barclays'

12   assertion that certain arguments raised in the Rule 60(b)

13   motions have constituted a waiver of the attorney-client

14   privilege.

15           Speaking with respect to the committee, it's their

16   position that arguments that we raise waive attorney-client

17   privilege between the creditors' committee and its counsel and

18   work product privileges between the creditors' committee and

19   its financial advisors.  And as a consequence of that, Barclays

20   is entitled to discover all attorney-client communications, all

21   work product, etcetera.

22           The committee does not agree with that position and

23   will not agree with that position.  And we actually advised

24   Barclays of that definitively earlier this week.  The question

25   is whether or not, at the time -- the question is when this

28

1    issue, to the extent that it cannot be resolved -- and we're

2    not optimistic that it can be resolved -- the question is when

3    and how to put this issue to the Court for resolution.  And the

4    question is whether or not promptly after written responses and

5    objections are filed, the issue can be immediately submitted to

6    the Court or whether or not the parties should first produce

7    documents, identify documents that are withheld on the basis of

8    privilege, and provide privilege logs, and then at that point

9    in time, with respect to privilege disputes, take any disputes

10   to the Court that exist.

11          Otherwise, the committee is placed in a very difficult

12   position of litigating the question of whether or not its

13   papers waived attorney-client privilege in the abstract.  And

14   the Court is basically issuing an advisory opinion without

15   having seen a single document that has been withheld on the

16   basis of privilege, really in a vacuum.  So our position is

17   that nothing in this order should be deemed to authorize a

18   motion to compel until the documents have been produced by

19   parties and a privilege log has been provided by the creditors'

20   committee.

21          If Your Honor has any questions, that's the dispute as

22   we see it.

23          THE COURT:  Well, I don't have any questions yet.  I

24   want to hear Mr. Hume's response.

25          MR. HUME:  Thank you, Your Honor.  There may be some

29

1    confusion about this.  Our provision in the proposed schedule

2    was actually motivated by something other than this privilege

3    dispute, which I'll come back to.  We, as Your Honor knows,

4    Barclays, and as I've said, would like to move as expeditiously

5    as possible.  We recognize the practical constraints on that.

6    We adjusted from our original schedule to, I think, what we

7    believe are quite generous document production deadlines.

8    November 16th for the first round, and we had a second request

9    that's gone out; we're giving them now until December the 8th

10   for that, like six or seven weeks.

11        But the order says, and we both agreed to this, it's a

12   rolling production.  What happened this week was we were told

13   by counsel for the debtor that for documents that we've

14   requested after September 30th, he thinks they're irrelevant.

15   Nothing to do with privilege, just that the documents --

16   they're not going to produce.  So what do we have to do?  Wait

17   until December 8th to get -- learn that they're not producing

18   those documents, or get a few but basically nothing, and then

19   move to compel?

20        We think the written objection should say that we've

21   all agreed will be served promptly.  It should say here's your

22   request, here's what we agreed to do, here's what we don't,

23   here's what we're going to produce.  And we may agree, we may

24   meet and confer and compromise, or we may say okay, we don't

25   agree, we're going to move to compel.  And we just want to be

30

1    able to do that now, and yes, on an expedited basis, so that we

2    can stick to the schedule we've worked so hard to frame, and

3    not end up getting all the documents in February.

4         THE COURT:  Well, let me understand how this works in

5    your estimation in a practical setting.  Let's just say that no

6    documents have been turned over, but there is a broad-based

7    assertion in an objection to the turning over of documents that

8    are a certain category of identified documents, are not

9    discoverable on account of joint defense privilege or some

10   other doctrine.  You would then be proposing that instead of

11   waiting for production to run its course, that you would have

12   the ability to trigger a meet and confer session, see if you

13   can resolve it, and to the extent that you can't, request a

14   discovery conference, leading ultimately to a motion to compel.

15   Is that correct?

16        MR. HUME:  That is correct.  I do think about it

17   slightly differently for the privilege issue and the relevance

18   or other undue burden objections, whatever else they may make.

19        For privilege, it is a broad issue that we've raised

20   on whether their papers waive the privilege.  We have reached

21   an agreement, I'm happy to announce, with the debtor, on a

22   waiver of privilege for the September weeks through September

23   30th of the deal negotiations.  We have a signed agreement.  So

24   we're not pressing that.  For now, we reserved rights on later

25   dates.

31

1          We'll be discussing -- we think the issue is ripe on

2    privilege now, because we've had letters exchanged about it,

3    we've had subpoena -- we've subpoenaed law firms and third

4    parties who've objected based on privilege.  So yes, to answer

5    your question, if there's an objection based on privilege, we

6    think the issue is ripe immediately.

7          And if the problem is a desire to have more time to

8    brief privilege, and the problem is we suggest a ten-day and

9    five-day reply for briefing on motions to compel, on privilege,

10   if the thought is this is too difficult an issue to brief that

11   quickly, we could carve out a different schedule for briefing

12   privilege under the normal rules.  That is a bigger issue.  I

13   just want the ability, after I get an objection, and I know I'm

14   not going to get a document or a series of documents, to be

15   able to move after a discovery conference; not have to wait

16   until the middle of December.

17          THE COURT:  Okay.  I understand the point.  Do you

18   want to respond?

19          MR. TECCE:  Briefly, Your Honor.  First of all, Your

20   Honor, the December dates with respect to when Barclays would

21   receive written responses and objections relate to one document

22   request.  The balance of the document requests will be

23   responded to on the 16th of November, and that's when written

24   responses and objections would be provided.  Typically, we

25   would have thirty days to provide written responses and

32

1    objections.  We've actually agreed with Barclays that we'll

2    submit written responses and objections in twenty days, not

3    thirty days.  So they're getting written responses and

4    objections earlier.

5         I'm not advocating that to the extent there's a

6    dispute about a category, a subject matter of documents, for

7    example, date -- we will not produce documents after a certain

8    date; we will not produce documents concerning a certain aspect

9    of the transaction -- I'm not advocating that Barclays wait to

10   get those documents to actually move to compel.  They will have

11   written responses and objections that indicate we won't produce

12   a certain category of documents, and they can proceed.

13        But privilege, Your Honor, is a different issue.  And

14   that is something that needs to be treated differently, from

15   the standard run-of-the-mill objection.  The issue is not when

16   Barclays gets written responses and objections; because I

17   advised them on Monday, and I'm telling them now, that we will

18   not agree that by filing the Rule 60(b) motions we have waived

19   attorney-client privilege.  We don't agree to that.  So they

20   know that today.  And it's not a question of how much time --

21   although I think it's a very complicated issue and one that

22   does require extensive briefing, given the sensitive nature and

23   the drastic relief that's requested, yes it's something that

24   needs to be briefed.

25        The issue is, it would be briefed in a vacuum.  It

33

1   would be briefed in the hypothetical sense.  Because there's

2   not a single document that anybody would be looking at to

3   determine whether the privilege has been waived.  So with

4   respect to requests for privileged documents, and there are

5   many subpoenas to law firms, subpoenas to the committee, there

6   are many -- with respect to privilege, we think that there

7   should not be motions to compel until the documents have

8   actually been produced and a log has been provided, so that the

9   motion to compel can be analyzed within that context.

10          And considering that with respect to the majority of

11  the document requests, the responses will be coming in

12  November; with respect to one document request that was served

13  later, the responses will be coming in December; Barclays won't

14  be prejudiced by that, because they can take that fight up at

15  that time.

16          THE COURT:  I'm a little confused.  And it mostly

17  relates to your opening statement to the effect that there is

18  this threshold legal issue as to whether the filing of the

19  60(b) motion itself --

20          MR. TECCE:  Oh, no.

21          THE COURT:  -- effected a waiver.  Did I misunderstand

22  you?

23          MR. TECCE:  Your Honor, I think you did.  It's not --

24  as I understand Barclays' position, it's not because we filed

25  the Rule 60(b) motion.  It's because of certain arguments that

34

1    we make in the Rule 60(b) motion that purport to involve

2    conversations between committee and its counsel, although we

3    don't mention any conversations between committee and its

4    counsel in our motion.  Our motion does reference conversations

5    between the committee's financial advisor and Barclays, and it

6    does discuss, at certain points, the committee's understanding.

7         I suppose that Barclays derives from that that it has

8    put privileged communications at issue.  I would disagree with

9    that completely.  And our motion does not rely on

10   communications between attorney and the committee.  And I think

11   what Barclays is saying is that there is a line of cases out

12   there that say that where your claim rests on communications

13   between attorney and client, you put attorney-client

14   communications at issue and you waive the privilege.  That's as

15   I understand their argument.

16        I dispute that because we don't put attorney-client

17   communications between the committee and its advisors at issue

18   in our pleading.  I dispute that.  And I dispute the

19   applicability of the doctrine.

20        THE COURT:  Well, let's just -- without getting into

21   whether or not statements made in your 60(b) motion did or did

22   not rise to the level of giving Barclays the ability to make

23   the argument that there has been a waiver of privilege, let's

24   just assume for the sake of the conversation we're now having,

25   that Barclays wants to assert that position.

35

1          MR. TECCE:  Right.

2          THE COURT:  And wants to assert that position in a

3    setting that has nothing to do with underlying documents --

4          MR. TECCE:  Right.

5          THE COURT:  -- but has everything to do with the

6    statements made in the publicly filed pleadings.  In other

7    words, you said something which they say, oh, the door's open.

8          MR. TECCE:  Right.

9          THE COURT:  Isn't that what they're going to say?  So

10   let's just say that's what they say.

11         MR. TECCE:  Right.

12         THE COURT:  That has nothing to do with whether or not

13   documents are delivered by any particular date.  It's an issue

14   that appears to be -- whether it's easy to resolve or not, I

15   don't know -- but it appears to be unrelated to documents.

16         MR. TECCE:  Well, I will -- I actually wouldn't agree

17   with that, Your Honor.  It's not only is it unrelated to

18   documents, but how about deposition testimony?  Meaning, the

19   statements -- the waiver, the issue of whether or not the

20   waiver has taken place by virtue of the arguments, that

21   decision should only be made within the context of what the

22   documents ultimately end up being at the end of the day.  There

23   may be no documents, there may be a number of documents.

24         What's more, it becomes an issue with respect to what

25   witnesses will testify to in depositions and what they won't

36

1    testify to in depositions.  So it's not something that can be

2    decided in a vacuum based on statements that are just simply

3    made in a pleading, because it's going to govern the scope of

4    the production of the documents and what's testified to at

5    depositions as well.

6          So I think it would be premature, based on what is in

7    a pleading, to litigate the issue of whether or not the

8    attorney-client privilege and the work product doctrine between

9    the creditors' committee and its advisors, has been waived for

10   any and all purposes in connection with the sale transaction.

11   To decide that issue before a single document had been produced

12   or logged, is simply premature.

13         And one final point, Your Honor.  Our papers, our

14   position, do not necessarily mirror those of the other parties

15   to this dispute.  We are not a party to any document that was

16   signed.  We are not a party to the sale transaction documents.

17   The creditors' committee was not in existence at the time the

18   asset purchase agreement was negotiated and drafted.  We are

19   not a party to any of those documents.  So it's not an issue --

20   to the extent that other papers have raised the issue of what

21   people drafting documents knew, it just simply does not apply

22   to us.  So if other parties reach agreements with Barclays,

23   that's fine, but that shouldn't be something that's negatively

24   construed against us.

25         THE COURT:  Okay.

37

1          MR. TECCE:  Thank you.

2          THE COURT:  Mr. Hume is signaling that he just wants

3     to briefly comment.

4          MR. HUME:  Very brief -- just two very brief points.

5     I think Your Honor is one hundred percent correct, and I should

6     have made it more clear.  Our motion to compel on privilege, if

7     we file one, will not require any in camera review of a

8     document.  It is not a motion about whether something's

9     privileged, it's a motion about whether the arguments they make

10    have waived the privilege.  It is clearly ripe now.

11         And the only other point that I should have made is we

12    are spending a lot of time arguing about something that we

13    think is already provided for and required by the rules.  If

14    you get an objection that says we're not producing X documents,

15    either because we think it's irrelevant, unduly burdensome or

16    privileged, it's ripe.  You have to meet and confer, etcetera,

17    but it's ripe.  We can move to compel.  Arguably, we could have

18    left it out of the order and just done it.  Given that we had

19    some disagreement, I wanted to be explicit, for better or for

20    worse.

21         THE COURT:  Okay.  Here's my disposition of this

22    relatively narrow issue.  I believe that Barclays should have

23    the ability now, if it chooses to, to raise issues concerning

24    possible waiver of privilege or work product doctrine

25    protections on account of the statements made in the 60(b)

38

1    motion by the committee.  But that is certainly without

2    prejudice to the arguments that may be made -- I expect will be

3    made -- by the committee, that it is premature to adjudicate

4    that dispute until after materials have been discovered and

5    turned over that might in fact be attorney-client privileged

6    documents effected by the waiver.

7         In effect, this is another examples of accelerating

8    into an early stage of the litigation procedures a matter

9    which, in the ordinary course of a contested matter or

10   adversary proceeding discovery, would simply come up as

11   appropriate.  I don't think it makes good sense to prohibit

12   behavior that is otherwise permissible under the applicable

13   rules, simply by virtue of putting it into a pretrial order.

14        Whether or not a filed motion by Barclays for a

15   determination on privilege would even be ruled on before the

16   discovery deadline for documents, is a matter that I can't even

17   begin to comment on.  Having been through a similar debate in

18   an adversary proceeding in this case that actually involves

19   Barclays, I recognize that this is a very difficult issue.

20        In the adversary proceeding, which I believe has been

21   settled, American Express v. Barclays, issues were raised

22   concerning potential waiver of the attorney-client privilege,

23   on account of certain statements that appeared in an affidavit

24   given by a partner in a respected law firm.  That issue took

25   time, was distracting, and frankly, didn't speed things up, it

39

1    slowed things down.  So for someone who is an advocate of

2    expedition, an early motion on the issue of waiver of

3    privilege, may actually have the opposite effect.  But I'm

4    certainly not going to restrain it.

5         The consequences of filing that motion will be what it

6    is, presumably a response that says I shouldn't rule on it.  So

7    I think that the parties are probably better served by active

8    meeting and conferring sessions that might lead to consensual

9    resolutions of disputes of this sort, as opposed to pulling the

10   trigger quickly.  But you have the right to pull the trigger,

11   should you choose to do it.

12        Assuming you understand what I said, the order should

13   be modified in a manner consistent with Barclays' view, coupled

14   with the admonition that it may not be good practice to do what

15   they want to do.

16        MR. TECCE:  Just a clarification question, Your Honor.

17   Barclays' position -- I don't want to take away anything that

18   they were just awarded -- but I think their position was that

19   they could file at the time we submitted our written responses

20   an objection.  I just want to clarify, I think Your Honor is

21   going beyond that.

22        THE COURT:  My position is that based on the argument,

23   they can file whatever discovery motion is permissible under

24   the rules, assuming that discovery motion suppression

25   procedures have been followed.  Discovery motion suppression

40

1   procedures include meet and confer sessions.  As a result of

2   the argument, and it may have been an unintended consequence of

3   the argument, I recognize that there is another element in the

4   Barclays position that has nothing to do with responses to

5   discovery, and has to do instead with the argument -- and I

6   take no position on this subject in terms of the merits of

7   it -- that the contents of the 60(b) motion of the committee

8   may have effected a waiver of privilege.  That has nothing to

9   do with discovery timetables.  It has nothing to do with when a

10  response is made.  It has to do with whether or not as to all

11  discovery, there has been, perhaps an unintentional waiver, but

12  a waiver nonetheless of the attorney-client privilege.

13        What I said before still goes.  It's fair game.

14  Whether it's a good thing to do is another story altogether.

15  And by the way, it would have been fair game regardless of

16  anything that was stated in the proposed order.  Presumably, if

17  there had been no order, Barclays would still have the ability

18  tomorrow to file a motion saying gotcha.

19        MR. HUME:  Understood, Your Honor.  We'll take those

20  comments to heart.  The one thing that I'm not clear on is we

21  do ask in our proposal for expedited briefing, whether a

22  response would be due ten days after the motion and a reply

23  five days after that.

24        THE COURT:  I don't choose to get involved in

25  micromanaging your briefing schedule.  I think that the parties

41

1    should try to reach an agreement as to what makes sense on

2    that.  And please recognize that just because you put yourself

3    under the gun, doesn't mean that I'm under the gun.  So it may

4    be just as well for you to take the time that you need to do it

5    without losing a lot of weekends.  Inhumane behavior doesn't

6    make a lawyer better.  I think that the fact that you stay up

7    all night is a shame.  And there should be nothing about this

8    schedule that forces that.

9         MR. HUME:  I appreciate that being on the record, Your

10   Honor.  We'll get that to our clients.

11        THE COURT:  I didn't actually say that you personally

12   stayed up all night, but I recognize that lawyers in this Court

13   who appear alert, do so without a lot of sleep, very

14   frequently.

15        Is there more for this hearing?

16        MR. GAFFEY:  I think we've resolved everything else,

17   Your Honor.  I don't think we have anything else that we need

18   to --

19        THE COURT:  Okay.

20        MR. GAFFEY:  -- have Your Honor resolve for us.

21        THE COURT:  Then we're adjourned until next time.

22        MR. GAFFEY:  Thank you, Your Honor.

23        THE COURT:  Thank you.

24      (Proceedings concluded at 2:52 p.m.)

25

42

1

2                        I N D E X

3

4                        RULINGS

5                          Page      Line

6   Schedule for evidentiary  22        15

7   hearing and/or argument

8   set by the Court

9   Barclays may submit an    37        22

10  order to compel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1

2                          C E R T I F I C A T I O N

3

4        I, Penina Wolicki, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Penina Wolicki

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  October 19, 2008

16

17

18

19

20

21

22

23

24

25